October 20, 2024

Colorado Commission on Judicial Discipline
Ralph L. Carr Judicial Center
1300 Broadway, Suite 210
Denver, CO 80203

Dear Commission Members:

For years, the Justices of the Colorado Supreme Court, the Colorado Attorney General, and other public officials/employees have conspired to openly engage in a pattern of misusing public funds, public resources, and the authority of their positions to unlawfully conceal evidence of misconduct by judges, attorneys, and public officials/employees. The Justices have repeatedly abused their power to hurt honorable whistleblowers and victims in order to fraudulently protect the Justices' own reputations and the reputations of other judges. The fraudulent actions of the Justices, the Colorado Attorney General, and their accomplices have cost taxpayers millions of dollars. These fraudulent actions have further deprived the people of the State of Colorado of the continuing contributions of those honest public servants and public employees who had the integrity and courage to stand against corruption. With the legitimacy of Colorado's state government substantially compromised, it has become necessary for Colorado's elected officials, appointees, and Colorado voters to publicly address the lack of integrity within the Colorado Supreme Court, the Colorado Judicial Department, the Colorado Attorney General's Office, and this Commission.

According to Colo. RJD 13(b), this Commission is required to process a request for evaluation of judicial conduct as a complaint and to proceed with an investigation and notice to the subject judge or justice whenever there is a reasonable basis for judicial disciplinary proceedings. In this context, it is important to further emphasize that judicial disciplinary proceedings are appropriate under the Colorado Code of Judicial Conduct (the Code) to address actual impropriety or even a judge or justice's creation of appearances of impropriety. Canon Rule 1.2; *see also* Colo. Const. Art. VI, § 23(3)(d); Colo. RJD 5(a). Colo. RJD 4(a) recognizes that this Commission has jurisdiction to discipline a current judge or justice for any misconduct occurring while the judge or justice is actively serving.

In 2019, the Colorado Supreme Court negotiated and approved the facially absurd $2.66-2.75 million *quid pro quo* Masias Contract without notice to the State Court Administrator's Office's Financial Services Division (SCAO FSD) or the Colorado Office of the State Auditor (OSA). Through the Masias Contract and a pre-conditional separation agreement, the Justices knowingly contracted for non-disclosure obligations with the SCAO's then-Chief of Staff, Mindy Masias, who was being fired due to her suspected financial misconduct. In contemplation of the non-disclosure agreement and the broader Masias Contract, Masias had threatened to reveal compromising information about the Judicial Department, including previously undisclosed allegations of judicial, attorney, and employee misconduct. When the Masias Contract was made public, the Justices cancelled the contract and required the State Court Administrator and the SCAO Human Resources Director to resign. The Justices, assisted by others (who now include the current members of this Commission, its Special Counsel, and its new Executive Director),



then engaged in an ongoing five-year effort to conceal and suppress their own judicial misconduct.  The Justices' misconduct has included publicly commenting on pending or impending cases, knowingly enabling or directly participating in retaliation, misusing public funds to control their own self-serving investigations, and persistently refusing to recuse themselves from matters related to the Masias Controversy and from other judicial discipline cases.  The Colorado Judicial Department's undeniably "toxic" workplace continues to exist due to systematic intimidation/retaliation and the normalized misuse of public funds as hush money or to otherwise coverup misconduct.  The Judicial Department, the Colorado Attorney General's Office, and this Commission are not "safe" workplaces for their public employees.  Former Chief Justice Coats was publicly censured for his role in authorizing the Masias Contract without notice to the SCAO FSD or the OSA.  None of the other Justices, however, have been held accountable for their respective roles.  An endemic culture of corruption within the Colorado Judicial Department, the Colorado Attorney General's Office, and now this Commission remains firmly entrenched.

As established through *Matter of Nathan Coats*, 2023 CO 44, reasonable grounds exist to suspect that all current Justices of the Colorado Supreme Court have substantially departed from their obligations under the Colorado Code of Judicial Conduct and, at minimum, have created appearances of impropriety through their conduct.  The details of these potential violations are explained more specifically in the accompanying request for evaluation (RFE) and its appendices.

The underlying grounds for judicial disciplinary proceedings can be summarized as follows:

1.  **The Masias Contract.**  With knowledge of the significance of a continuous, ongoing statewide single audit related to federal funding and to verify the adequacy of the Judicial Department's internal controls, the involved Justices (Coats, Boatright, Márquez, Hood, Gabriel, Samour, and Hart) personally approved awarding a facially absurd $2.66-2.75 million sole-source contract[1] (the Masias Contract) to the SCAO's former Chief of Staff, Mindy Masias, who was being fired due to financial misconduct material to the audit.  The single statewide audit conducted by the OSA is required for the State of Colorado to receive federal grant funding and to be able to issue public bonds.[2]  Accordingly, the

---

[1] A sole-source contract is a contract that is issued without a competitive bidding process.  Essentially, the Justices approved personally giving former SCAO Chief of Staff Mindy Masias annual renumeration equivalent to approximately 3-times their own individual salaries without requiring meaningful deliverables.  The sole-source Masias Contract was facially absurd and recognized by the Colorado Office of the State Auditor (the OSA) as creating an "appearance of impropriety."  Colo. Office of the State Auditor, JUDICIAL DEPARTMENT STATE COURT ADMINISTRATOR'S OFFICE PERFORMANCE AUDIT REPORT, p. 69 (November 18, 2020) *available* as Appendix 15 to the accompanying RFE.  Copies of the Masias Contract are included with the accompanying RFE as Appendix 5.

[2] As context and to emphasize the importance of the integrity of the statewide single audit, the State of Colorado expended approximately ***$12.3 billion*** of federal funds in fiscal year 2019.

2

reasons for Masias's termination related to the use of federal funds.  Prior to ratifying their final approval of the Masias Contract, the Justices each personally received an anonymous fraud report describing further financial misconduct within the SCAO and involving Masias.  The involved Justices did not inform the OSA (which was conducting its audit as well as initiating a fraud hotline investigation based on the anonymous fraud report) or the internal SCAO FSD that the Court was considering or negotiating the Masias Contract, which was pre-conditioned upon Masias signing a separation agreement that contained a non-disclosure provision.  Indeed, the Masias Contract was executed twice as part of a scheme to prevent then-Director of Financial Services David Kribs from learning of its negotiation and existence.  Kribs and SCAO Controller Myra Dukes were apparently retaliated against (i.e. fired or encouraged to retire) for raising concerns about Masias's probable financial misconduct and their insistence on Masias being disciplined for her misconduct as a condition for them to sign the Judicial Department's management representation letter attesting to the integrity of the single statewide audit.  It was later alleged by the former State Court Administrator, Christopher Ryan, that the Masias Contract was a *quid-pro-quo* agreement for Masias's silence.  Chief Justice Coats was publicly censured for violating Canon Rule 2.5 through his role in awarding the Masias Contract.  Notwithstanding Chief Justice Coats's stipulated discipline, the conduct and involvement of the other Justices implicate violations of Canon Rules 1.1 (Compliance with Law), 1.2 (Promoting Confidence in the Judiciary), 1.3 (Avoiding Abuse of the Prestige of Judicial Office), 2.2 (Impartiality and Fairness), 2.3 (Bias, Prejudice, and Harassment), 2.5 (Competence and Cooperation), 2.6 (Ensuring the Right to be Heard), 2.12 (Supervisory Duties), 2.13 (Administrative Appointments), 2.15 (Responding to Judicial and Lawyer Misconduct), and 2.16 (Cooperation with Disciplinary Authorities).

2. **The Masias Memo / Further Concealment of Material Information Related to the Use of Public Funds.** The Masias Contract was negotiated in conjunction with a list of talking points (the Masias Memo) that alleged various instances where allegations or evidence of judicial or employee misconduct were suppressed by the Court or SCAO.  Despite knowing of its existence, the involved Justices (Coats, Boatright, Márquez, Hood, Gabriel, Samour, and Hart) in collusion with attorneys within SCAO and the Attorney General's Office intentionally concealed/withheld the Masias Memo from the OSA while the OSA conducted its fraud hotline investigation and a contemporaneous 2020 performance audit of SCAO.  As with the single statewide audit (which verifies the Department's internal controls), the fraud hotline investigation and the OSA's 2020 performance audit related to the State of Colorado's access to and use of federal funding.  Simultaneously, the Justices knowingly concealed and withheld the Masias Memo from this Commission for over two years.  While recognizing that the judicial discipline of former Chief Justice Coats has been resolved, the conduct and involvement of the other Justices in knowingly withholding the Masias Memo implicate violations of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.5, 2.6, 2.12, 2.15, and 2.16.

---

Colorado Office of the State Auditor, STATEWIDE SINGLE AUDIT, FISCAL YEAR ENDED JUNE 30, 2019, p. I-1, March 3, 2020 *available* at: https://leg.colorado.gov/sites/default/files/ documents/audits/1901f_statewide_single_audit_fiscal_year_ended_june_30_2019.pdf.

3

3. **Improper Public Commentary on Pending and Impending Cases.**  Once the allegations of a *quid-pro-quo* contract and the existence of the Masias Memo became public knowledge, the current Justices (Boatright, Márquez, Hood, Gabriel, Samour, Hart, and Berkenkotter) made or authorized public statements commenting on and pre-judging the merits of the Masias Controversy (including in relation to various pending or impending cases).  Later public statements included Chief Justice Boatright summarizing/characterizing the purported significance of the Executive Summary of the OSA's Fraud Hotline Investigation Report and the reports of the two outside investigations contracted-for by the Court / Judicial Department.  The Justices have also misused substantial public funds and resources (including co-opting the assistance, participation, and endorsements of Court of Appeals Judges and the State Commission on Judicial Performance) to promote the Court's "Workplace Culture Initiative." The Workplace Culture Initiative is essentially further commentary on the merits of the Masias Controversy and the purported sufficiency of the Justices' response to strawman recommendations for organizational reform presented through the Justices' self-serving "independent" investigations.  In order to fund the "Workplace Culture Initiative," the Justices have requested a recurring appropriation from the Legislature of over $1.2 million per year.  Moreover, despite the OSA's recognition that the Masias Contract created appearances of impropriety, the Justices had the audacity to request appropriations of $500,000 in FY 2024-25 (increasing to $750,000 in FY 2025-26) for "Leadership Development."  The Justices' resurrected funding request includes further unethical commentary on the merits/reasonableness of the Masias Contract.  The current Justices' repeated public statements on the merits of the Masias Controversy implicate violations of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.6, 2.10 (Judicial Statements on Pending and Impending Cases), 2.11 (Disqualification), 2.12, 2.15, 2.16, 3.1 (Extrajudicial Activities in General), and 4.1 (Political and Campaign Activities of Judges and Judicial Candidates in General).

4. **Conspiracy to Proceed with Unethical Judicial Fact Investigations and the Non-Disclosure of Conflicts of Interest.**  Using public resources for their own personal benefit, the current Justices collectively approved the appropriation of substantial public funding (approximately $350,000) to contract-for investigations of their own and other involved individuals' conduct in relation to the Masias Controversy.[3]  The Justices proceeded to contract for these "independent" investigations after and despite this Commission raising concerns about the authority for and propriety of the investigations directly to Chief Justice Boatright.  The current Justices applied undue influence on the

---

[3] The Justices' use of substantial taxpayer dollars to fund the self-serving, contracted-for, and ethically prohibited investigations appears to satisfy the definition of "fraud" according to the OSA Fraud Hotline statute, § 2-3-110.5(1)(d), C.R.S.  As so defined, "fraud" means "occupational fraud or the use of one's occupation for personal enrichment through the deliberate misuse or misapplication of the employing organization's resources or assets."  Canon Rule 2.9 categorically prohibits judges from directly or indirectly conducting independent fact investigations.

contracted-for investigations by defining their scope, controlling access to information/records, and having oversight as to the final reports/outcomes.  Through public statements made by Chief Justice Boatright and others, the Court misrepresented the scope, substance, and outcomes of the investigations.  The contracted-for investigations were a blatantly unethical effort by the Justices to apply a fix and to cover up the Masias Controversy.  The Justices' decision to use public funds to pay for the ethically prohibited and self-controlled investigations of their own conduct and their related public statements occurred in consultation and coordination with others (including individuals with connections to the multi-billion-dollar law firm WilmerHale).  The individuals who conspired with or otherwise assisted the Justices in their misconduct include Counsel to the Chief Justice Andrew Rottman, State Court Administrator Steven Vasconcellos, SCAO Legal Counsel Terri Morrison, former WilmerHale Partner-in-Charge / current Chief Deputy Attorney General Natalie Hanlon Leh, 1st Assistant Attorney General LeeAnn Morrill, then-Assistant Solicitor General and now-Court of Appeals Judge Grant Sullivan, other unspecified members of leadership within the Attorney General's Office (including by implication Attorney General Phil Weiser and Deputy Attorney General Kurtis Morrison), Attorney Regulation Counsel Jessica Yates, former U.S. Attorney for the District of Colorado / former WilmerHale Partner / presumptive Denver District Attorney John F. Walsh, former Colorado Attorney General / former U.S. Senator / former U.S. Secretary of the Interior / former WilmerHale Partner / current U.S. Ambassador to Mexico Ken Salazar, the Governor's then-Chief Legal Counsel Jacki Cooper Melmed, and this Commission's current Chair / WilmerHale Partner-in-Charge Mindy Sooter.[4]  The contracted-for investigations implicate violations

---

[4] Chief Justice Coats has admitted that he authorized the Masias Contract only after consulting with others.  Specifically, Coats stipulated that he "made many of [his] decisions with, or based on the representations and recommendations of, the State Court Administrator, fellow judicial officers, non-lawyer professionals, and lawyers."  *Coats* at ¶ 7.  An outside investigation overseen by the Legal Regulation Committee further confirmed that clear and convincing evidence supports a finding that Chief Justice Coats failed to report the involved attorney misconduct as required by Colo. RJD 5.1 and 8.3.  The legislative record and other evidence similarly confirm that the Justices developed their strategy and response to the Masias Controversy (including commissioning their ethically prohibited "independent" investigations and commenting on pending or impending cases) through consultation with other attorneys and Judicial Department employees.  The assistance provided by attorneys implicates violations of Colo. RJD 8.4(f), which prohibits attorneys (including other judges) from "knowingly assist[ing] a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law."  The assistance provided by Judicial Department employees implicates violations of the Judicial Department's Personnel Rules, specifically the Code of Conduct contained in Personnel Rule 20.C (requiring compliance with the law (including the Code) and avoidance of impropriety or appearances of impropriety).  Because individuals who compose the respective judicial oversight entities (the Office of Attorney Regulation Counsel (OARC), SCAO, the Attorney General's Office, and this Commission) are themselves directly involved in enabling the Justices' misconduct, there is presently no meaningful path to accountability or uniform/equal enforcement of the law through the very systems designed to provide such

of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.6, 2.9 (Ex Parte Communications), 2.10, 2.11, 2.12, 2.13, 2.15, and 2.16.

5. **The Justices' Persistent Refusals to Disqualify / Obstruction of Investigations and the Equal Enforcement of Law.** Even after being personally and individually notified by this Commission of conflicts of interest requiring their disqualification, all of the current Justices remained involved in controlling access to information and resources, in reviewing other judicial disciplinary cases,[5] in directly and indirectly opposing legislative reforms, in rulemaking, and in the appointment of members to this Commission (i.e. stacking this Commission). A substantial part of the Justices' lobbying efforts and public commentary occurred through their influence upon other judges as well as third-party non-profit entities/interest groups. The current Justices have also knowingly allowed their agents/accomplices (who include this Commission's Chair Mindy Sooter and Attorney Regulation Counsel Jessica Yates) to unlawfully intimidate, interfere with, and retaliate against persons who advocated for scrutiny of the Justices' conduct and for reforms as part of the legislative process. The current Justices' interference with and obstruction of the OSA's fraud hotline investigation resulted in the expiration of the applicable statute of limitations and the non-prosecution of involved persons under Colorado law. The Justices have further knowingly allowed retaliation to occur and to

---

accountability. These circumstances create overall appearances of impropriety in violation of Canon Rules 1.1, 1.2, 1.3, and 2.6.

Moreover, these circumstances raise fundamental doubts as to the integrity of the Colorado Supreme Court's self-proclaimed inherent authority to act as the exclusive regulator of the Colorado legal profession. *See, e.g., Colo. Supreme Ct. Grievance Comm. v. Dist. Ct.*, 850 P.2d 150, 152 (Colo. 1993) (authored by Erickson, J. citing line of prior cases authored by Erickson, J.). The Colorado Supreme Court has never addressed whether having an investigative arm directly controlled by the Court (which also makes the ultimate decisions on attorney discipline) is itself a violation of Canon Rule 2.9(C). *See* C.R.C.P. 242 (defining the Court's supervisory authority over attorney regulation system). A possible stopgap solution until the structural deficiencies in the attorney regulation system can be fully addressed and remedied through legislation would be to appoint and negotiate an intergovernmental agreement with another state's attorney regulation authority to report to the Colorado Legislature or to a Special Tribunal composed according to HCR 23-1001 (rather than reporting to the Colorado Supreme Court, to the Legal Regulation Committee, or to the Advisory Committee on the Practice of Law (both Committees which are controlled by the Court)). The Ohio Office of Disciplinary Counsel might be a good choice for an appointee given its dual role in acting as the State of Ohio's regulator of both attorneys and judges.

[5] The Justices' refusal to disqualify themselves extends to their allowing former 18th Judicial District Court Judge John Scipione to receive an approximately $189,530 combined windfall from his judicial misconduct and the litigation costs caused by his bad faith assertion of disability status in response to then-pending judicial discipline proceedings. *Matter of Scipione*, 2024 CO 23.

remain suppressed within the Colorado Judicial Department up to the present time.[6] Moreover, the Justices' facilitation of retaliation against the integrity of this Commission includes their collective and persistent concealment of Commission Chair Mindy Sooter's individual/professional involvement in the Justices' overall plan to cover up their misconduct by commissioning "independent" investigations otherwise prohibited by Canon Rule 2.9(C). Specifically, with the personal support of Attorney General Phil Weiser, Sooter sought appointment to this Commission while her law firm WilmerHale (where she is the "Partner in Charge") was bidding on the Justices' self-serving investigations and after WilmerHale and the Justices had originally negotiated for a *sole-source* investigation contract. Through WilmerHale and her connections to the Colorado Attorney General's Office, Sooter directly assisted the Justices in violating Canon Rule 2.9(C) and in covering up their misconduct, as described in the accompanying RFE. Nevertheless, as a Commissioner, Sooter has not disqualified herself from participating in matters involving the Justices or the broader Masias Controversy. The current Justices' non-recusal and obstruction implicates violations of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.6, 2.10, 2.11, 2.12, 2.13, 2.15, 2.16, 3.1, and 4.1.

This Commission's calculated suppression and summary dismissal of another RFE raising similar issues (which this Commission had previously recognized as a complaint according to Colo. RJD 13(b)) and its recent retaliatory ouster of its Executive Director create substantial appearances of impropriety and require this Commission's complete disqualification.[7] An

---

[6] David Migoya, *Top Judges Ignored Colleague's Drinking*, DENVER GAZETTE, March 3, 2024; David Migoya, *Case Against District Judge in Adams County Allegedly 'Slow Walked' to Discipline Commission*, DENVER GAZETTE, March 3, 2024.

[7] David Migoya, *Colorado Judicial Discipline Director Put on Leave; Ouster Met with Widespread Shock*, DENVER GAZETTE, January 20, 2024; *see also* Dennis Maes, *Perspective: Clouds Over Colorado's Highest Court*, DENVER GAZETTE, March 3, 2024; Dennis Maes, *Sans Clarity, State Supreme Court Marginalizes Misconduct Allegations*, COLORADO POLITICS, June 28, 2024 (describing this Commission's dismissal of former 10th Judicial District Chief Judge Dennis Maes's RFE and recognized complaint against Chief Justice Boatright with a partial "expression of concern"; also describing this Commission's refusal to disclose Boatright's Colo. RJD 14(d) response to the complaint). This Commission's dismissal letter contains a further assertion that, "As a threshold matter, the Commission voted to recognize your RFE as a complaint only as to Chief Justice Boatright, per Colo. RJD 13(b)." The dismissal letter, however, is not clear when the purported vote declining to recognize a complaint as to the other Justices occurred. A copy of the Maes RFE and this Commission's dismissal letter are contained in Appendix 14 to the accompanying RFE. Additionally, Appendix 30, pp. 1-7, to the accompanying RFE documents Chief Justice Márquez's more recent preemptive denial of a request for Justice Boatright to waive confidentiality and disclose his correspondence with this Commission, as allowed under Colo. RJD 6.5(d)(9). The current Commission members' and its Special Counsel's decision to intentionally disregard and suppress legitimate grounds for judicial discipline in conjunction with their retaliation against the former Executive Director violates Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.4 (External Influences on Judicial Conduct), 2.5, 2.6, 2.11,

entirely re-constituted and conflict-free special Commission must be formed with appointed outside Special Counsel to evaluate, investigate, and prosecute these allegations of judicial misconduct by all current Justices of the Colorado Supreme Court. *See* Colo. RJD 3.5(a), (b), (d), and (g). The existence of a reasonable basis to suspect that all the current Justices have engaged in actual or apparent impropriety under the Code will require the re-constituted Special Commission to process this RFE as a complaint, notify the Justices, and commence a formal investigation. Colo. RJD 13(b) and 14. The expansive history of the Justices' obstruction and non-cooperation with this Commission also provides grounds for seeking their immediate temporary paid suspensions under Colo. RJD 34 pending resolution of further disciplinary proceedings (including an administratively recognized basis for this Commission to initiate formal discipline proceedings).[8]

The accompanying RFE presents the factual background relating to the Justices' substantial misconduct in granular detail. This level of detail, however, should not detract from the fundamental point being raised. Following the systematic erosion of this Commission's integrity and independence, the current Commissioners have abdicated their duties to perform this Commission's constitutional mandate, as described by Colo. RJD 1(b). More specifically, the current Commissioners are failing to apply standards for their disqualification, are selectively disregarding legitimate grounds for judicial discipline as to the Justices of the Colorado Supreme

---

2.12(C), 2.15, and 2.16. The denial of a right to be heard is further aggravated by the Colorado Court of Appeals having previously held that this Commission's dismissal decisions do not provide subject matter jurisdiction for any form of judicial review. *Higgins v. Owens*, 13 P.3d 837 (Colo. App. 2000) (affirming jurisdictional dismissal of C.R.C.P. 106 challenge to Commission's dismissal of RFE without investigation). These decisions and actions are further violative of Colo. RPC 8.4(f) (prohibiting attorneys from helping facilitate judicial misconduct).

[8] Colo. RJD 34(a) provides:

> **(a) Request to Supreme Court.** The Commission, by its chair, the executive director, or special counsel, may request the Supreme Court to order temporary suspension of a Judge, with pay, ***pending the resolution of preliminary or formal proceedings***. The request shall include a statement of the reasons in support of the suspension, ***which may include the Judge's failure to cooperate with the Commission***. Upon receipt of such a request, the Court may require additional information from the Commission. (Emphasis added).

Under Colo. RJD 5(b)-(d), a subject judge or justice's non-cooperation with the Commission, including the subject judge or justice's failure to comply with the Commission's orders (i.e. a subpoena duces tecum or a formal request for disqualification), is expressly recognized as grounds for judicial discipline, an adequate basis for the initiation of formal proceedings, and grounds for collateral contempt proceedings. The Justices' continuing efforts to intentionally withhold and conceal evidence of their own and other individuals' misconduct are evident through their obstructive responses to recent public records requests. *See generally* Appendix 30 to the accompanying RFE.

Court, are failing to apply the reasonable basis standard/threshold required by Colo. RJD 13(b) for recognizing complaints with concurrent obligations to conduct full investigations, and are otherwise categorically failing to enforce the Colorado Code of Judicial Conduct.  The current Commissioners are denying the public and individuals aggrieved by judicial misconduct any meaningful right to be heard (including having access to report suspected misconduct / crimes to a legitimate regulator through otherwise guaranteed privileges and immunities), in violation of the 1st and 14th Amendments to the U.S. Constitution, Colorado Constitution Article II, §§ 6, 10, and 25, and Canon Rule 2.6.  These circumstances require a public inquiry into both the conduct of the Justices and continuing deficiencies in Colorado's corrupted, secretive, and unaccountable judicial discipline system.

The Governor should consider exercising his authority to immediately recall the appointments of the current attorney and citizen members of this Commission.  Colo. RJD 3.5(b)(3); *Cf.*, Colo. RGCJP 2(d) ("for cause" grounds for removal of performance commissioners under § 13-5.5-104(5)(c), C.R.S. include malfeasance in or failure to perform commission functions, failure to disclose basis for recusal, and refusal to recuse when appropriate).  Likewise, the conduct of the current judge members of this Commission should be evaluated separately under the Code and their immediate recall from this Commission should be considered through appointment of a Special Tribunal (composed according to the structure and process defined in HCR 23-1001).

Given that the deterrents against facilitating judicial misconduct contained in the Code, the Rules of Professional Conduct, and the Judicial Department's Personnel Rules have been ineffective/unenforced with such unregulated misconduct likely to continue in response to the accompanying RFE, the Colorado Legislature should further consider taking immediate action to introduce and pass legislation recognizing obstruction of judicial disciplinary proceedings as a felony.  A felony conviction related to governmental processes, in turn, would require the automatic removal of any judge and, at minimum, the presumptive suspension of any attorney found guilty of such misconduct.  Colo. Const. Art. VI, § 23(2) (conviction of felony requires procedures for automatic removal of judge); *see also, e.g.*, *People v. Jenna Lynn Ellis*, 24PDJ002 (3-year suspension for felony conviction related to dishonest representations made as to 2020 presidential election); *People v. Holden Chadwick*, 23PDJ072 (3-year suspension following felony convictions for Attempting to Influence a Public Servant by interfering with law enforcement investigation of a friend through authority as deputy district attorney); *People v. Ryan L. Kamada*, 20PDJ057 (judge disciplined for disclosing existence of search warrant to a friend further disbarred for violations of Code and guilty plea to felony Obstruction of Proceedings Before a Federal Department or Agency).

To deter and prevent further obstruction of access to public records and impediments to complainants submitting legitimate requests for evaluation of judicial conduct, the Colorado Legislature should also consider amending the scope of the Colorado Open Records Act, Title 24, Art. 72, C.R.S., to include the administrative records of the Judicial Department and its affiliated independent agencies.  Moreover, to allow the still yet to be established Office of the Judicial Discipline Ombudsman to function as intended, the Legislature should also consider amending Title 13, Art. 3, C.R.S. to authorize the Ombudsman, on behalf of its clients/visitors, to seek public records from the Judicial Department and other agencies with reciprocal

9

obligations for those entities to provide records to the Ombudsman without charge.[9]  *Cf.* § 13-3-120(2), C.R.S. (current statute only *limits* the ombudsman's authority to request records: "The ombudsman shall not request records from the department or the commission related to specific employees, judges, or justices, except at the discretion of the complainant.").  This change would assist the Ombudsman and this Commission better focus their respective resources on the reliable reporting and the effective resolution of legitimate complaints.

Finally, to reinforce this Commission's independence, the Colorado Legislature should immediately amend § 13-5.3-102(3)(e), C.R.S. to strike "pursuant to sections 24-31-101(1)(g) and 24-31-111." As currently written § 13-5.3-102(3)(e), C.R.S. ostensibly gives the Attorney General sole discretion to choose who is appointed as "outside special counsel" through the designation of a "special assistant attorney general." *See* § 24-31-101(1)(g), C.R.S. ("The Attorney General: * * * (g) May, at his or her sole discretion, appoint special assistant attorneys general to provide legal services to state agencies except as otherwise provided in section 24-31-111 (5)[.]").  The Attorney General should have no influence upon this Commission's use of its Special Cash Fund and its selection of outside special counsel to prosecute judicial misconduct or to address other matters critical to the Commission's function.  It should be noted that this problematic language was added to SB 22-201 through inappropriate lobbying by Deputy

---

[9] Ironically, ousted Executive Director Chirstopher Gregory was asked about the status of the still inchoate Office of the Judicial Ombudsman at the Joint Judiciary Committee's SMART Act hearing on January 12, 2024.  In his response, Executive Director Gregory emphasized the importance of the new Office to help eliminate retaliation within the Judicial Department. Executive Director Gregory stated:

> I'm sorry, Mr. Chair. Representative Bacon, I'm uncertain what has happened with the ombuds program, because we were not added as part of their board. And they're in sort of a formative stage, much like the ASIA Office that was mentioned at the end of the last presentation. In that vein, yeah, I would like more information as far as what progress has been made. I do think that that office is absolutely essential, particularly given this scandal over the last couple of years. Even just the reporting and the investigations that were done, revealed a problem with retaliation and folks being concerned that if they come forward, it's going to be a wall. And the Ombuds Office provides a wonderful facilitation tool, so that those concerns can be brought up in an anonymous way. But the person that's interested would still, you know, have that information. So, at least from our Office, and our Commission's perspective, we remain 100% committed to the success of that office and are very supportive of it.
>
> *Hearing on the Colo. Comm. on Jud. Discipline annual SMART Act reporting before the J. Judiciary Comm.*, Colo. Leg., January 12, 2024; Appendix 27(dd)(ii), p. 8:14-23 *attached to* accompanying RFE.

10

Attorney General Kurtis Morrison and is relevant to the Justices' underlying misconduct and non-cooperation, as described in the accompanying RFE.

To date, most of the press reporting on the Masias Controversy and the Justices' involvement in covering up evidence of intimidation, retaliation, and enforced silence within the Judicial Department has focused on the substance of the underlying factual allegations.  Public discussion of the Code and its application has been limited.  The accompanying RFE analyzes how the Justices' conduct presents reasonable grounds for suspecting violations of specific provisions of the Code.  Critically, the only threshold question to be addressed by this Commission through the accompanying RFE is whether, under the circumstances described, a reasonable basis exists for judicial disciplinary proceedings (including this Commission completing required full and thorough investigations) as to each of the current Justices.  Colo. RJD 13(b), 14(a).  The existence of such a reasonable basis appears indisputable through the detailed history of the Justices' personal involvement in and their response to the Masias Controversy.

A copy of this letter and its accompanying RFE is also provided to the Colorado Office of Judicial Performance Evaluation so that the respective performance commissions can fulfill their independent statutory duties to verify the integrity and fitness of the implicated judges and justices.  § 13-5.5-107(1)(a), C.R.S. (performance commissions *shall* evaluate each judge and justice for impropriety or even creating appearances of impropriety under the Code); Colo. RGCJP 12(h), *Form 1*, pp. 1(a)-4-5; Colo. RGCJP 13(h), *Form 2* (III)(a)(2)(c), p. 3; Colo. RGCJP 14(b).  A copy of this letter and RFE is, likewise, provided to the U.S. Department of Justice's Public Integrity Section for its evaluation of potential conflict-free federal prosecution of the Justices and others involved in suppressing probable criminal, civil, and ethical misconduct.  Additionally, copies of this letter and RFE are provided to members of Colorado's Legislative Leadership for their evaluation of the appropriateness of judicial impeachment proceedings under Article XIII, § 2 of the Colorado Constitution.

In order to truly repair the lack of integrity within Colorado's Judicial Branch, the Attorney General's Office, and this Commission as well as to fully remedy the "toxic" culture found within the Judicial Department and the public's rightful loss of confidence in the Judiciary, the people of Colorado should seek the immediate suspension, public accountability, punishment, and removal (by impeachment, non-retention, resignation, or discipline) of all judges, public officials, public employees, and licensed attorneys who knowingly participated in, enabled, or helped cover up the significant unlawful and unethical conduct involved in the Masias Controversy.  As respected U.S. Attorney Michael Wheat said about his ongoing investigation and prosecution of analogous wide-spread governmental corruption and conspiracies in the State of Hawai'i, it is time to "Run it to the ground."

Sincerely,

Anonymous

11

## Table of Contents

**INTRODUCTION** ........................................................................................................................... 1

**THRESHOLD ISSUES FOR THE COMMISSION'S  EVALUATION OF JUDICIAL
CONDUCT** ...................................................................................................................................... 9

1.    **Misconduct Involving the Masias Contract.**  Canon Rule 1.1 of the Code requires judges to comply with the law.  Canon Rule 1.2 further requires that judges avoid impropriety and even the appearance of impropriety.  Canon Rule 2.5 requires that judges perform their judicial and administrative duties "competently and diligently." Canon Rule 2.13 prohibits judges from exercising favoritism or approving disproportionate compensation, hiring, or contracting decisions.  The Colorado Judicial Department and former Chief Justice Coats have publicly acknowledged that the entire Colorado Supreme Court approved and, subsequently, cancelled a $2.66-2.75 million sole-source contract (the Masias Contract) with its former State Court Administrator's Office (SCAO) Chief of Staff Mindy Masias (who was being fired due to suspected financial misconduct).  The sole-source Masias Contract was preconditioned upon a non-disclosure agreement and general waiver.  Despite personal knowledge of the materiality of Masias's financial misconduct to a continuous, ongoing audit related to the State of Colorado's access to federal funding and bond issuance, none of the Justices disclosed their consideration or approval of the Masias Contract to SCAO's Financial Services Division (FSD) or to the Colorado Office of the State Auditor (OSA).  Indeed, there is evidence that the FSD Director and the SCAO Controller were retaliated against in order to allow the Masias Contract to move forward without reporting to the OSA.  Does the involved Justices' failure to contemporaneously disclose their consideration and their ultimate approval of the Masias Contract provide a reasonable basis for judicial disciplinary proceedings according to Colo. RJD 13(b)? .................................................................................................................... 9

2.    **The Justices' Persistent Refusal to Disqualify Themselves.**  Canon Rule 2.2 requires judges to uphold and apply the law while being fair and impartial in the performance of all duties of their judicial office  Canon Rule 2.11 of the Code requires disqualification when a judge or justice has personal knowledge of disputed facts in a proceeding, is likely to be a material witness, has economic interests in the outcome of the proceeding, or has made public statements that commit or appear to commit the judge or justice to reach a particular result.  Canon Rule 1.3 further prohibits abuse of the prestige of judicial office (including the misuse of public funding) to advance a judge's personal interests.  Canon Rule 2.6 requires judges to provide persons with legally protected interests full and fair opportunities to be heard, including access to judicial remedies. Canon Rule 2.13 prohibits favoritism in a judge or justice's exercise of appointment powers and prohibits unnecessary appointments.  As part of prohibitions against *ex parte* communications, judges are not allowed to conduct or direct their own fact investigations of pending or impending matters.  Canon Rule 2.9(C).  Canon Rule 2.10 contains similar prohibitions against judges and justices making statements reasonably expected to impair a fair hearing.  Canon Rule 4.1 also prohibits judges from making false or misleading statements, commenting on pending and impeding cases, and pre-announcing the outcomes of such cases.  Despite this Commission expressly and personally requesting their disqualification, all the current Colorado Supreme Court Justices remained involved in matters

related to their own and/or to Chief Justice Coats's now established judicial misconduct.  The entire Colorado Supreme Court has repeatedly commented on the merits of potential judicial discipline arising from the Masias Contract, including pre-judging the sufficiency of grounds for criminal, civil, and disciplinary investigations and prosecutions.  Additionally, despite this Commission raising concerns about the propriety and sufficiency of the Court's authority to do so, the current Justices proceeded to use substantial public funds to contract for and direct investigations related to the Justices' own involvement in the Masias Contract.  By limiting access to information, controlling the scope of these investigations, and having oversight as to the substance of the final reports issued, the current Justices applied undue influence and denied fair opportunities to be heard.  Do the individual Justices' refusals to disqualify themselves, their legislative efforts, their investigations, and their collective commentary provide a reasonable basis for disciplinary proceedings according to Colo. RJD 13(b)? .......... 9

3.    **Retaliation, Obstruction, and Non-Reporting of Judicial, Attorney, and Employee Misconduct.**  Canon Rule 2.3 prohibits retaliation against persons reporting misconduct.  Canon Rule 2.15 mandates the reporting of known judicial or attorney misconduct raising substantial questions about a judge's honesty, trustworthiness, or fitness as a judge or attorney.  Additionally, Canon Rule 2.15 requires "appropriate action" when a judge receives information indicating a substantial likelihood that a judge or attorney has violated their respective ethical codes.  Canon Rule 2.16 requires cooperation with disciplinary authorities and prohibits direct or indirect retaliation against those assisting in the investigation of a judge or an attorney.  Canon Rule 2.12 further makes judges responsible for ensuring that persons subject to their direction and control act in a manner consistent with the judges' duties under the Code.  Evidence exists that the Colorado Supreme Court, through its administration of SCAO, its representation by the Attorney General's Office, and oversight of its own Office of Attorney Regulation Counsel (OARC), has suppressed matters of public record and has continually prevented this Commission from accessing records and funding resources.  Through what appears to be an endorsement of attorney misconduct, the Justices have not taken any administrative action in response to evidence that employees of SCAO and OARC interfered with the legislative process and the 1st and 14th Amendment and Colo. Const. Art. II, §§ 6, 10, 16, and 25 and Art. V, § 16 rights of those involved in that process.  Moreover, through their control of the OSA's fraud hotline investigation, the current Justices caused the statute of limitations to lapse for the state-level prosecution of probable crimes related to the Masias Contract.  Up to the present, the current Justices have also knowingly and repeatedly allowed retaliation to occur and to remain suppressed within the Colorado Judicial Department.  Does the individual Justices' apparent complicity in obstructing investigations of judicial, attorney, and employee misconduct provide a reasonable basis for judicial disciplinary proceedings according to Colo. RJD 13(b)? ......................................................... 11

**Background ......................................................................................................................... 12**

Summary ......................................................................................................................... 12

Probable Violations of Code Provisions Relating to Responsible Financial Decision-Making / Withholding of Material Information ...................................................................................... 17

Administrative Structure of the Colorado Supreme Court and the Colorado Judicial Branch ......................................................................................................................... 17

Masias's Suspected Financial Misconduct Reported........................................................... 19

The Justices collectively decide to terminate Masias's employment because of the impacts of her financial misconduct on the ACFR audit. .................................................... 22

Chief Justice Coats and the Judicial Department begin negotiating the Masias Contract.... 23

Chief Justice Coats approves the Masias Contract, which is executed twice to conceal it from the SCAO FSD contemporaneous with retaliation against the FSD Director and FSD Controller for whistleblowing. .............................................................................. 27

The terms of the Masias Contract were facially absurd and created an appearance of impropriety ......................................................................................................................... 34

All the Justices and the Attorney General personally receive copies of an anonymous Fraud Hotline report and material information about the negotiation of the Masias Contract is withheld from the OSA. ...................................................................................... 37

The Masias Contract is cancelled / the Judicial Department publicly confirms that all the Justices approved and later cancelled the Masias Contract. ................................................. 40

The Colorado Supreme Court and the Colorado Attorney General's Office conceal/withhold the materially significant Masias Memo from the OSA while the Fraud Hotline Investigation and 2020 Performance Audit are in-progress. ................................................. 44

The 2020 OSA Performance Audit Report finds substantial deficiencies in SCAO's internal controls and recognizes the Masias Contract as creating an "Appearance of Impropriety." 48

Despite Chief Justice Coats's ultimate admissions and his public censure for violating Canon Rule 2.5, none of the other Justices have been held accountable for their same misconduct or their failures to report that and other judicial and attorney misconduct. ...... 48

The Current Justices' Commentary and Refusal to Disqualify Themselves ............................ 51

December 7, 2020 Testimony before the Legislative Audit Committee ............................... 51

The Justices, through State Court Administrator Steven Vasconcellos, announce that they and the Attorney General's Office have pre-judged that the issues identified in the OSA's Performance Audit Report do not merit referrals to law enforcement or further civil fraud enforcement actions, other than allowing the OSA's fraud hotline investigation to proceed. .............................................................................................................................. 54

*The Denver Post* publishes an interview with former State Court Administrator Christopher Ryan, who publicly alleges that he acted at the direction of others and that the Masias Contract was a *quid-pro-quo* arrangement to suppress evidence of judicial and other misconduct within the Colorado Judicial Branch. .................................................................. 58

The Colorado Supreme Court begins publicly covering up and minimizing the misconduct involved in the Masias Contract. ........................................................................................... 60

To avoid legislative oversight and in anticipation of the OSA's Fraud Hotline Investigation expanding, the Justices disclose the Masias Memo and publicly announce an "outside" investigation. ..................................................................................................................... 63

The Colorado Supreme Court amends its previous public statements to propose the selection of "independent" investigators through a committee appointed by multiple governmental branches / departments. ................................................................................................... 70

The "independent investigations," however, were to be controlled by the Colorado Supreme Court and the Judicial Department. ....................................................................................... 77

In addition to the "independent investigations," the Justices and the Judicial Department also ultimately controlled the OSA Fraud Hotline Investigation. .......................................... 83

The Justices were aware of grounds for their disqualification but persistently refused to recuse from judicial discipline related matters and proceeded with their ethically prohibited "independent" investigations. ..................................................................................................... 85

Circumstances through which the Justices exerted undue influence upon, interfered with, or suppressed each of the investigations. .......................................................................................... 92

OSA Fraud Hotline Investigation ........................................................................................... 92

The OSA's referrals to law enforcement were delayed "extensively" by the Court and the Judicial Department. ...................................................................................................... 92

The Court and the Judicial Department used their control over the Fraud Hotline Investigation to redact information from the OSA's law enforcement referral prior to its submission to the 2nd Judicial District Attorney's Office. ................................................. 95

Chief Justice Boatright publicly comments on the merits of the OSA's findings and referrals to law enforcement. ............................................................................................ 97

This Commission's Investigation and Discipline of Former Chief Justice Coats ................. 99

The Justices obstructed this Commission's access to records and resources. .................. 99

The Justices abused their rulemaking authority. ............................................................. 108

The Justices abused their appointment authority and with members of this Commission have created substantial appearances of impropriety......................................................... 114

The Justices refused to disqualify themselves and allowed their agent to interfere with the discipline of former Chief Justice Coats. ......................................................................... 136

The Troyer-Mitchell Investigation........................................................................................... 137

The scope of the Troyer-Mitchell Investigation, as defined by the Justices, specifically prohibited inquiry into whether the Masias Contract involved ethical or criminal misconduct. ........................................................................................................................ 138

Critical evidence was not available to the Troyer-Mitchell Investigation or was otherwise not presented with the Troyer-Mitchell Report. .............................................................. 139

The ultimate conclusion in the Troyer-Mitchell Report that the Masias Contract was not a Quid-Pro-Quo arrangement is clearly erroneous. ............................................................ 140

The Justices, directly and indirectly, made or encouraged public statements that misrepresented the scope and relevance of the Troyer-Mitchell Report. ....................... 144

The ILG Investigation............................................................................................................... 149

General Limitations Imposed Upon the ILG Investigation ............................................ 149

The ILG Report does not address the confirmed destruction of evidence...................... 151

ILG is prohibited from examining an allegation as to two current Justices. .................. 151

ILG's finding that a harassment complaint was not suppressed to keep now-Justice Gabriel "safe" is questionable given evidence of retaliation against the reporting employee. ........................................................................................................................... 151

Chief Justice Boatright used the ILG Report as another opportunity to improperly comment on the merits of the Masias Controversy. ....................................................... 156

Contracted-for investigation of former Chief Justice Coats by the Office of Attorney Regulation Counsel and the Legal Regulation Committee................................................. 158

FBI Investigation ...................................................................................................................... 160

The Colorado Supreme Court's Involvement in the Consideration of Legislative Reforms to Colorado's Judicial Disciplinary System.............................................................................. 163

The Justices, directly as well as through other judges and Judicial Department employees, lobby against legislative reforms and pursue a pre-planned / coordinated public relations strategy premised upon the Court's self-serving investigations. .................................... 163

Chief Justice Boatright and Justice Márquez testify at the initial April 14, 2022 Senate Judiciary Committee Hearing on SB 22-201 after the Justices had previously lobbied Legislators, legal interest groups, and other judges to oppose reform of Colorado's judicial discipline system pending the pre-announced outcomes of the Court's contracted-for "independent" investigations............................................................... 163

Chief Justice Boatright uses his 2023 State of the Judiciary Address to rehabilitate the Justices and State Court Administrator Vasconcellos's public reputations while making further comments as to the merits of the Masias Controversy and the Court's "independent" investigations. ...................................................................................... 177

Through lobbying and the budget process, the Justices attempt to turn the concept of a Judicial Ombuds Office into an internal entity that the Justices and the Judicial Department could control. ............................................................................................. 184

Through SCAO lobbyist Terry Scanlon, the Justices persuade ranking Senator Bob Gardner to unwittingly assist in their conspiracy by publicly defending the Justices' conduct and by sponsoring amendments intended to blunt reforms that sought to reduce the Colorado Supreme Court's control over the judicial discipline process. ... 187

The Colorado Supreme Court manipulates legal interest groups as part of lobbying efforts intended to stifle legislative reforms and to bolster the Justices' public credibility as to the Masias Controversy. .................................................................................................. 190

The Justices coordinate legislative advocacy and public relations efforts with the Colorado Judicial Institute. ............................................................................................. 190

The Justices coordinate legislative advocacy and public relations efforts with the Colorado Bar Association. ............................................................................................. 197

The Justices coordinate legislative advocacy, public relations efforts, and the development of a public record for the Justices' self-interested rulemaking with the Institute for the Advancement of the American Legal System.................................. 202

The Justices use "listening tours" to directly lobby judges and Judicial employees as to the merits of the Masias Controversy and the "toxic" culture pervasive in the Judicial Department.................................................................................................................... 205

The coordinated effort to nominate Justice Gabriel for the American Inns of Court 10th Circuit Professionalism Award .................................................................................... 207

As enabled by the Colorado Supreme Court, the Office of Attorney Regulation Counsel committed unconstitutional, illegal, and retaliatory acts intended to obstruct the legislative process. ................................................................................................................. 211

Through their orders and disciplinary opinion in *Kiesnowski*, all of the current Justices used the authority of their offices to knowingly suppress evidence that Chief Justice Boatright and others failed to disclose substantial judicial misconduct to this Commission as required by Canon Rule 2.15. ..................................................................................................... 230

Without recognizing grounds for their collective disqualification, the Justices affirmed allowing now publicly censured former District Court Judge John Scipione to retain an over $189,530 windfall obtained through Judge Scipione's bad faith in judicial discipline proceedings. ................................................................................................................. 238

Ongoing Efforts to Minimize the Justices' Responsibilities for the Masias Controversy ...... 247

Need for Further Inquiry and Judicial Disciplinary Proceedings .......................................... 251

**ANALYSIS** ........................................................................................................................... **252**

The only issue before this Commission is whether a "reasonable basis exists" for judicial disciplinary proceedings. ....................................................................................................... 252

Judges and justices are expected to avoid both actual impropriety and appearances of impropriety so as to ensure the greatest possible public confidence in the independence, impartiality, integrity, and competence of the Judiciary as an institution.  At minimum, all the current Justices have created appearances of impropriety that present a reasonable basis for judicial disciplinary proceedings according to Canon Rule 1.2 and Colo. RJD 13(b). .......... 254

The Justices' conduct has been contrary to various duties under the Code.  A reasonable basis exists to suspect that the Justices have engaged in actual impropriety................................... 256

Canon Rule 1.1 (Compliance with Law) ............................................................................ 256

A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 1.1. ........................................................... 257

Canon Rule 1.2 (Promoting Confidence in the Judiciary)................................................. 259

A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety, have created appearances of impropriety, and have otherwise violated Canon Rule 1.2. .................................................................................................................. 260

Canon Rule 1.3 (Avoiding Abuse of the Prestige of Judicial Office) ............................... 261

A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 1.3. .......................................................................... 262

Canon Rule 2.2 (Impartiality and Fairness)........................................................................... 263

All the current Justices have engaged in actual impropriety and have violated Canon Rule 2.2.................................................................................................................................... 263

Canon Rule 2.3 (Bias, Prejudice, and Harassment)............................................................. 263

A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 2.3. .......................................................................... 264

Canon Rule 2.5 (Competence, Diligence, and Cooperation).............................................. 268

A reasonable basis exists to suspect that the involved Justices have engaged in actual impropriety and have violated Canon Rule 2.5. .......................................................................... 269

Canon Rule 2.6 (Ensuring the Right to Be Heard) .............................................................. 270

A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 2.6. .......................................................................... 270

Canon Rule 2.9 (Ex Parte Communications)......................................................................... 271

A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 2.9. .......................................................................... 273

Canon Rule 2.10 (Judicial Statements on Pending and Impending Cases) ........................ 274

A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 2.10. .......................................................................... 276

Canon Rule 2.11 (Disqualification) ....................................................................................... 278

All the current Justices have engaged in actual impropriety and have violated Canon Rule 2.11.................................................................................................................................... 279

Canon Rule 2.12 (Supervisory Duties) .................................................................................. 281

A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 2.12. .......................................................................... 281

Canon Rule 2.13 (Administrative Appointments) ............................................................... 282

A reasonable basis exists to suspect that all the current Justices have engaged in actual improadiety, created appearances of impropriety, and have violated Canon Rule 2.13. 283

Canon Rule 2.15 (Responding to Judicial and Lawyer Misconduct) .................................. 284

A reasonable basis exists to suspect that all the current Justices have engaged in actual improadiety and have violated Canon Rule 2.15. .......................................................... 285

Canon Rule 2.16 (Cooperation with Disciplinary Authorities) ......................................... 287

A reasonable basis exists to suspect that all the current Justices have engaged in actual improadiety and have violated Canon Rule 2.16. .......................................................... 287

Canon Rule 3.1 (Extrajudicial Activities in General)......................................................... 288

A reasonable basis exists to suspect that all the current Justices have engaged in actual improadiety and have violated Canon Rule 3.1. ........................................................... 290

Canon Rule 4.1 (Political and Campaign Activities of Judges and Judicial Candidates in General).................................................................................................................................. 291

A reasonable basis exists to suspect that all the current Justices have engaged in actual improadiety and have violated Canon Rule 4.1. ........................................................... 292

The general circumstances involved in the Masias Controversy and the Justices' subsequent efforts to cover up those circumstances present a reasonable basis for judicial discipline proceedings and require this Commission to recognize this request for evaluation as a complaint according to Colo. RJD 13(b). ................................................................................ 293

1.    **Misconduct Involving the Masias Contract.**  With former Chief Justice Coats having been publicly disciplined for his role, the involved Justices' approval of the facially absurd $2.66-2.75 million Masias Contract and their withholding of material information from the OSA and the SCAO FSD presents a reasonable basis for judicial discipline proceedings under Colo. RJD 13(b).  This Commission is required to process this RFE as a complaint as to each of the other involved Justices.............................................................................................. 293

2.    **The Justices' Persistent Refusal to Disqualify Themselves.**  The current Justices' persistent refusal to disqualify themselves from judicial disciplinary proceedings and matters impacting the Justices' own potential judicial discipline (including their misuse of substantial public funding to contract for investigations prohibited by Canon Rule 2.9, commentary on pending and impeding cases, legislative lobbying, rulemaking, and continued exercise of appointment powers) presents a reasonable basis for judicial discipline proceedings under Colo. RJD 13(b).  This Commission is required to process this RFE as a complaint as to each of the current Justices. .............................................................................................. 293

3.    **Retaliation, Obstruction, and Non-Reporting of Judicial, Attorney, and Employee Misconduct.**  The current Justices' failure to take appropriate action, including the timely reporting of known or suspected judicial, attorney, and criminal misconduct, their failure to administratively respond to such misconduct, their obstruction of criminal prosecutions, and their non-cooperation with this Commission's constitutional mandate presents a reasonable basis for judicial discipline proceedings under Colo. RJD 13(b).  This Commission is required to process this RFE as a complaint as to each of the current Justices. ................................... 293

The alleged misconduct of the Justices could not be more serious and, if proven, warrants the most stringent disciplinary sanctions. ....................................................................................... 293

**CONCLUSION** ...................................................................................................................... **302**

October 20, 2024

Colorado Commission on Judicial Discipline
Ralph L. Carr Judicial Center
1300 Broadway, Suite 210
Denver, CO 80203

*Re:  Request for Evaluation of Judicial Conduct as to all Current Colorado Supreme Court
Justices; Appendices 1 through 31*

Dear Commission Members:

INTRODUCTION

For years, the Justices of the Colorado Supreme Court, the Colorado Attorney General, and other
public officials/employees have conspired to openly engage in a pattern of misusing public
funds, public resources, and the authority of their positions to unlawfully conceal evidence of
misconduct by judges, attorneys, and public officials/employees.[1]  The Justices have repeatedly
abused their power to hurt honorable whistleblowers and victims in order to fraudulently protect
the Justices' own reputations and the reputations of other judges.  The fraudulent actions of the
Justices, the Colorado Attorney General, and their accomplices have cost taxpayers millions of
dollars.  These fraudulent actions have further deprived the people of the State of Colorado of the
continuing contributions of those honest public servants and public employees who had the
integrity and courage to stand against corruption.  With the legitimacy of Colorado's state
government substantially compromised, it has become necessary for Colorado's elected officials,
appointees, and Colorado voters to publicly address the lack of integrity within the Colorado
Supreme Court, the Colorado Judicial Department, the Colorado Attorney General's Office, and
this Commission.

On August 7, 2023, the Special Tribunal issued its disciplinary opinion in *Matter of Nathan
Coats*, 2023 CO 44.  The opinion marks the first time a Colorado Supreme Court Justice or Chief
Justice has been disciplined under the authority of Colorado Constitution Article VI, § 23(3).  In
the context of media reporting from 2019 to the present, the decision in *Coats* and its underlying
stipulation raise significant questions as to whether all current Justices of the Colorado Supreme
Court have substantially departed from their duties under the Colorado Code of Judicial Conduct
(the Code).  The circumstances in the *Coats* case have revealed an endemic culture of corruption
within the Colorado Judicial Department, the Colorado Attorney General's Office, and now this
Commission where substantial government resources and the prestige of public positions have

---

[1] As reported, the Attorney General's Office "largely negotiates every settlement agreement with
a state employee" and, circumstantially, Attorney General Phil Weiser (through a spokesman)
was aware of his Office's widespread practice of bargaining for non-disclosure agreements
(which obstructed reporting of misconduct) in such settlements.  David Migoya, *Nondisclosures
Under Fire: State Confidentiality Agreements Cost Millions, Silence Whistleblowers*, DENVER
GAZETTE, November 13, 2022.  It was further reported that such settlements cost taxpayers **over
$4 million** between 2019 and November 13, 2022.  *Id.*

been leveraged to enable intimidation, retaliation, and to suppress evidence of serious criminal and ethical misconduct.

The media has encapsulated the basic misconduct underlying the *Coats* case and the broader deficiencies in Colorado's judicial oversight systems:

> [Former State Court Administrator's Office Chief of Staff Mindy] Masias was prepared to reveal indiscretions at the highest level of the state's judicial system, including allegations that justices of the Colorado Supreme Court had ordered evidence destroyed and had paid harassment victims to protect judges' reputations.  Masias was being fired at the time because of financial improprieties.[2]

In sum, the underlying problems in the Colorado Judiciary stem from a normalized culture of intimidation, retaliation, misuse of public resources, concealment, dishonesty, and bribery.  At the heart of the Masias Controversy and confirmed in *Coats*, ***there is uncontroverted evidence*** that the involved Justices, with the assistance of others, knowingly concealed material evidence of fraud from the Colorado Office of the State Auditor (OSA) as the OSA performed oversight functions related to the State of Colorado's eligibility for and its use of federal funding.  *See* § 2-3-110.5(1)(d), C.R.S. (defining "fraud" for purposes of OSA investigation).

The concealment and non-disclosure of significant judicial misconduct by the Justices and the Judicial Department remains a recurring, current, and ongoing issue.  Indeed, recent media reporting has uncovered evidence that Chief Justice Boatright repeatedly used his position with the support of the other Justices to enable and to conceal knowledge of judges retaliating against Judicial Department employees who dared to come forward with allegations of judicial misconduct.[3]  As with the Masias Controversy, Chief Justice Boatright's concealment of

---

[2] David Migoya, *FBI Starts Own Probe of Contract*, DENVER POST, October 1, 2021.

[3] David Migoya, *Colorado Supreme Court Chief Justice and Others Aware of Colleague's Drinking Problem, But Kept Silent*, DENVER GAZETTE, March 3, 2024 (discussing pending disciplinary proceedings against former Denver Juvenile Court Presiding Judge D. Brett Woods); David Migoya, *Case Against District Judge in Adams County Allegedly 'Slow Walked' to Discipline Commission*, DENVER GAZETTE, March 3, 2024 (discussing disciplinary proceedings against former Adams County District Court Judge Robert Kiesnowski).  Following publication of the *Gazette* articles, which included allegations that Chief Justice Boatright had delayed reporting Judge Kiesnowski's history of retaliation to this Commission and that the other Justices had issued orders to suppress these allegations of this delayed reporting, the Justices did not recuse themselves.  Instead, the Justices immediately proceeded to issue a final disciplinary opinion on March 4, 2024.  *Matter of Kiesnowski*, 2024 CO 12; *see also* Michael Karlik, *Colorado Supreme Court Censures Ex-Adams County Judge Who Repeatedly Committed Misconduct: Former Judge Robert Kiesnowski Agreed to Privately Resign Last Year in the Face of a Misconduct Investigation, But Almost Immediately Committed More Misconduct*, DENVER GAZETTE, March 4, 2024.  Chief Justice Boatright's knowing concealment of judicial misconduct in the Woods matter continued after his elevation to Chief Justice and after passage

2

retaliation included knowledge that the Judicial Department was misusing public funds to cover up the retaliation through non-disclosure agreements.  These systemic problems could not be more serious or more fundamentally inconsistent with the purposes of Colorado's courts as fair, objective, and accessible forums for application of the rule of law.

Colo. RPC 8.3(b) provides: "A lawyer who knows that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judge's fitness for office shall inform the appropriate authority."  Canon Rule 2.15 provides: "A judge having knowledge that another judge has committed a violation of this Code that raises a substantial question regarding the judge's honesty, trustworthiness, or fitness as a judge in other respects shall inform the appropriate authority."  Canon Rule 3B(6) of the Code of Conduct for United States Judges, obligates federal judges to report to the "appropriate authorit[y]" reliable information reasonably likely to constitute judicial misconduct by any judge or justice.  This Commission is obviously the "appropriate authority" to report grounds for suspected misconduct by the Justices of the Colorado Supreme Court.

To the extent that the Colorado Legislature has concurrent authority to conduct impeachment proceedings under Colorado Constitution Article VI, § 23(3)(i) and Article XIII, § 2, it is also an "appropriate authority."[4]  A copy of this request for evaluation is provided to the members of

_____

of SB 22-201, which reinforced expectations of mandatory reporting under Canon Rule 2.15.  P.A.I.R.R. 2 § 1(c)(1) (Chief Justice custodian of Judicial Department records); §§ 13-5.3-101(5) (defining "complaint" as "information in any form from any source that alleges or from which a reasonable inference can be drawn that a judge committed misconduct or is incapacitated"), 13-5.3-106(2) (requiring mandatory reporting of employee-related complaints of judicial misconduct to this Commission within 35-days with concurrent duty to retain records), C.R.S.  Having taken no action to address Chief Justice Boatright and other judges' concealment of judicial misconduct in the Woods matter, the current members of this Commission, its Special Counsel, and its Executive Director are complicit in facilitating continuing violations of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.6, 2.12, 2.15, and 2.16.

Although the Denver County Court is part of the City and County of Denver and operates through its own independent system of judicial oversight, similar current problems appear to have crossed over to that system as well.  Shelly Bradbury, *Denver Court Manager Spent $25,000 Hiring Freelancers to Do Her Job, Left Work for Sexual Encounters, Investigation Found: Employees Say Case Undermined Confidence in Denver Courts' Human Resources Process*, DENVER POST, March 1, 2024 (describing employee fears of retaliation among other facts involved).

[4] On March 19, 2024, Attorney General Phil Weiser issued a formal opinion addressing Colorado's undefined procedural process for impeachment and interpreting "malfeasance in office" as grounds for impeachment.  Malfeasance is recognized to include a public official's violation of legal duties or other corrupt conduct.  Op. Colo. Att'y Gen. 24-1.

The national history of judicial impeachments includes appropriate uses of legislative oversight as well as instances where impeachment was abused primarily as a means of political

3

Legislative Leadership in addition to this Commission.  Likewise, to the extent that the circumstances present probable cause to suspect federal crimes, a copy of this request for evaluation is also provided to the Public Integrity Section of the U.S. Department of Justice. Chief Justice Brian Boatright, Associate Justice Monica Márquez, and Associate Justice Maria Berkenkotter all have terms ending in 2025 and, accordingly, will stand for retention elections in November 2024.[5]  A copy of this request for evaluation is, therefore, also provided to the Colorado Office of Judicial Performance Evaluation.

---

intimidation and retaliation.  *See generally*, JOSHUA A. KASTENBERG, THE CAMPAIGN TO IMPEACH JUSTICE WILLIAM O. DOUGLAS: NIXON, VIETNAM, AND THE CONSERVATIVE ATTACK ON JUDICIAL INDEPENDENCE (2019); *see also Hearing before the Interim Comm. Jud. Discipline*, Colo. Leg., August 10, 2022; Appendix 27(s)(iii)(2), pp. 1:25-2:19, 4:28-39 (Professor Charles Geyh broadly describing historical relationship of impeachment and judicial discipline systems). The Colorado Supreme Court's misuse of public funds and its conspiracies to obstruct legitimate investigations into criminal and ethical misconduct, however, are consistent with circumstances where impeachment proceedings were both necessary and appropriate.  *See, e.g.,* Dave Mistich, *The Looming West Virgina Supreme Court Impeachment Proceedings: An Explainer*, WEST VIRGINIA PUBLIC BROADCASTING, July 6, 2018—story *available at* https://wvpublic.org/the-looming-west-virginia-supreme-court-impeachment-proceedings-an-explainer/ (describing basis for then-unprecedented impeachment of entire West Virgina Supreme Court due to financial misconduct, incompetent administration, and abuse of the prestige of judicial office; even with meritorious grounds, however, explaining political complications of impeachment process).

The 2018 impeachment of the entire West Virginia Supreme Court resulted in two of the five justices resigning/retiring (with one of those justices being convicted of a federal wire fraud charge), the acquittal of one justice, and a divided, recomposed special supreme court panel enjoining further impeachment proceedings against the remaining two justices based upon arguments that "separation of powers" principles prevented the West Virginia Legislature from enforcing the West Virginia Code of Judicial Conduct.  Ultimately, the U.S. Supreme Court declined to hear a petition to reverse the special panel's injunction and further impeachment proceedings were abandoned.  John Raby, *Supreme Court Won't Intervene Over West Virginia Justices*, ASSOCIATED PRESS, October 7, 2019; *see also State ex rel. Workman v. Carmichael*, 819 S.E.2d 251 (W. Va. 2018) (divided special panel holding that West Virginia Supreme Court has exclusive authority to apply/enforce Code of Judicial Conduct).  In contrast to the West Virginia Constitution and the special panel's interpretation of it, Colorado Constitution Article VI, § 23(3)(i) and Article XIII, § 2 unambiguously provide the Colorado Legislature with impeachment authority as to the State's judges and justices, including the Colorado Legislature's authority to consider the Code in such proceedings.  Colo. Const. Art. VI, § 23(3)(i) provides: "Nothing contained in this subsection (3) shall be construed to have any effect on article XIII [(authority for impeachment)] of this constitution."

[5] In a recent poll, registered voters (primarily self-described moderates and liberals) identified democracy and good government as the issue most important to them in the 2024 General Election.  "[T]hat simple selection covers a wide array of concerns, from money in politics to threats to personal liberties to politicians more worried about their careers than their

4

The State Commission on Judicial Performance has adopted standards that specifically require consideration of a judge or justice's compliance with parts of the Code in the determination of whether the judge or justice meets the statutory performance criteria of having integrity. § 13-5.5-107(1)(a), C.R.S.  As so defined, the performance commissions are required to verify whether a judge or justice has complied with disqualification obligations, has avoided impropriety or even the appearance of impropriety (i.e. has generally complied with the Code), has refrained from improper *ex parte* communications, and has refrained from improperly commenting on pending or impending cases.  Colo. RGCJP 12(h), *Form 1*, pp. 1(a)-4-5; Colo. RGCJP 13(h), *Form 2* (III)(a)(2)(c), p. 3.  Accordingly, many of the issues raised in this RFE are equally applicable to the performance commissions' decisions regarding performance recommendations in the 2024 election cycle and as part of their discretionary interim reviews. The performance commissions' discretion to conduct interim reviews is perhaps those commissions' greatest tool to ensure timely enforcement of the relevant portions of the Code which overlap with this Commission's overarching disciplinary enforcement authority. § 13-5.5-109(3), C.R.S.; Colo. RGCJP 17.

Disappointingly and despite being specifically requested to do so, the performance commissions, however, have refused to consider judges' failures to file required financial disclosures as part of the 2024 judicial evaluation cycle.  *See* Appendix 25 (July 2, 2024 anonymous letter to Executive Director Kent Wagner requesting evaluation of judges listed in press reporting as failing to have filed required annual personal financial disclosure reports).  Of the judges eligible for retention, the performance commissions have found that only Garfield County Court Judge Angela Roff "does not meet performance standards."  None of the performance commissions' evaluation reports relating to the judges listed as having problems by *The Denver Gazette* contain discussion of those judges' compliance with Canon Rules 1.1, 1.2, 2.5, and 3.15 as well as § 24-6-202, C.R.S.[6]  Ironically, Judge Roff is not one of the judges publicly reported/listed to have failed to file her required annual personal financial disclosures.

The evaluation reports for Chief Justice Boatright, Chief Justice Márquez, and Justice Berkenkotter, likewise, do not address the factual basis established in *Coats* or the Justices' respective individual roles in the Masias Controversy.  It is particularly appalling that the State Commission on Judicial Performance credits Chief Justice Boatright with implementing the Court's "Workplace Culture Initiative" (which should itself be recognized as a violation of the Code) as part of that commission's reasons for finding that Boatright "meets performance standards."  As with this current Commission, the performance commissions appear to have

---

constituents."  Megan Verlee and Tina Griego, *Coloradoans Want Candidates to Focus on Good Government and Democracy—But That Can Mean Many Things: Issue Emerged as Top Concern in the Colorado Voter Voices Survey*, Denver Post, June 9, 2024.

[6] Migoya, *infra* note 165 (listing judges with disclosure issues).  The 2024 Judicial Performance Evaluations can be found at:  https://judicialperformance.colorado.gov/2024-judicial-performance-evaluations-full-list.

5

abdicated their mandated duties to evaluate subject judges for "integrity" and compliance with the Code.[7]

The performance commissions should reconsider their 2024 Evaluations in light of this RFE. Moreover, the performance commissions should explain the reasons for their current failures to examine the "integrity" of evaluated judges and justices (as otherwise required by § 13-5.5-107(1)(a), C.R.S.) to the Colorado Legislature. The Legislature, in turn, may wish to consider legislation that will require and further define public access to judicial nominating and judicial performance commission proceedings (at least through a recorded virtual forum).[8] Finally, as discussed *infra* at note 128 and p. 153, respectively, State Performance Commissioners Mark Fogg and Alan Loeb have conflicts of interest that should require their disqualification from evaluating the Justices based upon the circumstances raised in this RFE. *See also* Colo. RGCJP 7 (defining standards for performance commissioner disqualification).

Colorado Constitution Article VI, § 23(3)(g) contemplates that those persons involved in judicial disciplinary matters (complainants, witnesses, Commissioners, Special Masters, attorneys, investigators, etc.) should have an absolute privilege to present statements, documents, and testimony. *See also Barr v. Matteo*, 360 U.S. 564 (1959) (describing absolute privilege doctrine); *accord* § 18-8-115, C.R.S. (recognizing duty to report "reasonable grounds" for suspecting a crime; providing immunity for such reporting). The overriding public interests in disclosure and awareness of judicial misconduct (as opposed to any possible public interests in protecting the reputations of individual judges) are also well-established:

> As Mr. Justice Black observed in *Bridges v. California*[:]
>
> "The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion . . . [A]n enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect."
>
> Mr. Justice Frankfurter, in his dissent in *Bridges*, agreed that speech cannot be punished when the purpose is simply "to protect

---

[7] Dennis Maes, *Perspective: Colorado Courts—Still in the Dark*, DENVER GAZETTE, September 1, 2024.

[8] It should be recognized that Colorado Constitution Article VI, § 20, which authorizes judicial nominating commissions, does not contain any requirements for secrecy or confidentiality in the judicial nominating process. Likewise, the judicial performance commissions are a creature of statue. Title 13, Art. 5.5, C.R.S.; § 13-5.5-113, C.R.S. (limiting confidentiality to specific records and matters discussed in executive session). Accordingly, there are no constitutional barriers to the Legislature requiring transparency in both the judicial nominating and judicial performance evaluation processes. In addition to the Legislature, the Colorado Supreme Court has the administrative authority to increase transparency in the judicial nomination and retention processes if it were willing to do so.

6

> the court as a mystical entity or the judges as individuals or as anointed priests set apart from the community and spared the criticism to which in a democracy other public servants are exposed."
>
> *Landmark Communications, Inc. v. Virginia*, 455 U.S. 843 (1978) (internal citations omitted).

The circumstances detailed in *Coats*, in published investigation reports, and in media coverage reflect a significant history of systematic retaliation against whistleblowers and even regulators, most recently this Commission's ousted Executive Director.[9]

The Executive Director's ouster is particularly ironic when analogized with the history of Watergate and the turning point "Saturday Night Massacre" that resulted in the firing of special prosecutor Archibald Cox. Indeed, as pointed out by one commentator, Archibald Cox was Justice Melissa Hart's grandfather.[10] Following Watergate and the Iran-Contra Affair, the late Oregon Supreme Court Justice Hans Linde observed that a meaningful oversight entity must have independence and autonomy (particularly from the agency it is charged with overseeing). As Justice Linde described such an effective watchdog:

> (1) It must be a permanent institution, with authority beyond that of its changing members, (2) it must be nonpartisan and independent of [the Legislative and Executive Branches], and seen to be so; (3) it must explain its conclusions publicly, not advise in secret; (4) it must have some fact-finding procedures if facts are decisive; (5) it must maintain a long view, beyond the exigencies of the immediate case; and (6) it must have enough other work so that a constitutional case is the exception rather than its *raison d'être*.[11]

The corruption of this Commission, which allowed for the retaliatory ouster of its Executive Director and the suppression of otherwise sufficient grounds for the public discipline of all current Justices of the Colorado Supreme Court, should be scrutinized for what it is—a premeditated attack on the legitimacy and independence of this Commission to perform its mandate as Colorado's constitutionally empowered judicial oversight authority.

---

[9] David Migoya, *Colorado Judicial Discipline Director Put on Leave; Ouster Met with Widespread Shock*, DENVER GAZETTE, January 20, 2024; *see also* Dennis Maes, *Perspective: Clouds Over Colorado's Highest Court*, DENVER GAZETTE, March 3, 2024 (explaining that, as with Watergate, the Justices' cover up of the Colorado Judicial scandal is "more egregious than the scandal itself").

[10] Eric Sondermann, *It's Time for Us to Start Judging Our Judges*, DENVER GAZETTE, February 17, 2021.

[11] Hans A. Linde, *A Republic… If You Can Keep It*, 16 HASTINGS CONST. L.Q. 295, 307-8 (1989).

7

Because of this history of retaliation and to preserve collateral federal remedies, the author submits this request for evaluation (RFE) of judicial conduct anonymously.  *See* § 13-5.3-111(2), C.R.S. (requiring Commission to permit confidential or anonymous requests for evaluation of judicial conduct); *see also* Colo. RJD 12 ("A request may be in any format.").

Colorado's present failure to address apparent and serious judicial misconduct amongst the Justices of its highest court is not unique.  Rather, the lack of any meaningful accountability is reflective of both the indisputably "toxic" culture found within Colorado's Judiciary and historic national deficiencies in judicial disciplinary structures and procedures.[12]  These structural and procedural obstacles help explain why it has been so difficult for this Commission and the Colorado Legislature to address the judicial misconduct described in this request for evaluation.

To prevent further appearances of impropriety, the circumstances and conflicts of interest involved here require complete disqualification of this Commission from all matters involving

---

[12] In 2020, Reuters investigated deficiencies in judicial discipline systems nationally.  The Reuters investigation reported on how the historic absence of meaningful disciplinary responses, judicial disciplinary systems that depend upon "judges judging judges," and the degree of secrecy (in contrast to other ordinary court proceedings) found in many judicial disciplinary systems has and continues to cause significant public harms.  *The Teflon Robe: Holding Judges Accountable—A Reuters Investigation*, REUTERS (2020) *available at:* https://www.reuters.com/investigates/section/usa-judges/.

Beyond the Reuters investigation, this Commission's former Vice-Chair, 4th Judicial District Court Judge David Prince provides a detailed history of the causes for structural weaknesses in judicial disciplinary systems nationally.  David Prince, *Judicial Discipline, Examining Ethics Oversight for the Highest Levels of our Least Accountable Branch*, 59 COURT REVIEW 88, 89-92 (2023).  As more specifically observed by Judge Prince:

> [Judicial Discipline] Commissions are a powerful symbol of independent accountability for judiciaries but, too often, commissions of the original design are paper tigers serving a more symbolic than substantive role, camouflaging what is no more than collegial self-policing or self-protection.  *Id.* at 92.

Judge Prince further highlights the practical impacts of a "toxic" Colorado Judicial Branch where silence is enforced through systematic intimidation and retaliation.

> The person contemplating the price of speaking the truth about judicial power in Colorado will observe the level of pressure and the 'politics of personal destruction' even the most privileged people apparently had to endure.  They will also note that nearly everyone who dared to speak about judicial power, no matter their own standing in our society needed to have the resources to hire an attorney to protect themselves.  *Id.* at 115.

8

the Colorado Supreme Court and the formation of an entirely re-constituted conflict-free special Commission with appointed outside Special Counsel to evaluate, investigate, and prosecute the issues raised in this request for evaluation.  *See* Colo. RJD 3.5(a), (d), and (g).  The circumstances detailed in this request for evaluation unquestionably provide a reasonable basis for judicial disciplinary proceedings as to all the current Justices of the Colorado Supreme Court and require this Commission to process this request as a complaint under Colo. RJD 13(b) and 14(a).[13]

THRESHOLD ISSUES FOR THE COMMISSION'S<br>EVALUATION OF JUDICIAL CONDUCT

1. **Misconduct Involving the Masias Contract.**  Canon Rule 1.1 of the Code requires judges to comply with the law.  Canon Rule 1.2 further requires that judges avoid impropriety and even the appearance of impropriety.  Canon Rule 2.5 requires that judges perform their judicial and administrative duties "competently and diligently." Canon Rule 2.13 prohibits judges from exercising favoritism or approving disproportionate compensation, hiring, or contracting decisions.  The Colorado Judicial Department and former Chief Justice Coats have publicly acknowledged that the entire Colorado Supreme Court approved and, subsequently, cancelled a $2.66-2.75 million sole-source contract (the Masias Contract) with its former State Court Administrator's Office (SCAO) Chief of Staff Mindy Masias (who was being fired due to suspected financial misconduct).  The sole-source Masias Contract was preconditioned upon a non-disclosure agreement and general waiver.  Despite personal knowledge of the materiality of Masias's financial misconduct to a continuous, ongoing audit related to the State of Colorado's access to federal funding and bond issuance, none of the Justices disclosed their consideration or approval of the Masias Contract to SCAO's Financial Services Division (FSD) or to the Colorado Office of the State Auditor (OSA).  Indeed, there is evidence that the FSD Director and the SCAO Controller were retaliated against in order to allow the Masias Contract to move forward without reporting to the OSA.  Does the involved Justices' failure to contemporaneously disclose their consideration and their ultimate approval of the Masias Contract provide a reasonable basis for judicial disciplinary proceedings according to Colo. RJD 13(b)?

2. **The Justices' Persistent Refusal to Disqualify Themselves.**  Canon Rule 2.2 requires judges to uphold and apply the law while being fair and impartial in the performance of all duties of their judicial office  Canon Rule 2.11 of the Code requires disqualification

---

[13] With recognition of this RFE as a complaint, this Commission will be obligated to complete full investigations as to each of the Justices.  Colo. RJD 14(a)-(b).  Full investigations, in turn, will require this Commission to obtain the *unredacted* public records that the author has requested but which the Justices have constructively denied access to through absurdly excessive estimated costs for production or outright misrepresentations about the existence/discoverability of specific documents.  Appendix 30, pp. 1-3, 10-31, 40, 43-48, 71-72 (including, at p. 3, Chief Justice Márquez's preemptive position that the Colorado Supreme Court does not possess discipline-related correspondence between this Commission and then-Chief Justice Boatright); *see also infra* note 87 (describing circumstances of constructive denial of records access).

when a judge or justice has personal knowledge of disputed facts in a proceeding, is likely to be a material witness, has economic interests in the outcome of the proceeding, or has made public statements that commit or appear to commit the judge or justice to reach a particular result. Canon Rule 1.3 further prohibits abuse of the prestige of judicial office (including the misuse of public funding) to advance a judge's personal interests. Canon Rule 2.6 requires judges to provide persons with legally protected interests full and fair opportunities to be heard, including access to judicial remedies. Canon Rule 2.13 prohibits favoritism in a judge or justice's exercise of appointment powers and prohibits unnecessary appointments. As part of prohibitions against *ex parte* communications, judges are not allowed to conduct or direct their own fact investigations of pending or impending matters. Canon Rule 2.9(C). Canon Rule 2.10 contains similar prohibitions against judges and justices making statements reasonably expected to impair a fair hearing. Canon Rule 4.1 also prohibits judges from making false or misleading statements, commenting on pending and impeding cases, and pre-announcing the outcomes of such cases. Despite this Commission expressly and personally requesting their disqualification, all the current Colorado Supreme Court Justices remained involved in matters related to their own and/or to Chief Justice Coats's now established judicial misconduct.[14] The entire Colorado Supreme Court has repeatedly commented on

---

[14] The *Coats* decision establishes that allowing consideration and approval of the Masias Contract violated Chief Justice Coats's duties to "perform judicial and administrative duties competently and diligently," as required by Canon Rule 2.5(A). *Coats*, ¶ 5. The nature of this violation should have been apparent to all those involved when the Masias Contract was considered and approved. Through reported correspondence, Chief Justice Boatright acknowledged that six of the seven Justices received letters from this Commission advising them of grounds for their disqualification. Chief Justice Boatright's correspondence further confirms the Justices' awareness of the nature of the involved conflicts. David Migoya, *Discipline Commission told Supreme Court Justices They Had Conflict of Interest in Investigation and Should Recuse; They Haven't*, DENVER GAZETTE, October 8, 2022. When asked to produce them, the Colorado Supreme Court withheld this Commission's letters advising the Justices of grounds for their disqualification from public disclosure through general claims of confidentiality under Colorado Constitution Article VI, § 23(3)(g). Migoya (10/8/22), *supra* at note 14; *accord* Appendix 30, pp. 10, 40, 71-72; *but see* Colo. RJD 6.5(d)(9) (allowing subject judges and justices to expressly waive confidentiality of judicial disciplinary records).

Moreover, instead of disqualifying themselves from further involvement in controlling access to records, from consideration of all pending judicial discipline matters, from legislative engagement on issues of judicial discipline, from appointing new judge members to this Commission, and from exercising their rulemaking function, the Justices (with Justice Monica Márquez recusing herself) proceeded to adopt a rule that effectively allowed the Justices to choose their own pool of replacements when composing Special Tribunals. David Migoya, *Colorado Supreme Court Adopts New Rule on Disciplining Justices*, January 20, 2023, DENVER GAZETTE; *compare* Colo. RJD 41 (Special Tribunal selected from members of the Colorado Court of Appeals) *with* HCR 23-1001 (Special Tribunal to be selected from randomly selected conflict-free Court of Appeals and District Court Judges with prohibitions against more than one

10

the merits of potential judicial discipline arising from the Masias Contract, including pre-judging the sufficiency of grounds for criminal, civil, and disciplinary investigations and prosecutions. Additionally, despite this Commission raising concerns about the propriety and sufficiency of the Court's authority to do so, the current Justices proceeded to use substantial public funds to contract for and direct investigations related to the Justices' own involvement in the Masias Contract. By limiting access to information, controlling the scope of these investigations, and having oversight as to the substance of the final reports issued, the current Justices applied undue influence and denied fair opportunities to be heard. Do the individual Justices' refusals to disqualify themselves, their legislative efforts, their investigations, and their collective commentary provide a reasonable basis for disciplinary proceedings according to Colo. RJD 13(b)?

3. **Retaliation, Obstruction, and Non-Reporting of Judicial, Attorney, and Employee Misconduct.** Canon Rule 2.3 prohibits retaliation against persons reporting misconduct. Canon Rule 2.15 mandates the reporting of known judicial or attorney misconduct raising substantial questions about a judge's honesty, trustworthiness, or fitness as a judge or attorney. Additionally, Canon Rule 2.15 requires "appropriate action" when a judge receives information indicating a substantial likelihood that a judge or attorney has violated their respective ethical codes. Canon Rule 2.16 requires cooperation with disciplinary authorities and prohibits direct or indirect retaliation against those assisting

---

judge serving from a single court or Judicial District); *see also Hearing before the Interim Comm. on Judicial Discipline*, Colo. Leg., August 10, 2022 (testimony of Prof. Charles Geyh, "The scandal . . . could have been avoided if Colorado's disciplinary process were structured to disqualify members of the Supreme Court from any involvement in that process when a fellow member was under investigation."); Appendix 27(s)(iii)(2), p. 3:35-38. Put more plainly, despite acknowledging the existence of grounds for their disqualification, the Justices persisted in exercising powers to act as their own legislature, to choose their own prosecutor, and to select the judges who would consider foreseeable allegations of the Justices' own misconduct. David Migoya, *Colorado Supreme Court to Hear New Discipline Rule Regarding Justices*, DENVER GAZETTE, January 8, 2023 (quoting written comments from this Commission that make the same observations regarding conflicts in context of the Court's consideration of proposed RJD 41). Former Senator and Judiciary Committee Chair Pete Lee made similar observations: "If the judges control the budget, the rules, the appeals, and the outcome, the system is at best suspect, and at worst, fundamentally flawed." *Infra*, note 238. Notwithstanding the unanimous passage of the relevant provisions of HCR 23-1001 by the Legislature, the Court has refused to amend Colo. RJD 41 to conform the pool, composition, and qualifications of Special Tribunal judges drawn from **both** the Court of Appeals and the District Courts as contemplated under HCR 23-1001. The Justices have refused to adopt a conforming amendment even with Chief Justice Boatright having publicly expressed support for including District Court judges in the Special Tribunals. *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the S. Judiciary Comm.*, Colo. Leg., April 19, 2023; Appendix 27(y)(i), p. 4:12-15 ("There was an amendment to include District Court judges, which we completely support."). The Justices' opposition to this Commission's requests for a conforming Rule is only one example of the Justices' non-cooperation with this Commission, as otherwise required by Canon Rule 2.16(A).

11

in the investigation of a judge or an attorney.  Canon Rule 2.12 further makes judges responsible for ensuring that persons subject to their direction and control act in a manner consistent with the judges' duties under the Code.  Evidence exists that the Colorado Supreme Court, through its administration of SCAO, its representation by the Attorney General's Office, and oversight of its own Office of Attorney Regulation Counsel (OARC),[15] has suppressed matters of public record and has continually prevented this Commission from accessing records and funding resources.  Through what appears to be an endorsement of attorney misconduct, the Justices have not taken any administrative action in response to evidence that employees of SCAO and OARC interfered with the legislative process and the 1st and 14th Amendment and Colo. Const. Art. II, §§ 6, 10, 16, and 25 and Art. V, § 16 rights of those involved in that process.  Moreover, through their control of the OSA's fraud hotline investigation, the current Justices caused the statute of limitations to lapse for the state-level prosecution of probable crimes related to the Masias Contract.  Up to the present, the current Justices have also knowingly and repeatedly allowed retaliation to occur and to remain suppressed within the Colorado Judicial Department.  Does the individual Justices' apparent complicity in obstructing investigations of judicial, attorney, and employee misconduct provide a reasonable basis for judicial disciplinary proceedings according to Colo. RJD 13(b)?

BACKGROUND

**Summary**

The contextual history of the events and actions involved in the overall Masias Controversy are complex; the core grounds for suspecting that the Justices have engaged in significant judicial misconduct and that there is a reasonable basis for judicial discipline proceedings are not.  In summary, these core grounds are as follows:

- The involved Justices (as confirmed through the Court's repeated and uncontested official statements) have admitted to personally approving the $2.66-2.75 million sole-source Masias Contract without notifying the SCAO FSD or the OSA.  The Masias Contract was itself pre-conditioned upon Masias having signed a non-disclosure agreement and general release in exchange for her receiving/retaining paid leave.  The involved Justices allowed the Masias Contract to move forward even though they were

---

[15] According to C.R.C.P. 242.5, Attorney Regulation Counsel "serves at the pleasure of the supreme court," "hir[es] and supervis[es] a staff to carry out the duties of the Regulation Counsel," and (in addition to other enumerated duties) "perform[s] such other duties as the supreme court may direct."  Similarly, the Colorado Supreme Court controls the Legal Regulation Committee, whose entire membership is appointed by and serves at the pleasure of the Court.  C.R.C.P. 242.4.  The Legal Regulation Committee's duties include reporting on its operations to the Advisory Committee on the Practice of Law (the Advisory Committee), which is also controlled by the Colorado Supreme Court with a membership entirely appointed by the Court and who serve at the pleasure of the Court.  C.R.C.P. 242.3.  The Advisory Committee's authority includes oversight of OARC and "assisting in any matters the supreme court directs." C.R.C.P. 242.3(c)(2), (8).

12

individually aware that Masias was being fired because of the impacts of her suspected financial misconduct upon the OSA's ongoing internal controls audit and the integrity of Colorado's Annual Comprehensive Financial Report (ACFR).  Of equal importance, the Justices allowed the Masias Contract to move forward notwithstanding their having personally received copies of an April 15, 2019 anonymous fraud report, which raised significant (and later verified) concerns about Masias's financial misconduct and issues involved in the negotiation of the Masias Contract.  The history of the Masias Contract also suggests that one or more of the Justices were contemporaneously aware of efforts to retaliate against whistleblowers, including SCAO Financial Services Director David Kribs and Controller Myra Dukes (who had insisted upon Masias's termination and reporting to the OSA).

- The Masias Contract was negotiated in conjunction with a list of talking points (the Masias Memo) that alleged various instances where allegations or evidence of judicial or employee misconduct were suppressed by the Court or SCAO.  The Justices were aware of the existence of the Masias Memo and, like the Masias Contract, knowingly withheld material information from the OSA during its 2020 performance audit and its fraud hotline investigation.  The allegations of judicial misconduct presented in the Masias Memo were also knowingly withheld from this Commission for over two years.

- The current Justices have persistently refused to recuse themselves from involvement in and control of legislative efforts, investigations, and legal proceedings related to the Masias Contract and the involved Justices' own probable misconduct.  This refusal to disqualify has continued notwithstanding the Justices having personally and individually received notice of the grounds for their disqualification from this Commission.  Instead of recusing themselves, the current Justices openly engaged in extraordinary efforts to prevent the same independent, full, and transparent investigations that the Justices repeatedly expressed public commitments to allow.  Most significantly, the Justices have misused substantial public funds (approximately $350,000) to contract-for the Court's own "independent" investigations, in violation of Canon Rule 2.9.  The Justices proceeded to contract-for the "independent" investigations even after this Commission raised concerns about the authority for such investigations directly to Chief Justice Boatright.  The Justices' decision to use public funds to pay for ethically prohibited investigations of their own conduct and their related public statements occurred in consultation and coordination with others (including individuals with connections to the multi-billion-dollar law firm WilmerHale).[16]  The individuals who conspired with or otherwise assisted the Justices in their misconduct included Counsel to the Chief Justice Andrew Rottman, State Court Administrator Steven Vasconcellos, SCAO Legal Counsel Terri Morrison, former WilmerHale Partner-in-Charge / current Chief Deputy Attorney

---

[16] In addition to the circumstances here, WilmerHale has received recent public criticism in connection with apparent conflicts of interest in its multi-million-dollar representation of Harvard University while a WilmerHale partner concurrently served on Harvard's financial governing board.  Justin Wise, *WilmerHale Work for Harvard Scrutinized in Ethics Complaint*, BLOOMBERG LAW, March 12, 2024.

13

General Natalie Hanlon Leh, 1st Assistant Attorney General LeeAnn Morrill, then-Assistant Solicitor General / now-Court of Appeals Judge Grant Sullivan, other unspecified members of leadership in the Attorney General's Office (including by implication Attorney General Phil Weiser and Deputy Attorney General Kurtis Morrison), former U.S. Attorney for the District of Colorado / former WilmerHale Partner / presumptive Denver District Attorney John F. Walsh, former Colorado Attorney General / former U.S. Senator / former U.S. Secretary of the Interior / former WilmerHale Partner / current U.S. Ambassador to Mexico Ken Salazar, the Governor's then-Chief Legal Counsel Jacki Cooper Melmed, and this Commission's current Chair / WilmerHale Partner-in-Charge Mindy Sooter.  The Justices have further used unquantified public resources and the prestige of their positions to otherwise present exculpatory narratives regarding their and their accomplices' involvement in the Masias Controversy.  A substantial part of the Justices' legislative lobbying efforts and public commentary occurred through their influence upon other judges as well as third-party non-profit entities/interest groups.  In particular, the Justices' ongoing use of substantial public funds and resources (including co-opting Court of Appeals Judges and the State Commission on Judicial Performance) to promote the Court's "Workplace Culture Initiative" is further inappropriate public commentary on the merits of the Masias Controversy and the purported sufficiency of the Justices' response to strawman recommendations for organizational reform presented through the Justices' self-serving "independent" investigations.  Moreover, the Justices have continued to hear judicial discipline cases, even though the resolution of such cases impacts the Justices' own potential culpability and financial liabilities in pending or impending judicial disciplinary proceedings.

- The current Justices' misconduct with respect to commissioning their ethically prohibited "independent" investigations was exacerbated by their awareness that attorney Mindy Sooter (whose law firm WilmerHale had originally and ironically engaged in *sole-source* negotiations to conduct the Court's unethical investigations and which, at the time, was bidding on the later-issued public RFP for those "independent" investigations) applied for and was appointed to this Commission on July 1, 2021.  When she applied for this Commission, Sooter listed her law partner (former Colorado Attorney General and now U.S. Ambassador) Ken Salazar, Attorney General Phil Weiser, and the Governor's Chief Legal Counsel Jacki Cooper Melmed as her references.[17]  Sooter was appointed to replace then-Chair Christopher Gregory after Chair Gregory (who was eligible for a second term) repeatedly raised concerns about the Justices' authority to contract-for / control their "independent" investigations directly to Chief Justice Boatright.  Sooter's appointment presents the appearance of coordinated retaliation against the integrity and independence of this Commission from the outset of this Commission's inquiry into *Coats* and the broader Masias Controversy.  Sooter's appointment and non-disqualification further proves the Justices' intentional and pre-meditated use of their ethically prohibited "independent" investigations as a means of fixing or covering up their own involvement in the Masias Controversy.  The non-

---

[17] Appendix 29, p. 199.

14

disclosure of Sooter's conflicts of interest by her, the Justices, and others involved raises substantial ethical concerns and creates unquestionably significant appearances of impropriety.

- The current Justices were aware that agents subject to their control (specifically OARC employees) may have committed criminal offenses and civil violations through the provision of false information to law enforcement and by intimidating persons involved in the legislative and judicial disciplinary processes. The impacts of the OARC employees' actions were readily apparent at the time and directly interfered with participation in the legislative process. This, in turn, should be recognized as a clear infringement of the 1st and 14th Amendment and Colorado Constitution Art. II, §§ 6, 10, 16, and 25 and Art. V, § 16 rights of the persons with whom the OARC employees interfered. By taking no action in response to their agents' misconduct and through evidence of complicity in the misconduct, the current Justices have effectively endorsed actions and violations of individuals' constitutional rights that are recognized as judicial misconduct under the Code.

- The Court interfered with the OSA's fraud hotline investigation by limiting access to / withholding records, by improperly asserting blanket claims of confidentiality / privilege, and by delaying the full and timely release of the OSA's Fraud Hotline Investigation Report with referrals to law enforcement. This interference resulted in the expiration of the applicable Colorado statute of limitations. Because of the Court's actions (and willful inaction by the Attorney General), state-level prosecutions were effectively prevented from occurring and the persons involved in potentially criminal or ethical misconduct in connection with the Masias Contract have thus far avoided any meaningful accountability. By not referring the OSA fraud hotline investigation and other evidence to federal law enforcement, the current Justices now appear to be suppressing public scrutiny pending expiration of the federal statute of limitations, as it relates to at least some of the federal crimes implicated by Masias and Brown's suspected financial misconduct as well as the Court's approval of Masias's separation agreement and the Masias Contract.[18]

- The current Justices continue to knowingly enable and/or conceal a pattern of intimidation, retaliation, misuse of public funds, and non-reporting of substantial misconduct within the Judicial Department. Migoya, *supra*, note 3. By intentionally, arbitrarily, and summarily disregarding evidence in their possession and in the public record to dismiss an RFE/complaint against the Justices that raises violations of Canon Rules 2.9, 2.10, 2.11, and 2.15 (as also asserted in the present RFE), the members of this current Commission and its Special Counsel are complicit in the Justices' continuing misconduct. This Commission's new Executive Director is, likewise, complicit in

---

[18] Former 10th Judicial District Chief Judge Dennis Maes has described the Colorado Supreme Court's continuing efforts to prevent and/or delay meaningful public scrutiny as a "slow burn." Dennis Maes, *Opinion: Slow Burn for Colorado Supreme Court Scandal*, COLORADO POLITICS, July 28, 2023.

15

covering up the Justices' misconduct by continuing to fail to take corrective action in response to the allegations that Chief Justice Boatright and other justices/judges knowingly failed to report probable judicial misconduct in the pending disciplinary matter involving former Denver Presiding Juvenile Court Judge D. Brett Woods and his alleged retaliation against court staff.

- When the whole Court should have disqualified itself,[19] the current Justices knowingly enabled this current Commission and now publicly censured former District Court Judge John Scipione to conspire in permitting Judge Scipione to retain an over $120,000 windfall[20] from public funds that he unjustly received through his judicial misconduct.

---

[19] Although Chief Justice Boatright and Justice Samour are described as not participating in the decision, they are equally responsible for the failure of the entire court to disqualify itself given that all the Justices knew that they faced their own separate pending or impending judicial discipline proceedings. *See* Colo. RJD 41 (disqualification of Court expected *sua sponte*; Court of Appeals judges facing pending judicial disciplinary proceedings may not serve on Special Tribunal); Canon Rule 2.11(A)(2)(c) (judge must disqualify when judge has more than *de minimis* interest that could be substantially affected by the proceeding); *see also In re Frese*, 789 A.2d 654 (N.J. 2002) (judge publicly reprimanded for hearing DUI cases while himself facing DUI charges in a separate case); *infra*, p. 115 (Boatright describing fears of judicial discipline reporting being career ending). With respect to substantial misconduct by the members of this Commission, there should be further inquiry as to why this Commission did not file Colo. RJD 41 notices requiring the Justices' disqualification and formation of Special Tribunals in all pending judicial discipline proceedings as defined by Colo. RJD 2(w), or at least in those cases (including *Kiesnowski* and *Scipione*) which had reached formal proceedings under Colo. RJD 18.

[20] $120,000 is roughly estimated based upon six-months of Judge Scipione's 2022 $183,816 salary with benefits. Appendix 22, pp. 217-18, 345-46 (Colorado Supreme Court's Temporary Suspension Order effective August 3, 2022 and Scipione District Court vacancy announcement). The Judicial Department has constructively denied a public records request seeking an accounting of the salary and benefits paid to Judge Scipione following his temporary suspension and, then, his bad faith invocation of disability status. Appendix 30, pp. 21, 40, 71-72; *see infra* note 87 (describing nature of constructive denial of records access). Moreover, the Court and this Commission have intentionally suppressed the briefings that supported this Commission's request for restitution on behalf of the State of Colorado and the $69,530 of attorney's fees and costs sought in the disability portion of the case. Appendix 22, p. 315. In addition to disgorgement of the salary and benefits originally requested by this Commission, the Court's disciplinary opinion notes that Judge Scipione indirectly received another $130,000 benefit through the Judicial Department's settlement of civil sexual harassment claims without the Judicial Department seeking reimbursement. *Matter of Scipione*, 2024 CO 23, ¶ 44; Appendix 22, pp. 287, 308. Judge Scipione's overall unjust enrichment and impact on public funds is consequently more than $250,000. As the administrative heads of the Judicial Department and with the authority to interpret the Colorado Rules of Judicial Discipline (which the Court itself promulgates), the Justices control both the availability of equitable relief in judicial disciplinary proceedings and the Judicial Department's ability to seek civil remedies by initiating separate legal proceedings.

16

The Justices further excused Judge Scipione from having to pay $69,530 in attorney's fees and costs for his bad faith litigation tactics in the relevant disability portion of his case (i.e. an over $189,530 combined total windfall).[21]  With their *per curiam* opinion issued May 6, 2024, the Justices have again abused their positions and misused substantial public funds to conceal or otherwise minimize accountability for serious judicial misconduct.  This, in turn, has adversely burdened the Colorado State Treasury and, indirectly, the U.S. Treasury.

**Probable Violations of Code Provisions Relating to Responsible Financial Decision-Making / Withholding of Material Information**

**Administrative Structure of the Colorado Supreme Court and the Colorado Judicial Branch**

From 2018 through January 1, 2021, the Colorado Supreme Court was composed of Chief Justice Nathan Coats, Justice Brian Boatright, Justice Richard Gabriel, Justice Monica Márquez, Justice Melissa Hart, Justice William Hood III, and Justice Carlos Samour.  On January 1, 2021, Chief Justice Coats retired and was replaced by former 20th Judicial District Court Chief Judge Maria Berkenkotter.  Justice Boatright was chosen by the Court to become the succeeding Chief Justice.  Most recently, on July 26, 2024, Justice Márquez has rotated to replace Justice Boatright as Chief Justice.

As described on the Colorado Supreme Court's website, the Chief Justice acts as the equivalent of the Judicial Department's Chief Executive Officer,[22] the State Court Administrator acts as the

---

[21] *Scipione*, ¶¶ 24-24 (calculated difference between $51,189.50 of attorney's fees ordered in disciplinary portion of case and $120,719.50 of total fees and costs originally requested by this Commission).

[22] As part of his January 11, 2019 State of the Judiciary Speech, Chief Justice Coats emphasized how the Chief Justice of the Colorado Supreme Court serves at the pleasure of the other justices in his or her role as "the executive head of the judicial system."  Chief Justice Coats stated, in relevant part:

> Unlike the United States Supreme Court, where the Chief Justice is nominated by the President and confirmed by the Senate into the specific slot of Chief, the Chief Justice of the Colorado Supreme Court is selected by and serves at the pleasure of the court itself.

> In addition, however, Article VI, section 5 of the state constitution also specifies that the Chief Justice selected by a majority of the court "shall be the executive head of the judicial system" of the state. It is in that latter capacity, as the chief executive officer of the judicial branch of government, that I address you today.

17

equivalent of the President or Chief Operating Officer, and the Colorado Supreme Court functions as a Board of Directors with the ability to decide upon "administrative matters, including rule changes and any other matter concerning governance of the Court or the Judicial Branch" as part of the Court's weekly conferences.[23]  Under Article VI, § 5(3) of the Colorado Constitution, the Justices are directly responsible for the appointment of the State Court Administrator and "such other personnel as the court may deem necessary to aid the administration of the courts."  The Chief Justice and the Colorado Supreme Court are presently responsible for overseeing an annual budget of over $800 million and over 4,200 Judicial Department employees, including judges.  Colorado's 22 Chief Judges are appointed by and serve at the pleasure of the Chief Justice with supervisory authority over other judges and court staff in their respective Districts, as delegated by the Chief Justice.  Colo. Const. Art. VI, § 5(4).

According to the Judicial Department's Personnel Rules effective July 1, 2018 (and as retained in the current Personnel Rules), the Chief Justice is recognized as having ultimate authority as to all corrective and disciplinary actions taken upon Judicial Department employees.

> As the foremost Administrative Authority for the Judicial Department, the Chief Justice of the Supreme Court may take corrective or disciplinary action over any employee within the Judicial Department, consistent with these rules.  Colo. JSPR, Rule 29.A.1 (Jul. 1, 2018 and Oct. 23, 2023).

The Chief Justice and the other Justices are collectively responsible for the promulgation, adoption, and implementation of the Judicial Department's Personnel Rules according to Colo.

---

> 2019 Colo. House Journal, p. 68:39-46; Appendix 27 (a), p. 1:39-46.

[23] *See* https://web.archive.org/web/20240303192221/https://www.courts.state.co.us/Courts/Supreme_Court/Protocols.cfm; https://www.coloradojudicial.gov/supreme-court/supreme-court-protocols (current version); *see also* Colo. Const. Art. VI, § 5; *see generally* Colo. JSPR, Rule 5 (Oct. 23, 2023) (defining Judicial Department's HR structure and responsibilities of the Supreme Court and Chief Justice as the ultimate administrative authority).  Critically, although the Justices make administrative decisions as part of their weekly conferences, the records of their discussions and decision-making are either not preserved or are not made available to the public.  The judicial deliberative privilege and judicial immunity do not extend to administrative decisions (such as the Justices' decisions to award contracts, spend public funds, use public resources, make appointments, or take disciplinary action against Judicial Department employees).  *Forrester v. White*, 484 U.S. 219, 228 (1988).  The full records of the Justices' consideration of Masias Contract, the Masias separation agreement, and other similar administrative decisions should have been made publicly available yet have not been produced over the course of the Masias Controversy.  Nevertheless, the Justices continue to refuse to publicly disclose this critical evidence.  Appendix 30, pp. 40-48, 71-72 (public records request detailing relevance of conference records; Judicial Department's constructive denial of access to requested records); *see also infra* note 87 (describing circumstances of constructive denial of public records access).

18

Const. Art. VI, § 5(3) and § 13-3-105(2)-(3), C.R.S.  Order Adopting Colo. JSPR (Oct. 23, 2023).[24]  Similarly, the Colorado Supreme Court is collectively responsible for promulgating, adopting, and implementing the Judicial Department's fiscal policies and procedures.  CJD 04-02 (2007) ("The Colorado Supreme Court approves the fiscal policies and procedures, and subsequent amendments, established by the State Court Administrator, pursuant to the requirements of Section 13-3-106 (2), C.R.S.").  Through their "Workplace Culture Initiative," the Justices have further confirmed that they each have assumed more direct and involved administrative roles following the public scrutiny caused by the Masias Controversy.  Appendix 28, p. 2:2-18.  As the ultimate administrative authority, the Justices have a collective duty to be aware of the Personnel Rules, the Fiscal Rules, and high-level personnel actions taken within the Judicial Department.  *See* Canon Rule 2.5(A) ("A judge shall perform judicial and administrative duties, competently and diligently.").

**Masias's Suspected Financial Misconduct Reported**

On July 15, 2018, SCAO Controller Myra Dukes discovered and reported that SCAO Chief of Staff Mindy Masias may have intentionally altered a receipt as part of a request for personal reimbursement and in violation of the Judicial Department's Fiscal Rules, Chapters 1-2.  As Chief of Staff, Masias was the second highest ranking member of SCAO management.  In turn, SCAO Director of Financial Services David Kribs and Senior Finance Manager Marty Galvin reported the circumstances to State Court Administrator Christopher Ryan.  Masias's suspected conduct was immediately recognized by Ryan as material to a continuous, recurring annual single statewide audit of the Judicial Department's internal controls conducted as a component for certification of the State of Colorado's Annual Comprehensive Financial Report (ACFR).[25]

---

[24] Remarkably, during the April 19, 2023 Senate Judiciary Committee hearing on SB 23-1205 (which creates the new Office of the Judicial Ombudsman), Justice Márquez interrupted Senator Bob Gardner to reinforce the Court's broader, though incorrect, narrative that the Chief Justice does not have any supervisory authority over lower court judges and that the Colorado Judicial Department Personnel Rules categorically do not apply to judges.  *Compare* Appendix 27(y)(ii), p. 20:33 ("The Chief Justice has no supervisory authority.") *with* CJDPR Rule 5 (July 1, 2024) (defining the administrative chain of command, including recognition of Chief Judges (who report to the Chief Justice) as primary administrative authority within Judicial Districts); *see also* Canon Rule 1.1 (judges have general duty to comply with law, including its equal enforcement). Separately, then-Chief Justice Boatright similarly testified to the Joint Judiciary Committee that he did not have supervisory authority over lower court judges.  *Hearing before the J. Judiciary Comm.*, Colo. Leg., February 1, 2023 (SMART Act presentation of Colo. Jud. Dep't); Appendix 27(v), 11:24-25 ("[W]e have independent constitutional officers and I can't fire them if they don't.").

[25] As part of the OSA's later 2020 performance audit of SCAO, the materiality of Masias's conduct to the ACFR audit was further verified by the OSA's discovery that Masias had personally signed "nearly half" of the Judicial Department's contracts (totaling millions of dollars) that were reviewed as part of the audit.  *Hearing of the Colo. Legis. Audit Comm.*, December 7, 2020; Appendix 27(c), p. 22:9-10.  The OSA further explained that the Judicial

Like other states and governments, Colorado is required to produce its ACFR as a condition of receiving Federal funding and for its federally granted authority to issue bonds.[26]  Upon learning of Masias's suspected conduct, Ryan met with Chief Justice Coats and Counsel to the Chief Justice Andrew Rottman to brief them on the significance of the conduct and to discuss the Department's response, which included conducting an internal audit of Masias's personal reimbursement requests and contracting with attorney David Powell to complete an external investigation.  *Coats*, ¶ 4(4-6).

Reflective of the understood importance to the ACFR-related audit, on August 22, 2018, Ryan sent the OSA and its contracting outside auditing firm, RubinBrown, LLP, a letter with supporting documents that explained the discovery of Masias's suspected financial misconduct and the actions taken by SCAO in response.[27]  Ryan's letter promised: 1) ***that the OSA would be kept informed as part of SCAO's required disclosures related to the ACFR audit***, 2) that the

---

Department changed its justification for paid leave approvals (at least some of which Masias and Brown had authority to grant) over the course of the 2020 performance audit when documentation that was likely destroyed by Masias and Brown could not be located.  *Id.*, p. 22:26-28.

[26] 31 U.S.C. § 7502 (defining and requiring single audit (encompassing all subsidiary departments and agencies) by non-federal entity receiving federal funds from the General Assistance Administration above threshold amount); *see generally* C.F.R. Title 2, Part 200 (Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards); 2 C.F.R. § 200.113 (recognizing mandatory reporting of fraud by non-federal entities receiving or applying for federal grant awards); 2 C.F.R. § 200.300 (non-federal entities must comply with all federal requirements when receiving federal award); 2 C.F.R. § 200.302 (requirement that non-federal entities maintain adequate financial management and accounting systems); 2 C.F.R. § 200.303 (non-federal entities responsible for maintaining required internal controls, including fraud reporting); 2 C.F.R. § 501(b) (requiring single audit for non-federal entities receiving federal awards in excess of $750,000); 2 C.F.R. § 514 (defining scope of single audit and recognizing application of GAAP standards); *see also* Governmental Accounting Standards Board Statement No. 98 (explaining racially sensitive basis for adoption of new term: Annual Comprehensive Financial Report (ACFR)).

As explained in the OSA's Single Statewide Audit Report for Fiscal Year 2019, the State of Colorado expended approximately ***$12.3 billion of federal funds*** related to the internal controls being verified through the audit.  Colorado Office of the State Auditor, *Statewide Single Audit, Fiscal Year Ended June 30, 2019*, p. I-1, March 3, 2020 *available* at: https://leg.colorado.gov /sites/default/files/documents/audits/1901f_statewide_single_audit_fiscal_year_ended_june_30_ 2019.pdf.  The single statewide audit is referred to interchangeably in this RFE as the "ACFR audit."

[27] Ryan's August 22, 2018 letter to the OSA is publicly available through a link contained in a news article.  David Migoya*, Colorado's Chief Court Administrator Resigns Amid Denver Post Investigation into Contract*, DENVER POST, July 18, 2019; Appendix 6.

20

Department would no longer reimburse Masias for personal and travel expenses, 3) that SCAO had stripped Masias of her authority to approve expenditures, and 4) that SCAO had revoked Masias's authority to sign contracts and grant documents on behalf of the Department. Ryan's letter further emphasized the importance of protecting the integrity of the Department's internal controls framework (both its automated systems and its written policies and procedures).

Later, Powell's investigation report found that the second invoice submitted by Masias had been fabricated but presented inconclusive findings regarding whether Masias had personally altered her submitted invoice.[28] Nevertheless, Chief Justice Coats reached his own conclusion that the

---

[28] *Coats*, ¶ 4(5); Elizabeth R. Rita and Anne R. McCord, COLORADO JUDICIAL BRANCH INVESTIGATION REPORT AND ASSESSMENT OF WORKPLACE CULTURE, July 11, 2022, p. 60 (hereinafter the "ILG Report" or "ILG, LLC Rpt."); Appendix 18. Incidentally, Powell's inconclusive finding later became part of the major premise of the Masias Memo (a document described *infra* at p. 23 and contained in Appendix 2)—that internal controls were not applied equally within the Judicial Department and that Masias had been singled out. The opening lines of the Masias Memo state:

> **Even the investigator [Powell] stated in his report that he couldn't prove Mindy fabricated any document.**
>
> The reason for [Masias's] termination is potentially debunked. Also, Mindy has a significant number of examples where "tone at the top" was not applied equally.
>
> **Instances where Judges were NOT held to the "tone at the top" but who have violated policy significantly: . . .**
>
> Appendix 2, p. 1.

Rather than the allegations of the Masias Memo being the basis for a gender discrimination suit, Masias appears to have threatened a claim of selective retaliation (i.e. that she was being terminated after following the directives of her superiors to suppress compromising information that she otherwise had mandatory obligations to report to this Commission and to other oversight entities). *See* CJD 08-06, Attachment B—Code of Conduct (2017). Chief Justice Boatright's legislative testimony confirmed the Justices' understanding that the primary premise of the Masias Memo was that known allegations of judicial misconduct were intentionally withheld from this Commission. *Hearing on SB 22-201 before S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27-m, p. 9:23-25. In other words, the Masias Memo is itself evidence of the Judicial Department's long-established pattern and culture of using public funds and public resources to unlawfully cover up examples of judicial misconduct (regardless of the merit of the underlying allegations). *See also Hearing of Colo. Leg. Joint Budget Comm.*, Colo. Leg., December 7, 2020; Appendix 27-c, p. 10:3-6 (Chief Justice Coats acknowledging standard practice of including non-disclosure provisions in separation agreements (including those settling claims of retaliation)).

21

invoice had, in fact, been altered by Masias.  Although Chief Justice Coats denies contemporaneous knowledge and asserts that Ryan did not inform him of it, the SCAO internal audit discovered that Masias had uniform irregularities with other past reimbursement requests. In contrast with Coats's denial of knowledge, an email dated October 5, 2018 confirmed that Ryan had indeed forwarded to Coats a description of the significant impacts of Masias's conduct on the Department's financial controls with reference to the internal audit report.  *Coats*, ¶ 4(5-7).

**The Justices collectively decide to terminate Masias's employment because of the impacts of her financial misconduct on the ACFR audit.**

Chief Justice Coats confirms that he kept the other Justices "apprised of [SCAO's] investigation and [the employee discipline] options under consideration."  *Id.* at ¶ 4(8).  After members of SCAO's FSD refused to sign the management representation letter relating to the ACFR audit unless Masias was terminated, Coats and the other Justices discussed the possibility of allowing Masias to work as an independent contractor "in a teaching and coordinating capacity" if no further evidence of misconduct arose.  *Id.* at ¶ 4(9).  Sometime in October 2018, Dukes met in-person with Chief Justice Coats to express her concerns about allowing a high-ranking member of management to continue employment despite evidence of financial misconduct.  Migoya,

---

A close reading of the 2017 Masias-Rice Recording, transcribed and provided as Appendix 4, reveals that the focus of Masias's conversation with Chief Justice Rice was to provide a path and recommendations on how Masias could position herself to become the next State Court Administrator (with the understanding that Christopher Ryan was only serving in the position on an interim basis and was "really doing [the Justices] a favor" by stepping in).  Appendix 4, p. 3:32-33.  Chief Justice Rice's statements were also consistent with Ryan's later legislative testimony that he never wanted to become the State Court Administrator. *Accord Hearing of the Interim Comm. on Jud. Discipline*, Colo. Leg., August 10, 2022 (presentation of Christopher Ryan); Appendix 27(s)(iii)(9), p. 6:21-23.  If read in its totality, the Masias-Rice recording was not evidence of grounds for a potential gender discrimination lawsuit, as asserted by the Justices and the Judicial Department in their ethically problematic public comments.  The Masias-Rice recording, however, is circumstantial evidence that the Judicial Department experienced an internal crisis with a probability of substantial unreported employee misconduct related to former State Court Administrator Jerry Marroney's departure and Ryan's interim appointment. *Compare* Appendix 4, p. 6:8-9 (Chief Justice Rice: "Jerry has done nobody any favors. I hope that he just stays away, frankly. I saw that his car was here, but I don't want to have meetings with him.") *with* Ryan Severance, *Former Pueblo Judge Gerald "Jerry" Marroney Set to Retire*, PUEBLO CHIEFTAIN, February 23, 2017 (quoting Chief Justice Rice: "I would like to thank Jerry for his many years of dedicated service to the courts, probation and Colorado both as a district court judge and as the state court administrator[.] Jerry's contributions to the branch are too numerous to count. I, and the rest of the court, wish him well in his retirement. He will be missed."). The contours of this internal crisis have never been investigated.  As with other administrative records, the Judicial Department has constructively denied access to documentation of State Court Administrator Marroney's departure.  Appendix 30, p. 40, 43-44, 71-72; *see also infra* at note 87 (describing context of constructive denial of records access).

22

*supra* note 27. With Chief Justice Coats's knowledge and approval (and presumedly the other Justices' approval as well), Ryan proceeded to provide Masias with a "Notice of Disciplinary Decision." The disciplinary notice explained how Masias's financial misconduct jeopardized an unqualified ACFR audit opinion and required termination of her employment. Specifically, in the disciplinary notice, Ryan stated:

> As the Chief of Staff for the Office of the State Court Administrator, you are expected to behave in a manner that exemplifies compliance with the rules and policies of the Judicial Department, and demonstrate integrity in your conduct. Your failure to act with integrity, your refusal to acknowledge the impact of your actions, and your continued dishonesty throughout the investigation [which included both the Powell and Griffith inquiries] is seriously concerning. Your dishonest conduct with a routine reimbursement request has created a lack of trust that is impossible to overcome. Further, the timing of your dishonesty coincided with an audit of the State of Colorado's financial records and systems, and your conduct had to be disclosed to the independent auditors. Your dishonesty caused third parties to question the integrity of Judicial's financial records and systems. Because of the ongoing audit, failure to address this situation appropriately could have resulted in this information being specifically referenced in the opinion letter of the State of Colorado Comprehensive Annual Financial Report, resulting in mistrust of the Judicial Department among other agencies. To that end, I have made the decision that termination is appropriate given the nature of your conduct, and the concerns your conduct raises.[29]

Rather than accepting her termination or agreeing to resign, Masias activated paid leave under the Family Medical Leave Act (FMLA). *Coats*, ¶ 4(10).

**Chief Justice Coats and the Judicial Department begin negotiating the Masias Contract.**

In December 2018, Chief Justice Coats personally signed the ACFR audit management representation letter certifying management's compliance with disclosure and other obligations during the audit. *Id*. at ¶ 4(11). Shortly after signing the management representation letter, Coats met with Rottman, Ryan, and SCAO Human Resources Director Eric Brown. During the meeting and a subsequent meeting, Brown essentially presented an ultimatum that Masias would release compromising information about the Department (including unreported judicial misconduct) as part of a threatened lawsuit with claims that Masias was passed over due to her gender when she applied to become the State Court Administrator. The substantive allegations raised at these meetings were memorialized in a memorandum (the Masias Memo). *Id.* at ¶ 4(12); *see also supra* at note 28. Reportedly, Brown had already exchanged a draft contract with Ryan for Masias to provide leadership education services to the Department prior to the

---

[29] Appendix 8, p. 3.

23

meetings.[30]  After the meetings, Chief Justice Coats learned of concerns that Masias remotely erased her laptop.[31]  Nevertheless, Coats and the other Justices remained open to the possibility of an independent contract with Masias.  *Coats*, ¶ 4(16).

At Ryan's insistence, a request for proposals (RFP) process was initiated in January 2019 as to the then-generally contemplated leadership training contract.[32]  Brown had drafted the original RFP, which required qualifications so restrictive that "few companies could qualify."  Ryan then met with SCAO's chief procurement officer, John Kane, and SCAO Legal Counsel Terri Morrison to amend the qualifications so that at least one firm/company would submit a bid. Migoya, *supra* note 32.  As Ryan explained in an interview with *The Denver Post*: "It couldn't be written too tightly so that no one would apply.  We definitely had [the RFP] tailored for what we were looking for, but not so much that no one would reply."  *Id.*  After issuing the RFP, the Judicial Department did not follow its normal business practice of outreach to encourage / generate bids.  Instead, the circumstances reflected apparent bid-rigging with Brown actively working to make the RFP process a sham and to ensure that Masias would ultimately receive a sole-source contract.  In an interview with *The Denver Post*, then-former SCAO FSD Director David Kribs explained that Brown had openly described his objective of laying the foundation for a planned sole-source determination (though Brown lied to Kane about Masias being the intended contractor).

> 'Kane (the procurement officer) told me he had been approached by Brown and was told not to tell anyone, including me, that the idea was they had someone in mind for the leadership training contract and told him it was a retiring judge,' Kribs told The Post. 'It was initially to be so restrictive that no one would apply and this judge could get it.'
>
> There would be no bid from the judge because he was uncomfortable making one, Kribs said he was told. The hope was to disqualify any bidders and ensure the retiring judge would then gain the contract as a sole source provider, Kribs said.  *Id.*

---

[30] David Migoya, *Colorado Judicial Department Gave $2.5 Million Contract to Prevent Tell-All Sex Discrimination Lawsuit about Judges', Court Officials' Misconduct: Former Chief Administrator Says Deal was Approved at the Highest Levels*, DENVER POST, February 3, 2021.

[31] The Chair of the Legislative Audit Committee, Representative Lori Saine, analogized these circumstances described in the OSA's 2020 performance audit as an "Enron-type shredding of evidence."  *Hearing of the Legis. Audit Comm.*, Colo. Leg., December 7, 2020; Appendix 27-c, p. 24:6; *see also* Colo. Office of the State Auditor, JUDICIAL DEPARTMENT STATE COURT ADMINISTRATOR'S OFFICE PERFORMANCE AUDIT REPORT (November 18, 2020) (hereinafter 2020 OSA Rpt.); Appendix 15, p. 73 (referencing destruction of data on Masias and Brown's laptops).

[32] David Migoya, *Colorado Judicial Department Ran Internal Ruse to Keep Lid on $2.5 Million Contract, Sources Say*, DENVER POST, July 18, 2021.

24

When Kribs raised concerns about the apparent bid-rigging to Morrison, she implicitly acknowledged that the malfeasance was planned with others.

> 'I told her what I was hearing and that such a narrow approach wasn't defensible, that it would open us up to appeals or lawsuit by any company that bid,' Kribs said. 'I got a look from her, and she said we're not supposed to talk about this. They already knew what they were up to at that point.' *Id*.

Chief Justice Coats refused to comment about his contemporaneous awareness of the RFP process when confronted with the described facts and statements by reporter David Migoya. *Id*.; *but see Coats*, ¶ 4(15) (confirming Coats's awareness of the RFP). Ultimately, although nearly two dozen companies downloaded the RFP, none submitted a bid. Migoya, *supra* note 32. Masias also did not submit a bid, as she remained ineligible to do so while still an employee of the Judicial Department and receiving paid leave.[33] Moreover, had Masias submitted a bid, the RFP process would have required disclosure of the bid to the SCAO FSD.

It deserves note that the Justices met with procurement officer Kane in July 2019, at which time Kane fully briefed them on the problems with the RFP process. Conversely, however, the Justices did not inform Kane of the existence of the Masias Memo or its relationship to negotiation of the Masias Contract. Kane's briefing on the RFP process was considered as part of the Justices' decision to cancel the Masias Contract and to direct Ryan and Brown's resignations.[34]

Masias remained on FMLA and ordinary paid leave until March 2019. On March 15, 2019, Masias executed a separation agreement, effective March 19, 2019, that allowed her to keep her income from paid leave in exchange for a general release of claims and a non-disclosure agreement.[35] The Department's Fiscal and Personnel Rules prohibited current employees from

---

[33] Through a June 1, 2015 Memo, Masias had, herself, circulated policy guidance confirming the prohibition against Judicial Department employees contracting with the Department as well as the limited circumstances in which Judicial Department employees could enter independent contracts with other outside governmental agencies. Appendix 9, pp. 1-2.

[34] Like other administrative records, the Judicial Department has constructively denied access to documentation of the Justices' consultations with procurement officer John Kane. Appendix 30, p. 40, 43, 71-72; *see also infra* at note 87 (describing context of constructive denial of records access).

[35] A copy of Masias's separation agreement which referenced her having created a "recording between herself and a Justice of the Supreme Court" and which required production of the recording was published with the initial article in *The Denver Post* reporting on Ryan's resignation and the existence of the Masias Contract. Migoya, *supra* note 27. The non-disclosure provision of Masias's separation agreement provides:

contracting with SCAO for independent services but did not, at that time, require a waiting period (analogous to the Executive Branch's contracting requirements).  Accordingly, it was clear that Masias recognized her separation agreement (with its general waiver and non-disclosure provisions) as a pre-condition for her to be awarded a sole-source contract for the Department's leadership training program.  *Coats* at ¶ 4(14); *see also* RCT, Ltd. Rpt., p. 23.  Draft versions of SCAO's sole-source determination allowing the Masias Contract to move forward were submitted by Brown on March 14th and 20th, 2019 and a final version was provided to Masias on March 25, 2019.[36]  On March 21, 2019, Masias met with Chief Justice Coats, Ryan, and Rottman to present her proposal for a leadership training program.

> EMPLOYEE agrees that she shall not affirmatively disclose or discuss any aspect of this Resignation and Release of Claims Agreement, confidential and nonpublic information regarding the DEPARTMENT, and the circumstances surrounding the Agreement to any third party except to the extent disclosure is required for tax, retirement, benefits, insurance or banking purposes, or in response to a valid subpoena. EMPLOYEE shall provide a copy of the recording she made of communication between herself and a Justice of the Supreme Court, EMPLOYEE'S possession of this recording being disclosed during the settlement negotiations for this Agreement. EMPLOYEE shall provide a copy of the recording on or before the date that EMPLOYEE submits her non-revocable letter of resignation.

According to normal practices, the Masias separation agreement and its NDA were presumably negotiated with the assistance of the Attorney General's Office as well as SCAO's Legal Division.  *See* Migoya, *supra* note 1.  If such ordinary practices were not followed, there are additional questions about a greater lack of internal controls and intentional impropriety in the contract negotiations.  The expected involvement of the Attorney General's Office also raises doubts as to the veracity of Counsel to the Chief Justice Andrew Rottman's assertions that he was not aware of the existence of the Masias-Rice recording until July 2019.  The original *Denver Post* article that reported Ryan's resignation, included quotes from the Masias-Rice recording (which the *Post* had apparently obtained from the Judicial Department prior to publication).  Migoya, *supra* note 27; *see also* Migoya, *infra* note 192 (discussing direct quotation of recording in memo).  As noted, however, the Masias-Rice recording was not identified at that time as the reason for the Justices cancelling the Masias Contract.  *Infra*, p. 40.

---

[36] The timing of Masias's separation agreement, the sole-source determination, and the execution of the Masias Contract are addressed in the November 2020 OSA Performance Audit Report relating to SCAO.  The OSA concluded that the timing of these documents presented an appearance of impropriety prohibited by the Judicial Code of Conduct.  2020 OSA Audit Rpt. (Appendix 15), pp. 52-54, 69.  Along with other requested administrative records, the Judicial Department has constructively denied access to the sole-source determination.  Appendix 30, pp. 40, 43, 71-72.

26

**Chief Justice Coats approves the Masias Contract, which is executed twice to conceal it from the SCAO FSD contemporaneous with retaliation against the FSD Director and FSD Controller for whistleblowing.**

Sometime in early April 2019, a contract (the Masias Contract) was circulated for execution. The Masias Contract was fully executed the first time on April 11, 2019. *Coats*, ¶ 4(23); Appendix 5, p. 8. Only after having signed the contract did Masias (with SCAO's approval) send an email to all Judicial Department employees (including all judges and justices) announcing her resignation as Chief of Staff. *Id.*, ¶ 4(19).[37] In an effort to hide the contract from SCAO's FSD (which included Dukes, Kribs, and Galvin who were involved in the original reporting of Masias's misconduct), the contract was executed a second time on June 3, 2019.[38]

---

The Troyer-Mitchell Report (cited herein as RCT, Ltd. Rpt.) also highlights the problematic timing of Masias's separation agreement, her proposal for the Masias Contract, the sole-source determination, and the initial/secondary executions of the Masias Contract. Robert C. Troyer and Nicholas E. Mitchell, INDEPENDENT INVESTIGATION INTO THE LEADERSHIP SERVICES CONTRACT AWARDED BY THE COLORADO JUDICIAL DEPARTMENT TO THE LEADERSHIP PRACTICE LLC, June 22, 2022 (alternatively herein as "the Troyer-Mitchell Report" or the "RCT, Ltd. Rpt."); Appendix 17. As described, Brown first circulated a draft sole-source determination on March 14, 2019. Masias signed her separation agreement the following day, March 15, 2019, and the separation agreement was fully executed on March 18, 2019. Brown, then, circulated a revised draft of the single-source determination to Ryan on March 20, 2019. On March 21, 2019, Masias met with Coats, Rottman, and Ryan to present her leadership training proposal. RCT., Ltd. Rpt. (Appendix 17), p. 25. Following the March 21st meeting, Coats personally directed Ryan to proceed with the sole-source determination and the Masias Contract. *Id.* ***Before Ryan signed the sole-source determination on March 25, 2019, Chief Justice Coats informed all the other Justices of Masias's resignation and her proposal for the leadership training program.*** *Id.*, pp. 25-26. With Coats's approval (though he disputes having contemporaneous knowledge of the April 11, 2019 signing), the Masias Contract was then fully executed on April 11, 2019 and re-executed/re-ratified on June 3, 2019. *Id.*, pp. 28 and 30. The timing and coordination of the sole-source determination, the separation agreement, Masias's meeting with Coats, Masias's publicly announced resignation, the alleged retaliation against Kribs and Dukes, and the repeated executions of the contract create an overall appearance of intentionality and impropriety.

[37] Masias's email and documentation of its authorization are also records to which the Judicial Department has constructively denied access. Appendix 30, pp. 40, 43, 71-72.

[38] Migoya, *supra* note 32; *see also Coats*, ¶ 4(23). In an interview with *The Denver Post* as part of its story, Myra Dukes described the circumstances of how the Masias Contract was intentionally kept from her and others in the SCAO FSD:

> Weeks passed before the plot would come to light. A department
> attorney tasked with drafting the paperwork noticed the contract

The concealment of the originally executed contract is also consistent with evidence that Kribs and Dukes were retaliated against because of their reporting of Masias's suspected financial misconduct and their refusal to sign the December 2019 ACFR audit management representation letter unless Masias's employment was terminated.

As reported in the Troyer-Mitchell Report, on November 8, 2018 (the day following Ryan giving Masias notice of her termination), Ryan told Kribs to "watch out because HR will be coming for you." RCT, Ltd. Rpt. (Appendix 17), p. 14. It is not entirely clear to what extent Ryan, the Justices, and others were involved in this retaliation and Kribs's departure from SCAO. The Troyer-Mitchell Report, however, contains findings that the retaliation against Kribs was directly related to the reasons why the Masias Contract was executed twice:

> [Ryan] indicated that he intended to wait to sign until the two Financial Services Division employees who had originally demanded Masias's termination for reimbursement misconduct left the Department. Indeed, Ryan and Brown had discussed their concern that the Financial Services Director [Kribs] would not approve the Contract, and their need to form a plan to get around him. Consistent with such a plan, and likely also in retaliation for his role in Masias's separation from the Department, Brown and Ryan placed the Financial Services Director on leave on March 22, 2019, the day after Masias's contract proposal meeting with Coats. And they waited for the SCAO's Controller [Dukes] to retire. She did so on May 31, 2019, and one business day later, on June 3rd, Ryan signed another copy of the Contract. RCT, Ltd. Rpt., p. 30.

---

> was really being awarded to Masias. The attorney alerted Kane, who went to Dukes, the controller.

> 'John (Kane) comes in to tell me what was really happening,' Dukes said in a telephone interview, noting her office adjoined Kane's. 'We couldn't say anything because we weren't supposed to know.' Dukes said she waited to see the paperwork come through the normal departmental routing process for her signature, but she never saw any.

> That's because there wasn't any for anyone to see. With Kribs gone, officials waited for Dukes to retire, Ryan said, before the deal was sealed.

> Ryan signed the contract with Masias on June 3, 2019, three days after Dukes left, according to a copy of the document.

A copy of the June 3, 2019 version of the Masias Contract is provided in Appendix 5, pp. 14-26.

28

The Troyer-Mitchell Report further includes a detailed explanation of findings as to the "toxic" culture within the Judicial Department and SCAO that allowed the retaliation against Kribs to occur.

### The SCAO's Internal Culture Was Toxic, Which Deterred Employees from Coming Forward with Their Concerns about the Contract

There were multiple Department employees who could have come forward to raise concerns about the Contract before it was approved. This includes Legal Counsel Unit personnel like [SCAO Legal Counsel Terri] Morrison, and others who were concerned but failed to act.[39] They did not act because the Department's internal culture was toxic, and there was a pervasive fear of opposing Masias, Brown, or Ryan in any way. The fear-based culture deterred reliable information-sharing, rewarded silence and self-protection, led to lax enforcement of Court rules, and minimized accountability within the SCAO.

**A Culture of Fear and Intimidation Pervaded the SCAO**

It was well known within the SCAO that the Directors of the Human Resources and Financial Services Divisions despised one another. Financial Services Division personnel, as a result, felt defensive, fearful, and vulnerable given the extremely close relationship between Brown and Masias. It was enormously corrosive throughout the entire SCAO that the SCAO's second-in command and the Director in charge of enforcing all Human Resources rules – who had unilateral firing authority – openly flaunted their inappropriate personal relationship. This relationship destroyed staff confidence in their leaders' reliability and fairness, and it undermined any trust that they would be protected if they spoke up about misconduct.

Consistent with the brazenness of that relationship, Brown was known to disregard Department rules when it suited him, and to target and retaliate against those who sought to enforce rules against him, including the Financial Services and Information Technology Directors. Masias herself was often dictatorial and vindictive toward other SCAO senior leaders. For example, she

---

[39] Terri Morrison's justification for not reporting the judicial and attorney misconduct involved in the Masias Contract is now questionable given that she is directly obstructing access to the Judicial Department's public and administrative records.  *See infra* at note 87 (describing context of Morrison constructively denying access to *any* public records with pre-inspection/production requirement of $11,820 deposit and refusing to provide specific documents separated from overall request).

29

proclaimed that "heads would roll" if personnel communicated with any Justice without her permission. Similarly, she demanded that even authorized contacts with Justices had to be documented in writing and reported to her. Ironically, she also forced SCAO employees to sign a document she created barring them from surveilling or collecting compromising information about the Department. Masias's prohibition on communicating with Justices deepened the sentiment held by many at the SCAO that the Justices were aloof, disengaged, controlled by Masias on administrative matters, and therefore also to be feared.

In addition, Masias and Brown were perceived to have unilateral discretion to receive, investigate, and resolve complaints against judges and Justices. This perpetuated the belief that the judges and Justices were themselves shielded from accountability, and that Masias and Brown had leverage over them, which strengthened the perception that it would be dangerous to come forward about the Contract.

Compounding this climate of fear, employees were frequently investigated and terminated by the Human Resources Division without that Division reporting those terminations to the Chief Justice. Unsurprisingly in this environment, employees often stayed silent about misconduct and "kept book" on the activities of others in order to acquire compromising information to use as leverage in case of potential discipline. Remarkably, this strategy seemed to work, the behavior was rewarded, such employees were often granted paid leave as compensation upon termination, and non-disclosure terms were inserted into their termination agreements. This practice masked the financial impact of these terminations on the Department's budget, it shielded the termination from scrutiny by the SCAO Legal Counsel Unit and the Attorney General's Office, and it rewarded silence.

In addition, fear of retaliation caused employees to disregard their duties to the Department in favor of self-protection. It caused behavior like sending anonymous tips to outside oversight agencies, or making open-records requests for documents, rather than raising concerns up-the-chain to Department leadership. Even the Judicial Legal Counsel herself (Morrison) was disempowered, disrespected, intimidated, and fearful.

* * *

**There Was a Lack of Accountability for Certain Senior Leaders**

30

> The SCAO's culture was also tainted by the fact that rules were not always enforced against senior leadership. For example, Masias and Brown openly disregarded Department rules, especially Financial Services Division and Information Technology Division rules, without consequence. Masias failed to follow the SCAO's reimbursement rules 100% of the time. Ryan allowed Brown's open and persistent use of his personal laptop for Department business despite repeated complaints from the Information Technology Services Director that the practice compromised Court security. Moreover, the SCA had broad discretion to act without oversight. For example, Ryan had the authority under the Department's permissive procurement rules to sign sole-source contracts without consulting the Procurement Manager.

> RCT, Ltd. Rpt. (Appendix 17), pp. 38-40.

The second investigation commissioned by the Colorado Supreme Court and completed by Elizabeth Rita of the Investigations Law Group, LLC (ILG), also made findings that Kribs's and Dukes's departures from SCAO related to retaliation by Brown, Masias, and (potentially) Ryan and Coats. As with the Troyer-Mitchell Report, however, the ILG Report does not examine the substance of the separation agreement/settlement negotiated with Kribs or whether the other Justices were aware of/involved in the negotiation of Kribs's departure while the Masias Contract was being finalized without notice to SCAO's FSD or to the OSA. The fact that each of the Justices received the April 15, 2019 anonymous fraud report, which described Kribs being paid without being at work, establishes that the Justices either knew or should have known of the retaliation against Kribs before they authorized the final execution of the Masias Contract on June, 3, 2019 without notice to the SCAO FSD or the OSA. Because of the non-disclosure provision in Kribs's separation agreement and ILG's lack of subpoena powers as well as for other unidentified reasons, ILG was unable to interview Kribs as part of its investigation. ILG, LLC Rpt. (Appendix 18), p. 59.

Nevertheless, the ILG Report makes findings and concludes 1) that the underlying allegations against Kribs in the Masias Memo were unsubstantiated and 2) that SCAO did not adequately investigate Kribs's colorable claims of retaliation.

> According to both Finance Director [Kribs] and Controller [Dukes], the State Court Administrator [Ryan] told [Kribs] words to the effect of, '[W]atch your back.' Further, according to [Kribs], [Ryan] was instructed by the Chief Justice [Coats] to get rid of both [Kribs] and [Dukes] for insubordination. [Coats] (from that time) has denied that he gave this instruction.
>
> * * *
>
> Seven (7) witnesses stated their concern that the HR investigation into [Kribs] was retaliatory, based on [Kribs's] role in the Mindy Masias expense reimbursement situation. One person said, '[T]his

31

looks like they just wanted to get rid of him . . . they were working to a defined end.  This was not an investigation it was a justification."  Another noted, '[W]hen the whole thing with Mindy first occurred and [Dukes] and [Kribs] said '[W]e are not signing off on the audit,' [Ryan] told me that he had told [Kribs], '[Y]ou better watch your own house.'  He threatened him and then he made good on it by sic-ing Eric [Brown] on him.  Timing looks very suspicious.'  Several employees said they heard that Ms. Masias drove by [Kribs's] house on a workday when she was out on leave and saw his car in the driveway.  This surveillance was identified as the instigating factor that started the HR investigation going.  The well-known animosity between Ms. Masias and [Kribs] exacerbated these concerns about retaliation.

[Ryan] contends that it was the Chief Justice [Coats] who was driving the investigation of [Kribs].  According to [Ryan], [Coats] had said to him, 'These two [Kribs and Dukes] need to go for insubordination,' for their refusal to sign off on the judicial audit.  [Coats] strenuously disagreed with this contention and denied being behind the investigation or ultimate personnel action.

\* \* \*

With respect to [Kribs's] performance, [Ryan] said he told [Kribs] to engage 'more on a department-wide level' and stop focusing just on the budget. 'His work performance was generally fine. For what it's worth, [Kribs] is one of the most knowledgeable people about the state budget that I ever encountered over my entire career.'

\* \* \*

[Ryan] did not agree with the decision to move to termination of [Kribs].  'I would have looked at options like putting someone on a plan.  A whole year of performance plans were put on IT when there were issues there.  [Kribs] for all of the realization of what he wasn't doing, was extremely talented and was very good at what he did.  He would have been someone who warranted another chance.'  [Ryan] said that the move to termination was not his call but was directed by [Chief Justice Coats], who wanted [Kribs] gone.  [Chief Justice Coats] denied this contention.

\* \* \*

Based on these facts, there is insufficient evidence to substantiate the claim about [Kribs's] behaviors.  First, the investigation into [these behaviors] was inadequate and appears biased (based upon the existing reports and records).  As such it is not a reliable

32

> foundation to establish evidence of wrongdoing by [Kribs].
> Second, while there were likely some performance areas [Kribs]
> needed to improve upon, they were not so serious that his
> supervisor agreed he should be terminated.  Finally, the timeframe
> strongly suggests retaliatory motives for investigating [Kribs] were
> a possibility, and this possibility was not investigated.
>
> * * *
>
> [Ryan] contends that the investigation [of Kribs] occurred under
> the direction of the (then) Chief Justice [(Coats)].  [Ryan] stated
> that the Chief Justice wanted to terminate [Kribs] and one of his
> staff [(Dukes)] for "insubordination" in refusing to sign off on the
> agency's audit.  The investigator did not talk to [Ryan] or to [Chief
> Justice Coats] to explore this possibility.
>
> ILG, LLC Rpt. (Appendix 18), pp. 60, 63-64, 67.

At least after the fact, all the Justices became aware of the retaliation against Kribs and yet did nothing to report or correct it.  Tellingly, the testimony of the OSA's Performance Audit Manager Derrick Johnson to the Legislative Audit Committee on December 7, 2020 further attests to the fact that the Justices (even with Chief Justice Coats and State Court Administrator Vasconcellos present at the hearing) intentionally concealed from the OSA that the Masias Contract had been executed twice and that the double execution allegedly occurred as part of retaliation against Dukes and Kribs.[40]  Like Chief Justice Boatright's concealment of retaliation in the Woods matter, the other Justices are equally responsible for concealing the retaliation against Kribs through their non-reporting and non-waiver of the NDA in Kribs's VSI agreement. The evidence of retaliation against Kribs and Dukes implicates potential violations of both civil and criminal laws.  41 U.S.C. § 4712 (providing civil process for enforcing federally prohibited reprisal against employees/contractors who make protected disclosures); C.R.S. Title 24, Art. 50.5 (defining Colorado law prohibiting retaliation and providing civil processes for enforcement); § 18-8-706, C.R.S. (recognizing acts of retaliation against potential witness to current or prospective civil or criminal proceedings as a Class 4 felony); *see also* 42 U.S.C. § 1983 (prohibiting deprivation of federal constitutional rights including protected expression under 1st Amendment and due process under 14th Amendment).  The suspected retaliation against Kribs was also contrary to the Judicial Department Personnel Rules, which Chief Justice Coats himself later approved, and the then-effective Chief Justice Directive (CJD) 08-06.[41]  The

---

[40] *Hearing of the Legis. Audit Comm.*, Colo. Leg., December 7, 2020; Appendix 27(c), p. 17:1-8 (Audit Manager Johnson describing only the single execution of the Masias Contract on June 3, 2019).

[41] The Personnel Rules approved by Chief Justice Coats, effective October 1, 2020 provided:

> 20.A.3. – Retaliation - Retaliation is a serious violation of Rule 20.
> Retaliation against any individual who has filed a report or

existence and continued existence of the "toxic" culture that allowed the retaliation against Kribs and others further implicates the Justices' obligations under Canon Rule 2.5 to administer the Judicial Department (as the equivalent of its Board of Directors) in a competent manner.[42]

**The terms of the Masias Contract were facially absurd and created an appearance of impropriety.**

The terms of the Masias Contract were facially unreasonable.[43]  As reported, the contract was essentially a personal services contract without meaningful deliverables, any requirements that

> complaint, witnessed a violation of any policy listed herein, and/or assisted or participated in any manner in an investigation/inquiry, proceeding, or hearing pursuant to a policy or provision of Rule 20 will not be tolerated.  Reports of retaliation are taken seriously and may be the subject of a separate investigation. Any act of retaliation may result in appropriate corrective or disciplinary action, which may include termination of employment.

> Colo. JSPR, Rule 20 (Oct. 1, 2020).

Prior to Chief Justice Coats's adoption of the 2020 Personnel Rules, the prohibition against retaliation was provided/enforceable through Chief Justice Directive 08-06:

> Retaliation is a serious violation of this policy. Retaliation against any individual who has made a charge, filed a report or complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this policy will not be tolerated. Reports of retaliation are taken seriously and may be the subject of a separate investigation. Any act of retaliation may result in appropriate corrective or disciplinary action, which may include dismissal.

> CJD 08-06, Attachment B—Code of Conduct (2017).

[42] As part of her legislative testimony to the House Judiciary Committee, the Public Policy Director for the Colorado Coalition Against Sexual Assault, Elizabeth Newman, further expounded on why heightened risks of retaliation within the Judicial Department are particularly damaging due to inherent power differentials between judges, supervisors, staff, and litigants. Newman emphasized that even with the changes proposed through HCR 23-1001, HB 23-1019, and HB 23-1205, the Judicial Department still has not embraced or implemented adequate protections against continuing retaliation. *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the H. Judiciary Comm.*, Colo. Leg., March 15, 2023; Appendix 27(w), pp. 9:33-10:2.

[43] Notably, copies of the two versions (April 11, 2019 and June 3, 2019) of the Masias Contract do not appear to have been made public or accessible through the various published news

34

Masias employ staff, or any responsibilities for paying for associated production costs.[44]  The
contract contemplated Masias receiving minimum annual payments of $532,000 renewable for
up to 5-years.[45]  In contrast, the salary for a Colorado Supreme Court Justice in fiscal year 2019-

articles.  *But see* Migoya, *supra* note 27 (referencing expectations Masias to be paid "$44,000
per month" . . . "according to a copy of the deal"; publishing copy of Masias separation
agreement online).  Indeed, the Troyer-Mitchell Report that the Colorado Supreme Court
contracted-for under the auspices of an "independent" investigation into the Masias Contract
does not append a copy of the Masias Contract(s) or the pre-conditional Masias separation
agreement.  Obtained through a public records request, however, copies of the April 11, 2019
and June 3, 2019 Masias Contracts are provided with this RFE as Appendix 5.

[44] Among other findings, the Troyer-Mitchell Report confirms that Chief Justice Coats and
Rottman were aware of the price term of the Masias Contract prior to its execution (both on
April 11, 2019 and on June 3, 2019).  Coats's justified the apparently excessive price term of the
contract on presumptions (not defined in the contract itself) that "Masias undoubtedly would
have to hire and pay others to perform under the Contract."  RCT, Ltd. Rpt. (Appendix 17), p.
27.  As noted *supra* at note 43, the Troyer-Mitchell Report presents an interpretation of the
Masias Contract without providing a copy of the actual contract or the pre-conditional Masias
separation agreement.

[45] In testimony to the Joint Budget Committee (JBC), Chief Justice Coats quibbled over his
understanding of the price term of the Masias Contract, emphasizing that it was a one-year,
$532,000 contract subject to renewal rather than a 5-year, $2.66-2.75 million overall contract.
*Contra* the Masias Contract § 5(A) ("The Parties' respective performances under this Agreement
shall commence on the latter of the Effective Date or April 1, 2019 and shall terminate on March
31, 2024 ("Initial Term")[.]"); Appendix 5, p. 1.  This distinction seems semantic, when even a
1-year sole-source contract for $532,000 was facially unreasonable.  When he testified, Chief
Justice Coats did not provide the JBC with a copy of the Masias Contract, including its material
terms.  At the hearing, Chief Justice Coats stated:

> With regard to the contract. There was suggestion in the article.
> First of all, it referred to it as a two and a half million-dollar
> contract. I didn't understand it that way. It was not presented that
> way to me, but rather as a $532,000 contract for a year with an
> option to extend. And I have no reason right now to believe that's
> not the proper construction of that contract. But where I wanted to
> go though was the suggestion was this, and other people have
> approached me, suggesting this was an unusually large amount.
> But I need to remind you, we're a department of some 4,000
> employees. For leadership training, we had a contract for the
> previous 5 years, and even going back before that, that were for
> commensurate amounts, actually more, in some years. Starting
> years for that kind of leadership training for all over the State and
> all of the different levels of employees that we needed trained,
> including judges, I think our records show that the contract's

35

2020 was \$188,151 (or approximately 35% of what Masias was to receive annually).[46] The annual contract price was also approximately three times Masias's own roughly \$172,000 per year salary as SCAO Chief of Staff.[47] The contract's overall value ranged from \$2.66 to \$2.75 million with Masias being able to seek additional reimbursement for pre-approved travel and other expenses. *Coats*, ¶ 4(23). Ironically, the contract provided Masias with authority to seek personal reimbursements notwithstanding abuse of such authority having previously been the grounds for her termination. The terms of the Masias Contract were so facially unreasonable that the contract's existence, alone, should be recognized as creating an appearance of impropriety.[48] The fact that Chief Justice Coats further used his December 13, 2019 testimony to the Joint Budget Committee as an opportunity to disparage former State Court Administrator Ryan, to complement Mindy Masias, and to develop arguments justifying the Masias Contract (specifically its underlying sole-source determination) is extremely troubling.[49] The general idea

---

> amount were as high as close to 700,000 at various times. So, consulting with others, I don't believe this is an extraordinarily large amount for this kind of thing.
>
> *Hearing before the J. Budget Comm.*, Colo. Leg., December 13, 2019; Appendix 27(b), p. 3:19-29.

[46] In fiscal year 2019-20, Chief Justice Coats received a salary of \$192,256. 2019 Colo. Sess. Laws 451, p. 4261.

[47] David Migoya, *Colorado Supreme Court Asks Other Branches of Government to Pick Investigators: Investigators Would Explore Alleged Effort to Keep Misconduct Quiet*, DENVER POST, February 16, 2021.

[48] Chief Justice Coats's stipulation acknowledges: "[C]ompliance with the Colorado Code of Judicial Conduct required that Chief Justice Coats prevent the Judicial Department from entering the contract prior to its public execution in June 2019." *Coats*, ¶ 6. As made clear through their testimony to the Legislature, Troyer and Mitchell also acknowledged that the Masias Contract "should never have been approved" and "the contract itself was a serious breach of the public trust." *Infra*, p. 142. As noted, the OSA's 2020 Performance Audit Report expressly found an "appearance of impropriety" under the Code. *Supra* note 36.

[49] In justifying the sole-source nature of the Masias Contract, Chief Justice Coats stated:

> And that was, if you saw even in the newspaper article, I think it referred to Mr. Ryan making the choice of the prior Chief of Staff to do this training, in large part because it was very close to a sole-source contract. It was pinpoint training with regard to all of the Judicial Districts. And the initial phase was to go through a lengthy process of setting up a relationship, and, in effect, changing the paradigm of, or maybe I should say, relationship between the Court

36

of paying someone who was being fired for financial misconduct millions of dollars to teach "leadership" to all judges and Judicial Department employees was patently ridiculous, especially when honesty and integrity are essential components of any meaningful concept of a good leader.  In this context, it remains unclear what underlying circumstances induced the involved Justices to personally approve such a facially absurd sole-source contract.

**All the Justices and the Attorney General personally receive copies of an anonymous Fraud Hotline report and material information about the negotiation of the Masias Contract is withheld from the OSA.**

On April 15, 2019, an anonymous fraud report was sent to the OSA's fraud hotline, Governor Jared Polis, Attorney General Phil Weiser, and *each* Justice of the Colorado Supreme Court. The anonymous report referenced problems with the Department's leadership education contract prior to the Masias Contract: "[SCAO] have . . . had two women teach hundreds of judicial employees management skills for millions of dollars."  Appendix 7, p. 3.  Additionally, the anonymous report detailed problems with the use of paid time off to obtain non-disclosure agreements and other employment settlements.  The most relevant part of the anonymous report states:

> Besides wasting money, Chris Ryan has continued to pay senior staff who are not working.  Jane Hood disappeared one day because she was watching Mindy Masias and Eric Brown.  She has been paid for months not to disclose what she had.  Mindy Masias committed fraud and threatened to sue Chris Ryan, so she was put on FMLA.  Chris Ryan, Eric Brown, and Mindy Masias are part of a cover up of FMLA fraud.  David Kribs was not showing up for work and is still being paid.  Mindy Masias and Eric Brown travel together and speak at conferences for the National Center [for] State Courts.  They earn consulting and speaking fees as judicial

> Administrator and the Districts. So, that was what was at issue with regard to this contract.

> *Hearing Before J. Budget Comm.*, Colo. Leg., December 13, 2019; Appendix 27(b), pp. 3:36-4:1.

Elsewhere in his remarks, Chief Justice Coats emphasized the good relationship and reputation that Masias had with the Chief Judges while presenting Ryan's forced resignation as having occurred due to a lack of candor. *Id.,* pp. 3:10-17.  As the Justices' later narrative would confirm, Coats planted a flag to implicitly suggest that Ryan and others had intentionally kept the existence of the Masias-Rice recording hidden from him.  In turn, this became the Justices' official explanation/justification for Ryan's forced resignation and the cancellation of the Masias Contract.  The Justices' narrative (developed in consultation with the Attorney General's Office) would also, later, provide a fallacious premise for the Troyer-Mitchell Report's ultimate finding that the Masias Contract was not a *quid pro quo* arrangement.  *See* discussion *Infra*, starting at p. 140.

37

> employees on state time.  Eric doesn't use a state computer so
> there is no way to see how much consulting work he does during
> the day.  They both speak on ethics and management even though
> they are covering up fraud.  Mindy and Eric spoke at the NACM
> conference in Arkansas while Mindy was still on FMLA or 2 days
> after it was done.[50]

Chief Justice Coats and the other Justices each personally received a copy of the anonymous fraud report.  Although Chief Justice Coats recognized the settlement with Ms. Hood as one of the "stupidest" things he ever heard of and received confirmation from Attorney General Phil Weiser that the fraud allegations were serious, Coats allowed the Masias Contract to move forward.  *Coats*, ¶ 4(20).  Apparently, none of the Justices took any action to stop negotiations or to rescind the Masias Contract.  *Id.* at ¶ 4(22-23).  On May 16, 2019, Chief Justice Coats received a letter from the OSA notifying him of the anonymous fraud report and asking him how the Judicial Department wished to proceed.  On May 29, 2019, Chief Justice Coats responded with a letter that stated, in relevant parts:

> ***My colleagues and I, along with the Attorney General** were also
> copied on this anonymous letter, and I have therefore already
> had a chance to look into these allegations myself and have been
> in consultation with the Attorney General about them.  After
> further consultation with **my own***[51] *and the **Attorney General's**
> **staff** about your letter*, there is consensus, which I am in accord
> that it makes the most sense for the OSA to simply conduct the
> investigation, with which we will of course fully cooperate.
>
> In large part, ***my decision in this regard flows from my earnest
> desire to have these allegations resolved as thoroughly and***

---

[50] Links to correspondence between the OSA and Chief Justice Coats, with a copy of the anonymous fraud report are appended to a July 22, 2019 news article.  David Migoya, *Colorado State-Auditors Investigating Whistle-Blower Claims about Fraud in Judicial Department*, DENVER POST, July 22, 2019.  Many of the allegations presented in the anonymous fraud report were later substantiated through the 2020 OSA Performance Audit Report and the OSA's February 4, 2022 Fraud Hotline Investigation Report.  Copies of the correspondence, including the anonymous fraud report, are attached to this RFE as Appendix 7 with the anonymous report found at p. 3.

[51] It should be noted that with this statement, Chief Justice Coats confirmed that other individuals within SCAO (including Ryan, Rottman, Brown, and Morrison) who knew about the Masias Contract were also personally aware of the anonymous fraud hotline report before the Masias Contract was finally executed/re-ratified on June 3, 2019.  With this concurrent knowledge, however, none of those individuals informed the SCAO FSD or the OSA that the Court had approved or was finalizing the Masias Contract.  These circumstances implicate further violations of Canon Rules 2.5 and 2.12 by Chief Justice Coats and the other involved Justices as well as violations of Colo. RPC 8.4(f) by the involved attorneys.

38

> *expeditiously as feasible*.  To that end, I am anxious for my
> counsel, Andrew Rottman . . . to coordinate with the appropriate
> members of your staff concerning how your office will plan to
> proceed and how we may best assist with your investigation.[52]
> (Emphasis added).

Nowhere in his letter did Chief Justice Coats inform the OSA that the Colorado Supreme Court and the Judicial Department had approved or expected to imminently approve a $2.66-$2.75 million contract with Masias, who was the primary subject of the anonymous fraud report. Likewise, Chief Justice Coats did not inform the OSA of Masias's separation agreement with its non-disclosure provision and general release.  Chief Justice Coats's stipulation asserts that neither he nor the other Justices informed the Attorney General or the OSA of the pending Masias Contract prior to its re-execution/re-ratification on June 3, 2019.  *Coats*, ¶ 4(22-23).[53] Material information about the Masias Contract was withheld from the OSA notwithstanding Chief Justice Coats's and the other Justices' awareness of management reporting obligations as to both the ongoing ACFR-related audit and the OSA fraud-hotline investigation directed by Coats's May 29th letter.[54]   The withholding of material information from the SCAO's FSD, the

---

[52] A copy of Chief Justice Coats's May 29, 2023 letter is also appended to *The Denver Post's* July 23, 2019 article, *supra* at note 50.  Appendix 7, p. 4.

[53] As further highlighted in Chief Justice Coats's stipulation and the Special Tribunal's disciplinary opinion:

> Particularly concerning is that former Chief Justice Coats was
> separately contacted by the Attorney General and the State Auditor
> to advise him of the need to investigate the April 15 letter's
> allegations, which included Masias, but he did not notify the
> Attorney General or the OSA about the contemplated contract with
> a subject of the allegations.  *Coats*, ¶ 6.

[54] To the extent that any person involved willfully withheld or concealed material information in connection with a federal function (including eligibility for federal grant funding and authorization to issue bonds as relevant to the ACFR-related audit), there is a likelihood of criminal liability punishable as a felony. 18 U.S.C. § 1001 (False Statements); *see United States v. Suggs*, 755 F.2d 1538, 1542 (11th Cir. 1985) (that state agency impacted by concealed/false information receives federal funding is sufficient to establish jurisdictional element required for prosecution under 18 U.S.C. § 1001). 18 U.S.C. § 1001 provides, in relevant parts:

> Except as otherwise provided in this section, whoever, in any
> matter within the jurisdiction of the executive, legislative, or
> judicial branch of the Government of the United States, knowingly
> and willfully--

39

Attorney General's Office, and the OSA also contrasts with Chief Justice Coats's assertion that the Masias Contract would be possible "only after [Masias] had resigned and only if the contract could be executed in strict compliance with all applicable statutes, rules, and departmental policies." *Coats*, ¶¶ 4(14), 7.

**The Masias Contract is cancelled / the Judicial Department publicly confirms that all the Justices approved and later cancelled the Masias Contract.**

After media inquiries and the public became aware of the Masias Contract, the Justices cancelled the contract.  The decision to cancel the contract was later attributed to the Justices learning that Masias recorded a conversation with former Chief Justice Rice, the existence of which was disclosed in Masias's March 15, 2019 separation agreement.  *Coats*, ¶ 4(24).

On July 18, 2019, however, the reasons given for cancellation of the Masias Contract were limited to Masias's failure to comply with various technical requirements, including obtaining a timely background check and providing proof of insurance.  Although the existence of the Masias-Rice recording was known by the Justices at that time, it was not presented as the reason for cancellation of the Masias Contract.  Migoya, *supra* at note 27.  Moreover, as explained *supra* at note 35, *The Denver Post* described the Masias-Rice recording and published a full copy of the Masias separation agreement (which expressly required production of the Masias-Rice recording) with its July 18, 2019 story.  In addition to the reference to the recording in the Masias separation agreement, the Masias Memo also implicitly referenced the recording through

> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>
> * * *
>
> shall be fined under this title, imprisoned not more than 5 years[.]

To the extent that the OSA may be recognized as a "Federal auditor" required to perform an audit on behalf of the United States or that Colorado's ACFR and Single Statewide Audit are subject to secondary auditing by the U.S. Government, persons involved in the concealment of the Masias Contract may also have federal criminal liability under 18 U.S.C. § 1516 (Obstruction of Federal Audit).  *See United States v. Hames*, 185 Fed. Appx. 318, 324 (5th Cir. 2006) (private benefits administrator that received federal funds and performed required audit within definition of "Federal auditor").  If the date of the Masias Contract is recognized as the trigger date for at least some of the potentially chargeable offenses, the relevant 5-year federal statute of limitations expired on June 3, 2024.  18 U.S.C. § 3282(a).  According to Colorado Constitution Article VI, § 23(2), any judge or justice convicted of a felony or crime of moral turpitude is subject to mandatory removal from office.  As explained *infra* at p. 256, however, judicial discipline based upon Canon Rule 1.1 (Compliance with Law), may be imposed regardless of whether there is a conviction or the respective statute of limitations has expired.

direct quotations.[55]  Despite the amplified importance that the Court has attributed to the Masias-Rice recording, it should be acknowledged Masias did not violate any laws by creating the recording. *See* § 18-9-304, C.R.S. (defining eavesdropping not to include situations where at least one party to a conversation records or consents to recording the conversation).  At the time of the Masias-Rice recording's creation, the Judicial Department's Personnel Rules also did not contain prohibitions against workplace recordings.  *Compare* Colo. JSPR (July 1, 2018) *with* Colo. JSPR, Rule 20.I.2 (July 1, 2022).

The Court's initial explanation for canceling the Masias Contract (which did not mention the Masias-Rice recording) was confirmed through written testimony presented by Chief Justice Coats to the legislative Joint Budget Committee (JBC) on December 13, 2019:

> While the Department still firmly believes that leadership training is important to achieving its mission of serving the State of Colorado, the July media reports surfaced certain information about the vendor selected to provide such training. On July 17, former State Court Administrator Ryan, at the direction of the Chief Justice, notified Ms. Masias that the Department was terminating the contract with The Leadership Practice because it had ceased to further the public policy of the Colorado Judicial Branch, which the contract refers to as termination in the public interest, and because the vendor had defaulted by failing to comply with certain contractual duties and obligations.[56]

Apparently, the idea that Coats becoming aware of the Masias-Rice recording justified cancelling the Masias Contract and requiring Ryan's resignation was also first publicly expressed through Chief Justice Coats's testimony to the JBC on December 13, 2019.  This explanation, made both orally and through the written submission, avoided discussion about the specific grounds for terminating the Masias Contract on the basis that the Attorney General's Office (including Attorney General Weiser personally) advised Coats not to speak on the topic due to potential legal liabilities.

> With regard to some of the other things about the circumstances of the Chief of Staff leaving which were also a big part of the [July 18, 2019 *Denver Post*] article and reflected on the contract and some of the criticisms the article suggested. ***I am for legal reasons, instructed <u>by the attorney general</u> that I really can't say***

---

[55] Christopher Osher, *Memo Detailing Alleged Colorado Judicial Misconduct, Sexual Harassment also Describes Sexist Workplace*, DENVER GAZETTE, February 9, 2021 (with Masias Memo linked); David Migoya, *Colorado Supreme Court Releases Memo Citing Examples of Sex-Discrimination, Judicial Misconduct that Led to Alleged Contract for Silence*, DENVER POST, February 9, 2021.

[56] REP. OF COLO. JUD. DEP'T TO J. BUDGET COMM., December 13, 2019, p. JUD 6 (hereinafter 12/13/2019 JBC Hearing Materials); Appendix 27(b)(i).

41

> *very much about that.* And that hopefully you understand that or will understand that with regard to protection of the public "fisc." If nothing else here. But with regard to the contract, let me make clear a couple of things. Although I can't talk about the reasons for the Chief of Staff's departure from the office, that other than I can say she left voluntarily. (Emphasis added).[57]

> \* \* \*

> The July media reports brought to the Chief Justice's direct attention for the first time certain material information that, *for legal reasons*, the Department is unable to go into detail about in answering this question. Within days afterward, the Department terminated the contract with Ms. Masias's company, and former State Court Administrator Chris Ryan and former SCAO Chief Administrative Officer Eric Brown resigned their positions. (Emphasis added).[58]

Notwithstanding contentions in the anonymous fraud report about the propriety of the prior contracts, Chief Justice Coats also used his oral testimony to assert that the sole-source nature and the price term of the Masias Contract were reasonable given the costs of the Judicial Department's prior leadership education contracts.  Coats, however, did not explain how the Masias Contract provided for an annual cost that was approximately three times the salaries of the Justices and three times Masias's own salary as SCAO Chief of Staff.  Chief Justice Coats, without accepting any responsibility on the part of himself and the other Justices, blamed the issues relating to the Masias Contract on Masias, Ryan, Brown, and other employees who had left the Department.

> But I would say, it is not that there was a breakdown in the system completely here. It was a question of lack of candor, and particular individuals, knowing things and acting in a way that was not for the benefit of the Department. . .  But it is more a personnel problem than it is broadly, an organizational problem.[59]

---

[57] *Hearing before the J. Budget Comm.*, Colo. Leg., December 13, 2019; Appendix 27(b), p. 3:6-12.

[58] 12/13/19 JBC Hearing Materials (Appendix 27(b)(i)), p. JUD 6.

[59] *Hearing before the J. Budget Comm.*, Colo. Leg., December 13, 2019; Appendix 27(b), p. 4:22-27.  This narrative of ridding the Judicial Department of a few bad apples would continue into the Judicial Department's later lobbying efforts to oppose the creation of an independent, external Office of the Judicial Discipline Ombudsman.  *Hearing before the H. Judiciary Comm.*, Colo. Leg., March 15, 2023 (testimony of SCAO lobbyist Terry Scanlon); Appendix 27(w)(i), p.

42

One should recognize the general paradox between the Justices' potential criminal and ethical liabilities for not disclosing material information to the OSA (i.e. negotiation of the Masias Contract and the existence of the Masias Memo) and the Court's *post hoc* creation of a narrative justifying the Court's approval of the Masias Contract as reasonable because of Ryan's and others' alleged concealment of material information (i.e. the Masias-Rice recording) from Coats.

According to Coats, neither he nor the other Justices, knowing of its existence, sought a copy of the separation agreement before approving the Masias Contract.  *See* RCT, Ltd. Rpt. (Appendix 17), pp. 25-26; *Coats*, ¶ 4(17).  The Masias Contract was cancelled on July 17, 2018[60] and Ryan resigned on July 18, 2019.  Through a contemporaneous official statement to *The Denver Post* provided on or about July 18, 2019, a spokesperson for the Judicial Department confirmed: "***The seven Supreme Court justices, including Chief Justice Coats, approved of Masias's contract as well as its cancellation.***"  Migoya, *supra* at note 27 (Emphasis added).  None of the Justices have

---

51:28-52:17 ("And that toxic culture, by the way, is gone. It's been gone for three or four years, however, long since those three folks resigned and we had a change in leadership.").

[60] The Court and the Judicial Department have presented the Masias Contract as a harmless error because it was cancelled before the Department made any payments to Masias.  *Contra*, *Inquiry Concerning a Judge*, 822 P.2d 1333, 1040 n. 4 (Alaska 1991) (fact that judge did not ultimately obtain financial benefits through improper conduct irrelevant to recognition of an appearance of impropriety under Canon Rule 1.2).  This narrative ignores how the contract at least ostensibly created legally binding obligations and was executed only after Masias had already received consideration (over $35,000) as part of a pre-condition of the Masias Contract—execution of her separation agreement with a release of claims and a non-disclosure agreement.  *See* Migoya, *supra* at note 27 (describing Masias's compensation).  In addition, the execution of the Masias Contract without notice to the OSA itself defeated the lawful objectives of the ACFR-related audit and its function in protecting United States Government funds from fraud.  The fact that those involved with the Masias Contract were only partially successful in achieving their criminal objectives does not absolve them of criminal liability and does not prevent their prosecution through a conspiracy theory.  Indeed, to prove the elements of Conspiracy to Commit Offense or to Defraud United States under 18 U.S.C. § 371 (specifically an agreed effort to defraud the United States Government), the Government only needs to demonstrate an agreement to defeat a lawful government function.

> To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention.

> *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).

43

ever requested correction of this official statement or have denied that the decision to approve the Masias Contract was made by the entire Colorado Supreme Court. *See also Coats*, ¶ 4(23) ("On June 3, 2019, with Justice Coats's and the Supreme Court's knowledge, Ryan publicly signed the same training contract on behalf of the Judicial Department with Masias."); Migoya (2/12/21), *infra* at note 62 ("All the justices approved of Masias' contract at the time, but Boatright said they saw the memo for the first time this week."). Chief Justice Coats also made statements in oral and written testimony to the JBC on December 13, 2019 which confirmed that the whole Court made the decisions to enter and, later, to cancel the Masias Contract. *Supra* at p. 41; Appendix 27(b), p. 4:1-4 ("As I said, from the discovery of things that were kept from me that made the contract not fulfillable, I thought, and we thought as a Court and, also, clear that we would not have entered into it. We terminated that contract, and that's where we are now."). In a February 8, 2021 public statement, the current Justices further collectively confirmed that six of them were contemporaneously aware of the Masias Contract and that Chief Justice Coats had kept them fully informed:

> As these events [the Justices' summary of the formation (including Chief Justice Coats's authorization) and cancellation of the Masias Contract] unfolded over the past two years, **and after being apprised of all the facts**, the supreme court continued to have full confidence in the leadership of former Chief Justice Coats.[61]

Ultimately, Chief Justice Coats asserted that he "made many of [his] decisions with, or based on the representations and recommendations of, the State Court Administrator, fellow judicial officers, non-lawyer professionals, and lawyers." *Coats,* ¶ 7.

**The Colorado Supreme Court and the Colorado Attorney General's Office conceal/withhold the materially significant Masias Memo from the OSA while the Fraud Hotline Investigation and 2020 Performance Audit are in-progress.**

Beyond the Masias Contract itself, media reports and the deposition testimony of Justice Hart confirm that the Justices and lawyers in the Attorney General's Office (1st Assistant Attorney General LeeAnn Morrill (who supervises the Public Officials Unit of the State Services Division) and then-Assistant Solicitor General Grant Sullivan[62]) were aware of the existence of

---

[61] Statement from the Colorado Supreme Court to all Colorado Judicial Department Employees (Feb. 8, 2021) (hereinafter February 8, 2021 Statement) (Emphasis added).

[62] On November 9, 2023, Governor Polis issued a press release announcing Sullivan's appointment to the Colorado Court of Appeals. Sullivan's appointment occurred despite media coverage that highlighted his direct involvement in the Masias Controversy and his employment history as former Chief Justice Coats's law clerk from 2010-11. David Migoya, *Appellate Court Nominees Include One of Most-Reversed Judges and a Lawyer Tied to Memo Scandal*, DENVER GAZETTE, November 1, 2023. Chief Justice Boatright presided as *ex officio* chair of the Supreme Court Nominating Commission that selected Sullivan. When asked by the media for comment about his nomination, Sullivan refused. Sullivan's acceptance of an appointment to the Court of Appeals notwithstanding the appearances of impropriety created implicates a potential violation

and had access to the Masias Memo in 2019 (concurrent with Ryan's resignation).[63]  The existence of the Masias Memo, however, was not disclosed and the memo was not produced to

---

of Canon Rule 1.2 (Promoting Confidence in the Judiciary).  *See In re Huckaby*, 656 So. 2d 292 (La. 1995) (failure to file federal tax return several years before taking office recognized as violation of Code); *In re Hedges*, 20 N.Y.3d 677 (2013) (admitted sexual contact with minor 13 years before judge took office supported judge's removal); *Matter of Wright*, (Md. Comm. Jud. Disabilities Sept. 24, 2018) (public reprimand for failure to disclose disciplinary history on judicial application) order *available at* https://www.mdcourts.gov/sites/default/files/ import/cjd/pdfs/cjd2016148wrightreprimand.pdf.  Historically, judges' pre-judicial misconduct (including alleged violations of prosecutors' disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963)) has also been recognized by voters as a basis for non-retention.  Susan Greene, *Judges, Judged: Voters Turn Out Two in Larimer, But Retain One the State Urged Them to Fire*, DENVER POST, November 3, 2010; Associated Press, *Ex-Prosecutors Defend Actions in Masters Case*, DENVER POST, October 9, 2010; *see also People v. Gilmore*, 08PDJ084; *People v. Blair*, 08PDJ085.  Chief Justice Boatright's involvement in the nominating process with an awareness of Sullivan's direct involvement in the Masias Controversy further implicates potential violations of Canon Rules 1.2, 1.3 (Abuse of Prestige of Office), and 2.15 (Responding to Judicial and Lawyer Misconduct).  *See also* Canon Rule 1.3, Comment 3 ("Judges may participate in the process of judicial selection by cooperating with appointing authorities and screening committees, and by responding to inquiries from such entities concerning the professional qualifications of a person being considered for judicial office.").  Chief Justice Boatright's and Sullivan's duties of candor during the nomination and appointment processes were further amplified by the Colorado Supreme Court, which in violation of its duties to consult with this Commission under § 13-5.3-107(2), C.R.S. (2022), unilaterally amended the judicial application form.  When the Court amended the form in December 2022, it removed Question 47 which had asked judicial applicants:

> Is there any circumstance or event in your personal or professional life which, if brought to the attention of the Commission, might tend to affect adversely your qualifications to serve on the court for which you have applied?

Even after public scrutiny of the removal of Question 47, which contemporaneously provided grounds for discipline in the then-pending case involving former 18th Judicial District Court Judge John Scipione, the Justices took no action to restore Question 47.  Michael Karlik, *Colorado Supreme Court Drops 'Catch-All' Question About Prospective Judges' Backgrounds from Application*, COLORADO POLITICS, May 25, 2023; *see also Scipione*, ¶ 9, fn. 2.  Sullivan was not asked Question 47 as part of his application for the Court of Appeals.

[63] David Migoya, *Colorado Supreme Court Justices Knew about Memo Alleging Misconduct 2 Years Before It Became Public*, DENVER GAZETTE, December 15, 2021; David Migoya, *Colorado Attorney General's Office Lawyers Knew about Judicial Misconduct Memo*, DENVER GAZETTE, February 12, 2021; *see also* RCT, Ltd. Rpt. (Appendix 17), p. 31 ("Before leaving (on July 17, 2019), Ryan gave his copy of [the Masias Memo] to [SCAO Legal Counsel Terri] Morrison, who gave it to the Attorney General's Office.").

45

the OSA until February 8, 2021.[64]  This withholding occurred notwithstanding the apparent materiality of the Masias Memo to the fraud hotline investigation begun in June 2019 and the OSA's performance audit of SCAO completed in November 2020.[65]

The Justices' and the Attorney General's Office's withholding of the Masias Memo from the OSA implicates the same criminal liabilities as arising through the Colorado Supreme Court and the Colorado Judicial Department's non-disclosure of their negotiation and approval of the Masias Contract.  18 U.S.C. § 1001 (False Statements); 18 U.S.C. § 371 (Conspiracy to Commit Offense or to Defraud United States).  As principals with supervisory duties as to their agents, the Justices of the Colorado Supreme Court are responsible for the conduct of the lawyers who represent the Court.  Canon Rule 2.12(A); *see generally* Restatement (Third) of Agency § 7.05 (2006) (principals are responsible for harms caused by agents that arise from negligent or intentional supervision).  Conversely, attorneys are personally responsible for refraining from "knowingly assist[ing] a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law."  RPC 8.4(f).

It is equally troubling that, when confronted with the probable misconduct of his employees, Attorney General Phil Weiser refused to confirm whether, at the time, he was personally aware that his Office chose to withhold the Masias Memo from the OSA.  Instead of calling for further investigation, Attorney General Weiser (through a spokesman) made an official statement justifying the withholding as consistent with his Office's obligations to protect "confidentiality."

---

[64] In their February 8, 2021 Statement signed by "The Colorado Supreme Court" and published to all Judicial employees, the Justices explained:

> Today, we met as a court and viewed the memo for the first time.
> We unanimously decided to take the following actions:
>
> First, ***we have released the memo to the State Auditor*** to assist in her fully investigating the circumstances surrounding the contract with former Chief of Staff Mindy Masia[s].  (Emphasis added).

[65] Further investigation will reveal a July 19, 2019 email chain between Counsel to the Chief Justice Andrew Rottman and 1st Assistant Attorney General LeeAnn Morrill in which Morrill acknowledges possession of the Masias Memo, its materiality to the OSA's Fraud Hotline investigation, and the need to preserve the document.  Appendix 30, p. 43; *see also infra* at note 87 (describing context of Judicial Department's constructive denial of access to this and other administrative records).  At the same time, however, Rottman and Morrill implicitly made the decision (presumably in consultation with the Justices and Rottman/Morrill's other superiors) to conceal the existence of the Masias Memo from the OSA.  *The Denver Post* made a public records request for a copy of the Masias Memo on or about December 2020.  Despite authorizing legislative testimony during this time and being directly confronted with its existence, the Justices continued to intentionally conceal / withhold the Masias Memo from the OSA (and legislators) for two months.  As confirmed through the Justices' February 8, 2021 public statement and despite its acknowledged materiality, the Masias Memo was finally discovered by the press and disclosed to the OSA over 1 ½ years after Morrill and Rottman's email discussion.

46

> Weiser would not say if he was previously aware of the document [(the Masias Memo)] or its contents.
>
> 'The Colorado Rules of Professional Conduct prohibit a lawyer from revealing information or documents related to the representation of that lawyer's client,' Weiser's office told The Denver Post in an email Wednesday. 'The Attorney General's Office is required under state law to be the legal counsel to the Judicial Department and the State Auditor, and all state lawyers must follow these rules requiring confidentiality of client information.'
>
> Asked directly whether Weiser knew, his spokesman would not say.
>
> 'We cannot confirm or deny any information,' Lawrence Pacheco wrote in an email to The Post.[66]

As explained by Deputy State Auditor Michelle Colin, former State Auditor Dianne Ray decided to complete a performance audit of SCAO because of the nature of the allegations raised through the fraud hotline investigation and to make more information available to the public. Accordingly, the withholding of the Masias Memo by the Judicial Department and employees of the Attorney General's Office during the performance audit had profound consequences as to the timing of reporting to law enforcement and public awareness of the overall issues involved with the Masias Contract.  As explained by Colin:

> There are some very strict confidentiality requirements around any fraud allegations that we receive, as well as any fraud investigations that we conduct. . .  However, given the issues that were brought up in the fraud allegations, the former State Auditor decided at that time that we would conduct a performance audit at the State Court Administrator's Office with the idea being that our performance audit results, our report is made public. And so that information would be available to you as legislators as well as just the general public.[67]

Notably, with knowledge that the Masias Memo was being withheld from the OSA, the Court's February 4, 2021 public statement emphasized the importance of the 2022 OSA Performance Audit Report as proof that problems with the Masias Contract had been fully resolved.  *Infra*, p. 61.

---

[66] Migoya (February 12, 2021), *supra* note 63; *see also infra*, note 48 (describing dubious nature of the Court's assertions of confidentiality and attorney client privilege).

[67] *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., June 14, 2022 (testimony of Deputy State Auditor Michelle Colin); Appendix 27(s)(i)(6), p. 1:5-13.

**The 2020 OSA Performance Audit Report finds substantial deficiencies in SCAO's internal controls and recognizes the Masias Contract as creating an "Appearance of Impropriety."**

Although the OSA was not aware of and did not have access to the Masias Memo, its November 2020 Performance Audit Report found substantial deficiencies in SCAO's internal controls and business practices.  The OSA's Performance Audit Report was critical of SCAO's excessive use of paid leave to settle employment claims.  2020 OSA Rpt. (Appendix 15), pp. 32-35.  The audit report was also highly critical of the substance and nature of the Masias Contract, ultimately finding that the timing of the sole-source determination and the price-term of the contract presented an appearance of impropriety in violation of the Judicial Code of Conduct.  *Id.* at pp. 52-53.  With its finding of an appearance of impropriety, the OSA further found that Masias Contract was not supported by any documentation of negotiations as to its price term.  *Id.* at p. 54 (reference to Procurement E).  The OSA's recommendations included proposed rule changes that would require the approval of the Director of Financial Services (i.e. consultation with SCAO's FSD) for any future substantial sole-source procurements.  *Id.* at pp. 55, 57.

**Despite Chief Justice Coats's ultimate admissions and his public censure for violating Canon Rule 2.5, none of the other Justices have been held accountable for their same misconduct or their failures to report that and other judicial and attorney misconduct.**

With Chief Justice Coats now having admitted to and having been publicly censured for violating Canon Rule 2.5 of the Code, a fundamental question arises why the other Justices who also approved and allowed the Masias Contract to move forward without notice to SCAO's FSD and the OSA should not be accountable for essentially the same prohibited judicial misconduct.

Moreover, with Chief Justice Coats's established judicial misconduct, there is also a legitimate question why neither he nor any of the other Justices reported their own or each other's then-apparent violations of the Code with regards to the Masias Contract.  Canon Rules 2.15(A), (C) and 2.16(A).

Media reporting described Chief Justice Boatright's 2021 correspondence with this Commission, in which he fences over the definition of "knowingly" under the Code.  As described in the news article:

> Boatright responded to the commission on June 11, 2021, saying it seemed to misunderstand when a judge is required to report allegations of misconduct by another judge. They need only do so if they actually witnessed the event.
>
> 'Based on the tone and substance (of the commission's letter), I'm concerned that the duty of individual judicial officers to report known violations of the Colorado Code of Judicial Conduct (to the commission) … has been misconstrued as encompassing the duty to report . . . unsubstantiated allegations of judicial misconduct leveled indirectly by a third-party long after the fact,' Boatright wrote on June 11, 2021. 'We need to start with the same basic

48

understanding … because 'knowledge' … is limited to 'actual knowledge,' Boatright wrote.

Boatright added that 'I of course recognize and take very seriously' the obligation 'to report known violations' to the commission and would 'promptly comply' when the court had 'actual knowledge' of them.

The commission shot back that Boatright was wrong and doing little more than stalling.

'The Commission does not agree with the suggestion … that your office and the department are relieved of disclosure and cooperation obligations if information is outside the 'actual knowledge' of an individual judicial officer[.]'[68]

Chief Justice Boatright's position was nonsense and directly contrary to the text and intent of Canon Rule 2.15 and its accompanying comments, which on one hand require the mandatory reporting of known misconduct raising substantial questions regarding a judge's honesty, trustworthiness, and fitness and on the other hand require "appropriate action" when a judge learns of "information indicating a substantial likelihood that another judge has committed a violation of this Code."[69]  Canon Rule 2.15, Comment 3 provides:

[3] A judge who does not have actual knowledge that another judge or a lawyer may have committed misconduct, but receives information indicating a substantial likelihood of such misconduct, is required to take appropriate action under paragraphs (C) and (D). *Appropriate action may include*, but is not limited to, communicating directly with the judge who may have violated this Code, communicating with a supervising judge, or *reporting the suspected violation to the appropriate authority or other agency or body.* Similarly, actions to be taken in response to information indicating that a lawyer has committed a violation of the Rules of Professional Conduct may include but are not limited to communicating directly with the lawyer who may have committed

---

[68] David Migoya, *Letters Show State High Court Stalled Scandal Investigation*, DENVER GAZETTE, March 6, 2022; *see also* Appendix 19 (with partial copies of correspondence).

[69] Chief Justice Boatright's interpretation is particularly problematic considering the recent allegations that, since 2019, he has knowingly concealed yet another judge's unfitness and retaliation towards a Judicial Department employee.  *Supra*, note 3.  It deserves emphasis that "appropriate action" is required under Canon Rule 2.15 (C) and (D) whenever there is a "substantial likelihood" of *any* violation of the Code.

49

> the violation, *or reporting the suspected violation to the*
> *appropriate authority or other agency or body.*

(Emphasis added).

The Reporters' Notes to Canon Rule 2.15 of the ABA Model Code further affirm that required reporting may be the "appropriate action" in certain circumstances regardless of whether a judge actually knows or can be inferred to know of judicial misconduct under the Code's definition of "knowingly."

> Paragraph (C) states that when a judge receives information indicating a substantial likelihood that another judge has violated the Rules, the judge receiving such information shall – no longer 'should' – take appropriate action. In the Commission's view, in situations where the judge does not know, but receives information making it substantially likely that another judge has violated the Rules, the judge receiving such information shall take action. The appropriate action will vary with the circumstances. In some instances, it could involve talking to the judge in question or in other instances, taking steps to verify the information received and reporting it to the appropriate authorities.[70]

It should also be noted that Chief Justice Boatright disingenuously asserted his position that reporting requirements are triggered only with actual knowledge just eight days after he signed an order from the Court amending the Code and Canon Rule 2.15 to include an additional Comment 1:

> [1] Public confidence in the integrity and impartiality of the judiciary is promoted when judges take appropriate action based on reliable evidence of misconduct. Appropriate action depends on the circumstances, *but the overarching goal of such action should be to prevent harm to those affected by misconduct and to prevent recurrence.*[71]  (Emphasis added).

Expectations of self-reporting are necessarily implied through the requirements in Canon Rule 2.16 that, at all times, a judge must "cooperate and be candid and honest with judicial . . . disciplinary agencies."  Efforts to conceal evidence of a judge's own judicial misconduct have

---

[70] Charles G. Geyh and W. William Hodes, REPORTERS' NOTES TO THE MODEL CODE OF JUDICIAL CONDUCT 52 (2009).

[71] Colorado Supreme Court, Rule Change 2021(15), June 11, 2021; *see also Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., July 12, 2022; Appendix 27(s)(ii)(5), p. 7:29-8:1 (Emeritus Director of National Center for Judicial Ethics Cynthia Gray explaining purposes of Canon Rule 2.15 in stopping patterns of unreported judicial misconduct).

50

been recognized as violative of Canon Rule 2.16.[72]  The intentional nature of Chief Justice
Boatright's withholding of known judicial misconduct has only become clearer through the
circumstances of the pending Woods case and in *Kiesnowski*. Migoya, *supra* note 3.  These case
examples raise an additional reasonable basis to question Chief Justice Boatright's history of
honesty and candor towards this Commission under Canon Rules 1.2 and 2.16.

**The Current Justices' Commentary and Refusal to Disqualify Themselves**

**December 7, 2020 Testimony before the Legislative Audit Committee**

Following publication of the 2020 OSA Report, Chief Justice Coats, succeeding State Court
Administrator Steven Vasconcellos, Deputy State Auditor Michelle Colin, and other members of
the OSA's Staff appeared before the Legislative Audit Committee on December 7, 2020.[73]
Chief Justice Coats testified that leadership within SCAO had "changed substantially" after
Ryan's resignation and that the Colorado Supreme Court had modified its supervisory structure
to assign individual justices as liaisons to SCAO's respective Divisions.  OSA Staff explained
the primary findings of the 2020 OSA Report, including concerns about:

1. SCAO's awards of paid time off / voluntary separation incentive (VSI) agreements as
   employment settlements and employment record keeping practices,[74]
2. Expense reimbursements,

---

[72] *See, e.g. In re Maggio*, 440 S.W.3d 333 (Ark. 2014) (judge removed partly due to efforts to
remove his published comments about pending cases from internet forum); Ark. Jud. Discpl. &
Disab. Comm., *Letter of Suspension and Removal from Office* (JDDC Case # 14-136), August 6,
2014 *available at* https://www.jddc.arkansas.gov/commission-final-actions/.

[73] *Hearing before the Legis. Audit Comm.*, Colo. Leg., December 7, 2020; Appendix 27(c), pp.
4:8-5:34.  Additionally, the substance of the hearing and the 2020 OSA Report were highlighted
in press coverage.  David Migoya, *State Court Admin Office Mismanaged Spending on
Contracts, Family Medical Leave*, DENVER POST, December 8, 2020.  A summary of the OSA's
findings with regards to the 2020 OSA Audit Report was repeated as part of OSA Performance
Audit Manager Derek Johnson's testimony provided to the Legislative Interim Committee on
Judicial Discipline (ICJD) at its June 14, 2022 hearing.  *Hearing before the Interim Comm. on
Jud. Discipline*, Colo. Leg., June 14, 2022; Appendix 27(s)(i)(6), pp. 2:1-4:27.

[74] More particularly, the OSA's Staff explained that poor record keeping practices created
liability risks for SCAO relating to potential claims of retaliation and wrongful termination.
OSA further explained that SCAO's problematic VSI agreements cost the State at least $178,000
and that SCAO's problematic provision of paid time off cost the State more than $476,000
during the audited period.  *Supra* at note 73; *see also* Appendix 27(c), pp. 5:18-22, 12:21.

51

3. The Judicial Department's non-adoption of internal control principles consistent with the Green Book published by the United States Government Accountability Office,[75] and

4. Sole-source contracting, including the Masias Contract.

Without identifying it specifically, Chief Justice Coats confirmed his awareness that at least one of the voluntary separation agreements (presumedly the VSI agreement with Kribs) was made in conjunction with a non-disclosure agreement. Although he implicitly acknowledged the existence of the VSI with Kribs, Chief Justice Coats did not provide the context that the VSI had been negotiated to settle a claim of retaliation related to the reporting of Masias's suspected financial misconduct and to facilitate surreptitious approval of the Masias Contract. Critically, Chief Justice Coats acknowledged on the record that it was the pattern and standard practice of the Judicial Department to negotiate separation agreements with general waivers and non-disclosure provisions. State Court Administrator Vasconcellos and Chief Justice Coats, respectively, had the following dialogue with Representative Rod Bockenfeld:

> **Rep. Saine**
> Representative Bockenfeld.
>
> **Rep. Bockenfeld**
> Thank you, Madam Chair. Am I to assume that, if you received a voluntary separation incentive, you also signed a waiver of any claims that you may have against the State? Or is that an accurate statement?
>
> **Rep. Saine**
> Mr. Vasconcellos.
>
> **Steven Vasconcellos**
> Madam Chair. Representative Bockenfeld, that's correct.
>
> **Rep. Bockenfeld**
> Thank you.
>                     * * *

---

[75] The OSA identified $55,000 of expenses for a seven-person SCAO leadership training through the University of Virginia's rowing program as an example of a failure of internal controls. *Hearing before the Legis. Audit Comm.*, December 7, 2020; Appendix 27(c), p. 23:12-14; Appendix 15, p. 74. Notably, this expense was something reported specifically in the April 15, 2019 anonymous fraud report. Appendix 7, p. 3 ¶ 1. More generally, the OSA identified the University of Virginia training and other similar expenses as reflective of the Department's failure to establish an appropriate "tone at the top." *Supra* at note 73. The concept of "tone at the top" is a pervasive issue in the broader Masias Controversy. Generally defined: "Tone at the top in internal controls is a level of commitment among the leadership to ethical conduct. It is an embodiment of an [organization]'s values and set of ethics." https://www.esgthereport.com /what-is-tone-at-the-top-internal-control/.

52

**Rep. Saine**
Thank you very much. Representative Bockenfeld.

**Rep. Bockenfeld**
Thank you, Madam Chair. My last question was about the waiver of any claims. Do these waivers also include any non-disclosure agreements?

**Rep. Saine**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. Not that I'm aware of, Representative Bockenfeld.

**Rep. Saine**
Any further questions on Recommendation 1 to the Department. All right, seeing none.

**Chief Justice Coats**
Madam Chair, could I? Could I make one remark?

**Rep. Saine**
Yes, your Honor.

**Chief Justice Coats**
Representative Bockenfeld, just to make clear. And I would agree, I think, from what I understand with Mr. Vasconcellos. But to the extent that a VSI, and I think one that had been identified here was made in conjunction with a separate separation agreement. *That one, I'm sure, given the practice at the time, did involve non-disclosure. And it involved other things, involving the separation.* It was not a typical VSI. But I think one of the ones they talk about may have fallen into that category.

**Rep. Saine**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair, that's correct. I apologize. One of them, one of the VSIs, was associated with a separate separation agreement. *And that one does have nondisclosure provisions.*[76]

---

[76] *Hearing before the Legis. Audit Comm.*, Colo. Leg., December 7, 2020; Appendix 27(c), pp. 8:27-9:2, 9:19-10:13.

Neither Chief Justice Coats nor Vasconcellos addressed the propriety of any of the identified paid leave settlements noted as problematic in the 2020 OSA Report.  Likewise, neither Chief Justice Coats nor Vasconcellos informed the Legislative Audit Committee that Coats had authorized the Masias Contract with the approval of all the other Justices but without notice to SCAO's FSD or to the OSA.  Moreover, neither Chief Justice Coats nor Vasconcellos disclosed their knowledge of the existence of the Masias Memo and its withholding from the OSA to the Legislative Audit Committee.

Chief Justice Coats retired and Justice Berkenkotter replaced him on January 1, 2021.  At the same time, Justice Boatright succeeded Coats as Chief Justice.

**The Justices, through State Court Administrator Steven Vasconcellos, announce that they and the Attorney General's Office have pre-judged that the issues identified in the OSA's Performance Audit Report do not merit referrals to law enforcement or further civil fraud enforcement actions, other than allowing the OSA's fraud hotline investigation to proceed.**

In mid to late-December 2020, *The Denver Post* first requested that the Judicial Department produce a copy of the Masias Memo as a public record under P.A.I.R.R. 2.  Internally, 1st Assistant Attorney General LeeAnn Morrill, Counsel to the Chief Justice Andrew Rottman, and SCAO's Chief Legal Counsel Terri Morrison discussed ways of imposing a prior restraint upon and silencing former State Court Administrator Christopher Ryan, who they suspected to be reporter David Migoya's source of information.  These internal discussions culminated in the Judicial Department sending Ryan a cease-and-desist letter sometime around January 2021.[77]

The timing of *The Denver Post's* request for the Masias Memo, however, establishes the critical fact that both Chief Justice Boatright and State Court Administrator Steven Vasconcellos were fully aware of the Masias Memo's existence and that it was intentionally being withheld from the OSA when they testified to the Joint Judiciary Committee on January 28, 2021 at the Judicial Department's annual SMART Act hearing.  The Joint Judiciary Committee's January 28, 2021 hearing followed an earlier January 25, 2021 SMART Act hearing for the OSA.

At the January 25, 2021 hearing, the OSA again discussed the findings and recommendations of its 2020 performance audit of SCAO.  During discussion with the committee, Representative Adrienne Benevides asked whether the OSA was making criminal referrals or seeking restitution for public funds that were misused.  The following dialogue occurred on the record:

> **Rep. Benevides**
> My question was to Ms. Heller. I did listen to the JBC presentation
> on this. I'm just wondering if, because there were so many issues,

---

[77] As with other material records and information, Terri Morrison has constructively denied a P.A.I.R.R. 2 request for these specific records.  Appendix 30, p. 12, 40, 71-72; *see also infra* at note 87 (describing context of Judicial Department's constructive denial of records access); Migoya, *infra* note 81 (describing cease and desist letter).

54

*especially contracting issues, were there any criminal referrals of your audit*?

**Sen. Lee**
Ms Heller.

**Vickie Heller**
Thank you, Mr. Chair. No, there were not. Not as a result of this audit. I might defer back to Deputy Hunter for specifics, but I can tell you that, in addition to this audit, there were fraud allegations that, under a separate function of our Office, separate staff are looking into the fraud allegations. And if Deputy Hunter wants to elaborate on that, she may. But, I do know that because of media attention that that led to this audit, there were also fraud allegations that are leading to a fraud investigation that's ongoing at this point in time.

**Sen. Lee**
Ms. Hunter do you want to elaborate on any of that?

**Kerri Hunter**
Thank you, Mr. Chair, at this point I really cannot, because it's ongoing. But we are in the midst of looking into that.

\* \* \*

**Rep. Benevides**
And thank you, Ms. Heller. And, you know, fraud can result in administrative findings, not just criminal. Particularly with regard to the separation incentives, where those can be clawed back if they were improper. As well as the almost 50,000 in potentially problematic Procurement Card [use]. *That, also, can be clawed back from the employees, and there can be administrative matters taken up as far as discipline. So, it's not just criminal.* So, I'm just wondering, are you all looking at those aspects and expecting something to be done or by the Judiciary?

**Sen. Lee**
Ms. Heller.

**Vickie Heller**
Thank you, Mr. Chair. I would say, for the purposes of the audit and the types of recommendations we make, our focus in the audit was to point out and conclude and make recommendations to change the overall system and process. So, what you are talking about is a little bit different, more specific, and I guess *I would just*

55

> ***recommend potentially asking the Judicial Department about
> those specific questions*** when they're here to talk to you, which I
> believe is not today, but maybe about your Thursday meeting.
> They'll be reporting to you about what they're doing. [78]

Although there has been a focus on the Colorado Supreme Courts' later February 4th and
February 8th, 2021 public statements responding to the Masias Controversy, the Justices actually
first announced their pre-judgment of the issues involved in the Masias Controversy at the
January 28, 2021 SMART Act hearing.  Specifically, State Court Administrator Vasconcellos
announced that the Judicial Department (overseen by the Justices themselves) had determined
that there was no "overt criminal behavior that merits review" and that the Attorney General's
Office had been consulted as to the legality / enforceability of the contracts highlighted in the
OSA's 2020 Performance Audit Report with the Attorney General's Office advising that the
contracts should be "honored."

Because of the OSA's response at the January 25, 2021 hearing, Chief Justice Boatright and
Vasconcellos were on notice that Representative Benevides intended to ask similar questions at
the January 28, 2021 hearing.  On January 28, 2021, with Chief Justice Boatright present,
Representative Benevides and State Court Administrator Vasconcellos had the following
exchange:

> **Rep Benevides**
> Yes, thank you for that answer. And I guess I had asked the
> Auditors this question, so I wanted to ask you, as well. Is that these
> findings were significant, as far as over half a million in voluntary
> separation incentives, and it was 27% of your administrative leave
> that was granted, that may have been improper. There was 50,000
> in Procurement Card issues, and then it was 6 out of 10 sole-source
> contracts. So, while I appreciate you all, and I know this was not
> under your watch, sir. But, I appreciate you doing training and
> fixing the Rules. And my question had to do with, as far as any of
> the employees who were in this situation that received these
> incentives or had the errors. Because anybody that gets a
> Procurement Card gets training and information when they receive
> it. ***So, is there a real push on your behalf to maybe go after some
> of these individuals administratively and claw back some of those
> payments, since it's such a significant amount? Because that's
> doable, along with potentially any criminal referrals.***
>
> **Steven Vasconcellos**
> Thank you, Mr. Chair.

---

[78] *Hearing before the J. Jud. Comm.*, Colo. Leg., January 25, 2021 (OSA SMART Act
Presentation); Appendix 27(e), pp. 6:26-7:6, 8:2-8:18.

**Rep. Weissman**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Representative Benevides, thank you for your question. Not to minimize any of the issues identified in the audit, but they're not all created equally, I would argue. Some are best addressed through training, and at the other end of the scale, some of the folks involved are no longer employed by the Colorado Judicial Department. So, you know, a range of responses commensurate with the with the severity of the issue. You know, in terms of clawing back some of the money involved. If we use the example, say, of the voluntary separation incentives, we entered into contractual agreements with those parties, ***and based on the legal advice we received internally and from the Office of the Attorney General, we felt the best course of action was to honor those legal agreements that we entered into***. Our big challenge with some of those VSIs, were they just weren't reviewed by our legal experts up front, and had various deficiencies around, say, compliance with the Americans with Disabilities Act, etc. And, so, when I started, the first thing we had to do was get those reviewed and correct deficiencies. But we had already entered into legal agreements on some of these matters. ***You know, in terms of any criminal referrals, I am not aware and we have not found within our own review, overt criminal behavior that merits review.*** However, I think many of you are aware that the Office of the State Auditor, beyond the SCAO Performance Audit, is also conducting a fraud hotline investigation under the fraud hotline statute. And, I think as the committee may know, when one of those is brought to light, the agency that's subject to the investigation has several choices. They can conduct the investigation themselves. They can partner with the OSA to conduct the investigation. ***Or the agency can hand the investigation solely over to the OSA, which was the choice that we made. The latter, to have the OSA conduct the investigation independently of us.*** And, so, you know, there's a range of things that could happen under the fraud investigation, including, in the most extreme, a referral to a local District Attorney for fraud charges. That investigation is ongoing. I don't have details to report. ***The OSA is still doing their work, and I don't want to get too invasive in their investigation.*** I think it's better that they have a little bit of independence in doing that. So, we'll see how some of this lands. I hope that answers your question, Representative Benevides.

57

**Rep Benevides**
Yes.[79]

To summarize, Chief Justice Boatright and State Court Administrator Vasconcellos were fully aware of the existence of the Masias Memo, the fact that it was being withheld from this Commission and the OSA, and that it was also being concealed from the Legislature. Notwithstanding their awareness of these circumstances, Chief Justice Boatright and State Court Administrator Vasconcellos proceeded to announce and pre-judge that, with the Attorney General's blessing, the Masias Controversy did not present grounds for criminal investigation and prosecution or even further investigations of fraud for civil and disciplinary enforcement, outside of the OSA's then-pending fraud hotline investigation (which the Justices knew they ultimately controlled).

State Court Administrator Vasconcellos's testimony at the January 28, 2021 SMART Act Hearing implicates the Justices having violated Canon Rules 1.1, 1.2, 2.2, 2.6, 2.10, 2.11, 2.12, 2.15, 2.16, and 3.1. Additionally, the suppression of referrals to conflict-free law enforcement, this Commission, and other civil fraud enforcement agencies by the attorneys involved in advising the Justices implicates further violations of Colo. RPC 8.4(f).

***The Denver Post* publishes an interview with former State Court Administrator Christopher Ryan, who publicly alleges that he acted at the direction of others and that the Masias Contract was a *quid-pro-quo* arrangement to suppress evidence of judicial and other misconduct within the Colorado Judicial Branch.**

In response to his adverse portrayal in the media following release of the 2020 OSA Report and the December 7, 2020 Legislative Audit Committee Hearing, Ryan provided an interview to reporter David Migoya.[80] Significantly, Ryan disclosed the existence of the Masias Memo and asserted that the Masias Contract was negotiated "*quid-pro-quo*" to avoid Masias bringing a gender discrimination lawsuit with the disclosure of compromising information about the Judicial Department, including allegations of judicial misconduct. *Supra*, note 30; *see also supra*, note 28. Ryan described reading the Masias Memo and, then, arranging a meeting to discuss the Department's next steps with Coats. Ryan asserted that he only acted at the direction of others when he executed the Masias Contract.

> I did execute the Masias contract, but note that this was not an undertaking of a single individual, Ryan said. 'Chief Justice Coats

---

[79] *Hearing before the J. Jud. Comm.*, January 28, 2021 (Colo. Jud. Dep't SMART Act Presentation); Appendix 27(f), pp. 5:35-7:2.

[80] "Ryan said he came forward about the memo after the OSA blamed him for financial irregularities that had 'degraded the public trust,' including how the Masias contract was awarded. The OSA made no mention of the memo or the meeting with Coats that was convened to discuss it." Migoya, *supra,* note 30. The OSA's attribution of internal control failures to Ryan personally, as expressed in the OSA's December 7, 2020 testimony to the Legislative Audit Committee, can be found in Appendix 27(c) at p. 23:18-30.

58

and …   Andrew Rottman were involved in every discussion,
review of the contract language and all aspects of the decision for
implementation.' *Id.*

The *Denver Post* story noted that the Judicial Department denied repeated requests for public disclosure of the Masias Memo and the Department's further assertions that: "The Judicial Department does not publicly comment on attorney-client privileged communications, and has not authorized any current or former employee to do so either."  The Department's spokesman did not explain how the Masias Memo or any other administrative matters reported in the article were within the scope of attorney-client privilege or confidential work product.  Ryan attributed losing his job to the Colorado Supreme Court's and the Department's efforts to suppress the Masias Memo: "I ended up losing my job to prevent it from getting out."  In addition to asserting privilege and confidentiality, as explained *supra* at p. 54, the Department had attempted to apply a prior restraint and silence Ryan directly by sending a cease-and-desist order/letter in anticipation of the *Denver Post* article.[81]

---

[81] David Migoya, *Colorado Judicial Department Says Contract-for-Silence Allegations by Former Top Official are False: Christipher Ryan, Former State Court Administrator, Stands by His Story*, DENVER POST, February 5, 2019.

The general validity of the Judicial Department's claims of attorney client privilege is also questionable given the nature of the communications involved (i.e. administrative decisions and the perpetuation of a crime or fraud) and the role of government counsel.  *See* Colo. RPC 1.6(b)(3-4) (recognizing attorney-client privilege non-applicable to circumstances where a client has used legal services to perpetuate a fraud or crime); *Caldwell v. Dist. Court In & For City & Cnty. of Denver*, 644 P.2d 26, 31 (Colo. 1982) (extending application of common law crime-fraud exception to allegations of civil fraud); *In re Lindsey,* 158 F.3d 1263, 1278 (D.C. Cir. 1998) ("When government attorneys learn, through communications with their clients, of information related to criminal misconduct, they may not rely on the government attorney-client privilege . . ."); *In re Witness Before Special Grand Jury 2000-2*, 288 F.3d 289, 294 (7th Cir. 2002) ("[R]eason and experience dictate that the lack of criminal liability for government agencies and the duty of public lawyers to uphold the law and foster an open and accountable government outweigh any need for a privilege in this context."); *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir. 1997) ("[T]he strong public interest in honest government and in exposing wrongdoing by public officials would be ill-served by recognition of a governmental attorney-client privilege applicable in criminal proceedings inquiring in to the actions of public officials."); *accord In re Grand Jury Investigation*, 399 F.3d 527, 535-36 (2d Cir. 2005) (even in single federal circuit that recognizes attorney client privilege applicable to government attorneys, crime-fraud exception does not protect "'client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct'"); *see also* § 13-5.3-106(6)(b), C.R.S. (2022) (Judicial Department prohibited from withholding disclosure of information to the Commission on Judicial Discipline based upon claims of attorney-client privilege, work product, confidentiality, or contractual obligations; beyond protections provided in Canon Rule 2.16, Judicial Department prohibited from directly or indirectly retaliating against reporting parties and persons assisting Commission perform its constitutional mandate).

59

The legal significance of Ryan's statements and allegations, however, was not reported on at the time.  By alleging that the management of a state-level department (which directly and indirectly benefits from the State of Colorado receiving federal funding) approved the payment of public funds as a *quid-pro-quo* agreement to suppress evidence of judicial and other misconduct, Ryan made *de facto* claims that one or more persons (including himself) committed the federal crime of Bribery of Public Officials and Witnesses.  18 U.S.C. § 201.  Similarly, because the conduct allegedly occurred through the agreement of multiple public officials, Ryan's assertions also implicated the federal crime of Conspiracy to Commit Offense or to Defraud United States. 18 U.S.C. § 371.  Because of the number of people allegedly involved and the number of distinct crimes potentially involved, Ryan's assertion further implicated violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act.  18 U.S.C. §§ 1961-1968.  Federal law recognizes Bribery, Conspiracy, and RICO violations as felony-level offenses.  As a direct participant in the formation and non-disclosure of the Masias Contract to the OSA, Ryan also faced potential criminal liability for False Statements according to 18 U.S.C. § 1001.  Within this context, the degree to which Ryan exposed himself to significant potential criminal liability by coming forward without any sort of proffer agreement should be acknowledged with recognition that Ryan's statements have a degree of credibility given how they are contrary to his own interests.

**The Colorado Supreme Court begins publicly covering up and minimizing the misconduct involved in the Masias Contract.**

On February 4, 2021 (the day following publication of Ryan's interview), the Colorado Supreme Court, through an email sent by Chief Justice Boatright, responded with an official statement directed to all Judicial Department employees.  In a follow up statement, the Judicial Department's spokesman confirmed that the official statement was authored "by the Court."  The Court's official statement provided:

> Dear Judges and Judicial Department Personnel:
>
> In response to the February 3, 2021 article published by The Denver Post, the Judicial Department categorically denies that the contract for leadership training was awarded to The Leadership Practice, LLC in June 2019 due to blackmail or to keep information about the Department quiet. The notion that former Chief Justice Coats and his counsel Andrew Rottman—both dedicated public servants—would ever authorize the use of state resources to silence a blackmailer is simply false.
>
> Former Chief of Staff Mindy Masias was not promised any contract prior to her resignation. In fact, at the time of her resignation she had applied and was under consideration for a position in another state.[82] Only after her resignation, and with the

---

[82] Other than confirming the Justices' contemporaneous awareness of Masias's separation agreement (including its non-disclosure provision) and approval of the Masias Contract, it is

60

strong recommendation of former State Court Administrator Chris Ryan, did former Chief Justice Coats authorize Mr. Ryan to finalize a contract with Ms. Masias. The contract was signed by Mr. Ryan on behalf of the Department on June 3, 2019, and it was subsequently canceled on July 17, 2019, after learning that important information was withheld from Chief Justice Coats.

As these events unfolded over the past two years, and after being apprised of all the facts, the supreme court continued to have full confidence in the leadership of former Chief Justice Coats.

Regarding other items in the *Post* article, the Judicial Department takes allegations of misconduct by judges and staff very seriously. The Department is committed to working with its legal team, HR department, the Attorney General's Office, and the Judicial Discipline Commission to ensure that complaints are heard and concerns are addressed. We understand the importance of this function, and we are constantly working to ensure we have systems in place to address these allegations quickly and effectively. We are committed to ensuring a safe and professional work environment.

If you have not already done so, we strongly encourage you to review the Performance Audit Report recently issued by the State Auditor—an independent officer of the Legislative Department—

---

unclear why the Court's official public statement contains factual assertions that Masias was not "promised" the Masias Contract prior to her resignation or that she was contemporaneously applying for employment in another state. Further investigation will confirm the existence of an April 4, 2019 email chain between Chief Justice Coats and Justice Hart discussing Masias having applied to become the Utah State Court Administrator with Coats explaining that Masias had signed an NDA and was negotiating the Masias Contract with the Judicial Department. Appendix 30, pp. 40, 43, 71-72; *see also infra* at note 87 (describing context in which Judicial Department is constructively denying access to public records). Beyond Masias's application for the Utah position, the Court's statement also neglects to acknowledge that the Judicial Department's sole-source determination was authorized just six days after Masias's resignation became effective (which the OSA's 2020 Performance Audit Report recognized as creating an appearance of impropriety). In addition, the Court's statement omits the fact that the Masias Contract was executed twice, on April 11, 2019 and, again, on June 3, 2019. As stated by the Court: "Only after her resignation, and with the strong recommendation of former State Court Administrator Chris Ryan, did former Chief Justice Coats authorize Mr. Ryan to finalize a contract with Ms. Masias." This factual assertion was made in striking contrast with Ryan's own words questioning Masias's honesty and integrity, as he expressed them in the November 7, 2018 "Notice of Disciplinary Decision" provided to Masias. *Supra*, p. 23; Appendix 8. On this point, the facts align with Ryan's consistent position that he just followed orders. Nevertheless, these factual assertions and admissions by the Justices are clearly improper commentary prohibited by Canon Rule 2.10.

61

> detailing findings about the management of the State Court
> Administrator's Office while under its former leadership. As
> indicated throughout the report, the State Court Administrator's
> Office—under the helm of current State Court Administrator
> Steven Vasconcellos—is fully committed to complying with all
> Department rules and policies governing its contracting processes
> and relationships with outside vendors, many of which have been
> fortified to address the deficiencies identified by the State Auditor.
> During this difficult time, we thank each of you for continuing to
> focus on performing the Department's critical functions for the
> State of Colorado as we move forward together.

The Colorado Supreme Court's February 4, 2021 Statement was problematic for a number of reasons.

First, the statement commented on the merits of allegations relating to the Masias Contract and pending/impending cases (including reasonably foreseeable attorney and judicial disciplinary proceedings, civil actions, and potential criminal prosecutions). *See also Kiesnowski*, ¶ 15 ("But this court, and only this court, is the ultimate decisionmaker in judicial disciplinary proceedings."). The statement also characterized Ryan's interview with *The Denver Post* as allegations of Masias successfully blackmailing the Judicial Department (rather than the Judicial Department knowingly paying a bribe). The statement went on to make factual assertions regarding the circumstances of the Masias Contract's formation and its subsequent cancellation, including the claim that the cancellation occurred "after [the court] learn[ed] that important information was withheld from Chief Justice Coats."

Second, the Court effectively announced the outcomes of anticipated attorney and judicial discipline cases that the Court, itself, had ultimate authority to review. Put more directly, the Court prejudged the allegations and prospectively exonerated Chief Justice Coats and Rottman by stating: "***The notion that former Chief Justice Coats and his counsel Andrew Rottman—both dedicated public servants—would ever authorize the use of state resources to silence a blackmailer is simply false.***" (Emphasis added). With the issuance of the disciplinary opinion in *Coats*, however, at least some of the allegations raised through the February 3, 2021 *Denver Post* article have now been proven meritorious. The Court's statement prospectively exonerating Chief Justice Coats and Rottman also distracted from the Court omitting explanation of the other Justices' personal involvement in the approval and cancellation of the Masias Contract.

Third, although the Court's February 4, 2021 Statement provided assurances that the Court would cooperate with this Commission, the OSA, and others, the Court did not explain how it had previously withheld material information about the Masias Contract from the OSA and how it was continuing to withhold the Masias Memo from disclosure to the OSA, this Commission, and the public.[83]

---

[83] David Migoya, *Colorado Auditor to Investigate Allegations of Contract for Silence at Judicial Department: Legislators Considering Own Independent Inquiries*, DENVER POST, February 5,

62

The inappropriate use of the Court's institutional ethos to promote a factual narrative and to publicly diminish Ryan's credibility was apparent at the time.  Responding to the Court's statement, Ryan explained:

> They're trying to say its their word, the revered public servants, against me, the discredited public servant.  They're riding it for all its worth to evade public responsibility. . . I was there.  I know what happened.  What was in the [February 3, 2019 *Denver Post*] article is accurate.  The court is characterizing it in a way that is not accurate because there's no contradictory source but me.  They're simply not being truthful.
>
> Migoya, *supra* at note 26.

There was a significant public reaction to the February 3rd *Denver Post* article and the Colorado Supreme Court's official statement.  The then-State Auditor Dianne Ray announced that the OSA would investigate Ryan's allegations as part of its broader Fraud Hotline investigation started in May 2019.  Legislators, including then-Speaker of the House Alec Garnett[84] and Senate President Leroy Garcia expressed concern and the Colorado Legislature's willingness to consider exercising legislative oversight and to open legislative inquiries with the reconvening of the legislative session on February 16, 2019.  Senator Garcia was quoted as explaining: "We have a lot of different leverage we can exercise for full accountability.  As we peel back the layers, we have to have accountability and my fear is a lack of integrity, especially at the highest levels of our Supreme Court."  Migoya, *supra* at note 27.  The then-Senate Judiciary Chair Pete Lee and the current House Judiciary Chair Michael Weissman also confirmed discussions about what role the Judiciary Committees might have in such inquiries.  *Id.*

**To avoid legislative oversight and in anticipation of the OSA's Fraud Hotline Investigation expanding, the Justices disclose the Masias Memo and publicly announce an "outside" investigation.**

In apprehension of an expansion of the OSA's Fraud Hotline investigation, legislative scrutiny, and prospective public investigations, the Colorado Supreme Court through Chief Justice

---

2021 (noting that the February 4, 2021 Statement did not reference the Masias Memo despite efforts by the Judicial Department to prevent its production to *The Denver Post*).

[84] On January 1, 2023, Speaker Garnett became Governor Jared Polis's Chief of Staff.  Recently, Speaker Garnett announced his departure from the Governor's Office to become UC Health's Vice President for Government and Regulatory Affairs where he will report directly to Jacki Cooper Melmed, who is now working as UC Health's Chief Legal Officer.  Garnett left the Governor's Office on September 13, 2024 and was replaced by his Deputy Chief of Staff, David Oppenheim.  Marianne Goodland, *Gov. Jared Polis Names a New Chief of Staff*, DENVER GAZETTE, September 3, 2024.

Boatright made a second official public statement directed to all Judicial Department employees. The February 8, 2021 Statement[85] provided:

> Judges and Judicial Personnel:
>
> ***The Colorado Supreme Court*** is committed to ensuring that we all have a safe work environment, that any allegation of wrongdoing is fully investigated, and if wrongdoing is found, that there is full accountability. As you are aware, there have been several news stories in the past week regarding a "memo" that was created in 2018 or 2019. Today, ***we met as a court** and viewed the memo for the first time*. We ***unanimously decided*** to take the following actions:
>
> First, ***we have released the memo to the State Auditor*** to assist in her fully investigating the circumstances surrounding the contract with former Chief of Staff Mindy Masias's company, The Leadership Practice. ***We steadfastly deny that the decision to enter into a contract with The Leadership Practice was motivated in any way by a desire to keep information about the Department quiet***, and we are committed to cooperating with the Auditor's investigation.
>
> Second, we are going to release the memo pursuant to any PAIRR requests we receive.
>
> And third, ***we are retaining the services of an outside investigator to conduct an independent review of all of the allegations mentioned in the memo. We will also ask the investigator to make recommendations as to any actions needed regarding the incidents alleged*** and to offer suggestions to support our ongoing efforts to improve our handling of personnel matters.
>
> ***We believe this is the correct course of action – both to determine any actual wrongdoing and to clear those wrongly accused***. We feel strongly that this transparency, ***coupled with an independent investigation***, is the best way to review every allegation and ensure that any lingering issues are addressed. ***The entire court*** is committed to providing a safe work environment.
>
> Sincerely,

---

[85] A copy of the Colorado Supreme Court's February 8, 2021 statement and a copy of the Masias Memo were published online with a news article. David Migoya, *Colorado Supreme Court Releases Memo Citing Examples of Sex-Discrimination, Judicial Misconduct That Led to Alleged Contract for Silence: Memo Behind $2.5 Million Contract Released and High Court Maintains There Was No Quid-Pro-Quo*, DENVER POST, February 9, 2021.

64

The Colorado Supreme Court

(Emphasis added).

As with its prior February 4, 2019 public statement, the Court's February 8, 2019 public statement was problematic on various levels.

First, the statement makes factual statements about the authenticity and circumstances of the Masias Memo's creation, including the Court's access to and knowledge of the memo. The Justices' statement that they "viewed the memo for the first time" only minimized the fact that they were contemporaneously aware of the Masias Memo's existence in 2019 but chose not to review it until it was discovered by the press in late 2020-early 2021. *See supra*, note 63.

Second, the Court again commented on the merits of allegations regarding the Masias Contract, specifically denying that it was a *quid-pro-quo* arrangement to purchase Masias's silence. In a plain effort to avoid investigations that it could not control, the Court announced that it was retaining an "outside investigator to conduct an independent review of the allegations" in the Masias Memo. Juxtaposed with public assurances of transparency, the Court went on to characterize its proposed contracted-for arrangement as "an independent investigation."

Third, the Court confirmed that it had not previously disclosed the Masias Memo to the OSA and that it no longer perceived any reasons to continue suppressing the memo from public disclosure. The Court did not explain its changed position.[86]

Finally, the February 8, 2019 Statement presented the announced "independent investigation" as a means for the Court to prove its previously pre-judged exonerations of Chief Justice Coats and Andrew Rottman: "We believe this is the correct course of action – both to determine any actual wrongdoing *and to clear those wrongly accused*." (Emphasis added).

Although the Court stated, "we are retaining the services of an outside investigator," it did not say which outside attorney or law firm it was negotiating a contract with. Drafts of the February 8, 2019 statement, however, stated that the Justices were "retaining the services of former U.S. Attorney John Walsh" from the law firm WilmerHale to conduct the Court's announced "independent" investigation. The email chains related to the Court's February 4, 2019 and February 8, 2019 public statements also include confirmation that 1st Assistant Attorney General LeeAnn Morrill and Assistant Solicitor General Grant Sullivan discussed drafts of the statements with "leadership" within the Attorney General's Office that expressly included Chief Deputy Attorney General (and former WilmerHale managing partner) Natalie Hanlon Leh. Without further investigation, however, it is unclear specifically who drafted the Court's February 4, 2019

---

[86] The decision to release the Masias Memo appears to be the Court's direct response to being publicly called out for a lack of transparency and its specious assertions of confidentiality in an editorial published earlier the same day. *Editorial: Colorado Chief Justice Brian Boatright Has One More Chance to Reform the Judicial Department: Colorado Voters Should Prepare to Force Change Upon a Branch of Government that Operates in an Unaccountable Silo*, DENVER POST, February 8, 2021.

65

and February 8, 2019 Statements, who participated in the editing of the statements, who was involved in the decision/negotiations to hire WilmerHale, and how individual Justices approved the statements for publication on behalf of the full "Colorado Supreme Court."[87]

Similar to the public response to the Court's February 4, 2019 Statement, the public response to the Court's February 8, 2019 Statement included amplified demands for independent oversight of the Colorado Supreme Court and the Colorado Judicial Department.  These demands further included an editorial in *The Denver Post* calling for the appointment of a special prosecutor.[88]

---

[87] Through clear bad faith and intentional obstruction, the Judicial Department has constructively refused to produce the relevant records in response to P.A.I.R.R. 2 requests by grouping all requests and demanding a $7,050 deposit (later increased to $11,820) as a precondition for production of *any* responsive documents.  Most recently, SCAO Chief Legal Counsel Terri Morrison added to the absurdity of the Judicial Department's position by now conditioning even the *calculation of an estimate* to produce additional records sought through "Request #22" upon payment of a $2,370 deposit.  As before, Morrison continues to refuse to immediately produce documents that are specifically identified in the submitted requests.  Appendix 30, pp. 27, 40, 45, 71-72; *contra* P.A.I.R.R. 2, § 2(b) ("The custodian must take reasonable measures to locate any specific administrative record sought and to ensure public access to the administrative record without unreasonable delay or unreasonable cost.").  Moreover, through email tracking reports, it is evident that Morrison widely distributed the P.A.I.R.R. 2 requests within the Judicial Department (assumably seeking ways to avoid or delay production of responsive materials, including requests for specific and readily producible documents).  Appendix 30, pp. 4-7, 49-57.

[88] *Editorial: Hire a Special Prosecutor to Root out the Bad Apples in the Judicial Department*, Denver Post, February 12, 2021; *see also* Sondermann, *supra* note 9.  As part of public comments following the Judicial Department's presentation at the Joint Judiciary Committee's January 12, 2024 SMART Act hearing, retired attorney and former 4th Judicial District Judicial Performance Commission member Alan Higbie called for the creation of a special prosecutor statute.  Higbie supported his request with the submission of a comprehensive report into the legislative record.  Alan Higbie, *Preparing for the Next Scandal: Valuable Insights from the 2019-2023 Judicial Corruption Scandal*, January 4, 2024.  Appendix 27(dd)(iii)(1).  Higbie has also created a website that contains much of the press reporting, legislative history, and primary source documents relating to the Masias Controversy.  His website can be found at www.coloradojudges.org.  As part of his public testimony and the submission of his report to the Joint Judiciary Committee on January 12, 2024, Higbie raised many of the same basic issues asserted in this RFE through commonsensical explanations.  *Hearing before the J. Jud. Comm.*, Colo. Leg., January 12, 2024 (testimony of Alan Higbie); Appendix 27(dd)(i), p. 21:17-23-17. For reasons that are unclear, neither this Commission nor the Legislature took any action in response to Higbie's report and his testimony (which accurately highlighted how the Justices openly covered up the Masias Controversy and engaged in conduct within the statutory definition of "fraud").

With revelation of the Masias Memo, Legislators expressed a general frustration with the confidential nature of the judicial disciplinary process.  Then-Senate President Garcia stated his concerns and intentions to pursue legislative oversight, as follows:

> [Garcia] called the memo and the subsequent alleged cover-up at the highest levels of the judicial department 'concerning and alarming,' and said legislators are considering a variety of responses to ensure 'accountability, transparency and fairness,' including holding hearings or forming committees to examine the situation.
>
> 'In conversations with my colleagues, who are all expressing deep concern, we are looking to have this resolved sooner rather than later,' he said. 'I am not going to be stonewalled or delayed in this. This is alarming.'
>
> 'I don't understand it,' Garcia said. 'In my world, as an elected official, we are held accountable… As you look at these judges functioning in a high capacity in which they are giving a sentence to someone and judging, but their own integrity, their own house is not in order? To me that is just unbecoming.'
>
> He added that the judicial department's response — officials initially refused to release the memo to The Denver Post — raises concern as well.
>
> 'If you didn't have these whistleblowers and the commitment of the press to shine a light on this, where might this have landed?' he said.[89]

House Speaker Garnett and Senate President Garcia issued a joint statement calling for a full investigation:

> ***As more and more details are revealed, the questions around taxpayer-funded contracts being awarded to cover up these allegations are deeply disturbing and point to <u>a potential culture of abuse</u>***. . . This is a time when its more important than ever to reinforce faith in our democratic institutions and uphold integrity, transparency and accountability in our government.  These allegations must be investigated in full view of the public until trust in our judiciary is no longer in question.  *Osher*, *supra* note 55 (Emphasis added).

---

[89] Shelly Bradbury, *Alarming Cover-Up Allegation Brings Fresh Scrutiny to Colorado's Largely Secret Judicial Discipline: State Senate President Says Legislators are Considering Ways to Ensure "Accountability, Transparency, and Fairness*," DENVER POST, February 9, 2021.

At the time, Senator Bob Gardner observed that deficiencies in Colorado's judicial discipline system would likely require consideration of a constitutional amendment.  As reported by *The Denver Gazette*, Senator Gardner opined:

> Acknowledging the likelihood that a constitutional change to the judicial discipline process would be necessary, Sen. Bob Gardner, R-Colorado Springs, also raised the possibility of an inspector general to investigate judicial misconduct, something that members of Congress have proposed for the federal judiciary without success.
>
> "I know that the chief justice really wants to see this resolved, that the truth would be made known," said Gardner, who is a member of the Senate Judiciary Committee, referring to current Chief Justice Brian D. Boatright. Gardner recalled the General Assembly's own procedural changes after an outcry over sexual harassment at the capitol, climaxing with the first expulsion of a legislator in over 100 years in 2018.
>
> The Judicial Department "has, by its nature, been largely self policing and there are reasons for that," Gardner added. "By the same token, there's a public demand for transparency and accountability that needs to be met."[90]

*The Denver Gazette* further quoted 1st Judicial District Attorney Alexis King and the Colorado Trial Lawyer's Association's reactions to revelation of the Masias Memo's existence:

> Then-Chief Justice Nathan B. Coats reportedly approved giving Masias an approximately $2.72 million contract from the department to prevent her from going public with the allegations. The Office of the State Auditor referred to the contract award in December, before the memo came to light, as having "the appearance of impropriety."
>
> "As a woman, I am not surprised by this development," said Alexis King, the First Judicial District Attorney in Jefferson and Gilpin counties. "No branch of government is above the law, and that includes the rights of workers to be free from harassment and abuse."
>
> The Colorado Trial Lawyers Association went a step farther on Thursday, likening the Judicial Department employees involved in misconduct to offenders.

---

[90] Michael Karlik, *Lawyers, Judges Ask for Investigations, Reform Following Judicial Scandal*, DENVER GAZETTE, February 12, 2017.

68

> The group "stands with all victims of discrimination, including sexual harassment, abuse, and workplace misconduct," the association wrote. "The recently reported actions of the Colorado Judicial Department to shield judges and other high-ranking employees from accountability is unethical and corrodes public trust in our judicial system. Any effort to prevent offenders at any level from being held accountable cannot be tolerated." Karlik, *supra* note 90.

Also in *The Denver Gazette's* February 12, 2021 article, an anonymous judge expressed prescient doubts about the fairness and effectiveness of Colorado's secretive and unaccountable judicial discipline system. The anonymous judge, however, further noted that the Justices themselves have always had the authority to provide the necessary public transparency and path to fair and effective enforcement of the Code through issuance of a Chief Justice Directive:

> The judge who asked to speak on condition of anonymity doubted that legislation was the appropriate means of furthering transparency in the judiciary, given the separation of powers between branches. They felt "robust measures through a chief justice directive" would be sufficient.
>
> "Once you're a judge, assaults on your reputation really take a toll on you," they warned, acknowledging that only if complaints had probable cause should they be disclosed.
>
> Asked how confident the judge would be that the current system could fairly handle a hypothetical misconduct complaint against a colleague, the judge responded simply, "it depends on the complaint, but not very." *Id.*[91]

On February 12, 2021, Governor Jared Polis issued a similar public statement supporting a meaningful investigation:

---

[91] Instead of using their authority to expand public access to the Court's and the Judicial Department's administrative records, the Justices have consistently asserted specious claims of attorney client privilege and confidentiality to limit such access. It should be emphasized that, like their concealment of the Masias Memo, the Justices have not been forthcoming with the production of other material and relevant administrative records. *See* Appendix 30 (documenting public records requests made in drafting this RFE and the Court / Judicial Department's obstructive responses); *see also supra* at note 87 (describing context of Judicial Department constructively denying access to administrative records). It deserves note that the anonymous judge further recognized the appropriateness of opening judicial discipline proceedings to the public after an initial "probable cause" threshold of proof is met. This observation foreshadowed the constitutional changes that are now proposed through Amendment H / HCR 23-1001.

69

> This memo describes unacceptable behavior within our judicial
> system, both among members of the bench as well as Judicial
> employees.  This type of conduct has no place in Colorado.  Every
> person should feel safe in the workplace and every Coloradoan
> should be able to feel confident in the integrity of our judicial
> system and the high standards to which we hold our judges and our
> judicial system. Migoya (2/12/21), *supra* at note 62.

In an endorsement of the Court's withholding/delayed release of the Masias Memo (i.e. confirming the Attorney General's complicity in the Justices' pre-planned cover up) and the Court's proposal to commission "independent investigation(s)" controlled by the Judicial Department, however, the Attorney General's Office made the following statement:

> Releasing the memorandum at the center of this matter regarding
> the State Judicial Department, as well as opening independent
> investigations into the allegations contained in the memo, are
> necessary steps to address these serious concerns and instill
> confidence in the judiciary.  Bradbury, *supra* at note 30.

In response to the implication that this Commission had been part of an effort to conceal the historic misconduct of judges (particularly the purported examples presented through the Masias Memo), this Commission issued a public statement on February 12, 2021 confirming that the Masias Memo and the allegations it contained had not been previously disclosed to the Commission.[92]

**The Colorado Supreme Court amends its previous public statements to propose the selection of "independent" investigators through a committee appointed by multiple governmental branches / departments.**

On February 16, 2021, the Colorado Supreme Court announced that it would contract for two separate investigations, one to examine the allegations of the Masias Memo and one to examine

---

[92] *Statement of the Colorado Commission on Judicial Discipline*, February 12, 2021 *available at* ccjd.colorado.gov/resources/media-information.  The Commission's review of its internal records was limited to the prior five years (i.e. 2016-2021).  It was subsequently verified that the Commission had issued a private admonition in May 2008, after receiving partial information about one of the Memo's allegations (the "hairy chest" allegation) involving a then-serving 17th Judicial District Court Judge.  ILG, LLC Rpt. (Appendix 18), p. 29.  Contrary to an accusation of non-disclosure later made by State Court Administrator Vasconcellos, however, this Commission had in fact disclosed its informal disciplinary determination when Vasconcellos (as then-Director of the SCAO Court Services Division) participated in a panel that recommended the Judge's approval for the Senior Judge Program.  David Migoya, *Discipline Commission Says State Court Administrator Falsely Accused It of Withholding Information*, DENVER GAZETTE, August 8, 2022.  The ILG Report is notable in its finding that despite the Judge having received private discipline, SCAO's HR Division (led by Masias) did not report subsequent allegations of judicial misconduct by the same Judge to this Commission.

70

the circumstances of the Masias Contract.[93]  Notably, although the contracts would be between the Judicial Department and the investigators, the Court "invited" representatives from the Governor's Office, the Attorney General's Office,[94] and the Legislature to "select" the "external" investigators.

> In advance of Thursday's biennial State of the Judiciary speech, the Colorado Supreme Court today announced it has invited the state's other government branches to select external investigators who will independently examine allegations of sexual harassment and gender discrimination within the Judicial Branch, and of claims that a training services contract was awarded improperly to a former senior administrator. Representatives from the Governor's Office, the Attorney General's Office and the General Assembly will constitute a panel to select the independent investigators. *Supra,* note 93.

The press release further promised that the contracted-for investigations would ultimately present public reports with "all findings and recommendations."

> The independent investigations will result in public reports of all findings and recommendations, including steps for procedural improvement to ensure accountability, fairness and transparency throughout Colorado's Judicial Branch.  *Id.*

Beyond announcing its intention to contract-for two investigations, the Court described the OSA's fraud hotline investigation as also addressing the circumstances of the Masias Contract. The Court did not explain why a second investigation of the same facts was necessary or even helpful.

> Earlier this month, allegations emerged that former chief of staff Mindy Masias was awarded a training services contract in order to prevent her from filing a lawsuit revealing incidents of sexual harassment and discrimination inside the department. The contract was later terminated. The situation is part of a broader investigation being conducted by the Colorado Office of the State Auditor.  *Id.*

---

[93] Colorado Judicial Department, *Colorado Supreme Court Requests Outside Panel to Select Independent Investigators*, February 16, 2021 *available at* https://web.archive.org/web/20210226044332/https://www.courts.state.co.us/Media/release.cfm?id=1962.

[94] The inclusion of the Attorney General's Office, which had been collaborating in the drafting of the Justices' public statements responding to the Masias Controversy and which, by all appearances, helped engineer the Justices' cover up through the idea of the "independent" investigations, creates pronounced appearances of impropriety.  *See* Canon Rules 1.1, 1.2, 1.3, 2.6, 2.9, 2.10, 2.11, and 2.12.

71

Similar to the Court's February 4th and 8th, 2021 statements, Chief Justice Boatright made statements promising cultural changes, transparency, and accountability.

> My promise to [the Department's employees], and to all of Colorado, is that the Court is going to work equally hard not just to repair our internal culture but to greatly enhance the entire department.  We're going to get this right.  *Id.*

At his February 18, 2021 State of the Judiciary Speech, Chief Justice Boatright included the following statements:

> We have all heard the claims about the training contract. The document which has been referred to as a memo has been released, and that has been the subject of much conjecture. I am not here to comment on any of the claims and conjecture—except to say that the branch takes allegations of misconduct by judges and staff extremely seriously. The conduct described in the allegations, if accurate, is unacceptable and cannot and will not be tolerated. We need to know if human resources investigated any of these allegations, and if they did, what action was taken. And if they didn't investigate the allegations, we need to know why. What we need, first and foremost, is the truth. Therefore, I have requested a full investigation of the circumstances surrounding the contract and an investigation into each and every incident listed in the document. I have asked the Governor, the Attorney General, as well as leaders of both parties in the House and Senate to provide representatives for an independent panel that will draft a request for proposal to first define the scope of the investigation. Per our procurement regulations (we are going to do this "by the book"), that request stays open for thirty days. Then, the panel will meet again and select the independent counsel or counsels from those who submitted proposals. That person or firm will then conduct the investigation. We hope to announce the members of the panel this week.
>
> With this procedure, the judicial branch will not have any say in the selection process. We will cooperate with the investigation and will publicly release the results. We also hope that the investigation will provide specific recommendations for changes that we can make to ensure a safe and healthy work environment for all members of the branch going forward. All we ask is that the independent counsel conduct a thorough, efficient, and fair investigation. Until the investigation is completed and any recommendations are implemented, I am to be made aware of any new allegations of misconduct and kept apprised of the progress of any investigation on a weekly basis.

72

* * *

> I am talking about maintaining the independence and integrity of
> the judicial branch. And so I echo [Abraham Lincoln's] words: We
> will think anew, and we will act anew.
>
> I want to assure you that we—the judicial branch—will bring that
> same clear-eyed perspective, energy, and determination to tackling
> the challenges that face the branch and the administration of justice
> in Colorado during these trying times. We are committed to lifting
> the current clouds over the branch and making it, once again, a
> rightful point of pride. We are going to *get this right*.[95]

In his State of the Judiciary speech, Chief Justice Boatright made one particularly problematic statement.

> ***Until the investigation is completed and any recommendations
> are implemented, I am to be made aware of any new allegations
> of misconduct and kept apprised of the progress of any
> investigation on a weekly basis.***[96]

Although the investigations were presented as "independent," Chief Justice Boatright confirmed that he would directly supervise the investigations as well as receive personal notice of "any new allegations of misconduct" learned internally through the Judicial Department.  Chief Justice Boatright, however, provided no assurances that he would promptly report such "new allegations of misconduct" to this Commission.[97]  Later, at the June 14, 2022 hearing of the Legislative Interim Committee on Judicial Discipline, concerns were expressly raised as to how Chief Justice Boatright's review of all allegations and supervision of investigations of judicial misconduct impacted his obligations to disqualify himself from cases in which he develops personal knowledge of facts.  Appendix 27(s)(ii)(5), pp. 11:29-12:9 (Emeritus Director of the National Center for Judicial Ethics Cynthia Gray responding to question from Senator Pete Lee).

---

[95] 2021 Colo. House Journal, pp. 111:1-29, 118:16-25.

[96] In addition to this statement, the press release issued by Chief Justice Boatright on behalf of the whole Colorado Supreme Court on February 16, 2021 made a similar announcement.

> More immediately, Chief Justice Boatright has directed that he be
> notified and receive weekly updates on all future misconduct
> complaints across the department to ensure each incident is fully
> investigated and acted on as appropriate without delay.  *Supra*,
> note 93.

[97] Chief Justice Boatright's statement is a focus of his now denying that he failed to report known or substantially likely violations of the Code in the pending Woods matter and in *Kiesnowski*.  Migoya, *supra* note 3.

As described *infra*, Chief Justice Boatright and the Court's promises of full disclosure, cultural change, transparency, and accountability were never realized.  Instead, the contracted-for investigations became only another avenue for the Court to control the scope of inquiries and the substance/messaging of publicly released findings and conclusions.  Rather than being legitimate independent investigations, the Court's contracted-for investigations perpetuated the Court's publicly pre-announced goal of exonerating persons identified in the Masias Memo and involved in the Masias Contract.  Significantly, Chief Justice Boatright later accompanied the announcement of each of the final reports of the contracted-for investigations and the OSA's Fraud Hotline Investigation Report with personal commentaries interpreting the significance of findings and conclusions contained therein.[98]  Instead of getting things right, Chief Justice Boatright and the other Justices used their access to substantial public funding (approximately $350,000) in order to further minimize and hide the problematic nature of the underlying circumstances presented through the Masias Controversy.  Notably, Chief Justice Boatright and the other Justices have never disclosed specifically where they sourced the public funds used for the two contracted-for investigations.[99]  The use of $350,000 of taxpayer funds for the ethically

---

[98] Inexplicably, the Judicial Department removed the banners for the three reports and Chief Justice Boatright's commentary from the cover page of its website in September 2023.  The documents, however, are attached as Appendices 16 to 18; *see also* https://web.archive.org /web/20220809105324/https://www.courts.state.co.us/.

[99] The Judicial Department was reported to have allocated up to $350,000 and to have initially authorized $325,000 for the two investigations.  *Two Denver Law Firms Picked to Investigate Allegations of Harassment and Misconduct in Colorado Judiciary: Inquiry Comes After Denver Post Stories Revealing Alleged Quid-Pro-Quo Deal with Former Official Who Threatened Tell-All Lawsuit*, DENVER POST, August 5, 2021; *see also* https://data.colorado.gov/stories/s/TOPS-Expenses/pqw4-6m8r (providing access to data from the State of Colorado's "checkbook" with the identity of some vendors redacted; no publicly searchable records of payments to ILG & RCT, Ltd. from the Judicial Department); Colo. State Ct. Admin. Office, *Background on the Independent Investigations*, June 14, 2022 (describing $250,000 ILG contract and $75,000 RCT. Ltd. contract) *available at* https://leg.colorado.gov/sites/default/files/images/lcs/ independent_investigation_background_june2022.pdf.  During the public comments hearing on Colo. RJD 41, Justice Hood merely confirmed that, "the money that was provided came out of the judicial budget." *Infra*, p. 82.  The Justices, however, have never disclosed the total final amount of public funds spent on their investigations.  The Court's ability to freely re-allocate $350,000 of public funds from the Judicial Department's overall budget without any outside approvals and to further the personal interests of the Justices themselves sharply contrasts with the Court's resistance to funding this Commission's investigation in the *Coats* matter, as discussed *infra* at p. 99.  *See also* C.R.C.P. 227 (2021) (authorizing use of attorney registration fees separate from Judicial Department's access to State General Fund to provide this Commission's investigation and prosecution support).  The allocation of $350,000 from the Judicial Department's overall budget is also problematic where the Judicial Department is a direct recipient of federal grant funding.  *See, e.g.*, The Colorado Supreme Court's Court Improvement Program website ("***The federal government awards close to $500,000*** to help

dubious investigations is particularly offensive given that the Justices announced the investigations only two months after Chief Justice Coats testified to the Joint Budget Committee on December 17, 2020 about hardships and layoffs within the Judicial Department caused by the (then still ongoing) Covid-19 pandemic.[100]  In his concurrent testimony, State Court Administrator Vasconcellos further described ways that the Judicial Department sought to expand access to federal grant funding to lessen some of these impacts.[101]  The Justices' commissioning of the "independent" investigations defrauded those Judicial Department employees affected by budget cuts, Colorado taxpayers, and, ultimately, the U.S. Government.

As a former member of this Commission and former 10th Judicial District Court Chief Judge, Dennis Maes, openly criticized the Colorado Supreme Court commissioning and controlling the scope/substance of the RCT, Ltd. and ILG, LLC investigations. In an op-ed article, former Chief Judge Maes and attorney Frances Koncilja argued that the gravity of the Colorado Supreme Court's apparent judicial misconduct supports Chief Justice Boatright and future Chief Justice Márquez resigning from the Court.  "The leadership of the court, Justices Boatright and Marquez have, in our opinion, lost all credibility and legitimacy."[102]

Separately, Chief Judge Maes contended that the Court had violated various provisions of the Code and criticized the Justices for repeatedly making public comments on the merits of the Masias Controversy.[103]  As quoted, Judge Maes explained:

---

Colorado achieve its goals and improving outcomes.") *available at* https://web.archive.org/web/20240603091843/https://www.courts.state.co.us/Courts/Supreme_Court/Committees/Committee.cfm?Committee_ID=8.  In FY 2023, the Colorado Judicial Department directly received federal grants totaling $10,471,335, which included $7,476,372 of Coronavirus Fiscal Recovery Funds and $447,463 for the State Court Improvement Program.  State of Colorado, REPORT OF EXPENDITURES OF FEDERAL FUNDS BY STATE AGENCY FOR THE FISCAL YEAR ENDED JUNE 30, 2023, p. 17, March 6, 2024.  From 2020 to the present, it can be assumed that federal Coronavirus relief and Fiscal Recovery Funds were generally comingled with the Colorado Treasury and funds in the Judicial Department's overall budget.

[100] Hearing before the J. Budget Comm., Colo. Leg., December 17, 2020; Appendix 27(d), p. 1:28-2:21.

[101] *Id.*, p. 14:28-33 (discussing ways SCAO was working with federal trustee to gain access to fund created through consent decree with the Colo. Dep't of Hum. Serv. and Disability Law Colo.).

[102] Dennis Maes and Frances Koncilja, *Perspective: Colorado's Judicial Integrity in Question*, COLORADO SPRINGS GAZETTE, July 2, 2022.

[103] David Migoya, *Testimony: Scrap, Then Rebuild Judicial Discipline System: Any Change to the Current Method of Discipline Would Require a Change to the Colorado Constitution Approved by Voters*, DENVER GAZETTE, July 13, 2022.

It is my belief that the Boatright court lost its way concerning this sad and embarrassing moment in the history of the Colorado Supreme Court when it disregarded and disrespected long established principles, rules, processes and ethical considerations that judges take an oath to obey[.]

* * *

It appears that the Court had little or no concern commenting on information that was being provided to it . . . It was clear that certain decisions had already been made by the court in determining to hire private counsel to conduct an independent investigation to clear those [the Court described as] wrongly accused.[104]

More recently, Judge Maes publicly confirmed that he submitted an RFE as to the public comments issues, the Justices commissioning their own investigations, the Justices' persistent non-disqualification, and the Justices' failures to report judicial misconduct. *See* Canon Rules 2.9, 2.10, 2.11, and 2.15. After initially being recognized by this Commission as a complaint, action on the Maes RFE was not taken for approximately 1-year. Through correspondence from this Commission, Judge Maes was informed that a notice letter was sent to Chief Justice Boatright in December 2023 but not to any of the other Justices. Migoya and Maes, *supra* at note 9. A copy of the Maes RFE was published online.[105] In an astounding and calculated dereliction of their obligations to perform this Commission's constitutional mandate under Colo. RJD 1(b), the current Commissioners and then-Interim Executive Director Jeff Walsh dismissed Chief Judge Maes's recognized complaint with a limited expression of concerns to Chief Justice Boatright and without any explanation of the Commission's basis for dismissal.[106] Concurrently, this Commission refused to disclose Chief Justice Boatright's Colo. RJD 14(d) response to the complaint, which likely contains further evidence of dishonesty and non-cooperation by

---

[104] *Id.*; *see also Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., July 12, 2022; Appendix 27(s)(ii)(2), p. 1:35-2:1, 2:28-29, 3:8-10.

[105] Luige Del Puerto, *Request for Evaluation of Current Members of the Colorado Supreme Court*, COLORADO SPRINGS GAZETTE, January 25, 2024; the Maes RFE is also provided in Appendix 14 at pp. 3-5.

[106] A copy of this Commission's June 11, 2024 dismissal/closing letter addressed to Chief Judge Maes is attached in Appendix 14 at pp. 1-2. This Commission's dismissal states that, "As a threshold matter, the Commission voted to recognize your RFE as a complaint only as to Chief Justice Boatright, per Colo. RJD 13(b)." The dismissal letter, however, is not clear when the purported vote declining to recognize a complaint as to the other Justices occurred. In conflict with Interim Director Jeff Walsh's assertion of limited recognition, Chief Judge Maes was originally asked for his permission to share his RFE with ***all*** the Justices in conjunction with issuance of the expected and procedurally required Colo. RJD 14(a) notices. Maes, *supra*, note 9; Appendix 20, p. 8.

Boatright.[107]  The handling of the Maes RFE is the preeminent example of this current
Commission intentionally and unlawfully suppressing legitimate grounds for judicial disciplinary
proceedings in violation of the Code, specifically Canon Rules 1.1, 1.2, and 2.6.

**The "independent investigations," however, were to be controlled by the Colorado
Supreme Court and the Judicial Department.**

The intentions behind the announced contracted-for investigations became clearer after reporter
David Migoya sought comments from persons described in the Masias Memo.  When questioned
about the allegation in the Memo that he (with the assistance of the Judicial Department) had
suppressed a harassment complaint against him while applying for a vacancy on the Colorado
Supreme Court, Justice Gabriel responded with an email that presented one of the "independent"
investigations as a vehicle for his "vindicat[ion]."  Specifically, Justice Gabriel stated:

> I will cooperate fully with the forthcoming independent
> investigation ***and will be vindicated***.  Pending completion of that
> investigation, I will have no further comment.[108]  (Emphasis
> added).

The Judicial Department's former IT Director, Chad Corneilius, responded similarly when
questioned about an allegation in the Memo made against him.

---

[107] Dennis Maes, *Sans Clarity, State Supreme Court Marginalizes Misconduct Allegations*,
COLORADO POLITICS, June 28, 2024.  When directly requested to waive confidentiality under
Colo. RJD 6.5(d)(9) and to allow the public disclosure of his correspondence with this
Commission, Justice Boatright refused to respond and, instead, redirected the request to Chief
Justice Márquez.  In turn, acting as the custodian of records for the Colorado Supreme Court and
despite press reporting that the documents do, in fact, exist, Chief Justice Márquez responded:
"The Colorado Supreme Court does not have any administrative records that are responsive to
your request."  Appendix 30, p. 1-7 (also showing frequency (67 times) of email request being
opened or forwarded); *but see* PAIRR2 § 1(a) (defining administrative records as: "a record
maintained for the purpose of managing the business or performing the duties of the Judicial
Branch that is not defined as a court record in P.A.I.R.R. 1 and Chief Justice Directive 05-01"
(i.e. non-case records)).

[108] David Migoya, *Supreme Court Justice Richard Gabriel Faced Harassment Accusation While
a Candidate for Colorado's High Court: Agreement with Accuser Kept the Issue from Tainting
His Chances, Memo Says*, DENVER POST, February 26, 2021; attached as Appendix 12, pp. 1-4.
In an apparently extraordinary act of after-the-fact censorship, the ILG Report and its finding
that the underlying "harassment complaint was never substantiated" were presented as reason to
remove this original article and its headline from *The Denver Post's* website.  *Report Determines
Harassment Accusation Unfounded*, DENVER POST, updated July 29, 2022; attached as Appendix
12, pp. 5-6.

77

> The assertions in the memo you reference with my name are inaccurate.  I look forward to the independent investigation.[109]

It was also clear that the Court's proposal for "independent" investigations was mistakenly interpreted by at least some of the public officials co-opted for selecting the investigation firms as an invitation for a collaborative investigation jointly overseen by the legislative, executive, and judicial branches. [110]  Senate Judiciary Chair Pete Lee stated, at the time:

> Public trust in our Judicial Department is absolutely crucial to the health and stability of our democracy.  The accusations brought against the state judicial branch are serious and have the power to undermine the faith Coloradans have in their judges.  Restoring public confidence requires accountability and transparency.  ***The legislature looks forward to working with the Executive and Judicial Branches to oversee an independent, impartial investigation into the claims of misconduct.***  We anticipate that recommendations for structural, procedural, and systemic changes will be considered to ensure that all employees have a healthy

---

[109] David Migoya, *Not All the Misconduct Allegations in a Colorado Judicial Department Memo are as Serious as Implied:  Interviews Offer a Clearer Explanation Behind the Misdeeds That Were Allegedly Covered Up*, DENVER POST, March 15, 2021.

[110] The selection committee included the following members:

- Then-Senate Judiciary Committee Chair Pete Lee
- Then-House Judiciary Committee Vice-Chair Kerry Tipper
- Representative Adrienne Benavidez
- Senator Bob Gardner
- Then-Representative (and later Interim Committee Co-Chair) Terri Carver
- The Governor's then-Chief Legal Counsel Jacki Cooper Melmed
- The Governor's current Chief Legal Counsel Kara Veitch
- Deputy Attorney General Maritza Dominguez Braswell

Colorado Judicial Department, *Panel Selecting Independent Investigators to Examine Judicial Branch Conduct Chosen*, February 19, 2021 previously *available at* https://www.courts.state.co.us/Media/release.cfm?id=1964.  In 2022, Deputy Attorney General Braswell was appointed to become a U.S. District Court Magistrate Judge.  Michael Karlik, *Deputy AG Named as Federal Magistrate Judge in Colorado*, COLORADO POLITICS, January 21, 2022.

workplace, safe from harassment and discrimination.[111] (Emphasis added).

Chief Justice Boatright, however, did not translate into action his promises that the multi-faceted selection panel would meaningfully define the scope of the contracted-for investigations, that the investigators would have free/full access to evidence, and that the final results of the investigations would become public.  In a letter sent to the selection panel on February 24, 2021, Chief Justice Boatright included the following foreboding statement:

> I believe this is clear to everyone, but *any investigators selected will contract with the Judicial Department*. It is essential that we adhere to this structure *to ensure a more thorough investigation as it will allow us to remain in compliance with our legal obligations and will permit us to speak to the investigators about privileged and otherwise confidential matters*. With that said, I repeat my commitment that the results of the investigations will be made public, *recognizing that portions of the reports themselves may not be made public due to the Department's legal obligations and concerns about victim and witness identification*.[112]
> (Emphasis added).

As stated, the Court proposed a structure by which it would control the contracted-for investigators' access to records while maintaining the arbitrary ability to define "legal obligations," "privileg[e]," "confidential[ity]," and vague "victim and witness" privacy interests. In effect, the Court created a system that allowed it to censor both the inputs and the outcomes of its so-called "independent" investigations.[113]

At the January 25, 2022 SMART Act hearing for the Judicial Department, Chief Justice Boatright explicitly confirmed the Justices' strategy in using an "access agreement" in the investigation contracts and having overall control of the substance of the investigators' final reports.  State Court Administrator Vasconcellos further explicitly confirmed that the Attorney General's Office helped engineer and enforce the Justices' control over the investigations and self-definition of confidentiality and privilege.  In other words, Vasconcellos's testimony confirms that the Attorney General's Office acted hand in glove as the Justices violated the prohibitions against judicial fact investigations contained in Canon Rule 2.9(C).  The dialogue that occurred at the January 25, 2022 hearing, included the following statements:

---

[111] Statement of Senator Pete Lee in response to State of the Judiciary Speech, available at: https://www.senatedems.co/newsroom/2021/02/18/senate-leaders-react-to-state-of-the-judiciary-address-5fs2y?rq=judicial.

[112] Brian D. Boatright, *Letter to Selection Panel Members*, February 24, 2021.

[113] Former Commission Vice-Chair Prince has explained the fundamental problems and practical consequences of the Justices contracting-for investigations into their own and their colleagues alleged misconduct.  Prince, *supra* note 12 at pp. 95-97.

79

**Chief Justice Boatright**

And the final thing I'll say about that is that we are committed to releasing the results of those investigations to the public, and will make those obviously available to members of the Legislature. I also want to say that *we are giving them unfettered access* to a number of documents, through an access agreement, that aren't publicly accessible. ***And, so, the entire report will not be produced.*** But any results that the independent investigators come to will be provided publicly.

\* \* \*

**Chief Justice Boatright**

Can I provide one point of clarification? In August, the panel members recommended the vendors. We actually did not enter into the contracts with the access agreements until October and November. So, the timeframes will start to run from there.

\* \* \*

**Steven Vasconcellos**

Thank you, Mr. Chair, and we will certainly reach out to the committee if there's any extension. I just had earlier this week, update meetings with *the Attorney General's Office, who's acting as a go-between between ourselves and the investigators*, and things are progressing well, there's no anticipation at this point that we're going to need to trigger the extensions. Of course, we'll just see what remains to be seen. But so far, no concern about extensions at this point.

\* \* \*

**Rep. Tipper**

Thank you, Mr. Chair. And I know I picked the worst seat in the house. If you can both see me. Justice Boatright, can you clarify for me again. You mentioned essentially what we anticipate. It sounds like it's going to be the summer. Obviously, there could be extensions. A report, but I think you made a distinction between what would be publicly available and what wouldn't. Can you clarify that for me again, please.

**Rep. Weissman**

Chief Justice Boatright.

**Chief Justice Boatright**

Thank you. Yes. Thank you, Representative, Tipper. What we anticipate is that they will put out a report that is available for the public to be able to read with regard to conclusions, disclosing as

80

> [much] of the background information as they can. ***But as I indicated, we're giving them unfettered access to attorney client privilege and to non-disclosure agreements that if we were to release those publicly, it would subject the Branch and, ultimately, the State to financial liability, and obviously that's something that we want to be very careful about.*** [114] (Emphasis added).

As with other requested records, the Judicial Department has constructively denied public access to the contracts executed with the "independent" investigators and communications with those investigators that relate to the Justices' and the Attorney General's exercise of control and undue influence on the outcomes.[115]

If there were any doubts about uniform agreement amongst the Justices as to the Court's decision to commission and contract-for investigations that it could control, such doubts were eliminated when Justice Hood later attempted to publicly justify the integrity of the investigations through an impromptu debate with Attorney Chris Forsyth.  The debate occurred as Forsyth presented in-person comments during the Court's January 11, 2023 public hearing to consider the adoption of Colo. RJD 41.

> **Justice Hood:** You talked about what you termed a judicial scandal, and that phrase has been used in the press at times as well. I assume that you have read the Troyer report and the ILG report?
>
> **Mr. Forsyth:** I have. Yes, I've looked through those.
>
> **Justice Hood:** And therefore you're aware that, with respect to allegations made against judicial officers, there was only one of those allegations that was sustained, and that turned out to be something that had been referred to the Judicial Discipline Commission?
>
> **Mr. Forsyth:** I'm also aware that those investigations are highly suspect because the judicial branch took the lead and paid for those investigations.
>
> **Justice Hood:** Well, let's talk about that for a moment. There was a request for proposals that was done after we asked both the state legislature and the governor's office to form a committee to then

---

[114] *Transcript of Hearing before the J. Judiciary Comm.*, Colo. Leg., January 25, 2022 (SMART Act Presentation by Colo. Jud. Dep't); Appendix 27(j), pp. 6:21-26, 7:1-4, 7:21-26, 7:32-8:7.

[115] Appendix 30, pp. 30, 40, 46, 71-72; *see also supra*, note 87 (describing context of constructive denial of records access).

look at those proposals and select investigators. You're familiar with that, right?

**Mr. Forsyth:** I'm very familiar with that.

**Justice Hood:** And you're also aware, I assume, that we had no say during that process over whom they would select to conduct those investigations?

**Mr. Forsyth:** Oh, I don't know that at all. I don't know. I know that the judicial branch has had a lot of contact with the legislature. The legislators have stated as such. So, I don't know that at all.

**Justice Hood:** All right. I encourage you, and any members of the public and the media, to confer with those who were actually on the committee to find out the answer to that question. I think that it will be clear that this court played no role in selecting those folks. That was the reason that we did it that way, was so that there wouldn't be questions about us selecting the folks who would be conducting that investigation. And the money that was provided came out of the judicial budget, but it was not something that we orchestrated. It was something that was done through the committee. In other words --

**Mr. Forsyth:** Because it was done that way, when the investigators were testifying before the legislative branch, they had to say, I can't tell you that because that information is privileged and the judicial branch owns that privilege.

**Justice Hood:** I'm not going to get into a debate with you about the discovery process that's been discussed at length in other contexts. We provided thousands of documents, and that's of record.[116]

At the January 25, 2022 SMART Act hearing, Chief Justice Boatright and Justice Márquez further confirmed that proceeding with the "independent" investigations was a collective decision that they were both personally part of executing.  Justice Márquez stated, in relevant part:

Thank you, Mr. Chair. Again. I'd like to echo the Chief's comments and just emphasize that both he and I are personally very committed to moving forward with these investigations and dealing with whatever the results may be. Our eyes are trained forward to correcting whatever needs to be corrected, to improving

---

[116] Public Hearing—Colorado Rules of Judicial Discipline, January 11, 2023, *available at* https://youtu.be/TXYhKkycnV4; Appendix 26, p. 6:36-8:5.

the work culture within Judicial. And we recognize that this isn't something that's going to be changed overnight with a wave of a hand. It's a long-term commitment. And that's why I'm here as Chief Justice Boatright's successor, to demonstrate that he and I will do this together, and I will carry this forward into the years that come.[117]

Although the Court consistently reinforced a narrative that it had no part in selecting its contracted-for investigators, the Justices, the Court, and the Department have never explained what, if any involvement, they had in soliciting firms to participate in the RFP process. It is striking that of the eight submitted proposals, at least three included former United States Attorneys who could project credibility in making findings (or implied findings) that the circumstances involved in the Masias Controversy did not violate federal law. Notwithstanding a call for selecting conflict-free investigators without ties to the Colorado legal community, all the described firms who submitted bids were from the Denver Metro Area.[118]

**In addition to the "independent investigations," the Justices and the Judicial Department also ultimately controlled the OSA Fraud Hotline Investigation.**

When he sent his February 24, 2021 letter to the selection panel, Chief Justice Boatright announced the basic ways in which the Court, through the Judicial Department, would control its contracted-for investigations. Shortly before this, on February 12, 2021, the press reported on how the Court also ultimately controlled the OSA's fraud hotline investigation. As reported, the Court retained the ability to prevent the publication of the OSA's final investigation report, entirely or in part.

> The Colorado Supreme Court this week handed over for investigation to the Colorado State Auditor's Office a memo detailing nearly two dozen instances of judicial and administrator misconduct at the heart of an alleged $2.72 million hush money contract scandal, but the public may never get a chance to find out what the Auditor's Office concludes.
>
> Fraud audits conducted by the State Auditor's Office are confidential under state law. Colorado State Auditor Dianne Ray confirmed that in accordance with the law governing fraud audits,

---

[117] Hearing before the J. Judiciary Comm., Colo. Leg., January 25, 2022 (SMART Act Presentation by Colo. Jud. Dep't); Appendix 27(j), p. 6:12-19.

[118] The successful bids were submitted by attorney Elizabeth Rita through her firm, ILG, LLC, and former United States Attorney for Colorado Robert Troyer through his firm, RCT, Ltd. The unsuccessful bids included former United States Attorney for Colorado John F. Walsh from the law firm WilmerHale and former U.S. Attorney for Colorado Jason Dunn from the law firm Brownstein Hyatt Farber Schreck. David Migoya, *Investigations into Alleged Judicial Misconduct Underway as Colorado Signs Contracts*, DENVER GAZETTE, November 3, 2021.

83

> her office will deliver the final findings to the state's Judicial
> Department and not to the public.
>
> She said it was up to the Judicial Department whether it would
> make the findings public.
>
> "Fraud investigation final reports will never be made public by our
> office," Ray said. "They are completely confidential and provided
> to the department that requested our assistance."
>
> \* \* \*
>
> Robert McCallum, a spokesman for the Colorado State Court
> Administrator's Office, did not respond to requests for comment
> on whether the Colorado Supreme Court would release to the
> public the fraud audit's findings.[119]

When the OSA finally released its Fraud Hotline Investigation Report on February 7, 2022, only an "Executive Summary" "which omit[ed] confidential and privileged information" was made available to the public.[120] Like the two other contracted-for investigations, Chief Justice Boatright presented the OSA's Executive Summary with his own cover letter interpreting the OSA's findings and recommendations. *Supra* at note 40. Because of the Court's control over the timing and substance of the OSA's referral to law enforcement, the applicable statutes of limitations for state-level prosecutions lapsed.[121]

---

[119] Christopher Osher, *Results of Fraud Audit into Colorado Judicial Misconduct Memo May Never Become Public*, DENVER GAZETTE, February 12, 2021. A request for production of supporting deposition transcripts from the fraud hotline investigation are among the records that the Judicial Department has constructively denied public access to as part of the preparation of this RFE. Appendix 30, pp. 31.

[120] Kerri Hunter, *Executive Summary of Fraud Hotline Investigation Report*, February 4, 2022, p. 2; Brian Boatright, *Cover Letter to OSA Executive Summary of Fraud Hotline Investigation Report*, p. 3, February 7, 2022; both documents available through link *supra* at note 98; Appendix 16.

[121] As described in a *Denver Post* article, the Court's redaction of information in the fraud hotline investigation report contributed to 2nd Judicial District Attorney's Office's inability to file charges before expiration of the statute of limitations.

> The Denver District Attorney's Office did not have enough time
> after receiving the auditor's referral to investigate the cases before
> the statute of limitations on any relevant criminal charges expired,
> spokeswoman Carolyn Tyler said Wednesday.

84

It deserves further emphasis, however, that (as Colorado's chief law enforcement officer) Attorney General Phil Weiser also personally received the anonymous April 15, 2019 fraud hotline report and contemporaneously confirmed with Chief Justice Coats the problematic nature of the Jane Hood separation agreement, in particular. *Coats*, ¶ 4(19-20).  Notwithstanding his awareness of its significance, Attorney General Weiser did not take any independent action to investigate the agreement or the involved conduct, which the OSA ultimately referred to the 2nd Judicial District Attorney's Office for prosecution.  Attorney General Weiser also became personally aware of the existence of the Masias Contract when it became public on July 18, 2019, concurrent with Chirstopher Ryan's announced resignation as State Court Administrator. *Migoya*, *supra* note 27. Moreover, Attorney General Weiser's employees, which included now Colorado Court of Appeals Judge W. Eric Kuhn, [122] were directly involved in providing investigation/litigation support to the OSA as it completed its fraud hotline investigation.  The Attorney General's Office had access to the factual basis (including the Masias Memo) for the OSA's ultimate referrals to the 2nd Judicial District Attorney's Office throughout the OSA's entire investigation.  The inaction of Attorney General Weiser (with his awareness starting in 2019 that the Masias Memo was not disclosed to the OSA) occurred despite a statutory duty requiring him to "diligently investigate" claims of fraud involving state funds. [123]  As with the Justices, Attorney General Weiser personally bears responsibility for the limitations period lapsing.

**The Justices were aware of grounds for their disqualification but persistently refused to recuse from judicial discipline related matters and proceeded with their ethically prohibited "independent" investigations.**

It should have been clear to each Justice of the Colorado Supreme Court that conflicts existed requiring their disqualification and refrain from public commentary in February 2021 when *The*

---

> 'The statute of limitations was going to run out, and the materials we received were heavily redacted, the data set incomplete,' she said. '…We just did not have enough time to get the production of the materials, overcome other legal hurdles, interview witnesses, analyze data or present the case to a grand jury.'
>
> Shelly Bradbury, *No Criminal Charges in Wake of Auditor's Report of Fraud, Misuse of Public Funds by Colorado Judicial Department Employees: Denver DA's Office Says It Was Unable to Act on State Auditor's Report Before Statute of Limitations Expired*, DENVER POST, June 2, 2022.

[122] Judge Kuhn is also subject to a retention election in November 2024.

[123] § 24-31-1204(1)(a), C.R.S.; *see also* Colorado Attorney General's Office, COLORADO FALSE CLAIMS ACT: STATEMENT OF ENFORCEMENT POLICIES, January 5, 2024 (describing, *inter alia*, obligations of COAG's False Claims Unit to collaborate with other investigators when examining allegations of fraud involving public funds), *available at* https://coag.gov/app/uploads/2024/03/2024.01.05-Statement-of-Enforcement-Policies.pdf.

*Denver Post* first reported Ryan's allegations that the Masias Contract was a *quid-pro-quo* arrangement authorized by Chief Justice Coats and others.  Not a single Justice, however, publicly declared their recusal or disagreement with the Court publicly commenting on then-pending or impending cases.  Likewise, none of the Justices expressed disagreement with the Court and the Judicial Department's plan to contract-for their own investigations of the Masias Contract and the Masias Memo.  Had any of the Justices responded appropriately, they would have recused themselves after self-reporting their own potential misconduct and reporting the potential misconduct of others to the appropriate authorities (including this Commission, the Office of Attorney Regulation Counsel, the Colorado Legislature, state and local law enforcement, and federal law enforcement).

Instead of recusing themselves from judicial disciplinary proceedings, including the investigation of suspected or implicated judicial misconduct, the Justices ignored this Commission when it directly raised concerns about the Justices proceeding with their own contracted-for investigations.  Through a letter addressed to Chief Justice Boatright dated May 18, 2021, then-Commission Chair Gregory wrote, in relevant parts:

> Consistent with the discussion in our original February letter, the Commission has a unique constitutional role in Colorado. Under Article VI, § 23 of the Colorado Constitution and Rule of Judicial Discipline 4(a), the Colorado Commission on Judicial Discipline has exclusive jurisdiction to evaluate allegations of judicial misconduct or judicial disabilities. The Commission is authorized to initiate a complaint either through its consideration of a request for evaluation of judicial conduct submitted by an outside party or by taking action *sua sponte*, as provided in RJD 12 and RJD 13(f). Please be aware that each of the Commission's requests for information is based on a concern for which the Commission needs to perform an evaluation in order to fulfill its charge. Our requests for disclosure from your office are an early step in this effort.

* * *

> Your [April 26, 2021] letter next addresses the independent investigation entity you are creating. You note that the creation of the investigation entity has not moved as swiftly as you had hoped. We can sympathize with your concern that things do not always move as quickly as one would like.

* * *

> As noted above, the Commission has exclusive jurisdiction under the Colorado Constitution to evaluate and address potential judicial misconduct. While the Commission appreciates the potential assistance that may result from the investigating entity, the Commission must undertake its charge. Ultimately, the

86

> Commission remains responsible to fulfill its constitutional charge regardless of the evolution of the new investigatory entity.
>
> \* \* \*
>
> Finally, the Commission would like a better understanding of the investigating entity you are creating. The February 16, 2021 SCAO press release explained that this new entity's purpose is to "independently examine allegations of sexual harassment and gender discrimination within the Judicial Branch, and of claims that a training services contract was awarded improperly to a senior administrator." We have heard that the request for proposal document has been issued but have not seen the document and do not know if a document exists that defines the scope of the independent investigation or the respective role of the independent investigator. The Commission would appreciate a better understanding of your plans. We would also like to understand the authority on which the new entity is based, who will give it direction, what investigative authority it will have, and how it will work with or relate to the Commission.
>
> The Commission has some concerns that your April 26th letter suggests your office and the Judicial Department view the plan to create the new entity as a substitute for the Commission's role or as a basis for delaying the work of the Commission. The Commission disagrees with these views, if they are held. The Commission is also concerned about the interplay of the confidentiality requirements under Article VI, § 23(3)(g) of the Colorado Constitution, the work of the new entity, and the work of the Commission. Will all of the work of the new entity be public? Will some be confidential? What is the basis of authority for making those decisions? What instructions are being given to the new entity regarding cooperation and disclosure with the Commission and, what is the basis of authority for those instructions? What authority will the Commission have to communicate and cooperate with the new entity and, again, what is the basis of that authority?
>
> Appendix 19, pp. 1-3, 7.

In his letter responding to this Commission dated June 11, 2021, Chief Justice Boatright denied that the "independent" investigations related to issues of judicial discipline or that he was aware of a basis to report any then-suspected judicial misconduct to this Commission (including judicial involvement in the Masias Contract and allegations of judicial misconduct in the Masias Memo):

[I] of course recognize and take very seriously the affirmative obligation of judicial officers, myself included, to report known violations of the Code to the Commission, as well as for the Judicial Department to do so in accordance with the terms of the Memorandum of Understanding ("MOU") between it and the Commission dated February 5, 2010.

\* \* \*

*As the executive head of the Judicial Branch*, I directed the Judicial Department to work with members of the legislative and executive branches to retain an independent investigator to conduct a thorough investigation of the allegations in "the memo." *Should I or the Department obtain actual knowledge of any Code violation that requires reporting under Rule 2.15(A) or the MOU, either independently or through the investigation, we will promptly comply with our reporting obligations.*

Finally, you requested a copy of the Request for Proposals to retain the independent investigator that was issued by the Judicial Department, which is attached. As you can see, the independent investigation will not substitute for the Commission's constitutional role, nor will it result in the creation of a freestanding investigative "entity." Rather, *the Department is contracting for a discrete investigation* of the allegations in "the memo" many of which are unrelated to alleged misconduct by individual judicial officers and instead relate to alleged misconduct by employees who are not judicial officers and may implicate broader cultural and systemic concerns for the Department as an employer. *Clearly, the Commission's role does not encompass such allegations.* The investigations will also look into the hiring process for the State Court Administrator that occurred in 2017 and the contracting process for the Department's leadership contract. *I will keep you updated on the progress of the investigations to the extent that they concern misconduct by judicial officers.*

The Commission undoubtedly serves an important function in safeguarding the integrity of the Judicial Department, and I extend my sincerest thanks to you and your fellow Commissioners for their public service.[124] (Emphasis added).

---

[124] Letter from Chief Justice Brian Boatright to the Colo. Comm. on Jud. Discipline, June 11, 2021; Appendix 19, pp. 8-9.  Notably, Chief Justice Boatright specifically cited his obligations to disclose information to this Commission under Canon Rule 2.15(A) and the Judicial

88

Chief Justice Boatright's characterization of the "independent" investigations as "discrete" from issues of judicial discipline conflicts with his later public commentary as to how the Troyer-Mitchell and ILG investigations did not find evidence of judicial misconduct (and essentially supported the Court's pre-announced exonerations of Chief Justice Coats and others involved in the Masias Controversy). *Compare with* discussion *infra* at pp. 144 and 156. Justice Boatright's characterization of "discrete" investigations also conflicts with State Court Administrator Steven Vasconcellos's testimony at the June 14, 2022 hearing of the Legislative Interim Committee on Judicial Discipline. During that hearing, Vasconcellos described the purpose of the Troyer-Mitchell investigation as an inquiry "into the circumstances and process leading to the award of a leadership training contract to a person by the name of Mindy Masias, who is formerly the Chief of Staff at the State Court Administrator's Office, and whether that contract was awarded in exchange for silence about misconduct within the Department."[125] Vasconcellos described the purpose of the ILG investigation as follows:

> The other investigation is into allegations of sexual harassment and gender discrimination within the Judicial Department. Those allegations being a key area of interest as to whether or not they were why a contract was offered to Ms. Masias. The investigation into the allegations of sexual harassment and gender discrimination also include a cultural assessment of the current state of the Colorado Judicial Department, not just the State Court Administrator's Office, but the Department statewide. *Supra*, note 125; Appendix 27(s)(i)(3), p. 19:32-37.

Additionally, Chief Justice Boatright's efforts to push forward with the "independent" investigations while refusing to cooperate in funding this Commission's then-contemplated appointment of outside Special Counsel reflects the Justices' overall non-cooperation and their informed willfulness in violating Canon Rules 2.9(C) and 2.16(A) at the start of judicial disciplinary proceedings in *Coats*. In response to Chief Justice Boatright's June 11, 2021 letter and to address this Commission's resourcing needs, then-Vice Chair Prince wrote in a letter dated July 23, 2021:

> The Commission renews its prior requests to you for disclosure and active cooperation in the Commission's fulfillment of its constitutional obligations.
>
> * * *
>
> In the response provided through Mr. Vasconcellos, the Commission was invited to confer with our counsel to pursue our pending requests further with you. Given the progress to date, we

---

Department's MOU while omitting acknowledgment of his expanded obligations to report suspected judicial misconduct under Canon Rule 2.15(C).

[125] *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., June 14, 2022 (Colo. Jud. Dep't Presentation); Appendix 27(s)(i)(3), p. 19:27-30.

understand the value of involving counsel. However, the need to involve counsel creates logistical challenges for the Commission. As you are aware, the Commission does not have its own counsel and does not have the dedicated resources to secure the specialized personnel needed to fill that role. As you are also likely aware, the Commission's usual source of loaned personnel, the OARC, is not able to provide OARC personnel on this set of matters—recall that the OARC announced on March 15, 2021 that OARC itself is using outside counsel for their own work on these issues. Our understanding is that the Department budgets only a modest amount, approximately $1,000 annually, for the Commission to engage outside personnel. Thus, the Commission is placed in a difficult position because it does not currently have the identified resources, direct or indirect, to engage the personnel now needed to proceed with its information gathering efforts. The Commission is attempting to explore options but will appreciate any insights you can offer on meeting these resource needs.

\* \* \*

Chief Justice Boatright, the decisions made by your predecessors are fixtures of history at this point. However, you now chart the course of interactions with the Commission for the Department and your staff. During this pause for the Commission to try and resolve the resource challenges presented, the Commission implores you to reconsider the overall approach to the Commission pursued to date this year. The Commission appreciates your statements of support for our work as well as your prior statements of commitment to transparency and cooperation with the Commission's work. Actual implementation of those statements will, in the long run, best serve the interests of our respective institutions as well as the interests of the People of Colorado.[126]

The revelation of Chief Justice Boatright's knowledge of unreported judicial misconduct in *Kiesnowski* and in the Woods matter at the time he composed his June 11, 2021 letter underscores a level of dishonesty and pre-meditation in the Chief Justice's communications with this Commission throughout the Masias Controversy.

On June 13, 2022, this Commission is further reported to have personally and individually confronted at least six of the current Justices with their conflicts of interest and to have requested their disqualification from all matters related to the Masias Controversy.  Migoya (10/8/22), *supra* at note 14.  Not one of the Justices had the integrity to do so.  Instead, as described *infra*, the Justices individually and collectively remained involved in limiting this Commission and law enforcement's access to evidence, in controlling this Commission's access to resources, in

---

[126] Appendix 19, pp. 10-11.

90

permitting/endorsing various forms of intimidation, in appointing/influencing the appointment of Commission members, and in otherwise seeking to undermine efforts for legislative and administrative reform.  In contemptuous disregard for this Commission's request for disqualification, Chief Justice Boatright proceeded to publish his commentaries on the Troyer-Mitchell and ILG Reports immediately after the Justices had received this Commission's letters. *See* Migoya (10/8/22), *supra* note 14 (quoting Boatright letter referencing receipt of disqualification letters on June 13, 2022).  Moreover, Chief Justice Boatright published his commentaries contemporaneous with former Chief Judge Maes publicly raising alleged violations of Canon Rules 2.9, 2.10, 2.11, and 2.15 through the Justices' comments on pending cases, their commissioning of the "independent" investigations, and their refusals to disqualify themselves.  *See* Maes and Koncilja, *supra* note 102.  Despite having the ability to waive confidentiality and allow publication through Colo. RJD 6.5(d)(9), the Justices have individually refused to disclose the Commission's letters detailing the Justices' conflicts of interest and their required collective disqualification under Canon Rule 2.11 of the Code.[127]  Disclosure of the Commission's letters will confirm the intentionality of the Justices' violations of Canon Rule 2.11 as well as their awareness of their other misconduct under the Code which has occurred as a consequence of their refusals to disqualify.  It can also be presumed, in addition to being advised of grounds for their disqualification and consistent with the concerns contemporaneously raised by former Chief Judge Maes, that this Commission's letters informed the Justices that their conduct up to that point implicated potential violations of Canon Rules 1.2, 2.9, 2.10, 2.12, and 2.16.

Even after the *Coats* case was assigned to a Special Tribunal for final resolution, the Court appears to have remained involved by allowing its employee, the Chief Justice's Counsel Andrew Rottman, to challenge the factual admissions contained in this Commission's and Chief Justice Coats's Stipulation for Public Censure.[128]  Rottman was a non-party who arguably lacked standing to intervene.

---

[127] As with other requests for disclosure of administrative records and the Justices' waiver of confidentiality under Colo. RJD 6.5(d)(9), the Judicial Department has responded by constructively denying access to records through excessive demands for deposits (first $7,050 and now $11,820) as a condition for inspection/production.  Appendix 30, pp. 10, 40, 71-72; *see also supra* at note 87 (more fully describing context of constructive denial of records access).

[128] Notably, the one factual admission that Rottman challenged was a statement that, knowing of the Masias-Rice recording, he failed to disclose its existence to Chief Justice Coats when the Masias Contract was authorized.  Rottman's objection seems focused on preserving the Court and the Judicial Department's *post hoc* defense and justification for cancelling the Masias Contract, as described *supra* at p. 40.  In this context, it should also be recognized that the end of the Masias-Rice recording suggests that Rottman may have been present when the recording was created.  Appendix 4, p. 29; *See also AUDIO: Chief Supreme Court Justice Nancy Rice: "About the only way to make sexism go away, I've noticed, is to be the boss.",* DENVER GAZETTE, February 9, 2021 *available at* https://denvergazette.com.  The court filings in the *Coats* matter are available on this Commission's website.  https://ccjd.colorado.gov/resources/legal-authority-and-information.

91

After this Commission notified them of the involved conflicts and requested their recusal, the Justices refused to disqualify themselves and instead actively remained involved in efforts to cover up or obstruct investigation of the Masias Controversy.  The Justices' intentional and persistent refusal to disqualify themselves and to proceed with their contracted-for investigations should be recognized as a clear violation of the Code, particularly Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, 2.15, 2.16, 3.1, and 4.1 as described *infra* starting at p. 252.

**Circumstances through which the Justices exerted undue influence upon, interfered with, or suppressed each of the investigations.**

The specific ways through which one or more of the Justices exerted undue influence upon, interfered with, or suppressed the various investigations are now discussed as to each of the investigations.

**OSA Fraud Hotline Investigation**

***The OSA's referrals to law enforcement were delayed "extensively" by the Court and the Judicial Department.***

For the purposes of a fraud hotline investigation, "fraud" is defined as "occupational fraud or the use of one's occupation for personal enrichment through the deliberate misuse or misapplication of the employing organization's resources or assets."  § 2-3-110.5(1)(d), C.R.S. The OSA's Executive Summary of its Fraud Hotline Investigation Report was issued on February 4, 2022.[129]

---

In yet another apparent conflict of interest, however, Mark Fogg, an attorney who currently serves on the State Commission on Judicial Performance (which evaluates the performance of the Colorado Supreme Court Justices and the Colorado Court of Appeals Judges), represented Rottman in his effort to intervene as a third-party. *See* https://judicialperformance.colorado.gov/about-us/state-commission-of-judicial-performance; *see also* Colo. RGCJP 7(a) (defining standard requiring disqualification of performance commissioner from evaluating judge or justice because of conflicting personal relationship, professional relationship, or interest).  One of the factors that the performance commissions specifically consider is whether a judge has appropriately disqualified himself or herself from matters involving conflicts.  Colo. RGCJP 13(h), *Form 2* (III)(a)(2)(c), p. 3.  Fogg along with Justice Gabriel and Justice Hart are also emeritus members of the Colorado Judicial Institute's (CJI) Board of Directors. https://coloradojudicialinstitute.org/who-we-are/our-team/board.html.  As discussed, *infra* at p. 190, despite significant conflicts of interest as to their influence over CJI, the Justices relied on CJI to act as a *de facto* lobbyist advocating for the Justices' personal interests in the outcome of the Masias Controversy.

[129] Colo. Office of the State Auditor, EXECUTIVE SUMMARY OF FRAUD HOTLINE INVESTIGATION REPORT, February 4, 2022 (cited herein as the "2022 OSA FHI Rpt."); Appendix 16, pp. 4-10.

92

The Fraud Hotline Report includes findings that evidence supported the following referrals to law enforcement:

- Through outside employment, Masias earned at least $17,200 of her state salary that should have been categorized as paid time off.  Similarly, Brown earned at least $26,800 of his state salary that should have been categorized as paid time off.  These findings supported the referral of Masias and Brown to law enforcement.  2022 OSA FHI Rpt. (Appendix 16), p. 3.

- As described in the anonymous fraud report (and later addressed in *Coats*), the employee separation agreement negotiated with Jane Hood as a contract for silence presented evidence of fraud supporting the referral of Ms. Hood, Ryan, Masias, and Brown to law enforcement.  *Id*., p. 4.

- The totality of circumstances relating to the Masias Contract presented "at least some evidence of occupational fraud, illegal transactions, and/or misuse or embezzlement of public funds or property" which supported the referral of Masias and Brown to law enforcement.  *Id.*, pp. 6-7.

As reported by the media, the agency subject to a fraud hotline investigation ultimately controls the confidentiality of the investigation.  *Supra* at p. 83.  The restrictions upon disclosure of confidential information, however, are not intended as a barrier to the timely communication of information to law enforcement.  § 2-3-110.5(2)(f)(II), C.R.S. provides, in relevant part:

> All workpapers prepared or maintained by the state auditor in connection with hotline calls must be held as strictly confidential by the state auditor and not for public release. The restrictions imposed by this subsection (2)(f)(II) ***shall not prevent communication*** by and among the state auditor, a state agency, the governor, the committee, a law enforcement agency, a district attorney, or the attorney general in accordance with the requirements of this section.  (Emphasis added).

Chief Justice Coats, through his May 29, 2019 letter to the OSA, requested that the OSA conduct the investigation of the April 15, 2019 anonymous fraud hotline report.  Accordingly, the Judicial Department had statutory obligations to provide the OSA with unfettered access to relevant records and to allow the OSA to comply with its obligations to immediately report apparent misuse of public funds to law enforcement.  Because the amount of the alleged fraud involved in the Masias Controversy exceeded $100,000, the OSA had additional obligations to report its findings to the Legislative Audit Committee, which then had authority to authorize further reporting to the Governor.  § 2-3-110.5(3)(c), C.R.S. provides:

> When, at the request of a state agency, the state auditor either participates in or conducts an investigation of a hotline call pursuant to subsection (3)(b) of this section, the following additional requirements apply:

**(I)** *The state auditor has <u>access at all times to all</u> of the books, accounts, reports, vouchers, or other records or information maintained by the agency that are directly related to the scope of the investigation.*

**(II)** The state auditor shall report the results of the investigation to the head of the affected agency or, in the case of alleged fraud involving a gubernatorial appointee, to the governor's office. The state auditor shall also provide any workpapers prepared or maintained by the state auditor during the investigation.

**(III)** If the investigation finds evidence that the amount of the alleged fraud exceeds one hundred thousand dollars, the state auditor shall also report the results of the investigation to the committee and, with the approval of the committee, to the governor.

**(IV)** If the investigation finds evidence of apparently illegal transactions or misuse or embezzlement of public funds or property, *the state auditor <u>shall immediately report</u> the matter to a law enforcement agency, a district attorney, or the attorney general, as appropriate*. *The state auditor <u>shall also provide</u> any workpapers prepared or maintained by the state auditor during the investigation.*  (Emphasis added).

During her June 14, 2022 testimony to the Interim Committee on Judicial Discipline, Deputy State Auditor Michelle Colin described how Chief Justice Boatright's and the Judicial Department's insistence upon an "access agreement," limitations upon the manner in which the OSA could review records (with the Judicial Department screening all records before production), and the Court/Department defining the "confidentiality" of materials reviewed "extended [the OSA's] investigation timeline quite extensively."[130]  Colin confirmed that the Judicial Department controlled the OSA's access to information in general:

---

[130] An extended dialogue between Deputy State Auditor Michelle Colin and the Legislative Interim Committee on Judicial Discipline occurred on as part of the hearing on June 14, 2022. *Hearing before the Interim Comm. Jud. Discipline*, Colo. Leg., June 14, 2022 (OSA Presentation); Appendix 27(s)(i)(6), p. 8:24.  The circumstances relating to the access agreement itself are described in the 2022 OSA Fraud Hotline Investigation Report:

On July 24, 2019, the Judicial Branch requested, and the OSA agreed to, an access agreement to "facilitate the OSA's access to all records and information directly related to the scope of the investigation while still preserving and protecting any confidentiality, privilege, or other protection applicable to the

94

Our statute does say that we should have access to all of the
information directly related to the scope of the investigation. And
so that was part of our access agreement. With that said, I will say
that the judicial department was concerned about privileged
information that was relevant to the scope of the investigation, we
did come up with a process for us to be able to view that privileged
information without it being considered a waiver of Judicial's
privilege by sharing that with us. ***We did not have actual custody
of those privileged documents and judicial is the one that
determined what was privileged and what was not.*** *Supra,* note
130; Appendix 27(s)(i)(6), p. 6:36-7:3. (Emphasis added).

***The Court and the Judicial Department used their control over the Fraud Hotline
Investigation to redact information from the OSA's law enforcement referral prior to its
submission to the 2nd Judicial District Attorney's Office.***

Through its "access agreement," the Colorado Supreme Court and the Judicial Department
further controlled the timing of the OSA's communications and referral to law enforcement.
Contrary to the expectations of § 2-3-110.5(3)(c)(IV), C.R.S., which allow the open sharing of
the OSA's workpapers with law enforcement, the restrictions imposed on the OSA resulted in
the production of redacted records when a referral to the 2nd Judicial District Attorney's Office
finally occurred.  In her dialogue with Senator Van Winkle, Colin explained that the Judicial
Department and Chief Justice Boatright were responsible for the redactions in the records
provided to the 2nd Judicial District Attorney's Office.

**Sen. Van Winkle**
Thank you, Madam Chair, or Madam Vice Chair. If I understand
correctly, your office referred four people to the Denver District
Attorney's office for criminal investigations. But what the
prosecutors said, I believe they said this in in the press, they were
given highly redacted copies of the report. Why would a criminal
referral be given a redacted copy? And how did that happen?

---

records and information." The access agreement was executed on
August 23, 2019.

* * *

Since the OSA's intention is not to inadvertently waive the Judicial
Branch's privileges, the Judicial Branch and its attorneys were
granted multiple opportunities to review the report and executive
summary and redact information they identified as privileged,
attorney work product, or subject to other legal protections.

2022 OSA FHI Rpt. (Appendix 16), pp. 1-2.

95

**Rep. Carver**
Ms. Colin.

**Michelle Colin**
Thank you, Madam Chair. We did provide a redacted version of the report to law enforcement when we issued that. I guess I would say it's still consistent with what I had said earlier is that the Judicial Department was concerned about waiving its privilege if that information was not redacted and provided to the Denver DA's office. ***And so, we did provide them with the opportunity to redact any information that they felt was privileged or protected information. And that is the information that we provided to the Denver DA's office.*** And I think that was the basis for that.

**Rep. Carver**
Senator Van Winkle.

**Sen. Van Winkle**
Thank you, Madam Vice Chair. And if I guess the next question would be somewhat obvious if there's a criminal referral that needs to be given, why would in any case a redaction be allowed to be made?

**Michelle Colin**
I will take a shot at that. Our statute does not direct us either way on that. Not to I guess just keep repeating ourselves. But we were conducting that investigation on behalf of the Chief Justice and Judicial Department. And, therefore, we did ask and have conversations with them about it. They were aware we would be reporting if we identified any appearance of fraud or illegal activity. That we would be required to report that. ***We did have discussions about that. In the interest of protecting that privilege, we did allow them to redact that information.*** With that said, the Denver DA 's office could contact judicial and have that discussion with judicial about obtaining that information. It was not our privilege to waive, but it was Judicial's privilege to waive. And that was a conversation between judicial or that could have happened. I can't speak to whether it did happen. But that could happen between judicial and the Denver DA 's office.

*Supra*, note 130; Appendix 27(s)(i)(6), p. 21:12-22:17. (Emphasis added).

It should be clear from the Chief Justice and the Judicial Department's control over the OSA's external communications, that the Court and the Department were responsible for delayed reporting to law enforcement and the redaction of information when such reporting finally

96

occurred.[131]  This obstruction of the OSA's statutory obligations to "immediately report" the matter to law enforcement had the practical effect of causing the applicable statutes of limitations to expire.

***Chief Justice Boatright publicly comments on the merits of the OSA's findings and referrals to law enforcement.***

As he also did with respect to the RCT, Ltd. and the ILG reports, Chief Justice Boatright prefaced the publication of the OSA's Executive Summary with a cover letter that commented on or otherwise characterized the OSA's findings.  Chief Justice Boatright again commented on the merits of the Masias Controversy and facts relating to the Masias Contract:

> The OSA determined that this evidence requires a report to law enforcement with respect to Mr. Brown and Ms. Masias. This referral does not include any current Judicial Department employee or any current or former judicial officer. The OSA did not take a position on whether fiscal rules were violated in the contracting

---

[131] State Court Administrator Vasconcellos separately confirmed the Judicial Department's interference with the reporting to law enforcement, its insistence upon an "access agreement" before providing unredacted materials to the 2nd Judicial District Attorney's Office, and its control of redactions:

> For the investigation by the Denver District Attorney's Office arising out of the State Auditor's Fraud Hotline Investigation, the State Auditor provided the D.A. with a report that had attorney-client privileged information redacted.  When we were contacted by the D.A.'s investigator, we responded the same day explaining both the redactions and proposing a process for the D.A.'s office to obtain an unredacted report and all relevant documents.  Our attorneys drafted a C.R.E. 502 agreement that same day and the D.A.'s office indicated that they understood the need for and purpose of the agreement.  The next day, the D.A.'s office notified us that they had decided not to pursue the case.  We remained ready and willing to work with the D.A. to provide complete information.

> Letter from Steven Vasconcellos to Legis. Interim Comm. on Jud. Discipline (Jul. 11, 2020) (hereinafter "7/11/2022 Vasconcellos Letter" cited as "7/11/2022 Vasconcellos Ltr."), Appendix 27(s)(ii)(9)(m), pp. 2-3; *see also* p. 6 ("Prior to the referral to law enforcement, the Department was provided an opportunity by the OSA to propose redactions of privileged information as well as information protected by federal law that was not part of the law enforcement referral.").

> process or whether there were any ethical or code of conduct
> violations.  Boatright, *supra* note 120, p. 3.

Consistent with the Court's narrative expressed in its February 4, 2021 and February 8, 2021
public statements, Chief Justice Boatright maintained that the Masias Contract had been
cancelled due to the Masias-Rice recording:

> The Department terminated the leadership training contract at the
> direction of Chief Justice Coats less than two days after he first
> learned of information that Mr. Ryan and others withheld from
> him, and the Department made no payments under it.  *Id.*

Through interference with the disclosure of records to the OSA and control over the OSA's
external communications with law enforcement, the Court and the Department undermined the
basic process and procedures expected in a fraud hotline investigation and defined by
§ 2-3-110.5(3)(c), C.R.S.  At any point in the fraud hotline investigation process, the Judicial
Department could have allowed the timely free flow of information to the OSA and to law
enforcement by withdrawing its assertions of confidentiality and attorney-client privilege.[132]  It
should be emphasized that the OSA ultimately did find sufficient evidence to support its referrals
to law enforcement.  By using their control over the OSA fraud hotline investigation to limit the

---

[132] Shortly after the 2nd Judicial District Attorney's Office announced its decision not to file
charges, Ryan's attorney, Philip Geigle, provided an interview with *The Denver Gazette*, in
which he explained Ryan's perspective that the Colorado Supreme Court's control of the Fraud
Hotline Investigation effectively produced a rigged outcome.  As stated by Geigle: "This process
has been conducted with one goal in mind, to protect the powers that be and in no way is
designed to get to the truth of the matter."  David Migoya, *'One Goal in Mind'': Lawyer Says
Judicial Probe Designed to 'Protect the Powers That Be',* DENVER GAZETTE, June 1, 2022.  In
his testimony to the Legislative Interim Committee on Judicial Discipline on August 10, 2022,
Ryan further explained his perception that the OSA fraud hotline investigation, the Troyer-
Mitchell investigation, and the ILG investigation were all unduly controlled by the Justices and
the Judicial Department:

> Remember, Judicial controlled the timing, execution, and terms of
> the contracts with RCT and ILG, including the conditions
> concerning retention of materials after their publication. Further,
> the Judicial Branch and its attorneys were granted multiple
> opportunities to review the State Auditor's report, their Executive
> Summary and redact information they identified as privileged,
> attorney work product, or subject to other legal protections. In this
> respect, although not the primary actor, Judicial was in full control
> of these investigations.
>
> *Hearing before the Interim Comm. on Jud. Discipline.*, Colo. Leg.,
> August 10, 2022 (testimony of Christopher Ryan); Appendix
> 27(s)(iii)(9), pp. 1:36-2:6.

98

public's access to the full OSA Fraud Hotline Investigation Report as well as the underlying investigation record (which includes interview transcripts of Ryan and numerous other key witnesses), the Justices have blunted the significance of the OSA's ultimate findings of grounds to suspect fraud.[133]  As with the other investigations, the Justices exercise of control over the OSA fraud hotline investigation presents a reasonable basis to suspect that the Justices have violated Canon Rule 2.9(C) through judicially directed fact investigation.

**This Commission's Investigation and Discipline of Former Chief Justice Coats**

***The Justices obstructed this Commission's access to records and resources.***

Chief Justice Boatright, the Court, and the Judicial Department's efforts to obstruct this Commission's investigation of the Masias Controversy are well-documented in the records of the Interim Committee on Judicial Discipline and in contemporaneous reporting in the press.[134]

As part of the Interim Committee's initial hearing on June 14, 2022, this Commission submitted a report detailing obstacles that it had encountered and reasons for various proposed reforms.[135] The primary obstacles identified included the following:

---

[133] Appendix 27(s)(ii)(6), p. 3:18-26 (Troyer describes reviewing transcripts of Ryan's OSA interviews); *see also* Appendix 30, pp. 31, 40, 71-72 (Judicial Department's constructive refusal to produce transcripts and other materials in response to public records request).

[134] David Migoya, *Discipline Commission Says Judicial Department Continues to Stall* Investigation, DENVER GAZETTE, August 4, 2022; David Migoya, *Judicial Discipline Commission Says Supreme Court Lied, Misled, Misinformed Public During Probe*, DENVER GAZETTE, August 8, 2022; David Migoya, *State Supreme Court Chief Sought to Restrict Media's Access to Information Surrounding Scandal Investigation*, DENVER GAZETTE, October 24, 2022; *see also* Prince, *supra* note 12, p. 107 (quoting internal email of this Commission selectively disclosed/redacted by Chief Justice Boatright / the Judicial Department in response to public records request from the press).  The internal email quoted by Prince was authored by former Executive Director William Campbell.  The email stated:

> [I talked to the Chief Justice [Boatright] in the parking garage.]  He also said, very emphatically, that he wants us to have all info we are seeking, but to do so without a subpoena at this point might give the media an argument on which to obtain it, or possibly result in a leak to them, and might disrupt the process.  That's why they are suggesting a subpoena since they could grant that to us and deny it to others.  ***He does not want to give it easily***, lest the press will ask for it and there won't be any credible way to decline providing it.  He seemed very sincere.

[135] Colo. Comm. Jud. Discipline, REPORT OF THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE TO THE INTERIM COMMITTEE ON JUDICIAL DISCIPLINE OF THE COLORADO GENERAL

- That the Judicial Department contested the Commission's authority to use its subpoena power under Colo. RJD 22 during the pre-filing / investigative phase of a judicial disciplinary proceeding.[136]

- The Judicial Department had been non-compliant with a 2010 memorandum of understanding that required the Judicial Department to automatically report allegations of judicial misconduct to this Commission.  When specifically requested to comply with the agreement, the Judicial Department was non-cooperative or otherwise delayed in responding to this Commission's requests for information.  6/14/22 CCJD Rpt. (Appendix 27(s)(i)(9)(d)), pp. 13-14.

- Judicial "leadership" sought to control the scope of this Commission's investigation, its ability to utilize investigation resources through OARC, its authority to retain outside Special Counsel, and its ability to fund that outside Special Counsel.  *Id.*, p. 14.[137]

---

ASSEMBLY—JUNE 14, 2022 INITIAL HEARING, June 14, 2022 (hereinafter "6/14/22 CCJD Rpt."); Appendix 27(s)(i)(9)(d).

[136] 6/14/22 CCJD Rpt., pp. 9, 15-16; *see also Hearing before the Interim Comm. Jud. Discipline*, Colo. Leg., August 10, 2022; Appendix 27(s)(iii)(8), p. 4:5-11 (Vasconcellos testimony seeking to tie Commission's subpoena powers to specific complaints and therefore removing subpoena authority in preliminary proceedings).

[137] The explanation provided by this Commission illustrates how the Justices' refusal to disqualify themselves caused the obstruction that this Commission encountered.  This Commission's June 14, 2022 Report to the Interim Committee on Judicial Discipline states, in relevant part:

> In the past, the Discipline Commission has been primarily reliant on personnel loaned by the Colorado Judiciary (specifically, the Supreme Court's Office of Attorney Regulation Counsel) to conduct these investigations. In 2021-22, the leadership of the Colorado Judiciary acted to impede the Discipline Commission's access to conflict-free personnel and resources. The leadership asserted the authority to control the scope of the Discipline Commission's investigatory assignments to special counsel and the authority to control the Discipline Commission's retention of special counsel.

> The leadership of the Colorado Judiciary also asserted the authority to block funding for investigatory special counsel. The Discipline Commission's primary objection to this asserted authority was that any financial oversight should be through a conflict-free decision-maker. The Discipline Commission did not, and does not, object to oversight of its finances but objected to

100

- Starting in 2021, the Judicial Department began to selectively control and limit this Commission's access the Department's records.  6/14/22 CCJD Rpt. (Appendix 27(s)(i)(9)(d)), p. 15.

- The Colorado Supreme Court had rulemaking authority without requirements that it consult with the Commission but with opportunities to selectively/informally interpret requirements under the Rules.  *Id*., p. 16.

- Despite making repeated public comments on the merits of the Masias Controversy (on February 4, 2021, February 8, 2021, February 16, 2021, January 25, 2022, and February 7, 2022), the Justices had refused to recuse themselves from judicial disciplinary proceedings or related administrative matters.  *Id.*, pp. 17-19.  This Commission further highlighted how the Court used its rulemaking authority to adopt a one-sided disqualification standard that applied to Commission members but not to the Justices, as the final decision-makers in judicial disciplinary proceedings.  *Id.*, p. 20.

In response, on July 11, 2022, State Court Administrator Vasconcellos, speaking on behalf of the Court and the Judicial Department, submitted a letter to the Interim Committee stating that "[m]any of the Commission's statements about recent events are missing important background and context and are not consistent with the Department's understanding of events."[138] Vasconcellos went on to argue that allegations that the Department was obstructing this Commission's function involved "confidential [matters] under the Constitution and related state law."  Consistent with the Department's other frivolous assertions of confidentiality and privilege as a barrier to this Commission having access to records for its investigation, Vasconcellos confirmed that the Judicial Department insisted upon this Commission entering an "access agreement" and that similar access agreements were required with respect to all the other investigations as a condition for records production.  7/11/2022 Vasconcellos Ltr. (Appendix

---

having that financial oversight exercised by those involved in the conduct to be examined.

Additionally, the leadership of the Colorado Judiciary asserted that a number of unwritten and evolving rules would be used to limit and constrain the financing of the investigation at issue. The Discipline Commission objected strongly to use of unwritten and undisclosed "rules" to constrain an ongoing investigation. Again, these were asserted to provide control of the investigative resources to conflicted individuals and even individuals that had asserted publicly that they had disqualified themselves from participation in the relevant matters.  6/14/22 CCJD Rpt., p. 14.

[138] 7/11/2022 Vasconcellos Ltr. (Appendix 27(s)(ii)(9)(m)), p. 1; *see also* David Migoya, *Indignant Court Details Cooperation*, DENVER GAZETTE, July 12, 2022.

27(s)(ii)(9)(m)), pp. 2-4.[139] Vasconcellos further confirmed that the Court, through OARC, had opposed this Commission's funding of outside Special Counsel (though Vasconcellos maintained that the OARC had "legitimate" concerns about the Commission's RFP process and an undefined amount budgeted for outside Special Counsel) and had sought to limit the scope of outside Special Counsel's role. 7/11/2022 Vasconcellos Ltr. (Appendix 27(s)(ii)(9)(m)), pp. 4-5. Importantly, Vasconcellos responded to this Commission's expressed concerns about the need for the Justices' disqualification with the following statement:

> ***The Supreme Court believes that its recusal obligations under the Code of Judicial Conduct applies in judicial discipline proceedings*** and understands that one or more of the justices may need to recuse in any given case. The Court has acknowledged its recusal obligation to the Commission on multiple occasions and on June 28 proposed a rule amendment to the Commission to address this issue. The Commission asked for more time to respond to the proposed rule change; to accommodate the Commission's request, the Court has delayed publication of the proposed rule. *Id.,* p. 6.

The promulgation of Colo. RJD 41, then, became yet another excuse for the Justices to delay their individual recusals in *Coats* indefinitely until they adopted the Rule and, ultimately, until this Commission actually filed a notice activating the process for appointing a Special Tribunal.

There are underlying issues as to the appropriateness under Canon Rules 1.1, 1.2, 1.3, 2.10, 2.12, 3.1, and 4.1 of Vasconcellos acting as an agent of the Justices, commenting on their behalf as to the merits of the Masias Controversy, and asserting that the Court and the Judicial Department fully cooperated with this Commission's investigation (the topic of which implicates violations of the Justices' obligations under Canon Rule 2.16).

In turn, this Commission responded to the various representations made by Vasconcellos with specific examples of how the Court and the Judicial Department had in fact interfered with its

---

[139] In his April 14, 2022 testimony to the Senate Judiciary Committee, Chief Justice Boatright further confirmed that the so-called "access agreements" were drafted in consultation with the Attorney General's Office. As stated by Chief Justice Boatright:

> I think ***one of the things that we've learned from the Attorney General's Office is*** that ***the access agreement*** that we've been able to enter into with the five other investigations. Well, we've entered into agreements, including the access agreements have provided provides more protection, ***according to their advice***, but we would accept the amendment [proposed as L.006 to SB 22-201].
>
> *Hearing before the S. Judiciary Comm.*, Colo. Leg. April 14, 2022; Appendix 27(m)(i), p. 22:7-11.

investigation.[140]  Highlights of this Commission's response, presented through an August 7, 2022 letter from its Executive Director, include the following:

- In contrast to the 12,000 documents that were immediately made available to the Troyer-Mitchell investigation, during all of 2021 the Court and the Judicial Department only provided this Commission with 10 documents totaling 60 pages.  8/7/22 CCJD Ltr. (Appendix 27(s)(iii)(12)(f)), p. 2.

- Even with Vasconcellos's assertion that 1,600 documents had been provided to the Commission by July 11, 2022, the documents produced were approximately 10 percent of what the Judicial Department had already produced to the other investigators, respectively.  *Id.*

- Chief Justice Boatright and the Judicial Department's insistence upon an "access agreement" circumvented the production of records otherwise required under 2010 and 2012 memorandums of understanding and provided no guarantees that the Judicial Department would produce complete records.[141]  8/7/22 CCJD Ltr. (Appendix 27(s)(iii)(12)(f)), p. 4-5.

---

[140] Letter from Christopher Gregory to the Interim Comm. on Jud. Discipline with Appendices 1-2, August 7, 2022 (hereinafter "8/7/22 CCJD Ltr."); Appendix 27(s)(iii)(13)(f); Shelly Bradbury, *Watchdog Says Colorado Supreme Court, Judicial Department Blocked Investigations: Reform Effort Reveals Colorado Judicial Department's Fraught Relationship with Commission on Judicial Discipline*, DENVER POST, August 9, 2022.

[141] During testimony to the Legislature on April 14, 2022, Chief Justice Boatright explained that the Commission not having signed an "access agreement" justified why information relevant to the allegations in the Masias Memo had yet to be disclosed:

> *I need to kind of tread lightly around this because proceedings before the Commission should be confidential.* But what I will say is that, with the five other investigations, we've been able to reach an agreement with regard to waiver, including your own auditor. With regard to documents, the memorandum itself provides that investigatory notes and findings shall be turned over. What we're talking about are confidential and privileged documents, that we have sought protection with all of the investigative agencies to have what's called an access agreement to show what they would do with the documents. So that it can't be later argued that by giving them to a third party, we've waived them. So, the memorandum itself is not an access agreement.
>
> *Hearing before the S. Judiciary Comm.*, Colo. Leg. April 14, 2022; Appendix 27(m)(i), pp. 18:38-19:6.

103

- That even with an "access agreement," a letter from Chief Justice Boatright dated August 18, 2021 suggested that the Judicial Department would continue withholding certain documents because of other undefined "agreements." *Id.*, p. 4.

- The initial "access agreement" proposed by the Judicial Department provided the Department with arbitrary license to determine what information might or might not be confidential, without disclosing whether the information even exists. *Id.*, p. 4-5.

- Only after being required to do so by SB 22-201(which adopted significant reforms of the judicial disciplinary system) did the Judicial Department execute an "access agreement" limited to application of CRE 502.  The final agreement, however, still contained no affirmative assurances that the Department would produce all discoverable records. *Id.*, p. 5.

- In response to Vasconcellos's assertion that the Judicial Department had never challenged or questioned this Commission's subpoena authority, the Commission responded with two specific examples of conversations with the Department and OARC raising such challenges. *Id.*, p. 5-6.

- Contrary to Vasconcellos's description of legislation as a path to "independent" funding, this Commission explained that pre-existing mechanisms allowed for the Commission to control its funding.  The difficulties that this Commission faced were attributed to the Court and the Department's obstruction of funding for outside Special Counsel to investigate the *Coats* matter. *Id.*, pp. 6-7.

- The Commission rebutted Vasconcellos's assertions that OARC had "legitimate" reasons for withholding funding.  Specifically, the Commission confirmed that it had followed prudent procurement processes when selecting and contracting with its outside Special Counsel. *Id.*, pp. 7-8.

- This Commission also responded to Vasconcellos's contentions that it had not requested funding for outside Special Counsel as part of the ordinary budgetary process and that the contracted for rates were unreasonable.  As explained, the need for outside Special Counsel was first recognized beyond the normal budgetary submission timeframes.  This Commission also explained that its contracting rate was approved by the Solicitor General. *Id.*, pp. 8-10.

- The Commission provided specific examples of Attorney Regulation Counsel Jessica Yates exerting pressure to control the scope of the *Coats* investigation, claiming a self-appointed role as the "fiduciary" of attorney registration fees, and asserting that the investigators were ethically obligated to conform to the positions taken by the Judicial Department. *Id.*, p. 10.[142]

---

[142] In sharp contrast to the Justices' intentional non-disclosure of the Masias Contract and Masias Memo to the OSA, the Justices insisted that this Commission meet with Colorado State Auditor

- Through a May 18, 2021 letter, this Commission had expressly inquired as to the nature and scope of the "independent" investigations proposed by the Justices with a request for documents related to the Judicial Department's selection and contracting process. Specifically, this Commission asked Chief Justice Boatright to explain the Court's authority for commissioning its "independent" investigations. ***The letter provided Chief Justice Boatright and the other Justices with constructive notice of potential problems with the contracted-for investigations under the Code (i.e. Canon Rule 2.9) and Colo. Const Art. VI, § 23(3) (recognizing this Commission's exclusive jurisdiction to investigate judicial discipline allegations apart from impeachment proceedings)***.  8/7/22 CCJD Ltr. (Appendix 27(s)(iii)(12)(f)), Appendix 1 to Ltr., pp. 2-3 (describing substance of May 18, 2021 letter); *see also* discussion *supra* starting at p. 85 with May 18, 2021 letter included in Appendix 19, pp. 1-7.

- A chronological listing of specific obstacles this Commission encountered while seeking records and discovery is presented through Appendix 1 of the 8/7/22 CCJD Ltr.  A chronological listing of specific obstacles this Commission encountered with respect to investigation resources (through OARC and the funding of outside Special Counsel) and administrative support (through both SCAO and OARC) is presented through Appendix 2 to the 8/7/22 CCJD Ltr.

- Through an e-mail dated November 2, 2021, Attorney Regulation Counsel Yates expressly informed this Commission's counsel through the Attorney General's Office that OARC was leveraging its obligations to provide attorney and investigation support to this Commission on the Commission agreeing to Yates's terms for appointing outside Special Counsel in the *Coats* matter.  8/7/22 CCJD Ltr. (Appendix 27(s)(iii)(12)(f)), Appendix 2 to Ltr., p. 10.  It is unclear why ARC Yates's explicit obstruction of this Commission's funding source and resources was not recognized as assisting the Justices violate their duties of cooperation under Canon Rule 2.16 and a basis for Yates's own discipline under Colo. RJD 8.4(f).

Rather than addressing or disputing any of the specifically detailed examples of obstruction described in this Commission's August 7, 2022 letter, the Judicial Department responded with an unsigned three-paragraph statement that essentially presented a general denial.  Specifically, the Judicial Department stated:

> The Commission's response, which includes a timeline of events and discussions, omits many relevant statements, ignores important context, in some instances misstates discussions, misquotes language from the Department's written communications, modifies quotes to imply something other than what was stated (in some

---

Kerri Hunter, Justice Márquez, and ARC Yates to confirm internal controls / payment processes before the Justices finally authorized/released interim funding in late-Spring 2022 for this Commission's outside Special Counsel in *Coats*.

> cases not indicating the quote has been modified), and falsely
> attributes ill-intent to many members of Department leadership. [143]

Ignoring the fact that it accepted service of this Commission's subpoena duces tecum for records on January 5, 2022 and Vasconcellos's explanation that all responsive documents were provided on June 29, 2022 after the CRE 502 "access agreement" was finalized, the Department's statement again attempted to shift blame for withholding substantial discovery to this Commission.

> The Judicial Department is cooperating with all document requests
> from the Commission. On July 12 – three weeks prior to the recent
> allegation from the Commission – attorneys for the Department
> notified the Commission's counsel that it had fully complied with
> the Commission's subpoena, including production of privileged
> and confidential information. The Department recently received
> five broad new requests for documents that require the collection,
> labeling, and production of what will likely comprise nearly
> 30,000 documents. *Supra,* note 143.

The accuracy of this Commission's descriptions of the Judicial Department intentionally obstructing the Commission's investigation and access to material information/records was also verified, in part, through Mr. Vasconcellos confirming that, even though the OSA had issued its full and final Fraud Hotline Investigation Report on February 4, 2022, a copy of the full-unredacted report had still not been provided to this Commission when the Interim Committee on Judicial Discipline held its initial hearing June 14, 2022. [144]  Vasconcellos offered no justifications for the Judicial Department's withholding of the OSA's critical report and investigation records from this Commission for over 4 months.

Beyond withheld records, the Judicial Department and OARC's documented withholding of administrative resources from this Commission occurred in contrast with Chief Justice Boatright's public expression of support for helping this Commission become truly independent with adequate resources.  As stated in his April 14, 2022 testimony to the Legislature, Chief Justice Boatright explained:

> As I said, it, it puts us in a position of having to say no, potentially
> at some point or questioning them with regard to expenditures, if
> we're doing the finance, we have procurement rules, we have
> financial rules that they would then need to abide by. And I think
> that just if we were to run afoul with it, it has an appearance that
> we're attempting to control. You know, if our IT department isn't

---

[143] Press release from Colo. Jud. Dep't re: Colo. Comm'n. on Jud. Discipline August 7, 2022 Letter, August 8, 2022; Appendix 27(s)(iii)(13)(g).

[144] *Hearing before the Interim Comm. Jud. Discipline*, Colo. Leg., June 14, 2022 (Colo. Comm'n Jud. Discipline Presentation); Appendix 27(s)(i)(4), p. 1:15-24.

> able to produce something that is to their liking, it looks like we're exerting some type of control or interference. And we just want to remove any, any appearance of that at all. You know, I think it's difficult because they would be a very small office, but by the same token, they need to be independent, not kind of independent or mostly independent. Our position is we would like them to be completely independent.[145]

From the documentation that this Commission provided to the Legislative Interim Committee on Judicial Discipline on August 7, 2022, alone, it should be clear that the Colorado Supreme Court, the Judicial Department, and the Attorney General's Office exerted significant efforts to stifle this Commission's abilities to perform basic functions, including a thorough and complete investigation into the Masias Controversy. By any objective standard, the Justices did not cooperate with this Commission and, more likely, actively concealed their own substantial misconduct.[146]

As discussed *infra* starting at p. 112, the Justices, OARC, and the SCAO continued to obstruct this Commission's access to administrative resources by announcing the removal of the Commission as a recipient of attorney registration fee funding under C.R.C.P. 227, by continuing to delay/refuse to provide this Commission with a lease for its space in the Ralph L. Carr Judicial Center, and by disconnecting some of this Commission's IT resources without notice. Former Executive Director Gregory spoke in detail regarding this obstruction of administrative resources at the December 15, 2022 Joint Budget Committee hearing.[147]

In the Summer and Fall of 2023, obstruction of this Commission's administrative resources continued through 1st Assistant Attorney General LeeAnn Morrill, Chief Deputy Attorney General Natalie Hanlon Leh, Deputy Attorney General Kurtis Morrison, and then-Assistant Attorney General Christopher Van Hall presenting arguments and opinions intended to expand membership of the Board governing the Colorado Office of Administrative Support for Independent Agencies (ASIA) and to effectively dilute the level of service provided by the ASIA Office to the core group of small agencies (including this Commission) that it was intended to

---

[145] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m)(i), p. 15:1-9.

[146] Even in his most recent statements to the press, Chief Justice Boatright maintains that he has always been cooperative with this Commission: "[T]he Judicial Department fully cooperates with every investigation by the Commission." Migoya, *supra* note 3. Chief Justice Boatright, however, declined to respond to whether he knowingly concealed evidence of and failed to report former Presiding Denver Juvenile Court Judge D. Brett Woods's unfitness/intemperance and history of retaliation. Likewise, Boatright refused to address the delays involved in the circumstances of *Kiesnowski* being reported to this Commission. Boatright's incredulous assertions of cooperation cross any boundaries of honesty under Canon Rules 1.2 and 2.16.

[147] *Hearing before the J. Budget Comm.*, Colo. Leg., December 15, 2022 (Colo. Comm'n. Jud. Discipline Presentation); Appendix 27(t)(i); *see also infra*, p. 112.

107

serve.  During these discussions, Senior Assistant Attorney General Gina Cannan represented this Commission and the Independent Ethics Commission as general counsel. The Attorney General's Office persisted in presenting its arguments and opinions even after former Executive Director Gregory expressly raised the conflicts of interest involved through 1st Assistant AG Morrill's representation of the Justices / the Judicial Department in matters relating to the Masias Controversy.  The Attorney General's Office's efforts to undermine the ASIA Office, created by Senate Bill 23-228, were resolved after Joint Budget Committee Staff sent a memo providing the larger agencies that the Attorney General's Office sought to add to the ASIA Board the option of Board membership if they received full administrative support through the ASIA Office and gave up their existing internal administrative FTE staffing to supplement the ASIA Office's resources.  None of the larger agencies chose to take the option and the ASIA Board remains limited to those agencies that will receive full administrative support through the ASIA Office.[148]   Nevertheless, the Attorney General's Office's choice to interfere with the standing up of the ASIA Office is only another example of intentional and coordinated obstruction of this Commission's access to administrative resources by the Justices through the assistance of others.

Through their obstruction of this Commission's financial resources, its enforceable investigative authority, its administrative support, and its access to records and information, the Justices (through its OARC, the Judicial Department, and the Attorney General's Office) effectively hobbled the scope and depth of the investigation in the *Coats* matter.  Notwithstanding these obstacles, however, this Commission was able to obtain a meaningful disciplinary outcome. Nevertheless, the thousand pinpricks that the Justices used to eviscerate the effectiveness of the judicial disciplinary system should be recognized as violations of the Justices' duties of cooperation and non-retaliation under Canon Rules 1.1, 1.2, 2.3, 2.6, 2.15, and 2.16.

***The Justices abused their rulemaking authority.***

Over the course of the Masias Controversy, the Justices repeatedly used their rulemaking authority for self-serving purposes and without meaningful consultation with this Commission. As with other functions impacting pending and impending cases, including judicial discipline proceedings relating to the Justices themselves, the Justices refused to recuse themselves from

---

[148] Appendix 27(dd)(ii), pp. 9:33-10:23 (Executive Director Gregory providing general context after State Court Administrator Vasconcellos informed Joint Judiciary Committee of his understanding that the ASIA Office was going to be disbanded).  Notwithstanding Executive Director Gregory's explanation of context and without providing a candid explanation of his personal motives for doing so, the JBC Budget Analyst would attribute blame to the ASIA Board (rather than to the Attorney General's Office and the Judicial Department) for the delays caused in standing up the new ASIA Office.  *See* Colo. Legis. J. Budget Comm., STAFF FIGURE SETTING FY2024-25: JUD. DEP'T, February 15, 2024, pp. 79-90; *Cf.* Colo. Jud. Dep't, FY2024-25 BUDGET REQUEST, November 1, 2023, pp. 192-197 (budget request R10) (Colo. Jud. Dep't's request to have the Office of Judicial Performance Evaluation removed from Department's support obligations and added as a primary recipient of administrative support through ASIA).

rulemaking.[149]  An inventory of rulemaking or its equivalent that has occurred over the course of the Masias Controversy and which has impacted judicial discipline proceedings includes the following:

- Amendment of the Code and its comments, Canon Rules 1.2, 2.3, 2.12, 2.15, 4.1;[150]
- Amendment of Colo. RJD 3;[151]
- Adoption of Colo. RJD 3.5;[152]
- Adoption of Colo. RJD 41;[153]
- Amendment of C.R.C.P. 227;[154]
- Amendments of the Judicial System Personnel Rules, including the Judicial Department Code of Conduct;
- Amendments of the Judicial Department's Fiscal Rules;
- Adoption of CJD 22-01 (implementing mandatory information sharing obligations within the Judicial Department, as required by § 13-5.3-106, C.R.S.).

From a high-level perspective, the Justices' adoption of various rules and policies listed above reflects how the Justices sought to unilaterally make changes to Colorado's judicial discipline structure without any meaningful consultation with this Commission or acknowledgment that the Justices' conflicts with respect to the Masias Controversy should have required their disqualification from these decisions.  The Justices' engagement with Court of Appeals Judges to amend Canon Rule 4.1 (while not consulting with this Commission) is evident of the problems inherent with the Justices' insistence, through Colo. RJD 41, that the Special Tribunal that replaces the Court where there are conflicts is composed of Colorado Court of Appeals judges. This Commission's objections to Colo. RJD 41 and the Court's refusal to adopt a conforming amendment even after the Legislature passed HCR 23-1001 with near unanimity is discussed *supra*, note 14.

---

[149] As with this Commission's letters sent to the individual Justices asking for their disqualification from matters related to the Masias Controversy, the Judicial Department has constructively denied access to public records relating to exercise of the Justices' rulemaking and similar administrative authority.  Appendix 30, pp. 10, 26, 40, 47, 71-72; *see also supra*, note 87 (describing context of Judicial Department constructively denying records access).

[150] Colorado Supreme Court, Rule Change 2021(15), June 11, 2021; Colorado Supreme Court, Rule Change 2021(19), September 23, 2021; Colorado Supreme Court, Rule Change 2022(04), January 21, 2022 (with accompanying memo: Lino Lipinsky and Sueanna Johnson, *Judges' and Restricted Employee's Participation in Party Caucuses and Primaries*: *Recommended Changes to the Code of Judicial Conduct and the Judicial Personnel Rules*), December 22, 2021).

[151] Colorado Supreme Court, Rule Change 2021(20), October 12, 2021.

[152] *Id.*

[153] Colorado Supreme Court, Rule Change 2023(02), January 19, 2023.

[154] Colorado Supreme Court, Rule Change 2022(16), November 22, 2022.

Additionally, it deserves emphasis that the Justices continued to engage in rulemaking without meaningful consultation even after § 13-5.3-107, C.R.S. (2022) required it.  § 13-5.3-107, C.R.S. provided:

> (1) Section 23(3)(h) of article VI of the Colorado constitution directs the supreme court to provide by rule for procedures before the commission, the masters, and the supreme court. In exercising its rulemaking authority, ***the supreme court shall provide the commission reasonable notice and an opportunity to object before enacting any new rule or amendment as it pertains to judicial discipline.*** If the commission objects to any rule or amendment, representatives of the supreme court shall meet with representatives of the commission and engage in good-faith efforts to resolve their differences.
>
> (2) ***Whenever the supreme court proposes a rule, guideline, or procedure related to judicial discipline, the supreme court shall post notice of the proposed rule, guideline, or procedure***; allow for a period for public comment; and give the public an opportunity to address the supreme court concerning the proposed rule, guideline, or procedure at a public hearing.  (Emphasis added).

Significantly, the Justices' adoption of Colo. RJD 3.5 without consulting with this Commission resulted in the imposition of a one-sided standard for requiring the disqualification of Commission members and notification of the subject judge when a Commission member has personal or professional relationships with witnesses but, conversely, not requiring public disclosure of conflicts when the grounds for disqualification relate to a decisionmaker's personal or professional relationships with subject judges.  According to Colo. RJD 3.5, there are no obligations to inform the complainant or the public (beyond a generic non-case specific statement in the Annual Report) of the grounds for a Commission member's disqualification.  The apparent intent of the Justices in adopting Colo. RJD 3.5 was to require the recusal of then-Chair Elizabeth Espinosa Krupa from *Coats* and any related proceedings involving the other Justices.[155]

This Commission previously expressed its objections and a request for statutory reforms to Colo. RJD 3.5 at length as part of its initial report to the Legislative Interim Committee on Judicial Discipline.  This Commission stated:

> **Disqualification Standards**
> The rules for disqualification of decision-makers in the judicial discipline process are spotty, ambiguous, and inconsistent. For some decision-makers, such as the justice of the Colorado Supreme

---

[155] David Migoya, *Bill to Fund Independent Judicial Discipline Commission Heads to Polis, Chairwoman Recuses from Investigation*, DENVER GAZETTE, May 11, 2022.

110

Court, substantial ambiguity exists as to what rules of disqualification are accepted as applicable.

In 2021, the Colorado Supreme Court exercised its rulemaking authority to amend the Colo. RJD and adopt a new Colo. RJD 3.5. Rule 3.5 stems from a proposal made to the Supreme Court by the Discipline Commission in June of 2019 but rejected by the Supreme Court at the time. The Supreme Court later made material changes to the proposal and adopted the revised version in late 2021 without prior notice to or consultation with the Discipline Commission. When the Discipline Commission asked for the opportunity to provide input on the new rule, the Chief Justice advised in writing that "Feedback is not necessary."

As indicated above, the public allegations of judicial misconduct and allegations that these claims were suppressed by judicial leadership raised a number of serious disqualification issues for the Colorado Supreme Court regarding its roles in judicial discipline. The Supreme Court responded to these issues by enacting the 2021 amendments that created extensive disqualification rules, but rules applicable solely to *Discipline Commission members*. The new disqualification rules do not purport to apply to the other critical decision-makers in the discipline process such as the justices of the Supreme Court or special masters. This has exacerbated rather than ameliorated the uncertainty in addressing conflicts of interest in judicial discipline.

Additionally, the meaning of disqualifying oneself from a judicial discipline matter has been inconsistently defined. Under the new Rule 3.5, a disqualified member of the Discipline Commission must have "no involvement in any aspect of the proceedings after the date of recusal." This is a reasonable and appropriate standard and the Discipline Commission has complied with this standard. However, the Commission's experience is that other participants in the judicial discipline process from the Colorado Judiciary have declared a recusal but asserted a right to maintain active involvement in the proceedings at a substantive administrative level. The meaning of disqualification or recusal should be uniform for all those involved in judicial discipline matters.

**Recommendation:** The Discipline Commission recommends that the General Assembly set uniform, transparent, and reliable standards for disqualification of decision-makers in the judicial discipline system. The General Assembly has the authority to effect this change by statute. *People v. Prophet,* 42 P.3d 61, 62 (Colo. App. 2001); *People v. Bobian,* 626 P.2d 1132, 1134-35 (Colo. 1981).

111

> The Discipline Commission recommends the decision-makers in judicial discipline be defined as the members of the Commission, the members of the final decision-making body (whatever form may finally be chosen), and the special masters. The standards should be set as the same standards that govern judge disqualification in cases as stated in the Code, primarily at Rule 2.11.[156]

The Justices' conflicted rulemaking also carried over to the various ways through which the Justices sought to obstruct this Commission's access to resources and its ability to perform its constitutional mandate. The problems that this Commission encountered with respect to the Justices unilaterally announcing changes in the Office of Judicial Discipline's administrative support by removing the Commission from C.R.C.P. 227 were contemporaneously noted in this Commission's response to questions raised by the Joint Budget Committee as part of its hearing held on December 15, 2022.

> The incomplete nature of the Commission's current independence and autonomy is evident through the yet to be fulfilled expectations of SB 22-201. § 13-5.3-103(3), C.R.S. recognizes that the Department and the Office of Attorney Regulation Counsel have concurrent obligations to provide the Commission with administrative support equivalent to that provided to the Colorado judicial performance commissions through June 30, 2023. Although a draft memorandum of understanding has been circulated, the Commission does not have a current agreement defining the support provided to it. Similarly, even though § 13-5.3-103(3), C.R.S. requires that the Judicial Department house the Commission in the Ralph L. Carr Judicial Center indefinitely, the Department has not yet presented the Commission with a lease or other agreement ensuring the stability of its current office location and access to other facilities. The Colorado Supreme Court has further announced a rule change to Colorado Rule of Civil Procedure 227 (effective December 1, 2022) that removes the Commission as a beneficiary of attorney registration fees (either directly or through assistance provided through the Office of Attorney Regulation Counsel).[157]

At the December 15, 2022 Joint Budget Committee hearing, this Commission's Executive Director further explained how OARC, with the amendment of C.R.C.P. 227, had disconnected the Office's access to Westlaw and the Judicial Data Access System without notice. The following dialogue occurred as part of the hearing:

---

[156] *Supra,* note 135, 6/14/22 CCJD Rpt. (Appendix 27(s)(i)(9)(d)), pp. 20-21.

[157] Colo. Comm'n. Jud. Discipline., *Responses to Common Questions for Discussion at Department Hearings*, J. Budget Comm. Hrg. (Dec. 15, 2022); Appendix 27(t)(ii), p. 26.

112

**Sen. Kirkmeyer**
Thank you, Madam Chair, I just want to make sure I heard correctly. So, the SCAO is supposed to be providing certain things like leases for office space and certain other administrative responsibilities per statute, and they sent you a letter and told you that they're not going to. Did I hear that right? Or am I getting it wrong?

**Sen. Zenzinger**
Mr. Gregory.

**Executive Director Gregory**

Yes, I'm happy to clarify. Under 13- 5.3-103 (3), C.R.S., the expectation of the Legislature was that the Office of Attorney Regulation Counsel, which is part of the Supreme Court using attorney registration fees, and the State Court Administrator's Office would continue supporting our Commission over the course of this fiscal year as we sought to find a way to either make some of these things independent or to be able to continue having those supports provided in that way. What the Supreme Court did with that letter. Number one, they violated the other statute, which relates to our rulemaking, 13-5.3-107, C.R.S., which expects them to give us notice and give us an opportunity to discuss a rule with them before they would have to propose that rule change publicly. They didn't do that here. They just announced that they're changing a rule that would have taken away the source of funds for the Commission, and they did that just automatically. Shortly after that happened, I think the practical issue that we had. The Office of Attorney Regulation Counsel deactivated our access to Westlaw, which is an essential resource that we have to perform our function. Fortunately, I was able to speak with the State Court 1 Administrator and he was able to get that resource through the Department. However, it just illustrates an ongoing history where we have been having to fight over our basic resources. We've been facing threats of being essentially evicted from our office space because the Office of Attorney Regulation Counsel no longer wants us there. There's a whole history that was presented to the Interim Committee about these issues, but there is a difficulty with the Department essentially doing what they're obligated to do and what they're promised to do under our existing statutory structure.

**Sen. Zenzinger**
Thank you for that. Clarification. Members, any questions?

**Sen. Kirkmeyer**
I think we have lots of questions.

113

**Sen. Zenzinger**
That we might not be able to dig into fully today, but it does give really good context for your budget request today, and so we appreciate that. Senator Bridges.

**Sen. Bridges**
I was going to say that all seems pretty messed up. Wouldn't you agree?

**Executive Director Gregory**
I've been living it. [158]

Although the disconnection of Westlaw and Judicial Data Access occurred in connection with the Court's unilateral announced change to C.R.C.P. 227, the circumstances were consistent with the Court's and the Judicial Department's extended history of non-cooperation, including obstructing this Commission's access to necessary administrative resources. *See discussion supra*, starting at p. 99.

As with other examples of the Justices' persistent refusal to disqualify themselves, their engagement in rulemaking despite the Masias Controversy only reinforces the violations of Canon Rule 2.11 that have occurred as well as the Justices' overall non-cooperation and retaliation against this Commission in violation of Canon Rule 2.16.

***The Justices abused their appointment authority and with members of this Commission have created substantial appearances of impropriety.***

Article VI, § 23(3)(a) of the Colorado Constitution provides that the judge members of this Commission shall be "each selected by the supreme court." Notwithstanding the conflicts in doing so based upon their involvement in the Masias Contract and the Court's subsequent public cover up, the Justices refused to disqualify themselves from continuing to appoint members of this Commission. Instead, the Justices have appeared to intentionally appoint judge members to this Commission who either have conflicts of interest relating to the Masias Controversy or who have been openly critical of the Commission and its enforcement of the Code.

The intentionality of the Justices' impropriety in continuing to appoint members of this Commission is reinforced by analogous disqualification standards in the Rules Governing Commissions on Judicial Performance, which recognize that the performance commissioners should not evaluate the judges or justices that appointed them. Colo. RGCJP 7(a)(2) ("A commissioner shall: . . . Recuse himself or herself from any evaluation of the person who appointed the commissioner[.]); § 13-5.5-104, C.R.S. (defining appointing authorities for performance commissions); *see also* Colo. RGCJP 2(d) ("The State Commission may recommend to the appointing authority that a member of any commission be removed for cause . . . "Cause" means . . . failure to disclose any basis for recusal or to recuse when appropriate[.]").

---

[158] *Hearing before the J. Budget Comm.*, Colo. Leg., December 15, 2022; Appendix 27(t), pp. 4:20-5:23.

114

When Senate Judiciary Vice Chair Gonzales first raised the issue of whether the Colorado Supreme Court should continue appointing members of this Commission at the initial April 14, 2022 hearing on SB 22-201, Justice Márquez and Chief Justice Boatright both declined to respond directly.  Without addressing the conflicts of interest involved in the Court (with the Justices' own conduct in question) continuing to appoint members of this Commission, Chief Justice Boatright stated, in relevant part:

> [I] do think that having representation from people appointed by the Chief Justice on there is important for the confidence from the judges' perspective that this is going to be a fair process. I mean, I will say, quite honestly, *we had a training recently, and there was a lawyer who works in this area. And I think he scared everybody to death about nothing*, I don't think there's been any bad acts by judicial discipline. This isn't intended as a criticism at all, but people . . . *I mean, there's a psychological impact if you just send somebody's name to judicial discipline, and that is a scary proposition, you could lose your career.* So, I do think that there's an important part. What that number is, I don't know. But I do think having a voice is important.[159]

Justice Márquez stated:

> Thank you, Madam Vice Chair. Your question concerned whether the current Supreme Court or the Chief Justice specifically should continue to appoint the four members of the commission. That is the constitutional structure as it currently exists. If this interim committee wants to completely overhaul this process, which would require a constitutional amendment and adopt a totally different model, perhaps we revisit that question. *Supra*, note 159, p. 28:12-17.

The final version of HCR 23-1001, if approved by voters, will delegate authority to the Legislature to further define the process through which the Court may appoint members of this Commission.  *See* § 13-5.3-102(2)(b), C.R.S. (defining pool and criteria for selection of judge members if Amendment H / HCR 23-1001 passes).

As part of his July 12, 2022 testimony to the Interim Committee on Judicial Discipline, former Chief Judge Dennis Maes presciently warned that the Justices would abuse their appointment authority to attack the independence of this Commission.  Judge Maes stated:

> The Commission has performed admirably, despite the roadblocks it has encountered. There needs to be a level of stability for the Commission to carry out any reform that might be adopted

---

[159] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m)(i), pp. 27:39-28:7.

115

> consistent with the rules surrounding the appointment of members to the Commission on Judicial Discipline, all eligible members who are subject to reappointment should be reappointed. I am disappointed to say that I am concerned that judges presently serving on the Commission might not be reappointed by the Supreme Court because of the strength and courage they have exhibited in addressing this turmoil. Such refusal to appoint would reflect poorly on the Supreme Court.[160]

Later, and in the context of Attorney Regulation Counsel Jessica Yates having unlawfully attacked Vice-Chair and 4th Judicial District Court Judge David Prince personally because of his legislative testimony critical of OARC, Senator Kevin Van Winkle asked if there were any other constitutional reforms that should be considered as part of HCR 23-1001.  Vice-Chair Prince responded as follows:

> **Sen. Van Winkle**
> If you could just wave a magic wand and get whatever amendment you wanted. Is there one that you have in mind?
>
> * * *
>
> **David Prince**
> I'm willing to answer. It is excellent, and it is a compromise bill. And would there be differences if we were starting from scratch and I got to draft it myself, or the Commission itself got to draft it? Yeah, there probably would be. The one that strikes me that's the most important is the challenge that the judge members of the Commission are appointed by the Supreme Court. That appointment power is a challenge, and so in my ideal world, you would change that appointment authority. In fact, there was a draft that existed a year ago that had a different approach to that appointment authority. Reason for that is it's a little bit different. Let's say the Governor appoints Ms. Krupa as a member of the Commission. Well, frankly, the Governor has no continuing influence over Ms. Krupa once she's appointed. She's not an employee of the Governor. She doesn't work for some administrative agency that's influenced by the Governor. The judge member's relationship with their appointing authority the Supreme Court is a lot different. They have continuing authority over us. They have authority over dockets. They have authority over staff. They have authority and influence over the performance commission process. ***They have authority, one of the authorities we saw in the last several months, was that authority over our***

---

[160] *Hearing before the Interim Comm on Jud. Discipline*, Colo. Leg., July 12, 2022; Appendix 27(s)(ii)(2), p. 4:4-10.

116

> *licenses. They have authority and the ability to influence whether judges get what are considered perquisites in terms of desirable committee assignments and those kinds of things. So, there's a lot of opportunities to apply pressure to a judge member.* One of the issues.
>
> * * *
>
> I'm winding down and getting a little confused at this point. But if I could wave my magic wand, the one thing I would do would improve the appointment authority, so that you insulate the members of the Commission from undue pressure or undue influence. And I think we have seen some history of that, so it's not just an academic issue.[161] (Emphasis added).

After Judge Prince's testimony, the Senate Judiciary Committee considered and passed Amendment L.004 (in conjunction with Amendment L.005 to HB 23-1019), which would have substituted the Associations of District and County Court Judges as the appointment authority for the judge members of this Commission.[162]  Only because of lobbying by the Judicial Department were HCR 23-1001 and HB 23-1019 changed at the legislative conference committee to allow the Colorado Supreme Court to retain its appointive authority, but "as provided in law" (which at least reserves the possibility of future statutory modifications, including requiring random selection similar to the formation of a Special Tribunal under HCR 23-1001).  The Justices were fully aware of concerns about their exercise of appointive powers before they, then, continued to abuse those powers in their blatant campaign to rig this Commission and to undermine the efficacy of the judicial discipline system.

Despite Judge Maes's testimony, Judge Prince's additional testimony before the Senate Judiciary Committee about the need to remove the Court's appointment powers, and the unanimous passage of a preliminary version of HCR 23-1001 by the Senate that would have done so, the Justices did not re-appoint Vice-Chair Prince for a second term.   Judge Prince had been a vocal advocate of reforms and a proponent of meaningful investigation in the *Coats* matter.  In Judge Prince's place, the Justices appointed 4th Judicial District Court Judge Jill Brady, who had distinguished herself as a vocal critic of this Commission and its investigative work.[163]  The

---

[161] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 19, 2023; Appendix 27(y)(i), pp. 8:11-2, 8:23-39, 9:5-9.

[162] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 26

[163] In addition to Judge Brady's vocal criticism of this Commission at the 2022 Judicial Conference, there are allegations within the 4th Judicial District that Judge Brady (in her leadership position as Deputy Chief Judge) had also previously engaged in discrimination, harassment, intimidation, and retaliation that resulted in another judge resigning from office. These allegations have yet to be investigated or addressed in a meaningful way.  This context, however, adds to overall appearances of impropriety in Judge Brady accepting her appointment and her subsequent conduct on this Commission.

117

Justices timed their announcement of the appointment decision to occur in the middle of this Commission June 16, 2024 meeting.

In addition to media reporting on Judge Brady's apparent bias, former Chief Judge Maes provided an opinion that highlighted the Justices' apparent retaliatory and obstructive motives in appointing Judge Brady:

> What is clear to this day is the commission acted courageously and chose to speak truth to power in light of the overwhelming opposition by the immense power wielded by the Supreme Court. To some it came with a price.
>
> Liz Krupa, a [l]awyer, served as chair of the commission with Judge David Prince from El Paso County serving as vice-chair. Both were extremely vocal in their criticism of certain practices engaged in by the Supreme Court.
>
> Boatright and the Supreme Court appoint the judge members of the commission. Judge Prince was eligible for reappointment by Boatright upon the completion of his term on June 30, 2023. Although it was made clear at a public hearing held by the Interim Committee on Judicial Discipline that a failure by Boatright to reappoint Judge Prince would not only be viewed by many to be retaliation for his opinions which differed in many respects from Boatright's but would also deprive the commission of valuable institutional history as it moved forward to implement the recommended changes to the judicial discipline process.
>
> Consistent with thumbing his nose at the commission, Boatright chose to bypass Judge Prince for another term and instead appointed El Paso County District Judge Jill Brady to fill the vacant Prince seat. The decision smacks of retaliation for Prince's refusal to walk in lockstep with the boss.
>
> Let's weigh Boatright's retaliatory behavior in light of the following statements he made to the state Legislature in his State of the Judiciary speech on Feb. 18, 2021. He said the following, "Where there is wrongdoing, we will address it. Where there was an abuse of power, we will stop it. Where our policies are deficient, we will change them. We want to know the truth. We recognize the branch faces a crisis of confidence in the leadership."
>
> His appointment of Judge Brady followed her criticism concerning the Commission's investigation methods. The statements were made at a statewide meeting of judges with Boatright in attendance. While Judge Brady is certainly free to exercise her first amendment right, she should disclose whether her opinions have

118

been shaped by her own experiences and/or prior conversations with Boatright.  Maes, *supra* note 18.

A June 30, 2023 article in *The Denver Gazette* provided a broader explanation of the circumstances involved in the Justices' replacement of now former Commissioners, 5th Judicial District Court Judge Rachel Olguin-Fresquez and Vice-Chair Prince.  In the article, reporter David Migoya predicted that the current Commission would retaliate against the now ousted Executive Director Christopher Gregory and/or otherwise seek to suppress any further investigation into the Justices' roles in the Masias Controversy.

> Half the membership of Colorado's judicial discipline commission is expected to be replaced by new appointees as early as Friday, a move that could put the panel on a new path during a crucial transition to how it does its work.
>
> The appointments of six of the panel's 10 members expire July 1, leaving Gov. Jared Polis and Supreme Court Chief Justice Brian Boatright to name their replacements.
>
> In the past three years, the commission has faced push-back and threats during one of its most unprecedented inquiries into allegations of misconduct by members of the state's highest court. They have included the loss of funding and office space, fear of sanction to their law licenses, and repeated challenges to their work.
>
> Much of that became public when the commission appeared before legislative hearings into the discipline process last summer, culminating with legislation for a new, more-transparent system that will go before voters in November 2024 as part of a state constitutional amendment.
>
> The most prevalent of the voices speaking out about what was happening — and the key focus of the challenges put against the commission's work because of that — was its chairman, Denver attorney Elizabeth Espinosa Krupa, and its vice-chairman, El Paso County District Court Judge David Prince.
>
> They became the outward face of the commission and, by extension, its easiest targets.
>
> "There was a perception that David and I were leading the cause of change. We took the flak that we were the ones pushing something contrary to what (the Supreme Court) wanted. All of it stemming from us looking at one of their own," said Krupa, who's been on the commission for 8 years. "It's unprecedented for members of the commission to have to face the level of opposition we did. We

119

were unprepared for that and we didn't fully understand the value of the work until then."

An additional concern is that new appointees might not "reflect the geographic, ethnic and racial diversity of the Colorado community" as it does now, according to the commission's 2022 annual report.

And although one of two judges whose term expires has been re-appointed, Boatright has replaced the other — Prince — this week with a judge who has already vocalized her own criticisms about how the commission operates, several people said.

Prince consistently urged greater transparency and change to how the discipline process works. His replacement, El Paso County District Court Judge Jill Brady, at a meeting of judges not long ago, challenged the commission's investigation methods during a presentation by Krupa, people who attended the gathering confirmed.

"I look forward to serving the residents of Colorado as a new appointee to Colorado Commission on Judicial Discipline," Brady said in an email to The Gazette. "I hope I can do good work for the Commission, and I take my responsibility as a member very seriously."

Prince was the commission's vice-chairman and has served a 4-year term after filling in the final two years of his predecessor. He stands firm on the commission's accomplishments.

"These volunteer members of the (commission) rose to the challenges," he wrote in an email to The Denver Gazette. "They have earned praise, not the attacks they have sometimes had to endure, for their efforts to enforce ethics rules without fear or favor to strengthen the integrity of Colorado's judiciary."

Similarly, three other citizen members of the commission and Krupa are unlikely to be reappointed by Polis despite a request to his office to extend their time in order to complete their work at reforming the discipline system and continuing any investigations that might be outstanding.

Polis' office has told members of the commission that the governor is keeping with a tradition of allowing appointees to serve only two terms despite no prohibition on serving longer.

"Basically his office called to say I wasn't to be reappointed, that they'd be keeping with that two-term tradition," Krupa said in an

120

interview. "I appreciate that and am hopeful the change to the top of the commission will result in a more successful transition without those who the court perceived as the most contrary."

Krupa said she stands ready to help with any transition or committee that might be created after the 2024 vote.

She added: "If our legacy was only to get this reform over the hump and work our butts off to get the legislation to make the commission more independent, then I'm okay with that."

Polis' office on Thursday said the appointments haven't been decided.

"No decisions have been made yet for appointments for the Commission on Judicial Discipline but they will be made soon," spokesman Conor Cahill said in an emailed statement. "All eligible candidates that apply will be reviewed."

Replacing half of the commission could conceivably jeopardize the tenure of Christopher Gregory, the commission's executive director who was ousted as its appointed chairman in 2021 after only a single four-year term.

The commission hired Gregory only months after he stepped aside — the executive director serves at the panel's pleasure —as it continued its work investigating allegations the Supreme Court was mired in a scandal that allegedly involved coverup and misconduct, work that Gregory had begun.

Gregory had no comment for this story.

Changes to the commission's makeup could theoretically slam the brakes on any work it could still be doing in relation to that scandal, if that's where it wanted to go.

The panel last month recommended to the Supreme Court the public censure of its former Chief Justice Nathan "Ben" Coats for his role in approving a multi-million-dollar contract in 2019 to a former Judicial Department official despite her being fired over financial improprieties. The commission also wants Coats to be sanctioned for violations of the state's judicial code of conduct.

It was the first time in state history that a member of the high court ever faced investigation or sanction by the commission.

121

*__In its recommendation, the commission made clear Coats'
approval of the contract to former Chief of Staff Mindy Masias
was also authorized by the rest of the Supreme Court.__*

*It is unclear whether the commission is looking into any role
other justices — six of them were on the court at the time of the
Masias deal — might have had in the scandal, but a change in
commission leadership could have that effect.*

The commission's work, by law, is secret.

The commission's diversity — its membership extends from Fort
Collins to Pueblo, from Eagle to Centennial — is one of its
prideful points and any changes to the membership should reflect
that, members said.

"In what other country would you find a physicist, a social worker,
a lawyer, and a human-resources professional as volunteers
entrusted with bringing accountability to one of our most powerful
institutions," Prince wrote The Denver Gazette. "These diverse
individuals acting in unity reflect the best our society has to offer."

The other citizen members to be replaced include:

• Bruce Casias of Lakewood is a Native American physicist who in
2015 took on his employer, Raytheon, in federal court. As a test
manager, he was told to falsify data for a ground system that
communicates with satellites in space. A jury awarded him $1
million.

• Yolanda Lyons of Monument is Black and works in human
resources.

• Drucilla Pugh of Pueblo was director of Court Appointed Special
Advocates (CASA) for children.

Gregory has previously written Boatright to ask that any
appointments reflect that diversity. In October 2022, when
Boatright was to consider replacing outgoing commissioner Rachel
Olguin-Fresquez, an Eagle County court judge — she had been
promoted to a district court judge and had to step down — Gregory
appealed on several levels.

"Traditionally, the Commission has been composed with
mindfulness of diversity, including representation of both urban
and rural jurisdictions. The Commission's discussions have
benefitted from these differing perspectives," Gregory wrote
Boatright, according to a copy of that correspondence obtained by

122

> The Denver Gazette in an open-records request. "Judge Fresquez is currently the only member of the Commission who resides on the Western Slope and outside the Front Range urban corridor."
>
> He asked Boatright to "consider maintaining the tradition of appointing at least one judge member from a rural jurisdiction."
>
> After Brady in Colorado Springs, the other judges on the commission are Arapahoe County District Judge Bonnie McLean and Jefferson County Court Judge Sara Garrido.
>
> Judge Fresquez similarly wrote Boatright asking that he appoint someone from a rural district, even suggesting two judges by name, according to copies obtained by The Denver Gazette.
>
> Boatright appointed [Adams] County Court Judge Mariana Vielma.
>
> That means there is no judge on the commission representing a rural county.[164]  (Emphasis added).

In striking contrast to the Justices' active efforts to remove Vice-Chair Prince through abuse of their appointment powers, the Justices have allowed 18th Judicial District Court Judge Bonnie McLean to remain on this Commission despite press reporting (readily verifiable through public records) that Judge McLean failed to file required personal financial disclosures over several years.[165]  Judge McLean remaining on this Commission creates an irreconcilable conflict where she is considering the discipline of other judges, including the Justices, while herself potentially coming before the Colorado Supreme Court in her own judicial discipline proceeding.  Judge McLean has personal incentives to minimize the scrutiny applied to or sanctions imposed on other judges (particularly the Justices) while her own potential discipline is pending.  These

---

[164] David Migoya, *New Members to Colorado's Judicial Discipline Commission Could Mean New Direction*, DENVER GAZETTE, June 30, 2023.

[165] The Colorado Supreme Court has authority to recall judge members through Colo. RJD 3.5(b)(3).  Judge McLean was listed in an August 13, 2023 article in *The Denver Gazette* as having last filed a personal financial disclosure statement in 2019.  David Migoya, *One in Six Judges Lack Financial Disclosures: Little Enforcement Even as Misdemeanor Charge*, DENVER GAZETTE, August 13, 2023.  It deserves emphasis that if HCR 23-1001 (Amendment H) is approved by voters in November 2024 and the Commission objectively/impartially performs its constitutional mandate, having a disciplinary history will make Judge McLean ineligible for reappointment and, arguably, ineligible to continue serving on this Commission.
§ 13-5.3-102(2)(b)(II)(C), C.R.S.; *see also Frese*, *supra* note 19 (violation of Code for judge to continue presiding over category of cases when facing similar personal prosecution); Appendix 27(ee)(i) (former Senate Judiciary Chair Pete Lee, *inter alia*, requesting S. Judiciary Comm. inquiry as Judge McLean's conflicts of interest) .

circumstances implicate violations of Canon Rules 1.2 (Promoting Confidence in the Judiciary), 1.3 (Avoiding Abuse of the Prestige of Judicial Office), and 2.11 (Disqualification).  As further pointed out by reporter David Migoya, while the failure to file annual personal financial disclosures is recognized as a misdemeanor criminal offense under § 24-6-202, C.R.S., neither the Colorado Supreme Court nor the Attorney General Office have taken any action to enforce the statute.[166]  Migoya's reporting, however, also documented that this Commission opened investigations into public records with the Secretary of State's Office related to McLean and other judges' failures to file the annual personal financial disclosure statements, required by § 24-6-202, C.R.S. and Canon Rules 2.5 and 3.15.[167]  To date, there has not been any public discipline of the judges listed in the press reports.  The absence of public discipline suggests that this Commission, in collusion with Judge McLean, has yet again suppressed or minimized legitimate grounds for judicial discipline.  The disparate and selective treatment of Vice-Chair Prince and Judge McLean creates significant appearances of impropriety by the Justices and within this current Commission.  Excepting Judge McLean, all the judge members of this current Commission were appointed by the Justices after publication of Ryan's interview and his allegations regarding the Masias Contract became public in February 2021.

Beyond the Justices' apparent abuse of their appointment powers with respect to this Commission's judge members, something also seems "afoot" with respect to how this Commission's ousted Executive Director was previously ousted as this Commission's Chair after serving a single term.  As explained, Chair Gregory was ousted after he raised this Commission's concerns about the Justices' authority to commission their "independent" investigations through letters sent directly to Chief Justice Boatright.  *See* discussion *supra*, at p. 85.  Governor Polis replaced then-Commission Chair Gregory on July 1, 2021 with attorney Mindy Sooter, who is the "Partner-in-Charge" of the national law firm WilmerHale's Denver Office.[168]  Sooter is now

---

[166] David Migoya, *State Trains Judges About Financial Disclosure Requirements Weeks After Dozens Found Not Complying with Law*, DENVER GAZETTE, November 24, 2023; *see also* George Brauchler, *Column: Colorado Judges Break the Law—And Are Above It*, DENVER GAZETTE, August 18, 2023.

[167] David Migoya, *State Judicial Discipline Panel Seeks Information on More Than 120 Judges Who Did Not File Personal Financial Disclosures*, DENVER GAZETTE, August 20, 2023.  As part of the Joint Judiciary Committee's January 12, 2024 SMART Act Hearing, this Commission further confirmed that it was processing 73 requests for evaluation relating to judge's personal financial disclosure statements.  David Migoya, *73 Colorado Judges Under Investigation for Not Filing Financial Disclosures*, DENVER GAZETTE, January 12, 2024.

[168] https://www.wilmerhale.com/en/people/mindy-sooter; *see also* David Migoya, *Former Colorado Chief Justice Coats Under Investigation: Attorney Discipline Commission Examines Coats' Link to Alleged $2.5 Million Contract as Quid-Pro-Quo Deal*, DENVER POST, July 7, 2021 (reporting on Sooter's replacement of Gregory and then-unknown status of any investigation of Coats by this Commission; omitting Sooter's connection to WilmerHale and its pending bid for the "independent" investigations).  Significantly, Sooter assumed her role as "Partner-in-Charge" after her long-time colleague and former law partner (at both Fagre Baker

124

this current Commission's Chair.  At the time of her appointment, WilmerHale, through another then-partner, former U.S. Attorney for Colorado John Walsh,[169] was bidding on the contracts for the Justices' "independent" investigations.  *Supra*, note 118.[170]  As described *supra* at p. 65, the Justices had originally planned on hiring John Walsh and WilmerHale through a sole-source contract to fix / cover up the Masias Controversy by conducting the Court's ethically prohibited investigations. The Justices then changed course and announced that the outside investigation firm(s) would be chosen by a multi-agency panel.  The apparent obliviousness (or converse intentional awareness) of Mindy Sooter, John Walsh, and WilmerHale to the impropriety of the Justices commissioning an investigation of their own conduct (as unambiguously prohibited by Canon Rule 2.9(C)) raises basic questions as to Sooter and Walsh's fitness to serve on their respective professional conduct committees.  Sooter's personal involvement as WilmerHale's managing partner in the Justices' pre-determined plan to fix / cover up the Masias Controversy further raises substantial ethical concerns, particularly with Sooter subsequently and successfully seeking appointment to this Commission.  Chair Sooter's conduct is also aggravated by her having publicly denied that she had or has any conflicts as to matters before this Commission. Although the Justices were aware of negotiations with WilmerHale to originally conduct their

---

Daniels and WilmerHale), Natalie Hanlon-Leh, left the same position to become the Chief Deputy Attorney General in the Weiser administration.  *See* https://coag.gov/about-us/colorado-attorney-general-senior-staff/.

[169] John Walsh is currently a candidate for 2nd Judicial District Attorney (City and County of Denver).  https://www.walshfordenver.com/meet-john.  John Walsh won the June 25, 2024 Democratic Primary Election and is presumptively the next Denver District Attorney, without any opponents qualifying for the November 2, 2024 General Election ballot.  Thelma Grimes, *John Walsh, George Brauchler, Michael Allen Win Races for District Attorney*, DENVER GAZETTE, June 25, 2024.  Importantly, the Denver District Attorney (in addition to the Attorney General) has primary responsibilities for prosecuting state-level cases involving public corruption (such as the OSA's referrals for criminal prosecution in the Masias Controversy). In addition to running for office, John Walsh is a member of the U.S. District Court for the District of Colorado's Committee on Conduct.  http://www.cod.uscourts.gov/Portals/0/Documents /AttInfo/COC_Appt_9-2023.pdf.  It is important to recognize that if further referrals to law enforcement arise through this RFE or additional investigation by the OSA, John Walsh would head one of the primary law enforcement agencies responsible for investigation and prosecution. As one of the architects of the Justices' plans to cover up misconduct through "outside" investigations that violate Canon Rule 2.9(C), there are inherent conflicts of interest if John Walsh were to prospectively involve himself in assessing any of the probable criminality described in this RFE and involved in the Masias Controversy.

[170] The various firms who bid on the contracts downloaded the requests for proposal in May 2021.  David Migoya, *Local Law Firms Among Those Showing Interest in Investigating Colorado Supreme Court Contract and Culture*, DENVER POST, May 21, 2021.  At the time Ms. Sooter applied to join this Commission, the Commission had already expressed its concerns about the Court moving forward with its contracted-for "independent" investigations.  *Supra* at p. 85.

125

ethically prohibited "independent" investigations, the Justices did not disclose grounds for disqualifying Sooter from considering allegations of their own judicial misconduct (i.e. violations of Canon Rules 2.9(C), 2.10, and 2.11) to which Sooter herself had conflicted professional relationships and was a material witness.

Adding to Sooter's conflicts, her husband has worked as the "Director of Compliance" for Attorney General Phil Weiser's campaign since 2017.[171]  Attorney General Weiser, if not directly involved, was involved through his high-ranking subordinates' planning of the Justices' use of public statements, specious claims of confidentiality, and commissioning "independent" investigations to cover up the Justices' own misconduct.  Sooter credits Attorney General Weiser for inspiring her to attend law school and to pursue her legal career.[172]  When she applied to become a member of this Commission, Sooter listed former Colorado Attorney General Ken Salazar (who was then a partner at WilmerHale), Attorney General Weiser, and the Governor's then-Chief Legal Counsel Jacki Cooper Melmed as her references.[173]  At the time of Sooter's application and her firm's bidding on the Court's RFP for the "independent" investigations, Jacki Cooper Melmed was also serving on the multi-agency panel created by the Court to select the private-sector investigators. Cooper Melmed would have been aware of WilmerHale's pending bid.[174]  As another member of the selection panel, the Governor's current Chief Legal Counsel, Kara Veitch, would have also at least generally known about Sooter's conflicts when subsequent decisions were made to appoint new members affiliated with the Attorney General's Office to this Commission.  In describing her interest to serve on this Commission, Sooter stated:

> *Please explain why you wish to serve on a board or commission.*
>
> Two reasons. First, I would like to dedicate some of my time to public service, and this is a perfect opportunity to give back to the state of Colorado and the community in a way that fits well with my skills and my passion. Second, above all else in our legal system, ***I value the reputation of our judiciary. It must be unbiased, ethical, and moral, both in perception and reality.*** This requires a judiciary with the appropriate work ethic, demeanor, and temperament, as well as strong moral and ethical values. While the vast majority of judges are upstanding and well-meaning, issues

---

[171] https://www.linkedin.com/in/montysooter?trk=public_post_feed-actor-name.  In 2017, Mindy Sooter contributed $1,150 to the Phil Weiser for Colorado campaign. https://tracer.sos.colorado.gov/PublicSite/SearchPages/ContributionDetail.aspx? SeqID=2700377. In 2022, Sooter contributed $1,250 to Weiser's campaign. https://tracer.sos.colorado.gov/PublicSite/SearchPages/ContributionDetail.aspx?SeqID=3487292

[172] Jessica Folker, *Top Woman 2020—Mindy Sooter: Wilmer Hale's New Partner-In-Charge of Denver Office Earns Praise for High-Stakes IP Litigation and Firm Leadership*, LAW WEEK COLORADO, June 8, 2020.

[173] Appendix 29, p. 199.

[174] Migoya, *supra* note 170.

126

> inevitably occur, and ***since the judicial system is fragile***, I would
> be honored to help protect it.  (Emphasis added).

When asked if there was anything in her background that would prevent her from serving as a Commissioner, Sooter responded, "No."

> *Have you ever been a party to or the subject of or otherwise*
> *involved in any legal proceeding that might adversely affect your*
> *qualifications to serve on this board or commission? Is there*
> *anything in your background that might be an embarrassment to*
> *the Governor or you if it were to become public?*
>
> No[.]

Because of the lack of transparency under Colo. RJD 3.5(g)(2), it is unclear whether Chair Sooter disclosed her conflicts of interest to the Governor or to this Commission or if she has otherwise disqualified herself from considering issues related to the Masias Controversy or personnel decisions related to the former Executive Director.  The legislative record, however, confirms the Sooter did not disclose her conflicts of interest during her March 3, 2022 confirmation hearing before the Senate Judiciary Committee.  Rather, Sooter emphasized the federal and administrative nature of her legal practice as reducing the possibility of conflicts of interest that she might have as to the regulation of Colorado State Court Judges.  Sooter stated:

> And I am in private practice. I work for a firm called WilmerHale.
> And because I'm in private practice, I don't do as much work for
> the state or for the people as I would like to, and so ***when I was***
> ***asked*** to serve on this committee, it was a great honor to be able to
> help serve our judiciary and do work for the state to help make our
> government a better place.[175] (Emphasis added).

---

[175] Appendix 27(k), p. 2:6-10.  Sooter's testimony references her being "asked" to serve on this Commission.  Further investigation is needed to determine specifically who recruited Sooter to apply to replace then-Chair Gregory in apparent retaliation for his raising this Commission's objections to the Court proceeding with its unethical "independent" investigations.  By now voting to dismiss the Maes RFE/complaint, including its allegations that the "independent" investigations violated Canon Rule 2.9(C), Sooter has demonstrated actual bias and a refusal to disqualify herself as required by Colo. RJD 3.5(d)(1)-(5), (g)(1)(B)-(D),(F)-(G). Further investigation will also reveal that the dismissal of the Maes RFE/complaint was negotiated through Sooter's former law partner at WilmerHale, Chief Deputy Attorney General Natalie Hanlon Leh.  There are reasonable grounds to suspect that Sooter, Hanlon Leh, Commissioner Ingrid Barrier, Interim Director Jeff Walsh, and any other attorneys who facilitated the dismissal of the Maes RFE/complaint have violated Colo. RJD 8.4(f).

This Commission's Annual Reports from 2021 through 2023 also do not show Sooter having recused from any matters before the Commission, including the *Coats* case and the Maes complaint.[176]

Further investigation will verify that Chair Sooter and persons associated with her (John Walsh, Jacki Cooper Melmed, Chief Deputy Attorney General Natalie Hanlon Leh, Deputy Attorney General Kurtis Morrison, 1st Assistant Attorney General LeeAnn Morrill, Assistant Solicitor General Grant Sullivan, and Attorney General Phil Weiser) were directly involved in facilitating the Justices' apparent violations of Canon Rules 1.1, 1.2, 2.3, 2.9(C), 2.10, 2.11, 2.15, and 2.16 as well as the Justices' overall pre-planned fix / coverup of the judicial, attorney, and employee misconduct arising from the Masias Controversy.  With Chair Sooter's position as "Partner-In-Charge" and another partner, (former Colorado Attorney General / former U.S. Senator / former U.S. Secretary of the Interior / current U.S. Ambassador to Mexico) Ken Salazar, having supported her application to this Commission, Sooter apparently submitted her application and subsequently took official actions on this Commission (despite her presumably undisclosed conflicts) with the awareness, support, and authority of her employer, WilmerHale.  To the extent that this Commission's Vice-Chair James Carpenter became aware or was aware of Chair Sooter's conflicts, similar grounds for his disqualification existed.  Specifically, Carpenter's background includes having worked as Ken Salazar's 2004 Campaign Manager and as the then-Senator's State Director from 2004-2006.  Appendix 29, p. 212.  Beyond his background working for Senator Salazar, Vice-Chair Carpenter has not disclosed whether his firm, Freestone Strategies, has performed political consulting or lobbying work for any other persons involved in the Masias Controversy (including Attorney General Weiser and Denver District Attorney candidate John Walsh).[177]  It also deserves emphasis that Chief Justice Márquez's background includes having worked for Ken Salazar while he was serving as Colorado Attorney General.[178]  Chief Justice Márquez's background specifically includes having headed the same State Services Division that was used to later advise the Justices and respond to the Masias Controversy.  Chief Justice Márquez was appointed to the Colorado Supreme Court by Governor Bill Ritter.  Vice-Chair Carpenter was serving as Governor Ritter's Chief of Staff at the time and also when Justice Gabriel was originally appointed to the Colorado Court of Appeals. Carpenter listed Governor Ritter as a reference when he applied for this Commission.  Appendix 29, pp. 209, 211.

In December 2023, Governor Polis appointed Ingrid Barrier to replace this Commission's former Chair, Elizabeth Espinosa Krupa as an attorney member.  Prior to appointing Barrier, Governor

---

[176] This Commission's Annual Reports are available on its website: https://ccjd.colorado.gov/annual-reports.

[177] https://www.freestone-strategies.com/about-us.

[178] Colorado Judicial Department, New Supreme Court Chief Justice Sworn In: Justice Monica Márquez becomes the First Latina Chief Justice, July 26, 2024; https://www.coloradojudicial.gov/contact/monica-m-marquez; Appendix 29, p. 211.

Polis had appointed attorney David Powell in August 2023 to replace Chair Krupa.[179]  After having completed his investigation of Mindy Masias's suspected forged receipt in 2018, Powell was hired as the Deputy Attorney General to head Attorney General Weiser's State Services Division.  In that role, Powell supervised LeeAnn Morrill and Grant Sullivan, who advised the Justices directly on issues relating to the Masias Controversy.  The Governor's Office withdrew Powell's appointment after former Executive Director Gregory raised concerns of apparent conflicts of interest.  Notwithstanding her presumably then-still undisclosed conflicts of interest, Chair Sooter communicated directly with the Governor's Office in late Fall 2023 regarding Barrier's and citizen member Stefanie Trujillo's pending appointments to this Commission.  Like Sooter and Powell, Barrier has substantial ties to the Attorney General's Office, having worked there for 12-years before her present position as Chief Human Resources Officer with the Colorado Department of Public Safety.[180]  Barrier also served as a law clerk to former Colorado Supreme Court Justice Rebecca Love Korlis, who founded and served as the previous Executive Director of the Institute for the Advancement  of the American Legal System (IAALS).[181]  As explained *infra* at p. 202, at various times the Justices relied upon IAALS to lobby for or provide public testimony favorable to the Justices' personal legislative/rulemaking agendas and their efforts to suppress legitimate investigation of the Masias Controversy.  Again, it is unclear how or why Barrier was selected by Governor Polis and whether Barrier has disclosed her conflicts of interest.  At least according to this Commission's 2023 Annual Report and testimony at her March 6, 2024 confirmation hearing, Barrier has not otherwise disqualified herself from considering issues related to the Masias Controversy or personnel decisions regarding the former Executive Director.  The appointments of Sooter, Powell, and Barrier, however, create strong appearances that something was "afoot" with respect to how attorney and citizen members were chosen to serve on this Commission and the involvement of the Attorney General's Office in the Justices' probable misconduct under the Code.[182]

---

[179] Appendix 29, pp. 61-65, 129.

[180] https://www.linkedin.com/in/ingrid-carlson-barrier-4830a121a.  In her application for this Commission, Barrier listed Deputy Attorney General Michelle Brissette Miller as a reference.  Appendix 29, p. 14.  Brissette Miller supervised Barrier and Assistant Attorney General Christopher Van Hall.  As discussed *supra* at p. 107, Van Hall (in coordination with LeeAnn Morrill, Natalie Hanlon Leh, Kurtis Morrison, and Gina Cannan) was directly involved in the Attorney General's Office's conflicted and intentional efforts to undermine this Commission's efforts to stand up the new ASIA Office.

[181] Confirmation hearing testimony, March 6, 2024.

[182] It should also be noted that at the January 25, 2022 SMART Act Hearing, Chair Krupa had explained to the Joint Judiciary Committee that conflicts within OARC and the Attorney General's Office were the reason for this Commission having to seek Special Counsel from the private sector to investigate and prosecute *Coats*.  Appendix 27(j), pp. 25:19-26:9.  With respect to apparent improprieties, there are substantial questions as to why Sooter did not recuse herself from consideration of *Coats* (as well as all other matters involving the Justices) under those circumstances.

129

As further evidence of Sooter's undisclosed conflicts of interest, creation of appearances of impropriety, cronyism, and coordinated retaliation, this Commission quietly replaced ousted Executive Director Gregory in July 2024 with Senior Assistant Attorney General Anne Mangiardi, who had been working for Attorney General Weiser (including being directly involved in the Justices' contracted-for ILG investigation) immediately prior to her hiring by this Commission.[183]  Beyond the ultimate hiring decision, Chair Sooter and Senior Assistant Attorney General Gina Cannan organized Executive Director Mangiardi's recruitment. Appendix 32, p. 1 (including Sooter's use of her WilmerHale email address as her point of contact for Commission business).  By hiring a new Executive Director willing to disregard the public allegations against Chief Justice Boatright, particularly in connection with the pending Woods matter, Sooter and Cannan effectively laid a foundation to encourage Mangiardi to personally assist them in their collective violations of Colo. RJD 8.4(f) (prohibiting attorneys from knowingly assisting a judge violate the Code).

The coordination of retaliation against ousted Executive Director Gregory by the Justices, the Commissioners, and the Attorney General's Office can also be inferred through the inconsistent explanations provided by then-Interim Executive Jeff Walsh through the authority of this Commission.  In a February 7, 2024 court filing in *Scipione*, Walsh stated: "Christopher Gregory is on indefinite leave from the Commission on Judicial Discipline."  Appendix 22, p. 27.

In his testimony to the Senate Judiciary Committee on March 6, 2024, however, Walsh (with Commissioners James Carpenter, Ingrid Barrier, and Stefanie Trujillo present) changed his explanation through the following dialogue with Senate Judiciary Chair Julie Gonzales:

> **Sen. Gonzales**
> I would be remiss if I didn't take this opportunity to also just make an inquiry of Mr. Walsh, since you are here before us. I am curious on when we can expect the 2023 end of year report. I have been looking forward to that report, and the last time that we had the pleasure of chatting with you all. At the beginning of the legislative session, it was then, now former, Director Gregory, who said that the report was forthcoming. It's my understanding that he is no longer the Director and that you are now the Interim Director. One, do you have any insight that you can offer us in terms of his departure? And, two, that end of session, or that end of year report, when we might be able to review it?

---

[183] https://ccjd.colorado.gov/about-us.  ***Executive Director Mangiardi's undisclosed conflicts include having been the point of contact through the Attorney General's Office for the Justices' contracted-for ILG investigation.***  *Compare* ILG Rpt. (Appendix 18), p. 131 *with* Michael Karlik*, Q&A with Anne Mangiardi: New Judicial Discipline Director Shares Plans for Change*, COLORADO POLITICS, October 12, 2024 (Mangiardi: "I was at the AG's office for about seven years and my primary role there was tax — litigating tax cases, advice around TABOR — completely unrelated to what I'm doing now.").

130

**Jeff Walsh**

Sure. So, the end of your report is like on the one-yard line. And I expect it to be on the website, probably by Friday, if not sooner. So, and we can email it to you directly, if you'd like. So, that's going to be very soon. That didn't previously fall within my portfolio of responsibility. So, there has been a little bit. You know, I had to take that over. And Mr. Carpenter's been really helpful with that, as well. So we're very, very close. We're going to have that published imminently. *As far as Mr. Gregory, there's not much we can say, because it involves a personnel matter, other than to say he's no longer employed by the Commission. His last day was January 19. And other than that, <u>for legal reasons</u>, we can't comment further.*

**Sen. Gonzales**

I respect that. And thank you for the update.[184]

Just as Chief Justice Coats had declined to provide the Legislature with the grounds for and context of Mindy Masias's separation and cancellation of the Masias Contract "for legal reasons," Walsh and this Commission's current members referenced advice (i.e. "legal reasons") received from the Attorney General's Office as prevented them from commenting. *Compare* Appendix 27 (ee)(i), p. 14:8-9 (Walsh's comments) *and* Appendix 27 (b), p. 3:6-17 (Coats's comments).

The testimony provided and omissions made by Commission members Jim Carpenter, Ingrid Barrier, and Stefanie Trujillo as well as Special Counsel / then-Interim Executive Director Jeff Walsh at Barrier and Trujillo's March 6, 2024 confirmation hearings is evident of collective dishonesty and concealment with respect to both the Commissioners' conflicts of interest / ongoing misconduct in suppressing legitimate judicial misconduct complaints and the retaliatory motives behind Executive Director Gregory's ouster. The testimony at the March 6, 2024 hearing also further confirmed that the current Commission members and Special Counsel Walsh view their role as appeasing the Justices and the Judicial Department, rather than performing their duties to fairly, uniformly, and objectively enforce the law, including the requirements and prohibitions of the Code. The March 6, 2024 hearing record contains the following statements, in relevant parts:

**Stefanie Trujillo**

Sure. I'd be happy to comment. I am aware of, especially since serving on the [Commission]. I think it starts internally first, right? With this Commission. I know all of us are dedicated to fixing, you know, a multitude of issues that we may or may not have. Right?

---

[184] *Hearing on nominations of Ingrid C. Barrier and Stefanie Trujillo to the Colo. Comm'n on Jud. Discipline before the S. Judiciary Comm.*, Colo. Leg., March 6, 2024; Appendix 27 (ee)(i), pp. 13:31-14:12.

131

I'm still fairly new to the Commission, but *I'm very confident in my colleagues. I know that just in the short time on serving on this [Commission], that all of us are very committed to restoring that confidence in the in the community and ensuring that we are holding the entire Judiciary to a higher standard. You know, all I can say is, give us six months [laughter].* <u>*I am that confident in this Commission.*</u>

**Sen. Gardner**
Thank you. Ms. Barrier.

**Ingrid Barrier**
I agree. I think that the tone of the Commission is one where we recognize the value of building trusting relationships within the bounds of the confidentiality mandates that we have constitutionally. And I don't think this Commission in its current makeup is interested in any surprises. I think that we're interested in doing the right thing. I think we're interested in getting feedback. The judges that are currently on the Commission are outstanding and are helpful to those of us that aren't judges, about what it's actually like to be a judge, what the pressure is, what it means when the Commission comes knocking at your door to suggest that potentially there's some wrongdoing. *And having a trusting, you know, having really a reputation for being competent and dealing with challenging matters fairly and efficiently is where we want to be. And like Ms. Trujillo, I think we can get there.* <u>*We have outstanding leadership with Mr. Carpenter and Ms. Sooter.*</u>

* * *

**Jeff Walsh**
As far as your last question about what the Commission is doing. We have already begun discussions with the Judicial Department about how we can begin getting out in front of the judges and start an education process. I won't go into a whole lot of detail about that, but those discussions have already begun. *And it's been somewhat, I will also say,* <u>*without revealing too much detail,*</u> *therapeutic for both sides to get in the same room together and talk it out.* And to some degree, acknowledge that everybody has to be an adult. <u>***Bygones need to be bygones. We need to learn to work together.***</u> And the Commission. It's in everybody's interest that this Judiciary gets well educated, well prepared, engenders the respect it and deserves.

**Sen. Gonzales**
Thank you, Senator Gardner. I'd like to follow up, actually, on that

question in regards to the personal financial disclosures. Because I think for those of us who are elected officials, that is. You do it, you incur a $50 per day fine if you don't. And there are processes that can result in an administrative complaint resulting in civil penalties or criminal sanctions. I'd like for you all as appointees to this Commission. Certainly Mr. Walsh, I understand and respect where it's like, okay, let's navigate this on a case-by-case basis. But also, I'm curious for what your perspectives would be as appointees to serve on this Commission to ensure that judges and members of the Judiciary, along with those of us in the Legislature. Or, I guess, like those of us in the Legislature are comporting with those requirements and obligations. And I guess I will turn first to Ms. Trujillo.

**Stefanie Trujillo**
Madam Chair. Yes, I'm happy to address that. I think in addition to the educational piece, because I think there are some statutory requirements as well as other rules that kind of might be a little bit conflicting. So, the educational piece is very important. But in addition, I like the idea of, Hey, if you don't get this done, these are the penalties. I'm not opposed to that by any means. And I don't know if we do that by way of legislation, or how do we? I'd be happy to entertain that. So, thank you.

**Sen. Gonzales**
Ms. Barrier.

**Ingrid Barrier**
Thank you, Madam Chair. Having a trusted and collaborative relationship doesn't mean that there's not an investigative authority that means business. And the Commission means business. And some of these tasks that maybe folks would say that just seems kind of ministerial. It's not. They, our judges, have an obligation. You know, granted to them via statute, to do this kind of reporting. And our body is the one that needs to make sure it gets done. And, so, I agree a case-by-case examination is important, and education is vital, and us turning these cases around with more speed than has happened in the past. Recent history, from my understanding, is also really important. ***Because I think it just shows that the Commission is committed to executing on the on the Canons and the expectations for judges around the State.***

**Sen. Gonzales**
Thank you. I do appreciate that. Because, as I have been following. For those of us in the Legislature and in the political sphere, that is an important piece to ensure. It is an important piece of the process

133

in the statute that is, again, not fun to do. But it's important for us to comport with and to adhere to. I want to understand, if you all have any conflicts of interest for which you may need to step aside. Knowing that you are currently facing, if I'm understanding correctly, 350 requests for evaluation. ***Do you believe that either of you as appointees would have any conflicts of interest that may lead to you needing to step aside in any of those evaluations?*** Ms. Barrier.

**Ingrid Barrier**
Thank you, Madam Chair. I have only had the opportunity to attend one regularly scheduled meeting. And before we address any kind of complaint, there is a call for determination of any conflict of interest. ***And it's a robust discussion*** where people that, you know, if there's someone that you have a personal relationship with, or you're friendly with, or you have family dinner with, or whatever the case may be. Those are exactly the kind of conflicts. You know, you're appearing in front of a judge in an active proceeding. So, that discussion. ***And I would have to defer to Mr. Carpenter and Mr. Walsh, but I think that discussion is standard and critical.***

**Sen. Gonzales**
And, so, having participated in one full meeting. Would you feel comfortable disclosing your conflict? If you were to have a conflict, would you feel comfortable disclosing it?

**Ingrid Barrier**
Absolutely, yes. Madam Chair.

**Sen. Gonzales**
Thank you, and for you, Ms. Trujillo?

**Stefanie Trujillo**
Thank you, Madam Chair. As Ms. Barrier mentioned, we do go through a complex check before we address any RFE. It's, you know, an open dialog. We talk as a Commission. ***There have been certain matters in which some of the Commissioners have to step aside because there is a conflict. And it's never really been an issue. It's a very well thought out process. And that we have also received guidance from the Attorney General's Office on this, as well. So, I'm very confident in that process. And would be, you***

134

> ***know, <u>it's the right thing to do if there is a conflict, to step aside</u>.***
> So that we can, you know, look at matters from impartial lens.[185]

Notably, Vice-Chair Carpenter, Interim Executive Director Walsh, Commissioner Barrier, and Commissioner Trujillo all failed to disclose to the Senate Judiciary Committee whether they perceived themselves as having conflicts of interest with respect to pending and impending judicial discipline proceedings involving the Justices (i.e. the Maes RFE/Complaint and the circumstances in the Woods matter that were publicly raised in the press only three days prior to the March 6, 2024 confirmation hearings).  Although not directly addressed during the confirmation hearing, Commissioner Stefanie Trujillo's background includes having worked (from 2021-23) on the Colorado Supreme Court's Outreach and Working Group Committee for its Licensed Legal Professionals Initiative.[186]  The nature and extent of this apparent conflict of interest and objective appearances of impropriety have not been explored.

The Justices' abuse of their appointment powers and likely direct or indirect exercise of influence upon the Governor's appointments has occurred in the context of a valid critique of HCR 23-1001 / Amendment H by presumptive 23rd Judicial District Attorney George Brauchler.[187]  In his opinion, while Amendment H will achieve necessary structural change, the provision does not go far enough to protect the judicial discipline process from politicization, partisanship, cronyism, and corruption.  Brauchler, however, made his critique without recognizing that the corruption of this Commission and the judicial discipline process has already occurred.

The extent to which the Justices, through the Judicial Department or the Attorney General's Office, have communicated with Governor Polis or otherwise influenced his appointments has not been meaningfully investigated.  Likewise, communications that the Justices have had with their appointees to this Commission have also not been investigated.  Nevertheless, the overall circumstances involved in both the appointment of the judge and the attorney members of this Commission create substantial appearances of impropriety and apparent violations of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.6, 2.9, 2.11, 2.13, 2.15, and 2.16.

---

[185] *Hearing on nominations of Ingrid C. Barrier and Stefanie Trujillo to the Colo. Comm'n on Jud. Discipline before the S. Judiciary Comm.*, Colo. Leg., March 6, 2024; Appendix 27(ee)(i), pp. 4:35-5:17, 7:39-9:40.  The Senate Judiciary Committee's inquiry of Barrier, Trujillo, Carpenter, and Interim Director Walsh were prefaced by an email request for scrutiny by former Senate Judiciary Committee Chair Pete Lee sent to all members of the Senate Judiciary Committee.  Appendix 27(ee)(ii).

[186] Appendix 29, p. 79; *see also* https://coloradosupremecourt.com/AboutUs/PALS.asp (showing various connections between committee members and persons involved in the Masias Controversy).

[187] George Brauchler, *A Flawed Fix for Colorado's Compromised Court System*, COLORADO POLITICS, September 26, 2024.

135

***The Justices refused to disqualify themselves and allowed their agent to interfere with the discipline of former Chief Justice Coats.***

Despite this Commission having informed them of grounds for disqualification from the *Coats* case and matters relating to the Masias Controversy in June 2022, the current Justices drew out the process for adoption of Colo. RJD 41[188] until January 2023 and, then, approved their version

---

[188] Colo. RJD 41 provides:

> (a) In any proceeding in which any of the circumstances described in part (b) of this rule are present, the entire Supreme Court shall recuse itself, and a special tribunal composed of seven Colorado Court of Appeals judges shall replace the Supreme Court for the limited purpose of exercising any authority conferred by law to the Supreme Court as to the proceeding giving rise to recusal. The State Court Administrator, or the Administrator's designee, shall randomly select members of the tribunal from among all active, non-senior-status Court of Appeals judges ***who are not the subject of a current disciplinary investigation or proceeding pending before the Commission***; have not received a disciplinary sanction from the Commission or Supreme Court; and are not otherwise required by law, court rule, or judicial canon to recuse themselves from the tribunal. The random selection of tribunal members is a purely administrative function.
>
> (b) The special tribunal shall replace the Supreme Court in the following circumstances:
>
> (1) When the proceeding involves a complaint against a current or former Supreme Court justice;
>
> (2) When a current or former Supreme Court justice is a complainant or material witness in the proceeding;
>
> (3) When a staff member to a current Supreme Court justice is a complainant or material witness in the proceeding;
>
> (4) When a family member of a current Supreme Court justice is a complainant or material witness in the proceeding;
>
> (5) When any other circumstances exist due to which more than two Supreme Court justices have recused themselves from the proceeding.

As highlighted above, Colo. RJD 41 can be interpreted to require that the Colorado Supreme Court collectively recuse itself and authorize formation of a Special Tribunal in all pending

136

of Colo. RJD 41 over this Commission's objections.  Even after adopting Colo. RJD 41, however, the Justices did not immediately recuse themselves from the *Coats* case (including Chief Justice Boatright's continued control over production of records).  Only after this Commission filed its stipulation and recommendation for former Chief Justice Coats's public censure on May 3, 2023 did the Justices finally recuse themselves from the case and order the formation of a Special Tribunal.  *Notice [of Recusal]*, CSC Case No. 23SA114, May 3, 2023.

Notwithstanding the Justices' public recusal, they remained involved in the consideration of the *Coats* case by knowingly allowing their agent, Counsel to the Chief Justice Andrew Rottman, to pursue an effort to intervene and to seek amendment of factual admissions in Chief Justice Coats' Stipulation for Public Censure.  *See Andrew Rottman's Motion for Appropriate Relief*, CSC Case No. 23SA114 (5/16/23), Ex. A—*Affidavit of Andrew Rottman*, p. 3 (notarization provided by SCA Vasconcellos's Executive Assistant). Specifically, as also discussed *supra* at p. 91, Rottman sought to strike or amend the factual admission in the original *Coats* stipulation that stated:  "Other evidence demonstrates Rottman reviewed Masias's separation agreement earlier, learned of the [Rice-Masias] recording, but failed to notify Justice Coats of any such information." *Id*. at p. 5.  Without requiring Rottman to establish third-party standing before intervening in a judicial discipline proceeding, the Special Tribunal directed this Commission to respond to Rottman's "factual assertions."  *Order of Court*, CSC Case No. 23SA114, p. 1 (5/22/23) (requiring Commission to state its position "as to: (2) Mr. Rottman's factual and legal claims and requested relief").  Ultimately, Rottman's intervention was rendered moot by this Commission resubmitting an updated stipulation that removed the factual admission that Rottman objected to.  *Amended Stipulation for Public Censure*, CSC Case No. 23SA114, p. 11 ¶ 24 (6/20/23).  The adequacy of Rottman's standing to intervene was never resolved.  It is unknown whether Rottman paid for his own representation and, if not, who paid for it on his behalf.

**The Troyer-Mitchell Investigation**

The Troyer-Mitchell Report aptly recognizes:

> The [Colorado Judicial] Department's mission is to provide a "fair
> and impartial system of justice."  As such, its greatest asset is its

---

judicial discipline cases when three or more of the Justices are themselves subjects of a known colorable RFE or complaint pending before this Commission.  *See* Colo. RJD 2(w) (defining "proceedings" to include "consideration of a request for evaluation of judicial conduct; the investigation of a complaint ...").  By January 24, 2024 at the latest, the Justices were all aware of the Maes RFE, its inclusion of the whole Court, and its recognition by this Commission as a complaint as to at least Chief Justice Boatright.  Del Puerto, *infra* note 105.  At that time or when the Justices first became aware of the Maes RFE, the Court should have disqualified itself entirely from all pending judicial discipline cases *sua sponte*.  The Justices' refusal/failure to disqualify themselves from *Kiesnowski*, *Scipione*, and the Woods matter is particularly problematic under both Colo. RJD 41 and Canon Rule 2.11.  *Cf. In re Frese*, *supra* note 19 (judge publicly reprimanded for hearing DUI cases while himself facing DUI charges in a separate case).

137

credibility.  The collective trust of Colorado residents is premised on our belief that the courts and the Department as a whole, are administered with fairness and the public good as their highest goals.  Thus while allegations of corruption, self-dealing, and cover-up are problematic in any organ of government, they are particularly damaging when they arise within the Department. RCT, Ltd. Rpt., p. 5.[189]

***The scope of the Troyer-Mitchell Investigation, as defined by the Justices, specifically prohibited inquiry into whether the Masias Contract involved ethical or criminal misconduct.***

The Troyer-Mitchell investigation was presented as an investigation into the propriety of the Masias Contract.  The Colorado Supreme Court and the Judicial Department exercised undue control over the investigation primarily by restricting the scope of the investigation itself and, later, mischaracterizing that scope and the significance of the findings/conclusions reached through the investigation.  As testified to by Robert Troyer, the investigation did not analyze whether the conduct of anyone involved in the Masias Contract (including Chief Justice Coats or the other involved Justices) violated the Code, the Colo. RPC, or any state or federal criminal laws.  On the contrary, the investigation contract directed RCT, Ltd. specifically ***not*** to examine potential ethical, civil, or criminal culpability.

**Rep. Weissman**
Thank you, that discussion is helpful. Last one, Mr. Chair, appreciate your indulgence. I didn't see a ton of discussion in here squarely on this point. So I think I know the answer. But for the record. Part of what makes this committee's work challenging is just the, you know, the years of stuff that's been swirling out there and the press and, you know, frankly, the degrees of germaneness are not of all of that to what we are specifically charged to do. ***What I do not believe you were setting out to do is to squarely answer the question whether any action or omission, of anyone in particular, might have constituted a violation of the Code of Judicial Conduct. That is outside the scope.*** Is that correct?

**Sen. Lee**
Mr. Troyer.

**Robert Troyer**
Thank you. ***Yes, that is correct.***

---

[189] Representative Jennifer Bacon also focused upon the importance of this preface to the Troyer-Mitchell Report and the overall integrity of the Judicial Department as part of opening remarks on the House Judiciary Committee's March 15, 2023 consideration of her co-sponsored House Bill 23-1205. *Hearing before the H. Judiciary Comm.*, Colo. Leg., March 15, 2023; Appendix 27(w)(i), pp. 36:35-38:3.

**Rep. Weissman**
Thank you, Mr. Chair.

**Sen. Lee**
Did you not I'm sorry, what was your answer to that?

**Robert Troyer**
The answer is that is correct. That was specifically not in our scope.

**Sen. Lee**
Okay.

**Robert Troyer**
It was not in our scope. We were not asked to make a determination whether anyone violated the Judicial Code of Conduct, the code of attorney conduct, any employee code of conduct, or any criminal law. ***So, we were specifically not asked to do an assessment of either state or federal potential criminal violations. So, we did not do those things.***

**Sen. Lee**
Okay. and your contract was specifically to investigate contract, fraud, misconduct, etc. And not these other areas. Okay. Thanks for that.[190]  (Emphasis added).

Troyer and Mitchell were specifically prohibited from providing opinions as to the legality of the Masias Contract and the conduct of those involved.  Consequently, the conclusions reached through the Troyer-Mitchell investigation should be disregarded as irrelevant to the evaluation of whether the involved Justices violated the Code, violated civil prohibitions, or committed crimes through their approval of the Masias Contract notwithstanding their knowledge of the grounds for Masias' effective termination and their non-reporting of material information to SCAO's FSD and the OSA.  Beyond making the Troyer-Mitchell investigation irrelevant, contractual limitations on its scope confused Troyer and Mitchell's otherwise existing obligations to report judicial and attorney misconduct as well as any discovered evidence of criminal conduct.  *See* Colo. RPC 8.3(a)-(b); § 18-8-115, C.R.S.

***Critical evidence was not available to the Troyer-Mitchell Investigation or was otherwise not presented with the Troyer-Mitchell Report.***

The Troyer-Mitchell investigation was further limited by the lack of subpoena authority and the inability to interview material witnesses, primarily Ryan, Masias, Brown, and anyone subject to

---

[190] *Hearing before the Legis. Interim Comm. on Jud. Discipline*, Colo. Leg., July 12, 2022; Appendix 27(s)(ii)(6), pp. 16:37-17:32.

139

a non-disclosure agreement with the Judicial Department.  By not being able to interview these individuals and with a dependence upon the Judicial Department's preliminary determinations as to what constituted relevant documentary materials, the Troyer-Mitchell investigation relied upon a one-sided version of events.  Although no significant changes were ultimately suggested, the current Justices had an opportunity to review and (if they had chosen to do so) influence the substance of the report before its final issuance. The Troyer-Mitchell Report, itself, does not contain citations to the sourcing of information and, instead, is presented as bare findings and conclusions.[191]  As explained *supra* at note 43, even though the Troyer-Mitchell Report was required to address the propriety and formation circumstances of the Masias Contract, the Report did not include an appendix with a copy of the Masias separation agreement or the Masias Contract, itself.  Moreover, the Troyer-Mitchell Report did not analyze the substantive provisions of and necessary interrelationship between those contracts.

***The ultimate conclusion in the Troyer-Mitchell Report that the Masias Contract was not a Quid-Pro-Quo arrangement is clearly erroneous.***

Three primary findings are made in the Troyer-Mitchell Report:

1.  "[T]he internal culture of the SCAO was characterized by toxic relationships, factionalism, and a lack of accountability for key leaders."
2.  "[T]he Department's procurement rules were overly permissive and did not sufficiently deter procurement misconduct demonstrated . . . in the approval of the [Masias] Contract."
3.  "[S]everal Department leaders made critical errors in judgment or engaged in outright misconduct."  RCT, Ltd. Rpt. (Appendix 17), p. 6.

While the primary findings were generally supported by the facts, the ultimate conclusion reached in the Troyer-Mitchell Report, however, was met with immediate skepticism.  Troyer and Mitchell ultimately concluded that: "[T]he evidence also demonstrates that the Contract was not awarded to prevent the disclosure of allegations of judicial misconduct, as has been publicly alleged."  RCT, Ltd. Rpt. (Appendix 17), p. 6.[192]  A secondary conclusion that Chief Justice

---

[191] This bare presentation of findings and conclusions became a focal point of former Chief Judge Maes's criticism of the Troyer-Mitchell Report at the Interim Committee on Judicial Discipline.  Appendix 27(s)(ii)(2), p. 8:9-37.

[192] The press reported on the general skepticism of legislators and others to the findings.  Shelly Bradbury, *Investigators Defend Findings that Controversial $2.75 Million Judicial Contract was Not a Quid Pro Quo: Colorado Lawmakers Skeptical that Deal Wasn't Made to Keep Official Quiet about Judge's Misconduct*, DENVER POST, July 12, 2022.  Following the release of the Troyer-Mitchell Report but prior to the hearing itself, there was already considerable public skepticism regarding the ultimate conclusion reached.  Tristan Gorman, Policy Director for the Colorado Criminal Defense Bar, observed:

> Gorman, with the defense bar, on Tuesday called for more
> significant systemic change and oversight within the Colorado

Coats approved the Masias Contract in part due to Ryan withholding evidence of further financial misconduct by Masias was also questionable given the one-sided perspective of the investigation.  Indeed, this secondary conclusion was later disproven as part of Coats's own stipulation.  *See* discussion regarding Coats's constructive awareness of the SCAO internal audit *supra* at p. 22; *Coats*, ¶ 4(5-7) and *compare with* RCT Ltd., Rpt., p. 16 (finding that Ryan had intentionally concealed existence of the SCAO internal audit from Chief Justice Coats).

During the July 12, 2022 Interim Committee on Judicial Discipline hearing, there was the following exchange:

> **Sen. Gardner**
> Thank you, Mr. Chair and Mr. Troyer, Mr. Mitchell. As the chair noted, several of us were on the selection committee for your contract and are very familiar with your background and appreciate your work. I asked a question of Judge Maes earlier because he has been publicly very critical of your work, and I hope you heard that or have been apprised so that you might respond. But I'm struggling with something. And by the way, I think your report is very thorough. It reaches some conclusions. But when I got done, I still struggled with the conclusion that this contract was not awarded to Mindy Masias as a payoff or a cover up.  And perhaps there's no evidence that the Chief Justice, then Chief Justice

> Judicial Department, saying the effort to reform judicial discipline is a good start but falls short of the kind of change needed to restore public confidence in the department.
>
> "This is one of our major branches of state government, and basically what I'm seeing here is they can't be trusted," she said. "They literally sit in judgment of everyone else and have no one watching over them."
>
> Shelly Bradbury, *Critics Call for More Oversight After Investigation Reveals Colorado Court Bureaucrats Tried to Abuse Taxpayer Money: Findings of Investigation into Colorado Judicial Department Fuel More Calls for Reform*, DENVER POST, June 29, 2022.

Subsequently, in an article published before the Interim Committee on Judicial Discipline's August 10, 2022 hearing, reporter David Migoya printed an article detailing various objective grounds to question the accuracy of Troyer and Mitchell's conclusion that the Masias Contract was not a *quid pro quo* agreement.  These grounds included, a) the Justices having received the April 15, 2019 anonymous fraud report, b) inconsistencies in Coats's statement that he had not seen the anonymous report until receiving it from the OSA, and c) quotations of the Masias-Rice Recording in the Masias Memo, itself.  David Migoya, *Key Figure in Judicial Inquiry to Testify*, DENVER GAZETTE, August 5, 2022.

141

approved the contract in order to use the phrase: shut her up. But it did seem to me that there was a strong implication that this contract was awarded for improper motivations, some of which may have been to make Mindy happy or, or to get Mindy on her way out the door, or, you know, if not to shut her up, pay her off, or something and that just still lingers out there. So do you disagree with kind of my assertion altogether? Or are there elements but just not on the part of the Chief Justice? That's kind of a scattershot. But this is the core of, of a lot of the questions. And by the way, just so I don't have to come back in and be recognized. I really appreciate the recommendations you made and the observations and recommendations that I have found them very useful, but to the question.

**Sen. Lee**
Sure. Mr. Mitchell.

**Nick Mitchell**
Well, Senator, I appreciate that question. *For the avoidance of doubt, this contract should never have been approved. I think we want to be extremely clear about that.* We intended to be clear about that in the report, there is a heightened obligation. When you're talking about public monies being expended for public purposes. There were, as Bob mentioned earlier, there was both mismanagement and misconduct associated with the approval of that contract. And we want to be extremely clear about that point, it should not have been approved. No monies as we understand it, wherever paid under that contract, but *the contract itself was a serious breach of the public trust.* You know when we took this project, we had read all the media reporting, and we were aware of the facts as they had appeared in the press, and we were extremely diligent in pursuing the leads as we found them. And we have reached conclusions that we think are supported by the evidence that we found in the investigation. And we feel confident in the conclusions that we've reached. There may be other evidence that someone else may have and we that, you know, we were only able to find the evidence that we were able to find we feel confident in our conclusions. *But we certainly want to be extremely clear that the contract should never have been approved, and both reflected mismanagement and misconduct in the approval of that contract.*

\* \* \*

**Robert Troyer**
And that's really, you know, obviously Nick and I have picked up on this skepticism that that you guys have about this conclusion. But it's, it's just one of those things where sometimes we want a

story to be sexy and dramatic. And we've been told before we read the report or the actual investigation that it's going to be. And actually, it's much more common circumstance which is just poor human behavior. deficient, regrettable. Really, really disappointing human behavior, especially for a judicial department, any public service organization. ***But that is really what's going on from way back when this reimbursement stuff hits the fan in the fall. And that's why in our conclusion, we feel, still feel, and felt the report very firm in that conclusion that things didn't change in this meeting where the dirt memo was read, motivations didn't change.*** A contract for silence didn't spring out of someone's forehead. Instead, the simple fact that way back in July, Coats and Ryan had talked about needing a new training program, then they have a reimbursement problem with Masias. ***And Chris Ryan starts talking way back then, way back in October, about getting Mindy Masias on a leadership contract. That's undisputed.*** And it's confirmed in every interview, and all the Chris Ryan stuff and everything else and all the documents that this was under discussion and being propelled forward months before this meeting where dirt was discussed. As a result, when this starts with Eric Brown, there's, frankly, confusion and irritation from Rottman and Coats. Why are we talking about this? ***We've already been talking for two and a half, three months about the contract.*** First of all, is she okay? Second of all, where are we with this? Like? Where are we with moving the contract forward that we've been talking about for a long time, this stuff doesn't have anything to do with that. So that's probably more of a narrative version of my own on the fly summary of what's already in here already in the report.[193]

Troyer and Mitchell's analysis did not address the fact that Chief Justice Coats and all of the other involved Justices had ***each*** received copies of the April 15, 2019 anonymous fraud report before proceeding to approve/re-ratify the Masias Contract. Critically, the analysis did not address how all the involved Justices, knowing of the fraud report, then failed to notify either the SCAO FSD or the OSA that the Masias Contract was being contemplated. *See* RCT, Ltd. Rpt. (Appendix 17), pp. 29-30. The analysis also did not examine how Masias's separation agreement with a non-disclosure provision in exchange for approximately $35,000 was a necessary pre-condition for her, then, receiving the sole-source $2.66-2.75 million Masias Contract. *See* RCT, Ltd. Rpt. (Appendix 17), pp. 24-25 (discussing production of Rice-Masias recording as term of separation agreement but omitting discussion of the NDA, release of claims, and the Department's prohibition against contracting with current employees). As quoted above, Troyer apparently premised his conclusion that there wasn't a *quid-pro-quo* contract on the fact that the involved Justices and Ryan had discussed the possibility of offering Masias the option of returning to work for the Department in a training capacity as part of a contemplated resignation agreement in October 2018. Appendix 27(s)(ii)(6), pp. 20:25-21:4; *see also* RCT, Ltd. Rpt.

---

[193] *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., July 12, 2022; Appendix 27(s)(ii)(6), pp. 4:11-5:8, 20:25-21:4.

143

(Appendix 17), p. 13.  At that time, however, the idea of any contract was merely theoretical without discussion of a price term and premised upon expectations that Masias would sign a separation agreement without any risk of Masias divulging compromising information.  Troyer and Mitchell also failed to meaningfully address the sole source nature of the Masias Contract, the rigged RFP process, and the timing of the contract's execution as evidence of its *quid pro quo* intent. Troyer's premise suffers a further fallacy by ignoring the irrefutable fact that, if the Masias Contract did not have an improper or *quid pro quo* purpose, Chief Justice Coats, Ryan, Morrison, and Brown would have all disclosed its contemplation to the SCAO FSD and the OSA as part of the ACFR audit management representation letter in December 2018.  *Cf., Coats*, ¶ 4(11).  Quite clearly, there was a mutually agreed and premeditated effort to conceal the facially unreasonable contract and contemplated misuse of public funds, even in 2018.  In sum, the conclusion reached by Troyer and Mitchell that there wasn't a *quid-pro-quo* contract for silence appears clearly erroneous when, after Brown raised the existence of compromising information through the Masias Memo, Masias did, in fact, agree to a non-disclosure provision and release of claims as a pre-condition for her receiving the larger $2.66-2.75 million sole-source contract.

### *The Justices, directly and indirectly, made or encouraged public statements that misrepresented the scope and relevance of the Troyer-Mitchell Report.*

In anticipation of the pending release of the Troyer-Mitchell Report, on June 14, 2022 (the day after the Justices' received this Commission's letters advising them of grounds for their collective disqualification), State Court Administrator Vasconcellos provided testimony to the Legislative Interim Committee on Judicial Discipline in which he attempted to reinforce the legitimacy of both contracted-for "independent investigations."  Vasconcellos stated, in relevant part:

> But not all of you may be aware, neither myself, nor the Chief, nor the Supreme Court, nor anyone in the Judicial Department actually selected the investigators themselves. And that was for a number of reasons, not the least of which to avoid any sort of notion that we would pick investigators that were so-called, quote unquote, friendly to our cause. This needed to be sober, independent, and free from influence by the Judicial Department. So, a panel consisting of key legislative leaders, three of whom are on this interim committee and key leaders from the Executive Branch came together and used a public procurement tool, a request for proposals process, to identify potential investigators for each of these two key investigations. Ultimately recommending to the Department that we utilize RCT for the investigation into the leadership contract and a group called Investigations Law Group for the investigation into allegations of sexual harassment and gender discrimination.[194]

---

[194] *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., June 14, 2022 (Colo. Jud. Dep't presentation); Appendix 27(s)(i)(3), p. 20:2-12.  Significantly, Vasconcellos did not

Vasconcellos further used his testimony to lay a foundation for using the later published findings in the Troyer-Mitchell Report to excuse the conduct of Chief Justice Coats and the other Justices in approving the Masias Contract through a factually fallacious narrative that Christopher Ryan, Terri Morrison, Eric Brown, and others had withheld material information from Coats.  On this point, Vasconcellos stated:

> Historically, the Chief Justice was either the only or overwhelmingly the primary justice involved in administrative matters. There were certainly instances where individual justices may have had a particular administrative interest and dove deeper into that area, but by and large, when thinking about the operations of the Judicial Department at a high level, it was really the Chief Justice, along with the State Court Administrator, and over various generations, varying degrees of engagement with chief judges across the state, court executives, chief probation officers, etc. One of the critical, well, one of the blind spots that can accrue with that is you become heavily reliant, heavily reliant, arguably, on the person in my position, the State Court Administrator. Now, to be sure, I have an important role to play. It's a constitutionally created position. I'm an important advisor to the Chief Justice and the Supreme Court. And at the same time, nor should they be solely reliant on me or anyone in my in my role in decision making. We are all human. We're fallible.
>
> * * *
>
> The old, historic way wasn't working. We became too reliant on too few voices, arguably. ***Critical information was not shared in a timely fashion or shared at all.*** And I can tell you, just from the perspective of my role as State Court Administrator, I don't do this job by myself, nor could I possibly imagine doing it successfully alone.[195]  (Emphasis added).

Notwithstanding the contractual limitations on the scope of the Troyer-Mitchell investigation and being personally advised of ethical problems with judicial fact investigations, judicial commentary on pending/impending cases, and grounds for his disqualification, Chief Justice Boatright proceeded to attach a cover letter to the published Troyer-Mitchell Report.  Chief Justice Boatright's cover letter contained public statements effectively presenting the Troyer-Mitchell Report as exonerating those involved in the Masias Contract from allegations of judicial and other forms of misconduct (including criminal conduct).  Chief Justice Boatright's cover

---

disclose to the Legislature the fact that the Justices had originally contemplated a sole-source investigation contract with WilmerHale before they shifted to requesting the selection of the investigators through a multi-agency panel.

[195] *Id*.; Appendix 27(s)(i)(3), pp. 16:38-17:8, 17:13-16.

145

letter presented the Troyer-Mitchell Report as disproving that the Masias Contract was a *quid-pro-quo* agreement.

> **What the RCT Investigation Found: The Contract Was Not Awarded to Prevent Disclosure of Allegations of Judicial Misconduct**
>
> Contrary to allegations made and repeated in news media coverage, Troyer and his investigators concluded that the contract was not a "payoff" to silence Masias from filing a discrimination lawsuit or revealing supposed evidence of judicial misconduct. . .[196]

Chief Justice Boatright's public commentary as to the Mitchell-Troyer Investigation, like the Court's February 4, 2021 and February 8, 2021 public statements addressed the merits of Masias Controversy and related to pending or impending cases.

In addition to Chief Justice Boatright's public commentary, it appears that Justice Gabriel, through a publicly expressed friendship with attorney Tom Overton,[197] indirectly supported third-party public commentary and endorsement of the Justices' credibility, which mischaracterized the scope/significance of the Troyer-Mitchell Report.  The third-party public commentary further created false impressions that the Justices' "independent" investigations were consistent with their duties under the Code.  In an op-ed article, Overton and another attorney, Richard Kaudy, writing through the authority of their professional association, the American Board of Trial Advocates, stated in relevant part:

> No bribery. No payoffs. No cover-up. The headline should be "We were wrong. We're sorry."
>
> It's time to set the record straight.

---

[196] Chief Justice Boatright's full July 11, 2022 commentary on the RCT Ltd. Rpt. is contained in Appendix 17, pp. 1-6.  Importantly, Chief Justice Boatright presented this commentary and his June 22, 2022 commentary on the ILG Investigation Report after receiving this Commission's letter notifying him (with similar letters sent to the other Justices) of the Court's conflicts of interest and need to disqualify itself from matters involving the Masias Controversy.  *See supra*, note 14 (Migoya, October 8, 2020 (describing conflict letters as being sent in June 2022, a day prior to the first ICJD Hearing held June 14, 2022)).

[197] At the Colorado Bar Association's *Ethics and Professionalism: Bench Bar Conversations* seminar held on October 6, 2023 and other similar presentations Justice Gabriel has publicly described his longstanding friendship with Overton, including their collegial history as opposing counsel.

146

For a year and a half, the press has attacked the Colorado Supreme Court repeating mere allegations to try to find a scandal.

There were two allegations. One was that a leadership contract was granted to hush former employee Mindy Masias. The second was that there was a secret list of allegations of improper conduct by state court employees, including some judges.

The Court, transparent at every turn, publicly released the document that contained the allegations. It called for independent investigations with investigators to be picked by the legislative and executive branches. The Court promised to make the results of the investigations public, and it did so.

There were separate investigations into each allegation. The first investigation [the Troyer-Mitchell investigation] concluded that allegations of hush money were false. The second investigation concluded that while the allegations all contained a grain of truth, the "secret" list, which goes back 20 years, also contained claims that were "unsubstantiated," "unfounded," and "misleading." As the investigator's report noted: "many of the allegations leave out important context or misstate facts."

The independent investigators found nothing criminal or unethical but suggested ways that the Judicial Branch can manage its nearly 4,000 employees so the judiciary can better address and resolve employee issues. [198]

Reinforcing its intended purpose of blunting accountability and calls for reform, the op-ed article was re-formatted as a letter and submitted on American Board of Trial Advocates stationary to the Interim Committee on Judicial Discipline. Appendix 27(s)(iii)(12)(j).

Kaudy and Overton's op-ed article followed *The Denver Post's* more realistic call for further reforms based upon pervasive judicial impropriety and the "toxic" culture within the Judicial Department, as acknowledged through the Troyer-Mitchell Report. When the editorial was published immediately before the Interim Committee's hearing, however, the *Post's* reporters, its Editorial Board, and the public were not aware that the scope of the RCT, Ltd. contract prevented Troyer and Mitchell from reaching conclusions or investigating whether Chief Justice Coats or any of the other involved Justices had violated their ethical duties or criminal laws. The *Denver Post's* Editorial Board stated, in part:

An eight-month investigation into a shady contract awarded to the Colorado judicial department's former chief of staff found that

---

[198] Richard Kaudy and Tom Overton, *Opinion: Colorado's Judiciary is Unfairly Under Attack*, DENVER POST, August 8, 2022.

147

former Supreme Court Chief Justice Nathan Coats hadn't acted criminally in the deal but was rather out-of-touch, easily manipulated, and ill-equipped to manage a branch of government.

Consider for a moment that the investigation also might be a charitable assessment of Coats' behavior given that key whistleblowers in the case refused to participate in this investigation because it was paid for by the court system. Coats has declined to comment on the investigation, awaiting completion of a separate investigation later this summer.

Mismanagement from the chief justice created a pervasive culture problem throughout the judicial department where employees were not reporting misconduct or problems but were rather keeping personal records to be used as leverage for their own personal needs later, the report said.

* * *

***At this point, we know that not only are employees in the judicial branch acting in manipulative and conniving ways but that <u>valid complaints about harassment have been ignored or swept under the rug for years.</u>***

***It's time for a massive overhaul of the courts.***

Thankfully a committee of lawmakers is meeting this summer on the very issue. We urge them to be bold, and aggressive and exercise their rightful check on an independent branch of government that is out of control.

***Colorado Sen. Pete Lee is leading the charge, and he is right to focus on the ineffectiveness of the Commission on Judicial Discipline, which he said was "marginalized and ignored; disabled from doing its job."***

The Colorado Judicial Department needs permanent, aggressive external oversight; a new system for internal management that removes the duties of running an entire branch of government from the chief judge; increased transparency and openness that is made equal to the Colorado Open Records Act for other state agencies; and a general housecleaning that pushes out bad apples.[199] (Emphasis added).

---

[199] The Denver Post Editorial Board, *Editorial: Incompetence and Impropriety Threaten Colorado's Judicial Branch*, THE DENVER POST, July 12, 2022.

148

Robert Troyer and Nicholas Mitchell have not been asked, when they contracted for and conducted their investigation, if they were aware of the Code's prohibition against judicially directed fact investigations set forth in Canon Rule 2.9(C).  Likewise, Troyer and Mitchell have not been asked hypothetically if they had been aware of this prohibition, whether proceeding with their investigation would have violated Colo. RPC 8.4(f) (prohibiting attorneys from knowingly assisting judges violate the Code).  Robert Troyer has also not been asked, if through his review of discovery materials or other sources, whether he was aware that his fellow former U.S. Attorney for the District of Colorado, John F. Walsh, had originally negotiated (though he did not ultimately execute) a sole-source contract (similar to the Masias Contract, itself) to perform the "independent" investigations.

The Court's undue control over and public mischaracterization of the scope of the Troyer-Mitchell Report and the ILG Report had significant impacts upon then-contemporaneous discussion of legislative reforms and avoided scrutiny of the involved Justices' roles in approving and not disclosing the Masias Contract despite their prior awareness of the April 15, 2019 anonymous fraud report.  These problems illustrate the importance of enforcing the Code's prohibitions against commentary on pending or impending cases and prohibitions against judges directly or indirectly conducting their own investigations, particularly through the assistance of attorneys.  Canon Rules 2.9, 2.10, and 2.11; Colo. RPC 8.4(f).

**The ILG Investigation**

***General Limitations Imposed Upon the ILG Investigation***

As described in the ILG Report, the scope of the ILG investigation was defined as two-fold: First, to investigate each of the allegations contained in the Masias Memo, and Second, to "conduct a comprehensive assessment of the workplace environment in the Judicial Branch." ILG, LLC Rpt. (Appendix 18), p. 5.  Like the Mitchell-Troyer investigation, the scope of the ILG investigation did not include evaluation of whether there were violations of the Code or criminal conduct involved in the allegations investigated.  *Id.*, pp. 5, 7-9.  Consistent with the findings in the Troyer-Mitchell Report that "SCAO's internal culture was toxic, which deterred employees from coming forward with their concerns about the Contract," the ILG Report found evidence of continuing pervasive cultural problems within the Department that include fear of retaliation for reporting intimidation, harassment, discrimination, and other misconduct.  RCT Ltd., Rpt., pp. 38-40; ILG, LLC Rpt. (Appendix 18), pp. 89-90.[200]

---

[200] The ILG Report contains striking statistics.  ILG, LLC Rpt. (Appendix 18), pp. 89-90.  Of those surveyed, 18% (20% of female respondents and 10% of male respondents) reported having witnessed retaliation within the Judicial Department within the past 5 years.  25% of the survey participants reported that they did "not feel they can talk openly with leadership without fear of retaliation."  Of the witnesses that ILG actually interviewed, 58% described instances of retaliation or fear of retaliation from leadership within the Judicial Department.  With respect to particular forms of misconduct:

149

Also, as with the Troyer-Mitchell investigation, ILG lacked subpoena powers to conduct its investigation. Consequently, ILG did not interview or obtain discovery from necessary witnesses. Those not interviewed (because of non-disclosure agreements or otherwise) included Ryan, Masias, Brown, Kribs, and persons involved in the allegations contained in the Masias Memo that related to Justice Gabriel and Justice Hart. Like the findings made in the Troyer-Mitchell Report, the findings in the ILG report are limited to incomplete and one-sided versions of facts.

Similar to the Troyer-Mitchell investigation, the Court and the Judicial Department's undue influence upon the ILG investigation occurred primarily through their ability to define the scope of the investigation, to limit the extent of ILG's investigative authority, to gatekeep access to information, and to have input as to the substance of the final report. While the ILG Report accurately recognizes a pervasive culture of intimidation and retaliation within the Judicial Department, the ILG Report does not present any findings as to who, specifically, is responsible for this toxic culture and to what degree the Justices are personally responsible for defining the necessary "tone at the top." Likewise, while the ILG Report evaluates the merits of the underlying instances of misconduct alleged in the Masias Memo, the ILG Report only provides limited analysis of Masias's overall contention that individuals associated with the Colorado Supreme Court and/or the Judicial Department covered up or disregarded those underlying allegations of misconduct.[201] The ILG Report does not meaningfully address how the "toxic" culture within the Judicial Department includes a culture of enforced secrecy and the use of public resources to cover up judicial and other types of misconduct. Instead, it appears that the Justices used their control over the ILG investigation to prevent inquiry into this central aspect of the Judicial Department's flawed culture. As with the Troyer-Mitchell investigation, the contracted-for limitations on the scope of the ILG investigation unduly obstructed ILG's otherwise mandatory obligations to report attorney and judicial misconduct as well as discovered evidence of crimes. *See* Colo. RPC 8.3(a)-(b); § 18-8-115, C.R.S.

---

- 50% of respondents who experienced sexual harassment did not report it out of fear of retaliation;
- 62% of respondents who experienced gender discrimination did not report it out of fear of retaliation; and
- 63% of respondents who experienced retaliation did not report out of fear of further retaliation.

These statistics reflect a generally hostile and culturally flawed workplace that has remained even after the Masias Controversy and changes in the composition of SCAO.

[201] In addition to the Troyer-Mitchell and ILG Reports, general perceptions of the Judicial Department as a toxic and retaliatory workplace were confirmed in earlier independent press reporting. One former Judicial Department employee explained: "Judicial is the ex-boyfriend that abuses you, and when you say something about how they're abusing you, they tell you you're the crazy one[.]" Shelly Bradbury, *Women Describe Pervasive Sexism, Toxic Work Environment in Colorado's Judicial Branch: Seven Current, Former Employees Spoke to The Denver Post About Experiences Working in Judicial Department*, DENVER POST, April 2, 2021.

***The ILG Report does not address the confirmed destruction of evidence.***

For reasons that are unclear, ILG found an allegation of evidence destruction presented in the Masias Memo as "unsubstantiated" even though ILG was able to confirm that an anonymous complaint letter had indeed existed but that no one who had received the complaint retained a copy and that no copies of the letter now still exist. *See* ILG, LLC Rpt. (Appendix 18), p. 15. ILG's investigation further confirmed that, at the time the anonymous complaint was received, Judicial leadership decided not to investigate the allegations raised. ILG, LLC Rpt. (Appendix 18), pp. 13-14.

The allegation in the Masias Memo stated:

> No investigation was held when the anonymous allegations of sexism and harassment were made against the Chief Justice [Rice] and [IT staff] Chad [Cornelius]. [Masias] was told to destroy the letter. Osher, *supra* note 55; Appendix 2, p. 1.

In her ultimate finding on this issue, Elizabeth Rita stated:

> The allegation that Ms. Masias (or another 'she') was directed to destroy the complaint letter is **Not Substantiated**. While I found no material evidence to corroborate this contention, the letter was discounted—if not physically destroyed by leadership.
>
> ILG, LLC Rpt. (Appendix 18), p. 15.

***ILG is prohibited from examining an allegation as to two current Justices.***

Through their control of the ILG investigation, the Justices prevented ILG from conducting any investigation of an allegation in the Masias Memo involving Justice Gabriel and Justice Hart on grounds that the allegation involved "pending litigation." [202]

> Allegation 5: 'Current pending EEOC complaint against two Justices': ILG was directed to remove this item from the scope of work, because the matter was in current litigation at the time we were retained. The matter was resolved during the pendency of our work.
>
> ILG, LLC Rpt. (Appendix 18), p. 8.

***ILG's finding that a harassment complaint was not suppressed to keep now-Justice Gabriel "safe" is questionable given evidence of retaliation against the reporting employee.***

---

[202] Media reporting confirmed that this allegation related to Justice Gabriel and Justice Hart's inclusion on a 6-person hiring committee and the unsuccessful applicant's subsequent EEOC complaint. Migoya, *supra* note 109.

151

The most significant exercise of the Justices' undue influence upon the ILG investigation, however, involved the allegation contained in the Masias Memo that the Judicial Department had used public funding and resources to suppress allegations of harassment when, as a Court of Appeals Judge, Justice Gabriel previously applied for a vacancy on the Colorado Supreme Court.[203]  As explained *supra*, Justice Gabriel had preemptively announced that the then-contemplated ILG investigation would "***vindicat[e]***" him. *Supra* at p. 77 and note 108.  The Masias Memo stated, in relevant parts:

> **Instances where Judges were NOT held to the "tone at the top" but who have violated policy significantly:**
>
> * * *
>
> Negotiated a release agreement with a law clerk who accused her COA Judge of harassment in order to keep the COA Judge "safe" during the . . . Supreme Court Justice selection process per the chief justice.  Appendix 2, p. 1.

In finding that this allegation was "not substantiated," ILG Investigator Rita focused on the negotiation and timing of the release agreement itself and the merit of the underlying harassment allegation, rather than broader facts probative of a cover up.  ILG, LLC Rpt. (Appendix 18), p. 26.  These broader facts, however, support alternative findings that the law clerk was retaliated against for reporting to HR and that the Judicial Department used public funding (i.e. paid administrative leave) to keep then-Judge Gabriel "safe" during the contemporaneous supreme court nominating process and afterwards through the negotiation of a non-disclosure agreement that was not reported to this Commission.[204]  In addition to her direct findings about the agreement itself, Rita states:

> The processes that HR and Court Administration utilized to address the concerns raised by this clerk were not managed appropriately or consistently under the applicable policy or

---

[203] It has been observed elsewhere that the examination of this allegation is a primary example of the Justices undermining the ILG investigation.  Prince, *supra* at note 12, p. 114.

[204] As reported in the media, the separation agreement negotiated with the law clerk was intended to silence her.  Migoya, *supra* note 109.  The existence of an NDA provision would be consistent with the Troyer-Mitchell Report findings as to standard practices within the Judicial Department.  RCT, Ltd. Rpt. (Appendix 17), p. 39.  Although the ILG Report confirms some of the substance of the agreement, it inexplicably omits discussion of whether the agreement contained a NDA provision and, if so, what the nature of the NDA provision entailed.  ILG, LLC Rpt. (Appendix 18), p. 23.  The existence of an NDA, however, can be implied under these circumstances.  *See also supra*, note 92 (confirming this Commission did not receive notice of this and other allegations of judicial misconduct).  The Judicial Department has also constructively denied access to this specific record.  Appendix 30, pp. 11, 40, 71-72.

152

> standards for HR, legal or investigations best practices.  ILG, LLC
> Rpt. (Appendix 18), p. 26.

With respect to the law clerk being immediately placed on administrative leave during the pendency for the nominating process and then-Judge Gabriel not disclosing the pending HR complaint during that process, the ILG Report states:

> HR started an immediate inquiry.  An HR team member
> interviewed . . . the woman law clerk on ***September 12, 2013***.
>
> \* \* \*
>
> The woman law clerk went out on administrative leave, which
> started on the date she interviewed with HR.  She was out on leave
> for one month.  ***It is unclear who decided upon or authorized the
> leave.***
>
> While the woman law clerk was out on leave, the Court of Appeals
> Judge [(Gabriel)] interviewed for a seat on the Colorado Supreme
> Court.  He had submitted his application on ***September 13, 2013***,
> two days before he was aware of the harassment complaint.  He
> interviewed on either ***October 8th or 9th***, a day or two ***before*** the
> woman law clerk returned from leave.  He was not selected as a
> finalist.  ***According to [Judge Gabriel] and the commissioners I
> interviewed from the Supreme Court Nominating Commission,
> this matter was not raised in the interviews.***  ILG, LLC Rpt.
> (Appendix 18), pp. 21-22.[205] (Emphasis added).

Even if the harassment complaint was ultimately determined to lack merit, then-Judge Gabriel's lack of candor in failing to inform the nominating commission of its existence should cause pause with respect to his obligations under Canon Rules 1.2 (Promoting Confidence in the Judiciary) and 4.1 (Campaign Activities of Judges and Judicial Candidates). [206]  Another conflict of interest exists through the fact that former Judge Alan Loeb was the Chief Judge of the Colorado Court of Appeals in 2013, when the settlement agreement and NDA were negotiated with the female law clerk.  Judge Loeb now serves as a member of the Colorado State

---

[205] A list of the members of the 2013 Colorado State Judicial Nominating Commission is *available at* https://web.archive.org/web/20210310075106/https://www.courts.state.co.us /Careers/Judge_Opportunities/Announcements/SC%20CJ%20Bender%20vacancy% 20FINAL.pdf.

[206] A "Judicial Candidate" is defined by the Code as "a sitting judge who is seeking selection for judicial office by appointment or retention."  Canon Rule 4.1 prohibits a judicial candidate from "knowingly, or with reckless disregard for the truth, mak[ing] any false or misleading statement[.]"

153

Commission on Judicial Performance, which reviews the fitness and performance of Justice Gabriel and the other Justices.[207]

Justice Gabriel's subsequent non-reporting of the use of public funds to conceal the apparent or at least suspected retaliation against his female law clerk extended to his non-disclosure to this Commission as well as to likely omission/non-reporting when Justice Gabriel later successfully reapplied for a vacancy on the Colorado Supreme Court in 2015.  It does not appear that Investigator Rita inquired as to whether Justice Gabriel described the circumstances in his successful application for the Court.  Moreover, it does not appear that Investigator Rita interviewed any of the members of the latter nominating commission that selected Gabriel as a nominee (which resulted in his ultimate appointment to the Court by Governor John Hickenlooper).  Notably, on June 10, 2015, the three persons nominated were then-Judge Richard Gabriel, then-professor Melissa Hart, and Judge David Prince.[208]  This Commission's current Vice-Chair James Carpenter served on the latter nominating commission.[209]  Given Carpenter's personal knowledge of Gabriel's application and interview, it is unclear whether Carpenter (as a witness with personal knowledge of material facts) disclosed potential grounds for his disqualification from matters involving the Masias Controversy, including the Masias Memo's allegation relating to Gabriel's prior judicial application, and whether Carpenter has recused himself from this Commission's consideration of such matters.  Justice Gabriel has also publicly described Governor Polis's current Legal Counsel Kara Veitch as having been on Governor Hickenlooper's selection panel when Gabriel was appointed to the Colorado Supreme Court.

When the law clerk returned from administrative leave, she was reassigned with a qualitative demotion and made the "Senior Judge Clerk" with an office shared with the Clerk of the Court and without being assigned to a particular Court of Appeals Judge.  ILG, LLC Rpt. (Appendix 18), p. 22.  Investigator Rita documented how SCAO's own internal legal team perceived the treatment of the law clerk as inappropriate and retaliatory.

> One member of the legal team stated that they were "appalled"
> with how this situation "had come down":

---

[207] *Supra*, note 128 (providing link to roster of State Commission); *see also* Colo. RGCJP 7 (describing general grounds for performance commissioner disqualification).

[208] The nomination announcement is *available at* https://web.archive.org/web/20150905094741 /https://www.courts.state.co.us/Media/Judge_Nominees/SC%20J%20Hobbs%20nominees%20FI NAL.pdf.  Judge Prince had been previously nominated for the Colorado Supreme Court when then-Judge Gabriel was not nominated in 2013.  That nomination announcement is *available at* https://web.archive.org/web/20210310074738/https://www.courts.state.co.us/Media/Judge_Nomi nees/SC%20CJ%20Bender%20nominees%20FINAL.pdf.

[209] A list of the members of the 2015 Colorado State Judicial Nominating Commission is *available at* https://web.archive.org/web/20150905093705/https://www.courts.state.co.us /Careers/Judge_Opportunities/Announcements/SC%20J%20Hobbs%20vacancy%20FINAL.pdf.

154

> She files a complaint and then she is penalized by putting her off in a corner. I know they thought that was a good idea, but I think that was traumatizing. Legal wasn't consulted about putting her in a different position.

* * *

> [I]t was a really bad way to address her concerns – she was in a way arguably retaliated against. I don't think she actually was and I think instead they didn't know what to do with her. But it was a bad call unless she asked for this different assignment and wanted to do something like that. ILG, LLC Rpt. (Appendix 18), p. 23.

As with the retaliation against Kribs for whistleblowing, ILG's examination of the female law clerk's treatment for bringing concerns to HR does not address the impropriety of the Judicial Department's established (and now statutorily prohibited)[210] practice of using paid leave or VSIs to effectively suppress allegations of judicial misconduct through negotiated non-disclosure and release agreements. Presumably due to non-disclosure agreements and the lack of subpoena powers, the ILG investigation did not include interviews of Kribs or the female law clerk involved in the allegations as to Justice Gabriel. ILG, LLC Rpt. (Appendix 18), pp. 20, 59.[211] The ILG report further fails to address reasons why the harassment allegations made by the law clerk and HR's handling of the complaint were not reported to this Commission.

Consistent with the other investigations that they controlled, the Justices were able to apply undue influence to restrict the scope of the ILG investigation and, specifically, to prevent any meaningful inquiry into the Judicial Department's established practices of using intimidation, retaliation, and the negotiation of non-disclosure agreements and releases to suppress evidence of judicial and other misconduct. Ultimately, while the ILG Report confirmed the existence of a "toxic" culture within the Judicial Department, the ILG Report does not identify who is responsible for this harmful culture and what steps are necessary to hold those persons accountable.

---

[210] § 13-5.3-106(2)(c)(V), C.R.S. (prohibiting NDAs that limit reporting to this Commission); *see also* § 24-50.5-105.5, C.R.S. (prohibiting State agencies from entering NDAs with public employees generally, defining limited exceptions); David Migoya, *supra* note 1 (describing Masias Controversy as primary motivation for Senator Barbara Kirkmeyer's sponsorship of SB 21-23 (later passed as SB 23-53 and codified as § 24-50.5-105.5, C.R.S.); noting that both Masias and Brown signed NDAs; describing NDAs negotiated by the Attorney General's Office between 2019 and 2022 as having cost taxpayers *in excess of $4 million*).

[211] Contemporaneous with the public disclosure of the Masias Memo on February 8, 2021, the Judicial Department cited the allegations as to Justice Gabriel involving "sexual harassment" as its basis for denying public records requests for the settlement agreement with the female law clerk. Chirstopher Osher, *Judicial Branch Mum on Settlement Agreement*, DENVER GAZETTE, February 19, 2021.

155

***Chief Justice Boatright used the ILG Report as another opportunity to improperly comment on the merits of the Masias Controversy.***

Consistent with both the OSA's Fraud Hotline Investigation Report and the Troyer-Mitchell Report, Chief Justice Boatright published the ILG Report with a cover letter that interpreted the Report's findings and, again, commented on the merits of allegations arising through the Masias Controversy. In summarizing Investigator Rita's conclusions as to the Masias Memo allegations, Chief Justice Boatright selectively removed qualified findings and inserted additional facts, including termination of the "hairy chest" judge from the Senior Judge Program and the outcome of the EEOC litigation.[212] As part of legislative testimony, Investigator Rita herself acknowledged that Boatright had omitted material information from his summary: "I saw a lot of things that I would have added if it were me doing the summary, but he didn't ask my opinion about it."[213] Chief Justice Boatright's most problematic commentary states:

> On the one hand, ILG's findings clearly refute the often repeated
> assertion that alleged misconduct was systematically ignored or
> covered up by the Branch.
>
> Boatright ILG Cover Ltr. (Appendix 18), p. 2.

At the August 10, 2022 Interim Committee on Judicial Discipline hearing in which Investigator Rita and her co-investigator, Ann McCord, explained their findings, Steven Vasconcellos (on behalf of the Justices) made similar comments describing the ILG investigation as disproving the existence of systemic judicial misconduct. Vasconcellos stated:

> I am grateful that their investigation did not identify widespread
> judicial misconduct. At the same time, no one should have to
> endure workplace harassment, be unclear how to report it, or have
> to fear retaliation. I will tell you from my own personal
> perspective, the degree to which folks expressed concerns about
> the availability of safe reporting, and to the degree to which folks
> had personally observed retaliation was extraordinarily
> troubling.[214]

---

[212] Brian Boatright, *Statement from Chief Justice Brian D. Boatright regarding ILG investigation and assessment of Colorado Judicial Branch workplace culture*, pp. 3-5 (July 11, 2022) (cited hereinafter as "Boatright, ILG Cover Ltr."); Appendix 18. For the context of the "hairy chest" judge allegation, *see also supra* at note 92. Chief Justice Boatright's commentary was also contemporaneously reported in the press. David Migoya, *Colorado Judicial Investigation—Audit: No Cover-Up, Some Issues*, DENVER GAZETTE, July 12, 2022.

[213] *Hearing before the Legis. Interim Comm. on Jud. Discipline*, Colo. Leg., August 10, 2022; Appendix 27(s)(iii)(12), p.12:26-27.

[214] *Id.*; Appendix 27(s)(iii)(12), p. 18:3-18:8.

As foreshadowed through the Court's February 4, 2021 and February 8, 2021 statements, Chief Justice Boatright presented the ILG Report (which does not specifically address retaliation identified through the ILG investigation) as exonerating persons likely responsible for the Judicial Department's "toxic" culture.  Chief Justice Boatright further responded with another façade of reform, announcing that the Judicial Department would respond to the recommendations of the Troyer-Mitchell Report and the ILG Report with a "Workplace Culture Initiative."

> Going forward, let me be clear about two things:
>
> First, harassment and retaliation will not be tolerated, and everyone—appointed officials, senior executives and staff—will be held accountable.  My colleagues on the Colorado Supreme Court and I, along with SCAO leadership, are totally committed to this, and we will continue to put the necessary tools in place to accomplish this.
>
> Second, the ILG report reinforces the Troyer investigation findings that the Branch must "*improve the legitimacy of the process for handling complaints*."
>
> As I said then, it isn't enough to simply have the processes of accountability in place.  ***Our judges, their staffs, probation department, the legal community, elected officials, regulators and Coloradoans who rely on our system of justice must know how we deal with allegations of misconduct.***
>
> ***They must have confidence that the system works, because if they don't it isn't working.***
>
> To that end, I have asked Justice Monica Márquez, who will be Colorado's next Chief Justice, and State Court Administrator Steven Vasconcellos to lead an assertive *Colorado Judicial Branch Workplace Culture Initiative*.  While they will be leading this effort, the rest of the court and I will be laboring oars as well.  Together, we will navigate the choppy waters we find ourselves in.
>
> Boatright ILG Cover Ltr. (Appendix 18), p. 6. (Emphasis added).

With respect to both the Troyer-Mitchell Report and the ILG Report, the Justices did nothing to correct public misrepresentations and misunderstandings as to the scope, validity, and relevance of the findings presented.  Specifically, the Justices encouraged impressions that their own contracted-for investigations (otherwise prohibited by Canon Rule 2.9) validated the Court's previously pre-announced exonerations of the Justices and others involved in the Masias Controversy.  *See* discussion *supra* at p. 146.  Like Troyer and Mitchell, Elizabeth Rita and Ann McCord have not been asked if they were aware of the Code's prohibition against judicial fact investigations contained in Canon Rule 2.9(C) when they contracted for and conducted their investigation.  Likewise, Rita and McCord have not been asked hypothetically if they had been

157

aware of the prohibition in Canon Rule 2.9(C), whether proceeding with their investigation would have violated Colo. RPC 8.4(f) (prohibiting attorneys from knowingly assisting judges violate the Code).

**Contracted-for investigation of former Chief Justice Coats by the Office of Attorney Regulation Counsel and the Legal Regulation Committee.**

Through a March 21, 2021 posting on its website, OARC announced that it had opened an investigation into former Chief Justice Coats as to the Masias Controversy and Masias Contract. Through the Chair of the Legal Regulation Committee, outside counsel Wendy Muchman and James Grogan were appointed to conduct the investigation.  OARC further explained that pre-filed attorney regulation proceedings are generally confidential, but that C.R.C.P. 251.31(b)(3) (2021) allowed the disclosure of the "pendency, subject matter, and status" of the investigation because "[t]he proceeding is based on allegations that have become generally known to the public."[215]

According to C.R.C.P. 242.41(b)(2), attorney regulation cases that are dismissed prior to the filing of a formal complaint remain confidential absent the subject attorney/judge waiving confidentiality.

On January 20, 2023, the Legal Regulation Committee (the LRC) issued a statement closing the investigation into Chief Justice Coats' conduct.[216]  The statement provided, in material parts:

> Based on the investigation, the Committee determined that it cannot be proved by clear and convincing evidence that former Chief Justice Coats engaged in any behavior that would constitute a violation of the Colorado Rules of Professional Conduct as it concerns the awarding of the contract. However, the Committee did conclude that, during his tenure as chief justice, Justice Coats did not provide appropriate supervision of staff, and in doing so, failed to adhere to minimal standards of good governance. He displayed a lack of attention to the dysfunctional and toxic operations of the State Court Administrator's Office and made no effort to intervene. Nevertheless, the failure to supervise here does not constitute a violation of the Colorado Rules of Professional Conduct.
>
> Based on the evidence provided by outside counsel, the Committee believes that there is clear and convincing evidence that the former

---

[215] Statement of the Office of Attorney Regulation Counsel, March 15, 2021.  C.R.C.P. 251.31 (2021) has since been recodified as C.R.C.P. 242.41.

[216] Statement of the Legal Regulation Committee Re: Request for Investigation of Nathan B. Coats, January 20, 2023 *available at* https://coloradosupremecourt.com/PDF/1.20.23 %20%20Rev%20Statement%20of%20the%20Legal%20Regulation%20Committee.pdf.

158

> Chief Justice violated the rules with respect to his duty to report
> what appeared to be improper conduct of other lawyers which
> contributed to the ongoing consideration of awarding the contract.
> However, he was not made aware of such conduct until after the
> contract was awarded. When he was made aware of the conduct,
> he took action to cancel the contract.

Curiously, while the LRC concluded that Chief Justice Coats did not "provide appropriate supervision of staff and . . . failed to adhere to minimal standards of good governance," it did not analyze how the Colo. RPC 8.4(f) requires compliance with the Code, including Canon Rules 2.5 (Competence) and 2.12 (Supervisory Duties). Moreover, even though the LRC found sufficient evidence to charge Chief Justice Coats with a failure to report the misconduct of other attorneys, the LRC excused the suspected violation on grounds that Coats only became aware of the attorney misconduct after the Masias Contract was "awarded."

By not requiring Coats to waive confidentiality under C.R.C.P. 242.41(b)(2) as a condition of its dismissal, the LRC suppressed its investigation report from public disclosure.[217]  The LRC has not disclosed what, if any, disciplinary action was taken as to "what appeared to be improper conduct of other lawyers."

---

[217] Through his testimony to the Joint Judiciary Committee at the Judicial Department's February 1, 2023 SMART Act Hearing, Chief Justice Boatright confirmed the intentionality and the Justices' awareness of the LRC keeping the investigation report "confidential."  Chief Justice Boatright also confirmed that, ultimately, by authorizing disclosure to this Commission, the Court directly controlled access to the investigation report.  Chief Justice Boatright stated:

> I do think that the information flow is going very well. I've not
> received any feedback that judicial discipline has not been
> receiving the documents that they've requested. It's my
> understanding that they've been given all of the documents that
> were provided to the independent investigators. *We've also
> consented to the release of the Office of Attorney Regulation
> Counsel report that came out. I've not seen it because it is
> confidential, but we have authorized the release of that to judicial
> discipline.* So, we're trying to be as forthcoming as we possibly can
> in all of this. I have not received any information that people are
> dissatisfied with the flow of information. That's not risen to me at
> this point.  (Emphasis added).
>
> *Hearing on the Colorado Judicial Department's annual SMART
> Act reporting before the Joint Judiciary Comm.*, Colo. Leg.,
> February 1, 2023; Appendix 27(v), p. 6:31-38.

159

As previously noted, both the Attorney Regulation Counsel and the LRC are appointed by and report directly to the Colorado Supreme Court.  *Supra* at note 15.[218]  The lack of independence inherent in this structure raises an additional basis to suspect that the Colorado Supreme Court's indirect control over the LRC investigation and the records of that investigation was yet another instance of the Justices violating the prohibition against judicial fact investigations contained in Canon Rule 2.9(C).  Like Troyer, Mitchell, Rita, and McCord, Wendy Muchman and James Grogan have not been asked whether they were aware of the prohibition contained in Canon Rule 2.9(C) when they contracted for and conducted their investigation.  Moreover, Muchman and Grogan have not been asked whether their contract and the degree of supervision/control exercised by the LRC and OARC preserved the investigators' independence and adequately protected against violations of Colo. RPC 8.4(f) (prohibiting attorneys from knowingly assisting judges violate the Code).

**FBI Investigation**

At approximately the same time as this Commission appointed outside Special Counsel to investigate the *Coats* matter, media reporting recognized that the Federal Bureau of Investigation had also opened an investigation, having interviewed at least four witnesses.  Migoya, *supra* note 2.

Public corruption is identified as the FBI's "top investigative priority" and "a fundamental threat to our national security and way of life."[219]  Similarly, the U.S. Department of Justice has

---

[218] One observer and media reporting at the time have highlighted the reasonable appearances of impropriety created by a panel primarily composed of members appointed by Chief Justice Coats publicly declining to impose discipline for his otherwise recognized attorney misconduct.

> [I]n 2023 the Colorado Legal Regulation Committee announced that 'there is clear and convincing evidence' that the former chief justice 'violated' the [Rules of Professional Conduct] (but not as to the more sensational allegations).  However, the committee concluded that discipline was not warranted.  While such a result is plausible to those in the legal profession, it likely appears contradictory to members of the public.  Moreover, the media coverage of this result emphasized that 'nearly all the members of the panel [deciding not to discipline the former chief justice] were appointed by him.'

> Prince, *supra* note 12, p. 112; *see also* David Migoya, *Committee that Cleared Former Chief Justice Coats Need Not Have Followed Rule Requiring It to Step Aside: Legal Ethics Expert*, Denver Gazette, January 29, 2023; *accord* Colo. RGCJP 7(a)(2).

[219] FBI webpage, available at https://www.fbi.gov/investigate/public-corruption.

160

consistently reaffirmed its recognition of the prosecution of public corruption crimes as one of its "top priorities."[220]

In this context, it is unclear why the FBI's investigation apparently stalled and why the Department of Justice has not yet pursued prosecutions of any of the individuals involved in the Masias separation agreement, the Masias Contract, the allegations of the April 15, 2019 anonymous fraud report, and the related (and repeated) withholding of material information from SCAO's FSD and the OSA. The Justices' use of approximately $350,000 of public funds for their personal benefit in contracting for otherwise ethically prohibited investigations presents additional grounds for potential federal criminal liability. It is equally unclear what, if any, cooperation has been provided by the Judicial Department and the Department of Law as the FBI has conducted its investigation to date.[221] Given the substantial conflicts of interest that exist due to the Justices' efforts to retain former U.S. Attorneys for the District of Colorado as part of their self-serving, ethically prohibited, and contracted-for investigations, it is also unclear why the U.S. Department of Justice has not pursued prosecution through attorneys and staffing from outside Colorado.[222] The conflicts with the U.S. Department of Justice's Denver Office

---

[220] In 2008, former U.S. Attorney General Mike Mukasey said, "The investigation and prosecution of public corruption is among the highest obligations of law enforcement, and it should come as no surprise that I consider it to be one of the top priorities of the Department of Justice." Fact Sheet: The Department of Justice Public Corruption Efforts, available at https://www.justice.gov/archive/opa/pr/2008/March/08_ag_246.html.

[221] The letter Vasconcellos submitted to the Interim Committee on Judicial Discipline, dated July 11, 2022, describes the disclosure of unspecified documentary materials to the FBI and the Department of Justice in conjunction with yet another "access agreement" required by the Judicial Department. 7/11/2022 Vasconcellos Ltr. (Appendix 27(s)(ii)(9)(m)), *supra* note 131, pp. 2-3. It is unclear why the Department of Justice would consider, let alone, accept the Judicial Department's "access agreement" self-imposing limitations upon the Department of Justice and the FBI's investigative authority. Again, it appears that the Justices (assisted by the Attorney General's Office) intentionally interfered with, obstructed, and attempted to control an outside investigation of the Justices' own probable criminal and ethical misconduct.

[222] *Compare with* Alexander Silver, THE MAILBOX CONSPIRACY: THE INSIDE STORY OF THE GREATEST CORRUPTION CASE IN HAWAI'I HISTORY (2nd ed. 2024) (detailing unnecessarily high factual threshold for DOJ to initiate investigation of corruption in state and local law enforcement; describing how the assignment of a federal prosecution team from California was ultimately necessary to address systemic corruption within the Honolulu Police Department, the Honolulu Prosecutor's Office, the Honolulu Police Commission, and the City and County of Honolulu's government (the Kealoha Controversy)); *see also* U.S. Attorney's Office, Southern District of California, *Press Release: In "Staggering" Conspiracy, Former Police Chief, Prosecutor, and Police Officers Sentenced for Framing an Innocent Man with a Crime*, December 2, 2020 (noting multi-jurisdiction/multi-agency investigation and prosecution of the Kealoha Controversy) *available at* https://www.justice.gov/usao-sdca/pr/staggering-conspiracy-former-police-chief-prosecutor-and-police-officers-sentenced.

161

addressing these matters are further extended by the fact that Justice Hart's husband is employed in that Office.[223]

The Masias Controversy is directly comparable with Hawai'i's historically significant and ongoing Kealoha Controversy (2013-Present), which revolves around corruption involving former Honolulu Police Chief Louis Kealoha and his wife, former Honolulu Deputy Prosecuting Attorney Katherine Kealoha. Ultimately, the Kealoha Controversy has been partially resolved with the federal criminal convictions of many top-level government officials and through related civil actions. With the Kealoha Controversy and the Masias Controversy viewed together, an almost identical systematic erosion of the City and County of Honolulu Ethics Commission occurred through attacks on that Commission's composition and the ouster of its Executive Director. Silver, *supra* note 222 at p. 174. The attacks against the Ethics Commission rendered that Commission meaningless and resulted in the non-prosecution of the many ethical violations involved in the Kealoha Controversy. *Id.* at p. 240. After the Kealoha Controversy first became public, the Honolulu Police Commission (consistent with this current Commission's protection of the Justices) also refused to investigate allegations of official misconduct by Chief Kealoha. *Id.* at p. 178. In another striking parallel, the Kealoha Controversy involved Chief Kealoha misappropriating $100,000 of taxpayer funds for personal public relations support. *Id.* at p. 175. Also, analogous to the Justices and this current Commission allowing Judge Scipione to retain an over $120,000 windfall for his judicial misconduct, Chief Kealoha remained on paid leave after receiving a target letter from the DOJ and then, through the Honolulu Police Commission, he negotiated retirement in good standing (allowing him to retain full pension benefits) with an additional $250,000 cash payout. *Id.* at p. 181.[224] The Justices' enabling of the indictment of former Senator Pete Lee based upon false information provided by OARC is also analogous to the wrongful prosecution of Katherine Kealoha's uncle, Gerard Puana, which precipitated the initial exposure of the underlying facts of the Kealoha Controversy. When outside federal law enforcement resources were necessary to address comparable systemic official corruption in the Kealoha Controversy because of inherent conflicts of interest, it is unclear why a similar assignment to an outside jurisdiction has not occurred as part of the FBI's investigation and the DOJ's evaluation of the Masias Controversy.

---

[223] Michael Karlik, *Justice Melissa Hart Speaks Out About Threats Following Trump Disqualification Decision*, COLORADO POLITICS, September 6, 2024 ("Hart elaborated that her husband, who works for the U.S. Department of Justice, 'fears he will lose his job depending on the new administration. Judges live in fear.'").

[224] Ultimately, the negotiated payoff resulted in the indictments of Donna Leong, former City and County of Honolulu's former Corporation Counsel (City Attorney), Max Sword, former Chair of the Honolulu Police Commission, and Roy Amemiya, the Honolulu City and County's Managing Director. Leong, Sword, and Amemiya were charged with conspiracy to defraud the federal government. Silver, *supra* note 222 at p. 239. More recently, surreptitious recordings of discussions about the payout and contemporaneous objections to it have been made public. Lynn Kawano, *Secret Recordings Offer New Evidence in Corruption Case Against 3 Former City Executives*, HAWAII NEWS NOW, January 23, 2024.

**The Colorado Supreme Court's Involvement in the Consideration of Legislative Reforms to Colorado's Judicial Disciplinary System**

The Justices' involvement in the legislative process focused primarily on retaining the Colorado Supreme Court's and the Judicial Department's abilities to control access to resources and information, to control the outcome of its "independent" investigations, and to limit this Commission's abilities to meaningfully investigate the Masias Controversy. Given the Justices' awareness of their conflicts of interest as to the Masias Controversy, their non-recusal from legislative engagement presents clear appearances of impropriety if not outright misconduct under the Code. *See Nuss*, *infra* at p. 272 (recognizing justice's investigative discussions with legislators as violative of Code). A full and thorough investigation of the Justices' probable violations of the Code through their legislative advocacy will require obtaining all communications between the Justices and/or SCAO employees (Judicial Department lobbyist Terry Scanlon in particular) and other judges, outside interest groups, and/or legislators / legislative staff as such communications related to considered reforms of the judicial disciplinary system.[225] The scope of such an inquiry, however, is beyond the scope and limited purpose of this RFE (i.e., to state a reasonable basis for judicial discipline and formal investigation according to Colo. RJD 13(b) and 14)).

***The Justices, directly as well as through other judges and Judicial Department employees, lobby against legislative reforms and pursue a pre-planned / coordinated public relations strategy premised upon the Court's self-serving investigations.***

***<u>Chief Justice Boatright and Justice Márquez testify at the initial April 14, 2022 Senate Judiciary Committee Hearing on SB 22-201 after the Justices had previously lobbied Legislators, legal interest groups, and other judges to oppose reform of Colorado's judicial discipline system pending the pre-announced outcomes of the Court's contracted-for "independent" investigations.</u>***

When Senate Bill (SB) 22-201 (which ultimately resulted in substantial structural reforms to Colorado's judicial discipline system) was first introduced, Chief Justice Boatright's response on behalf of the Court and the Judicial Department was marked. The Department opposed statutorily imposed duties to report judicial misconduct to this Commission. Instead, Chief Justice Boatright asked the Legislature to adopt a system that would incentivize the Department placing pressure on vulnerable reporting parties to dismiss their complaints. Boatright called for a "more victim-centered model for complaints that allows the victim to have a say in how the complaint is addressed and ***provides options like mediation in lieu of a disciplinary process*** for the judge."[226] (Emphasis added). In a prelude to using outside interest groups to advocate on the

---

[225] *See* Appendix 30, pp. 15, 28, 29, 40, 43, 45-46, 71-72 (public records requests for legislative communications; response by Judicial Department); *see also supra*, note 87 (describing context of Judicial Department's constructive denial of records access).

[226] *Compare* Colo. Jud. Dep't, Written Testimony Regarding SB 22-201, April 14, 2022; Appendix 27(m)(ii)(1), p. 1 (hereinafter "04/14/22 Judicial Dep't Written Testimony") *and Hearing before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m)(i), p. 10:23-25.

Justices' behalf, Boatright emphasized the role of "stakeholders" and needs to consider the anticipated outcomes of the Courts' own "independent" investigations.  Boatright stated:

> There is a risk that a statutory requirement for automatic and immediate referral to the Commission may chill complaints.  The bill should allow room for creative discussions with stakeholders concerning these issues, ***taking into account the information learned from the investigations***.  04/14/22 Judicial Dep't Written Testimony, p. 1. (Emphasis added).

Additionally, Chief Justice Boatright contended that SB 22-201's expectations requiring disclosure of records to this Commission notwithstanding any assertions of privilege or confidentiality the Department might raise would force the Department to "violate the law." Specific examples that Chief Justice Boatright provided as "expos[ing] the state to financial harm" included records from employment discrimination cases, non-disclosure provisions in employment "separation agreements," and "legal advice from the Attorney General's Office." *Id.*, p. 2.

During the initial April 14, 2022 hearing before the Senate Judiciary Committee, Chief Justice Boatright made comments substantially similar to his written testimony, emphasizing the need to have the results of the contracted-for investigations before considering structural changes to the judicial disciplinary system.  The Chief Justice's testimony also sought to imply that the co-sponsors of SB 22-201 were vouching for the credibility of the Court's contracted-for "independent" investigations through their participation in the selection panel.  Boatright further sought to dilute the composition of the then-proposed Interim Committee with the inclusion of interest groups (with whom the Justices were lobbying), judges, and other non-legislators.

> **Chief Justice Boatright**
> What I want to do, though, is I want any decisions that we make with regard to reform, to be transparent, inclusive, and thorough. ***You know, what I want to make sure of is that we get the results of these investigations.*** And Senator Lee and Senator Gardner, you were on the panel that helped select the investigators. ***You know these are truly independent investigators*** that are going to come forward with findings and recommendations. And I committed to making the results of that public and I still will do that. And we will address any wrongdoing. And I think this interim committee is an excellent way of going about it. Obviously, I would like to see the Committee be a little more inclusive in terms of having some judges, some members of the bar, the affinity bars, certainly the women's bar on there, I also get how big can a committee be, but you know that that is primarily a concern that I would like to see amended[.]

* * *

I think the one other area that I did not touch on, is the document production should be done in a responsible manner, that doesn't expose the state to financial liability. And I think that's been at the core of some of the difficulties that we've had in terms of information sharing. We actually, under the current MOU are only supposed to provide records from HR investigations. And we're willing to go above and beyond that, if certain agreements can be reached, we just want to make sure that we're not exposing the State and the Department to financial liability. It's called an access agreement.

* * *

**Sen. Gardner**
And I just wonder if you want to take a moment to give your view of where we are and what your commitment has been and how we're getting there in the face of a bunch of headlines that have been repeated here today.

* * *

**Chief Justice Boatright**
Thank you for that question, Senator. Yeah, this has been really difficult for the Branch to just sit there and take, you know, hit after hit with regard to the headlines. ***But what I would say is we have confidence in the investigations.***

* * *

So, you know, the premise of the memo is that these things were investigated and then have not been properly turned over to judicial discipline. And what I am saying is, ***let's allow the <u>private</u> investigations to come forward***. ***Let's see what the results are. And then let's decide what the problems are.*** And we can move forward from there. Thank you for the question.

* * *

***The other thing, quite frankly, that we have consciously not done, is we tried not to get ahead of the independent investigations***. And, and I know they've taken much longer than any of us had hoped that they would. But I also think that that's going to be a reflection of the thoroughness with which they are doing it. And we know that they're going to make a number of recommendations. You know, because they've asked questions about them. And we're anxious to implement any changes that are made as a result of that.

165

> And one other thing that I want to say in response to your comment about the bribery and things like that is, I do think that one thing that I'd like to see us examine in the summer group, as I mentioned earlier, ***is something that is much more victim centric***, because one of the things that we need to be very, very conscious of is the power differential between the judges and the clerks and the reporting. And, you know, I am very comfortable with regard to the information that we have with regard to the so-called memo, but the unknown is going to be they surveyed 4,000 employees. And I don't know what's going to come forward in terms of people saying I didn't feel comfortable reporting something.[227]  (Emphasis added).

With respect to his request for a "victim centered" approach, Chief Justice Boatright explained that he had "a reach out from the 10th Circuit Chief Judge Tymkovich" about how judicial discipline is handled within the federal court system.  Although the communications with Judge Tymkovich raise concerns about the creation of conflicts of interest within the federal courts, Chief Justice Boatright provided the following explanation:

> [O]ne area that I think we could make better is we need to make any type of reporting or discipline, much more victim centric. Victims need to be consulted about what necessarily happens. When this all happened, we checked with, we actually received a reach out from the 10th Circuit Chief Judge Tymkovich. And they talked about what they learned when they went through some problems. And they created an Office for Judicial Integrity, where, where complaints were referred, and then that office could then work with victims and try to reach some type of an accommodation. Sometimes, a victim may or may not want something referred where a judge could lose his or her job, it may just be that they want the conduct to stop. I mean, it could be everything from you're not giving a staff member sufficient time to pump if they've, you know, recently had a baby to just mispronunciation of a name or not recognizing gender pronouns correctly, maybe they just want correction. So, I think the system has worked. I've not seen flaws in the system. But can it be improved? Absolutely. And we support that.[228]

Chief Justice Boatright also presented the information sharing obligations under SB 22-201 as removing attorney-client privilege in the judicial disciplinary process.  It was unclear if Boatright

---

[227] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m)(i), pp. 6:27-36, 8:10-8:16, 8:37-9:7, 9:23-7, 14:15-28.

[228] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m)(i), p. 10:24-35.

166

was asserting the existence of an attorney-client privilege between judges and attorneys employed by the Judicial Department (including OARC) and the Attorney General's Office. Boatright stated:

> **Chief Justice Boatright**
> Well, particularly the need to give up confidential and privileged information. What I have concerns about is, regardless of whose privilege it is, by giving it to a third party, there's an argument that you have then waived that privilege, regardless of what that third party is going to do with it. I mean, we have in the Constitution, and in the statute, it says that that information shall be confidential. But it still raises an argument that it could be, constitute a waiver of that privilege. And I am concerned about the wording. It strikes me as being so broad, that even a judge who may be the subject of an investigation, potentially, although I can't imagine this is the intent, would have communications with his or her private lawyer then be made subject to discovery.[229]

During the April 14, 2022 hearing, Senate Judiciary Chair Lee directly asked why draft language in SB 22-201 that recognized continuing confidentiality and privilege did not address the Justices' concerns.  In response, Justice Márquez emphasized her understanding that a federal court would not recognize the Judicial Department's claims of confidentiality and privilege in the context of a federal employment action.  It is important to highlight the Justices' effort to protect the Judicial Department's otherwise questionable assertions of privilege and confidentiality in the context of federal litigation.  The dialogue between Judiciary Chair Lee and Justice Márquez included the following:

> **Senator Lee**
> It's on line 60 or page 16, line 26. Through the next page, it says the timely disclosure to the commission of information or materials, pursuant to this section by the department does not by itself waive any otherwise valid claim of privilege or confidentiality by the department. What I understand is the reticence of the judicial department to turn over information was confidential and privileged. And that was the repeated retort and response to a request for information. Is that language sufficient to satisfy that?
>
>           * * *
>
> **Justice Márquez**
> Thank you. Thank you, Madam Vice Chair. Senator Lee, in response to your question. I think the concern is it doesn't go far enough to ensure that disclosure of that type of information to the

---

[229] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m)(i), p. 12:26-34.

167

Commission would not be deemed a waiver, an example would be in an employment discrimination context. If an employee were to claim discrimination by a judge supervisor and raise a discrimination claim, and we were required to turn over all of this privileged information with respect to the Commission, the concern is that that same potential plaintiff who goes to federal court, the federal court is not necessarily bound by this statutory language regarding privilege. That's the concern.

\* \* \*

**Senator Lee**
And I don't want to get down in the weeds on the minutiae of privilege and confidentiality. But there is the idea that the federal court would be applying Colorado law. Isn't that the general rule? And that that this language would be minimally persuasive, and maybe binding on them? I mean, how could they ignore Colorado law?

\* \* \*

**Justice Márquez**
Thank you, . . . Senator Lee. It's our understanding that federal courts are in fact not bound by that. That's the concern.[230]

Viewed with repose, it now appears that Chief Justice Boatright and Justice Márquez were intentionally seeking to preserve the internal structures and mechanisms within the Judicial Department which have facilitated its "toxic" culture of intimidation, retaliation, and secrecy enforced through non-disclosure provisions and overbroad interpretations of confidentiality.

Indeed, the Justices' narrative about a "victim centric" approach took the Code of Conduct for United States Judges (the "U.S. Judges' Code") out of context. In reality, the relevant Canon 3(B)(6) of the U.S. Judges' Code prioritizes the need to protect the public from recurring misconduct through mandatory reporting and states:

(B) *Administrative Responsibilities.*

\* \* \*

(6) A judge should take appropriate action upon receipt of reliable information indicating the likelihood that a judge's conduct contravened this Code, that a judicial employee's conduct contravened the Code of Conduct for Judicial Employees, or that a lawyer violated applicable rules of professional conduct.

---

[230] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m)(i), p. 19:26-32, 20:4-11, 20:16-20, 20:25-27.

168

The Comment to Canon 3(B)(6) of the U.S. Judge's Code further explains:

> **Canon 3B(6)**. Public confidence in the integrity and impartiality of the judiciary is promoted when judges take appropriate action based on reliable information of likely misconduct. Appropriate action depends on the circumstances, ***but the overarching goal of such action should be to prevent harm to those affected by the misconduct and to prevent recurrence.*** A judge, in deciding what action is appropriate, ***may take into account any request for confidentiality made by a person complaining of or reporting misconduct.*** See Rules for Judicial-Conduct and Judicial-Disability Proceedings, Rule 4(a)(6) (providing that "cognizable misconduct includes failing to call to the attention of the relevant chief district judge or chief circuit judge any reliable information reasonably likely to constitute judicial misconduct or disability. A judge who receives such reliable information shall respect a request for confidentiality but shall nonetheless disclose the information to the chief district judge or chief circuit judge, who shall also treat the information as confidential. Certain reliable information may be protected from disclosure by statute or rule. ***A judge's assurance of confidentiality must yield when there is reliable information of misconduct or disability that threatens the safety or security of any person or that is serious or egregious such that it threatens the integrity and proper functioning of the judiciary.*** A person reporting information of misconduct or disability must be informed at the outset of a judge's responsibility to disclose such information to the relevant chief district judge or chief circuit judge. Reliable information reasonably likely to constitute judicial misconduct or disability related to a chief circuit judge should be called to the attention of the next most-senior active circuit judge. Such information related to a chief district judge should be called to the attention of the chief circuit judge."). (Emphasis added).

The corrosiveness, oppression, and public danger created through Chief Justice Boatright and Justice Márquez's insincere advocacy for the necessity of a "victim centered" approach later played out in how this Commission handled *Matter of Timbreza*, 2023 CO 16 ("*Timbreza II*"). Despite stipulated facts suggesting probable cause to investigate a possible Sexual Assault under § 18-3-402, C.R.S., or at least possible misdemeanor Unlawful Sexual Contact under § 18-3-403, C.R.S., the protection of the victim's confidentiality appears to have prevented further reporting and referral to law enforcement. Given the stipulated facts in ¶¶ 6-7 of *Timbreza II*, the public should ask why the underlying circumstances were not referred to law enforcement for criminal investigation. This question is particularly apt with the risks of recurring circumstances given Judge Timbreza's previous public discipline for excessive alcohol use and DWAI (involving a single vehicle accident) in *Matter of Timbreza*, 2019 CO 98 ("*Timbreza I*"). Judge Timbreza was also disciplined through the attorney regulation system (directly overseen by the Colorado Supreme Court), which, likewise, did not report or refer the circumstances to law enforcement.

169

*People v. Lance Phillip Timbreza*, 23PDJ028.  As presented through *Timbreza II*, the Justices'
pressure and advocacy for a "victim centered" approach functioned as an indirect means for the
Justices' to, once again, misuse the prestige of their judicial offices to minimize accountability
for another judge's ultimately proven misconduct.

At the time Chief Justice Boatright and Justice Márquez expressed public support for SB 22-201
and presented their testimony at the April 14th hearing, press reporting revealed that they had met
with legislators individually in March 2022, prior to the bill's submission, in order to undermine
or otherwise kill the bill by delay.[231]  Specifically, Justices Boatright and Márquez sought to
delay SB 22-201 until after publication of final reports from the Court's contracted-for
"independent" investigations (which ultimately were not released until the mid-Summer of
2022).  The interactions with legislators were described as coercive and influenced by the
prestige of the Justices' positions.  *See* Canon Rules 1.3 (prohibiting abuse of prestige of judicial
office) and 3.1(D) (prohibiting extrajudicial activities that reasonable person might perceive as
coercive).  As explained by *Denver Post* reporter Shelly Bradbury:

> Earlier that month, on March 7, Boatright, Márquez and [Judicial
> Department Lobbyist Terry] Scanlon met with [Senator Julie]
> Gonzales about the reform bill. At that point, the bill was still a
> draft and Gonzales had not yet seen it, she said.
>
> The justices had "several concerns," and suggested the bill should
> be delayed, Gonzales said, adding they did not seem to be trying to
> stop the bill entirely during the 45-minute meeting, but were
> concerned about the timing of the reform effort.
>
> "I took the meeting because I am interested to hear their
> perspective, but I will state I came away from that meeting
> surprised over their raising concerns on a draft of a policy I had not
> yet had the opportunity to review," she said, adding she'd normally
> delay meetings with stakeholders until a bill is introduced or until
> she'd had a chance to talk with the bill's sponsors, but made an
> exception in this case in light of who requested the meeting.
>
> "The appropriate and polite thing to do is to sit down and have a
> meeting with the chief justice of the Colorado Supreme Court," she
> said. "You know? How do you say no to that?"
>
> Bradbury, *supra* note 231.

In addition to describing interactions between the Justices and legislators, the *Denver Post* article
described a coordinated effort within the Judicial Department that included drafting other judges
to lobby or take positions favorable to the Justices on the proposed judicial discipline reforms.

---

[231] Shelly Bradbury, *After Judicial Scandal, Colorado Supreme Court Justices Privately Sought
to Delay Reform Bill: Members of High Court Publicly Proclaimed Support for Reform, but
Privately Raised Objections with Lawmakers*, DENVER POST, April 13, 2022.

170

> The behind-the-scenes effort to influence the bill and the state
> Supreme Court's months-long back-and-forth with the Colorado
> Commission on Judicial Discipline was detailed to The Post by
> lawmakers and in 713 pages of documents and emails obtained this
> week under the state's public record laws.
>
> "Not to be alarmists (sic), ***but the discipline issue is in some ways
> getting more high-stakes and will probably be more public soon***,"
> judicial branch legislative liaison Terry Scanlon, the department's
> lobbyist, wrote in a March 22 email to chief judges Michelle
> Amico and James Hartmann, seeking a meeting about the bill.
> Neither chief judge returned requests for comment Wednesday.
> *Id.* (Emphasis added).

In a separate email, Chief Justice Boatright encouraged judges to inform the Judicial Department
if they planned to address the proposed reforms.

> Boatright said he plans to testify about the bill at a Senate Judiciary
> Committee meeting Thursday, and told judges to loop in the
> Judicial Department if they plan to follow suit.
>
> "***Our ability to advocate on behalf of the Department is
> strengthened when we speak with one voice and when we work
> together***," he wrote.  *Id.* [232] (Emphasis added).

When confronted with these circumstances at the April 14, 2022 hearing, Boatright back-peddled
and attributed his and Justice Márquez's meeting with Senator Gonzales to his perceptions of the
scope of the then-yet to be introduced legislation.  Boatright did not explain why the highly
unusual meeting occurred before the introduction of the legislation.  As quoted, Chief Justice
Boatright stated:

> 'When we met, we had a real fear that something vast was going to
> happen," Boatright said. "These are really complicated issues and I
> think the interim summer group (that would be created by the bill)

---

[232] Chief Justice Boatright's request for coordination of the Judicial Department's messaging
reinforced pressures that were placed on judges who were themselves aggrieved by judicial
misconduct not to speak out.  *See Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205
before the H. Judiciary Comm.*, Colo. Leg., March 15, 2023 (testimony of Vice-Chair David
Prince); Appendix 27(w), p. 45:9-28 (describing culture of intimidation and chilling effects
within Judicial Department).

171

> is going to be an excellent way to sort throughout a number of
> these things… when we met, it was a very different bill.'[233]

In an email sent to all judges shortly before the April 14, 2022 hearing, however, Chief Justice Boatright disparaged Senate Judiciary Committee Chair Pete Lee, who co-sponsored SB 22-201, for not being open to a "dialogue" "prior to introduction" and generally criticized the substance of the bill.

> "We had hoped to have a more meaningful dialogue with the prime
> bill sponsor prior to introduction, but he has largely not engaged
> with us or sought our feedback in the process," Boatright wrote.
>
> "Although I think there are serious flaws in the bill that would
> have significant unintended consequences and some of the
> language is unnecessarily inflammatory, there are some provisions
> of the bill that I wholeheartedly support."  Bradbury, *supra* note
> 231.

Separately, Scanlon and then-Colorado Court of Appeals Judge John Dailey had an email exchange in which Scanlon described the Department's relationship with Lee and the Legislature as "challenging."  As explained in the *Post's* article:

> As work progressed on the reform bill, Scanlon, the Judicial
> Department lobbyist, said in a March 17 email to Colorado Court
> of Appeals Judge John Dailey that the department's relationship
> with Lee and, "I guess, more largely the General Assembly" was in
> "a challenging stage."
>
> The pair were discussing a letter Lee sent about another bill he
> sponsored aimed at reducing implicit bias in jury selection that has
> since been defeated.
>
> "I've proposed an outline of the response," Dailey wrote,
> suggesting they tell the state senator: "Thanks. You've got a few
> things wrong. ***And don't try to tell the supreme court what to do.***"
> *Id.*  (Emphasis added).

In addition to the reporting in *The Denver Post*, reporting in *The Denver Gazette* further detailed how the Justices' engagement with Legislators and various special interest groups presented

---

[233] Shelly Bradbury, *Colorado's Chief Justice Acknowledges "Inadequacies" in State's System for Disciplining Judges: Chief Justice Brian Boatright Testifies Before Senate Judiciary Committee During Hearing on Reform Bill*, DENVER POST, April 15, 2022; *see also Hearing before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m)(i), p. 24:5-7,24:11-12 .

appearances of impropriety and coercion.[234]  The details of the Justices' legislative engagement and influence upon outside special interest groups has not been investigated beyond reporting in the press.[235]  Senator and then-Judiciary Committee Vice-Chair Gonzales, with support from her contemporaneous meeting notes, expanded on the statement she previously provided to the *Post*:

> One legislator who agreed to speak publicly - Sen. Julie Gonzales, vice chair of the Senate judiciary committee that on Thursday is scheduled to take up the bill - recalled a March meeting with Boatright and Márquez in which the two expressed a desire to see the bill, which had not been introduced yet, put off. Gonzales said they also said they worried the Supreme Court would have to take up the constitutionality of any changes the legislature makes to how judicial discipline currently works.[236]
>
> The bill was introduced late Monday.
>
> 'Chief Justice Boatright stated that another concern was that they did not want to find themselves in the position of ruling that this bill was unconstitutional, and that he did not want to create a constitutional crisis,' according to notes Gonzales took of the meeting, copies of which The Denver Gazette acquired under an open-records request.  Migoya, *supra* note 234.

The Justices' arguably improper direct and indirect lobbying created confusion during the April 14, 2022 Senate Judiciary Committee hearing, including causing Senator Bob Gardner (who is

---

[234] David Migoya, *Justices Lobbying Against Judicial Discipline Bill*, DENVER GAZETTE, April 14, 2022.

[235] The Judicial Department has constructively denied access to the records of interactions between the Justices, other judges, Judicial Department employees, employees of the Attorney General's Office (acting on behalf of the Justices), and the Legislature.  Appendix 30, pp. 20, 24, 28, 29, 40, 45, 71-72; *see also supra*, note 87 (describing context of Judicial Department requiring excessive $11,820 deposit as condition for production of *any* responsive records).

[236] It should not be lost that Chief Justice Boatright and Justice Márquez were threatening to prospectively use the Colorado Supreme Court's authority to overturn a yet to be enacted statute as unconstitutional.  Providing the equivalent of an advisory opinion (i.e. pre-announcing an outcome) and threatening use of the Court's power to achieve the Justices' personal interests in suppressing meaningful inquiry into the Masias Controversy was a blatant abuse of the Justices' power and likely violation of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.6, 2.9, 2.10, 2.11, 3.1, and 4.1. Throughout the legislative process, the Justices would rely upon the Attorney General's Office to oppose various provisions in SB 22-201 and to make similar "separation of powers" and "confidentiality" objections on their behalf.  *Infra*, p. 177.  These indirect efforts further implicate violation of Canon Rule 2.12.

also a practicing attorney) to defend the Justices without examining the propriety of their lobbying efforts under the Code.[237]  During his opening remarks, Senator Gardner stated:

> As many of you have met with members of the judicial branch, and the Commission on Judicial Discipline, and contrary to what might be said in the paper, all of my communications and all of their communications with me have been totally appropriate. I have agreed with both the Commission on Judicial Discipline and with the Court and have disagreed with them as well. I find us as a general assembly, serving in something of a role of what we are, the people's representative, to sort through this and find the right balance. Again, ***I was quite concerned when I picked up, I didn't pick up the paper this morning, I picked up my tablet and read, read the two major daily newspapers of both my community and out of Denver and was distressed because there seemed to be a tenor of the articles there that somehow this bill had led to the judicial branch, improperly lobbying us or something like that.*** That just has not been the case. I want to be very clear, with the press that is listening here. That certainly is not, in my view been the case, nor has anything about it, in my view, been out of line or inappropriate for a branch of government and an independent commission of the government to communicate with me as a legislator about the legislation that I'm considering, that I'm sponsoring and how it's to be done. We as elected state senators, and over in the other chamber, state representatives, have an independent charter from our constituents to do what we are doing. And we should not feel that anyone who approaches us from any other branch of government is, is doing anything other than

---

[237] Senator Gardner defended the Justices in the context of himself having been subject to a 2021 Senate Ethics Committee hearing that, ultimately, resulted in the unanimous dismissal of a judicial discipline-related complaint submitted by attorney Chris Forsyth.  Marianne Goodland, *Republican Sen. Bob Gardner Facing Ethics Complaint*, COLORADO POLITICS, June 11, 2021; Marianne Goodland, *State Senate Ethics Committee to Take Up Complaint Against Sen. Bob Gardner*, COLORADO POLITICS, June 24, 2021;  Marianne Goodland, *State Senate Ethics Committee Holds First Meeting on Gardner Complaint, No Resolution Reached*, COLORADO POLITICS, June 25, 2021; Marianne Goodland, *State Sen. Bob Gardner: Ethics Complaint Groundless*, COLORADO POLITICS, June 11, 2021; Pat Poblete, *Bipartisan Ethics Panel Unanimously Dismisses Complaint Against Sen. Bob Gardner*, COLORADO POLITICS, July 12, 2021.  Ironically, the complaint that Forsyth (an advocate of transparency in judicial discipline) submitted alleged that Senator Gardner had violated ethics rules by reporting a colleague's performance and ethical concerns about a senior judge to the Judicial Department (which administratively oversees the Senior Judge Program).  *Supra*, Goodland (6/11/21).

174

> advocating for a position of what they believe is best, given their constitutional duties and responsibilities. (Emphasis added).[238]

Partly in response to Senator Gardner's observations and directly in response to the Justices' improper lobbying efforts, Senator Lee attempted to refocus the discussion on the practical need for the reforms proposed through SB 22-201, as initially submitted. Senator Lee stated the following in his opening remarks:

> I know that people are imperfect, and that sometimes, impropriety and even corruption occurs. When it does, and particularly when misdeeds go unaddressed or are covered up, confidence in the legal system itself is undermined. When that occurs, we are no better than a tribal fiefdom run by despotic leaders who ignore the rule of law. If there is a belief that justice can be bought, that the scales of justice can be tipped, that money, influence and power trump justice, that we are a nation of men not laws, then our democracy at its core is threatened. This bill is prompted by the judicial misconduct scandals that have plagued our state for almost three years. There have been allegations of illegal activity, possible payoffs, and a cover up at the highest level of our judiciary. We do not know as a factual matter what has taken place in the courthouses across our state. We don't know because the institution charged with addressing the misconduct, the Commission on Judicial Discipline has been marginalized, ignored, and rendered powerless.

* * *

> Some who oppose this bill are engaged in a campaign to deny it, to undercut it, or to defeat it--the bill. To those, I say we have waited three years and the time to act is now. Opponents will claim that the bill is unconstitutional and violates separation of powers principles. To them, I respond that the bill was drafted and reviewed by experienced and competent staff at the Office of Legislative Legal Services, who have written thousands of bills. They know the issues and they don't write unconstitutional laws. Opponents will say that investigations are underway and let's await the results. To them, I say we have waited over two years and it's time to act. When recommendations from the investigations are suggested, we can include them in bills coming from the interim legislative committee that this bill sets up or any other bills that are appropriate. Opponents will argue that we should not do something this session, because there's not enough time. They say we need more stakeholder engagement. To them, I say we have the

---

[238] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m)(i), p. 1:27-2:9.

175

> responsibility to begin the discussion of this issue in this
> deliberative body of the Senate. We need to invite the public to
> express their views. We also need to hear from the lawyers, the Bar
> Associations, the specialty bars, the judges, and let them express
> their views on this issue right now. As a former defense attorney
> and present litigator, I recognize these arguments for what they are,
> I am committed to having a bill to begin to address this scandal
> that has undermined public confidence in our judicial system.[239]

At the initial April 14, 2022 hearing, Chief Justice Boatright openly acknowledged the Justices' and the Judicial Department's collective efforts to lobby bar associations and others to oppose SB 22-201 (prior to its submission at the legislature).  Boatright stated:

> [Y]ou know, when we heard about all of this happening, *we got the bar associations, the diversity bar associations, our consumers to come forward*. And I think if there are people who are identified as victims, they should be able to come forward and talk about, you know, different issues with regard to this. So I think when we [(Boatright, Márquez, Scanlon, and Gonzales)] met, it was a very different bill.[240]

Also, in an apparent effort to increase the influence of the Judicial Department in the proposed Interim Committee, Chief Justice Boatright repeatedly argued for the Interim Committee to include judges, bar associations, and other interest groups similar to those the Justices had already engaged with to lobby against SB 22-201.  As explained by Justice Boatright:

> Thank you, Madam Chair. Yeah, in a perfect world, I'd like to see,
> you know, three judges on there--from a small district, a larger
> district, and then someone who's probably experienced being the
> Chief through judicial discipline. I also think that members of the
> bar association, especially the diversity bars, the women's bar,
> need to be a member of this. And I, frankly, would like to see
> somebody who's probably been a victim of some type of
> harassment, maybe not necessarily judicial, but can give a victim's
> perspective on this. I think all those things would be valuable.[241]

Justice Márquez added to Chief Justice Boatright's statement by singling out IAALS as a group that should be included on the interim committee:

---

[239] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m)(i), p. 2:37-3:7, 4:19-34.

[240] *Id.*; Appendix 27(m)(i), p. 24:8-12.

[241] *Id.*; Appendix 27(m)(i), p. 26:23-29.

176

> [T]he Institute for the Advancement of the American Legal
> System, or IAALS has done a study on judicial discipline systems
> across the country. That 2018 report has some very thoughtful
> recommendations. Having someone from IAALS be a part of this
> interim summer committee, I think would be a wonderful idea and
> have that perspective, that national perspective. *Id.*

In addition to the behind-the-scenes coordination with legal interest groups (and as confirmed by Chief Justice Boatright and Justice Márquez's quoted legislative testimony), the Justices coordinated their opposition to SB 22-201 through the upper levels of the Colorado Attorney General's Office.  Early in the bill drafting process and contemporaneously with Chief Justice Boatright and Justice Márquez meeting directly with legislators, Kurtis Morrison, Deputy Attorney General for Intergovernmental Affairs, issued an opinion generally disputing the Legislature's authority to move forward with any of the then-contemplated substantive statutory reforms as violative of separation of powers and due process principles.[242]  Later, Morrison would present bill amendments that ostensibly allow the Attorney General's Office to interfere with this Commission's use of its Special Cash Fund (codified through § 13-5.3-104, C.R.S.) to hire and select outside Special Counsel.[243]

***Chief Justice Boatright uses his 2023 State of the Judiciary Address to rehabilitate the Justices and State Court Administrator Vasconcellos's public reputations while making further comments as to the merits of the Masias Controversy and the Court's "independent" investigations.***

While the *Coats* case remained pending before this Commission, Chief Justice Boatright used his January 13, 2023 State of the Judiciary Address to make maudlin appeals to the Colorado General Assembly as a means of reinforcing the Colorado Supreme Court's ethos.  With the other Justices present, Chief Justice Boatright apparently broke down crying while delivering a vignette about how probation officers had saved a probation client from a fentanyl overdose. Chief Justice Boatright then went on to tout demographic statistics within the Judicial Department while applauding the Legislature for its status as one of two state legislatures with a female majority composition.

---

[242] A copy of Deputy Attorney General Morrison's March 8, 2022 email and opinion is provided as Appendix 27(l).  Although the email states that it was generated per the bill sponsors' "request," it is unclear how Morrison became involved in the bill drafting process or why his opinion tracked the positions taken by the Justices and the Judicial Department at the time.

[243] *See* SB 22-201, Amend. L.011 (recognizing that this Commission may hire internal Special Counsel, but, according to § 13-5.3-102(3), C.R.S., providing that Attorney General has sole discretion in appointing "special assistant attorneys general to provide legal services" according to § 24-31-101(1)(g), C.R.S.); Appendix 27(n)(i); *see also Hearing before the S. Judiciary Comm.*, Colo. Leg., April 21, 2022; Appendix 27(n), p. 7:29-39 (presentation of intent of Amendment L.011 as providing this Commission's general counsel, rather than its Special Counsel, through Attorney General's Office).

177

A considerable part of Chief Justice Boatright's address focused on ethically questionable commentary regarding the Masias Controversy and the validity/relevance of the contracted-for Troyer-Mitchell and ILG investigations.  Once again (and with the full awareness of the other Justices), Chief Justice Boatright publicly commented on facts involved in pending or impeding cases related to the Masias Controversy.  Chief Justice Boatright's comments included encouraging misperceptions that employees do not care about the judicial misconduct involved and that the Judicial Department has fully addressed the underlying cultural deficiencies and misconduct.  Quite transparently, Chief Justice Boatright executed a mutually agreed and pre-conceived public relations strategy built around the Court's contracted-for investigations.  As relevant to the Court's shared intentions with respect to the "independent" investigations, Chief Justice Boatright (with the other Justices all present) stated, in parts:

> I now want to turn to a topic that I dedicated much time to in my last State of the Judiciary Address. Two years ago, I stood before you at a time when our branch was the subject of public allegations of misconduct. At that time I, on behalf of the supreme court and the entire Branch, committed to thorough and transparent investigations. We have lived up to those commitments. ***In so doing, we asked for the help of several of you here today and members of the Executive Branch in selecting not only the investigators for the allegations but also defining the scope of the investigations.*** The investigations were completed last summer, and the results are posted in their entirety on the court's website. If you have not read them, I urge you to do so. But today, I do not want to dwell on the past. Instead of treading back through history, I want to tell you what we learned and what we are doing in the future.

> \* \* \*

> In the spirit of looking forward and improving our workplace and operations, we asked the investigators to make concrete recommendations for improving our operations and our culture.

> Former U.S. Attorney Bob Troyer was the lead on the first investigation. Following the investigation, his group had recommendations for improving our operations. The Troyer report contained recommendations for strengthening the Branch's fiscal rules, ensuring that the leadership receives adequate support and training, and improving transparency in decision-making and communication. Consistent with the recommendations, the Branch is revising its rules, better defining leadership roles, improving training, and emphasizing more detailed ethical expectations. ***To that end, in our budget request you will see a request for additional resources for training.*** These training resources will be used to help staff and judges.

178

Investigations Law Group, led by Liz Rita, conducted the second investigation. A large part of that investigation scrutinized the Branch's workplace culture. ILG found that the Judicial Department has a positive workplace culture and, by and large, our employees are proud to work for us. ILG, however, also found areas for improvement. Women make up about 77% of our non-judge work force and about 44% of our judge population. But overall, women were less positive about our culture. ***Most upsetting to me was learning that some of our employees did not feel comfortable reporting unacceptable behavior or workplace concerns for fear of retaliation or because they didn't believe it would be taken seriously.***[244] That is not acceptable, and we will do better. One step we are taking to address that concern is contained in our budget request. ***We are asking for an Organizational Ombudsperson.***[245] Our Organizational Ombudsperson would provide a safe place for our employees to get assistance, support, and resources for workplace issues involving non-judge staff, while maintaining an independent complaint and investigation process for the Office of Judicial Discipline when a complaint concerns a judicial officer. That Organizational Ombudsperson would act as a guide for our employees when they have concerns.

\* \* \*

At an even higher level, we are re-examining our mission, vision, and values as an organization, both internally and to the public we serve. This will help us move forward together and ensure that our work is tethered to what we value as an organization.

\* \* \*

---

[244] With evidence that Chief Justice Boatright was aware of, but did not report, the retaliation by former Judge Woods against a judicial employee retrospectively raises substantial doubts as to Boatright's candor, honesty, and sincerity when he made this statement.  Rather than being part of a solution, Chief Justice Boatright failed to disclose that he was personally part of the underlying cultural problem and judicial misconduct involved in it.  Migoya, *supra* note 3.

[245] As later became clear with the Legislature's consideration of HB 23-1205 and with the 2023 State of the Judiciary address, the Justices and the Judicial Department began lobbying for an internal ombuds office that the Department could control, rather than an independent external ombuds office that could provide greater assurances of employee/client/visitor autonomy.  David Migoya, *Bills Overhauling Judicial Discipline Unanimously Pass Colorado House Panel: The bills are the result of summer-long hearings by a special legislative committee formed after allegations surfaced in 2021 about judicial misconduct that went unpunished or was handled leniently*, DENVER GAZETTE, March 15, 2023.

179

> [T]he seven justices decided that we needed to go to each of our courthouses and talk with our 4,000 employees and 300 plus judges, and we needed to do that in person. So, we did. From September through the end of December ***we divided up the state amongst the seven of us and, <u>many times accompanied by a Court of Appeals judge</u>***,[246] hit the road with the goal of meeting and hearing from every judicial branch employee. And while we didn't count heads for attendance, we were largely successful. Our goals were to listen to the concerns and issues that are important to our employees and judges and ***hopefully convey that we sincerely care*** about each and every one of them.
>
>                                     \* \* \*
>
> ***<u>Interestingly, the investigations were not an important topic to most Branch employees.</u>*** While the supreme court has been significantly involved with the investigations for the last two years, our employees have just been doing their jobs while confronting COVID, inflation, remote hearings, turnover, increased demands, understaffed human resources support, and trying to make ends meet. ***We heard from many of our employees that what happened over 3 years ago involving people who are no longer with the branch <u>was not important to them</u>, and they have confidence that the right steps are being taken for our future.***[247]  (Emphasis added).

In a plain effort to rehabilitate and bolster the Justices' reputations, Chief Justice Boatright concluded his remarks with biographical highlights of the Justices' backgrounds presented as explanation of their motivations for being judges.  Again, as relevant to the Justices' mutual

---

[246] The coordination of the Court's "listening tours" with Court of Appeals judges was problematic particularly when the Justices contemporaneously insisted upon composing special tribunals under Colo. RJD 41 exclusively with Court of Appeals judges (as opposed to this Commission's proposal and the structure ultimately presented through HCR 23-1001 which would create a non-collegial body with a combination of conflict-free District Court and Court of Appeals Judges).  *Supra*, note 14.  As with the Justices' co-oping of other public officials to select the contracted-for investigators and the Justices attempting to coordinate with other judges to lobby against judicial discipline reform, the "listening tours" are only another example of improper extra-judicial communications / lobbying otherwise prohibited by Canon Rules 1.1, 1.2, 1.3, 2.9, 2.10, 2.12, 3.1, and 4.1.  Depending upon the circumstances and substance of the statements they made as well as any involvement in the two special tribunals that have been formed under Colo. RJD 41, the individual Court of Appeals Judges who participated in the "listening tours" may have themselves violated Canon Rules 1.1, 1.2, 1.3, 2.2, 2.6, 2.9, 2.10, 2.11, 2.12, 2.15, 3.1, and 4.1.

[247] Brian D. Boatright, *State of the Judiciary Address*, 2023 Colo. House Journal, pp. 78-88 (January 13, 2023); Appendix 27(u).

180

objectives regarding use of the "independent" investigations, Chief Justice Boatright stated in parts:

> I started out talking about our judges' why. To me that is the most fundamental question of who we are as judges. I want to share with you all the justices' whys. ***I think it is important for you all to know who we are and why we are going to see the changes that we have started through to completion.***
>
>        \* \* \*
>
> Justice Hart has been passionate about civil access to justice – making the legal system accessible, understandable, and fair for civil litigants regardless of their economic status – for as long as she has been a lawyer. She realized (***in part through teaching legal ethics for two decades***) that state supreme courts have a central role in protecting and promoting access to justice through regulation of the legal system and the practice of law. She decided that she wanted to be a member of the Colorado Supreme Court, if given the opportunity, so that she could advocate for a focus on the needs of poor people in the civil justice system and the importance of making the system work for those who have to navigate the law without lawyers.
>
>       \* \* \*
>
> During her time as a trial court judge and chief judge in Boulder, Justice Berkenkotter had the opportunity to work with her colleagues and stakeholders in the 20th JD to modernize and streamline many of the court's practices. There are many reasons why Maria wanted to join our court: to preserve the rule of law, to serve the entire state in the midst of the turmoil caused by the pandemic, and to work with our court and staff and judges from across the state to modernize the branch. She knew from her time as a chief judge that effecting certain statewide changes could help not only the people who work in our courts, but also the many people we serve. ***For the past six months, that has meant working with her colleagues to examine the needs of the districts in order to <u>intentionally shape</u> our priorities and <u>directing</u> the implementation of the various recommendations in the ILG and Troyer reports***.
>
> As for myself, I have shared this before, but it is my why. I have always known that I wanted to be a lawyer. My dad was a lawyer, and I wanted to follow in his footsteps. Being a judge was never the plan. That changed when I was a young lawyer. I was trying a serious case, and I had a judge treat me very intemperately. I

181

> remember thinking that even if the judge was right on the law, there was a better way to handle that situation. That was the first day I thought of becoming a judge. A few years later, I had another experience that cemented that desire. I prosecuted a murder case that dragged on for about two years due to the defendant's significant mental health issues. Ultimately, the jury convicted the defendant of first-degree murder. As a result, the only sentencing option available to the judge was life in prison. I should note that this took place before the Victim's Rights Act was enacted. When I asked the judge if the victim's family could speak prior to sentencing, the judge – who happened to be an excellent judge – unfortunately denied the request, announcing that the court did not have any discretion regarding the sentencing. I will never forget the faces of the victim's family. They had waited two years to talk about the victim, and they never got the chance. That day, I decided that I wanted to become a judge, and I promised myself that if that ever happened, ***I would do everything in my power to let people know that I cared and that I truly listened***. A few years later, I was appointed to the district court in Jefferson County. That was twenty-three years ago. ***And treating everyone with dignity and respect to the very best of my ability has been the cornerstone of my judicial philosophy, and becoming Chief Justice didn't change that.***
>
> I thought it was important for you all to hear about the seven of us. I am proud to serve with each of them. While we frequently disagree on the difficult legal issues that come before us, ***we are of one mind in our dedication to the branch***. ***We are the leaders of the branch***, and we are all committing to our emerging future. *Id.* (Emphasis added).

In addition to the Justices' reputations, Boatright reinforced the public reputation of State Court Administrator Steven Vasconcellos (who, in likely violation of Canon Rules 1.1, 1.2, 2.10, 2.12, and 3.1, has repeatedly made factual statements on behalf of the Justices throughout the Masias Controversy). In describing Vasconcellos, Boatright emphasized Vasconcellos having a "shared vision" with respect to the Court's contracted-for investigations and overall plan. Boatright stated:

> And we are lucky to have a partner in our State Court Administrator – Steven Vasconcellos. Steven is the right person at the right time. ***He is a transformational leader, and he is committed to our vision. It is a shared vision.*** *Supra*, note 247. (Emphasis added).

Chief Justice Boatright's presentation of the outcome of the Court's contracted-for investigations and the overall theme of his speech were met with a tepid response by the television media and House Judiciary Chair Mike Weissman. As reported:

182

Chief Justice Brian Boatright painted a rosy picture of the reforms that have been underway within Colorado's judicial branch ever since allegations of misconduct surfaced.

The allegations stem from a $2.5 million, five-year contract for judicial training that was awarded to a former employee who allegedly threatened a sexual discrimination lawsuit if she was fired.

* * *

The chief justice said several justices decided to visit all of the state's courthouses and speak with the 4,000 employees and more than 300 judges under their purview. *In those conversations, he said employees were more worried about compensation with an expensive housing market and inflation than they were in investigations into wrongdoing.*

However, Rep. Mike Weissman, D-Aurora, told Denver7 that could be because of both economic factors and a fear of speaking up to some of the highest officers in the court with their concerns.

* * *

"Most upsetting to me was learning that some of our employees did not feel comfortable reporting unacceptable behavior or workplace concerns *due to fear of retaliation*," Boatright said. "That is not acceptable, and we will do better."

While the judicial branch is looking within itself to create change, state lawmakers have also proposed a bill and a concurrent resolution to force the department to change.

"We've had years of revelations reported in the media that had been really difficult to watch for me as a legislator, for me as an attorney and an officer of the court," Weissman said.

The concurrent resolution aims to reform the judicial discipline process. To do that, though, voters would need to approve a change to the Colorado constitution in 2024.

The concurrent resolution and subsequent ballot measure call for the Colorado Supreme Court's powers over judicial discipline proceedings to be reduced. It also offers some protections and a formal process for people who come forward with complaints.

Another concern is the veil of secrecy for the judicial disciplinary proceedings, where the media and the public are left in the dark.

183

> Weissman says one of the changes will make it so that the
> disciplinary discussions become public as soon as formal
> proceedings begin.
>
> Weissman says these changes would make investigations into
> judicial misconduct more transparent, modern and bring Colorado
> in line with most other states.
>
> Lawmakers also want to see a clear set of mechanisms put into
> place where if certain issues are present, then all seven justices
> would be recused and a different panel would come in to decide on
> a particular issue.
>
> ***Currently, the Supreme Court has the power to rule on and
> decide on punishments for judges who are found guilty of
> misconduct.***
>
> In the end, Weissman says there is a lot of work still to be done to
> reform the judicial department, but said lawmakers on both sides
> of the aisle are committed to finding a way forward.
>
> "I want folks to have confidence that legislators in this building,
> have been very concerned and have worked very hard on it," he
> said.[248] (Emphasis added).

If nothing else, Chief Justice Boatright's 2023 State of the Judiciary speech further confirmed that all the Justices were aware of and shared a common purpose with respect to presenting the Court's ethically prohibited / contracted-for investigations (and the investigators' strawman recommendations for organizational reform) as fully resolving the Masias Controversy and its associated judicial misconduct.  Of course, however, the then-pending proceedings in *Coats* subsequently confirmed Chief Justice Coats's violation of Canon Rule 2.5, the existence of unresolved judicial misconduct, and the involved Justices' own roles in the Masias Contract and the broader Masias Controversy.

***Through lobbying and the budget process, the Justices attempt to turn the concept of a Judicial Ombuds Office into an internal entity that the Justices and the Judicial Department could control.***

At its final meeting, the Legislative Interim Committee on Judicial Discipline abruptly recessed and, then, when it resumed, announced that the anticipated bill to establish an Office of the Judicial Discipline Ombudsman was being withdrawn pending further discussion /

---

[248] Megan Lopez, *Colorado's Chief Justice Paints Rosy Picture of Reforms After Years of Scandals*, Denver7, January 13, 2023 *available at* https://www.denver7.com/news/politics/colorados-chief-justice-paints-rosy-picture-of-reforms-after-years-of-scandals.

184

development.[249]  One can only assume that this surprising change occurred because of opposition to the draft bill by the Judicial Department and its lobbyist, Terry Scanlon.  At the time the idea of an external, independent ombudsman was first announced, it received public support from the Judicial Department.  However, by the time that budget requests were submitted, the Joint Budget Committee budget presentations, and the 2023 SMART Act hearings occurred, the Judicial Department shifted its position to substitute an independent *external* ombuds for an internal "organizational" ombuds.

The Judicial Department's public shift in policy positions was coupled with a significant supplemental budget request and projection to expand staffing at the SCAO premised upon the ILG Report's recommendation to create an "Office of People and Culture."  Notably, in its supplemental budget request for Fiscal Year 2022-23, the Judicial Department announced that it would be asking for an additional 10 FTE as part of its "Workplace Culture Initiative" in Fiscal Years 2023 and 2024. As projected, this level of additional staffing would have cost taxpayers $1,389,305 in FY2-23-24 and, then, $1,455,478 in FY 2024-25 with an additional $140,782 cost of implementation ($2,985,565 total).[250]  Initially, JBC Staff recommended denial of the request pending consideration of the Interim Committee's bills.  *Id.*  Later, JBC Staff amended its recommendation to support the Judicial Department's request for 8.0 FTE (removing the "organizational" ombudsman) and a requested appropriation of $1,252,500.[251]  It is unclear what amount the Colorado Legislature ultimately appropriated in response to the Judicial Department's request.[252]  Nevertheless, the size of the supplemental budget request's projections only reinforce how the Justices (using their "independent" investigations as justification) sought to misuse substantial public funds as a means of reinforcing their improper public comments and their promotion of personal interests through the "Workplace Culture Initiative."  Arguably, in this context, the Judicial Department's FY 2023-24 supplemental budget request, itself, created additional appearances of impropriety in violation of Canon Rules 1.1, 1.2, 1.3, and 2.5.

Beyond the actual funding for the "Workplace Culture Initiative," it deserves note that the Judicial Department included substantial public commentary on the merits of the Masias Controversy and an implicit argument that the terms of the Masias Contract were reasonable as part of the Judicial Department's FY 2024-25 budget submission. As proposed, budget request

---

[249] *Hearing before the Legis. Interim Comm. on Jud. Discipline*, Colo. Leg., September 30, 2022; Appendix 27(s)(vi), pp. 17:10-20:18.

[250] Colo. Legis. J. Budget Comm., SUPPLEMENTAL BUDGET REQUESTS FY2022-23, January 18, 2023, pp. 6-9.

[251] Colo. Legis. J. Budget Comm., STAFF FIGURE SETTING FY2023-24: JUD. DEP'T, March 1, 2023, pp. 14-15.

[252] An accounting for the cost of the "Workplace Culture Initiative" and this specific supplemental budget request were among the records to which the Judicial Department is constructively denying access.  Appendix 30, pp. 17, 20, 40, 47, 71-72; *see also supra*, note 87 (describing context of Judicial Department's constructive denial of records access).

185

item R12 (for "Leadership Development") sought $500,000 in FY2024-25, calculated to increase to $750,000 in FY 2025-26.[253]

As the 2023 Legislative Session evolved, the Judicial Department continued to pursue a strategy of seeking to have the contemplated external, independent Office of the Judicial Discipline Ombudsman become an internal "organizational" ombudsman.  Even at the initial hearing where HB 23-1205 (creating the Office of the Judicial Discipline Ombudsman) was introduced, however, legislators made it clear that an internal "organizational" ombudsman in lieu of an independent ombudsman would be unacceptable.[254]  The Justices and SCAO lobbyist Terry Scanlon, then, pivoted to advocating for ways to reduce the Ombudsman's abilities to actively seek information and other resources on behalf of a visitor/client.  As discussed in the cover letter to this RFE, the practical effect of this lobbying was to include language limiting the Ombudsman's ability to request public records in lieu of language authorizing the Ombuds to obtain such records without charge. Cover Ltr., pp. 9-10.  The Judicial Department also successfully lobbied to remove mandatory reporting requirements from the Ombuds statute which would have helped stop patterns of unreported/unaddressed misconduct similar to the intent behind Canon Rule 2.15 and as demonstrated necessary through the circumstances in *Timbreza II*.[255]

Somewhat surprisingly, the debate over the value of the proposed Office of the Judicial Discipline Ombudsman became heated outside of the committee rooms.  SCAO Legislative Liaison Terry Scanlon demonstrated a deficit in class and civility, as well as the Justices' overall efforts to coerce legislative outcomes, through his interactions with the Colorado Criminal Defense Bar's lobbyist, Tristan Gorman.  At one point during the Legislature's consideration of HB 23-1205, Scanlon accosted Gorman with anger and a wall of profanity while the two discussed their positions on the bill in front of the entrance to the Senate Chamber.  House Minority Leader and co-prime bill sponsor Mike Lynch was present nearby when the incident occurred.  Just as they effectively endorsed intimidation and retaliation by Attorney Regulation Counsel Jessica Yates and OARC towards Senate Judiciary Chair Pete Lee and this Commission for their participation in the legislative process, the Justices took no action to supervise or reprimand Scanlon for his publicly expressed unprofessionalism and misconduct.[256]  Rather,

---

[253] Colo. Jud. Dep't, FY2024-25 BUDGET REQUEST, November 1, 2023, pp. 208-16 (budget request R12).

[254] *Hearing on HB 23-1205 before the H. Judiciary Comm.*, Colo. Leg., March 15, 2023 (statement of Representative Bob Marshall), pp. 76:16-23.

[255] Amend. L.025 to HB 23-1205 (limiting public records by the Ombudsman to occur only "at the discretion of the complainant"); Appendix 27(z)(ii)(1); *see* also discussion, *supra*, p. 169.

[256] As with other material evidence, the Judicial Department has constructively denied access to records that would provide context around this incident, particularly any internal communications between the Justices, Vasconcellos, and Scanlon about HB 23-1205 and Scanlon's conduct. Appendix 30, pp. 28, 40, 71-72; *see also supra*, note 87 (describing

once again, the Justices appeared to implicitly condone and suppress a subordinate employee's bullying, misbehavior, and apparent violations of the Judicial Department's Personnel Rules / Code of Conduct.

Ultimately, HB 23-1205 passed with the concept of an external and independent ombuds intact. Even so, the Office of the Judicial Discipline Ombudsman still has not been stood up. The Justices' and the Judicial Department's interference with the legislative process as it related to HB 23-1205 should be recognized as further non-cooperation implicating violations of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.9, 2.10, 2.11, 2.12, 2.15, 2.16, 3.1, and 4.1.

***Through SCAO lobbyist Terry Scanlon, the Justices persuade ranking Senator Bob Gardner to unwittingly assist in their conspiracy by publicly defending the Justices' conduct and by sponsoring amendments intended to blunt reforms that sought to reduce the Colorado Supreme Court's control over the judicial discipline process.***

Just as this Commission began to focus its investigation in *Coats* on the withholding of material information from the OSA and after Attorney Regulation Counsel Jessica Yates's intimidation and retaliation towards this Commission, the Justices began to apply lobbying pressures on Senate Judiciary Committee ranking minority member Bob Gardner. Without being candid about their roles in the Masias Controversy and the need for their disqualification, the Justices, through SCAO Lobbyist Terry Scanlon, encouraged Senator Gardner to publicly defend their reputations for integrity, to oppose amendments sought by this Commission, and to sponsor an amendment sought by the Justices. Had the Justices conformed their conduct to the Code and disqualified themselves from legislative engagement, there would have been significantly different legislative outcomes and greater deterrents against the Justices' further retaliation against the integrity and composition of this Commission.

At the April 19, 2023 Senate Judiciary Committee hearing, Senator Gardner made the following comments:

> **Sen. Gardner**
> I do want to say that having appeared in the courts of the state and before the judges and Senator Roberts is the other among us who has that privilege. I leave the courthouse sometimes very happy with the outcome that I get. I leave the court sometimes very unhappy with the outcome that I've gotten. As often as not, I leave it with mixed feelings. Turns out, it's not a lot different than leaving committee here in the Colorado Legislature. ***But in my professional career, I have universally believed and see that our Judiciary in Colorado is of the highest quality.***
>
> **Halina Topa**
> Please, please. I need to leave.

---

circumstances of constructive denial of records access). The circumstances of ARC Yates's misconduct and intimidation are discussed *infra* starting at p. 211.

187

> **Sen. Gardner**
> Withstanding the testimony. Again, whether I agree with the particular ruling and so forth. ***That we have a Judiciary that is characterized by its honesty, its integrity, its forthrightness and its willingness to rule according to the law and in accord with due process.*** Again, I don't purport that they're perfect. I don't purport that out of the, I think 300 plus, that they're just as with any other institution or legislator, that there may be some outliers. ***But I have been in the past several weeks, grateful, as a Coloradoan that we have the judiciary we have appointed with a process that is not subject to politics, is not subject to the whims of the day. And our efforts and the efforts of the bench and the Commission on Judicial Discipline, I think all of this has been to ensure that same kind of culture going forward.*** I think we have work to do. What has impressed me is that the bench itself, as has the Commission, has been committed to that work and committed to that discussion. So with that, I renew our request to lay the bill over, and then we'll go to the more difficult bill in that process. Thank you. For your indulgence, Mr. Chair.[257]

It was also at the April 19, 2023 hearing that Chief Justice Boatright announced the Court and Judicial Department wanted HCR 23-1001 and HB 23-1019 amended to maintain the Supreme Court's control over rulemaking. *Infra*, p. 201 (quoting Chief Justice Boatright's testimony). Essentially, Chief Justice Boatright asked to change the composition of the proposed rulemaking committee so that there would be a plurality chosen by the Court with additional representation from the "defense community." HCR 23-1001, HB 23-1019, and HB 23-1205 were set over for further consideration and amendment following the April 19, 2023 hearing.

At the April 26, 2023 hearing, on behalf of this Commission, Senate Judiciary Chair Julie Gonzales sponsored Amendment L.004 to HCR 23-1001.[258] Amendment L.004 would have removed all appointment authority to this Commission from the Colorado Supreme Court and replaced it with the Associations of the District and County Court Judges. Additionally, Chair Gonzales sponsored Amendments L.003, L.004, and L.005 to HB 23-1019.[259] Respectively, these amendments would have expanded the requirements of mandatory information sharing to other "oversight entities" (i.e. the judicial performance commissions, OARC, and the Office of the Presiding Disciplinary Judge), expanded this Commission's jurisdiction to include

---

[257] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 19, 2023; Appendix (27)(y)(i), p. 21:18-21:40.

[258] HCR 23-1001, Amend. L.004; Appendix (27)(z)(i)(1), p. 2; *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 19, 2023; Appendix (27)(z)(i), p. 8:4-8.

[259] HB 23-1019, Amend. L.003, L.004, and L.005; Appendix 27(z)(i)(1), pp. 3-4 (omitting Amend. L.004); *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 26, 2023; Appendix (27)(z)(i), pp. 1:1-5.

magistrates, and implemented the change in appointment powers as provided in L.004 to HCR 23-1001.  Chair Gonzales withdrew Amendment L.004 to HB 23-1019 as a courtesy after Senator Gardner explained that he intended to pursue legislative reforms of the magistrate system as part of the 2024 legislative session.[260]  Leading up to the hearing, SCAO Lobbyist Terry Scanlon was present and actively seeking to have Senator Gardner oppose the other amendments sought by this Commission and to sponsor Amendment L.002 to HCR 23-1001, which would have established the composition of the judicial discipline rulemaking committee as requested by Chief Justice Boatright.[261]  Ultimately both Amendments L.002 and L.004 to HCR 23-1001 passed out of committee, as did Amendments L.003 and L.005 to HB-1019. Senator Gardner (joined by Senator Van Winkle on a party line) opposed all the amendments proposed by Chair Gonzales, while gaining aye votes from all the majority members as to Amendment L.002 to HCR 23-1001.[262]

The resulting conflict between the removal of the Colorado Supreme Court's appointment authority and allowing the Court to maintain control over rulemaking inevitably led to further compromise at the conference committee, where a final compromise provided for the Supreme Court to retained appointment authority as to this Commission, but "as provided by law," and the rulemaking committee would be composed of an equal division of 4 appointees from this Commission, 4 appointees from the new adjudicative board, 4 appointees from the Court, and 1 additional victim's advocate appointed by the Governor.[263]  The promised reforms of the magistrate system, however, never happened in the 2024 legislative session. Nevertheless, Amendment H is now being proposed to voters after a nearly unanimous vote in both Chambers, with Representative Rod Bockenfeld casting the solitary no vote. As presented through the Bluebook, the ballot analysis for Amendment H confirms that it is a "a compromise recommended by nearly all members of the General Assembly and formally by the Judicial Branch."[264]

Within a month of HCR 23-1001, HB 23-1019, and HB 23-1205 passing, the Justices immediately retaliated against Vice-Chair David Prince by not renewing his appointment for a second term.  Approximately 6 months later, this Commission would cycle its membership and remove all voices who had demanded accountability for the Justices' conduct with respect to the Masias Controversy, including Executive Director Gregory.  Although it has not been

---

[260] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 26, 2023; Appendix (27)(z)(i), p. 2:16-33.

[261] HCR 23-1001, Amend. L.002; Appendix (27)(y)(i)(1), p. 1.

[262] *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 26, 2023; Appendix (27)(z)(i) pp. 1:7-17, 1:25-26, 2:1-2, 2:22-30, 3:7-22, 3:30-31, 4:1-2, 4:16-17, 4:22-34, 5:1-3, 6:25-7:4, 7:39-40, 8:4-13, 9:10-12.

[263] HCR 23-1001, final signed act (May 23, 2023).

[264] Leg. Council of the Colo. Gen. Assembly, 2024 STATE BALLOT INFORMATION BOOKLET, p. 19.

emphasized, the fact that the Commission's two citizen members, Gina Lopez and Marissa Pacheco, whom the Governor had just appointed to this Commission in August 2023, have also resigned speaks volumes to the toxicity and corruption that has infiltrated this Commission. If nothing else, it should be clear that the Justices were willing to openly violate the Code to retain absolute control over the judicial discipline system, whether *de jure* or *de facto*.

This explanation of the circumstances related to the Judicial Department's advocacy around the ultimate passage of HCR 23-1001, HB 23-1019, and HB 23-1205 is not intended to disparage Senator Gardner in any way. Instead, it is intended to highlight the inappropriateness of the Justices' lobbying strategies, material misrepresentations, and coercion on matters from which they should have recused themselves. Yet again, the Justices' persistent refusals to disqualify themselves from involvement in matters related to their own impending judicial discipline proceedings, including legislative engagement, should be recognized as implicating probable violations of the Code, specifically Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, 2.15, 2.16, 3.1, and 4.1.

***The Colorado Supreme Court manipulates legal interest groups as part of lobbying efforts intended to stifle legislative reforms and to bolster the Justices' public credibility as to the Masias Controversy.***

As confirmed through Chief Justice Boatright's statements at the April 14, 2022 Senate Judiciary Committee hearing, the Justices intentionally engaged with various legal interest groups as part of lobbying efforts intended to stifle legislative reforms and to bolster the Justices' public credibility. *Supra*, at p. 176. The Code prohibits the Justices from directly lobbying for their own self-interested objectives and does not allow such prohibited conduct to occur using third party individuals and organizations as conduits for the Justices' public commentary on pending or impending judicial disciplinary proceedings. Canon Rule 1.3 (Avoiding Abuse of the Prestige of Judicial Office); Canon Rule 2.10 (under all circumstances judges prohibited from making public or non-public statements that might substantially interfere with fair trial or hearing; extending prohibition to "others subject to the judge's direction and control"); *see also In re Miller*, 949 So.2d. 379 (La. 2007) (despite exception for comments on personal litigation judge's statements about pending sexual harassment action against him lent prestige of office to advance judge's personal interests in violation of predecessor to Canon Rule 2.10(A) and Canon Rule 1.3). The Justices' apparent misconduct with respect to the Masias Contract was only exacerbated by their improper co-oping of other judges, Judicial Department employees, and third-party legal interest groups to perpetuate false and fraudulent narratives, including misrepresentation of the nature, scope, and outcomes of the Court's contracted-for "independent" investigations.

***The Justices coordinate legislative advocacy and public relations efforts with the Colorado Judicial Institute.***

At the House Judiciary Committee's May 3, 2022 hearing on SB 22-201, the Colorado Judicial Institute (CJI) parroted back the same positions taken by Chief Justice Boatright and Justice Márquez in their April 14, 2022 legislative testimony, including emphasizing the need for

190

legislative discussions to wait until after the Court had completed its "independent" investigations:

> CJI has three points of input. First, CJI supports a robust interim committee process involving relevant stakeholders and like Ms. Maxfield [who testified on behalf of the CBA], we do appreciate the efforts that have been made to take that input into account throughout the process of the spill. ***Second, we're concerned about the timing here. And as we all know, there are ongoing investigations of recent allegations of judicial misconduct. Those are allegations. And under our system of justice in the U.S., we have a system of due process, allowing completion of that investigatory process will enable fully formed decisions on the subject matter of this bill.*** And we again, support a robust interim committee process that will take stakeholder input into account that finally, this bill has some unnecessarily inflammatory language that itself contradicts the purpose to improve and increase public confidence in the judicial system.
>
> * * *
>
> And this language, unfortunately, as lawyers would say, assumes facts not in evidence, it assumes the truth of these yet unproven allegations of misconduct, and it assumes that the current system cannot address such alleged misconduct. So again, CJI thanks everybody and we respectfully request that it will be amended to eliminate or reframe that language to make it neutral.[265]

When asking to delay legislative reforms pending the Court's "independent" investigations, Ms. Chappell did not address how the Justices' control of the OSA's Fraud Hotline investigation and the OSA's resulting inability to immediately refer evidence of fraud to law enforcement caused the statute of limitations to expire. Moreover, like the commentary provided by Kaudy and Overton, CJI's legislative testimony created false impressions as to the scope and legitimacy of the Court's contracted-for "independent" investigations under Canon Rule 2.9. *See* discussion *supra*, p. 146.

The alignment of CJI's legislative testimony with the Justices was further apparent through substantially similar statements previously made by Ms. Chappell at the initial Senate Judiciary Committee hearing on April 14, 2022. Ms. Chappell's statements imply significant coordination of positions between CJI, the Justices, and the Judicial Department in advance of legislative proceedings. When later confronted about apparent conflicts of interest and coordination with CJI's judge members, its Executive Director Jeff Rupp was evasive in his responses, maintaining

---

[265] *Hearing before the H. Jud. Comm.*, Colo. Leg., May 3, 2022; Appendix 27(q), pp. 4:27-40, 5:2-6.

that policy positions are developed "independent[ly]."[266]  In her April 14th remarks, Ms. Chappell had also emphasized the need for the Justices' contracted-for investigations to move forward before legislative action and criticized the legislative declarations for raising doubts about the effectiveness of Colorado's judicial discipline system and the integrity of the Justices. Ms. Chappell stated:

> Good afternoon. Mr. Chair, members of the committee. I am Marilyn Chappell. I'm an attorney in private practice in Denver. I'm here on behalf of the Colorado Judicial Institute or CJI as a volunteer[.]
>
> * * *
>
> Let me first tell you a little bit about the Colorado Judicial Institute CJI. We've been in existence since 1979. We're a nonpartisan nonprofit. And our mission includes protecting and defending the ability of Colorado judges to decide cases fairly and impartially and free from partisan politics. The subject matter of this bill disciplining judges is part of Colorado's merit judicial system for selecting, evaluating, retaining, and disciplining judges. So this is of critical importance to us at CJI. Our system was adopted by the voters in 1966. And they did that rejecting a system of partisan elections where you would have to be in the position of worrying about campaign donations to judges. We don't have that in Colorado, because that's what our voters created. We have three concerns with the bill in its current form. And I'll be very brief here. First, with the timing. ***And you've all heard from Chief Justice Boatright. And Justice Marquez about that. That the fact that there are investigations in process. We at CJI support the full, fair, thorough investigations of allegations of judicial conduct consistently with our American system of justice, which includes due process, due process. And, again, we think on the timing here, allowing this process to go forward, and to discover what facts are to lead to wherever the facts go.*** That should happen so that that information can be used to most thoughtfully and properly and adequately look at what changes may be needed to our current system. There has been talk already about the disclosure and reporting requirements. I won't repeat that.  ***And also about the interim committee or task force. And we would hope that we at the Colorado Judicial Institute could be included along with the other entities and stakeholders.*** Getting back to the bill as it is currently phrased. There's a lot of language in there that's concerning to us. Yes, no system is perfect. But in the meantime, Colorado has a merit selection system that is a model

---

[266] *Hearing before the Legis. Interim Comm. on Jud. Discipline*, Colo. Leg., August 10, 2022 (CJI presentation); Appendix 27(s)(iii)(5), pp. 3:37-5:2.

192

> for other states and for the nation. And yes, of course, it can be
> improved. But in the meantime, the characterizations in the bill, as
> it is currently stated, do not reflect the reality of the fact that our
> system has worked well, for decades. Thank you.  *Supra* note 238.

Most recently, CJI has continued to quietly and indirectly lobby against reforms to the judicial discipline system on behalf of the Justices through its advocacy as to the ballot analysis / Bluebook statement for Amendment H.  When Amendment H was being drafted during the interim committee process, CJI had the distinction of being the only legal interest group to argue that Colorado's judicial discipline system did not need to be reformed. [267]  While maintaining that it publicly supports Amendment H, CJI made backhanded efforts to minimize the significance of how Amendment H removes control of the judicial discipline process from the Colorado Supreme Court.  Moreover, CJI sought to scrub any language critical of the Justices from the ballot analysis drafts.[268]  CJI argued for this deceptively benign censorship through a need for "neutral" language.[269]  CJI further requested that the Legislative Council Committee adopt ambivalent language in the arguments for voting "no" on Amendment H.  Specifically, CJI asked to have the "no" position include a statement that:

> The system has been in place for a long time and is based on the
> Colorado Constitution. Changing the Constitution is a complex
> process and cannot easily be undone if the new process does not
> work as intended.[270]

Former Executive Director Gregory also provided oral and written testimony to the Legislative Council Committee rebutting CJI's advocacy, emphasizing the importance of the structural changes presented through Amendment H to reduce the Justices' influence, and seeking amendment of the final ballot analysis to be presented in the Bluebook.[271]  Although many of former Director Gregory's previously requested edits were accepted by Legislative Council staff,

---

[267] Migoya, *infra* note 273 (describing CJI's position as well as context of Justice Gabriel and Justice Hart being emeritus board members); *see also* Appendix 27(s)(iii)(5) (CJI's hearing testimony); Appendix 27(s)(iii)(13(c) (CJI written submission).

[268] *Compare* Appendix 27(ff)(ii)(1), p. 1 (Amendment H would "reduce the Colorado Supreme Court's role in ethical misconduct cases involving judges") with pp. 9, 54 (language removed; amendment requested to restore it).

[269] *Hearing before the Legis. Council Comm.*, Colo. Leg., September 4, 2024; Appendix 27(ff)(i), p. 3:11-15.

[270] This ambivalent position tracked similar testimony that was provided to the Interim Committee on Judicial Discipline by Marilyn Chappell.  *Compare* Appendix 27(ff)(ii)(1), p. 44 *with* Appendix 27(s)(iii)(5), pp. 1:20-22, 3:27-29.

[271] *Hearing before the Legis. Council Comm.*, Colo. Leg., September 4, 2024, p. 3:20-4:18; Appendix 27(ff)(ii)(1), pp. 17-19, 35-39, 52-54.

193

the final amendment he requested was not acted upon by the Legislative Council Committee. Nevertheless, Governor Jared Polis has gone on the record to express his support for Amendment H as a positive response to the Masias Controversy.  As reported by *Colorado Politics*, "According to Polis, the amendment seeks to address "several recent scandals in the judicial branch of government. He said he will be voting in its favor."[272]  CJI's behind the scenes efforts to undermine the otherwise near universal recognition of Amendment H as good public policy as well as the conflicts arising from CJI's connections to the Justices deserve public exposure.

Marilyn Chappell, Justice Gabriel, Justice Hart, and Andrew Rottman's counsel, Mark Fogg, are all emeritus members of the CJI Board of Directors.[273]  Justice Gabriel is also a listed CJI donor.[274]  Beyond the CJI Board of Directors, this Commission's member, Adams County Court Judge Mariana Vielma, was selected by CJI as one of its three 2023 Judicial Excellence honorees.[275]  For 2024, CJI has selected 16th Judicial District Court Chief Judge Mark MacDonnell as an honoree.[276]  Chief Judge MacDonnell, however, is also listed as one of the judges who has failed to file annual personal financial disclosures over multiple years.  Migoya, *supra* note 165.

Justice Gabriel and Justice Márquez have further utilized CJI as a forum for direct public outreach and to publicly comment on the merits of the Masias Controversy and the Court's response to it.  *See* discussion *infra*, p. 247.  Ironically, the Justices' and the Judicial Department's relationships with CJI were acknowledged in the Masias-Rice recording, with Chief Justice Rice providing communications with CJI as an example of something that Masias

---

[272] Marissa Ventrelli, *Gov. Jared Polis Releases Stance on 14 Ballot Measures for 2024 Election*, COLORADO POLITICS, October 16, 2024.

[273] https://coloradojudicialinstitute.org/who-we-are/our-team/board.html; Justice Gabriel and Justice Hart's conflicts of interest as to CJI have also been reported in the press.  David Migoya, *Law Groups Are United that Judicial Discipline Process Needs Greater Transparency*, DENVER GAZETTE, August 10, 2022 (noting that CJI was the only interest group at the 8/10/22 ICJD hearing to advocate that there are not substantial issues with opacity in Colorado's judicial discipline system requiring reform).  Adding to the conflicts of interest with the Colorado Attorney General's Senior Staff, Solicitor General Shannon Stevenson is also an emeritus member of the CJI board.  https://coag.gov/about-us/colorado-attorney-general-senior-staff/. Court of Appeals Judge Stephanie Dunn, who is subject to a retention election in November 2024, has also listed her affiliations to include CJI and the related "Our Courts" interest group (which promotes general community outreach / public engagement in connection with CJI's public relations agenda).  https://web.archive.org/web/20221110055344 /https://www.courts.state.co.us/Bio.cfm?Employee_ID=718.

[274] https://coloradojudicialinstitute.org/who-we-are/our-partners/.

[275] https://coloradojudicialinstitute.org/what-we-do/judicial-awards-gala-dinner/gala-dinner.html.

[276] https://coloradojudicialinstitute.org/what-we-do/judicial-awards-gala-dinner/awardees.html.

should delegate to strengthen her case to become State Court Administrator.[277]  Remarkably, on February 4, 2021, when *The Denver Post* story first revealed Christopher Ryan's allegations that the Masias Contract was a *quid pro quo* agreement for Masias's silence, Justice Gabriel sent an email to the CJI Board of Directors disputing the merits of Ryan's allegations.[278]  This improper public commentary at the outset of the Masias Controversy only further reinforces grounds to find that the Justices perceive CJI as their personal lobbyist and public relations arm.

The overall optics of CJI as an organization, if viewed objectively, create appearances of impropriety and reasonable grounds for the public to lose confidence in the integrity of Colorado's Judiciary (which is, of course, the opposite of CJI's expressed mission).  CJI's primary fundraising mechanism is hosting the annual CJI Judicial Excellence Awards Gala Dinner.  Per its 2022 form 990 tax return, CJI reported receiving $146,521 in gross receipts through that year's Gala Dinner.[279]

In order to attend the Gala Dinner, an ordinary member of the public would need to pay $250 per person.[280]  CJI further advertises corporate "sponsorship levels to fit all budgets" ranging from a $500 "wine sponsorship add-on package" to a $9,000 "platinum sponsorship" with advertising on the CJI website.[281]  In its pitch for these sponsorships, CJI states on its website:

> Sponsorship of the CJI's annual *Judicial Excellence for Colorado Gala Dinner* is a terrific way to showcase your organization and show support for CJI and its work on behalf of Colorado's courts. Sponsorship benefits include event tickets (e.g., full table or half table), sponsor acknowledgment in promotion & materials, and more.[282]

As part of its recruitment of members, CJI further describes its benefits to include:

---

[277] Appendix 4, p. 16:14-16.

[278] *See* Appendix 30, p. 46, ¶ kk.

[279] https://coloradojudicialinstitute.org/file_download/inline/2e5ee6ee-b967-4824-94af-9d2b29881caf.

[280] https://coloradojudicialinstitute.org/news-events/event-calendar.html/event-form/cji-gala-2024-registration-form/101909/tickets.

[281] https://coloradojudicialinstitute.org/file_download/inline/65a035cd-8c78-43e4-b0da-597e4e237d75.

[282] https://coloradojudicialinstitute.org/what-we-do/judicial-awards-gala-dinner/gala-dinner.html.

Networking! ***Make connections with judges***, attorneys, business professionals, and others who share your commitment. (Emphasis added). [283]

CJI's pitch for general corporate sponsorships explains:

Sponsorship is a terrific way to showcase your organization <u>and</u> support CJI! ***And people [(i.e. judges)] will think more highly of you because you support what they support: CJI, its mission, and Colorado's courts!*** (Emphasis and comment added).

Despite CJI presenting itself as offering scholarships for legal education and other professional improvement, CJI's primary functional purpose from its 2022 tax return seems focused on providing public relations and lobbying assistance for the Judicial Department. Indeed, in making its pitch for donations, the CJI website highlights the organization's accomplishments (in 2023-2024) to include:

- 43 "Our Courts" education presentations to high school classes across Colorado, serving over 1,000 students. ***Also 30 presentations to adult groups serving over 300 people.***
- ***11 op-eds, letters to the editor, and interviews with media outlets advocating on behalf of Colorado's courts.***
- ***Legislative testimony about the ballot language for Amendment H, which proposes changes to judicial discipline procedures.***
- $3,000 in financial support for Legal Resource Day, an annual "access to justice" event that provides the general public with free legal information and advice.
- Leadership of the Diversity on the Bench coalition, which helps ensure Colorado's courts reflect the communities they serve.
- **$35,000 in financial support** for the continuing education of over 700 judges and court staff. [284]
- $2,500 scholarship for an aspiring attorney's bar exam preparation.
- Awards for 3 outstanding judges in recognition of their judicial excellence.
- ***7 educational and social events promoting engagement and community.*** [285] (Emphasis added).

The intentional performance of these functions and CJI's perception that (unlike the Judicial Department acting directly) CJI is not bound to conform its advocacy to the requirements of the

---

[283] https://coloradojudicialinstitute.org/how-to-help/join-sponsor/.

[284] It is unknown whether the judges who directly received these funds (in the form of scholarships or otherwise) have properly reported the income as part of their required personal financial disclosures and honorarium / gifts report filings.

[285] https://coloradojudicialinstitute.org/how-to-help/.

Code is openly acknowledged on the CJI website: "***CJI takes seriously its duty to advocate on behalf of a Colorado judicial system that, <u>bound by its code of conduct, cannot always speak for itself.</u>***"[286]  Despite CJI acting as the equivalent of a professional lobbyist, its spokespersons have not registered as either professional or volunteer lobbyists.[287]

Through this Commission's current Chair Mindy Sooter, the law firm WilmerHale was a table-level sponsor for the 2023 Judicial Excellence dinner where Judge Vielma was an honoree.  For the 2024 gala dinner, WilmerHale is advertised as a $3,000 Bronze-Level sponsor.[288]  The appearances of a $250 per plate and multi-thousand-dollar sponsorship event that focuses on networking with judges are objectively distasteful and create public impressions that access to the Judiciary can be purchased by wealthy individuals, attorneys, and law firms.  Indeed, one critic has publicly described CJI's annual Judicial Excellence dinner as the "Wanna buy a judge?" event.[289]

If nothing else, the very existence of CJI appears contrary to the spirit of Canon Rules 3.1 and 3.7.  The use of CJI as a lobbying platform, a forum for continued public commentary by the Justices, an advocate to publicly defend the Justices' personal reputations, a fundraising mechanism, a means of honoring a member of this Commission while the Justices face potential judicial disciplinary proceedings, and a means of honoring another judge who currently faces public allegations of judicial misconduct creates significant appearances of impropriety and presents a reasonable basis to suspect that all the Justices have violated Canon Rules 1.1, 1.2, 1.3, 2.10, 2.11, 3.1, and 4.1.

***The Justices coordinate legislative advocacy and public relations efforts with the Colorado Bar Association.***

At the May 3, 2022 legislative hearing, the Colorado Bar Association (CBA), while "taking a neutral position," also essentially parroted back Chief Justice Boatright and Justice Márquez's previously expressed positions:

---

[286] https://coloradojudicialinstitute.org/what-we-do/advocacy.html; *see also* Michael Karlik, *Q&A with Jeff Rupp: Judicial Advocacy Group's Director Talks About Common Goals, Differences with Judicial Branch*, COLORADO POLITICS, March 11, 2024 (Rupp: "We have a handful of judges who are involved with us and would probably want to bring influence to bear and might hew more closely to what the judicial branch might say.").

[287] *See generally*, https://www.sos.state.co.us/pubs/lobby/files/guidanceManual.pdf (including definitions of professional lobbyists and volunteer lobbyists at pp. 8-9; explanation of scope and limits of "expert testimony" exception at p. 11); see also https://www.sos.state.co.us/pubs/lobby /lobby_home.html (with links to directories of both professional and volunteer lobbyists).

[288] https://coloradojudicialinstitute.org/what-we-do/judicial-awards-gala-dinner/gala-dinner.html.

[289] *Hearing before the Legis. Interim Comm. on Jud. Discipline*, Colo. Leg., July 12, 2022 (Chris Forsyth / Judicial Integrity Project presentation); Appendix 27(s)(ii)(1), p. 4:32-36.

> The CBA remains in a neutral position on this bill. But we continue to request that consideration be given to expanding the body of persons appointed to the interim committee to include participation of members of the three branches of government community stakeholders, including a guarantee of racial, ethnic and gender diversity amongst those appointed to serve on the interim committee. The legislative policy committee intends to continue its engagement in both this proposed legislation and also the highly anticipated work of the interim committee.  As we do so we will be intensely focused on ensuring that in an effort to improve our system of judicial discipline here in Colorado, we avoid any unintended consequences.  Those unintended consequences could be any chilling effect on the willingness of our most qualified and ethical jurists to enter into public service and become judges, any negative effect or disproportional effect on equity, diversity and inclusivity within the department, and specifically those serving on our bench, ***and potentially any legal challenges to the constitutionality of the bill as it relates to the separation of powers, which may have the effect of, of delaying implementation of legislation*** that's intended to strengthen our system of governance here in Colorado.[290]

The CBA's references to "separation of powers" and "legal challenges to the constitutionality of the bill" are particularly problematic given the description of Chief Justice Boatright and Justice Márquez's meeting with Senate Judiciary Vice-Chair Gonzales in March 2022.  *Supra* note 236.

Like the legislative testimony provided by Ms. Chappell on behalf of CJI, Ms. Maxwell's earlier testimony at the initial April 14, 2022 Senate Judiciary Committee hearing tracked the positions taken by Chief Justice Boatright and Justice Márquez at the same hearing almost identically:

> My name is Leticia Maxfield, often called Letty and I'm appearing here today on behalf of the legislative policy committee of the Colorado Bar Association. And first, just on behalf of the CBA, we want to thank the sponsors for what we see as their very sincere effort to meaningfully engage with the CBA, the other branches of government, community stakeholders to promote this legislation which is intended to inspire greater confidence and public trust in our judiciary, and its independent oversight. The introduction of Senate Bill 22-201 set the stage for the CBA to engage in a critical and ongoing dialogue amongst its leadership and membership on the topic of judicial oversight in Colorado. This dialogue is continuing with members of not only the CBA, but the larger legal community. ***In the short time since the bill has been introduced many comments and questions have already been raised. You've***

---

[290] Testimony of Leticia Maxwell (speaking on behalf of the CBA), House Jud. Comm. Hrg. May 3, 2022.

*heard a lot of those here today already. <u>None of them articulated more clearly, perhaps by the Supreme Court Justice Boatright and the other Justice who appeared.</u>* The CBA remains intensely focused on its review of the bill. And the CBA currently takes no position on this bill.

\* \* \*

It's our position that requiring the Department specifically the State Court Administrator's Office to provide and manage services such as payroll, accounting, and human resources on behalf of the Commission does cause both real and perceived conflicts, which really undermine what the purpose of this legislation is: independence of the Commission, we understand that it may be very possible for another administrative agency to oversee these functions that's housed in a separate branch of government such as the executive branch, and we would welcome that for your consideration.

\* \* \*

*Third, we think further consideration should be given to the tools available to the Commission to obtain otherwise privileged or confidential information. As drafted the bill may require the department to violate federal and state laws regarding the disclosure of certain employment records or EEOC charges.* And while we appreciate that the language found on page 16, line 2026 of the bill is intended to protect against a waiver of privilege. *<u>A state law declaring that a waiver has not occurred does not bind a federal court, which you've also heard today.</u>* We'd ask you to consider using subpoenas or agreements for disclosure under Colorado Rule of Evidence 502 and Federal Rules of Evidence 502 as a more precise tool for disclosure of otherwise privileged information without a waiver.

\* \* \*

Fourth, Page nine line 11 of the bill provides an attorney shall not appear before the commission five years following service as its executive director. There's simply a concern that this provision violates Colorado Rule of Professional Conduct 5.6, which prevents an attorney from entering into an agreement that restricts the right of a lawyer to practice after the termination of the employment relationship. So, we just would ask you to take a closer look at that. Fifth, *consideration should also be given to expanding the body of persons appointed to the interim committee to include participation of members of all three*

199

> ***branches of government, community stakeholders, including a
> guarantee of racial, ethnic, and gender diversity amongst those
> appointed to serve on that interim committee.***
>
> And finally, as the legislative policy committee of the CBA
> continues to actively review and monitor this bill, we will be
> intensely focused on ensuring that this legislation is fine tuned to
> avoid any of the following three potential unintended
> consequences. One, a chilling effect on the willingness of our most
> qualified and ethical jurists to enter into public service and become
> judges. Two, any negative or disproportional effect on the equity,
> diversity, and inclusivity within the Department, and specifically
> those serving on the bench. ***And, three, legal challenges to the
> constitutionality of the bill as it relates to the separation of
> powers, which could delay the effective implementation of
> legislation intended to strengthen the our system of governance
> here in Colorado.***
>
> * * *
>
> If we do this, it will ensure an independent, fair, competent and
> impartial judiciary—a judiciary composed of persons committed to
> the highest levels of integrity, who hold office and the public trust
> and the promotion in the inspiration of greater confidence in our
> justice system. ***We all want to get this right***[.][291]

Ms. Maxfield's request for the Legislature to reconsider the proposed provision prohibiting the
Commission's Executive Director from representing judges before the Commission for 5-years
following employment was not without context.  As part of his attorney regulation and judicial
discipline proceedings, former Chief Justice Coats hired former Attorney Regulation Counsel
John Gleason to represent him as defense counsel.  The author understands that that the
"training" between the Justices and "an attorney who works in this area" referenced by Chief
Justice Boatright in his April 14, 2022 legislative testimony (*supra*, p. 115) involved Gleason
while he represented Chief Justice Coats in his then-pending attorney and judicial disciplinary
proceedings.[292]  Discussing these topics which "scared everybody to death about nothing" while

---

[291] *Compare Hearing before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix
27(m)(i), pp.  *with* testimony of Chief Justice Brian Boatright and Justice Monica Márquez as
described starting at p. 163.

[292] When specifically requested to disclose the identity of the presenter, the Justices
constructively refused to answer as part of their overall response, which conditioned the
production of ***any*** public records on payment of a $7,050 deposit (which was later increased to
$11,820 with a preconditional $2,370 deposit for the Department to even *calculate an estimate*
for an additional records request).  *Supra*, p. 115 (quoting Chief Justice Boatright's testimony);
*see also* Appendix 30, pp. 18, 40, 71-72 (request for public disclosure of presentation and the

disciplinary proceedings were pending raises additional grounds to suspect that the Justices engaged in *ex parte* communications prohibited by Canon Rule 2.9. [293]

The fact that the Justices appointed Mr. Gleason's law partner and co-counsel in *Coats*, Alec Rothrock, to serve on its Judicial Ethics Advisory Board (CJEAB) also presents a substantial conflict of interest and appearances of impropriety.  Rothrock is currently Chair of the CJEAB, which produces advisory opinions as to the application of the Code.[294]

As part of legislative consideration of the constitutional amendment proposed by HCR 23-1001, Chief Justice Boatright later argued that the composition of a judicial discipline rulemaking committee should include attorneys (i.e. Gleason and Rothrock) who represent judges in judicial disciplinary proceedings.  In his testimony, Boatright stated:

> We are in favor of the amendments. One of them is to make the rulemaking committee more balanced. And I think that that is just, again, good common sense. The way that the amendment was made is we would have five people from judicial discipline, which is the equivalent of the prosecution community. There would be three from the tribunal board and three from the Supreme Court. And I don't think that we would set up any type of a committee, rulemaking committee like that, because, first of all, *there's not anybody that would be from the defense community or representing the respondent judges*. And I think that those need to be added.[295]

A thorough investigation of the Justices' conduct and coordination with respect to the CBA will require obtaining all of the Justices' and the Department's internal communications relating to lobbying through the CBA as well as any external communications with the CBA.  Nevertheless, the substance of the CBA's testimony during the interim committee process and Chief Justice Boatright's public acknowledgment of getting "our consumers . . . to come forward" presents strong circumstantial evidence that the CBA's policy positions were developed in consultation

---

Department's general responses); *supra* note 87 (also discussing general context of Judicial Department's constructive denial of public records requests).

[293] John Gleason also represented former 18th Judicial District Court Judge John Scipione in judicial and attorney disciplinary proceedings that were pending from 2021 until May 6, 2024. *Matter of Scipione*, 2024 CO 23; *People v. John E. Scipione*, 23PDJ050.

[294] *See* CJD 94-01 (defining procedures and scope of CJEAB's authority); current roster of CJEAB board members *available at* https://www.courts.state.co.us/userfiles/file/ Court_Probation/Supreme_Court/Committees/Judicial_Ethics_Advisory_Board/2024%20Board %20Members%201-29-24.pdf.

[295] *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the S. Judiciary Comm.*, Colo. Leg., April 19, 2023; Appendix 27(y)(i), p. 4:4-11.

with the Justices and the Judicial Department, who were pursuing self-interested objectives in violation of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.11, 2.16, 3.1, and 4.1.

***The Justices coordinate legislative advocacy, public relations efforts, and the development of a public record for the Justices' self-interested rulemaking with the Institute for the Advancement of the American Legal System.***

The Justices' conflicts in their coordination of legislative advocacy, public relations efforts, and the development of a public record for rulemaking through the Institute for the Advancement of the American Legal System (IAALS) was more subtle than the Justices' engagement with other legal interest organizations. From the initial hearing on SB 22-201, the Justices presented IAALS as a neutral think tank capable of giving a "national perspective" on the contemplated reforms to Colorado's judicial discipline system. *See* discussion *Supra*, p. 177. At no time during the consideration of legislation or even the Justices' own promulgation of Colo. RJD 41, however, did the Justices disclose that Justice Samour is a member of the IAALS Board of Advisors.[296] By presenting IAALS as an objective and neutral outside organization, the Justices developed a narrative through which they attributed reforms that they were agreeable to as a sincere effort to bring Colorado in line with nationally recognized best practices.[297] This

---

[296] https://iaals.du.edu/partners; https://iaals.du.edu/profile/carlos-samour-jr.

[297] It should be noted that by endorsing IAALS and the recommendations made in its 2018 Report, Justice Márquez and the other Justices were, again, effectively pre-announcing the legality and merits of an outcome—this time the outcome of the legislative process. For general reference, the IAALS Report contains the following recommendations:

1. Develop clear written definitions of the distinction between requests for evaluation that raise issues of judicial discipline from requests limited to claimed legal errors;
2. Discipline commissions should be constitutional entities;
3. Greater information sharing with judicial performance entities to proactively address developing patterns of judicial misconduct;
4. Diverse membership (demographically, vocationally, and geographically) on discipline commissions;
5. Establishment / reinforcement of stable and independent funding sources;
6. Adoption of 2-tier systems, which separate a discipline commission's investigation and prosecution functions from adjudicative functions;
7. Establishment of internal procedures, codes of conduct, and defined processes for commissioner disqualification;
8. Legal authorities (i.e. the Code, the Colo. RJD, etc.) should be posted on commission websites;
9. Elimination of barriers to the filing of requests for evaluation with capabilities to receive such requests electronically;
10. Clear communications as to whether commissions accept anonymous complaints and verification that confidentiality rules are constitutional (i.e. not overbroad or vague);

202

narrative, incidentally, has now been adopted and endorsed by this Commission's Vice Chair James Carpenter in his public explanations of the merits of Amendment H (which the Judicial Department has had no choice but to also publicly support in order to avoid appearing hypocritical).[298]  Beneath this narrative, however, the Justices coordinated with IAALS to avoid addressing two of the primary needs for reform, 1) inclusion of the Judicial Department's administrative records in the scope of the Colorado Open Records Act and 2) composition of the Special Tribunal to ensure, in situations involving conflicts, that the Colorado Supreme Court is not replaced with a panel prone to the same problems of being a collegial body.  *See generally* ABA Model Code of Judicial Disciplinary Enforcement, Rule 26.  The need for the Judicial Department's inclusion in CORA was repeatedly raised during the Interim Committee's hearings.  Likewise, it was repeatedly noted that former Justice Rebecca Love Kourlis, who founded IAAS and served as its initial Executive Director, authored the Colorado Supreme Court case that had originally removed the Judicial Department from the scope of CORA.[299]  When Justice Kourlis testified to the Interim Committee, she was not questioned about either the merits of extending access to the Judicial Department's administrative records through CORA or whether a replacement Special Tribunal composed of multiple members of another collegial court (i.e. the Court of Appeals) effectively addressed the appearances of conflicts recognized through ABA Model Rule 26.

Beyond the overall narrative of selectively claiming "best practices" as the reason for the Justices to support only those legislative reforms that they agreed with, the 2018 IAALS Report was also

---

11. Commissions should be able to provide advice as to appropriate conduct with a searchable database of advisory opinions;
12. Development of standardized forms for commission orders with an online and searchable platform to record precedent; and
13. Rules should prevent resignations and retirements as a path to subject judges avoiding accountability for serious misconduct.

Inst. for the Adv. of the Am. Legal Sys., RECOMMENDATIONS FOR JUDICIAL DISCIPLINE SYSTEMS, July 2018; Appendix 27(s)(iii)(13)(l), pp. 24-25.

[298] Tony Gorman, *Amendment H: Judicial Discipline Board, Explained*, Colo. Pub. Radio, October 5, 2024 (attributing statement that "the new system would match national best practices in judicial discipline" to Vice Chair Carpenter); *see also* https://coloradojudicialinstitute.org /news-events/newsroom/newsroom.html/article/2023/01/27/where-does-colorado-s-judicial-discipline-legislation-go-from-here- (quoting SCAO lobbyist Terry Scanlon's public support of HCR 23-1001).

[299] *See State Ct. Admin. v. Background Info.*, 994 P.2d 420 (Colo. 1999); *see, e.g. Hearing before the Legis. Interim Comm. on Jud. Discipline*, Colo. Leg., July 12, 2022 (Chris Forsyth / Judicial Integrity Project presentation); Appendix 27(s)(ii)(1), p. 5:1-7.

used to justify the Justices' abuse of their rulemaking authority by adopting a one-sided Code of Conduct under Colo. RJD 3.5 without consulting this Commission.[300]

The Justices' conflicts of interest in relying upon narratives developed through IAALS became more apparent at the January 11, 2023 public comments hearing on Colo. RJD 41. Then-newly appointed IAALS CEO Brittany Kauffman testified in support of the Court's proposed rule. Kauffman did not disclose whether she appeared at the request of one or more of the Justices. Moreover, without disclosing his relationship as an IAALS board member (who was presumably involved in the decision to hire Kauffman as CEO) and proceeding to comment on the merits of the Masias Controversy, Justice Samour stated at the conclusion of IAALS's presentation:

> I just want to thank you.  You know it is easy to come here and
> cast dispersions on the Court and impugn the dignity of the Court
> based upon speculation and conjecture.  I appreciate you coming
> here and providing comments that are based on research and
> knowledge as opposed to just speculation, so thank you.[301]

During IAALS's presentation, none of the Justices asked IAALS CEO Kauffman her opinions on this Commission's objection to proposed Colo. RJD 41, specifically that the Special Tribunal should go beyond Court of Appeals judges to be composed of both Court of Appeals and District Court judges, none of whom serve on the same court or in the same Judicial District.[302]  This Commission's proposal for the composition of the Special Tribunal effectively resolves the problems of inherent conflicts of interest on a collegial court that Rule 26 of the ABA Model Code of Judicial Disciplinary Enforcement seeks to remedy.  Ultimately, the Justices ignored this Commission's objection and, even after the structure this Commission proposed was included in the final version of HCR 23-1001, the Justices failed to adopt a conforming amendment to Colo. RJD 41.

---

[300] *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., August 10, 2022 (IAALS presentation); Appendix 27(s)(iii)(3), p. 7:27-31; *see also* discussion *supra* starting at p. 108.

[301] Public Hearing—Colorado Rules of Judicial Discipline, January 11, 2023, *available at* https://youtu.be/TXYhKkycnV4; Appendix 26, p. 16:14-17.

[302] This Commission's objections to Colo. RJD 41 as well as objections raised by then-former Senator Lee are described in a press article published shortly before the Court's public hearing. Migoya (1/8/23), *supra* note 14.  Like other requested records, the Judicial Department has constructively denied access to both this Commission's written comments and the written comments submitted by Senator Lee.  Appendix 30, pp. 10, 40, 27, 71-72; *see also supra*, note 87 (describing context of Judicial Department's constructive denial of records access).  As further noted, the Court's refusal to even consider this Commission's objections occurred in conflict with Chief Justice Boatright having publicly expressed support for including District Court judges on the Special Tribunal.  *Supra*, note 14; *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the S. Judiciary Comm.*, Colo. Leg., April 19, 2023; Appendix 27(y)(i), p. 4:12-15 ("There was an amendment to include District Court judges, which we completely support.").

204

Like other forms of legislative engagement, the Justices appear to have used their influence with outside interest groups and non-profit organizations, including IAALS, to lobby for particular legislative or rulemaking outcomes.  A thorough investigation of the Justices' conduct as to their engagement with IAALS will require obtaining all the Justices' and the Departments' communications / documentation relating to lobbying around SB 22-201, HCR 23-1001, HB 23-1019, HB 23-1205, and Colo. RJD 41.  Relevant discovery further includes any external communications with IAALS, its staff, and its leadership.

Justice Samour's undisclosed connections to IAALS and the Justices' apparent indirect lobbying through IAALS created appearances of impropriety and presents a reasonable basis to suspect that all the Justices have violated Canon Rules 1.1, 1.2, 1.3, 2.2, 2.11, 3.1, and 4.1.

### *The Justices use "listening tours" to directly lobby judges and Judicial employees as to the merits of the Masias Controversy and the "toxic" culture pervasive in the Judicial Department.*

A significant part of the Justices' strategy in contracting for their self-serving "independent" investigations was to use the investigations and the recommendations generated through those investigations as an excuse for direct outreach to all the Judicial Department's judges and individual employees statewide.  Through this outreach, the Justices undoubtedly made many repeated public statements about the merits of the Masias Controversy and their own involvement in it.  When requested to provide records (including an accounting of public funds) of these so-called "listening tours" which are premised upon Justices' overall "Workplace Culture Initiative," the Justices have constructively denied access to the records.[303]  As expressed through Chief Justice Boatright's January 11, 2023 State of the Judiciary Address, however, it is clear that the substance of these "listening tours" included the Justices' collective efforts to develop a false narrative that the allegations involved in the Masias Controversy (including substantiation of the Judicial Department's "toxic" culture) were not important to Judicial Department employees, who primarily sought increases in pay.  Again, as stated in Chief Justice Boatright's address:

> We heard from many of our employees that what happened over 3 years ago involving people who are no longer with the branch was not important to them, and they have confidence that the right steps are being taken for our future.  *Supra*, p. 180; Appendix 27(u), p. 5:10-12.

In his address, Chief Justice Boatright further confirmed that the function of the "listening tours" was to have contact with every Judicial Department employee and to do so with a Court of Appeals Judge (who is part of the Court's limited pool for composing Special Tribunals under Colo. RJD 41 and who would likely later have to recuse from a Special Tribunal due to the *ex*

---

[303] Appendix 30, pp. 15-17, 40, 44, 46-47, 71-72; *see also supra*, note 87 (describing general context of Judicial Department's constructive denial of records access).

205

*parte* communications occurring through these "listening tours").  In relevant part, Chief Justice
Boatright stated:

> From September through the end of December we divided up the
> state amongst the seven of us and, ***many times accompanied by a
> Court of Appeals judge***, hit the road with the goal of meeting and
> hearing from every judicial branch employee.  (Emphasis added).
> *Supra*, p. 180; Appendix 27(u), p. 4:31-34.

The Court's "Workplace Culture Initiative" website also provides evidence of the degree of
coordination between the Justices and their colleagues on the Colorado Court of Appeals to use
public resources to develop and disseminate otherwise prohibited public comments about the
Masias Controversy and the Justices' response to it.  *See generally* Canon Rules 2.9, 2.10, 2.11,
and 4.1.  On the Colorado Supreme Court's "Workplace Culture Initiative" website and in
Justice Marquez's videos posted on the site, Court of Appeals Chief Judge Gilbert Román is
identified as being on the "Steering Committee" for the Court's initiative and helping with its
"training working group."[304]  Moreover, the Court's website explains that outreach through the
"Workplace Culture Initiative" went beyond meeting with Judicial Department employees to
include Justice Márquez and Chief Judge Román hosting "a series of meetings" with various
specialty bar associations to discuss the Troyer-Mitchell Report, the ILG Report, and the broader
initiative.  The website stated:

> In October-November 2022, Justice Márquez and Chief Judge
> Román also hosted a series of listening sessions with the diverse
> bar associations about the Troyer and ILG Reports and the
> Supreme Court's Workplace Culture Initiative. These sessions
> included meetings with the Asian Pacific American Bar
> Association (APABA), the Colorado Disability Bar
> Association(CDBA), the Colorado Hispanic Bar Association
> (CHBA), the Colorado Women's Bar Association (CWBA), the
> Colorado LGBT Bar Association, the South Asian Bar Association
> (SABA), and the Sam Cary Bar Association (SCBA). Justice
> Márquez also presented on these topics at the CWBA Legislative
> Breakfast.

Notably, these were among the same legal interest groups that the Justices had sought to recruit
for their lobbying efforts on judicial discipline issues.  Like Chief Justice Márquez, Chief Judge
Román is subject to a retention election in November 2024.

Although the records and information that the Judicial Department has made available regarding
the "listening tours" and the Justices' "Workplace Culture Initiative" are limited, there is a
reasonable basis to again suspect that the Justices misused substantial public resources as a
means of continuing to violate the Code's prohibitions against judicial commentary on pending
or impending cases.  Further investigation is needed to understand the scope of the suspected

---

[304] Appendix 28, p. 8:29-38.

206

violations, the substance and to identify which other judges, attorneys, and court staff may have assisted the Justices in violating the Code.

### *The coordinated effort to nominate Justice Gabriel for the American Inns of Court 10th Circuit Professionalism Award*

Beyond the Justices' influence on the CBA, IAALS, CJI, and the various specialty bar associations, the Justices have sought to co-op or influence other legal interest groups for their own personal advantage.  Through his close friend Tom Overton, Justice Gabriel recently sought and succeeded in using the American Inns of Court as a means of self-aggrandizing and bolstering the credibility of the ethically besieged Colorado Supreme Court.[305]  Overton, with a supporting letter from Chief Justice Boatright, nominated Justice Gabriel for the American Inns of Court 10th Circuit Professionalism Award.  Justice Gabriel was aware of his nomination and allowed it to move forward. Justice Gabriel allowed his nomination to proceed despite concerns being raised about its timing with judicial retention elections (for Chief Justice Boatright, Justice Márquez, and Justice Berkenkotter) and the constitutional amendment proposed through HCR 23-1001 being on the November 2024 ballot.  Justice Gabriel further allowed his nomination to proceed without informing the American Inns of Court of the existence of his personal involvement in the Masias Controversy.  Additional investigation is needed to identify other judges, justices, and attorneys who supported Justice Gabriel's nomination notwithstanding their knowledge of his reported involvement in the Masias Controversy.  Because the American Inns of Court selects recipients of the Professionalism Award through a committee composed of federal judges from various Federal Circuits and in consultation with the Chief Judge of the Circuit in which the Award is given (the 10th Circuit's Chief Judge is Jerome A. Holmes, who replaced former Chief Judge Timothy M. Tymkovich on October 1, 2022), the awards committee's considerations in recognizing Justice Gabriel also deserve further investigation.

The Professionalism Award is a national award for a lifetime of service that includes recognition at the 10th Circuit's bi-annual Bench and Bar Conference as well as an honorary reception at the U.S. Supreme Court.[306]  The reception at the U.S. Supreme Court occurs as part of the American

---

[305] Overton's efforts to promote Justice Gabriel through professional society awards is part of a broader pattern that includes having the American Board of Trial Advocates—Colorado Chapter, of which Overton is now the immediate past-President, honor Justice Gabriel with the Chapter's 2023 "Judicial Excellence Award."  *American Board of Trial Advocates Honors Justice Richard Gabriel with Judicial Excellence Award*, LAW WEEK COLORADO, November 21, 2023.  Justice Gabriel has diligently added the Judicial Excellence Award, further 2024 recognition as an "Honorary Life Fellow" in the American Board of Trial Advocates, a 2022 award from the Colorado Judicial Institute, and the most-recent 2024 American Inns of Court 10th Circuit Professionalism Award to his official biography.  https://www.coloradojudicial.gov/ contact/richard-l-gabriel.

[306] https://www.innsofcourt.org/AIC/Awards_and_Scholarships/Professionalism_Awards /Professionalism_Awards_Criteria.aspx.  Incidentally, the agenda for the 2024 10th Circuit Bench and Bar Conference held on September 4th through 7th included presentations by Justice Hart and

Inns of Court's celebration of October as National Civility Month.  Ultimately, Justice Gabriel was chosen by the American Inns of Court's selection panel to receive the 2024 10th Circuit Professionalism Award.[307]  Through its feed on Twitter/X, the Judicial Department posted a video ***produced by the Judicial Department*** announcing the award and featuring Chief Justice Márquez, Justice Hart, and SCA Vasconcellos all attesting to Justice Gabriel's character.[308]  The video also describes Justice Gabriel as having served as "Chair of the Colorado Judicial Institute."  Moreover, the video concludes with an incredulous statement that receiving the award reflects Justice Gabriel's "unquestioned integrity and dedication to the highest standards of the rule of law."  After Justice Gabriel's selection for the Professionalism Award, Tom Overton "suggested" to then-Inn President Courtney Radtke McConomy that the local Minoru Yasui American Inn of Court purchase a $1,090 half-page congratulatory announcement in the CBA's *The Colorado Lawyer* publication.[309]  Moreover, Marilyn Chappell (who lobbied on behalf of the Justices through CJI) has been selected to serve as the Yasui Inn's President for 2024-2025.  The membership of the Yasui Inn includes Justice Gabriel, Chief Justice Márquez,[310] Court of

---

Justice Berkenkotter on ethics-related topics.  If they were comprehensive, these ethics-related topics should have included a relevant summary of the Special Tribunal's disciplinary opinion in *Coats*, discussion of ethical deficiencies at the U.S. Supreme Court, and the limited Code of Conduct adopted by the U.S. Supreme Court in 2023.  In addition, U.S. Supreme Court Justice Amy Coney Barrett was the Conference's featured speaker.  Michael Karlik, *Justice Amy Coney Barrett Disputes Characterization of 'Divisive' SCOTUS Term*, COLORADO POLITICS, September 6, 2024.  As analogous to the present failures of Colorado's judicial discipline system and the need for impeachment as a backstop, it is intriguing that the national dialogue regarding the U.S. Supreme Court's ethical deficiencies has not included calls for a Congressional ultimatum demanding that the Justices adopt the same enforceable Code of Conduct for United States Judges applicable to all other federal judges, or face impeachment.  The 10th Circuit Conference Agenda with the scheduled presentation of the Professionalism Award to Justice Gabriel is *available at:* https://tenthcircuitconference.com/.  The reception to honor Justice Gabriel and others at the U.S. Supreme Court is scheduled to occur on October 26, 2024.  https://home.innsofcourt.org/AIC/Events/Celebration_of_Excellence/AIC/AIC_Events /Celebration_of_Excellence.aspx?hkey=c948a819-4e5c-4b7f-b169-66e991d9a35a.

[307] https://www.innsofcourt.org/AIC/Awards_and_Scholarships/Professionalism_Awards/ Professionalism_Awards_Recipients_by_Circuit.aspx.

[308] Colo. Jud. Dep't video announcing award of Am. Inns of Ct. 10th Cir. Professionalism Award to Justice Richard Gabriel (posted September 11, 2024) and *available at* https://youtu.be/QdWrlvsaTRw; Appendix 24(c).

[309] Appendix 24(a), p. 1.

[310] In addition to Justice Gabriel receiving the 10th Circuit Professionalism Award through the American Inns of Court, Justice Márquez received the Colorado Women's Bar Association's "Raising the Bar" Award on September 7, 2023.  Justice Gabriel, Justice Berkenkotter, Chief Judge Román, and other unidentified judges attended the awards reception with Justice Hart

Appeals Judge Grant Sullivan, Court of Appeals Judge W. Eric Kuhn, Court of Appeals Judge Craig Welling, and Court of Appeals Judge Rebecca Freyre.  At one time, Justice Hart was also a member of the Inn.  Tom Overton is also a past-President and a current member of the Yasui Inn.  Justice Gabriel is also, himself, a past-President and a current member of the Yasui Inn.  Quite clearly, there was a coordinated effort to seek the Professionalism Award and to co-op the American Inns of Court as a means of distracting from evidence that the Justices committed substantial misconduct through their involvement in the Masias Controversy.

The use of the Minoru Yasui American Inn of Court as a conduit for the Justices' violation of the Code is especially offensive given the Yasui Inn's purpose in honoring its namesake.  When others were silent, Minoru Yasui had the integrity and courage to stand against President Franklin Roosevelt's Executive Order 9066 (which required the curfew, removal, relocation, and internment of Japanese American citizens and permanent residents during the Second World War).  Minoru Yasui deliberately disobeyed the curfew to challenge the constitutionality of Executive Order 9066 through the federal courts.  Yasui sought justice throughout the balance of his life despite threats to his law license, an unconstitutional finding that he had forfeited his citizenship (even though he was born in Hood River, Oregon), his incarceration, and his internment at the Minidoka War Relocation Center in Idaho.  *See Yasui v. United States*, 320 U.S. 115 (1943) (vacating order recognizing forfeiture of citizenship but upholding Yasui's conviction for violation of curfew according to accompanying decision in *Hirabayashi v. United States*, 320 U.S. 81 (1943)).  Because of Colorado Governor Ralph L. Carr's symmetric integrity and courage in opposing the bigotry and unconstitutionality of Executive Order 9066, following his internment, Minoru Yasui joined other family members who had relocated to Colorado during the war.  Minoru Yasui's wife, True, was herself interned at Camp Amache in Granada, Colorado during the war.  Minoru Yasui went on to make significant contributions to the City of Denver and the broader State of Colorado as Vice-Chair, Chair, and Executive Director of what has become the Denver Agency for Human Rights and Community Partnerships.  In 2015, President Barack Obama posthumously awarded Minoru Yasui the Presidential Medal of Freedom.  The State of Oregon recognizes March 28th as Minoru Yasui Day in honor of this legacy.[311]

---

acting as the emcee.  Chief Deputy Attorney General Natalie Hanlon Leh is also mentioned as a past recipient of the "Rasing the Bar" award. Michael Karlik, *Justice Monica Márquez, Attorneys Honored for Efforts to Promote Lawyers' Wellbeing: The Judicial Department Has 'Really Fronted the Importance of Wellbeing,' said Justice Melissa Hart*, COLORADO POLITICS, September 11, 2023.  Márquez received the CWBA's award notwithstanding her involvement in lobbying the CWBA to take positions with respect to HCR 23-1001, HB 23-1019, and HB 23-1205.  The Justices' campaigns to influence and receive awards through legal interest groups appear to be part of an overall strategy connected to the Justices' legislative lobbying efforts and their retention elections.

[311] *See generally,* Peggy Nagae, *Minoru Yasui (1916-1986)*, THE OREGON ENCYCLOPEDIA *available at* https://www.oregonencyclopedia.org/articles/yasui_minoru_1916_1986_ /#.YFU5jGRKiEs; *see also* 2016 Or. Laws Chap. 64; Appendix 24(b).

Media reporting of the September 2014 10th Circuit Bench and Bar Conference included descriptions of comments made by 10th Circuit Court Chief Judge Holmes, former 10th Circuit Court Chief Judge Deanell Reece Tacha, and Justice Gabriel, himself.  According to Chief Judge Holmes, "As I was reading through his material, [Gabriel] could be the poster child for this award."[312]  The press article further describes Gabriel as communicating the following:

> Gabriel, who has sat on the state Supreme Court since 2015, said that in an era of "intense scrutiny of public institutions," he felt it important to highlight professionalism and civility in the legal profession.
>
> "I hope you all will join me in what I see as a truly noble effort, he said. "I know we can and will swing the pendulum back to where it needs to be." *Id.*

In a separate newspaper article and consistent with the Judicial Department's announcement video, Justice Gabriel is attributed to having received the 10th Circuit Professionalism Award because of his "sterling character and unquestioned integrity" and his "ongoing dedication to the highest standards of the legal profession and the rule of law."[313]  The misrepresented propaganda involved in Justice Gabriel seeking a self-aggrandizing professionalism award while the entire Colorado Supreme Court faces scrutiny for likely having engaged in the most serious forms of judicial misconduct (i.e. retaliation, intentional concealment of wrongdoing, and misappropriation of public funds) should not go unnoticed.  In one last embellishment on his seeking the 10th Circuit Professionalism Award during the 2024 election cycle, Justice Gabriel used the Minoru Yasui Inn's October 10, 2024 meeting as an opportunity to deliver a presentation on "Colorado's Judicial Merit Selection and Retention System" that he helped create through the Colorado Judicial Institute's affiliated "Our Courts" program (of which Gabriel chairs the Executive Committee).  Justice Gabriel's presentation focused on reinforcing confidence in Colorado's judicial nominating and retention processes, when the effectiveness of both systems is highly doubtful under the circumstances described in this RFE and in conjunction with the 2024 judicial retention elections, in particular.

As with the Justices' other self-motivated lobbying of and engagement with interest groups, Justice Gabriel's, Chief Justice Márquez's, Chief Justice Boatright's, and Justice Hart's conduct involving the American Inns of Court presents a reasonable basis to suspect that they (if not all the Justices pursuing a pre-determined public relations strategy) have violated Canon Rules 1.1, 1.2, 1.3, 2.2, 2.10, 2.11, 2.15, 2.16, 3.1, and 4.1.

---

[312] Michael Karlik, *AI, Criminal Sentencing, SCOTUS 'Messaging': 10th Circuit Conference Addresses Hot-Button Issues*, COLORADO POLITICS, September 9, 2024 (*inter alia*, confirming that Chief Judge Holmes was directly involved in selecting Justice Gabriel for the 10th Circuit Professionalism Award).

[313] Michael Karlik, *10th Circuit Conference Draws SCOTUS Attendance, Analysis of Judges' Financial Disclosures: Court Crawl*, COLORADO POLITICS, September 9, 2024.

210

***As enabled by the Colorado Supreme Court, the Office of Attorney Regulation Counsel committed unconstitutional, illegal, and retaliatory acts intended to obstruct the legislative process.***

No principle is more fundamental to the American constitutional republic than the universal understanding that the integrity of the legislative process and freedom of expression in that process are sacrosanct.[314] At the federal level, the legislative process is protected from interference by other branches of government through the speech or debate clause of the U.S. Constitution. U.S. Const., Art. I, § 6, cl. 1. "The legislative privilege, protecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary, is one manifestation of the 'practical security' for ensuring the independence of the legislature."[315]

The heritage of the speech or debate clause derives from historical context in England, where the Monarch had habitually intimidated and oppressed members of the House of Commons who opposed the Monarch by bringing criminal charges against them. Accordingly, a provision was adopted as part of the English Bill of Rights for members of Parliament that provides: "That the freedom of speech and debates or proceedings in Parliament ought not to be impeached or questioned in any court or place out of Parliament."[316] The basic principle of legislative independence and free debate was so well-accepted at the time of America's founding, it was also included in the Articles of Confederation, which provided:

> Freedom of speech and debate in Congress shall not be impeached or questioned in any court or place out of Congress, and the members of Congress shall be protected in their persons from arrests or imprisonments, during the time of their going to and from, and attendance on Congress, except for treason, felony, or breach of the peace.[317]

As ultimately adopted in Article I, § 6, clause 1 of the U.S. Constitution, the speech or debate clause guarantees members of Congress that:

> They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session their respective Houses, and in going to and returning from

---

[314] *See generally,* Peter J. Henning and Lee J. Radek, THE PROSECUTION AND DEFENSE OF PUBLIC CORRUPTION: THE LAW AND STRATEGIES, Chap. 16 (Oxford Univ. Press 2011) (providing overview of the Speech and Debate Clause and its operation).

[315] *United States v. Johnson*, 383 U.S. 169, 179 (1966).

[316] An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1689, 1 W.&M. Sess. 2, cl. 2.

[317] ARTICLES OF CONFEDERATION, art. V, § 5.

211

> the same; and for any Speech or Debate in either House, they shall
> not be questioned in any other Place.

Moreover, when the U.S. Constitution was drafted and ratified, the concept of legislative privilege was so well and universally established that there was only limited discussion of the speech or debate clause:

> The speech or debate clause in article I, section 6, is the product of a lineage of free speech or debate guarantees from the English Bill of Rights of 1689 to the first state constitutions and the Articles of Confederation.  Presumably because the principle was so firmly rooted, there was little discussion of the clause during the debates of the Constitutional Convention and virtually none at all in the ratification debates.[318]

It deserves emphasis that the concept of legislative privilege and the speech or debate clause arose through recognition that the Legislature was vulnerable to attacks from both the Executive and Judicial Branches.  As observed by the U.S. Supreme Court, "It was not only fear of the executive that caused concern in Parliament but of the judiciary as well, for the judges were often lackeys of the Stuart monarchy." *Johnson supra*, note 315 at 181.  The basis for the speech or debate clause was "not born primarily of a desire to avoid private suits . . . but rather to prevent intimidation by the executive and accountability before a possibly hostile judiciary." *Id.* Accordingly, the speech or debate clause was intended to protect against and to apply equally to prohibited intimidation by either the Executive Branch or the Judiciary.

Colorado has adopted the fundamental protections of the speech or debate clause through Article V, § 16 of the Colorado Constitution, which provides:

> **Section 16 Privileges of Members**
> The members of the general assembly shall, in all cases except treason or felony be privileged from arrest during their attendance at the sessions of their respective houses, or any committees thereof, and in going to and returning from the same; and for any speech or debate in either house, or any committees thereof, they shall not be questioned in any other place.

When interpreting Colorado Constitution, Article V, § 16, the Colorado Supreme Court has applied federal precedents and has recognized that the protections provided go beyond a guaranteed right of expression to include immunity from suit or prosecution for any legislative activity. *Romer v. Colo. Gen. Assembly*, 810 P.2d 215, 220-22 (Colo. 1991); *Lucchesi v. State*, 807 P.2d 1185, 1189 (1990).

---

[318] Robert J. Reinstein & Harvey A. Silverglate, *Legislative Privilege and the Separation of Powers*, 86 Harv. L. Rev. 1113, 1135-36 (1973); *see also Johnson supra,* note 315 at p. 177.

212

In addition to protections provided directly to legislators, the Colorado Legislature has further enacted prohibitions against government officials abusing their offices to intimidate legislative witnesses. § 8-2.5-101(1.5), C.R.S. provides, in relevant parts:

> (1.5)(a) It is unlawful for any person:
>
> (I) To intimidate a legislative witness, by use of a threat, in order to intentionally influence or induce a legislative witness:
>
> (A) To appear or not appear before a committee of the general assembly;
>
> (B) To give or refrain from giving testimony to a committee of the general assembly; [or]
>
> (C) To testify falsely before a committee of the general assembly[.]
>
> * * *
>
> (II) To take any action against a legislative witness for testifying before a committee of the general assembly.
>
> (b) For the purposes of this subsection (1.5):
>
> (I) "Legislative witness" means any individual that intends to testify or testifies before a committee of the general assembly either voluntarily or pursuant to a subpoena issued by any committee of the general assembly or of either house thereof.
>
> (II) "Threat" means to communicate directly the intent to do any act that is intended to harm the health, safety, property, business, or financial condition of the legislative witness.
>
> (c) Any person violating any provision of this subsection (1.5) commits a class 2 misdemeanor.

Moreover, § 8-2.5-101(2), C.R.S. recognizes a civil cause of action with authorization of an award of attorney's fees and costs to a plaintiff able to demonstrate violation of the section. § 8-2.5-101(2), C.R.S. provides:

> (2) (a) An employee, a franchisee, an agent or an entity under the control of any person, or a legislative witness may recover damages, including reasonable attorney fees, from any person for injuries suffered through a violation of this section.
>
> (b) Nothing in this section shall be construed to prohibit an employee, a franchisee, an agent or an entity under the control of any person, or a legislative witness from pursuing any other right

213

of action permitted pursuant to law for injuries suffered through a violation of this section.

To the extent that the intimidation of a legislative witness spills over to a witness or victim who may testify in a pending or impending civil or criminal proceeding, the intimidation is recognized as a felony.  § 18-8-704, C.R.S. provides, in relevant parts:

**(1)** A person commits intimidating a witness or victim if:

**(a)** By use of a threat, act of harassment as defined in section 18-9-111, or act of harm or injury to any person or property directed to or committed upon:

**(I)** A witness in any criminal or civil proceeding;

**(II)** A victim of any crime;

\* \* \*

**(X)** Any person who has reported a crime or who may be called to testify or who testifies as a witness to or victim of any crime; and

**(b)** He or she intentionally attempts to or does:

**(I)** Influence the witness or victim to testify falsely or unlawfully withhold any testimony; or

\* \* \*

**(III)** Induce the witness or victim to absent himself or herself from an official proceeding; or

**(IV)** Inflict such harm or injury prior to such testimony or expected testimony; or

**(V)** Influence the witness, victim, or any person with knowledge of relevant information to withhold information from, or provide false information to, law enforcement, a defense attorney, or a defense investigator.

**(2)** Intimidating a witness or victim is a class 4 felony.

Despite the universally understood importance of legislative independence and protection from coercion, the Justices, through their supervisory authority over OARC, allowed for and effectively endorsed the prosecution and removal of Senate Judiciary Chair Pete Lee based upon false information provided by OARC to the 4th Judicial District Attorney's Office.  Neither the Justices nor Attorney Regulation Counsel (ARC) Jessica Yates have taken any responsibility for the harm caused, including Senator Lee having to personally expend substantial funds for his

214

defense.  Then, even after being called out for enabling the prosecution of a sitting Senator based upon bogus information, ARC Yates personally sent a disciplinary letter that sought to intimidate and retaliate against Vice-Chair David Prince, the attorney/judge members of this Commission, and its Executive Director for testimony to the Joint Judiciary Committee that was critical of OARC's handling of cases and its obstruction of this Commission's constitutional mandate. Despite ARC Yates's conduct clearly violating the criminal and civil prohibitions against intimidating a legislative witness contained in § 8-2.5-101(1.5), C.R.S., the Attorney General's Office did not enforce § 8-2.5-101(1.5), C.R.S.  Likewise, the Justices did not take any personnel actions to discipline ARC Yates nor did they refer ARC Yates's conduct to an outside investigator/prosecutor for enforcement under the Colorado Rules of Professional Conduct.  *See* Colo. RPC 8.3 (Reporting Professional Misconduct), 8.4(a-1),(b)-(d),(f),(h) (Misconduct).  By taking no action to protect the integrity of the legislative process, including the legislative privilege guaranteed through Article V, § 16 of the Colorado Constitution, the Justices (like the Stuart Monarchs of yore) effectively condoned and endorsed intentional violations of fundamental constitutional rights.  Although the Legislature was not involved in the attacks against Senator Lee and this Commission, it is extremely concerning that no formal actions were taken by the Legislature to protect one of its members and the integrity of its process from the blatantly illegal acts and violations of legislative immunity that have occurred here.  Other than publicly identifying how ARC Yates's conduct likely violated § 8-2.5-101(1.5), C.R.S., this Commission also failed to pursue civil or criminal remedies on behalf of its members and staff.

The chronology of the attacks upon Senator Lee and this Commission provides direct and circumstantial evidence that the Justices intentionally sought to undermine both the legislative and the judicial disciplinary processes through their complicity with the misconduct committed by ARC Yates and other OARC employees.[319]

As explained *supra*, starting at p. 147, concurrent with the July 12, 2022 meeting of the Legislative Interim Committee on Judicial Discipline, the press publicly recognized Senate Judiciary Chair Pete Lee as a champion for reform and as ably pursuing accountability for the misconduct involved in the Masias Controversy. Chair Lee's progress was further evident through the enactment of SB 22-201 on May 20, 2022.  With the Legislative Interim Committee on Judicial Discipline halfway through its monumental task of developing legislation to structurally reform Colorado's judicial discipline system, it was abruptly announced that Senator Lee had been indicted on a felony charge related to his identification of his primary residence. The announcement of Senator Lee's indictment occurred immediately before the Interim Committee held the last of its series of public hearings during which expert and public witness testimony was received to inform the Interim Committee's policy decisions and drafting.

---

[319] Like the Judicial Department's withholding of other public records, OARC has constructively denied meaningful access to records relevant to these issues by requiring an excessive deposit ($370 for 220 pages) and maintaining the ability to redact the content of any records disclosed without providing a privilege log or similar explanation.  *See* Appendix 30, pp. 24-25, 45-46, 59-70.  With respect to the court records relating to Senator Lee's criminal case, the Judicial Department has responded (presumably because of sealing/expungement under § 24-72-703, C.R.S.) that "there are no court records responsive to this request."  Appendix 30, p. 58.

215

Consequently, Senator Lee was forced to remove himself from the Interim Committee at a moment in which his voice was most relevant.[320]

Shortly after the initial reporting on Senator Lee's felony charge, the press explained that the indictment against Senator Lee had included two counts of violating § 1-13-709.5, C.R.S.— Residence-False Information (F5).  The article, however, went on to explain that the grand jury only found a true bill as to one of the two charged counts. The single count that moved forward related to the March 3, 2020 primary election.[321]   Approximately one month after being charged, on September 20, 2022, Senator Lee filed a motion to dismiss the case because the evidence presented to the grand jury was premised upon false information that OARC had provided to the 4th Judicial District Attorney's Office.  Specifically, Senator Lee alleged that OARC had misrepresented information that he had submitted as part of his annual registration as an inactive attorney.  As explained by *The Denver Gazette*:

> The motion said the grand jury was repeatedly told "and with great emphasis, that Mr. Lee had changed his home residence" with the Office of Attorney Registration on Dec. 15, 2019.
>
> "Mr. Guest's testimony was unknowingly inaccurate," the motion said, referring to District Attorney investigator David Guest. [322]

OARC had provided this false information and its later correction through ***sworn affidavits*** submitted to the 4th Judicial District Attorney's Office.  Goodland and Migoya, supra, note 322. Without access to OARC's records and court records, it is unknown who signed these affidavits or with whom they consulted before signing and transmitting the affidavits.  Information from the initial false affidavit from OARC was presented to the grand jury on August 2, 2020. OARC, however, did not notify the District Attorney until September 15, 2020 with a corrective affidavit later submitted on September 17, 2020.  *Id.;* Goodland*, infra* note    Even with the correcting affidavit, however, the 4th Judicial District Attorney's Office did not confess Senator Lee's

---

[320] Marianne Goodland, *State Sen. Pete Lee Indicted on Felony Charge of Falsifying Residence Information*, Denver Gazette, August 9, 2022; Hugh Johnson, *State Senator Pete Lee Charged with Felony*, Denver Gazette, August 9, 2022; Saja Hindi, *Colorado Sen. Pete Lee Accused of Falsifying Residency Information, El Paso Grand Jury Indictment Shows*, Denver Post, August 9, 2022.

[321] Marianne Goodland, *El Paso Grand Jury Indictment Shows Two Counts Against State Sen. Pete Lee*, Denver Gazette, August 11, 2022.

[322] Marianne Goodland and David Migoya, *Pete Lee Asks for Felony Charge to be Dismissed, Saying It Was Based on Incorrect Information*, Denver Gazette, September 20, 2022; Shelly Bradbury, *DA's Office Unknowingly Gave False Information to Grand Jury that Indicted Colorado Sen. Pete Lee*, Denver Post, September 20, 2022.

motion for dismissal of the single charge against him.[323]  Instead, Senator Lee was forced to litigate and argue his motion.  As relevant to the apparent retaliation involved, the reporting on Senator Lee's motion to dismiss discussed his role in seeking reforms of Colorado's judicial discipline structure as well as OARC and the Justices' obstruction of this Commission's access to information and resources, as described in the 8/7/22 CCJD Ltr. (Appendix 27(s)(iii)(12)(f)) and this Commission's testimony to the Interim Committee on Judicial Discipline.  Goodland and Migoya, *supra*, note 322.  4th Judicial District Court Judge Eric Bentley ultimately granted the motion to dismiss on October 21, 2022.  Judge Bentley's dismissal order, however, was never made publicly available through the press.[324]  Even after Judge Bentley's dismissal order, OARC did not issue a public apology or otherwise seek to remedy the harm caused by its provision of false information to the 4th Judicial District Attorney's Office.  Likewise, neither the Justices, the Legal Regulation Committee, nor the Advisory Committee on the Practice of Law investigated the circumstances that caused the reporting of this false information and generation of a false affidavit to determine whether administrative and/or attorney discipline was appropriate for those responsible.  Effectively, by failing to perform their supervisory duties and mandatory reporting obligations under Canon Rules 2.12 and 2.15, the Justices openly endorsed OARC's significant and apparent violation of Senator Lee's legislative privilege under Colorado Constitution Article V, § 16 and his rights of free expression under the 1st and 14th Amendments to the U.S. Constitution and Colorado Constitution Article II, § 10.

In spite of the outcome of Senator Lee's criminal case, the Justices began laying a foundation for further intimidation, retaliation, and misconduct by the Court's OARC at the Judicial Department's February 1, 2023 SMART Act Hearing before the Joint Judiciary Committee.  In his testimony, Chief Justice Boatright made the incongruous and legally incorrect statement that

---

[323] Marianne Goodland, *District Attorney to Move Forward on Sen. Pete Lee Indictment*, DENVER GAZETTE, September 21, 2022.  In addition to discussing the status of the criminal case, the article also explained that Senator Lee was ineligible for a second term in the Senate because of redistricting.  In other words, the interim committees (including the Interim Committee on Judicial Discipline) would be Senator Lee's final contributions in the Colorado Senate.

A subsequent article reported on the District Attorney's responsive court filing.  Marianne Goodland, *DA Balks at Effort to Dismiss Voting Complaint Against State Senator*, COLORADO POLITICS, October 6, 2022.  The decision by 4th Judicial Deputy District Attorney Andrew Vaughn and his Office to maintain the prosecution against Senator Lee after learning that OARC had provided a false affidavit presents a factual basis to suspect that the 4th District Attorney's Office was also complicit in infringing upon Senator Lee's legislative privilege.  It is extremely concerning that the 4th Judicial District Attorney's Office did nothing to inquire into the circumstances through which OARC generated and provided the false affidavit.

[324] Marianne Goodland, *Indictment Against Sen. Pete Lee Dismissed*, COLORADO POLITICS, October 21, 2022; *but see* Nick Coltrain, *Judge Dismisses Illegal Voting Case Against State Sen. Pete Lee: Inaccurate Evidence Was Central to Original Charge, Judge Found*, DENVER POST, October 21, 2022 (quoting Judge Bentley's order).

OARC's operations are "entirely independent of the Supreme Court."  *Contra supra*, note 15; C.R.C.P. 242.5.  Chief Justice Boatright testified, in relevant part:

> Our Court along with the State Court Administrator have administrative authority over the Judicial Department as a whole. At times, it's talked about as judicial leadership. And there's been a suggestion that the Office of Attorney Regulation or as it's known as OARC, is part of the Department leadership on administrative matters, and that simply is not accurate. OARC is an independent office that's tasked with regulating the practice of law. While it serves a very vital function in ensuring attorneys' competence, compliance with continuing education requirements and mandating a robust disciplinary process for attorneys, it does not have administrative authority over the Branch. And we set the budget for OARC, but OARC's day-to-day operations are entirely independent of the Supreme Court and the State Court Administrator's Office. And this is important because matters that come before OARC could end up before the Supreme Court, so we don't have any control over their day-to-day operations.[325]

On February 6, 2023 at around 10:30 a.m., this Commission sent Chief Justice Boatright two letters requesting additional disclosures in *Coats* (including documentation of P.A.I.R.R. 2 requests received and responded to, documentation of the OSA's communications with the Judicial Department as to the ACFR audit, the 2020 performance audit, and the fraud hotline investigation, and materials related to the Legal Regulation Committee's contracted-for investigation of Chief Justice Coats).  At around 4:00 p.m., Attorney Regulation Counsel Jessica Yates transmitted a disciplinary letter addressed to Vice-Chair David Prince and copied to all attorney members, judge members, and the Executive Director of this Commission.  A connection can be implied given the timing and order of these communications.  ARC Yates's letter alleged that Vice-Chair Prince had knowingly made false factual statements to the Legislature through his testimony at the February 1, 2023 SMART Act hearing, which was critical of how OARC had handled this Commission's cases, particularly *Scipione*.

As the basis for her allegations of false statements, ARC Yates focused on Vice-Chair Prince's response to a seemingly innocuous question as to what was going well and what could be improved upon with respect to the changes brought through SB 22-201. House Judiciary Committee Chair Michael Weissman asked this same question of Chief Justice Boatright and SCA Vasconcellos.  Chair Weissman's questioning of Chief Justice Boatright, SCA Vasconcellos, and of Vice-Chair Prince included the following:

> **Rep. Weissman**
> Thank you and colleagues, just to the point that the Chief Justice mentioned. House Members may already know this, because they're starting in the House, but the Interim Committee that a lot

---

[325] *Hearing before the J. Judiciary Comm.*, Colo. Leg., February 1, 2023 (Colo. Jud. Dep't SMART Act presentation); Appendix 27(v), p. 1:36-2:10.

218

of us were involved with, did vote forward one concurrent resolution, one bill. We will all first in the House, then in the Senate, deal with these in the due course. It's HCR 1001 and HB 1019, which represents the work of the interim committee. So, we'll grapple with that as it comes up to the subjects, then, that both the Chief and the State Court Administrator have been speaking to, and you largely covered it. But I did want to ask and, in transparency, I will ask the Commission the same question. Interested to sort of hear what you know what is working, what is not working? We're well into the transition timeline, we have a few months left in terms of the launch Mr. Vasconcellos, as you called it, and then I would also like to hear how things are going as to another substantive element of HB, sorry, SB 201. Last year, the information sharing in Section 106 of that new article laid down again, what's working, what's maybe stuck from your perspective?

**Sen. Gonzales**
Chief Justice Boatright

**Chief Justice Boatright**
Thank you, Representative Weissman, for that question. I do think that the information flow is going very well. I've not received any feedback that judicial discipline has not been receiving the documents that they've requested. It's my understanding that they've been given all of the documents that were provided to the independent investigators. We've also consented to the release of the Office of Attorney Regulation Counsel report that came out. I've not seen it because it is confidential, but we have authorized the release of that to judicial discipline. So, we're trying to be as forthcoming as we possibly can in all of this. I have not received any information that people are dissatisfied with the flow of information. That's not risen to me at this point. With regard to sort of the administrative piece, Mr. Vasconcellos, I think probably is better to address that.

**Sen. Gonzales**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. Thank you, Representative Weissman, I think in terms of what's working well, on the administrative front, I have made it a priority to basically have, I mean this virtually, but an open door for Mr. Gregory and his concerns. And, you know, he is able to he has contact information, including personal cell phones for most of my Division Directors. So, we're trying to help put him in a position where he doesn't have to navigate a staff of 250 when he has questions, when he has a particular need that

219

needs to be addressed. He can work with me directly or can work with my senior team. So, I think that line of communication, that access to us is working well. And I think anytime you stand-up a new independent entity, there are growing pains. I think there's a pain period for new any new agency. I don't know that this is any better or any worse. I don't really have a ton of personal experience. I will admit that Mr. Gregory and I don't always agree on solutions. But I remain committed to working with him and collaborating on solutions so that he can be successful.

* * *

**Rep. Weissman**
Thank you. And just a parallel line of questioning earlier this afternoon, you've already spoken to the last of them, I would invite you to comment a bit more briefly on how two of the charges set up in 201 are proceeding. One is sort of provision of support upstream of the pivot, middle of this year, to a more fully independent structure for the Office as codified in the bill. And then you did speak to this next one a bit. But flow of information is obviously critical to the whole mechanism working. If you could speak to that. I just want everyone here to hear, you know, a little bit from both sides. So, I'm putting the questions to you, as I said that I would. And I think the third one was going to be the ombuds structure question, but you've spoken to that. So, thank you, Judge.

**Sen. Gonzales**
Judge Prince.

**David Prince**
Thank you, Madam Chair. And thank you, Mr. Vice Chair for the questions and the opportunity to respond to the same issues that were addressed by the Judiciary earlier. I'll try to take them in the order you provided.

The first question is about support. The Senate Bill 22-201 did provide us with our own independent funding for the future. Impossible really to have that happen like that. I think I heard earlier the phrase to turn the switch on or turn the switch off, so one of the things we negotiated with the judiciary and that the General Assembly passed was a one-year period through this summer of transition.

I think I would agree with the State Court Administrator's description earlier that there are a lot of successes to point to. There's also some friction and some problems that have occurred in that support. I would say that there are some examples of some

really great work that the State Court Administrator's Office has done in trying to help us with that transition. I'm thinking of the example see, we've been on their computer system through OARC in the past, and the State Court Administrator's IT system has been working with us, as babes in the woods, trying to understand what kind of software do we need? What kind of hardware do we need? How are we going to handle all the confidential, you know, all kinds of issues that you never would think about setting up your home or even an office system, and they've been just fabulous working with us. And we're still in that process. It's not done yet, but I can't even remember really a hiccup on that one. There have been other areas where there have been some disagreements.

But there have been some real challenges as well. Candidly, the Troyer Report talked to us a lot about the toxic environment at the Judiciary, we experienced that on occasion with some of this stuff, because some monkey wrenches get thrown at us that, really we're able to deal with we're able to get around. But for example, the Governor signed this Bill into law in May. 21-days later, the Supreme Court's Office of Attorney Regulation Counsel announced to us without prior warning, they were providing no more attorney or investigator support, effective immediately. We literally were in the midst of cases. And they just announced one day, we're dropping everything. And frankly, we then had to kind of fight with them to get our own litigation file in one of those cases, near in a case at that time. And, so, we've had some challenges.

That takes me into the information sharing. We were in a pretty bad position when we were in front of you a year ago. When we were with you a year ago. There was one particular case that ended up getting talked about. The Chief Justice at that time said that the investigators were being provided with unfettered access. And I think to information, I think we can all agree that that is absolutely the goal for something as important as judicial ethics oversight. That the Judiciary itself should be providing unfettered access to information so that we can have credible review of any allegations of misconduct. Unfortunately, we weren't even close to that last year, not trying to avoid characterizations, let's work with real numbers. The Judiciary itself had assembled 12,000 documents they considered relevant on one of the examinations we were doing. At the end of 2021, they had given us about a dozen. By the time we got to the SMART hearing, they'd given us about 1,000. So, a little less than 10%. The Legislature then signed into law Senate Bill 22 201, and actually required them to provide us with records. And it took a while, but we got a lot of that. So, I'd say the ratio now is more like 80/20, we probably have 80% of the

221

information we seek. There is probably 20%. And it's hard to come
up with a number on this one because I don't have a control set
where I can compare the numbers, or I could a year ago or
eventually after I got the numbers from Troyer, could last summer.
So, at this bit of an estimate, but an overwhelmingly better
position. Still a lot of information on various cases that we asked
for and we don't get. I'll tell you one of those files that we got
when the Supreme Court's OARC stopped doing work on our
cases. One of the files we got, we found that they had not disclosed
to us additional allegations of misconduct against the judge in an
ongoing matter and had not disclosed to us some evidence of those
allegations. They were serious, they resulted in sanction. And, so,
those are not ancient history. That's 2022. That's the last 12
months, but we're in an infinitely better position than we were in
about a year ago. Let's see. I think that's flow of information.

And then the ombuds I think you're right, I think I probably
addressed that. So, I don't think there's anything else to add there.
We just focus on: Gotta be independent.[326]

In response to ARC Yates's February 6, 2023 disciplinary letter, this Commission, through the
Attorney General's Office, had former Colorado State Public Defender David Kaplan (who had
also defended Senator Lee in his criminal case) appointed as a Special Assistant Attorney
General (SAAG) to represent Vice Chair Prince, the attorney/judge members, and Executive
Director Gregory.  Kaplan drafted a letter that was sent to ARC and copied to both the Justices
and members of the House and Senate Judiciary Committees.  The letter highlighted how Vice-
Chair Prince had engaged in protected speech, how ARC Yates likely violated § 8-2.5-101(1.5),
C.R.S., and how Yates's disciplinary letter created a significant and unconstitutional chilling
effect.  Although the actual letter was not published, contemporaneous press reporting described
its substance.[327]

A subtle point that has not been addressed in press reporting regarding ARC Yates's retaliatory
February 6, 2023 disciplinary letter is that Judge Prince engaged in not only protected speech but
privileged speech that was constitutionally, statutorily, and regulatorily compelled.  1st and 14th
amends., U.S. Const.; Colo. Const. Art. II, §§ 10, 25, Art. VI, § 23(3)(g) (recognizing absolute

---

[326] *Hearing before the J. Judiciary Comm.*, Colo. Leg., February 1, 2023; Appendix 27(v), pp.
6:13-7:15, 46:5-47:31.

[327] David Migoya, *Colorado Discipline Commission Accuses Legal System's Discipline Chief of
Illegal Intimidation: Discipline Enforcer Accused Commission Members of Making False
Statements About Lack of Cooperation*, DENVER GAZETTE, March 9, 2023; Shelly Bradbury,
*Colorado Judge Hit with "Intimidating" Admonishment Over Judicial Reform Work, Attorney
Says*, DENVER POST, March 17, 2023 (including quote from Judicial Department spokesman
confirming Justices' awareness of Yates's letter and Commission's objections but asserting that
the Justices were "not involved in the decision to send the letter"; continuing narrative that
OARC is "independent" from the Court).

privilege for reporting judicial misconduct), Art. XIII, § 2 (impeachment), §§ 8.2.5-101(1.5), 13-5.3-102(4) (recognizing application of Colo. Governmental Immunity Act to Commission), 13-5.3-106(2)(b)(III) (prohibiting retaliation for cooperating/information sharing) C.R.S., Canon Rules 2.3, 2.12, 2.15, 2.16 (collectively prohibiting retaliation and requiring reporting of judicial and attorney misconduct); Colo. RJD 1(b) (stating Commission's constitutional mandate), 6.5(d) (recognizing confidentiality yields to speech required for Commission to perform its constitutional mandate and in the interests of justice), 10 (recognizing immunity for Commissioners and Staff), Colo. RPC 8.3(a)-(b) (requiring reporting of judicial and attorney misconduct).  Like this Commission, the Legislature has constitutionally recognized oversight authority as to the Justices of the Colorado Supreme Court through its impeachment powers.  To the extent that Judge Prince provided examples of the Justices' non-cooperation and concealment of judicial misconduct under Canon Rules 2.15 and 2.16 as well as ARC Yates and OARC knowingly assisting the Justices in at least some of those violations as further prohibited by Colo. RPC 8.4(f), Judge Prince and this Commission, and its Executive Director were entitled to absolute immunity.  *See also* discussion *supra*, pp. 3, 6.  The significance of ARC Yates and OARC's infringement upon Senator Lee's legislative privilege and this Commission's absolute privilege were equivalently detrimental to the legislative process and a gross abuse of ARC Yates's and the Justices' official positions.

At the initial hearing on HCR 23-1001, HB 23-1019, and HB 23-1205, Vice-Chair Prince was indirectly asked by Representative Elizabeth Epps to describe the harms caused to him and the judicial discipline process by ARC Yates's disciplinary letter.  The dialogue between Representative Epps and Vice-Chair Prince included the following:

> **Rep. Epps**
> Thank you for that. Judge Prince. This is me working to be my most delicate in trying to think of the phrasing. I wonder, given that you and your colleagues have faced some criticism related to the exercise of this responsibility that you've taken on. I'm including, perhaps, suggestions about allegedly unethical behavior or related to the testimony and things like that. What I wonder is, and I acknowledge that making assumptions about what I have perceived about you, that if with the relative power and privilege that you have, whether it's demographically, educationally, financially, these ways that you are relatively positioned within the community, I wonder if you have any reflections on how, as compared to you and your colleagues, recipients in certain letters, you all being able to withstand this criticism. How that may invite us to consider how someone with significantly less privilege, comparatively, may be able to navigate challenges in the judicial system, specifically connected to how what this bill is proposing may or may not help someone who's within the system. I not trying to say you're the king of privilege, but within the system, you may be the king of privilege. So, within the system, someone who has less privilege, there, right? Is there a way in which this bill may

223

afford greater opportunities for them? I wonder if you have any comments on that.

**Rep. Weissman**
Mr. Prince.

**David Prince**
Thank you, Mr. Chair, and thank you Representative Epps for the question. As you can imagine, this is something. You don't know me, and I agree. I am a person that has had the luxury of many privileges in our society. Of course, my own insecurity requires me to say, but not the ultimate levels of privilege. But I am privileged in many ways, and had a leg up in many ways to have a very successful career and come to where I am, and I'm aware of that. And I've been involved in my career in implicit bias training. Giving it, I mean, not receiving it, and addressing procedural fairness issues. I feel like I have been cognizant of those issues throughout my career, and I'm very proud of that. But to understand it on an intellectual level is one thing. To have close contact with folks who are going through service on the discipline commission has me in close contact with people who are in great fear, and that helps you understand better what their experience is like. And you are accurately describing that I and the other members of the Commission who received the letter you're referencing, who all have law licenses. We're among the most privileged in our society. We're all lawyers, whether we're judges or not. That's a highly privileged position, as you yourself know, and so gives us a sophistication for dealing with issues. A lot of the people we're dealing with on the Commission obviously don't have that experience. I'm fumbling around because I don't really know how to answer your question other than to say that it is a significant challenge and what. And I have a better understanding, having now gone through it, of what it's really like.

And one of the things you can look at that was produced in the interim committee process is the CCASA survivor letter. That person was, as far as I can tell from the letter, pushed to the brink of suicide. By the way they were treated. You also see the involvement of the same personnel that were involved in that that were involved in our letter, that were involved in what happened with Senator Lee. ***There's a pattern here, and something like the ombuds can help with that. And with, despite all my privilege and all my ability to fight and the fact that I have a statutory privilege for testimony that others don't have in whatever they're doing.*** Despite all of that, when I received that letter, my wife's in tears for a couple of nights, my blood pressure hit a 15-year high. I had some other health issues. Went and saw my doctor. I feared for my

224

career. I effectively have to give up what were my plans for retirement because of the way things have gone.

Because we came forward and testified, and it's not just me, it was every lawyer on the Commission. And these are, as I think you can understand, volunteers who are doing their best. Nobody asked to be on the discipline commission. I've never heard of anyone who asked to be on the discipline commission. We get recruited. We get asked to do it. We know it's an incredibly important task, and it's an incredibly difficult one, because you are dealing with holding accountable the most powerful people and privileged people in our society, judges. And, so, you know it's going to be difficult when you go in, but you have no idea that you're going to be under this constant onslaught that we've been under for the last two years.

So yes, if someone is privileged as us, is affected as deeply as we are. And then you look and see what happened with the CCASA survivor, and then you look and see what happened with Senator Lee. And then I know, because people come up to me, just like Mr. Forsyth was saying, frankly, people come up to me, and I know cases and people say, thank you for what you're doing. What shocks me is the number of people who do that, who are judges. And at Judicial Conference, I couldn't go anywhere at conference without judges coming up saying that, but it was always in a quiet hallway near a dark corner, in a whispered voice. I made a joke at one point with my wife. They became urinal conversations. I couldn't go to the bathroom without people coming up to me in a quiet place telling me how much they appreciate what we did. And I've also had judges contact me, and other commission members have, too. Judges, again, the most privileged people in our society, to explain I've been the victim of harassment, abuse, unethical conduct by another judge. And I thank you that you're talking because I wasn't able, I wasn't willing to come forward on mine. I've had more than one judge who's a retired judge, tell me, I stepped down. One of these people, particularly, I was shocked. Because I knew their standing and could never imagine. And you've heard this story if you're in the world of sexual harassment at all, I could never imagine that person being victimized in any way. Because they are so powerful, so strong. And they explained to me, you know, I actually left the bench early because of the level of harassment I was getting from leadership, and I was ready to come down and testify last fall, not last fall, last spring, in the General Assembly session like this. And I got a friendly warning that it was too dangerous for me to do it and not to do it. They told me this after it had happened and had other people talking to me about other judges talking about deciding whether to come forward, who ultimately did not.

225

> All I have to do is look at that CCASA victim. What bravery. But
> in terms of a system, that CCASA victim said I cannot testify and
> give my name. Is that really the third branch of government that
> we want? That that Branch, according to Troyer and ILG, has a 20-
> year history of essentially suppressing these complaints. And it's
> not ancient history. The examples I've given are all 2022 and 2023
> and I'm not allowed to talk about cases, but if I could talk about
> cases, I could start giving you lots of examples of lawyers who are
> under what I would think would be inappropriate pressure right
> now, because they came forward about a judge.
>
> So yes, your question is very well focused. I, David Prince have
> the luxury of great privilege, great resources. Senator Lee had to
> pay for his own lawyer. I don't have to pay for my own lawyer. I
> got lucky because the Legislature created a fund last year for the
> Commission who could pay for a lawyer for me and my
> colleagues, every lawyer member of the Commission, to defend us.
> Other people in the system don't have that. And this is where I
> think CCASA talked earlier about, we wish this went further, in
> response to one of your questions. And part of that further, it
> would be nice to have some legal representation that would be
> available to these folks. So, I've rambled a little bit. I apologize for
> that, but I hadn't really thought through what to say. I suppose, in
> hindsight, I should have. But I honestly didn't really think this
> would come up today, so I apologize for rambling a bit.[328]
> (Emphasis added).

In addition to the press reporting on SAAG Kaplan's letter, Senator Pete Lee also published an op-ed article in *The Denver Post* that highlighted the unconstitutionality of ARC Yates's actions and the Justices' complicity or, at least, tolerance for the constitutional violations.  Senator Lee publicly demanded that the Justices stop the intimidation that was censoring and suppressing the legislative and judicial discipline processes.[329]  Using plain and direct language, Senator Lee explained the gravity of ARC Yates's and the Justices' misconduct in interfering with the legislative process:

> Unlike its usual role of looking into allegations such as sexual
> harassment, stealing clients' money, driving while impaired or
> neglecting cases, this letter was about the attorney's testimony
> presented before a joint House and Senate Judiciary Committee.

---

[328] *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the H. Judiciary Comm.*, Colo. Leg., March 15, 2023: Appendix 27(w)(i), pp. 43:33-46:6.

[329] Pete Lee, *Opinion: Intimidation Tactics from the Judicial Branch Cannot Stand*, Denver Post, March 27, 2023.

226

The regulator disagreed with the factual statements made to the Committee, so she threatened their licenses to practice law.

Such threats and intimidation strike at the heart of the legislative process — the necessity of elected representatives to both obtain public testimony as they consider policy and to provide oversight of government agencies. To allow this regulator's action to stand will chill all potential testimony to the legislature, as each witness will have to calculate the price of speaking truth to power and weigh the risk of career suicide out of fear that a politically motivated bureaucrat may want to prevent their public testimony, cover-up possible wrong-doing or exact retribution.

* * *

While past actions have, in my view, undermined attempts to improve the Judicial Branch, recent actions at the highest level of the Judicial Branch are now impacting the legislative branch in its lawmaking role. Threatening the law licenses of attorneys testifying before legislative committees will deprive lawmakers of critically important information, perspectives, and opinions of men and women who are often deeply knowledgeable about the issues being considered.

Having served in both the Colorado House and Senate and attended hundreds of hearings, I know the importance of hearing testimony from as many perspectives as possible. Sound public policy should only be developed with significant public input. The legislative process will be significantly impaired if lawyers can be intimidated by an over-eager attorney regulation counsel. These patterns and practices are unacceptable, and the Supreme Court should end them. *Id*.

Presumably because they anticipated criticism and scrutiny for ARC Yates's conduct as to both her Office's provision of false information in Senator Lee's case and for sending her disciplinary letter to this Commission, none of the Justices appeared at the March 15, 2023 hearing before the House Judiciary Committee. Instead, the Justices had SCAO lobbyist Terry Scanlon speak on their behalf with Jessica Yates also appearing before the committee. Instead of taking responsibility for the harms caused to Senator Lee and this Commission, ARC Yates's short testimony only reinforced Chief Justice Boatright's previous inaccurate representation that OARC's "day-to-day operations are entirely independent of the Supreme Court."[330]  Outside of

---

[330] In addition to this testimony, ARC Yates and the Judicial Department used their subsequent communications with the press to misrepresent Yates's status as an employee and agent of the Colorado Supreme Court with the Justices having reciprocal duties of direct supervision and

227

the hearing, ARC Yates submitted a letter to the Judiciary Committees and publicly defended her actions as occurring through a "good faith belief" while characterizing Kaplan's allegations of criminal conduct and civil violations under § 8-2.5-101(1.5), C.R.S. as "overblown."[331] Additionally, through her hearing testimony, ARC Yates contended that she controlled access to information relating to records within OARC's custody and control, including by implication records that this Commission sought through its February 6, 2023 discovery letters.  Yates testified, as follows:

> **Jessica Yates**
> Hi, my name is Jessica Yates. I'm Attorney Regulation Counsel. I did sign up, but apparently I didn't quite make the cut. So, sorry that I didn't get on that list. I really just wanted to introduce myself to you. I don't really show up at these hearings, ***because the way***

---

control through legal principles of agency and *respondeat superior*.  As described by *Denver Post* reporter Shelly Bradbury:

> She acknowledged that a letter from her, as head of the Office of Attorney Regulation Counsel, or OARC, holds more weight than a letter from a private attorney, but said she made it clear the letter was not an official action by the office.
>
> "OARC was never working on it," she said. "There was no pending matter in our office. So for my purposes, the matter is closed."
>
> As attorney regulation counsel, Yates serves at the pleasure of the Colorado Supreme Court justices — she was hired by them and could be fired by them — but the office operates independently from the Supreme Court and the judicial department, she said. The justices did not instruct her to send the letter and she did not seek their permission to do so, she said.
>
> "I did it completely on my own volition," she said. "We are an independent office. I don't take direction from the Supreme Court or the State Court Administrator's Office."
>
> Jon Sarché, spokesman for the Colorado Judicial Department, reiterated that in a statement Thursday.
>
> "The Supreme Court is not involved in the decision-making of attorney regulation counsel in individual cases, was not involved in the matters or discussions referenced in the letter, and was not involved in the decision to send the letter," he said.
>
> Bradbury, *supra* note 327; *Contra supra*, note 15.

[331]  Bradbury, *supra* note 320.

228

*our office is structured, we're an independent office within the Judicial Branch*. Mr. Scanlon, you heard from him today. You've heard from other individuals from SCAO. We're not within SCAO, so I wanted to make sure that you knew who I was and that I'm available. If you have questions or concerns, please let me know. We are not a black box. There's a lot that we do that is confidential, but there's a lot of information that I can share about the way we operate, sometimes even about specific cases. If it has come to a public stage or some public information that I can provide. We have an annual report online that describes what we do. I also wanted to let you know that we are not providing any services at this time to the Commission on Judicial Discipline relating to investigations or any of their legal work. And, so, I have just a completely neutral position on the legislation that is being discussed today. We do have some administrative services that we continue to provide, and we also are providing at this point some office space. So, at some time in the future when resource discussions come up, that is relevant to the stuff that we do. *Again, I just wanted to make sure that you knew who I was, that I am independent from the Judicial Department. I operate independently from the Supreme Court. Sometimes when there are questions about records. Are we getting records? I'm the custodian of records for our Office, and so those questions need to be directed to me. I've tried to encourage the Commission to direct those questions to me.*[332] Thank you so much for allowing me to testify today. *Id.* (Emphasis added).

It is indisputable that the actions of Attorney Regulation Counsel Jessica Yates and employees of OARC interfered with the legislative process as it related to consideration of reforms to Colorado's judicial discipline system.  In turn, this interference creates probable cause to suspect the violation of various criminal and civil laws, including infringement of Senator Pete Lee's legislative privilege under Colo. Const. Article V, § 16 and his rights to free expression in the legislative process as shared with the members of this Commission and its former Executive Director under Colo. Const. Art. II, § 10 and the 1st and 14th Amendments to the U.S. Constitution.  The actions of ARC Yates and OARC also directly obstructed this Commission and its Executive Director's absolute privilege to perform their constitutional mandate.  The Justices' tolerance for this probable illegality and the Justices' apparent pre-planned dishonesty in denying their supervisory authority over Jessica Yates and OARC provides a reasonable basis to suspect that they have collectively violated Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.6, 2.12, 2.15, 2.16, 3.1, and 4.1.

---

[332] With this statement, ARC Yates was apparently referring to her purported authority to control the production of the report and information from the LRC's contracted-for investigation. *Contra* Boatright, *supra*, p. 219 ("We've also consented to the release of the Office of Attorney Regulation Counsel report that came out.").

229

**Through their orders and disciplinary opinion in *Kiesnowski*, all of the current Justices used the authority of their offices to knowingly suppress evidence that Chief Justice Boatright and others failed to disclose substantial judicial misconduct to this Commission as required by Canon Rule 2.15.**

The Justices' interference in *Kiesnowski* arose from a significant history of workplace harassment and retaliation by 17th Judicial District Court Judge Robert Kiesnowski that occurred for approximately 5 ½ years before it was finally disclosed to this Commission.[333]  Even after this Commission actually received a copy of the second complaint submitted to SCAO's HR Division on May 19, 2021 (a prior complaint had been submitted on July 3, 2018 but was not provided to this Commission), it took an additional 1 ½ years before the first disciplinary case against Judge Robert Kiesnowski was finally resolved.  Within 3 months of having agreed to a stipulation for his retirement and private censure, Judge Kiesnowski committed additional violations of the Code which resulted in his immediate resignation, a formal discipline hearing held September 6, 2023, and, ultimately, his public censure.

As with other judicial discipline cases filed from 2021 onwards, the Justices did not disqualify themselves from hearing *Kiesnowski*.  Instead, when this Commission sought Judge Kiesnowski's public censure, the Justices (with only Chief Justice Boatright formally recusing)[334] retaliated by striking this Commission's publicly filed Recommendation and record of proceedings.  Colo. Const. Art. VI, § 23(3)(g).  This Commission's Recommendation contained an explanation of the delays in Judge Kiesnowski's original case, including the chronology of non-reporting and criticism of the manner in which OARC provided litigation support.  Through circumstances directly analogous to Attorney Regulation Counsel Jessica Yates sending her February 6, 2023 disciplinary letter to this Commission, the Justices responded to the revelations of judicial misconduct being persistently concealed and OARC's non-cooperation with blatant censorship and intimidation.  Also like the circumstances involved

---

[333] Appendix 21 contains the records filed with the Colorado Supreme Court in *Kiesnowski*.
[334] In response to allegations that he "slow walked" the May 19, 2021 SCAO HR complaint to this Commission, Chief Justice Boatright sent an email to *The Denver Gazette* in which he stated:

> After I committed publicly to ensuring all complaints are appropriately routed to the Commission on Judicial Discipline, I have recused on every disciplinary matter before the Supreme Court when I have learned information in my capacity as chief justice[.]  Migoya, *supra* note 3.

As with his other public statements, this comment had questionable veracity even in the context of *Kiesnowski*.  Through the record that the Court has made available, it is unclear whether Chief Justice Boatright had originally recused himself when this Commission requested the appointment of Special Masters or only after this Commission filed its October 19, 2023 Recommendation.  Further investigation is needed to clarify when Chief Justice Boatright's recusal actually occurred and why (with allegations of delayed reporting involving Chief Justice Boatright in the Recommendation) the entire Court did not conflict itself off of the case according to Colo. RJD 41.

230

in ARC Yates's February 6, 2023 letter, the retaliation related to this Commission having dared to publish facts that were inherently critical of judges (including Chief Justice Boatright), OARC, and SCAO.

The Justices entered their order striking this Commission's filings on the absurd premise that private discipline must remain permanently private/confidential, even if a judge engages in further misconduct requiring additional public discipline and consideration of the subject judge's disciplinary history.  Only after this Commission filed a Motion for Reconsideration arguing the unconstitutionality of the Court's position and its conflict with the Rules of Judicial Discipline, did the Justices allow the re-filing of the record of proceedings, including Judge Kiesnowski's Stipulation for Private Censure.  Even though they allowed the re-filing of the complete record of proceedings, however, the Justices' order partially granting this Commission's Motion for Reconsideration still required this Commission to excise the portion of its Recommendation that included facts critical of judges, OARC, and SCAO.  Immediately after Chief Justice Boatright was criticized in the press for his part in "slow walk[ing]" the referral of Ms. Betz's 2021 HR complaint to this Commission, the Justices proceeded to issue their final disciplinary opinion.  *Compare* Migoya, *supra* note 3 (article published March 3, 2024) with *Kiesnowski*, 2024 CO 12 (opinion issued March 4, 2024).  The Court's disciplinary opinion, in turn, contained further justifications for the Justices' censorship without addressing its impacts upon the Commission and Ms. Betz's fundamental rights to be heard.  *Compare Kiesnowski*, ¶¶ 11-12 *with* Canon Rule 2.6 *and* Colo. Const. Art. II, § 6.

In order to understand the significance and intentionality of the Justices' censorship, it is important to understand the factual context of *Kiesnowski* with reference to the actual statements, court filings, and orders involved.

From 2011 through 2013, Emily Betz worked as a Judicial Assistant for Judge Kiesnowski.  In 2016, Judge Kiesnowski began having a romantic relationship with Ms. Betz's supervisor, Maya Korbe.  As rumors of Judge Kiesnowski's affair with Ms. Korbe began to percolate around the Courthouse, Judge Kiesnowski directed blame towards Ms. Betz.  In August of 2016, Judge Kiesnowski and Supervisor Korbe disclosed their relationship to then-17th Judicial District Court Chief Judge Patrick Murphy.  Murphy, however, did not require Ms. Korbe's transfer to another jurisdiction as required by CJD 08-06.  Judge Kiesnowski and Ms. Korbe later married with Ms. Korbe remaining employed in the 17th Judicial District.  On September 1, 2016, Judge Kiesnowski met with the then-Court Executive Ben Stough to present him with a document titled "Restated Terms and Conditions of Emily Betz's Employment as Judge Kiesnowski's Division Clerk."  The document contained a litany of oppressive expectations.  *See* Appendix 21, pp. 10-12.

In response to his meeting with Judge Kiesnowski, Court Executive Stough transferred Ms. Betz to the Court's judicial assistant pool, which Ms. Betz perceived as a demotion.  Ms. Betz then learned that Judge Kiesnowski had been lobbying other judges with criminal dockets not to hire her as their division clerk.  In late 2016 or early 2017, however, Ms. Betz was hired by newly appointed District Court Judge Tomee Crespin to serve as her division clerk.  Judge Crespin hired Ms. Betz despite Judge Kiesnowski's continued retaliation and encouragement not to hire Ms. Betz.  On July 3, 2018, Court Executive Stough submitted a report to SCAO's HR

231

Department that included an explanation of Chief Judge Murphy's decision to allow Ms. Korbe to remain employed in the 17th Judicial District, expressed concerns about nepotism, allegations of criminal conduct, and a description of Ms. Betz's general allegations of retaliation and harassment. No action was taken by SCAO's HR Division on Stough's report of alleged judicial misconduct by Judge Kiesnowski and Chief Judge Murphy (in his supervisory role). The report was not forwarded to this Commission. Consequently, the non-reporting to this Commission resulted in the limitations period provided through Colo. RJD 4(a)(1) expiring as to Chief Judge Murphy's conduct. As explained by this Commission and Judge Kiesnowski in footnote 2 to the Stipulation for Public Censure:

> In his 2018 report to SCAO's HR Division, Mr. Stough describes the decision not to require Ms. Korbe's resignation or reassignment as occurring due to assurances made by Judge Kiesnowski and Ms. Korbe: "Based on assurances that their workplace conduct would remain professional, no immediate action was taken." Chief Judge Murphy retired July 15, 2019. Consequently, the Commission has no jurisdiction to address the violations of the Code arising from his failure to enforce CJD 08-06's prohibitions against a judge and employee involved in a relationship working in the same judicial district. Colo. RJD 4(a)(1). Appendix 21, p. 9.

In 2020, Judge Kiesnowski was subject to a retention election and blamed Ms. Betz for a series of Facebook postings calling for his non-retention. While erroneously attributing the Facebook posts to Ms. Betz, Judge Kiesnowski sent Judge Crespin a series of text messages and called her on the phone. In the text messages and during his telephone call, Judge Kiesnowski demanded that Judge Crespin take action to stop further Facebook posts. *Id.*, pp. 7-8. On May 19, 2021, Ms. Betz filed a complaint directly with SCAO's HR Division. Ms. Betz's complaint, however, was not forwarded to this Commission until on or about August 26, 2021. *Id.*, p. 4.

Once this Commission learned of the circumstances, it recognized Ms. Betz's HR report as a complaint under Colo. RJD 13(b) and commenced judicial discipline proceedings. With verification of the facts involved, this Commission and Judge Kiesnowski agreed to a stipulation through which Judge Kiesnowski agreed to retire effective July 1, 2023 and to not seek further employment / involvement with the Colorado Judicial Branch. The Stipulation for Private Censure was executed on March 14, 2023. *Id.*, p. 19. With his retirement pending, Judge Kiesnowski committed further violations of the Code by acting as his brother-in-law's attorney during a law enforcement interview in early June 2023. This misconduct under Canon Rules 1.1, 1.2, 1.3, and 3.10 resulted in this Commission initiating formal proceedings, Judge Kiesnowski's immediate resignation, a formal disciplinary hearing held September 6, 2023, and his ultimate public censure.

Following their hearing, the Special Masters issued a report finding Judge Kiesnowski responsible for violating all of the charged counts. Appendix 21, pp. 124-139. As part of its Recommendation, which asked for the Colorado Supreme Court to adopt the Special Masters' Report, this Commission expounded on the circumstances that caused the delays in resolving Judge Kiesnowski's initial disciplinary case. As provided by Colorado Constitution Article VI, § 23(3)(g) and Colo. RJD 6.5(a), 37(c), this Commission's Recommendation became public upon

232

its filing with the Court on October 19, 2023.  The Commission's Recommendation provided, in relevant part:

> This judicial disciplinary proceeding follows former Adams County District Court Judge Kiesnowski having been privately censured with an agreement to retire from office in CCJD Case No. 21-121. Judge Kiesnowski's Stipulation for Private Censure, filed with the Commission on March 14, 2023, is included in the Record of Proceedings in the present case as Exhibit 17 (admitted during the Formal Disciplinary Hearing held on September 6, 2023).
>
> The Commission has received written authorization from Judge Kiesnowski's former judicial assistant, Emily Betz, to publicly disclose her identity. Ms. Betz was the victim of Judge Kiesnowski's admitted misconduct in CCJD Case No. 21-121. Given that Judge Kiesnowski's prior private discipline will become public upon filing of this Recommendation and the Record of Proceedings according to Colo. RJD 37(c), the Commission is compelled to provide an explanation for the delays involved in Judge Kiesnowski's discipline in CCJD Case No. 21-121.
>
> Ms. Betz first contacted the 17th Judicial District Court Executive in 2016 to report her concerns about Judge Kiesnowski's judicial conduct and harassment towards her. At around the same time, former Court Executive Ben Stough and former 17th Judicial District Court Chief Judge Patrick Murphy became aware that Judge Kiesnowski had begun a relationship with his now wife, Maya, who also worked in the District as one of Ms. Betz's supervisors. Contrary to the Judicial Department's Personnel Rules and CJD 08-06, Judge Kiesnowski and Maya Kiesnowski (Korbe) were allowed to continue working together in the same judicial district. These circumstances were not reported to the Commission. Later, on July 3, 2018, Stough sent a letter to then-State Court Administrator's Office (SCAO) Human Resources Director Eric Brown detailing concerns about nepotism/retaliation involving Maya Kiesnowski and the underlying harassment of Ms. Betz. Stough's letter expressly referenced suspected violations of the Colorado Code of Judicial Conduct (the Code) and the criminal offense of Official Misconduct, § 18-8-404, C.R.S. Stough's letter and the updated allegations of judicial misconduct were again not reported to the Commission. Finally, on May 19, 2021, Ms. Betz filed a complaint directly with the SCAO HR Division alleging the circumstances involved in CCJD Case No. 21-121. Ms. Betz's complaint, however, was not forwarded to the Commission until on or about August 26, 2021.

233

> At that time, the Commission received its litigation support (provision of investigators and Special Counsel) through this Court's Office of Attorney Regulation Counsel (OARC). When the Commission requested litigation support for CCJD Case No. 21-121, OARC initially refused to comply with its obligations to provide such support under C.R.C.P. 227 (2021). After OARC eventually provided the requested litigation support, it withdrew as Special Counsel for the Commission in this and all other pending cases on June 10, 2022 (following enactment of SB22-201).
>
> As explained in footnote 2 of the Stipulation for Private Censure, the nondisclosure of Ms. Betz's reporting to administrators within the Judicial Department and Mr. Stough's July 3, 2018 letter resulted in the limitations period under Colo. RJD 4(a)(1) expiring.
>
> Appendix 21, pp. 2-4.

The Justices, with Chief Justice Boatright recusing himself, responded by issuing their Order on October 25, 2023 striking this Commission's publicly filed Recommendation and the entire record of proceedings that was also publicly filed under Colorado Constitution Article VI, § 23(3)(g).  As justification for this censorship, the Justices stated the following in their Order:

> The Recommendation includes as an attachment a Stipulation for Private Censure entered into between the Commission on Judicial Discipline and Judge Robert Kiesnowski in an earlier matter, CCJD Case No. 21-121. That Stipulated Private Censure was entered pursuant to Colorado Rule of Judicial Discipline 35(h), which provides that "[a] stipulated private disposition shall remain confidential, subject to Rule 6.5(g)." RJD 6.5(g) permits the Commission or a judge to file a motion asserting that allegations of misconduct "have become generally known to the public" and should be disclosed. The facts surrounding the Stipulated Private Censure are not generally known to the public and no motion has been filed pursuant to the rule, so their disclosure is therefore not authorized by RJD 6.5(g).
>
> [G]iven that RJD 35(h) requires a stipulated private disposition to remain confidential, with no exception for public disclosure other than that provided in RJD 6.5(g), the Stipulation of Private Censure must be redacted from the record of proceedings. Similarly, references to the details of the facts underlying the Stipulation of Private Censure contained in the hearing transcript or any of the exhibits or other materials included in the record of proceedings must be redacted. The fact that RJD 6.5(f) permits "the Commission and special masters [to] consider the record of any discipline previously imposed" does not mean that the confidentiality requirement of RJD 35(h) may be circumvented by

234

> attaching the Stipulated Private Censure or references to it to the record of proceedings in this subsequent case.
>
> Additionally, the Recommendation includes, at paragraphs 4 through 7, assertions related to the earlier matter that are neither part of the record in this case nor relevant to any issue the Court must decide in this proceeding. These statements shall be redacted from the Recommendation submitted to the court before the Recommendation and the record of proceedings are made public pursuant to RJD 37(c).
>
> Appendix 21, pp. 21-23.

In response, this Commission filed a Motion for Reconsideration that argued: 1) Colo. Const. Art. VI, § 23(3)(g) and Colo. RJD 6.5(a), 37(c) required this Commission to include the Special Masters Report (with Judge Kiesnowski's Stipulation and history of discipline) as part of the record of proceedings (which became public upon filing), 2) Colo. RJD 35(h) must be interpreted consistently with the context of the Rules of Judicial Discipline, as a whole, 3) Colo. RJD 6.5 did not support the Court's ordered redactions, and 4) Judge Kiesnowski had waived confidentiality through the unopposed admission of his Stipulation for Private Censure into evidence at his formal discipline hearing.  In its prayer for relief, this Commission asked the Justices to vacate their October 25, 2019 Order and to accept the previously filed Recommendation and record of proceedings for re-filing.  Appendix 21, pp. 29-46.

The Justices, in turn, issued a second Order, dated November 21, 2023, granting partial reconsideration, but still requiring this Commission to remove the factual statement in its Recommendation that described non-reporting of judicial misconduct and non-cooperation within the 17th Judicial District, SCAO, and OARC.  The Justice's order maintaining censorship of this Commission's Recommendation stated, in relevant part:

> As to the irrelevant and unproven assertions made in paragraphs 4 through 7 (pages 3-4) of the Commission's October 19 Recommendation for Judicial Discipline, 2023, the Motion for Reconsideration offered no argument or basis for reconsideration. The Court's Order dated October 25 therefore stands with respect to those assertions.
>
> Accordingly, the Commission on Judicial Discipline is ORDERED to submit forthwith a revised Recommendation that omits the assertions in paragraphs 4 through 7. When the revised Recommendation and the record of proceedings are submitted consistent with this Order, the Court shall make them public pursuant to RJD 37(c).
>
> Appendix 21, p. 48-49.

235

It should be highlighted that through their Order, the Justices self-asserted the authority to determine what does or does not become public in judicial disciplinary proceedings, despite the plain meaning of Colo. Const. Art. VI, § 23(3)(g), which provides that authority to this Commission in its determination of the record and its decision to file a Recommendation.  In other words, the Justices unconstitutionally self-created authority to impose a prior restraint, to censor, and to determine the **_content_** of this Commission's Recommendations under Colo. Const. Art. II, § 23(3)(g).  This should be recognized as a substantial abuse of the Justices' power and judicial authority.  Amends. 1 and 14, U.S. Const.; Colo. Const. Art. II §§ 6, 10, 25, Art. VI, § 23(3)(g); Colo. RJD 6(a), 32-33, 37(c).

This Commission apparently chose not to further litigate the Justices' censorship and constitutional violations.  Instead, this Commission proceeded to file an updated recommendation that conformed to the Court's second order.  Following the filing of this Amended Recommendation, this Commission ousted Executive Director Gregory and the press reported on the allegations of delayed reporting in *Kiesnowski* and Chief Justice Boatright's concealment of judicial misconduct in the Woods matter.  Despite these events and reporting, the Justices continued to refuse to disqualify themselves and immediately proceeded to issue a final disciplinary opinion.  The disciplinary opinion includes further discussion justifying the Justices' censorship of this Commission's original Recommendation and the disclosure of Judge Kiesnowski's Stipulation for Private Censure in the record of proceedings.  In their disciplinary order, the Justices state, in relevant part:

> In the recommendation filed in this court, the Commission included as an attachment the Stipulation for Private Censure entered between the Commission and Kiesnowski in the earlier, unrelated matter. Because that stipulation was entered pursuant to Colorado Rule of Judicial Discipline 35(h), and was thus intended to remain confidential, we struck the Commission's recommendation and attached record of proceedings. We simultaneously ordered the Commission to submit an amended recommendation and a record of proceedings excluding or redacting the confidential materials and extra-record statements.

> In response, the Commission filed a Motion to Reconsider this Court's Order to Redact from the Record All Information Related to Former Judge Kiesnowski's Prior Disciplinary History. The motion for reconsideration argued that (1) the Rules of Judicial Discipline permit disclosure of the details of Kiesnowski's previous Stipulation for Private Censure; and (2) Kiesnowski waived his right to confidentiality as to his Stipulation for Private Censure by not objecting to its admission into evidence and by committing new ethical breaches serious enough to warrant public discipline. We granted the motion in part and denied it in part. Because Kiesnowski had not disputed the issue of waiver, we declined to resolve any dispute over the interpretation of the Rules of Judicial Discipline. Based on the waiver, we allowed the Commission to include the Stipulation for Private Censure in the

236

> record of proceedings along with references to the facts underlying
> that stipulation. However, the part of our order requiring the
> redaction of the irrelevant and unproven assertions in paragraphs
> four through seven of the Commission's October recommendation
> remained unchanged. We thus ordered the Commission to file an
> amended recommendation and record of proceedings consistent
> with this new order.
>
> The Commission's amended recommendation was submitted on
> December 11, 2023. Thereafter, Kiesnowski timely filed
> exceptions to the Commission's amended recommendation.
>
> *Kiesnowski*, ¶¶ 11-13.

Despite the Justices' censorship, the final disciplinary order fully adopted the Special Masters Report and recommendations. *Id.*, ¶¶ 18-38.

Beyond the Justices proceeding to immediately issue their disciplinary opinion, they further directed State Court Administrator Steven Vasconcellos to publicly comment to both the press and to all Judicial Department employees as to the merits of the allegations that Chief Justice Boatright had "slow walked" Ms. Betz's HR complaint to this Commission. *See supra*, note 3. Vasconcellos's comments to *The Denver Gazette* were reported, as follows:

> State Court Administrator Steven Vasconcellos told The Denver
> Gazette the matter was actually shared with the commission on
> July 1, 2021, and the commission's executive director [Bill
> Campbell] at the time asked for the SCAO to gather additional
> information, which it did.
>
> The entire matter was then handed over in August, Vasconcellos
> said. *Id.*

Although it confirmed the accuracy of this Commission's statement that it did not receive Ms. Betz's complaint until August 26, 2021, Vasconcellos's commentary was again violative of Canon Rules 1.1, 1.2, 2.10 and 2.12.

Ultimately the harm caused by the extended concealment of judicial misconduct by Judge Kiesnowski to both the individual victim, Ms. Betz, and to, more broadly, the integrity of and public confidence in the Judiciary required public disclosure of the facts involved. The Justices' overt abuse of their judicial authority to suppress and censor these facts is a reasonable basis for judicial disciplinary proceedings through Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.5, 2.6, 2.11, 2.12, 2.15, and 2.16.

237

**Without recognizing grounds for their collective disqualification, the Justices affirmed allowing now publicly censured former District Court Judge John Scipione to retain an over $189,530 windfall obtained through Judge Scipione's bad faith in judicial discipline proceedings.**

As part of his efforts to undermine the legislative reforms contemplated through SB 22-201, Chief Justice Boatright used the initial hearing before the Senate Judiciary Committee to deride this Commission for having recommended a stipulation for public censure that included the subject judge's voluntary agreement to a short paid suspension under Colo. RJD 34(c).  Chief Justice Boatright further developed a misleading narrative that the Justices had rejected the recommended settlement to prevent the subject judge from receiving a golden parachute or "payout."  In other words, the Justices presented themselves as staunch enforcers of the Code while portraying this Commission as too lenient.  In his April 14, 2022 testimony, Chief Justice Boatright stated:

> [B]ut as a Justice, what I can say is we have had and I'd have to count him but five or six public matters that have come to the Supreme Court and the judicial discipline makes a recommendation. And only one time have we not accepted the recommendation. And quite frankly, it was because it wasn't severe enough, they were recommending a payout to a judge, and then their resignation. ***And we said we wouldn't agree to a payout.*** And then it went back to judicial discipline, they were able to work something out. And then we accepted the recommendations. So, in terms of, you know, judicial discipline doing their job, I don't have any belief that they are not performing their duties to the best of their ability. I know that there have been. I've looked at their website, and I know they had in 2020, they had almost 200 requests for evaluations and I know that a number of them may have turned into private admonitions. I know, the vast majority of them were what you had alluded to which were complaints about a decision, which really isn't the purview of judicial discipline. But from what I know, I don't think the system is broken.[335]
> (Emphasis added).

In rebuttal, Executive Director Gregory explained that the negotiated settlement involved part-time Baca County Court Judge Debra Gunkel (who had been repeatedly charged with DUI offenses), was intended to remove Judge Gunkel from the bench, and was intended to resolve the case as expeditiously as possible.  Although not explained specifically in Executive Director Gregory's testimony, Judge Gunkel's salary at the time was $2,763.25 per month as a 20% part-time judge.  Appendix 23, p. 57.  Judge Gunkel's original stipulation included a one-month voluntary paid suspension under Colo. RJD 34(c).  The so-called "payout" that Chief Justice Boatright accused this Commission of negotiating was minimal and approximately 1/5 of the salary that Judge Gunkel continued to receive until her case was finally resolved by a second

---

[335] *Hearing on SB 22-201 before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m), p. 10:11-22.

238

stipulation on May 11, 2021. *Id.*, pp. 53-56. Chief Justice Boatright's misleading narrative also failed to explain that the Court's rejection of Judge Gunkel's original stipulation necessitated this Commission filing formal charges and having to litigate formal proceedings with additional costs and burdens on publicly funded resources. *See* Appendix 23, pp. 7-56. In reality, the Justices rather than this Commission were responsible for providing Judge Gunkel with a windfall or "payout" through their refusal to correctly interpret the Rules of Judicial Discipline (which the Court itself adopts), particularly the authority for voluntary temporary paid suspensions under Colo. RJD 34(c). Ironically, of course, the short suspension that this Commission had negotiated with Judge Gunkel was in line with the findings and recommendations reached by the OSA in its analysis of the Judicial Department's negotiation of separation agreements related to the Masias Controversy. *See* 2022 OSA Performance Audit Report; Appendix 15, pp. 38-39, 43-46. Through his testimony, Executive Director Gregory explained:

> One thing that was mentioned in the Chief Justice's statements, which I think I need to bring up now, before I shift to the specific funding proposals in this bill, there was an allegation that on one case, the Commission had essentially enabled judicial misconduct by proposing that a judge receive a paid suspension prior to retirement. That case was involving Baca County Court Judge Deborah Gunkel. It's one of our public cases, there is a published opinion about what happened there. The judge had gotten two DUIs before, ultimately, leaving the bench. But as part of that process, there was a negotiation to avoid formal proceedings. The expense of that, and what it would cost the public treasury, or at least attorney registration fees with our current funding. And one of the proposals was for that judge, Judge Gunkel, to retire on a schedule, but also to have a little bit of time to sort out whatever was needed, as far as benefits and the like. But that effectively would have removed her from the bench sooner, immediately. We submitted that recommendation to the Supreme Court, and it was rejected and with really no explanation other than the rule for public sanctions provides for an unpaid suspension. However, we have another Rule of Judicial Discipline 34 that allows for voluntary suspensions with paid leave. So, it's not clear why that was rejected. But it wasn't that the Supreme Court was standing up and preventing the Commission from enabling judicial misconduct. On the contrary, because of the delay caused by rejecting that recommendation, the judge stayed on the bench until the final stipulation was submitted and approved by the Court.[336]

Despite the contemporaneous rebuttal that Executive Director Gregory provided, the insidiousness of Chief Justice Boatright's misleading narrative later became apparent when Senator Bob Gardner discussed the context for contemplated structural reforms with retired

---

[336] *Hearing on SB 22-201 before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m), p. 62:31-63:7.

239

Justice Rebecca Love Kourlis as part of IAALS's presentation to the Interim Committee on Judicial Discipline.  Senator Gardner stated, in relevant part:

> One is for the adjudicative function, who will do that in the system? The evidence would be that the recommendations that have come from the Commission on Judicial Discipline to the Supreme Court have been adopted almost universally, the one exception being when the Commission made a recommendation that was somewhat less than the Supreme Court thought appropriate, and they thought that something harsher was in-line. ***So that's the evidence.*** The perception of my constituents, however, is that we have a system in which judges judge judges, and that, as citizens, that's not to them very accountable.[337] (Emphasis added.).

At approximately the same time as Chief Justice Boatright made his statements on April 14, 2022, OARC was providing this Commission with investigation and litigation support for the then-pending case involving 18th Judicial District Court Judge John Scipione.  As later verified through Judge Scipione's Stipulation for Resolution of Fromal Proceedings and the Court's final disciplinary opinion, the judicial misconduct that Judge Scipione engaged in could not have been more serious and harmful to victims as well as to public confidence in the Judiciary.  Through his Stipulation, Judge Scipione acknowledged that he violated Canon Rules 1.1, 1.2, 1.3, 2.3, 2.8, 2.9, 2.16, and 4.1.  Judge Scipione's admitted misconduct that included having inappropriate conversations with his judicial staff about his "alternative 'lifestyle' of consensual non-monogamy," having an unpaid intern/law clerk assist him with using the Tinder application, referring to his judicial assistant in derogatory gender-based terms, having propositioned his former law clerk, having engaged in a 1 ½ year unreported affair with his judicial assistant when he originally served as a magistrate, and, then, being dishonest about this misconduct when he applied to become a County Court Judge and, later, a District Court Judge.  Judge Scipione also admitted to his dishonesty in responding to this Commission's Colo. RJD 14(a) notice letter.  Finally, Judge Scipione admitted to initiating improper *ex parte* communications with the Denver Probate Court in connection with a case involving his father's estate.  Appendix 22, pp. 10-20.  It should be recognized that Judge Scipione's case was among the matters Vice Chair Prince provided as examples of non-cooperation / obstruction by OARC in his February 1, 2023 testimony to the Joint Judiciary Committee (which ARC Jessica Yates, in turn, used as the basis for her retaliatory February 6, 2023 disciplinary letter directed to the judge and attorney members of this Commission).[338]  The anonymous victim's testimony presented through CCASA at the Interim Committee on Judicial Discipline also related to OARC's investigation

---

[337] *Hearing before the Legis. Interim Comm. on Jud. Discipline*, Colo. Leg., August 10, 2022 (IAALS presentation); Appendix 27(s)(iii)(3), p. 9:25-31.

[338] *See* testimony and description quoted *supra*, p. 220.

and litigation of the judicial discipline case against Judge Scipione, including how OARC's intimidating and unsympathetic interactions drove the victim to the brink of suicide.[339]

As referenced by the anonymous victim, while performing this Commission's investigative and litigation functions, OARC took the position that it represented the interests of "the People of the State of Colorado." Through this interpretation, OARC further asserted that could make decisions (such as proposing terms of settlements) without first consulting with victims and obtaining this Commission's authorization and approval.  As reflected in this Commission's filings with the Colorado Supreme Court, in legislative testimony, and in more recent press reporting, in May 2022, OARC directly negotiated a stipulation for a bare public censure with Judge Scipione's attorney, John Gleason, but without seeking prior approval from this Commission for the terms of the stipulation.[340]  Appendix 22, pp. 91-99 (stipulation with no

---

[339] The anonymous victim's testimony includes the following statements:

> I was sexually harassed by a judge while working as an intern during law school. I can tell you that it was an absolutely horrible experience.
>
> I reported the harassment, which went to the Judicial Commission. [OARC] interviewed me a month later and told me it could be months before I heard anything back. ***They requested I speak to no one about the investigation and warned me that doing so could result in a misdemeanor charge. Lastly, they told me that they did not represent me, but the People of Colorado.*** I was on my own. With that, I was released back into society—expected to go to school, carry on with my life, and keep my mouth shut.
>
> * * *
>
> Then I hit the lowest point in my life. I was driving home from a class and I remember being so hopeless and tired that I wanted it all to end. I let my hands hover off of the wheel for a few seconds and thought about how easy it would be to let go.
>
> I had never had thoughts of killing myself or wanting to die before this.
>
> Appendix 27(s)(iii)(13)(i), p. 2; *see also* Appendix 27(s)(iii)(6), pp. 1:23-31, 2:11-15.

[340] Despite discovery of his unreported affair while serving as a magistrate, OARC ultimately entered an almost identical bare public censure stipulation with Judge Scipione as to his attorney discipline. *People v. Scipione*, 23PDJ050 (imposing public censure which "takes into account significant mitigating factors").  Such an agreement, however, is reflective of OARC disproportionately addressing matters of attorney misconduct that involve judges.  Because

241

signature line for Commission approval), 105 ¶ 7 (noting Commission's objections to stipulation).  OARC, then, insisted that Colo. RJD 37(e) required this Commission to accept and submit the stipulation to the Court as the Commission's disciplinary recommendation.  These circumstances were further complicated by the fact that additional judicial misconduct was discovered simultaneously with OARC's negotiation of the stipulation. Specifically, this Commission then learned that Judge Scipione had been dishonest in his response to this Commission's Colo. RJD 14(a) notice by concealing additional inappropriate communications / interactions with his former law clerk.  In response, this Commission terminated OARC's representation according to § 13-5.3-102(3)(d), C.R.S., Colo. RJD 2(aa), 3(d)(11) and obtained substitute representation through the Colorado Attorney General's Office.  Appendix 22, p. 117.  Approximately two months later, the investigation conducted by the Attorney General's Office and further reporting from impacted persons resulted in the discovery that Judge Scipione had an approximately 1 ½ year affair with his judicial assistant while serving as a magistrate.  Scipione did not report this relationship to the Chief Judge, as was required by personnel rules and CJD 08-06, and did not disclose his violations of the personnel rules and CJD 08-06 when he later applied to become a County Court Judge and, ultimately, District Court Judge.  Scipione also concealed the existence of the unreported relationship throughout his judicial discipline proceedings.[341]

Upon learning of Judge Scipione's dishonesty and his unreported relationship, this Commission sought his immediate temporary paid suspension under Colo. RJD 34(a).  At the time, Judge Scipione's judicial discipline hearing had been rescheduled from June 7-8, 2022 to August 23-24, 2022.  Appendix 22, p. 296.  This Commission's Colo. RJD 34(a) suspension request was immediately granted.  Appendix 22, pp. 2-3; *Scipione*, ¶ 13.  Had Judge Scipione's case proceeded through the normal course, his temporary paid suspension would have only lasted approximately three weeks or until timely issuance of a final disciplinary opinion by the Court at the latest.  Instead, the day after his temporary suspension was ordered, Judge Scipione asserted that he was incompetent to proceed or otherwise unable to assist in his defense due to medical

---

Judge Scipione had concealed his unreported workplace relationship, the ordinary 5-year limitations period for attorney regulation cases did not apply.  C.R.C.P. 242.12.  Judge Scipione's misconduct as a magistrate should have been addressed by OARC, but it was not.  If precedent created when Judge Scipione's counsel, John Gleason, headed OARC had been followed, Judge Scipione's conduct warranted a substantial suspension from legal practice.  *Compare with People v. Biddle*, 07PDJ024 (another 18th Judicial District Court magistrate suspended for 3-years because of unreported relationship with deputy district attorney who appeared in his courtroom).  Instead, Scipione continues to work as a mediator without reference to his disciplinary history or his continuing attorney status as "Disability Inactive."  https://www.equiresolvemediation.com/blank-1.

[341] The procedural history of *Scipione* and cascading discovery of Judge Scipione's misconduct was also reported on by the press.  Michael Karlik, *Allegations Against ex-Arapahoe County Judge Encompassed Sexual Comments to Staff, Improper Influence in Case: Judicial Misconduct Investigators Learned About New Allegations Involving John Scipione as his Original Disciplinary Case Progressed*, COLORADO POLITICS, May 24, 2024.

242

and mental health conditions. *See* Appendix 22, p. 5-6 (describing timing of Scipione's notice initiating disability proceeding; describing appointment of cardiologist and mental health experts to assess Scipione's claimed conditions). This, in turn, stayed the judicial discipline proceedings indefinitely and increased the litigation resources required by this Commission significantly.

After three months, Judge Scipione was evaluated by three separate independent medical examiners who unanimously concluded that he did not meet the criteria for being unable to assist in his defense. Appendix 22, p. 6. Judge Scipione, then, agreed to a stipulation to resume the judicial disciplinary proceedings shortly before a hearing was scheduled to address his dubious claims of disability status. As stated in Special Master James Casebolt's "Report and Recommendation on Parties' Stipulation to Dismiss Disability Proceeding," dated December 15, 2022, this Commission expressly "reserved its right to request payment of its fees and costs for this disability proceeding in the disciplinary matter, as may be allowed by Colo. RJD 36(g)." Appendix 22, p. 6. Once disciplinary proceedings resumed, Judge Scipione executed another stipulation shortly before his re-scheduled discipline hearing. Through that "Stipulation for Resolution of Formal Proceedings," dated January 19, 2023, Judge Scipione admitted to his violations of Canon Rules 1.1, 1.2, 1.3, 2.3, 2.8, 2.9, 2.16, and 4.1. Further formal proceedings, however, were reserved to allow litigation of this Commission's request for disgorgement of Judge Scipione's salary and benefits received during his self-initiated disability proceeding as well as this Commission's request for an award of attorney's fees and costs under Colo. RJD 36(g), (h).[342]

Despite a full briefing of the issues, the appointed Special Masters declined to address the attorney's fees and costs sought in the disability portion of the case on the basis that they did not possess an adequate record. In their "Order Regarding RJD 36(h) Sanctions, Attorney's Fees, and Costs," dated August 14, 2023, the Special Masters state:

> A) SANCTIONS
>
> * * *
>
> All disability proceedings were before a separate Disability Special Master. Any briefing on that issue was submitted to the Disability Special Master. The Special Masters have only the parties' stipulated factual allegations, representations and conclusions regarding the disability proceedings. Accordingly, the Special Masters do not further address this issue or make any recommendation.

---

[342] Appendix 22, p. 21-23; *Accord Editorial: Overdue Discipline in Robert Rand's Case*, THE DENVER POST, April 27, 2016 (describing public criticism of unnecessarily drawn out judicial discipline proceeding allowing subject judge to continue receiving salary even when involved conduct warranted removal); *see also Matter of Booras*, 2019 CO 16, ¶¶ 10, 13, 15 (Court of Appeals Judge remained on temporary paid suspension for approximately 11 months, including after issuance of Special Masters' report recommending removal).

243

B) ATTORNEY'S FEES AND COSTS

\* \* \*

The Special Masters do not make a recommendation regarding attorney's fees for the disability proceedings for the same reasons we do not make a recommendation for sanctions for those proceedings.

\* \* \*

As previously explained, the Special Masters will not make recommendations on the disability portion but are willing to recommend costs related to the disciplinary proceedings. However, costs are not delineated [between the disability and disciplinary phases of the case] in the information provided to the Special Masters.

Appendix 22, pp. 301-02, 306; pp. 295-307 (full Order).

Although the Special Masters did not address the Commission's requests for relief as they related to the disability proceedings, the Special Masters did award $51,189.50 in requested attorney fees and costs for the disciplinary proceedings in Judge Scipione's case. *Id.*, p. 306.   The Special Masters' Order and recommendation awarding attorney's fees in the disciplinary proceeding were ultimately adopted by the Justices in their final *per curiam* opinion (with Chief Justice Boatright and Justice Samour not participating).  *Scipione*, ¶ 45.

This Commission did not seek reconsideration of the Special Masters' decision not to consider sanctions, fees, and costs in the disability proceedings.  Nor did this Commission request to supplement the record provided to the Special Masters to allow further consideration of its requests for fees and costs in the disability proceedings.  Moreover, this Commission did not seek the appointment of a Special Tribunal due to the pendency of the Maes RFE/complaint and the broader issues involved in the Masias Controversy.

Following the ouster of its Executive Director, this Commission responded to the Court's request for a status update by filing its Recommendation and record of proceedings on February 26, 2024.  With its Recommendation, this Commission abandoned its previous arguments for sanctions and for attorney's fees and costs in the disability proceedings. Appendix 22, p. 4-5. Additionally, this Commission concurrently filed the "Parties' Joint Request for Protective Order," also dated February 26, 2024, asking the Court to suppress almost the entire record of the disability proceedings.  *Id.*, pp. 309-10, 322 (Request and Order granting suppression of record).  Consequently, the factual basis for this Commission having sought recoupment of Judge Scipione's salary while suspended and its request for attorney's fees and costs as to the disability proceedings have been effectively hidden from the public.  Indeed, the suppressed record includes ***all of the parties' briefings*** to the Special Masters as to sanctions, attorney's fees, and costs issues in ***both the disciplinary and the disability proceedings***.  *See* Appendix 22 (briefings omitted), pp. 309-10 (Parties' Joint Request for Protective Order), 315 (Commission's

244

Recommendation explaining filing of private and public records of proceedings).  Because of this Commission's willingness to abandon its claims for sanctions, attorney's fees, and costs in the disability proceeding as well as to allow the suppression of the record of proceedings, Judge Scipione stipulated to not filing exceptions as part of the Court's review.  Appendix 22, pp. 331-32.

In contrast to Chief Justice Boatright's misleading narrative about the Justice's handling of *Gunkel*, the Justices' overtly facilitated Judge Scipione receiving a substantial "payout" or golden parachute as a reward for his bad faith litigation strategy.  The Justices ability to make their decision based upon concealed arguments and a suppressed record also raises fundamental concerns about the Justices' abilities to close those portions of judicial discipline proceedings (i.e. the Supreme Court's review of this Commission's Recommendation and record of proceedings) that were intended to occur in public according to Colorado Constitution Article II, § 6 and Article VI, § 23(3)(g).  Ultimately, the Justices' final disciplinary opinion provides only a conclusory analysis of why the Justices do not recognize the availability of full remedies in judicial discipline proceedings, whether through law or equity.  *Scipione*, ¶ 35 fn. 10 (declining to review fees and costs in disability proceedings because of parties' "agreement" and Commission's abandonment of arguments).  The Justices further rely upon this Commission's abandonment of arguments and dicta in the Special Masters' Order to justify the Court's failure to consider restitution of Judge Scipione's salary and benefits.

> Similarly, the Commission does not dispute the special masters' conclusion that Colo. RJD 36(h) does not permit recoupment of a judge's salary and benefits. We expressly agree with the special masters' conclusion on this issue.  *Id.*

The Justices also declined to address this Commission's entitlement to costs because of the Special Masters having not addressed the issue and this Commission, again, abandoning arguments on Supreme Court review.  *Id*, ¶ 45 fn. 12.

The Justices' reliance upon their authority to interpret rules that they themselves create is only an additional argument for the structural changes and creation of rulemaking committee proposed through Amendment H.  Likewise, the creation of an adjudicative board with proceedings becoming public upon the filing of charges will also help avoid the suppression of arguments and records of proceedings, as has occurred here.

Despite having received a significant windfall through his bad faith litigation tactics and his bogus assertion of disability status, Judge Scipione still takes no responsibility for his misconduct, the harms caused to his victims, his unjust enrichment from further misconduct in litigation, or for the other financial burdens that he has caused taxpayers (which include the costs of the Judicial Department's settlements of workplace harassment claims).  Instead, Scipione characterizes the judicial discipline proceedings against him as "a witch hunt" and "waste of taxpayer dollars."  Scipione also describes even the partial award of attorney's fees against him as "unconscionable."

> "The investigation was overzealous and a waste of taxpayer dollars," said former Judge John Scipione in his first media

245

> interview, "It could have been resolved in its infancy. This case is about a waste of taxpayer dollars and a vindictive, nasty witch hunt aimed at destroying a dedicated civil servant and his family."
>
> * * *
>
> "I made a bad decision, I used poor judgment, I said things in hindsight that I shouldn't have said and wish I hadn't and I will take the consequences for that," said Scipione.
>
> * * *
>
> While he agreed in January 2023 to a public censure for his behavior and resigned, just last month, the Colorado Supreme Court upheld an earlier ruling that Scipione should have to repay $51,189 in attorneys' fees to cover earlier disciplinary proceedings.
>
> "I don't have $51,000," said Scipione. "It's a judgment I'll have to pay over my lifetime."
>
> He called the judgment, "an unconscionable sanction." He went on to say he "absolutely" made mistakes, but considers the judicial investigation into his conduct "disproportionate conduct for the crime." He said he believes state judicial authorities went after him harder than other judges who he said were involved in more serious incidents due to the sexual nature of his conduct.[343]

Judge Scipione's protestations aside, this Commission and the Justices are directly responsible for allowing Judge Scipione to fraudulently benefit from and to unjustly enrich himself through public funds.  Under the Code, the Justices have both created appearances of impropriety and engaged in actual impropriety by failing to disqualify themselves *sua sponte* from consideration of the case.  Moreover, the Justices have likely violated various provisions of the Code by allowing this Commission, its Interim Executive Director, and Judge Scipione's counsel to conspire to abandon legitimate claims for the State's reimbursement and to suppress the record supporting those claims.  As explained *supra*, note 21, Judge Scipione's overall windfall is calculated to exceed $189,530 ($120,000 in estimated salary/benefits received while suspended plus the $69,530 of fees and costs requested in the disability proceedings).   Furthermore, as the administrative heads of the Judicial Branch, the Justices have authority to directly seek civil and equitable remedies against former Judge Scipione for the harm he has caused to the Judicial Department and to the State (including seeking reimbursement for the Judicial Department's $130,000 combined settlements).  *See Scipione*, ¶ 44 (acknowledging existence of settlements). The Justices, however, have not exercised their administrative authority to do so.

---

[343] Brian Maass, *Disciplined Judge Responds "We're Not Swingers" Following Colorado Investigation*, CBS 4 News, June 5, 2024.

246

A reasonable basis exists to suspect that the Justices, by failing to establish an appropriate "tone at the top," failing to disqualify themselves from matters in which they cannot be impartial, and in facilitating further misuse/misappropriation of public funds, have violated Canon Rules 1.1, 1.2, 1.3, 2.2, 2.5, 2.6, 2.11, 2.15, 2.16, and 4.1.

**Ongoing Efforts to Minimize the Justices' Responsibilities for the Masias Controversy**

The Colorado Supreme Court's commentary on the merits of the controversy surrounding the Masias Contract and its apparent efforts to suppress public scrutiny continue.  Through an August 2023 event hosted by CJI, Justice Márquez is quoted as stating: "The state's Judicial Branch, too, has been scrutinized for misdeeds, *real or imagined*, and that has spurred changes in how complaints against judges are handled."[344] (Emphasis added).  Justice Márquez did not specify which, if any, of the publicly reported allegations of the Justices' misconduct are "imagined."  In addition to Justice Márquez's individual public engagements, the Colorado Supreme Court replaced banners for the OSA Fraud Hotline Investigation Report, the Troyer-Mitchell Report, and the ILG Report on the Judicial Department website with a banner for the Court's "Workplace Culture Initiative" webpage.[345]  This new webpage includes a series of videos featuring Justice Hood and Justice Márquez with one video describing "Changes and the Supreme Court."  Another video presents the Court's "Listening Tours" as a response to recommendations from the Troyer-Mitchell Report and the ILG Report.  Yet another video discusses internal changes within the Judicial Department relating to HR reporting to this Commission and the function of the new external Judicial Ombuds Office created through HB23-1205.  Collectively, the videos contain continuing public commentary on issues raised through the Masias Controversy that omits or minimizes the Justices' own involvement.  Transcripts of the videos are provided in Appendix 28.

On January 18, 2024, at another event hosted by CJI, Justice Gabriel is quoted as presenting the scrutiny of the Colorado Judiciary through similar ambivalent terms as stated by Justice Márquez.  Justice Gabriel went on to criticize the general prohibitions against judicial commentary on pending and impending cases.

> I don't have to tell all of you, trust in our public institutions is a very big deal in this day and age. All public institutions have fallen under a microscope and are facing challenges to public trust — sometimes fairly and sometimes not.  A lot of times, as a judicial officer, we can't speak publicly when the courts are criticized —

---

[344] Charles Ashby, *Justice and One-Time GJ Resident Talks About Trust in the Courts*, GRAND JUNCTION DAILY SENTINEL, August 23, 2023.

[345] The Colorado Supreme Court's new "Workplace Culture Initiative" website can be found at https://judicialwci.colorado.gov/.  The primary Judicial Department homepage with navigational banners was found at https://www.courts.state.co.us/.  Most recently, the Judicial Department has redesigned its entire homepage and removed all the banners.  https://www.coloradojudicial.gov.

247

> sometimes unfairly, sometimes fairly — but we can't speak
> because of ethics rules.[346]

On May 25, 2024, Justice Hart delivered the Commencement Address for the Fountain Valley School.  As part of her remarks, Justice Hart focused upon the overarching value of "friendships" and described self-created "posses," including having "work posses" where "we have each other's backs in good times and in bad," "we give advice," "we take trips together," "we watch each other in court," and "we go to each other's swearings-in."[347]  Justice Hart further stated, "every one of us is self-reliant and we all need each other" and "because after all, friendships are one of the most valuable assets that you can carry with you."  *Id.*  Justice Hart notably omitted remarks about the importance of a judge having the integrity to stand up for what is right (including reporting colleagues' misconduct) regardless of its impacts upon workplace and personal friendships.[348]  Rather than offering John F. Kennedy's "Profiles in Courage" as a

---

[346] Michael Karlik, *Colorado Justices Hear Cases, Judicial Officials Put on Suspension*, COLORADO POLITICS, January 22, 2024.  Chief Justice Boatright also used substantially the same excuse given by Justice Gabriel, "we can't speak because of ethics rules," to avoid responding to the recent allegations of his misconduct raised in the Woods matter and in *Kiesnowski*.  In response to reporter David Migoya asking about his awareness of the other judges' misconduct, Boatright stated:

> 'As you know, matters pending before the Colorado Commission
> on Judicial Discipline are confidential. As a result, I am unable to
> comment directly on the questions you've posed[.]'

> Migoya (3/4/24-Woods Art.), *supra* note 3.

[347] The full recording of the 2024 Fountain Valley School Commencement Address is *available at* https://youtu.be/-DfPsNKCKgI.  Justice Hart's address was also reported on in the press. Michael Karlik, *Justice Melissa Hart Tells Fountain Valley School Graduates Public Service "Is an Attitude": Hart Spoke About the Judicial Department's Values, the Nature of Public Service and the Importance of Maintaining Friendships as Adults*, COLORADO POLITICS, May 27, 2024.

[348] Justice Hart's emphasis on prioritizing friendships contrasts with the history of the late Denver District Attorney Philip Sidney Van Cise, who was responsible for exposing racketeering and the organization of the Klu Klux Klan in Colorado during the 1920s.  A biography of Van Cise begins:

> It was something [Colonel Philip Sidney Van Cise] hammered into
> his investigators: Find out all you can about your target.  Start by
> identifying his associates.  You can learn a lot about a crook, he
> told them, if you discover who his friends are.  By his friends you
> shall know him.

> The same could not be said about an honest man.  More often than
> not, an honest man will have few friends.  A truly incorruptible one

personal and institutional value, Justice Hart's address offered profiles in appeasement and preserving friendships as preeminent life goals.  To borrow upon the Western lexicon used throughout the commencement address, Justice Hart's remarks essentially confirm that the Court had "circled the wagons" in response to the Masias Controversy.[349]

After emphasizing the importance of her friendships, Justice Hart proceeded to publicly comment on the Colorado Supreme Court's response to the Masias Controversy, particularly her own effort to redefine the Colorado Judicial Department's mission, vision, and values as part of a committee formed by the Court in response to the recognized toxicity of the Department's working environment.  As with the other Justices' propaganda and presentation of the Court's "Workplace Culture Initiative," Justice Hart was silent as to how, in the ongoing context of known concealment of judicial misconduct and enabled retaliation, the Justices are living up to the Department's newly re-defined mission, vision, and values.[350]  Justice Hart stated, in relevant parts:

> The idea of being intentional about the values you want to live into. During 2023, I had the honor of leading Colorado's Judicial Department in a restatement / re-envisioning of our mission, vision and values. It was a really amazing project. A group of about 50 employees, some judges, but also employees, from all 22 judicial districts all over the state. We got together and talked about what the organization does and why we do it, most especially. And we talked about all the different values that we might be serving. We came up with dozens, possibly even hundreds, but ultimately came away with six—distilled it to six values. We concluded that the Colorado Judicial Department is committed to being inclusive, collaborative, and innovative. And that we will act with fairness, transparency, and integrity. Those were the six values that we were

> might have none.  If the Colonel himself was ever to be investigated, you'd be better off studying his enemies.  There were so many of them.
>
> Alan Prendergast, GANGBUSTER: ONE MAN'S BATTLE AGAINST CRIME, CORRUPTION, AND THE KLAN 6 (2023).

[349] Ironically, the phrase "circle the wagons" was an initial reaction by an anonymous judge to the Justices' responses to the Masias Controversy following revelation of the Masias Memo. Karlik, *supra* note 90; *see also Hearing before the Interim Comm. Jud. Discipline*, Colo. Leg. July 12, 2022 (testimony of Dennis Maes); Appendix 27(s)(ii)(2), p. 2:6-8 ("It is necessary to identify specific instances when the Supreme Court chose to circle the wagons to protect the few, rather than to comply with established protocol, to illustrate the contempt it had for its own process.").

[350] Karlik, *supra* note 347: "Hart did not immediately respond to questions from Colorado Politics about the specific [workplace cultural] initiatives currently underway."

249

> going to work with as our core values. And we're now working on
> how best to integrate those values into our daily interactions with
> the public and with each other, and how to do that intentionally.
>
> And that process, doing that for a 4,500-person organization led
> me to reflect on how I'm doing that in my daily life. And it's not
> the first time I've done that. I've done it before. But this was sort of
> just a chance to think about it again, what are the values that matter
> to me, and for me, actually, some of them are the values that we
> talked about for the Judicial Department. It's very important to me
> to live with integrity, it's important to me to be collaborative, to be
> innovative, to be inclusive.
>
> * * *
>
> Ask yourself each day, did I . . . take a risk for a good cause? Did I
> speak up for a principle even in the face of a majority perspective
> very different from my own? * * * Ask yourself, did I ask any
> good questions today? Did I get a little uncomfortable? *Id.*[351]

Perhaps most critically, Justice Hart did not confirm whether she or any of the other Justices had the integrity to object to the Masias Contract prior to its approval by the whole Court or to the way the Court has responded to the broader Masias Controversy.  Justice Hart also did not explain how she and the other Justices have historically responded to dissenting voices on questions of judicial ethics or personal integrity.  Once again, the Court's "Workplace Culture Initiative" was offered to the public as a façade of reform within the Court and the Judicial Department.

As part of her swearing in to become the next Chief Justice, Justice Márquez issued yet another public statement regarding the merits of the Masias Controversy and the appropriateness of Chief Justice Boatright's conduct, specifically.  The press release issued by the Judicial Department quotes Chief Justice Márquez:

> I am deeply grateful to Chief Justice Boatright for his leadership.
> He has overseen significant changes to the administration of the
> branch in recent years, and his humble leadership has been a model
> for all of us," said Chief Justice Márquez. "As he now hands me
> the baton, I am ready to carry forward the momentum his
> leadership has created. ***Our highest mission remains serving the
> people of Colorado and upholding the integrity of the judicial
> system.*** I am also committed to strengthening our relationships

---

[351] Karlik, *supra* note 347, quotes the Colorado Judicial Department's restated vision through a screenshot.  The full statement of the re-stated mission, vision, and values can be found on the Department's "Workplace Culture Initiative" webpage *available at* https://judicialwci.colorado.gov/mission-vision-and-values#.

> with government and community partners and making the Judicial
> Branch an exceptional workplace.  *Supra*, note 178.  (Emphasis
> added).

In her statement Chief Justice Márquez did not acknowledge any of the concerns about the Justices' involvement in and their response to the Masias Controversy.  Perhaps most significantly, Chief Justice Márquez also failed to acknowledge the public allegations that Chief Justice Boatright (assisted by the other Justices) had knowingly concealed the retaliation and judicial misconduct involved in the Woods matter and in *Kiesnowski*.  The fact that Chief Justice Márquez spins Chief Justice Boatright's conduct, apparent dishonesty, and non-cooperation in judicial disciplinary proceedings as "humble leadership" that "has been a model for all of us" only reinforces how corruption pervades the entire Colorado Supreme Court.

In their role as the equivalent of the Judicial Department's Board of Directors, the Justices are personally responsible for defining the "tone at the top" and ensuring a legitimate culture of ethical governance.  Notwithstanding the spin and salesmanship that the Justices continue to apply (both individually and collectively), persons involved in the Masias Controversy have not been held accountable in a meaningful way and an indisputably toxic culture built around intimidation, retaliation, and secrecy remains strongly entrenched.

**Need for Further Inquiry and Judicial Disciplinary Proceedings**

In an editorial published on August 8, 2023, *The Denver Gazette* appeared to conclude that the public censure of Chief Justice Coats fully addressed the Masias Controversy and that focus should now shift to reforming Colorado's judicial performance review system.

> In light of the legislation as well as various investigations—
> including hearings conducted by a special legislative committee
> last summer—this week's action against Coats amounts to a
> vindication of long-standing allegations about the Judicial
> Department and of the reforms themselves.  And, in a sense, even
> that only scratches the surface.
>
> There are yet other facets of Colorado's judicial system—most
> notably, the way judges are reviewed and retained in office and the
> need for greater transparency in that process—that merit a
> reassessment.
>
> Perhaps Coats' censure will embolden policymakers to look into
> other policy reforms.  Let's hope so.[352]

This opinion appears premature given the substance of the *Coats* decision and its confirmation that the other Justices had also approved the Masias Contract while withholding material information from SCAO's FSD and the OSA.  Moreover, the Court's subsequent public

---

[352] *Editorial: Toward Accountability for Colorado's Judiciary*, DENVER GAZETTE, August 8, 2023.

251

commentary and obstruction of the various investigations remains unaddressed.  The suppression tactics used by the Court are recurring as systemic corruption continues.  The ouster of this Commission's Executive Director is only the latest, though perhaps most brazen example, of efforts to suppress legitimate investigations of significant misconduct within the Colorado Judiciary.  Rather than *Coats* being a "vindication" of Colorado's legislative and judicial disciplinary systems, the absence of meaningful and uniform accountability for others involved the Masias Controversy represents a continuing failure of both systems.

The endemic corruption and needs for reform within the Colorado Supreme Court, the Colorado Judicial Department, the Colorado Attorney General's Office, and now this Commission have not been resolved.  The history of media reporting and the disciplinary opinion in *Coats* should be recognized as a reasonable basis for further investigation of the other Colorado Supreme Court Justices and, potentially, additional judicial discipline or impeachment proceedings.

In 1966 Colorado voters approved Amendment 3, adopting the Missouri Plan of judicial selection, discipline, and retention with a 53% majority.  Not since 1966, however, have Colorado voters faced more significant decisions with respect to the integrity of the Code, Colorado's judicial discipline system, the administration of Colorado's Judiciary, and individual judges/justices.  It is imperative, in addition to potential judicial discipline and impeachment proceedings as to the Justices, that voters in the 2024 General Election make informed choices with respect to the retention of Chief Justice Boatright, Justice Márquez, Justice Berkenkotter, Judge Brady, Judge Kuhn, Judge McLean, Chief Judge Román, other Court of Appeals Judges who may have publicly commented on the Masias Controversy during the Colorado Supreme Court's "listening tours," and any judges on the ballot who have histories of failing to file their required annual personal financial disclosures.  It is, likewise, critical that voters understand the need for judicial discipline reform and the substantial merits of the constitutional amendment (Amendment H) proposed through HCR 23-1001.

ANALYSIS

**The only issue before this Commission is whether a "reasonable basis exists" for judicial disciplinary proceedings.**

Colorado's judicial disciplinary process requires the application of escalating burdens of proof or evidentiary thresholds.  Distortion of these evidentiary thresholds is legal error that undermines the function and efficacy of the judicial disciplinary process.  Consequently, it is important that this Commission evaluate this RFE ***only*** to determine whether "a reasonable basis exists" for judicial disciplinary proceedings and not to prejudge whether any specific allegation may or may not ultimately be proven through clear and convincing evidence (which must be developed first through a prospective investigation according to Colo. RJD 14(b) and 16(b)(4)).

- **Evaluation, Complaint, and Investigation**—At the initial evaluation stage, an RFE or other "information [deemed] reliable," is reviewed to determine whether "a reasonable basis exists for [judicial] disciplinary or disability proceedings."  Colo. RJD 13(b) (consideration of RFEs), (f) (complaints self-initiated by Commission).  In the context of a constitutional "rational basis" standard, Colo. RJD 13 should be interpreted to

252

recognize any plausible theory as sufficient grounds for recognizing a complaint.  *See, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 14 (1988) (generally describing rational basis standard for constitutional scrutiny); *United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (person challenging government's action has burden to demonstrate law has no plausible or conceivable legitimate purpose); *see Kaley v. United States*, 571 U.S. 320, 328 (2014) (explaining that more substantial probable cause standard for criminal charges is "not a high bar" requiring only a "fair probability" that is less than a preponderance finding).  Colo. RJD 13(c) expressly defines jurisdictional and other grounds that require finding that a reasonable basis does not exist.  These defined grounds require dismissal of an RFE.  In contrast, if a reasonable basis exists for judicial discipline, this Commission is required to process the RFE as a complaint.  Colo. RJD 13(b).  Once a complaint is recognized, this Commission must then, "[a]s soon as practicable," "provide written notice to the Judge of the allegations and commence an investigation."  Colo. RJD 14(a).  The Commission is further required to afford the subject judge or justice "a reasonable opportunity to provide a written response to the allegations or to appear before the Commission."  Colo. RJD 14(d).  The investigation completed by the Commission may broadly include the development of evidence as necessary to the particular case.  "The Commission's investigation may include interviews; an examination of pleadings, orders, transcripts, and other court records; and consideration of other evidence relevant to the allegations."  Colo. RJD 14(b).

- **Determination**—Following development of an investigation record, the Executive Director appoints a Commissioner to present a summary of the investigation to the full Commission.  The presenter must "provide a summary of [the] investigation, including the allegations, the Judge's response, and other relevant evidence."  Colo. RJD 16(a).  Based upon the presented summary, this Commission is then required to make determinations based upon a preponderance of evidence.  Colo. RJD 16(c).  Possible determinations and combinations of determinations include:

  > (1) Dismissal,
  > (2) Imposition of informal or private discipline,
  > (3) Initiation of disability proceedings,
  > (4) Requesting the subject judge's temporary suspension, and/or
  > (5) Appointment of Special Counsel to conduct further investigation and to determine whether "probable cause exists for the commencement of formal proceedings."

  > Colo. RJD 16(b).

- **Formal Proceedings**—If this Commission authorizes the filing of charges and a case proceeds to formal proceedings, Special Counsel has the burden of proving the charges through clear and convincing evidence at a trial-type hearing before appointed Special Masters.  Colo. RJD 26 and 31.

- **Agency/Commission and Appellate Review**—When the Report of the Special Masters is reviewed by this Commission in making a disciplinary recommendation and when that

253

recommendation is, in turn, reviewed by the Colorado Supreme Court or a Special Tribunal, the Special Masters' factual findings are reviewed for clear error and their determinations of law are reviewed *de novo*. *Matter of Booras*, 2019 CO 16 ¶ 18; HCR23-1001 (defining appellate standards of review).

Within this context, the ***only question*** presently before this Commission is whether the allegations raised in this request for evaluation present reasonable or plausible grounds for further judicial disciplinary proceedings, including formal investigation. To the extent that there are reasonable grounds to suspect that the current Justices have violated one or more duties under the Code (including, at minimum, creating appearances of impropriety under Canon Rule 1.2), this Commission ***is required*** to recognize this request for evaluation as a complaint, to open an investigation, and to promptly inform the subject Justices of the complaint with an opportunity for them to respond in writing. Colo. RJD 13(b), (f) and 14(a), (d).

As described in the background provided *supra*, the Justices' individual and collective conduct implicates violations of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, 2.15, 2.16, 3.1, and 4.1.

As further summarized *infra* at p. 293, 1) the involved Justices' role in the Masias Contract, 2) the current Justices' persistent refusal to disqualify themselves from matters involving judicial discipline, and 3) the current Justices' failure to take appropriate action in response to their own and others' misconduct all generally provide a reasonable basis for judicial discipline.

**Judges and justices are expected to avoid both actual impropriety and appearances of impropriety so as to ensure the greatest possible public confidence in the independence, impartiality, integrity, and competence of the Judiciary as an institution. At minimum, all the current Justices have created appearances of impropriety that present a reasonable basis for judicial disciplinary proceedings according to Canon Rule 1.2 and Colo. RJD 13(b).**

As stated in the preamble to the Code:

> Judges should maintain the dignity of judicial office at all times, and avoid both impropriety and the appearance of impropriety in their professional and personal lives. They should aspire at all times to conduct that ensures the greatest possible public confidence in their independence, impartiality, integrity, and competence.

The duties of a judge go beyond merely refraining from impropriety, defined as "conduct that violates the law, court rules, or provisions of [the] Code, and conduct that undermines the judge's independence, integrity, or impartiality." Colo. Code Jud. Conduct, Terminology. Rather, judges are required to avoid even the appearance of impropriety. Canon Rule 1.2. As explained in Comment 5 to Canon Rule 1.2:

> Impropriety occurs when the conduct compromises the ability of the judge to carry out judicial responsibilities with integrity,

254

> impartiality and competence. Actual improprieties include violations of law, court rules or provisions of this Code.  The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge.
>
> *See also Kiesnowski*, ¶ 36 (applying test for appearance of impropriety).

The Alaska Supreme Court has expounded upon the objective test for whether a judge has created an appearance of impropriety under Canon Rule 1.2.  This objective test, based upon an ordinary reasonable person standard, is applied through consideration of the totality of circumstances.

> The test is whether a judge fails 'to use reasonable care to prevent objectively reasonable persons from believing an impropriety was afoot.'
>
> * * *
>
> The duty to avoid creating an appearance of impropriety is one of taking `reasonable precautions' to avoid having a `negative effect on the confidence of the thinking public in the administration of justice.'
>
> * * *
>
> The objectively reasonable person is not a well trained lawyer or a highly sophisticated observer of public affairs. Neither is this person a cynic skeptical of the government and the courts. Moreover, an objectively reasonable person is not necessarily one who is informed of every conceivably relevant fact. He or she is the average person encountered in society.[353]

The Code is written with expectations that judges and justices are to be held to a higher standard and that they ultimately have obligations to protect public confidence in the integrity of the judicial system.  These expectations are also consistent with this Commission's constitutional mandate to:

1. Protect the public from improper conduct of judges;
2. Preserve the integrity of the judicial process;

---

[353] *Inquiry Concerning a Judge*, 822 P.2d at 1040 (quoting *In re Inquiry Concerning a Judge*, 788 P.2d 716 (Alaska 1990)); *see also In re Johnstone,* 2 P.3d 1226 (Alaska 2000) (appearance of impropriety standard applied through consideration of totality of circumstances; appearance of impropriety recognized through judge's influence upon preferential hiring/appointment of coroner)*.*

255

3.  Maintain public confidence in the judiciary;
4.  Create a greater awareness of proper judicial behavior on the part of the judiciary and the public; and
5.  Provide for the fair and expeditious disposition of complaints of judicial misconduct or judicial disabilities.  Colo. RJD 1(b).

Through their history of involvement with the Masias Contract and their response to the Masias Controversy, at minimum, there is evidence that each of the Justices is responsible for creating appearances of impropriety sufficient to provide a reasonable basis for judicial discipline under Canon Rule 1.2 and the broader expectations of the Code.

**The Justices' conduct has been contrary to various duties under the Code.  A reasonable basis exists to suspect that the Justices have engaged in actual impropriety.**

**Canon Rule 1.1 (Compliance with Law)**

Canon Rule 1.1 provides, in relevant parts:

> **(A)** A judge shall comply with the law,* including the Code of Judicial Conduct.
>
> **(B)** Conduct by a judge that violates a criminal law may, unless the violation is minor, constitute a violation of the requirement that a judge must comply with the law[.]

"Law" is broadly defined in the Code as "court rules and orders as well as statutes, constitutional provisions, and decisional law."  Colo. Code Jud. Conduct, Terminology; *see also Kiesnowski*, ¶ 38 (recognizing violations of other parts of the Code as violation of Canon Rule 1.1).

Enforcement of Canon Rule 1.1 does not require conviction of a criminal offense or a civil judgment.  *See, e.g., In re King*, 857 So. 2d 432 (La. 2003); *In re Halloran*, 647 N.W.2d 505 (Mich. 1991); *Miss. Comm'n on Jud. Performance v. Hartzog*, 822 So. 2d 941 (Miss. 2002); *In re Toler*, 613 S.E.2d 604 (W. Va. 2005) (magistrate not entitled to reinstatement following acquittal of all criminal charges; alleged conduct needed to be separately considered for impact upon public's confidence in honor, integrity, dignity, and efficiency of judicial system); *see also In re Fowler*, 696 S.E.2d 644 (Ga. 2010) (violations of court rules considered through disciplinary process sufficient to establish violation of Canon Rule 1.1; judge removed in part for failure "to grasp the basic tenets of criminal procedure, routinely telling defendants they must prove their innocence and hearing matters outside the court's jurisdiction").  Consequently, enforcement of Canon Rule 1.1 is unaffected by statutes of limitations otherwise applicable to civil violations or criminal offenses.  Colo. RJD 4(a)(1) (the Commission has jurisdiction based upon events that occur while the subject judge is an active judge).

The legality of a judge or justice's conduct must be separately considered in relation to Canon Rule 1.1, with the escalating burdens of proof applied according to the applicable stage of a judicial disciplinary proceeding.  At the evaluation stage, the question is merely whether there is a reasonable basis to suspect violation(s) of law.  Colo. RJD 13(b).  At the determination stage,

256

the suspected violation(s) of law would be considered through a preponderance of evidence. Colo. RJD 16(c). At the formal hearing stage, the suspected violation(s) of law would need to be proven through clear and convincing evidence. Colo. RJD 31.

The expectation that judges acknowledge the existence of applicable law and comply with that law (or explain reasons why the applicable law is unconstitutional or otherwise unenforceable) is consistent with and fundamental to maintaining judicial independence. The Maine Supreme Court has explained the importance of this concept:

> Independence of the judiciary is not inconsistent with accountability for judicial conduct. Lawless judicial conduct—the administration, in disregard of the law, of a personal brand of justice in which the judge becomes a law unto himself—is as threatening to the concept of government under law as is the loss of judicial independence. We see no conflict between judicial independence and judicial accountability. Indeed, a lack of judicial accountability may itself be the greatest danger to judicial independence.

> *In re Ross*, 428 A.2d 858 (Me. 1981).

***A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 1.1.***

Here, a reasonable basis exists to suspect that all the current Justices of the Colorado Supreme Court have violated one or more provisions of the Code, as detailed *infra*. The involved Justices have publicly admitted to approving the Masias Contract with knowledge of the allegations raised through the April 15, 2019 anonymous fraud hotline report. The withholding of material information (first, the contemplation/negotiation of the Masias Contract prior to its approval and, second, the existence of the Masias Memo) from the SCAO FSD and the OSA (which was performing a federal auditing function), creates a reasonable basis to suspect that the involved Justices and individuals subject to their supervision and control violated various criminal and civil laws. These suspected criminal and civil violations further include evidence of retaliation against those who raised concerns about Masias's suspected financial misconduct and fraud within the Judicial Department. Ancillary evidence exists that Chief Justice Boatright and the other Justices may have knowingly engaged in a pattern of conduct that enabled or concealed retaliation in the pending Woods matter and in *Kiesnowski*. The conduct of OARC employees subject to the Justices' control in interfering with the legislative process, including retaliatory actions against elected officials and members of this Commission, further provides reasonable grounds to suspect additional violations of law.

Reasonably suspected violations of the law that occurred directly or indirectly through the involved Justices' conduct or their endorsement of the conduct of others include:

- Action for Neglect to Prevent—42 U.S.C. § 1986;
- Attempt to Influence a Public Servant—§ 18-8-306, C.R.S.;

257

- Bribery—§ 18-8-302, C.R.S.;
- Bribery of Public Officials and Witnesses—18 U.S.C. § 201;
- Bribing a Witness or Victim—§ 18-8-703, C.R.S.; *see also People v. Lancaster*, 2022 COA 82 (offense can arise from either pending official proceedings or contemplated official proceedings);
- Civil Action for Deprivation of Rights—42 U.S.C. § 1983 (with associated violations of U.S. Const. 1st Amendment, U.S. Const. 14th Amendment, and Colo. Const. Art. II, §§ 10, 16, and 25);
- Colorado Constitution Art. II, §§ 6 (Equality of Justice), 10 (Freedom of Speech and Press), and 25 (Due Process of Law);
- Colorado Constitution Art. V, § 16 (Privilege of Members);
- Colorado Constitution Art. VI, § 23(3)(g) (Absolute Privilege for Reporting of Judicial Misconduct);
- Colorado Constitution Art. X, § 13 (Making Profit on Public Money—Felony);
- Colorado False Claims Act--§§ 24-31-1201 through 24-31-1211, C.R.S.;
- Colorado Judicial System Personnel Rules and Chief Justice Directive 08-06;
- Colorado Whistleblower Protections—Title 24, Art. 50.5, C.R.S.;
- Commission on Judicial Discipline—Powers and Duties (Absolute Immunity of Commission)—§ 13-5.3-102(4), C.R.S.;
- Compensation for Past Official Behavior—§ 18-8-303, C.R.S.;
- Conspiracy Against Rights—18 U.S.C. § 241;
- Conspiracy to Commit Offense or to Defraud United States—18 U.S.C. § 371;
- Conspiracy to Defraud the Government With Respect to Claims—18 U.S.C. § 286;
- Conspiracy to Interfere with Civil Rights—42 U.S.C. § 1985;
- Deprivation of Rights Under Color of Law—18 U.S.C. § 242;
- Duty to Report a Crime—§ 18-8-115, C.R.S.;
- False, Fictitious, or Fraudulent Claims—§ 18 U.S.C. 287;
- False Reporting to Authorities—§ 18-8-111(1)(a)(I)(II)-(III), C.R.S.;
- False Reporting of Identifying Information--§ 18-8-111.5, C.R.S.;
- False Statements—18 U.S.C. § 1001;
- Falsification of Records in Federal Investigations—§ 18 U.S.C. § 1519;
- Federal False Claims Act—31 U.S.C. §§ 3729 through 3733;
- Federal Whistleblower Protections—41 U.S.C. § 4712;
- First and Second Degree Official Misconduct—§§ 18-8-404 and 18-8-405, C.R.S.;
- Fraud by Wire, Radio, or Television—18 U.S.C. § 1343;
- Immunity—Colo. RJD 10;
- Information Sharing Within the Judicial Department--§ 13-5.3-106(6)(b)(3), C.R.S.;
- Intimidating Legislative Witnesses—§ 8-2.5-101(1.5), C.R.S.;
- Intimidating a Witness or Victim—§ 18-8-704, C.R.S.;
- Misconduct—Colo. RPC 8.4;
- Obstruction of Federal Audit—§ 18 U.S.C. § 1516;
- Official Oppression—§ 18-8-403, C.R.S.;
- Perjury in the First Degree--§ 18-8-502, C.R.S.; *but see* § 18-8-508, C.R.S. (recognizing retraction of a false statement during the official proceeding as an affirmative defense);

258

- Racketeer Influenced and Corrupt Organizations (RICO) Act.  18 U.S.C. §§ 1961-1968;
- Reporting Professional Misconduct—Colo. RPC 8.3;
- Responsibilities Regarding Nonlawyer Assistance—Colo. RPC 5.3;
- Responsibilities of Supervisory Lawyer—Colo. RPC 5.1;
- Retaliation Against a Witness or Victim--§ 18-8-706, C.R.S.;
- Retaliating Against a Witness, Victim, or Informant—§ 18 U.S.C. § 1513;
- Tampering with a Witness, Victim, or Informant—§ 18 U.S.C. § 1512; and
- U.S. Constitution, Amends. I and XIV.

The current Justices' authorization of approximately $350,000 of public funding for the contracted-for "independent" investigations despite prohibitions against such investigations in Canon Rule 2.9 and this Commission's direct admonishment against proceeding with the investigations also creates a reasonable basis to suspect additional fraud and other violations of law.  *See, e.g.*, § 2-3-110.5(1)(d), C.R.S. (defining "fraud" in context of fraud hotline investigations).  The Justices' apparent retaliation against Chair and later-Executive Director Gregory for his having raised concerns about the propriety of their "independent" investigations also presents a reasonable basis for suspecting that the Justices have engaged in fraud and otherwise violated the law / the Code.  Likewise, the Justices' persistent refusal to recuse themselves from matters involving their own probable misconduct and despite being expressly requested to do so by this Commission, presents a clear violation of Canon Rule 2.11 and is conduct contrary to the Justices' lawful duties.  The Justices' knowing concealment of conflicts of interest amongst the members of this Commission also provides a reasonable basis to suspect violations of Canon Rules 1.1, 1.2, 2.2, 2.3, 2.13, 2.15, and 2.16 with the possibility of additional civil and criminal liabilities.

There is a reasonable basis to suspect that all current Justices of the Colorado Supreme Court have violated Canon Rule 1.1 through the violation of other Canon Rules, through their efforts to cover up misconduct, and/or through, more specifically, the involved Justices' withholding of material information from the SCAO FSD, the OSA, and this Commission.  If established, violations of Canon Rule 1.1, other provisions of the Code, and other laws are "actual improprieties" under the Code.  Canon Rule 1.2, Comment 5.

**Canon Rule 1.2 (Promoting Confidence in the Judiciary)**

Canon Rule 1.2 provides:

> A judge shall act at all times in a manner that promotes public confidence in the independence,* integrity,* and impartiality* of the judiciary, and shall avoid impropriety and the appearance of impropriety.

Independence is defined as "a judge's freedom from influence or controls other than those established by law."  Colo. Code Jud. Conduct, Terminology.  Integrity is defined as "probity, fairness, honesty, uprightness, and soundness of character.  *Id.*  Impartiality means an "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge."  *Id.*

259

The requirements of Canon Rule 1.2 apply to the conduct of judges "at all times" (whether the conduct occurs as part of the judge's official duties or as part of their personal life).  As the New Mexico Supreme Court has observed, "[T]he behavior of a judge should be as circumspect off the bench as it is on the bench."  *In re Ramirez*, 135 P.3d 230, 233 (N.M. 2006).

As with Canon Rule 1.1, a judge may violate Canon Rule 1.2 by violating other provisions of the Code and, thus, committing actual improprieties or creating appearances of impropriety. Attempting to influence investigations of pending/impending matters and conducting investigations has been recognized as a violation of Canon Rule 1.2.  *Disc. Counsel v. Campbell*, 931 N.E.2d 558 (Ohio 2010) (judge's encouragement of law enforcement to follow up on issues, questioning of defendants, and review of prosecutor's file amounted to improper involvement in investigation and violation of Canon Rule 1.2).  Likewise, a judge's refusal to disqualify as required by Canon Rule 2.11 has also been found to create appearances of impropriety in violation of Canon Rule 1.2.  *White v. Sun Trust Bank*, 538 S.E.2d 889 (Ga. App. 2000); *see also In re Eriksson*, 36 So. 3d 580 (Fla. 2010) (judge violated Canon Rule 1.2 by retaliating against litigant that sought judge's disqualification).

***A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety, have created appearances of impropriety, and have otherwise violated Canon Rule 1.2.***

The constellation and pattern of the current Justices' conduct, at minimum, creates significant appearances of impropriety under the reasonable person standard applied through Canon Rule 1.2.  The Justices' involvement in the Masias Contract and their subsequent refusals to disqualify themselves from issues and matters related to the Masias Controversy (including the various allegations of retaliation, their repeated public commentary, their interference with the legislative process, their continued appointment of and influence upon the appointment of members to this Commission, and the Court's "independent" investigations) have materially diminished public confidence in an independent, upright, and impartial Colorado Judiciary.

Yet despite this Commission's current Chair Mindy Sooter, herself, having publicly acknowledged the heightened duties of judges to avoid even the appearances of impropriety, this Commission summarily dismissed the Maes RFE / complaint (which alleged many of the same actual violations of the Code raised in the present RFE).  *Supra* discussion at p. 76.  During her Senate confirmation hearing, Commissioner Sooter had the following exchange:

> **Sen. Gonzales**
> Thank you, Mr. Chair. I want to follow up on the question from Senator Gardner, and first, just extend my appreciation to you for being willing to serve in this capacity in this time where I do think that we are recognizing the need for some change to the way that things have been done. Ms Sooter, in your application, you reflected on ensuring that the Judiciary has an appropriate work ethic, demeanor and temperament. How do you, and this is a question, actually, for both of you. How do you respond in these moments of conflict, in these moments of challenge?

260

**Sen. Lee**
Ms. Sooter.

**Mindy Sooter**
Thank you, Mr. Chair and Senator Gonzales, well, I would like to think that our government and the Commission can get through this together. ***We do have a mission to increase the integrity or help protect the integrity of the judiciary***, and I do believe that the people who serve this state serve it with good intentions at heart, and ***we have a mission to investigate complaints that are brought to the Commission to ensure that the judges in the State are abiding by the judicial Canons and there's no appearance of impropriety, and that we take appropriate actions when there is***. ***So, we'll diligently conduct our investigations.*** Of course, we have a duty of confidentiality as well, but we take the responsibility very seriously, and so we're all willing to dedicate the time, and frankly, it's an honor to be able to serve in this capacity.[354] (Emphasis added).

Again, it deserves emphasis that Chair Sooter and the Justices have persistently concealed conflicts of interest that Chair Sooter has with respect to the Justices' publicly alleged misconduct, particularly the Justices' involvement in the Masias Contract, their unethical "independent" investigations, and their improper commentary on pending and impending cases. Nevertheless, neither the Justices nor Chair Sooter have disclosed their conflicts or recused themselves from matters involving this alleged misconduct.

This Commission is suppressing legitimate grounds for judicial discipline proceedings as to the Justices and is, itself, creating appearances of impropriety.  This Commission's members continue to facilitate retaliation against the victims, whistleblowers, former Commission members, and other persons who have provided information probative of the Justices' misconduct and who have sought accountability for such misconduct.  Because of the Justices' roles as the apex and management of the Colorado Judicial Branch, however, applying the Code equally to them (as to any other judge) is essential.  Likewise, the current members of this Commission, its Executive Director, and its Special Counsel should, themselves, be individually accountable for their enabling of the Justices misconduct and their collective refusal to perform this Commission's constitutional mandate to enforce the Code, as expressed through Colo. RJD 1(b).

If proven, the current Justices' alleged violations of Canon Rule 1.2 and any of the other Canon Rules are actual impropriety under the Code.

**Canon Rule 1.3 (Avoiding Abuse of the Prestige of Judicial Office)**

Canon Rule 1.3 provides:

---

[354] Appendix 27(k), pp. 3:23-4:3.

261

> A judge shall not abuse the prestige of judicial office to advance the personal or economic interests* of the judge or others, or allow others to do so.

As further explained through Comment 1 to Canon Rule 1.3, "It is improper for a judge to use or attempt to use his or her position to gain personal advantage or deferential treatment of any kind." As explicitly provided in Canon Rule 1.3, it is equally improper for a judge to abuse the prestige of office either for personal benefit or for the benefit of others. When a judge uses the prestige of judicial office to advance the interests of others, he or she effectively prostitutes the office. *See*, e.g. *In re Inquiry Concerning Eads*, 362 N.W. 2d 541 (Iowa 1985) (abuse of prestige of judicial office where judge interfered in attorney/friend's dissolution proceeding and intimidated opposing counsel). Violations of Canon Rule 1.3 have also been recognized where judges have used the authority and resources of their judicial offices to retaliate or seek retribution against others. *See, e.g., Matter of Edwards*, 459 S.E.2d 837 (S.C. 1993) (after being served with process, judge issued bench warrant for process server's arrest).

Although Canon Rule 1.3 allows a judge or justice to provide information to nominating commissions and to the Governor's Office as part of the judicial selection process, the expectation is that a judge or justice will not influence that process or promote/oppose a judicial candidate for improper reasons. Likewise, although Canon Rule 3.1 also allows a judge or justice to participate in extrajudicial activities that promote the law and legal systems, the expectation is that the judge or justice will not use such activities as a means of lobbying or advocating for their personal interests. The prestige of office for a Colorado Supreme Court Justice includes direct access to significant public funding sources. The use (and conversely the obstruction) of those funding sources for a Justice's own benefit or the benefit of others violates Canon Rule 1.3.

***A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 1.3.***

The circumstances described in this RFE present a reasonable basis to suspect that each of the Justices have repeatedly abused the prestige of their office to reinforce their own personal reputations and the reputations of other judges. Such abuse has occurred through the Justices' public commentary on the Masias Controversy, the involved Justices' underlying approval of the Masias Contract, the current Justices' approval of the "independent" investigations, use of public funds to pay for such investigations, and the direct/indirect lobbying that has occurred throughout the Masias Controversy (including the "Workplace Culture Initiative"). The Justices use of influence over interest groups and non-profit organizations to oppose legislative and constitutional reform of the judicial disciplinary system also, at minimum, creates appearances of impropriety. Likewise, Chief Justice Boatright's participation in the nominating commission that ultimately resulted in Grant Sullivan's appointment to the Colorado Court of Appeals appears to be an abuse of the prestige of his office. The Justices' non-recusal and misuse of their authority to appoint or influence the appointment of members of this Commission is further reflective of abuse of the prestige of their offices. The overarching allegations that the Justices have been aware of retaliation within the Judicial Department accompanied by repeated contracts for silence and yet did not report these circumstances to this Commission also forms a reasonable basis for suspecting violations of Canon Rule 1.3. These contracts for silence, intended to

262

protect other judges, are themselves an example of the Justices' prostituting their offices for the benefit of others.

The Justices' willingness to excuse the apparent bad faith litigation tactics used by former District Court Judge John Scipione and to allow him to retain an over $189,530 windfall for his judicial misconduct is another example of the Justices' prostituting their offices and the members of this current Commission and its Special Counsel doing the same.

By issuing orders censoring this Commission from describing the non-reporting and non-cooperation of judges and Judicial Department employees in connection with the prior disciplinary history of former District Court Judge Robert Kiesnowski, there are additional reasonable grounds to suspect that the Justices have abused or otherwise prostituted the prestige of their offices to benefit their own reputations and the reputations of other judges/justices.

If proven, the Justices' conduct violates Canon Rule 1.3 and is actual impropriety under the Code.

**Canon Rule 2.2 (Impartiality and Fairness)**

Canon Rule 2.2 provides:

> A judge shall uphold and apply the law,* and shall perform all
> duties of judicial office fairly and impartially.*

***All the current Justices have engaged in actual impropriety and have violated Canon Rule 2.2.***

The expectations of Canon Rule 2.2 are broader than the requirements for disqualification provided through Canon Rule 2.11. Nevertheless, the expectations that a judge must be impartial and fair in all aspects of their judicial duties is perhaps the most fundamental duty under the Code. For the Justices, their duties of judicial office include administrative duties under Canon Rule 2.5, supervisory authority under Canon Rule 2.12, and appointment authority under Canon Rule 2.13. There is a consistent history of the Justices involving themselves in decisions and in the fraudulent use of public resources to suppress scrutiny of the Justices' own probable misconduct under the Code. The Justices persistent refusal to disqualify themselves and other interested subordinates / third parties from involvement in these decisions and activities negates any appearance of fairness or impartiality. Moreover, the Justices' conduct and non-disqualification reinforces evidence that they are personally responsible for the "toxic" culture of intimidation, retaliation, and contracts for silence that still pervades the Colorado Judicial Department. In turn, the Justices have both created appearances of impropriety and undeniably violated their duties under Canon Rule 2.2.

The Justices' conduct should be recognized as actual impropriety under the Code.

**Canon Rule 2.3 (Bias, Prejudice, and Harassment)**

Canon Rule 2.3 provides, in relevant part:

263

**(C)** A judge shall not engage in retaliation for reporting of misconduct under this Code or other legal authority. The duty to refrain from retaliation includes retaliation against current and former Judicial Branch personnel as well as attorneys and other members of the public.

This section was added to Canon Rule 2.3, effective June 3, 2021. Because the section only clarifies the impropriety of conduct already prohibited through other provisions of the Code (i.e. Canon Rules 1.1, 1.2, 1.3, 2.12, and 2.16), there should not be any obstacles to applying the provision retroactively. *In re Schultz*, 420 N.Y.S.2d 54, 56 (NY Ct. on Jud. 1978) (commonly established misconduct and *malum in se* conduct under Code may be regulated regardless of retroactivity); *see also* Code of Conduct for United States Judges, Canon Rule 3B(4) (categorically prohibiting retaliation against current and former judicial personnel and other persons reporting misconduct).[355] Moreover, because the Code is civil rather than criminal in its application, constitutional prohibitions against *ex post facto* laws do not apply. *Calder v. Bull*, 3 U.S. 386, 391 (1798); *see also Carmell v. Texas*, 529 U.S. 513, 521-22 (2000) ("the phrase '*ex post facto*' referred only to certain types of criminal laws."); *Nicholson v. Jud. Ret. and Removal Comm'm.*, 562 S.W.2d. 306, 308 (Ky. 1978) (administrative purposes of Code non-criminal allowing amendments and application without violation of constitutional *ex post facto* prohibitions).

In the context of this collective authority, it should be clear that retaliation is a fundamental violation of the Code that goes to the core of a judge's function and proper role. As further explained *infra* starting at p. 293, retaliation requires uniform enforcement of the Code and merits the most stringent possible sanctions.

***A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 2.3.***

The current Justices were aware of the allegations of retaliation against Kribs, Dukes, Ryan, and others involved in raising concerns about the Masias Contract. By limiting the scope of

---

[355] The prohibitions against retaliation contained in Canon Rules 2.3, 2.5, 2.12, and 2.16 are also consistent with the similar prohibitions contained in Canon Rule 3(B)(4) of the Code of Conduct for United States Judges. Canon Rule 3(B)(4) of the federal Code of Conduct provides:

(B) *Administrative Responsibilities*

\* \* \*

(4) A judge should practice civility, by being patient, dignified, respectful, and courteous, in dealings with court personnel, including chambers staff. A judge should not engage in any form of harassment of court personnel. A judge should not retaliate against those who report misconduct. A judge should hold court personnel under the judge's direction to similar standards.

264

investigations into these allegations of retaliation, the current Justices have thus far prevented inquiry into who was responsible for the suspected retaliation.  To date, no one has been held accountable for the suspected retaliation.  The allegations that Justice Gabriel's law clerk was retaliated for reporting to SCAO's HR division have also avoided meaningful investigation.

The Justices' refusal to acknowledge grounds for their disqualification from all matters related to the Masias Controversy, including the appointment of members to this Commission provides clear evidence of retaliatory motives in the Justices' decision to appoint 4th Judicial District Court Judge Jill Brady to replace this Commission's Vice-Chair David Prince.  As discussed, Judge Prince distinguished himself as a brave voice calling for the Justices' accountability through judicial disciplinary proceedings.  Conversely, Judge Brady distinguished herself as a vocal critic of this Commission's efforts to be a legitimate agent for accountability.  The circumstances of Judge Brady's appointment present a reasonable basis to suspect that the Justices violated their duties to refrain from retaliation under Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.11, 2.13, 2.15, and 2.16 as well as § 13-5.3-106(2)(b), (6)(b)(III), C.R.S.  Moreover, by knowingly accepting her appointment with an awareness that Judge Prince was being retaliated against, Judge Brady also likely, herself, violated Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.11, 2.15, and 2.16 as well as § 13-5.3-106(2)(b), (6)(b)(III), C.R.S.

Additionally, to the extent that there are grounds to suspect that this Commission's ousted Executive Director was retaliated against because of the Masias Controversy, the current Justices' involvement beyond their general exercise of powers to appoint members of this Commission has not been investigated.  If it is proven that the judge members of this Commission retaliated against the ousted Executive Director in collaboration with the Justices, the judge members (18th Judicial District Court Judge Bonnie McLean, 4th Judicial District Court Judge Jill Brady, Adams County Court Judge Mariana Vielma, and Jefferson County Court Judge Sara Garrido)[356] are equally responsible for violating Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.6, 2.11, 2.12, 2.13, 2.15, and 2.16 as well as § 13-5.3-106(2)(b), (6)(b)(III), C.R.S..

---

[356] Like Chief Justice Boatright, Justice Márquez, and Justice Berkenkotter, Judge Brady and Judge McLean are subject to current-cycle judicial performance evaluations and retention elections in November 2024.  In concluding that Judge Brady and Judge McLean "Mee[t] Performance Standards," both the 4th Judicial District Performance Commission and the 18th Judicial District Performance Commission respectively highlight the Judges' appointments to this Commission.  With regards to Judge Brady, the 4th Judicial District Performance Commission makes the somewhat unusual statements: "Practitioners report that she has 'rectified her demeanor issues of the past.' Judge Brady has made her financial disclosures and has no disciplinary history." https://judicialperformance.colorado.gov/brady-jill-m-2024-evaluation. In contrast to the reference to financial disclosures in Judge Brady's evaluation report, Judge McLean's evaluation report does not mention her failure to file such disclosures over multiple years.  Instead, Judge McLean's evaluation report goes so far as to state, "***Judge McLean avoids impropriety***[.]" (Emphasis added).  https://judicialperformance.colorado.gov/mclean-bonnie-heather-2024-evaluation.

265

By failing to take any administrative action against the unidentified OARC employees who provided false information that resulted in the wrongful grand jury indictment of Senator Pete Lee and Attorney Regulation Counsel Jessica Yates who personally abused her official position to unlawfully and unconstitutionally intimidate or otherwise threaten the members of this Commission and its Staff for their legislative testimony, the current Justices appear complicit in retaliation prohibited by Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.6, 2.12, 2.15, and 2.16.

Recent media reporting has further presented allegations that, in 2019, then-Justice Boatright first knew about concerns that then-Denver Juvenile Court Presiding Judge D. Brett Woods was objectively unfit to perform his judicial duties due to habitual intemperance.[357]  With such knowledge, Justice Boatright also knew that the Judicial Department had enabled Judge Woods to retaliate against an employee who had reported their concerns about Judge Woods's alcohol use to others, including Justice Boatright and other judges.  Notwithstanding this knowledge, Justice Boatright did not report Judge Woods's unfitness to this Commission (from 2019 until the present).  Assuming that the non-disclosure agreement with the employee was handled like other NDAs, the full extent of who else was aware of and who helped enable the retaliation is unclear and requires further investigation.  This Commission's request to suspend Judge Woods according to Colo. RJD 34(a) was granted on December 21, 2023 and Judge Woods retired with disciplinary proceedings still pending on February 8, 2024.[358]  Justice Boatright did nothing to prevent, report, or remedy the retaliation that occurred against the Judicial Department employee.  Migoya, *supra*, note 3.  Justice Boatright's inaction occurred notwithstanding assurances he provided to the Legislature on April 14, 2022 that future allegations of non-reporting could be avoided.  Chief Justice Boatright did not disclose his then-awareness of additional unreported judicial misconduct by Judge Woods.  Justice Boatright testified:

> Thank you. Is [the 2010 Memorandum of Understanding between the Judicial Department and the Commission for information sharing] working? Well, the allegations in the so-called memo says that it's not. It has allowed an allegation that our HR department went in and investigated things, and then did not properly turn them over to judicial discipline, right. So, what I'm trying to do is avoid that allegation. Because I think we've been able to see the

---

[357] Habitual judicial intemperance has been recognized elsewhere as sufficient to warrant a judge's removal / permanent disqualification from office.  *See, e.g., In re Sasso*, 970 A.2d 1039 (N.J. 2009) (judge permanently disqualified from office after repeatedly presiding over cases while intoxicated); *see also In re Walker* (N.M. 2019) (judge stipulated to retirement and bar from future judicial office after being arrested and charged with DUI; consistent with New Mexico's categorial recognition of single DUI offense as basis for judicial removal) stipulation *available at* https://www.nmjsc.org/wp-content/uploads/2019/02/Walker-Petition.pdf.  Although the judicial disability structure hypothetically provides an avenue for a judge to promptly self-report alcohol and other substance dependencies to receive treatment/rehabilitation without discipline, the chronic concealment of such a condition (by the subject judge and/or others) makes a disciplinary response both necessary and appropriate.

[358] Michael Karlik, *Denver's Presiding Juvenile Judge Suspended, Few Details on Disciplinary Investigation*, DENVER GAZETTE, January 18, 2024 (updated February 12, 2024).

266

> harm that just allegations can make, as you alluded to, in your statement, there has been no finding at this point, that any of these things, any of those allegations in the memorandum were improperly handled. There's been no finding of that. ***But I will say that the allegations have been as damaging and has made this year, probably the most difficult year for me in my professional life. So would I like to get out of that, yes.*** And I think that if we can identify, procure safety for the alleged victim, turn it over, then those allegations can never be made again. *Supra,* note 238 (Emphasis added).

Similarly, Chief Justice Boatright failed to disclose his awareness of Judge Woods's intemperance and retaliation when responding to this Commission's 2021 correspondence, which expressly requested the consistent reporting of all suspected judicial misconduct. In his June 11, 2021 letter to this Commission, Chief Justice Boatright provided the following false assurances:

> Should I or the Department obtain ***actual knowledge*** of any Code violation that requires reporting under Rule 2.15(A) or the MOU, either ***independently*** or through the [contracted-for] investigation[s], we will promptly comply with our reporting obligations. *Supra*, note 124; Appendix 19, p. 9.

It is notable that Chief Justice Boatright attempted to draw a distinction between Canon Rule 2.15(A) (mandatory obligation to report known judicial misconduct) and Canon Rule 2.15(C) (requiring "appropriate action" in response to any suspected Code violations), which he did not acknowledge having any duties to comply with. In the Woods matter, however, it is alleged that Chief Justice Boatright had actual knowledge of substantial judicial misconduct (i.e. habitual intemperance and retaliation) sufficient to require his reporting under both Canon Rules 2.15(A) and (C).

The issues of unreported retaliation in the Woods matter and delayed reporting in *Kiesnowski* continued after Chief Justice Boatright had further publicly emphasized the Court's reinforcement of the Code through the addition of Canon Rule 2.3(C) in his April 14, 2022 testimony to the Legislature:

> The other thing that we have done is we've changed the professional rules for judges with regard to making sure that harassment is known as something that can go before judicial discipline, we put in there that retaliation is not accepted as a result of someone being reported. *Supra*, note 238.

This current Commission has taken no action to temporarily suspend Chief Justice Boatright under Colo. RJD 34(a) or to otherwise hold him publicly accountable for his alleged misconduct, which includes non-cooperation with and a lack of candor towards this Commission under Canon Rules 1.2 and 2.16.

267

Beyond the Woods matter, Chief Justice Boatright's apparent delayed reporting of now admitted retaliation by former 17th Judicial District Court Judge Robert Kiesnowski against his former judicial assistant, Emily Betts, over the course of approximately 5-years presents an additional basis to suspect that Chief Justice Boatright was complicit in enabling and covering up retaliation by other judges.[359]  The other current Justices' subsequent and unconstitutional efforts to suppress this Commission's original Recommendation and record of proceedings in *Kiesnowski* (including evidence that Chief Justice Boatright failed to perform his reporting duties under Canon Rule 2.15) also present a reasonable basis to suspect violations of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.5, 2.6, 2.11, 2.12, 2.15, and 2.16.

The Woods matter presumably remains pending before the Colorado Supreme Court without the Justices ordering formation of a special tribunal according to Colo. RJD 41.  Inexplicably, the Court (with Chief Justice Boatright still recusing) issued its final disciplinary opinion in *Matter of Kiesnowski* on March 4, 2024, immediately after publication of the articles in *The Denver Gazette* on March 3, 2024.  Although the Justices use the disciplinary opinion to further justify their unconstitutional orders striking this Commission's original recommendation and record of proceedings, the Justices do not address how the allegations of delayed reporting by Chief Justice Boatright should have otherwise required the full Court's disqualification and formation of a special tribunal through Colo. RJD 41.  *Kiesnowski*, ¶¶ 11-12.  The Justices' refusal to disqualify themselves implicates violations of Canon Rules 1.1, 1.2, 1.3, 2.2, and 2.11 within the overall appearance of enabling retaliation within the Judicial Department and towards this Commission in violation of Canon Rules 2.3, 2.12, and 2.16.

A reasonable basis exists to suspect that the current Justices have either directly or indirectly retaliated against persons who have raised concerns about the Masias Contract and the Justices' response to the Masias Controversy.  If proven, the Justices' conduct violates Canon Rule 2.3 and is actual impropriety under the Code.

**Canon Rule 2.5 (Competence, Diligence, and Cooperation)**

Canon Rule 2.5 provides:

> **(A)** A judge shall perform judicial and administrative duties, competently and diligently;

> **(B)** A judge shall cooperate with other judges and court officials in the administration of court business.

The duties recognized through Canon Rule 2.5 extend to record keeping practices and the responsible handling of public funds.  *See, e.g.*, *In re Seitz*, 495 N.W.2d 559 (Mich. 1993) (failure to file report with state court administrator); *In re Anderson*, 412 So.2d 743 (Miss. 1982)

---

[359] The circumstances in *Kiesnowski* were reported as part of the story regarding the Woods matter, but also through a separate article detailing the Justices' efforts to censor this Commission's public recommendation for judicial discipline, which had included an explanation of how material information was withheld from the Commission over the course of several years. Migoya, *supra* note 3; *see also* Appendix 20.

268

(failure to keep accurate record of public revenue and submission of fraudulent statements in monthly reports); *In re Sanders*, 564 S.E.2d 670 (S.C. 2002) (failure to follow accounting and payment processes); *In re Riley*, 380 S.E.2d 816 (S.C. 1989) (mismanagement of judicial finances).

The expectations of Canon Rule 2.5(B) further require candor in reporting material information to other court officials.  *See, e.g., In re Woodwood*, (Cal. Comm'n Jud. Perform. 2014) (Judge publicly censured for workplace relationship and providing misleading information to court administration in violation of equivalent to Canon Rule 2.5).[360]

***A reasonable basis exists to suspect that the involved Justices have engaged in actual impropriety and have violated Canon Rule 2.5.***

The fact that Chief Justice Coats allowed the facially absurd Masias Contract to move forward without notifying the SCAO FSD, the OSA, or the Attorney General has already been recognized as a violation of Canon Rule 2.5.  Chief Justice Coats's admissions create a reasonable basis to suspect that the other involved Justices also violated the requirements of Canon Rule 2.5 by collectively approving the Masias Contract despite their awareness of the April 15, 2019 anonymous fraud report and their own non-reporting of the contemplated contract to the SCAO FSD or the OSA.  In particular, the non-reporting of material information to the SCAO FSD implicates violation of Canon Rule 2.5(B).  The Justices renewal of their request for funding "Leadership Development" with further inappropriate commentary on the merits of the Masias Contract and a request for $500,000 in FY 2024-25 (increasing to $750,000 in FY 2025-26) is a another example of incompetent/unethical administration.  Based upon the more general circumstances described in this RFE, all the current Justices are likely to have failed to perform their administrative duties competently through their collective inability to establish the correct "tone at the top."

A reasonable basis exists to suspect that the involved Justices have engaged in actual impropriety and have created appearances of impropriety through their participation and complicity in the same conduct which Chief Justice Coats has already acknowledged and a Special Tribunal has recognized to have violated Canon Rule 2.5.  Moreover, the current Justices' failure to establish an appropriate "tone at the top" goes to their competency and provides an additional reasonable basis to suspect that they have engaged in actual impropriety and have violated Canon Rule 2.5. By intentionally allowing former Judge Scipione to unjustly receive an over $189,350 windfall for his bad faith and misconduct during judicial disciplinary proceedings also provides a reasonable basis to suspect that the Justices have violated Canon Rule 2.5.  The Justices' collective failure to stop the pattern of retaliation that exists within the Judicial Department also provides grounds to find that they have violated Canon Rule 2.5.

If proven, the Justices' conduct violates Canon Rule 2.5 and is actual impropriety under the Code.

---

[360] Decision *available at* https://cjp.ca.gov/wp-content/uploads/sites/40/2016/08/
Woodward_DO_Censure_09-02-14.pdf

269

**Canon Rule 2.6 (Ensuring the Right to Be Heard)**

Canon Rule 2.6 provides, in relevant part:

> **(A)** A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law.*

Law is broadly defined to "encompas[s] court rules as well as statutes, constitutional provisions, and decisional law." As further recognized through Canon Rule 1.1(A), "law" includes the Code, itself.

***A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 2.6.***

The movie *Spotlight* (2016) dramatizes *The Boston Globe's* exposure of the Boston Catholic Archdiocese's child sex abuse scandal. *Spotlight* opens with a scene where a priest has been arrested and is brought to a local police precinct. Once there, a ranking police officer and a prosecuting attorney conspire to excuse the priest's criminal conduct, and they then release him to harm additional children.

Just as that scene plays out in *Spotlight*, Colorado's judicial oversight and attorney regulation systems are reinforcing patterns of judicial misconduct by denying complainants meaningful, open, and conflict-free forums to raise allegations of misconduct and to seek accountability. As the ultimate overseers of judicial discipline, the Justices have now repeatedly excused judicial misconduct or minimized the sanctions imposed, with the most notable example occurring in *Scipione*. Moreover, when the circumstances involved relate to themselves or a close colleague, the Justices have persistently refused to disqualify themselves from actions that impact the proceedings (including timely reporting of complaints, control of access to records, appointments of special masters, appointments of members to this Commission, legislative engagement, rulemaking, etc.).

Even when a Justice does disqualify himself or herself, the reasons for doing so are not stated publicly. At least as related to issues involving the Justices and the Masias Controversy, this Commission, OARC, and the Attorney General's Office have all become rigged and corrupted forums where complaints of misconduct will be summarily snuffed out. The Justices have undermined the judicial discipline process and the public's right to be heard on issues of judicial misconduct by controlling, unduly influencing, conspiring with, or otherwise stacking the very oversight entities that should be the path for citizens and victims to seek redress and enforcement of Colorado's criminal laws, ethical standards, and civil fraud protections. Moreover, by striking this Commission's Recommendation in *Kiesnowski*, the Justices directly denied this Commission and the victim of the involved judicial misconduct, Emily Betts, their respective rights to be heard. By refusing to apply Colo. RJD 36(h) to allow consideration of this Commission's claims for restitution on behalf of the State and for a full award of attorney's fees and costs as allowed under Colo. RJD 36(g) and Colo. Const. Art. VI, § 23(3)(e), the Justices further denied the Commission's, the victims', and the public's rights to be heard in *Scipione*.

270

As evident in the Justices' refusals to waive confidentiality and to publicly disclose the 2022 disqualification letters sent to them as well as Justice Boatright's refusal to publicly disclose his correspondence with this Commission regarding the Maes RFE/complaint, the judicial discipline process has become a farce built around backroom agreements and coverups so absurd that they are intentionally hidden from all public scrutiny. Justice William O. Douglas once observed, "Sunlight is the best disinfectant." These damming materials must be made public to address the core of the Justices' misconduct and their probable violations of the Code, including Canon Rule 2.6 as reinforced by Colo. Const. Article II, § 6. *See* Colo. RJD 6.5(d) (recognizing that confidentiality yields as necessary to allow this Commission to perform its constitutional mandate and to ensure disclosure of information in the interests of justice).

By refusing to disqualify themselves from pending judicial discipline proceedings, by manipulating the composition of oversight entities, and by otherwise conspiring to ensure that legitimate complaints of judicial misconduct are not meaningfully considered, the Justices have created a reasonable basis to suspect that they are denying persons their fundamental rights to be heard. If proven, the Justices' conduct violates Canon Rule 2.6 and is actual impropriety under the Code.

**Canon Rule 2.9 (Ex Parte Communications)**

Canon Rule 2.9 provides, in relevant parts:

> **(A)** A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending* or impending matter,* . . .
>
> * * *
>
> **(C)** A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed.
>
> **(D)** A judge shall make reasonable efforts, including providing appropriate supervision, to ensure that this Rule is not violated by court staff, court officials, and others subject to the judge's direction and control.

A pending matter is defined as: "[A] matter that has commenced. A matter continues to be pending through any appellate process until final disposition." Colo. Code Jud. Conduct, Terminology. An impending matter "is a matter that is imminent or expected to occur in the near future." *Id.* More specifically, in the context of judicial discipline:

> **"Proceedings"** means informal or formal proceedings, including, but not limited to, consideration of a request for evaluation of judicial conduct; the investigation of a complaint; a meeting or

271

> hearing of or with the Commission, its staff, special counsel, or
> special masters; a disciplinary disposition; a disciplinary sanction;
> a disability disposition; or a communication with respect thereto.
>
> Colo. RJD 2(w).

The prohibition against *ex parte* communications in the context of judicially initiated or directed investigations is clear.  Such conduct is prohibited regardless of whether the investigation is minor or extensive in its scope.  *Matter of Nuss*, (Kan. Comm. Jud. Qual. 2006) (after cooperative self-reporting and additional reporting by Chief Justice, Associate Kansas Supreme Court Justice publicly admonished for investigation of statistics related to pending case through questioning of legislators)[361]; *see also In re Baker*, 813 So. 2d 36 (Fla. 2002) (judge publicly admonished for soliciting opinions of computer experts to address questions related to calculation of damages in pending contract dispute case).

The prohibition against independent investigations applies equally to circumstances where a judge directly investigates facts and to circumstances where a judge has staff or others conduct the investigation on his or her behalf.[362]

The prohibition against independent investigations is a fundamental concept because such investigations undermine the functional roles of the judge and the parties in an adversarial forum. A judge cannot maintain their neutral role as a decisionmaker if he or she is simultaneously

---

[361] *Available at* https://www.kscourts.org/KSCourts/media/KsCourts/Judges%20%20 Secondary%20Nav%20Page%20PDFs/PublishedJudicialDisciplineCases/In-re-Nuss-(954)-Admonishment-cease-and-desist-2006.pdf.

[362] *See, e.g. In re Crow*, 12-160 (Ark. Judicial Disc. & Disability Comm'n 2013) (judge directed judicial assistant to research defendant's criminal history; public censure imposed) disciplinary letter *available at* https://www.jddc.arkansas.gov/wp-content/uploads/2020/05/Gerald-Kent-Crow.pdf; *Davis v. U.S.*, 567 A.2d 36 (D.C. 1989) (judge directed court clerk to investigate defendant's background and alias); *In re Foret*, 144 So. 3d 1028 (La. 2014) (judge directed staff to obtain police report and question witnesses); *In re Bell*, 344 S.W.3d 304 (Tenn. 2011) (violation of equivalent of Canon Rule 2.9 for judge to initiate indirect *ex parte* communications with *pro se* litigant through judge's private attorney; *ex parte* communications involved judge seeking *pro se* litigant to dismiss judicial discipline complaint (unreasonable delay and inadequate notice of issued order) against judge while underlying litigation still pending before judge; judge violated equivalent of Canon Rule 2.11 by not disqualifying himself after undisclosed *ex parte* communications occurred); *In re Calvert*,  914 N.W.2d 765 (Wis. 2018) (judge suspended for relying on undisclosed investigation that included *ex parte* communications with police chief in making ruling); *In re Wanker*, (Nev. Comm. Jud. Discipline. 2016) (public reprimand for violations of Canon Rules 1.1, 2.2, 2.5, 2.6, 2.9, and 2.12(A); judge, *inter alia*, ordered law enforcement investigation as part of legally baseless contempt proceedings against litigant) Order of Consent *available at* https://judicial.nv.gov/uploadedFiles/judicialnvgov /content/Discipline/Dicisions/2016-03-03-Certified-Copy-of-Stipulation-and-Order-of-Consent-to-Public-Reprimand.pdf; *Sherman v. State*, 905 P.2d 355 (Wash. 1995) (judge directed staff to verify defendant's substance monitoring history with physician).

272

performing the functions of the plaintiff or the defendant.  Violations of the prohibition against independent investigations often justify reversal of a judicial decision or order as a form of structural error and as an infringement on the parties' fundamental rights to be heard.  *See*, e.g., *State v. McCrary*, 676 N.W.2d 116 (S.D. 2004) (*ex parte* contact with defendant's therapist to inform sentencing decision); *In re Guardianship of Garrard*, 624 N.E.2d 68 (Ind. App. 1993) (*ex parte* communication with expert that prepared report regarding guardianship basis for reversal and new trial); *see also* Canon Rule 2.6.

### *A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 2.9.*

The Justices do not dispute that their obligations under the Code, specifically disqualification requirements, apply to judicial disciplinary proceedings.  *Supra*, p. 102 (quoting Steven Vasconcellos).  Moreover, in *Kiesnowski*, the Justices have further confirmed their role as the ultimate decision-maker in judicial disciplinary proceedings. *Kiesnowski*, ¶ 15.

Nevertheless, and despite this Commission's express admonishments against doing so, the Justices approved approximately $350,000 of public funds to commission and contract-for "independent" investigations as to factual matters that were part of the initially impending and then pending *Coats* case.  The "independent" investigations further related to other impending or pending matters, including the potential criminal prosecutions of Masias, Brown, Ryan, and Jane Hood, the EEOC discrimination complaint described in the Masias Memo, and the attorney discipline proceedings involving Chief Justice Coats and unidentified other attorneys.  The Justices' use of substantial public resources to further their personal interests by controlling investigations of their own conduct and then messaging the outcomes of those investigations presents a reasonable basis for suspecting that they abused the prestige of their judicial offices and their appointment powers, in violation of Canon Rules 1.1, 1.2, 1.3, 2.2, and 2.13.   It should not matter that the Justices contracted for these investigations with vendors outside of the Judicial Department.  The fact that the Justices controlled the scope, substance, and public disclosure of these investigations, as well as the investigation completed by the OSA, presents a reasonable basis for suspecting that the Justices violated Canon Rule 2.9.  The investigations were particularly problematic because they related to events and actions/omissions that the Justices were themselves involved in and material witnesses to.  The suspected violations of Canon Rule 2.9 are further aggravated by the Justices' efforts to co-op other government officials into selecting the "independent" investigators, which improperly added credibility to conduct that is otherwise unambiguously prohibited by the Code.  Additionally, and perhaps most importantly, the Justices contracted for their "independent" investigations after this Commission expressly raised concerns about the Court's authority to commission the investigations.  The intentionality of the Justices' conduct is readily apparent through their individual participation in the Court's "Workplace Culture Initiative" and public presentation of the contracted-for investigations and the strawman recommendations produced through them as having resolved the cultural deficiencies and judicial misconduct arising from the Masias Controversy.

Beyond the Masias Controversy in general, Chief Justice Boatright's April 14, 2022 description of the Justices having "had a training recently, and there was a lawyer who works in this area.

273

And I think he scared everybody to death about nothing," raises a reasonable basis to suspect that the Justices may have had improper *ex parte* communications if the attorney involved was representing a subject judge with a then-pending or impending discipline case. *Supra*, p. 115. The Judicial Department's refusal to identify whether this attorney was Chief Justice Coats's attorney, John Gleason, or someone else is itself a reasonable basis for recognition of this RFE as a complaint and for further investigation of the Justices' potential violations of Canon Rule 2.9. Appendix 30, pp. 18, 40, 71-72.

A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have created appearances of impropriety through their contracting for and control over the various investigations in violation of Canon Rule 2.9. The contours of who else was involved in the Justices' pre-planned commissioning of the "independent investigations" and messaging as to the scope, purposes, and outcomes of the contracted-for investigations are factual issues that require further investigation.

If proven, the Justices' conduct violates Canon Rule 2.9 and is actual impropriety under the Code.

**Canon Rule 2.10 (Judicial Statements on Pending and Impending Cases)**

Canon Rule 2.10 provides:

> **(A)** A judge shall not make any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending* or impending* in any court, or make any nonpublic statement that might substantially interfere with a fair trial or hearing.

> **(B)** A judge shall not, in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial* performance of the adjudicative duties of judicial office.

> **(C)** A judge shall require court staff, court officials, and others subject to the judge's direction and control to refrain from making statements that the judge would be prohibited from making by paragraphs (A) and (B).

> **(D)** Notwithstanding the restrictions in paragraph (A), a judge may make public statements in the course of official duties, may explain court procedures, and may comment on any proceeding in which the judge is a litigant in a personal capacity, subject to Canon 1.

Canon Rule 2.10(D) specifically recognizes that any commentary by a judge must conform to expectations under Canon 1 of the Code, which requires that: "A judge shall uphold and promote the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the

274

appearance of impropriety." Under no circumstances, is a judge allowed to make public comments (or have others make public comments on their behalf) that are intended "to advance the personal or economic interests of the judge or others." Canon Rule 1.3.

Significantly, Colorado has not adopted Canon Rule 2.10, section (E) of the ABA Model Code of Judicial Conduct (2007), which provides:

> Subject to the requirements of paragraph (A), a judge may respond directly or through a third party to allegations in the media or elsewhere concerning the judge's conduct in a matter.

With regards to section (E), Comment [3] to Canon Rule 2.10 in the ABA Model Code further provides:

> [3] Depending upon the circumstances, the judge should consider whether it may be preferable for a third party, rather than the judge, to respond or issue statements in connection with allegations concerning the judge's conduct in a matter.

As explained by the reporters from the ABA's drafting committee, section (E) and Comment [3], which Colorado has also declined to adopt, were intended to allow judges to respond to criticism of their decision-making in specific cases:

> Comment [3] suggests that it may be appropriate in some instances for statements that explain or defend the role or action of a judge in a particular matter to be made by a third person, rather than by the judge. The reason judges are understandably hesitant to comment on pending cases is that even incongruous statements about ongoing matters, if taken out of context by the media or observers, have the potential to create the perception that the judge is less than impartial. One effective way to avoid such problems, while still addressing erroneous or distorted statements about a judge's record, is for the judge to delegate the task of responding to a bar association or other third party.[363]

The Colorado Supreme Court's rejection of section (E) and Comment [3] supports an interpretation that the exception and commentary allowed through section (E) are not recognized or applicable in Colorado and under the Code. Even if the exception did apply, however, it would only allow the generalized type of third-party commentary that occurred following the Colorado Supreme Court's decision in *Anderson v. Griswold*, 2023 CO 63.[364] With or without

---

[363] Geyh, *supra* note 70, p. 42.

[364] *See, e.g.*, Donald Samuels and Jeffrey Rupp, *Opinion: No Matter the Outcome for Trump in Anderson v. Griswold, Respect Our Judicial Process: The 14th Amendment Question Before the*

275

the exception provided through section (E), however, it is inappropriate for judges/justices to comment on the merits of their own or other judges' pending or impending judicial discipline proceedings, either directly or through third parties.

***A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 2.10.***

The inherent functions of a judge are to make findings of fact based upon evidence properly before the court, and then, to make legal conclusions by correctly applying the law to the facts that have been found.  These inherent functions presume that the judge will be neutral and detached from the factual and legal issues that he or she is deciding.  "[C]itizens have the right to expect judges to be fair-minded, eager to learn, hardworking, and always respectful of the dignity and rights of all persons and parties who appear in court. Any other mission is a desecration of the public trust—no matter the direction in which the political winds are blowing."[365]  Under all conceptions of the rule of law, it is understood a judge should not sit in judgment of himself or herself or on cases that impact his or her personal interests.  This general understanding of the judicial function and the rule of law does not tolerate public officials, including judges, using the authority of their offices and public resources to cover up or minimize their own misconduct or the misconduct others.

Unfortunately, the Justices of the Colorado Supreme Court have repeatedly abused their judicial offices through premeditated efforts to pre-announce the outcome of the Masias Controversy prior to any investigation and then, through the Justices remaining involved in controlling all aspects of the investigations that did occur.  Through a conspiracy that includes Attorney General Weiser, members of his senior leadership, attorneys within the Judicial Department, and others (including other judges), the Justices have made numerous public statements intended to directly or indirectly exonerate themselves from allegations of wrongdoing.  As explained *supra*, some of these initial public statements occurred: 1) through State Court Administrator Steven Vasconcellos's January 28, 2021 testimony to the Legislature (pre-judging that there was no basis for criminal investigations or civil fraud prosecutions other than allowing the OSA's fraud hotline investigation to proceed), 2) the Court's February 4, 2021 statement to Judicial Department employees (announcing that "The notion that former Chief Justice Coats and his counsel Andrew Rottman—both dedicated public servants—would ever authorize the use of state resources to silence a blackmailer is simply false."), 3) the Court's February 8, 2021 statement (announcing that the Justices had "unanimously decided" to contract for an "independent" investigation to "clear those wrongly accused"), 4) Justice Gabriel's statement that he would be "vindicated" by the Court-controlled "independent" investigations, and 5) through the cover letters Chief Justice Boatright attached to the OSA's Executive Summary of its Fraud Hotline Report, to the Troyer-Mitchell Report, and to the ILG Report all of which announced that there were no findings of judicial misconduct.

---

*Court is Checks and Balances in Action*, DENVER POST, February 3, 2024 (CJI representatives provide generalized public educational information about the trial and appellate processes).

[365] John L. Kane, *Judging and the Rule of Law*, 49 LITIGATION 2, 7 (2023).

The Justices, then, used their self-serving "independent" investigations as a platform for further announcing to all Judicial Department employees, to legal interest groups, to the Legislature, and to the public that all issues of wrongdoing within the Judicial Department have been resolved through the departure of certain employees and through the Court's "Workplace Culture Initiative" (which is itself fraudulently costing taxpayers millions of dollars). Through a sophisticated public relations strategy subsidized by their use of public funds, the Justices have substantially interfered with the Judiciary's ability to allow full investigations of the Justices' conduct and, ultimately, fair disciplinary hearings to determine if the Justices' conduct has violated the Code. Likewise, the Justices, through their enabled infringement of Senator Pete Lee's legislative privilege and other forms of overtly coercive legislative engagement, have impeded any meaningful legislative oversight of their conduct. These intimidation tactics carried over to this Commission through OARC's actions, which impeded judicial disciplinary oversight as to the Justices and culminated in this Commission's unlawful dismissal of the Maes RFE/complaint.

As provided through Canon Rule 2.10(A), there is substantial evidence that the Justices have repeatedly made public statements "that might reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court." Moreover, there are also examples of the Justices making "nonpublic statement[(s)] that might substantially interfere with a fair trial or hearing." Examples of such non-public statements include Justice Gabriel's communications to the Colorado Judicial Institute when *The Denver Post* published its February 4, 2021 article as well as similar communications by Chief Justice Boatright to individual judicial employees. By preemptively announcing that there was no judicial misconduct involved in the Masias Controversy and repeating that narrative in conjunction with public statements made about the various investigations and the Court's "Workplace Culture Initiative," the Justices also appear to have repeatedly "ma[de] pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office." Canon Rule 2.10(B). At various times, the Justices also appear to have required or encouraged subordinates (including State Court Administrator Vasconcellos, Counsel to the Chief Justice Rottman, and SCAO Legislative Liaison Terry Scanlon) to publicly defend the Justices' conduct. This direction and engagement further appears to violate expectations that the Justices "require court staff, court officials, and others subject to the judge's direction and control to refrain from making statements that the judge would be prohibited from making by paragraphs (A) and (B) [of Canon Rule 2.10]." Canon Rule 2.10(C). As has occurred when prior allegations of judicial misconduct by the Justices have been publicly raised, the author anticipates that the Justices will direct SCA Vasconcellos, Counsel to the Chief Justice Andrew Rottman, a Judicial Department spokesperson, or another Judicial Department employee to respond to this RFE and to publicly defend the Justices' conduct. Such communications, however, will be additional violations of Canon Rule 2.10(C).

When he testified to the Interim Committee on Judicial Discipline on the Judicial Department's behalf, this Commission's former Chair and now Court of Appeals Judge Ted Tow, III explained that it would be a violation of the Code for a judge to publicly comment on their own pending or impending judicial discipline, even as part of a judicial retention election. Judge Tow testified, as follows:

277

> You folks [legislators] get sometimes run through the mud in the press or in somebody's, you know, tweets or whatever. But the significant difference is, as a judge, our ethical code prohibits us from even responding. We cannot even counter with a public statement, any statement made against us. We can't campaign if we're standing for retention, unless there is an organized campaign against that judge, which, to my knowledge, in the time I've been on the bench or involved in the process, I think has happened once, maybe twice, that there was an organized campaign with billboards don't retain this judge, that type thing. So, we don't have the ability, we don't have the authority, and we are ethically prohibited from engaging in those discussions.[366]

A reasonable basis exists to suspect that the Justices have created appearances of impropriety and engaged in actual impropriety by repeatedly violating their duties to refrain from commenting on pending or impending cases, as required under Canon Rule 2.10.

If proven, the Justices' conduct violates Canon Rule 2.10 and is actual impropriety under the Code.

**Canon Rule 2.11 (Disqualification)**

Canon Rule 2.11 provides, in relevant parts:

> **(A)** A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality* might reasonably be questioned, including but not limited to the following circumstances:
>
> (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge* of facts that are in dispute in the proceeding.
>
> (2) The judge knows* that the judge . . . is:
>
> (a) a party to the proceeding, or an officer, director, general partner, managing member, or trustee of a party;
>
> * * *
>
> (c) a person who has more than a de minimis* interest that could be substantially affected by the proceeding; or
>
> (d) likely to be a material witness in the proceeding.

---

[366] *Hearing before the Legis. Interim Comm. on Jud. Discipline*, Colo. Leg., June 14, 2022 (Colo. Jud. Dep't presentation); Appendix 27(s)(i)(3), p. 5:17-24.

(3) The judge knows that he or she, individually, . . . has an economic interest* in the subject matter in controversy. . .

(4) The judge, while a judge or a judicial candidate,* has made a public statement, other than in a court proceeding, judicial decision, or opinion, that commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy.

* * *

**(D)** In limited circumstances, the rule of necessity applies and allows judges to hear a case in which all other judges also would have a disqualifying interest or the case could not otherwise be heard.

Knowledge means: "[A]ctual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." Colo. Code Jud. Conduct, Terminology. *De minimis*, "in the context of interests pertaining to disqualification of a judge, means an insignificant interest that could not raise a reasonable question regarding the judge's impartiality." *Id.*

***All the current Justices have engaged in actual impropriety and have violated Canon Rule 2.11.***

As part of his remarks during the second floor reading of HCR 23-1001, HB 23-1019, and HB 23-1205, House Minority Whip Richard Holtorf distilled the problems with the Justices' non-disqualification into practical terms:

> [During his 2021 State of the Judiciary Speech], the Chief Justice of the Colorado Supreme Court was in here talking about some very egregious and heinous things that were done at the highest levels of our justice system. As we reviewed, analyzed, and listened to what was going on, it was as if the fox was guarding the henhouse, as we say in the country. Because the oversight that was needed was not there. So, to the bill sponsors, does this slate of work that you have done guarantee that the fox is not watching the henhouse and that there is going to be true judicial reform? So, anybody in the justice system who is out of line, anybody who is doing things, that they actually as a judge are ruling on in some cases, that that is taken care of?[367]

Unfortunately, even with the reforms being proposed through Amendment H, the corruption that now pervades the Colorado Supreme Court, the Judicial Department, the Colorado Attorney General's Office, and this Commission leaves the foxes unsupervised at the henhouse.

---

[367] Colo. House Leg. Day 87, Floor Debate (Apr. 5, 2023, approx. 12:39 p.m.).

279

The Justices' conflicts and the application of Canon Rule 2.11 could not be clearer. Six of the seven current Justices were directly involved in the approval of the Masias Contract and the concealment of its negotiation from the SCAO FSD and the OSA. Those Justices were also all aware of the existence of the Masias Memo and its concealment from the OSA and this Commission for approximately 2 years. Once the existence of the Masias Memo and former State Court Administrator's allegations of a *quid-pro-quo* contract were made public, all of the current Justices became personally involved in covering up the involved Justices' underlying misconduct through public statements, the Court's "independent" investigations, and the resulting public relations campaign presented through the Court's "Workplace Culture Initiative." The Justices have used public funds and public resources to engage in their various conflicted activities. Accordingly, a number of criteria for mandatory disqualification under Canon Rule 2.11 exist:

- Under 2.11(A)(1), all of the Justices have personal knowledge of the facts at issue with respect to both their own judicial misconduct and the judicial misconduct of their colleagues;
- Under 2.11(A)(2)(a), all of the Justices would be parties to their own judicial disciplinary proceeding (based upon the same facts that have resulted in former Chief Justice Coats's public censure);
- Under 2.11(A)(2)(c) and as acknowledged by Chief Justice Boatright in his April 14, 2022 legislative testimony, the Justices have more than a *de minimis* interest in their careers and reputations if judicial discipline proceedings move forward;
- Under 2.11(A)(2)(d), all of the Justices are material witnesses in their own and in each other's pending or impending judicial discipline proceedings (which previously included *Coats*);
- Under 2.11(A)(3), all of the Justices know that they have an economic interest in judicial discipline proceedings while the Masias Controversy is at issue; and
- Under 2.11(A)(4), all of the Justices have repeatedly made commitments that pre-judge the merits of the Masias Controversy or otherwise present the misconduct involved as having been fully resolved (i.e. through their involvement in the "Workplace Culture Initiative").

By adopting Colo. RJD 41 and with the potential voter approval of Amendment H outstanding, the Justices have further admitted the rule of necessity provided through Canon Rule 2.11(D) does not excuse their duties to disqualify themselves from all judicial discipline proceedings until the Masias Controversy is fully resolved. *See In re Frese*, *supra* note 19 (judge publicly reprimanded for hearing DUI cases while himself facing DUI charges in a separate case). There is no question that all of the Justices should have recused themselves from all matters involving the Masias Controversy, including: 1) hearing any judicial discipline matters pending resolution of the Masias Controversy, 2) legislative engagement on issues related to judicial discipline, 3) rulemaking that impacts judicial discipline, 4) public or non-public commentary on the issues involved in the Masias Controversy, 5) contracting for the Court's "independent" investigations, and 6) continuing to appoint or influence the appointment of members to this Commission.

Beyond the criteria for disqualification set forth in Canon Rule 2.11, the most significant fact is that this Commission had individually notified the Justices of conflicts requiring their

280

disqualification and yet all of the Justices persistently refused to recuse themselves from matters related to the Masias Controversy, including their control of this Commission's access to records.  It is inexcusable that despite having informed the Justices in writing of the grounds for their disqualification and the Justices themselves having acknowledged the legitimacy of those grounds, this Commission has now dismissed the Justices' alleged violations of Canon Rule 2.11, as raised in the Maes RFE/complaint.  Appendix 14, p. 1.  As objectively verifiable evidence of the Justices' judicial misconduct, there is also no valid justification for this Commission to keep the disciplinary letters that were sent to the individual Justices in June-July 2022 confidential.  Colo. RJD 6.5(d) ("[C]onfidentiality does not apply to (i) the disclosure of the records and proceedings reasonably necessary for the Commission or the executive director to fulfill the Commission's Constitutional mandate under Rule 1(b) or (ii) disclosures in the interest of justice or public safety[.]").

There is incontrovertible evidence that the Justices have persistently violated their duties to disqualify under Canon Rule 2.11 and have committed actual impropriety under the Code.

**Canon Rule 2.12 (Supervisory Duties)**

Canon Rule 2.12 provides, in relevant parts:

> **(A)** A judge shall require court staff, court officials, and others subject to the judge's direction and control to act in a manner consistent with the judge's obligations under this Code in the performance of their official duties or in the presence of the judge.
>
> * * *
>
> **(C)** A judge should practice civility by being patient, dignified, respectful, and courteous, in dealings with court personnel, including chambers staff. . .  A judge should not engage in retaliation for reporting allegations of such misconduct. A judge should seek to hold court personnel who are subject to the judge's control to similar standards in their own dealings with other court personnel.

***A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 2.12.***

The facts described in this request for evaluation include repeated examples of the Justices' subordinates (Steven Vasconcellos, Andrew Rottman, Terri Morrison, Jessica Yates, Terry Scanlon, Christopher Ryan, Mindy Masias, Eric Brown, and others) having engaged in conduct that violates the Code.  Much of this conduct occurred with the awareness and endorsement of the Justices.  With regards to abusive conduct by Jessica Yates and Terry Scanlon, the Justices have gone so far as to immunize those subordinates from disciplinary actions.  In *Kiesnowski*, there are facts establishing how Judicial Department employees and judges knew of judicial misconduct for years but did not report it to this Commission, as required by Cannon Rules 2.15 and 2.16.  Likewise, the facts in the Woods matter similarly reflect the Justices' awareness that

281

both judges and Judicial Department employees had failed to report judicial misconduct and unfitness over the course of years.  In the Woods matter, Chief Justice Boatright, Judge Karen Ashby, and Judge Laurie Clark were all aware that retaliation had occurred but did nothing to investigate and report those involved, who included Presiding Juvenile Court Judge Woods and the judicial employees who negotiated the victim's separation agreement.  Similarly, the Justices' acceptance of the retaliation that occurred against FSD Director David Kribs and Controller Myra Dukes is also reflective of violations of Canon Rule 2.12.  The Justices' tolerance for and support of Judicial employees publicly commenting on pending and impending judicial discipline proceedings (including as to the Justices' own probable misconduct) also reflects enabled violations of the Code and its prohibitions against such commentary under Canon Rules 2.9, 2.10, and 4.1.  Perhaps most significantly, the Justices knowingly allowed the "independent" investigations to proceed despite admonishment from this Commission.  Moreover, the Justices later encouraged or required Judicial Department employees to participate in the Court's "Workplace Culture Initiative" and the Court's "listening tours" when the Justices knew or should have known that those taxpayer subsidized public relations efforts also violated the Code.

There is ample evidence to find that the Justices did not "require court staff, court officials, and others subject to the judge's direction and control to act in a manner consistent with the judge's obligations under this Code in the performance of their official duties or in the presence of the judge."  Canon Rule 2.12(A).  Rather, the Justices' encouraged or required Judicial employees and others to participate in the Justices' own probable violations of the Code.  The Justices were further aware of the Judicial Department's prevalent and "toxic" culture of intimidation and retaliation but, nevertheless, allowed it to continue.  Examples of the Justices' inaction and/or (direct/indirect) facilitation of retaliation include the attacks that occurred upon FSD Director David Kribs, Controller Myra Dukes, Emily Betts (the judicial assistant involved in *Kiesnowski*), the unidentified Judicial employee involved in the Woods matter, Christopher Ryan, Senator Pete Lee, CCJD Vice Chair David Prince, and CCJD Chair / Executive Director Christopher Gregory.  Canon Rule 2.12(C).

There is a reasonable basis to suspect that the Justices both have created appearances of impropriety and have committed actual violations of Canon Rule 2.12(A), (C).  If proven, the Justices' conduct is actual impropriety under the Code.

**Canon Rule 2.13 (Administrative Appointments)**

Canon Rule 2.13 provides:

> **(A)** In making administrative appointments, a judge:
>
> (1) shall exercise the power of appointment impartially* and on the basis of merit; and
>
> (2) shall avoid nepotism, favoritism, and unnecessary appointments.

282

> **(B)** A judge shall not approve compensation of appointees beyond
> the fair value of services rendered.

Canon Rule 2.13 requires that the Justices use their powers of appointment in an impartial way, only as necessary, and that any award of compensation arising from an appointment not exceed the "fair value of services rendered." As explained in Comment 1 to Canon Rule 2.13: "Appointees of a judge include assigned counsel; officials such as referees, commissioners, special masters, receivers, and guardians; and personnel such as clerks, secretaries, and bailiffs." With respect to favoritism in appointments, actual impropriety and the appearance of impropriety are recognized as equally serious under the Code. *In re Spector*, 392 N.E.2d 552, 554 (N.Y. 1979) ("an appearance of such impropriety is no less to be condemned than is the impropriety itself").

***A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety, created appearances of impropriety, and have violated Canon Rule 2.13.***

The sole-source nature and the $2.66-2.75 million price term of the Masias Contract were facially unreasonable. As recognized by the OSA, Troyer and Mitchell, and in *Coats*, the Masias Contract should never have been allowed to move forward. The OSA has specifically found that the Masias Contract created appearances of impropriety. Notwithstanding these readily apparent problems, the involved Justices concealed negotiations of the Masias Contract and then proceeded to collectively approve its re-execution/ratification. The involved Justices' conduct presents a reasonable basis to suspect violations of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.5, 2.11, 2.12, 2.13, and 4.1. The current Justices commissioning and contracting for the Troyer-Mitchell investigation and the ILG investigation despite such investigations being prohibited by Canon Rule 2.9(C) also presents a reasonable basis to suspect that all the current Justices violated the prohibition in Canon Rule 2.13(A)(2) against "unnecessary" appointments.

Beyond the involved Justices' approval of the Masias Contract and the current Justices' efforts to confuse or cover up the misconduct involved in the Masias Contract, a reasonable basis exists to suspect that the current Justices further violated Canon Rules 1.1, 1.2, 1.3, 2.2, 2.11, and 2.13 by refusing to disqualify themselves from involvement in the appointment of members to this Commission. The current Justices' abuse of the appointment process is particularly pronounced with the non-renewal of the Commission's former Vice-Chair and vocal proponent of reforms to Colorado's judicial disciplinary system, Judge David Prince. In Judge Prince's place, the current Justices selectively appointed a known critic of this Commission, Judge Jill Brady. The current Justices made this appointment even after this Commission notified them of their conflicts of interest and after the Colorado Senate passed a draft version of HCR 23-1001 (ultimately amended at the conference committee to be "as provided by law") which would have removed the Colorado Supreme Court's authority to appoint judge members. The Justices' support of Judge Bonnie McLean remaining on this commission despite publicly reported evidence of her failure to file required annual personal financial disclosures over multiple years is also reflective of the Justices abusing their appointment authority. The current Justices' unknown involvement and/or awareness of communications between the Judicial Department and the Governor's Office to influence the appointment of attorney and citizen Commissioners is also a valid topic for further investigation by this Commission. At minimum, the current Justices have created significant appearances of impropriety through their continued exercise of appointment powers

283

as to this Commission and despite having acknowledged the existence of the conflicts of interest involved.

If proven, the involved Justices' informed approval of the Masias Contract, the current Justices' unlawful commissioning of the Troyer-Mitchell and ILG investigations, and the current Justices' abuse of their authority/influence in appointing members of this Commission are violations of Canon Rule 2.13 and actual impropriety under the Code.

**Canon Rule 2.15 (Responding to Judicial and Lawyer Misconduct)**

Canon Rule 2.15 provides:

> **(A)** A judge having knowledge* that another judge has committed a violation of this Code that raises a substantial question regarding the judge's honesty, trustworthiness, or fitness as a judge in other respects shall inform the appropriate authority.*

> **(B)** A judge having knowledge that a lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question regarding the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate authority.

> **(C)** A judge who receives information indicating a substantial likelihood that another judge has committed a violation of this Code shall take appropriate action.

> **(D)** A judge who receives information indicating a substantial likelihood that a lawyer has committed a violation of the Rules of Professional Conduct shall take appropriate action.

Appropriate authority:

> [M]eans the authority having responsibility for initiation of disciplinary process in connection with the violation to be reported. In Colorado the Commission on Judicial Discipline is the authority responsible for investigating judicial misconduct and disciplining judges[.]

The mandatory reporting requirements of Canon Rule 2.15(A) and (B) are essential to maintaining the integrity of the judicial system and to protect the public from harm.

> [1] Public confidence in the integrity and impartiality of the judiciary is promoted when judges take appropriate action based on reliable evidence of misconduct. Appropriate action depends on the circumstances, but the overarching goal of such action should be to prevent harm to those affected by misconduct and to prevent recurrence.

284

> [2] Taking action to address known misconduct is a judge's
> obligation. Paragraphs (A) and (B) impose an obligation on the
> judge to report to the appropriate disciplinary authority the known
> misconduct of another judge or a lawyer that raises a substantial
> question regarding the honesty, trustworthiness, or fitness of that
> judge or lawyer. Ignoring or denying known misconduct among
> one's judicial colleagues or members of the legal profession
> undermines a judge's responsibility to participate in efforts to
> ensure public respect for the justice system. This Rule limits the
> reporting obligation to those offenses that an independent judiciary
> must vigorously endeavor to prevent.

> Canon Rule 2.15, Comments 1-2.

As discussed *supra* at pp. 48-51, regardless of whether a judge knows of a significant violation of the Code/RPC or is merely aware of a substantial likelihood of *any* violation of the Code/RPC, the "appropriate action" may be for the judge to report the suspected violation to the "appropriate authority." *See also* Canon Rule 2.15, Comments 1-3; *In re Glassman*, (N.Y. Comm. Jud. Conduct 1986) (admonishment for failure to report other judge's attempts to influence bond decision through *ex parte* communications).[368]  Beyond the requirements of Canon Rule 2.15, Colorado law recognizes a general obligation of every person with "reasonable grounds" to believe a crime has been committed to "promptly" report the suspected crime to law enforcement.  § 18-8-115, C.R.S.

***A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 2.15.***

Chief Justice Coats acknowledged that he violated Canon Rule 2.5 and was publicly censured for allowing the Masias Contract to move forward without notice to the SCAO FSD and the OSA. The contracted-for OARC/LRC investigation further found clear and convincing evidence that Chief Justice Coats violated his duties as an attorney by failing to report other attorneys' "improper conduct."  With these violations of the Code and the RPC now established, there is a reasonable basis to suspect that the other Justices also violated their duties to report judicial and attorney misconduct under Canon Rule 2.15.  The non-reporting of misconduct is further aggravated by the current Justices having made public statements, including the Court's initial February 4, 2021 Statement, that pre-emptively exonerated Chief Justice Coats, Rottman, and others from allegations of wrongdoing.  Beyond the Masias Contract, none of the current Justices self-reported their own involvement or the involvement of their colleagues in allowing retaliation, in withholding material evidence, in refusing to disqualify themselves from matters involving judicial discipline, in obstructing the various investigations, or in impeding the OSA's timely reporting of probable criminal conduct to law enforcement.  The recent reporting regarding Chief Justice Boatright and the other Justices' concealment of judicial misconduct in the pending Woods matter and in *Kiesnowski* only reinforces that the Justices intentionally did

---

[368] Determination *available at* https://cjc.ny.gov/Determinations/G/Gassman.Gerald.1986.03.25.DET.pdf

285

not report each other's potential judicial misconduct with respect to the Masias Contract. *See* Migoya, *supra* note 3.

Chief Justice Boatright's 4 ½ year non-reporting of Judge D. Brett Woods's intemperance and unfitness for judicial office is particularly egregious given Chief Justice Boatright's acknowledgment that, as the Presiding Denver Juvenile Court Judge, Judge Woods handled one of the most important and sensitive dockets in Colorado. At the February 1, 2023 SMART Act hearing, Chief Justice Boatright described caseload statistics with the following commentary:

> But I think what frequently is overlooked is that we have approximately 50,000 cases [statewide] that involve domestic and probate, ***which are really our children and most vulnerable people in our population***.[369]

At the January 25, 2022 SMART Act hearing, State Court Administrator Vasconcellos similarly stated: "We take our responsibilities toward cases with vulnerable parties who can't speak for themselves, very seriously."[370]

Chief Justice Boatright's non-reporting of known judicial misconduct harmed both those involved in cases before Judge Woods and the court employee who Judge Woods retaliated against. Significantly, Chief Justice Boatright's non-reporting also concealed his knowledge that public funds had been used to enable the retaliation. The non-reporting of Judge Woods's judicial misconduct could not be more serious or detrimental to the administration of justice.

Chief Justice Boatright's non-reporting of known judicial misconduct is particularly aggravated given the expectations of mandatory reporting reinforced by § 13-5.3-206, C.R.S. and Justice Boatright's repeated dishonesty in legislative testimony with promises to comply.

Even when SCAO lobbyist Terry Scanlon appeared on behalf of the Justices at the House Judiciary Committee's March 15, 2023 hearing, he acknowledged the expectation that all employees of the Judicial Department, including judges, must now comply with their mandatory reporting duties under § 13-5.3-106, C.R.S.

> Currently at Judicial, after last year's Bill 201 passed, every employee of the Department is a mandatory reporter. So, if someone whispers in my ear in the committee room that you know Judge Joe Jones did something unethical, I have an obligation under the statute to go report it to the discipline commission. If one of my colleagues tells me that a judge or a justice is involved in something unethical. We've got an obligation, so we're all

---

[369] *Hearing before the J. Judiciary Comm.*, Colo. Leg., February 1, 2023 (Colo. Jud. Dep't SMART Act reporting); Appendix 27(v), p. 3:10-12.

[370] *Hearing before the J. Judiciary Comm.*, Colo. Leg., January 25, 2022 (Colo. Jud. Dep't SMART Act reporting); Appendix 27(j), p. 14:21-22.

286

> mandatory reporters of these discipline systems. Not everything that's going on in the workplace involves a judge. The conversations can lead to a judge. People could be concerned about, you know, they could be unsure about whether it would be something that leads mandatory. This [an ombuds office without reporting duties] creates an option for them to have a conversation where they can do it in a safe space.[371]

There is substantial evidence that the Justices have collectively and repeatedly failed to comply with their mandatory reporting obligations as to attorneys, judges, and judicial employees.  The most readily apparent examples of this occurred in connection with the Masias Controversy (including incidents mentioned in the Masias Memo), *Kiesnowski*, and the Woods matter.

If proven, the current Justices' failure to comply with Canon Rule 2.15 is actual impropriety under the Code.

**Canon Rule 2.16 (Cooperation with Disciplinary Authorities)**

Canon Rule 2.16 provides:

> **(A)** A judge shall cooperate and be candid and honest with judicial and lawyer disciplinary agencies.

> **(B)** A judge shall not retaliate, directly or indirectly, against a person known* or suspected to have assisted or cooperated with an investigation of a judge or a lawyer.

***A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 2.16.***

Regardless of the degree to which the current Justices dispute the level of cooperation provided to this Commission, sufficient evidence exists to establish a reasonable basis for suspecting that the current Justices have violated Canon Rule 2.16 by withholding funding, resources, and records from this Commission as detailed *supra* at p. 99.  Despite this Commission directly confronting the current Justices with their acknowledged conflicts of interest, the Justices persistently refused to recuse themselves from proceedings (administrative, judicial, legislative, or rulemaking) as such proceedings related to the Masias Controversy.  Indeed, the Justices continued to control this Commission's access to records through the Attorney General's Office and generally have been uncooperative in establishing and applying disqualification mechanisms through Colo. RJD 41.  Through the Attorney General's Office, the Justices have also allowed active efforts to undermine this Commission's work to establish independent funding and administrative support through the new ASIA Office.  By further allowing OARC and Attorney Regulation Counsel Jessica Yates to unconstitutionally and unlawfully intimidate or prevent members of this Commission, its Staff, and former Senate Judiciary Committee Chair Pete Lee

---

[371] *Hearing before the H. Judiciary Comm.*, Colo. Leg., March 15, 2023; Appendix 27(w)(i), p. 52:19-26.

287

from freely participating in the legislative process, the Justices appear to have violated the prohibitions against retaliation and the requirements of cooperation in Canon Rule 2.16(B), while also departing from their supervisory duties under Canon Rule 2.12.  The current Justices' non-retention of this Commission's former Vice-Chair, their intentional stacking of this Commission, and their continued exercise of appointive powers despite their acknowledged awareness of conflicts also provides a reasonable basis to suspect non-cooperation and retaliation prohibited by Canon Rule 2.16.

In addition to these grounds for suspecting the Justices' non-cooperation and retaliation, the involved Justices' failures to self-report their own potential violations of the Code through the Masias Contract provide a reasonable basis for suspecting that they have not been candid and honest, as required by Canon Rules 1.2 and 2.16.  Likewise, both Chief Justice Boatright and the other Justices' responses to the concealment of retaliation and judicial unfitness (including their refusal to disqualify themselves) in the pending Woods matter and in *Kiesnowski* present additional grounds to suspect a lack of honesty and candor, required by Canon Rules 1.2 and 2.16.  Migoya, *supra* note 3.  Finally, the Justices knowingly concealing grounds requiring members of this Commission to disqualify themselves under Colo. RJD 3.5 also presents a reasonable basis to suspect that the Justices have further violated their duties of honesty and candor to this Commission.

If proven, the current Justices' failure to comply with Canon Rule 2.16 is actual impropriety under the Code.

**Canon Rule 3.1 (Extrajudicial Activities in General)**

Canon Rule 3.1 provides, in relevant parts:

> A judge may engage in extrajudicial activities, except as prohibited by law* or this Code. However, when engaging in extrajudicial activities, a judge shall not:
>
> * * *
>
> (C) participate in activities that would appear to a reasonable person to undermine the judge's independence,* integrity,* or impartiality;*
>
> (D) engage in conduct that would appear to a reasonable person to be coercive[.]

Although Canon Rule 3.2 allows judges to participate in legislative proceedings related to the legal system, such participation cannot violate other provisions of the Code, including Canon Rule 3.1(C)'s prohibition against conduct that undermines appearances of independence, integrity, and impartiality.  Canon Rule 3.2 (Appearances Before Governmental Bodies and Consultation with Government Officials) provides, in relevant part:

288

A judge shall not appear voluntarily at a public hearing before, or otherwise consult with, an executive or a legislative body or official, except:

(A) in connection with matters concerning the law, the legal system, or the administration of justice[.]

Comment 2 to Canon Rule 3.2 explains the general limitations on judges' legislative activities:

In appearing before governmental bodies or consulting with government officials, judges must be mindful that they remain subject to other provisions of this Code, such as Rule 1.3, prohibiting judges from using the prestige of office to advance their own or others' interests, Rule 2.10, governing public comment on pending and impending matters, Rule 2.11, outlining the circumstances under which a judge must disqualify himself or herself, and Rule 3.1(C), prohibiting judges from engaging in extrajudicial activities that would appear to a reasonable person to undermine the judge's independence, integrity, or impartiality.

Canon Rule 3.7 (Participation in Educational, Religious, Charitable, Fraternal, or Civic Organizations and Activities) further provides, in relevant parts:

(A) Subject to the requirements of Rule 3.1, a judge may participate in activities sponsored by organizations or governmental entities concerned with the law, the legal system, or the administration of justice, and those sponsored by or on behalf of educational, religious, charitable, fraternal, or civic organizations not conducted for profit, including but not limited to the following activities:

(1) assisting such an organization or entity in planning related to fund-raising, and participating in the management and investment of the organization's or entity's funds;

(2) soliciting* contributions* for such an organization or entity, but only from members of the judge's family,* or from judges over whom the judge does not exercise supervisory or appellate authority;

* * *

(4) appearing or speaking at, receiving an award or other recognition at, being featured on the program of, and permitting his or her title to be used in connection with an event of such an organization or entity, but if the event serves a fund-raising purpose, the judge may participate only if the event concerns the law, the legal system, or the administration of justice;

289

(5) making recommendations to such a public or private fund-granting organization or entity in connection with its programs and activities, but only if the organization or entity is concerned with the law, the legal system, or the administration of justice; and

(6) serving as an officer, director, trustee, or nonlegal advisor of such an organization or entity . . .

Applied in conjunction with Canon Rules 3.2 and 3.7, Canon Rule 3.1 allows judges to participate in a range of extrajudicial activities, particularly activities that promote the law, the legal system, and the administration of justice.  A judge participating in such activities, however, crosses a line and abuses the prestige of the judicial office if he or she uses the organization involved as a means of promoting his or her own personal interests.  Additionally, legislative activities that involve commentary on pending/impending cases, otherwise abuse the prestige of office for personal gain, or are a means of obstructing the judicial discipline process go beyond permitted extrajudicial conduct.  Such conduct is violative of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.11, and 2.16 as well as Canon Rule 3.1's disallowance of extra-judicial activities that violate the law or other provisions of the Code.

***A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 3.1.***

Although the Justices' engagement as donors, board members, attendees, honorees, etc. in various organizations related to the legal system would ordinarily be allowed under Canon Rules 3.1 and 3.7, a line was crossed when the Justices used such engagement as a means of co-oping the organizations for lobbying and public relations purposes as to allegations of their own judicial misconduct.  As discussed, CJI's funding structure is concerning and creates appearances of impropriety in violation of Canon Rule 1.2.  Likewise, there are significant appearances of impropriety where Justice Samour and other Justices have presented IAALS as an objective, neutral organization while simultaneously failing to disclose Justice Samour's membership on the IAALS advisory board.  Beyond CJI and IAALS, there are repeated examples of individual Justices allowing third parties and outside organizations to endorse the Justices' credibility and what are otherwise violations of the Code (i.e. the propriety of the Court's "independent" investigations under Canon Rule 2.9).  In particular, the lobbying of legal interest organizations to seek professionalism awards (for a member of this Commission and for multiple Justices) while the Justices face potential judicial discipline creates substantial appearances of impropriety both on the part of the Justices and on the part of this current Commission.

Similarly, the Justices deviated from their obligations under the Code by personally lobbying and repeatedly making public comments to legislators and others on the merits of the Masias Controversy.  *See* Canon Rule 3.2, Comment 2.  It is equally significant that Chief Justice Coats and, later, Chief Justice Boatright repeatedly appeared before legislative committees with knowledge that the Masias Memo existed but was being withheld from the OSA, this Commission, and the Legislature.  Stated differently, the Justices endorsed repeated testimony that misled the Legislature as to the seriousness of the Masias Controversy through the concealment of material information.  As further described *supra* at p. 170, there are allegations that Chief Justice Boatright and Justice Márquez were coercive in their interactions with

290

legislators when the reforms passed through SB 22-201 were first proposed.  Allowing OARC to interfere with the legislative process through intimidation directed against Senate Judiciary Committee Chair Lee, members of this Commission, and its Executive Director is also substantial evidence of coercive, intentional, and coordinated conduct by the Justices.  The intentional nature of the Justices' conduct is furhter apparent through Judicial Department Lobbyist Terry Scanlon's efforts to organize other judges to oppose legislative reforms and his statement: "[T]he discipline issue is in some ways getting more high-stakes and will probably be more public soon." Bradbury, *supra* note 231.  Additionally, Scanlon's bullying behaviors towards others, including CCDB lobbyist Tristan Gorman, is further evidence of the Justices' tolerance for coercive legislative strategies.  Such interactions with the Legislature and having outside organizations, the Attorney General's Office, judicial employees, and other judges effectively act on behalf of the Justices as a means of defending against allegations of the Justices' own judicial misconduct and obstructing this Commission's constitutional mandate presents a reasonable basis for suspecting that the Justices have violated Canon Rules 1.1, 1.2, 1.3, 2.2, 2.6, 2.9, 2.10, 2.11, 2.12, 2.16, and 3.1.

If proven, the Justices' conduct or complicity in such conduct violates Canon Rule 3.1 and is actual impropriety under the Code.

**Canon Rule 4.1 (Political and Campaign Activities of Judges and Judicial Candidates in General)**

Canon Rule 4.1 provides, in relevant parts:

> **(A)** Except as permitted by law,* or by this Canon, a judge or a judicial candidate* shall not:
>
> * * *
>
> (11) knowingly,* or with reckless disregard for the truth, make any false or misleading statement;
>
> (12) make any statement that would reasonably be expected to affect the outcome or impair the fairness of a matter pending* or impending* in any court; or
>
> (13) in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial* performance of the adjudicative duties of judicial office.
>
> **(B)** A judge or judicial candidate shall take reasonable measures to ensure that other persons do not undertake, on behalf of the judge or judicial candidate, any activities prohibited under paragraph (A), except as permitted by Rule 4.3 [(Retention Campaign Committees)].

291

"'Judicial candidate' means a sitting judge who is seeking selection for judicial office by appointment or retention." Colo. Code Jud. Conduct, Terminology.  With a "judicial candidate" so defined, the application of Canon Rule 4.1 does not require a judge's conduct to occur within a specific retention election cycle and does not define the temporal scope of when a sitting judge "seek[s] . . . retention."

***A reasonable basis exists to suspect that all the current Justices have engaged in actual impropriety and have violated Canon Rule 4.1.***

By concealing material information from the OSA and this Commission relevant to their remaining in office and prospectively seeking retention, the Justices arguably violated their duties under Canon Rule 4.1(A)(11), (12).

The circumstances of the Justices' many public comments as to the merits of the Masias Controversy, particularly the Justices maintaining that they have "integrity" despite the various grounds to suspect their violations of the Code present a reasonable basis to suspect that the Justices have made false or misleading statements.  Specifically, the Justice's statements self-exonerating themselves and others (including Andrew Rottman and Chief Justice Coats) in the February 2021 public statements provide an adequate basis to further investigate whether the Justices have violated Canon Rule 4.1(A)(11).  By standing for retention despite having engaged in the conduct described in this RFE, Chief Justice Márquez, Justice Boatright, and Justice Berkenkotter are all making representations to voters and the performance commission, which presents a reasonable basis to suspect violations of Canon Rule 4.1(A)(11).  Likewise, Justice Gabriel's failure to disclose the HR report made by his female law clerk when he applied for the Colorado Supreme Court in 2013 presents a reasonable basis to suspect his having previously violated Canon Rule 4.1(A)(11).  Similar issues also arise through the Justices having actively sought awards through legal interest groups notwithstanding their involvement in the Masias Controversy and awareness of potential violations of the Code.  The Justices' public comments pre-judging the merits of the Masias Controversy and presenting the "Workplace Culture Initiative" as having resolved all the misconduct involved further provides a reasonable basis to suspect that the Justices have made "make pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office."  Canon Rule 4.1(A)(13).  Through their recruitment of support through Judicial Department employees, individuals, and legal interest groups (such as IAALS, CJI, the CBA, and the American Inns of Court), the Justices have not taken "reasonable measures to ensure that other persons do not undertake, on behalf of the judge . . . , any activities prohibited under paragraph (A) [of Canon Rule 4.1]."  Canon Rule 4.1 (B).  If the employees, individuals, and groups with whom the Justices have previously encouraged to publicly defend them continue to do so in response to this RFE, those public statements would be additional violations of Canon Rule 4.1(B).

At minimum, the Justices' statements and direction of third parties creates appearances of impropriety.  If proven, however, the Justices' conduct violates Canon Rule 4.1 and is actual impropriety under the Code.

292

**The general circumstances involved in the Masias Controversy and the Justices'
subsequent efforts to cover up those circumstances present a reasonable basis for judicial
discipline proceedings and require this Commission to recognize this request for evaluation
as a complaint according to Colo. RJD 13(b).**

Based upon the analysis discussed above, the threshold questions for this Commission's
evaluation of judicial conduct can be answered, as follows:

1. **Misconduct Involving the Masias Contract.**  With former Chief Justice Coats having
   been publicly disciplined for his role, the involved Justices' approval of the facially
   absurd $2.66-2.75 million Masias Contract and their withholding of material information
   from the OSA and the SCAO FSD presents a reasonable basis for judicial discipline
   proceedings under Colo. RJD 13(b).  This Commission is required to process this RFE as
   a complaint as to each of the other involved Justices.

2. **The Justices' Persistent Refusal to Disqualify Themselves.**  The current Justices'
   persistent refusal to disqualify themselves from judicial disciplinary proceedings and
   matters impacting the Justices' own potential judicial discipline (including their misuse
   of substantial public funding to contract for investigations prohibited by Canon Rule 2.9,
   commentary on pending and impeding cases, legislative lobbying, rulemaking, and
   continued exercise of appointment powers) presents a reasonable basis for judicial
   discipline proceedings under Colo. RJD 13(b).  This Commission is required to process
   this RFE as a complaint as to each of the current Justices.

3. **Retaliation, Obstruction, and Non-Reporting of Judicial, Attorney, and Employee
   Misconduct.**  The current Justices' failure to take appropriate action, including the timely
   reporting of known or suspected judicial, attorney, and criminal misconduct, their failure
   to administratively respond to such misconduct, their obstruction of criminal
   prosecutions, and their non-cooperation with this Commission's constitutional mandate
   presents a reasonable basis for judicial discipline proceedings under Colo. RJD 13(b).
   This Commission is required to process this RFE as a complaint as to each of the current
   Justices.

**The alleged misconduct of the Justices could not be more serious and, if proven, warrants
the most stringent disciplinary sanctions.**

The ILG Report criticizes this Commission for not having a written standard defining its
discretion for determining whether a judicial disciplinary outcome should be private versus
public.  ILG, LLC Rpt. (Appendix 18), p. 129.[372]  Nevertheless, recent published judicial

---

[372] The ILG Report contains the following recommendation:

> There should be a set of agreed-upon criterion for escalating
> matters of formal judicial discipline to public proceedings.
> Presently, discretion about whether discipline proceedings will be
> private or public rests in the Commissioners and the Executive

293

disciplinary opinions appear to draw this distinction based upon whether a judge's conduct involves the performance/non-performance of an official public function/duty (other than general delays in rulings / actions that do not involve substantial abuse of individuals or civil rights) or matters of public record, such as being charged with a suspected crime. In such cases, the discipline is public.

Since 2014, there have been twelve published judicial disciplinary opinions in Colorado:

- *Matter of Rand*, 2014 CO 11 (public censure and agreed resignation for sexual harassment, *ex parte* communications, and non-disqualification in violation of Canon Rules 1.2, 2.8(B), 2.9(A) and (C), and 2.11);
- *Matter of Booras*, 2019 CO 16 (public censure, post-disciplinary hearing resignation, and award of costs for violations of Canon Rules 1.2, 3.1, and 3.5; Judge's misconduct included racial slurs against a colleague and her ex-husband's spouse and the disclosure of the anticipated outcome of a pending case);
- *Matter of Timbreza I*, 2019 CO 98 (public censure and 28-day unpaid suspension for DWAI conviction involving automobile crash and testing refusal; stipulated admissions to violating Canon Rules 1.1 and 1.2);
- *Matter of Kamada*, 2020 CO 83 (judge resigned after being confronted by federal law enforcement for disclosing search warrant and compromising investigation; it was later discovered that judge had various *ex parte* communications commenting on pending cases / providing non-public information; stipulated public censure with recognition of appropriateness of removal for violations of Canon Rules 1.1, 1.2, 1.3, 2.9, 2.10, and 3.5);
- *Matter of Chase*, 2021 CO 23 (judge resigned and publicly censured after using racial slur in presence of court staff and made other politically charged comments while in courtroom; conduct recognized as violations of Canon Rules 1.2, 1.3, 2.3, and 2.8);
- *Matter of Gunkel*, 2021 CO 30 (judge retired and publicly censured for repeated DUI offenses with the second occurring while the judge was on probation; conduct recognized as violations of Canon Rules 1.2 and 1.3);
- *Matter of Thompson I*, 2022 CO 19 (judge suspended for 30-days without pay and publicly censured after being originally charged with felony for menacing stepson with AR-15 style rifle and later pleading to reduced misdemeanor charge; conduct recognized as violations of Canon Rules 1.1 and 1.2);
- *Matter of Timbreza II*, 2023 CO 16 (following previous public censure for DUI-related offense, Judge resigned and publicly censured by Special Tribunal for excessive drinking at a conference, including unwanted sexual advances towards attorney attending conference; conduct stipulated as violations of Canon Rules 1.1, 1.2, 1.3, and 2.3 with further stipulation to award of $20,658 in attorney's fees and costs);

---

Director of the CCJD with no written guidance for its exercise. This discretion should be informed by written guidance, with a focus on escalating credible reports of harassment or misconduct based upon a protected class to public proceedings.

294

- *Matter of Thompson II*, 2023 CO 21 (shortly after returning from unpaid suspension as part of previous public censure, Judge was coercive and otherwise displayed improper demeanor in separate cases; Judge retired and stipulated to public censure recognizing violations of Canon Rules 1.1, 1.2, 2.8(B), and 2.11(A)(1));
- *Matter of Coats*, 2023 CO 44 (public censure by Special Tribunal for violation of Canon Rule 2.5 through involvement in approving and non-disclosure of the Masias Contract);
- *Matter of Kiesnowski*, 2024 CO 12 (while retirement pending through prior private censure for retaliation and stipulated violations of Code, Judge acted as brother-in-law's attorney during criminal investigation; conduct recognized as violating Canon Rules 1.1, 1.2, 1.3, and 3.1; public censure imposed with award of costs); and
- *Matter of Scipione*, 2024 CO 23 (judge retired and publicly censured for non-disclosure of sexual relationship with court staff while serving as magistrate, dishonesty to / non-cooperation with CCJD and nominating commissions, repeated harassment/sexual harassment of court staff, and *ex parte* communications with another judge regarding personal litigation; recognizing violations of Canon Rules 1.1, 1.2, 1.3, 2.3, 2.8, 2.9, 2.16, and 4.1 with partial award of attorney's fees).

Beyond those published opinions, in 2017, the Colorado Supreme Court ordered the public disclosure of the outcome in *Matter of Walker*, Case No. 16SA293.[373]  El Paso County Court Judge Jonathan Walker had been temporarily suspended under Colo. RJD 34 for a range of conduct that included harassment, retaliation in response to this Commission's investigation, and his failure to disqualify himself from cases with conflicts.  This Commission had charged Judge Walker with violations of Canon Rules 1.2, 2.2, 2.3, 2.8, 2.11, and 2.16.  Through an agreement with this Commission, Judge Walker retired with the Court ordering public disclosure of the grounds for the agreement, which included dismissal of the remaining judicial disciplinary proceeding.

In contrast to those published disciplinary opinions, if the subject judge's conduct involves purely private actions/omissions or violations of relatively minor severity, the discipline may be informal or private.[374]  With respect to the conduct alleged in this RFE, it deserves emphasis that this Commission has already determined that Chief Justice Coats's involvement in the Masias Contract warranted imposition of a public censure (which was the most stringent sanction possible given Chief Justice Coats's status as a retired judge).  *Coats*, ¶ 13; *see also* Colo. RJD 35(f) (defining private disciplinary dispositions; censure appropriate for "conduct which involves a *substantial breach* of the standards of judicial conduct").

This Commission's former Executive Director has also confirmed that *malum in se* violations of the Code involving retaliation, sexual harassment, and/or discrimination merit more stringent and impliedly public discipline (including a categorical bar to the subject judges serving in the Senior Judge Program).  As Executive Director Gregory explained:

---

[373] Order *available at* https://ccjd.colorado.gov/resources/legal-authority-and-information.

[374] Informal or private disciplinary outcomes can be found in this Commission's Annual Reports *available at* https://ccjd.colorado.gov/annual-reports.

**Rep. Garcia**
[M]y question then is looking at the different categories listed here of what an RFE could be requested. . . I'm just curious of all of these, which ones you find are appropriate to excuse—to say that a judge could then become a senior judge—when they've been found to have acted on these bases?

**Executive Director Gregory**
I think it would kind of equate to the same spectrum that you'd look at for criminal conduct or even tort liability. That it is really sort of the negligence-kind of lower-level culpability that would kind of fit into these categories. And quite honestly, when we do look at, like sort of a delayed ruling, many factors are considered in that situation. And oftentimes judges have unrealistic workloads, there's a lot of mitigating circumstances in what happens. [In] one of our cases, a family member has a medical issue and that gets the judge's attention distracted for a period of time, and that is considered in whether or not that would be a diversion-type case or something different. But on the other end, if there's retaliation, if there's sexual harassment, if there's discriminatory conduct. Those types of offenses are much more serious and wouldn't provide a basis for the judge to continue into the Senior Judge Program, or at least I would hope not.[375]

Former Commission Chair Elizabeth Espinosa Krupa also provided a similar response when asked an equivalent question by the Interim Committee on Judicial Discipline:

**Elizabeth Espinosa Krupa**
Yes, the informal or private discipline is usually a letter. It can be a letter of admonition or private censure, different language for the same kind of thing. And that determination is usually based upon either the harm mitigation that the judge has done to correct the issue, no prior discipline. There's many factors that go into that decision, but it is similar, I would say, or akin to, perhaps, like a performance plan. There are times that we will defer and let a judge work on something, and then we hold off on making a decision to see if and when the judge complies with some of those options. Those I think we would, the Department and the Commission, would agree should stay confidential. Because the judge is taking steps to remediate ***something that did not cause harm either to a party, to the public, to the to the bench itself. Where public discipline is usually entertained, or where taking it to a formal proceeding is entertained is typically where the harm***

---

[375] *Hearing before the Joint Jud. Comm.*, Colo. Leg. (Jan. 12, 2024) (Colo. Comm. on Jud. Discipline SMART Act reporting); Appendix 27(dd)(ii), p. 12:21-37.

296

> ***is larger, or the respondent judge just refuses to accept
> responsibility***, or an offer of resolution to the proceeding. The
> confidentiality portion of that isn't necessarily to try to protect the
> judge from anything other than it's more of a kind of single
> instance. It's not something that rises to the level where there's a
> concern that the public needs to be aware of.[376]

Coercion, intimidation, discrimination, and retaliation are perhaps the most inherently wrongful forms of misconduct a judge can engage in given the power, function, and purpose of the judicial office.

With the imminent and irreparable risks of harm to the integrity and reputation of the Colorado Judiciary presented by the current Justices' conduct, including their persistent refusals to disqualify themselves from matters involving their own potential judicial discipline and their documented history of non-cooperation with and retaliation against this Commission, valid grounds exist for this Commission to seek all of the current Justices' immediate temporary paid suspensions pending resolution of judicial discipline proceedings.  Colo. RJD 34(a) (describing standard for the Commission to seek a subject judge's temporary paid suspension, including specifically non-cooperation with judicial discipline process).

Assuming that the Justices' alleged misconduct is proven, the appropriate sanction should be determined by applying the nationally relevant ***non-exclusive*** factors defined in *Matter of Deming*, 736 P.2d 639 (Wash. 1987)[377]:

---

[376] *Hearing before the Legis. Interim Comm. on Jud. Discipline*, Colo. Leg., August 10, 2022; Appendix 27(9)(iii)(8), p. 10:13-26.

[377] In lieu of the *Deming* factors, the Court recently determined the severity of sanctions in *Kiesnowski* based upon Comment 6 of the Code's section defining Scope.  *Kiesnowski*, ¶ 59. The text of the Code (derived from the 2007 ABA Model Code of Judicial Conduct), however, is also non-exclusive and should not present any impediments to applying the *Deming* factors. Comment 6 states, in relevant part:

> Whether discipline should be imposed should be determined
> through a reasonable and reasoned application of the Rules, and
> should depend upon factors *such as* the seriousness of the
> transgression, the facts and circumstances that existed at the time
> of the transgression, the extent of any pattern of improper activity,
> whether there have been previous violations, and the effect of the
> improper activity upon the judicial system or others.  (Emphasis
> added).

Authority for judicial disciplinary sanctions in Colorado derives from Colo. Const. Art. VI, § 23(3)(d), which provides in relevant part:

297

- Whether the misconduct is an isolated instance or evidenced a pattern of misconduct;
- The nature, extent and frequency of the occurrence of acts of misconduct;
- Whether the misconduct occurred in or out of the courtroom;
- Whether the misconduct occurred in the judge's official capacity or in his [or her] private life;
- Whether the judge has acknowledged or recognized that the acts occurred;
- Whether the judge has evidenced an effort to change or modify his [or her] conduct;
- The length of service on the bench;
- Whether there have been prior complaints about this judge;
- The effect the misconduct has upon the integrity of the judiciary; and
- The extent which the judge exploited his [or her] position to satisfy his [or her] personal desires.

Here, most of the *Deming* factors would be considered aggravating as to each of the current Justices. The circumstances described in this RFE reflect a pattern of frequent and repeating misconduct that has occurred both inside and outside of the courtroom. The conduct has primarily occurred in the Justices' official capacities, though they have used extra-judicial functions/relationships to further self-serving narratives. Apart from Chief Justice Coats, none of the Justices have taken any responsibility for their conduct under the Code or have shown any intentions of changing such conduct. The Justices' prolonged history of non-cooperation with this Commission (including their persistent refusals to disqualify and tolerance for ARC Yates's retaliatory conduct) is a significant aggravating factor.[378] At the pinnacle of the Colorado Judicial Branch, each of the Justices has had substantial experience on the bench. Justice Hart's background, in particular, includes having taught law school courses on legal ethics for over 24 years. *Supra*, p. 181. Although none of the Justices have prior records of discipline, their efforts to suppress the alleged misconduct involved in the Masias Controversy have extended over approximately five years. Through their positions, the current Justices have been able to utilize resources (including the approximately $350,000 spent on the "independent" investigations) not available to other ordinary judges or ordinary citizens for their personal benefit. The misconduct alleged has had the greatest possible damaging effects on the integrity and reputation of the Colorado Judiciary.

The underlying judicial misconduct, if proven, could not be more serious in its nature: a) interfering with criminal and civil investigations, b) withholding material information from a

---

       (d) A justice or judge of any court of record of this state, in accordance with the procedure set forth in this subsection (3), may be removed or disciplined for willful misconduct in office, willful or persistent failure to perform his duties, intemperance, or violation of any canon of the Colorado code of judicial conduct[.]

[378] *See, e.g., In re O'Connor*, 32 N.Y.3d 121 (N.Y. Ct. App. 2018) (failure to cooperate "can be a significant aggravating factor in determining the appropriate sanction"; non-cooperation with other underlying misconduct supported judge's removal).

298

fraud investigation, c) otherwise not co-operating with this Commission's investigations of judicial misconduct, d) misappropriating public funds, e) enabling/concealing retaliation and other forms of serious judicial misconduct, f) dishonesty/lack of candor in the judicial selection and retention processes, g) non-disqualification, h) intentionally concealing the existence of conflicts of interest within this Commission, i) commenting on / self-investigating matters involved in pending and impending cases, j) intentionally abusing their authority to appoint / influence appointment of members of this Commission, and k) seeking judicial retention despite those Justices on the ballot failing to self-report their other judicial misconduct.

Based upon a survey of Colorado judicial disciplinary cases and judicial disciplinary cases nationally, proof of some or all of the Justices' alleged conduct will support the most stringent sanctions, including up to the Justices' removal from office.

- Colorado Cases

    - *Coats*, (public censure of retired Chief Justice for only some of the misconduct alleged in this present RFE);

    - *Kamada*, (resignation and public censure for Judge compromising a pending law enforcement investigation);

    - *Kiesnowski*, (retirement with private censure for retaliation and subsequent public censure for additional abuse of prestige of judicial office and extrajudicial misconduct while agreed retirement from prior discipline pending);

    - *Scipione*, (repeated harassment / sexual harassment of court staff, non-disclosure of sexual relationship with court staff while magistrate, dishonesty on judicial applications, dishonesty to / non-cooperation with Commission, and *ex parte* communications with another judge about pending personal case basis for Judge's resignation, public censure, and partial award of attorney's fees);

    - *Thompson II*, (coercive conduct analogous to retaliation basis for Judge's resignation and public censure);

    - *Walker*, (resignation with public explanation that Judge, *inter alia*, retaliated against persons assisting with judicial discipline investigation);

- *In re Dowling*, (Ga. Jud. Qual. Comm'n. 2022) (judge resigned with pending charges for *ex parte* communications and investigation of pending case);[379]

---

[379] Report *available at*  https://www.gasupreme.us/wp-content/uploads/2022/04/S22J0872-JQC-Rule-11.A-Report-of-the-JQC-1.pdf.

- *Matter of Sunukjian*, (NY Comm'n Jud. Discpl. 2022) (judge resigned and agreed to public discipline for nepotism and retaliation);[380]

- *Comm'n on Jud. Perform. v. Bozeman*, 302 So. 3d 1217 (Miss. 2020) (retaliation for judicial discipline reporting grounds for suspension, public reprimand, and fine);

- *Inquiry Concerning Bennett*, (Cal. Jud. Perform. Comm. 2020) (discourteous conduct and appearance of retaliation for believing deputy district attorney filed judicial discipline complaint grounds for public censure)[381];

- *In re Gentry*, 612 S.W.3d 832 (Ky. 2020) (removal appropriate sanction for judge who was coercive towards guardians ad litem, including filing bar complaint in retaliation for attorney cooperating with judicial disciplinary proceeding);

- *In re O'Shea*, 18-CC-3 (Ill. Jud. Inquiry Bd. 2018) (retaliation for sexual harassment allegations and dishonesty in discipline proceeding supported judge's removal);[382]

- *In re Nadeau*, 168 A.3d 746 (Me. 2017) (former judge suspended from practice of law for 2-years and $5,000 fine imposed for, *inter alia*, judge encouraging litigants to lobby county commissioners for increased court funding);

- *In re Maggio*, 440 S.W.3d 333 (Ark. 2014) (judge removed partly due to efforts to remove his published comments about pending cases from internet forum and failure to self-report misconduct); *see also supra* at p. 300;

- *Matter of Brown*, 4 N.E.3d 619 (Ind. 2014) (non-cooperation with court staff and retaliation for cooperation with Commission among grounds supporting Judge's removal);

- *Censure of Crow* (Ark. 2013) (acknowledged appearance of retaliation against complainant/witness in judicial discipline proceeding supported public censure);[383]

---

[380] Decisional order *available at* https://cjc.ny.gov/Determinations/S/ Sunukjian.Nancy.M.2022.02.03.DEC.pdf.

[381] Decision and Order *available at* https://cjp.ca.gov/wp-content/uploads/sites/40/2020/03 /Bennett_Censure_3-25-20.pdf

[382] Order *available at* https://www.illinois.gov/content/dam/soi/en/web/jib/documents/orders- from-courts-commission/o-shea.pdf.

[383] Disciplinary letter *available at* https://www.jddc.arkansas.gov/wp-content/uploads /2020/05/Gerald-Kent-Crow.pdf.

- *In re Tripp* (N.Y. 2010) (public censure imposed for intimidation and retaliation against litigants, including for litigant submitting judicial discipline complaint);[384]

- *In re Calderon* (N.Y. 2010) (public censure imposed for judge invocation of judicial status to request prison officials confiscate evidence related to judge's personal injury case against inmate; concurrence that removal appropriate if judge's motivations had been proven to obtain advantage in litigation (rather than personal privacy));[385]

- *Matter of Morgan*, CJC No. 5680 (Wash. 2008) (appearance of retaliation / intimidation supported intermediate sanction of public reprimand);[386]

- *Matter of Danikolas*, 838 N.E.2d 422 (Ind. 2005) (judge retaliated by firing magistrate responsible for testimony in disciplinary action against judge; imposing 60-day unpaid suspension);

- *Disc. Counsel v. Karto*, 760 N.E.2d 412 (Ohio 2001) (judge's use of informal contempt proceedings as means of intimidation recognized to "thro[w] doubts on [his] impartiality, but [which] also weakens the public's perception of the integrity of the judiciary [and] that indicates a clear abuse of . . . judicial authority"; imposing 6-month unpaid suspension);

- *In re Mogil*, 673 N.E.2d 896 (N.Y. 1996) (judge removed for lack of candor to discipline commission and threatened retaliation based upon attorney complaints against judges).

- *Matter of Inquiry Concerning a Judge No. 94-70*, 454 S.E. 780 (Ga. 1995) (judge violated Canon Rule 1.2 by using orders and contempt powers to intimidate other elected officials; removal recognized as appropriate sanction);

- *Matter of Schiff*, 635 N.E.2d 286 (N.Y. 1994) (judge removed for, among other issues, appearance of retaliation against another judge and mismanagement of court funds);[387]

---

[384] Determination *available at* https://cjc.ny.gov/Determinations/T/Tripp.Walter. 2010.04.20.DET.pdf.

[385] Determination *available at* https://cjc.ny.gov/Determinations/C/Calderon. Carlos.2010.03.26.DET.pdf.

[386] Stipulation *available at* https://www.cjc.state.wa.us/materials/activity/public_actions /2008/5680%20Morgan%20Stipulation.pdf.

[387] Determination *available at* https://cjc.ny.gov/Determinations/S/Schiff.David. 1993.09.15.DET.pdf.

- *Miss. Comm'n on Jud. Performance v. Walker*, 565 So. 2d 1117 (Miss. 1990) (judge's retaliation against attorney for personal verbal attacks on the judge recognized as inexcusable abuse of power and grounds for public reprimand).

- *In re Jordan*, 622 P.2d 297 (Or. 1981), *clarified by In re Jordan*, 624 P.2d 1074 (Or. 1981) (disciplinary commission's recommendation for 6-month unpaid suspension rejected and judge removed for repeatedly conducting his own investigations, failing to disqualify himself, and demonstrating overall lack of honesty and integrity).

- *In re Martin*, 275 S.E.2d 412 (N.C. 1981) (judge knowingly presiding over case where he was also a defendant was conduct prejudicial to the administration of justice warranting judge's removal).

- For a survey of sanctions imposed based upon a spectrum of misconduct related to Canon Rule 2.5, *see generally Removal or Discipline of State Judge for Neglect of, or Failure to Perform, Judicial Duties*, 87 A.L.R.4th 727.

Collectively, the various cases described above reinforce the legitimacy and importance of this Commission publicly addressing the current Justices' conduct under the Code, regardless of the ultimate outcomes of judicial disciplinary proceedings. When considering possible sanctions, however, it should not be forgotten that the Justices, with the Attorney General's and this current Commission's assistance, have systematically undermined the efficacy, fairness, and equal application of Colorado's judicial discipline system, its attorney regulation system, its civil protections against public fraud, its criminal justice system, and the Judicial Department's internal HR system. The judicial misconduct involved here could not be more significant in its detriment to public confidence in and the integrity of the Colorado Judiciary.

CONCLUSION

With respect to the Masias Controversy, the Justices of the Colorado Supreme Court have used their access to governmental and non-governmental resources to prevent meaningful investigation and prosecution of probable criminal and ethical misconduct, including causing the statute of limitations for some of this misconduct to lapse.

As a preface to the Colorado Supreme Court's February 4, 2021 Statement, Chief Justice Boatright sent a cover email that stated, in part:

> At its core, however, it serves as a reminder that we need to ensure that we have a safe work environment for everyone, that any allegation of wrongdoing is fully investigated, and if wrongdoing is found, that there is full accountability regardless of anyone's position. Migoya, *supra* at note 26.

302

Chief Justice Boatright should be held to his word.[388]  The investigations that have occurred to date have all, to one degree or another, been limited by the Justices' exercise of undue control, retaliation, or by the Justices' frivolous assertion of purported confidentiality protections.  None of the investigations has addressed basic questions as to the timing and nature of the six individual Justices' involvement in the Masias Contract as well as their and Justice Berkenkotter's subsequent roles controlling, limiting, and suppressing those investigations.  Importantly, none of the investigations has addressed the underlying impropriety of the Justices using public funds and public resources to suppress evidence of significant misconduct (including intimidation and retaliation) by judges, attorneys, and public officials/employees.  Ample evidence presented through the Court's public statements and media coverage provide a

---

[388] The quotation from Chief Justice Boatright is consistent with a similar observation made in the ILG Report:

> Complaints about any respondent, no matter how highly placed, should be independently assessed and investigated. . . This is particularly true where, as here, an organization intends to send the message that no one employee or judicial officer is above the law.
> ILG, LLC Rpt. (Appendix 18), p. 15.

Governor Jared Polis's reaction to the guilty verdicts in former President Donald Trump's New York criminal case (which involved the analogous falsification of business records to facilitate hush money payments) further reinforces this fundamental concept of equality under the law:

> 'No one is above the law. Coloradans have faith in our justice system and the guilty [findings] from a jury of his peers show the former President lacks the moral capacity to lead our country.'
>
> Nick Coltrain, *Colorado Officials React to Donald Trump's Conviction, from Saying He "Lacks Moral Capacity" to Criticizing "Scam Trial,"* DENVER POST, May 30, 2024.

At the April 14, 2022 Senate Judiciary Committee hearing, Chief Justice Boatright added:

> You know, I stood in front of the joint House and Senate and professed that we want to have accountability. And I still stand by that, I get that this is going to be my legacy. ***And I want to get this right.*** (Emphasis added).
>
> *Hearing before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022; Appendix 27(m), p. 7:25-27.

Equality of justice is also expressly guaranteed through Article II, § 6 of the Colorado Constitution and the 14th Amendment to the U.S. Constitution.  *See also Caldwell v. Texas*, 137 U.S. 692, 697 (1890) ("By the Fourteenth Amendment the powers of the States in dealing with crime within their borders are not limited, but no State can deprive particular persons or classes of persons equal and impartial justice under the law.").  Judges, like any other persons, should be equally accountable for following Colorado law, which includes the Code.

reasonable basis to suspect that each of the current Colorado Supreme Court Justices have (individually and/or collectively) violated various requirements of the Colorado Code of Judicial Conduct and, at minimum, have created appearances of impropriety. Moreover, probable cause supports further state and federal law enforcement investigations into the conduct of the Justices, current and former SCAO employees, OARC employees, and attorneys employed by the Colorado Attorney General's Office.

To the extent that the Colorado Supreme Court and its agents are allowed to continue exerting undue influence and control over the judicial discipline, attorney regulation, civil fraud protection, and criminal justice systems, there are substantial risks of imminent and irreparable harm to the integrity of Colorado's constitutional democracy, its republican form of government, and the rule of law. The cultures within the Colorado Judicial Department, the Colorado Attorney General's Office, and this Commission that have enabled intimidation, retaliation, misuse of public funding, and concealment of unlawful activities are wholly incompatible with conditions necessary to maintain the legitimacy of Colorado's state government. These cultural deficiencies have also harmed and continue to harm state employees, state contractors, litigants, and the public. If quantified, the Judicial Department and the Attorney General's Office's normalized practices of suppressing allegations of misconduct through retaliation, non-disclosure agreements, and general releases have wrongfully cost taxpayers millions of dollars and unlawfully ruined the careers of numerous public employees who had the character to stand against public corruption.

If nothing else, this RFE should make clear that the current Justices of the Colorado Supreme Court, assisted by the Attorney General, this Commission, and others have completely corrupted Colorado's systems of judicial oversight and attorney regulation. By abusing their rulemaking/decision-making authority, misusing public resources, and persistently refusing to disqualify themselves, the Justices have reinforced a bastardized system where they choose their own investigators, their own prosecutors, their own judges/adjudicators, and their own appellate review panel all while simultaneously acting as their own legislature. As observed in *Ross*, *supra* at p. 257, the Justices have destroyed judicial independence by becoming a law unto themselves. Even with a judicial disciplinary system and a dormant process for impeachment that have had little effect upon the current Justices to date, there remains hope that voters will apply meaningful scrutiny to the Justices' significant misconduct as part of Chief Justice Boatright's, Justice Márquez's, and Justice Berkenkotter's 2024 judicial retention elections. There is further hope that voters will recognize the importance of and need for the structural reforms proposed through the constitutional amendment (Amendment H) referred to them by HCR 23-1001. Ideally, through this RFE, the respective Commissions on Judicial Performance Evaluation will also perform their overlapping statutory function in helping inform voters as to the fitness of judges and justices subject to and prospectively subject to retention elections. At the 2024 General Election, voters will be able to realize structural change, to directly remedy at least some of the judicial misconduct that has occurred, and to ensure that these circumstances never happen again.

In the meantime, the author respectfully requests that this Commission perform its constitutionally mandated functions to protect the public from improper judicial conduct, to preserve the integrity of the judicial process, and to create greater awareness of proper judicial

304

behavior.  Colo. RJD 1(b).  With a reasonable basis for judicial discipline proceedings and the gravity and extent of the judicial misconduct apparently involved, this Commission is required to process this request for evaluation as a complaint under Colo. RJD 13(b), to commence an investigation under Colo. RJD 14(a), and, if deemed appropriate, request the immediate temporary suspensions of the current Justices pending further disciplinary proceedings and according to Colo. RJD 34(a).

As recognized by OARC in its March 15, 2021 Statement, as recognized by the Legal Regulation Committee in its January 20, 2023 Statement, and as expressed through the opinion in *Coats*, the underlying allegations raised through this request for evaluation have become generally known to the public.  Accordingly, this Commission should seek authorization from a Special Tribunal to allow the ongoing public disclosure of the nature, status, and result of this Commission's proceedings under RJD 6.5(g).  Because of the Justices' documented obstruction of and their non-cooperation with this Commission to date, it is also appropriate for this Commission to seek a determination from a Special Tribunal that the Justices have impliedly waived confidentiality in judicial disciplinary proceedings and that the record of all such relevant proceedings (including this Commission's 2021 correspondence admonishing Chief Justice Boatright not to pursue the Court's announced "independent" investigations, this Commission's June-July 2022 letters requesting the Justices' individual disqualifications, this Commission's records related to the processing of the Maes RFE/complaint, this Commission's correspondence with Chief Justice Boatright in response to the Maes RFE/complaint, and relevant actions/discussion that occurred as part of this Commission's meetings) should be made public.

To avoid further appearances of impropriety, however, this current Commission must first disqualify itself entirely from this and other matters involving the Colorado Supreme Court.  A conflict-free replacement Commission should then be formed by a special tribunal (selected according to the process and qualifications defined by HCR 23-1001, rather than Colo. RJD 41) and the Governor, respectively.  In turn, the replacement Special Commission should investigate and prosecute potential disciplinary charges through the appointment of outside Special Counsel.  Any potential conflicts of interest amongst the Special Tribunal members, appointed Special Masters, Special Commissioners, or appointed outside Special Counsel should be disclosed publicly to ensure the credibility of the judicial discipline process is maintained.

Ultimately, no one should lose sight of the fact that even the creation of appearances of impropriety in violation of Canon Rules 1.1 and 1.2 is sufficient to support judicial discipline proceedings and imposition of public judicial disciplinary sanctions up to and including a subject judge or justice's removal from office.  Colo. Const. Art. VI, § 23(3)(d) ("A justice or judge of any court of record of this state . . . may be removed or disciplined for willful misconduct in office . . . or violation of *any* canon of the Colorado code of judicial conduct[.]") (emphasis added); *see also* Colo. RJD 5(a)(1),(4) (grounds for judicial discipline include willful misconduct, conduct that brings the judicial office in disrepute, and *any* conduct in violation of the Code) (emphasis added).  The Justices' conduct, as described in this RFE, both creates appearances of impropriety and includes repeated instances of actual impropriety under the Code.  In particular, the involved Justices' underlying misconduct with respect to the Masias Contract has already been established through the disciplinary opinion in *Coats*.  According to Colo. RJD 13(b) and through the cover up described in this RFE, a reasonable basis indisputably

305

exists for judicial discipline proceedings as to all current Justices of the Colorado Supreme Court.  Consequently, this Commission is constitutionally and administratively mandated to process this RFE as a complaint, to notify the Justices, and to commence full and conflict-free investigations.  Colo. RJD 1(b), 14.  Unless and until action is taken, the Justices of the Colorado Supreme Court, the Colorado Attorney General, the members of this Commission, and other high-ranking public officials will continue to misuse public resources in order to undermine the integrity of the Colorado Judiciary and to harm the public, who depend upon the legitimacy of Colorado's State Government.

Respectfully submitted,

Anonymous

Cc:    House Speaker Julie McCluskie
       House Majority Leader Monica Duran
       House Minority Leader Rose Pugliese
       House Judiciary Chair Mike Weissman
       House Judiciary Vice-Chair Jennifer Bacon
       Senate President Steve Fenberg
       Senate Majority Leader Robert Rodriguez
       Senate Minority Leader Paul Lundeen
       Senate Judiciary Chair Julie Gonzales
       Senate Judiciary Vice-Chair Dylan Roberts
       U.S. Dept. of Justice Public Integrity Section
       Colorado Office of Judicial Performance Evaluation
       Colorado Governor's Office of Boards and Commissions
       Colorado Office of the State Auditor

306

## **Table of Appendices**

1. *Matter of Coats*, 2023 CO 44.
2. The Masias Memo (drafted ~ December 2018).
3. *Agreement for Resignation and Release of Claims* (the Masias separation agreement), executed March 18, 2019.
4. Transcribed recording of a conversation between Chief Justice Nancy Rice and SCAO Chief of Staff Mindy Masias (2017).
5. *Colorado Judicial Department Agreement for Services by Independent Contractor* (the Masias Contract), dually executed April 11, 2019 and June 3, 2019.
6. Letter from Chirstopher Ryan to Deputy State Auditor Kerri Hunter, dated August 22, 2018.
7. Correspondence between Colorado State Auditor Dianne Ray and Chief Justice Nathan Coats with letters dated May 16, 2019 and May 29, 2019.
8. *Notice of Disciplinary Decision* from State Court Administrator Christopher Ryan to Chief of Staff Mindy Masias, dated November 7, 2018.
9. *Policy Regarding Judicial Branch Employees Conducting Work for the Judicial Branch as Independent Contractors*, from Chief of Staff Mindy Masias (on behalf of State Court Administrator Jerry Marroney) to Judicial Department Leadership, dated June 1, 2015, with Judicial Department Purchasing Fiscal Rules, effective April 2015.
10. *Agreement for Resignation and Release of Claims* (Jane Hood separation agreement), executed September 4, 2018.
11. *Agreement for Voluntary Layoff and Release of Claims* (David Kribs separation agreement), executed May 15, 2019.
12. *Denver Post* and *Denver Gazette* articles re: allegations in Masias Memo as to Justice Richard Gabriel.
13. David Migoya, *Nondisclosures Under Fire: State Confidentiality Agreements Cost Millions, Silence Whistleblowers*, DENVER GAZETTE, November 13, 2022.
14. Letter from Colorado Commission on Judicial Discipline Interim Executive Director Jeff Walsh to former 10th Judicial District Chief Judge Dennis Maes dismissing RFE/Complaint as to all Justices of the Colorado Supreme Court, dated June 11, 2024; Former Chief Judge Maes's underlying RFE, submitted November 2022.
15. Colo. Office of the State Auditor, JUDICIAL DEPARTMENT STATE COURT ADMINISTRATOR'S OFFICE PERFORMANCE AUDIT REPORT (November 18, 2020).
16. Letter from Chief Justice Brian D. Boatright to all Colorado Judicial Department employees interpreting the Colo. Office of the State Auditor's Fraud Hotline Investigation Report, February 7, 2022; and Colo. Office of the State Auditor, EXECUTIVE SUMMARY OF FRAUD HOTLINE INVESTIGATION REPORT, February 4, 2022.
17. *Statement from Chief Justice Brian D. Boatright Regarding Investigation into Leadership Services Contract*, June 22, 2022; Robert C. Troyer and Nicholas E. Mitchell, INDEPENDENT INVESTIGATION INTO THE LEADERSHIP SERVICES CONTRACT AWARDED BY THE COLORADO JUDICIAL DEPARTMENT TO THE LEADERSHIP PRACTICE LLC, June 22, 2022.
18. *Statement from Chief Justice Brian D. Boatright Regarding ILG investigation and assessment of Colorado Judicial Branch workplace culture,* July 11, 2022; Elizabeth R.

Rita and Anne R. McCord, COLORADO JUDICIAL BRANCH INVESTIGATION REPORT AND ASSESSMENT OF WORKPLACE CULTURE, July 11, 2022.

19. 2021 Correspondence between the Colorado Commission on Judicial Discipline and Chief Justice Boatright re: "independent" investigations and records disclosure.

20. March 3, 2024 *Denver Gazette* articles re: *Kiesnowski*, the Woods matter, and the Masias Controversy generally.

21. Colorado Supreme Court Filings in *Matter of Kiesnowski*, 2024 CO 12.

22. Colorado Supreme Court Filings in *Matter of Scipione*, 2024 CO 23 and judicial vacancy announcement.

23. Colorado Supreme Court Filings in *Matter of Gunkel*, 2021 CO 30.

24. Materials Related to Justice Gabriel's Selection as the Recipient of the 2024 American Inns of Court 10th Circuit Professionalism Award:
    a. June 11, 2024 email re: attorney Tom Overton's request for the Minoru Yasui Inn of Court to sponsor an award announcement advertisement in *The Colorado Lawyer*;
    b. Or. Laws 2016, Chap. 64; and
    c. Colo. Jud. Dep't video announcing award of Am. Inns of Ct. 10th Cir. Professionalism Award to Justice Richard Gabriel (posted September 11, 2024).

25. Anonymous Letter to Colorado Office of Judicial Performance Evaluation Executive Director Kent Wagner, July 2, 2024 (requesting evaluation of all judges currently subject to retention elections who reportedly failed to file annual personal financial disclosure statements, as required by § 24-6-202, C.R.S. and Canon Rules 1.1, 1.2, 2.5, and 3.15).

26. Colorado Supreme Court Record re: Promulgation of Colo. RJD 41--January 11, 2023 Public Hearing Transcript.

27. Legislative Record:
    a. Nathan B. Coats, *State of the Judiciary Address*, 2019 Colo. House Journal, pp. 68-74 (January 11, 2019);
    b. Transcript of *Hearing before the J. Budget Comm.*, Colo. Leg., December 13, 2019;
        i. REP. OF COLO. JUD. DEP'T TO J. BUDGET COMM., December 13, 2019;
    c. Transcript of *Hearing before the Legis. Audit Comm.*, Colo. Leg., December 7, 2020;
    d. Transcript of *Hearing before the J. Budget Comm.*, Colo. Leg., December 17, 2020;
    e. Transcript of *Hearing before the J. Judiciary Comm.*, Colo. Leg., January 25, 2021 (OSA SMART Act Presentation);
    f. Transcript of *Hearing before the J. Judiciary Comm.*, January 28, 2021 (Jud. Dep't SMART Act Presentation);
    g. Brian D. Boatright, *State of the Judiciary Address*, 2021 Colo. House Journal, pp. 110-18 (February 18, 2021);
    h. Transcript of *Hearing before the Legis. Audit Comm.*, Colo. Leg., December 7, 2021;
    i. Transcript of *Hearing before the J. Budget Comm.*, Colo. Leg., December 15, 2021;

ii

j.  Transcript of *Hearing before the J. Judiciary Comm.*, Colo. Leg., January 25, 2022 (SMART Act Presentations by Colo. Jud. Dep't and Colo. Comm. Jud. Discipline):

k.  Transcript of *Hearing before the S. Judiciary Comm.*, Colo. Leg., March 3, 2022 (confirmation of James Carpenter and Mindy Sooter to Colo. Comm. Jud. Discipline);

l.  Email from Kurt Morrison to Judiciary Committee Chairs Pete Lee and Michael Weissman—March 8, 2022;

m.  *Hearing on SB 22-201 before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022:
    i.  Transcript;
    ii.  Relevant Hearing Materials and Exhibits:
        1.  Colo. Jud. Dep't, Written Testimony Regarding SB 22-201, April 14, 2022;
        2.  Colo. Comm'n on Jud. Discipline, Presentation Slides, April 14, 2022;
        3.  Colo. Jud. Dep't and Colo. Comm'n on Jud. Discipline, Memorandum of Understanding re: Access to Ct. Records, October 1, 2012;
        4.  Colo. Supreme Ct., Order Authorizing Colo. Comm'n on Jud. Discipline Access to Ct. Records, April 13, 2017;

n.  Transcript of *Hearing on SB 22-201 before the S. Judiciary Comm.*, Colo. Leg., April 21, 2022;
    i.  SB 22-201, Amend. L.011;

o.  Transcript of *Hearing on SB 22-201 before the S. Appropriations Comm.*, Colo. Leg., April 26, 2022;

p.  Transcript of *Hearing on SB 22-201 before the Legis. Council Comm.*, Colo. Leg., April 29, 2022;

q.  Transcript of *Hearing on SB 22-201 before the H. Judiciary Comm.*, Colo. Leg., May 3, 2022;

r.  Transcript of *Hearing on SB 22-201 before the H. Appropriations Comm.*, Colo. Leg., May 6, 2022;

s.  Legislative Interim Committee on Judicial Discipline (ICJD):
    i.  Hearing record for *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., June 14, 2022:
        1.  Introduction;
        2.  Legislative Staff Report;
        3.  Colorado Judicial Department Presentation;
        4.  Colorado Commission on Judicial Discipline Presentation;
        5.  Office of Attorney Regulation Counsel Presentation;
        6.  Colorado Office of the State Auditor Presentation;
        7.  Logistics and Next Steps;
        8.  Public Testimony and Adjournment;
        9.  Relevant Exhibits and Hearing Materials:
            a.  Interim Comm. on Jud. Discipline, Areas of Study, June 2022;

iii

b.  Staff Report for the Interim Comm. on Jud. Discipline, June 14, 2022;

c.  Colo. Comm'n. on Jud. Discipline Presentation, June 14, 2022;

d.  Colo. Comm'n. on Jud. Discipline, Report of the Colorado Commission on Judicial Discipline to the Interim Committee on Judicial Discipline of the Colorado General Assembly: June 14, 2022 Initial Hearing, June 14, 2022;

e.  Colo. State Ct. Admin. Office, Background on the Independent Investigations, June 14, 2022;

f.  Chris Forsyth, Evaluating a System of Judicial Discipline, June 14, 2022;

ii.  Hearing record for *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg. July 12, 2022:

1.  Introduction and Presentation by Chris Forsyth / The Judicial Integrity Project;

2.  Presentation by former CCJD Member and former 10th Judicial District Court Chief Judge Dennis Maes;

3.  Presentation by the National Conference of State Legislatures

4.  Public Testimony (Morning);

5.  Presentation by Cynthia Gray / The National Center for State Courts;

6.  Presentation by Robert Troyer and Nicholas Mitchell / RCT, Ltd.

7.  Logistics and Next Steps;

8.  Public Testimony (Afternoon) and Adjournment;

9.  Relevant Exhibits and Hearing Materials:

a.  Nat. Conf. of State. Leg., JUDICIAL CONDUCT COMMISSIONS., July 12, 2022;

b.  Michael Hartman, State Judiciary Conduct Committees Presentation, July 12, 2022;

c.  Chris Forsyth, PETITION AND PROPOSAL REGARDING JUDICIAL DISCIPLINE IN COLORADO, July 12, 2022;

d.  Cynthia Gray, ANONYMOUS COMPLAINTS TO JUDICIAL CONDUCT COMMISSIONS, July 12, 2022;

e.  Cynthia Gray, BIFURCATED JUDICIAL DISCIPLINE SYSTEMS, July 12, 2022;

f.  Cynthia Gray, WHEN CONFIDENTIALITY CEASES IN FORMAL JUDICIAL DISCIPLINE PROCEEDINGS, 2020;

g.  Cynthia Gray, RULEMAKING AUTHORITY FOR JUDICIAL DISCIPLINE PROCEEDINGS, July 22, 2022;

h.  Cynthia Gray, Judicial Discipline Proceedings Involving State Supreme Court Justices, July 22, 2022;

i.  Cynthia Gray, COMPOSITION OF JUDICIAL CONDUCT COMMISSIONS, 2019;

j. Dennis Maes and Frances Koncilja, Perspective: Colorado's Judicial Integrity in Question, COLORADO SPRINGS GAZETTE, July 2, 2022;

k. Dennis Maes, Written Comments to the Legis. Interim Comm. on Judicial Discipline, July 12, 2022;

l. Dennis Maes, Addendum to Testimony, July 12, 2022;

m. Letter from Steven Vasconcellos to the Interim Comm. on Jud. Discipline, July 11, 2022;

iii. Hearing record for *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., August 10, 2022:

1. Introduction;

2. Presentation by Professor Charles Geyh;

3. Presentation by the Institute for the Advancement of the American Legal System (IAALS);

4. Presentation by ILG, LLC and SCA Vasconcellos Comment;

5. Presentation by the Colorado Judicial Institute;

6. Presentation by the Colorado Coalition Against Sexual Assault (CCASA);

7. Presentation by Various Colorado Bar Associations;

8. Combined Presentation by the State Court Administrator and the Colorado Commission on Judicial Discipline;

9. Presentation by former State Court Administrator Christopher Ryan;

10. Public Testimony;

11. Committee Discussion re: Logistics and Future Actions; Adjournment;

12. Presentation by Investigations Law Group, LLC and Steven Vasconcellos;

13. Relevant Exhibits and Hearing Materials:

a. Letter from Thomas Neville to the Interim Comm. on Jud. Discipline, July 29, 2022;

b. Colo. Women's Bar Assoc., RECOMMENDATIONS ON THE JUDICIAL DISCIPLINE INTERIM COMMITTEE AREAS OF STUDY SENATE BILL 22-201, August 3, 2022;

c. Colo. Jud. Inst., STATEMENT OF THE COLORADO JUDICIAL INSTITUTE, August 10, 2022;

d. Colo. Jud. Dep't, RESPONSES TO RECOMMENDATIONS FROM THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE, August 1, 2022;

e. Colo. Comm'n on Jud. Discipline, RECOMMENDATIONS TO INTERIM COMMITTEE, August 2, 2022;

f. Letter from Christopher Gregory to the Interim Comm. on Jud. Discipline with Appendices 1-2, August 7, 2022;

g. Press release from Colo. Jud. Dep't re: Colo. Comm'n. on Jud. Discipline August 7, 2022 Letter, August 8, 2022;

v

h. Colo. Coalition Against Sexual Assault, RECOMMENDATIONS FOR PREVENTING AND RESPONDING TO SEXUAL MISCONDUCT IN THE STATE JUDICIAL BRANCH, August 9, 2022;

i. Colo. Coalition Against Sexual Assault, Anonymous Letter from a Victim to the Legis. Interim Comm. on Jud. Discipline, August 10, 2022;

j. Am. Bd. of Trial Advocates, OUR SUPREME COURT UNDER SIEGE, August 10, 2022;

k. Christopher Ryan, Written Testimony, August 10, 2022;

l. Inst. for the Advancement of the Am. Legal System, RECOMMENDATIONS FOR JUDICIAL DISCIPLINE SYSTEMS, July 2018; and

m. Letter from Paul Hurcomb to Legis. Interim Comm. on Jud. Discipline, August 10, 2022;

iv. Transcript of *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., August 17, 2022;

v. Transcript of *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., August 30, 2022;

vi. Transcript of *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., September 20, 2022;

t. *Hearing before J. Budget Comm.*, Colo. Leg., December 15, 2022 (Colo. Comm'n. Jud. Discipline budget request presentation):

i. Transcript;

ii. Written Submissions of the Colo. Jud. Dep't and the Colo. Comm'n on Jud. Discipline;

u. Brian D. Boatright, *State of the Judiciary Address*, 2023 Colo. House Journal, pp. 78-88 (January 13, 2023);

v. Transcript of *Hearing before the J. Judiciary Comm.*, Colo. Leg., February 1, 2023 (SMART Act presentations of Colo. Jud. Dep't and Colo. Comm'n on Jud. Discipline);

w. *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the H. Judiciary Comm.*, Colo. Leg., March 15, 2023:

i. Transcript;

ii. Exhibits and Hearing Materials:

1. Letter from Elizabeth Espinosa Krupa to Michael Weissman with summary, March 14, 2023;

2. HCR 23-1001, Amend. L.001;

x. Transcript of *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the H. Appropriations Comm.*, Colo. Leg., March 24, 2023;

y. *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the S. Judiciary Comm., Colo. Leg.*, April 19, 2023:

i. Transcript re: HCR 23-1001 and HB 23-1019;

ii. Transcript re: HB 23-1205;

z. *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the S. Judiciary Comm.*, Colo. Leg., April 26, 2023;

vi

      i.   Transcript;

      ii.  Exhibits and Hearing Materials:

         1.  Amendments;

aa. *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the Senate Appropriations Comm.*, Colo. Leg., April 28, 2023:

      i.   HCR 23-1001 Transcript;

      ii.  HB 23-1019 Transcript; and

      iii. HB 23-1205 Transcript;

bb. *Hearing on HCR 23-1001 and HB 23-1019 before the J. Colo. Legis. Conf. Comm.,* Colo. Leg., May 8, 2023:

      i.   HCR 23-1001 Transcript; and

      ii.  HB 23-1019 Transcript;

cc. *Hearing before the J. Budget Comm.*, Colo. Leg., December 18, 2023:

      i.   ASIA Bd. Presentation Transcript;

      ii.  Colo. Comm'n Jud. Discipline Presentation Transcript; and

      iii. Colo. Jud. Dep't Presentation Transcript;

dd. *Hearing before the J. Judiciary Comm.,* Colo. Leg., January 12, 2024 (annual SMART Act reports):

      i.   Transcript of Colo. Jud. Dep't Presentation; and

      ii.  Transcript of Colo. Comm'n on Jud. Discipline Presentation;

      iii. Relevant Hearing Materials and Exhibits:

         1.  Alan Higbie, PREPARING FOR THE NEXT SCANDAL: VALUABLE INSIGHTS FROM THE 2019-2023 JUDICIAL CORRUPTION SCANDAL, January 4, 2024;

         2.  Colo. Comm'n on Jud. Discipline PowerPoint Presentation;

ee. *Confirmation Hearing for Colo. Comm'n on Jud. Discipline appointees Ingrid Barrier and Stefanie Trujillo before the S. Judiciary Comm.*, Colo. Leg, March 6, 2024:

      i.   Transcript;

      ii.  Email from former Committee Chair Pete Lee to S. Judiciary Comm. Members requesting inquiry during March 6, 2024 Comm'n on Jud. Discipline Confirmation Hearings, March 6, 2024;

ff. *Hearing on the ballot analysis of HCR 23-1001 / Amendment H before the Legis. Council*, Colo. Leg., September 4, 2024:

      i.   Transcript;

      ii.  Exhibits and Hearing Materials:

         1.  Ballot Analysis Drafts and Written Submission.

28. Transcripts from the Colorado Supreme Court's *Workplace Culture Initiative* Videos—August 22, 2023.

29. Correspondence re: Responses by Governor Jared Polis's Office to Colorado Open Records Act Requests as to Documentation of Colo. Comm'n on Jud. Discipline Appointments.

30. Correspondence re: P.A.I.R.R. 2 (Public Records) Requests to and Responses from the Colo. Jud. Dep't;

31. Colo. Comm'n Jud. Discipline Posting for 2024 Executive Director Vacancy.