## Table of Appendices

1. *Matter of Coats*, 2023 CO 44.
2. The Masias Memo (drafted ~ December 2018).
3. *Agreement for Resignation and Release of Claims* (the Masias separation agreement), executed March 18, 2019.
4. Transcribed recording of a conversation between Chief Justice Nancy Rice and SCAO Chief of Staff Mindy Masias (2017).
5. *Colorado Judicial Department Agreement for Services by Independent Contractor* (the Masias Contract), dually executed April 11, 2019 and June 3, 2019.
6. Letter from Chirstopher Ryan to Deputy State Auditor Kerri Hunter, dated August 22, 2018.
7. Correspondence between Colorado State Auditor Dianne Ray and Chief Justice Nathan Coats with letters dated May 16, 2019 and May 29, 2019.
8. *Notice of Disciplinary Decision* from State Court Administrator Christopher Ryan to Chief of Staff Mindy Masias, dated November 7, 2018.
9. *Policy Regarding Judicial Branch Employees Conducting Work for the Judicial Branch as Independent Contractors*, from Chief of Staff Mindy Masias (on behalf of State Court Administrator Jerry Marroney) to Judicial Department Leadership, dated June 1, 2015, with Judicial Department Purchasing Fiscal Rules, effective April 2015.
10. *Agreement for Resignation and Release of Claims* (Jane Hood separation agreement), executed September 4, 2018.
11. *Agreement for Voluntary Layoff and Release of Claims* (David Kribs separation agreement), executed May 15, 2019.
12. *Denver Post* and *Denver Gazette* articles re: allegations in Masias Memo as to Justice Richard Gabriel.
13. David Migoya, *Nondisclosures Under Fire: State Confidentiality Agreements Cost Millions, Silence Whistleblowers*, DENVER GAZETTE, November 13, 2022.
14. Letter from Colorado Commission on Judicial Discipline Interim Executive Director Jeff Walsh to former 10th Judicial District Chief Judge Dennis Maes dismissing RFE/Complaint as to all Justices of the Colorado Supreme Court, dated June 11, 2024; Former Chief Judge Maes's underlying RFE, submitted November 2022.
15. Colo. Office of the State Auditor, JUDICIAL DEPARTMENT STATE COURT ADMINISTRATOR'S OFFICE PERFORMANCE AUDIT REPORT (November 18, 2020).
16. Letter from Chief Justice Brian D. Boatright to all Colorado Judicial Department employees interpreting the Colo. Office of the State Auditor's Fraud Hotline Investigation Report, February 7, 2022; and Colo. Office of the State Auditor, EXECUTIVE SUMMARY OF FRAUD HOTLINE INVESTIGATION REPORT, February 4, 2022.
17. *Statement from Chief Justice Brian D. Boatright Regarding Investigation into Leadership Services Contract*, June 22, 2022; Robert C. Troyer and Nicholas E. Mitchell, INDEPENDENT INVESTIGATION INTO THE LEADERSHIP SERVICES CONTRACT AWARDED BY THE COLORADO JUDICIAL DEPARTMENT TO THE LEADERSHIP PRACTICE LLC, June 22, 2022.
18. *Statement from Chief Justice Brian D. Boatright Regarding ILG investigation and assessment of Colorado Judicial Branch workplace culture,* July 11, 2022; Elizabeth R.

PLAINTIFF'S EXHIBIT
1-3

EXHIBIT
3

Rita and Anne R. McCord, COLORADO JUDICIAL BRANCH INVESTIGATION REPORT AND ASSESSMENT OF WORKPLACE CULTURE, July 11, 2022.

19. 2021 Correspondence between the Colorado Commission on Judicial Discipline and Chief Justice Boatright re: "independent" investigations and records disclosure.

20. March 3, 2024 *Denver Gazette* articles re: *Kiesnowski*, the Woods matter, and the Masias Controversy generally.

21. Colorado Supreme Court Filings in *Matter of Kiesnowski*, 2024 CO 12.

22. Colorado Supreme Court Filings in *Matter of Scipione*, 2024 CO 23 and judicial vacancy announcement.

23. Colorado Supreme Court Filings in *Matter of Gunkel*, 2021 CO 30.

24. Materials Related to Justice Gabriel's Selection as the Recipient of the 2024 American Inns of Court 10th Circuit Professionalism Award:
    a. June 11, 2024 email re: attorney Tom Overton's request for the Minoru Yasui Inn of Court to sponsor an award announcement advertisement in *The Colorado Lawyer*;
    b. Or. Laws 2016, Chap. 64; and
    c. Colo. Jud. Dep't video announcing award of Am. Inns of Ct. 10th Cir. Professionalism Award to Justice Richard Gabriel (posted September 11, 2024).

25. Anonymous Letter to Colorado Office of Judicial Performance Evaluation Executive Director Kent Wagner, July 2, 2024 (requesting evaluation of all judges currently subject to retention elections who reportedly failed to file annual personal financial disclosure statements, as required by § 24-6-202, C.R.S. and Canon Rules 1.1, 1.2, 2.5, and 3.15).

26. Colorado Supreme Court Record re: Promulgation of Colo. RJD 41--January 11, 2023 Public Hearing Transcript.

27. Legislative Record:
    a. Nathan B. Coats, *State of the Judiciary Address*, 2019 Colo. House Journal, pp. 68-74 (January 11, 2019);
    b. Transcript of *Hearing before the J. Budget Comm.*, Colo. Leg., December 13, 2019;
        i. REP. OF COLO. JUD. DEP'T TO J. BUDGET COMM., December 13, 2019;
    c. Transcript of *Hearing before the Legis. Audit Comm.*, Colo. Leg., December 7, 2020;
    d. Transcript of *Hearing before the J. Budget Comm.*, Colo. Leg., December 17, 2020;
    e. Transcript of *Hearing before the J. Judiciary Comm.*, Colo. Leg., January 25, 2021 (OSA SMART Act Presentation);
    f. Transcript of *Hearing before the J. Judiciary Comm.*, January 28, 2021 (Jud. Dep't SMART Act Presentation);
    g. Brian D. Boatright, *State of the Judiciary Address*, 2021 Colo. House Journal, pp. 110-18 (February 18, 2021);
    h. Transcript of *Hearing before the Legis. Audit Comm.*, Colo. Leg., December 7, 2021;
    i. Transcript of *Hearing before the J. Budget Comm.*, Colo. Leg., December 15, 2021;

ii

j.  Transcript of *Hearing before the J. Judiciary Comm.*, Colo. Leg., January 25, 2022 (SMART Act Presentations by Colo. Jud. Dep't and Colo. Comm. Jud. Discipline):

k.  Transcript of *Hearing before the S. Judiciary Comm.*, Colo. Leg., March 3, 2022 (confirmation of James Carpenter and Mindy Sooter to Colo. Comm. Jud. Discipline);

l.  Email from Kurt Morrison to Judiciary Committee Chairs Pete Lee and Michael Weissman—March 8, 2022;

m.  *Hearing on SB 22-201 before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022:
   i.  Transcript;
   ii.  Relevant Hearing Materials and Exhibits:
      1.  Colo. Jud. Dep't, Written Testimony Regarding SB 22-201, April 14, 2022;
      2.  Colo. Comm'n on Jud. Discipline, Presentation Slides, April 14, 2022;
      3.  Colo. Jud. Dep't and Colo. Comm'n on Jud. Discipline, Memorandum of Understanding re: Access to Ct. Records, October 1, 2012;
      4.  Colo. Supreme Ct., Order Authorizing Colo. Comm'n on Jud. Discipline Access to Ct. Records, April 13, 2017;

n.  Transcript of *Hearing on SB 22-201 before the S. Judiciary Comm.*, Colo. Leg., April 21, 2022;
   i.  SB 22-201, Amend. L.011;

o.  Transcript of *Hearing on SB 22-201 before the S. Appropriations Comm.*, Colo. Leg., April 26, 2022;

p.  Transcript of *Hearing on SB 22-201 before the Legis. Council Comm.*, Colo. Leg., April 29, 2022;

q.  Transcript of *Hearing on SB 22-201 before the H. Judiciary Comm.*, Colo. Leg., May 3, 2022;

r.  Transcript of *Hearing on SB 22-201 before the H. Appropriations Comm.*, Colo. Leg., May 6, 2022;

s.  Legislative Interim Committee on Judicial Discipline (ICJD):
   i.  Hearing record for *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., June 14, 2022:
      1.  Introduction;
      2.  Legislative Staff Report;
      3.  Colorado Judicial Department Presentation;
      4.  Colorado Commission on Judicial Discipline Presentation;
      5.  Office of Attorney Regulation Counsel Presentation;
      6.  Colorado Office of the State Auditor Presentation;
      7.  Logistics and Next Steps;
      8.  Public Testimony and Adjournment;
      9.  Relevant Exhibits and Hearing Materials:
         a.  Interim Comm. on Jud. Discipline, Areas of Study, June 2022;

iii

b. Staff Report for the Interim Comm. on Jud. Discipline, June 14, 2022;

c. Colo. Comm'n. on Jud. Discipline Presentation, June 14, 2022;

d. Colo. Comm'n. on Jud. Discipline, Report of the Colorado Commission on Judicial Discipline to the Interim Committee on Judicial Discipline of the Colorado General Assembly: June 14, 2022 Initial Hearing, June 14, 2022;

e. Colo. State Ct. Admin. Office, Background on the Independent Investigations, June 14, 2022;

f. Chris Forsyth, Evaluating a System of Judicial Discipline, June 14, 2022;

ii. Hearing record for *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg. July 12, 2022:

1. Introduction and Presentation by Chris Forsyth / The Judicial Integrity Project;

2. Presentation by former CCJD Member and former 10th Judicial District Court Chief Judge Dennis Maes;

3. Presentation by the National Conference of State Legislatures

4. Public Testimony (Morning);

5. Presentation by Cynthia Gray / The National Center for State Courts;

6. Presentation by Robert Troyer and Nicholas Mitchell / RCT, Ltd.

7. Logistics and Next Steps;

8. Public Testimony (Afternoon) and Adjournment;

9. Relevant Exhibits and Hearing Materials:

a. Nat. Conf. of State. Leg., JUDICIAL CONDUCT COMMISSIONS., July 12, 2022;

b. Michael Hartman, State Judiciary Conduct Committees Presentation, July 12, 2022;

c. Chris Forsyth, PETITION AND PROPOSAL REGARDING JUDICIAL DISCIPLINE IN COLORADO, July 12, 2022;

d. Cynthia Gray, ANONYMOUS COMPLAINTS TO JUDICIAL CONDUCT COMMISSIONS, July 12, 2022;

e. Cynthia Gray, BIFURCATED JUDICIAL DISCIPLINE SYSTEMS, July 12, 2022;

f. Cynthia Gray, WHEN CONFIDENTIALITY CEASES IN FORMAL JUDICIAL DISCIPLINE PROCEEDINGS, 2020;

g. Cynthia Gray, RULEMAKING AUTHORITY FOR JUDICIAL DISCIPLINE PROCEEDINGS, July 22, 2022;

h. Cynthia Gray, Judicial Discipline Proceedings Involving State Supreme Court Justices, July 22, 2022;

i. Cynthia Gray, COMPOSITION OF JUDICIAL CONDUCT COMMISSIONS, 2019;

j.   Dennis Maes and Frances Koncilja, Perspective: Colorado's Judicial Integrity in Question, COLORADO SPRINGS GAZETTE, July 2, 2022;

k.   Dennis Maes, Written Comments to the Legis. Interim Comm. on Judicial Discipline, July 12, 2022;

l.   Dennis Maes, Addendum to Testimony, July 12, 2022;

m.   Letter from Steven Vasconcellos to the Interim Comm. on Jud. Discipline, July 11, 2022;

iii.   Hearing record for *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., August 10, 2022:

1.   Introduction;

2.   Presentation by Professor Charles Geyh;

3.   Presentation by the Institute for the Advancement of the American Legal System (IAALS);

4.   Presentation by ILG, LLC and SCA Vasconcellos Comment;

5.   Presentation by the Colorado Judicial Institute;

6.   Presentation by the Colorado Coalition Against Sexual Assault (CCASA);

7.   Presentation by Various Colorado Bar Associations;

8.   Combined Presentation by the State Court Administrator and the Colorado Commission on Judicial Discipline;

9.   Presentation by former State Court Administrator Christopher Ryan;

10.   Public Testimony;

11.   Committee Discussion re: Logistics and Future Actions; Adjournment;

12.   Presentation by Investigations Law Group, LLC and Steven Vasconcellos;

13.   Relevant Exhibits and Hearing Materials:

a.   Letter from Thomas Neville to the Interim Comm. on Jud. Discipline, July 29, 2022;

b.   Colo. Women's Bar Assoc., RECOMMENDATIONS ON THE JUDICIAL DISCIPLINE INTERIM COMMITTEE AREAS OF STUDY SENATE BILL 22-201, August 3, 2022;

c.   Colo. Jud. Inst., STATEMENT OF THE COLORADO JUDICIAL INSTITUTE, August 10, 2022;

d.   Colo. Jud. Dep't, RESPONSES TO RECOMMENDATIONS FROM THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE, August 1, 2022;

e.   Colo. Comm'n on Jud. Discipline, RECOMMENDATIONS TO INTERIM COMMITTEE, August 2, 2022;

f.   Letter from Christopher Gregory to the Interim Comm. on Jud. Discipline with Appendices 1-2, August 7, 2022;

g.   Press release from Colo. Jud. Dep't re: Colo. Comm'n. on Jud. Discipline August 7, 2022 Letter, August 8, 2022;

h.  Colo. Coalition Against Sexual Assault, RECOMMENDATIONS FOR PREVENTING AND RESPONDING TO SEXUAL MISCONDUCT IN THE STATE JUDICIAL BRANCH, August 9, 2022;

i.  Colo. Coalition Against Sexual Assault, Anonymous Letter from a Victim to the Legis. Interim Comm. on Jud. Discipline, August 10, 2022;

j.  Am. Bd. of Trial Advocates, OUR SUPREME COURT UNDER SIEGE, August 10, 2022;

k.  Christopher Ryan, Written Testimony, August 10, 2022;

l.  Inst. for the Advancement of the Am. Legal System, RECOMMENDATIONS FOR JUDICIAL DISCIPLINE SYSTEMS, July 2018; and

m.  Letter from Paul Hurcomb to Legis. Interim Comm. on Jud. Discipline, August 10, 2022;

iv.  Transcript of *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., August 17, 2022;

v.  Transcript of *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., August 30, 2022;

vi.  Transcript of *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., September 20, 2022;

t.  *Hearing before J. Budget Comm.*, Colo. Leg., December 15, 2022 (Colo. Comm'n. Jud. Discipline budget request presentation):

i.  Transcript;

ii.  Written Submissions of the Colo. Jud. Dep't and the Colo. Comm'n on Jud. Discipline;

u.  Brian D. Boatright, *State of the Judiciary Address*, 2023 Colo. House Journal, pp. 78-88 (January 13, 2023);

v.  Transcript of *Hearing before the J. Judiciary Comm.*, Colo. Leg., February 1, 2023 (SMART Act presentations of Colo. Jud. Dep't and Colo. Comm'n on Jud. Discipline);

w.  *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the H. Judiciary Comm.*, Colo. Leg., March 15, 2023:

i.  Transcript;

ii.  Exhibits and Hearing Materials:

1.  Letter from Elizabeth Espinosa Krupa to Michael Weissman with summary, March 14, 2023;

2.  HCR 23-1001, Amend. L.001;

x.  Transcript of *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the H. Appropriations Comm.*, Colo. Leg., March 24, 2023;

y.  *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the S. Judiciary Comm., Colo. Leg.*, April 19, 2023:

i.  Transcript re: HCR 23-1001 and HB 23-1019;

ii.  Transcript re: HB 23-1205;

z.  *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the S. Judiciary Comm.*, Colo. Leg., April 26, 2023;

      i.   Transcript;

      ii.   Exhibits and Hearing Materials:

          1.   Amendments;

aa. *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the Senate Appropriations Comm.*, Colo. Leg., April 28, 2023:

      i.   HCR 23-1001 Transcript;

      ii.   HB 23-1019 Transcript; and

      iii.   HB 23-1205 Transcript;

bb. *Hearing on HCR 23-1001 and HB 23-1019 before the J. Colo. Legis. Conf. Comm.,* Colo. Leg., May 8, 2023:

      i.   HCR 23-1001 Transcript; and

      ii.   HB 23-1019 Transcript;

cc. *Hearing before the J. Budget Comm.*, Colo. Leg., December 18, 2023:

      i.   ASIA Bd. Presentation Transcript;

      ii.   Colo. Comm'n Jud. Discipline Presentation Transcript; and

      iii.   Colo. Jud. Dep't Presentation Transcript;

dd. *Hearing before the J. Judiciary Comm.,* Colo. Leg., January 12, 2024 (annual SMART Act reports):

      i.   Transcript of Colo. Jud. Dep't Presentation; and

      ii.   Transcript of Colo. Comm'n on Jud. Discipline Presentation;

      iii.   Relevant Hearing Materials and Exhibits:

          1.   Alan Higbie, PREPARING FOR THE NEXT SCANDAL: VALUABLE INSIGHTS FROM THE 2019-2023 JUDICIAL CORRUPTION SCANDAL, January 4, 2024;

          2.   Colo. Comm'n on Jud. Discipline PowerPoint Presentation;

ee. *Confirmation Hearing for Colo. Comm'n on Jud. Discipline appointees Ingrid Barrier and Stefanie Trujillo before the S. Judiciary Comm.*, Colo. Leg, March 6, 2024:

      i.   Transcript;

      ii.   Email from former Committee Chair Pete Lee to S. Judiciary Comm. Members requesting inquiry during March 6, 2024 Comm'n on Jud. Discipline Confirmation Hearings, March 6, 2024;

ff. *Hearing on the ballot analysis of HCR 23-1001 / Amendment H before the Legis. Council*, Colo. Leg., September 4, 2024:

      i.   Transcript;

      ii.   Exhibits and Hearing Materials:

          1.   Ballot Analysis Drafts and Written Submission.

28. Transcripts from the Colorado Supreme Court's *Workplace Culture Initiative* Videos—August 22, 2023.

29. Correspondence re: Responses by Governor Jared Polis's Office to Colorado Open Records Act Requests as to Documentation of Colo. Comm'n on Jud. Discipline Appointments.

30. Correspondence re: P.A.I.R.R. 2 (Public Records) Requests to and Responses from the Colo. Jud. Dep't;

31. Colo. Comm'n Jud. Discipline Posting for 2024 Executive Director Vacancy.

# Appendix 1

## *Matter of Coats*, 2023 CO 44.

**Special Tribunal of the Supreme Court of the State of Colorado**
**2 East 14th Avenue • Denver, Colorado 80203**

---

**2023 CO 44**

---

**Supreme Court Case No. 23SA114**
*Original Proceeding in Discipline*
Colorado Commission on Judicial Discipline Case No. 21-118

---

**In the Matter of Complainant:**

The People of the State of Colorado,

and

**Respondent:**

Nathan B. Coats, a Former Chief Justice of the Colorado Supreme Court.

---

**Order re: Recommendation of the Colorado Commission on Judicial**
**Discipline and Public Censure**
*en banc*
August 7, 2023

---

**Appearing for the Colorado Commission on Judicial Discipline:**
Christopher Gregory, Executive Director
　　*Denver, Colorado*

**Attorneys for Respondent:**
Burns, Figa & Will, PC
John S. Gleason
Alec Rothrock
　　*Greenwood Village, Colorado*

**Attorneys for Complainant:**
Rathod Mohamedbhai, LLC
Qusair Mohamedbhai
Omeed Azmoudeh

*Denver, Colorado*

**PER CURIAM**

**CHIEF JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE HOOD, JUSTICE GABRIEL, JUSTICE HART, JUSTICE SAMOUR,** and **JUSTICE BERKENKOTTER** did not participate.

¶ 1        Former Chief Justice Nathan B. Coats, you appear before the Special Tribunal of the Colorado Supreme Court ("the Special Tribunal") for imposition of discipline based on violations of the duties of your office as a Justice of the Colorado Supreme Court.  The Special Tribunal was convened because the Supreme Court was required to recuse itself in this matter under Rule 41(b) of the Colorado Rules of Judicial Discipline ("RJD").

¶ 2        The Colorado Commission on Judicial Discipline ("the Commission") recommends approval of the Amended Stipulation for Public Censure ("the Amended Stipulation"), which you and the Commission executed pursuant to RJD 37(e).

¶ 3        Consistent with the Amended Stipulation, the Commission recommends that the Special Tribunal issue a public censure.   The Special Tribunal adopts this recommendation.

## I.    Stipulated Facts

¶ 4        In the Amended Stipulation, you and the Commission agreed to the following facts:

> 1. In 2000, Justice Coats was appointed to the Colorado Supreme Court, where he served as an Associate Justice until he became the Chief Justice on June 30, 2018.  As provided by the Colorado Constitution, "the supreme court select(s) a chief justice from its own membership to serve at the pleasure of a majority of the court, who shall be the executive head of the judicial system."  Colo. Const. Art. VI, sec. 5(2).

1

2. Also by constitutional mandate, the Supreme Court appoints a State Court Administrator, Colo. Const. Art. VI, sec. 5(3), who by statute is responsible to the supreme court and who, in addition to the other duties dictated by the legislature, is directed to perform the duties assigned to him by the chief justice and the supreme court. Sec. 13-3-101(1), C.R.S. The State Court Administrator is also directed by statute to employ such other personnel as the Supreme Court deems necessary to aid the administration of the courts. Sec. 13-3-101(2), C. R. S.

3. In or around August of 2018, Justice Coats was briefed by Christopher T. Ryan, the State Court Administrator, of allegations that Mindy Masias, the Chief of Staff and second in command of the State Court Administrator's Office ("SCAO"), who had narrowly failed in her bid to be appointed State Court Administrator in the previous year, had falsified the date of an invoice in connection with a request for reimbursement for two chairs purchased for the Judicial Department rather than simply refiling her request on forms for the next fiscal year, as ordered by the SCAO Controller. Justice Coats also learned there was no apparent financial gain in Masias's decision to falsify the date of the invoice, given that she would have been entitled to the reimbursement with or without falsification.

4. Around the same time, Justice Coats, Ryan, and Andrew J. Rottman, Counsel to the Chief Justice, determined that if the allegations were true, appropriate discipline could depend upon whether this was an isolated incident of dishonesty or part of a pattern of misconduct. To that end, they decided that an independent employment investigator should be retained to determine whether Masias had actually falsified the date of the invoice, and that Masias's past requests for reimbursement should be audited to determine whether this was an isolated case of dishonesty or part of a pattern of misconduct.

5. David Powell of the law firm of Ogletree Deakins was retained to conduct the independent investigation

2

regarding the falsified invoice and ultimately concluded that, in the absence of direct evidence, he could not find that Masias altered the invoice in question.  At the same time, however, he could not find any evidence to support her account of initially returning the items and therefore having received multiple invoices.  Notwithstanding Powell's findings, Justice Coats personally concluded that it appeared likely that Masias had in fact falsified the invoice and then continued lying to Powell and SCAO officials to avoid admitting her earlier dishonesty.

6. Tracey Griffith, a member of the SCAO's internal audit staff, produced a memorandum summarizing a broader audit of select requests for reimbursement by Masias, which identified a number of irregularities in Masias's past requests for reimbursement.  When expressly queried by Justice Coats, Ryan represented to him and Rottman that the audit had revealed nothing beyond minor errors.  Justice Coats asserts that he only learned of the existence of the Griffith memo much later, well after Ryan had resigned.

7. However, on October 5, 2018, Ryan forwarded Justice Coats an email describing the significant negative impact of Masias's conduct on the financial controls of the Judicial Department.  The email referenced Griffith's memo as evidence.  Justice Coats made no further inquiry into the email or Griffith's memo, an inquiry which may have resulted in his or Rottman's review of additional findings regarding Masias.  Indeed, when shown the email much later, Justice Coats acknowledged receiving it but recalled nothing of its contents.  Justice Coats stated that had he seen Griffith's memo earlier, he likely would have decided that Masias would be unfit to work for the Judicial Department in any capacity.

8. Justice Coats recalls that, weighing in favor of Masias's fitness to continue work for the Judicial Department, Ryan made clear that Masias was very important to his ability to function as State Court Administrator, in large part

3

because of her experience and long-standing relationships with the chief judges and leadership teams throughout the state. According to Justice Coats, although not typical of personnel matters, considering Masias's high rank in the SCAO, various disciplinary remedies were discussed with Justice Coats, who kept the full Supreme Court apprised of the investigation and options under consideration.

9. During this same period, the SCAO was undergoing the Annual Financial and Compliance Audit conducted by the Office of the State Auditor ("OSA"). While discussions continued concerning appropriate discipline for Masias, Ryan reported to Justice Coats that the Financial Services Division would refuse to sign off on the audit unless Masias's employment was terminated. Ryan also discussed with Justice Coats the enmity between members of the Financial Services Division and Masias. Representing that Masias's continued employment with the SCAO would therefore place him in an untenable position, Ryan nevertheless suggested that Masias could still serve an important role with the Judicial Department as an independent contractor serving in a teaching and coordinating capacity. In response, and after consultation with the full Supreme Court, Justice Coats indicated that if no misconduct by Masias beyond the falsification of the invoice came to light, the Court would consider such a role — Justice Coats understood that if other misconduct by Masias did come to light, the Supreme Court had the authority to foreclose consideration of Masias for any such contract. If the Supreme Court objected to any such contract, and Ryan disregarded the Supreme Court's direction, the Supreme Court would be constitutionally empowered to remove Ryan from office.

10. On November 7, 2018, with Justice Coats's knowledge and approval, Ryan therefore presented Masias with a Notice of Disciplinary Decision. The Notice described Masias's falsification of records and subsequent dishonesty as having "created a lack of trust" and as having jeopardized "Judicial's financial records and

4

systems" during the OSA Annual Audit.  The Notice gave Masias an ultimatum to resign by November 15, 2018 or be terminated.  Rather than choose either course of action, Masias requested and was granted leave by Ryan under the Family Medical Leave Act for a period of 12 weeks, and later extended through March of 2019.

11. As part of the OSA's Annual Audit, Justice Coats signed off on a management representation letter dated December 7, 2018, attesting to the Judicial Department's financial controls.  Justice Coats did not require that this compliance letter be amended, or take any other action, to indicate to the OSA that the Judicial Department might consider a post-resignation contract with Masias.

12. On December 14, 2018, at an unscheduled meeting with Justice Coats attended by Rottman, Ryan, and Eric Brown, the Director of Human Resources for SCAO, Brown indicated that Masias felt her termination was unfair and that she could raise prior incidents of misconduct or discrimination by judges and staff resulting in lesser or no punishment, which could put the Judicial Department in an unfavorable light.  Justice Coats recalled that, after reciting three or four such allegations, which Justice Coats asserts he discounted as obviously false or inconsequential, Brown asked whether Justice Coats wanted to hear any more.  Justice Coats also recalled that when Ryan failed to respond to Justice Coats's inquiry whether there was any reason for him to hear more, Justice Coats simply told Brown he did not need to hear more because such information would not affect his evaluation of Masias.  In conjunction with Masias's apparent complaint regarding unfair treatment and her medical issues, Justice Coats recalls directing that Masias be reassured that "nobody's trying to hurt [Masias]."  Others recall these events differently.  Justice Coats asserts that he was not aware of the notes Brown was using at the meeting, what the press later called the "Brown Memo," which referenced other allegations of discrimination or undisciplined misconduct spanning more than 20 years.

5

Justice Coats further asserts that he and the rest of the [Supreme] Court did not learn of the Brown Memo until much later, after Ryan's departure from the SCAO.

13. At that meeting, Brown subsequently raised the question whether a training contract with Masias might still be a possibility. Justice Coats again agreed that he and the Supreme Court would consider approving such a contract, so long as no additional misconduct by Masias came to light.

14. Following that meeting, Justice Coats states that he was concerned that Brown might proceed with Masias on his own regarding a post-resignation contract. As a result, Justice Coats left Rottman a voice message, which was saved, instructing him to emphasize to Brown that he could make no representations to Masias, and Justice Coats recalls having similarly emphasized to Ryan in a phone call that any future contract with Masias could be entered into, if at all, only after she had resigned and only if the contract could be executed in strict compliance with all applicable statutes, rules, and departmental policies.

15. Justice Coats agreed to a recommendation from SCAO staff that any contract to replace the fast-expiring existing leadership training contract should be put out for bid via a Request for Proposal ("RFP"). Justice Coats reports that as Chief Justice, he had no role in the RFP and only later was informed by Ryan that it had produced no bids and therefore a sole source determination for a contract to Masias was permissible. Several investigations have uncovered improprieties underlying this RFP which are beyond the scope of this [Amended] Stipulation.

16. On March 1, 2019, prior to Masias's resignation, Justice Coats was made aware that the hard drive on a M[ac] laptop, for which Masias had received authorization to conduct office business, had been corrupted such that no information on it was recoverable. Although it was explained to him that this could result from various

6

causes, and Justice Coats ordered further analysis, the actual cause remains unexplained.  Justice Coats believed it possible that Masias, or someone acting on her behalf, intentionally wiped the laptop to destroy evidence of misconduct—but this belief did not cause Justice Coats to reconsider contracting with Masias.

17. Throughout March of 2019, the SCAO legal staff negotiated Masias's separation agreement with Masias's attorney.  Justice Coats asserts that as Chief Justice he was not involved in these negotiations, did not see the executed separation agreement until after Ryan's resignation, was not aware that Masias's attorney had unsuccessfully sought the promise of a training contract as part of that agreement, and was not aware that Masias's attorney had *successfully* sought the promise of a post-resignation meeting with Justice Coats regarding the training contract as part of those negotiations.  Masias's resignation became effective March 19, 2019.  Had Justice Coats personally reviewed the executed separation agreement, he likely would have learned of Masias's surreptitious recording of former Chief Justice Nancy Rice, information which would have (and eventually did) cause him and the full Supreme Court to determine that a contract with Masias was inappropriate.

18. On March 21, 2019, Justice Coats met with Masias, Ryan, and Rottman in his chambers for discussion of Justice Coats's vision of the kind of training he considered necessary for the different job categories in the Judicial Department and a briefing on what kind of training Masias was prepared to provide.  After this meeting, Justice Coats understood that the State Court Administrator, acting on behalf of the Judicial Department, would negotiate a contract with Masias.

19. On April 15, 2019, a month after signing her separation agreement, Masias emailed the entire Judicial Department that she was resigning as Chief of Staff due to a very serious health condition.  On the same day, Justice Coats

and the rest of the Supreme Court received an anonymous letter alleging all manner of misconduct by Masias, as well as Ryan, Brown, and David Kribs, Chief Financial Officer of the SCAO. Justice Coats and the Supreme Court had particular concerns about one allegation regarding a separation agreement with an SCAO employee, which included a lengthy period of administrative leave with pay, as to which Justice Coats asserts neither he nor anyone else on the Supreme Court had been made aware. This employee had been accused of conducting improper surveillance of personnel in the Carr Center, including Masias and Brown. Specifically, the letter stated: "[This employee] disappeared one day because she was watching Mindy Masias and Eric Brown. She has been paid for months to not disclose what she had."

20. After discussing this letter with the Supreme Court, Justice Coats therefore convened a meeting with Rottman, Ryan, Brown, as well as Terri Morrison and Beth Robinson, two members of the SCAO legal staff. Justice Coats learned that Masias had structured and negotiated the separation agreement with the employee, which was then approved by Ryan. The separation agreement included a non-disclosure provision. Justice Coats considered the agreement outrageous, said it was one of the "stupidest" things he had ever heard of, and was outraged that the Supreme Court had not been informed. Justice Coats demanded that in the future he be informed of all but the most mundane personnel actions. Justice Coats recalls that shortly after convening the meeting with SCAO staff, there were additional concerns about the allegation when Attorney General Phil Weiser called Justice Coats to say that the Controller was raising a similar allegation among employees in his office, that the allegation appeared very serious, and that the allegation warranted special attention. In response to direct questioning, however, Justice Coats recalls Ryan assuring him that the separation agreement may have been an overly cautious attempt to prevent a lawsuit but was not improper in any way. Justice Coats also recalls Morrison

8

advising him that the separation agreement itself did not violate any applicable laws.  Justice Coats therefore did not consider these anonymous allegations sufficient to foreclose consideration of Masias for the post-resignation contract.

21. On May 16, 2018, Justice Coats received a written notice from the OSA triggered by the April 15 anonymous letter.  The OSA's notice advised Justice Coats that it had received the anonymous letter and, by statute, all tips concerning employment fraud require formal investigation, which could be conducted either by the OSA or the State Court Administrator.  By letter dated May 29, 2019, Justice Coats advised the OSA that he and the Supreme Court had received the anonymous letter, looked into the allegations, and consulted with the Attorney General.  Justice Coats requested that the OSA conduct the formal investigation.

22. Even though there existed allegations of serious misconduct by Masias, the veracity of which were subject to a barely begun formal OSA investigation, neither Justice Coats nor the Supreme Court ordered a halt to the consideration of Masias for a contract.  Relatedly, when responding to the OSA inquiry whether it or the SCAO should conduct the investigation, Justice Coats did not mention that the Judicial Department was also close to finalizing a post-resignation contract with Masias.

23. Undisputed evidence reveals that Ryan, on behalf of the Judicial Department, entered into a contract with Masias on April 11, 2019, before the Judicial Department received the anonymous letter.  Justice Coats asserts he had no knowledge of Ryan's execution of the contract in April.  However, on June 3, 2019, with Justice Coats's and the Supreme Court's knowledge, Ryan publicly signed the same training contract on behalf of the Judicial Department with Masias.  The contract contemplated a five-year arrangement with the Judicial Department paying Masias between $2,660,000 and $2,750,000 with an

9

allowance for Masias to seek additional reimbursement for pre-approved travel and other expenses.  Because the contract, however, provided duties for only a single year, Justice Coats was assured by the SCAO legal staff, in writing, that the contract committed the Judicial Department to pay for Masias's services for no more than that single year and was therefore a one-year contract.

24. On July 15, 2019, Justice Coats personally learned for the first time that Masias had surreptitiously recorded a conversation with former Chief Justice Rice concerning the reasons she had not been chosen to be the State Court Administrator.  In March 2019, Justice Coats was aware that Masias had signed a separation agreement with the Judicial Department.  Had Justice Coats exercised due diligence by obtaining and reviewing the final separation agreement, he could have learned of the recording earlier, prior to the execution of the contract with Masias.  After Justice Coats discussed the matter with the Supreme Court in July 2019, consensus was reached that a contract to teach judges could not be fulfilled by someone known to surreptitiously record them and that the Court no longer had confidence in Ryan.  It was therefore agreed that the Judicial Department should withdraw from the contract and that Ryan should resign, both of which occurred in subsequent days.

## II.    Stipulated Admissions to Judicial Misconduct

¶ 5    Former Chief Justice Coats failed to "perform judicial and administrative duties competently and diligently," as required by Canon Rule 2.5(A) of the Colorado Code of Judicial Conduct.  By allowing the Judicial Department to contract with the former Chief of Staff after she had resigned in lieu of termination from the SCAO, former Chief Justice Coats undermined the public's confidence in

10

the integrity of the judiciary and failed to exercise diligence in the performance of his administrative duties.

¶ 6      That is, former Chief Justice Coats allowed the potentially multimillion-dollar contract to be awarded to an employee the Judicial Department had earlier been willing to terminate for falsifying an invoice, despite having set a standard that the contract would not go forward if additional causes for concern arose and having subsequently learned of strong circumstantial evidence of misconduct on Masias's part that demonstrated dishonesty while she was still employed with the SCAO. That circumstantial evidence included the meeting about Masias's "knowing some bad stuff" about the Judicial Department, Masias's corrupted laptop, and Masias's role in the surveillance-related separation agreement that Justice Coats considered outrageous and by which Masias was alleged to have used state funds to silence a witness to her own conduct. Particularly concerning is that former Chief Justice Coats was separately contacted by the Attorney General and the State Auditor to advise him of the need to investigate the April 15 letter's allegations, which included Masias, but he did not notify the Attorney General or the OSA about the contemplated contract with a subject of the allegations. Nor did he await the results of the OSA's formal investigation before approving the post-resignation contract with the person being investigated. Although former Chief Justice Coats authorized withdrawal from the contract immediately upon his learning of Masias's

11

surreptitious recording of former Chief Justice Rice, compliance with the Colorado

Code of Judicial Conduct required that former Chief Justice Coats prevent the

Judicial Department from entering the contract prior to its public execution in June

2019.

¶ 7    By way of mitigation, the Commission acknowledged that former Chief

Justice Coats made many of these decisions with, or based on the representations

and recommendations of, the State Court Administrator, fellow judicial officers,

non-lawyer professionals, and lawyers.

### III.    Stipulated Resolution of Formal Proceedings

¶ 8    RJD 37(e), titled "Stipulated Resolution of Formal Proceedings," allows the

Commission to file a "stipulated resolution" as a recommendation to the Special

Tribunal in a disciplinary proceeding.   In filing such a stipulation, the Commission

has authority to recommend, among other possible sanctions, that the Special

Tribunal "censure the [Justice] publicly . . . by written order."   RJD 36(e); *accord* Colo.

Const. art. VI, § 23(3)(e).

¶ 9    Under RJD 40, after considering the evidence and the law, the Special

Tribunal is required to issue a decision concerning the Commission's

recommendations.   If the Commission recommends adoption of a stipulated

resolution, "the [Special Tribunal] shall order it to become effective and issue any

sanction provided in the stipulated resolution, unless the [Special Tribunal]

12

determines that its terms do not comply with Rule 37(e) or are not supported by the record of proceedings."  RJD 40.

¶ 10    By the Amended Stipulation, former Chief Justice Coats waived his right to a hearing in formal proceedings and review by the Special Tribunal and agreed with the Commission's recommendations that he be publicly censured.  (Pursuant to RJD 6.5(a) and RJD 37(e), the Amended Stipulation, the Commission's recommendations, and the record of proceedings became public when the Commission filed its recommendations with the Special Tribunal.)

¶ 11    The Commission noted that it often seeks an award of fees and costs in disciplinary matters.  The Commission also noted that the expenses of this investigation were unusually high due to obstacles it encountered.  But the Commission found that former Chief Justice Coats was cooperative in the investigation, and it did not attribute the obstacles to him.  In light of his cooperation, the Commission does not seek fees or costs in this case.

¶ 12    Upon consideration of the law, the evidence, the record of proceedings, the Amended Stipulation, and the Commission's recommendations, and being sufficiently advised in the premises, the Special Tribunal concludes that the terms of the Amended Stipulation comply with RJD 37(e) and are supported by the record of proceedings.  Therefore, the Special Tribunal orders the Amended Stipulation to become effective and issues the agreed-upon sanction.

13

¶ 13    The Special Tribunal hereby publicly censures you, former Chief Justice

Nathan B. Coats, for violating Colorado Code of Judicial Conduct Canon Rule

2.5(A).

The Special Tribunal:

Hon. David M. Furman

Hon. Anthony J. Navarro

Hon. Elizabeth L. Harris

Hon. Rebecca R. Freyre

Hon. Craig R. Welling

Hon. Jaclyn C. Brown

Hon. Christina F. Gomez

# Appendix 2

# The Masias Memo
# (drafted ~ December 2018).

**Even the investigator stated in his report that he couldn't prove Mindy fabricated any document.**

The reason for the termination is potentially debunked.  Also, Mindy has a significant number of examples where "tone at the top" was not applied equally.

**Instances where Judges where NOT held to the "tone at the top" but who have violated policy significantly:**
- No investigation was held when the anonymous allegations of sexism and harassment were made against the Chief Justice and Chad.  She was told to destroy the letter.
- Judge sends pornographic video over judicial email; nothing happened to him; he was appointed Chief Judge less than two years later. Judge sent a video over Judicial Branch email to another Judge. The video depicts a woman performing sexual acts on a bald man's head. The Judge suffered no repercussions for sending the video, and in fact, was promoted to Chief Judge a few months later. Turned the matter over to the Chief Justice who took no action.
- Negotiated a release agreement with a law clerk who accused her COA Judge of harassment in order to keep the COA Judge "safe" during the selection Supreme Court Justice selection process per the chief justice.
- Judge exposed and rubbed his hairy chest on a female employee's back; no action taken against the judge; judge is currently being considered for the senior judge program.
- Current pending EEOC complaint against two Justices.
- Mindy recommended to Chief Judge Kuenhold it was in the best interest of the branch to terminate Mr. Duarte due to the sexual relationships he had with his staff. Chief Judge Kuenhold stated that Mindy needed "to leave the courthouse and drive slowly out of town."

**Instances where top level Managers in and outside SCAO (including two in Finance) were NOT held to the "tone at the top" level of accountability.**
- Evidence a Financial manager accessed personal information on various leaders throughout the state using Accurint for no business reason; no discipline taken on him and he was promoted less than two years later to deputy director.
- Financial manager investigated twice for harassing behavior.  Receives more staff and a better office.  No mention of the complaints in his 2017 performance appraisal.
- Director of FSD complained about not working "even banker's hours" by staff.  Staff of other division follow him to his bar and home and track that he does not place time in PTO system and is seen at home at 3:00 pm often or at bar.
- CPO takes picture of penis and sends to vendor; no disciplinary action taken.
- CPO has sex with a vendor on state time and on state property who later complains she felt she had to in order to keep her job; no disciplinary action taken.
- Court Administrator accused of asking an employee to backdate a document, no disciplinary action taken.
- Director of Court Services and FSD Director

- CPO directing all staff to swat a female on the backside, no disciplinary action taken.

**Systemic examples of harassment**
- Female employees in the room snapping fingers in unison asking when opportunities for women will ever be provided.
- Requested to convert part of the access to justice position to address diversity and inclusion; request ignored and thereby denied.
- Mindy's the only female Division Director out of 7.
- Data shows 73% of all terminated employees are female.
- Data shows females are promoted at a slower rate than men but performance on average is higher.
- After attempting to create a diversity and inclusion committee was told creating a diversity committee would never fly with the court and we aren't going to create an affirmative action plan.
- Was told by Chief Judges she needed to seek their permission to conduct harassment and discrimination investigations in districts, and seek their permission to visit districts before coming after an intense investigation of a Judge and Court Administrator for sexual harassment.  This directive was given in order to suppress complaints. Recollection of this event occurred in the 2018 Judicial Conference by a Chief Judge in the audience who was questioning if that matter ever resolved and recognizing that this was wrong.

**Report from a Justice about why MM wasn't selected for the position:**
Insinuates the entire Supreme Court made the decision she didn't get the SCA position based on her gender by the following comments to Mindy after she didn't get the job:
- "You have to get inside these guys minds' when their thinking about picking a boss."
- "You don't look the part."
- "You're a small woman; you don't look the part."
- "There's sexism out there still, even in the government.  If you don't think there is, you're wrong."
- "Need to dress less like a woman and more like an attorney on 17th street."
- When she ask if there was anything she could do to better position herself in the future, she was told, "Outside of running out and getting your law degree, there's not much you can do."  The position only required a bachelor's degree and is currently occupied by a non-holding JD.

# Appendix 3

# *Agreement for Resignation and Release of Claims* (the Masias separation agreement), executed March 18, 2019.

## AGREEMENT FOR RESIGNATION AND RELEASE OF CLAIMS

This Agreement for Resignation and Release of Claims ("Agreement") is entered into between the Colorado Judicial Department, State Court Administrator's Office (hereinafter referred to collectively as the "DEPARTMENT") and Mindy Masias (hereinafter referred to as "EMPLOYEE"). DEPARTMENT and EMPLOYEE may collectively be referred to as the parties.

## RECITALS

WHEREAS, EMPLOYEE currently works in the position of Chief of Staff for the Office of the State Court Administrator, and serves as the Director of the Executive Division of the Office of the State Court Administrator;

WHEREAS, EMPLOYEE desires to voluntarily resign from her position under the terms and conditions of this Agreement; and

WHEREAS, the DEPARTMENT is willing to accept EMPLOYEE'S voluntary resignation in exchange for a full release of claims in accordance with the terms and conditions set forth below;

IN CONSIDERATION of the mutual and unilateral covenants, obligations, promises and warranties contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

## OBLIGATIONS OF EMPLOYEE

1.      Resignation.  EMPLOYEE agrees to submit to the State Court Administrator, Christopher Ryan, a non-revocable letter of resignation, neutral in its wording, upon her execution of this Agreement, which shall occur on or before March 15, 2019.  The resignation shall be effective March 19, 2019.  EMPLOYEE understands and agrees that in doing so she waives any and all rights to withdraw the resignation and agrees that having voluntarily resigned she has no right to any grievance, appeal or review under the Colorado Judicial System Personnel Rules.

1

2.	Underline{General Release}

	a.  EMPLOYEE, including her successors, assigns, agents and estate, hereby releases DEPARTMENT and all current and former employees, officers, agents and attorneys, in their official or personal capacities, from any and all claims, causes of action, liabilities, expenses, attorney fees or damages waivable by law which EMPLOYEE may have or may assert against them as a result of any actions or omissions of the DEPARTMENT or any of its current and former employees, officers, agents or attorneys which have occurred or should have occurred on or prior to the date of this Agreement arising out of or relating to her employment with DEPARTMENT and/or her resignation.

	b.  EMPLOYEE further agrees and covenants that she will not sue, or assert any cause of action, at law or in equity, before any court of law or administrative agency, against the DEPARTMENT or any of its current and former employees, officers, agents or attorneys, in their official or personal capacities, for any claims, causes of action, liabilities, expenses, or damages arising out of any actions or omissions of the DEPARTMENT or any of its current and former employees, officers, agents, or attorneys which occurred or should have occurred on or prior to the date of this Agreement arising out of or relating to, in any way, her employment with the DEPARTMENT and/or her resignation, including without limitation, any and all claims waivable by law for violations of the civil rights laws or employment laws of the United States and/or the State of Colorado.  This release of claims shall include, without limitation, any claims or cause of actions under: the Constitution of the United States or the State of Colorado; Title VII of the Civil Rights Act of 1964, as amended; the Equal Employment Opportunity Act of 1972; 42 U.S.C. §§1981 and 1983, as amended; the Age Discrimination in Employment Act of 1967, as amended; the Americans with Disabilities Act of 1990, as amended, including the ADA Amendments Act of 2008; the Civil Rights Acts of 1991; the Family and Medical Leave Act of 1993, as amended; the Equal Pay Act; the Rehabilitation Act of 1973, as amended; the Colorado Anti-Discrimination Act, as amended; the Colorado Judicial System Personnel Rules; any Chief Justice Directive or Colorado Judicial Department policy; and any other state or federal statue or regulation.

	c.  EMPLOYEE warrants that she has not filed a charge or claim with the Equal Employment Opportunity Commission or any state agency, or any other complaint, civil action, or lawsuit, against the DEPARTMENT, and further that EMPLOYEE has not assigned or transferred to any person any portion of any claim which is released and waived by this Agreement.  Nothing in this section shall restrict EMPLOYEE from filing a charge with the Equal Employment Opportunity Commission, or an equivalent state agency, or participating in agency proceedings.  However, EMPLOYEE understands and agrees that, by entering into this Agreement, she is releasing any and all individual claims for relief, including any right to payment of any kind from any charge or complaint that is not restricted or waived in this Agreement.

3.	Underline{Non-Disclosure.}  EMPLOYEE agrees that she shall not affirmatively disclose or discuss any aspect of this Resignation and Release of Claims Agreement, confidential and nonpublic information regarding the DEPARTMENT, and the circumstances surrounding the Agreement to any third party except to the extent disclosure is required for tax, retirement, benefits, insurance

or banking purposes, or in response to a valid subpoena.  EMPLOYEE shall provide a copy of the recording she made of communication between herself and a Justice of the Supreme Court, EMPLOYEE'S possession of this recording being disclosed during the settlement negotiations for this Agreement.  EMPLOYEE shall provide a copy of the recording on or before the date that EMPLOYEE submits her non-revocable letter of resignation.

## OBLIGATIONS OF DEPARTMENT

4.      Acceptance of Resignation.  The DEPARTMENT agrees to accept EMPLOYEE's resignation from her employment in accordance with the terms and conditions of this Agreement, effective March 19, 2019.

5.      Paid Administrative Leave.  In consideration for the above release of claims, the DEPARTMENT agrees to place EMPLOYEE on paid administrative leave beginning on November 7, 2018 until the effective date of resignation, less any periods of FMLA leave that were requested by EMPLOYEE on November 12, 2018 and approved and provided to EMPLOYEE in accordance with the Colorado Judicial System Personnel Rules.  On the effective date of resignation, EMPLOYEE shall receive her final paycheck, if any, less usual and customary withholdings, and a pay-out for any accrued paid time off to which EMPLOYEE is entitled.  EMPLOYEE understands and acknowledges that the paid administrative leave the DEPARTMENT will provide is the consideration for EMPLOYEE'S duties and obligations pursuant to this Agreement, and EMPLOYEE would not be otherwise entitled to the payment of wages or receipt of benefits EMPLOYEE will receive during paid administrative leave.

6.      Personnel Coding.  The DEPARTMENT agrees that EMPLOYEE's separation from employment shall be coded internally as a voluntary resignation for personal reasons.  The DEPARTMENT shall remove any disciplinary action(s) and documentation pertaining to such action(s) from EMPLOYEE'S personnel file.

7.      External Reference Checks.  EMPLOYEE shall direct all inquiries regarding the circumstances surrounding her separation from employment to the State Court Administrator, Christopher Ryan.  Such inquiries will be answered by providing the dates of service, position held, salary and that she voluntarily resigned from her position.  The DEPARTMENT makes no representations as to the response to any inquiry made in any other manner or to any person other than pursuant to a reference check as set forth herein.

## GENERAL PROVISIONS

8.      Confidentiality.  The parties agree that the circumstances surrounding EMPLOYEE'S separation from employment, this Agreement and its terms shall be treated by the parties as a confidential matter.  Both parties understand, however, that this Agreement may be subject to open records requirements of applicable public disclosure laws or administrative directive or rule and that any such request for information is controlled by the provisions of that governing authority.  EMPLOYEE agrees she will not hold the DEPARTMENT or its administrators, officers, agents or employees liable for any information released in compliance with an applicable law, directive, rule or court order.

3

9.       Claims under the ADEA. With regard to any rights or claims arising under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, ("ADEA")*,* EMPLOYEE understands that all of those rights and claims are released by this Agreement, that she must have a period of at least 21 days within which to consider this Agreement before executing, and that she has seven (7) days following her execution of this Agreement to revoke the Agreement to the extent that it waives and releases those rights or claims.  EMPLOYEE understands that this Agreement is not effective or enforceable with respect to the waiver or release of those rights or claims until after the seven (7) day period.  If EMPLOYEE elects to revoke this Agreement with respect to her waiver of rights or claims arising under 29 U.S.C. § 621 *et seq.*, within the seven (7) day period, she must advise the DEPARTMENT by delivering a written revocation to be received by Christopher Ryan, State Court Administrator, State Court Administrator's Office, 1300 Broadway, Suite 1200, Denver, CO 80203, no later than 5:00 p.m. on the seventh (7th) calendar day after the date on which this Agreement was entered into.  Such revocation shall not affect the waiver or release of any rights or claims not arising under 29 U.S.C. § 621 *et seq*.

10.      Integration.  The parties understand, acknowledge and agree that this Agreement constitutes the entire release and settlement agreement between the parties with respect to the subject matter and transactions referred to herein and may not be amended absent a writing evidencing such an amendment executed by both parties.  The parties understand, acknowledge and agree that the terms of this Agreement are contractual in nature and not mere recitals.  As such, the parties understand, acknowledge and agree that this Agreement is fully integrated and supersedes all previous oral or written agreements of the parties.  The parties understand, acknowledge and agree that the signing of this Agreement pursuant to the terms stated herein shall be forever binding, and no rescission, modification or release by the parties of the terms of this Agreement will be made for mistake or any other reason.

11.      Binding Effect.  This Agreement shall inure to the benefit of, and be binding upon, the successors, assigns and heirs of the parties.

12.      Governing Law.  This Agreement is entered in Colorado and shall be governed by the laws of the State of Colorado.

13.      Headings.  The headings and article captions used in the Agreement are for the convenience of the parties only and shall not have any legal effect or in any way alter or modify the meaning or interpretation of the Agreement.

14.      Additional Assurances.  This Agreement is intended to be self-operative.  Notwithstanding the foregoing, both parties agree that, at the reasonable request of the other party, they shall execute any further documents or instruments reasonably necessary to effectuate the transactions contemplated by this Agreement.

15.      Attorney Fees and Costs.  The parties agree that each party shall be responsible for her/its own costs and expenses, including attorney fees associated with the negotiation and execution of this Agreement.

16.     <u>Warranties and Acknowledgments.</u>  The parties expressly warrant that they have carefully and completely read the terms of the Agreement and that they enter into it knowingly and voluntarily, and without coercion, duress or undue influence.  The parties acknowledge they have had the opportunity to consult with their respective attorneys prior to the execution of the Agreement and/or have consulted with their respective attorneys prior to executing the same. The parties further acknowledge they believe the terms of the Agreement to be lawful, fair, and conscionable.  The parties acknowledge they believe the terms of the Agreement are appropriate to reach a full and final settlement of the disputed matters referenced herein, which include but are not limited to the circumstances and reasons surrounding EMPLOYEE's separation from her employment with the DEPARTMENT.

17.     <u>No Admission.</u>  The parties agree that this Agreement shall not be construed as an admission of liability on the part of either party regarding any of the charges or claims which were made, or could have been made, as part of the disputed matters referenced herein.

18.     <u>Competency and Authority.</u>  The parties to the Agreement are legally competent and have the authority to execute the Agreement.

19.     <u>Severability.</u>  If any section of this Agreement is found to be invalid by a Court of competent jurisdiction, the rest of the Agreement will remain in full force and effect.

WHEREFORE, the parties agree to and accept the terms of this Agreement on the dates reflected below.

[Signatures found on the following page.]

I, EMPLOYEE, HAVE BEEN GIVEN THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY BEFORE SIGNING. I HAVE READ THE FOREGOING AGREEMENT FOR RESIGNATION AND RELEASE OF CLAIMS AND UNDERSTAND ITS TERMS AND LEGAL CONSEQUENCES.  BY SIGNING THIS AGREEMENT, I UNDERSTAND I AM RELEASING ANY AND ALL CLAIMS I MAY HAVE AGAINST THE COLORADO JUDICIAL DEPARTMENT, INCLUDING WITHOUT LIMITATION THE STATE COURT ADMINISTRATOR'S OFFICE AND VARIOUS OTHER PERSONS WHICH COULD HAVE BEEN ASSERTED AS SET FORTH ABOVE.  I UNDERSTAND THE TERMS USED IN THIS AGREEMENT AND HEREBY EXECUTE IT KNOWINGLY AND VOLUNTARILY.

*Mindy Masias*

Mindy Masias
Employee


Date:  March 15, 2019


Christopher T. Ryan
State Court Administrator
Office of the State Court Administrator
Colorado Judicial Department


Date:  March 18, 2019

6

# Appendix 4

# Transcribed recording of a conversation between Chief Justice Nancy Rice and SCAO Chief of Staff Mindy Masias (2017).

# Masias-Rice Recording--2017

**Mindy Masias**

Okay. Yeah, we will definitely get to the bottom of that, because when he left DPS, I thought that meant Denver Public Safety, yeah, I'm sure most schools use a contractor.

**Chief Justice Rice**

Why is Carol so irritated?

**Mindy Masias**

I don't know. I suppose because she was turned down for a senior job.

**Chief Justice Rice**

She understood why, didn't she?

**Mindy Masias**

She did. I think she just wants to make sure. Yeah, and I do as well, but it is just how Carol is. You know, equality is a big piece for her.

**Chief Justice Rice**

Yeah, I sort of have shown you favoritism to Alex.

**Mindy Masias**

No.

**Chief Justice Rice**

I don't know how any of that works, to tell you the truth. I thought once you retired, you could work for a certain number of hours,

**Mindy Masias**

110 days.

**Chief Justice Rice**

What does that 110 days?

**Mindy Masias**

110 days out of the calendar year, you can work 110 days.

**Chief Justice Rice**

For a PERA employer?

- 1 -

**Mindy Masias**

And beyond that, it'll reduce your benefit.

**Chief Justice Rice**

That's what Alex did.

**Mindy Masias**

Right. [Shuffling noises].

**Chief Justice Rice**

So, why do you think you didn't get it?

**Mindy Masias**

You know, I've thought a lot about it. And I'm assuming that part of the reason is, you know, I was in place at the time. That the Office is not running at its most optimal.

**Chief Justice Rice**

Yeah, I think it's a little more than that, which is. Well, there's a lot of that. Which is that, you know, I think Jerry, did you no favors. That the Office is not running well. But a lot of it has to do with sort of this bigger concept of whether what the State Court needs is, you know, a really good manager or more of visionary leader. And I think that people still see you as very much a day-to-day manager. Which is not bad at all. Of course, it's really quite wonderful. But I think someone at work wanted something beyond that. So, but it wasn't Mark who was nothing but ideas, and didn't really have any idea. So, it's a tricky thing, particularly when you think back over sort of the history, just my limited history, there's a person who was nothing but a D-kind of manager, really.  Nobody liked him and didn't we didn't hire him. Thinking that a guy from Langham.

**Mindy Masias**

Oh, Greg Langham.

**Chief Justice Rice**

Nor did we hire Dan Hall.

**Mindy Masias**

Right.

**Chief Justice Rice**

I don't think people were articulating it very well, but they wanted Jerry because he was a judge and lawyer. But that was kind of a different thing. You need to understand that this group of Justices has no experience with any of it. You know, I was the only person who was around.

**Mindy Masias**

Yeah, that's right, when Jerry was hired.

**Chief Justice Rice**

Yeah. So, Jerry is sort of what they think of. And almost in a way I don't know. But I have some sort of specific ideas which may or may not be helpful. One is, I think you should have absolutely nothing to do with HR. You should not identify yourself with HR in the least.

**Mindy Masias**

Okay.

**Chief Justice Rice**

If, and that's not because you do a bad job. It's because you've done over the years too good of a job and you are identified with that. You should not go out to the courts and do HR. You should not, if somebody calls you with an HR question, you should immediately forward it to Eric, you have to be something other than Mindy, who used to be in HR.

**Mindy Masias**

Okay.

**Chief Justice Rice**

I've said that before to you. In know its a real [indiscernible] area, but you do it really, really well. Eric has to develop a new Eric. He needs to develop . . . Who's his second? I don't even know.

**Mindy Masias**

Her name is Dawn, and she's fantastic.

**Chief Justice Rice**

Yeah, and I didn't know that. You see what I am saying?  So, if I don't know it, probably nobody on the Court does. I mean, so that all has to happen. You have to not have line up anything to do at all, because you are branded with that HR. Cut that, cut that umbilical cord right away. And second, I think and I don't know what Chris is going to do. I mean, I'm not giving him much direction at all, because he's really doing us a favor. But I think you and Chris need to have to talk about what it is you want to accomplish with these next models.

**Mindy Masias**

Okay.

- 3 -

**Chief Justice Rice**

And if what you want to accomplish is to put yourself in a whole lot better position, really, just a little bit better position, to get to be the State Court Administrator, I think you have to have some fairly firm goals.

**Mindy Masias**

Okay.

**Chief Justice Rice**

And objectives that you can articulate and meet, other than just managing the Branch.

**Mindy Masias**

Okay, it's helpful.

**Chief Justice Rice**

Yeah, real specific kinds of stuff. And, then, I think it would also be very, very helpful if you could let me give you another example. I mean, the difference between you and Eric at the Judicial Performance Awards was basically nothing, right? You were both doing sort of the same thing. You were even taking turns doing exactly the same thing. That, you can't do that anymore.

**Mindy Masias**

Okay, right. That's helpful.

**Chief Justice Rice**

And I don't think you even. You mean it in only the best way. It's just sort of [indiscernible], but if you want to be the State Court Administrator, you're not the Director of Human Relations. Does that make sense?

**Mindy Masias**

Yeah, it totally makes sense.

**Chief Justice Rice**

So, Eric has to do that. Maybe with Dawn. You may have to welcome people to be silly like I am, or whatever, but you have to be . . .

**Mindy Masias**

Different. Okay, which I always felt like Jerry should be a part of the Award Ceremony, but I hear what you're saying that I need to somehow differentiate myself.

- 4 -

**Chief Justice Rice**

But if you're taking the place of Jerry, then you aren't equal to Jerry. You're not taking turns with him reading from the script. If you have to do it, you have to be welcome, goodbye, or not at all.

**Mindy Masias**

Okay.

**Chief Justice Rice**

We're happy to have an [indiscernible]. You have to be different.

**Mindy Masias**

Okay.

**Chief Justice Rice**

Does that make sense?

**Mindy Masias**

It does. It does. So, here's where I'm at. I kind of struggle with whether or not I should try to put myself in the position of, you know, going after the State Court Administrator position, or if I should just be satisfied with being the Chief of Staff and be really good at it.

**Chief Justice Rice**

I would really recommend that the Chief of Staff position go away. And, then, we either have a deputy or nothing.

**Mindy Masias**

Okay.

**Chief Justice Rice**

Because the way it's set up right now doesn't make any sense, and everybody gets that it doesn't make any sense. I'll talk to Chris about that.

**Chief Justice Rice**

I'm giving him, I mean, he's got the authority come July 1. It is interim, and it will, but I'm not going to say here's how you have to do it.

**Mindy Masias**

Okay.

**Mindy Masias**

Sure.

**Chief Justice Rice**

That position doesn't make sense. It never did. It was set up wrong from the beginning. If I had really understood it, I might have suddenly learned or, I mean, I tried in the beginning. I think of being Chief to not mess around without Jerry [indiscernible]. I thought it was a very good choice, but it didn't work to your benefit. Jerry has done nobody any favors. I hope that he just stays away, frankly. I saw that his car was here, but I don't want to have meetings with him. I don't want to pretend it doesn't go down like [indiscernible], right? Right, you know what I mean. I don't want him coming. He's gone. I just think pre-Jerry was a really good guy. Did nice things. But post my film is, Jerry, screwed this up, and I don't want him back.

**Chief Justice Rice**

[Indiscernible]. So, I guess what I would say is you're gonna have to really work something out with Chris and do so not What do you want me to do, Chris? But more. Here's what I want to accomplish, and here's where I want to be after these seven months. And you are going to have to decide. I want to be the State Court Administrator. I want to be the Deputy. But, depending upon where you want to go, you need to kind of take control of it and say, And so, help me.

**Mindy Masias**

Ok.

**Mindy Masias**

Okay.

**Chief Justice Rice**

You know, how can you help me do this? Because you're in the best position to recreate yourself. Better than anybody else. And that's also the most challenging position, right?

**Mindy Masias**

Mm hum, It is.

**Chief Justice Rice**

The Division Directors are just going to be hunkering down trying to keep their jobs and do as well as they can.

**Mindy Masias**

Yeah, I think we're all feeling that way. Actually, I think we're all feeling that way.

**Chief Justice Rice**

[Indiscernible].

**Mindy Masias**

You know. At least not yet.

**Chief Justice Rice**

But you are the one who has the opportunity to re-define, so you need to. I would do something . . . thinking about it.

**Mindy Masias**

Chief, yeah, trust me, I thought all weekend about it.

**Chief Justice Rice**

Yeah.

**Mindy Masias**

What would you think about talking to Chris about the supervision of the Directors. I have always felt like . . .

**Chief Justice Rice**

No, I mean, that's the big, big problem. I've talked to Chris. I want to continue to talk to Chris.

**Chief Justice Rice**

Okay.

**Chief Justice Rice**

But that's still thinking a little bit too small. You need to, you need to talk with Chris about whether you supervise the Directors.

**Mindy Masias**

That's what I mean. Yeah, that I feel like I should supervise the Directors and there, if any real change is going to occur, then I feel like I need to have that leverage.

**Chief Justice Rice**

Yeah, and I think Chris is going to evaluate whether there needs to be any real change. So, over this period of time, he's going to be. He's not going to be delegating a lot. So, that's why I think your position is going to be kind of the trickiest to figure out.

**Mindy Masias**

Okay.

**Chief Justice Rice**

So, the only thing you can do, I think, is to say to Chris, You know, in eight months, I'm going to be the State Court Administrator. Will you please help me accomplish that? Or, in eight months, I'm going to be very happy to be the Deputy, and I'm here to help him in any way I can. Because, I think. I don't know. I mean, it's so hard to predict, but I think there might be other people that apply. I mean, I think this. Maybe not. Maybe yes. Maybe no. I mean, the Court is all over the place. So, . . .

**Mindy Masias**

Okay.

**Chief Justice Rice**

It's really hard.

**Mindy Masias**

Okay, did you get any specific feedback other than I'm specifically seen as in the mold of HR? Did you get any other feedback that I should consider?

**Chief Justice Rice**

No, I guess what I would say is this, I mean, do you have any familiarity with the military?

**Mindy Masias**

Um hum.

**Chief Justice Rice**

So, do you know what like a Master Sergeant would be?

**Mindy Masias**

Yeah.

**Chief Justice Rice**

Or even a Chief Master Sergeant, how the Army really could not run without that person?

**Mindy Masias**

Right.

- 8 -

**Chief Justice Rice**

But that the leaders of the Army are nonetheless the officers, the generals, the colonels. Well, I think that you are seen as the best, in some ways, the best Chief Master Sergeant there ever was. But that, maybe not as a general.

**Mindy Masias**

Because they're not seeing the visionary piece that I have.

**Chief Justice Rice**

Yeah, so.

**Mindy Masias**

Okay.

**Chief Justice Rice**

Which is why sometimes I think the Court felt pretty confused about everything. So, part of it is sort of a classist. I don't want to use the word classist. Sort of a stereotypical warrior-judge thing, which is interesting historically, since Jerry was the first State Court Administrator who was a lawyer-judge. But nonetheless, as I told you, that's kind of in their heads. There may be a tendency among some to think that we need a lawyer, we need a judge. Because that's the person who is able to communicate, as opposed to meeting somebody who just [indiscernible]. You know, I sort of think the stronger the Chief, the more that person should run things. But I do think that you need a State Court Administrator who can run interference to the Chief, who can be over in the Capitol talking.

**Chief Justice Rice**

Whereas others are seen as sort of bad generals who couldn't function without you.

**Mindy Masias**

Okay.

**Mindy Masias**

I agree.

**Chief Justice Rice**

Somebody else who can talk to the Bar and say things that the Chief wants to.

**Chief Justice Rice**

And totally they got none of that from Jerry. [Indiscernible]. Which is one of the things which I actually do recite. So, a strong Chief equals a, makes in my mind, means that we really need the ultimate Administrator. A weaker Chief needs a stronger Administrator, right? So, one of the issues used to be,

well, when am I going to quit? And everybody's very concerned about it, since I think that I'm now sort of perceived as a stronger Chief. Would you agree with that?

**Chief Justice Rice**
Yeah. So, people are really positioning around all of that, and looks like Allison's going to go over to the Feds. So, there's a lot of that sort of playing into it.

**Mindy Masias**
I would.

**Mindy Masias**
Mum Hum. I'm sure.

**Chief Justice Rice**
And these guys are the next crowd. I mean, think about the Court. There's me, there's Coats whose never been Chief, there's Allison, who will probably go to the Feds. Then, there's Gabriel, Hood, Boatright, Marquez. That's all of them within a couple of years of each other. All of them are about, you know, the same age. [Indiscernible]. So, who knows if Allison is going to be here when the next State Court Administrator is chosen. I think that, I mean absent, running out and getting yourself a law degree, there's nothing you can much do about that.

**Mindy Masias**
Mm hum, yeah.

**Chief Justice Rice**
And you're not necessarily different than Chris. He doesn't have a law degree, either. But in some ways, has more credibility because he worked in the courts.

**Mindy Masias**
Sure. And he works side by side with all of the Justices.

**Chief Justice Rice**
Well, and because he is good at law.  So, I mean, there's, it's like, weird. So, I don't know. I mean, I think, I think there's a good chance you'll get it this next [time], but I think it's equally a chance that you won't. Depending almost entirely on who applies. You know, what you could do with if this is your lifelong ambition is probably go be a District Administrator some place. Which would probably kill you.

**Mindy Masias**
[Laughter]. I would probably want to change the role of the District Administrator. I don't want to be the person who signs off on the bills. And I mean, I want to be the person who's pushing . . .

- 10 -

**Chief Justice Rice**

You made your choices.

**Mindy Masias**

I want to be the person who's pushing the envelope to make things different. I don't see our administrators doing that, but . . .

**Chief Justice Rice**

No, we don't. You can't go get a law degree, so you're going to have to figure out something. So, in general, another way to look at that. And, once again, sort of another Army is, sort of what we call, used to call it, line and staff. You remember that? [Indiscernible] attorney's office? I always think that the closer you are to being a real line officer. And I guess I should always model my career this way. The more chance, particularly as a woman, you have of advancement in that whenever possible you want to have a really good staff. So why? I mean budget, legislation. Some to help with the hard stuff. How are we paying for this? What are the bills? Who documents making the deals? And it's a little different in every environment, but you need to be line. And I was line at the U.S. Attorney's Office. I was line when I was the Chief of Civil at the U.S. Attorney's Office. I wasn't the woman appointed to the HR committee or the woman to the diversity committee. I was paying people and giving raises and firings. You know, making decisions that affected settling cases. I had all the settlement part. So, I had the power. That's what I think you and Chris need to negotiate. You don't want to be . . . Do you know what I mean by staff? Which is, it makes the operation move more smoothly, but it doesn't make it move. So, on the what more I could say, I guess that's what it is.

**Mindy Masias**

Okay.

**Chief Justice Rice**

Does any of that make sense to you?

**Chief Justice Rice**

It does. Yeah.

**Chief Justice Rice**

But its not easy to hear, though. Right?

**Mindy Masias**

Well, I think a lot of this is going to depend on my conversations with Chris and how amenable . . .

- 11 -

**Chief Justice Rice**

And I haven't actually talked with him. Because I was so busy. Except I talked with [indiscernible] all the time. We had a real deep conversation. He's trying to figure out what he's going to do with the Court of Appeals. Frankly, I just wish Jerry would leave so he could start.

**Mindy Masias**

Well, I think nonetheless, Chris and I probably need to get started before Jerry leaves.

**Chief Justice Rice**

Everybody needs to act as if Jerry's no longer there. So, I cancelled the staff meeting.  Because I do not want to go through that.

**Mindy Masias**

Yeah.

**Chief Justice Rice**

Give me a day or two.

**Mindy Masias**

So, yeah, yeah, I would like to sit down and talk with Chris.

**Chief Justice Rice**

But you see what I mean, this is also a real opportunity, which Jerry never gave you, for you for you to absolutely define yourself.

**Mindy Masias**

Mm hum. Because as soon as I would start defining myself,

**Chief Justice Rice**

You'd get pushback.

**Mindy Masias**

Mm hum. And it's really, I have to be honest with you, Chief. It's really hard to define yourself and make headway when you aren't the supervisor, because people cling to and they will, particularly now, cling to their authority.

**Chief Justice Rice**

Yeah, no I agree. I think you have the single hardest position. Nobody wants you to lay low, if you're even thinking about that. But I would understand that if you did, actually. Because I think this is a difficult situation for you. Where you go exactly to enhance your credentials, and frankly, maybe

- 12 -

whether you would want to move. I mean, I'm not even suggesting that it would be more [indiscernible] if you left, but sometimes you have to leave to be appreciated.

**Mindy Masias**

Yeah, true. I'm also very strong and I hope people see that.

**Chief Justice Rice**

I think people know that. I think you can maybe do this, without having to do that. You can get it, depending upon who applies.

**Mindy Masias**

And I'll see how I feel in six months. I mean.

**Chief Justice Rice**

Yeah, yeah. But I understand that this is far and away, the most, truly, the toughest position of everybody. So, you have to, I mean, I'm sorry.

**Mindy Masias**

Yeah, I just think that it'll be easier to react and have a better grasp on what the future is after Chris and I sit down and have a conversation.

**Chief Justice Rice**

Yeah, what I would do is probably ask for one later in the week. And I need to talk to Chris. I'll probably try to do that tomorrow.

**Mindy Masias**

I have a funeral to go to at the end of the week.

**Chief Justice Rice**

I'm sorry.

**Mindy Masias**

So, maybe the beginning.

**Chief Justice Rice**

I don't think there is any particular rush. Yeah, maybe next week.

**Mindy Masias**

Yeah.

**Chief Justice Rice**

Everybody likes you. I mean, you, you are the most popular.

**Mindy Masias**

Won the popular vote [laughs].

**Chief Justice Rice**

Right, but the thing is that. I mean, as I kept telling you over and over and over. You let the dust settle, you get Jerry out of the way. Really, truly out of the way. And I think a lot of things will be a lot clearer. And particularly with Chris running things over there, there's not going to be any excuses. Chris will have some, Chris will have many, many good thoughts. He'll get us through the budget, but you need to be two inches from him at all times. If you want, if you're willing.

**Mindy Masias**

Okay.

**Chief Justice Rice**

I mean, the hard stuff, don't worry. I'm sorry. Tell whoever.

**Mindy Masias**

Yeah, he's a supporter, so I'm too concerned about that.

**Chief Justice Rice**

And Eric's has got to do what people call you about this. And they do say, refer them to him. They'll go out to the courts. Don't let the courts identify you as the HR person.

**Mindy Masias**

Oh, you mean, go out on, on any kind of HR business. I see what you're saying. I'm just gonna say I don't, as a State Court Administrator, I think you have to be . . .

**Chief Justice Rice**

Nothing with HR.

**Mindy Masias**

Okay, yeah, I think we do need to be out and about in Districts.

**Chief Justice Rice**

I didn't mean to do that, I just . . . This Dawn person needs, she needs to become a face. I need to know who she is.

- 14 -

**Mindy Masias**

Okay. Okay.

**Chief Justice Rice**

So, I hope you won't leave us. That sounds so lame, but I mean, I know this is kind of a blow. I wish that you would give it a little bit of time to see how it seems to be working out.

**Mindy Masias**

Yeah.

**Chief Justice Rice**

Because I do think it might work out really, really well. But I'm not in a position to guarantee that.

**Mindy Masias**

No, of course not.

**Chief Justice Rice**

And it might be the same judges voting. [Excepting Allison Eid].

**Mindy Masias**

I'm sure it probably won't be in six months that things could change significantly with Justice Eid. And I heard that Justice Coats might retire soon or no?

**Chief Justice Rice**

Not that I am aware of.

**Mindy Masias**

Okay.

**Chief Justice Rice**

I suspect that I'll be the next person retiring.

**Mindy Masias**

Oh, okay.

**Chief Justice Rice**

But I won't retire, you know, to affect this whole situation. I'll see this through.

**Mindy Masias**

Well, I appreciate you taking the time.

- 15 -

**Chief Justice Rice**

I just hope that what I said kind of made sense.

**Mindy Masias**

It makes sense. I mean, I think I have a lot to think about.

**Chief Justice Rice**

You know, we can certainly talk more. But I guess it's more than just Jerry's sins being laid at your footsteps. So, I think it is also you being able to, not being able to because of Jerry.

**Mindy Masias**

Well, yeah, there's probably a whole.

**Chief Justice Rice**

Maybe the . . . will all do their jobs, like for example, another example. You know, the CJI wants to talk to me. Well, make Rob set that up.

**Mindy Masias**

Okay.

**Chief Justice Rice**

You don't have to do that. Rob, this needs to be set up for the Chief. Thank you.

**Mindy Masias**

Okay.

**Chief Justice Rice**

I mean, that's another example. That's his job. Make him do it.

**Mindy Masias**

Okay. I wasn't sure if that was something that you wanted to . . .

**Chief Justice Rice**

No, that's what I am saying. Rob can deal with some of them.

**Mindy Masias**

Okay.

**Chief Justice Rice**

What I'm saying is just, don't. The men in particular, really appreciate the person who is sort of secretarial and helpful and executive assistant-ish, but that's not the person who's going to hear from them.

**Mindy Masias**

Right. Yeah, it's very true.

**Chief Justice Rice**

So, don't make some man be that.

**Mindy Masias**

Okay.

**Chief Justice Rice**

Seriously. I just . . .

**Mindy Masias**

I appreciate that advice.

**Chief Justice Rice**

Yeah.

**Mindy Masias**

Because I've never been a secretary. It's not what I went to school for.

**Chief Justice Rice**

No, you're not. But I'm saying, now you need to be the general.

**Mindy Masias**

Okay.

**Chief Justice Rice**

Chris. And Chris is going to be, Do you want to be the general? You don't have time to do that. You pay people to do that.

**Mindy Masias**

Yeah. And Chris shared with me that he. That, you know, he doesn't want the position. But nonetheless, we need to be successful. No matter what I choose to do or what he chooses to do in the future, there's a lot of work to be done, and we need to be successful.

- 17 -

**Chief Justice Rice**

The situation with Terri. She now is involving Andy and you and me, and there was one question to be answered, which is, why don't you retire?

**Mindy Masias**

Yeah, why [indiscernible] retire?

**Chief Justice Rice**

That's not your problem, that's Terri's problem. Terri comes to you. You say she wants to know that answer. Thank you.

**Mindy Masias**

Okay.

**Chief Justice Rice**

It's not yours to find out that incidence. It's hers.

**Mindy Masias**

Yeah.

**Chief Justice Rice**

Do you see what I am saying?

**Mindy Masias**

I totally see what you're saying, and it's really . . .

**Chief Justice Rice**

You want me to keep? I can keep giving you examples, but I think you get it now.

**Mindy Masias**

I get it.

**Chief Justice Rice**

I'll keep saying,

**Mindy Masias**

Yeah, you're doing it again Mindy [laughing].

**Chief Justice Rice**

No, okay?

- 18 -

**Mindy Masias**

I appreciate it, because I've been . . .

**Chief Justice Rice**

It's your habit to . . .

**Mindy Masias**

Fill in the blanks.

**Chief Justice Rice**

Not only fill in the blanks, but to be a little bit of a caretaker. A lot of that is you, some of them just being a woman, but . . .

**Mindy Masias**

I'm feeling an obligation to make things happen. You know, I've felt an obligation.

**Chief Justice Rice**

That your tricky part is not down. Your tricky part is up. Chris, I think Chris truly. I suspect 98% that he will not change his mind. So, he doesn't want it. His wife makes plenty of money, more than he does. He's got kids who need him to attend all sorts of games. His life is a lot more fragile. I mean, I think he needs not to have that [indiscernible].

**Mindy Masias**

Well, and I'll just leave you with this Chief. I would like to be able to work more closely with you, and I feel like I haven't been able to do that as much as I would like to, you know, working on budget and legislative issues.

**Chief Justice Rice**

Always remember it's why and why and why. If something feels easy to you, change.

**Mindy Masias**

Okay.

**Chief Justice Rice**

Don't do judgment, don't do, you know, management theory. Do management. I don't know. That's all I can say. Tell Chris the job you want, and then he can say, yes, no. But you decide what you want.

**Mindy Masias**

Okay. I know how I would design it.

**Chief Justice Rice**

Don't.

**Mindy Masias**

I know exactly how, because I spent three years thinking about it.

**Chief Justice Rice**

You might see it as something different.

**Mindy Masias**

Yeah, absolutely.

**Chief Justice Rice**

But don't say that, don't tell him.

**Mindy Masias**

Okay.

**Chief Justice Rice**

I mean, Chris is just Chris, you know.

**Mindy Masias**

Yeah. But you know, like I said, I would like to be able to work more closely with you, and I have oftentimes felt like if I either asked for it or I did it, it would look like I was stepping on Jerry's toes. And I think I just need to have a really frank conversation with Chris.

**Chief Justice Rice**

Everybody knows you were in an impossible position.

**Mindy Masias**

And I just need to have . . .

**Chief Justice Rice**

And there is nobody who doesn't totally get that. But, nonetheless, the dust has . . .

**Mindy Masias**

Yeah, it settled, the more where we're at. And I just, I'm probably going to be really straightforward with Chris, because things need to change. I don't want them to be where they're at right now and continue to see this dysfunction. Because there's a lot of dysfunction.

- 20 -

**Chief Justice Rice**

I had a very frank talk of all the Chiefs about all of this. It was really nice of them to start including me in their things. You know, I think, from my perspective, a lot of things. We have a lot of opportunity to turn stuff around. But in my head, Jerry is gone, and I'm not gonna and you need to put that in your head. You need to put that in your head. And if Jerry acts like he's still here.

**Mindy Masias**

Okay, well, he's not acting like he's still here. I'll be honest with you, and that's why I feel like it'd be better for Chris and I to get started before he leaves.

**Chief Justice Rice**

Yes, absolutely.

**Mindy Masias**

Like it doesn't need to be tomorrow, but.

**Chief Justice Rice**

The decision is made. So, the only reason I'm saying is give Chris a little time to work things out with the Court and things.

**Mindy Masias**

Yeah, I get he's in a tough position.

**Chief Justice Rice**

He's got the Supreme Court all worked out and I've talked with Loeb. Everything is in place. Things are organized. We'll be fine. But like that Terri situation was a real chance to fix it. It doesn't need to involve you and Andy. If I were you guys, stop your stupid meetings, just like I have. I mean, it's a different world.

**Mindy Masias**

Okay. Stop which meetings?

**Chief Justice Rice**

Both Director meetings and the [indiscernible]. I'm not gonna micromanage to that extent. I'm gonna try to tell you how I'm gonna handle things over here. Which is somebody wants to talk about something, we'll talk about. We're not gonna have those meetings, because that's no longer our leadership.

**Mindy Masias**

Okay.

- 21 -

**Chief Justice Rice**

Just very straightforward. Jerry's gone.

**Mindy Masias**

All right. Do you want me to convey that to him?

**Chief Justice Rice**

No. Andy and I are going to do it, roll it out in our own way.

**Mindy Masias**

Okay, all right.

**Chief Justice Rice**

You know I don't do those meetings in the Summer, anyways.

**Mindy Masias**

Yeah, that's true. That's true.

**Chief Justice Rice**

I don't know what we also capture next. I mean, it's a problem.  We should probably ultimately just let it take care of itself. I'll also try to give you a couple of analogies. There are a couple ways to think about it. You know the difference between the most competent Chief Master Sergeant versus the General. What really mine versus staff? I remember when I was in the District Court, we always used to think. Some of the justices still think this way. That if you weren't a judge or a lawyer, you really couldn't understand. And some will even take the position that if your not a judge, you can't understand. And that, on occasion, HR takes over judging. I've told you this before, that it's better to have a bad judicial decision sometimes than a good HR decision. Judges just really need to own it, they need to screw up. You sort of have to impress upon people that you [indiscernible]. Whatever you can do to think, at least, to convince people that you have internalized leaders to be like a judge. And Chris I think gets that more from having worked . . .

**Mindy Masias**

Directly for a judge.

**Chief Justice Rice**

Even though she was a jerk.

**Mindy Masias**

Didn't he work for Hufnagle?

- 22 -

**Mindy Masias**

He worked for Connie Peterson.

**Mindy Masias**

Peterson, that's right.

**Chief Justice Rice**

[Indiscernible; mutual laughter].

**Mindy Masias**

Yeah, ah, sometimes those experiences are the best ones, though.

**Chief Justice Rice**

That was a long time ago, but I think . . .

**Mindy Masias**

It shapes who you are. It really does.

**Chief Justice Rice**

People think of me as a trial attorney and I haven't tried a case in 35 years. But I have it. It is in my pocket.  The trial judge thing gets me so far. It's been 20 years. So, I mean, all I'm saying is I don't know what you can do, but if you can identify with the judge, do so. I don't know how else to say it exactly.

**Mindy Masias**

Okay.

**Chief Justice Rice**

I mean I'm glad to sort of mentor along the way on a deal.

**Mindy Masias**

Yeah, any, any advice you take, I take it seriously. And I don't take advice from everybody, only people that I trust.

**Chief Justice Rice**

Nor do I. And please, I can't, I cannot tell you what's going to happen. I have no idea.

**Mindy Masias**

Yeah, I understand that.

- 23 -

**Chief Justice Rice**

I am one vote.

**Mindy Masias**

I understand that.

**Chief Justice Rice**

And I stress to the court, this is you guys's choice, really, because I'm going to be gone. Sooner or later, you guys are going to have to own this one.

**Mindy Masias**

Like 10 years from now, you'll leave.

**Chief Justice Rice**

Way before it's time, way before retention, which is 70, I'm going to be 68 so you can sort of figure out the parameters. 67, sorry. But in the next . . .

**Mindy Masias**

In a few days.

**Chief Justice Rice**

No, no, I think it is like next month. I mean it is in June.

**Mindy Masias**

June 2. I remember.

**Chief Justice Rice**

I mean, I don't think about it too much. All these birthdays, about the same time. Yeah. So that's what I've been thinking.

**Mindy Masias**

Okay.

**Chief Justice Rice**

Sorry.

**Mindy Masias**

Well, there's no need to apologize. This is not a situation that anyone needs to apologize for. We're at where we're at and continue to move forward.

- 24 -

**Chief Justice Rice**

No pauses with the Directors and trying to find. Try to be in a position to find as clearly as you can with Chris. Your objectives set out. Your goals set out as clearly as possible, coming from you. Not necessarily, what's best for the system.

**Mindy Masias**

Okay.

**Chief Justice Rice**

What's best for you, I think, versus the certainty, what's best for the system. But the mindset should be, here's what I want.

**Mindy Masias**

Okay.

**Chief Justice Rice**

And how can we work together to make this happen. And let Chris quantify it.

**Mindy Masias**

And you know, I do look forward to working with Chris.

**Chief Justice Rice**

Chris is very, very, very sharp.

**Mindy Masias**

He is.

**Chief Justice Rice**

I noticed in the way the two of you guys worked on my [indiscernible] 13 pay things really, was really. It was really good the way you guys put that together.

**Chief Justice Rice**

I never in my life would have come up with that. That was unbelievably creative. It got us all sorts of kudos, and all I had to do was give it a name and people like it, you know.

**Mindy Masias**

Yeah.

**Mindy Masias**

Yeah, I do think it's going to be the best thing for the system and for a whole variety of reasons.

- 25 -

**Chief Justice Rice**

The Justices, I told them.  I said this is really, really good. You should have seen them work together. So.

**Mindy Masias**

Good, thank you.

**Chief Justice Rice**

Nobody is selling you short. It's just.

**Mindy Masias**

Yeah, well, I'm used to being underestimated. I think my whole life I have been kind of underestimated, and people need to see me do what I do, and then they realize.

**Chief Justice Rice**

Why do you think that you have been underestimated?

**Mindy Masias**

I think. One, I'm not pushy. Two, I come in with a positive attitude. I never come in angry or forceful about anything, and so I think that is part of the package. It's part of what I bring that is a benefit. But it's also a part that I think has people underestimate me initially, until they can see what I can do.

**Chief Justice Rice**

You are a small woman.

**Mindy Masias**

Small in stature, yes.

**Chief Justice Rice**

You don't look the part of. You don't look like the women partners on 17th Street.

**Mindy Masias**

Yeah.

**Chief Justice Rice**

You don't look like Allison or me or Monica or even the women on the Court of Appeals.

**Mindy Masias**

Should I change my hair?

- 26 -

**Chief Justice Rice**

You might think about it. You need to do something to make yourself not be underestimated. You know, Allison gets underestimated. And I'm sure people say the same about me, but Allison gets underestimated a little bit sometimes. Because I've read, that she's told me, people say that, you know, she doesn't dress nicely enough, or she doesn't. You know, when I decided that I wanted to be Chief, I started dressing differently since almost every day, and not much I can do with my hair, because it's just so naturally curly. But you know, it's still trying to be, you know that old dress for your next job business? You might think about it a little bit. It's way too personal on my part, I suppose.

**Mindy Masias**

No, I appreciate that.

**Chief Justice Rice**

I don't want you not to be attractive. Yeah. So, so think of those guys. Think of that generation. They're used to women. But they're used to women who are the partners at the law firms, or older women, from their point of view, like me, who sort of, they've grown up with me being kind of their law [indiscernible]. Do you know what I mean?

**Mindy Masias**

Mm hum.

**Chief Justice Rice**

Just think of, just put yourself in that position.

**Mindy Masias**

Okay.

**Chief Justice Rice**

And then, I always go back to it at some certain point. I don't know if they can adjust to me. And I think that that sort of has worked for me in some ways, because I've been pretty lucky, but I don't think it always works.

**Mindy Masias**

Yeah, well, and sometimes you don't have that much time to have them adjust to me.

**Chief Justice Rice**

You know, there's, there's sexism out there still. And I think to pretend like there isn't even in the government is. . .

- 27 -

**Mindy Masias**

We're crazy to think there isn't. Yeah, no. I see it.

**Chief Justice Rice**

About the only way you can make the sexism go away, I've noticed, is to be the boss.

**Mindy Masias**

Yeah, okay.

**Chief Justice Rice**

Well.

**Mindy Masias**

Yeah, thank you, Chief. I really appreciate it. I have . . .

**Chief Justice Rice**

Thank you for being so [indiscernible].

**Mindy Masias**

Yeah, of course I do.

**Chief Justice Rice**

Why do you bring these to me as opposed to anybody else?

**Mindy Masias**

Oh, well, I just always pick up the basket of stuff that needs to be signed.

**Chief Justice Rice**

Well, then, maybe you should assign somebody to do that.

**Mindy Masias**

I will, but then I wouldn't get to come over and see you.

**Chief Justice Rice**

Well, if that's your goal, and that's actually not a bad goal. I mean, I agree, but what I'm saying is, don't let people assume, oh Mindy will do it.

**Mindy Masias**

Yeah, I hear that. I hear that and it's not something that I have given tons of thought to. But, I will. I will.

- 29 -

**Chief Justice Rice**

Go back and tell Terri, research this, or get somebody to research it.

**Chief Justice Rice**

And have the answers. And, then, based upon [indiscernible]. You don't need to do it.

**Mindy Masias**

Okay.

**Mindy Masias**

Okay, I will go [indiscernible]. You want change.

**Chief Justice Rice**

No, I want people to do their job. Not rely on me quite so much.

**Chief Justice Rice**

It can be crazy.

**Mindy Masias**

Yeah.

**Mindy Masias**

Yeah, and I'm sure it is. All right. Thanks, Chief.

**Mindy Masias**

Thank you , Mindy. You're doing great. I'm very glad you're [indiscernible].

[Indiscernible conversation that includes a male voice, possibly Andrew Rottman; recording ends].

# Appendix 5

## *Colorado Judicial Department Agreement for Services by Independent Contractor* (the Masias Contract), dually executed April 11, 2019 and June 3, 2019.

COLORADO JUDICIAL DEPARTMENT
AGREEMENT FOR SERVICES
BY INDEPENDENT CONTRACTOR

1. PARTIES. This Agreement is made between the COLORADO JUDICIAL DEPARTMENT ("Department"), by and through the OFFICE OF THE STATE COURT ADMINISTRATOR, and THE LEADERSHIP PRACTICE, LLC ("Contractor"), an independent contractor doing business as a Colorado limited liability company. Department and Contractor may individually be referred to as "Party" or collectively as "Parties." In consideration of their mutual promises and for their mutual benefit, the Parties agree as follows:

2. RECITALS AND PURPOSE.

   A. The Department needs a highly experienced vendor with extensive court and probation experience who understands the Department's unique leadership organizational structure to partner with the Department to develop and facilitate a sustainable leadership strategy that addresses the continued development of formal and informal leaders at various levels throughout the Department.

   B. Contractor is qualified, willing, and able to meet the Department's needs.

3. AUTHORITY.

   A. The Department has determined in its sole discretion to award Contractor the opportunity to provide the services described in this Agreement for a period not to exceed five years.

   B. Authority exists in the law and funds have been budgeted, appropriated, and otherwise made available, and a sufficient uncommitted balance thereof remains available for encumbering and subsequent payment for purposes of this Agreement.

4. EFFECTIVE DATE. This Agreement shall not be valid or enforceable until it is fully executed by both Parties (the "Effective Date"). The Department shall not be bound by any provision of this Agreement before the Effective Date, and shall have no obligation to pay Contractor for any work performed or expense incurred before the Effective Date.

5. TERM OF THE AGREEMENT.

   A. Initial Term; Work Commencement. The Parties' respective performances under this Agreement shall commence on the latter of the Effective Date or April 1, 2019 and shall terminate on March 31, 2024 ("Initial Term") unless sooner terminated or renewed in accordance with the terms of this Agreement.

   B. End of Term Extension. In the event this Agreement approaches the end of its Initial Term, the Department, at its discretion, upon written notice to Contractor as provided in §36, may unilaterally extend the Initial Term for a period not to exceed three months (an "End of Term Extension"). The provisions of this Agreement in effect when such notice is given shall remain in effect during the End of Term Extension. The End of Term Extension shall automatically terminate upon execution of a replacement contract or modification extending the total term of the Agreement.

   C. Survival of Certain Terms. Any provision of this Agreement that imposes an obligation after termination or expiration of the Agreement shall survive the termination or expiration of the Agreement.

6. SCOPE OF WORK. The Contractor shall complete the services described in **Exhibit A** in accordance with the terms and conditions of this Agreement. The Department shall have no liability to compensate Contractor in connection with any services performed outside the scope of **Exhibit A**.

The Leadership Practice, LLC
Leadership Program
Apr2019-Mar2024                                                                 Page 1 of 8

7.  FEE AND PAYMENT.

    A.  Fee. The Department shall compensate Contractor for services performed under this Agreement. The Department shall pay the Contractor in the amounts and in accordance with the schedule and other conditions set forth in **Exhibit B**.

    B.  Not a Wage or Salary. It is specifically agreed that the fees paid under this Agreement are neither salary nor hourly wage, and any computation of fees based on performance time is for convenience of the Parties in determining value of service and not as salary or hourly wage.

    C.  Method of Payment. Contractor shall initiate payment requests by submitting invoices to the Department on the schedule set forth in **Exhibit B**. Upon approval of the charges, Department shall promptly pay through its normal payment procedures. The Department's acceptance of an invoice does not constitute acceptance of services performed under this Agreement.

    D.  Disputes. If the Contractor disputes any calculation, determination or amount of any payment, the Contractor shall notify the Department of its dispute within 30 days following the Contractor's receipt of the payment or notification of the determination or calculation of the payment by the Department, as appropriate. The Department will review the information presented by the Contractor and may make changes to its determination based on this review. The calculation, determination or payment amount that results from the Department's review shall be final. No payment that is subject to a dispute under this subsection shall be due until after the Department has concluded its review.

    E.  Erroneous Payments. The Department may recover, at the Department's discretion, payments made to Contractor in error for any reason, including, but not limited to, overpayments or improper payments, and unexpended or excess funds received by Contractor. The Department may recover such payments by deduction from subsequent payments under this Contract, deduction from any payment due under any other contracts, grants or agreements between the Department and Contractor, or by any other appropriate method for collecting debt.

8.  STATUS AS INDEPENDENT CONTRACTOR. This Agreement does not constitute a hiring by either Party. It is the Parties' intention that Contractor shall be an independent contractor and not Department's employee for all purposes, including, but not limited to, the Federal Insurance Contribution Act, the Social Security Act, the Federal Unemployment Tax Act, the provisions of the Internal Revenue Code, the Colorado Workers' Compensation Act, the Colorado Unemployment Insurance Act, and the Public Employees Retirement Association. Accordingly, no federal, state or local income tax or payroll tax of any kind, and no retirement contribution shall be withheld or paid by Department on behalf of Contractor or the employees of Contractor, if any.

9.  PERFORMANCE SPECIFICATIONS. Department shall not exercise control over Contractor by overseeing the actual work or instructing Contractor as to how the work will be performed; however the parties agree that Contractor shall perform the services in accordance with recognized industry standards of care, skill and diligence for the type of services to be performed.

10. LICENSES, PERMITS, AND OTHER AUTHORIZATIONS. Contractor shall secure and maintain at all times during the term of this Agreement, at its sole expense, all licenses, permits, and other authorizations required by federal, state, and local laws and regulations to perform its obligations under this Agreement.

11. TRAINING. Department shall provide no training to Contractor, inasmuch as Contractor already possesses the skills needed to perform the work required under this Agreement.

12. CRIMINAL BACKGROUND CHECK .

    A.  Background Check. The Department requires that all persons who perform services under this Agreement must pass a criminal background check before working under the Agreement, which

The Leadership Practice, LLC
Leadership Program
Apr2019-Mar2024                                                                                    Page 2 of 8

background check shall be valid for two (2) years. All such background checks will be carried out, at no charge to the Contractor or the worker, by the Department's Human Resources Division under standards developed by the Department. In order to request a new or renewal background check, the Contractor should provide to the worker an "Authorization and Consent for Release of Information" form, in the form to be provided by the Department, and deliver the completed form to the Department's Representative, who will process the request and inform the Contractor of the result. No person shall perform any work under this Agreement without having in place a valid criminal background check. The decision as to whether the worker passes the criminal background check will be in the sole discretion of the Department.

B. <u>Notification</u>. Contractor shall notify the Department in writing immediately upon discovering that any person performing services under this Agreement pleads guilty to, or is convicted of, a petty, misdemeanor, or felony offense during the term of this Agreement. The Contractor's report shall be accompanied by a newly completed "Authorization and Consent for Release of Information" form authorizing a new background check for the person who pled guilty or was convicted. The person who is subject of the report shall immediately cease performing services under this Agreement until otherwise informed by the Department.

13. <u>VERIFICATION OF LEGAL STATUS</u>.

A. <u>Business Entities</u>. Contractor shall comply with C.R.S. §§ 8-17.5-101 *et seq*. Contractor certifies, warrants, and agrees that it does not knowingly employ or contract with an illegal alien to perform work under this Agreement and that it shall not knowingly contract with a subcontractor that fails to certify to Contractor that subcontractor shall not knowingly employ or contract with an illegal alien to perform work under this Agreement. Contractor shall confirm eligibility of all employees who are newly hired for employment in the United States to perform work under this Agreement through participation in either (i) the "E-verify Program," jointly administered by the Department of Homeland Security and the Social Security Administration or (ii) the "Department Program" administered by the Colorado Department of Labor and Employment ("DOL"). If Contractor elects to use the Department Program, Contractor must promptly provide copies of its "Notice of Participation" to the Department and to DOL. Contractor: (i) shall not use the E-verify or Department Program to undertake pre-employment screening of job applicants; (ii) shall notify the subcontractor and the Department within 3 days if Contractor has actual knowledge that a subcontractor is employing or contracting with an illegal alien for work under this Agreement; (iii) shall terminate the subcontractor if a subcontractor does not stop employing or contracting with the illegal alien within 3 days of receipt of notice; and (iv) shall comply with reasonable requests made during an investigation, undertaken by DOL pursuant to C.R.S. §8-17.5-102(5). If Contractor fails to comply with C.R.S. §8-17.5-101 et seq., Department may terminate this Agreement and Contractor shall be liable for actual and consequential damages.

B. <u>Sole Proprietors and Natural Persons</u>.

i. Contractor, if a natural person eighteen years of age or older, swears and affirms under penalty of perjury under Colorado state law that s/he is a United States citizen, legal permanent resident of the United States, or lawfully present in the United States pursuant to federal law. **Contractor shall provide proof that s/he is lawfully present in the United States prior to starting work for the Department by complying with §24-76.5-101 C.R.S., et seq., and producing a required form of identification upon signing this Agreement (e.g. driver's license)**. In signing this Agreement, Contractor acknowledges that making a false, fictitious, or fraudulent statement is punishable as perjury in Colorado, and it shall constitute a separate offense each time a public benefit is fraudulently received.

ii. Contractor must notify the Department in writing immediately if Contractor is no longer lawfully present in the United States pursuant to federal law, and/or if there is any change

to Contractor's status that may impact Contractor's ability to lawfully perform the duties contained in this Agreement, including the expiration of any visa or authorization or change in policy if Contractor is the recipient of any deferred status.

14. <u>PERA STATUS</u>. At all times during the term of this Agreement, Contractor shall have a duty to notify the Department of the existence of any person, including Contractor himself/herself if doing business as an individual or sole proprietor, who is providing services to the Department under this Agreement who is a service retiree from the Public Employee Retirement Association (PERA) of Colorado, and who is also an owner or operator, or is related to an owner or operator, of the Contractor business entity. If the retiree has in the past worked as a government employee in a position covered by PERA, but will not be receiving retirement benefits from PERA during the term of this Agreement, Contractor shall also notify the Department in the event the retiree's status changes to that of PERA benefit recipient during the term of this Agreement. If the retiree is currently receiving retirement benefits from PERA, Contractor understands and agrees, and shall also notify said retiree, that in the event the retiree experiences any reduction or loss of PERA retirement benefits due to work under this Agreement, the Department shall not be liable for reimbursement of any such reduction or loss.

15. **<u>INCOME TAXES</u>. Contractor understands and agrees that Contractor is responsible to pay, according to law, Contractor's federal, state and local income taxes. If Contractor is not a corporation, Contractor further understands and agrees to pay any self-employment (social security) tax that may be required by law.**

16. **<u>UNEMPLOYMENT COMPENSATION</u>. Contractor shall not be entitled to unemployment insurance benefits for work performed under this Agreement, unless unemployment compensation coverage is provided by Contractor or by some entity other than Department.**

17. **<u>WORKERS' COMPENSATION</u>. No workers' compensation insurance shall be obtained by Department concerning Contractor or the employees of Contractor, if any. Contractor shall comply with workers' compensation law concerning Contractor and the employees of Contractor, if any.**

18. **<u>FRINGE BENEFITS</u>. Because Contractor is engaged in Contractor's own independent business, Contractor is not eligible for, and shall not participate in, any employer pension, health, or other fringe benefit plan of the Department.**

19. <u>VENDOR OFFSET</u>. Pursuant to §24-30-202.4, as amended, C.R.S., the State Controller may withhold payment under the State's vendor offset intercept system for debts owed to State agencies for: (a) unpaid child support debt or child support arrearages; (b) unpaid balance of tax, accrued interest, or other charges specified in Article 21, Title 39, as amended, C.R.S.; (c) unpaid loans due to the Student Loan Division of the Department of Higher Education; (d) owed amounts required to be paid to the Unemployment Compensation Fund; and (e) any other unpaid debts owing to the State of any agency thereof, the amount of which is found to be owing as a result of final agency determination or reduced to judgment as certified by the Controller.

20. <u>INSURANCE REQUIREMENTS</u>.

    A. Contractor shall obtain, and maintain at all times during the term of this Agreement, insurance in the following kinds and amounts:

        (i) Workers' Compensation Insurance as required by state statute, and Employer's Liability Insurance covering all of contractor's employees acting within the course and scope of their employment.

        (ii) Commercial General Liability Insurance written on an ISO occurrence form, covering premises operations, fire damage, independent contractors, products and completed

operations, blanket contractual liability, personal injury, and advertising liability with minimum limits as follows:

a.    $1,000,000 each occurrence;

b.    $1,000,000 general aggregate;

c.    $1,000,000 products and completed operations aggregate; and

d.    $50,000 any one fire.

If any aggregate limit is reduced below $1,000,000 because of claims made or paid, Contractor shall immediately obtain additional insurance to restore the full aggregate limit and furnish to the Department a certificate or other document satisfactory to the Department showing compliance with this provision.

(iii)   Automobile Liability Insurance covering any auto used in performance of this Agreement (including owned, hired and non-owned autos) with a minimum limit of $1,000,000 each accident combined single limit.

(iv)   Professional liability insurance with an aggregate limit of at least $1,000,000. For policies written on a claims-made basis, the policy shall include an endorsement, certificate or other evidence that coverage extends two years beyond the performance period of the Agreement. The insurance policy shall not contain a sexual misconduct exclusion.

B.   The State of Colorado shall be named as additional insured on the Commercial General Liability and Automobile Liability policies. Coverage required by this Agreement shall be primary over any insurance or self-insurance program carried by the State of Colorado.

C.   The above insurance policies shall include provisions preventing cancellation or non-renewal without at least 30 days prior notice to Contractor, and Contractor shall notify the Department by certified mail, personal delivery with receipt or email of any such imminent cancellation or non-renewal within seven (7) days after Contractor's receipt of such notice.

D.   Contractor shall require all insurance policies in any way related to this Agreement and secured and maintained by Contractor to include clauses stating that each carrier shall waive all rights of recovery, under subrogation or otherwise, against the State of Colorado, its agencies, institutions, organizations, officers, agents, employees and volunteers.

E.   All policies evidencing the insurance coverage required hereunder shall be issued by insurance companies satisfactory to the State.

F.   Contractor shall provide certificates showing insurance coverage required by this Agreement to the Department within 7 business days of the Effective Date of this Agreement, if not previously provided, but in no event later than the commencement of the services or delivery of the goods under this Agreement. No later than 15 days prior to the expiration date of any such coverage, Contractor shall deliver to the Department certificates of insurance evidencing renewals thereof. At any time during the term of this Agreement, the Department may request in writing, and Contractor shall thereupon within 10 days supply to the Department, evidence satisfactory to the Department of compliance with the provisions of this section.

21.  CONFIDENTIALITY. In the event that Contractor obtains access to any records or files of the Department in connection with this Agreement, or in connection with the performance of its obligations under this Agreement, Contractor shall keep such records and information confidential and shall comply with all laws and regulations concerning the confidentiality of such records to the same extent as such laws and regulations apply to the Department. Contractor shall notify its employees and agents, if any, that they are subject to the confidentiality requirements as set forth above, and shall provide each

employee or agent with a written explanation of the confidentiality requirements before the employee or agent is permitted access to confidential data.

22. <u>COPYRIGHT/OWNERSHIP OF MATERIALS</u>. By virtue of the compensation paid by the Department for services rendered by the Contractor and its employees or agents under this Agreement, Contractor acknowledges that adequate compensation will have been paid for any data, materials, or work products produced or created by the Contractor as a result of this Agreement. Contractor grants to the Department all right, title and interest in and to all such data, materials, or work products. Further, all copyrights, patents and royalties, if any, arising from the distribution of such data, materials or work products shall become the property of the Department or its assigns. To the extent required by the Department, Contractor shall place a notice of the Department's copyright on any or all materials produced under this Agreement.

23. <u>PUBLICITY RELEASES</u>. Contractor agrees not to refer to this Agreement or the services provided pursuant to this Agreement in commercial advertising in such a manner as to state or imply that the services provided are endorsed or preferred by the Department.

24. <u>COMPLIANCE WITH LAW</u>. The Parties shall comply with the letter and spirit of all applicable federal, state and local laws and regulations related to performance under this Agreement, including but not limited to the Colorado Antidiscrimination Act of 1957, as amended, (Section 24-34-401 et seq., C.R.S.) and other applicable law respecting discrimination and unfair employment practices.

25. <u>CHOICE OF LAW; VENUE</u>. The construction, interpretation and performance of this Agreement shall be governed by the laws of the State of Colorado, and any claim arising out of or relating to this Agreement or breach thereof shall be brought exclusively in the state courts of Colorado.

26. <u>INDEMNIFICATION</u>. To the maximum extent allowable by law, Contractor shall indemnify, save and hold harmless the Department, its employees and agents, against any and all claims, damages, liability and court awards including costs, expenses, and attorney fees incurred as a result of any act or omission by Contractor, or its employees, agents, subcontractors, or assignees pursuant to the terms of this Agreement.

27. <u>LITIGATION REPORTING</u>. If Contractor is served with a pleading or other document in connection with an action before a court or other administrative decision making body, and such pleading or document relates to this Agreement or may affect Contractor's ability to perform its obligations under this Agreement, Contractor shall, within 10 days after being served, notify the Department of such action and deliver copies of such pleading or document to the Department's principal representative.

28. <u>TAX EXEMPTION</u>. The Department is exempt from the payment of federal, state, and/or local government tax assessments. Contractor shall collect no tax from the Department, and the Department shall have no liability to Contractor for such taxes regardless of whether any political subdivision of the state imposes such taxes on the Contractor.

29. <u>SEVERABILITY</u>. If any part of this Agreement shall be held unenforceable, the rest of this Agreement will nevertheless remain in full force and effect provided that the Parties can continue to perform their obligations under this Agreement in accordance with its intent.

30. <u>NON-WAIVER</u>. The failure of either Party to exercise any of its rights under this Agreement for a breach thereof shall not be deemed to be a waiver of such rights or a waiver of any subsequent breach.

31. <u>ENTIRE AGREEMENT; MODIFICATIONS</u>. This Agreement, including all exhibits and attachments, is the complete integration of all understandings between the Parties. No prior or contemporaneous addition, deletion, or other amendment hereto shall have any force or effect whatsoever, unless contained in this writing. No subsequent novation, renewal, addition, deletion, or other amendment hereto shall have any force or effect unless embodied in a written contract executed by both Parties to this Agreement.

32. ORDER OF PRECEDENCE. In the event of a conflict or inconsistency between this Agreement and any Exhibit or attachment such conflict or inconsistency shall be resolved by reference to the documents in the following order of priority:

   A. The provisions of the main body of this Agreement.

   B. Exhibit A, Scope of Work.

   C. Exhibit B, Pricing.

33. ASSIGNMENT; SUBCONTRACTING. Contractor's rights and obligations hereunder are personal and may not be transferred, assigned or subcontracted without the prior, written consent of the Department. Any attempt at transfer, assignment, or subcontracting without such consent shall be void. All assignments, subcontracts, or Subcontractors approved by the Department are subject to all of the provisions of this Agreement. Contractor shall be solely responsible for all aspects of subcontracting arrangements and performance.

34. THIRD PARTY BENEFICIARIES. Except for the Parties' respective successors and assigns described in Paragraph 33, this Agreement does not and is not intended to confer any rights or remedies upon any person or entity other than the Parties.

35. TERMINATION

   A. Default. Either Party may terminate this Agreement upon default by the other Party, effective upon receipt of notice or at such other time as may be stated in the notice. "Default" is defined as the failure of a Party to fulfill any of its duties and obligations under this Agreement. The non-defaulting Party may in its discretion permit the other Party a period of up to two weeks to cure the default.

   B. Loss of Funds. The Department is prohibited by law from making commitments beyond the term of the current Department Fiscal Year. Payment to Contractor beyond the current Department Fiscal Year is contingent on the appropriation and continuing availability of funding in any subsequent year. In the event that funding for any activity established by this Agreement is discontinued or decreased by the State of Colorado, or any federal funding source, Department may terminate this Agreement or reduce its scope effective immediately upon receipt of notice without penalty.

   C. Public Interest. The Department is entering into this Agreement for the purpose of carrying out the public policy of the Colorado Judicial Branch. If this Agreement ceases to further such public policy, the Department may terminate this Agreement, in whole or in part, for convenience of the Department, when the interests of the Department so require. The Department shall give at least thirty (30) days written notice of such termination, specifying the part of the Agreement terminated and when the termination becomes effective.

   D. Force Majeure. If acts of God or government authorities, natural disasters, or other emergencies beyond a party's reasonable control make it illegal or impossible for such Party to perform its obligations under this Agreement, such Party may terminate this Agreement upon written notice to the other Party without liability.

   E. Final Payment. In the event of termination for any reason, Contractor shall be compensated for the value of services actually performed prior to the effective date of the termination.

36. PARTY REPRESENTATIVES; NOTICES. The following persons are hereby designated by their respective employers as their representatives for the management of this Agreement:

FOR THE DEPARTMENT

Name: Chris Ryan
Title: State Court Administrator
Phone: (720) 625-5000
Email: christopher.ryan@judicial.state.co.us

FOR CONTRACTOR

Name: Mindy Masias
Title: Owner and Operator
Phone: (303) 656-8276
Email: mindy.masias@leadershippractice.org

Either Party may designate a substitute representative by notice to the other Party. Notices required or permitted to be given under this Agreement shall be in writing and shall be delivered by hand with receipt required, by certified or registered mail to such Party's representative at the address set forth above or as an email with read receipt requested to the representative at the email address, if any, set forth above. If a Party delivers a notice to another through email and the email is undeliverable and the Party is not provided with an alternate email contact, then the Party delivering the notice shall deliver it by hand with receipt required or by certified or registered mail to such Party's representative at the address set forth below. Unless otherwise provided in this Agreement, notices shall be effective upon receipt of the written notice.

37. <u>COUNTERPARTS; ELECTRONIC SIGNATURES AND ELECTRONIC RECORDS</u>. This Agreement and any amendments hereto may be executed in several counterparts, each of which shall be deemed an original, and all of which together shall constitute one agreement binding on the Parties. The Parties consent to the use of electronic signatures by either Party. The Agreement, and any other documents requiring a signature hereunder, may be signed electronically by the Parties in the manner specified by the Parties. The Parties agree not to deny the legal effect or enforceability of this Agreement solely because it is in electronic form or because an electronic record was used in its formation. The Parties agree not to object to the admissibility of this Agreement in the form of an electronic record, or a paper copy of an electronic document, or a paper copy of a document bearing an electronic signature, on the ground that it is an electronic record or electronic signature or that it is not in its original form or is not an original.

38. <u>SIGNATURE AUTHORITY</u>. By signing this Agreement, the person signing on behalf of Contractor hereby swears and affirms that they are authorized to act on Contractor's behalf and acknowledge that the Department is relying on their representations to that effect.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the dates written below.

STATE OF COLORADO
JUDICIAL DEPARTMENT

By: Christopher T. Ryan
Title: State Court Administrator
Date: 4/11/2019

THE LEADERSHIP PRACTICE, LLC

By: Mindy Masias
Title: President/Owner
Date: April 8, 2019

**Exhibit A – Scope of Work**

 **A.1**  **Annual Scope of Work - April 1, 2019-March 31, 2020**

| Milestone 1.0 – Solicit feedback from key stakeholders for the Annual Leadership Summit | |
| --- | --- |
| Activities | Timeline |
| - Hold initial meetings with identified Judicial key stakeholder staff, Chief Justice, State Court Administrator and Chief Human Resources Officer<br>- Conduct a flash survey of all Judicial Staff in collaboration with HR staff<br>- Establish communication streams for program coordination and consulting<br>- Clarify goals and outcomes of the summit<br>- Confirm roles and responsibilities and lines of communication<br>- Create open communication and feedback | April 1- July, 2019 |

| Milestone 2.0 - Develop Annual Leadership Agenda | |
| --- | --- |
| Tasks | Timeline |
| - Review of all feedback<br>- Develop agenda<br>- Present draft agenda to the Chief Justice, State Court Administrator and Chief Human Resources Officer – define roles, etc.<br>- Obtain final authorization of agenda | Aug 1, 2019 |

| Milestone 3.0 – Facilitate Annual Leadership Summit | |
| --- | --- |
| Tasks | Timeline |
| - Facilitate summit<br>- Provide follow up documentation from event | Aug 14-15, 2019 Summit<br>Aug 30, 2019 Follow Up Items Delivered |

| Milestone 4.0 – Redesign Leadership Education Program | |
| --- | --- |
| Tasks | Timeline |
| - Hold focus groups and personal interviews of leadership graduates to solicit areas of strength and weakness of current efforts<br>- Work with HR staff to redesign the leadership program<br>- Incorporate Annual Leadership Summit take aways<br>- Obtain State Court Administrator and Chief Justice approval of leadership program curriculum and plan | April 2019 – August 2019 |

| Milestone 5.0 Provide Leadership Education | |
| --- | --- |
| Tasks | Timeline |
| - Deliver up to 12 days of training over the remainder of the fiscal year.  Dependent upon the new education effort, may include initiation of several cohorts or segments of leadership education.<br>- Facilitation of all training curriculum<br>- Evaluation of program –<br>  • Participant pre-survey at initial session and post survey on last day of final session<br>  • Session evaluations at end of each training day<br>- Follow up meetings with Judicial Branch to gather feedback<br>- Modify curriculum based on participant and client feedback | Sept 2019 – March 31, 2020 |

| Milestone 6.0 - Develop Inclusion Workshop | |
| --- | --- |
| Tasks | Timeline |
| - Clarify desired outcomes and competencies with Chief Justice, State Court Administrator and Chief Human Resources Officer<br>- Meet with HR staff to design an Inclusion curriculum that integrates current Cultural Competency training and other leadership training<br>- Draft curriculum based on identified goals and outcomes<br>- Create training materials | October 2019 – January 2020 |

| Milestone 7.0 – Deliver Inclusion Workshop | |
|---|---|
| Tasks | Timeline |
| - Deliver one (1) day of training<br>- Facilitation of all training curriculum<br>- Evaluation of program –<br>    o Session evaluations at end of the training day<br>- Follow up meetings with Judicial Branch to gather feedback | TBD –<br>tentatively Jan-Feb 2020 |
| Milestone 8.0 – Strategy and Consultation Hours | |
| Tasks | Timeline |
| - Provide up to 50 hours of strategy and consultation to the Chief Justice, State Court Administrator and/or Chief Human Resources Officer<br>- Provide Chief Justice, State Court Administrator and Chief Human resources Officer information obtained through district visits, focus groups and personal interviews as appropriate | March 2019 – March 2020 timing at the discretion of the Chief Justice, State Court Administrator and Chief Human Resources Officer |

Location for all work described above will be as follows:

☐ Meetings with Judicial Department staff will take place at Judicial Department offices in Denver or on-site at courts house in the State of Colorado.

☐ Ongoing planning, coordination and curriculum development will take place at The Leadership Practice.

☐ The Annual Summit, Leadership Programs and Inclusion Workshop sessions will take place at location determined by Judicial Department staff.

**Exhibit B.    Compensation & Payment Schedule**

**B-1.    Compensation for Services:**

A. **For Specified Services.** Contractor shall be compensated a total of $532,000 annually for the performance of the following specified services as further detailed in Exhibit A:

| | |
|---|---|
| Annual Leadership Summit | Gather stakeholder feedback, plan, and facilitate 1.5 days |
| Leadership Education | Gather stakeholder feedback, redesign, plan, and facilitate up to 12 days of education |
| Inclusion Workshop | Design and deliver 1 day of education |
| Strategy and Consultation hours with Chief Justice, State Court Administrator and Chief Human Resources Officer | Up to 50 hours per year |
| **Total Cost** | **$532,000 each year for up to 5 years** |

The following are not included in the annual budget as provided above and will be provided by the Department at the Department's expense: Keynote or additional speakers selected by the Department, venue coordination, venue costs, copied materials, assessment costs, assessment coordination, food and beverage costs, and staff to coordinate events.

The Department will not reimburse Contractor for travel or other expenses associated with the performance of Specified Services.

B. **For Additional Services.** Contractor may provide additional optional services for the Department pursuant to the terms of the Agreement at the following rates:

| | |
|---|---|
| Teambuilding (team of 10 or less) | $2,700/day |
| Retreat Facilitation (teams of 11-60) | $4,000-$5,000/day |
| Personal Coaching | $250/hour |

A separate written agreement must be executed prior to the performance of any Additional Services detailing the scope of the Additional Services to be performed. Contractor may be reimbursed for travel and other expenses associated with the performance of Additional Services upon mutual agreement of the Parties. To be eligible for reimbursement, travel and other expenses must be pre-approved by the Department. The Department will not compensate Contractor for travel or other expenses associated with the performance of Additional Services that were not approved in advance by the Department.

**B-2.**    **Payment Schedule**:

Contractor shall initiate payment requests by submitting monthly invoices to the Department on a mutually agreed schedule. Each monthly invoice shall include 1/12 of the amount of the annual fee for Specified Services ($44,333.33) and the cost of any Additional Services performed in the month preceding the month in which the invoice is delivered. Invoices must also include narrative reports detailing services provided, specific milestones met or deliverables provided, and estimated or actual timeframes for completion of remaining milestones or deliverables as requested by the Department.

**B-3.**    **Total Amount Payable:**

The total amount payable under this Agreement for Specified Services and Additional Services shall not exceed $550,000 per year (April through March). Any expenditure for Additional Services that increases the value of this Agreement beyond $550,000 must be approved in the separate written agreement authorizing the performance of the Additional Services.

The Leadership Practice, LLC
Leadership Program
Apr2019-Mar2024                                                                Exhibit B - Page 2 of 2

COLORADO JUDICIAL DEPARTMENT
AGREEMENT FOR SERVICES
BY INDEPENDENT CONTRACTOR

1. PARTIES. This Agreement is made between the COLORADO JUDICIAL DEPARTMENT ("Department"), by and through the OFFICE OF THE STATE COURT ADMINISTRATOR, and THE LEADERSHIP PRACTICE, LLC ("Contractor"), an independent contractor doing business as a Colorado limited liability company. Department and Contractor may individually be referred to as "Party" or collectively as "Parties." In consideration of their mutual promises and for their mutual benefit, the Parties agree as follows:

2. RECITALS AND PURPOSE.

   A. The Department needs a highly experienced vendor with extensive court and probation experience who understands the Department's unique leadership organizational structure to partner with the Department to develop and facilitate a sustainable leadership strategy that addresses the continued development of formal and informal leaders at various levels throughout the Department.

   B. Contractor is qualified, willing, and able to meet the Department's needs.

3. AUTHORITY.

   A. The Department has determined in its sole discretion to award Contractor the opportunity to provide the services described in this Agreement for a period not to exceed five years.

   B. Authority exists in the law and funds have been budgeted, appropriated, and otherwise made available, and a sufficient uncommitted balance thereof remains available for encumbering and subsequent payment for purposes of this Agreement.

4. EFFECTIVE DATE. This Agreement shall not be valid or enforceable until it is fully executed by both Parties (the "Effective Date"). The Department shall not be bound by any provision of this Agreement before the Effective Date, and shall have no obligation to pay Contractor for any work performed or expense incurred before the Effective Date.

5. TERM OF THE AGREEMENT.

   A. Initial Term; Work Commencement. The Parties' respective performances under this Agreement shall commence on the latter of the Effective Date or April 1, 2019 and shall terminate on March 31, 2024 ("Initial Term") unless sooner terminated or renewed in accordance with the terms of this Agreement.

   B. End of Term Extension. In the event this Agreement approaches the end of its Initial Term, the Department, at its discretion, upon written notice to Contractor as provided in §36, may unilaterally extend the Initial Term for a period not to exceed three months (an "End of Term Extension"). The provisions of this Agreement in effect when such notice is given shall remain in effect during the End of Term Extension. The End of Term Extension shall automatically terminate upon execution of a replacement contract or modification extending the total term of the Agreement.

   C. Survival of Certain Terms. Any provision of this Agreement that imposes an obligation after termination or expiration of the Agreement shall survive the termination or expiration of the Agreement.

6. SCOPE OF WORK. The Contractor shall complete the services described in **Exhibit A** in accordance with the terms and conditions of this Agreement. The Department shall have no liability to compensate Contractor in connection with any services performed outside the scope of **Exhibit A**.

7. <u>FEE AND PAYMENT</u>.

   A. <u>Fee</u>. The Department shall compensate Contractor for services performed under this Agreement. The Department shall pay the Contractor in the amounts and in accordance with the schedule and other conditions set forth in **Exhibit B**.

   B. <u>Not a Wage or Salary</u>. It is specifically agreed that the fees paid under this Agreement are neither salary nor hourly wage, and any computation of fees based on performance time is for convenience of the Parties in determining value of service and not as salary or hourly wage.

   C. <u>Method of Payment</u>. Contractor shall initiate payment requests by submitting invoices to the Department on the schedule set forth in **Exhibit B**. Upon approval of the charges, Department shall promptly pay through its normal payment procedures. The Department's acceptance of an invoice does not constitute acceptance of services performed under this Agreement.

   D. <u>Disputes</u>. If the Contractor disputes any calculation, determination or amount of any payment, the Contractor shall notify the Department of its dispute within 30 days following the Contractor's receipt of the payment or notification of the determination or calculation of the payment by the Department, as appropriate. The Department will review the information presented by the Contractor and may make changes to its determination based on this review. The calculation, determination or payment amount that results from the Department's review shall be final. No payment that is subject to a dispute under this subsection shall be due until after the Department has concluded its review.

   E. <u>Erroneous Payments</u>. The Department may recover, at the Department's discretion, payments made to Contractor in error for any reason, including, but not limited to, overpayments or improper payments, and unexpended or excess funds received by Contractor. The Department may recover such payments by deduction from subsequent payments under this Contract, deduction from any payment due under any other contracts, grants or agreements between the Department and Contractor, or by any other appropriate method for collecting debt.

8. <u>STATUS AS INDEPENDENT CONTRACTOR</u>. This Agreement does not constitute a hiring by either Party. It is the Parties' intention that Contractor shall be an independent contractor and not Department's employee for all purposes, including, but not limited to, the Federal Insurance Contribution Act, the Social Security Act, the Federal Unemployment Tax Act, the provisions of the Internal Revenue Code, the Colorado Workers' Compensation Act, the Colorado Unemployment Insurance Act, and the Public Employees Retirement Association. Accordingly, no federal, state or local income tax or payroll tax of any kind, and no retirement contribution shall be withheld or paid by Department on behalf of Contractor or the employees of Contractor, if any.

9. <u>PERFORMANCE SPECIFICATIONS</u>. Department shall not exercise control over Contractor by overseeing the actual work or instructing Contractor as to how the work will be performed; however the parties agree that Contractor shall perform the services in accordance with recognized industry standards of care, skill and diligence for the type of services to be performed.

10. <u>LICENSES, PERMITS, AND OTHER AUTHORIZATIONS</u>. Contractor shall secure and maintain at all times during the term of this Agreement, at its sole expense, all licenses, permits, and other authorizations required by federal, state, and local laws and regulations to perform its obligations under this Agreement.

11. <u>TRAINING</u>. Department shall provide no training to Contractor, inasmuch as Contractor already possesses the skills needed to perform the work required under this Agreement.

12. <u>CRIMINAL BACKGROUND CHECK</u> .

   A. <u>Background Check</u>. The Department requires that all persons who perform services under this Agreement must pass a criminal background check before working under the Agreement, which

background check shall be valid for two (2) years. All such background checks will be carried out, at no charge to the Contractor or the worker, by the Department's Human Resources Division under standards developed by the Department. In order to request a new or renewal background check, the Contractor should provide to the worker an "Authorization and Consent for Release of Information" form, in the form to be provided by the Department, and deliver the completed form to the Department's Representative, who will process the request and inform the Contractor of the result. No person shall perform any work under this Agreement without having in place a valid criminal background check. The decision as to whether the worker passes the criminal background check will be in the sole discretion of the Department.

B. <u>Notification</u>. Contractor shall notify the Department in writing immediately upon discovering that any person performing services under this Agreement pleads guilty to, or is convicted of, a petty, misdemeanor, or felony offense during the term of this Agreement. The Contractor's report shall be accompanied by a newly completed "Authorization and Consent for Release of Information" form authorizing a new background check for the person who pled guilty or was convicted. The person who is subject of the report shall immediately cease performing services under this Agreement until otherwise informed by the Department.

13. <u>VERIFICATION OF LEGAL STATUS</u>.

A. <u>Business Entities</u>. Contractor shall comply with C.R.S. §§ 8-17.5-101 *et seq*. Contractor certifies, warrants, and agrees that it does not knowingly employ or contract with an illegal alien to perform work under this Agreement and that it shall not knowingly contract with a subcontractor that fails to certify to Contractor that subcontractor shall not knowingly employ or contract with an illegal alien to perform work under this Agreement. Contractor shall confirm eligibility of all employees who are newly hired for employment in the United States to perform work under this Agreement through participation in either (i) the "E-verify Program," jointly administered by the Department of Homeland Security and the Social Security Administration or (ii) the "Department Program" administered by the Colorado Department of Labor and Employment ("DOL"). If Contractor elects to use the Department Program, Contractor must promptly provide copies of its "Notice of Participation" to the Department and to DOL. Contractor: (i) shall not use the E-verify or Department Program to undertake pre-employment screening of job applicants; (ii) shall notify the subcontractor and the Department within 3 days if Contractor has actual knowledge that a subcontractor is employing or contracting with an illegal alien for work under this Agreement; (iii) shall terminate the subcontractor if a subcontractor does not stop employing or contracting with the illegal alien within 3 days of receipt of notice; and (iv) shall comply with reasonable requests made during an investigation, undertaken by DOL pursuant to C.R.S. §8-17.5-102(5). If Contractor fails to comply with C.R.S. §8-17.5-101 et seq., Department may terminate this Agreement and Contractor shall be liable for actual and consequential damages.

B. <u>Sole Proprietors and Natural Persons</u>.

i. Contractor, if a natural person eighteen years of age or older, swears and affirms under penalty of perjury under Colorado state law that s/he is a United States citizen, legal permanent resident of the United States, or lawfully present in the United States pursuant to federal law. **Contractor shall provide proof that s/he is lawfully present in the United States prior to starting work for the Department by complying with §24-76.5-101 C.R.S., et seq., and producing a required form of identification upon signing this Agreement (e.g. driver's license)**. In signing this Agreement, Contractor acknowledges that making a false, fictitious, or fraudulent statement is punishable as perjury in Colorado, and it shall constitute a separate offense each time a public benefit is fraudulently received.

ii. Contractor must notify the Department in writing immediately if Contractor is no longer lawfully present in the United States pursuant to federal law, and/or if there is any change

to Contractor's status that may impact Contractor's ability to lawfully perform the duties contained in this Agreement, including the expiration of any visa or authorization or change in policy if Contractor is the recipient of any deferred status.

14. PERA STATUS. At all times during the term of this Agreement, Contractor shall have a duty to notify the Department of the existence of any person, including Contractor himself/herself if doing business as an individual or sole proprietor, who is providing services to the Department under this Agreement who is a service retiree from the Public Employee Retirement Association (PERA) of Colorado, and who is also an owner or operator, or is related to an owner or operator, of the Contractor business entity. If the retiree has in the past worked as a government employee in a position covered by PERA, but will not be receiving retirement benefits from PERA during the term of this Agreement, Contractor shall also notify the Department in the event the retiree's status changes to that of PERA benefit recipient during the term of this Agreement. If the retiree is currently receiving retirement benefits from PERA, Contractor understands and agrees, and shall also notify said retiree, that in the event the retiree experiences any reduction or loss of PERA retirement benefits due to work under this Agreement, the Department shall not be liable for reimbursement of any such reduction or loss.

15. **INCOME TAXES. Contractor understands and agrees that Contractor is responsible to pay, according to law, Contractor's federal, state and local income taxes. If Contractor is not a corporation, Contractor further understands and agrees to pay any self-employment (social security) tax that may be required by law.**

16. **UNEMPLOYMENT COMPENSATION. Contractor shall not be entitled to unemployment insurance benefits for work performed under this Agreement, unless unemployment compensation coverage is provided by Contractor or by some entity other than Department.**

17. **WORKERS' COMPENSATION. No workers' compensation insurance shall be obtained by Department concerning Contractor or the employees of Contractor, if any. Contractor shall comply with workers' compensation law concerning Contractor and the employees of Contractor, if any.**

18. **FRINGE BENEFITS. Because Contractor is engaged in Contractor's own independent business, Contractor is not eligible for, and shall not participate in, any employer pension, health, or other fringe benefit plan of the Department.**

19. VENDOR OFFSET. Pursuant to §24-30-202.4, as amended, C.R.S., the State Controller may withhold payment under the State's vendor offset intercept system for debts owed to State agencies for: (a) unpaid child support debt or child support arrearages; (b) unpaid balance of tax, accrued interest, or other charges specified in Article 21, Title 39, as amended, C.R.S.; (c) unpaid loans due to the Student Loan Division of the Department of Higher Education; (d) owed amounts required to be paid to the Unemployment Compensation Fund; and (e) any other unpaid debts owing to the State of any agency thereof, the amount of which is found to be owing as a result of final agency determination or reduced to judgment as certified by the Controller.

20. INSURANCE REQUIREMENTS.

   A. Contractor shall obtain, and maintain at all times during the term of this Agreement, insurance in the following kinds and amounts:

   (i)    Workers' Compensation Insurance as required by state statute, and Employer's Liability Insurance covering all of contractor's employees acting within the course and scope of their employment.

   (ii)   Commercial General Liability Insurance written on an ISO occurrence form, covering premises operations, fire damage, independent contractors, products and completed

operations, blanket contractual liability, personal injury, and advertising liability with minimum limits as follows:

a.      $1,000,000 each occurrence;

b.      $1,000,000 general aggregate;

c.      $1,000,000 products and completed operations aggregate; and

d.      $50,000 any one fire.

If any aggregate limit is reduced below $1,000,000 because of claims made or paid, Contractor shall immediately obtain additional insurance to restore the full aggregate limit and furnish to the Department a certificate or other document satisfactory to the Department showing compliance with this provision.

(iii)    Automobile Liability Insurance covering any auto used in performance of this Agreement (including owned, hired and non-owned autos) with a minimum limit of $1,000,000 each accident combined single limit.

(iv)    Professional liability insurance with an aggregate limit of at least $1,000,000. For policies written on a claims-made basis, the policy shall include an endorsement, certificate or other evidence that coverage extends two years beyond the performance period of the Agreement. The insurance policy shall not contain a sexual misconduct exclusion.

B.  The State of Colorado shall be named as additional insured on the Commercial General Liability and Automobile Liability policies. Coverage required by this Agreement shall be primary over any insurance or self-insurance program carried by the State of Colorado.

C.  The above insurance policies shall include provisions preventing cancellation or non-renewal without at least 30 days prior notice to Contractor, and Contractor shall notify the Department by certified mail, personal delivery with receipt or email of any such imminent cancellation or non-renewal within seven (7) days after Contractor's receipt of such notice.

D.  Contractor shall require all insurance policies in any way related to this Agreement and secured and maintained by Contractor to include clauses stating that each carrier shall waive all rights of recovery, under subrogation or otherwise, against the State of Colorado, its agencies, institutions, organizations, officers, agents, employees and volunteers.

E.  All policies evidencing the insurance coverage required hereunder shall be issued by insurance companies satisfactory to the State.

F.  Contractor shall provide certificates showing insurance coverage required by this Agreement to the Department within 7 business days of the Effective Date of this Agreement, if not previously provided, but in no event later than the commencement of the services or delivery of the goods under this Agreement. No later than 15 days prior to the expiration date of any such coverage, Contractor shall deliver to the Department certificates of insurance evidencing renewals thereof. At any time during the term of this Agreement, the Department may request in writing, and Contractor shall thereupon within 10 days supply to the Department, evidence satisfactory to the Department of compliance with the provisions of this section.

21. <u>CONFIDENTIALITY</u>. In the event that Contractor obtains access to any records or files of the Department in connection with this Agreement, or in connection with the performance of its obligations under this Agreement, Contractor shall keep such records and information confidential and shall comply with all laws and regulations concerning the confidentiality of such records to the same extent as such laws and regulations apply to the Department. Contractor shall notify its employees and agents, if any, that they are subject to the confidentiality requirements as set forth above, and shall provide each

employee or agent with a written explanation of the confidentiality requirements before the employee or agent is permitted access to confidential data.

22. <u>COPYRIGHT/OWNERSHIP OF MATERIALS</u>. By virtue of the compensation paid by the Department for services rendered by the Contractor and its employees or agents under this Agreement, Contractor acknowledges that adequate compensation will have been paid for any data, materials, or work products produced or created by the Contractor as a result of this Agreement. Contractor grants to the Department all right, title and interest in and to all such data, materials, or work products. Further, all copyrights, patents and royalties, if any, arising from the distribution of such data, materials or work products shall become the property of the Department or its assigns. To the extent required by the Department, Contractor shall place a notice of the Department's copyright on any or all materials produced under this Agreement.

23. <u>PUBLICITY RELEASES</u>. Contractor agrees not to refer to this Agreement or the services provided pursuant to this Agreement in commercial advertising in such a manner as to state or imply that the services provided are endorsed or preferred by the Department.

24. <u>COMPLIANCE WITH LAW</u>. The Parties shall comply with the letter and spirit of all applicable federal, state and local laws and regulations related to performance under this Agreement, including but not limited to the Colorado Antidiscrimination Act of 1957, as amended, (Section 24-34-401 et seq., C.R.S.) and other applicable law respecting discrimination and unfair employment practices.

25. <u>CHOICE OF LAW; VENUE</u>. The construction, interpretation and performance of this Agreement shall be governed by the laws of the State of Colorado, and any claim arising out of or relating to this Agreement or breach thereof shall be brought exclusively in the state courts of Colorado.

26. <u>INDEMNIFICATION</u>. To the maximum extent allowable by law, Contractor shall indemnify, save and hold harmless the Department, its employees and agents, against any and all claims, damages, liability and court awards including costs, expenses, and attorney fees incurred as a result of any act or omission by Contractor, or its employees, agents, subcontractors, or assignees pursuant to the terms of this Agreement.

27. <u>LITIGATION REPORTING</u>. If Contractor is served with a pleading or other document in connection with an action before a court or other administrative decision making body, and such pleading or document relates to this Agreement or may affect Contractor's ability to perform its obligations under this Agreement, Contractor shall, within 10 days after being served, notify the Department of such action and deliver copies of such pleading or document to the Department's principal representative.

28. <u>TAX EXEMPTION</u>. The Department is exempt from the payment of federal, state, and/or local government tax assessments. Contractor shall collect no tax from the Department, and the Department shall have no liability to Contractor for such taxes regardless of whether any political subdivision of the state imposes such taxes on the Contractor.

29. <u>SEVERABILITY</u>. If any part of this Agreement shall be held unenforceable, the rest of this Agreement will nevertheless remain in full force and effect provided that the Parties can continue to perform their obligations under this Agreement in accordance with its intent.

30. <u>NON-WAIVER</u>. The failure of either Party to exercise any of its rights under this Agreement for a breach thereof shall not be deemed to be a waiver of such rights or a waiver of any subsequent breach.

31. <u>ENTIRE AGREEMENT; MODIFICATIONS</u>. This Agreement, including all exhibits and attachments, is the complete integration of all understandings between the Parties. No prior or contemporaneous addition, deletion, or other amendment hereto shall have any force or effect whatsoever, unless contained in this writing. No subsequent novation, renewal, addition, deletion, or other amendment hereto shall have any force or effect unless embodied in a written contract executed by both Parties to this Agreement.

32. <u>ORDER OF PRECEDENCE</u>. In the event of a conflict or inconsistency between this Agreement and any Exhibit or attachment such conflict or inconsistency shall be resolved by reference to the documents in the following order of priority:

    A.  The provisions of the main body of this Agreement.

    B.  Exhibit A, Scope of Work.

    C.  Exhibit B, Pricing.

33. <u>ASSIGNMENT; SUBCONTRACTING</u>. Contractor's rights and obligations hereunder are personal and may not be transferred, assigned or subcontracted without the prior, written consent of the Department. Any attempt at transfer, assignment, or subcontracting without such consent shall be void. All assignments, subcontracts, or Subcontractors approved by the Department are subject to all of the provisions of this Agreement. Contractor shall be solely responsible for all aspects of subcontracting arrangements and performance.

34. <u>THIRD PARTY BENEFICIARIES</u>. Except for the Parties' respective successors and assigns described in Paragraph 33, this Agreement does not and is not intended to confer any rights or remedies upon any person or entity other than the Parties.

35. <u>TERMINATION</u>

    A.  <u>Default</u>. Either Party may terminate this Agreement upon default by the other Party, effective upon receipt of notice or at such other time as may be stated in the notice. "Default" is defined as the failure of a Party to fulfill any of its duties and obligations under this Agreement. The non-defaulting Party may in its discretion permit the other Party a period of up to two weeks to cure the default.

    B.  <u>Loss of Funds</u>. The Department is prohibited by law from making commitments beyond the term of the current Department Fiscal Year. Payment to Contractor beyond the current Department Fiscal Year is contingent on the appropriation and continuing availability of funding in any subsequent year. In the event that funding for any activity established by this Agreement is discontinued or decreased by the State of Colorado, or any federal funding source, Department may terminate this Agreement or reduce its scope effective immediately upon receipt of notice without penalty.

    C.  <u>Public Interest</u>. The Department is entering into this Agreement for the purpose of carrying out the public policy of the Colorado Judicial Branch. If this Agreement ceases to further such public policy, the Department may terminate this Agreement, in whole or in part, for convenience of the Department, when the interests of the Department so require. The Department shall give at least thirty (30) days written notice of such termination, specifying the part of the Agreement terminated and when the termination becomes effective.

    D.  <u>Force Majeure</u>. If acts of God or government authorities, natural disasters, or other emergencies beyond a party's reasonable control make it illegal or impossible for such Party to perform its obligations under this Agreement, such Party may terminate this Agreement upon written notice to the other Party without liability.

    E.  <u>Final Payment</u>. In the event of termination for any reason, Contractor shall be compensated for the value of services actually performed prior to the effective date of the termination.

36. <u>PARTY REPRESENTATIVES; NOTICES</u>. The following persons are hereby designated by their respective employers as their representatives for the management of this Agreement:

FOR THE DEPARTMENT

Name: Chris Ryan
Title: State Court Administrator
Phone: (720) 625-5000
Email: christopher.ryan@judicial.state.co.us

FOR CONTRACTOR

Name: Mindy Masias
Title: Owner and Operator
Phone: (303) 656-8276
Email: mindy.masias@leadershippractice.org

Either Party may designate a substitute representative by notice to the other Party. Notices required or permitted to be given under this Agreement shall be in writing and shall be delivered by hand with receipt required, by certified or registered mail to such Party's representative at the address set forth above or as an email with read receipt requested to the representative at the email address, if any, set forth above. If a Party delivers a notice to another through email and the email is undeliverable and the Party is not provided with an alternate email contact, then the Party delivering the notice shall deliver it by hand with receipt required or by certified or registered mail to such Party's representative at the address set forth below. Unless otherwise provided in this Agreement, notices shall be effective upon receipt of the written notice.

37. COUNTERPARTS; ELECTRONIC SIGNATURES AND ELECTRONIC RECORDS. This Agreement and any amendments hereto may be executed in several counterparts, each of which shall be deemed an original, and all of which together shall constitute one agreement binding on the Parties. The Parties consent to the use of electronic signatures by either Party. The Agreement, and any other documents requiring a signature hereunder, may be signed electronically by the Parties in the manner specified by the Parties. The Parties agree not to deny the legal effect or enforceability of this Agreement solely because it is in electronic form or because an electronic record was used in its formation. The Parties agree not to object to the admissibility of this Agreement in the form of an electronic record, or a paper copy of an electronic document, or a paper copy of a document bearing an electronic signature, on the ground that it is an electronic record or electronic signature or that it is not in its original form or is not an original.

38. SIGNATURE AUTHORITY. By signing this Agreement, the person signing on behalf of Contractor hereby swears and affirms that they are authorized to act on Contractor's behalf and acknowledge that the Department is relying on their representations to that effect.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the dates written below.

STATE OF COLORADO
JUDICIAL DEPARTMENT

By: Christopher T. Ryan
Title: State Court Administrator
Date: 6/3/2019

THE LEADERSHIP PRACTICE, LLC

By: Mindy Masias
Title: President/Owner
Date: April 8, 2019

**Exhibit A – Scope of Work**

**A.1    Annual Scope of Work - April 1, 2019-March 31, 2020**

| Milestone 1.0 – Solicit feedback from key stakeholders for the Annual Leadership Summit | |
| --- | --- |
| Activities | Timeline |
| - Hold initial meetings with identified Judicial key stakeholder staff, Chief Justice, State Court Administrator and Chief Human Resources Officer<br>- Conduct a flash survey of all Judicial Staff in collaboration with HR staff<br>- Establish communication streams for program coordination and consulting<br>- Clarify goals and outcomes of the summit<br>- Confirm roles and responsibilities and lines of communication<br>- Create open communication and feedback | April 1- July, 2019 |

| Milestone 2.0 - Develop Annual Leadership Agenda | |
| --- | --- |
| Tasks | Timeline |
| - Review of all feedback<br>- Develop agenda<br>- Present draft agenda to the Chief Justice, State Court Administrator and Chief Human Resources Officer – define roles, etc.<br>- Obtain final authorization of agenda | Aug 1, 2019 |

| Milestone 3.0 – Facilitate Annual Leadership Summit | |
| --- | --- |
| Tasks | Timeline |
| - Facilitate summit<br>- Provide follow up documentation from event | Aug 14-15, 2019 Summit<br>Aug 30, 2019 Follow Up Items Delivered |

| Milestone 4.0 – Redesign Leadership Education Program | |
| --- | --- |
| Tasks | Timeline |
| - Hold focus groups and personal interviews of leadership graduates to solicit areas of strength and weakness of current efforts<br>- Work with HR staff to redesign the leadership program<br>- Incorporate Annual Leadership Summit take aways<br>- Obtain State Court Administrator and Chief Justice approval of leadership program curriculum and plan | April 2019 – August 2019 |

| Milestone 5.0 Provide Leadership Education | |
| --- | --- |
| Tasks | Timeline |
| - Deliver up to 12 days of training over the remainder of the fiscal year.  Dependent upon the new education effort, may include initiation of several cohorts or segments of leadership education.<br>- Facilitation of all training curriculum<br>- Evaluation of program –<br>  • Participant pre-survey at initial session and post survey on last day of final session<br>  • Session evaluations at end of each training day<br>- Follow up meetings with Judicial Branch to gather feedback<br>- Modify curriculum based on participant and client feedback | Sept 2019 – March 31, 2020 |

| Milestone 6.0 - Develop Inclusion Workshop | |
| --- | --- |
| Tasks | Timeline |
| - Clarify desired outcomes and competencies with Chief Justice, State Court Administrator and Chief Human Resources Officer<br>- Meet with HR staff to design an Inclusion curriculum that integrates current Cultural Competency training and other leadership training<br>- Draft curriculum based on identified goals and outcomes<br>- Create training materials | October 2019 – January 2020 |

| **Milestone 7.0 – Deliver Inclusion Workshop** | |
| --- | --- |
| Tasks | Timeline |
| - Deliver one (1) day of training<br>- Facilitation of all training curriculum<br>- Evaluation of program –<br>    o Session evaluations at end of the training day<br>- Follow up meetings with Judicial Branch to gather feedback | TBD –<br>tentatively Jan-Feb 2020 |

| **Milestone 8.0 – Strategy and Consultation Hours** | |
| --- | --- |
| Tasks | Timeline |
| - Provide up to 50 hours of strategy and consultation to the Chief Justice, State Court Administrator and/or Chief Human Resources Officer<br>- Provide Chief Justice, State Court Administrator and Chief Human resources Officer information obtained through district visits, focus groups and personal interviews as appropriate | March 2019 – March 2020 timing at the discretion of the Chief Justice, State Court Administrator and Chief Human Resources Officer |

Location for all work described above will be as follows:

☐ Meetings with Judicial Department staff will take place at Judicial Department offices in Denver or on-site at courts house in the State of Colorado.

☐ Ongoing planning, coordination and curriculum development will take place at The Leadership Practice.

☐ The Annual Summit, Leadership Programs and Inclusion Workshop sessions will take place at location determined by Judicial Department staff.

**Exhibit B.**     **Compensation & Payment Schedule**

**B-1.    Compensation for Services:**

A. **For Specified Services.** Contractor shall be compensated a total of $532,000 annually for the performance of the following specified services as further detailed in Exhibit A:

| | |
|---|---|
| Annual Leadership Summit | Gather stakeholder feedback, plan, and facilitate 1.5 days |
| Leadership Education | Gather stakeholder feedback, redesign, plan, and facilitate up to 12 days of education |
| Inclusion Workshop | Design and deliver 1 day of education |
| Strategy and Consultation hours with Chief Justice, State Court Administrator and Chief Human Resources Officer | Up to 50 hours per year |
| **Total Cost** | **$532,000 each year for up to 5 years** |

The following are not included in the annual budget as provided above and will be provided by the Department at the Department's expense: Keynote or additional speakers selected by the Department, venue coordination, venue costs, copied materials, assessment costs, assessment coordination, food and beverage costs, and staff to coordinate events.

The Department will not reimburse Contractor for travel or other expenses associated with the performance of Specified Services.

B. **For Additional Services.**  Contractor may provide additional optional services for the Department pursuant to the terms of the Agreement at the following rates:

| | |
|---|---|
| Teambuilding (team of 10 or less) | $2,700/day |
| Retreat Facilitation (teams of 11-60) | $4,000-$5,000/day |
| Personal Coaching | $250/hour |

A separate written agreement must be executed prior to the performance of any Additional Services detailing the scope of the Additional Services to be performed. Contractor may be reimbursed for travel and other expenses associated with the performance of Additional Services upon mutual agreement of the Parties. To be eligible for reimbursement, travel and other expenses must be pre-approved by the Department. The Department will not compensate Contractor for travel or other expenses associated with the performance of Additional Services that were not approved in advance by the Department.

**B-2.     Payment Schedule**:

Contractor shall initiate payment requests by submitting monthly invoices to the Department on a mutually agreed schedule. Each monthly invoice shall include 1/12 of the amount of the annual fee for Specified Services ($44,333.33) and the cost of any Additional Services performed in the month preceding the month in which the invoice is delivered. Invoices must also include narrative reports detailing services provided, specific milestones met or deliverables provided, and estimated or actual timeframes for completion of remaining milestones or deliverables as requested by the Department.

**B-3.     Total Amount Payable:**

The total amount payable under this Agreement for Specified Services and Additional Services shall not exceed $550,000 per year (April through March). Any expenditure for Additional Services that increases the value of this Agreement beyond $550,000 must be approved in the separate written agreement authorizing the performance of the Additional Services.

The Leadership Practice, LLC
Leadership Program
Apr2019-Mar2024                                                                            Exhibit B - Page 2 of 2

# Appendix 6

# Letter from Chirstopher Ryan to Deputy State Auditor Kerri Hunter, dated August 22, 2018.

# Office of the State Court Administrator



**Christopher T. Ryan**
*State Court Administrator*

**Mindy Masias**
*Chief of Staff*

**Terri Morrison**
*Judicial Legal Counsel*

**DIRECTORS**

**Steven Vasconcellos**
*Court Services*

**David Kribs, CFO**
*Financial Services*

**Eric D. Brown**
*Human Resources*

**Chad Cornelius, CIO**
*Information Technology Services*

**Glenn Tapia**
*Probation Services*

August 22, 2018

Kerri Hunter
Deputy State Auditor
Office of the State Auditor
1525 Sherman Street, 7th Floor
Denver, CO  80203

**Re: Disclosure of Employee Reimbursement Issue**

We have information that leads us to believe that on July 15, 2018, Mindy Masias, the current Chief of Staff for the Colorado Judicial Department and an employee of the Colorado Judicial Department for more than 20 years, signed a personal reimbursement request form that included a receipt from Amazon.com Inc. that appears to have been altered.  This was discovered on July 19, 2018 when Myra Dukes (Controller) retrieved the submitted reimbursement request from the accounting unit.  David Kribs (CFO) and Marty Galvin (Sr. Finance Manager) brought this to my attention on July 19, 2018.   Ms. Masias was subsequently provided numerous opportunities to explain the altered document, or to provide documentation showing that the Amazon receipt in question was in fact a valid receipt.  Ms. Masias has not been able to do so.  Rather, all additional information we have received has confirmed the altered nature of the receipt.

Management within the Office of the State Court Administrator has serious concerns with Ms. Masias' submission of what we believe to be an altered Amazon invoice because her conduct violates Colorado Judicial Department policy.  Chief Justice Directive 04-02 states that all Judicial Department personnel shall comply with the fiscal policies and procedures established by the State Court Administrator.  The Colorado Judicial Department Fiscal Rules and Procedures Chapter 1-2 states that funds shall not be disbursed without appropriate documentation and authorization of the goods purchased.  Ms. Masias attempted to circumvent the policy and procedure control process by submitting altered documents for the reimbursement and has likely violated Colorado law.

The Judicial Department has developed and implemented an internal control framework that provides management of the organization with reasonable assurance that the financial records, transactions, and activity are accurate and in compliance with established general accounting principles.  The organization depends on this framework to function as it is developed and intended.  The control environment includes both hard controls (automated systems) and soft controls (policies and procedures).

When an employee attempts to circumvent the established framework, the integrity of the system must be maintained, and appropriate steps taken to discourage this conduct. On Friday, August 17th, I informed Ms. Masias that, due to concerns about the integrity of the Colorado Judicial Department's financial systems, the following actions will be taken:

1. The Office of the State Auditor will be notified as part of the disclosures related to the statewide audit currently being performed. In addition, the Office of the State Auditor will be informed of the actions that have been taken internally to address the concerns raised by the altered Amazon receipt.
2. The Department will no longer reimburse Ms. Masias for out-of-pocket and travel-related expenditures.
3. Ms. Masias will no longer be allowed to approve any expenditures from any budget, including providing authorization for expenditures as a supervisor or budget manager.
4. Ms. Masias will no longer be allowed to be an authorized signer for Colorado Judicial Department documents, including contracts, intent-to-apply for grant forms, grant applications, and grant awards.

The Department may take other actions as necessary and required by Department policies and rules. Attached are copies of the emails and supporting documents, including the Amazon invoice, as well as any additional records pertaining to Ms. Masias. Enclosed with the letter is a copy of a timeline with supporting background information detailing how the altered Amazon receipt came to light. Also enclosed are relevant fiscal rules informing the decisions related to Ms. Masias.

Please feel free to contact me at 720-625-5151 with any questions or concerns.

Sincerely,

Christopher T. Ryan
State Court Administrator

cc: Mitch McFarland, RubinBrown, LLP

# Appendix 7

**Correspondence between Colorado State Auditor Dianne Ray and Chief Justice Nathan Coats with letters dated May 16, 2019 and May 29, 2019.**



Office of the State Auditor

Dianne E. Ray, CPA
State Auditor

<span style="color:red">CONFIDENTIAL</span>

VIA HAND DELIVERY

May 16, 2019

The Honorable Nathan B. Coats, Chief Justice
Colorado Supreme Court
2 East 14th Avenue
Denver CO 80203

Dear Chief Justice Coats:

The Office of the State Auditor (OSA) received an anonymous report to its Fraud Hotline concerning individuals and activities at the State Court Administrator's Office. We have conducted an initial screening of the report and determined that certain aspects of the report constitute allegations of occupational fraud (i.e., misappropriation of assets) that fall within the scope and jurisdiction of the Hotline.

Therefore, as required by Section 2-3-110.5(3)(b), C.R.S., we are referring this Hotline report to the Judicial Department, which has the responsibility for determining and taking appropriate action on the referred allegation. Due the nature of the complaint and the named individuals involved, we determined it was appropriate to address this referral directly to your attention. We have attached the workpapers related to the OSA's intake and screening of the Hotline report.

As the affected state agency, the Judicial Department may:

- Conduct an investigation internally with no involvement by the OSA.
- Conduct an investigation internally, but request the assistance of the OSA.
- Request that the OSA conduct an investigation.

Please contact me or Greg Fugate (greg.fugate@state.co.us, 303.869.2839) with any questions you have related to this Hotline referral, or if the Judicial Department is requesting that the



We Set the Standard for Good Government

State Services Building • 1525 Sherman Street, 7th Floor • Denver, Colorado 80203-1700
Phone: 303.869.2800

Office of the State Auditor
Page 2

OSA either conduct or assist with an investigation of this referred allegation. This referral has been assigned Ticket #20180081 for tracking purposes.

Section 2-3-110.5(4), C.R.S., requires the Judicial Department to report to the OSA by August 14, 2019 (i.e., within 90 days) on the disposition of this referral, including actions taken to respond to the fraud allegation and the results of any subsequent investigation. If a disposition has not been reached within 90 days, the Judicial Department must report to the OSA by August 8, 2019 on the status of the referral and then every 90 days thereafter until a disposition is reached. This disposition reporting requirement does not apply if the Judicial Department requests that the OSA conduct or assist with an investigation of the referred allegation.

Thank you for your assistance as we work together to fight occupational fraud and improve Colorado state government.

Sincerely,

Dianne E. Ray, CPA
State Auditor
303.869.2801
dianne.ray@state.co.us


Attachment:    Intake and Screening Report – Ticket #20190081

Mr. Governor and Chief Justice.

The moral of the employees at the State Court Administrator's Office is horrible as everyone is living in fear. Chris Ryan and senior staff have destroyed what used to be a positive environment. Nobody trusts anything they say as it has been a series of lies and deception. They all went to Virginia last year for a rowing class that cost thousands of dollars. This was a huge waste of money that did nothing for the good of the office. They have also had two women teach hundreds of judicial employees management skills for millions of dollars. They have also spent millions of dollars on consultants for ITS. This has caused everyone in ITS to believe they will be fired because the consultant doesn't like them. Management of the office believes it's ok to have retreats and meetings at resorts in the mountains. Most employees can't even afford to go these places.

Besides wasting money, Chris Ryan has continued to pay senior staff who are not working. Jane Hood, Mindy Masias and David Kribs are all still being paid but have not worked in months. Jane Hood disappeared one day because she was watching Mindy Masias and Eric Brown. She has been paid for months to not disclose what she had. Mindy Masias committed fraud and threatened to sue Chris Ryan, so she was put on FMLA. Chris Ryan, Eric Brown and Mindy Masias are part of a cover up of FMLA fraud. David Kribs was not showing up for work and is still being paid. Mindy Masias and Eric Brown travel together and speak at conferences for the National Center of State Courts. They earn consulting and speaking fees as judicial employees on state time. Eric doesn't use a state computer so there is no way to see how much consulting work he does during the day. They both speak on ethics and management eventhough they are covering up fraud. Mindy and Eric spoke at the NACM conference in Arkansas while Mindy was still on FMLA or 2 days after it was done.

There is so much more to write and so many more details, but everyone is terrified and sick of the corruption and coverups. Some simple questions and open records requests will make people answer questions about the management of the judicial department and bring about changes.

# $\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Colorado}$

2 East 14ᵗʰ Avenue
Denver, CO 80203
(720) 626-5460

NATHAN B. COATS
CHIEF JUSTICE

## SUPREME COURT OF COLORADO

### OFFICE OF THE CHIEF JUSTICE

**CONFIDENTIAL**

VIA HAND DELIVERY

May 29, 2019

Dianne E. Ray, CPA
State Auditor
State Services Building
1525 Sherman Street, 7ᵗʰ Floor
Denver, Colorado 80203

Dear Ms. Ray:

Thank you for your referral from the Fraud Hotline, ticketed #20180081.  My colleagues and I, along with the Attorney General, were also copied on this anonymous letter, and I have therefore already had a chance to look into these allegations myself and have been in consultation with the Attorney General about them.  After further consultation with my own and the Attorney General's staff about your letter, there is consensus, with which I am in accord, that it makes the most sense for the OSA to simply conduct the investigation, with which we will of course fully cooperate.

In large part, my decision in this regard flows from my earnest desire to have these allegations resolved as thoroughly and expeditiously as feasible.  To that end, I am anxious for my counsel, Andrew Rottman (andrew.rottman@judicial.state.co.us), to coordinate with the appropriate members of your staff concerning how your office will plan to proceed and how we may best assist with your investigation.

Thanks again.

Sincerely,

Nathan B. Coats
Chief Justice, Colorado Supreme Court

cc: Greg Fugate

# Appendix 8

# *Notice of Disciplinary Decision* from State Court Administrator Christopher Ryan to Chief of Staff Mindy Masias, dated November 7, 2018.



# Office of the
# State Court Administrator



**Christopher T. Ryan**
*State Court Administrator*

**Mindy Masias**
*Chief of Staff*

**Terri Morrison**
*Judicial Legal Counsel*

**DIRECTORS**

**Steven Vasconcellos**
*Court Services*

**David Kribs, CFO**
*Financial Services*

**Eric D. Brown**
*Human Resources*

**Chad Cornelius, CIO**
*Information Technology Services*

**Glenn Tapia**
*Probation Services*

Date:    November 7, 2018

To:      Mindy Masias
         Chief of Staff

From:    Christopher T. Ryan
         State Court Administrator

Re:      Notice of Disciplinary Decision

I have evaluated the information from the investigation into the circumstances surrounding your use of an invoice from Amazon.com, Inc. with an order date of June 19, 2018 to support a reimbursement request you signed on July 15, 2018 and submitted to the accounting department for reimbursement on that same date, in light of the Colorado Judicial Department Code of Conduct, Chief Justice Directive 04-02, and the Colorado Judicial System Fiscal Rules and Procedures.  In light of the information gleaned from the investigation, I have made a decision regarding appropriate discipline, as outlined below.

On August 22, 2018, I provided you with written notice of the investigation into the circumstances surrounding your July 15th reimbursement request.  In the August 22nd memo, I encouraged you to submit relevant and helpful information, and requested that you make yourself available to meet and answer questions related to the support for the July 15th reimbursement request.  You did so.  The specific facts and events that were investigated are as follows:

- On July 15, 2018, you emailed a reimbursement request to Myra Dukes that included an invoice from Amazon.com for "2 Big Joe Lux Milano in Shag, Ivory" bean bag chairs.  The Amazon invoice stated June 30, 2018 as the order date, and July 3, 2018 as the shipment and billing date. Ms. Dukes did not process the reimbursement request because it was unsigned.  She also noted that because of the shipping date on the invoice, the expenditure should have been billed to FY19 and required a separate reimbursement form.
- A second reimbursement, signed by you on July 15, 2018, was sent to the Accounts Payable team, and included an Amazon invoice that was identical to the invoice sent to Ms. Dukes (including order number, product description and color), but with a new order date of June 19, 2018, billing date of June 19, 2018, and shipping date of June 20, 2018, that would allow payment in FY18.
- On July 26, 2018, I met with you to discuss concerns regarding the June 19th Amazon invoice, and that it appeared to be altered.  You responded via email as follows to me and to Ms. Dukes:

1300 Broadway, Suite 1200, Denver, Colorado 80203
Phone: (720) 625-5000 • (800) 888-0001 • Fax: (720) 625-5933
http://www.courts.state.co.us

Mindy Masias
November 7, 2018
Pg. 2

> *Hi there. Chris just asked me about the receipt attached to this request for reimbursement. My apologies for the confusion. I printed one copy from the website and was sent a receipt with the chairs, which didn't match. I am assuming this is because I had to reorder the chairs on June 30 since the original color I chose was no longer available. In the end, and as I think I mentioned to you Myra, this should hit the FY19 budget since I didn't receive the products until after July 1. The correct receipt is attached.*

- With your July 26, 2018 email, you included the Amazon invoice you sent to Ms. Dukes on July 15th.
- On August 8, 2018, I again brought to your attention that we had not resolved the issue with discrepancies on the June 19th invoice, and you responded:

  > *I just looked through my account. When I originally received the chairs, I sent them back because they were white and I wanted gray, they no longer had gray and sent me white again. But the documentation isn't capturing all of that. In fact, I don't even have a copy of the receipt I originally submitted because it came from the original box. My best guess is that the sender changed my order color in order to fulfill the request.*
  >
  > *I request to pay for it myself and withdraw my request for reimbursement. I don't see how there could have been any benefit to change the date on the invoice. The administrators gave me a budget for this and next year knowing there could be some overlap. This was a one time budget for employee appreciation of staff, which is now complete.*

- On August 13, 2018, you and I met with David Kribs in another effort to resolve the concerns raised by the June 19th Amazon invoice. You showed us your Amazon account, and we noted that the only transaction listed for the time period was a transaction matching the June 30th invoice. You then stated your Amazon account was "messed up" because you had been billed three times on your Capital One credit card for the same transaction, including on June 19th. You showed us documentation supporting the alleged triple billing, but declined to provide us with a copy.
- On August 17, 2018, a review of your Capital One credit card statement confirmed that you were in fact billed only once in the amount of $161.92 for the Amazon.com purchase at issue, on July 3, 2018, which is consistent with the invoice emailed to Ms. Dukes on July 15th.

During the investigation, you and the investigator made a call to Amazon together regarding the June 19th Amazon invoice. Amazon had no record of the June 19th Amazon invoice. Amazon also had no record of any return related to the June 19th Amazon invoice. The report from the independent third-party investigator, which is attached to this notice, indicated that all of the information and evidence shows the June 19th Amazon invoice was fabricated and is not legitimate. The information obtained during the investigation and summarized in the investigation report directly undermined all of the representations you made to support the validity of the June 19th Amazon invoice, including your assertion that you had returned the chairs listed in the invoice because they were the wrong color. The emails you provided to the investigator confirmed the delivery of the chairs on one date, July 9, 2018. You confirmed for the investigator that your credit charge statement only reflects one charge for the purchase of the chairs, not multiple charges as you first claimed. The investigator, in his report, stated that he was unable to find any evidence to support that the transaction listed in the June 19th Amazon invoice ever occurred.

Mindy Masias
November 7, 2018
Pg. 3

Having completed the investigation and after review of the investigation report, I have concluded that you were dishonest with me, other Judicial Department employees, and the investigator regarding the June 19th Amazon invoice you submitted in support of your July 15th reimbursement request.  I also have determined that your actions related to the July 15th reimbursement request are in violation of the Colorado Judicial Department Code of Conduct, Chief Justice Directive 04-02, and the Colorado Judicial System Fiscal Rules and Procedures.

As the Chief of Staff for the Office of the State Court Administrator, you are expected to behave in a manner that exemplifies compliance with the rules and policies of the Judicial Department, and demonstrate integrity in your conduct.  Your failure to act with integrity, your refusal to acknowledge the impact of your actions, and your continued dishonesty throughout the investigation is seriously concerning.  Your dishonest conduct with a routine reimbursement request has created a lack of trust that is impossible to overcome.  Further, the timing of your dishonesty coincided with an audit of the State of Colorado's financial records and systems, and your conduct had to be disclosed to the independent auditors.  Your dishonesty caused third parties to question the integrity of Judicial's financial records and systems.  Because of the ongoing audit, failure to address this situation appropriately could have resulted in this information being specifically referenced in the opinion letter of the State of Colorado Comprehensive Annual Financial Report, resulting in mistrust of the Judicial Department among other agencies.  To that end, I have made the decision that termination is appropriate given the nature of your conduct, and the concerns your conduct raises.

As the Chief of Staff for the Office of the State Court Administrator, and the Division Director for the Executive Division, you are an at-will employee.  Colorado Judicial System Personnel Rules ("C.J.S.P.R."), Rule 35.A.(5).  As an at-will employee, you are not subject to the procedures for corrective or disciplinary action, as established in the C.J.S.P.R., Rule 29.A.1.  My decision to terminate your employment is not subject to appeal or review through the C.J.S.P.R.

Your termination will be effective on November 15, 2018.  You may elect to resign at any point prior to 12:00 p.m. on November 15, 2018, but after that time your separation will be considered a termination.  On November 15, 2018, you will receive your final paycheck for wages through November 15, 2018 and accrued paid time off.  The State utilizes a COBRA (continuation of health and dental plans) third-party administrator (TPA).  The TPA will send you information regarding COBRA and you will also receive information regarding state life insurance portability.

If you have any questions or concerns, please do not hesitate to contact me.

# Appendix 9

***Policy Regarding Judicial Branch Employees Conducting Work for the Judicial Branch as Independent Contractors*, from Chief of Staff Mindy Masias (on behalf of State Court Administrator Jerry Marroney) to Judicial Department Leadership, dated June 1, 2015, with Judicial Department Purchasing Fiscal Rules, effective April 2015.**

# Office of the State Court Administrator



**Gerald A. Marroney**
*State Court Administrator*

**Mindy Masias**
*Chief of Staff*

**Terri Morrison**
*Judicial Legal Counsel*
_____

**DIRECTORS**

**Sherry Stwalley**
*Court Services &
Legislative Relations*

**David Kribs, CFO**
*Financial Services*

**Eric D. Brown**
*Human Resources*

**Chad Cornelius, CIO**
*Information Technology
Services*

**Eric Philp**
*Probation Services*

**To:**    Chief Judges, Chief Probation Officers, District Administrators and SCAO Senior Staff

**From:**    Mindy Masias, Chief of Staff for
Gerald A. Marroney, State Court Administrator

**Date:**    June 1, 2015

**Re:**    Policy Regarding Judicial Branch Employees Conducting Work for the Judicial Branch as Independent Contractors

**BACKGROUND:**  The Colorado Judicial Branch has been monitoring the use of Independent Contractors to ensure compliance with all state and federal laws including but not limited to Fair Labor Standards, Section 530 of the Internal Revenue Service Revenue Act, and state unemployment regulations.

In the past, the Judicial Branch made Employee/Independent Contractor decisions independently of the Executive Branch by conducting a thorough analysis of each case.  A technological advancement by the Executive Branch allowing the Payroll System and CORE payment system to share data has created a flag system that "catches" current or previously employed state employees that share an employee and independent contractor status.   This has necessitated coordination with the Executive Branch to compel the release of vendor holds on workers identified as Independent Contractors for both current and past employees of the Judicial Branch and other Colorado state agencies.

Of additional concern is the potential for an appearance of conflict of interest that may arise when employees are conducting independent contractor work that is closely related to programs managed by the Judicial Branch.  Public trust in the impartiality of the Judicial Branch is of the utmost importance in conducting the business of the courts and probation.

**POLICY:**  In order to resolve the concerns regarding our current practices, beginning in FY16 (July 1, 2015) Colorado Judicial Branch personnel may not serve concurrently as independent contractors for the Judicial Branch. Independent contracts for current Judicial personnel that are set to expire on June 30, 2015 will not be renewed, and all other such contracts crossing over the fiscal year end shall be terminated no later than Dec 31, 2015.  This policy applies to judges, classified employees and contract employees.

---

Former judges or employees who seek to engage in independent contract work with the Judicial Branch must meet the IRS and Department of Labor factor tests set out to determine independent contract or employee status in order to be approved for such work.  Specific information utilized to make such determinations can be found on the IRS website or by accessing the following link:  IRS website.   The Human Resources Division, in consultation with the Executive Division, will review prospective contractor arrangements prior to execution of an independent contract to ensure compliance with all applicable laws and regulations and will make final determination as to appropriate status.

In accordance with Colorado Judicial System Personnel Rule 22.B.(4), Judicial employees who seek to provide services as an independent contractor for other Colorado State government entities must obtain written approval from their Administrative Authority before engaging in secondary employment.  If secondary employment is approved, Judicial employees should be encouraged to notify the government entity receiving the services of their status as a State of Colorado employee.  The receiving entity is responsible for determining whether the worker is an employee or an independent contractor for purposes of providing payment for any services performed.

Colorado Revised Statutes 13-4-104.5 addresses the temporary appointment of retired judges, thus this policy does not impact the Senior Judge Program.

# Colorado Judicial Department
# Financial Services Division

# Purchasing Fiscal Rules



Nancy E. Rice, Chief Justice
Gerald A. Marroney, State Court Administrator
David Kribs, Chief Financial Officer
Nancy Allen, Purchasing Manager

**Chief Justice Directive 04-02**

*The Colorado Supreme Court approves the fiscal policies and procedures, and subsequent amendments, established by the State Court Administrator, pursuant to the requirements of Section 13-3-106 (2), C.R.S. Each court of record, including judicial officers, probation departments, and Judicial Department personnel, shall comply with the fiscal policies and procedures established by the State Court Administrator. Upon a showing that extraordinary circumstances prevent a court or probation office from complying with a fiscal policy or procedure, the director of the financial services division may waive the application of the policy or procedure and may require a compensating control*

http://judicialnet/fin/finindex.htm

*This document prescribes the fiscal rules for purchasing and related activities of the Colorado Judicial Department. As a separate branch of government, the Judicial Department is not bound by the Colorado Procurement Code (Section 24-101-101 et. seq., C.R.S.), and/or the associated Procurement Rules. Accordingly, this document has been prepared for the following purposes:*

- *To establish a set of policies, procedures, and guidelines the Judicial Department will use to conduct its purchases of products and service.*
- *To ensure the fair and equitable treatment of all persons who deal with the Department's purchasing system.*
- *To foster effective broad-based competition.*

*These Purchasing Fiscal Rules, hereafter referred to as the "Rules," apply to all acquisitions, including purchases, leases and rentals, that result in a disbursement of public funds by Colorado appellate and trial courts, state probation offices, and the State Court Administrator's Office. Public funds include all state moneys received by the Department, as well as all federal, local and private moneys, grants, gifts, or donations, except to the extent that another government jurisdiction's or grantor's requirements specify the purchasing rules and procedures to be followed. These Rules do not apply to the expenditure of public funds for construction services as defined by the Department of Personnel and Administration, State Buildings.*

*These Rules do not apply to the Denver County Court, Office of Attorney Regulation Counsel, Office of Judicial Discipline, Board of Continuing Legal and Judicial Education, Board of Law Examiners, Office of Attorney Registration, Office of the Alternate Defense Counsel, Office of the Child's Representative, and Office of the Public Defender.*

*These Rules do not apply to acquisitions for which no funds are expended or where the transaction is revenue-producing. However, even in such circumstances the Department should strive to maximize its return and to ensure fair and open competition by competitive bidding.*

*Unless displaced by the particular provisions of this document, the principles of law and equity, including the "Uniform Commercial Code," the law merchant, and any law relative to capacity to contract or to agency fraud, misrepresentation, duress, coercion, or mistake shall supplement the provisions of this document.*

*To the extent these Rules fail to provide adequate guidance in addressing or resolving a specific problem or question, the State Court Administrator, through the Director of Financial Services, will establish the fiscal rules to be followed.*

# TABLE OF CONTENTS

1.  **General Requirements and Responsibilities**                     1.1

    1.  Good Faith and Ethical Conduct                          1.1
    2.  Competition and Purchasing Value                        1.2
    3.  Preferences                                             1.2
    4.  Purchasing Administration                              1.2
    5.  Public Access to Purchasing Records                    1.4
    6.  Use of Colorado VSS                                    1.4
    7.  Purchase of United States Flags                        1.6

2.  **Purchasing Methods**                                           2-1

    1.  Summary of Purchasing Methods                          2-1
    2.  Determination of Method                                2-2
    3.  Purchases Not Requiring Competition                    2-2
    4.  Purchases Requiring Competition                        2-3
    5.  State Awards and Cooperative Purchasing Agreements      2-4
    6.  Rental Agreements, Leases, and Lease Purchases          2-4
    7.  Information Technology Purchases                        2-5
    8.  Request for Information (RFI) or Qualifications (RFQ)    2-5

3.  **Request for Documented Quotes**                                3-1

4.  **Competitive Sealed Proposals and Bids**                        4-1

    1.  General Requirements                                   4-1
    2.  Specifications                                         4-3
    3.  Evaluation Factors                                     4-4
    4.  Notification and Clarification                         4-5
    5.  Amendments to Solicitations                            4-6
    6.  Responsibility of Vendors                              4-7
    7.  Receipt and Opening of Responses                       4-7
    8.  Late Delivery of Responses                             4-8
    9.  Withdrawal of Responses                                4-8
    10. Minor Informalities and Mistakes discovered After Opening   4-9
    11. Cancellation of Solicitation and Rejection of Responses   4-10
    12. Additional Performance Requirements                    4-11

i

5.  **Evaluation of Proposals and Bids**                          5-1

    1.  General Requirements                                  5-1
    2.  Evaluation of Bids                                     5-2
    3.  Evaluation of Proposals                                5-3
    4.  Evaluation Committee Members                           5-3
    5.  Notification and Award of Contract                     5-4

6.  **Protests of Award**                                         6-1

    1.  Resolution by Mutual Agreement                         6-1
    2.  Filing a Protest                                      6-1
    3.  Review of Protests and Director's Decision             6-2
    4.  Stay of Award                                         6-2

7.  **Unauthorized Purchases**                                    7-1

    1.  Decision to Ratify an Unauthorized Purchase           7-1
    2.  Contract Termination                                  7-2
    3.  Liability of Judicial Department Employees             7-2
    4.  Court Action                                          7-3

## Appendix

**Example of Rating Definitions**

# 1. GENERAL REQUIREMENTS AND RESPONSIBILITIES

## 1.1 Good Faith and Ethical Conduct

1. All parties involved in the negotiation, performance, or administration of the Judicial Department's purchases, acquisitions, and contracts shall act in good faith and in accordance with the Colorado Judicial Branch Code of Conduct.

2. By way of example, but not as a limitation, a Judicial Department employee shall not derive private gain from the Department's purchasing activities. Employees shall not:

   1. Solicit or accept any fee, compensation, gift, payment of expenses, or any other thing of value under circumstances in which the acceptance may, or may appear to, improperly influence job performance.

   2. Use authority or influence to secure anything of value for private gain, monetary or otherwise.

   3. Use state time, property, equipment, or resources for private gain, monetary or otherwise.

   4. Influence or attempt to influence an official decision of the Judicial Department that may result in a monetary gain or other benefit to the employee; the employee's family member; or a person, business, organization, or entity with which the employee is associated.

   5. Obtain a contract in which the employee; an employee's family member; or a person, business, organization, or entity with which the employee is associated; has an interest, monetary or otherwise.

3. Vendors who offer gifts, entertainment, or other similar items under circumstances in which such offering may attempt, or have the appearance of attempting, to improperly influence the Department's purchasing decisions, shall be debarred from the purchasing process.

4. When, for any reason, collusion or other anti-competitive practices are suspected among any Department employees and/or vendors, a written notice of the relevant facts shall be transmitted to the Purchasing Manager.

**1.2     Competition and Purchasing Value**

1.  Every effort shall be made to assure that all persons who desire to do business with the Department will have a fair and equal opportunity to compete in fulfilling the Department's needs.

2.  The Department shall seek competition in an orderly and defined manner, where the choice of vendor is determined primarily by the price of the acquisition and, as appropriate, by taking into account product functionality, delivery conditions, payment terms, vendor performance and capabilities, and other factors as described in the solicitation.

3.  All Department employees to whom purchasing responsibilities are delegated shall strive to maximize to the fullest extent practicable the purchasing value of the Department's funds.

**1.3     Preferences**

1.  The Department does not afford preferences to resident bidders unless specified in the solicitation document.

2.  The Department may afford a preference for environmentally preferable products, as defined in Section 24-103-207.5, C.R.S., if specified in the solicitation document.

**1.4     Purchasing Administration**

1.  The State Court Administrator (SCA), consistent with statutory authority and responsibility, shall:

    1.  Consider and implement, with approval of the Chief Justice, matters of policy related to purchasing by the Judicial Department.

    2.  Be the final authority on matters relating to the application or interpretation of the rules, except as it may relate to a protest of any aspect of the solicitation and award process pursuant to Protests of Award (Section 6).

    3.  Be the signature authority for all State Court Administrator's Office (SCAO) contracts and all contracts with Executive Branch agencies.

    4.  Authorize all Department sole source purchases.

    5.  Delegate purchasing authority and responsibility to division directors and other management staff as may be needed for purchases in their designated

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

areas of responsibility.  Such delegation may include signature authority for purchase orders and, in limited circumstances, contracts.

2. The Director of the Financial Services Division (Director), to whom the SCA has delegated the authority and responsibility for the administration of the Department's purchasing function, shall assist the SCA to carry out his/her purchasing responsibilities, and shall have the authority to settle and resolve protests pursuant to Protests of Award (Section 6).

3. The Purchasing Manager, to whom the Director has delegated the responsibility for the day-to-day administration of the Department's purchasing program, has the following responsibilities:

   1. Act as the principal contact and primary source of information and assistance for all Purchasing Officials.

   2. Maintain and update the Purchasing Fiscal Rules.

   3. Develop and carry out a Department-wide program of assistance and training for Purchasing Officials, Project Managers, and other staff with purchasing responsibilities.

   4. Assign a solicitation number for every request for bid or proposal and every request for documented quote (DQ), regardless of whether or not the DQ is subsequently posted on Colorado VSS).

   5. Post solicitations.

   6. Where practical, establish price agreements for products or services, through a competitive process, for use by the trial courts, probation departments, and all other programs or divisions of the Judicial Department.

4. Purchasing Officials include District Administrators, Chief Probation Officers, Clerks of the Supreme Court and Court of Appeals, SCAO Division Directors, and other similar positions.  These positions shall have the following authority and responsibilities:

   1. To administer the purchasing function within their jurisdictions in accordance with the Purchasing Fiscal Rules.

   2. To delegate day-to-day purchasing responsibilities and/or the management of specific purchasing projects, if desired; however, the overall responsibility for a purchasing project shall remain with the Purchasing Official.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

1-3

3. To have a thorough understanding of the overall requirements of their purchasing project(s).  With assistance from the Purchasing Manager as may be requested and, as appropriate, Judicial Business and Integrated Technology Services (JBITS) staff, Purchasing Officials' responsibilities include conducting market research, determining specifications (see Section 4.2), developing the solicitation document and evaluation criteria, and maintaining vendor relations during and after the solicitation process.

4. To maintain a file of purchasing records, identified by solicitation number, that shall include all requests for quotes, proposals and bids and the responses to same, including documents relating to any modifications or withdrawals, correspondence, determinations, justifications, evaluation materials, email, internal memoranda, contracts, and any and all other supporting documents and information pertaining to the purchase.

5. To retain all purchasing records and documents in accordance with the *Colorado Judicial Department Retention and Disposition Schedules & Imaging Procedures for Designated Records.*

5. Chief Judges and the Presiding Judge of the Denver Probate Court have the authority and responsibility for all fiscal matters within their jurisdictions, including the signing of contracts for district acquisitions, except contracts with Executive Branch agencies.

## 1.5    Public Access to Purchasing Records

1. After award, purchasing records and information are public records that shall be open to public inspection upon request as required by law, except as otherwise provided for below.

2. Prior to evaluation, a vendor may request nondisclosure of trade secrets and other proprietary data contained in a bid, or proposal.

   1. Any such request shall be made in writing to the Purchasing Official.

   2. The Purchasing Official shall consult with the Purchasing Manager to determine the validity of any written requests for nondisclosure.

   3. The Purchasing Official shall inform the vendor in writing what portions of the bid or proposal will be subject to disclosure and allow the vendor the opportunity to withdraw such information or data.  If withdrawn, the vendor shall be advised in writing that the withdrawn information will not be included in the evaluation of their bid or proposal.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

1-4

3. An entire bid or proposal, or the pricing portion of a bid or proposal, shall not be considered confidential or proprietary.

4. If the Department has approved a vendor's request that trade secrets or other proprietary data be held confidential, any material so designated must be readily identifiable and separable from the rest of the bid or proposal to facilitate public inspection of the non-confidential portion.

5. Information that may subsequently become a material part of any issued contract between the Department and the vendor shall not be considered confidential or proprietary.

## 1.6    Posting of Requests for Proposals and Bids

1. The Colorado VSS (Vendor Self Serve) System is a web site designed to notify interested vendors of the State of Colorado Executive Branch's intent to purchase goods or services competitively.  The Colorado Judicial Branch may also post to this site along with other sites to ensure full vendor participation.

2. Requests by vendors indicating a desire to compete for the Department's business does not guarantee they will be notified of the Department's solicitations.  Enrollment in Colorado VSS is the best way for vendors to gain access to the Department's solicitations.

3. The Purchasing Manager shall review and post all Judicial Department Requests for Bids (RFB) and Requests for Proposals (RFP).  Posting of Requests for Documented Quotes (RDQ) is recommended but not required.  If a solicitation posted on Colorado VSS receives no responses, or if the Purchasing Official and/or the Purchasing Manager determines that a posting on Colorado VSS will not yield adequate competition, the Purchasing Official in consultation with the Purchasing Manager, may use other notification methods as may be necessary to seek competition.

   1. Such methods may include, but are not limited to, advertisements in newspapers and trade magazines or through direct contact via various transmittal methods (email, letters, etc) with vendors that may provide the needed product or service.

   2. The method(s) chosen and any contacts made shall be documented in writing by the Purchasing Official.

4. When an award is made, the Purchasing Manager, upon written notification from the Purchasing Official, will promptly create and publish the appropriate award

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

notice after the letters of award and non-award are sent electronically to the submitting vendors.

## 1.7    Purchase of United States Flags

United States flags purchased for display at any State court or probation facility shall be made in the United States, pursuant to State statute.

# 2.  PURCHASING METHODS

## 2.1    Summary of Purchasing Methods

| Dollar Amount | Type of Purchase | Required Purchasing Method | Time Posted on Colorado VSS | Alternate Purchasing Method | Purchasing Document |
|---|---|---|---|---|---|
| Up to $10,000 | Products | Discretionary Purchase | N/A | RDQ | Invoice, Purchase Order, or Contract as may be required by Judicial Department legal counsel. |
| Up to $25,000 | Services | Discretionary Purchase | N/A | RDQ, RFP, or RFB | Invoice, Purchase Order, or Contract as may be required by Judicial Department legal counsel. |
| $10,001 - $150,000 | Products | Request for Documented Quotes (RDQ) | 14 Business Days, if posted | RFB or RFP | Purchase Order or Contract, as may be required by Judicial Department legal counsel. |
| $25,001 - $150,000 | Services | Request for Documented Quotes (RDQ) | 14 Business Days, if posted | RFP or RFB | Purchase Order or Contract, as may be required by Judicial Department legal counsel. |
| Over $150,000 | Products | Request for Bids (RFB) or Request for Proposals (RFP) | 14 Calendar Days | None | Contract |
| Over $150,000 | Services | Request for Proposals (RFP) or Request for Bids (RFB) | 21 Calendar Days | None | Contract |
| Any | Products or Services | State Awards and Cooperative Purchasing Agreements | N/A | As listed above depending on type and value of purchase | Purchase Order or Contract, as may be required by Judicial Department legal counsel. |
| Any | Products or Services | Emergency Purchase | N/A | N/A | Verbal initially, then as listed above depending upon type and value of purchase. |
| Over $10,000 for Products and $25,000 for Services | Products or Services | Sole Source Purchase | N/A | N/A | Written documentation required.  If over $25,000, State Court Administrator must approve.  Purchase Order or Contract, as may be required by Judicial Department legal counsel. |

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

2-1

**INFORMATION TECHNOLOGY PURCHASES REQUIRE SPECIAL TREATMENT.  SEE <u>SECTION 2.7</u>.**

## 2.2    Determination of Method

1. The purchasing method to be used shall be based primarily on the cost of the required product or service, the ease or difficulty in determining and describing product or service specifications (see <u>Section 4.2</u>), and the need (or lack thereof) for formal evaluation procedures, as further described in this document.

2. A purchase that would otherwise require competition, by virtue of the anticipated cost, shall not be broken into separate smaller purchases.

    1. A purchase shall not be defined as a sole source purchase unless it specifically meets all the criteria of such purchases as defined in <u>Section 2.3.2</u>.

    2. A purchase shall not be defined as an emergency purchase unless it specifically meets all the criteria of such purchases as defined in <u>Section 2.3.3.</u>

3. Rental and lease agreements, lease purchases, and information technology purchases require special treatment.  See <u>Section 2.6</u> and <u>Section 2.7</u>.

## 2.3    Purchases Not Requiring Competition

1. <u>Discretionary Purchases</u>.  No form of competition is required for purchases up to and including $10,000 for products and $25,000 for services; nonetheless, price competition may be advantageous.  If so, it may be obtained by the use of a Request for Documented Quotes.

2. <u>Sole Source Purchases</u>.  A sole source purchase shall be used when there is only one product or service that will meet the Department's need <u>and</u> there is only one vendor to provide that product or service.  A requirement for a particular proprietary item (i.e., a brand name specification) does not justify a sole source purchase if there is more than one potential vendor for that item.

    1. The Purchasing Official shall prepare a written document that justifies a sole source purchase of any product over $10,000 or service over $25,000.  This justification shall include sufficient facts, circumstances, and reasoning to substantiate that there is only one specific product or service that will meet the Department's need, that there is only one provider of that product or service, and an explanation as to why there are no other vendors suitable or acceptable to meet the need.

    2. The written justification for a sole source purchase of a product or service over $25,000 shall be approved by the State Court Administrator prior to any

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

commitments being made.  In cases of reasonable doubt, competition shall be solicited.

3. If a sole source purchase is approved, the Purchasing Official and/or the Purchasing Manager shall conduct, and document in writing, negotiations with the vendor to obtain the best possible conditions for the Department with regard to price, delivery, and terms.

3. <u>Emergency Purchases</u>.  An emergency purchase may be required when the Department is faced with a situation that threatens or obstructs its functioning.

1. Emergency purchases shall only be made when the existence of such a situation creates an immediate and serious need for products and/or services that cannot be met through normal purchasing methods, <u>and</u> the lack of which would seriously jeopardize the operation of the courts, probation departments, or other programs of the Department; the conduct of required and essential business; the preservation or protection of property; or the health or safety of any person or persons.

2. Even in emergency situations, as much competition as is reasonable under the circumstances shall be obtained.

3. Emergency purchases shall be limited to only the products and services specifically needed for resolving the emergency.

4. The Purchasing Official shall promptly notify the Purchasing Manager if an emergency purchase is necessary.

5. Upon resolution of the emergency, the Purchasing Official shall prepare a written document to justify the emergency purchase, which shall describe the facts and circumstances of the emergency and the reasoning for the services, products, and selection of the vendor(s) chosen to meet the emergency need.

## 2.4    Purchases Requiring Competition

1. Purchases estimated to range in price from $10,001 to $150,000 for products and from $25,001 to $150,000 for services shall be competitively bid through Documented Quotes (Section 3) or Competitive Sealed Proposals and Bids (Section 4) as appropriate.

2. Purchases of products and services estimated to exceed $150,000 shall be made only through Competitive Sealed Proposals and Bids (Section 4).

**2.5    State Awards and Cooperative Purchasing Agreements**

The Judicial Department, in lieu of conducting its own competitive solicitations, may utilize competitively bid price agreements negotiated by the State Executive Branch or by other governmental entities or public purchasing units or consortiums when it is in the Department's best interest to do so.

State Executive Branch awards are competitively bid price agreements that are established by the State Purchasing Office in the Executive Branch.  The Executive Branch price agreements are available to the Judicial Department, however, the Procurement Rules that rule the Executive Branch do not apply to the Judicial Branch.  Rather, it is this document, the Colorado Judicial Department Purchasing Fiscal Rules, which prescribes the policies and procedures for purchasing and related activities of the Colorado Judicial Department.

1. Cooperative purchasing agreements are competitively bid price agreements that are established by other governmental purchasing units or public purchasing consortiums.  Cooperative purchasing may also include entering into ("tagging onto") a contract that resulted from a competitive purchasing process conducted by another governmental entity.  Purchasing Officials may participate in cooperative purchasing agreements for the purchase of any products or services. To do so, contact the Purchasing Manager.

2. As time, requirements, and the quantities needed are considered, Purchasing Officials are strongly encouraged to utilize the Department's competitive process to obtain prices better than state awards and cooperative purchasing agreements.

**2.6    Rental Agreements, Leases, and Lease Purchases**

Rental agreements, leases, and lease purchases require special budget and accounting treatment.  Therefore:

1. All rental agreements, leases, and lease purchase contracts and associated invoice payments shall be handled by the State Court Administrator's Office, unless otherwise authorized by the Judicial Department Controller and/or the Purchasing Manager.

2. Rental agreements, leases, and lease purchase contracts shall not to be entered into by the courts or probation departments.

3. Contact the Controller or Purchasing Manager if you need assistance in this area.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

## 2.7    Information Technology (IT) Purchases

In addition to the requirements outlined in this document, all IT purchases (i.e., computers and computer equipment) are subject to all requirements established by the Judicial Business Integrated Technology Services (JBITS) Division.  In addition, IT purchases of $25,000 or more shall be approved by the governor's office, pursuant to statutory requirements.

## 2.8    Request for Information (RFI)

An RFI is used to gather information about a product, service, industry, or vendor when there is not enough information readily available to write adequate specifications.  An RFI may ask for vendor input to assist the Department in preparing specifications and estimating cost or pricing for a subsequent solicitation. It may also be used to pre-determine the capabilities or qualifications of vendors to meet a certain need.  This process is also known as a Request for Qualifications (RFQ).

1.  An RFI shall not result in vendor selection or award.  This shall be clearly stated in the RFI.

2.  When it is desirable to issue an RFI, contact the Purchasing Manager for assistance.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

# 3.  DOCUMENTED QUOTES

1.  A Request for Documented Quotes (RDQ) shall be used for purchases estimated to range in price from $10,001 to $150,000 for products or $25,001 to $150,000 for services, and when product or service specifications are known, easy to define, and subject to an informal evaluation process based primarily on cost/price.

2.  An RDQ shall only be issued when there is a valid purchasing need.  RDQs shall not be issued to obtain estimates or to "test the water."  If such action is necessary, see Section 2.8.

3.  The RDQ shall be prepared by the Purchasing Official, with assistance from the Purchasing Manager as may be desired.

4.  An RDQ shall include specifications (see Section 4.2), a delivery or performance schedule, payment and billing requirements, bid submission and other pertinent deadlines, evaluation factors in addition to price (if any), and other applicable terms, conditions, and requirements.

5.  Posting of RDQs on Colorado VSS is recommended but not required.

    1.  If posted on Colorado VSS, the RDQ shall be posted for at least three (3) business days.

    2.  If Colorado VSS is not used, the Purchasing Official shall solicit and obtain quotes from a minimum of three (3) or more vendors.  A District may use its own web site or the State Courts main web site to solicit competitive quotes.

6.  A written reply (or "documented quote") via email, postal mail, or fax, that addresses the requirements stated in the RDQ must be received in accordance with submission deadline.

    1.  Documented quotes via telephone shall not be accepted.

    2.  Hand-written replies shall not be accepted.

7.  After the submission deadline, the Purchasing Official may negotiate with vendors that have submitted a quote.  The purpose of these negotiations shall be to promote understanding of the Department's requirements and the quotes, so as to make the quotes acceptable and more advantageous to the Department.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

8.  The Purchasing Official may determine whether or not a vendor's response is acceptable, and may compare the relative value of competing quotes, considering price and, as may be applicable, other factors.

9.  Award shall be made to the vendor whose quote is determined by the Purchasing Official to be most advantageous to the Department, with price/cost being the primary (though not necessarily the sole) consideration.

10. No formal evaluation process is required; however, the Purchasing Official shall document in writing the facts, circumstances, and reasoning to substantiate the award decision and, if applicable, to explain any factors other than price that led to the decision.

11. The Purchasing Official shall inform, in writing via email, all vendors who submitted documented quotes of the award decision.

12. As may be required, the Purchasing Official and the successful vendor shall cooperate with the Judicial Department Legal counsel and the Purchasing Manager to develop a written contract.

# 4. COMPETITIVE SEALED PROPOSALS AND BIDS

Sealed competitive proposals and bids are solicited, respectively, through Requests for Proposals (RFPs) and Requests for Bids (RFBs). *"Sealed"* refers to the fact that the proposal or bid (that is, a vendor's response to the RFP or RFB) is kept sealed in an envelope or package until an official "opening" all of responses. As described in this section, many requirements for RFPs and RFBs are substantially the same; however, there is a significant difference with regard to how the responses are evaluated and, subsequently, how the winning vendor is chosen. See Evaluation of Proposals and Bids (Section 5).

## 4.1 General Requirements

1. A Request for Bid (RFB) shall be used for purchases of products or services estimated to cost over $150,000 and when specifications and other criteria are known and can be objectively stated and evaluated with no, or a minimal, degree of subjectivity.

2. A Request for Proposal (RFP) shall be used when purchasing services or products estimated to cost over $150,000 and when one or more of the factors below exist.

   1. Exact specifications and other criteria are not known.

   2. It is in the Department's best interest to provide for a subjective evaluation of offers.

   3. The primary considerations in determining the award may be factors other than price alone.

   4. It may be necessary to conduct oral or written discussions with responding vendors concerning technical and price aspects of their proposals.

   5. It may be necessary to afford responding vendors the opportunity to revise their proposal.

   6. It is advantageous to the Department to revise proposals after discussions with responding vendors.

7. It may be necessary to base an award on comparative evaluation of differing price, quality, and contractual factors to determine the most advantageous offering to the Department.

3. RFPs and RFBs, from here forward referred to as "solicitations," shall only be issued when there is a valid purchasing need.  Solicitations shall not be issued to obtain estimates or to "test the water."  If such action is necessary, see Section 2.8.

4. Solicitations may be cancelled if there are valid and compelling reasons to believe that the cancellation of the solicitation is in the Department's best interest.  Each solicitation issued by the Department shall contain language stating that the solicitations may be cancelled as provided in this document.  See Section 4.11.

5. The solicitation is prepared by the Purchasing Official, with assistance from the Purchasing Manager as desired.

6. The solicitation shall include a specifications (see Section 4.2); delivery or performance schedule; payment and billing requirements; bid submission deadline; date, time and place of opening; evaluation factors; other pertinent requirements, which may include, but are not limited to, product samples, descriptive literature, testing and inspection, and technical data; and all applicable terms and conditions.

7. The solicitation shall include directions for the vendors as to the format of their response, pricing information, and other forms as may be required to ensure that consistent information is received for each response.

8. A written bid or proposal (the vendor's "response"), prepared in the required format and upon the provided forms, that addresses all requirements stated in the solicitation and that contains the original signature of the vendor or the vendor's authorized official, shall be received in accordance with the submission deadline.

   1. Responses prepared in formats or on forms other than those provided shall not be accepted, except as provided in Section 4.10.

   2. Responses shall be hand-delivered or mailed in sealed envelopes or packages.

      1. The outside of the envelope or package shall clearly show the solicitation number, submission deadline date, and vendor's name and address.

      2. Telephone, fax, or e-mail responses shall not be accepted.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

4-2

3. Late responses shall not be accepted, except as provided in Section 4.8.

4. Responses that lack the original signature of the vendor or the vendor's authorized official shall not be accepted, except as provided in Section 4.10.

5. Hand-written responses shall not be accepted.

9. The Purchasing Official shall ensure that all responses are date/time-stamped immediately upon receipt, left unopened and sealed, and stored in a secure location until the specified opening date and time.

10. The Purchasing Official shall maintain any and all documents related to the purchasing project, including a copy of the solicitation, amendments, questions and answers, and all responses; along with determinations, summaries, score sheets, evaluation materials, disclosures, explanations, and any other written materials and place them in the purchasing file.

11. After award, all solicitation documents and the complete purchasing file shall be open to public inspection pursuant to Section 1.6.

## 4.2    Specifications

The purpose of specifications is to describe to the vendors the product or service that the Department needs and all related requirements.  Thoughtful and well-prepared specifications are critical to the success of a purchasing project.

1. To the extent practicable, specifications shall provide an accurate, thorough, detailed, measureable description of the physical or functional characteristics, the essential and technical requirements, the nature, and/or the desired results of the product or service to be purchased.

2. For an RFB, specifications shall be such that responses can be assessed as either meeting or not meeting the requirement.

3. For an RFP, specifications may allow for subjectivity, that is the level or degree to which the requirement is met.

4. Specifications shall permit maximum competition.  They shall not be unduly restrictive.

5. To the extent possible, accepted commercial standards shall be used and unique requirements shall be avoided.

6. When appropriate, specifications issued or used by other public purchasing entities or professional organizations may be referenced.  Vendors may be required to certify that the standardized specifications have been met.

7. "Brand name or equal" specifications (specifications that use one or more manufacturer's names or catalog numbers) may be used when the item to be purchased is best described by the use of such a specification.

   1. Brand name of equal specifications shall only be used for the purpose of describing the characteristics, standard of quality, and performance of the product or service required, and shall not, in any way, limit or restrict competition.

   2. Where brand name or equal specifications are used, the solicitation shall clearly state that the use of a brand name is only for the purpose of describing the product or service required, and that it is not to limit or restrict competition.

   3. The solicitation shall further state that substantially equivalent products to those designated will be considered for award.

## 4.3    Evaluation Factors

Evaluation factors are the criteria against which a bid or proposal is measured.  The development of these factors is critically important because it is the subsequent evaluation of these factors that leads to the winning bid or proposal.

1. In a Request for Bid, the factors shall be subject to an objective evaluation; the requirement is either met or not met. See Evaluation of Proposals and Bids (Section 5).

2. In a Request for Proposal, the factors may be subject to a subjective evaluation; the level or degree to which the requirement is met may be considered.  See Evaluation of Proposals and Bids (Section 5).

3. All solicitations shall include all evaluation factors necessary to determine whether all required specifications have been met.  Factors that do not lend themselves to such determinations shall not be included.

4. All solicitations shall include factors to evaluate whether the vendor has:

   1. The appropriate financial, material, equipment, facility, and personnel resources and expertise necessary to meet all requirements of the purchase.

   2. A satisfactory record of performance.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

3. Responded to all requirements of the solicitation and supplied all required information.

5. Factors not specified in the solicitation shall not be considered in the evaluation.

6. Factors may be prioritized or "weighted" to identify the relative importance of each factor.

7. By way of example and not limitation, evaluation factors shall include pricing/cost and may include (in no particular order) the following:

   1. Delivery date after receipt of order
   2. Cash discounts
   3. Type and length of warranties
   4. Cost of maintenance agreements
   5. Cost of operations
   6. Future availability
   7. Future trade-in value
   8. Availability of local service
   9. Results of site visits, demonstrations, or product testing
   10. Availability of training courses
   11. Esthetics
   12. Adaptability to environment
   13. Space limitations
   14. Safety and health features relating to codes, regulations, or policies
   15. Life cycle costs (see Section 5.2.5)

## 4.4    Notification and Clarification

1. Posting of solicitations on the Colorado VSS system is <mark>encouraged</mark>.

   1. An RFP shall be posted for at least twenty-one (21) calendar days.

   2. A RFB shall be posted for at least fourteen (14) calendar days.

   3. If special circumstances or conditions exist, the Purchasing Manager, in consultation with the Purchasing Official, may lengthen or shorten the posting time.  The Purchasing Official shall document in writing why a reduced period is required.  Under no circumstances shall the length of time be shortened to reduce competition.

2. Pre-proposal conferences may be conducted to explain the purchasing requirements.

    1.  The place, date, and time of the conference shall be contained in the solicitation.

    2.  Nothing stated at the conference shall change the solicitation unless by written amendment (see Section 4.5).

3.  Vendors may ask questions to clarify their understanding of the Department's needs and other pertinent matters but only during the timeframe specified in the solicitation.

    1.  All questions shall be collected by the Purchasing Official.

    2.  Responses to all questions shall be prepared by the Purchasing Official and submitted to the Purchasing Manager for review and posting in accordance with the timeframe specified in the solicitation.

## 4.5   Amendments to Solicitations

1.  After posting, changes to a solicitation are discouraged but, when required, any and all changes shall be made by written amendment.

    1.  Any such amendments shall be prepared by the Purchasing Official and review by the Purchasing Manager.

    2.  The amendment shall reference what specific part(s) of the solicitation is being amended.

2.  Amendments shall be identified as such and posted with sufficient time for vendors to review the changes, contemplate any consequences, and consider the content for inclusion in their proposals.

    1.  This may require an extension of bid submission, opening dates, and award dates.

    2.  Any such date changes shall also be confirmed in the amendment.

3.  If changes or amendments are not posted, the solicitation shall be considered unchanged, regardless of any exchanges that may have occurred between the Department and any vendor(s).

## 4.6   Responsibility of Vendors

1.  Vendors are solely responsible for frequently checking COLORADOVSS and availing themselves of all applicable instructions, amendments, and other information related to any solicitation that is posted thereon.

2.  To be considered acceptable, a vendor's response to a solicitation shall fully address any and all requirements stated in the solicitation, and shall be prepared in accordance with required formats and upon any forms provided.

3.  Responses shall contain the original signature of the vendor or the vendor's authorized official.

4.  It is the vendors' responsibility to ensure that their response is properly identified and received by the Department prior to the submission deadline specified in the solicitation.

5.  Situations such as a flat tire, slow traffic, accidents, parking problems, and other similar circumstances, shall not be cause for acceptance of late bids or proposals.  (See also Section 4.8 regarding late delivery of responses.)

6.  Hand-written, telephone, faxed, or e-mailed responses shall not be accepted.

7.  Vendors shall be legally qualified to contract with the Department and shall cooperate with the Department in fulfilling or resolving all legal and contractual matters as may be required by the Judicial Department and Colorado state statutes, including requirements to verify the legal status of their employees and contractors.

## 4.7    Receipt and Opening of Responses

1.  All responses received shall be opened by the Purchasing Official, or designee, in the presence of one or more witnesses on the date, time, and at the place specified in the solicitation.

2.  The name of each vendor shall be read aloud.  Other pertinent information, such as pricing, may be read aloud at the discretion of the Purchasing Official, except that information determined by the Department to be proprietary, pursuant to Section 1.5, shall not be read or otherwise disclosed.

3.  Each vendor's name, any other information announced at the opening, and the names of all witnesses to the opening shall be recorded in writing and such record shall be open for public inspection.

4.  Information that is not presented at the opening may be withheld from public inspection until after the award is announced.

5. Under no circumstances shall any vendor's response be opened prior to the public "opening."

6. Any interested parties shall be allowed to attend.

7. Responses shall be opened in a manner that avoids disclosure of contents to competing vendors.

## 4.8    Late Delivery of Responses

1. If, prior to the specified opening time and date, no mail has been delivered either directly by the post office or through the internal distribution system, any response received by the first, next scheduled delivery shall be accepted if it is reasonable to believe the response was in the delivery process.

2. In the event of a labor unrest (strike, work slow-down, etc.) that affects mail delivery, the Purchasing Official shall amend the submission deadline or develop alternate methods of receiving responses.  Any and all such changes shall be posted on Colorado VSS.

3. The Purchasing Official shall consult with the Purchasing Manager regarding situations (other than those above) that are beyond the control of the Department or the vendors to determine the acceptability of late responses, except as otherwise specified in Section 4.6.5.

## 4.9    Withdrawal of Responses

1. A vendor may withdraw its response to any solicitation at any time prior to opening date and time set forth in the solicitation by written notice (mail, email or fax) to the Purchasing Official.  In such circumstance, the Purchasing Official shall return the unopened response to the vendor.

2. The Purchasing Official may allow a bid or proposal to be withdrawn, if requested by the vendor in writing, after opening but prior to award, under the following circumstances:

    1. The vendor provides proof that clearly and convincing demonstrates to the Purchasing Official that a mistake was made in the costs or other material matter provided in the response.

    2. The Purchasing Official finds it unreasonable to allow the bid or proposal to proceed.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

4-8

3. Any decision to permit or deny withdrawal of a response shall be supported by a written determination prepared by the Purchasing Official in consultation with the Purchasing Manager.

4. If a proposal or bid is withdrawn in accordance with this section, any bid or performance bond (see Section 4.12.2) shall be returned to the vendor in a timely manner.

## 4.10    Minor Informalities and Mistakes Discovered After Opening

1. Minor informalities are matters of form rather than substance evident from the bid or proposal document, or insignificant mistakes that can be waived or corrected without prejudice to other bidders; that is, the effect on price, quantity, quality, delivery, or contractual conditions is negligible.

2. The Purchasing Official, in consultation with the Purchasing Manager, may waive minor informalities or allow the vendor to correct them, if it is determined to be in the best interests of the Department.  Examples include, but are not limited to, the failure of a bidder to:

    1. Return the number of signed bids or proposals required by the solicitation.

    2. Sign the bid or proposal, but only if the unsigned bid or proposal is accompanied by other material indicating the bidder's intent to be bound.

    3. Use a format or forms other than those specified in the solicitation instructions, but only if all requested information is provided.

3. Any decision to waive a minor informality or permit or deny correction of a response shall be supported by a written determination, prepared by the Purchasing Official in consultation with the Purchasing Manager, that such action is in the best interests of the Department.

4. If a response contains an obvious, material error(s), is unreasonably lower than the other responses, or otherwise appears to the Evaluation Committee that a substantive mistake has been made:

    1. The vendor shall be requested to confirm their response.

    2. If, after such confirmation, the vendor alleges mistake, the vendor shall be permitted to withdraw the response in accordance with Section 4.9.

## 4.11    Cancellation of Solicitation and Rejection of Responses

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

1. Prior to opening, a solicitation may be cancelled if such action is necessary to serve the best interests of the Department, for reasons including but not limited to the following:

    1. The Department no longer requires the products or services.

    2. The Department no longer can reasonably expect to fund the purchase.

    3. The solicitation is in violation of Department policy.

    4. Amendments to the solicitation would be of such magnitude that a new solicitation is desirable.

2. After opening but prior to award, any or all responses may be rejected when the Purchasing Official, in consultation with the Purchasing Manager, determines in writing that such action is in the Department's best interest for reasons including but not limited to the following:

    1. The products or services being purchased are no longer required.

    2. Ambiguous or otherwise inadequate specifications were part of the solicitation.

    3. The solicitation did not provide for consideration of all factors of significance to the Department.

    4. All otherwise acceptable responses are at unexpectedly high or clearly unreasonable prices.

    5. Prices exceed available funds.  In such case:

        1. The Purchasing Official may attempt to negotiate an adjustment of quantities, quality, scope, and/or price with the apparent winner to bring the proposal or bid within the amount of available funds.

        2. If it is not feasible to make such adjustments, the solicitation shall be cancelled.

    6. There is reason to believe that the bids or proposals may not have been independently arrived at in open competition, may have been collusive, or may have been submitted in bad faith.

3. If a solicitation is cancelled, notice of the cancellation shall be posted.  Such notice shall:

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

1. Identify the solicitation.

2. Explain the reason for cancellation.

3. As applicable, explain that an opportunity will be given to compete on any re-solicitation or any future purchases of similar products or services.

4. The Purchasing Official shall prepare a written explanation of the reasons for cancellation or rejection.

5. When a solicitation is cancelled, responses received prior to the opening shall remain unopened and shall be returned to the vendors.  If a cancellation occurs after the opening, all responses shall be retained in the purchasing file.

## 4.12   Additional Performance Requirements

Additional performance requirements may be called for if a purchase is of particular importance or criticality to the Department that such requirements are warranted.

1. **Insurance** - In cases where a vendor performs work on the Department's premises, or is required to travel in a vehicle while performing the Department's requirements, it is in the Department's best interest to require the vendor to demonstrate adequate insurance and/or to name the Department as an insured party.   In such circumstances, the Purchasing Official should follow the prescribed procedures recommended by the Department of Personnel and Administration, Division of Risk Management.

2. **Bonds** –

   1. Bid bonds are used to ensure a bidder's price will be valid for a specified period of time.  Such bonds are frequently used in purchase of products that are subject to rapid price fluctuations.  The amount of the bond should be adequate to deter a bidder from failing to honor a bid.

   2. Performance bonds are used to ensure a vendor's performance as to both quality and timeliness.  The amount of the bond should be adequate to cover the Department's losses and costs should the vendor fail to perform as required or agreed.

3. **Liquidated Damages** – Liquidated damages clauses may included in solicitations (and subsequent contracts) where there are critical time sensitive milestones to which the Department and vendor agree.  Should the vendor fail to meet one of more of these requirements, the vendor may be required to

reimburse the Department for actual losses and/or costs incurred. These damages are limited to the amount of reasonable actual demonstrable losses/costs.

# 5.  EVALUATION OF PROPOSALS AND BIDS

Though the requirements for Requests for Proposals (RFPs) and Requests for Bids (RFBs) are substantially similar, see Competitive Sealed Proposals and Bids (Section 4), there is a significant difference with regard to how the responses are evaluated and, subsequently, how the winning vendor is chosen.

## 5.1    General Requirements

1. The Purchasing Office shall establish an Evaluation Committee (see Section 5.5) and forms upon which to conduct the evaluation.

2. All products and services shall be evaluated against the specifications put forth in the solicitation.

    1. All bids shall be evaluated on the same criteria; no factors shall be added or omitted.

    2. If desired, a system to prioritize or "weight" the scores for each factor may be established if none was previously set forth in the solicitation.

3. Factors to be considered shall include whether the vendor has:

    1. The appropriate financial, material, equipment, facility, and personnel resources and expertise necessary to meet all requirements of the purchase.

    2. A satisfactory record of performance.

    3. Supplied all required information.

4. Vendors may demonstrate the availability of necessary financing, equipment, facilities, expertise, and personnel by submitting:

    1. Evidence that the vendor possesses such necessary items.

    2. Acceptable plans to subcontract for such necessary items.

    3. A documented commitment from, or explicit arrangement with, a satisfactory source to provide the necessary items.

5. Inspection and testing may be included as part of the evaluation to determine acceptability, workmanship, and suitability of the product or service being purchased.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

6. Bids or proposals that do not meet all requirements, specifications, and criteria put forth in the solicitation or that fail inspection and/or testing shall be rejected.

7. The Purchasing Official shall maintain all evaluation documents, score sheets, and other related documents.

## 5.2 Evaluation of Bids

1. The purpose of an evaluation of bids is to determine if a vendor's bid does or does not meet the Department's need as specified in the RFB and to select the winning bid. The evaluation shall be pass/fail only; with no or minimal level or degree of satisfaction.

2. If inspection and testing is included as part of the evaluation, it shall only be conducted, on a pass/fail basis, to determine whether a proposal is in accordance with the specifications and criteria specifically set forth in the RFB.

    1. Vendors shall be accorded fair and equal treatment with respect to any opportunity for demonstrations and/or site visits.

    2. Inspection and testing shall not be conducted to determine if one vendor's product or service is superior to another.

3. Bids that meet all specifications and criteria and that pass inspection and/or testing, as applicable, shall be considered for award.

4. Of the bids considered, award shall be made to the vendor offering the lowest price.

5. In addition to the actual cost of a product, life cycle cost factors may be considered, when applicable, to determine lowest price. Life cycle costs are reasonable estimates of the costs of ownership and operation (such as repair costs, licenses, and particular supplies) and/or trade-in value at the end of a product's useful life. If such factors are used, they shall be objectively measurable.

6. Award shall not be made to a bidder submitting a higher quality item than that designated in the RFB unless such bidder also offered the lowest bid (considering actual cost and any applicable life cycle cost factors).

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

**5.3     Evaluation of Proposals**

1.  The purpose of an evaluation of proposals is to determine the extent, level or degree to which a vendor's proposal meets the Department's need as specified in the RFP and to select the proposal most advantageous to the Department.

2.  The Evaluation Committee may engage in formal discussions with vendors, require and attend demonstrations, and/or conduct inspections or site visits to promote understanding of the Department's requirements and the vendors' proposals.

    1.  Vendors shall be accorded fair and equal treatment with respect to any opportunity for discussion of proposals, inspections, demonstrations, and/or site visits.

    2.  Revisions to proposals may be permitted prior to award for the purpose of obtaining proposals more advantageous to the Department.

    3.  In conducting discussions, there shall be no disclosure of any information contained in or derived from proposals submitted by competing vendors.

    4.  The Purchasing Official shall prepare a written summary of any and all negotiations with vendors.

3.  The Purchasing Official shall establish a numerical rating system and develop a score sheet to be used by the Evaluation Committee to rate each proposal.

4.  To promote consistency in the application of the rating system among the evaluators, each numerical rating shall be defined.  See example in Appendix A.

5.  Some evaluation factors may not be subject to a numerical system.  For such factors, a "pass/fail" or "yes/no" shall be utilized, where "pass" or "yes" is worth a set number of points (for example, three (3) points in a scale of 1 – 5) and "fail" or "no" equals zero (0) points.

6.  Award shall be made to the vendor whose proposal is determined by the Evaluation Committee, subject to final approval by the Purchasing Official, to be most advantageous to the Department, considering price and other factors.

**5.4     Evaluation Committee Members**

1.  Any number of members may serve on the Committee at the discretion of the Purchasing Official; however; all members shall have experience or familiarity with the product or service being purchased.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

2. If any committee member has any existing or previous relationship, connection, association, or involvement with any vendor whose bid or proposal is being evaluated; or if any committee member may, or may appear to, gain privately – financial or otherwise – from the award, that committee member shall disclose any such information in writing to the Purchasing Official prior to service.

   1. The Purchasing Official shall determine, in consideration of the disclosure, whether such committee member shall participate on the committee.  If the Purchasing Official is the committee member making the disclosure, the Purchasing Manager shall determine participation.

   2. The facts and circumstances leading to the decision shall be documented in writing.

## 5.5    Notification and Award of Contract

1. Once the award decision is made, the Purchasing Official shall inform the Purchasing Manager, who shall post the results.

2. The Purchasing Official shall issue a *Notice of Intent to Make Award* letter to the successful vendor.

3. The Purchasing Official shall cooperate with the Purchasing Manager and the Judicial Department Legal counsel to develop a written contract for the successful vendor in accordance with the terms of the solicitation.  However, a contract is not awarded until any protest which may have been made in connection with the award decision has been resolved.  See Protests of Award (Section 6).

4. No property interest of any nature shall accrue until the contract is awarded and signed by both parties.

# 6.  PROTESTS OF AWARD

## 6.1    Resolution by Mutual Agreement

1. The Purchasing Official, in consultation with the Purchasing Manager, shall attempt to settle and resolve, by mutual agreement through informal discussions, any questions, concerns, or controversies regarding the solicitation and the award of contract.

2. If a controversy cannot be resolved by mutual agreement, the vendor may file a protest.

## 6.2    Filing a Protest

1. Any vendor who is aggrieved in connection with a solicitation or the award of a contract may protest directly to the Director of the Financial Services Division (the "Director").  The protest shall be submitted in writing no later than ten (10) working days from the issuance date of the award or non-award letter where a solicitation was issued.

2. Any vendor who is aggrieved in connection with a purchase or acquisition that was not competitively bid may protest directly to the Director within thirty (30) days after such aggrieved vendor knows or should have known of the facts giving rise thereto.

3. Vendors may file a protest regarding any perceived failure of the Department to follow the requirements of the Purchasing Fiscal Rules, or to act unfairly arbitrarily, or unethically during any phase of solicitation or award process.

4. Protests shall be type-written, may be delivered either via postal mail or email, and shall include, as a minimum, the following:

    1. The name and address of the protestor.

    2. A statement of the reasons for the protest, which shall detail the unfair, arbitrary, or unethical actions of the Department, and the shall cite, as applicable, the specific Purchasing Fiscal Rules that the Department failed to follow.

    3. Evidence of the failures and/or documents substantiating the protest.

    4. The vendor's requested relief or resolution.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

6-1

## 6.3    Review of Protests and Director's Decision

1. The Director shall have the sole authority to settle and resolve a protest of an aggrieved vendor.

2. The Director shall render a decision regarding the protest within fifteen (15) working days after the Director, himself or herself, receives the written protest.

    1. The decision shall be based on <u>and</u> limited to a review of the issues raised by the aggrieved vendor.

    2. The Director shall promptly gather and review relevant information.

        1. The Purchasing Official and Purchasing Manager shall provide all information, materials, and documents as may be requested by the Director.

        2. The Director may also request additional information from the vendor.

        3. If any party fails to comply expeditiously with any request for information by the Director, the Director shall resolve the protest without such information.

3. The Director shall issue an objective, written decision based upon the facts of his or her review.

    1. Each issue brought forth by the aggrieved vendor shall be addressed.

    2. The Director shall state the reasons for his or her decision.

4. The Director shall issue his/her decision to the vendor post-marked within the timeframe allowed.

5. The Director's decision shall be final and conclusive.

## 6.4    Stay of Award

In the case of a protest of any award, the award will be stayed until the protest decision is issued.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

6-2

# 7. UNAUTHORIZED PURCHASES

For the purposes of this section, an "unauthorized purchase" is a purchase of any product or service that is made in violation of any of the provisions of the Purchasing Fiscal Rules herein.

## 7.1 Decision to Ratify an Unauthorized Purchase

1. If any Judicial Department employee purchases any products or services contrary to the provisions of the Rules contained in this document, the Purchasing Official shall need to determine whether or not to ratify (post-authorize) the purchase.

2. In making such determination, the Purchasing Official shall consider all factors related to the purchase including but not limited to the following:

    1. The facts and circumstances giving rise to the need for the product or service, including the employee's explanation as to why the Rules were not followed, and any lack of information or training on the part of the employee.

    2. Indications of intent to deliberately evade the Rules.

    3. Whether the purchase, if it had been made according to the Rules, would have been reasonable and appropriate.

    4. The extent to which any competition was obtained.

    5. Whether this is the first occurrence or a repeat instance.

    6. Indications as to whether either the employee or the vendor has acted fraudulently or in bad faith.

    7. The potential consequences of terminating the contract, if any.

3. A decision to ratify an unauthorized purchase shall weigh the above noted factors as they apply to the express goals of the Rules and, in particular, fairness to any vendor who has acted fairly and in good faith.

4. After consideration of the above factors, the Purchasing Official, in consultation with the Purchasing Manager, shall take one of the following actions:

    1. Ratify the purchase if it is determined to be in the best interests of the Department, and authorize payment. Such ratification shall be without

prejudice to the Department's right to such damages as may be appropriate. See Section 7.4.

2.  If it is determined that it is not in the best interests of the Department to ratify the purchase:

    1.  If practicable, return the product, or any portion thereof, or suspend or discontinue the service.

    2.  Authorize payment to the vendor for the product or service, or portion thereof, unless it is determined that the vendor acted fraudulently or in bad faith.

    3.  Terminate the contract, if any.

3.  If it is determined that a vendor has acted fraudulently or in bad faith, any contract with such vendor shall be terminated and there shall be no authorization of payment.

5.  A written determination setting forth the basis for any decisions made pursuant to this Section shall be included in the purchasing file.

## 7.2    Contract Termination

The Purchasing Official shall notify the Director of the Financial Services Division and Judicial legal counsel PRIOR to any termination of a contract.

## 7.3    Review of Procedures

The Purchasing Official shall review local policies and procedures, and establish safeguards to preclude subsequent unauthorized purchases.

## 7.4    Liability of Judicial Department Employees

1.  If any Judicial Department employee purchases any products or services contrary to the provisions of the Rules, the Purchasing Official and the Judicial Department employee actually making such purchase may be:

    1.  Personally liable for any costs incurred by the Department.

    2.  Subject to appropriate civil action to recover any costs incurred by the Department.

2.  In addition, any such Judicial Department employee may be subject to corrective or disciplinary action pursuant to Judicial Department personnel rules.

## 7.5    Court Action

In the event a court action is commenced by a vendor regarding any phase or aspect of a Judicial Department purchase, Judicial legal counsel shall be immediately notified.

## APPENDIX
## EXAMPLE OF RATING DEFINITIONS

**Zero (0) Points/Unacceptable:**

- Response is missing, absent, or left blank

- Response does not illustrate any skill, experience, knowledge, or ability.

- For factors requiring a "pass/fail" evaluation, a "fail" equals 0 points.

**One (1) Point/Poor:**

- The response minimally addresses the evaluation factor.

- The response is confusing, excessive, and/or unclear.

- The response is not supported and/or convincing.

- The response does not illustrate much knowledge, skill, experience, or ability.

**Two (2) Points/Marginal:**

- The response addresses the evaluation factor but not fully or completely.

- The response is somewhat confusing, excessive, and/or unclear.

- The response is not well supported or convincing.

- The response illustrates some knowledge, skill, experience, and ability.

**Three (3) Points/Acceptable:**

- The response addresses the basic components of the question.

- The response is generally clear and concise.

- The response is generally well supported and convincing. .

- The response illustrates basic knowledge, skill, experience, and ability.

- For factors requiring a "pass/fail" evaluation, a "pass" equals 3 points.

Colorado Judicial Department
Purchasing Fiscal Rules
April 2015

A-1

**Four (4) Points/Above Average:**

- The response fully addresses the question.

- The response is clear and concise.

- The response is well supported and convincing.

- The response illustrates significant knowledge, skill, experience, and ability.

**Five (5) Points/Superior:**

- The response fully addresses the question with obvious confidence and ease.

- The response is extremely articulate, clear, and concise.

- The response is extremely well supported and convincing.

- The response illustrates extensive knowledge, skill, experience, and ability.

# Appendix 10

# *Agreement for Resignation and Release of Claims* (Jane Hood separation agreement), executed September 4, 2018.

<u>**AGREEMENT FOR RESIGNATION AND RELEASE OF CLAIMS**</u>

This Agreement for Resignation and Release of Claims ("Agreement") is entered into between the Colorado Judicial Department, State Court Administrator's Office (hereinafter referred to collectively as the "DEPARTMENT") and Jane Hood (hereinafter referred to as "EMPLOYEE"). DEPARTMENT and EMPLOYEE may collectively be referred to as the parties.

<u>**RECITALS**</u>

WHEREAS, EMPLOYEE currently works in the position of Building Manager for the DEPARTMENT'S Executive Division;

WHEREAS, EMPLOYEE desires to reach an amicable resolution of the matter by voluntarily resigning from her position under the terms and conditions of this Agreement; and

WHEREAS, the DEPARTMENT is willing to accept EMPLOYEE'S voluntary resignation in exchange for a full release of claims in accordance with the terms and conditions set forth below;

IN CONSIDERATION of the mutual and unilateral covenants, obligations, promises and warranties contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

<u>**OBLIGATIONS OF EMPLOYEE**</u>

1.      <u>Resignation</u>.  EMPLOYEE agrees to submit to the Director of the Executive Division a non-revocable letter of resignation, neutral in its wording, upon her execution of this Agreement which shall occur on or before September 5, 2018.  The resignation shall be effective June 12, 2019.  EMPLOYEE understands and agrees that in doing so she waives any, and all rights to withdraw the resignation and agrees that having voluntarily resigned she has no right to any grievance, appeal or review under the Colorado Judicial System Personnel Rules ("CJSPR"). During the period between the date that EMPLOYEE signs this Agreement and her Resignation date, EMPLOYEE shall be placed on paid administrative leave.  EMPLOYEE understands and acknowledges that the paid administrative leave DEPARTMENT will provide is the consideration for EMPLOYEE's duties and obligations pursuant to this Agreement, and EMPLOYEE would not be otherwise entitled to the payment of wages or receipt of benefits EMPLOYEE will receive during paid administrative leave.  EMPLOYEE understands and acknowledges that, because her status with the DEPARTMENT is an employee on paid administrative leave, she must adhere to all personnel rules and polices during the period of paid administrative leave.  However, to the extent the personnel rules and policies conflict with this Agreement, the Agreement controls.  EMPLOYEE further acknowledges that a violation of any material provision of this Agreement shall terminate EMPLOYEE's period of paid administrative leave and negate the obligation of the DEPARTMENT to continue to pay EMPLOYEE her agreed upon salary for the period of administrative leave pursuant to this Agreement.  EMPLOYEE understands and acknowledges that because of her status as an employee of the DEPARTMENT during the period of paid administrative leave, if EMPLOYEE

1

takes another position with the State of Colorado, including any position with a department or agency that receives funding from the State of Colorado, her paid administrative leave period will end and no further payments pursuant to this provision will be made by the DEPARTMENT.

2.    General Release

a.  EMPLOYEE, including her successors, agents and estate, hereby releases DEPARTMENT and all current and former employees, officers, agents and attorneys, in their official or personal capacities, from any and all claims, causes of action, liabilities, expenses, attorney fees or damages waivable by law which EMPLOYEE may have or may assert against them as a result of any actions or omissions of the DEPARTMENT or any of its current and former employees, officers, agents or attorneys which have occurred or should have occurred on or prior to the date of this Agreement arising out of or relating to her employment with DEPARTMENT and/or her resignation.

b.  EMPLOYEE further agrees and covenants that she will not sue, or assert any cause of action, at law or in equity, before any court of law or administrative agency, against the DEPARTMENT or any of its current and former employees, officers, agents or attorneys, in their official or personal capacities, for any claims, causes of action, liabilities, expenses, or damages arising out of any actions or omissions of the DEPARTMENT or any of its current and former employees, officers, agents, or attorneys which occurred or should have occurred on or prior to the date of this Agreement arising out of or relating to her employment with the DEPARTMENT and/or her resignation, including without limitation, any and all claims waivable by law for violations of the civil rights laws or employment laws of the United States and/or the State of Colorado.  This release of claims shall include, without limitation, any claims or cause of actions under: the Constitution of the United States or the State of Colorado; Title VII of the Civil Rights Act of 1964, as amended, including the Equal Employment Opportunity Act of 1972; 42 U.S.C. §§1981 and 1983, amended; the Age Discrimination in Employment Act of 1967, as amended; the Americans with Disabilities Act of 1990, as amended, including the ADA Amendments Act of 2008; the Civil Rights Acts of 1991; the Family and Medical Leave Act of 1993, as amended; the Equal Pay Act; and the Rehabilitation Act of 1973, as amended, the Colorado Anti-Discrimination Act, and the Colorado Judicial System Personnel Rules.

c.  EMPLOYEE warrants that she has not filed a charge or claim with the Equal Employment Opportunity Commission or any state agency, or any other complaint, civil action, or lawsuit, against the DEPARTMENT, and further that EMPLOYEE has not assigned or transferred to any person any portion of any claim which is released and waived by this Agreement.  Nothing in this section shall restrict EMPLOYEE from filing a charge with the Equal Employment Opportunity Commission, or an equivalent state agency, or participating in agency proceedings.  However, EMPLOYEE understands and agrees that, by entering into this Agreement, she is releasing any and all individual claims for relief, including any right to payment of any kind from any charge or complaint that is not restricted or waived in this Agreement.

2

3.    Non-Disclosure.  EMPLOYEE agrees that she shall not disclose or discuss any aspect of this Resignation and Release of Claims Agreement, the circumstances surrounding the disciplinary action, confidential and nonpublic information obtained or collected during the course of her employment, or the circumstances surrounding the negotiation of this Agreement to any third party except to the extent disclosure is required for tax, retirement, benefits, insurance or banking purposes, or in response to a valid subpoena.  EMPLOYEE shall use reasonable efforts to maintain the confidentiality of information and materials, whether oral, written or in any form whatsoever, protected from disclosure pursuant to this provision, and shall preserve all such information as confidential.

4.    Return of Judicial Property and Information.  EMPLOYEE hereby warrants that she has returned all items, documents, data, information, passwords, access information, and any other property or data of any type whatsoever, whether printed or electronic, that belong to the DEPARTMENT and were in EMPLOYEE's possession or control.  EMPLOYEE will destroy any copies of documents, information or data she discovers in her possession that she has not returned and/or cannot return as of the date of this Agreement.

**OBLIGATIONS OF DEPARTMENT**

5.    Acceptance of Resignation.  The DEPARTMENT agrees to accept EMPLOYEE's resignation from her employment in accordance with the terms and conditions of this Agreement, effective June 12, 2019.

6.    Paid Administrative Leave.  In consideration for the above release of claims and the requirements of this Agreement related to confidentiality and nondisclosure, the DEPARTMENT agrees to place EMPLOYEE on paid administrative leave beginning on April 12, 2018 until the effective date of her resignation, at which time she shall receive her final paycheck, if any, less usual and customary withholdings, and a pay-out for any accrued paid time off to which EMPLOYEE is entitled under the CJSPR.  During the time which EMPLOYEE is on paid administrative leave, she shall be paid in accordance with the DEPARTMENT's regular pay period based on an annual salary of $122,397.  In addition, EMPLOYEE's benefits, including but not limited to PERA, shall continue while on paid administrative leave.  Currently, the DEPARTMENT is unaware of any actions EMPLOYEE took that were outside the scope of duties that DEPARTMENT assigned EMPLOYEE, but DEPARTMENT has not investigated all possible claims related to EMPLOYEE's employment, and will not investigate without further cause.

7.    Personnel Coding.  The DEPARTMENT agrees that EMPLOYEE's separation from employment shall be coded internally as a voluntary resignation for personal reasons.

8.    External Reference Checks.  EMPLOYEE shall direct all inquiries regarding the circumstances surrounding her separation from employment to the Division of Human Resources of the State Court Administrator's Office.  Such inquiries will be answered by providing only the dates of service, position held, salary and that she voluntarily resigned from her position.  The DEPARTMENT makes no representations as to the response to any inquiry made in any other manner or to any person other than pursuant to a reference check as set forth herein.

3

**GENERAL PROVISIONS**

9.      Confidentiality.  The parties agree that the circumstances surrounding EMPLOYEE'S separation from employment, the facts and allegations involved in the disciplinary process investigation, the discussions and negotiations leading to this Agreement, and the terms and provisions of this Agreement shall be treated by the parties as a confidential matter.  Any breach of the requirements of this Agreement as to confidentiality and nondisclosure shall be a material breach of this Agreement.  Both parties understand, however, that this Agreement may be subject to open records requirements of applicable public disclosure laws or administrative directive or rule and that any such request for information is controlled by the provisions of that governing authority.  EMPLOYEE agrees she will not hold the DEPARTMENT or its administrators, officers, agents or employees liable for any information released in compliance with an applicable law, directive, rule or court order.   Without violating the terms of this Agreement, the parties may disclose if asked by a third party, that the matter has been resolved to the mutual satisfaction of the parties.

10.      Claims under the ADEA. With regard to any rights or claims arising under the Age Discrimination Employment Act, 29 U.S.C. 621, *et. seq.*, ("ADEA")*,* EMPLOYEE understands that all of those rights and claims are released by this Agreement and that she must have a period of at least 21 days within which to consider this Agreement before executing, and that she has seven (7) days following her execution of this Agreement to revoke the Agreement to the extent that it waives and releases those rights or claims.  EMPLOYEE understands that this Agreement is not effective or enforceable with respect to the waiver or release of those rights or claims until after the seven (7) day period.  If EMPLOYEE elects to revoke this Agreement with respect to her waiver of rights or claims arising under 29 U.S.C.  621 *et. seq*., within the seven (7) day period, she must advise the DEPARTMENT by delivering a written revocation to be received by the Director of Human Resources, State Court Administrator's Office, 1300 Broadway, Suite 1200, Denver, CO 80203, no later than 5:00 p.m. on the seventh (7th) calendar day after the date on which this Agreement was entered into.  Such revocation shall not affect the waiver or release of any rights or claims not arising under 29 U.S.C. 621 *et. seq*.

11.      Integration.  The parties understand, acknowledge and agree that this Agreement constitutes the entire release and settlement agreement between the parties with respect to the subject matter and transactions referred to herein and may not be amended absent a writing evidencing such an amendment executed by both parties.  The parties understand, acknowledge and agree that the terms of this Agreement are contractual in nature and not mere recitals.  As such, the parties understand, acknowledge and agree that this Agreement is fully integrated and supersedes all previous oral or written agreements of the parties.  The parties understand, acknowledge and agree that the signing of this Agreement shall be forever binding, and no rescission, modification or release by the parties of the terms of this Agreement will be made for mistake or any other reason.

12.      Binding Effect.  This Agreement shall inure to the benefit of, and be binding upon, the successors, assigns and heirs of the parties.

13.    <u>Governing Law</u>.  This Agreement is entered in Colorado and shall be governed by the laws of the State of Colorado.

14.    <u>Headings.</u>  The headings and article captions used in the Agreement are for the convenience of the parties only and shall not have any legal effect or in any way alter or modify the meaning or interpretation of the Agreement.

15.    <u>Additional Assurances</u>.  This Agreement is intended to be self-operative. Notwithstanding the foregoing, both parties agree that, at the reasonable request of the other party, they shall execute any further documents or instruments reasonably necessary to effectuate the transactions contemplated by this Agreement.

16.    <u>Attorney Fees and Costs</u>.  The parties agree that each party shall be responsible for her/its own costs and expenses, including attorney fees associated with the negotiation and execution of this Agreement.

17.    <u>Warranties and Acknowledgments.</u>  The parties expressly warrant that they have carefully and completely read the terms of the Agreement and that they enter into it knowingly and voluntarily, and without coercion, duress or undue influence.  The parties acknowledge they have had the opportunity to consult with their respective attorneys prior to the execution of the Agreement and/or have consulted with their respective attorneys prior to executing the same. The parties further acknowledge they believe the terms of the Agreement to be lawful, fair, and conscionable.  The parties acknowledge they believe the terms of the Agreement are appropriate to reach a full and final settlement of the disputed matters referenced herein.

18.    <u>No Admission.</u>  The parties agree that this Agreement shall not be construed as an admission of liability on the part of either party regarding any of the charges or claims which were made, or could have been made, as part of the disputed matters referenced herein.

19.    <u>Competency and Authority.</u>  The parties to the Agreement are legally competent and have the authority to execute the Agreement.

20.    <u>Severability.</u>  If any section of this Agreement is found to be invalid by a Court of competent jurisdiction, the rest of the Agreement will remain in full force and effect.

    WHEREFORE, the parties agree to and accept the terms of this Agreement on the dates reflected with their signatures.

[Signature Page Follows]

I, EMPLOYEE, HAVE BEEN GIVEN THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY BEFORE SIGNING. I HAVE READ THE FOREGOING AGREEMENT FOR RESIGNATION AND RELEASE OF CLAIMS AND UNDERSTAND ITS TERMS AND LEGAL CONSEQUENCES. BY SIGNING THIS AGREEMENT, I UNDERSTAND I AM RELEASING ANY AND ALL CLAIMS I MAY HAVE AGAINST THE COLORADO JUDICIAL DEPARTMENT, INCLUDING WITHOUT LIMITATION THE STATE COURT ADMINISTRATOR'S OFFICE AND VARIOUS OTHER PERSONS WHICH COULD HAVE BEEN ASSERTED AS SET FORTH ABOVE.  I UNDERSTAND THE TERMS USED IN THIS AGREEMENT AND HEREBY EXECUTE IT KNOWINGLY AND VOLUNTARILY.

EMPLOYEE

Jane Hood

Date:    9\4\18

OFFICE OF THE STATE COURT ADMINISTRATOR, COLORADO JUDICIAL DEPARTMENT

Christopher T. Ryan
State Court Administrator

Date:    9/4/2018

6

# Appendix 11

# *Agreement for Voluntary Layoff and Release of Claims* (David Kribs separation agreement), executed May 15, 2019.

## AGREEMENT FOR VOLUNTARY LAYOFF AND RELEASE OF CLAIMS

This Agreement for Voluntary Layoff and Release of Claims ("Agreement") is entered into between the Colorado Judicial Department, State Court Administrator's Office (hereinafter referred to collectively as the "DEPARTMENT") and David Kribs (hereinafter referred to as "EMPLOYEE"). DEPARTMENT and EMPLOYEE may collectively be referred to as the parties.

## RECITALS

WHEREAS, EMPLOYEE worked in the position of Chief Financial Officer and Director of the Financial Services Division for the DEPARTMENT;

WHEREAS, the DEPARTMENT is considering restructuring and has agreed to allow EMPLOYEE to take part in a Voluntary Separation Incentive Program ("VSIP");

WHEREAS, EMPLOYEE desires to reach an amicable resolution of the matter by agreeing to take a voluntary layoff from his position under the terms and conditions of this Agreement; and

WHEREAS, the DEPARTMENT is willing to accept EMPLOYEE's voluntary layoff in exchange for a full release of claims in accordance with the terms and conditions set forth below;

IN CONSIDERATION of the mutual and unilateral covenants, obligations, promises and warranties contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

## OBLIGATIONS OF EMPLOYEE

1.    Voluntary Layoff. EMPLOYEE has agreed to take a voluntary layoff and receive VSIP benefits paid to him as administrative leave pursuant to Rule 31 of the Colorado Judicial System Personnel Rules ("CJSPR"). The layoff shall be effective September 30, 2019. EMPLOYEE understands and agrees that in doing so he waives all rights to withdraw the voluntary layoff and agrees that having agreed to a voluntary layoff he has no right to any appeal or review under the CJSPR.

2.    General Release.

a. EMPLOYEE, including his successors, agents, assigns, and estate, hereby releases DEPARTMENT and all current and former employees, officers, agents and attorneys, in their official or personal capacities, from any and all claims, causes of action, liabilities, expenses, attorney fees or damages waivable by law which EMPLOYEE may have or may assert against them as a result of any actions or omissions of the DEPARTMENT or any of its current and former employees, officers, agents or attorneys which have occurred or should have occurred on or prior to the date of this Agreement arising out of or relating to his employment with DEPARTMENT and/or his layoff.

1

b. EMPLOYEE further agrees and covenants that he will not sue, or assert any cause of action, at law or in equity, before any court of law or administrative agency, against the DEPARTMENT or any of its current and former employees, officers, agents or attorneys, in their official or personal capacities, for any claims, causes of action, liabilities, expenses, or damages arising out of any actions or omissions of the DEPARTMENT or any of its current and former employees, officers, agents, or attorneys which occurred or should have occurred on or prior to the date of this Agreement arising out of or relating to his employment with the DEPARTMENT and/or his layoff, including without limitation, any and all claims waivable by law for violations of the civil rights laws or employment laws of the United States and/or the State of Colorado. This release of claims shall include, without limitation, any claims or cause of actions under: the Constitution of the United States or the State of Colorado; Title VII of the Civil Rights Act of 1964, as amended, including the Equal Employment Opportunity Act of 1972; 42 U.S.C. §§1981 and 1983, as amended; the Age Discrimination in Employment Act of 1967, as amended; the Americans with Disabilities Act of 1990, as amended, including the ADA Amendments Act of 2008; the Civil Rights Acts of 1991, as amended; the Family and Medical Leave Act of 1993, as amended; the Equal Pay Act; the Rehabilitation Act of 1973, as amended; the Colorado Anti-Discrimination Act, as amended; the Colorado Judicial System Personnel Rules; and any other federal or state law, rule or regulation.

c. EMPLOYEE warrants that he has not filed a charge or claim with the Equal Employment Opportunity Commission or any state agency, or any other complaint, civil action, or lawsuit, against the DEPARTMENT, and further that EMPLOYEE has not assigned or transferred to any person any portion of any claim which is released and waived by this Agreement. Nothing in this section shall restrict EMPLOYEE from filing a charge with the Equal Employment Opportunity Commission, or an equivalent state agency, or participating in agency proceedings. However, EMPLOYEE understands and agrees that, by entering into this Agreement, he is releasing all individual claims for relief, including any right to payment of any kind from any charge or complaint that is not restricted or waived in this Agreement.

3.    Non-Disclosure. EMPLOYEE agrees that he shall not affirmatively disclose or discuss any aspect of this Agreement, the circumstances surrounding the Agreement to any third party except to the extent disclosure is required for tax, retirement, benefits, insurance or banking purposes, as legally required, or in response to a valid subpoena.

## OBLIGATIONS OF DEPARTMENT

4.    Acceptance of Voluntary Layoff.    The DEPARTMENT agrees to effectuate EMPLOYEE's voluntary layoff from his employment in accordance with the terms and conditions of this Agreement, effective September 30, 2019.

5.    Paid Administrative Leave. In consideration for the above release of claims, the DEPARTMENT agrees to place EMPLOYEE on paid administrative leave, inclusive of all pay and benefits, beginning on May 1, 2019 until the effective date of his layoff, September 30, 2019, at which time he shall receive his final paycheck, if any, less usual and customary withholdings, and a pay-out for any accrued paid time off to which EMPLOYEE is entitled under the CJSPR. EMPLOYEE's VSIP benefits shall begin on June 1, 2019 and shall last till the

2

effective date of his layoff.  EMPLOYEE shall not be required to perform any services for the benefit of the DEPARTMENT during this administrative leave.  EMPLOYEE understands and acknowledges that the paid administrative leave DEPARTMENT will provide is the consideration for EMPLOYEE'S duties and obligations pursuant to this Agreement, and EMPLOYEE would not be otherwise entitled to the payment of wages or receipt of benefits EMPLOYEE will receive during paid administrative leave.

6.    Personnel Coding.  The DEPARTMENT agrees that EMPLOYEE's separation from employment shall be coded internally as a voluntary layoff under Rule 31 of the CJSPR.  The DEPARTMENT shall remove any disciplinary action from EMPLOYEE's personnel file, and any supporting documentation for any disciplinary action found in the personnel file.  The DEPARTMENT will not contest any application by the EMPLOYEE for unemployment benefits.

7.    External Reference Checks.  EMPLOYEE shall direct all inquiries regarding the circumstances surrounding his separation from employment to the Division of Human Resources of the State Court Administrator's Office.  Such inquiries will be answered by providing EMPLOYEE's dates of service, position held, salary and that he was laid off from his position due to accepting a voluntary layoff and the effective date of layoff.

## GENERAL PROVISIONS

8.    Confidentiality.  The parties agree that the circumstances surrounding EMPLOYEE'S separation from employment, this Agreement and its terms shall be treated by the parties as a confidential matter.  Both parties understand, however, that this Agreement may be subject to open records requirements of applicable public disclosure laws or administrative directive or rule and that any such request for information is controlled by the provisions of that governing authority.  EMPLOYEE agrees he will not hold the DEPARTMENT or its administrators, officers, agents or employees liable for any information released in compliance with an applicable law, directive, rule or court order.

9.    Claims under the ADEA. With regard to any rights or claims arising under the Age Discrimination Employment Act, 29 U.S.C. § 621, *et seq.*, ("ADEA"), EMPLOYEE understands that all of those rights and claims are released by this Agreement and that he must have a period of at least forty five (45) days within which to consider this Agreement before executing, and that he has seven (7) days following his execution of this Agreement to revoke the Agreement to the extent that it waives and releases those rights or claims.  EMPLOYEE understands that this Agreement is not effective or enforceable with respect to the waiver or release of those rights or claims until after the seven (7) day period.  If EMPLOYEE elects to revoke this Agreement with respect to his waiver of rights or claims arising under the ADEA within the seven (7) day period, he must advise the DEPARTMENT by delivering a written revocation to be received by the Director of Human Resources, State Court Administrator's Office, 1300 Broadway, Suite 1200, Denver, CO 80203, no later than 5:00 p.m. on the seventh (7th) calendar day after the date on which this Agreement was entered into.  Such revocation shall not affect the waiver or release of any rights or claims not arising under the ADEA.

3

10.   Integration.   The parties understand, acknowledge and agree that this Agreement constitutes the entire release and settlement agreement between the parties with respect to the subject matter and transactions referred to herein and may not be amended absent a writing evidencing such an amendment executed by both parties.  The parties understand, acknowledge and agree that the terms of this Agreement are contractual in nature and not mere recitals.  As such, the parties understand, acknowledge and agree that this Agreement is fully integrated and supersedes all previous oral or written agreements of the parties.  The parties understand, acknowledge and agree that the signing of this Agreement shall be forever binding, and no rescission, modification or release by the parties of the terms of this Agreement will be made for mistake or any other reason.

11.   Binding Effect.  This Agreement shall inure to the benefit of, and be binding upon, the successors, assigns and heirs of the parties.

12.   Governing Law.  This Agreement is entered in Colorado and shall be governed by the laws of the State of Colorado.

13.   Headings.   The headings and article captions used in the Agreement are for the convenience of the parties only and shall not have any legal effect or in any way alter or modify the meaning or interpretation of the Agreement.

14.   Additional  Assurances.   This  Agreement  is  intended  to  be  self-operative. Notwithstanding the foregoing, both parties agree that, at the reasonable request of the other party, they shall execute any further documents or instruments reasonably necessary to effectuate the transactions contemplated by this Agreement.

15.   Attorney Fees and Costs.  The parties agree that each party shall be responsible for his/its own costs and expenses, including attorney fees associated with the negotiation and execution of this Agreement.

16.   Warranties and Acknowledgments.   The parties expressly warrant that they have carefully and completely read the terms of the Agreement and that they enter it knowingly and voluntarily, and without coercion, duress or undue influence.  The parties acknowledge they have had the opportunity to consult with their respective attorneys prior to the execution of the Agreement and/or have consulted with their respective attorneys prior to executing the same. The parties further acknowledge they believe the terms of the Agreement to be lawful, fair, and conscionable.  The parties acknowledge they believe the terms of the Agreement are appropriate to reach a full and final settlement of the disputed matters referenced herein.

17.   No Admission.  The parties agree that this Agreement shall not be construed as an admission of liability on the part of either party regarding any of the charges or claims which were made, or could have been made, as part of the disputed matters referenced herein.

18.   Competency and Authority.  The parties to the Agreement are legally competent and have the authority to execute the Agreement.

4

19.     Severability.  If any section of this Agreement is found to be invalid by a Court of competent jurisdiction, the rest of the Agreement will remain in full force and effect.

WHEREFORE, the parties agree to and accept the terms of this Agreement on the dates reflected below.

I, EMPLOYEE, HAVE BEEN GIVEN THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY BEFORE SIGNING. I HAVE READ THE FOREGOING AGREEMENT FOR VOLUNTARY LAYOFF AND RELEASE OF CLAIMS AND UNDERSTAND ITS TERMS AND LEGAL CONSEQUENCES.  BY SIGNING THIS AGREEMENT, I UNDERSTAND I AM RELEASING ANY AND ALL CLAIMS I MAY HAVE AGAINST THE COLORADO JUDICIAL DEPARTMENT, INCLUDING WITHOUT LIMITATION THE STATE COURT ADMINISTRATOR'S OFFICE AND VARIOUS OTHER PERSONS WHICH COULD HAVE BEEN ASSERTED AS SET FORTH ABOVE.  I UNDERSTAND THE TERMS USED IN THIS AGREEMENT AND HEREBY EXECUTE IT KNOWINGLY AND VOLUNTARILY.

David Kribs
Employee

Signed this 15 day of May, 2019.


Christopher T. Ryan
State Court Administrator

Signed this 15th day of May, 2019.

5

# Appendix 12

# *Denver Post* and *Denver Gazette* articles re: allegations in Masias Memo as to Justice Richard Gabriel.

NEWS › **COLORADO NEWS** • Investigative, News

# Supreme Court Justice Richard Gabriel faced harassment accusation while a candidate for Colorado's high court

Agreement with accuser kept the issue from tainting his chances, memo says



Justice Richard L. Gabriel listens as Chief Justice of the Colorado Supreme Court Brian D. Boatright delivers an emotional speech about misconduct within the state's justice department to the House of Representatives at the Colorado State Capitol Building on Thursday, February 18, 2021. Allegations of sexual misconduct, harassment and a possible coverup contract worth $2.5 million have resulted in a request by the supreme court to other branches of the government to investigate the department. (Photo by AAron Ontiveroz/The Denver Post)

By **DAVID MIGOYA** | dmigoya@denverpost.com | The Denver Post
PUBLISHED: February 26, 2021 at 6:00 a.m. | UPDATED: February 26, 2021 at 8:02 a.m.

19

A harassment accusation made nearly eight years ago against Colorado Supreme Court Justice Richard Gabriel, then a judge on the state Court of Appeals, by a newly hired law clerk was settled quickly and quietly, according to two people with knowledge of the agreement, essentially ensuring it would not sully his shot at the high court.



To safeguard that secrecy, the Colorado Judicial Department had the female appellate law clerk who made the accusation in September 2013 – then a 34-year-old who was a year out of an Ivy League law school – sign a non-disclosure agreement that kept her on the payroll for a year in return for her promise not to sue, the sources confirmed for The Denver Post.

The woman claimed the judge and a male law clerk in the court created an uncomfortable work environment for her shortly after her arrival in August 2013, the sources said.

In an email to The Post, Gabriel said that "any suggestion that I engaged in any form of harassment of anyone at any time is false."

At the time Gabriel hired the woman to work for him as a judicial clerk, he was an applicant for an opening on the state Supreme Court.

An internal department investigation was inconclusive about the woman's allegations. The release agreement she signed was allegedly approved by a chief justice and kept from reaching the Supreme Court Nominating Commission.

The allegation that the release agreement was crafted to keep Gabriel "safe" during the Supreme Court nomination process is part of a two-page memo at the center of a scandal over a $2.5 million contract awarded to a former department official. That official, Mindy Masias, was prepared to file a tell-all sex discrimination lawsuit if she was fired over financial irregularities.

Who conducted the investigation into the woman's complaint is unclear. Masias was the department's director of human resources at the time.

> **RELATED:** *Colorado Supreme Court releases memo citing examples of sex-discrimination, judicial misconduct that led to alleged contract for silence*

The woman left the department before her one-year contract was completed but continued to be paid for the full term, according to the sources, who refused to be identified because they could be disciplined for discussing the confidential matter publicly. Another female law clerk replaced the woman on Gabriel's staff in December 2013, she told The Post in an interview and one of the sources confirmed.

The Judicial Department has refused repeated Denver Post requests for a copy of the agreement under the judiciary's open records rules, saying internal personnel investigations and sexual harassment complaints and investigations are protected from disclosure.

Steven Zansberg, a 1st Amendment attorney for The Post, argued that settlement agreements between former public employees, in all branches of government, and their former government employers are routinely declared to be public records — even in cases where sexual harassment allegations are at issue.

The former clerk was paid about $50,400 in all, payroll records confirm, the standard annual salary for an appellate law clerk at the state's Court of Appeals.

Details of the conduct that led the woman to complain are unclear, but one of the sources described the alleged harassment as "a 2 on a scale of 1 to 10," and, at its heart, a misunderstanding over what was said.

The agreement was intended to "not ruin her career, to put this behind her and (allow her) to move on," the person said, refusing to offer specifics. "Basically it wasn't what she had signed up for. It wasn't a good fit. It was a very uncomfortable situation for her."

The former law clerk, now an attorney specializing in employment law outside of Colorado, did not respond to repeated telephone and email messages from The Post. The newspaper does not name the alleged victims of harassment without their permission, but sources confirmed her identity and judicial department records confirm her employment.

> **RELATED:** *Colorado Judicial Department gave $2.5 million contract to prevent tell-all sex discrimination lawsuit about judges', court officials' misconduct*

The male law clerk involved, now an attorney in private practice, confirmed a department investigation was conducted.

"I was interviewed as part of an internal investigation and during that process I was specifically told by the investigator that no allegations of inappropriate conduct had been made against me," he told The Post in an email. "I have never been made aware of any allegations of misconduct against me by (the woman) or anyone else during my time at the Judicial Department. I never engaged in any misconduct."

The memo, authored by then-Human Resources Director Eric Brown, highlighted a number of situations in the department in which alleged gender discrimination and sexually explicit misdeeds by male judges and other high-ranking officials dating back nearly a decade were ignored or covered up to protect them.

Brown was Masias' deputy when the law clerk's allegations were investigated.

The decision to negotiate the settlement with the law clerk was "per the chief justice," the memo said, though it did not name the judge. Chief Justice Michael Bender was retiring at the time and Chief Justice Nancy Rice was to replace him.

"Negotiated a release agreement with a law clerk who accused her COA (Court of Appeals) judge of harassment in order to keep the COA judge 'safe' during the … Supreme Court Justice selection process per the chief justice," the memo says.



At the request of the Supreme Court, a panel of eight people was named last week by Gov. Jared Polis, Attorney General Phil Weiser and the Legislature to hire and monitor an independent investigator to look into the memo's allegations. Simultaneously, Colorado Auditor Dianne Ray's office is investigating the assertion that the $2.5 million contract was given to Masias, the department's former chief of staff, to avoid the tell-all lawsuit.

Responding to an email from The Post seeking comment on the circumstances and details of the negotiated settlement with the former clerk, Gabriel said: "Your recitation of the facts of this matter is incorrect," but he declined to elaborate.

Gabriel also said he welcomed the inquiry.

"I will cooperate fully with the forthcoming independent investigation and will be fully vindicated," he said in the email. "Pending completion of that investigation, I will have no further comment."

While Gabriel was not among three Supreme Court finalists named in October 2013 to replace the retiring Bender – Justice William Hood eventually received the appointment – the release agreement ensured Gabriel's hopes for the state's highest court would not be marred.

Bender told The Denver Post he was not aware of any harassment complaint against any Court of Appeals judge applicant to the Supreme Court at the time. As an ex-officio chairman of the nominating commission, Bender said he would have been duty-bound to report any such incident to them, no matter how slight.

Then-incoming Chief Justice Rice has told The Post she was aware of the harassment complaint as detailed in the memo, but didn't say when she knew of it. She said she knew a department investigation had ensued and that there was a resolution.

She would not say whether the complaint was founded or not, or what the resolution was.

The Colorado Commission on Judicial Discipline has said none of the incidents listed in the memo was sent to them despite a department directive that requires the referral of all harassment complaints. The commission must disclose any founded complaint to a judicial nominating commission.

Several members of the 15-person Supreme Court nominating commission from that time have told The Post they recall Gabriel was an applicant for Bender's slot. They said they do not recall learning of any negative issues regarding anyone who applied for the court's open seat, and that such information would likely have had a material impact on whether an applicant would get nominated to the governor.

The commission fans out to conduct extensive interviews of the applicants, as well as associates and colleagues, then conducts multiple votes before deciding on three names to be forwarded to the governor.

Gov. John Hickenlooper appointed Gabriel to the Supreme Court in June 2015, replacing retiring Justice Gregory Hobbs Jr. Gabriel had been an appellate judge for eight years.

In a recent public hearing in which the Supreme Court heard comments regarding increased transparency in the attorney discipline process, Gabriel said there should be some limitation on what complaints become public.

"I am concerned with this, unlimited, everything is open to the world (approach) because I fear the damage, reputationally, that it could do to very fine lawyers who did nothing wrong, and clients using it as a weapon against a lawyer," Gabriel said.

He has also emailed others to say initial Denver Post stories that revealed the existence of the memo, the judicial department's refusal to release it, and former State Court Administrator Christopher Ryan's assertions of a quid-pro-quo contract were "simply not true."

"As in (The Post's) past articles on the branch, which are uniformly negative, in this one, (The Post) found an unhappy ex-employee and (The Post) ran with the one-sided, sensationalist narrative (The Post) was told," Gabriel emailed his staff on Feb. 3, the morning The Post's first story appeared, according to a copy obtained by the newspaper via an open records request.

The court released the memo five days later after the justices said they read it for the first time, and Chief Justice Brian Boatright called for an independent investigation into its contents and the auditor's inquiry into Ryan's claims.

AdChoices ▷          Sponsored

Policies
Report an Error
Contact Us
Submit a News Tip

 The Trust Project

---

TAGS:   **COLORADO COURT OF APPEALS**,   **COLORADO JUDICIARY SCANDAL**,   **COLORADO SUPREME COURT**,
**CONTRACT**,   **COURT**,   **COURTS**,   **DISCRIMINATION**,   **EMPLOYMENT**,   **GENDER**,   **HARASSMENT**,
**INVESTIGATION**,   **INVESTIGATIONS**,   **LAWSUIT**,   **OPEN RECORDS**,   **SEXUAL HARASSMENT**

 **David Migoya** | Investigative Reporter
David writes investigative projects and has been at The Denver Post since 1999. He was a founding member of the
investigations team before moving on to write about banking, finance, human services and consumer affairs, then
returned to investigations. David has also worked at publications in New York City, St. Louis and Detroit over a career
that began at the Post in 1983.

dmigoya@denverpost.com

🐦 Follow David Migoya @davidmigoya

---

SPONSORED CONTENT



**Higher Ed investment can reduce Latino equity gap**

By Education Today | Presented by Western Governors University

WGU

The Colorado Latino community has the lowest educational attainment and
the lowest college enrollment rate of any group in the state.



Report determines... Case No. 1:25-cv-03361-KHV-GEB  Document 1-6  denverpost.com... filed 10/23/25 02/2... USDC Colorado  harassme...

pg 167 of 3124

.NEWS > COLORADO NEWS • Investigative, News

# Report determines harassment accusation unfounded



By **THE DENVER POST** | newsroom@denverpost.com | The Denver Post
PUBLISHED: February 26, 2021 at 6:00 a.m. | UPDATED: July 29, 2022 at 1:50 p.m.

The original story and headline have been removed from The Denver Post website under guidelines meant to ensure our published archive is an accurate reflection of events. The original story detailed a harassment allegation against a sitting judge and an agreement with the accuser. It included sources who said the agreement was reached quickly and quietly, essentially ensuring it would not harm the judge's ability to obtain a seat on the high court. In the story, the judge said he had never engaged in harassment. The Judicial Department refused to release a copy of the agreement, saying internal personnel investigations and sexual harassment complaints and investigations are protected from disclosure.

However, a subsequent report by Investigations Law Group, which was hired by the Colorado Judicial Department to investigate allegations of sexual harassment and gender discrimination within the branch, showed the harassment complaint was never substantiated. While an agreement was reached with the woman who accused the judge, the report determined that was linked to "later complaints from the clerk, implicating retaliation concerns" that stemmed from a job reassignment.



Report determines Case No. 1:25-cv-03361-KHV-GEB ver Police... Document 1-6 denver filed 10/23/25 02/2...USDC Colorado arassme...

pg 168 of 3124

The report did say her complaints about retaliation and her job reassignment were not handled properly.

The full report can be found here. The information relevant to this allegation begins on Page 20.

Th

T The Trust Project ∨

**Prime is Now $179, But Few Know this Free Savings Hack**
Online Shopping Tools | Sponsored

**California Heart Surgeon Begs Americans: "Stop Doing This To Your Avocados"**
Gundry MD | Sponsored                                    Watch Now

**Seniors on SS Are Now Entitled To These 24 "Kickbacks" In February (Tap For Full List)**
YourPennySaver | Sponsored                               Learn More

**'Never Going Back to Prime'—Why 20,000 Users Prefer This Shopping Secret**
Online Shopping Tools | Sponsored

**California Surgeon: Dark Spots Are No Match For This Genius DIY Solution**
Gundry MD | Sponsored                                    Learn More

# COVER STORY

## Judicial branch mum on details of alleged settlement

**BY CHRISTOPHER OSHER**
The Denver Gazette

Colorado's judicial branch will neither confirm nor deny whether it has any additional records on the allegation that a Court of Appeals judge negotiated an agreement with a law clerk to prevent the clerk from disclosing sexual harassment claims, citing a provision of its rules that requires confidentiality for all investigations it conducts into sexual harassment claims against judges.

Terri Morrison, the legal counsel for Colorado's Judicial Department, denied a records request from The Gazette seeking details about the alleged release agreement, which was one of nearly two dozen misconduct allegations listed in a recent memo The Gazette and The Denver Post obtained.

"Without confirming or denying the factual assumptions in your request, any record responsive to your request necessarily would be required to be withheld," she said, citing a portion of the court system's rules for governing public access to information and records.

The section she cited states that a records custodian "must deny" public inspection of "any records of sexual harassment complaints and investigations, whether or not such records are maintained as part of a personnel file."

"Disclosure of all or a part of any records of sexual harassment complaints and investigations to the person in interest is permissible to the extent that the disclosure can be made without permitting the identification, as a result of the disclosure, of any individual involved," the section further states.

That section also states that harassment complaints and any investigation into those complaints can be made public by a "a person of interest" when

such "record supports the contention that a publicly reported, written, printed or spoken allegation of sexual harassment against such a person is false."

Jeffrey Roberts, executive director of the Colorado Freedom of Information Coalition, said details about the release agreement should be made public.

"The fact that there appears there was a settlement, which involved compensation to this law clerk, it's hard to see how that fits the definition of a sexual harassment complaint or investigation into such a complaint," Roberts said. "There could be details in this agreement that would have to be redacted, but the fact of the agreement and the exchange of money or payment of money, that would be seem to be something that would not be covered by that rule."

He added: "The public needs to know if this happened. If the allegation is true that there was a negotiated agreement to protect a Court of Appeals judge, that has to come out at some point."

Last week, the alleged release agreement between the law clerk and the Appeals Court judge was mentioned in a memo that became public detailing nearly two dozen instances of misconduct involving judges and court administrators. The memo stated that the release agreement was negotiated to settle allegations of harassment, and that the settlement preserved the judge's chances for potential selection to the Colorado Supreme Court.

The memo contained no further details about the settlement and did not reveal whether any money was paid as part of the settlement or detail any names involved in the settlement.

The release agreement was one of nearly two dozen instances of misconduct involving judges and administra-



**Mindy Masias**

COURTESY PHOTO

tors in the court system. The memo also states that Mindy Masias, the former chief of staff to the Colorado Supreme Court, was told to destroy an anonymous complaint alleging sexism and harassment by a former chief justice of the Colorado Supreme Court, who also was not identified.

The memo further alleged that two lower court judges were promoted to chief judge status in their judicial districts despite sending pornographic emails on their judicial emails and details instances involving court administrators, including one who allegedly was having sex with his staff.

The Colorado Supreme Court made the memo public after The Denver Post reported its existence. Christopher Ryan, Colorado's former state court administrator, told The Post he took the memo to Nathan "Ben" Coats, who at

that time was chief justice of the Colorado Supreme Court.

Ryan alleges that Coats agreed with Ryan's suggestion that they give Masias a sole source training contract worth up to $2.72 million to prevent her from filing a lawsuit that would make the misconduct detailed in the memo public.

The Colorado Supreme Court has denied that the contract, which later was terminated, was given to Masias to keep her allegations from becoming public. Brian Boatright, the current chief justice of the Colorado Supreme Court, announced this week that he will have the governor, Legislature and Colorado Attorney General's Office convene a panel that will select an independent counsel to investigate the allegations in the memo and release the results of that investigation to the public.

## Women's Bar seeks meeting with high court on sexual harassment

**BY MICHAEL KARLIK**
The Denver Gazette

The Colorado Women's Bar Association has requested a meeting with the state's Supreme Court justices to discuss sexual harassment within the judiciary.

"Recent revelations regarding complaints of sexual harassment within the judicial system, and their nontransparent handling, have been profoundly demoralizing to our members," wrote Miranda K. Hawkins, the president of

the association which represents approximately 1,5000 attorneys and other legal professionals.

Earlier this month, reports emerged of a multimillion dollar contract awarded to a former Judicial Department employee in exchange for her silence on a slew of misconduct allegations, including harassment and sexism.

"In keeping with our mission, we request an immediate meeting to discuss the following preliminary recommen-

dations for systemic reform," Hawkins added. "We value the independence of the judiciary along with safety for women, and offer our expertise to help build solutions that respect your independence but create sorely needed accountability."

Among the possible reforms to the judiciary, the CWBA proposed allowing judicial staff to anonymously review judges, soliciting any experiences of discrimination, harassment or bias.

The bar association also suggested including statistics about those types of complaints in judges' retention evaluations. The judicial retention process accounts for such factors as demeanor or knowledge of the law in a judge's public work, but may not describe the totality of complaints against judges for voters.

Finally, CWBA asked for the hiring of an independent investigator within the judiciary specifically for discrimination and harassment complaints.

FRIDAY, FEBRUARY 19, 2021 | THE DENVER GAZETTE | **A9**

pressreader PRINTED AND DISTRIBUTED BY PRESSREADER PressReader.com +1 604 278 4604 COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# Appendix 13

# David Migoya, *Nondisclosures Under Fire: State Confidentiality Agreements Cost Millions, Silence Whistleblowers*, DENVER GAZETTE, November 13, 2022.

**CRYPTO**
Collapsed FTX hit by rogue transactions; $1B in customer funds may have vanished. **C1**

**FOOTBALL**
Wyoming holds off CSU 14-13 to claim Border War, Bronze Boot. **D12**



**THEATER**
Family's harrowing, hopeful journey through COVID-19 ends up on stage. **E1**

# The Denver Gazette

SERVING DENVER & THE METRO AREA • DENVERGAZETTE.COM        MOSTLY SUNNY • HIGH 47: LOW 23        SUNDAY, NOVEMBER 13, 2022

# NONDISCLOSURES UNDER FIRE

**IN NATIONAL POLITICS**

## DEMS KEEP SENATE



REUTERS

Democratic Sen. Catherine Cortez Masto leads a rally ahead of the midterm elections Monday in Henderson, Nev.

Democratic Sen. Catherine Cortez Masto of Nevada has won a second term, defeating Republican Adam Laxalt to clinch the party's control of the chamber. Democrats now hold a 50-49 edge in the Senate and will retain control no matter how next month's Georgia runoff plays out, by virtue of Vice President Kamala Harris' tiebreaking vote. **Story, A18**

**Inside**
Vince Bzdek: Where do Colorado Republicans go from here?
**Column, A5**

## State confidentiality agreements cost millions, silence whistleblowers

**BY DAVID MIGOYA**
The Denver Gazette

With increasing frequency, Colorado is mandating its employees — some of them whistleblowers calling out misconduct or malfeasance — sign nondisclosure clauses in any financial settlement they make with the state, effectively silencing them from ever letting anyone know what happened in their cases, according to interviews and dozens of records reviewed by The Denver Gazette.

**COLORADO WATCH**

The Denver Gazette's investigative team

In other instances over the past three years, records show state employees who faced discipline for alleged misconduct were instead given lucrative send-offs and assurances of the government's silence through similar nondisclosure deals.

Confidentiality agreements have the potential to bury evidence and prevent investigations of crimes, discrimination, sexual harassment and wage inequality, leading to a growing chorus of lawmakers and advocacy groups calling for them to be abolished.

The Denver Gazette also uncovered dozens more examples where state employees agreed to the nondisclosure

**SEE CONFIDENTIAL • PAGE 9**

| DENVER & STATE A5 | NATION & WORLD A21 | BUSINESS C1 | SPORTS D1 | OUT THERE E9 | COMICS E14 |

pressreader    PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

10.    __NON-DISPARAGEMENT.__ Employee agrees that following the execution of this Agreement, Employee will refrain from making any disparaging remarks about Employer or any of its employees. The following individuals agree not to make disparaging remarks about Employee: ███████████,
████████.

11.    __SETTLEMENT PAYMENT.__ Employer shall pay $50,000 as follows:

a.    Employer will issue a 1099 to Employee on a $26,160 payment for emotional distress;

The leader of Colorado Parks and Wildlife retired after an investigation into racially insensitive remarks he allegedly made. He was given $26,000 for his own "emotional distress" in the ordeal and agreed not to say anything bad about anyone in the department.

## CONFIDENTIAL

**FROM PAGE 1**

clauses, sometimes for a payment of as little as $2,000, with little public record available to explain why.

Since 2019, there have been more than 80 settlement agreements with state employees totaling more than $4 million in taxpayer payouts, each with a nondisclosure clause preventing them from discussing it with anyone, records show.

Critics say the agreements are little more than government efforts to prevent the airing of its dirty laundry. The few proponents of the practice say it's an effective method of trimming the number of potential claims that would be filed if word of the settlements and their dollar amounts were to easily become public.

"I absolutely hate them. They are so hypocritical," said attorney Diane King, whose clients have signed some of the deals. "Public policy is that the public should know this stuff, but those who know what happened aren't allowed to talk about it. That's just muzzling and it's offensive. But we routinely have to agree to it if they want to settle."

Public records laws stop a government agency from hiding the amount of a settlement or with whom, but do

not extend to the reasons or underlying complaints behind a settlement unless they are already in a public record such as a lawsuit or official complaint.

The Denver Gazette was often forced to track down those other public records, sometimes via open-records requests when the documents could be found, to unravel the details behind taxpayer-funded financial settlements. Those settlements have included:

• A $50,000 payment — $26,000 of it for his own "emotional distress" — to the state's former Parks and Wildlife

> *"Public policy is that the public should know this stuff, but those who know what happened aren't allowed to talk about it. That's just muzzling and it's offensive. But we routinely have to agree to it if they want to settle."*
>
> **Attorney Diane King**

director who retired this month after using a racially insensitive remark to a fellow employee at a conference earlier this year. That employee was separately handed a year's salary — $75,634 — to resign.

• The long-time woman's softball coach at Adams State University who was paid $62,000 — $10,000 more than his annual salary — to resign following a Title IX investigation that

determined he bullied and retaliated against his ballplayers.

• A Department of Education finance official who was paid nearly $183,000 to resign after complaining about internal control problems that he claimed involved the misuse of public funds.

• A $750,000 settlement to seven women in the education department who each received more than $64,000 — and their attorney another $300,000 — to not sue the state after a male co-worker was convicted of a felony for taking up-skirt photos of them on the job.

• A Department of Human Services supervising nurse was paid nearly $384,000 to resign after being disciplined for disclosing unlicensed pharmacy technicians at Wheat Ridge Regional Center were dispensing medications without supervision.

• More than $160,000 was paid to an attorney at the Department of Public Health and Environment to resign after she claimed the lack of enforcement actions

against some assisted-living facilities were the result of political connections.

• A $100,000 settlement to a Department of Corrections prison guard who repeatedly complained of harassment that included being handcuffed to a pipe by his bosses, having a firearm pointed at him, being arrested on ginned-up criminal charges, and being tasered while sitting at a prison computer.



Attorney Mark Zaid of Washington said governments can make it appear employees need to sign nondisclosure agreements "when it's known that no such legal prohibitions actually exist."

### Deals would be illegal

Nearly all the agreements would be illegal if they were with federal employees under federal law, legal experts say. Colorado has a law banning retaliation against an employee who properly discloses information to a whistleblower agency, but not a prohibition on silencing them with cash payments.

"There are over-breadth steps taken by government — state and federal — to make it appear to employees that they are legally bound to maintain silence when it's known that no such legal prohibitions actually exist," said Mark

**SEE CONFIDENTIAL • PAGE 10**

SUNDAY, NOVEMBER 13, 2022 | THE DENVER GAZETTE | **A9**

**pressreader**  PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

## CONFIDENTIAL

**FROM PAGE 9**

Zaid, a Washington, D.C., attorney and national expert on nondisclosure deals. "Most people would think that if they want to settle they need to sign and won't believe anything to the contrary. Few would think to challenge it."

And the state is steadily increasing its mandate on requiring ND clauses in employee settlements, according to attorneys familiar with the practice who would only confirm the trend anonymously for fear of affecting negotiations with their clients.

Attorney General Phil Weiser's office, which largely negotiates every settlement agreement with a state employee, denied coercing anyone into signing an ND clause.

"The Department of Law represents state agencies in state employee/employer disputes. In settlement negotiations, the department attorneys discourage the use of nondisclosure or nondisparagement clauses," AG spokesman Lawrence Pacheco told The Denver Gazette. "Some agencies opt to use them anyway depending on the extenuating circumstances."

Attorneys who represent state workers, however, say that's not accurate.

"In cases where I have represented state employees, the Attorney General's office routinely not only encourages but requires the employee to agree to a nondisclosure provision in exchange for a settlement," Denver attorney Casey Leier said. "We used to have some ability to negotiate the exact scope of the nondisclosure, but this year, the state has changed its position and appears to be requiring a complete and total ban on any speech by the employee about their case and what they went through."

Several employees interviewed by The Denver Gazette say they frequently felt pressured to sign the documents while others said being silenced should not be allowed.

"They just make you feel as if you have to, that it's part of the deal, that everybody does it," said a state employee who refused to sign an NDA and agreed to discuss it only if their name was not used for fear of additional retaliation. "If I feel like they're doing something wrong, I should be able to say something, otherwise nothing will ever get fixed."

Said another: "I was just done with all the hassle, all the problems, all the threats. Signing was the easiest way for it to all go away and I could just get on with my life."

Efforts by Colorado's legislature to



TIMOTHY HURST, THE DENVER GAZETTE

Casey Leier, an attorney with Leventhal Lewis Kuhn Taylor Swan PC, sits for a portrait in his office Friday in Denver.

> *In cases where I have represented state employees, the Attorney General's Office routinely not only encourages but requires the employee to agree to a nondisclosure provision in exchange for a settlement."*
>
> **Denver attorney Casey Leier**

pass a law prohibiting all nondisclosure clauses with state employees have been unsuccessful as recently as two years ago. Colorado is among a majority of states that allow nondisclosure settlements with public employees.

Three states — Oregon, Washington and California — recently joined a growing number of others prohibiting the practice, largely the result of the #MeToo movement. After a wave of sexual misconduct allegations were made against powerful men such as movie mogul Harvey Weinstein, nondisclosure agreements that bar victims from discussing past claims of harassment

or abuse came under fire nationally, with calls from politicians and advocacy groups to abolish them.

"This is concerning, particularly in cases of discrimination, harassment, and wage inequality, because the public deserves to know when this illegal conduct is occurring," Leier said. "For instance, we know that when one woman has been harassed, we often later learn that there were many other women who were victims of the same treatment. The state can silence individual employees one by one, but the only way to stop discrimination in the long run is to bring the root cause to light."

### Nondisparagement deals common

The Denver Gazette even found nondisparagement agreements in which both the employees and the state agreed not to say bad things about each other. One of them, involving Secretary of State Jena Griswold, even restricted the employee, then-deputy Secretary of State Jenny Flanagan, from saying anything outside of a list of specific talking points outlined in the agreement.

Before joining Griswold's staff, Flanagan was vice president of state operations for Common Cause, a group that touts its efforts at keeping government transparent and accountable.

Neither Flanagan nor Griswold responded to efforts to reach them.

A similar nondisparagement and nondisclosure agreement exists between Erin Mewhinney, the former director of early care and learning at the Office of Early Childhood for the Colorado Department of Human Services, and her supervisors in that division.

Mewhinney was paid about $40,000 to resign in May 2021. There is no available document to explain why.

Yet her agreement appears to have been so cavalierly written that it re-

**SEE CONFIDENTIAL • PAGE 11**

**A10** | THE DENVER GAZETTE | SUNDAY, NOVEMBER 13, 2022

 pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

## CONFIDENTIAL

**FROM PAGE 10**

stricts Michelle Barnes, the executive director of DHS, Mary Alice Cohen, the deputy executive director of the Colorado Office of Early Childhood, and Anne-Marie Braga, the deputy executive director of community partnerships at DHS, from saying anything bad about each other, but not about Mewhinney.

Mewhinney did not respond to efforts to reach her.

And when Christopher Castilian left the Great Outdoors Colorado Trust Fund (GoCo) in June 2021 after a four-year tenure as its executive director, he pocketed $52,000 and both sides agreed not to mention the agreement or even its existence to anyone. In exchange, Castilian agreed not to disparage anyone, including Gov. Jared Polis and his staff — and everyone at any level of state government in any department is barred from talking badly about Castilian.

Unlike the other settlements reviewed by The Denver Gazette, however, Castilian's does not carry a provision that the document is accessible under the Colorado Open Records Act. That's because it did not go through the state controller's office, which routinely ensures that language is contained in any separation agreement.

"As far as we are concerned, and as a matter of practice, settlement agreements don't require an NDA, but must have a CORA clause," said Doug Platt, spokesman for the Department of Personnel and Administration, which houses the Office of the State Controller. "The other sides of an agreement might require the NDA, but that's not our business."

Pacheco at the AG's office told The Denver Gazette that while other state agencies have agreed to the ND clauses, "The Department of Law has not asked any employees separating from the DOL to sign a settlement with a nondisclosure clause, and no DOL employee has signed one" while Weiser has been at the helm.

That's sort of true.

The department in April finalized a $15,000 settlement with paralegal Tatyana Smith in which she agreed not to publicize any aspect of the agreement.

Smith had sued the department in U.S. District Court in Denver in 2020 claiming she was fired in retaliation for racial and religious discrimination she experienced in the department in the short five months she'd worked there beginning in March 2019.

Earlier claims she filed with the state's Civil Rights Division over alleged racism and discrimination were dismissed.

The AG's office said in the settlement document Smith was fired because of poor performance.

"This was actually to settle a lawsuit filed against the state, so it's not really a separation agreement," Pacheco said. "It's a bit of a different application of the settlement agreement."

### Colorado's effort quickly died

Sen. Barbara Kirkmeyer in 2021 sponsored Senate Bill 21-23, which would have prohibited state agencies from restricting employees from disclosing factual circumstances concerning their jobs. The only limits would be when disclosure would breach any privacy laws or reveal matters that were required to remain confidential, such as trade secrets, grand jury testimony or the like.

During committee hearings, Kirkmeyer said it was the ongoing judiciary scandal in which a number of high-ranking Judicial Department employees had signed nondisclosure settlements that had prompted her proposed legislation. One of them, former Chief of Staff Mindy Masias, landed a

multi-million-dollar training contract with the state just after signing her settlement.

Masias was to be fired when she allegedly threatened a tell-all sex-discrimination lawsuit in which she would reveal years of judicial misconduct that went undisciplined or was handled quietly. That threat included a two-page memo that outlined the alleged misconduct.

The author of the memo, then-operations chief Eric Brown, similarly signed a nondisclosure settlement when he resigned after news of the Masias deal became public in the summer of 2019.

Kirkmeyer at the time said the Masias story and ensuing scandal was partly responsible for why she drafted the bill.

"State government employees are public servants. They're hired to serve the public. They're paid with public funds. Non-disclosure agreements raise both ethical and legal implications," Kirkmeyer, a Weld County Republican, told the Senate Judiciary Committee in the bill's lone hearing before the legislature in March 2021. "A government employee should not be allowed to have their speech silenced, to be muzzled. The public is entitled to know

what public employees are doing and what their government is doing."

Miller Hudson, the former president of the Colorado Association of Public Employees, testified that state agencies will insist on a nondisclosure clause in a settlement agreement "when there's something they're trying to hide."

"By enforcing the nondisclosure deal, you essentially muzzle the employee and you put them in a position, even if they get a financially satisfactory settlement, they're left in a kind of PTSD position about what really happened," Hudson testified. "I'm aware of some employees who carried it to their grave, bitterness about the way that they were dealt with, signing their voice away."

Hudson said that at the CAPE he frequently witnessed the AG's office ramp up the state's settlement offer with an employee's refusal to sign the nondisclosure clause.

"The employee refused to sign at $180,000, so they were asked if they'd sign at $250,000 or $300,000," Hudson said. "This is not any way anyone wants to see government operate."

The bill ultimately died in committee

SEE CONFIDENTIAL • PAGE 13



TIMOTHY HURST, THE DENVER GAZETTE

Secretary of State Jena Griswold signed a nondisclosure deal with her former Deputy Jenny Flanagan that only allowed Flanagan to use specific talking points when discussing the office.

SUNDAY, NOVEMBER 13, 2022  |  THE DENVER GAZETTE  |  **A11**



pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

## CONFIDENTIAL

**FROM PAGE 11**

in a 3-2 vote that followed party lines, Democrat over Republican. The committee chairman, Sen. Pete Lee, D-Colorado Springs, told The Denver Gazette recently that he felt the bill was "simply too broad, too sweeping, covered too much ground."

Hudson today said he's not changed his mind, that nondisclosure deals are bad news.

"They're simply done to the employees you want to go away," he said. "They work their magic, asking what do we have to give you to make you leave and shut up."

### Several states enact prohibitions

At least 16 states have laws that deal with confidentiality agreements, largely in the private sector, although they would apply to government employees. Some are restricted only to the type of nondisclosure, such as ensuring names of victims in sexual misconduct cases are protected.

In Oregon, state law allows anyone to sue their employer for violating any confidentiality agreement and Illinois offers protection to whistleblowers who sign confidentiality agreements, preventing them from being enforced.

Maine this year banned employers from using confidentiality agreements that would stop workers from reporting misconduct to law enforcement.

Washington passed the "Silence No More" Act that bans confidentiality agreements in all workplace discrimination cases, as well wage claims and workplace conduct that are "against a clear mandate of public policy."

In Colorado, the prohibition is on re-taliating against any public employee for having disclosed information, leaving some to wonder if confidentiality agreements are even enforceable.

"These agreements seek to waive the rights of that statute," said Steve Zansberg, a First Amendment attorney in Denver who represents a number of news organizations including The Denver Gazette. "Aside from the First Amendment issues, one way to challenge any contract that includes a confidentiality clause is it's unenforceable and void since it is against public policy."

Agreements that prevent a public employee from speaking about them "are one-way deals, meaning the parties are in such an unfair bargaining position, the courts could call them unenforceable," he said.

That Colorado even allows confidentiality clauses in separation agreements with state employees, even in matters that settle litigation, "significantly reduces transparency and government accountability," according to Defend Colorado, a political group that funds conservative causes.

"If whistleblowers are silenced through government-funded payouts, it diminishes accountability, protects poorly functioning agencies, and hides systemic workplace problems," the group said in a statement. "Equally troubling, there are no standards or uniformity to dictate when an NDA should be offered or what terms should be included. As a result, state officials have enormous discretion to determine who should be silenced with taxpayer dollars."

9. **NON-DISCLOSURE.** The parties agree that they shall not affirmatively disclose to or discuss with any third party any aspect of the claims or allegations that form the basis for this agreement, the contents of the settlement negotiations among the parties, and the terms of the settlement among the parties, except (a) to the extent disclosure is required for tax, retirement, benefits, insurance or banking purposes, or in response to a valid subpoena, and (b) Employer may disclose the claims or allegations, the contents of the settlement negotiations among the parties, and the terms of the settlement to its Controller. Without violating the terms of this Agreement, the parties may disclose, if asked by a third party, that the matter has been resolved by settlement.

10. **RESIGNATION.** Employee agrees that Employee will voluntarily resign effective July 29, 2022. Employee will submit a letter of resignation when this Agreement is signed and will complete all applicable separation documents. The University agrees to accept the voluntary resignation effective July 29, 2022 and will place the resignation letter in Employee's official personnel file.

11. **SETTLEMENT PAYMENT.** The University will provide Employee with a settlement payment of $62,513.32, which represents disputed wages. The University will issue employee a W-2 on the payment.

The women's softball coach at Adams State University was found to have bullied and retaliated against his ballplayers. The state gave him more than a year's salary to resign as long as he did not disclose the deal or reason to anyone.

# John Ramsey says pain remains after 26 years

9News

It's been 26 years since the body of six year-old JonBenet Ramsey was found inside her Boulder home. It was December 26, 1996.

"You know, Christmas Day, for several years we just didn't have Christmas anymore, it was just too difficult," said John Ramsey, JonBenet's father.

Ramsey said the pain of JonBenet's still-unsolved murder remains, as does the anger.

"Boulder police has never contacted me, nor has the DA's office," Ramsey said.

Earlier this week, Boulder police issued a news release updating the investigation into JonBenet's murder. There was actually no new information, just a recap of the number of leads they've pursued, people they've interviewed and agencies with whom they've worked.

"It's like what they put out before, we're doing everything we can, we're trying really hard," Ramsey said.

The one aspect of the news release that Ramsey said drew his attention was its mention of DNA testing. According to Boulder police, the amount of DNA evidence available for analysis is extremely small and could be destroyed by testing. As a result, there are apparently no plans to test that evidence, which Ramsey said is a big mistake.

"Why aren't those being tested? They should be. Right now. Waiting for the next generation of DNA technology is silly," Ramsey said. "Why in the world you wouldn't test them now, given that the technology has advanced dramatically in 25 years, I don't understand that."

Ramsey said he sent a letter to Governor Jared Polis about a month ago asking him to ensure that the remaining DNA evidence in the case is tested by a private lab with the latest technology. So far, Ramsey said, he has not heard back from the Governor's Office.

When asked if he thought the case will ever be solved, Ramsey responded, "Not if it stays in the hands of the Boulder police, no, I don't, I really don't," Ramsey said.

**For more on this and other stories, visit our partners at 9News.com.**

SUNDAY, NOVEMBER 13, 2022 | THE DENVER GAZETTE | **A13**

pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER  PressReader.com +1 604 278 4604  COPYRIGHT AND PROTECTED BY APPLICABLE LAW

**Appendix 14**

**Letter from Colorado Commission on Judicial Discipline Interim Executive Director Jeff Walsh to former 10th Judicial District Chief Judge Dennis Maes dismissing RFE/Complaint as to all Justices of the Colorado Supreme Court, dated June 11, 2024; Former Chief Judge Maes's underlying RFE, submitted November 2022.**



June 11, 2024

**Case No. 22-226**
**Confidential Legal Mail**

To:     Judge Dennis Maes
From: Colorado Commission on Judicial Discipline
Via Email:


Dear Judge Maes:

On behalf of the Commission on Judicial Discipline, I write to inform you of the outcome of your Request for Evaluation (RFE) related to the Supreme Court's conduct in the wake of the Masias contract controversy. As a threshold matter, the Commission voted to recognize your RFE as a complaint only as to Chief Justice Boatright, per Colo. RJD 13(b).

Regarding your allegations against Chief Justice Boatright, your RFE claims that he violated (a) Canon Rule 2.9 related to ex parte communications; (b) Canon Rule 2.10(A) related to public comments on pending or impending cases; (c) Canon Rule 2.10(B) related to promises on the outcome of cases; (d) Canon Rule 2.11(A) related to judicial disqualification; and (e) Canon Rule 2.15(A) related to reporting known judicial misconduct.

After a thorough review of this matter, including Chief Justice Boatright's response to your RFE, the Commission has dismissed the allegations that Chief Justice Boatright violated Canon Rules 2.9, 2.10(B), 2.11(A), and 2.15(A).

Your allegation that Chief Justice Boatright violated Canon Rule 2.10(A) (regarding alleged inappropriate public comments) has also been dismissed, but with an expression of concern, per Colo. RJD 35(a). In short, the Commission has determined that the allegations in the complaint did not warrant discipline.

This matter is now closed, and pursuant to Colo. RJD 6.5, it must remain confidential.

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 457-5195

Page 2

Sincerely,

Jeffrey M. Walsh
Interim Executive Director

Christopher S.P. Gregory

Executive Director

Colorado Commission on Judicial Discipline

1300 Broadway, Suite210

Denver, Colorado 80203

Please accept this letter as a Request for Evaluation of the current members of the Colorado Supreme Court concerning its behavior surrounding the Mindy Masias contract matter and its aftermath. Should the Commission desire more detail please so advise.

The foundation of our government was built on a deep and abiding respect for the Rule of Law and the belief that no person or entity is above the law. Our judicial system is guided by long established principles, rules, processes and ethical considerations that all judges take an oath to obey. As the commission is well aware, it has jurisdiction over all Colorado state judges, including the Colorado Supreme Court. Rule 5 of the Colorado Rules of Judicial Discipline provides the grounds for judicial discipline.

The Colorado Constitution requires that any allegation of judicial misconduct must be referred to the Colorado Commission on Judicial Discipline.

Fundamental to the American commitment to the Rule of Law is that judicial disputes be decided by neutral decision-makers. Confidence in the system is severely undermined if the public believes an outcome has been determined prior to the commencement of an action or during the course of a proceeding and prior to a thorough inquiry of the contested matter. Similarly, all confidence would be lost if the public believes the guilt or innocence of an individual is determined before the presentation of evidence. The same result occurs if the court determines the credibility of witnesses prior to a court proceeding. The Colorado Supreme Court failed to respect these established principles during the Masias inquiry.

Rule 2.10(A) provides that a judge "shall not make any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court, or make any nonpublic statement that might interfere with a fair trial or hearing." It was distinctly possible the Supreme Court might be called upon to review matters concerning the Masias contract through litigation involving civil, criminal or judicial misconduct proceedings.

As early as February 4, 2021, Chief Justice Boatright issued a statement concerning an article that appeared in the Denver Post alleging that the judicial department entered into a contract with Masias to keep her from divulging judicial misconduct that occurred during the tenure of Chief Justice Nathan Coats. Boatright allegedly denied in the article that Chief Justice Coats and his counsel, Andrew Rottman, would ever authorize court resources to silence a blackmailer and any statement to the contrary was "simply false". The allegation was not referred to the Judicial Discipline Commission.

The denial was issued without a full investigation and failed to follow the Constitutional requirement that any allegation of judicial misconduct be referred to the Judicial Discipline Commission. Boatright's failure to comply with the Constitution and alleged violation of Rule 2.10(A) are grounds for discipline.

Boatright violated Rule 2.10(B) which provides a "judge shall not, in connection with any cases, controversies, or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office." Yet, Boatright announced that the court would be hiring private counsel to investigate the allegations and "clear those wrongly accused." It would be reasonable to believe that a pledge or promise was made prior to an investigation and ensured an outcome that would absolve the court of any misconduct. He referred to Coats and Rottman as "dedicated public servants." Opined that he and the other justices have "full confidence" in a judge who was alleged to have committed acts of judicial misconduct. Clearly, these statements indicate the Chief Justice and the other justices determined the credibility of witnesses prior to a thorough and fair investigation and, presumably, through the receipt of ex parte communications as prohibited by Rule 2.9.

Chief Justice Boatright violated Rule 2.10(A) and 2.10(B) of the Colorado Code of Judicial Conduct by commenting on an impending matter and making promises that could reasonably be expected to affect the outcome of the dispute and are inconsistent with the impartial performance of the adjudicative duties of judicial office.

Rule 2.9. Ex Parte Communications (A) provides "A judge shall not initiate, permit, or consider ex parte communications made to the judge outside the presence of the other parties or their lawyers concerning a pending or impending matter…". Rule 2.9(C) provides, "A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed." Boatright announced on February 16, 2021, that he would be briefed weekly on all "misconduct complaints across the department to ensure each incident is fully investigated and acted upon as approptiate without delay."  If he did so, Boatright violated Rule 2.9 by presumably receiving ex parte communications. Not only did it appear he was requiring and receiving ex parte communications, but failing to require that the judicial misconduct complaints be referred to the Commission on Judicial Discipline pursuant to the Constitution. I submit this fiat placed a cloud over the person, persons, or entities that might be the subject(s) of the investigation concerning the impartiality of the court system as prohibited by Rule 2.10(B).

Rule 2.11(A) provides that a "judge shall disqualify himself or herself in any proceeding which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances: (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding;" (2)(d) "The judge knows that the judge ..is likely to be a material witness in the proceeding;" (4) "The judge… has made a public statement, other than in a court proceeding, judicial decision, or opinion, that commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy; " (5)(c) "The judge was a material witness concerning the matter."

Th Supreme Court must disqualify itself pursuant to Rule 2.11. I submit the Supreme Court has a personal bias against those who disagree with its position concerning the Masias controversy by vouching for the credibility of certain witnesses as previously discussed. At the very least, the Chief Justice appears to have personal knowledge of facts that are in dispute. In order to determine the

validity of the dispute it will be necessary to determine the role and knowledge of each justice as the situation unfolded which means each justice is likely to be a material witness. The Chief Justice has made public statements concerning the credibility of certain witnesses, commented on the validity of certain claims and their resolution and has indicated on at least one occasion that he and the other justices have "full confidence" in a judge who was alleged to have committed acts of judicial misconduct. Any justice who has any knowledge of this matter from within the court would be a material witness. For example, it has been reported that one justice indicated she learned about circumstances concerning Masias' retirement and/or future job sources from others.

I strongly request that the Commission thoroughly investigate these allegations and reach the appropriate decisions including the need for the Colorado Supreme Court to recuse from further proceedings in this matter and to forthwith comply with the rules concerning judicial discipline. I would further suggest that the Commission review other reports of judicial misconduct documented in the ILG report that may have not been thoroughly investigated and may have provided misleading conclusions.

I would appreciate being informed about the progress and conclusion(s) of the request to the extent permitted by the rules.

Respectfully submitted,

Dennis Maes

# Appendix 15

# Colo. Office of the State Auditor, JUDICIAL DEPARTMENT STATE COURT ADMINISTRATOR'S OFFICE PERFORMANCE AUDIT REPORT (November 18, 2020).

# COLORADO OFFICE OF THE STATE AUDITOR



We Set the Standard for Good Government

JUDICIAL DEPARTMENT

# STATE COURT ADMINISTRATOR'S OFFICE





NOVEMBER 2020          PERFORMANCE AUDIT

THE MISSION OF THE OFFICE OF THE STATE AUDITOR
IS TO IMPROVE GOVERNMENT
FOR THE PEOPLE OF COLORADO

# LEGISLATIVE AUDIT COMMITTEE

Representative Lori Saine
Chair

Representative Dafna Michaelson Jenet
Vice-Chair

Representative Rod Bockenfeld
Senator Rhonda Fields
Representative Tracy Kraft-Tharp

Senator Paul Lundeen
Senator Robert Rodriguez
Senator Jim Smallwood

# OFFICE OF THE STATE AUDITOR

| | |
|---|---|
| Dianne E. Ray | State Auditor |
| Michelle Colin | Deputy State Auditor |
| Vickie Heller | Audit Manager |
| Derek Johnson | Team Leader |
| Tessa Mauer<br>Cariann Ryan<br>Lily Welborn | Auditors |

AN ELECTRONIC VERSION OF THIS REPORT IS AVAILABLE AT
**WWW.COLORADO.GOV/AUDITOR**

A BOUND REPORT MAY BE OBTAINED BY CALLING THE
OFFICE OF THE STATE AUDITOR
**303.869.2800**

PLEASE REFER TO REPORT NUMBER 2052P WHEN REQUESTING THIS REPORT



# OFFICE
## OF THE STATE AUDITOR



We Set the Standard for Good Government

November 18, 2020

DIANNE E. RAY, CPA
____
STATE AUDITOR

Members of the Legislative Audit Committee:

This report contains the results of a performance audit of the State Court Administrator's Office. The audit was conducted pursuant to Section 2-3-103, C.R.S., which authorizes the State Auditor to conduct audits of all departments, institutions, and agencies of state government, and Section 2-7-204(5), C.R.S., which requires the State Auditor to annually conduct performance audits of one or more specific programs or services in at least two departments for purposes of the SMART Government Act. The report presents our findings, conclusions, and recommendations, and the responses of the State Court Administrator's Office.



OFFICE OF THE STATE AUDITOR
1525 SHERMAN STREET
7TH FLOOR
DENVER, COLORADO
80203

303.869.2800



# CONTENTS



Report Highlights                                                            1

CHAPTER 1
OVERVIEW OF THE STATE COURT ADMINISTRATOR'S OFFICE        3

    SCAO Organization and Operations                              4
    Audit Purpose, Scope, and Methodology                         6

CHAPTER 2
STATE COURT ADMINISTRATOR'S OFFICE OPERATIONS            11

    Voluntary Separation Incentives                              13
    RECOMMENDATION 1                                             24

    Paid Administrative Leave                                    26
    RECOMMENDATION 2                                             39

    Human Resources Records Retention                            41
    RECOMMENDATION 3                                             48

    Sole Source Procurements                                     50
    RECOMMENDATION 4                                             57

    Procurement Cards                                            60
    RECOMMENDATION 5                                             65

    SCAO Administrative Framework                                66
    RECOMMENDATION 6                                             80



# REPORT
## HIGHLIGHTS



### STATE COURT ADMINISTRATOR'S OFFICE
PERFORMANCE AUDIT, NOVEMBER 2020

JUDICIAL DEPARTMENT

## CONCERN

Overall, we found that the State Court Administrator's Office (SCAO) should improve its administrative framework to increase accountability and cultivate public trust in its operations, including improvement to controls over awarding voluntary separation incentives and sole source contracts, staff use of paid administrative leave and procurement cards, and human resources document retention.

## KEY FINDINGS

- The SCAO awarded $518,000 in voluntary separation incentives to nine staff without all of the required approvals, without targeting the specific positions to receive incentives, and without knowing what the maximum payout amounts would be.

- For 3,600 of the 13,710 hours (27 percent) of administrative leave granted by delegated discretion, there were no records of the reasons the leave was granted.

- We identified 102 instances of staff who were granted, in total more than 1,060 hours of paid administrative leave above the "normal" amount that most staff received, including two staff who received more than 300 of these hours.

- The SCAO did not maintain documentation required to support decisions and actions taken in 10 Family Medical Leave Act cases and two disciplinary actions.

- We found that 6 of 10 sole source contracts awarded during the audit period, totaling up to $3.87 million, did not include sufficient documentation to support the decisions to award the contracts. One contract was awarded to a former SCAO employee who had resigned 6 days before the sole source justification was signed.

- We identified issues with the approvals for 30 of the 100 procurement card purchases (30 percent) we reviewed totaling $49,500.

- We identified problems with the SCAO's oversight of and accountability for its human resources and financial services functions that raise questions about the efficacy of the SCAO's system of internal control, including, in particular, its culture of accountability.

## BACKGROUND

- The Chief Justice of the Colorado Supreme Court appoints a State Court Administrator who heads the SCAO, which had 260 FTE and about $47 million in expenditures in Fiscal Year 2020.

- The SCAO provides administrative services, including financial (e.g. budgeting, procurement), human resources, and IT management services to the Judicial Department. It also provides policy guidance on Supreme Court rules and directives to the district courts.

## KEY RECOMMENDATIONS

The SCAO should implement written rules, policies, and procedures for:

- Offering voluntary separation agreements that specify who must approve the incentives, what strategic goals the incentives will serve, and what types and maximum amounts will be paid out.

- Defining the appropriate uses for paid administrative leave, requiring documentation and oversight of its usage, and establishing limits on its uses for certain purposes.

- Properly securing and storing all human resources documentation.

- Sole source contracting, including establishing required approvals and identifying required justification information, and prohibiting contracting with former employees within a specified time after resignation.

- Improving controls over the use of procurement cards, including who may serve as a "budget authority," that take into account the proper segregation of duties.

The SCAO should implement an effective system of internal control that fosters a culture of integrity, including implementing policies and monitoring activities to ensure that controls are working properly and staff adhere to Rules.

The SCAO agreed with these recommendations.



# CHAPTER 1

## OVERVIEW OF THE STATE COURT ADMINISTRATOR'S OFFICE

The State Court Administrator's Office (SCAO), established in the Colorado Constitution and state statutes, provides centralized administrative support for the Colorado Judicial Department (Department), which includes more than 300 judges and 3,500 staff who work in trial courts (county, district, and water), appellate courts, and probation services. The SCAO operates directly under the Colorado Supreme Court (Supreme Court) and the Chief Justice, who is the executive head of Colorado's judicial branch of state government.

4

# SCAO ORGANIZATION AND OPERATIONS

The SCAO consists of approximately 260 full-time equivalent (FTE) employees. These employees are overseen by the State Court Administrator, who is appointed by the justices of the Supreme Court and is ultimately responsible for ensuring that all duties, whether assigned by the Supreme Court or established in statutes, are accomplished [Section 13-3-101(1), C.R.S.]. These duties include, in general, providing administrative and technical support and centralized guidance to court staff and judges; developing and implementing operating standards and guidelines; and reporting information, statistics, and recommendations to the Supreme Court and General Assembly on operations (e.g., case management statistics for judges, court docket information, and annual operating budgets). Consistent with previous years, the current State Court Administrator, who was appointed in October 2019, has organized the SCAO into six divisions:

► **EXECUTIVE DIVISION**—headed by the State Court Administrator and includes the SCAO's legal team; oversees all SCAO operations to support the courts as well as all SCAO employees.

► **FINANCIAL SERVICES**—oversees the financial management of the Department, including developing and managing budgets; establishing fiscal rules, policies, and procedures; overseeing procurement; and executing internal audits.

► **HUMAN RESOURCES**—develops and manages the personnel system for the Department, including maintaining and interpreting judicial personnel rules and establishing related procedures; facilitating and retaining documentation for Family and Medical Leave requests, disciplinary actions, and employee settlements; overseeing the Department's record of employee timekeeping and leave, the Judicial Employee Time Recording System (JETRS); and coordinating SCAO staff benefits, trainings, and conference attendance.

▶ **INFORMATION TECHNOLOGY SERVICES**—provides technical support, engineers and maintains system and network infrastructure, and manages information security for all court buildings and Department offices.

▶ **COURT SERVICES**—oversees administrative processes and logistics for all parties who participate in court proceedings, including coordinating various services for internal and external court programs, such as assisting self-represented parties navigate court processes and scheduling; providing language access as needed; and implementing the statutory "Family Friendly" court program [Section 13-3-113(4), C.R.S.], which provides, in part, child care services as needed.

▶ **PROBATION SERVICES**—oversees probation policy and program development, facilitates collaboration across state departments involved with probation services, educates parties on probation as an alternative to incarceration, and coordinates trainings for and evaluations of probation staff.

Under Section 13-3-106, C.R.S., the State Court Administrator is responsible for preparing the Department's annual operating budget for approval by the Chief Justice and for disbursing funds that are appropriated by the General Assembly to administer the Department. Exhibit 1.1 shows the total annual expenditures of the SCAO, as well as the administration expenditures of the Department that the SCAO oversees.

6

| EXHIBIT 1.1. SCAO AND JUDICIAL DEPARTMENT ADMINISTRATION EXPENDITURES (IN MILLIONS) FISCAL YEARS 2017 THROUGH 2020 | | | | |
|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 |
| SCAO Expenditures | $41.8 | $43.2 | $44.5 | $47.0 |
| Department Administration Expenditures[1] | $97.0 | $103.0 | $104.3 | $119.3 |
| Total Administration Expenditures | $138.8 | $146.2 | $148.8 | $166.3 |

SOURCE: State Court Administrator's Office analysis of state accounting system data.
[1]The SCAO has minimal oversight of approximately 50 percent of these expenditures, as certain funds in this category are distributed to judicial districts based on formulas, such as staffing models.

# AUDIT PURPOSE, SCOPE, AND METHODOLOGY

We conducted this performance audit pursuant to Section 2-3-103, C.R.S., which authorizes the State Auditor to conduct audits of all departments, institutions, and agencies of the state government, and Section 2-7-204(5), C.R.S., the State Measurement for Accountable, Responsive, and Transparent (SMART) Government Act. The SCAO received public attention in July 2019, when media reports cited concerns with wasteful spending, excessive use of paid administrative leave, and potential fraud.

Audit work was performed from March 2020 through November 2020. We appreciate the cooperation and assistance provided by the SCAO management and staff during the audit.

We conducted this audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a

reasonable basis for our findings and conclusions based on our audit objectives.

The key objectives of the audit were to determine if the SCAO had controls in place to ensure responsible stewardship of state resources through its (1) personnel leave policies and practices and (2) purchasing policies and practices. This included evaluating the SCAO's use of paid administrative leave, Family and Medical Leave, disciplinary investigations, employee separation agreements, and administrative expenditures made through the SCAO's procurement process, purchasing cards, and staff reimbursements.

The scope of the audit did not include a review of court operations or the various independent agencies within the Judicial Branch (e.g., the Office of the Child Representative, Alternate Defense Counsel, and the Public Defender), which are not supported by the SCAO and are not subject to the Supreme Court rules implemented by the SCAO.

To accomplish our audit objectives, we performed the following audit work:

- Reviewed applicable state and federal laws and rules, Chief Justice Directives, Department rules, and SCAO guidance. Interviewed SCAO executive management and legal, human resources, financial, and procurement staff to gain an understanding of SCAO operations and application of criteria.

- Reviewed all available documentation regarding the SCAO reorganization and voluntary separation incentive program and contracts, enacted in Fiscal Year 2019. This included a review of payroll and benefits data for each employee who received incentives to calculate total costs.

- Analyzed paid administrative leave data recorded in JETRS, and reviewed other available documentation maintained for instances when an individual employee was awarded a large

8

amount of leave, to assess compliance with Department requirements; compared SCAO leave usage and approval to leave provided to executive branch agencies; and identified statistically normal ranges of approved administrative leave and outliers for Fiscal Years 2017 through 2020. This included a review of all available documentation regarding disciplinary investigations (e.g., complaints, investigative work, outcomes) for employees placed on paid administrative leave during these investigations.

- Reviewed all available Family and Medical Leave Act (FMLA) documentation (e.g., medical certificates, designation notices, notice of eligibility and rights, workers compensation first report of injury) and related employee leave usage for FMLA requests approved during Fiscal Years 2017 through 2020.

- Reviewed all available documentation for the 10 sole source contracts that the SCAO awarded during Fiscal Years 2017 through 2020 (e.g., executed contracts, justification letters, records of negotiations with the vendor) to assess compliance with Department procurement rules, and compared the SCAO's practices with respect to sole source contracts to those required of executive branch agencies.

- Tested a sample of 100 procurement card (P-card) transactions from Citibank data for adherence to Department administrative accounting rules regarding required supporting documentation and authorizing signatures.

- Reviewed travel reimbursement and P-card documentation to identify and assess the reasonableness of out-of-state travel purchases (e.g., conference registration fees, flights, meals, mileage) made by executive leadership.

9

We relied on sampling to support our audit work. We selected a random statistical sample of 100 of the 9,975 purchases made using SCAO-issued P-cards from July 2017 through April 2020. The purpose of the sample was to determine whether the funds spent on purchases were appropriate and for the benefit of the Department.

Our sample was selected using the Monetary Unit Sampling (MUS) method. MUS focuses on the monetary units, such as individual dollars, and randomly selects individual monetary units for the sample. Because we used MUS, our sample represents the distribution of dollars spent on purchases; therefore, those purchases that had more associated dollars had a greater likelihood of being selected.

As required by auditing standards, we planned our audit work to assess the effectiveness of those internal controls that were significant to our audit objectives. Specifically, our work related to internal control included the following components and underlying principles based on guidance issued by the U.S. Government Accountability Office:

**EXHIBIT 1.2. SIGNIFICANT INTERNAL CONTROL COMPONENTS AND UNDERLYING PRINCIPLES REVIEWED DURING THE AUDIT**

| **Control Environment** | **Control Activities** |
|---|---|
| • Demonstrate Commitment to Integrity and Ethical Values<br>• Exercise Oversight Responsibility<br>• Establish Structure, Responsibility, and Authority<br>• Enforce Accountability | • Design Control Activities<br>• Implement Control Activities |
| **Risk Assessment** | **Information and Communication** |
| • Identify, Analyze, and Respond to Risks<br>• Assess Fraud Risk | • Use Quality Information |
| | **Monitoring** |
| | • Perform Monitoring Activities<br>• Evaluate Issues and Remediate Deficiencies |

SOURCE: U.S. Government Accountability Office, Standards for Internal Control in the Federal Government (Green Book).

10

STATE COURT ADMINISTRATOR'S OFFICE, PERFORMANCE AUDIT – NOVEMBER 2020

Our conclusions on the effectiveness of those controls that were significant to our audit objectives, as well as specific details about the audit work supporting our findings, conclusions, and recommendations, are described in the remainder of this report.

A draft of this report was reviewed by the SCAO and the Chief Justice. We have incorporated the SCAO's and the Chief Justice's comments into the report where relevant. The written responses to the recommendations and the related implementation dates are the sole responsibility of the SCAO.

# CHAPTER 2

## STATE COURT ADMINISTRATOR'S OFFICE OPERATIONS

The Colorado trial and appellate courts, probation, and other services administered by the Judicial Department (Department) function, in large part, due to the administrative direction and support provided by the State Court Administrator's Office (SCAO). This includes providing all human resources, financial, and information technology services that the courts and Department staff require, as well as support for parties to court proceedings who need services such as language access, child care, and self-representation assistance. The SCAO's responsibilities vary widely, but are all overseen by the SCAO's executive head, the State Court Administrator, who is appointed by the justices of the

12

Colorado Supreme Court (Supreme Court) and provided broad decision-making authority. The State Court Administrator oversees the day-to-day administration of the courts and makes recommendations to the Supreme Court on rules to promulgate to effectively administer the courts, ensure that the Department operates with professionalism, and maintain public confidence and trust in the integrity of the judicial system. The State Court Administrator facilitates the establishment and implementation of the Judicial Department's Personnel, Fiscal, and Procurement Rules. This includes responsibility for establishing related policies, procedures, and other controls to, in part, set a tone for the Department that aligns with the Supreme Court's Code of Conduct, Chief Justice Directives, and the SCAO's published goal, "to cultivate public trust through the thoughtful stewardship of state resources."

Our audit work evaluated the SCAO's oversight and accountability of its human resources and financial services functions for Fiscal Years 2017 through 2020, including its practices for offering voluntary separation incentives to SCAO staff, providing SCAO staff paid administrative leave, retaining and securing personnel records, purchasing, and procurement. This chapter discusses our findings and recommendations regarding problems we identified in each of these areas. In addition, when applicable, we compared the SCAO's practices to what State Personnel Rules for executive branch agencies allow.

This chapter also discusses the overall impact of the deficiencies we found in the SCAO's system of controls and the tone the former State Court Administrator set for the organization, which, collectively, result in concerns about whether the SCAO has operated in a manner to foster a culture of integrity, ethical values, and accountability; maintain public confidence in the Department; and demonstrate good stewardship of state funds.

# VOLUNTARY SEPARATION INCENTIVES

A voluntary separation incentive (VSI), often referred to as a buyout, is generally a lump-sum payment made to eligible employees who separate from employment through their voluntary resignation. According to the SCAO, although VSI programs are not explicitly addressed in the Judicial Department's Personnel Rules (Judicial Personnel Rules), the authority to enact a VSI program is included within the broader authority that the State Court Administrator has to reorganize staffing.

In Fiscal Year 2019, the former State Court Administrator, after presenting a reorganization plan to the Supreme Court, notified staff that to minimize the impact of potential layoffs because of the reorganization, a VSI Program was being established. All SCAO staff who were certified, classified employees were allowed to apply for a VSI that included receiving paid "administrative leave," which is discretionary leave the Department grants to individual staff, generally on a case-by-case basis. The former State Court Administrator approved all 10 employees who applied for the VSI Program. These employees then entered into a contract with the SCAO to voluntarily end their employment for a specified amount of paid administrative leave based on their years of service, as shown in Exhibit 2.1. One of the 10 employees received a VSI contract through a separate settlement agreement in consultation with the SCAO legal team, after the nine other contracts were executed by the former State Court Administrator.

14

| EXHIBIT 2.1. VOLUNTARY SEPARATION INCENTIVE PROGRAM MONTHS OF PAID ADMINISTRATIVE LEAVE GRANTED BASED ON YEARS OF SERVICE | | |
| --- | --- | --- |
| Years of Service | Months of Paid Administrative Leave | Employees |
| 1-5 years | 1 | 0 |
| 6-19 years | 3 | 5 |
| 20+ years | 4 | 5 |
| SOURCE: State Court Administrator's Office contracts enacted under the Voluntary Separation Incentive Program. | | |

During the paid administrative leave period, each of the 10 employees continued to occupy their position and receive compensation, but they did not report to work. For example, if an employee entered into a VSI contract in July 2019 and had been with the SCAO for 10 years, they would have received 3 months of paid administrative leave and their official date of termination would have been October 2019. During this 3-month period, the employee would have stopped reporting for work as of the July contract date, but the SCAO would have continued to list the individual as a current employee, which meant they would have received their regular monthly paycheck as well as all health, retirement, and other benefits. In addition, the employee would have continued to accrue leave hours based on their years of service, which the Department provides to all SCAO staff. In October, the SCAO would have changed the employee's status to separated and, at that point, paid out any leave the employee had accrued and did not use during their time with the SCAO.

## HOW WERE THE RESULTS OF THE AUDIT WORK MEASURED?

We reviewed the contracts executed for the VSI Program, which state [clause 16] that the agreement "shall not be valid until it has been approved by the Colorado State Court Administrator, the

15

Administrative Authority [generally an SCAO Division Director or the employee's supervisor], the Director of the Division of Human Resources and the Employer's Chief Financial Officer."

We also reviewed the plan for the reorganization that the former State Court Administrator presented to the Supreme Court in February 2019, which included, in part, positions to be eliminated or reclassified, a timeline for implementation, and the processes the SCAO would implement for the VSI Program. In an April 2019 email to staff, the former State Court Administrator announced the VSI Program, stating that there would be a 30-day comment period and, if approved by the Chief Justice, the VSI Program would be finalized in August 2019.

Additionally, although the SCAO does not have formal written rules, policies, or procedures for designing a VSI program or entering into VSI agreements, statute [Section 13-3-105, C.R.S.] states that "To the end that all state employees are treated generally in a similar manner, the [S]upreme [C]ourt, in promulgating rules as set forth in this section, shall take into consideration the compensation and classification plans, vacation and sick leave provisions, and other conditions of employment applicable to employees of the executive and legislative departments." As such, we also reviewed the requirements established for employees working in the Executive Branch, under the authority granted to the State Personnel Director by Section 24-50-208, C.R.S. Specifically, when executive branch agencies reorganize staffing using payout incentives, State Personnel Rule 4 CCR 801-1 requires them to establish a strategic plan for why staffing changes are needed and how incentives will be used. The strategic plan is defined by State Personnel Rules and, in part, must include an incentive plan with eligibility criteria, the types of incentives allowed, cash amounts or limits and payment methods, and a communication plan. These plans must be developed with the input of employees and managers.

State Personnel Rules allows for different types of financial incentive payments to be offered, including payment towards the continuation of health benefits, tuition or educational training, a portion of salary, or

16

placement on a reemployment list, but states that the "total post employment compensation payment and other benefits shall not exceed an amount equal to one week of an employee's salary for every year of his or her service, up to 18 weeks" [State Personnel Rules 3-51 and 52].

Additionally, the employee and department "must execute a written contract before payment of any post employment compensation" that must be provided to the state personnel director, and "must include…acknowledgement that no payment will be made until after the last day of work and compliance with other provisions of the contract," as well as the employee's agreement to waive any and all claims they may have or assert against the employer [State Personnel Rule 3-54].

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY?

Overall, we found that the SCAO cannot demonstrate that its VSI contracts received the required approvals or that the positions approved for incentives were consistent with the SCAO reorganization plan. Additionally, the total incentives the SCAO provided were not known prior to or at the time of enactment and appear to be overly generous when compared with the Executive Branch. Specifically, we found:

**LACK OF REQUIRED APPROVALS.** We reviewed each of the nine VSI contracts executed by the former State Court Administrator and found that none of them had received all of the required levels of approval. In all instances, the VSI contracts had been approved by only the former State Court Administrator and were not signed by the other three parties required by the contract terms (the employee's Division Director, the Director of the Division of Human Resources, and the Chief Financial Officer). The SCAO informed us that the one other VSI contract went through a different review process because it was also part of a settlement agreement and it did not contain a requirement that other parties approve it. Additionally, each VSI contract was finalized

STATE COURT ADMINISTRATOR'S OFFICE, PERFORMANCE AUDIT – NOVEMBER 2020

17

prior to the approval of the Chief Justice, as detailed in the announcement of the VSI Program.

**THE POSITIONS APPROVED FOR INCENTIVES WERE NOT SUPPORTED BY THE SCAO REORGANIZATION PLAN.** We requested and reviewed all of the documentation the SCAO maintained related to the VSIs, including planning information presented to the Supreme Court on the positions to be eliminated or reclassified and associated costs and anticipated savings. The SCAO provided planning information prepared by the former State Court Administrator that specified that two FTE positions, overall, would be eliminated. However, the former State Court Administrator did not target specific positions to receive the incentives when announcing the VSI Program to staff, but instead offered incentives to all certified, classified, non-contract staff. Had more than 10 people volunteered for the VSI Program, it is not clear how many voluntary separations the former State Court Administrator would have approved. According to current SCAO staff, they do not know the former State Court Administrator's rationale for offering the VSIs to all staff or how the 10 eliminated positions fit into the planned reorganization. Ultimately, the SCAO reorganization did not occur; however, all 10 VSI contracts were executed prior to the decision not to proceed with the reorganization.

**TOTAL VOLUNTARY SEPARATION PAYOUT AMOUNTS WERE NOT KNOWN PRIOR TO ENACTMENT AND WERE MORE GENEROUS THAN WOULD HAVE BEEN PROVIDED BY THE EXECUTIVE BRANCH.** We found that none of the 10 VSI contracts, including the one that was part of a separate settlement agreement, included a total or maximum incentive payout amount. Further, the executed VSI contracts did not specify any dollar amounts, either to establish a maximum or to identify salary amounts paid directly to the separating staff. SCAO staff confirmed that the SCAO did not calculate the total amounts of all payments made on behalf of any of the 10 employees prior to execution of the VSI contracts.

18

STATE COURT ADMINISTRATOR'S OFFICE, PERFORMANCE AUDIT – NOVEMBER 2020

Although Judicial Personnel Rules are silent on the maximum payout amounts that staff may be offered under incentives, in contrast, the State Personnel Rules for executive branch agencies prohibit payouts in excess of the equivalent of 18 weeks salary, regardless of the type of financial incentive being used. As such, we compared the incentive provided by the SCAO to what executive branch agencies are authorized to offer their staff under State Personnel Rules.

We confirmed that the amount that the SCAO paid out to the 10 employees in salaries was comparable to the salary amounts that would have been paid out by executive branch agencies; however, we found that the SCAO incentives also included full benefits during the paid administrative leave period. Specifically, the SCAO paid employees between 1 and 4 months of salary, depending on years of service, as an incentive. In comparison, the State Personnel Rules allow executive branch agencies to pay an amount equal to 1 week of an employee's salary for every year of service, capped at 18 weeks. The salary amount that all but two of the employees received from the SCAO was less than the salary amount that they would have received from an executive branch agency; however, the SCAO *also* paid for each employee's full benefits for the 1- to 4-month period, including retirement and healthcare benefits. For example, during the 1- to 4-month period after each of these VSI contracts was executed by the former State Court Administrator, these employees were eligible to continue using their full medical benefits for scheduling appointments, surgeries and other procedures, and emergency care, for which the Department paid a portion of the monthly cost to retain medical insurance.

In response to concerns raised in this audit, the SCAO calculated its monthly share of employee benefits costs to be between $8,500 and $28,072 per person, based on salaries and the monthly plan premiums paid for all staff. EXHIBIT 2.2 shows benefits offered by the SCAO to employees and their associated costs to the State.

**EXHIBIT 2.2. JUDICIAL DEPARTMENT EMPLOYEE BENEFITS**

| Benefit | State's Cost Per Employee (Monthly) |
|---|---|
| PERA[1] | 21.2 percent of employee salary |
| Medical | $577.80 - $1,610.18 based on plan |
| Dental | $27.88 - $66.94 based on plan |
| Life & Accidental Death and Dismemberment Insurance | $7.66 |
| Short-Term Disability | 0.15 percent of employee salary |
| Medicare | 1.45 percent of employee salary |

SOURCE: State Court Administrator's Office benefits offering, based on the Division of Human Resources, within the Department of Personnel & Administration, Benefits Plan.
[1] Colorado Public Employees' Retirement Association (PERA) percentage includes the Amortization Equalization Disbursement (AED) and Supplemental Amortization Equalization Disbursement (SAED) for Judicial Department, as of Calendar Year 2019.

Further, since the SCAO delayed the separation date for the 10 employees with VSI contracts, they continued to accrue between 14 and 22 hours per month of "paid time off" that the Department provides to all staff to use for vacation and sick leave, and ultimately pays out to staff upon their separation. In comparison, for the Executive Branch, State Personnel Rules do not allow voluntary separation agreements to include delayed separation dates and continued leave accrual.

20

EXHIBIT 2.3 compares what the 10 separated SCAO employees received in voluntary separation incentives versus what they would have received under a similar type of agreement from an executive branch agency.

### EXHIBIT 2.3.
### VOLUNTARY SEPARATION INCENTIVE COMPARISON
### STATE COURT ADMINISTRATOR'S OFFICE COMPARED
### TO THE EXECUTIVE BRANCH REQUIREMENTS

| | Salary-Based Incentive | | Leave Accrual | | Benefits Paid | | Total Post-Employment Compensation and Other Benefits | |
|---|---|---|---|---|---|---|---|---|
| Employee | SCAO VSI Program | Executive Branch Maximum | SCAO VSI Program | Executive Branch | SCAO VSI Program | Executive Branch | SCAO VSI Program Total | Executive Branch Total Maximum |
| 1 | $57,328 | $59,969 | $7,330 | Not Allowed | $28,072 | Not Allowed | $92,730 | $59,969 |
| 2 | $51,512 | $53,493 | $6,538 | Not Allowed | $24,990 | Not Allowed | $83,040 | $53,493 |
| 3 | $35,492 | $36,857 | $4,505 | Not Allowed | $14,284 | Not Allowed | $54,281 | $36,857 |
| 4 | $31,251 | $43,271 | $3,966 | Not Allowed | $14,367 | Not Allowed | $49,585 | $43,271 |
| 5 | $29,196 | $20,620 | $2,721 | Not Allowed | $12,523 | Not Allowed | $44,439 | $20,620 |
| 6 | $26,062 | $35,013 | $3,308 | Not Allowed | $13,518 | Not Allowed | $42,888 | $35,013 |
| 7 | $26,398 | $27,413 | $3,350 | Not Allowed | $13,015 | Not Allowed | $42,763 | $27,413 |
| 8 | $25,235 | $26,205 | $3,203 | Not Allowed | $11,940 | Not Allowed | $40,377 | $26,205 |
| 9 | $25,998 | $15,287 | $2,550 | Not Allowed | $10,697 | Not Allowed | $39,245 | $15,287 |
| 10 | $18,463 | $25,128 | $2,303 | Not Allowed | $8,500 | Not Allowed | $29,266 | $25,128 |
| TOTAL | $326,933 | $343,256 | $39,774 | N/A | 151,906 | N/A | $518,614 | $343,256 |

SOURCE: Office of the State Auditor calculations based on SCAO Voluntary Separation Incentive Program contracts and payroll records and State Personnel Rules.

21

# WHY DID THESE PROBLEMS OCCUR?

The SCAO has not established controls, such as formal written rules, policies, or procedures, around offering voluntary separation incentives to employees. Specifically:

**THE SCAO ENTERED INTO VOLUNTARY SEPARATION AGREEMENTS PRIOR TO RECEIVING ALL APPROVALS.** While the announcement provided to staff about the VSI Program stated that the former State Court Administrator would seek the input of staff and final approval from the Supreme Court with respect to the reorganization, with a finalization date of August 2019, the first VSI contract was signed in May 2019 and the last in June 2019, prior to receiving Supreme Court approval. In addition, although the terms of the VSI contracts required approval from the employees' Division Director, the Director of Human Resources, and the Chief Financial Officer, only the former State Court Administrator signed the VSI contracts. There is no documentation to show that these other individuals reviewed or approved the VSI contracts. Further, the SCAO has a legal team to review contracts for procurement purposes and states that it generally obtains legal review for all contracts. However, according to SCAO staff, the VSI contracts were not drafted or reviewed by the SCAO's legal team prior to enactment or payout.

Current SCAO staff stated that the former State Court Administrator's rationale for not obtaining any legal or other review or input on the nine VSI contracts is unknown. As mentioned previously, one VSI contract was pulled into a larger settlement agreement with a former employee and this agreement was reviewed by the SCAO legal team. In contrast, for the Executive Branch, the State Personnel Director must receive all voluntary separation agreement contracts prior to their enactment, in addition to any other reviews that occur at agency executive directors' direction.

22

**THE SCAO DID NOT TARGET STAFF IN THE POSITIONS IDENTIFIED FOR RECLASSIFICATION OR ELIMINATION IN THE REORGANIZATION PLAN.** The employees in the specific positions designated for elimination, as reported in the documentation provided by the SCAO, were not targeted for voluntary separation, and only one of these employees actually accepted a voluntary separation.

**THE SCAO DID NOT APPEAR TO CONSIDER RULES ESTABLISHED FOR THE EXECUTIVE BRANCH'S VSI PROGRAM OFFERINGS AND PRACTICES.** State Personnel Rules have established parameters around the use of incentive payouts to safeguard state funds (e.g., limitations on any form of payout, a requirement that agreements include a maximum payout amount, a requirement that employees separate from employment prior to receiving any benefit). However, the SCAO did not include any of these or other types of provisions when creating its own VSI Program and agreements.

# WHY DO THESE PROBLEMS MATTER?

The SCAO's VSI contracts amounted to costs of more than $518,000 paid to employees, which is more than 50 percent higher than the maximum costs allowed ($343,000) for executive branch agencies. Additionally, because the employees who took the incentives were not targeted with the goals of the SCAO Reorganization Plan in mind, it is unclear whether any of the incentives paid to employees through the VSI Program were spent appropriately or were in the best interest of the State. Ultimately, because the SCAO reorganization never occurred, only three of the 10 staff positions that received voluntary separation incentives were abolished. The other vacated positions have since been staffed or are open to be filled.

Further, the SCAO identified five *Principle Strategies and Goals* in its Fiscal Year 2020 Strategic Plan, one of which is to "[c]ultivate public trust and confidence through the thoughtful stewardship of public resources." The VSI contracts we reviewed challenge this principle because they lacked reviews and approvals, are not supported by

23

information detailing how they would help meet reorganizational goals, hid total costs to the State in unknown benefit amounts, and did not reflect requirements established for employees in other branches of state government. As a result, it appears that the interests of the State may not have been protected and the SCAO's actions may not have encouraged public trust or demonstrated thoughtful stewardship of state resources. In particular, when senior management takes actions that are not transparent and appear contrary to established practices, they set a tone at the top and encourage an organizational culture that has disregard for establishing and adhering to controls that help ensure state funds are spent transparently and with integrity.

REPORT OF THE COLORADO STATE AUDITOR

24

# RECOMMENDATION 1

The State Court Administrator's Office should establish and implement formal written rules, policies, and procedures related to voluntary separation incentives that:

A   Specify who has to approve voluntary incentives prior to offering them to staff and who must sign any voluntary separation agreements prior to execution.

B   Ensure that separation incentives are only executed with employees whose separation would further the strategic goals of any reorganization.

C   Consider the types of incentives provided in the Executive Branch, detail the types of incentives that can be offered, and specify the total and/or maximum amount that will be paid out in incentives.

# RESPONSE

## STATE COURT ADMINISTRATOR'S OFFICE

A   AGREE. IMPLEMENTATION DATE: JULY 2021.

The State Court Administrator's Office agrees with the recommendation and will work with the Supreme Court to develop and implement rules within the Colorado Judicial System Personnel Rules about Voluntary Separation Incentives. These Rules apply to all employees of the Judicial Department whose positions are within the job classification and compensation plan established pursuant to Section 13-3-105, C.R.S., and Section 5(3) of Article VI of the Colorado Constitution.

The rules will specify the required approvals for offering incentives, as well as the necessary approvals for individual separation incentive agreements.

B AGREE. IMPLEMENTATION DATE: JULY 2021.

The State Court Administrator's Office agrees with the recommendation and will ensure that separation incentives are executed in a manner that furthers the goals of the Judicial Department.

C AGREE. IMPLEMENTATION DATE: JULY 2021.

The State Court Administrator's Office will consider the guidance provided in the executive branch when reviewing potential new policies and procedures related to Voluntary Separation Incentives, will detail the types of incentives that can be offered, and will require that agreements include a total or maximum amount that will be paid out in incentives.

26

STATE COURT ADMINISTRATOR'S OFFICE, PERFORMANCE AUDIT – NOVEMBER 2020

# PAID ADMINISTRATIVE LEAVE

The Department provides employees with different types of paid leave as a benefit of employment. For example, the Department offers staff "paid time off" (PTO), which is paid leave that can be used for any purpose, such as vacations, illness, or any other personal reason. Staff accrue PTO at a rate ranging from 14 hours to 22 hours per month, depending on how long they have been with the State. In addition, the Department provides staff with 4 hours per month of extended sick leave that can be used for certified medical events. Finally, the Department provides staff with paid "administrative leave" on an ad hoc basis.

Under the Judicial Personnel Rules, "administrative authorities" are authorized to grant paid administrative leave to employees "for reasons determined to be for the good of the [S]tate." The State Court Administrator is the administrative authority for the SCAO, but delegates the authority to grant leave to other staff, typically division directors, some human resources staff, and supervisors. Administrative leave may also be granted in instances when an individual employee is being investigated for possible wrong-doing or poor job performance and it is in the SCAO's best interest to not have the employee present in the office while the investigation is occurring. Finally, the SCAO has also used administrative leave as part of staff separation agreements and settlements.

Administrative leave, like all time-keeping at the SCAO, is tracked in the Department's database, Judicial Employee Time Reporting System (JETRS). Staff are required to enter their time, including any leave time, into JETRS, and supervisors are responsible for overseeing their employees' timesheets and leave usage.

27

During Fiscal Years 2017 through 2020, SCAO staff recorded a total of 25,520 hours of paid administrative leave in JETRS. Of these 25,520 hours, the SCAO reported that 13,710 hours were approved under Judicial Personnel Rules governing administrative or delegated authority's discretion to grant paid administrative leave, 3,070 hours were approved for disciplinary investigations, and about 2,650 hours were approved as part of settlement agreements. The remaining 6,090 hours were approved as part of voluntary separation agreements, which we discuss in the first finding.

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY AND HOW WERE THE RESULTS MEASURED?

Overall, we found that the SCAO's use of paid administrative leave is not transparent and may not demonstrate good stewardship of public funds. We reviewed all of the documentation that the SCAO maintained related to the 19,430 hours of paid administrative leave taken by SCAO staff during Fiscal Years 2017 through 2020 as a result of: (1) delegated discretion to grant leave (13,710 hours), (2) active disciplinary investigations (3,070 hours), and (3) settlement agreements (2,650 hours). We assessed the SCAO's use of leave against requirements established in the Judicial Personnel Rules and compared the SCAO's practices regarding paid administrative leave to what State Personnel Rules for executive branch agencies allow. We identified the following concerns:

### DISCRETIONARY ADMINISTRATIVE LEAVE

UNKNOWN OR QUESTIONABLE REASONS FOR GRANTING LEAVE. First, for 3,600 of the 13,710 hours (26 percent) of administrative leave granted by delegated discretion, we found that there were no records of the reasons the staff members were granted the leave. Judicial Personnel Rules [Rule 26.F.] allow administrative authorities to grant paid administrative leave to employees using their discretion for "reasons determined to be for the good of the [S]tate, including, but not limited

28

to, participate in community volunteer activities, and to participate in official activities of employee organizations." In some cases, paid administrative leave is granted to individual employees, but the Chief Justice and State Court Administrator can also grant leave on a Department- or office-wide basis, such as for holidays. The SCAO confirmed that there was no documentation to show the reasons that these 3,600 hours of administrative leave were granted, but contended that they were allowable because of the broad discretion to grant administrative leave allowed under Judicial Personnel Rules.

Second, for the remaining 10,100 hours (74 percent) of administrative leave recorded in JETRS that had a reason for the leave noted, we saw instances where it was not apparent how the leave would be "for the good of the State," based on the reasons provided. For example, we saw that paid administrative leave was taken for a "pre-operative appointment" and "family reunion," both of which are also examples of activities for which all staff members could reasonably be expected to use their PTO accruals. Without further information, we could not determine if administrative leave was appropriate for these purposes. The SCAO confirmed that it had no further information on the rationale used by the approvers as to how these purposes were for the good of the State, or why in the examples we pointed out, those employees were given additional leave.

**NUMBER OF HOURS APPROVED FOR SOME STAFF APPEAR DISPROPORTIONATE.** The Judicial Personnel Rules do not limit the number of paid administrative leave hours that may be granted to individuals based on delegated discretion. Therefore, we reviewed the total number of hours every employee received to determine if any employees were granted a disproportionate number of hours compared to other employees. Specifically, we calculated a statistically normal range of paid administrative leave the SCAO granted per staff person for each fiscal year we reviewed, based on the amounts of paid administrative leave recorded in JETRS. Based on this analysis, we determined that, depending on the year, between 8 and 48 hours of paid administrative leave per year, per person would be considered "normal"

for all SCAO staff. This includes time provided for events such as weather closures and extra holiday leave granted to all staff.

Through our analysis, we identified 102 instances of staff who were granted, in total, more than 1,060 hours of paid administrative leave above the "normal" amount that most staff received. Two employees accounted for more than 300 of the 1,060 hours. EXHIBIT 2.4 shows these 102 instances grouped by the number of hours of paid administrative leave granted above the normal range in each of the years we reviewed.

**EXHIBIT 2.4. PAID ADMINISTRATIVE LEAVE TAKEN MORE THAN THE NORMAL RANGE[1] FISCAL YEARS 2017 THROUGH 2020**



SOURCE: Office of the State Auditor analysis of SCAO paid administrative leave data for Fiscal Years 2017 through 2020.
[1] The normal ranges varied by years as follows: 2017—48 hours; 2018—8 hours; 2019—15.5 hours; 2020—27.5 hours.

30

STATE COURT ADMINISTRATOR'S OFFICE, PERFORMANCE AUDIT – NOVEMBER 2020

As shown, two employees—one in Fiscal Year 2017 and one in Fiscal Year 2018—each received 152 hours above the normal range. According to the SCAO, there is no information to explain why these employees were granted this amount of administrative leave, and both employees are no longer with the SCAO. Other employees received between 8 and 41 hours of leave more than the normal range in each of the 4 fiscal years we reviewed.

The SCAO stated that it believes there are good reasons for many of the hours these employees received above the normal range, such as incentive awards for top performers, granting leave for individuals to do volunteer work, or weather closures that affect some employees more than others.

It would be reasonable and expected that some employees may warrant receiving additional leave awards above the normal range for reasons that the SCAO indicated. However, the SCAO could not articulate what amounts of leave would be appropriate for these types of reasons and reasonably meet the Department's requirement that discretionary leave awards must be for the good of the State. For example, it is not apparent that granting an individual 56 hours of leave to conduct volunteer work within a 6-month period, in addition to the established salary, benefits, and monthly accrued PTO that all staff receive, would be for the good of the State.

**ADMINISTRATIVE LEAVE HOURS ALLOWED IN EXCESS OF STANDARD WORK DAY OR WEEK.** We identified seven instances when employees used either 9 or 10 hours of administrative leave for Department holidays granted to all staff by the Chief Justice, rather than the Department's standard 8-hour working day or standard 8-hour holiday leave for statewide and national holidays (e.g., Memorial Day). According to the SCAO, it would have been appropriate for staff to take the extra hours of leave if they normally work a 9- or 10-hour day because, when the Chief Justice announces these types of holidays, the announcement states it is for the day and does not specify a limit on the number of hours granted.

31

We also identified five instances where employees used paid administrative leave in conjunction with time worked to accrue compensatory time, which the SCAO awards at time-and-a-half for any hours over 40 hours in a week. Specifically, five employees received a total of 9 hours of compensatory time during weeks where the paid administrative leave they recorded during the week caused them to exceed 40 hours for the week.

## LEAVE USED FOR DISCIPLINARY INVESTIGATIONS

We identified nine cases in which the SCAO granted a total of about 3,070 hours of paid administrative leave to employees for disciplinary investigations. Judicial Personnel Rules [Rule 29.E.2] allow for an employee to be put on paid administrative leave during an investigation of the employee's conduct; relative to a pending disciplinary action when there is reason to believe that the employee's continued presence may endanger the safety or welfare of the public or the Department's employees, facilities, or property; or when there is reason to believe that the employee's presence may impair the investigation. The SCAO reported that these staff members had been placed on leave for disciplinary investigations; however, JETRS did not include any information on the reason for the leave, and the SCAO was not able to provide information to verify that two of the disciplinary investigations actually occurred. All of these employees did ultimately separate from the organization.

We found that the Judicial Personnel Rules do not limit the number of paid administrative leave hours that can be used for these investigations, nor do they establish any requirements for monitoring the time it takes to complete an investigation. The amount the SCAO granted for these nine cases averaged 341 hours, or 43 working days, per investigation. As shown in EXHIBIT 2.5, the nine SCAO investigations ranged from 27 days for the shortest investigation to 60 days for the longest.

32

STATE COURT ADMINISTRATOR'S OFFICE, PERFORMANCE AUDIT – NOVEMBER 2020

| EXHIBIT 2.5. HOURS OF PAID ADMINISTRATIVE LEAVE FOR INVESTIGATIONS | |
|---|---|
| Case | Total Days |
| 1 | 60 |
| 2 | 58.4 |
| 3 | 58 |
| 4 | 46 |
| 5 | 43.3 |
| 6 | 32 |
| 7 | 30.1 |
| 8 | 28.5 |
| 9 | 27 |

SOURCE: Office of the State Auditor analysis of SCAO paid administrative leave data for Fiscal Years 2017 through 2020.

For agencies within the Executive Branch, the State Personnel Rules require reporting to an agency executive director and the State Personnel Director for any paid administrative leave exceeding 20 consecutive working days (160 hours). This reporting includes the reason for the leave, start of the leave, end of the leave, and the final disposition of the case.

## LEAVE GRANTED UNDER SETTLEMENT AGREEMENTS

During our review period, the SCAO also granted two staff members nearly 2,650 hours (331 working days) of paid administrative leave, as shown in Exhibit 2.6. The SCAO reported that these two staff members had been granted the leave as part of settlement agreements; however, JETRS did not include any information on the reason for the leave.

| EXHIBIT 2.6. PAID ADMINISTRATIVE LEAVE GRANTED | | |
| --- | --- | --- |
| Employee | Hours | Days |
| 1 | 2,448 | 306 |
| 2 | 201 | 25.1 |
| TOTAL | 2,649 | 331.1 |

SOURCE: Office of the State Auditor analysis of SCAO paid administrative leave data from JETRS for Fiscal Years 2017 through 2020.

Judicial Personnel Rules are silent on the use of paid administrative leave for settlement agreements, although staff reported that it is common practice at the SCAO to use the leave for this purpose.

## WHY DID THESE PROBLEMS OCCUR?

The problems we identified occurred primarily because the SCAO has minimal rules and policies governing the use of paid administrative leave.

First, Judicial Personnel Rules provide limited guidance on the appropriate uses of paid administrative leave, and the SCAO has not elaborated on the rules in policies and procedures to further define the reasons that discretionary leave can be approved, including whether it can be used for settlement agreements. According to the SCAO, the Judicial Personnel Rules provide broad discretion to the State Court Administrator and those staff delegated discretionary authority to grant paid administrative leave for any reason they determine to be for the good of the State.

Second, the SCAO does not require staff to document the reason for paid administrative leave in JETRS. For example, the reason that the two employees who were each granted 152 hours of discretionary paid administrative leave in excess of the normal range in one year was not documented in JETRS or in any other known place, and all of the individuals involved are no longer with the SCAO. As a result, the SCAO could not provide an explanation for why this leave was granted.

34

Third, the SCAO does not have policies or procedures for monitoring the overall use of paid administrative leave across the organization, nor does it require supervisory oversight of leave use. For example:

▪ The SCAO does not run routine reports from JETRS to determine how much administrative leave has been used in total and for what purpose, if certain staff members are receiving a disproportionate amount of administrative leave, or if certain delegated authorities tend to approve large amounts of leave.

▪ Although supervisors are responsible for overseeing staff work and leave time, they have not been given any guidance as to what they should take into account when determining how much administrative leave would be appropriate for an individual to receive.

▪ If an employee requests administrative leave and their request is not approved in JETRS before the month-end posting, the leave will still be processed and paid even though it has not been approved. Any leave processed in this manner will also not have a record of any approval given after the fact. We found that 119 of 352 individuals employed by the SCAO during our testing period (34 percent) entered more than 6,500 hours of administrative leave in JETRS, which were processed without an approval.

▪ According to SCAO staff, some divisions and supervisors monitor that employees have recorded leave type and amounts accurately in JETRS, but not all divisions and supervisors do so. The SCAO does not have procedures in place to ensure that this monitoring is performed uniformly and consistently across the organization.

Fourth, the SCAO has not established any limits on the total amount of paid administrative leave that can be (1) granted for discretionary purposes, (2) used while conducting disciplinary investigations, or (3) included in a settlement agreement, nor does the SCAO require reporting of leave over a certain amount. According to the SCAO, there

35

are a variety of circumstances that might lead to utilizing administrative leave for an employee, and each case is reviewed individually based on the conditions involved.

In contrast, State Personnel Rules include specific requirements and guidance governing the use of paid administrative leave, including appropriate uses, documentation, supervisory review and approval, and limits on the amount of leave that can be used for certain purposes. EXHIBIT 2.7 compares SCAO rules and practices regarding paid administrative leave and State Personnel Rules for the Executive Branch.

REPORT OF THE COLORADO STATE AUDITOR

36

STATE COURT ADMINISTRATOR'S OFFICE, PERFORMANCE AUDIT – NOVEMBER 2020

| EXHIBIT 2.7. SCAO AND EXECUTIVE BRANCH ADMINISTRATIVE LEAVE POLICY AND RULE COMPARISON | | |
|---|---|---|
| Category of Rule | SCAO | Executive Branch |
| Allowable uses of paid administrative leave | Broad authority to grant leave determined to be for the good of the State. | An appointing authority[1] must consider prudent use of taxpayer and personal services dollars and the business needs of the department. |
| Tracking reason for leave | No requirement. | Departments must track, within time keeping systems, detailed reasons for administrative leave (e.g., community volunteer activity, incentive, investigation, parental academic leave). |
| Maximum hours that can be authorized | No limits. | Weather– typically no more than 2 hours
National emergencies – 15 days
Local emergencies – 5 days
Military service – not to exceed 90 days
Elections – 2 hours
Transplant/bone donations – 2 days
Election judge – 1 day |
| Paid administrative leave for investigations | No limits. | Any paid administrative leave that exceeds 20 consecutive working days must be reported to both the agency executive director and the State Personnel Director. |
| Use of excess hours in a workday for holidays | 8-hour limit for state holidays. No limitation on taking leave for 9 or 10 hours for holidays granted by the Chief Justice. | Full-time employees may charge 8 hours of holiday time. If the employee typically works a longer day (e.g., 9- or 10-hour day), the additional hours must be worked during the week and/or personal leave or annual leave must be taken to backfill the difference. |
| Accrual of compensatory time | No rules prohibiting administrative leave as part of total time worked to accrue compensatory time. | Employees cannot earn compensatory time through the use of paid administrative leave. |

SOURCE: Judicial Department Personnel Rules; Department of Personnel and Administration Classified Employee Handbook; Department of Personnel and Administration Technical Guidance for Time Off and Leave; State Personnel Rules.
[1] According to State Personnel Rules, appointing authorities include executive directors of the principal departments and presidents of higher education institutions, and their delegates, as appointed in writing.

37

# WHY DO THESE PROBLEMS MATTER?

The SCAO does not demonstrate good stewardship of state funds when it (1) grants large amounts of paid administrative leave to employees, specifically costing more than $476,000 in state funds during Fiscal Years 2017 through 2020; and (2) is not always clear why the administrative leave was granted and whether it was for the benefit of the State. For example:

**DISCRETIONARY LEAVE.** The 3,600 hours of discretionary administrative leave where there was no record of why the leave was granted cost the State an estimated $156,300. Further, since employees were allowed to use administrative leave and not PTO for at least some activities, employees retained more PTO for other uses or retained the PTO to be paid out upon job severance. One of the employees who was granted 152 hours of administrative leave over the normal range, which amounted to $12,400 in salary during the leave, also left the SCAO while on leave. As a result, the employee was paid out nearly $34,800 for unused PTO when they left, which was the maximum allowable for employees.

**DISCIPLINARY INVESTIGATIONS.** The nine cases where paid administrative leave was granted for disciplinary investigations used about 3,070 hours, or 383 days, of leave, which amounted to more than $158,900 in salary costs to the SCAO. These employees also accrued PTO and received benefits during the time they were out on leave. Each of the employees separated from the organization at the end of their administrative leave and received the full payout of all PTO they had accrued.

**SETTLEMENTS.** The 2,650 hours of paid administrative leave granted for the two settlement agreements cost the SCAO more than $160,800 in salaries, plus $22,600 in PTO accrued during the time the staff were on leave. Using paid administrative leave instead of a lump-sum payment for settlements is not transparent and conceals the true costs of the settlements to the State. During our review of the financial records the

38

SCAO maintained for the audit review period, there was no indication the SCAO had made settlement payments to employees because the cost of the payments was absorbed in salaries. Only when we discovered large amounts of leave taken with no notation for why the leave was granted did the SCAO indicate that administrative leave hours were used for settlements. Therefore, within the SCAO financials, payments made for employee settlement agreements appear as normal payments, combined with other salary and leave payments to all employees. Additionally, at the time of the agreements, the full cost of the settlements was unknown because the SCAO was still paying benefits (e.g., healthcare and retirement) while the employees were on leave and the value of those benefits was not quantified in the settlement agreements.

# RECOMMENDATION 2

The State Court Administrator's Office should ensure that it is using paid administrative leave responsibly and as a good steward of state funds by implementing policies and procedures that:

A   Define the appropriate uses of paid administrative leave, including whether it can be used for settlement agreements.

B   Require that employees record the reason that paid administrative leave was granted in the timekeeping system.

C   Require oversight of paid administrative leave use, both at the organizational level and by supervisors, to verify that it is being used appropriately and the amounts used are reasonable. This may include running organization-level reports on the amount of administrative leave used to determine standards and identify outliers and providing guidelines on how to monitor that the amounts of leave approved for individual staff are appropriate.

D   Establish limits on the amount of paid administrative leave that can be used for certain purposes. This could also include establishing threshold administrative leave amounts that would need to be reported to the State Court Administrator.

# RESPONSE

## STATE COURT ADMINISTRATOR'S OFFICE

A   AGREE. IMPLEMENTATION DATE: JULY 2021.

The State Court Administrator's Office agrees with the recommendation and will work with the Supreme Court to develop and implement rules within the Colorado Judicial System Personnel

40

Rules covering the use of paid administrative leave. These Rules apply to all employees of the Judicial Department whose positions are within the job classification and compensation plan established pursuant to Section 13-3-105, C.R.S., and Section 5(3) of Article VI of the Colorado Constitution.

B   AGREE. IMPLEMENTATION DATE: JULY 2021.

The Judicial Department is in the process of implementing a new timekeeping and leave system that will enhance the overall functionality and reporting of time and leave for all Department employees. Some of the issues identified in the audit report are the result of the inadequacies of the legacy system used by the Department. The Department will utilize the enhanced features of the new system to require a documented reason for the use of paid administrative leave.

C   AGREE. IMPLEMENTATION DATE: JULY 2021.

The Judicial Department is in the process of implementing a new timekeeping and leave system that will enhance the overall functionality and reporting of time and leave for all Department employees. Some of the issues identified in the audit report are the result of the inadequacies of the legacy system used by the Department. The Department will utilize the new timekeeping and leave system to design reports for use by Administrative Authorities and for Department-wide monitoring.

D   AGREE. IMPLEMENTATION DATE: JULY 2021.

The State Court Administrator's Office agrees with the recommendation and will work with the Supreme Court to develop and implement rules within the Colorado Judicial System Personnel Rules covering the use of paid administrative leave, including limits on the amount of administrative leave that can be used for certain purposes. These Rules apply to all employees of the Judicial Department whose positions are within the job classification and compensation plan established pursuant to Section 13-3-105, C.R.S., and Section 5(3) of Article VI of the Colorado Constitution.

41

# HUMAN RESOURCES RECORDS RETENTION

Within the SCAO, the Human Resources Division is responsible for retaining and securing all personnel records. Proper maintenance and retention of personnel records helps to protect any organization, for example, in cases of wrongful termination, disgruntled employees, and other litigation threats in employment law. Some of the most important records of this regard include Family and Medical Leave (FML) case files, which include employee medical records and disciplinary investigation and action records.

**FAMILY AND MEDICAL LEAVE ACT (FMLA).** For employee FMLA requests, which allow all eligible employees of covered employers to take unpaid, job-protected leave for specified family and medical reasons, a variety of information must be submitted to the employer, including a completed medical certificate and medical status reports; Notice of Eligibility and Rights & Responsibilities paperwork; and a First Report of Injury for any FMLA event involving workers' compensation. Between Fiscal Years 2017 and 2020, the SCAO approved 135 of the approximately 170 FMLA requests it received from employees. The SCAO's approved FMLA requests resulted in about 24,500 hours of leave taken, of which about 21,700 hours (89 percent) were paid through employees' accrual of extended sick leave and/or PTO. The remaining 2,800 hours were taken as unpaid leave.

**DISCIPLINARY INVESTIGATIONS.** Disciplinary investigations and actions are initiated by an employee's supervisor and can begin at any time when an employee is suspected of infringing on rules or failing to perform their duties as assigned, including, but not limited to, misconduct, violation of the law, or fraud. In instances when the employee's continued presence may endanger the safety or welfare of other staff, or impair the investigation, they can be put on paid administrative leave while their supervisor works with the Human Resources Division to conduct the investigation. In the event that

42

disciplinary or corrective action results, including termination, the Human Resources Division is responsible for maintaining records in the employee's personnel files, in part to defend the SCAO should the employee object to or appeal the results. For example, if an employee is terminated for cause, they can appeal the termination and a hearing officer adjudicates the matter. A final appeal to the Personnel Board of Review, consisting of eight members appointed by the Chief Justice, is allowed.

# HOW WERE THE RESULTS OF THE AUDIT WORK MEASURED?

We requested all SCAO personnel records for FMLA cases and employee disciplinary investigations and actions for Fiscal Years 2017 through 2020 and reviewed the information provided against the following document retention requirements:

- **FEDERAL LAW.** Federal law requires the retention of personnel and employment records, including FMLA files, as well as termination and separation documentation.

  - ▶ FMLA records must be kept for no less than 3 years [29 CFR 852.500 (b)].
  - ▶ Personnel and employment records shall be preserved by government agencies for 2 years [29 CFR 1602.31].

- **JUDICIAL DEPARTMENT.** The Judicial Department's Records Management Manual requires the Department to maintain certain human resources documentation for all employees, including documentation related to FMLA, for 10 years after separation. Given federal requirements for FMLA documentation, this would include documents such as:

  - ▶ Medical certificates
  - ▶ Notice of Eligibility and Rights & Responsibilities

43

> ► Designation Notice
> ► Workers' Compensation First Report of Injury
> ► Workers' Compensation Medical Status Report

For disciplinary investigations, documentation could include:

> ► Corrective Actions
> ► Disciplinary Actions
> ► Personnel Actions

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY AND WHY DO THEY MATTER?

Overall, we found that the SCAO has not maintained sufficient documentation to support decisions and actions taken in FMLA cases and disciplinary actions. Specifically, we found:

▪ **FAMILY AND MEDICAL LEAVE.** We found that for 10 of the 135 FMLA cases (7 percent) approved during Fiscal Years 2017 through 2020, the SCAO could not demonstrate that the employees were eligible for the amount of FML approved or, in some cases, that the employees were eligible for FML at all. All 10 cases were missing at least one of the required forms, and some cases were missing multiple forms. EXHIBIT 2.8 shows the required documents missing for these 10 cases.

44

STATE COURT ADMINISTRATOR'S OFFICE, PERFORMANCE AUDIT – NOVEMBER 2020

| EXHIBIT 2.8. FMLA CASES MISSING REQUIRED DOCUMENTATION FISCAL YEARS 2017 THROUGH 2020 | | | | |
|---|---|---|---|---|
| Required Documents | From | To | Purpose | Number of Cases Missing Document |
| Medical Certificate | Employee | Employer | Verifies: <br>• the FMLA-qualifying reasons for leave from healthcare provider <br>• the amount of leave needed | 4 |
| Notice of Eligibility and Rights & Responsibilities | Employer | Employee | Informs the employee of: <br>• eligibility for FMLA leave or at least one reason why the employee is not eligible <br>• the specific expectations and obligations associated with the FMLA leave request and the consequences of failure to meet those obligations | 6 |
| Designation Notice | Employer | Employee | Informs the employee: <br>• whether the FMLA leave request is approved <br>• the amount of leave that is designated and counted against the employee's FMLA entitlement <br>• if medical certification is incomplete or insufficient and additional information is needed | 1 |
| Workers' Compensation Medical Status Report[1] | Employee | Employer | Verifies: <br>• workers' compensation claim qualification <br>• reasons for any leave/accommodation from healthcare provider <br>• amount of leave needed | 2 |
| Workers' Compensation First Report of Injury[1] | Employee | Employer | • Notifies the employer and insurance provider of occupational injuries or illnesses that result in incapacity <br>• Begins the workers' compensation claims process | 2 |
| SOURCE: Office of the State Auditor analysis of SCAO FMLA documents and data from Fiscal Years 2017 through 2020. <br>[1] Workers' compensation documentation is only required if the FMLA event also involves a workers' compensation claim. | | | | |

45

The SCAO confirmed that it did not know what became of these required documents and, as such, cannot demonstrate whether these 10 employees qualified for their use of FML, which totaled more than 1,800 hours. These employees were paid for 935 of these 1,800 hours through extended sick leave, at a cost of about $40,500.

Further, under the Department's rules governing leave usage, the extended sick leave that employees accrue can only be used in FML cases and for medically certified events and, unlike PTO, is not paid out upon termination. If these employees were not actually eligible for FML, then this leave should not have been used. Instead, the employees would have had to use their accrued PTO, reducing any final payout or time that could be used for vacation. Thus, the SCAO may be providing an incentive for employees to request FML more frequently—accessing their accrued extended sick leave and allowing their PTO to accrue for greater payouts upon separation.

▪ **DISCIPLINARY INVESTIGATIONS.** We identified two of 11 cases during Fiscal Years 2017 through 2020 that the SCAO reports were disciplinary investigations, but it does not have documentation related to these cases, such as the allegations, complaints, outcomes, or any actions taken as a result of the investigations. The SCAO provided documentation to show that these two employees were placed on a total of more than 800 hours of paid administrative leave during these investigations. According to the SCAO, the human resources staff who would have conducted these investigations are no longer with the SCAO and there is no record of what occurred. Both employees resigned from the SCAO subsequent to the investigations.

According to the U.S. Equal Employment Opportunity Commission (EEOC), when an employer takes disciplinary actions against an employee, the employer can be subject to employee claims alleging discrimination or retaliation. If the SCAO does not have documentation to support why a disciplinary investigation occurred, the outcome of the investigation, and the justification for any actions

46

STATE COURT ADMINISTRATOR'S OFFICE, PERFORMANCE AUDIT – NOVEMBER 2020

taken, it could be difficult for the SCAO to defend itself against these types of claims, which could potentially result in a substantial monetary loss to the State.

The EEOC charges employers with the responsibility for securing and retaining sensitive employee information. Failure to do so can result in sanctions, civil monetary penalties and, in some cases, individual and criminal liabilities. In addition, employers can face sanctions and be sued for wrongful destruction of employment records. In 2019, the EEOC reported 36 recordkeeping and 237 breach of confidentiality violations nationally, resulting in charges filed against employers. Because the SCAO does not know what happened to the missing FMLA and disciplinary investigation documentation, it cannot show that personnel information was properly destroyed or secured and, therefore, could be at risk for such claims.

## WHY DID THIS PROBLEM OCCUR?

SCAO policies and procedures do not require that staff maintain human resources information in a central, secure, location within the organization, or require contingency plans for retaining information in cases of sudden personnel changes. The SCAO reports that staff responsible for processing FMLA requests and maintaining the related documentation did not consistently store the documents, and there was limited oversight to ensure that the SCAO's decisions on FMLA requests were supported and complied with applicable FMLA requirements. When staff left the SCAO, remaining staff discovered that FMLA records were incomplete and there was no way to obtain the information.

Additionally, some documentation related to disciplinary investigations was not backed up to an SCAO shared drive and hard copies were not maintained. The SCAO reported that one former employee used their personal MacBook and associated Apple account and another used an SCAO MacBook, but with their personal Apple account, even after

47

being asked not to do so. Because these employees used their personal accounts, they were not connected to the SCAO shared drive or IT system, which stores and backs up information. The information was lost upon these employees' departure from the SCAO.

Also, according to the SCAO, an employee took records related to other employees' disciplinary investigations upon leaving the SCAO because the records were not secured. The *Standards for Internal Control in the Federal Government* (Green Book), issued by the U.S. Government Accountability Office and adopted by the Executive Branch by the State Controller, provide that employers should implement policies related to retention of records and continuity of business, including placing limitations on access to sensitive records, properly maintaining documentation, and developing a contingency plan to respond to sudden personnel changes.

The SCAO stated that it has not conducted any reviews, including through its internal audit division, of its record retention policies, practices, or controls and risks as they relate to FMLA and disciplinary investigations.

48

STATE COURT ADMINISTRATOR'S OFFICE, PERFORMANCE AUDIT – NOVEMBER 2020

# RECOMMENDATION 3

The State Court Administrator's Office (SCAO) should ensure that it properly secures and documents all human resources information by:

A  Establishing policies and procedures requiring that all human resources documentation be stored in a secure shared file and training staff on these policies.

B  Developing a contingency plan to respond to sudden personnel changes.

C  Implementing a review process, including regular reviews by internal audit, to ensure that all required documentation is maintained in the appropriate files and the SCAO's policies and controls are adequate.

# RESPONSE

## STATE COURT ADMINISTRATOR'S OFFICE

A  AGREE. IMPLEMENTATION DATE: JULY 2021

The State Court Administrator's Office agrees with the recommendation and will implement policies and procedures to require that all documentation is stored in a secure shared location and that staff are trained on those policies.

B  AGREE. IMPLEMENTATION DATE: JULY 2021.

The State Court Administrator's Office will ensure there is a contingency plan to respond to personnel changes so that personnel records and documentation are secured and accessible.

49

C  AGREE. IMPLEMENTATION DATE: JULY 2021.

The State Court Administrator's Office agrees with the recommendation and will implement processes to ensure that required human resources documentation is maintained and secured in accordance with Judicial Department policies. Furthermore, the internal audit unit will begin conducting regular reviews of the documentation requirements.

REPORT OF THE COLORADO STATE AUDITOR

50

# SOLE SOURCE PROCUREMENTS

Between Fiscal Years 2017 and 2020, the SCAO awarded a total of 163 contracts from a competitive solicitation process and 10 additional contracts that were established using sole source procurement. Government agencies use sole source contracting to procure goods and services from a single vendor, without competition, when only one vendor is capable of meeting the agency's needs. This method bypasses the bidding and vendor evaluation processes of competitive procurements. As such, sole source procurements present a greater risk that the agency may pay a higher price than could be obtained through competitive procurements and can create the appearance of providing preferential treatment to a contractor. Agencies often enact rules to help minimize sole source procurement risks by requiring documentation of the justifying circumstances.

The Department's Purchasing Fiscal Rules (Judicial Fiscal Rules), which the SCAO operates under, specify that the State Court Administrator is the final authority on and must authorize all procurements, including sole source procurements, but may delegate purchasing responsibilities. The State Court Administrator has delegated most purchasing responsibilities to the Purchasing Manager, who oversees day-to-day administration of the Department's purchasing program by acting as the principle contact for all staff with purchasing responsibilities; posting all solicitations; maintaining and updating the Judicial Fiscal Rules related to procurement; and establishing price agreements for products or services, where appropriate.

51

# HOW WERE THE RESULTS OF THE AUDIT WORK MEASURED?

The Judicial Code of Conduct states that employees shall "[p]erform all duties without favoritism and without improper influence by family, social or other relationships," and shall "[a]void impropriety or any activity that gives the appearance of impropriety."

Judicial Fiscal Rules establish the following requirements for all SCAO procurements, including sole source procurements:

- Every effort must be made to "assure that all persons who desire to do business with the Department…have a fair and equal opportunity to compete in fulfilling the Department's needs" [Section 1.2.1].

- Employees with purchasing responsibilities must strive to maximize the purchasing value of the Department's funds [Section 1.2.3].

- Purchasing Officials must maintain a file of purchasing records that includes all documentation related to the purchase, including contracts [Section 1.4.4.4].

Judicial Fiscal Rules also set the following requirements specifically for sole source procurements:

- All sole source procurements must be accompanied by a written justification that includes "sufficient facts, circumstances, and reasoning to substantiate that there is only one specific product or service that will meet the Department's need, that there is only one provider of that product or service, and an explanation as to why there are no other vendors suitable or acceptable to meet that need" [Section 2.3.2.1].

52

- The State Court Administrator must sign the written justification prior to any commitments being made (e.g., signing a contract with the vendor) [Section 2.3.2.2] and must authorize all sole source purchases [Sections 1.4.1.2–1.4.1.4].

- The Purchasing Official and/or Purchasing Manager must engage in and document negotiations with the identified sole source vendor regarding the price, delivery, and terms of the contract [Section 2.3.2.3].

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY?

The 10 sole source contracts awarded by the SCAO between Fiscal Years 2017 and 2020 totaled $8.14 million. We reviewed all 10 sole source contracts against Judicial Fiscal Rules and identified issues with six contracts (60 percent) worth a total of up to $3.87 million, and on which $1.12 million was spent. Some contracts had multiple issues.

- In Fiscal Year 2019, the former State Court Administrator executed a sole source contract with a former employee for an internal leadership training program at an annual cost of $530,000 for up to 5 years and not to exceed a total of $2.75 million. The former employee had created their leadership training company while still employed by the SCAO. The employee submitted their resignation to the SCAO on March 15, 2019, with an effective date of March 19, 2020. On March 20, 2019, the former Director of Human Resources submitted a sole source justification to the former State Court Administrator to contract with the former employee's leadership training company. On March 25, 2019, the former State Court Administrator emailed the former employee with the signed sole source justification and indicated that the SCAO was moving forward with the contracting process. The former State Court Administrator executed the contract 11 weeks later, but at the direction of the Supreme Court, the contract was canceled 6 weeks after it was executed. The proximity of dates between when the employee resigned and when the sole source justification was

53

drafted and signed by the former State Court Administrator gives the appearance of impropriety and appears to be a violation of the Judicial Code of Conduct.

▪ For one contract worth about $244,700 for court reporting software and services, the SCAO did not maintain the executed contract, as required by Judicial Fiscal Rules.

▪ For four contracts, we found deficiencies in the SCAO's justification for using sole source procurement. Specifically:

▸ One contract worth $44,800 for the creation of an "interactive learning exhibit" did not contain any written justification for using the sole source method. The SCAO confirmed that they did not write a justification for this contract.

▸ Two contracts contained written justifications that were missing required statements to explain why there was only one service or one provider that could meet the Judicial Department's needs. In one of these contracts, worth $73,650 and for a specialized recidivism prevention program, the written justification lacked a statement to explain why other recidivism prevention programs were incapable of meeting the Department's needs. In the second contract, which was also the contract with the former SCAO employee, worth $530,000 per year for up to 5 years and not to exceed a total of $2.75 million, the written justification lacked a statement to explain why the vendor's leadership program was the only program capable of meeting the Department's needs.

▸ One contract worth $54,700 for mental health, substance abuse, and domestic violence treatment services for juvenile probationers contained a written justification for the sole source procurement, but it was signed by the former State Court Administrator several weeks after the contract itself was executed. Judicial Fiscal Rules require that the State Court Administrator sign the written justification prior to any commitments being made.

54

- For four contracts, with a total value of up to $3.55 million, the SCAO did not negotiate the price, delivery, or terms of the contracts with the vendors. Rather, the SCAO accepted the price, delivery, and terms proposed by the vendors.

EXHIBIT 2.9 shows the distribution of issues found across the six sole source procurements.

| EXHIBIT 2.9. SUMMARY OF ISSUES FOUND FISCAL YEARS 2017 THROUGH 2020 | | | | | |
|---|---|---|---|---|---|
| Sole Source Procurement | Contract Value | Missing Contract | Appearance of Impropriety | Missing or Incomplete Written Justification | Lack of Negotiations |
| A | $73,650 | | | X | |
| B | $44,800 | | | X | X |
| C | $244,739 | X | | | |
| D | $54,726 | | | X | X |
| E | $2,750,000[1] | | X | X | X |
| F | $698,448 | | | | X |

SOURCE: Office of the State Auditor analysis of procurement documentation provided by the SCAO.
[1] This contract was for $530,000 per year, for up to 5 years and not to exceed a total of $2.75 million. The SCAO canceled this contract prior to expending any funds.

# WHY DID THESE PROBLEMS OCCUR?

**INSUFFICIENT PROVISIONS IN JUDICIAL FISCAL RULES.** The Judicial Fiscal Rules do not explicitly prohibit former employees from pursuing a contract with the Department within a specified period after their resignation. Conversely, ethics statutes that govern the General Assembly, public officers, local government officials, and state employees prohibit former employees from contracting within 6 months of separation from state employment with a state agency, involving matters with which they were directly involved during their employment [Section 24-18-201(1), C.R.S.]. The former employee awarded the contract for leadership training had been directly involved in leadership training during their employment with the SCAO.

55

**LACK OF SCAO POLICIES AND PROCEDURES.** The SCAO did not establish sufficient written policies or procedures detailing how staff should comply with the Judicial Fiscal Rules related to sole source procurements. Specifically, although the Judicial Fiscal Rules state that the State Court Administrator is the final authority on and must authorize all procurements, including sole source procurements, the SCAO did not establish a clear internal review process to ensure that these contracts are complete and meet all of the Judicial Fiscal Rules, such as through ensuring that documented reviews are completed by other key staff prior to execution (e.g., Director of the Financial Services Division, the Purchasing Manager, fiscal staff, and legal team). Without specific policies and procedures to conduct and document review, it is not clear that these key staff were involved in the review process in six of the 10 sole source procurements made between Fiscal Years 2017 and 2020.

Further, while the Judicial Fiscal Rules that were in place during the period we reviewed stated that there must be a written justification and documentation of negotiations, they did not indicate what should be included in that documentation to justify the sole source procurement and contract terms.

Additionally, the SCAO did not establish written policies for staff to use when deciding whether a sole source procurement is appropriate and in the best interest of the Department. For example, the SCAO did not require that sole source solicitations be posted publicly to identify potential competing vendors and help the SCAO determine if other vendors can provide the goods or services they are seeking or if a sole source is the only means of procurement. Statutes governing executive branch agencies require a sole source notification be posted on the State's bid notification web site for at least 3 days to identify potential competing vendors [Section 24-106-103(5), C.R.S.].

In May 2020, after our audit review period ended, the SCAO implemented revised Judicial Fiscal Rules that it states address the

56

deficiencies we identified in the policies and procedures that were in place during the period we reviewed (July 2017 through April 2020).

## WHY DO THESE PROBLEMS MATTER?

The SCAO expended a total of $1.12 million on the six sole source procurements for which we identified issues. One of the five *Principle Strategies and Goals* the SCAO identified in its strategic plan is to "[c]ultivate public trust and confidence through the thoughtful stewardship of public resources." When the SCAO does not follow established fiscal rules when using the sole source solicitation process, it is not demonstrating "thoughtful stewardship of public resources."

# RECOMMENDATION 4

The State Court Administrator's Office should establish and implement written rules, policies, and procedures related to the sole source procurement process to help ensure that it is used appropriately by:

A   Updating procurement rules to prohibit former employees from contracting with the Department within a specified period after their resignation.

B   Establishing internal reviews and approvals for all phases of the sole source contracting process that includes identifying all parties required to review the contract documentation.

C   Identifying information required to support the written justification and negotiations for the sole source procurement and contract terms.

D   Requiring public sole source notifications be posted prior to awarding sole source contracts.

# RESPONSE

## STATE COURT ADMINISTRATOR'S OFFICE

A   AGREE. IMPLEMENTATION DATE: NOVEMBER 2020.

The State Court Administrator's Office agrees with the recommendation and has implemented new fiscal rules and procedures covering the use of independent contractors by the Department. These new Fiscal Rules and Procedures were approved by the Chief Justice in November 2020 and apply to all employees in the Department. The Rules include a mandatory waiting period of six months between an employee's date of separation from

58

STATE COURT ADMINISTRATOR'S OFFICE, PERFORMANCE AUDIT – NOVEMBER 2020

employment and the date when a former employee is eligible to begin providing services as an independent contractor with the Judicial Department.

B    AGREE. IMPLEMENTATION DATE: MAY 2020.

The State Court Administrator's Office agrees with the recommendation and had been working to revise the Procurement Fiscal Rules and Procedures earlier this year. The revised Rules were approved by the Chief Justice on May 1, 2020 and apply to all employees in the Department. The revised Rules, at Section 16, require all sole source procurements above the discretionary purchasing thresholds in the Rule to be coordinated by the Procurement Unit in the Financial Services Division.

The Procurement Unit is further required to provide an opinion on the sole source request to the State Court Administrator. The authority to approve or deny a sole source procurement request rests with the State Court Administrator. The revised Rules also require the State Court Administrator to report all approved sole source procurements to the Chief Justice on a quarterly basis.

C    AGREE. IMPLEMENTATION DATE: MAY 2020.

The State Court Administrator's Office agrees with the recommendation and revised the Procurement Fiscal Rules and Procedures earlier this year. The revised Rules were approved by the Chief Justice with an effective date of May 1, 2020 and apply to all employees in the Department. The revised Rules, at Section 16, outline the required information that shall be required in a sole source procurement request to support the justification. The Rules further require the request to include: (1) a summary of information detailing the costs of using an alternative good or service or of not making the purchase, and (2) a cost analysis explaining why the price offered from the vendor is fair and equitable. The Rules require the Procurement Unit to negotiate the most favorable price, terms, and conditions for the sole source procurement.

59

D   AGREE. IMPLEMENTATION DATE: MAY 2020.

The State Court Administrator's Office agrees with the recommendation and revised the Procurement Fiscal Rules and Procedures earlier this year. The revised Rules were approved by the Chief Justice with an effective date of May 1, 2020 and apply to all employees in the Department. The revised Rules, at Section 16, require the Procurement Unit to publish the sole source procurement on the electronic bid system for review by the public for 14 calendar days. The Rules further require that if one or more responses are received from qualified and responsible vendors who can meet the specifications identified in the notice, and who are not otherwise prohibited from bidding on the contract, the sole source procurement method shall not be used.

60

# PROCUREMENT CARDS

Staff at the SCAO are allowed to use procurement cards (P-cards) to make purchases that do not require a formal procurement process (i.e., generally goods under $10,000 and services under $25,000). This can include expenses such as:

- Office supplies and equipment
- Travel expenses, such as hotels
- Registration fees for conferences and trainings
- Reserving rooms and catering services for hosting conferences and trainings

During our audit, there were a total of 90 P-cards that were active for at least part of the audit review period. Of these cards, 67 were issued to specific staff for their own individual use, while 23 were issued to a work unit (e.g., Human Resources P-card, Information Technology P-card) for use by various staff within that work unit. The SCAO reported that, in Fiscal Year 2018, it began to increase the number of P-cards issued to specific individuals, citing that this would ease administrative burdens and hold purchasers more accountable because all cards will be tied directly to one person, as opposed to a group of people or work unit. For Fiscal Years 2017 through 2020, SCAO staff made almost 10,000 P-card purchases totaling about $3.5 million, as shown in EXHIBIT 2.10.

| EXHIBIT 2.10. SCAO PROCUREMENT CARD PURCHASE TOTALS FISCAL YEARS 2017 THROUGH 2020[1] | | |
|---|---|---|
| Fiscal Year | Number of Purchases | Amount |
| 2017 | 2,075 | $630,000 |
| 2018 | 2,510 | $848,000 |
| 2019 | 2,760 | $1,134,000 |
| 2020[1] | 2,630 | $897,000 |
| Total | 9,975 | $3,509,000 |

SOURCE: Office of the State Auditor analysis of report pulled from the Citibank Citi® Card reporting system.

[1] Through April 2020, when the data was pulled for testing.

# HOW WERE THE RESULTS OF THE AUDIT WORK MEASURED?

The Green Book [Principle 10.12-14] states that management should consider segregation of duties as part of its internal control design to prevent fraud, waste, and abuse. Segregation of duties involves the separation of activities including authority, custody, and accounting operations. Practically, this means that separate positions should be responsible for making, approving, and recording purchases. Although the SCAO is not governed by the Green Book, it is considered to be a best practice for establishing internal controls and has been adopted by the Executive Branch at the state level.

Section 2.2 of the Judicial Fiscal Rules requires staff, including SCAO staff, to maintain a detailed receipt or merchant/vendor invoice for each purchase on the credit card statement. The budget authority, a position that varies by division or budget, from the administrative assistant to the division director, is required by rules to review, date, and sign the

62

disbursement documentation (i.e., credit card statement) for compliance with Judicial Fiscal Rules, Chief Justice Directives, contractual agreements, invoice terms, budgetary guidelines, and applicable statutes.

## WHAT PROBLEM DID THE AUDIT WORK IDENTIFY AND WHY DOES IT MATTER?

We tested a statistically valid random sample of 100 SCAO P-card purchases made during Fiscal Years 2017 through 2020 and totaling almost $405,000 (12 percent of the total amount spent on P-cards during this period) to determine if these purchases complied with Judicial Fiscal Rules and were consistent with best practices related to internal control.

Overall, we identified issues with the approvals for 30 of the 100 purchases (30 percent) we reviewed; these 30 purchases totaled more than $49,500. Specifically, we found:

- 23 P-card purchases (23 percent) totaling more than $45,600 were approved by the same individuals whose cards were used for the purchases. Although these individuals were "Budget Authorities" who, under Judicial Fiscal Rules are authorized to approve purchases, approving one's own purchase is not consistent with best practices or an appropriate segregation of duties. Based on the information from our sample, we can estimate with 95 percent confidence with the most likely statistical projection that the total amount of purchases approved by the same individual who made them is about $807,100.

- 5 P-card purchases (5 percent) totaling more than $3,200 where it was not clear whether the purchases had been approved. For all five purchases, the SCAO pointed to markings on one of the related documents, such as a receipt, and stated the markings were the approving signature. However, these markings were not legible and there was no date on four of them to indicate that the markings were

intended to be an approval signature. Based on the information from our sample, we can estimate with 95 percent confidence with the most likely statistical projection that the total amount of purchases made without a legible indication of approval is about $175,500.

▪ 2 P-card purchases (2 percent) totaling about $600 that did not include any signature from the budget authority. Therefore, it appears these purchases were not reviewed and approved for appropriateness. Based on the information from our sample, we can estimate with 95 percent confidence with the most likely statistical projection that the total amount of purchases made without indication of approval is about $70,200.

In total, we estimate using the most likely error rate, with 95 percent confidence, that about $1,052,700 in purchases made during our audit period were both made and approved by the same individual, or the documentation to indicate approval was neither legible nor present. When there is no segregation of duties or when review procedures are not followed, we cannot be certain that the controls the SCAO has put in place are functioning as intended and lowering the risk of unnecessary or unreasonable purchases.

## WHY DID THESE PROBLEMS OCCUR?

Although Judicial Fiscal Rules require that all P-card purchases be approved by the budget authority, which is demonstrated by a signature and date on the monthly credit card statement, the SCAO has not established written policies or provided consistent direction to staff for how this rule should be implemented within the office. Specifically, although the accounting and budget teams maintain a list of budgetary authorities, the SCAO has not specified which positions across the organization should be considered "budget authorities" and, therefore, are responsible for approving purchases, nor has it specified that an individual cannot approve their own purchases. In addition, the SCAO has not provided guidance on how and where approvals should be documented to ensure consistency across the organization. Instead, each

64

division and unit within the SCAO has different practices for reviewing and approving purchases made on P-cards. For example, in one division, the administrative assistant makes purchases and the division director reviews and approves the P-card statement. However, in another division, the administrative assistant has been told by the division director to make purchases, but the administrative assistant is also responsible for reviewing and approving the P-card purchases.

65

# RECOMMENDATION 5

The State Court Administrator's Office should improve controls over the use of procurement cards by establishing written policies on which positions can serve as a "budget authority" and are authorized to approve procurement card purchases, taking into consideration the appropriate segregation of duties and how and where approvals should be documented.

# RESPONSE

## STATE COURT ADMINISTRATOR'S OFFICE

AGREE. IMPLEMENTATION DATE: JULY 2021.

The State Court Administrator's Office agrees with the recommendation and has developed Fiscal Rules and Procedures covering Commercial Cards that were approved by the Chief Justice in November 2020 and apply to all employees in the Department. The Rules, at Section 4, require the Administrative Authority (Division Directors at the State Court Administrator's Office) to review, sign, and date the statement for each cardholder and card custodian indicating approval of transactions.

Furthermore, the State Court Administrator's Office will develop clear guidance regarding budget management to include who can serve as a budget authority.

66

# SCAO ADMINISTRATIVE FRAMEWORK

The Colorado Constitution establishes the Supreme Court, led by the Chief Justice, as the executive head of Colorado's judicial system and provides it with the authority to appoint a court administrator and any other personnel necessary to administer the courts [Colorado Const., Art. VI, Sec. 5(2 and 3)]. To assist in administering the operations of the courts, the Supreme Court has established, within the Department, the SCAO, headed by a State Court Administrator [Section 13-3-101, C.R.S].

The SCAO operates within a governance framework established in rules promulgated by the Supreme Court, including Judicial Department Personnel Rules and Judicial Fiscal Rules, as well as written Chief Justice Directives, such as a Code of Conduct that all Department employees must follow.

The SCAO, under the authority of the State Court Administrator, is responsible for providing centralized policy guidance to courts on Supreme Court requirements and developing and implementing standards and guidelines for Department staff to facilitate operations under those requirements. In particular, Chief Justice Directive 04-02 (effective as of September 2007) states that, generally, all Department personnel shall comply with the fiscal policies and procedures established by the State Court Administrator.

## HOW WERE THE RESULTS OF THE AUDIT WORK MEASURED?

The Code of Conduct implemented by the Supreme Court for the Department states, "It is essential to the proper functioning of the State that all employees of the Judicial Department observe high standards of conduct to maintain professionalism in the workplace and public confidence in the integrity and independence of the judicial system" and

67

"[a]void impropriety or any activity that gives the appearance of impropriety." In addition, the Code of Conduct provides that staff should demonstrate high standards of integrity and honesty, and should always use state resources, time, property, and funds prudently.

Judicial Fiscal Rules state that, "All parties involved in the negotiation, performance, or administration of the Judicial Department's purchases, acquisitions, and contracts shall act in good faith and in accordance with the Colorado Judicial Branch Code of Conduct" [Section 1.1] and that employees shall not "[u]se state time, property, equipment, or resources for private gain, monetary or otherwise" [Section 1.1.2.3].

The Green Book defines internal control, in part, as a process implemented by an agency's management to provide reasonable assurance that the objectives of the agency will be achieved, including the objectives of operating efficiently and effectively and with accountability. Although the SCAO is not required to follow the standards established in the Green Book, they are considered a best practice for establishing internal controls and include principles and components that, if enacted by an entity's oversight body, management, and other personnel, provide "reasonable assurance that the objectives of an entity will be achieved" [OV1.01]. The Green Book notes that an entity's internal controls comprise "the plans, methods, policies, and procedures used to fulfill the mission, strategic plan, goals, and objectives of the entity," serve as "the first line of defense in safeguarding assets," and help the entity "achieve desired results through effective stewardship of public resources" [OV1.03]. Key Green Book principles relevant to the issues identified in this audit include:

- **DEMONSTRATE COMMITMENT TO INTEGRITY AND ETHICAL VALUES (PRINCIPLE 1).** "The oversight body and management should demonstrate a commitment to integrity and ethical values" [1.01]. This includes setting a tone at the top and throughout the organization that stresses the importance of these values through management's directives, attitudes, and behavior [1.02], and

68

establishing and adhering to standards of conduct that communicate expectations for all levels of the organization [1.06 and 1.09].

- **ESTABLISH STRUCTURE, RESPONSIBILITY, AND AUTHORITY (PRINCIPLE 3).** "Management should establish an organizational structure, assign responsibility, and delegate authority to achieve the entity's objectives" [3.01]. This includes developing and assigning responsibilities in a manner that addresses risks [3.02] and ensuring that lines of authority are defined and communication flows down, across, and up all levels of authority [3.04].

- **DESIGN AND IMPLEMENT CONTROL ACTIVITIES (PRINCIPLES 10 AND 12).** Management should "design control activities to achieve objectives and respond to risks" [10.01], and "implement control activities through policies" [12.01]. This includes assigning control activities at the proper levels [10.07], as well as establishing adequate segregation of duties [10.13]. Responsibilities should also be documented [12.02], and the organization should conduct periodic reviews of control activities [12.05].

Statute [Section 13-3-105(4), C.R.S.] states that, "To the end that all state employees are treated generally in a similar manner, the [S]upreme [C]ourt, in promulgating rules as set forth in this section, shall take into consideration the compensation and classification plans, vacation and sick leave provisions, and other conditions of employment applicable to employees of the executive and legislative departments."

69

# WHAT PROBLEMS DID THE AUDIT WORK IDENTIFY?

Throughout this audit, we identified problems with the SCAO's oversight of and accountability for its human resources and financial services functions that raise questions about the efficacy of the SCAO's system of internal control, including, in particular, its culture of accountability. These problems also raise questions as to whether the SCAO has acted in a way to maintain public confidence in the Department and demonstrate good stewardship of state funds. We applied relevant provisions of the Judicial Code of Conduct, Department rules, and the Green Book's Principles of Internal Control to actions taken by the SCAO during our audit review period and identified numerous instances where the SCAO's actions were not consistent with these provisions. Specifically, we found:

**APPEARANCE OF IMPROPRIETY.** The former State Court Administrator began the process of entering into a sole source contract with a former SCAO employee within days of the former employee's resignation. The contract, worth $530,000 per year for up to 5 years and not to exceed a total of $2.75 million, was to provide internal leadership training for the Department. This former employee created their leadership training company while still employed by the SCAO. Further, at the time this employee tendered their resignation, the SCAO had paid at least $21,800 during Fiscal Years 2017 and 2019 to send this individual to four leadership conferences and trainings, which provided the former employee with knowledge valuable to their company, using state funds. Contracting with an employee who had recently resigned to provide services developed by training paid for by the SCAO has the appearance of impropriety, which is prohibited by the Judicial Code of Conduct. This matter is discussed further in the fourth finding.

70

**FAILURE TO ESTABLISH STRUCTURE, RESPONSIBILITY, AND AUTHORITY.** We identified several areas during the audit where SCAO management had not assigned responsibility or delegated authority in a manner that appeared appropriate to achieve its objectives. Specifically:

- **CONTRACTS.** Judicial Fiscal Rules require the State Court Administrator to be the signature authority for all SCAO contracts [Section 1.4.1.3]. However, we found that the former SCAO Chief of Staff signed on behalf of the State Court Administrator for nearly half of the contracts we sampled. Specifically, the former SCAO Chief of Staff signed five contracts on behalf of the State Court Administrator between April 2017 and February 2018. Judicial Fiscal Rules permit the State Court Administrator to delegate the authority to sign contracts "in limited circumstances" [Section 1.4.1.5]; however, the SCAO has not established those circumstances when such delegation would be appropriate.

- **APPROVALS.** First, although Judicial Fiscal Rules require the "budget authority" to review, date, and sign disbursement documentation, the SCAO has not defined which positions should be considered a "budget authority." As a result, we found wide variation between divisions as to which staff had been designated as the "budget authority." For example, in one division, the Division Director was considered the budget authority. However, in another division, an administrative assistant had been appointed as the budget authority, and was tasked with approving the purchases for that division, including purchases made by their supervisor.

  Second, during Fiscal Years 2017 through 2020, the SCAO granted 25,520 hours of paid administrative leave to employees. Of this amount, 6,090 hours were approved as part of VSI contracts the SCAO entered into with 10 employees as part of a staffing reorganization announced by the former State Court Administrator. These agreements cost the SCAO more than $518,000 in salaries and benefits paid out to these individuals. We found, however, that these agreements were not prepared or reviewed by the SCAO's legal

71

team or other members of SCAO senior management who were listed as required signatories on the contracts. The VSI contracts were signed only by the former State Court Administrator. Ultimately, the SCAO refilled seven of the 10 positions when the reorganization did not occur, indicating the money spent on these VSI contracts may not have been a prudent use of state funds. This matter is discussed further in the first finding.

Finally, the SCAO has not established any limits or guidelines for approving staff use of paid administrative leave, and administrative authorities or delegates at all levels of the organization are allowed to grant administrative leave with limited oversight. This matter is discussed further in the second finding.

**FAILURE TO DESIGN AND IMPLEMENT CONTROL ACTIVITIES.** We identified several areas during the audit where the SCAO had not designed or implemented sufficient control activities (i.e., the policies, procedures, and mechanisms that enforce management's directives and mitigate risks) that are commonly established as part of an effective control system. Specifically:

▪ **SEGREGATION OF DUTIES.** We found that 23 of the 100 purchases (23 percent) in our sample totaling over $45,600 were approved by the same individual who made the purchase. The SCAO had not established policies or procedures requiring that purchases be approved by someone other than the individual making the purchases. This matter is discussed further in the fifth finding.

▪ **DOCUMENT RETENTION.** We found that the SCAO did not retain documentation regarding personnel records and paid administrative leave awards. Specifically:

  ► For four employees who had been granted a large amount of administrative leave, the SCAO had to change how it had categorized the reason for the leave after they were unable to locate documentation to support the original categorization. That is, the SCAO had originally reported that the leave was

72

granted for employee settlements, but later changed its response and said that, instead, the leave was granted for either disciplinary investigations (2 instances) or discretionary reasons (2 instances).

► For 10 cases where large amounts of leave were granted, the SCAO could not clearly categorize the leave without more research. For instance, two cases initially listed as "Workers' Compensation" cases, were subsequently re-labeled as "medical leave" and leave taken under the Families First Coronavirus Response Act, but not certified FMLA cases.

► For two disciplinary investigation cases, the SCAO does not have any documentation related to these cases, such as the allegations, complaints, outcomes, or any actions taken as a result of the investigations. This matter is discussed further in the third finding.

► During Fiscal Years 2017 through 2020, the SCAO granted 25,520 hours of paid administrative leave. Of this paid leave:

  o 2,650 hours were approved as part of settlement agreements with two former SCAO employees. The SCAO lacked transparency in the documentation of these settlements because the contracts did not contain the dollar amounts for the settlement (i.e., pay and benefits received for this leave), and Judicial Personnel Rules are silent on the use of paid administrative leave for settlements. These 2,650 hours equated to $160,000 in salaries and $22,600 in paid time off. This matter is discussed further in the second finding.

  o 13,710 hours were approved under Judicial Personnel Rules governing discretion to grant paid administrative leave. For 3,600 of these hours (26 percent), there were no records of the reasons the staff members were awarded the leave. More than 100 instances occurred where employees received 1,060 hours above the calculated normal amount granted to staff.

73

This included one employee who received a total of 200 hours of paid administrative leave in Fiscal Year 2017 and another who received 160 hours in Fiscal Year 2018—there was no documentation to explain why these employees were granted the large amounts of leave. This matter is discussed further in the second finding.

o 3,070 hours were approved for disciplinary investigations related to nine employees. For two of the nine employees, the SCAO could not provide any documentation to verify that the more than 800 hours of paid administrative leave granted to these employees was due to investigations, although the SCAO did have documentation indicating that these employees separated from the SCAO to forego disciplinary proceedings. Therefore, we could not determine if these hours were spent appropriately. This matter is discussed further in the second finding.

▶ At least two SCAO employees used computers for work that were not approved by the IT division and were not connected to the SCAO network, after being asked not to do so. One of the individuals continued to use a MacBook that was not connected to the network, even though it was the property of the SCAO. When this employee left the SCAO, their MacBook hard drive was wiped clean and the SCAO no longer had the records that had been on it. The other employee used a personal MacBook that was also not connected to the SCAO network. When this employee left the SCAO, they took their MacBook and all of the information that it contained with them. As a result, information related to settlements and disciplinary investigations may have been lost.

▶ Employees responsible for the retention of documents related to Family and Medical Leave cases stored documents on their local drives that were not backed up to the SCAO network. As a result, for 10 of the 135 FMLA cases (7 percent) approved during Fiscal Years 2017 through 2020, the SCAO could not

74

demonstrate that the employees were eligible for the 1,800 hours of FML approved, or in some cases, that the employees were eligible for FML at all. These employees were allowed to use extended sick leave, rather than PTO, for the time they were out. Extended sick leave can only be used in FML cases and if these employees were not actually eligible for FML, then it should not have been used. Instead, the employees would have had to use their accrued PTO rather than allowing them to retain the PTO for other uses or have it paid out upon separation. This matter is discussed further in the third finding.

► For 12 FMLA cases, the SCAO was eventually able to provide all required supporting documentation that we requested. However, it took the SCAO 6 weeks to locate the necessary information because it was not maintained in a central location and the employees who knew where the documents could be found no longer worked at the SCAO.

► The SCAO spent about $91,900 on leadership trainings during Fiscal Years 2017 through 2020, but did not have sufficient documentation to indicate how these expenses benefitted the SCAO or to show that they were reasonable or an appropriate use of state resources. Further, only two of the employees who were identified as having attended these trainings were still with the SCAO as of September 2020. Specifically, the SCAO spent:

  o $55,000 for seven employees on the executive team to attend a leadership course at the University of Virginia. The only documentation the SCAO had related to this course were emails between staff and the course administrator clarifying details on amenities. There was no documentation justifying how this leadership course would benefit the SCAO.

  o $27,700 for two employees to attend three leadership conferences in New York City over three consecutive years. The only documentation the SCAO had related to these charges was the receipt for the conference registration.

STATE COURT ADMINISTRATOR'S OFFICE, PERFORMANCE AUDIT – NOVEMBER 2020

75

- o $5,000 for a 1-day leadership training session for the "executive team." Neither the receipt for the registration nor the statement detail indicate exactly what the training was for or how many people attended.

- o $4,200 for an employee to receive leadership coaching. The only documentation the SCAO had related to this charge was a credit card receipt for the registration.

In total, all of these examples show a lack consistency with internal control principles related to the importance of management demonstrating a commitment to integrity and ethical values and setting a tone at the top and throughout the organization that stresses the importance of these values.

# WHY DID THESE PROBLEMS OCCUR?

Judicial Personnel Rules [Rule 6.A.3] provides the State Court Administrator with broad decision-making authority for the SCAO, which includes the responsibility for setting the tone for the organization. During this audit, we identified multiple actions taken by the former State Court Administrator that were problematic. They were able to take those actions, in part, because of a lack of an effective system of controls governing SCAO operations, including:

JUDICIAL RULES, POLICIES, AND PROCEDURES. Although there are Judicial rules related to human resources and financial services, these rules are generally broad and as of October 2020, the SCAO had not developed sufficient policies and procedures detailing how to implement these rules within the organization. For example, Judicial rules allow "administrative authorities" to grant paid administrative leave to employees "for reasons determined to be for the good of the [S]tate." However, the rules do not specify, and the SCAO has not established any policies and procedures to provide additional guidance to staff on which employees are considered "administrative authorities" and,

76

therefore, who would be authorized to grant administrative leave. In addition, rules do not specify, and the SCAO has not established any guidelines on, appropriate reasons for granting administrative leave or limits on the amount that can be granted.

Similarly, Judicial Fiscal Rules require that a "budget authority" must approve purchases, but they do not define, and the SCAO has not specified, which positions should be considered a "budget authority." SCAO staff informed us that the position responsible for these approvals can vary from the division director to an administrative assistant. Further, the Judicial Fiscal Rules do not indicate the manner in which purchases should be approved by the budget authority; some purchases have initials and dates on each receipt, some on the P-Card statement, and there is not always an indication that the signature is granting approval.

Either providing more detail in Judicial rules, or developing policies and procedures with guidance on how to implement the rules would help provide the SCAO with reasonable assurance that the objectives of the agency will be achieved. This includes the objectives of operating efficiently and effectively, with accountability, and helping ensure consistent application of the rules across the organization. The Executive Branch has established State Fiscal and Personnel Rules that all state agencies must follow. State agencies are also responsible for establishing their own policies and procedures to provide guidance to staff on how to implement the rules. In Fiscal Year 2020, the SCAO began updating Judicial rules and establishing procedures related to procurement, travel, and P-cards. Our review of the revised Judicial Procurement Rules showed changes that would improve controls for sole source procurements. These changes included detailing what information must be provided in the written justification (e.g., price-cost analysis), requiring review by the procurement unit before a sole source request is reviewed by the State Court Administrator, and publishing the sole source request on a public website for 14 days. As of May 2020, the revised Judicial Procurement Rules had been finalized,

while as of October 2020, revisions to the Judicial Fiscal Rules related to P-cards were still awaiting final approval by the Chief Justice.

MONITORING ACTIVITIES. The SCAO has not implemented sufficient monitoring activities to ensure that controls within the organization are working properly. Specifically, the SCAO has not established clear expectations for staff related to supervisory review of key administrative functions, such as expenditures and administrative leave use. For example, the SCAO does not have a process for periodically reviewing expenditures to ensure that all of the necessary information and approvals related to the expenditure have been documented. In addition, the SCAO does not track the amount of administrative leave that is being used within each division and across the organization, nor does it review personnel files to ensure that required documentation has been properly retained. Principle 16 in the Green Book states that "[m]anagement should establish and operate monitoring activities to monitor the internal control system and evaluate the results" [16.01]. This includes establishing a baseline from the current state of the system, continuously monitoring, and then evaluating results. Because the SCAO has not implemented key controls discussed previously, it does not have a baseline from which to monitor how it is operating.

Additionally, the SCAO has not routinely used its internal audit function to help monitor control activities within the SCAO. Instead, the internal audit division primarily conducts audits at the judicial districts and only looks at SCAO functions if directed by management. According to the SCAO, the only internal audits conducted on SCAO operations within the past 4 years were specific to the travel and spending of a single employee that were called into question.

## WHY DO THESE PROBLEMS MATTER?

Because the SCAO has not established an effective system of internal controls, it has not been transparent in some of its activities and cannot always demonstrate good stewardship of public funds. For example:

78

- By approving the justification for a sole source contract that could be worth as much as $2.75 million for an employee who had resigned only days before the approval, the SCAO degrades the public trust in an open and equitable solicitation process.

- By granting large amounts of administrative leave for employees, the SCAO is not demonstrating good stewardship in its use of public funds. Employees are being paid for not working while still accruing the leave they receive as an employment benefit. Further, this is compounded by the fact that Department employees accrue, on average, 25 percent more PTO and extended sick leave each month than leave accrued by employees in the Executive Branch. On average, Department employees are authorized to retain a maximum accrual amount that is 14 percent higher than the Executive Branch allows. In an effort to treat all state employees in a similar manner, statute requires the Chief Justice to take into consideration what the Executive and Legislative Branches offer their employees with respect to compensation and leave.

- Leaving administrative leave to the discretion of the State Court Administrator or delegated authorities without any limitations on the amount of leave that can be approved or for what purposes can lead to excessive use of administrative leave across the organization. In addition, employees who use administrative leave in place of their accrued PTO will receive a larger payout for their unused PTO upon separation.

- There is a lack of transparency when the SCAO uses administrative leave to compensate employees under voluntary separations and settlements, which can lessen the public trust. The cost of these agreements is hidden to the public, as there is no dollar value directly stated in these agreements. In our audit work, in order to calculate the cost of these agreements, we had to request and review payroll and benefit information that would not be accessible to the public.

79

▪ A lack of segregation of duties results in staff approving their own purchases, which creates a risk of purchases not being made for the benefit of the organization and possibly for personal gain.

REPORT OF THE COLORADO STATE AUDITOR

80

# RECOMMENDATION 6

The State Court Administrator's Office (SCAO) should implement an effective system of internal control that fosters a culture of integrity, ethical values, and accountability by:

A Implementing policies and procedures and continuing to update Judicial Rules as necessary, to ensure that collectively, they provide sufficient direction to staff on the human resources and financial services functions discussed throughout this report, and detail how staff are to implement Judicial rules within the organization.

B Implementing monitoring activities to ensure that controls within the organization are working properly, which should include conducting routine supervisory reviews of key administrative functions, such as expenditures and administrative leave use, and routinely using its internal audit function to monitor controls within the SCAO itself.

# RESPONSE

## STATE COURT ADMINISTRATOR'S OFFICE

A AGREE. IMPLEMENTATION DATE: JULY 2021.

The State Court Administrator's Office acknowledges the issues identified in the audit regarding the prior internal control environment. The current State Court Administrator fully understands and accepts the fiduciary responsibility associated with administering the Office. To this end, and with the support of the Supreme Court, the Office is operating within a set of core values to demonstrate integrity and ethical administration and use of public funds.

81

The Office has continued the work on implementing and updating rules and policies to strengthen internal controls to mitigate risks and ensure the appropriate use of public funds. These actions include the ongoing effort to develop, update and improve policy and procedure guidance related to financial and personnel issues necessary for the Department.

B   AGREE. IMPLEMENTATION DATE: JULY 2021.

The State Court Administrator's Office believes the internal audit function serves an important role in the overall internal control environment and agrees with the recommendation. The Office will implement monitoring activities to ensure the internal control environment is appropriate and effective.

# Appendix 16

# Letter from Chief Justice Brian D. Boatright to all Colorado Judicial Department employees interpreting the Colo. Office of the State Auditor's Fraud Hotline Investigation Report, February 7, 2022; and Colo. Office of the State Auditor, Executive Summary of Fraud Hotline Investigation Report, February 4, 2022.

# Supreme Court of Colorado

2 East 14th Avenue
Denver, CO 80203
(720) 625-5410

BRIAN D. BOATRIGHT
CHIEF JUSTICE

## SUPREME COURT OF COLORADO

### OFFICE OF THE CHIEF JUSTICE

_____

February 7, 2022

Justices, Judges, and Judicial Department Personnel,

I want you all to hear directly from me regarding the results of the Office of the State Auditor's ("OSA") Fraud Hotline Investigation. The OSA concluded its investigation last Friday and provided me with an Investigation Report and an Executive Summary.  I have summarized the process and conclusions below.

In April 2019, the OSA received an anonymous letter alleging that the State Court Administrator's Office ("SCAO") was misusing public funds, that certain SCAO employees were committing FMLA fraud, abusing paid time off, and that certain SCAO employees were being paid but not working.  The OSA referred the allegations to former Chief Justice Coats, who was provided the option of having the Judicial Department investigate the allegations on its own, conducting a joint investigation with the OSA, or requesting that the OSA conduct the investigation independently.  Chief Justice Coats asked the OSA to conduct the investigation independently and committed the Judicial Department to fully cooperate with the investigation, which it did.

In July 2019, a news media investigation raised questions about the training contract awarded to The Leadership Practice, LLC, a company owned by former Chief of Staff Mindy Masias. Based upon information learned at that time, Chief Justice Coats authorized the OSA to expand its investigation into the procurement process and this contract award.

While the COVID pandemic certainly delayed the investigation, the people of Colorado have been well-served by the OSA's careful and deliberative approach.  The OSA reviewed over 16,000 documents and interviewed 11 current and former Judicial Department employees, including former State Court Administrator Chris Ryan and former Chief Justice Coats.  Every

current Judicial Department employee who was asked to cooperate with the investigation did so.

As a result of the investigation, the OSA is referring four former SCAO employees to law enforcement for additional investigation to determine whether or not criminal charges should be filed against them.  The decision to refer matters to law enforcement was made by the OSA, not the Judicial Department.  The OSA is not referring any current Judicial Department employee or any current or former judicial officer to law enforcement.

**THREE IDENTIFIED ISSUES**

The OSA determined that three issues required a report to law enforcement under its Fraud Hotline statute. § 2-3-110.5(3)(c)(IV), C.R.S.  I must emphasize that this is not a determination that laws were broken, nor does it mean that criminal charges will be filed.  It means only that under Colorado's Fraud Hotline statute, the OSA determined the evidence it found in the investigation required the agency to submit a report to law enforcement.

First, the OSA found evidence that two former SCAO employees, Mindy Masias and Eric Brown, were conducting paid work for an outside employer while not appropriately accounting for Paid Time Off in our leave system.  The OSA found evidence that this resulted in both employees receiving state compensation while being paid for work by an outside employer.  The OSA concluded that "there is at least some evidence of occupational fraud and/or misuse of public funds that would require a report to law enforcement in connection with outside employment activities conducted by both Ms. Masias and Mr. Brown."

Second, the OSA found evidence that the settlement agreement for a former SCAO employee – referred to anonymously in the agency's Executive Summary as "SCAO Employee #1" – warranted a referral to law enforcement. Chris Ryan, Mindy Masias, and Eric Brown negotiated the settlement agreement with this former SCAO employee.  Former Chief Justice Coats was not informed or consulted regarding the settlement.  The OSA concluded that "there is at least some evidence of occupational fraud, apparently illegal transactions, and/or misuse or embezzlement of public funds or property in connection with SCAO Employee #1's settlement agreement, which would require a report to law enforcement as it concerns SCAO Employee #1, Mr. Brown, Ms. Masias, and Mr. Ryan."

Third, the OSA investigated the procurement and contracting process for the leadership training contract that was awarded to Ms. Masias's company, The Leadership Practice. In relation to the allegations that the contract was a "quid pro quo" arrangement in which Ms. Masias was promised a contract in exchange for her signing a resignation agreement that ensured her silence on alleged misconduct by judges and staff in the Department, the OSA "found some evidence that Ms. Masias requested the promise of a contract before resigning. However, the OSA did not obtain evidence that Ms. Masias was promised a contract for such services prior to her signing a Resignation Agreement and Release of Claims."  The OSA found evidence that Mr. Brown and Ms. Masias attempted "to influence the [Request for Proposals],

sole source contract, and related processes in favor of Ms. Masias, and ultimately resulting in the award of a sole source contract to Ms. Masias." The OSA determined that this evidence requires a report to law enforcement with respect to Mr. Brown and Ms. Masias. This referral does not include any current Judicial Department employee or any current or former judicial officer. The OSA did not take a position on whether fiscal rules were violated in the contracting process or whether there were any ethical or code of conduct violations.

The Department terminated the leadership training contract at the direction of Chief Justice Coats less than two days after he first learned of information that Mr. Ryan and others withheld from him, and the Department made no payments under it.

Regarding the other issues investigated, the OSA did not find evidence of FMLA fraud or misuse of state funds in the form of paid administrative leave other than what I've identified above.

**<u>GOING FORWARD</u>**

The Executive Summary, which omits confidential and privileged information, is available on the Judicial Department's website to anyone who wants to review it directly.  We are working to provide the full Investigation Report to the investigators for other pending investigations. Please understand that I will not be able to comment further on the OSA's report or the issues that have been referred to law enforcement, but we will continue to cooperate fully with any further investigation.

The OSA's investigation and report are helpful in continuing to improve the Department's policies regarding leave and contracting, and the Department has, since 2019, implemented several changes to the personnel and fiscal rules to improve operations.  We continue to look for ways to improve further.


Sincerely,

Brian D. Boatright



OFFICE OF THE STATE AUDITOR

KERRI L. HUNTER, CPA · STATE AUDITOR

| To: | The Honorable Brian D. Boatright |
| | Chief Justice |
| | Colorado Supreme Court |

**To:** The Honorable Brian D. Boatright
Chief Justice
Colorado Supreme Court

**From:** Kerri L. Hunter, CPA, CFE
State Auditor
Colorado Office of the State Auditor

**Date:** February 4, 2022

# Executive Summary of Fraud Hotline Investigation Report

On April 15, 2019, the Office of the State Auditor's (OSA) Fraud Hotline (Hotline) received an anonymous letter alleging fraud involving employees of the State Court Administrator's Office (SCAO), within the Colorado Judicial Branch. The Hotline's statutes define fraud as "occupational fraud or the use of one's occupation for personal enrichment through the deliberate misuse or misapplication of the employing organization's resources or assets" [Section 2-3-110.5(1)(d), C.R.S.]. When the OSA refers an occupational fraud allegation, the affected agency has the option to conduct its own investigation, request the State Auditor's participation in an investigation, or request that the State Auditor conduct the entire investigation [Section 2-3-110.5(3)(b), C.R.S.]. On May 29, 2019, Chief Justice Coats sent a letter to State Auditor Dianne Ray requesting that the OSA conduct an investigation of the allegations and stating that the Judicial Branch would fully cooperate.

## Scope and Approach

The objective of the OSA's investigation was to determine whether there was evidence of occupational fraud, apparently illegal transactions, and/or misuse or embezzlement of public funds or property, and whether a report to law enforcement would be required [Section 2-3-110.5(3)(c)(IV), C.R.S.]. The OSA's investigation was not a criminal investigation [Section 2-3-110.5(1)(g), C.R.S.].

The OSA investigated occupational fraud allegations related to:

- Job protection obtained as a result of FMLA fraud.

- State compensation paid to Eric Brown (former Director, Human Resources Division), and Mindy Masias (former Chief of Staff), while they were SCAO employees earning outside consulting and speaking fees on state time.

1525 Sherman Street, 7th Floor · Denver, Colorado 80203-1700 · 303.869.2800 · osa.ga@state.co.us · www.colorado.gov/auditor

- Payments to senior SCAO staff who were not working.

- A sole source contract awarded to Ms. Masias (dba The Leadership Practice) to provide leadership training after she left her SCAO employment.

Under the OSA's Fraud Hotline statutes, "the state auditor has access at all times to all of the books, accounts, reports, vouchers, or other records or information maintained by the agency that are directly related to the scope of the investigation" [Section 2-3-110.5(3)(c)(I), C.R.S.]. After the entrance conference on July 8, 2019, the OSA began requesting documents related to the occupational fraud allegations. The Judicial Branch initially provided documents that they determined to be relevant to the scope of the investigation. On July 24, 2019, the Judicial Branch requested, and the OSA agreed to, an access agreement to "facilitate the OSA's access to all records and information directly related to the scope of the investigation while still preserving and protecting any confidentiality, privilege, or other protection applicable to the records and information." The access agreement was executed on August 23, 2019.

After the access agreement was executed, at the request of attorneys for the Judicial Branch, the OSA provided search terms related to the scope of our investigation; the OSA and the Judicial Branch then discussed the final list of terms and agreed on the terms that would be used to query emails and some other documents and information. Based on this list, Judicial Branch staff and their attorneys then used software to identify and review the emails and some other documents and information before providing them to the OSA.

Throughout the OSA's investigation, the Judicial Branch and its attorneys were concerned about protecting their attorney-client and other privileges. Documentation that the Judicial Branch and its attorneys considered to be subject to attorney-client or other protections was not provided to the OSA, but rather the OSA was allowed to view the documentation. The Judicial Branch also provided the OSA with a log of emails and some other documents and information that the Judicial Branch (1) determined to be not relevant to the scope of the investigation and withheld on the basis of confidentiality and privilege protections, or (2) determined in consultation with the OSA to be outside the scope of our investigation. The OSA made an independent assessment of the information that the Judicial Branch provided and allowed the OSA to review. Since the OSA's intention is not to inadvertently waive the Judicial Branch's privileges, the Judicial Branch and its attorneys were granted multiple opportunities to review the report and executive summary and redact information they identified as privileged, attorney work product, or subject to other legal protections.

Through the OSA's investigation, the investigation team obtained and reviewed more than 16,000 Judicial Branch documents, including emails; obtained, reviewed, and analyzed documentation from the National Center for State Courts; obtained and reviewed public information accessible online; interviewed various Judicial Branch staff; and requested information from leadership training vendors that expressed interested in the Judicial Branch's 2019 Request for Proposals (RFP) for leadership training but did not submit a proposal.

This Executive Summary summarizes the results of the OSA's investigation but does not reference all evidence supporting the OSA's conclusions.

## Summary of Findings & Conclusions

Based on an examination and analysis of the information obtained and reviewed during the OSA's investigation, and based on the totality of the circumstances, the OSA made the findings and reached the conclusions summarized below.

### FMLA Job Protection

In response to the Judicial Branch's assertion that information related to SCAO employees' FMLA job protection is subject to confidentiality protections under law, the OSA is not providing details in this executive summary about the FMLA-related evidence we obtained.

Based on the totality of the circumstances, the OSA did not find evidence of occupational fraud, apparently illegal transactions, and/or misuse or embezzlement of public funds or property that would require a report to law enforcement related to FMLA job protection.

### Outside Employment

Ms. Masias and Mr. Brown were approved to perform outside employment work for the National Center for State Courts (NCSC) so long as it was conducted on personal time. Nevertheless, in 2018 and 2019, Ms. Masias earned at least $17,200 and Mr. Brown earned at least $26,800 in state salary while also conducting outside employment activities. The following table shows a breakout of hours that Ms. Masias and Mr. Brown devoted to outside employment activities while also getting paid their state salary.

| Mindy Masias's Outside Employment Hours Conducted on State Time | | Eric Brown's Outside Employment Hours Conducted on State Time | |
|---|---|---|---|
| Leave Type | Number of Outside Employment Hours | Leave Type | Number of Outside Employment Hours |
| No paid leave used[1] | 21 | No paid leave used[1] | 643 |
| Med-Cert Paid Time Off/Admin and other leave[2] | 184 | Other leave | 42 |
| | | Paid Time Off | 1 |
| Total | 205 | Total | 686 |

Source: Investigation team analysis of SCAO leave, payroll, and human resources records and NCSC time sheets.
[1] Our assumption was that the employee could reasonably work up to 12 hours in the same day (i.e., 8 hours at SCAO job plus up to 4 more hours in the evening on outside employment), so numbers only include time in excess of 4 hours that the employee charged to outside employment activities on normal state business days.
[2] Med-Cert refers to leave for employees who do not qualify for FMLA but have a medical certification. This allows employees to use extended sick leave.

Based on the totality of the circumstances, the OSA concludes that there is at least some evidence of occupational fraud, apparently illegal transactions, and/or misuse or embezzlement of public funds or property that would require a report to law enforcement in connection with outside employment activities conducted by both Ms. Masias and Mr. Brown.

## Paid Administrative Leave

### SCAO Employee #1[1]

On April 12, 2018, SCAO Employee #1 was notified that they were the subject of a disciplinary investigation related to inappropriate use of information they obtained through their position and was placed on paid administrative leave.

SCAO Employee #1 allegedly had access to information that SCAO Employee #1 could have used against Ms. Masias and Mr. Brown.

SCAO Employee #1 eventually separated from the SCAO and received 15 months of paid administrative leave and severance based their annual salary, for a total of $143,000. Based on settlement data the Judicial Branch provided for eight employees who received settlement agreements from 2000 through 2017, SCAO Employee #1 received the highest amount the Judicial Branch paid in administrative leave and severance.

Mr. Ryan was involved with the negotiation of SCAO Employee #1's settlement and ultimately approved the agreement. In addition, Mr. Brown and Ms. Masias handled certain aspects of SCAO Employee #1's disciplinary investigation and settlement themselves and without always involving legal counsel, even though they had actual or potential conflicts of interest since they were targets of SCAO Employee #1's alleged misconduct. Mr. Brown acknowledged the potential conflict by recusing himself from the SCAO's disciplinary investigation of SCAO Employee #1's alleged conduct, and there is evidence that Ms. Masias was concerned about information that SCAO Employee #1 might have had in their possession. During the negotiations, Mr. Brown and Ms. Masias acted contrary to the advice of the SCAO's legal counsel. Mr. Ryan's involvement could have neutralized any influence from Ms. Masias and/or Mr. Brown, but there is evidence that Mr. Ryan was a personal friend of SCAO Employee #1, and that he disregarded the SCAO counsel's perspective that a lower settlement amount would have been appropriate.

Based on the totality of the circumstances, the OSA concludes that there is at least some evidence of occupational fraud, apparently illegal transactions, and/or misuse or embezzlement of public funds or property in connection with SCAO Employee #1's settlement agreement that would require a report to law enforcement as it concerns SCAO Employee #1, Mr. Brown, Ms. Masias, and Mr. Ryan.

### Mindy Masias

In August 2018, Ms. Masias became the subject of an SCAO investigation that resulted in her negotiating a resignation agreement, through which she received $19,400 in paid administrative leave based on her annual salary and stayed employed through March 19, 2019. Although witnesses provided differing versions of how the agreement was reached and what influencing factors may have been present, the total amount paid under the agreement does not appear to be outside the bounds of reasonableness. Based on the totality of the circumstances, the OSA did not find evidence of occupational fraud, apparently illegal transactions, and/or misuse or embezzlement of public funds or property that would require a report to law enforcement on the issue of paid administrative leave for Ms. Masias.

---

[1] The Judicial Branch reported to us that it is not authorized to disclose the name of the employee and/or the circumstances of the employee's separation from the Branch.

**David Kribs**

In March 2019, Mr. Kribs became the subject of an SCAO investigation and was placed on paid administrative leave. Mr. Kribs chose to participate in the SCAO's Voluntary Separation Incentive Program and negotiated an Agreement for Voluntary Layoff and Release of Claims. According to this agreement, Mr. Kribs received $87,400 in paid administrative leave through September 30, 2019. Sources speculated that the timing of the SCAO's investigation of Mr. Kribs in relation to Ms. Masias's departure from SCAO employment created an impression that the two events could have been connected, but the OSA did not find evidence to corroborate this theory. Based on the totality of the circumstances, the OSA did not find evidence of occupational fraud, apparently illegal transactions, and/or misuse or embezzlement of public funds or property that would require a report to law enforcement on the issue of paid administrative leave for Mr. Kribs.

## Leadership Training Contract

Ms. Masias ended her employment with the SCAO on March 19, 2019. Twenty days later, Ms. Masias signed a contract between the Judicial Branch and her company, The Leadership Practice, to provide leadership training. The OSA reviewed evidence associated with each phase of the procurement and contracting process that resulted in this contract.

First, the OSA found that Ms. Masias had access to potentially damaging information about the Judicial Branch. This information included notes about alleged sexual misconduct, discrimination, and other misconduct by Judicial Branch staff and judges. Additionally, there is evidence that Ms. Masias secretly recorded her conversation with former Chief Justice Nancy Rice, which included a discussion about why Ms. Masias was not selected to be State Court Administrator when she applied for that job.

Second, the OSA found evidence that before Ms. Masias resigned, and while Ms. Masias was the subject of an SCAO investigation, Mr. Ryan reviewed proposed revisions to Ms. Masias's job description that would have made her head of the Judicial Branch's leadership training. In addition, multiple sources described two meetings in December 2018 and/or January 2019 (before Ms. Masias resigned) during which Judicial Branch staff discussed the possibility of contracting with Ms. Masias to provide leadership training.

Third, the OSA found some evidence that Ms. Masias requested the promise of a contract before resigning. However, the OSA did not obtain evidence that Ms. Masias was promised a contract for such services prior to her signing a Resignation Agreement and Release of Claims. Further, the contract has since been terminated, and as of the date this report was published, Ms. Masias had not received any public funds for services rendered under the contract. Additionally, the Judicial Branch has taken the position that it will not voluntarily pay any outstanding invoices.

Still, the process by which Ms. Masias was awarded the sole source contract for leadership training appears to have been flawed in several respects.

**Solicitation Phase**

The SCAO prepared an RFP to secure leadership training services. There is evidence that Mr. Brown was initially involved with drafting an RFP for leadership training services despite having a potential conflict of interest because of a personal relationship he had with Ms. Masias. In addition, there is some evidence that Mr. Brown sought to influence the RFP process in a way that would ensure Ms. Masias would receive the leadership training contract, including by inserting experience requirements that were restrictive enough to preclude any other vendors from submitting bids. There is also evidence that Mr. Brown shared information with Ms. Masias that may have conferred an

advantage to her and that she may have used to inform the proposal she submitted in March 2019 to provide leadership training. Additionally, there appear to be lapses in the process, sufficient to suggest that Ms. Masias and Mr. Brown were attempting to influence the process in Ms. Masias's favor.

Although 24 prospective bidders viewed the solicitation summary online and eight vendors downloaded the solicitation documents, the Judicial Branch did not receive any proposals in response to its RFP. Three of the vendors reported that they did not submit proposals because the experience requirements were too restrictive, and two vendors reported that they did not submit proposals because the RFP seemed to be tailored for another firm.

**Award Phase & Sole Source Justification**

The Judicial Branch never reissued the RFP after it closed without bids. Instead, the Judicial Branch proceeded with a sole source contract to Ms. Masias.

Judicial Branch Purchasing Fiscal Rule 2.3 allows sole source purchases "when there is only one product or service that will meet the Department's need and there is only one vendor to provide that product or service." However, there is evidence that Mr. Brown began contemplating and discussing the idea of entering into a sole source contract with Ms. Masias before the RFP was issued. The sole source justification, which Mr. Brown drafted, and Mr. Ryan approved, did not address why only Ms. Masias could meet the Judicial Branch's needs, nor did it explain why other available training vendors were not suitable to provide that service.

Further, Ms. Masias signed a contract to provide leadership training services 20 days after her resignation. Shortly thereafter she began providing services under the contract, which had an initial term of 5 years (June 3, 2019 through March 31, 2024) and was valued at $2.75 million (up to $550,000 per year).

**Post-Award and Administration Phase**

The evidence indicates that, although Chief Justice Coats participated in an earlier meeting to discuss preparing an RFP for leadership training services, it was not until July 2019 that he learned of Ms. Masias's secret recording of former Chief Justice Rice, and of the conversations about a possible sole source contract with Ms. Masias. At that point, after consulting with the Supreme Court, Chief Justice Coats recommended that the Judicial Branch withdraw from the sole source contract.

Soon thereafter, the Judicial Branch notified Ms. Masias that it was terminating her contract. The termination was effective August 19, 2019. By then, Ms. Masias had already submitted two invoices totaling $133,000. The first invoice was for services rendered April 15, 2019 through June 30, 2019. The second invoice was for services rendered July 1, 2019 through July 15, 2019. The Judicial Branch provided two signed versions of the same contract, one that Mr. Ryan signed on April 11, 2019, and a second that Mr. Ryan signed on June 3, 2019. A legal analysis as to the Judicial Branch's contractual obligations and resulting liability was beyond the scope of the OSA's investigation and report, but if the April 11, 2019 contract is operable and binding, the Judicial Branch may have some outstanding liability for services rendered.

Based on the totality of the circumstances, there is at least some evidence of occupational fraud, apparently illegal transactions, and/or misuse or embezzlement of public funds or property in connection with Mr. Brown's and Ms. Masias's apparent attempt to influence the RFP, sole source contract, and related processes in favor of Ms. Masias, and ultimately resulting in the award of a sole source contract to Ms. Masias. The evidence requires a report to law enforcement with respect

to Mr. Brown and Ms. Masias. The OSA does not take a position on whether any fiscal or procurement rules were violated in connection with the RFP and/or contract. Additionally, the OSA does not take a position with respect to any ethical or code of conduct issues raised by the facts uncovered during the OSA's investigation. Instead, the OSA considered only whether a report to law enforcement would be required under the circumstances.

## Law Enforcement Report

Section, 2-3-110.5(3)(c)(IV), C.R.S., states that if an investigation of a Hotline allegation "finds evidence of apparently illegal transactions or misuse or embezzlement of public funds or property," the State Auditor is required to report the matter to a law enforcement agency, a district attorney, or the Attorney General, as appropriate. Based on the evidence we obtained, the OSA has concluded that a report to law enforcement is required.

# Appendix 17

***Statement from Chief Justice Brian D. Boatright Regarding Investigation into Leadership Services Contract*, June 22, 2022; Robert C. Troyer and Nicholas E. Mitchell, INDEPENDENT INVESTIGATION INTO THE LEADERSHIP SERVICES CONTRACT AWARDED BY THE COLORADO JUDICIAL DEPARTMENT TO THE LEADERSHIP PRACTICE LLC, June 22, 2022.**

**STATEMENT FROM CHIEF JUSTICE BRIAN D. BOATRIGHT REGARDING INVESTIGATION INTO LEADERSHIP SERVICES CONTRACT**

Last year, the Colorado Supreme Court initiated an independent investigation into highly-publicized allegations that a training services contract was improperly awarded to former senior administrator Mindy Masias to prevent her from disclosing alleged misconduct within the Colorado Judicial Department.

A special committee of leaders from the executive and legislative branches selected RCT, Ltd. to conduct this investigation.  No one from the Judicial Department participated in the selection of RCT, which is led by former U.S. Attorney for the District of Colorado Robert Troyer.  RCT operated independently of the Department, and the Department did not have any say or control in the investigation process or in the findings of the investigation.

Today, we make public RCT's full, unredacted investigation report. The report is available here. https://www.courts.state.co.us/announcements/LeadershipServicesContract.cfm

(A separate independent investigation into allegations of harassment and discrimination is forthcoming, and we look forward to also sharing those results soon.)

Below I have spotlighted the investigation's most important findings relative to the public allegations, controversies, and speculations that have revolved around these events for more than a year. But I urge everyone with an interest in the Department's future to read the report in full.

**What the RCT Investigation Found:  The Contract Was Not Awarded to Prevent Disclosure of Allegations of Judicial Misconduct**

Contrary to allegations made and repeated in news media coverage, Troyer and his investigators concluded that the contract was not a "payoff" to silence Masias from filing a discrimination lawsuit or revealing supposed evidence of judicial misconduct:

> **From Report Page 43:** "*Of all the evidence we obtained, only one witness ([former State Court Administrator Chris] Ryan) asserts that the Contract was approved to hide misconduct.  Yet, there is overwhelming countervailing evidence, and Ryan's assertions are internally inconsistent and contrary to his own behavior.  Most importantly, [former Chief Justice]*

1

> *Coats had already tentatively agreed with the proposal to contract with Masias at least three months before [former Human Resources Director Eric] Brown presented the alleged "dirt" in his talking-points list. Therefore, we conclude that the "dirt" did not motivate Coats's thinking at that time."*

The report also provides important clarity to the nature and role of the alleged "memo" outlining Masias' purported knowledge of misconduct:

> **From Report Page 19** – *"Further, at no time did Brown or Ryan provide or even suggest that they possessed a document purporting to detail "dirt" about the Department. In fact, both Brown and Ryan did possess such a document. Indeed, Brown authored that document prior to the meeting [with Coats] at Ryan's request. The document is not truly a 'memo,' as it has been publicly characterized. It is better characterized as a list of talking points… Neither Morrison, Coats, nor Rottman ever saw a copy of Brown's talking points until July 2019 [after Ryan's resignation]."*

That said, the report is appropriately critical of the Leadership Services Contract, the environment that facilitated it, and the process by which it was awarded.  We acknowledge and accept those findings.  It is important to note here that the contract was cancelled in July 2019, and the Department made no payments under the contract.

The report concludes that  the awarding of the contract was driven by three key factors:

> **From Report Page 6 –** *"… First, the internal culture of SCAO was characterized by toxic relationships, factionalism, and a lack of accountability for key leaders in the Department. Second, the Department's procurement rules were overly permissive and did not sufficiently deter procurement misconduct, including the unethical behavior demonstrated (as we explain below) in the approval of the Contract. Third, several Department leaders made critical errors in judgment or engaged in outright misconduct."*

Of former Chief Justice Coats, the report finds:

> **From Report Page 46 –** *"Coats was misled, and his judgment failed him on other fronts, but he did not approve the Contract to silence Masias."*

2

Regarding Ryan's actions related to Masias and the Contract, RCT finds:

> **From Report Page 48-49** – *"Ryan was liked and trusted in his former position at the Department.  But he was relatively new to the SCA job, felt he had no alliances at the SCAO, and had no past leadership experience in this environment under these pressures.  He recognized the deep cultural flaws he inherited at the SCAO.  He also likely felt alone, vulnerable, and ill-equipped to fix the underlying problems with SCAO personnel and culture.  Justices detached from administrative and personnel matters had selected him without a fair process and left him to deal with managing Masias.  He misjudged that a contract with Masias would solve the problem, and he chose the worst of the tactics common in that culture to get the Contract approved.*
>
> *Specifically, over the next nine months, Ryan adopted a "keep your friends close and your enemies closer" relationship with Brown.  He [Ryan] controlled information.  He lied to Coats about Masias's history of reimbursement misconduct.  He lied to Coats about the justification for a sole-source contract.  He helped remove the Director of Financial Services because he was an obstacle to [the Masias] Contract approval.  He lied about signing the Contract in April 2019.  He hid Masias's surreptitious recording of [former Chief Justice] Rice from Coats and [the Chief Justice's counsel, Andrew] Rottman.  He lied to SCAO legal staff about Coats's knowledge of that recording, telling one lawyer he had told Coats about the recording and telling another he had not told Coats because Coats did not want to know.  He intimidated [SCAO Chief Legal Counsel, Terri] Morrison so she would not interfere with his plans.  Ryan thus gradually built an increasingly fragile edifice of deceits that eventually imploded."*

As for Masias and Brown, the investigation report states:

> **From Report Page 49** – *"Masias and Brown made their own misjudgments and engaged in their own misconduct. Their misconduct, though, was more clearly driven by self-interest than was Ryan's."*

There is no way to sugarcoat the uncomfortable findings of RCT's investigation. However, with new leadership throughout the SCAO since these events, I believe that we have made significant progress in addressing many of the issues that the report identifies.

3

But we obviously still have plenty of work to do.

**Where Do We Go From Here?**

Noting that the Judicial Branch has already made substantial improvements over the last year,  RCT provides 14 "actionable recommendations," divided into six categories:

> **From Report Page 54 --** *"(1) Changing the SCAO's Organizational Culture, (2) Enhancing Oversight of the SCAO, (3) Properly Preparing the Chief Justice, (4) Improving the Complaint Process for Judicial Officers, (5) Procurement Reform, and (6) Ongoing Transparency and Accountability."*

We are already evaluating how best to implement these recommendations to ensure an organizational culture of professionalism, accountability and transparency worthy of the thousands of hard-working and dedicated people of our Branch who serve the public so effectively on a daily basis.

One recommendation to "*improve the legitimacy of the process for handling complaints*" is not uniquely specific to the Masias contract award investigation, but certainly underscores a key aspect of the culture that allowed this fraud and abuse at SCAO to occur:

> **From Report Page 61 --** *"While the Court now has internal rules that address complaint handling, they are vague, and to this day insufficiently specific about how complaints are received, triaged, investigated, tracked, and when complaints are referred to other investigative entities (or not).*

In February 2021, I told the legislature that the Branch faces a crisis of confidence in leadership, and I committed to changing the culture for the better. We know now that just having the processes to hold institutions and people accountable, including at the highest levels, isn't enough.

Our judges and their staff, probation departments, the broader legal community, elected officials, regulators and Coloradoans who rely on our system of justice must know — or be able to know — how the Judicial Branch ensures accountability to its mission and deals with misconduct. This is a critical priority going forward.

4

To these ends, I want to summarize some of the key governance, oversight, and accountability initiatives that we have begun to implement over the last year:

- We have put in place and continue to enhance new channels for Judicial Department employees to share complaints and report misconduct.

- We changed how we hire the State Court Administrator (SCA) by engaging in a much more transparent process, including town hall meetings and soliciting feedback from all employees throughout the state.

- We are working with the Colorado legislature to evaluate and support effective, efficient  reforms in the judicial disciplinary system.

- We've changed our internal processes so that the Colorado Supreme Court functions more as a Judicial Branch "Board of Directors," rather than continuing the previously longstanding practice of having the Chief Justice alone involved in helping to administer the entire Judicial Department, while still discharging the ordinary responsibilities of a member of the state's highest court.

  - In this regard, each justice is now assigned to a major operational area of the Department (Financial Services, Court Services, Probation Services, HR, IT, etc.), with the justice sitting on the advisory committee for that operational area.  Through this direct engagement with SCAO staff, the full court now collaborates on many critical administrative issues.

- We are developing a formal executive management and administration training plan for the incoming Chief Justice.

- In May and November 2020, we updated Judicial Department rules to address independent contractor and sole-source contracting challenges. Key changes included:

  - A mandatory six-month waiting period between an employee's date of separation from the Judicial Department and the date when the former employee is eligible to provide services as an independent contractor (a period of time that we are prepared to lengthen).

5

- o Increased rigor around the use of sole-source contracts.

  - All sole-source procurements above discretionary purchasing thresholds must be coordinated by the Financial Services Division at SCAO.

  - The Financial Services Division's procurement team is required to analyze sole-source procurement requests and provide recommendations to the SCA.

  - Potential sole-source procurements are now required to be posted on a public electronic bid system utilized by the state. If a qualified vendor, other than the intended sole source provider, responds, then the procurement team will recommend a competitive procurement process be used.

  - Quarterly reporting of sole-source contracts by the SCA to the Chief Justice is now required.

- Procurement rules have been overhauled to be more in line with executive-branch procurement procedures.

- The SCA now reports monthly to the Chief Justice on every contract executed by the SCA.

We recognize that these initiatives are just the beginning and that we have much more to do.

As I said in my State of the Judiciary Address, we are fully committed to getting this right, and with your help, I am confident that we will do so.  I will certainly keep you apprised of our ongoing efforts.

In the meantime, we thank RCT for its hard work and professionalism in conducting its comprehensive investigation.

6

# Independent Investigation into the Leadership Services Contract Awarded by the Colorado Judicial Department to the Leadership Practice LLC

Robert C. Troyer and Nicholas E. Mitchell

June 22, 2022

Project Team/Subject Matter Experts

Judge Ladoris Hazzard Cordell (retired)
Michael Rankin
Cindy Lombardi

## Table of Contents

Table of Contents ........................................................................................................................................ 2

THIS PAGE INTENTIONALLY LEFT BLANK ...................................................................................... 4

Introduction .................................................................................................................................................. 5

Methodology ................................................................................................................................................. 7

Factual Summary ........................................................................................................................................ 9

    Ryan's Selection as SCA ...................................................................................................................... 10

    Masias's Falsified Reimbursement Request ................................................................................ 12

    The Existing Leadership Training Contracts .............................................................................. 14

    Initial Efforts by Brown to Secure a Contract for Masias ...................................................... 14

    Department Meetings about a Potential Contract with Masias ............................................ 16

    The RFP for Leadership Training ..................................................................................................... 19

    Sole-Source Contract and Resignation Negotiations .............................................................. 23

    The Signing of the Sole-Source Contract and its Key Terms ................................................ 27

    Revelation of the Secret Recording, Resignations, and the Cancellation of the Contract ................. 29

Analysis ....................................................................................................................................................... 33

    The Judicial Department was Poorly Administered at the Time of the Masias Reimbursement
    Dispute ...................................................................................................................................................... 33

    Ryan's Ascension to the SCA Position was not Transparent or Arms-Length, Which Created
    Tension Between Ryan and Masias ................................................................................................. 34

    Chief Justice Coats did not have the Support of the other Justices in Handling Administrative
    Matters, and he was not Trained or Equipped to Handle them Alone ................................ 35

    Ryan Administered the Department with Minimal Oversight from the Court and was not Held
    Accountable for his Performance .................................................................................................... 37

    The SCAO's Internal Culture was Toxic, Which Deterred Employees from Coming Forward with
    their Concerns About the Contract ................................................................................................. 38

    A Culture of Fear and Intimidation Pervaded the SCAO ........................................................ 38

    There was a Lack of Accountability for Certain Senior Leaders ........................................... 40

    The Department's Purchasing Rules did not Sufficiently Protect it from Risks of Procurement
    Misconduct .............................................................................................................................................. 41

    The Process for Handling Complaints Against Judges was not Fair or Transparent, Which Gave
    Masias Additional Leverage over the Department ................................................................... 42

    The Contract would have been an Abuse of Taxpayer Resources, but it was not Awarded to Cover
    up Allegations of Judicial Misconduct .......................................................................................... 43

If Not to Cover Up Alleged Misconduct, Why Did Coats Approve the Contract? ..................................47

Trigger Event: The Reimbursement Dispute ...........................................................................................47

Misconduct and Misjudgment ....................................................................................................................48

Conclusion .....................................................................................................................................................53

Recommendations...............................................................................................................................................54

Changing the SCAO's Organizational Culture .........................................................................................54

Enhancing Oversight of the SCAO .............................................................................................................56

Properly Preparing the Chief Justice.........................................................................................................59

Improving the Judicial-Officer Complaint Process.................................................................................61

Procurement Reform.....................................................................................................................................63

Ongoing Transparency and Accountability...............................................................................................64

APPENDIX A...........................................................................................................................................................66

APPENDIX B...........................................................................................................................................................67

THIS PAGE INTENTIONALLY LEFT BLANK

4

## Introduction

The Colorado Judicial Department ("Department") is one of three branches of Colorado's government. The Department administers state courts in 24 judicial districts spread across Colorado. Each year, those courts resolve tens of thousands of small-scale controversies that affect individual litigants, as well as large-scale, precedent-setting disputes that deeply impact residents across the entire state.

The Department's mission is to provide a "fair and impartial system of justice." As such, its greatest asset is its credibility. The collective trust of Colorado residents is premised on our belief that the courts, and the Department as a whole, are administered with fairness and the public good as their highest goals. Thus, while allegations of corruption, self-dealing, and cover-up are problematic in any organ of government, they are particularly damaging when they arise within the Department.

Mindy Masias worked for the Department for many years, ultimately serving as Chief of Staff in the State Court Administrator's Office ("SCAO"), which administers the state courts. In March 2019, Masias resigned under threat of termination for dishonesty and financial misconduct, which we discuss more fully below. Within three weeks thereafter, she received a sole-source, five-year contract from the Department to provide training to Judicial employees statewide at a cost of $532,000 per year ("Contract").

Initially, only insiders were aware of the Contract, but soon residents of Colorado learned about it through a series of news reports. These reports alleged, in summary, that the Department awarded the Contract to Masias in exchange for her agreement not to reveal information that might damage the Department, including allegations of sexual harassment and other rule violations by judges and senior Department staff. Following those reports, public officials,

5

including the Chief Justice of the Colorado Supreme Court, as well as Colorado's Governor, its Attorney General, and members of its legislature, called for or supported an independent investigation. In October 2021, we were retained to conduct that investigation. Specifically, we were asked to determine "whether the contract was awarded to prevent disclosure of alleged misconduct at the Department." Further, we were asked to review "management practices that were used to inform the handling of these events, including, but not limited to, procurement processes and oversight."

Today, through this report, we share our conclusions. First, the internal culture of the SCAO was characterized by toxic relationships, factionalism, and a lack of accountability for key leaders. Second, the Department's procurement rules were overly permissive and did not sufficiently deter procurement misconduct, including the unethical behavior demonstrated (as we explain below) in the approval of the Contract. Third, several Department leaders made critical errors in judgment or engaged in outright misconduct. However, the evidence also demonstrates that the Contract was <u>not</u> awarded to prevent the disclosure of allegations of judicial misconduct, as has been publicly alleged.

The Department has already taken steps to address some of these issues. But there is much more work to be done. At the conclusion of this Report, we provide fourteen actionable recommendations for changes the Department should make to correct the conditions discussed herein. We also strongly recommend that the Department commit to regular public reporting about the specific steps it takes and its progress in implementing these recommendations. Only through purposeful and transparent leadership from the Colorado Supreme Court can the Department -- a vital component of our state government -- regain the public trust.

6

## Methodology

During this investigation, we interviewed 27 current and former employees of the Department, including all sitting (and some retired) Justices of the Colorado Supreme Court, as well as Department leaders and subordinate employees. We also sought, received, and reviewed over ten thousand records from Department officials. The Department was transparent and open throughout this process, and it produced the information we sought.

Most individuals willingly cooperated with the investigation. However, in February 2022, the Office of the Colorado State Auditor ("OSA") released the results of its own audit. Among other things, the OSA referred three former Department employees -- Chris Ryan (former State Court Administrator), Mindy Masias (former Chief of Staff), and Eric Brown (former Director of Human Resources) -- for criminal investigation. Although Ryan had twice given extensive accounts to the press concerning the Contract and had been interviewed by the OSA about the same subject, after the OSA released its report Ryan declined our request for an interview. Nonetheless, we have reviewed all of his statements to the media and his interviews with the OSA. Masias and Brown also declined to cooperate with this investigation. We were therefore not able to obtain their first-hand accounts or question them about their roles in approving or obtaining the Contract.

The thousands of documents we reviewed included internal and external emails, policies and procedures, procurement and budget records, notes and memoranda, employment records, and other related material. During our investigation, however, we learned that Masias's laptop, which she used for her work on behalf of the Department, was "wiped" (likely by Masias or Brown) when she went on leave from the Department. Thus, data previously stored there was inaccessible to us despite forensic attempts to recover it. As discussed below, we also discovered

7

that Masias and Brown commonly used personal email accounts to avoid Department scrutiny of their communications. We did not have access to those personal email accounts.

Despite these limitations, we have full confidence in our core conclusions and the recommendations set forth herein for the simple reason that they are supported by numerous and diverse sources of corroborating and uncontroverted evidence, both testimonial and documentary.

8

Factual Summary

We begin with an overview of key facts regarding the Department, its relevant

employees, and the circumstances surrounding approval of the Contract. The powers of

Colorado's government are divided into three distinct departments: legislative, executive, and

judicial. The Judicial Department employs over 4,000 people. The Colorado Supreme Court has

"general superintending control" over all the Department courts, and the Chief Justice of the

Colorado Supreme Court is "the executive head of the judicial system." (Colo. Const. art. VI,

§5(2) (1876).) The Justices of the Colorado Supreme Court appoint one from among their ranks

to serve as Chief Justice. (Id.) The Chief Justice has a Counsel to the Chief Justice, a Department

employee who serves as an advisor and executive strategist to the Chief Justice on legal, policy,

and administrative matters. The Justices also appoint a State Court Administrator ("SCA") to aid

the administration "of all courts within the Judicial Department." (Id. at §5(3); §13-3-101, C.R.S.

(2021).) The SCA is responsible to the Colorado Supreme Court and serves at its pleasure. (§13-

3-101, C.R.S.) The SCA leads the SCAO, which resides within and provides central

administrative infrastructure services to the Department.

The SCA oversees all administrative responsibilities associated with the courts and

probation for the Department. In other words, the SCA is responsible for implementing and

enforcing the rules and policies of the Colorado Supreme Court as they apply to court

administration. In 2018, the SCA had a Chief of Staff, who was the second-in-command at the

SCAO.

The SCAO is organized into five Divisions, each of which is headed by a Director: Court

Services, Financial Services, Information Technology Services, Probation Services, and Human

Resources. The SCAO also has a "Legal Counsel Unit" staffed by seven attorneys. That unit

9

reviews and drafts contracts, handles personnel matters, provides counsel on legislative issues, and generally provides legal advice to Department personnel. The Legal Counsel Unit is led by the Judicial Legal Counsel, who serves as in-house counsel to the Department and reports directly to the SCA. The Judicial Legal Counsel is not a "Division Director" but is a member of the SCAO's senior management team and provides legal advice to Department personnel.

### Ryan's Selection as SCA

In late 2016, the then-SCA, Jerry Marroney, announced his intent to retire in June 2017; therefore, in March 2017 the Colorado Supreme Court began the process of selecting a new SCA. The Court engaged the National Center for State Courts to conduct a nationwide search. Applicants identified and screened in that search were interviewed by a selection committee comprised of Department personnel. That committee narrowed applicants to a group of four finalists who would be interviewed by the Supreme Court. Eric Brown, who was the SCAO's Director of Human Resources, was a member of that selection committee. Chris Ryan, who at the time was the Clerk of the Supreme Court and Court of Appeals, was a member of that selection committee. Ryan was not an applicant for the SCA job. Mindy Masias, who at the time was the SCA's Chief of Staff, did apply for the SCA job, and she was chosen as a finalist.[1]

Masias had been a Judicial Department employee since 1995. She rose to Director of Human Resources in 2004, and in June 2014 Marroney promoted her to Chief of Staff. In May 2017, the Supreme Court Justices decided not to select any of the four finalists for the SCA job and instead appointed Ryan as interim SCA. Several months later, in September 2017, the Justices decided to advance Ryan from interim to permanent SCA without engaging in another

---

[1] Appendix A, attached hereto, identifies the key players involved in the circumstances surrounding approval of the Contract. Appendix B is a timeline of the key events.

selection process. Masias remained in her SCA Chief of Staff position but now served under Ryan, her new boss. At least one Justice emphasized to Ryan that establishing a good working relationship with Masias should be one of his top priorities as new SCA because she likely would be stung by his selection for the SCA job outside the open hiring process she had endured -- and because she was an important leader within the SCAO and the Department.

Ten months later, on July 18, 2018, Justice Nathan "Ben" Coats was appointed by his colleagues to serve as Chief Justice. Numerous Department personnel have shared that at the time of his appointment a dysfunctional organizational culture existed within the SCAO that involved feuding, secrecy, retaliation, and fear, particularly between the Human Resources and Financial Services Divisions. Moreover, the Supreme Court did not actively supervise the SCAO and generally relied upon the SCA to oversee the SCAO. As a result, the Justices, including newly appointed Chief Justice Coats, were unaware of the toxic organizational culture within the SCAO.

Shortly after his appointment as Chief Justice, Coats attended a multi-day leadership training program provided by a vendor (who had been under contract to provide such training to Department employees since 2009). This training did not address the administrative responsibilities of a Chief Justice, such as managing a large budget or staff. In fact, Coats did not receive <u>any</u> training to handle his new administrative responsibilities as Chief Justice, the "executive head of the judicial system." (Colo. Const. art. IV, §5(2).) Ryan had participated in this leadership training several times before, and he attended it again alongside Coats. During and after the training, Ryan and Coats began to discuss their visions for a different, revamped leadership training program more tailored to the specific needs of the Department once the existing training contracts ended in about a year.

11

**Masias's Falsified Reimbursement Request**

The same week Coats was appointed Chief Justice, a dispute arose over a $161.82 reimbursement request Masias had submitted for two shag bean-bag chairs she had been approved to purchase as employee-appreciation gifts. Masias was entitled to reimbursement, but she submitted her request for the wrong fiscal year. Instead of correcting her error when it was pointed out to her, Masias falsified the date on the supporting paperwork and resubmitted it. When the Financial Services Division caught the falsification, Masias was repeatedly dishonest with Department personnel and an independent investigator who was hired by the Department. This reimbursement matter caused longstanding rancor between Masias and certain personnel in the Financial Services Division to boil to the surface.

Also at this time, the OSA was conducting its statewide audit, which included a routine audit of financial operations and controls within the Department. Top Financial Services Division personnel insisted to Ryan and Coats that unless Masias were terminated for her misconduct, they could not sign the Management Representation Letter required to pass that audit. Financial Services Division personnel also told Ryan and Coats that without that Management Representation Letter certifying the Department's financial controls as sound, the high bond rating for the entire State of Colorado could be jeopardized.

Ryan and Coats were reluctant to terminate Masias but believed that their options were limited because the Department needed a signed Management Representation Letter. They were also concerned about the optics of terminating the highest-ranking female employee at the SCAO, who had also recently been denied the SCA position. Masias was well-regarded in many of the Department's 24 judicial districts. Both Ryan and Coats therefore preferred demoting Masias for her dishonesty, placing her in a position to oversee leadership training, and removing her spending and signature authorities. They sought guidance from the OSA to determine if this

12

approach would satisfy the auditors. But the OSA would not provide such advice, and the SCAO's Financial Services Division leaders remained adamant that Masias must be terminated for her intentionally deceptive behavior, which violated the Department's fiscal and personnel rules.

Therefore, in October 2018, Coats and Ryan began to discuss allowing Masias to resign or terminating her if she chose not to. Ryan also suggested that if Masias chose to resign they might be able to bring her back to the Department on a contract to create a new leadership training program. Coats indicated that if Ryan investigated and found no other misconduct by Masias, and she resigned, the Department would consider contracting with her to perform leadership training. Coats explained this approach to the other Justices, and none objected.

To determine whether Masias had engaged in any other misconduct, Coats directed Ryan to audit the reimbursement compliance histories of all the SCAO Directors and compare them to Masias's history. Ryan agreed to do so and also mentioned to Coats the possibility of doing a "sole-source" contract with Masias, meaning that the Department would not publicly solicit bids but instead contract with Masias without first considering other possible vendors. Coats did not accept or reject this idea at that time. Instead, he simply directed Ryan to ensure that any contract with Masias would be done "above board," and "by the book," in full compliance with Department rules.

After Coats and Ryan discussed the "resignation and contract" idea, on November 7, 2018, Ryan notified Masias that she could voluntarily resign from the Department before November 14th or she would be terminated on November 15th. On November 9th, Masias instead filed for leave and protection under the Family Medical Leave Act. On November 12th, Ryan approved her for 12 weeks of leave. Once Ryan approved her leave, Masias was paid her

13

salary and protected from termination until February 2019. In November 2018, SCAO legal staff

began to arrange for termination or negotiate a resignation agreement with Masias's counsel. But

they received no meaningful response from Masias's counsel until February 2019. The day after

delivering Masias's termination/resignation notice to her, Ryan notified the Director of Financial

Services to "watch out because HR will be coming for you."

### The Existing Leadership Training Contracts

The Department began developing its leadership training program in 2006, and in 2009

two vendors began delivering leadership training. From 2012 to 2015, their contracts were

entered on a sole-source basis, without any public bidding. The 2012 "Sole Source

Determination" memo documenting this decision was superficial and provided no basis for doing

these contracts with a sole source; instead, it simply stated that the vendors were qualified. In

2015, the Department engaged in a public-bidding process for leadership trainers, received three

bids, and selected the same vendors the Department had been using since 2009. Without another

public-bidding process, the Department continued to enter into one-year contracts with those

same vendors for several more years.  In the spring and summer of 2018, before the Masias

reimbursement dispute and before Coats was appointed Chief Justice, Brown, Masias, and Ryan

were already discussing the need to revitalize the Department's leadership training and to

conduct a public-bidding process to find new vendors. Subsequent actions and discussions

regarding a training contract with Masias unfolded against that historical backdrop.

### Initial Efforts by Brown to Secure a Contract for Masias

On November 30, 2018, Brown obtained data from his staff about past and current

training-vendor costs and Department budgets for training. That same day, he also sent to Ryan,

"per our discussion," the Sole Source Determination memo from 2012 related to the

14

Department's current training vendors. These are among the first of many actions Brown took to help secure a sole-source contract for Masias. The exact nature of Masias and Brown's relationship is beyond the scope of this investigation except to the extent it damaged Department culture, shaped various parties' motivations and intentions regarding the Contract, and informs our recommendations for necessary improvements. Their relationship was viewed universally at the Department as blatantly and inappropriately close for professional colleagues. Brown prioritized Masias's interests over those of the Department itself. He was considered untrustworthy and even dishonest when it came to matters involving Masias. For example, during the SCA hiring process in the spring of 2017, Department personnel involved in the interviews chose not to share draft interview questions with Brown (a selection committee member) for fear he would share them with Masias before her interview.

In addition, while employed by the Department and with Department approval, Masias and Brown had for years worked together providing outside, paid consulting services for other entities. They also regularly discussed their future plans to work together as consultants after leaving the Department. Moreover, from the time Masias left, Brown repeatedly told others at the SCAO that he was making every effort to get Masias back working with the Department. One interviewee observed that Brown remained "obsessed" with that goal from November 2018 until March 2019.

It is noteworthy that Brown sent Masias information about current and past training vendor costs on November 5th, two days before she received her termination/resignation notice. And on December 3, 2018, Brown emailed the training cost and budget information he had obtained from staff to his personal email account.

15

**Department Meetings about a Potential Contract with Masias**

On December 14, 2018, Coats, Andy Rottman (Counsel to the Chief Justice), Ryan, and Brown met and discussed the possibility of contracting with Masias if she decided to resign at the end of her leave. Brown claimed that Masias was being treated unfairly, and Ryan or Brown suggested that she could be a sole-source contractor to handle the Department's leadership training program. Coats reiterated that any contracting process must be done in full compliance with Department rules. Ryan told Coats that he would work with SCAO legal and procurement staff to ensure compliance.

During this meeting, Ryan also assured Coats that a review of Masias's reimbursement compliance history revealed only a few minor irregularities, nothing more than other SCAO Directors had. This was false. Ryan never had the reimbursement histories of the Directors audited. Instead, Ryan had requested and received a written report from SCAO audit staff examining Masias's reimbursement requests only. Contrary to what Ryan told Coats, that audit revealed that from 2016 to 2018, Masias had failed to comply with the Department's reimbursement rules in 100% of her requests. The audit showed 44 errors or irregularities in her requests, and a conclusive pattern of Masias disregarding the Department's fiscal rules and (as a result) receiving overpayments totaling $726. Ryan did not tell Coats or Rottman any of this. Nor did he inform either of them there was a written audit report documenting these irregularities.

Based on Brown's singular advocacy for Masias at this December 14th meeting, Coats and Rottman were concerned that he was communicating with Masias; therefore, later that day Coats called Ryan and directed him to instruct Brown not to talk to Masias about her separation or make any commitments to her about a contract with the Department. Ryan agreed to do so.

On approximately December 22, 2018, Brown called Ryan to tell him that Masias was very angry and was threatening to sue the Department because her separation was not being

16

handled as it would be for a male employee. Brown also told Ryan that Masias was threatening to make public over 20 years of "dirt" on the Department. In response, Ryan convened a meeting on December 26, 2018, with Brown and the Department's Judicial Legal Counsel, Terri Morrison, to discuss Masias's alleged threats. Before that meeting, Ryan instructed Brown to document what Masias had told him. At the meeting Brown described some of the "dirt" to Morrison and Ryan, including past allegations of sexual harassment by judges and Department staff. Brown also told them that in May of 2017 Masias had surreptitiously recorded a conversation she had with then-Chief Justice Nancy Rice in which Rice appeared to confirm Masias did not get the SCA job, at least in part, because of her gender.

Brown claimed that Masias intended to sue the Department for discrimination. Brown and Ryan told Morrison that in order to avoid a lawsuit and prevent the public revelation of this "dirt," the Department needed to secure a leadership training contract for Masias. Morrison objected and was shocked to learn that Masias had breached the Department's trust by surreptitiously recording Rice. But she was adamant that none of this was a proper reason to contract with Masias. After the meeting Morrison also told Ryan that for several reasons Masias's threat was empty and she did not have a valid gender-discrimination claim. Ryan appeared to ignore Morrison's advice.

Numerous times over the ensuing months, Morrison implored Ryan to tell Coats about Masias's surreptitious recording of Rice. Each time, without further explanation or patience for discussion of the topic, Ryan told Morrison that "the Chief doesn't want to know." Morrison deliberated about whether to tell Coats herself, but she feared that Ryan would fire her for "going over his head." Ryan also lied about this issue to other Legal Counsel Unit staff, stating that he had informed Coats about the surreptitious recording. He had done no such thing.

17

Soon after the December 26th meeting, sometime in late December 2018 or early January 2019, Ryan and Brown went to meet with Coats and Rottman. Ryan has asserted that he convened the meeting to inform Coats and Rottman about Masias's threat to sue and reveal "dirt." Coats and Rottman did not know this was the meeting's purpose; they understood only that Ryan and Brown would report on the status of "the Mindy situation." There was no written agenda, and no documents were distributed. Instead, Brown simply launched into a description of long-past incidents of alleged misconduct within the Department of which Masias was aware. Brown did not present these as issues that needed attention, just as information Masias possessed. It was not clear whether Brown was reading from a document when he presented this information.

Rottman and Coats were unsure what Brown's point was in describing these incidents, and they grew impatient. After several minutes, Brown stopped and asked Coats if he should continue. Coats turned to Ryan and asked, "Do I need to hear more of this?" Ryan simply looked sheepish, shrugged, and may have said something akin to, "Up to you, Chief," whereupon Coats told Brown to stop. Coats then asked where they were with the Masias contract idea that had been under discussion for almost three months. He also asked about Masias's health. In addition, Coats stated that (1) he did not care what "dirt" Masias had about the Department, (2) the Department was not going to make any concessions to her about the termination, and (3) neither he nor the Department was trying to do anything to harm Masias.

Ryan reiterated that a training contract with Masias was in the best interests of the Department, and that it was essential to the SCAO's success and his plans to reorganize the SCAO. Coats authorized Ryan to pursue a contract. As he had done earlier, Coats told Ryan to proceed "by the book." *At no time during this meeting did Brown or Ryan tell Coats or Rottman*

18

*that Masias had surreptitiously recorded Rice. At no time did they indicate Masias was threatening to sue, claiming discrimination, making any other claim or demand, seeking a settlement, or demanding a contract (which had already been in discussion for months) in exchange for an agreement not to reveal "dirt" about the Department.* After Ryan and Brown left the meeting, Coats told Rottman that if they were going to explore a contract with Masias they were <u>not</u> going to consider any of the information that Brown had detailed.

Further, at no time did Brown or Ryan provide or even suggest that they possessed a document purporting to detail "dirt" about the Department. In fact, both Brown and Ryan did possess such a document. Indeed, Brown authored that document prior to the meeting at Ryan's request. The document is not truly a "memo," as it has been publicly described. It is better characterized as a list of talking points. It is undated, has no subject line, and is not to or from anyone. Without organization or introduction, it begins midstream with an incomplete sentence defending Masias in the reimbursement dispute. Then, under headings that do not always match the contents, it purports to list past examples of standards and rules not being applied to judges and senior staff at the Department, past examples of alleged harassment at the Department, and unattributed quotes that suggest Masias was not chosen for the SCA job because she was a woman. Neither Morrison, Coats, nor Rottman ever saw a copy of Brown's talking points until July 2019.[2]

### The RFP for Leadership Training

After this meeting, from January to April 2019, Ryan, Brown, and Morrison took steps to secure a training contract with Masias. At the end of the day on January 18, 2019, Brown

---

[2] The assertions in Brown's talking-points list are the subject of a separate investigation being conducted by the Investigations Law Group.

19

summoned the SCAO's Procurement Manager, John Kane, into Brown's office. When Kane

arrived, Brown began by telling him that Coats and Ryan no longer wanted to work with the

Department's current leadership training vendors and instead wanted to contract for leadership

training with a retired judge. This was false; Coats had never said this. Brown also told Kane that

they wanted to do a sole-source contract and that Ryan wanted Kane's approval before

proceeding. Brown also instructed Kane not to tell either of his supervisors about this project. In

response, Kane explained to Brown that leadership training was not appropriate for a sole-source

contract.

It is important to note here that the Department is not bound by the Colorado

Procurement Code (§24-101-101, *et seq*., C.R.S.) or the state's associated Procurement Rules.

The Department's own Purchasing Fiscal Rules from April 2015 (the "Purchasing Rules") were

applicable in 2018 and 2019. In accordance with the Department's Purchasing Rules, the

Department was not permitted to enter into a sole-source contract unless there was only one

product or service to meet the Department's need and only one vendor to provide that product or

service.

Kane explained that a contract for such training could only be properly entered after

publicly soliciting bids through a formal Request for Proposals ("RFP") process and selecting the

best vendor from the bidders. Brown pushed back, complained, and disagreed. For example,

Brown asserted they could not publish an RFP because the "retired judge" was not tech savvy

and would never respond. Kane explained that this was not a proper justification for

circumventing the RFP requirement. Brown eventually relented and agreed to proceed with an

RFP if it were open for only three to five days. When Kane informed Brown that this would

require a fiscal-rule waiver from the Director of Financial Services, Brown acquiesced to posting

20

the RFP for the minimum period allowed without a waiver (21 days). During this discussion, Brown asked Kane to explain the Department's sole-source and RFP rules, Kane did so, and Brown appeared to understand. Kane found it unusual that Brown had instructed him to keep all this secret. Kane therefore documented the meeting and immediately informed his supervisors.

Shortly thereafter, Brown sent Kane draft language for an RFP. Morrison and Kane both reviewed Brown's draft and concluded it was far too restrictive. In particular, Brown's draft required bidders to have at least 20 years of experience with the Department. Yet, the Department's Purchasing Rules explicitly seek to foster broad-based competition, and overly restrictive qualifications in an RFP do not align with this purpose. Kane changed various parts of the draft and sent his edits to Brown. Kane was concerned that even with his changes, the RFP might still be considered too restrictive; however, he believed it would at least be similar to the RFP used in 2015 to select the existing trainers. Kane also believed that if the RFP proved too restrictive to draw bids, the Department could modify it and extend or republish it. Notably, he also knew potential bidders had the right to protest any RFP requirements they believed were unreasonable or too restrictive. (*See* Purchasing Rules §6.2.)

On January 28, 2019, Kane was summoned to a meeting about the RFP with Brown, Ryan, and Morrison in Ryan's office. During the meeting, Brown resisted Kane's advice to reduce the years-of-experience requirement in the RFP. Brown also argued to retain the requirement that a bidder's experience must be with the Colorado Judicial Department specifically. Kane explained why both of those requirements needed to be loosened. He specifically noted that the process would appear inept or even corrupt if those requirements were not relaxed. In other words, Kane made clear that those requirements would be the kind of bar to open bidding that the Department's Purchasing Rules prohibited.

21

At this meeting, Ryan listened to both Kane and Brown before directing that the RFP requirements be modified to require only five years of experience in any judicial setting. Notably, during this meeting with Brown, Ryan, and Morrison, Kane mentioned that he knew their intent was to contract with a retired judge, and no one corrected him. During this meeting, Ryan also asked Kane whether a sole-source contract had ever previously been awarded after a posted RFP failed to attract any bidders. Kane responded that this had occurred but only when a sole-source contract was independently justified. He emphasized to Ryan that a failed solicitation did not <u>automatically</u> justify awarding a sole-source contract.

Consistent with the agreements reached at this meeting, and with the Financial Services' Director's approval, on January 31, 2019, Kane publicly posted the RFP. The deadline for submitting bids was 22 days later. The RFP did not state a price, price range, or price cap for the training services it solicited. The RFP was indeed sharply more restrictive than the Department's 2015 RFP for leadership training. For example, the 2015 RFP stated a <u>preference</u> for judicial experience <u>or</u> experience with similar organizations. The 2019 RFP stated a <u>requirement</u> for judicial experience <u>only</u>. The 2019 RFP also contained requirements that likely would exclude the Department's longtime training vendors, and a former SCAO employee interested in bidding, from consideration. For example, bidders were required to submit three references in support of their proposals, but they were prohibited from using references from the Department itself. Further, the RFP sought only bidders who would "break from work of the past" vendors.

During the RFP's open period, Brown instructed one of his supervisees to check with Kane periodically to see if any bids were coming in, and he directed that she would be in charge of the review and selection group if any bids were to come in. By the RFP deadline, 24 individuals or companies had reviewed the solicitation, only 14 (not all of which were in the

22

training industry) had downloaded the RFP documents, and none had submitted a bid (not even the Department's longtime training contractors). Several of those who downloaded the RFP documents did not bid because the experience requirements were too restrictive and the RFP appeared to be tailored for a specific company. Another potential bidder did not bid because the Department appeared to already have a specific contract partner in mind and a number of the RFP's requirements were too restrictive. Masias herself was prohibited from bidding because, though on leave, she was still a Department employee.

### Sole-Source Contract and Resignation Negotiations

Ryan had informed Coats that the Department was going through the RFP process. When no bids were submitted, Ryan told Coats (contrary to what Kane had told Ryan) that the Department was now allowed to pursue a sole-source contract with Masias. Ryan also informed Coats that there was no prohibition on contracting with a former Department employee immediately after her resignation. This was true. Coats had no experience with RFPs, procurement, or sole-source contracting. No one at the Department, including Ryan, advised Coats or Rottman that they should review the RFP, the sole-source documents, or the decision to sole-source the Contract. Coats believed the review of these documents and decision were properly the purview of Ryan and Morrison.

After the RFP bidding closed, Morrison and Masias's attorney began to negotiate the terms of a Resignation and Release of Claims Agreement for Masias ("Resignation Agreement"). When Masias went on leave in November 2018, an SCAO attorney was assigned to handle the legal side of her resignation or termination. However, Ryan directed Morrison to personally handle the matter going forward. In Morrison's first contact with Masias's attorney, the latter expressly stated that Masias wanted a training contract in return for her agreement to resign.

23

Morrison made it clear that a contract would not and could not be the consideration for Masias's resignation. Thereafter, Masias's attorney dropped this request. Next Masias's attorney proposed that if Coats would meet with Masias to discuss a contract, she would sign the Resignation Agreement. Morrison rejected this proposal as well, reiterating that the Department would not offer Masias a contract in return for resigning or signing a release.

Morrison knew, however, that Ryan and Brown's goal was to secure a training contract with Masias. In fact, Ryan not only expressed that goal, he also told Morrison not to talk to anyone else about it. But Morrison also knew that a contract was not the consideration for the Resignation Agreement. So she and Masias's attorney agreed that as long as Masias signed the Resignation Agreement first, Masias could meet with Coats to make her pitch for a contract. On March 14, 2019, Brown expressed his excitement about this to Ryan, stating that they were "so close" to "getting this thing over the top!"

Masias signed the Resignation Agreement on March 15, 2019 (to take effect on March 19th), only after her contract-proposal meeting with Ryan and Coats had been agreed to and calendared for March 21, 2019, at 1pm. The primary consideration Masias received for signing the Resignation Agreement was six weeks of paid leave. Masias's attorney never once indicated to Morrison that she was threatening to file a lawsuit. In fact, though SCAO lawyers had requested one, Masias's attorney never sent them a demand letter setting forth legal claims. Nor did the Department itself proceed in a manner indicating it was settling a threatened lawsuit. The Department never received a demand letter, and the Legal Counsel Unit had concluded back in December 2018 that Masias had no valid legal claims. Tellingly, SCAO lawyers had already commenced work on a Resignation Agreement for Masias a month before Brown described to Coats and Rottman the alleged "dirt" Masias possessed. It was not until December 2020 that

24

Coats or Rottman heard, through the media, any assertion that the Contract's purpose was to suppress a lawsuit or silence Masias.

Morrison included in the Resignation Agreement a term explicitly requiring Masias to "provide [to the Department] a copy of the recording she made of communication between herself and [former Chief Justice Rice]." Neither Ryan nor Morrison ever shared the Resignation Agreement with either Coats or Rottman.

On March 14th, the day before Masias signed the Resignation Agreement, Brown sent Ryan a draft Sole-Source Determination memo for Ryan's signature. That memo purported to set forth the justification for a sole-source contract with Masias and would, once Ryan signed it, constitute the Department's approval for entering a sole-source contract with her. That same day, March 14th, Masias formed a limited liability company ("The Leadership Practice LLC").

On March 18, 2019, three days after Masias signed the Resignation Agreement, Ryan signed it on behalf of the Department. The day after the Resignation Agreement became effective (March 19th), Brown sent a revised Sole-Source Determination memo to Ryan. The day after that, on March 21st, Masias met in person with Ryan, Rottman, and Coats and presented them with her training contract proposal. The proposal seemed to Coats to be consistent with what the Department would want from a training contractor, and he again asked Ryan if he thought this training contract was in the best interest of the Department. Ryan said that it was. Neither before, during, or after that meeting did Coats and Ryan discuss the specific price for the Contract. Coats simply (and repeatedly) instructed Ryan that the price must be "no more than we pay our current trainers." After the proposal meeting with Masias, and Ryan's affirmation that he believed the Contract was in the best interest of the Department, Coats directed Ryan to proceed with the Contract. Four days later, Ryan signed the Sole-Source Determination memo approving

25

the Contract with Masias. In the meantime, Coats advised the other Justices that Masias had resigned and informed them of her leadership training proposal.

The Sole-Source Determination memo, though, did not comply with the Department's Purchasing Rules. The statements in the memo about Masias's qualifications were not relevant to the rules' requirements for entering a sole-source contract, and no facts satisfying those requirements were included in the memo. Rather, the memo contained the irrelevant statement that no bidders had responded to an RFP, and the conclusory claim that Masias was "the most capable" vendor available. The memo did not establish that this was the only training available to meet the needs of the Department and that Masias was the only vendor who could provide it. Based on a typo in the date of the final Sole-Source Determination memo (March 25, 2018) and the date of a prior draft (November 2018), it also appears that the memo was actually drafted months earlier, soon after Masias went on leave. Notably, the Sole-Source Determination memo also asserted that the Department had "conducted a sole-source selection process" to choose Masias for the Contract. This was false; there was no such process. Nor could there have been: only one business day elapsed between Masias's proposal meeting and Ryan signing the memo.

In addition, it appears that Brown helped Masias prepare her March 21st proposal and pitch for the Contract, which violated the spirit, if not the letter, of the Purchasing Rules section on Good Faith and Ethical Conduct. Specifically, on March 9, 2019, Brown obtained Department training-budget information for 2019 and 2020. That same day he forwarded from his Department email account to his personal email account, and then on to Masias's personal email account, extensive information about the Department's future training budgets, costs paid to the Department's longtime training contractors, and the scope of work performed by those contractors. It also appears unlikely Masias prepared her lengthy, thorough, detailed proposal

26

and pitch for the Contract in the one business day between her resignation and the proposal meeting; therefore, it appears she prepared those materials while still a Department employee on the payroll.

### The Signing of the Sole-Source Contract and its Key Terms

After signing the Sole-Source Determination memo on March 25th, Ryan emailed a copy to Masias. Within a day or two, Ryan instructed one of the SCAO lawyers to draft the Contract for Masias. Ryan also instructed that SCAO attorney to keep it secret from the Financial Services Division.

Over an eight-day period from March 29 to April 5, 2019, the SCAO attorney drafted and revised the Contract, with input from Ryan, Masias, and Rottman. There was no negotiation of the Contract price; Masias presented her price and Ryan simply accepted it. Rottman thought her price seemed high. Coats's only instruction was that it be no higher than the Department's current training vendors' price. Coats told Rottman it was Ryan's budget decision, the legislature had long before approved a large training budget for the Department, and Masias undoubtedly would have to hire and pay others to perform under the Contract. Ryan assured Coats and Rottman that Masias's price was less than the current training vendors' price. That was false; Masias's price was higher. Brown had sent Masias the current trainers' pricing information, and it appears she used that as a guide for her own pricing. But the price she chose, $532,000 per year, was slightly higher than what the Department paid its vendors in 2017 and $148,000 higher than the Department paid them in 2018. Masias's price was also $88,000 per year higher than the average annual price the Department had paid those trainers since 2015.

The SCAO staff attorney who drafted the Contract thought it was unusual that this would be done as a sole-source contract because the price was high and there were many leadership

27

training companies in the market. The Director of Financial Services noted that sole-source

contracts were unusual for the Department and that one of this size and type was unprecedented.

But when he asked Ryan to discuss it with him, Ryan told him not to worry about it. Morrison

did not express any concerns.

On April 8, 2019, Ryan sent the Contract to Masias, and she signed it. Ryan then signed

it on April 11, 2019. On that day, Ryan had an opportunity to tell Coats that the Contract had

been signed by both parties, but he instead kept that information from Coats. Specifically, on

April 10th, Justice Hart told Coats that she learned Masias had applied for a judicial-department

job in Utah (a Utah Justice had sent her an email inquiring about Masias). Coats suggested to

Hart that when responding she should stay within the bounds of the Resignation Agreement,

which limited what they could say about Masias's separation from the Department. Coats also

called Ryan to say that he just learned Masias had applied for a job in Utah. Ryan responded by

text, telling Coats he knew Masias had applied for that job but that she was no longer interested

in it. He did not tell Coats that Masias had, in fact, already signed the Contract and that Ryan had

too.

The Contract required Masias to deliver leadership training and related services to the

Department for a period of five years, five times longer than the Department's contracts with

prior training vendors. But it only detailed the scope of work for Masias to perform in the

Contract's first year. Despite providing no scope of work for years two through five, it required

the Department to pay Masias "$532,000 each year for up to 5 years." The SCAO's legal staff

described it to Coats and Rottman as a "one-year contract;" however, the Contract expressly

stated in its "TERM OF THE AGREEMENT" section on its first page that "the parties'

respective performances under this Agreement shall commence on … April 1, 2019 and shall

28

terminate on March 31, 2024." The Contract further allowed the parties, by separate agreement, to contract for additional services at certain rates up to a total of $550,000 per year. Finally, by further "separate written agreement," the Department could agree to pay Masias even more than $550,000 per year, without monetary limitation. Unlike its prior training-vendor contracts, the Department's contract with Masias did not contain prices for each category of work to be performed; rather, it simply set an annual lump-sum price.

The Department's Purchasing Rules required Ryan to conduct, and document in writing, negotiations with Masias "to obtain the best possible conditions for the Department with regard to [Contract] price, delivery, and terms." (Purchasing Rules §2.3.) Ryan failed to comply with this requirement.

### Revelation of the Secret Recording, Resignations, and the Cancellation of the Contract

On April 15, 2019, the OSA received an anonymous letter alleging three instances of occupational fraud at the Department.[3] When Coats and Rottman reviewed this letter, they learned for the first time that the Department had settled with a former employee for over $140,000. That employee had been placed on leave and investigated in 2017 for monitoring the activities of senior SCAO staff (including Brown and Masias). The employee indicated that Ryan knew about and authorized that surveillance. Ryan represented to SCAO legal staff that he had informed Coats about this settlement. This was false. Coats and Rottman first learned about it when they read the anonymous letter to the OSA in April 2019. Astonished that they had not

---

[3] The OSA commenced its investigation of those allegations in July 2019. The investigation included the Masias Contract award. In February 2022, the OSA released an executive summary of its findings, which included its conclusion that "there is at least some evidence of occupational fraud" in the award of the Masias Contract. The OSA found that the Contract was awarded "under an apparently flawed process." The OSA did not examine whether that process violated the Department's procurement rules, any criminal law, or any ethics or code-of-conduct standards, but it did refer three former employees (Brown, Ryan, and Masias) to law enforcement authorities.

been informed, Coats called a meeting in April 2019 with Ryan, Brown, and Morrison and vehemently instructed them to keep him fully informed on all similar personnel matters. He also repeated this instruction to them several times after this meeting.  Despite these commands, Coats was not informed about Masias's surreptitious recording of Rice until July 2019.

Masias began performing work under the Contract on April 15, 2019. Though he had signed the contract on April 11th and sent the signed copy to Masias, Ryan did not tell Coats, Rottman, or Morrison that he had done so.[4] Instead, he indicated that he intended to wait to sign until the two Financial Services Division employees who had originally demanded Masias's termination for reimbursement misconduct left the Department. Indeed, Ryan and Brown had discussed their concern that the Financial Services Director would not approve the Contract, and their need to form a plan to get around him. Consistent with such a plan, and likely also in retaliation for his role in Masias's separation from the Department, Brown and Ryan placed the Financial Services Director on leave on March 22, 2019, the day after Masias's contract-proposal meeting with Coats. And they waited for the SCAO's Controller to retire. She did so on May 31, 2019, and one business day later, on June 3rd, Ryan signed another copy of the Contract.

Ryan did not route the Contract through the Department's required final approval process before either of his signings; neither the SCAO legal staff, nor the Human Resources or Financial Services Divisions, reviewed or provided final approval for the Contract. Ryan communicated his June 3rd signing to Coats, Rottman, and Morrison, and on June 14th Coats emailed all Department staff to announce that Masias was now under contract to provide leadership training to the Department.

---

[4] On two other occasions, Ryan intentionally concealed the Masias Contract he had signed on April 11, 2019. In response to an open-records request in June, he did not provide the Contract he signed on April 11th, and he did not disclose it during the OSA investigation. He also lied to Morrison when he told her in late April 2019 that he had not yet signed the Contract.

One month later, after some initial media reporting and requests for information about allegations of misconduct at the Department, Ryan, Morrison, Rottman, Coats, another SCAO attorney, and the SCAO's Public Information Manager met to discuss a media request for a copy of Masias's recording of Rice. At this meeting, on July 15, 2019, Ryan directed Morrison to tell Coats and Rottman about that recording. This was the first time that Coats or Rottman were told of the recording even though Ryan, Brown, and Morrison had known about it for at least seven months. During that time, Ryan had taken numerous steps to prevent Coats and Rottman from finding out about the recording. Particularly disturbing is the fact that in May 2019, Morrison, the Department's top in-house legal counsel, prevented the Colorado Attorney General's Office from finding out about the recording. Specifically, when the Attorney General's Office requested a copy of the Resignation Agreement that expressly referred to the surreptitious recording, Morrison initially ignored the request and, when pressed, she asserted that the Resignation Agreement's confidentiality provision barred her from sharing it. That was false.

Coats and Rottman were stunned and furious that so many senior personnel had withheld this critical information from them for so long. Ryan offered to resign. After much deliberation and with the approval of the other Justices, Coats met with Ryan on July 17th and accepted his resignation (effective July 18th). At that meeting, Ryan told Coats he never mentioned the recording because he did not think Coats would want to know about it and believed it was in the best interest of the Department to withhold it from Coats. Ryan spoke with Rottman that day too. He did not tell Rottman that he thought Coats did not want to know about the surreptitious recording. Instead, Ryan told Rottman, "I really stepped in it. I made some bad decisions." Before leaving, Ryan gave his copy of Brown's talking points to Morrison, who gave it to the Attorney General's Office. On July 18, 2019, the Department terminated the Contract, and on

31

July 19, 2019, Brown resigned. The Department never paid Masias for any work performed under the Contract, though the damage to the Department's credibility from these events has been profound.

32

## Analysis

There were numerous organizational and individual failures that contributed to the decision to approve the Contract. These include a toxic Department culture under which certain senior leaders, principally Ryan, Masias, and Brown, were able to act with minimal oversight and no accountability. They also include overly permissive procurement rules adopted by the Department, as well as errors in judgment by several individuals, including Coats and Morrison. Notwithstanding these issues, the evidence establishes that the Contract was not approved to prevent the disclosure of alleged misconduct within the Department. Below we examine the issues identified during this investigation, and we make a series of recommendations aimed at enabling the Department to improve its internal culture, avoid repeating these mistakes, and begin the hard work of regaining the public trust.

### The Judicial Department was Poorly Administered at the Time of the Masias Reimbursement Dispute

The Judicial Department is a large and complex organization with thousands of employees spread across 24 judicial districts.  It has an annual budget of over $600 million. While each judicial district has its own judges, administrators, and support staff, the administration of the Department is centralized within the SCAO in Denver. The SCA leads the SCAO and thus has tremendous authority to direct the policies and operations of the entire Department. The SCA is chosen by the Justices of the Supreme Court. However, given the amount of power concentrated in the SCA position, as well as the diverse body of stakeholders over whom the SCA has authority, a thorough, fair, and transparent process for selecting the SCA is essential. When Ryan was appointed SCA in 2017, however, the process was anything

33

but thorough and transparent, which exacerbated tension and dysfunction in the Department's senior leadership.

**Ryan's Ascension to the SCA Position was not Transparent or Arms-Length, Which Created Tension Between Ryan and Masias**

The process for selecting the SCA was deficient in several ways. First, Ryan was promoted to be interim SCA despite not going through the formal selection process and never interviewing for the job. Although he had a generally positive reputation in the Department, he was never specifically evaluated to determine his suitability for the role of SCA. His prior job (Clerk of the Court of Appeals and Supreme Court) involved a much smaller scope of administrative duties and authorities. It involved docket management and activity coordination, a smaller staff, and implementation—rather than creation—of SCAO policy and culture. In that job, Ryan was responsible for two courts, not 26. Most problematic, Ryan had been on the SCA selection committee, and his promotion to SCA created an appearance of bias and illegitimacy that tainted the entire SCA selection process.

To make matters worse, the Justices promoted Ryan over Masias, who had been one of the finalists for SCA. When none of the finalists was selected, Masias was assured that a new selection process would soon commence. It never did, and Ryan was instead appointed SCA by fiat. Unsurprisingly, this compromised Ryan's working relationship with Masias, who was well-liked in many of the judicial districts. Masias was alienated by Ryan's appointment and suspicious that she was rejected because of her gender -- indeed, her later surreptitious recording of Rice was an attempt to confirm that suspicion. She also suspected that Financial Services Division leadership had backed Ryan over her for the SCA job, which fed her rage and

34

obstinance when those leaders discovered her reimbursement error and pressed for her termination.

The deficiencies in the process of promoting Ryan to SCA created significant tension among SCAO senior leadership. Ryan understood that Masias did not want him in the SCA position; she wanted his job herself. He believed that he could not afford to have her and Brown as enemies. He also was quiet and reserved and came from outside the SCAO, without alliances of his own there, and he was taking charge of an office that was riven by factionalism and office politics. As a result, Ryan believed he needed Masias to succeed as SCA, and he knew he had to repair his relationship with her. This gave her certain leverage over Ryan once her falsified reimbursement request came to light.

### Chief Justice Coats did not have the Support of the other Justices in Handling Administrative Matters, and he was not Trained or Equipped to Handle them Alone

While tensions were increasing in the SCAO's senior leadership, the Justices were largely unaware of them. Many employees we interviewed explained that the Justices had little contact with SCAO employees and only provided the most cursory oversight of Department administration. As such, when Masias's defective reimbursement request came to light, the Court did not have an understanding of the fractured relationships among SCAO senior staff and did not step in to help Coats determine how the reimbursement matter should be resolved. Nor did they understand how much tension it would create within SCAO leadership to select Ryan as SCA without a transparent or fair process. Worse yet, having created the problem for him, the Justices left it to Ryan to resolve.

Coats was the only member of the Court who had administrative duties with respect to the SCAO. The other Justices focused exclusively on resolving the cases on the Court's docket

35

and were detached from administrative matters pursuant to the Court's long-standing practice. They did not know the SCAO culture, serve on its internal committees, or fully understand its functions. As a group, the Justices met weekly with the Chief Justice, but the Court did not function as a collaborative decision-making body on administrative and personnel matters. Members of the Court followed the Court's long-observed custom of remaining walled-off from such decisions in order to avoid potential recusal if litigation about those matters later arose. As a result, Coats was forced to act alone, or to rely only on Ryan (and to a lesser extent Rottman), when handling problematic administrative or personnel matters within the SCAO.

Further, Coats was not trained as an administrator, and managerial skill is not a selection criterion for appointment to the Colorado Supreme Court. Upon his appointment as Chief Justice, Coats received no training, orientation, or instruction on running a large, complicated organization like the Department. Nor was he given briefing materials or operational documents for the SCAO, instructional presentations from the SCA, or tutorials about the specialized functions of each SCAO Division. From the outset of his tenure, there was a wide gap between the new Chief Justice and the SCAO, which was mirrored -- and reinforced by -- the physical distance between the Court and the SCAO. Coats and other members of the Court were housed in one office tower while the administrative staff were housed in another. This prevented incidental contact between SCAO personnel and Coats, and the casual sharing of information that often happens in office environments. This further isolated Coats from the SCAO, forcing him to rely almost exclusively on Ryan (or Rottman) for information about its operations. Yet, as explained above, Ryan was actively concealing critical information from Coats and, in some cases, providing him with false information.

36

**Ryan Administered the Department with Minimal Oversight from the Court and was not Held Accountable for his Performance**

Ryan administered the Department, and its $600 million budget and thousands of employees, with only minimal oversight from Coats. Coats met with Ryan, but while these briefings were detailed about the annual budget, they were often shallow and devoid of detail about SCAO operations. When Coats was told, for example, that the SCAO had fired hundreds of employees in 2018, or that certain employees were receiving large payouts of taxpayer dollars at the time of their separations from the Department, he was shocked.

Ryan did not report to a board of directors who could hold him accountable for his decisions, as many chief executive or chief operating officers do. Although Ryan ostensibly reported to Coats, Coats did not have consistent, independent sources of information about the SCAO's operations to use in evaluating Ryan's decision-making as SCA. Moreover, there was no process to solicit feedback from Ryan's subordinates. Nor did the Court even conduct annual performance reviews to allow for periodic and formal reflections on the quality of Ryan's work. While strong organizations routinely evaluate all employees, including senior leaders, Ryan was allowed to run the SCAO with little oversight of his decision-making.

As we make this observation, we recognize that the Chief Justice had myriad duties and only limited time and bandwidth to focus on the SCAO's operations. His primary function was judicial rather than administrative; as Chief Justice, he continued to write opinions, conference with his colleagues, and participate in the ongoing back-and-forth necessary to resolve the cases on the Court's docket. He also had managerial duties of a judicial nature -- he oversaw the distribution of cases among his colleagues. Further, he served as the face of the Department to the public, making appearances, for example, before the Colorado General Assembly and the Colorado Bar Association. He also shouldered time-consuming duties related to the 24 judicial

37

districts, administering the nomination and selection of all District Court Chief Judges, attending investiture ceremonies, and serving as the principal point of contact for all those chief judges.

Meanwhile, Ryan's nearly unchecked authority to run the SCAO became increasingly problematic over time, as the Court had no formal mechanisms to hold him accountable -- or even assess his performance.

## The SCAO's Internal Culture was Toxic, Which Deterred Employees from Coming Forward with their Concerns About the Contract

There were multiple Department employees who could have come forward to raise concerns about the Contract before it was approved. This includes Legal Counsel Unit personnel like Morrison, and others who were concerned but failed to act. They did not act because the Department's internal culture was toxic, and there was a pervasive fear of opposing Masias, Brown, or Ryan in any way. The fear-based culture deterred reliable information-sharing, rewarded silence and self-protection, led to lax enforcement of Court rules, and minimized accountability within the SCAO.

### A Culture of Fear and Intimidation Pervaded the SCAO

It was well-known within the SCAO that the Directors of the Human Resources and Financial Services Divisions despised one another. Financial Services Division personnel, as a result, felt defensive, fearful, and vulnerable given the extremely close relationship between Brown and Masias. It was enormously corrosive throughout the entire SCAO that the SCAO's second-in-command and the Director in charge of enforcing all Human Resources rules -- who had unilateral firing authority -- openly flaunted their inappropriate personal relationship. This relationship destroyed staff confidence in their leaders' reliability and fairness, and it undermined any trust that they would be protected if they spoke up about misconduct.

38

Consistent with the brazenness of that relationship, Brown was known to disregard Department rules when it suited him, and to target and retaliate against those who sought to enforce rules against him, including the Financial Services and Information Technology Directors. Masias herself was often dictatorial and vindictive toward other SCAO senior leaders. For example, she proclaimed that "heads would roll" if personnel communicated with any Justice without her permission. Similarly, she demanded that even authorized contacts with Justices had to be documented in writing and reported to her. Ironically, she also forced SCAO employees to sign a document she created barring them from surveilling or collecting compromising information about the Department. Masias's prohibition on communicating with Justices deepened the sentiment held by many at the SCAO that the Justices were aloof, disengaged, controlled by Masias on administrative matters, and therefore also to be feared.

In addition, Masias and Brown were perceived to have unilateral discretion to receive, investigate, and resolve complaints against judges and Justices. This perpetuated the belief that the judges and Justices were themselves shielded from accountability, and that Masias and Brown had leverage over them, which strengthened the perception that it would be dangerous to come forward about the Contract.

Compounding this climate of fear, employees were frequently investigated and terminated by the Human Resources Division without that Division reporting those terminations to the Chief Justice. Unsurprisingly given this environment, employees often stayed silent about misconduct and "kept book" on the activities of others in order to acquire compromising information to use as leverage in case of potential discipline. Remarkably, this strategy seemed to work, the behavior was rewarded, such employees were often granted paid leave as compensation upon termination, and non-disclosure terms were inserted into their termination

39

agreements. This practice masked the financial impact of these terminations on the Department's budget, it shielded the terminations from scrutiny by the SCAO Legal Counsel Unit and the Attorney General's Office, and it rewarded silence.

In addition, fear of retaliation caused employees to disregard their duties to the Department in favor of self-protection. It caused behavior like sending anonymous tips to outside oversight agencies, or making open-records requests for documents, rather than raising concerns up-the-chain to Department leadership. Even the Judicial Legal Counsel herself (Morrison) was disempowered, disrespected, intimidated, and fearful. As a result, she did not report Ryan's misconduct, or Masias's surreptitious recording of Rice, to Coats or his counsel. Morrison advised Ryan not to pursue the Contract and pressed him to report the recording of Rice to Coats. Ryan ignored her, and she had seen him be vindictive when crossed. Thus, she was cowed into obeying the SCA, though her duty was to the Department.

### There was a Lack of Accountability for Certain Senior Leaders

The SCAO's culture was also tainted by the fact that rules were not always enforced against senior leadership. For example, Masias and Brown openly disregarded Department rules, especially Financial Services Division and Information Technology Division rules, without consequence. Masias failed to follow the SCAO's reimbursement rules 100% of the time. Ryan allowed Brown's open and persistent use of his personal laptop for Department business despite repeated complaints from the Information Technology Services Director that the practice compromised Court security. Moreover, the SCA had broad discretion to act without oversight. For example, Ryan had the authority under the Department's permissive procurement rules to sign sole-source contracts without consulting the Procurement Manager.

40

**The Department's Purchasing Rules did not Sufficiently Protect it from Risks of Procurement Misconduct**

The Department's Purchasing Rules diverged from the state procurement code and were overly permissive in ways that contributed to the approval of the Contract. The State of Colorado has adopted a body of procurement rules, enshrined in statute, that bind executive branch agencies ("State Procurement Code"). Those rules, however, do not apply to procurements by the Department.  *See* §24-101-105, C.R.S. (promulgating a procurement code that applies to all "publicly funded contracts entered into by all governmental bodies of the executive branch of this state"). Thus, the Department created its own set of purchasing and fiscal rules. At the time of the Contract, the Purchasing Rules explicitly recognized that the Department was exempted from the state's procurement code ("as a separate branch of government, the Judicial Department is not bound by the Colorado Procurement Code §24-101-101, *et seq*., C.R.S"). Yet, there were several notable weaknesses in the Purchasing Rules at the time the Contract was signed.

First, the Purchasing Rules did not establish consequences, such as disciplinary penalties, for violations. In contrast, the State Procurement Code articulates steep penalties for any violations, including personal civil liability for employees. *See* §24-109-404, C.R.S. (if any government entity violates the State Procurement Code, "the head of such governmental body and the public employee, which for the purposes of this section includes elected officials, actually making such purchase shall be personally liable for the costs of such supplies, services, or construction"). An articulation of stiff consequences for violations might have deterred the procurement misconduct committed in this case.

Second, the Purchasing Rules did not establish a time bar on former employees seeking to do business with the Department. Many government entities impose a time bar (often called a "revolving door" rule) on former employees before they are permitted to contract with their

41

former employer. This helps to ensure that government employees are not using their authority in government to create new business opportunities for themselves. The Purchasing Rules were silent on this important issue, and Masias was allowed to sign the Contract just three weeks after she separated from the Department.

Third, there was neither an internal audit process, nor external audits, of the Department's purchasing activities that would have helped ensure Department employees, including the SCA, complied with relevant purchasing rules. A routine audit process is an important safeguard and deterrent to procurement misconduct, but none existed within the Department at the time of the Contract.

**The Process for Handling Complaints Against Judges was not Fair or Transparent, Which Gave Masias Additional Leverage over the Department**

Masias was perceived to have leverage over the Department because she and Brown had nearly unilateral authority to receive, investigate, and handle complaints against judges. A transparent complaint process, with clearly articulated rules and standards, protects employees, the organization, and those accused of misconduct. That is, employees and others must be made aware of how to file complaints of misconduct and the standards that will be used to investigate and resolve such complaints. This is particularly important when the accused are extremely powerful, like judges, which creates strong incentives for employees to avoid coming forward.

During our investigation, employees, including Justices, were unable to describe the complaint-handling process and relevant standards for handling complaints against judges. They often noted, generally, that "HR handled complaints against judges" or that complaints were "referred to the Judicial Discipline Commission" without being able to describe how such

42

complaints were received, by whom, when they would be referred, how they would be tracked, and what steps would be taken to make sure that complainants were protected against retaliation.

In fact, Masias and Brown had broad discretion (subject to a 2010 Memorandum of Understanding between the Department and Colorado's Commission on Judicial Discipline) to determine how such complaints would be handled. They kept minimal records reflecting the investigations they conducted and when complaints were referred to the Commission on Judicial Discipline (or not). There was no central complaints registry, nor a formal process for notifying complainants of the outcomes of any investigation. This created the perception for some that Masias was serving as a "fixer" for the Court who had the power to make complaints against judges disappear if it served her interests. And it further caused to employees to fear coming forward with their concerns about the Contract.

**The Contract would have been an Abuse of Taxpayer Resources, but it was not Awarded to Cover up Allegations of Judicial Misconduct**

As set forth above, we conclude that the Department's toxic culture, permissive procurement rules, and deficient oversight of the SCA contributed to an environment in which the Contract was approved. However, we do not conclude that it was a payoff to silence Masias from revealing evidence of judicial misconduct. Why not?

Of all the evidence we obtained, only one witness (Ryan) asserts that the Contract was approved to hide misconduct. Yet there is overwhelming countervailing evidence, and Ryan's assertions are internally inconsistent and contrary to his own behavior. Most importantly, Coats had already tentatively agreed with the proposal to contract with Masias *at least three months before Brown presented the alleged "dirt"* in his talking-points list. Therefore, we conclude that the "dirt" did not motivate Coats's thinking at that time.

43

In fact, Brown, Ryan, and Masias herself had been propelling the Department toward a new training vendor as far back as the Spring of 2018. Ryan and many other witnesses acknowledge this. The documentary evidence also confirms the Contract did not arise as a strategy to conceal the alleged misconduct Brown brought to Coats's attention in late December 2018/early January 2019. It was in the works long before then. Several other key facts support this conclusion:

- No one involved, including Brown and Ryan, appears to have considered the alleged misconduct genuinely threatening to the Department. Certainly no one acted as if it were, and the Department's in-house counsel (and her staff) told them explicitly that it was not. The information in the Brown talking-points list appeared to Coats and Rottman to be exaggerated, "old news" already addressed by Brown or Masias back when the incidents occurred.

- It appears from the talking-points list that Brown and Masias considered her recording of Rice to be powerful leverage. Ryan and others went to great lengths to hide this information from Coats for over seven months. Coats did not learn of it until more than three months <u>after</u> he had approved the Contract. Thus, he could not have been -- and was not -- motivated by it when he approved the Contract. The fact that Ryan hid this information from Coats also indicates Ryan knew Coats was not, and was not going to be, motivated to cover up damaging information. If Ryan had really thought that Coats would approve the Contract to contain political damage to the Court, he would have told Coats about the surreptitious recording.

44

- On numerous occasions, Coats told Rottman and Ryan that he expected the Contract to be publicly criticized because it would be with a recently-resigned, high-ranking former employee. This was why Coats instructed Ryan to do it "by the book."  This was also why Coats repeatedly asked Ryan if he believed the Contract was in the best interest of the Department. Coats thus made it clear he was willing to be criticized, if necessary, for the good of the Department. This is another indication that when he approved the Contract, Coats was not motivated by fear of criticism or damage to the Department's reputation.

- Masias's attorney never mentioned any legal claim, let alone one grounded in the alleged misconduct. Similarly, neither Brown, Ryan, Coats, or Rottman ever referred to this "dirt" after the one meeting in which Brown partially described it. Nor did Masias's Resignation Agreement suggest that suppressing misconduct was a focus of any party. The Resignation Agreement contained boilerplate confidentiality language, nothing more restrictive than in any standard Department release agreement. Tellingly, the Resignation Agreement also did not try to suppress the surreptitious recording itself. Rather, the Resignation Agreement actually publicly revealed its existence and required Masias to give the Department only a copy of it (not the original, or all copies).

- Deploying "dirt," as Brown, Masias, and Ryan did here, was typical for them and a common technique in the Department, as described above. It appears that after Coats directed Ryan to proceed "by the book" in the December 14, 2018, meeting, Brown and Masias believed they needed to further motivate Coats to move ahead with a

45

contract. Brown and Masias had had success with intimidation tactics in the past and, as Brown said, Masias was very angry about how she had been treated. Here, though, they misjudged. Ryan had already convinced Coats that the Contract was the right path. And Ryan had already convinced Coats that Masias was vital to his plans for improving the SCAO. Though Masias, Brown, and Ryan may have thought it would cement Coats's approval, the "dirt" did not motivate him. We found no credible evidence that Coats's attitude, conduct, or motive was influenced by a desire to hide the alleged misconduct.

- When Department and Attorney General's Office personnel were deciding whether to terminate the Contract in July 2019, Brown's talking-points list was not yet public. Nonetheless, Coats, Rottman, Steven Vasconcellos (the SCA who replaced Ryan), SCAO legal staff, and Attorney General's Office personnel did not give any consideration to whether terminating the Contract would cause the talking points to become public. This was because suppression of that information had never been Coats's reason for approving the Contract.

Masias, Brown, and Ryan, each for his or her own reasons, clearly and brazenly pursued approval of the Contract. They pulled all the levers they thought would further that goal. It is equally clear, though, that the "dirt" lever did not affect Coats as they thought it would. Coats was misled, and his judgment failed him on other fronts, but he did not approve the Contract to silence Masias.

46

**If Not to Cover Up Alleged Misconduct, Why Did Coats Approve the Contract?**

The Contract was ill-advised, did not serve the interests of Coloradans, and should never have been approved. Though never paid, it resulted in real harm to the credibility of the Department. The Contract and its fallout have similarly harmed the many Department employees who perform exceptional service for Coloradans. So how could top Department officials have worked for it, supported it, and approved it? The answer lies both in the personnel and their environment.

**Trigger Event: The Reimbursement Dispute**

Given the environment at the SCAO, the events that transpired when the Financial Services Division caught errors in Masias's reimbursement submission in July 2018 were not surprising. First, Masias helped create a culture that discouraged leaders from showing weakness. Her personal power and image of strength were essential to her. Second, she had a habit of behaving as if the rules did not apply to her, and she disdained the Financial Services Division. Third, and as a result, she could not admit her reimbursement error to a perceived enemy and instead she was steadfastly unrepentant and dishonest in her own defense when confronted. Fourth, the Department was undergoing an audit at the time, and the Financial Services Division saw this as an opportunity to vanquish Masias for good. Their bases for insisting on terminating Masias were substantially justified, though it was the culture of combat that drove them to be completely uncompromising in their insistence. Finally, as discussed above, Coats had no relevant training on administrative issues, no Counsel to the Chief Justice tasked with helping solve such problems, and no collaborative support from his colleagues. All of this meant Coats had to rely primarily on Ryan, which amplified the risk that he would

47

exercise poor judgement. That is precisely what happened when Coats agreed to terminate

Masias and simultaneously considered entering into a contract with her.

### Misconduct and Misjudgment

In a different environment, experienced and collaborative leaders may have found a way

to discipline Masias short of termination and in a way that assured the OSA auditors the

Department still had sound financial controls. But in this environment, Ryan was at a loss as to

how to solve this problem. Ryan was liked and trusted in his former position at the Department.

But he was relatively new to the SCA job, felt he had no alliances at the SCAO, and had no past

leadership experience in this environment under these pressures. He recognized the deep cultural

flaws he inherited at the SCAO. He also likely felt alone, vulnerable, and ill-equipped to fix the

underlying problems with SCAO personnel and culture.  Justices detached from administrative

and personnel matters had selected him without a fair process and left him to deal with managing

Masias. He misjudged that a contract with Masias would solve the problem, and he chose the

worst of the tactics common in that culture to get the Contract approved.

Specifically, over the next nine months, Ryan adopted a "keep your friends close and

your enemies closer" relationship with Brown. He controlled information. He lied to Coats about

Masias's history of reimbursement misconduct. He lied to Coats about the justification for a

sole-source contract. He helped remove the Director of Financial Services because he was an

obstacle to Contract approval. He lied about signing the Contract in April 2019. He hid Masias's

surreptitious recording of Rice from Coats and Rottman. He lied to SCAO legal staff about

Coats's knowledge of that recording, telling one lawyer he had told Coats about the recording

and telling another he had not told Coats because Coats did not want to know. He intimidated

48

Morrison so she would not interfere with his plans. Ryan thus gradually built an increasingly fragile edifice of deceits that eventually imploded.[5]

Ryan also manipulated and tightly controlled the contract process. He rushed it along, violated the Purchasing Rule regarding sole-source determination, circumvented the requirement that legal staff and the Financial Services Division sign off on the Contract before execution, ignored the Purchasing Rule requiring him to show he had negotiated the best price terms possible for the Department, failed to investigate whether Masias was in fact the best available vendor and whether her pricing was justified, and accepted without any negotiation Masias's price and scope-of-work terms. As a result of all this misconduct, the Contract itself was sub-standard. Even the duration of the Contract was not clear. It bound the parties to a term of five years, but it only defined the work to be performed in the first year. It did not state the prices for each category of work. Yet it specifically defined the prices Masias could charge for additional work Ryan could approve above Masias's $532,000 annual fee. Inexplicably, the Contract set another annual cap -- $550,000 -- for additional work and payments and allowed Ryan to break even that higher cap without restriction.

Masias and Brown made their own misjudgments and engaged in their own misconduct. Their misconduct, though, was more clearly driven by self-interest than was Ryan's. Masias disrespected and ignored Ryan from the beginning. She disregarded rules, was dishonest with the SCAO's attorneys, ignored their advice, negotiated legal matters on her own, and cut them out of processes and decisions. While she was a hard and effective worker, outwardly upbeat and even

---

[5] Ryan's SCAO reorganization plan was another example of his bad judgment. Whether due to self-interest or lack of experience, that reorganization likely was going to cost the Department more money, diminish financial oversight by placing that function under the Human Resources Division, further reduce collaboration and accountability, and exacerbate the SCAO's unhealthy culture by increasing Brown's power. In another example of his poor judgment, at least as early as 2018, Ryan had allowed an employee to surveil Brown and Masias rather than address his concerns about their personal relationship by implementing genuine performance standards and supervisory reviews for them.

49

motivational, she acted out of self-interest and favored employees who would do her bidding. For years as a leader in the SCAO, Masias had an inappropriately close relationship with Brown, perpetuating the perception by SCAO employees that she was guided by her own agenda and above reproach. She never accepted responsibility for mistakes and never apologized.

This all lent a certain irony to her training mantra that the most important thing for Department leaders was to set the right "tone at the top." As set forth above, while she was one of those at the top, Masias disregarded reimbursement rules, surreptitiously recorded a conversation with Rice, shut down others' communications with the Justices, and lied repeatedly when confronted about a reimbursement submission. She used Department budget information to secure a sole-source contract for herself while she was still a Department employee. She attempted to secure approval for that contract by threatening, through Brown, to publicly reveal allegedly damaging information about the Department. Her behavior both before and after she went on leave reveals that Masias acted in her own self-interest rather than the Department's. Notably, her behavior pattern was one that was allowed to develop when Marroney was SCA. He was so busy with the Court's building project and legislative relations during that process that he elevated Masias to Chief of Staff and, in essence, left the keys to the kingdom in Masias's and Brown's hands.

During the same period, Brown too elevated his and Masias's interests over those of the Department. He fed Department information to Masias while she was on leave. He advocated on her behalf for a contract. He threatened disclosure of allegedly damaging information. He communicated with Masias after he was instructed not to. In the past they were overheard discussing future plans to work together as consultants, and they may have been planning to work together under the Contract. Brown directed the Procurement Manager to keep the RFP

50

secret from Financial Services Division leadership. He lied to the Procurement Manager repeatedly. He took action to terminate the Director of Financial Services so he would not obstruct the Contract (and also in apparent retaliation for his role in the Masias reimbursement dispute). It was well known even before she went on leave that Masias and Brown had an inappropriately close personal relationship. It was known that he could not be trusted when it came to matters involving her. It was also well known that Brown disliked rules and considered himself above them, exploited gray areas in Department personnel rules, strategically targeted enemies for retaliation, had employee emails monitored to gain advantage, bragged about how many people he fired, hired only investigators who would produce the outcomes he wanted, and ignored and diminished legal staff.

But Brown's and Masias's misconduct had less impact on approval of the Contract than did Ryan's. And it still would not have been approved if Coats himself had exercised better judgment. His first error was not meeting with Ryan immediately after taking over as Chief Justice to learn more about Ryan's role and clearly explain Coats's expectations of him – including the expectation that Ryan would keep him fully informed. Without doing so, Coats proceeded to make many pivotal decisions relying entirely on representations from Ryan. Ryan was not trustworthy, yet Coats neither detected this himself nor even suspected it enough to task Rottman with closer oversight and verification of information they were getting from Ryan. Coats's failures in this regard likely were due to his lack of understanding of SCAO functions like procurement, and the lack of advice from Morrison or Rottman that verification might be a good backstop.

Coats's failure was also due to his own lack of intuition that it was dangerous to rely so heavily on Ryan. His own intuition also should have told him that choosing a person known for

51

dishonesty and self-interest (Masias) as the face of the Department's leadership training program would gravely undermine trust and confidence in the Department and his own leadership. It should have told him it would erode public trust to rush a contract through with a former employee within weeks of her resignation. Finally, Coats himself could have -- but did not -- oversee or verify. He did not ask Ryan follow-up questions or do his own research as to whether the Management Representation Letter really required terminating Masias. He similarly failed to conduct his own analyses of the procurement process, Masias's reimbursement history, the Contract's pricing structure, the availability of other training vendors, or Ryan's conclusory assertion that the Contract was in the Department's best interest. Masias may have been qualified as a trainer, and her price may have been a fair market price, but Coats did not do any of his own diligence to make these determinations before approving the Contract.

The same can be said of Rottman. Coats did not instruct him to do any verifying, but Rottman also never suggested to Coats that that would be a good assignment for him. Despite signs that Ryan should be watched more closely, Rottman did not take the initiative to suggest a more active oversight role even though he knew Coats was new and untrained. As a result, Rottman missed opportunities to independently understand and assess the Management Representation Letter situation, the Contract, the sole-source determination, Masias's reimbursement history, the procurement process, and the Resignation Agreement. Like Coats, Rottman also independently failed to recognize how disastrous it would have been to have a former employee with Masias's known flaws representing the Department's leadership training program.

Morrison too made a key misjudgment. She was genuinely fearful that Ryan would fire her if she told Coats, Rottman, or the Attorney General's Office about the surreptitious

52

recording, so she hid it from them. Apparently out of fear of Ryan and Brown, she also stood silent while they lied to the Procurement Manager repeatedly. However, her fear that Coats and others would not protect her from termination if she "went over Ryan's head" does not appear justified. In fact, there appears to be no basis for it other than fear itself. She knew full well that Coats, Rottman, and the Attorney General's Office all would consider Masias surreptitiously recording a Chief Justice an outrageous breach of trust and would direct their anger at Ryan for hiding it and not at her for exposing it. Thus, her fear of Ryan does not excuse Morrison's abdication of her duty to the Department in favor of obedience to her direct supervisor (Ryan).

### Conclusion

The deep cultural flaws described above bred misconduct that Coats and Rottman did not detect and that led to the Contract's approval. Since these events, the Department has implemented a number of improvements to correct Department culture and inoculate it against individual misconduct and poor judgment. Recognizing those positive steps, we nonetheless strongly urge the Department to implement the recommendations below in order to continue advancing toward restored public trust.

53

## Recommendations

To address the issues discussed above, we provide 14 actionable recommendations, some of which the Department has already begun to implement. But more work remains to be done. We have divided our recommendations into six categories: (1) Changing the SCAO's Organizational Culture, (2) Enhancing Oversight of the SCAO, (3) Properly Preparing the Chief Justice, (4) Improving the Judicial-Officer Complaint Process, (5) Procurement Reform, and (6) Ongoing Transparency and Accountability.

### Changing the SCAO's Organizational Culture

1) **The Court Must Commit to Ending the Culture of Fear and Intimidation in the SCAO**

We make several specific suggestions for improving the toxic organizational culture discussed above. This is not an exclusive list; we recommend that Department leaders continually and proactively consider other opportunities for the Department to create for its employees and the public a culture of collaboration and public service.

First, the Department should adopt rules that unequivocally and clearly protect employees who possess information about fraud, waste, abuse, harassment, or other forms of misconduct -- including judicial misconduct -- from retaliation if they bring that information to the attention of Department or state authorities. While the State of Colorado has enshrined various whistleblower protections in statute, *see, e.g.*, Title 24, Art. 50.5e, *et seq.*, C.R.S., specific Department rules that assure employees of the Department's commitment to these protections are critical and should be adopted immediately. The rules should be explained, supported, and easily accessible to employees on the Department's intranet site and elsewhere. The Department should also evaluate other approaches to informing employees about these protections, such as periodic trainings.

54

Second, Department employees must never be deterred from providing information to members of the bench. As noted in this report, Masias forbade employees from providing information to members of the Court under threat of potential discipline. That directive was improper and counter to the Department's goals of accountability and transparency. While the Court has now increased contact between the Justices and Department employees, it is essential that all employees be informed that that improper prohibition is formally denounced and rescinded.

Third, the Department must commit to holding <u>all</u> employees accountable no matter their status or position. Rules must be fairly and evenly applied, such that no one is above the law or exempted due to their stature within the Department.

2) **The Court Must Infuse Ethics into the Department's Culture and Decision-Making**

The Department is served by thousands of hard-working public servants who have the best interests of Coloradans in mind. Yet, outliers, like some of the individuals discussed above, make it necessary for the Court to take steps to further infuse ethics and public service into the culture of the Department. That is, the Court must ensure that the culture of warring fiefdoms within the SCAO is ended and replaced with a shared commitment to collaboration, public service and ethical conduct.  Specifically:

First, we recommend that the Court establish a code of conduct and ethics that governs the behavior of employees in the Department. While the Colorado Constitution sets forth ethical rules for state employees generally, more specific rules should be adopted for the Department. Just as judicial officers must adhere to the Colorado Code of Judicial Conduct, non-judicial Department employees should similarly adhere to a code of conduct and ethics.

55

Second, we recommend that the Court establish a Department-wide Ethics Officer who is an expert on the rules of conduct and ethics, and with whom Department employees can consult (confidentially, if requested) when in need of advice. The Ethics Officer should conduct annual and mandatory Department-wide trainings on the rules of conduct and ethics. Just as judicial officers may submit ethics inquiries to the Judicial Ethics Advisory Board, Department employees should have similar access to a Department official who can respond to their ethics questions. The Ethics Officer must have the authority to assure employees of confidentiality and protection from retaliation.

3) **The Court Should Adopt a Two-Year Revolving Door Prohibition on Former Employees Doing Business with the Department**

Many government agencies have "revolving door" rules that prohibit individuals from doing business with their former employers for a prescribed period after their separation. Had such a rule been in place during the events described in this report, the Contract could not have been awarded to Masias. We recommend that the Court establish a two-year revolving door prohibition for its former employees to ensure that Department personnel cannot create contracting opportunities for themselves while they are in government service. Moreover, the rule should permanently bar former employees from working under any contracts that they were personally involved in securing during their tenure with the Department.

**Enhancing Oversight of the SCAO**

4) **The Court Must Require Annual Performance Evaluations for All Key Department Leaders, including the SCA**

It is incomprehensible that the SCA administered the Department, a large organization -- and a co-equal branch of our state government -- without sitting for regular reviews or being held accountable for his performance. The Court must correct this significant gap by requiring that

56

detailed, annual performance evaluations be completed for individuals in key supervisory positions, including but not limited to the SCA, Counsel to the Chief Justice, the Chief of Staff, the Judicial Legal Counsel, and the Directors of the Human Resources, Financial Services, Information Technology Services, Probation Services, and Court Services Divisions. Such evaluations, if detailed and comprehensive, will aid in holding key personnel accountable. Had there been such performance evaluations, the improper relationship between Masias and Brown, and the toxic work environment they created, would have come to light far sooner or, perhaps, would not have developed at all.

These evaluations should include not only assessments from supervisors, but also candid 360-degree feedback from subordinates. Subordinates should be encouraged to respond to questions about these leaders anonymously with assurance that there will be no retaliation for participating in the reviews. Further, these performance reviews should be grounded in specific performance standards and expectations set for each employee annually with input and agreement from both employee and supervisor.

5) **The Court Should Codify the Selection Process for the SCA**

One of the events that significantly contributed to approval of the Contract was the woefully deficient selection process used to appoint Ryan as SCA. The process was not fair or transparent and caused considerable tension in the SCAO's leadership ranks. To ensure that this is never repeated, the Court should clearly articulate the hiring process for its senior leaders, including the SCA, and ensure that the process is followed for future SCA appointments.

57

6) **The Court Should Clarify the Roles, Domains, and Obligations of Each of the Three Sources of Legal Advice to the Department**

The Court and SCAO draw upon three separate sources for legal advice. The Judicial Legal Counsel administers the Legal Counsel Unit and advises the Department. The Attorney General's Office provides legal advice to the Department, particularly on matters that are likely to result, or have resulted, in litigation. The Counsel to the Chief Justice also provides legal advice, but to the Chief Justice alone. The roles, domains, and purviews of each source have not been clearly articulated by the Department.

As noted in this report, the Judicial Legal Counsel (Morrison) was, at best, unclear about what duty she owed to whom. Specifically, when Coats was Chief Justice, Morrison withheld from him that Masias had secretly recorded former Chief Justice Rice. She discussed this critical fact with Ryan, head of the SCAO, but not with Coats, head of the entire Department. As a result, Coats was left unaware of the recording, which placed the Department in an untenable position. We recommend that the Department clearly delineate for its employees the roles and authorities of each of the three sources of legal advice, and clarify the circumstances under which one source, but not the others, will be used. Most importantly, we recommend the Department make plain that the Judicial Legal Counsel's duty is owed to the entire Department rather than any one administrator or subcomponent. *See* Colorado Rules of Professional Conduct Rule 1.13. The anti-retaliation reforms described above also should expressly empower the SCAO's entire Legal Counsel Unit to exercise that duty without fear of potential retaliation from SCAO leadership.

58

7) **The Court Should Enact an Effective Leadership Training Program for the Department**

It is somewhat ironic that we are recommending a leadership training program given the subject matter of the Contract we have investigated. Yet we are recommending it just the same because of the errors and failings displayed in this case. The Department must invest in preparing its leaders with the skills, ethics, and courage necessary to do their important work. Needless to say, any outside vendor sought to provide such training should be selected through a fair and competitive bidding process.

**<u>Properly Preparing the Chief Justice</u>**

8) **The Court Must Properly Prepare and Equip Chief Justices for the Substantial Management Obligations of that Position**

Coats was not well prepared to handle the crises concerning Masias' falsified reimbursement request and subsequent Contract with the Department. He was untrained as an administrator and did not have the active support of his colleagues, which he sorely needed. We make several recommendations to ensure that Chief Justices are never again placed into such a vulnerable position.

First, the Court must develop a formal training program for incoming Chief Justices. Coats described his preparation for the position as "learning on the job" that included attending a number of meetings with the departing Chief Justice. He was not informed about personnel problems in the SCAO administration and, as a result, was unprepared when those problems eventually spiraled out of control. He was given no briefing materials, performance metrics for the Divisions of the SCAO, or detailed explanations of its human resources, budget, or procurement processes. He was neither briefed by each division director nor given opportunities to inquire about their operations. In short, he was forced to learn all of the SCAO's operations

59

on-the-fly as issues arose during his tenure. The Court must invest in equipping Chief Justices to handle such issues by providing formal training and orientation, in advance, before problems arise.

Second, the Court has now implemented what it calls a "Shadow Chief" system (perhaps, more aptly, a "Chief-in-Waiting" system). The Shadow Chief follows the current Chief Justice for a prescribed period to help enable an orderly transition. During our interviews, we learned that while the Shadow Chief system is in use now, it may or may not be used again in the future. Given our findings in this investigation, we recommend that the system be codified as an essential component of the transition between Chief Justices now <u>and</u> in the future.

Third, the Court has long observed a custom of walling Justices off from administrative matters in the SCAO to avoid potential recusals should litigation later arise. While we understand this rationale, our interviews with the Court suggest that the actual risks of recusal are low. Moreover, we are certain that any Chief Justice will need the support of his or her colleagues in handling sensitive administrative issues in the Department. We therefore recommend that the Court identify the very limited circumstances in which a wall between the Chief Justice and the other Justices is necessary and otherwise enroll at least a Justice or two on a case-by-case basis to assist the Chief Justice with challenging issues when necessary.

Fourth, the Court should reduce the number of opinions assigned to the Chief Justice in an amount that offsets the substantial administrative and political duties of that position. The Chief Justice has various important responsibilities, including oversight of the SCA and serving as the face of the Department to the public. Given Coats's judicial duties, he did not have sufficient time to both handle his caseload and provide meaningful oversight of the SCA. The

60

Court must change that to enable the Chief Justice to effectively handle the administrative duties of the position.

9)  **The Court Should Establish a Specific Term for the Chief Justice**

There is no specific term for a sitting Chief Justice; rather, the Chief's tenure is left to the preference of members of the Court or the passage of time and operation of the Department's mandatory retirement rules. In recent decades, Chief Justices have served for terms ranging from just a few of years to more than a decade.

Improving the ability of the Chief Justice to oversee the SCA and SCAO will require establishing a specific term of years to ensure certainty and an orderly transition between administrations. According to Coats, it took a year for him to learn the varied and important responsibilities of the position, and we therefore recommend that the term be set for no fewer than three years—and possibly more. Should the Chief Justice wish to serve an additional term, they could seek reappointment by a vote of the majority of the members of the Court.

### Improving the Judicial-Officer Complaint Process

10) **The Court Must Improve the Legitimacy of the Process for Handling Complaints Against Judicial Officers**

It was clear that Masias was perceived as a "fixer" by some Department employees, due, in part, to her broad discretion to determine how complaints of misconduct against judicial officers would be handled. Record-keeping regarding complaints was poor, and the rules by which Masias (and later Brown) processed and investigated them were unclear. While the Court now has internal rules that address judicial-officer complaint handling, they are vague, and to this day, insufficiently specific about how complaints are received, triaged, investigated, tracked,

61

and referred (or not) to other investigative entities. The internal rules must be precise about these processes, and also clearly state the evidentiary standards that will govern complaint resolution.

Regarding complaint intake, since these events the SCAO has developed a portal on the Department intranet site through which employees can submit complaints (including those against judicial officers). While the SCAO provided us with statistics showing that employees have visited that portal hundreds of times, it was unable to tell us how often the portal has actually been used to file complaints or provide overall statistics about aggregate outcomes of any investigations conducted into those complaints. The Department should enhance its data collection about the complaints portal, ensure that complaints can truly be filed anonymously, and identify ways to seek employee feedback to determine whether or not the complaints portal is working as intended.

Finally, the judicial-officer complaint process is not transparent to the public. While there may be reasons for confidentiality about individual cases and open investigations, aggregate information could be provided to the public by the Department. For example, the Department's last available Annual Statistical Report for fiscal year 2021 includes various metrics about the Department's overall caseload, staffing, budget, and case dispositions, but no equivalent information about the number of complaints against judicial officers, the number referred to the Colorado Commission on Judicial Discipline, aggregate complaint outcomes, or even the process by which complaints against judicial officers are handled. We urge the Department to include this information in its annual statistical reports for public review.

**Procurement Reform**

11) **The Department Should Consent to be Bound by the State Procurement Code, Which Includes Civil Penalties for Violations**

Pursuant to state statute, the judicial and legislative branches of government are exempt from the State Procurement Code, which applies only to executive branch agencies. The Department has adopted its own set of purchasing and fiscal rules that differ from the state code in important ways.  Elected officials are also exempt from the Code but have consented, through a purchasing delegation, to comply with it. We recommend that the Department consent to be bound by the Colorado Procurement Code and associated procurement rules. This would align the Department with the rest of state government and create official oversight by the State Purchasing and Contract Office, which would help prevent the kinds of procurement misconduct demonstrated in this case.

12) **The SCAO Should Regularly Engage in Self-Assessments of its Purchasing Activities and Solicit Periodic Independent Audits**

We recommend that the SCAO enhance the compliance and transparency of its procurement functions by regularly assessing all purchases and procurements and evaluating whether or not they are in compliance with relevant procurement rules. This assessment and evaluation should include, but not be limited to, assessing the RFP and vendor selection process used, the adequacy and specificity of contract terms, the workflow and necessary approval processes employed, and the amounts invoiced and paid against these contracts. It should also specifically focus on sole-source contracts to determine if they were, in fact, properly entered into without competitive bidding. Moreover, the SCAO should periodically solicit an independent audit of its procurements, which will create additional accountability for, and public trust in, the Department's purchasing activities.

13) **The SCAO Should Train all Employees Involved in Purchasing About Ethical Standards for Procurement Activities**

Both the State Procurement Code (that did not apply to the Department at the time of the Contract) and the Department's Purchasing Rules (that did apply) include ethical standards for procurement. There were several significant ethical violations by Brown and Ryan in steering the Contract to a former employee with whom they were associated. While this Contract resulted in obvious violations, there may be other violations in the Department's purchases that could also raise significant ethical issues.

The Department must provide training about procurement ethics to all Department employees who engage in procurement activities. This training should be mandatory and documented before employees are permitted to work on procurements on behalf of the Department.

### Ongoing Transparency and Accountability

14) **The Chief Justice Should Commit to Regularly Reporting to the Governor, the Legislature, and the Public on the Steps Taken to Implement these Recommendations**

Finally, the Department is an independent and co-equal branch of government -- and it is also accountable to the citizenry, as are all public entities. We commend the Court for commissioning this independent investigation and demonstrating openness and cooperation with us.  To ensure continued momentum towards reform and transparency about the improvements implemented after these events, we urge the Department to: (1) publicly post this report on its web homepage; (2) post its public response to this report including an explanation of whether the recommendations above will be implemented and, if so, how and by when; and (3) commit to

64

annually updating the Governor, General Assembly, and the public on the status of the

Department's efforts to implement these recommendations.

APPENDIX A

**List of Involved Individuals**

1.   Eric Brown – Director of the SCAO's Human Resources Division.

2.  Nathan "Ben" Coats – Colorado Supreme Court Chief Justice, July 1, 2018, to December 31, 2020.

3.  John Kane – SCAO Procurement Manager.

4.  Jerry Marroney, State Court Administrator who preceded Ryan.

5.  Mindy Masias – Chief of Staff to the State Court Administrator, 2014 to 2019.

6.  Terri Morrison – Judicial Counsel to the Judicial Department.

7.  Nancy Rice – Colorado Supreme Court Chief Justice who preceded Chief Coats.

8.  Andrew Rottman – Counsel to the Chief Justice.

9.  Christopher Ryan – Interim State Court Administrator, July 2017 to September 2017; State Court Administrator, September 2017 to July 2019.

10.  Steven Vasconcellos – State Court Administrator who succeeded Ryan.

66

APPENDIX B

**Chronology**

**May 2017**: Search conducted to select new State Court Administrator (SCA); Masias applied and was not selected; Justices appointed Ryan interim SCA.

**September 2017**: Justices appointed Ryan permanent SCA.

**July 1, 2018**: Coats appointed Chief Justice.

**July 15, 2018**: Masias reimbursement dispute commenced.

**August 2018**: Ryan informed Coats about Masias reimbursement dispute; investigation into Masias reimbursement dispute commenced.

**October 2018**: Reimbursement dispute investigation concluded; Coats, Rottman, and Ryan agreed that Masias engaged in reimbursement misconduct and dishonesty, and they began to discuss their options for disciplining her including the possibility she could resign and enter a contract with the Department to conduct leadership training; Financial Services Division leadership refused to sign Management Representation Letter required by the Office of State Auditor unless Masias was terminated.

**November 7, 2018**: Masias notified that she will be terminated on November 15, 2018, unless she resigns before that date.

**November 12, 2018**: Ryan granted Masias's request for Family Medical Leave until February 2019.

**December 14, 2018**: Coats, Rottman, Brown, and Ryan again discussed the possibility of contracting with Masias for leadership training services if she resigned.

**December 22, 2018**: Brown informed Ryan that Masias was angry and upset, that she was threatening to sue the Department for gender discrimination, and intended to make public compromising information she had about the Department.

**December 26, 2018**: Ryan convened meeting with Brown and Morrison. Brown described Masias's alleged threat to sue and release compromising information. Brown informed them Masias possessed a surreptitious recording of a conversation she had with Rice in which Rice allegedly implied the Justices did not select Masias as SCA because of her gender. Brown and Ryan informed Morrison their proposed solution was a leadership training contract with Masias. Morrison objected to that proposed solution and informed Ryan Masias did not have a valid legal claim.

**Late December 2018/Early January 2019**: Coats, Rottman, Brown, and Ryan met. Brown began reading from a talking-points list of past alleged misconduct by judges and Department staff. Coats asked Ryan if he needed to hear more. Ryan shrugged and may have said, "Up to

67

you, Chief." Coats directed Brown to stop reading, asked about Masias's health, and where they stood on the Masias contract idea they began discussing in October.

**January 2019:** Ryan, Morrison, Brown, and Kane drafted and posted a Request for Proposals (RFP) for leadership training services.

**February 2019**: RFP closed. No one submitted a bid.

**February - March 18, 2019:** Morrison negotiated a resignation and release agreement with Masias's attorney. Masias signed it on March 15th. Ryan signed it on March 18th.

**March 19, 2019**: Masias's resignation became effective per her resignation and release agreement.

**March 21, 2019**: Masias met with Ryan, Coats, and Rottman and pitched her proposal for a leadership training contract with the Department.

**March 22, 2019**: Ryan placed the SCAO's Director of Financial Services on administrative leave.

**March 25, 2019**: Ryan signed the Sole-Source Determination memo approving a contract with Masias.

**March 29 - April 5, 2019**: Ryan, Masias, and SCAO legal staff drafted a contract for Masias.

**April 8, 2019**: Ryan sent contract to Masias. Masias signed it.

**April 11, 2019**: Ryan signed the Masias contract on behalf of the Department.

**April 19, 2019**: Anonymous letter received by the Department and the Office of State Auditor alleging occupational fraud at the Department.

**May 31, 2019**: The SCAO Controller retired.

**June 3, 2019**: Ryan signed the Masias contract a second time.

**July 15, 2019**: Coats and Rottman were told for the first time that in May 2017 Masias surreptitiously recorded a conversation with Rice.

**July 17, 2019**: The Department terminated the Masias contract.

**July 18, 2019**: Ryan resigned.

**July 19, 2019**: Brown resigned.

68

# Appendix 18

*Statement from Chief Justice Brian D. Boatright Regarding ILG investigation and assessment of Colorado Judicial Branch workplace culture,* **July 11, 2022; Elizabeth R. Rita and Anne R. McCord, Colorado Judicial Branch Investigation Report and Assessment of Workplace Culture, July 11, 2022.**

# Supreme Court of Colorado

2 East 14th Avenue
Denver, CO 80203
(720) 625-5410

BRIAN D. BOATRIGHT
CHIEF JUSTICE

## SUPREME COURT OF COLORADO

### OFFICE OF THE CHIEF JUSTICE

## Statement from Chief Justice Brian D. Boatright regarding ILG investigation and assessment of Colorado Judicial Branch workplace culture

Today we make public the full independent report prepared by Investigations Law Group, LLC,   an organization independently selected by leaders from the executive and legislative branches to accomplish three objectives:

> *First*, to investigate the informal, unsigned list of talking points allegedly prepared by former Human Resources Director Eric Brown in 2019, describing alleged misconduct by judges and other Judicial Department employees.

> *Second*, to conduct a comprehensive assessment of the Judicial Branch workplace environment, focusing especially on any issues of sexual harassment and gender discrimination.

> *Third*, to propose improvements based on its assessments and investigations.

In February 2021, I told the legislature that the Colorado Judicial Branch faced a crisis, and I committed to changing our culture for the better.  To do that, we asked for an independent, unvarnished assessment of where we stand.  And we got it.

ILG's findings are simultaneously clarifying and sobering.  They highlight the considerable progress we've already made, while underscoring that we still have much work to do.

To be sure, there are positives in the investigation's assessment of Branch culture:

> ***From Report Page 77*** *… "Given the nature of our project for the CJB [Colorado Judicial Branch], we expected that there would be more concerning or negative feedback provided by the voluntary interviews. As will be highlighted in the below sections, the work environment at the CJB is overall quite positive."*

> ***From Report Page 79 …*** *"Overall, the survey results indicated that the Colorado Judicial Branch is a positive place to work. A majority, 72% of participants, said they were satisfied with their job at CJB, with satisfaction level for Court Services at 76% and Probation Services division at 67%. Overall, satisfaction for appointed officials was higher, at 89% (47% reported being 'very satisfied' and 42% reported being 'satisfied')."*

> ***From Report Page 88 …*** *"We reviewed the statistics on promotions and separations for men*

> *versus women at the CJB between the years 2017 and 2021 and did not find evidence of systemic gender bias. In fact, statistics showed that women have been promoted at the same rate as men since 2019."*

But in continuing to move forward, we must also take to heart all of ILG's findings, beginning with its thorough investigation of Brown's list.

On the one hand, ILG's findings clearly refute the often-reported assertion that alleged misconduct was systematically ignored or covered up by the Branch:

> ***From Report, Page 9*** *… "First, every one of these instances was responded to in some way by the Judicial Branch. In most instances, Ms. Masais and Mr. Brown were the individuals responding. They investigated many of these allegations and in some cases, recommended that actions be taken. These were not instances where misconduct was ignored without some response."*

And ILG's findings also place events in context, by noting the size of the Judicial Department and the period of time at issue:

> ***From Report, Page 9*** *… "Finally, it should be noted that the Eric Brown List contains allegations that span more than 20 years of history at the Judicial Branch and encompass 22 separate Judicial Districts, containing more than 4,000 employees and judicial officers. Sixteen allegations of wrongdoing over 20 years and in the context of thousands of employees is not a statistically significant number. It, on its own, does not suggest a systemic problem of harassment within the Branch."*

At the same time, however, ILG is rightly critical of how some of these complaints were handled over those two decades. The firm's findings echo those of the separate Troyer investigation into the Masias contract award:

> ***From Report, Page 9*** *… "…My investigations revealed some problems in how some of these matters were handled (or not handled) by the Judicial Branch. There are instances where proper investigations were not done, or discipline that was recommended was not proportionate, or that other failures of process and accountability occurred."*

ILG's report spans more than 130 pages.  I offer here a synopsis, organized in the order that the incidents appeared on Brown's much-publicized list.  (ILG's report instead breaks out the allegations based on their nature and origin:  *Judicial, Finance Department, Probation Department*.)

While this synopsis provides a brief overview (with each allegation from the list in bold followed by ILG's core conclusion), I strongly encourage you to read the entire investigation summaries contained in ILG's report, as they provide important detail and insights to consider as we build an enhanced culture of governance throughout the Branch.

2

## Synopsis of Investigations into the 16 Allegations on Brown's List

1. **"No investigation was held when the anonymous allegations of sexism and harassment were made against the Chief Justice and [an IT leader]. She was told to destroy the letter."**

   There was such a letter in 2017, but the allegations in the letter are <u>not substantiated</u>. Even so, the allegations should have been investigated at the time.

   There is no evidence that anyone was directed to destroy the letter, but leadership either discounted or destroyed the letter.

2. **"Judge sent pornographic video over judicial email . . . ."**

   The allegation that a judicial officer transmitted pornography in 2002 to another judicial officer over judicial email is <u>not substantiated</u>. There was no discipline imposed, but nothing seemed to warrant discipline.

3. **"Negotiated a release agreement with a law clerk who accused her COA judge of harassment in order to keep the COA judge 'safe' during the Supreme Court Justice selection process per the Chief Justice."**

   The allegation that a settlement agreement was negotiated to keep the judge "safe" during the nomination process is <u>not substantiated</u>.

   The allegation that an agreement was negotiated or concealed by the Chief Justice or anyone else is also <u>not substantiated</u>.

   HR and court administration failed to properly address other concerns raised by the clerk. Those concerns were unrelated to the <u>unfounded</u> allegation of harassment by the judge.

4. **"Judge exposed and rubbed his hairy chest on a female employee's back; no action taken against the judge; Judge is currently being considered for the Senior Judge Program."**

   This incident occurred fifteen years ago, in 2007. It was reported to the Judicial Discipline Commission, which imposed a sanction it deemed appropriate. The judge's conduct warranted more serious consequences.

   *(Note: Although the judge served in the Senior Judge Program for two years, his contract was terminated.)*

5. **"Current pending EEOC complaint against two justices."**

   ILG was instructed not to investigate this matter because it was in litigation.

   *(Note: In February 2022, a federal district court judge dismissed the complaint, finding "definitively no" evidence of illegal discrimination.)*

6. **"Mindy recommended to [a chief judge] that it was in the best interest of the Branch to terminate [an employee] due to the sexual relationships he had with his staff. [The chief**

3

**judge] stated that Mindy needed 'to leave the courthouse and drive slowly out of town.'"**

*(Note: ILG concluded that this allegation is related to the next one.  Therefore, ILG considered them together.)*

Masias, then the SCAO HR director, investigated this matter approximately twelve years ago, when the complaint was first made.

The chief judge was extremely unhappy with how HR handled the investigation, believing the investigation took too long and was unnecessarily disruptive of court operations.

HR ultimately concluded that the underlying allegations of sexual misconduct were not substantiated.  The chief judge acknowledged that he may have told Masias that she "was not welcome in [his] district," reflecting his issues with her investigation methods.

7. **"Was told by chief judges she needed to seek their permission to conduct harassment and discrimination investigations in Districts . . . ."**

    HR was directed to notify the judicial districts before commencing investigations there, or visiting for any other reason, but the allegation that this directive was made to dissuade proper complaints is <u>not substantiated</u>.

8. **"Evidence a financial manager accessed personal information on various leaders . . . for no business reason; no discipline taken on him and he was promoted less than two years later to deputy director."**

    ILG <u>substantiated</u> this allegation after considering competing statements about this twelve-year-old incident.

9. **"Financial manager investigated twice for harassing behavior.  Receives more staff and a better office.  No mention of the complaints in his 2017 performance appraisal."**

    HR investigated alleged harassing behavior by this manager in 2015, 2017, and 2021. HR found no sexual harassment, but ILG <u>substantiated</u> this allegation in all respects and concluded that HR and Finance Division management have been reluctant to take claims against this manager seriously.

10. **"Director of FSD [Financial Services Division] complained about not working 'even banker's hours' by staff.  Staff of other division follow him to his bar, home, and track that he does not place time in PTO system and is seen at home at 3:00 pm often or at bar."**

    These allegations were <u>not substantiated</u>, and ILG expressed concern that HR's investigation of the allegations was inadequate, biased, and possibly retaliatory based on the director's role in events culminating in Masias's resignation.

    The "bar" was run by the director's brother, and the director received permission from the then State Court Administrator to help his brother with the books for the bar on the director's time.

4

11. **"CPO [Chief Probation Officer] takes picture of penis and sends to vendor; no disciplinary action taken; CPO has sex with a vendor on state time and on state property who later complains she felt she had to in order to keep her job; no disciplinary action taken."**

> The probation officer in question, before his promotion to CPO, shared such a photo close in time to the dissolution of a long-term, consensual relationship with the vendor in 2012, but the allegation is misleading because this was not a workplace situation.

> HR, through Masias and Brown, investigated the matter at the time. They concluded that the relationship was consensual and that the probation officer did not have a position of authority over the vendor.  Therefore, no discipline was imposed.

> ILG found that it is not substantiated that the probation officer had sex with the vendor on state time or on state property.

12. Consolidated into 11.

13. **"Court Administrator accused of asking an employee to backdate a document, no disciplinary action taken."**

> ILG tried to investigate this but found no information.

14. **"Director of Court Services and FSD Director."**

> ILG found this to be an incomplete statement that could not be investigated.

15. **"CPO directing all staff to swat a female on the backside, no disciplinary action."**

> The incident in question occurred during an all-hands meeting in 2018.  The CPO joked about everyone spanking a female probation officer for leaving them to work in another district.  The female probation officer said she thought it was a distasteful joke.  No one swatted her.

> HR investigated.  There was no recommendation for discipline.

16. **"Report from a Justice about why MM was not selected for the position:  Insinuates the entire Supreme Court made the decision she did not get the SCA position based on her gender."**

> The allegation that Masias was not selected for promotion to State Court Administrator because of her sex and/or sex stereotyping is not substantiated.

> At the same time, however, the process by which Chris Ryan received the job was highly irregular.

## A Path for Continued Change, Transparency & Accountability

Again, ILG's 360-degree-view of Branch culture reiterates that the Colorado Judicial Branch is largely a good place to work, that we are all working hard to do the right thing. This is also the reality that I hear from judges and staff across the state every day.

But the findings also underscore an urgency to continue building on the improved reporting and oversight

we've implemented over the last 19 months, beginning with new leadership throughout the State Court Administrator's Office (SCAO).

This investigation provides the Branch with a roadmap to remedy deficiencies:

> **From Report Page 120** … *"Our work in the Colorado Judicial Branch revealed several primary weaknesses in the workplace:*

> - *The absence of shared cultural values, to which everyone is held accountable, as the driver for decisions;*

> - *Insufficient avenues for confidential and safe reporting;*

> - *Broadly stated fears of retaliation, and concerns that nothing is done in response to complaints of misconduct;*

> - *A need for more transparency and accountability; and*

> - *Insufficient (and insufficiently modern) training on workplace conduct issues.*

Going forward, let me be clear about two things:

First, harassment and retaliation will not be tolerated, and everyone — appointed officials, senior executives and staff — will be held accountable. My colleagues on the Colorado Supreme Court and I, along with SCAO leadership, are totally committed to this, and we will continue to put the necessary tools in place to accomplish this.

Second, the ILG report reinforces the Troyer investigation findings that the Branch must "*improve the legitimacy of the process for handling complaints*."

As I said then, it isn't enough to simply have the processes of accountability in place. Our judges, their staffs, probation department, the legal community, elected officials, regulators and Coloradoans who rely on our system of justice must know how we deal with allegations of misconduct.

They must have confidence that the system works, because if they don't it isn't working.

To that end, I have asked Justice Monica Marquez, who will be Colorado's next Chief Justice, and State Court Administrator Steven Vasconcellos to lead an assertive *Colorado Judicial Branch Workplace Culture Initiative*. While they will be leading this effort, the rest of the court and I will be laboring oars as well. Together, we will navigate the choppy waters we find ourselves in.

We will begin with a comprehensive review of the specific recommendations made by the two independent investigation teams to determine how we can further implement their suggestions.

More information will be forthcoming, and we will be involving many people across the department.

We thank ILG for conducting this investigation. And I thank all of you for your continued dedication and hard work for the people of Colorado.



# COLORADO JUDICIAL BRANCH INVESTIGATION REPORT
# AND ASSESSMENT OF WORKPLACE CULTURE

## INVESTIGATIONS LAW GROUP, LLC

*Elizabeth R. Rita, Esq.*
*Anne R. McCord, SPHR, SHRM-SCP, PI, AWI-CH*







# July 11, 2022
## Submitted by Investigations Law Group, LLC

*Individual Allegation Investigations:* Elizabeth Rita
*Culture Assessment and Recommendations:* Anne McCord, Jennifer Volmer, and Elizabeth Rita
*Voluntary Interview Team:* Emily Smith, Kim Adamson, and Elliot Wertheim
*Proofing and Analyst Team:* Autumn Kassel, Claire Sweetman, and Abigail Castellano

*www.ilgdenver.com*

# Table of Contents

**OBJECTIVE & INTRODUCTION**                                                                    **5**

**ACKNOWLEDGEMENT**                                                                              **6**

**INVESTIGATION REPORT SUMMARIES**                                                               **7**

  **Report Summaries of Allegations**                                                  **10**

      *Allegations of Judicial Misconduct (1-4, 6, 7, and 16)*     *10*

    **Allegation One: Anonymous Letter**                                       **10**

    **Allegation Two: Pornographic Images**                                    **16**

    **Allegation Three: Release Agreement with Law Clerk**                     **20**

    **Allegation Four: Hairy Chest**                                           **27**

    **Allegations Six and Seven: "Leave the Courthouse and Drive Slowly Out of Town" and Requirement That HR Seek Permission from Chief Judges Prior to Investigating Misconduct in their Districts**  **32**

    **Allegation Sixteen: Mindy Masias Not Selected for State Court Administrator Position Because of Her Sex**  **40**

      *Allegations of Finance Department Misconduct (8-10)*          *47*

    **Allegation Eight: Financial Manager Impermissibly Using Accurint**       **47**

    **Allegation Nine: Financial Manager Investigated Twice for Harassment**   **52**

    **Allegation Ten: Director of FSB Complained of "Not Working Even Banker's Hours"**  **59**

      *Allegations of Probation Department Misconduct (11 and 12)*   *69*

    **Allegations Eleven and Twelve: CPO Sending Penis Pictures and CPO Having Sex on State Time and on State Property**  **69**

    **Allegation Fifteen: Chief Probation Officer Instructing All Staff to Swat Female on the Backside**  **73**

**ASSESSMENT OF THE WORKPLACE CULTURE IN THE COLORADO JUDICIAL BRANCH**                           **76**

  **Report of Data on Workplace Culture**                                              **76**

    *The Survey*                                                             *76*

    *The Interviews*                                                         *77*

    **Culture Feedback from Voluntary Interviews**                            **78**

*Summary of the Colorado Judicial Branch Workplace Assessment*    *79*

*Survey Results by Judicial District*    *91*

**RECCOMENDATIONS**    **120**

**Recommended Structural Changes**    **122**

*Office of People and Culture*    *122*

*Next Generation Policy*    *124*

**Diversity, Equity, and Inclusion**    **126**

**Safe Reporting**    **127**

**Accountability and Transparency**    **128**

*360 Reviews on an Annual Basis for Chief Judges*    *128*

*Biannual Judicial District Surveys*    *128*

*More Inclusive Data Considered and Made Public in Judicial Performance Evaluations*    *128*

*Formalized Criterion for the Commission on Judicial Discipline Regarding Public Proceedings*    *129*

**Immediate Support and Resources**    **130**

**SIGNATURES**    **131**

# OBJECTIVE & INTRODUCTION

On April 22, 2021, the Colorado Judicial Branch issued a Request for Proposal ("RFP") seeking bids from independent investigators to examine allegations of misconduct at the Branch. These allegations included sixteen separate misconduct allegations, general allegations of a hostile work environment for women, and an allegation related to the procurement of a contract for services, awarded to former Chief of Staff, Mindy Masias.  Investigations Law Group (ILG) submitted a bid in response to the RFP and was chosen on November 3, 2021, to conduct the investigation of the individually listed instances of alleged misconduct, and the allegations of a hostile work environment for women.  The deadline for completing the work was initially set for April 15, 2022 but was extended to July 29, 2022 to accommodate the volume of interviews necessary to accommodate everyone who wanted to meet with us.

The scope of ILG's work was threefold.  First, ILG was commissioned to investigate each of the allegations raised in a two-page document prepared by former Human Resources Director Eric Brown and published in a Denver Post piece dated February 2021 by David Migoya.[1]  These allegations included sixteen separate instances of alleged misconduct by judges, finance division employees, and probation division employees.  Thirteen of these sixteen allegations were separately investigated and individual Report Summaries, corresponding to these allegation, follows in the first substantive section of this Report.[2]

The second component of ILG's work was to conduct a comprehensive assessment of the workplace environment in the Judicial Branch, with a special focus on issues of hostile work environment based on sex / gender.  We approached this component of the project using a holistic set of tools, including a culture survey that was sent out to each of the 4,133 employees in the Judicial Branch across Judicial Districts and Divisions.  In addition to the culture survey, we conducted interviews with individuals who reached out to voluntarily share additional information relating to the workplace culture.  We also gathered information about best practices in Judicial workplaces around the country and used that to inform our assessment of the judicial workplace here in Colorado.

Finally, we were asked to propose recommendations for improvement based upon the data we gathered in our culture assessment, as well as in our investigations.  These recommendations, informed by our professional experience, were also to include consideration of the unique nature of the Judicial workplace as an organization. We have examined best practices in other Judicial Branches around the country and incorporated ideas from them, as well as from the many internal stakeholders we met with who expressed ideas about ways to improve the Judicial workplace in Colorado.

---

[1] *See Migoya, David: "Colorado Supreme Court Releases memo citing examples of sex-discrimination, judicial misconduct that led to alleged contract for silence," The Denver Post (February 9, 2021), available at: https://www.denverpost.com/2021/02/09/colorado-supreme-court-memo-sex-discrimination-harassment-lawsuit/*
[2] Three allegations were not investigated, as described below.

# ACKNOWLEDGEMENT

We would like to acknowledge the many members of the Judicial workplace who took the time to participate in our investigations, our survey, and our voluntary interviews. We interviewed front-line employees and staff members, directors, and employees in all but one of the Branch's 24 Judicial Districts and divisions.  We interviewed Judges, Chief judges, Justices, staff, and appointed personnel. We received thoughtful feedback to our questions, and evidence that allowed us to reach firm findings in nearly all the separate investigations that were part of this project.

We would also like to thank our team at ILG who worked tirelessly to ensure that this project was done thoroughly, respectfully to all participants, and mindfully in terms of time and resources. None of this would have been possible without your assistance.  We thank you.

6

# INVESTIGATION REPORT SUMMARIES
*Elizabeth R. Rita, Esq.*

The individual Report Summaries of each of the separate issues we were tasked to examine follows in the next section of the report. Each investigation had elements of its own methodology – or set of steps that were followed to conduct the investigation. However, some aspects of the methodology were consistent across all of the investigations:

## A.    Methodology

The allegations that we investigated come from a document drafted in 2019 by former Human Resources Director, Eric Brown, containing a list of sixteen (16) distinct allegations of misconduct in the Judicial Branch ("the Eric Brown List"), as well as general allegations of a discriminatory workplace for women.[3] Mr. Brown stated to colleagues at the time that the source of these allegations was former Chief of Staff, Mindy Masias. Mr. Brown verbally presented at least some of these allegations to the presiding Chief Justice and SCAO leadership in a meeting in late December 2018 or early January 2019.

Over the course of this project, one hundred sixty-eight people were interviewed, seven people submitted substantive written statement in lieu of interviewing, and at least twenty witnesses were interviewed two times (or more). Some individuals were identified as potential witnesses and were affirmatively contacted for interviews. Others reached out themselves and asked to participate in the process. We accommodated every witness who requested an interview.

I reached out to both Ms. Masias and Mr. Brown,[4] via their counsels, to request interviews to obtain additional information on all the allegations in the Eric Brown List. Both Ms. Masias and Mr. Brown declined to meet.[5]

We collected and reviewed hundreds of documents for these investigations, specific to each individual matter. Some materials were provided by the Judicial Branch, some materials were provided by witnesses, and I searched for materials myself – both from witnesses I met with and in a database containing thousands of documents that have been gathered and produced for this and other investigations. Several allegations were decades old, making document gathering more difficult. Other allegations were well documented.

Pursuant to the contract for services, ILG committed to finishing work on all 16 investigations and the workplace assessment project no later than July 28, 2022. All investigations were completed, and all work was done prior to that deadline.

I prepared full reports, as well as Report Summaries, for 13 of the 16 separate allegations. Three allegations were not investigated for the following reasons:

---

[3] Eric Brown List.

[4] Where "I," "me" or "my" is used in this section of our report, it is intended to refer to Ms. Rita.

[5] Mr. Brown's counsel directly declined a meeting. Ms. Masias's counsel did not respond to schedule an interview. I provided a one-month window during which counsel could reach out to schedule, and informed counsel I would interpret a non-response as a decision to decline the interview. I did not receive a response to schedule a meeting.

- Allegation 5: "Current pending EEOC complaint against two Justices":  ILG was directed to remove this item from the scope of work, because the matter was in current litigation at the time we were retained.  The matter was resolved during the pendency of our work.

- Allegation 13: Court Administrator accused of asking an employee to backdate a document, no disciplinary action taken":  We attempted to investigate this allegation but could find no data on it.  Our work on this matter was hampered by the fact that the allegation contained little information, and no one we interviewed knew what event or events it referred to.

- Allegation 14: Director of Court Services and FSD Director":  This appears to be an incomplete statement, and as such it was not investigated.

As part of our agreement, we agreed to produce a final work product suitable for public disclosure.  Accordingly, I created Report Summaries from the full reports for each investigation I conducted.  These Report Summaries retain the important substantive data I relied upon in reaching my findings, but present the data without as much quotation and in a more abbreviated format.  This was done to ensure that confidential information, such as material that would identify witnesses or disclose matters prohibited from disclosure by state law or privilege, could be protected. This was also done so that the results of the investigation could be more easily read and digested than would be the case with the full reports, some which exceed 20 pages in length.  Any data that the Judicial Branch considers to be confidential or privileged information, and that I included in my Report Summaries, may appear below as redacted portions within my Report Summaries.  The Judicial Branch was responsible for any such redactions pursuant to its independent assessment of confidentiality and/or privilege.

Consistent with my role as an impartial third-party investigator, I determined the list of witnesses, the documents, and any other data required to investigate each separate allegation.  No one at the Judicial Branch attempted to, or in fact did, influence or steer the fact-finding or preparation of my full reports or Report Summaries. While the Judicial Branch was provided the opportunity to identify factual errors or typographical issues prior to reports and report summaries being finalized, this review was explicitly limited to proofing and accuracy.  Matters of substance, style and ultimate conclusions were not reviewable and were not revised.

I weighed and considered evidence on both sides of each issue to reach findings in each case.  Because Report Summaries are, by definition, not full reports, they do not contain all the evidence I gathered and evaluated in each case.  They summarize the material evidence and contain my analysis of that evidence, and my findings.

In reaching my findings, I used a preponderance of the evidence standard. This means that an allegation was substantiated if it was more likely than not to have occurred. Conversely, an allegation was not substantiated if it was less likely than so to have occurred.

**B.    Overview of the investigations of the Eric Brown List of misconduct**

The misconduct set forth in the Eric Brown List falls into three categories:  allegations of Judicial misconduct; allegations of finance department employee misconduct; and allegations of probation

8

department employee misconduct. I investigated each set of facts as a separate matter, and individual Report Summaries of that work follows, under these three categories. While each matter is unique, there were some important patterns that arose from this assignment.

In each of the 13 matters I individually investigated, there was at least a grain of truth in the allegation, or the allegation was substantiated on some level. In other words, these were not fictitious events that my investigation disproved.

However, in many of these matters, I also found two important additional things to be true. First, the majority of these instances was responded to in some way by the Judicial Branch. In most instances, Ms. Masias and Mr. Brown were the individuals responding. They investigated many of these allegations and in some cases, recommended actions to be taken (or in some cases recommended no personnel action). These were not generally instances where misconduct was ignored without some response. In many cases, there is significant documentation in the files about what happened. In one instance, the Colorado Commission for Judicial Discipline was notified of the situation, became involved, and acted to assess the situation and impose discipline.

Second, many of the allegations leave out important context, or misstate some facts. The allegation may say, for instance, that "no discipline occurred," but leaves out the fact that HR did not recommend discipline or the situation did not really merit it. For this reason, the ultimate findings in most of these cases were more nuanced than simply findings that the allegation was – or was not – substantiated.

Finally, it should be noted that the Eric Brown List contains allegations that span more than 20 years of history at the Judicial Branch and encompass 24 separate Judicial Districts, containing more than 4,000 employees and judicial officers. Sixteen allegations of wrongdoing over 20 years and in the context of thousands of employees is not a statistically significant number. It, on its own, does not suggest a systemic problem of harassment within the Branch.

That said, my investigations revealed some problems in how some of these matters were handled (or not handled appropriately) by the Judicial Branch. There are instances where proper investigations were not done, or discipline that was recommended was not proportionate, or that other failures of process and accountability occurred. I point these problems out, directly, in my Report Summaries, below.

## Report Summaries of Allegations

### *Allegations of Judicial Misconduct (1-4, 6, 7, and 16)*

### Allegation One: Anonymous Letter

> *"No investigation was held when the anonymous allegations of sexism and harassment were made against the Chief Justice and [an IT leader]. She was told to destroy the letter."*

### A.    Methodology

I determined that these events occurred in 2017 when an anonymous letter appeared in the mailboxes of the Justices of the Supreme Court.  The letter included allegations of sexism and harassment from the Chief Justice and allegations of poor leadership by an IT leader.  These allegations were not investigated by HR or anyone else.  My investigation did not corroborate that Ms. Masias or any other "she" was told to destroy the letter.

I interviewed fourteen (14) people with knowledge about this situation.  These included the former Chief Justice who was the subject of the letter; the IT leader whom the letter was about; other members of the Supreme Court at the time; attorneys from Judicial who had recollections of this situation; the State Court Administrator at the time of these events and his predecessor; and several people who were present at the IT Standing Committee Meeting in question.

There were almost no documents about these events. I sought out documents from SCAO's HR department, the Judicial Legal Department, and members of the Supreme Court at the time. I also personally searched through databases of materials produced in response to subpoenas issued in related proceedings. There are no copies of "the letter," no HR records and no investigation or other "files" on the matter.  There are several records relating to IT Standing Committee Meetings, which became relevant to these allegations.

I submitted a full report on this investigation to counsel for the Judicial Branch on May 10, 2022. On May 24, 2022, I was directed to prepare Report Summaries on all matters for public release.  I completed this Report Summary pursuant to this requirement.

### B.    Summary of Material Evidence

#### *1.  The Anonymous Letter*

In August 2017,[6] each of the sitting Justices on the Supreme Court received an anonymous letter in hard copy form. The letter was delivered to their mailboxes at the Supreme Court. According to witnesses who remember this letter, it contained allegations against the Chief Justice and a member of leadership in the IT Department. The allegations arose in large part from two IT Standing Committee Meetings in January and February 2017, both of which the Chief Justice attended. Witnesses (and perhaps the allegation) have conflated these two meetings into a single meeting,

---

[6] One Justice remembered getting the letter right after returning from a family vacation that ended on July 15, 2017. This person's specific timeframe assisted in determining the timeframe of these events.

10

but the minutes set forth an overview of what occurred at each meeting:

[January 2017 Meeting Minutes]:  . . . [during presentation on Two-Factor Authentication] The Chief Justice expressed strong concern that several judges have told her that technology has made doing their jobs more and more difficult. She added that the more complicated we make it to sign-on, the less likely that they will do it when working from home. She said she believes that productivity has reduced as these technological demands have increased.

[February 2017 Meeting Minutes]:  . . . [The Chief Justice] asked what the history of the committee was and who set the priorities for ITS until now. [The State Court Administrator] answered that he worked with and set the priorities for ITS but with so many groups with opposing agendas, prioritizing projects can be difficult. The Chief Justice suggested that the members of the committee introduce themselves and share their reason for being on it.

Several of the (then) Justices had a strong recollection of the letter and what it contained. Primarily, the letter complained about the Chief Justice's remarks at both meetings.  "It mentioned [the Chief Justice] being rough on IT staff."  It said that she "focused her ire on the women in the room in an IT meeting where [the Chief Justice] was upset."  One Justice described it as "a hostile, screaming letter."[7]

There were also allegations relating to other sex-based misconduct in the letter.  It contended that the Chief Justice "appointed more men than women to chief judge spots," that she was holding women back in leadership opportunities, and that she had chosen a man instead of a woman for the State Court Administrator's position.  It also alleged that a female clerk left because she felt mistreated.

Regarding the IT leader, witnesses remember that the letter complained he was a poor leader and "incompetent." However, the gist of the letter was focused on the Chief Justice.

The Chief Justice did not have a strong memory of the letter but does remember an IT meeting she described as "disruptive."  At the meeting she recalled asking people "why they were there," and whether they wanted to work on the tasks the IT group was facing.

### 2. *The IT Standing Committee Meetings and Other Concerns Noted in the Letter*

Five people present at the IT Standing Committee Meetings had detailed recollections of what transpired.  They remember the Chief Justice being "so angry at our team," and asking people why they were on the committee.  One person remembered the Chief Justice interrupting a woman employee who was presenting on "2FA"[8] to tell her "You are focusing on the wrong things.  You need to make our judges' jobs easier, not harder."

Aside from that example regarding the 2FA presentation, none of the witnesses from the meetings stated a belief that the Chief Justice focused her frustration on the women in the group more so than the men.  In fact, they all shared the Chief's frustration with the direction and leadership in

---

[7] Throughout this report, I cite to some witness statements in quotations.  These remarks are taken from my notes our meetings.  While my notes are not verbatim transcripts, they are materially accurate records of what was said.
[8] Two Factor Authentication.

11

the IT group.  As one individual put it, "I found her frustration something that I resonated with in terms of being frustrated at not understanding, are the courts driving technology or is technology driving the courts?"  This person continued, "I actually thought the meeting was useful and it really did spur some structural and leadership changes at ITS."  The Chief's remarks "were not personal," but were her "trying to motivate people."  When I asked one witness if they thought the Chief was focusing more on the women in the group than on the men, they said, "That is ludicrous."  Another person said, "I thought a lot of it was pointed at the [male IT leader] . . . and honestly, she was right."

This frustration with the performance of the IT group is corroborated by draft memoranda I found, showing that the State Court Administrator was contemplating comprehensive written performance plans for at least two leaders in the IT department later in 2017. While these lengthy memoranda are not signed and do not appear to have been finalized, they set forth four single-spaced pages of criticisms of the performance in the IT group. These criticisms included a "lack of a clear vision for the future of our case management system," a "lack of forecasting regarding the sustainability of certain programs," a "lack of vision and long-range plans," and poor communication.

With respect to the other concerns in the letter, I found no corroboration for allegations that the Chief deprived women colleagues of opportunities, mistreated women colleagues specifically, or purposefully chose more men than women for chief judge roles.

No one I interviewed provided examples indicating that the Chief Justice deprived women in leadership of opportunities. Several witnesses said that she treated her women clerks well and her favorite clerks were women. I could not find evidence to corroborate this portion of the allegation.

Most of her colleagues – men and women – described the Chief Justice as difficult to work with at times. However, no one I interviewed said they observed her being hard only on women colleagues. Instead, men as well as women described receiving negative attention, from the Chief, at times. The Chief Justice was described as having extremely exacting standards, working quickly, and being tough on those who did not (or could not) act as decisively and quickly as she wanted them to. Her demeanor was described as blunt, direct, and harsh at times in expressing frustration or impatience with both men and women colleagues.  Men and women gave specific examples where they felt the brunt of this kind of attention from the Chief.

With respect to her decisions to appoint chief judges, records show the Chief Justice appointed three men and one woman to chief judge positions during her tenure. As an initial matter, it should be noted that the roster of individuals who are interested in the chief judge position is relatively slim. The position is limited to those judges in a District who express an interest in serving. The position involves significant additional work – taking on responsibility for all the administration of the District, attending meetings, and being responsible for budget and personnel – for no additional pay. More than one person I interviewed identified this position as one of the hardest jobs in the entire Branch. For these reasons, people were not universally enthusiastic about being considered for this job.

In every appointment she made, the Chief Justice reached out to the Districts for feedback.  She sought feedback from other judges, professional staff, and employees in each District.  This

12

feedback was a heavy component of each choice and in one instance, the Chief Justice appointed a judge who was not her pick because he was the clear preference of the District personnel.

In the available records and witness memories, I found two women candidates who were interested in chief judge roles but who were not chosen by the Chief Justice. One woman judge was described by the State Court Administrator, who assisted with the process at the time, as not having as much support from the District as the successful male candidate did. The second woman candidate was not chosen because she was under a judicial performance management plan at the time. Of the seven judges who expressed interest in the last two picks the Chief made, six were men and one was a woman. The Chief chose one man in the District where no women applied and selected the woman for the second open position she filled.

All these decisions involved a significant degree of collaboration between the Chief Justice, her administrative staff, and the Districts themselves. No appointment was made without soliciting input from the District where the new chief judge would serve. The evidence suggests that this feedback was of primary importance to the Chief Justice in these decisions.

### 3. *Response to the Letter*

At some point, Ms. Masias and the HR department were made aware of the letter, but it is not clear how this occurred. She and Mr. Brown reached out to the IT leader named in the letter to ask him about it. They "handed [him] the letter" and asked him if he knew who had written it. He had never seen it before, so answered that he did not know who wrote it. The IT leader did not have a strong memory of what the letter contained but like other witnesses, remembered that it focused on an IT Standing Committee Meeting (or Meetings) and the Chief Justice's remarks to the IT group.

Four Justices remembered that there was some discussion of the letter among the Chief Justice and Associate Justices after the letter was received. "[The Chief] got us together to talk about it. I don't remember very much. . . . I am pretty sure she presented this and said, 'What do you think?' I think it was agreement of the Court that there was not anything there."

Ultimately, there was no investigation conducted or any other response to the letter. As one Justice recalled, "We left it with the Chief Justice to determine the response. This was consistent with our practice at the time." Another remembered, "[A]s was typical at the time, we deferred to the Chief as to any response."

With respect to the allegation that Ms. Masias was directed to destroy the letter, no one had any direct evidence on this point. One Justice recalled, "[The letter] went to everyone including the Chief. Mindy was made aware of it . . . [the Chief Justice] might have instructed Mindy to throw it away because the Chief Justice was dismissive of it, not that she felt there was anything to it. To the contrary. It was someone overreacting to her speaking tough with IT." Another Justice said, "[The Chief Justice] was dismissive of the letter and may have conveyed the same to Mindy."

An attorney in the Legal Department remembered speaking to someone at the time (they could not remember who) about a possible investigation of this matter. This attorney recommended that no

13

investigation be conducted.  "These were random allegations I heard about, and the Chief Justice was not investigated because there was nothing to investigate. I just remember it was anonymous, nothing factual, that's all I remember. I told this person, 'You can't investigate a complaint with no facts.'"

I asked the Justices (both current and former) if they believed the letter ought to have been investigated. With the benefit of hindsight, many said they wished it had been managed differently. As summarized by one Justice, "In a general view, I don't think you should ask the person who is accused to investigate themselves."  Another said, "I wish [the Chief Justice] had taken it more seriously."

## C.    Analyses and Finding(s)

### 1.  Analysis

The Judicial Branch anti-harassment and Anti-Discrimination policy at the time of these events reads:

> (4) Investigation. Reports of harassment and discrimination from employees warranting an investigation **shall be referred to the Human Resources Division of the State Court Administrator's Office for investigation**. In some instances, an initial inquiry will be completed as a primary review by the Human Resources Division to determine whether there is cause to conduct a full investigation. A full investigation, at a minimum, will include conferences with the complainant, the alleged perpetrator, and any witnesses to the incident. Any party involved in a harassment complaint may submit any documentation they believe to be relevant to the matter at issue to the investigating authority.

(Emphasis added.)

My investigation revealed evidence that corroborates many elements of this allegation. It is corroborated that members of the Supreme Court each received a hard copy anonymous letter in their mailbox in the summer of 2017. It is substantiated that it contained allegations of sexism and harassment by the sitting Chief Justice and to a lesser extent, a leader in the IT department. It is substantiated that the complaint arose from the Chief Justice's actions during two IT Standing Committee meetings in early 2017. At these meetings, the Chief Justice directed frustration at the group for their failure to meet the needs of their primary clients – the courts. This includes one example of the Chief stopping a presentation by a woman on 2FA. It is also substantiated that no investigation of the allegations in the letter occurred, despite Branch policy requiring one. Instead of treating this letter as a complaint that required an investigation, it was largely discounted. Matters were left to the Chief Justice—the person complained about— to manage.

Conversely, I did not find evidence to corroborate that the Chief Justice likely mistreated anyone, whether in the IT meetings or elsewhere, because of sexism or unlawful harassment. While witnesses described the Chief Justice's frustration with IT and her brusque demeanor, no one stated a belief that her behavior was focused on anyone because of sex.  The volume of evidence suggests that the Chief could be direct and brusque with men as well as women.

In addition, the evidence suggests that filling the chief judge roles is not easy and there is not a

14

wide variety of candidates to select from.  I found that the Chief Justice employed a collaborative process in making her appointments to chief judge positions, heavily weighing District feedback. There is insufficient evidence to suggest that there was any sex-based pattern to those choices.

There is likewise insufficient evidence to corroborate the allegation that Ms. Masias was told to "destroy" the letter.  That said, it is likely that she received a clear message that the Chief was dismissive of the letter and what it contended.  Certainly, no one told Ms. Masias to investigate this letter or treat it as a serious matter.

This dismissiveness leads to my final point. Regardless of whether the Justices found the allegations credible on first reading or not, the letter should have been investigated.  It set forth an employee complaint of potentially unlawful behavior by the Chief Executive of the Branch.  The Branch's policy clearly states that such matters "shall be referred to the Human Resources Division of the State Court Administrator's Office for investigation."  Even without such a clearly worded policy, the decision not to investigate this matter fails to meet basic standards for HR, legal, and/or investigation best practices. Complaints about any respondent, no matter how highly placed, should be independently assessed and investigated if they implicate the organization's legal obligations to maintain a harassment free workplace for employees. This is particularly true where, as here, an organization intends to send the message that no one employee or judicial officer is above the law.

### 2. *Findings*

For the reasons set forth above, I find:

- The allegation that an anonymous letter stating sexism and harassment complaints against the Chief Justice and IT leader was received by the Supreme Court is **Substantiated.** I note that the underlying contentions in the anonymous letter, that the Chief Justice behaved in a way that implicates sexism and prohibited harassment, are **Not Substantiated.**

- The allegation that the letter was not investigated is **Substantiated** and this is problematic under the Branch's Anti-Harassment and Anti-Discrimination policy.

- The allegation that Ms. Masias (or another "she") was directed to destroy the complaint letter is **Not Substantiated**. While I found no material evidence to corroborate this contention, the letter was discounted – if not physically destroyed – by leadership.

**Allegation Two: Pornographic Images**

*Judge sent pornographic video over judicial email; nothing happened to him; he was appointed chief judge less than two years later. Judge sent a video over Judicial Branch email to another judge. The video depicts a woman performing sexual acts on a bald man's head. The judge suffered no repercussions for sending the video, and in fact, was promoted to chief judge a few months later. Turned the matter over to the Chief Justice who took no action.*

### A.    Methodology

I determined that between 2000 and 2002, a judge in the Branch received a 5-10 second "GIF" showing two people, large breasts, and a bald head.[9] Ms. Masias and Mr. Brown did an initial HR inquiry into this matter.  However, the evidence does not support the allegation that the judge in question sent the GIF to another judge over judicial email.  Moreover, I found no evidence to show that Ms. Masias and Mr. Brown recommended that discipline occur or that they reported this situation to the Commission on Judicial Discipline, as would have been required if this had occurred as stated.  I located no evidence suggesting that the Chief Justice was made aware of this matter and failed to act.  The judge in question was eventually promoted to chief judge in his District.

I interviewed eight (8) people who had knowledge about this situation, including both the Judge who allegedly sent this material and the Judge who allegedly received it. I also interviewed personnel from legal, who remembered this situation, and two people from the Commission on Judicial Discipline who were able to search for records (and did not find any). I was able to determine what likely happened from these interviews.

I did not locate any documents that were relevant to the allegation. I sought out documents from the State Court Administrator's Office ("SCAO") HR department, Judicial's Legal Department, the Commission on Judicial Discipline, and by personally searching through databases of materials produced in response to subpoenas issued in related proceedings. There were no copies of any investigation materials, the image(s) in question, or other records.

I submitted a full report on this investigation to counsel for the Judicial Branch on May 10, 2022. On May 24, 2022, I was directed to prepare Report Summaries on all matters for public release.  I completed this Report Summary pursuant to this requirement.

### B.    Summary of Material Evidence

I found and interviewed the Judge who is alleged to have sent this material.  He remembered this situation well:

---

[9] An animated GIF is an image encoded in graphics interchange format (GIF), which contains a number of images or frames in a single file and is described by its own graphic control extension. The frames are presented in a specific order to convey animation. An animated GIF can loop endlessly or stop after a few sequences.

> I remember this situation. I did receive an email with some kind of video in it, unsolicited. Because I knew the person who sent it and I thought it was just an email, I opened it and low and behold there it was. I can tell you that it did involve a man and a woman in a bathtub and that is the only thing I saw because I turned it off and deleted it. The person who sent it to me passed away this year. He did not work for Judicial.

According to the Judge, Ms. Masias and Mr. Brown came to speak to him about this material sometime after he received it.  They had the video on Ms. Masias's laptop and when she showed it to the Judge, he told her he wondered how she had that material because he had deleted it.  She told him, "You sent it to [another judge, same first name as me]" and the Judge replied, "That is not true…What I did do was I wrote an email to the person who sent it to me and said please don't do that again." The Judge said, "[H]e never did ever send me anything like that again. I told him I didn't appreciate him sending me stuff like that. I gave them [Masias and Brown] a copy of that email that I sent him. I assume Ms. Masias and Mr. Brown still have it. And they left."  The Judge heard nothing further about this, and I could not find any investigative file, investigation report or documentation of any report to the CCRD on this matter.

I also interviewed the Judge who allegedly received this material.  He shares the same first name as the judge who received this video from the outside sender.  He denied receiving such material or ever talking to Ms. Masias or Mr. Brown about it:

> I do not recall ever getting something like that. I would have immediately emailed the chief judge and said this is inappropriate. I don't believe I was sent that. I would have been offended. I knew Mindy she was great. We talked at judicial conference. I don't know who Eric Brown is. I never had a conversation with her about that. . . .   I not only do not remember, this did not happen. I did not talk to Mindy about this.

The Judge who was accused of sending this material said that it could be possible that he accidentally forwarded this material to the judge whose name he shares.  He indicated that months later, he was trying to forward some material to himself at home, and this other judge's name auto populated in his outlook message.  "I thought I'll be darned, maybe that happened – and maybe I did accidentally send it to [the other judge] when what I was trying to do was send it to my home computer so I could send it back to the guy who sent it to me. I didn't want to use my judicial email to do that. I never got the email on my home computer. That is the only thing I can figure out."

The Commission on Judicial Discipline has no records of this situation. I interviewed two Executive Directors, both of whose tenure occurred after these events. The first said that the records prior to his tenure were not well kept and it was possible that a complaint came in and the documents were lost. He conducted a thorough search but could not locate any records of this situation being reported to the Commission.  The second Executive Director undertook a search as well and could not locate any materials relating to this situation.

At the time of these events, there was a Memorandum of Understanding (the "MOU") between the HR department and the Commission on Judicial Discipline that imposed an obligation on HR to report such matters to the Commission.  Here, it does not appear that Ms. Masias or Mr. Brown made such a report.

17

I found no evidence to corroborate that this matter was brought to the attention of a Chief Justice. All the former Chief Justices I interviewed were asked about this situation and none of them remembered hearing about it.

## C.        Analyses and Finding(s)

### 1. Analysis

The evidence does not support a finding that this set of events took place as framed in the allegation.  This is true for three reasons.  First, the statement of the sending Judge (the alleged sender of the GIF) is credible, and he denied sending the GIF to any judicial colleague, particularly purposefully.  Second, the ostensible recipient Judge denied receiving the GIF and credibly denied having any conversation with Ms. Masias about it.  Third, the absence of an investigation report, or a report of misconduct to the CCJD, indicates that Ms. Masias and Mr. Brown did not see this event as necessitating a serious response.  This suggests that the transmission did not occur, as alleged. The sum of this evidence does not support a substantiated finding on a preponderance of the evidence basis.

The alleged sending Judge, who retired some years ago, agreed to speak to me while under no obligation to do so. In his interview, he admitted that he received this GIF without diminishing its inappropriateness, affecting a poor memory about the event, or trying to minimize the situation. He owned that he received this material, that it was not the kind of material that should have been coming into his judicial email, and that he spoke to Ms. Masias and Mr. Brown about it. The Judge did not adamantly deny that he sent this material, and in fact acknowledged that he could have accidentally sent it because of an autofill mistake with his email. He could have denied this. Instead, he voluntarily had a difficult conversation with an investigator tasked with looking into judicial misconduct and in doing so, directly admitted somewhat embarrassing facts. He acknowledged he might have inadvertently done something problematic, while providing a believable reason why this could have occurred. The Judge demonstrated that he was not trying to evade responsibility or hide anything. The sum of this evidence strengthens his credibility.

The alleged sending Judge's credibility is further enhanced by the statement of the alleged recipient judge, who is firm that he did not receive this material and even more adamant that he never spoke to Ms. Masias about it. This suggests one of two things: the material was never sent to the alleged recipient, as the purported sending judge contends; or it was sent inadvertently and somehow HR intercepted it without the alleged recipient's knowledge. Without speaking to Ms. Masias, I cannot determine which of these is more likely to have occurred. Either way, the alleged recipient firmly denied receiving this material and this was a strong piece of evidence weighing against this allegation.

Finally, the evidence suggests that whatever information Ms. Masias and Mr. Brown gathered in looking into this situation, it was not enough to trigger a full investigation or a report of judicial misconduct to the CCRD. Ms. Masias and Mr. Brown did not interview the alleged recipient, which would have been a critical step in a full-fledged investigation into this event. They did not create an investigation report.  Further, Ms. Masias knew how to report judicial misconduct to the CCRD because she had done it before, but no records were found indicating that a report was made. If Ms. Masias and Mr. Brown elected not to move forward with a full investigation or CCRD

18

report, as evidence indicates, this suggests that they did not believe they had cause to do so. Ms. Masias was an experienced HR practitioner and investigator at the time, and she completed comprehensive reports of other misconduct allegations I am investigating. The absence of such a report here supports a finding that Ms. Masias thought this matter insufficiently significant to fully investigate or to notify the CCJD about.

### 2. *Findings*

For the reasons set forth above, I find

- The allegation that a Judicial Officer transmitted inappropriate material to another Judicial Officer over Judicial email is **Not Substantiated**.

- It is **Substantiated** that no discipline against the alleged sending judge ensued here but as noted above, this was not likely inappropriate. Discipline does not appear to have been recommended by HR and was likely not called for under these facts.

19

**Allegation Three: Release Agreement with Law Clerk**

*"Negotiated a release agreement with a law clerk who accused her COA judge of harassment in order to keep the COA judge 'safe' during the selection Supreme Court Justice selection process per the Chief Justice."*

A.    **Methodology**

My investigation determined that these events happened during the period of September 2013 to August 2014.  While the investigation corroborated certain portions of the allegation, I did not find that the evidence supports a conclusion that a release agreement was signed to keep a Court of Appeals judge "safe" in a Supreme Court selection process.  This allegation misstates certain facts and omits essential information.

I interviewed seventeen (17) people with knowledge about this situation and received written response to questions from an 18th individual. I interviewed the (then) Court of Appeals Judge involved in this situation, members of the Judicial Nominating Commission at this time, the Chief Justice at that time, and members of the legal and HR teams who were aware of this situation and assisted in its resolution. I met with the HR representative who interviewed the woman law clerk—on whose behalf her male co-clerk went to HR with the harassment complaint.  This HR representative also interviewed the male co-clerk at the time of these events. I interviewed attorneys who weighed in on the situation and helped advise on next steps at the time.

I reached out to the woman law clerk and her male co-clerk for interviews. The woman law clerk did not respond to four attempts to reach her, including reaching out via a family member. The male co-clerk responded through his attorney and declined an interview but provided answers in writing to questions posed via email.

I sought out records relating to this situation and found a large amount of documentary evidence from both the Court of Appeals Judge this relates to and the Office of the State Court Administrator. These records included email and other communication, audio recordings of interviews with the woman law clerk as well as her male co-clerk, records from the Judicial Nominating Commission for the Supreme Court nomination process at issue, records relating to the law clerk's leave of absence, records relating to the law clerk's compensation, an Agreement and Release of Claims entered into between Judicial and the woman law clerk, and correspondence from Ms. Masias indicating the allegations of harassment made by the woman law clerk were "unfounded."

I submitted a full report on this investigation to counsel for the Judicial Branch on May 10, 2022. On May 24, 2022, I was directed to prepare Report Summaries on all matters for public release.  I completed this Report Summary pursuant to this requirement.

B.    **Summary of Material Evidence**

The woman law clerk was hired on August 19, 2013.  Early in her employment with the Branch, her male co-clerk invited her out socially to meet the clerk who preceded her ("her predecessor clerk"). Her male co-clerk thought it would be helpful for woman law clerk to meet the person

20

who had held her job previously. He also knew the woman law clerk was new in Denver and did not know many people.  He invited the woman law clerk out for an evening with her predecessor clerk (and his girlfriend), and she accepted.  The four went out on September 11, 2013.

There is no allegation that there was any inappropriate behavior at this social event.  After the social gathering, when co-clerk was dropping woman law clerk off at home, she told him she was uncomfortable with their Judge.  She said he had "touched her shoulder."  Male co-clerk was concerned by this statement.

The next day, he met with the woman law clerk and told her he would go to Human Resources with her, or for her, to report her concerns.  She told him she was okay with him going to HR and he did so that day, reporting the statements woman law clerk had made to him.

HR started an immediate inquiry. An HR team member interviewed the male co-clerk and the woman law clerk on September 12, 2013.  The interviews were recorded, and I listened to them. In the recording, the woman law clerk said that the Judge "touched her on the arm (once) when I first met him" and sent "jokey" texts to her and her co-clerk at night. She said she could not remember what the texts said precisely but recalled there was a joking discussion about wearing shorts in the office. She said she thought her co-clerk wanted to make it seem as though they were dating, and she objected to him making their relationship more personal. The woman law clerk also said she felt a difference in behavior towards her from the Court of Appeals Judge, starting a week before, when he "stopped talking to me about the work." She said he and the male co-clerk would speak in the mornings and "ignore" her.

Ms. Masias interviewed the Judge on September 15, 2013.  She initially asked him if he had any information about the woman law clerk's allegations regarding her co-clerk: "She said, 'There's been an allegation against your clerk.' The gist was that [the co-clerk] was showing her unwarranted attention – asking her to go out to bars- asking to walk her home from clerk happy hour."  According to the Judge, "[I]t was a really short conversation, 5-10 minutes."  The Judge said, "Toward the end she then said, 'Was there some issue of you touching her elbow, even inadvertently?' I remember that vividly. I said 'No.' That was about the size of that. [The woman law clerk] is a very nice woman, a really introverted shy person, a person who needs space. I would have been extremely careful. I was certain I had not touched her elbow. She said, 'Thank you we will let you know if we need anything.'"

According to the Judge, Ms. Masias returned the same day about two hours later, and told him that the woman law clerk had disclaimed her allegation about him. He stated Ms. Masias told him, "I just want to let you know we have talked to [the woman law clerk] and she said you have never touched her elbow." "That was the last I heard about anything relating to my involvement in this." He was asked about the touch on the arm, but not about "jokey" texts, discussions of wearing shorts, or the allegation that he "ignored" woman law clerk.

The woman law clerk went out on administrative leave, which started on the date she interviewed with HR.  She was out on leave for one month.  It is unclear who decided upon or authorized the leave.

21

While the woman law clerk was out on leave, the Court of Appeals Judge interviewed for a seat on the Colorado Supreme Court. He had submitted his application on September 13, 2013, two days before he was aware of this harassment complaint.  He interviewed on either October 8th or 9th, a day or two before the woman law clerk returned from leave.  He was not selected as a finalist. According to the Judge and the commissioners I interviewed from the Supreme Court Nominating Commission, this matter was not raised in the interviews.

I could not find any evidence that further work was done on the HR inquiry after the initial three interviews.  Neither of the clerks were re-interviewed, no additional witnesses were interviewed, and the Judge was not re-interviewed after his initial meeting with Ms. Masias on September 15, 2013.  There is no investigation file or report.

When the woman law clerk returned from leave on October 10, 2013, she was placed in a different assignment.  A decision was made to change her work assignment in discussions with the Human Resources department, the Legal Department, and the Chief Judge of the Court of Appeals.  She was moved out of the chambers where she had been hired and was made the "Senior Judge Clerk." She provided clerking assistance to all the Senior Court of Appeals judges and shared an office space with the clerk of the court.

This new assignment did not prove successful for the woman law clerk.  According to the clerk of the court, she began exhibiting attendance problems.  The woman law clerk reached out with concerns about her new role on April 10, 2014, and raised concerns of unlawful treatment in her reassignment:

> It's actually illegal to have an incomparable job to your original one after reporting sexual harassment (even though someone reported it on my behalf), so I don't think I should have moved from being a lawyer to being a secretary when I came back from the administrative leave (which I think I probably shouldn't have been put on). I was trying to go along with everything to be agreeable, but it gave me a huge career problem that I didn't end up getting the legal experience that I had originally intended, and I have no job reference for legal work right now. I had actually been considering talking to human resources about it again recently anyway. . .. I feel like I need to straighten out my job situation again with human resources and was wondering if you think that would be the next best step.[10]

The recipient of this email had begun working with HR and the Chief Judge about a response when the woman law clerk sent an email two days later to Ms. Masias saying the situation "has resolved itself."

Two months later, the woman law clerk sent several emails out over a 24-hour period referencing problems with her assignment, the previous concerns she had, and her belief this reassigned clerkship would hurt her career prospects.  Among other things, she said, "I probably can't be a lawyer because I wouldn't go to bars with [my co-clerk] all year or he would throw me under the bus (to eliminate the job competition not because of attraction) by reporting himself and [the Court of Appeals judge] to human resources (I do not think this was sane behavior and therefore do not judge him for it), but I'm not completely sure what to do next."  She said, 19 minutes later, "And

---

[10] Email from woman Law clerk dated April 10, 2014.

if being [her co-clerk's] fake girlfriend for a year was the price I needed to pay to be a lawyer, of course, it wasn't worth it."  She accused HR of trying to "cover for" her male co-clerk and said that "[A]s long as anyone retaliates against me [] HR can't help me anyway."

The woman law clerk asked for the remainder of her clerkship to be served from home so she could look for another job. Two days later, the Chief Judge granted that request.  He wrote a letter to the woman law clerk thanking her for her work and stating that she would be paid through the end of her agreed-upon clerkship.  He also said, "Further, we will place you on paid administrative leave as of today's date to allow you time to explore future employment opportunities per your request."

On June 26, 2014, there was an exchange of emails about her photograph being sent to State Patrol and about restricting her ability to send emails to members of the Judicial Branch. On June 27, 2014, Ms. Masias asked for access to the woman law clerk's email saying it was a time sensitive situation because of safety concerns.[11]

One member of the legal team stated they were "appalled" with how this situation "had come down":

> She files a complaint and then she is penalized by putting her off in a corner. I know they thought that was a good idea, but I think that was traumatizing. Legal wasn't consulted about putting her in a different position. I was not involved until the [family member] reached out [to the Legal Department employee]

The referenced family member of hers, who is an attorney, reached out to the Judicial Branch about negotiating an agreement that would give the woman law clerk a clean reference for the year and the chance to put this experience behind her [according to the attorney for Judicial who negotiated the agreement]. A release agreement was negotiated between the family member (on behalf of the clerk) and the lawyer for the Judicial Branch. It was signed on August 4, 2014. The agreement provided the woman law clerk would be paid through the end of her clerkship year, which was scheduled to end on August 31, 2014, and would receive a good reference. Both these contingencies were fulfilled.

The attorney who negotiated the agreement on behalf of the Judicial Branch indicated that the main concerns during the creation of the release were the recent statements about retaliation by the woman law clerk, and not the earlier allegations of harassment, which Ms. Masias had determined were unfounded.  They said:

> In this case – I don't remember ever thinking it was a sexual harassment claim against the judge. There was some discomfort with the clerk and maybe the judge favored the male clerk. I can't remember any facts that he sexually harassed her. I may not have been told those facts.

> But it was a really bad way to address her concerns – she was in a way arguably retaliated against. I don't think she actually was and I think instead that they didn't know what to do with her. But it was a bad call unless she asked for this different assignment and wanted to do something like that.

---

[11] No one else I interviewed remembered what the specific safety concerns were about.

In an email from July 2014, Ms. Masias made the following statement about her finding in the HR inquiry:

> Jerry is out for the next week, so I will share my thoughts.  . . .   As far as the gag order, I don't think I feel comfortable giving on this either since she can discuss that she filed a complaint against the judge of sexual harassment, but she doesn't need to divulge **that it was unfounded**. This would be so damaging for the judge. (Emphasis added.)

Finally, the allegation states the settlement agreement with the woman law clerk was entered to "[K]eep the Court of Appeals judge 'safe' during the selection Supreme Court Justice selection process **per the Chief Justice**." (Emphasis added.) I interviewed both the sitting Chief Justice at this time as well as the person who was poised to assume that position several months later. Neither one acknowledged any agreement or plan to settle this complaint, or otherwise keep it quiet to keep this Court of Appeals Judge "safe."  No other witness or document provided corroboration for this allegation.

## C.    Analyses and Finding(s)

### 1. Analysis

The Judicial Branch Anti-Harassment and Anti-Discrimination Policy in effect at the time of these events reads:

> (4) Investigation. Reports of harassment and discrimination **from employees warranting an investigation shall be referred to the Human Resources Division of the State Court Administrator's Office for investigation**. In some instances, **an initial inquiry** will be completed as a primary review by the Human Resources Division to determine whether there is cause to conduct a full investigation. **A full investigation, at a minimum, will include conferences with the complainant, the alleged perpetrator, and any witnesses to the incident.** Any party involved in a harassment complaint may submit any documentation they believe to be relevant to the matter at issue to the investigating authority.

(Emphasis added.)[12]

The credible evidence in this investigation does not support the allegation.  This is so for three primary reasons.  The timeline does not support a substantiated finding; the evidence does not corroborate that the harassment complaint, which was ultimately unfounded, was concealed; and the release agreement was more likely than not motivated by the later concerns the woman law clerk raised.

First, the allegation that a settlement agreement was negotiated to protect the Court of Appeals Judge in his application for a seat on the Colorado Supreme Court is refuted by the timeline. The Court of Appeals Judge applied for the Supreme Court seat on August 13, 2013, and a final decision was reached in the nomination process on October 25, 2013. The Branch began negotiating a release agreement with the clerk no earlier than June 26, 2014 – eight months after

---

[12] Chief Justice Directive: 08-06, Attachment A (Amendment date July 2017).

24

the selection process was complete. The timing is persuasive evidence that the agreement was not negotiated to protect the Court of Appeals Judge in his Supreme Court selection process.

Second, there is no credible evidence that the harassment complaint was improperly concealed during the Supreme Court nomination process. On the date the Court of Appeals Judge interviewed for the Supreme Court, he credibly did not believe there was any ongoing HR investigation involving him. He had been interviewed by HR on September 15, 2013 and was told the same day that the woman law clerk was disclaiming her allegations against him. He heard nothing further about it.

I looked to additional evidence to determine whether or not the Judge's statements here are credible. As the person accused I could not rely on his statements alone. Here, his credibility is strengthened by corroboration from other evidence. First there is no record showing that a "full investigation" took place here. There is no evidence of additional investigative work after September 15th, 2013. The Court of Appeals judge was not interviewed about several other statements the woman Law clerk made, there is no evidence that HR interviewed additional witnesses, and there is no record of an investigation report. This suggests that HR did an "initial inquiry," per Chief Justice Directive 08-06 but did not believe there was enough evidence to proceed to a full investigation. Furthermore, the timing of the woman Law clerk's return to work – the day after Supreme Court interviews – suggests the initial inquiry was likely over before the Court of Appeals judge interviewed. The sum of this evidence suggests, consistent with Ms. Masias's statement in the July 19, 2014, email, that the allegations were promptly determined to be unfounded.

Finally, the evidence suggests the release was ultimately negotiated and executed because of later complaints from the clerk, implicating retaliation concerns but not involving the Court of Appeals Judge. The timeline strongly supports this finding.

Starting in April 2014, more than seven months after the initial harassment inquiry, the clerk made a series of statements that she felt retaliated against by the new job placement she received when she came back to work after her leave. She complained about this with urgency and some hyperbole. Her statements raised retaliation concerns on their face. Upon receiving these concerns, the woman law clerk was permitted to take leave for the remainder of her term and negotiations on a Release Agreement commenced thereafter.

The lawyer for Judicial who drafted the release had these later allegations in mind when they negotiated the agreement. This attorney believed that a Release Agreement was not only necessary under these facts but also fair to the clerk. They had no recollection of any concern about sexual harassment allegations involving the Court of Appeals Judge being the motivator for the Release. Instead, they remembered the motivation being these later allegations. I found their memory of the events persuasive because it is consistent with the other evidence, which shows direct connections between these retaliation concerns and the release agreement.

Finally, I note that throughout this chronology, the woman law clerk's concerns were objectively mishandled. Initially, a decision was made to place the woman law clerk on leave after her harassment concerns were raised, with no evidence that she requested this. Neither Respondent

25

was placed on leave from the workplace. Moreover, the woman law clerk was returned to an objectively different and arguably less prestigious job placement when she returned. When she complained about this new posting, in language clearly raising retaliation concerns, no investigation was conducted. She was placed on leave (again) while her departure was negotiated. Someone should have investigated this situation, but no one did. These decisions failed to meet the requirements of Chief Justice Directive 08-06 or best practices from an HR, legal, and/or investigative standpoint.

### 2. *Findings*

For the reasons set forth above, I find:

- The allegation that a settlement agreement was negotiated with a law clerk to keep a Court of Appeals Judge 'safe' during a Supreme Court nomination process is **Not Substantiated.**

- The allegation that this agreement was negotiated, and/or this situation was concealed, by the Chief Justice or anyone else is **Not Substantiated.**

- The processes that HR and Court Administration utilized to address the concerns raised by this clerk were not managed appropriately or consistently under applicable policy or standards for HR, legal or investigations best practices.

26

**Allegation Four: Hairy Chest**

*"Judge exposed and rubbed his hairy chest on a female employee's back; no action taken against the judge; Judge is currently being considered for the Senior Judge Program."*

## A.    Methodology

My investigation determined that the events referenced in this allegation occurred in 2007. I substantiated that this episode of misconduct took place, however, I did not substantiate that "[N]o action [was] taken against the judge." He was referred to the Colorado Commission on Judicial Discipline and was privately admonished. I substantiated that this Judge was selected for participation in the Senior Judge Program. He served in that role for approximately two years until the Judicial Branch learned about the specific misconduct referenced above. Upon learning this information, the Judge's contract was terminated.

To investigate this matter, I sought out witnesses who were likely to have evidence about this allegation and interviewed ten (10) individuals who had recollection of this incident. Most witnesses were present or former Judicial Branch employees or judges two witnesses work or worked with the Commission on Judicial Discipline, and one witness I met with has deep knowledge of the Senior Judge Program. Five witnesses provided substantial direct evidence about what took place and five had a more attenuated recollection of the events.

I also sought out any existing documentation from the State Court Administrator's Office's Human Resources department, the Commission on Judicial Discipline, and the Senior Judge Program. I was provided with documentation from the Commission on Judicial Discipline and the Senior Judge Program. I located other materials in the State Court Administrator's Office's files, which enabled me to identify the judge and the timeframe. I reviewed confidential documents from the Commission on Judicial Discipline pertaining to this matter, which were provided to me by its Executive Director under an exception to the Commission's strict confidentiality rules.[13]

I submitted a full report on this investigation to counsel for the Judicial Branch on May 10, 2022. On May 24, 2022, I was directed to prepare Report Summaries on all matters for public release. I completed this Report Summary pursuant to this requirement.

## B.    Summary of Material Evidence

In late November or early December 2007, the Chief Judge of the District where this episode occurred was made aware of a complaint from an employee of the District. The Chief Judge notified the Human Resources department of the State Court Administrator's Office ("the State Court Administrator's Office") and according to the Chief Judge, "they took over the investigation." The Chief Judge had no direct conversation with either the employee or the Judge involved and "no one from State Judicial ever talked to [him] about it . . . before, during or after."

---

[13] The Colorado Constitution provides that records of proceedings before the Commission "shall be confidential," and the Colorado Rules of Judicial Discipline echo this requirement. I have not included quotations from these materials, or confidential matters contained therein, because these matters must be maintained confidentially pursuant to Colorado State law.

Ms. Masias conducted an inquiry into this allegation.  As noted above, the State Court Administrator's Office's Human Resources division had an MOU between itself and the Commission on Judicial Discipline, which stated that Human Resources would "inform the [Commission on Judicial Discipline] immediately if it became aware of conduct by a judge has occurred which "may have violated the Judicial Branch's Anti-Harassment Policy or otherwise engaged in conduct in violation of federal civil rights laws."  The MOU also stated that if the allegations involve a Judicial Branch employee, Human Resources "will conduct an investigation" and will forward its results to the Commission on Judicial Discipline for its consideration in initiating its own proceedings.

Ms. Masias interviewed witnesses on November 28, 2007 and prepared a report to the Chief Judge of the District, dated December 5, 2007. Her key findings were that:

- The judge unbuttoned his shirt, exposed his chest hair, and touched a female employee with his chest;
- The judge made a remark to the employee to "come sit on [his] lap;" and
- The judge engaged in inappropriate adult banter in the workplace.[14]

In her report, Ms. Masias made the following "Intermediate Recommendations:" that the Chief Judge discuss with the Judge the severity of the complaint made against him; inform the Judge that he should not touch staff with any part of his body including, hugging, tapping, or positioning to move past in tight proximity; warn the Judge that banter that is deemed unprofessional should not continue; and require the Judge to attend Anti-Harassment training and review the Colorado Judicial Department Anti-Harassment policy.  She also made the following "Recommendation:" that Human Resources would assist the Chief Judge in "drafting a letter detailing the bullet points found in this letter," which "will be sent to the [Commission on Judicial Discipline] for their review."

It is not clear whether this unsigned report was ever sent to the Chief Judge, who had no memory of receiving it.  He denied speaking with Ms. Masias, speaking with the Judge, or writing a letter to the Commission on Judicial Discipline.  He also denied receiving any Human Resources guidance on doing any of these things.

Ms. Masias prepared a draft letter to the Executive Director of the Commission on Judicial Discipline, dated "Decemeber [sic] the State Court Administrator's Office, 2007." It contained her findings and intermediate recommendations, set forth above. She described this letter as "an official letter of complaint." Because this is not dated or signed, it is unclear if this letter was the final transmission of the information to the Commission on Judicial Discipline.

On March 17, 2008, Ms. Masias wrote another letter to the Executive Director of the Commission on Judicial Discipline.  In this communication, she informed him that the Judge in question was enrolled in an Anti-Harassment course, as directed in her report.

---

[14] A fourth allegation was not substantiated.  It stated that the Judge made physical contact with the employee on the hips while passing her in close proximity in a copy room in the chambers.  Ms. Masias did not substantiate this allegation.

On March 6, 2008, the Executive Director of the Commission on Judicial Discipline brought this matter before the Commission for its consideration.  He included the data from Ms. Masias's Human Resources investigation.  The Commission instituted its own case pursuant to Rule 12 of the Colorado Rules of Judicial Discipline.  It conducted its own investigation, sought a response from the Judge, and deliberated upon the matter.  The Commission on Judicial Discipline issued a private admonishment to the Judge in May 2008.[15]

On March 17, 2010, the State Court Administrator's Office drafted a notification to the Commission on Judicial Discipline that there were allegations of further misconduct by the same Judge. The letter states, "[T]hat judge [Name Redacted] has been seen kissing a female employee on the "lips" and on "top of there [sic] heads." This letter is not dated or signed, and the Executive Director of the Commission on Judicial Discipline stated that he could not find any record that it was received by the Commission. The State Court Administrator at the time has no memory of sending this letter or of the allegations it describes.

This Judge applied for the Senior Judge Program in 2018.  As part of the process at the time, the State Court Administrator's Office reaches out to the Commission on Judicial Discipline, Attorney Regulation Counsel to determine if there have been any previous disciplinary matters.  The Commission on Judicial Discipline disclosed the 2008 private admonishment, without detail, to the State Court Administrator's Office in response to this outreach.  The Chief Justice, State Court Administrator, Senior Judge Program Administrator and Director of Court Services all signed off on this judge's application. However, none of them followed up on this notification from Commission on Judicial Discipline.  None of them asked the Judge what the private admonishment related to, and none of them reached out to the Commission on Judicial Discipline for further details.[16]

The Judge was selected for the Senior Judge Program and served in that program for approximately two years.  When the Eric Brown List was made public and personnel at the Judicial Branch realized that this Judge's behavior was described in Allegation Four, this Judge's tenure as a Senior Judge was terminated.

C.     Analyses and Finding(s)

1. *Analysis*

My investigation revealed straightforward facts on this issue. The credible evidence confirmed that there was a situation from 2007 involving a male judge behaving inappropriately toward women (one in particular) on his staff. The documentary and witness evidence are undisputed on that point. The behavior involved serious misconduct including displaying naked skin, the physical touching/rubbing of his chest on a woman's back, and inappropriate commentary. Moreover, it is

---

[15] This discipline was disclosed to SCAO as part of the judge's later application for the Senior Judge Program.  For that reason, I am including this data in the Report Summary as non-confidential data.

[16] Recent changes to the Senior Judge Program, effective May 4, 2021, by House Bill 21-1136 render any judge who has received "private admonishment, private reprimand, private censure, public reprimand, public censure, suspension, or removal" from the Commission on Judicial Discipline, ineligible for participation in the Senior Judge Program.

corroborated that this Judge applied and was selected for the Senior Judge Program after these events transpired.

Although it is inaccurate to state that "no action was taken" as a result of this Judge's behavior, it is accurate to conclude that insufficient action occurred.

On the one hand, the situation was investigated, and findings were reached. Ms. Masias conducted an investigation pursuant to her authority under the MOU cited above.  She also reported this matter to the Commission on Judicial Discipline for their handling and the Commission on Judicial Discipline conducted its own investigation. The Commission on Judicial Discipline issued private discipline. Moreover, the Judge enrolled in Anti-Harassment training recommended by Ms. Masias.

On the other hand, the Judge was given the mildest sanction possible under the Commission on Judicial Discipline Rules and went on to serve as a Senior Judge for the Judicial Branch. The sanction this Judge received, by definition, admonishes the Judge privately for "an appearance of impropriety even though the judge's behavior otherwise meets the minimum standards of judicial conduct." Unbuttoning clothing to naked skin, physical contact with another person, and remarks including the solicitation "come sit on my lap," clearly do not meet the "minimum standards of judicial conduct." Objectively, they do not meet the conduct expected of any person in any work environment, let alone a workplace charged with effecting justice for the people of the State of Colorado.

It is important to note that there are no set of fixed rules that govern what kind of response the Commission on Judicial Discipline takes in any given matter.  The Commission on Judicial Discipline has broad discretion to determine when matters should be treated as serious enough for formal proceedings, or when they necessitate more heightened private discipline. While it is reasonable to view the consequences imposed here as tepid, I cannot find that the decisions made by the Commission on Judicial Discipline violated any rule or standard requiring more rigorous treatment.  Simply put— there was and is no such set of rules.[17]

From the perspective of Judicial administration, this Judge was allowed to serve as a Senior Judge after these events, despite at least four senior leaders at the State Court Administrator's Office being notified that he had been the subject of a private admonition in the past. None of these four individuals investigated what had taken place before approving him for the Senior Judge Program. Although I found no evidence to suggest that any of these individuals had actual knowledge of the facts underlying the admonition, it is striking that none of them asked any questions about it. Any one of these four could have, and should have, done more to unearth the facts underlying the private admonition the Commission on Judicial Discipline disclosed.

Finally, there were failures of process at other junctures in this case. It does not appear that Human Resources notified the Chief Judge in the District of the findings or recommendations from Human Resource's investigation. It does not appear that Human Resources told the Chief Judge to have a discussion with the Judge or to ensure he got the trainings recommended by Human Resources.  It also does not appear that Human Resources or the State Court Administrator's Office notified the

---

[17] One of our recommendations is that there should be some written guidance around the exercise of this discretion.

30

Commission on Judicial Discipline about a subsequent complaint involving the same Judge. A notification was drafted to that effect but does not appear to have been sent.

On balance, this case from 15 years ago demonstrates failures in process and oversight as well as a failure to provide serious consequences on both the Commission on Judicial Discipline's and Judicial Administration's accounts. The Branch and the Commission on Judicial Discipline can and should do better to treat this kind of misbehavior seriously.

## 2. *Findings*

For the reasons set forth above, I find:

- The portion of Allegation Four contending that inappropriate behavior took place is **Substantiated,** essentially as stated in the allegation.

- The portion of the Allegation stating that no action was taken against the judge in question is **Not Substantiated.**

- Finally, the portion of the Allegation stating that this judge was being considered for the Senior Judge Program is **Substantiated**, and the judge in fact participated in this program after these events.

31

**Allegations Six and Seven: "Leave the Courthouse and Drive Slowly Out of Town" and Requirement That HR Seek Permission from Chief Judges Prior to Investigating Misconduct in their Districts**

*6: "Mindy recommended to Chief Judge Kuenhold that it was in the best interest of the Branch to terminate Mr. Duarte due to the sexual relationships he had with his staff. Chief Judge Kuenhold stated that Mindy needed "to leave the courthouse and drive slowly out of town."*

*7: "Was told by chief judges she needed to seek their permission to conduct harassment and discrimination investigations in Districts and seek their permission to visit Districts before coming after an intense investigation of a judge and Court Administrator for sexual harassment. This directive was given in order to suppress complaints. Recollection of this event occurred in the 2018 Judicial Conference by a chief judge in the audience who was questioning if that matter [was] ever resolved and recognizing that this was wrong."*

### A.    Methodology

Through my investigation, I determined that Allegations Six and Seven relate to one another and for that reason I decided to include them in a single Report Summary.  I found that the events alleged in Allegation Six took place in late 2009 and early 2010 and the events described in Allegation Seven took place in 2011.  I substantiated some portions of what appeared in these two allegations and did not substantiate other parts.

There were several individuals who had good memories of these events.  I interviewed former Chief Judge Kuenhold, Mr. Duarte, and others about Allegation Six. I also interviewed a number of chief judges from this time who could speak to Allegation Seven. Altogether, I interviewed twelve (12) people who had knowledge about one or both situations. This included the named parties, other individuals who worked in this Judicial District, witnesses from the Legal Department, other chief judges who served at the time, two Justices with recollections of this set of events, and the State Court Administrator at the time.

I also located a number of documents relevant to Allegations Six and Seven. These included: drafts of the Human Resources investigation reports of the Allegation Six matter [one set of drafts of a report to Chief Judge Kuenhold and a separate set of drafts for the Chief Justice]; email traffic between Ms. Masias and Mr. Brown on this subject; and minutes from chief judge meetings discussing the request for notification and emails on that subject. I also found a document entitled "Talking Points re Kuenhold matter" that is undated and unsigned.

I submitted a full report on this investigation to counsel for the Judicial Branch on May 11, 2022. On May 24, 2022, I was directed to prepare Report Summaries on all matters for public release.  I completed this Report Summary pursuant to this requirement.

32

B.    **Summary of Material Evidence**

1.    *Material Evidence on the Events of Allegation Six*

The evidence is clear that there was a Human Resources investigation in Chief Judge Kuenhold's District in late 2009. It is equally clear that Chief Judge Kuenhold was unhappy with the process. Ms. Masias received an anonymous letter dated December 9, 2009, contending misconduct in this Judicial District. The report describes the scope of the allegations in the anonymous letter as having two components: "sexual misconduct" and "bribery or 'hush money.'" More specifically, the letter alleges:

> I am writing to complain about the fact that three staff in the 12[th] District are receiving taxpayer money to leave the employment for judicial. These employees don't deserve money any more than I do, unless you must consider the fact that it is payoff money for sleeping with your boss. What you don't know is that this District is so willing to approve voluntary separation incentives because our administrator has screwed almost every clerk in the District. You don't get ahead if you don't. Consider this hush money. The court report [sic] to our supposed "chief judge" is no better. It's a well-known fact that she screws the judge to keep her job. This is a culture that is only exaggerated when these programs come up. I plead for someone to recognize the overuse of power and sex to control in this District.

At some point, four additional issues were added to the investigation scope:[18] religious harassment; reverse ethnic discrimination; threats of retaliation for participation in the complaint process; and creation of a quid pro quo sexual harassment environment.  Ms. Masias explained these additions in the reports she wrote on this investigation: "To gain an accurate assessment of the culture in the 12[th] Judicial District as it is perceived by those involved, each interviewee was specifically asked to give their own personal assessment of the 'culture and workings of the 12[th] Judicial District.' This led to the new allegations that are reported in the bullet points above that were not alleged in the original letter."

According to Chief Judge Kuenhold and another Judicial officer who worked in the District, Ms. Masias and Mr. Brown conducted their investigation without appropriate due process and improperly from start to finish.  Both Judges said that Ms. Masias and Mr. Brown pulled employees out of the workplace, which upset them, and asked some employees "if they had heard rumors" of misconduct.  Chief Judge Kuenhold objected to the air of secrecy around the investigation. Moreover, according to Chief Judge Kuenhold, the investigation "dragged on for 9 months" with no communication from Human Resources.[19] Chief Judge Kuenhold had to "deal with crying staff" and "a change in the culture from open doors and gathering around a coffee pot to everyone behind closed doors." He said "[I]t was a very unpleasant thing. It has negatively impacted the 12[th] Judicial in ways I can't describe."  His colleague Judge said, "I remember being appalled" by the process.

---

[18] It is not clear when this happened, but the addition is referenced in both the 1/7/10 and 1/14/10 report drafts.

[19] I could not corroborate this timeline. According to the documents I could find, it appears that interviews in this investigation took place from December 21, 2009, through January 13, 2010 (Notes of Interviews Relativity Doc JDJD011020). The reports appear to have been in the drafting process contemporaneously with the interviews, as I found drafts dated January 7, 2010, and January 14, 2010. I do not have final signed reports or any email correspondence confirming when Chief Judge Kuenhold was summoned to Denver. Chief Judge Kuenhold feels certain that he was presented with the findings "in the Fall."

According to Chief Judge Kuenhold, several months went by after the interviews before Ms. Masias reached out to him to say she would be back in his District to provide the results of the investigation. According to Chief Judge Kuenhold, Ms. Masias told him, "[T]hey had concluded their investigation, and it showed the initial allegations were unsupported and a report would be provided to me." However, according to Chief Judge Kuenhold, more months went by, and he expressed his dissatisfaction with the process during this time. He conveyed this to Ms. Masias: "I made it very clear that I was not happy with the harm that had been done in the District and why it had taken so long. I said that I was not pleased with the outcome. I may have said something [to Ms. Masias] like, 'You really are not welcome here,' because of how this was handled."

During this time, Chief Judge Kuenhold and a Judge colleague drafted an email to members of his District, commenting negatively on the investigation process. In the draft I found, which reflects his Judicial colleague's feedback, it says that the investigation was a "dark cloud on the horizon" for the District.[20] The email describes the "harm the investigation is causing to our District," noting that employees were "interrogated" and stating that the damage done was "a direct result of the manner in which Human Resources chose to conduct this investigation." The email asks the District to "[S]top the gossip, rumors and talking behind other people's backs and focus on the important role our courts play in the communities we serve."

Two months after Ms. Masias's report to him on the investigation,[21] Chief Judge Kuenhold was contacted to come to Denver to meet with the Chief Justice on the matter. He arrived and was given the report for the first time. He read it right before his meeting with the Chief Justice. He remembered that the report echoed "what [Ms. Masias] had told me months before – that the allegations were unproven." However, the report also stated that, after finding the allegations were not substantiated, Human Resources found a former employee "who alleged a consensual relationship 10 years before (so approximately 1996)" with Mr. Duarte. There were no rules at the time prohibiting the relationship and Chief Judge Kuenhold was upset about this allegation being added as he felt it raised concerns about due process.

Ultimately, the Chief Justice recommended to Chief Judge Kuenhold that he terminate Mr. Duarte based on these facts. Chief Judge Kuenhold declined to do this, "because of the illegitimate process."

An attorney in Judicial's Legal Department expressed concerns about the recommendation of termination in this case before the reports were finalized. In this person's view, the investigation had not substantiated conduct that violated policy and the termination recommendation had no precedent under such facts.

Several witnesses remember Chief Judge Kuenhold, and other chief judges being upset about the way this investigation was handled:

---

[20] This draft document was located (JDJD012568 in the Judicial Relativity database), but no email could be found showing that it was sent.
[21] The timing is based on Chief Judge Kuenhold's memory of events. I could not find any email showing dates of meetings.

That was very ugly on a lot of different plains.  . . .   Human Resources went down and did exactly what they are supposed to do, they went to the District and did interviews.  Mindy did her investigation and she felt there was an inappropriate relationship there. She suggested to Kuenhold that they both be fired. He really didn't want to do that. Ben Duarte had been there a long time, and Kuenhold was really angry about it. He was angry that he wasn't told about investigation. Mindy was pretty heavy handed. It was like "I am in charge of this Human Resources world" and she didn't like it when people didn't agree with her. A lot of what is in this memo is about people not agreeing with her or she didn't get what she wanted.

Mr. Duarte said that he never saw any report from this investigation, and he felt "blindsided" by what happened. According to him, "[Ms. Masias and Mr. Brown] were asking about a relationship from 12 years ago. I was livid and I moved on." Mr. Duarte said that no one called him after the investigation was completed to talk to him about additional information. He said, "It was like a secret investigation. Like the Gestapo. I did Human Resources for seven years and it was not right to me."

One witness remembered hearing from Ms. Masias and Mr. Brown that Ms. Masias had been "kicked out of [Chief Judge Kuenhold's] District."  Another person remembered, specifically, that Ms. Masias reported to him the statement, "[L]eave the courthouse and drive slowly out of town."

Ms. Masias prepared two reports of this investigation: a 9-page report for Chief Judge Kuenhold and a 13-page report for the Chief Justice at the time. We do not have a "Final" of either report, but have multiple drafts of each one, some dated January 7, 2010, and some dated January 14, 2010. Interviews were ongoing as of January 13, 2010, which suggests that the January 14 document was finalized after that last interview was done.

The reports corroborate that the allegations of improper behavior by Chief Judge Kuenhold and payment of "hush money" were not substantiated. Similarly, the allegation that Mr. Duarte had slept with almost all the clerks was not substantiated. They also show that Ms. Masias found that Mr. Duarte had had a relationship with an employee more than ten years before the investigation, during a time when there was no policy prohibiting such a relationship.[22] There were some allegations that this relationship was "overbearing and controlling," but it does not appear that Ms. Masias asked Mr. Duarte about this aspect of the prior relationship.

Ms. Masias's reports reference rumors of other possible misbehavior in her investigation. She states that there were rumors and a perception among employees that Mr. Duarte treated young women differently/flirtatiously; that he may have promoted the person he had a relationship with despite her not having a college degree; that he helped one woman pay for college; and that he may have had other relationships with employees. Ms. Masias also states that a number of witnesses said they were afraid of retaliation and some witnesses described being interviewed by leadership in the District about what they said in the investigation. There was some contention that the Chief Judge (and possibly others) tried to find out what was said and tried to interfere in the investigation.

From the face of the reports, it does not appear that Ms. Masias sought out information that would

---

[22] One of the later-raised allegations was also substantiated – that an employee distributed religious information to others at work.

35

have revealed important information on these claims.  It does not appear that she asked Mr. Duarte for his side of the story on the rumors and perceptions, or about the contention that the relationship from ten years ago was coercive.  It also does not appear that she asked Chief Judge Kuenhold about the allegations of interference in the investigation.[23] It does not appear that Ms. Masias sought out documentation on the promotion decision or the allegation that Mr. Duarte (or the District) helped pay for college for an employee.

The report to the Chief Justice recommends several courses of action, including that discipline be issued against Mr. Duarte because of his "efforts to isolate employees, exploit his position of authority, and his failure to promote an atmosphere of fairness." It also recommends that "the efforts by leadership in the 12th to prevent, undermine and interfere with the investigation by Human Resources should be discussed with Chief Judge Kuenhold."[24]

### 2.   *Material Evidence on the Events of Allegation Seven*

Multiple witnesses remembered a shift taking place in the relationship between the chief judges and Human Resources/the State Court Administrator's Office following this investigation. Witnesses said this shift occurred primarily in response to the different vision the new Chief Justice had for the role of the SCAO vis-à-vis the trial courts. According to many, the Chief Justice wanted to move the focus away from SCAO  being the compliance monitor of the Districts, to the SCAO being a service provider in support of the work of the Districts.  This new approach included better communication from SCAO when employees would be out in the Districts, including for Human Resources investigations.   There was concern that "SCA 'investigations' or involvement in Districts were happening without any notification to the chief judge about what was happening, or that they would be in the District. There was concern about that. The consensus of the chief judges was that they expect the courtesy of being notified when Human Resources was going to be in the District."

While there was not agreement among the chief judges about whether Human Resources ought to notify them when doing investigations in their Districts, there was some consensus that Human Resources under Ms. Masias overstepped at times, and this violated the autonomy of the Districts. As Chief Judge Kuenhold put it, "[G]overnance was an issue.  . . . What I would call the weaponization of Human Resources was possible because there was such deference and because Human Resources was tasked with doing things that maybe should have gone to judicial discipline."

That said, the State Court Administrator at the time views this allegation as "a misrepresentation." As he recalled it"

> There was not a directive to seek permission to conduct investigations – this is way narrower than what the request from the Districts was. It was, anytime you come to my District I need to know you are in my District. You need to notify me for any reason that you are in my District. This goes back to 2010 when they were told to get permission to go into the District. This was after Kuenhold

---

[23] I do not have the witness interviews, which were apparently recorded, so I cannot be sure what questions were asked of these witnesses. There is no reference to this information, if it was gathered, in the report.
[24] No recommendations appeared in the draft report addressed to Chief Judge Kuenhold.

but there was also an investigation in Pueblo about a District Administrator being nasty – and Mindy and Eric went down to investigate. [The judge in Pueblo] agreed with Judge Kuenhold – we want to know what is going on. It is my District I need to know there is an investigation. It wasn't to stop harassment and discrimination investigations.

Minutes from chief judge meetings during this period, and email correspondence, corroborate that there was a focus on improving the relationship between SCAO and the Districts. There was also an emphasis on the service-provider role of SCAO and Human Resources.  This included a request that Human Resources – and other Divisions – notify the Chiefs when they would be in their Districts.

## C.    Analyses and Finding(s)

### 1.    Allegation Six

This allegation states that Ms. Masias recommended termination of Mr. Duarte because of sexual relationships he had with staff and that Chief Judge Kuenhold responded by telling her to "[L]eave the courthouse and drive slowly out of town." In part, the allegation is corroborated, but it also conflates several details and contains inaccuracies.

On the one hand, there are some portions of the allegation that are substantiated. Chief Judge Kuenhold acknowledged that he may have told Ms. Masias she was "not welcome in [his] District" because of the manner and timing of this investigation. This part of the allegation, while worded differently from "[D]rive slowly out of town," is not in dispute. A person in a position as powerful as a Chief Judge making statements like this to Human Resources personnel investigating alleged harassment is problematic.

Moreover, the evidence suggests that Chief Judge Kuenhold may have intervened improperly in the investigation in other ways. Ms. Masias's reports state that he wanted to fire the person who wrote the anonymous complaint and that he pulled in at least one employee to ask her what questions were being asked. He may have referred to the interviews taking place as "interrogations" of his employees. For a high-level respondent in a position of leadership, particularly the top job in a Judicial District, to engage in these behaviors during an investigation is at least disruptive, if not coercive. It can dissuade people from coming forward, harm the data the investigator is trying to gather, and increase fears of retaliation. From Ms. Masias's vantage point, it was reasonable for her to conclude that Chief Judge Kuenhold was trying to obstruct a legitimate harassment investigation. This would be concerning to any competent HR investigator.

In addition, this investigation was done right in some respects. Ms. Masias followed proper protocol in not talking to a respondent about the allegations ahead of time, interviewing witnesses away from the workplace (and confidentially), and not sharing information about the investigation with the respondent during the investigation.  These general rules apply in every case, even in those where powerful people are respondents.  In fact, they are most important in just such cases.

That said, some aspects of the investigation were not done properly.  First, Ms. Masias or the State Court Administrator could have notified the Chief Probation Officer, the Court Executive, or some other person in leadership in the District, about the investigation. It is unusual in any setting for an

37

investigation to begin with no one being apprised, because of exactly the kind of reaction that occurred here. In a workplace like the Judicial Branch, with twenty-two independently run Districts, this sort of approach is even less acceptable. Investigations must be conducted confidentially but this does not mean in secrecy. Ms. Masias or the State Court Administrator could have discussed the process with someone in leadership within the District, to explain what was going on, answer questions, and alleviate any concerns.

Chief Judge Kuenhold and other witnesses felt that employees were surprised and stressed. They also felt the District was disrupted by this "secret" approach. From their perspective, the Chief Judge's interventions were an effort to support his employees and provide guidance. Appropriate communication could have helped avoid what may have been inadvertent interference, as Chief Judge Kuenhold was making decisions in an information vacuum.

Second, Ms. Masias expanded the scope of her findings but did not concurrently expand the scope of her work. Expanding the scope can be a proper decision. However, when it is made, the investigator must thoroughly investigate the new allegations. Here, the report reflects that Ms. Masias took some rumor and speculation at face value without testing it. It does not appear that she gathered corroborative or countervailing evidence. For example, Ms. Masias did not ask Chief Judge Kuenhold about his obstructive behaviors and did not ask Mr. Duarte about most of the rumors and speculations about him. It does not appear that she did a credibility assessment where there was not any corroborative data. It is unclear if she sought additional documentation – like records on the promotion decision or on the allegation that District funds were used to pay for an employee's education. None of this data appeared in the record.

Rumor and speculation sometimes play a role in investigations because they can be leads. If an investigator follows these leads, it can take them to credible evidence. An essential part of the process in following leads is giving important witnesses the opportunity to know what is being said about them and to hear, as well as test, their side of the story. It requires that the investigator do follow up interviews, credibility assessments, and additional data gathering. This comports with fairness and impartiality requirements. It helps reveal both sides of the issue and resolves conflicts in the data. Ms. Masias may have undertaken these steps and the documentation is simply lost. However, the report shows only one side of the story in evidence, so this fulsome process cannot be corroborated here.

Finally, if the timeline of this investigation was over nine months in duration as Chief Judge Kuenhold recalled, this was an objective problem. The work was done by January 2010 and the report appears to have been completed in January as well. If it took nine months to convey results to the stakeholders, this is an unacceptably long time for a single investigation in a single District.

On the evidence set forth in the report, it is unclear what the basis was for Ms. Masias's recommendation of discipline for Mr. Duarte. This was the precise concern that the attorney for Judicial laid out in her email: "Considering that the allegations in this letter were not substantiated, I would move cautiously to impose actions based on the witness statements alone." (Emphasis added.) There was not credible evidence identified in the report upon which to substantiate that wrongdoing implicating policy took place. From that vantage point, Chief Judge Kuenhold's decision to not impose termination was a reasonable choice.

38

### 2. *Allegation Seven*

With respect to the contention that Ms. Masias was told not to travel to Districts to conduct investigations without permission, there was clearly a directive from the chief judges to Human Resources and the State Court Administrator's Office to be more communicative. This includes a request that Human Resources notify the chief judges if they were going to be in the District for any reason, including an investigation.

The evidence corroborates that there was bad blood between the Chiefs and Human Resources during this time. This stemmed in part from the Kuenhold matter and from another Human Resources investigation in Pueblo. Ms. Masias was described as "pretty heavy-handed" in doing her investigations. These investigations were described as the "weaponization of Human Resources." The Chief Judge's directive was likely based, at least in part, on dissatisfaction with Ms. Masias and her methods.

That said, the directive came from a larger discussion of cooperation and support from the State Court Administrator's Office for the operations of the Districts. This was a global concern at the time. The meeting notes, emails, and witness recollections suggest that a larger effort was being made to get the State Court Administrator's Office to begin seeing itself as a service provider to the Districts and not a compliance arm. This was in keeping with the Chief Justice's vision at the time—the movement to a more cooperative and collaborative relationship between the State Court Administrator's Office and the 22 Districts it serves. It is this focus on cooperation, evident in contemporaneous records from the time, and not an effort to suppress investigations that most persuasively explains the Chief Judge Directive.

### 3. *Findings*

For the reasons set forth above, I find:

- The allegation that Ms. Masias found substantiated wrongdoing in an investigation in (former) Chief Judge Kuenhold's District, and recommended termination because of that substantiated wrongdoing, is **Not Substantiated.**

- The allegation that Chief Judge Kuenhold told Ms. Masias, in so many words, to leave his District and that she was not welcome there is **Substantiated** because of Chief Judge Kuenhold's acknowledgement of what he said.

- The allegation that after the Kuenhold matter, Human Resources was directed to notify the Districts before commencing investigations there, or visiting for any other reason, is **Substantiated.**

- The allegation that this directive was made to dissuade proper complaints and investigations is **Not Substantiated.**

39

**Allegation Sixteen: Mindy Masias Not Selected for State Court Administrator Position Because of Her Sex**

> *"Report from a Justice about why MM was not selected for the position: Insinuates the entire Supreme Court made the decision she did not get the SCA position based on her gender."*

### A.    Methodology

This allegation relates to the selection process for the State Court Administrator position that took place in 2017.  Ms. Masias was a candidate for the position and was not selected.  Ultimately a male candidate got the job.  My investigation did not substantiate that this decision happened because of sex, but it did substantiate that the person who ultimately got the job never applied, was not interviewed, and received the job via an irregular process.

I interviewed sixteen (16) witnesses who were involved in or had information about this promotion decision—seven (7) women and nine (9) men. These witnesses included members of the Supreme Court who were the decision makers on this promotion at that time, individuals from HR and the Legal Department who were involved in the process, the two prior State Court Administrators, and a representative from the organization that ran the search for this position.

There are many documents and materials related to this allegation. They include the announcements of the position and job description, the application materials for all the applicants for this position, notes on interviews, emails, references (for Ms. Masias) for the position, applicant screening spreadsheets, and a recorded meeting between Ms. Masias and the Chief Justice at the time of these events.  I reviewed all these materials and considered them in reaching my finding.

I submitted a full report on this investigation to counsel for the Judicial Branch on May 11, 2022.  On May 24, 2022, I was directed to prepare Report Summaries on all matters for public release.  I completed this Report Summary pursuant to this requirement.

### B.    Summary of Material Facts

#### 1.  Chronology of Events

In February 2017, then State Court Administrator Gerald "Jerry" Marroney announced his retirement effective June 30, 2017.[25] This set into motion the process at issue here, to select his successor. At the time of this announcement, Ms. Masias was serving as Chief of Staff and had been, in the opinions of many, running SCAO at the end of Mr. Marroney's tenure. From the vantage point of several witnesses interviewed, Ms. Masias was groomed by Mr. Marroney for the role of State Court Administrator. More than one person described her as the "heir apparent."

The National Center for State Courts ("NCSC") was retained to run the recruitment effort and

---

[25] *See* Ryan Severance, "Former Pueblo Judge Gerald "Jerry" Marroney set to retire," THE PUEBLO CHIEFTAIN (2/23/17): available at: https://www.chieftain.com/story/news/2017/02/24/former-pueblo-judge-gerald-jerry/9254823007/.

promotion process.  NCSC worked with Christopher Ryan as the internal contact in doing this work.  Mr. Ryan ultimately received the State Court Administrator position.  He was the clerk of the Colorado Supreme Court and Colorado Court of Appeals at the time recruitment began.

Ms. Masias applied for this position on April 11, 2017 and was one of nine candidates who applied. The Committee interviewed candidates and selected four to send on to the members of the Supreme Court for final interviews.  One was an external male candidate, one was an external woman candidate and there were two internal candidates: Ms. Masias and a male colleague.

As part of the process, the Chief Justice asked each Division leader from SCAO to come to the Court and provide a presentation on their Division.  This was done to provide the Associate Justices with some insight into SCAO and leaders that they did not frequently work with.  This took place before candidates for the position were interviewed.

The four finalists were interviewed by the Justices of the Supreme Court on Monday May 15, 2017, but no successful candidate was selected at that time. In short, the Court could not reach consensus on a candidate, so the recruitment process was extended.

According to Mr. Ryan, he was first approached by the Chief Justice before the process was underway and she "implored" him to apply for the position. Moreover, he said, the Chief Justice sent other Justices to pressure him in a friendly way to consider applying. He thought about it but declined. He said, "I was interested in the work, but not in the job. I had a good job where I was."

According to Mr. Ryan, the Chief Justice came to him after the interviews to ask what options they had. She asked him if she could put Ms. Masias in the role in an interim capacity and he said he did not think that was fair, or a good idea, if the Court was not united in favor of her as the candidate. He offered to do the job for a six-month period and the Chief Justice accepted that offer. On May 18, 2022, the Court announced it was extending its search and announced that Mr. Ryan would serve in the role in an acting capacity.

Over the summer, Mr. Ryan started the job and realized he enjoyed it. When the Court came out of recess in September, the Chief Justice asked him what his thoughts were, and he said he really enjoyed it and was interested in doing the job. The Chief Justice brought this back to the Court. According to colleagues on the Court at the time, the Chief Justice told her fellow jurists she believed it was in the best interests of the Branch to get this position settled and to go with Mr. Ryan. According to Mr. Ryan, he was appointed as the State Court Administrator the next day. There was no application or interview process for Mr. Ryan and no one else had the opportunity to apply (or re-apply) for the position.

## 2. *Supreme Court Justices Were Split in Support of Two Candidates for the Position*

According to all the Justices I spoke with about this decision, the Court was divided about the candidates for the position. No one was particularly impressed by the internal male candidate or the external female candidate. Instead, the Justices were split between Ms. Masias and the external male candidate. The support broke down around gender lines, with the women Justices (3) in favor of Ms. Masias and the men (4) favoring the external male candidate.  Justices I interviewed, both

41

men and women, expressed concern about whether Ms. Masias had "the vision to lead the whole Branch," and indicated there was concern whether the external male candidate had "a solid grasp of what the role was going to entail." As summarized by one Justice, "We were very divided." The male candidate was described as having "a ton of gravitas," but "had no idea what the job was about."

The Justices remarked that the presentations they received from SCAO leadership were enlightening, but not in a way that was helpful for Ms. Masias's candidacy for the State Court Administrator position. The presentations revealed "weird and bitter rivalries" between HR and other Divisions at SCAO. As one Justice put it, "[W]hat we came to learn there was a ton of dysfunction in the SCAO. The other thing we came to learn was that HR was at war with IT, finance and legal. It was very concerning to me if Mindy got the position that there would be a split down the middle in SCAO. . . . Mindy was terrific and I considered her a friend. Nonetheless I had concern about the HR piece. She never stopped being 'HR Mindy,' she and Eric were inseparable, and she was still considered HR." Another Justice said, "My concerns were the infighting going on, could she rise above it and lead the Branch without dragging the HR piece into it." Another Justice said, "There are minders, finders, and grinders . . . Mindy was a quintessential grinder. In the weeds, the worker bee. . . . That was the issue, was she ready to step into that high level policy role."

The decision was made that, in the absence of consensus, the Court would open the position back up to more applicants and the Chief would encourage Ms. Masias to apply again. "My thinking in supporting Mindy – I was hopeful she could overcome these concerns we had. It was clear to me she had solid relationships with the Districts and that counted for a lot." As noted by another Justice, the Court asked the Chief Justice to speak to Ms. Masias and convey, "You need to disengage HR Mindy and be Chief of Staff Mindy . . . If we could separate her [from HR and tactics] she could become a viable candidate."

The Chief Justice mentioned Ms. Masias's demeanor as well as gossip about her in discussing the lack of consensus around her candidacy. While she voted for Ms. Masias as the best candidate, she said there was concern because, "[S]he was a different person with different people. She was someone who was flirtatious / provocative with the men, and trial judges would gossip about that . . . From the SCAO perspective, something I do know, there were a lot of complaints about her from the other department heads. . . . There was a mini campaign against her - some gossip about some of her relationships and whatnot." The Chief "[D]iscounted all that stuff – maybe a little more than I should have in retrospect." She added, "[T]he weakest aspect she had, she was just much too wed to HR." "[S]he had some real positives in my point of view . . . I wanted her to get the job."

The Justices did not agree that sex or sex stereotyping motivated the decision. "There was certainly no discussion that she was a woman and not up to the task. I liked the idea of appointing a woman. I came into that thinking she would probably be the person for the job given all the accolades she had received, given her experience in SCAO in various roles, she seemed like a logical successor. I figured that was where we would end up landing."

42

### 3.  The Decision to Offer the Position to Mr. Ryan

Mr. Ryan indicated that it was his idea to offer to serve in the interim role when it became clear that the Court was deadlocked and could not reach a consensus.  He took this suggestion to the Chief Justice, who immediately agreed with this idea.

Once he had served in the role for several months, Mr. Ryan realized he liked the job. "When the Court came out of recess in September, [the Chief Justice] asked what my thoughts were, and I said I really enjoyed it and am interested in doing it. She said, 'Great I will talk to Court, and they will appoint you,' and it happened the next day."

Mr. Ryan did not apply or interview for the position.  Instead, he was appointed as the Interim and then made the permanent SCA several months into his interim tenure.

A number of witnesses expressed concern about the appropriateness of appointing Mr. Ryan into this position without him participating in a competitive process.  As one Justice put it, "I was really torn about that. On the one hand I was thrilled, I wish he had applied from the beginning . . . On the other hand, I was really bothered by the way this went down. He had chosen not to apply and had run the search committee. How optically weird this was, given how this all unfolded. I said as much."

This Justice added that it was the Chief Justice who drove the ultimate decision and the Associate Justices were expected to ratify it.  "So yes, technically, we all agreed and got on board. But I was deeply uncomfortable. Chris came to the court again. I said, "Chris, I am thrilled you are in this role, but I am uncomfortable with how this went down, I don't feel like this was at all transparent. It feels icky how it happened.' I was concerned at the optics."

Others at SCAO had similar concerns.  "The court handled it terribly – appointing Chris was a terrible idea. He didn't apply for the job; he evidently didn't want the job. . . .  This violated all the rules about competitive selection."  Another witness noted, "I can tell you the way that they did that hire was not consistent with our rules. . . .  So many things went wrong that created more animus than necessary. When there is an employee who was groomed and didn't get it."

### 4.  The Surreptitiously Recorded Statement

At some point after the promotion decision was made, Ms. Masias met with the Chief Justice, who had agreed to give her feedback about the decision. Ms. Masias decided to surreptitiously record the meeting without the Chief Justice's knowledge or agreement.

The meeting was approximately 47 minutes in length. During the meeting, the Chief Justice offered feedback to Ms. Masias that was primarily consistent with the feedback I received from the decision-makers quoted above. This included advice on cultivating her leadership, separating from HR, developing more of a strategic rather than a tactical mindset, and defining herself as a leader with vision. The Chief Justice asked Ms. Masias to think about the military and how Officers and Master Sergeants serve leadership versus tactical roles, respectively. She also mentioned "line" and "staff" in the military, as examples of strategic leaders and tactical "doers."  The Chief

43

Justice discussed "classist" issues, describing some on the Court as believing the position needed to be filled with a lawyer or judge. She also talked about her own career as an example and said that she was hiring people, giving raises, firing people, settling cases, and exerting authority in an effort to be "line" and not "staff." "I had the power, and that's what I think you and Chris need to negotiate. You don't want to be staff. Staff makes the operation move more smoothly but it doesn't make it move."

The Chief Justice attempted to end the meeting at several points over the 47 minutes. The first time was approximately 20 minutes in. "So, I don't know Mindy what more I can say. I guess that's sort of it. Does any of that make sense to you?" Ms. Masias responded, "It does."

The meeting continued, and at around 28 minutes, the meeting appeared to be ending again. Ms. Masias told the Chief Justice, "I appreciate you taking the time." Instead of ending the meeting, the Chief Justice noted that while "the men in particular appreciate the person who is sort of secretarial and helpful . . . that is not the person who is going to get promoted. So don't be." Ms. Masias said she appreciated that advice because she was not a secretary and had never done that job. The Chief Justice noted that Ms. Masias had a "habit of [being] a little bit of a caretaker . . . but other people can do that."

At around 39 minutes, Ms. Masias said she had always "been underestimated" and during this last part of the meeting, the Chief Justice made additional remarks implicating sex-based stereotyping. Ms. Masias said she had been underestimated because she is not pushy and has a positive attitude. The Chief responded, "You're a small woman [*Ms. Masias: Small in stature, yes*], big hair still. You don't look the part of… you don't look like the women partners on 17th Street. You don't look like [the women on the Supreme Court] or the women on the Court of Appeals." Ms. Masias asked, "[S]hould I change my hair?" and the Chief responded, "[Y]ou might want to think about it. I mean, I am not kidding. You need to do something to make yourself not be underestimated." The Chief went on to reference the "generation" of men in the court who are "used to women who are the partners at the law firms or older women." She added, "[Y]ou know there is sexism out there still and I think that to pretend like there isn't, even in government … the only way you can make the sexism go away I've noticed is to be the boss." The meeting ended with Ms. Masias saying, "[T]hank you Chief I really appreciate it," and the Chief responding, "[T]hank you, Mindy. You're doing great. I'm very glad you're my friend."

I asked the Chief Justice about the statements made at the end of the recording. She had not listened to the recording but shared some observations regarding the statements. She said, "[H]istorically the people that the court hires as the State Court Administrator were judges. That is who the judges really want, in that sense that they want someone who looks more like a judge than someone who doesn't." She said Ms. Masias was "like the opposite of that," and sometimes dressed in "tight clothing and short skirts – the antithesis of the traditional lawyer / judge look – right wrong or indifferent." The Chief Justice said, "I was telling her to dress for the job you want." With respect to the statement, "[T]here is sexism – we can't pretend that there isn't," the Chief Justice did not remember saying this, but noted, "[O]f course there is sexism in the world. We spend a huge amount of dollars trying to educate judges on all aspects of discrimination. Implicit bias, training on that. Oh my God, and of course I have experienced it myself in lots of ways. It is out there and to pretend that it is not is sort of silly."

44

When I asked the Chief Justice if she had anything else to offer, she said, "I don't think anyone deserves a job like that. It is a big deal job. I think Mindy thought she would get it and was kind of stunned when she didn't.  . . .  I was surprised she didn't get the four votes. I voted for her. I don't think she was entitled to it, but I thought she was going to get it."

## C.    Analyses and Finding(s)

### 1. Analysis

On the one hand, there is credible evidence of sex stereotyping, and potentially a sex-based decision with respect to this promotion decision.  First, there are the words used by decision makers to characterize the two leading candidates.  Second, there are the words the Chief Justice used in discussing the situation with Ms. Masias.

The decision makers characterized the two leading candidates as "HR Mindy," and the external male candidate with "gravitas." On its face, these descriptions implicate sex stereotyping; a woman cast in a typically female job (HR) versus a male candidate's presence described using a strong, male-oriented adjective. However, the fact is that at the time, Ms. Masias was tightly connected to the HR operation because of her history in the position and her close working relationship to Eric Brown. Moreover, the male candidate was objectively a person with professional gravitas because of his accomplishments in the bar and in the legal community. For these reasons, I did not weigh these remarks heavily in my finding.

In contrast, I closely considered the remarks that the Chief Justice made in the surreptitious recording and in her interview. The Chief Justice was the most powerful decision maker in this promotion process. She was the Chief.  She wanted Mr. Ryan to apply for the position and accepted his offer to step into the role temporarily. Most importantly, she likely drove the decision to move him into the permanent role without initiating a competitive process. For these reasons, I weighed her statements carefully as they are particularly important to my analysis.

There is no dispute that the Chief Justice made remarks that implicate sexism. They include remarks that invoke sex stereotyping about Ms. Masias's small stature, appearance, hair, and clothing. They include statements about the "type" of woman the male members of the Court are most accustomed to – women partners in 17th Street firms and judges and Justices on the highest courts of the State. They include commentary about Ms. Masias caretaking as well as advice to her to not be "secretarial."

That said, the context and timing of these remarks is important. The Chief Justice spent most of the first 42 minutes of a 47-minute meeting giving Ms. Masias advice about how to position herself more favorably to win the State Court Administrator promotion after Mr. Ryan's six-month acting period. In doing so, she echoed the concerns voiced by the other Justices discussed above.  These centered around Ms. Masias's perceived focus on tactics, HR, and operations rather than strategy, vision, and leadership.  The Chief Justice ended the meeting two times during the recording – at minute 20 and at minute 39. In both cases, she said that was all she had to say. By these points in the meeting, she had said nothing about Ms. Masias's stature, hair, or clothes. From a fair reading of the timing, the reasons for the decision that mattered most to the Chief Justice were the non-

45

sex-based reasons described above.  Ms. Masias needed to take on more visible leadership, distance herself from HR, and be firm in developing herself as a visionary leader. All of that had been said by minute 42 of this meeting.

Moreover, the remarks about stature, hair, and clothing happened after Ms. Masias said she had "always been underestimated" and the discussion that followed relates to that statement.  In that sense, the remarks are distanced from feedback about the reasons for the decision.

Finally, one additional piece of evidence stands out as strongly persuasive against this allegation. There is compelling evidence that, according to the SCAO Directors the Court invited to present, the HR function under Ms. Masias had developed toxic relationships across SCAO. This surprised many Justices and caused credible concerns for them about what might transpire if Ms. Masias were promoted to the State Court Administrator position. This evidence of poor relationships bolsters the non-discriminatory reasons given for not awarding Ms. Masias the promotion.

Finally, it is not contested that the Chief Justice, despite her remarks, was a champion for Ms. Masias in the promotion process.  She voted for her candidacy and gave the other Justices the clear impression that she wanted Ms. Masias to get the job.

On balance, the evidence of credible non-sex-based reasons for the decision outweigh the remarks of one decision maker, even the most important one.  The concerns about Ms. Masias's tactical focus, the infighting in SCAO that appeared to revolve around HR, and questions about her strategic vision were broadly shared and corroborated by the weight of the evidence in this investigation.  These factors were the reasons, more likely than not, for the decision not to award Ms. Masias the position.

In closing, while I do not find that sex-based discrimination is the likely reason for this promotion decision, I do find that this process deviated in important ways from the standard SCAO promotion process. The evidence is not contested on the point that there was no competitive process for Mr. Ryan. There was no second chance for Ms. Masias, despite that being the plan.  There was no application, no interview and no process required for Mr. Ryan.  This was described by both attorneys and HR witnesses as violating the accepted processes within SCAO at the time, particularly for such a prominent position.  This decision – to just award the job to a favored candidate – echoes a theme I found throughout this process.  In a number of these cases, individuals operated as if the rules, procedures and processes just did not apply to them.  If this attitude still exists, those holding it must be swiftly disabused of this notion if the public is to regain trust in the Branch.

### 2.  *Findings*

For the reasons set forth above, I find:

- Allegation Sixteen, contending that Ms. Masias was not selected for promotion to State Court Administrator because of her sex and/or sex stereotyping, is **Not Substantiated.**

- However, it is **Substantiated** that this promotion decision was made as the result of an irregular process that deviated significantly from SCAO standards for fair promotions within the Branch.

**Allegations of Finance Department Misconduct (8-10)**

**Allegation Eight: Financial Manager Impermissibly Using Accurint**

*Evidence a financial manager accessed personal information on various leaders throughout the state using Accurint for no business reason; no discipline taken on him and he was promoted less than two years later to deputy director.*

## A.    Methodology

As background, Accurint is a system operated by LexisNexis that allows users to access public and non-public information about individuals. It is widely used by law enforcement and other government agencies to obtain detailed personal information including assets, relatives, associates, arrest records, corrections records, and sexual offender records. It is a powerful tool with access to sensitive information.[26]  The Colorado Judicial Branch has used Accurint since 2009 for specifically delineated and limited purposes.

My investigation determined that the events in this allegation likely occurred at some point between 2009 and 2011. This allegation was raised by Mr. Brown in 2018 before he left the Judicial Branch.  According to employees at the Branch, Mr. Brown raised this allegation as an example of leadership misconduct. Mr. Brown thought was as serious as the misconduct Ms. Masias was being accused of at the time, with respect to her expense reimbursements.

I substantiated that some episode of improper access to Accurint likely took place, but I could not determine with certainty the date of that access.  I substantiated that it is more likely than not that at least one target of the access was Ms. Masias, based on the financial manager's (described hereafter as "Finance Manager") recollections as conveyed to me in his interview.  I corroborated that there was no discipline of this Finance Manager, but I could not corroborate that this situation was ever formally investigated or that Human Resources made any recommendation of discipline. It is true that this person was ultimately promoted to Deputy Director after these events.

I interviewed nine (9) people with knowledge about this situation.  The Finance Manager did not remember any specifics but offered speculations about what this could be about.  Other witnesses had recollections of his explanations at the time this instance was complained about.  The people I interviewed included the Finance Manager, his supervisor at the time, members of the finance and legal teams, and an individual who is responsible for the management of the Accurint system for Judicial.  This witness likely would have been aware of any formal complaint or investigation into Accurint use because of their responsibility for the program.

I attempted to locate any relevant documents, images, or records relating to this alleged complaint about Accurint use.  I also requested and reviewed the Finance Manager's performance evaluations and promotion history. I reviewed the rules around Accurint use and requested a search for any complaints about this Finance Manager's use of Accurint (there are none). I reviewed audit files relating to two audits done under Finance Manager's tenure as Audit Manager because of his recollection that there may be some connection between that work and his use of Accurint to check on property records relating to Ms. Masias. Review of these records, including handwritten notes,

---

[26] Accurint: https://www.accurint.com.

revealed no connection. I could not locate any investigation file relating to Accurint use. If this was investigated by HR at the time, the files have not been retained.

I submitted a full report on this investigation to counsel for the Judicial Branch on May 23, 2022. On May 24, 2022, I was directed to prepare Report Summaries on all matters for public release. I completed this Report Summary pursuant to this requirement.

## B.    Summary of Material Evidence

The Judicial Branch obtained Accurint in 2009 and authorizes its use only in circumscribed instances:

**Official Use of Databases:**

**All searches on the database are electronically logged along with the user conducting the search.** These search logs are maintained by Accurint and are subject to review and monitoring by Accurint, the District Customer Administrator, and the Central Customer Administrator. **No searches may be conducted that do not directly relate to court cases being worked by Judicial staff in their official capacity. In other words, any searches not concerning Judicial official business, such as requests for data on celebrities and other public figures, relatives, acquaintances, Judicial employees, etc., ARE PROHIBITED. Violations will result in immediate termination of access and could result in disciplinary and other action.**

**Keep the following rules in mind as you use Accurint:**

1)  Do not conduct person or property (or other) searches on yourself, your own social security number (SSN), last name or former name, your spouse or former spouse (incl. significant others), co-workers or other employees, friends, relatives, neighbors, acquaintances, officials, celebrities, public figures, or any other person, business, or entity (or related SSN, ID number, phone number, address, etc.) that is not directly tied to a court case and official Judicial matter *that needs your attention in your official capacity*. **No personal use is authorized.** Our contract with LexisNexis for the use of Accurint is predicated on the agreement and understanding that searches will be conducted for official Judicial business only.

(Emphasis in original.)[27] The Judicial Accurint Use Policy contains a written User Agreement and Acknowledgement that every user must sign. This document states that the user has read and understands the policies pertaining to Accurint use.[28] Finance Manager, who was Audit Manager at the time, signed his User Agreement on July 1, 2009.[29]

The investigation revealed two possible chronologies around the alleged improper use of Accurint by Finance Manager. The first is that Finance Manager made some improper searches, using real Judicial Branch personnel, when he was testing the Accurint system in 2009. According to one employee at the Judicial Branch, they recalled that Finance Manager tested Accurint "on live people" and this caused a credit check to enter on those individuals' credit reports:

---

[27] Colorado Judicial Branch Policies and Procedures Concerning the Use of Accurint.com, updated December 2011.
[28] *Id.*
[29] This date, before the execution of the contract, would make sense as in his role of Audit Manager at the time, he was the individual tasked with trying the system out to determine if Judicial would buy it or not.

48

[Finance Manager] was testing [Accurint]and he tested it on live people – I don't think he knew it would cause a credit check thing. He had to have a real person to check. He didn't know it would cause a credit hit. I don't know how he picked who to look up.  . . .  It was more than one person. I don't remember who it was. I remember it was completely an innocuous effort to make sure we were going to get our money's worth. . . .  When that happened, we looked into it. He felt terrible it impacted anyone.

Three other witnesses remember that when they asked Finance Manager about these allegations in 2018, he speculated that "[M]aybe it was when he was testing the system" or it was when he was training on the system.

However, in his interview with me, Finance Manager speculated that he may have used Accurint to examine Ms. Masias's real estate transactions in connection with an audit he was doing in the Probation Department. According to Finance Manager, the State Court Administrator at the time raised the prospect that there may have been some connection between Ms. Masias and the subject of the audit.  He said, "I might have looked on something at Accurint to find something on the two of them."  He said that there were contentions that Ms. Masias and the subject of the audit were personal friends and worked together.  He also said he did this review "in talking with [the State Court Administrator]. He was aware of what I was doing in that audit."

The State Court Administrator at the time adamantly denied this.  He said, "That never happened. We did investigate issues on [the person in Probation] but there were never allegations about a connection between [them] and Mindy.  . . .  I never authorized any use of that tool for any judicial employee. [It was] only to be used for those defendants who owed money via fines, fees, and restitution."

When I asked the Finance Manager why a friendship or working relationship – without any other evidence of wrongdoing – would subject a person to being searched on Accurint, he did not have a logical explanation as this exchange reflects:

*Why was Mindy involved?* She had a pretty close relationship with them down there. She was involved in a lot of what they were doing. Her and [the person] had been working together for a while. . . As an auditor I have to run down a lot of different scenarios, different things you have to look at to see if there is any trail there.

*How would Accurint have come in?* I don't even know. Seeing if there was any sort of real estate transactions and property transactions, different things like that. *Did you have a lead that they owned property together?* No. That's the point you are trying to follow leads and disprove things. I don't know if I even did that or not. The whole allegation is based on something - I don't know what it is based on. . . This came about because [the former SCA] said there was a connection. I remember a general conversation with [him] about the [Probation person] and potential collusion or corruption. *With Mindy?* Maybe. It might have been other people I don't recall specifically . . .

*Were Mindy and this person personal friends?* That is what I understood yes. *What was the connection between that and what you were looking at in the audit?* [The Probation person] had a consultant she had used without going thru procurement. That is a red flag.

*A red flag for Mindy?* I don't even remember if that is what we used that for. It was because of the

49

relationship that they had as a possible red flag. . . . *If you are looking at someone for audit purposes do you look at all the people they are friends with or work with at Judicial?* Most don't get to this level. They don't have the aspects of what [the Probation person]'s position was in judicial. No I wouldn't think that is a common practice. . . . *Have you done that before in other audits?* I don't recall specifically.[30]

Finance Manager provided me with a copy of the referenced audit report, and I also obtained access to the working papers relating to this audit. Neither the report, nor the work papers, mention Ms. Masias in connection with the audit issues of compliance or other misconduct.

The person who oversees Accurint use for Judicial described what this program is used for at the Judicial Branch and said they were unaware of any complaint of misuse of Accurint by Finance Manager: "I know I was never asked to look at his use. While I was Administrator of the program, prior to being the Manager, I would have been the one to do that search."

There were no records of such a complaint or any investigation. There were likewise no discipline or performance plans in this Finance Manager's personnel file on this or other matters. This person was promoted three times since being hired and was promoted to a Deputy Director position in 2013.

## D.    Analyses and Finding(s)

### 1. Analysis

This investigation did not reveal hard evidence about the complaint—specifically, how Accurint was misused or who it impacted. We have no HR records, interviews, or investigation report. It does not appear that anyone sought out information from the individual responsible for Accurint and they were unaware of any complaint. While some records at Judicial have been difficult to locate during this project, I have typically unearthed some documentation in those cases where there was an HR investigation. I would expect the person responsible for the system to have been interviewed. The absence of such data here suggests that this situation was not considered serious enough at the time to justify an investigation.

Instead, I found two possible explanations from six people with some recollection that there was a complaint from Mr. Brown about this topic. Four people remembered some issue around Finance Manager testing or training on the system. One witness, who has offered credible data in other investigations, remembered this with a degree of particularity. They remembered that credit checks popped up, signaling to management that Accurint had been improperly used. In contrast, Finance Manager believes this may be about an audit he did and the State Court Administrator's request to run Ms. Masias's name as part of that audit.

Ultimately, whether Finance Manager used Accurint on "live" coworkers while testing the program or whether he used it to look at Ms. Masias's real estate transactions, it appears that the usage would have been improper under either scenario. The terms of the User Agreement he signed are clear. Finance Manager agreed not to conduct searches that did not "relate to court

---

[30] The two people who met with Finance Manager to ask him about the complaint issue did not have any recollection of him mentioning Ms. Masias as being involved in an audit in some way.

cases being worked by Judicial staff in their official capacity." As clearly stated, "any searches not concerning Judicial official business, such as requests for data on . . . Judicial employees, etc., ARE PROHIBITED" (emphasis in original removed.) Whether his usage was innocent, as recalled by one employee in remembering the credit checks, or more purposefully illegitimate, as suggested by the implausible audit explanation, it was improper either way.

It should be noted that the version of events Finance Manager put forward in this investigation regarding the audit is implausible and not corroborated by any other evidence. The idea that Finance Manager would have run Ms. Masias's name in a Probation audit because of her friendship with the subject is farfetched. Finance Manager did not satisfactorily explain why a leader in one operational group would be audited on the mere fact of a working or personal relationship - without some evidence of potential wrongdoing. There is nothing in the work papers to suggest a legitimate reason to include Ms. Masias in the audit. The person Finance Manager identified as directing this activity, the State Court Administrator, adamantly denied it. The State Court Administrator firmly stated that he gave no such direction and the audit in question had nothing to do with Ms. Masias. It is notable that Finance Manager's statements around the audit also exhibited poor credibility because of the change from his first explanation for this situation, his audit explanation's inherent illogic, and inconsistency with other data.

Given other data unearthed in the investigation about the toxic relationship between HR and Finance, this improbable explanation is even less credible. If anything, the bitterness between Ms. Masias and this group might suggest that the improper Accurint use had improper motives as well.

Ultimately, there is no documentation that details what the complaint was specifically about, but there is sufficient evidence under a preponderance of the evidence standard to conclude that Finance Manager engaged in some improper use of Accurint.

### 2. *Findings*

For the reasons set forth above, I find:

- The allegation concerning the inappropriate Accurint use is **Substantiated.**

- The allegation contending that Finance Manager was not disciplined is **Substantiated**, with the caveat that it does not appear that any formal investigation was done, or that any discipline was recommended.

**Allegation Nine: Financial Manager Investigated Twice for Harassment**

*"Financial manager investigated twice for harassing behavior. Receives more staff and a better office. No mention of the complaints in his 2017 performance appraisal."*

## A.    Methodology

Through this investigation, I determined that the financial manager (described hereafter as "Finance Manager") was investigated three times for harassing behavior.  These investigations occurred in 2015, 2017, and 2021 and involved two different complainants. I also confirmed that the Finance Manager received more staff and a better office, and there was no mention of these harassment complaints in his evaluations.

I interviewed eleven (11) people with knowledge about this situation. These included Finance Manager, his present supervisor, one of the two individuals who had filed complaints about harassment, and members of the HR and Legal Department teams who were aware of and involved in this situation. People had strong recollections of what happened.

I sought out documents, images, or records relating to the alleged harassment complaints and investigations. These included Finance Manager's performance evaluations, discipline, and trainings as well as documentation of his staffing and office situation. There was a great deal of documentation on these events, which helped the investigation proceed. This consisted of investigation interviews and reports, email communication, texts, performance evaluations and other material.

I submitted a full report on this investigation to counsel for the Judicial Branch on May 10, 2022. On May 24, 2022, I was directed to prepare Report Summaries on all matters for public release.  I completed this Report Summary pursuant to this requirement.

## B.    Summary of Material Evidence

### 1.  *The First Complaint and Investigation - 2015*

On September 30, 2015, a woman employee in the Legal Department spoke with her supervisor and made statements which the supervisor interpreted as raising a complaint of potentially discriminatory comments.  She stated that Finance Manager had told her there were concerns about the quality of her work because she was "young, blond and female." The supervisor reported these comments to her supervisor on October 1, 2015 and requested that HR assist in an investigation.

The woman employee said she did not see herself as stating a complaint of discrimination and did not want these concerns investigated. She described herself as "venting" to her supervisor. The investigation proceeded against her wishes.

The Human Resources investigator interviewed three individuals in conducting this investigation: the woman employee, her supervisor, and the Finance Manager. The investigation found that the allegations of harassment were not substantiated. This was so because the investigator found that Finance Manager was not stating his own views when he made the statement about concerns with

52

her work being because she was "young, blond, and female." Instead, it was determined that he was sharing his perceptions of what other male finance employees believed about this woman employee. In short, he was sharing this information with the woman attorney to help her figure out why she was feeling disrespected for her work.

The HR investigator recommended no disciplinary action or punitive consequence for Finance Manager. She recommended that he be "reminded that discussions about age, gender and other personal characteristics are unsuitable for the work environment." Finance Manager's supervisor said that he followed these recommendations and spoke to the Finance Manager about these topics.

### 2. *The Second Complaint and Investigation - 2017*

On April 21, 2017, an employee in the Finance organization (described hereafter as "Complainant") met with HR to file a complaint against this same Finance Manager. She provided a written complaint on April 24, 2017. The Complainant stated that Finance Manager engaged in "public shaming and belittling on multiple occasions," and discriminated against her based on "socioeconomic status." She stated she was resigning because of this treatment.

The Complainant provided examples of this behavior. It included Finance Manager "shush[ing]" her in meetings, interrupting her, and becoming red in the face during meetings. The Complainant reported this behavior to Finance Manager's supervisor. She said the behavior was not as blatant or reoccurring after this report, however Finance Manager continued to "become irate and turn[] red in the face, shake[] [h]is head and become[] real short and dismissive."

The examples also included statements around her career progression and performance. The woman employee stated that Finance Manager dissuaded her from applying for a promotion, saying, "While I cannot tell you not to apply, I will tell you that if anyone else has more experience in either IT or procurement you will not get the job." Further, Finance Manager told her he did not like employees who marked themselves at the top or close to the top in their self-evaluations, and "[She] should remain modest." In the meeting on that performance evaluation, Finance Manager allegedly told her, "I lowered your scores across the board because you had displayed your frustration out loud and I do not feel that you communicate effectively." He went on, "[Y]ou have a problem with remaining positive, but I scored you high on teamwork because you're the first to jump in and see if anyone needs help." At the end of the review he said, "[C]ommunication is the largest skill you need to improve on, you just want to be heard." The Complainant responded that "[M]ay be a little unreasonable" but she could understand, adding, "a lot of millennials get a bad rap for that but we just communicate differently." He replied, "Off the record no it is not because you're a millennial . . . it is clear that you are from a lower socioeconomic background and you've had to fight to get to where you are and because of that you just want to be heard."

These statements caused the Complainant to feel "judged, prosecuted and profiled." She was highly upset, went home, cried, and "was truly hurt and baffled."

Two HR investigators interviewed six additional employees and substantiated that the Finance Manager subjected the woman employee to unprofessional behavior that violated the Code of Conduct, Standards of Conduct, which stated: "[E]mployees shall 'demonstrate high standards of

53

professionalism in the workplace that includes interacting with the public, co-workers and management in a civil, courteous, and respectful manner.'" They did not substantiate that the Finance Manager dissuaded the woman employee from applying for an open position or that he discriminated against her because of her socioeconomic status.

The HR team recommended corrective action against Finance Manager for violating the Judicial Department Code of Conduct. They also recommended that he take mandatory trainings in the Code of Conduct, Introduction to Cultural Competency, STAR workshop, HR Law, Anti-Harassment for Supervisor, Performance Management for Supervisors and My Role As: Team Leader.

However, no discipline was imposed, and Finance Manager did not do any of the training at the time.  Training records show that Finance Manager failed to complete any of the recommended training within two years of the report and most of it remained incomplete until 2021:

- Code of Conduct: started in 2017 but incomplete; completed 6/14/19.
- Intro to Cultural Competency: started six times but dropped four times and incomplete two times.
- STAR Workshops: started eight times but dropped four times, incomplete three times, one time in progress.
- HR Law: started in 2018 but dropped; Completed in 2021.
- Anti-Harassment for Supervisors: Completed in 2021.
- Performance Management for Supervisors: never taken.
- My role as: Team Leader: never taken.

The cadence and lack of progress on these trainings does not suggest that there was any urgency around Finance Manager doing this training from him or from his management.

Finance Manager's 2017 evaluation contains no direct reference to this substantiated complaint. It states, with respect to Finance Manager's communication skills, "[Finance Manager] communicates effectively and uses acceptable language in the workplace."  It ranks him 4/6 in the category that includes "Uses Good Judgement." It states (incorrectly) that "[Finance Manager] has completed assigned training . . ."  The evaluation contains several veiled references that might relate to this investigation:

- Under "Professionalism," for which Finance Manger received a 3/6, it states, "[Finance Manager] is quick to accept accountability for his and his department's actions."  It goes on to say, "[Finance Manager] demonstrates the appropriate level of professionalism for [his] position."
- Under "Teamwork," for which he is scored 4/6, it says "[Finance Manager] can continue to improve by always fully listening to others."
- Under "Supervision" which is ranked 3/6, it says "[Finance Manager adequately supervises the [] unit.  . . .  [Finance Manager] should continue to improve on listening to staff in the unit and letting them express themselves."

Finance Manager is described as an "asset to the Judicial Department and SCAO" and he received an overall positive evaluation for 2017.

### 3. *The Third Complaint and Investigation - 2021*

The same woman employee referenced under "the first complaint" raised the third complaint. During her exit interview prior to leaving Judicial, she said that she was uncomfortable with the male Finance Manager and found herself subjected to inappropriate behaviors in the years following the first complaint. She did not come forward with these behaviors because of the negative experience of going through an investigation against her wishes the first time.

Her complaint included that:

- The Finance Manager was "creepy" to herself and others, including speaking in a sort of creepy voice.
- He made comments when she was wearing stretchy pants that they made her thighs look thinner.
- He would frequently look at the zipper on her pants and comment when it was down.
- He frequently commented about her appearance including about her nails, her earrings, the color of her shift and her overall appearance.
- He made a comment about a string on her back pocket, which made her think he was looking at her butt.
- When they went on a run together, he talked about taking a woman friend to a movie about swingers.
- He made statements giving her the impression that his marriage was, at some point, an "open marriage."
- He would abruptly switch directions in a professional conversation to talk about something personal.
- He frequently opened doors and invited her to walk through them before him, she suspected so he could look at her butt.
- He changed the way he interacted with her after she became more assertive, being disrespectful and demeaning.
- Following the Finance Manager's request to the employee to "vouch" for him with respect to the "memo that was published by the Denver Post," this woman employee decided to leave the Judicial Branch.

HR investigated these allegations. Two investigators conducted interviews with three individuals, which included the two mentioned parties and one additional witness from another department.

Finance Manager denied making comments about the woman attorney's appearance or body and said that from his perspective, the two were friends. He provided friendly text messages the two exchanged, including one congratulatory email he sent her upon her decision to leave Judicial where she asked him to "[P]lease stay in touch!" as evidence of their collegial relationships.

The investigators found that the allegations were not substantiated. Their report, dated July 2, 2021, provides the reasons for this finding: that the woman attorney never told Finance Manager that his behavior or comments were inappropriate or made her uncomfortable; and that while the woman employee said these behaviors caused her to avoid Finance Manager, she continued to

exchange friendly text messages with him, including asking him to stay in touch after she left Judicial.

The HR investigators recommended that Finance Manager's supervisor meet with him to go over the expectations of professionalism and supervisor/Finance Manager conduct pursuant to Branch policies. They recommended that this meeting be documented, and a copy of this documentation be placed in his file. They recommended that Finance Manager immediately read and comply with policy and personnel rules and confirm that he had read these policies by email. They proposed additional training, including mandatory classes he had not completed following the second investigation such as Introduction to Cultural Competency and Basic Management STAR Workshops 1-3 and 4. They also directed him to take an Anti-harassment for Supervisors and Code of Conduct training, which he was "due to retake in 2022."

Finance Manager's supervisor remembered talking with Finance Manager but did not recall that he documented the discussion.  He said he did not recall that discipline was considered.  He said he thought that Finance Manager had completed all the training that was required.

I found that Finance Manager did receive a better office and an additional staff person in 2018 and 2017, respectively. The additional staff person joined after the first investigation but before the second one in March 2017. Finance Manager moved into his supervisor's office in 2018.  Finance Manager's supervisor said that expanding workload explained the additional staff person Finance Manager was allocated. He also said that an office remodel resulted in him getting a better office, so Finance Manager backfilled the office his supervisor had previously occupied.

## C.    Analyses and Finding(s)

### 1. Analysis

There were three substantiated incidents where Finance Manager was accused of inappropriate statements and conduct toward female teammates. The 2017 investigation substantiated a Code of Conduct violation not based on sex; and the 2013 and 2021 investigations did not substantiate the allegations.  However, both the 2017 and 2021 investigations are problematic in terms of management's failure to respond to them and because neither investigation appears to have been sufficiently thorough.

The 2017 investigation substantiated a Code of Conduct violation and recommended documented discussions between Finance Manager and his supervisor, policy review, and training.  None of those steps were taken at the time.  Two years later in 2019, one training was done and four years later in 2021, several more were completed. Some recommended training remains incomplete as of the date of this report. There is no direct mention of this substantiated finding in Finance Manager's Performance Evaluation that year and no discipline ensued. Management apparently discounted what happened and moved on.

Moreover, the 2017 investigation data reveals some evidence of possible gender stereotyping that appears to have been missed by the investigator. Finance Manager told the female complainant not to express her frustrations "out loud," to "remain positive," and to "remain modest," among other things. This kind of commentary can be coded stereotyping for asking women to "smile more" and

56

to be more pleasant – a requirement that is often not asked of men. It does not appear that the investigators evaluated these remarks as potential indicators of gender bias.

The investigation into the third complaint was likewise not thorough. The complainant raised concerns about comments regarding her appearance, inappropriate personal commentary, and "creepy" interactions that spanned at least eleven (11) different topic areas over the course of six years. To fully investigate this set of allegations, HR should have interviewed more than just the parties and one additional witness (who does not appear to be someone who worked closely with either party). With at least eleven incidents over six years, this was a substantial investigation. The approach should have started with interviewing other coworkers who were in positions to observe behavior— particularly women who worked closely with Finance Manager.

In shortening this investigation, the investigators appeared focused on the facts that complainant never told Finance Manager that his behavior was offensive and that she continued to send him friendly texts. However, it is not an employee's responsibility to notify a coworker when their behavior is problematic. While direct conversations are one way for workplace conflict to be resolved, they are not the only (or even the recommended) way to deal with workplace harassment. It is not a requirement that someone tell a person they are offended or to stop. Further, the friendly texting could be motivated by several things including fear of conflict, avoidance, welcomeness, or an absence of negative impact from the behavior. More data is needed to determine what was going on in this situation. The texting does not negate the alleged behaviors, which do not appear to have been fully examined.

A more robust investigation would have comported with best practices and would have addressed the fact that this was the third complaint in seven years from female employees about this male employee. Three complaints from women could suggest a pattern requiring a closer look than the investigation that was done. There may be no pattern but without a thorough investigation, there is no way to make that assessment.

Finally, it should be noted that Finance Manager was given an additional direct report and a nicer office between the second and third investigations. The explanations are innocuous and do not suggest that Finance Manager was "rewarded" for inappropriate behavior.  Moreover, the additional staff person was added after a completed investigation that did not substantiate misconduct.

However, the office move happened a year after the substantiated finding in the second investigation.  At the very least, the optics are not good where Finance Manager received a better office a year after he was found to have violated the Code of Conduct. This, together with the indifferent response to the finding from management, does not convey that concerns about Finance Manager's behavior were deemed serious in the minds of management.

In conclusion, the facts suggest that HR and Finance Management should have taken a more deliberate approach to the issues raised about Finance Manager, including acting upon the findings in the second investigation, taking a closer look at Finance Manager in the most recent HR investigation, and ensuring proper training and consequences were implemented. The facts suggest

that leadership in the Finance organization has been reluctant to take these kinds of claims against Finance Manager seriously.

## 2. *Finding*

For the reasons set forth above, I find:

- The allegation is **Substantiated** on all accounts.

**Allegation Ten: Director of FSB Complained of "Not Working Even Banker's Hours"**

*"Director of FSD complained about not working "even banker's hours" by staff. Staff of other division follow him to his bar, home, and track that he does not place time in PTO system and is seen at home at 3:00 pm often or at bar."*

## A.    Methodology

My investigation did not substantiate the allegations here.  There is some data to suggest that the Director of FSD (described hereafter as "Finance Manager") worked less than some colleagues and was not in the office as much as people expected.  However, the investigation into his whereabouts and performance was not appropriately thorough or impartial. Moreover, while there may have been performance areas Finance Director needed to improve upon, these were not serious enough in the eyes of his supervisor to justify termination.  Finally, the timing of these events strongly suggests that there could have been a retaliatory motive for the investigations into the Finance Director and these motives were not investigated.  On this record, I cannot substantiate the allegations claimed.

I interviewed ten (10) witnesses who had recollection of this incident and obtained additional information from a transcribed interview conducted in another investigation.  I reached out to Finance Director, who is no longer with the Branch, several times to seek an interview.  After initially agreeing to meet for an interview, he stopped responding to my requests. I was able to find his recorded interview from the investigation of this incident, which provided useful information.

While an in-person interview with Finance Director would have been ideal in my investigation, even without it, I believe I have received enough evidence to reach firm findings on this allegation under a preponderance of the evidence standard. This is particularly so because of the volume of documentation on this set of issues.

I sought out existing documentation from the Supreme Court Administrator's Office, HR, and Legal Department.  There is significant documentary data that is relevant to this allegation. Some documents were provided to me and others, I personally located by searching through databases of material that were made available to me.

The full report on this investigation was submitted to the Judicial Branch on June 9, 2022.  On May 24, 2022, I was directed to prepare Report Summaries on all matters for public release.  I completed this Report Summary pursuant to this requirement.

## B.    Summary of Material Evidence

### 1.   *The Timeline of Relevant Events*

- **Investigation into Alleged Reimbursement Misconduct by Ms. Masias**

According to witnesses who were involved in this incident, as well as documents I reviewed, it is accurate that allegations were raised about the Director of the Financial Services Division in

January 2019. However, the relevant chronology of events goes further back in time and is important in understanding what took place.

In July 2018, Ms. Masias submitted receipts and requests for reimbursement to the Controller of Judicial. Her receipts indicated that the expense occurred in FY19, but Ms. Masias submitted them for FY18. The Controller pointed this out to Ms. Masias and told her to resubmit the forms.

Ms. Masias did so but submitted the forms to the general accounting email and not to the Controller directly. The forms still requested reimbursement for FY19, and the invoices were altered to reflect different expense dates.

This concerned the Controller, who got the Director and other members of management involved. An investigation ensued and the external investigator concluded that the second invoice was fabricated, although he stated he could not reach a finding as to who altered the invoice.

As a result of the investigation, the State Court Administrator notified Ms. Masias on November 7, 2018, that he would be terminating her employment, effective November 15, 2018. Ms. Masias requested FMLA leave on November 12th and informed the Branch that she had retained counsel.

Initially, the State Court Administrator had not planned to terminate Ms. Masias because of this situation. However, Finance Director and Controller informed him that they refused to sign off on documents required for a pending audit unless Ms. Masias was terminated. The State Court Administrator had little choice but to proceed with termination.

According to both Finance Director and Controller, the State Court Administrator told Finance Director words to the effect of, "[W]atch your back." Further, according to Finance Director, the State Court Administrator was instructed by the Chief Justice to get rid of both Finance Director and Controller for insubordination. The Chief Justice (from that time) has denied that he gave this instruction.

- **Human Resources inquiry into alleged wrongdoing by Finance Director**

Less than a month later, Human Resources Director Eric Brown began an HR inquiry into wrongdoing by Finance Director. This inquiry culminated in a January 22, 2019 memorandum from a Senior Human Resources Manager to the State Court Administrator, setting forth allegations of misconduct by Finance Director in five areas: email usage that showed Finance Director was hardly using email, suggesting he was not working at his job; time theft in that his hours at work were insufficient for a full-time executive of the Branch; a lack of appropriate leadership in the division; "sexual harassment" concerns based on Finance Director being "creepy," asking women questions about their married life "out of the blue," and invading the investigator's personal space in a manner that was "unnerving"; and the fact of falling morale in the division. The investigator concluded that Finance Director was performing minimal work, stealing time, failing to engage, failing to lead, and engaging in potentially sexually harassing interactions with female staff. The memorandum, which explicitly states it is "cursory" and "not an exhaustive and complete review," sets forth investigative efforts HR had already undertaken, starting as early as December 7, 2018, to investigate these concerns.

60

The State Court Administrator received this report, and nothing further appears to have happened for two months. During this timeframe between February and March 2019, negotiations occurred amongst Ms. Masias, her counsel, and SCAO regarding the terms of her departure and the leadership contract. Ms. Masias resigned on March 15, 2019.

- **External Investigation into Alleged Wrongdoing by Finance Director**

One week after Ms. Masias's departure, on March 22, 2019, Finance Director was placed on administrative leave while the allegations raised in the January 22nd memorandum were investigated by an outside investigator hired by HR. According to several witnesses, the investigator was previously known to, and connected with, Ms. Masias and Mr. Brown through their presentation work with the National Center for State Courts.

The investigator relied in part on the previous investigation done by HR, interviews with seven individuals including Finance Director, a review of records of activity in Finance Director's building access badge, Finance Director's email files, his performance reviews, and FSD employee satisfaction surveys. The investigator also examined Finance Director's hard drive to determine the number of working files actively being accessed and his VPN to determine how much remote access was taking place.

I listened to the one hour and 45-minute recorded interview that the investigator conducted with Finance Director. In that interview, the investigator spent the first 40 minutes asking questions about Finance Director's leadership style and practices. Following this, the investigator asked direct, and at times adversarial, questions of Finance Director about his time at work, use of email and overall professional commitment to his position.[31] The investigator also discussed the connection that Finance Director was making between the investigation of him, and his role in the inquiry of Ms. Masias. At one point, the investigator said (inaccurately), "I don't believe your individual productivity is at issue."  At the end, the investigator told Finance Director, "I'm not seeing a good strategy that leads to your continued employment, I gotta be honest with you.  I think there are just things beyond repair."

The investigator gathered and reviewed documentary evidence about Finance Director's time spent in work or on work activities. He reviewed Finance Director's building access and PTO records from the period of October 1, 2018, through March 22, 2019, indicating that Finance Director's time in the office amounted to approximately 32 hours per week. When considering holidays, PTO and early closure days, the investigator concluded that 4.8 hours each week was "unaccounted for" based on a nine-hour workday (eight hours work and one hour lunch). He also reviewed Finance Director's computer files on his hard drive and found 33 work files that showed activity during this five-month timeframe. Finally, the investigator reviewed Finance Director's access to the network via VPN, which showed only one occasion where Finance Director was logged on remotely for a measurable period of time.

The investigator reviewed some slight evidence relating to Finance Director spending time on

---

[31] The one exception to this statement was the allegation that Finance Director left work frequently to go work at a bar he co-owns with a family member. This subject was not raised by the investigator in his interview.

personal matters during the workday. He found evidence that Finance Director worked on volunteer boards, including one spreadsheet. His report does not reflect that he reviewed any data relating to work time allegedly spent at the bar that Finance Director and a family member owned.[32]

Finally, the investigator reviewed evidence relating to leadership accountability and employee satisfaction. He cited his surprise that Finance Director, as "an individual who expressed such an enlightenment as [he] described," would not remember the details of a personnel action memo he received directing him to engage more with his staff.  However, in the interview it was the investigator who used the word "enlightenment," not Finance Director.  Investigator described the receipt of this memo as, "A pretty significant period of enlightenment . . . in your career."  He also noted that it was concerning that Finance Director did not ensure that HR's recommendations were followed with respect to the employee in his group who had a substantiated harassment complaint. Moreover, he found that employee satisfaction was low and "unhealthy" in the division.

The investigator reached findings in his investigation report, dated April 8, 2019.  These included that Finance Director's time in the office was "substandard" for a person in his position, that his use of "state time and equipment" for personal business was problematic, that his leadership "lack[ed] accountability," and that his organization was "unhealthy."  In his conclusion, the investigator noted Finance Director had "failed the division and SCAO."

The State Court Administrator responded to this investigation report by drafting a termination notice to Finance Director on April 14, 2022, which he finalized and sent to Finance Director on April 24, 2019. The termination took effect on April 26, 2019.[33]

- **Finance Director Appealed the Termination Decision**

Finance Director appealed his termination and hired counsel. Negotiations between counsel and SCAO commenced, with the parties settling upon allowing Finance Director to depart as part of a layoff instead of departing as a result of a termination of employment.

### 2. *Witnesses' Recollection of Events*

Witnesses generally stated that it was known throughout the Branch that Finance Director did not work in the office with as much regularity as might be expected for a person in his position and that he would go to a bar owned by his family to help with the books (or do other tasks on behalf of that business). However, the previous State Court Administrator, for whom this Finance Director worked, said that this was done with his knowledge and permission, and he never found Finance Director unavailable when he needed him:

> [Finance Director] had talked to me about his brother running this bar in Aurora and he needed to help with the books, they were trying to sell it. He asked me if he could go there and I said sure if it was on his time. In addition, [Finance Director] not only had permission but had the responsibility

---

[32] It is possible that the investigator asked other witnesses about this issue but did not include it in his investigation report. I was not provided with, and could not locate, the other recorded interviews done in this investigation.
[33] Finance Director appealed his termination and hired counsel.

> to meet with the Chief Justice when the Chief was meeting with budget committee members.   . . .
> He not only had permission, but he [had] responsibility to do this.  . . . The role is not just an 8-5
> job. I can tell you there was never a time, I had [Finance Director]'s cell phone number, when I
> would ask him for documents/budget data that he didn't answer my phone call and get me the
> information I needed immediately. When they are talking about bankers hours – issues that were
> there but I considered them all professionals.

A number of witnesses confirmed that Finance Director's job required him to be off site to work
periodically, particularly during budget season in the Colorado Legislature (which overlaps with
the timeframe that the outside investigator evaluated as insufficient).

Seven (7) witnesses stated their concern that the HR investigation into Director was retaliatory,
based on Director's role in the Mindy Masias expense reimbursement situation.  One person said,
"[T]his looks like they just wanted to get rid of him . . .  they were working toward a defined end.
This was not an investigation it was a justification."  Another noted, "[W]hen the whole thing with
Mindy first occurred and [Controller] and [Finance Director] said, '[W]e are not signing off on the
audit,' [the State Court Administrator] told me that he had told [Finance Director], '[Y]ou better
watch your own house.' He threatened him and then he made good on it by sic-ing Eric on him.
Timing looked very suspicious."  Several employees said they heard that Ms. Masias drove by
Finance Director's house on a workday when she was out on leave and saw his car in the driveway.
This surveillance was identified as the instigating factor that started the HR investigation going.
The well-known animosity between Ms. Masias and Finance Director exacerbated these concerns
about retaliation.

The State Court Administrator from this time contends that it was the Chief Justice who was
driving the investigation of Finance Director.  According to the State Court Administrator, the
Chief Justice had said to him, "These two [Finance Manager and his staff person] need to go for
insubordination," for their refusal to sign off on the judicial audit.  The former Chief Justice
strenuously disagreed with this contention and denied being behind the investigation or ultimate
personnel action.

Neither the HR inquiry nor the investigation report contains any data on what the State Court
Administrator's expectations were for Director's time in the office or how he viewed the conduct
that was being examined.  The investigators did not interview the State Court Administrator or any
fellow Directors about expectations.  The State Court Administrator said that he "didn't necessarily
have [in-the-office] expectations for Division Directors or for Staff."  To the State Court
Administrator, what was important was getting the work done, and not necessarily where it was
being done.  He said that his leadership team "did a lot of things outside of the office."  Directors
I interviewed from that time said that there was flexibility in people's work schedules and some
people were in the office more than others.

The State Court Administrator said he that he was aware that Finance Director "had attendance
issues," but acknowledged that he did not "check[] people's desks" to see who was in or not.  He
described Finance Director as responsive to him when he needed him.

With respect to Finance Director's performance, the State Court Administrator said he told Finance
Director to engage "more on a department-wide level" and stop focusing just on the budget.  "His

63

work performance was generally fine.  For what it's worth, [Finance Director] is one of the most knowledgeable people about the state budget that I ever encountered over my entire career.  I just didn't know until investigation got going was how little he was doing."  The State Court Administrator said he was concerned when he saw how few emails the Finance Director sent and received, and also by what the investigation revealed in the way of odd personal documents on his computer.[34] This made the State Court Administrator concerned that he did not know what the Finance Director was doing.  All the directors I met with said they would expect to be sending and receiving many dozens of emails a day, not the 5-8 emails per day that the Finance Director was handling.

With respect to the allegations of personal use of email and equipment, Judicial's Electronic Usage Policy, Chief Justice Directive 701, does not prohibit personal use, but allows for some incidental use of Judicial's electronic resources:

> Limited personal use of the Department's electronic communication technologies [with some exceptions] is permissible when it does not consume more than a minimal amount of resources, interfere with employee productivity, conflict with this policies goals or any other judicial department policy, or preempt any work-related activity, in accordance with the Colorado judicial department code of conduct.[35]

This policy, and the "limited personal use" allowed, was not discussed, or apparently considered by the investigator.

The State Court Administrator at the time did not agree with the decision to move to termination of this individual.  "I would have looked at options like putting someone on a plan.  A whole year of performance plans were put on IT when there were issues there.  [Finance Manager] for all of the realization of what he wasn't doing, was extremely talented and was very good at what he did.  He would have been someone who warranted another chance."  The State Court Administrator said that the move to termination was not his call but was directed by the Chief Justice at the time, who wanted Finance Director gone.  The Chief Justice denied this contention.

## C.    Analyses and Finding(s)

### 1. Analysis

Based on these facts, there is insufficient evidence to substantiate the claim about Finance Manager's behaviors. First, the investigation into this behavior was inadequate and appears biased (based on the existing reports and records). As such it is a not reliable foundation to establish evidence of wrongdoing by Finance Director. Second, while there were likely some performance areas Finance Director needed to improve upon, they were not so serious that his supervisor agreed he should be terminated.  Finally, the timeframe strongly suggests retaliatory motives for investigating Finance Director were a possibility, and this possibility was not investigated.

---

[34] The State Court Administrator mentioned spreadsheets correlating his salary to his weight, as one example.  I could not confirm that this material existed as neither investigator mentioned it in their report.
[35] CJD 07-01 (Amended April 2014).

- ***The Investigation Was Not Thorough***

The investigation report and materials raise many questions that ought to have been answered in the investigation. There is a large body of important data that the investigator should have gone after but did not apparently seek.

First, despite his statement in the report that Finance Director "indicated acceptance of [the attendance concern]," this is an inaccurate characterization.  Finance Director indicated it would be "correctable" if there was a perception that he could not be reached.  He said "If there are concerns about my behavior and practices, I will be all over it.  I will correct that."  Finance Director did not acknowledge that he committed time theft or spent less than full-time in pursuing his job.  He acknowledged that if there was a perception that he was not around enough, he would work to fix that.

Secondly, more specific questions would have resulted in more concrete data on Finance Director's work activities, which was particularly important to gather in analyzing the work schedule of a salaried exempt employee.  But the investigator did not ask many of the questions that could have elicited this evidence.  The investigator did not ask Finance Director about his time out of the office at the Capitol for budget season. This is despite the fact that the timeframe for budget season overlaps with the timeframe the outside investigator examined.  The investigator did not ask Finance Director if he stored documents in OneDrive.  He did not ask about the time allegedly spent at the family bar, working on that enterprise.  In fact, at one point the investigator told Finance Director, "*I don't believe your individual productivity is at issue*," when in fact, it was a central issue in the investigation.  In other words, it does not appear that Finance Director was given a full opportunity to understand and answer the specific allegations against him, which is a necessary part of a thorough, impartial process.

Critically, the investigator did not interview the State Court Administrator to ask him what his expectations were for Finance Director in terms of time in the office, hours per week of computer/office work, personal use of email and computer, or work performance in general. Instead, the investigator relied on general statements like "In today's office environment" in describing what the expectations ought to be.  There is likewise no evidence that the investigator asked other SCAO executives about their time in the office, how many files they worked on in a five-month period, or whether it is prohibited to ever use state email or resources of personal reasons (even for de minimus use). It is not clear that the investigator reviewed the policies that exist on these issues.

There is no evidence showing that the "drive-bys" of Finance Director's home, which instigated the HR inquiry, were corroborated by evidence other than an unnamed person's word. There is no indication that either investigator confronted or tested any bias that could have been present in that person's surveillance efforts. If, as reported, this person was Ms. Masias, the investigator ignored an inquiry into an ostensible retaliatory motive for the investigation.

Certainly, the data raised in the HR inquiry and investigation raised concerns about Finance

Director's work habits.  A full investigation may or may not have borne those concerns out.  The point is, only part of the necessary work was done.

- ***The Inquiry and Investigation Contain Indicia of Bias Against Finance Director and Others Who Were Involved in the Investigation of Ms. Masias***

In addition, there are indicators of bias against Finance Director in both the HR inquiry and the investigation report. Both documents include personally pejorative statements about Finance Director, often without a factual foundation. The investigator characterized Finance Director's work schedule as constituting "egregious time theft," even though he was a salaried exempt employee, and the investigator failed to ask enough questions to understand Finance Director's work schedule, work production or work engagement.  The external investigator described Finance Director as "aloof and defensive."  He cited his surprise that Finance Director, as "an individual who expressed such an enlightenment as [he] described," would not remember the details of an action memo he received directing him to engage more with his staff.  However, as noted above it was the investigator who used the word "enlightenment," not Finance Director.  Investigator described this timeframe as, "A pretty significant period of enlightenment . . . in your career."  The investigator's use of the word in the report, as though Finance Director was describing himself with this word, is inaccurate and sarcastic.

Second, the external investigator was aggressive at the end of his interview with Finance Director. He used leading questions, with significant characterization of evidence, in a confrontational manner.  At the end of the interview, he said "I'm not seeing a good strategy that leads to your continued employment, I gotta be honest with you.  I think there are just things beyond repair." An impartial investigator would not question in this manner and would not make a pronouncement about someone likely losing their job.

Moreover, both the HR inquiry and the investigation report include detailed data about behaviors of two of Finance Director's employees, both of whom were involved in the Mindy Masias expense reimbursement issue.  The HR inquiry requests permission to do a full investigation of Finance Manager <u>and</u> his two staff members – in other words, of all three people primarily involved in investigating the expense reimbursement situation.  These staff members are characterized pejoratively as well.  One person's work cadence is described as "an embarrassment." The other was described as perpetuating "perceptions of [] hostile and discriminatory behavior towards staff," despite no investigative finding of discriminatory behavior by this person.

It is not likely an accident that these two individuals appear in a negative light in reports written by two individuals who have been described as having alliances with Ms. Masias.  Their behaviors had no central relevance to the purpose of the investigations, which was to examine Finance Director's work habits.  The inclusion of such tangentially relevant evidence, to the detriment of two additional people who were instrumental in the Mindy Masias matter, adds to the air of bias (and potential retaliation) permeating these investigations.

66

- ***Finance Director Was Not Disciplined, or Even Admonished Verbally, About Attendance and Work Performance Problems Prior to the Investigations***

There apparently was a written discipline issued to Finance Director about his leadership and engagement with staff. I asked for but was not provided with this document, so I cannot assess how seriously these issues were treated.

I was provided with no record of verbal counseling, disciplines, performance plans or other serious disciplinary action against Finance Director for his attendance, use of email, diligence, or work task engagement. In fact, the State Court Administrator thought he was doing a decent job, was worthy of rehabilitation and would have given him another chance. The State Court Administrator was not aware of these concerns until the investigation occurred.

On this record, there does not appear to be enough factual support to sustain an action as drastic as termination, particularly on problems described in the HR inquiry as "long existing concerns." This raises the question that, if concerns were so long-existing, why were they investigated when they were? This question was not asked, or seriously considered, by the investigator here.

- ***The Report Shows That the Investigation Ignored the "Elephant in the Room" – the Possibility That the Investigation Was Retaliatory***

This leads to my last point. Finance Director strenuously claimed that HR's scrutiny of his work performance was retaliation for his involvement in Ms. Masias's fraudulent receipt investigation. He raised this with the investigator, but the investigator did not seriously investigate this possibility.

This is notable as the timing, alone, raises the possibility of a retaliatory investigation. Only one month transpired between Ms. Masias receiving her termination notice, and the HR investigation into Finance Director beginning. Only one week transpired between Ms. Masias's resignation, and the outside investigation into Finance Director. This is close temporal proximity that would have been worth exploring in the investigations.

Moreover, the State Court Administrator contends that the investigation occurred under the direction of the (then) Chief Justice. He stated that the Chief Justice wanted to terminate Finance Director and one of his staff for "insubordination" in refusing to sign off on the agency's audit. The investigator did not talk to the State Court Administrator or the Chief Justice to explore this possibility.

Whether either of these scenarios would have been substantiated or not, the failure of the investigator to take a serious look at them is a glaring omission of directly relevant data. It suggests that the investigator was focused on one ultimate resolution: documenting the case for termination. It makes the investigation appear to be, as one witness put it, "justification" and not investigation. Had this issue been fully vetted, it may or may not have shown a foundation for Finance Director's claims. However, the reader of the report is left wondering because this critical issue was never considered.

In summary, the failures of this investigation render it an unreliable foundation upon which to substantiate the misconduct alleged.

## 2. *Finding*

For the reasons set forth above, I find:

- The allegations are **Not Substantiated.**

***Allegations of Probation Department Misconduct (11 and 12)***

**Allegations Eleven and Twelve: CPO Sending Penis Pictures and CPO Having Sex on State Time and on State Property**

*"CPO takes picture of penis and sends to vendor; no disciplinary action taken; CPO has sex with a vendor on state time and on state property who later complains she felt she had to in order to keep her job; no disciplinary action taken."*

### A. Methodology

I determined that these events pertain to the same people and sets of facts and accordingly, I am combining them into one Report Summary. These events occurred in 2012, shortly after the dissolution of a consensual relationship between this Chief Probation Officer (described hereafter as "CPO") and a woman he was dating. The relationship began before the CPO's promotion when he was a Probation Officer and the woman in question provided services to the Probation Division through a local vendor. He did not supervise her. While the parties disputed the chronology of events around the photo, they agreed that their relationship was consensual, non-coercive, and outside of the office. My investigation found that Ms. Masias and Mr. Brown conducted a full investigation of these allegations, and no disciplinary action was recommended.

I interviewed eight (8) people who had knowledge about this situation. This included the CPO, the female "vendor" in question, the Chief Judge of this District, an individual from the Legal Department, and coworkers in this Judicial District. People had strong recollections of what happened.

I searched for any relevant documents, images, or records relating to the incidents. I located very few documents that were relevant to the allegation. I sought out documents from SCAO's HR department, the Judicial Legal Department, and this CPO's chief judge in databases of materials produced in response to subpoenas issued in related proceedings. There were no copies of any investigation materials, the image, or any other records. I discovered one email sent by this CPO's Chief Judge to the CPO after the investigation of the incident, which I will discuss below. I also located and reviewed this CPO's evaluations during this timeframe to determine if any discipline was issued (it was not).

I submitted a full report on this investigation to counsel for the Judicial Branch on May 11, 2022. On May 24, 2022, I was directed to prepare Report Summaries on all matters for public release. I completed this Report Summary pursuant to this requirement.

### B. Summary of Material Evidence

There is no dispute that the CPO in this allegation had a relationship, before his promotion, with a woman who was working for a local agency that provides probation services to the Division on a contract basis. Both the woman involved, and the CPO characterized the relationship as long-term, consensual, and happy. No one I interviewed expressed any concern about coercion or inappropriateness based on their respective roles. The (then) PO did not supervise the woman or have any impact on her employment

69

At some point near the end, or after the end, of the relationship (the parties disagreed on this timing), the CPO sent a penis picture to the woman.  The woman recalled that he sent it to her after she had begun dating someone else and the CPO stated that he sent it to her when they were still dating.  Neither party contended that the photo was sent or received at work.

Ms. Masias and Mr. Brown "showed up" at the probation office in this District and told the CPO that he was accused of "extorting" this woman "for sex."  He met and provided them with an interview. They also interviewed the woman involved.  After her interview, the Ms. Masias and Mr. Brown returned to the CPO and told him, "[H]er story is the same as yours – a mutual relationship, two consenting adults."

The woman remembered this chronology fairly consistently.  She recalled getting a call from Ms. Masias and Mr. Brown and recalled meeting with them.  She told them that her relationship with the CPO was consensual and not coerced.

Her version of events differs, however, with respect to the image in question. She said that the CPO sent her the penis picture after they broke up when she was dating someone else and the two had conflict about this at a local bar when they both showed up with their new partners.  While she was upset that he sent the picture, she said that the workplace had nothing to do with this exchange and she never felt pressured or coerced into the relationship by the CPO's position.

The Chief Judge in this Judicial District remembered this situation and the HR investigation by Ms. Masias and Mr. Brown. The Chief Judge reported the situation to HR, after an employee in the District brought the photo to his attention.  This triggered the HR investigation. According to the Chief Judge, HR concluded that this was a consensual relationship, and the CPO was not in a position of authority or supervision over the woman.  According to the Chief Judge, Ms. Masias and Mr. Brown did not write a report, but made verbal recommendations to reinstate the CPO and issue no discipline. The Chief Judge sent the CPO an email on January 11, 2013, reflecting Ms. Masias's and Mr. Brown's recommendations. They reviewed this email before he sent it to the CPO:

> I am pleased to formally reinstate you to your position as CPO effective 1/9/2013. This outlines the expectations I have for you in light of the recent investigation conducted by HR.
>
> First, as was suggested to you by HR, I strongly suggest that you obtain personal counseling. Although I am confident you are capable of finding your own counseling resources, you may want to contact CSEAP for finding resources. http://www.co lo rado.gov / cs/Sate 11 lte/ D PA-EO /D EO/1214905946179
>
> I believe it is critical to impress upon you the importance of your adherence to ethical guidelines established by the Code of Conduct and other Judicial Department policies. It is my expectation that you error on the side of caution. The recent circumstances that led to the investigation into your behavior are a result of the fact that your behavior and performance are closely inspected by employees, business partners and community members.  . . .
>
> It is my concern that your recent behavior will open you to significant scrutiny. Because of this, it is my expectation that you use extreme diligence and conservative decisions personally as well as

70

professionally. I ask that you continue to work with the Division of Human Resources and use them as a sounding board for any ethical dilemmas you encounter.

The Chief Judge said, "[T]he bottom line – it was astonishing to me to know that a memo drafted by Eric was reciting this as an example of problem culture in the Judicial Department. Everything that was done was done at Mindy's and Eric's direction. I am utterly exasperated."

I found no corroborating evidence for the claim that the CPO and vendor had sex on state time or on state property. The CPO denied that the two ever had sex in the office or on state time. The woman involved was adamant that the two never had sex on state property or on state time: "I can't think of a single time when we were even alone in the office. We were never in the office with the door shut, ever."

The corroborated fact that Ms. Masias and Mr. Brown recommended no discipline in this matter suggests that they did not substantiate any abuse of power or position in the CPO having sex on state time, on state property, or otherwise.

Finally, I found no record that the CPO in question was disciplined for this event.  His 2013 evaluation was all positive, with scores of four (primarily) and one five (for professionalism).  I requested records of any discipline that was issued, and nothing was located.

## C.    Analyses and Finding(s)

### 1.  Analysis

The sum of this data reveals a consensual relationship and an unwanted photo that was sent. There was no inappropriate impact on the workplace and in fact, no connection to the workplace as far as the photo is concerned. Moreover, Ms. Masias's and Mr. Brown's investigation nine years ago appear to have found the same thing.

There is no evidence that this conduct arose out of or impacted the workplace. The (then) PO had no position of authority over his girlfriend. If this situation had, indeed, involved an abuse of power like "sex with a vendor on state time and on state property," it is unlikely Ms. Masias and Mr. Brown would have recommended no discipline.  Yet, that was what they did.  If this woman later "complain[ed] she felt she had to in order to keep her job," it would be inappropriate for them to have recommended reinstatement. But it appears that Ms. Masias and Mr. Brown recommended just that.

In fact, the woman involved in this relationship told me she felt no pressure or coercion about engaging in the relationship, and said the same thing to the HR investigators.  While she did not appreciate the photo and was angry about it at the time, she was clear that this had nothing to do with the workplace. She did not report this situation to Judicial, but a coworker she showed the photo to did.

There is nothing in the evidence to suggest that the CPO should have been disciplined as stated in this allegation. This allegation of serious (and embarrassing) workplace wrongdoing, and the implication that this person got away with something, is not supported by any credible evidence.

71

## 2. *Findings*

For the reasons set forth above, I find:

- The allegation of the photo is **Substantiated**; however, I find that the allegation is misleading because this was not a workplace situation, and the HR investigation determined no policy violation had taken place.

- It is **Not Substantiated** that there were instances of sex with this vendor on state time and on state property.

- It is **Substantiated** that no discipline occurred; however, HR did not recommend discipline in this matter.

**Allegation Fifteen: Chief Probation Officer Instructing All Staff to Swat Female on the Backside**

*CPO directing all staff to swat a female on the backside, no disciplinary action taken.*

#### A.    Methodology

It took significant work to find out who this allegation was about. Unlike other matters we investigated, no one at SCA had an idea about who this Chief Probation Officer (described hereafter as "CPO") or woman Probation Officer (described hereafter as "female PO") are. I finally located one document that referenced this matter, which had names in it. By this, I was able to identify the parties.

I determined that this event happened in 2018 when the CPO in question made a statement to the effect of directing attendees at a meeting to "spank" the female PO on her way out as she was leaving the District to work for another Judicial District.  The female PO in question construed this as an awkward and unwelcome attempt at a joke but was otherwise unbothered by the comment. She liked the CPO and characterized their relationship as friendly and supportive.

I interviewed four (4) people with direct knowledge about this situation: the CPO involved, the woman about whom the remarks were allegedly made, the person who raised the complaint, and the chief judge of this District. These individuals had a strong memory of these events and together with the few documents that were located, they provided enough information for me to reach firm findings in the case.

There were only two documents located on this incident, including notes from a phone call someone in HR had taken with a team member from this probation department. These notes reflect an initial inquiry into the event. I also found an undated, unsigned draft letter from the HR Department to the Chief Judge in this District, laying out the concerns that had been raised. This letter was likely not sent. I also reviewed this CPO's evaluations and asked for discipline records (none were located).

I submitted a full report on this investigation to counsel for the Judicial Branch on May 18, 2022. On May 24, 2022, I was directed to prepare Report Summaries on all matters for public release.  I completed this Report Summary pursuant to this requirement.

#### B.    Summary of Material Evidence

The witnesses who remembered this situation identified it happening in 2018 and identified the specific Judicial District where it took place. A woman PO was transferring to another Judicial District. The CPO called an all-staff meeting to announce her departure to the department and allegedly made remarks that were later reported to HR.  As described by the woman PO:

> It was at my last All Staff – and [the CPO] was saying a few words about me. He said, "Okay everyone line up behind [name redacted]," and he insinuated slapping my behind on my way out. I do not remember the date. It was the beginning of July.  . . .  He acted it out (witness raised her hand high up and swung it around). He didn't actually hit my butt but he did the arm movement. I

73

don't remember exactly what he said. *Who all was there?* The whole department - probably around 100 people.

She indicated that she "really liked" this CPO, and "felt I had a good relationship with him." She said, "I felt it was inappropriate for anyone, especially a chief to do. But I didn't feel I was being harassed in any way. I didn't make any type of complaint. I don't want to minimize how it made my colleagues feel. It should have been taken seriously and was. I didn't really feel that I was offended in any way." She said she did not experience any other instance of inappropriate behavior or commentary from the CPO.

The CPO did not remember this and said that no one from HR (or anywhere else) talked to him about it. He said he did not recall saying this but "it wouldn't be unlike me to tease [this woman PO]. She was a great PO and is still working in [another District]. I supported her. It would have been like me to tease her about being a traitor to our District. I was not aware of this and no one questioned me about it."

> My standard joke when someone left was to say, "You're dead to me now" – I teased anyone like that, at the same time wishing them well. It doesn't always work when moving one District to another, it's a risk. I thought the world of [this woman PO]. I certainly meant no disrespect. . . . I think I would remember this. And no one came to talk to me.

The event was raised by a coworker, who went to another person in the Probation department because they were offended by the comment. This person forwarded the complaint along to HR for its handling.

The Chief Judge in this District said that he was never informed about this allegation, the inquiry, any findings, or any recommended consequences. No one from HR reached out to discuss the situation with him and he was not interviewed as part of any investigative process.

HR did a preliminary inquiry of the matter, interviewing the staff member who had been offended and the woman PO. The individual from HR drafted a letter for the Chief Judge of this District, with the data she found. It contains references to the spanking comment and another remark that was alleged by the CPO that a woman PO had a lot of experience "under the belt, I mean skirt." It also notes the allegations of poor morale and a poor work environment. This letter is not denominated an investigation report, likely because no full investigation was done. It is unsigned and undated and the chief judge in question said he never received it. He said he knew nothing about this situation at the time or thereafter.

I reviewed this CPOs performance evaluation from 2019. There was no mention of this incident as might be expected if his supervisor was unaware of the incident. There was no discipline located in the file.

**D.    Analyses and Finding(s)**

*1.  Analysis*

This investigation did not reveal a complicated set of facts. An all-hands meeting occurred in 2018 and the CPO in question made a remark about a female subordinate, who was leaving to work in another District. He made a remark, which she construed as an attempted joke, about everyone lining up and "spanking" her on the way out.

An initial HR inquiry took place in which the HR investigator spoke to the woman PO and a couple of other individuals. The CPO was not interviewed, there was no investigation file, and no investigation report was located. No one notified the Chief Judge in the District and no discipline was recommended.

The female PO has not been impacted by this situation and said she really liked (and likes) this CPO. She felt he was trying to be funny "in a distasteful way."

The person who raised this complaint had some motivations that went beyond identifying wrongful behavior. He felt upset that his own actions were called into question in an investigation where he was the respondent. He felt leaders in the Probation Department were saying inappropriate things and he wanted to raise this remark when he heard about it, in part because of this disparity in his own actions being called into question versus this leader's actions. While his motives may not have been entirely "pure" in raising the situation, the fact is that the remark was made in front of almost a hundred people, and it was objectively offensive.

The HR professional who did the initial inquiry appears to have determined, perhaps with feedback from Ms. Masias and/or Mr. Brown, that this case did not rise to the level requiring a full investigation. Without interviewing one of (or all) these witnesses, I cannot know with certainty why this decision was made. However, it does suggest that the situation was not deemed serious enough to require a full investigation.  Relatedly, I found no recommendation for discipline and no discipline ultimately was issued in this case.

Moreover, no inquiry appears to have been done into the "experience under the skirt" remark.  This is additional evidence suggesting that the event was not deemed important enough by HR to merit a full investigation and disciplinary recommendations.

*2.  Findings*

For the reasons set forth above, I find:

- The allegation about the spanking comment is **Substantiated**.

- The allegation that no discipline was issued is **Substantiated**, with the caveat that the chief judge was likely not notified and there is no documentation that discipline was recommended.

75

# ASSESSMENT OF THE WORKPLACE CULTURE IN THE COLORADO JUDICIAL BRANCH
*Anne R. McCord, SPHR, SHRM-SCP, PI, AWI-CH*

## Report of Data on Workplace Culture

### *The Survey*

We used a survey to solicit information from as many people in the Colorado Judicial Branch's (CJB's) workplace as possible. This was our primary tool to gather data to help us understand the present state of the Colorado Judicial Branch's culture. Our goal was to better understand the culture across the Colorado Judicial Branch as a whole and to understand the workplace culture of the specific Districts that make up the CJB.  The survey was augmented by voluntary interviews from employees and appointed officials from most Districts.  We then evaluated whether, and to what extent, the culture has encouraged, normalized, or failed to deter sexual harassment, sex-based discrimination, and retaliation.

Investigations Law Group (ILG) worked with Survey Design & Analysis (SDA) on the design of a climate survey as a part of the overall evaluation of the climate at the Colorado Judicial Branch. The survey went through several iterations of edits and tests to produce the final survey. We implemented two versions of the Survey— one for appointed officials and one for employees of the CJB.

The Workplace Culture Survey was designed to provide all members of the Colorado Judicial Branch an opportunity to provide anonymous feedback on the current culture in their workplace(s), observations and experiences regarding sexual harassment, sex-based discrimination, and retaliation, as well as the culture on reporting these issues, knowledge of CJB policies, and more general observations about the work environment. We collected a range of demographic data to allow detailed analysis by role, age, gender, and ethnic/racial background.[36] The breadth and depth of information collected from the survey provided comprehensive input to our recommendations to improve the current culture.

A five-point Likert scale was used for all satisfaction and agreement questions. For this report, "Satisfaction Level" is defined as the percent of respondents selecting "Very satisfied" or "Satisfied" to a satisfaction question; the top two boxes of the 5-point scale. Similarly, "Agreement Level" is defined as the percent of respondents selecting "Strongly agree or Agree" to an agreement question; the top two boxes of the 5-point satisfaction scale.

We sent the Workplace Culture Survey to 4,133 individuals who work in Colorado Judicial Branch workplace(s). This included administration, directors, magistrates, managers, supervisors, staff, and various other roles with the CJB. The survey was sent to participants via email and invited all

---

[36] Participants were afforded the opportunity to not provide demographic information if they were concerned about confidentiality.

employees and appointed officials within the CJB to participate in the study. The survey opened January 5, 2022 and closed at midnight on January 19, 2022.

The Colorado Judicial Branch is split up among twenty-four (24) Districts, including Districts 1 through 22, as well the State Court Administrators Office (SCAO), and the Supreme Court and Colorado Court of Appeals or SC/COA. The individual Districts operate separately, with centralized support from SCAO. As such, the survey identified that there is no centralized culture at the Colorado Judicial Branch. While we assessed the survey results for the CJB and the same two versions of the survey were sent out to every District of the CJB, the results that are most significant for this project were informed by the survey data collected from each District.

The results of our survey efforts were enlightening and offer a rich set of data to draw upon in understanding the Colorado Judicial Branch's culture as it relates to issues of sexual harassment, sex-based discrimination, and retaliation. The survey also provides information on the confidence employees have in their leadership, specifically around reporting issues related to these concerns.

Out of 4,133 survey recipients, ILG received two-thousand five-hundred and sixty-six (2,506) completed responses and one-hundred and eighteen (118) partially complete responses between January 5, 2022, and January 19, 2022. Two-hundred and sixty-three (263) appointed officials and two-thousand three-hundred and fifty-five (2,355) employees responded to the survey for a strong response rate of 63%. Seventy-five of survey participants are female, who make up 41% of appointed officials and 75% of employees. Ninety percent of participants are under sixty (60) years of age and 15% of participants are under 30 years of age. Fifty-three percent of participants work in Court Services, while 37% work in Probation Services. Seventy-four percent of participants are staff. Fifty-five percent of the appointed officials who participated in the survey have been with CJB for more than six (6) years, and 43% of employee participants have been with the CJB for more than 10 years.

### *The Interviews*

An essential part of the information gathering process was hearing directly from voluntary stakeholders about their firsthand experiences and insights into the culture and environment at the Colorado Judicial Branch. It was important that our conversations with stakeholders encouraged open and honest dialogue. As such, we conducted one-on-one interviews in a manner that would guarantee anonymity and ensure comfort with the process.

We interviewed self-selected individuals[37] (voluntary interviews), who we asked a general set of questions about the working environment at the Colorado Judicial Branch. We also reached out to specific individuals for interviews (targeted witnesses) who we asked questions that were specific to allegations and / or their role and experiences while working at CJB. Below is a discussion of the interview process for the voluntary witnesses and what we learned.

---

[37] Given the nature of our project for the CJB, we expected that there would be more concerning or negative feedback provided by the voluntary interviews. As will be highlighted in below sections, the work environment at the CJB overall is quite positive. Some Districts rated lower in the survey, and it was from those Districts that the more negative and concerning voluntary interview feedback was provided.

**Culture Feedback from Voluntary Interviews**

One-hundred and three (103) witnesses reached out to ILG asking to be interviewed. Out of this number, six (6) witnesses provided written statements and 97 witnesses were interviewed over telephone or video conference. Voluntary interviews included witnesses from various backgrounds, roles, and Districts within the CJB.  Twenty-two Districts were represented among the nearly hundred voluntary witnesses. The only District not represented was District 20 (Boulder).  Districts 1, 2, 17, and 18 were the top four represented Districts among voluntary witnesses. These were also the Districts that received the most negative scores in terms of survey results.  Voluntary interviewees included both current and former employees and most of the stakeholder groups at the CJB, including probation, attorneys, judges, court executives, clerks, judicial assistants, Human Resources, trainers, supervisors, and support staff.

We followed the same outline of questions in most of the interviews we conducted, although we allowed people to stray from this and direct the dialogue elsewhere if they wished. Additionally, there were certain questions we asked only if witnesses raised issues of discrimination or harassment outside of the scope of our investigation. Questions consisted of both "Yes/No" and open-ended answers. The "Yes/No" questioning allowed us to quantify answers numerically so that we could analyze answers both as a whole and broken down by stakeholder group. Interviewees were allowed and encouraged to expand upon their "Yes/No" answers to provide more explanation and deeper insight into their experience at the Colorado Judicial Branch workplace.

Pursuant to our contract with the Judicial Branch, we were empowered to identify other issues of discrimination or harassment – outside the matters identified in the Eric Brown List – for further investigation.  Issues that were raised in the survey were done so anonymously, but witnesses in individual interviews raised additional matters that implicate the Branch's anti-discrimination and anti-harassment policies.  We asked these witnesses whether they wanted their matter investigated further.  For those who answered in the affirmative, we provided their data to the Judicial Branch for further investigation. We offered to conduct this work, or provide referrals to other local investigators to do so.  As of the date of this report we have not been asked to conduct any of these additional investigations, but understand that the Branch will be making determinations about these investigations following the publication of this report.

78

*Summary of the Colorado Judicial Branch Workplace Assessment*

Given that the CJB is decentralized, made up of twenty-four (24) distinct and individual workplaces, there is not one consistent, overall workplace. In this section we provide the general survey results and information we gathered from the interviews. Later, we dive into the top and bottom Districts[38] within the CJB, which reported substantially different results on the culture of the CJB.

Overall, the survey results indicated that the Colorado Judicial Branch is a positive place to work. A majority, 72%, of participants, said they were satisfied with their job at CJB, with satisfaction level for Court Services at 76% and Probation Services division at 67%.  Overall satisfaction for appointed officials was higher, at 89% (47% reported being "very satisfied" and 42% reported being "satisfied").

Most of the individuals who participated in the survey were satisfied with their work environment and their work relationships. Overwhelmingly, survey participants feel respected by their supervisors (86%), coworkers (89%), and appointed officials (77%). Most survey participants believe that the CJB provides a healthy and safe work environment and agree they would feel safe reporting any concerns they have about unethical behavior. However, with 14%-21% of participants giving negative responses to these questions, there is still work to be done.



Responses are skewed by gender, with men answering more positively than women in these areas across the board.

- 77% of men are satisfied with their work environment at CJB, while 66% of women are satisfied with their work environment.
- 81% of men agree that the CJB provides a healthy and safe work environment, while 69% of women agree that that the CJB provides a healthy and safe work environment.
- 81% of men agree they would feel comfortable reporting unethical behavior, while 69% of women agree they would feel comfortable reporting unethical behavior

---

[38] In determining the top and bottom performing Districts, we considered data from Districts with more than 80 participants to ensure statistically relevant information.

Seventy-one percent of participants said they would be likely to recommend the CJB to others as a good place to work, if a qualified colleague or acquaintance was interested and/or looking for a position.  In the detailed section below, we will highlight how this question relates to the Districts that have fewer issues and those that have more issues with respect to gender discrimination, sexual harassment, and retaliation.



*Respectful Workplace Behavior*

We were tasked with understanding whether there is an environment at CJB where sexual harassment, gender discrimination and / or retaliation is prevalent.  Ninety-five percent of survey participants said they understand the policies on acceptable behavior in their department. Ninety-two percent of participants said they know how to locate personnel rules and 91% had received training on anti-retaliation in the past five years. Finally, 64% indicated they know how to file a grievance against an employee while 62% stated that they know how to file a grievance against an appointed official.

While it is positive that most participants indicated that they understand acceptable workplace behavior, there continues to be some misconduct that is witnessed and / or experienced.  Overall, 17% of those who responded to the survey **experienced,** and 21% **witnessed,** one or more of the mistreatments that we assessed (gender-based discrimination, sexual harassment, or retaliation).[39] Those who have been with the CJB longer were more likely to have experienced or witnessed incidents of mistreatment.  Only 2% of those in their first year at CJB experienced any of the three areas of mistreatment. Additionally, a greater percentage of women reported experiencing mistreatment in every area. Of the categories we surveyed, retaliation was the most frequently witnessed or experienced misconduct and we found this was consistent across most Districts.

---

[39] It is important to note that the same survey participant could answer yes to experiencing and witnessing all three types of problematic behavior. Thus, 17% does not equate to an exact number of participants in the survey.



[40]

The survey prompted participants to qualify the timeframe in which mistreatment occurred within three time periods: 2019 to present, between 2016 and 2018, and prior to 2016. In terms of gender-based discrimination and retaliation, a greater number of participants experienced incidents after 2019.   Participants indicated that more incidents of sexual harassment occurred prior to 2019, particularly in the period from 2016 to 2018.[41] The CJB has focused on training and education on Sexual Harassment in recent years and this data may indicate that the training has had an impact given the lower numbers 2019 to present.[42]



As mentioned above, 21% of participants said they observed one of the three forms of mistreatment. There was overlap between participants who said they personally experienced

---

[40] As stated in a previous footnote, the same participant could have answered yes to both witnessing and experiencing the misbehavior, which could give the impression that the issues are more prevalent than they are.

[41] The below chart shows a percentage total that totals greater than 100%. This indicates that a number of participants reported their experiences to have occurred during multiple of these timeframes, or over a longer period.

[42] There are also multiple societal issues that have brought sexual harassment into the forefront in that timeframe, namely the #METOO movement.

mistreatment and those who said that they observed it, but these participants did not specify whether the incidents they observed were the same as those they experienced.



*Reporting Misconduct*

The survey highlights the participants' lack of confidence that anything would result from reporting mistreatment at the CJB. While 61% of participants said that leadership takes reports of sexual harassment seriously, and 63% said they would be comfortable reporting misconduct by an Appointed Official, only 39% agreed that Appointed Officials would be held accountable when allegations of sexual harassment are raised against them.

Among survey participants who experienced mistreatment, 69% did not report it.



Out of those who chose to report, 77% indicated they were not satisfied with the response or outcome they received from doing so.  Those who reported retaliation were the least satisfied with the response from management.



The top reasons provided[43] for not reporting an incident were "I knew it wouldn't do any good" and "I was afraid of retaliation."



Other comments about why participants did not report included:

- "I discussed it with the person who did it but not that person's superior."
- "I spoke to my direct supervisor about it who told me that if I continued to talk about it, she would have to report it."
- "HR still has bullies working there and they don't help employees when they are being mistreated by their supervisors."
- "It involved the chief judge."
- "The behavior is not always "concrete" enough to report- like I notice that my male colleagues treat me differently than they treat each other."
- "Came from the top."

---

[43] Participants were given the opportunity to select multiple reasons for not reporting, thus the totals exceed 100%.

- "HR was friends with the chief judge so I could not go to HR."
- "I generally experience this behavior from older male colleagues and recognize that I just have to wait until they retire and hope their spots are filled with someone who is different."
- "It was the chief judge at the time and I knew he was known for retaliation."

As mentioned above, 63% of total participants said they would feel safe reporting sexual misconduct by an appointed official. For those who said they would not feel safe doing so, the top reasons provided were "nothing would be done" and "afraid it would end my career."

Other reasons given for not reporting misconduct by an appointed official included:

- "Administrative authorities work to protect appointed officials from Judicial Performance Evaluators to the detriment of employees (and voters)."
- "Appointed Officials (i.e., judges) have an enormous amount of power and influence in the Branch. They are often "worshipped" by many as they have worked so "hard" to get where they are at, which is demeaning to everyone else who works hard. Since they have such a strong knowledge of Law and judicial practices it would be silly for anyone to file a complaint against them. At the end of the day the Branch only cares about its judges, so what would be the point? They are not held to the same standards. They are held to lesser standards."
- "There is zero trust with the current HR team.  Further, they rarely take actionable steps with complaints."
- "CJA's are told to move if not happy with Judicial Officer or direct supervisor. The supervisor remains in their position, and we're told we won't see what if any action is taken."
- "HR is in the same bed as officials, they don't have loyalty beyond Administration."
- "From past experience (more than five years ago): These incidents are kept quiet within departments/the Branch and the victim is rarely made aware of what, if any, action is taken. The secrecy of the whole process protects the perpetuators and allows them to further victimize. Additionally, once a report is filed, the victim/reporting party is directed to not speak to anyone about the matter; furthering the secrecy and often isolating the victim/reporting party to deal with what happened and their feelings about it alone."

The numbers are different among appointed officials—81% of whom said they would feel safe reporting sexual misconduct by another appointed official.

Out of those who reported they had witnessed one of the areas of mistreatment (sexual harassment, gender-based discrimination, retaliation), 83% did not report it, suggesting concern around the reporting culture at the CJB.



Fifty percent of those who reported observing sexual harassment, 91% of those who reported observing gender-based discrimination, and 78% of those who reported having observed retaliation were dissatisfied with the response they received. For those who chose not to report, the most prevalent reasons provided were "I knew it wouldn't do any good" and "I was afraid of retaliation."

Out of the witnesses interviewed, a significant number[44] experienced or witnessed one of the three forms of mistreatment being investigated (sexual harassment, gender-based discrimination, retaliation).[45]



*Sexual Harassment*

Seven percent (175)[46] of survey participants reported that they had either observed or witnessed sexual harassment in the CJB workplace. More women than men answered "Yes" to this question. Overall, the majority of those who participated in the survey **did not** indicate that sexual harassment is prevalent at the CJB or enabled by its leadership. However, 20% of participants did not agree and 42% were neutral on the statement that appointed officials are held accountable

---

[44] Again, this is to be expected given the voluntary nature of the interviews.

[45] Witnesses raised issues that were outside of the scope of our project, including bullying, favoritism, age discrimination, harassment, hostile work environment and other perceived misconduct at CJB.

[46] Because survey participants could indicate that they both witnessed and observed sexual harassment, the 175 responses may not represent 175 different participants.

when allegations of sexual harassment are raised.  Thirteen percent indicated that leadership does not take appropriate action on reports of sexual harassment where an additional 39% were neutral on this topic.

Twenty-seven (27) voluntary witnesses reported experiences of sexual harassment at the CJB. This number includes witnesses subjected to sexual harassment and those who witnessed others being subjected to sexual harassment. Voluntary witnesses who reported sexual harassment included appointed officials, supervisors, and employees.



When broken down by gender, the survey results show that in terms of sexual harassment, a greater percentage of women negatively characterized the climate at the CJB.



86

Only 3% of employees who participated in the survey reported they have been told within the past year that their style of dress was not appropriate; 70% of these participants said their supervisor told them this. Seventy-one percent of participants said it was a woman who told them their dress was not appropriate; and 27% said they heard it from a man.[47]

Eighty-two percent of survey participants answered that they received training on sexual harassment at the CJB within the past 5 years; 11% of participants said they had not received this training; and 7% said they were not sure if they had received training. Out of those who received training, most found it useful.



*Gender-based Discrimination*

Ten percent (257) of survey participants said that within the past five years, they either experienced or observed gender-based discrimination at the Colorado Judicial Branch. Ten percent (170) of women participants reported they experienced or witnessed gender-based discrimination, whereas 7% (39) of male participants reported experiencing or observing gender-based discrimination. Overall, the belief that gender-based discrimination occurs in the CJB is more prevalent than reported experiences— personal or observed. Twenty-one percent of participants believe that women versus men are not held to the same standards at the CJB; 14% of participants believe that women are not offered the same opportunities as men at the CJB; and 17% of participants believe that women are not promoted at the same rate as men at the CJB.



---

[47] Two percent said they preferred not to answer whether a man or a woman had told them their dress was inappropriate.

Forty-one (41) voluntary witnesses reported gender-based discrimination at the CJB. This number included those subjected to gender-based discrimination as well as those who witnessed it more generally or described an environment in which it was prevalent.

Across the board, a greater percentage of women in the survey provided negative responses to questions on gender-based discrimination than did male participants.



More generally, a substantial number of survey participants did not agree that all employees are treated equally at the Colorado Judicial Branch. Thirty percent (568) of participants did not agree that all employees are treated equally at the CJB. Again, the responses varied between women and men; 29% (434) of female participants do not agree that all employees are treated equally at CJB, while 20% (79) male participants do not agree.

We reviewed the statistics on promotions and separations for men versus women at the CJB between the years 2017 and 2021 and did not find evidence of systemic gender bias. In fact, statistics showed that women have been promoted at the same rate as men since 2019.

The data included 2,629 separations and 676 promotions during the five-year period, 2017 to 2021.[48]   The analysis looked at overall rates across the five-year period and the rates for each individual year. See the table below.

---

[48] Because complete data was not available for each year on the total number of employees and the total numbers of men and women within the CJB, it was assumed that 4,000 people were employed at the CJB for each of the five years in question. Further the current survey with 2,272 responses from CJB personnel, showed there to be 25% men and 75% women. This information was used to compare promotion and separation rates for men versus women.

Promotion and Separation Rates for Men and Women, 2017-2021

*Results in blue denote significant differences at the 95% confidence level.*

| Year | Promotion Rates | Separation Rates |
|---|---|---|
| Overall | Men – 17.6%<br>Women – 16.7% | Men – 72.5%<br>Women – 63.1% |
| 2021 | Men – 2.9%<br>Women – 4.7% | Men – 15.9%<br>Women – 14.1% |
| 2020 | Men – 2.6%<br>Women – 2.6% | Men – 14.5%<br>Women – 14.7% |
| 2019 | Men – 4.2%<br>Women – 2.9% | Men – 14.3%<br>Women – 12.3% |
| 2018 | Men – 4.5%<br>Women – 3.6% | Men – 13.1%<br>Women – 11.3% |
| 2017 | Men – 3.4%<br>Women – 2.9% | Men – 14.7%<br>Women – 10.7% |

**Miscellaneous Result** - *Reasons for Separation Overall:*
- Accepted New Job Outside State – Men – 38%, Women – 29%
  Personal Reasons – Men, 10%; Women 16%

*Retaliation*

Eighteen percent (460) of survey participants reported they either witnessed or observed retaliation at the Colorado Judicial Branch within the past 5 years. This is by far the largest area of misconduct in the survey. Twenty percent (326) of female participants either witnessed or experienced retaliation at CJB; whereas 10% (54) of male participants either witnessed or experienced retaliation.[49] Twenty-five percent of survey participants do not feel they can talk openly with leadership without fear of retaliation. Twenty-nine percent of participants do not have confidence that discipline is applied consistently in their department. Thirteen percent of survey participants do not believe that employee terminations are fair in their department.



---

[49] The total number of participants (460) who witnessed or observed retaliation at the CJB include a majority of participants who identified as male or female, but there were also participants that provided feedback who preferred not to specify their gender and a smaller number who identified as transgender or non-binary.

Fifty-eight (58) witnesses interviewed described instances of retaliation or a fear of retaliation from leadership at the CJB. This includes both those who experienced retaliatory incidents, as well as those who witnessed retaliation or expressed a fear of retaliation for coming forward.

The trend continued in that there was a greater ratio of negative survey responses from women participants regarding retaliation. Twenty-six percent (384) of women participants did not feel they are able to talk openly with leadership without fear of retaliation, while only 17% (87) of male participants expressed the same fear of retaliation.



Given the data presented in the "Reporting Misconduct" section above, a majority of those who experienced sexual harassment, gender-based discrimination, and/or retaliation did not report it. Among those who did not report sexual harassment they experienced, 50% said they did not do so because they were afraid of retaliation. Of those who did not report experiencing gender-based discrimination, 62% said fear of retaliation kept them from doing so. The numbers were highest regarding those who did not report the retaliation they experienced, with 63% not reporting due to a fear of retaliation.

*Survey Results by Judicial District*

Due to the decentralized structure of the Colorado Judicial Branch, the data showed that each District had its own individual climate around employee satisfaction and the prevalence of sexual harassment, gender-based discrimination, and retaliation. While data from some Districts indicated problems exist, the data for others showed healthier climates.

Out of Districts that had more than eighty survey participants,[50] we analyzed five with more positive results and four with more negative results. Data on the prevalence of sexual harassment, discrimination based on sex, and retaliation remained consistent with these top and bottom performing Districts. Districts with less reported misconduct were the Supreme Court & Court of Appeals ("SC/COA"), District 19, District 10, SCAO and District 8 in that order.[51]  Districts with more misconduct reported included District 17, District 2, District 1, and District 18, in that order.

Information from the voluntary interviews mirrored that of the survey in that Districts that scored lower in the survey had more voluntary interviewees who reported misconduct they had either witnessed or experienced while working there. This information is highlighted in the appropriate sections below.

The charts that follow provide a macro level view of the misconduct witnessed or experienced across all Districts.  Again, to ensure a statistically sound analysis by District in the sections that follow, we focused on only those Districts with 80 or more participants.



50 We analyzed the information from Districts with more than 80 participants to ensure more statistically relevant data. There were Districts with fewer than 80 participants that performed well and had negative results.
51 Across the board, the Supreme Court and Court of Appeals ranked at number one for the most part.

The previous chart illustrates the percent of participants from each District who reported experiencing some form of misconduct (sexual harassment, gender discrimination and / or retaliation).

We then looked at each category of misconduct by District.  This data reinforces the thesis that there were Districts that had significantly less misconduct in each category and those that had greater issues with misconduct.











Of those who participated in the survey, 60% (1,455) belonged to one of the nine Districts we analyzed (five top performing and four with more issues). Out of that number, 60% (874) participants were among those in the bottom for Districts.



The bottom four Districts accounted for 51% (88) of sexual harassment, 55% (113) of gender-based discrimination, and 57% (204) of retaliation survey participants either experienced or witnessed at the CJB. The top five Districts accounted for 22% (39) of sexual harassment, 26% (53) of gender-based discrimination, and 24% (87) of retaliation survey participants either experienced or witnessed at the CJB.

Although the bottom four Districts made up for 33% of survey participants, more than half of the instances of mistreatment (sexual harassment, gender-based discrimination, retaliation) occurred in these Districts, across all three areas. The top five Districts, comprising 26% of survey participants, hit the mark or below in terms of an even distribution in incidents. Importantly, had the top five Districts included Districts with less than 90 participants, some of the larger Districts included would fall closer to the middle of the pack. Out of the other fifteen Districts, not included in the top five or bottom four with more than 80 participants, fourteen (14) had less than 90 participants take part in the survey.

Similarly, voluntary interviewees who reported misconduct tended to fall into one of the bottom Districts with 80 or more survey participants.

Further illuminating is the data collected from the survey about whether participants would recommend their District as a good place to work to others. Again, the top performing Districts tend to rank highest on this question and lower performing Districts rank lower.

---

[52] The fourth set of columns in the above table shows a hypothetical set of complaints, were the complaints distributed evenly between the three groups (top five Districts, bottom four Districts, and other 15 Districts). We include this even distribution to provide a clearer picture of the actual distribution of complaints given the different number of participants from each group. As the chart shows, both the top five Districts and the other 15 Districts fall below an even distribution of complaints. The bottom four Districts were far above an even distribution, as would be expected given the nature of being the bottom four.



Although there is currently not a centralized system in place to build a cohesive and shared culture at CJB, the survey data highlights an opportunity to learn from the top performing Districts as to what they are doing to minimize misconduct and create an environment that supports employee engagement and happiness.

**Top three Districts with over 80 participants: Supreme Court / Court of Appeals ("SC/COA"), District 19 & District 10**

Given that SCAO and District 8 did not perform much above the average with respect to workplace satisfaction, we focused our detailed analysis on the top three performing Districts to highlight positive themes. Common subjects from the top performing Districts included employee satisfaction with their job, lesser witnessed or experienced misconduct, higher willingness to recommend the District as a good place to work, and a higher likelihood that experienced misconduct was reported. However, participants who reported misconduct were generally dissatisfied with the response. Additionally, the belief that appointed officials are held accountable was low, consistent with all other Districts.

The top three Districts had higher levels of job satisfaction and participants indicated they were more comfortable reporting misconduct than the survey average.



Similarly, the top three Districts were generally[53] more confident that leadership would take reports of sexual harassment seriously, would act on sexual harassment reports, and indicated that gender-based jokes were not tolerated. However, like the survey in general, participants in these Districts had lower scores on the statement that appointed officials would be held accountable when reports of sexual harassment are made.

---

[53] District 10 scored just below the average for two of the questions specifically related to appointed officials.



Once again, the top three large Districts reported more favorably about the treatment of men versus women than the average found in the survey. However, in this set of questions, the SC/COA scored lower than Districts 10 and 19.



Compared to the survey average, the top three performing Districts had less witnessed and observed mistreatment, with the exception that District 10 had more incidents of experienced or witnessed sexual harassment than the survey average.



The positive data collected about SC/COA is meaningful given the power in those courts and the prominence of the roles that support them.  That level of power and influence may be a contributing factor in workplace misconduct, yet the SC/COA has done well in this regard to rate at the top of the survey. Similarly, Districts 10 and 19 warrant additional evaluation by CJB to identify best practices that can be replicated across the CJB.

Even in the top performing three Districts, there were anomalies that warrant additional follow up. These include that much of the reported misconduct at SC/COA occurred since 2019 (83% of the 6 responses) and District 10 has more reports of experienced or witnessed sexual harassment than the survey average (13% or 12 affirmative responses). While more participants indicated they reported the misconduct they experienced at the SC/COA (75%), none of those who reported the misconduct were dissatisfied with the outcome.  This contrasts with Districts 19 and 10 where a majority of those who reported experienced misconduct were satisfied with the outcome (75% each), yet a much lower percentage reported the experienced misconduct in these Districts (43% and 57% respectively).

**Four lowest rated Districts with over 80 participants: District 17, District 2, District 1, District 18**

The four Districts with over 80 participants that rated lowest in the survey highlight an opportunity for the CJB to focus efforts and resources. This will have an impact on the employee experience in those Districts as a first step to address workplace issues.  The lower performing Districts had consistently lower employee satisfaction and more instances of experienced or witnessed misconduct.

The survey statements used to assess employee engagement and satisfaction rated lower than the average in all four of these Districts.  District 17 was much lower than the other three Districts evaluated in this section as well as the average of the survey.



These Districts highlighted concerns about the environment to support a respectful workplace where sexual harassment and gender-based jokes occur as compared to the survey average.



Similarly, the four Districts examined showed that participants had concerns about equal treatment of men versus women, with District 2 scoring the lowest overall.

100



Retaliation was a big concern in these Districts, especially in District 17 where 33% of survey participants indicated they experienced or observed retaliation while working there.  District 2 had more participants who experienced or observed gender discrimination (17%) and District 18 had the most experienced or observed sexual harassment (14%).



The voluntary interviews provided additional context in these four Districts.  Reports of sexual harassment were most prevalent amongst witnesses from District 18, with eight (8) witnesses raising issues of sexual harassment. District 1 was second, with four (4) witnesses raising issues of sexual harassment.

With respect to gender-based discrimination, voluntary interviewees reported more issues from District 18 and District 1, with six (6) witnesses from each District raising issues of gender-based discrimination. District 2 (along with two other Districts) followed this with three (3) reports of gender-based discrimination from each. Voluntary witnesses who reported gender-based discrimination included appointed officials, supervisors, and employees. Nine (9) judges from eight (8) Districts reported concerns with gender-based discrimination.

101

Reports of retaliation were most prevalent among voluntary interviewees from District 18, with 11 witnesses from that workplace reporting issues of retaliation. District 17 came second, with nine (9) witnesses raising issues of retaliation. District 2 came next, with seven (7) witnesses raising issues retaliation, followed by District 1, where six (6) witnesses raised issues of retaliation. Concerns about retaliation came from appointed officials, supervisors, and employees.

Finally, participants from these Districts all indicated that they did not feel comfortable talking openly with leadership without fear of retaliation.  The survey average showed that 55% of participants answered that statement positively. District 1 was the lowest at 25%, followed by District 2 at 30%, District 17 at 38% and District 18 closer to the average at 52%.  This concern likely contributes to a lack of reporting misconduct.

Detailed information about each of the lower performing Districts provides better context and information about employees' experiences and how they differ from higher rated Districts.

### 1.  District 17 – Adams, Broomfield

Out of three-hundred and fifty-four (354) District 17 employees who took the survey, two-hundred and five (205) participated at a rate of 58%.  Ninety-one percent (186) identified themselves as employees of the Colorado Judicial Branch, while 9% (8) identified as appointed officials. Seventy-six percent (155) of participants at District 17 identified as female and 11% (22) identified as male.[54]

Job satisfaction in District 17 was lower than in any other District, with 24% (28) of those who responded to the question saying they were either "Dissatisfied" or "Very dissatisfied" with their job at the CJB. Only 55% said they would be "Very likely" or "Likely" to recommend the CJB to others as a good place to work. Overall, a significant number (around a third) of participants from District 17 do not feel it is a healthy working environment.



---

[54] This does not equal 100% as some participants elected not to provide this information or selected non-binary or transgender as a category.

Forty percent (83) of participants[55] from District 17 either **experienced** or **witnessed** one or more of the forms of mistreatment we assessed (gender-based discrimination, sexual harassment, or retaliation) within the past five years. Twenty-eight percent (57) of participants from District 17 **experienced** one or more forms of mistreatment**,** while 25% (71) **witnessed** one or more forms of mistreatment.



The survey prompted participants to qualify the timeframe in which mistreatment occurred within three time periods: 2019 to present, between 2016 and 2018, and prior to 2016. Out of the experiences of mistreatment reported by participants, 53% reported mistreatment from 2019-present, 60% reported mistreatment 2018 and 2016, and 34% reported mistreatment prior to 2016.

*Reporting Misconduct*

Only 30% of those participants who experienced mistreatment at District 17 reported it. The 70% of participants who did not report provided the following reasons for that decision:

- I knew it wouldn't do any good. (94%)
- I was afraid of retaliation. (65%)
- It wasn't that serious. (13%)
- I didn't know who to go to. (7%)
- I didn't want to make the effort. (3%)

Other reasons for not reporting included, "I was blackballed," "The behavior is not always concrete enough to report – like I notice that my male colleagues treat me differently than they treat each other," "I generally experience this behavior from older male colleagues and recognize that I have to wait until they retire and hope their spots are filled with someone who is different," "It was a [redacted] at the time and I knew he was known for retaliation," "Since it was the [redacted] I felt

---

[55] Participants can select more than one category in this section; thus, the total exceeds 100%.

powerless," and "Too many bad people involved in the whole process, it wouldn't make a difference. I would probably be the one who pays the price."

Out of those who did report, 77% were not satisfied with the response/outcome they received, while only 8% were satisfied with the response/outcome they received.

Out of those who observed mistreatment, 86% chose not to report it. Reasons provided for not reporting included:

- I knew it wouldn't do any good (76%).
- I was afraid of retaliation. (60%)
- I didn't know who to go to. (12%)
- It wasn't that serious. (4%)

Other answers included, "Felt that people involved would be protected by higher ups," "I was not involved," "Since it was [title redacted], I felt powerless," "Supervisors forced an employee to quit," "Favoritism is strong in our dept. Management is 'never wrong'," and "People who sexually harass are in high levels of authority."

All the participants who reported observed mistreatment were dissatisfied with the response/outcome they received.

Fifty-two percent of total participants said they would feel safe reporting sexual misconduct by an appointed official. For the 18% who said they would not feel safe doing so, the top reasons provided were "Nothing would be done about it" (85%), "I would be afraid of retaliation at work" (85%), and "I would be afraid of losing my job." (70%).

The numbers among participants who were appointed officials were better, with 68% reporting they would feel safe reporting sexual misconduct by another appointed official and 16% reporting they would not.

When asked to rate the likelihood that CJB leadership will act on the results from this assessment, 36% of participants from District 17 believe leadership is unlikely to do so.

*Sexual Harassment*

Ten percent (21) of survey participants reported that they either observed or witnessed sexual harassment in District 17's workplace. Survey results were mixed on the environment of sexual harassment at District 17 and a considerable number (34%) of participants expressed a lack of faith that appointed officials are held accountable when allegations of sexual harassment are raised. Sixteen percent believe that leadership does not take appropriate action on reports of sexual harassment. Fourteen percent feel that CJB leadership does not take complaints of sexual harassment seriously, and 13% said gender-based jokes are tolerated at District 17.

104



*Gender-based Discrimination*

Fourteen percent (29) of survey participants said they either experienced or observed gender-based discrimination at District 17 within the past five years. Overall, the belief that gender-based discrimination is a problem at District 17 is more prevalent than reported experiences— personal or observed. Twenty-eight percent of participants believe that women versus men are not held to the same standards at the CJB; 16% of participants believe that women are not offered the same opportunities as men at the CJB; and 20% of participants believe that women are not promoted at the same rate as men at the CJB.



More generally, nearly half (48%) of survey participants from District 17 **did not** agree that all employees are treated equally at District 17.

105

*Retaliation*

Thirty-three percent (68) of survey participants from District 17 reported they had either witnessed or observed retaliation at District 17 within the past 5 years. At District 17, more participants fear retaliation from leadership and do not trust leadership to apply fair discipline than those who trust leadership and do not fear retaliation. Forty-three percent of survey participants do not feel they can talk openly with leadership without fear of retaliation. Forty-four percent of participants do not have faith that discipline is applied consistently in their department. Twenty-five percent of survey participants do not believe that employee termination decisions are fair in their department.



Retaliation was the biggest issue raised by voluntary interviewees from District 17. Out of twelve (12) interviews from District of 17, nine (9) raised issues of retaliation. Several comments we heard from the voluntary interviews reinforced the survey data about retaliation:

- "There is a huge concern regarding retaliation in District 17. When problems are presented to the management team, that team is "never wrong." Instead, they will begin to focus on the person who raised the concern."
- "I brought my concern to HR because my coworkers and I filed a complaint about a judge and nothing was happening with the Judicial Review Committee. Instead, the judge started retaliation against us."
- "My main concern is that the Judicial system states they do not tolerate retaliation. I filed complaint against my co-worker, and instead of addressing the issue, my supervisor gave me a poor performance review."

Voluntary witnesses from District 17 suggested that an anonymous process for victims to report misconduct would help reduce retaliation and would solicit more feedback from employees. These witnesses stressed the importance of leadership training and accountability. Witnesses said that training would help leaders address issues, better manage conflict, and improve morale.

Given the data presented in the "Reporting Misconduct" section above, a majority of those who experienced sexual harassment, gender-based discrimination, and/or retaliation in District 17's

workplace chose not to report it. Out of this number, 65% indicated they chose not to report the mistreatment because they were afraid of retaliation.

## 2. District 2 – Denver

Out of three-hundred and fifty-three (353) District 2 employees who took the survey, one-hundred and eighty-six (186) participated, at a rate of 53%. Eighty-nine percent (165) identified themselves as employees of the Colorado Judicial Branch, while 11% (21) identified as appointed officials. Sixty-five percent (121) of the participants at District 2 identified as female and 23% (43) identified as male.

Job satisfaction at District 2 was more positive than many other Districts, with 65% (77) of those who responded to the question saying they were either "Satisfied" or "Very satisfied" with their job at the CJB. Sixty-one percent (111) said they would be "Very likely" or "Likely" to recommend the CJB to others as a good place to work, whereas 22% (39) would not be likely to recommend it. Overall, a substantial number (around a quarter) of participants from District 1 did not feel it is a healthy working environment. Twenty-six percent of participants reported they would not feel comfortable reporting unethical behavior and 24% reported they were not satisfied with the physical and emotional work environment at District 2.



Thirty-two percent (59) of participants from District 2 either **experienced** or **witnessed** one or more forms of mistreatment (gender-based discrimination, sexual harassment, or retaliation) within the past five years. Twenty percent (37) of participants from District 2 **experienced** one or more forms of mistreatment, while 28% (52) **witnessed** one or more forms of mistreatment.



The survey prompted participants to qualify the timeframe in which mistreatment occurred within three time periods: 2019 to present, between 2016 and 2018, and prior to 2016. Out of the experiences of mistreatment reported by participants, 68% reported mistreatment from 2019-present, 50% reported mistreatment 2018 and 2016, and 18% reported mistreatment prior to 2016.

*Reporting Misconduct*

Thirty-eight percent of participants who experienced mistreatment at District 2 reported it. The 62% of participants who did not report provided the following reasons for that decision:

- I knew it wouldn't do any good. (86%)
- I was afraid of retaliation. (52%)
- It wasn't that serious. (10%)
- I didn't know who to go to. (10%)
- I didn't want to make the effort. (10%)

Other reasons for not reporting the mistreatment include, "My department knows how to use policy to protect themselves" and "It would only result in further personal scrutiny."

Out of those who did report, 100% were **not** satisfied with the response/outcome they received.

Out of those who observed mistreatment, 85% chose not to report it. Reasons provided for not reporting include:

- I knew it wouldn't do any good (73%).
- I was afraid of retaliation. (53%)
- I didn't know who to go to. (3%)
- It wasn't that serious. (3%)

Other answers include, "Information found out a couple of years after. Hard to prove in other instances. I spoke out years ago, was basically told to look the other way," "It was a 'disparate impact' situation, i.e., not intentional, and had to do with courtroom assignments of new judges, and has been and continues to be in the process of being resolved," "The co-worker filed multiple

grievances, nothing happened to management, and the worker was further scrutinized," and "Did not affect me and if the other person wanted to make a complaint they could. I would not start a complaint that the person involved did not want to be an issue."

All participants who reported the mistreatment they observed were dissatisfied with the response/outcome they received.

Sixty-one percent of total participants said they would feel safe reporting sexual misconduct by an appointed official. For the 16% who said they would not feel safe doing so, the top reasons provided were "I would be afraid of retaliation at work" (78%), "I would be afraid of losing my job" (72%), and "Nothing would be done about it" (56%).

The numbers among participants who are appointed officials were better, with 81% reporting they would feel safe reporting sexual misconduct by another appointed official and 10% reporting they would not.

When asked to rate the likelihood that CJB leadership will act on the results from this assessment, 32% of participants from District 2 believe leadership is unlikely to do so.

*Sexual Harassment*

Nine percent (16) of survey participants reported that they had either observed or witnessed sexual harassment in District 2's workplace. Thirty-two percent of participants **did not** believe that appointed officials are held accountable when allegations of sexual harassment are raised. Twenty-three percent **did not** believe that leadership takes appropriate action on reports of sexual harassment. Twenty-two percent **did not** feel that CJB leadership takes complaints of sexual harassment seriously, and 13% said gender-based jokes are tolerated at District 2.



*Gender-based Discrimination*

Seventeen percent (32) of survey participants said they either experienced or observed gender-based discrimination at District 2 within the past five years. Overall, the belief that gender-based discrimination is a problem at District 2 is more prevalent than reported experiences— personal or observed. Twenty-nine percent of participants believe that women versus men are not held to the same standards at the CJB; 21% of participants believe that women are not offered the same opportunities as men at the CJB; and 21% of participants believe that women are not promoted at the same rate as men at the CJB.



More generally, 40% of survey participants from District 2 **did not** agree that all employees are treated equally at District 2.

*Retaliation*

Twenty-two percent (40) of survey participants from District 2 reported they either witnessed or observed retaliation at District 2 within the past 5 years. At District 2, many participants did not feel they could go to leadership with concerns without retaliation. A quarter or more of participants did not trust leadership to make fair disciplinary or employee termination decisions. More participants (37%) did not feel they could talk openly with leadership without fear of retaliation than those who do (30%). Thirty-five percent of participants did not have faith that discipline is applied consistently in their department. Twenty-four percent of survey participants did not agree that employee termination decisions are fair in their department.

110



Retaliation was the biggest issue reported by voluntary interviews from District 2, with seven (7) out of ten (10) voluntary witnesses reporting concerns of retaliation. Quotes from the interviews highlight this issue:

- "I was offered opportunity to meet with HR and [redacted] regarding my supervisor's behavior but refused for fear of retaliation.  My supervisor then gave me the lowest performance rating I have ever received in [number redacted] years with Judicial and was put on a performance plan."
- "People are unable to speak up without consequences, even if you are found to be right and justified you are still given questionable treatment."

Given the data presented in the "Reporting Misconduct" section above, a majority of those who experienced sexual harassment, gender-based discrimination, and/or retaliation in District 2's workplace chose not to report it. Out of this number, 52% indicated they did not report the mistreatment because they were afraid of retaliation.

### 3.  District 1 – Gilpin, Jefferson

Out of three-hundred and forty-three (343) District 1 employees who took the survey, two-hundred and twelve (212) participated, at a rate of 62%. Eighty-nine percent (188) identified themselves as employees of the Colorado Judicial Branch, while 11% (24) identified as appointed officials. Sixty-nine percent (145) of participants at District 1 identified as female and 22% (46) identified as male.

Job satisfaction at District 1 was more positive than many other Districts, with 70% (93) of those who responded to the question saying they were either "Satisfied" or "Very satisfied" with their job at the CJB. Sixty-six percent (139) said they would be "Very likely" or "Likely" to recommend the CJB to others as a good place to work. Overall, most participants from District 1 agreed it is a healthy working environment, although 27% of participants would not feel comfortable reporting unethical behavior.

111



Twenty-nine percent (62) of participants from District 1 either **experienced** or **witnessed** one or more forms of the mistreatment we investigated (gender-based discrimination, sexual harassment, or retaliation) within the past five years. Twenty percent (43) of participants from District 1 **experienced** one or more forms of mistreatment, and 22% (46) **witnessed** one or more forms of mistreatment



The survey prompted participants to qualify the timeframe in which mistreatment occurred within three time periods: 2019 to present, between 2016 and 2018, and prior to 2016. Out of the experiences of mistreatment reported by participants, 55% reported mistreatment from 2019-present, 47% reported mistreatment 2018 and 2016, and 21% reported mistreatment prior to 2016.

*Reporting Misconduct*

Only 28% of participants who experienced mistreatment at District 1 reported it. The 72% of participants who did not report provided the following reasons for that decision:

- I was afraid of retaliation. (61%)
- I knew it wouldn't do any good. (57%)
- It wasn't that serious. (17%)
- I didn't know who to go to. (13%)
- I didn't want to make the effort. (9%)

Other reasons for not reporting included, "Entire team was yelled at in a meeting for reporting concerns to [name redacted]," "Retaliation is difficult to prove when it is subtle," and "I was threatened that I would be fired."

Out of those who did report, 67% were **not** satisfied with the response/outcome they received, while only 11% were satisfied with the response/outcome they received.

Out of those who observed mistreatment, 87% chose not to report it. Reasons provided for not reporting included:

- I knew it wouldn't do any good (67%).
- I was afraid of retaliation. (42%)
- I didn't know who to go to. (30%)
- It wasn't that serious. (9%)
- I didn't want to make the effort. (6%)

Other answers included, "The police were involved and I wasn't the one it happened to, I just observed it between other people, and while it was something I felt was inappropriate, the persons involved did not seem to be bothered and so I let it go," "The individual it happened to did not want to report and that is not my decision to make for them," "Wasn't toward me directly," "Sometimes the retaliation is very subtle. I feel we sometimes get a clear message that no one really wants to hear about it or deal with the conflict if it's not that important enough to them," and "The initial incident was reported and then the retaliation was clearly supported."

Eighty percent of participants who reported the mistreatment they observed were dissatisfied with the response/outcome they received.

Fifty-five percent of total participants said they would feel safe reporting sexual misconduct by an appointed official. For the 13% who said they would not feel safe doing so, the top reasons provided were "Nothing would be done about it" (79%), "I would be afraid of retaliation at work" (79%), "I would be afraid it would ruin my career prospects" (47%), and "I would be afraid of losing my job" (47%).

The numbers among participants who are appointed officials were better, with 79% reporting they would feel safe reporting sexual misconduct by another appointed official and only 4% reporting they would not.

113

When asked to rate the likelihood that CJB leadership will act on the results from this assessment, 23% of participants from District 1 believe leadership is unlikely to do so.   This is lower than in other Districts.

*Sexual Harassment*

Six percent (13) of survey participants reported that they either observed or witnessed sexual harassment in District 1's workplace. Survey results were mixed on the environment of sexual harassment at District 1, and only 25% of participants believe that appointed officials are held accountable when allegations of sexual harassment are raised. Thirty-seven percent believe that leadership takes appropriate action on reports of sexual harassment. Less than half, 44% feel that CJB leadership takes complaints of sexual harassment seriously, while 64% said gender-based jokes are not tolerated at District 1.

There were ten (10) voluntary interviews from District 1, with 4 reporting concerns about sexual harassment at the District.

*Gender-based Discrimination*

Ten percent (22) of survey participants said they had either experienced or observed gender-based discrimination at District 1 within the past five years. Overall, the belief that gender-based discrimination is a problem at District 1 is more prevalent than reported experiences—personal or observed. Twenty-three percent of participants believe that women versus men are not held to the same standards at the CJB; 16% of participants believe that women are not offered the same opportunities as men at the CJB; and 16% of participants believe that women are not promoted at the same rate as men at the CJB.

Of the ten (10) voluntary interviews from District 1, 6 reported concerns about gender-based discrimination.



114

More generally, 35% of survey participants from District 1 **did not** agree that all employees are treated equally at District 1.

*Retaliation*

Twenty percent (42) of survey participants from District 1 reported they had either witnessed or observed retaliation at District 1 within the past 5 years. At District 1, most participants were ambivalent about whether they could go to leadership with concerns without retaliation. They were also unsure if leadership is fair about employee termination decisions.  Eighteen percent of survey participants did not feel they can talk openly with leadership without fear of retaliation. Twenty-nine percent of participants did not have faith that discipline is applied consistently in their department. Fifteen percent of survey participants did not agree that employee termination decisions are fair in their department.

Six (6) of the ten (10) voluntary interviews form District 1 reported concerns about retaliation while working there.

Given the data presented in the "Reporting Misconduct" section above, a majority of those who experienced sexual harassment, gender-based discrimination, and/or retaliation in District 1's workplace chose not to report it. Out of this number, 61% indicated they chose not to report the mistreatment because they were afraid of retaliation.

## 4.  District 18 – Arapahoe, Douglas, Elbert, Lincoln

Out of four-hundred and fifty-four (454) District 18 employees who took the survey, two-hundred and seventy-one (271) participated, at a rate of 60%. Ninety-one percent (246) identified as employees of the Colorado Judicial Branch, while 9% (25) identified as appointed officials. Seventy-three percent (199) of participants at District 18 identified as female and 18% (48) identified as male.

Job satisfaction at District 18 was more positive than in many Districts, with 63% (113) of employees who responded to the question saying they were either "Satisfied" or "Very satisfied" with their job at the CJB. Sixty-four percent (172) said they would be "Very likely" or "Likely" to recommend the CJB to others as a good place to work, whereas 17% (86) would not be likely to recommend. Most participants from District 18 feel it is a healthy working environment. However, 19% of participants reported they would not feel comfortable reporting unethical behavior, 18% reported they were not satisfied with the physical and emotional work environment, and 16% do not believe the CJB provides a healthy and safe working environment for employees.

115



Thirty percent (82) of participants from District 18 have either **experienced** or **witnessed** one or more forms of the mistreatment being investigated (gender-based discrimination, sexual harassment, or retaliation) within the past five years. Seventeen percent (47) of participants from District 2 **experienced** one or more the forms of mistreatment and 24% (66) have **witnessed** one or more forms of mistreatment in the workplace.



The survey prompted participants to qualify the timeframe in which mistreatment occurred within three time periods: 2019 to present, between 2016 and 2018, and prior to 2016. Out of the experiences of mistreatment reported by participants, 71% reported mistreatment from 2019-present, 51% reported mistreatment 2018 and 2016, and 6% reported mistreatment prior to 2016.

116

*Reporting Misconduct*

Thirty-five percent of participants who experienced mistreatment at District 18 reported it. The 65% of participants who did not report provided the following reasons for that decision:

- I knew it wouldn't do any good. (70%)
- I was afraid of retaliation. (58%)
- It wasn't that serious. (15%)
- I didn't know who to go to. (6%)
- I didn't want to make the effort. (6%)

Other reasons for not reporting the mistreatment included, "I convinced myself that it was my perspective," "I would have been laughed at. It would not have been seen as retaliation," "Afraid of being fired," "Higher person in charge and if you're not a favorite you are looked upon as a trouble-maker or whiner," and "The retaliation came from upper management, reporting it would have made it worse."

Out of those who did report, 83% were **not** satisfied with the response/outcome they received.

Out of those who observed mistreatment, 76% chose not to report it. Reasons provided for not reporting included:

- I knew it wouldn't do any good (56%).
- I was afraid of retaliation. (38%)
- It wasn't that serious. (9%)

Other answers included, "Couldn't prove it was discrimination or just politics within the department," "Damage was already done and dealt with not appropriately," Higher person in charge is guilty and then you are targeted and labeled a problem employee," and "Someone else reported."

Among those who reported the mistreatment they observed, satisfaction with the response/outcome they received was even, with 41% of participants dissatisfied and 41% satisfied with the response.

Sixty-eight percent of participating employees said they would feel safe reporting sexual misconduct by an appointed official. For the 9% who said they would not feel safe doing so, the top reasons provided were "Nothing would be done about it" (72%), "I would be afraid of retaliation at work" (56%), "I would be afraid it would ruin my career prospects" (44%), and "I would be afraid of losing my job" (44%).

The numbers among participants who are appointed officials were slightly better, with 72% reporting they would feel safe reporting sexual misconduct by another appointed official, and 4% reporting they would not.

When asked to rate the likelihood that CJB leadership will act on the results from this assessment, 22% of participants from District 18 believe leadership is unlikely to do so.

*Sexual Harassment*

Fourteen percent (37) of survey participants reported that they had either observed or witnessed sexual harassment in District 18's workplace. Survey results were mixed on the environment of sexual harassment at District 18. Twenty-three percent of participants **did not** believe that appointed officials are held accountable when allegations of sexual harassment are raised and 16% **did not** believe that leadership takes appropriate action on reports of sexual harassment. However, 59% feel that CJB leadership takes complaints of sexual harassment seriously, and 67% said gender-based jokes are not tolerated.



*Gender-based Discrimination*

Eleven percent (29) of survey participants from District 18 said they either experienced or observed gender-based discrimination at District 18 within the past five years. Overall, the belief that gender-based discrimination is a problem at District 18 was more prevalent than reported experiences— personal or observed. Twenty-three percent of participants believe that women and men are not held to the same standards at the CJB; 14% of participants believe that women are not offered the same opportunities as men at the CJB; and 20% of participants believe that women are not promoted at the same rate as men at the CJB.



118

More generally, 30% of survey participants from District 18 **did not** agree that all employees are treated equally at the CJB.

*Retaliation*

Twenty percent (54) of survey participants from District 18 reported they either witnessed or observed retaliation at District 18 within the past 5 years. At District 18, more than a quarter of participants did not feel they could go to leadership with concerns without retaliation. Additionally, they did not believe that discipline is applied consistently in their department. Twenty-six percent did not feel they could talk openly with leadership without fear of retaliation. Thirty-six percent of participants did not have faith that discipline is applied consistently in their department. Eleven percent of survey participants did not agree that employee termination decisions are fair in their department.



Given the data presented in the "Reporting Misconduct" section above, a majority of those who experienced sexual harassment, gender-based discrimination, and/or retaliation in District 18's workplace chose not to report it. Out of this number, 58% indicated they chose not to report the mistreatment because they were afraid of retaliation.

# RECCOMENDATIONS

*Anne R. McCord, SPHR, SHRM-SCP, PI, AWI-CH*
*Elizabeth R. Rita, Esq.*

In the last part of this report, we set forth our recommendations for the Judicial Branch to address the problems identified in our assessment, leverage its strengths, and rebrand itself moving forward. These recommendations are based upon our work assessing the Judicial workplace; meeting with employees, judicial officers, and other stakeholders; and the results of our comprehensive workplace survey. Our research on best practices in judicial workplaces around the country informs these recommendations, including the comprehensive work being done on the federal bench. We also bring our experience assessing cultures and investigating misconduct in workplaces in Colorado and around the nation.

The Colorado Judicial Branch has already begun to act in some of these areas. Our recommendations are in alignment with much of what has already begun. Our Supreme Court has recognized an opportunity to join the growing number of judicial institutions around the country who are critically examining their policies and practices, considering their own allegations of misconduct.

There is a special risk for harassment occurring in workplaces like the Judicial Branch. There are significant disparities of power between appointed officials and employees. Many judges supervise staff and run their individual courtrooms without any background in management or legal compliance. Some employees in rural Districts work in relative isolation. Many employees fear retaliation and are confused about their reporting avenues. All these factors can increase the likelihood of harassment in a workplace. The EEOC's 2016 Select Task Force Report identified these and other factors as contributing to higher incidents of harassment in a workplace.[56] We heard about all these areas while meeting with employees in the Branch.

Our work in the Colorado Judicial Branch revealed several primary weaknesses in the workplace:

- The absence of shared cultural values, to which everyone is held accountable, as the driver for decisions;
- Insufficient avenues for confidential and safe reporting;
- Broadly stated fears of retaliation, and concerns that nothing is done in response to complaints of misconduct;
- A need for more transparency and accountability; and
- Insufficient (and insufficiently modern) training on workplace conduct issues.

---

[56] *See Select Task Force on the Study of Harassment in the Workplace*, available online at: https://www.eeoc.gov/eeoc/task_force/harassment/upload/report.pdf.

We propose recommended action to address these weaknesses.  Our recommendations focus on the employee experience, accountability and transparency, and best practices in the modern workplace. These recommendations are specifically tailored to the Colorado Judicial Branch, while also reflecting state-of-the-art approaches to creating an environment where employees and judicial officers can do their best work for their communities and the State of Colorado. These five areas are interwoven in some ways but are set forth separately to emphasize the importance of each one.

These recommendations begin at the most important part: redefining the importance of culture in the Judicial workplace. Strong policies, procedures, and training are important but without a solid culture, they are simply a window dressing. The data we have gathered in this project overwhelmingly suggests that focusing on creating a shared set of cultural values – emphasizing respect, collegiality, and inclusion – is essential for the Judicial Branch.

### Our Five Areas of Focus Are:

1. Recommended **STRUCTURAL** changes that we believe will help provide the resources and expertise the Colorado Judiciary will need as it moves forward in this endeavor, including the creation of the Office of People and Culture. This recommendation touches on many areas of life within the Judicial workplace.

2. Next, we outline the importance of institutionalizing a commitment to **DIVERSITY, EQUITY, AND INCLUSION** as a tangible demonstration of Judicial's commitment to a **CULTURE** where respectful, inclusive, and supportive behaviorsare encouraged and rewarded.

3. Third, we recommend specific mechanisms that will allow the Judicial Branch to maximize employee's access to **SAFE REPORTING** of issues that arise in the Judicial workplace.

4. Fourth, we discuss the importance of creating mechanisms for more **ACCOUNTABILITY** for leadership, particularly judicial officers, as a core tenant of the Colorado Judicial Branch's culture.

5. Finally, we include recommendations aimed  toward prompt **SUPPORT and RESOURCES** for Districts needing immediate attention.

One foundational recommendation drives all others.  It is that the Colorado Judicial Branch must transform its workplace through building a strong culture that manifests in every Judicial District and administrative department. This evolution will drive everything else that must be done.  For this to be successful, investments of time, money, and resources must take place.  The first recommendation is the creation of a new Division: The Office of People and Culture.  This organization will build and own the foundational culture that will support all other recommended actions.

121

## <u>Recommended Structural Changes</u>

### *Office of People and Culture*

Our first recommendation is that the Judicial Branch create an **Office of People and Culture** (the "OPC"). This Division will house a small team responsible for creating the structures and programs necessary to produce impactful changes in the culture.  This OPC will own many pieces of the new approach we are recommending:

We believe that a commitment to a healthy culture begins with committing resources to provide the necessary expertise and services to do so. The essential first step is hiring or appointing a **Director of People and Culture** (the "DPC" or "Director of OPC") to lead this effort.  This person will head up the OPC. This Director should be experienced, respected, and independent.  They need to have deep expertise on the building blocks of organizational culture and DEI, with the ability to engage all stakeholders around the fundamentals of a respectful, inclusive, and collegial workplace.  This person will be, in effect, the ambassador of Judicial Culture across the organization.

The DPC may require the help of an administrator, and as described below, we recommend that the OPC also house an impartial Ombudsperson.  In future years, as funding and needs dictate, a deputy director position may be required to meet the workload of the Division.

The Office of People and Culture will not replace or duplicate Human Resources, which will continue to provide operational HR support, talent acquisition, compensation, benefits, and employee relations services to the Branch.  Instead, OPC will work in tandem with HR, and will take on the task of building and leading culture initiatives in five areas:

- **Diversity, Equity, and Inclusion**

The DPC will be responsible for providing tools, programs, and resources to support DEI strategies across the Branch.  We will say more about the importance of DEI below.

- **Creation and support of an Ombudsperson and other Safe Reporting mechanisms**

We recommend that the Director of OPC hire an impartial Ombudsperson to provide a safe reporting venue for employees and judicial officers.  The Ombudsperson should be empowered to provide a confidential space for reporting; ideas, and advice; information about policies and procedures; resources for informal resolution including mediation and restorative justice; and referrals for formal investigations within Judicial and by the Colorado Commission on Judicial Discipline ("CCJD"), where necessary.  This person should retain sufficient autonomy in their interactions with employees, staff, and judges to maintain credibility and independence in the eyes of all stakeholders.

- **Culture Development across the Branch**

The Director of OPC should begin their tenure with a comprehensive listening tour of the Branch. Those Districts identified as needing immediate attention should come first, but every District

should be part of this tour.  The "Why?" behind this effort is to get a comprehensive understanding of the challenges and strengths that exist, to build collegial relationships with stakeholders, and to re-brand the people experience.

Alongside this fieldwork, the DPC should design a program for Town Halls, Summits, and Listening Sessions particularly geared toward the development of a shared institutional culture upon which to base all other initiatives. This collaborative development of a set of shared values should ask the fundamental question, "What are the Judicial Branch's non-negotiable values? What should drive the employee experience, the relationship between judicial officers and their staff, and the resolution of conflict?"

Another important preliminary effort should be the creation of an intensive development program for the court executives in all twenty-two Judicial Districts.  These individuals should be tasked with acting as the conduits of culture in their respective locations.  In our outreach to this group of employees, we found they are underutilized and eager to help as instrumental parts of the culture development across the Branch.

- **Training**

The Director of OPC should be responsible for all training that drives and reinforces the culture for the Judicial Branch.  This includes next generation training programs around Diversity, Equity, and Inclusion; Respectful Workplace; Anti-Bullying; Bystander Awareness and Assertiveness; Management Training for employees and judicial officers; Leadership Development; Managing Conflict; and Communication.   These trainings should be geared towards employees and judicial officers, as equally important constituencies in the Judicial workplace.

This does not mean that OPC should be tasked with providing all this training.  The Judicial Branch has distinct groups that already focus exclusively on training for employees and for judicial officers, and much of this is effective.  However, there is no one organization that evaluates training system-wide or assesses it for priorities and maximum effectiveness. We do not recommend dismantling effective training that is already being used.   However, the Director of OPC should take on assessing the training resources that exist, determining in collaboration with their peers what works, and figuring out what needs to be changed, added, enhanced, or discontinued.

The last part of training we believe is imperative is the creation of a training program for judicial officers, specifically focused on enhancing their skills as managers of their organizations. Leadership training is important, but without the fundamentals of people management, it gilds a lily that may be languishing in a fallow garden. This training should leverage the management training Judicial already uses for employee managers.  Ideally this training should be required but at the least, it should be highly recommended. Records of training should be made public so they can be considered as part of a judge's performance scoring for retention.  The Director of OPC should own and help weigh in on the components of this training.

There should be required training on an annual basis for all employees and all judicial officers.

123

- **Mentoring**

Mentorship programs are a low-cost resource that can and should be leveraged in a workplace as rich in experience as the Judicial workplace. Mentorship is directly tied to employee satisfaction and retention. The Director of OPC should identify where this is already happening across the Branch and determine if larger more formalized program would be beneficial to the organization.

*Next Generation Policy*

The Judicial Branch should create a **Next Generation Policy.** This set of written policies should reflect a commitment to maintaining a workplace that encourages mutual respect, professionalism, and collegiality across ranks and divisions within the Branch. The citizens of Colorado expect judges and judicial leaders to behave in a manner befitting the honor and privilege of their roles. Disrespectful behavior and harassment, even when not unlawful or directed at someone because of a protected class, diminishes the dignity and stature of the Branch and can lead to unlawful harassment.

We recommend that the Colorado Judicial Branch adopt a formal Respectful Workplace Policy, as an adjunct to the work the SC/COA has already done in amending the Code of Judicial Conduct. The SC/COA has already determined that judges must abide by the values of civil, professional, and respectful treatment. We advise that the Branch's policies be amended to support these expectations for employees, judicial officers, and staff.

In June of 2021, the Colorado SC/COA amended its Code of Judicial Conduct in a manner designed to restore public confidence in the institution of the Colorado judiciary. These Amendments revised Code of Judicial conduct Rule 1.2, which mandates that judges behave in a manner to promote public confidence in the independence, integrity, and impartiality of the judiciary. The comment to this rule now specifies that this requirement includes avoiding harassment and other inappropriate workplace behavior. Moreover, the rules reflecting the obligations of impartiality, competence, and bias were also amended. Rule 2.3, which speaks to the prohibition of acting with bias, prejudice, and harassment, now explicitly prohibits retaliation against employees (including former employees), attorneys and members of the public. Moreover, revisions to the rule governing a judge's supervisory duties now states that a judge should practice civility, patience, respect, dignity, and courtesy with employees and their staff; should not engage in any harassment and should not retaliate against staff who report misconduct. Finally, the revisions make clear that judges should report misconduct of other judges and lawyers. "Public confidence in the integrity and impartiality of the judiciary is promoted when a judge takes appropriate action based upon reliable evidence of misconduct."

We recommend that the Judicial Branch embrace these new requirements and codify them in a Respectful Workplace Policy applicable to all personnel in the Branch. There are many good examples of Respectful Workplace Policies available, but at its heart the policy should emphasize that the expectation goes higher than just legal compliance. The goal should be fostering behavior that creates great culture and intercepting problem behavior before it becomes unlawful behavior. Policies should prohibit illegal conduct, but the standard for behavior should be set higher.

124

The newly revamped policy should explicitly address anti-retaliation and bystander reporting. Retaliation should explicitly be made a violation of the Judicial Branch's policies and judicial officers and all leaders should be required (and not simply encouraged) to report misconduct by others. Leaders in the Branch should be the most visible bystanders creating and maintaining the integrity of the Judicial workplace culture.

## Diversity, Equity, and Inclusion

As indicated above, the new OPC will house the Judicial Branch's programs for diversity, equity, and inclusion. However, this is an important enough focus of our recommendations that we wanted to devote specific attention to it.

At this juncture of our nation's and state's history, it is critical for the Judicial Branch to prioritize DEI as an institutional value. There are a multitude of studies, sociological and economic research, and news stories offering insights into why this is so critical. We cannot overstate enough the importance of fostering and supporting a diverse, equitable and inclusive workplace. Research shows the wisdom of prioritizing such a focus, in terms of improved productivity, outcomes, employee retention, and attracting and keeping top talent.

According to a cross-country study in the Harvard Business Review, organizations with better diversity ratings were more innovative and profitable, averaging "19% points higher innovation revenues."[57] In terms of employee well-being, a 2015 study from the *Journal of Applied Social Psychology,* which utilized a sample of 4,597 health sector employees, found that "diversity practices are associated with a trusting climate that, in turn, is positively related to employee engagement." The research article also notes that the organization's focus on diversity practices positively correlated with not only minority group engagement, but engagement "across all employees" as well as improved employee well-being.[58]

As a first step, the Director of OPC should conduct a readiness evaluation of the workplace to determine a baseline understanding of DEI, obstacles and gap analysis, and foundational data that will be used to craft a DEI strategy that is specifically tailored to the Judicial Branch. An outside consultant can help put this strategy into effect but without this first step, it is an attempt to build the right structure in an information vacuum. This would lessen the likelihood of a successful impact.

Once the strategy is in place and appropriate resources are obtained, the Director of OPC should institutionalize the priority of DEI in all aspects of the people experience from recruiting and hiring, onboarding, promotion and pay, resolution of conflict, education and training and monitoring metrics for improvement milestones over time. Evaluating success in tangible terms should be part of this strategy.

---

[57] *See How and Where Diversity Dries Financial Performance,* available online at: https://hbr.org/2018/01/how-and-where-diversity-drives-financial-performance
[58] *See The Role of Diversity Practices and Inclusion in Promoting Trust and Employee Engagement,* available at: https://www2.deloitte.com/au/en/pages/human-capital/articles/role-diversity-practices-inclusion-trust-employee-engagement.html

## **Safe Reporting**

We touch on this, above, in discussing the Office of People and Culture. One theme we heard repeatedly from employees we met with is that they do not feel safe bringing forward concerns, particularly about judicial officers. This needs to be rectified by a robust system of safe reporting options.

The ombudsperson will be a principal component of the Safe Reporting System. As outlined above, employees and judicial officers will be empowered to seek out advice, resources, and support for workplace issues through this confidential reporting option. This person will provide mediation and informal resolution support as well as act as an impartial sounding-board for individuals who need someone to hear them. It will be important that this person is trained in identifying circumstances that may require further action, such as formal investigations or referrals to the CCJD.

An additional component of the Safe Reporting system should include an anonymous complaint management system managed by a third party. These systems allow for anonymous reports with the benefit of allowing communication with an anonymous reporter. This makes gathering information for investigations more effective in these circumstances. These systems also provide information on tracking, patterns, and themes. These tools can help an organization identify problem patterns in complaint types, locations, or individual personnel requiring intervention. The bottom line is that in today's workplace, employees expect that they will have the ability to bring forward complaints without identifying themselves. Many times, if this is not available, they resort to social media or lawsuits to inspire action.

Finally, in providing numerous ways of bringing forward concerns – formal investigation, informal resolution via the ombudsperson and mediation, anonymous complaints – the Judicial Branch will resolve one of the loudest criticisms we heard from employees and staff:  distrust in the reporting structures in place.

127

## **Accountability and Transparency**

Two themes discussed in the media as well as discovered in our interviews and from survey respondents are that most people who experienced misconduct did not report it because they felt it would not do any good.  There is a deep concern that nothing will change, nothing will be done, and wrongdoing will be concealed.

To provide confidence that appointed officials and leadership at the Branch are held to the highest ethical and behavioral standards, an appropriate degree of transparency and accountability is imperative.

### *360 Reviews on an Annual Basis for Chief Judges*

Most chief judges who participated in our assessment and investigations, and who we heard about from employees, are hardworking and dedicated individuals who go above and beyond in terms of the extra work they do for the Judicial Branch.  That said, their position is uniquely powerful within their Judicial District, and we heard about instances where that power was abused.  There is no real check and balance on this power except for the retention process, which historically has not taken information from staff and employees working for the Chief into its evaluations.

To correct this and provide more data upon which to assess the judicial performance of these important leaders in the Branch, we recommend that an annual 360 review be completed for each chief judge. To get a balanced perspective, we recommend that the following stakeholders are given an opportunity to provide feedback: staff and employees in the District, judicial officers in the District, peers in the chief judge community, leaders at SCAO including the State Court Administrator, the Director of HR, the Director of OPC, and the Chief Justice of the SC/COA.

These reviews should be examined by the Chief Justice of the SC/COA together with a panel of reviewers selected for an impartial assessment of the information to ensure that problem areas are identified and addressed.

### *Biannual Judicial District Surveys*

In addition to the 360 Reviews, we recommend that the Judicial District staff and judicial officers are surveyed biannually, using the same questions each time to determine progress or decline in identified culture measurements.  If surveys reveal problem areas, the Judicial Branch should consider annual surveys for those Districts and public identification of struggling Districts. These surveys should likewise be reviewed by the Chief Justice and a panel of assessors to identify and correct problem areas.

### *More Inclusive Data Considered and Made Public in Judicial Performance Evaluations*

We recommend that the Colorado Commission on Judicial Performance ("CCJP") consider its own mechanisms for gathering information about judicial officers' interactions with their employees and staff.  This source of information has been underrepresented in terms of relevance to performance by a judicial officer.  We believe it needs to be a key component.

This could be accomplished with surveys, interviews with staff, exit interviews with departing personnel, or other methods.  There could be some combination of the CCJP using its own data gathering and leveraging data compiled by the Branch.

We recommend that the CCJP consider the annual 360 reviews, the District surveys, and judicial training records described above in its reporting on each judicial officer.  These metrics could be included (in some form) in the public disclosures made to provide a more holistic assessment of performance upon which voters can make their retention decisions.

### *Formalized Criterion for the Commission on Judicial Discipline Regarding Public Proceedings*

There should be a set of agreed-upon criterion for escalating matters of formal judicial discipline to public proceedings.  Presently, discretion about whether discipline proceedings will be private or public rests in the Commissioners and the Executive Director of the CCJD with no written guidance for its exercise.  This discretion should be informed by written guidance, with a focus on escalating credible reports of harassment or misconduct based upon a protected class to public proceedings.

## **Immediate Support and Resources**

To make meaningful change in the Colorado Judicial Branch, a staged approach may be required across the Branch. For this reason, we recommend focusing first on those Districts where employee satisfaction is lower and where more misconduct is experienced and witnessed.

The CJB should immediately solicit feedback from employees and appointed officials through focus groups and listening sessions to design a plan to address the issues that are most pressing. This will not be a "one size fits all" solution and will require a tailored approach for each District. As highlighted above, there may be opportunities to learn from Districts with higher employee satisfaction and less misconduct and apply that learning to the lower performing Districts.

Once a plan is established, each District should be held accountable to a strategy with milestones and metrics. A committee or workgroup should be created and empowered to follow through on the plan. The survey conducted can be easily replicated to measure the success of the efforts and focus on accountability for those in leadership positions.

These Districts may also be the right place to first introduce the Ombuds and an anonymous complaint line as well. By phasing these resources into the CJB, the Director of OPC[1] can iron out procedural and policy hiccups before rolling out the final product to the rest of the organization.

With this as a starting point, the OPC can then partner with Human Resources and each individual Branch to develop a longer-term strategy to implement the recommendations made in the previous sections.

---

[1] If a director is not immediately hired, the CJB may consider giving more resources to Human Resources to launch this effort or engage a third-party consultant.

130

# SIGNATURES

This Colorado Judicial Branch Investigation Report and Culture Assessment is respectfully submitted to Anne Mangiardi, Esq., this 11th day of July, 2022.


_____
Elizabeth R. Rita, Esq.


_____
Anne R. McCord, SPHR, SHRM-SCP, PI, AWI-CH

131

# Appendix 19

## 2021 Correspondence between the Colorado Commission on Judicial Discipline and Chief Justice Boatright re: "independent" investigations and records disclosure.

# COLORADO COMMISSION ON JUDICIAL DISCIPLINE



May 18, 2021

Chief Justice Brian Boatright
Colorado Supreme Court
2 E. 14th Avenue
Denver, CO 80203
**Via E-Mail and U.S. Mail**

Dear Chief Justice Boatright,

Thank you for your letter dated April 26, 2021.  The Commission appreciates your public and private statements of commitment to providing information to the Commission.  As much as we appreciate those reassurances, the Commissioners are looking forward to receiving the information previously requested.

Your April 26th letter raises a number of concerns relating to the Commission's February 23rd request for information.  We will address each in turn.  However, we first want to emphasize that the Judicial Department has an affirmative duty of disclosure to the Commission.  This duty is akin to the duty of a prosecutor in a criminal case or a party in a civil case to make affirmative disclosure of files and information without being asked.  While the Commission has asked questions and we will discuss those requests further in this letter, addressing these questions is not intended in anyway to relieve your office of fulfilling those duties of affirmative disclosure.  Our questions can never comprehensively and adequately address the issues as we simply do not know what we do not know and we do not know what your office and the Judicial Department know until you tell us.

Consistent with the discussion in our original February letter, the Commission has a unique constitutional role in Colorado.  Under Article VI, § 23 of the Colorado Constitution and Rule of Judicial Discipline 4(a), the Colorado Commission on Judicial Discipline has exclusive jurisdiction to evaluate allegations of judicial misconduct or judicial disabilities.  The Commission is authorized to initiate a complaint either through its consideration of a request for evaluation of judicial conduct submitted by an outside party or by taking action *sua sponte*, as provided in RJD 12 and RJD 13(f).  Please be aware that each of the Commission's requests for information is based on a concern for which the Commission needs to perform an evaluation in order to fulfill its charge.  Our requests for disclosure from your office are an early step in this effort.

Consistent with the discussion in our original February letter, the Judicial Department has express obligations to disclose information and materials to the Commission.  These are found in CJC Canon Rule 2.15(A), CJC Canon Rule 2.15(C), RJD 5 as well as the current Memorandum of Understanding between our entities and CJD 08-06.  CJC Canon Rule 2.16(A) also directs that a "judge shall cooperate and be candid and honest with judicial and lawyer disciplinary agencies."

The Commission is further authorized to obtain records and testimony by subpoena under

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 501-1143

Page 2

RJD 4.  Of course, the Commission has rarely ever had to invoke that authority because of the level of cooperation provided to the Commission in conducting its evaluations.

These authorities unequivocally display an intent to create an affirmative duty of disclosure.  This interpretation makes sense because the Commission usually knows very little beyond what is disclosed to it.  Therefore, we want to emphasize again that, while the Commission has asked for specific information and will discuss your requests for clarification, these discussions do not abrogate these obligations of proactive information sharing without waiting to be asked.

Turning to the Commission's requests for information,



Page 3

[REDACTED]

Your letter next addresses the independent investigation entity you are creating.  You note that the creation of the investigation entity has not moved as swiftly as you had hoped.  We can sympathize with your concern that things do not always move as quickly as one would like.

[REDACTED]

As noted above, the Commission has exclusive jurisdiction under the Colorado Constitution to evaluate and address potential judicial misconduct. While the Commission appreciates the potential assistance that may result from the investigating entity, the Commission must undertake its charge.   Ultimately, the Commission remains responsible to fulfill its constitutional charge regardless of the evolution of the new investigatory entity.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

The specific questions you asked about our requests for information are addressed below:

Page 4



As your letter asks generally for a better understanding of our original requests and more public reporting allows us to supplement those requests, we will now review and supplement those original requests.



Page 5



Page 6



The requests above are based on the limited information that the Commission has been able to learn from publicly reported information.  Our preference, however, is to hear directly from your office and the Judicial Department about their knowledge and views on these topics rather

Page 7

than await press reports.  At this stage, the Commission asks only for your office and the Judicial Department to share the basic information available to you so the Commission can decide on a course forward.  We ask you again to please convert your assurances of disclosure and cooperation into concrete action.

Finally, the Commission would like a better understanding of the investigating entity you are creating.  The February 16, 2021 SCAO press release explained that this new entity's purpose is to "independently examine allegations of sexual harassment and gender discrimination within the Judicial Branch, and of claims that a training services contract was awarded improperly to a senior administrator."  We have heard that the request for proposal document has been issued but have not seen the document and do not know if a document exists that defines the scope of the independent investigation or the respective role of the independent investigator.  The Commission would appreciate a better understanding of your plans.  We would also like to understand the authority on which the new entity is based, who will give it direction, what investigative authority it will have, and how it will work with or relate to the Commission.

The Commission has some concerns that your April 26th letter suggests your office and the Judicial Department view the plan to create the new entity as a substitute for the Commission's role or as a basis for delaying the work of the Commission.  The Commission disagrees with these views, if they are held.  The Commission is also concerned about the interplay of the confidentiality requirements under Article VI, § 23(3)(g) of the Colorado Constitution, the work of the new entity, and the work of the Commission.  Will all of the work of the new entity be public?  Will some be confidential?  What is the basis of authority for making those decisions?  What instructions are being given to the new entity regarding cooperation and disclosure with the Commission and, what is the basis of authority for those instructions?  What authority will the Commission have to communicate and cooperate with the new entity and, again, what is the basis of that authority?

Thank you for your time.  The Commission will appreciate responsive material within three weeks as well as description of a plan for providing future materials.

Sincerely,

Christopher Gregory
Commission Chair

# Supreme Court of Colorado

2 East 14th Avenue
Denver, CO 80203
(720) 625-5410

BRIAN D. BOATRIGHT
CHIEF JUSTICE

## SUPREME COURT OF COLORADO

### OFFICE OF THE CHIEF JUSTICE

June 11, 2021

Dear Mr. Gregory,

I am in receipt of your letter dated May 18.  Based on the tone and substance, I'm concerned that the duty of individual judicial officers to report known violations of the Colorado Code of Judicial Conduct ("Code") to the Colorado Commission on Judicial Discipline Commission ("Commission") under Rule 2.15(A) has been misconstrued as encompassing the duty to report either unsubstantiated allegations of judicial misconduct leveled indirectly by any third-party long after the fact or disputed legal claims that the Judicial Department is actively defending against.  We therefore need to start with the same basic understanding, which is that the former does not encompass the latter because "knowledge" under Rule 2.15(A) is limited to "actual knowledge."

That said, I of course recognize and take very seriously the affirmative obligation of individual judicial officers, myself included, to report known violations of the Code to the Commission, as well as for the Judicial Department to do so in accordance with the terms of the Memorandum of Understanding ("MOU") between it and the Commission dated February 5, 2010.

As the executive head of the Judicial Branch, I directed the Judicial Department to work with members of the legislative and executive branches to retain an independent investigator to conduct a thorough investigation of the allegations in "the memo." Should I or the Department obtain actual knowledge of any Code violation that requires reporting under Rule 2.15(A) or the MOU, either independently or through the investigation, we will promptly comply with our reporting obligations.

Finally, you requested a copy of the Request for Proposals to retain the independent investigator that was issued by the Judicial Department, which is attached. As you can see, the independent investigation will not substitute for the Commission's constitutional role, nor will it result in the creation of a free-standing investigative "entity." Rather, the Department is contracting for a discrete investigation of the allegations in "the memo," many of which are unrelated to alleged misconduct by individual judicial officers and instead relate to alleged misconduct by employees who are not judicial officers and may implicate broader cultural and systemic concerns for the Department as an employer. Clearly, the Commission's role does not encompass such allegations. The investigations will also look into the hiring process for State Court Administrator that occurred in 2017 and the contracting process for the Department's leadership contract. I will keep you updated on the progress of the investigations to the extent that they concern misconduct by judicial officers.

The Commission undoubtedly serves an important function in safeguarding the integrity of the Judicial Department, and I extend my sincerest thanks to you and your fellow Commissioners for their public service.

Regards,

Brian D. Boatright
Chief Justice, Colorado Supreme Court

Attachment

# COLORADO COMMISSION ON JUDICIAL DISCIPLINE



July 23, 2021

Chief Justice Brian Boatright
Colorado Supreme Court
2 E. 14th Avenue
Denver, CO 80203

Dear Chief Justice Boatright,

Thank you for your letter dated June 11, 2021.  The Commission is temporarily without a chair.  As a result, I am writing to you on behalf of the Commission as the vice chair to follow up on our prior correspondence.

In your June 11th letter you express concern about the apparent differences in views regarding duties of disclosure of information to the Commission.  As our prior correspondence indicates, the Commission has shared that concern for some months now.  The Commission understands your views that an *individual judge*'s duty of disclosure under Rule 2.15(A) of the Colorado Code of Judicial Conduct (the "Code") is limited to the "actual knowledge" of that judicial officer.  However, this discussion is only incidentally responsive to the Commission's pending requests.

The Commission has reached out to you as the judicial officer that leads the Colorado Judicial Department (the "Department"), the ultimate decision-maker for the Department in these matters.  Since February, the Commission has asked you to cooperate with, and provide information to, the Commission in fulfillment of obligations under Rule 2.16, CJD 08-06, the Memorandum of Understanding between our entities, your public statements undertaking personal commitments of cooperation, as well as the rule you addressed, Rule 2.15(A).  Each authority addresses a different aspect of the Commission's pending requests for information/disclosure and have been discussed in Mr. Gregory's prior letters to you.

The Commission does not agree with the suggestion in your June 11th letter that your office and the Department are relieved of disclosure and cooperation obligations if information is outside the "actual knowledge" of an individual judicial officer.  The Commission understands that if you make a report solely under Rule 2.15(A), you will limit your report to your personal, actual knowledge.  However, the Commission maintains its requests for disclosure and cooperation under the additional authorities cited.  These are in addition to Rule 2.15(A), are broader in scope, and do not contain such a limitation.

The Commission renews its prior requests to you for disclosure and active cooperation in the Commission's fulfillment of its constitutional obligations.

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 501-1143

Page 2



In the response provided through Mr. Vasconcellos, the Commission was invited to confer with our counsel to pursue our pending requests further with you.  Given the progress to date, we understand the value of involving counsel.  However, the need to involve counsel creates logistical challenges for the Commission.  As you are aware, the Commission does not have its own counsel and does not have the dedicated resources to secure the specialized personnel needed to fill that role.  As you are also likely aware, the Commission's usual source of loaned personnel, the OARC, is not able to provide OARC personnel on this set of matters—recall that the OARC announced on March 15, 2021 that OARC itself is using outside counsel for their own work on these issues.  Our understanding is that the Department budgets only a modest amount, approximately $1,000 annually, for the Commission to engage outside personnel.  Thus, the Commission is placed in a difficult position because it does not currently have the identified resources, direct or indirect, to engage the personnel now needed to proceed with its information gathering efforts.  The Commission is attempting to explore options but will appreciate any insights you can offer on meeting these resource needs.

Chief Justice Boatright, the decisions made by your predecessors are fixtures of history at this point.  However, you now chart the course of interactions with the Commission for the Department and your staff.  During this pause for the Commission to try and resolve the resource challenges presented, the Commission implores you to reconsider the overall approach to the Commission pursued to date this year.  The Commission appreciates your statements of support for our work as well as your prior statements of commitment to transparency and cooperation with the Commission's work.  Actual implementation of those statements will, in the long run, best serve the interests of our respective institutions as well as the interests of the People of Colorado.

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 501-1143

Page 3

Thank you for your time.

Sincerely,

David Prince
Commission Vice Chair

# Appendix 20

# March 3, 2024 *Denver Gazette* articles re: *Kiesnowski*, the Woods matter, and the Masias Controversy generally.



**PRIMARIES**
Donald Trump notches three more easy caucus victories. **A19-A21**

**MIDEAST**
U.S.: Israel has agreed to framework for cease-fire; now it's up to Hamas. **A23**

**HOCKEY**
NHLPA assistance program helps Nichushkin, others get back on the ice. **D1**

# The Denver Gazette

SERVING DENVER & THE METRO AREA • DENVERGAZETTE.COM        RAIN/SNOW • HIGH 53; LOW 32        SUNDAY, MARCH 3, 2024

## SKI JORING RULES




Thousands lined the streets of Leadville on Saturday to cheer on competitors in the 76th annual Leadville Ski Joring. In the event, a horse and rider race down the street pulling a skier who's holding onto a rope. The skier flies over jumps and spears rings along the course. The event continues at noon on Sunday.

PARKER SEIBOLD, THE DENVER GAZETTE
Rider Noah Gregory pulls Bryon Coll in the 76th annual Leadville Ski Joring on Saturday.

## Deli dream lives on through 3 generations

**BY SETH BOSTER**
The Denver Gazette

Tom Craft walks into a busy Bagel Deli, where owner Jared Kaplan and others behind the counter are slicing meats to stack on rye while shouting at customers for orders.

"Whaddya need?" goes Kaplan's common line.

Craft wants a — "I know, I know," Kaplan says, cutting off the regular. Another Reuben piled high, half corned beef, half pastrami.

More importantly, "How's your boy doing?" Kaplan asks. Craft's boy is just fine, though surely he would prefer to be here with his dad for another Bagel Deli run.

Craft has been coming for years. The reason is simple. "This is the best deli in Denver," he says, "if not the only *real* deli in Denver."

Or take it from Terry Varkony, another regular of 35

SEE DELI • PAGE 14

## Top judges ignored colleague's drinking

**BY DAVID MIGOYA**
The Denver Gazette

At least three judges — Colorado's Supreme Court chief justice and a now-retired appellate court judge among them — years ago knew of a Denver juvenile court judge's drinking problems but never reported them, then maintained that silence while a courthouse manager who had sought their help in confronting the judge faced firing instead, The Denver Gazette has learned.

**COLORADO WATCH**
Denver Gazette investigations

**Inside**
Documents: Judicial discipline case 'slow-walked' in Adams County. **A8**

The judge, D. Brett Woods, 63, presided over Denver's juvenile court until he resigned Feb. 8, seven weeks after he was suspended pending an inquiry by the Colorado Commission on Judicial Discipline into recent allegations of misconduct. The commission has not disclosed the nature of the inquiry — commission investigations are by law secret — and the case

SEE DRINKING • PAGE 8

DENVER & STATE A5    |    NATION & WORLD A23    |    BUSINESS C1    |    SPORTS D1    |    OUT THERE E9    |    COMICS E14

**pressreader** PRINTED AND DISTRIBUTED BY PRESSREADER PressReader.com +1 604 278 4604 COPYRIGHT AND PROTECTED BY APPLICABLE LAW

Case No. 1:25-cv-03361-KHV-GEB    Document 1-6    filed 10/23/25    USDC Colorado
pg 509 of 3124

## COVER STORY

# Docs: AdamsCo judicial discipline case 'slow-walked'

**BY DAVID MIGOYA**
*The Denver Gazette*

A second judicial discipline case, that of 17th Judicial District Judge Robert Kiesnowski Jr. who resigned last year, has key connections with Colorado Supreme Court Chief Justice Brian Boatright, according to documents and interviews.

Despite promises by Boatright to state legislators in 2021 that he would monitor all complaints of judicial misconduct personally and ensure they're handled promptly, the state's discipline commission said the Kiesnowski case took months to reach it and then languished for another two years before action was taken.

In that case, Kiesnowski, whose courtroom was in Adams and Broomfield counties, agreed to resign after admitting to a campaign of harassment and retaliation that lasted for years against a court clerk who had begun complaining to her courthouse superiors about his conduct as early as 2016.

Kiesnowski had accused his courtroom clerk, Emily Betz, of talking behind his back about an extra-marital affair he was having with another courthouse employee who was Betz's supervisor and who eventually became the judge's wife, according to public discipline records.

Kiesnowski embarked on a protracted campaign to harass Betz, including efforts to prevent her from speaking to anyone while working her courthouse job for him, public discipline records show.

Although Betz's superiors took her concerns to the upper levels of the Judicial Department, they never made it to the discipline commission, people familiar with those events said.

When the harassment didn't stop — Kiesnowski's paramour was not transferred to a different judicial district as personnel rules required — Betz filed her own complaint with human resources within the Judicial Department's State Court Administrator's Office in May 2021, documents reviewed by The Denver

**SEE CASE • PAGE 9**

## DRINKING

**FROM PAGE 1**

remains open.

But Woods' use of alcohol, which multiple sources confirm is at the core of his discipline case, wasn't new to anyone except commission investigators, and several judges, including Supreme Court Chief Justice Brian Boatright, were aware of it for years, The Denver Gazette has learned.

Woods did not respond to telephone messages from The Denver Gazette.

The discipline commission, the state's constitutional authority for investigating and sanctioning judicial misconduct, only recently learned that Boatright and other judges knew about Woods' drinking and did not report it nor the subsequent alleged retaliation against the courthouse manager. That happened in January when the commission investigated a complaint filed last summer, people familiar with the inquiry confirmed. It was last summer's complaint that led to Woods' resignation last month.

Since 1966, the Colorado Constitution has recognized that a judge's problems with alcohol, called "intemperance," are reason enough to remove the judge from the bench. The state's judicial discipline rules define intemperance as including the abuse of alcohol. And the state's Code of Judicial Conduct prohibits retaliation for reporting any alleged misconduct.

The commission handles all violations of the code of conduct and recommends discipline for any infractions, which could include a judge being removed from the bench. That can only happen with the Supreme Court's approval or by a special tribunal if a conflict of interest exists. The legislature also has constitutional authority to impeach judges and justices, though that has never happened.

The commission has disciplined judges for problematic alcohol consumption outside of the courtroom, including at public events such as conferences or other semi-official gatherings.

The current complaint against Woods came from courthouse employees concerned about Woods' drinking who were reticent, for some time, to come forward because they feared the same retaliation the



**JUDGE BRETT WOODS**
Presiding Judge
Denver Juvenile Court

COURTESY OF THE CITY AND COUNTY OF DENVER

Juvenile Court Presiding Judge D. Brett Woods

courthouse manager had faced earlier, people familiar with the inquiry confirmed to The Denver Gazette.

Several high-ranking Denver juvenile court employees in 2019 planned to confront Woods about his drinking and their concerns it was impacting his work as a judge, similar to an intervention session held with a colleague or family member suffering from addiction, The Denver Gazette has learned.

To that end, the employees asked for support or advice from at least three judges — Boatright, now-retired Court of Appeals Judge Karen Ashby, and Denver Juvenile Court Judge Laurie Clark — according to several people with knowledge of the events.

At least two — Ashby and Boatright — offered their support to the employees, sources confirmed, though it's unclear whether either agreed to participate in any intervention plan.

Additionally, commission investigators were told that Clark had been approached multiple times by the courthouse manager, but that stopped when it appeared no help was forthcoming, sources said.

**SEE DRINKING • PAGE 9**



SCOTT CRABTREE, GRAND JUNCTION SENTINEL

Colorado Supreme Court Justice Brian Boatright listens to oral arguments May 4 at Colorado Mesa University in Grand Junction.

**P pressreader** PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

## DRINKING

### FROM PAGE 8

Additionally, investigators learned that Clark had allegedly expressed her own concerns with the court manager about Woods' alcohol use in discussions about a class the judges co-taught at a law school, sources confirmed.

Despite ethics rules compelling judges to tell the discipline commission about any troublesome conduct of their colleagues or to take other appropriate action, none reported Woods' drinking, according to several sources who asked not to be identified because they feared repercussions or were not authorized to discuss the matter publicly.

Then, when Woods learned of the court manager's efforts to confront him, he instead pursued disciplinary measures against the manager specifically because discussions about his personal conduct and alcohol use were had with others, including his judicial colleagues, according to interviews and documents reviewed by The Denver Gazette.

That discipline included an admonishment against the manager for having said Woods was disengaged and frequently absent from court, according to documents and interviews.

The manager was told by a superior that Woods had lost confidence in the manager and was likely to fire them, according to people familiar with that conversation and documents reviewed by The Denver Gazette.

Though the judges who were notified of Woods' alcohol use were also aware of the alleged retaliatory discipline he pursued, none of them reported it to the commission, though two of the judges — Ashby and Boatright — agreed to provide the manager with a favorable job reference going forward, people familiar with those discussions said.

Clark told The Denver Gazette that she was unaware of Wood's drinking on the job and does not know the focus of the discipline commission's inquiry.

"I want to be clear, no employee ever came to me regarding Judge Woods use of alcohol related to court business," she wrote in an email. "I never had a concern regarding any alcohol use by Judge Woods at the courthouse or while we co-taught at the" law school."




COURTESY OF 9NEWS     COURTESY PHOTO

Court of Appeals Judge Karen Ashby, left, and District Court Judge Robert W. Kiesnowski Jr.

Regarding the manager's discipline, Clark said she knew little about it.

"I was aware of the firing but had no information regarding the purpose of that firing," Clark wrote in an email to The Denver Gazette. "I have never been privy to the basis of that firing."

Ashby told The Denver Gazette she wasn't aware of any concerns that Woods' drinking had impacted his performance on the bench and that employees only expressed a general concern to her of his lack of leadership and the poor performance of the juvenile court.

"There were no specific allegations that he was drinking on the job, that he was drunk on the bench or at the courthouse," Ashby said. "Had there been, I would have the responsibility to report that kind of thing."

As an at-will employee of the juvenile court's presiding judge, the manager chose to resign rather than be fired in June 2019, leaving behind a career that spanned more than two decades and relinquishing nearly all the retirement benefits that came from it,

according to people with knowledge of that outcome.

The Judicial Department also required the manager to sign a non-disclosure agreement, which would not be possible today following legislation last year banning the practice in state government.

Several high-ranking positions within a judicial district — Denver's juvenile court is viewed as wholly separate from the overarching Second Judicial District in which it sits — are hired at the discretion of the presiding or chief judge. Because they are at-will employees, they can be terminated at any time and without reason.

None of the colleagues who assisted the manager in planning the intervention with Woods, nor the judges whose advice they sought, came to the manager's assistance when the manager was suspended and faced termination, sources confirmed.

Ashby was the only one of the judges to remain in touch with the manager and offer additional support — but still did not report any of Woods' conduct or

SEE DRINKING • PAGE 10

## CASE

### FROM PAGE 8

Gazette show.

However, the discipline commission said in public documents that her complaint was not to them until August 2021 — roughly four months later, an assertion SCAO denies.

In February 2021 — three months before Betz filed her complaint to the SCAO, which answers to the chief justice — Boatright told a joint gathering of both houses of Colorado's General Assembly that he would personally monitor all allegations of judicial misconduct across the state.

Betz's complaint would have been one of them.

Boatright made the announcement just two weeks after newspaper reports exposed a multi-million-dollar contract that had been given to a high-ranking Judicial Department employee who faced firing. It was allegedly to silence the employee's threats of a tell-all sex-discrimination lawsuit exposing years of undisclosed judicial misconduct. The allegations were laid out in a two-page memo the Judicial Department kept secret until the newspaper stories appeared.

"The branch takes allegations of misconduct by judges and staff extremely seriously," Boatright told the legislators on Feb. 18, 2021, in response to the newspaper stories.

Then, referring to the memo, he told the General Assembly: "We need to know if human resources investigated any of these allegations, and if they did, what action was taken. And if they didn't … we need to know why."

Named chief justice just seven weeks earlier, Boatright called for a special investigation into the memo and its allegations of covered-up or soft discipline against judges.

"Until the investigation is completed and any recommendations are implemented, I am to be made aware of any new allegations of misconduct and kept appraised of the progress of any investigation on a weekly basis," he said.

Two days before his General Assembly speech, Boatright issued a statement that said he had made a department-wide order that he get the weekly updates "to ensure each (complaint) is fully investigated and acted on as appropriate without delay."

Boatright told The Denver Gazette he has maintained that vigilance.

SEE CASE • PAGE 10

SUNDAY, MARCH 3, 2024 | THE DENVER GAZETTE | **A9**

pressreader   PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

## DRINKING

### FROM PAGE 9

the retaliation to the discipline commission, according to interviews.

Ashby told The Denver Gazette that she was unaware of the reasons for the court manager's discipline, did not ask why, but did say the manager was "in my experience a very good employee. I didn't like the fact that it happened."

Many of the manager's colleagues at the time feared for their jobs if they said anything or approached the manager, several people with knowledge of their thinking told The Denver Gazette.

The Woods' inquiry has again put Chief Justice Boatright in the spotlight of scrutiny. He was named to the Colorado Supreme Court in 2011 and became its chief justice in January 2021.

In just the past several months, The Denver Gazette has learned Boatright is at the center of at least two additional matters before the commission. They include recent allegations that a judicial misconduct complaint that led to the resignation of 17th Judicial District Judge Robert Kiesnowski Jr. was slow-walked to the commission — claims the Supreme Court quickly forced the commission to remove from the public record — at a time when Boatright had assured legislators he was personally tracking all misconduct complaints to ensure they were handled promptly.

Also before the commission is an inquiry into the Supreme Court's public denial in February 2021 of allegations that former Chief Justice Nathan "Ben" Coats had approved a quid-pro-quo contract to silence claims that judicial misconduct was being covered up for years. That denial was delivered by Boatright although it was signed as coming from the Supreme Court's seven justices.

Coats was later censured by the judicial discipline commission for his role in that scandal. In November 2022, former 10th Judicial District Chief Judge Dennis Maes filed a formal complaint — known as a "request for evaluation" — with the discipline commission about the Supreme Court's public denial because judges are precluded from expressing public opinions on matters that might come before them. Maes' com-



TIMOTHY HURST, THE DENVER GAZETTE

**Colorado Supreme Court justices and Gateway High School students take their seats before hearing arguments in the County of Jefferson v. Beverly Stickle case during Courts in the Community on Oct. 26 at Gateway High School in Aurora.**

plaint remains under investigation.

Importantly, Boatright has grappled with the discipline commission the past few years over when a judge is required under the Code of Judicial Conduct to report the misconduct of others, which Boatright has said only applies to a judge's "actual" first-hand knowledge of any misconduct rather than through someone else, such as what occurred with Woods, no matter how credible they might be.

In an emailed statement to The Denver Gazette through a spokesman, Boatright said he could not comment about discipline matters or the issues involving Woods.

"As you know, matters pending before the Colorado Commission on Judicial Discipline are confidential pursuant to the Colorado Constitution. As a result, I am unable to comment directly on the questions you've posed," the statement read. "That said, the Judicial Department fully cooperates with every investigation by the Commission."

He added that he has recused himself from every judicial disciplinary case brought to the Supreme Court whenever he had information gleaned while he has been chief judge.

### New complaint exposes prior knowledge

What had been kept quiet in 2019 was allowed to fester for four more years before another courthouse

SEE DRINKING • PAGE 11

## CASE

### FROM PAGE 9

"After I committed publicly to ensuring all complaints are appropriately routed to the Commission on Judicial Discipline, I have recused on every disciplinary matter before the Supreme Court when I have learned information in my capacity as chief justice," he said in an email statement.

The independent investigations into the memo were not made public until June 2022 — a year after Betz had filed her complaint to SCAO.

In the months following Boatright's speech, the Supreme Court and the discipline commission tangled over several issues involving their investigation into

the memo scandal. As a result, Betz's complaint languished for two years.

Finally, in March 2023, Kiesnowski agreed to resign in July that year, but for reasons that would remain secret from the public.

Just before he was to retire, however, the discipline commission found Kiesnowski had helped a family member during an unrelated criminal investigation, another violation of the rules of judicial conduct that prohibit sitting judges from working as attorneys.

It was over that misconduct the commission in October 2023 publicly asked the Supreme Court to admonish Kiesnowski. But in doing so, the commission also revealed the details behind the earlier private sanction behind his resignation. Those details implied the earliest allegations of misconduct against Kiesnowski from 2016 had been covered up.

The discipline commission's recommendation also

revealed that the chief judge and court administrator in the 17th Judicial District where Kiesnowski worked were aware of his extramarital relationship but did not transfer his girlfriend as was required nor reported the infraction to the commission, according to a copy of the document obtained by The Denver Gazette at the time the document was made public.

The commission also revealed that the 17th district's court administrator had actually written SCAO officials in 2018 about the judge's personal relationship and raised concerns about suspected violations of judicial conduct rules and potential criminal misconduct. That letter, the commission said, was never forwarded to them.

Lastly, the commission noted in its public recommendation for discipline how Betz's complaint

SEE CASE • PAGE 11

A10 | THE DENVER GAZETTE | SUNDAY, MARCH 3, 2024


pressreader    PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

## DRINKING

### FROM PAGE 10

employee, fed up and indignant over Woods' conduct, reported him last summer.

But courthouse employees remained reticent to cooperate with any investigation, still fearful for their jobs, people familiar with their thinking said. That changed last December at a retirement reception for another district court judge, where Woods' conduct again came into question, sources said.

Notably, when the Supreme Court suspended Woods in December pending the discipline commission's investigation, Boatright did not participate in that decision, according to a copy of the court's order.

The court did not give a reason for Boatright's recusal and it is not required that he provide one.

Commission investigators soon learned of the courthouse manager who lost their job in 2019 and interviewed them in January, revealing the details of the three judges' knowledge about Woods' drinking and the alleged retaliation, people familiar with the inquiry said.

The Judicial Department's personnel rules take a hardline stance against retaliation, calling it a fireable offense. However, department insiders say there is a serious argument that those personnel rules don't specifically apply to judges.

The nature of the Woods inquiry has not been made public, but The Denver Gazette has learned the complaint surrounds only his use of alcohol and has nothing to do with the cases he presided over or any of the juveniles who appeared in his court. It's unclear if Woods was ever believed to be in court under the influence of alcohol.

Concerns over Woods' drinking started to become evident during an October 2018 awards dinner held in Denver by the Colorado Judicial Institute where several judges' performance was to be honored, sources told The Denver Gazette. A number of judges from across the state attended — it's unclear if Boatright or Ashby did — and commented about Woods' drinking, the sources said.

At the CJI event, judges and staff from Denver's juvenile courts, including Woods, sat at one table; judges and staff from Denver's district court sat nearby. Other judges sat with their staffs at other tables.



COLORADO JUDICIAL BRANCH
**4th Judicial District Judge David Prince**

At one point, someone had a discussion with Woods over his ability to drive home from the event, several people said.

Juvenile Court Judge Clark, who attended the event, had already been approached several times previously by at least one courthouse employee to discuss Woods' alcohol use, several people said.

Clark told The Denver Gazette that had she known about Woods' excessive drinking at any time, "I would have reported it, as I am required to do so."

Concerns about Woods drinking came to a head again in April 2019 during a Colorado mountain resort conference on juvenile justice, according to several people who attended that event.

It was there the manager and at least two other high-ranking Denver juvenile court employees approached Ashby and asked for her help about confronting Woods, several people said. Offering her support, Ashby told them she would also reach out to Boatright to inform him of their efforts.

Ashby later confirmed to the two employees that she had spoken to Boatright — he was referred to as "Brian" in their communications — and that they had his approval and support, several sources confirmed.

Ashby told The Denver Gazette she only spoke to Boatright generally about the concerns regarding Woods' judicial performance, but not his drinking.

"If there were concerns about his drinking they were never concerns that it impacted his performance or (that he) was drinking on the job," Ashby said. "They were (employee) concerns he was not a good leader for the (juvenile) court. I didn't discuss alcohol (with Boatright), I discussed just the leadership."

Ashby said she couldn't recall if Boatright took any action about Woods following their conversation.

Within weeks, Woods placed the manager on administrative leave pending discipline, specifically noting it was because the manager had spoken to others about his alcohol use.

Clark is the interim presiding judge of Denver's juvenile court following Woods' resignation. Ashby was the presiding judge of that court until she was appointed to the Court of Appeals in 2013. She retired in May 2019.

Boatright was a member of the Supreme Court at the time of the mountain conference, but not its chief justice. He was previously a district court judge in Jefferson County who was noted for his expertise in juvenile and family law.

It's unclear whether any of the judges had spoken with Woods about his use of alcohol at the time.

### 'Actual' knowledge vs. second-hand

Boatright has tangled with the discipline commission over the requirement that a judge report alleged misconduct of a colleague. The sticking point was whether the judge has the information through first-hand knowledge or through a second-hand source.

The Code of Judicial Conduct is an array of rules judges are required to follow. They span a variety of topics that include conflicts of interest, personal conduct, and issues related to their work on the bench.

A key and often-discussed mandate (Rule 2.15) deals with a judge's obligation to report any misconduct, whether actual or alleged.

It says: "A judge, having knowledge that another judge has committed a violation of this code that raises a substantial question regarding the judge's honesty, trustworthiness or fitness as a judge in other respects shall inform the appropriate authority."

**SEE DRINKING • PAGE 13**

## CASE

### FROM PAGE 10

in 2021 took months to reach them, implying that Boatright would have known about it and, despite his promise to legislators for swift action, it languished nonetheless.

Boatright would not comment about any matters before the commission and said he has properly recused himself from any discipline cases brought to the Supreme Court when necessary.

State Court Administrator Steven Vasconcellos told The Denver Gazette the matter was actually shared with the commission on July 1, 2021, and the commission's executive director at the time asked for the SCAO to gather additional information, which it did. The entire matter was then handed over in August, Vasconcellos said.

"Your understanding of the timing is incorrect," Vasconcellos wrote The Denver Gazette. "The Commission has not communicated any concerns to me about the timing of our referral in this matter."

Within days of the commission making its recommendation public, the Supreme Court ordered it to remove it from the commission's website and, more specifically, to delete from any resubmission it would make the four paragraphs that described the delay for Betz's complaint to make it to the discipline commission, as well as any reference that Kiesnowski's misconduct wasn't reported to the commission years earlier.

Boatright recused himself from participating in that Supreme Court order, records show.

The commission asked the court to reconsider its order to remove references to Kiesnowski's private discipline, arguing it was an unprecedented — and likely unconstitutional — censure of the commission's public recommendations for judicial discipline, records show.

The commission did not, however, ask the court to reconsider its order to remove its allegations of a cover-up, records show.

The court agreed and Kiesnowski's previous discipline remained on the record, according to the court's order. The cover-up and slow-walk allegations, which the court called "irrelevant" and "unproven assertions," however, remained deleted, records show.

Boatright did not participate in that decision, either.



pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

Case No. 1:25-cv-03361-KHV-GEB     Document 1-6     filed 10/23/25     USDC Colorado
pg 513 of 3124

# COVER STORY



GETTY IMAGES

The Ralph L. Carr Colorado Judicial Center in downtown Denver houses the Colorado Supreme Court.

# DRINKING

### FROM PAGE 11

That "appropriate authority" in Colorado is defined as the Commission on Judicial Discipline.

The rule goes on: "A judge who receives information indicating a substantial likelihood that another judge has committed a violation of this code shall take appropriate action."

What "appropriate action" actually means is not defined, but it extends to virtually any potential violation of the code of conduct. It's the commission's function to determine whether a violation actually occurred.

The rule was at the heart of a back-and-forth exchange between the discipline commission and Boatright as the alleged contract-for-silence scandal unfolded in 2021.

The commission repeatedly admonished the Supreme Court for not being forthcoming with information it said it needed to determine whether a deeper investigation into the scandal was necessary, The Denver Gazette has reported previously.

Despite Boatright's public assurances of transparency and cooperation with investigations into the misconduct allegations, the letters between him and the commission portrayed a broader showdown between two constitutionally created entities, each pressing for control of what it deemed to be its mandate.

Specifically at issue was the commission's charge to investigate any form of judicial misconduct, no matter whether the Judicial Department's personnel

office in SCAO had already deemed it to be inconsequential, and the Supreme Court's view that judges need only report the misbehavior of another judge if they witnessed it firsthand.

Much of the commission's annoyance appeared rooted in concerns it was learning the details of the contract-memo scandal through press reports and not from the judiciary itself, The Denver Gazette reported.

Rather than answer the commission's questions about what it was reading in the newspaper, Boatright — and by extension the Judicial Department — appeared to delay, asking the commission for more specifics or that it provide a "better understanding" of what it wanted.

For its part, the commission said it merely needed the court to report what it knew.

Boatright wrote the commission in June 2021 — just a month after an Adams County court clerk, Emily Betz, filed her complaint about Judge Kiesnowski — that the panel seemed to misunderstand when a judge is required to report allegations of misconduct by another judge. The commission's 10-member board includes 4 judges who are appointed by the chief justice.

Judges need only report if they actually witness the conduct, Boatright wrote.

"I'm concerned that the duty of individual judicial officers to report known violations of the Colorado Code of Judicial Conduct (to the commission) ... has been misconstrued as encompassing the duty to report either unsubstantiated allegations of judicial misconduct leveled indirectly by a third-party long after the fact," Boatright wrote.

"We need to start with the same basic understanding

... because 'knowledge' ... is limited to 'actual knowledge,'" he wrote, adding that "I of course recognize and take very seriously" the obligation "to report known violations" to the commission and would "promptly comply" if he had "actual knowledge" of them.

The commission replied that Boatright was wrong.

"The Commission does not agree with the suggestion ... that your office and the department are relieved of disclosure and cooperation obligations if information is outside the 'actual knowledge' of an individual judicial officer," El Paso County District Judge David Prince, then the acting-chairman of the commission, wrote Boatright in July 2021. "The Commission renews its prior requests to you for disclosure and active cooperation in the Commission's fulfillment of its constitutional obligations."

Prince left the commission in July 2023 after six years when Boatright, as chief justice, did not reappoint him to a second term.

Two weeks after the commission learned of Boatright's knowledge in the Woods' matter last month, it removed Christopher Gregory as its executive director. He had been a vocal critic of the department's response to the scandal since it began when he was the commission's chairman.

David is an award-winning Senior Investigative Reporter at The Gazette and has worked in Colorado for more than two decades. He has been a journalist since 1982 and has also worked in New York, St. Louis, and Detroit.

David is an award-winning Senior Investigative Reporter at The Gazette and has worked in Colorado for more than two decades. He has been a journalist since 1982 and has also worked in New York, St. Louis, and Detroit.

SUNDAY, MARCH 3, 2024 | THE DENVER GAZETTE | **A13**

**pressreader**  PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# SUNDAY PERSPECTIVE

DENVERGAZETTE.COM · SUNDAY, MARCH 3, 2024



**GUEST COLUMNIST**

**DENNIS MAES**

The Watergate scandal clearly shows that covering up governmental wrongdoings is oftentimes more egregious than the scandal itself. A two-bit burglary eventually led to the disgraceful resignation of the most powerful person in the world, President Richard Nixon.

The Gazette news staff uncovered the now infamous pay-for-silence scandal that had its roots in the Colorado Supreme Court beginning in 2019. Then-Chief Justice Nathan Coats offered a $2.5 million contract to Mindy Masias, state court administrator chief of staff, at a time she was facing dismissal over financial irregularities. Masias allegedly threatened to go public concerning numerous allegations of judicial and official misconduct that had gone unreported if she were not awarded the contract. The contract was never consummated and Coats would subsequently become the first Colorado Supreme Court justice to be disciplined by the Colorado Commission on Judicial Discipline (CCJD).

That's when the dominoes began — and continue — to fall, resulting in numerous missteps by the present Supreme Court under the leadership of Chief Justice Brian Boatright. The missteps threaten the very safeguards which were enacted to convince the electorate to adopt the present merit selection system of Colorado judges also known as the Missouri Plan. One of the safeguards was the establishment of the CCJD.

The commission is comprised of 10 citizen members. Four of the members are judges appointed by the chief justice of the Colorado Supreme Court; two are lawyers who are appointed by the governor, and four citizens who are neither lawyers nor judges also appointed by the governor. It has the

SEE CLOUDS · PAGE 2



GETTY IMAGES

# CLOUDS over Colorado's highest court

---

## MORE INSIDE

The GOP's governing crisis: Chaos in the House is just the beginning. **B4**



## OUR TAKE

Wolves bite back at Polis' picks for members of wildlife commission. **B7**

## CALDARA

People in Colorado should be allowed to smoke if they want to. **B9**

SUNDAY, MARCH 3, 2024 | THE DENVER GAZETTE | **B1**

pressreader — PRINTED AND DISTRIBUTED BY PRESSREADER PressReader.com +1 604 278 4604 COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# CLOUDS

FROM PAGE 1



THE DENVER GAZETTE FILE

**The Ralph L. Carr Colorado Judicial Center in downtown Denver is the home of the Colorado Supreme Court.**

responsibility to investigate allegations of judicial misconduct and suggest disciplinary action to the Colorado Supreme Court. The Colorado Constitution requires any allegation of judicial misconduct to be referred to the CCJD.

Throughout the investigation into the scandal, there have been numerous occasions when the Colorado Supreme Court has ignored the constitutional requirement and thereby compromised the integrity of the CCJD.

The CCJD vigorously and with a great deal of courage and integrity challenged the behavior of the Supreme Court during its investigation of the scandal, including testifying before a legislative body which was charged to look into potential judicial reform as a result of the Supreme Court's interference. In July 2023, the CCJD experienced a significant change in its membership and diligence in discharging its responsibilities.

Gov. Jared Polis and Chief Justice Boatright appointed six members to the commission, which now comprised the majority. Although Judge David Prince, a member of the commission and outspoken critic of the Supreme Court, was eligible for reappointment, Boatright refused to reappoint him and instead replaced him with a judge who had been critical of the CCJD.

I filed a Request for Evaluation of the current members of the Colorado Supreme Court who might have been on the bench at the time of the Masias contract and its aftermath. An RFE is the method for bringing allegations of judicial misconduct before the CCJD. The RFE was filed on Nov. 15, 2022. The CCJD confirmed receipt of my request on Nov. 28 of that year.

On or about Feb. 27, 2023, I gave permission to the CCJD to forward my RFE to the Colorado Supreme Court and disclose my identity. This action indicated my allegations were sufficient to be processed as a complaint under the rules.

The appropriate rule provides that written notice to the subject judge(s) shall be provided, "as soon as practicable after the members of the commission have concluded that the allegations are sufficient to be processed as a complaint."

Along the way, but prior to July 1, 2023, Jessica Yates, executive director of the Office of Attorney Regulation Counsel (OARC) chose to inform Judge Prince that previous testimony he had given "may have been in violation" of professional conduct that is expected to be followed by all attorneys. OARC is charged with ensuring that "Colorado providers of legal services are compe-

tent, diligent, communicative, honest and in compliance with the Colorado Rules of Professional Conduct." The OARC, incidentally, serves at the pleasure of the Colorado Supreme Court.

The CCJD retained David Kaplan, former Colorado public defender, to respond to the perceived threat by Yates and adamantly denied that any commission members would make false statements. Yates extended her accusations to include Christopher Gregory, the then-executive director of the CCJD "and all attorney/judge members of the commission in a potential violation … if they assisted in the alleged violations." Kaplan described Yates' allegation as having a "terrible chilling effect" on anyone asked to testify before the legislature. Kaplan responded to Yates on or about June 29, 2023, just days before the massive commission membership turnover on the CCJD.

The CCJD lacked the diligence required in processing my RFE although, on numerous occasions, I inquired about the status of the investigation. It appeared the "as soon as practicable" requirement had somehow taken on a different meaning.

On this past Jan. 5, some 13 months after I filed the RFE, I demanded that action be taken on the RFE.

Executive Director Gregory advised me on Jan. 8 the RFE had been sent to Chief Justice Boatright on Dec. 14, 2023, and he was requested to respond to the allegations on or before Jan. 15, 2024. Boatright complied with the request.

On Jan. 19, four days after the

Boatright response, the CCJD announced that Gregory was placed "on leave and is unavailable to engage in Commission on Judicial Discipline business."

I have since been advised that all matters shall remain confidential unless and until the Commission files a recommendation with the Supreme Court.

Not to be lost in the litany of concerns caused by the failings of the Boatright court and its cronies is the circumstances surrounding Sen. Pete Lee of Colorado Springs, who chaired a 2022 interim special legislative committee looking into judicial reform as a result of the scandal. Lee resigned after he was faced with unfounded allegations of voter fraud in part because of records submitted by the OARC, as reported by The Gazette. Recall that the OARC is the entity that threatened the lawyer members of the CCJD, threatened to withhold funding from the CCJD and aided in the efforts to stall the work of the CCJD. Felony charges were dismissed against Lee shortly after he left the committee.

The thrust of this narrative is to expose the damage caused by the Colorado Supreme to the integrity and independence of the CCJD, which is charged with the responsibility to ensure the judicial branch of government is free from taint and committed to transparency.

The Colorado Supreme Court has failed to abide by its own set of rules and procedures by interfering with the process designed to address judicial misconduct by protecting its own when convenient, by allowing the OARC

to intimidate commission members without consequence, by sanctioning the transmission of unfounded allegations against a member of a separate branch of government, and by arguably retaliating against a judge member of the CCJD who had the courage to call the integrity of the behavior of the highest court into question by refusing to reappoint him to the commission.

It is for the reader to draw their own conclusions whether the delay involved in handling the RFE was a result of the Yates reprimand of the lawyer commissioners or the influx of a majority of new commissioners who may or may not have had questions about moving forward with the RFE after determining it merited a response from Chief Justice Boatright.

It is for the reader to draw their own conclusion as to what prompted the CCJD to relieve Executive Director Gregory of his duties within days after Boatright filed his response.

Suffice to say, the scandal exposed the tremendous influence the Supreme Court exerts over the CCJD to the extent the court can dictate their desired results.

The only way to avoid the mess that has ensued since the uncovering of the pay-for-silence scandal is to remove the Colorado Supreme Court from any involvement with the Colorado Commission on Judicial Discipline.

*Dennis Maes served 24 years as a 10th Judicial District judge in Pueblo and was chief judge for 17 of those years. He previously served as director of Pueblo County Legal Services Inc., as a public defender and as an attorney in private practice.*



PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# Appendix 21

# Colorado Supreme Court Filings in *Matter of Kiesnowski*, 2024 CO 12.

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | DATE FILED: October 19, 2023 9:54 PM<br>FILING ID: A0ABED9671317<br>CASE NUMBER: 2023SA171 |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case No. 23-104 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>  and<br><br>Robert W. Kiesnowski, A former Judge of the Adams County District Court<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Christopher S.P. Gregory, esq.<br>Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  judicialconduct@jd.state.co.us<br>Atty. Reg. # 37095 | Case Number: 23SA171 |
| **RECOMMENDATION FOR JUDICIAL DISCIPLINE—COLO. RJD 37(A)** | |

The Colorado Commission on Judicial Discipline ("the Commission" or

"CCJD"), upon consideration of the accompanying Record of Proceedings,

recommends that this Court publicly censure Respondent Robert W. Kiesnowski and enter a judgment for costs in the amount of $4,966.95 according to Colo. RJD 36(e),(g).[1]  The Commission submits its Recommendation according to Colo. RJD 37(a).  Exceptions to this Recommendation may be filed according to Colo. RJD 38.

As grounds for its Recommendation, the Commission adopts the findings of fact and conclusions of law included in the Report of the Special Masters, issued September 22, 2023, and the Special Master's Award of Costs, issued October 3, 2023.  Both of the Special Masters' orders are included in the Record of Proceedings.  The Special Masters' factual findings, as adopted by the Commission, are subject to review for clear error and verification of support through substantial evidence in the record.  *Matter of Booras*, 2019 CO 16, ¶ 18.

This judicial disciplinary proceeding follows former Adams County District Court Judge Kiesnowski having been privately censured with an agreement to retire from office in CCJD Case No. 21-121.  Judge Kiesnowski's Stipulation for Private Censure, filed with the Commission on March 14, 2023, is included in the Record of Proceedings in the present case as Exhibit 17 (admitted during the Formal Disciplinary Hearing held on September 6, 2023).

---

[1] Commissioner and Adams County Court Judge Mariana Vielma has recused herself throughout the Commission's proceedings below.

The Commission has received written authorization from Judge Kiesnowski's former judicial assistant, Emily Betz, to publicly disclose her identity. Ms. Betz was the victim of Judge Kiesnowski's admitted misconduct in CCJD Case No. 21-121. Given that Judge Kiesnowski's prior private discipline will become public upon filing of this Recommendation and the Record of Proceedings according to Colo. RJD 37(c), the Commission is compelled to provide an explanation for the delays involved in Judge Kiesnowski's discipline in CCJD Case No. 21-121.

Ms. Betz first contacted the 17th Judicial District Court Executive in 2016 to report her concerns about Judge Kiesnowski's judicial conduct and harassment towards her. At around the same time, former Court Executive Ben Stough and former 17th Judicial District Court Chief Judge Patrick Murphy became aware that Judge Kiesnowski had begun a relationship with his now wife, Maya, who also worked in the District as one of Ms. Betz's supervisors. Contrary to the Judicial Department's Personnel Rules and CJD 08-06, Judge Kiesnowski and Maya Kiesnowski (Korbe) were allowed to continue working together in the same judicial district. These circumstances were not reported to the Commission. Later, on July 3, 2018, Stough sent a letter to then-State Court Administrator's Office (SCAO) Human Resources Director Eric Brown detailing concerns about nepotism/retaliation involving Maya Kiesnowski and the underlying harassment of Ms. Betz. Stough's letter expressly referenced suspected violations of the Colorado

-3-

Code of Judicial Conduct (the Code) and the criminal offense of Official

Misconduct, § 18-8-404, C.R.S.  Stough's letter and the updated allegations of

judicial misconduct were again not reported to the Commission.  Finally, on May 19,

2021, Ms. Betz filed a complaint directly with the SCAO HR Division alleging the

circumstances involved in CCJD Case No. 21-121.  Ms. Betz's complaint, however,

was not forwarded to the Commission until on or about August 26, 2021.

At that time, the Commission received its litigation support (provision of

investigators and Special Counsel) through this Court's Office of Attorney

Regulation Counsel (OARC).  When the Commission requested litigation support

for CCJD Case No. 21-121, OARC initially refused to comply with its obligations to

provide such support under C.R.C.P. 227 (2021).  After OARC eventually provided

the requested litigation support, it withdrew as Special Counsel for the Commission

in this and all other pending cases on June 10, 2022 (following enactment of SB22-

201).

As explained in footnote 2 of the Stipulation for Private Censure, the non-

disclosure of Ms. Betz's reporting to administrators within the Judicial Department

and Mr. Stough's July 3, 2018 letter resulted in the limitations period under Colo.

RJD 4(a)(1) expiring.

-4-

DATED:  October 19, 2023

Respectfully submitted,

Christopher S.P. Gregory, #37095
Executive Director
Colorado Commission on Judicial Discipline

-5-

## CERTIFICATE OF SERVICE

I certify that on October 19, 2023, a true and correct copy of the foregoing RECOMMENDATION FOR JUDICIAL DISCIPLINE—COLO. RJD 37(A) was filed with the Court and served via e-mail upon the following persons:

Counsel for Respondent:
Mr. Craig L. Truman, Atty. Reg. # 5331
Craig L. Truman, P.C.
455 N. Sherman St., Ste. 310
Denver, CO 80203

Special Counsel:

Jeffrey M. Walsh, esq.
Special Counsel
Colorado Commission on Judicial Discipline
Ralph L. Carr Colorado Judicial Center
1300 Broadway, Suite 210
Denver, CO 80203
Phone:  303-457-5131
Atty. Reg. # 33762

By: _____
Christopher S.P. Gregory, #37095

-6-

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>Phone Number: 303-457-5131 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>       and<br><br>Robert W. Keisnowski, A Judge of the Adams County District Court,<br><br>Respondent. | RECEIVED<br><br>03/14/2023<br><br>Colorado<br>Commission on<br>Judicial Discipline<br><br><br>▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Wash, esq.<br>Special Counsel<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:<br>Atty. Reg. # 33762 | CCJD Case No.: 21-121 |
| **STIPULATION FOR PRIVATE CENSURE** ||

## INTRODUCTION

This case is currently in formal proceedings with a disciplinary hearing on the merits scheduled for March 27-30, 2023. Pursuant to this stipulation, the parties have agreed to resolve this case as follows. The Commission will dismiss the formal proceedings against Judge Kiesnowski. In exchange, Judge Kiesnowski will announce his retirement from the bench on

-1-

March 14, 2023 to become effective July 1, 2023. Judge Kiesnowski also agrees to this private

censure in which he admits to several violations of the Code of Judicial Conduct as detailed below.

## SUMMARY OF PRINCIPAL ALLEGATIONS

Judge Kiesnowski harassed and retaliated against his judicial assistant, Emily Betz, based on

his belief that Ms. Betz (1) reported his judicial misconduct to other judges and court staff, and (2)

campaigned against his retention via Facebook posts.

## STIPULATED FACTS

1.  Between 2011 and 2016, Emily Betz worked for Judge Kiesnowski as the only judicial
    assistant in Judge Kiesnowski's division.

2.  Prior to being assigned to Judge Kiesnowski's division, Ms. Betz had worked for the
    Colorado Judicial Department for approximately 4 years.

3.  In the Spring of 2016, Ms. Betz noticed a changed dynamic between Judge Kiesnowski and
    one of Ms. Betz's supervisors, Maya Korbe. Specifically, Ms. Korbe began spending an
    increasing amount of time in Judge Kiesnowski's courtroom and in his chambers.

4.  The increased presence of a supervisor in Judge Kiesnowski's courtroom and division
    created apprehension that Ms. Betz was being scrutinized for her work performance.
    Simultaneously, suspicions began developing around the courthouse that Judge Kiesnowski
    and Ms. Korbe (who were both separately married at the time) were having an affair.[1]

5.  The suspicions of an affair were reinforced by other Judicial employees and law
    enforcement sharing stories of seeing Ms. Korbe in Judge Kiesnowski's car, Ms. Korbe
    ducking down in the car when Judicial employees passed, Judge Kiesnowski and Ms.

---

[1] Ms. Korbe later obtained a divorce from her husband on July 21, 2016. Judge Kiesnowski's
divorce became final on April 20, 2018. Ms. Korbe and Judge Kiesnowski would later marry each
other.

Korbe arriving to work together, and Judge Kiesnowski's vehicle being parked overnight at Ms. Korbe's apartment.

6. During the summer of 2016, Judge Kiesnowski became increasingly frustrated about the rumors related to the alleged affair. Specifically, he came to believe that Ms. Betz was gossiping about the alleged affair to other judges and court staff and thereby contributing to the spread of rumors.

7. In August of 2016, Judge Kiesnowski and Ms. Korbe met with then-Chief Judge Patrick Murphy to provide notice of their romantic relationship, as required by Chief Justice Directive 08-06, Attachment F (2013).  But Chief Judge Murphy did not require either Judge Kiesnowski's or Ms. Korbe's resignation or transfer to another jurisdiction, as required by CJD 08-06.[2]  Neither did Ms. Korbe or Judge Kiesnowski voluntarily resign or transfer to another jurisdiction as is required by CJD 08-06.

8. On September 1, 2016, Judge Kiesnowski contacted Ben Stough (Ms. Betz's direct supervisor). Because of Judge Kiesnowski's belief that Ms. Betz was gossiping about him, he provided to Mr. Stough a document titled "Restated Terms and Conditions of Emily Betz's Employment as Judge Kiesnowski's Division Clerk."

9. Via the Terms and Conditions document, Judge Kiesnowski sought to alter the terms and conditions of Judicial Assistant 1's employment. In relevant part, the document stated:

---

[2] In his 2018 report to SCAO's HR Division, Mr. Stough describes the decision not to require Ms. Korbe's resignation or reassignment as occurring due to assurances made by Judge Kiesnowski and Ms. Korbe:  "Based on assurances that their workplace conduct would remain professional, no immediate action was taken."  Chief Judge Murphy retired July 15, 2019.  Consequently, the Commission has no jurisdiction to address the violations of the Code arising from his failure to enforce CJD 08-06's prohibitions against a judge and employee involved in a relationship working in the same judicial district.  Colo. RJD 4(a)(1).

"Restated Terms and Conditions of [Judicial Assistant 1's]
Employment as Judge Kiesnowski's Division Clerk:"

Below are, in part, the restated terms and conditions of [Judicial
Assistant 1's] Employment as Judge Kiesnowski's division clerk.
Violation of any of these restated terms and conditions of
employment shall, pursuant to the State's Personnel Rules, subject
[Judicial Assistant 1] to disciplinary action including, but not limited
to, reassignment and/or termination.

Nothing contained herein shall be construed as an employment
contract or any contract right to continued employment.
At all times, [Judicial Assistant 1] shall abide by the following:
(1) [Judicial Assistant 1] shall not use the State's internet system for
any purpose other than to discharge and perform her functions as
division clerk. Under no circumstances shall [Judicial Assistant 1]
use the State's internet system for personal purposes, whether for
herself or any other person, and regardless of whether she is caught
up with all of work duties and functions. Under no circumstances
shall [Judicial Assistant 1] "surf" the internet while court is in session
and shall not otherwise use the State's internet system unless
expressly authorized and directed to do so by Judge Kiesnowski.
Failure to abide by any provision of this paragraph shall, pursuant to
the State's Personnel Rules, subject [Judicial Assistant 1] to
disciplinary action, including, but not limited to, reassignment
and/or termination.

(2) [Judicial Assistant 1] shall not use the State's electronic mail
("email") system for any purpose other than to discharge and
perform her functions as division clerk. Under no circumstances
shall [Judicial Assistant 1] use email for personal purposes, whether
for herself or any other person.  understands and agrees that any
email she sends or receives is subject to being accessed and audited
by administration at any time and without prior notice. Failure to
abide by any provision of this paragraph shall, pursuant to the State's
Personnel Rules, subject [Judicial Assistant 1] to disciplinary action,
including, but not limited to, reassignment and/or termination.

(3) [Judicial Assistant 1] shall not use the State's instant messaging
system ("IM") for any purpose other than to discharge and perform
her functions as division clerk. Under no circumstances shall
[Judicial Assistant 1] use the State's IM system for personal
purposes, whether for herself or any other person. By way of
example and not limitation, [Judicial Assistant 1] shall not use the
State's IM system to even invite a co-worker to lunch or to respond
to any non-business purpose IM that has been sent to her. [Judicial

-4-

Assistant 1] understands and agrees that any **IM** she sends or receives is subject to being accessed and audited by administration at any time and without prior notice. Failure to abide by any provision of this paragraph shall, pursuant to the State's Personnel Rules, subject [Judicial Assistant 1] to disciplinary action, including, but not limited to, reassignment and/or termination.

(4) [Judicial Assistant 1] shall not gossip about, or disparage in any way, any judicial officer or courthouse employee by any means or in any manner. By way of example and not limitation, should [Judicial Assistant 1] make, utter, or post any disparaging comment or remark about any judicial officer or courthouse employee while at work or on her personal time on social media, whether explicit or implicit, she shall, pursuant to the State's Personnel Rules, be subject to disciplinary action, including, but not limited to, reassignment and/or termination.

(5) [Judicial Assistant 1] expressly understands and agrees that the workday begins at 8:00 a.m. and ends at 5:00 p.m. Therefore, [Judicial Assistant 1] shall be at her desk no later than 8:00 a.m. each workday and shall, with the exception of authorized breaks and lunch, not leave work until 5:00 p.m. Leaving work, even five minutes early without Judge Kiesnowski's approval, is unacceptable. Further, [Judicial Assistant 1] expressly understands and agrees that all leave requests shall first be authorized by Judge Kiesnowski and ultimately be approved by Ben Stough or his successor or his designee. Under no circumstances, without the express written approval of Judge Kiesnowski or Ben Stough or his successor or designee, shall [Judicial Assistant 1] submit leave requests to Maya Korbe. Failure to abide by any provision of this paragraph shall, pursuant to the State's Personnel Rules, subject [Judicial Assistant 1] to disciplinary action, including, but not limited to, reassignment and/or termination.

(6) In the event that [Judicial Assistant 1] has completed or is otherwise "caught up" with all of her Division G duties and/or any task assigned to her by any judicial officer and/or supervisory personnel, she may not visit with or observe court in any other division or otherwise "socialize" with courthouse personnel without the express, written approval of Judge Kiesnowski. Any such requests shall first be submitted to Judge Kiesnowski by email for his approval, which request shall be approved or denied by Judge Kiesnowski in his sole and absolute discretion. Failure to abide by any provision of this paragraph shall, pursuant to the State's Personnel Rules, subject [Judicial Assistant 1] to disciplinary action, including, but not limited to, reassignment and/or termination.

-5-

(7) [Judicial Assistant 1] shall, at all times, maintain a professional demeanor and treat all judicial officers, including Judge Kiesnowski, and courthouse personnel with courtesy, decency, and respect, and shall, like other courthouse employees, attend to her personal affairs on her own time, not the State's time. Further, under no circumstances without the express approval of Judge Kiesnowski, shall [Judicial Assistant 1] refer to Judge Kiesnowski as "Bob." Failure to abide by any provision of this paragraph shall, pursuant to the State's Personnel Rules, subject [Judicial Assistant 1] to disciplinary action, including, but not limited to, reassignment and/or termination.

(8) With the exception of authorized breaks and lunch, [Judicial Assistant 1] shall not use or monitor her personal cell phone during the workday. In those instances, where [Judicial Assistant 1] is permitted to use and/or monitor her personal cell phone, under no circumstances shall [Judicial Assistant 1] gossip about, or disparage in any way, any judicial officer or courthouse employee by any means or in any manner. Failure to abide by any provision of this paragraph shall, pursuant to the State's Personnel Rules, subject [Judicial Assistant 1] to disciplinary action, including, but not limited to, reassignment and/or termination.

10. Ben Stough rejected Judge Kiesnowski's attempt to force Ms. Betz into the above restated contract. Recognizing that Judge Kiezanowski's and Ms. Betz's working relationship was too frayed to continue, Mr. Stough (with Chief Judge Murphy's approval) transferred Ms. Betz to the court's judicial assistant (CJA) pool. Although Ms. Betz maintained her title, pay, duty location, and other working conditions, inclusion in the CJA pool was effectively a demotion from being an assigned division judicial assistant (i.e. it resulted in a loss of status and stability). For example, during Ms. Betz's time in the CJA pool, she was reassigned three times within six months. Ms. Betz claims that she learned that Judge Kiesnowski attempted to influence/encourage other criminal judges to refuse having her in their divisions. Ms. Betz further alleges that Mr. Stough told her that she was ultimately assigned to domestic relations divisions for her own protection.

-6-

11. Sometime in late 2016 or early 2017, Ms. Betz applied to work as a judicial assistant for newly appointed District Court Judge Tomee Crespin.  Judge Kiesnowski continued to retaliate against Ms. Betz by contacting Judge Crespin and encouraging her not to hire Ms. Betz.  According to now former Judge Crespin, Judge Kiesnowski told her not to hire Ms. Betz because she was not loyal, she could not be trusted, and she would talk about the judge she works with.

12. Judge Crespin hired Ms. Betz despite Judge Kiesnowski's communications to her.  Judge Crespin confirmed that, while working for her, Ms. Betz did her job competently and professionally.  Judge Crespin described Ms. Betz's job performance as "excellent" and "above average."  Judge Crespin said that, although Ms. Betz never gossiped to her about Judge Kiesnowski, she recalls Ms. Betz repeatedly stating that Judge Kiesnowski glared at her or otherwise made her feel uncomfortable during encounters on the same floor of the courthouse.

13. Judge Kiesnowski was up for a retention election in 2020.  Prior to the election, Judge Kiesnowski discovered social media/Facebook posts encouraging voters not to retain him. The social media posts were presented through a username "Silky Pete" and included the following selected postings:

    a.  "Please forgive me for bringing this up but it is not political, it is what is best for our children. Trust me that Judge Kiesnowski should NOT be retained. He has a long history of lenient sentences on child molesters";

    b.  "Please don't forget. Even Samuel L. Jackson is on board! VOTE JUDGE KIESNOWKSI OUT OF OFFICE";

    c.  "VOTE OUT JUDGE KIESNOWSKI SPREAD THE WORD";

d. "I need everyone to trust me on this one. He has to go. Let everyone you know in Adams and Broomfield County vote him out. WHAT IF I TOLD YOU TO VOTE JUDGE KIESNOWSKI OUT OF OFFICE";

e. "Be sure to tell your friends in Adams and Broomfield to vote Kiesnowski off the bench this November"; and

f. "VOTE OUT JUDGE KIESNOWKSI TELL YOUR FRIENDS."

14. Without verification, Judge Kiesnowski blamed Ms. Betz for the social media posts and sent several text messages to Judge Crespin, which included Judge Kiesnowski forwarding a Facebook post from his then-serving division clerk.  Judge Kiesnowski called Judge Crespin later that same night to accuse Ms. Betz of authoring the Facebook posts and demanding that Judge Crespin take action against Ms. Betz to stop further posts.

15. The investigation of the present case confirmed that the Facebook posts quoted above were authored by an Adams County Sheriff's Office Deputy without connection to Ms. Betz.

16. The People initiated formal proceedings by filing a Statement of Charges.  Through his Answer, Judge Kiesnowski disputed various factual allegations that are beyond the scope of this Stipulation.  The parties acknowledge that Judge Kiesnowski's admissions to both a factual basis and to his violations of the Code are limited to the admissions expressly stated in this Stipulation.

## STIPULATED RULE VIOLATIONS

### Count 1
### Canon Rule 1.1
### A Judge Shall Comply with the Law

17. Paragraphs 1-16 are incorporated herein.

18. Canon Rule 1.1 states, in relevant part: "A judge shall comply with the law, including the Code of Judicial Conduct."

19. Judge Kiesnowski violated Canon Rule 1.1 when he engaged in the conduct described herein in violation of Canon Rules 1.2, 2.3, 2.8, 2.12(C), 2.16(B), and 4.2.

20. Judge Kiesnowski further violated Canon Rule 1.1 through his prolonged non-compliance with CJD 08-06, Attachment F (2013), which provided in relevant parts:

> Where employees and/or judicial officers are married to each other, living together, or otherwise engaged in a romantic and/or sexual relationship, they shall not hold a position in which:
>
> * * *
>
> One party is a justice, judge or magistrate working within the same court or judicial district of the other party who is employed as a classified or contract employee in that court or judicial district.

### Count 2
### Canon Rule 1.2
### A Judge Shall Promote Confidence in the Judiciary

21. Paragraphs 1-16 are incorporated herein.

22. Canon Rule 1.2 states:

> A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

-9-

23. Comment 1 to the rule makes clear that it applies "to both the professional and personal conduct of a judge."

24. A judge's obligation to act with integrity does not end when he leaves the courthouse. *See e.g.* Section 2 of Preamble to Rules of Judicial Conduct; Rule 1.2 Comments.

25. The Colorado Code of Judicial Conduct ("the Code") further defines "integrity" as "probity, fairness, honesty, uprightness, and soundness of character." The Code recognizes "impropriety" to include: "conduct that violates the law, court rules, or provisions of this Code, and conduct that undermines a judge's independence, integrity, or impartiality.

26. Through his conduct as described above, Respondent violated Canon Rule 1.2 because he engaged in conduct that was actually improper and which created the appearance of impropriety.

<div align="center">

<u>Count 3</u>
Canon Rule 2.3
Bias, Prejudice, Harassment

</div>

27. Paragraphs 1-16 are incorporated herein.

28. Canon Rule 2.3 provides, in relevant parts:

> (A) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.

> (B) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so.

> (C) A judge shall not engage in retaliation for reporting of misconduct under this Code or other legal authority. The duty to refrain from retaliation includes retaliation against current and former Judicial Branch personnel as well as attorneys and other members of the public.

<div align="center">

-10-

</div>

29. The factual allegations described in Paragraphs 1-15 include Judge Kiesnowski engaging in various forms of retaliation and intimidation based upon his perceptions that Emily Betz (via perceived gossip) was responsible for reporting his judicial misconduct to other judges and Judicial Department staff.

30. Through his conduct as described above, Judge Kiesnowski violated Canon Rule 2.3.

<u>Count 4</u>
Canon Rule 2.8
Demeanor

31. Paragraphs 1-16 are incorporated herein.

32. Canon Rule 2.8(B) provides:

> (B) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control.

33. Through his conduct as described above, Judge Kiesnowski violated Canon rule 2.8(B).

<u>Count 5</u>
Canon Rule 2.12
Supervisory Duties

34. Paragraphs 1-16 are incorporated herein.

35. Canon Rule 2.12(C) provides:

> (C) A judge should practice civility by being patient, dignified, respectful, and courteous in dealings with court personnel, including chambers staff. A judge should not engage in any type of harassment of court personnel. A judge should not engage in retaliation for reporting allegations of misconduct. A judge should seek to hold court personnel who are subject to the judge's control to similar standards in their own dealings with other court personnel.

36. Through his conduct as described above, Judge Kiesnowski violated Canon rule 2.12(C).

-11-

Count 6
Canon Rule 2.16
Cooperation with Disciplinary Authorities

37. Paragraphs 1-16 are incorporated herein.

38. Canon Rule 2.16(B) provides:

> (B) A judge shall not retaliate, directly or indirectly, against a person
> known or suspected to have assisted or cooperated with an
> investigation of a judge or a lawyer.

39. The factual allegations described in Paragraphs 1-15 include Judge Kiesnowski engaging in various forms of retaliation and intimidation based upon his perceptions that Emily Betz (via perceived gossip) was responsible for reporting judicial misconduct to other judges and court staff.

40. Through his conduct as described above, Judge Kiesnowski violated Canon Rule 2.16(B).

Count 7
Canon Rule 4.2
Political and Campaign Activities of a Judge Who is a Candidate for Retention

41. Paragraphs 1-16 are incorporated herein.

42. Canon Rule 4.2(A) provides, in relevant part:

> (A) A judicial candidate in a retention public election shall:
> (1) act at all times in a manner consistent with the independence,
> integrity, and impartiality of the judiciary[.]

43. As described herein, Judge Kiesnowski inappropriately communicated with Judge Crespin in an effort to intimidate and control Emily Betz in connection with Judge Kiesnowski's upcoming retention election.

44. Through his conduct as described above, Judge Kiesnowski violated Canon Rule 4.2(A).

-12-

## COLO. RJD 35(H) STIPULATED DISPOSITION

1. On March 14, 2023 Judge Kiesnowski will announce his retirement, effective July 1, 2023;

2. Judge Kiesnowski shall be privately censured according to Colo. RJD 35(f) based upon the factual circumstances set forth in this stipulation and Judge Kiesnowski's admitted violations of Canon Rules 1.2, 2.3, 2.8, 2.12(C), 2.16(B), and 4.2;

3. Judge Kiesnowski waives his rights to a hearing in formal proceedings and review by the Colorado Supreme Court (as otherwise allowed according to Colo. RJD 35(i) and Colo. RJD 37(d));

4. Given Judge Kiesnowski's cooperation in resolving this case by stipulation, the Commission will not seek an assessment of costs and fees under either Colo. RJD 35(g) or Colo. RJD 36(g);

5. Judge Kiesnowski agrees that he will not: apply (a) to again become a judge under Article VI of the Colorado Constitution, (b) to participate in the Senior Judge program under § 13-4-104.5, C.R.S., or (c) to prospectively serve as a private judge appointed according to § 13-3-111. Judge Kiesnowski further agrees that he will not act as a presenter/mentor in leadership, mentoring, or training programs conducted through the Colorado Judicial Department and/or the State Court Administrator's Office;

6. The parties shall file a separate stipulation with the Colorado Supreme Court under Colo. RJD 37(e) to dismiss the formal proceedings previously initiated in this matter; and

7. As qualified according to Colo. RJD 3(d), records and information relating to this matter shall remain confidential according to Colo. Const. Art. VI, § 23(3)(g).

Stipulated and agreed to this 14ᵗʰ day of March, 2023.

Robert W. Kiesnowski, Respondent

Craig Truman, Counsel to Respondent
Attorney Reg. No. 5331

Jeffrey M. Walsh, Special Counsel to the Commission
Attorney Reg. No. 33762

-13-

-14-

Colorado Commission on Judicial Discipline

By: _____
Christopher Gregory, Executive Director
Attorney Reg. No. 37095

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: October 25, 2023 |
| Original Proceeding in Discipline<br>Commission on Judicial Discipline 23-104 | |
| In the Matter of Complainant:<br><br>The People of the State of Colorado,<br><br>**and**<br><br>**Respondent:**<br><br>Robert Kiesnowski, a former judge of the Adams County<br>District Court. | Supreme Court Case No:<br>2023SA171 |
| ORDER OF COURT | |

The Court is in receipt of the Recommendation for Judicial Discipline—

Colo. RJD 37(A) filed on October 19, 2023.

The Recommendation includes as an attachment a Stipulation for Private

Censure entered into between the Commission on Judicial Discipline and Judge

Robert Kiesnowski in an earlier matter, CCJD Case No. 21-121.  That Stipulated

Private Censure was entered pursuant to Colorado Rule of Judicial Discipline

35(h), which provides that "[a] stipulated private disposition shall remain

confidential, subject to Rule 6.5(g)."  RJD 6.5(g) permits the Commission or a

judge to file a motion asserting that allegations of misconduct "have become

generally known to the public" and should be disclosed.  The facts surrounding the

Stipulated Private Censure are not generally known to the public and no motion

has been filed pursuant to the rule, so their disclosure is therefore not authorized by RJD 6.5(g).

The Recommendation notes that RJD 37(c) provides that the "recommendation for sanctions and the record of proceedings shall become public upon the filing of the recommendation with the Supreme Court." The Recommendation assumes that this provision means that the earlier agreed-to Stipulation of Private Censure will become public because the Special Masters considered that prior disciplinary history in recommending a sanction as permitted by RJD 6.5(f). However, given that RJD 35(h) requires a stipulated private disposition to remain confidential, with no exception for public disclosure other than that provided in RJD 6.5(g), the Stipulation of Private Censure must be redacted from the record of proceedings. Similarly, references to the details of the facts underlying the Stipulation of Private Censure contained in the hearing transcript or any of the exhibits or other materials included in the record of proceedings must be redacted. The fact that RJD 6.5(f) permits "the Commission and special masters [to] consider the record of any discipline previously imposed" does not mean that the confidentiality requirement of RJD 35(h) may be circumvented by attaching the Stipulated Private Censure or references to it to the record of proceedings in this subsequent case.

Additionally, the Recommendation includes, at paragraphs 4 through 7, assertions related to the earlier matter that are neither part of the record in this case nor relevant to any issue the Court must decide in this proceeding. These statements shall be redacted from the Recommendation submitted to the court before the Recommendation and the record of proceedings are made public pursuant to RJD 37(c).

Accordingly, the Recommendation for Judicial Discipline and attached record of proceedings are stricken. The Commission on Judicial Discipline is ordered to submit forthwith a revised Recommendation and a record of proceedings that excludes or redacts the confidential materials and extra-record statements as set forth in this Order.

BY THE COURT, EN BANC, OCTOBER 25, 2023
CHIEF JUSTICE BOATRIGHT does not participate.

1

Colorado Commission on Judicial Discipline
Ralph L. Carr Judicial Center
1300 Broadway
Suite 210
Denver, Colorado 80203
Phone No.:  303-457-5131

DATE FILED: November 11, 2023

_____

IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,

Complainant,

and

ROBERT KIESNOWSKI, A Former Judge of the Adams County District Court,

^ COURT USE ONLY ^

Respondent.

_____

Colorado Commission on Judicial Discipline:

CCJD Case No. 23-104

JEFFREY M. WALSH, ESQ.
Special Counsel
Ralph L. Carr Judicial Center
1300 Broadway
Suite 210
Denver, Colorado  80203
Phone: 303-457-5131
j.walsh@jd.state.co.us
Atty. Reg. No. 33762

_____

DEPOSITION OF ROBERT KIESNOWSKI
August 28, 2023

_____

For the Respondent:
CRAIG L. TRUMAN, ESQ.
Craig L. Truman, P.C.
455 Sherman Street
Suite 310
Denver, Colorado  80203
Phone:  303-595-8008
craig@cltrumanlaw.com

EXHIBIT

A

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

176

between Huston and my brother-in-law.

Q    Okay.  Let me just take a minute here, and I think we're pretty close.

MR. TRUMAN:  Thank God.

Q    (By Mr. Walsh)  Let's just talk briefly about your prior -- your prior discipline history with the commission.  That was a -- you're obviously aware that was private -- it's a private censure, right?

A    Correct.

Q    And are you aware that -- that the commission, as part of this pending proceeding, will submit that disciplinary history as part of the record in its -- as being relevant to the -- to whatever discipline may or may not be imposed in this case?

A    I was not aware of that.

Q    Yeah.  And that, in the event there is a final decision for public discipline in this case, that that private censure would become part of the public record?

A    I was unaware of that.

Q    Yeah.

A    Seems to me it kind of defeats the purpose of confidentiality and why I did it, and maybe I should try to move to vacate the whole determination, then, if that's the case.  That doesn't make any sense.  But it's

177

a discussion I'll have with Mr. Truman.

Q    Yeah.  Well, we can -- I don't -- I don't know if that has to be on the record, actually, frankly. I just . . .

MR. TRUMAN:  Fine with me.

Q    (By Mr. Walsh)  The emails.  Is there -- I don't know if we need to go through these in detail. Have you seen the emails between you and Investigator Huston?

A    Yes.

Q    Okay.  Actually, I have one quick question, actually, about those.  I'll try not to . . .

I don't know what exhibit number we're on.

MR. TRUMAN:  Six.

(Exhibit Number 6 was marked for identification.)

Q    (By Mr. Walsh)  We're which?

A    I think 6.

Q    Six?  I've kind of stapled these all together into one exhibit.  So will you just go to page 2.

A    Sure.

Q    I think that these emails pretty much speak for themselves.  That's why I don't want to --

A    Page 2?

Q    Yeah.  You see, how, like, page 2 has -- it's

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | DATE FILED: November 11, 2023 |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case No. 23-104 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>Robert W. Kiesnowski, A former Judge of the Adams County District Court<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| | Case Number: 23SA171 |
| **DECLARATION OF SPECIAL COUNSEL JEFFREY M. WALSH** | |

Comes now Jeffrey M. Walsh to make the following declaration:

1. I am Special Counsel to the Colorado Commission on Judicial Discipline.

2. In my role as Special Counsel, I prosecuted the allegations of ethical misconduct against former Judge Robert Kiesnowski in the above captioned case.

-1-

3. I deposed Judge Kiesnowski on August 28, 2023 in relation to this case. Attorney Craig Truman acted as Judge Kiesnowski's counsel at the deposition and at the formal disciplinary hearing which took place on September 6, 2023.

4. During the deposition, I advised Judge Kiesnowski that I intended to introduce into evidence at his upcoming disciplinary hearing his prior private censure as being relevant to whatever discipline may be imposed in this case. I further advised Judge Kiesnowski that if his prior private censure is admitted into the record, and if there is ultimately a recommendation for public discipline, then his prior private censure would become part of the public record. *See* [TR (8/28/23), pp. 176.5-177:5] (attached as Exhibit A).

5. At some point after the deposition – I can't remember the exact date – I spoke on the phone to Judge Kiesnowski's counsel, Craig Truman, about this issue. As a professional courtesy, I wanted to advise Mr. Truman of my continued intent to introduce Judge Kiesnowski's prior private censure into the record in this case, which could in turn lead to the private censure becoming part of the public record in the event of a recommendation to the Supreme Court for public discipline. I explained to Mr. Truman that I wanted him to be aware of my intent so that he could request a protective order if he deemed it appropriate. During this phone conversation, I also

-2-

directed Mr. Truman to Colo. RJD 32 and the part of that rule that requires the special masters to provide a report to the Commission on Judge Kiesnowski's prior disciplinary history. I stated that I believed the disciplinary history mandate of Rule 32 permitted Judge Kiesnowski's prior private censure to be admitted into evidence at the formal disciplinary hearing. After reviewing Colo. RJD 32, Mr. Truman stated that he agreed with my position that the prior private censure would be admissible to the record in this case and that he felt it would be futile to file a request for a protective order.

6. At the formal disciplinary hearing in this matter, I introduced into evidence Judge Kiesnowski's prior private censure as Exhibit 17. Neither Mr. Truman nor Judge Kiesnowski objected to the admission of Exhibit 17, so the special masters admitted the exhibit into the evidentiary record.

I declare under penalty of perjury under the law of Colorado that the foregoing is true and correct.

Executed on the 10th day of November, 2023 at Steamboat Springs, Colorado.

Jeffrey M. Walsh

<table>
<tr><td>

**Colorado Supreme Court**
2 East 14th Avenue
Denver, CO 80203
Phone Number: 720-625-5150

**Original Proceeding Pursuant to Colorado Constitution
Article VI, § 23**

Colorado Commission on Judicial Discipline
Case No. 23-104

IN RE THE MATTER OF THE PEOPLE OF THE
STATE OF COLORADO,

Complainant,

    and

Robert W. Kiesnowski, A former Judge of the Adams
County District Court

Respondent.

</td><td>

DATE FILED: November 11, 2023

 

▲  COURT USE ONLY  ▲

</td></tr>
<tr><td>

**Colorado Commission on Judicial Discipline:**

Christopher S.P. Gregory, esq.
Executive Director
Ralph L. Carr Colorado Judicial Center
1300 Broadway, Suite 210
Denver, CO 80203
Phone:  303-457-5131
Email:  c.gregory@jd.state.co.us
Atty. Reg. # 37095

</td><td>

Case Number: 23SA171

</td></tr>
</table>

**MOTION TO RECONSIDER THIS COURT'S ORDER TO REDACT
FROM THE RECORD ALL INFORMATION RELATED TO FORMER
JUDGE KIESNOWSKI'S PRIOR DISCIPLINARY HISTORY**

<u>Introduction</u>

This Court issued its October 25, 2023 "Order of Court" (a) striking the Commission's Recommendation for Judicial Discipline and the Record of Proceedings and (b) ordering the Commission to refile after redacting all information related to Judge Kiesnowski's prior history of judicial misconduct.  This Court reasoned that redaction was required because Judge Kiesnowski's prior disciplinary matter resulted in a private censure per Rule 35(h) of the Colorado's Rules of Judicial Discipline ("Colo. RJD"), which requires that private censures "shall remain confidential" unless the matter is "generally known" to the public (*i.e.*, an exception not present here).

The Commission respectfully requests reconsideration because the Order of the Court is inconsistent with Colo. RJD 32 and 33 and the Colorado Constitution. Rule 32 requires the Special Masters to provide a report of any prior disciplinary action by the Commission against Judge Kiesnowski, without distinguishing between public or private discipline.  The Special Masters performed their required function. In turn, Rule 33 requires the Commission to include the Special Masters' report as part of the formal record of proceedings, which also occurred here. The record became public upon filing with this Court pursuant to the Colorado Constitution and Colo. RJD 6.5(a) and 37(c).  Put simply, the Special Masters and the Commission had

-2-

no choice but to include Judge Kiesnowski's disciplinary history in their analysis and as part of the public record.

The confidentiality requirements of Colo. RJD 35(h) do not conflict with the disciplinary history mandate of Rule 32. The two rules exist in harmony such that a private censure shall remain confidential per Rule 35(h) as long as the misconduct in that case is the only matter at issue. If, however, the judge commits a new ethical breach serious enough to warrant the filing of a public discipline recommendation under Colo. Const. Art. VI, § 23(3)(g) and Colo. RJD 37(c), the prior disciplinary matter ceases to be confidential as it becomes *a necessary and inextricable* part of the new case per the disciplinary history mandate of Rule 32.

For the reasons discussed below, the Commission respectfully asks this Court to reconsider its Order of October 25, 2023.

<u>Argument</u>

I.    **The filing of Judge Kiesnowski's prior disciplinary history, which was considered by the Special Masters and admitted into evidence at the disciplinary hearing, is required by Colo. RJD 32 and 33.**

Colo. RJD 32 states, in relevant part:

> At the conclusion of the hearing in formal proceedings, the special masters shall issue and file with the executive director a report which *shall* include written findings of fact regarding the evidence in support of and in defense to the allegations in the complaint, *a report of any prior disciplinary action by the Commission against the Judge,* and its recommendations to the Commission . . . The

-3-

> executive director *shall* certify the special masters' report *as part of the record of proceedings* to be filed with the Supreme Court in accordance with Rule 37. (Emphasis added).

Here, the Special Masters complied with Rule 32. Judge Kiesnowski's prior stipulation for private censure was admitted as evidence without objection by Judge Kiesnowski at the formal disciplinary proceeding. [Tr. (9/6/23), p. 119:4-16; Exhibit 17]. The Special Masters used that evidence to provide the required report[1] of Judge Kiesnowski's prior private discipline in their final Report of the Special Masters. [R., pp. 73, 82-85].

> Colo. RJD 33, for its part, provides:

> > The record of proceedings *shall consist of the report of the special masters together with* pleadings, motions, verbatim electronic or written transcripts of proceedings, affidavits, *exhibits*, findings of fact and conclusions of law, legal briefs, and any other documentation designated by the Commission for the Supreme Court's consideration. (Emphasis added).

The Commission followed the requirements of Rule 33 by filing a record of proceedings that includes the various documents listed in the Rule, including a copy of the Special Masters' Report, which discusses Judge Kiesnowski's prior disciplinary

---

[1] Consistent with its plain meaning, the word "report" is defined by Merriam-Webster as "a usually detailed account or statement." https://www.merriam-webster.com/dictionary/report.

history and which includes Judge Kiesnowski's previous stipulation for private censure (Exhibit 17).

II. **Per Colo. Const. Art. VI, § 23(3)(g) and Colo. RJD 6.5(a) and 37(c), the record of proceedings – which must contain the Special Masters' Report on Judge Kiesnowski's prior discipline -- became public upon its filing with the Colorado Supreme Court.**

A. **Colorado's Constitution and the Rules of Judicial Discipline require public disclosure of the record here.**

Under the Colorado Constitution, the records of judicial disciplinary proceedings are confidential *until* the filing of the Commission's recommendation with this Court. *See* Colo. Const. Art. VI, §23(3)(g) ("*Prior to the filing of a recommendation* to the supreme court by the commission against any justice or judge, all papers filed with and proceedings before the commission on judicial discipline or masters appointed by the supreme court, pursuant to this subsection (3), shall be confidential[.]") (Emphasis added). Likewise, Rules 6.5(a) and 37(c) recognize that the entire record of proceedings, along with the Commission's recommendation for discipline, become public upon filing with this Court. Rule 6.5(a) reads in relevant part as follows:

> The proceedings of the Commission and special masters, including all papers, investigative notes and reports, pleadings, and other written or electronic records, shall be confidential unless and until the Commission files a recommendation with the Supreme Court under Rule 37. *The recommendation and the record of proceedings shall*

-5-

> *thereupon become public*, subject to the limitations provided in Rule 37. (Emphasis added).

Rule 37(c) states in relevant part that "[t]he Commission's recommendation for sanctions and the record of proceedings shall become public upon filing the recommendation with the Supreme Court."

Here, Judge Kiesnowski's prior disciplinary action, while previously private, became a part of the record in his disciplinary proceedings without any objection from him. Since it was part of the record, it necessarily became public when the recommendation and record were filed. Rule 37 provides no relevant exception here. Specifically, Rule 37 does not require that a private censure subsequently made part of the record of a formal disciplinary proceeding remain confidential.[2]

### B. Judge Kiesnowski's prior discipline is a necessary factor to consider when determining the appropriate discipline and therefore cannot be removed from the record of proceedings.

Notwithstanding any other confidentiality protections under the Rules, Colo. RJD 6.5(f) authorizes the Special Masters to consider "[t]he record of any discipline previously imposed on the Judge by the Commission or the Supreme Court" in

---

[2] It should also be noted that Colo. RJD 6.5(d) provides a separate and independent basis for the Commission to make public a judge's prior, private disciplinary history when it is necessary "in the interest of justice" or to "fulfill the Commission's constitutional mandate." The Commission's constitutional mandate, per Colo. RJD 1(b) is to "maintain public confidence in the judiciary" and to "preserve the integrity of the judicial process." The Commission's position is that, in this case, Judge Kiesnowski's disciplinary history must be part of the public record in order to perform and protect its constitutional mandate.

-6-

"investigating a complaint, determining a disposition under Rule 35, *or in recommending a sanction under Rule 36*[.]" (Emphasis added). This rule does not distinguish between public or private discipline.  Here, the Special Masters expressly and properly considered the nationally recognized list of factors in *Matter of Deming*, 736 P.2d 639, 659 (Wash. 1987), *which includes a judge's disciplinary history*, in determining the appropriate discipline for Judge Kiesnowski.[3] They noted that Judge Kiesnowski's prior private discipline was relevant to his second disciplinary case because it showed a persistent abuse of the prestige and power of judicial office. [R., pp. 83-85] (Special Masters Report applying *Deming* factors). Thus, the Special Masters' detailed report on Judge Kiesnowski's prior private discipline based on the *Deming* factors was consistent with Rule 6.5(f) and the disciplinary history mandate of Rule 32.  Similarly, the Commission performed its required function by considering the Special Masters' Report and Judge Kiesnowski's disciplinary history when making its recommendation under Colo. RJD 37(c).

---

[3] *Deming* requires consideration of "whether there have been prior complaints about [the subject] judge." *Id.* The following is a non-exhaustive sampling of cases that have adopted the *Deming* factors to evaluate the appropriateness of sanctions in judicial discipline cases: *Mississippi Comm'n on Jud. Performance v. Skinner*, 119 So. 3d 294, 306 (Miss. 2013); *In re Sharp*, 480 S.W.3d 829, 839 (Tex. Spec. Ct. Rev. 2013); *Arkansas Judicial Discipline and Disability Comm'n v. Proctor,* 360 S.W.3d 61, 95–96 (2010); *In re Coffee's Case*, 159 N.H. 156, 172 (2008); *In re Singletary*, 967 A.2d 1094, 1102 (Pa. Ct. Jud. Disc. 2008); *In re Disciplinary Action Against McGuire,* 2004 N.D. 71, ¶¶ 33-34; *In re Moore*, 464 Mich. 98, 118 (2001); *In re Jett*, 180 Ariz. 103, 108 (1994); *In re Chaisson*, 549 So.2d 259, 266 (La. 1989).

Other courts have reached the same conclusion that a judge's prior private discipline becomes public when he or she commits a new ethical violation that justifies public discipline. *See In re Cerbone*, 812 N.E.2d 932 (N.Y. 2004) (examining details of 5 prior otherwise confidential informal disciplinary responses as basis for disciplinary commission's recommendation for public discipline and removal); *In re Canaday*, 2023 WL 6937262, 4, 2023-00735, 6-7 (La. 10/1/23) (applying *Deming* factors with consideration of prior private disciplinary history).

Our own precedent also establishes the relevance and making public of prior disciplinary history, even when the prior discipline was private. Earlier this year, the Commission and former Judge Lance Timbreza entered into a stipulation for public censure, which contained, as part of the record, disclosure of Judge Timbreza's previously *private* discipline. *People v. Timbreza,* 2023 CO ¶ 9. This Court disqualified itself from that case, and per Colo. RJD 41(b), it appointed a special tribunal of seven judges from the Court of Appeals. *Timbreza,* ¶ 1. In that case, neither Judge Timbreza nor any of the seven appointed Court of Appeals judges objected to Judge Timbreza's prior private discipline being part of the record, being a relevant factor in the disciplinary decision, or necessarily being made public upon filing of the Commission's Recommendation and the underlying stipulations/record of proceedings.

-8-

Here, the Special Masters performed a permitted function by considering Judge Kiesnowski's prior disciplinary history.  As discussed above, Rule 32 required the Special Masters to include a report of the Judge's prior discipline in their final report. By operation of law, the record became public upon filing. For this Court to order the Commission to excise from the record all references to Judge Kiesnowski's prior discipline – that is, to erase a critical piece of information considered by the Special Masters – would result in this Court receiving an incomplete and inaccurate record of the formal disciplinary proceeding. This is inconsistent with the Rules of Judicial Discipline and well-settled precedent (both in Colorado and nationally).

### III.    Colo. RJD 35(h) does not support this Court's redaction order.

Rule 35(h) does not support the redaction ordered by this Court.  The Rules of Judicial Discipline must be construed in accordance with the rules of statutory interpretation. *See People v. G.S.*, 2018 CO 31, ¶ 32 (holding that the standard principles of statutory construction apply to the interpretation of court rules). Ultimately, the Rules must be construed so that they are consistent with their related overall constitutional and statutory context. *See, e.g., Campaign Integrity Watchdog LLC v. Colorado Republican Party Indep. Expenditure Comm.*, 2017 COA 32, ¶ 10. "When the statutory language is clear, the Supreme Court applies the plain and ordinary meaning of the provision[s] and gives consistent, *harmonious*, and sensible

effect *to each part of the statute." People v. Moore*, 2021 CO 26, ¶ 25 (emphasis added).

The disciplinary history mandate of Rule 32 and the confidentiality requirement of Rule 35(h) exist in harmony. Per Rule 35(h), a private disposition shall remain confidential if the underlying ethical breach is the only matter at issue. But if the judge commits a subsequent breach of the ethical rules, the fact of the prior discipline then becomes *a necessary and inextricable part* of the new case, per the disciplinary history mandate of Rule 32. Thus, the prior discipline can no longer be confidential by virtue of the new ethical breach and the Commission's filing of a recommendation with this Court. Were this Court to hold otherwise would be to render the disciplinary history mandate of Rule 32 illogical and meaningless. *See Educhildren LLC v. Cnty. of Douglas Bd. of Equalization*, 2023 CO 29, ¶ 27 (we must "avoid constructions that would yield illogical or absurd results").[4]

IV.    Nothing in Colo. RJD 6.5 permits this Court, without good cause, to order redaction of portions of the public record of proceedings, including the Special Masters' Report.

The Rules of Judicial Discipline do not anywhere permit the redaction of a judge's prior disciplinary history, thereby preventing this Court from performing its

---

[4] Notably, all of the circumstances and exceptions described in Colo. RJD 6.5(g) relate to judicial disciplinary proceedings occurring prior to or without the filing of the Commission's public recommendation and record of proceedings according to Colo. Const. Art. VI, § 23(3)(g).

obligations to consider it pursuant to the disciplinary history mandate of Rule 32. The

closest the Rules come to authorizing the suppression of information in the record is

via a protective order for confidential material pursuant to Rule 6.5(a). Yet the

requirements for a protective order cannot be met here.

Colo. RJD 6.5(a) states, in relevant part:

> The Supreme Court may enter a protective order requiring
> that certain portions of the record remain confidential upon
> a showing of good cause by the Commission, special
> counsel, special masters, or the Judge.

Thus, Rule 6.5(a) requires two things before this Court could enter a protective

order. First, Judge Kiesnowski must request one, which he has not. Second, the judge

must show "good cause" which he cannot do.

As a threshold matter, Colo. Const. Art. VI, § 23(3)(g) and the Rules – namely,

Colo. RJD 6.5(a), 32, 33, and 37(c) read together – dictate that Judge Kiesnowski's

prior discipline must be made public, as discussed above. Thus, the Colorado

Constitution and the Rules themselves undermine any purported claim of "good

cause" here.

Moreover, sound public policy also undermines any purported claim of "good

cause" for three reasons. First, as the final arbiter of any judicial discipline case, this

Court *must* have access to and consider a complete record, *including a judge's prior*

-11-

*disciplinary history,* before deciding upon the appropriate outcome of a case.[5] This is precisely why Rule 32 dictates that the special masters report *shall* contain a report on the offending judge's disciplinary history. To excise a judge's disciplinary history would be directly analogous to a judge in a criminal matter refusing to permit the prosecutor to introduce at sentencing any evidence of the defendant's prior criminal history, even though the law mandates that the judge consider, via the presentence report, a defendant's criminal history as part of the sentencing decision. *See* § 16-11-102, C.R.S. (requiring a report on the defendant's prior criminal history).

Second, when a judge's misbehavior is serious enough to warrant public discipline, the public – to whom the judiciary is ultimately answerable – should be told why. Not just a partial explanation based on the present case, but a full explanation of all factors that influenced the disciplinary decision, including the judge's disciplinary history. Judicial discipline, importantly, is not just about correcting, punishing, and/or removing misbehaving judges. It is also about "maintaining public confidence in the judiciary," without which the judiciary is ultimately powerless. *See* Colo. RJD 1(b) (the Commission's constitutional mandate is to "maintain public confidence in the judiciary"). Public confidence in the judiciary cannot be maintained if, when a judge's

---

[5] Colo. Const. Art. VI, § 23(3)(f) ("the supreme court shall review") and Colo. RJD 40 ("The Supreme Court shall consider") both require that this Court consider the complete record presented to it when issuing a final judicial discipline opinion.

-12-

misbehavior is serious enough to warrant public discipline, vital information about the judge's misbehavior *and his or her history of misbehavior* are not known. *See Bridges v. California,* 314 U.S. 252, 270–271 (1941) ("The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. . . . [A]n enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.").

Third, the release of previously confidential disciplinary matters when a judge commits subsequent ethical violations serious enough to warrant public discipline achieves the important goal of deterrence. If private discipline always remains confidential, save for the unusual circumstance of public knowledge contemplated by Rule 6.5(g), the final arbiter of discipline (*i.e.,* this Court) cannot perform its duty to consider the judge's disciplinary history in deciding the case. Suppressing a subject judge's prior disciplinary history only creates expectations that no matter how serious a future ethical breach may be, the judge's prior misconduct (if only privately disciplined) will not be considered in the ultimate sanction imposed. This will undermine the Commission's and this Court's abilities to apply appropriate discipline (whether private or public).[6]

---

[6] It should be noted the public policy justifications that support confidentiality in the adjudicatory phase of a disciplinary case can no longer be relied upon here as "good cause"

-13-

V.    Judge Kiesnowski waived his right to confidentiality (1) by choosing not to object to the admission of his disciplinary history into the record here, and (2) by committing new ethical breaches serious enough to warrant public discipline.

### A. Judge Kiesnowski waived confidentiality by choosing not to object to his disciplinary history being admitted into evidence.

Waiver "is the intentional relinquishment of a known right or privilege." *People v. Rediger*, 2018 CO 32, ¶ 32. Here, Judge Kiesnowski's prior private censure was admitted into evidence at the formal disciplinary hearing without his objection. As noted in Special Counsel Jeff Walsh's accompanying declaration, during the deposition of Judge Kiesnowski in this matter, Special Counsel, as a professional courtesy, disclosed to the Judge and his counsel that Special Counsel intended to introduce into evidence at the disciplinary hearing a copy of Judge Kiesnowski's prior private censure pursuant to Rule 32. Special Counsel advised Judge Kiesnowski and his counsel that, if the private censure were admitted into evidence at the hearing, the formerly private censure would become part of the public record if the hearing resulted in a recommendation for public discipline. A few days after the hearing, Special Counsel again conferred with Judge Kiesnowski's counsel about this issue and

---

to maintain confidentiality because the adjudication of this case is complete, the Special Masters have issued their report, and the Commission has filed its recommendation with this Court. *See Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 835, 842-846 (invalidating on First Amendment grounds criminalization of the unauthorized third-party release of confidential/non-public judicial disciplinary information; applying a balancing test through inventory of public policy considerations that favor interests in public disclosure over a judge's right to confidentiality).

-14-

specifically advised opposing counsel about the judge's right to file a protective order if he deemed it appropriate. After reviewing the disciplinary history mandate of Rule 32, opposing counsel agreed that Rule 32 permitted the admission of the prior private censure into the record and stated that he felt that filing a request for a protective order would be futile.

**B. Judge Kiesnowski waived confidentiality by committing new ethical breaches serious enough to warrant a formal disciplinary hearing in this matter, the record of which must contain a report on the Judge's prior disciplinary history.**

The Rules of Judicial Discipline – read in their entirety, construed harmoniously with each of their separate parts, and given sensible effect – are clear. If a subject judge commits new ethical violations serious enough to warrant a formal disciplinary proceeding that results in the filing of a recommendation for public sanctions and a record of proceedings, the subject judge loses the benefit of any agreement for confidentiality which previously attached to his or her prior informal discipline. It is important to recognize that the confidentiality recognized through Colo. Const. Art. VI, § 23(3)(g) and applied through the Rules of Judicial Discipline depends exclusively upon whether or not a judicial disciplinary proceeding results in the public filing of a recommendation or stipulated recommendation under Rule 37. A previously private informal disposition necessarily becomes public when it becomes material to the subject judge's subsequent violation(s) of the Code, which, in turn,

-15-

result in the filing of a public recommendation for discipline according to Colo. Const. Art. VI, § 23(3)(g), Colo. RJD 6.5(a), 32, and 37(c),(e).

### Conclusion

The Commission respectfully requests that this Court: (1) vacate its Order, (2) accept the Commission's previous filings as public records under Colo. Const. Art. VI, § 23(3)(g), (3) provide deadlines for Judge Kiesnowski to file exceptions under Colo. RJD 38, and (4) issue a disciplinary opinion in this case, as required by Colo. Const. Art. VI, § 23(3)(f) and Colo. RJD 40.


DATED:  November 11, 2023


Respectfully submitted,


Christopher S.P. Gregory, #37095
Executive Director
Colorado Commission on Judicial Discipline


-16-

## CERTIFICATE OF SERVICE

I certify that on November 11, 2023, a true and correct copy of the foregoing MOTION TO RECONSIDER THIS COURT'S ORDER TO REDACT FROM THE RECORD ALL INFORMATION RELATED TO FORMER JUDGE KIESNOWSKI'S PRIOR DISCIPLINARY HISTORY and its accompanying DECLARATION OF SPECIAL COUNSEL JEFFREY M. WALSH; EXHIBIT A were filed with the Court and served via the Colorado Courts E-File system upon the following persons:

Counsel for Respondent:
Mr. Craig L. Truman, Atty. Reg. # 5331
Craig L. Truman, P.C.
455 N. Sherman St., Ste. 310
Denver, CO 80203

Special Counsel:

Jeffrey M. Walsh, esq.
Special Counsel
Colorado Commission on Judicial Discipline
Ralph L. Carr Colorado Judicial Center
1300 Broadway, Suite 210
Denver, CO 80203
Phone:  303-457-5131
Atty. Reg. # 33762


By:  _____
Christopher S.P. Gregory, #37095

-17-

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: November 21, 2023 |
| Original Proceeding in Discipline<br>Commission on Judicial Discipline 23-104 | |
| In the Matter of Complainant:<br><br>The People of the State of Colorado,<br><br>**and**<br><br>**Respondent:**<br><br>Robert Kiesnowski, a former judge of the Adams County<br>District Court. | Supreme Court Case No:<br>2023SA171 |
| ORDER OF COURT | |

The Commission on Judicial Discipline filed a Recommendation for Judicial

Discipline in this matter on October 19, 2023.   On review of the Recommendation

and accompanying materials, the Court concluded that certain information should

have been excluded or redacted from the filing to comply with the Rules of

Judicial Discipline.  Accordingly, on October 25, 2023, the court issued an order

striking the Recommendation and accompanying materials and directing the

Commission to submit forthwith a revised Recommendation that omitted

confidential information from the record of proceedings and certain irrelevant and

unproven allegations from the Recommendation.

On November 11, 2023, the Commission filed a Motion to Reconsider this

Court's Order to Redact from the Record All Information Related to Former Judge

Kiesnowski's Prior Disciplinary History.  The Motion for Reconsideration argues that the Rules of Judicial Discipline permit disclosure of the details of Judge Kiesnowski's previous stipulated private censure.  It separately notes that Judge Kiesnowski waived his right to confidentiality as to his earlier Stipulated Private Censure when he did not object to including it in the record of proceedings in this matter.  The Court need not resolve any dispute regarding interpretation of the Rules of Judicial Discipline, as Judge Kiesnowski has not disputed the issue of waiver.  Based on Judge Kiesnowski's waiver, the Court allows the Commission to include the Stipulation of Private Censure in the record of proceedings along with references to the facts underlying that Stipulation.  Accordingly, the Court GRANTS the Motion to Reconsider IN PART.

As to the irrelevant and unproven assertions made in paragraphs 4 through 7 (pages 3-4) of the Commission's October 19 Recommendation for Judicial Discipline, 2023, the Motion for Reconsideration offered no argument or basis for reconsideration.  The Court's Order dated October 25 therefore stands with respect to those assertions.

Accordingly, the Commission on Judicial Discipline is ORDERED to submit forthwith a revised Recommendation that omits the assertions in paragraphs 4 through 7.  When the revised Recommendation and the record of proceedings are

submitted consistent with this Order, the Court shall make them public pursuant to

RJD 37(c).

Pursuant to R.J.D. 38, Judge Kiesnowski may file any exceptions to the

Recommendation within 21 days after service of notice of its filing.

BY THE COURT, EN BANC, NOVEMBER 21, 2023
CHIEF JUSTICE BOATRIGHT DOES NOT PARTICIPATE

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | DATE FILED: December 11, 2023 4:19 PM |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case No. 23-104 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>        and<br><br>Robert W. Kiesnowski, A former Judge of the Adams County District Court<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Christopher S.P. Gregory, esq.<br>Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone: 303-457-5131<br>Email: judicialconduct@jd.state.co.us<br>Atty. Reg. # 37095 | Case Number: 23SA171 |
| **AMENDED RECOMMENDATION FOR JUDICIAL DISCIPLINE—COLO. RJD 37(A)** | |

The Colorado Commission on Judicial Discipline ("the Commission" or

"CCJD"), upon consideration of the accompanying Record of Proceedings,

recommends that this Court publicly censure Respondent Robert W. Kiesnowski

and enter a judgment for costs in the amount of $4,966.95 according to Colo. RJD

36(e),(g).[1]  The Commission submits its Recommendation according to Colo. RJD

37(a).  Exceptions to this Recommendation may be filed according to Colo. RJD 38.

As grounds for its Recommendation, the Commission adopts the findings of

fact and conclusions of law included in the Report of the Special Masters, issued

September 22, 2023, and the Special Master's Award of Costs, issued October 3,

2023.  Both of the Special Masters' orders are included in the Record of

Proceedings.  The Special Masters' factual findings, as adopted by the Commission,

are subject to review for clear error and verification of support through substantial

evidence in the record.  *Matter of Booras*, 2019 CO 16, ¶ 18.

This judicial disciplinary proceeding follows former Adams County District

Court Judge Kiesnowski having been privately censured with an agreement to retire

from office in CCJD Case No. 21-121.  Judge Kiesnowski's Stipulation for Private

Censure, filed with the Commission on March 14, 2023, is included in the Record

of Proceedings in the present case as Exhibit 17 (admitted during the Formal

Disciplinary Hearing held on September 6, 2023).

---

[1] Commissioner and Adams County Court Judge Mariana Vielma has recused
herself throughout the Commission's proceedings below.

-2-

DATED:  December 11, 2023

Respectfully submitted,

Christopher S.P. Gregory, #37095
Executive Director
Colorado Commission on Judicial Discipline

## CERTIFICATE OF SERVICE

I certify that on December 11, 2023, a true and correct copy of the foregoing AMENED RECOMMENDATION FOR JUDICIAL DISCIPLINE—COLO. RJD 37(A) was filed with the Court and served via e-mail upon the following persons:

Counsel for Respondent:
Mr. Craig L. Truman, Atty. Reg. # 5331
Craig L. Truman, P.C.
455 N. Sherman St., Ste. 310
Denver, CO 80203

Special Counsel:

Jeffrey M. Walsh, esq.
Special Counsel
Colorado Commission on Judicial Discipline
Ralph L. Carr Colorado Judicial Center
1300 Broadway, Suite 210
Denver, CO 80203
Phone:  303-457-5131
Atty. Reg. # 33762

By:  _____
Christopher S.P. Gregory, #37095

-4-

<table>
<tr><td>

**Colorado Commission on Judicial Discipline**
Ralph L. Carr Judicial Center
1300 Broadway, Ste. 210
Denver, CO 80203
Phone Number: 303-457-5131

IN RE THE MATTER OF THE PEOPLE OF THE
STATE OF COLORADO,

Complainant,

     and

Robert W. Kiesnowski, a judge of the Adams County
District Court,

Respondent.

</td><td>

DATE FILED: December 11, 2023 4:19 PM

**RECEIVED**
06/30/2023

Colorado
Commission on
Judicial Discipline

▲ COURT USE ONLY ▲

</td></tr>
<tr><td>

**Colorado Commission on Judicial Discipline:**

Jeffrey M. Walsh, esq.
Special Counsel
Ralph L. Carr Colorado Judicial Center
1300 Broadway, Suite 210
Denver, CO 80203
Phone:  303-457-5131
Email:
Atty. Reg. # 33762

</td><td>

CCJD Case No.: 23-104

</td></tr>
<tr><td colspan="2" align="center">

**STATEMENT OF CHARGES**

</td></tr>
</table>

This Statement of Charges is filed pursuant to Colorado Rules of Judicial Discipline (Colo.

RJD) 4, 16(b)(4), and 18 and it is alleged as follows:

I.     **Background and Jurisdiction**

1. Robert W. Kiesnowski ("Respondent") was appointed as a Judge of the Adams

County District Court in 2011.

2. Respondent is subject to the jurisdiction of the Colorado Supreme Court and the Colorado Commission on Judicial Discipline ("the Commission" or "CCJD") in these judicial discipline proceedings.

3. The Commission has determined that probable cause exists to commence formal proceedings under Colo. RJD 16(b)(4).

## II. Factual Allegations

4. On June 1, 2023, Judge Kiesnowski's brother-in-law was in the hospital recovering from stab wounds he received during a conflict with his girlfriend a few days prior. On this same date, an investigator with the 13th Judicial District Attorney's Office ("the investigator") requested to interview the brother-in-law. This interview request was made through Judge Kiesnowski's wife, who indicated that her brother was too tired at the time to participate in an interview. Later that same day, Judge Kiesnowski called the investigator and disclosed that he is a 17th Judicial District Court Judge. He then disclosed to the investigator that he had spoken to his brother-in-law about the incident under investigation. Judge Kiesnowski relayed to the investigator detailed facts about what the brother-in-law reported remembering from the incident.

5. The next day, on June 2, 2023, Judge Kiesnowski's brother-in-law was still in the hospital, and the investigator came to again request to interview him. However, the brother-in-law did not want to consent to an interview without first seeking advice from Judge Kiesnowski. Therefore, the investigator and the brother-in-law called Judge Kiesnowski. During this call, Judge Kiesnowski indicated he wanted to be present for the interview and stated that he could be at the hospital in approximately 40 minutes.

-2-

ROP000002

6. Judge Kiesnowski soon arrived at the hospital. He consulted privately with his brother-in-law, after which the brother-in-law consented to a formal interview, which was video and audio recorded. Before the interrogation began, however, Judge Kiesnowski told the investigator that he would be acting as his brother-in-law's counsel during the interrogation and that his brother-in-law needed to "wait for me to tell him to answer" after each question.

7. After the interrogation began, Judge Kiesnowski disparaged the credibility of the alleged victim. He said, "Historically, she's a total disaster. Jesus. Okay. Okay. And we're going to give you a list of employees who can corroborate her behavior." He went on to say, "[My brother-in-law] is a hard-working guy, okay. And so she's savvy, she knows if, for example, she is labelled a crime victim, she gets to stay [in the country]."[1] Later, he said things, such as:

   a) "I've seen it. Yeah, [the alleged victim] sent me a video. I saw her with her phone hit [the brother-in-law] in the face."

   b) "She has made statements that she will self-inflict injury, and say that he did it."

   c) "She repeatedly accuses [him] of having multiple affairs." The was said to corroborate the brother-in-law's claim that the alleged victim was "bananas."

   d) Judge Kiesnowski at one point re-characterized his brother-in-law's statements and said, "You feel you're being set up by her."

8. Throughout the interrogation, Judge Kiesnowski actively counseled his brother-in-law. At one point, he told his brother-in-law to "get back to what he remembers." At

---

[1] The alleged victim may not be in the country legally.

ROP000003

another point, he told his brother-in-law, "You're answer is you do not recall . . . Don't answer the question." Later, when the investigator confronted the brother-in-law with the alleged victim's claims of assault and strangulation, Judge Kiesnowski stopped the interview to consult with his brother-in-law privately. After this consultation, Judge Kiesnowski directed his brother-in-law not to answer any more questions and ended the interrogation.

9. After the interrogation, the investigator asked Judge Kiesnowski's brother-in-law to sign a medical release so that law enforcement could access the brother-in-law's medical records related to his injuries. Judge Kiesnowski then signed the release for his brother-in-law on the line labeled "Signature of Authorized Personal Representative." He also stated that he was signing the release in his "official" capacity as counsel for his brother-in-law and noted his bar registration number on the release.

III.    Charges

Charge 1
Canon Rule 1.1
A Judge Shall Comply with the Law

10. Paragraphs 1-9 are incorporated herein.

11. Canon Rule 1.1 states, in relevant part: "A judge shall comply with the law, including the Code of Judicial Conduct."

12. Judge Kiesnowski violated Canon Rule 1.1 when he engaged in the conduct described below in violation of Canon Rules 1.2, 1.3, and 3.10.

Charge 2
Canon Rule 1.2
A Judge Shall Promote Confidence in the Judiciary

13. Paragraphs 1-9 are incorporated herein.

-4-

ROP000004

14.  Canon Rule 1.2 states:

> A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

15.  The Code recognizes "impropriety" to include: "conduct that violates the law, court rules, or provisions of this Code." *See* Canon Rule 1.2, Comment 5.

16.  Through his conduct as described above, Judge Kiesnowski violated Canon Rule 1.2 by violating Canon Rule 1.3 and 3.10 (described below) and thereby engaging in actual impropriety.

<div align="center">

Count 3
Canon Rule 1.3
Abuse of the Prestige of Judicial Office

</div>

17.  Paragraphs 1-9 are incorporated herein.

18.  Canon Rule 1.3 says, in relevant part:

> A judge shall be not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others.

19. "A judge who, without being subpoenaed, testifies as a character witness abuses the prestige of judicial office to advance the interests of another." *See* Canon Rule 3.3, Comment 1 (prohibiting judges from testifying as a character witness and indicating that to do so violates Rule 1.3).

20. During the interrogation, Judge Kiesnowski violated Canon Rule 1.3 by identifying himself to the investigator as a judge and then vouching for the credibility of his brother-in-law while also disparaging the credibility of the alleged victim.

<div align="center">-5-</div>

ROP000005

Count 4
Canon Rule 3.10
Practice of Law

21.   Paragraphs 1-9 are incorporated herein.

22.   Canon Rule 3.10 says, in relevant part:

> A judge shall not practice law except as permitted by law or this
> Code. . . .The judge may, without compensation, give legal advice
> to and draft or review documents for a member of the judge's
> family, but is prohibited from serving as the family member's
> lawyer in any forum.

23. Here, Judge Kiesnowski did more than simply give free legal advice to a member of his family. Instead, he actively engaged in a criminal interrogation and conducted himself as his brother-in-law's attorney when he directed the brother-in-law on how to answer questions and whether to answer questions. He explicitly told the investigator he was acting as counsel, and he signed a medical release for his brother-in-law as his counsel. By doing so, Judge Kiesnowski improperly engaged in the practice of law and thereby violated Canon Rule 3.10.

WHEREFORE, Complainant requests that the Commission recommend that, for his misconduct, appropriate disciplinary sanctions be imposed upon Judge Kiesnowski by the Colorado Supreme Court under Colo. RJD 36; that the Commission assess costs, attorney's fees and expenses of this proceeding against Respondent pursuant to Colo. RJD 36(g), and that the Commission recommend any such other relief as it deems appropriate pursuant to Colo. RJD 36(h).

-6-

ROP000006

-7-

DATED:  June 30, 2023

Respectfully submitted,


*/s/ Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762
Special Counsel
Colorado Commission on Judicial Discipline

**ROP000007**

## CERTIFICATE OF SERVICE

I certify that on June 30, 2023, a true and correct copy of the foregoing STATEMENT OF CHARGES was filed with the Commission and served via e-mail upon the following persons:

Craig L. Truman, P.C.
455 N. Sherman St.
Suite 310
Denver, CO 80203

By: */s/ Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762

-8-

ROP000008

| Colorado Commission on Judicial Discipline | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>Phone Number: 303-457-5131 | **RECEIVED**<br>**07/05/2023**<br><br>Colorado<br>Commission on<br>Judicial Discipline |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>ROBERT W. KEISNOWSKI, A Judge of the Adams County District Court,<br><br>Respondent. | **▲ COURT USE ONLY ▲** |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:<br>Atty. Reg. # 33762 | CCJD Case No.: 23-104 |
| **NOTICE OF FORMAL CHARGES** | |

To: Judge Robert W. Keisnowski:

You are hereby notified that, pursuant to the Colorado Rules of Judicial Discipline (Colo. RJD), Rule 18(a), formal proceedings have been instituted against you by the Commission on Judicial Discipline (the "Commission") as specifically alleged in the Statement of Charges served on June 30, 2023.

You are further notified that:

**ROP000009**

1. Jeffrey W. Walsh, Atty. Reg. # 33762, has been appointed Special Counsel for the Commission in this action and is designated to gather and present evidence related to the attached Statement of Charges.

2. The Statement of Charges, dated June 30, 2023, is hereby served on you with this Notice of Formal Charges.

3. Pursuant to Colo. RJD 19, you have the right to file a written answer to the charges against you within twenty-one (21) days after service of this Notice.

4. Your answer shall include a response to each allegation in the Statement of Charges together with applicable affirmative defenses or mitigation factors.

5. Upon receipt of your answer, or upon expiration of the time limit in which to file an answer, the Presiding Special Master will order that formal proceedings are at issue and shall schedule a hearing regarding the matters contained in the Statement of Charges and the response, if any.

6. The special masters will serve you with notice of the time and place of the hearing pursuant to Colo. RJD 20.

7. This proceeding is confidential in accordance with Article VI, § 23(3)(g) of the Colorado Constitution, C.R.S. §§ 24-72-401 and 402, as amended, and under the terms and conditions of Colo. RJD 6.5.

8. Colo. RJD is incorporated herein by reference from Book 1 of the Colorado Revised Statutes.

DATED: July 5, 2023

Respectfully submitted,


/s/ *Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762
Special Counsel
Colorado Commission on Judicial Discipline

-2-

ROP000010

## CERTIFICATE OF SERVICE

I certify that on July 5, 2023, a true and correct copy of the foregoing NOTICE OF FORMAL CHARGES was filed with the Commission and served via e-mail upon the following persons:

Counsel for Respondent:

Mr. Craig L. Truman, Atty. Reg. # 5331
Craig L. Truman, P.C.
455 N. Sherman St., Ste. 310
Denver, CO 80203

By:  */s/ Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762

-3-

ROP000011

<table>
<tr><td>

**Colorado Commission on Judicial Discipline**
Ralph L. Carr Judicial Center
1300 Broadway, Ste. 210
Denver, CO 80203
(303) 457-5131

</td><td>

RECEIVED

07/20/2023

Colorado
Commission on
Judicial Discipline

</td></tr>
<tr><td>

**IN THE MATTER OF PEOPLE OF THE STATE OF COLORADO**

Complainant,

   and

Robert W. Kiesnowski, A Former Judge of the Adams County District Court

Respondent,

</td><td rowspan="2">

☐ **COURT USE ONLY** ☐

</td></tr>
<tr><td>

Craig L. Truman, Esq.
Craig L. Truman, P.C.
455 Sherman St., Suite 310
Denver, Colorado 80203
(303) 595-8008
Atty. Reg. #:  5331

</td><td>

CCJD Case No.:  23-104

</td></tr>
<tr><td colspan="2">

### ANSWER TO THE STATEMENT OF CHARGES FILED JUNE 30, 2023

</td></tr>
</table>

Robert W. Kiesnowski, A Former Judge of the Adams County District Court, files this answer to the Statement of Charges as follows:

## I.  BACKGROUND AND JURISDICTION

1.      Robert W. Kiesnowski, the Respondent, admits that he was appointed as a District Judge of the Adams County District Court in 2011.  Respondent Kiesnowski retired effective on June 12, 2023.

2.      Respondent Kiesnowski admits he is subject to the Colorado Supreme Court and the Colorado Commission on Judicial Discipline jurisdictions.

ROP000012

3.      Respondent Kiesnowski is without sufficient information and belief regarding the finding of probable cause.

## II.  FACTUAL ALLEGATIONS

4.      Respondent Kiesnowski admits that he met with the Chief Investigator from the 13th Judicial District Attorney's Office on June 1, 2023.  Respondent Kiesnowski admits that meeting involved the district attorney's chief investigator's request to interview Respondent Kiesnowski's brother-in-law.  Respondent Kiesnowski admits that he telephoned the chief investigator and disclosed that he was presently a District Court Judge in the 17th Judicial District.  Respondent Kiesnowski made this disclosure in an effort to be fully transparent.  Respondent Kiesnowski admits that in the discussion with the chief investigator, he revealed that he had spoken to his brother-in-law about the on-going investigation and conveyed factual information.

5.      On June 2, 2023, the brother-in-law remained in the hospital and was visited by the chief investigator unannounced.  The brother-in-law sought advice from Respondent Kiesnowski before submitting to an interrogation.  Respondent Kiesnowski requested to be present at any interview and agreed to meet with the chief investigator shortly thereafter to participate in the criminal interrogation.

6.      Respondent Kiesnowski admits that he arrived at the hospital and consulted privately with his brother-in-law.  After the consultation, the brother-in-law consented to a formal interview.  Respondent Kiesnowski had researched Canon Rule 3.10 and determined that he was authorized to provide legal advice to his brother-in-law as a member of his family.  Respondent Kiesnowski after brief review of Canon Rule 3.10 researched both Blacks Law and Heritage dictionary to determine whether the advice was prohibited because of serving as his brother-in-law's lawyer in any "forum".  Respondent Kiesnowski, based on the short research, determined that an interview with the police was not representation in any "forum".  Respondent Kiesnowski even told the chief investigator of his research and decision in another effort of transparency.  After determining to go forward, Respondent Kiesnowski admits he told the chief investigator that he would be acting as his brother-in-law's counsel during the police interrogation and then requested his brother-in-law to wait for instructions after each police question.

7.      Respondent Kiesnowski admits paragraph 7.

8.      Respondent Kiesnowski admits that he provided advice to his brother-in-law's responses to the police interrogation.

9.      Respondent Kiesnowski admits that he signed the medical release in the manner set forth in paragraph 9.

2

## III. CHARGES

<div align="center">

Charge 1
Canon Rule 1.1
A Judge Shall Comply with the Law

</div>

10.     Respondent Kiesnowski asks that his answers to paragraph 1-9 be incorporated herein.

11.     Respondent Kiesnowski admits the substance of Canon Rule 1.1.

12.     Respondent Kiesnowski denies he violated Canon Rule 1.1.

<div align="center">

Charge 2
Canon Rule 1.2
A Judge Shall Promote Confidence in the Judiciary

</div>

13.     Paragraphs 1-9 of the answer are incorporated herein.

14.     Respondent Kiesnowski admits the substance of Canon Rule 1.2.

15.     Respondent Kiesnowski admits the definition of impropriety as set forth in Canon 1.2, comment 5.

16.     Respondent Kiesnowski denies paragraph 16 that he engaged in actual impropriety and violated the Canon Rules.

<div align="center">

Count 3
Canon Rule 1.3
Abuse of the Prestige of Judicial Office

</div>

17.     Paragraph to 1 through 9 are incorporated.

18.     Respondent Kiesnowski admits the substance of Canon Rule 1.3.

19.     Respondent Kiesnowski admits the Canon Rule 3.3 and the comment.

20.     Respondent Kiesnowski denies he violated Canon Rule 1.3 by identifying himself to the chief investigator as a Judge.  Respondent Kiesnowski was overly compliant with required transparency to tell the chief investigator that not only was he a district court judge but was the brother-in-law of the person being interrogated. Respondent Kiesnowski told the chief investigator he had reviewed Canon Rule 3.10 and believed he was permitted to give legal advice to his brother-in-law under the

<div align="center">

3

</div>

ROP000014

expedited interrogation requested by the chief investigator. Respondent Kiesnowski admits vouching for the credibility of his brother-in-law while also commenting on the credibility of the alleged victim but denies his actions are testimony of a character witness contemplated by Canon Rule 3.3.

<div align="center">

Count 4
Canon Rule 3.10
Practice of Law

</div>

21.    Respondent Kiesnowski requests his answers to paragraph 1-9 be incorporated.

22.    Respondent Kiesnowski admits that Canon Rule 3.10 is set forth in relevant part.

23.    Respondent Kiesnowski denies that he did anything more than provide legal advice to his brother-in-law, a member of his family.  Respondent Kiesnowski believes that he was authorized to do so as a police interrogation is not representation in any "forum". Respondent Kiesnowski denies his signing a medical release constituted representation in any "forum".  Respondent Kiesnowski affirmatively asserts that an expedited perhaps emergency police interrogation is not serving as a lawyer in any forum.  Respondent Kiesnowski denies that he entered his appearance in any court and only participated to provide advice to the expedited interrogation requested by the chief investigator.

WHEREFORE, Respondent Robert W. Kiesnowski, A Former Judge of the Adams County District Court, requests that the answer be received and the complaint dismissed.

DATED this 20th day of July, 2023.

Respectfully submitted,

_____
Craig L. Truman, #5331

4

ROP000015

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of July, 2023, I served a true and accurate copy of the above and foregoing **ANSWER TO THE STATEMENT OF CHARGES** to:

Jeffrey M. Walsh, Esq., Special Counsel
Ralph L. Carr Colorado Judicial Center
1300 Broadway, Suite 210
Denver, CO 80203

(X) by email

_Carlu Paciella_

ROP000016

**Colorado Commission on Judicial Discipline**
Ralph L. Carr Judicial Center
1300 Broadway, Ste. 210
Denver, CO 80203
(303) 457-5131

**IN THE MATTER OF PEOPLE OF THE STATE OF COLORADO**

Complainant,

and

Robert W. Kiesnowski, A Former Judge of the Adams County District Court

Respondent,

_____

Craig L. Truman, Esq.
Craig L. Truman, P.C.
455 Sherman St., Suite 310
Denver, Colorado 80203
(303) 595-8008
Atty. Reg. #: 5331

RECEIVED

09/01/2023

Colorado
Commission on
Judicial Discipline

☐ **COURT USE ONLY** ☐

_____

CCJD Case No.: 23-104

**TRIAL BRIEF FOR RESPONDENT ROBERT W. KIESNOWSKI,
A FORMER JUDGE OF THE ADAMS COUNTY DISTRICT COURT**

This is a case that involves very little factual dispute. Respondent Kiesnowski in the last month of his judicial tenure, was placed in an <u>untenable</u> situation. His brother-in-law, Jesse Lee Vaughn, was involved in a domestic violence situation on Thursday, June 1, 2023. Mr. Vaughn was stabbed in the upper thigh and lower leg. Mr. Vaughn was then taken to the local Fort Morgan hospital and then emergently to Saint Anthony's Hospital in Lakewood, Colorado, a class 1 trauma center.

What unfolded was a dilemma for Former Judge Kiesnowski. His testimony will show how he tried to determine the best way to advise his brother-in-law within the confines of Canon 3.10. Former Judge Kiesnowski will explain how he tried to facilitate

ROP000017

cooperating with law enforcement by providing a statement while advising his brother-in-law Vaughn about very serious criminal charges.  Former Judge Kiesnowski will testify about he tried to determine the definitions of "forum" and "testimony" as applied to the Canons of Judicial Conduct.

Former Judge Kiesnowski's dilemma is of first impression in Colorado.  Former Judge Kiesnowski struggled as he tried to make the best possible decision without violating the Canons.  It is the Respondent's position that Former Judge Kiesnowski did not violate the Canons of Judicial Conduct.

Respondent requests that the Special Masters find that Former Judge Kiesnowski did not violate:

1) Charge 1, Canon Rule 1.1, A Judge Shall Comply with the Law
2) Charge 2, Canon Rule 1.2, A Judge Shall Promote Confidence in the Judiciary
3) Count 3, Canon Rule 1.3, Abuse of the Prestige of Judicial Office
4) Count 4, Canon Rule 3.10, Practice of Law

DATED this 1st day of September, 2023.

Respectfully submitted,

Craig L. Truman, #5331

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of September, 2023, I served a true and accurate copy of the above and foregoing **TRIAL BRIEF FOR RESPONDENT KIESNOWSKI, A FORMER JUDGE OF THE ADAMS COUNTY DISTRICT COURT** to:

Jeffrey M. Walsh, Esq., Special Counsel
Ralph L. Carr Colorado Judicial Center
1300 Broadway, Suite 210
Denver, CO 80203

(X) by email

2

ROP000018

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>Phone Number: 303-457-5131 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>Robert W. Kiesnowski, a judge of the Adams County District Court,<br><br>Respondent. | RECEIVED<br><br>09/01/2023<br><br>Colorado Commission on Judicial Discipline<br><br><br>▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:<br>Atty. Reg. # 33762 | CCJD Case No.: 23-104 |
| **THE PEOPLES' PRE-HEARING BRIEF IN SUPPORT OF REQUEST FOR PUBLIC DISCIPLINE** | |

## INTRODUCTION

This case is about the persistent abuse of the status of judicial office. Judge Robert

Kiesnowski was privately disciplined in March of 2023 for years of harassment, intimidation

ROP000019

-2-

and retaliation against a judicial assistant because he believed she had gossiped about his extramarital affair with another judicial department employee who was his subordinate. *See* Exhibit A. A condition of Judge Kiesnowski's private censure was that he resign as a judge, effectively July 1, 2023. Yet despite being disciplined in March for abusing his status as a judge, Kiesnowski – while still a judge – again abused his status as a judge just three months later when his brother-in-law was facing felony assault charges. Kiesnowski intervened (a) to act as his brother-in-law's counsel during an interrogation, and (b) to lobby the DA's investigator not to file charges, claiming repeatedly that the complaining witness is essentially a crazy liar. The misconduct here – i.e. the abuse of the prestige of judicial office – is persistent and serious. Thus, public censure is appropriate and justified.

<u>SUMMARY OF THE FACTS</u>

On June 1, 2023, Judge Kiesnowski's brother-in-law was in the hospital recovering from stab wounds he received during a conflict with his wife a few days prior. On this same date, an investigator with the 13th Judicial District Attorney's Office (i.e. Investigator Jeff Huston) requested to interview the brother-in-law. This interview request was made through Judge Kiesnowski's wife, who indicated that her brother was too tired at the time to participate in an interview. Later that same day, Judge Kiesnowski called Investigator Huston on two separate occasions. During the first phone call, Kiesnowski disclosed that he is a 17th Judicial District Court Judge, and he relayed detailed facts about what his brother-in-law reported remembering from the incident. During the second phone call, he again disclosed

-2-

ROP000020

his identity as "Judge Kiesnowski" and asked Investigator Huston about getting his brother-in-law's dog out of the brother-in-law's house, which was the scene of the crime.

The next day, on June 2, 2023, Judge Kiesnowski's brother-in-law was still in the hospital, and Investigator Huston came again to request to interview him. However, the brother-in-law did not want to consent to an interview without first seeking advice from Judge Kiesnowski. Therefore, Investigator Huston and the brother-in-law called Judge Kiesnowski. During this call, Judge Kiesnowski indicated he wanted to be present for the interview and stated that he could be at the hospital in approximately 40 minutes.

Before leaving his home to go to the hospital, Judge Kiesnowski reviewed the Colorado Code of Judicial Conduct to determine if Rule 3.10 (barring the practice of law) permitted him to represent his brother-in-law. Judge Kiesnowski concluded that the Rule did in fact permit him to act as his brother-in-law's counsel, so he drove to the hospital to do exactly that.

Judge Kiesnowski soon arrived at the hospital. He consulted privately with his brother-in-law, after which the brother-in-law consented to a formal interview, which was video and audio recorded. As discussed more fully below, Judge Kiesnowski proactively represented his brother-in-law as his counsel during the interrogation. At the end of the interrogation, Judge Kiesnowski signed a medical release for his brother-in-law, noting that he was acting as his brother-in-law's legal representative, and he provided his Colorado Bar number beside his signature.

-3-

ROP000021

## ARGUMENT

As a threshold matter, it is important to note that in the arguments below, the People often rely on persuasive authority from other jurisdictions that have interpreted Code provisions which are identical to the Code provision at issue here. This is necessary because the body of judicial discipline cases in any one state, such as Colorado, is typically small. Moreover, it is appropriate, and indeed recommended, because Colorado's Code of Judicial Conduct mimics the 2007 ABA Model Code of Judicial Conduct. When a statutory scheme is patterned after a model code, judges should draw upon available persuasive authority from other jurisdictions that have interpreted the model code. *See e.g. Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209, 1212 (Colo. 2008) ("When a Colorado statute is patterned after a model code, we may draw upon available persuasive authority in reaching our decision."); *West v. Roberts*, 143 P.3d 1037, 1041 (Colo. 2006) (same); *Szaloczi v. John R. Behrmann Revocable Tr.*, 90 P.3d 835, 838–39 (Colo. 2004) (same).

I.     **Judge Kiesnowski's active representation of his brother-in-law in a criminal interrogation violated Rule 3.10's prohibition against "serving as a family member's lawyer in any forum."**

Canon Rule 3.10 reads as follows:

> A judge shall not practice law except as permitted by law or this Code. A judge may act pro se but should not defend himself or herself when sued in an official capacity. The judge may, without compensation, give legal advice to and draft or review documents for a member of the judge's family, but is prohibited from serving as the family member's lawyer in any forum.

Here, Judge Kiesnowski undisputedly acted as his brother-in-law's attorney. Judge Kiesnowski admitted, during the recorded interrogation, that he was acting as counsel. He

-4-

ROP000022

also admitted to this fact in his deposition. Moreover, his conduct during the interrogation supports these admissions. For example, Judge Kiesnowski stated that his brother-in-law would need to "wait for me to tell him to answer" after each question. On one occasion, he told his brother-in-law how to answer a question when he said, "You're answer is you do not recall." Judge Kiesnowski stopped the interrogation at one point to confer privately with his brother-in-law. He asserted his brother-in-law's Fourth Amendment rights when he refused to agree to a consensual search of the brother-in-law's phone, instead insisting that a warrant be obtained. Ultimately, he invoked his brother-in-law's Fifth Amendment right against self-incrimination when he stopped the interrogation when the brother-in-law was confronted with allegations that he had strangled his wife and assaulted her son.

Despite the above, Judge Kiesnowski claims he did not violate Rule 3.10 because his representation of his brother-in-law did not take place in a formal adjudicatory setting, such as a court room. More specifically, Judge Kiesnowski claims that the word "forum" in the prohibition against representing a family member "in any forum" limits the prohibited practice of law only to settings contemplated by the definition of "forum" in Black's Law Dictionary. Black's Law Dictionary defines "forum" as follows:

> (1) A public place, especially one devoted to assembly or debate; (2) A court or other judicial body; a place of jurisdiction. *See* Exhibit B.

Judge Kiesnowski argues that, since the hospital room in which the interrogation here took place is not a public place devoted to assembly or debate, or a court or other judicial body, his practice of law in this setting was permitted by Rule 3.10.

ROP000023

But Judge Kiesnowski's arguments fail for the following two reasons:

First, the rules of statutory construction dictate an interpretation of the rule that is plainly opposite from Kiewsnowski's interpretation.[1] A court's primary purpose in construing a statute or rule is "to ascertain and give effect to the legislature's intent." *Linnebur v. People*, 2020 CO 79M, ¶ 9. Courts accept the intent of the drafters of a uniform act, such as the Model Code of Judicial Conduct, as the legislature's intent when it adopts that uniform act. *Giguere v. SJS Family Enterprises, Ltd.*, 155 P.3d 462 (Colo. App. 2006). To ascertain the legislature's intent, "we look first to the language of the statute, giving its words and phrases their plain and ordinary meanings." *Id.* "If the plain language of the statute demonstrates a clear legislative intent, we look no further in conducting our analysis." *Id.* If, and only if, "the language is ambiguous – that is, if it is reasonably susceptible of multiple interpretations – then we may consider other aids to statutory construction. *Id.*

Here, the language of the rule, read as a whole, yields only one reasonable interpretation, which is this. Rule 3.10 prohibits judges from practicing law, unless it is explicitly permitted by law. The most obvious exception permitted by law is the rule that part-time judges may still practice law. C.R. S. 13-6-204(2). Rule 3.10 does, however, permit judges to give free and informal advice to family members, such as by drafting or editing documents in a behind-the-scenes manner.[2] But the drafters of the rule intentionally limited

---

[1] *People v. G.S.*, 2018 CO 31, ¶ 32 holds that the standard principles of statutory construction apply to the interpretation of court rules.

[2] The New York Advisory Committee on Judicial Ethics Opinion No. 92-118 (attached as Exhibit C), interpreting the previous version of Rule 3.10, is very similar in language and intent to the current rule. The Committee held that a judge may give "informal,

-6-

ROP000024

a judge's permissible advice to informal, private settings by explicitly stating that a judge may never act as a family member's lawyer "in *any* forum." *See* Rule 3.10 (emphasis added). The operative word here is "any," not "forum." In other words, a judge may not act as counsel to a family member in "any" forum, whether that forum is public or private. Thus, the word "any" here essentially turns "forum" into a synonym for the word "setting."

Any other interpretation – such as Kiesnowski's – yields an illogical and absurd result. For example, Judge Kiesnowski's interpretation of Rule 3.10 – i.e. prohibiting the representation of family member's only in places of public assembly or in a court of jurisdiction – would bar him from acting as a family member's counsel in a formal "forum," such as a court. But it would permit him to act as a family member's counsel in a private arbitration held, for example, in a conference room at a hotel. This exceedingly narrow interpretation of Rule 3.10 is illogical, and it yields the absurd result that a judge may act as a litigator for his family in arbitration but not in court. *See Educhildren LLC v. Cnty. of Douglas Bd. of Equalization*, 2023 CO 29, ¶ 27 (We must "avoid constructions that would yield illogical or absurd results."). Judge Kiesnowski's interpretation also ignores the effect of the word "any" preceding the word "forum." *See Ceja v. Lemire*, 154 P.3d 1064, 1066 (Colo. 2007) ("If courts can give effect to the ordinary meaning of words used by the legislature, the statute should be construed as written, *giving full effect to the words chosen*, as it is presumed

---

uncompensated legal advice" to a family member as long as "there exists no attorney-client relationship."

-7-

ROP000025

that the General Assembly meant what it clearly said.").[3] Here, the only way to give full effect to the word "any" preceding "forum" is to interpret "any forum" to mean that a judge may not act as a lawyer for a family member in any setting, whether public or private.

Given the above, the plain and ordinary language or Rule 3.10 yields just one reasonable interpretation of the rule. There is no ambiguity, so resorting to other levels and rules of statutory interpretation is not necessary or permissible. As such, Judge Kiesnowski's reliance on the definition of the word "forum" in Black's Law Dictionary is not permitted.

The <u>second</u> reason Judge Kiesnowski's interpretation of Rule 3.10 fails is because it flies in the face of persuasive authority that has considered and rejected the exact same argument that Kiesnowski makes here and with respect to the exact same model rule. In Arizona's Judicial Ethics Advisory Opinion No. 2010-06 (attached as Exhibit D), the Advisory Committee held that a judge could not represent his spouse in negotiations with an insurance company related to an injury the spouse sustained in a car accident. The Committee held that "had the drafters of the canon and [Rule 3.10] intended that 'forum' be restricted to a courthouse context, they would have so stated, and the Reporters' Notes would have had no need to engage in the discussion of 'informal setting' and the other matters set out therein. The rule would have been a bright line one." This opinion is well-reasoned and thorough. It discusses the previous version of Rule 3.10 and how it changed to the current version, and it discusses as well how the primary concern animating Rule 3.10

---

[3] *See also State v. Nieto*, 993 P.2d 493, 500 (Colo. 2000) (Courts should give "full effect" to the words chosen by the legislature to be included in a statute or rule).

ROP000026

was that judges who seek to formally act as counsel for a family member might appear to have an unfair advantage by virtue of their judicial status. Given this rationale for the rule, it is not surprising thus that Judge Kiesnowski's conduct here (as discussed more fully below) raises serious concerns about abuse of his judicial status.

In sum, the plain meaning of Rule 3.10 prohibits exactly what happened here. Judge Kiesnowski did not merely offer free, informal legal advice to a family member in a behind-the-scenes manner. Instead, he formally acted as his brother-in-law's legal counsel during a recorded interrogation of the brother-in-law, who was a suspect in a felony assault case. As such, this tribunal should find that clear and convincing evidence exists that Judge Kiesnowski violated Canon Rule 3.10.

II.     **Judge Kiesnowski abused the prestige of judicial office and thereby violated Canon Rule 1.3 when he tried to influence whether criminal charges were filed against his brother-in-law by speaking to the DA's investigator about the brother-in-law's good character and repeatedly attacking the credibility of the complaining witness.**

Canon Rule 1.3 reads as follows:

> A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so.

Comment 1 to the rule provides a concrete example of how a judge may improperly use the prestige of office, i.e. by alluding to his or her judicial status to gain favorable treatment for himself or herself or others in encounters with traffic officers.

Case law from around the country is replete with analogous examples of judges who have been disciplined for improperly using their status to try to influence a legal matter. For

ROP000027

example, a judge in Arizona was publicly disciplined for trying to help his niece by calling a psychologist who had been appointed to evaluate the niece's child custody dispute in New York. The judge, while repeatedly referencing his judicial experience, tried to influence the psychologist's custody recommendation. *See* Exhibit E. A judge in Texas was publicly disciplined for trying to help his electrician in a dispute with a general contractor who owed the electrician money. Though there was not yet litigation between the parties, the judge called the general contractor on behalf of the electrician, identified himself as a judge, and said, "It would be best for him to pay the electrician to avoid the cost associated with going to court." *See* Exhibit F. Another judge in Texas was publicly disciplined for calling a juvenile detention facility, identifying himself as a judge, and trying to get his friend's daughter, who had been arrested for shoplifting, released early so she need to spend the night incarcerated. *In re Sharp,* 480 S.W.3d 829 (Tex. 2013). A judge in New Mexico was publicly disciplined when the judge's stepson was arrested for failure to pay child support, and the judge called the presiding judge in the child support action to vouch for his stepson's character. Specifically, the judge said his stepson was not a flight risk and was deserving of a bond reduction. *In re Naranjo,* 303 P.3d 849 (N.M. 2013). Finally, a judge in Mississippi was publicly disciplined merely for attending a meeting between a bondsman (who was the judge's friend) and the local sheriff at which the bondsman tried to convince the sheriff to lift a suspension on his bonding license. Though the judge said he was simply there for "moral support," he was disciplined because his presence was an overt act designed to advance the

-10-

ROP000028

private interests of the bondsman. *Mississippi Com'n on Judicial Performance v. Thompson,* 169 So.3d 857 (Miss. 2015).

Here, Judge Kiesnowski's conduct is closely analogous to the sort of conduct discussed above which has been publicly disciplined around the country because it was deemed to misuse the prestige of judicial office.

First, Judge Kiesnowski made it clear to Investigator Huston that he was a judge. In his first recorded call with Investigator Huston on June 1, 2023, he identified himself as a District Court judge in the 17th Judicial District. In his second recorded call with Investigator Huston later that same day, he said, "This is Judge Kiesnowski," when Investigator Huston answered the phone. In neither of these calls was it relevant for Kiesnowski to identify himself as a judge, which creates a reasonable inference that Kiesnowski wanted Investigator Huston to be aware of his status as a judge.

Second, with Kiesnowski's status as a judge well established, Kiesnowski then tried to advance the personal interests of his brother-in-law throughout the brother-in-law's interrogation. Judge Kiesnowski vouched for the brother-in-law's good character when he said, "He's a hard-working guy." Then Judge Kiesnowski effectively called the alleged victim a liar when he made the following statements:

- "She is savvy and knows if she is labelled a crime victim, she gets to stay [in the country]."[4]

- "She is a total disaster, and we're going to give you a list of people who can corroborate."

---

[4] It appears the alleged victim in the case is not in the country legally.

-11-

ROP000029

- "[My brother-in-law] has videos. She has hit him and split his lip. He has a video."

- "I've seen it . . . I saw her with her phone hit him in the face."

- "She repeatedly accuses him of having multiple affairs."

- "She has made statements that she will self-inflict injury and say that he did it."

- "Please know how erratic her behavior is."

Importantly, it is significant here that Judge Kiesnowski made the above comments to Investigator Jeff Huston, who is the lead investigator for the 13ᵗʰ Judicial District Attorney's Office, which office would be making the decision about whether or not to charge Judge Kiesnowski's brother-in-law with a crime. Under these circumstances, the evidence is strong that Judge Kiesnowski violated Canon Rule 1.3 by abusing the prestige of judicial office to advance the personal interests of his brother-in-law.

Despite the above, Judge Kiesnowski maintains that he did not violate Rule 1.3 because, in making the above statements, he was not "testifying" as a character witness. He makes this argument because Comment 1 to Canon Rule 3.3 (which bars a judge from voluntarily testifying as a character witness) states that "A judge who, without being subpoenaed, testifies as a character witness abuses the prestige of judicial office" in violation of Rule 1.3. Judge Kiesnowski argues that to "testify" as a character witness, a judge must be under oath, and since he was not under oath during his brother-in-law's interrogation, he did not "testify" as a character witness.

But Judge Kiesnowski's argument here fails for two reasons.

-12-

ROP000030

First, the argument is fundamentally misleading because the People do not need to prove a violation of Rule 3.3 (barring character witness testimony) in order to prove a violation of Rule 1.3 (abuse of the prestige of office). Rule 1.3, on its face, says nothing about a judge testifying as a character witness. And, as the cases discussed above indicate, a judge can easily abuse the prestige of office to advance the interests of another without formally testifying as a character witness.

The Annotation to Rule 3.3 of the Model Code of Judicial Conduct explains the purpose of Comment 1 to the rule. *See* Exhibit G. Comment 1, upon which Judge Kiesnowski relies, exists only to highlight the rationale for Rule 3.3. The rationale for Rule 3.3 (barring judges from testifying as a character witness) is that, if a judge testifies as a character witness without being subpoenaed, he or she abuses the prestige of judicial office. Thus, a violation of Rule 3.3 (by testifying as a character witness) is just one of many possible ways of violating Rule 1.3 (abusing the prestige of judicial office). It is not the o*nly* way, as suggested by Kiesnowski's argument.

Second, even if the People did have to prove that Judge Kiesnowski violated Rule 3.3 (by acting as a character witness) in order to prove that he violated Rule 1.3 (by abusing the status of his judicial office), Kiesnowski's argument that one can only violate Rule 3.3 by giving "testimony" under oath is simply incorrect. Again, the commentary to Rule 3.3 of the Model Code is illuminating. It discusses how the current version of the rule was changed from the prior version such that a judge shall not offer character testimony in adjudicatory proceedings (i.e. the prior rule) *and* now shall also not "otherwise vouch for the character of

-13-

ROP000031

a person in a legal proceeding." *See* Exhibit H (full text of Rule 3.3). The commentary to the rule explicitly states that the new prohibition against "otherwise vouching for the character of a person in a legal proceeding" was added "in recognition of the fact that *under oath* is not the only mode in which judges might abuse the prestige of office when the character of a person is at issue in a legal proceeding." *See* Exhibit G (emphasis added). Thus, Kiesnowski's argument that sworn testimony is necessary to violate Rule 3.3 is plainly contradicted by the commentary to the model rule. And the commentary to the model rule makes it clear that the sort of character-based statements offered by Kiesnowski in the formal, recorded interrogation of his brother-in-law are exactly the sort of character-based statements prohibited by Rule 3.3, and which, if made, also violate Rule 1.3.

In sum, regardless of whether Judge Kiesnowski's character assassination of his brother-in-law's accuser violates the formal requirements of Rule 3.3 (barring character testimony), the point here is that the commentary to Rule 3.3 is highly persuasive authority that the sort of character-based comments Judge Kiesnowski made here are exactly the sort of comments that a judge should avoid making because they abuse the prestige of judicial office and, thus, violate Rule 1.3.

For the foregoing reasons, this tribunal should find by clear and convincing evidence that Judge Kiesnowski violated Rule 1.3 because his above referenced comments to the DA's investigator abused the prestige of judicial office to advance the interests of Kiesnowski's brother-in-law. Alternatively, this tribunal should find that Judge Kiesnowski's character-based comments were either exactly, or highly analogous to, the sort of character-based

-14-

ROP000032

statements prohibited by Rule 3.3. As such, even though the comments were not made under

oath, by making them, Judge Kiesnowski violated Rule 1.3 pursuant to Comment 1 of Rule

3.3.

III.    **Judge Kiesnowski violated Canon Rule 1.2 by creating an appearance of impropriety (a) when he acted as counsel for his brother-in-law during a criminal interrogation, and (b) when he tried to influence whether charges were filed against the brother-in-law by speaking to the DA's investigator about the brother-in-law's good character and repeatedly attacking the credibility of the complaining witness.**

Canon Rule 1.2 reads as follows:

> A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

Comment 1 to the Rules states: "Public confidence in the judiciary is eroded by

improper conduct and conduct that creates the appearance of impropriety. This principle

applies to both the professional *and personal* conduct of a judge." (emphasis added).

Comment 2 to the rule states: "A judge should expect to be the subject of public scrutiny that

might be viewed as burdensome if applied to other citizens." The point is twofold -- that

judges are held to a higher standard of conduct than the ordinary person, and this principle

applies to both their professional and their personal lives.

Here, Judge Kiesnowski's conduct violated Canon Rule 1.2 in three different ways.

First, his conduct compromised, or at the very least, *appeared to compromise*, the

-15-

ROP000033

independence and impartiality of the judiciary.[5] Judge Kiesnowski inserted himself into a high-stakes criminal interrogation of his brother-in-law, who was a suspect in a felony assault case. He played a major role in the interrogation, actively conducting himself as legal counsel to his brother-in-law. And he embarked upon a mission to assassinate the character of his brother-in-law's accuser in an attempt to influence the DA investigator's charging decision. This was the opposite of judicial independence and impartiality. Thus, it violated Canon Rule 1.2.

Second, Rule 1.2 dictates that "actual impropriety" violates the rule. Comment 5 to the rule states: "Actual improprieties include violations of law, court rules or provisions of this Code." Thus, if this tribunal finds that Judge Kiesnowski violated either Canon Rule 1.3 or 3.10 (discussed above), it must necessarily find that he committed actual impropriety and thereby violated Rule 1.2.

Finally, Judge Kiesnowski violated Rule 1.2 because his conduct created an "appearance of impropriety." Comment 5 to the rule states: "The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." The "appearance of impropriety" standard is an objective one. *See e.g. Inquiry Concerning a Judge,* 822 P.2d 1333 (Alaska 1991) (test is whether a judge fails "to use reasonable care to prevent objectively

---

[5] Comment 3 to Rule 1.2 states: "Conduct that compromises *or appears to compromise* the independence, integrity, and impartiality of a judge undermines public confidence in the judiciary." (emphasis added).

-16-

ROP000034

reasonable person from believing an impropriety was afoot"; [t]he objectively reasonable person is not a well-trained lawyer or a highly sophisticated observer of public affairs. Neither is this person a cynic skeptical of the government and the courts. Moreover, an objectively reasonable person is not necessarily one who is informed of every conceivably relevant fact. He or she is the average person encountered in society.")

Here, Judge Kiesnowski's conduct would create in the mind of an ordinary and reasonably objective citizen the "perception" that Judge Kiesnowski was not independent or impartial (i.e. the very touchstones of being an acceptable judge). His insertion of himself into such a serious case and in such a major way, not only *would* raise eyebrows, it actually did, which is why a complaint was filed. Moreover, his attempt to influence the charging decision by assassinating the alleged victim's character to the DA's lead investigator would cause an ordinary and reasonable person to "perceive" that the judge was not independent or impartial. As such, Judge Kiesnowski's conduct created an appearance of impropriety and thereby violated Rule 1.2.

Despite the above, Judge Kiesnowski claims that he did not violate Rule 1.2 because his comments bolstering his brother-in-law's character and attacking the accuser's were not intended to either influence the charging decision or to diminish the credibility of the alleged victim. Judge Kiesnowski's deposition testimony on this point was that he was merely "offering information" to Investigator Huston, without any intent attached.

But Kiesnowski's argument here fails for two reasons.

-17-

ROP000035

First, because the standard for determining the appearance of impropriety is objective, a judge's own perception of his or her motivation behind challenged conduct is irrelevant to the analysis. *See e.g. People for Ethical Treatment of Animals v. Bobby Berosini, Ltd., 894 P.2d 337* (Nev. 1995) *overruled in part on other grounds by Towbin Dodge, LLC v. Dist. Ct.,* 112 P.3d 1063 (2005) (judge's subjective impartiality irrelevant); *In re Case of Snow,* 674 A.2d 573 (N.H. 1996) ("There is no intent requirement in these Canons. In fact, it is practically impossible to impose a mens rea element on the 'appearance of impropriety' standard."); *In re Larsen,* 616 A.2d 529 (Pa. 1992) (judge's conduct warranted "disciplinary action despite the absence of an improper motive because the conduct by itself raised an appearance of impropriety, which could undermine public confidence in our judiciary.").

Second, it is simply disingenuous for Judge Kiesnowski to claim that his comments bolstering his brother-in-law's character and attacking the accuser's were not intended to either influence the charging decision or to diminish the credibility of the alleged victim. Judge Kiesnowski has been a lawyer for over thirty years. He's been a judge for nearly 13 years. He estimates that he has presided over approximately 100 criminal trials. It is not believable that he was simply "offering information" without any intent attached when he said to the DA's lead investigator things about the alleged victim, such as: "She is savvy and knows if she is labelled a crime victim, she gets to stay [in the country]." Or: "She has made statements that she will self-inflict injury and say that he did it."

-18-

ROP000036

For the foregoing reasons, this tribunal should reject Judge Kiesnowski's arguments in defense of his conduct and find by clear and convincing evidence that he violated Rule 1.2.

IV.    **Judge Kiesnowski violated Canon Rule 1.1  by virtue of violating Canon Rules 1.2, 1.3, and 3.10.**

Can Rule 1.1 reads as follows:

> A judge shall comply with the law, including the Code of Judicial Conduct.

Here, as discussed above, Judge Kiesnowski violated several provisions of the Code. By doing so, he necessarily also violated Rule 1.1. Therefore, this tribunal should find by clear and convincing evidence that Judge Kiesnowski violated Rule 1.1.

## RECOMMENDED DISCIPLINE

When evaluating the appropriateness of judicial disciplinary sanctions in general, jurisdictions nationally apply the following list of factors recognized in *Matter of Deming*, 736 P.2d 639, 659 (Wash. 1987):

*(a) whether the misconduct is an isolated instance or evidences a pattern of conduct;*

Judge Kiesnowski's misconduct is not isolated. It is instead a pattern. A review is his private censure (Exhibit A) reveals that for years he abused his status to harass, intimidate and retaliate against a judicial assistant who he believed gossiped about his extramarital affair with a subordinate judicial department employee. After being disciplined for this misconduct and being forced to resign, he nevertheless, while still on the bench and before the effective date of his resignation, engaged in the misconduct that is the subject of this case.

-19-

ROP000037

*(b) the nature, extent and frequency of occurrence of the acts of misconduct;*

As noted above, Judge Kiesnowski's misconduct, i.e. the general abuse of the status of judicial office, has been a pattern for years.

*(c) whether the misconduct occurred in or out of the courtroom;*

Judge Kiesnowski's prior and current misconduct did not occur in the courtroom.

*(d) whether the misconduct occurred in the judge's official capacity or in his private life;*

Judge Kiesnowski's prior misconduct as detailed in his private censure (Exhibit A) occurred in his official capacity as a judge. The current misconduct occurred in his private capacity.

*(e) whether the judge has acknowledged or recognized that the acts occurred;*

Judge Kiesnowski acknowledged his prior misconduct by agreeing to a private censure, which required his resignation. He has not, however, acknowledged any misconduct in the present case, which is a formal hearing on the merits is scheduled.

*(f) whether the judge has evidenced an effort to change or modify his conduct;*

Judge Kiesnowski has not evidenced any effort to change or modify his pattern of abusing the status of judicial office, as shown by the fact that just three months after being disciplined and being forced to resign, he engaged in the same general form of misconduct, i.e. abuse of the prestige of judicial office.

*(g) the length of service on the bench;*

Judge Kiesnowski served as a District Court Judge for approximately 12.5 years, i.e. from 2011 to June of 2023.

-20-

*(h) whether there have been prior complaints about this judge;*

There have been prior complaints. See Exhibit A.

*(i)  the effect the misconduct has upon the integrity of and respect for the judiciary;*

Judge Kiesnowski's prior and current misconduct is exactly the sort of behavior that erodes public confidence in the judiciary. The narrative is essentially this: a person in power abuses his status/power to harass, intimidate, and retaliate against his perceived enemies (i.e. the prior misconduct). Or he uses his status/power/influence to try to benefit those close to him, like family members (i.e. the current misconduct). This sort of narrative is extremely damaging to the public's perception of the integrity of the judiciary.

*(j) the extent to which the judge exploited his position to satisfy his personal desires.*

In Judge Kiesnowski's prior disciplinary case, he exploited his position as a judge to retaliate against a subordinate who he believed had gossiped about his own misconduct. He tried to make this individual's work life intolerable. He effectively got her demoted.  And he even tried to get her fired once she was reassigned to be a different judge's judicial assistant. All of this was to exact a personal vendetta against a person with less power and influence who Judge Kiesnowski perceived had wronged him. In the present case, Judge Kiesnowski exploited his position to try to benefit his brother-in-law.

In sum, as the above factors indicate, the misconduct here is serious and persistent. It warrants public censure. Anything less disserves the public interest in accountability for misconduct like this. That, in turn, diminishes the public's confidence in the judiciary, the protection of which is the entire purpose of the judicial discipline process.

-21-

ROP000039

## CONCLUSION

Judging is not merely a "job." It is the privilege of dealing with society's most precious asset – justice. That is why judges are held to a higher standard of conduct than the ordinary person. And it is why the Colorado Code of Judicial Conduct applies equally to the judge's professional and personal life. Here, the present misconduct occurred in Judge Kiesnowski's private life. But that is no excuse. His behavior, combined with his prior disciplinary history, demonstrates a pattern of misconduct, and he should have known better.

This tribunal should find that Judge Kiesnowski violated Canon Rules 1.1, 1.2, 1.3, and 3.10, and it should recommend that the judge be publicly censured.

DATED:  September 1, 2023

Respectfully submitted,

*/s/ Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762
Special Counsel
Colorado Commission on Judicial Discipline

-22-

ROP000040

-23-

## CERTIFICATE OF SERVICE

I certify that on September 1, 2023, a true and correct copy of the foregoing BRIEF was filed with the Commission and served via e-mail upon the following persons:

Counsel for Respondent:

Mr. Craig L. Truman, Atty. Reg. # 5331
Craig L. Truman, P.C.
455 N. Sherman St., Ste. 310
Denver, CO 80203

By:  */s/ Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762

ROP000041

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>Phone Number: 303-457-5131 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>and<br><br>Robert W. Keisnowski, A Judge of the Adams County District Court,<br><br>Respondent. | **RECEIVED**<br><br>03/14/2023<br><br>Colorado Commission on Judicial Discipline<br><br><br>▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Wash, esq.<br>Special Counsel<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:<br>Atty. Reg. # 33762 | CCJD Case No.: 21-121 |
| **STIPULATION FOR PRIVATE CENSURE** ||

## INTRODUCTION

This case is currently in formal proceedings with a disciplinary hearing on the merits scheduled for March 27-30, 2023. Pursuant to this stipulation, the parties have agreed to resolve this case as follows. The Commission will dismiss the formal proceedings against Judge Kiesnowski. In exchange, Judge Kiesnowski will announce his retirement from the bench on

-1-

Exhibit
A

ROP000042

March 14, 2023 to become effective July 1, 2023. Judge Kiesnowski also agrees to this private

censure in which he admits to several violations of the Code of Judicial Conduct as detailed below.

## SUMMARY OF PRINCIPAL ALLEGATIONS

Judge Kiesnowski harassed and retaliated against his judicial assistant, Emily Betz, based on

his belief that Ms. Betz (1) reported his judicial misconduct to other judges and court staff, and (2)

campaigned against his retention via Facebook posts.

## STIPULATED FACTS

1.  Between 2011 and 2016, Emily Betz worked for Judge Kiesnowski as the only judicial

    assistant in Judge Kiesnowski's division.

2.  Prior to being assigned to Judge Kiesnowski's division, Ms. Betz had worked for the

    Colorado Judicial Department for approximately 4 years.

3.  In the Spring of 2016, Ms. Betz noticed a changed dynamic between Judge Kiesnowski and

    one of Ms. Betz's supervisors, Maya Korbe. Specifically, Ms. Korbe began spending an

    increasing amount of time in Judge Kiesnowski's courtroom and in his chambers.

4.  The increased presence of a supervisor in Judge Kiesnowski's courtroom and division

    created apprehension that Ms. Betz was being scrutinized for her work performance.

    Simultaneously, suspicions began developing around the courthouse that Judge Kiesnowski

    and Ms. Korbe (who were both separately married at the time) were having an affair.[1]

5.  The suspicions of an affair were reinforced by other Judicial employees and law

    enforcement sharing stories of seeing Ms. Korbe in Judge Kiesnowski's car, Ms. Korbe

    ducking down in the car when Judicial employees passed, Judge Kiesnowski and Ms.

---

[1] Ms. Korbe later obtained a divorce from her husband on July 21, 2016.  Judge Kiesnowski's
divorce became final on April 20, 2018. Ms. Korbe and Judge Kiesnowski would later marry each
other.

-2-

ROP000043

Korbe arriving to work together, and Judge Kiesnowski's vehicle being parked overnight at Ms. Korbe's apartment.

6. During the summer of 2016, Judge Kiesnowski became increasingly frustrated about the rumors related to the alleged affair. Specifically, he came to believe that Ms. Betz was gossiping about the alleged affair to other judges and court staff and thereby contributing to the spread of rumors.

7. In August of 2016, Judge Kiesnowski and Ms. Korbe met with then-Chief Judge Patrick Murphy to provide notice of their romantic relationship, as required by Chief Justice Directive 08-06, Attachment F (2013). But Chief Judge Murphy did not require either Judge Kiesnowski's or Ms. Korbe's resignation or transfer to another jurisdiction, as required by CJD 08-06.[2] Neither did Ms. Korbe or Judge Kiesnowski voluntarily resign or transfer to another jurisdiction as is required by CJD 08-06.

8. On September 1, 2016, Judge Kiesnowski contacted Ben Stough (Ms. Betz's direct supervisor). Because of Judge Kiesnowski's belief that Ms. Betz was gossiping about him, he provided to Mr. Stough a document titled "Restated Terms and Conditions of Emily Betz's Employment as Judge Kiesnowski's Division Clerk."

9. Via the Terms and Conditions document, Judge Kiesnowski sought to alter the terms and conditions of Judicial Assistant 1's employment. In relevant part, the document stated:

---

[2] In his 2018 report to SCAO's HR Division, Mr. Stough describes the decision not to require Ms. Korbe's resignation or reassignment as occurring due to assurances made by Judge Kiesnowski and Ms. Korbe: "Based on assurances that their workplace conduct would remain professional, no immediate action was taken." Chief Judge Murphy retired July 15, 2019. Consequently, the Commission has no jurisdiction to address the violations of the Code arising from his failure to enforce CJD 08-06's prohibitions against a judge and employee involved in a relationship working in the same judicial district. Colo. RJD 4(a)(1).

-3-

"Restated Terms and Conditions of [Judicial Assistant 1's]
Employment as Judge Kiesnowski's Division Clerk:"

Below are, in part, the restated terms and conditions of [Judicial
Assistant 1's] Employment as Judge Kiesnowski's division clerk.
Violation of any of these restated terms and conditions of
employment shall, pursuant to the State's Personnel Rules, subject
[Judicial Assistant 1] to disciplinary action including, but not limited
to, reassignment and/or termination.

Nothing contained herein shall be construed as an employment
contract or any contract right to continued employment.
At all times, [Judicial Assistant 1] shall abide by the following:
(1) [Judicial Assistant 1] shall not use the State's internet system for
any purpose other than to discharge and perform her functions as
division clerk. Under no circumstances shall [Judicial Assistant 1]
use the State's internet system for personal purposes, whether for
herself or any other person, and regardless of whether she is caught
up with all of work duties and functions. Under no circumstances
shall [Judicial Assistant 1] "surf" the internet while court is in session
and shall not otherwise use the State's internet system unless
expressly authorized and directed to do so by Judge Kiesnowski.
Failure to abide by any provision of this paragraph shall, pursuant to
the State's Personnel Rules, subject [Judicial Assistant 1] to
disciplinary action, including, but not limited to, reassignment
and/or termination.

(2) [Judicial Assistant 1] shall not use the State's electronic mail
("email") system for any purpose other than to discharge and
perform her functions as division clerk. Under no circumstances
shall [Judicial Assistant 1] use email for personal purposes, whether
for herself or any other person.  understands and agrees that any
email she sends or receives is subject to being accessed and audited
by administration at any time and without prior notice. Failure to
abide by any provision of this paragraph shall, pursuant to the State's
Personnel Rules, subject [Judicial Assistant 1] to disciplinary action,
including, but not limited to, reassignment and/or termination.

(3) [Judicial Assistant 1] shall not use the State's instant messaging
system ("IM") for any purpose other than to discharge and perform
her functions as division clerk. Under no circumstances shall
[Judicial Assistant 1] use the State's IM system for personal
purposes, whether for herself or any other person. By way of
example and not limitation, [Judicial Assistant 1] shall not use the
State's IM system to even invite a co-worker to lunch or to respond
to any non-business purpose IM that has been sent to her. [Judicial

-4-

ROP000045

Assistant 1] understands and agrees that any **IM** she sends or receives is subject to being accessed and audited by administration at any time and without prior notice. Failure to abide by any provision of this paragraph shall, pursuant to the State's Personnel Rules, subject [Judicial Assistant 1] to disciplinary action, including, but not limited to, reassignment and/or termination.

(4) [Judicial Assistant 1] shall not gossip about, or disparage in any way, any judicial officer or courthouse employee by any means or in any manner. By way of example and not limitation, should [Judicial Assistant 1] make, utter, or post any disparaging comment or remark about any judicial officer or courthouse employee while at work or on her personal time on social media, whether explicit or implicit, she shall, pursuant to the State's Personnel Rules, be subject to disciplinary action, including, but not limited to, reassignment and/or termination.

(5) [Judicial Assistant 1] expressly understands and agrees that the workday begins at 8:00 a.m. and ends at 5:00 p.m. Therefore, [Judicial Assistant 1] shall be at her desk no later than 8:00 a.m. each workday and shall, with the exception of authorized breaks and lunch, not leave work until 5:00 p.m. Leaving work, even five minutes early without Judge Kiesnowski's approval, is unacceptable. Further, [Judicial Assistant 1] expressly understands and agrees that all leave requests shall first be authorized by Judge Kiesnowski and ultimately be approved by Ben Stough or his successor or his designee. Under no circumstances, without the express written approval of Judge Kiesnowski or Ben Stough or his successor or designee, shall [Judicial Assistant 1] submit leave requests to Maya Korbe. Failure to abide by any provision of this paragraph shall, pursuant to the State's Personnel Rules, subject [Judicial Assistant 1] to disciplinary action, including, but not limited to, reassignment and/or termination.

(6) In the event that [Judicial Assistant 1] has completed or is otherwise "caught up" with all of her Division G duties and/or any task assigned to her by any judicial officer and/or supervisory personnel, she may not visit with or observe court in any other division or otherwise "socialize" with courthouse personnel without the express, written approval of Judge Kiesnowski. Any such requests shall first be submitted to Judge Kiesnowski by email for his approval, which request shall be approved or denied by Judge Kiesnowski in his sole and absolute discretion. Failure to abide by any provision of this paragraph shall, pursuant to the State's Personnel Rules, subject [Judicial Assistant 1] to disciplinary action, including, but not limited to, reassignment and/or termination.

-5-

ROP000046

(7) [Judicial Assistant 1] shall, at all times, maintain a professional demeanor and treat all judicial officers, including Judge Kiesnowski, and courthouse personnel with courtesy, decency, and respect, and shall, like other courthouse employees, attend to her personal affairs on her own time, not the State's time. Further, under no circumstances without the express approval of Judge Kiesnowski, shall [Judicial Assistant 1] refer to Judge Kiesnowski as "Bob." Failure to abide by any provision of this paragraph shall, pursuant to the State's Personnel Rules, subject [Judicial Assistant 1] to disciplinary action, including, but not limited to, reassignment and/or termination.

(8) With the exception of authorized breaks and lunch, [Judicial Assistant 1] shall not use or monitor her personal cell phone during the workday. In those instances, where [Judicial Assistant 1] is permitted to use and/or monitor her personal cell phone, under no circumstances shall [Judicial Assistant 1] gossip about, or disparage in any way, any judicial officer or courthouse employee by any means or in any manner. Failure to abide by any provision of this paragraph shall, pursuant to the State's Personnel Rules, subject [Judicial Assistant 1] to disciplinary action, including, but not limited to, reassignment and/or termination.

10. Ben Stough rejected Judge Kiesnowski's attempt to force Ms. Betz into the above restated contract. Recognizing that Judge Kiezanowski's and Ms. Betz's working relationship was too frayed to continue, Mr. Stough (with Chief Judge Murphy's approval) transferred Ms. Betz to the court's judicial assistant (CJA) pool.  Although Ms. Betz maintained her title, pay, duty location, and other working conditions, inclusion in the CJA pool was effectively a demotion from being an assigned division judicial assistant (i.e. it resulted in a loss of status and stability). For example, during Ms. Betz's time in the CJA pool, she was reassigned three times within six months.  Ms. Betz claims that she learned that Judge Kiesnowski attempted to influence/encourage other criminal judges to refuse having her in their divisions.  Ms. Betz further alleges that Mr. Stough told her that she was ultimately assigned to domestic relations divisions for her own protection.

-6-

ROP000047

11. Sometime in late 2016 or early 2017, Ms. Betz applied to work as a judicial assistant for newly appointed District Court Judge Tomee Crespin.  Judge Kiesnowski continued to retaliate against Ms. Betz by contacting Judge Crespin and encouraging her not to hire Ms. Betz.  According to now former Judge Crespin, Judge Kiesnowski told her not to hire Ms. Betz because she was not loyal, she could not be trusted, and she would talk about the judge she works with.

12. Judge Crespin hired Ms. Betz despite Judge Kiesnowski's communications to her.  Judge Crespin confirmed that, while working for her, Ms. Betz did her job competently and professionally.  Judge Crespin described Ms. Betz's job performance as "excellent" and "above average."  Judge Crespin said that, although Ms. Betz never gossiped to her about Judge Kiesnowski, she recalls Ms. Betz repeatedly stating that Judge Kiesnowski glared at her or otherwise made her feel uncomfortable during encounters on the same floor of the courthouse.

13. Judge Kiesnowski was up for a retention election in 2020.  Prior to the election, Judge Kiesnowski discovered social media/Facebook posts encouraging voters not to retain him. The social media posts were presented through a username "Silky Pete" and included the following selected postings:

    a.  "Please forgive me for bringing this up but it is not political, it is what is best for our children. Trust me that Judge Kiesnowski should NOT be retained. He has a long history of lenient sentences on child molesters";

    b.  "Please don't forget. Even Samuel L. Jackson is on board! VOTE JUDGE KIESNOWKSI OUT OF OFFICE";

    c.  "VOTE OUT JUDGE KIESNOWSKI SPREAD THE WORD";

-7-

ROP000048

d. "I need everyone to trust me on this one. He has to go. Let everyone you know in Adams and Broomfield County vote him out. WHAT IF I TOLD YOU TO VOTE JUDGE KIESNOWSKI OUT OF OFFICE";

e. "Be sure to tell your friends in Adams and Broomfield to vote Kiesnowski off the bench this November"; and

f. "VOTE OUT JUDGE KIESNOWKSI TELL YOUR FRIENDS."

14. Without verification, Judge Kiesnowski blamed Ms. Betz for the social media posts and sent several text messages to Judge Crespin, which included Judge Kiesnowski forwarding a Facebook post from his then-serving division clerk.  Judge Kiesnowski called Judge Crespin later that same night to accuse Ms. Betz of authoring the Facebook posts and demanding that Judge Crespin take action against Ms. Betz to stop further posts.

15. The investigation of the present case confirmed that the Facebook posts quoted above were authored by an Adams County Sheriff's Office Deputy without connection to Ms. Betz.

16. The People initiated formal proceedings by filing a Statement of Charges.  Through his Answer, Judge Kiesnowski disputed various factual allegations that are beyond the scope of this Stipulation.  The parties acknowledge that Judge Kiesnowski's admissions to both a factual basis and to his violations of the Code are limited to the admissions expressly stated in this Stipulation.

-8-

ROP000049

## STIPULATED RULE VIOLATIONS

### Count 1
### Canon Rule 1.1
### A Judge Shall Comply with the Law

17. Paragraphs 1-16 are incorporated herein.

18. Canon Rule 1.1 states, in relevant part: "A judge shall comply with the law, including the Code of Judicial Conduct."

19. Judge Kiesnowski violated Canon Rule 1.1 when he engaged in the conduct described herein in violation of Canon Rules 1.2, 2.3, 2.8, 2.12(C), 2.16(B), and 4.2.

20. Judge Kiesnowski further violated Canon Rule 1.1 through his prolonged non-compliance with CJD 08-06, Attachment F (2013), which provided in relevant parts:

> Where employees and/or judicial officers are married to each other, living together, or otherwise engaged in a romantic and/or sexual relationship, they shall not hold a position in which:
>
> * * *
>
> One party is a justice, judge or magistrate working within the same court or judicial district of the other party who is employed as a classified or contract employee in that court or judicial district.

### Count 2
### Canon Rule 1.2
### A Judge Shall Promote Confidence in the Judiciary

21. Paragraphs 1-16 are incorporated herein.

22. Canon Rule 1.2 states:

> A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

ROP000050

23. Comment 1 to the rule makes clear that it applies "to both the professional and personal conduct of a judge."

24. A judge's obligation to act with integrity does not end when he leaves the courthouse. *See e.g.* Section 2 of Preamble to Rules of Judicial Conduct; Rule 1.2 Comments.

25. The Colorado Code of Judicial Conduct ("the Code") further defines "integrity" as "probity, fairness, honesty, uprightness, and soundness of character." The Code recognizes "impropriety" to include: "conduct that violates the law, court rules, or provisions of this Code, and conduct that undermines a judge's independence, integrity, or impartiality.

26. Through his conduct as described above, Respondent violated Canon Rule 1.2 because he engaged in conduct that was actually improper and which created the appearance of impropriety.

<u>Count 3</u>
Canon Rule 2.3
Bias, Prejudice, Harassment

27. Paragraphs 1-16 are incorporated herein.

28. Canon Rule 2.3 provides, in relevant parts:

> (A) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.
>
> (B) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so.
>
> (C) A judge shall not engage in retaliation for reporting of misconduct under this Code or other legal authority. The duty to refrain from retaliation includes retaliation against current and former Judicial Branch personnel as well as attorneys and other members of the public.

-10-

ROP000051

29. The factual allegations described in Paragraphs 1-15 include Judge Kiesnowski engaging in various forms of retaliation and intimidation based upon his perceptions that Emily Betz (via perceived gossip) was responsible for reporting his judicial misconduct to other judges and Judicial Department staff.

30. Through his conduct as described above, Judge Kiesnowski violated Canon Rule 2.3.

<div align="center">

Count 4
Canon Rule 2.8
Demeanor

</div>

31. Paragraphs 1-16 are incorporated herein.

32. Canon Rule 2.8(B) provides:

> (B) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control.

33. Through his conduct as described above, Judge Kiesnowski violated Canon rule 2.8(B).

<div align="center">

Count 5
Canon Rule 2.12
Supervisory Duties

</div>

34. Paragraphs 1-16 are incorporated herein.

35. Canon Rule 2.12(C) provides:

> (C) A judge should practice civility by being patient, dignified, respectful, and courteous in dealings with court personnel, including chambers staff. A judge should not engage in any type of harassment of court personnel. A judge should not engage in retaliation for reporting allegations of misconduct. A judge should seek to hold court personnel who are subject to the judge's control to similar standards in their own dealings with other court personnel.

36. Through his conduct as described above, Judge Kiesnowski violated Canon rule 2.12(C).

<div align="center">-11-</div>

ROP000052

Count 6
Canon Rule 2.16
Cooperation with Disciplinary Authorities

37. Paragraphs 1-16 are incorporated herein.

38. Canon Rule 2.16(B) provides:

> (B) A judge shall not retaliate, directly or indirectly, against a person
> known or suspected to have assisted or cooperated with an
> investigation of a judge or a lawyer.

39. The factual allegations described in Paragraphs 1-15 include Judge Kiesnowski engaging in various forms of retaliation and intimidation based upon his perceptions that Emily Betz (via perceived gossip) was responsible for reporting judicial misconduct to other judges and court staff.

40. Through his conduct as described above, Judge Kiesnowski violated Canon Rule 2.16(B).

Count 7
Canon Rule 4.2
Political and Campaign Activities of a Judge Who is a Candidate for Retention

41. Paragraphs 1-16 are incorporated herein.

42. Canon Rule 4.2(A) provides, in relevant part:

> (A) A judicial candidate in a retention public election shall:
> (1) act at all times in a manner consistent with the independence,
> integrity, and impartiality of the judiciary[.]

43. As described herein, Judge Kiesnowski inappropriately communicated with Judge Crespin in an effort to intimidate and control Emily Betz in connection with Judge Kiesnowski's upcoming retention election.

44. Through his conduct as described above, Judge Kiesnowski violated Canon Rule 4.2(A).

-12-

ROP000053

## COLO. RJD 35(H) STIPULATED DISPOSITION

1. On March 14, 2023 Judge Kiesnowski will announce his retirement, effective July 1, 2023;

2. Judge Kiesnowski shall be privately censured according to Colo. RJD 35(f) based upon the factual circumstances set forth in this stipulation and Judge Kiesnowski's admitted violations of Canon Rules 1.2, 2.3, 2.8, 2.12(C), 2.16(B), and 4.2;

3. Judge Kiesnowski waives his rights to a hearing in formal proceedings and review by the Colorado Supreme Court (as otherwise allowed according to Colo. RJD 35(i) and Colo. RJD 37(d));

4. Given Judge Kiesnowski's cooperation in resolving this case by stipulation, the Commission will not seek an assessment of costs and fees under either Colo. RJD 35(g) or Colo. RJD 36(g);

5. Judge Kiesnowski agrees that he will not:  apply (a) to again become a judge under Article VI of the Colorado Constitution, (b) to participate in the Senior Judge program under § 13-4-104.5, C.R.S., or (c) to prospectively serve as a private judge appointed according to § 13-3-111. Judge Kiesnowski further agrees that he will not act as a presenter/mentor in leadership, mentoring, or training programs conducted through the Colorado Judicial Department and/or the State Court Administrator's Office;

6. The parties shall file a separate stipulation with the Colorado Supreme Court under Colo. RJD 37(e) to dismiss the formal proceedings previously initiated in this matter; and

7. As qualified according to Colo. RJD 3(d), records and information relating to this matter shall remain confidential according to Colo. Const. Art. VI, § 23(3)(g).

Stipulated and agreed to this 14th day of March, 2023.

Robert W. Kiesnowski, Respondent

Craig Truman, Counsel to Respondent
Attorney Reg. No. 5331

Jeffrey M. Walsh, Special Counsel to the Commission
Attorney Reg. No. 33762

-13-

ROP000054

-14-

Colorado Commission on Judicial Discipline

By: _____

Christopher Gregory, Executive Director
Attorney Reg. No. 37095

ROP000055

**FORUM, Black's Law Dictionary (11th ed. 2019)**

Black's Law Dictionary (11th ed. 2019), forum

FORUM

Bryan A. Garner, Editor in Chief

Preface | Guide | Legal Maxims | Bibliography

**forum** *n.* (15c)  **1.** A public place, esp. one devoted to assembly or debate. See PUBLIC FORUM; NONPUBLIC FORUM. **2.** A court or other judicial body; a place of jurisdiction. Pl. **forums, fora.**

- **neutral forum.** (1915) A forum where all parties are equal and the decision-makers are impartial and disinterested.

- **public forum.** See PUBLIC FORUM.

Westlaw. © 2019 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit
B

ROP000056

**New York Advisory Committee on Judicial Ethics**
**Opinion 92-118**

November 19, 1992

**NOTE:** Although Opinion 92-118 remains in effect, Opinion 91-05 (cited herein) was overruled to the extent it suggests that a judge may provide informal, uncompensated legal advice to <u>a friend</u> who is not a member of the judge's family (*see* 22 NYCRR 100.4[G]).

(G) Practice of Law. A full-time judge shall not practice law. Notwithstanding this prohibition, a judge may act pro se and may, without compensation, give legal advice to a member of the judge's family.

<u>Digest</u>:     A full-time judge may not represent his or her daughter at a real estate closing.

<u>Rules</u>:     Canon 5(F) of the Code of Judicial Conduct.

<u>Opinion</u>:

A full-time judge asks if the judge may represent his or her daughter, as an attorney, in her purchase of a co-op apartment, without a fee.

As Canon 5(F) of the Code of Judicial Conduct states that "a judge should not practice law," the inquiring judge may not represent his or her daughter, even though the judge is not charging a legal fee. The judge, however, may offer informal, uncompensated legal advice when there exists no attorney-client relationship. [<u>See</u> letter 91-05].

Exhibit
C

ROP000057

*Arizona Supreme Court*
*Judicial Ethics Advisory Committee*

ADVISORY OPINION 10-06
(December 21, 2010)

## Representation of Spouse in Negotiations with Insurance Company

### Issue

May a judge represent a spouse in negotiations with an insurance company?

**Answer**: No.

### Facts

A judge's spouse was injured in an automobile accident, and the judge, a former personal injury attorney, would like to represent the spouse in negotiations with the insurance company.

### Discussion

Canon 4G of the 1993 Code of Judicial Conduct allowed a judge to "give legal advice to and draft or review documents for a member of the judge's family." This limited exception to the canon prohibiting the practice of law was further restricted by the following language in the second paragraph of the related commentary:

> The code allows a judge to give legal advice to and draft legal documents for members of the judge's family, so long as the judge receives no compensation. A judge must not, however, act as an *advocate or negotiator* for a member of the judge's family in a legal matter (emphasis added).

Clearly, under the old code a judge could not act as an advocate or negotiator for a family member. The language in Rule 3.10, the corresponding section of the 2009 code, is less explicit:

> A judge may represent himself or herself and may, without compensation, give legal advice to and draft or review documents for a member of the judge's family, but is prohibited from serving as a family member's lawyer in any forum.

The words "advocate or negotiator" no longer appear in the rule or its related comment and the term "forum" is not defined.

*In re Fleischman*, 188 Ariz. 106, 933 P.2d 563 (1997), speaks definitively to this issue. The case involved a sitting judge serving as an advisor and negotiator for a third party (a non-family member) in a contractual matter. The court stated as follows:

> We find the respondent's effort and work for AEI constitute acts that are customarily performed from day to day in the ordinary practice of members of the legal profession. That they also may be performed in part or in whole by non-lawyers from time to time does not exclude them from the practice of law.

Exhibit
D

Page 1 of 2

ROP000058

> We therefore conclude that respondent did engage in the practice of law in violation of both Article 6, Section 28 of the Arizona Constitution and Canon 4G of the Arizona Code of Judicial Conduct.  Respondent's arguments to the contrary are entirely without merit.

Fleischman, 188 Ariz. at 111, 933 P.2d at 568.

Under the *Fleischman* standard, representing an individual in negotiations with an insurance carrier would constitute the practice of law. The question then becomes whether the language "in any forum" in Rule 3.1 of the 2009 code limits the reach of the prohibition against representing a family member as articulated in Canon 4G in the 1993 code. "Forum" is not defined in the relevant provisions. *See also* Ariz. Code Jud. Conduct, Scope. The definitions of "forum" vary and some *include* a court or place where disputes are heard.

The Reporters' Notes to the 2009 code provide that the rule is essentially identical to Canon 4G and was merely moved to the black letter portion of the rule. The concern of the ABA Commission remained unchanged.

> The Commission believed that the primary concern animating Rule 3.10 was that judges who undertake formally to represent another individual in a forum might appear to have an advantage by virtue of their judicial status.

Geyh and Hodes. *Reporters' Notes to the Model Code of Judicial Conduct.* ABA, 2009, 74.

The Reporters's Notes do indicate that a judge may represent a family member in a more informal setting and cites neighborhood association disputes, purely private and minor commercial matters as examples of allowed conduct. *Id.* at 75.

Had the drafters of the canon and rule intended that "forum" be restricted to a courthouse context, they would have so stated, and the Reporters' Notes would have had no need to engage in the discussion of "informal setting" and the other matters set out therein.  The rule would have been a bright line one.

**Conclusion**

The committee believes that settlement negotiations in a personal injury matter are not sufficiently informal and minor to avoid the danger "of the judge abusing the prestige of office" and an exception to the general prohibition. *Id.* A judge may not represent a family member in negotiations with an insurance carrier.

## References

Arizona Code of Judicial Conduct, Scope and Canon 4, Rule 3.10 (2009).

Charles E. Geyh and W. William Hodes. *Reporters' Notes to the Model Code of Judicial Conduct.* American Bar Association, 2009.

ROP000059

State of Arizona

COMMISSION ON JUDICIAL CONDUCT

---

Disposition of Complaint 12-263

---

Complainant:    John Catapano

Judge:    Robert Gottsfield

---

# ORDER

The complainant alleged that a superior court judge tried to bully a psychologist on behalf of a family member involved in a custody dispute in another state.

After reviewing the complaint and the judge's response as well as speaking with the psychologist, the Commission finds that Judge Gottsfield violated the Code of Judicial Conduct. Specifically, the judge sent an email and initiated a telephone conversation with the psychologist, both of which were intended to influence the outcome of his family member's custody dispute. In the course of both communications, Judge Gottsfield repeatedly referenced his judicial experience, giving at least the appearance of abusing the prestige of his judicial office, which is a violation of Rules 1.2 and 1.3 of the Code.

Accordingly, Judge Robert Gottsfield is hereby reprimanded for his conduct as described above and pursuant to Commission Rule 17(a). The record of this case, consisting of the complaints, the judge's response, and this order, shall be made public as required by Rule 9(a).

Dated: December 4, 2012.

FOR THE COMMISSION

Louis Frank Dominguez
Commission Chair

Copies of this order were mailed
to the complainant and the judges
on December 4, 2012.

*This order may not be used as a basis for disqualification of a judge.*

1

Exhibit
E

ROP000060



## BEFORE THE STATE COMMISSION
## ON JUDICIAL CONDUCT

## CJC No. 14-0823-JP

# PUBLIC REPRIMAND
# AND
# ORDER OF ADDITIONAL EDUCATION

**HONORABLE ESEQUIEL ("CHEQUE") DE LA PAZ
JUSTICE OF THE PEACE, PRECINCT 4
KINGSVILLE, KLEBERG COUNTY, TEXAS**

During its meeting on October 15-16, 2014, the State Commission on Judicial Conduct concluded a review of allegations against the Honorable Esequiel ("Cheque") De La Paz, Justice of the Peace for Precinct 4, Kingsville, Kleberg County, Texas. Judge De La Paz was advised by letter of the Commission's concerns and provided written responses. After considering the evidence before it, the Commission entered the following Findings and Conclusion:

### FINDINGS OF FACT

1. At all times relevant hereto, the Honorable Esequiel ("Cheque") De La Paz, was Justice of the Peace for Precinct 4, Kingsville, Kleberg County, Texas.

2. In March of 2014, Judge De La Paz met privately with an electrician who informed the judge that he had not been paid by the contractor for electrical work performed at a building site.

3. After meeting with the electrician, Judge De La Paz met with a Kingsville building inspector to determine if the electrician's work had been completed and whether the building inspector had issued a "green tag" at the building site, which would have permitted the contractor to turn on the electricity at the property.

4. Shortly thereafter, on or about April 3, 2014, Judge De La Paz telephoned the home of the contractor. In a conversation with the contractor's teenage son, Judge De La Paz identified himself and advised the son that his father owed money to the electrician; his father needed to pay the electrician; the judge was trying to save his father "court fees;" and the father needed to call the court about the "balance that was being claimed" by the electrician.

Exhibit
F

1

ROP000061

5. Shortly thereafter, the contractor called Judge De La Paz to discuss the electrician's claims.

6. During this call, Judge De La Paz advised the contractor that it would be "best for [him] to pay the electrician to avoid the costs associated with going to court" and insisted that the contractor should pay the electrician.

7. In addition, Judge De La Paz informed the contractor that he had already spoken to the city's building inspector and had learned that a green tag had been issued to the contractor. The judge also advised the contractor that the building inspector might need to be summoned to court to testify if the electrician filed a lawsuit against him.

8. At the time of the above-described events, there was no case pending in Judge De La Paz's court relating to the dispute between the contractor and the electrician.

9. On or about May 15, 2014, the electrician filed a lawsuit against the contractor in Judge De La Paz's court claiming that the contractor had breached the parties' contract.

10. The contractor retained an attorney and subsequently filed a counterclaim, in which he alleged that the electrician had breached the parties' contract by failing to satisfactorily perform his job. In particular, the counterclaim alleged that the contractor had been required to retain the services of another electrician to correct the defective work and to complete the job as contemplated by the parties' contract.

11. The contractor also filed a "Motion to Recuse Judge," based on Judge De La Paz's previous communications with the parties in the case, as well as with the city's building inspector. In the motion, the contractor alleged that Judge De La Paz's conduct had caused him to have "personal knowledge of disputed evidentiary facts in this case" and to develop a bias in the case in favor of the electrician.

12. Judge De La Paz agreed to recuse himself and transferred the case to another justice of the peace in the county, who held a trial on July 29, 2014.

13. Following trial, the other justice of the peace concluded that the electrician had not satisfactorily performed his work in accordance with the parties' contract, and that the contractor had incurred additional expenses in correcting the defective work performed by the electrician.

14. The other justice of the peace issued a judgment in favor of the contractor on his counterclaim, and further ordered the electrician to pay the contractor's attorney's fees.

## RELEVANT STANDARDS

1. Canon 2A of the Texas Code of Judicial Conduct provides, in relevant part: "A judge shall comply with the law ..."

2. Canon 2B of the Texas Code of Judicial Conduct provides, in relevant part: "A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge."

3. Canon 3B(2) of the Texas Code of Judicial Conduct states, in relevant part, that: "A judge should be faithful to the law and shall maintain professional competence in it."

ROP000062

**CONCLUSION**

The Commission concludes based on the facts and evidence before it that Judge De La Paz failed to comply with the law and demonstrated a lack of professional competence in the law by intervening in a private dispute between the contractor and the electrician when no case was pending in his court. Further, Judge De La Paz exceeded his authority when he conducted an independent investigation into the merits of the electrician's claims by meeting with a witness and the parties to the dispute. As a result of his independent investigation, Judge De La Paz obtained information from an extra judicial source and used that information to form an opinion that the contractor was indebted to the electrician. In all of his actions on behalf of the electrician, Judge De La Paz lent the prestige of his judicial office to advance the electrician's private interests and gave the impression that the electrician was in a special position to influence the judge. By attempting to assist the electrician in recovering payment from the contractor, Judge De La Paz abandoned his judicial role as a neutral and independent arbiter of the facts, which necessitated his recusal from the case once the matter was filed in his court. In light of the above, the Commission concludes that Judge De La Paz engaged in willful and persistent violations of Canons 2A, 2B and 3B(2) of the Texas Code of Judicial Conduct. In reaching this decision, the Commission considered as an aggravating factor the fact that it had recently issued a public sanction against Judge De La Paz for substantially similar conduct.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

In condemnation of the conduct described above that violated Canons 2A, 2B, and 3B(2) of the Texas Code of Judicial Conduct, it is the Commission's decision to issue a **PUBLIC REPRIMAND AND ORDER OF ADDITIONAL EDUCATION** to Judge Esequiel ("Cheque") De La Paz, Justice of the Peace, Precinct 4, Kingsville, Kleberg County, Texas.

Pursuant to this Order, Judge De La Paz must obtain **two (2) hours** of instruction with a mentor judge, in addition to his required judicial education in Fiscal Year 2015. In particular, the Commission desires that Judge De La Paz receive this additional instruction in the area of (1) the limits of a judge's authority to intervene in or mediate disputes that are not pending in his court; (2) avoiding the use of the prestige of judicial office to advance the private interests of the judge or others; and (3) maintaining impartiality by avoiding independent investigations into the merits of matters that may come before the court.

Judge De La Paz shall complete the additional **two (2) hours** of instruction described above within **sixty (60) days** from the date of written notification from the Commission of the assignment of a mentor. Upon receipt of such notice, it is Judge De La Paz's responsibility to contact the assigned mentor and schedule the additional education.

Upon the completion of the **two (2) hours** of instruction described above, Judge De La Paz shall sign and return the Respondent Judge Survey indicating compliance with this Order. Failure to complete, or report the completion of, the required additional education in a timely manner may result in further Commission action.

Pursuant to the authority contained in Article V, §l-a(8) of the Texas Constitution, it is ordered that the actions described above be made the subject of a **PUBLIC REPRIMAND AND ORDER OF ADDITIONAL EDUCATION** by the Commission.

3

ROP000063

The Commission has taken this action in a continuing effort to protect the public confidence in the judicial system and to assist the state's judiciary in its efforts to embody the principles and values set forth in the Texas Constitution and the Texas Code of Judicial Conduct.

Issued this the 19th day of December, 2014.

ORIGINAL SIGNED BY

_____

Honorable Steven L. Seider, Chair
State Commission on Judicial Conduct

4

ROP000064

their real property." Model Code of Judicial Conduct Rule 3.2 cmt. [3]. This is in accord with an advisory opinion of The United States Committee on Code of Conduct, which stated that judges may appear at a hearing regarding zoning or rezoning of the judge's property or for the imposition of assessments for improvements. United States Committee on Codes of Conduct, Advisory Op. 50 (1977, revised 1998).

### RULE 3.3    TESTIFYING AS A CHARACTER WITNESS

**A judge shall not testify as a character witness in a judicial, administrative, or other adjudicatory proceeding or otherwise vouch for the character of a person in a legal proceeding, except when duly summoned.**

### COMMENT

[1] A judge who, without being subpoenaed, testifies as a character witness abuses the prestige of judicial office to advance the interests of another. See Rule 1.3. Except in unusual circumstances where the demands of justice require, a judge should discourage a party from requiring the judge to testify as a character witness.

### 1990 CODE COMPARISON

Rule 3.3 originates from the last sentence of Canon 2B and the Comment is the last sentence of the Commentary to Canon 2B. Rule 3.3 substituted the phrase "except when duly summoned" for "testify voluntarily," and added the phrase "otherwise vouch for the character of a person in a legal proceeding." New language, specifying that the Rule applies in all forms of "adjudicatory proceedings," was also added as a reminder that Rule 3.3 is not limited to civil or criminal trials in courts, but applies whenever testimony is taken on a formal record. Charles G. Geyh & W. William Hodes, *Reporters' Notes to the Model Code of Judicial Conduct* 60–61 (2009).

---

### ANNOTATION

Rule 3.3 is clear in prohibiting a judge from testifying as a character witness, unless duly summoned. The commentary explains the rationale behind this prohibition. A judge who testifies as a character witness without being subpoenaed abuses the prestige of office to advance the interests of another in violation of Rule 1.3. A judge must actively discourage a party from requiring the judge to testify as a character witness, except in the unusual circumstances when the demands of justice require such testimony. Rule 3.3 also provides that a judge shall not "vouch for the character of a person in a legal proceeding." This language was added to the Code in 2007 in recognition of the fact that under oath



is not the only mode in which judges might abuse the prestige of office when the character of a person is at issue in a legal proceeding. Charles G. Geyh & W. William Hodes, *Reporters' Notes to the Model Code of Judicial Conduct* 60–61 (2009).

The 1972 Code drafters learned of numerous instances where judges were called upon to exploit the dignity and prestige of their office when asked to testify as character witnesses. In fact, some judges sought protection from the demands of being asked to testify as character witnesses. E. Wayne Thode, *Reporter's Notes to Code of Judicial Conduct* 49 (1972). As a result, the 1972 Code imposed a ban against judges voluntarily testifying as character witnesses. The Commentary to the 1972 Code, however, stated that the Canon "does not afford [the judge] a privilege against testifying in response to an official summons." 1972 Code of Judicial Conduct, Canon 2, Commentary, Paragraph 2.

Unfortunately, by the time of the 1990 Code review, it was clear that the "official summons" exception could be misused to circumvent the rule. The comment language discouraging a judge from testifying as a character witness "except in unusual circumstances" was added in response to the problem of avoiding the ban through the "friendly subpoena." Lisa Milord, *The Development of the ABA Judicial Code* 14 (1992). Although it has always been understood that judges should not encourage a party to issue a sham subpoena for what is in fact voluntary testimony, the comment to Rule 3.3 suggests that judges should actively discourage parties from seeking their testimony as character witnesses. Charles G. Geyh & W. William Hodes, *Reporters' Notes to the Model Code of Judicial Conduct* 61 (2009).

The case law and state judicial ethics opinions have followed the approach that it is improper for a judge to testify as a character witness unless necessitated by the demands of justice. *See, e.g., In re Abel*, 632 So. 2d 600 (Fla. 1994) (improper for judge to testify as character witness in any proceeding, except in response to official witness subpoena); *In re Fogan*, 646 So. 2d 191 (Fla. 1994) (rejecting argument that judge's letter to sentencing judge was not "testifying" because it was not under oath or affirmation; court noted that Canon prohibiting judge from being a character witness was broad enough to include written statements voluntarily submitted with the understanding that such statements may be used by a court); *Hatcher v. McBride*, 650 S.E.2d 104 (W. Va. 2006) (a judge who is requested to testify as a witness shall discourage the party from requiring him or her to testify; however, the judge may testify when properly summoned upon approval of the trial court and with such limitations as may be imposed by the trial court); Ky. Jud. Ethics Op. JE-104 (2004) (in the absence of a formal request from the Governor, a judge may not communicate with the Governor's office regarding a pardon, and in the absence of a formal request from the parole board, may not communicate with the board regarding a parole proceeding);

ROP000066

| West's Colorado Revised Statutes Annotated |
| Colorado Court Rules |
| Chapters 1--24. Rules of Civil Procedure |
| Chapter 24. Rules of Judicial Discipline |
| Colorado Code of Judicial Conduct (Appendix to Chapter 24) |
| Canon 3. A Judge Shall Conduct the Judge's Personal and Extrajudicial Activities to Minimize the Risk of Conflict with the Obligations of Judicial Office. |

Code of Jud.Conduct, Rule 3.3

## Rule 3.3. Testifying as a Character Witness

Currentness

A judge shall not testify as a character witness in a judicial, administrative, or other adjudicatory proceeding or otherwise vouch for the character of a person in a legal proceeding, except when duly summoned.

**Credits**

Adopted effective July 1, 2010.

**Editors' Notes**

**COMMENT**

[1] A judge who, without being subpoenaed, testifies as a character witness abuses the prestige of judicial office to advance the interests of another. See Rule 1.3. Except in unusual circumstances where the demands of justice require, a judge should discourage a party from requiring the judge to testify as a character witness.

Code of Jud. Conduct, Rule 3.3, CO ST CJC Rule 3.3
Current with amendments received through December 1, 2022.

**End of Document**     © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit
H

**ROP000067**

<table>
<tr><td>

**Colorado Commission on Judicial Discipline**

Ralph L. Carr Judicial Center
1300 Broadway, Suite 210
Denver, Colorado 80203
(303) 457-5134

---

IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,

**Complainant,**

and

ROBERT W. KIESNOWSKI, a Former Judge of the Adams County District Court,

**Respondent.**

</td>
<td>

RECEIVED

09/05/2023

Colorado
Commission on
Judicial Discipline

▲ COURT USE ONLY ▲

---

CCJD Case No. 23-104

</td></tr>
<tr><td colspan="2" align="center">

**JOINT PROPOSED CASE MANAGEMENT ORDER**

</td></tr>
</table>

A virtual appearance occurred on July 25, 2023 with the special masters to address case management deadlines and the setting of a formal hearing. Present at this appearance was Craig Truman as Respondent's counsel, Jeff Walsh as Special Counsel for the People, and Christopher Gregory, Executive Director of the Colorado Commission on Judicial Discipline.

The procedural posture of the case is as follows. The Statement of Charges was filed on June 30, 2023. The Answer to such was filed on July 20, 2023, which triggered the "at issue" date pursuant to Colo. RJD 20. Pursuant to Colo. RJD 20, the disciplinary hearing must be held within 91 days of the "at issue" date (i.e. by October 19, 2023). At the status hearing on July 25, the parties agreed that two days were sufficient to conduct the hearing and that the dates of September 5-6, 2023 were acceptable dates for the hearing. Accordingly, the hearing in this matter was scheduled for September 5-6, 2023. However, on August 14, counsel for the parties notified the special masters via email that,

-1-

after consultation, they believe the hearing will only take one day and should be scheduled only for Wednesday, September 6, 2023 to accommodate witness scheduling issues. Given this, the hearing is now formally scheduled for 9 a.m. on Wednesday, September 6, 2023. Mr. Gregory has arranged for a court reporter for the hearing. He has also reserved Room 2C in the Ralph L. Carr Judicial Center as the location for the hearing.

Colo. RJD 21.5 will govern discovery in this matter, and its limits will apply to all matters in this case unless "good cause" is shown to justify deviation pursuant to Colo. RJD 21.5(d).

To maintain the confidentiality of these proceedings pursuant to Colo. RJD 6.5(a), all pleading, motions, briefs, and other filings in the case shall be filed by emailing the filing to Christopher Gregory at                         (with all parties and this Panel copied) and/or by saving documents directly into the shared folder created for this case.  Mr. Gregory will date-stamp the filing and verify that the document has been filed into the Commission's secure/shared electronic folder.  The file sharing system should automatically email an alert that the filing has been uploaded. Any problems or questions about the electronic file system should be directed to Mr. Gregory's attention.

The following deadlines shall apply:

1. Hearing date:                     September 6, 2023 at 9 a.m.

2. Exchange exhibits:                 on or before September 1, 2023

3. Exchange witness lists:            on or before September 1, 2023

4. Close of discovery, if any:        on or before September 1, 2023

5. File pre-hearing briefs on merits of charges:        on or before September 1, 2023

-2-

ROP000069

SO ORDERED:

Date: August 30, 2023

_____
Chief Judge Julie Hoskins, Presiding Special Master

-3-

ROP000070

| | |
|---|---|
| **Colorado Commission on Judicial Discipline** Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>Phone Number: 303-457-5131 | **RECEIVED**<br><br>09/22/2023<br><br>Colorado Commission on Judicial Discipline |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>and<br><br>Robert W. Kiesnowski, a judge of the Adams County District Court,<br><br>Respondent. | ▲  COURT USE ONLY  ▲ |
| | CCJD Case No.: 23-104 |
| **REPORT OF THE SPECIAL MASTERS** | |

## I.    INTRODUCTION

In this original proceeding in discipline, the Special Masters find and conclude that the People have proved, by clear and convincing evidence, that Robert W. Kiesnowski, a Former Judge of the Adams County District Court (herein after Respondent), as charged by the People, violated four Canons of the Colorado Code of Judicial Conduct; namely, Canon Rule 1.1., Canon Rule 1.2, a Judge Shall Promote Confidence in the Judiciary; Canon Rule 1.3, Abuse of the Prestige of Judicial Office and Canon Rule 3.10, Practice of Law.

After reviewing the evidence and considering the range of sanctions available under Colorado Rule of Judicial Discipline, 3, the Special Masters unanimously recommend that Respondent be subject to public censure.

1

ROP000071

## II.    PROCEDURAL HISTORY

Respondent was appointed as a District Judge of the Adams County District Court in 2011. On May 31, 2023, Respondent's brother-in-law was hospitalized due to stab wounds he received during a conflict with his girlfriend. On June 1, 2023, an investigator with the 13th Judicial District Attorney's Office ("the investigator") requested to interview the brother-in-law. This interview request was made through Respondent's wife who indicated her brother was in too much pain to participate in an interview. Later that same day, Respondent called the investigator, disclosing he was a 17th Judicial District Court Judge.  The Special Masters find this disclosure was appropriate, and there was no particular emphasis placed on the fact he was a district court judge. Respondent further disclosed to the investigator he had spoken to his brother-in-law about the incident under investigation.  He relayed to the investigator the information of what the brother-in-law reported remembering from the incident. The investigator informed Respondent that he would let Respondent know if he was going to the hospital to interview the brother-in-law.

The next day, June 2, 2023, Respondent's brother-in-law was still in the hospital. The investigator came to the hospital again to request to interview him. The investigator did not, however, call Respondent to let Respondent know he was going to the hospital to visit the brother-in-law. During the initial contact between the investigator and the brother-in-law, the brother-in-law indicated he did not want to consent to an interview without first seeking advice from Respondent.

Respondent advised the investigator he wanted to be present for the interview and stated that he could be at the hospital in approximately 40 minutes. Before leaving his home to go to the hospital, Respondent reviewed the Colorado Code of Judicial Conduct to determine if Rule 3.10 (barring the practice of law) permitted him to represent his brother-in-law.  Respondent concluded that the Rule did in fact permit him to act as his brother-in-law's counsel, so he drove to the hospital to act as his brother-in-law's legal counsel.

2

ROP000072

Respondent arrived at the hospital as he indicated to the investigator. He spoke to his brother-in-law prior to the interview by the investigator. Respondent advised his brother-in-law of his rights, after which the brother-in-law consented to a formal interview, which was video and audio recorded. Respondent proactively represented his brother-in-law as his counsel during the interrogation. Additionally, Respondent inserted his own opinions to the investigator regarding the situation between the brother-in-law and the victim. At the end of the interview, Respondent signed a medical release for his brother-in-law, noting that he was acting as his brother-in-law's legal representative, and he provided his Colorado Bar number beside his signature.

The Commission filed the Statement of Charges on June 30, 2023. The Answer was filed July 20, 2023. The Supreme Court appointed Judge Julie C. Hoskins, Judge Timothy O'Shea and Judge Kandace C. Gerdes to serve as Special Masters for this action. The Special Masters convened a one day hearing on September 6, 2023. Jeffrey M. Walsh represented the Commission. Respondent appeared with his attorney Craig L. Truman. The parties stipulated to the admission into evidence Exhibits 1 through 17. The Commission presented testimony from investigator Jeff Huston. The Respondent presented testimony from himself. The Special Masters took the matter under advisement and now present this written report to the Executive Director of the Commission, pursuant to Rules 26 and 32, Colo. RJD, and Article VI, Section 23(3)(e), Colo. Const.

## III.    STANDARD OF PROOF

The standard of proof in formal disciplinary hearings is clear and convincing evidence. Colo. RJD 31. Colorado Civil Jury Instruction 3.2 provides that "a fact or proposition has been proved by 'clear and convincing evidence' if, after considering all the evidence, [the fact finders] find it to be highly probable and [the fact finders] have no serious or substantial doubt." The Special Masters find the Commission has met its burden of proving the allegations against Respondent, Robert W. Kiesnowki,

ROP000073

a Former Judge of the Adams County District Court.

## IV.    FACTUAL FINDINGS

1.  Violation of Canon Rule 3.10 which states in relevant part:

**A judge shall not practice law except as permitted by law or this Code...The judge may, without compensation, give legal advice to and draft or review documents for a member of the judge's family, but is prohibited from serving as the family member's lawyer in any forum.**

During the time period of May 31, 2023, through June 5, 2023, the date of the last email exchange between Respondent and the investigator, Respondent, a district court judge, acted as his brother-in-law's attorney. Respondent stated explicitly during the recorded interview between Respondent's brother-in-law and the investigator, Exhibit 12 page 1, line 26 of the written transcript, that Respondent was acting as counsel for his brother-in-law. Additionally, Respondent actively acted as counsel when he told his brother-in-law he would need to "wait for me to tell him to answer" after each question. On one occasion, Respondent told his brother-in-law how to answer a question when he said, "Your answer is you do not recall." Respondent stopped the interview at one point to confer privately with his brother-in-law. He asserted his brother-in-law's Fourth Amendment rights when Respondent refused to agree to a consensual search of the brother-in-law's phone, instead insisting that a warrant be obtained. Ultimately, he invoked his brother-in-law's Fifth Amendment right against self- incrimination when he stopped the interrogation when the brother-in-law was confronted with allegations that he had strangled his wife and assaulted her son.

Despite the undisputed evidence, Respondent claims he did not violate Rule 3.10 because his representation of his brother-in-law did not take place in a formal adjudicatory setting, such as a court room. More specifically, Respondent claims that the word "forum" in the prohibition against representing a family member "in any forum" limits the prohibited practice of law only to settings contemplated by

4

ROP000074

the definition of "forum" in Black's Law Dictionary. Black's Law Dictionary defines "forum" as follows:

> (1) A public place, especially one devoted to assembly or debate; (2) A court or other judicial body; a place of jurisdiction.

Respondent argues that, since the hospital room in which the interrogation here took place is not a public place devoted to assembly or debate, or a court or other judicial body, his practice of law in this setting was permitted by Rule 3.10.

The Special Masters find Respondent's arguments fail for the following reasons:

The rules of statutory construction dictate an interpretation of the rule that is plainly opposite from Respondent's interpretation. *People v. G.S.*, 2018 CO 31, ¶ 32 holds that the standard principles of statutory construction apply to the interpretation of court rules. A court's primary purpose in construing a statute or rule is "to ascertain and give effect to the legislature's intent." *Linnebur v. People*, 2020 CO 79M, ¶ 9. Courts accept the intent of the drafters of a uniform act, such as the Model Code of Judicial Conduct, as the legislature's intent when it adopts that uniform act. *Giguere v. SJS Family Enterprises, Ltd.*, 155 P.3d 462 (Colo. App. 2006). To ascertain the legislature's intent, "we look first to the language of the statute, giving its words and phrases their plain and ordinary meanings." *Id.* "If the plain language of the statute demonstrates a clear legislative intent, we look no further in conducting our analysis." *Id.* If, and only if, "the language is ambiguous – that is, if it is reasonably susceptible of multiple interpretations – then we may consider other aids to statutory construction. *Id.*

Here, the language of the rule, read as a whole, yields only one reasonable interpretation, which is this: Rule 3.10 prohibits judges from practicing law unless it is explicitly permitted by law. A widely recognized exception as "permitted by law" is the rule that part-time judges may still practice law. C.R. S. 13-6-204(2). Rule 3.10 does, however, permit judges to give free and informal advice to family members,

5

ROP000075

such as by drafting or editing documents in a behind-the-scenes manner. But the drafters of the rule intentionally limited a judge's permissible advice to informal, private settings by explicitly stating that a judge may never act as a family member's lawyer "in *any* forum." *See* Rule 3.10 (emphasis added). The operative word here is "any," not "forum." In other words, a judge may not act as counsel to a family member in "any" forum, whether that forum is public or private. Thus, the word "any" here essentially turns "forum" into a synonym for the word "setting." Respondent specifically advised the investigator he was acting as counsel for his brother-in-law, during a formal, recorded interview between a District Attorney Investigator and Respondent's brother-in-law, which is a violation of the rule. Respondent's interpretation also ignores the effect of the word "any" preceding the word "forum." *See Ceja v. Lemire*, 154 P.3d 1064, 1066 (Colo. 2007) ("If courts can give effect to the ordinary meaning of words used by the legislature, the statute should be construed as written, *giving full effect to the words chosen*, as it is presumed.") Here, the only way to give full effect to the word "any" preceding "forum" is to interpret "any forum" to mean that a judge may not act as a lawyer for a family member in any setting, whether public or private.

Given the above, the plain and ordinary language of Rule 3.10 requires just one reasonable interpretation of the rule. There is no ambiguity, so considering other rules of statutory interpretation is not permissible. As such, Respondent's reliance on the definition of the word "forum" in Black's Law Dictionary is not appropriate or permitted.

Additionally, Respondent's interpretation of Rule 3.10 fails because it is directly contradicted by persuasive authority that has considered and rejected this same argument. In Arizona's Judicial Ethics Advisory Opinion No. 2010-06 the Advisory Committee held a judge could not represent his spouse in negotiations with an insurance company related to an injury the spouse sustained in a car accident. The Committee held that "had the drafters of the canon and [Rule 3.10] intended that 'forum' be restricted to a courthouse context, they would have so

6

ROP000076

stated, and the Reporters' Notes would have had no need to engage in the discussion of 'informal setting' and the other matters set therein. The rule would have been a bright line one." The Special Masters note Arizona Rule 3.1 mirrors Colorado's Rule 3.10. The Special Masters find the opinion to be well reasoned and applicable to the facts here.

To conclude, the plain meaning of Rule 3.10 prohibits exactly what happened here. Respondent did not merely offer free, informal legal advice to a family member in a behind- the-scenes manner. Instead, he formally acted as his brother-in-law's legal counsel during a recorded interview of the brother-in-law, and represented to the investigator that he was doing the same, and Respondent believed he had the authority to do so. As such, the Special Masters find by clear and convincing evidence that Respondent violated Canon Rule 3.10.

2. Violation of Canon Rule 1.3 which reads as follows:

> **A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so.**

Respondent abused the prestige of his judicial office and thereby violated Canon Rule 1.3 when he spoke to the DA's investigator about his brother-in-law's good character and attacked the credibility of the complaining witness through the brother-in-law's reports as well as Respondent's own opinion as to the character of the complaining witness.

Respondent made it clear to the investigator he was a district court judge. In his first recorded call with Investigator Huston on June 1, 2023, he identified himself as a District Court judge in the 17th Judicial District. As stated above, the Special Masters find no issue with his identification as a judge in this first phone call. The tone and tenor of that call supports his being transparent and merely providing information and context in that first call. The Respondent in that call does not emphasize the fact or appear to use the fact to cause the investigator to take or not to take any action. In his second recorded call with the investigator later that same day,

7

he said, "This is Judge Kiesnowski," when the investigator answered the phone. In that second recorded call, it was not relevant for Respondent to identify himself as a judge, which creates a reasonable inference that Respondent wanted to remind the investigator of his status as a judge. Additionally, the investigator testified that as a sign of respect to Respondent, he departed from his usual style of investigation by questioning in a deferential manner, even giving cues about questions of a more incriminating nature.

With Respondent's status as a judge well established, the Special Masters find by clear and convincing evidence that Respondent then tried to advance the personal interests of his brother-in-law throughout the brother-in-law's interrogation. Respondent vouched for the brother-in-law's good character when he said, "He's a hard-working guy." Exhibit 12, pg 4 line 20. Respondent effectively called the alleged victim a liar when he made the following statements:

- "She's – historically she's a total loose cannon." Ex 12, Pg. 4 line 6 which appears to be Respondent's own impression, not, as Respondent argues, simply conveying information his brother-in-law reported.

- "And we're going to give you a list of his employes who can corroborate-her behavior" Ex. 12 pg 4 lines 10 – 12.  Here, Respondent is inserting himself into the investigation and promising his own follow up to provide damning information about the complaining witness to the investigator.
- "so, she's very savvy. She knows, if, for example, if she is labeled a crime victim, she gets to stay [in the country]." Ex. 12, pg. 4 lines 20 -21.
- "She hit him and split his lip. He has video." Ex 12 pg 6 line 6.
- "I've seen it . . . I saw her with her phone hit him in the face."
- "She repeatedly accuses him of having multiple affairs." Ex. 12 pg 9, lines 8 – 10.
- "She has made statements that she will self-inflict injury and say that he did it." Ex 12 pg 22 lines 5 – 7.

It is significant here that Respondent made the above comments to the investigator, who is the lead investigator for the 13th Judicial District Attorney's Office, which office would be making the decision about whether or not to charge Respondent's brother-in-law with a crime.

8

ROP000078

Despite the above, Respondent maintains that he did not violate Rule 1.3 because, in making the above statements, he was not "testifying" as a character witness. He makes this argument because Comment 1 to Canon Rule 3.3 (which bars a judge from voluntarily testifying as a character witness) states that "A judge who, without being subpoenaed, testifies as a character witness abuses the prestige of judicial office" in violation of Rule 1.3. Respondent argues that to "testify" as a character witness, a judge must be under oath, and since he was not under oath during his brother-in-law's interrogation, he did not "testify" as a character witness.

This argument misses the mark.   The allegation is that Respondent abused the prestige of his judicial office to advance the personal interests of his brother-in-law.  The Special Masters find that he has.  The factual allegations made by Respondent, as well as his tone and tenor while making derogatory statements regarding the complaining witness, could be for no other reason than to persuade the investigator of her lack of credibility.

Respondent also alleges through his testimony that he was merely acting as a conduit of information provided by his brother-in-law so that the investigator would have a better understanding of the situation.   However, that argument fails. Certainly, some statements and opinions were stated as information provided by Respondent's brother-in-law.   However, at times Respondent provided his own observations and opinions, and corroborated his brother-in-law's experience when Respondent indicated he has seen videos of the same.

3.  Violation of Canon Rule 1.2 which reads as follows:

**A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.**

First, Comment 1 to the Rules states: "Public confidence in the judiciary is eroded by improper conduct and conduct that creates the appearance of impropriety. This principle applies to both the professional *and personal* conduct of a judge." (emphasis added). Comment 2 to the rule states: "A judge should expect

9

ROP000079

to be the subject of public scrutiny that might be viewed as burdensome if applied to other citizens." The point is twofold -- that judges are held to a higher standard of conduct than the ordinary person, and this principle applies to both their professional and their personal lives.

Respondent's conduct appeared to attempt to compromise the independence and impartiality of the judiciary. Respondent inserted himself into a criminal interrogation of his brother-in-law, who was a suspect in a felony assault case. He played a major role in the interrogation, actively conducting himself as legal counsel to his brother-in-law. And, as found by the Special Masters above, he attempted to persuade the investigator of the bad character of his brother-in-law's accuser and the good character of his brother-in-law, in an attempt to influence the investigator's charging decision. This was the opposite of judicial independence and impartiality. Thus, it violated Canon Rule 1.2.

Second, Rule 1.2 dictates that "actual impropriety" violates the rule. Comment 5 to the rule states: "Actual improprieties include violations of law, court rules or provisions of this Code." The Special Masters have found Respondent violated Canon Rule 1.3 and 3.10 as stated above and therefore necessarily find that he committed actual impropriety in violation of Rule 1.2.

In addition, Respondent violated Rule 1.2 because his conduct created an "appearance of impropriety." Comment 5 to the rule states: "The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." The "appearance of impropriety" standard is an objective one. *See e.g. Inquiry Concerning a Judge,* 822 P.2d 1333 (Alaska 1991) (test is whether a judge fails "to use reasonable care to prevent objectively reasonable persons from believing an impropriety was afoot"; [t]he objectively reasonable person is not a well-trained lawyer or a highly sophisticated observer of public affairs. Neither is this person a cynic

10

ROP000080

skeptical of the government and the courts. Moreover, an objectively reasonable person is not necessarily one who is informed of every conceivably relevant fact. He or she is the average person encountered in society.")

Here, Respondent's conduct would create in the mind of an ordinary and reasonably objective citizen the perception that Respondent was not independent or impartial (i.e. the very touchstones of being an acceptable judge). His insertion of himself into a serious case and in such a major way, not only *would* raise eyebrows, it actually did, which is why a complaint was filed. Moreover, his attempt to influence the charging decision by assassinating the alleged victim's character to the DA's lead investigator would cause an ordinary and reasonable person to perceive that the judge was not independent or impartial. As such, Respondent's conduct created an appearance of impropriety and thereby violated Rule 1.2.

Despite the above, Respondent claims that he did not violate Rule 1.2 because his comments bolstering his brother-in-law's character and attacking the accuser's were not intended to either influence the charging decision or to diminish the credibility of the alleged victim.

Respondent's argument here fails for two reasons.

First, because the standard for determining the appearance of impropriety is objective, a judge's own perception of his or her motivation behind challenged conduct is irrelevant to the analysis. *See e.g. People for Ethical Treatment of Animals v. Bobby Berosini, Ltd., 894 P.2d 337* (Nev. 1995) *overruled in part on other grounds by Towbin Dodge, LLC v. Dist. Ct.,* 112 P.3d 1063 (2005) (judge's subjective impartiality irrelevant); *In re Case of Snow,* 674 A.2d 573 (N.H. 1996) ("There is no intent requirement in these Canons. In fact, it is practically impossible to impose a mens rea element on the 'appearance of impropriety' standard."); *In re Larsen,* 616 A.2d 529 (Pa. 1992) (judge's conduct warranted "disciplinary action despite the absence of an improper motive because the conduct by itself raised an appearance of impropriety, which could undermine public confidence in our judiciary.").

11

ROP000081

<u>Second</u>, it is simply not credible for Respondent to claim that his comments bolstering his brother-in-law's character and attacking the accuser's were not intended to either influence the charging decision or to diminish the credibility of the alleged victim. Respondent has been a lawyer for over thirty years. He was a district court judge for nearly 13 years. He estimates that he has presided over approximately 100 criminal trials. It is not believable that he was simply "offering information" without any intent attached when he said to the investigator things about the alleged victim, such as: "She is savvy and knows if she is labelled a crime victim, she gets to stay [in the country]," or: "She has made statements that she will self-inflict injury and say that he did it."

The Special Masters reject Respondent's arguments and find by clear and convincing evidence Respondent violated Rule 1.2.

4. **Judge Kiesnowski violated Canon Rule 1.1 by virtue of violating Canon Rules 1.2, 1.3, and 3.10.**

Can Rule 1.1 reads as follows:

> A judge shall comply with the law, including the Code of Judicial Conduct.

As found by clear and convincing evidence, Respondent violated Canon Rules 1.2, 1.3 and 3.10. By doing so, he necessarily also violated Rule 1.1. Therefore, the Special Masters find by clear and convincing evidence that Respondent violated Rule 1.1.

## <u>RECOMMENDED DISCIPLINE</u>

Judging is not merely a "job." It is the privilege of presiding over society's most precious asset – justice. That is why judges are held to a higher standard of conduct than the ordinary person. And it is why the Colorado Code of Judicial Conduct applies equally to the judge's professional and personal life. The misconduct here is serious and persistent. The present misconduct occurred in Respondent's private life. But that is no excuse. His behavior in the instant matter, combined with his

12

ROP000082

prior disciplinary history, demonstrates a pattern of misconduct. Respondent's demeanor, manner and at times dismissive and indignant attitude while testifying about the prior disciplinary matter, reveals he knew better. Respondent during these proceedings has shown no remorse. He has shown no acknowledgement of his violation of the canons. His complete disavowal of any wrongdoing in the private censure, to which he stipulated to the underlying, supporting facts, is offensive to the Special Masters.

When evaluating the appropriateness of judicial disciplinary sanctions in general, the Special Masters reviewed the following list of factors recognized in *Matter of Deming*, 736 P.2d 639, 659 (Wash. 1987):

> (a) *whether the misconduct is an isolated instance or evidences a pattern of conduct;*

Respondent's misconduct is not isolated. It is instead a pattern. A review of his private censure provided at hearing, but not attached herein reveals that for years he abused his status to harass, intimidate and retaliate against judicial personnel who were subordinate to him. After being disciplined for this misconduct and being forced to resign, he nevertheless, while still on the bench, and within months of his private censure, and before the effective date of his resignation, engaged in the misconduct that is the subject of this case.

> (b) *the nature, extent and frequency of occurrence of the acts of misconduct;*

As noted above, Respondent's misconduct, i.e. the general abuse of the status of judicial office, has been a pattern for years.

> (c) *whether the misconduct occurred in or out of the courtroom;*

Respondent's prior and current misconduct did not occur in the courtroom.

> (d) *whether the misconduct occurred in the judge's official capacity or in his private life;*

Respondent's prior misconduct as detailed in his private censure occurred in

13

ROP000083

his official capacity as a judge. The current misconduct occurred in his private capacity.

(e) *whether the judge has acknowledged or recognized that the acts occurred;*

During the hearing held September 6, 2023, Respondent adamantly refused to acknowledge any wrongdoing in his prior matter.  Furthermore, he disavowed the stipulated prior misconduct which served as the basis for his private censure and ultimate resignation. He has further failed to acknowledge any misconduct in the present case.  The closest he has come to admitting any misconduct in the present case is an allowance that he can see how someone *might* view his actions not maintaining impartiality and independence in the  judiciary.

(f) *whether the judge has evidenced an effort to change or modify his conduct;*

Respondent has not evidenced any effort to change or modify his pattern of abusing the status of judicial office, as shown by the fact that just three months after being disciplined and being forced to resign, he engaged in the same general form of misconduct, i.e. abuse of the prestige of judicial office. Further, he doubled down on his denials of the of the private case, despite the enormous harm he caused over a significant period of time.

(g) *the length of service on the bench;*

Respondent served as a District Court Judge for approximately 12.5 years, i.e. from 2011 to June of 2023.

(h) *whether there have been prior complaints about this judge;*

There have been prior complaints as outlined in his prior judicial discipline proceeding which resulted in the sanction of his resignation.

(i) *the effect the misconduct has upon the integrity of and respect for the judiciary;*

Respondent's prior and current misconduct is exactly the sort of behavior that erodes public confidence in the judiciary. The narrative is essentially this: a person in power abuses his status/power to harass, intimidate, and retaliate against his perceived enemies (i.e. the prior misconduct). Or he uses his

14

ROP000084

status/power/influence to try to benefit those close to him, like family members (i.e. the current misconduct). This sort of narrative is extremely damaging to the public's perception of the integrity of the judiciary.

> *(j) the extent to which the judge exploited his position to satisfy his personal desires.*

In Respondent's prior disciplinary case, he exploited his position as a judge to retaliate against a subordinate. He tried to make this individual's work life intolerable. He effectively got the employee demoted. And he even tried to get the employee fired once this employee was reassigned to be a different judge's staff. All of this was to exact a personal vendetta against a person with less power and influence who Respondent perceived had wronged him. As stated by his counsel during closings, Respondent did some bad things, and he did some terrible things in the prior matter. Again, the Special Masters noting the facts referred to are facts Respondent himself refuses to acknowledge. In the present case, Respondent exploited his position to try to benefit his brother-in-law.

Respondent presents to the Special Masters mitigation for his behavior in that during the time and place this took place he felt he had no choice based on the hysterics of his mother-in-law and his wife's insistence he help her brother. He argues his position was untenable. The Special Masters do not find his argument to be persuasive as a defense or as a point of mitigation. The factors outlined in *Matter of Deming,* simply do not support a different outcome in this matter.

As this is a second disciplinary action, and given Respondent is retired at this point, the only appropriate sanction here is public censure. There is no other more severe sanction available, or it is likely the Special Masters would recommend the same.

15

ROP000085

Dated:  September 22, 2023

BY THE SPECIAL MASTERS:

_____
Julie C. Hoskins
Chief Judge, 19th Judicial District

_____
Timothy O'Shea
District Court Judge, 10th Judicial District

_____
Kandace C. Gerdes
District Court Judge, 2nd Judicial District

16

ROP000086

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>Phone Number: 303-457-5131 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>         and<br><br>ROBERT W. KIESNOWSKI, A former Judge of the Adams County District Court,<br><br>Respondent. | RECEIVED<br><br>10/03/2023<br><br>Colorado<br>Commission on<br>Judicial Discipline<br><br><br><br>▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:<br>Atty. Reg. # 33762 | CCJD Case No.: 23-104 |
| **UNOPPOSED BILL OF COSTS PURSUANT TO COLO RJD. 36(G)** | |

Special Counsel, on behalf of the People of the State of Colorado, submits the following

Bill of Costs pursuant to Colo. RJD 36(g) following entry of the Report of the Special Masters,

filed September 22, 2023. Following the Commission's conferral with Respondent's Counsel,

Special Counsel understands that this Bill of Costs is unopposed.

ROP000087

| Date | Description | Amount |
|------|-------------|--------|
| 9/6/2023 | Special Master's Hotel Room: Chief Judge Julie Hoskins | $199.00 |
| 9/6/2023 | Special Master's Hotel Room: Judge Tim O'Shea | $199.00 |
| 9/8/2023 | Reimbursement for Special Masters's Travel: Chief Judge Julie Hoskins | $183.16 |
| 9/22/2023 | Reimbursement for Special Master's Travel: Judge Tim O'Shea | $299.34 |
| 9/16/2023 | Javernick & Stenstrom, LLC Invoice #23724 – Transcription of August 28, 2023 deposition of Robert W. Kiesnowski | $1,960.45 |
| 9/25/2023 | Javernick & Stenstrom, LLC Invoice #23726 – Transcription of September 6, 2023 formal judicial disciplinary hearing Re: Robert W. Kiesnowski | $2,126.00 |
| | | $4,966.95 |

DATED:  October 3, 2023

Respectfully submitted,

*/s/ Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762
Special Counsel
Colorado Commission on Judicial Discipline

-2-

ROP000088

-3-

<u>CERTIFICATE OF SERVICE</u>

I certify that on October 3, 2023, a true and correct copy of the foregoing **UNOPPOSED BILL OF COSTS** was filed with the Commission and served via e-mail upon the following persons:

Craig L. Truman, P.C.
455 N. Sherman St.
Suite 310
Denver, CO 80203


By:  _____
            Jeffrey M. Walsh, #33762

-3-

**ROP000089**

| Colorado Commission on Judicial Discipline<br>Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>Phone Number: 303-457-5131 | |
|---|---|
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>     and<br><br>ROBERT W. KIESNOWSKI, A former Judge of the Adams County District Court,<br><br>Respondent. | RECEIVED<br><br>10/06/2023<br><br>Colorado<br>Commission on<br>Judicial Discipline<br><br><br>▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:<br>Atty. Reg. # 33762 | CCJD Case No.: 23-104 |
| **AWARD OF COSTS** | |

Upon receipt of the People's Unopposed Bill of Costs, the Special Masters incorporate the following Award of Costs as part of their Report entered September 22, 2023 in this matter. Costs shall be assessed and awarded against Respondent, as follows, pursuant to Colo. RJD 36(g):

| Date | Description | Amount |
|---|---|---|
| 9/6/2023 | Special Master's Hotel Room: Chief Judge Julie Hoskins | $199.00 |
| 9/6/2023 | Special Master's Hotel Room: Judge Tim O'Shea | $199.00 |
| 9/8/2023 | Reimbursement for Special Masters's Travel: Chief Judge Julie Hoskins | $183.16 |

ROP000090

| 9/22/2023 | Reimbursement for Special Master's Travel: Judge Tim O'Shea | $299.34 |
|---|---|---|
| 9/16/2023 | Javernick & Stenstrom, LLC Invoice #23724 – Transcription of August 28, 2023 deposition of Robert W. Kiesnowski | $1,960.45 |
| 9/25/2023 | Javernick & Stenstrom, LLC Invoice #23726 – Transcription of September 6, 2023 formal judicial disciplinary hearing Re: Robert W. Kiesnowski | $2,126.00 |
| | | $4,966.95 |

Dated: October 3, 2023

BY THE SPECIAL MASTERS:

Julie C. Hoskins
Chief Judge, 19th Judicial District

Timothy O'Shea
District Court Judge, 10th Judicial District

Kandace C. Gerdes
District Court Judge, 2nd Judicial District

**ROP000091**

DATE FILED: January 03, 2024 4:06 PM

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>720-625-5150 | |
| **Original Proceedings Pursuant to Colorado Commission Article VI, §23**<br><br>**Colorado Commission on Judicial Disciplne:**<br>**Case No. 23-104** | |
| **IN THE MATTER OF PEOPLE OF THE STATE OF COLORADO**<br><br>Complainant,<br><br>　　　and<br><br>Robert W. Kiesnowski, A Former Judge of the Adams County District Court<br><br>Respondent, | ☐ **COURT USE ONLY** ☐ |
| Craig L. Truman, Esq.<br>Craig L. Truman, P.C.<br>455 Sherman St., Suite 310<br>Denver, Colorado 80203<br>(303) 595-8008<br>Atty. Reg. #:  5331<br>craig@cltrumanlaw.com | Case Number:  23SA171 |
| **NOTICE OF EXCEPTIONS** | |

　　　Robert W. Kiesnowski, a Former Judge of the Adams County District Court (17th Judicial District) sets forth the Notice of Exceptions to the Colorado Commission on Judicial Disciplne (CCJD) and their amended recommendation for judicial discipline.

　　　In support of these exceptions, Former Judge Kiesnowski states the following:

## I.     Background

This is a petition with very few factual disputes.  Respondent Kiesnowski sets forth these exceptions because he believes that the recommendation of the Special Masters did not fully take into consideration, Respondent Kiesnowski's predicament and attempts to do a balancing act between what he believed was the appropriate short-term transparent representation of his brother-in-law, Mr. Vaughn and his judicial employment.

## II.     Factual Allegations

Respondent Kiesnowski petitions the Court to consider these additions and corrections to the CCJD's allegations.

1.     Respondent Kiesnowski admits that he met with Chief Investigator of the 13th Judicial District Attorney's Office, Mr. Huston.  Respondent Kiesnowski admits that he telephoned Chief Investigator Huston and early in that conversation, disclosed that he was a present District Court Judge in the 17th Judicial District.  Respondent Kiesnowski testified that he made this disclosure in an effort to be fully transparent so as not to blindside Investigator Huston if he later learned that information.  Respondent Kiesnowski admitted in the telephone conversation with Chief Inv. Huston that he had spoken to his brother-in-law Vaughn about the ongoing investigation.  Respondent Kiesnowski advised Chief Inv. Huston that he had garnered factual information from Mr. Vaughn which would be helpful to Chief Inv. Huston's investigation.  The investigator promised that he would contact Respondent Kiesnowski before he went to interview Mr. Vaughn who was still hospitalized with serious stab wounds.  Mr. Vaughn was first in intensive care at St. Anthony's Central and later, in a general surgical.

2.     Respondent Kiesnowski had been alerted by his brother-in-law Vaughn that Chief Inv. Huston was at St. Anthony Central to interview him.  Respondent Kiesnowski believed he had an agreement with Chief Inv. Huston that Chief Inv. Huston would not attempt to interview Mr. Vaughn at St. Anthony's without advising Respondent Kiesnowski.  He had been alerted by Mr. Vaughn that Chief Inv. Huston was at St. Anthony's to interview him without regard to his promise.  Respondent Kiesnowski raced to the hospital, consulted with Mr. Vaughn and consented to a formal interview by Chief Inv. Huston.  In the hurry scurry, Respondent Kiesnowski recognized that he has a potential difficulty with Canon Rule 3.10.  As Respondent Kiesnowski was at home, he made the quick decisions to review Canon Rule 3.10 and used the only available research tools he had available.  The research tools, not only the Canon, but also the definitions from Black's Law and Heritage Dictionary.  He reviewed those sources to determine whether his actions helping Mr. Vaughn were prohibited because he would be serving as Mr. Vaughn's lawyer in any "forum".  After hurried review,

2

Respondent Kiesnowski determined that an interview with the police investigators was not representation in any "forum". After arrival at St. Anthony's Central, Respondent Kiesnowski even told Chief Inv. Huston of his struggle to research whether his representation in a police interrogation was any "forum". With that brief misunderstanding, Respondent Kiesnowski agreed to a formal interview in order to help Chief Inv. Huston and to be fully transparent. Respondent Kiesnowski told Chief Inv. Huston he would be acting as his brother-in-law's counsel and requested Mr. Vaughn wait for instructions after each police question. After the interrogation and in a cordial atmosphere, Chief Inv. Huston walking down the hall in the surgical recovery wing of St. Anthony's Central told Respondent Kiesnowski that he forgot to have Mr. Vaughn sign a medical release. To make things easier for Chief Inv. Huston, Respondent Kiesnowski signed the medical release. Respondent Kiesnowski was under the belief that signing the medical release was a convenience for the investigator and not representation in any "forum".

3.      In an effort to complete his transparent focus with the Chief Inv., Respondent Kiesnowski added to Mr. Vaughn's statement in an effort to be helpful. Respondent Kiesnowski knew that his brother-in-law Vaughn had been in intensive care recently, was in extreme pain, under treatment with opiates and not thinking very clearly. Respondent Kiesnowski was trying to help Chief Inv. Huston with as much information as possible and trusted the information would be vetted by Chief Inv. Huston and other officers of the Ft. Morgan law enforcement establishment. Respondent Kiesnowski denies that he ever intended to slander or attack the credibility of Mr. Vaughn's wife complainant in the initial domestic violence allegation and also the stabber of Mr. Vaugh requiring his extensive hospital stay. Respondent Kiesnowski believed that he was just giving assistance and that other law enforcement authorities would track down, vet the information and to determine its substantive credibility.

4.      Respondent Kiesnowski admits that if he had more time to research his position regarding the violation of Canon allegations, he certainly would have taken advantage of it. In the time Chief Inv. Huston disregarded the previous agreement and unannounced appearance at the hospital looking to ambush Mr. Vaughn. Respondent Kiesnowski scrambled the best he could to get the best information in the shortest time under pressure, Respondent Kiesnowski did the best he could under this difficult situation.

5.      Respondent Kiesnowski believed that his representation of his brother-in-law Vaughn was not serving as a lawyer in any forum. Further, Respondent Kiesnowski believes that after checking the definition of testimony, he believed that he and Mr. Vaughn were not giving testimony in a police interrogation. Respondent Kiesnowski steadfastly believes he was not vouching for the credibility of his brother-in-law or commenting on the credibility of the alleged victim in violation of Canon Rule 3.3. Respondent Kiesnowski expected all the information given to Chief Inv. Huston would be verified for truthfulness. Respondent Kiesnowski believed that his information to

3

supplement Mr. Vaughn's inaccuracies or memory lapses would be of assistance to Chief Inv. Huston and was certainly not testimony in any court of law or oath.

WHEREFORE, Respondent Robert W. Kiesnowski, a Former Judge of the Adams County District Court, requests this Court to take into account his situation as it occurred to him and credit his attempts to find an answer under pressure in a very short period of time. Respondent Kiesnowski wants the Court to know that while he may have made mistakes given the circumstance, he did so in good faith, trying to do the best he could in the shortest period of time under pressure.

DATED this 3rd day of January, 2024.

Respectfully submitted,

Craig L. Truman, #5331

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of January, 2024, I served a true and accurate copy of the above and foregoing **NOTICE OF EXCEPTIONS** to:

Jeffrey M. Walsh, Esq., Special Counsel
Ralph L. Carr Colorado Judicial Center
Colorado Commission on Judicial Discipline
1300 Broadway, Suite 210
Denver, CO 80203

(X) by email (j.walsh@jd.state.co.us) or ICCES.

4

<table>
<tr><td>

**Colorado Supreme Court**
2 East 14th Avenue
Denver, CO 80203
Phone Number: 720-625-5150

</td><td rowspan="3">

DATE FILED: January 18, 2024 7:49 AM

</td></tr>
</table>

| | |
|---|---|
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case No. 23-104 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>Robert W. Kiesnowski, A former Judge of the Adams County District Court<br><br>Respondent. | ▲  COURT USE ONLY  ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  j.walsh@jd.state.co.us<br>Atty. Reg. # 33762 | Case Number: 23SA171 |
| **PEOPLE'S ANSWER BRIEF TO JUDGE KIESNOWKI'S EXCEPTIONS** | |

The People respond to former Judge Robert Kiesnowski's exceptions to the Commission's recommendation for discipline as follows:

<u>Standard of Review</u>

Challenges to the Special Masters' findings of fact are evaluated under the clearly erroneous standard of review. *Matter of Booras,* 2019 CO 16, ¶ 18. Challenges to the Special Masters' legal conclusions are reviewed de novo. *Id.*

<u>Argument</u>

## I.    Canon Rule 3.10 (Practice of Law).

Kiesnowski does not dispute that he practiced law in this case. The only dispute below was about the meaning of the word "forum" in the text of Rule 3.10 and whether it bars the practice of law only in public forums, such a court room (which Kiesnowski argued), or whether it instead bars the practice of law in any setting, whether public or private (which the People argued). The Special Masters agreed with the People.

Here, it is not clear from Kiesnowski's exceptions if he is challenging the Special Masters' legal ruling on this matter, which would be subject to de novo review. Presumably he is not, however, because he offers no argument and no legal authority to support a claim that the Special Masters erred as a matter of law.

It appears instead that Kiesnowski is merely arguing that the Special Masters erred *factually* when they rejected his proffered mitigation that in the "hurry scurry" circumstances of this case, "he did his best" in a "difficult situation." *See* Exceptions, ¶¶ 2 & 4.  This argument fails, however. To be clear, Kiesnowski is not arguing that the Special Masters failed to consider this mitigation. In fact, Kiesnowski offered this

same mitigation at the formal hearing, and the Special Masters explicitly rejected it as either a defense or as mitigation when they wrote the following in their report:

> Respondent presents to the Special Masters mitigation for his behavior in that during the time and place this took place he felt he had no choice based on the hysterics of his mother-in-law and his wife's insistence he help her brother. He argues his position was untenable. The Special Masters do not find his argument to be persuasive as a defense or as a point of mitigation. The factors outlined in *Matter of Deming* simply do not support a different outcome in this matter. [Report of the Special Masters, p. 15].

Kiesnowski offers no evidence to support his argument that the Special Masters "clearly erred" when they rejected his mitigation to a violation of Rule 3.10. Moreover, his proffered mitigation makes little sense. He acts as if the criminal interrogation of his brother-in-law was unavoidable and that he, Kiesnowski, had to act to help his family member in this pseudo "crisis." But this purported crisis was no crisis at all. Kiesnowski is a very experienced lawyer and judge. He knew perfectly well that he could have directed his brother-in-law to refuse to be interrogated, which Kiesnowski admitted at the formal hearing. *See* Transcript, pp. 136-138. This would have eliminated this purported "crisis" completely. It would have avoided the "hurry scurry." And it would have provided Kiesnowski plenty of time to research appropriately whether he could in fact engage in the practice of law by representing someone in a criminal interrogation without violating Canon Rule 3.10.

-3-

Put simply, the Special Masters rejected Kiesnowski's proffered mitigation for good reason. This court should do the same as well.

## II.    Canon Rule 1.3 (Abuse of the Prestige of Judicial Office).

Kiesnowski makes two arguments in exception to the Special Masters' finding that he violated Canon Rule 1.3.

First, he challenges the Special Masters' factual finding that he used his status as a judge to advance the interests of his brother-in-law by bolstering the brother-in-law's character while simultaneously attacking the character of the brother-in-law's accuser. Yet Kiesnowski provides no argument or evidentiary support of any kind to establish that the Special Masters' finding here was "clearly erroneous." *See Booras,* ¶ 18 (factual findings may only be reversed if clearly erroneous). All Kiesnowski does is reiterate the same argument he made below – namely, that the comments he made about the brother-in-law and his accuser were merely to help the investigator by offering information, which he expected the investigator to later verify. But the Special Masters explicitly rejected this argument when they wrote in their report the following:

> The factual allegations made by Respondent, as well as his tone and tenor while making derogatory statements regarding the complaining witness, could be for no other reason than to persuade the investigator of her lack of credibility. Respondent also alleges through his testimony that he was merely acting as a conduit of information provided by his brother-in-law so that the investigator would have a better understanding of the situation. However, that argument fails. Certainly, some statements and opinions

were stated as information provided by Respondent's brother-in-law. However, at times Respondent provided his own observations and opinions, and corroborated his brother-in-law's experience when Respondent indicated he has seen videos of the same. [Report of the Special Masters, p. 9].

Second, Kiesnowski argues that he did not violate Rule 1.3 (abuse of the prestige of office) because he did not violate Rule 3.3 (testifying as a character witness), as if the two rules are the same. But this argument is a red herring. Kiesnowski was not charged with a violation of Rule 3.3, so his argument is irrelevant. Moreover, the Commission need not prove a violation of Rule 3.3 in order to prove a violation of Rule 1.3. Again, the Special Masters considered and rejected this argument on page 9 of their report, and Kiesnowski offers no argument of legal support of any kind to reverse that ruling. *See also* CCJD Record of Proceedings, SC Pre-Hearing Brief, pp. 30-32 for a more robust discussion of why this argument should be rejected.

For the above reasons, this court should reject Kiesnowski's exception to the Special Masters' report finding that he violated Canon Rule 1.3.

## III.    Canon Rule 1.2 (Independence, Integrity, and Impartiality; Avoiding Impropriety and the Appearance of Impropriety).

Kiesnowski does not contest any legal or factual findings made by the Special Masters' conclusion that he violated Canon Rule 1.2 by engaging in conduct that created an appearance of impropriety.

-5-

## Conclusion

Other than reiterating arguments he made below, Kiesnowski's exceptions to the Special Masters' report offer no real argument, and certainly no evidentiary support, for this court to find that the Special Masters erred in any of their legal rulings or *clearly* erred in any of their factual findings. Therefore, this court should reject Kiesnowski's exceptions and accept the recommendation from the Commission to publicly censure Kiesnowski for his multiple and repeated violations of the Code of Judicial Conduct.

DATED:  January 18, 2024

Respectfully submitted,

*/s/ Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762
Special Counsel
Colorado Commission on Judicial Discipline

-6-

## CERTIFICATE OF SERVICE

I certify that on January 18, 2024, a true and correct copy of the foregoing ANSWER BRIEF was filed with the Court and served via the Colorado Courts E-File system upon the following persons:

Counsel for Respondent:
Mr. Craig L. Truman, Atty. Reg. # 5331
Craig L. Truman, P.C.
455 N. Sherman St., Ste. 310
Denver, CO 80203

By:   */s/ Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762

-7-

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | DATE FILED: February 07, 2024 3:57 PM |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case No. 23-104 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>ROBERT W. KIESNOWSKI, A Former Judge of the Adams County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Interim Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5134<br>Email:  j.walsh@jd.state.co.us<br>Atty. Reg. # 33762 | Case Number: 2023SA171 |
| **ENTRY OF APPEARANCE AND SUBSTITUTION OF COUNSEL** | |

Jeffey M. Walsh, as Special Counsel and Interim Executive Director to the Commission on Judicial Discipline, hereby enters his appearance in the above captioned matter. Christopher Gregory is on indefinite leave from the Commission on Judicial Discipline. Therefore, undersigned counsel respectfully requests this court to remove him as counsel on this matter and to please send copies of all future correspondence, pleadings, motions, briefs, notices, and decisions to undersigned counsel.

DATED:  February 7, 2024

Respectfully submitted,

*Jeffrey M. Walsh*

_____
Jeffrey M. Walsh, #33762
Interim Executive Director / Special Counsel
Colorado Commission on Judicial Discipline

-2-

## CERTIFICATE OF SERVICE

I certify that on February 7, 2024, a true and correct copy of the foregoing MOTION served via ICCES on the following person(s):

Counsel for Respondent:
Mr. Craig L. Truman, Atty. Reg. # 5331
Craig L. Truman, P.C.
455 N. Sherman St., Ste. 310
Denver, CO 80203

By:  _____
Jeffrey M. Walsh, #33762

-3-

**Colorado Courts, Probation Departments and State Court Administrator's Office
Policy Governing the Inspection of Administrative Records**

The following policy specifies the implementation of the Colorado Supreme Court Public Access to Information and Records Rule 2  P.A.I.R.R. 2  for the Colorado Courts, Probation Departments and State Court Administrator's Office (SCAO) concerning the public access to administrative records.  The policy is intended to ensure the above entities respond to requests for administrative records in a consistent and expeditious manner.  This policy is not intended to govern requests made of other Judicial Branch agencies.

**Request to the Custodian.** Pursuant to P.A.I.R.R. 2 , a request to inspect or obtain a copy of an administrative record must be directed to the custodian of the record or designee. If a recipient of a request is not the custodian of the sought record but the recipient knows or believes the custodian is or may be someone else in the Courts, Probation Department or the SCAO, the recipient will inform the requestor and forward the request to the person believed to be the custodian.  The time frames for acknowledgment of and response to the request shall begin following receipt of the forwarded request.

Requests that cite the federal Freedom of Information Act or the Colorado Open Records Act, section 24-72-200.1, et seq., C.R.S. will be treated as though they were made pursuant to P.A.I.R.R. 2 and the rule provisions shall apply to the request.  All requests for administrative records must at minimum include the following information: date the request was delivered to the record custodian, requested record, and requestor's name, address, telephone number and email address.

Persons requesting access to administrative records of the Courts, Probation Departments or the SCAO may use the form attached to this Policy.

**Time for Inspection.**
The custodian of the record shall provide written notice of the date, time and location for inspection of records that are subject to inspection under P.A.I.R.R. 2
.

**Format of Records Produced.**
P.A.I.R.R. 2, §4(b)(1)(B) provides for the custodian to determine whether a record will be provided in print or electronic format.

**Fees.**
- **Copies, Scanned Images or Data Storage Device.**
  - A fee of $ .25 per page ($.50 if double-sided) may be charged for a photocopy or scanned image of a record.

- o   If a substantial request is made requiring the production of more than 20 pages of documents the requestor **will be charged** $.25 per page ($.50 if double-sided) for all documents photocopied, scanned or produced.
- o   If the record is provided on a data storage device, the actual cost of the data storage device will also be charged.

- **Research, Retrieval, Redaction.**

If review or research, including redaction of documents, is required to provide the information requested, a fee may be assessed at the rate of $30.00 per hour to recoup the costs of the Court's, Probation Department's and the SCAO's employee time and resources; however, there shall be no charge for the first hour expended in connection with research and redaction.

- **Notice to Requestor.**

Prior to fulfilling a request for administrative records that will involve the assessment of fees, the custodian or designee will provide the requestor with advance notice of an estimate of the cost of complying with the request.  Payment of the actual cost must be received prior to delivery of the requested record.

**REQUEST TO ACCESS ADMINSTRATIVE RECORDS**
*Pursuant to P.A.I.R.R. 2*

Describe the record you would like to access:

 All documents filed in Colorado Supreme Court Case No. 23SA171--Matter of Kiesnowski,
 including the Colorado Commission on Judicial Discipline's original Recommendation,
 filed on or about October 19, 2023, the Court's order striking the Recommendation, the
 Commission's Response and Motion for Reconsideration, and the Court's Order partially
 granting reconsideration.

_____

Requestor

_____

Address

_____

City, State and Zip Code

_____

Telephone Number (Day)

_____

Telephone Number (Alternate)

_____

Email Address

_____

Date Request Delivered to the Custodian

**FOR INTERNAL USE ONLY:**

Date Request Was Received: _____

Person Fulfilling The Request _____ Date Fulfilled_____

Fees Charged (If Any): _____

Copy Costs $_____ Research Retrieval $_____ Redaction $_____ Other $_____

3

# Appendix 22

# Colorado Supreme Court Filings in
# *Matter of Scipione*, 2024 CO 23 and judicial
# vacancy announcement.

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: July 22, 2022 |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 22CJD112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236 |
| ORDER OF COURT | |

Upon consideration of the Motion for Appointment of Special Masters filed in this matter on July 22, 2022, it is HEREBY ORDERED that the following judges are appointed as special masters pursuant to Colo. RJD 18.5(a) in the disciplinary proceedings against the Respondent:

1. Chief Judge Susan Blanco (presiding special master), 8th Judicial District

2. Judge Lindsay Van Gilder, 1st Judicial District

3. Retired Justice Alex Martinez, Senior Justice

BY THE COURT, JULY 22, 2022.
CHIEF JUSTICE BOATRIGHT does not participate.

| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | **DATE FILED: August 03, 2022** |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 22CJD112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236 |
| ORDER OF COURT | |

The Court having considered the REQUEST FOR TEMPORARY JUDICIAL SUSPENSION ACCORDING TO COLO. RJD 34(A), filed by the Colorado Commission on Judicial Discipline ("Commission"), and finding that it has been fully advised and that temporary suspension is appropriate, hereby ORDERS that the Honorable John E. Scipione is suspended temporarily, with pay, from performing any or all judicial duties as a Judge for the District Court for the 18th Judicial District on this 3rd day of August, 2022, effective upon service, pending the resolution of preliminary or formal proceedings before the Commission.
IT IS FURTHER ORDERED that the Commission shall issue to Judge John E. Scipione, an Order to Show Cause directing him to respond in writing to the Commission within 21 days of the date of such Order why he should not continue to be temporarily suspended from any or all judicial duties pending the outcome of preliminary or formal proceedings before the Commission.

This Order and the Commission's Order to Show Cause shall be served together upon Judge John E. Scipione.
IT IS FURTHER ORDERED that the following judge is appointed as a special master to preside over a show cause hearing in this matter, pursuant to Colo. RJD 14(e), 34(c): Honorable Susan Blanco.
IT IS FURTHER ORDERED that pursuant to Colo. RJD 34(f) the Commission's investigation, pleadings, and other records with respect to the temporary suspension and its record of proceedings in preliminary or formal proceedings shall remain confidential unless and until a recommendation for

sanctions or a recommendation for approval of a stipulated resolution is filed with the Court under Colo. RJD 37.


BY THE COURT, EN BANC, AUGUST 3, 2022.
CHIEF JUSTICE BOATRIGHT and JUSTICE SAMOUR do not participate.

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: August 09, 2022 |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 21-138 and 22-112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | Supreme Court Case No:<br>2022SA236<br>& 2022SA14 |
| ORDER OF COURT | |

Pursuant to Colo. RJD 33.5, the Court hereby ORDERS that the Honorable John E. Scipione is transferred to lawyer and judicial disability inactive status, effective immediately. Pursuant to C.R.C.P. 243.8(c), the clerk of the supreme court shall promptly notify all courts within the supreme court's jurisdiction of this order transferring Judge Scipione to lawyer disability inactive status.

BY THE COURT, EN BANC, AUGUST 9, 2022.
CHIEF JUSTICE BOATRIGHT and JUSTICE SAMOUR do not participate.

DATE FILED: December 15, 2022

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>John E. Scipione, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| | Case Number: 22SA236 |

**REPORT AND RECOMMENDATION ON PARTIES' STIPULATION TO DISMISS DISABILITY PROCEEDING**

At issue before the Special Master is the Parties' Stipulation to Dismiss the Disability Proceeding. Having reviewed the appended Stipulation [Exhibit A], the Special Master enters the following report and recommendation:

This disability proceeding was initiated by Respondent's Verified Motion Pursuant to the Colorado Rules of Judicial Discipline Rule 33.5(c), filed in CCJD case numbers 21-138 and 22-112 on August 4, 2022. Respondent asserted that medical and mental health conditions prevented him from assisting in his defense in the pending disciplinary matters. Per Colo. RJD 33.5(c),

Respondent's Motion automatically stayed the disciplinary proceedings against him, and the

Supreme Court appointed this Special Master to "consider all relevant factors and/or stipulations

of the parties, conduct a hearing if necessary, and report to the Colorado Supreme Court

concerning the alleged disability of the Honorable John E. Scipione."

On October 25, 2022, this Special Master entered an Order re: Legal Standard, defining

the legal standard to be applied in determining whether Respondent is able to assist in his

defense in the disciplinary proceedings. Following that order, a court-appointed cardiologist and

two court-appointed mental health experts conducted independent medical examinations of

Respondent.[1] Applying the legal standard, the three IME experts concluded that Respondent was

able to assist in his defense. The expert reports are part of the record.

Following receipt of the expert reports, on December 2, 2022, the Parties submitted a

Stipulation to Dismiss the Disability Proceeding. By that stipulation, Respondent acknowledges

that, under the legal standard as determined by this Special Master, he cannot meet his burden to

prove by clear and convincing evidence that he is unable to assist in his defense. Respondent

made a record that he disagrees with the legal standard applied in this proceeding, and in the

Stipulation, Respondent included a reservation of his right to challenge the legal standard

adopted by this Special Master for this disability proceeding on appeal. The Commission

likewise reserved its right to request payment of its fees and costs for this disability proceeding

in the disciplinary matter, as may be allowed by Colo. RJD 36(g).

---

[1] The cardiologist did not physically examine Respondent, but conducted a review of
Respondent's medical records and issued an expert report.

On December 2, 2022, this Special Master vacated the evidentiary hearing set for December 6-8, 2022, finding that based on the Parties' Stipulation, no hearing was necessary.

The Special Master recommends, pursuant to Colo. RJD 33.5(c)(2), that the Supreme Court accept the Stipulation to Dismiss the Disability Proceeding and resume the disciplinary proceedings against Respondent.

Pursuant to Colo. RJD 33.5(i), this recommendation of the Special Master and any orders of the Supreme Court shall be public.

ORDERED this 15th day of December, 2022.

BY THE SPECIAL MASTER

3

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: December 16, 2022 |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 21-138 and 22-112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236<br>& 2022SA14 |
| ORDER OF COURT | |

Upon consideration of the special master's Report and Recommendation on Parties' Stipulation to Dismiss Disability Proceeding dated December 15, 2022, the Court ADOPTS the special master's recommendation and APPROVES the parties' Stipulation to Dismiss Disability Proceeding.

Pursuant to Colo. RJD 33.5(c)(2), the Court finds, based on the special master's Report and Recommendation and the parties' Stipulation to Dismiss Disability Proceeding, that Judge Scipione can assist in his defense in the disciplinary proceeding. Accordingly, the Court ORDERS that "the disciplinary proceeding shall be resumed but [Judge Scipione] shall remain on lawyer and judicial inactive status, pending the results of the disciplinary proceeding." Colo. RJD 33.5(c)(2). Pursuant to Colo. RJD 33.5(i), this Order and the special master's Report and Recommendation shall be public.

BY THE COURT, EN BANC, DECEMBER 16, 2022.
CHIEF JUSTICE BOATRIGHT and
JUSTICE SAMOUR do not participate.

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | DATE FILED: January 19, 2023 4:41 PM |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 & 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>        and<br><br>John E. Scipione, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲  COURT USE ONLY  ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Christopher S.P. Gregory, esq.<br>Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  c.gregory@jd.state.co.us<br>Atty. Reg. # 37095 | Case Number:  22SA236 |
| **EXHIBIT A—STIPULATION FOR RESOLUTION OF FORMAL PROCEEDINGS** | |

The members of the Colorado Commission on Judicial Discipline ("the

Commission"), upon agreement of Complainant and Judge John E. Scipione, file

the following recommended stipulation for resolution of formal proceedings according to Colo. RJD 37(e):

<div align="center">**SUMMARY AND STIPULATED FACTS**</div>

Judge Scipione is an 18th Judicial District Court Judge, having been appointed to his office effective September 19, 2018. After serving as a magistrate in the 18th Judicial District from 2012-2017, Judge Scipione served as an Arapahoe County Court Judge effective May 31, 2017. Judge Scipione is subject to the jurisdiction of the Commission and of this Court.

The Commission's jurisdiction is limited to recommending discipline based upon Judge Scipione's conduct as a judge and as a candidate for judicial office. CO ST CJC Application; *see also* CO ST CJC Rule 4.1.

Judge Scipione, on at least three occasions, used his position as a judicial officer to seek intimate relationships with Judicial Department employees or court personnel. While serving as a magistrate, Judge Scipione engaged in an approximately 1-year extra-marital personal relationship with his judicial assistant (Judicial Assistant 1). Judge Scipione did not report this relationship to his supervising Chief Judge or the Judicial Department's Human Resources Division, as required by the Judicial Department's personnel rules.[1] As relevant to the

---

[1] Colorado Chief Justice Directive (CJD) 08-06, Attachment F (2012), required the reporting of romantic/sexual relationships between Judicial Department employees and prohibited the employees from remaining in a supervisory / subordinate

-2-

Commission's jurisdiction to impose discipline in this matter, Judge Scipione did not

disclose the existence of this relationship when he applied to become a county court

judge in 2017 and when he applied to become a district court judge in 2018.[2]

In 2021, the Commission notified Judge Scipione of allegations of judicial

misconduct made by a more recent judicial assistant (Judicial Assistant 2) and an

---

employment relationship.  Specifically, Attachment F prohibited circumstances where:

> One party is a justice, judge or magistrate working within the same court or judicial district of the other party who is employed as a classified or contract employee in that court or judicial district.

Attachment F further explained that:

> Failure to comply with this policy may result in cancellation of a contract, corrective and/or disciplinary action, including termination, or a referral to the Commission on Judicial Discipline.

[2] The standard judicial application form asks:

> **46.** Is there any circumstance or event in your personal or professional life which, if brought to the attention of the Commission, might tend to affect adversely your qualifications to serve on the court for which you have applied? If so, please explain.

The standard form further requires the applicant to certify its accuracy, completeness, and compliance with the Colorado Code of Judicial Conduct.  With awareness of his unreported relationship, Judge Scipione responded on both his applications:  "No."

-3-

unpaid intern/law clerk (Law Clerk 1).  These allegations related to claims of sexual harassment, including that Judge Scipione referred to the Judicial Assistant 2 using a derogatory term, openly discussed his involvement in an alternative "lifestyle" of consensual non-monagamy and asked the intern/law clerk to assist him in using the Tinder dating application.  In its investigation, the Commission learned that Judge Scipione pursued a personal relationship with a former law clerk (Law Clerk 2). Judge Scipione failed to disclose the personal relationship with Judicial Assistant 1 and his conduct with Law Clerk 2 in these disciplinary proceedings.  Judge Scipione represented that former staff and others would affirm that he never engaged in similar misconduct in the workplace, without disclosing that he had done so in the past.

Separately, Judge Scipione contacted another judge and that judge's probate clerk in a different jurisdiction to seek favorable treatment in probate proceedings involving Judge Scipione's father's estate.

Following a request from the Commission, this Court issued an order on August 4, 2022 that temporarily suspended Judge Scipione from his judicial duties with pay according to Colo. RJD 34(a). The disciplinary proceedings were stayed for approximately six months pending resolution of disability proceedings initiated by Judge Scipione under Colo. RJD 33.5(c).

-4-

# COLORADO CODE OF JUDICIAL CONDUCT

## Preamble

1.  The Preamble to the Code states, in relevant part:

> "Judges should maintain the dignity of judicial office at all times and avoid both impropriety and the appearance of impropriety in their professional and personal lives."

As defined in the Code, "'Integrity' means probity, fairness, honesty, uprightness, and soundness of character."

## Canon Rule 1.1

2.  Canon Rule 1.1 provides, in relevant part:

> (A) A judge shall comply with the law, including the Code of Judicial Conduct.

## Canon Rule 1.2

3.  Canon Rule 1.2 provides:

> A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

## Canon Rule 1.3

4.  Canon Rule 1.3 states:

> A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others or allow others to do so.

-5-

## Canon Rule 2.16

5.    Canon Rule 2.16(A) states: "A judge shall cooperate and be candid and honest

with judicial and lawyer disciplinary agencies."

## Canon Rule 2.3

6.    Canon Rule 2.3(B) states, in relevant part, that a judge shall not:

>    "[E]ngage in harassment, including but not limited to bias,
>    prejudice, or harassment based upon race, sex, [or]
>    gender..."

7.    Additionally, Chief Justice Directive 08-06 defines sexual harassment to

include: "unwanted sexual advances or propositions; unwelcome

touching; . . ."

8.    Chief Justice Directive 08-06 further states, in part:

>    Harassment, whether verbal, physical, or environmental, is
>    unacceptable and will not be tolerated in the workplace
>    itself or in other work-related settings such as business
>    trips, conferences, or work-related social events.

## Canon Rule 2.8

9.    Canon Rule 2.8 provides, in relevant parts:

>    (A)    A judge shall require order and decorum in
>    proceedings before the court.
>
>    (B) A judge shall be patient, dignified, and courteous to
>    litigants, jurors, witnesses, lawyers, court staff, court
>    officials, and others with whom the judge deals in an
>    official capacity[.]

-6-

## Canon Rule 2.9

10.  Canon Rule 2.9 provides, in relevant part:

> (A) A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter[.]

## Canon Rule 4.1

11. Canon Rule 4.1(A)(11) states:

> (A) Except as permitted by law, or by this Canon, a judge or a judicial candidate shall not:
>
> * * *
>
> (11) knowingly, or with reckless disregard for the truth, make any false or misleading statement[.]

**Stipulated Admissions to Judicial Misconduct:**

12.  Judge Scipione admits to knowingly engaging in conduct that violated Canon Rules 1.1, 1.2, 2.3, and 2.8 through his communications with and about Law Clerk 1 and Judicial Assistant 2.  These communications included discussion of Judge Scipione's sexual preferences and habits outside the workplace. Judge Scipione also inappropriately referred to his judicial assistant in derogatory terms.

13.  Judge Scipione admits to knowingly engaging in conduct that violates Canon Rules 1.1, 1.2, 1.3, and 2.9 by initiating *ex parte* communications with another

-7-

district court judge and that judge's probate clerk in a different jurisdiction to

expedite a probate matter involving Judge Scipione's father's estate.

14.  Judge Scipione admits to knowingly engaging in conduct that violates Canon

Rules 1.1, 1.2, 2.3, 2.16, and 4.1(A)(11) by failing to disclose, on his judicial

applications, an unreported intimate personal relationship with Judicial

Assistant 1 while serving as a 18th Judicial District Court Magistrate. He also

did not disclose this prior relationship during the course of the disciplinary

proceedings.

<div align="center"><strong>STIPULATED RECOMMENDATIONS FOR SANCTIONS:</strong></div>

Based on the foregoing, the Commission and the Respondent agree and

recommend that:

a.  Judge Scipione shall resign from judicial office immediately upon filing
of this Stipulation;

b.  Judge Scipione shall receive a written public censure from the Supreme
Court according to Colo. RJD 36(e) for violations of Canon Rules 1.1,
1.2, 1.3, 2.16, 2.3, 2.8, 2.9, and 4.1, above;

c.  While the stipulated resignation and admissions to judicial misconduct
shall be effective immediately, the parties further agree that other
sanctions, including requests for an award of attorney's fees and costs
and the Colorado Judicial Department's recoupment of certain salary
and benefits paid shall remain open for further determination, with
both sides given the opportunity to brief the issue to the Special
Masters; and

d. Judge Scipione shall, apart from being able to address the remaining sanctions contemplated through Colo. RJD 36(g) and (h) with a final determination by this Court, waive his rights to a hearing in formal proceedings and review by this Court as provided according to Colo. RJD 37(e) and Colo. RJD 40.

The Parties further acknowledge that this stipulated partial resolution, the sanctions imposed by the Colorado Supreme Court, and the prospective record of proceedings as defined by Colo. RJD 33 shall become public upon their respective filings.

Stipulated and agreed this 19th day of January, 2023.

_____
Judge John E. Scipione, Respondent


_____
John S. Gleason, Counsel to Respondent
Attorney Reg. No. 15011


_____
Leslie Schulze, Special Counsel to the Commission
Attorney Reg. No. 43685

Colorado Commission on Judicial Discipline


By: _____
Christopher Gregory, Executive Director
Attorney Reg. No. 37095

-9-

determination by this Court, waive his rights to a hearing in formal proceedings and review by this Court as provided according to Colo. RJD 37(e) and Colo. RJD 40.

The Parties further acknowledge that this stipulated partial resolution, the sanctions imposed by the Colorado Supreme Court, and the prospective record of proceedings as defined by Colo. RJD 33 shall become public upon their respective filings.

Stipulated and agreed this _14th_ day of January, 2023.

Judge John E. Scipione, Respondent

*Jane Cox, #45770 for*

John S. Gleason, Counsel to Respondent
Attorney Reg. No. 15011

Leslie Schulze, Special Counsel to the Commission
Attorney Reg. No. 15685

Colorado Commission on Judicial Discipline

By: _____
Christopher Gregory, Executive Director
Attorney Reg. No. 17405

determination by this Court, waive his rights to a hearing in formal proceedings and review by this Court as provided according to Colo. RJD 37(e) and Colo. RJD 40.

The Parties further acknowledge that this stipulated partial resolution, the sanctions imposed by the Colorado Supreme Court, and the prospective record of proceedings as defined by Colo. RJD 33 shall become public upon their respective filings.

Stipulated and agreed this 19th day of January, 2023.

_____
Judge John E. Scipione, Respondent

*Jane Cox, #45770 for*

_____
John S Gleason, Counsel to Respondent
Attorney Reg. No. 15011


_____
Leslie Schulze, Special Counsel to the Commission
Attorney Reg. No. 43685

Colorado Commission on Judicial Discipline


By: _____
Christopher Gregory, Executive Director
Attorney Reg. No. 37005

-9-

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | DATE FILED: January 19, 2023 4:41 PM |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>        and<br><br>John E. Scipione, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲  COURT USE ONLY  ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Christopher S.P. Gregory, esq.<br>Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  c.gregory@jd.state.co.us<br>Atty. Reg. # 37095 | Case Number:  22SA236 |
| **NOTICE OF COLO. RJD 37(e) STIPULATION AND PARTIAL RECOMMENDATIONS FOR SANCTIONS** | |

The Parties have reached a partial agreement to resolve this matter. The Parties' agreement is attached as "Exhibit A—Stipulation for Resolution of Formal Proceedings." The stipulation resolves the merits of the alleged rule violations with recognition that Respondent Judge John E. Scipione will resign immediately and be publicly censured for his violations of the Colorado Code of Judicial Conduct. The stipulation does not resolve other sanctions sought by the People under Colo. RJD 36(g) and (h). Both Parties will argue the issue of other sanctions under Colo. RJD 36(g) and (h) in briefing before the Special Masters, who will issue a report to the Commission under Colo. RJD 32. Upon the conclusion of these further proceedings, the Commission will complete the record of proceedings in this matter pursuant to Colo. RJD 33 and file that record with this court along with the Commission's final recommendations under Colo. RJD 37.

Because the expectation is that the record in this matter, as defined by Colo. RJD 33, will be supplemented with the special masters' report and the Commission's final recommendations, the Commission requests that this Court take no action at this time apart from: 1) acknowledging receipt of the present filing; 2) acknowledging Respondent's immediate resignation; and 3) recognizing that this

notice and accompanying stipulation is a matter of public record upon filing,

according to Colo. RJD 37(e).[1]

DATED: January 19, 2023

Respectfully submitted,

_____
Christopher S.P. Gregory, #37095
Executive Director
Colorado Commission on Judicial Discipline

---

[1] Colo. RJD 37(e) states, in relevant part:

> The recommendation, the stipulated resolution, the
> record of proceedings, and any sanctions proposed in the
> stipulated resolution shall become public upon the
> Commission's filing of the recommendation with the
> Court.

-3-

## CERTIFICATE OF SERVICE

I certify that on January 19, 2023, a true and correct copy of the foregoing NOTICE OF COLO. RJD 37(E) STIPULATION AND PARTIAL RECOMMENDATIONS FOR JUDICIAL DISCIPLINE and accompanying Stipulation for Resolution of Formal Proceedings were filed with the Court and served via the Colorado Courts E-Filing system upon the following persons:

Attorneys for Respondent:

John S. Gleason, Atty. Reg. #15011
Jane Cox, Atty. Reg. #45770
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111

Appointed Special Counsel:

Leslie C. Schulze, #43685
Lucia Padilla, #35150
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 8th Floor
Denver, CO 80203

By: _____
Christopher S.P. Gregory, #37095

-4-

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: January 20, 2023 |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 21-138 and 22-112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236<br>& 2022SA14 |
| ORDER OF COURT | |

The parties are hereby notified the Court has received the "Notice of Colo. RJD 37(e) Stipulation and Partial Recommendations for Sanctions" and "Exhibit-A Stipulation for Resolution of Formal Proceedings." The Court acknowledges the Respondent's immediate resignation. Pursuant to Colo. RJD 37(e) the Notice and Stipulation filed with the Court on January 19, 2023 are a matter of public record.

BY THE COURT, JANUARY 20, 2023.
CHIEF JUSTICE BOATRIGHT and JUSTICE SAMOUR do not participate.

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | DATE FILED: February 07, 2024 4:41 PM |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 & 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>     and<br><br>JOHN E. SCIPIONE, A Former Judge of the Arapahoe County District Court,<br><br>Respondent. | **▲  COURT USE ONLY  ▲** |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Interim Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5134<br>Email:  j.walsh@jd.state.co.us<br>Atty. Reg. # 33762 | Case Number: 2022SA236 |
| **ENTRY OF APPEARANCE AND SUBSTITUTION OF COUNSEL** | |

Jeffey M. Walsh, as Special Counsel and Interim Executive Director to the Commission on Judicial Discipline, hereby enters his appearance in the above captioned matter. Christopher Gregory is on indefinite leave from the Commission on Judicial Discipline. Therefore, undersigned counsel respectfully requests this court to remove him as counsel on this matter and to please send copies of all future correspondence, pleadings, motions, briefs, notices, and decisions to undersigned counsel.

DATED:  February 7, 2024

Respectfully submitted,

_____
Jeffrey M. Walsh, #33762
Interim Executive Director / Special Counsel
Colorado Commission on Judicial Discipline

-2-

## CERTIFICATE OF SERVICE

I certify that on February 7, 2024, a true and correct copy of the foregoing MOTION was filed via ICCES on the following person(s):

Counsel for Respondent:
John S. Gleason, esq.
Jane B. Cox, esq.
Burns, Figa, & Will, P.C.
6400 South Fiddler's Green Cir., Ste. 1000
Greenwood Village, CO 80111


By:  *Jeffrey M. Walsh* _____
Jeffrey M. Walsh, #33762

-3-

| | DATE FILED: February 08, 2024 |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 21-138 and 22-112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236<br>& 2022SA14 |
| ORDER OF COURT | |

On January 19, 2023, the Commission filed a "Notice of Colo. RJD 37(e) Stipulation and Partial Recommendation for Sanctions" with the Court, along with "Exhibit A – Stipulation for Resolution of Formal Proceedings."  That filing indicated that the parties had reached a partial agreement to resolve this matter.

The Parties' Stipulation purported to resolve the merits of the alleged rule violations with the recognition that Respondent Judge John E. Scipione would resign immediately and be publicly censured for his violations of the Code of Judicial Conduct.  The Stipulation did not resolve other sanctions sought by the People under Colo. RJD 36(g) and (h).  The Commission's Notice indicated that the parties would argue the remaining issues in briefing before the Special Masters, who would issue a report to the Commission under Colo. RJD 32.  The Notice further indicated that upon conclusion of those further proceedings, the Commission would file with the court a completed record of proceedings under

Colo. RJD 33 along with the Commission's final recommendations under Colo. RJD 37.  In light of these unresolved issues regarding other sanctions sought by the Commission, the Commission requested that the Court take no action at that time apart from acknowledging receipt of the Commission's Notice, Respondent's immediate resignation, and the fact that the Commission's Notice and accompanying stipulation was a matter of public record.

On January 20, 2023, consistent with the Commission's request, the Court issued an Order acknowledging receipt of the Commission's Notice and Stipulation; acknowledging the Respondent's immediate resignation; and stating that the Notice and Stipulation are a matter of public record.

Since that date, the Court has received nothing further from the Commission. Because this matter has remained pending for over a year, the Court ORDERS the Special Masters to provide the Court with a status report on this matter on or before February 26, 2024.


BY THE COURT, EN BANC, FEBRUARY 8, 2024.
CHIEF JUSTICE BOATRIGHT and JUSTICE SAMOUR do not participate.

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | DATE FILED: February 26, 2024 |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Former Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲  COURT USE ONLY  ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel / Interim Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  j.walsh@jd.state.co.us<br>Atty. Reg. # 33762 | Case Number:  22SA236 & 22SA14 |
| **COMMISSION ON JUDICIAL DISCIPLINE'S REQUEST TO VACATE THIS COURT'S ORDER FOR A STATUS UPDATE FROM THE SPECIAL MASTERS** | |

1. On February 8, 2024, this court issued an order to the special masters to provide a status report on this case by Monday, February 26, 2024.

2. Filed concurrently with this motion, the Commission today files its formal recommendation for discipline with this court, which should obviate the need for a status update from the special masters. As a result, the Commission requests this court to vacate its order to the special masters to provide a status update.

3. The timeline of this case has been as follows:

   a. January 19, 2023: the parties entered into a stipulation for public discipline, which also required Scipione to resign as a judge.

   b. March 31, 2023: briefing to the special masters on the issues of attorneys' fees and sanctions closed with the filing of the Peoples' Reply Brief on Fees and Costs.

   c. August 24, 2023: the special masters issued their recommendation and report to the Commission.

   d. February 26, 2024: the Commission files with this court its recommendation for discipline.

4. For the foregoing reasons, the Commission hereby requests this court to vacate its February 8, 2024 order for a status update from the special masters.

Respectfully submitted,

*Jeffrey M. Walsh*

_____

Jeffrey M. Walsh
Special Counsel / Interim Executive Director
Colorado Commission on Judicial Discipline

-2-

## <u>CERTIFICATE OF SERVICE</u>

   I certify that on February 26, 2024, a true and correct copy of the foregoing MOTION was filed with the Court and served via the Colorado Courts E-Filing system upon the following persons:

Attorneys for Respondent:

John S. Gleason, Atty. Reg. #15011
Jane Cox, Atty. Reg. #45770
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111

By:   *Jeffrey M. Walsh*
      _____
      Jeffrey M. Walsh, Reg. #33762

-3-

# COLORADO COMMISSION ON JUDICIAL DISCIPLINE



DATE FILED: February 26, 2024 10:09 AM

October 28, 2021

**No. 21-138**
**Confidential**

Hon. John Scipione
District Judge
Arapahoe County Justice Center
7525 South Potomac Street
Centennial, CO 80112

Dear Judge Scipione:

Chief Judge Amico received information from several staff members of the 18th Judicial District about your conduct with a law student intern. She reported these concerns to the Commission, pursuant to Canon Rule 2.15. In addition, we received information that you may have attempted to influence the actions of a Denver Probate Judge who was presiding over your father's estate. The Commission determined that there were sufficient allegations to be considered as a complaint, under Colo. RJD 13.

At their October 22nd meeting, the members of the Commission reviewed a preliminary investigation report from staff of Attorney Regulation who provide investigative support for the Commission. As is our usual procedure, the case was assigned to one of the members who analyzed it in detail and summarized it for the other members.

The Commission reached no conclusions about the allegations, except to determine that they were sufficiently serious to require your response and the Commission's further investigation. The Commission members will consider the allegations in accordance with Colo. RJD 16. We emphasize that the Commission needs your views in order to form an objective view about whether your conduct may have violated any of the Canons and, if so, what type of disposition or sanction would be warranted. Accordingly, pursuant to Colo. RJD 14(a) we are notifying you of these allegations and are requesting your response.

Initially, the Canon Rules that may be implicated in this situation include Canon Rule 1.2 which requires a judge to promote confidence in the judiciary and avoid the appearance of impropriety; Canon Rule 2.3 which, along with Chief Justice Directive 08-06, Attachment A, prohibits conduct that results in harassment of staff; and Canon Rule 2.8 requiring a judge to be patient, dignified and courteous to staff. And an attempt to use your judicial position to influence a decision in your family's probate case could present

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 501-1143

Page 2

conduct issues under Canon Rule 1.3, which prohibits using the prestige of judicial officer for personal benefit; or under Canon Rule 2.9 which prohibits ex parte communications.

As explained in more detail below, it is alleged that your conduct with your law student intern, ███████████████, created an adverse and uncomfortable work environment.

Ms. ██████████ began her clerkship with you in June 2021, after completing her ███████ year of law school. While having lunch with you on her first day at work, you allegedly stated that it was nice to have someone friendly and nice in the office, because your ████████████████, ██████████, was a "bitch." At the time, Ms. ██████████ didn't think much about it.

However, as the weeks passed, she started to feel uncomfortable around you. On several occasions, after your CJA left for the day, you would call her into your office and talk about family or other non-work issues. In her second or third week on the job, when she wore her hair in a high ponytail, you said that high pony tails were your weakness. On another day, she wore a dress exposing her arms which led to your comment that "your guns are out" and asked if she was a fitness model. She felt your statements were flirtatious.

She got acquainted with a janitor named ███. She told investigators that he was an older man and they would chat about Bonsai trees and his kids. But when you saw her talking with him, you remarked that "███ got a crush on you -- trying to make me jealous?" Initially, she thought you were joking but she felt uncomfortable when on another day you saw her talking with ███ and said it was making you jealous.

On a Friday, you told her that your wife and you were having friends sleepover at your house while your kids were out of town. On Monday, when she asked about the weekend, you stated that the neighbors were probably not happy because the guests were walking around in the nude.

Toward the end of June, you showed her the black ring you were wearing on your right hand and explained that if a man wore a black ring on his left hand, it meant that he was asexual and you didn't want anyone to perceive that as your sexual status. You then commented that you lived a very different lifestyle. She laughed but you then said "Do you know what I'm saying?" You then closed the door and began telling her the details of what you called your "swinger lifestyle." You explained some problems in your marriage and your wife's efforts to try the swinger lifestyle. You explained that you and your wife go to a swinger ranch/club where some people participate and others just watch and walk around nude.

You asked Ms. ██████████ to help you download the "Tinder" application which apparently is used to meet and engage in brief sexual encounters. You wanted her to

Page 3

help you describe yourself on this app. She became uncomfortable and tried leave. You then told her that he knew he could trust her with this information and that if she told anyone about this, it would be "really bad" for you.

She reported this incident to a friend and another law student the next day, and later reported it to ██████████████████████████████

A few days later, she was talking with Ms. ████████ at work and was determined not to share this information with her. However, Ms. ████████ told her that other clerks had heard rumors that you had an affair with a former clerk and that you were a "swinger." Ms. ████████ then felt comfortable disclosing the description you provided about your lifestyle.

Ms. ████████ encouraged her to report what you had told her. Ms. ████████████ was reluctant to do so because of potential repercussions regarding her internship, law school, and attempts to get future jobs. Ms. ████████ suggested that she talk with retired Judge John Wheeler, for whom ████████████ had served as a CJA, because she knew Ms. ████████ could trust him. So, Ms. ████████ took it on herself to discuss it with Judge Wheeler who advised her to report your conduct.

Later that week, Ms. ████████ was alone in the courtroom with you. You told her that your friend's wife was going to Florida to see her boyfriend. When this appeared to confuse her, you explained that they were "in the lifestyle. You know the lifestyle?" You then described it as an "open relationship thing." Ms. ████████ later told Ms. ████████ about the conversation.

When Ms. ████████████ told you that she needed to end her internship in July -- earlier than planned, you reacted angrily and asked her to stay until September. She felt intimidated and agreed to stay a few more days. You later called her into your office, thanked her for doing really great work for you, and told her she was "not just a pretty face."

Ms. ████████ asked to transfer to the CJA position for Magistrate Amanda Bradley. This allegedly upset you and you commented that the magistrate didn't know what she was doing and was always getting reversed. After Magistrate Bradley decided to hire her, Ms. ████████ relayed to Magistrate Bradley what Ms. ████████████ had shared with her. The magistrate then told Ms. ████████████ that she had an obligation to report all this. Ms. ████████ also shared this same information with CJA ████████████ who reported it to her judge, District Judge Eric White, who also concluded that it must be reported. Judge White had also heard the rumor that you had an affair with a prior clerk.

It was apparent to the investigators and the Commission members that these incidents had an adverse emotional impact on the staff who were interviewed.

Page 4

Magistrate Bradley, Judge White, Ms. ▇▇▇▇▇ and Ms. ▇▇▇▇ got together on a call to discuss the situation and decided to bring it to the attention of Chief Judge Amico. On September 1st, Magistrate Bradley, former Judge Wheeler, and Judge White met with the Chief Judge and Deputy Court Executive, Jenni Turnidge. Chief Judge Amico then reported the allegations about your conduct to the Commission. We are told that there are staff members who are concerned that your new CJA may have similar experiences involving inappropriate conversations with you.

Chief Judge Amico subsequently was contacted by a Denver Probate Judge whose staff reported that you had asked a favor of the Probate Court in expediting approval of an emergency motion for your appointment as a co-personal representative in your father's estate and the issuance of Letters Testamentary. This involves The Estate of Robert A. Scipione, Case No. 2021PR356. We will be seeking more information about this allegation, but the Commission is concerned that it may involve violations of Canon Rules 1.3 and/or 2.9.

We would appreciate your cooperation in providing us a written response to these allegations well in advance of the Commission's next regular meeting, scheduled for December 17th, so that we can do whatever further investigation may be warranted and, if necessary, arrange for our investigators to interview you. You may send your response by regular mail to our office address or by email to me.

Our proceedings are confidential, in accordance with the guidelines in Colo. RJD 6.5.

Sincerely,

William J. Campbell
Executive Director
w.campbell@jd.state.co.us

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 501-1143

 

John Gleason
jgleason@bfwlaw.com

December 16, 2021

Colorado Commission on Judicial Discipline
William Campbell, Executive Director
1300 Broadway, Suite 210
Denver, CO 80203

     Re:    No. 21-138

Dear Commission Members:

I represent Judge John E. Scipione in this matter. Judge Scipione's response to the Commission's inquiry follows.

### Personal and Professional Background

Judge Scipione obtained his undergraduate degree from the State University of New York at Binghamton and his law degree from the University of Colorado. He was in the private practice of law from 1995 to 2012, when he became a District Court Magistrate. He served in that role until 2017, when he was appointed to the Arapahoe County Court bench. He was appointed to the District Court bench for the 18th Judicial District in September 2018. In 2020, the Eighteenth Judicial District Commission on Judicial Performance unanimously agreed (with one member absent) that Judge Scipione meets all performance standards.

Judge Scipione has been married to Dr. Kymberly J. Scipione, PsyD, EdD, LPC for 22 years. The Scipiones have five children, ages 12 through 29. Dr. Scipione is a Colorado licensed professional counselor, clinical psychologist and AASECT certified sex therapist in private practice specializing in individual therapy with adult women and couples. Dr. Scipione received her PsyD in 2021 and her EdD degree in 2014. Dr. Scipione's doctorial research and dissertation was in *consensual non-monogamy relationships between married heterosexual couples.* This educational undertaking was extensive and took place over five years. Judge Scipione supported his wife's academic endeavors and assisted with the editing process before she published.

### Overview of Allegations

The primary focus of the inquiry is on the internship of ███████████████ . Ms. █████████'s internship in Judge Scipione's division lasted approximately six weeks (when accounting for her four-day work week and scheduled time off) beginning in June 2021. Her allegations comprise minutes in her six-week internship and minutes out of Judge Scipione's nine years on the bench.

Colorado Commission on Judicial Discipline
William Campbell, Executive Director
December 16, 2021
Page 2

Judge Scipione takes full responsibility for any inappropriate comment or statement made to Ms. ████████  Nothing here should be perceived as an attack on her.  Rather, the Commission must understand and consider the context of Judge Scipione's discussions with Ms. ████████ and any comments made to her.  For much of Ms. ████████'s six-week internship, Judge Scipione was either out of his division or in his office writing.  As discussed below, Judge Scipione and his family endured multiple family crises beginning at the time Ms. ████████ started her internship.  The information provided is not a defense to any inappropriate statement made by Judge Scipione.  It is provided for the Commission's consideration that during the time in question the Judge was under enormous stress.

- On June 2, 2021, Judge Scipione's young son had oral surgery which resulted in his hospitalization because of breathing issues following his surgery.

  During this time, Judge Scipione's spouse was in a comprehensive Internal Family Systems training program related to her practice.  As such, Judge Scipione was the primary parent for the couple's children.

- In mid-June 2021, Judge Scipione's father became critically ill.  Because his sister lived in Maine, Judge Scipione was essential to his father's care.  His father's illness meant early morning and after work trips to provide care and assistance.  His work schedule was erratic, and he was often gone from the courthouse.  On June 21, 2021, the Judge's father was hospitalized at St. Joseph's Hospital.  The Judge spent the next forty days driving back and forth to five different hospitals and rehabilitation facilities caring for his father.  His father was in and out of rehabilitation and hospitals due to pneumonia and other complications, including a hip fracture from a fall during rehabilitation.  His father died on July 30, 2021.  Judge Scipione was out of his office much of the months of June and July caring for his father.  The Judge was also off work from August 1 through August 16, 2021, following his father's death.

- On June 25, 2021, his spouse had surgery to repair issues from a November 2019 surgery.

- On July 19, 2021, two of the Judge's children were injured in a serious car accident.  Both were transported to the hospital with head trauma and other injuries.  Both children were in physical therapy two or three days a week following the accident and treatment continues for their injuries.

- On August 6, 2021, the Judge's spouse graduated with her second doctorate.

BURNS FIGA & WILL

4896-1231-2070, v. 1

Colorado Commission on Judicial Discipline
William Campbell, Executive Director
December 16, 2021
Page 3

- From August 7, 2021 until the present time, the Judge and his sister, who traveled to Denver from Maine, were attempting to prepare and sell their deceased father's home and other matters related to settling the estate.

- On September 16, 2021, the Judge's oldest son became ill and was taken to the ER and released.

- On September 17, 2021, his son was admitted to St. Joseph's Hospital with severe COVID. His son remained hospitalized until November 5, 2021. His son was in the ICU on a ventilator for 36 days. The Judge drove to and from the hospital daily to be with his son. On November 5th, he was released to rehabilitation and the Judge returned to work.

### Responses to Allegations

Judge Scipione responds to the allegations in the order in which they are addressed in the Commission's letter.

1. Reference to ███████████ as a "bitch."

At no time did the Judge refer to Ms. ████████ in such a manner. On Ms. ██████████ first day, the Judge took her to lunch. At lunch, he told her that ██████ was quiet, did not engage in any meaningful conversation, and could come across as cold. The Judge wanted Ms. ███████████ to feel welcome and not take it personally if Ms. ████████ was unfriendly. The Judge expressed that he was happy to have Ms. █████████ onboard for the summer.

In January 2021, Judge Scipione was asked by Chief Judge Amico if he would agree to transfer to a civil division docket from his criminal docket. The Judge agreed. However, much to his disappointment, his clerk of 4.5 years, Madison Eutsler, did not want to transfer to a civil division. In addition, the Judge would lose his court reporter, Cathy Troyanek, with the transfer. The Judge, Madison, and Cathy enjoyed a close and collegial work environment and were all sad to be breaking up.

With the impending transfer to a civil division, the Judge found himself having to hire a new CJA in the middle of the COVID crisis. Judge Wheeler had just retired and Ms. █████████, his former CJA, was looking for a new division. She was an experienced clerk and familiar with the civil docket. Ms. █████████ had nowhere to go so the Judge agreed to interview her given her civil background. Following the initial interview, he decided not to offer her the position. He found Ms. █████████ to be sullen and a poor communicator. She also told the Judge that she had been working from home for nine months and had no interest in returning to the courthouse in person, but would do so if she had to. Judge Scipione was concerned as he was new to the civil division

4896-1231-2070, v. 1

Colorado Commission on Judicial Discipline
William Campbell, Executive Director
December 16, 2021
Page 4

and wanted his clerk present while he learned the new docket.  He was also concerned that Ms. ████ may become resentful for having to return to work in person.  She assured him she would be fine and do what she needed to do.

The Judge consulted with the administrative department of the 18th Judicial District and was told that there was no one else available who was looking to transfer or who had civil experience.  The options were - interview Ms. ████ again and see if things might work with her or wait until such time that there were viable outside applicants available to interview.

The Judge conducted a second interview of Ms. ████r and, despite his concern, had little choice but to offer her the position.  Ms. ████'s personality was diametrically opposite of his personality and his former clerk's personality.  Nonetheless, he promised himself and the administrative department that he would make the best of the situation and give Ms. ████ a chance and hope that they could make things work.

Judge Scipione inherited a difficult docket in the middle of a pandemic, had a new clerk who he found difficult to work with, and no law clerk.  He was desperate for help as he had a large trial looming and, by that time, had written over a thousand pages of decisions.  He interviewed Ms. ████ as a potential intern and found her smart and personable. Ms. ████ started her internship the first part of June 2021.  The Judge is confident that he told Ms. ████n that Ms. ████ was not a good communicator.  As previously discussed, at the same time Ms. ████ started, Judge Scipione's father was critically ill, which required him to provide daily care for him.  By the middle of June 2021, the Judge's father was hospitalized, two of his children were injured in an automobile accident, and his spouse was headed into a second surgery.

2. Discussions about "family" and "non-work issues" and alleged comments about Ms. ████s physical appearance.

First, the allegation about calling Ms. ████ into his office and closing the door is false.  It never happened.  Witness interviews with former law clerks and CJAs confirm that the Judge virtually never closed his office door.  The witnesses will testify that the only time they ever saw the Judge close his office door was when another judge was in his office or on the rare occasion when he discussed a personnel issue.  His habit was that his office door was always open.

Ms. ████ frequently left work early and always earlier than the Judge or Ms. ████ during the summer.  The Judge rarely spoke to either Ms. ████ or Ms. ████ during the regular workday.  He was either running back and forth to various medical appointments, sitting in his office writing, or in court.  There was no idle chit chat during the day. As was the Judge's custom and routine with his previous law clerks and

BURNS FIGA & WILL

4896-1231-2070, v. 1

Colorado Commission on Judicial Discipline
William Campbell, Executive Director
December 16, 2021
Page 5

Ms. ███████, the Judge conducted "check-ins" at the end of the day (usually between 4:30-5:00 p.m.) to discuss work assignments and answer any questions from staff.  Closing the door was not necessary and did not occur.

Over the course of last summer, when the Judge was at the courthouse, he would sit down with Ms. ███████ in his office - on opposite sides of his desk with the door open.  In addition to discussions about various legal assignments and cases, Ms. ███████ initiated conversations with the Judge about law school, friends, her family and other mundane matters.  In addition, throughout the summer, Ms. ███████ routinely thanked the Judge and shared how lucky she was to have the summer internship, how meaningful and interesting the assignments were, and how much she was learning.  She also shared how jealous her fellow summer interns were of her experience relative to the types of assignments they were receiving.

In reciprocal conversation, the Judge talked about his five children, his wife, his ill father, and the work that the court was doing.  On more than one occasion, Ms. ███████ asked about Dr. Scipione's work as a psychologist/therapist and commented about her pictures and those of his children in his office.  Again, it is critical that the Commission understand the timing of Ms. ███████ internship.  Much of the time, the Judge was not present because he was addressing one of the multiple crises taking place in his personal and family life.

Regarding the "high ponytail" comment: On a particular occasion, Ms. ███████ wore her hair in a "high ponytail."  The Judge commented that he liked that hairstyle and particularly liked it when his wife wore her hair that way.  He also remembers commenting that it looked like how the singer, Ariana Grande, wore her hair.  In response, Ms. ███████ smiled and said, "Thank You!"  That was the end of the conversation.  It was a harmless comment and compliment with no indication from Ms. ███████ that it was off-putting or offensive in any way.

Regarding the "guns-out" comment: On a particular occasion, Ms. ███████ wore a sleeveless shirt to work.  She regularly commented about her gym routine, having to get to the gym after work, and lifting weights.  Acknowledging her fitness routine, the Judge commented that the "guns were out" or "gun-show" referring to her arms.  In response, Ms. ███████ flexed both arms, and said "Thank You!"  That was the end of the conversation.  Again, it was a harmless comment and compliment with no indication from Ms. ███████ that it was off-putting or offensive in any way.

Judge Scipione never made comments to Ms. ███████ or any other intern or law clerk that could be considered "flirtatious" within the courthouse or work environment.  Multiple witness interviews dating back to Judge Scipione's early days on the bench confirm that he never made any off-color, sexually flirtatious, or any demeaning comments about women or anyone.

Colorado Commission on Judicial Discipline
William Campbell, Executive Director
December 16, 2021
Page 6

To the contrary, a courtroom full of prior clerks, law clerks, and others will confirm that Judge Scipione never engaged in the type of conduct alleged by Ms. ██████████.

3.  A custodian named "Tan."

Ms. ██████████ turned a friendly, teasing banter about a custodian making frequent trips into the court offices into a sexual innuendo.  It is a ridiculous and childish allegation.  "Tan" has been Judge Scipione's courtroom and office janitor for years.  The Judge loves "Tan" and chats with him whenever he has the opportunity.  "Tan" did make more frequent trips into the courtroom and office when Ms. ██████████ was present.  In response, the Judge commented on one occasion that "You better watch out. Tan has a crush on you."  Nothing else.  She laughed in response.  Any comment was made in a joking or humorous manner and certainly not with the sexual overtone portrayed by Ms. ██████████.

4.  The black ring.

It is true that Judge Scipione did have a conversation about his wearing a black ring. However, the conversation with Ms. ██████████ occurred much differently than she describes. In one of many "check-in" conversations at the end of the day where both work and non-work matters were discussed, Ms. ██████████ asked the Judge about the black ring he wore on his right hand.  Initially, the Judge responded in a vague manner without detail and told her that it related to his personal life, his spouse and "the lifestyle."  She responded with, "Well, now you have me curious.  I'm always interested in learning about other lifestyles."  She asked him questions and he responded.  The conversation lasted about 15 minutes.

While the Judge is not in the habit of talking about his ring, he's had similar conversations with anyone who asks him about it.  It should also be noted that the black ring is always discussed in the context of Dr. Scipione's work, dissertation, and their research as a couple into the subject.  Not only did Ms. ██████████ never appear uncomfortable, but she also stated she was "intrigued" and thanked the Judge for sharing.  At the end of the conversation, which corresponded with the end of the workday, the Judge reminded Ms. ██████████ that their conversation was not for public dissemination and should remain private.  At no time did the Judge imply that Ms. ██████████ needed to keep a secret because it would be "really bad" if anyone found out.  Plain and simple, it was no one's business and it would not have come up if not asked.  In retrospect, the Judge regrets his truthful response to her questions.

Contrary to Ms. ██████████'s allegations, the Judge never engaged in a conversation that included details about his sex life with his wife or with other people.  In the context of discussing the "lifestyle" and answering Ms. ██████████'s questions, the Judge defined terms, specifically said that the word "swinger" can be considered pejorative, and the term did not reflect what the "lifestyle" is about.  He mentioned that there were "lifestyle" friendly clubs in the Denver metro

BURNS FIGA & WILL

Colorado Commission on Judicial Discipline
William Campbell, Executive Director
December 16, 2021
Page 7

area and that he and his wife had many good friends they met in the "lifestyle" that have nothing
to do with sex.  Most importantly, he described Dr. Scipione's research and work on the subject
and how important it was related to educating mental health professionals about this growing
sect of the LGBTQ+ community of which Dr. Scipione and the Judge are a part.

Given the high level of stress and everything that was going on with the Judge at the time
as described above, Dr. Scipione suggested that he make a dating profile on an app such as
"Tinder" for a distraction.  The Judge shared this information with Ms. ███████.  At no time
did the Judge ask for assistance downloading the app or making a profile.  In fact, the Judge
shared that he had even been "unliked" on Tinder so maybe it was the wrong place to be.
Ms. ███████ smiled and laughed.  In hindsight, the Judge regrets what might appear as
"oversharing" about his personal life.  The allegation that he "could trust her with the
information" is false.  He barely knew Ms. ███████.  She was in his division for a period of a
few weeks and much of the time he was attending to his father or his family crises.  As stated
previously, the total time he spent in conversations with Ms. ███████, especially related to
non-work-related matters, amounted to minutes.

5.  Ms. ███████'s departure.

It was understood when the Judge hired Ms. ███████, that her internship would last
from the first week in June until the middle of August when classes resumed.  About ten days
before the end of July, Ms. ███████ announced that her last day would be July 30th because
she had other academic projects she needed to attend to.  While surprised and taken off guard,
the Judge indicated that he understood, but that it would "suck" because there was so much work
to do and no help to do it.  Notwithstanding the announcement, the Judge's first reaction was to
tell Ms. ███████ and Ms. ███████ to figure out a day they could *all* go out for a farewell
lunch.  Ms. ███████ was happy to celebrate her last day and picked a local sushi restaurant.
They all decided that Friday, July 30th would be the best day.  And they all went.  Sadly, less
than an hour after returning from lunch, the Judge's father died.  He left the office and never saw
or heard from Ms. ███████ again.

On two occasions, Ms. ███████ had lunch with Judge Scipione…her first day and her
last day.  This has been Judge Scipione's practice during his time as a Magistrate and Judge.  If
he was angry with her for her early departure, why would he take her to lunch or, for that matter,
if she was intimidated or threatened by him, why would she agree to lunch?

At no time did Judge Scipione ever "beg" her to stay and certainly not until the middle of
September when he knew from the beginning that she had to start school again in mid-August.
Although Judge Scipione desperately needed her help, he understood that she was unpaid, and it
was her choice.  He never questioned her decision, never spoke angrily towards her or any staff
ever, never "intimidated" her, and most importantly never talked about her "pretty face."  To the

BURNS FIGA & WILL

4896-1231-2070, v. 1

Colorado Commission on Judicial Discipline
William Campbell, Executive Director
December 16, 2021
Page 8

contrary, the Judge, even up to Ms. ██████████'s last day, thanked her for all of her hard work, commented about how much she accomplished, and told her that she would be successful as an attorney given her intellectual acumen.  She stated how incredibly grateful she was for the opportunity and what an amazing summer it had been.

Ms. ██████████'s internship came at a very stressful and difficult time in Judge Scipione's life.  Never in his years on the bench had he experienced the personal anguish and struggle of his father's lingering illness and ultimate death, the injuries to two of his children, and the near death of another child from COVID.  Frankly, Ms.██████████ departure was not that important to him at the time.

6.  The call to the Denver probate clerk.

The Commission is "concerned" about a call Judge Scipione made to the clerk's office at the Denver Probate Court.  The Judge was not asking for any "favor" or special treatment.  Rather, because the appointment of co-personal representatives was delaying the administration of his father's estate, he asked that the court expedite the issuing of letters testamentary and the appointment of co-personal representatives.

Judge Scipione has known the Denver Probate Judge for twenty-five years.  He did not believe at the time that he was asking for a "favor."  Rather, because his sister and he were serving as co-personal representatives of their father's estate, he viewed the appointment as a ministerial act.  There was no dispute, his sister was extending her stay in Colorado to assist him with the administration of the estate, and he was not asking the court for anything other than to review the matter expeditiously.  Later, on August 21, 2021, the Judge filed an Emergency Motion for Forthwith Informal Appointment of Co-Personal Representatives and Issuance of Letters Testamentary.  [Attached as **Exhibit 1**.]  The motion details the urgent issues that the Judge and his sister were facing regarding the administration of the estate.

In retrospect, Judge Scipione recognizes that he should not have used his title in the message left for the probate court.  He also appreciates the fact that the court's clerk may have perceived his call as a request for special treatment and attention.  It was a mistake that will not be repeated.

### Conclusion

The truth of this matter is addressed on page 3 of the Commission's letter.  Ms. ██████████s spreading of "rumors" about Judge Scipione.  She certainly knows that the Judge was not happy with her and that they did not work well together.  Ms. ████████ is the driving force behind Ms. ██████████'s allegations.  This is evident from her conduct encouraging Ms. ██████████s complaint, involving other judges and magistrates in orchestrating the complaint instead of taking the matter to the administrative department, human resources, or even the Chief Judge,

BURNS FIGA & WILL

Colorado Commission on Judicial Discipline
William Campbell, Executive Director
December 16, 2021
Page 9


and her transfer to a different division.  Most significantly, Ms. ████████ a long-time judicial employee, purposefully avoided advising Ms. ████████ about reporting any concerns to human resources through the administrative department or going to the administrative department herself.  It should be noted that Judge Scipione's Division 204 is steps away from the Court Executive (Shaun Clark), Deputy Court Executive (Jenni Turnidge) and the Administrative Office Manager (Carol Rigato).

In its letter, the Commission repeatedly mentions the "rumors" about Judge Scipione's "lifestyle" spreading around the courthouse.  However inappropriate and unfortunate, that seems to be a common occurrence in the judicial branch.  Certainly, some of the rumors and innuendos may be driven by the fact that it is common knowledge that Judge Scipione's spouse did her dissertation on the research topic of *non-monogamous relationships in marriages*.  The Judge has never shied from discussing his spouse's professional practice and training when asked.

The motives of ████████ and ████████ are not relevant.  Judge Scipione understands the importance of his demeanor on and off the bench.  In his many years on the bench, he has never intentionally done anything to demean or impugn the integrity of his position or the judiciary.

Judge Scipione did not violate any Judicial Canons or Chief Justice Directives.  He takes full responsibility for his conduct and is profoundly sorry if ████████ found any comment or conversation uncomfortable or inappropriate.  The Commission can be assured that the Judge has learned from this experience and understands the importance of always maintaining appropriate boundaries.

Sincerely,

BURNS, FIGA & WILL, P.C.

John S. Gleason

Enclosure

4896-1231-2070, v. 1

<table>
<tr><td>
Denver Probate Court

Denver County, Colorado

1437 Bannock St. # 230

Denver, CO 80202

</td><td>

↑ **COURT USE ONLY** ↑
</td></tr>
<tr><td>

**In the Matter of the Estate of:**

**ROBERT A. SCIPIONE**

**Deceased**

---

**John E. Scipione (Atty Reg. # 25527), Applicant for co-personal representative**

**7629 S. Country Club Parkway Aurora, CO 80016**

**Jscipione69@gmail.com**

**720-563-9833**

</td><td>

Case No.: 2021PR356

Div: 3

</td></tr>
<tr><td colspan="2">

**EMERGENCY MOTION FOR FORTHWITH INFORMAL APPOINTMENT OF CO-PERSONAL REPRESENTATIVES AND ISSUANCE OF LETTERS TESTAMENTARY**

</td></tr>
</table>

The Applicants for co-personal representatives, John E. Scipione and Ellen S. Scipione, as interested persons pursuant to § 15-10-201(27), C.R.S., hereby moves this Honorable Court for the forthwith appointment of Applicants as co-personal representatives and issuance of letters testamentary. And for support states as follows:

1.      The Decedent, Robert A. Scipione passed away on July 30, 2021. He named his surviving children, John E. Scipione and Ellen S. Scipione as co-personal representatives in his will to manage his estate upon his death.

2.      On August 10, 2021, the Applicant John E. Scipione filed the Application for Informal Probate of Will and Informal Appointment of Personal Representative ("Application")

**EXHIBIT 1**

with a Proposed Order for Informal Probate of Will and Informal Appointment of Personal Representatives. The Decedent's original Will was filed with the Application. In addition, Acceptance of Appointments were also filed for John E. Scipione and Ellen S. Scipione as co-personal representatives. Proposed Letters Testamentary (x4) were also filed so that proof of the Personal Representative's authority to act pursuant to § 15-12-701, et. seq., C.R.S. could be issued. All documents were filed in person at the Denver Probate Court and accepted as complete for filing.

3.      On August 17, 2021, the Court issued an Order Re: Informal Testate indicating that the Applicants' file was incomplete: Applicant was directed to file an addendum to the Application for Informal Probate of Will and Informal Appointment of Personal Representative to include the Trust listed under Article 1.5 of the Will in section 8 of the application as well as the Irrevocable Power of Attorney from Ellen Scipione, the proposed co-personal representative.   Both documents, including a Trust Certification were filed on August 20, 2021.

4.      Since this matter has been pending and the applicants have been waiting for the Order of Informal Appointment and Letters Testamentary to be issued, the Decedent's estate has been substantially and negatively impacted. To date, Decedent's bank accounts have been frozen. As a result, all the automatic withdrawals for the Decedent's HOA dues, taxes, insurance, credit card and car payments, have been rejected for payment by the bank. Applicant is now receiving notices of delinquency, default, and threats of repossession of Decedent's vehicle. Without the Order of Informal Appointment and Letters Testamentary, the co-personal representatives are crippled and unable to handle the financial affairs of Decedent's estate as contemplated by his Will and Trust.

5.      In addition to the negative impact to Decedent's estate, the financial and emotional consequences to co-personal representatives have been particularly burdensome and overwhelming. Specifically, co-representative, Ellen Scipione, Decedent's daughter, lives in Corinth, ME. She has been away from home for several weeks, is unable to return to work, and is now forced to live in a hotel until the financial affairs of the estate are concluded. Further, as a disabled veteran, she is unable to receive her regularly scheduled therapy for PTSD through the VA Hospital. As a co-personal representative, the banks will not take any action to transfer or open an estate account unless she is present in person. As stated above, no actions can be taken without the necessary orders and letters from the Court to authorize co-representatives to act on behalf of Decedent's estate.

For all of the reasons outlined herein, the Applicants respectfully request that the Court / Probate Registrar issue the Order for Informal Probate of Will and Informal Appointment of Personal Representative with Letters Testamentary (x4) forthwith given the emergent circumstances.

Respectfully Submitted this 25th day of August 2021.

2

4890-6049-7926, v. 1

_____
John E. Scipione
7629 S. Country Club Parkway
Aurora, CO 80016
Applicant for Co-Personal
Representative

3

SUPREME COURT, STATE OF COLORADO
ORIGINAL PROCEEDING IN DISCIPLINE
BEFORE THE COLORADO COMMISSION ON
JUDICIAL DISCIPLINE

1300 Broadway, Suite 210
Denver, Colorado  80203

IN RE THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,
Complainant,

and

JOHN E. SCIPIONE, A Judge of the Arapahoe
County District Court,

Respondent.

Erin Robson Kristofco, #33100
Assistant Regulation Counsel
Jessica E. Yates, #38003
Regulation Counsel
Special Counsel for the Commission
On Judicial Discipline
1300 Broadway, Suite 500
Denver, Colorado 80203
Telephone: (303) 928-7911
Email: e.kristofco@csc.state.co.us

▲COURT USE
ONLY▲

Case Number:
(and Commission Case
No. 21-138)

**STATEMENT OF CHARGES**

THIS STATEMENT OF CHARGES is filed pursuant to the authority of Colorado Rules of Judicial Discipline ("Colo. RJD") Rules 4, 16(b)(4)[1] and 18, and it is alleged as follows:

## I.    BACKGROUND AND JURISDICTION

1.    Respondent John E. Scipione ("Respondent") was appointed as a Judge of the Arapahoe County District Court in 2018. He was serving in that capacity at all times pertinent to this Statement of Charges.

2.    Respondent is subject to the jurisdiction of the Colorado Supreme Court and the Colorado Commission on Judicial Discipline (the "Commission") in these disciplinary proceedings.

## II.    FACTUAL ALLEGATIONS

### A. SEXUAL HARASSMENT

3.    In early June 2021, Ms. ██████████ had completed her second year of law school at ████████████████████████████████████, and began a judicial law clerk internship with Respondent.

4. On her first day, Respondent was friendly and chatty with ███. ██████████, and took her out to lunch.

5. The two briefly discussed Respondent's ████ ███████ ████████ ████████████████████████, who was not in the office that day.

6. Respondent stated it was so nice to finally have someone friendly and nice in the office because his ████████████, "was a bitch."

7. Ms. ██████████'s work schedule was usually 8:30 a.m. to 5:30 p.m., while Ms. ███████ generally left at 4:30 p.m.

8. After Ms.██████████ left for the day, Respondent would often call Ms. ██████████ into his office, or stand at her doorway, and they would "chit chat"— sometimes about family or other non-work issues.

---

[1] On December 17, 2021, the Commission on Judicial Discipline determined there was probable cause to proceed with formal charges against Respondent John E. Scipione.

2

9. Although Ms. ▮▮▮▮▮▮▮ usually wanted to leave at 5:00, she stayed later because Respondent was a judge and she didn't want to tell him that she needed or wanted to go home.

10. During Ms. ▮▮▮▮▮▮▮'s second or third week working for Respondent, Respondent began making comments that made her uncomfortable.

11. One day, Ms. ▮▮▮▮▮▮▮ wore her hair in a high ponytail and Respondent said, "I gotta warn you high ponytails are my weakness. What are you Ariana Grande?"

12. Ms. ▮▮▮▮▮▮▮ stated she thought the ponytail comment was odd, but "laughed it off."

13. Another day, Ms. ▮▮▮▮▮▮▮ was wearing a dress that showed her arms and Respondent commented, "Your guns are out" and asked if she was a fitness model.

14. Ms. ▮▮▮▮▮▮▮ noted that Respondent asked the question using a flirtatious voice, but again, Ms. ▮▮▮▮▮▮▮ tried to "laugh it off."

15. Ms. ▮▮▮▮▮▮▮ developed a friendship with a janitor at the courthouse named Tan.

16. When Respondent saw Ms. R▮▮▮▮▮▮ talking with Tan, he said to her, "Oh Tan's got a crush on you – trying to make me jealous!"

17. Ms. ▮▮▮▮▮▮▮ felt uncomfortable when Respondent again commented about Tan making him jealous on another day when Ms. ▮▮▮▮▮▮▮ was talking with the janitor.

18. Ms. ▮▮▮▮▮▮▮▮▮▮▮▮ also reported that the Judge made uncomfortable comments to her during this time period.

19. In mid-June, Ms. ▮▮▮▮▮ was talking with Respondent on a Friday when Respondent told her he and his wife were having friends sleep over at their house, his kids were out of town and his wife was buying new sheets.

20. The following Monday morning Ms. ▮▮▮▮▮ asked Respondent about his party.

3

21. Respondent stated that his neighbors were probably not happy about the party because his guests were walking around nude outside in his yard.

22. Ms. ▆▆▆▆ thought his statement was weird and didn't ask any more questions.

23. On or about June 17, 2021, Respondent called Ms. ▆▆▆▆▆ into his office to talk.

24. Respondent was wearing a black ring and asked Ms. ▆▆▆▆▆ if she knew what it meant.

25. Ms. ▆▆▆▆▆ said she didn't know.

26. Respondent told her that a black ring on someone's left hand meant that the person is asexual.

27. He said he moved his black ring to his right hand so people wouldn't think he was asexual.

28. Respondent told Ms. ▆▆▆▆, "I live a very different lifestyle, do you know what I'm saying?"

29. Respondent then told Ms. ▆▆▆▆n to close his door.

30. Ms. ▆▆▆▆ closed the door.

31. Ms. ▆▆▆▆s heart began pounding and she started sweating.

32. Respondent then began telling Ms. ▆▆▆▆ the details of his lifestyle, which he referred to as the "swinger lifestyle."

33. Respondent told Ms. ▆▆▆▆ about problems in his marriage.

34. Respondent then told Ms. ▆▆▆▆ how his wife had pushed him to try the swinger lifestyle.

35. He told her he and his wife go to a swinger ranch/club in Colorado.

4

36. Respondent told Ms. ▮▮▮▮▮ that at the ranch, some people,

    a) "participate in sex;"

    b) some "hit it and quit it;"

    c) "others just watch, but it is all very respectful;" and

    d) "Women run the show and people walk around completely nude."

37. Respondent then told Ms. ▮▮▮▮▮ the club/ranch cost for women to get in is $25; for men $300; for couples $100.

38. Respondent said he and his wife went with other couples on swinger vacations; his wife was encouraging him to put himself out there; and Colorado is number one in the nation for the swinger lifestyle.

39. Respondent then told Ms. ▮▮▮▮▮ his wife told him to download the Tinder application (an "app" commonly used to meet and engage with others in brief sexual encounters).

40. Respondent asked Ms. ▮▮▮▮▮ if she could help him set up his Tinder account because he didn't know much about it, and didn't know what to say about himself on his Tinder profile.

41. Ms. ▮▮▮▮▮ was extremely nervous.

42. Ms. ▮▮▮▮▮ then changed the subject to try to start talking about her family in Arkansas.

43. Toward the end of the conversation Mr. ▮▮▮▮▮ indicated she needed to leave.

44. Before Ms. ▮▮▮▮▮ left, Respondent told her he knew he could trust her with this information—and he hadn't even told his best friend about his lifestyle.

45. He told Ms. ▮▮▮▮▮, "If you tell anyone this, it would be really bad for me."

5

46. Once she was in her car, Ms. ███████ tried to call her best friend from high school to tell her what had just happened with Respondent, but had to leave a voicemail for her friend.

47. Ms. ████████ also told a fellow law student what had occurred that day, and later told her law school mentor what Judge Scipione said to her while his door was closed.

48. Ms. ████████ avoided Respondent for the next week.

49.  Later that week, Ms. ████████████ was alone in the courtroom with Respondent.

50. They began chatting and Respondent said his friend's wife was going to Florida to see her boyfriend.

51. Respondent saw that Ms. ███████ was confused and said, "They're in the lifestyle. You know the lifestyle?"

52. Ms. ██████ indicated she didn't know.

53. Respondent went on to tell Ms. ███████ about the swinger lifestyle, which he described as "the open relationship thing."

54.  Respondent then told Ms. ██████ about a swinger ranch where,

   a)  some people like to go on vacations for open relationships;

   b)  some people like to watch; and

   c)  some people "hit it and quit it."

55. Ms. ██████ changed the subject and left the courtroom.

56. Ms. ███████ then told Ms. ████████ what had just occurred in the courtroom.

57. Because of the closed door conversation regarding his swinger lifestyle, Ms. ████████ was no longer comfortable working for Respondent.

6

58. Ms. ███████ informed Respondent that she needed to end her internship in July—earlier than planned.

59. Respondent became angry and said he was counting on Ms. ███████ to stay until at least September.

60. Ms.███████ felt intimidated and agreed to work a couple more days.

61. During her last two days, Respondent called Ms.███████ into his office and said she'd done some really great work for him, and then said, "See, ██████ – you're not just a pretty face."

62. Ms. ██████ asked administration for a transfer.

63. When Ms. ██████ learned that Magistrate Amanda Bradley needed a CJA, Ms. ██████ immediately applied to transfer to Magistrate Bradley's division.

64. When she told Respondent that she had applied to transfer to Magistrate Bradley, Respondent became angry and told her, "You won't learn anything from Magistrate Bradley anyway. She doesn't know what she's doing. She's always getting reversed."

65. Magistrate Bradley interviewed and hired Ms.████████████.

## <u>CHARGE I</u>
### CCJC Rule 2.3
### A Judge Shall Not by Words or Actions Engage in Harassment Based on Sex or Gender

66. Paragraphs 1 – 65 above are incorporated herein.

67. CCJC Rule 2.3 states,

(A) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.

(B) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political

7

affiliation, and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so.

68. In addition, Chief Justice Directive 08-06, Amended 05/11, ANTI-HARASSMENT AND ANTI-DISCRIMINATION POLICY - COLORADO JUDICIAL DEPARTMENT, states,

Harassment, whether verbal, physical, or environmental, is unacceptable and will not be tolerated in the workplace itself or in other work-related settings such as business trips, conferences, or work-related social events.

69. Respondent violated Canon 2.3, and the Chief Justice Directive 08-06, when he engaged in a closed door conversation with his young, female law clerk, Ms. ████████, about his sex life, sexual practices, and opportunities for sexual engagements at a "swingers" ranch.

70. Respondent again violated Canon 2.3, and the Chief Justice Directive 08-06, when he engaged in a conversation with his ███████████, about his sex life, and opportunities for sexual engagements at a "swingers" ranch

71. Through his conduct as described above, Respondent violated CCJC Rule 2.3, whether viewed as separate incidents or as a pattern of similar conduct.

## CHARGE II
### CCJC Rule 2.8
### A Judge Shall be Patient, Dignified and Courteous

72.    Paragraphs 1- 71 above are incorporated herein.

73.    Canon Rule 2.8 states,

(A) A judge shall require order and decorum in proceedings before the court.

(B) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control…

8

74. Respondent violated Canon 2.8 when he discussed the details of his sex life and sexual practices with his ████████, Ms.████████.

75. Respondent violated Canon 2.8 when he discussed the details of his sex life and sexual practices with his ████████████.

76. Respondent was not dignified or courteous when he discussed the details of his sex life and sexual practices with his ████████████.

77. Respondent failed to act dignified or courteous when he referred to his CJA as a "bitch," when speaking to his law clerk.

78. Respondent failed to act dignified or courteous when he told Ms. ████████ "You won't learn anything from Magistrate Bradley anyway. She doesn't know what she's doing. She's always getting reversed.".

79. Through his conduct as described above, Respondent violated CCJC Rule 2.8, whether viewed as separate incidents or as a pattern of similar conduct.

## B. IMPROPER EX PARTE CONTACT WITH ANOTHER JUDGE

80. Respondent's father passed away on July 30, 2021.

81. On August 10, 2021, Respondent filed an Application for Informal Probate of Will and Informal Appointment of Personal Representative, in Denver County District Court, case 21PR356, but did not get an immediate ruling.

82. Judge Elizabeth D. Leith, Presiding Judge of the Denver Probate Court, was assigned to case 21PR356.

83. On approximately August 18, 2021, Respondent left a voicemail message for Judge Leith's clerk, stating that he was a judge and indicating he needed a prompt order from the court appointing him as personal representative so he could take care of his father's affairs.

84. On August 20, 2021, Respondent sent the following email to Judge Leith:

Hi Elizabeth-
Hope you're well. I was hoping you could help me out. My dad recently passed away and I filed to open his estate on August 10. I was hoping to get an order of appointment and letters testamentary issued forthwith but have not had much success going through the

9

clerk's office. I was hoping you might be able to help out and get things expedited for me so I can handle his affairs. Your assistance is greatly appreciated. Thank you!
John Scipione
District Court Judge
720-563-9833

85.    On August 25, 2021, Respondent filed an Emergency Motion for Forthwith Informal Appointment of Co-Personal Representatives and Issuance of Letters Testamentary.

86.    The court issued the order appointing Respondent as personal representative of his father's estate on August 26, 2021.

## CHARGE III
### CCJC Rule 1.3
### A Judge Shall Not Abuse the Prestige of Judicial Office

87.    Paragraphs 1- 86 above are incorporated herein.

88.    Canon Rule 1.3 states,

A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so.

89.    Respondent violated Rule 1.3 when he improperly contacted Judge Leith and her clerk, ex parte, seeking special, expedited treatment of his Application for Informal Probate of Will and Informal Appointment of Personal Representative.

90.    Respondent abused the prestige of his office by telling both the clerk and Judge Leith that he was a judge and that he needed a prompt ruling on his motion filed in his father's case, 21PR356.

91.    Through his conduct as described above, Respondent violated CCJC Rule 1.3, whether viewed as separate incidents or as a pattern of similar conduct.

WHEREFORE, Complainant requests that the Commission recommend that, for his misconduct, appropriate disciplinary sanctions be imposed upon Judge John E. Scipione by the Colorado Supreme Court under Colo. RJD 36; that the Commission assess costs, attorney's fees and expenses of this proceeding against

10

him; and that the Commission recommend any such other and further relief as it deems appropriate.

DATED this 20th day of January, 2022.

Respectfully submitted,

_Erin Kristofco_

Erin Robson Kristofco, #33100
Assistant Regulation Counsel
Jessica E. Yates, #38003
Attorney Regulation Counsel
Special Counsel for the Colorado Commission
On Judicial Discipline

1300 Broadway, Suite 500
Denver, CO 80203
Telephone: (303) 928-7911
Email: e.kristofco@csc.state.co.us

11

## <u>Certificate of Service</u>

The undersigned certifies that the foregoing Statement of Charges was served on the following by regular mail sent through the United States Postal Service on January 20, 2022, addressed to:

John S. Gleason, Esq.
Burns Figa & Will P.C.
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, Colorado 80111

Also served by secure email: jgleason@bfwlaw.com


*/s/ Sarah Walsh*

12

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case No. 21-138 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>          and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲  COURT USE ONLY  ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Christopher S.P. Gregory, esq.<br>Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  970-672-0847<br>Email:  c.gregory@jd.state.co.us<br>Atty. Reg. # 37095 | Case Number: |
| **MOTION FOR APPOINTMENT OF SPECIAL MASTERS** | |

Pursuant to Colo. RJD 18(a), the Colorado Commission on Judicial Discipline, through its Special Counsel, has commenced formal proceedings against the Respondent by serving Respondent's Counsel with a Statement of Charges and a Notice of Formal Charges.  These documents have been duly filed with the Commission's Executive Director.

Colo. RJD 18.5(a) provides:

> After special counsel has served the statement of charges and notice of formal charges on the Judge and filed copies thereof with the executive director, the Commission shall request the Supreme Court to appoint three special masters to preside over formal proceedings who shall hear and take evidence concerning the charges and provide a report to the Commission in accordance with the Constitution and these Rules. The appointees may be retired justices or active or retired judges of courts of record, who have no conflicts of interest and who are able to serve diligently and impartially as special masters. Unless otherwise designated, the judge or justice first named in the Supreme Court's order shall be the presiding special master. The presiding special master is authorized to act on behalf of the special masters in resolving pre-hearing issues, including but not limited to discovery disputes; conducting pre-hearing conferences; and ruling on evidentiary, procedural, and legal issues that arise during hearings.

The proceedings of the Commission and the Special Masters remain confidential, excepting matters that require the Supreme Court's attention prior to the Commission filing recommendations and the Commission's record of

proceedings pursuant to Colorado Constitution Article VI, § 23(3)(g) and Colo. RJD 37(a). As an administrative matter, however, it is necessary for the Supreme Court (while maintaining confidentiality) to assign a case number to address the present motion according to Colo. RJD 18.5(a) and to allow the filing of other prospective pleadings.

The Commission respectfully moves for this Court to appoint three special masters pursuant to Colo. RJD 18.5(a) and, while maintaining confidentiality under Colorado Constitution Article VI, § 23(3)(e)-(g), assign a case number for further proceedings.

DATED: January 21, 2022

Respectfully submitted,

_____
Christopher S.P. Gregory, #37095
Executive Director
Colorado Commission on Judicial Discipline

-3-

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 21, 2022, a true and correct copy of the foregoing MOTION FOR APPOINTMENT OF SPECIAL MASTERS was filed with the Court and served via e-mail upon the following persons:

John S. Gleason, Atty. Reg. #15011
Counsel of Record for Respondent
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111
jgleason@bfwlaw.com

Erin Robinson Kristofco, Reg.  #33100
Assistant Regulation Counsel
Special Counsel for the Colorado Commission on Judicial Discipline
1300 Broadway, Suite 500
Denver, CO 80203
e.kristofco@csc.state.co.us

By:  _____
Christopher S.P. Gregory, #37095

-4-

<table>
<tr><td>

Colorado Supreme Court
2 East 14th Avenue
Denver, CO 80203

Original Proceeding in Discipline
Colorado Commission on Judicial Discipline, 21-138

**In the Matter of Complainant:**

The People of the State of Colorado,

**and**

**Respondent:**

Judge John E. Scipione.

</td><td>

DATE FILED: January 27, 2022
CASE NUMBER: 2022SA14

Supreme Court Case No:
2022SA14

</td></tr>
<tr><td colspan="2" align="center">

ORDER OF COURT

</td></tr>
</table>

Upon consideration of the Motion for Appointment of Special Masters filed in this matter, on January 21, 2022 it is HEREBY ORDERED that the following judges are appointed as special masters in the disciplinary proceedings against Respondent, John E. Scipione, pursuant to RJD 18:

1. Chief Judge Susan Blanco (presiding special master), 8th Judicial District

2. Judge Lindsay Van Gilder, 1st Judicial District

3. Retired Justice Alex Martinez, Senior Justice

BY THE COURT, JANUARY 27, 2022.

<table>
<tr><td>

SUPREME COURT, STATE OF COLORADO

ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE

1300 Broadway, Suite 210
Denver, Colorado 80203

</td><td></td></tr>
<tr><td>

IN RE THE MATTER OF:

THE PEOPLE OF THE STATE OF COLORADO,

**Complainant,**

    and

JOHN E. SCIPIONE, a Judge of the Arapahoe County District Court,

**Respondent.**

</td><td>

▲  **COURT USE ONLY**  ▲

</td></tr>
<tr><td>

**Attorneys for Respondent**

Name:     John S. Gleason (#15011)
Address:   BURNS, FIGA & WILL, P.C.
           6400 South Fiddler's Green Circle
           Suite 1000
           Greenwood Village, CO 80111
Telephone: (303) 796-2626
Facsimile:  (303) 796-2777
E-mail:    jgleason@bfwlaw.com

</td><td>

Case No. 2022SA14

(Commission Case No. 21-138)

</td></tr>
<tr><td colspan="2">

**ANSWER TO STATEMENT OF CHARGES**

</td></tr>
</table>

Respondent, John E. Scipione, by and through his undersigned counsel, John S. Gleason and Burns, Figa & Will, P.C., hereby submits his Answer to The People of the State of Colorado's Statement of Charges.

## I.    BACKGROUND AND JURISDICTION

1.    Respondent John E. Scipione ("Respondent") was appointed as a Judge of the Arapahoe County District Court in 2018.  He was serving in that capacity at all times pertinent to this Statement of Charges.

**RESPONSE:** Admitted

2.      Respondent is subject to the jurisdiction of the Colorado Supreme Court and the Colorado Commission on Judicial Discipline (the "Commission") in these disciplinary proceedings.

**RESPONSE:** Admitted.

## II.      FACTUAL ALLEGATIONS

### A.  SEXUAL HARASSMENT

3.      In early June 2021, Ms. ▮▮▮▮▮▮▮ had completed her second year of law school at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and began a judicial law clerk internship with Respondent.

**RESPONSE:** Admitted.

4.      On her first day, Respondent was friendly and chatty with Ms. ▮▮▮▮▮▮ and took her out to lunch.

**RESPONSE:** Admitted.

5.      The two briefly discussed Respondent's ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ who was not in the office that day.

**RESPONSE:** Admitted.

6.      Respondent stated it was so nice to finally have someone friendly and nice in the office because his ▮▮▮▮▮▮▮▮, "was a bitch."

**RESPONSE:** Denied.  Respondent was unsure how his CJA, Ms. ▮▮▮▮, would treat Ms. ▮▮▮▮▮▮ and wanted to make sure that she felt welcome.  Respondent described her as non-talkative, sullen, moody, and relatively unfriendly.  Respondent never used "bitch" to describe Ms. ▮▮▮▮ or any other CJA to Ms. ▮▮▮▮▮▮.

7.      Ms. ▮▮▮▮▮▮▮'s work schedule was usually 8:30 a.m. to 5:30 p.m., while Ms. ▮▮▮▮ generally left at 4:30 p.m.

**RESPONSE:** Admitted in part.  Ms. ▮▮▮▮▮▮▮s work schedule, which was set up before she started her summer internship, was Monday-Thursday from 8:30 am to 5:30 pm by her design.

8.      After Ms. ▮▮▮▮ left for the day, Respondent would often call Ms. ▮▮▮▮▮▮ into his office, or stand at her doorway, and they would "chit chat"  sometimes about family or other non-work issues.

**RESPONSE:** Admitted in part. As was customary, Respondent had a habit and routine of checking in with his staff, particularly law clerks, at the end of the day to discuss pending projects, answer questions, and engage in general reciprocal conversations about non-work-related matters such as family, friends, and weekend plans, etc.

9.      Although Ms. ███████ usually wanted to leave at 5:00, she stayed later because Respondent was a judge and she didn't want to tell him that she needed or wanted to go home.

**RESPONSE:** Denied. See Paragraph 7. As stated above, Ms. ███████ work schedule was Monday to Thursday from 8:30 am to 5:30 pm. She did not stay later. Although she was scheduled to work until 5:30 pm, she always told Respondent when she wanted to, or needed to, leave early to see friends, go to the gym to work out, or visit with her brother by video chat every Wednesday afternoon, since he was in prison.

10.     During Ms. ███████'s second or third week working for Respondent, Respondent began making comments that made her uncomfortable.

**RESPONSE:** Denied. Respondent denies ever making any comments that he knowingly knew made Ms. ███████ uncomfortable. Respondent is without information sufficient to form a belief that any of his comments ever made Ms. ███████n uncomfortable since she never said so. To the contrary, Ms. ███████ regularly engaged in friendly conversation and banter, unsolicited by Respondent, asked questions about Respondent's wife, Dr. Kymberly Scipione, and made comments about Dr. Kymberly and his children's pictures which adorned Respondent's office.

11.     One day, Ms. ███████ wore her hair in a high ponytail and Respondent said, "I gotta warn you high ponytails are my weakness. What are you, Ariana Grande?"

**RESPONSE:** Admitted in part. On a particular day that Ms. ███████ wore her hair in a high ponytail, Respondent stated that he liked that hairstyle, that he liked when his wife wore her hair in a high ponytail and that she looked like the singer Ariana Grande. In response, Ms. ███████ smiled, said "Thank You!" and swirled her ponytail around.

12.     Ms. ███████ stated she thought the ponytail comment was odd, but "laughed it off."

**RESPONSE:** Denied. Respondent is without information sufficient to form a belief as to what Ms. ███████ was thinking other than what she said in response, which was "Thank You."

13.     Another day, Ms. ███████ was wearing a dress that showed her arms and Respondent commented, "Your guns are out" and asked if she was a fitness model.

**RESPONSE:** Admitted in part. Ms. ███████n repeatedly told Respondent about her workout routine and lifting weights. On a particular day, Respondent commented that "the guns were

3

out" referring to her arms.  In response, Ms. ▮▮▮▮▮▮ flexed her arms in a bodybuilding pose and said, "Thank You!"  Respondent denies that he ever asked Ms. ▮▮▮▮▮▮ if she was a fitness model.

14.     Ms. ▮▮▮▮▮▮ noted that Respondent asked the question using a flirtatious voice, but again, Ms. ▮▮▮▮▮▮ tried to "laugh it off."

**RESPONSE:**  Denied. At no point in time did Respondent ever use a "flirtatious" voice and never asked if Ms. ▮▮▮▮▮▮ was a fitness model.  Respondent is also without information sufficient to even know what is meant by a flirtatious voice.

15.     Ms. ▮▮▮▮▮▮ developed a friendship with a janitor at the courthouse named Tan.

**RESPONSE:**  Denied.  Respondent is without information sufficient to admit or deny whether Ms. ▮▮▮▮▮▮ ever developed a friendship with Tan, the custodial engineer, who worked at the courthouse.  Respondent has known Tan for years and he often visits his court staff, particularly female CJAs, when he gets to work and before his shift.  As was his custom, he liked to talk, bring small gifts and treats, and chat with anyone who was around, including Ms. ▮▮▮▮▮▮.

16.     When Respondent saw Ms. ▮▮▮▮▮▮ talking with Tan, he said to her, "Oh Tan's got a crush on you - trying to make me jealous!"

**RESPONSE:**  Admitted in part.  After several days in a row of Tan coming by to visit Ms. ▮▮▮▮▮▮, Respondent teased Ms. ▮▮▮▮▮▮ and said, "Better watch out, Tan's got a crush on you."  Both Respondent and Ms. ▮▮▮▮▮▮ laughed.  Respondent denies ever saying to Ms. ▮▮▮▮▮▮, or anyone that talking to Tan made him jealous.

17.     Ms. ▮▮▮▮▮▮ felt uncomfortable when Respondent again commented about Tan making him jealous on another day when Ms. ▮▮▮▮▮▮ was talking with the janitor.

**RESPONSE:**  Denied.  Respondent is without information sufficient to admit or deny that Ms. ▮▮▮▮▮▮ felt uncomfortable when Respondent made a comment about Tan on one occasion, as she never told Respondent that such comment, or any other comment, ever made her uncomfortable during the entire 8-week summer internship.

18.     Ms. ▮▮▮▮▮▮▮▮▮▮▮ also reported that the Judge made uncomfortable comments to her during this time period.

**RESPONSE:**  Denied.  Respondent is without information sufficient to admit or deny that Ms. ▮▮▮▮ ever reported that Respondent made comments that made her uncomfortable during this time period, to the extent that "this time period" is during the 8-week summer internship of Ms. ▮▮▮▮▮▮.  Further, between January 2021 and June 2021, Respondent spent every working day alone with Ms. ▮▮▮▮ who not only never stated she felt uncomfortable with

4

Respondent, but barely managed more than a hello or goodbye to Respondent from her first day working with Respondent as a CJA.

19.    In mid-June, Ms. ████████ was talking with Respondent on a Friday when Respondent told her he and his wife were having friends sleep over at their house, his kids were out of town and his wife was buying new sheets.

**RESPONSE:** Admitted in part.  On Friday, June 11, 2021, Respondent was telling ████████ that he and his wife were hosting a soft launch BBQ and a pool party for their new food truck business at their home on Saturday, June 12, 2021, and expecting about 50 people, including out-of-town guests.  Respondent stated that they were excited for the launch, their kids were out of town, and were excited to have their friends over.  They were working frantically to get their house ready for their guests.  ████████ responded how exciting that was and that she could not wait to hear all about it on Monday.

20.    The following Monday morning Ms. ████████ asked Respondent about his party.

**RESPONSE:** Admitted.

21.    Respondent stated that his neighbors were probably not happy about the party because his guests were walking around nude outside in his yard.

**RESPONSE:** Admitted in part.  In response to ████████ asking about how the party went over the weekend, Respondent joked that his neighbors probably were not thrilled as the party went late, people were loud and running around half naked since it was a pool party.  Respondent denies saying that his guests were walking around nude outside in his yard.

22.    Ms. ████████ thought his statement was weird and didn't ask any more questions.

**RESPONSE:** Denied.  Respondent is without information sufficient to admit or deny whether ████████ thought "his statement" was weird and didn't ask any more questions.  Unknown what "his statement" refers to.  ████████ said, "Sounds like you guys had a great time" and laughed when the Respondent told her about the neighbors.

23.    On or about June 17, 2021, Respondent called Ms. ████████ into his office to talk.

**RESPONSE:** Denied.  Respondent is without information sufficient to admit or deny that on or about June 17, 2021 Respondent called Ms. ████████ into his office to talk as it was his habit and routine to check in with staff, including his law clerks, and Ms. ████████ at the end of the day about pending assignments, answer questions, and make small talk.

24.    Respondent was wearing a black ring and asked Ms. ████████ if she knew what it meant.

**RESPONSE:** Admitted in part. On a particular day, in mid-June, while Ms. ███████ was in Respondent's office before leaving for the day, she said she was curious about the black ring that Respondent wore on this right hand. At first, Respondent hesitated and stated, without detail, that the black ring on his right hand was a "lifestyle" ring, but did not elaborate. Ms. R███████ then stated, "Now you have me curious." I'm interested in all types of lifestyles. "You have to tell me." In response to her questions, Respondent explained, in matter-of-fact fashion, what the "lifestyle" was, including, but not limited to, alternative relationships, consensual non-monogamy, polyamory, and what some people call "swingers." Respondent said he hated the word "swinger", didn't use the word, and that "swinger" was considered to be an archaic and pejorative term of limited significance.

All of Respondent's statements about the "lifestyle" were explained to Ms. ███████ in an informative, educational, and non-sexual manner, all within the context of Dr. Kymberly Scipione's (Respondent's spouse) recently published doctoral dissertation titled "A Qualitative Exploration of Consensual Non-Monogamy Relationships between Married Heterosexual Couples." In previous discussions, Respondent and Ms. ███████ discussed Dr. Scipione's academic research and work as a clinical psychologist and AASECT certified sex therapist. Ms. ███████ was interested and asked several follow-up questions about Dr. Scipione's clinical practice.

25. Ms. ███████ said she didn't know.

**RESPONSE:** Denied. Ms. ███████ asked Respondent what the black ring on his right hand signified. See Paragraph 24.

26. Respondent told her that a black ring on someone's left hand meant that the person is asexual.

**RESPONSE:** Denied. Respondent told Ms. ███████ that he learned from his spouse's research that a black ring on someone's middle finger signified that the person was asexual.

27. He said he moved his black ring to his right hand so people wouldn't think he was asexual.

**RESPONSE:** Denied. Respondent stated that he moved his ring from his middle finger to right ring finger when he discovered the different meanings.

28. Respondent told Ms. ███████, "I live a very different lifestyle, do you know what I'm saying?"

**RESPONSE:** Denied. In response to Ms. ███████'s question about his black ring, Respondent stated that it was a "lifestyle" ring. When Ms. ███████ prompted Respondent for more information and stated that she was interested in all lifestyles, Respondent explained what the term included and was not limited to "swinger." See Paragraph 24.

6

29.    Respondent then told Ms. ▓▓▓▓▓▓▓ to close his door.

**RESPONSE:** Denied.  Respondent did not tell Ms. ▓▓▓▓▓▓ to close his door.  Respondent never closed the door to his office with Ms. ▓▓▓▓▓▓ or any other clerk or intern in his office.

30.    Ms. ▓▓▓▓▓▓ closed the door.

**RESPONSE:** Denied.  Ms. R▓▓▓▓▓ did not close Respondent's door.

31.    Ms. ▓▓▓▓▓▓s heart began pounding and she started sweating.

**RESPONSE:** Denied.  At no time did Ms. ▓▓▓▓▓n ever show any signs of discomfort, including sweating.  To the contrary, not only did Ms. ▓▓▓▓▓▓ initiate the "black ring" conversation with Respondent, but she stated she was curious and asked a number of questions, including questions about Dr. Scipione's research.

32.    Respondent then began telling Ms. ▓▓▓▓▓▓ the details of his lifestyle, which he referred to as the "swinger lifestyle."

**RESPONSE:** Denied.  In response to Ms. ▓▓▓▓▓▓ asking Respondent about his black ring, and telling Respondent she was curious about and interested in learning about all different lifestyles, Respondent explained what "lifestyle" included.  At no time did Respondent refer to the details of his lifestyle as the "swinger lifestyle".  At no time has Respondent ever described himself as a "swinger" and explained why the term "swinger" is archaic and can be pejorative in nature.  See Paragraph 24.

33.    Respondent told Ms. ▓▓▓▓▓▓ about problems in his marriage.

**RESPONSE:** Denied.  Respondent never told Ms. ▓▓▓▓▓▓, or any other person, that he had problems, or was having problems, in his marriage.  To the contrary, Respondent proudly displayed many pictures of his wife in his office, spoke of her in the most complimentary and admiring terms, and told everyone, including Ms.▓▓▓▓▓▓, how lucky he was and how proud of Dr. Scipione he was, particularly relative to her extraordinary academic achievements and research.

34.    Respondent then told Ms. ▓▓▓▓▓▓ how his wife had pushed him to try the swinger lifestyle.

**RESPONSE:** Denied.  Respondent never told Ms. ▓▓▓▓▓n, or any other person, that his wife pushed him to try the swinger lifestyle.  Respondent told Ms. ▓▓▓▓▓▓ that over the course of five years of academic research, he and Dr. Scipione had explored different aspects of the lifestyle.

35.    He told her he and his wife go to a swinger ranch/club in Colorado.

7

4883-1963-2652, v. 3

**RESPONSE:** Admitted. Respondent told Ms. ████████ that he and Dr. Scipione are members of an adult-only lifestyle club in Colorado called the Scarlet Ranch ("The Ranch") where they have met many close friends.

36. Respondent told Ms. ████████ that at the ranch, some people,

    a) "participate in sex;"

    b) some "hit it and quit it;"

    c) "others just watch, but it is all very respectful;" and

    d) "Women run the show and people walk around completely nude."

**RESPONSE:** Admitted in part. Respondent told Ms. ████████ about the Ranch and what a welcoming, and respectful environment it is, especially for women, where people can go to express themselves freely without judgment. Respondent explained that people go to the Ranch for many different reasons – to dance, to have dinner and drinks with friends, theme parties, and just to enjoy the atmosphere. Any sexual activities that occur within the private confines of the Ranch are at the discretion of consenting adults and is not the focus of the club.

37. Respondent then told Ms. ████████ the club/ranch cost for women to get in is $25; for men $300; for couples $100.

**RESPONSE:** Admitted in part. Respondent explained how membership works at the Ranch, including the screening process of new members. Respondent explained there are annual membership and nightly fees.

38. Respondent said he and his wife went with other couples on swinger vacations; his wife was encouraging him to put himself out there; and Colorado is number one in the nation for the swinger lifestyle.

**RESPONSE:** Admitted in part. Respondent told Ms. ████████ that he and his wife enjoyed going to lifestyle friendly vacation resorts, including in Mexico. Respondent explained to Ms. ████████ that his wife was encouraging him to "put himself out there" as a welcome distraction to all of the trauma and stress Respondent was experiencing at that time due to his father's hospitalizations, his children's car accidents, and Respondent's recent medical trauma, including the removal of his kidney in the summer of 2020. Additionally, Respondent told Ms. R████████ that Colorado had one of the largest lifestyle communities in the United States.

39. Respondent then told Ms. ████████ his wife told him to download the Tinder application (an "app" commonly used to meet and engage with others in brief sexual encounters).

4883-1963-2652, v. 3

**RESPONSE:** Admitted in part. As a stress relief and attempt to deal with all the recent trauma Respondent was dealing with, Dr. Scipione encouraged Respondent to download different dating apps, including Tinder, as a distraction and entertainment for them both.[1]

40. Respondent asked Ms. ▮▮▮▮▮▮ if she could help him set up his Tinder account because he didn't know much about it, and didn't know what to say about himself on his Tinder profile.

**RESPONSE:** Denied. Respondent and Dr. Scipione created dating profiles as a couple. Respondent never asked Ms. ▮▮▮▮▮ to help him set up his Tinder account or asked her to assist with creating a profile.

41. Ms. ▮▮▮▮▮ was extremely nervous.

**RESPONSE:** Denied. At no time did Ms. ▮▮▮▮▮ ever appear nervous in any way. Respondent and Ms. ▮▮▮▮▮ had a short, casual, and light-hearted conversation where Ms. R▮▮▮▮ smiled, laughed, and asked questions. Respondent never saw Ms. ▮▮▮▮▮ appear nervous or uncomfortable.

42. Ms. ▮▮▮▮▮ then changed the subject to try to start talking about her family in Arkansas.

**RESPONSE:** Denied. Ms. ▮▮▮▮▮ never changed the conversation. The conversation ended shortly after it began and Ms. ▮▮▮▮▮ left for the day.

43. Toward the end of the conversation Mr. ▮▮▮▮▮ indicated she needed to leave.

**RESPONSE:** Denied. Ms. ▮▮▮▮▮ never indicated that she needed to leave. The conversation, as referenced, occurred at the end of the day and Ms. ▮▮▮▮▮ left at her normally scheduled time.

44. Before Ms. ▮▮▮▮▮ left, Respondent told her he knew he could trust her with this information-and he hadn't even told his best friend about his lifestyle.

**RESPONSE:** Denied. Before Ms. ▮▮▮▮▮ left, Respondent asked her to keep their conversation between them as it was private and nobody's business. Respondent never told her that he knew he could trust her with this information (he had known her for about 2 weeks at this point) or that even his best friend didn't know about his lifestyle. Respondent's best friend has always known about the lifestyle.

---

[1] Dr. Scipione had advised Respondent about the "The Big Tinder Project" which studied the 13 Motives to use Tinder. The most commonly cited reason is using Tinder as an entertainment tool when wanting to pass time and for distraction. See Elizabeth Dorrance Hall, Ph.D., "Why People Use Tinder", Psychology Today, February 13, 2018.

9

4883-1963-2652, v. 3

45.     He told Ms. ▮▮▮▮▮▮▮, "If you tell anyone this, it would be really bad for me."

**RESPONSE:** Denied. Respondent never told Ms. ▮▮▮▮▮▮ that "if you tell anyone this, it would be really bad for me." Respondent asked her to keep their conversation private as it was nobody's business.

46.     Once she was in her car, Ms. ▮▮▮▮▮▮ tried to call her best friend from high school to tell her what had just happened with Respondent, but had to leave a voicemail for her friend.

**RESPONSE:** Denied. Respondent is without information sufficient to know what Ms. ▮▮▮▮▮▮ did when she was in her car or whether she called anyone. At no time did Ms. ▮▮▮▮▮▮ ever report to Respondent that she was uncomfortable with the short one-time conversation she had with Respondent about the lifestyle.

47.     Ms. ▮▮▮▮▮▮ also told a fellow law student what had occurred that day, and later told her law school mentor what Judge Scipione said to her while his door was closed.

**RESPONSE:** Denied. Respondent is without information sufficient to know who Ms. ▮▮▮▮▮▮ told about the conversation that occurred in his office with the door opened.

48.     Ms. ▮▮▮▮▮▮ avoided Respondent for the next week.

**RESPONSE:** Denied. Ms. ▮▮▮▮▮▮ never avoided Respondent in the following week or weeks thereafter. In fact, Ms. ▮▮▮▮▮▮ continued to work her normal schedule and speak with Respondent regularly for the next 6 weeks until she ended her internship on July 30, 2021 – two weeks before her scheduled end date.

49.     Later that week, Ms. ▮▮▮▮▮▮ was alone in the courtroom with Respondent.

**RESPONSE:** Denied. Respondent was always in the courtroom alone with ▮▮▮▮▮▮, including, but not limited to, every working day between January 2021 when she started and August 2021 when she transferred to another division. Respondent is unclear what week in particular is referenced.

50.     They began chatting and Respondent said his friend's wife was going to Florida to see her boyfriend.

**RESPONSE:** Denied. After a hearing, Respondent told ▮▮▮▮▮▮ that he was receiving text messages and pictures from his friends who were vacationing in Florida with another couple. Pictures included his friends, and the couple they were staying with, including the boyfriend of

10

his friend's wife.  Respondent explained that his friends were in an open-marriage.  Respondent never mentioned anything about the "lifestyle".

51.    Respondent saw that Ms. ▮▮▮▮▮ was confused and said, "They're in the lifestyle.  You know the lifestyle?"

**RESPONSE:** Denied.  Respondent stated to ▮▮▮▮▮▮ that his friends had an open marriage.  He never said they were in the "lifestyle".

52.    Ms. ▮▮▮▮▮ indicated she didn't know.

**RESPONSE:** Denied.  In response to Respondent stating that his friends were in an open marriage, Ms. ▮▮▮▮▮ stated, "Well, I know I could never do that."  That was the end of the conversation.

53.    Respondent went on to tell Ms. ▮▮▮▮▮ about the swinger lifestyle, which he described as "the open relationship thing."

**RESPONSE:** Denied.  Respondent never spoke with ▮▮▮▮▮▮ about the lifestyle.  He told Ms. ▮▮▮▮ that his friends were in an open marriage.

54.    Respondent then told Ms. ▮▮▮▮▮ about a swinger ranch where,

     a)  some people like to go on vacations for open relationships;

     b)  some people like to watch; and

     c)  some people "hit it and quit it."

**RESPONSE:** Denied.  Respondent never spoke with ▮▮▮▮▮▮ about the Ranch on any occasion.  Ms. ▮▮▮▮ rarely spoke to Respondent about anything during her 8 months as his CJA.

55.    Ms. ▮▮▮▮▮ changed the subject and left the courtroom.

**RESPONSE:** Denied.  Respondent never spoke with ▮▮▮▮▮▮ about the Ranch, or the lifestyle.  Respondent and Ms. ▮▮▮▮ both left the courtroom at the same time because they were done with their hearings and conversation.

56.    Ms. B▮▮▮ then told Ms. ▮▮▮▮▮▮ what had just occurred in the courtroom.

**RESPONSE:** Denied.  Respondent is without any information to know what Ms. ▮▮▮▮ told Ms. ▮▮▮▮▮▮ about what had occurred in the courtroom.

11

57.    Because of the closed door conversation regarding his swinger lifestyle, Ms. ▇▇▇▇▇▇ was no longer comfortable working for Respondent.

**RESPONSE:** Denied.  Ms. ▇▇▇▇▇▇ never advised Respondent that she was no longer comfortable working for Respondent.  In fact, Ms. ▇▇▇▇▇n worked with Respondent for the next 6 weeks until July 30, 2021 – just two weeks before her summer internship was scheduled to end.

58.    Ms. ▇▇▇▇▇▇ informed Respondent that she needed to end her internship in July-earlier than planned.

**RESPONSE:** Denied.  Sometime between July 21-23, 2021, Ms. ▇▇▇▇▇▇ informed Respondent that she needed to end her internship 2 weeks early or by July 30, 2021 as she had other academic and job prospect related activities the first part of August before classes resumed the middle of August.

59.    Respondent became angry and said he was counting on Ms. ▇▇▇▇▇▇ to stay until at least September.

**RESPONSE:** Denied.  When Ms. ▇▇▇▇▇▇ advised Respondent that she would be leaving July 30, 2021 (or two weeks earlier than planned), Respondent was surprised and said that "would suck" given all the work that was pending and how much work she had completed over the summer.  Respondent never became angry with Ms. ▇▇▇▇▇▇ and never said he was counting on her to stay until at least September when everyone knew that the internship would always end when classes resumed in mid-August.

60.    Ms. ▇▇▇▇▇▇ felt intimidated and agreed to work a couple more days.

**RESPONSE:** Denied.  Ms. ▇▇▇▇▇▇ never gave any indication at any point in time that she was intimidated by Respondent.  Further, she announced on or about July 21-23, 2021 that her last day would be July 30, 2021 or two weeks earlier than originally planned.  In response, Respondent announced that they would all (including Ms. ▇▇▇▇▇) go out to lunch in honor of her last day.  Ms. ▇▇▇▇▇▇ was excited and all three (▇▇▇▇r, ▇▇▇▇▇▇ and Respondent) picked July 30, 2021 for their office lunch.  Ms. ▇▇▇▇▇▇ picked a sushi restaurant and they all went to lunch.  An hour after returning from lunch, Respondent's father passed away.  Respondent never heard from or saw Ms. ▇▇▇▇▇▇ again.

61.    During her last two days, Respondent called Ms. ▇▇▇▇▇▇ into his office and said she'd done some really great work for him, and then said, "See, ▇▇▇▇- you 're not just a pretty face."

**RESPONSE:** Admitted in part.  During Ms. ▇▇▇▇▇▇'s last scheduled days, Respondent spoke with her in his office and told her that she had done great work over the summer, did great legal research and writing, and was going to be a very successful attorney.  Ms. ▇▇▇▇▇ told Respondent what an amazing experience she had, how grateful she was for the opportunity, and

12

how much she had learned.  Respondent never made any comment in any form that included "You're not just another pretty face."

62.    Ms. ▮▮▮▮▮ asked administration for a transfer.

**RESPONSE:** Denied.  Respondent is without information sufficient to know whether ▮▮▮▮ ▮▮▮▮▮r ever asked administration for a transfer.

63.    When Ms. ▮▮▮▮▮ learned that Magistrate Amanda Bradley needed a CJA, Ms. ▮▮▮▮▮r immediately applied to transfer to Magistrate Bradley's division.

**RESPONSE:** Denied.  Respondent is without information sufficient to know when Ms. ▮▮▮▮▮ applied to transfer to Magistrate Bradley's division.

64.    When she told Respondent that she had applied to transfer to Magistrate Bradley, Respondent became angry and told her, "You won't learn anything from Magistrate Bradley anyway.  She doesn't know what she's doing.  She's always getting reversed."

**RESPONSE:** On or about July 30th, Ms.▮▮▮▮▮▮▮ last day, Ms. ▮▮▮▮▮ announced to Respondent, out of the blue, that she was going to apply for a position with Magistrate Bradley. Confused and taken off guard, Respondent asked why and thought it odd that she wanted to transfer from district court to a Magistrate division.  Ms.▮▮▮▮▮ stated that she thought it was time for her to start learning something new and was particularly interested in probate. Respondent never told ▮▮▮▮▮r that she would never learn anything from Magistrate Bradley, that she doesn't know what she's doing, or that she was always getting reversed.  Respondent suggested to ▮▮▮▮▮ that she investigate the division before making the change since she admitted that she knew nothing about the position or about Magistrate Bradley.  Further, on August 9th (while Respondent was on bereavement leave following his father's death on July 30), the following text exchange occurred between Ms. ▮▮▮▮▮ and Respondent:

> ▮▮▮▮▮: Hi Judge, I intended to talk to you but I wasn't sure when would be a good time and I believe admin beat me to it.  As you already know I had a meeting with Mag. Bradley and she selected me for the transfer opportunity.  I will be working with admin to assist on the training plan and I will be available for any questions that your new clerk may have.  The division is now in good shape and I feel good handing it over.

> **Respondent**: Yup…just saw the announcement…lol.  Thanks for reaching out.  *I appreciate all your hard work and assistance since taking over the division in January.  I learned a lot from you and I know you'll be an incredible addition to Mag. Bradley's division.  She is very lucky!*  We'll talk in person soon.

> ▮▮▮▮▮: Thank you Judge!...

13

4883-1963-2652, v. 3

65.    Magistrate Bradley interviewed and hired Ms. ███████████████.

**RESPONSE:** Admitted.

<div align="center">

**CHARGE 1**
**CCJC Rule 2.3**
**A Judge Shall Not by Words or Actions Engage in Harassment**
**Based on Sex or Gender**

</div>

66.    Paragraphs 1 - 65 above are incorporated herein.

**RESPONSE:** Respondents responses to Paragraphs 1-65 above are incorporated herein.

67.    CCJC Rule 2.3 states,

(A)    A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.

(B)    A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so.

**RESPONSE:** Admitted.  CCJC Rule 2.3 says what it says.

68.    In addition, Chief Justice Directive 08-06, Amended 05/11, ANTI-HARASSMENT AND ANTI-DISCRIMINATION POLICY - COLORADO JUDICIAL DEPARTMENT, states,

Harassment, whether verbal, physical, or environmental, is unacceptable and will not be tolerated in the workplace itself or in other work-related settings such as business trips, conferences, or work-related social events.

**RESPONSE:** Admitted.  CJD says what it says.

69.    Respondent violated Canon 2.3, and the Chief Justice Directive 08-06, when he engaged in a closed door conversation with his young, female law clerk, Ms. ██████████, about his sex life, sexual practices, and opportunities for sexual engagements at a "swingers" ranch.

**RESPONSE:** Denied.  Respondent did not violate Canon 2.3 or CJD 08-06.  He did not engage in closed door conversations of any kind with Ms. ██████████, did not discuss his sex life, sexual practices, or opportunities for sexual engagements at a "swingers ranch".  Respondent answered

<div align="center">14</div>

4883-1963-2652, v. 3

Ms. ████████'s question about his black ring, explained its meaning, explained and described the lifestyle, and spoke about Dr. Scipione's research regarding consensual non-monogamy.

70.    Respondent again violated Canon 2.3, and the Chief Justice Directive 08-06, when he engaged in a conversation with his CJA, Ms. ████r, about his sex life, and opportunities for sexual engagements at a "swingers" ranch

**RESPONSE:** Denied.  See Response to 69.  Respondent never spoke with ████████ about his sex life or opportunities for sexual engagements at a "swingers" ranch.

71.    Through his conduct as described above, Respondent violated CCJC Rule 2.3, whether viewed as separate incidents or as a pattern of similar conduct.

**RESPONSE:** Denied.

<div align="center">

**CHARGE II**
**CCJC Rule 2.8**
**A Judge Shall be Patient, Dignified and Courteous**

</div>

72.    Paragraphs 1- 71 above are incorporated herein.

**RESPONSE:** Respondents responses to Paragraphs 1-71 above are incorporated herein.

73.    Canon Rule 2.8 states,

(A)    A judge shall require order and decorum in proceedings before the court.

(B)    A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control ...

**RESPONSE:** Admitted.  Canon Rule 2.8 says what it says.

74.    Respondent violated Canon 2.8 when he discussed the details of his sex life and sexual practices with his ████████, Ms. ████████.

**RESPONSE:** Denied.

75.    Respondent violated Canon 2.8 when he discussed the details of his sex life and sexual practices with his ████████.

**RESPONSE:** Denied.

<div align="center">

15

</div>

76.     Respondent was not dignified or courteous when he discussed the details of his sex life and sexual practices with ███████████████ .

**RESPONSE:** Denied.

77.     Respondent failed to act dignified or courteous when he referred to his CJA as a "bitch," when speaking to ████████ .

**RESPONSE:** Denied.

78.     Respondent failed to act dignified or courteous when he told Ms. ████████ "You won't learn anything from Magistrate Bradley anyway.  She doesn't know what she's doing. She's always getting reversed."

**RESPONSE:** Denied.

79.     Through his conduct as described above, Respondent violated CCJC Rule 2.8, whether viewed as separate incidents or as a pattern of similar conduct.

**RESPONSE:** Denied.

### B.  IMPROPER EX PARTE CONTACT WITH ANOTHER JUDGE

80.     Respondent's father passed away on July 30, 2021.

**RESPONSE:** Admitted.

81.     On August 10, 2021, Respondent filed an Application for Informal Probate of Will and Informal Appointment of Personal Representative in Denver County District Court, Case No. 21PR356, but did not get an immediate ruling.

**RESPONSE:** Admitted.

82.     Judge Elizabeth D. Leith, Presiding Judge of the Denver Probate Court, was assigned to case 21PR356.

**RESPONSE:** Admitted.

83.     On approximately August 18, 2021, Respondent left a voicemail message for Judge Leith's clerk, stating that he was a judge and indicating he needed a prompt order from the court appointing him as personal representative so he could take care of his father's affairs.

**RESPONSE:** Admitted in part.  Respondent called the Denver Probate Court from his office at the ACJC and left a message for the Probate Clerk identifying himself as Judge John Scipione. At the time the message was left, Respondent hoped that the clerk's office would take immediate

16

4883-1963-2652, v. 3

administrative action and issue the letters testamentary so that he and his sister could act on behalf of his father's estate as personal representatives to handle his father's affairs.

84.    On August 20, 2021, Respondent sent the following email to Judge Leith:

Hi Elizabeth-

Hope you're well.  I was hoping you could help me out.  My dad recently passed away and I filed to open his estate on August 10.  I was hoping to get an order of appointment and letters testamentary issued forthwith but have not had much success going through the clerk's office.  I was hoping you might be able to help out and get things expedited for me so I can handle his affairs.  Your assistance is greatly appreciated.  Thank you!
John Scipione
District Court Judge
720-563-9833

**RESPONSE:** Admitted.

85.    On August 25, 2021, Respondent filed an Emergency Motion for Forthwith Informal Appointment of Co-Personal Representatives and Issuance of Letters Testamentary.

**RESPONSE:** Admitted.

86.    The court issued the order appointing Respondent as personal representative of his father's estate on August 26, 2021.

**RESPONSE:** Admitted.

<div align="center">

**CHARGE III**
**CCJC Rule 1.3**
**A Judge Shall Not Abuse the Prestige of Judicial Office**

</div>

87.    Paragraphs 1- 86 above are incorporated herein.

**RESPONSE:** Respondents responses to Paragraphs 1-86 above are incorporated herein.

88.    Canon Rule 1.3 states,

A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so.

**RESPONSE:** Admitted.  Canon Rule 1.3 says what it says.

<div align="center">17</div>

89.     Respondent violated Rule 1.3 when he improperly contacted Judge Leith and her clerk, ex parte, seeking special, expedited treatment of his Application for Informal Probate of Will and Informal Appointment of Personal Representative.

**RESPONSE:** Denied.

90.     Respondent abused the prestige of his office by telling both the clerk and Judge Leith that he was a judge and that he needed a prompt ruling on his motion filed in his father's case, 21PR356.

**RESPONSE:** Denied.

91.     Through his conduct as described above, Respondent violated CCJC Rule 1.3, whether viewed as separate incidents or as a pattern of similar conduct.

**RESPONSE:** Denied.

WHEREFORE, Respondent, Judge John E. Scipione, respectfully requests that the Special Masters enter judgment in favor of Respondent and against Complainant on each of the claims for relief and for such other relief as they deem just and proper. Furthermore, the Respondent requests such relief as is contemplated by the Colorado Rules of Judicial Discipline.

Respectfully submitted this 9th day of February, 2022.

BURNS, FIGA & WILL, P.C.

*\*\*Original signature at the offices of
Burns, Figa & Will, P.C.\*\**

By:  S/ John S. Gleason
            John S. Gleason (#15011)

**Attorneys for Respondent
John E. Scipione**

18

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 9th day of February, 2022, a true and correct copy of the above and foregoing **ANSWER TO STATEMENT OF CHARGES** was served on the following via email or by depositing a copy of same in the United States mail, postage prepaid, addressed as follows:

Erin Robson Kristofco, Esq.
Assistant Regulation Counsel
Jessica E. Yates, Esq.
Regulation Counsel
Special Counsel for the Commission
On Judicial Discipline
1300 Broadway, Suite 500
Denver, Colorado 80203

*\*\*Original signature at the offices of
Burns, Figa & Will, P.C.\*\**

 S/ Kim Shanley

19

4883-1963-2652, v. 3

| | |
|---|---|
| SUPREME COURT, STATE OF COLORADO<br><br>*ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE*<br><br>1300 Broadway, Suite 210<br>Denver, Colorado 80203 | |
| In re the Matter of<br><br>THE PEOPLE OF THE STATE OF COLORADO,<br>Complainant,<br><br>And<br><br>JOHN E. SCIPIONE, a Judge of the Arapahoe County Court,<br>Respondent | **COURT USE ONLY** |
| | Case: 2022SA14<br><br>Commission Case: 21-138 |
| **CASE MANAGEMENT ORDER** | |

A virtual appearance occurred on March 10, 2022 with the three special masters to address case management deadlines. Present at this appearance was John Gleason as Respondent's Counsel, Erin Robson Kristofco on behalf of the People, and Christopher Gregory from the Colorado Commission on Judicial Discipline. A verbatim recording was electronically made using the FTR in Courtroom 3A of the 8th Judicial District.

Procedurally, on January 20, 2022, the Notice and the Statement of Charges were filed. The Response was filed on February 9, 2022. The matter is formally at issue before this body. The parties have already met in accordance with Rule 21.5(b) and the parties agree to Rule 21.5(c) disclosures by March 31, 2022.

Also at this virtual proceeding, Mr. Gleason explained he has obligations in the month of May which include non-refundable travel out of country. Parties agreed to set matter for a two day hearing on June 7th and June 8th, 2022 beginning at 9am. Mr. Gregory will assist in finding a location for this hearing at the Carr Center 1300 Broadway, Denver, Colorado. The special masters find there is good cause to set this matter to these dates pursuant to Rule 20 given the delay is minimal and provides an opportunity for parties to be adequately prepared for hearing.

Parties are on notice the special masters may need to set a status conference in April prior to Mr. Gleason leaving the country to address a deadline for trial briefs (if necessary), deadline to exchange/file exhibit and witness lists prior to the hearing, and whether a court reporter will be provided or digital recording will need to be utilized. If parties agree and file a stipulation to address these matters by March 31, 2022, a status conference on this issue may not be necessary.

Date: March 7, 2022

On Behalf of the Special Masters:

Susan Blanco
Chief Judge, 8th Judicial District
Presiding Special Master

| | |
|---|---|
| SUPREME COURT, STATE OF COLORADO ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE<br><br>1300 Broadway, Suite 210<br>Denver, Colorado 80203<br><br>IN RE THE MATTER OF<br><br>THE PEOPLE OF THE STATE OF COLORADO, Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲COURT USE ONLY▲<br><br>Case Number:<br>2022SA14<br><br>(and Commission Case No. 21-138) |

## STIPULATION REGARDING CASE MANAGEMENT DEADLINES

Per the request of the Presiding Special Master, the parties stipulate to the following case management deadlines:

Exchange initial disclosures:    on or before March 31, 2022

Close of discovery:    on or before May 6, 2022

File trial briefs:    on or before June 3, 2022

Exchange and file witness list:    on or before June 3, 2022

Exchange and file exhibit lists:    on or before June 3, 2022

The parties request that the hearing June 7-8, 2022, be recorded by a certified court reporter.

WHEREFORE, the parties request that the Presiding Special Master issue an order including the above case management deadlines.

DATED this 23rd day of March, 2022.

Respectfully submitted,

| | |
|---|---|
| *Erin Kristofco*<br>Erin Robson Kristofco, #33100<br>Assistant Regulation Counsel<br>Jessica E. Yates, #38003<br>Attorney Regulation Counsel<br>Special Counsel for the Colorado Commission On Judicial Discipline<br>1300 Broadway, Suite 500<br>Denver, CO 80203<br>Telephone: (303) 928-7911<br>Email: e.kristofco@csc.state.co.us | *s/ John Gleason*<br>John S. Gleason, #15011<br>Burns Figa & Will P.C.<br>6400 S. Fiddlers Green Circle,<br>Suite 1000<br>Greenwood Village, Colorado 80111<br>jgleason@bfwlaw.com |

## Certificate of Service

The undersigned certifies that the foregoing **STIPULATION REGARDING CASE MANAGEMENT DEADLINES** was served on the following by regular mail sent through the United States Postal Service on March 23, 2022, addressed to:

John S. Gleason, Esq.
Burns Figa & Will P.C.
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, Colorado 80111

Also served by secure email: jgleason@bfwlaw.com

*/s/ Sarah Walsh*

3

SUPREME COURT, STATE OF COLORADO

ORIGINAL PROCEEDING IN DISCIPLINE
BEFORE THE COLORADO COMMISSION ON
JUDICIAL DISCIPLINE
1300 Broadway, Suite 210
Denver, Colorado  80203

IN RE THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,
Complainant,
         and

JOHN E. SCIPIONE,
A Judge of the Arapahoe County District Court,
Respondent.

Erin Robson Kristofco, #33100
Assistant Regulation Counsel
Jessica E. Yates, #38003
Regulation Counsel
Special Counsel for the Commission
On Judicial Discipline
1300 Broadway, Suite 500
Denver, Colorado 80203
Telephone: (303) 928-7911
Email: e.kristofco@csc.state.co.us

▲COURT USE ONLY▲

Case Number:
2022SA14
(and Commission Case
No. 21-138)

## EXHIBIT A—STIPULATION FOR PUBLIC CENSURE

Special Counsel, on behalf of the People of the State of Colorado, and Judge John E. Scipione stipulate as follows:

## I.    SUMMARY OF PRINCIPLE ALLEGATIONS AND STIPULATED MATERIAL FACTS

1.  Respondent John E. Scipione ("Respondent") was appointed as a Judge of the Arapahoe County District Court in 2018. He was serving in that capacity at all times pertinent to this stipulation.

**CCJC Rule 2.3 (A Judge Shall Not by Words or Actions Engage in Harassment Based on Sex or Gender); and CCJC Rule 2.8 (A Judge Shall be Patient, Dignified and Courteous**

2.  In early June 2021, Ms. ███████████████ had completed her first year of law school at University of Denver Sturm College of Law, and began a judicial law clerk internship with Respondent.

3.  During Ms. ██████████'s second or third week working for Respondent, Respondent began making comments that made her uncomfortable.  One day, Ms. ██████████ wore her hair in a high ponytail and Respondent said, "I gotta warn you high ponytails are my weakness. What are you Ariana Grande?"

4.  Ms. ██████████ stated she thought the ponytail comment was odd, but "laughed it off."

5.  Ms. ██████████ had previously told Respondent she worked out frequently and typically went to the gym after leaving work. On a different day, Ms. ██████████ was wearing a dress that showed her arms and Respondent commented, "Your guns are out" and asked if she was a fitness model.  Again, Ms. ██████████ tried to "laugh it off."

6.  Ms. ██████████ developed a friendship with a janitor at the courthouse named Tan.  When Respondent saw Ms. ██████████ talking with Tan, he said to her, "Oh Tan's got a crush on you – trying to make me jealous!"  Respondent intended his comment as a joke as he, too, was friends with Tan.

7.  Ms. ██████ (Respondent's CJA) also reported that the Judge made uncomfortable comments to her during this time period.

8.  In mid-June, Ms. ██████ was talking with Respondent on a Friday when Respondent told her he and his wife were hosting an opening/pool party for their

2

food truck business and were having many friends over including some out of town guests who would spend the night at their house.

9.  The following Monday morning Ms. ███████ asked Respondent about his party.  Respondent stated that his neighbors were probably not happy with him because his friends didn't want to keep their clothes on. Ms. ███████ thought his statement was not appropriate for the work environment and didn't ask any more questions.

10. On or about June 17, 2021, Respondent and Ms. ███████ talked while in Respondent's office. Respondent was seated behind his desk throughout the conversation which lasted approximately fifteen minutes.

11. Respondent was wearing a black ring and Ms. ███████ commented on his ring. Respondent asked Ms. ███████ if she knew what it meant.  Ms. ███████ said she didn't know.  Respondent told her that a black ring on someone's right hand meant that the person lived an alternative lifestyle.

12. Respondent told Ms. ███████, "I live a very different lifestyle, do you know what I'm saying?"  Respondent then asked Ms. ███████ to close his door. Ms. ███████ closed the door.  Respondent then began telling Ms. ███████ the details of his alternative sexual lifestyle, which he referred to as the polyamory lifestyle.  Respondent explained that his lifestyle was not a monogamous lifestyle that his wife and he had chosen.

13.  Respondent told her he and his wife go to an alternative sexual lifestyle club in Colorado where similar couples interact in a non-monogamous setting conducive to their lifestyle.

14. Respondent told Ms. ███████ that at the ranch, some people,

   a) "participate in sex;"

   b) some "hit it and quit it;"

   c) "others just watch, but it is all very respectful;" and

   d) "Women run the show and people walk around completely nude."

3

15. Respondent then told Ms. ▮▮▮▮ the alternative sexual lifestyle club cost for women to get in is $25; for men $300; for couples $100.

16. Respondent said he and his wife went with other couples on vacations to engage in his alternative sexual lifestyle.

17. Respondent then told Ms. ▮▮▮▮ his wife told him to download the Tinder application.

18. Ms. ▮▮▮▮ then changed the subject and discussed her family in Arkansas. Toward the end of the conversation Ms. ▮▮▮▮ indicated she needed to leave and she did so.

19. Before Ms. ▮▮▮▮ left, Respondent told her he knew he could trust her with this information—and he hadn't even told his best friend about his lifestyle. He told Ms. ▮▮▮▮, "If you tell anyone this, it would be really bad for me." Ms. ▮▮▮▮ avoided Respondent for the remainder of her internship.

20. Later that week, Ms. ▮▮▮▮ was alone in the courtroom with Respondent. They began chatting and Respondent said his friend's wife was going out of state to see her boyfriend. Respondent saw that Ms. ▮▮▮r was confused and said, "They're in the lifestyle. You know the lifestyle?"

21. Ms. ▮▮▮▮ indicated she didn't know. Respondent went on to tell Ms. ▮▮▮▮ about his alternative sexual lifestyle, which he described as "the open relationship thing."

22. Respondent then told Ms. ▮▮▮▮ about the alternative sexual lifestyle,

    a) some people like to go on vacations for open relationships;

    b) some people like to watch; and

    c) some people "hit it and quit it."

23. Ms. ▮▮▮▮ changed the subject and left the courtroom.

24. Ms. ▮▮▮▮ then told Ms. ▮▮▮▮ what had just occurred in the courtroom.

4

25. Because of the closed door conversation regarding his alternative sexual lifestyle, Ms. ▮▮▮▮▮ was no longer comfortable working for Respondent.

26. During her last two days, Respondent called Ms. ▮▮▮▮ into his office and said she'd done some really great work for him, and then said, "See, ▮▮▮▮ – you're not just a pretty face."

27. Ms. ▮▮▮ asked administration for a transfer.

28. When Ms. ▮▮▮ learned that Magistrate Amanda Bradley needed a CJA, Ms.▮▮▮ immediately applied to transfer to Magistrate Bradley's division.

29. Magistrate Bradley interviewed and hired Ms.▮▮▮ as her CJA.

30. Respondent violated Canon 2.3, and the Chief Justice Directive 08-06, when he engaged in a conversation with ▮▮▮▮▮▮▮▮▮, about his alternative sexual lifestyle.

31. Respondent again violated Canon 2.3, and the Chief Justice Directive 08-06, when he engaged in a conversation with his ▮▮▮▮▮, about his sex life and alternative sexual practices.

32. Through his conduct as described above, Respondent violated CCJC Rule 2.3, whether viewed as separate incidents or as a pattern of similar conduct.

33. Respondent violated Canon 2.8 when he discussed the details of his alternative sexual lifestyle with his ▮▮▮▮▮▮.

34. Respondent violated Canon 2.8 when he discussed the details of his alternative sexual lifestyle with his ▮▮▮▮.

35. Respondent was not dignified or courteous when he discussed the details of his alternative sexual lifestyle with ▮▮▮▮▮.

36. Through his conduct as described above, Respondent violated CCJC Rule 2.8, whether viewed as separate incidents or as a pattern of similar conduct.

## CCJC Rule 1.3 (Judge Shall Not Abuse the Prestige of Judicial Office)

37. Respondent's father passed away on July 30, 2021.

5

38.    On August 10, 2021, Respondent filed an Application for Informal Probate of Will and Informal Appointment of Personal Representative, in Denver County District Court, case 21PR356, but did not get an immediate ruling.

39.    Judge Elizabeth D. Leith, Presiding Judge of the Denver Probate Court, was assigned to case 21PR356.

40.    On approximately August 18, 2021, Respondent left a voicemail message for Judge Leith's clerk, stating that he was a judge and indicating he needed a prompt order from the court appointing him as personal representative so he could take care of his father's affairs.

41.    On August 20, 2021, Respondent sent the following email to Judge Leith:

> Hi Elizabeth-
> Hope you're well. I was hoping you could help me out. My dad recently passed away and I filed to open his estate on August 10. I was hoping to get an order of appointment and letters testamentary issued forthwith but have not had much success going through the clerk's office. I was hoping you might be able to help out and get things expedited for me so I can handle his affairs. Your assistance is greatly appreciated. Thank you!
> John Scipione
> District Court Judge

42.    On August 25, 2021, Respondent filed an Emergency Motion for Forthwith Informal Appointment of Co-Personal Representatives and Issuance of Letters Testamentary.

43.    The court issued the order appointing Respondent as personal representative of his father's estate on August 26, 2021.

44.    Respondent violated Rule 1.3 when he identified himself as a judge when he improperly contacted Judge Leith and her clerk, seeking expedited treatment of his Application for Informal Probate of Will and Informal Appointment of Personal Representative.

45.    Respondent abused the prestige of his office by telling both the clerk and Judge Leith that he was a judge.

6

46.    Through his conduct as described above, Respondent violated CCJC Rule 1.3, whether viewed as separate incidents or as a pattern of similar conduct.

**Response from Judge Scipione**

47.    Judge Scipione is very remorseful and acknowledges that he failed to act dignified or courteous.

48.    Judge Scipione apologizes for his conduct and apologizes to Ms. ████████ and Ms. ██████ for his actions.

49.    During the time period of the above described conduct the Respondent experienced significant stress in his and his family's life.  His father became seriously ill and passed away, his youngest child was hospitalized after experiencing serious health issues following oral surgery, and two of his children were involved in a serious automobile accident which resulted in their hospitalization and injuries that are still under treatment.

**Recommendation for sanction of public censure:**

The following judicial discipline cases indicate a public censure is the proper sanction in this case.

*In re the Honorable Michael Morgan*, Washington Commission on Judicial Conduct, NO. CJC No. 5680, December 5, 2008, (Public censure where judge violated the Code of Judicial Conduct by engaging in impatient, undignified and discourteous behavior towards court personnel, former court personnel and employees of the City, and by making comments that were, or reasonably could be perceived as, disparaging, threatening or otherwise unbecoming a judicial officer).

*Re The Honorable James McKenzie*, Tennessee Board of Judicial Conduct, File Nos. B12-5167, B13-5219, and B13-5220, April 11, 2013, (Public reprimand for judge who made a comment in court about sexual relationship between lawyers appearing in his court, and later an abrasive statement made to a court employee).

*In the Matter of Howard Gerber*, Justice of the Clarkstown Town Court, State of New York Commission on Judicial Conduct, June 17, 2020, (Public admonition for judge's disparaging remarks to probation department, and inappropriate sexual remark to two attorneys in his courtroom).

*In Re Honorable Daniel F. Kathren*, Judge of the Benton County District Court, CJC No. 8895-F-181, Washington Commission on Judicial Conduct, December 7,

7

*Honorable William P. Rainey*, District Judge Arkansas, Re: Case # 01-133, September 21, 2001, (Public censure where judge made sexually derogatory remarks on the record to two female defendants in his courtroom).

Based upon the facts and circumstances described above, Special Counsel and the Judge propose that the Colorado Commission on Judicial Discipline adopt this stipulated resolution of a public censure, and file this stipulated resolution with the Supreme Court as its recommendation under RJD 37(e).

Judge Scipione acknowledges that this stipulated resolution and the record of proceedings will become public once this stipulation is submitted to the Colorado Supreme Court.

DATED this 18 day of May, 2022.

Respectfully submitted,

_____
Erin Robson Kristofco, #33100
Special Counsel
1300 Broadway, Suite 500
Denver, Colorado 80203
Special Counsel for Complainant

_____
Judge John E. Scipione
District Court Judge, Arapahoe County

_____
John S. Gleason (#15011)
BURNS, FIGA & WILL, P.C.
6400 South Fiddlers Green Circle
Suite 1000
Greenwood Village, CO 80111
E-mail: jgleason@bfwlaw.com

Counsel for Respondent

8

_Honorable William P. Rainey_, District Judge Arkansas, Re: Case # 01-133, September 21, 2001, (Public censure where judge made sexually derogatory remarks on the record to two female defendants in his courtroom).

Based upon the facts and circumstances described above, Special Counsel and the Judge propose that the Colorado Commission on Judicial Discipline adopt this stipulated resolution of a public censure, and file this stipulated resolution with the Supreme Court as its recommendation under RJD 37(e).

Judge Scipione acknowledges that this stipulated resolution and the record of proceedings will become public once this stipulation is submitted to the Colorado Supreme Court.

DATED this _8th_ day of May, 2022.

Respectfully submitted,


_Erin Kristofco_
_____
Erin Robson Kristofco, #33100
Special Counsel
1300 Broadway, Suite 500
Denver, Colorado 80203
Special Counsel for Complainant

_____
Judge John E. Scipione
District Court Judge, Arapahoe County


_____
John S. Gleason (#15011)
BURNS, FIGA & WILL, P.C.
6400 South Fiddlers Green Circle
Suite 1000
Greenwood Village, CO 80111
E-mail: jgleason@bfwlaw.com

Counsel for Respondent

8

<table>
<tr>
<td>

SUPREME COURT, STATE OF COLORADO

ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE

1300 Broadway, Suite 210
Denver, Colorado 80203

</td>
<td rowspan="2"></td>
</tr>
<tr>
<td>

IN RE THE MATTER OF:

THE PEOPLE OF THE STATE OF COLORADO,

**Complainant,**

    and

JOHN E. SCIPIONE, a Judge of the Arapahoe County District Court,

**Respondent.**

</td>
<td>▲  COURT USE ONLY  ▲</td>
</tr>
<tr>
<td>

**Attorneys for Respondent**

| | |
|---|---|
| Name: | John S. Gleason (#15011) |
| Address: | BURNS, FIGA & WILL, P.C. |
| | 6400 South Fiddler's Green Circle |
| | Suite 1000 |
| | Greenwood Village, CO 80111 |
| Telephone: | (303) 796-2626 |
| Facsimile: | (303) 796-2777 |
| E-mail: | jgleason@bfwlaw.com |

</td>
<td>

Case No. 2022SA14

(Commission Case No. 21-138)

</td>
</tr>
<tr>
<td colspan="2">

**FORTHWITH MOTION TO VACATE HEARING SCHEDULED ON JUNE 7-8, 2022**

</td>
</tr>
</table>

Respondent, John E. Scipione, through his counsel, John S. Gleason, submits this Forthwith Motion to Vacate Hearing Scheduled on June 7-8, 2022, as allowed by C.R.C.P. 7(b) and 121 § 1-15(11).  In support, Judge Scipione states as follows:

1.    *Certification of Conferral Pursuant to C.R.C.P. 121 § 1-15(8)*.  Undersigned counsel certifies that he attempted to confer with counsel for the People via email regarding this motion on May 20, 2022.  Undersigned counsel is presently traveling out of the country with a significant time difference, making conferral by telephone difficult at best.  As of the filing of this motion, no response has yet been received regarding the conferral and Respondent is unaware whether the People oppose the relief requested herein.

2.      This matter remains scheduled for a two-day hearing on June 7 and June 8, 2022. Respondent submits this motion on a forthwith basis due to the time-sensitive nature of the requested relief.

3.      The parties recently reached a stipulation to resolve this matter, which they submitted to the Commission on Judicial Discipline for approval on May 18, 2022.

4.      However, Respondent just learned of new facts and circumstances on May 19, 2022, which will cause him to request that the proposed stipulation be withdrawn from the Commission's consideration.

5.      The change of circumstances are substantive in nature and may significantly impact Judge Scipione's right to due process.  Because of the confidentiality provisions of Commission matters pursuant to Colo. RJD 6.5(a), Judge Scipione is precluded from providing further information to this Panel.  The change in circumstances will not be resolved for several weeks or longer.  No resolution can be accomplished prior to the presently scheduled hearing set on June 7-8, 2022, however.

6.      In addition, the parties no longer have sufficient time in which to prepare for a two-day hearing on this matter, which they reasonably believed would be unnecessary due to the proposed resolution by stipulation.

7.      Respondent respectfully requests that the hearing scheduled on June 7-8, 2022 be vacated to afford the parties an opportunity to evaluate the new information and determine if alternate resolution might still be possible, or to incorporate the newly-obtained information into a hearing at a later date.

8.      This request is not made for the purpose of delay or for any improper purposes. Neither party will be prejudiced by vacating the hearing.

WHEREFORE, Respondent, Judge Scipione, requests that the Court vacate the hearing presently set on June 7-8, 2022.

Respectfully submitted this 20th day of May, 2022.

BURNS, FIGA & WILL, P.C.

*\*\*Original signature at the offices of
  Burns, Figa & Will, P.C.\*\**

By:  S/ John S. Gleason
      John S. Gleason (#15011)

**Attorneys for Respondent
John E. Scipione**

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 20th day of May, 2022, a true and correct copy of the above and foregoing **FORTHWITH MOTION TO VACATE HEARING SCHEDULED ON JUNE 7-8, 2022** was served on the following via email or by depositing a copy of same in the United States mail, postage prepaid, addressed as follows:

Erin Robson Kristofco, Esq.
Assistant Regulation Counsel
Jessica E. Yates, Esq.
Regulation Counsel
Special Counsel for the Commission
on Judicial Discipline
1300 Broadway, Suite 500
Denver, Colorado 80203

*\*\*Original signature at the offices of
    Burns, Figa & Will, P.C.\*\**

 S/ Kim Shanley

3

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone Number: 303-457-5131 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲  COURT USE ONLY  ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Christopher S.P. Gregory, esq.<br>Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  970-672-0847<br>Email:  c.gregory@jd.state.co.us<br>Atty. Reg. # 37095 | Case Number:  22-138 |
| **OBJECTION TO RESPONDENT'S "FORTHWITH MOTION TO VACATE HEARING SCHEDULED ON JUNE 7-8, 2022"** | |

On May 20, 2022, Respondent Judge John Scipione filed his "Forthwith Motion to Vacate Hearing Scheduled on June 7-8, 2022" with the Colorado Commission on Judicial Discipline (the "CCJD").  The C.R.C.P. 121 certification states that Respondent's Counsel attempted to confer with Special Counsel.  However, the certification fails to disclose to the Special Masters that Respondent's counsel did confer with the undersigned and was advised that the CCJD objects to the motion to vacate and continue the hearing/trial scheduled in this matter for June 7-8, 2022. The grounds for the CCJD's objections are, as follows:

1.  On March 10, 2022, the parties agreed and the Special Masters set a two-day hearing in this case for June 7-8, 2022.  The Case Management Order also issued

on March 10, 2022 reflects that the Special Masters found good cause to extend the deadline for scheduling the hearing to accommodate the parties' preparations and need for a minor delay.

2. The Statement of Charges filed in this case includes allegations that Judge Scipione misused his judicial position to knowingly engage in sexual harassment through specific communications and interactions with his law clerk (**M.R.**) and judicial assistant (**I.B.**).  These allegations also include descriptions of how such communications and interactions adversely impacted the law clerk and the judicial assistant's work and professional relationships.  Judge Scipione is charged with violating Canon Rules 2.3 and 2.8 of the Colorado Code of Judicial Conduct.  In addition to alleging sexual harassment, the Statement of Charges asserts that Judge Scipione used his judicial position to seek preferential consideration of a Denver Probate Court case involving Judge Scipione's father's estate.  For this alleged misconduct, Judge Scipione is charged with violating Canon Rule 1.3.

3. In his Answer, Judge Scipione denies specific communications occurred and how his admitted communications and interactions were interpreted by his law clerk and judicial assistant.  Judge Scipione disputes that his communications were intended to include his law clerk or his judicial assistant in his admitted/alleged "swinger lifestyle."

4. The existence, substance, and nature of Judge Scipione's identified communications and interactions is the subject of the hearing/trial scheduled in this case for June 7-8, 2022.  The CCJD expects that the Special Masters' determination of ultimate facts in this case will depend significantly upon findings of witness credibility, including Judge Scipione's own credibility.

5. On October 28, 2021, the CCJD notified Judge Scipione that the underlying circumstances would be treated as a complaint and requested a written response according to Colo. RJD 14(a).

6. In Respondent's request to continue the trial, he declines to state the grounds.  However, Respondent has discussed the grounds with the CCJD.  The CCJD disputes that confidentiality rules excuse Respondent from stating the actual grounds for the requested continuance.  The CCJD also disputes that the developments referenced impact due process rights.  The issue to which Respondent refers relates to facts flowing from Respondent's efforts to schedule a witness' testimony and the issues referenced are independent of the current proceeding and will likely take weeks and months to develop.  Respondent's witness is available to testify at the hearing as scheduled.  Respondent's request for a continuance appears to the CCJD to be presented primarily for purposes of delay and leverage in settlement negotiations.

-2-

7. In the current Motion, Respondent notes that a stipulation to settle this case has been entered between Special Counsel and Respondent. However, the Motion does not disclose that the CCJD opposes the stipulation entered. Respondent has stated that he wishes to hold the stipulation "in abeyance." The CCJD's position is that Respondent needs to clarify that he is either seeking to enforce the stipulation, so that the CCJD's objections can be timely heard by the Supreme Court, or affirmatively abrogate the stipulation so that trial may proceed.

8. Instead of seeking a defined continuance (i.e. two weeks), Judge Scipione seeks an order from the Special Masters vacating the current hearing and postponing it indefinitely. This risks significant prejudice to public interests by delaying a determination of the facts and potential sanctions for an extended time. The Forthwith Motion also conflicts with expectations under Colo. RJD 20 that formal proceedings in judicial disciplinary matters occur expeditiously with the hearing occurring within 91 days of becoming at issue, absent demonstration of good cause.

9. C.R.C.P. 121 § 1-11 also requires a party seeking to continue a trial or hearing to demonstrate good cause. A court's decision to grant or deny a continuance is reviewed for an abuse of discretion. "Continuances are granted only for good cause. The trial court must consider 'the circumstances of the particular case, weighing the right of the party requesting the continuance to a fair hearing against the prejudice that may result from delay.' Trial continuances 'should be limited to circumstances in which unforeseen and exceptional circumstances require diligent attorneys to request an adjournment.' *Kallas v. Spinozzi*, 2014 COA 164, ¶ 41 (internal citations omitted).

The circumstances described in this Objection do not satisfy standards for good cause. Accordingly, the CCJD respectfully requests that the Special Masters deny Respondent's Forthwith Motion.

DATED: May 23, 2022

Respectfully submitted,

_____
Christopher S.P. Gregory, #27095
Executive Director
Colorado Commission on Judicial Discipline

-3-

## CERTIFICATE OF SERVICE

I certify that on May 23, 2022, a true and correct copy of the foregoing **MOTION FOR APPOINTMENT OF SPECIAL MASTERS** was filed with the Court and served via e-mail upon the following persons:

John S. Gleason, Atty. Reg. #15011
Counsel of Record for Respondent
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111
jgleason@bfwlaw.com

Erin Robinson Kristofco, Reg.  #33100
Assistant Regulation Counsel
Special Counsel for the Colorado Commission on Judicial Discipline
1300 Broadway, Suite 500
Denver, CO 80203
e.kristofco@csc.state.co.us

By: _____
Christopher S.P. Gregory, #37095

-4-

<table>
<tr><td>

SUPREME COURT, STATE OF COLORADO

ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE
COLORADO COMMISSION ON JUDICIAL DISCIPLINE

1300 Broadway, Suite 210
Denver, Colorado 80203
</td><td rowspan="2"></td></tr>
<tr><td>

IN RE THE MATTER OF:

THE PEOPLE OF THE STATE OF COLORADO,

**Complainant,**

    and

JOHN E. SCIPIONE, a Judge of the Arapahoe County District
Court,

**Respondent.**
</td></tr>
</table>

| | |
|---|---|
| | ▲ **COURT USE ONLY** ▲ |
| **Attorneys for Respondent** <br><br> Name:     John S. Gleason (#15011) <br> Address:   BURNS, FIGA & WILL, P.C. <br>           6400 South Fiddler's Green Circle <br>           Suite 1000 <br>           Greenwood Village, CO 80111 <br> Telephone:  (303) 796-2626 <br> Facsimile:  (303) 796-2777 <br> E-mail:     jgleason@bfwlaw.com | Case No. 2022SA14 <br><br> (Commission Case No. 21-138) |

**RESPONDENT'S MOTION TO STRIKE THE COLORADO COMMISSION ON
JUDICIAL DISCIPLINE'S UNAUTHORIZED OBJECTION TO RESPONDENT'S
MOTION TO VACATE HEARING**

Respondent, John E. Scipione, by and through his counsel, John S. Gleason, submits this Motion to Strike the Colorado Commission on Judicial Discipline's Unauthorized Objection to Respondent's Motion to Vacate Hearing. In support, Respondent states as follows:

1. Respondent's counsel is presently traveling out of the country with a significant time difference and limited access to internet service, making communications difficult and untimely. Special counsel for the People was aware of Respondent's counsel's travel out of the country with his family and his limited availability prior to his departure.

2. This matter is currently scheduled for a two-day hearing on June 7-8, 2022.

3.      Respondent filed a Forthwith Motion to Vacate Hearing on May 20, 2022.

4.      Special counsel for the People filed an objection to such motion on May 23, 2022. Contemporaneously with this Motion to Strike, Respondent submits his Reply to the People's Objection to Respondent's Forthwith Motion to Vacate Hearing Scheduled on June 7-8, 2022.

5.      The Colorado Commission on Judicial Discipline ("Commission") also filed an objection to Respondent's motion to vacate hearing on May 23, 2022.  The Commission's filing is unauthorized by the Rules of Judicial Discipline and is unprecedented in defense counsel's over thirty-five of years of practice as counsel for the Commission or defense counsel in judicial discipline matters.

6.      The Commission does not have authority to file an objection to a motion filed in a formal hearing as the Commission is not a party to the proceeding.  It is clear from the Commission's objection to the motion to vacate that the Commission and/or its Director has now become an advocate for the prosecution.  This position is unprecedented and an outrageous violation of Respondent's due process.

7.      The Executive Director has the following authority under C.R.J.D. Rule 3(d): Executive director - The Commission shall appoint an executive director whose duties and responsibilities, subject to general oversight by the Commission, shall be to:

> (1) Establish and maintain a permanent office; (2) Respond to inquiries about the Commission or the Canons; (3) Process requests for evaluation of judicial conduct;
> (4) Conduct investigations; (5) Recommend dispositions; (6) Maintain Commission records; (7) Maintain statistics concerning the operation of the Commission and make them available to the Commission and to the Supreme Court; (8) Prepare the Commission's budget and administer its funds; (9) Employ the Commission's staff; (10) Prepare an annual report of the Commission's activities for presentation to the Commission, to the Supreme Court, and to the public; (11) Employ special counsel, investigators, or other experts as necessary to investigate and process matters before the Commission and before the Supreme Court; and (12) Perform such other duties as these Rules, the Commission, or the Supreme Court may require.

Nothing in this list gives the Executive Director the authority to seek or object to relief requested by the parties in formal proceedings.  With one exception, the duties and responsibilities in this list are purely ministerial in nature.  The power to "conduct investigations" is the exception, but this investigative power is limited to informal proceedings that necessarily pre-date formal proceedings.  C.R.J.D. Rule 14.  The Executive Director is exceeding his authority under the Rules of Judicial Discipline by acting as an advocate for the prosecution in a formal proceeding.

2

8.      Respondent's position is that the Executive Director is interfering with the role of the presiding special master, who is "authorized to act on behalf of the special masters in resolving pre-hearing issues, including but not limited to discovery disputes; conducting pre-hearing conferences; and ruling on evidentiary, <u>procedural</u>, and legal issues that arise during hearings." C.R.J.D. Rule 18.5(a) (emphasis added). *See* also C.R.J.D. Rule 20 ("The special masters shall serve notice on all parties of the location and date of the hearing, which shall begin no later than 91 days after the at issue date, <u>unless extended for good cause by order of the presiding special master</u>.") (emphasis added). Respondent is also concerned that the presiding special master will give the Executive Director's arguments and positions greater weight than those of the parties of the case (the People and the Respondent Judge). The Commission's Objection to vacate the trial should be stricken based on its lack of standing and the impropriety of the Commission assuming the role of prosecutor or Special Counsel.

9.      Respondent is also challenged to respond to the Commission's Objection, as the Executive Director seems to have taken contradictory positions regarding the disputed issues, or the Commission's positions continue to shift, or both. On one hand, the Executive Director acknowledges that the new allegations are materially linked to the matters at issue in this case and chastises special counsel for the failure to disclose the new investigation prior to execution of the parties' stipulation; on the other hand, the Commission denies that the material link between the new allegations and the present formal proceeding pose any threat to Respondent's fundamental due process right to try these matters together.

10.     If anything, the Commission's improper insertion into this formal proceeding, in revealing significant detail regarding the confidential second investigation as well as advocating for the prosecution, has exponentially increased the concerns of violations of Respondent's due process. Respondent asserts a grave concern that the Special Masters are now tainted by their exposure to confidential information regarding a potential second disciplinary proceeding involving Respondent, as a result of the Commission's unauthorized Objection.

11.     The Commission has no standing to file any pleading in this formal proceeding, and any advocacy on the part of the Commission is highly improper. Respondent, therefore, requests that the Commission's Objection be stricken.

WHEREFORE, Respondent, Judge Scipione, requests that the Special Master strike the Commission's pleading objecting to continuing the trial date as improperly filed.

3

Respectfully submitted this 24th day of May, 2022.

BURNS, FIGA & WILL, P.C.

*\*\*Original signature at the offices of
Burns, Figa & Will, P.C.\*\**

By:  S/ John S. Gleason
                John S. Gleason (#15011)

**Attorneys for Respondent
John E. Scipione**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 24th day of May, 2022, a true and correct copy of the above and foregoing **RESPONDENT'S MOTION TO STRIKE THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE'S UNAUTHORIZED OBJECTION TO RESPONDENT'S MOTION TO VACATE HEARING** was served on the following via email or by depositing a copy of same in the United States mail, postage prepaid, addressed as follows:

Erin Robson Kristofco, Esq.
Assistant Regulation Counsel
Jessica E. Yates, Esq.
Regulation Counsel
Special Counsel for the Commission
on Judicial Discipline
1300 Broadway, Suite 500
Denver, Colorado 80203

*Also served to the non-party CCJD as a courtesy, addressed as follows:*

Christopher Gregory
Executive Director
Colorado Commission on Judicial Discipline
1300 Broadway, Suite 210
Denver, Colorado 80203

*\*\*Original signature at the offices of
Burns, Figa & Will, P.C.\*\**

 S/ Kim Shanley

4

<table>
<tr><td colspan="2">

SUPREME COURT, STATE OF COLORADO

ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE

1300 Broadway, Suite 210
Denver, Colorado 80203

</td></tr>
</table>

| | |
|---|---|
| IN RE THE MATTER OF:<br><br>THE PEOPLE OF THE STATE OF COLORADO,<br><br>**Complainant,**<br><br>    and<br><br>JOHN E. SCIPIONE, a Judge of the Arapahoe County District Court,<br><br>**Respondent.** | <br><br><br><br><br><br><br><br><br><br>▲ **COURT USE ONLY** ▲ |
| **Attorneys for Respondent**<br><br>Name:    John S. Gleason (#15011)<br>Address:  BURNS, FIGA & WILL, P.C.<br>           6400 South Fiddler's Green Circle<br>           Suite 1000<br>           Greenwood Village, CO 80111<br>Telephone:  (303) 796-2626<br>Facsimile:  (303) 796-2777<br>E-mail:     jgleason@bfwlaw.com | Case No. 2022SA14<br><br>(Commission Case No. 21-138) |

| |
|---|
| **RESPONDENT'S REPLY TO THE PEOPLE'S OBJECTION TO RESPONDENT'S FORTHWITH MOTION TO VACATE HEARING SCHEDULED ON JUNE 7-8, 2022** |

Respondent, John E. Scipione, by and through his counsel, John S. Gleason, submits this Reply to the People's Objection to Respondent's Forthwith Motion to Vacate Hearing Scheduled on June 7-8, 2022, as allowed by C.R.C.P. 7(b) and 121 § 1-15(11). In support, Respondent states as follows:

1. Respondent's counsel is presently traveling out of the country with a significant time difference and limited access to internet service, making communications difficult and untimely. Special counsel for the People was aware of Respondent's counsel's travel out of the country with his family and his limited availability prior to his departure.

2. This matter is currently scheduled for a two-day hearing on June 7-8, 2022.

3.  Respondent filed a Forthwith Motion to Vacate Hearing on May 20, 2022. Respondent incorporates his Forthwith Motion, as if the allegations stated therein were fully restated herein.

4.  The Colorado Commission on Judicial Discipline ("Commission") filed an objection to Respondent's motion to vacate hearing on May 23, 2022.  Contemporaneously with the filing of this Reply, Respondent also submits a Motion to Strike the Commission's unauthorized filing in this proceeding.

5.  Special counsel for the People filed an objection to the motion to vacate hearing on May 23, 2022.  The People's objection is inexplicable.  The facts establish that it was exclusively the conduct of special counsel for the People that resulted in the Respondent withdrawing the Stipulation and the filing of the motion to vacate the hearing.  The People would now like to benefit from the improper conduct of its counsel by compelling the Respondent to go to trial on June 7-8, 2022.

6.  The People sent a draft stipulation to Respondent on May 10, 2022.  During the next week, Respondent's counsel and special counsel for the People were engaged in settlement discussions with multiple revisions to the stipulation.

7.  Special counsel for the People provided their fifth supplemental disclosures on May 12, 2022 at 6:57 p.m., which included documents relating to witness ███████'s recent allegations.  Counsel for the People, Ms. Kristofco, sent an email to Respondent's counsel stating that the People planned to now call Ms. ███████ in their case in chief and encouraged Respondent to sign the stipulation due to this new information provided by Ms. ███████  In other words, Ms. Kristofco urged Respondent's counsel to enter into the stipulation to avoid the impact of Ms. ███████'s new allegations, knowing that the stipulation would not avoid Ms. ███████'s new allegations because, unbeknownst to the Respondent, they were the subject of a new complaint against the Respondent.

8.  It is important to note that Respondent's counsel's paralegal spoke with Ms. ███████ on December 10, 2021 and again on May 10, 2022 whereby Ms. ███████ did not mention anything about her new allegations.  Ms. ███████ had nothing but supportive and glowing comments about Judge Scipione when asked a series of questions in December.  She told the paralegal that she was willing to testify on Respondent's behalf, although she would prefer not to because she is still working with courtrooms and judges in her position as attorney at SCAO.  The new information provided in the fifth supplemental disclosures was unknown to Respondent or his counsel until special counsel for the People informed him of the new evidence and change of Ms. ███████'s position regarding the Respondent.  Based on the statements made by special counsel for the People, Respondent's counsel had absolutely no information or expectation that the Commission would authorize a new and separate investigation based on Ms. ███████'s changed position.

9.    Respondent's counsel sent an email to special counsel for the People on May 17, 2022 inquiring about any other potential matters, stating: "I want to ensure that other than the COCR allegations of discrimination by ▇▇▇▇▇ and ▇▇▇▇ there is nothing else pending at CJD or OARC that is any way related to this matter". Her response was: "We don't know what is at CCJD and I cannot make any binding statements about what CCJD will do in the future. At this point in the proceedings I represent the People, not CCJD." Respondent's counsel sent a reply email stating "While you may represent the People we know where the direction is coming from". We now know based on statements by the Director of the Commission that special counsel for the People knew of the new investigation and failed to disclose it when specifically asked. Neither Respondent nor his counsel became aware of the new investigation until after the execution of the negotiated stipulation.

10.    The parties finally reached a stipulation to resolve this matter, which they submitted to the Commission for approval on May 18, 2022. Respondent never would have agreed to this stipulation if he knew another formal investigation was authorized by the Commission regarding Ms. ▇▇▇▇▇ Notwithstanding special counsel for the People's knowledge of the new investigation and its materiality to the Stipulation, she failed or refused to disclose it to Respondent's counsel. The evidence is incontrovertible that special counsel for the People intentionally withheld the information despite a direct question. It is inconceivable that Respondent or his counsel would agree to a Stipulation on one matter with the knowledge that a second investigation on a separate but related matter was imminent.

11.    The next day, on May 19, 2022 at 1:50 p.m., Christopher Gregory (the Executive Director of Colorado Commission on Judicial Discipline) sent a letter to Respondent's counsel notifying him that a new complaint had been filed regarding ▇▇▇ ▇▇▇▇▇ and required a response to such allegations by June 3, 2022. Due to the time difference, Respondent's counsel did not receive the notice until the morning of May 20, 2022. Respondent's counsel immediately sent an email to special counsel for the People asking if she concurred with withdrawing the stipulation and vacating the trial date.

12.    At no time during the negotiation of the Stipulation was it ever revealed to the Respondent that the Commission had chosen to open an investigation on the recently provided ▇▇▇ ▇▇▇▇▇ letter. In the email from Mr. Gregory objecting to the stipulation, he even states that an issue they have with the stipulation is the fact that the ▇▇▇▇ complaint was not addressed in such stipulation. It was not addressed in the stipulation because it was NOT disclosed prior to the stipulation.

13.    Respondent and his counsel cannot meet or meaningly confer on the new investigation until after June 1, 2022. Respondent must have time to investigate the dramatic change of position taken by Ms. ▇▇▇▇▇ and the facts alleged in her letter to the Commission. Counsel cannot prepare for trial and investigate new allegations, which are critical to testimony in the trial and the pending investigation prior to the scheduled trial. Continuances should be granted where a party needs additional time to complete discovery. *Miller v. First National Bank of Englewood*, 399 P.2d 99, 101 (Colo. 1965).

3

14.     Respondent's counsel received an email from Mr. Gregory on May 23, 2022 stating "The Commission opposes the Stipulation in its current form because of substantive and procedural deficiencies. A significant objection is the Stipulation's failure to address its relation to the new complaint." Even the Commission objected to the stipulation because it didn't mention the new ███ ██████ complaint. Obviously, these two matters are materially related and must be addressed together. The rationale of cases allowing continuances usually is that "the trial court's legitimate concern for the prevention of delay in the trial of cases should not prejudice the substantial rights of parties by forcing them to go to trial without being able to fairly present their case." *Gonzales v. Harris,* 542 P.2d 842, 844 (Colo. 1975); see *Lane v. Gooding,* 166 P. 245 (Colo. 1917); *Bithell v. Western Care Corp.,* 762 P.2d 708 (Colo. App. 1988).

15.     The change of circumstances are substantive in nature and will significantly impact Judge Scipione's right to due process. The change in circumstances will not be resolved for several weeks or longer. No resolution can be accomplished prior to the presently scheduled hearing set on June 7-8, 2022. Continuances of scheduled trials should be limited to circumstances in which "unforeseen and exceptional circumstances" require diligent attorneys to request a continuance. *Todd v. Bear Valley Village Apartments,* 980 P.2d 973, 976 (Colo. 1999); *Kallas v. Spinozzi*, 342 P.3d 607, 614 (Colo. App. 2014).

16.     It is critical that the Special Masters have a clear understanding that the Respondent did absolutely nothing to cause the issues requiring the vacating of the trial date. Rather, it was the conduct of special counsel for the People who intentionally failed to disclose material information in a clear effort to reach a Stipulation on the pending matter despite her knowledge of a new matter that would dramatically change the Respondent's trial strategy and ability to defend. Additionally, based on the statements of the Director of the Commission, there is every basis to believe that a second formal proceeding will follow the current one. Rather than join the matters for trial, the special counsel for the People and the Commission want to financially ruin the Respondent or force him to defend without counsel. An additional significant risk is that if the Special Masters determined that discipline is appropriate in the pending matter, the Respondent would then have to defend this aggravating factor in a second matter.

17.     The decision to deny or grant a motion for continuance is within the sound discretion of the Court. See *Cherry Creek Sch. Dist. No. 5 v. Voelker, 859* P.2d 805, 809 (Colo. 1993); *Butler v. Farner,* 704 P.2d 853, 858 (Colo. 1985). "[A] motion to continue shall be granted only for good cause." C.R.C.P. 121(c) § 1-11. Good cause exists when there are unforeseen and exceptional circumstances requiring a continuance." *Miller v. Brannon*, 207 P.3d 923, 932 (Colo. App. 2009) (citing *Todd v. Bear Valley Village Apts*., 980 P.2d 973, 976 (Colo. 1999)).

18.     In making the determination of whether to grant a continuance, the court should consider the circumstances of the particular case, weighing the right of the party requesting the continuance against the prejudice that may result from the delay. *Butler*, 740 P.2d at 858. Failure of a trial court to consider these factors is an abuse of discretion. *Moody v. Larsen*, 802 P.2d 1169, 1173 (Colo. App. 1990).

4

19.    The Colorado Rules of Civil Procedure "shall be liberally construed…to secure the just, speedy and inexpensive determination of every action."  C.R.C.P. 1(a).

20.    In addition, the parties no longer have sufficient time in which to prepare for a two-day hearing on this matter, which they reasonably believed would be unnecessary due to the proposed resolution by stipulation.

21.    Respondent respectfully requests that the hearing scheduled on June 7-8, 2022 be vacated to afford the parties an opportunity to evaluate the new information and determine if an alternate resolution might still be possible, or to incorporate the newly-obtained information into a hearing at a later date.  Continuances should be granted where a party needs to amend the pleadings.  *Eagle River Mobile Home Park, Ltd. v. District Court,* 647 P.2d 660, 663-64 (Colo. 1982); see, *Burrows v. Reed, 487 P.2d 576* (Colo. App. 1971) (not selected for official publication).

22.    This request is not made for the purpose of delay or for any improper purposes. Neither party will be prejudiced by vacating the hearing.  If the trial is not continued, Respondent will be significantly harmed by facing a trial and at the same time defending a second complaint, which may result in further discipline.  This would result in a significant violation of even the most basic due process rights that Respondent is entitled to.  The Stipulation Respondent agreed to was based on incomplete information and would have never been signed had he known that a second matter was under consideration by the Commission.  Respondent is now confronted with the possibility that the Commission approves a flawed Stipulation and sends it to the Supreme Court for its consideration.  At the same time, the Commission is insisting on a response to a second complaint, which very likely will result in a second formal complaint proceeding.  This would result in Respondent having to address prior discipline based on the Stipulation when the conduct alleged was contemporaneous in time and substance to the stipulated discipline.  This is untenable and an abuse of discretion.

23.    The concepts of joinder and fundamental due process support the vacating of the looming trial date and a stay of that proceeding until either a disposition is reached, which accurately reflects the facts of both complaints, or the complaints are joined for trial.  The Special Master has the authority to set a status conference following a reasonable time to allow the Respondent to investigate and respond to the new allegations.  Furthermore, if a second formal proceeding is allowed, the extension of time would allow joinder of the matters for trial.

24.    Accordingly, Respondent renews his request that the hearing be vacated to allow these two materially related cases to be resolved, or tried, together.

WHEREFORE, Respondent, Judge Scipione, requests that the Special Master vacate the hearing presently set on June 7-8, 2022, for the good cause described herein.

Respectfully submitted this 24th day of May, 2022.

BURNS, FIGA & WILL, P.C.

**\*\*Original signature at the offices of**
  *Burns, Figa & Will, P.C.\*\**

By:  S/ John S. Gleason
              John S. Gleason (#15011)

**Attorneys for Respondent**
**John E. Scipione**

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 24th day of May, 2022, a true and correct copy of the above and foregoing **RESPONDENT'S REPLY TO THE PEOPLE'S OBJECTION TO RESPONDENT'S FORTHWITH MOTION TO VACATE HEARING SCHEDULED ON JUNE 7-8, 2022** was served on the following via email or by depositing a copy of same in the United States mail, postage prepaid, addressed as follows:

Erin Robson Kristofco, Esq.
Assistant Regulation Counsel
Jessica E. Yates, Esq.
Regulation Counsel
Special Counsel for the Commission
on Judicial Discipline
1300 Broadway, Suite 500
Denver, Colorado 80203

*\*\*Original signature at the offices of*
  *Burns, Figa & Will, P.C.\*\**

 S/ Kim Shanley

6

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Telephone: (303) 457-5131 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>       and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| Erin Robson Kristofco, #33100<br>Assistant Regulation Counsel<br>Jessica E. Yates, #38003<br>Regulation Counsel<br>Special Counsel for the Commission on Judicial Discipline<br>1300 Broadway, Suite 500<br>Denver, Colorado 80203<br>Telephone: (303) 928-7911<br>Email: e.kristofco@csc.state.co.us | Case Number:  22-138<br>          2022SA14 |

## NOTICE OF SUBSTITUTION OF COUNSEL

Pursuant to C.R.C.P. 121 § 1-1, Special Counsel, Office of Attorney Regulation Counsel, on behalf of the People of the State of Colorado, hereby file this Notice of Substitution of Counsel. The Colorado Commission on Judicial Discipline hereby appoints and substitutes the following counsel for the Office of Attorney Regulation Counsel pursuant to § 13-5.3-102(3)(d), C.R.S., and Colo. RJD 2(aa) and 3(d)(11) in the above-captioned matter:

Jodanna L. Haskins
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, 8th Floor, Denver, CO 80203

jody.haskins@coag.gov
(720) 508-6443 (direct)
Attorney Reg. No. 41285


DATED:  May 26, 2022

Respectfully submitted,

_____
Office of Attorney Regulation Counsel


*s/ Jodanna L. Haskins*_____
Jodanna L. Haskins
Senior Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that on May 26, 2022, a true and correct copy of the foregoing was filed with the Commission and served via e-mail upon the following persons:

John S. Gleason
Counsel of Record for Respondent
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111
jgleason@bfwlaw.com

Jodanna Haskins
Colorado Department of Law
1300 Broadway, 8th Floor
Denver, CO 80203
jody.haskins@coag.gov

By: _____

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Telephone: (303) 457-5131 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| Gina Cannan, Atty. Reg. No. 45071<br>Senior Assistant Attorney General<br>Colorado Department of Law<br>1300 Broadway, 8th Floor<br>Denver, Colorado 80203<br>Telephone: (720) 508-6431<br>Email: gina.cannan@coag.gov | Case Number:  22-138 |
| **NOTICE OF WITHDRAWAL OF OBJECTION TO MOTION TO VACATE HEARING** | |

On May 20, 2022, Respondent Judge John Scipione filed a Motion to Vacate the Hearing currently scheduled for June 7-8, 2022. On May 23, 2022, the Colorado Commission on Judicial Discipline ("CCJD") filed an Objection to that Motion. On May 24, 2022, Respondent filed a Motion to Strike CCJD's Objection. On May 26, 2022, Special Counsel for the People filed a Substitution of Counsel. The People are now represented by Special Counsel at the Attorney General's Office. *See* § 13-5.3-102(3)(e), C.R.S.; Colo. RJD 2(aa), 3(d)(11).

CCJD recognizes that new Special Counsel for the People may need additional time to prepare for hearing. CCJD does not oppose a short continuance, to the extent such continuance will address Respondent's concerns regarding new facts and allow adequate time for Respondent and the new Special Counsel to prepare to address those facts at hearing. Accordingly, CCJD withdraws its Objection to Respondent's Motion.

DATED:  May 31, 2022

Respectfully submitted,

/s/ Gina Cannan

Gina Cannan
Senior Assistant Attorney General

*Attorney for the Colorado Commission on
Judicial Discipline*

## CERTIFICATE OF SERVICE

I certify that on May 31, 2022, a true and correct copy of the foregoing was filed with the Commission and served via e-mail upon the following persons:

John S. Gleason
Counsel of Record for Respondent
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111
jgleason@bfwlaw.com

Jodanna Haskins
Colorado Department of Law
1300 Broadway, 8th Floor
Denver, CO 80203
jody.haskins@coag.gov

By: _____

| | |
|---|---|
| **SUPREME COURT, STATE OF COLORADO** <br><br> **Original Proceeding in Discipline Before the Colorado Commission on Judicial Discipline** <br><br> 1300 Broadway, Suite 210 <br> Denver, Colorado 80203 <br><br> In re the Matter of <br><br> **THE PEOPLE OF THE STATE OF COLORADO,** Complainant, <br><br> And <br><br> **JOHN E. SCIPIONE,** a Judge of the Arapahoe County Court, Respondent, Respondent. | RECEIVED <br><br> June 10, 2022 <br><br> Colorado Commission on Judicial Discipline <br><br><br> ▲  **COURT USE ONLY**  ▲ |
| JODANNA L. HASKINS, 41285 <br> Senior Assistant Attorney General <br> Special Counsel for the Commission on Judicial Discipline <br> Colorado Department of Law <br> Ralph L. Carr Judicial Building <br> 1300 Broadway, 8th Floor <br> Denver, CO  80203 <br> Tel: (720) 508-6443 <br> Fax: (720) 508-6037 <br> E-Mail: Jody.Haskins@coag.gov <br> *Counsel of Record | Case: 2022SA14 <br><br> Commission Case: 21-138 |
| **COMPLAINANT'S MOTION FOR LEAVE TO AMEND STATEMENT OF CHARGES** | |

COMES NOW Complainant, the People of the State of Colorado (the "People"), by and through undersigned Special Counsel for the Commission on Judicial Discipline ("CCJD"), and pursuant to C.R.C.P. 15(a), hereby submits the following *Motion for Leave to Amend Statement of Charges* and *First Amended Statement of Charges* (attached hereto as **Attachment A**).  In support thereof, the People state as follows:

1

Conferral Pursuant to C.R.C.P. 121, Section 1-15(8)

Undersigned counsel conferred with Respondent's counsel via email on June 7 and 9, 2022, respectively.  Respondent is opposed to the relief sought herein,

ARGUMENT

1.    On October 28, 2021, the CCJD sent a letter (attached hereto as **Exhibit 1**) to Respondent regarding receipt of allegations sufficient to be considered as a complaint under Colorado Rule of Judicial Discipline 13.  Therein, Respondent was notified that Canon Rules 1.2, 1.3, 2.3, 2.8, and 2.9 may be implicated and that an investigation would ensue.

2.    Subsequent to an investigation, the People filed their *Statement of Charges* on or about January 20, 2022.  For reasons unknown, Canon Rule 1.1[1], a rule of general applicability, and Cannon Rules 1.2[2] and 2.9[3], specifically referenced in the October 28, 2021 letter from CCJD, were not included therein.

3.    C.R.C.P. 15(a) states as follows, with emphasis added:

> A party may amend his pleading once as a matter of course at any time before a responsive pleading is filed or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 21 days after it is filed.  **Otherwise, a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires**….

4.    In this case, justice requires that the People be permitted to amend the Statement of Charges to add violations of Canon Rules 1.1, 1.2, and 2.9.

5.    Colorado courts have held that amendments at all times should be liberally allowed when they do not lead to surprise or injury.  See *Green v. Davis*, 185 P 369 (Colo. 1919).  Here, as noted above, Respondent received notice that

---

[1] Canon Rule 1.1 provides, in relevant part: "A judge shall comply with the law, including the Code of Judicial Conduct."

[2] Canon Rule 1.2 provides: "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

[3] Canon Rule 2.9 provides, in relevant part: "A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending* or impending matter."

2

Canon Rules 1.2 and 2.9 were implicated back in October 2021.  **Exhibit 1**.
Moreover, Canon Rule 1.1 has general applicability and, as such, the addition of a
charge related thereto does not lead to surprise or injury.

6.　This matter is scheduled to go to hearing between August 22 – 25,
2022, thereby allowing Respondent sufficient time to file an Answer to the First
Amended Statement of Charges (**Attachment A**).

7.　Moreover, as the People are not amending any of the underlying
factual allegations set forth in the *Statement of Charges*, allowing the People to add
the aforementioned charges will not result in prejudice nor necessitate any further
discovery or cause any further delay.

WHEREFORE, pursuant to the above, the People respectfully request the
Special Masters grant leave to amend the *Statement of Charges* as set forth in
**Attachment A**, and for such other and further relief as may be deemed just and
proper.

DATED this 10th day of June, 2022.

Respectfully submitted,

*s/ Jodanna L. Haskins*
JODANNA L. HASKINS #41285
Senior Assistant Attorney General
Special Counsel for the Colorado Commission
on Judicial Discipline

Colorado Department of Law
1300 Broadway, 8th Floor
Denver, Colorado  80203
Telephone:  720-508-6443
FAX:  720-508-6037
E-Mail:  jody.haskins@coag.gov

3

## CERTIFICATE OF SERVICE

This is to certify that I have duly served the within **MOTION FOR LEAVE TO AMEND STATEMENT OF CHARGES** upon all parties herein by electronic mail this 10th day of June, 2022, addressed as follows:

John S. Gleason, Esq.
Burns Figa & Will, P.C.
6400 South Fiddlers Green Circle, Suite 1000
Greenwood Village, Colorado 80111
jgleason@bfwlaw.com

*s/ Jodanna L. Haskins*
Colorado Department of Law

4

Attachment A

| | |
|---|---|
| **SUPREME COURT, STATE OF COLORADO**<br><br>**Original Proceeding in Discipline Before the Colorado Commission on Judicial Discipline**<br><br>1300 Broadway, Suite 210<br>Denver, Colorado 80203<br><br>In re the Matter of<br><br>**THE PEOPLE OF THE STATE OF COLORADO,** Complainant,<br><br>  And<br><br>**JOHN E. SCIPIONE,** a Judge of the Arapahoe County Court, Respondent, Respondent. | |
| | ▲  **COURT USE ONLY**  ▲ |
| JODANNA L. HASKINS, 41285<br>Senior Assistant Attorney General<br>Special Counsel for the Commission on Judicial<br>    Discipline<br>Colorado Department of Law<br>Ralph L. Carr Judicial Building<br>1300 Broadway, 8th Floor<br>Denver, CO  80203<br>Tel: (720) 508-6443<br>Fax: (720) 508-6037<br>E-Mail: Jody.Haskins@coag.gov<br>*Counsel of Record | Case: 2022SA14<br><br>Commission Case: 21-138 |
| **FIRST AMENDED STATEMENT OF CHARGES** | |

THIS FIRST AMENDED STATEMENT OF CHARGES is filed pursuant to the authority of Colorado Rules of Judicial Discipline ("Colo. RJD") Rules 4, 16(b)(4)[1], and 18, and it is alleged as follows:

## I.    BACKGROUND AND JURISDICTION

1.    John E. Scipione ("Respondent") was appointed as a Judge of the

---

[1] On December 17, 2021, the Colorado Commission on Judicial Discipline (the "Commission") determined there was probably cause to proceed with formal charges against Respondent Judge John E. Scipione.

1

Arapahoe County District Court in 2018. He was serving in that capacity at all times pertinent to this Statement of Charges.

2. Respondent is subject to the jurisdiction of the Colorado Supreme Court and the Commission in these disciplinary proceedings.

## II.    FACTUAL ALLEGATIONS

### A.    SEXUAL HARASSMENT

3. In early June 2021, ▇▇▇▇▇▇▇▇▇ had completed her second year of law school at University of Denver Sturm College of Law and began a judicial law clerk internship with Respondent.

4. On her first day, Respondent was friendly and chatty with Ms. ▇▇▇▇▇▇ and took her out to lunch.

5. The two briefly discussed Respondent's ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇, who was not in the office that day.

6. Respondent stated it was so nice to finally have someone friendly and nice in the office because his ▇▇▇▇▇▇▇▇▇, "was a bitch."

7. Ms. ▇▇▇▇▇▇'s work schedule was usually 8:30 a.m. to 5:30 p.m., while Ms. ▇▇▇▇ generally left at 4:30 p.m.

8. After Ms. ▇▇▇▇ left for the day, Respondent would often call Ms. ▇▇▇▇▇▇ into his office or stand at her doorway, and they would "chit chat" – sometimes about family or other non-work issues.

9. Although Ms. ▇▇▇▇▇▇ usually wanted to leave at 5:00, she stayed later because Respondent was a judge, and she did not want to tell him that she needed or wanted to go home.

10. During Ms. ▇▇▇▇▇▇'s second or third week working for Respondent, Respondent began making comments that made her uncomfortable.

11. One day, Ms. ▇▇▇▇▇▇ wore her hair in a high ponytail and Respondent said, "I gotta warn you high ponytails are my weakness. What are you, Ariana Grande?"

12. Ms. ▇▇▇▇▇▇ stated she thought the ponytail comment was odd, but "laughed it off."

2

13.    Another day, Ms. ████████n was wearing a dress that showed her arms and Respondent commented "your guns are out" and asked if she was a fitness model.

14.    Ms. ████████ noted that Respondent asked the question using a flirtatious voice, but again, Ms. ████████ tried to "laugh it off."

15.    Ms. ████████ developed a friendship with a janitor at the courthouse named Tan.

16.    When Respondent saw Ms. ████████ talking with Tan, he said to her, "Oh Tan's got a crush on you – trying to make me jealous!"

17.    Ms. ████████ felt uncomfortable when Respondent again commented about Tan making him jealous on another day when Ms. ████████ was talking with the janitor.

18.    Ms. ██████ also reported that Respondent made uncomfortable comments to her during this time period.

19.    In mid-June, Ms. ██████ was talking with Respondent on a Friday when Respondent told her he and his wife were having friends sleep over at their house, his kids were out of town, and his wife was buying new sheets.

20.    The following Monday morning Ms. ██████ asked Respondent about his party.

21.    Respondent stated that his neighbors were probably not happy about the party because his guests were walking around nude outside in his yard.

22.    Ms. ██████ thought his statement was weird and did not ask any more questions.

23.    On or about June 17, 2021, Respondent called Ms. ████████ into his office to talk.

24.    Respondent was wearing a black ring and asked Ms. ████████ if she knew what it meant.

25.    Ms. ████████ said she did not know.

26.    Respondent told her that a black ring on someone's left hand meant that the person is asexual.

3

27.    Respondent said he moved his black ring to his right hand so people would not think he was asexual.

28.    Respondent told Ms. ▮▮▮▮▮▮▮, "I live a very different lifestyle, do you know what I'm saying?"

29.    Respondent then told Ms. ▮▮▮▮▮▮ to close his door.

30.    Ms. ▮▮▮▮▮▮ closed the door.

31.    Ms. ▮▮▮▮▮▮'s heart began pounding and she started sweating.

32.    Respondent then began telling Ms. ▮▮▮▮▮▮ the details of his lifestyle, which he referred to as the "swinger lifestyle."

33.    Respondent told Ms. ▮▮▮▮▮▮ about problems in his marriage.

34.    Respondent then told Ms. ▮▮▮▮▮▮ how his wife had pushed him to try the swinger lifestyle.

35.    He told her he and his wife go to a swinger ranch/club in Colorado.

36.    Respondent told Ms. ▮▮▮▮▮▮ that at the ranch, some people:

    a.    "Participate in sex;"

    b.    Some "hit it and quit it;"

    c.    "Others just watch, but it is all very respectful;" and

    d.    "Women run the show and people walk around completely nude."

37.    Respondent then told Ms. ▮▮▮▮▮▮ the club/ranch cost for women to get in is $25; for men $300; for couples $100.

38.    Respondent said he and his wife went with other couples on swinger vacations; his wife was encouraging him to put himself out there; and Colorado is number one in the nation for the swinger lifestyle.

39.    Respondent then told Ms. ▮▮▮▮▮▮ his wife told him to download the Tinder application (an "app" commonly used to meet and engage with others in brief sexual encounters).

4

40.    Respondent asked Ms. ███████ if she could help him set up his Tinder account because he did not know much about it and did not know what to say about himself on his Tinder profile.

41.    Ms. ███████ was extremely nervous.

42.    Ms. ███████ then changed the subject to try to start talking about her family in Arkansas.

43.    Toward the end of the conversation Mr. ███████ indicated she needed to leave.

44.    Before Ms. ███████ left, Respondent told her he knew he could trust her with this information – and he had not even told his best friend about his lifestyle.

45.    He told Ms. ███████, "If you tell anyone this, it would be really bad for me."

46.    Once she was in her car, Ms. ███████ tried to call her best friend from high school to tell her what had just happened with Respondent but had to leave a voicemail for her friend.

47.    Ms. ███████ also told a fellow law student what had occurred that day, and later told her law school mentor what Respondent said to her while his door was closed.

48.    Ms. ███████ avoided Respondent for the next week.

49.    Later that week, Ms. ███████ was alone in the courtroom with Respondent.

50.    They began chatting and Respondent said his friend's wife was going to Florida to see her boyfriend.

51.    Respondent saw that Ms. ███████ was confused and said: "They're in the lifestyle. You know the lifestyle?"

52.    Ms. ███████ indicated she did not know.

53.    Respondent went on to tell Ms. ███████ about the swinger lifestyle, which he described as "the open relationship thing."

54.    Respondent then told Ms. ███████ about a swinger ranch where:

5

a.    Some people like to go on vacations for open relationships;

b.    Some people like to watch; and

c.    Some people "hit it and quit it."

55.    Ms. ▮▮▮▮ changed the subject and left the courtroom.

56.    Ms. ▮▮▮▮ then told Ms. ▮▮▮▮ what had just occurred in the courtroom.

57.    Because of the closed door conversation regarding his swinger lifestyle, Ms. ▮▮▮▮ was no longer comfortable working for Respondent.

58.    Ms. ▮▮▮▮ informed Respondent that she needed to end her internship in July – earlier than planned.

59.    Respondent became angry and said he was counting on Ms. ▮▮▮▮ to stay until at least September.

60.    Ms. ▮▮▮▮ felt intimidated and agreed to work a couple more days.

61.    During her last two days, Respondent called Ms. ▮▮▮▮ into his office and said she had done some really great work for him, and then said: "See, ▮▮▮▮ – you're not just a pretty face."

62.    Ms. ▮▮▮▮ asked administration for a transfer.

63.    When Ms. ▮▮▮▮ learned that Magistrate Amanda Bradley needed a ▮▮▮▮ immediately applied to transfer to Magistrate Bradley's division.

64.    When she told Respondent that she had applied to transfer to Magistrate Bradley, Respondent became angry and told her: "You won't learn anything from Magistrate Bradley anyway.  She doesn't know what she's doing.  She's always getting reversed."

65.    Magistrate Bradley interviewed and hired Ms. ▮▮▮▮ as her CJA.

## B.    IMPROPER EX PARTE CONTACT WITH ANOTHER JUDGE

66.    Respondent's father passed away on July 30, 2021.

6

67.    On August 10, 2021, Respondent filed an Application for Informal Probate of Will and Informal Appointment of Personal Representative, in Denver County District Court, case 21PR356, but did not get an immediate ruling.

68.    Judge Elizabeth D. Leith, Presiding Judge of the Denver Probate Court, was assigned to case 21PR356.

69.    On approximately August 18, 2021, Respondent left a voicemail message for Judge Leith's clerk, stating that he was a judge and indicating he needed a prompt order from the court appointing him as personal representative so he could take care of his father's affairs.

70.    On August 20, 2021, Respondent sent the following email to Judge Leith:

> Hi Elizabeth-
>
> Hope you're well.  I was hoping you could help me out. My dad recently passed away and I filed to open his estate on August 10.  I was hoping to get an order of appointment and letters testamentary issued forthwith but have not had much success going through the clerk's office.  I was hoping you might be able to help out and get things expedited for me so I can handle his affairs. Your assistance is greatly appreciated. Thank you!
>
> John Scipione
> District Court Judge
> 720-563-9833

71.    On August 25, 2021, Respondent filed an Emergency Motion for Forthwith Informal Appointment of Co-Personal Representatives and Issuance of Letters Testamentary.

72.    The court issued the order appointing Respondent as personal representative of his father's estate on August 26, 2021.

III.    **CHARGES**

<div align="center">

**CHARGE I**
**CCJC Rule 2.3**
**A Judge Shall Not by Words or Actions Engage in Harassment**
**Based on Sex or Gender**

</div>

7

73.    Paragraphs 1 – 72 are incorporated herein.

74.    Canon Rule 2.3 states:

(A)    A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.

(B)    A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so.

75.    In addition, Chief Justice Directive 08-06, Amended 05/11, ANTI-HARASSMENT AND ANTI-DISCRIMINATION POLICY - COLORADO JUDICIAL DEPARTMENT, states:

> Harassment, whether verbal, physical, or environmental, is unacceptable and will not be tolerated in the workplace itself or in other work-related settings such as business trips, conferences, or work-related social events.

76.    Respondent violated Canon Rule 2.3, and the Chief Justice Directive 08-06, when he engaged in a closed door conversation with his young, female law clerk, Ms. ▓▓▓▓▓▓▓, about his sex life, sexual practices, and opportunities for sexual engagements at a "swingers" ranch.

77.    Respondent violated Canon Rule 2.3, and the Chief Justice Directive 08-06, when he engaged in a conversation with his ▓▓▓▓▓▓▓▓▓▓, about his sex life, and opportunities for sexual engagements at a "swingers" ranch.

78.    Through his conduct as described above, Respondent violated CCJC Rule 2.3, whether viewed as separate incidents or as a pattern of similar conduct.

## CHARGE II
### CCJC Rule 2.8
### A Judge Shall be Patient, Dignified and Courteous

8

79.     Paragraphs 1 – 78 above are incorporated herein.

80.     Canon Rule 2.8 states:

   (A)   A judge shall require order and decorum in proceedings before the court.

   (B)   A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control…

81.     Respondent violated Canon 2.8 when he discussed the details of his sex life and sexual practices with ████████████████████████.

82.     Respondent violated Canon 2.8 when he discussed the details of his sex life and sexual practices with ████████████████.

83.     Respondent was not dignified or courteous when he discussed the details of his sex life and sexual practices with ████████████████.

84.     Respondent failed to act dignified or courteous when he referred to his CJA as a "bitch," when speaking to ████████████.

85.     Respondent failed to act dignified or courteous when he told Ms. ████████: "You won't learn anything from Magistrate Bradley anyway.  She doesn't know what she's doing.  She's always getting reversed."

86.     Through his conduct as described above, Respondent violated CCJC Rule 2.8, whether viewed as separate incidents or as a pattern of similar conduct.

<div align="center">

### CHARGE III
### CCJC 2.9
### A Judge Shall Not Initiate, Permit, or Consider Ex Parte Communications

</div>

87.     Paragraphs 1 – 86 above are incorporated herein.

88.     Canon Rule 2.9 states, in relevant part:

   (A)   A judge shall not initiate, permit, or consider ex parte communications, or consider other

<div align="center">9</div>

communications made to the judge outside the presence of the parties or their lawyers, concerning a pending[2] or impending matter[3]….

89.     Respondent violated Rule 2.9 when he improperly contacted Judge Leith and her clerk, ex parte, seeking special, expedited treatment of his Application for Informal Probate of Will and Informal Appointment of Personal Representative, a pending matter.

90.     Through his conduct as described above, Respondent violated CCJC Rule 2.9, whether viewed as separate incidents or as a pattern of similar conduct.

## CHARGE IV
### CCJC Rule 1.3
### A Judge Shall Not Abuse the Prestige of Judicial Office

91.     Paragraphs 1 – 90 above are incorporated herein.

92.     Canon Rule 1.3 states:

A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so.

93.     Respondent violated Rule 1.3 when he improperly contacted Judge Leith and her clerk, ex parte, seeking special, expedited treatment of his Application for Informal Probate of Will and Informal Appointment of Personal Representative.

94.     Respondent abused the prestige of his office by telling both the clerk and Judge Leith that he was a judge and that he needed a prompt ruling on his motion filed in his father's case, 21PR356.

95.     Through his conduct as described above, Respondent violated CCJC Rule 1.3, whether viewed as separate incidents or as a pattern of similar conduct.

## CHARGE V
### CCJC 1.2
### A Judge Shall Promote Confidence in the Judiciary

---

[2] "Pending matter" is defined in the "Terminology" section of the CCJC as "a matter that has commenced. A matter continues to be pending through any appellate process until final disposition."
[3] "Impending matter" is defined in the "Terminology" section of the CCJC as "a matter that is imminent or expected to occur in the near future."

10

96.    Paragraphs 1 – 95 above are incorporated herein.

97.    Canon Rule 1.2 states:

A judge shall act at all times in a manner that promotes confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

98.    Respondent violated Canon Rule 1.2 when he engaged in a closed door conversation with his young, female law clerk, Ms. ███████████, about his sex life, sexual practices, and opportunities for sexual engagements at a "swingers" ranch.

99.    Respondent violated Canon Rule 1.2 when he engaged in a conversation with his CJA, Ms. ███████, about his sex life, and opportunities for sexual engagements at a "swingers" ranch.

100.    Respondent violated Canon Rule 1.2 when he discussed the details of his sex life and sexual practices with his law clerk, Ms. ██████████n.

101.    Respondent violated Canon Rule 1.2 when he discussed the details of his sex life and sexual practices with his CJA, Ms. ███████.

102.    Respondent violated Canon Rule 1.2 when he referred to his CJA as a "bitch," when speaking to his law clerk.

103.    Respondent violated Canon Rule 1.2 when he told Ms. ████████: "You won't learn anything from Magistrate Bradley anyway.  She doesn't know what she's doing.  She's always getting reversed."

104.    Respondent violated Canon Rule 1.2 when he improperly contacted Judge Leith and her clerk, ex parte, seeking special, expedited treatment of his Application for Informal Probate of Will and Informal Appointment of Personal Representative.

105.    Respondent violated Canon Rule 1.2 when he abused the prestige of his office by telling both the clerk and Judge Leith that he was a judge and that he needed a prompt ruling on his motion filed in his father's case, 21PR356.

106.    Through his conduct as described above, Respondent violated CCJC Rule 1.2, whether viewed as separate incidents or as a pattern of similar conduct.

11

## CHARGE VI
### CCJC 1.1
### A Judge Shall Comply with the Law

107.    Paragraphs 1 – 106 above are incorporated herein.

108.    Canon Rule 1.1 states, in relevant part: "A judge shall comply with the law, including the Code of Judicial Conduct."

109.    Respondent violated Canon Rule 1.1 when he engaged in the conduct described herein in violation of Canon Rules 1.2, 1.3, 2.3, 2.8 and 2.9.

110.    Through his conduct as described above, Respondent violated CCJC Rule 1.1, whether viewed as separate incidents or as a pattern of similar conduct.

WHEREFORE, Complainant requests that the Commission recommend that, for his misconduct, appropriate disciplinary sanctions be imposed upon Judge John E. Scipione by the Colorado Supreme Court under Colo. RJD 36; that the Commission assess costs, attorney's fees and expenses of this proceeding against him and that the Commission recommend any such other and further relief as it deems appropriate.

DATED this 10th day of June, 2022.

Respectfully submitted,


*s/ Jodanna L. Haskins*
JODANNA L. HASKINS #41285
Senior Assistant Attorney General
Special Counsel for the Colorado Commission
on Judicial Discipline

Colorado Department of Law
1300 Broadway, 8th Floor
Denver, Colorado  80203
Telephone:  720-508-6443
FAX:  720-508-6037
E-Mail:  jody.haskins@coag.gov

12

## CERTIFICATE OF SERVICE

This is to certify that I have duly served the within **MOTION FOR LEAVE TO AMEND STATEMENT OF CHARGES** upon all parties herein by electronic mail this 10th day of June, 2022, addressed as follows:

John S. Gleason, Esq.
Burns Figa & Will, P.C.
6400 South Fiddlers Green Circle, Suite 1000
Greenwood Village, Colorado 80111
jgleason@bfwlaw.com

*s/ Jodanna L. Haskins*
Colorado Department of Law

# COLORADO COMMISSION ON JUDICIAL DISCIPLINE



October 28, 2021

**No. 21-138**
**Confidential**

Hon. John Scipione
District Judge
Arapahoe County Justice Center
7525 South Potomac Street
Centennial, CO 80112

Dear Judge Scipione:

Chief Judge Amico received information from several staff members of the 18th Judicial District about your conduct with a law student intern. She reported these concerns to the Commission, pursuant to Canon Rule 2.15. In addition, we received information that you may have attempted to influence the actions of a Denver Probate Judge who was presiding over your father's estate. The Commission determined that there were sufficient allegations to be considered as a complaint, under Colo. RJD 13.

At their October 22nd meeting, the members of the Commission reviewed a preliminary investigation report from staff of Attorney Regulation who provide investigative support for the Commission. As is our usual procedure, the case was assigned to one of the members who analyzed it in detail and summarized it for the other members.

The Commission reached no conclusions about the allegations, except to determine that they were sufficiently serious to require your response and the Commission's further investigation. The Commission members will consider the allegations in accordance with Colo. RJD 16. We emphasize that the Commission needs your views in order to form an objective view about whether your conduct may have violated any of the Canons and, if so, what type of disposition or sanction would be warranted. Accordingly, pursuant to Colo. RJD 14(a) we are notifying you of these allegations and are requesting your response.

Initially, the Canon Rules that may be implicated in this situation include Canon Rule 1.2 which requires a judge to promote confidence in the judiciary and avoid the appearance of impropriety; Canon Rule 2.3 which, along with Chief Justice Directive 08-06, Attachment A, prohibits conduct that results in harassment of staff; and Canon Rule 2.8 requiring a judge to be patient, dignified and courteous to staff. And an attempt to use your judicial position to influence a decision in your family's probate case could present

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 501-1143

**EXHIBIT**

**1**

Page 2

conduct issues under Canon Rule 1.3, which prohibits using the prestige of judicial officer for personal benefit; or under Canon Rule 2.9 which prohibits ex parte communications.

As explained in more detail below, it is alleged that your conduct with your law student intern, ████████████, created an adverse and uncomfortable work environment.

Ms. █████████ began her clerkship with you in June 2021, after completing her ██████ year of law school. While having lunch with you on her first day at work, you allegedly stated that it was nice to have someone friendly and nice in the office, because your ████████████████, █████████, was a "bitch." At the time, Ms. ███████████ didn't think much about it.

However, as the weeks passed, she started to feel uncomfortable around you. On several occasions, after your CJA left for the day, you would call her into your office and talk about family or other non-work issues. In her second or third week on the job, when she wore her hair in a high ponytail, you said that high pony tails were your weakness. On another day, she wore a dress exposing her arms which led to your comment that "your guns are out" and asked if she was a fitness model. She felt your statements were flirtatious.

She got acquainted with a janitor named ████. She told investigators that he was an older man and they would chat about Bonsai trees and his kids. But when you saw her talking with him, you remarked that "████ got a crush on you -- trying to make me jealous?" Initially, she thought you were joking but she felt uncomfortable when on another day you saw her talking with ████ and said it was making you jealous.

On a Friday, you told her that your wife and you were having friends sleepover at your house while your kids were out of town. On Monday, when she asked about the weekend, you stated that the neighbors were probably not happy because the guests were walking around in the nude.

Toward the end of June, you showed her the black ring you were wearing on your right hand and explained that if a man wore a black ring on his left hand, it meant that he was asexual and you didn't want anyone to perceive that as your sexual status. You then commented that you lived a very different lifestyle. She laughed but you then said "Do you know what I'm saying?" You then closed the door and began telling her the details of what you called your "swinger lifestyle." You explained some problems in your marriage and your wife's efforts to try the swinger lifestyle. You explained that you and your wife go to a swinger ranch/club where some people participate and others just watch and walk around nude.

You asked Ms. ███████████ to help you download the "Tinder" application which apparently is used to meet and engage in brief sexual encounters. You wanted her to

Page 3

help you describe yourself on this app. She became uncomfortable and tried leave. You then told her that he knew he could trust her with this information and that if she told anyone about this, it would be "really bad" for you.

She reported this incident to a friend and another law student the next day, and later reported it to ███████████████████████████

A few days later, she was talking with Ms. ███████ at work and was determined not to share this information with her. However, Ms. ███████ told her that other clerks had heard rumors that you had an affair with a former clerk and that you were a "swinger." Ms. ███████ then felt comfortable disclosing the description you provided about your lifestyle.

Ms. ███████ encouraged her to report what you had told her. Ms. ███████ was reluctant to do so because of potential repercussions regarding her internship, law school, and attempts to get future jobs. Ms. ███████ suggested that she talk with retired Judge John Wheeler, for whom ███████ had served as a CJA, because she knew Ms. ███████ could trust him. So, Ms. ███████ took it on herself to discuss it with Judge Wheeler who advised her to report your conduct.

Later that week, Ms. ███████ was alone in the courtroom with you. You told her that your friend's wife was going to Florida to see her boyfriend. When this appeared to confuse her, you explained that they were "in the lifestyle. You know the lifestyle?" You then described it as an "open relationship thing." Ms. ███████ later told Ms. ███████ about the conversation.

When Ms. ███████ told you that she needed to end her internship in July -- earlier than planned, you reacted angrily and asked her to stay until September. She felt intimidated and agreed to stay a few more days. You later called her into your office, thanked her for doing really great work for you, and told her she was "not just a pretty face."

Ms. ███████ asked to transfer to the CJA position for Magistrate Amanda Bradley. This allegedly upset you and you commented that the magistrate didn't know what she was doing and was always getting reversed. After Magistrate Bradley decided to hire her, Ms. ███████ relayed to Magistrate Bradley what Ms. ███████ had shared with her. The magistrate then told Ms. ███████ that she had an obligation to report all this. Ms. ███████ also shared this same information with CJA ███████ who reported it to her judge, District Judge Eric White, who also concluded that it must be reported. Judge White had also heard the rumor that you had an affair with a prior clerk.

It was apparent to the investigators and the Commission members that these incidents had an adverse emotional impact on the staff who were interviewed.

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 501-1143

Page 4

Magistrate Bradley, Judge White, Ms. █████████ and Ms. ██████ got together on a call to discuss the situation and decided to bring it to the attention of Chief Judge Amico. On September 1st, Magistrate Bradley, former Judge Wheeler, and Judge White met with the Chief Judge and Deputy Court Executive, Jenni Turnidge. Chief Judge Amico then reported the allegations about your conduct to the Commission. We are told that there are staff members who are concerned that your new CJA may have similar experiences involving inappropriate conversations with you.

Chief Judge Amico subsequently was contacted by a Denver Probate Judge whose staff reported that you had asked a favor of the Probate Court in expediting approval of an emergency motion for your appointment as a co-personal representative in your father's estate and the issuance of Letters Testamentary. This involves The Estate of Robert A. Scipione, Case No. 2021PR356. We will be seeking more information about this allegation, but the Commission is concerned that it may involve violations of Canon Rules 1.3 and/or 2.9.

We would appreciate your cooperation in providing us a written response to these allegations well in advance of the Commission's next regular meeting, scheduled for December 17th, so that we can do whatever further investigation may be warranted and, if necessary, arrange for our investigators to interview you. You may send your response by regular mail to our office address or by email to me.

Our proceedings are confidential, in accordance with the guidelines in Colo. RJD 6.5.

Sincerely,

William J. Campbell
Executive Director
w.campbell@jd.state.co.us

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 501-1143

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone Number: 303-457-5131 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>        and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | RECEIVED<br><br>June 29, 2022<br><br>Colorado<br>Commission on<br>Judicial Discipline<br><br>▲  COURT USE ONLY  ▲ |
| | Case No:  21-138 |
| **ORDER GRANTING MOTION FOR LEAVE TO AMEND STATEMENT OF CHARGES** | |

The appointed Special Masters have reviewed the Motion requesting leave to amend charges filed on June 11, 2022 and the Response filed by Respondent on June 15, 2022 and hereby grant the People's request to amend the statement of charges. In this case the Special Masters find there has been an absence of bad faith and granting the request of the People would not cause undue delay considering the timeline of when this case is set for hearing. The Special Masters find there would be no surprise, prejudice, or injury to the Respondent by allowing the People leave to amend. The Special Masters recognize the need for leave to be freely permitted and find it appropriate to do so this instance in the interest of justice.

Dated this 20th day of June, 2022.



Chief Judge Susan Blanco
Presiding Special Master

<table>
<tr><td>

SUPREME COURT, STATE OF COLORADO

ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE

1300 Broadway, Suite 210
Denver, Colorado 80203

</td><td rowspan="2">

RECEIVED

July 1, 2022

Colorado
Commission on
Judicial Discipline

</td></tr>
</table>

| | |
|---|---|
| IN RE THE MATTER OF:<br><br>THE PEOPLE OF THE STATE OF COLORADO,<br><br>**Complainant,**<br><br>     and<br><br>JOHN E. SCIPIONE, a Judge of the Arapahoe County District Court,<br><br>**Respondent.** | |
| | ▲  COURT USE ONLY  ▲ |
| **Attorneys for Respondent**<br><br>Name:       John S. Gleason (#15011)<br>Address:    BURNS, FIGA & WILL, P.C.<br>               6400 South Fiddler's Green Circle<br>               Suite 1000<br>               Greenwood Village, CO 80111<br>Telephone:  (303) 796-2626<br>Facsimile:  (303) 796-2777<br>E-mail:      jgleason@bfwlaw.com | Case No. 2022SA14<br><br>(Commission Case No. 21-138) |
| **ANSWER TO FIRST AMENDED STATEMENT OF CHARGES** | |

Respondent, John E. Scipione, by and through his undersigned counsel, John S. Gleason and Burns, Figa & Will, P.C., hereby submits his Answer to The People of the State of Colorado's First Amended Statement of Charges.

## I.    BACKGROUND AND JURISDICTION

1.    John E. Scipione ("Respondent") was appointed as a Judge of the Arapahoe County District Court in 2018. He was serving in that capacity at all times pertinent to this Statement of Charges.

**RESPONSE:**    Admitted.

2.      Respondent is subject to the jurisdiction of the Colorado Supreme Court and the Commission in these disciplinary proceedings.

**RESPONSE:**    Admitted.

**II.      FACTUAL ALLEGATIONS**

**A.      SEXUAL HARASSMENT**

3.      In early June 2021, ▇▇▇▇▇▇▇▇ had completed her second year of law school at ▇▇▇▇▇▇▇▇▇▇▇▇▇ and began a judicial law clerk internship with Respondent.

**RESPONSE:**    Admitted.

4.      On her first day, Respondent was friendly and chatty with Ms. ▇▇▇▇ and took her out to lunch.

**RESPONSE:**    Admitted.

5.      The two briefly discussed Respondent's Court Judicial Assistant ("CJA"), ▇▇▇ ▇▇r, who was not in the office that day.

**RESPONSE:**    Admitted.

6.      Respondent stated it was so nice to finally have someone friendly and nice in the office because his ▇▇▇▇▇▇▇, "was a bitch."

**RESPONSE:**    Denied.  Respondent was unsure how his CJA, Ms. ▇▇▇▇, would treat Ms. ▇▇▇▇ and wanted to make sure that she felt welcome.  Respondent described her as non-talkative, sullen, moody, and relatively unfriendly.  Respondent never used "bitch" to describe Ms. ▇▇▇ or any other CJA to Ms. ▇▇▇▇.

7.      Ms. ▇▇▇▇'s work schedule was usually 8:30 a.m. to 5:30 p.m., while Ms. ▇▇▇ generally left at 4:30 p.m.

**RESPONSE:**    Admitted in part.  Ms. ▇▇▇▇ work schedule, which was set up before she started her summer internship, was Monday-Thursday from 8:30 am to 5:30 pm by her design.

8.      After Ms. ▇▇▇ left for the day, Respondent would often call Ms. ▇▇▇▇ into his office or stand at her doorway, and they would "chit chat" – sometimes about family or other non-work issues.

**RESPONSE:**    Admitted in part.  As was customary, Respondent had a habit and routine of checking in with his staff, particularly law clerks, at the end of the day to discuss pending

2

projects, answer questions, and engage in general reciprocal conversations about non-work-related matters such as family, friends, and weekend plans, etc.

9.    Although Ms. ▮▮▮▮▮ usually wanted to leave at 5:00, she stayed later because Respondent was a judge, and she did not want to tell him that she needed or wanted to go home.

**RESPONSE:**    Denied.  See Paragraph 7.  As stated above, Ms. ▮▮▮▮▮'s work schedule was Monday to Thursday from 8:30 am to 5:30 pm.  She did not stay later.  Although she was scheduled to work until 5:30 pm, she always told Respondent when she wanted to, or needed to, leave early to see friends, go to the gym to work out, or visit with her brother by video chat every Wednesday afternoon, since he was in prison.

10.    During Ms. ▮▮▮▮▮'s second or third week working for Respondent, Respondent began making comments that made her uncomfortable.

**RESPONSE:**    Denied.   Respondent denies ever making any comments that he knowingly knew made Ms. ▮▮▮▮▮ uncomfortable.  Respondent is without information sufficient to form a belief that any of his comments ever made Ms. ▮▮▮▮▮ uncomfortable since she never said so.  To the contrary, Ms. ▮▮▮▮▮ regularly engaged in friendly conversation and banter, unsolicited by Respondent, asked questions about Respondent's wife, Dr. Kymberly Scipione, and made comments about Dr. Kymberly and his children's pictures which adorned Respondent's office.

11.    One day, Ms. ▮▮▮▮▮ wore her hair in a high ponytail and Respondent said, "I gotta warn you high ponytails are my weakness. What are you, Ariana Grande?"

**RESPONSE:**    Admitted in part.  On a particular day that Ms. ▮▮▮▮▮ wore her hair in a high ponytail, Respondent stated that he liked that hairstyle, that he liked when his wife wore her hair in a high ponytail and that she looked like the singer Ariana Grande.  In response, Ms. ▮▮▮▮▮ smiled, said "Thank You!" and swirled her ponytail around.

12.    Ms. ▮▮▮▮▮ stated she thought the ponytail comment was odd, but "laughed it off."

**RESPONSE:**    Denied.  Respondent is without information sufficient to form a belief as to what Ms. ▮▮▮▮▮ was thinking other than what she said in response, which was "Thank You."

13.    Another day, Ms. ▮▮▮▮▮ was wearing a dress that showed her arms and Respondent commented "your guns are out" and asked if she was a fitness model.

**RESPONSE:**    Admitted in part.  Ms. ▮▮▮▮▮ repeatedly told Respondent about her workout routine and lifting weights.  On a particular day, Respondent commented that "the guns were out" referring to her arms.  In response, Ms. ▮▮▮▮▮ flexed her arms in a

3

bodybuilding pose and said, "Thank You!" Respondent denies that he ever asked Ms. ███████████ if she was a fitness model.

14.    Ms. ███████████ noted that Respondent asked the question using a flirtatious voice, but again, Ms. ███████████ tried to "laugh it off."

**RESPONSE:**    Denied. At no point in time did Respondent ever use a "flirtatious" voice and never asked if Ms. ███████████ was a fitness model. Respondent is also without information sufficient to even know what is meant by a flirtatious voice.

15.    Ms. ███████████ developed a friendship with a janitor at the courthouse named Tan.

**RESPONSE:**    Denied. Respondent is without information sufficient to admit or deny whether Ms. ███████████ ever developed a friendship with Tan, the custodial engineer, who worked at the courthouse. Respondent has known Tan for years and he often visits his court staff, particularly female CJAs, when he gets to work and before his shift. As was his custom, he liked to talk, bring small gifts and treats, and chat with anyone who was around, including Ms. ███████████.

16.    When Respondent saw Ms. ███████████ talking with Tan, he said to her, "Oh Tan's got a crush on you – trying to make me jealous!"

**RESPONSE:**    Admitted in part. After several days in a row of Tan coming by to visit Ms. ███████████, Respondent teased Ms. ███████████ and said, "Better watch out, Tan's got a crush on you." Both Respondent and Ms. ███████████ laughed. Respondent denies ever saying to Ms. ███████████, or anyone that talking to Tan made him jealous.

17.    Ms. ███████████ felt uncomfortable when Respondent again commented about Tan making him jealous on another day when Ms. ███████████ was talking with the janitor.

**RESPONSE:**    Denied. Respondent is without information sufficient to admit or deny that Ms. ███████████ felt uncomfortable when Respondent made a comment about Tan on one occasion, as she never told Respondent that such comment, or any other comment, ever made her uncomfortable during the entire 8-week summer internship.

18.    Ms. ███████ also reported that Respondent made uncomfortable comments to her during this time period.

**RESPONSE:**    Denied. Respondent is without information sufficient to admit or deny that Ms. ███████ ever reported that Respondent made comments that made her uncomfortable during this time period, to the extent that "this time period" is during the 8-week summer internship of Ms. ███████████. Further, between January 2021 and June 2021, Respondent spent every working day alone with Ms. ███████ who not only never stated she felt uncomfortable with Respondent, but barely managed more than a

4

hello or goodbye to Respondent from her first day working with Respondent as a
CJA.

19.     In mid-June, Ms. ███████ was talking with Respondent on a Friday when
Respondent told her he and his wife were having friends sleep over at their house, his kids were
out of town, and his wife was buying new sheets.

**RESPONSE:**    Admitted in part.  On Friday, June 11, 2021, Respondent was telling CJA
████████ that he and his wife were hosting a soft launch BBQ and a pool party for their new
food truck business at their home on Saturday, June 12, 2021, and expecting about 50
people, including out-of-town guests.  Respondent stated that they were excited for the
launch, their kids were out of town, and were excited to have their friends over.  They were
working frantically to get their house ready for their guests.  ████████████ responded how
exciting that was and that she could not wait to hear all about it on Monday.

20.     The following Monday morning Ms. ████████ asked Respondent about his

party.

**RESPONSE:**    Admitted.

21.     Respondent stated that his neighbors were probably not happy about the party
because his guests were walking around nude outside in his yard.

**RESPONSE:**    Admitted in part.  In response to ████████████ asking about how the party
went over the weekend, Respondent joked that his neighbors probably were not thrilled as
the party went late, people were loud and running around half naked since it was a pool
party.  Respondent denies saying that his guests were walking around nude outside in his
yard.

22.     Ms. ████████ thought his statement was weird and did not ask any more questions.

**RESPONSE:**    Denied.  Respondent is without information sufficient to admit or deny
whether ████████████ thought "his statement" was weird and didn't ask any more
questions.  Unknown what "his statement" refers to.  ████████████ said, "Sounds like
you guys had a great time" and laughed when the Respondent told her about the
neighbors.

23.     On or about June 17, 2021, Respondent called Ms.████████████ into his office to
talk.

**RESPONSE:**    Denied.  Respondent is without information sufficient to admit or deny
that on or about June 17, 2021 Respondent called Ms. ████████████ into his office to talk
as it was his habit and routine to check in with staff, including his law clerks, and Ms.

5

███████ at the end of the day about pending assignments, answer questions, and make small talk.

24.    Respondent was wearing a black ring and asked Ms. ███████ if she knew what it meant.

**RESPONSE:**    Admitted in part.  On a particular day, in mid-June, while Ms. ███████ was in Respondent's office before leaving for the day, she said she was curious about the black ring that Respondent wore on this right hand.  At first, Respondent hesitated and stated, without detail, that the black ring on his right hand was a "lifestyle" ring, but did not elaborate.  Ms. ███████ then stated, "Now you have me curious."  I'm interested in all types of lifestyles.  "You have to tell me."  In response to her questions, Respondent explained, in matter-of-fact fashion, what the "lifestyle" was, including, but not limited to, alternative relationships, consensual non-monogamy, polyamory, and what some people call "swingers."  Respondent said he hated the word "swinger", didn't use the word, and that "swinger" was considered to be an archaic and pejorative term of limited significance.

All of Respondent's statements about the "lifestyle" were explained to Ms. ███████ in an informative, educational, and non-sexual manner, all within the context of Dr. Kymberly Scipione's (Respondent's spouse) recently published doctoral dissertation titled "A Qualitative Exploration of Consensual Non-Monogamy Relationships between Married Heterosexual Couples."  In previous discussions, Respondent and Ms. ███████ discussed Dr. Scipione's academic research and work as a clinical psychologist and AASECT certified sex therapist.  Ms. ███████ was interested and asked several follow-up questions about Dr. Scipione's clinical practice.

25.    Ms. ███████ said she did not know.

**RESPONSE:**    Denied.  Ms. ███████ asked Respondent what the black ring on his right hand signified.  See Paragraph 24.

26.    Respondent told her that a black ring on someone's left hand meant that the person is asexual.

**RESPONSE:**    Denied.  Respondent told Ms. ███████ that he learned from his spouse's research that a black ring on someone's middle finger signified that the person was asexual.

27.    Respondent said he moved his black ring to his right hand so people would not think he was asexual.

**RESPONSE:**    Denied.  Respondent stated that he moved his ring from his middle finger to right ring finger when he discovered the different meanings.

6

28.    Respondent told Ms. ████████, "I live a very different lifestyle, do you know what I'm saying?"

**RESPONSE:**    Denied.  In response to Ms. ████████'s question about his black ring, Respondent stated that it was a "lifestyle" ring.  When Ms. ████████ prompted Respondent for more information and stated that she was interested in all lifestyles, Respondent explained what the term included and was not limited to "swinger."  See Paragraph 24.

29.    Respondent then told Ms. ████████ to close his door.

**RESPONSE:**    Denied.  Respondent did not tell Ms. ████████ to close his door.  Respondent never closed the door to his office with Ms. ████████ or any other clerk or intern in his office.

30.    Ms. ████████ closed the door.

**RESPONSE:**    Denied.  Ms. ████████ did not close Respondent's door.

31.    Ms. ████████ heart began pounding and she started sweating.

**RESPONSE:**    Denied.  At no time did Ms. ████████ ever show any signs of discomfort, including sweating.  To the contrary, not only did Ms. ████████ initiate the "black ring" conversation with Respondent, but she stated she was curious and asked a number of questions, including questions about Dr. Scipione's research.

32.    Respondent then began telling Ms. ████████ the details of his lifestyle, which he referred to as the "swinger lifestyle."

**RESPONSE:**    Denied.  In response to Ms. ████████ asking Respondent about his black ring, and telling Respondent she was curious about and interested in learning about all different lifestyles, Respondent explained what "lifestyle" included.  At no time did Respondent refer to the details of his lifestyle as the "swinger lifestyle".  At no time has Respondent ever described himself as a "swinger" and explained why the term "swinger" is archaic and can be pejorative in nature.  See Paragraph 24.

33.    Respondent told Ms. ████████ about problems in his marriage.

**RESPONSE:**    Denied.  Respondent never told Ms. ████████, or any other person, that he had problems, or was having problems, in his marriage.  To the contrary, Respondent proudly displayed many pictures of his wife in his office, spoke of her in the most complimentary and admiring terms, and told everyone, including Ms. ████████, how lucky he was and how proud of Dr. Scipione he was, particularly relative to her extraordinary academic achievements and research.

7

34.    Respondent then told Ms. ▮▮▮▮▮▮ how his wife had pushed him to try the swinger lifestyle.

**RESPONSE:**    Denied.  Respondent never told Ms. ▮▮▮▮▮▮, or any other person, that his wife pushed him to try the swinger lifestyle.  Respondent told Ms. ▮▮▮▮▮▮ that over the course of five years of academic research, he and Dr. Scipione had explored different aspects of the lifestyle.

35.    He told her he and his wife go to a swinger ranch/club in Colorado.

**RESPONSE:**    Admitted.  Respondent told Ms. ▮▮▮▮▮▮ that he and Dr. Scipione are members of an adult-only lifestyle club in Colorado called the Scarlet Ranch ("The Ranch") where they have met many close friends.

36.    Respondent told Ms. ▮▮▮▮▮▮ that at the ranch, some people:

    a.    "Participate in sex;"

    b.    Some "hit it and quit it;"

    c.    "Others just watch, but it is all very respectful;" and

    d.    "Women run the show and people walk around completely nude."

**RESPONSE:**    Admitted in part.  Respondent told Ms. ▮▮▮▮▮▮ about the Ranch and what a welcoming, and respectful environment it is, especially for women, where people can go to express themselves freely without judgment.  Respondent explained that people go to the Ranch for many different reasons – to dance, to have dinner and drinks with friends, theme parties, and just to enjoy the atmosphere.  Any sexual activities that occur within the private confines of the Ranch are at the discretion of consenting adults and is not the focus of the club.

37.    Respondent then told Ms. ▮▮▮▮▮▮n the club/ranch cost for women to get in is $25; for men $300; for couples $100.

**RESPONSE:**    Admitted in part.  Respondent explained how membership works at the Ranch, including the screening process of new members.  Respondent explained there are annual membership and nightly fees.

38.    Respondent said he and his wife went with other couples on swinger vacations; his wife was encouraging him to put himself out there; and Colorado is number one in the nation for the swinger lifestyle.

**RESPONSE:**    Admitted in part.  Respondent told Ms. ▮▮▮▮▮▮ that he and his wife enjoyed going to lifestyle friendly vacation resorts, including in Mexico.  Respondent explained to Ms. ▮▮▮▮▮▮ that his wife was encouraging him to "put himself out there" as

a welcome distraction to all of the trauma and stress Respondent was experiencing at that time due to his father's hospitalizations, his children's car accidents, and Respondent's recent medical trauma, including the removal of his kidney in the summer of 2020. Additionally, Respondent told Ms. ████████ that Colorado had one of the largest lifestyle communities in the United States.

39.     Respondent then told Ms. ████████ his wife told him to download the Tinder application (an "app" commonly used to meet and engage with others in brief sexual encounters).

**RESPONSE:**    Admitted in part. As a stress relief and attempt to deal with all the recent trauma Respondent was dealing with, Dr. Scipione encouraged Respondent to download different dating apps, including Tinder, as a distraction and entertainment for them both.[1]

40.     Respondent asked Ms. ████████ if she could help him set up his Tinder account because he did not know much about it and did not know what to say about himself on his Tinder profile.

**RESPONSE:**    Denied. Respondent and Dr. Scipione created dating profiles as a couple. Respondent never asked Ms. ████████ to help him set up his Tinder account or asked her to assist with creating a profile.

41.     Ms. ████████ was extremely nervous.

**RESPONSE:**    Denied. At no time did Ms. ████████ ever appear nervous in any way. Respondent and Ms. ████████n had a short, casual, and light-hearted conversation where Ms. ████████ smiled, laughed, and asked questions. Respondent never saw Ms. ████████ appear nervous or uncomfortable.

42.     Ms. ████████ then changed the subject to try to start talking about her family in Arkansas.

**RESPONSE:**    Denied. Ms. ████████ never changed the conversation. The conversation ended shortly after it began and Ms. ████████ left for the day.

43.     Toward the end of the conversation Mr. ████████ indicated she needed to leave.

**RESPONSE:**    Denied. Ms. ████████ never indicated that she needed to leave. The conversation, as referenced, occurred at the end of the day and Ms. ████████ left at her normally scheduled time.

---

[1] Dr. Scipione had advised Respondent about the "The Big Tinder Project" which studied the 13 Motives to use Tinder. The most commonly cited reason is using Tinder as an entertainment tool when wanting to pass time and for distraction. See Elizabeth Dorrance Hall, Ph.D., "Why People Use Tinder", Psychology Today, February 13, 2018.

9

44.    Before Ms. ████████ left, Respondent told her he knew he could trust her with this information – and he had not even told his best friend about his lifestyle.

**RESPONSE:**    Denied.  Before Ms. ████████ left, Respondent asked her to keep their conversation between them as it was private and nobody's business.  Respondent never told her that he knew he could trust her with this information (he had known her for about 2 weeks at this point) or that even his best friend didn't know about his lifestyle.  Respondent's best friend has always known about the lifestyle.

45.    He told Ms. ██████n, "If you tell anyone this, it would be really bad for me."

**RESPONSE:**    Denied.  Respondent never told Ms. ████████ that "if you tell anyone this, it would be really bad for me."  Respondent asked her to keep their conversation private as it was nobody's business.

46.    Once she was in her car, Ms. ████████ tried to call her best friend from high school to tell her what had just happened with Respondent but had to leave a voicemail for her friend.

**RESPONSE:**    Denied.  Respondent is without information sufficient to know what Ms. ██████ did when she was in her car or whether she called anyone.  At no time did Ms. ██████ ever report to Respondent that she was uncomfortable with the short one-time conversation she had with Respondent about the lifestyle.

47.    Ms. ████████ also told a fellow law student what had occurred that day, and later told her law school mentor what Respondent said to her while his door was closed.

**RESPONSE:**    Denied.  Respondent is without information sufficient to know who Ms. ██████ told about the conversation that occurred in his office with the door opened.

48.    Ms. ██████████ Respondent for the next week.

**RESPONSE:**    Denied.  Ms. ██████n never avoided Respondent in the following week or weeks thereafter.  In fact, Ms. ██████ continued to work her normal schedule and speak with Respondent regularly for the next 6 weeks until she ended her internship on July 30, 2021 – two weeks before her scheduled end date.

49.    Later that week, Ms. ██████ was alone in the courtroom with Respondent.

**RESPONSE:**    Denied.  Respondent was always in the courtroom alone with ████████, including, but not limited to, every working day between January 2021 when she started and August 2021 when she transferred to another division.  Respondent is unclear what week in particular is referenced.

50.     They began chatting and Respondent said his friend's wife was going to Florida to see her boyfriend.

**RESPONSE:**    Denied.  After a hearing, Respondent told ███████████ that he was receiving text messages and pictures from his friends who were vacationing in Florida with another couple. Pictures included his friends, and the couple they were staying with, including the boyfriend of his friend's wife.  Respondent explained that his friends were in an open-marriage.  Respondent never mentioned anything about the "lifestyle".

51.     Respondent saw that Ms. ████████ was confused and said: "They're in the lifestyle. You know the lifestyle?"

**RESPONSE:**    Denied.  Respondent stated to ███████████ that his friends had an open marriage.  He never said they were in the "lifestyle".

52.     Ms. ████████ indicated she did not know.

**RESPONSE:**    Denied.  In response to Respondent stating that his friends were in an open marriage, Ms. ████████ stated, "Well, I know I could never do that."  That was the end of the conversation.

53.     Respondent went on to tell Ms. ████████ about the swinger lifestyle, which he described as "the open relationship thing."

**RESPONSE:    Denied.  Respondent never spoke with CJA ████████ about the lifestyle.  He told** Ms. ████████ that his friends were in an open marriage.

54.     Respondent then told Ms. ████████ about a swinger ranch where:

      a.     Some people like to go on vacations for open relationships;

      b.     Some people like to watch; and

      c.     Some people "hit it and quit it."

**RESPONSE:**    Denied.  Respondent never spoke with ███████████ about the Ranch on any occasion.  Ms. ████████ rarely spoke to Respondent about anything during her 8 months as his CJA.

55.     ████████████ changed the subject and left the courtroom.

**RESPONSE:**    Denied.  Respondent never spoke with ███████████ about the Ranch, or the lifestyle.  Respondent and Ms. ████████ both left the courtroom at the same time because they were done with their hearings and conversation.

56.     ████████████ then told Ms. █████████ what had just occurred in the courtroom.



**RESPONSE:**    Denied.  Respondent is without any information to know what Ms. ██████ told Ms. ████████n about what had occurred in the courtroom.

57.    Because of the closed door conversation regarding his swinger lifestyle, Ms. █████████ was no longer comfortable working for Respondent.

**RESPONSE:**    Denied.  Ms. █████████ never advised Respondent that she was no longer comfortable working for Respondent.  In fact, Ms. █████████n worked with Respondent for the next 6 weeks until July 30, 2021 – just two weeks before her summer internship was scheduled to end.

58.    Ms. █████████ informed Respondent that she needed to end her internship in July – earlier than planned.

**RESPONSE:**    Denied.  Sometime between July 21-23, 2021, Ms. █████████ informed Respondent that she needed to end her internship 2 weeks early or by July 30, 2021 as she had other academic and job prospect related activities the first part of August before classes resumed the middle of August.

59.    Respondent became angry and said he was counting on Ms. █████████ to stay until at least September.

**RESPONSE:**    Denied.  When Ms. █████████ advised Respondent that she would be leaving July 30, 2021 (or two weeks earlier than planned), Respondent was surprised and said that "would suck" given all the work that was pending and how much work she had completed over the summer.  Respondent never became angry with Ms. █████████ and never said he was counting on her to stay until at least September when everyone knew that the internship would always end when classes resumed in mid-August.

60.    Ms. █████████ felt intimidated and agreed to work a couple more days.

**RESPONSE:**    Denied.  Ms. █████████never gave any indication at any point in time that she was intimidated by Respondent.  Further, she announced on or about July 21-23, 2021 that her last day would be July 30, 2021 or two weeks earlier than originally planned.  In response, Respondent announced that they would all (including Ms. ████████) go out to lunch in honor of her last day.  Ms. █████████ was excited and all three (███████████████ and Respondent) picked July 30, 2021 for their office lunch.  Ms. █████████ picked a sushi restaurant and they all went to lunch.  An hour after returning from lunch, Respondent's father passed away.  Respondent never heard from or saw Ms. █████████ again.

61.    During her last two days, Respondent called Ms. █████████ into his office and said she had done some really great work for him, and then said: "See, ████████ – you're not just a pretty face."

12

**RESPONSE:**    Admitted in part.  During Ms. ▮▮▮▮▮▮▮▮▮s last scheduled days, Respondent spoke with her in his office and told her that she had done great work over the summer, did great legal research and writing, and was going to be a very successful attorney.  Ms. ▮▮▮▮▮▮▮ told Respondent what an amazing experience she had, how grateful she was for the opportunity, and how much she had learned.  Respondent never made any comment in any form that included "You're not just another pretty face."

62.    Ms. ▮▮▮▮▮▮asked administration for a transfer.

**RESPONSE:**    Denied.  Respondent is without information sufficient to know whether ▮▮▮▮ ▮▮▮▮▮ ever asked administration for a transfer.

63.    When Ms. ▮▮▮▮▮▮ learned that Magistrate Amanda Bradley needed a CJA, Ms. ▮▮▮▮▮ immediately applied to transfer to Magistrate Bradley's division.

**RESPONSE:**    Denied.  Respondent is without information sufficient to know when Ms. ▮▮▮▮▮ applied to transfer to Magistrate Bradley's division.

64.    When she told Respondent that she had applied to transfer to Magistrate Bradley, Respondent became angry and told her: "You won't learn anything from Magistrate Bradley anyway. She doesn't know what she's doing. She's always getting reversed."

**RESPONSE:**    On or about July 30th, Ms. ▮▮▮▮▮▮▮▮▮s last day, Ms. ▮▮▮▮▮▮ announced to Respondent, out of the blue, that she was going to apply for a position with Magistrate Bradley. Confused and taken off guard, Respondent asked why and thought it odd that she wanted to transfer from district court to a Magistrate division.  Ms. ▮▮▮▮▮▮ stated that she thought it was time for her to start learning something new and was particularly interested in probate. Respondent never told ▮▮▮▮▮ that she would never learn anything from Magistrate Bradley, that she doesn't know what she's doing, or that she was always getting reversed.  Respondent suggested to ▮▮▮▮▮ that she investigate the division before making the change since she admitted that she knew nothing about the position or about Magistrate Bradley.  Further, on August 9th (while Respondent was on bereavement leave following his father's death on July 30), the following text exchange occurred between Ms. ▮▮▮▮▮ and Respondent:

> ▮▮▮▮: Hi Judge, I intended to talk to you but I wasn't sure when would be a good time and I believe admin beat me to it.  As you already know I had a meeting with Mag. Bradley and she selected me for the transfer opportunity.  I will be working with admin to assist on the training plan and I will be available for any questions that your new clerk may have.  The division is now in good shape and I feel good handing it over.

> **Respondent**: Yup…just saw the announcement…lol.  Thanks for reaching out.  *I appreciate all your hard work and assistance since taking over the division in January.  I learned a lot from you and I know you'll be an incredible addition to Mag. Bradley's division.  She is very lucky!*  We'll talk in person soon.

13

██████ : Thank you Judge!...

65.    Magistrate Bradley interviewed and hired Ms. ██████ as her CJA.

**RESPONSE:**    Admitted.

**B.    IMPROPER EX PARTE CONTACT WITH ANOTHER JUDGE**

66.    Respondent's father passed away on July 30, 2021.

**RESPONSE:**    Admitted.

67.    On August 10, 2021, Respondent filed an Application for Informal Probate of Will and Informal Appointment of Personal Representative, in Denver County District Court, case 21PR356, but did not get an immediate ruling.

**RESPONSE:**    Admitted.

68.    Judge Elizabeth D. Leith, Presiding Judge of the Denver Probate Court, was assigned to case 21PR356.

**RESPONSE:**    Admitted.

69.    On approximately August 18, 2021, Respondent left a voicemail message for Judge Leith's clerk, stating that he was a judge and indicating he needed a prompt order from the court appointing him as personal representative so he could take care of his father's affairs.

**RESPONSE:**    Admitted in part.  Respondent called the Denver Probate Court from his office at the ACJC and left a message for the Probate Clerk identifying himself as Judge John Scipione. At the time the message was left, Respondent hoped that the clerk's office would take immediate administrative action and issue the letters testamentary so that he and his sister could act on behalf of his father's estate as personal representatives to handle his father's affairs.

70.    On August 20, 2021, Respondent sent the following email to Judge Leith:

Hi Elizabeth-

Hope you're well. I was hoping you could help me out. My dad recently passed away and I filed to open his estate on August 10. I was hoping to get an order of appointment and letters testamentary issued forthwith but have not had much success going through the clerk's office. I was hoping you might be able to help out and get things expedited for me so I can handle his affairs. Your assistance is greatly appreciated. Thank you!

14

John Scipione
District Court Judge
720-563-9833

**RESPONSE:**    Admitted.

71.    On August 25, 2021, Respondent filed an Emergency Motion for Forthwith Informal Appointment of Co-Personal Representatives and Issuance of Letters Testamentary.

**RESPONSE:**    Admitted.

72.    The court issued the order appointing Respondent as personal representative of his father's estate on August 26, 2021.

**RESPONSE:**    Admitted.

**III.    CHARGES**

<u>**CHARGE I**</u>
**CCJC Rule 2.3**
**A Judge Shall Not by Words or Actions Engage in Harassment**
**Based on Sex or Gender**

73.    Paragraphs 1 – 72 are incorporated herein.

**RESPONSE:**    Respondents responses to Paragraphs 1-72 above are incorporated herein.

74.    Canon Rule 2.3 states:

(A)    A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.

(B)    A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so.

**RESPONSE:**    Admitted.  CCJC Rule 2.3 says what it says.

15

75.     In addition, Chief Justice Directive 08-06, Amended 05/11, ANTI-HARASSMENT AND ANTI-DISCRIMINATION POLICY - COLORADO JUDICIAL DEPARTMENT, states:

> Harassment, whether verbal, physical, or environmental, is unacceptable and will not be tolerated in the workplace itself or in other work-related settings such as business trips, conferences, or work-related social events.

**RESPONSE:**     Admitted.  CJD says what it says.

76.     Respondent violated Canon Rule 2.3, and the Chief Justice Directive 08-06, when he engaged in a closed door conversation with his young, female law clerk, Ms. ███████, about his sex life, sexual practices, and opportunities for sexual engagements at a "swingers" ranch.

**RESPONSE:**     Denied.  Respondent did not violate Canon 2.3 or CJD 08-06.  He did not engage in closed door conversations of any kind with Ms. ███████ did not discuss his sex life, sexual practices, or opportunities for sexual engagements at a "swingers ranch".  Respondent answered Ms. ███████'s question about his black ring, explained its meaning, explained and described the lifestyle, and spoke about Dr. Scipione's research regarding consensual non-monogamy.

77.     Respondent violated Canon Rule 2.3, and the Chief Justice Directive 08-06, when he engaged in a conversation with his CJA, Ms. █████r, about his sex life, and opportunities for sexual engagements at a "swingers" ranch.

**RESPONSE:**     Denied.  See Response to 76.  Respondent never spoke with ███████ about his sex life or opportunities for sexual engagements at a "swingers" ranch.

78.     Through his conduct as described above, Respondent violated CCJC Rule 2.3, whether viewed as separate incidents or as a pattern of similar conduct.

**RESPONSE:**     Denied.

<div align="center">

**CHARGE II**
**CCJC Rule 2.8**
**A Judge Shall be Patient, Dignified and Courteous**

</div>

79.     Paragraphs 1 – 78 above are incorporated herein.

**RESPONSE:**     Respondents responses to Paragraphs 1-78 above are incorporated herein.

80.     Canon Rule 2.8 states:

<div align="center">16</div>

(A)    A judge shall require order and decorum in proceedings before the court.

(B)    A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control…

**RESPONSE:**    Admitted.  Canon Rule 2.8 says what it says.

81.    Respondent violated Canon 2.8 when he discussed the details of his sex life and sexual practices with ███████████ █████████n.

**RESPONSE:**    Denied.

82.    Respondent violated Canon 2.8 when he discussed the details of his sex life and sexual practices with █████████████ .

**RESPONSE:**    Denied.

83.    Respondent was not dignified or courteous when he discussed the details of his sex life and sexual practices with █████████████ .

**RESPONSE:**    Denied.

84.    Respondent failed to act dignified or courteous when he referred to his CJA as a "bitch," when speaking to his law clerk.

**RESPONSE:**    Denied.

85.    Respondent failed to act dignified or courteous when he told Ms. ████████: "You won't learn anything from Magistrate Bradley anyway.  She doesn't know what she's doing.  She's always getting reversed."

**RESPONSE:**    Denied.

86.    Through his conduct as described above, Respondent violated CCJC Rule 2.8, whether viewed as separate incidents or as a pattern of similar conduct.

**RESPONSE:**    Denied.

17

## CHARGE III
### CCJC 2.9
### A Judge Shall Not Initiate, Permit, or Consider Ex Parte Communications

87.     Paragraphs 1 – 86 above are incorporated herein.

**RESPONSE:**     Respondents responses to Paragraphs 1-86 above are incorporated herein.

88.     Canon Rule 2.9 states, in relevant part:

(A)     A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending[2] or impending matter[3]….

**RESPONSE:**     Admitted.  Canon Rule 2.9 says what it says.

89.     Respondent violated Rule 2.9 when he improperly contacted Judge Leith and her clerk, ex parte, seeking special, expedited treatment of his Application for Informal Probate of Will and Informal Appointment of Personal Representative, a pending matter.

**RESPONSE:**     Denied.

90.     Through his conduct as described above, Respondent violated CCJC Rule 2.9, whether viewed as separate incidents or as a pattern of similar conduct.

**RESPONSE:**     Denied.

## CHARGE IV
### CCJC Rule 1.3
### A Judge Shall Not Abuse the Prestige of Judicial Office

91.     Paragraphs 1 – 90 above are incorporated herein.

**RESPONSE:**     Respondents responses to Paragraphs 1-90 above are incorporated herein.

92.     Canon Rule 1.3 states:

---

[2] "Pending matter" is defined in the "Terminology" section of the CCJC as "a matter that has commenced. A matter continues to be pending through any appellate process until final disposition."
[3] "Impending matter" is defined in the "Terminology" section of the CCJC as "a matter that is imminent or expected to occur in the near future."

18

A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so.

**RESPONSE:**    Admitted.  Canon Rule 1.3 says what it says.

93.    Respondent violated Rule 1.3 when he improperly contacted Judge Leith and her clerk, ex parte, seeking special, expedited treatment of his Application for Informal Probate of Will and Informal Appointment of Personal Representative.

**RESPONSE:**    Denied.

94.    Respondent abused the prestige of his office by telling both the clerk and Judge Leith that he was a judge and that he needed a prompt ruling on his motion filed in his father's case, 21PR356.

**RESPONSE:**    Denied.

95.    Through his conduct as described above, Respondent violated CCJC Rule 1.3, whether viewed as separate incidents or as a pattern of similar conduct.

**RESPONSE:**    Denied.

## CHARGE V
### CCJC 1.2
### A Judge Shall Promote Confidence in the Judiciary

96.    Paragraphs 1 – 95 above are incorporated herein.

**RESPONSE:**    Respondents responses to Paragraphs 1-95 above are incorporated herein.

97.    Canon Rule 1.2 states:

A judge shall act at all times in a manner that promotes confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

**RESPONSE:**    Admitted.  Canon Rule 1.2 says what it says.

98.    Respondent violated Canon Rule 1.2 when he engaged in a closed door conversation with his young, female law clerk, Ms. ▮▮▮▮▮, about his sex life, sexual practices, and opportunities for sexual engagements at a "swingers" ranch.

**RESPONSE:**    Denied.

19

99.     Respondent violated Canon Rule 1.2 when he engaged in a conversation with his ███████████, about his sex life, and opportunities for sexual engagements at a "swingers" ranch.

**RESPONSE:**   Denied.

100.    Respondent violated Canon Rule 1.2 when he discussed the details of his sex life and sexual practices with ████████████████████████.

**RESPONSE:**   Denied.

101.    Respondent violated Canon Rule 1.2 when he discussed the details of his sex life and sexual practices with ██████████████████.

**RESPONSE:**   Denied.

102.    Respondent violated Canon Rule 1.2 when he referred to his CJA as a "bitch," when speaking to ██████████.

**RESPONSE:**   Denied.

103.    Respondent violated Canon Rule 1.2 when he told Ms. ████████: "You won't learn anything from Magistrate Bradley anyway.  She doesn't know what she's doing.  She's always getting reversed."

**RESPONSE:**   Denied.

104.    Respondent violated Canon Rule 1.2 when he improperly contacted Judge Leith and her clerk, ex parte, seeking special, expedited treatment of his Application for Informal Probate of Will and Informal Appointment of Personal Representative.

**RESPONSE:**   Denied.

105.    Respondent violated Canon Rule 1.2 when he abused the prestige of his office by telling both the clerk and Judge Leith that he was a judge and that he needed a prompt ruling on his motion filed in his father's case, 21PR356.

**RESPONSE:**   Denied.

106.    Through his conduct as described above, Respondent violated CCJC Rule 1.2, whether viewed as separate incidents or as a pattern of similar conduct.

**RESPONSE:**   Denied.

## CHARGE VI
### CCJC 1.1
### A Judge Shall Comply with the Law

107.    Paragraphs 1 – 106 above are incorporated herein.

**RESPONSE:**    Respondents responses to Paragraphs 1-106 above are incorporated herein.

108.    Canon Rule 1.1 states, in relevant part: "A judge shall comply with the law, including the Code of Judicial Conduct."

**RESPONSE:**    Admitted.  Canon Rule 1.1 says what it says.

109.    Respondent violated Canon Rule 1.1 when he engaged in the conduct described herein in violation of Canon Rules 1.2, 1.3, 2.3, 2.8 and 2.9.

**RESPONSE:**    Denied.

110.    Through his conduct as described above, Respondent violated CCJC Rule 1.1, whether viewed as separate incidents or as a pattern of similar conduct.

**RESPONSE:**    Denied.

WHEREFORE, Respondent, Judge John E. Scipione, respectfully requests that the Special Masters enter judgment in favor of Respondent and against Complainant on each of the claims for relief and for such other relief as they deem just and proper.  Furthermore, the Respondent requests such relief as is contemplated by the Colorado Rules of Judicial Discipline.

Respectfully submitted this 1st day of July, 2022.

BURNS, FIGA & WILL, P.C.

*\*\*Original signature at the offices of
Burns, Figa & Will, P.C.\*\**

By:  S/ John S. Gleason
         John S. Gleason (#15011)

**Attorneys for Respondent
John E. Scipione**

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 1st day of July, 2022, a true and correct copy of the above and foregoing **ANSWER TO FIRST AMENDED STATEMENT OF CHARGES** was served on the following via email or by depositing a copy of same in the United States mail, postage prepaid, addressed as follows:

Jodanna L. Haskins, Esq.
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, 8th Floor
Denver, Colorado 80203
(jody.haskins@coag.gov)

*\*\*Original signature at the offices of
Burns, Figa & Will, P.C.\*\**

 S/ Kim Shanley

22

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Telephone: (303) 457-5131 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>        and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | RECEIVED<br><br>July 7, 2022<br><br>Colorado<br>Commission on<br>Judicial Discipline<br><br>▲ COURT USE ONLY ▲ |
| PHILIP J. WEISER, Attorney General<br>Jodanna L. Haskins, #41285*<br>Senior Assistant Attorney General<br>Colorado Department of Law<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, 10th Floor<br>Denver, Colorado 80203<br>*Counsel of Record<br>Telephone: (720) 508-6000<br>Email:  jody.haskins@coag.gov | Case Number:  22-138<br>          2022SA14 |

## NOTICE OF SUBSTITUTION OF COUNSEL

Pursuant to C.R.C.P. 121 § 1-1, Special Counsel, the Colorado Attorney General, on behalf of the People of the State of Colorado, hereby file this Notice of Substitution of Counsel. The Colorado Commission on Judicial Discipline hereby appoints and substitutes the following counsel pursuant to §§ 13-5.3-102(3)(e), 13-5.3-109(1)[1] and 24-31-111 C.R.S. and Colo. RJD 2(aa) and 3(d)(11) in the above-captioned matter:

Leslie C. Schulze
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor, Denver, CO 80203

---

[1] Title 13, Article 5.3 was amended by CO LEGIS 201 (2022), 2022 Colo. Legis. Serv. Ch. 201 (S.B. 22-201).

leslie.schulze@coag.gov
(720) 508-6600 (direct)
Attorney Reg. No. 43685


DATED: July 7, 2022

Respectfully submitted,


*s/ Jodanna L. Haskins*
Jodanna L. Haskins
Senior Assistant Attorney General


*s/ Leslie C. Schulze*
Leslie C. Schulze
Senior Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 7, 2022, a true and correct copy of the foregoing was filed with the Commission and served via e-mail upon the following persons:

John S. Gleason
Counsel of Record for Respondent
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111
jgleason@bfwlaw.com

Jodanna Haskins
Colorado Department of Law
1300 Broadway, 8th Floor
Denver, CO 80203
jody.haskins@coag.gov

By: ___*s/ Leslie C. Schulze*___

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Telephone: (303) 457-5131 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | RECEIVED<br><br>July 19, 2022<br><br>Colorado<br>Commission on<br>Judicial Discipline<br><br>▲ COURT USE ONLY ▲ |
| PHILIP J. WEISER, Attorney General<br>Leslie C. Schulze, #43685*<br>Lucia Padilla, #35150*<br>Senior Assistant Attorneys General<br>Colorado Department of Law<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, 10th Floor<br>Denver, Colorado 80203<br>*Counsel of Record<br>Telephone: (720) 508-6600<br>Email:  leslie.schulze@coag.gov<br>        Lucia.padilla@coag.gov | Commission<br>Case Number:  21-138<br><br>2022SA14 |
| **NOTICE OF ENTRY OF APPEARANCE** | |

Pursuant to C.R.C.P. 121 § 1-1, Special Counsel, the Colorado Attorney General, on behalf of the People of the State of Colorado, hereby files this Notice of Entry of Counsel. The Colorado Commission on Judicial Discipline hereby appoints as co-counsel the following counsel pursuant to §§ 13-5.3-102(3)(e), 13-5.3-109(1)[1] and 24-31-111 C.R.S. and Colo. RJD 2(aa) and 3(d)(11) in the above-captioned matter:

Lucia Padilla
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor, Denver, CO 80203

---

[1] Title 13, Article 5.3 was amended by CO LEGIS 201 (2022), 2022 Colo. Legis. Serv. Ch. 201 (S.B. 22-201).

Lucia.Padilla@coag.gov
(720) 508-6572 (direct)
Attorney Reg. No. 35150

DATED: July 19, 2022

_s/ Lucia Padilla_
Lucia Padilla
Senior Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that on July 19, 2022, a true and correct copy of the foregoing was filed with the Commission and served via e-mail upon the following persons:

John S. Gleason
Counsel of Record for Respondent
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111
jgleason@bfwlaw.com

Lucia C. Padilla
Colorado Department of Law
1300 Broadway, 8th Floor
Denver, CO 80203
Lucia.Padilla@coag.gov

By:     *s/ Leslie C. Schulze*

<table>
<tr>
<td>

**Colorado Commission on Judicial Discipline**
Ralph L. Carr Judicial Center
1300 Broadway, Ste. 210
Denver, CO 80203
303.457.5134

</td>
<td rowspan="2"></td>
</tr>
</table>

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>303.457.5134 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | **RECEIVED**<br><br>July 21, 2022<br><br>Colorado Commission on Judicial Discipline<br><br><br>▲ COURT USE ONLY ▲ |
| **Special Counsel for the Colorado Commission on Judicial Discipline:**<br><br>PHILIP J. WEISER, Attorney General<br>Leslie C. Schulze, #43685\*<br>Lucia Padilla, #35150\*<br>Colorado Department of Law<br>Ralph L. Carr Judicial Center<br>1300 Broadway, 8th Floor<br>Denver, CO 80203<br>Phone: 720-508-6600<br>Fax: 720-508-6030<br>E-Mail: leslie.schulze@coag.gov<br>Lucia.padilla@coag.gov<br>\*Counsel of record | CCJD Case No. 22-112 |
| **STATEMENT OF CHARGES** | |

This Statement of Charges is filed pursuant to Colorado Rules of Judicial Discipline (Colo. RJD) 4, 16(b)(4), and 18 and it is alleged as follows:

## I.    BACKGROUND AND JURISDICTION

1. John E. Scipione ("Respondent") was appointed as a Judge of the Arapahoe County District Court in 2018. Respondent continues to serve as an Arapahoe

County District Court Judge and served in that capacity at all times relevant to this Statement of Charges.

2. Respondent is subject to the jurisdiction of the Colorado Supreme Court and the Colorado Commission on Judicial Discipline ("the Commission" or "CCJD") in these judicial discipline proceedings.

3. The Commission has determined that probable cause exists to commence formal proceedings under Colo. RJD 16(b)(4).

## II.    FACTUAL ALLEGATIONS

1. K.O. began working as a law clerk for Respondent in May 2019. Like many lawyers, one of the reasons K.O. sought and accepted a clerkship with Respondent was to build a professional connection with a person of influence in the legal community. K.O. expected that, in exchange for good work, Respondent would provide ongoing mentorship, professional development advice, and serve as a reference for her future employment.

2. Respondent hired K.O., in part, due to K.O.'s prior experience as a law clerk for the Douglas County District Court and because she had experience in complex probate matters.

3. As part of her clerkship, K.O. worked with Respondent on the complex and high-profile probate case involving the estate of Denver Broncos owner Pat Bowlen ("the Bowlen Case").

4. K.O. had a positive experience while employed as Respondent's law clerk. K.O. perceived that she was respected and appreciated for her contributions to Respondent's Division.

5. While working for Respondent, K.O.'s professional interactions with Respondent outside of the courtroom were limited to a few lunches that included Respondent's court reporter and judicial assistant.

6. Part way through her term as a law clerk for Respondent, K.O.'s job title was reclassified from law clerk to legal research attorney. When this change took effect, K.O. no longer worked in Respondent's chambers, though she continued to work in the Arapahoe County Justice Center.

7. When K.O. finished her term as a law clerk, she expected to maintain a professional mentoring relationship with Respondent and to rely upon Respondent as a professional reference.

8. K.O. and Respondent discussed K.O.'s intent and desire to continue a mentor-mentee relationship with Respondent. During her time as a legal research

-2-

attorney, K.O. and Respondent maintained a professional relationship, and K.O. occasionally visited Respondent's chambers for this purpose.

9. In June of 2021, K.O. left her position as a legal research attorney and accepted a job as Assistant Legal Counsel with the Colorado Judicial Department.

10. Although the trial in the Bowlen Case was expected to occur during the Summer of 2021, it settled in late June 2021. By this time, K.O. had left the 18th Judicial District for her new job as assistant legal counsel.

11. Following the resolution of the Bowlen Case, Respondent contacted K.O. to tell her about the settlement because of the considerable amount of work K.O. did on the case. Respondent invited K.O. to meet for dinner to discuss the resolution of the Bowlen Case.

12. Prior to meeting, K.O. and Respondent had at least one phone call. During the call, K.O. and Respondent both conveyed that the purpose of their meeting was to discuss the Bowlen Case's unexpected settlement, as well as K.O.'s new job and career path. At no time during these calls did Respondent ever suggest to K.O. that he wished the meeting to be anything other than a professional one. Had Respondent told her that he viewed the meeting as a personal or intimate one, K.O. would not have agreed to attend.

13. Following their phone call, Respondent and K.O. exchanged text messages to finalize a time and a place to meet.

14. At no time prior to their meeting did Respondent suggest to K.O. that he wished to transform their professional relationship into an intimate one.

15. At no time in her professional relationship with Respondent has K.O. ever expressed an interest in, or conveyed receptiveness to, having an intimate relationship or other non-professional relationship with Respondent.

16. Respondent and K.O. met at Slattery's Pub and Grill in the Denver Tech Center the evening of August 4, 2021.

17. Respondent's conversation with K.O. started with discussion about the Bowlen matter, other cases K.O. had been involved in, and K.O.'s experience with her new job within the Judicial Department.

18. Respondent then changed the topic of conversation and began asking K.O. about her relationship status.

19. Respondent asked K.O, something along the lines of: "So, do you have a boyfriend?  Girlfriend?  We never really talked about this."

-3-

20. Respondent asking these personal questions made K.O. very uncomfortable. K.O. answered Respondent's initial question and then attempted to quickly redirect the conversation to a professional topic.

21. Respondent proceeded to tell K.O. that in his house everyone knew that his meeting with K.O. was a "date." Respondent did not ask K.O. whether she wished the meeting to be a date, nor seek any input from her as to his characterization of the meeting.

22. K.O. was extremely uncomfortable when Respondent said this. She displayed visible reluctance to discuss a personal relationship and again attempted to change the subject.

23. Respondent ignored K.O.'s attempts to divert the conversation and refused to drop the topic. Instead, Respondent told K.O. that his wife had given him permission to date K.O.

24. Respondent then informed K.O. that his wife was available by phone or FaceTime to respond to any concerns that K.O. might have with dating Respondent.

25. Respondent further told K.O. that he had online dating profiles and explained "the concept of consensual non-monogamy."

26. K.O. told Respondent repeatedly that she did not know what to say in response to his proposal, and Respondent became defensive.

27. K.O. perceived that Respondent badly misread the situation: Respondent did not appear to recognize that K.O. was offended because Respondent was using what he presented as a professional meeting and his role as a formerly trusted professional mentor to K.O. to pursue a personal relationship.

28. Due to her extreme discomfort and concern about the personal and sexual comments Respondent made to her, K.O. tried to quickly end the meeting with Respondent: she stopped eating her meal and requested the check.

29. Despite K.O.'s cues that she was uncomfortable with the subject of the conversation initiated by Respondent, Respondent did not relent and continued to share with K.O. very personal information about himself and his wife for the purpose of pursuing an intimate relationship with K.O.

30. At the conclusion of the dinner, Respondent told K.O. "don't disappear on me now." Respondent attempted to give K.O. a hug, and K.O. rebuffed his attempt at physical contact.

31. On August 9, 2021, Respondent followed up with a text message to K.O. that stated:

> Hi!  So with everything going on last week I didn't get a chance to tell you how much I enjoyed having dinner last week.  I hope that I didn't leave you too overwhelmed with everything we talked about.  When you are ready I'm anxious to hear your thoughts.
>
> Side note… the big announcement went out today that [I.B.] will be joining Bradley.  She didn't even tell me.  ☺

32. K.O. did not respond to the text message.

33. Through a letter dated October 28, 2021, the Commission informed Respondent that allegations of inappropriate communications with his former judicial assistant and a law student intern would be treated as the complainants.  Essentially, Respondent was alleged to have brought discussion of his "alternative lifestyle" into office conversations with his judicial assistant and legal intern.  Respondent was further alleged to have repeatedly commented on the legal intern's physical appearance. Similar to the conversation Respondent had with K.O., he also allegedly talked with the legal intern about his use of the dating app Tinder. This letter forms the basis of another pending judicial discipline proceeding against Respondent: CCJD Case No. 21-138 and Colorado Supreme Court Case No. 2022SA14.

34. On November 16, 2021, Respondent sent K.O. a text message asking her to speak with his attorney's paralegal about her time as a law clerk. At that time, K.O. believed the paralegal was only conducting due diligence, not requesting that K.O. agree to testify on behalf of Respondent.

35. Copies of text messages between Respondent and K.O. from July 27, 2021 through November 16, 2021 are incorporated in these allegations through attached Exhibit A.  Respondent has provided an additional text message image from August 4, 2021 that apparently shows K.O. replying to a text from Respondent with a heart emoji and an image of a Guinness bar sign. This additional message (without waiving potential challenges to its authenticity) is incorporated in these allegations through attached Exhibit B.

36. K.O. spoke by phone with the paralegal. The questions asked were limited to K.O.'s interactions with Respondent during the time she was actually employed as Respondent's law clerk.

37. When the paralegal asked if K.O. was willing to testify at a hearing on Respondent's behalf, K.O. explained that she "felt incredibly uncomfortable

testifying as a character witness . . ., that [her] strong preference would be not to testify, but that [she] would comply with any court order or subpoena."

38. K.O. believed Respondent's request that she testify put her in an untenable position: K.O. worried that if she did not testify favorably for Respondent, because of Respondent's position as a judge and influence within the broader legal community, Respondent could negatively impact K.O.'s reputation and future career. Yet, K.O. did not believe that she could give complete and truthful testimony without revealing Respondent's harassing conduct.

39. A notice and statement of charges was filed in CCJD Case No. 21-138 on January 20, 2022. The Colorado Supreme Court, in turn, issued an order on January 27, 2022 appointing special masters to hear the case.

40. Respondent's alleged conduct in Case No. 21-138 and alleged interactions with K.O. create an appearance that Respondent was using his professional position to attempt to recruit his current and former employees as intimate partners and to join his "alternative lifestyle."

41. On May 10, 2022, the same paralegal whom K.O. previously spoke with called her back to inform her that Respondent's attorney would subpoena her to testify on June 8, 2022.

42. Because of Respondent's attempt to manipulate his and K.O.'s professional relationship into an intimate one as explained above, K.O. was understandably extremely uncomfortable testifying as a character witness for Respondent. On May 12, 2022, K.O. reported Respondent's conduct to the Commission through a written statement at the direction of her supervisor, Terri Morrison.

III.    **CHARGES**

<u>Charge 1</u>
Canon Rule 2.3
A Judge Shall Not Engage in Harassment Based on Sex or Gender

43. Paragraphs 1-42 are incorporated herein.

44. Canon Rule 2.3(B) states, in relevant part, that a judge shall not:

"[E]ngage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, [or] gender…"

45. Additionally, Chief Justice Directive 08-06 delineates a zero-tolerance harassment policy for all Judicial employees, and states, in part:

Harassment, whether verbal, physical, or environmental, is unacceptable and will not be tolerated in the workplace itself or in other work-related settings such as business trips, conferences, or work-related social events.

46. By using a professional meeting arranged to discuss court-related business and mentoring as a guise for pursing an intimate relationship with a former employee, Respondent violated Canon Rule 2.3 and Chief Justice Directive 08-06.

47. The inappropriateness of Respondent's conduct and Respondent's intent is further apparent as part of a larger pattern of similar conduct towards others, as presented in CCJD Case No. 21-138.

48. Through his conduct as described above, Respondent violated Canon Rule 2.3(B), whether viewed as separate incidents or as a pattern of similar conduct.

<u>Charge 2</u>
Canon Rule 3.1
Extrajudicial Activities

49. Paragraphs 1-48 are incorporated herein.

50. Canon Rule 3.1 states, in relevant part: "when in engaging in extrajudicial activities, a judge shall not":

    a. "(C) participate in activities that would appear to a reasonable person to undermine the judge's independence, integrity, or impartiality"; or
    b. "(D) engage in conduct that would appear to a reasonable person to be coercive."

51. Moreover, the Preamble to the Colorado Code of Judicial Conduct states, in relevant part:

"Judges should maintain the dignity of judicial office at all times, and avoid both impropriety and the appearance of impropriety in their professional and personal lives."

52. Through his conduct as described above, Respondent violated Canon Rule 3.1 by engaging in extrajudicial behavior that undermined the judge's integrity and was reasonably perceived as coercive.

<u>Charge 3</u>
Canon Rule 1.2
A Judge Shall Promote Confidence in the Judiciary

53. Paragraphs 1-52 are incorporated herein.

54. Canon Rule 1.2 states:

A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

55. Comment 1 to the rule makes clear that it applies "to both the professional and personal conduct of a judge." Comments 4 and 6 to the rule (as well as Canon 4 of the Code of Judicial Conduct) emphasize the expectation that a judge participate in activities that further ethical conduct, integrity, and professionalism in the legal profession and promote confidence in the judiciary.

56. A judge's obligation to act with integrity does not end when he leaves the courthouse. *See, e.g.,* Section 2 of Preamble to Rules of Judicial Conduct; Rule 1.2 Comments 1-3.

57. The Colorado Code of Judicial Conduct ("the Code") further defines "integrity" as "probity, fairness, honesty, uprightness, and soundness of character." The Code recognizes "impropriety" to include: "conduct that violates the law, court rules, or provisions of this Code, and conduct that undermines a judge's independence, integrity, or impartiality.

58. Respondent's conduct in inviting K.O. to a professional dinner as a ruse to proposition her to engage in an intimate relationship with him did not display integrity and created an appearance of impropriety and violated Canon Rule 1.2.

59. Similarly, with knowledge of his interactions with K.O. on August 4, 2021, Respondent further created an appearance of impropriety and violated Canon Rule 1.2 by seeking to have K.O. testify on his behalf in CCJD Case No. 21-138.

60. Through his conduct as described above, Respondent violated Canon Rule 1.2 whether viewed as separate incidents or as a pattern of similar conduct.

Charge 4
Canon Rule 1.1
A Judge Shall Comply with the Law

61. Paragraphs 1-60 are incorporated herein.

62. Canon Rule 1.1 states, in relevant part: "A judge shall comply with the law, including the Code of Judicial Conduct."

-8-

63. Respondent violated Canon Rule 1.1 when he engaged in the conduct described herein in violation of Canon Rules 1.2, 2.3, and 3.1.

64. Through his conduct as described above, Respondent violated Canon Rule 1.1 whether viewed as separate incidents or as a pattern of similar conduct.

WHEREFORE, Complainant requests that the Commission recommend that, for his misconduct, appropriate disciplinary sanctions be imposed upon Judge John E. Scipione by the Colorado Supreme Court under Colo. RJD 36; that the Commission assess costs, attorney's fees and expenses of this proceeding against Respondent and that the Commission recommend any such other and further relief as it deems appropriate.

DATED this 21st day of July, 2022.

Respectfully submitted,


_s/ Leslie Schulze_____
Leslie Schulze, #43685
Lucia Padilla, #35150
Senior Assistant Attorneys General
Special Counsel for the
Colorado Commission on Judicial Discipline

### Certificate of Service

The undersigned certifies that the foregoing Notice of Formal Charges was served on the following by email and by regular mail sent through the United States Postal Service on July 21st, 2022, addressed to:

John S. Gleason, Esq.
Burns Figa & Will P.C.
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, Colorado 80111

_____

-10-

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case No. 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Christopher S.P. Gregory, esq.<br>Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5134<br>Email:  c.gregory@jd.state.co.us<br>Atty. Reg. # 37095 | Case Number: |
| **MOTION FOR APPOINTMENT OF SPECIAL MASTERS** ||

Pursuant to Colo. RJD 18(a), the Colorado Commission on Judicial

Discipline (the CCJD), through its Special Counsel, has commenced formal

proceedings against the Respondent by serving Respondent's Counsel with a

Statement of Charges and a Notice of Formal Charges.  These documents have been

duly filed with the Commission's Executive Director.

Colo. RJD 18.5(a) provides:

> After special counsel has served the statement of charges
> and notice of formal charges on the Judge and filed copies
> thereof with the executive director, the Commission shall
> request the Supreme Court to appoint three special
> masters to preside over formal proceedings who shall hear
> and take evidence concerning the charges and provide a
> report to the Commission in accordance with the
> Constitution and these Rules. The appointees may be
> retired justices or active or retired judges of courts of
> record, who have no conflicts of interest and who are able
> to serve diligently and impartially as special masters.
> Unless otherwise designated, the judge or justice first
> named in the Supreme Court's order shall be the
> presiding special master. The presiding special master is
> authorized to act on behalf of the special masters in
> resolving pre-hearing issues, including but not limited to
> discovery disputes; conducting pre-hearing conferences;
> and ruling on evidentiary, procedural, and legal issues that
> arise during hearings.

The proceedings of the CCJD and the Special Masters remain confidential,

excepting matters that require the Supreme Court's attention prior to the CCJD

filing recommendations and the CCJD's record of proceedings pursuant to

-2-

Colorado Constitution Article VI, § 23(3)(g) and Colo. RJD 37(a).  As an administrative matter, however, it is necessary for the Supreme Court (while maintaining confidentiality) to assign a case number to address the present motion according to Colo. RJD 18.5(a) and to allow the filing of other prospective pleadings.

The CCJD respectfully moves for this Court to appoint three special masters pursuant to Colo. RJD 18.5(a) and, while maintaining confidentiality under Colorado Constitution Article VI, § 23(3)(e)-(g), assign a case number for further proceedings.

This case, however, follows a currently pending case involving the Respondent Judge, *Matter of Scipione*, CCJD Case No. 21-138 and Colorado Supreme Court Case No. 22SA14.  The CCJD does not oppose the possible joinder of the two cases according to C.R.C.P. 18 with a consolidated hearing according to C.R.C.P. 42(a). Joinder and consolidation, however, are properly matters for consideration by the appointed special masters.  Accordingly, the CCJD moves for this Court to issue a more specific order appointing the same special masters already appointed in CCJD Case No. 21-138 to the present case.

DATED: July 22, 2022

Respectfully submitted,

_____
Christopher S.P. Gregory, #37095
Executive Director
Colorado Commission on Judicial Discipline

-4-

# CERTIFICATE OF SERVICE

I certify that on July 22, 2022, a true and correct copy of the foregoing MOTION FOR APPOINTMENT OF SPECIAL MASTERS and accompanying proposed order were filed with the Court and served via e-mail upon the following persons:

John S. Gleason, Atty. Reg. #15011
Counsel of Record for Respondent
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111
jgleason@bfwlaw.com

Appointed Special Counsel:

Leslie C. Schulze, #43685
Lucia Padilla, #35150
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 8th Floor
Denver, CO 80203
leslie.schulze@coag.gov
lucia.padilla@coag.gov

By: _____
Christopher S.P. Gregory, #37095

-5-

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: July 22, 2022<br>CASE NUMBER: 2022SA236 |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 22CJD112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236 |
| ORDER OF COURT | |

Upon consideration of the Motion for Appointment of Special Masters filed in this matter on July 22, 2022, it is HEREBY ORDERED that the following judges are appointed as special masters pursuant to Colo. RJD 18.5(a) in the disciplinary proceedings against the Respondent:

1. Chief Judge Susan Blanco (presiding special master), 8th Judicial District

2. Judge Lindsay Van Gilder, 1st Judicial District

3. Retired Justice Alex Martinez, Senior Justice

BY THE COURT, JULY 22, 2022.
CHIEF JUSTICE BOATRIGHT does not participate.

| | |
|---|---|
| SUPREME COURT, STATE OF COLORADO<br><br>ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE<br>COLORADO COMMISSION ON JUDICIAL DISCIPLINE<br><br>1300 Broadway, Suite 210<br>Denver, Colorado 80203 | |
| IN RE THE MATTER OF:<br><br>THE PEOPLE OF THE STATE OF COLORADO,<br><br>**Complainant,**<br><br>and<br><br>JOHN E. SCIPIONE, a Judge of the Arapahoe County District Court,<br><br>**Respondent.** | **RECEIVED**<br><br>July 25, 2022<br><br>Colorado<br>Commission on<br>Judicial Discipline<br><br>▲  **COURT USE ONLY**  ▲ |
| **Attorneys for Respondent**<br><br>Name:      John S. Gleason (#15011)<br>Address:   BURNS, FIGA & WILL, P.C.<br>                6400 South Fiddler's Green Circle<br>                Suite 1000<br>                Greenwood Village, CO 80111<br>Telephone:  (303) 796-2626<br>Facsimile:  (303) 796-2777<br>E-mail:     jgleason@bfwlaw.com | Case No. 2022SA14<br><br>(Commission Case<br>No. 21-138) |
| **UNOPPOSED MOTION TO CONSOLIDATE CASES** | |

Respondent, Judge John E. Scipione, by and through his counsel, moves the Special Masters for an Order consolidating Supreme Court Case No. 2022SA14 (Commission Case No. 21CJD138) with Supreme Court Case No. 2022SA236 (Commission Case No. 22CJD112). In support, Respondent states as follows:

1.      *Certification of Conferral Pursuant to C.R.C.P. 121 § 1-15(8).*  Counsel for Respondent conferred with counsel for the People regarding this Motion.  Counsel for the People do not object to the Motion to Consolidate Cases.

2.      C.R.C.P. 42(a) provides that "when actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions, it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."

3.    In the interests of judicial economy and to avoid additional costs to the Respondent, the Respondent requests that both matters be consolidated into one action.

WHEREFORE, the Respondent requests that the Presiding Masters enter an order consolidating the two matters identified herein, and that they hear the consolidated cases in one trial.

Respectfully submitted this 25th day of July, 2022.

BURNS, FIGA & WILL, P.C.

*\*\*Original signature at the offices of
  Burns, Figa & Will, P.C.\*\**

By:  S/ John S. Gleason
           John S. Gleason (#15011)

**Attorneys for Respondent
John E. Scipione**

2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 25th day of July, 2022, a true and correct copy of the above and foregoing **UNOPPOSED MOTION TO CONSOLIDATE CASES** was served on the following via email or by depositing a copy of same in the United States mail, postage prepaid, addressed as follows:

Leslie C. Schulze, Esq.
Lucia Padilla, Esq.
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, 8th Floor
Denver, Colorado 80203
(*leslie.schulze@coag.gov*
 *Lucia.padilla@coag.gov*)

*\*\*Original signature at the offices of
  Burns, Figa & Will, P.C.\*\**

 S/ Kim Shanley

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>        and<br><br>John E. Scipione, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲  COURT USE ONLY  ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Christopher S.P. Gregory, Esq.<br>Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5134<br>Email:  c.gregory@jd.state.co.us<br>Atty. Reg. # 37095 | Case Number:  22SA14 |
| **REQUEST FOR TEMPORARY JUDICIAL SUSPENSION ACCORDING TO COLO. RJD 34(A)** | |

Pursuant to Colo. RJD 34(a), the Colorado Commission on Judicial Discipline ("the CCJD"), through its Executive Director, requests that the Colorado Supreme Court order the immediate paid suspension of Arapahoe District Court Judge John E. Scipione pending further proceedings according to Colo. RJD, Parts B and C.  As grounds for this request, the CCJD states the following upon information and belief:

1. Judge Scipione was appointed to the Arapahoe County Court effective May 31, 2017 after having served as an 18th Judicial District Court Magistrate since 2012.  Then, effective September 29, 2018, Judge Scipione was elevated to the 18th Judicial District Court.

2. Question 47 (formerly Question 46) of the Judicial Nominating Commission Application for Colorado State Court Judgeship ("Nominating Application") asks:

> Is there any circumstance or event in your personal or professional life which, if brought to the attention of the Commission, might tend to affect adversely your qualifications to serve on the court for which you have applied? If so, please explain.

3. On both his certified February 10, 2017 and August 2, 2018 Nominating Applications, Judge Scipione answered "No," denying that any

-2-

circumstances existed which adversely affected his qualifications to serve as a judge.

4. On September 1, 2021, the CCJD received multiple reports of judicial misconduct by Judge Scipione. These reports included allegations that Judge Scipione used his position as a judge to sexually harass court employees in his Division and to seek preferential treatment in a Denver Probate Court proceeding involving his father's estate.

5. Specifically, Judge Scipione's misconduct included discussing his "alternative lifestyle" or "swinger lifestyle" of extra-marital non-monogamous sexual relationships with a legal intern and judicial assistant. These alleged communications further included Judge Scipione making derogatory comments about his judicial assistant (Judicial Assistant 2), making comments to his law clerk/intern (Law Clerk 2) about her physical appearance, and discussing his "lifestyle" with both Judicial Assistant 2 and Law Clerk 2. Judge Scipione's alleged communications with Law Clerk 2 also included discussion of his and his wife's membership in a swinger ranch/club, the membership dues, and the rules/general activities of the ranch/club. Judge Scipione is alleged to have had a similar subsequent conversation with Judicial Assistant 2 while in his courtroom.

-3-

6. It deserves emphasis that Law Clerk 2 was working for Judge Scipione as a non-credit earning summer intern who did not receive pay or compensation through the Judicial Department.

7. The allegations of sexual harassment align with the term as defined by the Colorado Judicial System Personnel Rules (C.J.S.P.R.), specifically C.J.S.P.R. 20.B.2.b., and by Comments 3 and 4 to Canon Rule 2.3 of the Colorado Rules of Judicial Conduct ("the Code").

8. Judge Scipione is also alleged to have requested Law Clerk 2's assistance in setting up/using the Tinder dating application on his phone.

9. When Judicial Assistant 2 sought to transfer to a different judicial officer's division, Judge Scipione is alleged to have made disparaging comments about the other judicial officer.

10. With regards to improper *ex parte* communications and seeking special treatment through communications with the Denver Probate Court, Judge Scipione is accused of leaving a voicemail message with Judge Elizabeth Leith's division clerk identifying himself as a judge and asking for prompt issuance of an order appointing him as personal representative for his father's estate. Judge Scipione, then, directly sent Judge Leith an e-mail (from his judicial account to her judicial account) asking for her to "help

-4-

[him] out" in getting "an order of appointment and letters testamentary issued forthwith."

11. The alleged circumstances raised in the initial reports of judicial misconduct occurred between June 2021 and August 2021.

12. The allegations against Judge Scipione raised general concerns that he violated general policies against sexual harassment under Canon Rule 2.3 of the Code and Chief Justice Directive 08-06[1] by using his position in attempts to recruit younger female subordinate employees assigned to his Division to participate in his "lifestyle."

13. Through a letter dated October 28, 2021, the CCJD notified Judge Scipione that it would treat the allegations described in paragraphs 4-10 as a complaint according to Colo. RJD 14(a).

14. Judge Scipione, through his counsel, responded to the CCJD's Colo. RJD 14(a) notice with a letter dated December 16, 2021. In this letter, Judge Scipione denied making derogatory comments about Judicial Assistant 2 while presenting a narrative that he had reluctantly hired Judicial Assistant 2 (who had previously worked in another recently retired judge's division).

---

[1] The definition of "sexual harassment" in CJD 08-06, Attachment A is identical to the definition provided by C.J.S.P.R. 20.B.2.b.

-5-

15.   Judge Scipione emphasized that he was under "stress" due to various illnesses and injuries suffered by members of his family, including his father's contemporaneous death, during the Summer and Fall of 2021.

16.   Judge Scipione further characterized his statements to Law Clerk 2 as "compliment[s]" and "friendly, teasing banter" without any sexual implications.  While acknowledging that he had a conversation with Law Clerk 2 about Tinder, Judge Scipione denied having any closed-door conversations or requesting that Law Clerk 2 assist him with setting up or using the application.

17.   Most significantly, Judge Scipione, through his counsel's December 16, 2021 letter, expressly denied any history of inappropriate sexual communications or conduct towards subordinate female employees.  As stated in the letter:

> Judge Scipione never made comments to [Law Clerk 2] or any other intern or law clerk that could be considered "flirtatious" within the courthouse or work environment. Multiple witness interviews dating back to Judge Scipione's early days on the bench confirm that he never made any off-color, sexually flirtatious, or any demeaning comments about women or anyone.  To the contrary, a courtroom full of prior clerks, law clerks, and others will confirm that Judge Scipione never engaged in the type of conduct alleged by [Law Clerk 2].

-6-

18.  At the same time as Judge Scipione was allegedly having improper communications and interactions with Law Clerk 2 and Judicial Assistant 2, he was communicating with his former law clerk and research attorney, Law Clerk 1.  Allegedly, under the pretense of a meeting to discuss court-related developments that occurred after Law Clerk 1 left his Division and as part of continuing mentoring, Judge Scipione arranged to have dinner with Law Clerk 1 on August 4, 2021.

19. During that dinner, Judge Scipione is further alleged to have asked Law Clerk 1 about her relationship status.  Judge Scipione then allegedly informed Law Clerk 1 that in his household everyone knew that their dinner was a "date."

20.  Judge Scipione is also alleged to have invited Law Clerk 1 to talk with his wife over FaceTime to confirm that his wife had given him permission to "date" Law Clerk 1 and to answer questions that Law Clerk 1 might have.

21.  Law Clerk 1 denies doing anything to have encouraged or invited Judge Scipione's unwanted advances.

22.  After the CCJD sent its October 28, 2021 Colo. RJD 14(a) notification, Judge Scipione texted Law Clerk 1 to ask her to speak with his counsel's paralegal to provide a character reference in response to the allegations pending against him.  When the paralegal spoke with Law Clerk 1,

questions were limited to Law Clerk 1's interactions with Judge Scipione during the time that she actually worked with Judge Scipione's Division (from May 2019-May 2021). When asked if she would testify at a future hearing, Law Clerk 1 expressed a reluctance but confirmed that she would comply with a court order or subpoena.

23. Through special counsel, formal proceedings were commenced in CCJD Case No. 21-138 on January 20, 2022, and this Court appointed special masters on January 27, 2022 through Case No. 22SA14.

24. On February 9, 2021, Judge Scipione filed an answer to the statement of charges in Case No. 21-138. In his answer, Judge Scipione denied allegations that he knew or should have been aware of Law Clerk 2 and Judicial Assistant 2's discomfort regarding communications about his "lifestyle." Likewise, Judge Scipione denied making Law Clerk 2 uncomfortable through conversation about his use of the Tinder application. While admitting the alleged communications with the Denver Probate Court, Judge Scipione denied that his conduct violated Canon Rule 1.3. Judge Scipione further denied violating any other provisions of the Code through his alleged conduct.

25. Judge Scipione maintained these same responses in his July l, 2022, Answer to the Amended Statement of Charges in Case No. 21-138.

26. On May 10, 2022, the same paralegal contacted Law Clerk 1 again to inform her that Judge Scipione would subpoena her to testify at a hearing then-scheduled for June 7-8, 2022.

27. On May 12, 2022, Law Clerk 1 reported the circumstances of the August 4, 2021 dinner and Judge Scipione's communications/conduct to the CCJD.

28. Judge Scipione responded to a second Colo RJD 14(a) notice regarding Law Clerk 1's allegations through another letter from his counsel dated June 8, 2022. While denying that he had engaged in sexual harassment, Judge Scipione described his interactions with Law Clerk 1 as an unrequited interest. As stated in the June 8th letter:

> The simple truth is that Judge Scipione had an interest in [Law Clerk 1] that she did not share with him. Nothing more sinister. [Law Clerk 1] was not a stranger to Judge Scipione and he simply misread her feelings.

29. Judge Scipione, through counsel, further contended in the June 8th letter that a single heart emoji in a series of text messages with Law Clerk 1 had given Judge Scipione reasonable grounds to believe she was interested in the intimate relationship he sought.

30. Formal proceedings based upon Law Clerk 1's additional allegations were commenced in CCJD Case No. 22-112 on July 21, 2022. On July 22,

-9-

2022, this Court issued an order in Case No. 22SA236 expanding the appointments of the Special Masters in Case No. 21-138 to Case No. 22-112. Through agreement, the parties have consented to the consolidation of Case Nos. 21-138 and 22-112 for a two-day hearing scheduled the week of August 22, 2022.

31. Early in the investigation of Case No. 21-138, Judicial Assistant 2 explained that courthouse rumors existed that Judge Scipione had an intimate relationship with one of his prior judicial assistants. The investigation performed by the Colorado Supreme Court's Office of Attorney Regulation Counsel (OARC) in Case No. 21-138, however, did not obtain employment records verifying who else was previously employed in Judge Scipione's respective Divisions and did not interview those former employees.

32. On July 13, 2022, the CCJD received additional information about the courthouse rumors and directed its current special counsel (assigned through the Office of the Attorney General) to conduct further investigation. Through that investigation, the CCJD was able to locate Judge Scipione's judicial assistant (Judicial Assistant 1) who served with him while he was an 18th Judicial District Court Magistrate.

-10-

33.  Judicial Assistant 1 verified that she had an approximately year and a half (2013-2014) sexual relationship with Judge Scipione after Judge Scipione initiated the relationship in the workplace and through similar circumstances as alleged in Case Nos. 21-138 and 22-122.  Specifically, Judge Scipione allegedly used his position as a judicial officer and his workplace interactions to build a personal relationship with a younger female subordinate employee as a means for developing a further intimate, coercive relationship.  Judge Scipione's alleged conduct is probative of a pattern of attempting to use his authority over subordinate employees and to convert what should be strictly professional relationships into personal and, potentially, sexual relationships.

34.  Critically, Judge Scipione did not disclose his intimate relationship with Judicial Assistant 1 at the time and as required by then-effective CJD 08-06, Attachment F.  The requirements of former CJD 08-06, Attachment F have now been incorporated into the current CJD 08-06, Attachment A and the current version of **C.J.S.P.R. 20.G.2.**[2]

---

[2] C.J.S.P.R 20.G.2(1)(a) prohibits relationships between a supervisor and a direct subordinate, and (3) prohibits a judge from having a relationship with an individual employed in the same court or judicial district.

-11-

35.  Moreover, Judge Scipione did not disclose his relationship with Judicial Assistant 1 and his failure to comply with former CJD 08-06, Attachment F in his repeated responses to then Nominating Application Question 46.

36.  Judge Scipione's categorical denial of any prior inappropriate conduct with subordinate employees in his December 16, 2021 letter further raises material doubts as to Judge Scipione's veracity and cooperation with the CCJD in its disciplinary processes.

37.  In addition, the chronology and context of Judicial Assistant 1 and Law Clerk 1's allegations conflict with Judge Scipione's denials.  Specifically, Judge Scipione was not forthcoming with his intentions in initiating sexual conversations with subordinate employees. Moreover, the additional context provided by Judicial Assistant 1 makes it implausible Judge Scipione was unaware of the offense caused by his conduct or how such conduct violates the Code.

38.  Put more plainly, Judge Scipione has not been candid about the existence of his past relationship with Judicial Assistant 1 and how that relationship impacts the merits of the allegations in Case Nos. 21-138 and 22-112.

39.  Given the circumstances described above, it is likely that the allegations against Judge Scipione will be proven in both Case No. 21-138 and Case No. 22-112.

-12-

40.  Without an order temporarily suspending Judge Scipione, it is also likely that the reputation of the Judiciary, the judicial process, and the judicial disciplinary process will suffer imminent and irreparable harm.  Colo. RJD 1(b) (describing constitutional mandate of the CCJD, including protecting integrity of judicial process and public confidence in Judiciary).  Allowing Judge Scipione to continue hearing cases despite his extended failure to disclose material information and while Case Nos. 21-138 and 22-112 remain pending will significantly diminish public confidence in the judicial process as well as individual litigants' confidence in the outcome of proceedings currently pending before Judge Scipione.  Colo. RJD 34(a) (grounds for temporary suspension include judge's failure to cooperate with the CCJD).

41.  In light of the CCJD's recent discovery of Judge Scipione's 2013-2014 prohibited relationship, it is likely that the hearing currently scheduled for the week of August 22nd will need to be continued to allow further investigation into Judge Scipione's relationships with his former employees, to allow amendment of the pleadings, and to provide an opportunity for Judge Scipione to answer.  Accordingly, there is a heightened need for Judge Scipione's immediate suspension pending further proceedings.

-13-

42.  While the judicial disciplinary proceedings against Judge Scipione remain
pending in Case Nos. 21-138 and 22-112, Judge Scipione continues to
supervise at least one younger female subordinate employee in his
Division.  Reasonable risks of imminent and irreparable harm exist
through Judge Scipione's continuing supervision of younger female
subordinate employees who are similarly situated as Judicial Assistant 1,
Judicial Assistant 2, Law Clerk 1, and Law Clerk 2.

43.  Based upon the circumstances described in this request, the CCJD
expects to request further amendment of the Statement of Charges in
CCJD Case No. 21-138.  Because the most recent and previously
undiscovered allegations relate to Judge Scipione's conduct as a magistrate,
the CCJD anticipates referring the allegations to OARC with a request for
the appointment of conflict-free special counsel pursuant to C.R.C.P.
242.4(e).

Based upon the foregoing, the CCJD respectfully requests that, pursuant to
Colo. RJD 34(b), this Court:  1. Issue an order for Judge Scipione's temporary
suspension, 2. Direct/authorize the CCJD to issue an order to Judge Scipione to
show cause in writing, within 21 days, why the suspension should not continue
pending the outcome of proceedings before the CCJD, and 3. Appoint a special

-14-

master, or designate one of the existing special masters, to preside over the potential

show cause hearing.

DATED:  August 2, 2022

Respectfully submitted,

_____
Christopher S.P. Gregory, #87095
Executive Director
Colorado Commission on Judicial Discipline

-15-

## CERTIFICATE OF SERVICE

I certify that on August 2, 2022, a true and correct copy of the foregoing REQUEST FOR TEMPORARY JUDICIAL SUSPENSION ACCORDING TO COLO. RJD 34(A) was filed with the Court and served via the Colorado E-Filing system or as indicated upon the following persons:

John S. Gleason, Esq.
Jane B. Cox, Esq.
Burns, Figa, & Will, P.C.
6400 South Fiddler's Green Cir., Ste. 1000
Greenwood Village, CO 80111
*Attorneys for Respondent Judge John E. Scipione*

Leslie Schulze, Esq.
Lucia Padilla, Esq.
Colorado Office of the Attorney General
1300 Broadway
8th Floor
Denver, CO 80203
*Special Counsel for the Colorado Commission on Judicial Discipline*

By: _____
Christopher S.P. Gregory, #87095

-16-

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>Phone Number: 303-457-5131 | RECEIVED<br><br>August 3, 2022<br><br>Colorado<br>Commission on<br>Judicial Discipline |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| | CCJD Case Numbers: 21-138 &<br>                  22-112 |
| **ORDER TO SHOW CAUSE** | |

The Colorado Commission on Judicial Discipline ("the Commission") has received the accompanying Order from the Colorado Supreme Court in Case No. 22SA194 granting its request for Respondent Judge John E. Scipione's temporary suspension from any or all judicial duties, effective August 3, 2022. Through the authority provided to it by Colo. RJD 34(b), and the Colorado Supreme Court's Order, the Commission issues the following Order to Show Cause.

**Notice to Hon. John E. Scipione, Respondent:**

IT IS SO ORDERED that, within 21-days, you show cause to the

Commission in writing why your temporary suspension from any or all judicial

duties pending the outcome of the Commission's proceedings should not continue

until the resolution of such proceedings.

Your failure to respond as ordered may result in a confession of the

Commission's underlying request for your continuing temporary suspension

according to C.R.C.P. 121 § 1-15(3) and/or contempt proceedings according to

Colo. RJD 4(e).

DATED:  August 3, 2022

BY THE COMMISSION:

_____
Christopher S.P. Gregory, #37095
Executive Director
Colorado Commission on Judicial Discipline

-2-

## CERTIFICATE OF SERVICE

I certify that on August 3, 2022, a true and correct copy of the foregoing ORDER TO SHOW CAUSE was filed with the Commission and served via e-mail as indicated upon the following persons:

John S. Gleason, Esq.
Jane B. Cox, Esq.
Burns, Figa, & Will, P.C.
6400 South Fiddler's Green Cir., Ste. 1000
Greenwood Village, CO 80111
*Attorneys for Respondent Judge John E. Scipione*

Leslie Schulze, Esq.
Lucia Padilla, Esq.
Colorado Office of the Attorney General
1300 Broadway
8th Floor
Denver, CO 80203
*Special Counsel for the Colorado Commission on Judicial Discipline*

By: _____
Christopher S.P. Gregory, #37095

-3-

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: August 3, 2022<br>CASE NUMBER: 2022SA236 |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 22CJD112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236 |
| ORDER OF COURT | |

The Court having considered the REQUEST FOR TEMPORARY JUDICIAL SUSPENSION ACCORDING TO COLO. RJD 34(A), filed by the Colorado Commission on Judicial Discipline ("Commission"), and finding that it has been fully advised and that temporary suspension is appropriate, hereby ORDERS that the Honorable John E. Scipione is suspended temporarily, with pay, from performing any or all judicial duties as a Judge for the District Court for the 18th Judicial District on this 3rd day of August, 2022, effective upon service, pending the resolution of preliminary or formal proceedings before the Commission.

IT IS FURTHER ORDERED that the Commission shall issue to Judge John E. Scipione, an Order to Show Cause directing him to respond in writing to the Commission within 21 days of the date of such Order why he should not continue to be temporarily suspended from any or all judicial duties pending the outcome of preliminary or formal proceedings before the Commission.

This Order and the Commission's Order to Show Cause shall be served together upon Judge John E. Scipione.

IT IS FURTHER ORDERED that the following judge is appointed as a special master to preside over a show cause hearing in this matter, pursuant to Colo. RJD 14(e), 34(c): Honorable Susan Blanco.

IT IS FURTHER ORDERED that pursuant to Colo. RJD 34(f) the Commission's investigation, pleadings, and other records with respect to the temporary suspension and its record of proceedings in preliminary or formal proceedings shall remain confidential unless and until a recommendation for

sanctions or a recommendation for approval of a stipulated resolution is filed with the Court under Colo. RJD 37.


BY THE COURT, EN BANC, AUGUST 3, 2022.
CHIEF JUSTICE BOATRIGHT and JUSTICE SAMOUR do not participate.

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>John E. Scipione, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Christopher S.P. Gregory, esq.<br>Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5134<br>Email:  c.gregory@jd.state.co.us<br>Atty. Reg. # 37095 | Case Number:  22SA14 |
| **MOTION TO CONSOLIDATE CASES** | |

On January 21, 2022, the Colorado Commission on Judicial Discipline (the CCJD), initiated Case No. 22SA14 by filing its Motion for Appointment of Special Masters in connection with CCJD case No. 21-138. Subsequently, separate and additional allegations arose causing the CCJD to initiate a second Case No. 22SA236 through the filing of another Motion for Appointment of Special Masters for CCJD Case No. 22-112. The CCJD filed Case No. 22SA236 on July 22, 2022. With both Case Nos. 21-138 and 22-112 assigned to the same group of Special Masters, Respondent filed an "Unopposed Motion to Consolidate Cases" in CCJD Case No. 21-138 on July 25, 2022. Most recently, the CCJD filed a "Request for Temporary Judicial Suspension According to Colo. RJD 34(A)" in Case No. 22SA14 with reference to both CCJD Case Nos. 21-138 and 22-112. This Court then issued a temporary suspension order in Case No. 22SA236. Additional motions in the respective cases are forthcoming, but there remains a need to avoid further confusion caused by multiple cases pending before this Court.

The CCJD respectfully moves this Court to consolidate Case Nos. 22SA14 and 22SA236 with prospective filings to occur exclusively through Case No. 22SA236. Pending resolution of this Motion, the CCJD will file relevant documents into Case No. 22SA236 only. The relief sought through this Motion is contemplated according to C.A.R. 27(a)(2)(D).

-2-

DATED:  August 4, 2022

Respectfully submitted,

_____
Christopher S.P. Gregory, #37095
Executive Director
Colorado Commission on Judicial Discipline

-3-

## CERTIFICATE OF SERVICE

I certify that on August 4, 2022, a true and correct copy of the foregoing MOTION TO CONSOLIDATE CASES was filed with the Court and served via the Colorado E-Filing system or as indicated upon the following persons:

John S. Gleason, esq.
Jane B. Cox, esq.
Burns, Figa, & Will, P.C.
6400 South Fiddler's Green Cir., Ste. 1000
Greenwood Village, CO 80111
*Attorneys for Respondent Judge John E. Scipione*

Leslie Schultze, esq.
Lucia Padilla, esq.
Colorado Office of the Attorney General
1300 Broadway
8th Floor
Denver, CO 80203
*Special Counsel for the Colorado Commission on Judicial Discipline*

By: _____
Christopher S.P. Gregory, #37095

-4-

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: August 5, 2022<br>CASE NUMBER: 2022SA14 |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline, 21-138 | |
| **In the Matter of Complainant:**<br><br>The People of the State of Colorado,<br><br>**and**<br><br>**Respondent:**<br><br>Judge John E. Scipione. | Supreme Court Case No:<br>2022SA14 |
| ORDER OF COURT | |

The Court having considered the REQUEST FOR TEMPORARY JUDICIAL

SUSPENSION ACCORDING TO COLO. RJD 34(A), filed by the Colorado Commission on

Judicial Discipline ("Commission"), and finding that it has been fully advised and that temporary

suspension is appropriate, hereby ORDERS that the Honorable John E. Scipione is suspended

temporarily, with pay, from performing any or all judicial duties as a Judge for the District Court

for the 18th  Judicial District on this 3rd day of August, 2022, effective upon service, pending the

resolution of preliminary or formal proceedings before the Commission.

IT IS FURTHER ORDERED that the Commission shall issue to Judge John E. Scipione,

an Order to Show Cause directing him to respond in writing to the Commission within 21 days

of the date of such Order why he should not continue to be temporarily suspended from any or

all judicial duties pending the outcome of preliminary or formal proceedings before the

Commission.  This Order and the Commission's Order to Show Cause shall be served together

upon Judge John E. Scipione.

IT IS FURTHER ORDERED that the following judge is appointed as a special master to preside over a show cause hearing in this matter, pursuant to Colo. RJD 14(e), 34(c): Honorable Susan Blanco.

IT IS FURTHER ORDERED that pursuant to Colo. RJD 34(f) the Commission's investigation, pleadings, and other records with respect to the temporary suspension and its record of proceedings in preliminary or formal proceedings shall remain confidential unless and until a recommendation for sanctions or a recommendation for approval of a stipulated resolution is filed with the Court under Colo. RJD 37.

BY THE COURT, EN BANC, *NUNC PRO TUNC* AUGUST 3, 2022.
CHIEF JUSTICE BOATRIGHT and JUSTICE SAMOUR do not participate.

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Christopher S.P. Gregory, esq.<br>Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone: 303-457-5134<br>Email: c.gregory@jd.state.co.us<br>Atty. Reg. # 37095 | Case Number:    22SA14 |
| **NOTICE OF CONSOLIDATION ORDER BELOW** ||

On August 4, 2022, the Colorado Commission on Judicial Discipline (the CCJD) filed its "Motion to Consolidate Cases" with this Court.  The Motion references an "Unopposed Motion to Consolidate Cases" pending in the underlying CCJD Case Nos. 21-138 and 22-112.  The CCJD notifies this Court that the Presiding Special Master issued a "Consolidation Order and Acknowledgment of Stay" earlier this afternoon.  According to this Consolidation Order, the Special Masters granted the Unopposed Motion, directing that CCJD Case No. 21-138 (Supreme Court Case No. 22SA14) and CCJD Case No. 22-112 (Supreme Court Case No. 22SA236) "will formally be consolidated into one matter."  The CCJD provides this Notice to inform this Court's consideration of its pending Motion.

DATED:  July 22, 2022

Respectfully submitted,

_____
Christopher S.P. Gregory, #37095
Executive Director
Colorado Commission on Judicial Discipline

-2-

## CERTIFICATE OF SERVICE

I certify that on August 8, 2022, a true and correct copy of the foregoing NOTICE OF CONSOLIDATION ORDER BELOW was filed with the Court and served via e-mail upon the following persons:

John S. Gleason, Atty. Reg. #15011
Counsel of Record for Respondent
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111
jgleason@bfwlaw.com

Appointed Special Counsel:

Leslie C. Schulze, #43685
Lucia Padilla, #35150
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 8th Floor
Denver, CO 80203
leslie.schulze@coag.gov
lucia.padilla@coag.gov

By: _____
Christopher S.P. Gregory, #37095

-3-

| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: August 9, 2022<br>CASE NUMBER: 2022SA236 |
|---|---|
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 21-138 and 22-112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236<br>& 2022SA14 |
| ORDER OF COURT | |

Upon consideration of the "Motion to Consolidate Cases" filed into case number 22SA14 requesting this Court consolidate case numbers 22SA14 and 22SA236,

IT IS ORDERED said Motion to Consolidate Cases is GRANTED.  All future filings must be filed into case number 22SA236.

BY THE COURT, AUGUST 9, 2022.

<table>
<tr><td>

**Colorado Supreme Court**
2 East 14th Avenue
Denver, CO 80203
Phone Number: 720-625-5150

**Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**

Colorado Commission on Judicial Discipline
Case Nos. 21-138 and 22-112

IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,

Complainant,

    and

John E. Scipione, A Judge of the Arapahoe County District Court,

Respondent.

</td><td>

▲  COURT USE ONLY  ▲

Case Number: 22SA236

</td></tr>
</table>

### REPORT AND RECOMMENDATION ON PARTIES' STIPULATION TO DISMISS DISABILITY PROCEEDING

At issue before the Special Master is the Parties' Stipulation to Dismiss the Disability Proceeding. Having reviewed the appended Stipulation [Exhibit A], the Special Master enters the following report and recommendation:

This disability proceeding was initiated by Respondent's Verified Motion Pursuant to the Colorado Rules of Judicial Discipline Rule 33.5(c), filed in CCJD case numbers 21-138 and 22-112 on August 4, 2022. Respondent asserted that medical and mental health conditions prevented him from assisting in his defense in the pending disciplinary matters. Per Colo. RJD 33.5(c),

Respondent's Motion automatically stayed the disciplinary proceedings against him, and the Supreme Court appointed this Special Master to "consider all relevant factors and/or stipulations of the parties, conduct a hearing if necessary, and report to the Colorado Supreme Court concerning the alleged disability of the Honorable John E. Scipione."

On October 25, 2022, this Special Master entered an Order re: Legal Standard, defining the legal standard to be applied in determining whether Respondent is able to assist in his defense in the disciplinary proceedings. Following that order, a court-appointed cardiologist and two court-appointed mental health experts conducted independent medical examinations of Respondent.[1] Applying the legal standard, the three IME experts concluded that Respondent was able to assist in his defense. The expert reports are part of the record.

Following receipt of the expert reports, on December 2, 2022, the Parties submitted a Stipulation to Dismiss the Disability Proceeding. By that stipulation, Respondent acknowledges that, under the legal standard as determined by this Special Master, he cannot meet his burden to prove by clear and convincing evidence that he is unable to assist in his defense. Respondent made a record that he disagrees with the legal standard applied in this proceeding, and in the Stipulation, Respondent included a reservation of his right to challenge the legal standard adopted by this Special Master for this disability proceeding on appeal. The Commission likewise reserved its right to request payment of its fees and costs for this disability proceeding in the disciplinary matter, as may be allowed by Colo. RJD 36(g).

---

[1] The cardiologist did not physically examine Respondent, but conducted a review of Respondent's medical records and issued an expert report.

2

On December 2, 2022, this Special Master vacated the evidentiary hearing set for December 6-8, 2022, finding that based on the Parties' Stipulation, no hearing was necessary.

The Special Master recommends, pursuant to Colo. RJD 33.5(c)(2), that the Supreme Court accept the Stipulation to Dismiss the Disability Proceeding and resume the disciplinary proceedings against Respondent.

Pursuant to Colo. RJD 33.5(i), this recommendation of the Special Master and any orders of the Supreme Court shall be public.

ORDERED this 15th day of December, 2022.

BY THE SPECIAL MASTER

3

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: December 16, 2022<br>CASE NUMBER: 2022SA236 |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 21-138 and 22-112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236<br>& 2022SA14 |
| ORDER OF COURT | |

Upon consideration of the special master's Report and Recommendation on Parties' Stipulation to Dismiss Disability Proceeding dated December 15, 2022, the Court ADOPTS the special master's recommendation and APPROVES the parties' Stipulation to Dismiss Disability Proceeding.

Pursuant to Colo. RJD 33.5(c)(2), the Court finds, based on the special master's Report and Recommendation and the parties' Stipulation to Dismiss Disability Proceeding, that Judge Scipione can assist in his defense in the disciplinary proceeding. Accordingly, the Court ORDERS that "the disciplinary proceeding shall be resumed but [Judge Scipione] shall remain on lawyer and judicial inactive status, pending the results of the disciplinary proceeding." Colo. RJD 33.5(c)(2). Pursuant to Colo. RJD 33.5(i), this Order and the special master's Report and Recommendation shall be public.

BY THE COURT, EN BANC, DECEMBER 16, 2022.
CHIEF JUSTICE BOATRIGHT and
JUSTICE SAMOUR do not participate.

| | |
|---|---|
| **Colorado Commission on Judicial Discipline** <br> Ralph L. Carr Judicial Center <br> 1300 Broadway, Ste. 210 <br> Denver, CO 80203 <br> 303.457.5134 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO, <br><br> Complainant, <br><br>     and <br><br> JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court, <br><br> Respondent. | **RECEIVED** <br><br> 12/22/2022 <br><br> Colorado Commission on Judicial Discipline <br><br><br> ▲ COURT USE ONLY ▲ |
| **Special Counsel for the Colorado Commission on Judicial Discipline:** <br><br> PHILIP J. WEISER, Attorney General <br> Leslie C. Schulze, #43685* <br> Lucia Padilla, #35150* <br> Colorado Department of Law <br> Ralph L. Carr Judicial Center <br> 1300 Broadway, 8th Floor <br> Denver, CO 80203 <br> Phone: 720-508-6600 <br> Fax: 720-508-6030 <br> E-Mail: leslie.schulze@coag.gov <br> Lucia.padilla@coag.gov <br> *Counsel of record | CCJD Case No. 21-138 & 22-112 |
| **AMENDED STATEMENT OF CHARGES** | |

This Amended Statement of Charges is filed pursuant to Colorado Rules of Judicial Discipline (Colo. RJD) 4, 16(b)(4), and 18, and C.R.C.P. 15(a). The People allege as follows:

I.    **BACKGROUND AND JURISDICTION**

1.  On October 9, 2012, Respondent, Judge John Scipione, began work as an Arapahoe County and District Court magistrate in the 18th Judicial District.

2. In June of 2017, Respondent was sworn in as an Arapahoe County Court Judge.

3. On October 1, 2018, Respondent was sworn in as a District Court Judge of the Arapahoe County District Court.

4. Respondent is subject to the jurisdiction of the Colorado Supreme Court and the Colorado Commission on Judicial Discipline ("the Commission" or "CCJD") in these judicial discipline proceedings for the time he served as a county and district court judge.

5. The Commission has determined that probable cause exists to commence formal proceedings under Colo. RJD 16(b)(4).

II. **FACTUAL ALLEGATIONS**

1. Respondent was employed as an Arapahoe County District Court magistrate from October 2012 through his appointment to the county court bench in Arapahoe County in 2017. From December of 2012 to July of 2014, Respondent employed a court judicial assistant (CJA 1).

2. In early 2013, Respondent began to pursue a personal relationship with CJA 1. Respondent took CJA 1 out to lunch or for drinks several times a week, and shared intimate details about his family and personal life. Respondent also made frequent comments about CJA 1's appearance. Respondent's comments escalated to touching CJA 1's arms, shoulders, and back.

3. In the spring of 2013, Respondent asked CJA 1 to have drinks with him at a hotel bar. When it became late in the evening, CJA 1 informed Respondent that she needed to go home. Respondent offered to reserve a hotel room for them to continue drinking and talking. CJA 1 was uncomfortable with this suggestion and attempted to refuse. However, when Respondent continued to insist, CJA 1 gave in to his advances.

4. When they were in the hotel room, Respondent initiated sexual contact and ultimately sexual intercourse. Respondent's sexual relationship with CJA 1 continued for approximately one year. CJA 1 believed that if she ended the relationship she could lose her job. In July of 2014 CJA 1 left employment with the 18th Judicial District.

5. Chief Justice Directive 08-06 prohibits a judicial officer, including magistrates, from holding a position in which they exercise supervisory authority over a person with whom they have a sexual relationship. Judicial officers and magistrates are required to immediately report any such

relationship up their chain of command or to the State Court Administrator's Office's Human Resources Division.[1]

6.  Respondent never reported his relationship with CJA 1 to anyone at the 18th Judicial District.

7.  In February of 2017, Respondent submitted an application for appointment as an Arapahoe County Court Judge. In that application Respondent was asked, "Is there any circumstance or event in your personal or professional life which, if brought to the attention of the Commission, might tend to affect adversely your qualifications to serve on the court for which you have applied?" Respondent answered, "No." He did not report the relationship with CJA 1 or his failure to comply with Chief Justice Directive 08-06 by disclosing that relationship as required. Respondent certified that "the information given in [his] application [was] correct and complete."

8.  On August 2, 2018, Respondent submitted an application for appointment as a district court judge. In the application Respondent was again asked, "Is there any circumstance or event in your personal or professional life which, if brought to the attention of the Commission, might tend to affect adversely your qualifications to serve on the court for which you have applied?" Respondent answered, "No," failing to disclose the former relationship with CJA 1 and failing to report that he did not disclose that relationship as required by Chief Justice Directive 08-06. Respondent again certified that "the information given in [his] application [was] correct and complete."

9.  Respondent was appointed as a District Court Judge in October of 2018.

---

[1] Chief Justice Directive 08-06, as amended in May of 2011 and effective during Respondent's relationship with CJA 1, at Attachment F states:

"Personal relationships of a romantic and/or sexual nature between supervisors and their subordinates can create problems in the workplace including conflicts of interest, the appearance of favoritism or preferential treatment, and an increased potential for claims of harassment, coercion or retaliation."

The Directive expressly prohibits sexual relationships, including relationships where "[o]ne party is a justice, judge, or magistrate working within the same court or judicial district as a person who is employed as classified or contract employee in that court or judicial district."

10. In May of 2019, Law Clerk 1 began working as a law clerk for Respondent after he was appointed a District Court Judge. Like many lawyers, one of the reasons Law Clerk 1 sought and accepted a clerkship with Respondent was to build a professional connection with a person of influence in the legal community. Law Clerk 1 expected that, in exchange for good work, Respondent would provide ongoing mentorship, professional development advice, and serve as a reference for her future employment.

11. Respondent hired Law Clerk 1, in part, due to Law Clerk 1's prior experience as a law clerk for the Douglas County District Court and because she had experience in complex probate matters.

12. As part of her clerkship, Law Clerk 1 worked with Respondent on the complex and high-profile probate case involving the estate of Denver Broncos owner Pat Bowlen ("the Bowlen Case").

13. Law Clerk 1had a positive experience while employed as Respondent's law clerk.  Law Clerk 1 perceived that she was respected and appreciated for her contributions to Respondent's Division.

14. While working for Respondent, Law Clerk 1's professional interactions with Respondent outside of the courtroom were limited to a few lunches that included Respondent's court reporter and judicial assistant.

15. Part way through her term as a law clerk for Respondent, Law Clerk 1's job title was reclassified from law clerk to legal research attorney. When this change took effect, Law Clerk 1 no longer worked in Respondent's chambers, though she continued to work in the Arapahoe County Justice Center.

16. When Law Clerk 1 finished her term as a law clerk, she expected to maintain a professional mentoring relationship with Respondent and to rely upon Respondent as a professional reference.

17. Law Clerk 1 and Respondent discussed Law Clerk 1's intent and desire to continue a mentor-mentee relationship with Respondent. During her time as a legal research attorney, Law Clerk 1 and Respondent maintained a professional relationship, and Law Clerk 1 occasionally visited Respondent's chambers for this purpose.

18. In June of 2021, Law Clerk 1 left her position as a legal research attorney and accepted a job as Assistant Legal Counsel with the Colorado Judicial Department.

19. Although the trial in the Bowlen Case was expected to occur during the Summer of 2021, it settled in late June 2021. By this time, Law Clerk 1 had left the 18th Judicial District for her new job as assistant legal counsel.

20. Following the resolution of the Bowlen Case, Respondent contacted Law Clerk 1 to tell her about the settlement because of the considerable amount of work Law Clerk 1 did on the case. Respondent invited Law Clerk 1 to meet for dinner to discuss the resolution of the Bowlen Case.

21. Prior to meeting, Law Clerk 1 and Respondent had at least one phone call. During the call, Law Clerk 1 and Respondent both conveyed that the purpose of their meeting was to discuss the Bowlen Case's unexpected settlement, as well as Law Clerk 1's new job and career path. At no time during these calls did Respondent ever suggest to Law Clerk 1 that he wished the meeting to be anything other than a professional one. Had Respondent told her that he viewed the meeting as a personal or intimate one, Law Clerk 1 would not have agreed to attend.

22. Following their phone call, Respondent and Law Clerk 1 exchanged text messages to finalize a time and a place to meet.

23. At no time prior to their meeting did Respondent suggest to Law Clerk 1 that he wished to transform their professional relationship into an intimate one.

24. At no time in her professional relationship with Respondent did Law Clerk 1 ever express an interest in, or convey receptiveness to, having an intimate relationship or other non-professional relationship with Respondent.

25. Respondent and Law Clerk 1 met at Slattery's Pub and Grill in the Denver Tech Center the evening of August 4, 2021.

26. Respondent's conversation with Law Clerk 1 started with discussion about the Bowlen matter, other cases Law Clerk 1 had been involved in, and her experience with her new job within the Judicial Department.

27. Respondent then changed the topic of conversation and began asking Law Clerk 1 about her relationship status.

28. Respondent asked Law Clerk 1, something along the lines of: "So, do you have a boyfriend?  Girlfriend?  We never really talked about this."

29. Respondent asking these personal questions made Law Clerk 1 very uncomfortable. Law Clerk 1 answered Respondent's initial question and then attempted to quickly redirect the conversation to a professional topic.

30. Respondent proceeded to tell Law Clerk 1 that in his house everyone knew that his meeting with Law Clerk 1 was a "date." Respondent did not ask Law Clerk 1 whether she wished the meeting to be a date, nor seek any input from her as to his characterization of the meeting.

31. Law Clerk 1 was extremely uncomfortable when Respondent said this. She displayed visible reluctance to discuss a personal relationship and again attempted to change the subject.

32. Respondent ignored Law Clerk 1's attempts to divert the conversation and refused to drop the topic.  Instead, Respondent told her that his wife had given him permission to date Law Clerk 1.

33. Respondent then informed Law Clerk 1 that his wife was available by phone or FaceTime to respond to any concerns that Law Clerk 1 might have with dating Respondent.

34. Respondent further told Law Clerk 1 that he had online dating profiles and explained "the concept of consensual non-monogamy."

35. Law Clerk 1 told Respondent repeatedly that she did not know what to say in response to his proposal, and Respondent became defensive.

36. Law Clerk 1 perceived that Respondent badly misread the situation: Respondent did not appear to recognize that Law Clerk 1 was offended because Respondent was using what he presented as a professional meeting and his role as a formerly trusted mentor to Law Clerk 1 to pursue a personal relationship.

37. Due to her extreme discomfort and concern about the personal and sexual comments Respondent made to her, Law Clerk 1 tried to quickly end the meeting with Respondent: she stopped eating her meal and requested the check.

38. Despite Law Clerk 1's cues that she was uncomfortable with the subject of the conversation initiated by Respondent, Respondent did not relent and continued to share with Law Clerk 1 very personal information about himself and his wife for the purpose of pursuing an intimate relationship with Law Clerk 1.

39. At the conclusion of the dinner, Respondent told Law Clerk 1 "don't disappear on me now." Respondent attempted to give Law Clerk 1 a hug, and Law Clerk 1 rebuffed his attempt at physical contact.

40. On August 9, 2021, Respondent followed up with a text message to Law Clerk 1 that stated:

Hi!  So with everything going on last week I didn't get a chance to tell you how much I enjoyed having dinner last week.  I hope that I didn't leave you too overwhelmed with everything we

talked about.  When you are ready I'm anxious to hear your thoughts.

Side note… the big announcement went out today that [Judicial Assistant 2.] will be joining Bradley.  She didn't even tell me. ☺

41. Law Clerk 1 did not respond to the text message.

42. Through a letter dated October 28, 2021, the Commission informed Respondent that allegations of inappropriate communications with his former judicial assistant and a law student intern would be treated as the complainants.  Essentially, Respondent was alleged to have brought discussion of his "alternative lifestyle" into office conversations with his judicial assistant and legal intern.  Respondent was further alleged to have repeatedly commented on the legal intern's physical appearance. Similar to the conversation Respondent had with Law Clerk 1, he also allegedly talked with the legal intern about his use of the dating app Tinder. This letter forms the basis of another pending judicial discipline proceeding against Respondent: CCJD Case No. 21-138 and Colorado Supreme Court Case No. 2022SA14.

43. On November 16, 2021, Respondent sent Law Clerk 1 a text message asking her to speak with his attorney's paralegal about her time as a law clerk. At that time, Law Clerk 1 believed the paralegal was only conducting due diligence, not requesting that Law Clerk 1 agree to testify on behalf of Respondent.

44. Copies of text messages between Respondent and Law Clerk 1 from July 27, 2021 through November 16, 2021 are incorporated in these allegations through attached Exhibit A.  Respondent has provided an additional text message image from August 4, 2021 that apparently shows Law Clerk 1 replying to a text from Respondent with a heart emoji and an image of a Guinness bar sign.  This additional message (without waiving potential challenges to its authenticity) is incorporated in these allegations through attached Exhibit B.

45. Law Clerk 1 spoke by phone with the paralegal. The questions asked were limited to Law Clerk 1's interactions with Respondent during the time she was actually employed as his law clerk.

46. When the paralegal asked if Law Clerk 1 was willing to testify at a hearing on Respondent's behalf, Law Clerk 1 explained that she "felt incredibly uncomfortable testifying as a character witness . . ., that [her] strong preference would be not to testify, but that [she] would comply with any court order or subpoena."

47. Law Clerk 1 believed Respondent's request that she testify put her in an untenable position: Law Clerk 1 worried that if she did not testify favorably for Respondent, because of Respondent's position as a judge and influence within the broader legal community, Respondent could negatively impact Law Clerk 1's reputation and future career. Yet, Law Clerk 1 did not believe that she could give complete and truthful testimony without revealing Respondent's conduct.

48. On December 16, 2021, Respondent, through counsel, submitted a response to the Commission's inquiry and investigation. In that letter, Respondent represented that "a courtroom full of prior clerks, law clerks, and others will confirm that [Respondent] never engaged in the type of conduct alleged"; namely, sexual harassment.

49. A notice and statement of charges was filed in CCJD Case No. 21-138 on January 20, 2022. The Colorado Supreme Court, in turn, issued an order on January 27, 2022 appointing special masters to hear the case.

50. Respondent's alleged conduct in Case No. 21-138 and alleged interactions with Law Clerk 1 create an appearance that Respondent was using his professional position to attempt to recruit his current and former employees as intimate partners and to join his "alternative lifestyle."

51. On May 10, 2022, the same paralegal whom Law Clerk 1 previously spoke with called her back to inform her that Respondent's attorney would subpoena her to testify on June 8, 2022.

52. Because of Respondent's attempt to manipulate his and Law Clerk 1's professional relationship into an intimate one as explained above, Law Clerk 1 was extremely uncomfortable testifying as a character witness for Respondent. On May 12, 2022, Law Clerk 1 reported Respondent's conduct to the Commission through a written statement at the direction of her supervisor, Terri Morrison.

III.    **CHARGES**

Charge 1
Canon Rule 1.2
A Judge Shall Promote Confidence in the Judiciary

53. Paragraphs 1-53 are incorporated herein.

54. Canon Rule 1.2 states:

-8-

A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

55. Per Comment 1, Canon Rule 1.2 applies "to both the professional and personal conduct of a judge." Comment 3 to the rule prohibits conduct that appears to compromise a judge's integrity. A judge's obligation to act with integrity does not end when he leaves the courthouse. *See, e.g.,* Section 2 of Preamble to Rules of Judicial Conduct; Rule 1.2 Comments 1-3.

56. The Colorado Code of Judicial Conduct ("the Code") further defines "integrity" as "probity, fairness, honesty, uprightness, and soundness of character." The Code recognizes "impropriety" to include: "conduct that violates the law, court rules, or provisions of this Code, and conduct that undermines a judge's independence, integrity, or impartiality.

57. By failing to disclose the sexual relationship with CJA 1, and his failure to abide by the personnel rules regarding that relationship, on his application to be a District Court Judge, Respondent failed to act with the integrity required by virtue of his position as a Judge.

<div align="center">

Charge 2
Canon Rule 2.16
Cooperation with Disciplinary Authorities

</div>

58. Paragraphs 1-57 are incorporated herein.

59. Canon Rule 2.16(A) states that "[a] Judge shall cooperate and be candid and honest with judicial and lawyer disciplinary agencies." Comment 1 to Canon Rule 2.16 notes that the rule is intended to ensure confidence in judges' commitment to the integrity of the judicial system.

60. Respondent violated Canon Rule 2.16 by representing that the alleged incidents of sexual harassment charged in CCJD Case No. 21-138 and Colorado Supreme Court Case No. 2022SA14 were isolated incidents and that his prior judicial staff and others would report that he never engaged in any sort of similar conduct or sexual harassment.

<div align="center">

Charge 3
Canon Rule 2.3
A Judge Shall Not Engage in Harassment Based on Sex or Gender

</div>

61. Paragraphs 1-60 are incorporated herein.

62. Canon Rule 2.3(B) states, in relevant part, that a judge shall not:

<div align="center">-9-</div>

"[E]ngage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, [or] gender…"

63. Additionally, Chief Justice Directive 08-06 delineates a zero-tolerance harassment policy for all Judicial employees, and states, in part:

Harassment, whether verbal, physical, or environmental, is unacceptable and will not be tolerated in the workplace itself or in other work-related settings such as business trips, conferences, or work-related social events.

64. By using a professional meeting arranged to discuss court-related business and mentoring as a guise for pursing an intimate relationship with a former employee, Respondent violated Canon Rule 2.3 and Chief Justice Directive 08-06.

65. The inappropriateness of Respondent's conduct and Respondent's intent is further apparent as part of a larger pattern of similar conduct towards others, as presented in CCJD Case No. 21-138.

66. Through his conduct as described above, Respondent violated Canon Rule 2.3(B), whether viewed as separate incidents or as a pattern of similar conduct.

<u>Charge 4</u>
Canon Rule 3.1
Extrajudicial Activities

67. Paragraphs 1-66 are incorporated herein.

68. Canon Rule 3.1 states, in relevant part: "when in engaging in extrajudicial activities, a judge shall not":

    a. "(C) participate in activities that would appear to a reasonable person to undermine the judge's independence, integrity, or impartiality"; or
    b. "(D) engage in conduct that would appear to a reasonable person to be coercive."

69. Moreover, the Preamble to the Colorado Code of Judicial Conduct states, in relevant part:

"Judges should maintain the dignity of judicial office at all times, and avoid both impropriety and the appearance of impropriety in their professional and personal lives."

70. Through his conduct as described above, Respondent violated Canon Rule 3.1 by engaging in extrajudicial behavior that undermined the judge's integrity and was reasonably perceived as coercive.

Charge 5
Canon Rule 1.2
A Judge Shall Promote Confidence in the Judiciary

71. Paragraphs 1-70 are incorporated herein.

72. Canon Rule 1.2 states:

> A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

73. Comment 1 to the rule makes clear that it applies "to both the professional and personal conduct of a judge." Comments 4 and 6 to the rule (as well as Canon 4 of the Code of Judicial Conduct) emphasize the expectation that a judge participate in activities that further ethical conduct, integrity, and professionalism in the legal profession and promote confidence in the judiciary.

74. A judge's obligation to act with integrity does not end when he leaves the courthouse. *See, e.g.,* Section 2 of Preamble to Rules of Judicial Conduct; Rule 1.2 Comments 1-3.

75. The Colorado Code of Judicial Conduct ("the Code") further defines "integrity" as "probity, fairness, honesty, uprightness, and soundness of character." The Code recognizes "impropriety" to include: "conduct that violates the law, court rules, or provisions of this Code, and conduct that undermines a judge's independence, integrity, or impartiality."

76. Respondent's conduct in inviting Law Clerk 1 to a professional dinner as a ruse to proposition her to engage in an intimate relationship with him did not display integrity and created an appearance of impropriety and violated Canon Rule 1.2.

77. Similarly, with knowledge of his interactions with Law Clerk 1 on August 4, 2021, Respondent further created an appearance of impropriety and violated Canon Rule 1.2 by seeking to have Law Clerk 1 testify on his behalf in CCJD Case No. 21-138.

78. Through his conduct as described above, Respondent violated Canon Rule 1.2 whether viewed as separate incidents or as a pattern of similar conduct.

Charge 6
Canon Rule 1.1
A Judge Shall Comply with the Law

-11-

79. Paragraphs 1-60 are incorporated herein.

80. Canon Rule 1.1 states, in relevant part: "A judge shall comply with the law, including the Code of Judicial Conduct."

81. Respondent violated Canon Rule 1.1 when he engaged in the conduct described herein in violation of Canon Rules 1.2, 2.3, 2.16, and 3.1.

82. Through his conduct as described above, Respondent violated Canon Rule 1.1 whether viewed as separate incidents or as a pattern of similar conduct.

WHEREFORE, Complainant requests that the Commission recommend that, for his misconduct, appropriate disciplinary sanctions be imposed upon Judge John E. Scipione by the Colorado Supreme Court under Colo. RJD 36; that the Commission assess costs, attorney's fees and expenses of this proceeding against Respondent and that the Commission recommend any such other and further relief as it deems appropriate.

DATED this 22nd day of December, 2022.

Respectfully submitted,

_s/ Leslie Schulze_____
Leslie Schulze, #43685

Senior Assistant Attorney General
Special Counsel for the
Colorado Commission on Judicial Discipline

-12-

-13-

**Certificate of Service**

The undersigned certifies that the foregoing Amended Statement of Charges was served on the following by email on December 22nd, 2022, addressed to:

John S. Gleason, Esq.
Burns Figa & Will P.C.
6400 S. Fiddlers Green Circle, Suite 1000
Greenwood Village, Colorado 80111
jgleason@bfwlaw.com


_s/ Jennifer Reynard_

-13-

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br><br>Ralph L. Carr Judicial Center<br>1300 Broadway, Suite 210<br>Denver, Colorado 80203<br>(303) 457-5131 | RECEIVED<br><br>12/30/2022<br><br>Colorado<br>Commission on<br>Judicial Discipline |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>**Complainant,**<br><br>and<br><br>JOHN E. SCIPIONE, a Judge of the Arapahoe County District Court,<br><br>**Respondent**. | <br><br><br><br>▲  **COURT USE ONLY**  ▲ |
| **Attorneys for Respondent**<br><br>Name:        John S. Gleason (#15011)<br>                   Jane B. Cox (#45770)<br>Address:     BURNS, FIGA & WILL, P.C.<br>                   6400 South Fiddler's Green Circle<br>                   Suite 1000<br>                   Greenwood Village, CO 80111<br>Telephone:  (303) 796-2626<br>Facsimile:   (303) 796-2777<br>E-mail:       jgleason@bfwlaw.com<br>                   jcox@bfwlaw.com | CCJD Case Nos. 21-138 & 22-112 |
| **RESPONDENT JUDGE JOHN E. SCIPIONE'S OPPOSITION TO AMENDED STATEMENT OF CHARGES** | |

Respondent, Judge John E. Scipione, through his counsel, respectfully objects to the Amended Statement of Charges filed on or about December 22, 2022.

1.      The original statement of charges in CCJD Case No. 21-138 was filed on January 20, 2022.  The Supreme Court appointed Special Masters on January 27, 2022.

2.      The allegations in the Amended Statement of Charges date to alleged conduct in 2012/2013.  The CCJD and special counsel knew of the information which serves as the basis for the new allegations in July 2022.  The CCJD and Special Counsel used the information in their

August 2, 2022, Request for Temporary Judicial Suspension.  The CCJD and Special Counsel delayed filing the Amended Statement of Charges until December 22, 2022.

3.    Trial in the underlying matters is scheduled to begin in a little over a month, on February 6, 2023.

4.    If the Special Masters allow the filing of the Amended Statement of Charges, counsel for Judge Scipione will need to conduct discovery, including the deposition of the former Judicial Assistant, to prepare for trial.  Counsel for Judge Scipione will seek a continuance of the scheduled trial to conduct the discovery.

5.    Grounds for denying a motion for leave to amend include undue delay, bad faith, dilatory motive, undue prejudice to the opposing party, and futility of amendment. *Benton v. Adams*, 56 P.3d 81, 86 (Colo. 2002); *Polk v. District Court,* 849 P.2d 23, 25-26 (Colo. 1993); *Ajay Sports, Inc. v. Casazza*, 1 P.3d 267, 273 (Colo. App. 2000). The court must assess the motion to amend in light of the totality of the circumstances, and must balance the amendment against the burdens which granting the amendment may impose on the other parties. *Polk*, 849 P.2d at 26.

6.    Delay, standing alone, may justify denial of leave to amend. *Riccatone v. Colorado Choice Health Plans*, 315 P.3d 203, 211 (Colo. App. 2013). "Delay devalues judgments, creates anxiety in litigants and uncertainty for lawyers, results in loss or deterioration of evidence, and wastes court resources." *Benton*, 56 P.3d at 85. If a party seeks leave to amend after substantial progress toward trial has occurred, or if granting leave to amend would significantly delay the progress of the case to trial, a trial court may deny leave to amend if it should have been sought earlier. *Id.* The moving party carries the burden of demonstrating a lack of knowledge, mistake, inadvertence, or other reason for not pleading a claim earlier. *Riccatone*, 315 P.3d at 211.  The CCJD and special counsel offer no explanation for their delay.

7.    Courts deny leave to amend based on prejudice where, as here, the proposed amendment raises new issues outside the scope of the original pleading which would require additional and unanticipated discovery long after the case was at issue. *See, e.g., Polk*, 849 P.2d at 26; *Robertson v. Board of Educ.*, 570 P.2d 19, 23 (Colo. App. 1977); *Apollo Tire, Inc. v. United Bank of Lakewood Nat'l Ass'n*, 531 P.2d 976, 978 (Colo. App. 1974).

WHEREFORE,  Judge Scipione respectfully requests that the Special Masters deny the CCJD and special counsel's filing of the Amended Statement of Charges.

Respectfully submitted this 30th day of December, 2022.

BURNS, FIGA & WILL, P.C.

*\*\*Original signature at the offices of
Burns, Figa & Will, P.C.\*\**

By:  S/ John Gleason
         John S. Gleason (#15011)
         Jane B. Cox (#45770)

**Attorneys for Respondent
John E. Scipione**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 30th day of December, 2022, a true and correct copy of the above and foregoing **RESPONDENT JUDGE JOHN E. SCIPIONE'S OPPOSITION TO AMENDED STATEMENT OF CHARGES** was served on the following via email, addressed as follows:

Leslie C. Schulze, Esq.
Lucia Padilla, Esq.
Senior Assistant Attorney(s) General
Colorado Department of Law
1300 Broadway, 8th Floor
Denver, Colorado 80203
(*leslie.schulze@coag.gov*
 *Lucia.padilla@coag.gov*)

*\*\*Original signature at the offices of
Burns, Figa & Will, P.C.\*\**

 S/ John Gleason

3

<table>
<tr><td>

SUPREME COURT, STATE OF COLORADO

*ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE*

1300 Broadway, Suite 210
Denver, Colorado 80203

---

In re the Matter of

THE PEOPLE OF THE STATE OF COLORADO,
Complainant,

And

JOHN E. SCIPIONE, a Judge of the Arapahoe County Court,
Respondent

</td><td>

RECEIVED

1/4/2023

Colorado
Commission on
Judicial Discipline

**COURT USE ONLY**

</td></tr>
<tr><td></td><td>

Case: 2022SA236

Commission Case: 22-112

</td></tr>
</table>

**ORDER REGARDING SECOND AMENDED STATEMENT OF CHARGES**

The Special Masters grant the request and accept the Second Amended Statement of Charges. The new charges are based on information Judge Scipione was aware of and knew were being investigated by the People since July 2022, prior to the stay in this case. The People's timing of filing the Second Amened Statement of Charges does not appear to be delayed given the matter was on a stay until December 16, 2022. This matter was heard in open Court on December 19, 2022 and the People indicated during the appearance that they were going to file a Second Amended Statement of Charges, which they filed seven days later. There is no undue delay in their action. There is also no prejudice in allowing the Second Amended Statement of Charges to stand as Judge Scipione has been aware of the investigation and potential allegations for over five months. The allegations will not delay the process of discovery. The Special Masters are adopting a liberal policy for the amendment to allow all pending issues to be resolved in one hearing considering judicial economy and the circumstances surrounding the new charges. Judge Scipione

has adequate time to file an Answer by January 9, 2023 as was previously ordered in the December 20, 2022 case management order.

Date: January 4, 2023

On Behalf of the Special Masters:

Susan Blanco
Chief Judge, 8th Judicial District
Presiding Special Master

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>        and<br><br>John E. Scipione, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲  COURT USE ONLY  ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Christopher S.P. Gregory, esq.<br>Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  c.gregory@jd.state.co.us<br>Atty. Reg. # 37095 | Case Number:  22SA236 |
| **NOTICE OF COLO. RJD 37(e) STIPULATION AND PARTIAL RECOMMENDATIONS FOR SANCTIONS** | |

The Parties have reached a partial agreement to resolve this matter. The Parties' agreement is attached as "Exhibit A—Stipulation for Resolution of Formal Proceedings." The stipulation resolves the merits of the alleged rule violations with recognition that Respondent Judge John E. Scipione will resign immediately and be publicly censured for his violations of the Colorado Code of Judicial Conduct. The stipulation does not resolve other sanctions sought by the People under Colo. RJD 36(g) and (h). Both Parties will argue the issue of other sanctions under Colo. RJD 36(g) and (h) in briefing before the Special Masters, who will issue a report to the Commission under Colo. RJD 32. Upon the conclusion of these further proceedings, the Commission will complete the record of proceedings in this matter pursuant to Colo. RJD 33 and file that record with this court along with the Commission's final recommendations under Colo. RJD 37.

Because the expectation is that the record in this matter, as defined by Colo. RJD 33, will be supplemented with the special masters' report and the Commission's final recommendations, the Commission requests that this Court take no action at this time apart from: 1) acknowledging receipt of the present filing; 2) acknowledging Respondent's immediate resignation; and 3) recognizing that this

notice and accompanying stipulation is a matter of public record upon filing,

according to Colo. RJD 37(e).[1]

DATED: January 19, 2023

Respectfully submitted,

_____

Christopher S.P. Gregory, #37095
Executive Director
Colorado Commission on Judicial Discipline

---

[1] Colo. RJD 37(e) states, in relevant part:

> The recommendation, the stipulated resolution, the
> record of proceedings, and any sanctions proposed in the
> stipulated resolution shall become public upon the
> Commission's filing of the recommendation with the
> Court.

## CERTIFICATE OF SERVICE

I certify that on January 19, 2023, a true and correct copy of the foregoing NOTICE OF COLO. RJD 37(E) STIPULATION AND PARTIAL RECOMMENDATIONS FOR JUDICIAL DISCIPLINE and accompanying Stipulation for Resolution of Formal Proceedings were filed with the Court and served via the Colorado Courts E-Filing system upon the following persons:

Attorneys for Respondent:

John S. Gleason, Atty. Reg. #15011
Jane Cox, Atty. Reg. #45770
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111

Appointed Special Counsel:

Leslie C. Schulze, #43685
Lucia Padilla, #35150
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 8th Floor
Denver, CO 80203

By: _____
Christopher S.P. Gregory, #37095

-4-

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 & 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>        and<br><br>John E. Scipione, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Christopher S.P. Gregory, esq.<br>Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  c.gregory@jd.state.co.us<br>Atty. Reg. # 37095 | Case Number:  22SA236 |
| **EXHIBIT A—STIPULATION FOR RESOLUTION OF FORMAL PROCEEDINGS** | |

The members of the Colorado Commission on Judicial Discipline ("the

Commission"), upon agreement of Complainant and Judge John E. Scipione, file

the following recommended stipulation for resolution of formal proceedings

according to Colo. RJD 37(e):

## SUMMARY AND STIPULATED FACTS

Judge Scipione is an 18th Judicial District Court Judge, having been appointed

to his office effective September 19, 2018.  After serving as a magistrate in the 18th

Judicial District from 2012-2017, Judge Scipione served as an Arapahoe County

Court Judge effective May 31, 2017.  Judge Scipione is subject to the jurisdiction of

the Commission and of this Court.

The Commission's jurisdiction is limited to recommending discipline based

upon Judge Scipione's conduct as a judge and as a candidate for judicial office.  CO

ST CJC Application; *see also* CO ST CJC Rule 4.1.

Judge Scipione, on at least three occasions, used his position as a judicial

officer to seek intimate relationships with Judicial Department employees or court

personnel.  While serving as a magistrate, Judge Scipione engaged in an

approximately 1-year extra-marital personal relationship with his judicial assistant

(Judicial Assistant 1).  Judge Scipione did not report this relationship to his

supervising Chief Judge or the Judicial Department's Human Resources Division, as

required by the Judicial Department's personnel rules.[1]  As relevant to the

---

[1] Colorado Chief Justice Directive (CJD) 08-06, Attachment F (2012), required the
reporting of romantic/sexual relationships between Judicial Department employees
and prohibited the employees from remaining in a supervisory / subordinate

-2-

Commission's jurisdiction to impose discipline in this matter, Judge Scipione did not

disclose the existence of this relationship when he applied to become a county court

judge in 2017 and when he applied to become a district court judge in 2018.[2]

In 2021, the Commission notified Judge Scipione of allegations of judicial

misconduct made by a more recent judicial assistant (Judicial Assistant 2) and an

---

employment relationship.  Specifically, Attachment F prohibited circumstances where:

> One party is a justice, judge or magistrate working within the same court or judicial district of the other party who is employed as a classified or contract employee in that court or judicial district.

Attachment F further explained that:

> Failure to comply with this policy may result in cancellation of a contract, corrective and/or disciplinary action, including termination, or a referral to the Commission on Judicial Discipline.

[2] The standard judicial application form asks:

> **46.** Is there any circumstance or event in your personal or professional life which, if brought to the attention of the Commission, might tend to affect adversely your qualifications to serve on the court for which you have applied? If so, please explain.

The standard form further requires the applicant to certify its accuracy, completeness, and compliance with the Colorado Code of Judicial Conduct.  With awareness of his unreported relationship, Judge Scipione responded on both his applications:  "No."

-3-

unpaid intern/law clerk (Law Clerk 1).  These allegations related to claims of sexual

harassment, including that Judge Scipione referred to the Judicial Assistant 2 using a

derogatory term, openly discussed his involvement in an alternative "lifestyle" of

consensual non-monagamy and asked the intern/law clerk to assist him in using the

Tinder dating application.  In its investigation, the Commission learned that Judge

Scipione pursued a personal relationship with a former law clerk (Law Clerk 2).

Judge Scipione failed to disclose the personal relationship with Judicial Assistant 1

and his conduct with Law Clerk 2 in these disciplinary proceedings.  Judge Scipione

represented that former staff and others would affirm that he never engaged in

similar misconduct in the workplace, without disclosing that he had done so in the

past.

Separately, Judge Scipione contacted another judge and that judge's probate

clerk in a different jurisdiction to seek favorable treatment in probate proceedings

involving Judge Scipione's father's estate.

Following a request from the Commission, this Court issued an order on

August 4, 2022 that temporarily suspended Judge Scipione from his judicial duties

with pay according to Colo. RJD 34(a). The disciplinary proceedings were stayed for

approximately six months pending resolution of disability proceedings initiated by

Judge Scipione under Colo. RJD 33.5(c).

-4-

# COLORADO CODE OF JUDICIAL CONDUCT

## Preamble

1.  The Preamble to the Code states, in relevant part:

> "Judges should maintain the dignity of judicial office at all times and avoid both impropriety and the appearance of impropriety in their professional and personal lives."

As defined in the Code, "'Integrity' means probity, fairness, honesty, uprightness, and soundness of character."

## Canon Rule 1.1

2.  Canon Rule 1.1 provides, in relevant part:

> (A) A judge shall comply with the law, including the Code of Judicial Conduct.

## Canon Rule 1.2

3.  Canon Rule 1.2 provides:

> A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

## Canon Rule 1.3

4.  Canon Rule 1.3 states:

> A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others or allow others to do so.

## Canon Rule 2.16

5.    Canon Rule 2.16(A) states: "A judge shall cooperate and be candid and honest

with judicial and lawyer disciplinary agencies."

## Canon Rule 2.3

6.    Canon Rule 2.3(B) states, in relevant part, that a judge shall not:

> "[E]ngage in harassment, including but not limited to bias,
> prejudice, or harassment based upon race, sex, [or]
> gender..."

7.    Additionally, Chief Justice Directive 08-06 defines sexual harassment to

include: "unwanted sexual advances or propositions; unwelcome

touching; . . ."

8.    Chief Justice Directive 08-06 further states, in part:

> Harassment, whether verbal, physical, or environmental, is
> unacceptable and will not be tolerated in the workplace
> itself or in other work-related settings such as business
> trips, conferences, or work-related social events.

## Canon Rule 2.8

9.    Canon Rule 2.8 provides, in relevant parts:

> (A)    A judge shall require order and decorum in
> proceedings before the court.
>
> (B) A judge shall be patient, dignified, and courteous to
> litigants, jurors, witnesses, lawyers, court staff, court
> officials, and others with whom the judge deals in an
> official capacity[.]

-6-

## Canon Rule 2.9

10.  Canon Rule 2.9 provides, in relevant part:

> (A) A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter[.]

## Canon Rule 4.1

11. Canon Rule 4.1(A)(11) states:

> (A) Except as permitted by law, or by this Canon, a judge or a judicial candidate shall not:
> * * *
> (11) knowingly, or with reckless disregard for the truth, make any false or misleading statement[.]

### Stipulated Admissions to Judicial Misconduct:

12.  Judge Scipione admits to knowingly engaging in conduct that violated Canon Rules 1.1, 1.2, 2.3, and 2.8 through his communications with and about Law Clerk 1 and Judicial Assistant 2.  These communications included discussion of Judge Scipione's sexual preferences and habits outside the workplace. Judge Scipione also inappropriately referred to his judicial assistant in derogatory terms.

13.  Judge Scipione admits to knowingly engaging in conduct that violates Canon Rules 1.1, 1.2, 1.3, and 2.9 by initiating *ex parte* communications with another

district court judge and that judge's probate clerk in a different jurisdiction to expedite a probate matter involving Judge Scipione's father's estate.

14.  Judge Scipione admits to knowingly engaging in conduct that violates Canon Rules 1.1, 1.2, 2.3, 2.16, and 4.1(A)(11) by failing to disclose, on his judicial applications, an unreported intimate personal relationship with Judicial Assistant 1 while serving as a 18th Judicial District Court Magistrate. He also did not disclose this prior relationship during the course of the disciplinary proceedings.

## STIPULATED RECOMMENDATIONS FOR SANCTIONS:

Based on the foregoing, the Commission and the Respondent agree and recommend that:

a.  Judge Scipione shall resign from judicial office immediately upon filing of this Stipulation;

b.  Judge Scipione shall receive a written public censure from the Supreme Court according to Colo. RJD 36(e) for violations of Canon Rules 1.1, 1.2, 1.3, 2.16, 2.3, 2.8, 2.9, and 4.1, above;

c.  While the stipulated resignation and admissions to judicial misconduct shall be effective immediately, the parties further agree that other sanctions, including requests for an award of attorney's fees and costs and the Colorado Judicial Department's recoupment of certain salary and benefits paid shall remain open for further determination, with both sides given the opportunity to brief the issue to the Special Masters; and

-8-

    d. Judge Scipione shall, apart from being able to address the remaining sanctions contemplated through Colo. RJD 36(g) and (h) with a final determination by this Court, waive his rights to a hearing in formal proceedings and review by this Court as provided according to Colo. RJD 37(e) and Colo. RJD 40.

The Parties further acknowledge that this stipulated partial resolution, the sanctions imposed by the Colorado Supreme Court, and the prospective record of proceedings as defined by Colo. RJD 33 shall become public upon their respective filings.

Stipulated and agreed this 19th day of January, 2023.


_____
Judge John E. Scipione, Respondent


_____
John S. Gleason, Counsel to Respondent
Attorney Reg. No. 15011


_____
Leslie Schulze, Special Counsel to the Commission
Attorney Reg. No. 43685

Colorado Commission on Judicial Discipline


By: _____
Christopher Gregory, Executive Director
Attorney Reg. No. 37095

-9-

determination by this Court, waive his rights to a hearing in formal proceedings and review by this Court as provided according to Colo. RJD 37(e) and Colo. RJD 40.

The Parties further acknowledge that this stipulated partial resolution, the sanctions imposed by the Colorado Supreme Court, and the prospective record of proceedings as defined by Colo. RJD 33 shall become public upon their respective filings.

Stipulated and agreed this ⟨17th⟩ day of January, 2023.

Jud John E. Scipione, Respondent

_Jane Cox, #45770 for_
John S. Gleason, Counsel to Respondent
Attorney Reg. No. 15011

_[signature]_
Leslie Schulze, Special Counsel to the Commission
Attorney Reg. No. 15035

Colorado Commission on Judicial Discipline

By: _____
Christopher Gregory, Executive Director
Attorney Reg. No. 37045

determination by this Court, waive his rights to a hearing in formal proceedings and review by this Court as provided according to Colo. RJD 37(e) and Colo. RJD 40.

The Parties further acknowledge that this stipulated partial resolution, the sanctions imposed by the Colorado Supreme Court, and the prospective record of proceedings as defined by Colo. RJD 33 shall become public upon their respective filings.

Stipulated and agreed this 19th day of January, 2023.

_____
Judge John E. Scipione, Respondent

Gene Cox, #45770 for
_____
John S Gleason, Counsel to Respondent
Attorney Reg. No. 15011

_____
Leslie Schulze, Special Counsel to the Commission
Attorney Reg. No. 43685

Colorado Commission on Judicial Discipline

By: _____
Christopher Gregory, Executive Director
Attorney Reg. No. 37095

| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: January 20, 2023<br>CASE NUMBER: 2022SA236 |
|---|---|
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 21-138 and 22-112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236<br>& 2022SA14 |
| ORDER OF COURT | |

The parties are hereby notified the Court has received the "Notice of Colo.

RJD 37(e) Stipulation and Partial Recommendations for Sanctions" and "Exhibit-A

Stipulation for Resolution of Formal Proceedings."  The Court acknowledges the

Respondent's immediate resignation.  Pursuant to Colo. RJD 37(e) the Notice and

Stipulation filed with the Court on January 19, 2023 are a matter of public record.

BY THE COURT, JANUARY 20, 2023.
CHIEF JUSTICE BOATRIGHT and JUSTICE SAMOUR do not
participate.

| | |
|---|---|
| SUPREME COURT, STATE OF COLORADO<br><br>*ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE*<br><br>1300 Broadway, Suite 210<br>Denver, Colorado 80203<br><br>---<br><br>In re the Matter of<br><br>THE PEOPLE OF THE STATE OF COLORADO,<br>Complainant,<br><br>And<br><br>JOHN E. SCIPIONE, a Judge of the Arapahoe County Court,<br>Respondent | RECEIVED<br><br>02/07/2023<br><br>Colorado<br>Commission on<br>Judicial Discipline<br><br>**COURT USE ONLY** |
| | Case: 2022SA112 |
| **ORDER TO VACATE HEARING** | |

This matter has been pending before the special masters and upon review of the file, the special masters recount the following timeline of events:

- The special masters conducted a Status Conference on January 27, 2023 and asked parties to hold Tuesday, February 7, 2023 on their calendars to conduct a hearing on the remaining matters regarding financial sanctions.

- The parties have since requested the February 7, 2023 hearing be vacated to allow additional time to research the remaining financial issues, potentially consult with experts, and work on a resolution. The exchange of information has been recent regarding the financial issues and the Special Masters grant the request and hereby vacate the February 7, 2023 hearing.

- The briefing schedule will continue to remain in effect. A new hearing date will not be set at this time. If there is a need for a hearing, the parties may notify the Special Masters in writing.

Date: February 6, 2023

On Behalf of the Special Masters:

_____

Susan Blanco
Chief Judge, 8th Judicial District
Presiding Special Master

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>303.457.5134 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | RECEIVED<br><br>04/26/2023<br><br>Colorado<br>Commission on<br>Judicial Discipline<br><br>▲  COURT USE ONLY  ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  j.walsh@jd.state.co.us<br>Atty. Reg. # 33762 | CCJD Case Nos. 21-138 & 22-112 |
| **THE PEOPLE'S NOTICE OF SUPPLEMENTAL AUTHORITY ON THE LEGAL FEES ISSUE** | |

This panel is currently considering (1) whether to assess against Judge Scipione the Commission's "reasonable attorney fees" pursuant to Colo. RJD 36(g), and (2) whether the phrase "reasonable attorney fees" requires a prevailing market rate or instead some lower "cost-plus" rate based upon special counsel's salary as a government lawyer.

The Commission, through special counsel's briefing, has cited binding authority from the Colorado Court of Appeals which requires that "reasonable attorney fees" means a prevailing market rate. But no Colorado appellate court has explicitly addressed this issue in the precise context of the Colorado Rules of Judicial Discipline.

Recently, however, a special tribunal of seven Colorado Court of Appeals judges, appointed in lieu of the Supreme Court due to a conflict, upheld an award of attorney fees against a disciplined judge at a prevailing market rate. *Matter of Timbreza,* 2023 CO 16. In *Timbreza,* the case was resolved via stipulation in which the parties agreed the judge would pay $17,500 in fees based on 50 hours of work at a rate of $350 per hour. *Id.* The parties further agreed that $350 per hour was a reasonable prevailing market rate. *Id.* Pursuant to Colo. RJD 40, the special tribunal was required to uphold the stipulation unless it was "not supported by the record of proceedings." Here, the special tribunal upheld the stipulation on attorney fees, including the agreement that the $350 per hour prevailing market rate was reasonable.

While *Timbreza* is not binding on this panel, it is nevertheless persuasive authority that a prevailing market rate should apply in this case. Attached to this Notice are the *Timbreza* opinion as well as the stipulation on fees in that case.

DATED:  April 26, 2023

Respectfully submitted,

*/s/ Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762
Special Counsel
Colorado Commission on Judicial Discipline

-2-

## CERTIFICATE OF SERVICE

I certify that on April 26, 2023, a true and correct copy of the foregoing NOTICE was filed with the Commission and served via e-mail upon the following persons:

John S. Gleason, esq.
Jane B. Cox, esq.
Burns, Figa, & Will, P.C.
6400 South Fiddler's Green Cir., Ste. 1000
Greenwood Village, CO 80111
*Attorneys for Respondent Judge John E. Scipione*

By:  */s/ Jeffrey M. Walsh*
        Jeffrey M. Walsh, #33762

-3-

**Special Tribunal of the Supreme Court of the State of Colorado**
**2 East 14th Avenue • Denver, Colorado 80203**

DATE FILED: April 24, 2023
CASE NUMBER: 2022SA194

**2023 CO 16**

**Supreme Court Case No. 22SA194**
*Original Proceeding in Discipline*
Colorado Commission on Judicial Discipline Case No. 22-125

**In the Matter of Complainant:**

The People of the State of Colorado,

and

**Respondent:**

Lance P. Timbreza, a Former Judge of the Mesa County District Court.

**Order re: Recommendation of the Colorado Commission on Judicial Discipline and Public Censure**
*en banc*
April 24, 2023

**Appearing for the Colorado Commission on Judicial Discipline:**
Christopher Gregory, Executive Director
    *Denver, Colorado*

**Attorneys for Respondent**
Cohen Black Law LLC
Nancy Cohen
    *Denver, Colorado*

**Attorney for Complainant:**
Jeffrey Walsh
    *Denver, Colorado*

**PER CURIAM**

**CHIEF JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE HOOD, JUSTICE GABRIEL, JUSTICE HART, JUSTICE SAMOUR,** and **JUSTICE BERKENKOTTER** did not participate.

¶ 1    Former Judge Lance P. Timbreza, you appear before the Special Tribunal of the Colorado Supreme Court ("the Special Tribunal") for imposition of discipline based on violations of the duties of your office as a Judge of the Mesa County District Court. The Special Tribunal was convened because the Supreme Court had to recuse itself in this matter under Rule 41(b) of the Colorado Rules of Judicial Discipline ("RJD").

¶ 2    The Colorado Commission on Judicial Discipline ("the Commission") recommends approval of the Stipulation for Resolution of Formal Proceedings ("the First Stipulation"), which you and the Commission executed pursuant to RJD 37(e), and a second Stipulation for Resolution of Fees and Costs ("the Second Stipulation"), which you and the Commission executed pursuant to RJD 37(c), 38, and 40. (We refer to the First Stipulation and the Second Stipulation jointly as the Stipulations.)

¶ 3    Before the entry of the First Stipulation, you resigned your position as a judge. As part of the First Stipulation, you also stipulated to the entry of a public censure. You and the Commission further agreed that the issue of whether any additional sanctions should be imposed against you would be resolved at a future date. These remaining issues were addressed in the Second Stipulation.

¶ 4    Consistent with the Stipulations, the Commission recommends that the Special Tribunal issue a public censure and order you to pay $20,658.00 in attorney fees and costs to the State of Colorado, through the Commission.  The Special Tribunal adopts these recommendations.

1

## I.    Stipulated and Disputed Facts

¶ 5    In the First Stipulation, you and the Commission agreed to the following facts:

1.    In June 2022, [former] Judge Timbreza attended a Colorado Bar Association hosted conference at a condominium complex in the mountains.  On the first night of the conference, eight of the attendees (including [former] Judge Timbreza and Attorney 1, who met for the first time earlier that evening) gathered in the lobby of the hotel for an informal social gathering.  Most members of the group were drinking alcohol.  Several witnesses reported that [former] Judge Timbreza became visibly intoxicated around midnight.  During the gathering, [former] Judge Timbreza (a gay male) privately made repeated sexual propositions to Attorney 1 (also a gay male), which included requests that they leave the gathering together to go to Attorney 1's condo/hotel room by themselves.  (The Commission felt that the sexual orientation of [former] Judge Timbreza and Attorney 1 is not relevant to the propriety of the conduct in this case or to the issue of sanctions.  [Former] Judge Timbreza's and Attorney 1's sexual orientation is referenced here for context, at the request of Judge Timbreza.)  [Former] Judge Timbreza used his cell phone to show Attorney 1 at least one pornographic image.  However, [former] Judge Timbreza maintains that he merely showed Attorney 1 a single still photograph of a naked gay porn actor from an adult website.  [Former] Judge Timbreza believed he had Attorney 1's permission to show the picture.  Attorney 1 maintains that he did not give such permission and did not welcome these propositions.  Several witnesses reported that Attorney 1 appeared comfortable with [former] Judge Timbreza initially.  But as [former] Judge Timbreza became more intoxicated, Attorney 1 appeared uncomfortable and tense while talking to [former] Judge Timbreza.  Some witnesses also reported that both looked at one of the men's cell phone for a couple of minutes and both appeared to be sitting very close together.

2

2.      Attorney 1 is a younger and less experienced lawyer than [former] Judge Timbreza.  Given this, Attorney 1 was nervous about [former] Judge Timbreza's overtures.  These feelings were compounded by the fact that Attorney 1 and [former] Judge Timbreza share much in common in both their background and interests.  Attorney 1 made best efforts to politely decline [former] Judge Timbreza's overtures instead of forcefully rejecting them.  Ultimately, at the end of the evening, [former] Judge Timbreza and Attorney 1 went to Attorney 1's hotel room.  On the way to the hotel room, [former] Judge Timbreza kissed Attorney 1.  Though Attorney 1 did not want this kiss, Attorney 1 did not physically stop [former] Judge Timbreza or tell him no either.

3.      Ultimately, [former] Judge Timbreza entered Attorney 1's hotel room.  Attorney 1 did not physically try to stop [former] Judge Timbreza from entering and did not expressly tell him no.

¶ 6     You and the Commission note the following disputed facts:

What happened next is unclear.  Attorney 1 has been emotional when discussing this case and has been unwilling or unable to disclose what happened in the hotel room.  [Former] Judge Timbreza claims that he laid in bed with Attorney 1 and fell asleep for approximately four hours before leaving early the next morning.  There are other disputed facts.  But as part of the compromise of this stipulation, the parties have agreed not to detail all those disputed facts in [the First S]tipulation.

¶ 7     In the First Stipulation, you and the Commission also agreed to the following

facts:

[Former] Judge Timbreza maintains that at all times throughout the evening he believed that his propositions to Attorney 1 were welcome.  [Former] Judge Timbreza recognizes now that his perception of the evening's events,

3

on the one hand, and Attorney 1's perception of the evening's events, on the other, stand in contrast to one another.  [Former] Judge Timbreza acknowledges that due to his alcohol consumption on the night in question, his judgment and his ability to objectively perceive events were compromised.  In light of the investigation in this case, he sees now that his propositions were not welcome and that his conduct was inappropriate.

## II.    Stipulated Rule Violations

¶ 8    In the First Stipulation, you and the Commission agreed that you violated the following rules:

**Colorado Code of Judicial Conduct Canon Rule 1.1**

1. Canon Rule 1.1 provides, in relevant part: "A judge shall comply with the law, including the Code of Judicial Conduct."

2. As described below, former Judge Timbreza admits his non-compliance with Canon Rule 1.2, Canon Rule 1.3, and Canon Rule 2.3, which establishes that he has violated Canon Rule 1.1.

**Colorado Code of Judicial Conduct Canon Rule 1.2**

3. Canon Rule 1.2 provides: "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

4

4. Former Judge Timbreza acknowledges that his admitted conduct was improper and created an appearance of impropriety in violation of Canon Rule 1.2.

**Colorado Code of Judicial Conduct Canon Rule 1.3**

5. Canon Rule 1.3 states: "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so."

6. Former Judge Timbreza admits that by making sexual propositions, as described above, to Attorney 1, he abused the prestige of his judicial office to advance his personal interests and thereby violated Canon Rule 1.3.

**Colorado Code of Judicial Conduct Canon Rule 2.3**

7. Canon Rule 2.3(B) states, in relevant part: "A judge shall not . . . engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, [or] gender . . . ."

8. Additionally, Chief Justice Directive ("CJD") 08-06 defines sexual harassment to include "unwanted sexual advances or propositions; unwelcome touching; . . . repeated sexual comments; . . . [and] the display in the workplace of sexually suggestive objects or pictures."

9.  CJD 08-06 further states, in part: "The Colorado Judicial Department will not tolerate, condone or allow harassment . . . in the workplace or during any work-related activity . . . ."

10. Former Judge Timbreza acknowledges that his admitted conduct was improper and violated Canon Rule 2.3 and CJD 08-06.

### III.   Prior Disciplinary History

¶ 9     In the First Stipulation, you and the Commission agreed that you have the following prior disciplinary history:

> As detailed in *Matter of Timbreza*, 2019 CO 98, [former] Judge Timbreza previously received a public censure and 28-day unpaid suspension for driving while impaired by alcohol and resulting consequences.  In that case, "according to witnesses and the arresting officer's report, [former] Judge Timbreza consumed several glasses of wine at a vineyard and, after leaving the vineyard, drank more wine at a poolside party." *Id.* Upon leaving the poolside party, [former] Judge Timbreza crashed his vehicle into roadside trees and bushes to avoid a collision with another vehicle. *Id.* He subsequently refused to take a blood alcohol test.  According to one of his colleagues, [former] Judge Timbreza ignored advice not to drive home from the poolside party. *Id.*
>
> [Former] Judge Timbreza's judicial disciplinary history further includes a private censure for delay in the performance of his judicial duties.

6

### IV.    Stipulated Resolution of Formal Proceedings

¶ 10    RJD 37(e), titled "Stipulated Resolution of Formal Proceedings," allows the Commission to file a "stipulated resolution" as a recommendation to the Special Tribunal in a disciplinary proceeding.   In filing such a stipulation, the Commission has authority to recommend, among other possible sanctions, that the Special Tribunal "censure the Judge publicly . . . by written order."    RJD 36(e); *accord* Colo. Const. art. VI, § 23(3)(f).  The Commission also has authority to recommend that the Special Tribunal "[a]ssess costs and fees incurred by the Commission."  RJD 36(g).

¶ 11    Under RJD 40, after considering the evidence and the law, the Special Tribunal is required to issue a decision concerning the Commission's recommendations.   If the Commission recommends adoption of a stipulated resolution, "the [Special Tribunal] shall order it to become effective and issue any sanction provided in the stipulated resolution, unless the [Special Tribunal] determines that its terms do not comply with Rule 37(e) or are not supported by the record of proceedings."  RJD 40.

¶ 12    By the Stipulations, former Judge Lance P. Timbreza waived his right to a hearing in formal proceedings and review by the Special Tribunal and agrees with the Commission's recommendations that he be publicly censured and ordered to pay $20,658.00 in attorney fees and costs to the State of Colorado, through the Commission.    (Pursuant to RJD 6.5(a) and RJD 37(e), the Stipulations, the

7

Commission's recommendations, and the record of proceedings became public when the Commission filed its recommendations with the Special Tribunal.)

¶ 13     Upon consideration of the law, the evidence, the record of proceedings, the Stipulations, and the Commission's recommendations, and being sufficiently advised in the premises, the Special Tribunal concludes that the terms of the Stipulations comply with RJD 37(e) and are supported by the record of proceedings.  Therefore, the Special Tribunal orders the Stipulations to become effective and issues the agreed-upon sanctions.

¶ 14     The Special Tribunal hereby publicly censures you, former Judge Lance P. Timbreza, for violating Code of Judicial Conduct Canon Rules 1.1, 1.2, 1.3, and 2.3, as well as CJD 08-06.  The Special Tribunal also orders you to pay $20,658.00 in attorney fees and costs to the State of Colorado, through the Commission.

The Special Tribunal:

Hon. David Furman

Hon. Craig Welling

Hon. Lino Lipinsky de Orlov

Hon. Neeti Pawar

Hon. David Yun

Hon. Timothy Schutz

Hon. Katharine Lum

| | |
|---|---|
| **Judicial Discipline Special Tribunal**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case No. 22-125 | RECEIVED<br><br>04/05/2023<br><br>Colorado<br>Commission on<br>Judicial Discipline |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>     and<br><br>Lance P. Timbreza, A former Judge of the Mesa County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| | Case Number: 22SA194 |
| **STIPULATION FOR RESOLUTION OF FEES AND COSTS** | |

## INTRODUCTION

On January 6, 2023, the Colorado Commission on Judicial Discipline ("the Commission") and former Judge Lance P. Timbreza entered into a formal stipulation related to the merits of this disciplinary proceeding. In that stipulation, the parties agreed that the issues of fees, costs, and salary recoupment pursuant to Colo. RJD 36(g) and (h) would be litigated before the special masters at a future hearing. The need for that future hearing is now moot because the parties have reached the following stipulation on fees, costs, and salary recoupment.

## STIPULATION

The parties agree that Respondent will pay the sum of $20,658.00 for fees and costs as follows: fees of $17,500.00 (50 hours at $350.00 per hour) and costs of $3,158.00.  Respondent agrees to pay directly to expert Natasha Powers her invoice of  $1200.00  for  her  appearance  at  the  deposition  taken  by  the Commission. Regarding the fees calculation, the parties have agreed that 50 hours of work performed by the Commission's current special counsel will be assessed against Respondent. The parties further stipulate that $350/hour is an appropriate prevailing market rate based on special counsel's experience. Thus, the parties stipulate that the $17,500.00 in fees here (i.e. 50 hours at $350.00 per hour) is a "reasonable" lodestar sum pursuant to Colo. RJD 36(g), and Respondent hereby waives his right to argue to

2

the Special Masters and/or the Special Tribunal that a downward departure should apply.

In exchange for the above stipulations, the Commission agrees not to seek reimbursement for all other time expended by the Commission's current special counsel or by the Commission's prior special counsel appointed through the Attorney General's Office, including time billed by investigators and paralegals.

The Commission also agrees it will not seek salary recoupment against Respondent, pursuant to Colo. RJD 36(h), for the time Respondent was on temporary paid suspension until he resigned on September 12, 2022.

Respondent hereby waives his right to a hearing in formal proceedings and review by the Special Tribunal, as provided according to Colo. RJD 37(e), 38, and 40. Pursuant to this stipulation, 20 days after the Special Tribunal approves the stipulation, Respondent shall mail a check in the amount of $20,658.00 made payable to the State of Colorado (with reference to CCJD Case No. 22-125) to the following address:

Colorado Commission on Judicial Discipline
1300 Broadway, Suite 210
Denver, CO 80203

If Respondent fails to pay within this time, a judgment shall enter against Lance Timbreza in the amount of $20,658.00 payable to the State of Colorado.

This stipulation shall effectively merge with the stipulation on the merits dated January 6, 2023 and shall become part of the public censure in this case as provided through Colo. RJD 37(e).

Stipulated and agreed this 31st day of March, 2023.


Lance P. Timbreza, Respondent


_____
Nancy Cohen, Counsel to Respondent
Attorney Reg. No. 11846


_____
Jeff Walsh, Special Counsel to the Commission
Attorney Reg. No. 33762


Colorado Commission on Judicial Discipline


By: _____
Christopher Gregory, Executive Director
Attorney Reg. No. 37095

4

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br><br>Ralph L. Carr Judicial Center<br>1300 Broadway, Suite 210<br>Denver, Colorado 80203<br>(303) 457-5134 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>**Complainant,**<br><br>and<br><br>JOHN E. SCIPIONE, a Judge of the Arapahoe County District Court,<br><br>**Respondent.** | **RECEIVED**<br><br>04/28/2023<br><br>Colorado Commission on Judicial Discipline<br><br>▲ **COURT USE ONLY** ▲ |
| **Attorneys for Respondent**<br><br>Name:  John S. Gleason (#15011)<br>   Jane B. Cox (#45770)<br>Address:  BURNS, FIGA & WILL, P.C.<br>   6400 South Fiddler's Green Circle<br>   Suite 1000<br>   Greenwood Village, Colorado 80111<br>Telephone:  (303) 796-2626<br>Facsimile:  (303) 796-2777<br>E-mail:  jgleason@bfwlaw.com<br>   jcox@bfwlaw.com | CCJD Case Nos. 21-138 & 22-112 |
| **RESPONDENT'S OBJECTION TO THE PEOPLE'S NOTICE OF SUPPLEMENTAL AUTHORITY ON THE LEGAL FEES ISSUE** | |

Respondent, John E. Scipione, by and through his undersigned counsel, John S. Gleason and Jane B. Cox of Burns, Figa & Will, P.C., hereby submits the following Objection to the People's Notice of Supplemental Authority on the Legal Fees Issue and states as follows:

1. On January 19, 2023, the parties submitted a Stipulation for Resolution of Formal Proceedings, which resolved the sanction to be imposed in this matter, and left open the unresolved requests for additional punitive financial sanctions against Respondent. Thereafter, the Special Masters established a briefing schedule for the Commission's separate requests for disgorgement of salary and benefits and for assessment of attorney's fees and costs. Following some unopposed

modifications to the briefing schedule, the Commission submitted its Reply Briefs on March 31, 2023.

2.      On April 26, 2023, without conferral or advance courtesy notice to Respondent, the Commission filed The People's Notice of Supplemental Authority on the Legal Fees Issue.  The Commission already enjoyed the advantage of the ability to submit Reply Briefs in this matter and the Special Masters gave no previous instruction that any further briefing would be allowed. Without any leave from the Special Masters, the Commission submitted its Notice nearly four weeks after the briefing schedule closed.

3.      Respondent strenuously objects to the mischaracterized Notice of Supplemental Authority on the Legal Fees Issue.  The Stipulation from a separate judicial discipline proceeding submitted to the Special Maters is not "authority" in this case, nor is it even persuasive.  In Judicial Discipline Case Number 22-125, the Respondent Judge entered into a Stipulation as to the sanction of attorney's fees.  Such Stipulations have never been regarded as persuasive in the attorney regulation system, as the hallmark of negotiated resolutions is compromise.  There is no other precedent for the Special Masters to consider beyond the substantially similar attorney disciple system, and the Special Masters should look to the logic and reasoning behind the decades of decisions within that well-established system for guidance on this matter.

4.      Additionally, the Stipulation from case number 22-125 describes the negotiated attorney's fees to be paid by that Respondent Judge, including the following:

> In exchange for the above stipulations, the Commission agrees not to seek reimbursement for all other time expended by the Commission's current special counsel or by the Commission's prior special counsel appointed through the Attorney General's Office, including time billed by investigators and paralegals.

> The Commission also agrees it will not seek salary recoupment against Respondent, pursuant to Colo. RJD 36(h), for the time Respondent was on temporary paid suspension until he resigned on September 12, 2022.

However, upon inquiry from counsel in this matter, the Commission refused to provide information critical to drawing any comparison to this case, such as how much of current Special Counsel's time was discounted, how much of prior Special Counsel (appointed by the Attorney General' Office) was discounted, and how much of the Judge's paid salary the Commission agreed would not be sought in recoupment.

5.      The Commission relies on the confidentiality provisions of the Rules of Judicial Discipline to deny Respondent access to information that is key for the Special Masters to determine how analogous the cases are, and thus how much weight, if any, should be afforded to the negotiated resolution of a similar issue in a different case.  Respondent notes that he sought

2

administrative records such as billing records and other information specific to this case through a CORA request, to aid in his analysis for attempted settlement negotiations and preparation of his Answer Briefs of these disputed issues. The Commission similarly refused to provide information regarding Respondent's own disciplinary matter, asserting that it is not subject to CORA or any other means of records request. This is yet another example of the serious due process concerns Respondent has endured by the Commission's actions throughout this and the related disability proceeding.

6.    Respondent can attest that his experience in negotiating any stipulations with the Commission, through various Special Counsel, has been marked by threats and intimidation tactics. His attempts to negotiate resolution of the financial sanctions in this matter have been no exception, including a condition by the Commission that Respondent agree that this case be allowed to be used to establish the precedent of awards of attorney's fees and disgorgement of salary that did not previously exist. Respondent has every reason to believe that the former Judge in case number 22-125 experienced the same threats and pressure, leading to the so-called precedential Stipulation submitted on April 26, 2023 to the Special Masters.

7.    A judge's decision to enter into a stipulation in an entirely separate judicial discipline matter does not establish precedent binding on the Special Masters here. Conclusions of law, as determined by the Courts, establish precedent. The Commission's belated and unauthorized efforts to submit the Stipulation underscore its acknowledgement that there is no precedent for its requests for attorney's fees and for disgorgement of salary and benefits. The Notice provided by the Commission does not constitute "authority" nor it is persuasive. For these reasons, Respondent objects to the filing itself and to the mischaracterized substance of the Commission's Notice filed April 26, 2023.

WHEREFORE, Respondent, John E. Scipione, respectfully objects to The People's Notice of Supplemental Authority on the Legal Fees Issue and requests that the Special Masters decline to consider the Notice in their determinations as to the pending issue of the request for a punitive award of attorney's fees and costs against Respondent.

Respectfully submitted this 28th day of April, 2023.

BURNS, FIGA & WILL, P.C.

*\*\*Original signature at the offices of
    Burns, Figa & Will, P.C.\*\**

By:  S/ John S. Gleason
         John S. Gleason (#15011)
         Jane B. Cox (#45770)
**Attorneys for Respondent
John E. Scipione**

3

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 28th day of April, 2023, a true and correct copy of the above and foregoing **RESPONDENT'S OBJECTION TO THE PEOPLE'S NOTICE OF SUPPLEMENTAL AUTHORITY ON THE LEGAL FEES ISSUE** was served on the following via the established electronic filing system, addressed as follows:

Jeffrey M. Walsh, Esq.
Special Counsel
Colorado Commission on Judicial Discipline
1300 Broadway, Suite 210
Denver, Colorado 80203

j.walsh@jd.state.co.us

*\*\*Original signature at the offices of
Burns, Figa & Will, P.C.\*\**

 S/ Karina Sapp

4

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>303.457.5134 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | **RECEIVED**<br><br>06/22/2023<br><br>Colorado<br>Commission on<br>Judicial Discipline<br><br><br>▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  j.walsh@jd.state.co.us<br>Atty. Reg. # 33762 | CCJD Case Nos. 21-138 & 22-112 |
| **THE PEOPLE'S REQUEST TO SUPPLEMENT THE RECORD** | |

The People hereby request to supplement the record in this case and have conferred with opposing counsel, John Gleason, about this request pursuant to Colo. R. Civ. P. 121. Mr. Gleason objects to this request on behalf of Judge Scipione.

The People recently received the attached letter from the Office of the State Court Administrator indicating that another financial settlement has been reached with a complaining witness related to Judge Scipione's misconduct. The Commission believes that this $45,000

-2-

settlement with one complaining witness, along with the $85,000 settlement with another,

highlights the severity of Judge Scipione's misconduct and the damage that this misconduct has

done (a) to the integrity and reputation of the judiciary, and (b) to his judicial district specifically.

Given this, the People believe the record of this settlement further supports the Peoples' request

for fees and costs as being "appropriate and equitable in the circumstances" pursuant to Colo.

RJD 36(g).

For the foregoing reasons, the People respectfully request that the attached letter be

included in the factual record in this case.

DATED:  June 22, 2023


Respectfully submitted,

*/s/ Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762
Special Counsel
Colorado Commission on Judicial Discipline


## CERTIFICATE OF SERVICE

I certify that on June 22, 2023, a true and correct copy of the foregoing REQUEST was
filed with the Commission and served via e-mail upon the following persons:

John S. Gleason, esq.
Jane B. Cox, esq.
Burns, Figa, & Will, P.C.
6400 South Fiddler's Green Cir., Ste. 1000
Greenwood Village, CO 80111
*Attorneys for Respondent Judge John E. Scipione*


By: */s/ Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762


-2-

# OFFICE OF THE STATE COURT ADMINISTRATOR



**Steven Vasconcellos**
*State Court Administrator*

**Terri Morrison**
*Judicial Legal Counsel*

**DIRECTORS**

**Brenidy Rice**
*Court Services*

**Marty Galvin**
*Financial Services*

**Amy Burne**
*Human Resources*

**Glenn Tapia**
*Probation Services*

**ACTING DIRECTOR**

**Jason Bergbower**
*Information Technology
Services*

June 22, 2023

Christopher Gregory, Executive Director
Colorado Commission on Judicial Discipline
1300 Broadway, Suite 210
Denver, Colorado 80203

*Via email:* c.gregory@jd.state.co.us

Dear Mr. Gregory,

At your request, I am writing to inform you that the Judicial Department, through the 18th Judicial District, has settled another claim filed with the EEOC or CCRD in connection with the conduct of former Judge John Scipione. The claim was settled for $45,000.00. The district will pay the full amount. At this time we do not know if State Risk Management will pay half of the amount back to the 18th Judicial District.

Sincerely,

*Terri S. Morrison*

Cc: Jeff Walsh, Esq.

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br><br>Ralph L. Carr Judicial Center<br>1300 Broadway, Suite 210<br>Denver, Colorado 80203<br>(303) 457-5134 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>**Complainant,**<br><br>and<br><br>JOHN E. SCIPIONE, a Judge of the Arapahoe County District Court,<br><br>**Respondent.** | RECEIVED<br>07/05/2023<br><br>Colorado Commission on Judicial Discipline<br><br><br>▲  COURT USE ONLY  ▲ |
| **Attorneys for Respondent**<br><br>Name:  John S. Gleason (#15011)<br>           Jane B. Cox (#45770)<br>Address:  BURNS, FIGA & WILL, P.C.<br>           6400 South Fiddler's Green Circle<br>           Suite 1000<br>           Greenwood Village, Colorado 80111<br>Telephone:  (303) 796-2626<br>Facsimile:  (303) 796-2777<br>E-mail:  jgleason@bfwlaw.com<br>           jcox@bfwlaw.com | CCJD Case Nos. 21-138 & 22-112 |
| **RESPONDENT'S OBJECTION TO THE PEOPLE'S REQUEST TO SUPPLEMENT THE RECORD** | |

Respondent, John E. Scipione, by and through his undersigned counsel, John S. Gleason and Jane B. Cox of Burns, Figa & Will, P.C., hereby submits the following Objection to the People's (second) Request to Supplement the Record and states as follows:

1.     On January 19, 2023, the parties submitted a Stipulation for Resolution of Formal Proceedings, which resolved the sanction to be imposed in this matter, and left open the unresolved requests for additional punitive financial sanctions against Respondent.  Thereafter, the Special Masters established a briefing schedule for the Commission's separate requests for disgorgement of salary and benefits, and for assessment of attorney's fees and costs.  Following some unopposed

modifications to the briefing schedule, the Commission submitted its Reply Briefs on March 31, 2023.

2.      On April 26, 2023, without conferral or advance courtesy notice to Respondent, the Commission filed The People's Notice of Supplemental Authority on the Legal Fees Issue.  The Commission already enjoyed the advantage of the ability to submit Reply Briefs in this matter, and the Special Masters gave no previous instruction that any further briefing would be allowed.  Without any leave from the Special Masters, the Commission submitted its Notice nearly four weeks after the briefing schedule closed.

3.      On June 22, 2023, Special Counsel for the Commission conferred with counsel for Respondent regarding its intent to again request to supplement the record in this matter, regardless of the fact that the briefing schedule closed nearly three months previously.  For the reasons described herein, Respondent again objects to the supplementation.

4.      The Commission's current second request to supplement the proceeding in this matter arises from the Office of the State Court Administrator's notification to the Commission that the Judicial Department, on behalf of the 18th Judicial District, recently settled an EEOC claim with a complaining witness related to Respondent's conduct in this disciplinary proceeding.

5.      As with the first such settlement reached by the Judicial Department, Respondent had no notice of the EEOC claim.  He had no opportunity to produce evidence or testimony regarding the (unadjudicated) merits of the claims or the veracity of the witnesses' allegations.  He had no opportunity to participate in the mediation during which the settlement was purportedly reached.

6.      There is no information available to the Special Masters regarding how or why the Judicial Department determined that a financial settlement was in its best interests, or how the amount of the settlement was calculated.  The Commission implies additional "guilt" on Respondent's part based on the fact of the settlement itself, with no objective evidence to support that inference.

7.      Put simply, it is not appropriate for Respondent to be punished for decisions made by the Judicial Department, without any ability for Respondent to participate or defend himself, and in which the Judicial Department did not have the benefit of the factual evidence developed during the disciplinary matter, such as the deposition testimony of the complaining witnesses.

8.      The stipulated facts of this matter remain unchanged.  Those are the facts in evidence upon which the Special Masters should rely in making any determinations regarding the outstanding unprecedented financial sanctions sought against Respondent.

2

WHEREFORE, Respondent, John E. Scipione, respectfully objects to The People's Request to Supplement the Record and requests that the Special Masters decline to consider the Request in their determinations as to the pending issues of the requests for punitive disgorgement and the punitive award of attorney's fees and costs against Respondent.

Respectfully submitted this 5th day of July, 2023.

BURNS, FIGA & WILL, P.C.

*\*\*Original signature at the offices of
Burns, Figa & Will, P.C.\*\**

By:  S/ Jane B. Cox
          John S. Gleason (#15011)
          Jane B. Cox (#45770)
**Attorneys for Respondent
John E. Scipione**

3

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 5th day of July, 2023, a true and correct copy of the above and foregoing **RESPONDENT'S OBJECTION TO THE PEOPLE'S REQUEST TO SUPPLEMENT THE RECORD** was served on the following via the established electronic filing system, addressed as follows:

Jeffrey M. Walsh, Esq.
Special Counsel
Colorado Commission on Judicial Discipline
1300 Broadway, Suite 210
Denver, Colorado 80203

j.walsh@jd.state.co.us

*\*\*Original signature at the offices of
Burns, Figa & Will, P.C.\*\**

 S/ Karina Sapp

4

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>303.457.5134 | **RECEIVED**<br><br>07/18/2023<br><br>Colorado<br>Commission on<br>Judicial Discipline |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  j.walsh@jd.state.co.us<br>Atty. Reg. # 33762 | CCJD Case Nos. 21-138 & 22-112 |

### THE PEOPLE'S REPLY TO JUDGE SCIPIONE'S OBJECTION TO SUPPLEMENTING THE RECORD

The People recently requested to supplement the record in this case to include evidence of a second financial settlement the Judicial Department entered into with one of the complaining witnesses here based on Judge Scipione's misconduct.

Judge Scipione makes two objections. First, he asserts that since the briefing is closed, this panel should reject the People's request to supplement. Second, he asserts that, since he did not

participate in the litigation that led to that settlement, no adverse inference should be drawn against him based on the fact of the settlement.

Both of these arguments fail.

First, that the briefing in this matter is closed does not bar the admission of additional, relevant evidence. The Colorado Constitution and the Rules of Judicial Discipline both explicitly contemplate the possibility of supplementing the factual record. *See* Colo. Const. Art. VI, § 23 (f) ("the Supreme Court . . . in its discretion may permit the introduction of additional evidence."); Colo. RJD 39 (same). Moreover, it is well accepted generally that a trial court may "exercise its discretion to permit a party who has rested to reopen a case for the purpose of presenting further evidence." *Justi v. RHO Condominium Ass'n,* 277 P.3d 847, 849 (Colo. App. 2011); *Rocky Mountain Animal Defense v. Colo. Div. of Wildlife,* 100 P.3d 508, 519 (Colo. App. 2004). Here, the evidence of the additional, second settlement related to Judge Scipione's misconduct was not available to the Commission when briefing closed. Thus, the Commission could not have presented this information sooner. But now that the Commission has learned of the settlement, and given its relevance as stated in the People's motion to supplement, this additional evidenced should be admitted into the record.

Second, it is in fact reasonable to draw an adverse inference against Judge Scipione based on the fact of a second legal settlement with a second complaining witness against him. Here, it is not only reasonable to assume that the Judicial Department is a rational actor, but that it is in fact a highly sophisticated rational actor, especially in matters related to the law. It is the Judicial Department after all. Therefore, if it decided, as it did, that the merits of the litigation against it were such that the Department needed to settle the case for a large sum of money, then it is reasonable to assume that Judge Scipione's conduct, which led to the litigation in the first place, was indeed highly problematic. Put simply, it is not reasonable to assume, as Judge Scipione suggests, that the Judicial Department

-2-

merely settled the cases here without a thorough investigation and due consideration of the merits of the claims against him.

For the foregoing reasons, the evidence of the second settlement should be admitted into the factual record in this case, and this panel should draw an adverse inference against Judge Scipione based on that settlement.

DATED:  July 18, 2023

Respectfully submitted,

*/s/ Jeffrey M. Walsh*
Jeffrey M. Walsh, #33762
Special Counsel
Colorado Commission on Judicial Discipline

**CERTIFICATE OF SERVICE**

I certify that on July 18, 2023, a true and correct copy of the foregoing MOTION was filed with the Commission and served via e-mail upon the following persons:

John S. Gleason, esq.
Jane B. Cox, esq.
Burns, Figa, & Will, P.C.
6400 South Fiddler's Green Cir., Ste. 1000
Greenwood Village, CO 80111
*Attorneys for Respondent Judge John E. Scipione*

By:  */s/ Jeffrey M. Walsh*
       Jeffrey M. Walsh, #33762

-3-

| | |
|---|---|
| **Colorado Commission on Judicial Discipline**<br>Ralph L. Carr Judicial Center<br>1300 Broadway, Ste. 210<br>Denver, CO 80203<br>Phone Number: 303-457-5131<br><br>_____<br>IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>**Complainant**,<br><br>        and<br><br>JOHN E. SCIPIONE, A Judge of the Arapahoe County District Court,<br><br>**Respondent**. | RECEIVED<br><br>08/14/2023<br><br>Colorado<br>Commission on<br>Judicial Discipline<br><br>⅄ FOR COURT USE ⅄<br>_____<br><br><br>CCJD Case No.: 21-138 & 21-112<br><br>(Supreme Court Case 22SA14 & 22SA236) |

## ORDER REGARDING RJD 36(H) SANCTIONS, ATTORNEY'S FEES, AND COSTS

THIS MATTER comes before the Special Masters on Special Counsel's Brief in Support of Sanctions Pursuant to Colorado Rules of Judicial Discipline 36(h), filed February 10, 2023. Respondent filed his Answer on February 25, 2023. Special Counsel filed their Reply on March 31, 2023. The Special Masters have reviewed the Brief, Answer, Reply, and the case file.[1] Being otherwise fully informed in the premises, the Special Masters find, and order, as follows:

### I.    PROCEDURAL HISTORY

This matter was initiated on January 20, 2022 when a Notice and Statement of Charges was served on Commission Case 21-138 (Supreme Court Case 22SA14). The Special Masters were appointed on January 27, 2022. Respondent's Answer was filed February 9, 2022, and the Special Masters held an initial Case Management Conference and issued a Case Management Order on March 10, 2022. An additional Stipulated Case Management Order was approved on April 4, 2022. The matter was originally set for a two-day hearing on June 7 and 8, 2022, after the Special Masters found good cause for a slight delay outside the timeframes based on previously scheduled

---

[1] The Special Masters note there is a pending request to supplement the record and argument related to settlements reached with complaining parties regarding Respondent's actions. The Special Masters have not considered these requests to supplement the record.

international travel of Respondent's counsel.  Respondent filed a Motion to continue that hearing on May 20, 2022, which was initially opposed but then agreed to allow new allegations to be investigated.  A continued hearing was set for August 23-24, 2022.  A Motion to Amend Statement of Charges in 21-138 was filed on June 10, 2022, and the amendment was granted over objection of Respondent on June 20, 2022.  On July 21, 2022, a Notice and Statement of Charges was served on Commission Case 22-112 (Supreme Court Case 22SA236).  The Special Masters were appointed on July 22, 2022, and an Unopposed Motion to Consolidate the case was filed on July 25, 2022.

There was a Request for Temporary Judicial Suspension filed on August 2, 2022, which was granted by Order of the Supreme Court on August 3, 2022.  Respondent filed a Verified Motion Raising Disability on August 4, 2022, and Respondent was temporarily suspended from his judicial duties with pay, pursuant to Colo. R. of Jud. Discipline (RJD) Rule 34(a).  An Order Staying Proceedings issued on August 5, 2022, and Respondent was transferred to disability inactive status by Order of the Supreme Court on August 9, 2022.  The Honorable James Casebolt was appointed as Special Master of the disability proceeding.  On August 8, 2022, the Special Masters granted the unopposed consolidation, acknowledged the stay for the disability proceedings, and vacated the disciplinary hearing scheduled for August 23-24, 2022.

By Order dated December 15, 2022, Special Master Casebolt recommended the Supreme Court accept the parties' Stipulation to Dismiss the Disability Proceeding and resume the disciplinary proceedings against Respondent.  The Supreme Court adopted the recommendation on December 16, 2022, and maintained Respondent on inactive status.  These Special Masters then held a status conference on December 19, 2022 to resume the disciplinary proceedings, and set a deadline for Respondent's Answer to the Statement of Charges in Commission case 22-112 of January 9, 2023.  A three-day hearing was scheduled for February 6-8, 2023, on the consolidated allegations.

The People filed a Second Amended Statement of the Charges on December 22, 2022, which was allowed over Respondent's objection by Order of the Special Masters on January 4, 2023.  Respondent filed his Answer January 9, 2023.  On January 19, 2023, the parties filed a Notice of Colo. RJD 37(e) Stipulation and Partial Recommendations for Sanctions, which agreed to Respondent's immediate resignation and public censure for violations of the Colorado Code of Judicial Conduct.  Respondent stipulated that he knowingly engaged in conduct that violated

Canons 1.1, 1.2, 1.3, 2.3, 2.8, 2.9, 2.16, and 4.1(A)(11).  The parties agreed that other requested sanctions, including requests for an award of attorney's fees and costs and recoupment of certain salary and benefits paid, would remain open for determination by the Special Masters pursuant to Colo. RJD 36(g) and (h).

The specific issues before these Special Masters are a request for sanctions in the form of repayment of salary and benefits in an unspecified amount and a request for attorney's fees and costs in the amount of $120,719.50.

## II.    ARGUMENTS ALLEGED BY THE COMMISSION

The Commission recommends Judge Scipione be required to repay all his salary and state-paid benefits he received while on suspension.  The Special Masters note the Commission never states the specific amount of salary and benefits being sought.  The Commission makes several fact-based arguments in support of their recommendation which primarily center on Judge Scipione's disability proceedings.

First, the Commission states the timing and the circumstances surrounding Judge Scipione's disability claim are highly suspicious given he was still a presiding judge during the initial proceeding and had just finished presiding over a trial the day before the amended charges were entered.  One day after amended charges were entered, Judge Scipione alleged he had a disability affecting his ability to proceed with the disciplinary proceedings.  As a result, the proceedings were paused while another review was conducted into Judge Scipione's ability to undergo the disciplinary proceeding.  The Commission argues Judge Scipione initiated the disability claim to needlessly delay the disciplinary proceedings, resulting in Judge Scipione being paid his salary and benefits for the additional six-month delay caused by the disability claim and generating additional attorney's fees and costs.  Thus, the Commission asserts the disability claim was meritless and designed to delay the disciplinary proceedings.

Second, the Commission states the legal arguments made by Judge Scipione in support of his disability claim also suggest the claim was meritless.  The Commission argues Judge Scipione's legal interpretation of the meaning of "disability" was so permissive that it was simply

unreasonable.  Specifically, Judge Scipione argued that "disability" was to include any mental or physical condition that adversely affects a judge's ability to assist in his defense.

Third, considering the meritless disability claim, the Commission argues policy concerns dictate Judge Scipione should be punished, his conduct should be sanctioned to deter others from engaging in similar conduct, and the state's treasury should be restored.  The Commission states requiring Judge Scipione to repay all his salary and state-paid benefits received while on suspension is the only full and adequate remedy to eliminate the misconduct.  In support of this argument, the Commission states that paid leave is appropriate for a judge who is suspended temporarily based on allegations of misconduct because the suspended judge should be presumed innocent.  Further, the Commission claims RJD Rule 20 provides for a speedy resolution of allegations of misconduct and the catchall provision in RJD Rule 36(h) allows for salary recoupment when a judge needlessly delays their resignation, the disciplinary proceeding, or otherwise abuses the paid suspension rule.  The Commission concludes that Judge Scipione's meritless claim of disability was an abuse of the paid suspension rule and unnecessarily delayed the proceedings.  Because Judge Scipione received salary and benefits during the period of the unnecessary delay, he should be required to pay back an amount equal to the value of his salary and benefits.

The Respondent disagrees with the assertions of the Commission and opposes the request to repay salary and benefits as well as attorney's fees and costs.

### III.    STIPULATED FACTS

On January 19, 2023, Judge Scipione entered Stipulated Admissions to Judicial Misconduct in which Judge Scipione made the following admissions:

[1] Judge Scipione admits to knowingly engaging in conduct that violated Canon Rules 1.1, 1.2, 2.3, and 2.8 through his communications with and about Law Clerk 1 and Judicial Assistant 2.  These communications included discussion of Judge Scipione's sexual preferences and habits outside the workplace.  Judge Scipione also inappropriately referred to his judicial assistant in derogatory terms.

[2] Judge Scipione admits to knowingly engaging in conduct that violates Canon Rules 1.1, 1.2, 1.3, and 2.9 by initiating *ex parte* communications with another district court judge and that judge's probate clerk in a different jurisdiction to expedite a probate matter involving Judge Scipione's father's estate.

[3] Judge Scipione admits to knowingly engaging in conduct that violates Canon Rules 1.1, 1.2, 2.3, 2.16, and 4.1(A)(11) by failing to disclose, on his judicial applications, an unreported intimate personal relationship with Judicial Assistant 1 while serving as a 18th Judicial District Court Magistrate.  He also did not disclose this prior relationship during the disciplinary proceedings.

The Special Masters received the admissions but did not hear any evidence.  Thus, the January 19, 2023 stipulated admissions are the only facts the Special Masters consider.  The Special Masters note the violated Canons 1.1, 1.2, 1.3, 2.3, 2.8, 2.9, 2.16, and 4.1(A)(11) are included verbatim in Respondent's stipulated admissions and include violations of avoiding any impropriety or appearance of impropriety, abusing the prestige of judicial office, engaging in harassment including sexual harassment, violating the requirement for judges to be dignified and courteous with others, initiating impermissible *ex parte* communication, and knowingly making false or misleading statements.

## IV.    LEGAL STANDARD

The Commission relies on the Colorado Constitution and Rules of Judicial Discipline to support their argument that the Colorado Supreme Court is permitted to sanction the misconduct and require Judge Scipione to repay the salary and benefits he received while on suspension.  The Commission cites to Colorado Constitution Art. 6 § 23(3)(f) which states:

> "Following receipt of a recommendation from the commission, the supreme court shall review the record of the proceedings on the law and facts and in its discretion may permit the introduction of additional evidence and shall order removal, retirement, suspension, censure, reprimand, or discipline, as it finds just and proper, or wholly reject the recommendation."

Additionally, the Commission cites to RJD Rule 36(h):

> "After considering the record of proceedings and the report of the special masters, in accordance with Article VI, Section 23(3)(e) of the Constitution, the Commission…shall recommend that the Supreme Court dismiss the charges or order one or more of the following sanctions…[The Supreme Court may] impose any other sanction or combination of sanctions, including dispositions under Rule 35, that the Court determines will curtail or eliminate the Judge's misconduct."

Finally, the Commission argues RJD 34(a), which states the Commission may request the Colorado Supreme Court to "order temporary suspension of a judge, with pay, pending the resolution of preliminary or formal proceedings," is not in conflict with their request for sanctions as the Supreme Court, pursuant to its plenary authority, can recoup the salary and benefits if the Court finds Judge Scipione abused the paid suspension rule.

The Special Masters rely on the Colorado Supreme Court's analysis in *In the Matter of Laurie A. Booras*, 2019 CO 16.  In *Booras*, the Colorado Supreme Court observed that RJD Rule 36 provides the possible sanctions for a judge's misconduct are: (a) removal; (b) retirement; (c) suspension; (d) disability proceedings; (e) public reprimand or censure; (f) diversion or deferred discipline; (g) costs and fees; or (h) any other discipline that will curtail or eliminate the judge's misconduct.  *Id.* at ¶41.  The Commission relies on (h), any other discipline that will curtail or eliminate the judge's misconduct, to argue that Judge Scipione should be required to repay the value of his salary and benefits during the unnecessary delay of the discipline case.

In *Booras,* our Supreme Court, turned to the Colorado Code of Judicial Conduct to consider the appropriate sanction for judicial misconduct:

> "Although the black letter of the Rules is binding and enforceable, it is not contemplated that every transgression will result in the imposition of discipline. Whether discipline should be imposed should be determined through a reasonable and reasoned application of the Rules, and should depend upon factors such as the seriousness of the transgression, the facts and circumstances that existed at the time of the transgression, the extent of any pattern of improper activity, whether there have been previous violations, and the effect of the improper activity upon the judicial system or others."  Colo. Code of Judicial Conduct, Scope ¶ 6.

The Court imposed sanctions on Judge Booras because she used inappropriate racial epithets and revealed confidential information of the Court of Appeals about a division vote.  *Booras* at ¶ 8.

Further, the Court found her misconduct impacted her ability to work with her colleagues and sit on any case involving ethnic minorities. *Id.* at ¶ 44. The Court found the violations of Rules 1.2, 3.1, and 3.5 of the Colorado Code of Judicial Conduct were serious enough to warrant the acceptance of Judge Borras's resignation as a judge of the court of appeals, the imposition of public censure, and an order that Judge Booras be required to pay the Commission's costs in the proceeding. *Id.* at ¶ 45.


## V.    ANALYSIS

### A) SANCTIONS

The Commission requests Judge Scipione pay an amount equivalent to his salary and benefits for period of delay caused by the disability proceedings. RJD 34(a) allows a judicial officer to be suspended with pay pending the resolution of the proceedings. Pay does not cease until a judicial officer is formally removed from their office under Colorado Constitution Article VI Section 23(3)(f). The catchall provision for sanctions under RJD 36(h) does not override the specific provisions authorizing suspension with pay under RJD 34(a) and Article VI Section 23(3)(f)'s mandate that salary ceases from the date of removal from office. Further, the Special Masters cannot make necessary findings to support the conclusion that the delay was unnecessary and that the claim of disability was essentially frivolous from the stipulations and the limited proceedings before the Special Masters. As mentioned, the Special Masters did not hear any evidence or make any findings. The proceeding before the Special Masters consisted entirely of case management and setting conferences. All disability proceedings were before a separate Disability Special Master. Any briefing on that issue was submitted to the Disability Special Master. The Special Masters have only the parties' stipulated factual allegations, representations and conclusions regarding the disability proceedings. Accordingly, the Special Masters do not further address this issue or make any recommendation.

### B) ATTORNEY'S FEES AND COSTS

The Special Masters find it both appropriate and equitable pursuant to RJD 36(g) and *Booras* to award attorney's fees as requested by the Commission for the disciplinary portion of the proceedings. The Special Masters do not make a recommendation regarding attorney's fees for

the disability proceedings for the same reasons we do not make a recommendation for sanctions for those proceedings.

Applying RJD 36(g), the Court in *Booras* established three main factors to determine whether the award of attorney's fees is appropriate. First, the Court looked at the seriousness of the transgressions and the circumstances existing at the time. Second, the Court looked at the extent of any pattern of improper activity and whether there were previous violations. Third, the Court looked at the effect of the violations on the judicial system or others. We proceed with the matter before us in the same manner.

First, the transgressions and circumstances as presented in the stipulated facts are serious. Judge Scipione is a judicial officer, appointed by the Governor and retained by the citizens of the 18th Jurisdiction. He had the benefit of having a law clerk work with him. Law clerks typically come to work for the Judicial Branch for an opportunity to work closely with a judicial officer, develop their understanding of the practice of law, and witness the demonstration of professionalism in the legal field. Frequently, judges become mentors for their law clerks and form lifetime professional relationships. Judge Scipione, while in his capacity as a judicial officer, decided to communicate his sexual preferences, an extremely personal matter, to the law clerk. A law clerk is a subordinate employee with far less power than a judge, who is a constitutional officer. This type of communication is a violation of personal boundaries by the one with all the power inflicted on a subordinate. A judicial officer is held to a high standard of professionalism and in maintaining appropriate interactions with all of those who are in our employ. In discussing sexual preferences with a law clerk, Judge Scipione abused his power as a judicial officer for his personal benefit. This abuse of the power dynamics between a judicial officer and a law clerk presented a grave risk of damaging the law clerk's perception of the judiciary and the judicial process. Further, Judge Scipione's derogatory reference about his judicial assistant, the employee who assists the Judge in nearly all judicial proceedings and processes, is disrespectful both to his judicial assistant and to the law clerk to whom he made the remark. Judge Scipione used his position as a judge in an attempt to expedite a personal probate matter pending before another judge. This is another abuse of the power of his office for his personal benefit. Finally, Judge Scipione had a consensual intimate relationship with a judicial assistant when he was a Magistrate but failed to honestly disclose this information during his application to become a judicial officer.

A Magistrate is also a judicial officer with professional obligations like that of a judge.  An intimate relationship, even though consensual, with a judicial assistant is also an abuse of the power dynamics in the workplace.  Although there is limited information from the stipulations about the circumstances existing at the time of these transgressions, the Special Masters nonetheless conclude they are all a serious nature.

Second, the judge's transgressions are repeated, and form a pattern of behavior.   Judge Scipione's conduct formed a pattern of disregard for the Colorado Code of Judicial Conduct, specifically Canon 1.1, Canon 1.2, Canon 1.3, Canon 2.3, Canon 2.8, Canon 2.9, Canon 2.16, and Canon 4.1(A)(11).  Collectively there is a pattern that shows Judge Scipione abused his power for self-gain regardless of the barriers created by the Canons to prevent a judicial officer from doing so.  Particularly Judge Scipione repeatedly violated Rule 1.2 when he acted in a pattern that did not promote public confidence in the independence, integrity, and the impartiality of the judiciary and failed to avoid impropriety.  This was evidenced by each of the stipulated conduct he committed.  Even within Rule 2.3 there was a pattern of improper activity, both in his behavior with the law clerk and with the way he spoke of Judicial Assistant 2.  This violation is demonstrated in each of the choices he made which were independent of one another and decisions made over a long duration of time.  Judge Scipione's behavior he engaged in with the law clerk is also a violation of Chief Justice Directive ("CJD") 08-06 which defines sexual harassment to include "unwanted sexual advances or propositions; unwelcome touching; ... repeated sexual comments; ... [and] the display in the workplace of sexually suggestive objects or pictures."  All in all, the consensual intimate relationship with a judicial assistant, discourteous remark about a judicial assistant to a law clerk, discussion with a law clerk about his sexual preferences and habits and attempt to have another judge expedite a probate matter involving his father's estate are all things Judge Scipione did pursuing his own personal interests.  Though the interests may differ, ranging from sexual or romantic to family business and whatever pleasure is taken from speaking ill of others, they are all very personal to him and were all pursued abusing his position as a judicial officer and occurred in multiple occasions over time.

Third, our consideration of the effect of the violations on the judicial system or others begins with the recognition that public trust is critical to the Judicial Branch. Judges make decisions that have a profound effect on the lives of people.  The people's acceptance of the

legitimacy of those decision depends on trusting that judicial officers are impartial and use their power in the public interest. Although the effect of Judge Scipione's conduct on public confidence in the judiciary is not quantified, it is negative and hardly negligible. And his conduct likely affected the law clerk and his judicial assistant and their impression of the judicial branch in general and judges in particular.

Although attorney fees are generally not recoverable, the exception is when they are specifically provided for by rule or statute. An award of reasonable attorney's fees and costs in this case is available pursuant to RJD 36(g). Because the Colorado Supreme Court has not distinguished attorney fees and costs from other possible sanctions, we have considered the relevant factors for sanctions generally in our analysis of whether attorney fees and costs should be imposed here. Although we are hindered in our analysis by the lack of detail provided in the stipulation, there is nonetheless sufficient information for us to make the above analysis. Similarly, we are hindered because the impact of the judge's conduct is not quantified, but we can nevertheless conclude that the impact is significant. For the reasons state above, we conclude that an award of attorney fees and costs would be appropriate.

The Commission has provided the necessary documentation to support the work invested in this process and it is appropriate and equitable for Judge Scipione to pay the attorney's fees and costs. Typically, when a statute providing for a fee award does not provide a specific definition of "reasonableness," the amount must be determined considering all the circumstances, based upon the time and effort reasonably expended by the prevailing party's attorney. *Crow v. Penrose-St. Francis Healthcare Sys.*, 262 P.3d 991, 998 (Colo. App. 2011). "The party seeking attorney fees bears the burden of proving, by a preponderance of the evidence, entitlement to the award." *Munoz v. Measner*, 214 P.3d 510 (Colo. App. 2009).

Judge Scipione highlights that the Court in *Booras* only allowed for the payment of costs— not the payment of attorney's fees. The Special Masters note only costs were awarded in *Booras* because the Commission in *Booras* did not request attorney's fees and in *Timbreza* there was a stipulation to $20,658 in attorney's fees and costs. As mentioned, RJD 36(g) and our Supreme Court contemplate the award of attorney's fees based on the same considerations pertinent to other sanctions.

The Commission is seeking attorney's fees of $120,719.50. However, this includes $69,530 in attorney's fees for the disability portion of the proceedings which the Special Masters, for reasons previously explained, are not considering. With this amount removed from the analysis, that leaves $51,189.50 as the lodestar amount remaining for the disciplinary portion of the proceedings which is the focus of this analysis.

The Special Masters utilized the lodestar method in determining reasonable attorney's fees to be awarded. "The initial estimate of a reasonable attorney fee is reached by calculating the lodestar amount, which represents the number of hours reasonably expended multiplied by a reasonable hourly rate." *Dubray v. Intertribal Bison Cooperative*, 192 P.3d 604 (Colo. App. 2008). The lodestar method is presumptively reasonable. *See Homeward Bound, Inc. v. Hissom Mem'l Ctr.*, 963 F.2d 1352, 1353 (10th Cir. 1992*); Blanchard v. Bergeron*, 489 U.S. 87, 85 (1989). Under the lodestar method, the Commission argues that Counsel Schulze is entitled to $375/hour, Counsel Padilla is entitled to $385/hour, and paralegal Reynard is entitled to $155/hour. The Commission argues these numbers are equitable under *Balkind v. Telluride*, which holds that salaried public attorneys are awarded fees based upon the prevailing market rate instead of a calculation focused solely on the attorney's current salary. 8 P.3d 581, 588 (Colo. App. 2000). The Commission seeks an award of $51,189.50 for attorney's fees for the disciplinary proceeding. Counsel for Judge Scipione argues the attorney fees should be assessed considering the actual salaries/hourly rates the Special Counsel earns. Counsel determines the salaries of the Commission's attorneys and paralegal by consulting with a website from a watchdog organization called "GovSalaries" which is a salary database for government employees. This website allows a user to put the name of a government employee into the site and will provide the annual salary of the government employee by each year of employment. Respondent asserts that an award of attorney's fees greater than the earnings of the attorneys and paralegal is disproportionately punitive. However, there is no guarantee that the website accurately captures the salaries of these individuals.

Once the lodestar amount is determined, the Special Masters are permitted to adjust that amount upwards or downwards. *Balkind*, 8 P.3d at 588. *Balkind* provides a multitude of factors that the Special Masters may consider when adjusting the loadstar amount. These include the nature of the litigation, the level of skill involved, the degree of attention given, the success or

failure of the claims, the length of time necessary for effective representation, the existence or non-existence of a fee agreement, and awards ordered in similar cases.

The Special Masters accept the attorney and paralegal hours proposed by the Commission on the disciplinary proceedings as being reasonable upon review, specifically Paralegal Jennifer Reynard worked 103.80 hours on the disciplinary proceeding, Counsel Lucia Padilla worked 131.26 hours, and Counsel Leslie Schulze worked 136.51 hours. The salary the Commission has put forth is a reasonable hourly rate and, based on *Balkind,* the Special Masters do not find there is a basis to adjust the amount upwards or downwards. The nature of the litigation involved in this case and level of skill to handle the litigation is specialized and requires the attorneys and staff to dedicate attention to litigate their claims. The amount of time and hourly rate are reasonable. Thus, the Special Masters recommend the Commission be awarded $51,189.50 in attorney's fees.

Regarding costs, the request from the Commission is for $3,704.58 in costs which includes the portion of the case related to the disability proceedings. The disability proceedings were from August 4, 2022 through December 2, 2022. As previously explained, the Special Masters will not make recommendations on the disability portion but are willing to recommend costs related to the disciplinary proceedings. However, costs are not delineated in the information provided to the Special Masters. In their request, the Commission specifically states $270.73 in costs related to collecting medical records should be ordered as part of the disciplinary proceedings. There is no reasonable association between the medical related costs to the disciplinary action and when the Special Masters referred to the Exhibits provided, the amounts which support $3,704.58 were costs which did not have much explanation as to when they were incurred but rather when they were approved to be paid. These amounts in Exhibit 15 to the Commission's brief were paid between November 7, 2022 and November 29, 2022 which makes it unclear whether it was costs related to the disability proceedings. There was one cost paid in January 2023 but it was for Dr. Mack's examination which took place during the disability proceedings but was not paid until the disability proceedings had concluded. The date of payment does not conclusively indicate when the cost was incurred. The Special Masters find the Commission has not adequately provided a layout of the costs for the disciplinary portion of the proceedings specifically. Therefore, we do not recommend that costs be awarded to the Commission for the disciplinary portion of the proceedings.

## VI.     RECOMMENDATION

The Commission recommends Judge Scipione pay attorney's fees for the disciplinary proceedings as specified above.

Dated: August 14, 2023

On Behalf of the Special Masters:

Susan Blanco
Chief Judge, 8th Judicial District
Presiding Special Master

# OFFICE OF THE STATE COURT ADMINISTRATOR



**Steven Vasconcellos**
*State Court Administrator*

**Terri Morrison**
*Judicial Legal Counsel*

**DIRECTORS**

**Brenidy Rice**
*Court Services*

**Marty Galvin**
*Financial Services*

**Amy Burne**
*Human Resources*

**Glenn Tapia**
*Probation Services*

**ACTING DIRECTOR**

**Jason Bergbower**
*Information Technology
Services*

March 14, 2023

Christopher Gregory, Executive Director
Colorado Commission on Judicial Discipline
1300 Broadway, Suite 210
Denver, Colorado 80203

*Via email:* c.gregory@jd.state.co.us

Dear Mr. Gregory,

At your request, I am writing to inform you that the Judicial Department, through the 18th Judicial District, has settled one of the claims filed with the EEOC or CCRD in connection with the conduct of former Judge John Scipione. The claim was settled for $85,000.00. The district paid the full amount and State Risk Management has agreed to pay half of the amount back to the 18th Judicial District. The other claimant's case is going to mediation later this month.

Sincerely,

Terri S. Morrison

|  |
|---|
| Exhibit A |
| 21-138 & 22-112 |
| CCJD Colo. RJD |
| 36(g) Atty Fees Rqst |

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150<br><br>**Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | DATE FILED: February 26, 2024 |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Former Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel / Interim Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  j.walsh@jd.state.co.us<br>Atty. Reg. # 33762 | Case Number:  22SA236 & 22SA14 |
| **PARTIES' JOINT REQUEST FOR PROTECTIVE ORDER** | |

-1-

1. Filed concurrently with this motion, the Commission today files its formal recommendation for discipline in the above captioned matter, along with the record of proceedings.

2. Per Colo. RJD 6.5(a) and 37(c), the record shall be public.

3. However, a substantial portion of the record relates to a disability proceeding, and per Colo. RJD 33.5(i), all pleadings, briefs and evidence related to the disability proceeding must remain confidential.

4. Therefore, the Commission has filed two different records. One is labelled "Public Record," which contains all record materials that the parties have agreed are now public. The other is labelled "Private Record," which contains all the confidential materials that the parties agree must remain confidential, per Colo. RJD 33.5(i).

5. Based on the above, the parties hereby jointly submit that "good cause" exists for this court to issue a protective order with respect to the "Private Record," per Colo. RJD 6.5(a). Therefore, the parties hereby jointly request this court to issue a protective order with respect to the materials labelled, "Private Record."

Dated: February 26, 2024

_____
Jeffrey M. Walsh
Special Counsel / Interim Executive Director
Colorado Commission on Judicial Discipline

_____
Jane B. Cox, #45770
Counsel for Respondent

-2-

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150<br><br>**Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | DATE FILED: February 26, 2024 |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Former Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲  COURT USE ONLY  ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel / Interim Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  j.walsh@jd.state.co.us<br>Atty. Reg. # 33762 | Case Number:  22SA236 & 22SA14 |

**COMMISSION ON JUDICIAL DISCIPLINE'S RECOMMENDATION FOR PUBLIC DISCIPLINE AND AWARD OF FEES**

**Introduction and Procedural History**

This is a judicial discipline case in which former Judge John Scipione admitted to knowingly violating eight rules of the Colorado Code of Judicial Conduct (1) by abusing the prestige of his judicial office to seek, on at least three occasions, intimate relationships with lower-ranking or subordinate Judicial Department personnel, and (2) by abusing the prestige of his judicial office and engaging in *ex parte* communications with another judge, and that judge's clerk, to seek favorable treatment in a probate matter involving Scipione's father's estate. [Public Record, Stipulation dated 1/19/23, pp. 217-227]. As a result of Scipione's inappropriate attempts to seek intimate relationship with Judicial Department personnel, two sexual harassment lawsuits were filed against the 18th Judicial District, where Scipione was a judge. One case resulted in the 18th Judicial District paying a financial settlement of $85,000 and the other in the District paying a financial settlement of $45,000. [Public Record, pp. 254 & 275].

The litigation of this disciplinary case was both contentious and protracted. During the nearly one-year course of discovery and litigation (i.e. from October of 2021 to August of 2022), more evidence of Scipione's misconduct surfaced, which resulted in additional formal charges and, ultimately, Scipione's paid suspension from work. [Public Record, pp. 159-174, 178, 195-207]. Immediately after this court ordered Scipione's suspension in August of 2022, Scipione claimed disability under Colo. RJD 33.5, which halted the disciplinary proceedings against him indefinitely. [Private Record, pp. 1 - 4]. This claim of disability then created a second phase of litigation in which the parties litigated the merits

-2-

of Scipione's alleged disability for four months between August of 2022 and December of 2022. [Private Record, pp. 8 - 130]. Ultimately, in December of 2022, Scipione stipulated that he could not prove he was disabled under Colo. RJD 33.5, which ended the disability phase of the litigation and restarted the disciplinary proceedings. [Private Record, pp. 128-130].

To finally resolve this case, in January of 2023, Scipione entered into a stipulation with the Commission which dictated that he would resign as a judge and that he will be publicly censured by this court for his misconduct. [Public Record, pp. 217-227]. The stipulation, however, provided for a panel of three special masters to decide the following issues: (1) whether Judge Scipione, per Colo. RJD 36(h), should be required to repay the salary and benefits he received while on suspension; (2) whether Scipione, per Colo. RJD 36(g), should be required to pay the Commission's legal fees for the disciplinary phase of the litigation, and at market rate; and (3) whether Scipione, per Colo. RJD  36(g), should be required to pay the Commission's legal fees for the disability phase of the litigation, and at market rate. [*Id.*].

After the parties briefed the above matters, the special masters made the following findings and recommendation. First, the special masters held that Scipione should not be required to repay his salary and benefits while on suspension, holding that the specificity of Colo. RJD 34(a) (requiring paid suspension) and Colo. Const. Art. VI, § 23(3)(f) (requiring judge to be paid until formally removed) trumps the catch-all disciplinary authority provision of Colo. RJD 36(h), upon which the People relied in support of their

-3-

claim. Second, the special masters held that, given the severity and repetitive nature of Scipione's misconduct, he should be required to pay the Commission's legal fees, at market rate, for the disciplinary phase of the litigation (totaling $51,189.50). Third, the special masters declined to rule on whether Scipione should be ordered to pay the Commission's legal feels for the disability phase of litigation, holding that the record was not sufficiently complete to make findings on that issue. [Public Record, pp. 262-274].

### The Commission's Recommendation per Colo. RJD 37(a)

The Commission hereby recommends that this court adopt the stipulation for public censure, dated January 19, 2023, by which the parties agreed that Scipione will be publicly censured for violating Canon Rules 1.1, 1.2, 1.3, 2.16, 2.3, 2.8, 2.9, and 4.1. The Commission also recommends that this court adopt the findings and recommendation of the special masters issued on August 24, 2023 – in particular, the finding that Scipione should pay the Commission's $51,189.50 in legal fees for the disciplinary phase of the litigation, and at market rate, as required by well-accepted caselaw in this state.[1] *See Balkind v. Telluride,* 8 P.3d 581, 588 (Colo. App. 2000) (Salaried public attorneys are awarded fees based upon the prevailing market rate, not a calculation focused on the attorney's salary.). The Commission does not here contest the special masters' ruling regarding Scipione's repayment of salary and benefits while he was suspended from work.

---

[1] This court must "uphold the special masters' findings of fact unless, after considering the record as a whole, [it] concludes that they are clearly erroneous or unsupported by substantial evidence." *Matter of Booras,* 2019 CO 16, ¶ 18. Conclusions of law, on the other hand, are reviewed de novo. *Id.*

Moreover, the Commission now abandons its position that Scipione should be required to pay its legal fees for the disability phase of the litigation, but reserves the right to pursue such reimbursement in other cases, if appropriate.

### The Record of Proceedings – One Public, One Private

Per Colo. RJD 6.5(a) and 37(c), the record of proceedings in this case must become public upon the filing of this recommendation with this court. However, a substantial portion of the record pertains to the disability phase of the litigation, and per Colo. RJD 33.5(i), all pleadings, briefs, and evidence related to the claim of disability must remain confidential. Given this, the Commission is filing two records with this court – one public, one private. To protect Scipione's privacy rights, the Commission has conferred with Scipione's counsel, and the parties have agreed what materials may be made part of the public record and what materials must remain private and filed under seal.

### Conclusion

This is a serious case that involves a judge who, over the course of a decade, abused his status as a judge to seek inappropriate intimate relationships with judicial department employees and staff, some of them his direct subordinates. The harm he has caused to the public confidence in, and the integrity of, Colorado's judiciary – though not easily quantifiable – is substantial. What is quantifiable, however, is the financial harm. Scipione's conduct directly resulted in the payment of $130,000 in public funds to settle two sexual harassment lawsuits against him.

It is because of the severity of this misconduct that the Commission now recommends this court to order Scipione to pay the Commission's attorneys' fees from the disciplinary phase of the case. However, even though the Commission now abandons its request for fees in the disability phase of the case, it urges this court to nevertheless review the briefs filed by the People in support of fees in the disability phase. [Private Record, pp. 131, 143, 347, and 384]. This is because, ultimately, this court's decision on fees, per Colo. RJD 36(g), is an equitable one. Thus, it should consider not only the nature of the misconduct but the manner in which Scipione chose to litigate this case, including the merits of his various claims and defenses in both the disciplinary and disability phases of the case. The Commission is confident that, upon a full review of the record, this court will deem it appropriate to adopt the following recommendations: (1) that when judicial misconduct is as serious and prolonged as it is here, an award of fees is appropriate, (2) that when dubious litigation tactics are employed for strategic advantage, an award of fees is appropriate, and (3) that when fees are awarded, they should be charged at market rate, consistent with the precedent established in *Balkind v. Telluride,* 8 P.3d at 588, which held that salaried public attorneys are awarded fees based upon the prevailing market rate, not a calculation focused on the attorney's salary.

For the foregoing reasons, the Commission hereby requests this court to adopt the findings of fact and conclusions of law in the special masters' recommendation for discipline, dated August 24, 2023. The Commission also recommends that this court adopt the stipulation for public censure, dated January 19, 2023, by which the parties agreed that

-6-

-7-

Scipione will be publicly censured for violating Canon Rules 1.1, 1.2, 1.3, 2.16, 2.3, 2.8, 2.9, and 4.1.

DATED:  February 26, 2024

Respectfully submitted,

*Jeffrey M. Walsh*

_____
Jeffrey M. Walsh
Special Counsel / Interim Executive Director
Colorado Commission on Judicial Discipline

## CERTIFICATE OF SERVICE

       I certify that on February 26, 2024, a true and correct copy of the foregoing RECOMMENDATION was filed with the Court and served via the Colorado Courts E-Filing system upon the following persons:

Attorneys for Respondent:

John S. Gleason, Atty. Reg. #15011
Jane Cox, Atty. Reg. #45770
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111

By: _____
      Jeffrey M. Walsh, Reg. #33762

-8-

| | |
|---|---|
| SUPREME COURT, STATE OF COLORADO<br><br>*ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE*<br><br>1300 Broadway, Suite 210<br>Denver, Colorado 80203 | DATE FILED: February 27, 2024 |
| In re the Matter of<br><br>THE PEOPLE OF THE STATE OF COLORADO,<br>Complainant,<br><br>And<br><br>JOHN E. SCIPIONE, a Former Judge of the Arapahoe County Court,<br>Respondent | **COURT USE ONLY** |
| | Case: 2022SA236/2022SA14 |
| **UPDATE** | |

The Supreme Court had ordered the Special Masters to provide an update by February 26, 2024. The Special Masters had provided recommendations on this matter to the Commission on August 24, 2023. Since that date, the Special Masters have not been involved further with this matter.

Date: February 26, 2024

On Behalf of the Special Masters:

_____

Susan Blanco
Chief Judge, 8th Judicial District
Presiding Special Master

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: February 27, 2024 11:31 AM |
| Original Proceeding in Discipline | |
| Colorado Commission on Judicial Discipline 21-138 and 22-112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | ⚠ **COURT USE ONLY** ⚠ |
| | Case Number:<br>2022SA236 |
| **Order** | |

ISSUED.

The Court having received the attached status update from the presiding special master, Chief Justice Susan Blanco, hereby notifies all parties that the status update is accepted for filing into this matter.

THEREFORE, the request to vacate this court.s order for a status update from the special masters is denied as MOOT.

BY THE COURT, THIS 27th day of FEBRUARY, 2024.  EN BANC. CHIEF JUSTICE BOATRIGHT AND JUSTICE SAMOUR DO NOT PARTICIPATE.

Issue      2/27/2024

BY THE COURT

| | |
|---|---|
| SUPREME COURT, STATE OF COLORADO<br><br>*ORIGINAL PROCEEDING IN DISCIPLINE BEFORE THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE*<br><br>1300 Broadway, Suite 210<br>Denver, Colorado 80203 | DATE FILED: February 27, 2024 |
| In re the Matter of<br><br>THE PEOPLE OF THE STATE OF COLORADO,<br>Complainant,<br><br>And<br><br>JOHN E. SCIPIONE, a Former Judge of the Arapahoe County Court,<br>Respondent | **COURT USE ONLY** |
| | Case: 2022SA236/2022SA14 |
| **UPDATE** | |

The Supreme Court had ordered the Special Masters to provide an update by February 26, 2024. The Special Masters had provided recommendations on this matter to the Commission on August 24, 2023. Since that date, the Special Masters have not been involved further with this matter.

Date: February 26, 2024

On Behalf of the Special Masters:

SpBlanco

_____

Susan Blanco
Chief Judge, 8th Judicial District
Presiding Special Master

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: February 27, 2024 |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 21-138 and 22-112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236<br>& 2022SA14 |
| ORDER OF COURT | |

Upon consideration of the Parties' Joint Request for Protective Order, and

now being sufficiently advised in the premises,

IT IS ORDERED said Parties' Joint Request for Protective Order Parties'

Joint Request for Protective Order is GRANTED.

BY THE COURT, THIS 27th day of FEBRUARY, 2024.  EN BANC.
CHIEF JUSTICE BOATRIGHT AND JUSTICE SAMOUR DO NOT
PARTICIPATE.

| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: March 18, 2024 |
|---|---|
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 21-138 and 22-112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236<br>& 2022SA14 |
| ORDER OF COURT | |

Upon consideration of the Parties' Joint Request for Extension of Time to Submit Exceptions filed in the above cause, and now being sufficiently advised in the premises,

IT IS ORDERED that said Motion shall be, and the same hereby is, GRANTED TO AND INCLUDING MARCH 25, 2024.

BY THE COURT, MARCH 18, 2024.

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | DATE FILED: March 18, 2024 12:38 PM |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>    and<br><br>JOHN E. SCIPIONE, A Former Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| **Colorado Commission on Judicial Discipline:**<br>Jeffrey M. Walsh, Atty. Reg. #33762<br>Special Counsel / Interim Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  j.walsh@jd.state.co.us<br><br>**Attorneys for Respondent:**<br>John S. Gleason, #15011<br>Jane B. Cox, #45770<br>Burns, Figa & Will, P.C.<br>6400 S. Fiddler's Green Circle, Suite 1000<br>Greenwood Village, Colorado 80111<br>Phone: 303-796-2626<br>Email: jgleason@bfwlaw.com; jcox@bfwlaw.com | Case Number:  22SA236 & 22SA14 |
| **PARTIES' JOINT REQUEST FOR EXTENSION OF TIME TO SUBMIT EXCEPTIONS** | |

-1-

1.     The Colorado Commission on Judicial Discipline ("the Commission) submitted its Recommendation for Public Discipline and Award of Fees ("Recommendations") in this matter pursuant to Colo. RJD 37(a), on February 26, 2024.

2.     Accordingly, pursuant to Colo. RJD 38, any Exceptions to the Recommendations must be filed within twenty-one (21) days, which elapses on March 18, 2024.

3.     At present, Respondent believes grounds exist to support Exceptions to the Recommendations.

4.     However, the parties have engaged in some negotiations which, if fruitful in producing an agreement, may obviate the need for Respondent to submit Exceptions.

5.     The parties respectfully request an extension of time of the Exceptions deadline, to and through March 25, 2024, to continue to negotiate resolution of the present dispute.

6.     The request for an extension of time is not interposed for any inappropriate purpose such as delay.  Neither party shall be prejudiced by the extension of the Exceptions deadline; rather, judicial economy will be promoted if the parties are able to focus on the ongoing negotiations to eliminate the need for additional litigation and Court involvement.

WHEREFORE, the parties submit that good cause exists to extend the deadline for Respondent to submit any Exceptions to the Commission's Recommendations.  The parties

-2-

request that the Court grant this request for an extension of time and enter any other orders

that the Court deems necessary and just.


Dated: March 18, 2024




/s/ Jeffrey M. Walsh

_____          _____
Jeffrey M. Walsh, #33762                  John S. Gleason, #15011
Special Counsel / Interim Executive Director    Jane B. Cox, #45770
Colorado Commission on Judicial Discipline    Counsel for Respondent

-3-

<table>
<tr><td>

**Colorado Supreme Court**
2 East 14th Avenue
Denver, CO 80203
Phone Number: 720-625-5150

**Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**

Colorado Commission on Judicial Discipline
Case Nos. 21-138 and 22-112

</td><td>

DATE FILED: March 22, 2024

</td></tr>
<tr><td>

IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,

Complainant,

   and

JOHN E. SCIPIONE, A Former Judge of the Arapahoe County District Court,

Respondent.

</td><td>

▲ COURT USE ONLY ▲

</td></tr>
<tr><td>

**Colorado Commission on Judicial Discipline:**

Jeffrey M. Walsh, esq.
Special Counsel / Interim Executive Director
Ralph L. Carr Colorado Judicial Center
1300 Broadway, Suite 210
Denver, CO 80203
Phone: 303-457-5131
Email: j.walsh@jd.state.co.us
Atty. Reg. # 33762

</td><td>

Case Number: 22SA236 & 22SA14

</td></tr>
<tr><td colspan="2">

**COMMISSION ON JUDICIAL DISCIPLINE'S MOTION TO STRIKE ITS ORIGINAL RECOMMENDATION FOR DISCIPLINE AND TO ACCEPT UPDATED RECOMMENDATION FOR DISCIPLINE**

</td></tr>
</table>

1. The Commission on Judicial Discipline ("the Commission") hereby requests this Court to strike its Recommendation for Discipline filed on February 26, 2024. In its stead, the Commission requests this Court to accept its updated Recommendation for Discipline, which is filed concurrently with this motion.

2. The updated Recommendation for Discipline is no different in substance from the original Recommendation. There are, however, minor line edits to the Conclusion in the updated Recommendation. Thus, the filing of an updated Recommendation in no way prejudices Respondent. Indeed, undersigned counsel has conferred with Respondent's counsel about this request, and Respondent's counsel actually joins in this request, as indicated in the accompanying Notification filed concurrently with this motion.

3. The filing of the updated Recommendation will not delay this Court's consideration of this case. Also filed concurrently with this motion is a jointly submitted notification to this Court that Respondent will not be filing exceptions to the Commission's updated Recommendation, per Colo. RJD 38, thus making the case formally at issue so that this Court may now decide upon the matter.

4. For the above reasons, the Commission respectfully requests this Court to strike its original Recommendation for Discipline, dated February 26, 2024, and to accept in its stead the updated Recommendation for Discipline filed concurrently with this motion.

DATED:  March 22, 2024

Respectfully submitted,

*Jeffrey M. Walsh*

_____
Jeffrey M. Walsh
Special Counsel / Interim Executive Director
Colorado Commission on Judicial Discipline

-3-

**CERTIFICATE OF SERVICE**

I certify that on March 22, 2024, a true and correct copy of the foregoing
MOTION was filed with the Court via email to Court Clerk Cheryl Stevens at
cheryl.stevens@judicial.state.co.us and served via email upon the following persons:

Attorneys for Respondent:

John S. Gleason, Atty. Reg. #15011
jgleason@bfwlaw.com
Jane Cox, Atty. Reg. #45770
jcox@bfwlaw
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111

By: _____
Jeffrey M. Walsh, Reg. #33762

-4-

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150<br><br>**Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | DATE FILED: March 22, 2024 |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>       and<br><br>JOHN E. SCIPIONE, A Former Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲  COURT USE ONLY  ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel / Interim Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  j.walsh@jd.state.co.us<br>Atty. Reg. # 33762 | Case Number:  22SA236 & 22SA14 |
| **PARTIES' JOINT NOTIFICATION THAT, IF THIS COURT ACCEPTS THE COMMISSION'S UPDATED RECOMMENDATION, THIS CASE MAY NOW BE DEEMED AT ISSUE AND MAY BE DECIDED UPON BY THE COURT** | |

-1-

1.  The Parties hereby jointly request that this Court grant the Commission's request to strike its original Recommendation for Discipline, dated February 26, 2024, and to accept in its stead the updated Recommendation for Discipline filed concurrently with this Notice.

2.  If the Court strikes the Commission's original Recommendation and accepts the updated Recommendation, Respondent will not file any exceptions to the updated Recommendation, per Colo. RJD 38. Thus, neither party will be making any additional filings into this case, which makes the case formally at issue before this Court so that it may decide upon this matter when its docket permits.

DATED:  March 22, 2024

*/s/ Jeffrey M. Walsh*

_____
Jeffrey M. Walsh, #33762
Special Counsel / Interim Executive Director
Colorado Commission on Judicial Discipline

*/s/ Jane B. Cox*

_____
John S. Gleason, #15011
Jane B. Cox, #45770
Counsel for Respondent

-2-

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | DATE FILED: March 22, 2024 |
| **Original Proceeding Pursuant to Colorado Constitution Article VI, § 23**<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br><br>Complainant,<br><br>        and<br><br>JOHN E. SCIPIONE, A Former Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲  COURT USE ONLY  ▲ |
| **Colorado Commission on Judicial Discipline:**<br><br>Jeffrey M. Walsh, esq.<br>Special Counsel / Interim Executive Director<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, Suite 210<br>Denver, CO 80203<br>Phone:  303-457-5131<br>Email:  j.walsh@jd.state.co.us<br>Atty. Reg. # 33762 | Case Number:  22SA236 & 22SA14 |
| **COMMISSION ON JUDICIAL DISCIPLINE'S UPDATED RECOMMENDATION FOR PUBLIC DISCIPLINE AND AWARD OF FEES** | |

### Introduction and Procedural History

This is a judicial discipline case in which former Judge John Scipione admitted to knowingly violating eight rules of the Colorado Code of Judicial Conduct (1) by abusing the prestige of his judicial office to seek, on at least three occasions, intimate relationships with lower-ranking or subordinate Judicial Department personnel, and (2) by abusing the prestige of his judicial office and engaging in *ex parte* communications with another judge, and that judge's clerk, to seek favorable treatment in a probate matter involving Scipione's father's estate. [Public Record, Stipulation dated 1/19/23, pp. 217-227]. As a result of Scipione's inappropriate attempts to seek intimate relationship with Judicial Department personnel, two sexual harassment lawsuits were filed against the 18th Judicial District, where Scipione was a judge. One case resulted in the 18th Judicial District paying a financial settlement of $85,000 and the other in the District paying a financial settlement of $45,000. [Public Record, pp. 254 & 275].

The litigation of this disciplinary case was both contentious and protracted. During the nearly one-year course of discovery and litigation (i.e. from October of 2021 to August of 2022), more evidence of Scipione's misconduct surfaced, which resulted in additional formal charges and, ultimately, Scipione's paid suspension from work. [Public Record, pp. 159-174, 178, 195-207]. Immediately after this court ordered Scipione's suspension in August of 2022, Scipione claimed disability under Colo. RJD 33.5, which halted the disciplinary proceedings against him indefinitely. [Private Record, pp. 1 - 4]. This claim of disability then created a second phase of litigation in which the parties litigated the merits

-2-

of Scipione's alleged disability for four months between August of 2022 and December of 2022. [Private Record, pp. 8 - 130]. Ultimately, in December of 2022, Scipione stipulated that he could not prove he was disabled under Colo. RJD 33.5, which ended the disability phase of the litigation and restarted the disciplinary proceedings. [Private Record, pp. 128-130].

To finally resolve this case, in January of 2023, Scipione entered into a stipulation with the Commission which dictated that he would resign as a judge and that he will be publicly censured by this court for his misconduct. [Public Record, pp. 217-227]. The stipulation, however, provided for a panel of three special masters to decide the following issues: (1) whether Judge Scipione, per Colo. RJD 36(h), should be required to repay the salary and benefits he received while on suspension; (2) whether Scipione, per Colo. RJD 36(g), should be required to pay the Commission's legal fees for the disciplinary phase of the litigation, and at market rate; and (3) whether Scipione, per Colo. RJD  36(g), should be required to pay the Commission's legal fees for the disability phase of the litigation, and at market rate. [*Id.*].

After the parties briefed the above matters, the Special Masters made the following findings and recommendation. First, the Special Masters held that Scipione should not be required to repay his salary and benefits while on suspension, holding that the specificity of Colo. RJD 34(a) (requiring paid suspension) and Colo. Const. Art. VI, § 23(3)(f) (requiring judge to be paid until formally removed) trumps the catch-all disciplinary authority provision of Colo. RJD 36(h), upon which the People relied in support of their

-3-

claim. <u>Second</u>, the Special Masters held that, given the severity and repetitive nature of Scipione's misconduct, he <u>should</u> be required to pay the Commission's legal fees, at market rate, for the disciplinary phase of the litigation (totaling $51,189.50). <u>Third</u>, the Special Masters declined to rule on whether Scipione should be ordered to pay the Commission's legal fees for the disability phase of litigation, holding that the record was not sufficiently complete to make findings on that issue. [Public Record, pp. 262-274].

### The Commission's Recommendation per Colo. RJD 37(a)

The Commission hereby recommends that this court adopt the stipulation for public censure, dated January 19, 2023, by which the parties agreed that Scipione will be publicly censured for violating Canon Rules 1.1, 1.2, 1.3, 2.16, 2.3, 2.8, 2.9, and 4.1. The Commission also recommends that this court adopt the findings and recommendation of the Special Masters issued on August 24, 2023 – in particular, the finding that Scipione should pay the Commission's $51,189.50 in legal fees for the disciplinary phase of the litigation, and at market rate, as required by well-accepted caselaw in this state.[1] *See Balkind v. Telluride,* 8 P.3d 581, 588 (Colo. App. 2000) (Salaried public attorneys are awarded fees based upon the prevailing market rate, not a calculation focused on the attorney's salary.). The Commission does not here contest the Special Masters' ruling regarding Scipione's repayment of salary and benefits while he was suspended from work.

---

[1] This court must "uphold the special masters' findings of fact unless, after considering the record as a whole, [it] concludes that they are clearly erroneous or unsupported by substantial evidence." *Matter of Booras,* 2019 CO 16, ¶ 18. Conclusions of law, on the other hand, are reviewed de novo. *Id.*

Moreover, the Commission now abandons its position that Scipione should be required to pay its legal fees for the disability phase of the litigation, but reserves the right to pursue such reimbursement in other cases, if appropriate.

### The Record of Proceedings – One Public, One Private

Per Colo. RJD 6.5(a) and 37(c), the record of proceedings in this case must become public upon the filing of this recommendation with this court. However, a substantial portion of the record pertains to the disability phase of the litigation, and per Colo. RJD 33.5(i), all pleadings, briefs, and evidence related to the claim of disability must remain confidential. Given this, the Commission is filing two records with this court – one public, one private. To protect Scipione's privacy rights, the Commission has conferred with Scipione's counsel, and the parties have agreed what materials may be made part of the public record and what materials must remain private and filed under seal.

### Conclusion

This is a serious case that involves a judge who, over the course of a decade, abused his status as a judge to seek inappropriate intimate relationships with judicial department employees and staff, some of them his direct subordinates. The harm he has caused to the public confidence in, and the integrity of, Colorado's judiciary – though not easily quantifiable – is substantial. What is quantifiable, however, is the financial harm. Scipione's conduct directly resulted in the payment of $130,000 in public funds to settle two sexual harassment lawsuits against him.

-5-

It is because of the severity of this misconduct that the Commission now recommends this court to order Scipione to pay the Commission's attorneys' fees from the disciplinary phase of the case. However, even though the Commission now abandons its request for fees in the disability phase of the case, it urges this court to nevertheless review the briefs filed by the parties in the fee dispute in the disability phase. [Private Record, pp. 131, 143, 315, 326, 347, and 384]. This is because, ultimately, this court's decision on fees, per Colo. RJD 36(g), is an equitable one. Thus, it should consider the nature of the misconduct, including the merits of the various claims and defenses in both the disciplinary and disability phases of the case. The Commission is confident that, upon a full review of the record, this court will deem it appropriate to adopt the following recommendations: (1) that when judicial misconduct is as serious and prolonged as it is here, an award of fees is appropriate, and (2) that when fees are awarded, they should be charged at market rate, consistent with the precedent established in *Balkind v. Telluride,* 8 P.3d at 588, which held that salaried public attorneys are awarded fees based upon the prevailing market rate, not a calculation focused on the attorney's salary.

For the foregoing reasons, the Commission hereby requests this court to adopt the findings of fact and conclusions of law in the Special Masters' recommendation for discipline, dated August 24, 2023. The Commission also recommends that this court adopt the stipulation for public censure, dated January 19, 2023, by which the parties agreed that Scipione will be publicly censured for violating Canon Rules 1.1, 1.2, 1.3, 2.16, 2.3, 2.8, 2.9, and 4.1.

-6-

DATED:  March 22, 2024

Respectfully submitted,

*Jeffrey M. Walsh*

_____

Jeffrey M. Walsh
Special Counsel / Interim Executive Director
Colorado Commission on Judicial Discipline

-7-

-8-

## CERTIFICATE OF SERVICE

I certify that on March 22, 2024, a true and correct copy of the foregoing MOTION was filed with the Court via email to Court Clerk Cheryl Stevens at cheryl.stevens@judicial.state.co.us and served via email upon the following persons:

Attorneys for Respondent:

John S. Gleason, Atty. Reg. #15011
jgleason@bfwlaw.com
Jane Cox, Atty. Reg. #45770
jcox@bfwlaw
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Cir., Suite 1000
Greenwood Village, CO 80111

By: _____
Jeffrey M. Walsh, Reg. #33762

-8-

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: March 25, 2024 |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline 21-138 and 22-112 | |
| In the Matter of John E. Scipione, a Judge of the Arapahoe County District Court. | |
| | Supreme Court Case No:<br>2022SA236<br>& 2022SA14 |
| ORDER OF COURT | |

Upon consideration of the Commission on Judicial Discipline's motion to strike its original recommendation for discipline submitted on February 26, 2024, and to accept its updated recommendation for discipline (filed concurrently with its March 22, 2024 motion); and the parties' joint notification that former Judge Scipione will not file exceptions to the Commission's updated recommendation,

IT IS ORDERED that the Commission's motion to strike its original recommendation for discipline submitted on February 26, 2024 is GRANTED. The original recommendation shall be STRICKEN and replaced with the Commission's March 22, 2024 updated recommendation for discipline and award of certain attorney's fees.

IT IS FURTHER ORDERED that this Court ACCEPTS the parties' joint notification that former Judge Scipione will not be filing exceptions to the Commission's updated recommendation. The case now stands at issue.

BY THE COURT, MARCH 25, 2024
CHIEF JUSTICE BOATRIGHT and JUSTICE SAMOUR do not participate.

| | |
|---|---|
| **Colorado Supreme Court**<br>2 East 14th Avenue<br>Denver, CO 80203<br>Phone Number: 720-625-5150 | DATE FILED: April 02, 2024 3:09 PM |
| Original Proceeding Pursuant to Colorado Constitution Article VI, § 23<br><br>Colorado Commission on Judicial Discipline<br>Case Nos. 21-138 and 22-112 | |
| IN RE THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO,<br>Complainant,<br><br>        and<br><br>JOHN E. SCIPIONE, a Former Judge of the Arapahoe County District Court,<br><br>Respondent. | ▲ COURT USE ONLY ▲ |
| PHILIP J. WEISER<br>Attorney General<br>HEATHER K. KELLY, # 36052<br>First Assistant Attorney General<br>Civil Litigation and Cross Unit Litigation Team<br>Colorado Department of Law<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, 10th Floor<br>Denver, Colorado 80203<br>*Counsel of Record<br>Telephone: (720) 508-6593<br>Email:  Heather.Kelly@coag.gov | Case: 2022SA236 and 2022SA14 |
| **NOTICE OF WITHDRAWAL OF COUNSEL** | |

Former Counsel for Complainant Colorado Commission on Judicial Discipline in the underlying Judicial Discipline matters, hereby provides

notice of the withdrawal of attorneys Lucia Padilla (Atty. Reg. No. 35150) and Leslie Schulze (Atty. Reg. No. 43685), pursuant to Colo. R. Civ. P. 121, § 1-1(2)(a). Ms. Padilla and Ms. Schulze represented the Colorado Commission on Judicial Discipline in the underlying Judicial Discipline matters, Case Nos. 21-138 and 22-112. Both Ms. Padilla and Ms. Schulze left the Colorado Attorney General's Office last year. Undersigned provides this Notice based on continued service of process to Ms. Padilla and Ms. Schulze and at the request of current counsel to Complainant Jeffrey Walsh.

Special Counsel Jeffrey Walsh remains as active counsel of record for Complainant Colorado Commission on Judicial Discipline. The undersigned certifies that former counsel have complied with all outstanding orders of the Court and have provided notification of the notice of withdrawal by the means detailed in the certificate of service below.

Respectfully submitted this 2nd day of April, 2024.

PHILIP J. WEISER
Attorney General

*s/ Heather K. Kelly*
HEATHER K. KELLY, #36052*
First Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that on April 2, 2024, a true and correct copy of the foregoing **NOTICE OF WITHDRAWAL OF COUNSEL** served via CCES upon the following persons:

John S. Gleason, esq.
Janie B. Cox, esq.
Burns, Figa, & Will, P.C.
6400 South Fiddler's Green Cir.,
Ste. 1000
Greenwood Village, CO 80111

Jeffrey M. Walsh, esq.
Special Counsel / Interim
Executive Director
Ralph L. Carr Colorado Judicial
Center
1300 Broadway, Suite 210

*Attorneys for Respondent Judge*
*John E. Scipione*

Denver, CO 80203

Phone: 303-457-5131

*Attorneys for Complainant*
*Colorado Commission on Judicial*
*Discipline*


By:  *s/ Jennifer Reynard*
      Jennifer Reynard



*news*

Colorado Judicial Department
Brian D. Boatright, Chief Justice
Steven Vasconcellos, State Court Administrator

FOR IMMEDIATE RELEASE
Jan. 24, 2023

Contact: Robert McCallum or Jon Sarché
720-625-5815
720-625-5811
robert.mccallum@judicial.state.co.us
jon.sarche@judicial.state.co.us

### 18th Judicial District announces District Court vacancy
*Commission sets date to select nominees*

The Eighteenth Judicial District Nominating Commission will meet at the Arapahoe County Justice Center on Feb. 17, 2023, to interview and select nominees for appointment by the governor to the office of district judge for the Eighteenth Judicial District (Arapahoe, Douglas, Elbert and Lincoln counties). The vacancy, which occurred on Jan. 19, 2023, was created by the resignation of the Hon. John Scipione.

To be eligible, the applicant must be a qualified elector of the Eighteenth Judicial District at the time of investiture and must have been admitted to the practice of law in Colorado for five years. The current annual salary for this position is $183,816. The initial term of office of a district judge is a provisional term of two years; thereafter, the incumbent district judge, if approved by the voters, has a term of six years.

Application forms are available from the office of the ex officio chair of the nominating commission, Justice Carlos A. Samour Jr., 2 E. 14th Ave., Denver, CO 80203; and the office of the court executive, Shaun Clark, 7325 S. Potomac St., Centennial, CO 80112. Applications also are available on the court's home page at http://www.courts.state.co.us/Careers/Judge.cfm.

The completed application must be e-mailed to the address listed in the instructions below no later than 4 p.m. on Feb. 7, 2023. Late applications will not be considered. Any person

wishing to suggest a candidate to fill the vacancy may do so by letter to be submitted to any

member of the nominating commission, with a copy to the ex officio chair, no later than 4 p.m.

on Feb. 6, 2023.

The members of the nominating commission for the Eighteenth Judicial District are:

Tracie Keesee of Elizabeth; Becky Hogan and Eric Nesbitt, both of Aurora; Stephen Burg of

Lone Tree; Troy Porras of Parker; Louis Martin of Rush; and Emily Valdez of Centennial.

**Editor's Note:** Contact information for the nominating commission members.
- Tracie Keesee, tdoctor45@yahoo.com
- Becky Hogan, bhedgeconsulting@yahoo.com
- Stephen Burg, sburg@burgsimpson.com
- Troy Porras, troyporras@gmail.com
- Eric Nesbitt, eric@nesbittlawoffices.com
- Louis Martin, louis@roundriver.biz
- Emily Valdez, emily.valdez@coloradodefenders.us

*This information is provided as an e-mail service of the Colorado State Judicial Department, Office of State Court Administrator, 1300 Broadway, Suite 1200, Denver, CO 80203. To discontinue this service or update your e-mail address, please respond to this message with your name, contact information and any comments.*

# Appendix 23

# Colorado Supreme Court Filings in *Matter of Gunkel*, 2021 CO 30.

| | |
|---|---|
| SUPREME COURT, STATE OF COLORADO<br><br>ORIGINAL PROCEEDING IN JUDICIAL DISCIPLINE<br><br>2 East 14th Avenue<br>Denver, Colorado 80203<br><br>In the Matter of the People of the State of Colorado, by and through the Colorado Commission on Judicial Discipline, and Judge Debra M. Gunkel, Respondent | DATE FILED: December 04, 2020<br>FILED IN THE<br>SUPREME COURT<br><br>DEC 04 2020<br><br>OF THE STATE OF COLORADO<br>Cheryl L. Stevens, Clerk |
| William J. Campbell<br>Executive Director<br>Colorado Commission on Judicial Discipline<br>1300 Broadway, Suite 210<br>Denver, Colorado 80203<br>Telephone: (303) 457-5131<br>Email: w.campbell@jd.state.co.us | ▲ COURT USE ONLY ▲<br><br>CCJD Case Number: 18-173<br><br>Supreme Court Number:<br>20SA409 |
| STIPULATED DISPOSITION | |

The Colorado Commission on Judicial Discipline, having commenced disciplinary proceedings to consider allegations of misconduct by Respondent, hereby stipulates with Respondent to the following Findings of Fact, in lieu of the Court appointing three special masters to issue findings and conclusions following a hearing in formal proceedings pursuant to Colo. RJD 26 and 32:

1. Respondent has been serving as a 20 per cent part-time Baca County Judge.

2. On January 14, 2018, Respondent, in Case No. 2018T54, was charged with Driving Under the Influence of Alcohol in neighboring Prowers County. Upon her arrest, her preliminary blood alcohol content was 0.137. According to the Arrest Report, Respondent told the two arresting officers that she was a judge and asked if they could just take her home. Respondent asserts she did not make this statement.

3. On November 9, 2018, Respondent entered a plea of guilty to DUI and Careless Driving. She was fined $100 for Careless Driving. On the DUI charge, she received a deferred sentence of two years involving probation, community service, and abstention from alcohol. She served a driver's license revocation followed by a requirement for two years

to operate only those vehicles equipped with an ignition interlock device that would monitor her blood alcohol content.

4. On August 17, 2019, Respondent was arrested in Kansas and charged with Driving Under the Influence of Alcohol. In noting the restriction on her driver's license, the arresting officer also charged her with failure to have an interlock device operating in her vehicle. Her preliminary blood alcohol test registered 0.164. The charges were filed in Greeley County Case No. 2019TR89.

5. In light of concerns about whether litigants might question Respondent's impartiality and fairness, having been charged with DUI, the Chief Judge in the 15th Judicial District ordered that no DUI or probation revocation cases would be assigned to her.

6. On May 7, 2020, with a senior judge from outside Prowers County presiding over the proceedings, Respondent admitted that her arrest in Kansas violated the terms of the Prowers County deferred sentence. The Judge then revoked her deferred sentence and entered a conviction for DUI. She was sentenced to 48 hours of public service, alcohol evaluation, probation, and payment of fines and fees of totaling $1924.50.

7. On June 8, 2020, Respondent pleaded guilty and was convicted under Kansas law of Driving Under the Influence of Alcohol Second Offense. On June 22, 2020, she was sentenced to twelve months of supervised probation; 90 days in jail, which was suspended upon serving 48 consecutive hours of confinement and 120 hours of house arrest; and ordered to pay fines and fees of $1,903.00.

Based on the foregoing Findings of Fact, the Commission and the Respondent agree that:

a. Respondent shall serve a voluntary temporary suspension from her judicial duties, with pay, pursuant to Colo. RJD 34(c), from January 1, 2021 through January 31, 2021;

b. Respondent shall retire from her judicial office as of February 1, 2021;

c. The Commission, within 7 days after the filing of these Stipulated Findings of Fact, shall file with the Court, pursuant to Colo. RJD 37(a), a Recommendation to the Supreme Court that in addition to the suspension and retirement included in this stipulation that the Court publically censure Respondent; and

d. Respondent shall within 10 days following the filing of the Recommendation submit her recommendation that the additional sanction should be a private reprimand, and the Commission may file a Reply within 5 days.

e. The Court shall determine whether the additional sanction shall be that recommended by the Commission or by Respondent but impose no sanction less than proposed by Respondent nor greater than recommended by the Commission.

2

Respondent waives her rights to a hearing in formal proceedings and an appeal.

Done this 4ᵗʰ day of December, 2020.

_____
Debra M. Gunkel, Respondent

_____
Abraham V. Hutt, Counsel to Respondent
Attorney Reg. No. 14137

Colorado Commission on Judicial Discipline

By: _____
William J. Campbell, Executive Director
Attorney Reg. No. 472

SUPREME COURT, STATE OF COLORADO
ORIGINAL PROCEEDING IN JUDICIAL DISCIPLINE

2 East 14th Avenue
Denver, Colorado 80203

In the matter of:

DEBRA M. GUNKEL

William J. Campbell
Executive Director
Colorado Commission on Judicial Discipline
1300 Broadway, Suite 210
Denver, Colorado 80203
Telephone: (303) 457-5131
Email: w.campbell@jd.state.co.us

FILED IN THE
DATE FILED: December 08, 2020

DEC 0 8 2020

OF THE STATE OF COLORADO
Cheryl L. Stevens, Clerk

▲ COURT USE ONLY ▲

CCJD Case Number: 18-173

Supreme Court
Number: 20SA409

RECOMMENDATION FOR SUSPENSION, PUBLIC CENSURE, AND RETIREMENT

Rather than incur further delay through a trial in formal proceedings, the parties have agreed to submit this matter to the Court in accordance with the Stipulated Disposition of December 4, 2020, to be followed by the Commission's Recommendation for public censure, Respondent's filing of Exceptions to the Recommendation, and a Reply by the Commission.

Accordingly, the Commission hereby Recommends that Respondent be publicly censured for driving under the influence of alcohol in Colorado in 2018 and in Kansas in 2019, and for asking the two arresting officers in the Colorado case to just take her home because of her status as a judge. Her convictions are in violation of Canon Rule 1.1, which requires a judge to comply with the law; and Canon Rule 1.2, which requires a judge to act at all times in a manner promotes confidence in the judiciary and avoids "impropriety and the appearance of impropriety." Her requests of the two officers are in violation of Canon Rule 1.3, which prohibits a judge from abusing the prestige of judicial office for the judge's personal interests.

In the Stipulated Disposition, Respondent asserts that she did not ask the officers to take her home. However, in Incident Report #180101 provided by the Prowers County Sheriff's Office, Officer Jason Freouf reported that: "Debra informed me she was a Baca County Judge" and "asked why I was trying to ruin her life and career." She told him again that she was a judge and asked if he "could just take her home." In the same report, Officer Colton Green said: "Debra also asked several times why we wanted to end her career and explained multiple times that she was a Judge in Baca County."

Precedent for the Court's issuance of a public censure is provided in Supreme Court Case No.19SA260 concerning Judge Lance Timbreza's conviction for driving while ability impaired. The Court censured the judge:

> . . . for failing to maintain the high standards of judicial conduct required of a judge; for violating Canon Rule 1.1, which requires a judge to comply with the law; and for violating Canon Rule 1.2, which requires that a judge at all times shall act in a manner that promotes public confidence in the judiciary and avoids impropriety and the appearance of impropriety.

The Commission has conferred with Respondent's counsel about the Commission's Recommendation. Counsel has notified the Commission that he intends to file Exceptions to the Recommendation, as provided in Colo. RJD 38. In the Stipulated Findings of Fact, the parties have agreed to a shortened timetable for Exceptions and any Reply filed by the Commission, in order to expedite the Supreme Court's disposition of this case before January 1, 2021.

In summary, it is the Recommendation of the Commission for the Court to order:

1. That Respondent be voluntarily SUSPENDED, with pay, pursuant to Colo. RJD 34(a) and (e), from her judicial duties from January 1, 2021 through January 31, 2021.
2. That Respondent be PUBLICLY CENSURED by the Court's written order, in accordance with Colo. RJD 36(e), for the following violations of the Canons:
   a) Canon Rule 1.1: Failing to comply with the law by driving a motor vehicle while under the influence of alcohol in Prowers County, Colorado in 2018 and in Greeley County, Kansas in 2019.
   b) Canon Rule 1.2: Failing to "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary" and to "avoid the appearance of impropriety."
   c) Canon Rule 1.3: Abusing the prestige of judicial office by identifying herself as a judge and asking the two arresting officers in the Prowers County case to just take her home.
3. And, as provided in Colo. RJD 36(b), that Respondent be RETIRED from judicial office, effective February 1, 2021.

Respectfully submitted this 8 day of December 2020.

Colorado Commission on Judicial Discipline

By _William J. Campbell_

William J. Campbell, Executive Director
Attorney Reg. No. 472

2

Certificate of Service

The undersigned hereby certifies that, on December __8__, 2020, the foregoing Recommendation for Suspension, Public Censure, and Retirement was served by email on Abraham V. Hutt, counsel to Respondent at the following address: abe@rklawpc.com.


_____

William J. Campbell

3

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: December 11, 2020 |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline CJD 18-173 | |
| In the Matter of Debra Gunkel. | |
| | Supreme Court Case No:<br>2020SA409 |
| ORDER OF COURT | |

Upon review of the parties' Stipulated Disposition, filed in the above-captioned matter on December 4, 2020, and the Commission's Recommendation for Suspension, Public Censure, and Retirement, filed on December 8, 2020, and now being sufficiently advised in the premises, the court ORDERS as follows:

The court rejects the parties' Stipulated Disposition because it fails to comply with either C.R.J.D. 35(h) or 37(e).

Based on the stipulated facts, the court also rejects any disposition that contemplates voluntary suspension *with* pay under C.R.J.D. 34(a), (e).

BY THE COURT, EN BANC, DECEMBER 11, 2020.

SUPREME COURT, STATE OF COLORADO
ORIGINAL PROCEEDING IN JUDICIAL DISCIPLINE

DATE FILED: December 23, 2020 1:24 PM

2 East 14th Avenue
Denver, Colorado 80203

In the Matter of the People of the State of Colorado, by and through the Colorado Commission on Judicial Discipline, and Judge Debra M. Gunkel, Respondent

Attorney for Respondent:
Abraham V Hutt, #14137
Recht Kornfeld, P.C.
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 573-1900
Fax: (303) 446-9400
abe@rklawpc.com

▲ COURT USE ONLY ▲

CCJD Case Number: 18-173

Supreme Court Number:
2020SA409

ENTRY OF APPEARANCE AND REQUEST TO BE SERVED
ELECTRONICALLY

Abraham V Hutt and the law firm of Recht Kornfeld, P.C. enter their appearance as counsel for Debra Gunkel in the above-captioned action.

On Wednesday December 23, 2020, counsel for Judge Gunkel received by U.S. mail an Order of the Court issued twelve days earlier, on December 11, 2020.  The envelope in which it arrived was postmarked December 14, 2020, three days after the Order was issued and nine days before it was delivered.  Counsel received no electronic notice of the Order but fortunately was informed of it by the Executive Director of the Commission on Judicial Discipline on December 15, 2020, four days after it was issued.  Counsel respectfully requests that he be notified electronically of any future filings with this Court in this matter.

Respectfully submitted,

**RECHT KORNFELD, P.C.**

s/ Abraham V Hutt
Abraham V Hutt

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing has been served by email to William J. Campbell, Executive Director, Colorado Commission on Judicial Discipline, 1300 Broadway, Suite 210, Denver, Colorado 80203, w.campbell@jd.state.co.us, this ___23rd___ day of December 2020.

<u>Leni Charles, Legal Assistant</u>

2

| | DATE FILED: January 26, 2021 |
|---|---|
| **COLORADO SUPREME COURT**<br>2 East 14th Avenue<br>Denver, Colorado 80203 | |
| **Original Proceeding in Judicial Discipline**,<br>   from the Colorado Commission on Judicial<br>   Discipline, No. 18-173 | |
| In re the matter of DEBRA GUNKEL,<br><br>The People of the State of Colorado,<br>COMPLAINANT,<br><br>v.<br><br>Debra Gunkel, a Judge of the County Court<br>of Baca County,<br>RESPONDENT. | ▲ **COURT USE ONLY** ▲<br><br>Case No. 2020SA409 |
| *Special Counsel for Complainant:*<br>PHILIP J. WEISER, Attorney General<br>   CHRISTOPHER P. BEALL, #28536*<br>      Deputy Attorney General<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, 10th Floor<br>Denver, CO  80203<br>Telephone:  720.508.6000<br>FAX:  720.508.6037<br>E-Mail:  Christopher.Beall@CoAG.gov;<br>*Counsel of Record | |
| **ENTRY OF APPEARANCE OF COMPLAINANT'S COUNSEL** | |

The undersigned **Christopher P. Beall**, designated as Special
Counsel to the Colorado Commission on Judicial Discipline for purposes

1

of the prosecution of Formal Proceedings in this matter, pursuant to Rule 18(b) of the Colorado Rules of Judicial Discipline, hereby enters his appearance on behalf of Complainant in this matter.

Respectfully submitted this __26th__ day of January 2021.


PHILIP J. WEISER
Attorney General

/s/ *Christopher P. Beall*
CHRISTOPHER P. BEALL, #28536*
  Deputy Attorney General

*Special Counsel to the Colorado
  Commission on Judicial Discipline*

Colorado Attorney General's Office
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6413
Christopher.Beall@CoAG.gov
  *Counsel of Record

2

## CERTIFICATE OF SERVICE

This is to certify that I have duly served the foregoing **ENTRY OF APPEARANCE OF COMPLAINANT'S COUNSEL** upon the following parties via email delivery this __26th__ day of January 2021:


Clerk of Court
Colorado Supreme Court
(Via CCES efiling service)

Abraham V. Hutt
Recht Kornfeld P.C.
(Via CCES efiling service, with courtesy copy to abe@rklawpc.com)

William J. Campbell
Executive Director, Colorado Commission on Judicial Discipline
w.campbell@jd.state.co.us



/s/ *Maria Ruiz*
_____

3

**COLORADO SUPREME COURT**
  2 East 14th Avenue
  Denver, Colorado 80203

**Original Proceeding in Judicial Discipline**,
  from the Colorado Commission on Judicial
  Discipline, No. 18-173

In re the matter of DEBRA M. GUNKEL,

The People of the State of Colorado,
COMPLAINANT,

v.

Debra M. Gunkel, a Judge of the County
Court of Baca County,
RESPONDENT.

*Special Counsel for Complainant:*
PHILIP J. WEISER, Attorney General
  CHRISTOPHER P. BEALL, #28536*
    Deputy Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
Telephone:  720.508.6000
FAX:  720.508.6037
E-Mail:  Christopher.Beall@CoAG.gov;
*Counsel of Record

DATE FILED: January 26, 2021

▲ **COURT USE ONLY** ▲

Case No. 2020SA409

## STATEMENT OF CHARGES

THIS STATEMENT OF CHARGES is filed by Complainant in
Formal Proceedings pursuant to the authority of Rules 4(a)(1), 5(a)(1) &

1

(a)(4), 16(b)(4), and 18(a) of the Colorado Rules of Judicial Discipline (herein, "Rules"), and it is alleged as follows:

## I.  BACKGROUND & JURISDICTION

1.      Respondent Debra M. Gunkel ("Respondent") is a Judge of the County Court of Baca County, serving in a twenty percent part-time position.  Respondent was appointed to the bench in 2010 and was retained by the voters of Baca County in 2014 and 2018.

2.      At all times pertinent to this Statement of Charges, Respondent was serving in her capacity as a Judge of the County Court of Baca County.

3.      Respondent is subject to the jurisdiction of the Colorado Supreme Court and the Colorado Commission on Judicial Discipline.

4.      Respondent's conduct is governed by the Colorado Code of Judicial Conduct ("Code").

## II.  FACTUAL ALLEGATIONS

### A.  Prowers County DUI Arrest

5.      On the evening of January 14, 2018, deputies of the Prowers County Sheriff's Office arrested Respondent after encountering her in her vehicle on the side of a county road in Prowers County outside Lamar, Colorado.

6.      Respondent had appeared to be asleep and then confused in her vehicle, and the arresting deputy reported a smell of alcohol when he was speaking with her.

2

7.     Respondent initially denied having consumed any alcohol, and then admitted to drinking "two beers." When asked how large the beers were, she responded "a 12 pack." Respondent failed a field sobriety examination administered by the responding deputies, and her blood alcohol content registered at .137 in a preliminary breath test administered in the field.

8.     During Respondent's interactions with the sheriff's deputies called to the scene, she repeatedly stated that she was a county judge in Baca County, and she requested that they take her home. Both deputies reported that Respondent repeatedly asked them why they were trying to ruin her life and career.

9.     Respondent was charged with one misdemeanor count of driving under the influence of alcohol in violation of C.R.S. § 42-4-1301(1)(a), as well as two traffic infractions for careless driving and failure to display proof of insurance.

10.     On November 9, 2018, Respondent entered guilty pleas on the DUI and careless driving offenses, and the proof of insurance charge was voluntarily dismissed.

11.     Respondent received a $100 fine for the careless driving infraction, and a deferred sentence of two years of probation, community service, and abstention from alcohol.

12.     Respondent served a driver's license revocation, followed by a two-year requirement to operate only vehicles equipped with an ignition interlock device that would monitor her blood alcohol content.

3

## B. Greeley County (Kan.) DUI Arrest

13.    Nine months after her sentencing on the Prowers County charges, on the evening of August 17, 2019, Respondent was arrested again on a DUI charge, this time in Greeley County, Kansas.

14.    The arresting sheriff's deputy reported that he clocked Respondent driving 78 miles per hour in a 65 miles per hour zone of a state highway in Tribune, Kansas. The deputy indicated that Respondent did not immediately pull over when he signaled her to stop, and that while she continued to drive for another two miles, she swerved over both the white and yellow lines of her traveling lane.

15.    The arresting deputy stated that Respondent spoke with slurred words and that there was a strong odor of consumed alcohol coming from Respondent. He indicated that on the passenger seat next to Respondent were two empty cans, and a third partially full can, of Wyldewood Cellar Wylde Kooler elderberry wine (a beverage with 7.1% alcohol by volume). He also observed that the car Respondent was driving was not equipped with an ignition interlock device.

16.    Respondent registered a .167 blood alcohol content through a preliminary breath test administered in the field, and she was then arrested on charges of driving under the influence of alcohol, driving a vehicle without a required interlock device, transporting an open container of alcohol, and exceeding the maximum posted speed limit.

17.    One month after her arrest, on September 16, 2019, the chief judge of the 15th Judicial District issued an Order of Reassignment directing that Respondent no longer be assigned to hear any alcohol-related driving offenses or any probation revocation complaints. The order also directed that Respondent no longer be assigned to review warrantless arrest affidavits, affidavits for arrest warrants, and search warrants completed in connection with such offenses.

4

## C. Prowers County Sentencing

18.     On May 7, 2020, before a senior judge from outside the 15th Judicial District sitting by designation in Prowers County, Respondent admitted that her arrest in Kansas violated the terms of her earlier deferred sentence in the Prowers County DUI case.

19.     Upon that admission, Respondent's deferred sentence was revoked, and Respondent was sentenced to 48 hours community service, alcohol evaluations, probation, and payment of fines and costs of $1,924.50.

20.     The Clerk of Court of the Prowers County Combined Courts transmitted a certified copy of the sentencing order in Respondent's first DUI case to the Commission on May 8, 2020.

## D. Greeley County (Kan.) Sentencing

21.     On June 8, 2020, Respondent pleaded guilty and was convicted in Greeley County District Court on a misdemeanor charge of driving under the influence of alcohol – second offense.

22.     On June 22, 2020, Respondent was sentenced to 90 days in jail, 12 months of supervised probation, and payment of fines and costs of $1,903.00. Respondent's jail sentence was suspended upon completion of 48 consecutive hours in jail and 120 hours of electronically monitored house arrest.

23.     The terms of Respondent's supervised probation subject her to random breath, blood, and urine testing, and prohibit her from consuming any alcoholic beverages or illegal controlled substances or being present in any place where such beverages or substances are sold, served, or consumed.

5

### E.  Proceedings Before the Commission

24.     On December 4, 2020, Respondent entered a stipulation with the Commission whereby she agreed to serve a one-month suspension with pay from January 1, 2021, to January 31, 2021, and to retire from her judicial office as of February 1, 2021.

25.     Pursuant to that stipulation, on December 8, 2020, the Commission filed a recommendation with the Colorado Supreme Court seeking entry of public censure against Respondent with an order imposing the stipulated sanction of one-month suspension with pay and retirement from judicial office.

26.     On December 11, 2020, the Court entered an order rejecting the parties' Stipulated Disposition and indicating that the Court would reject any disposition that contemplates voluntary suspension with pay.

27.     Thereupon, the Commission directed that Formal Proceedings be commenced against Respondent pursuant to CRJD Rule 18(a).

### CHARGE I
### CCJC Rule 1.1(A)
### Failure to Comply with the Law

28.     Paragraphs 1 through 27 are incorporated here as though set forth in full.

29.     The Colorado Code of Judicial Conduct Rule 1.1(A) provides that at all times "A judge shall comply with the law." CCJC Rule 1.1(A). The Code further specifies that conduct which constitutes a violation of a criminal law, unless the violation is minor, constitutes a violation of the requirement that a judge must comply with the law. CCJC Rule 1.1(B)

6

30.     Through her conduct as described above, particularly in her driving a motor vehicle under the influence of alcohol in Prowers County in 2018 and in Greeley County (Kansas) in 2019, Respondent failed to comply with the applicable law of Colorado and Kansas.

31.     Respondent's violations of the criminal laws of Colorado and Kansas were not minor in that in both instances, Respondent's operation of a motor vehicle while under the influence of alcohol resulted in careless driving and created a risk of accident and injury to others who might have been on the road at the time Respondent was driving.

32.     Respondent's conduct violated CCJC Rule 1.1(A).

### CHARGE II
### CCJC Rule 1.2
### Failure to Act in a Manner that Promotes Confidence in the Judiciary and Avoids the Appearance of Impropriety

33.     Paragraphs 1 through 27 are incorporated here as though set forth in full.

34.     The Colorado Code of Judicial Conduct Rule 1.2 provides that "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." CCJC Rule 1.2.

35.     The Comments to Rule 1.2 establish that the Rule's requirements apply to both the professional and personal conduct of a judge and that "Impropriety occurs when the conduct compromises the ability of the judge to carry out judicial responsibilities with integrity, impartiality and competence. Actual improprieties include violations of law, court rules or provisions of this Code. The test for appearance of impropriety is whether the conduct would create in reasonable minds a

7

perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." CCJC Rule 1.2 cmts [1] & [5].

36.    Through her conduct described above, both in her violations of law in both Colorado and Kansas, and her invocations of her status as a judge during her arrest in Colorado, Respondent acted in a manner that failed to promote confidence in the judiciary and failed to avoid impropriety in her personal conduct.

37.    Respondent's conduct violated CCJC Rule 1.2

## CHARGE III
## CCJC Rule 1.3
## Failure to Avoid Abuse of the Prestige of Judicial Office

38.    Paragraphs 1 through 27 are incorporated here as though set forth in full.

39.    The Colorado Code of Judicial Conduct Rule 1.3 provides that "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so." CCJC Rule 1.3.

40.    The Comments to Rule 1.3 establish that "It is improper for a judge to use or attempt to use his or her position to gain personal advantage or deferential treatment of any kind. For example, it would be improper for a judge to allude to his or her judicial status to gain favorable treatment in encounters with traffic officials." CCJC Rule 1.3 cmt [1].

41.    Through her conduct described above, particularly her repeated invocation during the Prowers County traffic stop in 2018 of

8

her status as a judge and her request that the responding deputies take her home rather than booking her on a DUI charge, Respondent attempted to use her position as a county judge in a neighboring county to gain favorable treatment from the Prowers County Sheriff's Office.

42.    Respondent's conduct violated CCJC Rule 1.3.

## PRAYER FOR RELIEF

**WHEREFORE**, Complainant requests the following relief:

(a) That the Supreme Court appoint three special masters, pursuant to Colo. Const. Article VI, section 23(e), to conduct Formal Proceedings in this matter;

(b) That the Commission recommend to the Colorado Supreme Court, upon appropriate findings by the special masters, that appropriate sanctions including public censure and retirement from judicial office be imposed on Judge Debra M. Gunkel for her misconduct;

(c) That the Court assess Respondent, pursuant to Rule 36(g), for costs and fees incurred by the Commission and the special masters in Formal Proceedings; and,

(d) That the Commission recommend such other and further relief as it deems appropriate.

9

Respectfully submitted this __26th__ day of January 2021.

PHILIP J. WEISER
Attorney General

/s/ *Christopher P. Beall*

CHRISTOPHER P. BEALL, #28536*
   Deputy Attorney General

*Special Counsel to the Colorado
   Commission on Judicial Discipline*

Colorado Attorney General's Office
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6413
Christopher.Beall@CoAG.gov
   *Counsel of Record

10

# CERTIFICATE OF SERVICE

This is to certify that I have duly served the foregoing **STATEMENT OF CHARGES** upon the following parties via email delivery this  26th  day of January 2021:

Clerk of Court
Colorado Supreme Court
(Via CCES efiling service)

Abraham V. Hutt
Recht Kornfeld P.C.
(Via CCES efiling service, with courtesy copy to abe@rklawpc.com)

William J. Campbell
Executive Director, Colorado Commission on Judicial Discipline
w.campbell@jd.state.co.us


/s/ *Christopher P. Beall*

11

<table>
<tr><td>

**COLORADO SUPREME COURT**
2 East 14th Avenue
Denver, Colorado 80203

**Original Proceeding in Judicial Discipline**,
   from the Colorado Commission on Judicial
   Discipline, No. 18-173

In re the matter of DEBRA M. GUNKEL,

The People of the State of Colorado,
COMPLAINANT,

v.

Debra M. Gunkel, a Judge of the County
Court of Baca County,
RESPONDENT.

</td><td>

DATE FILED: January 27, 2021

</td></tr>
</table>

| |
|---|
| ▲ **COURT USE ONLY** ▲ |
| Case No. 2020SA409 |

*Special Counsel for Complainant:*
PHILIP J. WEISER, Attorney General
   CHRISTOPHER P. BEALL, #28536*
      Deputy Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
Telephone:  720.508.6000
FAX:  720.508.6037
E-Mail:  Christopher.Beall@CoAG.gov;
*Counsel of Record

## NOTICE OF RIGHT TO RESPOND

The People of the State of Colorado, Complainant in this Formal
Proceeding, through undersigned counsel, hereby give notice pursuant

1

Rule 18(a)(1) of the Colorado Rules of Judicial Discipline ("C.R.J.D.") of Respondent's right to respond to the Statement of Charges previously filed with the Court and attached hereto.  C.R.J.D. Rule 18(a)(1) ("The notice shall advise the Judge of . . . her right to file an answer to the statement of charges, which shall include a response to each allegation together with applicable affirmative defenses or mitigation factors.").

Furthermore, pursuant to C.R.J.D. Rule 19, the Respondent's answer must be filed within twenty-one days from service of the Statement of Charges and this notice.

Respectfully submitted this  27th  day of January 2021.

PHILIP J. WEISER
Attorney General

/s/ *Christopher P. Beall*

CHRISTOPHER P. BEALL, #28536*
  Deputy Attorney General

*Special Counsel to the Colorado
  Commission on Judicial Discipline*

Colorado Attorney General's Office
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6413
Christopher.Beall@CoAG.gov
    *Counsel of Record

2

**COLORADO SUPREME COURT**
 2 East 14th Avenue
 Denver, Colorado 80203

**Original Proceeding in Judicial Discipline**,
  from the Colorado Commission on Judicial
  Discipline, No. 18-173

In re the matter of DEBRA M. GUNKEL,

The People of the State of Colorado,
COMPLAINANT,

v.

Debra M. Gunkel, a Judge of the County
Court of Baca County,
RESPONDENT.

*Special Counsel for Complainant:*
PHILIP J. WEISER, Attorney General
  CHRISTOPHER P. BEALL, #28536*
    Deputy Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
Telephone:  720.508.6000
FAX:  720.508.6037
E-Mail:  Christopher.Beall@CoAG.gov;
*Counsel of Record

DATE FILED: January 26, 2021 5:49 PM
FILING ID: 8B435B86B469F
CASE NUMBER: 2020SA409

▲ **COURT USE ONLY** ▲

Case No. 2020SA409

**STATEMENT OF CHARGES**

THE STATEMENT OF CHARGES is filed by Complainant in
Formal Proceedings pursuant to the authority of Rules 4(a)(1), 5(a)(1) &

1

Attachment to
Notice of Right to Respond

(a)(4), 16(b)(4), and 18(a) of the Colorado Rules of Judicial Discipline (herein, "Rules"), and it is alleged as follows:

## I.  BACKGROUND & JURISDICTION

1.      Respondent Debra M. Gunkel ("Respondent") is a Judge of the County Court of Baca County, serving in a twenty percent part-time position.  Respondent was appointed to the bench in 2010 and was retained by the voters of Baca County in 2014 and 2018.

2.      At all times pertinent to this Statement of Charges, Respondent was serving in her capacity as a Judge of the County Court of Baca County.

3.      Respondent is subject to the jurisdiction of the Colorado Supreme Court and the Colorado Commission on Judicial Discipline.

4.      Respondent's conduct is governed by the Colorado Code of Judicial Conduct ("Code").

## II.  FACTUAL ALLEGATIONS

### A.  Prowers County DUI Arrest

5.      On the evening of January 14, 2018, deputies of the Prowers County Sheriff's Office arrested Respondent after encountering her in her vehicle on the side of a county road in Prowers County outside Lamar, Colorado.

6.      Respondent had appeared to be asleep and then confused in her vehicle, and the arresting deputy reported a smell of alcohol when he was speaking with her.

2

7.     Respondent initially denied having consumed any alcohol, and then admitted to drinking "two beers." When asked how large the beers were, she responded "a 12 pack." Respondent failed a field sobriety examination administered by the responding deputies, and her blood alcohol content registered at .137 in a preliminary breath test administered in the field.

8.     During Respondent's interactions with the sheriff's deputies called to the scene, she repeatedly stated that she was a county judge in Baca County, and she requested that they take her home. Both deputies reported that Respondent repeatedly asked them why they were trying to ruin her life and career.

9.     Respondent was charged with one misdemeanor count of driving under the influence of alcohol in violation of C.R.S. § 42-4-1301(1)(a), as well as two traffic infractions for careless driving and failure to display proof of insurance.

10.    On November 9, 2018, Respondent entered guilty pleas on the DUI and careless driving offenses, and the proof of insurance charge was voluntarily dismissed.

11.    Respondent received a $100 fine for the careless driving infraction, and a deferred sentence of two years of probation, community service, and abstention from alcohol.

12.    Respondent served a driver's license revocation, followed by a two-year requirement to operate only vehicles equipped with an ignition interlock device that would monitor her blood alcohol content.

3

## B. Greeley County (Kan.) DUI Arrest

13.     Nine months after her sentencing on the Prowers County charges, on the evening of August 17, 2019, Respondent was arrested again on a DUI charge, this time in Greeley County, Kansas.

14.     The arresting sheriff's deputy reported that he clocked Respondent driving 78 miles per hour in a 65 miles per hour zone of a state highway in Tribune, Kansas. The deputy indicated that Respondent did not immediately pull over when he signaled her to stop, and that while she continued to drive for another two miles, she swerved over both the white and yellow lines of her traveling lane.

15.     The arresting deputy stated that Respondent spoke with slurred words and that there was a strong odor of consumed alcohol coming from Respondent. He indicated that on the passenger seat next to Respondent were two empty cans, and a third partially full can, of Wyldewood Cellar Wylde Kooler elderberry wine (a beverage with 7.1% alcohol by volume). He also observed that the car Respondent was driving was not equipped with an ignition interlock device.

16.     Respondent registered a .167 blood alcohol content through a preliminary breath test administered in the field, and she was then arrested on charges of driving under the influence of alcohol, driving a vehicle without a required interlock device, transporting an open container of alcohol, and exceeding the maximum posted speed limit.

17.     One month after her arrest, on September 16, 2019, the chief judge of the 15th Judicial District issued an Order of Reassignment directing that Respondent no longer be assigned to hear any alcohol-related driving offenses or any probation revocation complaints. The order also directed that Respondent no longer be assigned to review warrantless arrest affidavits, affidavits for arrest warrants, and search warrants completed in connection with such offenses.

## C.  Prowers County Sentencing

18.    On May 7, 2020, before a senior judge from outside the 15th Judicial District sitting by designation in Prowers County, Respondent admitted that her arrest in Kansas violated the terms of her earlier deferred sentence in the Prowers County DUI case.

19.    Upon that admission, Respondent's deferred sentence was revoked, and Respondent was sentenced to 48 hours community service, alcohol evaluations, probation, and payment of fines and costs of $1,924.50.

20.    The Clerk of Court of the Prowers County Combined Courts transmitted a certified copy of the sentencing order in Respondent's first DUI case to the Commission on May 8, 2020.

## D.  Greeley County (Kan.) Sentencing

21.    On June 8, 2020, Respondent pleaded guilty and was convicted in Greeley County District Court on a misdemeanor charge of driving under the influence of alcohol – second offense.

22.    On June 22, 2020, Respondent was sentenced to 90 days in jail, 12 months of supervised probation, and payment of fines and costs of $1,903.00. Respondent's jail sentence was suspended upon completion of 48 consecutive hours in jail and 120 hours of electronically monitored house arrest.

23.    The terms of Respondent's supervised probation subject her to random breath, blood, and urine testing, and prohibit her from consuming any alcoholic beverages or illegal controlled substances or being present in any place where such beverages or substances are sold, served, or consumed.

### E. Proceedings Before the Commission

24.    On December 4, 2020, Respondent entered a stipulation with the Commission whereby she agreed to serve a one-month suspension with pay from January 1, 2021, to January 31, 2021, and to retire from her judicial office as of February 1, 2021.

25.    Pursuant to that stipulation, on December 8, 2020, the Commission filed a recommendation with the Colorado Supreme Court seeking entry of public censure against Respondent with an order imposing the stipulated sanction of one-month suspension with pay and retirement from judicial office.

26.    On December 11, 2020, the Court entered an order rejecting the parties' Stipulated Disposition and indicating that the Court would reject any disposition that contemplates voluntary suspension with pay.

27.    Thereupon, the Commission directed that Formal Proceedings be commenced against Respondent pursuant to CRJD Rule 18(a).

**CHARGE I**
**CCJC Rule 1.1(A)**
**Failure to Comply with the Law**

28.    Paragraphs 1 through 27 are incorporated here as though set forth in full.

29.    The Colorado Code of Judicial Conduct Rule 1.1(A) provides that at all times "A judge shall comply with the law." CCJC Rule 1.1(A). The Code further specifies that conduct which constitutes a violation of a criminal law, unless the violation is minor, constitutes a violation of the requirement that a judge must comply with the law. CCJC Rule 1.1(B)

6

30.    Through her conduct as described above, particularly in her driving a motor vehicle under the influence of alcohol in Prowers County in 2018 and in Greeley County (Kansas) in 2019, Respondent failed to comply with the applicable law of Colorado and Kansas.

31.    Respondent's violations of the criminal laws of Colorado and Kansas were not minor in that in both instances, Respondent's operation of a motor vehicle while under the influence of alcohol resulted in careless driving and created a risk of accident and injury to others who might have been on the road at the time Respondent was driving.

32.    Respondent's conduct violated CCJC Rule 1.1(A).

### CHARGE II
### CCJC Rule 1.2
### Failure to Act in a Manner that Promotes Confidence in the Judiciary and Avoids the Appearance of Impropriety

33.    Paragraphs 1 through 27 are incorporated here as though set forth in full.

34.    The Colorado Code of Judicial Conduct Rule 1.2 provides that "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." CCJC Rule 1.2.

35.    The Comments to Rule 1.2 establish that the Rule's requirements apply to both the professional and personal conduct of a judge and that "Impropriety occurs when the conduct compromises the ability of the judge to carry out judicial responsibilities with integrity, impartiality and competence. Actual improprieties include violations of law, court rules or provisions of this Code. The test for appearance of impropriety is whether the conduct would create in reasonable minds a

7

perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." CCJC Rule 1.2 cmts [1] & [5].

36.    Through her conduct described above, both in her violations of law in both Colorado and Kansas, and her invocations of her status as a judge during her arrest in Colorado, Respondent acted in a manner that failed to promote confidence in the judiciary and failed to avoid impropriety in her personal conduct.

37.    Respondent's conduct violated CCJC Rule 1.2

## CHARGE III
## CCJC Rule 1.3
## Failure to Avoid Abuse of the Prestige of Judicial Office

38.    Paragraphs 1 through 27 are incorporated here as though set forth in full.

39.    The Colorado Code of Judicial Conduct Rule 1.3 provides that "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so." CCJC Rule 1.3.

40.    The Comments to Rule 1.3 establish that "It is improper for a judge to use or attempt to use his or her position to gain personal advantage or deferential treatment of any kind. For example, it would be improper for a judge to allude to his or her judicial status to gain favorable treatment in encounters with traffic officials." CCJC Rule 1.3 cmt [1].

41.    Through her conduct described above, particularly her repeated invocation during the Prowers County traffic stop in 2018 of

8

her status as a judge and her request that the responding deputies take her home rather than booking her on a DUI charge, Respondent attempted to use her position as a county judge in a neighboring county to gain favorable treatment from the Prowers County Sheriff's Office.

42.     Respondent's conduct violated CCJC Rule 1.3.

## PRAYER FOR RELIEF

**WHEREFORE**, Complainant requests the following relief:

(a) That the Supreme Court appoint three special masters, pursuant to Colo. Const. Article VI, section 23(e), to conduct Formal Proceedings in this matter;

(b) That the Commission recommend to the Colorado Supreme Court, upon appropriate findings by the special masters, that appropriate sanctions including public censure and retirement from judicial office be imposed on Judge Debra M. Gunkel for her misconduct;

(c) That the Court assess Respondent, pursuant to Rule 36(g), for costs and fees incurred by the Commission and the special masters in Formal Proceedings; and,

(d) That the Commission recommend such other and further relief as it deems appropriate.

Respectfully submitted this __26th__ day of January 2021.

PHILIP J. WEISER
Attorney General

/s/ *Christopher P. Beall*

CHRISTOPHER P. BEALL, #28536*
  Deputy Attorney General

*Special Counsel to the Colorado
  Commission on Judicial Discipline*

Colorado Attorney General's Office
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6413
Christopher.Beall@CoAG.gov
  *Counsel of Record

10

## CERTIFICATE OF SERVICE

This is to certify that I have duly served the foregoing **NOTICE OF RIGHT TO RESPOND** upon the following parties via email delivery this _27th_ day of January 2021:


Clerk of Court
Colorado Supreme Court
(Via CCES efiling service)

Abraham V. Hutt
Recht Kornfeld P.C.
(Via CCES efiling service, with courtesy copy to abe@rklawpc.com)

William J. Campbell
Executive Director, Colorado Commission on Judicial Discipline
w.campbell@jd.state.co.us


/s/ *Maria Ruiz*

3

| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: February 16, 2021 |
|---|---|
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline CJD 18-173 | |
| In the Matter of Debra Gunkel. | |
| | Supreme Court Case No:<br>2020SA409 |
| ORDER OF COURT | |

Upon consideration of the Statement of Charges filed in this matter on

January 26, 2021, it is HEREBY ORDERED that the following judges are

appointed as special masters in disciplinary proceedings against Respondent

Debra M. Gunkel, pursuant to Colo. RJD 18.15(a):

1. Hon. Michelle A. Amico, 18th Judicial District, Presiding Special Master
2. Hon. Mark D. Thompson, 5th Judicial District
3. Hon. Keri A. Yoder, 7th Judicial District

   BY THE COURT, FEBRUARY 16, 2021.

| | |
|---|---|
| SUPREME COURT, STATE OF COLORADO<br>ORIGINAL PROCEEDING IN JUDICIAL DISCIPLINE<br><br>2 East 14th Avenue<br>Denver, Colorado 80203<br><hr>In the Matter of the People of the State of Colorado, by and through the Colorado Commission on Judicial Discipline, and Judge Debra M. Gunkel, Respondent<br><hr>Attorney for Respondent:<br>Abraham V Hutt, #14137<br>Recht Kornfeld, P.C.<br>1600 Stout Street, Suite 1400<br>Denver, CO 80202<br>(303) 573-1900<br>Fax: (303) 446-9400<br>abe@rklawpc.com | DATE FILED: February 16, 2021 1:28 PM<br><br><br>▲ COURT USE ONLY ▲<br><hr>CCJD Case Number: 18-173<br><br>Supreme Court Number:<br>2020SA409 |
| RESPONDENT'S ANSWER AND RESPONSE TO STATEMENT OF CHARGES | |

Judge Debra Gunkel through counsel, Abraham V Hutt of Recht Kornfeld, P.C. submits the following Answer and Response to the Statement of Charges pursuant to RJD 18(a)(1) and 19:

## Introduction

1.      On January 27, 2021, Judge Gunkel received a Statement of Charges dated January 26, 2021.

2.      RJD 18(a)(1) directs her to "file an answer to the statement of charges, which shall include a response to each allegation together with applicable affirmative defenses or mitigation factors."

3.      This Answer and Response will provide a response to each numbered paragraph of the Statement of Charges using a number for the response corresponding to the number of the allegation and stating whether Respondent admits the allegations in the paragraph, denies them or is without sufficient information either to admit or deny them and therefore denies them. For the sake of brevity, if all of the allegations of a paragraph are admitted, the response will read "Admit;" and if all the allegations of a paragraph are denied, the response will read "Deny."

**Response to Numbered Paragraphs of Statement of Charges**

1.    Admit.

2.    Admit.

3.    Admit.

4.    Admit.

5.    Admit.

6.    Judge Gunkel admits that the police report states the facts contained in paragraph 6 of the Statement of Charges.

7.    Judge Gunkel admits that the police report attributes to her the statements contained in paragraph 7 of the Statement of Charges.  She is without sufficient information to admit or deny whether she failed a field sobriety exam or registered .137 on a preliminary breath test and therefore denies those allegations.

8.    Judge Gunkel denies the allegation that she repeatedly stated she was a county judge and that she repeatedly asked deputies why they were trying to ruin her life and career.  Judge Gunkel admits that she asked the deputies to take her home.

9.    Admit.

10.    Deny.

11.    Judge Gunkel admits that she received a $100 fine for careless driving and denies the remaining allegations of paragraph 11 of the Statement of Charges.

12.    Admit.

13.    Judge Gunkel admits that she was arrested on August 17, 2019 on a DUI charge in Greeley County Kansas and denies the remaining allegations of paragraph 13 of the Statement of Charges.

14.    Judge Gunkel admits that the police report contains the allegations listed in paragraph 14 of the Statement of Charges.

15.    Judge Gunkel admits that the police report contains the allegations listed in paragraph 15 of the Statement of Charges.

16.     Judge Gunkel is without sufficient information to admit or deny the result of a preliminary breath test and therefore denies it.  She admits the remaining allegations of paragraph 16 of the Statement of Charges.

17.     Admit.

18.     Admit.

19.     Deny.

20.     Judge Gunkel is without sufficient information to admit or deny the allegations contained in paragraph 20 of the Statement of Charges and therefore denies them.

21.     Admit.

22.     Admit.

23.     Admit.

24.     Admit.

25.     Admit.

26.     Admit.

27.     Admit.

28.     Responses to paragraphs 1 through 27 incorporated by reference as if fully set forth herein.

29.     Admit.

30.     Admit.

31.     Deny.

32.     Deny.

33.     Responses to paragraphs 1 through 27 incorporated by reference as if fully set forth herein.

34.     Admit.

35.     Admit.

36.     Deny.

37.    Deny.

38.    Responses to paragraphs 1 through 27 incorporated by reference as if fully set forth herein.

39.    Admit.

40.    Admit.

41.    Deny.

42.    Deny.

## **Mitigation Factors**

RJD 18(a)(1) mandates that this Answer and Response include "mitigation factors" for the consideration of the Special Masters and the Court.  Accordingly, Judge Gunkel provides the following information concerning such mitigation:

1.    Judge Gunkel has been diagnosed with the diseases of alcoholism and depression as well as an anxiety disorder.  Both of her DUI convictions are the direct result of these disorders.

2.    Judge Gunkel was **not** diagnosed with Depression or with Alcohol Abuse Disorder at the time of her first DUI case. While she underwent a psychological evaluation following that conviction, she was **not** found to be suffering from either of those disorders at that time.  The depression appeared during the time that she was on the deferred judgment for the first DUI and resulted in a relapse in drinking.  That relapse occurred the week that she committed the second DUI offense in August of 2019.

3.    It was in the weeks following that second offense that Judge Gunkel was diagnosed with Depression and began treatment for it.  Since beginning to take medication for depression and anxiety and learning other coping mechanisms from her therapist her conditions have improved considerably and she has maintained complete abstinence from alcohol for 18 months. Judge Gunkel's Depression, Alcohol Abuse and Anxiety disorders were all exacerbated at the time of her relapse in August of 2019 by her husband's stage 4 cancer, his decision not to undertake additional chemotherapy, and his reactions to his illness.

4.    There is medical evidence corroborating Judge Gunkel's disorders as well as her sustained recovery and rehabilitation from them.  Immediately upon recognizing her symptoms, and receiving the diagnoses of Depression Disorder, Anxiety Disorder and Alcohol Abuse Disorder, Judge Gunkel undertook both individual and group therapy, began taking prescribed medication and made lifestyle changes recommended by her treating physician and therapists that have resulted in recovery that has been sustained for 18 months.

5.    Judge Gunkel's disorders have never interfered with her ability to perform her judicial duties.  Except for the two DUI offenses, the disorders have not impacted her ability to abide by the Code of Judicial Conduct.

6.    Judge Gunkel has no prior disciplinary record of any kind and her offenses had no dishonest, selfish or financial motive but were the direct result of her mental disorders.  Monitoring of her continued treatment and recovery during her remaining tenure in office will insure that she does not reoffend and that the Commission on Judicial Discipline is promptly notified of any relapse.

### **Prayer for Relief**

**WHEREFORE,** Judge Gunkel requests that:

1.    That the Commission's recommendation of public censure and retirement be rejected:

2.    That "Diversion or Deferred Discipline" pursuant to RJD 36(f) or "Other Discipline" pursuant to RJD 36(h) be deemed the proper consequence of her behavior;

3.    That costs and fees not be imposed against her.


Respectfully submitted,

**RECHT KORNFELD, P.C.**


s/ Abraham V Hutt
 Abraham V Hutt

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been served via ICCES to:

Christopher P. Beall
Deputy Attorney General
Special Counsel to the Colorado
Commission on Judicial Discipline
Colorado Attorney General's Office
1300 Broadway, 10th Floor
Denver, CO 80203
Christopher.Beall@CoAG.gov

And by email to:

William J. Campbell
Executive Director
Colorado Commission on Judicial Discipline
1300 Broadway, Suite 210
Denver, Colorado 80203
w.campbell@jd.state.co.us

this   16th   day of February 2021.

Leni Charles, Legal Assistant

**COLORADO SUPREME COURT**
 2 East 14th Avenue
 Denver, Colorado 80203

**Original Proceeding in Judicial Discipline**,
   from the Colorado Commission on Judicial
   Discipline, No. 18-173

In re the matter of DEBRA GUNKEL,

The People of the State of Colorado,
COMPLAINANT,

v.

Debra Gunkel, a Judge of the County Court
of Baca County,
RESPONDENT.

*Special Counsel for Complainant:*
PHILIP J. WEISER, Attorney General
   ASHLEY E. MOLLER, #29362*
    First Assistant Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 8th Floor
Denver, CO 80203
Telephone: 720.508.6000
FAX: 720.508.6037
E-Mail: Ashley.Moller@coag.gov;
*Counsel of Record

DATE FILED: February 24, 2021 2:41 PM

▲ **COURT USE ONLY** ▲

Case No. 2020SA409

**ENTRY OF APPEARANCE OF COMPLAINANT'S COUNSEL**

The undersigned **Ashley E Moller**, designated as Special
Counsel to the Colorado Commission on Judicial Discipline for purposes

1

of the prosecution of Formal Proceedings in this matter, pursuant to Rule 18(b) of the Colorado Rules of Judicial Discipline, hereby enters her appearance on behalf of Complainant in this matter.

Respectfully submitted this __24th__ day of February 2021.


PHILIP J. WEISER
Attorney General

/s/ *Ashley E. Moller*

ASHLEY E. MOLLER, #29362*
   First Assistant Attorney General

*Special Counsel to the Colorado*
  *Commission on Judicial Discipline*

Colorado Attorney General's Office
1300 Broadway, 8th Floor
Denver, CO 80203
(720) 508-6400
Ashley.Moller@coag.gov
   *Counsel of Record

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have duly served the foregoing **ENTRY OF APPEARANCE OF COMPLAINANT'S COUNSEL** upon the following parties via email delivery this 24th day of February 2021:

Clerk of Court
Colorado Supreme Court
(Via CCES efiling service)

Abraham V. Hutt
Recht Kornfeld P.C.
(Via CCES efiling service, with courtesy copy to abe@rklawpc.com)

William J. Campbell
Executive Director, Colorado Commission on Judicial Discipline
w.campbell@jd.state.co.us

/s/ *Maria Ruiz*

<table>
<tr><td>

**COLORADO SUPREME COURT**
 2 East 14th Avenue
 Denver, Colorado 80203

**Original Proceeding in Judicial Discipline**,
  from the Colorado Commission on Judicial
  Discipline, No. 18-173

In re the matter of DEBRA GUNKEL,

The People of the State of Colorado,
COMPLAINANT,

v.

Debra Gunkel, a Judge of the County Court
of Baca County,
RESPONDENT.

</td><td>

DATE FILED: March 03, 2021 11:22 AM

</td></tr>
<tr><td>

*Special Counsel for Complainant:*
PHILIP J. WEISER, Attorney General
  CHRISTOPHER P. BEALL, #28536*
    Deputy Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
Telephone:  720.508.6000
FAX:  720.508.6037
E-Mail:  Christopher.Beall@CoAG.gov;
*Counsel of Record

</td><td>

▲ **COURT USE ONLY** ▲

Case No. 2020SA409

</td></tr>
</table>

## MOTION TO WITHDRAW AS COMPLAINANT'S COUNSEL

The undersigned Special Counsel to the Colorado Commission on
Judicial Discipline hereby moves for leave to withdraw from this

1

proceeding.  The Colorado Secretary of State has named undersigned counsel to the position of Deputy Secretary of State at the Colorado Department of State, effective March 8, 2021, and as a result, undersigned counsel has tendered a resignation of his appointment as Deputy Attorney General at the Colorado Department of Law.  Pursuant to § 24-31-111(4), C.R.S., following his resignation from the Department of Law, undersigned counsel will no longer be authorized to appear in this court on behalf of the People.  In his stead, the Attorney General and Ms. Ashley E. Moller, who previously has entered her appearance, will continue to represent the Complainant.

WHEREFORE, Christopher P. Beall respectfully requests leave to withdraw from this matter as counsel for the Complainant.

Respectfully submitted this __3rd__ day of March 2021.


PHILIP J. WEISER
Attorney General

/s/ *Christopher P. Beall*

CHRISTOPHER P. BEALL, #28536*
  Deputy Attorney General

*Special Counsel to the Colorado
  Commission on Judicial Discipline*

Colorado Attorney General's Office
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6413
Christopher.Beall@CoAG.gov
    *Counsel of Record

2

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have duly served the foregoing **MOTION TO WITHDRAW AS COMPLAINANT'S COUNSEL** upon the following parties via email delivery this __3rd__ day of March 2021:


Clerk of Court
Colorado Supreme Court
(Via CCES efiling service)

Abraham V. Hutt
Recht Kornfeld P.C.
(Via CCES efiling service, with courtesy copy to abe@rklawpc.com)

William J. Campbell
Executive Director, Colorado Commission on Judicial Discipline
w.campbell@jd.state.co.us


/s/ *Maria Ruiz*

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: March 04, 2021 |
| Original Proceeding in Discipline<br>Colorado Commission on Judicial Discipline CJD 18-173 | |
| In the Matter of Debra Gunkel. | |
| | Supreme Court Case No:<br>2020SA409 |
| ORDER OF COURT | |

Upon consideration of the Motion to Withdraw as Complainant's Counsel filed in the above cause, and now being sufficiently advised in the premises,

IT IS ORDERED that said Motion shall be, and the same hereby is, GRANTED.

BY THE COURT, MARCH 4, 2021.



SUPREME COURT, STATE OF COLORADO
ORIGINAL PROCEEDING IN JUDICIAL DISCIPLINE

2 East 14th Avenue
Denver, Colorado 80203

In the matter of:

DEBRA M. GUNKEL

William J. Campbell
Executive Director
Colorado Commission on Judicial Discipline
1300 Broadway, Suite 210
Denver, Colorado 80203
Telephone: (303) 457-5131
Email: w.campbell@jd.state.co.us

DATE FILED: May 11, 2021

FILED IN THE
SUPREME COURT

MAY 1 1 2021

OF THE STATE OF COLORADO
Cheryl L. Stevens, Clerk

▲ COURT USE ONLY ▲

CJD Case Number: 18-173

Supreme Court Number:
20SA409

**COMMISSION'S RECOMMENDATION TO THE SUPREME COURT**

Based on the Stipulated Disposition of May 11, 2021 between the Colorado Commission on Judicial Discipline and County Judge Debra M. Gunkel, which has been approved by her counsel and attached hereto, and in which Judge Gunkel has acknowledged her misconduct as described in the Stipulation; waived her right to a hearing in formal proceedings; agreed to accept a public censure; and agreed to retire from judicial office within three days following the filing the Stipulation with the Court;

The Commission hereby RECOMMENDS, pursuant to Colo. RJD 37(c), that the Colorado Supreme Court approve the Stipulation; and, in accordance with Colo. RJD 36(e), publicly censure Judge Gunkel for the following violations of the Colorado Code of Judicial Conduct:

1. In being arrested and charged under the laws of Colorado in 2018 and Kansas in 2019 that prohibit driving a motor vehicle while under the influence of alcohol and being convicted of said offenses in both states in 2020, Judge Gunkel's conduct failed to comply with Canon Rule 1.1, which requires a judge to comply with the law, including traffic offenses that involve the use of alcohol or drugs.

2. Her arrest and convictions in Colorado and Kansas were contrary to the provisions of Canon Rule 1.2, which requires a judge to act at all times in a manner that promotes public confidence in the judiciary and avoids impropriety or the appearance of impropriety.

3. In telling the arresting officers in each state that she was a judge and requesting the Colorado officers to "just take her home" and requesting the Kansas officers to ask her husband to "come get her," her conduct was contrary to Canon Rule 1.3 which prohibits a judge from attempting to use the prestige of judicial office for a personal benefit.

The Commission further recommends that the Court approve Judge Gunkel's retirement to be effective three days following the filing of the Stipulation with the Court; dismiss these formal proceedings that are scheduled for trial before the Special Masters on May 18 and 19, 2021; approve the Commission's waiver of its fees and costs incurred in this matter; and approve the Judge's waiver of an appeal and further proceedings.

DATED this 11th day of May, 2021.

Respectfully submitted,

William J. Campbell
Attorney Reg. No. 472
Executive Director
Colorado Commission on Judicial Discipline
1300 Broadway – Suite 210
Denver, Colorado 80203

### Certificate of Service

The undersigned certifies that the foregoing COMMISSION'S RECOMMENDATION TO THE SUPREME COURT was served on counsel for Judge Gunkel by U. S. Mail and email on May 11, 2021 addressed to:

Abraham V. Hutt, Esq.
Attorney Reg. No. 14137
RECHT KORNFELD P.C.
1600 Stout Street – Suite 1400
Denver, CO 80202
abe@rklawpc.com

By:_____

2

| | |
|---|---|
| **COLORADO SUPREME COURT**<br>2 East 14th Avenue<br>Denver, Colorado 80203 | |
| **Original Proceeding in Judicial Discipline**,<br>from the Colorado Commission on Judicial<br>Discipline, No. 18-173 | |
| In re the matter of DEBRA GUNKEL,<br><br>The People of the State of Colorado,<br>COMPLAINANT,<br><br>v.<br><br>Debra Gunkel, a Judge of the County Court<br>of Baca County,<br>RESPONDENT. | ▲ **COURT USE ONLY** ▲ |
| | Case No. 2020SA409 |

## STIPULATED DISPOSITION

The Colorado Commission on Judicial Discipline, having commenced disciplinary proceedings to consider allegations of misconduct by Respondent, hereby stipulates with Respondent Debra M. Gunkel to the following Findings of Fact, in order to resolve the issues in this matter prior to hearing in the formal proceedings commenced pursuant to Colo. RJD 26 and 32.

The parties agree to the following Findings of Fact:

1.    Respondent has served as a 20 per cent part-time Baca County Judge.

2.    On January 14, 2018, Respondent, in Case No. 2018T54, was charged with Driving Under the Influence of Alcohol in neighboring Prowers County.  Upon her arrest, her preliminary blood alcohol content was

1

0.137.  According to the Arrest Report, Respondent told the two arresting officers that she was a judge and asked if they could just take her home.

3.    On November 9, 2018 Respondent entered a plea of guilty to DUI and Careless Driving.  She was fined $100 for Careless Driving.  On the DUI charge, she received a deferred sentence of two years involving probation, community service, and abstention from alcohol.  She served a driver's license revocation followed by a requirement for two years to operate only those vehicles equipped with an ignition interlock device that would monitor her blood alcohol content.

4.    On August 19, 2019, Respondent was arrested in Kansas and charged with Driving Under the Influence of Alcohol.  In noting the restriction on her driver's license, the arresting officer also charged her with failure to have an interlock device operating in her vehicle.  Her preliminary blood alcohol test registered 0.164.  According to the sheriff's narrative supporting his arrest, Respondent stated that she was a judge and asked if her husband could come get her. The charges were filed in Greeley County Case No. 2019TR89.

5.    In light of concerns about whether litigants might question Respondent's impartiality and fairness, having been charged with DUI, the Chief Judge in the 15th Judicial District ordered that no DUI or probation revocation cases would be assigned to her.

6.    On May 7, 2020, with a senior judge from outside Prowers County presiding over the proceedings, Respondent admitted that her arrest in Kansas violated the terms of the Prowers County deferred sentence. The Judge then revoked her deferred sentence and entered a conviction for DUI.  She was sentenced to 48 hours of public service, alcohol evaluation, probation, and payment of fines and fees totaling $1924.50.

7.    On June 8, 2020, Respondent pleaded guilty and was convicted under Kansas law of Driving Under the Influence of Alcohol Second Offense. On June 22, 2020, she was sentenced to twelve months of supervised probation; 90 days in jail, which was suspended upon servicing 48 consecutive hours of confinement and 120 hours of house arrest; and ordered to pay fines and fees of $1903.00.

2

Based on the foregoing Findings of Fact, the Commission and Respondent agree that:

A. Respondent shall retire from her judicial office no later than three days following the filing of this Stipulated Disposition with the Supreme Court;

B. Respondent will not object to the Commission's filing of a recommendation to the Supreme Court that the Court publicly censure Respondent;

C. Upon approval by the Supreme Court of this Stipulated Disposition, the Commission will dismiss its formal proceedings against Respondent, and will waive payment of fees and costs.

D. Respondent waives any remaining right to a hearing in formal proceedings and an appeal.

Dated this 11th day of May, 2021.

_____
Debra M. Gunkel, Respondent

_____
William J. Campbell, Executive Director,
Colorado Commission on Judicial Discipline

Attorney Reg. No. 472

___/s/ Abraham V Hutt_____
Abraham V Hutt
Attorney Reg. No. 14137

Counsel for Respondent

_____
Ashley E. Moller
Attorney Reg. No. 29362

Special Counsel to Colorado Commission on
Judicial Discipline

**Appendix 24**

**Materials Related to Justice Gabriel's Selection as the Recipient of the 2024 American Inns of Court 10th Circuit Professionalism Award:**

# Appendix 24(a)

# June 11, 2024 email re: attorney Tom Overton's request for the Minoru Yasui Inn of Court to sponsor an award announcement advertisement in *The Colorado Lawyer*;

**From:**
**Sent:**                                      Tuesday, June 11, 2024 11:10 AM
**Subject:**                                  INN - Exec Comm - Colorado Lawyer/Justice Gabriel

**Importance:**                             High

Dear Executive Committee -

Tom Overton has suggested (motioned) for us to submit a half page congratulatory advertisement related to Justice Richard Gabriel receiving the American Inns of Court Professionalism Award for the Tenth Circuit for 2024.

The cost would be $1,090.00

Please respond **TO ME ONLY** [courtney@spalfamilylaw.com](mailto:courtney@spalfamilylaw.com) if you are opposed to this.

Courtney Radtke McConomy, J.D.
SHERR PUTTMANN AKINS LAMB PC
7979 East Tufts Avenue; Suite 1650
Denver, Colorado 80237
(303) 741-5300
courtney@spalfamilylaw.com
www.spalfamilylaw.com

1

**Appendix 24(b)**

**Or. Laws 2016, Chap. 64;**

**CHAPTER 64**

AN ACT                    HB 4009

Relating to a day to honor Minoru Yasui; and declaring an emergency.

Whereas 100 years ago, in 1916, Minoru Yasui was born in Hood River, Oregon, to Masuo and Shidzuyo Yasui, Japanese immigrants, making him a second generation Japanese American, or *Nisei*; and

Whereas in 1933, Minoru Yasui graduated salutatorian from Hood River High School, and in 1937 graduated Phi Beta Kappa from the University of Oregon and was commissioned a Second Lieutenant in the United States Army; and

Whereas in 1939, Minoru Yasui became the first Japanese American graduate of the University of Oregon School of Law and the first Japanese American member of the Oregon State Bar; and

Whereas on March 28, 1942, Minoru Yasui violated a military curfew imposed under Executive Order 9066—the order that led to the incarceration of 120,000 Japanese Americans during World War II; and

Whereas Minoru Yasui deliberately challenged that curfew by walking the streets of Portland, Oregon, and then turned himself in to the Portland police so that he could test the constitutionality of such discriminatory regulations; and

Whereas Minoru Yasui lost his case in the United States District Court for the District of Oregon and spent nine months in solitary confinement in a six-foot-by-eight-foot cell in the Multnomah County Jail awaiting his appeal to the United States Supreme Court; and

Whereas the United States Supreme Court ruled against Minoru Yasui in regard to the military curfew, and he was released from jail only to be incarcerated in the Minidoka War Relocation Center in Idaho; and

Whereas after his release from Minidoka in 1944, Minoru Yasui settled in Denver, Colorado, where he practiced law and helped found and participated in many organizations, including the Urban League of Metropolitan Denver, the Latin American Research and Service Agency, Denver Native Americans United and various War on Poverty programs; and

Whereas Minoru Yasui was appointed to the Denver Commission on Community Relations, for which he served as vice-chair, chair and executive director, and as such was an active advocate for civil and human rights whose efforts cut across ethnic and religious lines and addressed the concerns of all minorities and marginalized people; and

Whereas Minoru Yasui was an active member of the Japanese American Citizens League (JACL) throughout his life, taking on leadership roles at both the local and national level, and was a founding member of the Mile High Chapter of JACL in Colorado and the Mid-Columbia Chapter of JACL in Hood River, Oregon; and

Whereas Minoru Yasui reopened his World War II Supreme Court case in 1983 under a writ of error *coram nobis* in the United States District Court for the District of Oregon; and

Whereas as chair of the JACL National Redress Committee, Minoru Yasui helped build and lead the movement seeking an official apology and reparations for the injustices perpetrated against Japanese Americans during World War II, actions that led to passage of the Civil Liberties Act of 1988 two years after his death; and

Whereas Minoru Yasui is buried in his beloved hometown of Hood River, Oregon, despite his many years based in Denver; and

Whereas President Barack Obama awarded Minoru Yasui the Presidential Medal of Freedom on November 24, 2015, for devoting his life "to fighting for basic human rights and the fair and equal treatment of every American"; and

Whereas when presenting the medal, President Obama said, "Min's legacy has never been more important. It is a call to our national conscience, a reminder of our enduring obligation to be the land of the free and the home of the brave, an America worthy of his sacrifices"; now, therefore,

**Be It Enacted by the People of the State of Oregon:**

**SECTION 1. March 28 of each year is designated as Minoru Yasui Day.**

**SECTION 2. This 2016 Act being necessary for the immediate preservation of the public peace, health and safety, an emergency is declared to exist, and this 2016 Act takes effect on its passage.**

Approved by the Governor March 28, 2016
Filed in the office of Secretary of State March 28, 2016
Effective date March 28, 2016

_____

# Appendix 24(c)

# Colo. Jud. Dep't video announcing award of Am. Inns of Ct. 10th Cir. Professionalism Award to Justice Richard Gabriel (posted September 11, 2024).

# Colorado Judicial Department Video Congratulating Justice Richard Gabriel on Receiving the American Inns of Court 10th Circuit Professionalism Award (Posted on YouTube September 11, 2024)

**Judicial Department Narrator**

[Music]. Justice Richard Gabriel. Justice Richard Gabriel is originally from Brooklyn, New York, and is one of seven children. He received a Bachelor's of Arts in American Studies in 1984 from Yale University, and received a Juris Doctorate from the University of Pennsylvania Law School in 1987. From 1987 to 1988, Justice Gabriel clerked for Judge J. Frederick Motz of the United States District Court for the District of Maryland. He then worked for the law firm Shea and Gould LLC in New York City. Gabriel moved to Colorado in 1990 and was an associate and then, a partner at the law firm Holme Roberts and Owens LLP in Denver, from 1994 to 2008. Justice Gabriel specialized in business law, including commercial litigation and intellectual property law. For several years, he also served as City Prosecutor for Lafayette, Colorado. In 2007, Gabriel was named the intellectual property lawyer of the year by Law Week Colorado. Governor Bill Ritter announced in May 2008 that Gabriel would be appointed to the Colorado Court of Appeals, where he was sworn in as an appellate judge on June 30, 2008. In March 2015, Supreme Court Justice Gregory J. Hobbs, Jr. announced that he would retire, effective on September 1. 2015. The Colorado Judicial Nominating Commission selected Gabriel as one of the three possible candidates to replace Hobbs. Governor John Hickenlooper announced Gabriel as his choice to replace Hobbs on June 23, 2015. Gabriel's other experiences include serving as President of the Minoru Yasui Inn of Court and serving as Chair of the Colorado Judicial Institute. He has also been a trumpeter with a Colorado Wind Ensemble, where he served as President from 1994 to 2008. In September 2024, it was announced that Justice Richard Gabriel had been selected as the recipient of the 10th Circuit's American Inns of Court Professional[ism] Award. This prestigious award is given to a lawyer or judge whose life and practice displays sterling character and unquestioned integrity, coupled with ongoing dedication to the highest standards of the legal profession and the rule of law. We at the Colorado Judicial Branch, and those who know Justice Gabriel are so incredibly proud of our colleague and leader on this tremendous recognition.

**Courtney Radtke McConomy**

Each year, the American Inns of Court award the 10th Circuit Professionalism Award to a candidate that displays the core values of the American Inns of Court, which are professionalism, civility, excellence, and ethics.

**Steven Vasconcellos**

If you spend any time with Justice Richard Gabriel, and you can't help but be struck by his passion. His passion for the law. His passion for service. And his passion for the quality of civil discourse that should fuel access to justice and the rule of law.

- 1 -

**Justice Hart**

He really symbolized to me what a great lawyer is. He was a great mentor to a very young law student, even then. And I've known him throughout my career. Therefore, when I moved back to Colorado from my practice in Washington, DC, he was one of the people I sought out in the legal community here.

**Justice Marquez**

He is fast. He's thorough. He is extremely professional. He is a wonderful, amazing colleague that cares so much about doing the work well, representing people, making sure that we serve the people of Colorado.

**Courtney Radtke McConomy**

Our Inn of Court nominated Justice Gabriel this year, because, frankly, there's no one more deserving. Justice Gabriel is a pillar of professionalism in Colorado. He doesn't just promote it. He really exhibits it every day.

**Justice Hart**

He really models professionalism, which is why he's such a perfect recipient for this award. He really is what the profession should be, both as a lawyer and then as a judge on the Court of Appeals and then as a judge on the Colorado Supreme Court. He exemplifies professionalism.

**Justice Marquez**

Justice Gabriel cares very, very deeply about professionalism, and spends a great deal of speaking engagement time, going around talking on the topic all the time. So, he constantly mentors younger attorneys. He mentors law clerks and students. He mentors our less experienced attorneys at the Inn of Court. Always, always talking about professionalism to ensure that people bring their best game to go on, that they treat each other well in this profession, that they act with candor and respect in court, and that we all work hard to promote and honor the rule of law.

**Steven Vasconcellos**

I'm thrilled that Justice Gabriel has won the American Inns of Court Professionalism Award.

**Courtney Radtke McConomy**

Congratulations, Justice Gabriel on receiving the 10th Circuit Professionalism Award.

**Justice Hart**

Congratulations, Justice Rich Gabriel.

**Justice Marquez**

Enjoy this, you deserve it.

- 3 -

**Judicial Department Narrator**

Receiving this distinguished honor reflects Justice Gabriel's unquestioned integrity, commitment to fairness, and dedication to the highest standards of the rule of law. Congratulations, Justice Richard Gabriel.

# Appendix 25

# Anonymous Letter to Colorado Office of Judicial Performance Evaluation Executive Director Kent Wagner, July 2, 2024 (requesting evaluation of all judges currently subject to retention elections who reportedly failed to file annual personal financial disclosure statements, as required by § 24-6-202, C.R.S. and Canon Rules 1.1, 1.2, 2.5, and 3.15).

July 2, 2024

Colorado Office of Judicial Performance Evaluation
Kent Wagner, Executive Director
Ralph L. Carr Judicial Center
1300 Broadway, Suite 220
Denver, CO 80203

Dear Executive Director Wagner:

§ 13-5.5-107(1)(a), C.R.S. requires the State and District Judicial Performance Commissions to evaluate each judge or justice for their integrity, including whether the judge or justice has engaged in any impropriety or appearances of impropriety.  *See also* Colo. RGCJP 12(h), *Form 1*, pp. 1(a)-4-5; Colo. RGCJP 13(h), *Form 2* (III)(a)(2)(c), p. 3; Colo. RGCJP 14(b).  Canon Rule 1.1 of the Colorado Code of Judicial Conduct (the Code) requires that judges comply with the law, including their ethical duties under the Code itself.   Actual impropriety means and "includes conduct that violates the law, court rules, or provisions of this Code, and conduct that undermines a judge's independence, integrity, or impartiality." Colo. Code Jud. Conduct, Terminology.  "The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." Canon Rule 1.2, Comment 3.

Unfortunately, the Performance Commissions have a history of failing to scrutinize the integrity of evaluated judges based upon the judges' compliance with the Code.  *See, e.g.*, Susan Greene, *Judges, Judged: Voters Turn Out Two in Larimer, But Retain One the State Urged Them to Fire*, DENVER POST, November 3, 2010 (retention recommendations made despite evidence of Canon Rule 1.2 violations by judges through pre-judicial non-disclosure of *Brady* material).  In this context it is critically important for voters in the 2024 General Election to make informed choices about the judges subject to retention, particularly those judges who have been publicly identified as failing to perform their legally required financial reporting obligations as public officials.

On August 13, 2023, *The Denver Gazette* published an article detailing how one in six Colorado Judges had failed to file annual personal financial disclosure (PFD) statements required by § 24-6-202, C.R.S. and Canon Rules 1.1, 1.2, 2.5, and 3.15 of the Code.[1]  As pointed out in the

---

[1] § 24-6-202, C.R.S. provides, in relevant parts:

> (1) Except as otherwise provided in subsection (1.7) of this section, not later than the January 10 following his or her election, reelection, appointment, or retention in office, written disclosure, in such form as the secretary of state shall prescribe, stating the interests named in subsection (2) of this section shall be made to and filed with the secretary of state of Colorado by:
> * * *
> (c) Each justice or judge of a court of record[.]
> * * *

article, violation of § 24-6-202(7), C.R.S. through the non-filing of the required annual PFD statements is recognized as a misdemeanor criminal offense.  David Migoya, *One in Six Judges Lack Financial Disclosures: Little Enforcement Even as Misdemeanor Charge*, DENVER GAZETTE, August 13, 2023.  With regards to judges, in particular, the required annual PFD statements are important to inform litigants and the public of financial conflicts of interest that require judges' disqualification under Canon Rule 2.11.  Additional press reporting described how the Colorado Commission on Judicial Discipline had opened 73 investigations based upon the August 13, 2023 article as well as records obtained from the Colorado Secretary of State's Office.  David Migoya, *73 Colorado Judges Under Investigation for Not Filing Financial Disclosures*, DENVER GAZETTE, January 12, 2024.  The Performance Commissions may share information with and request information from the Discipline Commission according to § 13-5.3-105(1), (2), C.R.S.  Notwithstanding the Discipline Commission's investigations, there has been significant public criticism of the Attorney General's Office and the Colorado Supreme Court for their failure to enforce the criminal penalties of § 24-6-202(7), C.R.S. within the statute of limitations.  George Brauchler, *Column: Colorado Judges Break the Law—And Are Above It*, DENVER GAZETTE, August 18, 2023.  Under § 13-5.5-107(1)(a), C.R.S., the Performance

---

(7) Any person . . . who willfully fails to make any filing required by this section is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not less than one thousand dollars nor more than five thousand dollars.

Canon Rule 1.1 provides, in relevant part:

(A) A judge shall comply with the law,* including the Code of Judicial Conduct.

(B) Conduct by a judge that violates a criminal law may, unless the violation is minor, constitute a violation of the requirement that a judge must comply with the law.

Canon Rule 1.2 provides:

A judge shall act at all times in a manner that promotes public confidence in the independence,*integrity,* and impartiality* of the judiciary, and shall avoid impropriety and the appearance of impropriety.

Canon Rule 2.5(A) provides:

A judge shall perform judicial and administrative duties, competently and diligently.

Canon Rule 3.15 provides, in relevant parts:

(A) A judge shall publicly report the source and amount or value of:

(1) compensation received for extrajudicial activities as permitted by Rule 3.12;

(2) gifts and other things of value as permitted by Rule 3.13(C), unless the value of such items does not exceed the statutory amount specified in Title 24, Article 6 of the Colorado Revised Statutes; and

(3) reimbursement of expenses and waiver of fees or charges permitted by Rule 3.14(A).
* * *
(C) The public report required by paragraph (A)(1) shall be made at least annually. Public reports required by paragraph (A)(2) and (3) shall be made quarterly.

2

Commissions have a separate and independent duty to examine judges' failures to file their required annual PFD statements when verifying the judges' integrity under the Code.

As correlated with the judges who are subject to retention in 2024, the August 13, 2023 *Gazette* article lists the following judges as having failed to file at least their most then-recent 2023 PFD statements:

> Pitkin County Court Judge Ashley Andrews
> Gunnison County Court Judge Ashley Burgemeister
> Bent County Court Judge Lance P. Clark
> 12th Judicial District Court Judge Kimberly Cortez-Rodriguez
> 15th Judicial District Court Chief Judge Michael Davidson
> San Juan County Court Judge Anthony Edwards
> Adams County Court Judge Martin Flaum
> 2nd Judicial District Court Judge Jay Grant
> Mesa County Court Judge Michael Grattan, III
> 17th Judicial District Court Judge Sharon Holbrook
> Adams County Court Judge Madoche Jean
> Yuma County Court Judge Kristei Jones
> Adams County Court Judge Leroy Kirby
> Sedgwick County Court Judge Myka Landry
> 20th Judicial District Court Judge Dea Lindsey
> 18th Judicial District Court Judge Bonnie McLean
> Adams County Court Judge Joshua Nowak
> Denver County Court Judge Frances Simonet
> Douglas County Court Judge Kelly Waidler

Of the Judges listed above, the following Judges were further reported as either never having filed their annual personal financial disclosure statements or as having repeatedly failed to do so:

> Ashley Andrews
> Lance Clark
> Kimberly Cortez-Rodriguez
> Michael J. Davidson
> Jay Grant
> Madoche Jean
> Kristei Jones
> Dea Lindsey
> Bonnie McLean
> Joshua Nowak
> Kelly Waidler

One can assume that each of the listed judges' failures to file their required PFD statements arose from individualized circumstances.  Nevertheless, the failure to file the PFD statements and non-compliance with the Code are factors that must be considered and addressed by the respective Performance Commissions as they determine whether each of the listed judges either does or

3

does not meet performance expectations by demonstrating integrity through the avoidance of impropriety or even the appearance of impropriety.  Colo. RGCJP 14(b).

Please accept this letter as a formal request for the respective Performance Commissions to publicly document consideration of the non-filing of required annual PFD statements in their evaluations and their required statutory findings with respect to each of the judges named in the August 13, 2023 *Gazette* article.  The Performance Commissions should also verify whether the Discipline Commission opened investigations as to any of the other judges (beyond those listed in the August 13th article) included in this retention cycle for the subject judges' failures to file their annual PFD statements in years prior to 2023.

It is further appropriate under § 13-5.3-105, C.R.S. and § 13-5.5-107(1)(a), C.R.S for the Performance Commissions to verify the disciplinary histories (private or public) of all the judges and justices subject to retention elections in 2024.  When considering such disciplinary histories, however, it should not matter whether the discipline occurred within the subject judge or justice's current review period or before.  The Performance Commissions can make their own determinations as to whether issues arising through judicial disciplinary histories have been fully addressed by the subject judges or justices sufficient to verify their integrity under § 13-5.5-107(1)(a), C.R.S.  Such an analysis will be particularly important if any of the judges identified as failing to submit annual PFD statements also have prior histories of judicial discipline.

Sincerely,

Anonymous

4

# Appendix 26

# Colorado Supreme Court Record re: Promulgation of Colo. RJD 41—January 11, 2023 Public Hearing Transcript.

# Colorado Supreme Court—January 11, 2023
# Public Comment Hearing for Colo. RJD 41

**Chief Justice Boatright**

You may be seated. Thank you. All right, we are here on a rules hearing. I am going to hand the mantle over to Justice Hood, as he's been leading the communications on this. So, Justice Hood.

**Justice Hood**

Thank you, Chief Justice Boatright, and thank you to those of you who are physically in attendance today, and we welcome those of you who are in attendance remotely. We're streaming this. I should note now that not only is this available live, but we also archive it for future viewing on our website. It's under the oral arguments tab of our state judicial website. So, the proposed rule at issue today is Rule 41, of the Colorado Rules of Judicial Discipline. It has to do with recusal of members of this Court when a member of the Court or former member of the Court is at issue in some fashion, we posted the details of that rule, the proposed rule, on the website. Justice Marquez has recused from this rulemaking proceeding today, this hearing, I thought it would be useful at the outset to talk for a moment just about the scope of the proceeding. I just want to make it abundantly clear that we're here to talk about just the recusal rule. We're not talking about restructuring the entire judicial discipline process. What we're doing today doesn't affect the broader legislative reforms that have been discussed in the media that came through the work of the interim legislative committee at the General Assembly. And I would note, for that matter, we've embraced those proposed reforms. This is one small segment. This Rule is just one small segment of that broader set of reforms. And the language of the proposed rule tracks the ILCs recommendation regarding recusal. In fact, we've extended it to make it more comprehensive in a couple of ways. But we've done nothing to narrow it in any way, to exclude anything that would be the subject of the proposed constitutional amendment through the work of the interim legislative committee. I should note that the comment period for this was roughly November 7 to December 28. And, so, it's been available for the better part of two months. Not only did we publish the proposed Rule on our website, we also provided notice of the proposed rule through *The Colorado Lawyer*. So, we have followed the steps that we ordinarily follow in publishing and making available for comments any proposed rule. We also established a deadline of January 3 for people to offer to speak today, we have three speakers to whom I'll refer in a moment. We ordinarily give speakers five minutes. Because we have few speakers today, and we want to make sure they have ample opportunity to address us. We're giving them 15 minutes a piece. And I would also note that in compliance with the Colorado Revised Statute, 13-5.3-107, we have done several things. We've provided the Judicial Discipline Commission with reasonable notice and opportunity to object, which they've done. And I'm sure that Mr. Gregory is here to speak today, will elaborate his objection on behalf of the Judicial Discipline Commission, which has been posted on the website. We posted the proposed rule, and we have conferred with the Judicial Discipline Commission about our differences at length. We have also allowed for public comment, as I noted, and we've invited members of the public to speak, as I noted, all of that complies with the

- 1 -

statutory mandate, as well. So, without further ado, I'll invite our speakers. We have Christopher Gregory, who is the Director of the Colorado Judicial Discipline Commission. We have Chris Forsyth with the Judicial Integrity Project. We have Brittany Kauffman, who is the Executive Director of the Institute for the Advancement of the American Legal System. And, so, in that order, we'll have them come and share their thoughts with us. Mr. Gregory.

**Christopher Gregory**

Good afternoon. I'm Christopher Gregory, Executive Director of the Colorado Commission on Judicial Discipline. Thank you for the opportunity to address the Commission's response to the proposed rule. The Commission submitted a written response, and I'm here to answer any questions that this Court may have. Are there any questions?

**Justice Hood**

Not that spring to mind? Do you want to summarize your letter or make any additional comments beyond those that you set forth in the letter?

**Christopher Gregory**

No, I think that the letter speaks for itself.

**Justice Hood**

All right, any questions from any members of the court?

**Christopher Gregory**

Thank you.

**Justice Hood**

Thank you. And then we have Chris Forsyth.

**Chris Forsyth**

Good afternoon. My name is Chris Forsyth. I'm an attorney who's practiced law in Colorado for 30 years. I'm also Executive Director of the Judicial Integrity Project. That's where we focus on improving the justice system by focusing on changes in the law that increase transparency, enhance accountability, and remove conflicts of interest.

The Supreme Court is an institution with which you have been entrusted. The people of Colorado rightfully expect you to be the epitome of ethical behavior. They expect you to demand a rigorous system for ensuring ethical behavior by judges, and that you will behave in a manner beyond reproach. Your proposed Rule 41 and your actions regarding judicial discipline in general fall short of these expectations. The initial question I'd like to address is something that has not been addressed. And that question is, does the Supreme Court have the power to increase the jurisdiction of the Court of Appeals

- 2 -

to determine disciplinary complaints? The answer to this question appears to be, no. In 1970 the Colorado Supreme Court determined that the Supreme Court cannot adopt a rule that changes jurisdiction of a court contrary to a statutory provision. The case is *Bill Dreiling Motor Company v. Court of Appeals*, 468 P.2d 37. It involved a criminal procedural rule where the Supreme Court allowed a writ of certiorari from County Court, where the County Court's judgment was based on an appeal of a municipal court or police court order. The Supreme Court ruled its own rule was invalid. The Supreme Court, quote, "cannot adopt a rule which changes jurisdiction of a court contrary to a provision of a statute." In 1992, the Court of Appeals determined that the General Assembly's authority to determine the jurisdiction of the Court of Appeals is exclusive. That case is *South Washington Associates v. Flanagan*, 859 P.2d 17. The Court of Appeals is a legislatively created court. Its jurisdiction is limited to that found in Section 13-4-102 of the Colorado Revised Statutes. The statute does not provide for the Court of Appeals to have jurisdiction over disciplinary matters. No one can increase the jurisdiction of the Court of Appeals except the General Assembly. The Constitution, in Section 5 of Article VI, allows the Supreme Court to temporarily assign any District, Juvenile, or Probate judge to duties in any court. The section does not reference Court of Appeals judges. It does not reference disciplinary matters. Furthermore, the Constitution specifically references what happens when a Supreme Court justice is the subject of a disciplinary complaint. In paragraph H of Section 23 of Article VI, it states that "a justice or judge who is a member of the commission or Supreme Court shall not participate in any proceedings involving his own removal or retirement." The Constitution did not provide for removal of Justices of the Supreme Court in any other situation when, obviously the drafters could have chosen to do so. Rule 41 is contrary to the state Constitution. The Court cannot amend the Constitution with a rule. Absent a constitutional amendment, who presides over judicial discipline cases cannot be changed. Therefore, for multiple reasons, the legal foundation for Rule 41 is questionable. Pursuant to case law, statutory analysis, and constitutional analysis, it would appear the adoption of Rule 41 would be in excess of the Supreme Court's jurisdiction.

In addition to the lack of legal authority to adopt such a rule, the rule would be colossally bad public policy. Rule 41 was created in response to what's been referred to as the judicial scandal. The scandal involved a State Court Administrator improperly using his power to contract with a former employee, allegedly to keep the employee from disclosing unethical judicial behavior that was not disciplined. The genesis of the scandal was the fact that alleged misconduct was hidden from public view. What must be done to show you that hiding information about judges is more dangerous than disclosing it? The State Court Administrator undisputedly behaved badly, yet your response to the scandal is to increase the power of the State Court Administrator by allowing whoever is in that position to select who would preside over a disciplinary matter where you might be the defendant. The State Court Administrator is hired by you, reports to you, and obviously would feel conflicted about you being subject to discipline. Inserting that conflict of interest into a rule or law is a bad idea. History shows that the administrator has had difficulty making good decisions. Rule 41 would have the administrator appoint Court of Appeals judges to a Special Tribunal to hear cases involving you. Court of Appeals judges work in this Building with you, are assigned to cases directly by the Chief Justice, and work regularly with the State Court

- 3 -

Administrator. The Court of Appeals is not an independent court. The proposed Rule does not remove conflicts of interest. Should the Court of Appeals be an independent court that is formed in the state Constitution? Yes, but that is a discussion for another day.

Using the Rules of Judicial Discipline to limit or negate the prosecution of judicial misconduct is not new. The fact that you make the Rules of Judicial Discipline, as opposed to the Judicial Discipline Commission, is a conflict of interest, and it's a conflict of which your predecessors have taken advantage. In 1984, the Colorado Supreme Court issued a rule that judges cannot be disciplined for actions related to an appealable order. That rule has changed wording over the years, but the thought process has remained the same. It's currently Rule 5(e). The rule is extensively used by the discipline commission to dismiss complaints against judges. After the rule was initially adopted, the dismissal rate of complaints against judges rose to 97% in 1993 and has remained at 97% ever since. According to the National Center for State Courts, most states have dismissal rates in the 80% range. It's been 37 years since a Colorado judge has been disciplined for actions related to a case in court. It's a preposterous statistic, unbelievable. One would think we go to court sing supercalifragilistic, expialidocious, and bound out on carousel horses. The point is, proposed Rule 41 is not the first time individuals sitting on the Supreme Court have acted on a conflict of interest. Rule 41 is unlawful. It would be bad public policy.

It is misdirection that is keeping the focus off of preventing the judicial scandal from happening again and off of ensuring judicial ethics are rigorously enforced in general. Yet, you have the legislature proposing basically identical changes in the law. House Conference Resolution 23-1001 contains the same ridiculous scheme of having the State Court Administrator appoint Court of Appeals judges, as Rule 41 does. After the Legislative Interim Committee on Judicial Discipline, the Legislature was expected to propose some changes. The changes that have been proposed, however, are not quite what was expected or suggested in the committee. At the end of the committee, the committee's members clearly stated that there should be no criminal penalty for someone who reveals the contents of the complaint before the discipline commission. After all, criminalizing speech is radical. It's un-American. It's something Vladimir Putin uses in Russia to do all sorts of nasty things. Yet here we are in Colorado, and speech is criminalized. You opened up this proceeding to public comment, but we must all understand that some may be reluctant to testify about the Judicial Discipline Commission because of the criminal penalty. The criminal penalty tainted the content of the Legislative Interim Committee, and it hangs over this proceeding today. The Interim Committee stated on the record they would change it, but House Bill 23-1019, would continue criminalized speech in Colorado. The question is, what did you do after the interim committee's public hearings to influence the sponsors of the bill? Given the fact that the Interim Committee publicly declared that the criminal penalty was not appropriate, but changed its mind before introducing legislation leads one to believe that you were involved in ensuring the committee changed its mind and criminalized speech remains the law in Colorado.

- 4 -

You are determining your legacy. The judicial scandal has brought you under great scrutiny. So far, you've used your skills to ensure you kept control of investigations by paying for them. You've kept evidence away from public view while criminal statute of limitations passed. You've shown that the state Legislature and the judicial discipline commission are completely inept. You're helping yourselves. The people of Colorado are your victims. We encourage you to withdraw Rule 41. We encourage you to disclose all communication you've had with any member of the General Assembly over the past year regarding the judicial discipline system. We encourage you to start working on measures that improve the justice system, not measures that protect bad judges and justices. You could start with one good admission in proposed Rule 41. It clearly shows that discipline information is crucial for knowing whether a judge can be fair on any given case. You don't want a judge judging you if that judge has any disciplinary history whatsoever, or if there's currently an investigation. At the same time, you're pursuing legislation that would keep the disciplinary history of judges from the public, so much so that some could face conviction of a crime if they expose discipline information. You want to be treated differently than the people. Your actions are hypocritical and not worthy of the public trust. We encourage you to support making the entire judicial discipline process public. You should treat people the way you want to be treated. Judicial integrity is doing the right thing when no one is looking. When people haven't been looking, you've been lobbying legislators for laws that benefit you personally, but that don't benefit the administration of justice. We respectfully request that you change course. If there is anything that should be criminalized, it should be the amount of contact the Judicial Branch has had with the Legislature to influence the policies they propose.

Proposed Rule 41 should be withdrawn. You should encourage legislators to propose a completely public judicial discipline process. Hiding information about judges is dangerous and provides the impetus for extortion and blackmail. Judges should be held to the highest standards in Colorado instead of the lowest standards. Judicial independence should not mean that judges are free to lie. In Colorado, that is what judicial independence means. You are in a position where you can do so much good, increasing transparency, enhancing accountability, and removing conflicts of interest, are good things for which you should be remembered. Rule 41 does none of those things. I'm happy to answer any questions you may have.

**Justice Hood**
I have a question. Mr. Forsyth, would you agree that there are instances when this Court would need to recuse from a discipline proceeding?

**Chris Forsyth**
Absolutely, the Constitution addressed that.

**Justice Hood**
Okay, and so your argument to us is that there is no instance beyond the specific language in the Constitution that would mandate our recusal.

**Chris Forsyth**

The Constitution states what it's supposed to say.

**Justice Hood**

So, for example, if a current or former member of the Court were a respondent in a judicial discipline proceeding. Do you think that it would be appropriate for members of the Court who've been a colleague to sit in judgment?

**Chris Forsyth**

Your question is, whether it's appropriate. Is it a policy that should change? Yes. The question is, what does the Constitution provide for? The Constitution only provides for recusal when you are the member being disciplined.

**Justice Hood**

So, your solution then would be for us to sit in judgment of one of our colleagues or former colleagues.

**Chris Forsyth**

No, the solution would be to go through the appropriate process and amend the Constitution to correct the judicial discipline system.

**Justice Hood**

You're aware that that process can't take place until November of 2024, and that any constitutional amendment that's adopted would not take effect in the ordinary course until January of 2025.

**Chris Forsyth**

That is correct, but haste is no reason to violate the Constitution.

**Justice Hood**

So, what is your solution in the interim?

**Chris Forsyth**

In the interim, you need to abide by the Constitution. And in the interim, you need to be more forthright regarding the problems with judicial discipline, you need to request that the Legislature propose an amendment that actually removes the conflicts of interest in the Constitution.

**Justice Hood**

You talked about what you termed a judicial scandal, and that phrase has been used in the press at times, as well. I assume that you have read the Troyer Report and the ILG report.

- 6 -

**Chris Forsyth**

I have. Yes, I've looked through those.

**Justice Hood**

And, therefore, you're aware that with respect to allegations made against judicial officers, there was only one of those allegations that was sustained, and that turned out to be something that had been referred to the judicial discipline commission.

**Chris Forsyth**

I'm also aware that those investigations are highly suspect because the Judicial Branch took the lead and paid for these investigations.

**Justice Hood**

Well, let's talk about that for a moment. There was a request for proposals that was done after we asked both the state Legislature and the Governor's Office to form a committee to then look at those proposals and select investigators. You're familiar with that, right?

**Chris Forsyth**

I'm very familiar with that.

**Justice Hood**

And you are also aware, I assume, that we had no say during that process over whom they would select to conduct those investigations.

**Chris Forsyth**

Oh, I don't know that at all. I don't know. That the Judicial Branch has had a lot of contact with the Legislature. The legislators have stated as such, so I don't know that at all.

**Justice Hood**

All right, I encourage you and any members of the public and the media to confer with those who were actually on the committee to find out the answer to that question. I think that it will be clear that this Court played no role in selecting those folks. That was the reason that we did it that way was so that there wouldn't be questions about us selecting the folks who would be conducting that investigation. And the money that was provided came out of the judicial budget, but it was not something that we orchestrated. It was something that was done through the committee. In other words . . .

**Chris Forsyth**

Because it was done that way, when the investigators were testifying before the Legislative Branch, they had to say, I can't tell you that, because that information is privileged, and the Judicial Branch owns that privilege.

- 7 -

**Justice Hood**

I'm not going to get into a debate with you about the discovery process. That's been discussed at length in other contexts. We provided 1,000s of documents, and that's of record. So let me ask you about your assertion that the Chief Justice or members of this Court play a role in assigning cases to Court of Appeals judges. I don't understand why you think that.

**Chris Forsyth**

Well, first of all, it's in the Constitution, so that's why I think that.

**Justice Hood**

Well, give us an example in recent history of this Court playing any role in assigning cases to judges on the Court of Appeals.

**Chris Forsyth**

Well sir, you have to get the State Court Administrator pursuant to, I believe it's in the Constitution, could be statute. Pursuant to one of them, you have to get the State Court Administrator and Chief Justice to agree to the assignment of a retired judge to any particular case. The law specifically implicates your involvement.

**Justice Hood**

So, your reference is just to the senior judge program. Is that right?

**Chris Forsyth**

No, not at all.

**Justice Hood**

And you're aware that when senior judges are assigned in the ordinary course, it's just to enter into a contract and not to assign them to any particular case. We don't hand pick Court of Appeals judges to sit on particular cases.

**Chris Forsyth**

I would differ. I would differ with that. I in particular, had a case back in probably around 2,000 involving the jurisdiction of Executive Branch Judges over workers compensation cases. In that case, the chief judge assigned herself and not one, but two retired judges to hear that case. So, my experience has not been consistent with your thought process.

**Justice Hood**

I'm not familiar with the experience that you had, so I can't speak to it. All I can tell you is that in the ordinary course of business for this Court, we have nothing to do with the assignment of Court of Appeals judges to particular cases. Let me talk to you more specifically about the process that is set

- 8 -

forth in the proposed rule. You're no doubt aware that it says that the State Court Administrator shall randomly select members of the tribunal. Correct?

**Chris Forsyth**

Correct. There is no way to enforce randomly.

**Justice Hood**

But in saying that you're also aware, and I think you acknowledged it in your earlier remarks, that we are simply using the language that the interim legislative committee used in their proposed constitutional amendment.

**Chris Forsyth**

That's kind of difficult to ascertain, because there was so much communication going on between the Judicial Branch, that's what we'd like to know who came up with what? Because the changes that have come out of the Interim Committee aren't consistent with what the members of the Interim Committee were saying at the end of the Interim Committee.

**Justice Hood**

You have no evidence that we put that language in the mouths of the interim legislative committee. Nor do you have anything that would suggest that we have the ability to tell them what they should do.

**Chris Forsyth**

Do I have evidence of what you've done, well, of what you've alleged to do. I wasn't there when these conversations were taking place. I know legislators have complained about, or not complained about, but referenced communications, and you hold great sway.

**Justice Hood**

You're aware that there was a series of public hearings. Correct? Before the interim legislative committee.

**Chris Forsyth**

Correct.

**Justice Hood**

And there were presentations made by many different stakeholders, including Chris Gregory from the judicial discipline commission, other members of the judicial discipline commission. I believe you testified. Didn't you?

**Chris Forsyth**

I did after begging to do so, yes.

- 9 -

**Justice Hood**

And, so, you were given an audience. And there were many documents that were submitted. Those were posted on the legislative website. And through all of that, there's nothing you can point to that suggests that we drafted the Rule that they ultimately adopted.

**Chris Forsyth**

Okay, number one, I didn't say you drafted them. You've been involved with them, and it's somewhat alarming that you're finding the need to cross-examine me here on these questions, leading questions trying to get me to confess to something. I know this. I know that the judicial interim committee spent 85 to 90% of its time listening to judges or former judges, or groups composed of judges. It spent very little time listening to the public. Indeed, when people got up to give relevant testimony, bravely, you know, letting free the possibility that they might be accused of a criminal violation for speaking out against the discipline commission. And they did so. The interim committee cut them off at three minutes and told them to go. No judge was ever stopped by the interim committee. The interim committee only stopped individuals who were trying to testify.

**Justice Hood**

This was a legislative choice. Am I right?

**Chris Forsyth**

You're correct. It was the interim committee. But you're trying through your cross-examining of me. You're saying the Legislature had to do this all on their own, and that you had no influence whatsoever. When I would beg to differ on that.

**Justice Hood**

You talk about my cross examination of you, Mr. Forsyth. My concern is that in many instances, you and other folks make statements about this process that are just untrue and unsupported by any record, and then the media takes these things and they make it seem as though there is validity to what you're saying in the absence of any evidence to support it. And, so, I just think that it's appropriate for us in this context to probe some of the assertions that you've made.

**Chris Forsyth**

The assertions I have made, simply focus on Rule 41. I did as you instructed. I focused on Rule 41 and the most it went out was that this proceeding is tainted due to the criminal penalty regarding judicial discipline. I kept it very focused. So, I can't even begin to understand what you're saying I don't have support for. Because my comments are scripted. They're all true. There's nothing misleading about them. And I would ask you, if you really didn't have much involvement, show us. You're saying, oh, I can't prove you had involvement. Well, show us that you didn't have involvement.

- 10 -

**Justice Hood**

How do you propose that we prove a negative?

**Chris Forsyth**

That goes both ways. But you can disclose your emails or communications with the legislators for the past year. That's what I requested. So, your legislative liaison, Terry Scanlon, Rob McCallum, let's see that communication. Let's see how this developed. That you proposed the identical language and Rule before it's. Well, I guess it was on the Legislature's website, but your Rule came out before it was introduced as legislation. I'm not certain when the Legislature posted it on their website with the Interim Committee.

**Justice Hood**

Do you have anything else? Any other questions from the Court?

**Chris Forsyth**

No, I want to thank you for your time, and I encourage you to focus on improving the discipline system. Thank you very much.

**Justice Hood**

Thank you, Mr. Forsyth, and I believe our final speaker is Ms. Brittany Kauffman. Ms Kauffman, thank you for your patience, and congratulations on your elevation to Executive Director.

**Brittany Kauffman**

Thank you, Justice Hood. And may it please the Court. As previously noted, my name is Brittany Kauffman, and I'm the CEO of IAALS, the Institute for the Advancement of the American Legal System, and I appreciate the opportunity to speak with you all today about the proposed Rule. I will be speaking about related recommendations from IAALS on judicial discipline and recusal, and narrowing in on that focus that we have here today, and sharing some relevant experiences from around the country that I thought would be helpful. So, just to provide a little bit of background to my comments, I wanted to share two projects that we have undertaken at IAALS that I think are relevant to the proposed Rule. So, the first is a project that we undertook in 2018. And leading up to March of 2018, we held a convening at IAALS of experts from around the country, groups of commissioners, commission staff, judges, lawyers, and scholars from all around the country. To talk about the functioning of judicial conduct commissions around the country, to identify opportunities for improvement, and to develop a set of best practices. And that group included a number of experts from around the country, and I will circle back to this. So, I just wanted to share a few names. It included Cynthia Gray, who's the Director of the Center for Judicial Ethics at the National Center for State Courts, as well as William Campbell, former Executive Director of the Colorado Commission on Judicial Discipline. So, we also had some folks from Colorado as part of that effort. And while we looked at best practices, we also recognize that there are a variety of approaches around the country to the functionings and models of commissions. But

- 11 -

we sought to bring together some best practices, including touching briefly on recusal, which is why I mention this report. So, coming out of that effort, we did have a set of report and recommendations, drawing from wide-ranging comments as part of that convening, and also the research that we have done at IAALS and in addition to identifying some best practices for commissions to put in place, we also sought to highlight concrete ways to improve the trustworthiness of the Judiciary. And the recommendations really build off the goal of our, today's judicial discipline system, and I see those goals as protecting the public and the integrity of judicial proceedings, deterring future misconduct, and promoting public confidence in the judicial system. So that was really at the heart of our work and our recommendations in pulling together work from around the country.

And, then, I also mention a second project which is related. It's a project on recusal that we did even earlier than our project on judicial discipline. Back in 2016, IAALS hosted a similar convening of experts from around the country. Judges, lawyers, court administrators, scholars from around the country to think about best practices with regard to recusal proceedings. And, so, I haven't shared those reports into the record, but I do have copies, if you all would like to have those with me. So, we have reports out from both of those efforts, and I think they may be relevant for your consideration of this proposed rule.

Focusing in specifically on recusal and judicial discipline proceedings. IAALS recommends that states adopt and enforce recusal provisions to protect impartiality and its appearance. We think that that's critical, and that recusal rules should be rigorous. They should be understandable to the public and to judges. They should be accessible and they should be clearly articulated. Those are some of the parameters that we came up with in terms of the importance of written procedures and how to apply them to our courts. It's important to communicate to the public that such recusal procedures are in place, and that enhances transparency and public trust and confidence in our system. And that's true generally, but it's also true when a matter comes before the court and the judicial discipline commission, and when a conflict arises, it's important to have those previously created rules, recusal rules, to turn to, to show that they're already in place and that can further support public trust and confidence in the court and the rules that we rely upon. So, in terms of those recommendations, the proposed Rule 41 is in line with those recommendations and helps to achieve an approach that is transparent, that has written procedures, and the recusal rules would then be clear. And I also wanted to speak to relevant practices across the country. So, as to those practices in most states, the Supreme Court is the final decision maker with regard to a judicial officer, whether a judicial officer will be publicly disciplined, reviewing a recommendation either of the judicial conduct commission or a commission's decision at the judge's request. So, that's the common practice around the country.

The ABA Model Rules for Judicial Disciplin[ary] Enforcement do include a model rule for complaints against a member of the highest court, and I think that's directly relevant to the proposed rule here today. The commentary to that ABA rule recognizes and reinforces the importance of recusal. The commentary notes that the highest court is a collegial body, granting it the authority to discipline its members would

- 12 -

create appearances of impropriety and conflicts of interest. And for that reason, the model rule creates, similar to Rule 41, a process for designation of a special court with a number equal to the number of justices on the court. So, the ABA itself has a model rule that would put in place such a rule.

And then I also encourage you to look to the conduct of other states as well, around the country. In at least 13 states, judicial discipline provisions follow an approach where they create a substitute court, similar to Rule 41 and those substitute courts are comprised of temporary justices to hear the case if a Supreme Court justice is the respondent of a judicial discipline case. So, we have 13 other states that have basically followed a general approach, like the ABA model rule, and have implemented such a rule that would create this Special Tribunal.

And here, too, I want to point to the work of the National Center for State Courts. So, Cynthia Gray, last summer, shared with the Legislative Interim Committee, a summary of the other 13 states, and provided that to the committee and summarized all the different approaches of these 13 states that have followed the model rule. And I'm just going to share a few highlights for you. So, when we look at those 13 states, the provisions, of course, the language, the exact rule, is not the same across all those 13 states. They kind of vary across the states, and that's true of judicial discipline commissions and their rules generally. We see that variation. By just a few, a majority provide for such a substitute tribunal by rule. So, 7 of those states provide it by rule. Less than half, five, provided it in the language of the Constitution itself. And then depending upon the state, the substitute court is comprised of either appellate court judges, trial court judges, or both, those are delineated in that language of creating those special tribunals. Sometimes, it's by position, sometimes it's by seniority, and sometimes it's randomly selected. So, we do have examples of states that choose those randomly. Either, I think there are examples of either a Secretary of State or the court administrator or a random list that's created and kept within the court for use during recusal. So, we have some examples you all can look to from other states who choose these randomly. Proposed Rule 41 is generally consistent with other states in that it provides for the full Supreme Court to recuse itself in this instance and replace it with that special tribunal. So, not just one justice, but all of the justices would be replaced in those 13 states. And, then, I also wanted to note the proposed Rule 41 goes further than other states in providing additional circumstances. And I think previously you mentioned Justice, that it's a bit more comprehensive. So, it provides additional circumstances upon which, beyond when just a complaint involves one of the judges but there would be a recusal and the creation of this special tribunal.

**Justice Samour**
Ms Kaufman, good afternoon. Just so that I make sure I'm understanding you correctly, based on your research and all the reading you've done on this, do you believe that the proposed Rule 41 measures up with what other states have done and are doing, and do you believe it's an appropriate rule?

- 13 -

**Brittany Kauffman**

Yes, yes. That's an excellent question here. And in summary of my comment, so it is an example from, you know, we have 13 states, so that's not the majority of states, but it really is 13 states that I think are on the cutting edge, I guess, of putting in place recusal measures, I think that's a really positive effort, and in line with the research that we have done and our recommendations. To have clear recusal standards, and in line with the ABA recommendations, as well. So, I think it's important to have a rule such as Rule 41. I think it's consistent with other states who have taken this extra step based on that research and put in place those types of rules. In general, it's consistent across the board, in approach, recognizing that there's not a lot of consistency in the exact language or type.

**Justice Hart**

So, excuse me, just to clarify, 13 states. You've mentioned the 13 states. We're the 14th one. So, the other 36 states, do they not have specific recusal rules, or do they have other different kinds of recusal rules?

**Brittany Kauffman**

So, I don't believe that they create a recusal where the entire court would be replaced with a Special Tribunal. They may have a rule, and I haven't done the full 50-state survey on this, but where, of course, the justices themselves who might be under a complaint, would recuse. But these are the states that create a full new court, similar to the rule that you all have proposed.

**Justice Hood**

Ms Kauffman, you mentioned Cynthia Gray. She's with the National Center for State Courts. Is that right?

**Brittany Kauffman**

Yes.

**Justice Hood**

She testified to the interim legislative committee, as you noted, is that right?

**Brittany Kauffman**

Yes.

**Justice Hood**

And she spoke at length about much of the same information that you shared with us today. Is that fair?

- 14 -

**Brittany Kauffman**

I don't know that she testified to this, but she did provide materials to the Interim Committee that I have looked at as well in terms of that summary and provided those resources to the committee and they're part of the website.

**Justice Hood**

Would you infer, and I don't ask you to speculate, but do you think it's a fair inference that the Legislature based much of the language that they put forth in their proposed constitutional amendment on the testimony of Ms. Gray?

**Brittany Kauffman**

I don't know that I can say or infer that, but I do hope that the legislative committee looked to all of the testimony that was provided by the experts, including her and IAALS as well. I testified as well to form the basis for those recommendations. We all provided a lot of research, and I hope they took that into account and really based their work on that.

**Justice Hood**

And as you say, in any event, what you do know is that this Rule is very much in keeping with the rules that are considered to be models around the country.

**Brittany Kauffman**

Yes. This rule would be in keeping with the model rule from the ABA, as well as the other 13 states that have followed that approach.

**Justice Hood**

That were discussed with the interim legislative committee?

**Brittany Kauffman**

Yes, in the materials. Yes.

**Justice Berkenkotter**

And part of the point of that is to promote public confidence in the integrity of the Judiciary. Is that correct?

**Brittany Kauffman**

Yes, that is, I believe the reason for such a recusal rule is that it's clear when there is a complaint that is against one of the supreme court justices, there could be concerns by the public as well as the judges in the court. 360-degrees really of public trust and confidence there. And I think having clear recusal procedures helps to enhance public trust and confidence, and that really is the goal of the Court and the judicial discipline commission, as well.

**Justice Samour**

Is there any aspect of the proposed Rule that causes you concern or gives you heartburn?

**Brittany Kauffman**

No, I don't think so. You know, it does provide a more comprehensive list than the other states in terms of when recusal is appropriate, but when I look back at our work and our research, we have really encouraged recusal rules to be comprehensive for the very purpose that they are about public trust and confidence, and that erring on the side of comprehension is a good thing. So, it is more comprehensive, but none of those circumstances that are listed here, cause me heartburn.

**Justice Hood**

Anything else?

**Justice Samour**

I just want to thank you. You know it's easy to come here and cast dispersions on the court and impugn the dignity of the court based on speculation and conjecture. I appreciate you coming here and providing comments that are based on research and knowledge as opposed to just speculation. So, thank you.

**Justice Hood**

Anyone else?

**Justice Hart**

Were you in fact, done, or did we interrupt you?

**Brittany Kauffman**

No, I was done. I was just going to say thank you for the opportunity to highlight IAALS's recommendations and our research. I think that looking to the research and experiences of other states is really important when developing these recommendations. I think that also goes to public trust and confidence, to show that the work looks to other states, other examples, best practices, and model rules. And so, I appreciate the opportunity to share that. That was the conclusion of my comments.

**Chief Justice Boatright**

Can I ask you one question? The 13, now, maybe 14 states that do it. The other states, they just leave the supreme court intact, except for maybe the person that was being accused, and they act as the decision maker? That's the alternative model.

**Brittany Kauffman**

That's my understanding.

- 16 -

- 17 -

**Chief Justice Boatright**

Okay, thank you.

**Justice Hood**

Thank you so much for your time and again congratulations on your promotion.

**Brittany Kauffman**

Thank you so much.

**Justice Hood**

Thank you for being here today. And so that concludes our list of speakers. We're finished our list of speakers, so I'll turn it back over to the Chief to finish the hearing.

**Chief Justice Boatright**

All right, I want to thank everybody for their time and attention to this. The comments were appreciated, and we will be in recess.

- 17 -

# Appendix 27

# Legislative Record:

# Appendix 27(a)

# Nathan B. Coats, *State of the Judiciary Address*, 2019 Colo. House Journal, pp. 68-74 (January 11, 2019);

The Speaker declared a quorum present and as is customary presented the gavel to the President of the Senate to preside over the Joint Session.

President Garcia requested the Joint Committee, composed of Senators Todd and Gardner, and Representatives Weissman, Gonzales-Gutierrez, and Carver to escort the Chief Justice to the rostrum.

Chief Sergeant-at-Arms Jon Judson announced the arrival of the Honorable Nathan B. Coats, Chief Justice of the State of Colorado.

The Joint Committee escorted the Chief Justice to the rostrum where he addressed the Joint Session.

_____

**ADDRESS BY THE HONORABLE
Chief Justice Nathan B. Coats**

Madam Speaker Becker, Senate President Garcia, distinguished members of the Senate and House of Representatives:

My thanks for your generous invitation for a co-ordinate branch of the government to address you in this chamber. This has become a very worthwhile and meaningful tradition in the state, and I would like to express both the appreciation of the judicial branch and my personal hope that the tradition continues long into the future.

Let me begin by introducing my fellow justices, who have also come to represent the branch today. Although we make all important decisions en banc, or as a whole court, with each justice having equal voting power, after the Chief Justice we measure seniority by longevity on the court. In order of seniority, then, my colleagues are Justice Monica Marquez; Justice Brian Boatright; Justice Will Hood; Justice Rich Gabriel; and since we last appeared in this chamber for a State of the Judiciary address, our newest members, Justice Melissa Hart; and Justice Carlos Samour.

I would also like to introduce the State Court Administrator, Chris Ryan, whom I have asked to sit with the court today. And finally, I am pleased to introduce my wife, Dean Emerita of the Sturm College of Law at DU, Mary Ricketson . . . and my daughter, currently a deputy district attorney at my old office in Denver, Johanna Coats.

The Chief Justice of the Supreme Court in this jurisdiction actually wears two very distinctly different hats. Although the Chief has an important leadership role in the organization and conduct of the business of the court, the position of Chief Justice can best be described as "first among equals." The Chief has equal, but no more than equal, voting power with the other members of the court. Unlike the United States Supreme Court, where the Chief Justice is nominated by the President and confirmed by the Senate into the specific slot of Chief, the Chief Justice of the Colorado Supreme Court is selected by and serves at the pleasure of the court itself.

In addition, however, Article VI, section 5 of the state constitution also specifies that the Chief Justice selected by a majority of the court "shall be the executive head of the judicial system" of the state. It is in that latter capacity, as the chief executive officer of the judicial branch of government, that I address you today.

In thanking you for the invitation to speak, I referred to us as coordinate branches of government, and I would like to explain what I understand to be the coordinate nature of our relationship. Although we are very expressly and purposefully organized in the constitution as separate but co-equal branches of government, we are not only co-equal branches, but in fact we share what might be described as a symbiotic, or cooperative, relationship. In an important sense, each

depends on the other. The roles assigned to each of us, although different, are necessarily cooperative, both being essential to the fulfillment of the core obligations of government.

As limited by the constitution, the fundamental law from which each of our branches

derives its powers and authority, and apart from that portion of the legislative power of government that you have willingly delegated to the executive, in the form of the administration, this body is clearly the law giver with regard to matters concerning the governance of the state generally. You indisputably set policy for the state, and enact that policy into governing law, to be carried out and enforced by the executive branch. The power of the judiciary, on the other hand, is largely limited, except for supervising its own operations and the practice of law, to making judgments about the nature and effect of policy choices already made by others. With regard to the laws enacted by you, our role in the system is limited to determining what you meant in enacting those laws, how you intended them to apply in individual cases, and that they do not conflict with the constitution. Similarly, where you have left it to others to arrange their own affairs, whether by contract, lease, will, or any other legally enforceable arrangement, it is the role of the judiciary to determine what those parties intended. The core function of the judiciary is therefore to provide appropriate forums, a fair process, and neutral and impartial decision-makers, schooled at interpreting the law according to well-established principles, which permit your constituents to resolve their grievances and order their important affairs, with the force of law.

Included within your function – the legislative function of government – is, of course, both the power and duty to raise and allocate the resources necessary for the functioning of state government, regardless of the particular branch exercising governmental power. Both the executive and judicial branches are dependent upon you for the resources required for them to fulfill their constitutional obligations. It is therefore both natural and proper for us to regularly report to you how we are fulfilling those obligations and offer our professional assessment of the resources we need to continue to do so.

Although I am now well into my 19th year serving as a justice on the supreme court, and I have, for more than the last 40 years, been an advocate, close court-watcher, and participant in the boards, committees, and other organs established by the supreme court to assist with the conduct of its business and supervisory obligations, I measure my responsibilities as Chief only in months. I am quite proud of the accomplishments of the branch I now have the honor to lead, and with your indulgence, I would like to give you a brief overview of what I am finding. As you might well imagine, over the 40 years I have served the judicial branch, it has grown along with the state whose people it serves.

We now have 64 counties in the state, the last being Broomfield, which was created just over 20 years ago. For about the last half-century, the counties of the state have been organized into 22 judicial districts. The district courts are the trial courts of general jurisdiction, meaning they can hear both civil and criminal cases of all kinds, while the county courts are limited to deciding the less serious criminal offenses, or misdemeanors, and certain civil cases with lesser amounts in controversy. Each county and judicial district must have at least one judge, but of course in light of growing populations and case filings, the vast majority have many more. Counting some 40 magistrates, who are authorized to perform only limited judicial tasks, along with the county and district court judges, the total number of judicial officers in the state now approaches 400.

In 1969, this legislative body created an intermediate appellate court, the court of appeals. At that time, the court of appeals was comprised of 7 judges, with limited authority, to help deal with the burgeoning backlog of trial court judgments awaiting appellate review. Since that time, you have continuously expanded the authority of the court of appeals to include the review of all but very select kinds of cases – like cases involving water rights – and to keep pace with ever increasing demand, you have correspondingly increased the size of that court to 22 judges.

The ultimate legal authority with regard to matters of state law, however, rests with the 7-member state supreme court. In one form or another, the supreme court has authority over virtually every kind of legal dispute that can arise in state, over all lower courts of the state, as well as over the practice of law in the state. While the

court of appeals has become the workhorse of appellate review in the state, now resolving some 2,300 appeals a year, the Colorado Supreme Court, like the United States Supreme Court, has become largely a court of discretionary review, which means that for the most part we choose the cases we will decide based on how important they are and how broadly our decision will impact other cases throughout the state, rather than just correct errors in individual cases. While the Colorado Supreme Court, like the United States Supreme Court in federal system, therefore fully resolves, by published opinion, a lot fewer cases than the court of appeals, it nevertheless has to evaluate in detail some 1,100 petitions for review each year, just to pick the ones that will likely have the biggest impact.

In addition to the 1969 creation of the modern court of appeals, several other initiatives, taking effect roughly around the same time, radically altered the nature of the judiciary in this state and its relationship to the state legislature, and they did so in ways that are critical to a complete understanding of the current state of the judicial branch.

With regard to the method of selecting state judges, and therefore the very nature and make-up of the judging profession in this state, an amendment to the state constitution in 1966 created a kind of merit selection system, in which applications for judicial openings are reviewed by independent commissions in each judicial district - or by a separate statewide commission for openings on the appellate courts. The members of the nominating commissions are chosen according to a constitutionally established formula, to include both lawyers and non-lawyers and a balance of political party affiliation. Each nominating commission is chaired by a justice of the supreme court, who serves as a non-voting member. The ultimate selection of judges by the governor is then limited to a short list of two or three qualified applicants, forwarded to him by the appropriate commission.

While perhaps no system of selection involving human beings can be entirely objective, and the selection process in this jurisdiction was clearly designed to account for very diverse views in the community concerning the appropriate credentials for being a judge, after chairing commissions all over the state for going on 20 years, that have been responsible for sending names to the governor for some 75 judgeships, I can truthfully say that I have never witnessed overtly partisan, or party, politics to be a factor in any judicial selection. Since the adoption of our merit selection system, more and more legal scholars, judges, and political figures throughout the country have touted it, and more and more states have adopted some version of it.

In addition to the make-up of the judiciary of the state, the organization and funding of the judicial branch also underwent a big change during roughly this same period. In 1970, after years of debate, the general assembly pretty much assumed the role of funding the state judicial system - apart from providing the courthouses themselves, that is - and in particular, funding a centralized support mechanism to assist the supreme court in administering that judicial system. In commenting on the value of this system of state financing several years later, former Chief Justice Pringle was quoted as saying, "State funding makes it possible to budget on a system wide basis, makes it possible to shift personnel, as well as judges, on a temporary basis when workloads require, permits economies of scale, facilitates the overall development of a management information system, makes it possible to meet unusual emergencies, and makes greater operational efficiency possible through control of resources and the development of cost and caseload data that show meaningful comparisons among courts and among different kinds of cases."

To satisfy the vast array of legal needs of the people of this state and the need to fairly and appropriately hear and finally resolve their grievances, the branch now operates 410 courtrooms throughout the state. And while the responsibility for financing the physical structures housing those courtrooms remains with the individual counties, for nearly the last half-century it has therefore been the statutory responsibility of the state to furnish those courtrooms and fund the judges and necessary supporting staff, now accounting for some 3,800 full time equivalent positions, with a budget approaching

$600M.

I must pause here for a brief aside on this body's provision of funding for courthouses themselves.

Although the individual counties remain responsible for providing courthouses for their own county and district courts, since 2014 this body has also provided additional funding to assist with construction and remodeling of court facilities in areas of the state incapable of doing so by themselves. In that regard, allow me a word of thanks to you and praise for the joint efforts of the judicial and county officials in the 12th judicial district in bringing on line just this past September a much needed, modern courthouse in Alamosa, now housing one county and four district court courtrooms. Supplemental funds from the state were instrumental in finding a funding solution for that facility. Similarly, assistance from the state through the underfunded facilities fund is making possible a new courthouse to the replace the 1904 facility in Walsenburg,

the dire condition of which my predecessor, Chief Justice Nancy Rice, described so colorfully in this chamber several years ago.

Through efficiencies involving computer and other technological advances, as well as the centralization of a host of administrative and support functions, we have managed to free up judicial officers from many of the collateral, but time-consuming tasks, that once diverted them from their core function: sitting in judgment of actual cases and controversies. But at some point, the need for more well-trained, impartial judges simply cannot be got around.

To assist you in the rational allocation of scarce resources among competing interests, we have for more than 20 years now measured need much more precisely than older methods of simply extrapolating from general metrics like population growth and changes in overall case filings. By collecting data on the time actually spent on different duties and different kinds of cases, we have been able to provide you with figures – in the form of empirical, weighted caseload studies - more precisely demonstrating demand, which you have relied on to increase the number of judges in the state a number of times since then. In fact, since 2000, you have regularly credited these calculations to increase the number of district court judges statewide. In the past, we have generally not made any request until the demand was beyond dispute; and so in 2001, for example, you agreed and approved an increase of 25 district court judges, and again in 2007, another 32, to meet the burgeoning demand in each instance.

Using this same system of measurement, the branch is now prepared to represent to you that we are currently operating with about 77% of the district court judges actually needed in the state. I am happy to report that a bill has already been introduced in the Senate to increase the number of district court judgeships by 15, precisely allocated throughout the state according to greatest need, which would bring that 77% figure to about 82% of actual demand. While not completely offsetting existing need, members of both our branches who have looked at the demand consider this figure both realistic and sufficient to prevent serious shortages in the immediate term. At this time, may I offer my special thanks to Senators Lee and Gardner, and Representatives Herod and Carver for sponsoring this much needed measure.

The need for more impartial decision-makers is being driven largely from two directions: the first is the easily measured jump in felony case filings throughout the state in recent years; the second is perhaps more subtle and has more to do with the expanding role of the judicial branch, alongside the legislative and executive branches, in addressing the broader societal problems giving rise to this increasing need for legal services.

With regard to the first, for various reasons, which may be the subject of debate, felony filings in this state in the last five years have climbed by more than 40%. Our data indicate that this trend is statewide, not limited to filing practices in any particular districts. Lest someone leap to the conclusion that this represents a problem for criminal cases alone, it would be well to take stock of the impact this startling explosion is having on the availability of judge time on every other aspect of our

judicial system. As the result of both constitutional and statutory provisions designed to protect the rights of those charged with committing crimes, criminal cases cannot be delayed for lack of available courtroom time, in the same way as almost all other legal matters, unpleasant as that reality may seem. The immediate and undesirable effect of this surge in criminal demand is therefore to starve virtually every other aspect of the justice system of much needed resources and cause often extremely harmful delay in the resolution of pressing, noncriminal legal problems. The state is replete with examples of Chief Judges having to reassign their judges from handling civil cases of various kinds to handling criminal cases; and in districts where different case types are typically handled in a single court, judges are not infrequently having to simply allocate more of their available courtroom time for their criminal docket, making less available for pending civil cases. Not only are civil cases being crowded off the docket, but in some places criminal matters are having to be handled in a way that impacts logistical and security concerns. In Denver, for example, criminal matters are regularly being handled in courtrooms that would otherwise be devoted to civil matters, despite the fact that those courtrooms operate out of the City and County Building, which lacks the logistical and security advantages for which the new Lindsay-Flanigan criminal facility was specifically designed.

Few legal matters are more emotional and anxiety provoking than family law matters involving the dissolution of marriages; decisions about the custody, parenting time, and financial support of the children; and the division of marital property. Quite apart from the breakup of marriages, however, the plight of abused or dependent and neglected children is among the most urgent problems needing timely resolution by the courts. And yet the delay resulting from a lack of available judge time greatly elevates the anxiety level of adults and children alike in these situations, and prolongs uncertainty concerning the permanency of child placement, reducing the likelihood of satisfactory outcomes for many children.

But there are any number of examples of hardship suffered by very ordinary people when they are unable to get a timely resolution of important legal matters affecting their lives, relationships, property, or finances. Whether the matter needing legal attention is large or small, delay caused by backlog can be terribly significant for the people actually involved. Delay caused by backlog and a lack of available judicial decision-makers adversely affects not only the contractual arrangements of large commercial enterprises but of small businesses and consumers as well; not only property disputes among large corporations involving, for example, valuable mineral or water rights, but perhaps even more so among small farmers or homeowners needing some degree of certainty concerning their financial arrangements; not only the devolution of large estates of wealthy decedents but also pressing questions of guardianship of the elderly or infirm and the distribution of even modest assets among the survivors of non-wealthy decedents; and not only wrongful death actions and substantial monetary claims for debilitating personal injuries but even common insurance disputes over property damage or the medical costs of injuries that are ordinary enough but nevertheless beyond the means of the damaged parties.

In addition to sheer volume, however, the need for more judges and specialized support staff is also being driven by both the changing nature of the people typically appearing in court and the changing role of the judiciary in helping to solve the more fundamental societal problems leading these people to court in the first place. Not so long ago, a debate raged in the judicial community about the appropriateness of involving the courts too directly in treatment and rehabilitation. At least in this state, I believe that time is largely past.

The judicial department in general, and the district courts in particular, are increasingly involved in innovative approaches to dealing with societal problems that go beyond, and are often the cause of, criminal or other anti-social behavior – problems like poverty, addiction, and mental illness. One specific example of an approach that is particularly demanding of judge time is the ever-expanding use of

what has come to be referred as "problem-solving courts." Problem-solving courts can take many forms and be directed at a wide array of different social ills – like drug or alcohol dependency courts – or specific classes of defendants – like veterans' courts. But the approach they share is close monitoring, with regular reappearances of participating criminal defendants, by judicial officers themselves rather than only by probation officers or treatment providers, with the objective of immediate step by step increases of rewards and punishments, for compliance or non-compliance, with judicial directives. The increasing demand for these kinds of courts reflects their success with regard to rehabilitation and reducing recidivism, but in order to be successful they require extensive courtroom supervision and place additional demands on judge and staff time. While these approaches appear to be extremely beneficial for the individuals involved and for society in general, and they are clearly much less costly overall than simply imposing punitive sentences, their immediate impact on judge-intensive supervision, and therefore the need for more judges, is great.

Even in more traditional courtroom proceedings, however, the increasing numbers of folks appearing without legal assistance of any kind is taking a toll on judge time. Each year, fully 75% of the parties appearing before judges in domestic relations cases throughout the state are not represented by counsel. While judges cannot act as lawyers for self-represented parties, basic fairness requires more lengthy explanations about the proceedings and available options, greatly slowing down even what might otherwise be the most perfunctory formalities. The judicial branch continues to work on a number of initiatives with the practicing bar and the other two branches to provide greater access to justice, including the use of Sherlocks, or Self-Represented Litigant Coordinators, in courthouses all over the state, as a way of assisting pro se litigants and saving valuable judge time.

Finally, let me briefly mention the expanding role of the probation department. In line with these other initiatives, the probation department is being asked to supervise higher and higher risk individuals, requiring greater and greater supervision for the protection of the public. While actual numbers of supervisees may not have dramatically increased, the staff-hours involved in providing this alternative to incarceration are therefore steadily and predictably increasing. Colorado probation is by far the largest single sentencing option in Colorado. The active probation population in probation is more than 80,000 people. Our average daily population is about 4 times the number of inmates in department of corrections custody, nearly 9 times the size of the parole population and over 20 times the size of community corrections.

In this state, the probation function continues to reside within the supervision of the judicial branch of government, and it has proven to be one of the most cost-effective ways of supervising and rehabilitating many individuals convicted of crimes. For adults, the annual cost per person is just over $1,500 compared to $6,000 for someone on parole, nearly $9,000 in community corrections, and over $38,000 in prison.

As long as sentencing courts have available to them probation as an effective alternative means of rehabilitation and reducing recidivism, rather than much more costly and less effective incapacitation by incarceration, the community will benefit. But because probation is a function of the judicial branch of government in this state, funds cannot merely be shifted within the executive branch's department of corrections from one form of supervision to another, but must be separately appropriated for the judicial branch.

Let me close by saying that if it were not already apparent, let me reemphasize how pleased I have been with what I have discovered since taking on the responsibility for overseeing the judicial system in this state, and just how proud I am of the department. We have a highly skilled, impartial, and dedicated corps of judges in this state, intent on providing, to the best of their ability, the kind of justice the people of this state deserve. After working closely now for some time with the State Court Administrator I have every confidence that he is equally intent upon ensuring that all those under his supervision do all they can to assist the judges of this state in having sufficient time

Page 74                         House Journal--8th Day--January 11, 2019

and resources to perform their core function of acting as neutral decision-makers for the benefit of the people of the state.

While the burden ultimately falls on you, as legislators, to wisely allocate the resources of the state, I can assure you that under my watch, the judiciary will continue to provide you with the most reliable and helpful data we can to assist with that task.

Thank you once more for the opportunity to address you today.

_____

The Joint Committee escorted the Chief Justice from the Chamber.

_____

On motion of Representative Garnett, the Chief Justice's message was ordered printed in the House Journal.

_____

On motion of Senator Fenberg, the Joint Session was dissolved.

_____

House reconvened.

_____

**MESSAGE FROM THE SENATE**

The Senate has adopted HJR19-1004 and returns herewith.

_____

**INTRODUCTION OF BILLS**
**First Reading**

The following bills were read by title and referred to the committees indicated:

**HB19-1070**   by Representative(s) Arndt, Hooton, McKean; also Senator(s) Tate, Moreno, Zenzinger--Concerning the repeal of statutory provisions requiring the department of public health and environment to test substances that are purported to have value in the treatment of cancer.
Committee on Public Health Care & Human Services

**HB19-1071**   by Representative(s) McKean, Arndt, Hooton; also Senator(s) Zenzinger, Moreno--Concerning the repeal of obsolete provisions regarding water quality control, and, in connection therewith, eliminating the requirement that the state board of health approve a municipality's entrance into a joint operating agreement with an industrial enterprise for work relating to sewerage facilities and clarifying that the board of directors of a water conservancy district must comply with the rules of the water quality control commission concerning the manner in which watercourses of the district are used for waste disposal.
Committee on Energy & Environment

# Appendix 27(b)

# Transcript of *Hearing before the J. Budget Comm.*, Colo. Leg., December 13, 2019;

# Colorado Legislature Joint Budget Committee—December 13, 2019: Presentation of the Colorado Judicial Department

**Rep. Esgar**

The Joint Budget Committee will come to order. Good morning, everyone. We are going to start off today. We'd like to start off with a moment of silence in honor of our colleague, Representative Kimmi Lewis. Her services are today, and we need to be here to continue doing the work of the State. And we wish we could be there with her and her family and friends. But that is where our colleague, Representative Ransom, is today, as well. She went kind of on her own accord, but also to represent us as well. And we appreciate it. But we really wanted to just take a moment to acknowledge the loss to the State of Colorado.

Thank you for that. We are going to get started today with the Office of the State Court Administrator, the Judicial Branch, and our first presenter today is . . . where I'd like to welcome our Chief Justice, Nathan Coats, to the table as well. And I believe you're bringing your State Court Administrator with you as well. And I'm not going to attempt to butcher your last name, so I'll have you say it on the microphone when you come up. So, please, welcome. And Chief Justice Coats, I will turn it over to you to take us away.

**Chief Justice Coats**

Thank you, Madam Chair, appreciate it. I am Ben Coats, the Chief Justice, and this is Steven Vasconcellos, the State Court Administrator. Although Steven is fairly new as the State Court Administrator, he has had a lot of experience, especially in some of the areas that we're going to talk about today. If you want to find out more than the major decision rule reasons why we chose something, I'll probably turn it to Steven and have him explain how that works. Well, thank you very much for having us. I appreciate the opportunity to address you. I addressed you last year, just a few months after I'd become Chief Justice. Now, I'm feeling kind of like an old timer.

It seems like the year and slightly less than a half has been for me, a lot of putting out fires, both literally and figuratively. You remember, right after I took over last year, we were having judges, chief judges, even courthouses being evacuated because of fires. One, over in El Jebel, I think, was actually turned into the emergency evacuation center. So, we had the literally there. We had one, actually this year, too. The Chief Judge in Salida was out of his home, evacuated for some time. So, these are kind of some things to deal with. But more recently, the fires have probably been more figuratively than literally.

Last year, you probably remember our large request, really, that we presented and you accepted in the Legislature and gave us 15 new District Court judges, very important for us. We appreciated that very much. All 15 have now been appointed, if not yet, taken office. Some will do that at the first of the year. I just wanted to point out, though, in terms of change with regard to the Judiciary, particularly we're

really faced with almost a generational change. Those 15 are not the only new appointees during this last year. In the slightly less than a year and a half that I've been Chief, I checked figures, and by our calculations, 53 new judges have been appointed, 7 of those from the Court of Appeals. That's a third of the Court of Appeals have turned over just in this short time period. You remember, you know, our 64 counties, in which we all have at least some judge representation, are organized into 22 Judicial Districts. And they, of course, have District Court representation. I just wanted to point out, as well, in that short time period, I have now appointed 7 new Chief Judges in the Districts. There's that much turnover and change.

In addition, though, the complexion, really of the State Court Administrator's Office has changed substantially, and that's partly what I want to talk about today. Basically, since I started the State Court Administrator is gone. The Chief of Staff, who was the number two, is gone. The Director of Financial Services is gone. The Controller is gone. The Director of Human Resources is gone and the Deputy Director of Human Resources is gone. Just to mention some. So, it's a much different looking body. I'd like to get to the questions you've asked. Given the time constraints, though, obviously we'll go wherever you want to go, and I'll watch for you to interrupt and ask me questions. But I thought I would try to organize this in a way so that we piece together things that seem related in terms of presentation, rather than just going straight down the list of questions. But, obviously, I'm here to answer what you have in mind. Let me start off, then, by saying, with regard to the [State] Court Administrator's Office, you all ask a question.

And I thought I should clear the air by starting and addressing this about the events of the past Summer, particularly with regard to news reports and the effect that that had on the Court Administrator leaving. Basically, this is about, of course, an investigation and report that came out in *The Post* in July. The investigation had to do with, largely with, a contract that we entered into with the former Chief of Staff, who had left only a short time before from the Office. And, also, with regard to an anonymous letter that made accusations of misconduct by specific members in the leadership in the Court Administrator's Office. We say a few things about that. We gave, I think an overly lengthy, I shouldn't say overly, but overly for what we'd like to do, but we thought it was important to give you a very lengthy written explanation. But, just to emphasize some of the key points of that. What happened was during, and sequentially I'll do this. During the investigation by *The Post* into some things they were concerned about, they made requests of us of documents. And during our compliance to give them those documents, things came to my attention as the Chief Justice that I determined I not only didn't know, but had been kept from me. And as a result of that, we moved very quickly. Things with regard to this particular contract, we moved very quickly. I consulted that day with our legal representative from the Attorney General's Office, got my colleagues together. We deliberated for some hours that day and the next day. And, basically, the effect, the upshot of that was we terminated. That we decided the contract had to be terminated because the things that had come to my attention were things that, had I known them at the time, would have caused me not to authorize that contract at all. In addition to that, however, the Court decided that it no longer had confidence in the State Court Administrator as the result, and I'll

- 2 -

say generally, of a lack of candor with regard to bringing things to the Court's attention. And as a result, we accepted the resignation of the State Court Administrator. *The Post* article ran, then immediately after the State Court Administrator resigned. And that was the sequence.

Basically, I thought I would, if I could, just briefly talk about a little bit of a couple of things about the contract. With regard to some of the other things about the circumstances of the Chief of Staff leaving, which were also a big part of the article and reflected on the contract and some of the criticisms the article suggested, I am for legal reasons instructed by the Attorney General that I really can't say very much about that. And that's, hopefully, you understand that, or will understand that with regard to protection of the public fisc, if nothing else here. But with regard to the contract, let me make clear a couple of things. Although I can't talk about the reasons for the Chief of Staff's departure from the Office, I can say she left voluntarily. She was an employee of the Department for some 23-years. Was highly respected, particularly by the Chief Judges of the Districts. She, as the article even indicated, she had been one of the finalists for position of the State Court Administrator only in the two years or so before in the choosing of a new Court Administrator. And I can tell you. I personally saw over a dozen, I think, letters from Chief Judges advocating that she become the State Court Administrator. So, that was the situation with regard to her, personally.

With regard to the contract. There was suggestion in the article. First of all, it referred to it as a two and a half million-dollar contract. I didn't understand it that way. It was not presented that way to me, but rather as a $532,000 contract for a year with an option to extend. And I have no reason right now to believe that's not the proper construction of that contract. But where I wanted to go though was the suggestion was this, and other people have approached me, suggesting this was an unusually large amount. But I need to remind you, we're a department of some 4,000 employees. For leadership training, we had a contract for the previous 5 years, and even going back before that, that were for commensurate amounts, actually more, in some years. Starting years for that kind of leadership training for all over the State and all of the different levels of employees that we needed trained, including judges, I think our records show that the contract's amount were as high as close to 700,000 at various times. So, consulting with others, I don't believe this is an extraordinarily large amount for this kind of thing.

The unusual thing about this contract, had it continued, was that our previous contract expired, and our question had been whether to extend it. And I went through the training, as did Mr. Vasconcellos right near the end, in one of the last sessions. In part, to make determinations about the value of continuing this kind of thing for the Department. And we came to the conclusion, then, with Mr. Ryan, that. I came to the conclusion with Mr. Ryan that a much more targeted kind of training would be more effective. And that was what we were aiming at. And that was, if you saw even in the newspaper article, I think it referred to Mr. Ryan making the choice of the prior Chief of Staff to do this training, in large part because it was very close to a sole-source contract. It was pinpoint training with regard to all of the Judicial Districts. And the initial phase was to go through a lengthy process of setting up a relationship, and, in effect, changing the paradigm of, or maybe I should say, relationship between the Court

- 3 -

Administrator and the Districts. So, that was what was at issue with regard to this contract. As I said, from the discovery of things that were kept from me that made the contract not fulfillable, I thought, and we thought as a Court and, also, clear that we would not have entered into it. We terminated that contract, and that's where we are now. And maybe I can sort of leave that part there.

I wanted to go on and say just a little bit more. Part of your question was about, well, what has changed as a result of this in the way we deal in the Department? And that goes to my point earlier about the way in which, basically, the complexion of the Department has changed. A great number of things. Ironically, we were in the process of making different organizational changes when this all occurred, and they had to be truncated at that point, and we had to move in a different direction.

Nevertheless, we have vastly different personnel and leadership right at the moment. We have hired some, in addition to the new Court Administrator. And, by the way, that was a rather very lengthy and public process in which we brought in response from people in the Department, from not only in the Court Administrator's Office, but all over. We wound up doing, I don't know if you saw even a thing somewhat like the University of Colorado has done, in which we basically a finalist, held a, you know, a sort of a town hall type of meeting. And publicized it throughout the State, over the internet. That type of thing. So, we're following those kind of procedures, very open procedures, to make these replacements of personnel. We're reviewing very many things that I think just it was time to do.

With regard to contracting procurement, we've identified places where we think we need to beef up our resources provide more, probably internal auditing. Very many things in this regard. But I would say, it is not that there was a breakdown in the system completely. Here. It was a question of lack of candor and particular individuals knowing things and acting in a way that was not for the benefit of the Department. And one faces that in organizations. It leads to great turmoil. It can be very harmful to the continued operation of the of the Department. But, it is more a personnel problem than it is broadly an organizational problem. I will just say when I said that about the Department, I think that it did cause turmoil in the Department. But because of the way we have handled things over the Summer. Mr. Vasconcellos, acting as the Interim State Court Administrator and I conferred daily many times and a number of other people. And our primary objective was to ensure that none of the services were interrupted that the Department provides. And I think we've done a very good job. They have done a very good job in doing that. Maybe, I should end at that point.

But let me move on to a related point that you've asked about very specifically that also has to do with reporting, and that is with regard to this question of suppression of cases that were reported also by *The Post*. Actually, the Summer before, shortly after I became Chief. This really has a dual aspect to it, and part of the story really had to do with cases he referred to as suppressed, largely in criminal cases, but throughout the State. And by suppressed, meaning that they were, in effect, sealed from anybody other than the parties. You know, hate to learn things in newspaper stories, but this was kind of new to all of us. Nobody had really stopped to think about this. It was not an intentional matter, really. It largely had

to do with, again, largely criminal cases in which, and by the way, in one District in particular, where the policy of the District Attorney had become to ask to suppress an entire case early on, for legitimate reasons, dealing with search warrants that had not been executed, and various other things of this sort. That early in an investigation, it was important to keep quiet. But what happens in those cases is the defense may and in lots of cases, does not object to that either, because they would like to keep these things sealed. The court is simply in the position of having nobody object, and so it grants an order, not really sealed, but it's what we have designated suppressed. And, then, in the absence of some kind of a suspense mechanism to bring this back to his attention, it just remains that way. So, that was the effect of why we came up with, I don't know that we actually verified the post numbers, but 1,000s of cases. We immediately, though, set to work as soon as we found out about this. Gathered the Chief Judges, had conferences with them, disseminating the information then to their judges, and did reviews of all of these things. And the numbers were vastly reduced then of cases that were suppressed in the primary District, which was the 18th, actually. Where so many of these cases, because of the policy of the prosecution, largely had been suppressed. Within days, they were able to review those down there. And I don't have the figures right in front of me, but it was something like 19 remained suppressed for specific reasons, and those would have to be reviewed by the court. Things that still shouldn't be made public until investigations were complete, or various things of this nature. So, I think that we made a good faith effort, and hopefully we've been able to keep control of that. I don't have exact figures. But those big numbers have been taken care of.

But, more importantly, I wanted to communicate to you all, this hasn't finished yet, but we also started in to a process, then. I sent a communication to the folks who run our Criminal Rules Committee, asking them to delve into this problem, to see what other jurisdictions had done, to look at the ABA standards, to consult with outside press-related counsel, who I know have appeared in the committee and probably will in a public hearing once we get this. But my last report is that we are very close, what one can ever predict with a committee process, but this has gone through a very serious process, subcommittee work, revisions, back to the committee, and it will come before in what looks to be very close to a final form in January. And we're hopeful that something will be presented to the Court, and we, with this kind of a rule, will undoubtedly have a public hearing. The things I asked them to look at were, what kind of limitations should we make on process to get this kind of a suppression done in the first place? What should be required in a motion? What kind of notice should be given to other parties? What kind of a hearing should be? What criteria? When should the courts have to? How long can they do this without reviewing it? All of those kind of things to try to avoid just this situation that occurred.

The second part of that really is, I said it's sort of a two-part. The other part has to do with some questions that you all ask about our version of CORA, of the Colorado Open Records Act, which we've designated, PAIRRS (Public Access to Information and Records). It's the second part of our Rule. It, by the way, just virtually mirrors CORA, as a result of a case decided by the Court of Appeals some years ago. It appeared that, and we have not reviewed that, that Cora does not strictly apply to judicial records. So, we passed a Rule the Supreme Court that mirrors CORA with regard to administrative records, as

opposed to court records. You made a request last year. The Legislature did. That we make some changes so that we would make records, and with regard to sexual harassment, more available. Particularly to the to the parties. And we've done that. We actually changed three different sets of rules, really. We changed the Rules of Professional Conduct to make it clear that sexual harassment in the in the context of legal representation, or anything involving that is a discipline-able offense. So, we made that clear. We also changed the Rules of Attorney Regulation to make clear that these records, allegations of sexual harassment will be available to the complainant and the respondent, which was the request. And then, finally, we actually added the part to our PAIRR, our open records rule, to exactly mirror, to precisely mirror, CORA. So, those are kind of the things we've done. I wanted to get to those and clear the air about them right away, because they seem like things that you had particular interest in the questions dealing with. But if I could move on.

**Rep. Esgar**
We do have a few questions.

**Chief Justice Coats**
Yes.

**Rep. Esgar**
So, Representative Hansen.

**Rep. Hansen**
Great. Thank you, Madam Chair. And Mr. Chief Justice, thank you for that thorough explanation. And, I appreciated the thoroughness of the written write up. I just had a couple follow ups on this topic. One, you had mentioned in the written responses about benchmarking or looking at other jurisdictions. And I think you just mentioned something along those lines in your verbal testimony. Could you give us a little bit more detail about maybe how we compare, or how that comparison is being brought into your review process right now?

**Rep. Esgar**
Mr. Chief Justice.

**Chief Justice Coats**
Thank you, Representative Hansen, are you referring specifically, I presume, to our creation of a rule to deal with this?

**Rep. Esgar**
Representative Hansen.

- 6 -

**Rep. Hansen**

Yeah, thank you, Madam Chair. And Mr. Chief Justice. I think. Sorry, I'll try to be more clear on my question, thinking about, you know, the large numbers that accumulated. And you said, you described it as almost like there was some inertia in the system. That it became a default in some instances, and, therefore, the numbers started to add up pretty quickly. And I think I was trying to understand. As you're doing this review and making some adjustments, are we benchmarking to other jurisdictions? How do we compare to other states and other similar situations? And are there some standards, perhaps ABA or other standards, that will help guide us here, as we rebalance the numbers?

**Rep. Esgar**

Mr. Chief Justice.

**Chief Justice Coats**

Yes, thank you. Well, I can't give you detail about other jurisdictions and how they work right at the moment. That's the mandate to the Criminal Rules Committee. But I know from discussions with them, that's a large part of what they have been doing. Is looking at other jurisdictions. There are ABA standards that prescribe exactly how to deal with these kind of things. We have not, in the past, followed the ABA standards strictly. For a number of reasons, not least being they on their face, require lengthy notice, or, from our point of view, lengthy notice periods and opportunities for representation from outside. That the decision had been made up to this point, I think although we hadn't had a rule specifically posed to us, that those could interfere with the process. And it hadn't seemed like as urgent a situation. Now with the situation posed to us, that's exactly the kind of thing we're looking at. I know that. You know, our rules committee has looked at Arizona's and California's rule and the ABA standards, and they're hammering out right now exactly which of those procedures they think will work in Colorado and with our particular system. But I'm afraid I can't give you real specifics about which, what other jurisdictions are doing.

**Rep. Esgar**

Representative Hansen.

**Rep. Hansen**

Thank you, Madam Chair, and I really appreciate that. And it sounds like it's in process. Would you be able to share with us, kind of the timeline, and would you be able to come back to us when that process kind of reaches a conclusion on this?

**Chief Justice Coats**

I'm sure we will, and would be delighted to do that. And again, not quite as bad as trying to predict an appellate court and what they will do, but I wouldn't firmly say what the committee will do. But it has been through a number of iterations, and the last I saw which should be considered. And matter of fact, I think we've posted this on online, on our website, the proposal that will be considered should be

- 7 -

considered in January by the full committee. The way the process would work is, when the committee votes to send up a rule, they've resolved what they believe is the appropriate rule, they will send it to the full Court. We take it up, usually at the very next conference we have that week, and we will make a decision. Sometimes, we would just make a decision to adopt the rule or not, or send it back for some amendments. But, with this kind of a rule, almost always we would immediately schedule it for a public hearing. And, especially with this kind of a rule, you know, there is no doubt members of the Fourth Estate and their representatives would like to be present. Its that kind of a hearing, and that'll give the Court a chance to hear their criticism of the final product, and then, typically, we will either send it back, if there's some really controversial part to the committee to resolve that, or, very frequently, we'll just make a decision based on the testimony that we've had in front of us. So, I am hopeful that within the reasonably foreseeable future, we will make a decision about whether to have a rule and what kind of rule.

**Rep. Hansen**
Thank you.

**Rep. Esgar**
Mr. Vice Chair.

**Sen. Moreno**
Thank you, Madam Chair. And Mr. Chief Justice, really appreciate the detailed response in the written write up, and you taking us through it, the situation as well. It was very helpful and very much appreciated. I zeroed in on one particular line in the written response, and that's the Department learned that the amount of money spent on services provided to the Department is not a default benchmark for future similar services. I just think that's particularly sage advice for all Departments. So, very much appreciated.

**Rep. Esgar**
Mr. Chief Justice.

**Chief Justice Coats**
I can't take credit for writing that sentence myself, but it expresses the position I would have to admit, without getting into specific amounts, my only limitation with regard to approving such a contract was we can't spend more than we did on the prior contract. Obviously, as you point out, there are reasons to go beyond that in deciding how to approve such a contract and how much to approve it for.

**Rep. Esgar**
Other questions? Senator Rankin.

- 8 -

**Sen. Rankin**

I assume you're under the state procurement rules that we updated a couple years ago. We heard from Personnel the other day about it and it's in a rule now. Something called invitation to negotiate. It's kind of a more flexible way to do what you're, the kind of thing you're trying to do. So, you might look at that, at that rule. Which I think is fairly recent, it's called invitations to negotiate, and it's a sub-paragraph of the procurement rules.

**Rep. Esgar**

Mr. Chief Justice.

**Chief Justice Coats**

And, maybe, Steven is better at this than I, but my understanding is we may not be bound precisely by those procurement rules. But we attempt to, if we're not, to the extent we're not, we attempt to write our Rules to accomplish the same thing and be along the same lines. But, I appreciate that question because it raises something. A different request we have made, and that is in this process, it has come to our attention on the Court that we have been rather skimpy in terms of our resources with regard to reviewing the whole procurement process. You know, we're in a funny kind of situation, where the administrative authority in the 22 districts is the Chief Judge. Especially, in areas like probation and related things that they do. There's a perpetual contracting process, and we have discovered, in the review this Summer, that probably we need to beef up our procurement review and assistance to the Districts by a great amount. We've, actually, as you will see, one of our items we've requested, I believe it's 6 FTE specifically in this area, so that we can strengthen our procurement standards and the advice and the review that we give. What happens frequently because of our shortage of resources in this regard, although we have, I think, serious expertise in the Court Administrator's Office. But you get these requests for contracts that have to be done very quickly from the Districts, and if our limited resources are so backed up, we can't get advice and review within the short time period. Then, they have to rely on themselves. We're hoping to exactly delve into this area and really beef up.

**Rep. Esgar**

Senator Rankin.

**Sen. Rankin**

I just want to point out, because we completely updated the law for procurement rules, and in the two years since then, there have been a lot of rules written by the Department. So, might be some clues in there.

**Chief Justice Coats**

Thank you.

- 9 -

**Rep. Esgar**

Members. Any other questions? Before we move on, I just wanted to say, as a former journalist, thank you for taking the time to answer these questions about public access. And I completely understand when things do need to be held back for continuing cases. But I just want to encourage you to continue to look in and make sure you're continually finding ways to communicate to the public some of these issues that have come up. So, thanks for taking the time to answer those questions. Appreciate it very much.

**Chief Justice Coats**

You're very welcome.

**Rep. Esgar**

So, Mr. Chief Justice, you answered a lot of the questions, kind of in the back. You answered some other of these questions. But why don't we just kind of start walking through some of these so we don't miss anything, and if you feel like you've already touched on them, we'll just move past them. We'll just start from there. Mr. Chief Justice.

**Chief Justice Coats**

Yes, Madam Chair. So, would you like me to just move through these by number? May I suggest there's some of them that jump back and forth, if it's helpful to you to go by number. But our primary requests, important ones, deal with probably the magistrate request. And we've got a bundle of these questions that go to that. I thought I would address maybe that first, then we could move on to the probation request, which is big. What we've got time for, if that works. With regard to the magistrate request, let me say some things about our decision, and then probably with regard to a lot of the specifics in the questions. Like, how these would be used and how we make those calculations, Steven would be much better at that. But with regard to the determination, I listened to your hearing with the analyst tonight, and I detected there was some question about why we decided to go for magistrate increases, particularly as opposed to County Court judges. And let me just say broadly, that was an important discussion on our part. The reason we need more resources, I think, we think, can be justified in terms of our weighted case load studies. Particularly with regard to the matters that County Courts deal with. The real numbers were not as strong. And that always seems to be a factor, or it seemed to be last year when we made a District Court request. And there were two things in particular that made us want to hold off on a request for County Court judges, should that become necessary. And they were really, you increase the jurisdictional amount for civil cases in County up to 25,000, I think about. But it only took effect this year, and we have a very small sample to measure how much that increase, I think we're showing of the year, 4 or 5% increase in cases in County Court. But we wanted to wait on that. The even bigger reason, though, is last year's decision to move felony to misdemeanor designation for a lot of drug cases. And that, we've had a lot of debate over and just decided it was too tenuous for us to project. There are too many variables. It probably doesn't work for us to just say all of those cases that were felonies will now be misdemeanors. There are a lot of variables in terms of how prosecutors will approach this. Maybe

- 10 -

even how law enforcement people will approach it. How many of these were the result of settlement negotiations? Which would no longer be the case if there are only misdemeanors to start with. So, enough said on that. But so, the reason we held off on the County Court was we really wanted to present you a firmer picture of the need.

Magistrates, you know, and I think we indicated pretty much in our answers. But magistrates give a great deal more flexibility. They can take care of a lot of the same problems. They can do, aside from jury trials, you know, and a few other things. They can do, most of the things that trial court judges could do, especially in terms of, I don't know, advisements, preliminary hearings, arraignments. There are just very many things that we felt the County Court Judges could be relieved of. And, by the way, you know, very many of the duties that County Court judges react to as taking away their time are things that really have to do with felonies. But County Court judges are allowed to do them. So, in the individual districts, Chief Judges may assign a great number of these duties to County Court, and that takes up their time from actually hearing the cases that would be in front of them. So, those things can be done by magistrates, very many. And that kind of flexibility, is really why. One of the reasons we did it. The other though, is we were making a serious attempt to keep an increase in budget down, and we were ordering our priorities. And I think in our answers, you can see we felt like there was a substantial saving by going for magistrates rather than County Court judges,

**Rep. Esgar**
We do have a question. I'm sorry to interrupt you, Mr. Chief Justice, we have a question. And Senator Zenzinger, if you hold one moment, those of you following in the book, he's answering the questions that are on page 8, and we're really looking at the judicial request R-2. So, if you're following along, just that way people know where we're at. So, Senator Zinzinger, please.

**Sen. Zinzinger**
Well, I just want to comment that I very much appreciate that approach. So, oftentimes, when we're putting together legislation, we'll kind of estimate what we think the fiscal impact will be, and then we just go ahead and meet whatever that high number was, and then that goes into the budget, and then that becomes the new reality based on little to no actual evidence about whether that's truly what is needed in order to meet the new legislation. So, I very much appreciate the fact that you're going to wait. Actually, figure out what is needed. And, then, perhaps at some point we will see you for a supplemental request, if needed. But, I very much appreciate that approach. So, just want to compliment your team for thinking through that. And then, secondly, I did have questions about why a magistrate versus the County judge, and so thank you for clarifying that that makes total sense, and I think that having that kind of flexibility also increases efficiency. So, thank you.

**Rep. Esgar**
Mr. Chief Justice. Please continue.

**Chief Justice Coats**

Thank you, and maybe I will just. Would you like to add anything with regard to the magistrates, or use of them, or allocation? Doing okay? Okay. I was trying to think of what other questions you asked with regard to that. But, maybe, that's enough. You did ask some questions about where they would be located, how we would do that. And actually, I may pitch that to Steven.

**Rep. Esgar**

Mr. Vas . . Please say it, so I don't say it wrong.

**Steven Vasconcellos**

Thank you, Madam Chair. Vasconcellos.

**Rep. Esgar**

Vasconcellos, Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. In terms of where the magistrates will be allocated. Obviously, we have to have some sense of where those needs are in order to request the resources. But one of the things we like to do with staff and magistrates, judges are a different case because their location is baked into the statute. But with staff and magistrates, we will request with specific locations in mind, but then based on what we're actually funded for, which may or may not be what is requested, and any last minute changes in the pattern of need, what's happened with filings between the time of the request and the allocation, our organization likes to take one last look at that need and really make allocation recommendations to the Chief Justice based on the freshest information of that need. So, the table that's included in our answer on page 9 is where we're thinking. And these are all large locations, which means there's a certain amount of stability to the filings. I don't anticipate that this will change radically, but we will take one last look again, based on whether or not the General Assembly chooses to fund the request, how much of it they fund, and any changes in need patterns. And that will guide our recommendations to the Chief.

**Rep. Esgar**

Thank you for that, Mr. Vasconcellos., The only question I had on page 9, and I'm sure there's a good reason I would just like to know what it is. I see Judicial District 10 and 20 not getting any allocation. Can you just fill us in as to why those two are not included?

**Steven Vasconcellos**

Thank you, Madam Chair, you're referring to why Mesa County and Pueblo County are getting a half FTE rather than a full FTE. And it has to do with their staffing level. They have needs. Those are both. While those are not rural locations in our thought process of workload, they are urban locations. They are smaller, and if we gave those locations a full FTE, we'd overstaff them.

**Rep. Esgar**

I'm sorry. I was looking at the probation staff table.

**Steven Vasconcellos**

Oh, I'm sorry. I apologize.

**Rep. Esgar**

My fault, my fault. So, we can come back to that, later. I had my tables confused. Senator Rankin.

**Sen. Rankin**

Well, actually I was asking, going to ask the question that you did answer. So how does that work? Do, we have a half-time magistrate working, or do we share that with another county? How does the half work?

**Rep. Esgar**

Mr. Vasconcellos.

**Steven Vasconcellos**

My apologies, Madam Chair. Madam Chair, Senator Rankin, over time, in sort of informal discussions with Districts over the years. For judicial officer FTE magistrates in particular, it's hard to hire somebody below halftime in many cases. And, so, we use that as a sort of a loose floor for allocating. We have been pretty successful, and we will talk as we're putting these requests together. We have a lot of contact with the potentially impacted districts. Is this a resource that you feel you can use? When I first started many years ago, you know, sometimes our organization would try to request point one-five or something like that. And Districts would respond to us and say, Thank you, but I can't really use that small of a resource. And so, pardon me, we in our experience, half FTE is very impactful and very useful. And you know you should be able to hire.

**Rep. Esgar**

Senator Rankin.

**Sen. Rankin**

That exactly leads to my next concern, which is more remote rural counties who might need a quarter time person or something. How will they address the growing need for magistrates?

**Rep. Esgar**

Mr. Vasconcellos.

- 13 -

**Steven Vasconcellos**

Madam Chair, Senator Rankin. So, the way . . . the majority of Counties in Colorado are rural, and statutorily, they are considered Class C and D judgeships. And they have a statutorily created methodology for determining what level those judgeships would be. And, in my opinion, it's kind of a nice system, because as caseloads rise. Say, in one of the counties of the 14th Judicial District, statute provides a mechanism for the judge-level to rise automatically with the caseload. And we use the same caseload modeling tools behind that to make those determinations. But let's say if the judgeship in Grand County showed 10% additional need, statute provides an automatic mechanism for that to happen.

**Rep. Esgar**

Representative Hansen.

**Rep. Hansen**

Thank you, Madam Chair. And I was going to switch gears. So, I don't want to cut off anything else on probation, on the magistrates.

**Rep. Esgar**

Is it something they've covered?

**Rep. Hansen**

Well, I was going to, we didn't cover it with much. It was back to page 2 on the felony caseload.

**Rep. Esgar**

Oh, we haven't gone there yet.

**Rep. Hansen**

So, desire to move on to that?

**Rep. Esgar**

Were you complete with your magistrate presentation, Mr. Chief Justice?

**Chief Justice Coats**

Yes, Madam Chair.

**Rep. Esgar**

I just want to make sure, if we're hopping around, I want to make sure we clear up everything that we're doing. So, Representative Hansen take us to our next spot.

- 14 -

**Rep. Hansen**

Thank you. Appreciate it. Thank you, committee. On page 2, your response to page 2. And I found this chart really fascinating. Obviously, the population of Colorado has not increased by 88% but, yet, we have several categories here that have exploded in numbers of cases. And, I think what I'd love some context on is kind of the driving factors behind this. It's clearly not in your control which cases are filed. You have to deal with the pipeline that comes at you. But is there something that we might be able to discern from conviction rates or the quality of these cases? And I think the crux of my question is, are we are we getting a situation where the numbers have gone up, but there's perhaps a dilution in quality of case because of that? And could we figure that out from the end result at the court?

**Rep. Esgar**

Mr. Chief Justice.

**Chief Justice Coats**

Thank you, Madam Chair. I'm not sure that I'm focusing exactly on your point. But let me just say, with regard to the chart and our attempt here. Part of what we've done here, I think, is to just break down cases to show just in pure numbers, what changes have been made. And I understand you're asking about making some determinations about the why and wherefore of these. I'm not sure that we're able to do that too much in the sense of causation, if that's where you're going and how we would prevent those kind of things. If that is it.

**Rep. Esgar**

Representative Hansen.

**Rep. Hansen**

Yeah thank you, Madam Chair, and realize you, I mean, that is not in your purview. That this is ultimately decisions being made by individual prosecutors and DA offices. I think I was just trying to figure out, if given the information you would have, the end result of this pipeline. So, here we're seeing the front edge of that. Here are the cases filed. I'm wondering if you might help us follow that through as it moves through the process. Are we seeing an 88% increase in convictions, as well? Does this flow through, or is there some underlying change in the quality of cases that are making it to the end of that process?

**Rep. Esgar**

Mr. Chief Justice.

**Chief Justice Coats**

I see, thank you. Thank you, Madam Chair. Representative Hansen, I say, I apologize. I wasn't picking up on work where you were going with that. The problem with that is, I don't know that I really can give you data in terms of what percentage of these charged actually wind up as convictions. I guess the

- 15 -

presumption from us with this data that we've got is it would not very radically, as a result of the different kind of crime. There would be no particular reason, I think, why a particular kind of crime charged would not result in a conviction. Other than if you're if you're thinking about pleading down. And that can happen, and those things will vary greatly. For instance, with the drug cases, as they as they get categorized in smaller, smaller categories. But I'm, I'm afraid I really probably don't, am not able to draw just from this material a conclusion there. Do we have other data, Steven?

**Rep. Esgar**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. Representative Hansen, so I think part of the most direct. We don't have it put together, as a matter of course. But given the court's role in adjudicating the cases, what we could do, if this would be more helpful, is have staff put together some information, like for the most recent fiscal year, on convictions, broadly. Number of cases that went to trial. Number of cases. Number of convictions in the year. We could even give some information on the highest charge that was convicted. Number of cases sentenced to DOC. I can have staff from our Office work with Mr. Allen to refine sort of the portfolio of information you'd like to see, and whether we have it, and we'd be happy to put something together and provide that information to Mr. Allen to share with the committee

**Rep. Esgar**
Representative. Hansen.

**Rep. Hansen**
Thank you, Madam Chair. I think that would be extremely illuminating, given this massive change in the statistics on the filing side to help not only this committee figure out, okay, how do we handle this from a budgetary standpoint and get the resources that are needed and align those correctly. But I think as, also, for our colleagues in the General Assembly that are looking at criminal justice issues. I think that would be very, very helpful, because, you know, I don't, again, don't want to prejudge anything here, but this is a huge change. And it would be great to have that contextual information to understand. You know, we can ask the DAs directly and get that information on their side. At the front end of this pipeline. But I think it would be very helpful for the General Assembly to understand how that has worked its way through the system. So, I appreciate that effort.

**Rep. Esgar**
Senator Rankin.

- 16 -

**Sen. Rankin**

As well as relating it to convictions. I mean, we always ask the question, what's really happening with crime. I mean and that relates to arrest, I suppose. Does anybody try to relate caseload to crime rates and actual arrest data?

**Rep. Esgar**

Mr. Chief Justice.

**Chief Justice Coats**

Well, there again, and I'll let Mr. Vasconcellos talk about data we've done. I would just say, with regard to these kind of attempts, broadly, to look at why has crime gone up? Has it? What way has it gone up? It is a slippery . . . I mean, we can, we can measure numbers of cases. We could come back and find convictions. Because of the plea-bargaining process, the charging discretion, but, also, it's difficult to separate out what the motive, what the motivation was for various crimes. And it sort of leads to difficulty, I think, in us attaching one cause to an increase in crime. In one of the more famous opinions by the United States Supreme Court, where they're discussing recidivism and particularly the problem of drugs, drug crime. I think a lot of us associate and really can tell anecdotally that a lot of this probably does have to do with a change in the culture and a drug problem. But, you know, in this opinion, I was going to say, as I recall, the Justice says, well, drugs are serious crime because people who are on drugs may commit crimes because they're not in control, because they're driven to it. That may be something. Lots of other crimes, thefts, other kinds of property crimes, even assaults, may also be related to the drug crime. But they are because the person needs to get the ability to purchase the drugs and get them. It goes on to a third and says, and part of it may just be a culture, because those who are involved in a drug culture are likely to be less respectful of the law and less concerned to follow it. I just use that as an example that the question of attaching a cause to one of these things is difficult. But if you'll let Mr. Vasconcellos speak again. I bet he can tell you what we could come up with.

**Rep. Esgar**

Absolutely, Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Senator Rankin, the only thing I would add to the Chief Justice's remarks is that approximately a year or so ago, we contributed some data to an effort that the Division of Criminal Justice was working on they think is more in line with their questioning, and they have, of course, more of a pure research function that we don't. And, so, I haven't seen the outcome of that. I don't know if that's still in process. But I do believe DCJ was working to try to understand more root causes in the vein that you're asking.

**Rep. Esgar**

Senator Rankin.

- 17 -

**Sen. Rankin**

Just to comment, to be fair, we're this is not a question about your budget. We get a lot. We get a lot of requests that say, if you do this, things will get better in the future. Everything from third grade reading to intervention for two-year olds. And you know, our big question is, how will we know? Because everybody promises, you know, all these other programs we hear about to reduce your caseload. So, we're just looking for some opinion and guidance from you who see the big picture, I think. So, this is not a budget question, so don't take it that way.

**Rep. Esgar**

Mr. Chief Justice, if there's other items you specifically wanted to point out in your write up.

**Chief Justice Coats**

Thank you, Madam Chair. Could I just move very quickly, and maybe even Mr. Vasconcellos, more than I. That we could point out. Also, we think a very important request is our request for increase in probation officers. This was partly a flow from last year, even. You gave us additional probation officers, and the expectation was we would need even more. This is closely related to caseload and the particular kinds of cases that we wind up having to have our probation officers supervise, as distinguished from a private probation officer. And if it would be all right, Madam Chair, maybe especially given the shortness of time, I'll just let Mr. Vasconcellos.

**Rep. Esgar**

Absolutely, Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. So, given the criminal filing data that we looked at, it's probably no great surprise that that's putting additional workload pressure on our probation departments statewide. And in particular, the greatest area of growth for new incoming probation clients are high-risk clients, and those are something that we keep under state supervision. That is not something we send to private supervision, and really so not to oversimplify, but it's a straight caseload and workload challenge. With felony criminal filings increasing by almost 50% in the last five years, downstream. Keep in mind, again, I'm sure the committee knows. But as a quick reminder, probation is the largest supervising arm in the criminal justice system. There are about 80,000 people on active supervision by probation in Colorado at any given time. Far larger than the number of folks in DOC or in Comm Corr, etc. And so, you know, such a strident increase in criminal filings has put pressure on our ability to adequately supervise folks, and our request for 16 additional FTE is linked directly to that caseload increase.

**Rep. Esgar**

So, back to my question then. Page 9 at the table I was looking at. And just out of curiosity, is there not a need in the 10th or the 20th Judicial District for more FTE, for probation staff?

**Steven Vasconcellos**

Thank you, Madam Chair. I don't have those numbers with me. I'm happy to provide those to Mr. Allen to share with the committee. My suspicion is that I doubt seriously that there's zero need in those jurisdictions. We usually in given the scarcity of resources, always in these conversations, we try to prioritize our highest needs. And I suspect there are needs in those locations, but they didn't make the cut. However, we can provide the committee with statewide what the needs are, District by District.

**Rep. Esgar**

That'd be helpful, just in case we do get questions from our colleagues as to why did you fund this and my District didn't get any? You know? Okay, great. Any other questions on the probation staff request? And I'm trying to be respectful of your time too, Mr. Chief Justice. Members, are there any questions you have that aren't answered within the documents that they provided? Or further clarification on any of the answers they provided that you need right now? Sure, and the written responses as well? Yes, that's great. Mr. Vice Chair.

**Sen. Moreno**

Thank you, Madam Chair. And appreciate the written responses that you provided. I was just wondering. Let me see if I can find it. If we can get a recent appropriation history and balance history for let me find the cash fund that you identified, the Judicial Center Cash Fund.

**Rep. Esgar**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you Madam Chair. Mr. Vice Chair, I will be happy to provide that information.

**Rep. Esgar**

Members, any other questions on any of the materials submitted to us about this, about courts and probation? Mr. Chief Justice, anything further for us?

**Chief Justice Coats**

Don't believe so. Thank you. Madam Chair.

**Rep. Esgar**

Mr. Vasconcellos, I apologize for slaughtering your name the entire hour. Anything further that you think needs to be related to us right now?

**Steven Vasconcellos**

No, Madam Chair. And no apology necessary.

**Rep. Esgar**

Well, we appreciate the time and effort that your staff put into this document. We know it was a lot of questions, looking for a lot of answers, but it is very helpful. It's things we take back with us, and we appreciate it. And we appreciate you being here today and your service to Colorado, as well. Thanks for joining us.

**Chief Justice Coats**

Thank you. Thank you for the opportunity.

**Steven Vasconcellos**

Thank you, committee.

- 20 -

# Appendix 27(b)(i)

# REP. OF COLO. JUD. DEP'T TO J. BUDGET COMM., December 13, 2019;

# OFFICE OF THE STATE COURT ADMINISTRATOR

Judicial Branch

FY 2019-20 Joint Budget Committee Hearing

**Friday, December 13, 2019**

**9:00 am – 10:00 am**

Main Presenters:

- Chief Justice Nathan Coats
- Steven Vasconcellos, State Court Administrator

Supporting Presenters:

- Hugh Wilson, Budget Manager
- Terry Scanlon, Legislative Liaison

**Introductions and opening comments**

QUESTIONS FOR THE OFFICE OF THE STATE COURT ADMINISTRATOR

**JUD 1: Why have county court filings declined? Have recent statutory changes increased the jurisdiction of county courts? If so, shouldn't this increase their caseload?**

Changes to laws and policies at the local, state and federal levels and changes to other criminal justice agencies can directly impact the volume of cases filed with the courts. For example, federal banking regulation changes related to debt collection practices have resulted in decreases to county court collection cases. Also, when broader economic shifts occur there may be different engagement with existing practices, such as municipalities retaining more traffic and lower level misdemeanor cases under the model traffic code to supplement lean revenues. While overall volume of cases may be down, there are still some class classes experiencing growth more recently. For example, misdemeanor case filings are showing a 2% increase compared to FY16. When considering workload impact of caseloads, the composition of the caseload is far more important than the overall volume of filings. The time it takes to process a traffic infraction is significantly less than the resource demands of a domestic violence case.

The General Assembly recently passed two pieces of legislation that are expected to increase the volume of filings in county courts. Senate Bill 18-56 increased the jurisdictional limit from $15,000 to $25,000 for civil cases in county court. While there is still concurrent jurisdiction with district court, allowing litigants to recover a greater amount of money in a simplified

JUD Page 1

court process is expected to attract more individuals to pursue claims of $25,000 or less in county court. Although the Governor signed the Act in May of 2019, the changes did not go into effect until January 1, 2019.  A year-to-date comparison with preliminary data shows a nearly 4% increase in money cases filed in county court.

In the 2019 Legislative Session, the General Assembly changed the classification of drug possession offenses (House Bill 19-1263).  This legislation reclassifies a number of felony drug possession offenses to misdemeanors.  As a result, an unknown number of cases that the District Attorney would formerly charge as felonies and file in the district court will now be charged as misdemeanor offenses and filed in the county courts.  This legislation does not go into effect until March of 2020, but the Department anticipates misdemeanor caseloads will increase as a result and will be monitoring the impact closely.

**JUD 2: What is driving the felony caseload increase?**

Felony drug cases, specifically drug possession cases, drive a large part of the increases to felony filings.  In comparison to FY 2019, felony drug case filings, i.e. cases were a felony drug offense was the most serious charge, have increased approximately 88% since FY 2013 statewide.  Additional cases types contributing to the increase include: violent offenses; property offenses (e.g. forgery/fraud, motor vehicle theft); and custody violations (e.g. bond violations, escapes, and contraband-related violations).

| Felony Filings by Case Type FY14 v. FY19 | | | |
|---|---|---|---|
| Felony Case Type | FY14 | FY19 | Percent Change |
| Drugs | 9,395 | 17,708 | 88.5% |
| Theft | 5,120 | 6,462 | 26.2% |
| Assault | 2,924 | 5,469 | 87.0% |
| Burglary | 3,167 | 3,694 | 16.6% |
| Other | 2,889 | 2,352 | -18.6% |
| Menacing | 1,839 | 2,255 | 22.6% |
| Sex Offense | 1,738 | 2,032 | 16.9% |
| Trespass | 1,493 | 1,924 | 28.9% |
| Fugitive | 1,274 | 1,855 | 45.6% |
| Escape | 1,354 | 1,757 | 29.8% |

**JUD 3: How long has the State been using private probation services?**

The General Assembly authorized the Department to contract with private probation in 1996 through House Bill 96-1120, which took effect on July 1, 1996. The table below provides a

JUD Page 2

summary of the number of probationers supervised by private probation by district.  Less than half of the judicial districts in Colorado currently utilize private probation.

| Private Probation | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| District | 1st | 4th | 5th | 8th | 10th | 11th | 17th | 18th | 19th | 20th | Total |
| Active    Count 6/30/19 | 1,278 | 1,967 | 246 | 1,047 | 593 | 219 | 1,115 | 2,712 | 666 | 1,404 | 11,247 |

**JUD 4: What kinds of cases are being referred to private probation?**

Probation supervises individuals based on their individual and actuarial risks and needs rather than the type of crime they commit.   In this case, *risk* refers to a person's probability of committing a crime again via the results of an actuarial risk assessment.  An abundance of research showing no relationship between the type of crime and a individual's probability of re-offending.

Chief Justice Directive 16-01 states, "Given limited resources, lower (low medium and low) risk offenders, either felony or misdemeanor, and certain alcohol/drug/driving related offenders may be supervised by use of contract probation services…"  As such, clients transferred to private probation have been assessed as lower risk to reoffend, based on the results of the Level of Supervision Inventory (LSI), a validated risk assessment. The LSI categorizes individuals into low, medium, and high risk to re-offend. Cases that are transferred to private are low risk or they are on the low end of the medium risk range. These individuals tend to have little to no criminal history and have few issues that are disrupting their life, such as substance abuse or employment problems. About nine out of ten clients transferred to private probation are lower risk and on supervision for a misdemeanor or petty offense.

**JUD 5: What data does the Department collect concerning probation outcomes? Does the Department have any data comparing outcomes for public versus private probation services?**

In the Department's *Annual Statistical Report*, the probation section provides outcome data for probation, including private probation. Additionally, probation publishes and submits an annual report to the legislature titled, *Pre-Release Termination and Post-Release Recidivism Rates of Colorado Probationers*.  Both state and private outcomes are included in the annual report and the recidivism report; however, the recidivism report combines state and private probation data together, while the annual report provides the data in separate sections.

Since lower risk probationers are supervised by private probation, it is expected that most probationers will complete their probation successfully and remain crime-free upon completion of probation.  Historically, private probation's success rates have been in the 81%-86% range, meaning more than 80% of probationers supervised by private probation

successfully complete their sentence.  Additionally, lower-risk probationers are the least likely to recidivate.  Historically, approximately 96% of low risk probationers remain crime-free at least one year after they complete their probation sentence.

Higher risk probationers are supervised by state probation.  Due to the risk factors high risk probationers are less likely to be successful during supervision and post-supervision even with interventions and treatment.  State probation also provides intensive supervision for those probationers that present with the highest risks and needs.  Historically, state probation's success rates have been in the 59%-61% range, meaning approximately 60% of probationers supervised by state probation successfully complete their sentence. Additionally, higher-risk probationers are more likely to recidivate. Approximately 83% of high and 90% of medium risk probationers, who complete their probation sentence remain crime-free after successfully completing probation.

Beyond the data above, the Department has not compared state probation to private probation in greater depth.  Private probation is a cost-saving measure more so than an efficacy-based concept.  As the two programs are designed to interact with two different types of probationers, a specific in-depth comparison study has not been prioritized. However, the Department is contemplating an independent external process and outcome study of probation next year.

**JUD 6: Last summer, troubling events were reported at the Judicial Department. Provide a detailed accounting of what occurred and the actions the Department has taken to ensure that these problems do not reoccur.**

Background

This question refers to media reports in July of this year about a contract awarded to The Leadership Practice, LLC, a company owned by Mindy Masias, the former Chief of Staff for the State Court Administrator's Office (SCAO).  Ms. Masias was employed by the Judicial Department for 23 years and reported directly to the State Court Administrator.  She voluntarily resigned from the Judicial Department for personal reasons on March 19, and The Leadership Practice entered a contract to provide training to the Judicial Department on June 3.  The July media reports brought to the Chief Justice's direct attention for the first-time certain material information that, for legal reasons, the Department is unable to go into detail about in answering this question.  Within days afterward, the Department terminated the contract with Ms. Masias's company, and former State Court Administrator Chris Ryan and former SCAO Chief Administrative Officer Eric Brown resigned their positions.

This question also refers to media reports about an anonymous complaint received by the State Auditor's Fraud Hotline alleging occupational fraud on the part of former SCAO leaders and high-level SCAO employees.  In May of this year, the State Auditor referred the complaint to the Chief Justice, who elected to have the Auditor conduct an independent investigation of the allegations, which is still ongoing.

The information below provides context regarding the Department's leadership development training initiatives, the process that resulted in a contract with The Leadership Practice, the fraud hotline investigation being conducted by the State Auditor, and actions taken by the Department in response to the reported events.

Leadership Development Contracting

Over the past 10 years, the Judicial Department—which totals approximately 4,000 employees and judicial officers—has placed an increasingly heavy emphasis on education and leadership training. Employees and judges have had the ability to receive intensive and comprehensive leadership development training through a centralized training program administered by SCAO. Around 2009, the Department began contracting with outside vendors to provide leadership development training to judges and employees. For FY 2014, the Department submitted a decision item request to the JBC to implement a leadership development and education program at a cost of $517,500.

The Department paid vendors an increasing amount of money annually, peaking at $689,000 in 2013. In 2015, the Department issued an RFP for leadership development training. The Department received three responses to the RFP and selected the previous vendors, who submitted a bid to provide the training at a cost of $633,500 per year. To help reduce this cost, the Judicial Department committed additional internal resources and staffing to assist in the development and delivery of the training programs. Between 2013 and 2018, the average annual cost for the vendors to provide training was $530,000. The leadership development and training opportunities have been valuable in creating a common culture within the department, and participants in the trainings have overwhelmingly provided positive feedback. The program has trained hundreds of Department judges and employees.

The Department's contract with the previous vendors was set to expire on September 30, 2019. In 2018, SCAO began work on a new RFP for leadership and training services. The previous State Court Administrator, after consulting with the Chief Justice, determined that the program needed to be restructured to provide more direct and targeted training to employees and focus on the unique work of the branch, as opposed to high-level theoretical leadership. In January of 2019, SCAO issued an RFP for a revised development and training program that placed a heavy emphasis on knowledge of judicial functions and operations. The RFP was posted for 22 days. The RFP was sent to 401 businesses, and the materials were downloaded by 24 of them. The Department received no questions about or responses to the RFP.

On March 20, Mr. Brown, who at the time was SCAO Chief Human Resources Officer, signed a sole source determination letter concluding that Ms. Masias's company, The Leadership Practice, was the only vendor capable of developing and delivering the training program described in the RFP. On June 3, Mr. Ryan executed a contract with The Leadership Practice on the Department's behalf in the amount of $532,000 per year. The contract with The

Leadership Practice required a more robust and tailored development and training program specific to the work of the Department and was an expansion of the leadership development training offered by the Department's previous vendors.

While the Department still firmly believes that leadership training is important to achieving its mission of serving the State of Colorado, the July media reports surfaced certain information about the vendor selected to provide such training.  On July 17, former State Court Administrator Ryan, at the direction of the Chief Justice, notified Ms. Masias that the Department was terminating the contract with The Leadership Practice because it had ceased to further the public policy of the Colorado Judicial Branch, which the contract refers to as termination in the public interest, and because the vendor had defaulted by failing to comply with certain contractual duties and obligations.  That same day, Mr. Ryan resigned his position, and two days later Mr. Brown resigned his position as Chief Administrative Officer.

The Office of the State Auditor Fraud Hotline Investigation

On May 16 of this year, the Office of the State Auditor (OSA) notified the Chief Justice that it had received an anonymous letter with allegations that could amount to occupational fraud. Consistent with the fraud hotline statute, Section 2-3-110.5, C.R.S., OSA gave the Judicial Department the option to investigate the allegations itself, investigate the allegations in conjunction with OSA, or request that OSA conduct the investigation itself.  The Chief Justice elected to have OSA conduct the investigation independently.  The investigation is in process, and it is not clear when it will be complete.  The scope of the investigation includes the procurement process for and contract award to The Leadership Practice, allegations of misuse of paid time off by former SCAO directors, allegations of Family Medical Leave Act fraud, and improper use of administrative leave for certain SCAO employees. The Department is working closely with OSA to provide access to information and documents directly related to the scope of OSA's investigation.

Actions Taken in Response

In response to these events, the Judicial Department has taken a number of steps to reflect on past actions, review existing fiscal controls, and make enhancements to the selection process for future contracts awards.  More fundamentally, the Department learned that the amount of money spent on services provided to the Department, even if initially determined through an RFP process, is not a default benchmark for future similar services.

As explained above, the Department terminated the contract with The Leadership Practice. The Department is reviewing whether its policies were followed in the procurement and contracting process.  At this point, it appears that some requirements in the Department's fiscal rules were not strictly followed.  The Department has also undertaken a review of its existing contracts to determine whether they have complied with the Department's contracting and procurement rules.  Additionally, the Department is reviewing its fiscal rules for consistency with Executive Branch fiscal rules and for ways to further tighten fiscal

JUD Page 6

controls and enhance transparency in our contracting process.  The Department has reviewed its capacity for procurement and contracting review and has asked the Joint Budget Committee for additional resources to procure and manage contracts around the state.   The Department is currently working with a vendor to develop and implement a statewide ERP system to manage the overall contract process, vendor management and procurement functions.

The Supreme Court has taken a more active role in the work of SCAO.  Historically, the Chief Justice has worked closely with the executive team at SCAO, in keeping with his or her constitutional role as the executive head of the judicial system, and the rest of the court has assisted with administration indirectly through various committees.   Still, day-to-day operations have been largely the work of SCAO, given the court's other responsibilities to the public and the size of the organization.  In light of recent events, however, Supreme Court Justices are serving as liaisons to work directly with the different Divisions at SCAO to provide support and strategic direction.  The Supreme Court has discussed the situation with SCAO and employees and judges around the state and has encouraged them to report anything concerning in the course of their work.  This is not a short-term measure.  The Court is committed to long-term, active involvement in administrative operations of the Department.

There have been major changes in leadership at SCAO, including the appointment of current State Court Administrator Steven Vasconcellos through a robust, transparent, and competitive selection process.  The Supreme Court has heightened expectations for SCAO leadership positions and has communicated these expectations clearly.  SCAO is currently in the process of hiring three different division directors, who will serve as part of Mr. Vasconcellos's senior leadership team.
This summer and fall have largely been a reset period for the work of SCAO.  This has presented the Supreme Court and SCAO leadership with an opportunity to take a deep look at its existing practices and explore opportunities to improve accountability to the public and service to the rest of the Department.

At the direction of the Chief Justice, the Department has asked the Attorney General's Office to be much more involved in providing advice to the Department on issues of contracting and personnel.  The Attorney General's office has been integral in advising the Department over the past seven months.

The Department is working diligently with OSA to facilitate its completion of the fraud hotline investigation and will closely review and digest OSA's independent findings to identify areas for continued improvement.

**JUD 7: Provide a brief history of the court reporter page rate.**

The transcript preparer's rate per page has been increased two times since 1993.  The transcript rate began at $2.00 per page in 1993 increased to $2.35 and finally increased to $3.00 where it has remained since Fiscal Year 2016.

JUD Page 7

**JUD 8: What would be the cost to the Judicial Department if the court reporter page rate increased by 50¢ per page?**

About $14,000/year

QUESTIONS ABOUT REQUESTS

**JUD R1 ($500,000 Judicial budget reduction): Is this a one-time reduction or is it ongoing?**

This is an on-going reduction.  OSPB instructed Executive Agencies to submit budgets with a 2% budget increase (including all fund sources).  The Judicial Department took the opportunity to review its programs and identified an opportunity to reduce General Fund expenditures by $500,000.  The Department terminated its leadership and training contract in July of this year and does not intend to resume a similar education and training program this fiscal year.  However, the Department sees value in some level of education and training that is specific to the work of the Department.  The Department anticipates that it may submit a decision item in a future fiscal year detailing its education and training needs.

**JUD R2(a) (Magistrates): Who conducts judicial officer workload studies for the Department? How do these studies inform the Department's budget requests?**

The Judicial Department utilizes an independent vendor, selected through a competitive procurement process, to conduct all workload studies for judicial officers and trial court staff.  The National Center for State Courts has conducted the most recent weighted caseload studies for the trial courts.  Weighted caseload studies are the preferred method of measuring workload in courts and probation nationally.  Using a weighted caseload approach to workload modeling offers an advantage over other approaches by assessing staff need based on the complexity of each case type. The utilization of a workload model allows the Department to closely monitor resource needs and deployment and helps objectively identify areas where additional resources are necessary to support the work and mission of the courts.  The information regarding staffing levels is a critical component to the Department's evaluation of needs and is utilized to demonstrate and support budget requests for additional resources when appropriate.

**JUD R2(b) (Magistrates) and JUD R3 (Additional Probation Officers): Provide a detailed explanation about how the requested judicial officers and probation officers will be deployed.**

The Judicial Department's magistrate and probation officer request is based on workload needs identified in Class B County Courts and the Probation Staffing Model.  The tables below outline the Class B County Court locations and the probation departments with the greatest resources needs. Final allocations will depend on the amount of funding received from the

JUD Page 8

General Assembly and an analysis just prior to FY 2021 allocations to determine if there were any dramatic changes in the distribution of resource needs since the budget request.

| Proposed New Magistrate Allocation | |
|---|---|
| **Class B County** | **Total** |
| Adams | 2.0 |
| Weld | 1.0 |
| Larimer | 1.0 |
| Jefferson | 1.0 |
| El Paso | 1.0 |
| Arapahoe | 1.0 |
| Mesa | 0.5 |
| Pueblo | 0.5 |
| **Total** | **8.0** |

| Proposed Probation Staff FTE Allocation | |
|---|---|
| **Judicial District** | **FTE** |
| 1st | 2.0 |
| 2nd (Adult) | 2.25 |
| 3rd | .25 |
| 4th | 2.75 |
| 6th | .75 |
| 7th | .50 |
| 8th | 2.1 |
| 9th | .25 |
| 11th | .45 |
| 12th | .25 |
| 13th | .50 |
| 17th | .85 |
| 18th | .50 |
| 19th | 1.75 |
| 21st | .5 |
| 22nd | .25 |
| **Total** | **15.9** |

JUD Page 9

**JUD R2(c) (Magistrates): Senate Bill 19-191 required each judicial district to develop a plan for setting bond for all in-custody defendants within forty-eight hours of arrest. In November, the Judicial Department issued a report on the cost of these plans. What were the findings? Would the Department use video links to conduct bail hearings remotely? Would the Department use the magistrates requested in R2 to address this requirement if it became law?**

The Judicial Department submitted a report regarding the potential costs associated with the implementation of mandatory 48-hour bond hearings.  While many variables remain unknown, according to the reports from the districts, statewide trial courts will require 4.6 FTE judicial officers and 10.10 FTE support staff (trial court and probation) to comply with a 48-hour bond setting requirement. Although we anticipate additional need for interpreter FTE as well as contractor needs for interpreter services, we are not currently able to create an estimate. We also anticipate technological and A/V needs to fulfill these plans. Costs come from both the equipment needed to make weekend bond hearings accessible to parties and the public, as well as the IT staff needed to support the equipment and technology in the districts. Obtaining the equipment alone, without any support staff, would require approximately $4.1 million. On demand Information Technology support options exist on a scale, though the risk of not holding hearings due to technological issues increases with the fewer in-person support positions. Additional FTE are necessary to ensure the continued type of technical support the courts receive. Hands-on, statewide weekday-level technical support on the weekends will cost up to $1.9 million, with lower-end vendor provided virtual services costing approximately $260,000.  These estimates are subject to changes once more details regarding the exact process and requirements of any proposed legislation are available.

While the legislation requesting this report required each individual judicial district to submit a plan, several alternative strategies emerged in discussions and stakeholder meetings that are worth noting. These alternatives focus on ways judicial districts can coordinate to accomplish 48-hour bond settings including regionalization and/or the creation of a statewide bond commission.  These alternatives will require additional research and discussion.

The magistrate request (R2) is not related to the resource needs identified in the SB19-191 report because the Judicial Department has not experienced a workload impact from the bill. SB19-191 did not implement changes to the timing of bond hearings but required an analysis of the broad concept of weekend bond hearings.  While it is possible that magistrates received from R2 may share the burden of a 48-hour bond hearing requirement should it become law, the current magistrate request is separate.

**JUD R3 (Additional Probation Officers): Last year there was discussion about using probation strategically.  There was a conversation about using probation as an alternative to incarceration to save money and prevent unnecessary justice-system involvement. Are we still pursuing this strategy? Is this request related to this proactive strategy?**

The discussion last year pertained to HB 19-1226 and the possibility of using Judicial Department resources for monitoring defendants on pre-trial supervision as an alternative to

JUD Page 10

pretrial detention.  The concept centered around using Judicial Department staff to perform pretrial supervision, specifically in rural areas where local-level capacity limitations might prevent counties from implementing pretrial service programs.  In those conversations, some stakeholders expressed concerns about using Judicial Department staff to perform pretrial supervision rather than local-level employees of county governments.   Despite these concerns, the Department remains open to discussions about probation as an alternative to pretrial detention in local jails.

With respect to pre-plea or post-plea diversion programs, C.R.S. 18-1.3-101 (8)(9)(a)(b) authorizes probation to supervise individuals who have been sentenced to diversion and given suspended prosecution either before or after charges are filed, for a period not to exceed 2 years. Currently, this is an option that is rarely utilized. For the last five years, less than 1% of all new probation clients were diversion clients supervised by probation. Currently, probation has approximately 22 people in probation-based diversion programs in five judicial districts and counties (Gilpin, Arapahoe, Jefferson, Larimer, Prowers).  Diversion programs are typically operated at the local level by District Attorney offices or local law enforcement.

As an alternative to post-sentence jail or prison incarceration, Colorado probation is, by far, the largest single sentencing option in Colorado.  The active population in probation is more than 80,000 people in various levels of supervision and specialized programs.  Our average daily population is about four times the number of inmates in DOC custody, nearly nine times the size the parole population and over 20 times the size of community corrections.  Colorado probation is also the most economical per-person sentencing option.  For adults, the annual cost per person is just over $1,500 compared to $6,000 on parole, nearly $9,000 in community corrections, and over $38,000 in DOC prison institutions. Overall, our adult population makes up 61% of the state funded corrections population yet only consumes 9% of state appropriations for that same corrections population.  On the juvenile side, our population represents 82% of the juvenile corrections population yet only consumes about 9% of state appropriations for that same population.  From this perspective, probation already exists as a large, economical, and strategic alternative to incarceration.  Our budget request is intended to further advance this strategy and to maintain minimal staffing levels to meet the needs of the state and local communities.

**JUD R9(a) (Courthouse Capital): What is the process for identifying requests for courthouse capital funding? How does the Department prioritize projects and calculate a reasonable amount of funding for each project?**

Counties planning courthouse remodel/construction projects contact the State Court Administrator's office to notify the Department of their intent to proceed with a project. Department staff then work with the counties on courtroom design, requirements, and needs.   The counties are initiating these projects, and the Department is merely reacting to their initiative and has no say in prioritization.  The state funds courtroom furnishings, IT and

IT infrastructure, and A/V within the courtroom.  Each project component is costed individually by Department staff and is identified in the budget submission annually.

**JUD R9(b) (Courthouse Capital): What happens if a very large number of counties decide to build or refurbish courthouses at the same time? Are state Courthouse Capital expenditures required? Must the state fund them all when they are completed? Explain the statutory requirements and how the Department prepares its annual budget request for Courthouse Capital.**

13-3-108 C.R.S. requires the board of county commissioners in each county to provide and maintain adequate courtrooms and other facilities.  It is silent on what the state is to provide however, since unification of the court system in the late 1960's the state has assumed financial responsibility for the furnishings within the courtroom.  What furnishing this includes has evolved over the years to include furniture, IT infrastructure (computers, networks including phone, wireless, recordings and other connected devises) and AV equipment for evidence presentation.   If multiple counties decided to build/remodel their courthouses at the same time it could be potentially impactful financially to the State or if a front range county were to build a new courthouse, the cost to the State of furnishings could run into the millions.  In the last few years, the number of county projects has been between six and fifteen each year and the appropriations have been:

| | |
|---|---|
| FY17 | $4,720,569 |
| FY18 | $2,639,800 |
| FY19 | $1,963,781 |
| FY20 | $4,135,390 |
| FY21 Req: | $2,273,235 |

**JUD R10 (IT Data Center Equipment Replacement): The request asks for funding to purchase servers. What are the alternatives? Leasing? Cloud-based services? What solution would be most cost-effective and reliable?**

The Department is evaluating alternatives to purchasing servers, including leasing and cloud-based options and will provide the results to the Committee early in January.

**Unnumbered Salary Survey Request (a): Identify the job classes involved in this request, stating the salary increases in dollars and percent for each.**

| Classification Title | FY20 Recommended Paygrade Realignment | Head Count in Classification | Total Increase (Dollars)** |
|---|---|---|---|
| Appellate Law Clerk* | 3% | 62 | $ 122,174 |
| Auxiliary Services | 10% | 1 | $ 1,146 |
| Business Intelligence Developer | 2% | 1 | $ 2,521 |
| Chief Staff Attorney | 2% | 1 | $ 3,317 |
| Customer Support Technician I | 5% | 2 | $ 2,922 |
| Customer Support Technician II | 5% | 3 | $ 4,262 |
| Deputy Chief Probation Officer | 2% | 8 | $ 22,151 |
| Deputy Court Executive | 2% | 8 | $ 20,600 |
| Human Resources Assistant | 7.5% | 2 | $ 4,939 |
| Human Resources Technician | 3% | 2 | $ 2,090 |
| Law Clerk | 5% | 82 | $ 168,426 |
| Legal Research Attorney | 2% | 26 | $ 31,238 |
| Payroll Analyst | 4% | 3 | $ 8,305 |
| Probation Manager | 2% | 13 | $ 30,672 |
| Probation Officer* | 2% | 861 | $ 1,178,461 |
| Senior Customer Support Tech | 5% | 4 | $ 9,774 |
| Senior Network Engineer | 2% | 1 | $ 2,063 |
| Senior Systems Engineer | 2% | 3 | $ 6,525 |
| Software Engineer I* | 9% | 3 | $ 20,520 |
| Systems Engineer I | 3% | 2 | $ 2,157 |
| Systems Engineer II | 3% | 3 | $ 7,766 |
| *Classifications where only the range minimum and incumbents will move. | | | |
| ** Includes salary increase, PERA and Medicare | | | |

**Unnumbered Salary Survey Request (b): Compare the results of the Judicial Department's salary survey with the results of the Department of Personnel and Administration's salary survey. How do the salary ranges compare for similar job classifications?**

The Judicial Department uses a separate compensation system structure for salary ranges and different methodologies for how it determines salaries compared to how DPA uses its compensation study. The Judicial Department has individual salary ranges for every job classification while the Executive Branch has a matrix system that slots job classifications into predetermined ranges. The Executive Branch analysis within its compensation survey focuses on job families and overall wage medians of its employees rather than analysis on all individual job classes that the Judicial Department uses.

The Judicial Department does use salary data from the Executive Branch for similarly situated job classifications within its salary survey performed by an outside vendor, Segal Waters. Using this information within the Department's custom survey ensures that it are

JUD Page 13

treating comparable job classification salary ranges in a similar manner while still allowing for appropriate market salary ranges for judicial personnel. However, the Department examines different factors than the Executive Branch for salary surveys.

The Department evaluates job ranges at the median of the market, and if our salary range is below the median of the market at a variable greater than 3%, we request additional dollars to move the salaries for those employees.  If the additional dollars are not requested and we are forced to move the salary range to be competitive for hiring salary rates (recruitment), the current employees are not able to move along the salary range and are then being paid at the same rate as a new employee.  This is called compensation compression and is a large factor in the retention of employees.  For example, if a five-year employee is paid the same as a newly hired employee, the five-year employee will look elsewhere for employment.   Given the low unemployment rate and the demands of higher wages for living on the front range, the Department sees substantial value in retaining knowledgeable and experienced employees.

## ISSUE 2: S.B. 18-249 AND S.B. 18-251

**I2 – JUD 1: For SB 18-251, what has been the experience in other judicial districts (other than the Western Slope) in contracting for the liaisons required by the bill? Has the Department been able to find appropriate people who are familiar with local behavioral health services to fill this role?**

The Bridges Program was able in its first year to contract successfully with community partners to employ Court Liaisons in all 22 judicial districts as follows:

- o Ten mental health centers covering 15 districts
- o Three private non-profit behavioral health organizations, covering four districts
- o Two pre-trial services providers, covering two districts
- o One public health department, cover one district

While there is no shortage of appropriate individuals to fill the role of Court Liaison, contracting has presented significant challenges as follows:

- o **Allocation of Funds**:  Contractors have been unable to pay Court Liaisons the salaries initially anticipated in the creation of the legislation, which was an annual average of $64,000 plus benefits.  Instead, Court Liaisons are paid an average of $43,000 plus benefits annually across all contracts, with the difference going toward the contractors' administrative expenses.  This significantly lower salary presents challenges with both recruitment and retention.  In contrast, contractors have indicated they feel the contract amount (average $85K) is not significant for the cost of the program.

- o **Disruption of Services**:  As a direct result of the lower salaries, six of the 29 liaisons have left the position for higher paid positions in the past year.  Recruiting and training replacements is a slow process, and those districts have experienced 2-4 months of disruption in Court Liaison services.

- o **Appropriate Supervision:**  The majority of contracts reflect a 1:1 supervisor-to-liaison ratio, presenting a challenge for contractors.  While contracted partners provide employment supervision to liaisons, many have not been able to provide the necessary guidance in navigating the criminal justice system nor implementing a program that is different than the rest of their services.

- o **Secure File Storage Solutions and Case Management Systems:**  For various reasons, all but two contractors have indicated they cannot provide secure file storage solutions and/or case management systems for the use of Court Liaisons.

**I2 – JUD 2: Are we achieving the legislative intent of S.B. 18-251? Is it promoting collaboration and consultation among behavioral health providers, district attorneys, and defense attorneys about available community-based behavioral health services and supports, competency evaluations, restoration to competency services, and other relevant decisions and issues facing individuals with behavioral health conditions who are involved with the criminal justice system, including appropriateness for community treatment and resource availability? Please provide numbers to support your response.**

The Bridges Program has been well-received by participants and stakeholders, including behavioral health providers, attorneys, judges, and the Office of Behavioral Health.  As of December 1, 580 participants representing 724 cases have entered the Bridges Program.  The program is expected to grow exponentially as more judges across districts begin utilizing Court Liaisons.

The impact of Court Liaison involvement on a defendant's well-being is often immediate and significant.  In one month alone, Court Liaisons facilitated cross-agency responses that resulted in three successful suicide interventions.  The Bridges Program is working to develop a program evaluation that will provide quantitative data to allow us to measure program effectiveness both quantitatively and qualitatively toward specific program goals and objectives.  In the meantime, the below testimonials illustrate the positive impact Bridges is having on courts, defendants, and OBH competency programs:

- *A Court Liaison was assigned to work with a female participant who had been incarcerated in the County Jail for seven months.  The Court Liaison coordinated services and family support to the point that all parties agreed there was enough stability for the participant to be released from jail and receive outpatient restoration services, rather than remain in jail awaiting inpatient restoration. The Judge's decision rested primarily on the fact that the participant would have the*

*continued support of the Bridges Program.  The participant has also joined the Bridges Program Statewide Steering Committee to help provide insight on the client experience.*

- *A Court Liaison was assigned to work with a participant who has had an open case since 2016. The participant's frustration with the system over the years had escalated to the point that necessitated court security during his hearings.  He was ordered to outpatient restoration but never engaged.  The Court Liaison was able to contact this participant at court and connect him to outpatient restoration services for a same day intake. The participant now attends all of his restoration classes.  He reports that he feels like, "God brought Bridges and outpatient restoration into his life for a reason," and that he feels supported and is making progress in a system that before seemed never-ending.*

- *A public defender in a rural community shared, "I'm so happy about [my client's] turnaround.  He looked so good.  I can't thank you enough for all of your help throughout this case.  You did amazing work while remaining impartial and neutral.  That's a very hard task."  A family member in this same case stated to the Court Liaison, "Thanks to… your efforts as far as I am concerned the outcome for [defendant] couldn't have been better."*

- *A public defender in another community reported that not only were her clients appreciative of the program, but that a client not in the program requested to participate because he had heard positive things from other defendants where he was in custody.*

- *A director at the Colorado Mental Health Institute (CMHIP) reports, "Wonderful!  I can already see/feel improvements.  The Court Liaison is down here just feeding us contact info and such on cases - this is going to be such a wonderful program addition!"*

- *A district court judge shared, "Thank you for all your time and dedication to this. This is an invaluable tool in our extremely heavy caseload and addressing a very serious issue."*

- *Special masters overseeing the consent decree in the lawsuit with the Colorado Department of Human Services have encouraged coordination with the Bridges Program, calling the system in place to date "impressive" and "innovative."  In an August 13, 2019, memo to Colorado Department of Human Services, special masters stated, "Although Bridges is not under our supervision, we certainly appreciate their work and view it as quite complementary to the goals of the Consent Decree and the work of CDHS that we do oversee."*

JUD Page 16

- *In an August 29, 2019, program review call with the Council of State Governments, the National Governors Association, the National Center for State Courts, and the National Criminal Justice Association, this group of consultants to the Governor's Office were highly encouraged by the efforts of the Bridges Program and stated, "It's calls like this that make our work worthwhile."*

## ISSUE 3: JUDICIAL OFFICER STAFFING

**I3 – JUD 1: The Department's 2018 workload study for county court judges shows that the work required for many types of cases has gone up. What types of cases have been affected? What are the reasons for the increase?**

The 2018 county court judicial officer workload study indicated significant increases in the time required by judicial officers to process DUI/DWAI, domestic violence, and misdemeanor cases. Time associated with felony criminal work by county court judicial officers also increased. The study identified several factors influencing the increase in time required to handle these types of cases specifically.  The Department believes that the expansion of technology and changes in policy and legal practices are key contributors to the change in workload.  Some specific examples of how these factors contributed to an increase in the time associated with such cases are as follows:

- The county court has experienced an increase of court time required due to body camera footage and other related technologies.  Judicial officers are reviewing lengthy camera footage submitted into evidence, and when these cases proceed to trial, the parties and juries are also spending increased time reviewing footage.  This increases the number of multi-day jury trials.  DUI cases, in particular, are impacted by these developments as there is often body camera or dashboard camera footage of these incidents.

- With legalization of recreational marijuana, the number of drug related Driving Under the Influence cases has increased.  These cases involve blood tests rather than breath tests.  At trial, the prosecution must call a toxicologist expert to testify to the blood test results and effects of the drugs.  Often the defense may call a toxicology expert to give a contrary opinion.  This means that most of these cases take at least two days instead of the normal one to one-and-a-half-day county court jury trial.

- The Rothgery v. Gillespie County decision in 2008 clarified the defendant's right to counsel at all initial proceedings, the county court has experienced an increase in cases where defendants are represented by court-appointed counsel.  This has increased the number of appearances on cases and increased the length of time required to handle each appearance.  More cases are set for jury trial, requiring evidentiary motions hearings and other pre-trial matters, even if the case is ultimately resolved before it proceeds to trial. For example, misdemeanor jury trials have increased approximately 93 percent in Jefferson County and approximately 14

JUD Page 17

percent in Adams County since FY14. County court has also seen more cases where mental competency to proceed is an issue.  When a defendant is ordered to undergo a competency, sanity, or mental condition evaluation, a mental health stay is ordered in the case until the evaluation is completed and considered by the court.  The court continues to set reviews and monitor progress during this time.  Compared to FY18, mental health stays ordered in county court cases increased 18 percent statewide in FY19. Certain districts are experiencing more pronounced increases to competency work. For example, the number of mental health stays ordered in a misdemeanor or traffic cases increased by 114 percent in Mesa County and 80 percent in Arapahoe County between FY18 and FY19.

- With the passage of House Bill 15-1043, a person faces a felony charge for a fourth or subsequent drinking and driving offense.  The increased penalties and collateral consequences due to DUI/DWAI convictions has contributed to an increase in litigation and trials in these cases.

- Senate Bill 16-116 created a new process for sealing certain criminal justice records. County court judicial officers are now required to review and process these motions that were previously handled via a separate district court filing.  If the case in question involves a victim, the judge must review the motion, set the matter for hearing and call the case on record to ensure victim notification requirements are satisfied before ultimately ruling on the motion to seal.  This process takes time and requires additional county court judge review of the case beyond what was previously required. There were 3,315 motions to seal in county court cases received in FY19; an increase of 20 percent in comparison to FY18.

- The increase of the county court civil jurisdictional limit as of January 1, 2019 (Senate Bill 18-056), has expanded the number of civil matters cases that may be heard in county courts.  While the full scope of impact is not yet known, this change may result in both increases to the number of cases as well as the work required to process the cases involving disputes over greater dollar amounts.   A year-to-date comparison with preliminary data shows a nearly 4% increase in money cases filed in county court.

**I3 – JUD 2: Page 41: Since magistrates are not retained by voters, what is the process for holding magistrates accountable? When is it appropriate to utilize a magistrate rather than a judge? What would be the cost difference if county court judges rather than magistrates were requested in R2?**

Magistrates report to the Chief Judge of the judicial district, are at-will employees and are subject to the Department's Personnel Rules and Policies. For instance, magistrates undergo the same performance appraisals received by other Judicial Department employees. Magistrates are evaluated on the essential functions and any additional functions assigned by their supervisor. Upon completion of the annual evaluation, the magistrate and supervisor

meet to discuss performance and actions can be taken for below standard or unacceptable performance.

Chapter 35 of the Supreme Court Rules outlines the Rules for Magistrates. While the matters that magistrates may preside over are limited, they can perform many of the same duties as a constitutionally elected or appointed judge. Work assignments are designated by the Chief Judge of the judicial district and can require performing judicial duties in any or all the following areas: criminal, civil, juvenile, domestic relations, probate, and traffic. Such duties may include deciding the merits of cases, hearing and evaluating evidence and witness credibility, analyzing laws and rules, making findings of facts and conclusions of law, and issuing oral or written decisions and orders to resolve cases. Magistrates cannot preside over jury trials, cannot rule on constitutionality of laws, and, in some cases, can only preside with the consent of the parties.  Unlike statutorily created judgeships, magistrate positions can be utilized in various locations over time as workload and staffing needs change.

A request for 8.0 County Court Judges would cost approximately $692,115 more in FY21 than for 8.0 magistrates of which the salary differential (including PERA and Medicare) is $192,964; capital outlay is $335,920 and operating is $163,231.

## OSPB's FY 2020-21 budget instructions asked executive-branch agencies to search for the following budget saving opportunities:

**Unspent Funds**

- o **Positions vacant > six months –is it really needed?**

- o **Reversions of prior year spending –is there a pattern or a one-time occurrence?**

**Actuals vs Estimates**

- o **Fiscal Notes-did enacted programs really cost what was estimated?**

- o **Decision Items –are there pilot programs still on-going?  Did the Department receive permanent FTE for functions no longer needed?**

- o **End of year spending-review purchases for the final 8 weeks of each fiscal year – were the purchases budgeted for in advance or end of year "spend-up"?**

- o **Travel, meals, official functions –review for least cost vs maximum allowable.**

**Unrequested Funds**

- o **Sunset recommendations—were any sunset recommendations not adopted by the legislature?**

- o **Appropriations—was the Department appropriated more than was requested?**

- o **Supplemental Requests—why did the Department not include these requests in regular budget cycle?**

**Underutilized assets**

- o **Goods or services that could be purchased less expensively in private sector.**

In preparing the FY21 budget request, the Department was aware of the OSPB budget guidelines and consequently submitted a budget that is 3.1% (in total) greater than the FY20 appropriations.  As part of the budget review process, the Department was initially able to identify $500,000 in General Fund savings.

Factors driving the Department's General Fund increase include the annualization of legislation (nearly $1 million), increased payments to OIT (FY19 - $4,527,616; FY20 - $7,401,966; FY21 request - $8,112,286), the state PERA increase of .5% and the decision item requests.

Subsequent to the November 1 budget submission, the Department has identified budget efficiencies that will be submitted in January as a budget amendment.   The amendment identifies $6.0 million in reductions in the FY21 request, lowering Department's overall budget increase to <u>1.51% </u>(compared to a statewide average of 2.6%) from the FY20 appropriation.

## PUBLIC ACCESS TO COURT RECORDS

**PA – JUD 1: Does the Judicial Department have a policy in place to ensure that the public may have access to its records showing how the courts perform their official duties, such as a uniform standard for sealing criminal court records? If not, why?**

The Judicial Department, and judges throughout Colorado, share the General Assembly's commitment to transparency.  Of course, some cases necessitate restricted public access for various reasons, such as safeguarding ongoing criminal investigations and protecting highly personal information in domestic relations cases.  In the interest of promoting transparency while recognizing the need for restricted access in such cases, the Judicial Department has crafted the rules outlined below.

Access to records of the Judicial Department is governed by the provisions of the Public Access to Information and Records Rules (PAIRR), which are promulgated by the supreme court, as well as the determinations of judicial officers in individual cases.  PAIRR Rule 1 incorporates Chief Justice Directive 05-01 and governs access to court records, such as filings in particular cases.  PAIRR Rule 2 governs access to administrative records of the branch and largely mirrors the provisions of CORA.  For both civil and criminal cases, judicial officers may restrict public access to court records in a particular case in accordance with the law.

JUD Page 20

The question references uniform standards for sealing criminal court records.  Sealing of criminal court records typically involves an individual convicted of a crime attempting to have that conviction sealed so that there is no longer a public record of the conviction.  Sealing is governed entirely by statute, and most criminal record sealing statutes are contained in Title 24.  Judges are required to follow those statutory provisions in sealing criminal cases.

The question appears to be directed at something other than sealing of criminal records.  Judges have the authority to "suppress" court records in certain situations, meaning that they can restrict public access to certain filings within a case or the entire case.  Rule of Civil Procedure 121, section 1-5, and case law govern the restriction of public access to court records in civil cases.  For criminal cases, restriction of public access to court records is governed by the Constitution and case law related to public access.  The Department does not have a separate court rule governing restriction of public access to records in criminal cases, but the Criminal Rules Committee of the supreme court is in the process of drafting a proposal for the supreme court.  The committee is expected to vote on a proposal in January 2020.  In the vast majority of cases where the judge restricts public access, one of the parties to the case files a motion asking the judge to restrict access, and the opposing party has an opportunity to respond to that motion.  In very few cases does a judge decide to restrict access without a request from the parties.

**PA – JUD 2: How many other states have adopted a uniform standard to ensure reasonable accountability to the public?**

The Department is not aware of how many other states have a uniform standard for restricting public access to records in criminal cases.  Every state has open records statutes or court rules that address public access.  In addition to general open records rules, some states specify the process for a court to follow in restricting public access, and other states have varying specificity of standards the court applies in restricting access.

**PA – JUD 3: Will the Judicial Department use any of the increased appropriations that it is requesting for FY 2020-21 to provide better accountability to the public?**

Undoubtedly, the requested appropriations will allow the Department to better serve the citizens of the state.  The Department continually strives to be open and accountable, while at the same time recognizing that it is the repository for extremely sensitive information in both civil and criminal cases.  The Department has a history and reputation of working with concerned citizens and legislators regarding its level of transparency and accountability.

**PA – JUD 4: Has the Judicial Department complied with public accountability measures that the Colorado General Assembly has passed, such as H.B. 18-1152, which dealt with CORA and sexual harassment complaints?**

Yes.  On May 31, 2018, the supreme court amended the provisions of PAIRR 2 to mirror the provisions of CORA related to sexual harassment complaints. On January 24, 2019, the

JUD Page 21

supreme court amended the Rules of Procedure regarding Attorney Discipline to add a provision that the Office of Attorney Regulation Counsel's investigation records regarding allegations of sexual harassment shall be available to the complainant and the respondent. On September 19, 2019, the supreme court amended the Rules of Professional Conduct governing attorneys in the state to clarify that sexual harassment in connection with an attorney's professional activities constitutes a violation of the Rules and is grounds for discipline by the Office of Attorney Regulation Counsel.

**PA – JUD 5: Describe how the Judicial Department currently handles CORA requests for sexual harassment complaints. Describe how the Department handles other types of CORA requests.**

For sexual harassment complaints regarding Department employees, the Department handles PAIRR requests the same way that other branches handle CORA requests for that information. PAIRR is identical to CORA with respect to sexual harassment complaints against Department employees.

Complaints against judges are handled by the Colorado Commission on Judicial Discipline. Confidentiality of those proceedings is governed by the Constitution (Article VI, § 23(3)(g)), statutes (§§ 24-72-401 and 402, C.R.S.), and court rule (C.R.J.D. 6.5).

Requests for sexual harassment complaints regarding attorneys who are licensed by the Office of Attorney Regulation Counsel are treated the same as other complaints filed with OARC. The information in the complaints is confidential until there is a determination that there is reasonable cause to believe that grounds for discipline exist and OARC files and serves a complaint against an attorney. It is important to remember that OARC regulates attorneys, the vast majority of whom are not Department employees. These records are maintained by OARC in its capacity as the licensing and regulating authority for attorneys throughout the state.

**PA – JUD 6: Describe how the Judicial Department currently decides to suppress records.**

When a court receives a filing that may contain confidential personal information, a court clerk may temporarily restrict public access to the document until the clerk has reviewed the document and redacted the confidential information. But in general, the Department does not decide whether to suppress records. It is up to each individual judicial officer to decide, based on the law and facts before him or her, whether to restrict public access to some or all of the records in a case.

**PA – JUD 7: In 2018, the Denver Post published a series of articles on suppression of court records. According to one of these articles:**

> **More than 6,700 civil and criminal cases have been restricted from public access since 2013, usually by judges who agreed to a request from prosecutors or**

JUD Page 22

**defense lawyers to shield them, The Post found. Of those, 3,076 are still under suppression orders that keep the details away from the public….**

**The Post found one criminal case — that of a board member and part-owner of the Broomfield Academy charged and convicted of felony sexual assault of a child and misdemeanor child abuse — in which prosecutors requested and received a suppression order to avoid publicity. The case remains suppressed.**

**It found another — of a member of the Adams County 14 school board eventually convicted with attempting to lure a child for sex — in which the judge ordered the suppression at the outset, without anyone even asking for it, because the judge "had concerns about releasing information," records obtained by The Post show. The case remains suppressed.**

**The case of Clifford Galley, 28, convicted of attempted first-degree murder, was one of a number The Post found that remained suppressed long after the defendant went to prison. Galley was sentenced to 169 years in prison and won't see freedom in his lifetime. Documents related to the case were suppressed after his arrest in 2013 and no one except for his lawyer, prosecutors or a judge could see them. Last month, a judge lifted the suppression order after The Post asked prosecutors' questions about it. His appeal, however, remains suppressed.**

**Does the Judicial Department think this type of suppression is appropriate? What has the Department done to address this issue?**

The Judicial Department cannot comment on whether actions taken by judges in specific cases are appropriate.  However, in response to the concerns raised in the Post articles, the Department scheduled and held multiple conferences with chief judges throughout the state.  Those discussions were fruitful and revealed, among other things, that many of the suppression concerns involved requests by the prosecution at the beginning of a case either because the investigation was still ongoing or to avoid alerting the defendant that a warrant for his arrest had issued; after the investigation was completed and the defendant was arrested in those cases, there was no follow-up motion filed to notify the court that suppression was no longer necessary.  That meant that the cases inadvertently remained suppressed.  As mentioned, the Criminal Rules Committee of the Supreme Court is currently working on a new rule to avoid these and other issues the Department learned about through its review and the discussions it had with the chief judges.  The goal of the rule the committee is working on is precisely to ensure transparency and public access.  It is also worth mentioning that the Department understands that the number of cases restricted from public access has been greatly reduced since the discussions held with the chief judges.

---------------------------

JUD Page 23

**ADDENDUM: OTHER QUESTIONS FOR WHICH SOLELY WRITTEN RESPONSES ARE REQUESTED. PLEASE RETAIN THE NUMBERING IN ORDER TO MAINTAIN CONSISTENT LABELING FOR COMMON QUESTIONS ACROSS DEPARTMENTS.**

1   **Provide a list of any legislation that the Department has:  (a) not implemented, or (b) partially implemented.  Explain why the Department has not implemented or has only partially implemented the legislation on this list. Please explain any problems the Department is having implementing any legislation and any suggestions you have to modify legislation.**

   The Department is on track to implement all legislation in the time prescribed in the legislation.

2   **Does the Department have any HIGH PRIORITY OUTSTANDING recommendations as identified in the "Annual Report: Status of Outstanding Audit Recommendations" that was published by the State Auditor's Office and dated June 30, 2019 (link below)? What is the Department doing to resolve the HIGH PRIORITY OUTSTANDING recommendations? Please indicate where in the Department's budget request actions taken towards resolving HIGH PRIORITY OUTSTANDING recommendations can be found.**

   http://leg.colorado.gov/audits/annual-report-status-outstanding-audit-recommendations-june-30-2019

   None

3   **If the Department receives federal funds of any type, please respond to the following:**
   a.    **Are you expecting any changes in federal funding with the passage of the FFY 2020-21 federal budget?  If yes, in which programs, and what is the match requirement for each program?**

      None

   b.   **Does the Department have a contingency plan if federal funds are eliminated?**

      N/A

   c.   **Please provide a detailed description of any federal sanctions or potential sanctions for state activities of which the Department is already aware.  In addition, please provide a detailed description of any sanctions that MAY be issued against the Department by the federal government during FFY 2019-20 or 2020-21.**

      N/A

   d.   **Compared to other states, Colorado ranks low in receipt of federal dollars. How can**

**the Department increase the amount of federal money received?**

The Department pursues federal grants when it makes sense programmatically particularly in the Probation and the Problem-Solving Court programs.    However, federal grants aren't necessary free and often require a state match or state paid management of grant or awards and the Department may not have the capacity to manage a grant within existing resources.

e.  **What state funds are currently utilized to draw down (or match) federal dollars? What state funding would be required to increase the amount of federal funding received?**

None

4  **Is the Department spending money on public awareness campaigns?   If so, please describe these campaigns, the goal of the messaging, the cost of the campaign, and distinguish between paid media and earned media. Further, please describe any metrics regarding effectiveness and whether the Department is working with other state or federal departments to coordinate the campaign?**

N/A

5  **Based on the Department's most recent available record, what is the FTE vacancy and turnover rate: (1) by department; (2) by division; (3) by program for programs with at least 20 FTE; and (4) by occupational class for classes that are located within a larger occupational group containing at least 20 FTE. To what does the Department attribute this turnover/vacancy experience? Do the statewide compensation policies or practices administered by the Department of Personnel help or hinder the department in addressing vacancy or turnover issues?**

Our current turnover can be linked back to the inability to move employee's through salary ranges.  The statewide common policy decision of only giving across the board increases or no increase has completely negated the pay for performance program set into place that was to help move employees through the ranges.  Without the two-tiered system of increases (Across the Board and Pay for Performance) coupled with the need to move salary ranges for market competitive starting wages, longer term employee salaries have not been able to progress through the range and are now compressed to be equal with employees who have started working with the state.

JUD Page 25

| | Appellate | Probation | SCAO | Trial Courts |
|---|---|---|---|---|
| Overall | | | | |
| Terminations | 2 | 103 | 26 | 192 |
| Total Head Count | 55 | 1226 | 256 | 1651 |
| Turnover | 3.6% | 8.4% | 10.2% | 11.6% |
| | | | | |
| Voluntary | | | | |
| Terminations | 1 | 63 | 18 | 118 |
| Total Head Count | 55 | 1226 | 256 | 1651 |
| Turnover | 1.8% | 5.1% | 7.0% | 7.1% |
| | | | | |
| Involuntary | | | | |
| Terminations | 0 | 8 | 2 | 26 |
| Total Head Count | 55 | 1226 | 256 | 1651 |
| Turnover | 0.0% | 0.7% | 0.8% | 1.6% |
| | | | | |
| Layoffs | | | | |
| Terminations | 0 | 0 | 0 | 1 |
| Total Head Count | 55 | 1226 | 256 | 1651 |
| Turnover | 0.0% | 0.0% | 0.0% | 0.1% |
| | | | | |
| Retirement | | | | |
| Terminations | 1 | 32 | 6 | 47 |
| Total Head Count | 55 | 1226 | 256 | 1651 |
| Turnover | 1.8% | 2.6% | 2.3% | 2.8% |
| | | | | |
| Death | | | | |
| Terminations | 0 | 0 | 0 | 0 |
| Total Head Count | 55 | 1226 | 256 | 1651 |
| Turnover | 0.0% | 0.0% | 0.0% | 0.0% |

6   **Please identify how many rules you have promulgated in the past two years (FYs 2017-18 and 2018-19). With respect to these rules, have you done any cost-benefit analyses pursuant to Section 24-4-103 (2.5), C.R.S., regulatory analyses pursuant to Section 24-4-103 (4.5), C.R.S., or any other similar analysis? Have you conducted a cost-benefit analysis of the Department's rules as a whole? If so, please provide an overview of each analysis.**

N/A

JUD Page 26

7   **What are the major cost drivers impacting the Department? Is there a difference between the price inflation the Department is experiencing compared to the general CPI? Please describe any specific cost escalations.**

Caseload is the main cost driver for the Judicial Department. Variations in caseload are mainly driven by policy decisions of the District Attorneys, such as charging practices. Legislative, social, and technological changes may influence not only the volume of cases, but trial court processes as well. For example, the expanded use of technology and body cameras in law enforcement has increased the amount of time spent reviewing evidence. Conversely, introducing E-Filing and other court technologies reduces material and data entry costs while also increasing accessibility of the trial courts. To the best of our knowledge, the Judicial Department is not experiencing significant price inflation compared to the general CPI.

8   **How is the Department's caseload changing and how does it impact the Department's budget? Are there specific population changes, demographic changes, or service needs (e.g. aging population) that are different from general population growth?**

The Department's probation population has changed considerably over the last several years.  The regular adult population has increased by more than 9,000 probationers from FY13-FY19, and the juvenile population has decreased by nearly 1,000 in that same timeframe. Adults sentenced to probation for felony convictions have increased by 33% over the last seven years (from 10,360 in FY13 to 13,773 in FY19). Additionally, the risk profile of probation's population has changed.   Colorado probation has measured increases in the number of high-risk adults being sentenced to probation and a corresponding increase in severity of need. Probation has seen an 80% increase in high risk probationers from FY13 to FY19. Comparatively, probation's low risk population has only grown by 11% in that same timeframe. High risk probationers present with greater needs and have more complex and disrupted stability factors (e.g. homelessness), behavioral problems, acute mental illness, longer histories of failure on community supervision and higher probability of failure on probation. These cases require great strategic and time-intensive supervision increases workload demands of state probation officers. Despite legislative efforts to reduce penalties and decriminalize various offenses, felony filings continue to increase, and probation's higher-risk population continues to grow.

While total trial court filings have declined slightly in the last year, the decrease has not been uniform. Some significant case types have increased over the past several years. For example, felony criminal filings have experienced robust growth, increasing 58 percent since FY 2012. During this same time, mental health filings have increased 28 percent and probate filings have increased 15 percent.

The complexity of cases has also changed over time, contributing to increased time constraints on judicial officers. For instance, additional time is required to process DUI/DWAI,

domestic violence, and misdemeanor cases. In many jurisdictions, county court judicial officers handle preliminary proceedings in felony criminal cases or in some locations oversee lower level felony cases for the duration of the case. The time associated with felony criminal work by county court judicial officers is another area that has experienced an increase.

The increased number of self-represented parties has changed the workload demands on the trial courts as well. Over the past ten to fifteen years, more citizens are now participating in a court case without the services of an attorney. Self-represented parties present unique challenges to the court system in several ways.  For example, self-represented litigants can increase the amount of time necessary for clerks to handle the day-to-day business of the courts as individuals require one-on-one procedural assistance.  Pro se litigants may be unable to print necessary documents and forms and often lack access to and/or struggle to understand state statutes, court rules, and policies and procedures necessary to properly handle their cases. The provision of assistance to parties without attorney representation continues to be a significant demand on the trial courts and needs related to this issue continue to be monitored closely.

Colorado Courts are experiencing the impact of two specific demographic trends in the state of Colorado. The rapid increase in population over the age of 65 and increased diversity of Colorado's population both have implications for the courts.

As the population ages, the courts expect to see increases in probate, protective proceedings cases, guardianship and conservatorship proceedings. Unlike some types of court cases, which can be resolved in a year or less, many protective proceedings cases require long-term oversight by the courts. More than 3,000 new protective proceedings cases were filed in FY 2019, and roughly 15,000 probate matters are subject to ongoing court monitoring at any given time.

Language and cultural barriers can create obstacles such as misconceptions about the role of the court system and law enforcement. These challenges can keep litigants with limited English proficiency (LEP) from participating fully in their own court proceedings. Court interpretation and translation require increased management and scheduling as the trial courts as they are increasingly compelled to use language interpreters in court proceedings and translators for written documents.  Additional time is required to determine the need for interpreter services, to schedule the appearance of interpreters, to conduct proceedings using interpreter services, and to process payments for interpreter services. Further, if an interpreter is not available or does not show up to a hearing, proceedings must be delayed. These factors can add significantly to the time required to resolve cases.

9  **Please provide an overview of the Department's current and future strategies for the use of outward facing technology (e.g. websites, apps), the role of these technologies in the Department's interactions with the public and other state agencies, the Department's total spending on these efforts in FY 2018-19 and expected spending in FYs 2019-20 and 2020-21.**

JUD Page 28

The Judicial Department ("Department") currently provides several external facing applications/websites to support an important Department goal of providing Access to Justice. The applications include an external facing website with a variety of self-service functionality such as the ability to pay fees and fines online, information regarding public records, and several online court reports. Additionally, the Department provides a statewide e-filing system (Colorado Courts E-Filing), which was developed inhouse, for all civil, criminal, probate, water, and domestic relations cases. In April 2019 (FY19), the Department also launched pro se e-filing for domestic relations cases in the 8th and 18th judicial districts. The Department will continue its rollout of pro se e-filing across the state in FY20 and FY21.

In FY20 and FY21, the Department's strategy to increase Access to Justice includes planning, and possibly the implementation of, a new external website. The vision for the Department's new website will be to create Unity in Justice by integrating several new applications that will be benefit the citizens of Colorado such as the Colorado Legal Help Center (CLHC) website and Online Dispute Resolution (ODR). The goal for CLHC and ODR is to seamlessly integrate these applications with the Department's Colorado Courts E-Filing (CCE) system for easier Access to Justice and increased efficiencies throughout the court filing process. The Department is working with the State Internet Portal Authority (SIPA) on options to replace the Department's external website at a minimal cost. The Department estimates the CLHC system will cost approximately $130,000 but does not include the automation of all court forms. The total cost for the ODR system is currently unknown.

Additionally, in FY20 and FY21, the Department will be implementing a court reminder text messaging program to remind criminal defendants and juvenile participants to appear at each of their scheduled court appearances. The Department's court reminder program will also be used to notify these same participants of court closures due to inclement weather. The development of court reminder program will cost approximately $203,000 in FY20 with ongoing costs of approximately $99,186 per year.

Lastly, in FY20 and FY21, the Department will be putting together a strategy to add juvenile e-filing as part of the CCE application for attorneys and other state agencies to file juvenile cases with the Department. This added functionality will be developed with internal Department resources.

10   **There are many ways in which the Department may interact with internal or external customers, including the public and other departments. How is the Department gathering feedback and evaluating customer experience? Please address all interactions, e.g. technology, in-person, call centers, as well as total spending on these efforts in FY 2018-19 and expected spending in FYs 2019-20 and 2020-21.**

One of the primary ways the Department gathers customer feedback on trial courts is through Access and Fairness surveys.  In order to gauge the level of perceived trust and confidence

within the courts, the Judicial Department conducts an Access and Fairness survey in every judicial district in the state every two years. The purpose of the survey is to:

(1) Rate the court user's perceptions of the courts accessibility and its treatment of court users in terms of fairness, equality, and respect;

(2) Provide a general snapshot on how the public perceives access and fairness in the courts;

(3) Establish a baseline of information so that the courts can evaluate current practices and create plans for more improved and efficient court practices.



JUD Page 30



11  **Please highlight the long-term financial challenges of fulfilling the mission of the Department with particular attention to any scenarios identified in the Department's Long-Range Financial Plan involving an economic downturn, department-specific contingencies, emerging trends, or major anticipated expenses (Subsections 3-6 of Section 4 of the Long Range Financial Plan submitted pursuant to H.B. 18-1430).**

State Policy changes enacted by the General Assembly (Criminal Justice reform etc.) present the biggest financial challenge to the Department.   Legislation such as SB19-191 requiring a bond hearing within 48 hours of arrest will impact courts operations and there will be a financial cost for implementation.

12  **In some cases, the roles and duties of existing FTE may have changed over time. For all FY 2020-21 budget requests that include an increase in FTE:**

a.  **Specify whether existing staff will be trained to assume these roles or these duties, and if not, why;**

JUD Page 31

The new FTE positions will be posted and filled competitively.  A qualified candidate will be required to meet the minimum qualifications to perform the job.  All new positions will require some degree of training.

b.  **Specify why additional FTE are necessary; and**

The FY21 requested FTE are required to meet caseload/workload growth, improve operating practices or implement new statutory requirements.

c.  **Describe the evaluation process you used to determine the number of FTE requested.**

Each Decision Item with FTE requested includes a detailed justification of the FTE need.

13  **Please describe the impact of Colorado's low unemployment rate on the Department's efforts to recruit and retain employees.**

Response: The unemployment rate in Colorado continues to have a specific impact on our recruitment and retention efforts for our specialized/niche positions. The unemployment rate sits around 2.7% (Sept 2019).

A study just completed by Bloomberg and Workday finds that college graduates are not bringing enough technical or soft skills to the job market requiring employers to build soft skills training programs and mentorships in order to remedy the lack of skill. While there are a lot of jobs open, we are seeing an increasingly wide gap between the jobs being created and the skills and experiences in the workforce to fill them. For Colorado Judicial this means that while we may be receiving enough applications for some roles, we are not seeing the quality we require for our professional standards. Specifically, for our IT positions we are seeing record lows in terms of applicants. For several positions we have only had 4 individuals apply even after posting the position multiple times and casting a wider net. These individuals are not adequately meeting the minimum qualifications for the position or who do not exhibit the qualifications needed to be successful in our organization. We are having to post position multiple times in order for find any viable applicants which then creates strain and production issues for our current employees who then begin to consider other opportunities where the work load may be more manageable. This cycle continues to throughout our recruitment/retention efforts.

Ex. Network Security Engineer was posted in September for 2 weeks and only received 7 applications of which no individuals were selected. The position was posted again for two weeks at the end of October with only 5 applicants of which once again none have been selected due to the lack of qualified applicants. We will now post a third time for the position.

We are also seeing many individuals leave our organization due to being offered higher salaries at other companies in the private sector. This has had an impact on our financial services, human resources, and information technology positions. The high cost of living in Colorado also makes it difficult to recruit as individuals are not making enough to cover the high cost of housing and living. Our state salaries and wages are barely increasing while the cost of living is now going up by 2-2.5% per year. Inflation is here (we just don't notice it) and the gap between wages and costs is not closing. This fact makes it more difficult for our current employees to refuse a job in the private sector that is willing to offer a higher salary.

Candidates are also able to be more selective on the opportunities they are seeking, and we have seen an increase in "ghosting" where applicants are applying and/or accepting interviews/offers and never reporting for duty or responding to correspondence to move forward in the process.

14   **NOTE: An example template for providing data for this question will be provided by the JBC Staff.**

State revenues are projected to exceed the TABOR limit in each of the next two fiscal years. Thus, increases in cash fund revenues that are subject to TABOR will require an equivalent amount of General Fund for taxpayer refunds. Please:

a.   **List each source of non-tax revenue (e.g., fees, fines, parking revenue, etc.) collected by your department that is subject to TABOR and that exceeds $100,000 annually. Describe the nature of the revenue, what drives the amount collected each year, and the associated fund where these revenues are deposited.**

Most of the cash revenues collected by the Judicial Department are court fines, fees and costs.   The attachment at the end of this document provides a 3-year history of collections of these various sources. The notable exception to court fines and fee revenue for the Judicial Department is e-filing fees and probation supervision fees.  E-filing fees are charged for electronic filings, network access, searches of court databases, etc. while the probationers pay a $50/month supervision fee.  The revenues of the two funds are listed below:

| Revenues | | | |
|---|---|---|---|
| | **FY18** | **FY19** | **Projected FY20** |
| Judicial IT CF | 16,047,415 | 17,149,752 | 17,749,993 |
| Offender Treatment and Services CF | 18,635,772 | 19,062,533 | 18,586,601 |

b.   **For each source, list actual revenues collected in FY 2018-19, and projected revenue collections for FY 2019-20 and FY 2020-21.**

JUD Page 33

It is difficult to predict revenue growth as they are fines and fees associated with court proceedings.  In the last three fiscal years growth has averaged approximately 2%.  Using a 2% growth factor would result in an aggregate revenue increase of $4.3 million in FY21.

c.  **List each decision item that your department has submitted that, if approved, would increase revenues subject to TABOR collected in FY 2020-21.**

None

15  **Please describe the Department's current practice regarding employee parking and other transportation options (i.e. EcoPass). Please address the following:**

a.  **Does the Department have adequate parking for all employees at all locations?**

No

b.  **If parking is limited, how are available spaces allocated?**

Most the Judicial Department employees work in county provided facilities and the individual counties determine parking policy.   At the Ralph L Carr Judicial Center, parking is provided in a dedicated garage (for a monthly fee) with a wait list for those seeking a space.

c.  **If free parking is not available, how is parking paid for, and who pays (employee or Department)? (e.g. stipends, subsidized parking, eco passes)**

The Department does not pay for or subsidize parking.  The Department does provide for Eco pass for employees of the Ralph L. Carr Judicial Center for a $15/month fee to the employees.   Two Judicial Districts, Jeffco and Denver also provide Eco passes for their employees.

d.  **If employees pay fees for parking, where is the revenue credited and how is it spent, and is it subject to TABOR?**

The revenue from parking fees is deposited in the Judicial Center Cash Fund and is counted as Tabor revenue.

e.  **Do parking and/or transportation benefits factor into Department compensation and/or retention efforts?**

Yes, transportation assistance is part of the Department's compensation package.

16  **Please identify all continuously appropriated funds within the Department's purview with a fund balance or annual revenue of $5.0 million or more. Please indicate if these funds are reflected in the FY 2019-20 Long Bill.**

JUD Page 34

Attorney Regulation Cash Fund which is identified in the Long Bill as the cash fund source for the Office of Attorney Regulation.

JUD Page 35

# Appendix 27(c)

# Transcript of *Hearing before the Legis. Audit Comm.*, Colo. Leg., December 7, 2020;

# Legislative Audit Committee—December 7, 2020 Hearing:
The Colorado Office of the State Auditor and The Colorado Judicial Department's Presentations as to 2020 OSA Performance Audit of the State Court Administrator's Office

**Rep. Saine**

All right, we will start with the Judicial Department, State Court Administrator's Office performance audit, November, 2020. Do I hear a motion to release? So moved. Do I hear a second? Thank you. Any opposed? All right, seeing none. I believe we have the Honorable Nathan B. Coats, Chief Justice of the Colorado Supreme Court, with us. Sir, would you like to introduce yourself and your staff? Want to push the green button?

**Chief Justice Coats**

I see a green light come on. That's probably a good sign. Thank you, Madam Chair, I'm Ben Coats. I am the Chief Justice of the Colorado Supreme Court, right now. With me is Steven Vasconcellos, who is the State Court Administrator. I wonder if this would be an appropriate time for me to just make a few remarks with regard to perspective.

**Rep. Saine**

For you, Chief Justice. Please go ahead.

**Chief Justice Coats**

Thank you, Madam Chair. I've been the Chief Justice for just about two and a half years now. I'm going to leave my glasses off so I can have some idea that you all are up there for the moment. About two and a half years. I don't think anybody would suggest that those two and a half years have been uneventful. I just thought I'd mention I've come up, I bump up against the magic constitutional age of 72 right at the beginning of the year. So, I'll also be retiring at the end of this month.

But let me just say a quick word or two to give some perspective, I think, to this performance report and evaluation. Let me say, virtually from the moment that I became Chief Justice two and a half years ago, it's been apparent that there were things that probably needed to change in terms of the structure of the Department. And this is, this was nothing really new. But, over my time as Chief Justice, this became more and more apparent. We'll answer your questions as best we can with regard to specifics. So, I won't try to get into any lengthy explanation there. But let me just point out that with the former Court Administrator's rather abrupt departure a year ago, last summer, the Department, really the complexion of the Department has completely changed. And I will just say, so that you understand, for purposes of Mr. Vasconcellos being here. Since I've been Chief, the Court Administrator is gone. The number two in the Department that we called Chief of Staff is gone. The Director of the Financial Services Division,

- 1 -

which is one of the six major Divisions, is gone. The Controller for the Department is gone. The Director for the Human Resources Department is gone. The Deputy Director for the Human Resources Department, who took his place, is gone. I'll stop there. But enough to give you an idea that the organization has completely changed. When things change that abruptly. And it started in the summer, a year back, the Court appointed Mr. Vasconcellos to be the acting Court Administrator. And, I have to say, for some time period he and I, I think, acted largely as co-Court Administrators trying to keep things on track for the Department. I think he's done an excellent job at that. And as a matter of fact, such a good job that, after a lengthy process and national search, the Court appointed him to be the permanent Court Administrator. The one last thing I would say, just to give you some idea about the Court. This model, out of necessity of me acting as Chief Justice in such close coordination with the Court Administrator, I think is not only undesirable, but it's unsustainable. In this crisis situation, like maybe I shouldn't use the word crisis. But in this kind of situation, we felt it was very important. I think it's been important to keep things on track and to make changes in the Department, I would say, though, with regard to the Court as well. I think the philosophy of the Court in having a more immediate oversight of the operations of the Court Administrator's Office has changed over this time period. Now, each of my colleagues on the Court has a liaison or partially supervisory role over different aspects of the Court Administrator's Office. That, unlike my current role. That I don't expect to change. And I think will continue with that closer supervision. But, thank you very much. I appreciate the time to make a few remarks.

**Rep. Saine**
Thank you, Your Honor. All right. Ms. Colin, if you would introduce yourself and staff.

**Michelle Colin**
Thank you, Madam Chair. Michelle Colin, Deputy State Auditor. And I would just make a couple of comments, and then I'll introduce my team, as well. So, just to recognize. So, we'll be presenting the results of this audit of the State Court Administrator's Office. Although we have conducted several audits at the Judicial Department in recent years, we had not ever focused specifically on the State Court Administrator's Office. And, so, that's what this one did. We specifically looked at the SCAO's operations and specifically its controls over its Human Resources and Financial Services functions. And, so, this morning, we'll be discussing our findings and recommendations in the report. And we have issues and findings related to both of these areas. They are six total. And, so, the audit team next to me. To my right, is Vicki Heller, she was the audit manager. And then next to Vicki is Carrie Ann Ryan, who's one of our staff auditors. Sitting behind us is Derrick Johnson, the team leader. And then we also had Tessa Mauer and Lily Wellborn, who also worked on the audit. And then finally, I would just like to thank the Chief Justice and the State Court Administrator and all of their staff for their assistance throughout the audit. Thank you.

**Rep. Saine**
Thank you, Mr. Vasconcellos, would you like to introduce yourself and any other presenters?

- 2 -

**Steven Vasconcellos**

Thank you, Madam Chair. My name is Stephen Vasconcellos. I am the State Court Administrator for the State of Colorado. I'm the only other presenter this morning.

**Rep. Saine**

Thank you. All right. I think we're going to move back to staff presentations, and we're going to start with Ms. Heller with the chapter one overview.

**Vickie Heller**

Thank you, Madam Chair. Our overview chapter starts on page 3 just after the report highlights page. The SCAO provides centralized administrative support to all of the judges and the staff who work for the Colorado courts within the Judicial Department. The office is overseen by the State Court Administrator who is appointed by the Colorado Supreme Court. The current State Court Administrator here with us today was appointed just over a year ago, in October, 2019. Under his oversight, about 260 employees provide the types of services that we lay out in the report, starting on page 4. For example, the SCAO provides financial management services for the Department, including developing budgets, overseeing procurement, and dispersing funds appropriated by the General Assembly. They also manage the Department's personnel system. And this includes overseeing employee time keeping and leave, and facilitating any disciplinary actions, employee settlements, and FMLA requests. They also provide IT support and security for the Department and other administrative and logistical tasks for the day-to-day operations of the courts. Additionally, they help the Colorado Supreme Court implement rules in all of these areas, and they're responsible for providing guidance and direction on the rules. For example, by developing written policies and procedures. On page 6, the table there shows the SCAO's administrative expenditures over the last few years. And these have been about $45 million annually for its own Office's operations, as well as roughly $100 million for Department-wide administration. The rest of this Chapter 1 gives a summary of the audit work that we did. The team will go into this when they talk about each finding. And so, Madam Chair, I can pause for questions or move to Ms Ryan for Chapter 2.

**Rep. Saine**

Any questions from the committee for Ms. Heller? Senator Fields.

**Sen. Fields**

Thank you. Madam Chair. I was just wondering if all the presenters, if they could make sure the mic is closer. From over here and this end, it was just hard to kind of understand what you just said. So, if you guys could help me out a little bit, that would be very helpful.

**Rep. Saine**

All right. Any further questions or requests? Right, seeing none. We will move on to Ms. Ryan with Recommendation number 1.

- 3 -

**Carrie Ann Ryan**

Thank you, Madam Chair. I'm going to present the first three findings in Chapter 2, which begins on page 11. As mentioned by Ms. Heller, the State Court Administrator's Office, or SCAO, provides all human resources, financial, and information technology services the Judicial Department staff need. This is overseen by the State Court Administrator. Our audit looked at SCAO's oversight and accountability of human resources and financial services functions.

Our first finding on voluntary separation incentives begins on page 13. A voluntary separation incentive, or VSI for short, is generally a lump sum payment offered to staff to incentivize leaving in times of budget shortfalls and reorganizations. We found that one of the ways that employees left SCAO during a review period was through these voluntary separation incentives. These were initiated by the former State Court Administrator as a part of a Department reorganization. Instead of lump sum payments, the former State Court Administrator offered incentives in the form of paid administrative leave to all staff in fiscal year 2019. Turning to page 14, a lump sum payment provides an employee with a one-time total payment upon leaving employment. However, using administrative leave, the employees continue to occupy their position and receive compensation, benefits, and accrue paid time off, but do not work. Turning to exhibit 2.1 on page 14, you can see that the months of paid administrative leave were awarded based on years of employment with SCAO, as shown in the left most column. Where they were awarded 1 to 4 months of paid administrative leave, shown in the middle column. And the right most column shows the number of participating employees in each category. So, for example, if an employee were with SCAO for 10 years, their VSI contract would provide three months of paid administrative leave. Meaning, that if they agreed to start leaving July, they would continue to be paid, receive benefits, including accruing paid time off. But, again, would not be working. Their official termination date would not be until October. At which point, they would no longer be employed and any leave accrued, including that while on paid administrative leave, would be paid out. At the bottom of page 14 and on to page 15, the State Court Administrator, the employee's Division Director, the Director of Human Resources, and the Chief Financial Officer, had to approve the VSI contracts. Otherwise, SCAO had no rules, policies, or procedures for the VSIs. Because of this, turning to the bottom of page 15 and onto the top of page 16, we looked at State Personnel Rules for VSIs for Executive Branch employees as a point of comparison.

Towards the middle of page 16. Overall, we found that the VSI contracts did not receive the required approvals. And the positions approved for the incentives were not consistent with the reorganization plan. First, none of the nine VSI contracts executed by the former State Court Administrator received the required approvals. Instead, only the former State Court Administrator approved the contracts. The contracts were also finalized prior to the Chief Justice's approval of the incentives.

Next, turning to page 17, the positions that were supposed to be eliminated by the VSIs and the reorganization plan were not the positions targeted to participate. The former State Court Administrator allowed all classified, certified employees to apply. 10 employees applied for the incentives, and all 10

- 4 -

applicants were approved for participation. Even if the positions did not fit into the plan. The reorganization didn't end up happening, but all 10 VSI contracts were already executed prior to that decision. Then, the contracts did not provide any dollar amount for what would be paid to separating staff. Instead, only stating the months of administrative leave. SCAO confirmed that they did not calculate the total cost of the incentives prior to execution of the VSI contracts.

Turning to page 18, Judicial Personnel Rules do not limit the payout amount that staff can be offered. The Colorado statute requires all employees are treated in a generally similar manner. And Judicial is supposed to take into account compensation and leave plans of the Executive Branch. Because of this, we compared judicial VSIs to the Executive Branch rules. The State Personnel Rules for the Executive Branch prohibit incentives in any form in excess of 18-weeks worth of an employee's salary. As mentioned earlier, by using paid administrative leave for incentives, instead of a lump sum payment, SCAO was still responsible for contributing to benefits such as retirement and health insurance. In Exhibit 2.2 at the top of page 19, we showed the benefits available to employees and their associated costs to the State. SCAO also allowed paid time off to be accrued during each employee's period of paid administrative leave. And employees were paid out for any paid time off accrued during this time. So, turning to page 20, we compared how much SCAO paid out through administrative leave versus the maximum amount that would have been allowed by the Executive Branch. In Exhibit 2.3, for each of the 10 employees participating in the VSIs, we compared the salary based incentives, leave accrual, and benefits paid with the SCAO VSIs versus the maximum that the Executive Branch would have allowed. At the bottom of the right most columns, we showed that SCAO paid out over $518,000 where the Executive Branch maximum possible payout would have been just over $340,000.

Turning to page 21 we discussed why these problems happened. Ultimately, SCAO has not established rules, policies, or procedures for the voluntary separation incentives. Because of this, they entered into the separation agreements without the required approvals, or even the SCAO legal team reviewing the contracts before they were executed.

Then, turning to page 22, they also did not consider rules established for the Executive Branch's VSIs. As a result, in the middle of page 22, the SCAO VSI costs were over 50% higher than the maximum that would have been offered by the Executive Branch. Also, only 3 of the 10 staff positions that received VSIs were eliminated. Because the employees who took the incentives were not targeted with the SCAO reorg in mind, it is unclear whether any of the $518,000 were spent appropriately or in the best interests of the State.

And, turning to page 23, while one of SCAO's goals is to cultivate public trust and confidence through thoughtful stewardship of public resources. It appears that the interest of the State may not have been protected and sets a tone in culture that has disregard for ensuring State funds are spent transparently and with integrity.

So, on page 24 we recommend that SCAO specifies who approves voluntary separation incentives prior to offering them and who must sign the agreements prior to execution. That they ensure that separation incentives are only executed with employees whose separation furthers the goals of reorganization, consider the types of incentives offered in the Executive Branch, and specifies the maximum amount that can be paid out. Thank you, Madam Chair.

**Rep. Saine**
Ms. Ryan, I'm gonna move on to the response from the State Court Administrator's Office before we take questions from the committee. So, Mr. Vasconcellos, if you would please proceed.

**Steven Vasconcellos**
Thank you, Madam Chair. We agree with all three components, A, B and C, of the recommendations from the Office of the State Auditor. And you'll note throughout our responses, there's a significant amount of work that has either already been done in changing our rules and additional work to come between now and the summer and fall of 21 to improve our internal control structure through updating our Personnel and Fiscal Rules. But specific to this Recommendation 1, we do agree with all three sub parts. Specifically, we will be updating, working with the Supreme Court to update our Personnel Rules about Voluntary Separation Incentives. I should note parenthetically that, when we change these rules, these are not rules that only apply to the State Court Administrator's Office. These rules apply to the entire Judicial Department. Which is to say the trial courts, the appellate courts, probation and the State Court Administrator's Office. But we will be updating our Personnel Rules with regard to VSIs to specifically identify what the required approvals are for offering incentives, as well as the necessary approvals for individual separation agreements. Additionally, rule changes to ensure that separation incentives are executed in a manner that could be tied to the goals of the Department. That they're not just unclear or opaque why someone was offered a separation incentive. And, finally, we will, the Chief Justice and I both believe that we, over time, have not looked to our peer branches of government as we should. And as statute guides us to look to the Executive Branch, to look to the Legislative Branch for guidance when forming our own Personnel Rules, when forming our Fiscal Rules. And all this work is done through that lens as we move forward. And rule changes will also detail the types of incentives that can be offered, and will require that agreements include total or maximum amounts that are associated with individual incentives.

**Rep. Saine**
Thank you. Now, questions from the committee. Senator Lundeen.

**Sen. Lundeen**
Thank you very much, Madam Chair. I appreciate the audit, as always. Appreciate the professionalism of the Auditor's Department and the response of the State Court Administrator's Office, as well. Thank you for the agreement. My question is this. There's been a time in between the production of the audit which identified an overpayment, essentially, just to put it in very blunt terms. Since the audit was

performed and today, there's been a time. And there's a time from today until new rules will be in place. My question is, what happens with regard to severances in the evaluation of those severances in the interim?

**Rep. Saine**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. Senator Lundeen, I would note that the use of voluntary separation incentives, historically, has been extraordinarily rare. Through our research. The last time they were offered out of our Office was about 12 years ago. And prior to that, we cannot find an instance when they're used. So, I don't see. My crystal ball is probably no better than anybody else's. However, they're so rare in our history that I don't foresee the likelihood of separation incentives coming up again between now and when the rules are fully updated is very low.

**Rep. Saine**
Senator Lundeen.

**Sen. Lundeen**
The follow up question is simply, Should one occur, what would be the process for managing it?

**Rep. Saine**
Mr. Vasconcellos.

**Steven Vasconcellos**
Well, I'm sorry, thank you, Madam Chair. Senator Lundeen, I think at the barest minimum, we need to follow the rules that are already in place. Which you will note, in the report, did not happen. And I think there's some easy logical steps to go beyond that, even in advance. And it's the items we already discussed through the findings in the audit and where we foresee the rules heading. That's having legal review, financial review, proper checks and balances along the way. So that, as a decision maker, you're loaded with the complete and proper information. How are these incentives tied to the goals and needs of the organization. All of those things, I think, can be attended to, even in advance of rule changes.

**Sen. Lundeen**
Thank you

**Rep. Saine**
Senator Fields.

- 7 -

**Sen. Fields**

Thank you Madam Chair. And thank you all for your presentation today. So, when I'm looking at the report, I'm looking at page 20 and 21 all the way through 23. I'm just trying to understand the culture within the organization. What were the guiding principles that you used as it relates to determining who gets what? Because when I look at the numbers here, it looks like it varied a lot. So, I'm wondering how some of these decisions were made. What were the inequities or disparities that exist? I don't know if the 10 employees that you have listed there. How many were men, women, people of color? And I'm not quite sure how these decisions were made, because some people got more, some people got less, and looks like most of them got more than what they should have received. Is what I'm kind of picking up. So, if you could highlight for me. What were the guiding principles for them to award this benefit? Because it's like unclear here. Seems like there wasn't much standards involved.

**Rep. Saine**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Senator Fields, thank you for your question. I think the biggest driver in differences in the amounts are linked to the salary levels that the employees were at at the time of the incentive. So, if you look at, for example, the salary component. Which is the largest component of the incentive. That's keyed to the amount that the employee was making, and that probably drives the biggest driver. And that also sort of spins out across leave accrual, as well. I think that's probably the single biggest driver, in terms of differences between the amounts that individual employees received. In terms of what the guiding principles were for the previous State Court Administrator in their decision making, I can't really speak to that. I do not know what they were.

**Rep. Saine**

Representative Bockenfeld.

**Rep. Bockenfeld**

Thank you, Madam Chair. Am I to assume that, if you received a voluntary separation incentive, you also signed a waiver of any claims that you may have against the State? Or, is that an accurate statement?

**Rep. Saine**

Mr. Vasconcellos.

**Steven Vasconcellos**

Madam Chair. Representative Bockenfeld, that's correct.

- 8 -

**Rep. Bockenfeld**

Thank you.

**Rep. Saine**

All right. Any further questions from the committee on this recommendation? Mr. Vasconcellos, I have a quick one. I thought I heard the number 3 earlier from Ms. Ryan, and there is a list of 6 from this Chief Justice that have left employ with the State Court Administrator. Just a question as to why the number 3. Which would make me ask a question. The other folks that received the VSI, are they still employed with State Court? And what was the rationale there?

**Steven Vasconcellos**

Thank you, Madam Chair. None of the employees who received a voluntary separation incentive are employed any longer with the State Judicial Department. In terms of why we eliminated number 3. This happened in the backdrop of a number of other things, including the rather unprecedented budgetary downturn in the State of Colorado, and budget cuts. And positions that were eliminated were in line with what I felt strategically we needed to eliminate moving forward to help meet our cut.

**Rep. Saine**

Thank you very much. Representative Bockenfeld.

**Rep. Bockenfeld**

Thank you, Madam Chair. My last question was about the waiver of any claims. Do these waivers also include any non-disclosure agreements?

**Rep. Saine**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Not that I'm aware of, Representative Bockenfeld.

**Rep. Saine**

Any further questions on Recommendation 1 to the Department. All right, seeing none.

**Chief Justice Coats**

Madam Chair, could I? Could I make one remark?

**Rep. Saine**

Yes, your Honor.

- 9 -

**Chief Justice Coats**

Representative Bockenfeld, just to make clear. And I would agree, I think, from what I understand with Mr. Vasconcellos. But to the extent that a VSI, and I think one that had been identified here was made in conjunction with a separate separation agreement. That one, I'm sure, given the practice at the time, did involve non-disclosure. And it involved other things, involving the separation. It was not a typical VSI. But I think one of the ones they talk about may have fallen into that category.

**Rep. Saine**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair, that's correct. I apologize. One of them, one of the VSIs, was associated with a separate separation agreement. And that one does have non-disclosure provisions.

**Rep. Saine**

Further questions from the committee? Seeing none. Ms. Ryan, would you please proceed?

**Carrie Ann Ryan**

Thank you, Madam Chair. Our next finding on paid administrative leave begins on page 26. As a bit of background, there are different types of leave available to Judicial employees, such as paid time off, which can be used for personal reasons, and as accrued monthly. Extended sick leave, which can be used for certified medical events, also accrued monthly. And paid administrative leave, or admin leave, for short, which can be granted on an ad hoc basis. With Judicial Personnel Rules, admin leave can be granted for reasons determined to be for the good of the State by administrative authorities. At SCAO, administrative authorities can be the State Court Administrator, Division Directors, Human Resources Staff, or other supervisors. Admin leave can also be granted when an employee is being investigated for wrongdoing or poor job performance, and it is in the SCAOs best interest not to have the employee in the office while the investigation takes place.

Turning to page 27, during fiscal years 2017 through 2020, SCAO's staff recorded over 25,000 hours of admin leave. This included nearly 14,000 hours of discretionary or ad hoc leave. Over 3,000 hours were approved for disciplinary investigations. Over 2,600 hours were approved for settlement agreements. And the remaining 6,000 hours were approved for voluntary separations discussed in the first finding. Towards the middle of page 27, we looked at all records related to the over 19,000 hours of admin leave granted through discretion, disciplinary investigations, and settlement agreements.

We compared SCAO's use of leave with Judicial Personnel Rules. And, also, similarly to Finding number 1, we compared SCAO's practices to State Personnel Rules for the Executive Branch. First, we discussed the discretionary uses of admin leave, starting at the bottom of page 27. Of the nearly 14,000 hours of discretionary admin leave, we found that 3,600 hours did not have any reason or documentation

- 10 -

for the leave granted. However, SCAO said that they were allowed because of the broad discretion given to administrative authorities to grant leave for reasons they determined to be for the good of the State. On page 28, for the remaining 10,100 hours of admin leave that did have a reason noted, we found instances where it was unclear why the leave was for the good of the State. A couple of examples were pre-operative appointment or family reunion, which employees could have used PTO for. Then towards the bottom of page 28, we also found that hours of admin leave were approved disproportionately for some employees.

Because SCAO does not have limits on the amount of admin leave that can be granted to employees, we did a statistical analysis to calculate the normal range of the hours awarded each year, instead, to identify any uses above the norm. We found, depending on the year, between 8 and 48 hours of admin leave would be considered normal for all staff for things like weather closures and extra holidays. Turning to page 29, we found 102 instances where staff were granted over 1,000 hours above the norm during our review period. In Exhibit 2.4, we show fiscal year, 2017 in the left most section, 2018 and 2019 in the middle and 2020 in the right-most section. Each of the dots represents employees and their hours of leave about the norm. As you can see, in fiscal year 2017 and 2018 two employees got over 150 hours above the norm, each. And SCAO could not provide information for why these employees were granted this amount of leave. Turning to the second paragraph on page 30, it would be reasonable for some employees to receive more hours than others due to performance awards or volunteer work. However, it is not apparent that the hours granted and all of the situations we identified would be for the good of the State. Also, regarding discretionary leave, we identified instances where employees were granted 9 or 10 hours of leave for one day, as opposed to the standard eight hours. And turning to page 31, instances where employees were allowed to use admin leave in conjunction with work time to accrue compensatory time off, also known as comp time or time and a half.

For the next section, we discuss admin leave used for disciplinary investigations. Towards the middle of page 31, we identified 9 cases where over 3,000 hours of admin leave was granted for employee disciplinary investigations. While judicial personnel rules allow for employees to be put on admin leave for investigations, SCAO could not provide documentation showing the investigations for two staff members actually took place. Additionally, as with discretionary leave, Judicial Personnel Rules do not provide any limitations or require monitoring of the time it takes to complete an investigation. As shown in Exhibit 2.5 on page 32, admin leave for investigations lasted for as many as 60 days, shown in the top right row. In our final section, we discussed admin leave use for settlement agreements. At the end of page 32 and on to page 33, we found that SCAO also granted two staff over 2,600 hours, or 331 days, of admin lead for settlement agreements. Settlement agreements can result from staff appealing disciplinary action. Here, similarly to the employees with the voluntary separation incentives discussed in the first finding, employees continued to occupy their positions and received all benefits, but did not work in the months leading up to their separation from employment. According to staff, it is common practice for SCAO to use leave for this purpose. Then, towards the middle of page 33, we discussed why these problems happened. Overall, we found it was because Judicial Personnel Rules provide limited

- 11 -

guidance on the appropriate uses of admin leave, summarized in four areas. First, according to SCAO, the Rules provide broad discretion to administrative authorities to grant leave for reasons, any reason they determined to be for the good of the State. Second, the rules also do not require staff to provide a reason for admin leave in the Judicial time reporting system. This is why, for example, the two employees were granted 152 hours each, and the reason for why is unknown. Turning to page 34. The third reason these problems happened is because the SCAO does not have policies or procedures for monitoring admin leave. Reports are not run to determine if employees are being granted leave appropriately, and supervisors are not required to review admin leave. If employees request admin leave through the Judicial time reporting system and it is not approved before payroll posting, the leave will still be paid out, even though it has not been approved. We found 119 individuals during our testing period were paid more than 6,500 hours of admin leave this way. Finally, at the bottom of page 34 and on to page 35 there are no limits established on how much leave can be granted for any reason. Because of this, as with the last finding, we compared SCAO's uses of admin leave to the Executive Branch Rules. The State Personnel Rules for the Executive Branch include specific requirements on the use of admin leave. In Exhibit 2.7 on page 36, we show comparison of the Rules for admin leave for the Executive Branch versus SCAO. There's a lot of information here, so I won't go into a lot of detail. But contrary to SCAO, the Executive Branch, whose rules are summarized in the right most column, requires agencies track detailed reasons for their admin leave. [The Executive Branch Rule] only allows eight hours for holidays and does not allow admin leave to be used to earn comp time. On page 37 and 38, overall, we found that SCAO does not demonstrate good stewardship of State funds when granting admin leave. SCAO's uses of admin leave cost the State more than $476,000 during our review period. The discretionary leave, without any stated reason, accounted for over $156,000. Disciplinary investigations accounted for nearly $159,000. And settlements cost over $160,000 in salaries, alone, not counting the benefits and PTO accrued during this time. Which were not shown in the total cost of the settlements. Because of this, turning to page 39, we recommend that the SCAO should define the appropriate uses of admin leave, including whether or not leave should be used in settlements. Also, require that employees record the reason for their admin leave, have oversight of the use of admin leave, and establish limits on the amount of leave that can be used for certain purposes. Thank you, Madam Chair.

**Rep. Saine**
Thank you. Ms, Ryan. Response from the SCAO, Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. As with the previous set of recommendations, we are in agreement with the recommendations of the Office of the State Auditor on all of the components in recommendation 2. Specifically, we will be working, our Office will be working with the Colorado Supreme Court to develop and implement rules within our personnel system identifying the proper uses of administrative leave. Including their use in settlement agreements. As you can tell from the chart identified on page 36, we have a dramatically different structure, currently, than the Executive Branch. And it is my intent to

- 12 -

look toward the Executive Branch structure in forming our updated rules in this area. Next, under 2(b), we currently use a leave tracking system that was homegrown and developed over 20 years ago. We are in the process actively of stepping away from that and moving to the Kronos system, which is in wide use in the Executive Branch of government by many state agencies. And that will also include features that will require reasons given for the use of different types of leave, including administrative leave. To Part C, the new time tracking system will also allow us to run reports and do monitoring, oversight, look at patterns of usage. Try to identify problems before they happen, rather than after the fact. And, finally, in Section D, we will work with the Supreme Court to develop rules, including limits on the amount of administrative leave that can be used for certain purposes. As I mentioned previously, we'll be looking to the Executive Branch structure as our jumping off point.

**Rep. Saine**
Thank you, Mr. Vasconcellos. Any questions from the committee on this recommendation? Senator Fields.

**Sen. Fields**
There was a ballot measure that was just passed by the people of the State of Colorado, as relates to granting family medical leave. But Bill Clinton did it in 1993. And there's already federal criteria that's already been established in reference to how to manage it, who's eligible, and the requirements for tracking it. And, when I think about these recommendations. When we have mothers and fathers and people who are trying to take care of whatever they need for family leave. We have, what I see is really troubling to me, a sense of neglect as it relates to oversight and management of this program. Which is not new. So, I just need to kind of understand why we didn't have processes in place already. And, then, when I look at the recommendation that says July 2021. That's 7 months from now. Why is it going to take so long to implement some of these procedures when these procedures should already be in place? I mean, you could probably pull something off of a shelf. Managing leave is something that private sectors and government have been doing for a very long time. Explain to me why it's going to take July 2021 to implement these procedures. And why can't we accelerate it earlier to ensure that we're in full compliance with the Family Medical Leave Act and making sure that we're being good stewards of our funds. As relates, for people, you know, maybe. I don't know. Someone's not watching. Someone's not being mindful of what needs to be done to have the right administrative oversight on some of these areas. So, I know we've been fighting really hard for family leave. And here we have a government that. I don't know. I'm just not. I'm concerned about the leadership.

**Rep. Saine**
Senator Fields, you're ahead of the curve, as always. We're getting to that presentation, next. Do you want to hold your question, or would you like Mr. Vasconcellos to answer it now? Senator Fields, would you like Mr. Vasconcellos to answer the question now?

- 13 -

**Sen. Fields**

However you want, I'm having hard time hearing, so.


**Rep. Saine**

I understand. Mr. Vasconcellos, would you like to answer Senator Fields's question?


**Steven Vasconcellos**

Thank you, Madam Chair. I'd be happy to. Thank you for your question, Senator Fields. And your concerns. I think, first, by way of background, our system historically has demonstrated a level of informality and lack of structure in its rules. That really isn't acceptable for a branch of government that employs over 4,000 people and has a $600 million annual budget. So, I certainly am sympathetic and appreciate your concerns. In terms of the timelines, there are a couple of factors. I would like this done, excuse me, as soon as humanly possible. When we're looking at implementing a new IT system, like Kronos, statewide for a large and complex branch of government. Unfortunately, it can't be done in a month or two months. And we believe the timeline we've laid out is the soonest we can possibly get it done and do it well without causing damage to Judicial Branch operations. And in terms of rule changes and why the timing here? This may not be an entirely satisfactory answer. But I think the challenge has been. I wish that I had the opportunity to focus solely on this. But we have other intervening events outside of our control. Our office support for the trial courts and probation, Covid management operations, and unprecedented budget cuts. I feel like we have three once in a career activities happening all at once. And that's not boo hoo for me. That's just the way things happened. But it does complicate and make timelines a little challenging, on occasion.


**Rep. Saine**

Further questions from the committee on Recommendation 2? All right, seeing none, we're going to move on again to Ms. Ryan for Recommendation 3.


**Carrie Ann Ryan**

Thank you, Madam Chair. Our third finding on human resources records retention begins on page 41. At SCAO, the Human Resources Division is responsible for retaining and securing personnel records. At any organization, retaining and securing HR documents is done to protect an organization and its employees. Particularly, in cases that could result in claims of wrongful termination, disgruntled employees, or other litigation threats. Some of the most important records are those related to FMLA and disciplinary investigations.

First, FMLA allows eligible employees to take up to 12 weeks of unpaid job protected leave for family and medical reasons. To qualify, the employer must collect certain information, such as a medical certificate, notice of eligibility, and report of injury forms for FMLA involving workers compensation. Between fiscal years 2017 through 2020, the SCAO approved 135 out of roughly 170 FMLA requests from employees.

- 14 -

Next, disciplinary investigations are for employees suspected of violating rules or failing to perform job duties. If a disciplinary investigation results in action or termination, SCAO's HR is responsible for maintaining records in the employee's personnel files, in case the employee decides to appeal.

Turning to page 42 and at the top of page 43, both federal law and the Judicial Department requires the retention of personnel and employment records, such as FMLA files and termination and separation documents. Towards the middle of page 43, we first discuss issues identified with FMLA cases. In our review of FMLA cases, we found that 10 of the 135 approved cases were missing at least one of the required forms, and SCAO could not demonstrate that employees were eligible for the amount of FMLA approved. As shown in Exhibit 2.8 on page 44, the left most column lists required FMLA documents. The largest middle column explains the purpose of the documents. And the right most column shows how many cases were missing each one. So, for example, 4 cases were missing medical certificates and 6 cases were missing notices of eligibility, in addition to other required documents. Turning to page 45. These employees received more than 1,800 hours of leave, 935 of which were paid through extended sick leave at a cost of over $40,000 to the State. Extended sick leave, unlike paid time off, can only be used for FMLA or medically certified events. If these employees were not actually eligible for FMLA, then paid time off, also referred to as PTO, should have been used. Unlike extended sick leave, unused accrued PTO gets paid out if an employee leaves employment. So, SCAO may be providing an incentive for employees to request FMLA more frequently to avoid using PTO.

Next, towards the middle of page 45, we discuss issues identified with disciplinary investigations. Of the 11 disciplinary investigations during our review period, two cases did not have documentation showing that an investigation actually took place. Such as allegations, complaints, outcomes, or actions taken. SCAO stated that these two employees are placed on more than 800 hours of paid administrative leave for investigations, but the Human Resources staff conducting the investigations are no longer employed there, and the information was not stored on a shared file. And, so, any record of what happened is gone. When employers take disciplinary action against an employee, the employer can be subject to claims of discrimination and retaliation. If SCAO does not have documents for all disciplinary cases, they are at risk of not being able to defend their actions. On page 46, employers are also responsible for securing and retaining HR documents. Failing to do so can result in charges filed against employers. Because SCAO does not know what happened to the FMLA and disciplinary investigation documents, it cannot show that these documents were properly destroyed or secured, and could be at risk of these types of claims. Towards the middle of page 46 and on to page 47, these issues happen because SCAO policies and procedures do not require staff to maintain human resources information in a central, secure location. They also don't have a contingency plan for retaining information and unexpected staffing changes. Nor does internal audit review personnel files for complete information. For example, when staff left SCAO during our audit, other staff realized that FMLA documents were missing from the shared drive and they could not recover them. Then two employees [(Mindy Masias and Eric Brown)] that left had been using personal Apple accounts rather than an SCAO account to store documents that also could not be recovered.

- 15 -

So, on page 48, we recommend that SCAO ensure it properly secures and documents human resources information by establishing policies and procedures that require all human resources documents are stored in a secure shared file and train staff on these policies. Also, develop a contingency plan for when staff leave and implement a review process for personnel files. Thank you, Madam Chair.

**Rep. Saine**

Thank you. Ms. Ryan. Response from SCAO, Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair, the Office of the State Court Administrator agrees with all of the recommendations contained in the 3rd Recommendation. Specifically, under (a), we will implement policies and procedures that require all documentation stored in a secured, shared location. And that staff are trained on those policies. We will ensure that we build contingency plans to respond to personnel changes so that personnel records and documentation are secure and accessible and not lost in the shuffle during those changes in personnel. And, finally, that we will implement processes to ensure that the required HR documentation is maintained and secured in accordance with Judicial Department Policies. Additionally, we will be using our internal audit unit to conduct regular reviews of documentation requirements.

**Rep. Saine**

Questions from the committee on Recommendation Number 3. Seeing none. We're going to move on and change chairs with Mr. Johnson for Recommendation Number 4. Mr. Johnson, if could you introduce yourself.

**Derrick Johnson**

Thank you, Madam Chair. I'm Derrick Johnson. I was the team lead on the audit. And our sole-source finding begins on page 50. During our testing period, the SCAO entered into 10 contracts using the sole-source process. The sole-source process is used when an agency determines that only one vendor can meet their needs and, therefore, going through the normal solicitation process isn't worthwhile. So, because you're bypassing that system, safeguards are needed to make sure that the State is still receiving valuable goods and that those goods or services are for the benefit of the State and the Department. Some of those safeguards include drafting a sole-source justification letter for why you're entering into a sole-source contract before moving forward with it. And documenting that there were negotiations of prices and terms in the contracts. We compared those requirements with the documentation for all 10 sole-source procurements during our period. And starting on page 52, you can see the problems that we identified. We did find issues with 6 of the contracts using this method worth nearly $4 million. And that's about half of the total amount for all 10 contracts.

The first issue concerned the manner in which a contract [(the Masias Contract)] for a leadership training program was awarded. This contract was given to a former employee who had started the

- 16 -

leadership training company while still employed with the SCAO. The employee resigned effective March 19 of 2019 and on March 20 of 2019 the former Human Resources Director submitted a sole-source justification letter, which the former State Court Administrator signed just days later, on March 25. The contract was executed 11 weeks after that. Although it was subsequently canceled by the direction of the Supreme Court six weeks after that point. The proximity of the dates between the resignation the signing of the sole source justification letter gives the appearance of an impropriety which would be a violation of the Judicial Code of Conduct that applies to all purchasing in the Department.

Moving on to page 53, you'll see some of the other issues that we found. One was that the SCAO did not have a copy of one of the executed contracts. There were four contracts that had deficient justifications. One of those had no justification. Two of those had were lacking elements that were required by rule. And, then, one of the justification letters was signed weeks after the contract was executed, even though the justification is supposed to be signed before any commitments are made. Then, on the top of page 54, you will see that four contracts didn't have any proof that the SCAO negotiated the terms or the price of the contracts. As some of these contracts had more than one issue, you'll see in the Exhibit on page 54 each of the contracts and the issues that we found with them. So, for instance, you can see with contract E, it lacked documentation of negotiations. It was missing or had an inadequate justification, was also the contract that had the appearance of impropriety.

On the bottom of this page and, then, moving over to 55, we report on why these problems occurred. First, Judicial Fiscal Rules were insufficient and that they didn't have a requirement that there be a cool down period before entering into contracts with former employees. Conversely, ethics laws that cover the other Branches of government require that they don't contract with former employees for six months after separation. Secondly, the SCAO lacks policies and procedures to ensure that the process is followed for every sole-source. This would include reviewing the contracts by key staff, such as the Legal Department or the Director of Financial Services. The Rules also don't indicate, specifically, what elements are needed to justify using sole-source method or how to document the negotiation of the terms. And, lastly, there was no requirement that the intent to pursue sole-source be posted on the procurement web page, as another check for possible bidders. The statutes for the Executive Branch require that this be done for three days. On to page 56, we note that these issues are important because sole-source contracting is inherently high-risk for lessening public trust. The SCAO spent over $1 million on these contracts. And by not following the established rules, they are not demonstrating thoughtful stewardship of public resources.

So, on page 57, we recommend that the SCAO establish rules, policies and procedures for the sole-source contracting process that prohibit former employees from contracting with the SCAO for a specified period of time, establishing internal review and approval for all phases of the process, identify specific information required for justification and negotiations, and publicly notifying of the intent to use the sole-source process. Thank you, Madam Chair.

- 17 -

**Rep. Saine**

Response, Mr. Vasconcellos.


**Steven Vasconcellos**

Thank you, Madam Chair. I'm pleased to report that not only do we agree with the recommendations noted in Section 4, but we have already implemented rule changes in every single one of the areas identified in 4. Specifically, in November of this year, we updated our Fiscal Rules and procedures to require a mandatory cooling off period of six months between an employee's date of separation and when they can be eligible for employment with the Branch as an independent contractor. Additionally, in May of this year, we revised rules that require all sole source procurements above the discretionary purchasing thresholds to be coordinated by our Procurement Unit in Financial Services. That Procurement Unit is required to provide an opinion on the sole-source request to me. The authority to approve or deny the request rests with me. My position, the State Court Administrator, and the revised rules also require that I report quarterly all sole-source procurements to the Chief Justice and the Supreme Court. On Section C of the recommendations, rules were revised in May of this year that outline the required information that are included in sole-source procurement requests. To support the justification, the rules require that requests include a summary of information, detailing the costs of using an alternate good or service or of not making the purchase at all. And a cost analysis, explaining why the price offered from the vendor is fair and equitable. The rule requires the procurement unit to negotiate the most favorable price terms and conditions for the sole-source procurement. I would also note that the sole-source rules also now include a Code of Ethics associated with sole-source procurement. And that finally, also, in May of this year, rules were updated to require the Procurement Unit to publish sole-source procurements on the electronic bid system used in state government in Colorado for review by the public for 14 calendar days. If there are more than one inquiry, it's no longer a sole-source. It goes through a competitive bid process at that point. The rules further require, I'm sorry, I actually just mentioned that. That's all, Ma'am.


**Rep. Saine**

Thank you, Madam Vice Chair,


**Sen. Michaelson Jenet**

Thank you, Madam Chair. Thank you for your answers, Mr. Vasconcellos. My question is, and the Chief Justice alluded to this earlier, that you've had the change in staff. But what was the culture that allowed for these discretions to happen? And how will you make certain that that culture does not thrive again?


**Rep. Saine**

Mr. Vasconcellos.




- 18 -

**Steven Vasconcellos**
Thank you, Madam Chair. Representative Michaelson Jenet, thank you for your question. I think you've seen pretty consistently throughout that we've had a relatively informal and, in many cases, lacking internal control environment. And our rule structure has been fairly relaxed. So, there is just sort of the objective work of tightening that up. But in terms of how we engage in long-term cultural change, that has to start with me. I take my fiduciary responsibilities as the State Court Administrator extraordinarily seriously. I've dedicated my entire adult professional career to the Colorado Judicial Department, both starting in the trial courts and for the last 20 years at the State Court Administrator's Office. How I behave, the things that I identify to my staff as priorities, have a tremendous impact on their behavior. And, so, that has started right from the first day of, my even as an interim state court administrator, talking. While there are clearly legal limits while the audit was going on about what I could talk about, being as open and transparent with my staff and with key leadership constituencies around the State. Chief Judges, Court Executives, Chief Probation Officers, about, This is where we're at. This is what's happening. And sharing with them as much as I can appropriately along the way. You can imagine, the remainder of this week, I'm going to be spending a lot of time in meetings with Chief Judges, with Court Executives and with Chief Probation Officers and my own staff going through this audit in great detail and answering questions and talking about the values that are important to me moving forward as State Court Administrator.

**Rep. Saine**
Senator Rodriguez.

**Sen. Rodriguez**
Thank you, Madam Chair, I might have slipped over this, and I'm a little new to the committee. I just had a question on the cooling off period. Is it a current rule? Is it the Department? Is it legislative? I'm not even really sure if six months is enough of a cooling period with PTO. Somebody could leave and do it quickly. And I don't know who can answer that question. I'm just curious as to where the six months came from.

**Rep. Saine**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. Senator Rodriguez, we mirrored the Executive Branch provisions with regard to guidance on that. So, the Executive Branch already had a six-month cooling off period between the time of separation and when somebody could be brought on as an independent contractor. And we used that as our jumping off point in updating our rule.

**Rep. Saine**

All right. Further questions from the committee on this recommendation? Seeing none, Mr. Johnson, would you please proceed?

**Derrick Johnson**

Thank you, Madam Chair. Our next finding is on Procurement Cards, and it starts on page 60. Procurement Cards, or P-Cards, are used to make purchases that don't require a formal solicitation procurement process. During our testing period, the thresholds for such purchases were $10,000 for goods and $25,000 for services. The SCAO at the time had 90 cards, 67 of which were assigned to individuals, 23 of which were assigned to units, such as the IT Division or the Human Resources Division. The chart on page 61 shows that staff made about 10,000 purchases totaling over $3.5 million using P-Cards. On page 62, you can see that we looked at the SCAO's rules for P-Card usage. But we also looked at government standards for internal control, and compared those with a statistically valid random sample of 100 purchases. Those purchases totaled $405,000 or 12% of the total amount spent in our period using P-Cards. Looking at the bullets, you'll see we found problems with 30 purchases. This included 23 purchases totaling $45,600 for which the person who made the purchase also later approved it. Second, there were five purchases totaling $3,200 where there was no clear indication of the approval. While the SCAO was able to direct us to where the approval was located, it was not clear that the person who had signed or initialed the purchase was the budget authority, or that the signature was an indication of approval. And then lastly, two purchases for $600 had no approval whatsoever. In total, using statistical projections, we can say with 95% certainty that within the total population, over $1 million in purchases would have this same issue, or these same issues. Continuing down page 63 and on to 64, we discuss why these problems happen. Judicial Fiscal Rules state that the budget authority will approve all purchases. However, there are no policies to define who should be designated as budget authorities. And, therefore, you have variances across the Office of the State Court Administrator, so budget authorities can be admin staff, or they can be Division Directors. And the rules also don't indicate how the approval should be indicated. So then, you have initials on individual receipts, or you'll have a signature on a complete P-Card statement. So, therefore, on page 65, we recommend that the SCAO improve controls in this area by establishing written policies to indicate who can serve as budget authorities and how approvals should be indicated. Thank you, Madam Chair.

**Rep. Saine**

Response, Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. As with the other sections thus far, we agree with all of the recommendations in Section 5 made by the Office of the State Auditor. And we have partially implemented some of our improvements already. To wit, in November of this year, we updated our Fiscal Rules that require administrative authorities, which is to say the Division Directors at the State Court Administrator's Office, to review, sign, and date the statement for each card holder and card custodian indicating the

- 20 -

approval of transactions. Our next step is to finish developing clear guidance regarding budget management, guidance, and training, I should say, regarding budget management, including who can actually serve as a budget authority.

**Rep. Saine**

Senator Smallwood.

**Sen. Smallwood**

Thank you, Madam Chair. My question's for the Auditor's Office. So, of the expenses that you actually reviewed, were 100% of those retroactively deemed to be appropriate uses for the P-Card? Because I don't see anything in here that mentions whether the expense theoretically would have been approved by the budgeting authority or would not have been approved.

**Rep. Saine**

Everybody is looking at Mr. Johnson. So, Mr. Johnson.

**Derrick Johnson**

Thank you, Madam Chair. Senator Smallwood, if I'm understanding your question correctly. We did look at whether these purchases would be appropriate, whether they would be for the benefit of the SCAO or, possibly, for somebody's personal use. And we didn't conclude that any of them were outside the bounds of what might be appropriate.

**Sen. Smallwood**

Great. Thank you very much.

**Rep. Saine**

Further questions on Recommendation Number 5 from the committee? Seeing none, we're going to move on to number 6. Mr. Johnson.

**Derrick Johnson**

Thank you, Madam Chair. So, our final finding begins on page 66. And this finding is largely the result of the findings presented previously, as well as other work conducted during the audit. The SCAO is the administrative head of the judicial department within the Judicial Branch. As a separate branch of government, the SCAO and the Department overall are not subject to rules that govern the Executive and Legislative Branch[es], so it administers the Department through its own rules, policy, and Chief Justice Directives. In conducting this audit, we considered the rules the SCAO has established, including its Code of Conduct. But we also considered principles established in the standards for internal control in the federal government or the Green Book. The Green Book has been adopted by the State's Executive Branch. And while it hasn't been adopted at Judicial, it contains valuable principles that any organization should consider. Such as a commitment to integrity, establishment of clear responsibilities

- 21 -

and authority, and the design and implementation of control activities. Starting on page 69, we discussed the issues we identified. I will hit some of these at a very high level, because we've already discussed them.

First, we mentioned the awarding of the sole-source contract to a former employee. Which raises concerns about the commitment to integrity.

Second, on pages 70 and 71, we detail the SCAO's failure to establish structure, responsibility, and authority. This includes the former Chief of Staff signing nearly half of the contracts that the SCAO entered into during our audit period. While this is allowed in limited circumstances, the SCAO has not identified what those circumstances are or why the State Court Administrator was not able to sign so many of the contracts.

Additionally, Judicial Fiscal Rules do not specify who budget authorities are, leading to poor controls over purchase approvals the voluntary separation incentives that Ms. Ryan talked about in our first finding were not prepared or reviewed by the legal team or members of senior management, as required. And money spent on them might not have been spent prudently, as the reorganization never happened. And as Ms. Ryan stated in the second finding, the authorities designated to approve administrative leave vary across the organization, leading to variances in the amount of leave granted to employees.

Further down 71, we begin detailing the issues we identified due to the SCAO's failure to implement control activities.

The first of these as a lack of segregation of duties. As I just mentioned in the fifth finding, we reported on the 23 purchases for over $45,000 which were approved by the same individual who made them. The other control activity we found lacking relates to issues with document and information retention. As seen in the bullets on page 71 and 72, for four employees, the SCAO changed the reason given to us for the use of administrative leave after they were unable to locate documents to support the original reason.

Then, for 10 cases involving large amounts of leave, the SCAO could not categorize the reason for the leave without more research. And as Ms. Ryan mentioned, for two disciplinary investigations, there was no documentation, such as the allegations or actions taken as a result.

Further down page 72 and on to page 73, the bullets detail the issues we found with the lack of controls over granting and documenting administrative leave. As Ms Ryan discussed in the second finding, this included over 2,600 hours for settlement agreements, nearly 3,600 hours for discretionary reasons without description, and over 3,000 hours for nine disciplinary investigations.

On the middle of page 73, we discussed document retention issues that occurred in part because at least two employees used computers not connected to the SCAO network. When they left the organization, the information from their MacBooks was lost.

And then, over on page 74, there were 12 FMLA cases. It took the SCAO 6 weeks to locate the necessary information because it was not maintained in a central location, and the employees who knew where it was no longer work at the SCAO.

Lastly, on the bottom of this page and on to page 75, we bring up an issue not discussed in the earlier recommendations. But which points to a lack of controls and tone at the top. We identified $92,000 the SCAO spent on leadership training without sufficient justification as to how the expenses benefited the organization, or to show that there were an appropriate use of state funds. For example, there was $55,000 spent for seven employees on the executive team to attend a leadership course at the University of Virginia. And over $27,000 for two employees to attend leadership conferences in New York City for three consecutive years. Not only is it unclear these expenses were appropriate, but further, only two of the employees who we identified as having attended these trainings are still with the SCAO.

Starting in the middle of page 75, we report on why these problems occurred. The State Court Administrator has broad decision-making authority, which includes the responsibility for setting the tone of the organization. We identified multiple actions taken by the former State Court Administrator that were problematic. These were made possible in part due to a lack of effective system of controls. First, Judicial Fiscal and Personnel Rules are broad. And the SCAO has not developed policies or procedures to detail how to implement them. So, for example, in the Executive Branch, we have statewide rules that cover fiscal rules, personnel rules. But it's up to each agency to develop policies and procedures for how to implement those rules. On page 77, the Green Book states that management should conduct activities to monitor the internal control system and evaluate the results. The SCAO has not set clear expectations for review of functions such as reviewing expenditures, tracking the use of administrative leave, or reviewing personnel files to assure that documents are properly retained. Also, the SCAO has rarely used its Internal Audit Unit to look at operations within itself. It's largely used to conduct audits out in the Judicial Districts.

On the bottom of this page and over on 78, we discuss why these problems matter. The lack of an effective system of internal controls resulted in a lack of transparency and lack of stewardship over public funds. This is evident in the approval of justification for a sole-source contract for an employee who resigned only days before. As well as in granting large amounts of administrative leave for employees. Granting this leave is compounded because judicial employees accrue, on average, 25% more paid time off and extended sick leave each month than leave accrued by employees of the Executive Branch. Employees using administrative leave in place of their accrued leave results in larger payouts for unused leave upon separation. And using administrative leave to compensate employees through voluntary separations and settlements, lacks transparency in the total costs. And lastly, the

- 23 -

segregation of duties can result in people approving the purchases they made. And it poses a risk that the purchases are inappropriate or even for personal use.

So, on page 80, we recommend that the SCAO implement an effective system of internal control that fosters a culture of integrity, ethical values, and accountability by implementing policies and procedures and updating rules to ensure that they provide direction to staff on how to implement the rules. And, also, by implementing monitoring activities to ensure the controls are working properly, including supervisory review and routinely using its internal audit to monitor the controls. Thank you, Madam Chair.

**Rep. Saine**
Response, Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. The Office of the State Court Administrator agrees with the recommendations contained in Section 6. I acknowledge the issues identified in the audit regarding the prior internal control environment, and I fully understand and accept my fiduciary responsibility as the State Court Administrator. To this end, and with the support of the Supreme Court, our Office is operating within a set of core values that we discussed earlier in response to Representative Michaelson Jenet's question. To demonstrate integrity and ethical administration and use of public funds, our Office has already implemented changes, as we've discussed. And we have more work to do. We're making these changes to strengthen our internal control environment, to mitigate risks, and to ensure the appropriate use of public funds. These actions include the ongoing effort to develop, update, and improve policy and procedure guidance related to financial and personnel issues necessary for the Department's operations. Additionally, we have a strong internal audit team. But, historically, that audit team's efforts have been focused on the activities in the Judicial Districts. And there's no reason why my Office should not be held to the same standard within the organization. And, so, to that end, I've already directed our internal audit manager to do a couple of things. One, to add us to the normal rotation schedule of audits in with the Judicial Districts so that happens on a regular basis. The two specific to the findings in this audit. They'll be conducting an internal review of our implementation project progress this spring and summer, using the findings and recommendations in this report as the framework for the review.

**Rep. Saine**
Questions from the committee? Just a quick one. Mr. Vasconcellos. I read about the MacBooks that are being wiped. It's kind of like a modern Enron-type shredding of evidence. But just out of curiosity, we talked about a cooldown period of six months with previous employees. Any of the employees that were mentioned in, you know, [they] are not mentioned by name, but involved in that kind of document shredding. Or the employees that the Chief Justice had enumerated earlier. Are there any contracts you're involved with those previous employees that were mentioned or positions?

- 24 -

- 25 -

**Steven Vasconcellos**

Thank you, Madam Chair. We are not involved with any contracts that I'm aware of with any of those previous employees. Specifically, document shredding. I think in this modern age, it's really about control of electronic information. And the auditor's office has identified areas where we need to improve our oversight and controls. Particularly with regard to HR documentation and how that's managed and maintained. I think that's probably our biggest liability versus there's relatively few paper documents anymore. Almost everything's electronic, and I think our liabilities and where we need to strengthen is in that area of electronic information management.

**Rep. Saine**

All right, further questions from the committee? If not, we'll move on. Thank you, Mr. Vasconcellos. And your Honor, thank you for coming down here today.

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, committee.

**Appendix 27(d)**

**Transcript of *Hearing before the J. Budget Comm.*, Colo. Leg., December 17, 2020;**

# Colorado Legislative Joint Budget Committee—
# December 17, 2020 Hearing:
# Presentation of the Colorado Judicial Department

**Sen. Moreno**
The Joint Budget Committee will come to order. We continue our proceedings this afternoon with a hearing with the Department of the Judiciary as well as the independent agencies. We have here presenting Chief Justice Nathan Coats, as well as Mr. Vasconcellos, the State Court Administrator. Mr. Chief Justice, whenever you're ready.

**Chief Justice Coats**
Thank you. Thank you, Senator Moreno. Maybe if I could take just a few minutes at the beginning, I'll give a little overview. Hopefully, it will bridge right into the first few questions that you all ask us. I did kind of want to say early on that, although we are obviously a separate branch of government and not an administrative agency, and we have our own constitutional obligations, I think it is fair to say and very clear that when this budgetary situation arose in the Spring, there was no thought in our Department of seeking some special dispensation or dragging our feet in any way. And I think we made every attempt all the way along to cooperate and do our share, just as all the other agencies in the State. When we first got wind that there was going to be a big problem, you know, we did a freeze, a hiring freeze, immediately. Stopped all non-essential spending. Then, when we actually got the figures, and they were so cataclysmic. Our folks, Mr. Vasconcellos's Department, got creative and did everything they could to shift money away from General Fund dollars. Basically, we wound up in that process, having to figure out to do something with about 35 or 40 million dollars, I think. Which was a really big deal for us, especially as little programmatic stuff as we have. And I think I've seen figures that we submitted to you of being about 90% people. Just by example, during part of that process, everybody, though, was very wanting to participate. Judges, you know, because of salary, couldn't have salary cuts. The Chief Judges with whom we, by then, because of the pandemic, we were meeting by WebEx twice a week for an hour and a half. With all the Chief Judges in the state. They actually generated an idea of having judges give up an extra 5% of their salary to PERA to offset expenses that would hurt other employees and help us manage the budget. So, those are just the type of example things.

Then, of course, we came up with the final across the board cut for personnel like everybody else, personal services. And had to manage about 10 million plus dollars with regard to personal service cuts. For us, and I mentioned this, this was a very difficult decision, and we worked through it with the Chiefs. But I ultimately made the decision this was going to involve such a burden in terms of furloughs from what we calculated, we decided to actually make reductions in the FTE. And, so, in that process, we gave up about 200 FTE. Because of the freeze on hiring, we were able to offset about 100-110 jobs that had not been refilled. But that still meant letting a tremendous number of people go. It was a very

difficult choice. It is definitely having its effect. We can talk about all these things with regard to your questions a little more. But I do want to emphasize that and the feeling of cooperation and our attempt to comply and do our share. But at the same time, I don't want to give a false impression. It would be a mistake to minimize just how devastating this has been to the Judiciary throughout the State. We, as I said, we were meeting with the Chiefs, and we tried to work with the Chiefs to figure out how to allocate these cuts. And we did them as evenly as we could throughout our four major budget lines, which are the appellate courts, probation, the trial courts, and the SCAO, the Court Administrator's Office. Just, if I could quickly, the way these things, and maybe later I can give some personal examples or specific examples. But basically, we allowed the trial courts in each District, the Chief Judge to decide how to satisfy their proportionate share of cuts. And, so, you'll see in our Department, vastly different solutions because of the different problems we have throughout the State. In some Districts, they actually cut magistrate spots. So, we lost judicial officers. In some, things like court reporters. So, no more court reporters. We've given up what we call the Sherlocks and the Family Coordinators in many instances. So, that was the kind of thing they did. The Court Administrator's Office actually took twice the amount of cuts they would have proportional share. They cut about a million dollars over their proportional share of the budget, which amounted to a substantial loss of FTE for the Court Administrator's Office. Just giving you an idea, even in the appellate courts, the Supreme Court, there's not that much we can do, But we gave up staff counsel, people in the Library. The discussion was about law clerks, even. They are so integral to what we do, we didn't cut them right then. But depending on what happens with further required reductions, Supreme Court law clerks are on the table for the next line of cuts for us. So, we're kind of down to the bone on that. And I just wanted to give you that I that idea.

Further on, you ask about the effect of when we open up again, and that's what we're very worried about. Because it's going to be bad enough if we were fully staffed, but actually being cut. We're really worried about how we're going to do a lot of this. Just to give you an idea, though, because things are getting bad again, now, we've sort of figured out how to handle this in terms of allowing individual Districts to exercise discretion about when they will allow jury pools. When they believe they can be safely called again in their District. Which means, until then, there can't be jury trials. That's where the real backup is. Although so much is done, you know, remotely now that that slowed things down. But the real backup is with jury trials. Just to give you an idea, today, just before I walked over, the Chiefs are emailing back and forth to get online about where they're going, with closures. Everybody, I think there may be maybe three of the rural counties of Districts that haven't formally stopped jury trials. But they do very little anyway. Among the other Districts. Everybody, I think, is pretty much cut, at least till about the third week in January before we'll start up again. And as of today, just when I walked over, the preference in the bigger ones, bigger Districts now seems to be to stop all jury trials until March. I mention that because, just to show the exacerbation of the problem, the figures I was getting right now. Is that we have something like 13 or 1,400. 100,000? 13 or 14,000 cases set for trial that are backed up that far. And we'll see what the situation is if we go another three months without even being able to do any trials.

- 2 -

I probably used up enough time for an opening. Maybe I'll pitch it to Mr. Vasconcellos and kind of run through your questions, and unless you had a question of me right now.

**Sen. Moreno**
Thank you, Mr. Chief Justice. I think some folks do you have questions. Representative Herod.

**Rep. Herod**
Thank you, Mr. Chair, and thank you so much for being here. I know it's a very tough time for everyone. And I know there's a huge strain on our courts in our system. I'm just wondering if you guys are worried about any lawsuits for lack of speedy trial issues or anything like that, that you've heard about in other states or that you're worried about coming down in Colorado. And I guess really, just, what are these? What are the impacts on access to justice?

**Sen. Moreno**
Mr. Chief Justice.

**Chief Justice Coats**
Thank you. Well, there are tremendous impacts, I think, on the Access to Justice problem, particularly, usually we use that term with reference to difficulty getting lawyers. But right now, of course, it's even the broader and I take it that's part of your question, getting into court. Our business, our obligations, obviously, are to provide forums, to provide neutral arbiters, decision makers, for people to be able to. Well, for us to enforce the law with regard to speedy trial, but for people, all of our constituents, your constituents, to get in to court and be able to resolve their important financial and personal matters with the force of law. This has taken a real hit. We're getting as much done as we can remotely. I issued an order in. March, which is basically, although we varied it with regard to some things in jury trials and more discretion for Chief Judges in the Districts. But, basically, it set out about 10 things that we decided had to be done, no matter how bad the emergency. And we've continued to do those. But with regard to many other things, they just have to fall in terms of priorities down the list of importance. So, it is making a big effect.

With regard to suits. So, I take it when you say like speedy trial, the big problem there for us is that it's not a question really, of somebody suing us, but simply that criminal defendants who are not provided the speedy trial within the legislative limits will move for dismissal. And their cases will have to be dismissed. And that's what we're trying so hard to avoid. But in other things that, you know your question suggests, I have been a little surprised. But we've been pretty good in Colorado not having, let's say, lawsuits in the nature of inverse condemnation that you might get from people who say, Well, you've just deprived me of property without due process of law, and I want to make the government pay for it. Those are kinds of things. And you might see class action type of things there that obviously we've seen some places around the country with regard to landlord groups and dealing with eviction. Again, in this question of are they being deprived of property without due process? So, these are

- 3 -

important things for us. If I could mention real quickly with regard to the evictions we haven't felt. Now, the Governor's done things, and, you know, CDC has done things, nationally, and we'll see. We haven't really had those come to us in terms of lawsuits or get up to the appellate level. But I think all the trial courts are behaving very rationally in simply, without barring things, simply deciding that some things fall further down the list of priorities. And if we just don't have time for them, they're just pushed back. And that's kind of an example, would be evictions. Now, of course, with the Governor's issued orders telling people they can't file evictions, we haven't had, up to the appellate level, a lawsuit on that yet. But that staved off some of that problem, as well. Is that sort of along the lines of what you're asking?

**Sen. Moreno**
Representative Herod.

**Rep. Herod**
Yes, thank you, and you anticipated my questions and answered them fully. I'm very concerned about the access to justice, not just in, obviously obtaining counsel, but actually being able to work your way through the system. I don't think people realize how much the courts are used and what they are used for. But, you know, if I have a case in front of you right now, or something that I need to, you know, work through the process, it's on hold. And, that could be hurting my financial situation. That could hurt my household. And definitely my family, right? And, so, these are all things that outside of the criminal courts that people think about are going through the process right now and are being gunked up. And, so, I am concerned about the implications on the system as a whole. Once we get out of Covid and we see how many, you know, if there are cases that are brought forward, class actions against the State of Colorado or against the courts for inaction, or how many folks have not been able to seek justice in a manner that is timely enough for their situation and timely enough in the in the framework that we've even put on the courts. And, so, it's very concerning to me, and I think these cuts have a lasting impact on the entire ecosystem of justice. So, thank you for the allowance for that diatribe.

**Sen. Moreno**
Committee. Any other questions? Understanding we're going to dive deep on some of the ones we asked. Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair, would you just prefer I start running through the answers in order?

**Sen. Moreno**
Yeah, let's go ahead and start going through the questions that we presented.

**Steven Vasconcellos**
Thank you, Mr. Chair, I like to tease the Chief Justice that he always steals all the good headline bullet points. So, I apologize some of this may be a little repetitive. I'll try not to belabor any of these points

- 4 -

too much. Please feel free to move me along or slow me down as needed. With regard to the first question, how are the health, life, and dental cuts apportioned across our budget? And to what degree will be able to use measures such as vacancy savings, hiring freezes, operating cuts, and furloughs. As the Chief mentioned earlier, our main programmatic lines are over 90% personal services. They're not sort of traditional discretionary programs. And, so, even at that first dollar of reduction we're looking at where. Thinking about implications for impact on staff and, by extension, most importantly, impacts on services that Representative Herod refers to, to the people in the State of Colorado. This goes back to the last quarter of Fiscal Year 20 with trying to take a very proactive approach, working closely with our JBC analyst at the time, and instituting a hiring freeze. And stopping discretionary spending, basically stopping all operating spending, unless it was of an emergency sort of nature. We were able to contribute to an almost $7 million negative supplemental at the end of Fiscal Year 20. And, then, in terms of terms of managing the reductions in 21, after all was said and done, we had just shy of $11 million in personal services cuts to manage. And, even in the programmatic cuts that were assessed to us before that, those are essentially personnel cuts as well. Unless we find alternate measures. So, we were fairly aggressive, as you might remember, in cash fund refinancing where possible. And, again, trying to find a balance. We don't want to bankrupt cash funds that does us no good either, and puts people in just as much jeopardy. But we took a lot of staff out of General Fund sources and put them into cash fund sources to preserve continuity for their employment and to preserve services for the people in the State of Colorado, as much as reasonably possible. At the end of the day, it was a calculation between about 12 days of furlough, both this fiscal year and next fiscal year, and ongoing until the General Assembly would have enough money to basically buy us out of furlough or to make permanent cuts. It is an unpalatable choice by any measure. In the end, the discussion around the State and the final decision was. . . In an environment where the revenue picture is so volatile and still could turn I mean, we're all hoping for the best, but I don't think any of our crystal balls work well enough to know where revenue is going. In an environment where there's such volatility, it just didn't feel right to say to every staff person in the entire Branch, you have to take a little over half of a month off over the course of the year, and I can't guarantee that that's going to be it. It could be more. And that lack of predictability and that amount, you start putting a lot of our staff into an untenable personal financial situation. This is not to say, obviously, that layoffs don't have a profound impact on people, but what we wanted to do is take them, sort of the most permanent measures we could, to promote predictability. Not only for our staff, but for the services that we provide. So, we looked at everything. And certainly the hiring freeze and the vacancies, vacancy savings that was generated from that, did allow us to meet about half of our burden through vacant positions. But, ultimately, about half that burden had to be met through layoffs.

**Sen. Moreno**

Mr. Vasconcellos, I was wondering that a lot of the cash fund refinancing that you did. That did save General Fund, which obviously this committee was very grateful for. Do you envision that being temporary or cash fund revenues sufficient to support that of an ongoing nature? Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Mr. Chair, there are some areas where I am concerned. It's not in the next, not in the current fiscal year, not in FY 22 but in more of a 3 to 5 year posture. I am concerned about relying on them as heavily as we are. Particularly, what I consider our marquee cash funds, the Trial Court Stabilization Fund and one of our main probation cash funds. Where we have a lot of staff currently sacked away. That we moved out of General Fund sources. Again, we feel, we watch, we get very nervous around revenue projection time. And, of course, we'll be watching closely this week. But assuming stable revenue projections, we feel okay this year. We feel relatively optimistic next year, but it is a concern long term.

**Sen. Moreno**

Please continue.

**Steven Vasconcellos**

Thank you. Moving on to the second question in terms of how Covid has changed the Department's work, and what are the programmatic, budgetary and office space impacts? I think we've covered many of the budgetary impacts, and I have to say right back to the themes that Representative Herod was laying out at the beginning. Timely access to justice is the biggest impact in our and our biggest collective concern. And we have a basic capacity throughput problem that isn't just Covid-related, but we laid folks off at the beginning of the fiscal year. And, so, we've got the combination of the inefficiencies that come with trying to maintain operations during Covid in a socially distant manner or in a virtual sphere. And don't get me wrong, we are very grateful. We use WebEx, much like you guys, as our virtual hearing platform, and it has been a boon in many ways. But it is, by surveying the bench in Colorado, 2 to 3 times slower per individual hearing. Just because when you're in person, I mean, think of your own work. How quickly you can transition between issues, how quickly you can transition between agencies. It's just not as quick. Presentation of evidence looks different. It's not that it doesn't work. It's just not as fast. And, so, we're grateful for these virtual tools. They help buy down some of the backlog. But the backlog continues to grow because it's just not as quick, just not as efficient. So, we have to consider our impacts, both from a Covid lens and the same time a budget reduction lens. And you can imagine, we've done a lot of the standard things you see, either in your own operations or in your life, moving around. And that's spacing things out tremendously, limiting the number of staff at front counters. A lot of people-flow control, how many people can be led into the courthouse at a time, and how we manage people through their experience in the court. And, again, we're all doing that sort of through the lens of, Can we do this safely? Because we don't want to put our citizens unnecessarily at risk while we do this. The Chief has hit some of the other high points here.

I'd like to talk a little bit, maybe about probation and some of the impacts there, because we haven't talked much about that, at this point. As you can imagine, in-person probation appointments are extraordinarily rare, at this point. As are home visits. And, so, most of the probation appointments are done virtually because of space limitations and health considerations. Education and treatment

engagements for probationers have been impacted. And particularly, both of those. It's not that telemedicine, for example, doesn't work. It's not that, you know, my kids have been going to middle school and high school now online for a number of months. It's not that it doesn't work, but it is not the same, either. In my estimation, at least. And, so, are we getting? Are the probationers getting that same impact from the educational resources we're putting out? Are they getting the same impact from the treatment resources we're putting out? It is a concern. It is better. We're certainly not going to abdicate and say we're just going to stop because it's not working. We're going to do our best in this circumstance. But, we're certainly hopeful that this is not a long-term situation.

**Sen. Moreno**
Mr. Chief Justice.

**Chief Justice Coats**
Can I interrupt one second. Let me just pick up on that again with regard to the trial back up. Just to give you a sense. So, I see in the report we indicated in this 11-month period last year, we tried about 1,900 cases and probably 1,600 plus of those were criminal. That's most of that. We've show in here, that so far this year, we've tried 742. But I want to just point out. So that's like, what do we say, 38%? But remember, we had two and a half months of regular trials before we hit the pandemic. So, if you figure about how much, with the percentages, probably between 350 and 400 of those were actually tried before the pandemic. That means since the pandemic, we've been able to try, what, 300 and some odd cases. That's all. Those trials, even those. I need to point out, the vast majority of which are misdemeanor, very small cases with us trying to only bring in 6 jurors and space them out appropriately. So, I just want to emphasize that, that we are facing a real flood of trying to deal with felony cases. And we may talk about it later, but this is going to come up against this speedy trial problem, which we don't have a great deal of control over. And, actually, just to point out. Because I don't know it was emphasized in our response that much. There are constitutional speedy trial limitations, but they're not our problem. They're balancing-type of tests. We can accommodate this. We are stuck on the 180-day statute that basically says you got to try a guy within 180 days, unless he is responsible for the continuance. And, unlike even the Feds, even the federal courts, where judges have some discretion for things like this, we do not. And, so, that's the kind of crunch we're going to be looking at in terms of speedy trial. Thank you very much.

**Sen. Moreno**
Representative Herod.

**Rep. Herod**
Thank you, Mr. Chair. And I think, contrary to what some might assume, for me, I don't believe that all folks should be not going through the system and also not incarcerated at times. That's a joke for some people who think, I think everyone should be let out. But, I am concerned. So, basically, what you're telling me is, if I am, I guess, suspected of being an offender, a felony offender, and my attorney would

probably say, do a jury trial. Let's roll the dice and see if they actually can get it, make it happen within a certain amount of time. And if not, then I don't ever have to stand trial. And this family over here, whomever I may or may not have harmed, never gets access to justice. Is that right?

**Chief Justice Coats**
That's right.

**Rep. Herod**
Okay, huge problem. And I think the other question I have is about compliance with court orders. And, so, if I'm in a program, say I'm in a drug court or some other court, and I'm being ordered to take a [UA] or do whatever, and I don't. Am I coming back to court, or those being kind of pushed off, as well? If I want to come back and give you my explanation or reason, or see my time again? Is that happening? Or are they being kind of moved to the side?

**Sen. Moreno**
Mr. Chief Justice.

**Chief Justice Coats**
We're doing much better with those kinds of things, because we can do so much of that remotely. And as Mr. Vasconcellos was saying, we've actually done an incredible job, I think, of transforming procedures to be done remotely. So, with things, for instance, in reappearances and sentencing, probation. Much of that can be done remotely, and we're continuing to do that. They're not just being ignored. There's some things that we will even, you know, whether it's you're safe enough is a balance And depending on how serious they are, we would even do. And it's what we talk about as doing the docket, doing the motions, doing things that come up. That can be done in person, to some extent, if we can do it safely. But we're doing most of that remotely. And I would point out, although we can't fool around with something. We can't do something that would violate or be contrary to statute. And so, for instance, the speedy trial is a problem for us. Nevertheless, we have done a tremendous amount by rule changes that we think we can do. Apropos of this question, we have changed our rules dramatically to allow everything that we think can constitutionally be done, not in person, but remotely. We've changed our rules to allow those to be done remotely and we've arranged for the computer and phone arrangements and those kind of things to deal with jails. So ,people don't have to leave the jail. Lots of things along that line. So, I feel like we've been tremendously successful in that. Those kind of things, I wouldn't be surprised if many of them continue.

**Sen. Moreno**
Mr. Vasconcellos.

**Sen. Moreno**

Thank you, Mr. Chair. And Representative Herod, we don't want to set up gotcha moments. If the treatment providers closed or the UA facility is closed. I mean, it's very circumstantial. These are not normal times. And, so, there are different considerations. It's not like my treatment provider was closed. I couldn't go to treatment. I'm going to get revoked. It's just a different world today. All that's being taken into consideration.

**Sen. Moreno**

Senator Hansen.

**Sen. Hansen**

Thank you very much, Mr. Chair. And appreciate the very thorough response on the written side. And I just want to continue on this same conversation. Because you mentioned some statutory constraints that could really make life even more difficult than it already is. And I think, importantly, for this discussion, have budget implications, if there were financial consequences or safety consequences that resulted. And, so, I wonder today, or as we continue this conversation over the next few months, are there statutory changes or flexibility that you would recommend that the GA take up in a timely manner? Or perhaps, are there Executive Orders that should be considered to both address logistical challenges, but then also potential future financial liability in some form for the State. So, that I wonder if we might continue that piece of this. And love your initial thoughts, but obviously we can dig into that in more detail over the coming months.

**Sen. Moreno**

Mr. Chief Justice.

**Chief Justice Coats**

In terms of the money, I'm not sure that's our expertise, and I'm not really prepared to talk about that right at the minute. What may happen with things down the road? I suppose the obvious thing about legislation that we, some folks, I don't know who, the district attorneys maybe, whoever tried to get changed was this speedy trial problem. That would provide great relief. That would release a lot of pressure on the timing of these things. But ultimately, they have to get done anyway. So, we're still going to be faced with it. It's just we're not faced with kind of Jerry-rigging or coming up with reasons why we can parcel these things out. It is a complicated problem, though, and in the Spring, when there were attempts at that. From what got reported back to me, there were quite disparate views, particularly between the defense and prosecution communities, about how one should go about solving those. That I do have to say, though is one thing that is really, totally in control of the of the Legislature. We've tried to do some things with rules on mistrials and things, but those are just nibbling around the edges. This is really the elephant in the room for criminal cases, and they will have to get tried. Yeah, so, that's really the only thing I have on my radar screen about legislation.

- 9 -

**Sen. Moreno**

Representative Herod.

**Rep. Herod**

Thank you, Mr. Chair. Just to follow up. I think a lot of the conversation is around, are we keeping people in jail for longer than they should be, in an unsafe environment. Because we know how problematic that is, and so there is a lot of balancing, but I do think that shuffling the decks in a way that is appropriate could be helpful. Because the way that I know Denver works is that the judges are able to take on different dockets, and they rotate through different. So, they're not all family court or all one kind. And I do think that there's some ability to move there. It might still need statute change. It sounds like it does, because you guys have done everything you can. But I do think that the hard part is going to be balancing the prosecution community and the defense community. But it's something that the General Assembly needs to address, because I do think we're going to be paying for it down the line.

**Sen. Moreno**

Senator Hansen.

**Sen. Hansen**

Thank you, Mr. Chair. And this is great discussion. I mean, I think what I'm seeing on page 10 of your written response is that you have done your very best to reallocate resources, but we still have a building backlog in these numbers. And I take your point, which is that we still had 10 weeks of the year that was relatively normal. So, it might be even slightly worse than it would appear at first blush. And I think that leads me to my question. Should this committee? Should the General Assembly, as we look forward, think about some type of catch up resources? I see this as like a stock and flow problem, right? There's only so much they can move through the system right now. You got this build up in the upstream tanks, so to speak. And I think that's a conversation we're going to have to have here at the JBC. And then, of course, with the rest of the General Assembly. Is how do we ever get caught back up in the bright day ahead when we can go back to something that looks a little more normal? So, I think we're going to have to get into the details of that, probably sooner than later.

**Sen. Moreno**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Mr. Chair. Senator Hansen, I absolutely agree. Ultimately, we have a throughput problem, considering the resource reductions that have taken place, even with statutory assistance, which would be very, very helpful. You've just got the mountain of work to eat through. And we absolutely appreciate the fiscal limitations that the State is struggling under. But, at the very first possible opportunity to try to recover some resources, we would be interested in that conversation. Timely access to justice is why we

- 10 -

exist, period. And we currently don't have the adequate resources to address that, even when the pressures of Covid are off of us, because of the budget impacts.

**Sen. Moreno**
Please proceed.

**Steven Vasconcellos**
All righty in the interest of time, just really quick. I think Senator Hansen, during the briefing had a follow up question under number 2, in terms of which changes are permanent, which may be temporary. We have learned a tremendous amount, Senator Hansen about virtual proceedings in the last several months. And I think there's a consensus of court leaders around the State, that virtual proceedings are here to stay. What we'd like to do is get to a place where we can use them in a more targeted method. In support of our in-person proceedings to really realize the efficiency. Because right now, there's not an efficiency to be realized. But, if we can use them in concert, in-person proceedings where appropriate, virtual proceedings were appropriate. We can definitely see those hanging around. Additionally, on the probation side. If you think of maybe a large, rural, multi-county jurisdiction, where someone who's on probation might have to drive 100-150 miles for a probation appointment. That may not be a burden that we're interested in putting people under and using those virtual tools to have a meaningful contact with that person on probation, but not put them under so much personal distress. A lot of the folks that we work with in the Judiciary are hourly employees. They're not making money when they are engaging with us. And, so, what can we do to minimize those impacts? So, we see some of these, particularly the virtual tools continuing on.

Mr. Chair, moving on to question number 3, given the workload and the case-loads, what impacts do we foresee when we return to normal? I think we just talked about this. It's really the capacity issues. Yes, we've tried to do as much as we can with rule change. There may be some statutory relief in certain areas. Ultimately, when the time is right, we need additional resources to get back to normal. Unless there's questions, Mr. Chair, I'm going to keep moving.

Moving on to question number 4, the identification of IT gaps. How these gaps impacted access to the courts and other services? What technology investments would assist us during the pandemic and into the future? We were not, really in any meaningful way, using virtual hearing platforms prior to the pandemic, and it has been a crash course. We have learned a lot, including which virtual tools work well for us and which ones do not. Which tools work well for the constituents we serve and which ones do not. In our answer, we've drilled it down to really four areas that we are currently doing planning around that ultimately could result in a supplemental request sometime in Fiscal Year 22. We believe we have enough money in our Information Technology Cash Fund to pay for these. Just not enough spending authority. But they really focus on Internet and broadband access. You can imagine the impact our networks are taking with a lot of video based online hearings. And particularly in outlying areas, our infrastructure is not as strong as we would love. And that leads to service outages and challenges to just

conduct normal business. Related to that, some court audio-visual needs, particularly focusing on capturing the court record electronically. Arguably, right after making the decision in a case, the most important thing we do in the Judiciary is have a record that that actually took place, and being able to do that. And districts vary depending on their needs, whether they use a court reporter or whether they use electronic recording tools. But using those tools in the virtual environment has, as we've noted in our answer, provided some challenges. And, so, we want to do some upgrades to our audio-visual systems to improve the quality of capturing the record in a virtual environment. Is it a big access to justice issue? Court interpretation for folks who are limited English proficient. We are still providing that. We are very proud of our system in Colorado. We have one of the, I would argue, premier engagements with court interpretation in the country. Certainly among states that have a statewide, unified judiciary. But doing it online has presented challenges. Because in a live courtroom environment. Sorry, Representative Ransom. I should swivel around once in a while. But in a live courtroom environment, the interpreter can interpret simultaneously. So, while the judge is talking, or while someone's testifying, while that's happening, interpretation can happen discreetly and in real time. When you've got 10 people together in WebEx on a hearing, not so much. Now, we're still providing those services at the same level, same quality, that we always have. But it's a time sink, because we have to stop and so that the audio is not all over each other and the record is being captured properly. We have to stop and it just adds time. Now, of course, we're willing to do that right now. But long-term, if we want virtual proceedings to be an efficient, effective tool, we're looking at some technology solutions to allow that simultaneous interpretation to happen virtually, while not impeding the flow of the general proceedings.

**Sen. Moreno**

Mr. Vasconcellos, on that point, ha[ve] the courts looked into captioning at all? Is that a viable option for some of those interpretation needs?

**Steven Vasconcellos**

Thank you. Mr. Chair. It is not. Ultimately, it is not a sufficient level of engagement and participation for the part. And, ultimately, simultaneous interpretation is the gold standard. We've consulted with the Department of Justice on this issue in the past. And captioning is just not the way to go. And that's an area where we're really unwilling to cut into the quality.

**Sen. Moreno**

Please proceed.

**Steven Vasconcellos**

Thank you. Just briefly, the last area of technology we're looking at. We still have analog phone lines in a lot of areas in the State, and that severely limits our capacity when we're looking at web-based proceedings, virtual proceedings, etc. Sometimes, in some locations, just getting, handling the amount of normal phone traffic. It's not okay with analog lines. So, some greater investment in digital lines. If it's okay with the committee, Mr. Chair, I think we've addressed speedy trial in-depth.

- 12 -

And, so, I will move beyond question 5 into question 6. I believe, a question originally from Representative Herod about our work to ensure equal access to problem solving courts. We are committed to equal access to problem solving courts. And, so, there are three areas that we're currently actively focusing on right now. One, although our budget line for problem solving courts was a victim of the recent budget reductions, we were able to secure a federal grant from the Bureau of Justice Assistance. And it's really got three prongs, one is education and providing statewide training and technical support broadly on issues around diversity, equity, and inclusion in problem solving courts. But the second prong is a deeper dive, with five pilot locations to really explore the issues in those Districts, and they may not be the same challenges given the multiplicity of partners that come together to have a problem solving court work. Understand what is the situation in those five pilot Districts. That work will start at the beginning of the New Year, just after the holidays, with the five pilots. And, then, the final area is data. And as pointed out, I believe the recent article in *The Denver Gazette* was referenced during briefing. And as identified in that article, the data between whether it's the Judiciary, Executive entities like District Attorney's offices, other Executive Branch agencies. The data can be inconsistent, it can be incomprehensible, it can be nonexistent. Obviously, we can only take full ownership of our own data. And our third prong of spending under that federal grant has been updating our database that we use to support management decisions within problem solving courts. That is on tap to be rolled out in February of 21. So that we have a higher quality of information about our participants, to help inform better decision making

**Sen. Moreno**
Representative Herod.

**Rep. Herod**
Thank you, Mr. Chair. And thank you for that very thorough response in this packet. It was of much dismay to me to see that in the article about, you know, how folks of color tended to not get access to the same problem-solving court. And, so, while we're disproportionate in the system, we are underrepresented in these amazing opportunities that we've just seen have such powerful outcomes. And, so, I want to thank you for taking a look at this, for your continued work on this. And I just wanted to, I don't know if it is appropriate or not, but to say that I'd like to have regular updates on your progress in this area. And again, I just want to thank you for your work.

**Sen. Moreno**
Please continue.

**Steven Vasconcellos**
Thank you, Mr. Chair. And Representative Herod, we would be happy to provide regular updates and engage in an ongoing conversation. Alrighty.

- 13 -

So, committee moving on to Question 7 regarding the Eviction Legal Defense Fund and how the Department plans to use the additional $1 million appropriation that came about during the recent Special Session. The quick answer is, get it out as fast as humanly possible. We are working with the six original grantees, and are going to distribute the million dollars to those six original grantees in the same proportion that they received the original grant. I'm pleased to say that we already have. So, an amended contract, grant contract needs to be executed with those entities with 2 of the 6, the contract is already fully executed. And we're just waiting for signatures and wrapping up a couple of small issues with the remaining 4. We hope to have this wrapped up in the next couple of weeks, frankly, and have that money all distributed where it can be used.

Moving on to question number 8, our progress on the recent performance audit of the State Court Administrator's Office by the Office of the State Auditor. At the beginning of last week, Chief Justice Coats and myself testified at the audit hearing in front of the Legislative Audit Committee. As you may know, there were 6 main thematic areas of findings. We agreed with all of the recommendations made by the Office of the State Auditor, and have implemented several of those already and are on track to complete implementation of all the recommendations by July of 2021.

Moving on to Question 9, programmatic impact of budget reductions. Mr. Chair, I'm not sure if this is entirely what the committee was looking for here. We've talked broadly about impacts in a number of areas related to the budget reductions. And we have relatively few traditional programmatic areas. We listed some of those out here in our answer to this question. Whether it was reductions to the adult pretrial diversion program, the mental health diversion program, the behavioral health liaison program, or the problem-solving court line. I mean, these are some of the more traditional programmatic areas that we have a little flexibility. These were not easy cuts to make. Again, balancing programmatic cuts versus reductions in staff, and, by extension, reductions to service to the citizens of Colorado. Not easy or pleasant decisions. I would note that related to the diversion programming, you have a decision item from us to, in essence, replenish some of that money, but not through either State General Fund or cash fund resources. You may know that, because of the consent decree entered into in federal court with CDHS and Disability Law Colorado, there is a fund that is built up. That is the source of which are fine revenues, frankly. And there is a rather large amount of money available there. The federal special masters who oversee that fund have encouraged us to apply to the fund for funding. So, we're asking for cash fund spending authority in advance of an application to that fund to help replenish diversion monies that were cut.

**Sen. Moreno**
Representative Herod.

**Rep. Herod**
Thank you, Mr. Chair. Do you have any type of calculation for the cost of these cuts? So, I see that multiple jurisdictions had to completely end programs. Where are those people going? I mean, I know

- 14 -

it's hard, because not everyone has come through the system in a quick way. But, in general, where are these people going? Are they coming into DOC or into jails. Do we have any cost estimates from these cuts?

**Sen. Moreno**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Representative Herod, we don't at this point. I think part of it is because it's probably too soon to know those downstream costs, like you're referring to. Whether it's incarceration at the county level, incarceration in State Department of Corrections. Are they on probation? Some of their cases haven't been finished. You know, these are diversionary programs. So, their cases are generally put on hold pending the outcome of engagement with treatment and education and other matters. And, ultimately, their case could be dismissed rather than proceeding. In the case where, particularly in the mental health diversion program, where 3 of the 4 programs had to shut down due to lack of funding, you know. The district attorney has to make a charging decision as to whether they want to proceed or not. That's going to look different across these jurisdictions, as you might imagine. And even if they chose to proceed with the case, it's likely, given the timing, that some of these cases, many of these cases where folks would have otherwise been in a mental health diversionary program, their case isn't complete yet.

**Sen. Moreno**
Representative Herod.

**Rep. Herod**
Yeah, that's it. I think that's important. And, again, thank you for that discussion. I'm also wondering the cost of folks not coming into the programs, as well. Because if we don't have the programs existing right now, people are being sentenced if the DA chooses to charge them. And, so, where is that going? So again, I think I just would love to see, and I don't need it today, obviously, but just a little bit more discussion around the cost of these cuts and the longer-term impacts that, again, we're going to end up paying for. If, in fact, they exist.

**Sen. Moreno**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Representative Herod, as with other matters, we will be more than happy to have an ongoing conversation and do the best we can. Some of these are. This is not an argument against trying, but some of these costs are so complicated. I don't have the sort of statistical and economic horsepower on our staff to really suss all this out. But I think, you know, certainly a multi-agency, multi

- 15 -

branch conversation is healthy on this matter, Mr. Chair, I think we've in terms of number 10 and budget reductions, impact. I think we've covered that pretty robustly at this point.

If you don't mind, I'll move on to number 11. How would appropriation consult? Excuse me, pardon me, how would the requested appropriation consolidations achieve programmatic efficiency, budget flexibility, etc. There's really, we've identified 4 areas in our budget request for consolidation. Two, the Child Support Enforcement area and our underfunded courthouse facilities program, are single FTE appropriations that candidly require disproportionate amount of time to manage separately. Those FTE, are part of my office at the State Court Administrator's Office. They're a normal part of the staff, and there's really no reason in our mind why they shouldn't be moved to the general courts administration budget and gives us just two fewer lines to have to manage, and a little more flexibility. In the instance of the Law Library. The Supreme Court Law Library, not surprisingly, is overseen by the Supreme Court and is managed as if it were, you know, from an operational, programmatic standpoint, no different than any other part of the appellate court programs line. And so, again, there's an artificiality to the separation of the lines. And, so, we would like to see those collapsed. It's fewer lines to manage, and it's a little more programmatic flexibility and staffing flexibility for the managers on the ground. Finally, with the collections program, our staff in this program are part of the larger on the ground court operations. And this program is decades old at this point. And at this point, we don't believe there's a strong argument for a separate long bill line or even a separate cash fund source. And that the FTE should be collapsed into the general court's programmatic line. And that the specific cash funds related to this program should be redirected out of their current source and into the Judicial Stabilization Fund. Still maintaining the program. But there's an artificiality to the separation that just doesn't make sense at this point. I'll take a pause to take a quick breath and see if you have any questions.

**Sen. Moreno**
Mr. Vasconcellos, I was wondering. And this is going back to something previously that we discussed. I'm wondering if you could speak a little bit to the uniqueness of your Department. Not only are you a separate branch of government, but federal resources are limited to nonexistent that you can draw upon. I think with the budget reductions that we saw in other departments, they had ways to leverage other sources, whether that was federal support through the many federal relief packages provided, or it was vacancy savings or things like that. Can you just speak to how those options were limited? I think in your case. Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Well, you pretty well took the words right out of my mouth. We don't have the same tools, options, flexibility that may be your run of the mill. No offense intended, the run of the mill Executive Branch agency would. We've harped a little bit on sort of the biggest structural difference. We don't have discretionary programs. Our work is driven by our statutory and constitutional obligations. And unless statute changes, or unless the Constitution changes, the work keeps coming. And, so, in that regard, our budget is the personnel, whether it's the judicial officers and the staff who are needed to

make that work happen, probation officers, etc. And, so, that first dollar of reduction, whether it was intended to be personal services or not, what's on our mind is that's a personal services reduction when we're this people intensive in our work and don't have discretion. We can use tools like vacancy savings, and certainly the hiring freeze helped take some of the edges off of the pain of the cuts. But, not to come to the same issue over and over again. But being 90% plus personal services doesn't allow us a lot of wiggle room. And the few programs that the General Assembly has given to us, they're not really discretionary, per se. But if we talk about the diversion programs that I was discussing earlier with Representative Herod, these are these are not easy program cuts, either. These, these impact citizens, directly, when we make those. And we were not eligible. We looked into, we spent a lot of time. Our financial staff, looking into federal grant options. Were we eligible for certain Cares Act funding? And we just were not very successful in finding those options.

**Sen. Moreno**
Thank you.

**Steven Vasconcellos**
Moving on to Question 12, committee. IT systems and their source of funding is that a state or county responsibility? You know, Colorado has a unified state-funded court system for County and District Courts. In the State, with the exception loan exception of the Denver County Court. And as a result, our case management systems, the data systems we use on an operations front to drive the day to day work. That's a statewide system. All of our state courts use it, and that's a state-funded obligation. From an infrastructure standpoint, that has evolved as I understand it from over the decades, and where, maybe, 30 years ago plus. Those were maybe more county funded. Certainly, in my time at the State Court Administrator's Office over the last 20 years, that has been, by and large, a state obligation. There's statutory language that that's been discussed a lot in the General Assembly about the division of costs between counties and the State as it relates to courthouse facilities. Generally, the way things have been funded, the Counties are responsible for the building itself, and a certain part of the infrastructure. We're responsible for filling that courthouse up, whether it's with staff, furnishings, and, really of late, the network and IT infrastructure that go with it. I would not really find it advantageous for us to be in a situation, although it would cost the State less for the Counties to have that obligation, the uneven funding from county to county in that IT infrastructure and our engagement and the impact on operations could be pretty substantial. We've got counties in vastly different financial postures across the State, as you well know. And, in terms of continuity of service, we feel the current funding approach is the best approach. Finally, I think Representative McCluskie for our last question, had a question about our courthouse facilities programs, some history there. We put a fairly exhaustive history of funding. Who's been funded over the years, for what purposes, etc. I could, we have easily blown through our hour. But I'm happy to, if there are specific questions about our facilities. Funded programs, we have three main sources of funding related to courthouse facilities, and I'm happy to speak at length if the committee has any questions.

- 17 -

**Sen. Moreno**

Senator Hansen.

**Sen. Hansen**

Thank you, Mr. Chair. And just quickly on that, I really appreciate the back story or the back history. It's fantastic to see how that's played out over the last few years. Anything for this committee to know about kind of anticipated big project coming up, a new courthouse we know is going to have to come in a certain jurisdiction that is likely going to need or will be applying for these resources?

**Sen. Moreno**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Mr. Chair. Senator Hansen, forgive me as I fumble about in my binder here. We have, as part of our request to the General Assembly this year. We have four projects identified. And, probably, the marquee project on that list is in the 6th Judicial District in Archuleta County. Where they have already broken ground on a new courthouse, and there will be furnishings and obligations for the new courtrooms and the new probation office there. And, so, that's part of this year's request. There are some other projects, a significant remodel of, or I shouldn't say remodel. It's a modernization, frankly, of the facility in San Juan County, also in the 6th Judicial District. And, in a couple of instances, counties are moving us around. Counties, ultimately being responsible for providing the physical space. On occasion, approach us and say, you need to move. And, so, in Weld County, there is some remodeling happening in the probation department to move them into some new space and create some new space for the probation department. Additionally, the main probation office in the 17th Judicial District is being relocated within the City of Westminster. So, we're going to a different building there, and that has costs associated in this year's request.

**Sen. Moreno**

Colleagues, we have been joined by a number of our fellow colleagues. I just want to thank and welcome Representatives Benevides, Woodrow, Weissman and Representative-elect Daugherty for joining us. Thank you for being here. Representative Weissman, you had a question?

**Rep. Weissman**

Yes. Thank you, Mr. Chair. And I think this is by way of following up on Senator Hansen's question about sort of upcoming major projects. Mr. Vasconcellos, apologize, I know this is generally a forum for you to speak to questions previously put by the committee. I'll confess that Senator Hansen just sort of put me in mind of this one. You were speaking of sort of physical projects. And I'm aware of the issue that's been going on in Southwest Colorado with physical facilities. I wonder if you could speak to any significant upcoming, essentially, software or system overhauls. Specifically, I think, you know, I have an interest in record sealing policy. And I won't ask you to go into the policy aspects of that, but because

- 18 -

we are not a unified registry, State and Judicial has custody of the case records, and CBI has custody of the arrest records. There are sometimes just operational problems in trying to effectuate policy. And it's been suggested to me in another conversation that there might be some upgrades going on anyway that might tend to facilitate that kind of thing. I wonder if you're in a position to say more about that and the timelines. And, if I'm catching you off guard, I also be happy to follow up offline. Thank you.

**Sen. Moreno**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Representative Weissman, you have successfully caught me off guard. I need to check in with my IT director and see the status of the issue that you're referring to. I'd be more than happy to follow up with you, both in writing and happy to discuss the issue at length with you. If you're interested.

**Sen. Moreno**
Great. Thank you.

**Rep. Weissman**
Thank you.

**Sen. Moreno**
That, committee, concludes the questions that were submitted for response from the Department. Are there any final questions? Senator Hansen.

**Sen. Hansen**
Thank you, Mr. Chair. And, yeah, just, I guess, one other subject. And Mr. Chief Justice, that this will be a bit of a rewind the clock by one year, because I think we had a great back and forth last year about court sealing of documents. And I wonder, from what you described basically 12 months ago, which seems like 10 years ago now, but that was something that was a kind of a discussion you were having with your Chief Judges in each District about trying to understand how much it's being used, and what potential bumpers and procedures might be put in place around that. And, I think I raised the concern last year about the use and perhaps overuse. And I don't prejudge that, but that was essentially what I was asking you last year. And your very thoughtful response was, Hey, we're going to take a hard look at this. We're going to talk about this. And I wonder if I might ask you today, you know, what came of that process? If there's any direction that you have with your colleagues. On, you know, are there need for any change or reform and how court sealing are ordered around the State?

**Sen. Hansen**
Mr. Chief Justice.

- 19 -

**Chief Justice Coats**

Yes, Senator Hansen. I remember our discussion. We got derailed a little bit in terms of timing. But we were talking particularly about a change in the criminal rules. Was a big part of that discussion, I take it. And we had a committee process going on. I think, at the time, I told you that we were expecting something from the committee imminently. We did get it, and we scheduled that for a public hearing as a result of the pandemic. That's all got bumped off until we wound up having a virtual hearing in September. And it was quite lively, and there was a lot of discussion, and some members from the representatives, lawyers from the press spoke. As a result of that, we actually took it back in hand in the Court and worked a little bit back and forth with the committee. But, basically, didn't want to send it back to them, lest it get back into a committee process forever. I can tell you, today, the Court took a final vote on that, our criminal Rule 55.1. Which was substantially written even within the Court, as a result of the public comments and the comments by, particularly Mr. Zansberg, on behalf of some of the press. And, so, that probably, that Rule won't take effect for several months because it involves enough changes we need to make some technological change to be able to accommodate the kinds of motions and things that will be involved. But, probably no later than the beginning of April that rule will take effect then. And it's not. You talked about the, I think, the ABA model rule a little bit last time. As I explained, we probably were not going exactly in that direction and everything that it was doing. But it is a substantial rule that lays out a process. One that expressly permits for motions to seal, requires notice to the other side, requires, has various hearing and entertainment requirements and requirements on the part of the courts to specify times, suspension dates, call backs when it has to be reviewed. All intended to solve this problem of sealing without totally *ex parte* sealing. And, then, the problem we had that led to all this of it just sort of disappearing into a black hole. So, that should take effect shortly.

**Sen. Hansen**

Thank you. I really appreciate that. I guess perfect timing on my question. This would be my chance to do some light reading over the weekend. Go read 55.1. So, thank you.

**Sen. Moreno**

All right, Mr. Chief Justice, Mr. Vasconcellos, would you like any closing comments?

**Chief Justice Coats**

I don't believe I do, thank you.

**Sen. Moreno**

Very grateful for your presentation today and the comprehensive information you submitted. Thank you.

**Steven Vasconcellos**

Thank you, committee. We appreciate your time and wish you well on the difficult task ahead.

**Sen. Moreno**

Thank you, and thank you as well to Justice Boatright for being here as well. Senator Hansen.

**Sen. Hansen**

I don't want to lose this opportunity. This may be the last time we see you with your current title. And I just want to express a very heartfelt thank you for your service to the State. I think all of us, in one form or another, in public service, know the ups, the downs, the costs to the sacrifices you've made to help lead this State. And I just really, I want to publicly express that as you wind up your tenure. And I really appreciate your service to Colorado.

**Chief Justice Coats**

Thank you very much.

**Sen. Moreno**

Representative Herod.

**Rep. Herod**

Thank you. And I'll just echo that and just add that the State of Colorado is better because of your service, and that we are forever grateful. So, thank you.

**Chief Justice Coats**

Very generous. Thank you.

**Sen. Moreno**

Thank you again, Mr. Chief Justice. I think a round of applause from the committee is in order, thank you for your service. [Applause].

# Appendix 27(e)

# Transcript of *Hearing before the J. Judiciary Comm.*, Colo. Leg., January 25, 2021 (OSA SMART Act Presentation);

# Colorado Joint Judiciary Committee—January 25, 2021
## SMART Act Hearing: Office of the State Auditor Presentation

**Sen. Lee**

Okay. Ms Jenson, please call the roll of the Joint House-Senate Judiciary Committee.

**Juliann Jenson**

Representative Bacon.

**Rep. Bacon**

Here.

**Juliann Jenson**

Representative Benevides.

**Rep. Benevides**

Here.

**Juliann Jenson**

Representative Bockenfeld.

**Rep. Bockenfeld**

Here.

**Juliann Jenson**

Representative Carver.

**Rep. Carver**

Here.

**Juliann Jenson**

Senator Cooke.

**Sen. Lee**

Excused.

**Juliann Jenson**

Representative Daugherty.

- 2 -

**Rep. Daugherty**

Here.

**Juliann Jenson**

Senator Gardner.

**Sen. Gardner**

Here.

**Juliann Jenson**

Senator Gonzales.

**Juliann Jenson**

Representative Luck.

**Rep. Luck**

Here.

**Juliann Jenson**

Representative Lynch.

**Rep. Lynch**

Here.

**Juliann Jenson**

Representative Roberts.

**Rep. Roberts**

Here.

**Juliann Jenson**

Senator Rodriguez.

**Sen. Lee**

Excused.

**Juliann Jenson**

Representative Tipper.

**Rep Tipper**

Here.

**Juliann Jenson**

Representative Woodrow.

**Rep. Woodrow**

Here.

**Juliann Jenson**

Representative Weissman.

**Rep. Weissman**

Here.

**Juliann Jenson**

Senator Lee, Mr. Chair.

**Sen. Lee**

Here.

**Sen. Lee**

Thank you, Ms. Jenson. We do have a quorum. I hear an echo in the background. Well, anyway, I'd like to welcome the members and staff and public to the opening round of the House-Senate, Judiciary Committee hearings. I'd like, in particular, to welcome new members in the House, Representatives Daugherty, Luck, Bacon, and Lynch. And we have some new members to the Judiciary Committee, so I welcome you as well. Look forward to working with you over the course of the next year. Let me encourage active participation in all Judiciary Committee hearings. The only inappropriate question is the one that did not get asked. So, if you have questions, ask the questions.

Today, we are having the SMART Act hearings. The SMART Act was set up pursuant to House Bill 13-1299. It stands for State Measurement for Accountable, Responsive, and Transparent government. It basically requires the executive committee and the Judicial Branch and other state government agencies to publicly share their annual performance goals. They share at the beginning of each fiscal year, and the Act requires the Executive Branch to implement performance plans and performance management systems throughout each of the Departments, and to incorporate continuous policy improvements to increase government efficiency and to ensure that state employees obtain training on such things. So, we have, I think, 9 Departments and Independent Agencies that operate under the Judiciary Committees of the House and Senate as the committees of reference, and we will also hear from the State Auditor and a report from CCJJ on the work that they have been doing on criminal and juvenile justice reform.

- 3 -

As a matter of procedure, I'm going to ask members to hold questions until the end of the presentation, excepting those questions which are brief and clarifying in nature. Both to let the presenters get through their materials and reduce the chances of technological feedback. All documents are available online, and the public has been invited to participate. They can either submit written testimony, or there will be opportunities at the end of each presentation by departments and agencies for the public to testify, if they so choose. So, with that in mind and seeing no questions, I welcome the State Auditor to present.

I see Vickie Heller is with us. I wanted to note at the outset, because we do have some new members, both to the Legislature and on the Judiciary Committee, that the function of the State Auditor is absolutely critical and important to good government. Here in Colorado, they will do performance audits, financial audits. They will find the money left in the couch or inappropriate operations in any of the Departments and you, as members, can request an audit. We would encourage you to contact the State Auditor's Office, if you want additional information. And I would note also that Dianne Ray, the State Auditor, was acknowledged and recognized this year by the National State Auditors Association as the Auditor of the Year. So, she is recognized by her peers, which is a high honor. With that in mind, I turn it over to Ms. Heller, if you will introduce yourself and whoever might be with you and provide us with your report.

**Vickie Heller**

Thank you and, actually, Deputy Kerri Hunter was going to start briefly. And, then, I was going to go into our audit reports, if that works.

**Sen. Lee**

That's fine. Thank you. Welcome, Ms. Hunter.

**Kerri Hunter**

Thank you, Mr. Chair. This is Kerri Hunter. I'm a Deputy State Auditor with the Office of the State Auditor. And Ms. Heller and I are here this morning to provide you with an update related to the SMART Government Act. For our part, the SMART Act requires our Office to update the various committees of reference each year on the audits that we've conducted over the last year and the audit recommendations that still need to be implemented by those agencies that each committee oversees. So, we'll be providing a brief update on that this morning. As a reminder about our Office, the State Auditor is part of the Legislative Branch, is established in the State's Constitution, and serves as the State's independent external auditor. And our responsibility is to audit state programs. We perform three types of audits, financial audits, performance audits, as well as information technology or IT audits. And one of the results of our audits is to make recommendations to the State Departments and Agencies. Those recommendations address such things as improvements in operations, compliance with laws and regulations, as well as possible areas to increase efficiencies or to improve accountability. And each year, we do issue about 50 audits. So, you should have received electronic copies of the reports that we'll be providing in summary to you this morning, in case you want to have them for your reference during

our presentation. And, then, you should have also received a copy of our Office's Annual Report that provides more general information about our Office. So, with that, Mr. Chair, I would like to turn it back over to Ms. Heller to provide the update.

**Sen. Lee**
Thank you, Ms. Hunter. Ms. Heller, welcome to the joint Senate House-Judiciary Committee, virtual as it may be.

**Vickie Heller**
Thank you, Mr. Chair. And, so, last year, our Office conducted performance audits under the SMART Act at two of the Departments that this committee oversees. So, today I'm going to talk a little bit about each of those two. And then after that, I'll also give you guys some information from the Annual Report that our Office publishes about older audit recommendations.

So, first I'm going to talk about our audit at the Judicial Department. For this audit, we focused on the State Court Administrator's Office, and our report was released by the Legislative Audit Committee last month, in December. And, in that copy of the report that you should have received, there is a summary page of the audit report highlights, and that's on page 3 of the report, just after the Table of Contents. In general, the core function of the State Court Administrator's Office is to provide administrative support to the entire Judicial Department. So, this includes financial services, such as handling procurement and managing the Department's human resources function. In our audit, we looked at how this Office has been managing these types of internal functions, and overall, we had findings and recommendations in a variety of the HR and financial service areas. So, to give you just a very general, high-level sense, these included problems with how the Office manages paid administrative leave for its staff, how it awards separation incentives to staff who voluntarily leave their positions. We also saw that it lacked some key HR documents related to FMLA cases and staff disciplinary investigations, and we saw issues in how it awarded contracts without support for why it used sole-source contracting instead of going through a vendor bidding process. And, last, we saw issues in how it managed and approved staff use of Procurement Cards. So, altogether, the specific issues that we found were significant enough to lead us to conclude that overall, this Office's culture and management, Tone at the Top, during the period that we reviewed were not fostering accountability or integrity.

And, so, we made recommendations that the Judicial Department implement a number of different policies and practices to address the specific problems that we saw. For example, one recommendation is to set some limits on how many hours of administrative leave that staff can take. But, we also made broader recommendations in an attempt to help address the Office's bigger cultural issues with accountability. And, so, for example, by conducting monitoring activities and in particular involving more than one member of management to review and approve sole-source contracting. The Judicial Department reviewed our report, and they agreed with all of our recommendations, and the Chief Justice of the Supreme Court and the State Court Administrator talked to the Legislative Audit Committee last

- 5 -

month about how they will implement all of our recommendations. They'll also be updating the Legislative Audit Committee later this year, in the Summer, on their progress. Mr. Chair, that's all I have on that audit. And, so, I can pause here for questions, or I can move to the second audit.

**Sen. Lee**
Well, let's hold on. Questions? I can't see all the members, so I don't know if members have questions. In particular, I can't see Representative Weissman on my screen. Is Rep. Weissman with us?

**Rep. Weissman**
I am here, Mr. Chair, if it would help. You know, if I'm in a better position being in the media room to observe members here, you know I can handle the calling on folks here, if you'd like, when we get to questions.

**Sen. Lee**
Sure, let's say. I can see some of the members. I can see about 8 of them. But, yeah, that might be helpful. Do you see questions that would be helpful? Does anyone have any questions? Representative Benevides?

**Rep. Benevides**
Yeah, and I raised my hand on this function. So, I don't know if you can see those.

**Sen. Lee**
Just raise your hand on the screen, Representative. I can see that, there you go. I'm sort of a hands-on guy.

**Rep. Benevides**
My question was to Ms. Heller. I did listen to the JBC presentation on this. I'm just wondering if, because there were so many issues, especially contracting issues, were there any criminal referrals of your audit?

**Sen. Lee**
Ms Heller.

**Vickie Heller**
Thank you, Mr. Chair. No, there were not. Not as a result of this audit. I might defer back to Deputy Hunter for specifics, but I can tell you that, in addition to this audit, there were fraud allegations that, under a separate function of our Office, separate staff are looking into the fraud allegations. And if Deputy Hunter wants to elaborate on that, she may. But, I do know that because of media attention that that led to this audit, there were also fraud allegations that are leading to a fraud investigation that's ongoing at this point in time.

**Sen. Lee**

Ms. Hunter do you want to elaborate on any of that?

**Kerri Hunter**

Thank you, Mr. Chair, at this point I really cannot, because it's ongoing. But we are in the midst of looking into that.

**Sen. Lee**

Okay, just as a general question, then, for either of you. Following the conduct of the audit and revealing of the misfeasance and malfeasance, you met with the State Court Administrator's Office. Were they receptive and responsive to the recommendations that you made? Were they acknowledging the issues that you identified? Or were they in denial? And what was the outcome of those discussions? You made recommendations. Did they acknowledge them and implement changes? Who wants that?

**Vickie Heller**

Thank you, Mr. Chair. I can take that.

**Sen. Lee**

Go ahead Ms. Heller.

**Vickie Heller**

For the audit, I was the Performance Audit Manager for this audit, and I would say, yes. They were very receptive to our recommendations, and, I guess, I can elaborate just a little bit more. To help distinguish the fraud investigation that's happening, I would imagine, would have to do with any criminal charges or anything specific on instances of fraud. The audit was conducted to look at the State Court Administrator's Office, more generally. To see if there are general weaknesses or deficiencies in their systems and their processes. So that, you know, if there's a risk that something's happening or could happen, that our recommendations help address that. And, so, I would say that the Chief Justice of the Supreme Court, who is now retired, and there is a new gentleman. But the State Court Administrator who is still in place, who was not in place during the period that our audit reviewed, both were very receptive to our audit recommendations and talked to the Legislative Audit Committee last month quite a bit about how they specifically plan to implement the recommendations that we have. We typically give auditees anywhere from 6 months to a year to come back to the Legislative Audit Committee to, then, talk about what they have implemented or have not. And that is the plan for this audit. That at some point later this year, most likely at the end of the Summer, the current Chief Justice of the Supreme Court and the current State Court Administrator will talk about what they put into place. But they do plan to implement everything that we recommended, is what they reported to us.

**Sen. Lee**

Okay. Representative Benevides.

**Rep. Benevides**

And thank you, Ms. Heller. And, you know, fraud can result in administrative findings, not just criminal. Particularly with regard to the separation incentives, where those can be clawed back if they were improper. As well as the almost 50,000 in potentially problematic Procurement Card [use]. That, also, can be clawed back from the employees, and there can be administrative matters taken up as far as discipline. So, it's not just criminal. So, I'm just wondering, are you all looking at those aspects and expecting something to be done or by the Judiciary?

**Sen. Lee**

Ms. Heller.

**Vickie Heller**

Thank you, Mr. Chair. I would say, for the purposes of the audit and the types of recommendations we make, our focus in the audit was to point out and conclude and make recommendations to change the overall system and process. So, what you are talking about is a little bit different, more specific, and I guess I would just recommend potentially asking the Judicial Department about those specific questions when they're here to talk to you, which I believe is not today, but maybe about your Thursday meeting. They'll be reporting to you about what they're doing.

**Sen. Lee**

Okay, very good. Seeing no further questions. Why don't we move on, Ms. Heller or Ms. Hunter, with any further reporting.

**Vickie Heller**

Thank you, Mr. Chair. So, next, I'm going to turn to our audit at the Department of Public Safety. And for this one, we focused our review on the Sex Offender Management Board. Our report for this audit was released by the Legislative Audit Committee about 6 months ago. This was in July 2020, and for this audit report two, that you should have received, there is a summary highlights page on page 3, right after that Table of Contents. In the report, if you'd like to take a look at that. So, at the Department of Public Safety, the Sex Offender Management Board has 25 members, and their primary function is to develop and to keep updated a set of standards of conduct as well as processes that all of the state agencies and the service providers who are involved with the treatment or management of sex offenders must follow. The Board is statutorily responsible for making sure that any of the standards that it creates are evidence based, and this is with the overarching intent to prioritize protecting victims and potential victims and to promote factors that help keep offenders from re-offending. The Board's responsible for approving applications from providers who wish to treat sex offenders, as well. And they're also responsible for investigating any complaints that are made about those providers. And, so, in this audit, our Office found that most of the published Board standards do not reference supporting evidence, as is required by statute. And, so, we made recommendations that the Board implement some more policies and some better procedures. Essentially, to better guide how its members establish and update the

standards, including that the standards themselves more clearly note which ones are evidence based, which are not, and why not.

**Sen. Lee**

Ms. Heller, if you could elaborate on that a little bit. I read that report, spent a good deal of time reading that report. And, as I recall, there was a significant number of standards that did not have evidence-based research supporting them. And, as I recall, it was like 4 out of 19, but it's been 6 months or more since I read that report. Can you elaborate a little bit on what you found with respect to the lack of evidence to support the standards that were implemented?

**Vickie Heller**

Thank you, Mr. Chair. Sure thing. I can tell you. The Board standards comprise hundreds and hundreds of pages of requirements and direction and guidance to providers and to state agencies. And, so, what we report in our audit report, what we found, is that, I believe, it's just about 380 of the different sections of the Board standards. We saw that only 18% of those 380 sections referenced the evidence, the research that was used to support that this standard should be in place. Within the report, we talk about our methodology for what else we looked at and how we talked to the Board members. The Board establishes different subsets of Board members, committees to conduct research. It has staff at the Department of Public Safety help it decide what standards to put in place based on research and evidence. And what we found was, generally, there just wasn't really a process or a way to show what work these committees of Board members were doing to get to a point where they decided, here is what evidence is out there, and here is what we should use to establish a standard. And, so, we do talk about all that in the report. We report as well, the reasons that the Board gave for why something might not be evidence-based. One thing in particular, for example, is that there is quite a bit less research, they stated for standards that have to do with juvenile offenders. And, so, in some cases, there just is not scientific evidence at that point in time to support a standard. And, so, we ultimately recognized that there could be good reasons for not having evidence to support a standard or to, if there is conflicting evidence, to choose one set of research versus something else. We absolutely agree that that is the Board's charge, to decide that. Our recommendation came down to transparency and accountability. And, essentially, just putting something in the standards that it's clear to anybody reading them. Why? Whether there is evidence, and if there's not, why there is not? So, a little bit more transparency in the work that the Board is doing. Instead of just, you know, explaining to the auditors verbally, oh, this is what happened in this case, or what happened in this case. We felt that that should be apparent within the standards and within the Board's documented kind of decisions.

**Sen. Lee**

Okay, so what else did you find in your audit of SOMB, Ms. Heller?

- 9 -

**Vickie Heller**

Thank you, Mr. Chair. So, we also found some instances where the Board didn't follow the requirements that it's set up for minimum qualifications for treatment providers. And we found instances where the Board didn't investigate complaints as they're required to be by statute. And, so, we had recommendations that it improve its processes in those two areas, as well. Finally, we found instances of Board members who did have conflicts of interest that were not disclosed. For example, when the Board voted on changes to its standards that affected the businesses that some Board members owned or directed. And, so, we also made some recommendations for the Board to better demonstrate that it's mitigating conflicts in line with the State Code of Ethics. The Department of Public Safety and the Board agreed with all of our recommendations, here as well, and they'll be updating the Legislative Audit Committee this Summer on their progress.

**Sen. Lee**

Okay. Thank you, Ms. Heller. I'd like to welcome and acknowledge Senator Cooke, who has joined our hearings. Anything else on SOMB, Ms. Heller?

**Vickie Heller**

Not on SOMB. Mr. Chair, thank you.

**Sen. Lee**

Why don't you continue, then?

**Vickie Heller**

Thank you, Mr. Chair. So, under the SMART Act, our Office is also required to give you an update on the older audit recommendations that we've made in prior years that still need to be implemented. And, so, I'll shift gears a bit, and I'll provide you that update now. In addition to the two audit reports, you should have received a copy of our informational report, and this one is titled audit report, a status of audit recommendations that are not fully implemented as of June 30, 2020. This is a report that our Office issues every December. And it compiles all of the audit recommendations that our Office has made over the prior five-year period. And, so, this one covers fiscal years, 2015, through 2019, and it gives you details about all of the performance, financial, and IT recommendations that still needed to be implemented as of last June, 2020. If you look at this report, that very first section gives some overview information and statistics on all of the state agencies. For example, if you look at the very first couple of pages, if you start on page 2 in the section that's noted Summary Information. There, we note that our Office made a grand total of about 1,500 audit recommendations. And on page 4 of the report, we note that the state agencies agreed to implement 98% of these recommendations. If you turn to page 5, there is a large table taking up that whole page called Exhibit 2. And, there, we give you a list of all of the agencies that still need to implement audit recommendations. In this table, looking at the far right at the bottom of that dark red column there, you can see that there are a total of 95 recommendations that still needed to be implemented as of June 2020.

And I will point you to an example. This committee oversees the Department of Corrections, and you'll see them listed here because they've reported to us that they still need to implement four recommendations. In that table, the Department of Law is also listed and they still need to implement one recommendation. The majority of the rest of this report is organized so that there's a section for each agency that has recommendations to implement. So, now if you look for the section for the Department of Corrections, this starts on page 23 electronically in the paper copy. It's listed as Roman numeral II-1. It's the second tab. You'll see there that for the five-year period that this report covers for Department of Corrections, we made a grand total of 87 recommendations. And, there, you'll see that 4 again that I mentioned, which are the ones that still need to be implemented. Scrolling or turning to the next page, which is page 24 or Roman numeral II-2. You can see more detail there about the four recommendations that Department of Corrections still needs to implement. You can see that these are all from performance audits, and they're highlighted in orange. Any recommendation in this report that's highlighted orange is high priority, and that means that the recommendation either relates to a more severe problem or that it hasn't been implemented for three years or longer. In the table here with the Department of Corrections, four orange high priority recommendations, we give you information that includes the original audit report title and the date that it was released, then each recommendation number and a brief description of what the recommendation was and the implementation status. And, so, a status of partially implemented, which is what these recommendations have, means that the Department has taken some steps to implement. The table also shows the original implementation date that the Department gave us when we made the recommendation, and then the current implementation date that they've most recently provided. And you can see here for these 4, for our audit of the behavioral health programs at corrections, they are now reporting an implementation date of June of this year. I can tell you these 4 recommendations are the only high priority recommendations that this committee has. But, if any of you have other SMART hearings to attend, then you may hear about other departments those committees that are also listed in this report.

**Sen. Lee**
Well, we can highlight the fact that both Public Safety and Judicial have no audit recommendations to implement. So, in addition to pointing out where we have some deficiencies, we should point out the ones who have done what they were asked to do and agreed to do. So, thank you, Ms. Heller. Are there any questions on any of those issues? Seeing none, go right ahead.

**Vickie Heller**
Thank you. Mr. Chair, the only other thing I'd like to mention is just to remind everyone here to let you know that at the very end of this large report on page 106, the very back page, we show you there how to find any of the audit reports that we've released on our website. If anyone is interested. That concludes my presentation today, Mr. Chair. Thank you.

- 12 -

**Sen. Lee**
Okay, thank you. We also have a note in the chat from Mr. Lobanov-Rostovsky, who's the head of the SOMB, indicating that there is a website dashboard, and he gives you the citation to it. And we will be having a hearing with the SOMB. So, let's proceed on, at this point, and not have any further questioning on this one. Anything else, Ms. Heller or Ms. Hunter that you want to talk to us about?

**Vickie Heller**
No, Mr. Chair. Thank you so much.

**Sen. Lee**
Okay, any questions committee? Seeing none, we thank you very much for your presentation this morning, and thank you, as usual, for the good work that you did on behalf of the people the State of Colorado. Thank you.

# Appendix 27(f)

# Transcript of *Hearing before the J. Judiciary Comm.*, January 28, 2021 (Jud. Dep't SMART Act Presentation);

# Joint Judiciary Committee—January 28, 2021 SMART Act Hearing: Colorado Judicial Department

**Rep. Weissman**

Okay, the Joint Judiciary SMART Act hearings will come back to order. Excuse me, for the afternoon portion of our business. We are joined by the Chief Justice of the Colorado Supreme Court and State Court Administrator, Mr. Vasconcellos. Gentlemen, thank you for being here in person. We know that there's a lot bearing down on the Judicial Branch of the State, and we look forward to hearing updates from you. So, please go ahead.

**Steven Vasconcellos**

Thank you, Mr. Chair. My name is Steven Vasconcellos. I'm the State Court Administrator for the Colorado Judicial Department. With me today is Chief Justice Brian Boatright. I'm going to kick us off and then hand it over to the Chief, if you don't mind. We've got a lot of information to cover today. Obviously, we've got our statutory obligations under the SMART act, but there are several of the moment issues that I think the general assembly and particularly our committees of reference, we believe should hear about. And, so, if it's okay, Mr. Chair, we'd like to start there, if possible. First, while many of you are probably already familiar with the business of the courts and probation in Colorado for some of the newer members, we just wanted to very briefly, sort of orient you to the organization. We are, of course, a statewide entity with a presence for courts and probation and every county in the State of Colorado. We have just under 4,000 members of our personnel. About 3,500 staff in the trial courts and probation and about 340 judges and justices. We have a diverse range of business. I think people tend to think of criminal cases first and foremost in our business, but we have a half a million new case filings every year in a diverse matter of topics. Whether that's divorces, juvenile matters, small claims. Large and small, all kinds of cases all over the great State of Colorado. Additionally, we are the single largest supervising agency of offenders in the state, and our daily rate right now is about 75,000 offenders in community supervision in Colorado.

**Chief Justice Boatright**

I am going to apologize in advance, because I'm probably not very good at how the protocol and all that.

**Rep. Weissman**

Please proceed, Mr. Chief Justice.

**Chief Justice Boatright**

Thank you. Let me introduce myself. I'm Brian Boatright. I am the Chief Justice of the Colorado Supreme Court. I started on January 1, so I'm still trying to figure out where the light switches are and all of that. Obviously, there are seven members on our Court. I would say that on our Court, in my nine-years that I've been on the Court, I think we have reached an all-time high in terms of collegiality and,

not coincidentally, productivity. Last year, despite the pandemic, we produced as many opinions as we have in the last 12 years.

One thing that we changed when I became Chief. We decided this prior to my selection, as you may know, unlike the U.S. Supreme Court, we select our own Chief. And we decided to go to terms instead of just having this sort of indefinite end and all the way to retirement. And people have asked, What's the term? Because we didn't formally announce it, and I will tell you that my term will either be two and a half years or three and a half years. And part of that is we learned this past year to be a little more nimble. You know, ideally, if Chief Justice Coats didn't need to retire because of the mandatory requirement, we would loved to have had him continue.

Ideally, we would make the transition during the Summer, rather than walking right into the legislative session and being asked to testify in the SMART Act, like in your first month. The other thing that has changed, I think, significantly on our Court, and this happened over the last year and a half, and I'm proud to say, it was at my suggestion, we have greatly increased our administrative responsibilities amongst the Justices. Part of that is accountability. Part of that is visibility. We wanted to get out in front of our people and let them know that we care. So, we have created liaisons to the IT Department, the Finance Department, the Clerks of Court, the Court Executives, the Probation Department, because we want them to know that we're there to serve them in our role through the State Court Administrator's Office.

**Steven Vasconcellos**

One of the catalysts for that greater engagement between the Court and the various arms of the Branch, including, importantly, the State Court Administrator's Office, was a recent Performance Audit of the State Court Administrator's Office, I believe, the Office of the State Auditor several days ago, gave you an update on that, and I just wanted to cover it briefly from my perspective. You know, the final report was released, and a hearing was held in December of this year, and there were six main topical areas, and I'll not go through those in depth unless there are specific questions. And of course, I'm more than happy to meet outside of the hearing at your convenience if there are follow-up questions or the interest in a longer discussion about the audit. But the bottom line is that the State Court Administrator's Office had several profound deficiencies. And there were six main areas of recommendation by the Office of the State Auditor. We agreed and the Supreme Court agreed with every single recommendation made by the Office of the State Auditor. I've been the State Court Administrator just over a year. The audit started right at the beginning of my tenure, and one of the most important things in this initial period of my service as State Court Administrator is successfully implementing every single one of the recommendations to put our Office in a better footing, to serve trial courts and probation across the State, and to serve the people of the State of Colorado. I take that responsibility very seriously. In fact, we came to the hearing with what we viewed as the most serious recommendations around some of our contracting procedures already implemented. Those changes are already in and, in fact, we're on pace to implement all of the audit recommendations by July of this year.

- 2 -

**Chief Justice Boatright**

And what I would add to that is you have my personal commitment that we're going to fulfill all of those obligations in a timely fashion. And if you have any concerns about any of those recommendations, I welcome you to reach out to me, personally. You have my commitment.

**Steven Vasconcellos**

In the interest of time, Mr. Chair, I'm just going to keep on rolling unless the committee has questions. Is that all right?

**Rep. Weissman**

Sure. Since you asked, let's pause just for a sec. Committee questions so far? Yeah, I think I see Rep. Woodrow's hand raised. Representative, go ahead.

**Rep. Woodrow**

Thank you, Mr. Chair. I was just wondering if you could speak. Thank you very much for being here, gentlemen and Justice, Chief Justice, it's always good to see you. Could you speak to what those recommendations were?

**Steven Vasconcellos**

I'm happy to and I apologize for the record I, did not.

**Rep. Weissman**

Mr. Vasconcellos, please go ahead.

**Steven Vasconcellos**

Thank you. Mr. Chair, the six main areas of recommendation were, first, procedures regarding voluntary separation agreements. And I will just say, sort of at an overall level, as our organization grew over the years. You know, there's a certain administrative infrastructure in any state organization, and it's kind of the plumbing and electric of an organization, the real basic functions. And it's been my perspective that we just didn't focus on modernizing those, updating those as needed, and, frankly, taking notice of how the Executive Branch has evolved in those areas. And a lot of what we're implementing are really looking toward current Executive Branch procedures and adopting those as our own. But the first main finding area was in the area of voluntary separation agreements. These happen, you know, due to reorganization or budget shortfalls, what have you. The Executive Branch has a pretty clear set of procedures and policies about when they can and can't be used, how they're how they're to be reviewed, etc. We had one, one or two sentences in our in our Personnel Rules. And while I'm not looking for a Byzantine, overly complicated structure, it was just too loose. And it wasn't clear what the review procedures and approval procedures would be, what the oversight looks like, the kind of analysis regarding cost and benefit to the organization from entering into these incentives are. And those are all changes we're making to our Personnel Rules.

The second area was around the use of administrative leave in the Branch. And again, the Executive Branch currently has some pretty clear guidance on when administrative leave can and cannot be used. Limits around the use of in terms of volume of administrative leave. And we had one sentence that the administrative leave must be for the benefit of the organization. And further, our time tracking system just wasn't set up in a way to capture the reasons. And that was another big finding under administrative leave, not so much that there was always a problem with the amount. But you can't tell why. And, so, that's just not good record keeping. We need to be able to demonstrate clearly why administrative leave was used, what the circumstance was, etc. And, so, again, we're looking to the Executive Branch procedures to buff up our current internal policies around administrative leave and improving our IT systems to just captured some, just real, basic information about, So why? Why did Steven take this time off? You know, we've got there was a body of hours. It was something in the neighborhood of 3,000 hours of administrative leave across our organization that was identified as problematic. When we dug into the data, almost all of it was between Christmas and New Year's, and much like the Governor does annually, the Chief Justice often grants extra administrative days off. And I think the linkage is pretty clear. The problem is, when you can't point to specific data that just says, "Chief Justice's day off," it opens questions, and it's problematic. So, on that element, it's really just tightening up our procedures.

Our next main area was around HR record keeping. And this is really one of those real basic, if I can plumbing and electric kind of issues. We weren't always storing our electronic personnel records in a secure fashion. There weren't clear transition procedures. You know what happens when this key player on the staff moves on to another job, or otherwise leaves employment with us. How do we manage those transitions? Just frankly, too sloppy for an organization our size. We're a 4,000 person, $600 million organization. I think some neighborhood lemonade stands were a little tighter on that than we are. And, so, again, it's just fully inhabiting the size and scope and responsibility of an organization like ours.

The next area, I mentioned briefly was regarding sole-source contracting, probably the marquee area that required attention. And, as I've mentioned, we've already made several personnel rule changes in that area and are compliant with the audit recommendations, already. We came to the table at the hearing with those changes already made. That's how important this one was to us, and it really goes to, you know, when can we contract with former employees? Previously, we did not have a cooling off period between the time of employment with the organization and when you could enter into an independent contractor agreement with the Judicial Department. Cooling off periods are just standard. Public sector, private sector. That's not rocket science. And, so, we again looked to the Executive Branch and adopted their time frame, which is six-months. And, so, that change has already been made.

And, then, also buffing up our procedures around review input justification, so that we can demonstrate transparently why. I want to be able to . . . One, sole-source agreements, by their very nature, should be extraordinarily rare. And, two, anytime that I enter into one on behalf of the State Court Administrator's Office, I want to feel comfortable sitting in front of a group like you and telling you why. And if I can't meet those bars, then there's something wrong.

- 4 -

The next area was with regard to Procurement Cards. As you know, state agencies have to buy things on short term credit, just like we do sometimes in our personal lives, and, so, we have a certain number of Procurement Cards and people authorized to make those purchases within our Office at SCAO. And we had some challenges with review procedures. And, in some instances, where the purchaser was also the approver. And, again, not super complicated stuff we're talking about in a number of these areas. The person who purchases should not be the person who approves. And, so, clarifying our Fiscal Rules around that has already happened, and pushing out training. I don't want to belabor it. It's pretty straightforward. But that's really kind of the thrust of the Procurement Card issue.

And then the final issue was entitled SCAO administrative environment, SCAO administrative culture. And it's really a summation of all the previous issues. I have a responsibility as a State Court Administrator to not just talk to you about the highest standards of behavior. But to actually, in my day-to-day work life, exhibit the highest behaviors. It's not what I say, it's how I behave that I'm ultimately going to be judged on. And if you don't have that tone at the top of the organization, how can you expect employees to behave in the same way? So really, I'd say a healthy organizational culture at SCAO has to start with me and my position and how we behave. And, then, the administrative rule structure that we create beneath it. Again, I should be able to. Any of the major decisions that we make, even the mundane decisions. I should be able to sit with any audience and talk about, why. What were the reasons? What are the benefits? What are the downsides? We all realize that running any organization of any size, it's an art, not a science. And, there are sometimes judgment calls that need to be made. But even when judgment calls are made, I should be able to have a clear justification, why. Demonstrate the analysis that went in. Talk about, you know, how I worked with the Chief Justice, what gets brought to the Chief Justice, what doesn't. All of those things are incredibly important to the health of an organization. And, so, this last recommendation from the OSA was essentially, one, implement all of the previous recommendations. And, two, the State Court Administrator needs to take seriously their responsibility as. This is not the words they use, but the way I take it is, as an emotional leader of the organization. If I'm not invested in the highest standard of behavior, how can I expect everyone else to be?

**Rep. Weissman**
Okay. Thank you for the detailed answer. I think while we're at this point, Rep. Benevides also had a question.

**Rep Benevides**
Yes, thank you for that answer. And I guess I had asked the Auditors this question, so I wanted to ask you, as well. Is that these findings were significant, as far as over half a million in voluntary separation incentives, and it was 27% of your administrative leave that was granted, that may have been improper. There was 50,000 in Procurement Card issues, and then it was 6 out of 10 sole-source contracts. So, while I appreciate you all, and I know this was not under your watch, sir. But, I appreciate you doing training and fixing the Rules. And my question had to do with, as far as any of the employees who were

in this situation that received these incentives or had the errors. Because anybody that gets a Procurement Card gets training and information when they receive it. So, is there a real push on your behalf to maybe go after some of these individuals administratively and claw back some of those payments, since it's such a significant amount? Because that's doable, along with potentially any criminal referrals.

**Steven Vasconcellos**
Thank you, Mr. Chair.

**Rep. Weissman**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Representative Benevides, thank you for your question. Not to minimize any of the issues identified in the audit, but they're not all created equally, I would argue. Some are best addressed through training, and at the other end of the scale, some of the folks involved are no longer employed by the Colorado Judicial Department. So, you know, a range of responses commensurate with the with the severity of the issue. You know, in terms of clawing back some of the money involved. If we use the example, say, of the voluntary separation incentives, we entered into contractual agreements with those parties, and based on the legal advice we received internally and from the Office of the Attorney General, we felt the best course of action was to honor those legal agreements that we entered into. Our big challenge with some of those VSIs, were they just weren't reviewed by our legal experts up front, and had various deficiencies around, say, compliance with the Americans with Disabilities Act, etc. And, so, when I started, the first thing we had to do was get those reviewed and correct deficiencies. But we had already entered into legal agreements on some of these matters. You know, in terms of any criminal referrals, I am not aware and we have not found within our own review, overt criminal behavior that merits review. However, I think many of you are aware that the Office of the State Auditor, beyond the SCAO Performance Audit, is also conducting a fraud hotline investigation under the fraud hotline statute. And, I think as the committee may know, when one of those is brought to light, the agency that's subject to the investigation has several choices. They can conduct the investigation themselves. They can partner with the OSA to conduct the investigation. Or the agency can hand the investigation solely over to the OSA, which was the choice that we made. The latter, to have the OSA conduct the investigation independently of us. And, so, you know, there's a range of things that could happen under the fraud investigation, including, in the most extreme, a referral to a local District Attorney for fraud charges. That investigation is ongoing. I don't have details to report. The OSA is still doing their work, and I don't want to get too invasive in their investigation. I think it's better that they have a little bit of independence in doing that. So, we'll see how some of this lands. I hope that answers your question, Representative Benevides.

- 6 -

**Rep Benevides**

Yes.


**Rep. Weissman**

Okay, thank you. Just keeping an eye on the clock, why don't we invite you to keep moving through the presentation? And, I'm sure we'll have more questions.


**Steven Vasconcellos**

So, no surprise. A worldwide, hopefully, once in a lifetime, pandemic has had a tremendous impact on the operations of court and probation in Colorado. And there's several areas that we'd like to highlight briefly for you. You know, the pandemic itself, almost a year ago now, when it really hit us full force, created a whole host of kind of first time, first blush operational challenges. Which, in very short order, were then complicated by, at least in my 25-year career, the largest budget reductions that we've ever experienced in the Judicial Department, kind of compounding those operational challenges. Just briefly. You know, we took a pretty, no different than every other element of state government, we took a pretty substantial General Fund reduction to come into this fiscal year. And, unlike many other state agencies, we don't really have a programmatic budget, per se. We are well over 90% personal services. We are an agency of people. Our programs, if you will, are the statutory and constitutional requirements to hear different kinds of cases. And, so, we can't choose unilaterally to stop hearing misdemeanors or not process divorce cases or what have you. And, so, even at that very first dollar of budget reduction, it implicates potential impact on staff. And ultimately, we lost approximately 200 positions at the beginning of this fiscal year. Over half of them through layoff. Now, obviously, we saw this coming. At the end of last fiscal year, we implemented a hiring freeze, which was able to help us somewhat. And, so, a little less than half of the positions lost were through vacancies that we accrued through our hiring freeze. But we did have some pretty substantial layoffs that touched most areas of the State. I made a recommendation, a decision, a recommendation to the Chief Justice, former Chief Justice Coats, that my Office, the State Court Administrator's Office take double its proportionate share of cuts. Now, we're not an enormous office, we're about 200 people out of the entire 4,000. But, it was an attempt to try to minimize the impact on the day to day operations of the Branch, where the work day to day really happens in courts and in probation offices in our communities around the State. And, so, our Office took double its proportionate share. But this cut, ultimately, touched most every trial court, most every probation office, and the appellate courts here in Colorado. Again, as you can imagine, several operational changes. And this is such a fluid environment. It's hard to talk about this statically. This is what's happened. Because so many issues are changing month to month, week to week, and sometimes day to day. But we've gone through extended periods with courthouses being closed for health/safety reasons or very limited operations. We used to be able to just set up dockets and run them like clockwork and move people through in an efficient, effective manner.


And the requirements for social distancing, while important, have tremendously complicated our operations. And we are grateful for virtual tools. In some ways, the pandemic, I'm reluctant to call it a

silver lining. But the pandemic has forced us to look at some of our operations and modernize in ways that we might not have, but for the pandemic. And one of those areas is through virtual hearings and doing essentially hearings online via WebEx, using the same tools we're using here today, to keep business going. And we've been very grateful. We had to figure it out in a very compressed time period. And I'm sure folks like Senator Gardner, we might have tested their patience as they were participating in some of those events, as we were trying to figure it out. But we're now at a point where, even in looking toward the post pandemic horizon, virtual hearings are likely to stay. We don't see those going away. That's an incredibly important tool. When you look in retrospect, is there really a reason to have someone drive in to the county seat for a 15-minute status conference in person, when they can probably do it from their living room? Those kind of things are here to stay. What I'm personally looking forward to is the opportunity to use it in a more targeted fashion. I think there are some types of hearings that lend themselves better to virtual proceedings than others. We are not doing trials virtually. And, as we'll talk about here in a moment, trials are where we're really, really struggling in terms of workload and backlog. Chief.

**Chief Justice Boatright**
I would amend that slightly, the jury trials. We are conducting a lot of trials, civil trials, to the court by WebEx, hearing stories about that. I've had the opportunity since I started to have meetings with all of the different Judicial Districts' Leadership, again, by WebEx. And one of the questions I've been asking all of them is, what practices do you plan on carrying forward? And echoing what Mr. Vasconcellos said, a lot of these short hearings where people are having to travel a long way. And, interestingly, also, I think some probation services are going to change, because they're finding that there's some long-term travel that they can cut back with regard, especially our rural districts, where we have very few service providers, where they've been able to do some of these therapy sessions and some of their program requirements remotely. And they plan on continuing that, as well. But, the one issue that we are having a problem with is our jury trials, and specifically criminal. And I will tell you that, I could go on and on about it, but I think these two numbers will sum it up. On January 19 of 2020, we had 2,718 criminal jury trials scheduled across the entire State, 2,718. On January 19 of 2021, we have 14,635 trials scheduled. In every month, that goes up by 1,200 jury trials. We simply cannot, keep up with all of the demand with regard to jury trials. And part of that's because we're trying to do this safely, as well. I'll give you two examples. In Boulder, they have 104 jury trials scheduled in March. And if they do everything by social distancing standards, which we're doing right now, they can have one County Court trial and one District Court trial per week. So, you can see that number is going to continue to go up. In Arapahoe County, which is one of our a little more high-volume courts, they have 367 jury trials scheduled in March, and they can try seven or eight jury trials in any given week. So, that's why that number of 1,200 continues to go up. The other thing that we have done, and I completely support. And frankly, we've gotten some criticism, is one size doesn't fit all. So, we have allowed the local Chief Judges to control kind of how they're doing the trials and whether to commence trials and when to stop them. And it's for a very simple reason. That is, as I said, one size doesn't fit all. The positivity rates vary greatly. Yesterday, I looked. One of our Districts or one of our counties has a 13.8 positivity rate.

- 8 -

Another has a 1.9 so just those numbers alone indicate that we've got to, we've got to treat things differently. We can't have one way of doing it. The other thing is, we have very different facilities. For example, our courthouse in Montrose does not have a jury assembly room, so they have to use the other courtroom to safely assemble the jury for a trial in another courtroom. So, we have those limitations that we're facing.

**Steven Vasconcellos**

Yeah, no, I can. I'll kick us off. So, as you can imagine, we haven't been sitting on our heels. And we're, in fact, very grateful that while the overall financial picture of the State is still pretty challenging and volatile, that the most recent revenue projections came in a little better than anticipated. And the JBC asked us, with no guarantee, of course, but to submit some amendments, to consider submitting some amendments to our fiscal year, 2022 request. To focus on really that hard kernel of additional resources that we need to address the backlog of work that Chief Justice Boatright has been has been referring to. Former Chief Justice Coats and I were asked at our budget hearing this year, do you have the resources you need to dig out of the backlog in a reasonable amount of time. And the honest answer is, no. We are smaller than we were a year ago. We have an unprecedented amount of work. We were not fully staffed, as any state agency is, but we were not fully staffed prior to the cuts. I can't say with a straight face that we're going to be able to address this in a reasonable amount of time, without additional resources. Which is ultimately, what's most important about that, is it's an access to justice issue. We want folks to have timely resolution of their cases, regardless of the type of case. We want victims to have their day in court. We want offenders to have their day in court. We want folks to be able to get divorced. We want neighborly disputes on small claims cases to be resolved timely. There's just, again, we think about kind of the marquee types of cases, but there's all kinds of average citizen business that happen in our courts, and we are not going to be able to get to those timely.

So, we have several initiatives, we want to just talk to you briefly, that we have proposed to the Joint Budget Committee. And, in fact, this first one is not a budget amendment per se, but it will have a financial implication, and it's addressing our statutory Senior Judge Program. Just very briefly, for those who may not be familiar, there's a statutory program by which we enter into contracts with retired judges. And retired judges are a tremendous resource in helping support the workload of the bench, because they've done the work before. They don't require a lot of ramp-up in training. We can utilize them in any type of case, and they can serve anywhere in the State. And, now, with some remote, virtual hearing tools, that makes it even easier. But there are some limitations to the current program statutorily that we're hoping to address, and I want to take out just a real brief opportunity to thank Representatives Tipper and Carver who have agreed to serve as co-prime sponsors of legislation. If legislation does, in fact, move forward. But, as an example of something we'd like to address, there's a statutory floor for the contracts. They cannot be less than 60 days. And in my first year of service at the State Court Administrator, I've had several judges who are on the cusp of retirement approach me and say, Steven, I would love to join the program, but I don't want to make a 60-day commitment. I have other things I want to do in retirement. I'd like to serve still, in retirement. But I don't want to make a 60-day

- 9 -

commitment. That's the kind of thing we want to try to address through some statutory change. Additionally, because of current program funding, we only have room for about 40 contractors on the Program at any given time, and we've got about 15 or so folks on a waiting list. We'd like to get some additional resources to get everybody off the waiting list who wants to be off the waiting list to serve. We're probably not too far, hopefully, from a point in time when we're going to have every single County Court judge, every single District Court judge, doing trials and little else. To start addressing this trial backlog. And Senior Judges are going to be an important resource who can help us, support us on trial work, but non-trial work, as well. Chief.

**Chief Justice Boatright**
The other thing that we are asking for are going to be some additional staff and magistrates. Because, again, if the magistrates are able to take some of the non-jury trial matters, that will free up our judges to be able to go after the trials. We're asking for right now, and, again, we understand there's no guarantee. We're looking for 76 court staff. We need additional 53 approximately probation staff, 2 full-time employees for the Court of Appeals, and one of the things our Court feels very strongly about is we're not asking for any of our cuts to be to be placed back on our Court. We recognize that right now, the burden is on the trial court, almost exclusively. We've had some minor inconveniences. I kind of jokingly say when I meet these guys, you know, don't tell me about how hard you've had it. I've had to learn how to scan. So, you know, we recognize that the trial courts are bearing the brunt of all of this. So, we're not asking for anything for our Court.

**Steven Vasconcellos**
Mr. Chair. Additionally, we're not asking for any additional resources for the State Court Administrator's Office. Again, we're trying to focus these budget amendments on the most important point in the organization, which is where the day-to-day business happens in the trial courts and in probation offices around the State. And we realize that it's still a very difficult budget environment. We are not asking to be restored to the level of funding we were prior to the cuts. We don't think that's realistic. We're trying to focus on what we need to dig out of this unprecedented backlog.

**Rep. Weissman**
Thank you. Before we move on. Rep Benevides has a question on budget matters. Rep. Benevides, please go ahead.

**Rep Benevides**
And, actually, my question is about budget matters. But the other things you were talking about with respect to the backlog on jury trials, you had indicated that a year ago, in January, it was 2,700. This year, it's 14,000. So, I have a couple of questions with regard to that. One is, is the waiver of speedy trial indefinite? Where those 14,000 for you to address that backlog using the ways you've just described. It's still south. So, I'm wondering how long that lasts, and if there's been any discussions, I know in Judicial Districts there are discussions with all of the stakeholders. I'm talking defense bar, PD, DA, and the

court. To try to figure out what to do. Because I'm just wondering if 14[,000] in this past year has been, I don't like to say this, but sort of legal strategy. That, you know, if I ask for a jury trial, I'm more likely eventually to get a plea deal, because they're never going to get to my trial. So, I'm just wondering if any kinds of discussions are being held amongst all the stakeholders involved in the court system.

**Rep. Weissman**
Okay, Chief, please go ahead.

**Chief Justice Boatright**
Yeah, that's a that's a great question. Thank you for asking that. And we are asking for the for the Legislature to help us. We come, kind of hat in hand. Right now, there is a six-month speedy trial that statutory, that's not constitutional. And we are asking to try and gain some flexibility with regard to that. How? The exact form of that. As the Representative said, there's a lot of stakeholders, and I certainly think there are a lot of different concerns about it. You know, people in custody. We don't want them sitting in jail, waiting for their day in court, those types of things. But we are asking to have some flexibility to be able to address that, because, as the question clearly recognizes, we're not going to be able to try these in in the 90-day period. Right now, what we did in response to the pandemic, was we amended one of our Rules to allow for a mistrial to be granted if a jury could not be safely assembled. And we gave an additional 90-days to the speedy trial time-period. But as you can see, the 90-days which is going to apply, I think, to a large number of cases, I don't have the exact percentage, is not going to be sufficient for us to be able to try these cases. And even the six-month time period, this is not something that we're going to be able to dig out in six months. As far as the trial strategy, what I can tell you is, I'm a former trial court judge. I was a judge in Jeffco for 12-years, and I have the privilege of teaching all of our new judges. And one of the things I tell them is we are in a deadline driven business. If people know that there is a deadline, they will make decisions. So, I think that if we are able to get these trials going, we know that we're not going to be up against the clock quite as severely. Cases will start to dispo. But there are going to be a large number of cases. What I would say is it's fairly uneven around the state because of different philosophies from defense attorneys and from the DAs. In some of the Districts, they say once the trials are open, we're going to be trying homicides and sex assault on children cases almost non-stop. Some of the jurisdictions say we still have a lot of the lower-level felonies that are pending, and obviously we have domestic violence and DUI cases. So, we are coming to ask for help with regard to that statutory six-month speedy trial. And there's been some conversation, I know, from different stakeholders, that our Rule is good enough. And I would say it is not, because at some point we are not going to be able to make the finding that the pandemic, that there is a health reason for not calling juries. We're going to have to open up the spigot, so to speak, and start trying these cases. And at that point, whether they're 90-days or 6-months, we're going to be up against the clock. And again, as Mr. Vasconcellos said, this is an access to justice question. I can tell you, that our judges take their personal responsibility, is to try these cases and provide a forum. To dismiss cases because of a lack of speedy trial, feels like a personal failure to our judges and having to face, you know, defendants and victims that because of that, it really is unpalatable for us.

**Rep. Weissman**

Mr. Vasconcellos, did you want to add further to that? I am seeing other questions. Okay, Rep. Benevides. If you wanted to ask a follow up.

**Rep Benevides**

Just to ask a follow up is thank you for that. And I'm glad you're, at least the courts are doing some prioritization of those criminal cases. But, I guess I was, also, when I was talking about. I mean, you all have to do the cases that come in front of you, but the other players in it, the DAs, the PDs, the defense bar, they also have stake in this. And I'm just wondering if something like, it came up in a different bill, is that somebody sitting in jail had served, actually, it was for a low-level crime, the maximum amount for that. They shouldn't have to stay in there longer. They should be able to be released. Or I would even say, for certain charges, that, if they serve the minimum range, that we will never get to it, that there may be consideration of letting them out and dismissing the case at that point. So, it's those kinds of things to get together and think of other ways, because money is not the only way to resolve this problem. There's going to have to be some other ways, and maybe getting those other stakeholders involved with the court may be a way to resolve it. Just a suggestion.

**Rep. Weissman**

Okay, Chief or Mr. Vasconcellos, whoever would like to speak to that.

**Chief Justice Boatright**

Yeah. What I would say is, I don't disagree with any of the sentiments that were just expressed. I think if people have served their time based on a penalty, quite frankly, those cases, in my experience, can be resolved fairly easily. I think what we're talking about are, you know, some of the more serious cases, as I indicated, the homicides and sex assaults and the severe, the more high-level Class 1-2-3 felonies that we're facing. But, we also can only twist arms so hard in terms of the separation of powers. The DAs and the public defenders and the defense attorneys have to come to some kind of an agreement, a resolution. But, I think our Court and our Branch is very mindful of the people that are being in custody, and I'm sure that those are the people are going to be prioritized in terms of getting their day in court.

**Rep. Weissman**

Okay. Senator Gardner, had a question, and then Senator Lee,

**Sen. Gardner**

Thank you, Mr. Chair. Chief Justice or Mr. Vasconcellos, I'm just wondering if you happen to have the numbers for the Fourth Judicial District or El Paso County as to what we have pending there? And, if you don't have them right at hand, you can just send them to me later.

**Chief Justice Boatright**

I actually do. That's from 2019.

- 12 -

**Steven Vasconcellos**

Mr. Chair, Senator Gardner. Just to clarify, are you asking for the number of pending trials in the Fourth Judicial District?

**Sen. Gardner**

Thank you. I'm asking, yeah, number, the backlog for felony cases, jury trials in El Paso County.

**Steven Vasconcellos**

I don't believe we have that at hand, but we can get that easily, and we'd be happy to pass that along to you.

**Sen. Gardner**

I have heard, anecdotally, because I am a member of the Bar and speak to colleagues. The magnitude of this problem before this week, it has been a matter of concern to me since March, and I appreciated the Judicial Department the Supreme Court's Rule change. But thought at the time that we would find ourselves sitting here today. There are interests, if you will, or concerns on both sides of this equation. Both with respect to the rights of defendants and those who in particular, are not on bond, but the rights of crime victims and the rights of the community and public safety concerns, as well. And I appreciate the discussion. I really, I don't think I have a question, although I would invite your response. I just want to say on the record with my colleagues from both sides of the aisle here that one, this is of all of the fallout problems from the pandemic, from a public safety standpoint, this is the most serious, or at least among the most serious. And we need to act as a Legislature in February, when we return and I want to express my commitment and make a plea to my colleagues that we address this. We address it openly, we have a fair discussion about it, and that we deal with it as quickly as possible. And, if it means we all have to get in a room and do what legislators and lawyers and others do to resolve these things. To finally get to what we can all do. But what works for the Department? And I want to ask the Judiciary to be very candid with us at that time about whether it will work or not. Because my fear is it [affects] any compromise that we might reach. If it doesn't do what we need, then we will have spent a whole lot of time. So, I don't really have a question, Chief or Mr. Vasconcellos. I just want to make that commitment and ask my colleagues to make that commitment today, as well.

**Rep. Weissman**

Senator Gardner, thank you. I'm just again watching the clock. What I might do is invite Senator Lee to question or comment. I have a hunch it may be on the same subject, and then we can have the Chief and Mr. Vasconcellos maybe respond. Senator Lee, please go ahead.

**Sen. Lee**

Thank you, Mr. Chair, and I echo the sentiments of my colleague from El Paso County about the urgency of this issue. An ancillary issue, though, is the civil trial docket. The criminal cases are prioritized as a matter of necessity and law, but meanwhile, all of the civil cases are still pending. Could

- 13 -

you, Chief, comment on that? Both the numbers of cases and the impact on justice and the economy of having a lot of civil cases pending which can't be addressed because they are on the back burner while the criminal cases are being held.

**Rep. Weissman**
Okay, Chief, if you'd like to try to weave a response to all of the points that have been laid out.

**Chief Justice Boatright**
Sure, I don't have an exact number of the number of jury trials, but Senator Lee is absolutely correct. We're not trying any civil jury trials, either. One of the things that we are looking at, and with regard to the Senior Judges, also is looking at alternative locations for maybe trying some of those cases. For example, Arapahoe County looked at renting out the fairgrounds, because we need to have space. Frankly, doing criminal trials in remote locations probably isn't feasible because of security, and, especially, if someone's in custody and having sheriffs spread out, having to transport people and remain there during the trial. But, we are looking at alternative ways of trying the civil jury trials. You know, we're open to all kinds of different alternatives with regard to that. And my guess is there's going to be some office space possibly available that we may be able to try some of these things. And we're open to that. Those possibilities. But he's right. We're not trying them right now.

**Rep. Weissman**
Okay, thank you. And, you know, Members, this is a big subject before us, and we, unfortunately, only have this hour here. But, I think we all know we're going to be talking further about these issues very soon. For now, why don't we invite you to continue?

**Steven Vasconcellos**
Thank you, Mr. Chair. If I may, Mr. Chair, we have about five minutes left, and I probably have well more than five minutes.

**Rep. Weissman**
Yeah, Mr. Vasoconcellos, I've noticed these clocks are actually a hair fast according to the all-knowing Apple standard time. It's 1:50. Nonetheless, I would invite you to be selective. Maybe hit the highlights. We do have the material that was sent in advance to staff and the members can review that in more depth and I'm pretty liberal in giving out Mr. Scanlon's contact information for members who need to follow up, as well. Please go ahead.

**Steven Vasconcellos**
Yes. Thank you, Mr. Chair. Please feel free to give Mr. Scanlon's contact information out very liberally, very liberally. And, on a serious note, I'm more than happy to make myself available for any of the members to talk about any of the issues in greater depth that we've already discussed, or if something folks felt like it didn't get its full attention because of time constraints today. I'm happy to make time to

- 14 -

have follow-up discussions, as well. If it's okay with you, Mr. Chair, rather than go through each of these issues, I just want to hit a couple of the remaining issues in a little greater depth and leave a couple maybe for another day, if possible.

One of the things that is a long-standing important part of our judicial culture in Colorado is actually engaging. Beyond the actual business engagement we have with the citizens who come to our courthouses and probation offices, is to actually reach out to them in kind of a customer service survey style. And we've done this for about 15 years now. And I think folks often are somewhat cynical about the results of such affairs, because you know, if you think about the average court case, somebody wins and somebody loses, and you must have at least 50% of the folks who are coming to the courthouse leaving upset, and that's really not borne out by actual data. And, so, for the last 15 years, we take half of the Judicial Districts in the State, and we deploy in-person surveys. Now you can imagine in this time and place, that's not possible, and you'll see the survey data that we've. Included, only runs through 2019 because the pandemic really threw us for a loop. And, candidly, with some staff reductions in my Office and everything else we needed to manage, we need to let something go. But we are parenthetically looking at reviving the survey in a virtual, online format, and probably having that be the format that we use moving forward. But we ask folks who are exiting the courthouse what brought them to the court that day, and what their perceptions of access and fairness are in the service that've received from the courts. It's important not just to do justice, but that folks actually believe personally that that was done in their particular instance. And, so, when we look at, we included some of that data from our most recent surveys. And when we look at really important issues, and some of it may seem basic, but a sense of safety within the courthouse to conduct business. When we look at were folks who came to the court treated with courtesy and respect. We're well over 80 pushing 90% of the folks who we survey that feel strongly that they received a positive experience and that the courts were accessible. And when we look at that really tough question around issues of fairness. You know, do folks feel like they were treated equitably compared to other parties? Do they feel that the judicial officer listened to them? Do they feel ultimately, was the process fair? And this is an area, I think, where sometimes some of that cynicism crops up. It's not just, you know, half the folks leaving our courthouses upset with the outcome. Is it 100%? No. Is 100% possible? Probably not. But, when I look at our data in Colorado compared to other jurisdictions around the nation who engage in surveys like this, we come out in a very strong posture, and I feel very strongly about continuing this kind of engagement with the citizens we serve.

One of the other areas, I'm going to skip ahead here, to talk a little bit about the text reminder program. The Chief Justice and I had an opportunity to speak with Senator Lee yesterday about a number of issues, including the text reminder program, which was a statutory initiative from a couple of years ago, and before July of last year, there was a Pilot Program, and then the program launched formally in July of 2020. Which, from a timing standpoint, given the onset of the pandemic, was tough. And I have to admit that we don't have the kind of adoption for the text reminder program that I think we all were hoping for up front. I mean, we've had over almost 31,000 defendants engage in the text reminder program. And I may be going too fast here. But for those who don't know, statute requires that

- 15 -

defendants receive two reminders prior to each court appearance. We do one a week prior, and we do one the day prior. Now, it's an opt-in program, and that's because federal communication or FCC regulations prohibit an opt-out program, and, so, that does put us on our heels a little bit. When you're working with an opt-in program, you're trying to convince people to share their information. And, of course, we have an obligation in statute to notify folks that this program is available. Also, I believe statute requires that summonses be updated so that at the point of contact with law enforcement, someone can say, hey, I want my reminders via text. And I will say that I think while we are looking at ways to have a more robust engagement with this program. And, certainly, the pandemic has complicated this, because we've gone from what used to be an almost completely in-person engagement with folks to now an almost entirely virtual engagement. And we're going to come out of this with a mix, where we're going to be engaging with folks, both in person and virtually. And we just didn't program our IT systems to handle that. My crystal ball was broken and I didn't see a pandemic coming. So, while we still have work to do, I do believe that in an opt-in sort of environment, one of the most powerful things we can do is continue to collaborate with our law enforcement partners about getting summonses updated, and so that at that point of contact, which I think is probably the most effective way, the effective time to opt-in. So, that can happen more cleanly. Any questions?

**Rep. Weissman**
Mr. Vasconcellos on this point, I think Senator Lee had a question specifically on the court reminders. I'll also observe. I mean, I think there would be a lot of interest, at least speaking for myself. You know, this was sort of among other things, about making more efficient use of judicial capacity, which we know was constrained before this pandemic. And you know, we've just heard it is acutely constrained, now. So, this seems to me a place that we can push in connection with whatever else is going on, but with that, Senator Lee, please go ahead.

**Sen. Lee**
Thank you, Mr. Chair. The State Court Administrator and I spoke yesterday and the Chief Justice. And he really answered the question, and I thank him for anticipating my inquiries. I look forward to the court engaging robustly in the implementation of the court text reminder and to the extent that they can urge their law enforcement partners to upgrade the summonses. That's really the point of contact when that mobile phone information is turned over. So, I appreciate the State Court Administrator's engagement and willingness to try to get this more robustly implemented. So, thanks. I don't really have a question. He anticipated it.

**Rep. Weissman**
Okay. Thank you, Senator. Please go ahead, Chief.

**Chief Justice Boatright**
One area that I would like to talk about is our judicial outreach that we've conducted this past year. As you may recall, we hired, the Legislature authorized and we hired a Diversity Outreach Position in 2020.

And we spent a lot of time. Our court, the Court of Appeals, have spent a lot of time reaching out to minorities to try and encourage a career on the bench. There is a lot of work to do, but I am proud to say that the number of minority judges have increased from 40 to 51 in the past year, and that in the last year, we've had 5 black female judges appointed, and that's more than the last 25 years, combined. There's clearly work to be done, but we are proud of the work, and we are gaining, I think, momentum on that. And, so, we thank you for the Diversity Outreach position. It's been helpful.

**Rep. Weissman**

Okay. Mr. Vasconcellos, did you want to hit one or two more key things? Oh, I apologize. Rep Bacon, did you have a question? Oh, I apologize. Representative Tipper. Its a little bit hard to see the screen sometimes. Please go ahead.

**Rep Tipper**

It's actually on the backlog, so I can circle back if we have time at the end.

**Rep. Weissman**

Okay, thank you so Mr. Vasconcellos, one or two sort of other key points who wanted to hit, or should we go to questions?

**Steven Vasconcellos**

Thank you, Mr. Chair. Just briefly, some out-year statutory obligations we have. The General Assembly, back in 2020, created a new Judicial District that will come online in 2025. We currently have 22 Judicial Districts. This statutory initiative essentially bifurcates the 18th Judicial District, which is currently Arapahoe, Douglas Elbert and Lincoln Counties. It would cleave off Arapahoe, which would remain the 18th Judicial District. And then, Douglas, Elbert, and Lincoln Counties would become the 23rd Judicial District. As you can imagine, there's a fair amount of planning and logistics that are involved in standing up a new Judicial District, particularly given the pandemic and the pressures on our resources statewide, I'm grateful that that's not until 2025. Our planning for that has been derailed a bit. I remain committed to working with all the affected stakeholders, but this, unfortunately, has not received the attention that it might have otherwise, but for the pandemic. But we are cognizant of our obligation there still. And look forward to some ongoing conversations, additionally, with the General Assembly about ways to make that happen effectively. So that there's a smooth transfer of cases and that our citizens really don't know the difference at the end of the day. Finally, I would like to talk just a little bit about our statutory restorative justice programs. These are some of the more powerful, positive work that we do. The juvenile components of the program were created in statute in 2014. And while a relatively small program, 1,200 juveniles have been served since 2014. It is a mighty program with powerful results. Over 90% of participants do not recidivate, and it's just a wonderful opportunity when the circumstances present themselves. When the victim is willing, when the offender is willing, to engage in conversations to address and repair the harm that was done during the crime. Chief.

- 17 -

**Chief Justice Boatright**

Because of time, I had a great story, but I won't tell you so, but it works in the right situations.

**Rep. Weissman**

Okay, thank you. Let's see, I am. Okay. I think that the Child Protection Ombudsman folks are going to join us online. Maybe we'll just take a few minutes to see if there are any last questions from members of the committee. And again, this is the first, but by no means the only opportunity to get questions answered. Senator Lee, please go ahead and then. Rep Tipper.

**Sen. Lee**

Well, thank you. I would like to hear the Chief Justice's story, because I anticipate that it was going to be a restorative justice story, and I would be interested in hearing that.

**Chief Justice Boatright**

All right, I'll try to give you the Reader's Digest version. I had a couple of kids when I. . . A little background about me, as I said, I was a judge in Jeffco for 12 years, and the last 5 or 6 years, I post exclusively on juvenile. And I had two young men who vandalized a local mom and pop grocery store, and they were referred to a restorative justice program, and they were ordered to do their community service at the grocery store. And it turned out, after they had completed their community service, the grocery store ended up hiring one of the young men to work there. And, so, that, I think, is a is a great story of how the restorative justice program can work. And I'm sure we're not going to see that young man back again.

**Rep. Weissman**

Thank you. Okay, and I think Rep. Tipper said she would take her question offline. Members, any other questions for the Chief Justice and Mr. Vasconcellos? All right, seeing none. Thank you for visiting with us this afternoon, and we will all certainly be in touch.

**Steven Vasconcellos**

Thank you, committee. Appreciate your time.

**Rep. Weissman**

Okay, committee, we're going to move right on.

- 18 -

# Appendix 27(g)

# Brian D. Boatright, *State of the Judiciary Address*, 2021 Colo. House Journal, pp. 110-18 (February 18, 2021);

Page 110                              House Journal--6th Day--February 18, 2021

President Garcia requested the Joint Committee, composed of Senators Coleman and Cooke, and Representatives Gonzalez-Gutierrez, chair, Daugherty, and Lynch to escort the Honorable Brian D. Boatright to the rostrum.

Chief Sergeant-at-Arms Jon Judson announced the arrival of the Honorable Brian D. Boatright, Chief Justice of the State of Colorado.

The Joint Committee escorted the Chief Justice to the rostrum where he addressed the Joint Session.

————————

**ADDRESS BY THE HONORABLE**
**Chief Justice Brian D. Boatright**

Speaker Garnett, Senate President Garcia, distinguished members of the House of Representatives and Senate:

This past week, I reached out to a longtime employee of the judicial branch. I asked her how she was doing. She is normally very upbeat and positive. That day, she was very direct. She responded that—for the first time in her twenty-year career—she was not proud to tell people that she works for the judicial branch. That broke my heart. But it also steeled my desire for answers. I am here to tell her, the legislature, the governor, every member of the branch, and most importantly, the citizens of Colorado, that we are going to *get this right*: Where there was wrongdoing, we will address it. Where there was an abuse of power, we will stop it. Where our policies are deficient, we will change them. We want to know the truth. We recognize that the branch faces a crisis of confidence in its leadership. We know that investigating and addressing the allegations within the branch will be a difficult process, but we are committed to seeing it through to the end: This will result in a culture change, and we are going to make sure that happens.

When I say "we," I mean every member of the supreme court. While we frequently disagree on the difficult legal issues that come before us, we are united and speak with one voice when we declare our commitment to this cause. When I say "we," I also mean our State Court Administrator, Steven Vasconcellos, who started in that role shortly after the first round of allegations came to light eighteen months ago. When I say "we," I include the leadership team at the State Court Administrator's Office. When I say "we," I also mean the chief judges, court executives, and chief probation officers of courts across the state—all leadership in the branch is committed to ensuring a safe and healthy work environment. With the flood of news in the past couple weeks, it is easy to lose sight of the fact that we have so many dedicated public servants in the branch who care deeply about the citizens we serve. I know that every member of the branch wants answers. I know that every member of the branch wants answers and wants to *get this right*—everyone at the State Court Administrator's Office, every judicial officer, every clerk, and every probation officer. Even though they may not be proud of me at this time, I want to say here that I am proud of each and every one of them. In the end, I want them all to be proud to say that they work for the judicial branch.

We have all heard the claims about the training contract. The document which has been referred to as a memo has been released, and that has been the subject of much conjecture. I am not here to comment on any of the claims and conjecture—except to say that the branch takes allegations of misconduct by judges and staff extremely seriously. The conduct described in the allegations, if accurate, is unacceptable and cannot and *will not* be tolerated. We need to know if human resources investigated any of these allegations, and if they did, what action was taken. And if they didn't investigate the allegations, we need to know why. What we need, first and foremost, is the truth. Therefore, I have requested a full investigation of the circumstances surrounding the contract and an investigation into each and every incident listed in the document. I have asked the Governor, the Attorney General, as well as leaders of both parties in the House and Senate to provide representatives for an independent panel that will draft a request for proposal to first define the scope of the investigation. Per our procurement regulations (we are going to do this "by the book"), that request stays open for thirty days. Then, the panel will meet again and select the independent counsel or counsels from those who submitted proposals. That person or firm will then conduct the investigation. We hope to announce the members of the panel this week.

With this procedure, the judicial branch will not have any say in the selection process. We will cooperate with the investigation and will publicly release the results. We also hope that the investigation will provide specific recommendations for changes that we can make to ensure a safe and healthy work environment for all members of the branch going forward. All we ask is that the independent counsel conduct a thorough, efficient, and fair investigation. Until the investigation is completed and any recommendations are implemented, I am to be made aware of any new allegations of misconduct and kept apprised of the progress of any investigation on a weekly basis.

I said that each and every justice is committed to reform. I would like to tell you briefly who we are—not who we are academically or professionally, but who we are as people. Since we do everything in order of seniority, I will start with the most senior.

First, Justice Monica Márquez. Justice Márquez's roots lie in the San Luis Valley, where the Márquez family has farmed and ranched for several generations. She grew up on the western slope and graduated from Grand Junction High School. After college, she served in the Jesuit Volunteer Corps, working with inner city youth. Her teaching and community organizing experiences in underserved communities inspired her to go to law school. Throughout her career, she has worked tirelessly to promote diversity in the legal profession, and she engages regularly with diverse youth, law students, attorneys, and judges to build an inclusive legal community in Colorado.

Second, Justice Will Hood. Justice Hood and his wife, Diana, moved to Denver more than thirty years ago with a desire to put their new law degrees to use for the public good. Will has spent twenty-four years as a government lawyer or judge. When he was last in private practice, he was the firm's pro bono coordinator. Diana has spent twenty-nine years working at Legal Aid or running a non-profit that helps abused children. They are most proud of their two adult daughters, one of whom is a legislative aide combatting climate change and one of whom is training to become a wildlife rehabilitation specialist.

Page 112                                  House Journal--6th Day--February 18, 2021

Third, Justice Richard Gabriel.  Justice Gabriel grew up in a working-class family in Brooklyn, New York.  He is the first generation in his family to go to college.  Because he was able to attend college and then law school only with the help of significant financial aid, he has devoted his over thirty-year career to "paying it forward," mentoring countless students and young lawyers, educating the public about the judiciary through the Our Courts civic education program, and promoting professionalism and civility among the bench and bar. Additionally, you can't introduce Rich without noting that he has played the trumpet professionally for almost fifty years.

Fourth, Justice Melissa Hart.  Justice Hart grew up in the Park Hill neighborhood in Denver, where she and her family still live today.  She was appointed to the court in 2017.  For eighteen years before joining the court she taught at the University of Colorado Law School, where her scholarship, teaching, and public service work were focused on anti-discrimination and access to justice.  She has carried those commitments with her to the bench.  In 2018, Justice Hart helped launch Legal Entrepreneurs for Justice, an affordable law practice incubator committed to training lawyers who will serve low- and moderate-income Coloradans.  She had continued to teach at CU and now also teaches at DU, where her class this semester focuses on access to justice issues.

Fifth, Justice Carlos Samour.  Justice Samour was born and raised in El Salvador.  When he was thirteen, political unrest forced him, his parents, and his eleven siblings to flee the country.  After receiving a death threat, the family packed what they could in their van and left El Salvador forever.  With visas in hand, they made the five-day journey to Colorado.  When they arrived, they could not speak English, were in culture shock, and only had what they packed in their van.  Today, Carlos volunteers at Centro San Juan Diego as part of the Our Court program, teaching citizenship classes to Spanish-speaking immigrants, just like the classes he and his family took when they became citizens.  Before joining the court, Carlos was a district court judge in Arapahoe County, where he presided over the Aurora Theater shooting trial.

Finally, Justice Maria Berkenkotter.  Justice Berkenkotter is our newest member of the court.  As my first official act as Chief Justice, I had the pleasure of swearing in Maria on January 4.  She is a former trial court judge and chief judge in the 20th Judicial District, who has spent years working with stakeholders to develop innovative programs that address public safety, mental health, and substance abuse issues, as well as to improve court operations. Maria has two daughters who are also interested in the law—one was sworn in to the bar in the fall of 2019, and one will start law school this fall.

At the risk of appearing selfish, I would also like to tell you who I am, since I have given you my personal commitment to lead this culture change.  I am a Colorado native.  I grew up the Wheat Ridge/Edgewater area and am a proud Jefferson High School Saint.  I decided I wanted to be a lawyer when I was five years old after my dad—who was a lawyer—took me to work one day.  He took me to an adoption, and I remember that he made the two people involved so happy—I thought he was like Santa Claus.  After that, I never thought of being anything but a lawyer, just like my dad.

Flash forward twenty-five years or so, and I am in court trying a case.  At one particular hearing, the judge treated me very badly, very intemperately.  I remember thinking that even if the judge was right on the law, there had to be a better way of communicating.  That was the first day I thought of becoming a judge.  A few years later, I had another experience that cemented that desire.

I prosecuted a murder case that dragged on for about two years due to the defendant's significant mental health issues. Ultimately, the jury convicted the defendant of first-degree murder. As a result, the only sentencing option available to the judge was life in prison. I should note that this took place before the Victim's Rights Act was enacted. When I asked the judge if the victim's family could speak prior to sentencing, the judge—who happened to be an excellent judge—unfortunately denied the request, announcing that the court did not have any discretion regarding the sentencing. I will never forget the faces of the victim's family. That day, I decided that I wanted to become a judge, and I promised myself that if that ever happened, I would do everything in my power to let people know that I cared and that I truly listened. A few years later, I was appointed to the district court in Jefferson County. That was twenty-two years ago. And treating everyone with dignity and respect to the very best of my ability has been the cornerstone of my judicial philosophy. And becoming chief justice didn't change that. That is why I am serious about getting answers. Because, at heart, all of this is about how people are treated.

Approximately eighteen months ago, our court realized that we had significant issues within the Department that required immediate action. While the culture problems were not caused by any specific individual—and I am not blaming anyone—we realized that change was necessary. As a result, since that time, almost the entire SCAO leadership team has been replaced. First, Steven Vasconcellos became the new State Court Administrator. We selected him after a national search. During that process, we engaged all members of the branch and solicited their thoughts on the finalists' vision statements as well as their thoughts after in-person and virtual town hall appearances. We made every attempt to run a transparent process. Since that time, we also hired a new Director of Finance, a new Director of Court Services, and we are in the ongoing process of hiring a new Director of Human Resources.

Next, our court changed how we handle administrative responsibilities. Traditionally, the chief justice handled all of the administrative responsibilities, and the rest of the court received reports on various actions. While the goal of insulating a majority of the court from matters on which it might ultimately have to render a decision was laudable, it was not workable. We realized that we all needed to be much more involved in the running of the branch. We were too disconnected from the employees. As a result, we decided to assign justices to the different departments or functions within the branch. Justice Márquez is assigned to the clerks of court, Justice Hood to financial, Justice Gabriel to IT, Justice Hart to the court executives, and Justice Samour to human resources. We are going to let Justice Berkenkotter get her legs under her before we give her an assignment. At the time, I remained the liaison to probation. We implemented this system to not only improve the flow of information but also to hopefully develop relationships with the employees of the branch. We realized that important information was not getting to the chief justice or the court. If information needed to reach leadership, we wanted our people to feel comfortable approaching and talking with us. In addition, we instituted rotational terms for our chief justice. Justice Márquez will be the next chief. We did this, in part, to keep fresh eyes on things. We now embrace the philosophy that seven brains are better than one and fourteen ears are better than two: There is a real benefit to relying on the collective wisdom and experience of all seven justices.

I would be remiss if I didn't recognize another crisis around how our minority communities perceive their treatment in the criminal justice system. To that end, we also stepped up our efforts to help diversify the bench. We feel that is an important part of enacting real, lasting change. One of the best ways to ensure equal justice for all is to have judges that reflect the communities they serve. Too that end, five years ago, several of our justices formed a "Bench Diversity Dream Team" through Colorado's Center for Legal Inclusiveness. The Bench Dream Team became a vehicle to encourage diverse lawyers to consider a career on the bench and to help them navigate the judicial application process. Bench Dream Team members have volunteered countless hours hosting informational sessions, meeting with potential applicants, and conducting mock interviews. As part of the Dream Team's efforts, Justice Márquez teamed with the Center for Legal Inclusiveness, the diverse bar associations, judges, nominating commission members, and 9News alum Adele Arakawa to produce a training video for new nominating commission members. Among other things, that video teaches commissioners how to combat implicit bias.

Retired Judge Gary Jackson, through his tireless work, made diversifying the bench an urgent priority. Representative Leslie Herod suggested that we hire a Judicial Outreach Coordinator, who would help identify and recruit diverse candidates to the bench. Because of the hard work of the Bench Dream Team; Judge Jackson; Representative Herod; Sumi Lee, our outreach coordinator; Patty Jarzobsky; and many, many others, we have made some inroads. I am proud to say that Governor Polis appointed more Black women to the bench—five—in the one-year period between September 1, 2019, and August 31, 2020, than in the previous twenty-five years combined. In addition, fifty-nine percent of judges appointed by Governor Polis in that same time period were female. That has resulted in a nearly 13 percent increase in female judges in the last four years. With that said, the protest for racial justice which took place this past summer and more recent events remind us that much work remains to be done.

Those events have led us to significantly increase our training around issues of racial equality. Judges Paul Dunkelman and Adam Espinoza—through their leadership roles as Presidents of the District Court and County Court Judges Associations, respectively—have put on a continuing series of excellent webinars on these issues. The webinars are extremely well-attended by judges across the state and, in addition, several districts have made discussing racial justice a special priority. I want to acknowledge the work of the court of appeals. That court established an Inclusivity, Diversity, Equity, and Anti-Racism Committee to combat systemic racism and injustice by promoting acceptance, respect, and value for all persons and creating an ongoing dialogue to confront biases. To date, the Committee has undertaken a number of projects, including spearheading amendments to the Court of Appeals' strategic plan regarding diversity and inclusion, compiling and sharing resources about DEI trainings, and facilitating discussions inside and outside the court, including with regional law schools and law students on these issues.

In the vein of openness, we also looked at the court's practices around sealing records. This past December, with the able assistance of the Colorado Criminal Rules Committee, our court added Rule 55.1 to our Rules of Criminal Procedure. Rule 55.1 is a rule of transparency and accessibility. To borrow from Justice Louis Brandeis, by allowing better and more expedient access to court records, the new rule recognizes sunlight as the best disinfectant. Once the rule takes effect this May, a trial court will not be able to limit the public's

House Journal--6th Day--February 18, 2021                    Page 115

access to any part of a court record in a criminal case unless the judge makes written findings that (1) a substantial interest would be served by making the court record or any part of it inaccessible to the public, (2) there is no less restrictive means than making the court record or part of it inaccessible to the public in order to achieve or protect the substantial interest identified, and (3) any substantial interest identified overrides the presumptive public access to the entire court record. Additionally, any order limiting public access to a court record or to any part of it must indicate the date or event certain by which the order will expire. This will ensure that orders limiting public access do not linger unnecessarily.

I bring these changes up not to claim that we have already changed the branch's culture but only to demonstrate that we are committed to continued reflection on how we can improve. It will take time, but we are committed to the cause.

I started my speech by recognizing that we as a branch are in crisis. But we also face another crisis. This, however, is not a crisis of our own making. This is the practical crisis caused by the pandemic.

To be clear: our trial courts and probation officers have borne the brunt of the effects of the pandemic. Despite risks to their health, our trial courts and probation departments have remained open for business at all times during the pandemic. Our people have acted with the courage of first responders by doing the work required. In my opinion, they have been heroic. While we have made significant changes to how we do business by having virtual and telephonic hearings when possible, there are some hearings that simply require in-person proceedings. Our chief judges have been amazing in how they have innovated and now have modified courtrooms to allow these hearings that must be held in person to be as safe as possible.

But then there are jury trials. They just have not been possible for much of the past twelve months for safety reasons. As a result, we face an unprecedented backlog of jury trials. I will give you a few numbers that demonstrate our plight. Over the past five years, we have had an average of 2,716 jury trials, with 2,400 of those being criminal trials. On January 19, 2021, we had 14,635 jury trials scheduled, statewide—with over 10,000 of those being criminal trials. What that means is that we have somewhere between four and five times the number of criminal jury trials scheduled that we try in an average year. And crime has not stopped, serious crime as not stopped. We come to you, asking for help. But before I address what our strategy is to confront this unprecedented challenge, I want to share my greatest fear about what I am asking.

I recognize that many of you are angry at the branch for the unwanted attention that it has brought to government. You have every right to feel myriad different emotions about the situation. My plea is that you don't take out your anger on our trial courts and on probation, because this is about us serving the people of this state. So I ask you: If you are mad, then be mad at me.

Our trial courts need help to provide the access to justice that our citizens need and deserve. Without assistance from the General Assembly and, ultimately, the Governor, we will not be able to adequately address the tsunami of jury trials that await. I've had discussions with some of you about one of the biggest challenges—enforcing a defendant's statutory right to trial within six months of entering a not guilty plea. In the early stages of the pandemic, with the assistance of the Criminal Rules Committee, we were proactive on this front

Page 116                         House Journal--6th Day--February 18, 2021

and adopted amendments to Rule 24 of our Rules of Criminal Procedure.  This amendment provides us flexibility while we're in survival mode.  Rule 24, however, only applies so long as a fair jury pool cannot safely be assembled.  Therefore, once our trial courts are able to summon jurors with some semblance of normalcy, we will face significant challenges in this area.  We are going to have thousands of trials with either ninety-day or six-month deadlines.  We need your help.

We are asking for three things:  (1) We are asking that you revise the senior judge program to create flexibility that will allow more of our most experienced jurists to either preside over jury trials or to free up our currently sitting judges to try more cases.  We have recently retired judges who are willing and able to step in but who do not want to commit to the required sixty- or ninety-day contracts that currently are required by statute.  We need more options for length of service.  We also need additional money to expand the program.  We have good judges on a waiting list, hoping to help.  (2) We are asking for additional staff and magistrates.  As you may be aware, when the Governor asked for a budget reduction last spring, we complied.  After significant soul-searching, we eliminated nearly two hundred positions, which required laying off 110 people from every part of the branch.  With the exception of one position, we are only asking for staff to help the trial courts and probation.  Jury trials require staff, and conducting jury trials safely during and after a pandemic requires more staff than usual.  (3) We are asking you to allow us some flexibility around the six-month statutory deadline.  As I just mentioned, the amendment to Rule 24 will no longer be effective once trials resume in earnest.

Just knowing that trials can be held will encourage resolution.  Recently, I had a meeting with many of my partners in the criminal justice system.  This included two chief judges, the Attorney General, the Public Defender, the director of the Office of Alternative Defense Counsel, the head of the Colorado District Attorneys' Council, several D.A.s, and others.  It was a productive meeting where we discussed developing a "Best Practice Template" for triaging the backlog of cases.  I welcome working with these same partners around reasonable amendments to the six-month statutory deadline for criminal trials.

As I speak to you today, jury trials are slowly resuming in some judicial districts, with others to follow in the coming months.  I am continuing the practice started by my predecessor, Chief Justice Coats, of empowering our chief judges in each district to decide how and when to resume jury trials.  Despite criticism to the contrary, one size does not fit all in how individual courts are run.  For example, what works in Greeley may not work in Montrose and vice-versa.  That is because we have different positivity rates in different counties, coupled with different courthouses with different facilities and different technological capabilities.  The decision of how and when to resume trials has to be made at the local level.  The chief judges are working extremely hard, and they all have a common goal:  to resume jury trials as soon as they can be done safely.  But even then, the trials will start slowly due to safety protocols.  We want our jurors safe when they serve.

The pandemic has also brought about some positive changes to practices in the courts and probation departments.  I fully expect that many of these new practices will continue into the future.  As just one example, many parents in the Dependency and Neglect cases have difficulty traveling to and from court due to a lack of dependable transportation.  We have seen that many of the review hearings in these cases—which can be brief if things are going

well—can be handled remotely, thus helping parents avoid missing work or treatment. This practice will be employed across all case types as appropriate.

The pandemic complicated work for our probation departments, in particular, because establishing the relationship between a probation officer and their client is frequently the key to successfully completing probation. I am sure everyone in this room has experienced the difficulties of connecting with people via one of the virtual platforms. With that said, our probation officers have made necessary adjustments and have remained committed to helping their clients and providing services to the best of their ability.

When people talk about the work of the judicial branch, they often overlook probation. But I want to remind everyone that probation remains the most cost-effective method for supervising offenders. This fiscal year, an offender incarcerated in the Department of Corrections will cost the state approximately $46,866, an offender in the Community Corrections program approximately $9,936, and an offender on parole approximately $6,924. An offender on probation, by contrast, will cost the state about $1,662—a fraction of the cost of any of the alternatives.

I also recognize that some people are under the impression that probation operates as a sort of zero-tolerance, punitive system—that if, for example, an offender on probation misses an appointment with her probation officer, the officer will immediately file a motion to revoke probation. That's just not accurate. To the contrary, probation focuses on providing offenders with the rehabilitation and support they need to regain control of their own lives and contribute meaningfully to society. I want to share a story about one probation client. Her story is not an outlier. I am going to share her story in her own words:

"When I started probation, I came as a broken soul. When I came to my first appointment, my children and I were bouncing between living in my truck and a house filled with multiple dealers. We struggled with basic necessities like finding a restroom and getting water. After a few months of failing regular probation miserably, I was handed off to a new program: Specialized Drug Offender Program.

"I sat in orientation and they discussed the program and the treatment provider, Mile High Behavioral Healthcare. They identified so many resources, expressed an underlying faith in us as addicts and our ability to recover, and provided support from all angles. I left the room with tears in my eyes. This is what I needed.

"I started treatment and saw my probation officers weekly. Treatment became my family, probation officers my mentors. They helped instill my faith in myself again. They believed in me and truly cared about my children and [me].

"Today, I am a Peer Coach. My future is limitless."

Her probation officer said that this client was granted early termination and has carried what she learned forward in her new life.

This is emblematic of the work of probation officers across the state. I know from my time as a trial judge that probation officers take great pride in their clients' success and consider it a personal defeat when their clients fail. I am proud to have such dedicated people as part of the branch.

Page 118                          House Journal--6th Day--February 18, 2021

Although I gave you a brief summary of who I am a few minutes ago, I neglected to mention that, in the limited free time that I have as a justice, I enjoy reading history—even if that means listening to a book on tape during my commute. I'm particularly fond of Abraham Lincoln for his strength of character, grace under pressure, and communication skills. If you visit my office or home, you'll notice multiple books on Lincoln, including one about his time "riding the circuit" in Illinois as a young lawyer. As he so often did, he wrote something that still is true today.

In his "Second Annual Message to Congress"—delivered December 2, 1862, after one of the costliest battles of the early Civil War, when he feared that the Union's resolve to win the war was waning—Lincoln stated, and the words have meaning to me today, that "The dogmas of the quiet past are inadequate to the stormy present. The occasion is piled high with difficulty, and we must rise with the occasion. As our case is new, so must we think anew and act anew." Lincoln was talking about the survival of the country. I am talking about maintaining the independence and integrity of the judicial branch. And so I echo his words: We will think anew, and we will act anew.

I want to assure you that we—the judicial branch—will bring that the same clear-eyed perspective, energy, and determination to tacking the challenges that face the branch and the administration of justice in Colorado during these trying times. We are committed to lifting the current clouds over the branch and making it, once again, a rightful point of pride. We are going to *get this right*.

Thank you for the privilege of addressing you today.

———————————

The Joint Committee escorted the Chief Justice from the Chamber.

———————————

On motion of Representative Esgar, the Chief Justice's message was ordered printed in the House Journal.

———————————

On motion of Senator Fenberg, the Joint Session was dissolved.

———————————

House reconvened.

———————————

**SIGNING OF BILLS - RESOLUTIONS - MEMORIALS**

The Speaker has signed:  **HJR21-1003, 1004**.

———————————

# Appendix 27(h)

# Transcript of *Hearing before the Legis. Audit Comm.*, Colo. Leg., December 7, 2021;

# Legislative Audit Committee—December 7, 2021 Hearing: Colorado Judicial Department Presentation

**Sen. Michaelson Jenet**

We are going to go to the State Court Administrator, which is Attachment J. They're here and will be coming in shortly. All right, are we all already to come to the table? Thank you. Let's start with Ms. Colin. Good morning.

**Michelle Colin**

Good morning. Thank you, Madam Chair. I'm going to turn it over to Mr. Johnson. He was the team lead on the State Court Administrator's Office Performance Audit, and he'll give you a refresher about the audit and the findings that we had. Thank you.

**Sen. Michaelson Jenet**

Thank you. Welcome Mr. Johnson.

**Derrick Johnson**

Thank you, Madam Chair. As you just indicated, Attachment J in the packet contains the status report update for the performance audit that we did at the State Court Administrator's Office, which was released in December of 2020. The report had six findings and recommendations. These were in the areas of establishing rules and policies for voluntary separation incentives, better controls over paid administrative leave, processes for the secure retention of human resources documents, improved rules for when it's proper to use sole-source contracting method, tighter controls over the use of the procurement cards. And, then, the sixth and final finding in that report had to do with the SCAO's overall administrative framework and the implementation of internal controls to foster a culture of integrity and accountability. The SCAO agreed to all of these recommendations. For the status report process, we requested, received, and reviewed documentation. And from that we concluded that the status report, as reported by the SCAO is accurate. We do have the State Court Administrator here to update you on the implementation status of these recommendations or to answer any questions that you might have. Thank you, Madam Chair.

**Sen. Michaelson Jenet**

Thank you, Mr. Johnson. Welcome, Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. If it's okay, Madam Chair, I have some brief opening remarks.

**Sen. Michaelson Jenet**

Please.

**Steven Vasconcellos**

And then I'll just proceed through the status of each of the recommendations. And, of course, happy to stop for any questions that the committee may have along the way. The performance audit of the State Court Administrator's Office last year illuminated a series of critical policy and procedural deficiencies. Deficiencies that, if left unaddressed, would not only impede SCAO's ability to carry out its mission of supporting Colorado's State trial courts, appellate courts, and probation. But could also undermine confidence in the Judicial Department as a whole. I am grateful that the audit came relatively early in my tenure as State Court Administrator, as it has provided a roadmap for investing in the health of SCAO and by extension, the Judicial Department. Implementation of the audit recommendations has been one of Chief Justice Boatright's and my highest priorities. Since the performance audit was released last year, the Department has taken meaningful steps to implement the recommendations. As our status update shows, while we have not fully implemented every recommendation, we have made significant progress on all of them, with full implementation anticipated in the next couple of months. Implementing the OSA's recommendations is not merely an audit compliance effort, it also represents a change in leadership culture at the State Court Administrator's Office. Concrete steps have been taken to create greater Supreme Court engagement and oversight of SCAO operations. While I have, as the State Court Administrator, an important role in advising the Chief Justice on administrative matters, mine should not be the only voice. Each Division at the State Court Administrator's Office now works with a Supreme Court Justice liaison. Each liaison Justice is providing input and critical advice to the Chief Justice on key administrative matters. My senior executive team, two-thirds of which are new to their positions since I became State Court Administrator, now meet twice weekly, working together collaboratively to lead the State Court Administrator's Office. The collaborative leadership model is the only way I know how to make recommendations to the Chief Justice and decisions about SCAO operations that best serve the Judicial Department's Mission. These and other measures are helping foster a culture of integrity, transparency, and accountability in the administration of the State Court Administrator's Office.

That said, our progress has not been without challenges. Like all sectors of state government, the State Court Administrator's Office has faced a variety of challenges presented by the Covid pandemic and budget reductions, all while supporting the courts and probation statewide in implementing massive pandemic-related operational changes. Additionally, the events that led to the performance audit have certainly damaged employee morale, along with internal and external trust in the organization. Notably, we were without a permanent HR Director for close to two years. As a result, other senior managers in the HR division were pressed in to serve as Acting Director, in addition to their existing duties. I am happy to report that after several recruiting attempts, we were able to hire a permanent HR Director this past June. Despite these challenges, we've been able to make significant updates to both our Personnel Rules and Fiscal Rules and have been pushing forward with the development and testing of our new time and leave system. Really the last key component in audit implementation that will be piloted next month with plans for statewide implementation in February. I'll pause there for any questions before I move into our progress on individual recommendations.

**Sen. Michaelson Jenet**

Wonderful. Any questions? Please proceed.

**Steven Vasconcellos**

Thank you, Madam Chair. Out of Recommendation 1, really focused on policies and procedures related to voluntary separation agreements. I'm pleased to report that the elements of Recommendation 1 have been fully implemented with updates to our Personnel Rules that align with Executive Branch guidance. And I'm going to sound a little bit like a broken record this morning. I think correctly, time and again, the OSA pointed us to existing Executive Branch policies and procedures when addressing our own deficiencies in our policies and procedures. Which is what we've largely done. As I mentioned at the LAC hearing last year, the use of voluntary separation incentives in our organization, historically is very rare. And since the performance audit, we have not offered any VSIs to SCAO employees.

Moving on to the second Audit Recommendation, policies and procedures related to administrative leave. That recommendation has been partially implemented at this point, largely through updates to our Personnel Rules related to administrative leave and post-employment compensation, addressing issues that were identified in the audit. Here again, we have reviewed and incorporated many of the provisions that are currently under Executive Branch guidance. Under our new rules, administrative leave cannot be used to extend an employee's termination date, which was a key concern identified in the performance audit. Still outstanding for us is the implementation of our new time and leave system, which will provide more robust tracking and reporting of administrative leave, including addressing the concerns about the reasons why administrative leave was used, and, then, the reporting functions to follow up on whether administrative leave is being used properly and within rule guidelines. I would mention. So, we're using, it is now called UKG. It was formerly called Kronos, which is a system widely used in the Executive Branch. So, we were able to attach to an Executive Branch agreement through our procurement procedure. The main reasons for the delay. One, it is a new time and leave system for a 4,000-person organization. So, it is not a small implementation at a time when our Office is smaller than it's ever been in my career, in the aftermath of budget cuts. So, there's some complication there. We've had to make some changes to the system on the fly to help make sure that we're going to be in compliance with the Colorado Equal Pay Act. And, additionally, trying to do all of this without an HR Director for most of the last two years has been a little bit of a challenge. So, about six months ended up being added on to our initial expected implementation date. But, pre-pilot work is happening as we speak. The pilot, which will include our office at the State Court Administrator's Office and a handful of Judicial Districts across the State, we'll go live the first week of January. So, we're inside. We're about three weeks out from going live with the hope that we can go statewide with UKG in February. Questions on the second recommendation before I move on to the third?

Pardon me, Audit Recommendation 3 focused on the storage and review of HR related records. And this is another area where the recommendations have been partially implemented. Our takeaway from the audit was that we needed to focus on the concerns related to family medical leave first. And, so, we've

focused on tightening up our controls and policies and procedures related to family medical leave requests, storage of the documentation associated with that, and associated security. We used to have one person in the organization assigned to benefits for 4,000 people. And, while times are tight, we've been able to move some folks around, and now have two people. So, we have doubled the number of folks. I have concerns long-term over whether that's an adequate number of people working on benefits and related issues for the Department.  But we're trying to address that through our budget request in this upcoming fiscal year cycle. Our legal team and the Attorney General's Office review every request for family medical leave, and I have final approval or denial over each request. So, at each stage in the recommendation, our legal team will review, they'll make a recommendation on whether to approve. Then the AGs Office will review, they'll make a recommendation on whether to approve. I read the recommendations and then make a final determination. Pardon me. We're in the process of developing similar written policies and procedures for other areas identified in the audit. Specifically, disciplinary investigations and settlement agreements. That's the work that remains to be done there. The documentation is currently being stored securely in a centralized location. You may remember that there were concerns about key HR documentation being stored on personal computers or state computers that weren't somehow connected to the network. And while this sounds like a relatively mundane issue, we are all using the same computer, no one's using private computers, and everyone's using the same secure, centralized network, document storage. So, we do have procedures. What we need to do is reduce to writing formal organizational policies that support those procedures. Any questions? I apologize. My voice is really gravely this morning. I might be a little nervous, too. Any questions on Audit Recommendation Number 3?

Moving on to Number 4, sole-source procurement, I'm happy to report that this item was fully implemented, and it was fully implemented before we came to the table at the hearing last year. We updated our purchasing rules and created a new fiscal rule related to independent contractors. You may remember, there was concerns that we did not have clear guidance on any sort of cooling off period between when a former employee left service at the Judicial Department before they could become an independent contractor. This is another area where we've mirrored Executive Branch policies and now have a six-month mandatory waiting period between an employee's separation and the date when that individual is eligible to serve as an independent contractor. We have only had one sole-source procurement since our hearing last year. Our internal audit team reviewed that process over the Summer and determined that it was conducted in compliance with our updated rules and procedures. Any questions on Recommendation 4?

Moving on to Recommendation 5, budget authority and approval of credit card purchases. I'm also happy to report that we have fully implemented all of the provisions associated with Audit Recommendation Number 5, with updated commercial card rules that went into effect in November 2020 and a new budget fiscal rule that was implemented in September of this year, which defines budget authority and formalizes processes for delegation of that authority. Questions regarding Number 5?

- 4 -

Finally, Audit Recommendation Number 6, which I really view as a summation of all of the previous recommendations. Asking us to engage in a system of controls that fosters integrity, ethical values, and accountability. And I talk about this in two different veins, I think there's sort of the basics of the implementation. And I won't go on in length, but I think there's a philosophical issue embedded in there, as well, that I'd like to speak to briefly. We have made great progress in all the previous areas leading up. The two areas, I think, from an audit compliance standpoint, that keep us from being fully implemented. Are, one, that full implementation of our new time and leave system, which is coming in the next eight weeks statewide. And the last written policies and procedures in HR that we need to finish. But again, this is kind of beyond, excuse me. I think it's tempting sometimes. Because there's a lot of operational things, rules, procedures that need to be updated. It's easy sometimes to think of audit compliance as a checklist of things to do. But really this is a matter of vigilance. Healthy organizations are always engaged. They're always looking for their areas of liability and weakness, and if they're really in pursuit of the highest level of integrity and health, there's going to be that constant vigilance in this area. One area, for years, the State Court Administrator's Office was not subject to review by our internal audit team. That has changed. We are on the calendar for September of 22. Now, you might ask, why so far out? I think again, in a checking an item off a checklist, fashion, we could have put ourselves on the calendar much earlier. But there wouldn't have been a lot of significant data to work with to see whether we're compliant. I wanted six months to pass. I wanted some time for the new time and leave system to be in place. And some time for some repetition under the new rules, so that our audit team has something to dig into. And, so, that's really the last component that isn't going to be done by February, which is that first full internal follow up audit. Our audit team has done some preliminary looks, whether it was the sole-source I mentioned earlier, or several other areas under the umbrella of this audit to see how we're doing preliminarily. But for me, there wasn't enough data there with a straight face to come to this committee and say we are fully compliant. Which is why I want a little bit of that buffer of time to have more data for them to work with and dig into whether we're really walking the talk.

**Sen. Michaelson Jenet**
Thank you, Mr. Vasconcellos. It sounds like a significant amount of work has been done, and I really appreciate your dedication to it and your comment regarding vigilance. We do rely on you, and we appreciate you. Thank you.

**Steven Vasconcellos**
Thank you, Madam Chair.

**Sen. Michaelson Jenet**
Any other questions? Comments? All right. Thank you very much.

**Steven Vasconcellos**
Thank you, committee.

# Appendix 27(i)

## Transcript of *Hearing before the J. Budget Comm.*, Colo. Leg., December 15, 2021;

# Legislative Joint Budget Committee—December 15, 2021 Hearing: Presentation of the Colorado Judicial Department

**Rep. McCluskie**

The Joint Budget Committee will come to order. Welcome back members. We have a terrific afternoon planned with our Judicial Department and Independent Agencies. I am delighted to welcome before us Chief Justice Boatright and State Court Administrator Vasconcellos. Really looking forward to our conversation, and I will turn it over to you, Chief Justice, to begin.

**Chief Justice Boatright**

All right. Thank you, Madam Chair. If I can do a brief introduction. A year ago, at this time, we were not holding any jury trials. We faced a huge backlog of cases. In the Spring of 2020, we had cut over 205 positions, and that included significant layoffs. And we appeared at this hearing with the paralyzing fear that we were going to face more cuts. Because we really had then reached a point where we feared we could not do our constitutional obligation if we endured any additional cuts. I'm pleased to report that we started doing jury trials in many of our jurisdictions in February. Very slowly at first. And we built up the pre-pandemic levels during the Summer. I will say that everyone in the system worked exceedingly hard. And when I say that, I mean the DAs, the public defenders, alternate defense counsel, private counsel. Our trial judges worked exceedingly hard. And in checking with our Chiefs, I think we are not having that backlog that we had a year ago at this time. There's still work to be done, but we're not facing sort of that catastrophic backlog that we feared. Now, the surge of the Delta variant has caused some of our smaller jurisdictions to stop holding jury trials, and we'll see what happens with the Omicron. But we're in a much better place than we were a year ago. Importantly, there were no super spreader events, as jurors have come back. And I will say that I'm really proud of our citizens because they've shown up and they're willing and anxious to serve as jurors in our cases. And, so, I want to say thank you to them. And I want to compliment all the judges, our court staff, probation officers, and especially our Chief Judges, for being careful in making sure that safety was a priority. As kind of an anecdote, one of our Chief Judges told us that, after completing the jury trial, one of his jurors came up to him and said, I wish the doctor's office had as many protocols as you guys did. I felt exceedingly safe to be there. And I think we wanted to make sure that jurors felt safe in coming in. And they're still attending. And I kind of view that as sort of a canary in the mine. If we weren't doing things safely, we'd see a dramatic drop off. And we're just not seeing that.

So, as the background. As I indicated, we had cut 205 positions in the Spring or Summer of 2020. And I will say at the time, the State Court Administrator's Office took a very high disproportionate share of those cutoffs. Because we recognized that the trial courts were bearing the brunt of what was happening with regard to Covid. And we tried to preserve as much trial court staff as we possibly could. When we were lucky enough to get 163 positions restored, we again focused on the trial court because, again, they were bearing the brunt of what was happening with regard to Covid. And I think we did exclusively trial

- 1 -

court staff replacement, with the exception of one Court of Appeals Staff Attorney. But everybody else went. Meanwhile, our State Court Administrator's Office has continued to operate, really with, I think a fairly skeleton crew. Is how I would describe it.

Our budget requests this year are really driven by three primary forces.

Number one, the pandemic. Obviously, the pandemic has caused all of us to change how we do business. And I do think there's a silver lining, because it forced us to innovate and pushed us to use virtual proceedings. And the number that I think is really important is, every month we hold 17,500 virtual proceedings. And that serves over 130,000 participants.

Number two, the performance audit of over a year ago taught us some valuable lessons. We learned that we just can't run the State Court Administrator's Office, the Department like we did 20 years ago. We've grown in numbers and complexity. As a result, we have substantial needs in our HR Department, contract procurement department, and training. As an example, we enter into approximately 2,500 to 3,000 contracts a year that we know of. And we need to make sure that our procurement process is safe and we're monitoring our liabilities.

And, then, number three, and I'm sure you're going to hear this from all kinds of different agencies that come before you, the current market environment. We are really struggling to hire people. We are losing people at levels that I've never seen. And I've been a judge for 22 years. I spent my first 12 years in the trial court, and I've never seen the turnover. I've never seen the low application rate. And I know Mr. Vasconcellos has some information that can fill that in. And who we're really hurting are our court judicial assistants. We call them our CJAs. And, really, they're the heart and soul of our trial court organization. They interface with the public. And in many ways, they are the face of the judicial system to many of the people who come into court. It's considered an entry-level position, but it has extraordinary responsibilities. They are our workers who are entering information for warrants, protection, orders, sentencing. And, yet, we're competing with fast food restaurants for keeping them employed. And again, as way of a story. We had, and I go back to Jeffco because that's where I came from. One of our CJAs had been who had been working for particular judge for 15 years, tearfully came in and told him she had to leave. She gotten a job at a municipal court for substantially more money. And even though they had that kind of special relationship. Just for her family, she had to leave. So, in broad strokes, we need people for our financial services and HR departments. These directly tie to the lessons we learned from the audit. These people are necessary because of the turnover and the need for training. And we need professionals to run a good business and limit liabilities on the procurement process.

Number two, IT staff and infrastructure. One of the things that we have learned is, a lot of the public and I think a lot of the attorneys, like the virtual proceedings. And, although it is harder on our staff, we are urging our courts to try and use them whenever possible. And they're just going to be some things we're

- 2 -

not going to be able to use them for. Jury trials, I don't think are on the horizon and things like that. But there are a lot of things for short hearings. Another really good example of cost savings is if you have somebody in the Department of Corrections and they have a hearing up in Weld County that you know is going to get continued. Do that with a virtual hearing. Rather than sending sheriff's deputies down to Canon City, transporting them up and then transporting them back. For, you know, what's really a pretty perfunctory hearing. But we need infrastructure upgrades. One of the things that we've learned is the public likes virtual proceedings, but they want them to go well. And we are struggling with a lot of our infrastructure. The Carr Building is a perfect example. We want to do some certain things with virtual proceedings, like giving one of the attorneys an option to appear in person and another virtually. We did virtual oral arguments for all of last year, and thought they went very well. We don't have the infrastructure. And our Building is eight years old. So, this is really true around the entire State. And many of our buildings, obviously, are much, much older than the Ralph Carr Building.

And, then, the third thing is training. As I indicated, our CJAs because of new programs, turnover, and the significant responsibilities they have. We need to have extensive training. And that's a lot of the IT staff, desktop training. We can do some of that virtually. Some of that needs to be in person. We need training for our probation officers, so they continue to be able to supervise safely. And for our judges. No new District Court judge comes in with the experience. And I'll tell you, in the District Court you handle criminal, civil, juvenile, probate, domestic, mental health, and in many jurisdictions, water law. And no one comes in with that kind of experience. And, so, we're asking for restoration of our judicial education budget. So that we can improve and include our training.

At the end, I'll say, we need your help. We are here to serve the public, and we are trying to do it in an efficient, safe and compassionate manner. And we're here today asking for your help. Thank you.

**Rep. McCluskie**
Thank you, Chief Justice Boatright. Really appreciate your comments. Mr. Vasconcellos your next. Or would we'd like to take questions at this point?

**Steven Vasconcellos**
We're happy to take questions at this point, Madam Chair.

**Rep. McCluskie**
Thank you. Any questions or comments? Mr. Vice Chair.

**Sen. Moreno**
Thank you, Madam Chair. I have a quick question that I don't think is on the agenda. But I would just be curious to get your general thoughts on it. There's been a few folks in my community who are concerned with the workload for the County Courts and I'm wondering if that is something you're seeing statewide, or if it's limited to certain areas? Just curious to get your thoughts on that issue.

**Chief Justice Boatright**

I'll try. And, then, Mr. Vasconcellos can tell me where I'm wrong.

**Rep. McCluskie**

Chief Justice Boatright.

**Chief Justice Boatright**

Thank you, and I apologize. I would say, right now, it's a little bit to be determined because of the big shift in the cases that take effect in April. So, what we have done is. We anticipate asking for some additional County Court judges, I think, in the future. But we just honestly don't know what the impact of that is going to be at the present time, and we didn't want to come to you with speculative information. But we'd rather do a knowledgeable, weighted caseload study to be able to give you real numbers. So that we're not over-asking or under-asking.

**Rep. McCluskie**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. That's correct, Senator Moreno. I think we're really in a period of flux. There have been policy changes that have pushed more cases in the County Court. If that's durable, we will be back. But we want to see some stability. Charging practices, we're still in this sort of we're not quite in the initial teeth of Covid when everything shut down. But things are still in flux. And it doesn't feel stable enough to make that serious of an ask. Particularly, for bench resources, where we know that's a special ask of the General Assembly, requiring the super majority. We want to make sure we're on really solid ground before we approach you on that.

**Sen. Moreno**

Thank you.

**Rep. McCluskie**

I'd like to welcome Representatives Bockenfeld and Weissman and Senator Lee. Thank you for joining us today. Mr. Vasconcellos, please proceed.

**Steven Vasconcellos**

Thank you, Madam Chair. If it's okay with you and the committee, we've submitted detailed answers to the 20-plus questions. I will spare you going through them in excruciating detail and try to hit the high points of each of the questions, understanding, of course, that the committee may have additional questions or may want to redirect me. Completely understand. So, we'll just jump right in if it's okay.

- 4 -

With the first common question, which asked us to comment about our remote work policies and their potential impact on leased space, vehicle needs, some challenges and efficiencies related to Covid and whether we expect remote work to continue. By way of background, on the leased space issue. It's somewhat moot for the Judicial Department. The only leased space that the Judicial Department has is the Ralph Carr Judicial Center. By statute, counties provide all of the office space for courts and probation. So that is our one leased space engagement. Is the Carr Center. So, generally speaking, remote work policies aren't going to affect that. Pragmatically speaking, much of the work of the courts and probation, even when they're supporting virtual engagement, is done on site in the office. Because that's where the tools to support that work are located, the network capacity, etc. And, so, most of the courts are in person. My office at the State Court Administrator's Office, at the first of the year, is going to embark on implementing a hybrid work plan. Where folks will spend a mix of time, either working from home or in the office. So, that's to be seen, whether we have some long-term space changes at the Carr Center. But as we sit here now, no change in plans with regard to leased space. With regard to fleet, we have a relatively small fleet in the Department. Approximately 40 vehicles that are used primarily by probation officers in geographically large Judicial Districts and also some regional staff. About 25% of my staff are actually not here in Denver. They're regionalized around the State, including IT support staff, HR staff, training staff. So, that they're closer to the people that they serve. They also utilize some of the fleet. Too early to tell whether we're going to have any changes in fleet. I imagine that to be stable for the time being. With regard to opportunities, the Chief has already referred to this. We probably moved 10 to 15 years in the space, frankly, of a few weeks with regard to implementation of virtual proceedings. That has been both a blessing and somewhat of a challenge, as well. On the upside. And it's tough to look for silver landings and something that's been as catastrophic in our society as a pandemic. But from a business operations standpoint only, it really moved the ball forward for us. We had to engage in virtual proceedings in order to meet our statutory and constitutional mandates. The flip side is we did that on a network that wasn't prepared for the load. And, so, while it's gone, I give us a solid C plus. But due to challenges outside of our control. That's hearings dropping in the middle, freezing, connectivity challenges. Things you can imagine. And we did it over a network that we didn't prep for this. And we went, we pretty much flipped the switch in the space of less than a month. Which, of course, is driving part of our request. So, definitely an opportunity, though. And an improvement that we don't want to let go of. We've had the opportunity to discuss a little bit of this offline with some of you. But, if you're thinking about a geographically large jurisdiction and maybe a status conference that's going to take 20 or 30 minutes in a domestic relations case, why have someone drive in an hour, two hours? In some cases, some of our Districts are so large, three hours for a 30 minute event. We're also very cognizant that many of the people who are engaging in the court services are hourly employees. They're losing money when they come to us. So, this for us is an access to justice issue. We want to make sure that we have the network infrastructure to continue to support this. Not just what we have today, but that we can continue to grow to meet the citizens' needs. Flip side though, there are challenges that have come not just with the network. With regard to virtual proceedings, it is slower process-wise to run through a docket, and the Chief can provide some highlights on this. But it's not just slower, it's also more labor intensive. I've had the opportunity to work as support staff early in my career in the courts.

- 5 -

And you can run through a large sentencing docket with relative efficiency. One case is done. You call the next case. The person walks up. If they're not there, that's set aside. But boom, boom, there's a certain flow that happens. We've got to check for audio, connectivity. The folks who are engaging with us have a wide variety of technical facility, a wide variety of quality in sort of their own personal IT equipment. Some folks are on their phone, some folks are on a laptop, some folks are on a desktop, all kinds of things. It's not the end of the world. Justice is not intended necessarily to be an efficiency exercise. So, this is not a complaint. But it is not necessarily more efficient or less work for us to do proceedings virtually. So, that's one of the challenges we've faced. Any questions on the first common question before I move forward?

**Rep. McCluskie**

Seeing none, please proceed.

**Steven Vasconcellos**

Thank you, Madam Chair. If it's okay, Madam Chair, I'll just continue to roll through and just stop me whenever if that's all right?

**Rep. McCluskie**

We'll do that. Thank you.

**Steven Vasconcellos**

Thank you. The second common question asked us to identify the significant one-time federal funds from stimulus that the Department has received. There are several areas. One, under the Cares Act, we received approximately $350,000 for eviction legal defense grants under ARPA. And we received ARPA funds actually the via a mechanism, through two bills that the General Assembly passed, House Bill 1329 and Senate Bill 292. Both from last session. Under House Bill 1329, we received $1.5 million in eviction legal defense funds to grant out. Similarly, under Senate Bill 292, we received about three quarters of a million dollars in Family Violence Justice monies to grant out to organizations. Finally, through ARPA, we've received approximately $3 million for community-based victim services programs that pass through the Department to DAs offices via the VALE program. So, those are sort of the highlights of the one-time federal funds that we've received.

Moving on to question three. Senator Rankin you asked about the impact of recent legislation on the mix of misdemeanor and felony cases, and whether that mix is going to impact our operational needs, whether that's technology, problem solving, courts, language, access, et cetera. Every year, the General Assembly passes a large number of bills that has some either small or large impact on Branch operations. I'm only going to highlight a couple of key pieces of legislation. One that passed a couple of years ago and is already effective, one that passed last year and is not yet effective.

- 6 -

First, is House Bill 19-1263 which changed defense levels for controlled substance possession. It moved a number of felony drug charges down to misdemeanors. That was effective in March of 2020. The effective date of that bill, interestingly, and the start of the pandemic happened almost on top of each other. And I think it's fair to say, for the better part of a year, our world looked nothing like the last 25 years in terms of filings. It didn't matter whether it was criminal, civil, what have you. Everything just went topsy turvy. So, not to be evasive, but it is still a little hard to tell what's going on with the impact of that bill. When you look at the competing inputs of the policy change, the operational changes related to impact and, frankly, charging decisions that local district attorneys are coming with. They've had their own, I'm sure, staffing challenges, etc. So, we're not entirely clear yet. What we have seen is a drop in filing of felony drug cases. We have not seen a concomitant increase in misdemeanor drug filings. There has been some small increase, but not the same rate of the decrease in felonies. But, I think the story is still to be told there.

The other piece of legislation.

**Rep. McCluskie**
Representative Herod.

**Rep. Herod**
Thank you, Madam Chair. And do you have those exact numbers in the in the document you provided, or is that, one you can provide later?

**Rep. McCluskie**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. Representative Herod, the filing numbers. There's a historical trend line in the information that we provided to you. And, if you'd like to dig deeper into it, beyond what we've provided, we would be happy to.

**Rep. McCluskie**
Representative Herod.

**Rep. Herod**
Thank you, Madam Chair. I would like to dig a little bit deeper into that. And, I think it was interesting. This trend line is I think, very interesting. But when you mention that you have not seen the same level of misdemeanor filings correlated with the drop in the felony filings, it makes me wonder what's going on? Do you feel like the DAs are not filing based on issues with court processes? Or do you believe that they are maybe making other determinations as to why they're not actually filing these misdemeanor drug cases?

- 7 -

**Rep. McCluskie**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Representative Herod. In terms of some of the DAs' reasoning, I don't have access to.

**Rep. Herod**

Okay.

**Steven Vasconcellos**

We have not heard much in the way of complaints or concerns about court processes. We are not in a position where we feel. In fact, we've really tried to bend over backwards to make the courts accessible during these difficult times. And as the Chief mentioned earlier, we've received a lot of positive feedback about offering virtual proceedings. I don't perceive, at least at this point, that that's been the challenge. There may be other considerations that DA's have liberty to, that I don't.

**Rep. McCluskie**

Representative Herod.

**Rep. Herod**

Thank you, Madam Chair. I guess when I meant court processes, I was thinking about capacity issues. It sounds like that's not a challenge. It's interesting to me that the misdemeanor filings are down when drug deaths are up, quite frankly. And I'm just trying to get at the heart of why. You know, has there been a change in disposition from the DAs or needing more, offering more treatment options. Are they just not filing because they don't believe it's worth their time anymore? Just again, trying to see if there's any type of way that we can parse that out. Outside of the political but more of like the actual court processes. And then are we seeing that these cases are less successful in conviction? Is also something, possibly could be an issue here, as well. So, wanting to know if you have any data or anecdotal or otherwise that you can present us.

**Rep. McCluskie**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Representative Herod. We will not have a lot of data that is illuminating DA decision making, necessarily. And I imagine that Mr. Raines at the District Attorney's Council can probably give, I don't want to speak for him. But, I imagine he's got a good sense of the pulse of DAs statewide. And what those considerations are. If there's anything I can do to help facilitate a conversation along those lines, I'd be happy to. Again, I think our data really supports the operation of

- 8 -

the courts. So, we're going to know a lot about the charges, the disposition in the case, what the sentence was, if anything like that. Success in treatment, things of that nature. We'll have data along those lines. And I'd be happy to work closely with you and get you what we do have.

**Rep. McCluskie**

Representative Herod.

**Rep. Herod**

Thank you, Madam Chair. And I would love to chat with you about that and kind of dig in a little deeper. Thank you. And I think we also have some folks today, possibly with the Public Defender's Office, that might shed some light on this, as well. So, thank you so much. Chief Justice.

**Rep. Herod**

Chief Justice Boatright.

**Chief Justice Boatright**

I would just add, and Mr. Vasconcellos alluded to that. This started at the exact same time everything kind of got shut down in court. So, I don't know how much that contributed to it. But I will say that if, through this process of learning. If there's things that we can do better, we're certainly open to seeing what can be done. But I don't know that there's an easy, quick answer right now. Especially, with those two things intersecting at the same time.

**Rep. McCluskie**

Thank you. Mr. Vasconcellos, please proceed.

**Steven Vasconcellos**

Thank you, Madam Chair. Moving on to a question for Senator Moreno. You had asked about complexity of our caseload and impacts on Department resources. Of course, historically, caseload, a combination of caseload volume and the relative complexity of those cases are what drive our staffing needs. Covid has, and Chief Justice Boatright spoke about this earlier. Covid has changed our business engagement model pretty substantially. And we have not had an opportunity. It's important, but given everything else that's been going on, it just hasn't been able to be a top priority. Which is to say we haven't had a chance to update our workload models and do full-time and motion studies, as we would prefer. We've made some short-term adjustments to our modeling to try to account for Covid. But what's really called for here, and we were planning on starting on this in the next year. Are from scratch updates to our workload models to account for all the changes in Covid practices.

Moving on to another question from you, Senator Moreno. Number 5 about the Colorado WINS partnership, and sort of our feelings, since we're not necessarily subject to the WINS partnership. We feel pretty strongly that expanding total comp is critical to attracting and retaining the talent that we

- 9 -

need in state government. And we don't want to be in a situation where, depending on which branch of government you work for, you have a different set of benefits that are available to you. We did some outreach earlier with DPA, this week. And one of the things on our mind, that caught our eye, was the possible tuition benefits that are part of the WINS agreement, and that DPA is asking for funding for this year. According to the feedback we received from DPA, all state employees, regardless of branch, would have access to that educational reimbursement program. We're hoping that's the case. We need to see how that program develops. If, for some reason that's not the case, you could anticipate that we would likely approach the General Assembly, the Joint Budget Committee for parity in funding. We feel that's critical.

Moving on to Question 6. Senator Rankin, you had inquired about the oversight our IT team provides to or assistance that they provide to the independent agencies within the Judicial Branch. As we sit here today, we are only actively supporting one of the independent agencies, and that is the Independent Ethics Commission. It is literally a one-person shop, and we are able to support them very easily. The other independent agencies address their own IT needs. It has not been uncommon when a brand new independent agency is created that we provide sort of startup and gap-filling IT support for the first year to 18 months. And we've done that with several agencies over the last decade. But we usually, when we enter into an MOU, we usually have a limited time that we do that. And, as I mentioned, right now, it's only currently IEC. And we plan on supporting them long-term. Again, one person shop. It doesn't make sense necessarily for IEC to approach you for money for a vendor or what have you. They're in our Building. It's easy enough to support him.

**Rep. McCluskie**
Senator Rankin.

**Sen. Rankin**
Thank you. I think there's definitely some concerns behind the question. Security, privacy, you know, efficiency of resources in a time when it's really hard to find IT resources. So, maybe we can have the agencies comment when they give their presentation.

**Rep. McCluskie**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. I certainly would never speak for the other agencies. I would just say, if the proposal was for one of them to take over our IT, I might value our independence. So, for what it's worth.

Moving on to Question 7. Madam Chair, you had asked for an overview of the positions that have been hard to fill. And the challenges in recruitment based on what we've been able to put together, really hit

- 10 -

all levels of positions within the organization. That being said, our greatest concerns are around our two largest entry-level pools of employees. Our court judicial assistants, that Chief Justice Boatright referred to earlier, and probation officers. Those are our two largest employment classes. That's where, really, the meat and potatoes of the work of the Department gets done, frankly. By way of data, in the three years leading up to the pandemic, we received on average about 55 applications per posting. In the last six months, we are receiving on average, and this is all positions, not just the our two largest position types, our two most critical position types, in many ways, among support staff. But in the last six months, we were averaging 12. So, we are down from 55 to a dozen. And it is not uncommon. Of course, those being averages, just thinking from the perspective of what I have direct purview over and our Office at SCAO will get 5-6-7, single digit numbers sometimes. And need to repost because the applicant pool just isn't there. But when we focus, again, back on the direct services to the citizens that happen in the trial courts, that happen in probation, our salaries are not competitive. If you look at the salaries for a court judicial assistant, our starting salary is on par with what most fast food restaurant establishments are offering. And while I have done that work in my youth, and it has a stress of its own. I think it's different than asking someone to come in and meet the public's legal process needs to put on protection orders where people's life safety is at issue, to enter sentences to DOC. The work and the level of training, the level of responsibility is not on par, and we are not competitive. We are not even competitive in Colorado, within sort of the judicial community, if you compare us to say, municipal courts that are funded by the cities. You know, beyond salary, we've also mentioned total compensation, one of the areas that I think is sort of a silent filter on applications that prevent people from maybe even expressing interest in the Judicial Department is an issue like dependent care.

And I'll highlight child care, but that's only one component, of course, of dependent care. You know, DU did a study back in 2017 so this data is now five years old. And we've seen cost of living in Colorado explode in that time frame. So, it's probably even more pointed as we sit here today. But at that time, the cost of infant care was approximately $15,000. Using today's salary, that's about 40% of a starting CJA's salary. They can't afford to work for us. And I have no doubt, I have no doubt that there are a large number of thoughtful people who would love to take a path of public service, who simply can't afford to. And, so, we don't have an ask today related, you know, to dependent care. But it is a discussion that I'm hoping that we can keep going beyond just today's hearing. Because I think it's not just affecting the Judicial Department, but all branches of government.

**Rep. McCluskie**
Representative Herod.

**Rep. Herod**
Thank you, Madam Chair. We had an interesting conversation sometime recently. The days blur together. On the JBC about childcare, yesterday. And the state opportunities for funding to provide childcare in business facilities or where folks work, and it just makes me wonder if we're taking care of state departments, agencies and judicial first. So, I encourage you all to reach out to human services and

specifically the Division of Early Childhood, to see if there are opportunities to provide child care in in your courts statewide.

**Rep. McCluskie**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. It is a time for creativity. Representative Herod and I appreciate the referral. Thank you.

Moving on to Question 8. Senator Hansen, you had asked about the interrelationship between the Department's existing data systems. Particularly, some gaps that have been identified in data that may be of interest to the General Assembly in supporting policy. You know, of course, the number one primary reason for our data management system is it's an administrative support system to support the flow of cases through the courts. To support successful offender engagement for successful outcomes in probation. But in my 20 years at the State Court Administrator's Office, one of my first jobs was pulling data and responding to a lot of requests from the General Assembly. Something we do to this very day. And, so, of course, we are more than happy. We have a history of providing data. We anticipate and expect to provide data in the future. Sometimes we have something that you guys are interested in that we simply don't collect. But we are at a place with our data management system. It is 25 years old. Part of our request this year is a request for some planning money to look at what the next generation of our case management system would look like. By all accounts, I think we are at or near end of life. The programming language that it's programmed in, RPG, is difficult to procure. And, when you can, it's extraordinarily expensive. And, so, with that planning will necessarily come a rich and robust look at the type of data we collect. And, so, I think there's opportunities moving forward.

**Rep. McCluskie**
Senator Hansen.

**Sen. Hansen**
Thank you, Madam Chair. And, yeah, really appreciate that response. And as we take a fresh look at the IT systems that are needed, I think it's a great time to take a fresh look at the data needs and engage stakeholders of different issues and different points of view on what data is needed. So, this is the perfect time. And you're not the first part of the State that has a 25-year-old data system. But this refresh moment is a great chance to take on some of the data questions. So, thanks for doing that, and appreciate the long history of helping the General Assembly with those requests.

**Rep. McCluskie**
Mr. Vasconcellos.

- 12 -

**Steven Vasconcellos**

Thank you, Madam Chair. Moving on to Question 9. Senator Moreno, you had asked, How does our IT infrastructure request fit under ARPA? Our request for ARPA funds is based on a nexus between the impacts of Covid on our technology infrastructure and the available funds provided both by the state and local fiscal recovery funds that are part of ARPA and the revenue loss restoration cash fund that was created in Senate Bill 289 last year. The Federal Register provides some policy guidance to states on this matter. And I'll quote here, "The use of federal fiscal recovery funds can be used for the provision of government services, including modernization of cybersecurity, including hardware, software, and protection of critical infrastructure." And it's really that infrastructure component that we're honing in on with our request. And the Federal Register added with emphasis, "Recipients should have broad latitude for these IT needs under ARPA." So, we feel this is not a terribly provocative request, frankly. As we mentioned, we made some pretty substantial business operational changes. Largely catalyzed, not even largely. Catalyzed, by Covid period. We would not have made the progress to virtual proceedings that we have made today without Covid. And, so, we really feel this is an in-the-pocket request under ARPA.

Moving on to Question number 10, Mr. Kemm from JBC Staff asked us to comment on the IT issue brief and the IT requests, in general. I'll go through this relatively quick, because I'm going to start to sound a little bit like a broken record. Covid, of course, resulted in a massive transformation and how we do business. Our $33 million in infrastructure and staff requests cover upgrades and improvements to our infrastructure and staffing that we need to sustain stably the changes that we've made. We have critical staffing needs around the state for AV support, IT, desktop support, network engineers. We don't want to see an erosion of the gains that we've made in virtual proceedings and other operational changes catalyzed by Covid due to a network that can't stand up to it and insufficient staff to support the day-to-day needs. The Chief referred to it in his opening but not just these, IT staff, but every single component of the State Court Administrator's Office request is what I think of as sort of plumbing and electric. This is stuff that supports the day-to-day success, the day-to-day operations of trial courts and probation. This is not, I mean policy initiatives are important. The General Assembly occasionally passes initiatives that they want us to own and take forward. This is about keeping the lights on and having a justice system that is fully accessible to the citizens of Colorado. That's every component of this request, not just IT.

**Rep. McCluskie**

Chief Justice Boatright.

**Chief Justice Boatright**

Two things that I'd like to add to that. Number one is probation also has changed how they do business. And I don't want to underestimate the value of being able to communicate with clients virtually, and not having them come in and miss work. They're able to do some of their treatments and therapy virtually. And we'd like to continue to do that. Because I think we're seeing that that's being very successful. And, as to the last point, Mr. Vasconcellos said, as I alluded to earlier. I'm an old trial court guy, and trial courts have always been sort of my primary focus. And, so, when we began discussing what we were

- 13 -

asking for here, it felt very State Court Administrator heavy to me. And, so, we partnered with and this has been, again, been one of the benefits of the transformation we've made over the last couple years with our Chief Probation Officers, our Court Executives and our Chief Judges. And they uniformly support this. Our trial court staff and judges support this request because they said we need this to do our job. And to me, that was the biggest selling point in us going forward with this. You know, getting contracts done, so that services can be provided. Getting HR work done, so people can get hired, etc, etc. Uniformly, they were in support of that. And to me, that was a big selling point.

**Rep. McCluskie**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Moving on to Question 11. Representative Herod, you had asked us a fairly in depth question about the Bridges adult diversion and problem solving court programs within the Department. Ranging from their availability to felony and misdemeanor cases. How the programs are adapting to the needs of unhoused individuals, the severely mentally ill, etc. I'll try to hit some high points. Please feel free to guide me into what you're most interested in. In terms of type and level of offense.

Generally, none of these programs limit on offense level. There are some statutory limitations currently with Bridges and the adult diversion program. Mostly very high-level felonies. But, generally speaking, there aren't severe limitations based on type and level of offense. You will see both folks charged with felonies and misdemeanors in these programs. Moving on to the challenge of the unhoused. Lack of stable housing is one of the most critical challenges to success in these programs, and one of the most critical challenges that our staff out in the Judicial Districts are trying to work through. Of course, if folks don't have stable housing, they don't have that most basic human need met, we can't really expect them to be successful in treatment or other provisions of their sentence. Demand is exceeding availability. The housing market in Colorado is extraordinarily aggressive. We have staff, frankly, out hustling every day trying to find solutions, creative solutions, to get folks into temporary, transitional housing, long term housing, etc. It is not merely a matter of funding, although more funding is always appreciated, availability is an enormous, enormous challenge. No one is barred from participation in these programs based on their housing status. But sometimes as far as we can get with a participant in one of these programs is just working on their housing needs. Because, again, until that's stabilized, we really can't go much further. With regard to folks with severe behavioral health needs. For the Bridges Program, that is its statutory reason to be. So, our Bridges liaisons and the work they do connecting offenders to behavioral health services, the case planning and case management work that they do. That's the statutory reason for Bridges to be. Similarly, with adult diversion and problem-solving courts, while behavioral health challenges aren't the reason those programs exist, they are postured to deal with those. Because the majority of our felony cases, defendants have some combination of substance abuse or behavioral health challenges. And, so, if we're not addressing those, we're just setting up ourselves for

- 14 -

recidivism and a revolving door. But, again, availability of treatment. So, Covid has been also a good catalyst to kick us in the rear to pursue telehealth. That has been great. Challenges. There's still a limited pool of providers. So, you know, telehealth has in some ways, created opportunity. It's also put greater pressure on the treatment community. Because there are more opportunities for out of community treatment opportunities. So, definitely a challenge there. In terms of the adequacy of the funding request. This is really. The funding request related to these programs are really to get us back to where we were prior to the budget reductions. And, so, this is not going to solve everything. And frankly, even if we came to you today with a substantial increase. The courts by themselves cannot unilaterally solve all these challenges. It will be a multisystem effort, a multi system partnership in order to address these issues adequately.

**Rep. McCluskie**
Representative Herod.

**Rep. Herod**
Thank you, Madam Chair. And thank you for this very thorough write up. It's extremely helpful. I think, just to get us to some of the higher-level points here. Something that's jumped out at me was the workload model shows the need for 7.9 FTE coordinator positions in the Bridges Program. But that wasn't included in the restoration request. Just to pick that as an example. To parse out a little bit. Is it because. I mean, would you, if you had those FTEs, would you be able to fill them? And is treatment available in the community for the Bridges Program to continue to be successful if you're operating at that capacity?

**Rep. McCluskie**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. Representative, of the two, I would be more concerned about the availability of treatment. Yes, hiring is hard. However, we are able to get there. It's taking longer. It is more difficult. It's more time-consuming, but we're able to get there. Of the two, I am more concerned about the availability of treatment in the community.

**Rep. McCluskie**
Representative Herod.

**Rep. Herod**
Okay, great. So, to be clear, if you were to get those positions, you would need more community placement options for the program to be successful and for those coordinator positions to actually be able to coordinate to something?

**Rep. McCluskie**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. I think for optimum success, yes. Do I think they would have no impact? No, I don't know that. It wouldn't be throwing money away. But I think for optimum success, we need more in the community, more treatment in the community. And we did not. We made a conscious decision. I can't really fathom the challenge of the decision making that the JBC has to engage in. Every single agency has needs beyond what they present in their budget request every year. Just our own internal discussion. I say that because even our own internal to the Department discussions are really challenging to identify. What are we going to go for? Because there are, there are meritorious things that are always left behind. We're trying to be respectful of an amount of growth that's sustainable. The economy is not entirely stable and entirely out of the woods. So, no, we did not request additional staffing for Bridges. And ultimately, while it is important, we were again focusing on some really, really core positions that we felt would help our most basic operations. This is really a plumbing and electric kind of request, this year.

**Rep. McCluskie**

Representative Herod.

**Rep. Herod**

Thank you, Madam Chair. And I think we appreciate that as a JBC. But as we look to some of these additional dollars coming to the State, and what we need to meet some of the challenges right now. Obviously, you live or at least work in Denver, so you see what's going on right here in the area, and having more options. Treatment options is something that our mental behavioral health task force is looking at, and there will be an infusion of more resources into our communities. I want to make sure that people have access to those programs, especially those who are in the courts. And, so, it seems to me like there might be an opportunity here, in partnership with the work that they're doing. To provide more folks who can do the case management and the coordination to those treatment beds that will be available in our communities. But, then, it also shows me that we actually have to charge people to get into these programs. Is that accurate? So, these aren't these aren't diversion programs. You have to have a felony or misdemeanor charge to get into these programs. And if the misdemeanor charges are down, people aren't getting into these programs, either.

**Rep. McCluskie**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Representative Herod, generally speaking, yes, I agree with you. These are all programs that take place post-filing. You know, Bridges. Participation in problem solving courts, for

example, in Colorado, are primarily post sentencing, even. And, so, the adult diversion program is a diversionary program, but it is post-filing. So, charges have already been filed. Now they could be dismissed as part of your diversionary agreement, if one is successful. But this is post criminal justice system involvement.

**Rep. McCluskie**
Please proceed.

**Steven Vasconcellos**
Thank you. Madam Chair. Question Number 12 came from representative Benevides. She inquired whether we were eliminating the mental health diversion program and what the plan for use for additional diversionary funding was. Our decision item request for the adult diversion program would actually expand, not reduce diversion participation and access to behavioral health interventions. The adult diversion. What we're choosing to do so during. Let me back up, sorry. During the budget reductions, programmatic funding for both the mental health diversion program and the adult diversion program were essentially reduced to zero. We're focusing the recovery request exclusively on the adult diversion program, and we're doing that because that program has the flexibility, not just to grow back to its size, but also to take on the participants that would have been eligible for the mental health diversion program. There's some statutory benefits, frankly, to the adult diversion program, and they really run to program flexibility. Whether that's more flexibility in the kind of charges that can be accepted in the program. More flexibility in the length of stay for the participant to support stable recovery in the program. There's just frankly, more flexibility in statute under the adult diversion program. So, we're focusing the recovery on that program and being able to subsume, essentially, participants who would have otherwise been in the mental health diversion program. Representative Herod, you had asked us about Question Number 13, with regard to our problem solving with court funding requests around accessibility, equitable accessibility, to problem solving courts and our use of funding. I suppose it goes without saying, but equitable access to problem solving court programs is a high priority for the Judicial Department. And we have work to do. We are not there yet. We have active work to do. Our statewide Problem-Solving Court Advisory Committee, which is made up of judges, staff, treatment providers, district attorneys, and defense counsel from around the State are leading this effort. Our team at the State Court Administrator's Office is working closely with the committee to create meaningful change around equitable access and problem-solving courts. Right now, we're working on building a foundation for success that includes some of the following elements. One, maybe most importantly and most impactful right now, is the creation of an equity court pilot program that is only active in two districts right now, the 5th Judicial District along the I-70 corridor, and here in Denver. But the goal is to provide resources, education, and expertise to remove all barriers for participation including language ADA accommodations. I mean, we just want full equity and opportunity for access to these programs. The hope is to expand this pilot to nine jurisdictions in the near term and then spread it statewide based on lessons learned after that. We need better data. Data alone doesn't solve problems, but we need better data on equity and accessibility. So that programs can have a clear-eyed view of the state of their

- 17 -

program. So, they know what problems they're addressing in their particular locality. And then, we want to follow up with educational tools to address those identified gaps. We're also looking at reforming our problem-solving court accreditation criteria so that equity is a more clear priority.

Moving on to Question 14. That also came from Representative Benevides regarding the responsibilities and scope of the training positions that were requested. And I think there was a discussion among the committee about how is training provided to staff in the Judicial Department? And I can tell you that the overwhelming majority of job training, the training on how to do the work for court staff, for probation staff, and for judges, is provided in-house. We do farm some specific topics out, specialized topics out, but the actual job-related training is all done in-house, and this request would expand our capacity. We did lose capacity for training, both for judges and staff, via the budget cuts. And, so, we're trying to get back all of that. And, frankly, grow a little. Investing in education, in the bench, in our support staff, in probation. And our support staff and the trial courts is a very high priority. Right now, our ratios of staff to trainers are well over 200 staff per trainer. Both on the court and probation side. This doesn't mean folks never get training. It does mean sometimes they wait an awful long time to do it and have a little bit of a trial by fire when they start their jobs. And it's really not the way we should be doing things.

**Rep. McCluskie**
Mr. Vasconcelos, what is a long period of time before they get the training?

**Steven Vasconcellos**
Thank you, Madam Chair. So, most annoyingly, it depends. And it may look different depending on your geographic region. Upside, we are using a number of training modalities. We are not simply driving 30,000 miles around the state to provide training. We've used the opportunities provided by Covid to really expand. We were doing virtual trainings prior to Covid, that curriculum has exploded since. But what we found to be most successful is a virtual training curriculum that is based on solid in-person training. There are some areas of court process, there are some areas of offender management that really are best trained in person. So, what's that right mix of in-person training, one-on-one training and virtual training? We're using all modalities right now. Thank you so much. Somebody knows I get dry mouth. And Madam Chair, I possibly talk too much. Anyway, what could happen, pragmatically is you receive local training to get started. And that's still valuable, and there's always a place for that. So, I have no intention of demeaning that. But that's working on the job training to get you through. To get the solid, strong foundation you need in the work of a CJA, in the work of a probation officer. You need to engage with our with our training unit. And when we're at plus 200 per staff person, we can't hit all the Districts with the kind of frequency that we would really like to and that they're requesting from us. I mean, this isn't just our assessment. This is almost weekly calls to my Office. What can we do? What can we do? What can we do? So, we have a request to try to address that.

- 18 -

**Rep. McCluskie**

Thank you. Glad to hear that virtual training is being utilized. And if it's exploded, then obviously it is a valuable path. Please proceed.

**Steven Vasconcellos**

Thank you, Madam Chair. And the other thing I'd point out just briefly in wrapping that question up. Is the curriculum maintenance. I think one of the challenges we've also had with the size of our team is you get curriculum created, you take a loop of the State, or you distribute the training virtually. Department policy changes, statute changes, case law changes. We need to change training. Curriculum maintenance takes a tremendous amount of time, and we are probably, more than probably, not doing the best job on that side, as well. And additional staff will help there. Moving on to Question 15. Senator Moreno, you had asked about the process for allocating VALE. I will keep this at a very high level if you'd like to delve deeper. We've brought our Director of Financial Services, and we're also happy to speak longer offline, but we consulted with DCJ staff and VALE program administrators, as required by Senate Bill 292, from last year. Our office allocated funds based on the DCJ created model. 5 of our 22 Districts rejected, declined funding. So, that money was put back in the pool and those funds were successfully redistributed equitably among the remaining districts, DCJ staff and VALE program administrators have received final notice of allocations as of the end of August. Most of the local VALE programs operate on a calendar year basis instead of a fiscal year. So, the majority of funds will be spent between January and June of next calendar year.

**Rep. McCluskie**

Mr. Vice Chair.

**Sen. Moreno**

Thank you, Madam Chair. And thank you for this information. This is one of the areas where folks have said that support for programming was really impacted by the reduction in court fines and fees. I guess I'd be interested in just broadly, if the Department could follow up with information about how those fines and fees have been affected by the pandemic, where the shortfalls are. That would be really useful information for the committee.

**Rep. McCluskie**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Senator Moreno., we would be happy to provide that information. I do have a eye on the clock, Madam Chair. We just have a handful of questions. I will proceed briskly.

**Rep. McCluskie**

Please continue. Thank you.

- 19 -

**Steven Vasconcellos**

Question 16, you had asked, Madam Chair, to describe our implementation of House Bill 21-1280. Which is the 48-hour hearing bill. And, specifically, why both weekend days are implicated under that bill. You might remember that there are really two pathways that a Judicial District can take under that legislation. One, a Judicial District can choose to handle those weekend bond hearings themselves, locally. Additionally, there's an option to be part of a regional bond hearing office. There are two regional bond hearing offices. We roughly split the state in half, east and west. 40 of the 64 counties in our Judicial Districts elected to be in the regional offices and have the regional bond hearing officers address those. With 40 counties and a majority of Judicial Districts involved, there's simply logistically, cannot be done in one day. While giving adequate time, for example, defense counsel to have access to their clients in advance of the hearings. Without the court having adequate time to prepare. So, this is as much a function of popularity and logistics related to the regional bond hearing offices as anything else. I can assure you that no Judicial District is split across both days. So, for example, the 5th Judicial District, I believe, is in your representation. They're not split on Saturday and Sunday. All Judicial Districts, all counties of a single Judicial District are in a single day to help provide continuity and reduce challenge for the District Attorney's Office and for the Regional Public Defender's Offices.

**Rep. McCluskie**

Mr. Vasconcellos, the 40 out of 64. Are those primarily rural, smaller and rural? Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair, they are. There are two larger urban districts, not our largest, but in the 8th Judicial District, which is Larimer County and Jackson as well, elected to go into the bond hearing office program. As did the 21st Judicial District, Mesa County. And they are certainly not our largest jurisdictions, but by no means, from an operational standpoint, do we consider them rural. They are good size jurisdictions.

**Rep. McCluskie**

Thank you. Does that impact volume? Just the size of those two. Is that part of what's playing out here? Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Somewhat, but I'm pretty confident, having talked at length with program staff and been involved in several of these planning meetings for the implementation. I mean, this is a generational shift in operations, frankly. Only a couple of our locations were doing weekend bond hearings. We're happy to implement this, but it is a substantial, substantial shift. So, I've been personally attending many of the planning sessions. Even if we removed Larimer, even if we removed Mesa, we'd still be across two days. The overwhelming, I think. With the exception of two rural jurisdictions, all of our rural just jurisdictions jumped in with both feet to the regional bond hearing offices. There's enough volume from those alone to require two days.

- 20 -

**Rep. McCluskie**

Thank you. If there are additional learnings, experiences that inform how this evolves, I'd love to learn more about that and what your needs may be. Please proceed.

**Steven Vasconcellos**

Thank you, Madam Chair. Moving on to Question 17. Representative Herod, you had asked for some information related to cash fund usages within our budget request. I will candidly admit, I think our written response doesn't quite hit the mark. Hopefully, what I covered today in the hearing, we'll get a little closer. And again, we're happy to follow up offline as well. But you'd asked about, you know, cash funds related to our request. Balances, reserves, the plans, etc. Only one of our requests is seeking additional cash fund spending authority, and that is part of our IT request. We're seeking additional spending authority out of the Information Technology Cash Fund. It is Decision Item Request Number 2, $1.1 million of the $1.9 million request for 16 FTE would be funded out of that cash fund source. In addition, ongoing costs associated with Decision Item Number 2, the Department is projected to spend down some of that cash fund. Those associated costs include security, rising software service fees, and hardware replacement costs. Last, and I've already mentioned the possible funding for planning for a new case management system, as well. But again, Representative Herod, if we're not hitting the mark on what you're looking for there, I'd be happy to meet with you and provide additional information.

**Rep. McCluskie**

Representative Herod.

**Rep. Herod**

Thank you, Madam Chair. This is good information to start with. I think as I have questions about certain cash funds, I'm happy to direct them to you and have conversation. But this is the chart that I'm looking for. So, thank you for that. And, hopefully I can probably dig into some of this from other departments as well. But this is very helpful, and I appreciate you pulling that together. Thank you.

**Rep. McCluskie**

Mr. Vice Chair

**Sen. Moreno**

Thank you, Madam Chair. And I also appreciated this chart. I think it's great to get an idea of what the revenues and the expenditures are. But just tying back to my earlier question, I know the Department's going to follow up with this information. I am particularly interested in that revenue side and how that has been impacted by the pandemic.

**Rep. McCluskie**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Down to our last couple of questions. Senator Moreno, on Question 18. You had asked us about recommendations to improve data sharing between Judicial, DOC, and DCJ. I'm always happy data is, sadly, maybe near and dear to my heart. And, frankly, we're always open to the opportunity to expand data sharing. My sense of the situation right now is we have a very strong partnership with both DOC and DCJ on data sharing. Felony sentences to corrections are shared with DOC via CJIS in real time. We share other data elements with DOC via CJIS in real time. The Judicial Department and the Department of Public Safety recently renewed an MOU that allows DCJ to access our data directly without having to filter or ask a staff person. They have direct database access to our case management system to support policy research, to support the annual recidivism study. And, so, we again feel that our relationship is very strong there. If there is a particular deficit that is of concern, we're happy to address that. One final thing on this note I'd like to identify, and that is the Department recently has entered into an agreement with the linked information network of Colorado, which is a collaboration between the Governor's Office of Information Technology and the Colorado Evaluation Action Lab at DU. The link provides a streamlined, secure process to research complex policy initiatives. This gets beyond, this allows for a deeper dive, a deeper dig into the data for some of the policy interests that Senator Hansen referred to in an earlier question. So, I think this is another demonstration of our commitment to data sharing.

Moving on to Question 19. Senator Rankin, you and Senator Hansen had asked about competency data, drivers of that data. We've provided information in our packet on the number of court orders coming from each Judicial District. We're not finding, frankly, that either a single location or a single judge or group of judges are disproportionately driving the number of competency evaluations. Chief?

**Rep. McCluskie**

Chief Justice Boatright.

**Chief Justice Boatright**

Thank you, Madam Chair. What I would say on this is the numbers that we are seeing that I think tells us that these competency evals are being requested in good faith. When you look at the number of the competency evaluations and the number of restoration services. It shows that no one's getting restoration services unless they were found to be incompetent. So, if you had a really high competency request and a really low restoration you would see there was a lot of maybe unnecessary or frivolous requests. And it's not going to be 80 or 90%. But the numbers are fairly consistent across every District. So, there's nothing in terms of the data that jumps out. And what I can tell you is, and this is going back to my, you know, 17 years is either a DA or being in the trial court. Is, these are largely requested by defense counsel, and that is not any type of a criticism. But they're the people who are working directly with the defendants and have the best information. But we're not seeing anything in the data to show that that is frivolous or unnecessarily being requested across the board. In terms of why, that's a really complex question. I think some of it, frankly, is that we have some additional representation of defendants. And I

think that's a sign that we were having some people with mental health issues that were skating through and we were missing. And what I would say is very, very rarely does a court just on its own request a competency evaluation. The only time I've ever seen that is when the person is going pro se, meaning unrepresented, and the judge is having to deal with them one on one. And they can see that maybe those mental health issues are affecting even their decision to go pro se. But the judges have very little discretion. If there's a request, typically, the court has to grant that. But again, I want to make it clear that we're not seeing anything that's being done for delay or frivolous in terms of these.

**Rep. McCluskie**
Senator Rankin.

**Sen. Rankin**
I'm just, I'm forgetting what. We had some statute that changed the representation requirement. And does that, and you mentioned that. Does that correlate with the increase?

**Rep. McCluskie**
Chief Justice Boatright.

**Chief Justice Boatright**
Thank you, Madam Chair.

**Rep. McCluskie**
Sorry.

**Chief Justice Boatright**
No, no, I apologize. I don't think that's the single driving factor, by any means. I think that that is a factor. But I think the complexities, the lack of safety nets, the amount of mentally ill people. I just think that we end up being as a judicial system, sort of the stopping point. The catch all at the end of the day, where people with mental health needs end up. But I think that's a really complex question, and I don't think, by any means, that's the single, or, probably, even the most significant driving factor. But it is a factor.

**Rep. McCluskie**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. Moving on to Question 20. Representative Ransom, you had also asked several questions about competency. I believe the Chief's and my earlier remarks largely cover that. Unless you have some additional follow up, I'll move on. Thank you, Representative.

- 23 -

And, then, Madam Chair, our final Question, number 21. You had asked about, for some information on offense levels compared to competency requests. And I would say, not a lot of shock, frankly, in that data. Half of the requests, alone, are driven by felony charges. Another 30% by misdemeanor charges. Our more serious offenses drive the majority of competency requests. The remaining 20% are made up of the drug felonies, the misdemeanor drug cases, and petty offenses.

**Rep. McCluskie**

Thank you, members. Any final questions? Seeing none. I am reflecting on the word tsunami, which I remember hearing from one of our Chief Judges about the backlog of cases. To your earlier comments, Chief Justice Boatright. Thank you. Thank you all for your tremendous work over the last 20 months. And, obviously, it has been a burden. But you've worked through the challenges in a very admirable way. So, thank you.

**Steven Vasconcellos**

Thank you. Thank you, Madam Chair. Thank you, committee.

# Appendix 27(j)

**Transcript of *Hearing before the J. Judiciary Comm.*, Colo. Leg., January 25, 2022 (SMART Act Presentations by Colo. Jud. Dep't and Colo. Comm. Jud. Discipline);**

# Joint Judiciary Committee—January 25, 2022 SMART Act Hearing: Colorado Judicial Department and Colorado Commission on Judicial Discipline

**Steven Vasconcellos**

Mr. Chair, we need a couple of minutes to set up. If that's okay.

**Rep. Weissman**

Okay, sure. Yeah, if you need to get a PowerPoint over here, hopefully our IT, staff can facilitate that. Okay, looks like we have overcome the glitches in the matrix. Mr. Chief Justice, Mr. Vasconcellos, whoever would like to commence.

**Chief Justice Boatright**

Well, thank you. Now that we've created an air of suspense. I'll start. I want to introduce myself. I'm Brian Boatright. For the past year I've had the privilege of being the Chief Justice.

**Rep. Weissman**

I'm sorry, Mr. Chief Justice, if you could just maybe pull the mic a little bit closer so everybody can hear. Thank you. Please go ahead.

**Chief Justice Boatright**

I'll introduce myself. I'm Brian Boatright. For the past year, I've had the privilege of being the Chief Justice of the Colorado Supreme Court. To my right is Steven Vasconcellos, our State Court Administrator. And he has been in that position since 2019. And appearing remotely is Justice Monica Marquez. I was hoping to have Justice Marquez sit with us at table, but unfortunately, she has a family member who has taken ill, and, you know, to err on the side of caution, she's going to appear virtually. But I'm going to ask Justice Marquez to participate, because one of the things I want to talk about, that I think we're really quite proud of, is our diversification efforts on the bench. And Justice Marquez, quite frankly, has been a champion in that area. We have a number of areas that we want to get into. We want to talk about diversifying the bench, the pandemic impacts. We want to talk about our budget request, legislative agenda, and then the required reporting for the SMART Act. Just as a broad overview, the Colorado Judicial Branch covers the entire State. There's 22 Judicial Districts, soon to be 23. We have courthouses in all 64 counties, and we have 3,580 approximate court and probation staff. And when you add that with 337 judges and justices, we have approximately 4,000 employees in the Branch. And when you talk about having 337 judges, it's a group that's diversifying. And with that, I'm going to turn it over to Justice Marquez to talk briefly about our outreach program and our diversification efforts.

- 1 -

**Rep. Weissman**

Okay, Justice, please go ahead.


**Justice Marquez**

Thank you, Chief Justice Boatright. Thank you, Mr. Chair. And thank you all for the opportunity to appear remotely today. I appreciate it. Of course, it's critical that the public has confidence in our Judiciary. We derive our legitimacy from public confidence in and respect for the decisions that we render. And, so, when our courts reflect the diversity of the communities that we serve, it strengthens public perception that that Justice is, in fact, truly equal for all. We thank again, the General Assembly for the 2019 legislation that created the full-time position within SCAO that is responsible for education and outreach regarding judicial vacancies and the judicial application process. Sumi Lee, who is our head of judicial diversity outreach, began her work in February 2020. And to our knowledge, Colorado is actually the first state in the nation to have a position of this kind embedded within its judicial department. Colorado has become a leader nationally in these efforts. So much so that I was invited to testify before Congress last summer on Colorado's efforts and our work in this area.

This particular slide here captures some of the demographic data about the judges that have been appointed since that judicial outreach program began in February of 2020. Obviously, at the end of the day, it's the Governor who makes these appointments. But Ms. Lee's work has helped us consolidate and systematize what have been previously ad hoc volunteer efforts by a number of judges who happen to be passionate about this work. So, what Ms. Lee has done is collected and centralized this key data. She's fostered community partnerships. She has developed robust educational and outreach, pardon me, outreach programming. And all this has resulted, thankfully, in a wonderful increase in highly qualified, diverse applicants who have in fact, been appointed to the bench. This slide, at its nub, shows that of the 57 judges that have been appointed in that time, they roughly represent the diversity of Colorado's population.

And, in particular, we saw a number of black judges appointed. Turning to the next slide quickly, I'd like to highlight just a couple of things. In 2018, due to some retirements, we were faced with a prospect of having literally zero black District Court judges in the State. And now, here at the beginning of 2022, we have 12 black state court judges. Fifteen, if you count Denver County Court. During this time, we've had our first black County Court judge in Adams County, our first black District Court judge in Boulder, and right now we have the largest number of black judges serving at one time in the history of the State. Clearly, we still have work to do. Our Latino judge population continues to lag significantly behind the general population in Colorado.

But, what does that mean? That means part of this is a pipeline issue. We don't pull our judges from off the street. We pull them from our attorney ranks. And our attorney ranks themselves do not reflect the diversity of our general population. So, with that pipeline issue in mind, we've launched some pipeline efforts. We are partnering with the Center for Legal Inclusiveness to pilot a Dream Team 2.0 project.

This is a six-month intensive coaching program that pairs qualified, diverse judicial applicants with coaches to prepare them for this process, the application and interview process. We have this wildly popular Java with Judges program that pairs current law students with judges all across the State in virtual coffee house settings for informal conversation. And we also have our Lorenzo Marquez Scholars Program, which is named after my father. He was the first Latino judge on the Colorado Court of Appeals. And this externship program pairs law students with judges and justices in our appellate court system to learn a little bit more about the writing and research process.

And then finally, what I'd like to just say is we're not only interested in bringing diverse judges into the state court system, but making sure that the judges who are there feel supported and can thrive. We have two programs that are working to do that. One is our peer-to-peer coaching program led by Chief Judge Gilbert Roman, and then the second is a recently launched program called Chambers Chat. This is a virtual meeting session for our diverse judges to just brainstorm solutions to everyday work problems that they're experiencing. So again, thank you for this legislation. It's really making a difference, and I'll pass this back.

**Rep. Weissman**
Okay Justice Marquez, thank you. Whoever would like to continue.

**Chief Justice Boatright**
Thank you. The next slide will show that in the fiscal year 20 and 2021, I think it's corrected now. We had over a half million cases filed in the in the courts. I think that most of the time we focus on the criminal cases. That was 154,000 cases. But we also had 190,000 civil cases, 32,000 domestic, and 18,000 probate. The other thing that is important with regard to our workload is currently, our probation officers are supervising approximately 68,000 probationers at the current time. And we'll talk a little bit more later about the cost effectiveness of that. But one of the things that I want to give a shout out to our trial courts. You can see with this volume, we just didn't have the luxury of just stopping business. We had to stay open. We're an essential business and we were able to maintain. We did have a shutdown of jury trials, but we've worked forward, and I want to make sure that I pat all of our trial court staff and our probation officers in particular, who I think get overlooked by this, for their hard work and dedication over the past year. They've done extraordinary work. And we'll talk about one statistic, I think that is really important later on. And that is despite the fact that we've gone and had to pivot to some virtual things and do things during the pandemic, our success rate with regard to our probationers, has not decreased at all. And I think that's a tribute to our probation officers. And I'm extremely proud of all of them.

The Colorado Supreme Court, as you know, is a seven-member panel. We are the administrative head of the Branch. As a court, we appoint the State Court Administrator, which we did with Steven Vasconcellos back in 2019. And I think one of the things that gets overlooked is that, other than our

head of probation and our IT department, our entire leadership program has changed since 2019. And, so, that includes State Court Administrators, as well as a number of heads, as well as the Chief Justice.

One of the things I also would like to tout is that I am very proud of our merit selection system. We currently have four former trial judges on the Supreme Court. But what's significant about that is, of the four, three of the Justices were appointed by a Republican to the District Court and a Democrat to the Supreme Court. And I don't think that you would find that record on the federal court in that type of numbers.

I would also say that in our time, since 2018 and 2019 our Court has learned a number of valuable lessons. I think we recognized in in late 2018, when we were going through the hiring process for Mr. Vasconcellos, that there was a lot of dysfunction in the State Court Administrator's Office. And we began some changes under former Chief Justice Coats. You can see we updated personnel rules. We updated our purchasing fiscal rules. That also was a result of an audit report that frankly showed that we had a number of deficiencies, including a real lack in our HR Department of any type of real record keeping. The other thing that I would say is one of the big changes that we made as a Court was we kind of changed how we did business. I started in 2011. Justice Marquez started in 2010. And I think we both would attest to the fact that the Chief Justice handled all of the administrative responsibilities, and it was just basically a report out to the other Justices on a need-to-know basis. And the theory of it basically was that if anything should come up to the Court in our role as judicial officers, that we would be able to maintain that type of separation. But we found that that's not an effective way to lead a Branch of nearly 4,000 people. And, so, we changed significantly the way we administer our responsibilities. And we got directly involved with a number of the operations within the Court. And I won't go through all of them. But each one of the Justices has been assigned to a different part of the Judicial Branch. For example, we have a Justice assigned to the HR Committee. We have a Justice assigned to the Clerks of Court. One to the Court Execs. One to the Probation Department. And what we came to the conclusion of was that that 14 sets of eyes and ears was much better than two sets of eyes and ears. And we learned that there are more opportunities for the employees at the State Court Administrators Office, in the field, to have a direct line of communication with the Court. And I don't know if Justice Marquez, being the senior member, wants to comment any further on that.

**Rep. Weissman**
Justice Marquez, please go ahead if you'd like.

**Justice Marquez**
Thank you, Mr. Chair. I would just echo what the Chief has shared. I would say that the overall structure of the way we communicate vis-a-vis SCAO and the field has changed completely. I think that it has been a vast improvement. And I think that we now provide multiple ways for folks at SCAO and in the field to have a direct link of communication with the Supreme Court. So, I think it's been a very good improvement.

- 4 -

**Rep. Weissman**

Okay, thank you. Please go ahead.

**Chief Justice Boatright**

Mr. Chair. Okay, I want to give a report on an update in an investigation. If you recall, at the State of my Judiciary speech last February, we called for an independent investigation into the allegations that were put into the paper. And in so doing, we asked an 8-member member panel of the Legislature and Executive Branch to meet to select our vendors, to maintain the independence of those vendors. It was a long process, but in August of 2021 the panel made recommendation to vendors, and I will say that they did exactly what we hoped. They vetted a number of really qualified applicants that had put in for this and selected two excellent investigators. And they bifurcated how they're doing the investigation. We have one group called ILG that is to investigate the allegations of workplace culture. And we have one group called RCT that has been hired to investigate the leadership contract procurement process that went through. The other investigation that I'd like to comment on is, we called for, through Chief Justice Coats, requested an investigation of an allegation of workplace fraud based on an anonymous letter back in 2019. And we had the option of investigating that internally. Chief Justice Coats felt that it was better to have an outside set of eyes on that. And we asked the Auditor to conduct that investigation. And after the allegations of the leadership contract was made public, Chief Justice Coats also asked the State Court Administrator to investigate that. That has been ongoing. We're hopeful that we will get the audit report at some time in the near future. But, obviously, that's something that we don't directly control. The contract with the ILG group is for six months, I believe. And work for RCT is five months. And Mr. Vasconcellos can correct me if I'm wrong about that.

**Rep. Weissman**

Mr. Vasconcellos.

**Steven Vasconcellos**

I would just reverse those. Mr. Chair. It is a six-month time period for the investigation of the procurement of the leadership contract with RCT. It is a five-month time period, contractually, with ILG for the other investigation.

**Chief Justice Boatright**

May I resume?

**Rep. Weissman**

Sure, please go ahead.

**Chief Justice Boatright**

And I would just say that both of them, because they didn't know what entirely they were contracting for, there are provisions in the contract for extensions. Justice Marquez, do you want to comment on?

- 5 -

And part of the reason I asked Justice Marquez to participate with me here, is because I want to demonstrate that we have a long-term commitment to resolving any issues that might be uncovered by this. As I indicated in the State of the Judiciary speech, we have also gone to term limits with regard to our Chief Justice. We haven't set an exact term for my initial term. It's going to be somewhere around three years, depending on how things work. But Justice Marquez has been identified as the follow up, or the next Chief Justice. And, so, I want to give Justice Marquez a chance to talk about our ongoing commitment to this.

**Rep. Weissman**
Justice Marquez.

**Justice Marquez**
Thank you, Mr. Chair. Again. I'd like to echo the Chief's comments and just emphasize that both he and I are personally very committed to moving forward with these investigations and dealing with whatever the results may be. Our eyes are trained forward to correcting whatever needs to be corrected, to improving the work culture within Judicial. And we recognize that this isn't something that's going to be changed overnight with a wave of a hand. It's a long-term commitment. And that's why I'm here as Chief Justice Boatright's successor, to demonstrate that he and I will do this together, and I will carry this forward into the years that come.

**Chief Justice Boatright**
And the final thing I'll say about that is that we are committed to releasing the results of those investigations to the public, and will make those obviously available to members of the Legislature. I also want to say that we are giving them unfettered access to a number of documents, through an access agreement, that aren't publicly accessible. And, so, the entire report will not be produced. But any results that the independent investigators come to will be provided publicly.

**Rep. Weissman**
Okay, Mr Vasconcellos. On that last point, and Mr. Chief Justice, I appreciate your stating here the commitment to release at least some of those findings. I also appreciate the point that when undertaking something in this magnitude, one doesn't necessarily know where it's going to go or how long it will go. If you add five or six months, let's even skip August, if you just start counting from September, those courses of time should conclude while we're still in session here. But I did hear that there was a provision to, a contractual provision, maybe for more time. I would just ask, and maybe this would come to us through Mr. Scanlon. In the event that those provisions are triggered, so as to delay the likely delivery of some kind of results to these committees and the public. We would appreciate notification at the soonest possible moment. Chief.

**Chief Justice Boatright**

Can I provide one point of clarification? In August, the panel members recommended the vendors. We actually did not enter into the contracts with the access agreements until October and November. So, the timeframes will start to run from there.

**Rep. Weissman**

Okay. So, the clock runs from October or November.

**Chief Justice Boatright**

Yes.

**Rep. Weissman**

Okay, thank you.

**Chief Justice Boatright**

Thank you.

**Rep. Weissman**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Mr. Chair, and we will certainly reach out to the committee if there's any extension. I just had earlier this week, update meetings with the Attorney General's Office, who's acting as a go-between between ourselves and the investigators. And things are progressing well. There's no anticipation at this point that we're going to need to trigger the extensions. Of course, we'll just see what remains to be seen. But so far, no concern about extensions at this point.

**Rep. Weissman**

Okay, thank you. And before we go to the next major segment of the presentation, Rep. Tipper had a question.

**Rep Tipper**

Thank you, Mr. Chair. And I know I picked the worst seat in the house. If you can both see me. Justice Boatright, can you clarify for me again. You mentioned essentially what we anticipate. It sounds like it's going to be the summer. Obviously, there could be extensions. A report, but I think you made a distinction between what would be publicly available and what wouldn't. Can you clarify that for me again, please.

**Rep. Weissman**

Chief Justice Boatright.

**Chief Justice Boatright**

Thank you. Yes. Thank you, Representative, Tipper. What we anticipate is that they will put out a report that is available for the public to be able to read with regard to conclusions, disclosing as [much] of the background information as they can. But as I indicated, we're giving them unfettered access to attorney client privilege and to non-disclosure agreements that if we were to release those publicly, it would subject the Branch and, ultimately, the State to financial liability, and obviously that's something that we want to be very careful about.

**Rep. Weissman**

Rep. Tipper, good for now, follow up? Okay. Senator Gardner.

**Sen. Gardner**

Thank you, Mr. Chair. I wasn't quite sure where I wanted to raise this, but since we're talking about investigations and concerns. As you know, there has been some discussion about our Colorado Commission on Judicial Discipline. Because of the level at which these matters investigated occurred, it has raised questions about the Commission on Judicial Discipline, its independence. Can it operate fully independently? Does it have the funds to do so and so forth? So, I have two or three pages of questions I thought of Chief. We don't have that amount of time. I wonder if I could just ask for you to comment on the Commission on Judicial Discipline, its existence, its independence. Is it supervised by the Colorado Supreme Court? There is a memorandum of understanding between the two entities and my bar registration fees go to pay for the administration of all of that, as do all of the members of our Colorado Bar. So, that's very open ended. But if you could comment, Chief. I would appreciate it.

**Rep. Weissman**

Chief Justice.

**Chief Justice Boatright**

Thank you. To answer your question, no, we do not supervise the judicial discipline commission. But I will say that the system that had been set up long before I was ever a Justice on the Court, was that those attorney's fees would pay for an Executive Director and for a part time administrative assistant. And then it was anticipated that all the legal work that would be done would be done kind of in-kind through the attorney regulation group. This particular situation, I don't believe was ever anticipated when we set up that type of a funding stream. And I will say that that the budget that was established in June for judicial discipline. I went and looked back, its $300,000. And that, obviously, covers the Executive Director's salary, the administrative person's salary, and some of the PERA and whatnot. So, what I would say, is it's my understanding that judicial discipline is asking to be taken outside of that type of a funding stream and to be funded by the Legislature. With regard to the legal fees and with regard to any investigative services, I want to state unequivocally, we completely support that. Because we absolutely value the independence of the judicial discipline commission. Their work is essential to people having confidence in the integrity with regard to the Branch. The difficulty is that under our financial rules, our

- 8 -

fiscal rules. Is that anything over $5,000 has to be reviewed by the Supreme Court with regard to fees that are expended out of the attorney regulation. Because we do have a fiscal responsibility. That clearly can't work under these current circumstances. So, we absolutely support their ability to obtain separate funding and to have a separate monitoring. We should not be looking at the expenditures of the judicial discipline commission. Does that?

**Rep. Weissman**
Senator Gardner.

**Sen. Gardner**
Thank you. And thank you, Chief. So, if we were to create an entirely separate funding stream and accountability basis for the Commission on Judicial Discipline, I'm wondering, would there still be a need for a memorandum of understanding between the Court and the Commission on Judicial Discipline as to how matters are handled?

**Rep. Weissman**
Chief Justice.

**Chief Justice Boatright**
I believe that we do. And I'll give you a couple of examples. How things are ultimately reported to judicial discipline is probably not quite as simple as you might think. And I'll give you one example. Unfortunately, it's a true story where we had a judge who was criminally prosecuted and we had a judge, another judge, who was made privy to information in an affidavit that was sealed. And that put the judge in a position of do I report that or do I not report that to judicial discipline? Because it's confidential and it's not. I think what we would like to do is just have a clear understanding of what each of our roles are. If you look at the core of what the problem is with this so-called Memo, is that the HR people investigated things and then did not turn it over to judicial discipline. And what we want to try and do is get out of the business of investigating the judges. That's what the prior Memorandum of Understanding basically required. And so what I would like to see is, have a memorandum of understanding that if we get a report, say, of some type of and I'll use a hypothetical. Some type of sexual harassment. That our HR Department can come in, make sure that our employees are safe, and then turn that matter immediately over to judicial discipline to conduct any kind of investigation. That way, we're out of the business of reporting and having the questions raised that were raised in that memorandum of understanding. Now the truth of those things will come out through the investigations, quite frankly. But that's really what the crux of the of the allegations were, that HR was investigating these things but not turning them over. So, I think we just need to have clear lines drawn. And that was actually a conversation prior to all of this happening. That Chief Justice Coats had started just a couple years ago. And I think things got derailed by the pandemic and whatnot.

- 9 -

**Sen. Gardner**

Thank you.


**Rep. Weissman**

Senator Gardner, good for now?


**Sen. Gardner**

I'll stop there.


**Rep. Weissman**

Mr. Vasconcellos, as you were.


**Steven Vasconcellos**

Thank you, Mr. Chair. I'd like to turn our attention to the impacts that the Covid-19 pandemic has had.


**Rep. Weissman**

I'm sorry, Mr. Vasconcellos. I'm just trying to keep the questions grouped by subject. Rep Tipper, did you want to follow up?


**Rep Tipper**

I'm sorry. Thank you, Mr. Chair. I'm sorry to interrupt you. Just wanting to go back. Just so I understand. So, the gist of the ask would be to create a fund and essentially give authority to an independent entity. I'm obviously speaking at a very high level. And where does that money come from? Are we then providing money through the general fund, or is that money that you all are shifting over into that? And maybe I just don't understand, but I don't want it to be duplicative taxpayer dollars. I don't mean this, but as a windfall. I mean, I think that's what I'm concerned about. If you could just explain that mechanism.


**Rep. Weissman**

Chief Justice.


**Chief Justice Boatright**

I think smarter minds can address that. What we are here saying is that we are in support of the independence. I think the problem is, anytime the funding comes from Judicial we have fiduciary responsibilities over the expenditure of those monies and have to verify. And I don't think that that's a workable model, currently. So, I do think the funding has to come from outside. I've heard conversations about cash funds or different things. I don't pretend to be an expert in in the legislative funding. But what I will say is that, with regard to the legal advice, the legal work, and the investigative work. They do need to be outside of the judicial finance umbrella. Because I don't know that we can just say, here's a blank check and go forward with it. There does need to be some type of oversight. But it shouldn't be us,

- 10 -

because at the end of the day, their charge is to investigate judicial officers. And I will say, over the past several months, it's really been an uncomfortable situation to try and figure out this funding. Because of that very implication.

**Rep. Weissman**
Rep. Tipper, good for now? Okay. Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Moving on to the impacts that the pandemic has caused. We've had opportunities with this committee to talk about some of this before, but we did want to spend a moment. Because the pandemic continues to have an impact on Judicial Department Operations, both the trial courts, appellate courts, and probation. And you know, as a reminder, in the span of a few short weeks in 2020, we had to completely rethink and change our business model. We historically have been primarily an in-person operation. You come in person to court, you come in person to your probation visit. You come in person to do oral arguments with the Court of Appeals or Supreme Court. And for good public health reasons, that just wasn't possible for a large portion of 2020. And intermittently since then. In terms of what kind of volume are we talking about. These are, these are current active numbers. Every single day, there are 1,000 hours of video conferencing happening across the state in Colorado. Those are court hearings, those are probation visits, those are arguments in front of appellate courts. Every month, 17,000, over 17,000 video conferences, representing 130,000 users participating. Every single month. We've gone from primarily an in-person operation to the majority of our business being handled virtually. We are thrilled that we were able to do that, and candidly, it probably moved our operations 10 years forward in the span of a few weeks. We also did that over an IT infrastructure that wasn't entirely prepared for that. And with a staff load that wasn't entirely prepared to support it. And that informs important parts of our budget request that we will talk about a little later.

**Chief Justice Boatright**
Can I say one thing about the?

**Rep. Weissman**
Please go ahead.

**Chief Justice Boatright**
Thank you. We are looking very closely at how we can continue with regard to the virtual hearings into the future. We found them to be extremely convenient for the public. They're a great access to justice issue. You know, just by way of example. If you have a short 10-minute hearing that you're able to conduct virtually, it's better than having somebody miss a day of work to take three buses to get to that hearing. And, so, we're exploring ways to continue those virtual hearings. I will say that one of the things that we are trying to balance is that while they are extremely convenient for the public, they can be extremely cumbersome for a trial court in a busy docket. You know, calling on my past history, you

have 100-person criminal docket, you're able to call people up, one after another after another. And as we saw just today, connecting virtually can be, really, a time-consuming thing. So, we're really trying to find that balance. But we are committed to moving forward, to having virtual hearings be a part of our platform in in the future.

**Rep. Weissman**
Oh, I'm sorry. Senator Gardner, go ahead.

**Sen. Gardner**
Yes, thank you, Mr. Chair. Well, just to comment as a practitioner. The system has worked very well. And one interesting advantage is I sometimes virtually attend a hearing on a matter that I wouldn't have gone to the courthouse to see what happened there. But I had some interest as a non-party, but nevertheless an interest in the litigation. And being able to click on the link and watch has made a huge difference in being able to properly advise others who might be affected by the litigation. So, I applaud you for taking a good hard look at what we're doing there.

**Chief Justice Boatright**
Thank you.

**Rep. Weissman**
Okay. Please continue.

**Steven Vasconcellos**
Thank you, Mr. Chair. And has been already mentioned, the virtual hearing approach has been a tremendous boon to access to justice and something we remain committed to long-term. However, one area of our business that has not lent itself well to virtual proceedings are jury trials. And we are extremely grateful for the General Assembly's support on creating limited continuances due to Covid. The slide that's up on the screen right now illustrates what's happened with jury trials since just before the pandemic started in January of 2020 until December of last year. And, of course, you see quickly things shutting down in the spring of 2020, some fits and starts in trying to ramp things up, and some relative success in the last handful of months in having jury trials move forward again. But I will note that we have not gotten back to pre-pandemic historic levels of jury trials. And, as we sit here today, 20 of our 22 Judicial Districts, the Chief Judge has issued an order suspending jury trials again because of local public health conditions.

**Rep. Weissman**
Senator Lee.

- 12 -

**Sen. Lee**

Thank you, Mr. Chair. Chief, have there been any dismissals of cases against criminal defendants for failure to comply with the time limits, the speedy trial rules?

**Rep. Weissman**

Chief Justice.

**Chief Justice Boatright**

Senator Lee, that's a good question. I don't have that number in front of me. I can tell you that there are a number of those issues in the appellate pipeline. Because we've gotten a number of Rule 21s on them. I can also say, what we called the Covid continuance bill that was passed last year was used 102 times. All on class threes, fours and fives--felonies. So that was not widely used, but actually very valuable. But I can find out if there have been speedy trial dismissals. I just don't have that number at hand today, but that's a good question. I apologize.

**Sen. Lee**

Thank you.

**Rep. Weissman**

I think we would find that information helpful. Mr. Vasconcellos, Mr. Scanlon, if the good people in the court data office could see what they can do. Please go ahead.

**Steven Vasconcellos**

Thank you, Mr. Chair. And just to wrap this up, you know, given the fact that the overwhelming majority of our Judicial Districts have jury trials suspended, we are anticipating this volume to go down again on this chart. And then heading into the next chart, which illustrates our trial backlog since April of 2021. While we are not out of the woods and haven't caught up, so to speak, we were able, until the Omicron surge, to make significant progress on our trial backlog. We did see the backlog grow again slightly, in January, it will probably grow a little through the spring. Hopefully Omicron subsides and we can get back to regular trial business.

**Rep. Weissman**

Mr. Chief Justice.

**Chief Justice Boatright**

Can I say one thing? We've been under a little bit of criticism from different parts with regard to stopping the jury trials. But I will say, I think our Chief Judges and our judges have done a marvelous job being committed to the safety of our jurors. I mean jurors don't volunteer. I mean they are asked to come in and compelled to be in there. And I am very proud of the fact that we've not had any super spreader events or anything that's originated out of any of our jury trials. And we're going to do this

- 13 -

safely while also balancing people's rights. And maybe Mr. Vasconcellos was going to say this, but one of the things is, I don't anticipate that we're going to be asking for any further extension of the Covid continuance bill at this point. I've learned to never say never, especially in these current conditions. But I think just through hard work and cooperation, we're going to get through this absent some extended, prolonged period. But at this point, we're not asking to extend that. It does basically become ineffective at the end of April.

**Rep. Weissman**
Thank you. Please go ahead.

**Steven Vasconcellos**
Thank you, Mr. Chair. Now, I'm going to move into some data that we report as part of our required SMART Act reporting, and that we reported to the committee every year. And you can see another area where backlog because of slowdowns in our business operations due to Covid have raised their head. This first slide here illustrates how our open caseload in District Court is comparing to time standards that are established by Chief Justice Directive. And, in a lot of areas we are behind. Historically, you may remember that we run pretty close to the time standards that are identified by Chief Justice Directive. But in this pandemic era, we have struggled. That being said, I am pleased to report that in one of our most critical areas, which is child protection, which is represented on this chart by what you see as D&N, which is dependency and neglect, both for children under the age of six and for children over the age of six, we are still meeting or right at our time standards. We take our responsibilities toward cases with vulnerable parties who can't speak for themselves, very seriously.

**Rep. Weissman**
Mr. Vasconcellos, small question on that. I think Covid delays are the fundament of the work. But, when we've talked about volumes in the past, and I'm also thinking back a few slides, but no need to reverse the deck. When we come into sort of an economic recessionary period, like we've been in. Distraint warrants and Rule 120 matters tend to explode in number. And I was looking through the soft copy of this Annual Report here. It looks like those are 75% of all the District Court-level civil filings in fiscal 21. Is that contributing to that open number, or is it really just more Covid, itself?

**Steven Vasconcellos**
Great question, Mr. Chair. For these purposes, we removed to distraint warrants from the data. They are administrative to the point of no human hand really touches them unless some something is filed asking for review. So, they proceed really quickly. They don't, they aren't managed like a regular case. And so frankly, if it would be to our advantage from a data standpoint, to include those because they proceed so quickly. But I would not be comfortable with what that would do to the numbers. It would paint us in an unfairly rosy light. Not based on something we really manage. So, we remove those from the data.

- 14 -

**Rep. Weissman**
Okay. Thank you. Please go ahead.

**Steven Vasconcellos**
Similarly, moving on to County Court, we see some of the backlog impacts, there. It doesn't happen universally across the board. Much of county court civil that is probably closest to meeting the standards. That case area includes protection orders. It also includes some civil money actions in County Court, as well. But the main point of these last two slides is you can't go. You might have seen that jury trial slide earlier. And we had several months where there were no jury trials. We had several months where there was very little business, particularly in the weeks that we are transitioning to virtual proceedings. You can't shut down court operations. We are in every county across the State, as the Chief mentioned. Conducting court business every single day. When you shut down, even for a period of a few weeks, you're going to spend a long time digging back out. And we still haven't had the opportunity to be back at full operational capacity because of the pandemic. I'd like to transition into a discussion about probation. I think most of the members know at this point, but I like to say it every time that I appear. That Colorado probation is the largest criminal justice supervising agency in the State of Colorado. And I'd like to share a few data points about probation. First, we are large. We are 66% of the adult criminal justice population, corrections population in Colorado. We, as the Chief mentioned earlier, supervise over 68,000 adults and juveniles on any given day. We have about 1,200 probation officers, or 1,200 probation FTE statewide. Most of the overwhelming majority of that number are probation officers. We have 70 probation locations across the State of Colorado. We are 20 times larger than community corrections, four times larger than DOC and five times larger than parole. We are also cost effective. The average annual cost of a probationer in Colorado is about $1,600 and there are good reasons for different levels of supervision having different costs. So, this isn't a criticism of other agencies, but just to note that we are cost effective when you look at us in comparison to parole, to Comm Corr and to DOC.

**Sen. Lee**
Thank you for that presentation, Mr. Vasconcellos. On probation, there is research that supports the idea that excessive amounts of supervision sometimes is counterproductive. And I'm wondering if, one, the Probation Department operates under that premise, and whether they have attempted to reduce the amount of supervision.

**Rep. Weissman**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Thank you for your question, Senator Lee. We do a risk-based approach to supervision. So, it is not a one size fits all. There are a number of different factors that drive the level of supervision that an individual may receive. And, so, to use an example from our problem solving courts.

- 15 -

We find it highly problematic, and the research does not support, for example, including high risk, high need offenders with low risk, low need offenders. It's counterintuitive. You want just the right amount of supervision, no more, no less.

**Rep. Weissman**
Via LSIR, is that the instrument they use in probation?

**Steven Vasconcellos**
Sorry, Mr. Chair, I couldn't quite.

**Rep. Weissman**
I see the chief nodding. I think the question of risk assessment and probation is ascertained by the LSIR instrument. Okay.

**Steven Vasconcellos**
Correct, Mr. Chair.

**Rep. Weissman**
Okay. Please go ahead.

**Steven Vasconcellos**
Thank you. Moving on to another metric that we report as part of our annual SMART Act reporting. This shows probation success rates over the last decade. And they've remained within a relatively narrow band, percentage wise. Showing slight improvement year over year for the last handful of years. The nature of the population that we are supervising has changed over time with legislative policy changes. And we've been pleased that we've been able to kind of flex and meet those needs, as directed by the by the General Assembly, over time. One thing I want to highlight briefly is that we are partnering with the Crime and Justice Institute to do an in-depth study of revocations across Colorado to better understand the reasons why for revocations and identify areas where we can do better and improve. We don't want to just wait for outside pressure to look for opportunities to improve our game.

**Rep. Weissman**
Chief Justice.

**Chief Justice Boatright**
Thank you. One of the things that I want to emphasize in this number, and partially in response to Senator Lee. I know just anecdotally that that the probation department is very mindful about bringing people into probation and the potential harm that may cause if they're low risk. So, I think this current pandemic has given us opportunity to a lot of things virtually. And I think we're seeing some benefits with regard to that. But the other thing that I want to emphasize is that the success rate around 70% is

- 16 -

not because 70% of people are easy to supervise. It's because our probation officers take great pride in having probationers succeed. And the amount of work that goes into having people succeed is really kind of missed in this data. I guarantee you, in my experience, that 70% of people just walk through probation. There's failures, there's relapses, there's working, there's unbelievable relationships that are set up, and our probation officers are doing a remarkable job. And I think 70% success rate is a credit to their service.

**Rep. Weissman**
Thank you. Mr. Vasconcellos, I see that you have a number of pretty weighty topics here. I might encourage you to move through the budget information in a summary way. We have engaged with JBC on that. I know that you want to speak to the pending question of the 23rd District, and I see some other subjects on here. So, please go ahead.

**Steven Vasconcellos**
Thank you, Mr. Chair. I will move at pace. And of course, happy to pause for any questions that the committee may have. You did have a presentation, as noted earlier today, from the from the Joint Budget Committee members on our budget request. Some of the key highlights include getting additional staff to address areas of liability to the organization, areas where the trial court districts across the state are not getting the support they need to be successful every day in areas that we've learned we need to improve from last year's performance audit of the State Court Administrator's Office. Those areas include additional HR staff, particularly when we look in the areas of HR, IT, and contract management. And when we look at industry standards. When we look at partner agencies in the Executive Branch who have similar levels of complexity in terms of size of staff overall, on the HR front, volume and complexity of contracts on the financial front, etc. We are lagging well behind our Executive Branch partners.

On the Information Technology front, again, we are looking. We made pretty dramatic changes. And I think we did a fairly good job, given the circumstances to our business engagement model, moving to primarily a virtual platform. But for sustainability, to prevent the intermittent outages that we're having in Districts across the State that impact, negatively impact access to justice. We need to continue to invest in our IT infrastructure, our network infrastructure, our bandwidth, our security protocols. In order to just maintain what we're doing today and, also, so that we can continue to grow as we move forward. There's also a staffing component to that. Those are not positions that reside at the central offices. They are actually positions that sit out in the Judicial Districts to provide hands on support when there are AV problems. To provide hands on support when desktop support is needed. Just briefly, when I was a fresh-faced young clerk in the 4th Judicial District, 26 years ago, one of the first things I learned about is that we were going to get a brand new case management system. It is the same case management system half my lifetime later that we still have. You'll notice, I now have a head full of gray hair. So, does our case management system. It is a legacy system. It is written in a language, RPG, that it is nearly impossible to find developers for. We have reached a time where it is no longer serving

- 17 -

our needs and it's not cost effective to continue to invest in it. I am committed to a robust ongoing discussion with this committee, with the joint technology committee, and with the Joint Budget Committee as we plan to move forward to meet not just the Judicial Department's day to day business operational needs, but the larger needs of the State of Colorado with this new system. We do have some planning money in this year's budget request for the system.

I'd like to briefly highlight an amendment we just submitted on the 15th of this month to our budget request related to staff salaries. Specifically, requesting some additional dollars for our lowest paid employees in the Judicial Department, who, through a recent market study that we conducted in 2021 were identified to be well outside of market. An entry level court judicial assistant in the Judicial Department is paid approximately the same as an entry-level fast food worker in the metropolitan area. And we are losing those new employees in competition. You know, I have done restaurant work when I was a young man. It is not stress free, but you don't necessarily take the work home with you. We are doing felony criminal sentencing, child protection cases, custody cases. All manner of intense work. It is important work. It's honorable work. But we are not competitive in the marketplace. We are losing our experienced folks to county government, to federal government. I would like to, I'm not looking to be, ultimately, top end competitive with the private sector. But I would like us to be at least competitive with some of our governmental peers. Market data supports that, strongly. And, so, we've made a supplemental request, again, to focus on our lowest paid employees, primarily court judicial assistants to raise their salaries.

Moving on to the creation of the 23rd Judicial District, which is coming in 2025. You know, it is a large affair, both for the State in terms of the Judicial Department changes, and for the Counties. Prior to the holiday season, myself and a few others from our team met with each of the four Counties impacted by the change. We have another series of meetings coming up later this month and into next month to share ideas, talk about how we can best support each other, best collaborate through this. From the State perspective, our biggest changes are to our IT system to accommodate a new Judicial District. We do have some money in our budget request for FY 23 to facilitate programming. Additionally, in advance of the actual creation of the District, we will be requesting FTE positions, not this year, but in upcoming years. For the administrative team, the Court Executive, the Chief Probation Officer that will, on the administrative side, lead that Judicial District. So, more to come from us. So far so good. Part of our money is for a project manager to kind of ride herd over the entire project. We're hoping that we'll be successful with that request. That will help us out tremendously, our team. And for very good reasons and for a very intentional decision. As the Judicial Department has recovered dollars in FTE after the budget cuts that were attached to the pandemic, we have not taken any of those FTE at the State Court Administrator's Office. And focused all those FTE in the trial courts and probation, where the day to day hands on services happen. I think that was the right way to go. It has left our team a little thin, and we need some we need some help. And one of those areas is project management for this project.

**Rep. Weissman**

Okay. Rep. Benevides has a question. Representative, please go ahead.

**Rep. Benevides**

Thank you. And my question went back to the request for financial services and human resource staff. That I'm just hoping, maybe you don't have to do it right now, but could provide more information. That's 16 FTE. And as to what the request is for. One that sticks out in my mind is that 6 FTE for contract management. I wasn't aware you had any managing contracts. And most contract management is done by whoever holds that contract. I'm quite surprised. You have 5,000 contracts. I would also say if your need is that big. I know DPA used to have a contract management system that departments can use to monitor contracts. And there's also, off the shelf, different kinds of technology that could be used, because that's really huge. I oversaw procurement, say, for the City, and we only had a couple of contract managers. So, I'm just curious. And I didn't see any explanation for the 2 FTE for accounting and for grant administrators, and 5 more for Human Resources. I'm just wondering how they'll be used, and how does that compare to what you have. Because this sounds like a significant increase in your current staff. So, either you could address it now or send it to me, however you want.

**Rep. Weissman**

Okay. Rep Benavides, we're getting tight on time, so I'll invite a brief response from Mr. Vasconcellos, if one is possible. And we'll urge a detailed follow up to your very legitimate questions. Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Mr. Chair. And, at the front, Representative Benevides, we'd be happy offline to spend as much time as you'd like, going through the requests in detail. But just principally, we historically, did not do the job we should have investing in what I like to think of as the plumbing and electric, the unglamorous parts of our organization. And a lot of that is HR contract management, IT. To just use the contract management example briefly. When our controller, who's been with us only since my term of office, came over to us from the Department of Education. And kind of did an initial assessment of the size of the team. He was appalled. Given the complexity, the amount of money, given the complexity of the contracting. And we have looked toward agencies with similar contract volumes, similar complexity, similar dollar amounts, notably HCPF and CDPHE in trying to build a contract management function that we never really had. We had quite literally 1,000s of contracts. Well, 1000s of vendor relationships that were not covered by contract. And we've been bringing those in one by one, out of the dark, if you will. And this is a long-term. I am signing, every six months, approximately three to 400 contracts in the areas of probation treatment providers, various IT contracts, court interpreters, contract court reporters, the list goes on and on. Representative Benevides, more than happy to get your perspective on this. More than happy to meet with you offline at length.

- 19 -

**Rep. Weissman**

Thank you, Mr. Vasconcellos. If you could kind of race to the end of the presentation and not more than five minutes. I know there's at least one member of the public wanting to speak to us about this subject, as well. Please go ahead.

**Steven Vasconcellos**

Thank you, Mr. Chair. Briefly, Chief, would you like to speak to the constitutional amendment?

**Chief Justice Boatright**

Sure. One of the things that we're asking is for a constitutional amendment around the 23rd Judicial District because of the disbursement of the judges from the 18th. And I won't go into detail because I know our time is short. But it is absolutely critical for a smooth transition to a 23rd Judicial District without any disruption. So, we asking for your support on that. And we can talk in more detail, offline.

**Steven Vasconcellos**

I am going to bound through several statutorily required reporting elements. One on House Bill 21-1280, on weekend bond hearings. Planning for that has been complicated. But so far, so good. Bond hearing officers, magistrates for the western region of the State have been hired. And in the eastern region of the State, those recruitments should be done in the next handful of weeks. We work with a large, multi-agency, group of stakeholders in the planning process. We feel like we're on track to be ready this April. So, so far so good.

On our legislative agenda, we have a request related to County Court. We have some unique residency requirements for county judgeships in Rangely and Rifle that are unique and different than the rest of the State. You actually have to live in the municipality in order to apply for the judgeship, unlike most judgeships. Rather than just living in the county. It limits the pool of applicants quite severely. And, so, we'd like, we are hoping to expand that. Additionally, we have two courts that we would like to move from Class C to Class D. That just means they would become full-time as a matter of law. They have been full time and paid full time for a number of years. Their caseloads aren't shrinking down. These are Montezuma and Garfield Counties.

On the text reminder program, nearly 300,000 text reminders sent. About 17% of participants opt-in to receiving text reminders. We have an ongoing conversation with Senator Lee about the next iteration of that program, and look forward to that collaboration.

On extreme risk protection orders. You see data in that slide on the total number of cases that have been filed in the last two years. Last year, 144 total cases filed. 75 temporary extreme risk protection orders granted. 47, I'm sorry, 43 denied. I don't want to give it a short shrift. It's a very serious issue. But I just want to keep pace here. I believe that's all, unless there are other questions.

- 20 -

**Rep. Weissman**

Okay. Thank you, Mr. Vasconcellos. Sorry to ask you to mash the gas there. Okay. Seeing no hands shooting skyward, I will thank you both for taking the time to visit with us in-person and to Justice Marquez for being with us online, as well. Commissioner Jackson, if you would like to come forward. I apologize. Yeah, yeah, I'm sorry. Rep. Bockenfeld, go ahead.

**Rep. Bockenfeld**

Thank you, Mr. Chairman, it kind of piqued my interest that you're. That you may have to have a constitutional amendment, which I believe would have to be approved by the voters. What are the ramifications if the voters in the 18th Judicial District would turn down whatever amendment you would propose?

**Chief Justice Boatright**

It actually would have to be statewide, because it would be a constitutional amendment. So, it wouldn't be just the voters in the 18th. But I think what it would do is create a situation where we have more judges in one Judicial District and no judges in another Judicial District, because, depending on where they live. Because right now, it would be dividing the 18th. And I would anticipate that we would end up with an incredibly inexperienced bench. And what would we do with these other judges that would be in the other Judicial District? This just allows a more rationed reason for being able to separate the judges and transition them without an interruption of services. I think the ramifications would be, we'd have services interrupted.

**Rep. Weissman**

Rep. Bockenfeld, good for now? And I'll just note for any members of the committee, as one of the sponsors of this bill, a couple years ago, before Covid, I've been in ongoing conversations with the Judicial Branch about making sure that there is no disruption of judgeships due to their residency requirements that are themselves constitutionalized. Idea being that a duly appointed and in some cases, retained by the voters, judge can continue to preside as we are making technical changes to the boundaries in a way that we all approved of here. We never intended to bump off duly appointed judges as part of this transition. And it's been identified that we may need to ask the voters for a small textual change within Article VI, which is of course to make sure that that's the case. Okay, again, thank you both for visiting with us and to Justice Marquez online. And as ever, we invite further follow up offline outside of what time allows here. Now, Commissioner Jackson, if you'd like to join us, I'm sorry to have you waiting here. Okay, Commissioner, again, thanks for waiting with us. Please go ahead.

**Nancy Jackson**

Thank you very much. Good to see you all. And thank you for having me today. I'm Commissioner Nancy Jackson. I'm currently the Chair of the Board of Commissioners for Arapahoe County. And, so, with the passage of House Bill 20-1026 Colorado will see the establishment of a new Judicial District for the first time in more than 60 years. Given the magnitude of this change, Arapahoe County is

grateful to the sponsors who identified the need to provide transition time as part of the legislation. As well as the formal process for consultation and progress reports. As part of today's state measurement for its accountable, responsive, and transparent hearings, Arapahoe County appreciates the opportunity to provide members an update of the progress to date and to identify some issues of concern as we move forward in this process. For example, shrinking timeline. Given the ongoing pandemic and other issues within the Judicial Department, it is understandable, albeit somewhat concerning, that the creation of a new judicial district has not been top of mind for the State.

In the summer of 2021, Arapahoe County convened its county partners and the 18th Judicial District Attorneys, the Attorney's Office, sorry, to begin discussions surrounding transition needs, including goals, objectives, and the timeline. We really did appreciate the opportunity to speak with Representative Weissman and Senator Fields this past summer. And finally connected with the State Court Administrator in late 2021 to understand their goals and approach.

A significant amount of work is needed to achieve the implementation date of January 7, 2025 and our time frame now is much shorter. We support the Judicial Department's budget request to support this transition, and would respectfully request that these be funded as soon as practical to ensure the technical work and coordination with counties that can be completed in efficient and swift manner. One time costs. Arapahoe County appreciates the General Assembly recognizing local governments will face one time transition costs through the revision of the Judicial District boundaries and their willingness to understand those costs and assist our Counties with the transition. We are currently in the process of hiring a consultant to support the transition effort to split the 18th Judicial District and create the 23rd. We anticipate knowing the specific costs associated with such an effort within the next year. And we will report as such to the General Assembly as soon as possible to ensure that such funds can be allocated.

As we enter 2022, we would ask committee members to seek regular updates from Counties and the Judicial Department in terms of progress towards the creation of a new district. Identifying potential roadblocks or items of concern sooner than later, so implementation is not delayed. We thank you for the opportunity to provide this input, and we will look forward to working with you and the Judicial Department in the months and years ahead. And I'm very happy to answer any questions that you may have.

**Rep. Weissman**
Okay. Commissioner, thank you. And we did receive the letter officially from Mr. Boddich on behalf of the County as well. For members newly joining us, subsequent to 2020, I was one of the sponsors, along with Rep. Van Winkle, Senator Gardner, Senator Fields of a bill to establish, prospectively, a new Judicial District. I think that we passed that in February 2020. And then things started getting difficult in the world. So, the large increment of time that we had as of that point has been somewhat reduced by two years of Covid. I believe that we still have an adequate amount of time, if everybody is expeditious

about things. And I believe that efforts are being made to be expeditious. Obviously, Commissioner I have a vested interest in seeing this all come to pass. And we'll be staying on it, and I know that others of us will be as well. Thank you for being here to speak with us. Are there questions for Commissioner Jackson? Seeing none. Okay, thank you.

**Nancy Jackson**
Thank you very much.

**Rep. Weissman**
Thank you again, all of you for being with us today. All right, we will move right into the next segment of our agenda today, which is to hear from the Commission on Judicial Discipline. Thank you all for being with us and sorry for making you wait a little bit here. If you have any paper handouts, Ms. Jenson can help get those around. We do have some information in the box folder as well. Okay, looks like we're just getting the presentation set up. Ms. Krupa, Judge Prince, Mr. Gregory, however you would like to proceed once you are ready. Okay, whoever would like to start.

**Elizabeth Espinosa Krupa**
Thank you. My name is Elizabeth Espinosa Krupa. I'm the Chair of the Commission on Judicial Discipline. Joining me today are David Prince, who is Vice Chair of the Commission, and Christopher Gregory, who is our recently hired Executive Director. In the audience is also Jim Carpenter, who is a Commission member and many of the other Commissioners are appearing remotely, as many of them come from far out jurisdictions, including Eagle, Pueblo, and Arapahoe County. Thank you for allowing us to be here today.

The Commission on Judicial Discipline is hoping that we can establish accountability of the Judiciary through independent oversight of judicial ethics. The Commission was established in 1966 through an amendment to Article VI of the Colorado Constitution. The current members include, and always include, four judges, four lay members or citizens, and two experienced attorneys. As far as staff, we have one Executive Director and one part time administrative assistant that we share with other organizations within the Judiciary. Of our duties, Article VI grants the Commission the authority to recommend judges and justices in Colorado either be removed or disciplined for willful misconduct in their office, willful or persistent failure to perform their duties, intemperance, or violation of any Canon of the Code of Judicial Conduct. The Commission investigates complaints of judicial impropriety and makes recommendations regarding discipline, if and when necessary. We are somewhat similar to a grand jury. The Commission aims to maintain public confidence in the Judiciary and create greater awareness of proper judicial conduct in Colorado. The Commission's jurisdiction is of County and District Court judges, the Court of Appeals, and the Supreme Court. The Commission has no jurisdiction over magistrates, court staff, municipal judges, administrative law judges, or the federal judiciary. The Commission, as I said, is comprised of judges, attorneys and citizens of the State. Each of the Commissioners serve a four-year appointment with no salary. For administration, we have one

- 23 -

Executive Director and one part time assistant, and we arrange separate professional staffing for investigations on a case-by-case basis. Typically, what that means is the Office of Attorney Regulation serves as our investigators and counsel for any proceeding that goes formal. If the Office of Attorney Regulation is unable to assist us, we have, at times, had the assistance of the Attorney General's Office.

Any concern about a judge's compliance with the Canons is reported to the Commission in writing through a request for evaluation of judicial conduct, or an RFE, that is submitted online through our website. And the Executive Director or a Commission member is assigned to do a preliminary review of the allegations to determine if they involve the conduct of a judge as far as jurisdiction, and if there is a reasonable basis for the Commission to process the request for evaluation as a complaint through any type of disciplinary proceeding. If there's a reasonable basis for that complaint, the judge is notified and asked to respond to the allegations, and the Commission conducts a thorough investigation of the alleged misconduct. Upon a finding of misconduct, the Commission may confidentially issue a letter of admonition, reprimand, or censure the judge, require the judge to seek training or counseling or medical treatment, or initiate disability proceedings. The Commission can also dismiss or dismiss with some concerns, if that is the case, after an investigation. Otherwise, the Commission can recommend to the Colorado Supreme Court that the judge in question be either publicly sanctioned or reprimanded, removed, suspended, or retire the judge, or pursue a diversion or deferred discipline type of plan. The Constitution provides that the papers and proceedings of the Commission are confidential. Most disciplinary actions are taken privately. When appropriate, the Commission can conduct formal proceedings and make a recommendation to the Colorado Supreme Court for further action. It is only when the Commission makes those recommendations to the Supreme Court for formal action or formal discipline that a matter becomes public.

The performance commission is somewhat different than the disciplinary commission, as it is not statewide, and rates performance of a judge not enforcing ethical rules. The reporting is to the voters, and they have a statute implemented, whereas the Commission on Judicial Discipline has never had a statute, as far as implementation. I refer to the ABA Model Rules for Judicial for Judicial Disciplinary Enforcement, for reasons why the Commission should be established by a constitutional provision to make sure that we are free from interference from any branch of government. To ensure that our fiscal and operational independence is assured, our budget should be separate from that of the Judicial Branch. This protects the Judicial Branch from the charge that it's withholding funds and therefore hampering our investigation of any of its members. The Commission should not have to rely on any other agency.

Our current funding is provided through attorney registration fees. And there are beneficiaries of those funds as the Judiciary collects them. The disciplinary commission is one of the beneficiaries of those funds. Pursuant to our Rules, the Executive Director for the Commission sets forth a budget and handles the funds with oversight by the disciplinary commission.

- 24 -

We provided a chart to demonstrate the annual request for evaluation volume in terms of years starting in 2016 through 2020. And to demonstrate that in 2020 of almost 200 requests for evaluations that we received, 73 of those required procuring evidence and examination to determine what action the Commission would take or recommend.

Our goals for this session, in 2022, are that we hope we can establish independent access to funding and resources for judicial discipline and implement a structure for independent judicial discipline in Colorado. We did provide in our materials, our Report from 2020 and also a draft of some items that we are providing to the JBC to try to secure funding and some of the independence that we are seeking. And we're happy to take any questions that you have.

**Rep. Weissman**
Okay, thank you. Just to confirm before we jump into questions, because I think there will be many. That concludes the presentation that you wanted to start off with?

**Elizabeth Espinosa Krupa**
Yes.

**Rep. Weissman**
Very good. Thank you. I think I have a few. There was reference earlier to an MOU by which you would gain information to conduct the investigations that you are constitutionally charged to conduct. I want to acknowledge having been looking at Article VI, Section 23 recently, and as you alluded to a few slides ago, there are things that you are not going to be able to say here. I think we all know that. But as much as you can, because this is a subject of significant importance and some recent press attention before this committee. It would just, I think that we would all benefit from as much as you can say. So, I'll start with this question of accessing information to facilitate the investigation. And then, might have another question. But whoever would like to speak to that.

**Elizabeth Espinosa Krupa**
Thank you. In regards to the Memorandum of Understanding, I believe that Chief Justice Boatright did discuss that there were some discussions that addressing the MOU between the judicial discipline commission and the Supreme Court, as well as the Supreme Court Administrator's Office, prior to Justice Coats's departure. Due to the pandemic and some other reasons, those discussions pretty much stalled for quite a while. We have yet to actually sit at the table and go further with that memorandum of understanding. We do not have a memorandum of understanding with either the Supreme Court or the Office of Attorney Regulation as far as providing an office or other types of support that we currently receive. Certain commissions do. The Independent Ethics Commission has such an MOU, we do not. We were somewhat subsumed by the Office of Attorney Regulation Counsel in terms of providing rent, printers, computers, pretty much all of the resources that we would need for an office. And they would provide attorneys and investigators when necessary to help us fulfill our mandate. Until 2021, that

worked rather seamlessly. In 2021, obviously, the Commission announced that we had to hire Special Counsel to investigate matters as the Office of Attorney Regulation, which is under the Supreme Court and works with the Supreme Court, was conflicted, as was the Attorney General's Office. That process and our lack of access and ability to fund our Special Counsel and move forward is what has created our request for independent funding, as well as just looking at this unprecedented time in 2021. Where really to make sure that the public and our citizens of Colorado are assured the integrity of the Commission and the independence of the Commission, we cannot have funding controlled by Judicial Leadership. And if you were asking specifically about the MOU as far as information. Sharing all defer to David Prince to respond to that.

**Rep. Weissman**
Okay. Mr. Prince, if you'd like to add to that.

**David Prince**
Sure. And I'm sorry, I had the impression that the gist of your question was how the MOU currently works, that we have for information sharing with the Judicial Department. We've got a memorandum of understanding, an agreement that goes back to 2010. The 2010 agreement requires that anytime the Judiciary receives allegations of judicial misconduct, which means an allegation that a judge has taken some action that violates the Code of judicial ethics, they're required to report that. They're required to report that. You're not hearing me?

**Rep. Weissman**
Could you just make sure the little green light is on for the mic, at the base of the microphone.

**David Prince**
Oh, now it's on.

**Rep. Weissman**
There we go. Okay, thank you.

**David Prince**
So, there's an agreement that requires that the Judiciary, anytime they receive an allegation of judicial misconduct, they report that allegation and any findings they may have from any investigation they did to the disciplinary commission. That agreement, as I said, has been in place since about 2010. We've found in the 2021-time frame that that's not really been an effective method of getting information from the Judiciary. And, so, there are some problems with the way the MOU is working now.

**Rep. Weissman**
Okay. Thank you. Couple follow ups. I guess, for Ms. Krupa and Mr. Prince, whoever like to speak to speak to this. To the point about hiring Special Counsel, couple slides back. You know, where there is

- 26 -

an interesting mix in terms of funding and authority and procedure, between funding flowing to you through CRCP 227. I'll come back to that. And you have some ability to adopt your own rules procedurally. What was the black letter law on point? Or was there sort of a gap of black letter law on point concerning your decision to go forward with outside counsel for the present matter? And has there been differences of opinion and understanding, perhaps, about proceeding in that fashion?

**David Prince**

Well, now you're going to test my memory on the Rule, because I believe it's 2(aa) under the Colorado Rules of Judicial Discipline that defines Special Counsel. Special Counsel is authorized to be engaged by the Commission at the Commission's decision. So, that's the basis of authority to hire Special Counsel. We looked at the issue. We actually in terms of the investigation of 2021 which is, I think, what you're talking about, and what was referenced by the Judiciary's presentation. We, frankly, originally, just turned to our traditional supplier of professional services, the Office of Attorney Regulation Counsel, checked with them to see if they would be providing those services as they do usually. They let us know that they had conflicted off the case, which is quite understandable, and that they had gone to the private sector to get counsel. Very similar to what the Judiciary itself did when they hired their own investigators from the private sector to pursue the investigation. The two investigations that you heard talked about earlier. Their suggestion to us that we follow suit and go to the private sector and get counsel. We, in fact, did that. Got counsel, checked with them on a procurement process, checked with them on a budget, got all that sorted out. Went out and got special counsel. Since that time, we have encountered some problems. While the written Rule provides that it's the Commission who decides what the scope of an engagement of Special Counsel is, the Judiciary, at least the leadership of the Judiciary, has asserted that that is subject to their oversight and approval. And we've been in a disagreement with them now for about four months, and part of that disagreement has been Judicial Leadership asserting that they have the authority to direct what would be the proper scope of our retention of counsel despite the black letter law.

**Rep. Weissman**

Okay, I think I have two more questions and then we'll go to Senator Gardner. So shifting gears a little bit, and I guess I'm going to ask you to opine on a question of law. And if you'd rather not do that, I understand. There were concerns raised about attorney client confidential information and information that might be subject to an NDA, for example, by way of an employment contract, previously. There is specific confidentiality language in Article VI itself, Section 23, I believe. Do we think that that language is sufficient to assuage concerns about NDA-protected information or attorney client confidential information? I'll leave it there and invite you to answer. And I guess if the answer is no. What other steps then might be taken to assuage those concerns, which are understandable among attorneys, while at the same time facilitating the flow of information to this constitutionally created function here? Ms. Krupa.

- 27 -

**Elizabeth Espinosa Krupa**

Thank you. The confidentiality that's provided for the Commission really is confidentiality during our investigative process. As I indicated before, if we make recommendations that we as a Commission find there was misconduct and recommend any kind of formal proceeding, there's procedures for that to move forward. However, just to even investigate the matter, obviously the Commission would need some information. In contrast to what you heard Chief Justice Boatright tell all of you during his presentation, the two investigations that the Supreme Court is currently undergoing is of harassment and workplace culture and the leadership training contract. The Commission on Judicial Discipline is the only agency or entity in Colorado that can look at the conduct of a judge in context of any of those allegations. While Chief Justice Boatright mentioned that there was unfettered access to attorney client privileged documents and nondisclosure agreements to investigators in each of those investigations, we do not have that access. We have not been given that access, regardless of an MOU. But we have the confidentiality rules to protect that. And as Chief Justice Boatright indicated, if, as in the hypothetical he gave, there was an allegation that a judge had committed some kind of sexual harassment of an employee, or something like that, and the commission is forwarded that information. The Commission does work with the Chief Judge in that District, as well as the State Court Administrator's Office, to try to make sure that the employee is protected and that any investigation moving forward or disclosures are taken with protection of that person in mind. And I'm not sure if that answered your question.

**Rep. Weissman**

That's helpful. I think in the interest of time, I won't follow up on that one. Last question, and then Senator Gardner will go. A little bit differently. And we, I think actually Senator Gardner's question previously raised this, and Rep. Tipper was asking about it. But for the record, for edification of the committee, as I feel like we might be continuing to discuss this, we are used to funds moving through JBC processes, through the long bill, through some other bill. And in the independent offices that we've been hearing from yesterday and today, and some of them come and ask for more resources sometime that might take the form of a line being newly added or whatever. But as far as the registration fees that we and other attorneys pay, that's moving in a bit of a different way. We've again, we've talked about it some, but I think it's important that we're clear on this. If you could articulate, from your standpoint, as the office and the Commission, sort of the waterfall of funds coming in from attorney payments moving around pursuant to CRCP 227 and then from there.

**Elizabeth Espinosa Krupa**

And I'll let Mr. Gregory respond to that, since he's been the one preparing most of the information for our request.

**Rep. Weissman**

Mr. Gregory, please go ahead.

- 28 -

**Christopher Gregory**

With the funding request. It contemplates sort of two sources of funding, the attorney registration fees, as they exist now. If you look at Rule 227, it contains two provisions. One is that OARC is supposed to be able to offset some of their expenses for wherever they would cooperate with the Commission to complete investigations, provide special counsel. But then, the Commission itself is also listed as a beneficiary. The problem that I think, and why we're here, is that that relationship with the Office of Attorney Regulation Counsel isn't 100% reliable. Where the Commission would be able to go to them in almost any circumstance and have them complete what was contemplated through that provision in Rule 227, where this investigation and Special Counsel will be provided. So, what's being requested with the funding request is that we would essentially turn the administrative assistant into a full-time position, add a staff attorney, and add an investigator. So, that those basic functions that the Commission has done over the years would be in-house and completely independent. As the request is written now, the expectation is funding for that would still come out of attorney registration fees, at least in some form. Secondary to that, we're asking that the Legislature approve an ongoing reserve fund, a repeating reserve fund, providing the initial funding for that this year out of general fund money. Something that would allow the Commission to provide, well, for the situation that we have right now, which requires funding for Special Counsel. But in the future, if there were other extraordinary expenses, that reserve fund could be used to address conflicts or whatever cost would be involved. So, that's kind of the separation of the two. But it doesn't, essentially, create that windfall in funding that Representative Tipper was asking about. Because we're not asking to be completely taken out of the funding source that we already have now, and that still would be the stable basis for all of our operations.

**Rep. Weissman**

Okay, thank you. I'll stop there. Senator Gardner. Then, Rep. Benevides.

**Sen. Gardner**

Thank you, Mr. Chair. First of all, let me just thank Ms. Krupa, Judge Prince, Mr. Gregory, the Executive Director. And let me recognize Mr. Jim Carpenter, who's also a member of the Commission on Judicial Discipline, as citizen. No stranger to the Capitol, though, Mr. Carpenter. So, we made you come back today. Mr. Carpenter, served in the Ritter Administration. You are here at the request of several of us, because the Commission on Judicial Discipline has never testified at SMART Act hearings, to my knowledge. Others can speak for themselves as to what that reason is. That they made the request. But my reason for the request was that, over the past year and a half, we have had a series of concerning allegations about the Judicial Department that in my 30 plus years as an attorney in the State, the likes of which I don't ever recall. My constituents who know that I'm a lawyer, and my lawyer colleagues who know that I'm a legislator, stop me on the street and call me up and say, What is going on? And whether that's fair or unfair, whether it's an unfortunate set of circumstances. One begins to look and say, what is the mechanism to ensure the ethics and integrity of the Judicial Branch, itself. Which must, by its nature, operate independently. And a judicial discipline commission, which, by its nature, itself, must operate freely and independently. So, thank you for taking the time to be here. I am

- 29 -

going to say this funding request is a bit out of cycle. But that's not outside the scope of what the Legislature can do. And I share Representative Tipper's concern of ensuring that that my bar registration fees don't just sort of disappear because they have been used in the past for the Commission. And there ought to be a commitment. But constitutionally, just for my colleagues who don't know. We can't touch those funds. They belong to the Judicial Department. I say we can't. I don't care, to provoke the constitutional crisis to find out if we could or should. But there are ways to ways to get to that. There's a question coming here, Mr. Chairman. So, having said all of that and not having time to go into every detail and in the interest of disclosure, I visited with the Chief Justice, members of the Department, as well as members of the Commission. To try to understand what we as a General Assembly need to do. Let me ask you this, what does independence for the Commission on Judicial Discipline look like? What in your view, do you think the General Assembly should do? And Senator Lee is in the back of the room, but he and I both have taken a bill title to try to do this and ensure for the people of Colorado that there is a Commission. It is set up in the Constitution and can operate independently. And in a way that I can answer the question and say, there is a Commission on Judicial discipline. It is independent. You may not agree with findings that they have, or you may. But there is a place to take your complaint, and you can be assured that as much as any process of citizens and our constitutional government, that it is a free one. I apologize for the speech. What does that mean to the Commission? How do we ensure that?

**Elizabeth Espinosa Krupa**
It would be implementation of funding that is not controlled by the Judiciary. That the disciplinary commission is charged to oversee, as opposed to Judicial Leadership. Establishing a durable obligation of the Judiciary to document and disclose allegations of misconduct by judges. So, that they can be examined independently by the discipline commission. And to fix some of the structural issues that undermine operational independence of the Commission, as we're experiencing for the first time this past year. And Judge Prince would like to add to that.

**Rep. Weissman**
Go ahead.

**David Prince**
Chair Krupa hits the big three topics. But your question also included a little bit broader, because when you say what the Legislature can do. The Legislature can address the independence of funding. Again, it's independent in the written rules, but it's not operating that way. The duty of disclosure and documentation, and then some of the structural issues. One of the primary issues is constitutional, of course. And that is, again, this analogy, that the disciplinary commission works as kind of a more robust grand jury. So, we do factual investigation. We do get to do some limited discipline. And then, we make recommendations. And, ultimately, those who conduct the trial and make the final decision is the Supreme Court, itself. In other words, the judges who are being overseen. That is in the Constitution. So, this body cannot change that piece of it. That's the only thing I wanted to clarify. But quite a few other

- 30 -

things can be done because we've learned many lessons in 2021 about methods in which the structure does not lend itself to our independent operation, at this point.

**Rep. Weissman**

Senator, good for now? Okay, follow up.

**Sen. Gardner**

Thank you. And just more of a follow up comment. I want to assure those that are listening, observing today. I am convinced that both the Colorado Supreme Court, the Judicial Department generally, and the Commission on Judicial Discipline are committed to this independent judicial commission. Getting there is a bit more complicated than it appears on its surface. And events of the past year and a half have shown us that there are things as we go through the process that need to be dealt with. So, none of my comments should be taken as critical of those on either side of this equation. But it is incumbent upon us, as legislators, representatives of the people. To do what we can to ensure that independence and accountability. And I think that is shared by everyone in the Judicial Department and the Commission, as well.

**Rep. Weissman**

Thank you, Senator. Okay, next and last word, we'll go to Rep. Benevides. And Representative, either the paint on the room in which you're zooming in from is yellow, or it looks yellow in the light. It's kind of camouflaging the yellow software hand. So, sorry if I'm not seeing you timely, but Mr. Pogue is also looking out. Please go ahead.

**Rep. Benevides**

Okay, no problem. I'll try to send you a text, as well. My question really has to do with. You know, I served on the panel that looked at some of these issues, the two investigations that are being done in the Judicial Department right now. We put together the RFP language to go out to hire those. And when we were doing that, we also looked at this Commission. We couldn't really figure out who's supposed to be looking at that. Because there are also state personnel rules when a judge that's in the Judicial Department, which can be in any of the Judicial Districts. If there's a complaint from employees, because the memo, and I think the Chief Justice had referred to it. That memo referenced several complaints over several years from several employees. And there were some issues in their HR Department and in their administration. And things may or may not have been carefully investigated and determinations made. And several of those had to do with sexual harassment and other harassment-type or discriminatory complaints. So, we could never figure out what anybody should do, particularly employees. Should they go to your Commission? Should they go to their employer? Who's the judge? So, we were also looking at, how can we improve on what you do? Because I pulled up, I just pulled up your 2018 Report. And you had 200 cases that went in front of you. And 183 were dismissed, you know. And so I get real worried about the complainant, the individual, is there something with that? That they're made aware of what happened? Or there's no basis? Or other places they could take this to?

- 31 -

Because a judge in the Judicial Department is also an employer. And if it is an employment complaint, the complainant has some other options. So, I'm really looking to see if you think the structure you have. If there's anything you've looked at that you could make recommendations to us for changes? Because, honestly, we didn't think this was. Or I'll just speak for me, others that are on this panel could speak, but that it was very effective.

**Elizabeth Espinosa Krupa**

Thank you and thank you for your question. The Commission on Judicial Discipline has a screening process, as I described before, that really is to make sure not only that we have jurisdiction. But that the complaint that we receive about the judge is within our purview of looking at their conduct. Whether it affects or implicates misconduct under the judicial Code or in timing issues, which is what we see a lot. Are judges that delay orders that are prejudicial or harmful to the litigants. Different things like that. When something is dismissed, sometimes it's because we don't have jurisdiction. A lot of the complaints that we get are asking for changes in a judge's ruling, which is not what we can do. So, when there is a complaint that is dismissed, the complainant is notified in writing. If there is another resource to send them towards, then we do that. But as far as making recommendations, Representative. We'd be happy to sit with you and discuss more of those without taking up everyone else's time. But as I mentioned before, one of the things that we've discussed is whatever the MOU in existence is, it isn't necessarily working. And this request of ours to document and disclose allegations of misconduct by a judge can include sexual harassment or other conduct that may be in the purview of an employment context. So, there is a request that, structurally, we find some kind of enforcement or requirement of the courts or the State Court Administrator's Office to document and disclose to us allegations of misconduct by judges. And through our screening process, with our confidentiality rules, we determine if we are the agency to deal with that or we can make a recommendation, where else that information can go.

**Rep. Weissman**

Okay? Rep Benevides, good for now?

**Rep. Benevides**

Yeah, I appreciate that, and would love to talk to you more about that.

**Elizabeth Espinosa Krupa**

Thank you.

**Rep. Weissman**

Okay, very good. Committee, I think we need to leave it there. We've gotten a little bit further behind time. Thank you all for being with us today. We will jump right into the next segment, which is. Oh, I'm sorry, Ms. Jenson. Oh, I apologize. We do need to. All right, I hadn't been given a sign-up list. Do we have anybody online? Okay. Mr. Forsyth, I think that we've got you connected. If you can hear us, please go ahead.

**Chris Forsyth**

Thank you. Can you hear me now?

**Rep. Weissman**

We are hearing you. Please commence.

**Chris Forsyth**

Thank you for allowing me to speak. My name is Chris Forsyth. I'm an attorney who's practiced in Colorado for 27 years. Through that practice, I started what we call the Judicial Integrity Project, which seeks to improve the justice system by advocating for laws that increase transparency, enhance accountability, and remove conflicts of interest. The problems with the Judicial Discipline Commission have always been there. It's been around for 55 years. And now in 2022, they're finally requesting some changes. It's a relief that changes are being requested. The funding is one part of what is wrong with this Commission. The Commission was created in 1966, went into place in 1967. In the early 80s, rules were adopted. There was some discipline being handed out by the Commission before the 80s. And rules were adopted creating an Executive Director and requiring the Executive Director to dismiss complaints. From 1986 to 2014 there was not one single case of public judicial discipline. 28 years, there wasn't any public judicial discipline. We started speaking up in 2012 and pointing that out. That there hadn't been a case of public judicial discipline in a surreal amount of time, In 2014, all of a sudden, a stipulation regarding a judge leaving the bench was published. And, then, now we get to the more recent years. In 2019, then, finally came another judge where the case was actually litigated. So, due to public pressure, the discipline commission has begun to act a little more responsibly. But problems with the Commission are in the Constitution.

And I disagree with some of the testimony thus far, saying that the General Assembly can't do anything about the Constitution. As we all know, the General Assembly can pass a resolution for a referendum to put it on the ballot. And that's where the judicial discipline commission originally came from. And we're advocating for the General Assembly to do that again. Because this Commission, as it is constituted, as it is created, is failing us miserably. The recent acts of discipline have been reactions of the judicial discipline to criminal prosecution and news stories. The discipline commission is not taking the forefront on disciplining judges for misconduct, as it should be. There is a state out there who handles judicial misconduct a lot more responsibly. That state is California. You simply need to look at California to see how that commission is set up. And you can draft a referendum off of that and come up with a better Commission. Just recently, NBC News wrote an article regarding judicial discipline, and the article states quote, "Legal ethics experts say, the minuscule share of judges punished every year isn't necessarily indicative that all is well in the judiciary. It suggests a lack of accountability." And that is exactly what we have in Colorado. Is a lack of accountability. California publishes judicial discipline proceedings. Colorado does not. That is the worst aspect of the current judicial discipline process. Is the overbearing lack of transparency. So, to give the discipline commission true independence. It's somewhat hypocritical for the judicial discipline commission testifying here today that it wants

- 33 -

independence when it is tied to the Supreme Court. The Supreme Court makes the Rules for the Commission. The Executive Director, by those Rules, reports to the Supreme Court. And as long as those items stay the way they are, there will be no true independence for the judicial discipline commission. In California, the commission makes its own rules. The commission is the entity that actually disciplines the judge, not the Supreme Court. They don't have an Executive Director who dismisses most of the complaints, as we do in Colorado. They allow the information that the commission has to be accessed by other agencies. In Colorado, we have a situation where judicial performance commissions are advising voters to retain judges who may very well have been disciplined or are going through disciplinary proceedings. It's unbelievable that this is taking place in the 21st century. Do we want the budget for the commission to be public? Yes, that's how California has it. And the budget in California states the budget shall be separate from the budget of any other state agency or court. California has it, right. Who is on the Commission? In California, they have a better situation because the citizens outnumber the legal professionals. In Colorado, we have four judges, two lawyers outnumbering four citizens. In California, they have six citizens outnumbering three judges and two lawyers.

**Rep. Weissman**

Mr. Forsyth, typically, we do three-minute public comments here. I've allowed you to run significantly over. I will ask you to conclude, please

**Chris Forsyth**

Okay. And thank you for allowing me that time. We encourage you to look harder at this and consider drafting a referendum to put before the people that would truly make the judicial discipline commission independent. Removing its ties from the Supreme Court, allowing it to create its own rules, and, most importantly, creating transparency. Documents filed with the discipline commission should be public. The public should know if a judge is facing discipline. And there should be funding for a published database on the Commission's website so people can search whether judges have been disciplined. This is the way it is in almost all the other states. Colorado is just way, way, way far behind. Thank you.

**Rep. Weissman**

Okay. Mr. Forsyth, thank you for speaking with us today. All right. Can we check? Is there anyone else who is wanting to speak online before we move away from public comments? I don't think we have any. Okay, thanks again for being with us this afternoon. We will now move to the next segment.

**Appendix 27(k)**

**Transcript of *Hearing before the S. Judiciary Comm.*, Colo. Leg., March 3, 2022 (confirmation of James Carpenter and Mindy Sooter to Colo. Comm. Jud. Discipline);**

# Senate Judiciary Committee—March 3, 2022 Confirmation Hearing for CCJD Members Mindy Sooter and James Carpenter

**Sen. Lee**

We do have a quorum, and we are ready to proceed. The first order of business, our confirmation hearings for the Colorado Commission on Judicial Discipline. I see we have some candidates here. If you want to join us at the witness table.

**Sen. Lee**

So who would like to begin? Go right ahead.

**Sen. Gonzales**

There is a little great, yep, gray button there at the bottom.

**Christopher Gregory**

We're on.

**Sen. Lee**

Okay, very good.

**Sen. Lee**

Start again, if you would please.

**Christopher Gregory**

Sorry, Mr. Chair. I'm Christopher Gregory, the Executive Director of the Commission, with me, Jim Carpenter and Mindy Sooter. They are serving terms that started July 1 of this past year, and we're here for that confirmation.

**Sen. Lee**

Very good. One of you, or either of you, tell us who you are. Just introduce yourself. Tell us a little bit about your background and why you want to serve in this august capacity. And I don't say that flippantly, I think this is really one of the most important commissions that we have in Colorado. I think the public trust in the integrity of judges and justices is absolutely critical to a functioning democracy, and I think we are in a time when everything is questioned. So, to have an independent agency that addresses those issues is, to me, one of the most critical things. So, tell us why you would like to be involved in this.

**Mindy Sooter**

Thank you. Mr. Chair. My name is Mindy Sooter, and I am an attorney in Colorado. I've been an attorney since 2003 when I graduated from the University of Colorado School of Law. Law is my second career, and perhaps because it is my second career, I came into it very enthusiastically. And one of the things that I can't say as well as you did, Mr. Chair, but I would just echo is that the institution of our judiciary, both in the state and the federal levels, is core to our democracy. And I am in private practice. I work for a firm called WilmerHale. And because I'm in private practice, I don't do as much work for the state or for the people as I would like to, and so when I was asked to serve on this committee, it was a great honor to be able to help serve our judiciary and do work for the state to help make our government a better place.

**Sen. Lee**

Okay, thank you. Why don't you follow that same script?

**Jim Carpenter**

Great. Thank you. Mr. Chairman, members of committee. My name is Jim Carpenter. I come to the Commission as a citizen member, which I think is an important piece of what the Commission's business is. That it not only has judges and attorneys on the Commission, but also four citizen members. I'm a native of Colorado. Grew up in a small town, Granby. I have had a career in both federal and state government. I was privileged enough to work in this building for Roy Romer for four years as his Communications Director, and then as Chief of Staff to Governor Ritter for four years. And you know, I'm a huge believer in the institutions of our democracy. My experience is obviously in the Executive Branch, but the Legislative and Judicial Branches, as well. Colorado has this really interesting system that the voters created in the 60s on how we select, evaluate, and ultimately discipline (in needed cases) judges. I also was fortunate enough to be a citizen member of both the 18th Judicial Nominating Commission and the Supreme Court Nominating Commission, which was an enormous honor to serve on both of those for six years each, actually. And when my term on the nominating commission, Supreme Court Nominating Commission was up, the Governor asked if I would serve on the Discipline Commission, which I have pleased and honored to do that. So, I thank you for your time and your work on all of this and appreciate the chance to be here today.

**Sen. Lee**

Okay. Well, thank you. Are there any questions from the committee for any of the nominees? Senator Gardner.

**Sen. Gardner**

Thank you, Mr. Chair. Mr. Carpenter, Ms Sooter, thank you both for being here. Just as a side comment to the committee, I told Ms Sooter that the most impressive part of her resume is that she has a degree in electrical engineering from Texas A & M. I never understood V equals IR but, and I won't ask you to explain it, because I looked it up and I saw something on Google that said YV equals IR is wrong, and I

don't even want to go down that road with you. But I would like to ask you both on a more serious vein, we have had a good deal of press discussion and concern in our state concerning the judiciary. The Commission on Judicial Discipline serves a vital role in the integrity and accountability of our Judiciary. I think it's been a good system overall. But do you have any thoughts for the committee? There's no secret that we're considering some legislation to ensure or further ensure the independence of the Commission. And I just wonder if you have thoughts about that legislative proposal, those thoughts you had, I know, Mr. Carpenter was in the room for the SMART Act hearings, and we sort of addressed the same thing. So, I'll stop and just let you comment as you wish, or if you'd rather not, that's okay as well.

**Sen. Lee**
Ms. Sooter, go right ahead.

**Mindy Sooter**
Thank you, Mr. Chair and Senator Gardner. I'm not prepared to discuss the legislation, certainly not in any detail, but I will say that I do come to the committee or the Commission with the interest of making the judiciary stronger and making our State stronger as a whole. So that will be the guiding principle in the acts that I help perform with the Commission. But apart from that, as familiar with the details of the process right now with the pending legislation.

**Sen. Lee**
Let the record reflect that Senator Cooke has joined us, Madam Vice Chair.

**Sen. Gonzales**
Thank you, Mr. Chair. I want to follow up on the question from Senator Gardner, and first, just extend my appreciation to you for being willing to serve in this capacity in this time where I do think that we are recognizing the need for some change to the way that things have been done. Ms Sooter, in your application, you reflected on ensuring that the Judiciary has an appropriate work ethic, demeanor and temperament. How do you, and this is a question, actually, for both of you. How do you respond in these moments of conflict, in these moments of challenge?

**Sen. Lee**
Ms. Sooter.

**Mindy Sooter**
Thank you, Mr. Chair and Senator Gonzales, well, I would like to think that our government and the Commission can get through this together. We do have a mission to increase the integrity or help protect the integrity of the judiciary, and I do believe that the people who serve this state serve it with good intentions at heart, and we have a mission to investigate complaints that are brought to the Commission to ensure that the judges in the State are abiding by the judicial Canons and there's no appearance of impropriety, and that we take appropriate actions when there is. So, we'll diligently conduct our

- 3 -

investigations. Of course, we have a duty of confidentiality as well, but we take the responsibility very seriously, and so we're all willing to dedicate the time, and frankly, it's an honor to be able to serve in this capacity.

**Sen. Gonzales**
Thank you. Mr. Carpenter,

**Jim Carpenter**
Yes, thank you, Mr. Chair. Senator Gonzales, I think I would just add to that. You know, the Commission is instituted in the in the Constitution and it goes to maybe Senator Gardner's question as well. You know, there isn't really a statute that provides additional guidance and information and rules and sideboards for the Commission. And, so, I think that those become more important to develop as this as this gets more and more complicated. The Judiciary is under a fair amount of pressure, Covid, growth in the state, just all of these other issues here that puts continued pressure on all of our institutions. And the discipline commission really is the only body that has this ability in the in the state Constitution, to review the behavior and conduct of judges and make these determinations and recommendations. It is a very confidential process. It's a very robust process. We're all volunteers. It's a lot of work. I mean there's a lot of information to read and process and deal with, and so we all I think, have this responsibility to kind of face these challenges that we have and do the very best we can within the constructs of the Constitution. Whatever decisions that you and the Legislature make about additional bills and guidance, we of course will follow those as well.

**Sen. Lee**
Any further questions from the committee? Just a final comment. I am impressed with the credentials that both of you bring. The fact, Mr. Carpenter, that you have served on a nominating commission and a disciplinary or on a performance commission gives you a robust background into how all of this work works, and then serving under the dome under two governors, I think gives you a real tremendous scope of knowledge. Ms. Sooter, as a practicing attorney, I think you bring those credentials, but I can't help but note your undergraduate academic record, of Magna Cum Laude, of phi beta kappa, Order of the Coif, and Law Review, which to lawyers, are the most highest honors and distinctions. So, you're obviously gifted, and we are honored that you would bring that background to this voluntary endeavor to improve the judicial conduct in Colorado. So with no further comments. Ms Jenson, would you.

**Sen. Gardner**
Do we need a motion?

**Sen. Lee**
Need a motion first. Madam Vice Chair.

- 4 -

**Sen. Gonzales**

Thank you, Mr. Chair. I really appreciate you all being willing to serve in this capacity, and I move to the full Senate with a favorable recommendation the appointment of Ms. Mindy Sooter and the reappointment of James Carpenter to the Colorado Commission on Judicial Discipline.

**Sen. Lee**

Very good. Good motion. Ms. Jenson, please poll the Committee.

**Juliann Jenson**

Senators. Cooke.

**Sen. Cooke**

Aye.

**Juliann Jenson**

Gardner.

**Sen. Gardner**

Aye.

**Juliann Jenson**

Rodriguez.

**Sen. Rodriguez**

Aye.

**Juliann Jenson**

Gonzales.

**Sen. Gonzales**

Aye.

**Juliann Jenson**

Mr. Chair.

**Sen. Lee**

Aye.

- 5 -

# Appendix 27(l)

# Email from Kurt Morrison to Judiciary Committee Chairs Pete Lee and Michael Weissman—March 8, 2022;

---

| **From:** | Kurtis Morrison <Kurtis.Morrison@coag.gov> |
|---|---|
| **Sent:** | Tuesday, March 8, 2022 4:16 AM |
| **To:** | senatorpetelee          Mike Weissman |
| **Cc:** | Jefferey Riester |
| **Subject:** | Bill Draft Analysis - Concerning the Commission on Judicial Discipline |
| **Attachments:** | 22-0764_01_20220225.pdf |

Rep. Weissman and Sen. Lee:

Per your request, below is a review we conducted of the constitutionality and other matters pertaining to bill draft LLS 22-0764.01 regarding the role, authority, and procedures of the Commission on Judicial Discipline ("Commission").

Please note that this feedback is compiled from the analysis of multiple attorneys throughout several separate sections and units at the Department of Law, and that this content does not constitute a formal legal opinion or an official position on the bill draft by Attorney General Weiser.  We are happy to work with you or the proponents on any of these matters or in suggesting language.

**Constitutionality Issues**
- ***Colo. Const. art. VI, § 23(3)(h)/Separation of Powers/Rulemaking Authority.***  The bill draft proposes several statutes that would be in conflict with the Colorado Constitution. The Constitution requires the Colorado Supreme Court to adopt rules governing the Judicial Discipline Commission's procedures.  The Court's rulemaking authority is not limited by the Constitution to "formal proceedings" as stated in the bill.  The Constitution states: "(h) The supreme court shall *by rule provide for procedures before the commission* on judicial discipline, the masters, and the supreme court.  The rules shall also provide the standards and degree of proof to be applied by the commission in its proceedings." Colo. Const. art. VI, § 23(3)(h) (emphasis added).  As such, the Constitution does not provide a role for the Commission or Legislative Branch in this process and rather leaves it solely to the discretion of the Court.  Furthermore, the Constitution does not place limits on the Court's rulemaking authority as provided in Colo. Const. art. VI, § 23(3)(h) or subject it to the legislative process.  There are multiple sections in the draft bill where the proposed statutes would conflict with the Constitution's issuance of rulemaking authority to the Supreme Court.  To allow the bill draft's provision on rulemaking by the Commission, a constitutional amendment is required.
  - ***Example.*** The Supreme Court presently has a rule on disqualification via C.R.J.D. 9., yet the bill's disqualification procedures allow the Commission to determine who may participate in the proceedings, including special masters appointed by the Supreme Court and, in fact, the Supreme Court justices themselves. *See* Proposed § 107, pp. 13-14.
  - ***Example.***  The Supreme Court presently has rules governing subpoenas issued by the Commission.  *See* C.R.J.D. 4(d), 22.  Yet the bill draft's procedures for issuing and enforcing subpoenas allows the Commission to issue subpoenas, gives the Commission authority to resolve any challenge to a subpoena on its own, and the Commission's decision is not reviewable.  *See* Proposed § 108, pp. 14-15.
  - ***Example.*** The Constitution provides that the Commission's proceedings "shall be confidential," Colo. Const. art. VI, § 23(3)(g), and also tasks the Supreme Court with rulemaking to implement the constitutional language. Colo. Const. art. VI, § 23(3)(h).  The Supreme Court has adopted rules that provide for narrow exceptions to confidentiality, and all of them are consistent with ensuring that there is an effective disciplinary process. *See* C.R.J.D. 6.5.  However, the bill draft would establish statutory exceptions to confidentiality in Proposed § 109, pp. 15-17, despite the express constitutional language that the proceedings "shall be confidential" and despite the Supreme Court's contrary rules promulgated under its constitutional authority to do so.

1

- ***Colo. Const. art. VI, § 23(3)(e), (3)(f)/Court's Exclusive Sui Generis Proceedings***. Like attorney regulation proceedings, judicial discipline proceedings are a *sui generis* process established by the Colorado Constitution over which the Supreme Court has exclusive ultimate authority under the Constitution.  *See* Colo. Const. art. VI, § 23(3)(e) (stating the Commission after formal proceedings may "*recommend* to the supreme court the removal, retirement, suspension, censure, reprimand, or discipline, … of the justice or judge." (emphasis added)); *id.* at § 23(3)(f) (stating Supreme Court "in its discretion" may "order removal, retirement, suspension, censure, reprimand, or discipline," or may "wholly reject the [Commission's] recommendation."); *cf. Chessin v. Office of Attorney Regulation Counsel*, 458 P.3d 888, 891 (Colo. 2020) (explaining attorney discipline proceedings are "sui generis," having been "designed for the precise, and sole, purpose of exercising [the Supreme Court's] exclusive jurisdiction and fulfilling this responsibility of the supreme court."").  Unless the Supreme Court changes its rules governing the judicial discipline process or a constitutional amendment is enacted, the bill's provisions purporting to move the existing Judicial Discipline Commission out from under the Supreme Court, and those giving the Denver District Court jurisdiction over certain enforcement issues, would conflict with the Constitution and be void. *See, e.g.*, *Chessin*, 458 P.3d at 892-93 (Denver District Court lacked subject matter jurisdiction to hear case attempting to compel the Attorney Regulation Counsel to investigate alleged attorney misconduct); *Ritchie v. Polis*, 467 P.3d 339, 345 (Colo. 2020) (state constitutional requirement that ballot initiative petitions be signed in the presence of the petition circulator could not be suspended by the Governor, even during a pandemic).

- ***Colo. Const. art. VI, § 21/Funding***. Under Colo. Const. art. VI, § 21, the Supreme Court has rulemaking authority over the administration of all state courts and has general supervisory authority over the practice of law in Colorado. *See Colo. Supreme Court Grievance Comm. v. Dist. Court*, 850 P.2d 150, 152 (Colo. 1993) ("The Colorado Supreme Court, as part of its inherent and plenary powers, has exclusive jurisdiction over attorneys and the authority to regulate, govern, and supervise the practice of law in Colorado to protect the public."). The Supreme Court, through the Office of Attorney Regulation Counsel ("OARC"), collects fees from attorneys to support the Supreme Court's obligation to regulate the practice of law. The bill's blended funding approach (*see* Proposed § 104(3), p. 10), which apparently is present practice but is incorporated in Judicial Department rules and not in statute, expressly requires an appropriation by the General Assembly and the Long Bill and legislative approval of expenditure of OARC funds.  The bill draft thus impedes both OARC's ability to budget for itself and funded units, and with the Supreme Court's ability to set registration fees consistent with its exclusive authority to regulate the practice of law.

- ***Due Process.*** The bill draft creates procedures which may violate due process protections. By limiting the Court's rulemaking authority, the bill draft creates an entity with no oversight regarding a large portion of complaints that come before the Commission.  There are no due process guarantees, and the bill appears to allow the Commission to unilaterally impose discipline with little or no process.  The bill draft creates a new mandatory reporting standard that is much lower than current reporting requirements.  It defines "judicial misconduct" as including hypothetical or fabricated allegations, which must be assumed as true, even before any process or opportunity for the judge to respond. *See* Proposed § 102(9), p. 5.  The bill requires reporting and documentation of any "allegation of potential judicial misconduct" (with "misconduct" defined in § 102(9) as "conduct that, if the conduct occurred, is subject to a reasonable argument that it violates the Code of Judicial Conduct").  The bill does not specify what the new "reasonable argument" standard is in the § 102(9) definition.  There is also no appellate review on certain issues, such as commissioner disqualification decisions and subpoena enforcement decisions.  Regarding disqualification, § 107(4) seems to state that the Commission may choose who to disqualify in the decision-making process, including special masters appointed by the Supreme Court and Supreme Court justices themselves. *See* Proposed § 107(2)).  That decision is not reviewable.  Any commissioner may request disqualification of a decisionmaker (including a Supreme Court justice) without even having to comply with affidavit requirements that would otherwise be required under C.R.C.P. 97.  In combination with § 111(2) requiring four conflict-free justices, as defined by the bill draft, this provision allows the Commission, at its sole discretion, to create cases where it can prevent any review of its decision.  This violates core due process protections under the US and Colorado constitutions and the basic constitutional requirement of separation of powers.  Notably, this provision concerns "procedures before the

2

commission" and thus falls under the rulemaking power delegated under Colo. Const. art. VI, § 23(3)(h) to the Supreme Court, not the Commission.

- **Taxpayer Bill of Rights.**  Use of fees derived from one source for a purpose that does not benefit the feepayer has the potential to convert a fee into a tax, thereby limiting the ability for that fee to be increased absent a vote of the electorate required by the Colorado Constitution under the Colorado Taxpayer Bill of Rights ("TABOR").  Our understanding is that the bill draft's fee sharing arrangements with OARC reflects current practice and is spelled out in Judicial Department rule.  However, it should be noted that if the fee levels are raised to accommodate new budgetary needs due to the bill draft's inclusion of the Commission, it is possible that such an action draws a legal challenge from a plaintiff on the reasonableness of the fee amount under the Supreme Court's case law interpreting TABOR.  The risk of such a lawsuit would be that a portion of the last four years of OARC fees could be subject to a refund to the feepayers.

## Statutory Issues
- **Deviation from State Laws on Legal Counsel to State Agencies and Commissions.**  Since the 1970s, state law has required the centralization of legal services to be provided by the Department of Law (commonly referred to as the "Oregon Plan").  This policy was reaffirmed in the 2020 legislative session when the legislature modified language governing the providing of legal services to all agencies, commissions, boards, departments, etc. within both the Executive and Judicial Branches.  § 24-31-111(1), (6)(b), C.R.S. ("The attorney general shall provide legal services for each state agency. . . . " and "'State agency' means any . . . . commission . . . . of the executive department and judicial department of state government.").   To account for additional expertise or supplemental legal representation as may be required by client agencies, the Attorney General has statutory authority to, when deemed necessary, appoint special assistant attorneys general to provide legal counsel. *Id.* at § 101(1)(g).  The bill draft's establishment of Commission counsel to provide legal services to the Commission and Office is outside of the State's Oregon Plan model, deviates from and conflicts with current state laws governing legal services to state commissions, and allows private sector attorneys not approved by the state attorney general to appear before the courts "as a representative of the people if a matter goes to formal proceedings.".  *See* Proposed §§ 105 & 106(3), pp. 7, 10, 11, 12, 14, 17.  Our understanding is that the bill proponents do not intend such a conflict, and the Department of Law is willing to offer language suggestions to address this matter.

- **Colorado Governmental Immunity Act.**  The bill draft provides immunity from suit for Commission members and office employees.  However, in doing so, the bill draft establishes new immunity laws under the proposed Article 5.3.  Consequently, the bill draft potentially removes state employees of the Commission that would already benefit from immunity laws provided under the Colorado Governmental Immunity Act ("CGIA") as well as substantial case law interpreting the CGIA.  *See* § 24-10-101, C.R.S. *et seq.*  Providing separate immunity provisions for state employees acting under Article 5.3 could create unintended consequences for individual employees.  *See* Proposed §§ 103 & 105, pp. 7, 10-11.  The Department of Law recommends removal of these provisions and reliance on the CGIA.

## Policy Considerations
- **Acceptance of Private Funds.**  The bill draft's proposed § 115(1) authorizes the Commission to accept "private funds" to be used for "any purpose consistent with the provisions of this article 5.3".  Such arrangements could create actual or apparent conflicts of interest should certain persons or law firms with interests before the Commission and its oversight of judges be allowed to make private donations to benefit the Commission's budget.

- **Minimum Salary Requirements.**  The bill draft's proposed §§ 103(3)(e), 103(3)(f), and 104(2)(b) provide that Commission employees' salaries cannot be reduced and the establishment of minimum starting salaries.  However, this may not be feasible in cases of budget downturns, revenue reductions and budget cuts, state employee furloughs, etc. But budget downturns may require reduction.

3

- **Information Sharing and Confidentiality**.  The bill draft seems to give the Commission authority to determine which claims of privilege or confidentiality are "valid." *See* Proposed §§ 109(1), 113(5)(c). This determination should involve the entity or person claiming the privilege or subject to the confidentiality restriction.

- **Privilege and Confidentiality Waiver**.  The bill draft's proposed § 113(5) would require the Judicial Department to divulge to the Commission privileged information and information that is confidential by contract.  Disclosure of privileged information to the Commission could constitute a waiver of the privilege, particularly under federal case law in which federal courts are not necessarily bound by contrary state statutes on issues of waiver.  Similarly, the Judicial Department is bound by agreements it has entered into in the past.  The language of the bill draft may require the Judicial Department to violate those agreements, creating potential financial liability to the State. For example, if an agreement states that it cannot be disclosed to a third party "absent a valid subpoena or court order," this provision seemingly requires the Judicial Department to violate that agreement.

- **Administrative Support**.  The bill draft's proposed § 104(3) requires the Judicial Department to provide administrative support for the Commission.  This runs counter to the bill draft's stated goals by permitting operational influence over the Commission.  For example, under proposed § 113(5)(b)(IV), stating the Judicial Department shall not use its authority to access confidential internal digital files or communications of the Commission, the Judicial Department's level of support and approval or disapproval of Commission actions could be viewed as interfering with the Commission's operations.

- **Fiscal Note/Resource Limitations.**  The bill draft requires a report and documentation from the Judicial Department for every complaint of judicial misconduct.  *See* Proposed § 113.  The Judicial Department receives thousands of complaints every year from litigants, and current practice is to refer these persons directly to the Commission.  If the Judicial Department must document every complaint, gather relevant information and witnesses, and refer that to the Commission, the Department will have a significant increase in workload, which will necessarily have a fiscal impact and require additional resources by the Judicial Department.

- **Requirement that All Allegations be Forwarded to the Commission.** Furthermore, the requirement contained in proposed § 113(2) that *all* allegations, however meritless, receive a detailed evaluation will create significant costs and burdens on the Commission.  This is also likely to lead to unintended outcome of empowering organized efforts to create the appearance of a misconduct when no factual basis exists for such an allegation.  Requiring such a process for every complaint, without any threshold or consequence for filing unfounded claims, is likely to result of harassment of judges, particularly those assigned high-profile cases with significant public interest.

- **Open Records.**  The bill draft contains no clear applications to or exemptions from state open records laws, particularly the Colorado Open Records Act, for Commission records and documents.

---------

Kurtis T. Morrison
Deputy Attorney General for Intergovernmental Affairs
Office of the Attorney General



C O L O R A D O
Department of Law
Attorney General Phil Weiser

P 720.508.6547 | C 303.990.3135
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
kurtis.morrison@coag.gov |www.coag.gov

4

**Second Regular Session**
**Seventy-third General Assembly**
**STATE OF COLORADO**

**DRAFT**

**DRAFT**
**2.25.22**

LLS NO. 22-0764.01 Jerry Barry x4341                                    **SENATE BILL**

**SENATE SPONSORSHIP**

**Lee and Gardner,**

**HOUSE SPONSORSHIP**

**Weissman and Carver,**

---

**BILL TOPIC:** "Commission On Judicial Discipline"

---

**A BILL FOR AN ACT**

101          **CONCERNING THE COMMISSION ON JUDICIAL DISCIPLINE.**

**Bill Summary**

*(Note: This summary applies to this bill as introduced and does not reflect any amendments that may be subsequently adopted. If this bill passes third reading in the house of introduction, a bill summary that applies to the reengrossed version of this bill will be available at http://leg.colorado.gov.)*

A commission on judicial discipline (commission) is established pursuant to section 23 (3) of article VI of the state constitution. The bill implements the commission by:

- Specifying the duties of the commission;
- Establishing and specifying the duties of an office of judicial discipline (office) as an independent office within the judicial department;
- Authorizing the commission to appoint an executive

*Capital letters or bold & italic numbers indicate new material to be added to existing statute.*
*Dashes through the words indicate deletions from existing statute.*

DRAFT
2.25.22

director of the office and specifying the duties of the executive director;

- Authorizing the commission to appoint and determine the duties of special counsel that may include representing the people in formal proceedings;
- Establishing immunity for commissioners, employees of the office, and special counsel;
- Authorizing the commission to adopt rules governing its administration and operation;
- Specifying when a person involved in a judicial discipline decision should be disqualified;
- Authorizing the administration of oaths or affirmations and the issuance of subpoenas;
- Providing for the confidentiality of information gathered in connection with the commission's work;
- Establishing procedures for when the commission submits recommendations to the supreme court;
- Specifying when information should be shared among offices with the judicial department responsible for reviewing actions of current and potential judges and justices;
- Specifying duties of personnel within the judicial department when they become aware of potential issues of judicial discipline; and
- Establishing a special cash fund and specifying sources of money for the fund and uses of the money in the fund.

---

*Be it enacted by the General Assembly of the State of Colorado:*

**SECTION 1.** In Colorado Revised Statutes, **add** article 5.3 to title 13 as follows:

### ARTICLE 5.3

### Commission on Judicial Discipline

**13-5.3-101. Legislative declaration.** (1) THE GENERAL ASSEMBLY FINDS AND DECLARES THAT:

(a) THE PEOPLE OF THE STATE OF COLORADO ARE ENTITLED TO AN ABLE, INDEPENDENT, FAIR, IMPARTIAL, AND ETHICAL JUDICIARY THAT IS FREE OF ACTUAL MISCONDUCT AND THE APPEARANCE OF IMPROPRIETY.

DRAFT
2.25.22

SUCH A JUDICIARY IS ESSENTIAL TO THE FUNCTIONING OF A CIVIL SOCIETY.

(b)   UNDER SECTION 23 (3) OF ARTICLE VI OF THE COLORADO CONSTITUTION, THE INTEGRITY OF COLORADO'S SYSTEM OF SELECTING AND RETAINING JUDGES DEPENDS UPON THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE BEING ABLE TO INDEPENDENTLY INVESTIGATE AND ADDRESS ALLEGATIONS OF JUDICIAL MISCONDUCT OR JUDICIAL DISABILITY;

(c)   AN INDEPENDENT COMMISSION ON JUDICIAL DISCIPLINE PROVIDES OVERSIGHT TO HOLD JUDGES AND JUSTICES ACCOUNTABLE FOR COMPLIANCE WITH THEIR ETHICAL OBLIGATIONS UNDER THE COLORADO CONSTITUTION AND THE COLORADO CODE OF JUDICIAL CONDUCT. THE COMMISSION FURTHER PROTECTS THE PUBLIC FROM CIRCUMSTANCES WHEN A DISABILITY PREVENTS A JUDGE OR JUSTICE FROM PERFORMING THE DUTIES OF THEIR OFFICE.

(d)   AN EFFECTIVE SYSTEM OF JUDICIAL ACCOUNTABILITY REINFORCES PUBLIC PERCEPTIONS OF THE CREDIBILITY OF THE JUDICIARY AND PRESERVES JUDICIAL INDEPENDENCE;

(e)   TO CREDIBLY INVESTIGATE AND ADDRESS ALLEGATIONS OF JUDICIAL MISCONDUCT AND THEREBY FULFILL THE REQUIREMENT OF ACCOUNTABILITY, THE COMMISSION MUST BE INDEPENDENT FROM THE JUDGES AND JUSTICES WHO ARE SUBJECT TO THE COMMISSION'S OVERSIGHT;

(f)   WITHIN THE CONSTITUTIONAL LIMITATIONS ON CONFIDENTIALITY, THE WORK OF THE COMMISSION SHOULD BE AS TRANSPARENT AS POSSIBLE;

(g)   TO EFFECTIVELY PERFORM ITS CONSTITUTIONAL FUNCTION, THE COMMISSION NEEDS UNFETTERED ACCESS TO ALL INFORMATION AND

-3-                    DRAFT

DRAFT
2.25.22

DOCUMENTS AVAILABLE TO THE DEPARTMENT AND RELEVANT TO ANY ALLEGATION OR INVESTIGATION OF JUDICIAL MISCONDUCT OR JUDICIAL DISABILITY; AND

(h) THE EFFICACY OF THE COMMISSION ALSO DEPENDS UPON THE EXISTENCE OF CONFLICT-FREE, SECURE, STABLE, AND DEFINED FUNDING THAT ALLOWS THE COMMISSION TO MAINTAIN INDEPENDENCE AND RESPOND TO DISCIPLINARY ISSUES WITHOUT DELAY AND WITHOUT BEING SUBJECT TO IMPROPER INFLUENCE EXERCISED BY THOSE BEING OVERSEEN.

**13-5.3-102. Definitions.** AS USED IN THIS ARTICLE 5.3, UNLESS THE CONTEXT OTHERWISE REQUIRES:

(1) "ATTORNEY" MEANS A PERSON ADMITTED TO PRACTICE LAW BEFORE THE COURTS OF THIS STATE.

(2) "CODE" MEANS THE COLORADO CODE OF JUDICIAL CONDUCT.

(3) "COMMISSION" MEANS THE COMMISSION ON JUDICIAL DISCIPLINE, ESTABLISHED PURSUANT TO SECTION 23 (3) OF ARTICLE VI OF THE COLORADO CONSTITUTION.

(4) "COMMISSIONER" MEANS AN APPOINTED MEMBER OF THE COMMISSION ON JUDICIAL DISCIPLINE OR A SPECIAL MEMBER APPOINTED PURSUANT TO SECTION 23 (3)(b) OF ARTICLE VI OF THE COLORADO CONSTITUTION.

(5) "DEPARTMENT" MEANS THE COLORADO STATE JUDICIAL DEPARTMENT AND ALL ITS SUBPARTS SUCH AS THE OFFICE OF THE STATE COURT ADMINISTRATOR; THE OFFICE OF THE CHIEF JUSTICE OF THE SUPREME COURT; THE OFFICE OF ATTORNEY REGULATION COUNSEL; THE JUDICIAL DISTRICTS AND THEIR ADMINISTRATIONS, INCLUDING CHIEF JUDGES AND DISTRICT ADMINISTRATORS; THE HUMAN RESOURCES DEPARTMENT; AND OTHER ADMINISTRATIVE SUBPARTS.

DRAFT

(6) "EXECUTIVE DIRECTOR" MEANS THE EXECUTIVE DIRECTOR OF THE OFFICE OF JUDICIAL DISCIPLINE APPOINTED PURSUANT TO SECTION 13-5.3-104.

(7) "FUND" MEANS THE COMMISSION ON JUDICIAL DISCIPLINE SPECIAL CASH FUND, CREATED IN SECTION 13-5.3-115.

(8) (a) "JUDGE" MEANS ANY JUSTICE OR JUDGE OF ANY COURT OF RECORD OF THIS STATE SERVING ON A FULL-TIME, PART-TIME, OR SENIOR BASIS.

(b) "JUDGE" ALSO INCLUDES ANY JUSTICE OR JUDGE WHO HAS RETIRED WITHIN THE JURISDICTIONAL LIMITS FOR DISCIPLINARY PROCEEDINGS ESTABLISHED BY THIS ARTICLE 5.3, THE COMMISSION, OR THE COLORADO SUPREME COURT.

(c) "JUDGE" DOES NOT INCLUDE MUNICIPAL JUDGES OR MAGISTRATES, ADMINISTRATIVE LAW JUDGES, OR DENVER COUNTY COURT JUDGES, SINCE THEY ARE SUBJECT TO DIFFERENT DISCIPLINARY AUTHORITIES.

(9) "JUDICIAL MISCONDUCT" MEANS CONDUCT THAT, IF THE CONDUCT OCCURRED, IS SUBJECT TO REASONABLE ARGUMENT THAT IT VIOLATES THE COLORADO CODE OF JUDICIAL CONDUCT.

(10) "JUSTICE" MEANS A JUSTICE SERVING ON THE SUPREME COURT OF COLORADO ON EITHER A FULL-TIME OR SENIOR BASIS.

(11) "OFFICE" MEANS THE OFFICE OF JUDICIAL DISCIPLINE CREATED IN SECTION 13-5.3-104.

(12) "OFFICE OF THE STATE COURT ADMINISTRATOR" MEANS THE OFFICE CREATED PURSUANT TO SECTION 13-3-101 (1).

(13) "SUPREME COURT" MEANS THE SUPREME COURT OF THE STATE OF COLORADO ESTABLISHED PURSUANT TO ARTICLE VI OF THE COLORADO

DRAFT
2.25.22

CONSTITUTION.

**13-5.3-103. Commission on judicial discipline - establish - term - powers and duties.** (1) PURSUANT TO SECTION 23 (3) OF ARTICLE VI OF THE COLORADO CONSTITUTION, THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE IS ESTABLISHED AS AN INDEPENDENT COMMISSION HOUSED WITHIN THE JUDICIAL DEPARTMENT.

(2) MEMBERS OF THE COMMISSION ARE APPOINTED AND SERVE PURSUANT TO THE PROVISIONS OF SECTIONS 23 (3) (a) AND (b) OF ARTICLE VI OF THE STATE CONSTITUTION.

(3) THE COMMISSION SHALL:

(a) HAVE JURISDICTION OVER A JUDGE REGARDING ALLEGATIONS OF MISCONDUCT OR A DISABILITY AND THE APPLICATION OF DISPOSITIONS AND SANCTIONS THERETO, BASED ON EVENTS THAT OCCURRED WHILE THE JUDGE WAS AN ACTIVE OR SENIOR JUDGE, IF A REQUEST FOR EVALUATION OF JUDICIAL CONDUCT IS RECEIVED BY THE COMMISSION OR A COMPLAINT IS STARTED ON THE COMMISSION'S MOTION DURING OR WITHIN ONE YEAR AFTER THE LATER OF:

(I) THE END OF THE JUDGE'S TERM OF OFFICE;

(II) THE JUDGE'S SERVICE IN THE SENIOR JUDGE PROGRAM; OR

(III) THE EFFECTIVE DATE OF THE JUDGE'S RETIREMENT OR RESIGNATION;

(b) INVESTIGATE AND RESOLVE REQUESTS FOR EVALUATION OF POTENTIAL JUDICIAL MISCONDUCT IN ACCORDANCE WITH THE COLORADO CONSTITUTION AND THIS ARTICLE 5.3;

(c) HAVE THE AUTHORITY TO INITIATE EVALUATIONS OR INVESTIGATIONS ON ITS OWN MOTION;

(d) APPOINT AN EXECUTIVE DIRECTOR OF THE OFFICE OF JUDICIAL

DRAFT
2.25.22

DISCIPLINE;

(e) ESTABLISH POSITIONS, ROLES, AND MINIMUM STARTING SALARIES FOR EMPLOYEES OF THE OFFICE;

(f) HIRE EMPLOYEES OF THE OFFICE WHO SERVE AT THE PLEASURE OF THE COMMISSION AND WHOSE SALARIES SHALL NOT BE REDUCED DURING THE EMPLOYEES' TENURE WITH THE OFFICE. EMPLOYEES OF THE OFFICE MAY INCLUDE CLERICAL ASSISTANTS; STAFF ATTORNEYS, WHO MAY SERVE AS SPECIAL COUNSEL IF SO APPOINTED BY THE COMMISSION; AND INVESTIGATORS.

(g) EMPLOY OR APPOINT SPECIAL COUNSEL, WHO SERVE AT THE PLEASURE OF THE COMMISSION; ASSIGN DUTIES TO SPECIAL COUNSEL AT THE DISCRETION OF THE COMMISSION, WHICH MAY INCLUDE SERVING AS REPRESENTATIVES OF THE PEOPLE OF THE STATE OF COLORADO IN FORMAL PROCEEDINGS; AND DETERMINE THE COMPENSATION OF SPECIAL COUNSEL;

(h) APPROVE A BUDGET FOR THE COMMISSION AND THE OFFICE AND ASSIST THE EXECUTIVE DIRECTOR IN MANAGING THE OFFICE AND PROVIDING FISCAL OVERSIGHT OF THE OFFICE'S OPERATING BUDGET;

(i) PROMULGATE RULES CONCERNING THE ADMINISTRATION AND OPERATION OF THE COMMISSION AS WELL AS THE OFFICE PURSUANT TO SECTION 13-5.3-105;

(j) PROPOSE AMENDMENTS TO THE COLORADO CODE OF JUDICIAL CONDUCT AND THE COLORADO RULES OF JUDICIAL DISCIPLINE; AND

(k) WORK WITH THE EXECUTIVE DIRECTOR TO PREPARE A REPORT PURSUANT TO SECTION 13-5.3-114.

(4) COMMISSIONERS ARE IMMUNE FROM SUIT IN ANY ACTION, CIVIL OR CRIMINAL, BASED UPON OFFICIAL ACTS PERFORMED IN GOOD FAITH AS COMMISSIONERS.

DRAFT
2.25.22

**13-5.3-104. Office of judicial discipline - executive director - duties - oversight - immunity.** (1) (a)  THE OFFICE ON JUDICIAL DISCIPLINE IS ESTABLISHED AS AN INDEPENDENT OFFICE HOUSED WITHIN THE JUDICIAL DEPARTMENT. THE COMMISSION ON JUDICIAL DISCIPLINE SHALL OVERSEE THE OFFICE.

(b)  SUBJECT TO THE COMMISSION'S SUPERVISION, THE OFFICE SHALL:

(I)  STAFF AND SUPPORT THE COMMISSION'S OPERATIONS;

(II)  RECEIVE REQUESTS FOR EVALUATION INVOLVING JUSTICES AND JUDGES;

(III)  CONDUCT PUBLIC EDUCATION EFFORTS CONCERNING THE JUDICIAL DISCIPLINE PROCESS AND THE RECOMMENDATIONS MADE BY THE COMMISSION;

(IV) ENGAGE IN AND PROVIDE EDUCATIONAL BACKGROUND TO THE PUBLIC, THE DEPARTMENT, JUDICIAL NOMINATING COMMISSIONS, AND JUDICIAL PERFORMANCE COMMISSIONS REGARDING THE REQUIREMENTS OF THE CODE AND THE COMMISSION; AND

(V)  COMPLETE ANY OTHER DUTIES AS ASSIGNED BY THE COMMISSION.

(2) (a) THE COMMISSION SHALL APPOINT AN EXECUTIVE DIRECTOR OF THE OFFICE. THE EXECUTIVE DIRECTOR:

(I)  MUST BE ADMITTED TO PRACTICE LAW IN THE COURTS OF THIS STATE AND HAVE PRACTICED LAW IN THIS STATE FOR AT LEAST TEN YEARS;

(II)  SHALL NOT BE INVOLVED IN THE PRIVATE PRACTICE OF LAW WHILE SERVING AS THE EXECUTIVE DIRECTOR; AND

(III)  SHALL NOT APPEAR AS AN ATTORNEY BEFORE THE COMMISSION FOR A PERIOD OF FIVE YEARS FOLLOWING SERVICE AS THE

-8-                                    DRAFT

EXECUTIVE DIRECTOR.

(b) THE EXECUTIVE DIRECTOR SERVES AT THE PLEASURE OF THE COMMISSION. THE EXECUTIVE DIRECTOR'S COMPENSATION IS THE SAME AS THAT WHICH THE GENERAL ASSEMBLY ESTABLISHES FOR DISTRICT COURT JUDGES. THE EXECUTIVE DIRECTOR'S COMPENSATION MUST NOT BE REDUCED DURING THE EXECUTIVE DIRECTOR'S APPOINTMENT. THE EXECUTIVE DIRECTOR SHALL HIRE ADDITIONAL STAFF FOR THE OFFICE AS NECESSARY AND AS APPROVED BY THE COMMISSION.

(c) THE EXECUTIVE DIRECTOR HAS THE FOLLOWING DUTIES:

(I) ESTABLISH AND MAINTAIN A PERMANENT OFFICE;

(II) RESPOND TO INQUIRIES ABOUT THE COMMISSION OR THE CODE;

(III) ADVISE THE COMMISSION ON THE APPLICATION AND INTERPRETATION OF THE CODE AND THE RULES OF JUDICIAL DISCIPLINE;

(IV) PROCESS REQUESTS FOR EVALUATION OF JUDICIAL CONDUCT;

(V) CONDUCT OR SUPERVISE EVALUATIONS AND INVESTIGATIONS AS DIRECTED BY THE COMMISSION;

(VI) ADVISE THE COMMISSION AS TO POTENTIAL DISPOSITIONAL RECOMMENDATIONS AS MAY BE REQUESTED BY THE COMMISSION;

(VII) MAINTAIN COMMISSION RECORDS;

(VIII) MAINTAIN STATISTICS CONCERNING THE OPERATION OF THE COMMISSION AND MAKE THEM AVAILABLE TO THE COMMISSION;

(IX) PREPARE THE COMMISSION'S BUDGET AND, ONCE APPROVED BY THE COMMISSION, SUBMIT IT TO THE JOINT BUDGET COMMITTEE OF THE GENERAL ASSEMBLY;

(X) ADMINISTER COMMISSION MONEY AND RESOURCES, INCLUDING MONEY IN THE COMMISSION ON JUDICIAL DISCIPLINE SPECIAL CASH FUND;

(XI) SUPERVISE COMMISSION STAFF;

DRAFT

(XII)  NOTIFY THE APPROPRIATE APPOINTING AUTHORITY OF VACANCIES ON THE COMMISSION;

(XIII) ASSIST THE COMMISSION IN PREPARING AN ANNUAL REPORT OF THE COMMISSION'S ACTIVITIES FOR PRESENTATION TO THE COMMISSION, THE SUPREME COURT, AND THE PUBLIC;

(XIV)  SUPERVISE SPECIAL COUNSEL, INVESTIGATORS, OTHER EXPERTS, OR PERSONNEL AS DIRECTED BY THE COMMISSION, AS THEY INVESTIGATE AND PROCESS MATTERS BEFORE THE COMMISSION AND BEFORE THE SUPREME COURT; AND

(XV) PERFORM SUCH OTHER DUTIES AS REQUIRED BY THIS ARTICLE 5.3, THE RULES PROMULGATED BY THE COMMISSION, OR THE COMMISSION.

(3) THE DEPARTMENT SHALL CONTINUE TO PROVIDE THE COMMISSION AND, NOW, THE OFFICE WITH OFFICE SPACE IN THE RALPH L. CARR COLORADO JUDICIAL CENTER, ACCOUNTING SUPPORT, INFORMATION TECHNOLOGY SUPPORT, HUMAN RESOURCES AND PAYROLL SERVICES, AND SIMILAR SUPPORT SERVICES TO THE SAME EXTENT, WITHOUT COST TO THE COMMISSION, AND ON THE SAME TERMS AS THE DEPARTMENT PROVIDES SUCH SUPPORT TO THE COLORADO JUDICIAL PERFORMANCE COMMISSIONS. THE PROVISION OF THESE ANCILLARY RESOURCES MUST BE FURTHER DEFINED THROUGH A MEMORANDUM OF UNDERSTANDING BETWEEN THE DEPARTMENT AND THE COMMISSION.

(4) THE BUDGET COVERING THE OPERATING EXPENSES OF THE COMMISSION AND THE OFFICE, AS ESTABLISHED BY THE GENERAL ASSEMBLY IN THE GENERAL APPROPRIATIONS BILL, ARE PAID FROM A PORTION OF THE FEES COLLECTED BY THE OFFICE OF ATTORNEY REGULATION FOR THE LICENSING OF ATTORNEYS.

(5) THE EXECUTIVE DIRECTOR AND OTHER EMPLOYEES OF THE

OFFICE ARE IMMUNE FROM SUIT IN ANY ACTION, CIVIL OR CRIMINAL, BASED UPON OFFICIAL ACTS PERFORMED IN GOOD FAITH AS EMPLOYEES OF THE OFFICE.

**13-5.3-105.    Special counsel - immunity.** (1) (a) THE COMMISSION MAY RETAIN OR APPOINT SPECIAL COUNSEL ON BEHALF OF THE COMMISSION. AT THE DISCRETION OF THE COMMISSION, AN EMPLOYEE OF THE OFFICE MAY BE SELECTED TO ACT AS SPECIAL COUNSEL. SPECIAL COUNSEL SERVES AT THE PLEASURE OF THE COMMISSION.

(b) SPECIAL COUNSEL MAY UNDERTAKE SUCH TASKS AS ARE ASSIGNED BY THE COMMISSION, WHICH MAY INCLUDE ASSISTING IN EVALUATING AND INVESTIGATING POTENTIAL JUDICIAL MISCONDUCT, ADVISING ON RULES AND APPLICATION OF THE CODE, TAKING DEPOSITIONS, PURSUING ENFORCEMENT OF INFORMATION-SHARING OBLIGATIONS, CONDUCTING LEGAL RESEARCH OR FACTUAL INVESTIGATION, ADVISING ON THE COURSE OF PROCEEDINGS AND DISPOSITIONS, ADVISING THE COMMISSION ON ANY ISSUE, AND SERVING AS A REPRESENTATIVE OF THE PEOPLE IF A MATTER GOES TO FORMAL PROCEEDINGS.

(2) SPECIAL COUNSEL IS IMMUNE FROM SUIT IN ANY ACTION, CIVIL OR CRIMINAL, BASED UPON OFFICIAL ACTS PERFORMED IN GOOD FAITH AS SPECIAL COUNSEL.

**13-5.3-106. Rules - guidelines - procedures.** (1) (a) SECTION 23 (3)(h) OF ARTICLE VI OF THE COLORADO CONSTITUTION DIRECTS THE COLORADO SUPREME COURT TO PROVIDE RULES DEFINING FORMAL JUDICIAL DISCIPLINARY PROCEEDINGS AND APPLICABLE STANDARDS OF PROOF. PURSUANT TO THIS ARTICLE 5.3, THE COMMISSION SHALL ESTABLISH RULES FOR ITS ADMINISTRATION AND OPERATIONS. THE COLORADO SUPREME COURT MAINTAINS AUTHORITY TO ESTABLISH RULES

FOR THE CONDUCT OF FORMAL DISCIPLINARY PROCEEDINGS. THOSE RULES PREVIOUSLY PROMULGATED BY THE COLORADO SUPREME COURT ADDRESSING ISSUES OTHER THAN THE CONDUCT OF FORMAL DISCIPLINARY PROCEEDINGS AND APPLICABLE STANDARDS OF PROOF ARE SUPERSEDED AND REPLACED BY THIS ARTICLE 5.3 AND ANY ADMINISTRATIVE RULES THAT THE COMMISSION PROMULGATES PURSUANT TO THIS SECTION.

(b) IN EXERCISING ITS RULEMAKING AUTHORITY, THE COLORADO SUPREME COURT SHALL PROVIDE THE COMMISSION REASONABLE NOTICE AND AN OPPORTUNITY TO OBJECT BEFORE ENACTING ANY NEW RULE OR AMENDMENT AS IT PERTAINS TO JUDICIAL DISCIPLINE. IF THE COMMISSION OBJECTS TO ANY RULE OR AMENDMENT, REPRESENTATIVES OF THE SUPREME COURT SHALL MEET WITH REPRESENTATIVES OF THE COMMISSION AND ENGAGE IN GOOD FAITH EFFORTS TO RESOLVE THEIR DIFFERENCES.

(2) THE COMMISSION SHALL ADOPT RULES, GUIDELINES, AND PROCEDURES AS NECESSARY TO IMPLEMENT AND EFFECTUATE THE PROVISIONS OF THIS ARTICLE 5.3.

(3) THE COMMISSION MAY, AT ITS DISCRETION AND WITHIN EXISTING APPROPRIATIONS AND RESOURCES, RETAIN INDEPENDENT LEGAL COUNSEL TO REVIEW ANY RULES, GUIDELINES, OR PROCEDURES UNDER CONSIDERATION FOR PROPOSAL OR ADOPTION PURSUANT TO THIS SECTION.

(4) WHENEVER THE COLORADO SUPREME COURT OR THE COMMISSION PROPOSES A RULE, GUIDELINE, OR PROCEDURE RELATED TO JUDICIAL DISCIPLINE, THE COURT OR COMMISSION SHALL POST A NOTICE OF THE PROPOSED RULE, GUIDELINE, OR PROCEDURE; ALLOW FOR A PERIOD FOR PUBLIC COMMENT; AND GIVE THE PUBLIC AN OPPORTUNITY TO ADDRESS THE SUPREME COURT OR COMMISSION CONCERNING THE PROPOSED RULE, GUIDELINE, OR PROCEDURE AT A PUBLIC HEARING.

DRAFT
2.25.22

**13-5.3-107. Decision maker disqualification - definition.** (1) As used in this section, "person involved in a judicial discipline decision" means a commissioner, the executive director, a special counsel or special master, or a justice of the supreme court serving in the justice's role in Colorado's system of judicial discipline.

(2) A person involved in a judicial discipline decision shall not participate in any matter involving the commission in which recusal would be required of a judicial officer under rule 2.11 of the code, section 23 (3)(h) of article VI of the Colorado constitution, or rule 97 of the Colorado rules of civil procedure.

(3) Any person involved in a judicial discipline decision who voluntarily disqualifies themselves from any matter shall file a written statement with the commission indicating the basic reasons for disqualification. The statement must be included in the commission records of the matter.

(4) A respondent judge may request to disqualify a person involved in a judicial discipline decision by filing a motion with the commission complying with rule 97 of the Colorado rules of civil procedure. Any member of the commission may request to disqualify a person involved in a judicial discipline decision but need not comply with the affidavit requirements of rule 97. If, after reviewing relevant facts and hearing argument, a majority of commissioners vote that a person involved in a judicial discipline decision be disqualified under the above standard, the person is disqualified from further participation

DRAFT

DRAFT
2.25.22

IN THE MATTER. THE DECISION OF THE COMMISSION IS FINAL AND IS NOT SUBJECT TO REVIEW.

**13-5.3-108. Oaths and subpoenas - enforcement - quashing.**

(1) ANY MEMBER OF THE COMMISSION, THE EXECUTIVE DIRECTOR, AND SPECIAL COUNSEL MAY ADMINISTER OATHS OR AFFIRMATIONS IN ANY MATTER BEFORE THE COMMISSION.

(2) THE COMMISSION MAY COMPEL BY SUBPOENA THE ATTENDANCE OF A RESPONDENT JUDGE OR ANY WITNESS AND THE PRODUCTION OF PERTINENT BOOKS, PAPERS, DOCUMENTS, AND INFORMATION FOR PURPOSES OF CONDUCTING AN EVALUATION OR INVESTIGATION OF ANY MATTER BEFORE THE COMMISSION. ANY COMMISSIONER, THE EXECUTIVE DIRECTOR, SPECIAL COUNSEL, OR SPECIAL MASTER MAY ISSUE SUBPOENAS FOR THE COMMISSION AT THE REQUEST OF A JUDGE UNDER INVESTIGATION.

(3) AFTER A FORMAL PROCEEDING IS INITIATED, ANY COMMISSIONER, THE EXECUTIVE DIRECTOR, SPECIAL COUNSEL, OR SPECIAL MASTER AND COUNSEL FOR A RESPONDENT JUDGE MAY COMPEL BY SUBPOENA THE ATTENDANCE OF WITNESSES AND THE PRODUCTION OF PERTINENT BOOKS, PAPERS, AND DOCUMENTS AT A DEPOSITION OR HEARING.

(4) IF REQUESTED BY THE COMMISSION, THE DISTRICT COURT FOR THE CITY AND COUNTY OF DENVER SHALL APPOINT A DISCOVERY SPECIAL MASTER DESIGNATED BY THE COMMISSION TO SERVE UNDER RULE 53 OF THE COLORADO RULES OF CIVIL PROCEDURE TO ADDRESS DISCOVERY ISSUES IN A GIVEN MATTER INCLUDING AN EVALUATION, INVESTIGATION, OR FORMAL PROCEEDING. THE DISTRICT COURT FOR THE CITY AND COUNTY OF DENVER SHALL ENFORCE THE ORDERS OF THE DISCOVERY SPECIAL

                    DRAFT

DRAFT
2.25.22

MASTER.

(5) AT THE DISCRETION OF THE COMMISSION, A SUBPOENA MAY BE ENFORCED IN THE DISTRICT COURT FOR THE CITY AND COUNTY OF DENVER OR THROUGH A DISCOVERY SPECIAL MASTER APPOINTED UNDER THIS SECTION.

(6) (a) AT THE DISCRETION OF THE COMMISSION, ANY CHALLENGE TO THE VALIDITY OF A SUBPOENA MUST BE HEARD AND DETERMINED BY ONE OF THE FOLLOWING:

(I) THE COMMISSION;

(II) A DISCOVERY SPECIAL MASTER APPOINTED PURSUANT TO SUBSECTION (4) OF THIS SECTION; OR

(III) THE COURT WHERE ENFORCEMENT OF THE SUBPOENA IS BEING SOUGHT.

(b) ANY ORDER RESULTING FROM A DISCOVERY PROCEEDING PURSUANT TO THIS SECTION MAY NOT BE APPEALED PRIOR TO ENTRY OF A FINAL ORDER IN THE PROCEEDING.

**13-5.3-109. Confidentiality.** (1) EXCEPT AS PROVIDED IN SUBSECTION (2) OF THIS SECTION, PRIOR TO THE FILING OF A RECOMMENDATION TO THE SUPREME COURT BY THE COMMISSION AGAINST ANY JUSTICE OR JUDGE, ALL PROCEEDINGS BEFORE THE COMMISSION ARE CONFIDENTIAL. UPON THE COMMISSION'S FILING OF RECOMMENDATIONS WITH THE SUPREME COURT, THAT FILING AND RECOMMENDATIONS ARE PUBLIC; EXCEPT THAT THE COMMISSION MAY DESIGNATE PORTIONS OF THE FILED RECORD TO BE HELD UNDER SEAL TO PROTECT VALID CLAIMS OF PRIVILEGE OR CONFIDENTIALITY.

(2) (a) IN DISABILITY PROCEEDINGS, ALL ORDERS TRANSFERRING A JUSTICE OR JUDGE TO OR FROM INACTIVE STATUS ARE MATTERS OF

-15-                    DRAFT

DRAFT
2.25.22

PUBLIC RECORD; OTHERWISE, DISABILITY PROCEEDINGS REMAIN CONFIDENTIAL AND SHALL NOT BE MADE PUBLIC, EXCEPT BY ORDER OF THE COLORADO SUPREME COURT.

(b) AT THE DISCRETION OF THE COMMISSION, CONFIDENTIALITY DOES NOT APPLY TO:

(I) DISCLOSURE OF RECORDS AND PROCEEDINGS REASONABLY NECESSARY FOR THE COMMISSION OR THE EXECUTIVE DIRECTOR TO FULFILL THE COMMISSION'S CONSTITUTIONAL MANDATE; OR

(II) DISCLOSURES IN THE INTEREST OF JUSTICE OR PUBLIC SAFETY, INCLUDING THE FOLLOWING:

(A) ALLEGATIONS IN A REQUEST FOR EVALUATION OR COMPLAINT AND RELATED MATERIALS WHOSE DISCLOSURE IS REASONABLY NECESSARY TO CONDUCT THE INVESTIGATION OF THE COMPLAINT;

(B) WHEN THE COMMISSION HAS DETERMINED A NEED TO NOTIFY LAW ENFORCEMENT, THE OFFICE OF ATTORNEY REGULATION COUNSEL, OR ANOTHER GOVERNMENT AGENCY IN ORDER TO PROTECT A PERSON, THE PUBLIC, OR THE JUDICIARY, OR TO FURTHER THE ADMINISTRATION OF JUSTICE;

(C) A JUDGE'S DISCIPLINARY RECORD, IF AUTHORIZED TO BE DISCLOSED BY THE COMMISSION PURSUANT TO SECTION 13-5.3-113;

(D) DISCIPLINARY MEASURES AGAINST A JUDGE BY THE OFFICE OF ATTORNEY REGULATION OR SIMILAR AGENCY, OR A JUDGE'S CONVICTION OF A CRIME;

(E) INFORMATION RELATED TO THE QUALIFICATIONS OF PERSONS FOR ADMISSION TO PRACTICE LAW OR APPOINTMENT AS A JUDGE UPON REQUEST OF AN AGENCY AUTHORIZED TO INVESTIGATE SUCH MATTERS;

(F) INFORMATION NECESSARY TO THE FUNCTION OF ANY

-16-                    DRAFT

ATTORNEY DISCIPLINE ENFORCEMENT AGENCY;

(G) INFORMATION REASONABLY RESPONSIVE TO THE REQUEST OF ANY LAW ENFORCEMENT AGENCY;

(H) INFORMATION SUBJECT TO A JUDGE'S WRITTEN WAIVER OF CONFIDENTIALITY AND CONSENT TO DISCLOSURE; OR

(I) INFORMATION SHARED BY THE COMMISSION OR THE EXECUTIVE DIRECTOR WITH THE OFFICE OF THE STATE COURT ADMINISTRATOR REGARDING KNOWLEDGE OF POTENTIAL GROUNDS FOR MISCONDUCT UNDER STATE OR FEDERAL LAW; A CHIEF JUSTICE DIRECTIVE; OR OTHER RULE APPLICABLE TO THE CONDUCT OF AN EMPLOYEE OF THE STATE JUDICIAL BRANCH, OTHER THAN A JUDGE.

(3) THE COMMISSION, DIRECTLY OR THROUGH ITS EXECUTIVE DIRECTOR OR SPECIAL COUNSEL, MAY NOTIFY A COMPLAINING WITNESS, OR ANY OTHER PERSON DETERMINED TO BE AFFECTED BY A JUDICIAL DISCIPLINARY MATTER OF THE PROGRESS OF AN INVESTIGATION OR FORMAL PROCEEDING, INCLUDING INFORMATION RELATED TO:

(a) THE DISMISSAL OF A MATTER AND REASONS FOR THE DECISION;

(b) THE DECISION TO OPEN AN INVESTIGATION;

(c) THE STATUS OF NEGOTIATIONS;

(d) THE TERMS OF ANY PROPOSED DISPOSITION;

(e) THE DECISION TO PURSUE FORMAL PROCEEDINGS;

(f) THE CONCLUSION OF SPECIAL PROCEEDINGS;

(g) RECOMMENDATIONS MADE BY THE COMMISSION TO THE SUPREME COURT; AND

(h) ANY ISSUED RULINGS ON SUCH RECOMMENDATIONS.

**13-5.3-110. Authority of disciplinary commission.** (1) THE COMMISSION HAS THE FOLLOWING INDEPENDENT AUTHORITY TO ADDRESS

DRAFT
2.25.22

JUDICIAL MISCONDUCT:

(a) DISMISSAL OF AN UNJUSTIFIED OR UNFOUNDED ALLEGATION OF JUDICIAL MISCONDUCT;

(b) INITIATION OF DISABILITY PROCEEDINGS OR ENTERING A STIPULATION WITH THE RESPONDENT JUDGE TO VOLUNTARILY RETIRE FOR A DISABILITY;

(c) REQUIRING A RESPONDENT JUDGE TO FOLLOW A DIVERSION PLAN THAT MAY INCLUDE EDUCATION, COUNSELING, DRUG AND ALCOHOL TESTING, MEDICAL TREATMENT, MEDICAL MONITORING, OR DOCKET MANAGEMENT, WHICH MAY BE ACCOMPANIED BY THE DEFERRAL OF FINAL DISCIPLINARY PROCEEDINGS;

(d) PRIVATE ADMONISHMENT OF THE RESPONDENT JUDGE FOR AN APPEARANCE OF IMPROPRIETY;

(e) PRIVATE REPRIMAND OF THE RESPONDENT JUDGE FOR CONDUCT THAT DOES NOT MEET THE MINIMUM STANDARDS OF JUDICIAL CONDUCT;

(f) PRIVATE CENSURE OF THE RESPONDENT JUDGE FOR CONDUCT WHICH INVOLVES A SUBSTANTIAL BREACH OF THE STANDARDS OF JUDICIAL CONDUCT;

(g) ENTERING INTO AN AGREEMENT OR STIPULATED DISPOSITION WITH A RESPONDENT JUDGE TO RESOLVE A MATTER ON MUTUALLY DETERMINED TERMS;

(h) RECOMMENDING TO THE SUPREME COURT THE TEMPORARY SUSPENSION OF A JUDGE UNDER EVALUATION OR INVESTIGATION PURSUANT TO THE RULES OF JUDICIAL DISCIPLINE;

(i) ASSESSING THE EXPENSES, COSTS AND ATTORNEY FEES OF AN EVALUATION, INVESTIGATION, OR PROCEEDING;

-18-                                      DRAFT

DRAFT
2.25.22

(j) RECOMMENDING TO THE SUPREME COURT PURSUANT TO THE RULES OF JUDICIAL DISCIPLINE FOR IMPOSITION OF A SANCTION BEYOND THE COMMISSION'S AUTHORITY;

(k) PURSUING OF ANY COMBINATION OF THESE DISPOSITIONS AT THE DISCRETION OF THE COMMISSION; OR

(l) ANY ADDITIONAL OPTIONS THAT MAY BE PROVIDED BY THE COLORADO RULES OF JUDICIAL DISCIPLINE.

**13-5.3-111. Recommendations to the supreme court - definition.** (1) PURSUANT TO SECTION 23 (3)(e) OF ARTICLE VI OF THE COLORADO CONSTITUTION, THE COMMISSION MAY SUBMIT RECOMMENDATIONS TO THE SUPREME COURT THAT A JUSTICE OR JUDGE BE REMOVED, RETIRED, SUSPENDED, CENSURED, REPRIMANDED, OR DISCIPLINED. THE COMMISSION'S RECOMMENDATIONS TAKE EFFECT THIRTY-FIVE DAYS AFTER THE JUDGE RECEIVES NOTICE OF THE SUBMISSION UNLESS THE JUDGE FILES AN OBJECTION TO THE RECOMMENDATION WITH THE SUPREME COURT AND THE COMMISSION WITHIN THOSE THIRTY-FIVE DAYS.

(2) IF A RESPONDENT JUDGE FILES AN OBJECTION TO THE COMMISSION'S RECOMMENDATIONS, THE COMMISSION'S RECOMMENDATIONS TAKE EFFECT AS PROVIDED IN THE RECOMMENDATIONS UNLESS AT LEAST FOUR CONFLICT-FREE JUSTICES ENTER PUBLIC, DETAILED FINDINGS AND CONCLUSIONS REJECTING OR MODIFYING THE COMMISSION'S RECOMMENDATIONS.

(3) AS USED IN THIS SECTION, UNLESS THE CONTEXT OTHERWISE REQUIRES, "CONFLICT-FREE" MEANS THAT THE JUSTICE IS NOT:

(a) DISQUALIFIED PURSUANT TO RULE 2.11 OF THE CODE OR SECTION 13-5.3-107;

(b) A WITNESS TO THE FACTS RELEVANT TO THE MATTER AT ISSUE; OR

(c) OTHERWISE INVOLVED IN THE INFORMATION-GATHERING, INFORMATION-SHARING, OR DECISIONS RELATED TO THE MATTER BEING EXAMINED.

**13-5.3-112. Information-sharing with judicial oversight entities - legislative declaration.** (1) THE GENERAL ASSEMBLY FINDS AND DECLARES THAT:

(a) SEVERAL ENTITIES WITHIN THE DEPARTMENT SHARE A ROLE IN THE OVERSIGHT OF THE JUDICIARY AND, AS A RESULT, OFTEN BECOME AWARE OF AND INVOLVED IN INVESTIGATIONS THAT RELATE TO MATTERS THAT MAY COME BEFORE THE COMMISSION, INCLUDING THE OFFICE OF JUDICIAL PERFORMANCE EVALUATION, THE JUDICIAL NOMINATING COMMISSIONS, THE OFFICE OF THE PRESIDING DISCIPLINARY JUDGE, AND THE OFFICE OF ATTORNEY REGULATION COUNSEL, COLLECTIVELY REFERRED TO IN THIS SECTION AS "JUDICIAL OVERSIGHT ENTITIES"; AND

(b) IN ORDER FOR THE COMMISSION AND THE JUDICIAL OVERSIGHT ENTITIES TO PROPERLY PERFORM THEIR FUNCTIONS, THEY NEED TO BE ABLE TO SHARE RELEVANT INFORMATION AND DOCUMENTS WHILE MAINTAINING THEIR RESPECTIVE RULES OF CONFIDENTIALITY.

(2) WHEN REQUESTED BY A JUDICIAL OVERSIGHT ENTITY, THE COMMISSION MAY PROVIDE THE DISCIPLINARY RECORD OF A JUDGE OR JUSTICE TO THE REQUESTING ENTITY. THE JUDICIAL OVERSIGHT ENTITY SHALL KEEP THE INFORMATION CONFIDENTIAL TO THE SAME EXTENT THAT THE COMMISSION IS REQUIRED TO DO SO PURSUANT TO SECTION 13-5.3-109.

(3) WHEN A JUDICIAL OVERSIGHT ENTITY RECEIVES INFORMATION

INDICATING OR ALLEGING POTENTIAL JUDICIAL MISCONDUCT, THE ENTITY SHALL SHARE ALL SUCH INFORMATION WITH THE COMMISSION WITHIN A REASONABLE TIME. ANY INFORMATION OR MATERIALS RECEIVED FROM THE ENTITY ARE SUBJECT TO THE COMMISSION'S RULES OF CONFIDENTIALITY.

**13-5.3-113.    Information-sharing within the judicial department - legislative declaration.** (1) THE GENERAL ASSEMBLY FINDS AND DECLARES THAT:

(a) OFFICES OR PERSONNEL WITHIN THE DEPARTMENT ARE OFTEN THE FIRST TO RECEIVE INFORMATION OR LEARN ABOUT ALLEGATIONS OF POTENTIAL JUDICIAL MISCONDUCT;

(b) THE DEPARTMENT OFTEN HOLDS EVIDENTIARY MATERIALS RELATING TO ALLEGATIONS OF JUDICIAL MISCONDUCT AND OFTEN DEVELOPS EVIDENCE, THROUGH INVESTIGATIONS OR OTHERWISE, RELATING TO SUCH ALLEGATIONS;

(c) THE COMMISSION CANNOT FULLY PURSUE ITS CONSTITUTIONAL MANDATE UNLESS ALL INFORMATION RELEVANT TO POTENTIAL JUDICIAL MISCONDUCT AVAILABLE TO THE DEPARTMENT IS FREELY AND PROMPTLY SHARED WITH THE COMMISSION; AND

(d) THE CREDIBILITY OF THE JUDICIARY AND JUDICIAL DISCIPLINE ARE BEST SERVED BY THE DEPARTMENT SHARING PROMPTLY WITH THE COMMISSION ALL INFORMATION AND MATERIALS AVAILABLE TO THE DEPARTMENT RELEVANT TO POTENTIAL JUDICIAL MISCONDUCT.

(2) THE DEPARTMENT SHALL ENSURE THAT IF ANY MEMBER OF THE DEPARTMENT, INCLUDING MEMBERS OF THE OFFICE OF THE STATE COURT ADMINISTRATOR, THE OFFICE OF THE CHIEF JUSTICE, CHIEF JUDGES, DISTRICT ADMINISTRATORS, THE HUMAN RESOURCES DEPARTMENT,

DRAFT
2.25.22

ADMINISTRATIVE PERSONNEL, JUDICIAL DISTRICTS, CLERKS OF COURT, THE OFFICE OF ATTORNEY REGULATION COUNSEL, AND OTHERS, RECEIVES AN ALLEGATION OF POTENTIAL JUDICIAL MISCONDUCT OR LEARNS OF FACTS COMPRISING POTENTIAL JUDICIAL MISCONDUCT, THE PERSON OR OFFICE RECEIVING THE INFORMATION SHALL:

(a) DOCUMENT BOTH THE RECEIPT OF THE ALLEGATION OR INFORMATION AND THE DEPARTMENT'S HANDLING OF THE ALLEGATIONS OR INFORMATION, INCLUDING ANY INVESTIGATION CONDUCTED, AND SHALL MAINTAIN SUCH DOCUMENTATION AS LONG AS THE SUBJECT OF THE ALLEGATION IS A JUDGE, PLUS THREE CALENDAR YEARS;

(b) WITHIN NOT MORE THAN THIRTY-FIVE DAYS AFTER RECEIPT OF AN ALLEGATION OR INFORMATION IMPLICATING JUDICIAL MISCONDUCT, NOTIFY THE OFFICE OF THE ALLEGATION OR INFORMATION AND PROVIDE THE OFFICE WITH ALL INFORMATION WITHIN THE CUSTODY OR CONTROL OF THE DEPARTMENT RELATED TO THE POTENTIAL JUDICIAL MISCONDUCT OR THE ALLEGATION, INCLUDING:

(I) IDENTIFICATION OF POTENTIAL WITNESSES;

(II) A LIST OF ANY EVIDENCE HELD OR KNOWN;

(III) ACCESS TO ALL EVIDENCE, INCLUDING ADMINISTRATIVE FILES, DIGITAL DATA, DIGITAL OR PAPER CASE FILES, RECORDINGS AND TRANSCRIPTS, COMMUNICATIONS, AND METADATA, WITHOUT CHARGE; AND

(IV) ANY DEPARTMENT INVESTIGATIVE MATERIALS, INCLUDING ANY INVESTIGATIVE OR ACTION PLANS;

(c) NOTIFY ANY PERSON SUPPLYING ANY INFORMATION CONCERNING POTENTIAL JUDICIAL MISCONDUCT, AND ANY WITNESS INTERVIEWED, OF THE FOLLOWING:

(I) THE EXISTENCE, ROLE, INDEPENDENCE FROM THE DEPARTMENT, AND PROCESS OF COMMUNICATING WITH THE COMMISSION;

(II) THAT INFORMATION GIVEN TO THE COMMISSION IS CONFIDENTIAL UNLESS AND UNTIL A RECOMMENDATION IS MADE TO THE SUPREME COURT;

(III) THE RULE PROHIBITING RETALIATION AGAINST ANY PERSON ASSISTING THE COMMISSION;

(IV) THAT THE DEPARTMENT HAS A DUTY TO DISCLOSE ALL INFORMATION RELATED TO POTENTIAL JUDICIAL MISCONDUCT TO THE COMMISSION; AND

(V) THAT THE DEPARTMENT IS PROHIBITED FROM DISCOURAGING A PERSON FROM SHARING INFORMATION WITH THE COMMISSION, INCLUDING ENTERING INTO A NONDISCLOSURE AGREEMENT THAT WOULD HAVE THAT EFFECT.

(3) THE DEPARTMENT'S DUTIES OF DISCLOSURE ARISE WHEN THE DEPARTMENT RECEIVES INFORMATION COVERED BY THIS SECTION, INCLUDING WHEN THE FOLLOWING OCCURS:

(a) ANY TIME THE DEPARTMENT RECEIVES AN INTERNAL ALLEGATION OF JUDICIAL MISCONDUCT;

(b) ANY TIME THE DEPARTMENT RECEIVES AN EXTERNAL ALLEGATION OF JUDICIAL MISCONDUCT;

(c) ANY TIME A JUDGE OR JUSTICE'S ASSIGNED DUTIES ARE ALTERED IN WHOLE OR IN PART DUE TO ALLEGATIONS OR FACTS THAT IMPLICATE JUDICIAL MISCONDUCT;

(d) ANY TIME THE DEPARTMENT LEARNS THAT LITIGATION OR AN ADMINISTRATIVE PROCEEDING HAS COMMENCED THAT INCLUDES ALLEGATIONS OF POTENTIAL JUDICIAL MISCONDUCT;

DRAFT
2.25.22

(e) ANY TIME A CRIMINAL INVESTIGATION OF A JUDGE BEGINS OR CRIMINAL CHARGES ARE FILED AGAINST A JUDGE;

(f) ANY TIME THE DEPARTMENT LEARNS OF A FINDING BY ANY GOVERNMENTAL AGENCY THAT IMPLICATES JUDICIAL MISCONDUCT;

(g) ANY TIME A JUDGE IS NAMED AS THE POTENTIALLY RESTRAINED PARTY IN THE FILING OR ENTRY OF ANY CIVIL PROTECTION ORDER.

(4) THE DUTIES TO DOCUMENT AND DISCLOSE POTENTIAL JUDICIAL MISCONDUCT AND RELATED INFORMATION CONTINUE AS THE DEPARTMENT RECEIVES ADDITIONAL INFORMATION.

(5) (a) THE DEPARTMENT SHALL:

(I) ADOPT PROCEDURES AND POLICIES TO IMPLEMENT THE DUTIES STATED HEREIN AND TO EDUCATE DEPARTMENT PERSONNEL ABOUT THESE DUTIES; AND

(II) COOPERATE WITH ANY REQUEST FROM THE COMMISSION FOR INFORMATION RELATED TO EVALUATING POTENTIAL JUDICIAL MISCONDUCT AND SUPPLY REQUESTED INFORMATION OR MATERIALS WITHIN A REASONABLE TIME OF NOT MORE THAN THIRTY-FIVE DAYS AFTER THE DATE OF REQUEST.

(b) THE DEPARTMENT SHALL NOT:

(I) ADOPT ANY POLICY NOR ENTER INTO ANY CONTRACT THAT PURPORTS TO IMPEDE DISCLOSURE OF INFORMATION RELATED TO POTENTIAL JUDICIAL MISCONDUCT TO THE COMMISSION. THE DEPARTMENT SHALL NOT DISCOURAGE ANY PERSON OR ENTITY FROM COOPERATING WITH THE COMMISSION OR DISCLOSING INFORMATION TO THE COMMISSION;

(II) WITHHOLD FROM THE COMMISSION DISCLOSURE OTHERWISE REQUIRED BY THIS SECTION FOR ANY OF THE FOLLOWING REASONS:

(A)  A CLAIM OF PRIVILEGE, INCLUDING ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, JUDICIAL DELIBERATION, OR OTHER CLAIM OF PRIVILEGE;

(B) A CLAIM OF CONFIDENTIALITY; OR

(C)  A CLAIM OF CONTRACTUAL RIGHT OR OBLIGATION NOT TO DISCLOSE INFORMATION, INCLUDING A NON-DISCLOSURE AGREEMENT;

(III) RETALIATE, DIRECTLY OR INDIRECTLY, AGAINST ANY PERSON COMMUNICATING WITH THE COMMISSION REGARDING POTENTIAL JUDICIAL MISCONDUCT OR ITS EXAMINATION, ANY PERSON SEEKING TO COMPLY WITH THE DOCUMENTATION AND DISCLOSURE OBLIGATIONS OF THIS SECTION, OR ANY PERSON OTHERWISE ASSISTING OR SUSPECTED OF ASSISTING IN THE COMMISSION TO FULFILL ITS CONSTITUTIONAL MANDATE OR ITS ROLE IN JUDICIAL OVERSIGHT; OR

(IV) USE THE DEPARTMENT'S AUTHORITY TO ACCESS AND REVIEW THE DATA OF USERS OF THE DEPARTMENT'S COMPUTER NETWORK AND SYSTEMS TO THEREBY ACCESS THE OTHERWISE CONFIDENTIAL INTERNAL DIGITAL FILES OR COMMUNICATIONS OF THE COMMISSION.

(c) THE TIMELY DISCLOSURE TO THE COMMISSION OF INFORMATION OR MATERIALS UNDER THIS SECTION BY THE DEPARTMENT DOES NOT, BY ITSELF, WAIVE ANY OTHERWISE VALID CLAIM OF PRIVILEGE OR CONFIDENTIALITY HELD BY THE DEPARTMENT.

(6) (a)  THE DEPARTMENT SHALL DESIGNATE A JUDICIAL OFFICER TO PROVIDE A CERTIFICATION OF THE DEPARTMENT'S COMPLIANCE WITH THIS SECTION BY DECEMBER 31 OF EACH CALENDAR YEAR. A FALSE OR MISLEADING CERTIFICATION SUBJECTS THE JUDICIAL OFFICER TO SANCTION BY THE COMMISSION.

(b)  IF THE DEPARTMENT FAILS TO FULFILL THESE DUTIES OF

DOCUMENTATION AND DISCLOSURE, THE DEPARTMENT SHALL REIMBURSE THE COMMISSION FOR ALL EXPENSES, INCLUDING ATTORNEY FEES AND COSTS, INCURRED SEEKING FULFILLMENT OF THE DUTIES.

(7) IF ANY PERSON FAILS TO COMPLY WITH THE PROVISIONS OF THIS SECTION, UPON REQUEST OF THE COMMISSION, THE DISTRICT COURT FOR THE CITY AND COUNTY OF DENVER SHALL ISSUE AN ORDER FOR THE PERSON TO SHOW CAUSE TO THE COURT AS TO WHY THE PERSON SHOULD NOT BE HELD IN CONTEMPT FOR SUCH FAILURE. FOLLOWING A SHOW CAUSE HEARING, THE COURT MAY MAKE FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MAY ENTER APPROPRIATE ORDERS, WHICH MAY INCLUDE FINDING THE PERSON IN CONTEMPT.

**13-5.3-114. Reporting requirements - "State Measurement for Accountable, Responsive, and Transparent (SMART) Government Act" report.** (1) THE COMMISSION SHALL GATHER AND MAINTAIN ANNUAL DATA AND STATISTICS ON:

(a) THE NUMBER OF REQUESTS FOR EVALUATION RECEIVED;

(b) THE NUMBER OF INVESTIGATIONS PERFORMED;

(c) THE NUMBER OF FORMAL PROCEEDINGS PURSUED;

(d) THE TYPES AND RELATIVE VOLUME OF MISCONDUCT ALLEGATIONS RECEIVED;

(e) THE TYPE AND RELATIVE VOLUME OF INCIDENTS OF JUDICIAL MISCONDUCT IDENTIFIED; AND

(f) THE NUMBER AND TYPES OF DISPOSITIONS ENTERED.

(2) BEGINNING JANUARY 2023, AND EVERY TWO YEARS THEREAFTER, THE COMMISSION SHALL REPORT ON THE ACTIVITIES OF THE COMMISSIONERS TO COMMITTEES OF REFERENCE OF THE GENERAL ASSEMBLY AS PART OF ITS "STATE MEASUREMENT FOR ACCOUNTABLE,

-26-    DRAFT

DRAFT
2.25.22

RESPONSIVE, AND TRANSPARENT (SMART) GOVERNMENT ACT"

PRESENTATION REQUIRED BY SECTION 2-7-203.

**13-5.3-115. Commission on judicial discipline special cash fund - acceptance of private or federal grants - general appropriations.** (1) THE COMMISSION IS AUTHORIZED TO ACCEPT ANY GRANTS OF FEDERAL OR PRIVATE FUNDS MADE AVAILABLE FOR ANY PURPOSE CONSISTENT WITH THE PROVISIONS OF THIS ARTICLE 5.3.

(2) ANY MONEY RECEIVED PURSUANT TO THIS SECTION MUST BE TRANSMITTED TO THE STATE TREASURER, WHO SHALL CREDIT THE SAME TO THE COMMISSION ON JUDICIAL DISCIPLINE SPECIAL CASH FUND, WHICH IS CREATED IN THE STATE TREASURY.

(3) ANY EXPENSES, ATTORNEY FEES, OR COSTS RECOVERED UNDER THIS ARTICLE 5.3 MUST BE TRANSMITTED TO THE STATE TREASURER, WHO SHALL CREDIT THE SAME TO THE FUND.

(4) MONEY IN THE FUND IS CONTINUOUSLY APPROPRIATED TO THE COMMISSION FOR THE PURPOSES SPECIFIED IN SUBSECTION (6) OF THIS SECTION.

(5) ANY INTEREST DERIVED FROM THE DEPOSIT AND INVESTMENT OF MONEY IN THE FUND IS CREDITED TO THE FUND. ANY UNEXPENDED AND UNENCUMBERED MONEY REMAINING IN THE FUND AT THE END OF ANY FISCAL YEAR REMAINS IN THE FUND AND SHALL NOT BE CREDITED OR TRANSFERRED TO THE GENERAL FUND OR ANOTHER FUND.

(6) MONEY IN THE FUND MAY BE USED FOR PAYMENT OF THE EXPENSES FOR EVALUATIONS, INVESTIGATIONS, FORMAL PROCEEDINGS, OR SPECIAL PROJECTS THAT THE COMMISSION HAS DETERMINED ARE TO BE UNDERTAKEN BY PERSONNEL OTHER THAN OR IN ADDITION TO THOSE EMPLOYED BY THE OFFICE.

DRAFT

DRAFT
2.25.22

(7) IN STATE FISCAL YEAR 2022-23, THE GENERAL ASSEMBLY SHALL APPROPRIATE FROM THE GENERAL FUND TO THE FUND FOUR HUNDRED THOUSAND DOLLARS. IN EACH SUBSEQUENT FISCAL YEAR, THE GENERAL ASSEMBLY SHALL APPROPRIATE SUFFICIENT MONEY TO THE FUND SO THAT IT BEGINS THE FISCAL YEAR WITH NOT LESS THAN FOUR HUNDRED THOUSAND DOLLARS.

**SECTION 2.** In Colorado Revised Statutes, 24-75-402, **add** (5)(vv) as follows:

**24-75-402. Cash funds - limit on uncommitted reserves - reduction in the amount of fees - exclusions - repeal.** (5) Notwithstanding any provision of this section to the contrary, the following cash funds are excluded from the limitation specified in this section:

(vv) THE COMMISSION ON JUDICIAL DISCIPLINE SPECIAL CASH FUND CREATED IN SECTION 13-5.3-115.

<{***Do you want a safety clause or the 90-day referendum langauge?***}>

-28- **DRAFT**

# Appendix 27(m)

# *Hearing on SB 22-201 before the S. Judiciary Comm.*, Colo. Leg., April 14, 2022:

# Appendix 27(m)(i)
# Transcript

# Colorado Senate Judiciary Committee—
# April 14, 2022 Hearing on SB 22-201

**Sen. Gonzales**

Welcome back to the Senate Judiciary Committee. Our last bill that we will be taking under consideration today is Senate Bill 201. And I am excited. Maybe excited is not the right word. But I'm glad that we're having this conversation regarding the bill concerning independent oversight of matters concerning judicial discipline. We are joined by our co-prime sponsors, Senator Lee and Senator Gardner, and who would like to begin?  Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair. This bill concerns the independent oversight of the judicial discipline process and I will not review all the history of how we got here. I simply will say that Section 23 (3) of Article VI of the State Constitution establishes a Commission on Judicial Discipline with an intent that it be largely independent. That has over the past year become a question of the independence of the Commission, vis-a-vis the Judicial Department because of matters of finance and information sharing, how the handling of complaints should be done and so forth. This bill seeks to address those issues, add some clarity to them. But I must say as we legislate at anytime concerning the Judiciary we always meet the challenge of what is our authority as a General Assembly, a different branch of government. Again, vis-a-vis the Judicial Branch and its independence. We can say what the law is by passing bills that the other Branch on the first-floor signs into law. And then the Court implements those through its decisions consistent with the writing of the laws, and sometimes when we disagree with them we, we say no, that wasn't it, and we rewrite the law. But that's all a very clear thing. This bill begins to create some divisions between the Judicial Department, the Supreme Court, and the Commission on Judicial Discipline. And I must say, as a co-prime sponsor, this must be one of well over 100 bills, I've been a co-prime sponsor on, I've never quite experienced the feeling that I have about this bill and its current state, it is absolutely necessary that we deal with this issue. Necessary that we deal with it responsibly. As you will see, as we proceed, I am not convinced that the formulation we have in front of us is the right bill, it does address the right issues. But the way in which it addresses them is something that at the moment, I'm not entirely in agreement with. As many of you have met with members of the Judicial Branch, and the Commission on Judicial Discipline, and contrary to what might be said in the paper, all of my communications and all of their communications with me have been totally appropriate. I have agreed with both the Commission on Judicial Discipline and with the Court and have disagreed with them as well. I find us as a General Assembly, serving in something of a role of what we are--the people's representative, to sort through this and find the right balance. Again, I was quite concerned when I picked up, I didn't pick up the paper this morning, I picked up my tablet and read, read the two major daily newspapers of both my community and out of Denver and was distressed because there seemed to be a tenor of the articles there that somehow this bill had led to the Judicial Branch,

- 1 -

improperly lobbying us or something like that. That just has not been the case. I want to be very clear, with the press that is listening here. That certainly is not, in my view been the case, nor has anything about it, in my view, been out of line or inappropriate for a branch of government and an independent commission of the government to communicate with me as a legislator about the legislation that I'm considering, that I'm sponsoring, and how it's to be done. We as elected state Senators, and over in the other chamber, state Representatives, have an independent charter from our constituents to do what we are doing. And we should not feel that anyone who approaches us from any other branch of government is doing anything other than advocating for a position of what they believe is best, given their constitutional duties and responsibilities. And I guess that brings me to what I think is the challenge of this bill, and it is for us to navigate and find an accommodation between an independent commission and another complete branch of our government, and what their respective roles are with respect to accountability and transparency to the people of Colorado. I think there's a lot to be said about that. We're going to hear a lot more about it. And at the end of it all, there are certainly amendments that focus on each and every one of these issues. My hope is that this is an ongoing conversation and process. Today being the beginning of that process and not the end of the discussion at all. So thank you, Madam Chair, and I'll leave it there, rather than talk for another two hours about what is a very complex topic. Thank you.

**Sen. Gonzales**
Thank you, Senator Gardner. Senator Lee.

**Sen. Lee**
Thank you, Madam Chair and members of the committee. I've been a lawyer for almost 50 years. My father was a lawyer, my great grandfather was a superior court judge in New York, I come to the issues we address today from a personal and professional standpoint. And I will explain, based on my background, the gravity of the situation that we today encounter, and the overriding importance of Senate Bill 201. To me, the legal profession is an esteemed and noble one exemplified by some of the brightest, most compassionate, caring, and ethical men and women I've ever known. And I've known them all my life. Many are the moral pillars of their community. They sit on nonprofit boards, they volunteer at schools, churches, Rotary Clubs, they're the ones I've seen step up when someone needs to volunteer, or undertake public service for the good of the community. What I have observed is that many times the best of the best aspire to be judges, and I honor them, because I have learned that is absolutely foundational to a democratic republic that we have intellectually gifted, fair, competent, impartial, independent, and trusted judges consisting of the best of the best. The people of our state need to believe that our judges are above reproach, committed to the highest standards of moral conduct, that they are honest, trustworthy, and fair. But I'm also a realist, and know that the ideal and the real will often diverge. I know that people are imperfect, and that sometimes, impropriety and even corruption occurs. When it does, and particularly when misdeeds go unaddressed, or are covered up, confidence in the legal system itself is undermined. When that occurs, we are no better than a tribal fiefdom run by despotic leaders who ignore the rule of law. If there is a belief that justice can be bought, that the scales

- 2 -

of justice can be tipped, that money, influence and power trump justice, that we are a nation of men, not laws, then our democracy at its core is threatened. This bill is prompted by the judicial misconduct scandals that have plagued our state for almost three years. There have been allegations of illegal activity, possible payoffs, and a cover up at the highest level of our judiciary. We do not know as a factual matter what has taken place in the courthouses across our state. We don't know because the institution charged with addressing the misconduct, the Commission on Judicial Discipline, has been marginalized, ignored, and rendered powerless. That institution established in Article VI section 23 of the Constitution does not have the requisite independence or resources to perform its constitutional duties. The allegations, and they are only that, that there are some judges who engaged in improper, unethical, immoral conduct, engaged in sex harassment, sex discrimination, and biased treatment of staff and the public of buying silence about misdeeds. If this misconduct, as alleged and reported in the media occurred, and they are not held to account, then we as a people, the public will lose faith in the institution of the judiciary. If there was no one to look at judicial misconduct, then the judiciary, that noble institution that I've revered all of my life, will be discredited in Colorado. The public will not have faith in a system in which those charged with assessing misconduct of judges are overseen by judges, where judges screen all complaints against judges and select which complaints move forward for investigation. If the judges control the budget, the rules, the appeals, and the outcome, the system is at best suspect, and at worst, fundamentally flawed. So why this bill and why is it needed at this time? I will address both of those issues. But lest we get sidetracked by peripheral issues. please indulge me for a moment as I read you some of the headlines and media stories, which have appeared over the last two and a half years. Understand that these are only media reports, not proven allegations. They have not been subjected to the standards of proof required in court. But there has been a slow and persistent flow of sordid revelations. And there has been no response from the legislature, no response from the Commission on Judicial Discipline, no resolution, and significantly not even investigation by the Commission on Judicial Discipline, the agency charged with doing so. The stories referred to what was called the Masias Memo, a list of complaints about Judicial Department misconduct kept by a high-level employee, Mindy Masias, who was fired and then awarded a $2.5 million contract, allegedly, and I admit as allegedly to buy her silence to train Judicial Department employees. It was never turned over to the Commission on Judicial Discipline.

Some of the headlines that have appeared in the newspapers over the past two and a half years: "Macias Memo Outlined How the Judicial Department has Created a Culture of Misogyny and Harassment." Two, the memo describes the destruction of evidence at the order of a Chief Judge ignoring allegations that two district court judges, each later named chief of their judicial district had circulated pornographic videos via the department's email system, paying a Court of Appeals law clerk who accused a judge of harassment and a judge who bared his chest and rubbed it on the back of a female employee. That was reported by Migoya and the Denver Post on February 13. Three, "Letters Show Supreme Court Stalled Discipline Commission Scandal Investigation: Supreme Court Threw Up Roadblock After Roadblock at the Efforts to Investigate the Scandal." Despite and I'm quoting the headline, "Despite Boatright's Public Assurances of Transparency and Cooperation: The Letters Portray a Broader Showdown." Four, "State

- 3 -

Auditor refers Four People Tied to the Scandal for Criminal Investigation." Five, "Eight Months Later, Still No Action on Promised Investigation, Panel picked in August." Six, "CCJD Launches Inquiry Into Misconduct Allegations: Investigation is Fourth Following Allegations of Quid Pro Quo Contract to Silence Tell All Lawsuit." Seven, Masias Memo was read to then Supreme Court Chief Justice Nathan Ben Coats describing dozens of incidents of misconduct that reached all the way to the State's Court of Appeals and Supreme Court that Masias was prepared to reveal in a lawsuit. Eight, "Colorado Judicial Department Ran Internal Ruse to Keep a Lid on $2.5 Million Contract Allegedly Awarded to Possibly Silence Complaints of Judges Engaged in Sex Harassment," Denver Post July 18 of 2021. Nine, "The Office of Judicial Discipline Reviewed Its Records for Five Years and Has Not Identified Any Referrals From the State Court Administrator's Office or the Office of the Chief Justice That Match the Memo Details." I want to take a moment and commend David Migoya, the reporter for The Denver Post for his intrepid pursuit of facts and truth. The importance of the press to a democracy cannot be under emphasized. He demonstrates the perseverance necessary to keep the spotlight on this issue, while government was ignoring it or attempting to hide it.

At this point, there are six investigations of these claims by the FBI, the State Auditor, the Office of Attorney Regulation Counsel, the Commission on Judicial Discipline, and two by lawyers and private investigative firms selected by a joint legislative executive committee hired by and responsible to the judicial branch. I recite this litany to keep the focus on the main issue. Some who oppose this bill are engaged in a campaign to deny it, to undercut it, or to defeat it--the bill. To those, I say we have waited three years and the time to act is now. Opponents will claim that the bill is unconstitutional and violates separation of powers principles. To them. I respond that the bill was drafted and reviewed by experienced and competent staff at the Office of Legislative Legal Services, who have written thousands of bills. They know the issues, and they don't write unconstitutional laws. Opponents will say that investigations are underway and let's await the results. To them. I say we have waited over two years and it's time to act. When recommendations from the investigations are suggested, we can include them in bills coming from the interim legislative committee that this bill sets up or any other bills that are appropriate. Opponents will argue that we should not do something this session, because there's not enough time. They say we need more stakeholder engagement. To them, I say we have the responsibility to begin the discussion of this issue in this deliberative body of the Senate. We need to invite the public to express their views. We also need to hear from the lawyers, the bar associations, the specialty bars, the judges, and let them express their views on this issue right now. As a former defense attorney and present litigator, I recognize these arguments for what they are, I am committed to having a bill to begin to address this scandal that has undermined public confidence in our judicial system.

This bill is a modest one to address the basic issues. First, it sets up the Commission on Judicial Discipline with independent funding from the general fund, rather than through the Supreme Court. I think we can all agree on that one. We will hear testimony that when the Commission on Judicial Discipline sought funds to investigate the complaints of judicial misconduct, they were denied funding for investigators by the Judicial Department. The Commission needs to have its own funding. The

- 4 -

Commission was established under Article VI, section 23. This bill implements the Constitution. It is entitled concerning independent oversight of matters concerning judicial discipline. We have a legislative declaration describing the necessity of the bill. We have a section two that sets up a new article 5.3 to address judicial discipline. Section 102 is definitions and establishes the Office/the Commission within the Department of the Judiciary, and it describes the duty of the 10-person Commission of six lawyers and four non lawyers also gives it the power to hire Special Counsel, approve a budget, and grant Commissioners immunity. Section 103 establishes the Office of Judicial Discipline as an independent office within the judicial department. It authorizes the commission to appoint an executive director of the office and sets the duties. It authorizes the commission to appoint and determine the responsibilities of Special Counsel and it gives the commission immunity. It requires the judicial department to continue to provide space in the Ralph Carr Building to the Commission and the Office and to provide accounting, IT, payroll, and HR services for the small two-to-four-person office. Section 104 provides that the budget comes from the General Assembly, not from lawyer registration fees. Section 105 is information sharing with judicial oversight entities, the Office of Attorney Regulation Counsel, the Office of Judicial Performance, the nominating commissions, and the Presiding Disciplinary Judge, while respecting confidentiality. Section 106 is information sharing within the Judicial Department. If anyone in the branch receives information about potential misconduct, they document it, they keep records of it, and within 35 days, share it with the Commission and notify the complainant about non retaliation. And they're required to notify them of the availability of the Commission. It requires the branch to send information to the Commission within 35 days, and it prohibits the branch from withholding based on confidentiality or privilege in order to give the judicial department power to fulfill its stated goal of providing unfettered access to all information and it adds a no waiver privilege or confidentiality provision, and it provides public comment for all rules proposed. Section 107 Is the rulemaking provision that the Supreme Court who is responsible for making rules will give notice to the public and the Commission about rulemaking and meet to discuss any objections to any rules. Section 108 is SMART Act reporting. Section 109 sets up a legislative interim committee with eight members two from the majority and two from the minority from each House empowered to introduce three bills and resolution, the Committee will have open hearings, duly noticed and will invite participation by the public, by attorneys by judges, by bars, specialty bars and anyone else. Section three provides for fraud hotline, disclosures to the state auditor of materials, or information pursuant to this section does not violate or waive any otherwise valid claim of privilege. The final section provides for a cash fund. So that's the essence of the bill and the reasons for the bill. And we're prepared to answer any questions or listen to witnesses.

**Sen. Gonzales**

I want to thank you both for bringing forward this bill for consideration. I acknowledge that there has been a tremendous amount of work that has gone into the drafting of this bill. And to Mr. Berry, the bill drafter, our respect and commendation. I also recognize that even here today, there will be a lot of discussion, and a lot of questions. And this is not going to be I think, a process where we run through amendments and just yes, no. Okay, next, yes, no. Okay, next. We'll have a lot of discussion about each

- 5 -

and every amendment, about each and every witness. Hopefully, not each and every word of this bill. But we'll have a lot of discussion today. And so I want to thank you both for bringing forward this policy. Senator Gardner, you acknowledge that even this bill of what your name is a co-prime sponsor, you still think that it's not perfect. I respect that. And I think that part of this process, this iterative legislative process is for us to strive to get it right. And so I want to just kind of open that. And I also want to acknowledge Senator Lee. The fourth estate, right, the importance of the media, in holding institutions to account. All of us, us included. Certainly, the executive branch and also the legislative branch and, and also the judicial branch.  We have a number of individuals who have signed up to testify. But before we get to that, I'd like to see if there are any questions for our bill sponsors before we begin the testimony portion of this hearing. Seeing none, I want to bring forward Chief Justice Brian Boatright.

**Sen. Gonzales**
Please. Chief Justice, welcome to Senate Judiciary Committee. I'll say this for everyone. And there is a, if you're here participating in person, there is at the in front of the seat, there is a little microphone with a cord and a little it'll be red, if it's turned off, it'll go green. If your microphone is turned on, we want to make sure that everyone participating is able to hear us. And so with that, I'll invite every witness who wishes to share their perspectives on this policy to state their name and the organization that they represent and then proceed to testimony. We generally invite our participants here in the Senate Judiciary Committee to share their perspectives for about three minutes. and given precedent from earlier today. We won't turn on the beep, Senator Cooke. Upon conclusion of the testimony from all of our witnesses we will then open up each witness to questions from members of the committee. And with that, Chief Justice Boatright, thank you so much for joining us here to discuss Senate Bill 201, please. But first, let's turn on your microphone. There's a little red. There's a little button. There you go.

**Chief Justice Boatright**
Okay. All right. Thank you. Thank you, Madam Vice Chair, I want to start out. I know, time is limited. I want to thank Senator Lee and Senator Gardner for bringing forth this bill, we are here in an amend position. We do not oppose the bill.

I want to state from the beginning that one of the primary components that we hope goes forward in the bill is full funding for judicial discipline. I will say very candidly, that I don't know that the bill goes far enough in terms of full funding, we would ask that not only are they funded for the things that they have in the bill, but we'd also ask that they be funded for the administrative services that we are required to provide as a result of the bill. And for the simple reason that at some point, it makes us say no, and that appearance, is inappropriate. I don't know how we can provide IT. For example, without looking at computers, I don't know how we can provide finance without looking at bills. And I think that the independence of the judicial discipline commission is greater than all of that. So, I would ask for funding to extend past that.

The other amendments that I would ask that we have, and I think that the primary one has to do with the reporting requirement. When I looked at the, the requirements in 13 . . . Now that we have human interaction, I am getting over my cold. Thank you, Senator. One of my concerns is that the reporting requirements are going to be very difficult for us to comply with, it's going to require a tremendous amount of manpower. And what I mean by that is, I think that what this does is it doesn't take into account that we have external complaints. And we have internal complaints. And I think the mechanism laid out in 13-5.3-106, with regard to internal complaints is excellent, because we already have a HR Department that can do reporting and documentation and evidence gathering, and things like that. Externally, unfortunately, in our business, we make a lot of decisions that make people upset. You know, we're terminating parental rights, we're deciding where kids live, we decide who goes to prison, we decide who doesn't. And I once told somebody, when I started, they said, you're gonna make it, you're gonna make 50% of people mad every time you make a decision. And after a year, I told them, they were wrong. And they said, What do you mean, I said, at least 50% of the people are upset at the decisions that we make. So as a result, we get a lot of complaints, we get a lot of complaints now that I'm Chief Justice, that you know, so and so on my domestic case was in cahoots and different things like that. What we have traditionally done, and what we would ask the bill to do is for us to just for those complaints on give the number, the email address for judicial discipline, but to go back and ask for staff in four corners of the state, because it does say any member of the department, to document, to gather witnesses, to get transcripts, and things like that, I think would be tremendously difficult. We're not against the reporting requirement. We just think that needs to be broken out into two different things.

The other area that I would like to briefly discuss, and I think I understand the practical considerations, is we completely support the interim committee, and that's what we've been asking for since the very beginning. You know, the initial bill did not provide for that draft of the bill and we are completely in support of that. You know, I stood in front of the Joint House and Senate and professed that we want to have accountability. And I still stand by that, I get that this is going to be my legacy. And I want to get this right. What I want to do, though, is I want any decisions that we make with regard to reform, to be transparent, inclusive, and thorough. You know, what I want to make sure of is that we get the results of these investigations. And Senator Lee and Senator Gardner, you were on the panel that helped select the investigators, you know, these are truly independent investigators that are going to come forward with findings and recommendations. And I committed to making the results of that public and I still will do that. And we will address any wrongdoing. And I think this interim committee is an excellent way of going about it. Obviously, I would like to see the Committee be a little more inclusive in terms of having some judges, some members of the Bar, the affinity bars, certainly the Women's Bar on there, I also get how big can a committee be, but you know that that is primarily a concern that I would like to see amended, but I think my time is up. And I think those are the primary considerations that I have.

**Sen. Gonzales**
Thank you, Chief Justice, for your remarks. And I see a number of questions. So, I'll start with Senator Gardner.

**Sen. Gardner**

Thank you, Chief Justice, I think I'll ask a leading question. Are there other concerns you have and what might they be?

**Sen. Gonzales**

Chief Justice.

**Chief Justice Boatright**

Thank you. Sorry. I have them laid out in the written testimony that I've provided to all of the legislators. So in the interest of time, you know, I will, I'll defer to that. Yeah, I mean, I think the one other area that I did not touch on, is the document production should be done in a responsible manner, that doesn't expose the state to financial liability. And I think that's been at the core of some of the difficulties that we've had in terms of information sharing. We actually, under the current MOU are only supposed to provide records from HR investigations. And we're willing to go above and beyond that, if certain agreements can be reached, we just want to make sure that we're not exposing the State and the Department to financial liability. It's called an access agreement. And I can go into more detail about that. And then the other. The other thing is, I think provisions in the legislative declaration are unnecessarily provocative, but I understand that that's beyond our control.

**Sen. Gonzales**

Senator Gardner.

**Sen. Gardner**

Thank you. And if I may, dialogue a bit with the Chief Justice Madam Chair, I'd appreciate it.

**Sen. Gonzales**

Certainly.

**Sen. Gardner**

Chief Justice, my co-sponsor, went through a litany of newspaper headlines and while emphasizing that these are only allegations and not proven, then made a very persuasive argument about the implication being the unhandled misconduct within the Judicial Department. And I take issue with that. I hoped we would avoid that, but apparently not. I just I know you would be somewhat reticent. But could you respond to some of that, please. I heard your commitment at the last State of Judiciary, and you and I've had many conversations and I know there is a commitment. We haven't always seen eye to eye about what it's going to take. But those have been good faith, disagreements between two branches of government more than even two people. And I just wonder if you want to take a moment to give your view of where we are and what your commitment has been and how we're getting there in the face of a bunch of headlines that have been repeated here today.

**Sen. Gonzales**

Please feel free to dialogue. Thank you.


**Chief Justice Boatright**

Thank you for that question, Senator. Yeah, this has been really difficult for the Branch to just sit there and take, you know, hit after hit with regard to the headlines. But what I would say is we have confidence in the investigations. And the reality is, I think, as Senator Lee pointed out, there are currently six investigations that are ongoing. I think that this meeting that took place is going to be the most thoroughly investigated meeting in the history of the Judiciary. And I'm confident that the investigators from the FBI on through judicial discipline will be able to sort through and necessarily find what happened. When I stood before the legislature in February of last year. I will confess, I truly had no idea what the allegations, what the truth of any of the allegations were. We have had an entire turnover of our leadership in the State Court Administrator's Office with the exception of a probation supervisor and our IT director, but our entire HR department, our leadership team left and so we were left with really not knowing what any of those allegations were. And if you recall, in the audit, our HR record keeping was taken to task and rightfully so. It was abysmal. And, so, we've been trying to piece together and provide whatever documentation we can to the investigators, and we have provided certain documentation to judicial discipline with regard to those investigations. You know, for example, one of them was a claim of racial discrimination against two justices that now was litigated in federal court and dismissed by summary judgment by a federal magistrate judge. So, you know, these things have been playing out. One of the allegations, the allegation that Senator Pete Lee brings up about the hairy chest judge, I assume that was a contemporaneous thing. We found out that that happened in the late 2000s, either 2006 or 2008. And that matter was, in fact, sent to judicial discipline. So, you know, the premise of the memo is that these things were investigated and then have not been properly turned over to judicial discipline. And what I am saying is, let's allow the private investigations to come forward. Let's see what the results are. And then let's decide what the problems are. And we can move forward from there. Thank you for the question.


**Sen. Gardner**

Chief Justice, I think, historically, because of the way that we have dealt with judicial discipline in Colorado, which is not unlike other states, there are different models. But how much of that is public and not? I've heard for years, and I've been a lawyer for over 40 years, and I still actively practice in the courts of Colorado. So, I have a lot at stake in the integrity of the system, as I take my clients there. There isn't a lot of public information about what actions might be taken in response to a complaint about judges. And as you say, we even as legislators get complaints about judges and I read them and I refer them to your department. Many of them, I frankly think I don't know enough when I read them to know, was the judge right or wrong, but they have to do with a legal ruling, not misconduct. Nevertheless, we refer them and tend to say to people, there is a Commission on Judicial Discipline, if you believe that this was misconduct. But I think the public doesn't see a lot of what happens. Do you think you've been a trial judge? Is that right?

- 9 -

**Chief Justice Boatright**

Correct.


**Sen. Gardner**

And now on the Supreme Court? Do you think that the system for judicial discipline works yourself? Or is it overly protective of judges, and I know you to be candid, so please be so.


**Chief Justice Boatright**

I, from everything that I am aware of, I think judicial discipline works. And what I can tell you is, as a trial judge, you really don't hear much about what's happening unless it would happen to be one of your peers, and I was lucky enough not to have that happen. Or at least one that was made public, but as a Justice, what I can say is we have had and I'd have to count him but five or six public matters that have come to the Supreme Court and the judicial discipline makes a recommendation. And only one time have we not accepted the recommendation. And quite frankly, it was because it wasn't severe enough, they were recommending a payout to a judge, and then their resignation. And we said we wouldn't agree to a payout. And then it went back to judicial discipline, they were able to work something out. And then we accepted the recommendations. So in terms of, you know, judicial discipline doing their job, I don't have any belief that they are not performing their duties to the best of their ability. I know that there have been. I've looked at their website, and I know they had in 2020, they had almost 200 requests for evaluations and I know that a number of them may have turned into private admonitions. I know, the vast majority of them were what you had alluded to which were complaints about a decision, which really isn't the purview of judicial discipline. But from what I know, I don't think the system is broken. But with that said, I want to emphasize something. I am completely supportive of looking at any reforms that would make the system better. And for example, one area that I think we could make better is we need to make any type of reporting or discipline, much more victim centric. Victims need to be consulted about what necessarily happens. When this all happened, we checked with, we actually received a reach out from the 10th Circuit Chief Judge Tymkovich. And they talked about what they learned when they went through some problems. And they created an Office for Judicial Integrity, where, where complaints were referred, and then that office could then work with victims and try to reach some type of an accommodation. Sometimes, a victim may or may not want something referred where a judge could lose his or her job, it may just be that they want the conduct to stop. I mean, it could be everything from you're not giving a staff member sufficient time to pump if they've, you know, recently had a baby to just mispronunciation of a name or not recognizing gender pronouns correctly, maybe they just want correction. So, I think the system has worked. I've not seen flaws in the system. But can it be improved? Absolutely. And we support that.


**Sen. Gardner**

I've heard you say, and if I get this wrong, please correct me. But I've heard you say that you would like for the Court, the Branch itself to get out of the complaint and discipline business? Is that pretty accurate?

**Chief Justice Boatright**

Yes, it is. Even before all of this happened, Chief Justice Coats had opened up the discussion with the former Executive Director Bill Campbell about doing just that. Because if you look at what the premise of the memo is, is that the HR department investigated things, potentially found misconduct and then did not turn it over to judicial discipline. And we would like to extricate us from doing any of that investigation. Now, I know, in this statute, it has that in there, where we have to document and do certain things. I mean, what I would prefer to do, if we have an internal complaint, is our HR department absolutely has to do an initial investigation, because we need to make sure a victim is safe, and then turn it over to judicial discipline for the investigation. The HR department shouldn't be involved in any type of fact finding or gathering just because of the danger of the premise of what was alleged in that memo. You know, again, the key thing is, is that that memo, accuses the Branch of investigating things and not turning it over. And we would like to have the investigations appropriately handled by judicial discipline. It's not part of this bill. But if I had a wish list that would be on it.

**Sen. Gardner**

I've had this discussion with some colleagues about the bill. You say, well, we want to be out of the business in in some ways the bill takes the branch out of the business of dealing with complaints, but then there's this huge information sharing component and on the one hand the answer or kind of the response to the judicial branch position is, well, they're out of the business, and they need to package all of this up. But what is your concern with that? And what's the difficulty with that?

**Chief Justice Boatright**

I think anytime that we are involved in the information gathering, there is the danger that it looks like we tampered with it. And, so, what we would like to do is just make sure that whomever is the reporting party is safe, and then allow judicial discipline to conduct the investigation. I mean, the longer that, in the bill, it says, identification of potential witnesses. Well, there's the danger that we identified somebody and didn't turn them over. A list of any evidence held or known. Maybe we identify, I mean, it just could be the accusation. And, you know, part of the thing why we support fully support financial independence, for judicial discipline, is not only for the functionality, but for the appearance. And so having us taken out of the investigative process, I think only improves the appearance of that.

**Sen. Gardner**

Now, you make a distinction, I think, between internal compliance, and external, if you will, compliance. And it seems to me that there are these two categories. And by the way, the things that have made so much of the headlines seem to have been of the internal nature, that is employment law kinds of issues, quite frankly, and I remind my colleagues here, we struggled and wrestled with this a few years ago as elected officials and how to properly deal with that. So, this isn't unique to the Judicial Branch. But is there in your mind a difference in how to deal with the complaint from a litigant who says I was mistreated by the judge from the bench and he or she made a bad decision and took my kids away from me when my spouse is an abuser. I get these all the time, and I've practiced law for 40 years, so I can

come up with that fact pattern pretty quickly. Is there a difference in how those should be dealt with in terms of information sharing? And then what the internal complaint should be done? Yeah, so that distinction.

**Chief Justice Boatright**

I think absolutely, because number one, we're not talking about the safety of somebody internally, if there was harassment or, or something like that, this is a decision that we can then just refer the person to judicial discipline directly. And, you know, even take out that minimal step of making sure that we have a reporting party internally made safe, and we can just refer that over. And then judicial discipline can conduct the investigation thoroughly, however they deem appropriate. So going back and getting one of those complaints, that complaint comes possibly to the judge's judicial assistant, and then judicial assistant, according to this to the proposed bill has to, at a minimum, identify potential witnesses, list any evidence held or known, access to all evidence, including administrative digital files, you know, notify the person supplying the information, a number of things. If we could just refer that over to judicial discipline, then we are completely out of the investigation business. And just that allegation that the memo thrusts at us of you did something and did nothing about it, we can be removed from and so the appearance part goes back to more confidence in the process. Which, you know, we may have had some disagreements with judicial discipline, but there's no disagreement as to the importance of their mission. They are vital to people having confidence in our judges. It's vital to our merit selection system. So, you know, anything that we can do to improve the public confidence we support.

**Sen. Gardner**

I guess I would ask in terms of confidentiality, observance of confidentiality. Some of that comes up in the information sharing. What are your concerns about that in the bill as written?

**Chief Justice Boatright**

Well, particularly the need to give up confidential and privileged information. What I have concerns about is, regardless of whose privilege it is, by giving it to a third party, there's an argument that you have then waived that privilege, regardless of what that third party is going to do with it. I mean, we have in the Constitution, and in the statute, it says that that information shall be confidential. But it still raises an argument that it could constitute a waiver of that privilege. And I am concerned about the wording. It strikes me as being so broad, that even a judge who may be the subject of an investigation, potentially, potentially, although I can't imagine this is the intent would have communications with his or her private lawyer than be made subject to discovery.

**Sen. Gardner**

Let me ask you something that gets lost here. We talk about, we're talking about judicial misconduct, not potential misconduct of a court clerk or an administrative person in the State Court Administrator's office or your HR person. We're just talking specifically about constitutional judicial officers. How many of those do we have in Colorado?

**Chief Justice Boatright**

Judicial officers?

**Sen. Gardner**

Yes.

**Chief Justice Boatright**

Wow, that's a great question. 350, roughly. Okay. Okay, Mr. Vasconcellos said I was right.

**Sen. Gardner**

So how, yeah it didn't need to be a trick question. But how many judges do we have on any given day? So, I guess I would just observe that when you have 350 people, no matter how carefully chosen, no matter how carefully vetted, and our judges are carefully chosen and carefully vetted. You have those 350 people, there are going to be some instances of misconduct. It's unacceptable, but inevitable. And that's why we have a Commission on Judicial Discipline.

**Sen. Gardner**

It's interesting. And I have pointed this out to colleagues and constituents. Really, I've not heard a single allegation of all of these and everything I've read in the newspaper, I've not heard a single one of these about a judge being offered a bribe to decide a case differently about, somehow a decision being affected by corruption, if you will. I have heard many allegations about. And, again, only allegations about sexual harassment and inappropriate language and dilatory entry of decisions. Do you know of any of these complaints that are about judges taking a bribe or taking a favor or something like that?

**Chief Justice Boatright**

No, I think the closest that I have been made aware of was when Judge Kamada up in Greeley, who resigned and was criminally prosecuted was reporting information that he had learned from warrants to friends. But I don't think there was any money being exchanged. I think it was a childhood friend. Not that it minimizes anything. But that's probably the closest that I can think of to what you've been referencing.

**Sen. Gardner**

My point is that, to my colleagues and constituents has been that unlike some states and some judicial departments across the United States, unfortunately, there has been this rampant concern about one litigant receiving a favor because money was paid or you know, or even campaign contributions made, which is perfectly legal in the states in which it occurs, but nevertheless, the issues we're talking about are not that kind of corruption in decisions. What changes have you made to address the things that we have seen reported in the media?

- 13 -

**Chief Justice Boatright**

Yeah, I mean, first of all, before anything was reported, we had a clean sweep, nearly a clean sweep of all of our leadership at the State Court Administrator's Office. We're now fortunate to have Mr. Vasconcellos as our State Court Administrator, he's been incredibly transparent.

Number two, we had an audit that was performed on the old leadership. And we were really taken to task on a number of areas, including as I mentioned earlier, our HR records. We have implemented every recommended change that was made.

The other things that we have done is we've changed the professional rules for judges with regard to making sure that harassment is known as something that can go before judicial discipline, we put in there that retaliation is not accepted as a result of someone being reported. We've made an ease of reporting.

The other thing, quite frankly, that we have consciously not done, is we tried not to get ahead of the independent investigations. And I know they've taken much longer than any of us had hoped that they would. But I also think that that's going to be a reflection of the thoroughness with which they are doing it. And we know that they're going to make a number of recommendations. You know, because they've asked questions about them. And we're anxious to implement any changes that are made as a result of that.

And one other thing that I want to say in response to your comment about the bribery and things like that is, I do think that one thing that I would, I'd like to see us examine in the summer group, as I mentioned earlier, is something that is much more victim centric, because one of the things that we need to be very, very conscious of is the power differential between the judges and the clerks and the reporting. And I am very comfortable with regard to, you know, the information that we have with regard to the so-called memo, but the unknown is going to be they serve I surveyed 4,000 employees. And I don't know what's going to come forward in terms of people saying I didn't feel comfortable reporting something. I don't, we don't know. And we'll learn that when that report is made public. So, I think that is also going to teach us some things that we need to do differently. But yeah, I kind of went off on a tangent.

**Sen. Gardner**

That's fine. Um, I think we've already talked about this but the financial piece of the bill and sort of the independence of operations and so forth is something that there's broad agreement on. But I do think there's a piece of this that you've addressed that the Judicial Department has concerns about, and it's almost as if you're saying the Commission on Judicial Discipline needs to be made independent, and the bill itself maybe doesn't make them as independent as they need to be if we're going to go down that road, and we ought to. Talk to that a little more for us.

- 14 -

**Chief Justice Boatright**

As I said, it, it puts us in a position of having to say no, potentially at some point or questioning them with regard to expenditures, if we're doing the finance. We have procurement rules, we have financial rules that they would then need to abide by. And I think that just if we were to run a foul with it, it has an appearance that we're attempting to control. You know, if our IT department isn't able to produce something that is to their liking, it looks like we're exerting some type of control or interference. And we just want to remove any, any appearance of that at all. You know, I think it's difficult because they would be a very small office, but by the same token, they need to be independent, not kind of independent or mostly independent. Our position is we would like them to be completely independent.

**Sen. Gardner**

It's my sense that part of the reason we're having this discussion today is that they've been independent under the Constitution, but not really as a matter of practice, wholly independent. That seemed like the thing to all of us for I don't know how many years to be. But recent events have shown that that's not independent enough. And part of this bill was to remedy that problem. And you can respond, as you wish.

**Chief Justice Boatright**

You know, that's exactly right. I mean, we operated under a system for as long as I've been a justice. And I think as long as our senior member Justice Marquez has been a justice, where we paid for the Executive Director through attorney regulation fees, and for a part time administrative assistant, and that any time there was an investigation, then OARC provided the Special Counsel for it. And it worked great until the current situation. And that shows that our current situation is inadequate. And we acknowledge that and even the difficulties that we've had surrounding funding has shown that there are inadequacies in the current funding system. So that's why, you know, we completely support, we're here in an amend position, but we completely support funding them independently. We just want them to be completely funded independently.

**Sen. Gardner**

Thank you. I think I'll stop there. I appreciate your answering all my questions. And I'm sure colleagues have questions as well. Thank you, sir.

**Sen. Gonzales**

Thank you, Senator Gardner, Colleagues, any other questions for the Chief Justice? Senator Cooke.

**Sen. Cooke**

Thank you, Madam Chair. Chief Justice Boatright. Thank you. Appreciate your testimony. It's been informative. And I appreciate your candidness. So, thank you. My background is law enforcement. And I did six years in internal affairs of a rather large law enforcement agency. And, so, I know how law enforcement handles internal and external complaints. And I think Senator Gardner, pretty much asked

- 15 -

the question that I wanted to ask, but I want to make sure I understand the external complaints. I think I heard you say that, you would like to just be able to refer the external complaints. And Senator Gardner used the example of, hey, I think this guy, this judge made the wrong decision. And that's what you'd like to refer to the Commission. And I understand that, what if it's a more serious external complaint? Would that be the same process? And then the kind of what do you do now on internal complaints? Would you like to do the same thing with internal complaints? Just send it directly to the Commission? Or would you like to have another step in between before it gets to the Commission?

**Sen. Gonzales**
Chief Justice Boatright.

**Chief Justice Boatright**
Thank you. Yes, Senator with regard to the internal complaints, for example, if we had a judge that was accused of harassing or sexually harassing one of our CJA's, I think out of necessity, we would need to have our HR department come in immediately, and be able to remove the CJA and make sure that they are safe, and then turn it over to judicial discipline immediately. So, there's no evidence gathering, there's no witness list, there's no way that we could have interfered with any type of investigation, or there can't be an allegation of that. With regard to the external part. If it's more serious, for example, the example that Senator Gardner gave, if we had a situation where there was an allegation of, and again, I'm not aware of anything, but let's say it's an allegation of a judge taking a bribe. I think that there would be a dual reporting requirement to law enforcement, and then also to judicial discipline. But again, having us come in and do an initial investigation to gather witnesses. There just is always that appearance of did you really turn over all of the witnesses names? Did you really, you know, you've had this now for a week, what, what should we have done? What could we have done a week earlier?

**Sen. Gonzales**
Senator Cooke.

**Sen. Cooke**
Thank you, Madam Chair. And thank you for that. So, I'm assuming that it would be very burdensome for your staff. The way the bills written regarding collection of internal I think that's what I heard you say, internal complaints?

**Chief Justice Boatright**
No, I think that, that. We performed somewhat, if the bill stands as it currently is comprised, our HR department has been doing similar work to this for a long time. That's what I was saying that former Chief Justice Coats before any of this happened, recognized that, that we should try to get out of doing even this preliminary investigation and then turning it over. But that's our HR department can do that. I don't think that that is an onerous burden. It just, it just creates a and sort of an appearance of what haven't we turned over? What evidence didn't we turn over? What witnesses did we disclose? But we're

- 16 -

in a position to be able to do that. External complaints would be extremely difficult, because of the volume of those, you know, if we get that call that Senator Gardner talks about and says, hey, this judge, I think, was sleeping with my wife, or whatever it may be. And that's why he gave her the house, you know, under this, we would have to collect. You know, we'd have to document receipt of the complaint, we'd have to provide notification, we'd have to identify witnesses who all testified in the domestic case, list of any evidence held. I mean, do we gather that evidence? It's just, it would be extremely difficult. If you're in law enforcement, then you've dealt with the people that don't recognize the authority of courts and law enforcement, and we get a lot of business.

**Sen. Gonzales**
Senator Cooke.

**Sen. Lee**
Okay. Thank you, Madame Chair. Yeah. Okay. That's great. One last question. Isn't that the job of the commission to get all that information? I mean, I'm assuming that's what would be I've never dealt with it. So, I'm assuming that would be their job, to get the witnesses and to then get all the information, and then do their investigation.

**Sen. Gonzales**
Chief Justice Boatright.

**Chief Justice Boatright**
Thank you. Yes, I think, again, sort of the iteration before this, that we found to be inaccurate, you know, they just didn't have the manpower to do that. They had an Executive Director and a part time administrative assistant, they then would go to OARC for special counsel. But we have a memorandum of understanding that our HR department would do an investigation, and then turn that information over. And again, I think the bill, as I read, it, sort of puts that into statute. And, again, we can live with that. I just think it would be better practice if we were able to, especially now that they're going to be staffed, hopefully, with this financial independence, that they can then conduct that investigation.

**Sen. Cooke**
Thank you.

**Sen. Gonzales**
Thank you. Further questions from members of the committee? Senator Lee.

**Sen. Lee**
Thank you, Madam Chair. You just mentioned the memorandum of understanding between HR and the Judicial Department and the Commission. When Senator Gardner and I were talking about this bill, I referred to that memorandum. And I basically said, we've pretty much in respect, put that memorandum

- 17 -

into the bill. I mean, not completely and precisely as it's set forth. But that memorandum has been in effect for 10-15 years. And I didn't see a date on it. But oh, from 2010. Is that working? And do you see shortcomings in that, or is it burdensome? And I guess the third part of that question is, well, answer those if you would.

**Sen. Gonzales**
Chief Justice Boatright.

**Chief Justice Boatright**
Thank you. Is it working? Well, the allegations in the in the so-called memo says that it's not. It has allowed an allegation that our HR department went in and investigated things, and then did not properly turn them over to judicial discipline, right. So, what I'm trying to do is avoid that allegation. Because I think we've been able to see the harm that just allegations can make, as you alluded to, in your statement, there has been no finding at this point, that any of these things, any of those allegations in the memorandum were improperly handled. There's been no finding of that. But I will say that the allegations have been as damaging and has made this year, probably the most difficult year for me in my professional life. So, would I like to get out of that? Yes. And I think that if we can identify, procure safety for the alleged victim, turn it over, then those allegations can never be made again.

**Sen. Gonzales**
Senator Lee.

**Sen. Lee**
Thank you. Well, that's helpful. And I think, is in addition to that there's a path for resolution of some of these concerns and issues. The concern that I have significantly is that information was not provided to the Commission to do an investigation. I mean, this thing has been going on for a long period of time. And, you know, I'm not being flippant when I say this. All I know is what I read in the newspapers. I mean, I don't know more about the allegations than that. But I what I'm hearing and reading, Justice, is that the information regarding the Masias Memo was not turned over to the Commission so they can conduct an investigation. Was there some flaw in the memorandum of understanding that could be remedied? Or how would we have gotten that information? I mean, look, retrospectively what could have been done differently, to get the information about those allegations to the Commission so that they could do their job?

**Sen. Gonzales**
Chief Justice Boatright.

**Chief Justice Boatright**
Thank you, I need to kind of tread lightly around this because proceedings before the Commission should be confidential. But what I will say is that, with the five other investigations, we've been able to

- 18 -

reach an agreement with regard to waiver, including your own Auditor. With regard to documents. The memorandum itself provides that investigatory notes and findings shall be turned over. What we're talking about are confidential and privileged documents, that we have sought protection with all of the investigative agencies to have what's called an access agreement to show what they would do with the documents. So that it can't be later argued that by giving them to a third party, we've waived them. So, the memorandum itself is not an access agreement.

**Sen. Lee**
Right. So, we put some language in the bill, and I'd be hard pressed to pull it up quickly. But there's language in the bill, probably about halfway through it in the area about disclosure, which says that the provision of information to the Commission of privileged and confidential information to the Commission does not waive any protections. And we put that in statutorily, and when you and I met a month ago, we identified that language as well, and pointed to it in that in the first edition of the bill, which you all objected to, in which we changed, but that same provision has been consistently in the bills, would that be satisfactory to you to address the issue?

**Sen. Gonzales**
Senator Lee, I think you're referring to page 16.

**Sen. Lee**
I knew it was in that neighborhood

**Sen. Gonzales**
Lines 7 through I believe 14.

**Sen. Lee**
That's not quite it. It's on line 60 or page 16, line 26. Through the next page, it says the timely disclosure to the commission of information or materials, pursuant to this section by the department does not by itself waive any otherwise valid claim of privilege or confidentiality by the department. What I understand is the reticence of the judicial department to turn over information was confidentiality and privilege. And that was the repeated retort and response to a request for information. Is that language sufficient to satisfy that?

**Sen. Gonzales**
Chief Justice Boatright.

**Chief Justice Boatright**
Well, I'm not an expert in it. I think it would go a long way. I don't object to that language being in there. I think what we're concerned with . . .  Can I phone a friend? Justice Marquez is going to be the next Chief Justice.

**Sen. Gonzales**

Justice Marquez, welcome.

**Justice Marquez**

Thank you. Thank you, Madam Vice Chair. Senator Lee, in response to your question. I think the concern is it doesn't go far enough to ensure that disclosure of that type of information to the Commission would not be deemed a waiver, an example would be in an employment discrimination context. If an employee were to claim discrimination by a judge supervisor and raise a discrimination claim, and we were required to turn over all of this privileged information with respect to the Commission, the concern is that that same potential plaintiff who goes to federal court. The federal court is not necessarily bound by this statutory language regarding privilege. That's the concern.

**Sen. Gonzales**

Senator Lee.

**Sen. Lee**

And I don't want to get down in the weeds on the minutiae of privilege and confidentiality. But there is the idea that the federal court would be applying Colorado law. Isn't that the general rule? And that this language would be minimally persuasive, and maybe binding on them? I mean, how could they ignore Colorado law?

**Sen. Gonzales**

Justice Marquez.

**Justice Marquez**

Thank you, Madam Chair, Senator Lee. It's our understanding that federal courts are in fact not bound by that. That's the concern.

**Sen. Gonzales**

Senator Lee.

**Sen. Lee**

So, you know, I guess there needs to be a way to do this. And you have a lot of legal horsepower over there on the Carr Building. Why don't you come up with some language and propose it to us, which would address this issue. We want to protect confidentiality, but we want to empower the Commission to get the information that they need. So there has to be a way to do it. So, can we request, implore you all to help us?

**Sen. Gonzales**

Justice Marquez.

- 20 -

**Justice Marquez**

Thank you, Madam Vice Chair, Senator Lee. In fact, I believe we have proposed language that would address those concerns, or at least address the concern that this drafted language, in fact protects against that waiver.

**Sen. Gonzales**

Senator Gardner.

**Sen. Gardner**

Thank you. Thank you, Justice Marquez. Let me just, and you won't have seen this specific amendment, but I was asked to prepare an amendment with some language, asked by the Department about privilege and so forth. Is that the language you're referring to that that would address that the proposed amendment that that Senator Lee is saying, well, all the folks over there in the Carr Building ought to be able to figure this out. And before you answer, let me just say, with regard to the federal court being bound by state law, my head already hurts from 40 years ago from my civil procedure problem and federal courts problem about that. Senator Lee, that's not the case that federal courts tend to do what they wish. But I digress, Justice Marquez, please.

**Sen. Gonzales**

Justice Marquez.

**Justice Marquez**

Thank you, Madam Vice Chair, Senator Gardner, in response to your question, the language you refer to. Yes, that is the language.

**Sen. Gonzales**

Senator Lee.

**Sen. Lee**

Thank you. What amendment? Senator Gardner?

**Sen. Gardner**

It would be amendment six, L 006.

**Sen. Lee**

Okay. Thank you.

**Sen. Gonzales**

Senator Lee.

- 21 -

**Chief Justice Boatright**

Madame Chair, Can I supplement?

**Sen. Gonzales**

Chief Justice Boatright.

**Chief Justice Boatright**

I think one of the things that we've learned from the Attorney General's Office is that the access agreement that we've been able to enter into with the five other investigations. Well, we've entered into agreements, including the access agreements that have provided, provides more protection, according to their advice, but we would accept the amendment.

**Sen. Gonzales**

Thank you. Any further questions? I do have I think just one question, and I'm very appreciative of the discussion that we've had here today. This, Senate Bill 201 does establish a legislative interim committee and I looked at the various issues that Senate Bill 201 asks this interim committee to review and study and one stood out, in particular to me and I wanted to ask your thoughts, just given your experiences navigating this question over the past two and a half years. And that's the question that you see, outlined on page 22, lines three through five. The best method of balancing the values of confidentiality and transparency for judicial discipline matters. I think that those values are both important and carry a lot of merit. But I'm curious for your perspectives, given the positions that you hold, what insights you would offer to us as we both struggle with these very questions around who receives what information? When? To whom should a complainant direct a complaint? What is the timeliness for a complaint to be adjudicated? How would you all respond to that question? Chief Justice Boatright.

**Chief Justice Boatright**

Well, thank you, Madam Chair. That's a great question. You know, I think when we talk about the values of confidentiality and transparency, we are almost we're not only talking about legally, but we're also talking about victims, and, you know, the information that they want to provide, and they feel safe in providing, especially with the disparity in the power. So, I think that that needs to be part of that conversation. I would also say that, you know, we want to be able to balance confidentiality and transparency so that we can get information. I mean, it has been extremely difficult the length of time that this has lingered, and I'd like to see something that is confidential, but yet provides the information necessary for any investigative agency to be able to conduct a thorough investigation on this. And I'll ask Justice Marquez if she has.

**Sen. Gonzales**

Justice Marquez.

- 22 -

**Justice Marquez**

Thank you, Madam Vice Chair. I echo the Chief Justice's comments about thinking about victims going through this process. I think the overarching goal of this should be to come up with a reporting structure that encourages reporting of complaints. And taking into account the victim's perspective, in that regard is an important part of coming up with that process. I think the federal courts have an interesting model that might be worth drawing from, I think that the investigations are going to offer some recommendations with thoughts along those lines that I hope will be taken into account with any reforms that are considered.

**Sen. Gonzales**

Thank you. You know, I've listened to the discussion that we've had here thus far. And, you know, I have incredible respect for my colleagues here on this committee who have been members of the bar for about as long as I've been alive, and with all the respect that I can wrap into that. But I come to this as a as a non-attorney, and I come to this as a as a member of the public. Right. And I hear you all, when you say, yes, let us be thoughtful about the victims in this process. What I think is complicated about the situation in which we are all in right now is that we are in a moment in our society and here in our State, where trust in our institutions is crumbling, is eroding. Where whether it's because of. We can go down and have probably have a long conversation about why. But whether we're talking about this building, in trust in government, trust in our elections, trust in the courts. The trust in each other is crumbling. And, so, I do, I really do struggle with right now with this idea of what should be confidential versus bringing things out into the light, and in transparency. And, so, we met about a month ago to talk about this policy. Prior to the bill having been introduced, prior to me being having been able to see the policy that was being drafted. And the meeting was the meeting, I had a conversation with both of the bill sponsors, to let them know that we'd spoken. And that was that. And two days ago, a reporter asked me questions about this. And they said, yeah and here was our conversation. And here's what we discussed, and here's, you know, my answer to the questions. I find myself in this fascinating position where we are trying to set forth as we come out of some really complicated and trying times, that have really shaken the public's trust in this institution. We're trying to find a path forward. I'm appreciative that you all have suggested language. I'm appreciative that we're here today, talking about this bill, and how best to make it something that we can all be proud of. Because this is what we've got to do. We've got to figure this out. So that when somebody comes to the court and feels like they got a raw deal, again with deference to both of my colleagues who practice before the courts, where it's another, roll your eyes and oh okay, you've got a complaint, all right. That you can say no, okay, if you've got a complaint, here's where to go. That everybody who comes to have their day in court is able to feel respected, that everybody who works within the court is able to be proud of their work. And, so, I'm appreciative of the fact that you both are here today that you've offered both written comments and that you've offered these. Your comments, and with that we've been able to just talk it through. I just want to see if there's anything else that you think it's important for us to know, as we debate the merits of the Senate Bill 201. Chief Justice Boatright.

- 23 -

**Chief Justice Boatright**

Thank you. Really well said and what I would say is, and Justice Marquez isn't here just because she's way smarter and knows all that stuff. But it's to show a commitment that she's gonna be the next Chief in a year or two. And this is a lasting commitment by our court, that we are going to move forward. What I would say is, I think when we met, we had a real fear that something fast was going to happen. And I think you hit the nail on the head in the sense that these are really complicated issues. And I think that the interim summer group, is going to be an excellent way to sort through a number of these things, not only from our perspective and your perspective, but you know, when we heard about all of this happening, we got the bar associations, the diversity bar associations, our consumers to come forward. And I think if there are people who are identified as victims, they should be able to come forward and talk about, you know, different issues with regard to this. So, I think when we met, it was a very different bill. I think Senator Lee acknowledged that there's been substantial rewrites since the time we chatted and, and I appreciate you taking the time. But I think that the Interim Summer Study is exactly what's needed. Because we need to be very deliberative. I use these words, we need to be transparent. We need to be inclusive. And we need to be deliberative about how we do this. Because it isn't just something that we can change a word here or two, and have an easy answer. Because you're right, this is bigger than all of us in terms of what our integrity is and the people's confidence in the system. And, so, I think, just having a summer study group where it is open, and people can come in and express their views, and then we can look at it and, you know, if there are ways that we can improve this, we are, despite the headlines, we do embrace constructive reform as we go forward. And I think there are ways to improve.

**Sen. Gonzales**

I do just want to. I'll go to Senator Cooke, and then come back to this. Thank you, Senator Cooke.

**Sen. Cooke**

Thank you, Madam Chair. I'd like to get Justice Marquez's kind of perspective on having staff document and report complaints from the public. Your perspective, kind of what I asked the Chief Justice. I want to get your perspective on that.

**Sen. Gonzales**

Justice Marquez.

**Justice Marquez**

Thank you, Madam Chair, Senator Cooke. As the Chief Justice began, I think he was drawing distinctions between these external complaints and internal complaints. Our main concern with the bill as drafted is the burden that it would cause for staff with respect to the external complaints. And here's an example, a long email that comes to a Chief Judge in a District complaining about all the things that went sideways in a case, and buried in that long email is magic words that say, and my judge was biased. The rest of it probably on its face looks like an example of a complaint that you and Senator

Gardner have often seen. But, because it contains a reference to alleged bias by a judge, it would meet the definition that would trigger all of these document collection, investigation, amassing of transcripts, advisement of potential witnesses, and then retention of all of those, turning it over to the commission, of course, but then retaining all of that documentation for the entire career of the judge plus three years. For every single one of those external complaints. I see a giant difference between those kinds of concerns and the internal concerns where you have a court judicial assistant, or a law clerk, raising a concern about a supervisor and sexual harassment. That's different. And I think our HR processes do reflect the memorandum of understanding and, frankly, are not all dissimilar from the requirements in this bill. I hope that distinction makes sense.

**Sen. Gonzales**
Senator Cooke.

**Sen. Cooke**
Yeah. Yes, it did. Thank you so much. And I guess I'll ask the same question, too, as I asked the Chief Justice. Under this bill wouldn't it be the judicial discipline commission that would, then should be getting, you know, the names and the evidence and following up on the complaint instead of your staff or the staff of the judicial department. I would think that would be their job and not yours.

**Sen. Gonzales**
Justice Marquez.

**Justice Marquez**
Thank you, Madam Vice Chair, Senator Cooke. Certainly, with respect to the external complaints, and again, just the triage and understanding the distinctions of what's a real serious complaint versus not, and what we what the Department currently does. And what we would like to see the bill amended to do would be to say in that instance, sir, ma'am, here's the information, the email address and the website and so forth. With respect to the internal complaints, I think the less involvement that we have at HR, the better just for the concerns expressed by the Chief. If we are left with what this bill requires, obviously, we will make it work.

**Sen. Cooke**
And Madam Chair, thank you. And I just want to make it clear, that's what I was referring to on the external complaints. That should be their job. They're getting 6.3 FTE this year and six next year, I'll have a staff of 12 people so I would think that would not be over burdensome for them, and that they should be then doing the investigation and collecting all the information, I guess is what I'm getting at on the external ones.

**Sen. Gonzales**
Justice Marquez.

- 25 -

**Justice Marquez**

Thank you, Mr. Vice Chair, Senator Cooke? Yes. Yes, I think that particularly with expanded FTE in the newly independent Office of Judicial Discipline, presumably they would have the resources to do exactly that.

**Sen. Cooke**

Thank you.

**Sen. Gonzales**

Senator Rodriguez.

**Sen. Rodriguez**

Thank you. I'm, I'm sorry, I'm gonna shift gears back because he got ahead of me. With the discussion from Senator Gonzalez, and the discussion about the task force. I see it's just made up of legislators and is there you've had a lot of discussions of things that didn't get brought up in the bill, as to maybe other solutions or a sub task force that could go to the task force that you have ideas about to address the specific concerns that we are either learning or the complications that you're dealing with? And whoever would like to answer that question.

**Sen. Gonzales**

Chief Justice Boatright.

**Chief Justice Boatright**

Thank you, Madam Chair. Yeah, in a perfect world, I'd like to see, you know, three judges on there-- from a small district, a larger district, and then someone who's probably experienced being the Chief through judicial discipline. I also think that members of the Bar Association, especially the diversity bars, the Women's Bar, need to be a member of this. And I, frankly, would like to see somebody who's probably been a victim of some type of harassment, maybe not necessarily judicial, but can give a victim's perspective on this. I think all those things would be valuable.

**Sen. Gonzales**

Senator Rodriguez.

**Sen. Rodriguez**

And, also, maybe in because I don't know, because I don't know if the research but also, is there other models in the country that have been through this process? Before that you could lean back on and maybe have some insight? Or I'm sure you attend enough conferences where his stuff gets brought up?

**Sen. Gonzales**

Chief Justice Boatright.

- 26 -

**Chief Justice Boatright**

I will confess, and maybe Justice Marquez can answer this better. We've not done an exhaustive search with regard to what other states have done. And with all due respect, I mean, I think the bill dropped on Monday, and here we are Friday. But, I mean, I know that there's been conversation about what the bill was going to be, but it's transformed. And, and I know there's mention of an Illinois system. And, and so we've talked about that. But I think that that would be another really valuable thing that we could look at through the taskforce is what are other states doing? I don't think, honestly, Colorado is out of the mainstream in terms of, you know, I think there can be different ways of doing it. But I don't think Colorado is out of the mainstream of what we're doing. But I have said this, and I said this to the bar association, people, we really have an opportunity to make Colorado a leader in this, we can transform this into a system that I think other people can say, hey, let's see what Colorado is doing.

**Sen. Gonzales**

Justice Marquez.

**Justice Marquez**

Thank you, Madam Vice Chair. In response to your question, Senator Rodriguez, the Institute for the Advancement of the American Legal System, or IAALS has done a study on judicial discipline systems across the country. That 2018 report has some very thoughtful recommendations. Having someone from IAALS be a part of this interim summer committee, I think would be a wonderful idea and have that perspective, that national perspective. And then the only thing I would add is to echo the Chief's comments. This has been an excruciating year. Chief Justice Boatright and I are committed to getting this right. And if one positive thing could be wrought from all of this, it's the idea that we have an opportunity here to make Colorado a national leader in this area. Chief Justice Boatright is correct Colorado is very consistent with any number of other merit selection systems across the country. Merit selection systems have key components, the merit selection nominating commission process, a performance review process, a retention process, and the discipline process. Colorado's system looks like pretty much every other merit selection state. Almost all of those merit selection systems came about in the 1960s. They haven't been refreshed for the 21st century. We have a really unique opportunity here to do something great. And I hope that this interim summer committee will come up with some great ideas that we can implement.

**Sen. Gonzales**

Thank you, Senator Rodriguez for your questions. I just had a few sort of brass tacks questions in terms of your thoughts on whether the members of the judicial discipline commission should continue to be appointed by the Supreme Court or not? Chief Justice Boatright.

**Chief Justice Boatright**

That's an interesting question. I would think that I don't know if four is the magic number. But I do think that having representation from people appointed by the Chief Justice on there is important for the

- 27 -

confidence from the judges' perspective that this is going to be a fair process. I mean, I will say, quite honestly, we had a training recently, and there was a lawyer who works in this area. And I think he scared everybody to death about nothing, I don't think there's been any bad acts by judicial discipline. This isn't intended as a criticism at all, but people . . .  I mean, there's a psychological impact if you just send somebody's name to judicial discipline, and that is a scary proposition, you could lose your career. So, I do think that there's an important part, what that number is, I don't know. But I do think having a voice is important.

**Chief Justice Boatright**
Thank you. Justice Marquez.

**Justice Marquez**
Thank you, Madam Vice Chair. Your question concerned whether the current Supreme Court or the Chief Justice specifically should continue to appoint the four members of the Commission. That is the constitutional structure as it currently exists. If this interim committee wants to completely overhaul this process, which would require a constitutional amendment and adopt a totally different model, perhaps we revisit that question.

**Sen. Gonzales**
Thank you. And this is one of those sorry, I'm not a lawyer questions. But on page six, line 10. In the definition of Judge, there is a reference to senior basis judges. Is that defined somewhere in statute? Chief Justice Boatright.

**Chief Justice Boatright**
I think that it is I can't give you the cite to it. But it's there. There are judges who have retired from the judicial branch and then have been retained by the branch on a contract basis. And I know that it's authorized by statute. I just I apologize. I can't give you the statute up top of my head.

**Sen. Gonzales**
It's one of those. No, I totally understand it. I think we all kind of recognize what it is and how it works. But anyway, at any rate. I want to see if there's any final questions. Seeing none, I want to thank you all, for your comments and for your perspectives as we're debating this important policy.

**Sen. Gonzales**
Thank you very much for your time.

**Sen. Gonzales**
Senator Lee.

- 28 -

**Sen. Lee**

Thank you. I'm not going to pose another question. I just also want to thank you on behalf of the rest of the committee for coming in and spending this amount of time and we look forward to continuing to work with you. I'm not sure we're going to resolve all the issues on this bill today, this afternoon in the next couple of hours. We may have to spend more time to work out some of the details. But you know, some of the, a lot of the things you've said today are refreshing. And we look forward to forthcoming discussions to continue to create the kind of model that, as you say, Justice Marquez could lead us into the next 50 years. So, thank you.

**Justice Marquez**

Thank you.

**Sen. Gonzales**

Excellent.

**Sen. Gardner**

Thank you.

**Sen. Gonzales**

At this point, we have a number of folks who have signed up in opposition to the policy, in an amend position. We've run the gamut here. In a neutral position and in support. Would you like for us to begin with opposition? Senator Lee or Senator Gardner?

**Sen. Lee**

Why don't we start with the amend and then opposition?

**Sen. Gonzales**

Amend and then opposition?

**Sen. Gonzales**

All right, well, then what we'll do is I will welcome Chris Forsyth from the Judicial Integrity Project, to come and testify.

**Sen. Gonzales**

I'll also welcome Robin Austin and LuAnne Fleming on deck. Given, usually what I would do is I would call panels. But given the policy and sort of the issues and the number of questions that we may anticipate, I'll go just go ahead and call folks one at a time. So, Mr. Forsyth, welcome to the Senate Judiciary Committee. Thank you for being here with us today. If you can please state, your name, the organization you represent, and then proceed to testimony. Thank you.

- 29 -

**Chris Forsyth**

Yes, my name is Chris Forsyth. I'm an attorney who has practiced 29 years in Colorado, and I'm executive director of the judicial integrity project. We try to improve the justice system by looking for measures that increase transparency, enhance accountability and remove conflicts of interest. We're happy that this bill shines a light on judicial discipline. The legislative declaration in the bill has some promising language. Unfortunately, the substance of this bill falls short on its legislative declaration and takes a really dark twist. The bill is misleading. So much so that an article published in the Gazette by Dave Migoya who has already been referenced here today, on April 11, declared that this bill quote would dissolve the Colorado Commission on Judicial discipline that sits within the judicial department and create the new independent body that dot dot dot end quote. That statement and other statements in the article are false. It's legally impossible for this bill to do what that article and the bill's title claim. The Supreme Court appoints for members of the discipline commission, writes the rules for the commission, and only the Supreme Court can remove a judge from the bench the Constitution says so. This bill can't change the Constitution. This bill cannot create the independence it claims. Therefore, the bill doesn't fit within its title. The fact that a reporter for a major publication was so confused by this bill shows that it was deceptive and misleading. Pages seven to eight of this bill simply parrot language in the state constitution. There's nothing new with that. Pages eight to nine arguably create a new office but the office, it's simply stating the duties of the current commission. The executive director of this office will most likely be the same executive director that serves the commission. This is the case with the judicial performance commissions. This section simply enshrines current procedure and claims its independent. Independent from what? According to the Gazette, Senator Lee has stated that it'll be independent of the Supreme Court. And that's false because this bill cannot edit or amend the Constitution that says the Supreme Court, you know, provides the rules for the commission and appoints members. The cash fund created on page 11 is a reasonable idea. But the commission has been in existence for 55 years and has never complained about money issues. We don't know if 400,000 is an increase or decrease of current funding for the commission because the funding has always been confidential. Funding this Commission that has failed to publicly discipline and judge for 28 years straight is unreasonable. Why would we provide money to this commission? On page 12, there's a section regarding sharing information with oversight entities, this is already covered by rule 6.5 of the Colorado Rules of Judicial Discipline. It's discretionary for the court to share that information and this bill does nothing to change that. Pages 13 through 16 regarding employees in the judicial branch. There's some reasonable words here but none of its binding on the judicial branch. The SMART act language. The Commission already writes an annual report that addresses all these topics. Now we get to the one thing the bill actually does-- this interim legislative committee. This bill is a little confusing, because it's proposing certain things be done at the same time as saying we need an interim committee. I mean, you need to pick your poison. Either we need an interim committee, or you need to come up with your specific ideas. It's misleading. The judiciary committees that have failed at handling this issue. The 2021 judicial scandal is really focused on in this bill, but the Judiciary Committees have refused to do anything. And quite frankly, the legislators have been as equally responsible for the 2021 judicial scandal as the judicial branch employees involved. Why? Because they've refused to act. I've been at

- 30 -

this judicial reform thing for over 10 years now. And repeatedly, we asked, you know, for a wall in between the state court administrator and the judiciary, if there had been that wall, we wouldn't have this judicial scandal. The problem is, is that the finances and the judging in the judicial branch is being mixed together, you need a wall. We've also proposed public judicial discipline and that all complaints of misconduct be public. If complaints and misconduct were public, there would have been nothing with which to blackmail the Chief Justice. So those policies had they been considered might have been able to help prevent the problem. And this bill wants to put the legislators who wouldn't listen back on an interim committee, where they won't listen to good comments. It's self-dealing. The bill doesn't require public hearings for the legislative interim committee and worse yet, allows the committee to limit who has to listen to by stating that the committee has to listen to quote, any other stakeholders the interim committee deems appropriate, end quote that's on page 22 lines 23-25. So, the bill creates an insular committee that will mostly likely have the sponsors on it, where they can do whatever they want, without opposing viewpoints. Or where they cater too much to the current judges in the judicial branch. Some of the things that Justice Boatright said, were reasonable. The problem is he's not going to be the Supreme Court Chief Justice forever. We need a system, a system that encourages that judges comply with the law. And our system does not do that. And we can't guarantee that someone will be there, you know, who will always do the right thing. This bill cannot create the independence it claims in its title. As Dave Migoya of the Colorado Springs Gazette reported in error the bill claims, it provides independent oversight and removes the commission from oversight of the Supreme Court, which is just false.

**Sen. Gonzales**
Thank you, Mr. Forsyth, for your testimony here today in opposition to this bill. Colleagues, do we have any questions for Mr. Forsyth? Senator Rodriguez.

**Sen. Rodriguez**
Thank you. Thank you for your testimony, Mr. Forsyth. And I hope you acknowledge we're trying to make some advances in this. I don't know how long your organization's been around. Have you guys pursued a ballot initiative or constitutional thing to put this on the ballot? We can't change the constitution unless we put it on the ballot. So, I'm just wondering what efforts your organization's made.

**Sen. Gonzales**
Mr. Forsyth.

**Chris Forsyth**
Thank you. Most recently, our effort included a letter to the Governor to ask him to work with the legislature to put a referendum on the ballot. That was done earlier this year. Previously, we did try to get efforts on the ballot back around 2014-2016. We were referring to them as the honest judge amendment that would have affected the discipline commission. The problem is, it's crazy hard to get something on the ballot. And if you have something that's truly nonpartisan, like our group would

- 31 -

support, nobody wants to fund it, because there's nothing in it for them. People want something that helps them. Fairness, they think it's just supposed to be provided by, you know, government. So, getting the necessary funding was a problem, then it got worse when the state adopted Amendment 71, which heightened the requirement signature requirements. And we've pretty much given up, given that signature requirement, we would have to get well over a million dollars for a nonpartisan altruistic amendment to the Constitution. And, you know, if people are paying for it, they want something in something in it for them. So, we believe that the legislature needs to adopt a referendum. And the problem with this bill is that if it's adopted, the legislature is not going to want to adopt a referendum because they'll say, well, we did something to address that. Or we need to wait and see if that works. When this bill doesn't really change much of anything. So, we would encourage, you know, a referendum that attacks Article VI section 23 and fixes those problems that were put in the Constitution. It's 55 years ago, that amendment went was adopted 1966 went into effect in 1967. It's been 55 years of this, and it's truly a problem. I still practice law. Lawyers don't file complaints because they won't get prosecuted--regarding judges. I mean, that's it why and it can lead to retaliation. So why would a lawyer do that? And it's very difficult because lawyers are ethically bound to complain. And the discipline commission doesn't discipline all alleged misconduct. I've heard the phrase several times, well, that's part of an order. So, we're not going to discipline there. The problem is when the code of judicial conduct is supposed to be in its most effective state is when a judge is issuing an order. So, if a judge does something unfair in that order, it should be looked at by the discipline commission. Other states do that. Other states have a wealth of case law to teach judges how to be judges. In Colorado we don't have that because we have a completely ineffective judicial discipline commission. I'm sorry, I've gone on and on.

**Sen. Gonzales**
Mr. Forsyth, I would point you to page 22 starting at line 26. That does ask the interim committee to study what amendments to constitutional, statutory, or rule-based law would be advisable.

**Chris Forsyth**
I understand that that language is in there. But the problem is if you adopt this bill, the impetus is going to be to let this work. We made those changes. We don't need that constitutional amendment. I understand that you've put that language in there. But there's always also that long section that talks about things that the interim committee is supposed to consider is problematic, because at some points it seems like it's pointing the interim commission committee in certain directions such as the Chief Justice brought up Illinois. Illinois is a long running joke. I mean, the misconduct of Chicago judges and courts is it's famous. So, following that system, and having that in there is problematic when there are other states such as California, who we would believe would be more proper. The ABA, you mentioned the ABA, in the interim committee section, and the interim committee, the ABA says we should have public judicial discipline proceedings. But this bill, the way it's written, appears to really hedge towards confidentiality, and I've heard the other members on this committee really hedge towards confidentiality. But we believe that transparency would heal the wounds and transparency is what's necessary. And this

confidentiality is a mistake. 35 states have public judicial discipline proceedings. Colorado is only one of 15 that has this secrecy. And that's the secrecy is what causes the lack of trust of governmental entities. We need it to be transparent.

**Sen. Gonzales**

Thank you any further questions for Mr. Forsyth? Thank you very much. Thank you for your time, sir. Next, I'll call up Mr. Robin Austin, I believe who is participating remotely? Welcome, sir to the Senate Judiciary Committee.

**Robin Austin**

Thank you. My name is Robin Austin, an advocate with families against court embezzlement and ethical standards (FACES) and co-host of a weekly radio show on blogtalkradio.com hidden truths revealed. I'm involved with American United International to hold the United States government responsible for violating international treaties concerning the lack of effective redress for victims of court sanctioned crimes. I would like to thank the members of the committee and the chairman, as well as the legislators that are that are brought forth this legislation. I believe this is a well-intentioned effort that, that I do recognize and acknowledge a lot of effort has gone into, and I appreciate much that the justices have said that they're trying to do. However, this bill seems on the surface to address problems in judicial oversight in Colorado. But I feel that it is fatally flawed. It repeats patterns that seem too well established in Colorado politics. There's simply too much deference given to those we purport to oversee. It leaves the actual discipline under the aegis of the Supreme Court of Colorado, which has clearly demonstrated as recent scandals show, it can't be trusted on its own to police its own. We see an effort to create a legislative oversight committee, but leave in place provisions shielding the process from public scrutiny. Any reasonable person knows justice and the appearance of justice requires both accountability which this bill pays lip service to but does not accomplish without a real oversight process from a truly independent body and transparency. So, there can be surety among the public. The high jinks and hooliganism are not occurring behind closed doors. Can we really expect an office in the Ralph Carr Building where the Supreme Court is staffed by a 10-year veteran attorney in Colorado courts tasked with determining who among all those he or she has worked with all those years, deserves to be brought up on corruption or incompetence charges. Do we expect that person will actually do it, and that the Supreme Court Justices will now suddenly hold their own accountable, even though it's all behind closed doors, and they never have before. I think not. The present discipline commission has proven it is completely unwilling and/or unable to discipline its own. And this bill maintains that status quo. For these reasons. I do not support passage of this bill.

**Sen. Gonzales**

Thank you, Mr. Austin, for your testimony today. Colleagues, do we have any questions for this witness? Seeing none thank you so much, sir, for sharing your perspectives with us as we debate this policy. Next, I'd like to call up Luanne Fleming. And then I'll bring up Ms. Marilyn Chappell. But Ms.

- 33 -

Fleming if you can please state your name, any organization you represent, and then proceed to testimony. Thank you.

**Luanne Flemming**

Members of the committee, thank you for the opportunity to testify to you today on this SB 22 201. My name is Luanne Fleming. I'm an advocate for families against court embezzlement unethical standards (FACES). I have an international radio show every Wednesday night on BlogTalkRadio hidden truths revealed. We are part of a grassroots human rights coalition to protect the elderly and the disabled from the abuses in the state's guardianship system. I'm a tier three ambassador for AUI, America United International and Opt In USA. The interim committee sounds like it might be good, but I have some doubts. We've tried several legislative bills to stop the isolation of our loved ones in probate courts, and introduced the judicial integrity project for judicial discipline, oversight transparency. All of this was shot down. The way it is written seems to avoid the input from the public, including advocate groups like us, the people in Colorado should be involved in a way that creates a degree of transparency and accountability that we've never seen before. We are all aware of the blackmail scandal cover up involving the Colorado Supreme Court. We Colorado citizens share the embarrassment as well. My question will be committee working will be behind closed doors. Where would he have that the judicial system currently doesn't work? The bill creates the legislative interim committee on judicial discipline to study Colorado's system of judicial discipline and make grant recommendations for necessary changes to that system. Does this change anything? Or does it just add more control, some oversight, and leaves everybody in the dark? It leaves the Supreme Court as the final arbiter? The positive side of all of this, it shines a spotlight on judicial discipline. I would urge you to consider asking the court of public opinion, the problems all of us have had gone through what the lack of judicial integrity in Colorado. Like I said, my family has lost millions of dollars in the probate court scams by unethical attorneys and judges on the bench. For the integrity, transparency and accountability. There is none. If this bill does not correct these issues, vote against it. I urge you to do that. Thank you.

**Sen. Gonzales**

Thank you, Miss Fleming for your testimony. Colleagues. Do we have any questions for this witness? Seeing none, I want to thank you for sharing your perspectives with us as we debate this bill. Thank you.

**Luanne Flemming**

Thank you.

**Sen. Gonzales**

Ms. I'm not sure if it's Chapel or Chappell. And then we will hear from Ms. Marlene McLean.

**Sen. Gonzales**

You'll get right at the base. There is a little red button. There's a little gray button with the red light. You don't want to turn it green. There you go. Okay.

**Marilyn Chappell**

Good afternoon. Mr. Chair, members of the committee. I am Marilyn Chappell. I'm an attorney and private practice in Denver. I'm here on behalf of the Colorado Judicial Institute or CJI as a volunteer, and, folks I checked the wrong box on the multiple choice quiz. It probably would have been more accurate to say that I'm here in an amend position.

**Sen. Gonzales**

Ok. Proceed With your testimony, thank you.

**Marilyn Chappell**

Let me first tell you a little bit about the Colorado Judicial Institute, CJI. We've been in existence since 1979. We're a nonpartisan nonprofit. And our mission includes protecting and defending the ability of Colorado judges to decide cases fairly and impartially and free from partisan politics. The subject matter of this bill, disciplining judges, is part of Colorado's merit judicial system for selecting, evaluating, retaining, and disciplining judges. So, this is of critical importance to us at CJI. Our system was adopted by the voters in 1966. And they did that rejecting a system of partisan elections where you would have to be in the position of worrying about campaign donations to judges. We don't have that in Colorado, because that's what our voters created. We have three concerns with the bill in its current form. And I'll be very brief here. First, with the timing. And you've all heard from Chief Justice Boatright. And Justice Marquez about that. That the fact that there are investigations in process. We at CJI support the full, fair, thorough investigations of allegations of judicial conduct consistently with our American system of justice, which includes due process, due process. And, again, we think on the timing here, allowing this process to go forward, and to discover what facts are to lead to wherever the facts go. That should happen so that that information can be used to most thoughtfully and properly and adequately look at what changes may be needed to our current system. There has been talk already about the disclosure and reporting requirements. I won't repeat that.  And, also, about the interim committee or task force. And we would hope that we at the Colorado Judicial Institute could be included along with the other entities and stakeholders. Getting back to the bill as it is currently phrased. There's a lot of language in there. That's concerning to us. Yes, no system is perfect. But in the meantime, Colorado has a merit selection system that is a model for other states and for the nation. And yes, of course, it can be improved. But in the meantime, the characterizations in the bill, as it is currently stated, do not reflect the reality of the fact that our system has worked well, for decades. Thank you.

**Sen. Gonzales**

Thank you, Ms. Chappell for your testimony. today. I wanted to see if there are any questions for this witness. Senator Lee.

**Sen. Lee**

Thank you, Ms. Chappell, thanks for being here. You and I talked on the phone a week or two ago? I just I didn't really have a question. But I just wanted to assure you, because a number of witnesses have

- 35 -

asked the same question. And that is about the interim committee process. And let me assure you that the interim committee process will be a public process. It'll be noticed publicly, the doors will be open, anyone can come and testify, we will have agendas, where we will specifically invite some people to testify that we want to hear from who may have specific expertise, but we will also have public comment periods where other people can come in voluntarily and testify. So, it'll be a very open, transparent process. And we want everyone to come in and participate. I just wanted to put that on the record because three witnesses in a row seem to express concerns about a private closed-door meeting and there's no . . . we can't do that in Colorado. We don't want to do that in Colorado. We want it to be open.

**Marilyn Chappell**

Senator Lee I would just say the thought there was not any concern about the transparency of that process, the concern that we at CJI have is more this, that if you're going to tweak our merit selection system, it should be done thoughtfully and include people who have knowledge of how the system works, and who were include stakeholders, and attorneys and judges, and so forth. That was the intent there. Thank you, Senator Lee.

**Sen. Lee**

Thank you.

**Sen. Gonzales**

Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair. Ms. Chappell, thank you for being here. It's good to see you again, after all these years. At least one witness and I think some others testifying remotely at least sort of implied this have argued for a public judicial disciplinary process. What is CJI's view on public disciplinary process? And what are the pros and cons of that? Because I take it that yours is kind of a think tank as well as advocacy group as well.

**Sen. Gonzales**

Ms. Chappell.

**Marilyn Chappell**

Thank you, Senators. CJI is a nonprofit, nonpartisan group. As I said, our mission is to basically do what we can to preserve and protect our system. And, also, to make litigants feel that they can get their day in court with dignity and respect. I'm not prepared to answer your question in detail. I will say that, as we all know, there is a confidentiality provision in the state constitution. And it makes it an interesting balance between as has been talked about confidentiality and transparency. So that that is I think, what informs this, the subject matter of this bill, part of that, and makes it difficult, and all I can say is we

- 36 -

support a way of threading this needle, that captures the need to maintain public trust, and also allows for an effective system to address judicial misconduct.

**Sen. Gonzales**

Senator Gardner.

**Sen. Gardner**

Thank you. And at the beginning of your testimony, you indicated that probably it was more accurate to say that you are in an amend position on the bill, just to understand what parts of the bill or what aspects of the bill, would you say are, are appropriate and that you would be supportive of if that's the right way to describe it?

**Marilyn Chappell**

Well, ah Senator, sorry.

**Sen. Gonzales**

Thank you. We're just trying to for the record, that's all. Okay.

**Marilyn Chappell**

Senator Gardner, again, we are not advocating for specific changes to the bill. Our concerns are more in the three areas I briefly outlined. We haven't really developed a full-throated position on the entire bill. I can't say, you know, given the testimony on financial or funding issues, that we would at all oppose that. But again, I'm not prepared to drill down to the specifics of that. The three areas of concern are what I've stated.

**Sen. Gardner**

Okay, thank you.

**Sen. Gonzales**

Any further questions for Ms. Chappell? Seeing none, thank you so much for joining us this afternoon as we debate this bill.

**Marilyn Chappell**

Thank you.

**Sen. Gonzales**

Is there anyone else either in the room or online who wishes to testify in an opposition position regarding Senate Bill 201? Seeing none, ah ha. This is why we ask.

**Sen. Gonzales**

We have one person, we have two folks who are online who wish to testify in an opposition position. And, so, we'll welcome you each. If you can please state your name. Any organization you represent and then proceed to testimony.

**Marilee McLean**

Hi, I'll go first, my name is Marilee McLean and I have been working on courtroom reform for 30 years. I work with mom's side back as an executive director and have brought forward lots of legislation in the last few years, and really wanting to have training for our judges that is lacking when it specified training for domestic violence, child abuse, child sexual abuse, and seeing that there's no discretionary rule. A judge can rule however he wants, especially in the family court. And yet, I'm seeing case after case after case where women who have been abused or their children are being abused, or judges are awarding these children to the abuser in epidemic numbers. So, this is not lightly. And so that's why I really believe me the transparency and accountability not only through what we're doing what you guys are doing right now, but through the courtrooms because there is no transparency and accountability for what they do. And I know there was a recent case that was in the news with Natalie Chase, and I'm sure you're aware of that case. But I followed her cases pretty closely. In one case in particular, where she had a woman that was trying to protect her daughters and, and it was actually abhorrent what she did in that courtroom. I've never, ever seen anything like this. And we're talking First Amendment rights being denied due process being denied. Ending parental rights with no grounds. And I know Chief Justice Boatright just said that there's people that are out there because of what's happened. But we're talking inadequacy and competency. So where are we going to do and this legislation, actual discipline for the judges, I believe that needs to be public discipline, and it needs to be out to the public. The blue books do nothing to say what's happening with these judges who they are what they do. There's no disciplinary records ever in those blue books. The public doesn't know who they're voting for and even how to get these judges in. So mainly specified training for these judges and actual discipline of the Supreme Court. That that's not going to work. If we're not going to if you're going to have an interim committee that's going to look at this, then it needs to be somebody just like just Chief Justice Boatright stated. It needs to be people on that interim that know about these issues, and not just ABA attorneys or people that are involved within the legislation. So, I believe it needs to be advocates. Absolutely. So that's really what I'm here to say, transparency and accountability. And I'm opposing it. Thank you.

**Sen. Gonzales**

Thank you, Ms. McLean, for your testimony. Colleagues, do we have any questions for this witness? Seeing none, thank you very much for sharing your perspectives with us today.

**Marilee McLean**

Thank you.

**Sen. Gonzales**

And then the last person participating remotely who is testifying in an oppose position?

**Sen. Gonzales**

Ms. Rosemary Van Gorder.

**Rosemary Van Gorder**

That's correct.

**Sen. Gonzales**

Please proceed. State your name, any organization you may represent, and proceed to testimony. Thank you.

**Sen. Gonzales**

We saw you just for a brief second. But we can hear you.

**Sen. Gonzales**

Oops, now we can't hear you.

**Sen. Gonzales**

Oops, we can't hear you, ma'am.

**Rosemary Van Gorder**

All right.

**Sen. Gonzales**

Yeah, there you go.

**Rosemary Van Gorder**

Okay. All right. Thank you for the opportunity to speak. I am changing my initial amend to not agree at all with passage of this bill 22-201. It's been a long afternoon. I'm glad I don't do this for a living. But I'm not with any particular group, just a regular citizen, non-attorney. I'm concerned that the bill does not change the discipline commission. I'm concerned that the bill doesn't create an independent entity. As long as the Supreme Court holds four seats. And only the Supreme Court can write rules for the discipline commission or remove a judge from office. It's not going to be independent. We've heard mention of six different investigations into judicial conduct. I'd like to suggest that there be a seventh and that is, I think very necessary for many cases that appeared before the 18th Judicial District Court Judge Natalie Chase, who was censored a year ago, and no longer on the bench. The atrocities to families in family court has resulted in quite a distrust of the public of family court process in general, because enough judges are not following due process protections for parents and are violating so many

- 39 -

codes of conduct. That just Chase was not an anomaly. She is not alone. And what she was censored for was the racial bias. I contacted the judicial discipline commission about this, and I said there are far worse cases and treatment of citizens in her courtroom that have gone unchallenged or dismissed by the referral process of a complaint that they have. Now, if you have a complaint, and the judicial discipline commission is accepting complaints on this judge for up to a year. But why we don't know they won't tell us why what we want is an independent. I think it's incumbent that the State look at every case that has gone before Judge Chase, that she handled, to undo the damage that she has caused. She is . . . I will pause there except that these families have been destroyed by her and the response from judicial discipline has been to refuse to even investigate the complaints. They're just dismissed as a referral letter. Would you please take a look at this and they all come back? I'm sorry. It's not that's not. But it is, it's very important. So, in closing, maybe this could be the seventh investigation that is taken on by support of legislators and the Governor and perhaps the Attorney General. I do know that reference to the 19th Judicial District, Judge Kamada. None of his cases were reviewed, and there were people who wanted that. So, I don't want to repeat, I don't want this last month to kick off and have no action taken on Judge Chase's conduct in the court.

**Sen. Gonzales**
Thank you, for your testimony with us here today. Ms. Van Gorder. Colleagues, do we have any questions for this witness? Senator Gardner.

**Sen. Gardner**
Thank you, Madam Chair. Yes, ma'am. You referred to Judge Chase from the 18th Judicial District, I think. It seems that the system worked as it should there. I just wanted to clarify this. And maybe you don't agree, I want to give you an opportunity to respond. Judge Chase was publicly censured and resigned. So was taken off the bench, fired essentially. So, I'm curious, do you believe the system still didn't work in spite of that result? Or what? What are you saying, ma'am?

**Sen. Gonzales**
Ms. Van Gorder.

**Rosemary Van Gorder**
Right, that seems like a token, politically correct, can't do anything but address the racial discrimination in that case at this time in this world. But she also disagreed. Within a month of her censure, she filed a complaint and said she felt she was forced to leave, which, you know, yes, she's gone. But there are still cases alive and some closed, where she did a lot of damage and the violations against parental rights and due process, just common decency of how you treat someone respectfully in court. She is . . . check them all. You know, that's what needs to go back and looked at just one reprimand for racial bias is not enough. Thank you.

**Sen. Gonzales**

Senator Gardner.

**Sen. Gardner**

Well, thank you and I appreciate your testimony. Ma'am. Are you suggesting that and this doesn't seem to be within the purview of the Commission on Judicial Discipline. Are you suggesting that we go back and review every case that Judge Chase had, invalidate the case, and retry the case? It sounds like you don't think her punishment was appropriate? What do you think the Commission on Judicial Discipline should have done to her?

**Rosemary Van Gorder**

I think they should. Thank you. I think that the Commission needs to investigate the complaints that have been received by parents from cases before her with an honest intent. And do more than one person, sometimes a staff person, just review it and dismiss it back. Those complaints, say a lot. And it is unusual, it would be time consuming, and not something anybody would look forward to, except the people out there who have suffered bad conduct and biased decisions from her temperament and lack of judicial demeanor in the courtroom. I'm surprised it hasn't happened already. But who can do that? Who can encourage at least the contested cases, those before her where she overruled by a summary judgment or default, no fault of your own in these family cases, but parents end up losing their children anyway. There's something wrong in family law courts, but Judge Chase took it to a whole new level, and walked all over people. And I'm appalled that attorneys in those courtrooms haven't filed complaints. But they're part of the problem too, some of them.

**Sen. Gonzales**

Ms. Van Gorder.

**Sen. Gardner**

Thank you.

**Sen. Gonzales**

Seeing no further questions. Thank you, Ms. Van Gorder for sharing your perspective with us as we debate this bill.

**Rosemary Van Gorder**

Thank you very much.

**Sen. Gonzales**

You have a good one. That concludes the list of individuals who had signed up to testify in opposition to Senate Bill 201. At this time, I'm going to start shifting over to individuals who have signed up to testify

- 41 -

in an amend position. And let's see, I'm going to welcome Phil Cherner from the Colorado Criminal Defense Bar.

**Sen. Gonzales**

Welcome to the Senate Judiciary, if you can please state, your name, the organization you represent and proceed to testimony.

**Phil Cherner**

Thank you. I'm Phil Cherner and I am representing today the Colorado Criminal Defense Bar. I litigated cases in Colorado for 40 plus years till I retired. I served on two Supreme Court committees over the decades. I'm currently, in the interest of full disclosure, on one of the character fitness panels that the Supreme Court employs to screen bar applicants. And I also did 20 years' worth of attorney grievance defense and representing law students who wanted to be lawyers. So, we are in a position of amend, we are generally in support of the bill, we have three areas that we think you should consider changes. And I'll try to do this in the remaining two minutes and 32 seconds that I have.

The first is concerning. Sorry, it's been a long afternoon. There is the possibility that a judge who serves on the Commission, as a result of that service, will learn about alleged conduct of not just a judge that they may be considering for discipline, but also litigants, lawyers and/or individuals. It's our concern that the confidentiality there puts the judge and the lawyer, perhaps one of our organization's lawyers and their client in an awkward position. The judge may be aware of allegations against another judge that also meanders into allegations against a lawyer who may have participated in the misconduct. But that judge sitting on the Commission, who was also presiding in some courtroom can't tell the litigants before he or she about that very allegation. So theoretically, you could have a lawyer standing before a judge, a judge who is aware of accusations against the lawyer, the lawyer doesn't even know so obviously has no chance to respond. We suggest an amendment that mandates recusal by the judge under those circumstances, because the lawyer can't make the recusal motion and I think that's already in the rules of the Commission. But we want to be sure that it's written into statute so that it's firm. And I'm getting a quizzical look. So maybe I didn't explain that. Well, all right.

The second has to do with the way the Commission is required to provide information. As I read the bill before you, and if you're looking at page 13, that's where it addresses it. The bill, there's a trigger once the judicial department learns of allegations of misconduct, the magic phrase is a complaint, which is defined in the bill broadly, an obligation arises. Pardon me, once the department learns of the information. An obligation arises, to provide a wealth of information to the Commission. We are very concerned of the confidentiality of these things. Because again, they affect not just information about the judge, but in many cases, ancillary allegations against a lawyer who might have participated in the conduct, and/or that lawyer's client. And I would remind you that it's probably the divorce bar that gets the most complaints before the disciplinary authorities. And right below them is the criminal defense community. Our lawyers get a lot of complaints. And remember, they're court appointed in many cases,

so they don't have a lot of choice about who their representing. Most of these, and I think it's safe to say the vast majority of these, get tossed out at the intake stage. So hypothetically, if a complaint specious or not, arises at Regulation Counsel's Office or some other mechanism to the Department, the judicial department, the Department immediately has an obligation to turn over everything it knows, to the Commission under this bill. We suggest rather that the Commission be notified that there is an allegation, and that upon their request, the Judicial Department provide whatever information the Commission needs to further their investigation. So that would postpone but not at all change the obligation to turnover, quote all the information as listed in the bill. So, it just changes the trigger process.

The third thing that concerns us again, because we're always concerned about confidentiality between lawyer and client, and protecting the lawyer members and their clients. Is this phrase about not non assertion of the attorney client privilege and confidentiality, the way the bill is drafted, when the information is turned over, whatever your trigger mechanism is, the Department rather, cannot assert attorney client privilege or confidentiality to refuse to provide the information. But the bill doesn't say attorney client privilege or confidentiality between who. So, we would like the bill to say that it does not abrogate in any way the attorney client relationship between a criminal defense lawyer and the client nor the confidentiality obligation between lawyer and client. And that it further it doesn't abrogate any attorney client privilege between a lawyer representing a respondent in a grievance proceeding and the respondent themselves. So those are the three things we would like to see tuned up in this bill should it get to that point. I'm happy to take questions.

**Sen. Gonzales**
Thank you, Mr. Cherner. I do see a few questions. I have a couple of questions, but I'll defer to Senator Gardner.

**Sen. Gardner**
Okay. Thank you. And thank you, sir, for being here. I wanted to visit your first concern. I think I followed what the concern is, there are sitting trial judges on the Commission. And the concern would be their hearing a case. So, take me through that. What?

**Sen. Gonzales**
Mr. Cherner.

**Phil Cherner**
Thank you for asking, and I do apologize for badly garbling that. Let me do it again. There are a I think it's four judges who would be on the Commission and as such, they would be privy to whatever commissioners get in terms of an investigation, which no doubt includes allegations against a judge. And often those allegations could involve the conduct of a lawyer. It may be conduct between them. It may be the lawyer is just a witness, but it may hypothetically at least cast the lawyer in a bad light. Now,

- 43 -

as you said, these are trial judges or could be. And so, hypothetically, you could have a trial judge presiding over say, a criminal case. And there's a lawyer representing the criminal defendant in that case. The judge, by virtue of his commission participation would have information about the lawyer and it could be negative information. He can't tell the lawyer in the courtroom that he has that information, because of the confidentiality rules of the commission. And I'm not complaining about that. I'm just laying out the scenario. If the lawyer knew the lawyer might move to recuse, or at least have a chance to rebut the allegations. But the lawyer isn't going to know, or probably isn't going to know. Is certainly not going to know through the official channels. So, we think the solution is for a judge in that situation to recuse themselves from that criminal case that they're presiding over. Not from their commission work. I don't know how often this would occur, I would hope not often. And as I said, I think it's already written into their rules. But it's something that we want to guard carefully to protect that lawyer and that lawyer's client.

**Sen. Gonzales**
Senator Gardner.

**Sen. Gardner**
Thank you. So, the solution there would be for the trial judge who was also a Commission member, while he or she could not disclose to the attorney appearing before the court. The judge would say, parties, I'm recusing myself from this case. I have conflict, have a concern. Can't say what it is doesn't matter. I'm throwing it back in in the pool for reassignment that. Is that?

**Sen. Gonzales**
Mr. Cherner.

**Phil Cherner**
Yes, that is succinct as I can be. And I would add that, in the limited times I've seen recusals judges don't often give reasons anyway, they just say I'm out. It goes to some other judge in the District.

**Sen. Gonzales**
Thank you, Senator Gardner, for the question. I wanted to, on the third concern that you raised, I wanted to see if you could point us where you were speaking about the confidentiality provision not being abrogated. If you can point us to specific sections of the bill where you have concerns about the language?

**Phil Cherner**
Yes, it's lines, page 16 rather, lines nine through 12. And if I could just add one more thing.

- 44 -

**Phil Cherner**

When I was speaking to the need for Regulation Counsel or whoever in Judicial gets initial information, to not give it all, to the Commission until the Commission asks for more of it. I didn't have a chance to explain why. Attorney grievance proceedings are presently under wraps unless and until Regulation Counsel files a formal complaint. The lawyers are protected from spurious allegations becoming public. At the same time, the public gets information when there's what I will very loosely call probable cause. When they decide to go forward formally. Any information that's disseminated between that office and the Commission, or the judicial department and the Commission. Every dissemination raises the risk, that there will be a leak. And we want to very carefully protect the confidentiality written into law. That's the reason we're suggesting that every shred of information not get forwarded instantly. Let's wait to see if the Commission actually wants it before we start sending it somewhere. And let's not forget a lot of this is done electronically these days. And if you've ever sent an email to the wrong person and embarrassed about it, you know exactly what I'm talking about.

**Sen. Gonzales**

Thank you, Mr. Cherner. Colleagues, do you have any questions? Any further questions for this witness? Seeing none. Thank you so much for your perspectives as we're working through this policy.

**Phil Cherner**

Thank you for hearing our concerns.

**Sen. Gonzales**

Is there anyone else who wishes to testify in an amend position? Either in the room or online?

**Sen. Gonzales**

Okay, well then at first this point we're gonna go shift over to folks testifying in a neutral position. I'd like to welcome Leticia Maxfield.

**Leticia Maxfield**

Thank you, Senator Gonzales.

**Sen. Gonzales**

Welcome. If you can state your name, any organization you represent, and proceed to testimony.

**Leticia Maxfield**

Yes, thank you. My name is Leticia Maxfield, often called Letty, and I'm appearing here today on behalf of the legislative policy committee of the Colorado Bar Association. And first, just on behalf of the CBA, we want to thank the sponsors for what we see as their very sincere effort to meaningfully engage with the CBA, the other branches of government, community stakeholders, to promote this legislation which is intended to inspire greater confidence and public trust in our judiciary, and its independent

- 45 -

oversight. The introduction of Senate Bill 22-201 set the stage for the CBA to engage in a critical and ongoing dialogue amongst its leadership and membership on the topic of judicial oversight in Colorado. This dialogue is continuing with members of not only the CBA, but the larger legal community. In the short time since the bill has been introduced, many comments and questions have already been raised. You've heard a lot of those here today already. None of them articulated more clearly, perhaps by the Supreme Court Justice Boatright and the other Justice who appeared. The CBA remains intensely focused on its review of the bill. And the CBA currently takes no position on this bill. Rather for the benefit of the committee and the sponsors and the Colorado citizens and stakeholders who have all been present and participated here today. We just wanted to offer our brief summary of some of the language and the concepts of the bill that we just think may merit some further consideration. Many have been raised by others, but I'd like you to hear them from the CBA's perspective.

First, there's broad unilateral buy in among the stakeholders for legislation to establish the financial and functional independence of the Commission on Judicial Discipline. As such, we believe that serious consideration should be given to Section 13-5.3-103 (3) found at page 10, line 22 of the bill. It's our position that requiring the Department, specifically the State Court Administrator's Office to provide and manage services such as payroll, accounting, and human resources on behalf of the Commission does cause both real and perceived conflicts, which really undermine what the purpose of this legislation is: independence of the Commission. We understand that it may be very possible for another administrative agency to oversee these functions that's housed in a separate branch of government such as the executive branch, and we would welcome that for your consideration.

Second, we understand the desire of this legislative body to cast a wide net and impose to what equates to a mandatory duty to report judicial misconduct at all levels within the Judicial Department. However, to ensure good faith compliance by the Department, or to effectively penalize somebody who fails to comply, what's actually required of the Department, it's judges, its staff must be wholly unambiguous. And there's just a handful of terms and areas in this bill, where we really think there could be some further clarity. And an example of that are the following terms and phrases which are used somewhat interchangeably throughout the bill. And we really think you should consider harmonizing or further defining or clarifying the relationship between these concepts, whether they're the same, what duties or requirements they trigger, and that language is really sort of all surrounded around the complaint. So the various terms that are used throughout the bill our complaint, request for evaluation of potential judicial misconduct, request for evaluation of judicial misconduct, potential misconduct, information indicating or alleging potential judicial misconduct, learns of facts compromising potential judicial misconduct, screening misconduct complaints, pre-screening judicial misconduct complaints, relevant to judicial misconduct, relating to potential misconduct, related to the complaint, relevant to a complaint or potential misconduct, misconduct allegations. And really the point being these are used throughout the bill to trigger certain things, duties, processes, or to really be a defined term, but how they're actually deployed should be harmonized and further clarified so that if we are seeking compliance, we know exactly what is required. As you've heard, the vast majority of judicial proceedings are adversarial. And

likewise, we understand that a vast majority of the requests for evaluation of conduct of a judge or a justice are grounded in dissatisfaction with the court's disposition of a particular matter or issue. The line between a complaint by a disaffected litigant and allegations of judicial misconduct just needs to be more clearly drawn in this bill. And I think you heard testimony about the difference between external complaints and internal complaints in the potential various investigative standards that can be used in those different contexts as it relates to the Commission.

Third, we think further consideration should be given to the tools available to the Commission to obtain otherwise privileged or confidential information. As drafted the bill may require the Department to violate federal and state laws regarding the disclosure of certain employment records or EEOC charges. And while we appreciate that the language found on page 16, lines 20-26 of the bill is intended to protect against a waiver of privilege. A state law declaring that a waiver has not occurred does not bind a federal court, which you've also heard today. We'd ask you to consider using subpoenas or agreements for disclosure under Colorado Rule of Evidence 502 and Federal Rules of Evidence 502 as a more precise tool for disclosure of otherwise privileged information without a waiver. Similarly, as others have said, consideration should be given to clarifying that the disclosure requirements in the bill did not extend to the attorney-client privileges and confidentiality of information between a judge or a justice and his or her legal counsel. While we do not believe it is in the intent of the bill to deprive our judges, or justices or other members, or staff of the Department to the right to privileged communications with counsel, a bright line should be delineated in the text of the bill itself and it shouldn't be open to interpretation.

Fourth, page 9, line 11 of the bill provides an attorney shall not appear before the Commission five years following service as its executive director. There's simply a concern that this provision violates Colorado Rule of Professional Conduct 5.6, which prevents an attorney from entering into an agreement that restricts the right of a lawyer to practice after the termination of the employment relationship. So, we just would ask you to take a closer look at that.

Fifth, consideration should also be given to expanding the body of persons appointed to the interim committee to include participation of members of all three branches of government, community stakeholders, including a guarantee of racial, ethnic, and gender diversity amongst those appointed to serve on that interim committee.

And finally, as the legislative policy committee of the CBA continues to actively review and monitor this bill, we will be intensely focused on ensuring that this legislation is fine tuned to avoid any of the following three potential unintended consequences. One, a chilling effect on the willingness of our most qualified and ethical jurists to enter into public service and become judges. Two, any negative or disproportional effect on the equity, diversity, and inclusivity within the Department, and specifically those serving on the bench. And, three, legal challenges to the constitutionality of the bill as it relates to

the separation of powers, which could delay the effective implementation of legislation intended to strengthen our system of governance here in Colorado.

Overarchingly, the CBA respectfully asks, that as a collective, we diligently move forward to ensure that the Colorado State Legislature, the Judicial Branch, and the Commission create the functional and financial independence of the Commission on Judicial Discipline. If we do this, it will ensure an independent, fair, competent and impartial judiciary. A judiciary composed of persons committed to the highest levels of integrity, who hold office and the public trust and the promotion in the inspiration of greater confidence in our justice system. We all want to get this right. And we look forward to continuing to engage with the sponsors, the community stakeholders and this legislative body on this critically important issue, which is central to our system of government and our democracy. And thank you for letting me have my time and I'm happy to answer additional questions if you have any.

**Sen. Gonzales**
Thank you. Ms. Maxfield for your testimony. I am curious if there are any questions from members of the committee regarding her testimony. Senator Lee.

**Sen. Lee**
Thank you, Madam Chair. Could you send us your remarks that you have written there? So, I have a lot there. And if you could get them and Ms. Jenson, she could distribute them to the committee members, and we could have them as we're working through the bill.

**Leticia Maxfield**
Certainly, we'll have the legislative director for the CBA send them over.

**Sen. Lee**
Okay. Very good. Getting a thumbs up in the back. Thank you.

**Sen. Gonzales**
Thumbs up. Here we go. Senator Gardner.

**Sen. Gardner**
Thank you, Ms. Maxfield for being here. Good to see you, again. Remote notary is that . . .

**Leticia Maxfield**
Don't bring back bad memories.

**Sen. Gardner**
Only Senator Rodriguez, and I would understand that. Seriously, you indicated that the CBA was neutral on the bill, do you anticipate a more firm position on the part of the Bar Association as we move

- 48 -

forward? I know the bill has come quickly. And I'm told there are a lot of lawyer members of the Colorado Bar Association and as I've learned at the Uniform Law Commission, if 350 lawyers in the room and only 5% want to say something, that's 15. So, is that kind of the issue we're working with here?

**Leticia Maxfield**

It is a little bit. Senator Gardner, what I will say is I meant what I said. This has really forced the CBA to roll up its sleeves and engage in extensive stakeholder dialogue, not only within CBA leadership, but membership and also our diversity and our affinity bars. We are getting memos from them. They are coming to the Legislative Policy Committee of the CBA. We are having discussions about it. Many of our Legislative Policy Committee members have been watching here today. We learned as much as you did about the position of the branch on some of these issues, some of which are much more nuanced than even I had come to understand in this brief period of time. So, I think we have a lot to discuss. I understand from what I've heard here today, there are probably a handful of amendments that are coming for consideration as well, some of which may be added on some of which may not. So, I can't say that the CBA is going to take a firm position, I imagine we will continue to have very thoughtful, critical comments and we want to be at this table and we want to make sure our diversity bars and our affinity bars are at this table, too. Because this this is a conversation that needs to happen. And like I said we have to get it right for all of us.

**Sen. Gardner**

Thank you.

**Sen. Gonzales**

Any further questions? Seeing none, Ms. Maxfield, thank you for your testimony.

**Leticia Maxfield**

Thank you so much for your time.

**Sen. Gonzales**

I also want to bring up Emma Garrison.

**Sen. Gonzales**

Welcome to the Senate Judiciary Committee. If you can please state your name, any organization you represent, and then proceed to testimony.

**Emma Garrison**

Thank you, Madam Chair. Members of the committee, thank you for the opportunity to provide testimony to you today. My name is Emma Garrison, and I am here on behalf of the Colorado Women's Bar Association. We are an organization of over 1,500 attorneys and legal professionals with chapters

- 49 -

across the state. Our mission is to promote women in the legal profession, and the interests of women generally. We are still in the process of reviewing this bill so we can better understand the specifics and implications of it as drafted. And the CWBA has not yet taken a formal position with respect to the bill. But we thought it important to be here today to share our overarching concerns on this important issue of judicial discipline that the bill seeks to address. The revelations over the last year and a half about complaints of sexual harassment within the judicial system. And allegations that these complaints were not handled in a transparent way has been profoundly demoralizing for our members. In February 2021, we called a town hall meeting to allow our members to voice their concerns. We also formed an internal committee to press these reforms forward, and to closely engage with this problem on behalf of our members. Since then, we have engaged with various stakeholders, and we are grateful for that opportunity. We are here today to show our dedication to continued engagement on this important issue. When we held the townhall meeting back in February of 2021. The overwhelming consensus was a need for a judicial discipline process that is independent from the judges subject to discipline. We support reform that would make the body responsible for judicial discipline financially independent from the judicial branch. We support changes to the structure of the commission to further keep the judicial disciplinary process independent from the judicial branch. We support further study of this issue in a setting that brings the various stakeholders together, examines what judicial discipline looks like in other states, and creates a solution that balances competing interests, including the concerns of the victims, and the public's confidence in the judiciary. It is our understanding that the vast majority of victims who have raised complaints in the past have been women. We want to ensure their interests are adequately protected, and not overlooked in the name of transparency, particularly when victims personally wish to keep a matter private. There is also significant research showing that women judges and judges of color are more likely to be on the receiving end of complaints as a result of implicit bias. We want to ensure any changes to the process will take this into account, and not lead to a system that discourages women and people of color from applying for the bench. Thank you for your time, we look forward to our continued study of this bill and engagement on this important issue.

**Sen. Gonzales**

Ms. Garrison, thank you for your testimony, colleagues, what questions do we have for this witness? Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair. Ms. Garrison is it? Thank you for being here. And thanks to the Colorado Women's Bar Association for early engagement on this issue. I've heard comments from several that you really did step up early on to talk about this. I want to ask you about this concern as to implicit bias against judges, women, and those of color and being the recipients of greater numbers of complaints and I intuitively get this issue and problem. What I wonder is systemically how do we address that? I mean, the process now is to screen complaints against whomever and to screen them in a way that says okay, what's here is this an unhappy litigant? I mean, it's a similar thing in Attorney Regulation Counsel. Is there something here that really merits further investigation? Or is it something that should be dismissed

fairly quickly? So that process exists? Do you have thoughts about what systemically else we could do to deal with the problem? I'm sorry for the long lead in.

**Sen. Gonzales**
Ms. Garrison.

**Emma Garrison**
Madam Chair, Senator Gardner, thank you for the question. And thank you for, for drilling in on that. In terms of systemic changes, it has been on our radar for years in terms of judicial performance and judicial nomination. The concerns about implicit bias training, the screeners of the complaints, could be an important issue. And I also think as we have the ongoing conversation of what is made public, that we're not harming women judges and judges of color, by not taking into account implicit bias that might have led to those complaints.

**Sen. Gonzales**
Further questions, Senator Gardner.

**Sen. Gardner**
Thank you so. So, I take it that your view would be that our system of confidentiality until you reach a certain point in the judicial discipline processes is important and necessary for what I would call unfounded complaints or complaints that are encouraged by implicit bias. Is that fair?

**Sen. Gonzales**
Ms. Garrison.

**Emma Garrison**
Madam Chair. Senator Gardner, yes. I would think that's fair.

**Sen. Gardner**
Thank you, Ms. Garrison.

**Sen. Gonzales**
Any further questions? Seeing none, thank you so much for sharing your perspectives with us as we're debating this policy.

**Sen. Gonzales**
All right. Is there anyone else who wishes to testify in a neutral position on this policy? Either in the room or online? All right. I'd like to welcome up Chris Wallner for questions only.

**Emma Garrison**
Thank you so much.

**Sen. Gonzales**
Oh, okay. Well, he signed up three times here. It's all good.

**Sen. Gardner**
Make him testify.

**Sen. Gonzales**
Come back. Okay, well, in that case, I'd like to welcome up the members of the judicial discipline commission.

**Sen. Gonzales**
Welcome. Before we get started, I just want to extend my appreciation to you all for your patience during this process. And for your service. And I'm sure you all have thoughts about this policy. I'm not quite sure who would like to begin. Ms. Krupa. If you would, please just for the record, state, your name, the organization you represent, and then proceed to testimony. Given the nature, I don't think we'll do a time clock. But please proceed.

**Elizabeth Espinosa Krupa**
Thank you. My name is Elizabeth Espinosa Krupa. I'm the Chair of the Commission on Judicial Discipline. I am also the Chair of the Independent Ethics Commission, and I serve on the boards of the Colorado Special Olympics and the National Institute for Trial Advocacy. I'm an almost 30-year attorney in the State of Colorado. I have my own firm, and I have worked mostly as a trial lawyer in criminal defense both for the public defender state and federal system, the Securities and Exchange Commission, and the Office of Attorney Regulation Counsel.

The Commission, as you're aware, has 10 members, the judicial members (two District Court, two County Court), the attorney members are myself and Mindy Sooter from WilmerHale. The judges are Rachel Fresquez from Summit County, Sara Garrido from Jefferson County, Bonnie McLean out of the 18th District in Arapahoe. And my Vice Chair David Prince who sits with me today in El Paso County. There are citizen members as well. Jim Carpenter, who some of you may know. Bruce Casias, Yolanda Lyons, and Drucilla Pugh. The judicial members are appointed by the Court. The attorney and citizen members are appointed by the Governor and the Senate.

The diversity of the Commission is worth mention as well. Our makeup is 70% Female 75% of judges are female. 50% of the commission is made up of people of color and only 20% of white men. When people raise the issue of implicit bias with a commission, and whether or not the Commission's done its job or doing it right. There have been six cases of public discipline since 2014. It is not the Commission

that decides when a case is public, it's the Court. We recommend things to the Supreme Court, we are a recommendation body we do investigate, but we don't make our own rules. And we don't make our own findings in terms of discipline or sanction. When it comes to those six cases of public discipline, the number is split 50/50 three male judges, three female judges and five white judges and one judge that was a person of color. There is currently not in any part of our country, a commission on judicial discipline that tracks the demographics of the complaints or the public discipline. That's not done. We've been in contact with the National Center and the national people that guide public discipline of judges and no one does it. So, Colorado would really set that standard. And it is important, it is a good thing to track those numbers.

The Commission is one of three oversight entities for the Court. The first is the Performance Commission and the Nominating Commission. And then us. There's been talk about a survey. I think, Justice Marquez for years has discussed a survey that shows disparate treatment of female judges and judges of color. That survey is as to performance commissions. The performance commission gets their information from surveys, lawyers, litigants that appear before judges are asked to complete a survey. If there's a bias in that system that definitely needs to be looked at. I'm not sure that there's any demonstrated survey that I'm aware of that shows any kind of disparate treatment. And I mentioned those six cases for that purpose.

The Senate also heard today about VRA, victims rights issues, there is not that equivalent for the discipline commission and we would welcome that. We do talk with the victims. In fact, in some of the information that we provided to you, there is, quotes, from victims. Of the judges that have been disciplined, four judges were disciplined for abusive conduct. And that compares to the 14 individuals that were targeted by that abusive conduct. I bring that up, because I do think that is an important thing that needs to be considered.

At the same time, I'll bring up the timing issue. A lot of people have talked about the timing of this bill. And we've heard even Senator Lee and everyone else talk about the timing since that infamous Masias Memo article, and that we still have not even been able to begin our investigation. Of the numbers of pending investigations, not one of them is looking solely at judicial misconduct. All of the pending investigations are focused in their wheelhouse, which is not judicial discipline. We are the only entity that would look at judicial discipline. So, when people say, oh, wait, wait for these other investigations, let them make their recommendations. Let's wait and see what happens. And then we can talk about it. The timing to do something is now. To let us fulfill our mandate, which is to restore the integrity of the judiciary and public trust in it. To be able to expeditiously and fully investigate claims of judicial misconduct, and to educate the judges and the public about judicial misconduct or proper conduct. If we wait and say, oh, let's get this interim committee together, oh, let's wait. We're not allowed to do our job.

You can pass a bill that gives us funding and creates a document and disclose obligation, which is really just our MOU that we currently have, just memorialized. And add if you want a friendly amendment

about victim rights issues. And then the interim committee can continue to look while we work as effectively as we can and as independently as we can at other issues that stakeholders bring.

The disclosure obligation is nothing new. The disclosure obligation has been there since 2010. And it's not working. Now when the court says well, we can handle internal but we can't handle external. Well, what happens when somebody walks into the court with a complaint and multiple affidavits. And the court clerk or somebody in a district outside of the judiciary says I don't have any duty to document disclose that. What happens to that complaint, what happens to that litigant? What happens to that victim? This is not an onerous process. And we're happy and have talked to stakeholders about amendments, that they give us a summary, that they don't have to give us the entire complaint that Attorney Reg receives. All we want is to be notified of claims of judicial misconduct. And we want, if there's documents provided or investigation done, for that to be shared. And one of the reasons is if you have multiple witnesses or victims, you don't want to expose them to eight different types of interviews during multiple different investigations.

As far as the interim committee and what stakeholders are there, I understand Senator Lee, that you will have an open process and whatever interim committee there is that you welcome everyone who is willing to provide input. I would hope that includes us. We're one of the bigger stakeholders in this because we do it. All 10 of us volunteer and spend a lot of time and take it very seriously. And we want to protect these people. We want to protect the public, we also want to be able to protect the Judiciary. Unless we are independent, what we do means nothing. How are we supposed to say that we are able to do our job and we can even investigate the one entity that has control an oversight over us? How does that give our Commission any credibility? Just let us do our job. That's all we're asking.

When the Supreme Court says that they want to get out of judicial discipline business, what they mean is the investigation part and the disclosure parts. We have some of the highest confidentiality rules that they created. What we can talk about is very minimal. So, anything that gets shared with us is not public. And we're not advocating for everything to be public, because out of the numbers of complaints we get, many of them are dismissed, either for jurisdictional issues, because they're complaining about a ruling, which we can't do anything about. Our jurisdiction is very clear. We don't get the volume, that they're making it sound like it's going to be so onerous and cost prohibitive.

The Supreme Court has exclusive authority to promulgate our rules, to decide the discipline and sanction. They control the entire process. So, when they say they want out of the judicial discipline business, what does that really mean? Because their efforts so far don't seem to indicate that. I would like to turn it over to my co-chair, David Prince, for him to be able to provide some information as well.

**Sen. Gonzales**
Thank you, Chair Krupa. Judge Prince.

- 54 -

**David Prince**

Good. I was about to say good afternoon, but I think I should say good evening. Thank you, Madam Vice Chair, and thank you to the members of the committee. Appreciate your dedication in a long day. And I know for you one of many, and frankly, still short by your standards a lot of times. But by my standards, I have to admit it's kind of long. We had been thinking of the of the three-minute clock, so I'm trying to adjust my plan as I go. But my name is David Prince. I'm the Vice Chair of the discipline commission. I've served on the Commission since about 2018. I always forget what year I started, but I think it was about 2018. I've been a lawyer for just over 30 years. So, I guess I'm junior to several in the room. I've been a judge for about half of that time. I was a commercial litigator beforehand in a large firm and involved in management. Relevant to today, I've been very involved in systems design for some reason in the grand scheme of my career. One of the larger projects I did a few years ago with Mr. Vasconcellos actually was designing the certification process for problem solving courts in Colorado, which we were one of the earliest adopters. We weren't the first, but we were one of the earliest adopters and a process that went remarkably smoothly. I am a member of the National Judicial College faculty. I do a lot of teaching also internationally through UNESCO and the State Department on rule of law and court design issues. Again, relevant to today's discussion. In fact, I was actually working on a long-term project remotely with the courts of Ukraine when we had to stop our project because the Russians invaded not that long ago. So, I have some experience with system design, which is part of what we're talking about here today. When we talked about our organization, we thought we would give you an overview of what the organization is because so few people know much about the disciplinary commission.

So, Ms. Krupa has talked a bit about who the Commission is and how the commission gets created. I was going to talk a little bit more about just our process. So, there are basically five phases or five steps in our process and this is in the slides that you have. If you want to look at them. We start with the screening process, investigation, formal proceedings recommendation, and then the final decision. So, under the Constitution, we the judicial discipline commission are assigned the task as an independent body created separate and apart from the judiciary with a judicial perspective. That's why we have judge members of the Commission with a lawyer perspective. That's why we have lawyer members of the Commission. And with a citizen perspective, a citizen involved commission. Now if you know our overall system of merit selection, you already know that's a very similar sounding design, because that's similar to the design that we use for the commissions on nominating and the commissions on performance, because it's meant to be citizen involved.

So, we take this independent body and we say, okay, all of the complaints about judicial misconduct come to this independent constitutional body and then that body decides what happens with it. We do the initial screening. Senator Lee asked me earlier, what's the rule on that? That's Rule 13. In case you care, Colorado Rule of Judicial Discipline 13 lays out exactly what our screening process is. And yes, the large majority of the complaints that we get are what I would call frivolous. There's a standard of reasonable basis, but they're usually a complaint about I didn't like the judge's ruling. That's the large

majority, that doesn't surprise you. We get about 200 complaints per year. Of those 200 complaints per year, we need to do factual development, we need to go out and find evidence on about 70 of them. So, that number is probably higher than you expected to hear. Because we look into quite a few of them. Okay, so that initial screening process is done. And that screening process can be done initially by our Executive Director, but he has to report to the Commission. So, the Commission continues to maintain that control.

Okay, then we go to our investigation phase. That is if the complaint survives, if there's something worth looking into, then we start looking for facts, and Senator Cooke was talking about, you know, our job is to go out and get the witnesses and facts. That's what we call our investigation phase. In that phase, we are essentially a grand jury. Those of you who know the criminal justice system will be familiar with that concept. That's really a fact-finding body and investigative body that does their work before any actual case in a criminal case is filed. In fact, they're the ones who decide whether a criminal case will be filed or not. In that investigative phase, we have to have tools to be able to go out and get evidence. The next phase is formal proceedings. Now, that's the equivalent of the trial if you want to use a criminal or civil analogy. So, if the grand jury says yes, there's going to be charges filed, that's what we do. We say, yes, there's going to be charges filed. We call that starting formal proceedings.

Formal proceedings start, there's actually two methods to do formal proceedings. You can either have the Commission itself hold the hearing, which is very rarely done. Or you can have the Supreme Court appoint three special masters, and they'll actually hold the hearing. That's the more common approach to it. Okay. And then once you do that trial proceeding, and that's a very abbreviated . . . Analogous to any trial, whether civil or criminal, there's discovery phase in that as well, and some back and forth, and some pleadings and motions. But it's meant to happen over about three months, it's meant to be pretty abbreviated at that point. And then the hearing, does the fact-finding, actual fact-finding on it. And recommendations are made. The Commission itself makes recommendations for formal proceedings, we use what's called Special Counsel under our rules, think of it like a DA, and they're the prosecutor that you bring in. So, when we prepare recommendations, the special counsel also prepares recommendations. If we had used special masters, then the Special Masters would also prepare recommendations. So, a great deal of diversity of opinion brought in here, you actually have three different entities that are coming up with the recommendations.

Assume it's serious discipline at that point, that goes to the final phase, which is final decision. And that's being proposed. And that recommendation is made to the Supreme Court. So, the entire record is packaged up by the Commission, based on that hearing, sent over to the Supreme Court. Recommendations are made and then the Supreme Court actually has a very wide discretion, it can pretty much do what it wants at that point. It can expand the evidentiary record. In other words, it could hold its own trial. It could hold supplemental proceedings to gather more evidence. It could do more discovery, if it wanted. It can take argument, that's more common, and then make a decision. So that's the basic process from front to back for us.

As I said, we get about 200 complaints, we call them RFEs. But we get about 200 complaints a year. About 70 of those we actually have to use and I'll say investigation without meaning necessarily the investigation phase, develop facts and then not many of them actually go to public discipline. We've literally had the six cases over the last several years that Ms. Krupa talked about. And she gave you the basic stats on those. What are the kinds of issues that get judges in trouble for serious discipline, public discipline? Three of those cases involved criminal proceedings. And then four of those cases, notice there's an overlap because there's six, four of those cases involved abusive behavior towards somebody else. And, so, Ms. Krupa gave you some of the statistics on that. Of the four judges who were abusive, they were 14 people who were the survivors of that abusive behavior. And that is only those who were part of the allegation that was the basis for sanction. Because one of things we found out is when we do public sanction, we then start to hear once it becomes public, have all these other instances. And you actually heard a little bit of that on some of the comments today. And turns out there are a lot more people who have issues. We don't end up having to look into those, because we've already done our role. So that's the basic overall process.

Let's come to the bill. I think I'll wait and see what questions there are about what challenges we've encountered. I think I'll just go to the bill at this point. So, what does the bill do? The bill actually only addresses, it's meant to be pretty narrow. It addresses three fairly simple things, that based on the iterations over the last couple of three months now of work on a bill in various drafts that the judiciary had indicated were appropriate for the bill at this time to address those three topics are.

Let's take the easy one, create the interim committee to look at the issues that can't be resolved at this point or are not being resolved at this point.

Next one is, address funding. Now that doesn't appear to be too controversial at that point, either. Independent funding, provide independent funding.

And then the third one that's gotten a lot more talk today is establish an information sharing system. And that information sharing is the one you're hearing a lot more about today. And there's two components of that. And I'll go ahead and talk about those. Okay, two basic components are one, we get, let's do one that hasn't talked about been talked about very much today, because I don't think it's controversial. So, let's try to get all those to the side. And that is information sharing among the three entities that are tasked with oversight in our merit selection system. Because right now, as you've already know, we've got nominating commission, we've got performance commission, and then we've got the discipline commission. But each of these three commissions are pretty siloed. They do their own work, they keep their head down, they do their own stuff. They have different rules of confidentiality, different rules about information sharing. They don't work cooperatively. They don't share information with each other.

Performance commission, there was actually a witness here for the performance commission, but couldn't stay and so he didn't get to testify. But one of the things he was talking about, he's the former

most recent former Chair, was that that it's been a continuing frustration with the performance commission, that they don't get information from the discipline commission. Well, our rules don't authorize us to do that. So, we don't really get to share it. Because again, we've got very robust confidentiality rules that go all the way up to the Constitution. The, and we're aware of it, I'm aware of at least one case where a performance commission got pretty serious allegations of judicial misconduct that they took very seriously. And it never got sent over to discipline commission. Now, they weren't hiding anything, they weren't covering anything up, they had their silo, their blinders on. And they were working on their own task and didn't think to send it over to us. And, so, it doesn't get examined. And they say the same thing that they're doing their performance evaluation, and then they find out after it's become public, that there was some discipline that they never knew about. So, they want us to communicate. And that's not provided for right now.

There is some provision for us to share information with the Judicial Department when it comes to a senior judge, who's someone asking to be a senior judge or a nominating commission when some judges asking to move to a different court, that kind of thing. Okay. So, they're very narrow rules that allow for some information sharing, but not a whole lot.

So, the bigger one, the one that people are really talking about is the obligation of the Judicial Department to share information with judicial discipline. That's pretty critical. Now, it's been talked about as if it's something novel, and it's something unusual, something burdensome, something onerous. And it really isn't. It comes from the 2010 Memorandum of Understanding. The 2010 Memorandum of Understanding, it's entered through the HR department at Judicial but the Judicial Department has confirmed for several times that it's the judicial department itself that has the duty of disclosure. And they are required to disclose to us when they receive a complaint from the outside of conduct that quote, could be judicial misconduct. They're required to forward that on to us. There's also a CJD, that that got just amended the other last year. And it also requires that complaints, but only complaints of harassment and discrimination, that they actually be passed to the HR department that the HR department then confer with us, and they provide us information. Now, back to the MOU. So, the two categories are the external and the internal. The internal, the old the 2010 MOU requires the Judiciary to actually investigate. A lot of discussion about the act requires an investigation. The bill doesn't actually require an investigation. The old MOU requires an investigation. And that requires an affirmative investigation and then after only the preliminary investigation, meaning relatively rapidly the Judicial Department is to disclose to the Commission all their investigative notes and the results of their investigation, the information that they have. That's the way the system is supposed to work. So, the bill is really designed just to codify that existing requirement.

Okay. Now, there's some discussion about whether some of the language should be shifted, those kinds of things. That's not a problem, we can tinker with that language. But the basic philosophy is not creating some new and onerous burden, it is to say, you agreed in 2010, judicial department, because it's a contract, that you are going to provide this disclosure information. We have found that that is not

happening. And we've also found that the MOU itself is not an effective mechanism for making it happen. And we have found that we don't have an effective means of requiring it to happen. Enforcement, if you want to call it that. And even this bill doesn't require enforcement. The difference is that the bill codifies it. So, it's not just an agreement, and it clarifies that that obligation to disclose is made. A lot of focus is on the requirement that well, witnesses have to be identified and passed on too those kinds of things. Well, there are reasons for those parts of the bill the way that they are. Let's talk about the witness. One, it doesn't require them to go out and find witnesses. All they have to do is pass along the file, and the file will contain the witnesses. Think about discovering a police matter, they hand over the police report. Well, they don't give you a separate list of who the witnesses are. They give you the police report, and the police report says the names in them. So, all they have to do is give us access and send over the file that's related to it. And the truth of the matter is a lot of these complaints, the core information, the actual evidence is in the files of the judiciary. So that's critical that we have that information and access to those files. And that's why the bill also says you'll send over the complaint, you'll send over this basic information that identifies witnesses, etc. But you'll also provide access. So that we can follow up and ask questions.

Why is witness in there? Well, one, if you look at the judicial. Now, that's embarrassing, because that's my phone.

**Sen. Gonzales**

Its been that kind of day.

**David Prince**

So, they're required to send over witness information, as I said earlier, they're not required to separately listed. But that comes from real experience, you already know that we have very strict confidentiality rules. And, so, we're not allowed to talk about the facts of individual investigations or the specifics of the investigation. But we are allowed to talk about how our operations are proceeding and how effective they are. And, so, we asked the judiciary on a question on a case. And we learn of it indirectly. And, so, we asked them about it. And they won't tell us the name of the complaining witness. I wish Senator Cooke were here because it was sort of what his question of well, isn't it the judicial discipline commission's job to go out and find the witnesses? Well, we have to have some help to find the starting place. And the complaining witness's name would be really helpful. And, so, we went month after month before we finally got the complaining witness's name. We have a similar kind of situation where we get word of an allegation that's known in an area, and it involves a judge who is unnamed, at least in the allegation that we're able to get that circulating in the public. You know, the worst kept secret in the courthouse. And, so, we ask about it. Who is this? The allegation is that they did this and this timeframe on this court, this basic identifying information, who is that? Judicial won't tell us. Now, four months go by, and eventually we get the name. And, so, we can pursue. The problem is the information sharing systems we have in place are not working. And, so, we need something more robust, so that hopefully

- 59 -

they will be respected. And hopefully, the interim committee will come up with some sort of enforcement mechanism down the road. But that's why that information sharing is so critical.

We are not trying to offload on to the Judiciary, the obligation of investigation. We have never taken that position. It gets raised a lot, but we're not asking them to investigate. We're asking them to let us do our job, let us investigate. Most of the pushback we've gotten from the Judiciary in the last few months had been more like, well, we want to do the screening of what gets sent to you. There was a proposal not long ago, if we would only send you complaints, if there's a substantial likelihood that they're going to result in discipline. Well, that's our job. The Constitution says the complaints come to the commission. And the commission then decides what to do, how much factual investigation how far along it should go. That's really not appropriate for the Judiciary, because it makes them vulnerable to exactly the kind of attacks we have right now. And it also prevents us from doing our job. We don't actually get to look into the evidence. So, that's why that is such a critical part of the bill. And that's why it's included at this time, because it should be non-controversial.

I can't tell you how many times I've heard Judicial Leadership say over the last year, we fully support transparency on investigations of judicial misconduct. We fully support and the phrase that was coined is unfettered access to the Judiciary's files and information for the investigators. But that's not our experience. That's not what we're getting. And we can come back to those for specific details. But that's really the overview of what the bill actually does.

There are reasons that only a couple of issues are addressed. You notice that most of the people that testified in opposition to the bill, they weren't really opposed to part of the bill. What they were opposed to was that the bill didn't do enough. Well, there's good reason for that. Some of their positions, some of their philosophies, I agree with. Some of them, I don't. But there's good reason it didn't go further, because of the interim committee. The interim committee is going to actually study the broader issues. These should be the non-controversial issues. If judiciary gets a complaint of judicial misconduct, it ought to be non-controversial, that they need to pass that on to the discipline commission, and give the discipline commission access to their evidence. I heard some ambiguity, only because we've had this experience for the last year in some of the phrasing of what the Judiciary opposed or didn't oppose, I heard a couple of times the phrase refer it on when they get a complaint. And that was actually used for the third, the outside complaints, the external complaints, we'd refer it on. Well, what that means is pretty important. And it could mean one of two things. It could mean, you raised a complaint. And, so, I will refer you that you need to go somewhere else. Do you need to go in a discipline commission and contact them? Or it could mean what I think it means is, I got a complaint from you, I will pass it on to judicial discipline so that they can do their job. That's all that they're required to do under the act. They're not required to go out and find witnesses, scour files, they're just required to pass along what they actually have. And again, we can narrow that I think it's a very good idea, particularly for the externals to say, if requested, where you where the statute lists what information has to be passed on, just put in a couple of words: if requested. But we have to know about the complaint first, and we have

to know the basics. Who's making the complaint? What is the substance of the complaint? Otherwise, we don't know how to even start the investigation. Okay. So that's big picture of what the act is intended to do. I'll stop talking now. We were going to ask our Executive Director, if he would present briefly on kind of our funding that turns out to be not that controversial today.

**Christopher Gregory**

We might be surprised. I'm Christopher Gregory. I'm the Executive Director of the Colorado Commission on Judicial Discipline. I'm a Colorado native. I was born and I grew up in Gunnison. I've practiced law for 18 years. Prior to becoming the Executive Director, my experience as a lawyer took me to both rural and urban jurisdictions. My focus was on criminal defense, representing children and parents in child welfare cases. I started my career as a public defender. So, I've had connections with, I think, a spectrum of people that have been involved in the court system as well as different clients. Around the State, my practice included being in Las Animas and Huerfano Counties, Gunnison County, Larimer County, Weld County and Boulder County, I spent the last four years as a Commissioner serving approximately two years of that role, either as the Vice Chair or the Chair of our Commission. And then, I was selected to become the present Executive Director. It is truly my privilege to serve in a role where I can work to protect the integrity of Colorado's judicial process.

That said, I think this bill really breaks down to three simple purposes. One, the Commission right now isn't able to do its job. And the reason that it's not able to do its job is it has to ask permission to do things. Whether that's asking for permission to get evidence to perform its investigations and go through that trial process that Judge Prince described, or it's even to ask for when we would get information. But perhaps the most practical issue here is that the Commission right now has to ask for its financial resources. And that's not what was intended with the constitutional provision, itself. If you were to look at Article VI, Section 23(3)(c), there's a notation that when the Commission was originally created, it was just the commissioners. With the growth of the judiciary, of course, there is more of an administrative function. There's an impossibility that 10 volunteer commissioners would be able to do all of the work. But even then, the idea was that the commissioners would travel and whatever their expenses would be, those would be provided and paid for by the Supreme Court, from its budget as appropriated by the Legislature. There was an expectation that whatever funding the Commission had, it wasn't going to be qualified. And there wasn't going to be discretion as to whether we could spend money on our basic function. Whether we could hire Special Counsel to do something, whether we would be able to afford a computer for our office, whether we'd be able to afford rent, that sort of thing. That was all contemplated at the constitutional founding of this Commission. And we shouldn't lose sight of that. Because I think what's being proposed here is that we shift from our existing funding mechanism, which had itself evolved over time.

Right now, the Commission is solely funded through attorney registration fees. And this is codified in Rule of Civil Procedure 227. And it notes this basic structure that's been talked about. That my salary, our legal assistant's salary, that's paid for directly through these funds. But then, these funds should also

- 61 -

provide for investigations and Special Counsel. In the Rule, it's specific that those resources are reimbursed through the Office of Regulation Counsel. If you look further at our Rules of Judicial Discipline, there's also notation that, as the Executive Director, I should be responsible for preparing a budget and administrating the Commission's funds. What's kind of happened is that, yes, I can submit a request. But all of this is sort of happening through whatever Office of Regulation Counsel and the Supreme Court signing off on their funding is willing to grant and there's our friction and there's, you know, sort of our problem. But just to be clear, right now, our resources are: me, our halftime legal assistant. The investigative resource and the Special Counsel resource, it was a brilliant idea. It's completely scalable. Like, no matter how many complaints we receive, no matter how intensive they would be, we would be able to rely on Office of Regulation Counsel to provide that resource. What's happened recently, and it's not just with this judicial scandal, Office of Regulation Counsel on different cases has said, oh well, we have a conflict, we can't do that function for you. You're going to have to go and find this elsewhere. But that's not accompanied with, let us pay for that. Or, you know, where are you going to get the financing, you know, to do that. Our core current budget right now is about $304,000.

What the Judiciary is asking for by requesting that that go to the General Fund is to take that off of their books, also to take off any expense of our investigations or the role that the Office of Attorney Regulation Counsel was providing previously. I think that this Commission, I think that this committee, and this Legislature should be somewhat concerned by that. Because this is essentially a windfall for the Judicial Branch in being able to kind of shift the responsibility for the Commission. Over time, there has been a considerable number of straw men that had been created. And getting to the finances, you will see some more of them. But it's really troublesome that the Judiciary stands and says, oh, it's a separation of powers concern. That's why none of this can be dealt with. If the committee focuses on the fact that Article VI, that is the portion of the Constitution that relates to the Judicial Branch includes the Commission, we are essentially affiliated with that branch of government, allowing us the independence to do what was constitutionally intended. It's hard to understand where that creates a separation of powers problem. The separation of powers problem is that the Supreme Court just is not consenting to the resources and the ability that we need to do our job.

One thing that was mentioned in the Chief Justice's statements, which I think I need to bring up now, before I shift to the specific funding proposals in this bill, there was an allegation that on one case, the Commission had essentially enabled judicial misconduct by proposing that a judge receive a paid suspension prior to retirement. That case was involving Baca County Court Judge Deborah Gunkel. It's one of our public cases, there is a published opinion about what happened there. The judge had gotten two DUIs before, ultimately, leaving the bench. But as part of that process, there was a negotiation to avoid formal proceedings. The expense of that, and what it would cost the public treasury, or at least attorney registration fees with our current funding. And one of the proposals was for that judge, Judge Gunkel, to retire on a schedule, but also to have a little bit of time to sort out whatever was needed, as far as benefits and the like. But that effectively would have removed her from the bench sooner,

immediately. We submitted that recommendation to the Supreme Court, and it was rejected and with really no explanation other than the rule for public sanctions provides for an unpaid suspension. However, we have another Rule of Judicial Discipline 34 that allows for voluntary suspensions with paid leave. So, it's not clear why that was rejected. But it wasn't that the Supreme Court was standing up and preventing the Commission from enabling judicial misconduct. On the contrary, because of the delay caused by rejecting that recommendation, the judge stayed on the bench until the final stipulation was submitted and approved by the Court.

That said, if I could move to our current funding request and the fiscal note that was prepared for this Committee. What the Commission is asking for is a 4-person FTE office that would include the Executive Director, Legal Assistant but at a full-time rate, an attorney, and an investigator. The reason that we would need a separate attorney and investigator is Rule of Professional Conduct 3.7 which prohibits witness and attorney conflicts and would just, essentially, be the minimal level of resources that we would need to have in order to in-house the functions that have always been or in recent times delegated to the Office of Attorney Regulation Counsel. I kind of analogize this to, you know, the fire station. That firefighters aren't utilized 100% of the time, but when they're needed, you need to have that resource ready and available. And that's essentially what we're asking for, with our request. Also, the bill includes a $400,000 essentially trust or insurance fund, so that if contingencies or extraordinary expenses came up, we wouldn't have to ask permission to get the funding, we could just appropriate that and use it. All the while being fiscally responsible and following any required oversight. But if you look at it this way, this isn't creating a real fiscal impact. You know, if the judiciary were responsible for the funds that are already being spent for the Commission, all this would do is just shift the resources around. So, I would just emphasize that. Looking at the fiscal note, though, that was prepared for this Committee. There was some additions in there that I think can probably be dealt with at different times. One was to include $100,000 education and outreach budget. I don't know if that's quite necessary, I think additional money could be added to our travel. So that either me or an attorney working with the office could go and give some in-house presentations to Judicial Districts, to nominating commissions, to performance commissions. Just to ensure that everybody is aware of the Code of Judicial Conduct and following things. The notation for centrally appropriated cost. I think that that's an erroneous figure in the fiscal note that should be corrected. One thing to note, after I took over as Executive Director, I realized that all of our old records from 1966, when the Commission was formed to, I guess, 1990, they're all on microfilm and will need to be transferred to a digital format, and that will cost $6,000. But here's the controversy.

And here's the problem with the fiscal note. If you look at it closely, there's a proposed $622,750 and an additional 1.8 FTEs being allocated to the Judicial Department to create, I guess, a liaison position between us and the other commissions, which hasn't been necessary up to this point. And, also, to create an IT position so that they can deploy a $350,000 computer system to track I guess, referrals or these external complaints or whatever. It doesn't make any sense. If you look at the existing MOU that we have from 2010, that does say records need to be conveyed to the Commission. But you know, one thing

that I think needs to be mentioned with that is it needs to be read in conjunction with the Chief Justice Directive, 08-06. And I provided both the memorandum of understanding the Chief Justice Directive, another order that we have from the Court delegating our access to cases that might be suppressed or otherwise. And this is, of course, complicated by the new electronic system that we have. But if you read those things in conjunction, the Chief Justice Directive, as it exists right now, says that if there's an allegation of harassment, physical violence, any of those things caused by a judge whether its internal or external, those things are supposed to be automatically reported to the Commission. We're not asking for anything different in the language of this bill. And it doesn't require that the Judiciary complete an investigation. All it says is that these things need to be referred over to the Commission. I would emphasize that if you look at Chief Justice Directive 08-06, what it existed in prior forms, the HR department would do their own internal investigation of things and come to a conclusion as to whether or not it was worthy of coming over to the Commission. It is that exercise of discretion that has created some real problems over time. And I would just emphasize to this Committee, one of them. In one of our older public discipline cases, Robert Rand, up in Larimer County. There was a parade of people impacted by the judge's conduct, and you can read the opinion. And you can see really how over the top those actions were. The difficulty was that case was first brought to the HR department at Judicial approximately a year before it was reported to the Commission. And during that delay, numerous people were harmed. So, all of this aside, it is the timing of when things are reported the Commission. And that's not the only case, we've had others where the Court did their whole evaluation, and then we only heard about it later, because it was directly reported to us. That type of case, you know, also resulted in discipline, but these things have to change. And if all it means is that we add the if requested phrase, and we obviate the need for $622,000, of spending, to the Judicial Department for this, I think it again strikes down one more of the straw persons that had been created in an opposition to this bill.

Accordingly, I would just humbly request that this committee do everything in its power to allow our Commission to do the work that was defined for it under the Constitution, and has been implemented through the Rules of Judicial Discipline. Thank you so much for listening to my long, drawn-out comments.

**Sen. Gonzales**
Thank you, Director Gregory, for sharing your perspectives alongside Chair Krupa and Judge Prince. At this time, I want to see what questions members of the Committee have for our witnesses here today. Colleagues questions? I know that you both do so. Senator Lee.

**Sen. Lee**
Thank you, Madam Chair and Judge Prince, you talked about the challenges you had in identifying complaining witnesses and getting that information. You got some information from the Judicial Department and an insufficient amount of information to follow up on it. And you indicated that that was an issue that prevented you from tracking down the witnesses? Could you go through that again,

because I know that was a response to Senator Cooke's, or that was an elaboration on an issue that Senator Cooke had raised earlier. And I wanted to have him get the benefit of that explanation.

**Sen. Gonzales**
Judge Prince.

**David Prince**
Thank you for the question, Senator. So, one of the comments made earlier is isn't it the discipline commission's job to go out and find the witnesses? Yes, it is. But you have to have a starting place. And so one, I think one has to be clear, or one has to be careful about saying what is the information? I'm not saying it's very well, what's the where does the commission gets started? So, the practical reality is that the complaint is going to come in. For many of these things through Judicial first, let's talk about the internal ones. That's the easiest thing to talk about. And again, that seems to be the least controversial. So, the internal complaint comes in at the judiciary, and they have file material. It's the nature of it being particularly an internal complaint. They have file material. Think of it as a police report. And the question is, and that was left a little vague earlier, is when you say, advised judicial discipline of the complaint, and then get out of the business. Wait a minute, there's an additional part missing. If we don't know what's in those files, we don't have much to investigate. And there is a case example. I can't get into the facts of the case, but I'm talking about our processes, how they work, where we learn of an allegation against a judge. There are some specifics, so it's identifiable. And, so, we ask the judiciary about it. And they won't even tell us who the complaining witness is. So, we don't have anybody to interview. It's in their files, but they won't tell us who it is. And they won't identify who the judge is. It's in their files, but they won't tell us. Months and months go by for the complaining witness. It was nearly a year before we got that information for the judge. It was many, many months. And so the bill that's why some of these provisions are specifically in the bill about you do have to provide the witness list, but they're not required to go out and make a list of witnesses or find out or search the files for witnesses, all they have to do is send over their file, just like a police officer would send over their police report. And in that police report would be the names of the key people. And that would be fulfilling the burden.

**Sen. Gonzales**
Senator Cooke.

**Sen. Cooke**
Thank you, Madam Chair. Thank you for that. I guess what I was getting at was, there's, like you said, there's a starting point. And, so, on an external complaint, somebody calls up and said, hey, I have a complaint against this judge? Would it be just enough for the person from judicial to say, Okay, what's your name and number and then forward that on to you? And then that then, and not say, okay, are there any more additional witnesses? What is their statements or whatever, but just say, hey, here's a name and a phone number of somebody that complained. And then you take it from there, and then you, the

Commission, goes out and finds additional witnesses, and then requests the reports, and, and all that kind of stuff. Would that be appropriate?

**Sen. Gonzales**
Judge Prince.

**David Prince**
Thank you, Senator for the question. Yes, all I do is send us what they've got. And that's part of the challenge is we just want what they've got so that we can then do our investigative work. We just need that minimum basic information. And sure, if all they have is this person called and made this complaint, and here's the number, they give it to us. That's all they have to give us. If they have a file, though, if it says on this date there was a court proceeding, and the judge used the N word from the bench or something like that. Well, they let us know that they have the complaint. Now, we actually already have access. And this bill also confirmed that we would continue to have access, we have access, so we can just listen to the recording. While they fulfilled their obligation. They've made the record available to us.

**Sen. Gonzales**
Thank you.

**David Prince**
Just that simple.

**Sen. Gonzales**
Senator Gardner.

**Sen. Gardner**
Thank you all. Thank you all for your service, for your commitment to this issue. I regret that members of the Judicial Department are not here. I didn't expect them to be here. But they can hear what I say on the record about this. It wouldn't have been appropriate to say it earlier. I have met with you more than I met with them. But I have met with them. I understand this problem. I understand it. I think about as well as anybody in the General Assembly does other than perhaps my colleague from El Paso County. And I walk away from talking with all of you both sides and shake my head. Because I think there ought to be a way through this. And there ought to be a way to a bill that everybody can do and I have opined to some of my colleagues and my associate that one would hope that people that were in the job of dispute resolution on all sides could resolve the dispute, but it doesn't seem to doesn't seem to be the case. And so here we are in lengthy committee meetings. Let me get to the chase. And I really appreciate I do what as I expressed to the outset, I think is a very nuanced problem. Judge prints, I appreciate your presenting it in a very simple way. But there are some nuances to it. As to funding, I think there is broad agreement in this room and out there and everywhere about funding because those of us who know what it means to control the purse strings of an organization know that you cannot be truly independent if

- 66 -

you're dependent upon your funding of the very people that you ultimately are in charge of having oversight of. But there's some things in the funding provision where I don't know if you intended to or not, but you try to have it both ways. I think the Judicial Department says well, if you're going to be free then be free. I don't want to put words in their mouth all together. But Is that acceptable to the Commission or do you have concerns?  It means we probably have to find money and we have to make that so. But are you prepared to do your own IT and your own? And I think that means you go to state OIT and figure all of that out. But are you prepared to run your own operation in that sense and be free?

**Sen. Gonzales**
Chair Krupa.

**Elizabeth Espinosa Krupa**
Thank you. Thank you, Senator Gardner. In the, in the challenges that we faced trying to really just get funding for our special counsel, more challenges became apparent. And if you remember the history, the Commission initially was funded by the Legislature, there were some issues with that some concerns that the Legislature would somehow interfere and guide what we did. So, we wouldn't be independent. Right. So, at that point, I believe it was John Gleason, who's the former head of Attorney Reg. and a Supreme Court Justice that said, okay, you know, let's do it through attorney regulation fees. And it seemed to work fine until it didn't. Because it had never been in an investigation of a Supreme Court Justice. So, when that becomes apparent, the conflict and the inability to resolve that conflict became more apparent. And it was at that point that the Court came to us and said, if you don't like us controlling the purse strings, go get your money. Go get it. And we had, I think, two weeks or less. Three days, excuse me.

**Sen. Gardner**
If I may, I understand that that was a challenge for you. And I respect your meeting the challenge.

**Sen. Gonzales**
Chair Krupa.

**Elizabeth Espinosa Krupa**
And if I may, what we had talked about was, well, you know, we're not lobbyists. We haven't done this before. We're all volunteers, we don't get paid. We're not really sure what we're doing. And our prior Executive Director did not create the budget. He did not. He relied on Attorney Reg. and the Court to really prepare all of that. So, we hire a new director, he comes in in January, God bless him for actually having some experience on the Commission on Judicial Discipline because he had to hit the floor running, and we had assistance we had some guidance on, tell us what you need. Tell us what you know, tell us your wish list. And we'll see what we can get written and agreed upon. And we're happy to negotiate. We've never not tried to negotiate. We're still trying to negotiate items with the Court. We're happy for whatever funding we can get. Are we prepared? Well, that would really be Mr. Gregory who

- 67 -

would have to jump through hiring an attorney, doing all of that work. But yes, initially, when we weren't sure if our funding was getting cut off entirely, we were trying to prepare a budget from scratch. The issue was, we didn't really have one, what we had is designated funds from Attorney Reg that only paid the salaries. That's it. And different from other commissions like the performance commission, the independent ethics commission, we've never had a memorandum of understanding with a court to be housed in the Carr Building, to have computers, phone, IT, all of that. So, we didn't even know if we had that. So, trying to resource that and figure out the funding, I'm sure would be way more than the funding that's proposed. To get us truly independent, we would need more than a million dollars. That's not what's contemplated. And we don't want to sound like oh, taxpayers, it's already being paid for. But let's take it out of there and make you pay for it. Because we pay taxes. We don't want to do that to people. I also pay attorney regulation fees, which I know you do as well. Happy to have either a hybrid of that, that Mr. Gregory as our Executive Director would get those funds into a bank account, and he would be the fiduciary over those funds. Not the Court, not Attorney Reg. If that's something that can't happen, then yes, we need completely independent funding.

**Sen. Gonzales**
Director Gregory.

**Christopher Gregory**
I'm sorry. There's kind of a nuance to some of those issues, though, if you start like kind of, you know, breaking out services that you would be, I guess, responsible for on our own. But one of the things that just being in the Carr Building. We are housed with the Presiding Disciplinary Judge in the only suite in that Building that has a trial courtroom. So, when we do have formal proceedings, there is a reason that we have security, that we have the recording system there. It is not a resource that we just go down the street and get a different office. Similarly, when I prepared these budget figures, I had to rely on SCAO because they have all the software and the expertise to break down the particular figures. I don't know how without relying upon them like the other performance commissions or the other commissions we would have been able to even accomplish what we've gotten here today. But on certain things, IT, sure maybe we look at what it would cost to have an outside IT consultant.

**Sen. Gardner**
Let me just say, Thank you. Let me just say that as far as my attorney registration fees, I've just given up on the fact that $5 of it, because it's your budget is, is a very small part of all of that I wouldn't get a whole lot if I forced him to cut it. And just for members of the committee who don't know that those are not our funds, they're the Judicial Department's funds so that I can practice law in my spare time. There seem to be two aspects of this problem if you kind of get back to 30,000 feet, and one of them is, and they're interrelated. But one of them is the investigation of the most immediate complaint. And the other is what do we do going forward? And I'm not sure that the bill can do a lot about the immediate complaint. I suppose we can give teeth to the turnover of information. But it doesn't sort of answer the question of how to deal with all of those things that can constitute a complaint. Legislative drafting wise,

- 68 -

there's different ways to deal with this problem. I have one colleague who says, well, you need to define what a complaint means. In one of my lives, that's what you do under the rules of civil procedure, and we know what that is. And over here, and they're very broad rules about that, that looks like a complaint, its complaint. Over here, it needs to be something very specific, or we have to differentiate between where it's lodged and not. And I do think the Department, I can't definitively speak for them. But what I hear them saying is that they subscribe to the idea that internal complaints, the HR thing and so forth, that yes, that needs to be immediately reported to you. Now, whether that will happen or not Judge Prince, whether it happened in the past, I have publicly said that we're not here because the Department has been perfect over the years, or that things haven't happened in Adams County. And I don't just you know, I can be fairly specific about that, or, or Douglas County or wherever. But it does the way the bill is drafted, cause this problem for people who have to do it. To say, well, we get hundreds. I know I get a bunch of them, and I send them to the legislative liaison that say I was in court. I'll pick on Judge Prince. I was in Judge Prince's court and he decided for the other person, you don't have a domestic docket, but it's tends to be domestic cases. And I know he's biased against men or he's biased against women or. And at that point, if I hit the button and send it over to the ledge liaison and say, well would you take a look at this and respond to it? And you multiply that by the number I know that are out there? Are those the things that everything that said across the desk to a clerk everything that said on the on the way out of the courtroom? Are those things that that need to be reported to you or documented and reported or? How are we going to deal with that.

**Sen. Gonzales**

Judge Prince, but let's see. Senator Lee, and then Judge Prince.

**Sen. Lee**

Not to interject, but I think I may be anticipating what you could be saying and the rules that the Commission operates under have preliminary proceedings that have evaluation of the request. And that was referred to by one of the witnesses. I think, I believe Maxfield. A request for an investigation, but then it defines a complaint if members of the commission based upon evaluation of the request conclude there was a reasonable basis for discipline or disciplinary proceedings. They'll process a request as a complaint under the rules, but you go back over to the rules of Judicial Conduct. They also have a definition of a complaint. A complaint means allegations that provide grounds for the Commission to conduct disability or disciplinary proceedings. So, I think we can figure it out in the bill to come up with a definition of what a complaint is, at a preliminary level, and at a commission evaluation for discipline level.

**Sen. Gardner**

Well, if I may, Senator. My question is what is the Commission's expectation of those hundreds of things that happen at the courthouse or happen by email to the chief judge that potentially constitute a reportable event? Or are they? What would the Commission like to see about that? And what's the intent about the bill? I think it does also, and I think Judge Prince, you may have alluded to it, or someone did,

- 69 -

and there. There's also this problem of an external thing, though, that that has more gravitas to it. That we've got to figure out. When someone says, I was at a restaurant last night, and I saw judge so and so. He had too much to drink. And he did a terrible thing to a waitress or somebody there. And that would be external, but it would be something more than an unhappy litigant. And we've, how are we going to deal with all those and not? Because the Judicial Department and you may say, well, they're making more of it than it is. But believe me, I've got 200 other bills like that where somebody on one side of it is said, but that will make me do X 1,000 times over. Every regulatory thing we do. Whoever is affected by it almost assuredly will say, I don't want to be in a position where I have a duty to report 150 things to the Commission on Judicial Discipline. So, I'll stop and let you respond to that. I think you understand what my concern is.

**Sen. Gonzales**
Judge Prince.

**David Prince**
Thank you, Senator Gardner, for the question a lot in there to unpack. So let me think for just a moment.

**Sen. Gonzales**
Your microphone a little bit closer.

**David Prince**
Oh, sorry. I usually talk so loud that I tried to get the microphone away, because I blow people's ears out.

**Sen. Gonzales**
I'm just the microphone police in this committee, so.

**David Prince**
Thank you for the advice, Madam Vice Chair. So, I hate the slippery slope argument. But the slippery slope, well, let me go back to mechanics.

**Sen. Gardner**
I hate it too. But it's made all the time. And we have to deal with it.

**David Prince**
Yeah. And I agree. Let's step back to mechanics for just a moment. So, the bill defines complaint. And it defines it for purposes of the bill. The one of the problems in drafting is that in our rules, as they currently exist, we draw this distinction between a request for evaluation and a complaint that nobody else can follow. Which is why you hear us saying, Well, when we get a complaint, but we call them RFEs. So that's a problem. So, really it's not reasonable to use the language of the rules in the statute.

But that's a potential problem right there, because it's a different set of terminology. But it's not unusual for a statute to make a definition. So, we have that problem. If the trigger is going to be a complaint, then how do we define a complaint? And, so, what we did was that definition of complaint is drawn from the ABA model. Now remember, you got to step back to context. We've got the MOU right now that says, When is this disclosure duty triggered? Well, the current MOU is says when conduct could be misconduct. Well, now you got a good slippery slope argument, because my goodness, almost anything you look crosswise at somebody and that could be misconduct to a skilled first year law student. It doesn't take a whole lot. So, we move away from that and we say, reasonable inference. I'm short cutting the definition. But the operative part is subject to a reasonable inference that it's violated the Code. So, you do have to have some standards so that you can separate the wheat from the chaff. One of the challenges in coming up to drafting to this point has been that the position taken by the Judiciary has been no reporting, zero reporting. So, its binary, we're either going to report everything under the MOU, which could be, which is an impossible standard to be honest. Or you're going to get nothing. And I think, I hope everybody would agree that those two options are both unacceptable. We've got to get somewhere else. So, we did what lawmakers often did do, we went out looking for where somebody else defines this. And, so, we use the ABA model. Reasonable minds can get into a room and figure out something. But it's also a problem if we went with a model of, we at Judiciary get an external complaint and we have no obligation to pass it on. Then you go back to my example of here's the three affidavits about the judge who was drunk and did the thing to the waitress, whatever your example was last night, and they have no obligation to pass that along. Is that a credible system with the public, if they take their hard gathered evidence, bring it to the courthouse and say, this judge is a bad actor, and that doesn't get passed along? You can't have it that extreme that nothing gets passed along. Now, I heard again, that word referred, but I don't know what it meant.

**Sen. Gardner**

Well, right now, complaint means information in any form, from any source that alleges, or from which a reasonable inference can be drawn that a judge committed misconduct or is incapacitated? Well, I get five of those a week. And I have to tell you that, as a legislator, I got it from a constituent and I will just pass it on. But when I when I do, I'm like, man, there's nothing going to come to that because it needs to be screened out. Not my job. My role is a different one. But I mean, maybe it is in the definition here. But then you raise a serious needle threading problem. The Department, I don't think I'd have any ill will or anything else, in searching for how to make this distinction has talked about internal versus external, I think that's a component of it. But I think there's also a level of seriousness and evidence around it. And there are a lot of smart lawyers in the Carr Building and down in the basement here, a lot smarter than I, and we probably can find that. But I think I that's the issue here. Is how much reporting? Or how much obligation are we going to impose on the clerk sitting across the desk? Who hears a lot of stuff, right? I mean, that's just the nature of that, of that position to interface with the public. And I don't want them sitting there and generating reports. But I also don't want, I don't want something to happen in a restaurant in Colorado Springs with a judge that many people know, and no one in our bench that I would know of would ever do this, but commit some sort of misconduct in the public that reflects badly.

And because it came from an external source, they just say, well, to the, to the person who makes it to the Chief Judge, well go to judicial discipline. When in fact, it ought to be incumbent upon any of us. If not, by ethics, by our own personal sense of what's right. Just pick up the phone and call judicial discipline. I don't mean to bore you go on. But that's one issue. Implicit bias, you started with that. I don't see any evidence when you cite the numbers of cases and all that somehow the Commission is not screening. And I the reason I asked the question I did is, what's the mechanism to deal with that? I mean, it's still the screening mechanism. I don't know any way else, because you can't control who makes complaints or what their perception is. They make them and the reason you have a screening process is exactly that. So, I just want to assure you about that. I've heard that, I understand what the concern is. I also am trying to figure out well, how do I do means what's happening. But as you say, we have a set of cases, it's pretty small. I do want to ask a very direct question. Judge Prince, do you, given the testimony of some of the lay witnesses, do you support a public, completely public disciplinary process for the bench?

**Sen. Gonzales**
Judge Prince.

**David Prince**
Well, you phrased that. Thank you, Senator Gardner for that awkward question to ask me. Happily, in good lawyerly fashion, you made it extremely easy, because you took sort of the extreme case. But I'm going to hedge first, which is one, that would be a question for the Commission as a whole rather than me as an individual. Two, you know, at the end of the day, I'm not sure that the Commission is going is ever going to make a real recommendation on this is where the line should be. We're more likely to tell you, here's what we see as the benefits or the burdens of setting it here and there. But you made it easy, because you made it extreme, should it be a completely open and public process. And I'm comfortable in predicting that the Commission would likely say no. And I'm also comfortable in that, because having looked at the way commissions design across the United States, there aren't any that go that extreme. When people talk, and they'll criticize judicial commissions and others, it's not unique to ours. They'll criticize where on the spectrum, the line is drawn for confidentiality. And I think there's legitimate reasons to criticize it. Criticize ours or criticize someone else's. But all of those the lines are drawn right here. They're this tiny little zone of the spectrum. Is it after, think back to our process. Is it after formal proceedings or before formal proceedings? That's pretty much where the debate is. And we wouldn't take a position on that we would just tell you straight up.

**Sen. Gardner**
And I think the public, I think a lot of the public witnesses perceive that they're talking about complete, open transparency. But I appreciate your answer. I mean, it's very instructive that even what purports to be a very transparent system is they're making a distinction here and there. And we'll get into that in the interim committee if this bill should pass, so.

**Sen. Gonzales**

Thank you, Senator Gardner. Chair Krupa. I don't know if you had wanted to respond to any of the comments that Senator Gardner raised regarding implicit bias.

**Elizabeth Espinosa Krupa**

Thank you. And Senator Gardner, implicit biases is something that in this day and age, every agency and organization that reports to protect the public or maintain integrity, should answer to, right. And that's one of the reasons that I brought up the diversity of the Commission itself. One of the ways that you address that, hopefully, is that you have diverse people that are making those decisions, because the more diversity that you have, then you have the strength of those different views. The other issue is, we are not the only commission that faces that. I was president of the Colorado Hispanic Bar for a while back. And one of the things that, we call them specialty bars, not affinity bars. If you're not a white male, you're special in Colorado, and we're specialty bars. So, what the specialty bars did for years was trying to get the Supreme Court to let us do implicit bias training with the nominating commissions, because one of the things that the specialty bars always look at is the makeup of the bench. And you have that in the in the information that we gave to you that was supplied to us from Gary Jackson. Judge Prince has worked on efforts to increase diversity on the bench. I've worked on it. I'm on a committee now for the CBA working on it. There's 18 ways of trying to affect implicit bias. And that's something that you know, as a Commission, we rotate. We only serve so many years, I was appointed similar to judge Prince in 2018, reaffirmed by Governor Polis. Both of our terms end in June of 2023, much to Mr. Gregory's chagrin. I would say chagrin.

**Christopher Gregory**

I will miss them terribly.

**Elizabeth Espinosa Krupa**

Maybe to others delight. However, because we keep rotating that also ensures some guarantee of various different personalities, types, genders, color, which hopefully is part of why those terms rotate, right? But because of that, we don't do retreats. We don't go on retreats as a commission and have implicit bias training or talk about it. What happens is we're reactionary, right. We get something that comes up, it's a challenge and we go, how do we fix it? And then we go to our controller, the Supreme Court and say, hey, we're butting up against this, you know, these are some issues. We don't create rules. We can bring things to them, but they just mandate rules. So, in addressing that, I think there's always room to think about that. And that's one of the reasons that we have hoped that we could be the first in the country, Colorado, to track these demographics. And I think that would be one of the first steps towards as much transparency of that as we can.

- 73 -

**Sen. Gonzales**

I want to thank you, for all of these really thoughtful responses to all of our questions as members of this committee. I want to see if there's any last final questions, because I suspect that we could go on talking about these for a lot longer. But I do want to say. Senator Gardner,

**Sen. Gardner**

I have another three and a half hours, so.

**Sen. Gonzales**

I know that's why I'm asking.

**Sen. Gardner**

Seriously. I just want to say are there other things I haven't asked. I spoke with the Chief Justice and all at length, I want to be fair just because y'all are at the end of the discussion here. It's important that the Committee hear all of this and that it be sort of on the record and those that want to listen. The make up of the commission, or the interim committee, what are your thoughts on that?

**Sen. Gonzales**

Chair Krupa?

**Elizabeth Espinosa Krupa**

Thank you. I respect all of you and the voters trust in you to create the committee, as you deem appropriate. As Senator Lee said, if it's made up of legislators, I don't think we have an issue with that. If the process is really public, and all the stakeholders are allowed to be involved in that process, the problem with creating too large of an interim committee of all of these specialty bars, CBA, DBA, CJI, IAALS, every single interested person is you're not going to get a whole lot done in a year. So, the smaller the committee, but the input from those stakeholders is what's needed. But I just thought it was interesting that from all the comments, everybody said, well, we want the Women's Bar, we want the specialty bars. Well, we're the ones that actually know the process and deal with it day in and day out. So, I would hope that we are part of that information gathering and input providing as well.

**Sen. Gardner**

Well, and I, I think I've come down, because I've been at both ends of the spectrum for what it's worth of just legislators. Because at the end of the day, we're the ones that can propose legislation and move it forward. And then there's 150 or sometimes in one night, there's 300 people come in and, and testify and give us our best. And by the way, we give a lot more time even in interim committees to those experts that have standing, if you will, for lack of a better term. Yourselves being people with the most standing. And the other end of the spectrum is you get a committee of 16 or, you know, the Colorado Commission on Criminal and Juvenile Justice is 30. And it's unwieldly and very difficult. So, I appreciate your thoughts. Anything else you would like to say to us?

- 74 -

**Christopher Gregory**

One point.

**Sen. Gonzales**

Director Gregory.

**Christopher Gregory**

I'm sorry, I just thought the financial point. I think, as a practical matter, this bill has to be looked at as a whole. And if we don't have sort of an automatic of expectation of information exchange, the difficulty is that becomes incredibly expensive. If in every one of these cases, if we're going to have a meaningful investigation. It's going to require litigation over discovery, and all of the legal expenses that are involved in that. So, I just hope that as the committee considers this bill, they look at it holistically and see the practical benefits of why each part is necessary.

**Sen. Gardner**

Thank you and Madam Chair. Ms. Krupa but thank you for pointing out the way we got to where we are with current funding. Because I do think there's no way for you to get a public dollar into your accounts to spend without having someone pull the strings and I don't know whether or the Judicial Department or the Legislature is better. We've been we've been through one department there's, I beg the JBC regularly. So, thank you for your indulgence, Madam Chair, and I wish everyone a good holiday. Thank you.

**Sen. Gonzales**

Did you Judge Prince? Did you want to speak or were you waving goodbye?

**David Prince**

Madam Vice Chair, I actually did want to say something, and I'm sorry to keep you even later. But I do have a couple of other things in response to Senator Gardner's invitation. I won't do the long list, because there's actually several things in my notes from those earlier conversations. But I want to emphasize and I have said this before, that there are reasons for what's in the bill. One example we didn't quite follow up on was you talked about the provision of I'll call it administrative support clause, why is it written that way? And we never quite got to really answer that question. Well, there's a reason it's written that way. And that is, one is sort of was hinted at, as we were seeking our funding for Special Counsel and pressed that claim, we were reminded that there was no obligation to provide office furniture, rent, financial support, etc. So, in one of the very first drafts of the bill, it's that's not enforceable. So, we better put that in a bill. So, it is enforceable. There's a reason that didn't change too, because our preference is as much independence as we can get. And some of you will remember from those early meetings, we were looking for that. And, so, the sponsors themselves, actually did some research work with some staffers, as can the OPA provide us that administrative support, because we're so small, it's not necessary reasonable for us to, and particularly with government, not so reasonable for

- 75 -

us to go out to the private sector and try to get some of those things. And it was determined that that was not a viable option. Maybe there was a separation of power issue. And maybe there were some practical issues. So that's why it ended up being drafted the way. It doesn't mean it can't change. But just be aware, it's not thrown in there willy nilly. It's not as sort of has been suggested, well, they want to be independent, but they don't really want to be independent. No, we really want to be independent. But we did our research. And people told us, there's not really another way you're going to get that administrative support. So, you better make sure you lock it down, because they've already told you it's not an enforceable right at this point.

**Sen. Gardner**
Okay.

**David Prince**
People have talked about the retention. They've got to retain the records for the time the person is a judge. And in three years, again, you can debate whether that's appropriate or not. But there's actually a reason for that our jurisdiction lasts over an individual until one year after they finish being a judge. And in some of our investigations, when we've gone and asked for records information on this complaint, we're told, we have no record retention policy that requires us to save that. Well, that sounds like a hole in the system that we ought to address. So, let's put it in the statute. And that's the reason for the length, because that's essentially our jurisdiction, plus a little bit of a safety margin. So, just those kinds of things.

The last thing I want to say, is to give you two examples of a couple of cases that we've handled in the last couple of years. That I think illustrates, and I'm just at the process, not the allegations. That illustrates why we are looking at statutory codification, particularly of this disclosure obligation, but of the rules of the road in general. Okay. So, these will both be internal complaints, because they're very similar. There's an internal complaint about the judge, their personnel, as most of those are, as you Senator Gardner observed earlier. And it's brought to a trusted person, a worker at the Judiciary, who's concerned about this conduct of the judge, they go to a trusted person, authority figure, another judge, ask them what they should do about it. That Judge very wisely, and insightfully says, we need to report this, let's get the Chief Judge involved because that's their job. So, they report it to the Chief Judge. The Chief Judge does an immediate quick investigation, calls witnesses, interviews, them, makes notes, handwritten notes, turns them into little memos that say what's going on exactly what you would expect in any private sector, or government sector, or nonprofit sector business when something happens. And you know, what the Chief Judge does next. Immediately forwards all of that on to the Judicial Discipline Commission and asks us to look at it. And, frankly, is asking us and what are you going to do within the next 24 hours or something like that? And we're not first responders so that we can't quite do. So that's the way the system is supposed to work. That's great. That's what we want. That's what's tried to be codified here. Then you contrast that with another case, same kinds of allegations. That one gets looked into notes are made, a little investigative report is made. Nothing is reported to judicial discipline.

- 76 -

Indirectly, judicial discipline finds out about it and so asks about it. Hey, we heard about this incident, can you tell us what happened? No answer. And it's actually the example I was using earlier about, and they don't tell you who the people are, because we didn't actually know. And they don't tell you who the complaining witness is, so you don't know anybody to talk to you don't have any files. Regardless of whether you agree or disagree, is it a functional system? And more importantly, is it credible with the public? When those two completely different routes are permissible? Those two completely different routes are up to the discretion of, in these cases, its Chief Judges, but it's whatever person at the judiciary gets the complaint. It could be an administrative person, too. Is that really a viable system? Or is that a system that's vulnerable to being subject to allegations that misconduct claims are being deep sixed instead of actually investigated? That's what's so important about actually going ahead and codifying a disclosure obligation? Because there is basic agreement on that, at least that I heard today, on a disclosure obligation. Its the same.

I said that was the last thing, but I will do one more. And that's just because you heard about it, because you talked with the Chief Justice about several things and he talked about the access agreement. And he sort of said, well, the other the other agencies that are investigating have all agreed to an access agreement, but we haven't been able to close a deal with the Commission. Well, there's reasons for that. And we won't get into the specific details of the of the back and forth of the access agreements. But step back for a second, and ask yourself: Have you guys ever entered an access agreement with them before? Nobody asked us that question. But I'll ask it for you. No, we haven't. Because we've got an MOU. We think that isn't access agreement, but set that aside, all these cases that we've done some very serious cases, all these cases very similar in terms of types of allegations. We've never had to do an access agreement. Why do we have to do an access agreement on this one? Why is this one different? And then you're back to the same question. Is it a viable credible system, when you can single out one case or line of cases and they get treated differently than everything else? And members of the public then get to start asking why are there all these extra hoops? For this stet a set of cases compared to any other? Those are all legitimate questions. And those are legitimate concerns that get answered, if you codify a standard. And a standard that applies, all judges are equal instead of well, some judges are more equal than others. That's one of the fundamental problems with this. The way it's operating now. Thank you.

**Sen. Gonzales**
Well, on behalf of all of the members here, of the Senate Judiciary Committee, we want to really thank you so much for sharing your perspectives with us as we debate the policy that we have here before us, and we've said it earlier, but we want to say it again. Thank you so much for your service to the people of Colorado and thank you for your work in regards to Senate Bill 201. We appreciate you. That concludes the list of individuals who had signed up to testify. I'd like to see if there's anyone else, either online or in the room who wishes to testify for or against, with a neutral position regarding Senate Bill 201. Seeing no further witnesses, we will go ahead and close the testimony portion of this hearing. Colleagues, I do understand that there have been a whole number of proposed amendments that have been circulated. But I do really want to thank everyone for sharing their perspectives on this really

- 78 -

fundamental and foundational issue. I spoke earlier about the importance of integrity and these competing values of confidentiality and transparency. And I think that it would serve us all well, to take some time to process what we've all learned today from this hearing and to have some time to let this testimony sit with us. And, so, I'm going to lay this bill over, at the sponsors' request, for action only, so that we can digest a little bit and come back to the table likely next week. Given the fact that It's that time of session and proceed forward. I want to thank everyone for sharing your thoughts, your perspectives, your critiques with us as we contemplate this bill. We will lay over Senate Bill 201 for action only. And with that, we have no further business and the Senate Judiciary Committee stands in adjournment. Thank you.

# Appendix 27(m)(ii)
# Relevant Hearing Materials
# and Exhibits:

**Appendix 27(m)(ii)(1)
Colo. Jud. Dep't, Written Testimony
Regarding SB 22-201, April 14, 2022;**

 STATE COURT ADMINISTRATOR'S OFFICE

## Written testimony regarding SB22-201

On behalf of the Judicial Department, I'm pleased to be here with you today. The core of this legislation is critical to preserving confidence in the courts and upholding our merit selection process. The Commission on Judicial Discipline will function most effectively with direct funding from the General Assembly. Thank you, Senator Lee and Senator Gardner, for running legislation that meets that goal.

I am here today in an "amend" position because I think there are opportunities to improve the bill and, by extension, improve the discipline process. This written testimony is intended to supplement my verbal remarks at the April 14, 2022 Senate Judiciary Committee hearing. I expect that in my limited time offering remarks that I might not have a chance to talk in detail about each of the concerns we have identified so I outline them here in more detail.

1. **The reporting process would be burdensome on court staff and would keep court staff in a position of making determinations about what information should be reported to the Commission on Judicial Discipline.**

Two independent investigators selected by the General Assembly are currently working to provide recommendations to improve internal Department processes related to complaints against judges. One of the investigations focuses on the handling of workplace harassment and discrimination complaints. Rigid statutory requirements for receiving, handling, and disclosing those complaints to the Commission may prevent the Department from implementing positive changes recommended by the investigators. The bill also places burdensome requirements on every judicial staff member to document and refer every complaint received from members of the public, regardless of the nature of the complaint. This issue would be better addressed by the interim committee, which by this summer will have the benefit of the results of the independent investigations and recommendations from experts in the field. For example, the federal courts have implemented a more victim-centered model for complaints that allows the victim to have a say in how the complaint is addressed and provides for options like mediation in lieu of a disciplinary process for the judge. There is a risk that a statutory requirement for automatic and immediate referral to the Commission may chill complaints. The bill should allow room for creative discussions with stakeholders concerning these issues, taking into account the information learned from the investigations.

2. **The interim committee should include leaders from across state government and across the community.**

Deliberations about possible amendments to the constitution should always include a broad cross-section of the community. Deliberations about how to amend the constitutional provisions governing the process for disciplining, and potentially removing, officers of the Judicial Branch should include

1

members of the Judicial Branch. One branch of government should not unilaterally overhaul the workings of another branch in a manner that could create an imbalance of power.

### 3. Document production by the judicial department should be done in a responsible manner that does not expose the state to financial harm.

As written, the bill would require the Department to violate the law, its confidentiality obligations, and risk waiver of attorney-client privilege. For example, the bill would require the Department to violate federal employment laws that protect certain information, like FMLA records and EEOC charges, as well as certain state laws, such as CCRD charges and laws sealing records in criminal cases, which the Commission is not statutorily permitted to access. The bill would also require the Department to violate its contractual obligations. If an employee's separation agreement states that it cannot be provided to any third party "absent a valid subpoena or court order," the act of providing that information to the COJD, even pursuant to a statutory requirement, subjects the Department and the state to liability. (The Department notes that it no longer enters into such agreements.) In such cases, it is reasonable for the Department to ask for a subpoena prior to production, which the Commission has the power to issue. This bill would require disclosure of attorney-client privileged communications, including legal advice from the Attorney General's Office and conceivably a subject judge's own communications with private counsel, private medical information, information from peer-to-peer coaching arrangements, and judicial deliberations in specific cases. A better solution for disclosure of privileged information lies in C.R.E. 502 and F.R.E. 502, and with agreements under those Rules indicating that the parties do not intend to waive privilege in sharing information.

### 4. Eliminate the risk of real or perceived conflicts between the Courts and the Commission.

The direct appropriation to the proposed new office is necessary and welcome. But for the Commission to be independent, it needs to have resources sufficient to manage its own administrative affairs without leaning on an arm of the Court to provide that support. Some of the challenges that have surfaced in recent months center on the Commission's conflict with staff who work in agencies that report to the Courts. The current challenge relates to the Commission's relationship with the Office of Attorney Regulation Counsel, which currently provides some minimal administrative support to the Commission.

While SCAO provides administrative support for some other small, independent agencies in the Judicial Branch, providing similar support to the Commission would be different and would perpetuate the risk of real and perceived conflicts of interest.

- Accounting support could create a conflict as accounting staff at SCAO require court staff to follow Judicial Department fiscal rules. If the staff at the Office of Judicial Discipline fails to follow the fiscal rules, how is the staff at SCAO expected to respond? Will the staff at SCAO be expected to report the Office of Judicial Discipline to the State Auditor or some other entity? If the staff at SCAO do not respond to requests from the Commission as quickly as it expects, what recourse does the Commission have? Will any sort of failure by SCAO staff to meet the expectations or demands of the Commission, or any criticism or pushback from the staff at SCAO, be seen by the staff at the Commission as retaliation or as an effort to impede the work of the Commission?

2

- Information Technology support could create a conflict for many of the reasons also listed above relating to accounting support. In addition, Page 16, lines 19-22, restrict SCAO staff from full access to files and data on the computer networks used by the Office of Judicial Discipline. The IT staff at SCAO cannot provide IT support to the Commission without complete, unfettered access to the computers and networks used by that office. No IT team can provide support without that sort of access. Judicial Department policies require that all users are subject to monitoring for improper or inappropriate use of the network, databases, software, files, and communications. The IT staff at SCAO are the frontline security for hundreds of thousands of court files across the state, touching nearly every family in Colorado. It would be irresponsible and reckless to allow an office onto the network secured by the IT team at SCAO unless that IT team has full access to the computer hardware, software, and network, including files and data.
- Human Services and payroll services create a risk of conflict as well. The new Commission will have several staff. The staff at the Commission deserve to have a human resources complaint process that is fair and conflict-free. Under the proposal in the bill, if a staff person at the Office of Judicial Discipline files a complaint against a supervisor, a fellow staff member, or a Commissioner, that complaint would be received by a staff person in the Human Resources Division at SCAO. How is the State Court Administrator, who works directly for the Colorado Supreme Court, expected to handle a workplace complaint against a staff person at the Commission? Any response from the State Court Administrator could be seen as retaliation against the Commission but the State Court Administrator would have an obligation to ensure the staff person is safe.

5. **A staff attorney of the Commission should not serve as special counsel to the Commission**

A staff attorney serving as special counsel to the Commission removes a layer of independence for the special counsel. A staff attorney employed by the Commission would serve as the prosecutor in the case, which creates an appearance of a conflict of interest and interferes with the special counsel's independence. Arrangements like this are contrary to the recommendations from IAALS.

6. **Certain provisions in the Legislative Declaration are unnecessarily provocative and unrelated to the bill.**

The fact that investigations are underway does not establish that our system of judicial discipline is broken or that this bill is necessary. The statement that our system "do[es] not now provide a fair and impartial system of judicial discipline" is inaccurate, untethered to any facts or analysis, and taints the existing constitutional process. That judges are involved in the discipline of other judges does not render the system inherently unfair. The legal profession is self-regulating, and the regulation of judges fits in the same model. Other state entities, including the legislature, have similar disciplinary bodies and processes for addressing complaints against their own members. Colorado's judicial discipline system is very similar to every other merit selection state in the country. The Commission is comprised of 6 non-judges and 4 judges. It is therefore inaccurate to state that the system of judicial discipline is "solely controlled by the judiciary" when the majority of the Commission is not part of the judicial branch. Judges serve an important role in the discipline process because they understand the work and can provide context for complaints and investigations. Every other merit selection state provides for

3

final review either by the supreme court or a panel of judges. In Colorado, the supreme court has not, to its knowledge, ever rejected a recommendation from the Commission in favor of a more lenient sanction.

### 7. Some of the definitions are unclear or confusing when read together.

The current definition of "complaint" is confusing when read in conjunction with the definition of "misconduct." The current language says that a complaint is an allegation "from which a reasonable inference can be drawn that a judge committed misconduct." "Misconduct" is defined as "conduct by a judge that may reasonably constitute grounds for discipline." Taken together, the current draft means that a complaint is an allegation from which a reasonable inference can be drawn that the conduct by a judge may reasonably constitute grounds for discipline. These added layers muddy any definition of what a complaint is. Additionally, the Commission has historically sought to separate a "complaint" from a "request for evaluation." The Commission currently receives "requests for evaluation," conducts a preliminary review, and then determines whether to process the request as a complaint. It's unclear if the bill is now trying to eliminate the Request for Evaluation process and require a formal investigation of every complaint it receives, which would conflict with the procedures adopted by the court, at the request of the Commission, for handling these matters. Other provisions in the bill reference "requests for evaluation." Additionally, the Constitution and rules should be referenced in the definition of "misconduct" because they define the "grounds for discipline" within the Commission's jurisdiction.

### 8. This bill would place a heavy burden on other judicial oversight entities and require them to violate confidentiality requirements.

Oversight entities like OARC receive numerous complaints about attorneys that may also state or imply wrongdoing by a judge. OARC's records may contain attorney-client privileged information, its own attorney work product, confidential case or client information, and sensitive records wholly unrelated to a judge. OARC's current practice is to notify the complainant of the Commission and provide contact information. If OARC were required to provide its entire record to the Commission, it would need to conduct extensive review and redaction of its records to comply with its confidentiality obligations, which would place a heavy burden on the office. The same is true for other oversight entities. It is appropriate to direct the Commission and the oversight entities to enter into an MOUs outlining their respective obligations, which would take into account the nature of the records at issue and the confidentiality restrictions that apply to those records.

If you have any questions about my comments, please reach out to our legislative liaison, Terry Scanlon. He can be reached at terry.scanlon@judicial.state.co.us

**Appendix 27(m)(ii)(2)
Colo. Comm'n on Jud. Discipline,
Presentation Slides, April 14, 2022;**



Merit Selection



Celebrating 50 — 1966 · 2016 — *Years of* MERIT SELECTION IN COLORADO

# Colorado's Judicial Merit Selection System:

## 50 years of choosing judges based on merit. Not money. Not politics.

In 1966, Colorado voters approved a merit selection system for judicial appointments. This citizen-involved process helps ensure that Colorado judges are highly-qualified, fair, and impartial. It is the gold standard that safeguards equal treatment for all Coloradans coming into court.

## How does it work?






## Judicial Members

Hon. Rachel Fresquez

Hon. Sara Garrido

Hon. Bonnie McLean

Hon. David Prince

## Attorney Members

Elizabeth Espinosa Krupa

Mindy Sooter

## Citizen Members

Jim Carpenter

Bruce A. Casias

Yolonda Lyons

Drucilla Pugh



Diversity of Commission

- 70% Female
- 75% of Judges Female
- 50% BIPOC
- 20% White Male

| Race / Ethnicity | CO Population | % of Judges | # of Judges |
|---|---|---|---|
| American Indian / Alaska Native | 1.6% | 0.3% | 1 |
| Asian | 3.5% | 1.8% | 6 |
| Black / African American | 4.6% | 3.0% | 10 |
| Hispanic / Latino | 21.8% | 9.5% | 32 |
| White, not Hispanic or Latino | 67.7% | 84.6% | 286 |
| Two or More Races - Not Hispanic or Latino | 3.1% | 0.9% | 3 |
| | | 100.0% | 338 |

| Race / Ethnicity | CO Population | % of Judges | # of Judges |
|---|---|---|---|
| Female | 49.9% | 40.8% | 138 |
| Male | 50.1% | 59.2% | 200 |
| | | | 338 |

SCAO Judicial Diversity Outreach



## Discipline Commission's Constitutional Mandate

- Protect the public
- Preserve integrity of judiciary
- Maintain public confidence in the judiciary
- Educate re proper judicial behavior
- Fair and expeditious disposition

Colo. Rule Judicial Discipline ("RJD") 1(b)





## Intake and Screening

- Governed by RJD 13
- Exec Dir or Commission may immediately dismiss if no <u>reasonable basis</u>



## Complaint Investigation

- Analogous to Grand Jury Role
- Governed by RJD 14
- Develop Factual Evidence
- May Use Investigators and Special Counsel
- Advances only if <u>preponderance of evidence</u> std. met



## Formal Proceedings

- **Trial Phase**
- **Special Counsel "prosecutes"**
- **Hearing conducted either by Commission itself or through special masters**
- **Standard of proof is <u>clear and convincing</u>**



## Recommendations

- Commission prepares and transmits recommendations to Supreme Court for discipline along with record of proceedings.
- Special Counsel may also make recommendations
- If used, special master recommendations included
- Proceedings confidential until recommendations filed



## Supreme Ct Proceedings

- SC may conduct further proceedings and expand record, RJD 39
- SC may adopt, reject, modify, or remand Commission recommendations
- SC makes final decision, RJD 40
- Decision published unless decide to keep confidential



# Public Discipline Cases
## (6 Cases Since 2014)

### Judges Disciplined (6)[1]

| | Number | Percent |
|---|---|---|
| Male | 3 | 50% |
| Female | 3 | 50% |
| | | |
| White | 5 | 83% |
| BIPOC | 1 (4) | 7% |

[1] 2014 to Present

[2] Litigants, attorneys, other groups affected cannot be quantified and are excluded, only a person that was the individual target of the misconduct is included.

[3] Listed as white if race/ethnicity not known.

[4] Discipline process was after Judge had already resigned facing criminal proceedings.

## Types of Conduct Resulting in Public Discipline

- Behavior Abusive of Others, Usually Discriminatory—four cases
- Criminal Proceedings/Convictions—three cases
  - Felony is mandatory removal, RJD 36.5
- Multiple Incidents—all but one case
  - Aggravating components in single incident case



**4**

Judges Disciplined For
Abusive Conduct

**14**

Individuals Targeted
by Abusive Judicial
Conduct

Can't risk angering him, clients in precarious positions

Uncomfortable appearing in front of him

Terrified

Afraid would get fired if told administration about this

Judge might retaliate and felt job was on the line

Tears

Threatened

Felt angry    Wanted to get out of the division

Appalled

Did not want to report to administration

Afraid of retaliation

Sweating, nervous, terrified, wanted to get out

Made [me] feel nauseated and scared

Scared to death might get fired, then angry

Not want to tell anyone just wait for a transfer

Uncomfortable

A stab through my heart each time

Had to put up with it, could not hurt my clients

Shocked



**RECOMMENDATIONS FOR JUDICIAL DISCIPLINE SYSTEMS**

IAALS
AMERICAN LEGAL SYSTEM

DENVER

## PREFACE



> Effective judicial discipline is an important part of a trusted and trustworthy court system. The public must know that judicial ethics and violations of the Code of Judicial Conduct are taken seriously. Absent that assurance, the system appears self-serving, protectionist, and even potentially corrupt. And it is not just the reality of the existence of effective systems that matters; it is also the appearance. A wholly effective system with no transparency and no public confidence will not suffice.

Importance of Credible Ethics Oversight

*The primary purpose of [judicial discipline] systems is not to punish judges but to maintain and restore public confidence in the integrity, independence, and impartiality of judges and the judicial system …*

Handbook for Members of Judicial Conduct Commissions

(NCSC Center for Judicial Ethics)

## Confidentiality

- Confidentiality is set by the Constitution, Art. VI, Sec. 23(3)(g)
  - The Disciplinary Commission's examination of misconduct allegations is confidential unless and until it files recommendations with the Colorado Supreme Court.
  - While individual investigations are confidential, the Disciplinary Commission can discuss how it operates and how its processes are working. See, e.g., RJD 6.5(h)
  - RJD 6.5(d)(i) authorizes the Commission to make disclosures as needed to fulfill the Commission's mandate.



## Existing Staffing

- 1.5 FTE Internal (Exec Dir and Asst)
- Borrow Investigators and Attorneys from Supreme Court's Office of Attorney Regulation Counsel

## System Design Challenges Illustrated in 2021

- Access to Judicial Dept. Records/Information
  - 2010 Access MoU
- Lack of Ability to Coordinate Among Oversight Entities
- Conflict/Disqualification System
  - Patchwork, incomplete, inconsistent, ambiguous
  - Does not provide for process when Supreme Court allegations/conduct at issue

## System Design Challenges Illustrated in 2021

- **Resources**
  - **Vulnerable to pressure**
- **Special Counsel**
  - **Control of Engagement, Scope, and Direction**
- **Discovery Tools for Complaint Investigation Phase**
  - **Implementation Process**

## System Design Challenges Illustrated in 2021

- **Special Master Selection**
  - Ambiguous Process
  - Vulnerable to conflicts
- **Rulemaking Authority**
  - Distinction from Performance Comm'ns
- **Confidentiality Rules**
  - Contradictory
  - Conflict with constitution
  - Lack VRA Equivalent

While Colorado's challenges are unique, they are not unusual nor are they as serious as other jurisdictions



Arts & Entertainment

The Washington Post

Democracy Dies in Darkness

Courts & Law

**Former judiciary workers urge Congress to protect court employees from discrimination and harassment**

By Ann E. Marimow



**With 'judges judging judges,' rogues on the bench have little to fear**

Secretive and cozy judicial oversight systems enable judges to subvert accountability in many states. Exhibit A: Oklahoma, where not a single judge was publicly disciplined in 14 years. When the state finally did charge a judge with wrongdoing, he was allowed to resign, his record pristine and his pension intact.



**Draft Bill**

- Addresses Topics Permitted by Supreme Court
- Change Funding Source
  - Statutory recognition of office in support of Commission required to get funding
  - Funds annual budget as well as creates a fund for contingencies
  - Replaces OARC stable of investigators/attorneys with staff investigator and staff attorney
- Judicial Dept. Disclosure Duty
  - Nonwaiver of Privilege/Confidentiality
- Rulemaking Public and Consultation
- Creates Interim Committee to Study Remaining Issues
- Define statistics to be reported, including demographics

# COMMISSION ON JUDICIAL DISCIPLINE

Elizabeth Espinosa Krupa
Chair

David Prince
Vice-Chair

CBA President's Diversity Council

April 13, 2022



## References

- ABA Model Rules of Judicial Disciplinary Enforcement, www.americanbar.org/groups/professional_responsibility/model_rules_judicial_disciplinary_enforcement/contents/

- Handbook for Members of Judicial Conduct Commissions, NCSC Center for Judicial Ethics

- Reuters, Teflon Robe Series, www.reuters.com/investigates/section/usa-judges/

- www.washingtonpost.com/politics/2022/03/17/court-workers-harassment-discrimination/

- IAALS Judicial Discipline Recommendations, 18-IAALS-104 Judicial Discipline Report R2.indd (du.edu)

**Appendix 27(m)(ii)(3)**
**Colo. Jud. Dep't and Colo. Comm'n on Jud.**
**Discipline, Memorandum of Understanding**
**re: Access to Ct. Records, October 1, 2012;**

MEMORANDUM OF UNDERSTANDING
ACCESS TO COURT RECORDS

The Parties to this Memorandum of Understanding (hereinafter "MOU") are the Colorado State
Court Administrator's Office (hereinafter "SCAO") and the Colorado Commission on Judicial
Discipline (hereinafter "Judicial Discipline"). SCAO and JUDICIAL DISCIPLINE may herein be
referred to as "Party" or "Parties".

WHEREAS, the Clerks of Court for the county and district courts in Colorado are the custodian
of records for non-electronic court records; AND

WHEREAS, JUDICIAL DISCIPLINE is in need of access to court records in its process of
investigating complaints against judges and justices in Colorado; AND

WHEREAS, pursuant to Chief Justice Directive 05-01, (hereinafter "CJD 05-01") not all court
records are available to the public and "public" is determined by the directive not to include
"people or entities, private or governmental, who assist the court in providing court services" or
"judicial branch staff"; AND

WHEREAS, JUDICIAL DISCIPLINE is a governmental entity established by the Colorado
Constitution for disciplining judges if an investigation merits it and if necessary recommending to
the Supreme Court that a judge be removed from office thereby assisting the Supreme Court,
and JUDICIAL DISCIPLINE is also judicial branch staff; AND

WHEREAS, the Parties desire to enter an Agreement to establish parameters for JUDICIAL
DISCIPLINE to access court files and court documents in order to accomplish its functions while
balancing any privacy issues of the persons whose court information is obtained;

NOW THEREFORE, in consideration of the premises and mutual promises and covenants
herein contained, the sufficiency of which is hereby acknowledged, SCAO and JUDICIAL
DISCIPLINE agree as follows:

1. TERM. This MOU shall be effective upon signature of the Parties and shall continue
   unless either Party notifies the other Party, in writing, that it is terminating the MOU.
2. DUTIES OF SCAO.
   a. SCAO will notify the Clerks of Court of each county and judicial district that upon
      request of staff from JUDICIAL DISCIPLINE they are, pursuant to this
      Agreement, to provide requested court files and documents to JUDICIAL
      DISCIPLINE unless the requested files are excluded from release by this MOU
      and/or CJD 05-01.
   b. SCAO will inform Clerks of Court that the requested records are to be provided to
      JUDICIAL DISCIPLINE without need for payment by JUDICIAL DISCIPLINE
   c. SCAO will inform the Clerks of Court that certain records that are protected from
      public access shall be provided to JUDICIAL DISCIPLINE under a cover sheet

Page 1 of 3

indicating that the records are protected and are to be treated as such and not re-released.

d. SCAO will instruct Clerks of Courts that if there is any question regarding the interpretation and application of this MOU to a request by JUDICIAL DISCIPLINE, the clerk shall consult Legal Counsel in the State Court Administrator's Office.

3. DUTIES OF JUDICIAL DISCIPLINE.

a. JUDICIAL DISCIPLINE staff are to keep confidential all information obtained pursuant to this MOU that is received under confidential cover from a clerk of court's office.

b. JUDICIAL DISCIPLINE will only use the information as necessary for the completion of its investigations and that upon completed use of the information, the documents obtained will be shredded.

c. JUDICIAL DISCIPLINE will submit all requests for documents from clerks of courts in writing to the respective clerk.  Such writing can include a request made via email. To the extent possible, the request should specify the documents requested from a court case file.

4. PROTECTED RECORDS. CJD 05-01, shall provide guidance regarding the release and/or protection of documents and cases provided to JUDICIAL DISCIPLINE

a. The following case types will never be provided to JUDICIAL DISCIPLINE without a court order:
   i. Judicial Bypass cases
   ii. Adoption cases
   iii. Relinquishment cases
   iv. Paternity cases
   v. Mental Health cases

b. The following case types and documents will only be provided under confidential cover:
   i. Juvenile Delinquency cases
   ii. Dependency and Neglect cases
   iii. Truancy cases
   iv. Expunged cases
   v. Sealed cases
   vi. Documents within a case that have been sealed by court order

c. The following documents can be provided to JUDICIAL DISCIPLINE with a release of information from the party whom it concerns, or a court order:
   i. Drug/Alcohol treatment information of a party to a case
   ii. Genetic testing information, including a paternity test
   iii. HIV/AIDS testing information
   iv. Medical and Mental Health information
   v. Psychological and intelligence test information

d. For all other documents listed in the policy attachment to CJD 05-01 at §4.60(d)(1-24), (attached hereto and incorporated herein by this reference) the

Page 2 of 3

request from JUDICIAL DISCIPLINE must specify these documents. Legal Counsel for SCAO will be consulted by the Clerk of Court regarding the release of any of these specified documents.

IN WITNESS WHEREOF, the Parties have executed this MOU on the dates written below.

COLORADO JUDICIAL DEPARTMENT,
STATE COURT ADMINISTRATOR'S OFFICE

BY: _____
TYPED: Gerald A. Marroney
TITLE: State Court Administrator

DATE: _____

COLORADO COMMISSION ON JUDICIAL DISCIPLINE

BY: _____
TYPED: William J. Campbell
TITLE: Executive Director

DATE: _____

Page **3** of **3**

**Appendix 27(m)(ii)(4)
Colo. Supreme Ct., Order Authorizing Colo.
Comm'n on Jud. Discipline Access to Ct.
Records, April 13, 2017;**

# Supreme Court of Colorado

2 EAST 14TH AVENUE
DENVER, CO 80203
(720) 625-5460

NANCY E. RICE
CHIEF JUSTICE

## SUPREME COURT OF COLORADO

### OFFICE OF THE CHIEF JUSTICE

---

### ORDER

---

## AUTHORIZATION FOR THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE TO ACCESS COURT RECORDS

Chief Justice Directive 05-01 (CJD) precludes the release of suppressed court records and records in certain identified case classes and case types in the absence of a court order. Additionally, the CJD requires the redaction of restricted and protected court records prior to their release.

The Colorado Commission on Judicial Discipline (Commission) is established pursuant to Article VI, Section 23(3) of the Colorado Constitution to investigate potential grounds for removal or other discipline of a judge. In order to effectuate access to court records by the Commission for the limited purpose of fulfilling its constitutional duties, the Chief Justice authorizes the Colorado clerks of court to release court records to the Commission, its Executive Director, and investigators or special counsel working at the direction of the Commission.

Pursuant to this Order, clerks are authorized to release, without redaction, suppressed records, protected records, and records whose release would otherwise require a court order under the CJD. Clerks must redact identifying information of sexual assault or child victims, as those terms are defined in section 24-72-304, C.R.S., prior to releasing restricted court records. This Order does not authorize clerks to release sealed records to the Commission.

Done at Denver, Colorado this _13_ day of April, 2017

_Ng F. Rice_
Nancy E. Rice
Chief Justice, Colorado Supreme Court

# Appendix 27(n)

# Transcript of *Hearing on SB 22-201 before the S. Judiciary Comm.*, Colo. Leg., April 21, 2022;

# Senate Judiciary Committee—April 21, 2022 Hearing on SB 22-201

**Sen. Gonzales**

The bill for consideration today is Senate Bill 201 and I will invite Senator Gardner and Senator Lee. Last time we met we heard the testimony portion of the hearing and today we are here for action only. Giving our sponsors just a brief moment to get set up here.

**Juliann Jenson**

Do you want me to hand anything out?

**Sen. Lee**

Do you have the amendments?

**Juliann Jenson**

I do have them.

**Sen. Lee**

Yeah the ones from last time. Do you have, well I'm looking for number 1 and 2 from. I've got one from Leg Council.

**Sen. Gonzales**

All right, y'all. The Senate Judiciary Committee, we'll come back to order. Our last bill that we have for consideration this evening is Senate Bill 201. We are here in the amendment phase for action only. We do have a packet of amendments that have now been distributed to members of the committee and I will turn it over for a motion from Senator Gardner.

**Sen. Gardner**

Thank you. I move L.001.

**Sen. Gonzales**

That is a proper motion. Would care to explain the amendment?

**Sen. Gardner**

So, this is requested by Leg Council. It requires this bill to go to Leg Councill because it creates an interim committee and I will just call to the attention of everyone here that we have very delicate timing issues. So, we're going to move this bill. It will be in Leg Council a week from Friday, but between now and then we're going to send it to appropriations. We're going to do seconds we're going to do thirds,

- 1 -

we're going to be a model of efficiency, something the General Assembly is not good at. But we'll try and I ask for an aye vote.

**Sen. Gonzales**

Well, I might want to read this amendment at length. We can do that. Is there any objection? Seeing no objection, L.001 is adopted. Senator Lee.

**Sen. Lee**

Thank you, Madam Chair. I move amendment L.002.

**Sen. Gonzales**

To the amendment.

**Sen. Lee**

This is an amendment requested by the Office of the State Auditor to clarify that section three only applies to a fraud investigation.

**Sen. Gonzales**

Is there a discussion on the amendment? Is there opposition to the amendment? Seeing none, L.002 is adopted. Senator Gardner.

**Sen. Gardner**

Madam Chair. Can we take a break?

**Sen. Gonzales**

Senatorial five.

**Sen. Gonzales**

We are back. And we are still in the amendment phase. Senator Lee.

**Sen. Lee**

Thank you, Madam Chair. I move Senate amendment L.015. And ask for an aye vote. And I will explain that amendment. This actually was the amendment, Madam Chair and committee, that was the result of significant meetings and deliberative discussions amongst a lot of the parties. So, I'll go through it to just give you an idea of what we've been doing with this.

So, the first part of it strikes the Office of Attorney Regulation Counsel over on page 5, because they are really separate and apart. The Department includes State Judicial and its sub parts, except for the Office of Attorney Regulation Counsel, and it was determined that it was inappropriate to have them in there.

- 2 -

The next one, over on page 10, is the issue of where the Commission on Judicial Discipline will live. And under the original bill, they were in the Ralph Carr Judicial Building, and the amendment provides that they will be there through June 30, 2023 and adds that the Judicial Department or OARC shall provide support. The idea is we want to keep the Commission where it is so that they can work out some of these details. They, it's the tension between being independent, and then still having to have these ancillary HR, Payroll, IT services. So, we'll keep them there under this agreement for a while, and let them try to work it out.

The next part, page 11, and the next several sections deal with the other primary issue, which was information sharing. And over on page 11, it strikes lines two through four, just that was unnecessary. But on page 13, it talks about what information is provided to the Commission. And you remember, there were concerns about internal or external information. So, the change on page 13, reduced the requirement of information from all such information to the portion of the complaint, alleging just judicial misconduct. And then if the Commission wants to come back and get additional information, that's on page 10-11, lines 10, 11, and 12 of the amended, they can come back and get further information. So, that will reduce the amount of information that the Department had to provide.

The next section is information sharing by the Department over on page 14 of the bill. And it basically took out the Office of Attorney Regulation Counsel as one of the components of the Office that asked to share information, they typically are not going to be involved in that involved in that process.

But really one of the hearts of the bill is page 15, after line 16, where this new language is inserted, and it talks about the external complaints. If the Department receives a complaint alleging judicial misconduct from an individual that is not an employee, a volunteer, or contractor of the Department, the Department shall notify the complainant of the role of the Commission. So, that information will be communicated to the complainant and they will give get the Commission's information. If the complainant then submits a written electronic complaint, the Department shall forward those materials to the Commission for them to deal with. So, it just sets up a process to simplify and routinize the provision of information.

The next section deals and we're talking about privilege and confidentiality and what information can be withheld. We have this tension between confidential and privileged information and transparency. And this was truly lawyers talking to lawyers, about lawyerly things about privilege and confidentiality. And they came up with agreements as to what is privileged and what is confidential, and they set forth what those provisions are. And they reverted to, well, there's a specific statement that the Department and the Office of Attorney Regulation will respect confidentiality of the Commission's communications and records. But then certain information can be withheld from disclosure. And that's if it's pursuant to federal law, judicial deliberative provision, really confidential sorts of things, information that might be part of, I wrote in my notes, an employee assistance program, but based upon mental health and professional development programs. That information can be maintained as confidential, but certain

- 3 -

information will be disclosed to the Commission, which is, what information is being withheld, the reasons it's being withheld, and providing a log of it. And that's pretty consistent with what lawyers do in the discovery process when they are not turning over information. They say what they're not turning over, and then they describe it.

And then the next section, page 17. When the department discloses materials or information, it asserts as privileged, they will enter into an agreement under the Rules of Evidence, and it describes how that would be set forth. And the fact of turning over information does not release the claim of privilege or confidentiality. So just by the mere fact of turning it over, doesn't make it public or doesn't waive privilege and confidentiality. And I think that's an important section of the bill for all parties concerned.

And then finally, on page 22, Chief Justice Boatright had talked about the importance of a victim centered approach to judicial misconduct complaints, to allow the victim to have a voice in how complaints are handled and resolved. So that was incorporated in the bill. So that's the work product of people operating in good faith to narrow the issues. We are still going to have an interim committee to deal with some of the bigger issues, but this addresses the issues that were in the bill satisfactorily to the parties. I ask for an aye vote.

**Sen. Gonzales**
Thank you, Senator Lee, for walking us through the aspects of this very thoughtfully worded, but also long amendment. And so I want to just make sure that I'm understanding correctly, sort of what's happening where, because we did hear a lot of testimony during our hearing the other day, regarding page 16 of the introduced bill lines 7 through 14, sort of who holds what obligation of either privilege or disclosure and L.015, I believe, seeks to amend that.

**Sen. Lee**
It does.

**Sen. Gonzales**
On page 1 lines 30 and 31.

**Sen. Lee**
What they wanted to make sure of is that the withholding from the Commission disclosure of materials for any of the following reasons, a claim of privilege held by the Department, the Department has a legitimate legal claim to withhold the information. So that phrase was incorporated in there. And then on line 13, a claim of contractual right or obligation occurring after the effective date. So, if there was moving forward. So that was the idea.

- 4 -

**Sen. Gonzales**

And then also, there was, we did hear a lot of testimony in the hearing as well in regards to the use of the Department's computer network. And sort of that aspect of the bill, creating a lot of consternation, and they see here that on page two of the amendment lines 4 through 20, that language is struck and replaced with a new process.

**Sen. Lee**

Well, and also Madam Chair, on lines 22 through 25, were struck page two of the amendment line 4, page 16 strike those and that's what discusses the computer network and access and that came out all together. And then this new language came in dealing with disclosure.

**Sen. Gonzales**

That is very helpful. Can you help me just understand the last lines 36 and 37 of page 2, and that walks through the end where we're talking about benefits of a victim centered approach to judicial misconduct. Where that fits in?

**Sen. Lee**

Thank you, Madam Chair, I'd be happy to explain that, as I understand that. Again, I was present when Chief Justice Boatright was talking, making his presentation to us. And he talked about having a more victim centered process. And we have heard that from other stakeholders that may be the victim of misconduct by a judge is looking for a process that is more responsive to their needs, and helping them to heal the harm in potentially a conference with the judge, it would not impair the capability of the Commission to impose discipline. But the views of the victim who may want to continue to work in the office with the judge should be taken into account, sometimes disciplinary processes can create adverse relationships between the complainant and the object of it. So, this just suggests that. And again, I would think some of the details of this will be worked out with the interim committee, that the input from people who are focused on victim centered processes could provide some input.

**Sen. Gonzales**

Senator Gardner.

**Sen. Gardner**

Yes, thank you, Madam Chair, having served on the Legislative Workplace Relations Committee, I have to say this is an important thing to be there because we spent a fair amount of time trying to address what is it that when you have a complaint, particularly internal in the workplace, what is it that the victim is seeking, and they have their own very legitimate concerns about continuation in the workplace. Whether they want to stay in that workplace, whether they need to move to another workplace. Whether that would be punishment for them when they're the victim and so forth. So, we're going to spend some time on that. And that's why it's there.

- 5 -

**Sen. Gonzales**

I appreciate that. Thank you for indulging me by walking me through this in detail. Are there any further questions or discussion from members of the committee regarding L.015. Is their opposition to L.015? Seeing none, L.015 is adopted. Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair, I move L.016. L.016 strikes some language concerning the votes of the interim committee. The interim committee in the statute now is made up of four members of the House, four members of the Senate, equal party representation. There was a line there that said in the event of a tie vote with that eight-person committee that the chair would get an additional vote to break the tie. I've discussed this with Senator Lee, as well, we feel like the interim committee needs to bring forth a constitutional provision. And if we don't have consensus, and this is not in any way a partisan issue, then we need to do that. So, it just it takes that somewhat unintended, I think partisan aspect to it. So, I hope to have an aye vote on that.

**Sen. Gonzales**

Thank you, Senator Gardner. Colleagues, any discussion?

**Sen. Lee**

Did we vote on 15?

**Sen. Gonzales**

We did.

**Sen. Lee**

Did it pass?

**Sen. Gonzales**

It did

**Sen. Lee**

Okay.

**Sen. Gonzales**

And is there any discussion on L.016? Is there opposition to L.016? Seeing none, L.016. is adopted. Senator Gardner.

**Sen. Gardner**

Thank you Madam Chair, I move L.017. L.017 was at the request of the Attorney General's Office. There was language in the original draft about withholding documents from the State Auditor and the

- 6 -

language was too broad. It was really outside the scope of the of the bill and this limits this to the Commission on Judicial Discipline and this particular Department, so, clarification and narrowing of that. I ask for an aye vote.

**Sen. Gonzales**

Colleagues any discussion regarding L.017? Is their opposition to L.017? Seeing none, L.017 is adopted. Any further amendments? Senator Lee.

**Sen. Lee**

Well, thank you, Madam Chair, I move L.018.

**Sen. Gonzales**

To the Amendment.

**Sen. Lee**

The amendment makes some clarifications. The original bill had a working group. We really wanted to come up with an interim committee after discussions amongst a number of people. The other changes to add rules of judicial discipline are just for clarification, I think the bill referred to rules and we wanted to just clarify. And then we also wanted to add the provision down in lines 15 through 18, which describes the outreach and input of the interim committee. That we want this to be an inclusive collaborative, broadly, stakeholder process. So, we just wanted to name some of the people that we certainly want to have involved in this, soliciting input from the commissioners themselves, employees, current and former judges and justices, attorneys, members of the bar association, and the public. That's not exclusive, it is supposed to be expansive.

**Sen. Gonzales**

Any further discussion? Is there opposition? Seeing none, L.018 is adopted. Senator Gardner.

**Sen. Gardner**

Thank you, and Madam Chair dropping back, I move L.011. This provides that the commission attorney for the Commission on Judicial discipline will be from the Attorney General's Office, rather than an employee of the Commission. And we clarify that in fact, that's that is the desire of the Commission, and is probably the most efficient way. So, we asked for an aye vote on L.011.

**Sen. Gonzales**

Is there any discussion? Is there opposition on L.011? Seeing none, L.011 is adopted. Any further amendments? I want to commend you all on this work. I want to commend everyone who has worked on this bill who testified regarding this bill who has been drafting amendments on this bill. Special shout out and commendations to Mr. Berry, for your yeoman's work on this policy, and with that, I will entertain a motion. Senator Gardner.

- 7 -

**Sen. Gardner**

Thank you, Madam Chair. I move Senate Bill 201, as amended, to the committee on appropriations.

**Sen. Gonzales**

That is a proper motion. And I do think that we will have much time to speak at length about the importance and justifications behind this policy. And with that, I'd like to see if there any closing comments from either of our bill sponsors. Good bill, vote, yes. But yes.

**Sen. Lee**

Thank you, Madam Chair. I guess I really want to start by talking about the importance of having an independent judiciary, and an independent judicial discipline commission, it is absolutely critical for public confidence in the judicial branch for the public to know that judges are held accountable, just like everyone else is held accountable. As I said, in my opening statement, the judges that I have known in my life have been some of the most extraordinary people that I've met. But like all of us, they have feet of clay. And there are times when they err. And this provides a system of accountability, while recognizing that people who may be victimized by misconduct, need to have an avenue that they can utilize effectively, to redress the wrongs that occurred. The importance of having this process that worked out in this room over the last week result in the discussions, collaborations that occurred amongst the players, amongst the judicial branch, amongst the commissioners themselves, the importance of that cannot be underestimated. And I really want to commend those folks for engaging openly, candidly in that process, and then I can't close without commending Jeremiah Berry, the indomitable bill drafter, who has been working assiduously on amendment after amendment after amendment and multiple bill drafts. This bill went through, as you may know, significant overhaul during the process as we got more and more input. So, I think what we have today sets up a process and we can feel confident that we're going to move forward. We've solved some of the basic problems of independent funding, and some of the basic problems and issues of information sharing. And we're going to put together an interim committee, which has a defined agenda of issues to look at. So, I'm pleased at the outcome of this and thank my co-prime sponsor for his insights and efforts and untiring work to make it come together.

**Sen. Gonzales**

Senator Gardner.

**Sen. Gardner**

Thank you. I'll do what I occasionally do on briefs and start with I endorse the comments of my co-party and co-prime. Thanks to Mr. Berry for working 26 hours a day on this, along with all of his other work. I wish the same press that was here and wrote about all of these things were, and I hope they are paying attention this evening, that the Commission on Judicial Discipline and the Judicial Department and particularly that the Supreme Court came together to deal with a very complex and nuanced set of interests in order to partner for judicial accountability and transparency. And that, I think has always

- 8 -

been the case. It certainly is the case today and is the case going forward and we look forward to the interim committee and I will stop there and ask for an aye vote with my gratitude expressed to everyone and to Madam Chair and the committee as well.

**Sen. Gonzales**
Thank you both for your diligence and working trying to address all of the concerns that were raised by the witnesses over the course of the hearing. You know, I think that had we gone to the testimony phase, I'm sorry to the amendment phase. At the end of our last hearing, we would have potentially ended up with a quite different policy. But I think taking the time and being willing to listen and really understand and process and then respond to said concerns, I think, I'm really proud of the work you all have done and know there is much more to do. But with that, Ms. Jenson will you please poll the members regarding this Senate Bill 201.

**Juliann Jenson**
Senator Gardner

**Sen. Gardner**
Aye.

**Juliann Jenson**
Rodriguez.

**Sen. Rodriguez**
Aye.

**Juliann Jenson**
Woodward.

**Sen. Woodward**
Aye.

**Juliann Jenson**
Lee

**Sen. Lee**
Aye.

**Juliann Jenson**
Madam Chair.

- 10 -

**Sen. Gonzales**

Aye.

**Sen. Gonzales**

That bill passes on a vote of 5 to 0 and it is on its way to the Appropriations Committee. With that, and seeing no further business, the Senate Judiciary Committee stands in adjournment.

# Appendix 27(n)(i)
# SB 22-201, Amend. L.011;

SB201_L.011
SENATE COMMITTEE OF REFERENCE AMENDMENT
Committee on <u>Judiciary</u>.
<u>SB22-201</u> be amended as follows:

Amend printed bill, page 7, strike lines 23 and 24 and substitute "ASSISTANTS; ATTORNEYS WHO SERVE AS SPECIAL COUNSEL; AND INVESTIGATORS;".

Page 7, strike line 25 and substitute:
(e)  EMPLOY ATTORNEYS OR APPOINT OUTSIDE SPECIAL COUNSEL PURSUANT TO SECTIONS 24-31-101 (1)(g) AND 24-31-111 WHO SERVE AT THE".

Page 8, line 18, strike "MAY INCLUDE" and substitute "INCLUDES".

Page 8, line 19, strike "A STAFF ATTORNEY," and substitute "AN ATTORNEY,".

Page 18, after line 15 insert:
"**13-5.3-109.    Representation by attorney general.** (1)  PURSUANT TO SECTION 24-31-111, THE ATTORNEY GENERAL SHALL PROVIDE LEGAL SERVICES, AS DEFINED IN SECTION 24-31-111 (6)(a), TO THE COMMISSION AND THE OFFICE. THE ATTORNEY GENERAL SHALL DESIGNATE ONE OR MORE ASSISTANT ATTORNEYS GENERAL TO PROVIDE SUCH LEGAL SERVICES. ANY ASSISTANT ATTORNEYS GENERAL SHALL NOT BE WITHIN THE SAME UNIT, SECTION, OF DIVISION OF THE COLORADO DEPARTMENT OF LAW THAT PROVIDES LEGAL SERVICES TO THE JUDICIAL DEPARTMENT.
(2)  THIS SECTION DOES NOT LIMIT THE COMMISSION'S OR OFFICE'S AUTHORITY TO HIRE ATTORNEYS TO SERVE AS SPECIAL COUNSEL PURSUANT TO SECTION 13-5.3-102 (3)(d).".

Renumber succeeding C.R.S. section accordingly.

** *** ** *** **

LLS: Jerry Barry x4341

# Appendix 27(o)

# Transcript of *Hearing on SB 22-201 before the S. Appropriations Comm.*, Colo. Leg., April 26, 2022;

# Colorado Senate Appropriations Committee—
## April 26, 2022: Hearing on SB 22-201

**Sen. Hansen**

All right. To Senate Bill 201, Senator Gardner.

**Sen. Gardner**

Thank you, Mr Chair. I move Senate Bill 201 and J.001.

**Sen. Hansen**

All right, let's start with J.001. Any discussion on the amendment, any objection? Seeing none, J.001 is adopted. Final discussion on 201, Senator Gardner.

**Sen. Gardner**

Just quickly, Mr Chair. Senate Bill 201 creates the independent oversight mechanisms for the Commission on Judicial Discipline. It is the result of some very hard work on behalf of both the Judicial Department and the Commission on Judicial Discipline to come to agreement on what are some very difficult and nuanced questions of independence and the Judicial Branch. It is very important bill, and I would also be remiss if I didn't thank both Leg Council Staff and our JBC Staff for getting this note and canary sheet done quickly so that we can get this to Leg Council as well, and I ask for an aye vote.

**Sen. Hansen**

All right, thank you, Senator Gardner. And I just wanted to pile on quickly there, because this was something that we also prioritized at the JBC and did the set aside to prepare for this bill. And, so, thank you for your hard work, Senator Lee and the staff, because this is, I think, clearly, an urgent need that we get this done and in a good spot and to the Governor's desk. So, thank you for your hard work.

**Sen. Gardner**

Thank you, Mr Chair.

**Sen. Hansen**

Members. Any other comment on 201? Ms. Uhl.

**Andrea Uhl**

Senator Coleman.

**Sen. Coleman**

Aye.

- 1 -

- 2 -

**Andrea Uhl**

Rankin.

**Sen. Rankin**

Aye.

**Andrea Uhl**

Sonnenberg.

**Sen. Sonnenberg**

Aye.

**Andrea Uhl**

Madam Vice Chair.

**Sen. Zenzinger**

Aye.

**Andrea Uhl**

Mr. Chair.

**Sen. Hansen**

Aye. That passes on a vote of 7 to 0.

# Appendix 27(p)

# Transcript of *Hearing on SB 22-201 before the Legis. Council Comm.*, Colo. Leg., April 29, 2022;

# Colorado General Assembly Legislative Council Committee—April 29, 2022 Hearing

**Speaker Garnett**

Okay, the next bill up is Senate Bill 201. Sorry about that mix up earlier. Representative Weissman and Representative Carver briefly describe your bill.

**Rep. Weissman**

Thank you, Mr Speaker and Mr President and Committee. Senate Bill 201 arises out of many months of conversations about how the legislative branch of government should better engage in questions that have arisen concerning judicial discipline and how the process goes in our State. We are here in Legislative Council because part of this bill proposes an interim committee. You can see that starting on page 20, we've modeled this interim committee off of what was set up in House Bill 1325, for school finance last year, because we think that that Bill had some good properties. Here, it's eight members. It is evenly bipartisan, bicameral. We think that that is important for grappling with a subject like this that ought not be partisan. The Chair of the committee is to be appointed by the Senate Majority Leader, the Vice Chair by the House Minority Leader. The interim committee would be approved for up to five meetings, and would be able to refer three measures, which could either be in the form of a bill or potentially a resolution. What three months of very, very intense conversations have surfaced is that there are some very, very big questions here that need to be grappled with in a way that goes beyond the confines of this legislative session. That is what the interim aspect of this work would be about.

**Speaker Garnett**

Thank you for that. This is technically the first committee of reference in the House for this bill. So, if there's anyone here. First of all, before we go there, are there any questions from members of the Committee for the sponsors? Madam Speaker Pro Tem Benevides.

**Rep Benevides**

Thank you. And honestly, I am going to apologize to the sponsors, because I haven't read the bill as it changed up a bit, but I thought there was some constitutional issue with regard to the review by the Commission, as opposed to the Court. So maybe, and I read about this, I don't know, so maybe you could tell us if there is or not.

**Speaker Garnett**

Representative Carver.

- 1 -

**Rep. Carver**

Thank you, Mr Speaker. Thank you, Representative Benevides. There are potentially some constitutional issues, and certainly that's what the interim committee is going to look at in the range of issues that are listed out on pages, 21-22 and I think perhaps going over to 23. Some of the issues may need a change in the Constitution, but that would be identified and brought back to the assembly in 2023

**Speaker Garnett**

Any further discussions from the committee members? Seeing none. Is there anyone here from the public who would like to testify? Seeing none. The public testimony phase is closed. And just if anyone's listening in, this bill, I think, will be referred to House Judiciary, so there'll be another opportunity for the public to weigh in if they so feel the need. Are there any? Representative Weissman.

**Rep. Weissman**

Sorry, Mr Speaker, just because you mentioned it, and for anybody listening here, and you know, in keeping with conversations we've had with interested parties. We're at the point in the session where it was necessary to come here first, but there will be certainly a robust conversation in Judiciary when we take this bill up next week, and we look forward to hearing in detail and questioning and discussion from anybody who wants to come to that committee at that point.

**Speaker Garnett**

Wonderful. Are there any amendments? Seeing none. The amendment phase is closed. Is there a motion? President Fenberg,

**Senate Pres. Fenberg**

Thank you, Mr Speaker, I move to refer Senate Bill 201, to the House Judiciary Committee.

**Speaker Garnett**

It has been properly moved and seconded. Ms. Walls, please call the roll.

**Ms. Walls**

Senators and Representatives. Benevides.

**Rep Benevides**

Yes.

**Ms. Walls**

Buckner.

**Sen. Buckner**

Aye.

- 2 -

**Ms. Walls**

Cooke.

**Sen. Cooke**

Aye.

**Ms. Walls**

Donovan.

**Speaker Garnett**

Excused.

**Ms. Walls**

Esgar.

**Rep. Esgar**

Yes.

**Ms. Walls**

Exum.

**Sen. Exum**

Yes.

**Ms. Walls**

Geitner.

**Rep. Geitner**

Yes.

**Ms. Walls**

Holbert.

**Sen. Holbert**

Aye.

**Ms. Walls**

Kennedy.

**Rep. Kennedy**

Yes.

**Ms. Walls**

Kolker.

**Sen. Kolker**

Aye.

**Ms. Walls**

Lundeen.

**Sen. Lundeen**

Aye.

**Ms. Walls**

McKean.

**Rep. McKean**

Yes.

**Ms. Walls**

Moreno.

**Sen. Moreno**

Aye.

**Ms. Walls**

Mullica

**Sen. Mullica**

Yes.

**Ms. Walls**

Pelton.

**Sen. R Pelton**

Yes.

- 5 -

**Ms. Walls**

Smallwood.

**Speaker Garnett**

Excused.

**Ms. Walls**

President Fenberg.

**Senate Pres. Fenberg**

Aye.

**Ms. Walls**

Mr Speaker.

**Speaker Garnett**

Yes

**Speaker Garnett**

That passes 16 to zero. Congratulations. Seeing no other business before the Committee, the House Legislative Council meeting is adjourned.

# Appendix 27(q)

# Transcript of *Hearing on SB 22-201 before the H. Judiciary Comm.*, Colo. Leg., May 3, 2022;

# House Judiciary Committee—
# May 3, 2022 Hearing on SB 22-201

**Rep Tipper**

Rep. Carver, why don't you tell us about Senate Bill 201?

**Rep. Carver**

Thank you, Madam Chair. This bill which I am on with my colleague Rep. Weissman is a path forward to address the issue of how do we ensure we have a system in Colorado for independent, objective, fact based judicial discipline so that when there are complaints against judges, those in the Judicial Branch, that we have a process that has integrity. That is accessible and addresses some of the concerns that have been raised with the process in the last couple of years.  And so, the just of this bill, and I will make brief remarks. We do have a number of witnesses that can go into more detail. But this bill basically establishes an independent source of funding for the Commission. It takes the Commission, which is currently established by rule in the Judicial Branch and places it in the statute and does preserve a lot of the current structure that the Commission has. But then, most importantly, this bill sets up an interim legislative committee to look at a whole range of issues with regards to our judicial discipline process, complaint process. And you'll see in the latter part of the bill, the range of issues that the interim legislative committee is going to take up. You will also see an amendment to create an advisory committee. We have done a lot of stake-holding process. And the Colorado Bar Association, the sections, others, obviously have great interest in this topic. They believe they can bring insight and some expertise and varying perspectives to this process, as we do the deep dive during the interim. And, so, with that, Madam Chair, I'll end my opening remarks and turn it over to my co-prime Rep. Weissman.

**Rep Tipper**

Thank you very much. Representative Weissman. And I'll just also let folks know that Representative Roberts has also joined us as well, remotely.

**Rep. Weissman**

All right, thank you, Madam Chair and committee. And I had really hoped on this issue of all issues to be able to be there in person today, but this is how it goes. At the risk of slightly duplicating Rep Carver's opening comments, I did want to sort of lay out the issue in the bill, as I have been thinking about it for many months now. To me, Senate Bill 201 arises out of the conviction I have that those of us who are beneficiaries of the public trust, and that's all of us, as state Representatives have a heightened duty to be protectors of that public trust. It's with no joy, therefore, that as an attorney, as a member of our legislature, as somebody who's been on this committee for six years and chaired it for four, to say that I think public trust in our judicial branch of government has been impaired over the last number of years. It gives me no joy to say that, but nonetheless, I believe that it has been. So, the purpose of this bill is to more actively involve us the legislative branch of government in helping to repair and rebuild

- 1 -

from that impairment of trust. So, we do that in a handful of ways in the bill. And I'm not going to go through section by section but thematically.

First, as Rep Carver said, we seek to codify both the Commission and the Office of Judicial Discipline, which has been around for decades, but we are now giving them a statutory foundation, and we set forth their powers and responsibilities.

Second, and in connection with that, and this is important, we are providing independent funding from the General Fund for the functions of the Commission and the Office. This ends the dependence on funding from attorney registration fees that flow through the judicial branch, which is the branch of government being overseen by the Commission.

Third, and this is one of the core parts of the bill to me, we are codifying obligations concerning the flow of information to the Commission so that they can do the work that they are constitutionally charged to do. This question of access to information has been the middle of a lot of the discussion that has happened the last number of months in particular.

Fourth, we require some annual reporting from the Commission to us at SMART Act that will start this coming January 2023, and will continue annually thereafter.

And last, as Rep Carver mentioned, we are establishing an evenly bipartisan, bicameral interim committee to continue to grapple with some of the issues that are in this space that are even bigger than the issues we are grappling with in this bill. For a bit of context, the model here was the House Bill 1325, interim committee, that was set up for school finance, we thought it was important on this subject, that the interim committee be evenly bipartisan, notwithstanding the current makeup of the General Assembly. These questions are bigger than party or at least they ought to be bigger than party. And as we move forward, particularly with substantive law changes that might involve questions of a constitutional nature and referring measures to the voters in a future year. There needs to be able to be bipartisan support for that. So that was one of the governing principles of how we decided to set up the interim committee. I'll stop there, but we would both be happy to speak to questions.

**Rep Tipper**
All right, thank you Representative and just wanted to let folks know that Representative Bacon and Representative Lynch have also joined us, as well. All right. Members, any questions for the bill sponsors? All right. Seeing none then why don't we proceed to witnesses and I know I had a little order here but I was told that . . . And I'm sorry sponsors to do that. I thought there was a particular order I just don't have in front of me. I know there was one witness that had a time constraint we're going to call her up first, but for some reason, I can't find it. Lettie Maxfield.

**Rep. Carver**

Madam Chair, your discretion.

**Rep Tipper**

Okay, so let's start with Lettie Maxfield who's joining us remotely and who has a time constraint. Let's also call Marilyn is it Chapell or Chapel that's number three on the list there. And then Mr. Forsyth, if you're here, we'll call you up in person. It's number four on the list. And then, the numbers corresponding to the list that we have. And then I'll also call Mr. Robin Austin, who's remote. Number 5 on the list.

**Rep Tipper**

Alrighty, why don't we go ahead and start with Miss Maxfield and just to let folks know, we're running three minutes of testimony. There's a buzzer that will go off when your time expires. Please introduce yourself and then let us know who you're testifying on behalf of if anyone other than yourself and proceed with your three minutes of testimony. Go ahead Ms. Maxfield.

**Leticia Maxfield**

Thank you. My name is Leticia Maxfield. I'm appearing today on behalf of the legislative policy committee of the Colorado Bar Association. And first, on behalf of the CBA, we want to thank both the House and Senate sponsors for their sincere efforts to meaningfully engage with the CBA, other government and community stakeholders on this legislation which is designed to promote and inspire greater confidence in public trust in our judiciary and its independent oversight. The introduction of Senate Bill 22 201 set the stage for the CBA to engage in critical and ongoing dialogue amongst its leadership and membership on the topic of judicial oversight here in Colorado. This dialog also continues with members of our larger legal community to this day. Upon introduction of the bill, many comments and questions were initially raised and, as such, the CBA has been and remains engaged in its review of the amendments, which are represented in the re-engrossed bill of April 27, 2022. Many of the initial questions and concerns of the CBA and those brought to us by others in the legal community and other community stakeholders had been resolved by the amendments to the bill. And we sincerely complement the efforts of the Senate Judiciary Committee, the sponsors, the Judicial Branch, and the Commission for what we see is truly a concerted effort to work collaboratively on this critically important piece of legislation. The CBA remains in a neutral position on this bill. But we continue to request that consideration be given to expanding the body of persons appointed to the interim committee to include participation of members of the three branches of government, community stakeholders, including a guarantee of racial, ethnic and gender diversity amongst those appointed to serve on the interim committee. The legislative policy committee intends to continue its engagement in both this proposed legislation and also the highly anticipated work of the interim committee. As we do so, we will be intensely focused on ensuring that, in an effort to improve our system of judicial discipline here in Colorado, we avoid any unintended consequences. Those unintended consequences could be any chilling effect on the willingness of our most qualified and ethical jurists to enter into public service and

- 3 -

become judges, any negative effect or disproportional effect on equity, diversity and inclusivity within the department, and specifically those serving on our bench, and potentially any legal challenges to the constitutionality of the bill as it relates to the separation of powers, which may have the effect of, of delaying implementation of legislation that's intended to strengthen our system of governance here in Colorado. Overarchingly, the CBA respectfully asks that as a collective, we continue to diligently move forward to ensure that the Colorado State Legislature, the Judicial Branch, and the Commission, create the functional and financial independence of the Commission, and in so doing, ensure an independent, fair, competent and impartial judiciary. A judiciary composed of persons committed to the highest levels of integrity, and who hold office in the public trust.

**Rep Tipper**
Thank you very much, Ms. Maxfield.  I'll ask you to wrap up there, appreciate it so much. And we will move on to and then just hold the line because if folks have questions for you, we'd love to give them an opportunity to ask them and we'll go to Marilyn Chapell or Chapel, I'm not sure how to pronounce it remotely. Go ahead and introduce yourself and proceed with your three minutes of testimony.

**Marilyn Chappell**
Yes, thank you. It is Chapell Thank you. I'm Marilyn Chapell. I'm an attorney in private practice in Denver. I'm here as a volunteer as an emeritus board member of the Colorado Judicial Institute. What is CJI? It's a unique organization. It's a nonpartisan nonprofit, established in 1979, with non-attorney and attorney members throughout Colorado, and CJI is committed to protecting and defending the ability of Colorado judges to decide cases fairly and impartially and free from partisan politics. This bill is about part of Colorado's merit system of selecting, evaluating, retaining and disciplining judges. Our system was adopted by our voters in 1966, when they rejected partisan judicial elections, and our system relies on volunteer bipartisan commissions, made up of non-attorneys as well as attorneys. Of course, no system is perfect. And of course, all systems can be improved. But our system is widely admired and a model for those of other states and it has served Colorado well for decades. CJI has three points of input.

First, CJI supports a robust interim committee process involving relevant stakeholders and, like Ms. Maxfield, we do appreciate the efforts that have been made to take that input into account throughout the process of this bill.

Second, we're concerned about the timing here. And as we all know, there are ongoing investigations of recent allegations of judicial misconduct. Those are allegations. And under our system of justice in the U.S., we have a system of due process, allowing completion of that investigatory process will enable fully formed decisions on the subject matter of this bill. And we again, support a robust interim committee process that will take stakeholder input into account.

But finally, this bill has some unnecessarily inflammatory language that itself contradicts the purpose to improve and increase public confidence in the judicial system. And specifically, this language is in

- 4 -

portions of the legislative declaration sections (1) (C), (D), and (H), on pages 3 and 4, and in Section 13-5.3-110, (7) (B) and (C) on page 22. And this language, unfortunately, as lawyers would say, assumes facts not in evidence. It assumes the truth of these yet unproven allegations of misconduct, and it assumes that the current system cannot address such alleged misconduct. So again, CJI thanks, everybody and we respectfully request that it will be amended to eliminate or reframe that language to make it neutral. Thank you very much.

**Rep Tipper**

Thank you for wrapping up. I appreciate that. All right, Mr. Austin, you're up next.

**Robin Austin**

Can you hear me?

**Rep Tipper**

We can't hear you quite yet.

**Rep Tipper**

We see that you're not muted. So that's good.

**Robin Austin**

Can you hear me now?

**Rep Tipper**

There you are.

**Robin Austin**

All right.

**Rep Tipper**

Introduce yourself and proceed with your three minutes of testimony.

**Robin Austin**

All right. Committee members and Chair I thank you for the opportunity to be involved in this legislative process on SB 22-201. My name is Robin Austin, I advocate with FACES families against court embezzlement, unethical standards, and AUI America United International. I oppose this bill, because it claims to establish and specify the duties of an office of judicial discipline as an independent office within the judicial department. An independent office of judicial discipline within the judicial department. Sounds like an independent office of the fry cook at the corner diner, doesn't it? What makes an office independent, I hope there's enough determination in this body to recognize the danger in creating an office under the umbrella of the court, which is responsible for disciplining the court. Before

- 5 -

adoption of the bill. This must be carefully considered and addressed. For the Supreme Court to appoint members of the Commission smells funny to me. There's nothing independent about that. This bill also requires the Attorney General to provide legal services to the Commission and Office. Well, it sounds good, doesn't it? But when I talked to the Attorney General, she stated that her responsibility was to defend the courts and judiciary from lawsuits. She can't both defend them from lawsuits and provide legal services to those tasked with disciplining them without a conflict of interest. She or he would have to choose where loyalty lies. Traditionally with the Judiciary, which will leave the people in the cold without meaningful recourse if this is codified into law. I know legislators wish to pass reforms in light of the very public humiliations our judiciary has recently brought upon themselves. I too, as an advocate for at least 10 years, have striven mightily, often with skeptical, indifferent officials in this very body. They have turned down our efforts to create reform several times. Your job is not to stroke the egos or enhance reputations of politicians with window dressing legislation that solves nothing. You are here to serve your constituents by making government accountable and responsible in transparent and concrete ways. Activists and victims must be included in every step of meaningful legislation. Only they can tell you what the real problems are. Coloradans are being victimized in our courts every day. This bill funds a system that doesn't work. Behind closed door proceedings empower an inept and corrupt status quo. We need legislation that clearly creates transparency and accountability that the people can see, know and participate in governance, and that implements real world consequences for violation of the public trust. I urge you not to pass this bill for these reasons.

**Rep Tipper**
Thank you, Mr. Austin. And we will proceed to Mr. Forsyth who is here in person. Witnesses online, please stay on for the next testimony.

**Chris Forsyth**
Thank you, Madam Chair. My name is Chris Forsyth. I'm an attorney who's practicing Colorado for almost 30 years. And during that I started the Judicial Integrity Project. About 10 years ago, we started with an initiative called the honest judge amendment. It was to change the discipline system in Colorado. So the legislature has finally caught up to where we were 10 years ago, that something needed to be done regarding the discipline problem. The discipline Commission has created an Article VI, section 23 of the Colorado Constitution. It's not created by rule. It's that constitutional amendment that must be amended or edited. And hopefully that is what the interim committee will do. The problem with this bill is that the first place legislators went is to judges, to ask judges how they should be disciplined. That's a conflict of interest. Can you not begin to see that asking judges how they should be disciplined is a conflict of interest. And maybe you should take what judges say with a grain of salt. A 50-state survey of Colorado shows that we're unlike most states, 35 states have public judicial discipline proceedings Colorado is one of only 15 that doesn't. Comparatively with other states, we are in the bottom five of public cases of judicial discipline. The bottom five. There's an argument, a strong argument, that we have the worst judicial discipline system in the country because it's a crime, literally a crime is on the books for somebody who reveals the contents of the proceedings at the discipline

- 6 -

commission. That's how confidential it is. That's what leads to corruption. That's what leads to the judicial scandal that this bill so often refers to. And it's the Legislature's failure to listen over the years that have led to this. Like this three-minute warning. Here we are, the legislators who spent all their time prior to this bill talking to judges, schmoozing with judges, the Colorado Bar Association, and not spending any time with the victims or those who want reforms. This bill was drafted by anti-reformers. And it's dishonest in its representation on page 8, line 16. The word independent, is used to describe the Office of Judicial Discipline. There is no way on God's green earth that that Office can be accurately described as independent. The employees in that Office will be paid by the Judicial Branch, the Supreme Court still places four judges on the discipline commission, writes the rules for the discipline commission, and only the Supreme Court can forcefully take a judge off the bench. So, it's misleading to the public to put the word independent in there. And unfortunately, what it's trying to do is bolster the current system with this funding. Let's give some funding, call it independent. Funding from the General Assembly will not fix what's wrong with the Colorado Judicial Discipline Commission. The problem is that the Code of Judicial Conduct is not enforced in Colorado courts, period. Thank you.

**Rep Tipper**
Thank you for your testimony. Mr. Forsyth. Witnesses, excuse me, members. Do we have any questions for the witnesses online or Mr. Forsyth aside here in person? Does anyone have a question for him? All right. Next, we will call up. Ms. Elizabeth Espinosa Krupa. Here in person, Ms. Emma Garrison. Mr. Steve Vasconcellos and Ms. Jenny Dees.

**Rep Tipper**
Alright, are we missing anyone? And why don't we go ahead and start with Ms. Dees, if we have her up, great.

**Rep Tipper**
Ms. Dees, I'm not sure I'm pronouncing it correctly. But if you're able to, go ahead and introduce yourself, and proceed with your three minutes of testimony. If you're able to turn your camera on great, if not, that's okay too.

**Jenny Dees**
I'm not able to.

**Rep Tipper**
No problem. Okay. Introduce yourself and proceed with your testimony.

**Jenny Dees**
Thank you. Good afternoon. My name is Jennifer Dees. I'm here to testify about the Commission on Judicial discipline and the issues that I've had in my personal filings and complaints. And I'm going to start last year, December 19 of 2021. I filed a complaint on Judge Sargent in Jeffco County Colorado for

- 7 -

threatening to throw me in jail for not wearing a mask and before being very political, just pretty much losing his cool. I filed another complaint on December 30 for the same thing and another on January 4 for the same cases. I finally got a confidential letter back January 31, refusing to do anything, even though I had the transcripts and such included in proving my complaint. Then fast forward to March 20, 2022, where I was on trial in front of Judge Sargent for a protection order violation, one that was never served. Judge Sargent interferes with my case, and changed the law to fit his agenda. There was no due process during the trial and when the jury came back, not one of them could look at me, knowing what the rest of us didn't know. Judge Sargent had talked to the jury off the record without calling the defense team to inform them. The written jury questions also were never turned in so that we have don't have those. So, we only have arguments on what to do. We did however, when I came back to court with my public defender, Judge Sargent on the record admitted that he had done this with the jury. So, the Commission on Judicial Discipline had plenty of opportunity to judge before he ever thought of a criminal trial, and was able to tamper with it. Because now what we have is a judge tampering with a jury. Think about that Colorado is a representative that has ignored all of these, because every one of these complaints have been sent out to the to you, Mr. Gardner, to you Senator Gonzales they have been sent out to each of you and you have ignored them. We are now further into this and now it's going to be civil lawsuits and other things. But you are wasting the taxpayers' time. You are wasting their money. Now you want to give further money for them to excel at their jobs.

**Rep Tipper**
Ms. Dees. Thank you very much for your testimony. We'll proceed to the witnesses in person if you just hold the line. We'll go ahead and start with Ms. I was gonna say Garrison, but I wasn't sure I got it, Ms. Garrison and then we'll move to her right.

**Emma Garrison**
Madam Chair, members of the committee, thank you for the opportunity to provide testimony to you today. My name is Emma Garrison and I am here on behalf of the Colorado Women's Bar Association. We are an organization of over 1500 attorneys and legal professionals with chapters across the State. Our mission is to promote women in the legal profession and the interests of women generally. We are here to support this bill. The CWBA is fully committed to addressing this issue and it as it is our number one, a number one priority for our members. We would like to state on the record our readiness to serve on the interim committee sub-panel, which is described in the amendment that will be proposed today. The revelations over the last year and a half about complaints of sexual harassment within the judicial system and allegations that these complaints were not handled in a transparent way has been profoundly demoralizing to our members. In February 2021, we called a town hall meeting to allow our members to voice their concerns. We also formed an internal committee to press these reforms forward, and to closely engage with this problem on our members' behalf. Since then, we have engaged with various stakeholders, and we are grateful for that opportunity. When we held the town hall meeting with our members back in February 2021. The overwhelming consensus was a need for a judicial discipline process that is independent from the judges subject to discipline. We support reform that would make

- 8 -

the body responsible for judicial discipline financially independent from the Judicial Branch. We support changes to the structure of the Commission to further keep the judicial disciplinary process independent from the Judicial Branch. We support further study of this issue in a setting that brings the various stakeholders together, examines what does judicial discipline looks like in other states, and creates a solution that balances competing interests, including the concerns of the victims and the public's confidence in the Judiciary. It is our understanding that the vast majority of victims who have raised complaints in the past have been women. We want to ensure their interests are adequately protected and not overlooked in the name of transparency, particularly when victims personally wish to keep a matter private. There's also significant research showing that women judges and judges of color are more likely to be on the receiving end of complaints as a result of implicit bias. We want to ensure any changes to the process would take this into account and not lead to a system that discourages women and people of color from applying for the bench. Thank you for your time. We urge a yes vote today and look forward to further engagement on this important issue.

**Rep Tipper**
Thank you very much Miss Espinosa Krupa.

**Elizabeth Espinosa Krupa**
Thank you. My name is Elizabeth Espinosa Krupa. I am an almost thirty-year lawyer in the State of Colorado. I am the Chair of the Independent Ethics Commission and also the Chair of the Commission on Judicial Discipline. I am one of two attorney members that serve on the Commission. The Commission does support the bill. The Commission is very grateful for the legislators, the lawmakers that have made this happen, and encourage collaboration to make sure that all the parties have been heard. The Commission is glad that we have some independent funding insight and some requirements regarding disclosure of complaints against judges, and grateful for an interim committee to continue to work on this. It's my understanding that an amendment was proposed for a sub-panel on judicial discipline, the Commission on Judicial Discipline, as a stakeholder, was not consulted in the creation of that or even a discussion of it. The Commission has in good faith negotiated with the Judiciary, on what we thought were all issues that were to be resolved. It's disappointing that we weren't consulted. We have always welcomed all of the stakeholders and spoke with the stakeholders. But the stakeholders aren't just bar associations and it shouldn't just be law schools and lawyers. There is not a quelling or stopping of women or minority lawyers from applying to be judges. And there is not an implicit bias that can be demonstrated by the Commission's work. The Commission is actually very diverse in its makeup and its constitution. The stakeholders that they keep talking about, the victims, are largely staff members, people that worked for the Court. So, I would encourage any sub panel that is created to consider other larger members of the public, not just lawyers, not just lawyer institutions or law schools, if you're really going to have participation, then get it from the public, because that's who needs to believe in the independence of our Commission for the Judicial Discipline to make decisions that work. There's a lot of talk about the confidentiality concerns. And we do have some of the highest rules of confidentiality amongst our Commission, higher the performance commission and the nominating

- 9 -

commissions and that's to protect judges similar to the Independent Ethics Commission from claims that are politically motivated or just not within their our jurisdiction. The judges are held to a higher standard just as lawyers are, and as they should be. And all the Commission is trying to do is fulfill our constitutional mandate. And we're hoping that this step towards complete independence gets us there. When the Judiciary says they want out of the Commission on Judicial Discipline's business, then they really should be. And we welcome and I will take any questions that you have at this time. Thank you.

**Rep Tipper**

Thank you very much, Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Committee, my name is Steven Vasconcellos. I'm the State Court Administrator for the Colorado Judicial Department. And I'm here today to testify in favor of Senate Bill 201. Like to take a brief moment to thank the bill sponsors Representative Weissman and Representative Carver for their sponsorship of this important legislation. The work of the Colorado Commission on Judicial Discipline is a critical component of Colorado's merit selection and retention process, which is designed to ensure that good qualified judges are allowed to make the tough decisions required of them without fear or retaliation. But it also means that judges who violate codes of ethics are held accountable. While we think many parts of the current system work well, it can certainly be improved. The Judicial Department worked with leadership from the Commission on Judicial Discipline to find common ground and compromise on the key issues that are represented in the re-engrossed version of Senate Bill 201. And I do want to extend my thanks to the Commission members for that very hard-earned compromise. I do appreciate it. First and foremost, the Commission on Judicial Discipline needs to be funded directly by the General Assembly, not through an arm of the Court. The public needs to have confidence that the Commission has the freedom and resources it needs to investigate judges as it deems appropriate, without concern of interference from the Judicial Department. We believe it's important that the General Assembly should have a robust open discussion about issues related to judicial discipline before it considers further legal changes to the judicial discipline process. That discussion should include all relevant stake holders, including the public, the legal community, the educational community, and, of course, judges. It's important that we're deliberative and thorough. It's important, excuse me, that we're deliberative and thorough to ensure that we strike the right balance of one accountability, sanctioning judges for unethical behavior. Two, transparency by letting the public know that judges are in fact held accountable. And, three, fairness, ensuring that judges and complaining parties are heard and given adequate due process through the entire disciplinary process. And with that, Madam Chair, I'm happy to answer any questions the committee may have.

**Rep Tipper**

Thank you very much. Representative Benevides.

- 10 -

**Rep Benevides**

Thank you, and I don't I think this will be for Mr. Vasconcellos. And also, Ms. Espinosa Krupa. I don't have any problems with the second half of the bill dealing with having an interim committee look at some of the issues and the questions addressed there. I'm really struggling with the first part of the bill, because, as far as I can tell, the Commission on Judicial Discipline doesn't go away, it continues. But there's also a new Office of Judicial Discipline that's created. And I am not sure how, first how they work together. Because even in our fiscal note, the money goes to the Office of Judicial Discipline. I don't see any money going here to the Commission through this fiscal note. And, so, I'm when you had indicated independent budgets, I'm missing something in this so either one or both of you can explain how those two offices work together.

**Rep Tipper**

Let's start with Ms. Espinosa Krupa.

**Elizabeth Espinosa Krupa**

Thank you, Madam Chair. So, the Commission on Judicial Discipline is the same Commission on Judicial Discipline that currently exists, there's not two separate ones. There had to be one created by statute so that the legislature could direct funding to it. Our funding traditionally, or at least in the recent past, has been through attorney registration fees, which is controlled by the Office of Attorney Regulation and ultimately, the Supreme Court. That in the recent couple of years has proved to be problematic and fraught with some conflicts of interest. Thus, we were basically in a position to obtain independent funding, which is what we were trying to do with the first part of the bill, but the Commission stays the same. The funding just wouldn't have to be approved by the Court or the Office of Attorney Regulation, there wouldn't be that oversight and control of our funding. I hope that answers your question

**Rep Tipper**

Representative Benevides. And, actually, before we proceed there, just wanted to make sure does anyone have questions for Ms. Dees online? Okay, seeing none, Ms. Dees, thank you for coming and testifying remotely. And we'll continue questions here with folks in person. Representative Benevides.

**Rep Benevides**

Okay. So, thank you for that response. So, what I'm seeing here is that the creation of the Office of Judicial Discipline on page 8, is merely just a function of getting the money into a separate office, as opposed to a commission. But since that is housed into the Judicial Department, I think, how are those kept distinct?

**Rep Tipper**

Ms. Espinosa or Mr. Vasconcellos?

- 11 -

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you for the question. Representative Benevides. For context, the notion of the Judicial Department that's referred to in the bill really is the entire judicial branch of government, including all the independent agencies. So, for example, the Office of the State Public Defender is legally within the Judicial Department. But it is a wholly separate entity, both administratively and financially from the court system. This would set up a similar structure such that the Commission's budget would be completely independent of the court and probation budget, and that the Supreme Court would have no direct or indirect oversight of that funding.

**Rep Tipper**

Rep. Benevides.

**Rep Benevides**

So, okay, so the people that are hired already work for the Commission, that are described or are these new hires in addition?

**Rep Tipper**

Ms Espinosa Krupa.

**Elizabeth Espinosa Krupa**

Thank you, Madam Chair. So, we currently have one Executive Director and one part time staff member that we share with another independent agency, those employees would remain the same. The commission members, the ten Commission members all serve as volunteer there's four judges, two lawyers and four non lawyer, non-judge members. So right now, we're only 1.5 staff, hoping to increase that so that we can do our own investigation and have our own attorney.

**Rep Benevides**

So, the bill does increase it to 4.5 the way I'm reading it.

**Elizabeth Espinosa Krupa**

Yes, those would be new hires.

**Rep Benevides**

Wait, would it be three new hires or four and a half new hires?

**Elizabeth Espinosa Krupa**

It would be a full-time administrative staff person, an attorney, an investigator, our current Executive Director, and part time assistant. Okay.

- 12 -

**Rep Benevides**

So, in if I may, because thank you for explaining because I was pretty confused on who was who doing this. But the bigger issue I have is the information sharing and the requirement. So, my understanding, and I could be wrong, is that the Commission accepts requests from a complainant that comes to the Commission and makes a complaint about a judicial officer. They don't go out and solicit complaints, or they don't automatically get complaints that already exist in the Judicial Department, like let's say an employee worked for a judge or some judge and made a complaint about that judge, you wouldn't get that currently in the Commission, unless that employee separately went to the Commission. Is that correct?

**Rep Tipper**

Go ahead. And you guys can go ahead and dialogue. And then if you're going to direct a question to someone else, direct it to them so that the record can reflect who is responding.

**Elizabeth Espinosa Krupa**

Thank you, Madam Chair. The Commission does not go out and seek any complaints or what we call requests for evaluation. The Commission receives those independently. What we have had in the past was a memorandum of understanding with the judiciary, that if there were complaints that went to the State Court Administrator's Office, let's say, or a chief judge, that those would be forwarded to us. It has come to our attention in recent years that that memorandum of understanding was not being honored. And we were not being provided with documentation and complaints, or requests for investigations against judges, at all. That was part of the purpose of adding the duty to disclose to this bill was to create a requirement for that duty to disclose. And that was a big issue with a lot of the stakeholders was, who are you asking to disclose? Are you asking every member of every courthouse to do it? And I think we've struck that compromise, to satisfy the stakeholders that we're not creating work for every employee that works for a judge.

**Rep Benevides**

If I may continue, is that it's, and that's what I'm really struggling with? I don't I didn't know anything. And this doesn't mention anything about a memorandum of agreement. And you say you haven't been getting that? When did you enter into that memorandum agreement? And how long has it been that you haven't been getting that information?

**Elizabeth Espinosa Krupa**

We've had the memorandum of understanding for several years. Over years, there's been some changes. The Commission became aware that we were not receiving that information when the article came out in the Denver Post about complaints of sexual harassment against judges that had been dealt with by Judicial and the Commission was not made aware of those. That's when we became aware that there was information that Judicial had that we were not provided with.

- 13 -

**Rep Benevides**

Okay, but being familiar with that memo that contained allegations going back in a couple of cases, 10 years. So, are you saying that you had not been receiving any information on any complaints for at least 10 years?

**Elizabeth Espinosa Krupa**

We received some, not all.

**Rep Benevides**

Okay, then. And why this is important, because I also understand you get complaints not only from employees or people that work with judges, but you also get them from parties to litigation, and that that's a big share of what you currently the work you currently do. Is that correct?

**Elizabeth Espinosa Krupa**

That is correct. And if I might, the numbers of public discipline cases that we've had, we in 2020, we had roughly 200 requests for evaluation. Of those 200, roughly 73 required us to procure any evidence or examination of those complaints. As you indicated, we do get a lot of complaints where people are dissatisfied with the ruling of a judge, which is for the Court of Appeals. We don't have jurisdiction for that it has to have a request for evaluation and a claim of conduct or misconduct by a judge under the rules that judges must adhere.

**Rep Benevides**

So, what you're saying, in the last year that you have, you have roughly 73 cases that actually are things that you would look at. The others are things that you would have referred to the Court of Appeals.

**Elizabeth Espinosa Krupa**

Correct.

**Rep Benevides**

So, the caseload is probably 70 to 100. More or less. I'm just making this up. So right now, and having been an EEO affirmative action officer, I know when individuals bring complaints, it's not easy. I mean, we read about it, and we think, oh, that's terrible that happened to you. But it takes an individual toll on the complainant to come forward. And in many cases, they come forward, anonymously, in order to bring the complaint's situation to someone's attention so, hopefully, it can be addressed. So, and they make a decision of where they can bring that because even as you would, maybe, maybe you did, ma'am, from the Bar Association had talked about a lot of women and sexual harassment complaints and those kinds of complaints, they have choices in where they bring the complaints. And they could go to CCRD, they could go to EEOC, there's a lot of different things they could do. So, in here, it's describing a procedure that says, whoever it is the district, judicial district or somewhere in the court, have roughly, I think it was 60 days to look into it. And then they send all that information to the Commission. And I

- 14 -

know from having investigated those 60 days isn't very long to fully complete an investigation. So, I would suspect most are not completed. And then after that period of time, they would go to the Commission, I'm guessing to start up or do a parallel investigation or something. But there's nothing in here that goes back to the victim, the complainant to say: Do you really want this to go there or someone else? That decision appears to be being made for them in this process. And that's just my reading of it. So, I'm just wondering if there's any place else where this process exists, where employers basically are starting investigations, probably not completing them in 60 days, and then handing them off or doing parallel investigations. So that's really the questions. There's somewhere else what was this model done? Because it seems like a little bit of a strange process to me.

**Elizabeth Espinosa Krupa**
Thank you. What our experience has been or what the Commission's experience has been is. . . I'll give an example that an employee has a claim of sexual harassment against a judge, law clerk, and goes to a confidant within the court to share that information. That confidant goes to the chief judge, the chief judge tries to do a pretty quick evaluation and investigation to determine how to keep that employee safe and let that employee know their options if they want to disclose it and make a complaint. Typically, then we get something in writing from the chief judge about who they've interviewed, what statements who the witnesses are timing, those 60 days have really been for the court, itself, the presiding disciplinary judge of whatever county to kind of do their assessment of how to keep the employee safe and whether or not if that judge should remain pending any investigation, what they're going to need as far as coverage, so the other parties and complainants aren't prejudiced by removing that judge, if that's necessary. Once the Commission gets it, in the past, how we have usually because we don't have our own investigator, we don't have our own lawyers, the Office of Attorney Regulation has shared their attorneys and investigators. They're very adept at going in and talking to victims and making sure that they feel safe and whatever the process can do to assist them. During our investigation. there usually isn't parallel investigations that we're aware of. Whether or not that person also made a complaint with EEOC, we wouldn't know. Our process is confidential. If that complainant wanted to remain anonymous, they could be however, we have to disclose some of the facts to try to get information from people which largely does then identify that employee. Not always, but at certain times. So, the 60 days is usually something that gives the presiding district disciplinary judge an opportunity to kind of keep house so to speak in their own county before bringing it to us. And sometimes they bring it to us initially and say we're going to hand you everything we have. But the 60 days was to make sure that we got it quick enough so that we could act if a judge needed perhaps not to be on the bench while the investigation was occurring.

**Rep Benevides**
And I guess I heard you say you're weren't being told about these. So, where what you just described probably happened rarely, in the last 10 years. And if you were waiting for the presiding disciplinary judge to bring it to you, there was no requirement, they bring it to you after 60 days. So that may be brought the ones that did bring it to you, after they completed that, but with a strict 60-day requirement

to turn over what you had all the names and all the information. It seems like that could create a problem and also contacting the complainant again, how is that done? Because they never chose the Commission to do this. And to give that information to the Commission, and that's why I have concerns because in most workplaces, it's left to the workplace for that investigation, and some do it well, some don't do very much. And I'm sure that's the same in in judicial districts. But to, and again, 60 days is not very long. That seems like you will have those problems come up. Where I'm a complainant, I complained to the judge, it went to the presiding judge, they're still looking at it. Maybe they interviewed me, they interviewed some people. The next thing I know, I might get something from you all to say now you have it or you have it at the same time. So that's kind of where I'm going is this processing is really quick. And there doesn't seem to be notice to the complainant. And was any of that thought through.

**Elizabeth Espinosa Krupa**

And there is correspondence with a complainant. And we do, there is not a victim's right act equivalent, so to speak. But we do work with a complainant. And do take that seriously. And we're looking at how to improve on that process. But we do keep in communication with them, not the chief that gave us their investigation and information.

**Rep Tipper**

Okay, are there further questions? Seeing no further questions. Other members, questions for these witnesses. Thank you very much for coming today. We appreciate it. I'll go ahead and call up. These next four witnesses are all remote. Ms. McLean. Ms. Fleming, Mrs. Van Gordon, Gorder, excuse me, and Miss Nystrom. So, we only have two of the four that are up there. Is there anybody else in the room that is here to testify on Senate Bill 201. Okay, ladies, it's just you testifying remotely. Why don't we start with Ms. McLean. Go ahead and introduce yourself and then proceed with your three minutes of testimony.

**Marilee McLean**

Thank you, Marilee McLean, an author, national speaker and international speaker on courtroom reform. So, I've been working on this for 30 years. And we're just barely touching the surface here to the problems that we have within our court system with our judges. I deal with it every day cases every day, where they're not getting their First Amendment rights, no due process. We have judges that are not trained in child abuse, child sexual abuse, domestic violence. And as much as you can think they're being trained, they're on the bench for two years, then they rotate, and they're not getting the training that's necessary to handle these type of cases. So, every day, I see women that are good loving moms that have done nothing wrong, but try to protect their children are losing their children to abusers in epidemic numbers. And that is due to lack of training. And that's also due to discretionary rules. The judges have a discretionary role. Where do these women go? When this happens? I'll give you an example. Last year, I handled a case here in Colorado, Natalie Chase was the judge. I know you've heard of her Judicial District 18. And the mother's case on that, I was very involved in it, and she believed her daughters, three daughters, were allegedly sexually abused and went to court with her with about 15

other women. We stood outside the courtroom, but I was an ADA advocate to come in with her so she'd have somebody with her. She went through $350,000 in legal fees. But it didn't matter, because she didn't have an attorney at this point. And Chase wouldn't let her get an attorney because they said she had too much money. On the bottom line, I watched what Chase did in that courtroom. And it's appalling and I don't think any of you can imagine that the fact that she had a racial bias was nothing compared to what she did this woman and her children for the rest of their lives. She lost her parental rights. There was an article in the newspaper on her case, but didn't name her or anything like that. In fact, the mother did going in the paper, and she lost her children and her parental rights. She went to jail. And another gentleman for the article that went to paper. I hope you can hear me it sounds like it's echoing. But there's so much that needs to be done. You guys are really hitting something, it's important, but it doesn't do any good for this to go to a commission of judges and other judges make the ruling. So, an interim committee, yes, you better have some advocates on that interim committee. Somebody like myself that knows what's going on in these cases. And seeing this every day, I have 1,000s of cases. This isn't just in Colorado, it's nationwide. And we have a huge problem with accountability, transparency is important. And until we get that taken care, of all this other stuff doesn't even matter because you're not being protected. Thank you for your time. If you have any questions, I'm here to answer.

**Rep Tipper**

Thank you very much and just let you know, we could hear you really appreciate it. Okay, well, we'll move to Ms. Fleming. Sometimes when our mics aren't muted in the room. There's an echo so we'll make sure that they're muted. Ms. Fleming go ahead and introduce yourself and proceed with your testimony.

**Luanne Flemming**

Members of the committee, thank you for the opportunity to testify. My name is Luanne Fleming. I'm an advocate for FACES, families against the court embezzlement standards. We are part of a grassroots human rights coalition to protect the elderly and the disabled from the abuses of the state's guardianship system. I am a tier three ambassador with America United International. An interim committee sounds like it might be good, but I have serious doubts. We've tried for 10 years to stop the isolation of our loved ones in probate courts and introduced the Judicial Integrity Project. This would create judicial discipline, oversight, and transparency. This has been an ongoing problem in Colorado. This bill doesn't include a means for public input. I'm even more concerned, because as noted in the Denver Post, the bill sponsors secretly spent time with the Chief Justice and the Judicial Branch beforehand. My question to you, legislators, who creates this independent judicial discipline commission? And will this committee work in secret? What does independence really mean? I ask that no sponsors of his bill serve on the committee, and you add an amendment creating a judicial task force. This includes public involvement, organizations, such as FACES, victims of probate, to seek real judicial discipline. In my opinion, this bill does not solve any problems at all. Thank you.

- 17 -

**Rep Tipper**

Thank you for your testimony. And I'm last call for Mrs. Van Gorder. And Ms. Nystrom. And neither are online. Do we have any questions for the two witnesses that just testified? For the two witnesses that are up there no questions for you. But we do have another witness joining us. Thank you very much for testifying. And Mrs. Van Gorder. If you could introduce yourself, tell us who you're testifying on behalf of someone other than yourself. And then proceed with your three minutes of testimony. Give us a second we can't quite hear you yet, if you're speaking.

**Rosmary Van Gorder**

Okay, how's that?

**Rep Tipper**

All right, all set go ahead and start over because we didn't hear anything.

**Rosmary Van Gorder**

All right, Madam Chair and committee members. Thank you for the opportunity today. I am Rosemary Van Gorder from Fort Collins. And I am appearing really on behalf of myself as a citizen but also as an advocate for parents involved with the child welfare system. I want to dovetail on Ms. McLean's comments about family court and the problems with the 18th Judicial District and Judge Natalie Chase. Because this is a perfect example of what do we do now? Well, how do we handle the multitude of complaints that came in after the public censure? I am aware of several families who have submitted complaints to judicial discipline. They have not received an acknowledgement or response or a denial of the it's called an RFE, request for evaluation, which isn't an even an investigation, it is just hey, this was awful. I need you to look at what happened in court with this judge. So, I can imagine from where this judicial discipline commission sits, that it is covering new ground about what to do after a judge has been censured, has left the bench, and get more complaints coming in. It has to be like an eyes wide shut situation. But something has to move forward in the interest of justice for these families who have valid complaints about misconduct. If these evaluations are given consideration for reasonable basis, but I want to know, how many does it take for there to be a consensus that the misconduct rose to the level of, we have to address this? People have a right to redress their grievances to the government. The Supreme Court makes good faith efforts to resolve differences with the Judicial Discipline Commission. That's in the bill. What about the people who have complaints not addressed? And the only avenue I see, due to all the media, the multitude of cases that resulted in complaints on a specific judge. What are you going to do about it? A rehearing, a formal review or rehearing of these cases, whether they're open, closed, old or new or in progress, deserve the same consideration that anybody else that is in a court of law deserves. Family courts are lacking in due process protections. We lack the right to the 14th Amendment due process clause to parent your children. What are we going to do about that? These complaints about family deserves a strong reaction response with the support of the Judiciary Commissions.

- 18 -

**Rep Tipper**

Thank you very much Ms. Van Gorder. Your time is up. We appreciate your testimony today. Members, do we have any questions for Ms. Van Gorder? Seeing none in the room, thank you again. And I'll do a last call in the room. Any witnesses on Senate Bill? 201? All right. Seeing none we will close the witness portion of the hearing and call the sponsor backup in person and Representative Weissman back up on the wall.

**Rep Tipper**

Rep Carver we have amendment L.022 And L.024. That's been distributed. Why don't you tell us what your intention is. Rep. Carver.

**Rep. Carver**

Thank you, Madam Chair. And at this time, may I go ahead and move L.022.

**Rep Tipper**

Second.

**Rep. Carver**

And then Madam Chair, I also need to move L.023 which is an amendment to L.022 and I would like to discuss them together if I may.

**Rep Tipper**

Sure. Committee members, do you have L.023? Okay, I'm just the only one that doesn't all right. Representative Carver please tell us about amendment L.022 and amendment. Excuse me. I'll second. Did you move 23?

**Rep. Carver**

I did.

**Rep Tipper**

Okay, I'll second it. So, thank you very much Representative Luck and Mr. Pogue. Why don't you talk about 23 and 22 and then procedurally when it comes to it, we'll deal with them accordingly.

**Rep. Carver**

Thank you, Madam Chair. There has been some reference in my opening comments, Rep Weissman's, and some of the witnesses. This is the advisory group called a sub-panel that we want to add to the bill structure. And the idea is that in this interim legislative committee, which is fully bipartisan four members from the House and Senate, equal number of each party. That this sub panel would, and you can see the membership listed in L.023, that it would bring together perspectives that we believe have some particular depth of understanding. Lawyers that have practiced within our legal system from the

- 19 -

bar associations, legal societies, law schools, also two members of the Commission, two members of the Judicial Department. And so we think, given the breadth, and members, I hope you had a chance to look at the breadth of the issues that the interim committee is going to take on, on pages 22 through 24, and those are at a minimum shall study. So those are the required topics. But this whole area of how best to approach a judicial discipline system is to be a very robust discussion, wide ranging, as you'll see, in the initial amendment, L.022. All meetings of this advisory panel are open to the public and broadcast over the internet. Every meeting of the advisory panel shall include an opportunity for public comment. And, so, we are looking at a process that is transparent to the public, that involves the public. But that also brings these varying perspectives and areas of expertise as an advisory committee to assist in working our way through the many areas that we have raised in 201, that need to be looked at. And it is also contemplated in this bill, that when recommendations are brought back to the Colorado General Assembly in 2023. They may, in fact include recommendations involving both statutory issues and perhaps some areas that touch upon current constitutional provisions in the Colorado Constitution that perhaps need to be amended. And so we recognize that there are those issues involved in this area. And, so, I would also just call out, based on some of the comments made, that we really have tried to work, and Rep Weissman and I will make a pledge, we will continue to have robust discussion with all the stakeholders should the committee approve the bill and move it to the House floor. That stakeholder discussion and our commitment to talk with all of those with interest in this bill would continue. So with that, Madam Chair, would request approval of both L.022 as amended by L.023.

**Rep Tipper**
Thank you. Representative Weissman.

**Rep. Weissman**
Thank you, Madam Chair. I want to add just a bit to that. Rep Carver was quite thorough in her explication of what's going on here. A couple of key things. One, this is an advisory entity. I think a lot of members of the committee are familiar with this structure where you have have an interim committee, and then you have a supportive group. We use that with a lot of the ARGO work last year when grappling with similarly big issue spaces, but the ultimate decisions are to be made by the eight legislator members who are appointed, as we said in a bipartisan, bicameral way. That's one important thing. This has come together pretty quickly as Rep Carver hinted at, you know, in these last days of session here, we are aware of some concerns that maybe we don't have the balance entirely right. In every respect here and I am certainly open to further refinements and you know, in putting that commitment on the record here, you know, we were running out of time in session, but I believe we do have time to continue to polish details after today. Fundamentally, this structure arises out of things that we have heard from certain key folks, for example, the Women's Bar Association, who the committee heard from earlier, that they want to make sure that they are heard. And I have communicated to everybody who has expressed an interest in this. In the interim committee, you will be heard there will be public meetings. I mean, a lot of people want to weigh in on this over the Summer and Fall in should be able to. This idea of a sub panel structure was sort of just a way to formalize that a little bit without

- 20 -

trying to be exclusive as to the many, many hours of public hearings and opportunity for public comment that would also happen in connection with the interim committee.

**Rep Tipper**

All right, any questions on amendment L.023. Representative Benevides.

**Rep Benevides**

Thank you. And, you know, I just did another bill that created a task force in the interim committee, and it cost us a little over $100,000 to have legislative services facilitate that. And as you both describe, with hours of public testimony, what the things are required for the interim committee to look at plus handling a task force. I don't see anything in here in the amendments or in the bill, or in the fiscal note that says who is going to do this, who's going to facilitate this work this Summer? Because it's a very short timeframe from the end of our session, until I think October.

**Rep. Carver**

Thank you, Madam Chair. Thank you, Representative Benevides, I believe on the revised fiscal note. And if we need to call the fiscal analyst, we can certainly try and do that. That we do have on page five, sub heading legislative department, a reference to cause for Legislative Council Staff and also Office of Legislative Legal Services to staff an interim committee. And it references a researcher, attorney, legislative editor. And then certainly member reimbursements. So, because we are talking of a legislative committee consisting of eight members, so I believe those costs and the staffing costs are reflected in the revised fiscal note.

**Rep Tipper**

Rep Benevides.

**Rep Benevides**

Thank you for that. I did see those but they were so much less than the small committee we're doing on jail standards, that I was surprised and didn't think that was enough to cover the numbers of meetings and things you all are describing. So, but if the legislative department is saying they can do it for that price, that's interesting. It'll certainly have me revisit other fiscal notes. But that's all.

**Rep Tipper**

All right. Any further discussion, Representative Weissman.

**Rep. Weissman**

Thank you, you know, to Rep Benevides's question. You know, what's in that part of the fiscal note is simply what the fiscal analysis process came back with for the number of meetings and other details that we scoped. You'll notice that, you know, we haven't written in per diem or mileage or some other kind of amount for the work of the sub panel.

- 21 -

**Rep Tipper**

All right, any further discussion on amendment L 023? Seeing none, any objection to amendment L.023? Seeing none, amendment L.023 to amendment L.022 passes. Any further discussion on amendment L.022, as amended? Seeing none. Any objection to amendment L 022 as amended? Seeing none, amendment L.022 passes. Sponsors, Representative Carver.

**Rep. Carver**

Thank you, Madam Chair, I move amendment L.024.

**Rep Tipper**

Second. Rep. Carver.

**Rep. Carver**

Thank you, Madam Chair. On page 24. at the tail end of the long list of things that the interim committee needs to look at. It makes reference the relative benefits of the models for achieving independent judicial discipline adopted by Illinois and the American Bar Association Model Rules or any other model addressing the final decision maker. This is to delete Illinois. While I'm sure the great State of Illinois has many things to recommend itself, and we are glad to look at their system for judicial discipline, I don't know that we need to call out one of 49 states specifically. We will be looking broadly at how other states. That is, the bill contemplates that the legislative committee will be looking at what other states do as well as the Model Rules of the ABA as part of their review and evaluation, and so with that I ask for an aye vote.

**Rep Tipper**

Thank you. Any questions on amendment L.024? Representative Weissman.

**Rep. Weissman**

Thank you just wanted to add, you know, Members, this is this is friendly, I'm supportive of this is something Rep Carver and I talked about. There is casual language whereby, you know, we are not precluding the Summer or Fall process from looking at Illinois or frankly, any other state for that matter. I think Rep. Carver felt, sort of philosophically, it's perhaps odd to call out a single state even though it is one that came to our attention in prior research. But I feel the ability to look at and learn from that or not, if that's what the interim committee and in its judgment decides it is still there. So, no problem was with this clarification.

**Rep Tipper**

Any questions on amendment L.024. Seeing none, any objection to amendment L.024? Seeing none, amendment L.024 passes. Sponsors any further amendments?

- 22 -

**Rep. Carver**

No, Madam Chair.

**Rep Tipper**

All right, and Representative Weissman, do you have another amendment?

**Rep. Weissman**

Yeah, I'm sorry, Madam Chair looks like we might not be able to move it today. The last one was really just technical. Nothing more than a couple of cross reference cleanups. There was a lot of amendment action in the Senate. And I noticed when I was reading, a few things got missed. We're talking about nothing more than 7(b) where it should have said 7(c), that kind of thing. But that's something that we could clean up on second reading. Sorry we are not set to go today.

**Rep Tipper**

All right, Members, any amendments from the committee? Seeing none, the amendment portion is closed. Sponsors wrap up. Representative Carver.

**Rep. Carver**

Thank you, Madam Chair. Members. This is the start of what we hope to be a robust, thoughtful, informed process that involves the public, that involves many different perspectives. All with the commitment of strengthening our system of judicial discipline, both in process and substantive standards and doing that in a systemic and thoughtful way. I did want to, Rep. Benevides with regards to your comment about information sharing, point out on page 23, subsection J. Well, actually I and J, that the interim legislative committee is tasked with, must address, the best method of balancing the values of confidentiality and transparency for judicial discipline matters. That's sub (I) but then also (J). How to ensure that the Commission can obtain unfettered access to information and files in the custody or control of the department relevant to judicial misconduct complaints. So, the language in the bill currently on information sharing is the start of the process in looking at this issue, not the end. And members, appreciate your time. My thanks to all the many stakeholders who have worked so hard on this bill, that discussion will continue. And at this time, Madam Chair, I'm ready to move the bill. Thank you, Madam Chair. I move Senate Bill 22-201 as amended to appropriations with a favorable recommendation.

**Rep Tipper**

Alright it's been moved and seconded. Do we have any closing comments? Representative Benevides.

**Rep Benevides**

Thank you, Madam Chair. And thank you sponsors for bringing the bill I know you guys have worked a lot on this bill. I wish I could say I was in agreement with what you concluded, I do agree. And thank you for pointing those areas out for the interim committee and the panel to look at. And I think that goes

- 23 -

to my point. Those are things they're going to be looking at this Summer, yet, we've made some changes, where we are sharing information already, before the interim committee can actually look at and evaluate the best way to do those things. And I think, at least for me, it's sort of the cart before the horse, in that we are doing this interim committee and sub panel that we just passed, to evaluate other states' ways of doing judicial discipline, which I applaud and all of the other items listed here that the committee will be studying. I think those are important points. And I think they should do that, before we move forward with making changes. I think the changes that are being made in the first half of the bill are significant, including adding new staff, when listening to the numbers of complaints that have been looked at. We don't really know. And as far as I know, other than from a previous situation. There was only one time that I'm aware of that the Commission hired an outside investigation. And they hired that without any money in hand. So, I hope this $400,000 that's been appropriated in this is not to pay past debts of the Commission. This is going forward in the new fiscal year, not for the past. And if there is a need, since we're giving them new staffing, which includes investigators to spend that $400,000, then they should spend it on future cases, but not for past. So, I have real concerns about the first half of the bill. And I wish these were two separate bills, because I liked the second part of all of the things you put in here to have a group outside of Judicial and have the various different stakeholders weigh in on determining how we should be moving forward on this. But because it's an entire bill, I can't support the bill.

**Rep Tipper**
Any further closing comments from members of the committee? All right, seeing none, Mr. Pogue, please call the roll.

**Staff Pogue**
Representatives Bacon? Yes. Benevides? No. Bockenfeld? Yes. Carver Yes. Doherty. Yes. Luck? Yes. Lynch? Yes. Roberts? Yes. Woodrow? Yes. Weissman? Representative Weissman? Yes. Madam Chair? Yes.

**Rep Tipper**
That passes ten to one.

- 24 -

# Appendix 27(r)

## Transcript of *Hearing on SB 22-201 before the H. Appropriations Comm.*, Colo. Leg., May 6, 2022;

# House Appropriations Committee—May 6, 2022 Hearing: SB 22-201

**Rep. McCluskie**

Next up we have Senate Bill 201, Representatives, Weissman and Carver. Members, do we have any questions for our bill sponsors, I do want to direct your attention to an additional memo included in your canary packets today. Rep Weissman, or Rep Carver, could you explain to us the additional amendment, L.027. Rep. Weissman.

**Rep. Weissman**

Yes, thank you, Madam Chair. So, we are asking the committee today to adopt L.027, which essentially replaces what we did in Judiciary Committee a couple days ago. So 201, is a bill to try to improve the process for judicial discipline in Colorado. Part of that is we're going to set up an interim committee, and I won't go into that, that's set forth in the bill. Part of what we've been grappling with is how the interim committee will hear input from certain very, very interested stakeholders, for example, bar associations, professional legal societies in Colorado and others. We had landed on an approach that we thought might work in Judiciary Committee that was going to have timing challenges, because this being an even numbered year, we have a pretty short ramp for interim committees in the summer. It was also potentially going to drive more of an appropriation requirement here. So, what we have worked out instead in the last couple of days is what is set forth in L.027, which is just to sharpen and make more detailed and exacting the requirements on the interim committee itself to hear from and elicit input from certain key interested parties. So, that's what L.027 does with that. Then we're not actually changing the appropriation requirement as the bill comes from the Senate.

**Rep. McCluskie**

Thank you. Representative Weissman, any questions, members? I do want to clarify you are asking for amendment L.027, not amendment L.026?

**Rep. Weissman**

That is correct.

**Rep. McCluskie**

Thank you, Representative Weissman. Seeing no further discussion. Representative Tipper.

**Rep Tipper**

Thank you, Madam Chair, I move amendment L.027 to Senate Bill 201.

**Rep. Duran**

Second.

- 1 -

- 2 -

**Rep. McCluskie**

That's been properly moved and seconded. Any objections? Members, seeing none. L.027 is adopted.

Any additional amendments? Seeing none. The amendment phase is closed. Representative Tipper.

**Rep Tipper**

Thank you, Madam Chair, I move Senate Bill 201, as amended to the committee the whole.

**Rep. Duran**

Second.

**Rep Tipper**

 That's been properly moved and seconded. Please poll the committee.

**Justin Brakke**

Representatives. Duran.

**Rep. Duran**

Yes.

**Justin Brakke**

Hanks.

**Rep. Hanks**

Yes.

**Justin Brakke**

Kipp.

**Rep. Kipp**

Yes.

**Justin Brakke**

Lindsay.

**Rep. Lindsay**

Yes.

**Justin Brakke**

Lontine.

- 2 -

- 3 -

**Rep. Lontine**

Yes.


**Justin Brakke**

McCormick.


**Rep. McCormick**

 Yes.


**Justin Brakke**

Ransom.


**Rep. Ransom**

Yes.


**Justin Brakke**

Rich.


**Rep. Rich**

Yes.


**Justin Brakke**

Tipper


**Rep Tipper**

Yes.


**Justin Brakke**

Madam Chair


**Rep. McCluskie**

Yes.


**Rep. McCluskie**

That passes unanimously, 11 to zero. Thank you, committee. Thank you.

# Appendix 27(s)

# Legislative Interim Committee on Judicial Discipline (ICJD):

# Appendix 27(s)(i)

# Hearing record for *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., June 14, 2022:

# Appendix 27(s)(i)(1)

# Introduction;

# Legislative Interim Committee on Judicial Discipline: June 14, 2022 Hearing—Committee Introductions

**Sen. Lee**

We've got the gang back together. I know some of you must have been going through session withdrawal syndrome, and thus really welcome getting back together. So, thanks for being here. We convened today pursuant to Senate Bill 22-201, to undertake what I consider a significant and august responsibility to reestablish public trust in Colorado's Judicial Department. But initially, I want to thank my colleagues for accepting the charge from your leadership in both Houses to serve on this interim committee. It's an expression of their confidence in your knowledge, your commitment, and judgment. I note at the outset that this is a very diverse committee, four members from the House, four members from the Senate, four Democrats, four Republicans. We have lawyers and we have non-lawyers, which is appropriate for the beginning of this process. The impetus for Senate Bill 201, is, quite candidly, a judicial system under siege, a Department plagued over the past three, four years by allegations widely reported in the media. And these are just two of them, reporting significant scandals and judicial misconduct. And these are headlines. There were no less than 15 front page articles about challenges and misconduct within the system, high level misconduct, sex harassment, impropriety by judges and justices and employees of the Department, allegations of the awarding of a multi-million-dollar contract allegedly to cover up improper conduct. All of this resulting in multiple high-level resignations of senior Judicial Department leaders and six, almost seven, investigations by the State Auditor, the Office of Attorney Regulation Counsel, the FBI, two outside agencies engaged by the Judicial Department, and the Commission on Judicial Discipline. I say almost seven because the Denver District Attorney was given a file with information to evaluate misconduct by Department employees, but they received the file too late to conduct an investigation before the statute of limitations ran. Senate Bill 201 passed overwhelmingly, unanimously in the Senate, where it originated, and with 59 votes in the House. It was an attempt to address some of the issues raised in the SMART Act hearing and in the press, but we couldn't address them all, and thus this Interim Committee was formed. Senate Bill 201 did establish independent funding for the Office of Judicial Discipline, a significant issue identified at the SMART hearings. Another significant issue raised at the SMART hearings was the inability of the Commission to obtain information about judicial misconduct from the Judicial Department, which had come to the attention of the off the Commission on Judicial Discipline. It became clear at those SMART Act hearings that the Commission on Judicial Discipline, established under the constitution for this process, charged with addressing judicial misconduct had been marginalized, had been ignored, and had virtually been rendered incapable of performing its constitutional duty. So, Senate Bill 201, established rules for information sharing. It finally created this Legislative Interim Committee to address in greater detail the issues that needed to be addressed. The bill specifically identified 18 areas for the Committee to study,

and I encourage my committee members to look at page, I believe it's 18 of the bill, for the areas that this committee is charged with evaluating. Ask witnesses questions about those 18 areas. It's a significant amount of work and we have our work cut out for us. I also want to recognize and thank staff from OLLS, Hamza Syed, Will Clark, and Juliann Jenson. Did I say OLLS? I meant Leg. Council, but also we're being staffed by OLLS: Conrad Imel, Chelsea Prinzell. I really want to recognize the work and the efforts that our staff puts into these hearings. Ms Jenson and I have been in virtual daily communication to organize it. Communicating with members, scheduling the hearings, gathering background materials, and lining up witnesses. I encourage you to look at the box. I'm not sure how else to identify it, but the online place where background materials are provided. We are, committee members, dealing with some pretty arcane subject matter here, which isn't in the knowledge of most people. So we've given you some resource material in the box to read through. We've got the Annual Report by the Office of Judicial Discipline, a 2018 report by IAALS, a nationally recognized organization, the Institute for the Advancement of the American Legal System at the University of Denver about best practices for judicial discipline. They surveyed states all over the nation to determine what works. We also have a handbook for members of judicial discipline commissions and a judicial conduct commission guide, How Judicial Conduct Commissions Work, by a lady by name of Cynthia Gray, who is from the National Association of State Courts and is a recognized expert in this area. Again, I urge you to immerse yourself in this. I want to read just a brief sentence from the IAALS Report, which frames what we are talking about here today. Effective judicial discipline is an important part of a trusted and trustworthy court system. The public must know that judicial ethics and violations of the Code of Judicial Conduct are taken seriously. Absent that assurance, the system appears self-serving, protectionist, and even potentially corrupt. And it is not just the reality of the existence of effective systems that matters. It's the appearance. A wholly effective system with no transparency and no public confidence will not suffice. I need to say, after describing the challenges the Judicial Department has been facing over the past four years that Colorado has historically been recognized as having a gold standard judicial system. We had a constitutional amendment in 1966 which set up a merit system with local nominating commissioners made up of local practitioners to get good judges on the bench. We also statutorily set up a judicial performance system, which Senators Gardner, Van Winkle, and I worked on three or four years ago to improve, revise, and make even better. And the third component of the system is the Commission on Judicial Discipline. So that's the overview of the system. We're working over the next couple of weeks on the judicial discipline section of it. I think the question I want each of us to be considering as we go forward is, will the public have faith in a system in which those charged with assessing misconduct of judges are overseen exclusively by judges? Where judges screen all the complaints against judges, judges select which complaints move forward for investigation? If judges control the budget, the rules, the appeals and the outcomes, is that a system that will inspire public confidence? So that's the framing of what I see as the mandate of the committee, and I appreciate the indulgence of the members with that somewhat lengthy introduction. But I thought it was important to do so. I'll now turn to my esteemed colleague, Vice Chair Carver, for her opening thoughts.

**Rep. Carver**

Thank you, Mr. Chair. The task we have is spelled out on pages 18 and 19 of Senate Bill 201, and how did we get here? We got here through a memo that surfaced indicating misconduct, indicating improper process, indicating complaints made, and yet no records or little record showing thorough and timely investigation. And this kicked off a process in the Legislature where we looked at the entire system to include the fact that past practice had been that the judicial commission was actually funded by the Judicial Branch. In other words, there was no independent funding source, and that was an issue that was addressed in Senate Bill 201, as well as some of the basics on information sharing. However, the bulk of the review that we're doing in this committee with what we hope to be extensive participation by bar associations, bar sections, lawyers, the public, academics, and legal societies. And you can see on page 18, this committee has a mandate. We are directed to do outreach to various groups, and we take that responsibility very seriously. Our task, as the Chair said, is to focus on those 18 areas that are called out in Senate Bill 201, that run for several pages, to gather the input from those across the State, but also to look at what other states have done, any model codes, and really to bring back the goal and our mandate is to bring forward recommendations to be considered by the 2023 General Assembly. On how we can best have a process for judicial discipline, how complaints should be handled, and what are the basics here. I mean, yes, the details, the specific areas, are set out in the various subsections in 201, but a process that does timely and thorough investigation of complaints, that does it in a process that has integrity, that handles this in a way that shows that the process from start to finish is a fair process, is a process that the public can have faith in. That they, then, can see that process and say, yes, this is best practices, we're doing it right in Colorado. And so that is really our charge. And with that, I am grateful to be serving once again, as Senator Lee said, to a certain extent, this is a gathering up of band members, judicial members, and welcome new members as we take this on. So with that, we are looking forward to the presentations, again focused on, what is our task? What are what are the areas that we are to consider, study and make recommendations on. Thank you, Mr. Chair.

**Sen. Lee**

Thank you, Madam Vice Chair. I would also like to give any of the committee members an opportunity to make opening remarks, if they would like to do so. And at the outset, I would also like to welcome newly inaugurated. Senator Van Winkle, welcome to the to the Colorado Senate from the House. Go right ahead, if you'd like to make any remarks. Okay, Senator Gardner.

**Sen. Gardner**

Thank you, Mr. Chair. Thank you, Madam Vice Chair. I had not planned to make remarks this morning, but I appreciate the Chair inviting those, and I will try to be brief, others may wish to comment. The charter of this interim committee is clear. Nearly 18 months ago I think now, I heard the Chief Justice in his State of the Judiciary make a commitment to ensure the accountability of the Judicial Department, of the bench, as well as continue with an ongoing effort that every judiciary must have to ensure public confidence. There have been many articles in the newspaper of varying accuracy, quite frankly, and with different spins upon them. All of which have impressed upon me as an attorney practicing some 40 years

about how important public confidence in the judiciary is. I see the role of this Interim Committee in ensuring that ongoing effort at public confidence. There's no doubt that some of the events, and we'll talk about them more, have had the effect of decreasing public confidence in the judiciary, in our state. And yet, my own experience has been that there's a fair amount of public confidence in individual judges in judicial districts around the State. But that the unfortunate events, occurrences, inevitable complaints of any group of public servants does serve to decrease that public confidence. I think our challenge is not to turn this into any political football, for lack of a better term, but rather to do what we can to ensure, improve, and impress upon our citizens that we are committed to public confidence, as is our Judicial Department. And I believe that they are. How do we get there in a time in which public confidence in government generally is at an all-time low, public confidence in the legislative branch is at an all-time low? The public must have confidence in the Judicial Branch. And so what we need to do as we look at these 18 different elements is to look at them with clear eyes, with the best of advice, the best of information, and with a large sense of the responsibility that rests upon all of us as legislators in creating a process that will allow for transparency, accountability, and ongoing process, complaint processes, and so forth. I think that's what our charge is. I think the makeup of this committee of four members of each party and four members of each chain chamber is such that it is a recognition that this is not a time for any political speech or grandstanding, but rather to take our charge in this bill and as elected officials very seriously. To not overlook but at the same time, to ensure that we are not throwing gasoline on the fire. And, so, with that, I am ready to undertake this charge. Have been, as all of you, I think, have in the past many months, looking carefully at what we can do to ensure that ongoing confidence, transparency, and accountability. Thank you, Mr. Chair.

**Sen. Lee**
Thank you. Senator Gardner, Rep Weissman.

**Rep. Weissman**
Thank you, Mr. Chair. You know I hadn't prepared anything formally, but as we are at the outset here, I thought I would say a few things. First, thank you to you, and also to Vice Chair Carver for being willing to undertake the leadership roles this Summer. I know well it is a fair bit of additional work on top of simply serving. I think it's also significant that you are both doing this, even though neither of you will be rejoining the General Assembly in 2023 due to term limits and other reasons. But I think being part of making the structural changes that we will at least consider making here this Summer as a form of ongoing legacy and contribution, on top of what you both already done. Couple broad strokes. I agree with Senator Gardner that we are talking about public confidence here. I believe a lot of what, Mr. Chair, you referred to, a lot of what I've got in this binder that I just had to upgrade from a small into a big one last night, as I was reorganizing and getting ready for this. It has been public confidence shaking. Critically, though I think that that all important foundation stone of representative government is earned. It is not simply given. We have to carefully review the system that we have, some of the textual foundations of which are nearly 60 years old, and really question whether those are the foundation stones of a system that can earn confidence from the public. To the point about politics, I

- 4 -

agree. I mean, and for anybody listening in online, and because we're creating a record here, you know, it's not automatic that any interim committee is at least right now, given the makeup of the General Assembly is four, four like this one, but as two of the prime movers of the bill that put us here, Chair Lee and I didn't have to debate very long at all before we agreed, and our co-sponsors agreed, that an even division is the right way to go about this particular subject. This institution has seen majoritarian interim committees in the past. Whatever we are about here, it oughtn't fall along plainly party lines. And so far, hasn't been or hasn't. And I think that's important. You know, we drew a model from a school finance interim committee last year, which is another very big subject given to challenging debates that often don't fall down on party lines. And I think that we have a great mix of member perspectives here. And I think just the last major theme that's coming to mind is the near singularity of the very challenging occurrences and fact patterns that have sent us here. You know, it has been said, including in the press, that the judicial discipline system that we have in our state, you know, does work at least sometimes, and there have been some pretty awful cases at the District-level where judges have done things not befitting of those positions, and, more specifically, violative of the Canons and the Code of Conduct. And there has been severe discipline, and those judges have ceased to be judges. And in the handful of situations that I've talked about, I think those are the appropriate outcomes. What's challenging here is we're not talking about the District-level. I think in all of our legislative work, excuse me, you know, we find ourselves dealing with the edge cases. The simple stuff is dealt with under existing law. Or it wouldn't come to this place. It would not motivate an attempt to change the laws of our State by bill. I think that is why we're here, because what we're grappling with is anything but a simple case. So, I will be approaching what we do with some of those as my guideposts, and I'm eager for the discussion today and beyond. Thank you.

**Sen. Lee**
Thank you. Rep Weissman, any other members of the committee want to make any opening remarks? Seeing none, why don't we move immediately into the overview of judicial discipline in Colorado and the Senate Bill with Ms. Jenson and Mr. Immelt.

# Appendix 27(s)(i)(2)

# Legislative Staff Report;

# Legislative Interim Committee on Judicial Discipline:
# June 14, 2022 Hearing--Presentations by Committee Staff

**Sen. Lee**

Thank you for joining us. We have some handouts that you have given us, and we thank you for that.

**Juliann Jenson**

Hi, good morning. I'm Juliann Jenson. I want to take a brief moment to introduce ourselves. I think most of you know me from Judiciary. I've been with the Senate Judiciary Committee for about five years now. Hamza is also helping out with this committee. He's fairly, relatively new to LCS. And Will Clark is our fiscal analyst, who's not here today, and Marie Garcia is our office assistant. And then Conrad here is from OLLS, along with Chelsea Prinsell. And I would also just like to take a like a minute to talk about some important logistics, about the committee itself. Senate Bill 201 allotted us five hearings, and you can introduce up to a total of three bills, joint resolutions, or concurrent resolutions. We're on kind of a tight timeline this interim. Our last day to request a bill draft request is August 19. Of course, you can do it before August 19 as well, but that's the last day. September 30 is the last day to vote on those bill draft requests. There needs to be 42 days between the vote requesting them and voting on them, and then Leg. Council meets on October 14 to review the bill draft requests and make sure that they're within the scope the committee's charge. So, jumping over to judicial discipline, Senator Lee asked if Conrad and I could give a just kind of a brief overview about judicial discipline and SB 22-201. And again, you have many experts in the room. I'm going to just present a more overarching overview of judicial discipline in Colorado. All 50 states and DC have an oversight agency or commission that investigates judicial misconduct complaints. I think the first one started in California in about 1960. We followed suit in 1966 with a constitutional amendment. The judicial discipline commissions have no legal authority to reverse rulings or order new trials. This is simply about reviewing complaints about a judge's behavior, and these commissions may pursue disciplinary actions ranging from private reprimands to removal. As Senator Lee alluded to before in his opening remarks, there are some other oversight entities in this State. We have the Office of Judicial Performance Evaluation. They evaluate the judges and publish reports during election retention years. There's nominating commissions on every judicial district level that review judicial applicants, and the Attorney Regulation Counsel disciplines lawyers not serving in a judicial capacity. They'll be with us this afternoon and will explain their relationship with the Commission in more detail then.

The Colorado Commission on Judicial Discipline monitors state court judges, including those from the County and District courts, Court of Appeals, and justices of the Supreme Court. As I stated before, it does not review judicial rulings or case outcomes. It also does not include municipal court. Their authority and procedures are outlined in the Colorado Constitution, and the Canons regarding judicial conduct are found in the Colorado Code of Judicial Conduct. The state Supreme Court promulgates the Rules governing the Commission, and it is a one-tier system that operates confidentially. And what I

mean by a one-tier system, it is basically all under one umbrella. The Colorado Commission on Judicial Discipline receives and investigates the complaints, they bring formal charges, they conduct the hearing, and they discipline the judge, or they recommend disciplinary sanctions to the Supreme Court. Most states operate in a one-tier system. About eight states have a two-tier commission, and that first entity receives and investigates complaints and then determines to proceed or dismiss the complaint. If they proceed, the first-tier entity presents the findings before a second body that has a different name, membership, just operates very independently. The decision is reviewable by the state supreme courts. But otherwise, the state supreme courts do not have much to do with these two-tier commissions, unlike the first-tier commissions, where the state supreme court may recommend a disciplinary sanction.

Another area to point out is confidentiality. All states require confidentiality in the complaint-investigation stage, and that's for obvious reasons. You want to make sure that the complaint is legitimate before anything is made public. I did hand out a sheet to you. It's from the National Center of State Courts, and it outlines when confidentiality ceases in formal judicial discipline proceedings. Colorado is one of 15 states that conducts judicial disciplinary hearings in private until a recommendation for a public disciplinary sanction is made. Other states may allow proceedings to become public once charges are filed or judges have formally responded. Another area that relates to confidentiality is document accessibility. Some states post documents online as cases move through the proceedings and include outcomes of private admonitions. Colorado does not do that. They don't share any case related information with the public or on its website. There's reference to it and its Annual Report, and that's about it for the document sharing.

The Commission is comprised of 10 members who are appointed by the Chief Justice of the Supreme Court and the Governor, and they serve four-year terms, and they may be reappointed to those terms. The Supreme Court appoints the two County Court judges and the District Court judges. The Governor appoints the lawyers and the citizen members on the Commission. The Commission, in turn, appoints the Executive Director, who manages the Office, oversees operations, and reviews the initial complaints that are lodged with the office. They meet as needed to consider complaints and other business, and that's generally about bi-monthly according to their Annual Report.

And next I'll go into the case flow. Any person may file a complaint or a request for evaluation of judicial conduct. Once that complaint is filed, the Executive Director conducts a preliminary review of it, and if it's deemed warranted, may forward it to the Commission members for further review. If, again, it is deemed a reasonable complaint, the investigation starts, the judge is notified and asked to respond, and the Commission conducts an investigation. They may use investigators and Special Counsel, and it advances only if a preponderance of the evidence is met. As a side note, there's a high number of complaints that are dismissed early on. I would imagine most likely for falling outside of the scope of the Commission's authority. 63% of cases were dismissed in the early investigation stage. So, 73 cases were investigated, and of those 73, 64 were further dismissed because no violation could be established. And that was from the 2020 Annual Report of the Commission.

So, if there is a finding of judicial misconduct after investigation, the Commission has two routes they can take. One is the private disciplinary action, and this is used for misconduct cases that are relatively minor in nature. Maybe an isolated mistake or a judge agrees to step up to improve his or her behavior. And examples of these private disciplinary actions are letters of admonition, reprimand, censure, training or counseling, treatment, perhaps, docket, management reports. And, if for the more serious cases, formal proceedings may be requested, and these operate more like a trial. A Special Counsel issues the formal complaint and acts as a prosecutor. The hearing is conducted by the Commission or special masters appointed by the Supreme Court. The case is either dismissed or recommendations are made to the Supreme Court, and may include removal, retirement, public reprimand, or public censure. This is a confidential process until the recommendations are officially filed. There's only been six cases since 2014 and those have been for more serious cases like a judge, has been charged with a felony, has multiple incidents that continue, or some discriminatory behavior. So that is the conclusion of my synopsis of the Colorado Commission on Judicial Discipline. Again, we'll be hearing more about this this afternoon, and plenty of time to ask many questions, and I'm going to hand it over to Conrad to discuss Senate Bill 201.

**Sen. Lee**

Okay, but maybe before Mr. Imel begins, let's see if there's any questions for Ms. Jenson, based on preliminary presentation. Senator Gardner.

**Sen. Gardner**

Thank you, Ms. Jenson. Thank you, Mr. Chair and Ms. Jenson, you may not have the answer to this. I'm going to ask this question because everybody's in the room. So, for informal proceedings, for formal proceedings, you note that there are six cases. For informal proceedings. I didn't see any statistics, numbers, or anything. Are those available? Are they reported? Or are they just so subject to confidentiality that we don't even have the statistics on what those cases might be, how many, and so forth.

**Sen. Lee**

Ms. Jenson.

**Juliann Jenson**

I think I'll defer to the Commission on Judicial Discipline for that. I can look in their Annual Report as well and see. Some of them are ongoing. So, it's not like a clear, like this is what happened in 2020

**Sen. Gardner**

Thank you.

**Sen. Lee**

Okay, seeing no further questions. Mr. Imel, please tell us about Senate Bill 201.

**Conrad Imel**

Thank you. Mr. Chair. Conrad Imel, the Office of Legislative Legal Services. As Ms. Jenson just described, but with a brief little background, the Judicial Discipline Commission is established in the Constitution. It was first created in the 1960s and updated in 1983. Though the Commission is referenced in statutes, prior to Senate Bill 201, it was not established in any way in the statutes. It's governed by court rule, which is what is required by the Constitution and funded by attorney registration fees. So, what Senate Bill 201 did was it established, pursuant to the Constitution, the Commission in statute and a new Office of Judicial Discipline. It set forth a process for information sharing regarding judicial misconduct. It created a new mechanism by which to fund investigations and evaluations, and it created this Interim Committee. And I'll go through kind of each of those.

So, first, pursuant to the Constitution, the bill establishes the Commission as an independent entity in the Judicial Department, and the bill sets forth its duties, including investigating judicial misconduct and hiring employees for the new Office of Judicial Discipline and employing attorneys or outside counsel to help the Commission and its investigations, the bill established a new Office of Judicial Discipline also as an independent office within the Judicial Department. The Office is subject to supervision by the Commission, and the bill sets the duties for the new Office, including providing staff support to the Commission, receiving requests for evaluation of judges, and conducting public education efforts related to judicial discipline. The bill establishes as the head of the Office an Executive Director, who is appointed by the Commission, and it sets the Executive Director's duties, including conducting or supervising evaluations and investigations, as directed by the Commission. The bill requires the judicial Department to provide space in the Ralph Carr Judicial Center for both the Commission and the Office. And, through June 30 of 2023, so through the next fiscal year, requires the Judicial Department to provide administrative support to the Commission and the Office.

Next, the bill creates a new cash fund, the Commission on Judicial Discipline Special Cash Fund. This is a new mechanism to fund evaluations, investigations, formal proceedings, and special projects that are undertaken by the Office or outside counsel. For fiscal year 2022-23, the bill appropriates $400,000 to the cash fund from the General Fund, and the bill requires the General Assembly to replenish the cash fund each year up to that $400,000 amount. So, if the Commission and Office use $100,000 during the next fiscal year, then, next year, the General Assembly would appropriate $100,000 to get the cash fund back up to that $400,000 threshold that the Commission and Office can use for its work.

Next, the bill sets forth a process for sharing information regarding judicial misconduct with the Commission and Office and other entities. There's two sections that discuss this information sharing. First is a section concerning information sharing among the Commission and other judicial oversight entities, which the bill describes or mentions as the Office of Judicial Performance Evaluation, the judicial nominating commissions, the Office of the Presiding Disciplinary Judge, and the Office of Attorney Regulation Counsel. The bill permits the Commission to share information with these oversight entities upon request and requires the oversight entities to share information with the

- 4 -

Commission and the Office related to judicial misconduct. The second section in the bill concerns information sharing from the Judicial Department generally with the Commission and the Office. And this is detailed more specifically in the bill with the judicial oversight entities. If a member of the Judicial Department receives a complaint from an employee, volunteer, or contractor of the Department, so like an internal complaint, the Department must maintain a record of that complaint and within 35 days, notify the Office of Judicial Discipline and provide the Office with information related to the complaint that the Department has. If the Department receives a complaint from someone who is not an employee, volunteer, or contractor of the Judicial Department, it must tell the complainant about the Commission and the Office, give them the contact information for the Commission and the Office, and forward any information it received to the Commission. The bill requires Judicial to adopt policies related to information sharing and to cooperate with the Commission. And the bill prohibits retaliation against any person for communicating with the Commission. The bill also prohibits Judicial from withholding from the Commission any information or materials based on a claim of privilege or confidentiality, and it states that when judicial does share that information, it does not waive the privilege or confidentiality. There are a few exceptions to that. The Judicial Department is not required to disclose any information where disclosure is prohibited by federal law, that is protected by a judicial deliberation privilege, or that's learned as part of a confidential employee support program. So, generally speaking, the bill requires the Judicial Department generally to share information with the Commission, but that does not waive any privilege or confidentiality of that information.

Next, pursuant to the Constitution, the Supreme Court is required to make rules relating to the Commission's procedures. The bill requires certain notice requirements related to that rulemaking, notifying the Commission if it is undertaking any rule changes related to its procedures and notifying the public of any potential rule changes in allowing for public comment prior to those changes.

The bill requires an annual SMART Act report by the Commission, and it requires the Attorney General to provide representation for the Office.

Lastly, the bill establishes this Interim Committee. I know you've already talked a lot about what the committee will do, so I won't get into too many details. There are a number of subjects listed in the bill that the committee is required to consider, and those are on that green sheet that was handed out to you. The committee is required to solicit input from certain specified parties, as the Vice Chair mentioned in her comments, and as Juliann mentioned, the committee is permitted to recommend three pieces of legislation to Legislative Council. Those could be bills or joint or concurrent resolutions. Lastly, the bill appropriates money for this new Office of Judicial Discipline and the aforementioned $400,000 to the cash fund.

So that is kind of a brief summary of Senate Bill. 201, happy to take any questions that you may have.

- 6 -

**Sen. Lee**

Thank you for that summary, Mr. Imel. That was quite a task to present a summary of a bill to the four bill sponsors. So well done.

**Conrad Imel**

Thank you.

**Sen. Lee**

Rep Weissman.

**Rep. Weissman**

Thank you question for either of you, and thank you again for stepping up to provide support for this committee. I think years ago, there was no limit on the number of concepts that an interim committee could send downstairs to be drafted, and the Chair and I were members of a particular interim committee in 17 that might have broken a record by requesting for drafting 19 or 20 bills when we were allowed to approve five. My recollection is that the legislative rules have subsequently been updated to impose a two-times multiple. So that by bill having been approved for three bills or resolutions, we may send downstairs by the 8/19 deadline, not more than six. And I think I see nodding heads. Okay. I just wanted to clarify that for all of us as we think about scoping out our future work and for anyone else listening, thank you.

**Sen. Lee**

Okay, any further questions from the panel to Ms Jenson or Mr. Imel. Seeing none, thank you very much for your presentations.

# Appendix 27(s)(i)(3)

# Colorado Judicial Department Presentation;

# Legislative Interim Committee on Judicial Discipline: June 14, 2022 Hearing—Colorado Judicial Department Presentation

**Sen. Lee**

Next up, we have a presentation by the Judicial Branch State Court Administrator Steve Vasconcellos, and Court of Appeals Judge Ted Tow. If you would join us and we thank you very much for being here. I would be remiss if I did not acknowledge at this point the efforts put out by the State Court Administrator during the drafting and development of 201. I want to publicly acknowledge your input and cooperative work to put together what resulted in 201. Were it not for that, we would not be here today. So, we can either thank or condemn you, but I would prefer to thank and praise you for the good work you've done, sir. So, who would like to begin? Judge Tow.

**Judge Ted Tow**

This room is new since the last time I came here 12 years ago. I thank you for this opportunity. Chair Lee and Vice Chair Carver, as well as the other members of the Interim Committee. My name is Ted Tow. I currently sit as a Judge on the Colorado Court of Appeals. I was appointed to that court in 2018 after serving about seven years on the trial bench in Brighton in the 17th Judicial District. One of my roles in that position was that I sat on the judicial discipline commission for approximately five years and chaired it the last year that I was on the Commission. I had to leave the Commission when I was appointed to the Court of Appeals, because, as indicated in the slide presentation, the judicial representatives or the judicial presence on the judicial discipline commission is, by constitution, designated to be two District judges and two County judges. The Court of Appeals is not accounted for. I believe, although I can't swear to this because I wasn't around, but I believe it's because the Court of Appeals didn't exist when we first created this in 1966-67. The Court of Appeals, in its current format, was created 50 years ago. If it existed, it was very nascent. I don't remember the exact year this, this iteration of the Court of Appeals was created by the Legislature. But as a District Judge, I was tasked by then Chief Justice Bender to fill a position being vacated by retiring Chief Judge Bailin from Boulder to serve on the Commission. And it honestly is the singular honor of my career as a District Judge. And frankly, was one of the things that made me almost not apply for the Court of Appeals because I didn't want to leave the Commission. It was that good of work. In fact, Judge Prince, who is here today, took my seat when I when I left the Commission. I served with Ms. Krupa, who is also here, and I served with Mr. Gregory, the Executive Director. He was a recent appointee, as I left the Commission. I want to give you, most of the background of the Commission that was stated there.

There is a background to that, as indicated by Chair Lee in his opening comments, this Commission is part and parcel of our transition in the late 60s away from an elected judiciary to a merit selection and retention system. They are all equal components and all essential components of the system. They are designed to prevent or to ensure, I should say, to ensure an independent judiciary. As Alexander Hamilton wrote in the Federalist Papers, the complete independence of the courts of justice is peculiarly

- 1 -

essential in a limited constitution. The judiciary and the judges are not political entities. It is not a political body. We are not governed by and are not supposed to be subject to the whims of the political airs of that moment. We decide cases based on law and fact. The Court of Appeals, in particular, decides cases based on law. We take the facts as they come to us. But the independence is important so that we don't have judicial decision making. We don't have the law being interpreted, so to speak, based on whatever the popular sentiment of that moment is. That independence and that non-partisan, non-political element of the judiciary is essential, and it is part of why the Commission on Judicial Discipline and the Commission on Judicial Performance exist. They exist to ensure that a judiciary free of fear of retribution for an unpopular but legally sound decision, is the central core component of the judiciary. And the separation of powers under which our system is created recognizes that those lines need to be carefully maintained. I won't go so far as as Mr. Hamilton when he said, "There is no liberty if the power of judging be not separated from the legislative and executive powers." He wrote that in the context of why they were giving lifetime tenure to the federal judges, and one can certainly debate whether that's in 200 years of retrospective views a good thing or not. We don't have that. We do have a constitution that says the legislature will, to some extent, establish some of the procedures and that type of thing. So, there is some involvement, and that's why we're here. And, for example, the separation of the funding mechanism last year in 201 was an important step, and one that the judiciary welcomed.

I want to talk, though, briefly about the how the Commission works, and, obviously, I haven't been there in five years. There might be subtle changes in in the process since then. And obviously Mr. Gregory or Judge Prince or Ms. Krupa can correct me if how they're handling things is different now. I don't think it would be substantially different, because it's generally set up by the Rules. Again, the Commission exists as a way to investigate, discipline, and, if necessary, seek the removal of an unethical judge. It is important to understand what it is not. It is not an appellate body. It does not have the task of telling judges they got something wrong in their decision. Rather, its specific charge is limited to taking action against, "Willful misconduct in office, willful or persistent failure to perform duties, intemperance, or violation of any Canon of the Colorado Code of Judicial Conduct," and the language of the Constitution also goes on to say, "or the judge may be retired for disability interfering with the performance of his duties, which is, or is likely to become, of a permanent character." So, what does the Commission look like? And here I have to respectfully disagree with Chair Lee. The Commission is not judges deciding what charges are filed. The Commission is made up of 10 individuals, only four of whom, not even a majority, are judges. The two District judges and the two County judges that I spoke of. In addition to those four people, there are two attorneys and there are four citizens, who are not lawyers and have not been judges. So, 10 people, only four of which are actually sitting as judges, are the ones who make the decisions through 98.5% of this process, and I don't mean that to be a mathematically specific term, but through the vast majority of the process, and I'll get to the end of that.

I think this makeup is interesting. I have not read all of the Title 12 statutes, although some of them do come before me as a Court of Appeals Judge. But I would from the times that I have run across some of those statutes, the Architecture Board, the Pharmacy Board, the Medical Board, etc. They are all made

up of largely members of the profession they are governing with some non-member participation. I don't have mathematical statistics, but I would submit to you that 4 out of 10 is probably on the low end when you think about a board of a profession governing the disciplinary aspects of that profession, being actually members of the profession. That's important, because I've heard the viewpoint that judges shouldn't be judging judges, and I think it's important to understand that they aren't.

The Commission is, as was pointed out, in the one-tier system, the Commission receives the request for evaluation. The Commission, through its Executive Director, decides which ones are not just appellate issues and are actually within the bailiwick of the Commission. The Executive Director then refers to a Commission member the role of investigating whether there is merit, whether there is something that is a violation of the Code of Conduct, or one of the other bases: willful misconduct, willful or persistent failure to perform duties. That individual member, and this part is the part that may have changed, but when I was on the Commission, that individual Commission member would review the file, review the records, review all the documents that the Commission had available and make a recommendation to the Commission whether proceedings should begin, whether private discipline should happen, those types of things, or whether it should be dismissed because after review, there isn't an ethical issue here. Those decisions are all made by the Commission.

If the decision is then made to proceed with private discipline. And there are, there are three types of private discipline. There is a letter of admonition, a private admonition, that is for an appearance of impropriety, though the behavior otherwise meets the minimum standards of Judicial Conduct. If that's what the Commission decides this has happened, then they will have the Executive Director issue on their behalf, a private admonition. If it goes one step further, if the conduct does not meet the minimum standards of judicial conduct, then they'll they will issue a private reprimand. And if it's one step further, it will be a private censure, which is for a substantial breach of the standards of judicial conduct, but not one that the Commission feels warrants formal proceedings and formal charges.

On the other hand, if the Commission decides that formal process is appropriate in a particular case. And you've seen, as indicated, I think there was some number of approximately 10-ish in the last several years that have gone, if you look through the 2020 Annual Report which is the most recent one online, and that's normal. The Annual Report usually comes out about this time of the year for the previous year. And by the way, I would encourage all of you, if you go to the Office of Judicial Discipline's website, every Annual Report is right there online from 2001 on. And if you read them, you'll see, in my view, a remarkable consistency of how the system has worked. But if they recommend that a formal action gets taken, then the Commission will appoint Special Counsel. When I was there, it usually was essentially asking the Office of Attorney Regulation to loan us an attorney to do a deeper investigation and to come up with a formal decision as to whether or not to file charges. They recommend to the Commission, Special Counsel does, whether that next step is appropriate, and then the Commission makes that decision. All of this time, the Supreme Court is not involved. The Supreme Court doesn't even probably know about it, unless it happens to be one that is generated from within the Branch, like a

human resources complaint, a sexual harassment situation that the Supreme Court was made aware of for other reasons, but not through the Commission. But in my experience, the Supreme Court never reached out and monitored or suggested that things happen or micromanage the situation in any way. The only involvement of the Supreme Court up until the last steps in a formal process was essentially the funding decision, which Senate Bill 201 already fixed.

So, if the Commission decides to proceed with formal procedures, formal corrective action, then, as of approximately 2008, the process is that the Supreme Court is asked to appoint three Special Masters. And those Special Masters are judges who have no involvement with the case. Judges who have no reason to be conflicted off the case. There was a practice at the time that there was an attempt to get a variety of geographic background, gender, et cetera, to the extent you can get on a three-judge panel. But they would seek out people, not from all one District or even neighboring Districts, who could serve, who could find the time in their in their busy dockets, to serve as special masters. Those Special Masters would essentially act as a fact finding body. The Special Counsel would present the case to the Special Masters. The Special Masters would find facts as essentially a small jury would and when they were done, they would come back with a recommendation, which would be taken to the Commission. The Commission would then decide whether or not to make a recommendation to the Supreme Court to authorize formal discipline, public discipline, or actually, the Constitution still permits it to step back to go to private discipline, if that's what that fact finding would warrant and if that's what the Commission would recommend.

So, the Supreme Court's only involvement comes in at that point, and that is to approve or disapprove of the recommendations. To my knowledge, just I was not a part of those presentations, and I was obviously never on the Supreme Court. But if you read the Commission's public reports, Annual Reports, you will see only one mention of the Supreme Court not accepting one of the recommendations of the Commission, and in that case, I believe there's a reference in the Annual Report that they didn't accept it because they didn't feel that the that the timing of the judge's departure from the bench, which was part of the deal, was appropriate. So, it isn't a situation that is controlled by the seven Supreme Court Justices. It is not a situation that is micromanaged by the seven Supreme Court Justices. It is a situation that the Commission has the authority to initially screen, to, after screening, dismiss or proceed, to proceed with a private discipline, or to recommend a public discipline and the formal proceedings that are associated with that. That's very important, I think, in how this system works. The Supreme Court, again, by constitution, is not bound to accept the recommendation. It is free to impose any of the disciplinary levels.

I skipped over one thing. There's an important part of this, and that is that it's not always a disciplinary step. Sometimes there is what might be referred to as diversion or a monitoring program. For example, if a judge has trouble getting a docket under control and the delays in the cases are multiple and long standing, the discipline commission will get involved. And the discipline commission, in the past, has imposed a monitoring process where that judge has to file periodic reports with the Commission to say,

- 4 -

here's the steps I've taken to get caught up. I've made progress on this number of my outstanding cases, or it might be a requirement to take a class on employee management, if it's an employee-employer situation. Judges are not their clerk's employers, but for many intensive purposes, they're similar enough situated that that those issues can arise. Or maybe it's an anger management class if there are interpersonal issues, for example, amongst the judges, and one of the individuals is seen to be the problem in that regard.

So, there's a lot of pre-judicial discipline steps. Then there's the private discipline, then there's the public discipline, and all the way up to removal. And one of the stark things you will notice when you review the Annual Reports, is the outcome is often, especially once public charges are filed. Not public charges, they are not public until the recommendation is made, but once formal charges are filed. I don't have a percentage, but I would, I would submit to you, it is a majority of the time. If you go through and tally, I may be wrong, and it may be 50% or close to that, but it is a significant number of times that the individual simply retires or resigns during the process.

And that's where we get into some of the transparency difficulties, the confidentiality is essential. You know, obviously, judges are public figures. You folks are public figures. You folks get sometimes run through the mud in the press or in somebody's, you know, tweets or whatever. But the significant difference is, as a judge, our ethical code prohibits us from even responding. We cannot even counter with a public statement, any statement made against us. We can't campaign if we're standing for retention, unless there is an organized campaign against that judge, which, to my knowledge, in the time I've been on the bench or involved in the process, I think has happened once, maybe twice, that there was an organized campaign with billboards don't retain this judge, that type thing. So, we don't have the ability, we don't have the authority, and we are ethically prohibited from engaging in those discussions. So, the earlier these complaints or these requests for evaluation, which is what they're called in the Rules, get publicized, the more dangerous it is, because the more it can instill in a judge, the unfortunate human reaction of, well, now I got to be careful how I decide these cases. And we don't want that. We want the judges to be able to make the decisions that have to be made without fear of political retribution. That confidentiality sometimes leaves the public at some level of a disadvantage. In other words, frankly, it's much like the performance system as Chair Lee was involved in some of the modifications on that a few years ago. There are times when a judge will get an advanced copy of the evaluation they're going to receive from the Performance Commission in a retention year that says we're going to have an opinion that says you don't meet recommendations. And, more often than not, then when that happens, the judge says, well, I'm just not going to stand for retention, and the public never sees that the system worked. And that's a difficult line to draw. There's a value to that confidentiality, because if the rule were to change and say, well, that that report is going to become public anyway, then maybe that judge says, well, forget it, I'm going to try anyway. I might as well stand. And then we don't have an unperforming judge or a badly performing judge leaving the bench, which is what the system is designed for. But if it's private, then you have this question of, well, the public is out there asking questions or wondering, is the system really working, or is this just a rubber stamp? Discipline is kind of

the same way, in the sense that when the judge is brought up on formal charges, but before they become public, because they become public at the time the recommendation of sanction is made to the Supreme Court. If they retire or resign as part of the negotiation or just because they're they don't want to fight it.

We have this, a system worked, but maybe not in a way the public can see, and how do we bridge that? That's a difficult question, and one that can have adverse consequences, but I will suggest to you, and Ms. Jenson, I would say, in reviewing the Annual Reports, there has been a slight change over the years. I think Executive Director Campbell started it, and I think Executive Director Gregory, I would assume, is going to continue it. And that is the later Annual Reports do include a brief synopsis, without naming the judge of, in one case, we issued a private reprimand it involved, and a very brief description of what the judge did. I submit to you that has tremendous value. It does open that transparency to the to the public. They can see that the system is working. They may not find out who the judge was, because it was private. It was private discipline, but they're going to see, okay, but a judge who does that's going to get in trouble. And the other value of it is when a judge reads that Annual Report and says, okay, that's behavior I should stay away from. So, there's an educational value to the rest of the bench as well. But there is more transparency in this system than I think you might imagine there is. That Annual Report is full of information about how the system works, why it works the way it does. In reviewing those reports, you will see again, the vast majority, as Ms. Jenson's numbers showed. The vast majority of the of the initial requests for evaluation are screened out by the Executive Director because they are nothing more than the judge decided against me, they must have been biased. That's an appellate challenge. That's not a, if there's a specific allegation of he was biased, or she was biased because of these steps, then the Commission will look at it. But if it's a I lost, and I'm upset at the judge, which is this past year, the 2020 year being somewhat of an anomaly in the only 60% range. Most of the years, it's 80 to 90%, if you look at the statistics, I jotted a few of them down. For example, in 2018, 200 requests for evaluation, 183 of them were screened out. 154 the previous year, 123 of those were screened out. So, it's upwards of 80, low 80 percentages that that shouldn't even have gotten there. They are just an individual who's disgruntled because they lost. But then there's those dozen or so every year, and the Commission is given those by the Executive Director, and the Commission follows up on them, not the Supreme Court. Supreme Court doesn't even know about them. Yet, the confidentiality versus transparency is a tough line to walk. I will suggest to you that some of those answers are very difficult. But because of how the system often works by essentially forcing the hand of a poorly performing or poorly behaving judge to just step down, the system is working. And if you look at the Annual Reports over time since this system has been created, I believe you can add up somewhere over 40 judges have resigned while these disciplinary processes have been in place. And those are the ones that don't necessarily get tallied as showing that the system worked.

Happy to answer any questions that you may have.

- 6 -

**Sen. Lee**

Thank you. Judge Tow for that presentation. And I very much appreciate your background, having served on the Commission. So, you know it as a practitioner, not just an academic. So, thanks for that. Any questions from the committee? Senator Gardner.

**Sen. Gardner**

Thank you, Mr. Chair. Judge Tow, good to see you again.

**Judge Ted Tow**

Good to see you, sir.

**Sen. Gardner**

Thank you. A couple of procedural questions, and they kind of revolve around this issue of, are judges the judges of judges. And your points are well taken with regard to makeup of regulatory bodies and disciplinary bodies in the State and I think across the country. But there seemed to be a stage in the process at formal charges where Special Masters are appointed. And I think you indicated those Special Masters, all three are sitting judges, and they not only fact find, but make recommendations. And so let me sort of roll the questions out. One is, is the choice that those Special Masters all be judges, statutory or constitutional? And two, is it ever the case that non-judges are appointed as Special Masters or to serve on this panel of Special Masters? Because it does seem, and I'm not asking this to be unduly critical. But it does seem to me that is a point in the process where we do have all judges doing the judging, if you will, of those elected officials or those public servants.

**Judge Ted Tow**

I will.

**Sen. Lee**

Judge Tow.

**Judge Ted Tow**

Thank you, sorry, Mr. Chair. I will first have to tell you I know that the ability to appoint Special Masters is referenced in the Constitution and then embodied in the Rules after the 2007-2008 changes, I don't recall off top my head if it is designated that they are judges. Although the concept of Special Masters is not foreign to the judicial system, there's a there's a civil procedure rule where Special Masters can be appointed, and they quite often are. And the purpose of the Special Master in that context, and it equates in this context, is to appoint someone with subject matter expertise on a difficult area, because they're going to be the fact finder. They're essentially a highly trained jury, instead of just a jury. That's what a Special Master is designed to be. I would submit to you that it should be judges, and for various reasons. One, every one of them is as a judge. And by the way, at least on one occasion, I think one of the Special Masters was a retired judge who was in the Senior Judge Program, but still a

- 7 -

judge. In that context, those individuals are bound by the very same code of ethics that they are making fact findings about. Whereas if you had a somehow a citizen board that wasn't judges that there is not an ethical code. Those judges are trained to be judges. They're trained to make decisions. They're trained to be fact finders, and they have the subject matter expertise of knowing what those rules that are applicable and that are the governing principles and ethical obligations are. One of the things that I think the general public doesn't understand and doesn't know, and frankly, the press never seems to note this difference. In Colorado, and frankly, in most states, every single judge, including the supreme court justices, are bound by the judicial canons. The U.S. Supreme Court has no judicial canons that it must abide by. It's a different situation. So, if a Special Master is appointed by the Chief Justice or by the Supreme Court as a body or to serve on one of these three judge panels to do the fact finding. And by the way, they make the recommendations, again to the Commission. The ultimate recommendation for what the discipline should be comes from the Commission, which does include citizens, non-judges, non-lawyers. But the Special Masters, with their expertise in this subject matter, doing the fact finding is, I believe, essential, because they are bound by that same code of ethics. They know it. They understand it because they're bound by it, but they're also bound by it in their decision making. So, for example, if the Supreme Court says, you know Judge Smith, you're tapped to sit as a special master on these charges against Judge Jones. And Judge Smith says, I go to the theater with him every month. I can't sit on that case. He won't sit on that case, because he has to recuse. There are recusal rules. There are ethical obligations of when you cannot sit. And the Special Masters would have to follow those. The Supreme Court would have to follow those. And to my knowledge, never has failed to. So, I think that that is a significant difference. As Special Masters, they are supposed to be subject matter experts in this field.

**Sen. Lee**

And I'll clarify if I could, Senator Gardner. Under the Rules of Judicial Discipline, Rule 18.5 Special Masters, "The appointee may be retired justices or active or retired judges of courts of record who have no conflicts of interest and who are able to serve diligently and impartially as Special Masters. Unless otherwise designated, the judge or justice first named in the Supreme Court's order shall be the presiding Special Master. The presiding Special Master is authorized to act on behalf the Special Masters." So I would say they probably are. It says they may be. And it'd be interesting to know if there have any been appointed who were not judges. So, I think the answer is probably yes. Senator Gardner.

**Sen. Gardner**

Thank you. And on another aspect of this issue. So, we have four judges on the Commission, two District Court, two County Court judges. Are you aware of any instances, and I understand you have to respect confidentiality and so forth, but to the extent you can, are you aware of any instances when complaints have been made against sitting judges on the Commission itself, and if so, how are those handled?

- 8 -

**Sen. Lee**

Judge Tow.

**Judge Ted Tow**

Yes, sorry, I forget that part. Thank you, Mr. Chair. I was the subject of a complaint when I was on the Commission. In fact, when I was the Chair of the Commission, and what happened was the Executive Director called me and said, Come to the meeting 15 minutes late. We have something to talk about that you can't be there for, and it turned out to be one they screened out. It had to do with a complaint about how I handled two badly behaving lawyers, and one of the clients felt that I picked on their lawyer more than the other lawyer. But the process is that judge doesn't participate. There is also a process by which, for example, when I'm sitting as an Adams County Judge, and one of my good friends who, I use the theater example, because that happens, I have tickets, I go to the theater with a friend of mine who is also a judge. If that person is brought up on a complaint that is not going to get screened out by the Executive Director, but it's going to come to the Commission. I'm going to leave the room because I shouldn't sit on that and I am bound in that role, as I am in my black robe, sitting on the bench. I am bound by the obligation to not participate. And those happen, those judges would step out of the room.

**Sen. Lee**

Senator Gardner.

**Sen. Gardner**

Thank you. In your testimony, Judge Tow, you spoke briefly about the I'll call it non-involvement of the Supreme Court bench in these cases. At what point would a member of the Supreme Court become aware of a complaint against a County Court judge or District Court judge? Would they, I mean, they might hear about it through scuttlebutt, but I mean, sort of formally hear about it.

**Sen. Lee**

Judge Tow.

**Judge Ted Tow**

Thank you. That is absolutely true. I can't tell obviously, when the informality and the conversations in the back rooms and back hallways would lead to somebody knowing something. But from a formal process, unless the Supreme Court. Let me step back, sometimes a case would come to us when I was on the Commission that essentially started as an HR complaint that an employee went to HR with a complaint about how they're being treated by the judge, or whether they were being given appropriate breaks, or maybe it was, I don't think we had, no, we did have some allegations of sexual harassment that type, or hostile work environment. So, HR generally would be kind of the ones to bring it to our attention. I would assume that at some level, that conversation went up the chain to the head of the Branch before that step was taken, because they're the head of the Branch. They're the CEO, so to speak. So, they're going to have to know what's going on with their employees and their employment situations.

- 9 -

So, the ones that are generated internally, my guess is they probably learn about them because they're trying to fix the HR problem that's existing either parallel with it becoming a disciplinary issue, or not withstanding that it's becoming a disciplinary issue. But for those that are litigant based, or, frankly, a lot of times, you'll see in the in the Annual Reports, there's always a handful every year that are filed by somebody who's not even involved in the case. Those types that come from outside of the branch, I don't know why they would know, or how they would know, and they wouldn't know formally until the filing of the recommendation. I believe that's correct. I don't want to overstate that.

**Sen. Lee**
Senator Gardner.

**Judge Ted Tow**
They might be notified at the time of formal charges. I don't want to misstate but no earlier than that point.

**Sen. Gardner**
Let me ask, Mr. Vasconcellos, you haven't testified yet, sir, but as State Court Administrator, do you have anything to add to that, or can you shed any light on when might the Court learn of a complaint? Would they learn of it before it was a formal charge?

**Sen. Lee**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Thank you. Senator Gardner. Before it's formal, no. I will tell you I've had the opportunity to speak with the Court about this matter of recusal in general. I think it's important to note that the Constitution was not constructed, the current language was not constructed with Supreme Court recusal in mind. There is arguably a fairly significant flaw in the current structure, a flaw that is recognized by the Supreme Court, a flaw that they're concerned about and a flaw that they very much want addressed. I am confident that we can work with the Commission, leadership from the Commission on Judicial Discipline and do our level best to arrive at a consensus idea to present to this committee, obviously subject to where the committee ultimately wants to go themselves. But I think there's a rich opportunity here for collaboration between the Judicial Department and the Supreme Court to address the whole. I can wholeheartedly assure you that no member of the Supreme Court wants to be in a situation where there's clearly a conflict and unclear guidance in the law about how to address such a conflict.

**Sen. Lee**
Senator Gardner.

- 10 -

**Sen. Gardner**

Thank you. Well, for either of you, how would the Court handle a complaint? And I think you sort of touch on this, Mr. Vasconcellos, but how would the Court handle a complaint related to a current or former member of the of the State Supreme Court? Because that's really the issue below that, other than the sort of personal relationship recusals that might be required. It doesn't seem like we have a have a problem, but once you hit the Court, the Court is responsible for the entire system, and so how would, how would the court handle that?

**Sen. Lee**

Mr. Vasconcellos. And maybe you should introduce yourself.

**Steven Vasconcellos**

Thank you, Mr. Chair. My name is Steven Vasconcellos. I'm the State Court Administrator for the Colorado Judicial Department. Senator Gardner, thank you. If I may ask a clarifying question, are you speaking just sort of broadly about conflict that might arise, or, you know, more specifically, Judge Tow, for example, earlier gave an example where he was the subject of a complaint, or are you speaking more specifically about an issue such as that?

**Sen. Lee**

Senator Gardner.

**Sen. Gardner**

Thank you, and I appreciate the request for clarification. I suppose let's say that we had a new seventh member of the Court, someone retired, and this was Justice X. And there was a complaint that Justice X engaged in some conduct in chambers with an employee, and that complaint was made by the employee to the Commission on Judicial Discipline. What would the other members of the Court do? How would they handle this issue of their colleague sitting on the bench right next to them at the same level? Would they, and I think you sort of alluded to this. I mean, would they be required to recuse themselves? Should they? Is there a process? How do we deal with that? That may raise more questions back to me, I understand.

**Sen. Lee**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Mr. Chair. I think there's two components to this, and I wouldn't mind Judge Tow helping clean me up on this, but I think there's the ethical responsibility that attaches, regardless of what existing law is. But I think we'd be in a much better place if there were clear legal mechanisms for how those situations were handled when, you know, at the extreme case. You know, this is sort of a reverse telescope, if you will, this Commission on Judicial Discipline process where there may be a high number

- 11 -

of cases coming in the front end, ultimately winnowing down to the number that actually reached the consciousness of the Supreme Court, being relatively few. But it's possible, from just an intellectual standpoint, at least, that a case involving a justice of the Court would find itself before the Court. We need clearer mechanisms in the law to address it. This is an issue of great, great concern and great import to the Supreme Court that would be addressed through this process, through this interim committee process, because while the ethical obligations clearly attach, we're going to be in a much better shape if we have procedural mechanisms in place in parallel. Because there's, I think there's too much opportunity for reasonable questions about, will they? What happens? Will they do the right thing? It's a little bit of uncharted water.

**Sen. Lee**
Senator Gardner.

**Sen. Gardner**
Thank you. Well, is it then fair to say, and if I don't have this right, don't hesitate. That, if a complaint were filed against a sitting well even a retired justice of the Supreme Court, and it came to the formal charge stage at a point where there the other members of the Supreme Court would be required to consider, take action. On the one hand, the Constitution says that that's the duty of the members of the Court to do that. At the same time, the ethical Canons would call for them to recuse themselves, and presumably all six might say, I serve with this person, and I'm not comfortable doing this, and the appearance is not good. Constitutionally, on the one hand, it doesn't seem like there's a mechanism to deal with that. But the ethical Canons say you must recuse yourself, and we need to replace them with some justices, and maybe you go to the Court of Appeals, or maybe you do something. But we need to resolve that for you, and maybe you can do that by rule, but it's not clear to me that the rule trumps the Constitution, either. So, this may be one of the things that we need to take a good, hard look at as a commission. And I think Judge Tow may have a response. Mr. Chair.

**Sen. Lee**
Thank you for teeing that one up, Senator Gardner. Judge Tow.

**Judge Ted Tow**
Thank you. Mr. Chair. Thank you, Senator Gardner. I just wanted to give a little background just in the generic concepts of this recusal idea, because it's not easy. There is an ethical obligation that under certain circumstances, a judge must recuse. There is also an ethical obligation that the judge must sit. In other words, we can't recuse just to duck the hard case or to, you know, this one's got too much, too many pages in the record. I don't want to deal with this one. I recuse. That's an ethical violation. So, we have a duty to sit on these cases, unless there is the ethical obligation to recuse. The ethical obligations to recuse are not always entirely clear. Obviously, if we have a financial interest, we have to get off the case. Those types of things are the are the clear, easy ones. The appearance of impropriety ones are a little bit more difficult. And I'll be honest with you, to some extent every judge is going to have to be the

- 12 -

judge for him, her, or themself to make that call. For example, when I moved from the District Court bench in Adams County to the Appellate Court bench, I did not recuse off of every Adams County case, just because I used to sit with and considered myself professional colleagues with the judge. If the judge made an error, I would reverse the judge. When I sat in the District Court, I was the appellate judge for the County Court cases. I served with those County Court judges in the same building. I would reverse them if they were wrong. But there were a couple of judges that I had a social relationship with. I'm not going to sit on that case. Other judges felt that it was for them more comfortable to just say I'm not going to touch an Adams County case for three years until I've been on this Court of Appeals that long. Ironically, there are three of us on the Court that were Adams County trial judges who are now on the Court of Appeals. So that's why I say Adams County. So that's somewhat of a personal decision. But when it comes to something like this, when it comes to the Supreme Court Justices sitting in the decision of whether this colleague of theirs will be publicly sanctioned or even removed from office, that I would submit to you, that the vast majority of, not all of them, would have a very heavy weight on the side of this is an appearance of impropriety if I sit on this case. I can't speak for them, but it's a different calculation. I just wanted to be clear that this recusal idea of when it's an appearance of impropriety is a little in the eye of the beholder, and we have to ultimately make our own decisions. Some of my colleagues will never sit on a case that is argued in front of us by one of their former law clerks. Some will. I don't know that you can say that that's always an appearance of impropriety, but it depends on what their relationship continues to be. Another example, if I have a situation where I'm dealing with a case that is being prosecuted by my former office when I was a prosecutor, before I was a judge, I don't get off the case just because it's my old office. But if there's a claim that one of my former colleagues committed prosecutorial misconduct, where I'm actually making a decision as to this person's behavior, that's different than saying a legal error was made. I can say a legal error was made. I'm not going to put myself in the position or my former colleague in the position of judging an allegation that that prosecutor committed misconduct. I'm going to get off that case. So just an example of where some of the calculations come in, some of the decision making comes in. What is a reasonable expectation of what the public would see as an impropriety is where we're trying to make these decisions, and different people will come down differently. But on something like this, I would submit to you that you're probably going to get a fairly uniform answer. And as you noted, there is no answer for when they do, there is no constitutional construct to replace them. The Constitution does explicitly say, if a justice is the subject of the complaint, that judge will not sit. But it doesn't go one step further and say, well what about the colleagues?

**Sen. Gardner**

Thank you both.

**Sen. Lee**

So, thank you for that. That's a really challenging situation that we might find ourselves in. I'm looking at the Colorado Rules under Rule 2.11 under disqualification, and it talks about the grounds for disqualification, and then it gives the but for at the end, the rule of necessity. And it says in limited

- 13 -

circumstances, the rule of necessity applies and allows a judge to hear a case in which all other judges would have a disqualifying interest or the case would not otherwise be heard.

**Judge Ted Tow**
I think, in this, sorry Mr. Chair, if I may.

**Sen. Lee**
Go right ahead.

**Judge Ted Tow**
Under the current construct, I believe the rule of necessity would be the only backstop. And in a situation where, where a justice was facing discipline, the current court would, under the rule of necessity, probably have to sit, because otherwise there is no decision maker in place in the current construct.

**Sen. Lee**
Well plan B would be the case would not go forward, because all the judges would have to disqualify themselves, but for the rule of necessity, and that seems to me to be an impermissible or inappropriate end point. I just would ask for your opinion on that.

**Judge Ted Tow**
In my opinion, what would probably happen is that a majority, if not all of the remaining justices, would say to themselves and say publicly, if we don't sit, no one can. This case needs resolution. So, under the rule of necessity, where we would otherwise recuse, we cannot. And we will sit and they would do their utmost to fairly and appropriately adjudicate that proceeding.

**Sen. Lee**
The challenge there is the appearance.

**Judge Ted Tow**
That's the problem.

**Sen. Lee**
The public appearance of impropriety and the and the public might say, this just doesn't pass the smell test. So, we're going to be looking forward to a proposal, creative proposal, to help resolve that issue. So, thank you for raising it, Senator Gardner, and for discussing it in great detail. Very much appreciate it. Rep. Bacon.

- 14 -

**Rep. Bacon**

I'm sorry that you have to lean. Thank you. And I didn't mean to interrupt if I was, so please. And thank you, Senator Gardner, for your questions. I had very similar questions. And I just have one thing I want to do to check on my understanding. Then, I want to shift. And I know, Mr. Vasconcellos, you haven't testified yet, but I figure I'd put some questions out there, perhaps, if that might guide. And, so, I think, I guess my question is, in all of these processes, ultimately, the Supreme Court assigns the Special Masters, but then they also have the final call on a few things, not only the discipline, the disciplinary steps, but even what may come from the Commission. And I just want to understand, at the end of the day where the power really lies to be able to make final decisions. And I think we've kind of landed on it, and per the Constitution, it is with the Supreme Court. Is that an appropriate statement that I'm making?

**Sen. Lee**

Judge Tow.

**Judge Ted Tow**

Largely, yes. The ultimate answer, once formal proceedings are filed and a recommendation of discipline is made to the Supreme Court, the ultimate answer of what that discipline will be, whether it's accepting the recommendation or choosing one of the other options, ultimately lies with the Supreme Court. The only question I had was one of your phrases, was the ultimate power on what comes out of the Commission. And no, that is not the Supreme Court. The Commission makes the decision on whether a recommendation will be made, and that is not overridable by the Supreme Court.

**Rep. Bacon**

Yes, and thank you for that, and that's my understanding as well. So, I'm sorry for misspeaking there. I guess my question for both of you, then, when it comes to, you know, like this Branch, and, quite frankly, the managing and running of the courts, I guess I'd like to better understand whose responsibility is it to really address the culture that it feels like we're trying to address. I mean, you mentioned earlier that we have some things that the public doesn't see by way of the system working. We have, obviously, a lot of headlines. And if this isn't necessarily about judges judging judges, then to me, it seems like we may have some culture issues that's you know, kind of leading to these outcomes that we're seeing. And, so, my question is, in regards to the Branch that I think I'm going to phrase these questions, if we think about it as an organization. What is the Supreme Court's role in really addressing culture and really digging into everything from the lines of complaints? Where the complaints are coming from? By way of top lines, themes, right? Not necessarily digging in into any case, and the types of questions that I have under that, if I was thinking about this organization and an accountability system around its culture, there's some types of data points that I'd be curious to see, and so I'm going to provide these as an example for you to share what you may or may not do, but also it may lead to some insights into how we might mitigate some of these problems. So, for me, it's like, how many resignations do we have? Are they higher this year than they were last year. When do those resignations occur before,

- 15 -

during, or after? How many complaints do we have, and what are the categories? And if we dug down, who are the top five people with those types of complaints? What does that mean for interventions? What does that mean by way of what we want to see next year? Even from that is, what kind of goals do you set? Do you set goals or targets by way of what you want to see or what you don't want to see? And over and over again. I think some other questions that I'd have with that as well is, if we know that there is a Commission that has, you know, all of these wonderful people. How many times does the Supreme Court disagree with the Commission's findings? Is that public, you know? And so I guess all of that, for me, comes back down to the questions, what does the organization, theoretically, say every year about outcomes they may want to see? Questions that they may have? Whether it's internally derived or externally. Like it seems like Coloradans are curious about inclusion and diversity, or number of convictions or findings. And then what kind of information do you look to track that, and then how much of that is made public, right? And so, if you're going to get to that in your testimony, thank you. I know we're not necessarily talking to any of the Supreme Court Justices, at least today. But I am curious on an organizational level, and I think where that comes back to your testimony, Judge, is just to the extent of, how can we track then where the ultimate decision making is happening, for whom, and therefore, then, the effectiveness of, theoretically, the Commission, right. The effectiveness of justices, and so forth. Is that clear when I'm describing? If it's not, let me know. I tried to fit it in two minutes. We're going to be here for quite a while. But just let me know what isn't clear, and I might be able to help clarify.

**Sen. Lee**
Thank you, Rep. Bacon. Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Thank you, Representative Bacon. How about this? I'll do my best, and if I've forgotten something, bring me back in. And if I don't have a good answer today, I'll certainly endeavor to bring information back. But I think it's most important in the portfolio of areas of interest that you've expressed, I think it's most important to start with the notion of culture and the question, what is the Supreme Court's responsibility when you think of it as, I think you correctly described it as an organization. You know, the Colorado Judicial Department is a 4000 person nearly three quarter of a billion-dollar operation that is part of the Colorado State Government. But just from an organizational standpoint, it is a large, complex organization with lots and lots of employees. And if you will, I think you can think of the Chief Justice sort of as the CEO and the Supreme Court as his Board of Directors. Having said that, the current approach today. Where we're at today, with this current generation of the Supreme Court, this is a new approach, and we are in uncharted grounds that started around the time of my appointment. Frankly, because of events that led to my position being vacant and my subsequent appointment. It has nothing to do with me personally, but this time is now. This time is now. Historically, the Chief Justice was either the only or overwhelmingly the primary justice involved in administrative matters. There were certainly instances where individual justices may have had a particular administrative interest and dove deeper into that area, but by and large, when thinking about

- 16 -

the operations of the Judicial Department at a high level, it was really the Chief Justice, along with the State Court Administrator, and over various generations, varying degrees of engagement with Chief Judges across the state, court executives, chief probation officers, etc. One of the critical, well, one of the blind spots that can accrue with that is you become heavily reliant, heavily reliant, arguably, on the person in my position, the State Court Administrator. Now, to be sure, I have an important role to play. It's a constitutionally created position. I'm an important advisor to the Chief Justice and the Supreme Court. And at the same time, nor should they be solely reliant on me or anyone in my in my role in decision making. We are all human. We're fallible. We have blind spots. No one person can provide the entire global perspective of advice needed for a body like the Supreme Court to make the best decisions about the administration of the organization, not from a judging role. But again, I think in the vein that you're talking about, which is just sort of the real, basic operational, this is a large organization of people. How do we do our work well? How do we treat these people well? How do we have this be an organization we're proud of? The old, historic way wasn't working. We became too reliant on too few voices, arguably. Critical information was not shared in a timely fashion or shared at all. And I can tell you, just from the perspective of my role as State Court Administrator, I don't do this job by myself, nor could I possibly imagine doing it successfully alone. This sort of, you know, strong leader model, where I know best always. I am incredibly reliant and gratefully reliant on my staff of 200, on leaders across the State, be they chief judges, court executives, chief probation officers, clerks of court, to bring information to the table. To bring perspective to the table. In order for me to make the best decisions where I own the decision, or make the best recommendations to the Chief where I own them. Operationally, the big change now is, yes, the Chief Justice is still the Chief Executive Officer of the organization, but each one of the Justices is now also assigned to a major operational area of the Department, and they sit as an *ex officio* member of the standing committee the advisory body for that area of the Department. Those advisory bodies are made up of leadership from all over the State, from different levels within the organization. We are trying things that are different. Some things will probably work well, some things probably won't, and we will need to adjust. But we're trying to create a system now where there are a multiplicity of voices coming into the Chief Justice so that we avoid those blind spots, so that we avoid ceding too much power into one person, so that ultimately the Chief is still the Chief. They will still have this, this obligation as the CEO, if you will. But how do we put them in the best possible position? This is the big shift that the Supreme Court has made. That leads to culture. I would argue that culture in the organization. And let me, unfortunately, as I'm prone to do, digress for a moment. We have 24 because of the way Denver is constitutionally created differently than the rest of the state court system. We have 24, essentially, although they're not numbered 24 but we have 24 judicial districts. So, 24 separate court entities across the State in the state court system. Each of those has a Chief Judge, and that Chief Judge is the administrative authority for that entity. And by the way, you can do this to me, Representative Bacon, like move it on, Steven. If these are details you already know, or if I'm missing the mark for you. So, there's that appointed by the Chief Justice, local administrative authority. So, there is this kind of central administrative body, and then there are the local courts, where the work actually happens.

**Sen. Lee**

Rep Bacon.

**Rep. Bacon**

Thank you. I don't want to hurry you along. I just know I have colleagues here. Let's have our own day. But I guess my question, along the lines of your org structure, is, if you could help me identify, what is it that you all are looking for, right? And so, if I had to compare this to, I have experience at a school district, right, where we have a superintendent or a chief executive, but there's still like some sort of board. Same is true for corporate spaces or nonprofits that take a look and do, if not at least through its evaluation of its Chief Executive, an evaluation of the health of the organization. And they have things that they look for, right? Like an organization will set mission, vision, goals, targets, right? And I guess that's my question for the structure. And it's not to say that it needs to be structured like everything else, but given the way that it is. One, what are the things that you look for? But two, given the structure that you have, where are there opportunities perhaps to find external touch points? Maybe different eyes, right? To be sure that perhaps a collective culture isn't getting the way of what it is that you actually want to accomplish. It's like, if a whole bunch of people don't think it's a problem, but everybody out here does, and all of the stop gaps are in here, you're never going to see the problem, right? So where are those entry points, if you have any? If you don't, maybe that's what we can discuss as well. But before that, what kind of goals and targets are you setting? And then, ultimately, you know, part of the reason why I'm asking this too, in the sense of the Commission. You know, when I read through the Annual Reports, they talk about how many charges, how many cases, and to some extent, like public findings, but they don't do any sort of longitudinal data, you know, like, Is this getting worse or better? Also, this Commission does have non-judges on it that might be able to say, in addition to just looking at these particular disciplinary issues, here's what we're also seeing, big picture by way of it happening. There's no entry points for that. So, I guess is there an opportunity then for the Commission to be those externalized? But even if they were, what would they be looking for? What is it that you all look for? I think that's what I'm trying to hone in on. And if there isn't an answer to that, that's okay. But if there is, I would really just love to hear it.

**Sen. Lee**

And part of that question might want to be directed to the Commission when they testify this afternoon, but I think Administrator Vasconcellos can talk about it from the Judicial Department standpoint, what is their vision? If I'm capturing the essence of your question.

**Steven Vasconcellos**

Thank you Mr. Chair. Thank you, Representative Bacon. Parenthetically, I'm also happy to spend time offline with you in a longer form conversation, if that meets your needs as well. Let's be really blunt about you know what targets we're looking for. Historically, this organization has not been consistently, sustainably self-conscious in the way that I think you're describing. And as leaders in the organization, whether that's the Supreme Court, whether that's myself as the State Court Administrator, whether that's

- 18 -

other leaders locally around the state, this is not a sustainable approach anymore. I think part of it was born for many years. So, I've been with the department 26 years. I started as an entry level staff person in the Fourth Judicial District, in Colorado Springs. I've been in this role about two and a half years, a long, strange journey in between those two points, but it was a much smaller, lot fewer moving parts organization. And I think for many years, with the best of intent, I'm not here to question everything that came before me. That would be unfair. But I think sometimes with the best of intent, this was run as a very informal operation, a much smaller operation, and in its time and place that may well have been appropriate. This is a 4,000 person, almost $700 million organization with an incredibly, substantially important role in supporting a civil society. We have to ask better of ourselves, and we'll get into some of my prepared testimony about investigations. I know there's great curiosity, obviously. And if it's okay, Mr. Chair, I'm going to kind of transition into that, because I'm not here based on my deep expertise on the Commission process. Your staff has spoken to that, Judge Tow has spoken to that. The Commission leadership from the Commission on Judicial Discipline will speak with great expertise to that this afternoon. I'm here to talk about some of the events, background that got us here, that helped catalyze for better, for worse, this discussion, this necessary discussion.

**Sen. Lee**
Why don't you move into that? Thank you, Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Senator Lee. That really leads us here, you know, today. And I really want to start at, given my sort of digressive personality, I want to start by taking kind of a hard left turn into the elephant in the room. At least by my assessment, and that is what's going on with the independent investigations that were commissioned or called for by Chief Justice Boatright at his State of the Judiciary speech back in February of 2021. We're edging into almost a year and a half from his statement. So where are we at? What's going on? So why don't I start there? First of all, just to be clear, I think most folks know, but just to make sure we're level set on background and information, there are two investigations. One is into the circumstances and process leading to the award of a leadership training contract to a person by the name of Mindy Masias, who is formerly the Chief of Staff at the State Court Administrator's Office, and whether that contract was awarded in exchange for silence about misconduct within the Department. That investigation is being conducted by a group called RCT Ltd., and they are led by former US Attorney for Colorado, Bob Troyer. The other investigation is into allegations of sexual harassment and gender discrimination within the Judicial Department. Those allegations being a key area of interest as to whether or not they were why a contract was offered to Ms. Masias. The investigation into the allegations of sexual harassment and gender discrimination also include a cultural assessment of the current state of the Colorado Judicial Department, not just the State Court Administrator's Office, but the Department statewide. Both investigations will include recommendations for areas that the Department needs to address to increase the health and long-term strength and, ultimately, feed the public trust and confidence and rebuild the public trust and confidence in the organization.

- 19 -

So first, if we can, let me talk about timelines and process. Because it's important to note that, and some of you are aware, because you participated actively in this process. But not all of you may be aware, neither myself, nor the Chief, nor the Supreme Court, nor anyone in the Judicial Department actually selected the investigators themselves. And that was for a number of reasons, not the least of which to avoid any sort of notion that we would pick investigators that were so called, quote unquote, friendly to our cause. This needed to be sober, independent, and free from influence by the Judicial Department. So, a panel consisting of key legislative leaders, three of whom are on this interim committee and key leaders from the Executive Branch came together and used a public procurement tool, a request for proposals process, to Identify potential investigators for each of these two key investigations. Ultimately recommending to the Department that we utilize RCT for the investigation into the leadership contract and a group called Investigations Law Group for the investigation into allegations of sexual harassment and gender discrimination. Some of you committee members may remember ILG, they are firm that conducted a similar investigation into similar allegations within the Legislature several years ago. In terms of timeline, the panel was named in February of 2021. In August of 2021, the panel recommended vendors, essentially to myself. I'm the signatory on the contract with the vendors. We contracted with the vendors that the panel recommended. We signed a contract with RCT in October of 21 October 12, to be exact, and about two weeks later, executed a contract with ILG. And, so, the investigations proper have been taking place since about November of 2021. The original contracts were set to run in April of this year. At this point, extensions have been granted on both contracts; extensions initiated at the request of the investigators. I will admit right up front, that timing for all of this is a tricky bit to manage, and I probably reasonably am subject to criticism, no matter which way you sort of look at this. There's the perspective of being seen as pushing the investigators too hard, maybe with a with a dark turn of eye, because somehow we want to rush them so that's not a complete and thorough investigation. So, we have to be careful against those accusations. Similarly, we have to be careful about this taking too long, which has a number of impacts every day that goes by, I worry about public trust and confidence in the organization that I've devoted half of my entire life to. That's not healthy. And these are, I think by any estimation, incredibly complicated investigations that require their own time. So, when professionals who make their business of conducting these sorts of complex investigations say they need additional time, even though, even now I have a little physical wince, it's the right thing to do. In my opinion, it's the right thing to do, and we have granted those extensions.

Both RCT and ILG are under what we've collectively agreed to will be their final extensions. For RCT, that is June 29 of this month. For ILG, that is July 29, one month later. There's no intended symmetry between June 29 and July 29, it's just the way it worked out. Candidly, I was hoping that we could do something a little earlier for ILG. No criticism of them. They had some other personal matters scheduled that took them out of the office for several weeks. The key principals who are working on this. And everybody is hopeful that we won't need every last day of those extensions.

So, the million dollar question, When will reports come out? Will they be made public? We are hoping, as we sit here now, that the final report produced by the Troyer group, RCT, looking into the

- 20 -

circumstances and process around the award of the contract will be complete and released within the next 10 days. It is my hope that the report from ILG will be following only a couple of short weeks after that. This seems like a natural area, maybe to take a pause.

**Sen. Lee**
Let me start with Rep. Weissman.

**Rep. Weissman**
Thank you, Mr. Chair. I am mindful of time here, but we have some key witnesses. I think first for Mr. Vasconcellos and sir, you've already gone about halfway there. I noted in the information that went around earlier, we had these extensions, and yes, we need a balance between thorough and timely. I was going to ask, and you alluded to internal, personal capacity issues, if there's any more to say about the reason for those extensions. And just to get the second question on the record, I'll invite you to respond to both. Second question is different, a new affirmative responsibility on the Department pursuant to 201 is to be found at page 13 of the bill 106(6)(I), the Department shall adopt procedures and policies to implement the duties stated in this section and educate Department personnel about these duties. Understanding it's a touch early yet with reference to when the Governor signed the bill, I wonder if you could give us an interim update on progress toward that new charge upon the Department.

**Sen. Lee**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Thank you. Representative Weissman. Starting first with regard to essentially, why? Why extensions? The investigators wanted more time that may have been more time to analyze documents that were produced, more time to contact additional witnesses in the case, to use an example from the ILG led investigation into allegations of misconduct and also assessing the culture of the department. One of the, I think, key pieces of their effort was offering the opportunity for staff to be interviewed confidentially. The response, while in total number, it was somewhere north of 100 people, which out of 4000 may not strike one as a lot, it was nearly three times the amount that ILG was anticipating. That's an important effort as part of that investigation, and it takes time. It was time they were not planning for. They were thinking in the neighborhood of maybe 30, maybe 40 folks requesting an interview. We had north of 100 folks requesting interviews. If additional time to do that properly is what's needed, that's where we have to go. If an investigator needs more time to ask for subsequent document requests, that's what's needed. That's what we'll do. We want this to be thorough and complete. This is arguably, my opinion, this is the most important moment in the Department's history, at least since unification, in my opinion. You can't have a situation where, and it's not just the simple fact that you know, the majority of the senior executive team at the State Court Administrator's Office all resigned in short order. That did happen, that is a crisis of its own, but this is also much bigger than that. I think Representative Bacon alludes to it in her questions about maybe taking long, long overdue

- 21 -

stock of who we want to be. I mean, of course, the block and tackle of judging, the block and tackle of probation supervision, the stuffs of our work are incredibly important. Who are we as an organization? Who are we as a culture? We have not been sufficiently self-conscious about that historically. For us to be successful in that block and tackle of our work moving forward, we are going to have to step back and wrestle with who we are and who we want to be, and that leadership starts at the very top of the organization, with the Chief Justice and the Supreme Court. Sorry, I got a little sidetracked and was starting to rant there for a second, I apologize.

In terms of Senate Bill 201 responsibilities, Representative Weissman, obviously, we take those, the reporting requirements and the duty to educate all of our staff about reporting requirements, seriously. In many ways, what has been articulated in statute as it relates particularly to complaints that start internally within the organization. For example, a staff person, say, coming forward and making a claim of bias, of discrimination, of harassment, we have a responsibility statutorily that matches our current process today. Where we gather that information via an interview. I say an interview. It is not an investigation. It is not our role to investigate. It is the Commission's role, and we should not try to get in the middle of that or usurp that role, but focusing on employee safety in the example that I gave, gathering the information as soon as humanly possible, and making sure the Commission doesn't just get that within the statutory guideline time limit, of course, but as soon as possible. Because, as I think any of you who have led teams know and had to work through difficult HR issues, sometimes hours matter, certainly sometimes days matter. And the faster that we can get information to the Commission, effectively, the better it is for all involved. So, process wise, in terms of our procedures, I think we've got probably more work to do prospectively. And this is work that isn't, one thing I'm constantly reminded to appreciate is communication about process is not a one and done affair. You can have, I think there's a danger in viewing these sorts of things as an initiative, because with an initiative, you get a lot of energy, you have this big implementation, and then the big implementation is over, and everybody's tired, and then you kind of go back to the way things maybe were. And when you're communicating about critical processes, like reporting around employee safety or other critical issues, that's something you have to come back to as a practice, not an initiative, and you build that into the underlying structure of the organization, and you hit it regularly. Some of that's built, some of that is not. We have more work to do. Mercifully, I'm very confident that we will get it executed in a timely fashion. I hope that answers your question, Representative Weissman.

**Sen. Lee**
Rep. Weissman.

**Rep. Weissman**
Thank you, Mr. Chair. In the interest of time, I might just let this hang as a comment, rather than inviting a response from the Judge, because we moved on to other subjects. But I did want to say it. There was an analogy to Title 12 professions and occupations. And as far as that goes, look, I think that's a fair analogy. I'll use doctors as an example, because my grandfather was one. So, doctors are

overseen by doctors. They have expertise about what is the standard of care and so forth. I think, though, that in what we talk about the rest of today and the rest of this whole interim, there's this critical difference. Doctors, or pick any other profession, plumbers, electricians, are not 1/3 of constitutional government. And doctors, collectively and the highest institutions set up in the medical profession, as distinguished from the highest institutions set up in the business of judging, not least the state Supreme Court do not as courts do, adjudicate all manner of other disputes that 6 million people in our state may have with each other, arising in contract and tort, in constitutional matters. So, I do think that there is a fair analogy to a degree about how other professions, in fact, are overseen. But I just think that we cannot miss this very, very big difference. We all need doctors. We all respect doctors. Doctors are not 1/3 of constitutional government, likewise, plumbers, electricians, anybody else. What does that comment, that philosophical look, if you will, alone mean about the role of judges overseeing judges. No one thing necessarily, but I did want to make that observation. Thank you, Mr. Chair.

**Sen. Lee**
Judge Tow.

**Judge Ted Tow**
Thank you, if I may respond. I agree with you, and I only intended it as an analogy to the extent that it had any bearing. And I agree with you that that the Judiciary is different in that it is 1/3 of the constitutional governmental structure. But also a part of that is that it is the only 1/3 that is intended to be and designed to be insulated from the political pressure. It is not supposed to be governed by concerns about the popularity of its decisions. And while I do not make any suggestion that the current structure of the Commission is problematic, injecting in the final decision-making process or the final appointment, authority, etc., more and more non-trained, non-judicial Canon obligated entities in that decision, it takes more steps toward politicizing the process of judging that is, in my view, not the right steps and potentially dangerous. I do want to be, if I can take just one moment to circle back to one thing, the culture idea--we have to remember there, there are sometimes complaints made internally about a judge that have nothing to do with ethics. This judge won't take a break during trial, and the court reporter's fingers are falling off. That's a legitimate thing for the court reporter to complain about. That should not find its way to the discipline commission. That's a that's a training, that's an intervention from HR, those types of things. And I think the more we just kind of talk in these big pictures about culture and complaints, we need to remember that not every time a judge makes a personnel-based decision incorrectly, that it rises to the level of an ethical problem. Certainly hostile work environment, certainly sexual harassment, certainly misappropriation of government funds, those types of things obviously will. But not everything that is HR based is ethics based.

**Sen. Lee**
Okay, Madam Vice Chair.

- 23 -

**Rep. Carver**

Thank you, Mr. Chair. I have some questions and concerns just to follow up on your testimony, sir, regarding the two independent investigations. First of all, you know, the extensions were granted. We are where we are. I have to say that the RFP, which was a public document, criteria, specifically addressed when the reports were to be done, and another aspect of the RFP criteria on which decisions were made, on who to hire, and who not to hire, were the robustness of the organization, so that if there were personnel issues that come up unexpectedly, and we can never forecast when that might happen, or family situations, that there was sufficient depth within the organization to complete the task thoroughly and on time. So, I am dismayed to see when I know the RFP stating that as a criteria, and the hope that the reports would be delivered within a certain time period, to find ourselves where we're at. But I also appreciate, and in fact, the Chair and I had discussed this, we certainly understand that for the ILG investigation in particular, that when witnesses come forward with pertinent information, and it is within the scope of the investigation, those folks have information that needs to be gathered. And it needs to be done within a process. And sometimes you can't predict when those witnesses are going to come forward within your task. So having said all that, and having taken a look at the original due dates and the two extensions, we are where we are. With regards to both investigations, understanding now the expected due dates, and I would encourage strongly the extent to which the two groups can complete their report sooner than the deadline of the approved extension would be most appreciated. Again, with discussion with the Chair, it would be most helpful if the recommendations piece is done, or at the point at which the recommendations have been finalized. Even if the report itself is not yet finalized, if those recommendations could be delivered to this committee. We have a very, very tight schedule. You can see the problem we face with probably the set of more extensive recommendations, I'm assuming, from ILG, just given the scope of what they're looking at. And yet, the current deadline is July 29 our deadline to submit proposals for draft legislation is August 19. We are intending to be thorough in what we do. These investigations are critical, and so at the earliest possible date, sir, if you could inquire when those recommendations are in final form, regardless of if the report still needs to be processed and proofed and graphs made or whatever. That we get those ASAP. Your response?

**Sen. Lee**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Mr. Chair. Thank you, Madam Vice Chair. I am incredibly, so I am right in the middle of this every day. Every day that goes by is a day too long. I want to be fair. I want to make sure that my earlier comments did not come across as either complaining about the work of the investigators. Everything I've seen has been an extraordinarily high-quality professional engagement. Nor did I intend my remarks to seem like I am unconcerned about the deadlines. We are in a spot where overall, the difference between April and June is really not that much from a calendar standpoint, but given the incredibly important work of this committee, it makes a difference that has not been lost on me, and it was not lost on me before I walked in today. And I very much understand and appreciate the import of

- 24 -

your comments and where they're coming from. I would mention that particularly given that it wasn't while some capacity issues have driven a little bit of things in one investigation of late, not throughout of late, it is overall been the complexity. There is, I think it always an iceberg, sort of effect that can be at play with an investigation such as this. There are the things that are known, the things that are above water, the things that are largely known that you can see looking into the water in the first couple of feet, that you won't be surprised when they're surfaced. And then there are the things below the water that you only know once the investigation is launched. It is my speculation at some level, I will admit to that, it's partially speculation, but I think it is the things below the water. And that complexity that is attached to it, that has driven the timeline. I have every sense of investigators working incredibly hard. We have been and I would encourage you to speak to the investigators independently of me on this, because I think that probably has some merit given the circumstance. We have been timely, we have been complete, we have been thorough in our production of information for them for these investigations. There has been no slow walking of any information sharing in these investigations. These are complex investigations. We've got a small window to hit here with this committee's work. I feel sort of like it's a form of professional malpractice if I don't do everything in my power to make sure that those reports are ready to hit that window. I also think, I'm sorry, Madam Vice Chair for interrupting, I also think we have to think a little mindfully about recommendations that are provided without the context of the findings. And that's something that does concern me a little. I also am confident there are a lot of incredibly capable, intelligent people involved. We will figure this out.

**Sen. Lee**
Madam Vice Chair.

**Rep. Carver**
Thank you, and I appreciate that. And I can tell you that in the discussions the Chair and I have had concerning these two reports. I mean, you are absolutely right. The recommendations are informed by the context, by the full report. Quite frankly, it is simply looking at this challenging timeline that we are facing. And I will speak for myself on this but I suspect the other committee members, if we knew even the big picture recommendations, understanding that the full report will provide the meat and context and the understanding of the recommendations. But given that we've got six bills we can propose by August 19, you can see our concern. And, so, I don't know what the proper process would be, I suspect Chair Lee may have some thoughts on that, and that may be an offline discussion. But what would be appropriate, if any, before the final reports are issued. And certainly we would not want draft recommendations. We would have wanted the group to have finalized their discussion on what those recommendations should be. It's one possible option to help facilitate our work. So enough said. I suspect some additional offline discussions might be helpful. Thank you.

**Sen. Lee**
Any further comment? Mr. Vasconcellos.

- 25 -

**Steven Vasconcellos**

Thank you, Mr. Chair, thank you, Madam Vice Chair. I just want to be sure, you know I hear you loud and clear. This is incredibly important. We don't want to miss this opportunity. We don't want to miss this opportunity. So, I anticipate more conversation. We will figure this out. We will figure this out. Mr. Chair, if I may just briefly sure I understand the committee's schedule may be already a bit in the weeds. I had other prepared remarks that I'm more than happy to let go of. I suspect you may have heard from me on the things that you want to hear from me most. That being said, if the committee wants to entertain me for another 90 seconds, that's fine too.

**Sen. Lee**

We could certainly give you 90 seconds, Mr. Vasconcellos, but you can always provide us with written testimony as well, and I know the committee will take a look at that when it is submitted to us. I wanted to put an exclamation point after the Vice Chair's comments. We delayed and deferred certain action under Senate Bill 201, at the urging of the Chief Justice in anticipation of these reports, his words in May or June, and now we're being told late June, July, before the reports are going to be coming forth. If we get reports in June and July which are redacted or which are held back because they need to be further reviewed, I can assure you the committee will be displeased. We expect full reports sooner, hopefully. We agree with the necessity of having complete and accurate reports that are thorough and robust, but the delay is really difficult for us to swallow. Particularly, based on some of the history that we've had in not getting information. So, I appreciate the work the Vice Chair has been doing to try to move these reports to the to the forefront, and regret the delay. But let's do the best we can. Any further comment from the committee? Won't you give us your 90 seconds and go ahead.

**Steven Vasconcellos**

Thank you, Mr. Chair. Again, I'll just note briefly in passing, that the gravity of what's at stake here is not lost on me. It's not lost on me. So, one of the things I did want to highlight briefly is that the leadership contract itself has been the ongoing subject and continuing subject via the RCT investigation of scrutiny and investigation. Originally, the contract was reviewed as part of a performance audit done by the Office of the State Auditor. They'll be testifying later today. That report was issued in November of 2020, and at the risk of oversimplifying, but in the interest of time, two of the key questions around that contract, given the scope of what the performance audit was: Was the contract awarded consistent with Department rules? and Were our rules up to task? And the simple answer to both of those questions at that time was, no. It was neither comported with our rules that existed at the time, and taking a step back from those rules, those rules were not sufficient. Our procurement in my time as State Court Administrator . . . Well, one we have fully implemented all of the State Auditor's recommendations from that performance audit as it relates to the State Court Administrator's Office, including these recommendations specifically related to their findings around the award of the contract. Our procurement rules have essentially been overhauled from scratch, largely now in parallel with the Executive Branch procurement rules. There is no reasonable reason that in the overwhelming majority of cases, our rules should not track the Executive Branch's procurement rules. There are some limited

- 26 -

areas where ours do vary, and ours, in my opinion, are stricter or tighter than what is offered by the Executive Branch. That contract was also looked at as part of a larger fraud hotline investigation also conducted by the OSA. And I think as it regards to the contract, it was not the only issue reviewed, as I think everybody knows. But as it relates to the contract, two key findings, there was at least some evidence of either occupational fraud and or misuse of public funds that under the under the fraud hotline statute required the OSA to report to former employees of the State Court administrator's Office to law enforcement. I want to assure this committee that we neither had nor sought input on the timing of the referral to law enforcement, contrary to what's been published in the media. We neither had nor sought input, had any control over that timing, and it would have been highly, highly inappropriate for us to do so. Even through some sort of notion of passively trying to slow walk it. That goes against the core of my professional being. I realize even saying that, you have to trust me. But I would offer that several of you have worked with me for a number of years now, not just in this role, but in prior roles as well. And I can assure you that we sought no influence, had no influence over the timing of the referral. It would not have been appropriate for us to even think about that. The other key finding from the fraud investigation was that the Office of the State Auditor did not obtain evidence that Ms Masias was promised a contract in exchange for her resignation or silence. I'm eager to find the results of the Troyer Investigation and have that out in the public sphere. I look forward to robust discussions with this committee and with other key stakeholders in our communities about the results of the Troyer investigation and of the results to the ILG investigation. I appreciate the committee's patience with me this morning in my very nonlinear discussion and presentation. And I remain available to the committee at any point during this process to support positive outcomes that leave us with a system of judicial discipline in Colorado that not only we can all be proud of, but that is a model for other states in the country. Thank you committee.

**Sen. Lee**
Thank you for your testimony, and thank you for those final comments and for your offer to return to the committee should there be a need to do that. We've run over our time significantly, and I'm trying to figure out, how do we have the Commission on Judicial discipline set for one o'clock? Former Madam Vice Chair. Senator Gonzales.

**Sen. Gonzales**
Thank you, Mr. Chair. Just one brief question in regards to the final report. When those reports are released, will we receive full and unredacted versions of said reports?

**Sen. Lee**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Thank you, Senator Gonzales, it is my intent, it is the Supreme Court's intent to put as much information into the public sphere as reasonably possible. I cannot say with certainty the

- 27 -

action that may take place. I'm also keenly aware, keenly aware of how redaction looks and how that is received publicly. It is my goal to put reports out that are either unredacted or minimally redacted. And would be more than happy if we find ourselves in a situation where information needs to be redacted to talk to the committee about why. And be available for that conversation. I will tell you just briefly by way of background. No different than anyone in a position similar to mine, in a large organization, you inherit legal agreements from your predecessors. Whether or not you would have entered into them or not is immaterial. You inherit those agreements. Parties to legal agreements have every reasonable expectation that those agreements will be honored. The whole redaction question, at some level, boils down to looking at the legal liability of the organization, the cost of that legal liability, potentially, in comparison to what's at stake here with public trust and confidence. I'm going to push for as much, and have pushed, for as much transparency as we can reasonably bear. That is an artful assessment, that is not a formulaic or firm assessment there. That is a judgment call, ultimately. But you know, handing over some sort of report. I mean, I'm imagining a worst case scenario here, Senator, where we hand over report that is more blacked out than it's actually narrative or something to that effect. It's almost as bad. Representative Carver spoke thoughtfully earlier about the connection between findings and conclusions and seeing sort of the narrative arc of the investigation. You can do great damage to that through redaction. I recognize that, and I just recognize the public perception around redaction. I'm going to make every effort to eliminate or minimize that. I can't tell you with absolute certainty, as I sit here today what that's going to look like, but I did want to share my mindset around that.

**Steven Vasconcellos**
Senator Gonzales.

**Sen. Gonzales**
Thank you, Mr. Chair. And I appreciate that response. Mr. Vasconcellos. Just one other follow up, given that the members of the Legislative Audit Committee did receive a full report with those conclusions, has that full report been transmitted over to the members of the judicial discipline commission?

**Sen. Lee**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. I apologize. Senator, I'm a little confused. Which report are you referring to?

**Sen. Lee**
Senator Gonzales.

**Sen. Gonzales**
I'm referring to the report conducted by the State Auditor.

- 28 -

**Sen. Lee**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you Mr. Chair. Thank you Senator. Yes, we've shared audit reports, the fraud hotline investigative report. All of that has been shared. We entered with the investigators. We structured the relationship such that we have an attorney relationship with them. There is no holding back of information in what's been shared with investigators. Thank you.

**Sen. Lee**

Rep Weissman.

**Rep. Weissman**

Thank you. I was wondering if it was in the scope of the contracts with RCT and ILG, for there to be any kind of presentation, e.g., to a committee like this, one of their work. And then it occurs to me, the answer must be no, because the existence of this interim committee was not contemplated when those contracts were struck. Nonetheless, I would find it helpful, and I think it would be of interest to the public if in connection with the finalization of these reports or the bringing forward of the key parts of them in a timely way, as the Vice Chair alluded to, if at least some of the teams involved with these investigations could be available for discussion and questioning by this committee. If that is without the scope of the contract, and they would need to be compensated for that time in trouble, then I hope the Branch, and I hope this committee can make inquiries about such additional funds as might be necessary. These are professionals need to get paid for the time I get it. But we're talking about context, I think the ability to engage with the folks who actually are bringing these reports to us would be a value add.

**Sen. Lee**

I would affirm the suggestion of Rep. Weissman. Is that a possibility? Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Mr. Chair. Thank you Representative Weissman. It was not beyond the pale, even though we didn't know at the time that this committee would exist in its current form, it also struck me, at the time of contract creation that it was not beyond the pale, that there would be some sort of legislative reckoning around the findings from the reports. So, legislative testimony is not built into the contract per se. The issue has been broached with both investigators as something we need to realize is a possibility that it will be requested and then that there is merit. I want this committee to have a free-flowing engagement with the investigators that there's no perception of it being filtered through my eyes. You need to form your opinions of the results, and certainly the Department will want to be part of those conversations at some level. But the formation of your opinions about the findings and results need be based, I think, primarily on your own read of the final reports and your ability to engage with the

investigators, not through a filtered conversation via myself, or my office, or the Supreme Court. So, I will do everything in my power to try to have that happen. I don't know, as I sit here whether that will require more money or not, or what that might cost, and as I say, to the frustration of some, we'll figure it out. Even though I don't know what that solution looks like.

**Sen. Lee**

Okay, so with that good faith commitment, why don't you see what you can do with the independent investigators and schedule them with Juliann as soon as possible to come in and talk to the committee. And you know, I don't know if we need to have the final reports for that. We probably should. But anyway, once you try to work that out with the committee. So, we have a presentation beginning in 11 minutes from the Commission on Judicial Discipline. And I expect some people might want to have some lunch before that. Can you all wait until 1:15 or 1:30? Is that reasonable to request? Can we ask for 1:30? Does that work for the committee? Okay, all right, very good. So, the committee will be adjourned until 1:30. Thank you, Judge and Mr. Vasconcellos.

- 30 -

# Appendix 27(s)(i)(4)

# Colorado Commission on Judicial Discipline Presentation;

# Legislative Interim Committee on Judicial Discipline: June 14, 2022 Hearing—CCJD Presentation

**Rep. Weissman**

The Interim Committee on Judicial Discipline will come back to order. We are all present and accounted for, so we are prepared for a presentation by the Commission on Judicial Discipline. So, thank you for accommodating the lunch break, and we appreciate you joining us this afternoon.

**Sen. Gonzales**

Mr. Chair.

**Sen. Lee**

Senator Gonzales.

**Sen. Gonzales**

Thank you, Mr. Chair. I did just want to let the committee know that I did speak briefly to Mr. Vasconcellos to follow up, as he wished to clarify his response to my question on the record about having sent the Auditor's report to the members of the judicial discipline commission. The members of the judicial discipline committee have not, in fact, received said report, yet. And, so, he asked me to clarify the record in that regard. So, I just wanted to make the committee aware.

**Sen. Lee**

Okay, thank you. And Mr. Vasconcellos stated that to me as well. That he had made a mistake on the record. So, appreciate the clarification that the Commission has not received the Auditor's report. Okay. With no further ado, we are honored by the presence of three-tenths of the Commission. So, thanks for joining us. Who would like to begin? Ms. Krupa.

**Elizabeth Espinosa Krupa**

Thank you Chair. As many of you had sat through our presentation before, it is somewhat an overview of the current system, but also a presentation of some of the obstacles that we've hit in the last few months, 18 months or so, and some recommendations that we have, at least, based on the current structure.

**Sen. Lee**

And a PowerPoint presentation, that you have put up on the screen. Thank you.

**Elizabeth Espinosa Krupa**

Before I begin, we're here because we were invited to the SMART hearing. I think it was the first time that we actually spoke, and we were asked if we had everything we needed to fulfill our constitutional

mandate and do our job. And we said very frankly that we did not. We are very appreciative of the bill giving us independent funding, and we're very appreciative of this process and the opportunity to talk with you, today. I do want everyone on the Interim Committee to know that that we have been meeting with Mr. Vasconcellos. We are trying to work together. They have been very open to meeting with us. Obviously, Mr. Vasconcellos isn't the Court, can't speak for them, or bind them. But we are having those discussions, and we are hoping that we can come to you with agreed recommendations and very clearly where the delineation of non-agreement is so that we can make it easier for you to do your job.

So, as you heard earlier, the Colorado judicial system's merit selection process was kind of the beginning of how judges became judges in Colorado. The nominating commission is full of lawyers, one supreme court justice that serves as their ex officio chair, and then citizen members. People apply for judicial positions. The nominating committee decides who they're going to interview, and then makes recommendations to the Governor. Other than county court, that's how it works. In Denver County Court, those three names are given to the Denver Mayor. But that is just one of the commissions that provides oversight.

The importance of judicial oversight, I think, is clear to everyone on this committee, and we've just given a couple of quotes regarding what effective judicial discipline is, so that it's trusted, and that's what we hope to try to achieve. We don't want it to appear self-serving. We don't want it to appear that its judges protecting judges, or that the Commission is just trying to protect judges. When we talk about transparency, that's what we hope we can achieve. Obviously, that also carries with it some confidentiality requirements, and our confidentiality roles are some of the most strict out there. The purpose of our Commission isn't so much to punish the judges. What we are trying to achieve, or supposed to achieve, is to maintain and restore public confidence in our Judiciary. And people have said it today that there's a lack of confidence in government these days, a lack of trust in an independent judiciary. And our Commission doesn't function unless we are perceived as independent and maintaining that integrity.

While there are other paths to judicial removal, our discipline is really confidential for a variety of reasons. A lot of times we get complaints or concerns about judges over delay cases. That can be the nature of the case or the complexity of the case, or it can be something that, as any of us have experienced, where you get overwhelmed, and instead of making the right benchmarks to tackle it, it just kind of gets into a file and you bury your head in the sand. In those instances, when it's not a repeated instance, or the judge just really let something get away. We try to make sure that the judge has a system in place so that doesn't happen. That doesn't always need to be public. As you heard, we get roughly 200 complaints or requests for evaluation. The majority of those are outside of our jurisdiction, or they're seeking some appellate remedial measure. Or, as Mr. Vasconcellos or Ted Tow said, there are complaints that are really better handled by HR or an employee matter. It doesn't arise to the level of judicial discipline.

- 2 -

What becomes public, and what we're trying to achieve by that is similar to any sanction that is public, that is given, it is so that there's an education piece to it. So there's a piece of that that people recognize that there is a heavy and serious sanction for certain conduct to be a remedial measure as well. We don't impeach. We don't affect retention or recall. Obviously, if a judge is publicly sanctioned by the Commission that would affect their ability, I think, to sit and remain. But just as any body making a recommendation of a sanction for conduct, we take into consideration the length of the time the judge has served, if they're a new judge, if they got proper training, if there's a harm to keeping them on the bench, either to the public or to staff. There's a lot of considerations that the Commission tries to make. Obviously, we only make recommendations for any public sanction. We have no power to impose it.

I mentioned the oversight entities, and I talked a little bit about the nominating commissions. The performance commission is different. The performance commission sends out surveys to attorneys that practice before judges and asks us to complete surveys.

And I can back up, some of you may not know me. My name is Elizabeth Espinosa, Krupa. I'm an attorney. I have my own firm here in Colorado. I worked as a public defender for many years, a federal defender. I worked as a trial attorney for the Securities and Exchange Commission, and I worked at Attorney Regulation as a trial attorney for them before starting in my own firm. And I serve on many different boards and commissions. It's my way of giving back to Colorado, something my parents instilled in me a long time ago. It's important to me as a lawyer that there is oversight, not just of lawyers, but also of judges. And I have been very blessed to sit on this Commission. Our non-lawyer, non-judge members are some of the brightest and most helpful people I've ever had the pleasure of working with, and I would never say that they lacked subject matter jurisdiction to make any decision that we make.

**Sen. Lee**
Ms. Krupa, how much time do you and the other volunteer members of the Commission spend doing this volunteer work?

**Elizabeth Espinosa Krupa**
A lot. So, corporate board members are usually paid, but corporate board members usually spend about 200 hours a year serving on a corporate board, more if they're on an audit committee. Something like that, I would say.

**Sen. Lee**
Four hours a week.

**Elizabeth Espinosa Krupa**
Right, and I would say that we have been a little over that. Some of it with some of the obstacles that we faced since 2021 and some of it because of some of the publicity that's gone out there, whether that's the

- 3 -

reason for it or not. But our current numbers saw roughly a 25% increase of requests for evaluation, or what we call complaints, just in this year alone. And that may be some of it is just education. I'm not sure that a lot of people knew we existed before we testified at the SMART hearings and got to really have a public education piece.

If I may Senator Lee, the performance commission releases a report that basically summarizes the survey results that they get back, and the surveys obviously go to attorneys that practice before that judge, you're asked when you receive the survey, you know, how much time have you spent in front of this judge? Have you done a trial? Have you done a motions hearing. Have you had a written order from this judge? It asks questions about their demeanor, knowledge of the law, things like that. So, the performance commission, that piece that they look at actually gets published before elections for retention. It is a powerful piece, and something that I think the public relies on quite heavily, largely because we don't appear in front of these judges. We wouldn't know anything if we didn't get the information from the performance commission. The difference with the judicial discipline commission, again, is we only act upon requests for evaluation or complaints. Very rarely I think, if ever, have we had the opportunity to really do anything on our own. Nor have we, I don't believe during my tenure.

But the Commission on Judicial Discipline is similar to the nominating commission in terms of its makeup. So you've heard that there's four judges, two lawyer members, and four citizen members. That the judicial members are valuable to the Commission, and invaluable, if I could say, largely because when we get delay cases, whether it's a domestic relations courtroom or a civil courtroom, to have a judge that has that experience to explain what's a normal delay, or what a complex case might be, or how it's handled in different jurisdictions. Because some of our complaints that we get are from very rural jurisdictions where judges serve different roles. So, it's invaluable to have those judicial members. The attorney members, are helpful as well for their expertise in either the practice, or the cases, or experiences in different jurisdictions. As I mentioned, our four citizen members have been more than invaluable. Since the bill created some extra staffing for us, we've had the opportunity, and luckily, while working with the State Court Administrator's Office to have a member, a citizen member, that helps us write these, not only employee rules that we have to come up with, but also the postings and the guidelines for us to interview and hire people so that it meets employee guidelines and the legal ramifications of doing so.

There's a slide that provides our judicial members. Judge Fresquez is in the Fifth Judicial District in Eagle County. She's a County Court Judge. Judge Garrido is in Jefferson County. She is a County Court Judge. Bonnie McLean is in the 18th Judicial District. She is the Chief of their Domestic Relations Division, and then Judge Prince, who is my Vice Chair and right-hand man who sits in El Paso County. The other attorney member is Mindy Sooter, she replaced Chris's position when he left. And, then, the citizen members. Jim Carpenter, most of you know him. Bruce Casias, Yolanda, Lyons, and Drucilla Pugh. Bruce and Drucilla are from other jurisdictions, so they either have to travel, or at least during the pandemic, got to appear remotely, and not have to make the trip. The diversity of the Commission is

- 4 -

something I've mentioned before in terms of makeup. That we are a 70% female commission. 75% of the judges are female. We are 50% persons of color and only 20% white male, which is pretty remarkable for a government commission.

The next slide provides some indication of the Colorado population, and then the number of judges based on their race or ethnicity and/or sexual orientation to demonstrate the diversity of our current bench, by contrast. And as you heard, Mr. Gregory was hired as our Executive Director. We have, thank you for the bill, an administrative assistant, an attorney, and an investigator pursuit that we are doing to try to get those positions filled. You heard from Ms. Jenson that, traditionally, when we had to investigate or interview witnesses, obtain evidence, we had traditionally had attorneys from the Office of Attorney Regulation Counsel assist us with their investigators and their lawyers. They acted as our Special Counsel. Every now and then, we've used an attorney general or deputy attorney general to assist us, and the bill made that pretty clear that we can have their assistance when needed. And we are using them in the interim for a variety of reasons.

As I mentioned, our mandate under the Constitution is to protect the public from improper conduct of judges. Not only preserve the integrity of the judicial process and maintain public confidence, but we also need to create better awareness of what is proper judicial behavior and to provide a fair and quick resolution of those complaints for misconduct or disabilities. Disabilities, we've had judges who have suffered or start to suffer early onset of either dementia or Alzheimer's. Things like that, or sometimes there's a physical or other mental health disability that we need to step in and try to assist in that.

In terms of our process and how it works, there's five phases that we try to refer to to keep it as easy and clear as possible. So, there is the intake and screening that Judge Tow discussed and is governed by the Rule. Either our Executive Director or it's assigned to a Commission member, who can immediately dismiss a complaint or request for evaluation if there is no reasonable basis. And again, that's usually lack of jurisdiction, or it's just not conduct covered or contemplated by the rules. Whether the Commission moves forward to investigate a complaint, that is, again, only if there is that reasonable basis to move forward under the rules and the conduct is under our jurisdiction. I think Judge Prince had talked about it before, as have I, that the role of the commission at that point is really like a grand jury in a criminal proceeding. We develop factual evidence. We can use investigators and special counsel if necessary. We have, and there's some debate over this recently, but whether we have subpoena power to get information at that point, that complaint would only advance if the conduct that is alleged in our investigation provides a preponderance of evidence standard. Then, we can recommend formal proceedings. That formal proceeding phase is similar to a trial, not with a jury necessarily, but more like an administrative proceeding. The Special Counsel would become the prosecutor. The hearing is conducted and can be conducted either by the Commission itself or through the appointment of Special Masters. Those three special masters, as you heard, are judges or retired judges, and typically have been appointed by the Supreme Court. That standard is clear and convincing evidence at that trial phase. Chair Lee, I think Representative Weissman has a question.

- 5 -

**Sen. Lee**

Rep. Weissman.


**Rep. Weissman**

Thank you. And I don't want to disrupt the flow of Chair Krupa's comments, but narrow question, backing up a phase or two. I just wonder if I could invite you to unpack the reasonable basis standard in application, you know, less than the latter standards. I'm thinking enough evidence to survive a motion to dismiss, enough evidence to survive a motion for directed verdict, something like that. Just because there are concerns in the space, as you are, more well aware than almost anyone else. Things are brought forward that may be a matter for appeal, but are not a matter for judicial discipline. So, I think this threshold sort of screening in and screening out standard and exactly what quantum of evidence has to be there to proceed or not proceed is a question of public interest. So, I just wanted to build a bit of a record here today, as we're starting out. Thank you.


**Sen. Lee**

Ms. Krupa.


**Elizabeth Espinosa Krupa**

Thank you, Senator Lee. So, the reasonable basis, obviously, even under the rules, we're not an appellate body. We don't we don't look at appellate issues. We don't judge whether or not a judge made a correct legal finding or left out a fact. Some of the examples that I can provide are where the judge during a trial makes continuous remarks that are or seemingly appear to be based on gender, or if a lawyer or party is a person of color, things like that. There are times where we ask for the record. We want to hear the record because we want to hear the judge's tone. We ask for a transcript. We ask for a little bit of additional information before we even decide if there's a reasonable basis. It's usually either the Executive Director or the Commission member that reviews all of the material and then presents to the Commission as a whole the summary of the conduct, what was reviewed, and any recommendation as to whether or not it does meet a reasonable basis. If it's dismissed on its first onset because of lack of jurisdiction or it just doesn't rise to that reasonableness level, the Commission is apprised of that. Our Executive Director does prepare and provide reports at each meeting, of every letter of dismissal, and they're all reviewed by us, which is time consuming. But we are appraised of every dismissal, and we do get requests to review a dismissal when people don't like our dismissal. But the reasonable basis standard is really whether or not the conduct is something that comes within our jurisdiction or that a rule could even be applied to. But again, we do oftentimes get the record or look for extrinsic information as well to assist us to make sure that it's not something that was heard and offensive to the hearer, but there's nothing that we can see that arises to that level.


**Sen. Lee**

Rep. Weissman.


- 6 -

**Rep. Weissman**

Thank you. So your last comment, I think surfaces that it is not a purely subjective standard, as we would expect from the use of the word reasonable. There is an objective standard aspect applying. But as far as quantum of proof or quantum of evidence, it is not clear and convincing. It is not in this phase, Rule 13, preponderance. Fair to say that within the guidelines that you just laid out, at this early stage the Commission, acting through the Director or the individual Commissioner is looking for the presence of enough evidence, by analogy to a courtroom context, to send the matter to a jury. Is that about right? So if somebody is, and I think it's Rule 50 (a) or (b), if there is a motion for a directed verdict, which is made if one party, if the party making that motion, thinks that there could not possibly be evidence for the other outcome, we have to be more than there. Is that fair, just for our operating understanding right now?

**Sen. Lee**

Ms. Krupa.

**Elizabeth Espinosa Krupa**

Thank you. It's not quite at that level. I would compare it more to a preliminary hearing where you know is there evidence that would substantiate that claim, not looked at whether or not it was proven, but whether the claim has a factual basis and a reasonable factual basis that would fit under judicial misconduct rules or guidelines.

**Rep. Weissman**

Okay, the analogy to a PH, I think, is actually great for a largely bunch of lawyers and some people who are smart enough to not get into the profession. Rep Lynch, that's for you. Thank you. I'll leave it there for now.

**Elizabeth Espinosa Krupa**

As far as the recommendations that have been . . .

**Sen. Lee**

Rep Carver.

**Elizabeth Espinosa Krupa**

I'm sorry.

**Rep. Carver**

Just to follow on Rep. Weissman's question. Would it be more analogous to the standard of a prima facie case? Or would you think that closer?

**Sen. Lee**

Ms. Krupa.


**Elizabeth Espinosa Krupa**

So prima facie is really just more allegations. We would need some type of evidence or proof, rather than just a claim.


**Rep. Carver**

So elements supported by some evidence.


**Elizabeth Espinosa Krupa**

Correct.


**Rep. Carver**

Thank you.


**Sen. Lee**

Judge Prince.


**David Prince**

I'm just offering a simple analogy because it is a little hard to articulate. Thank you for recognizing . . . Is the microphone on? Now it's on. Okay, it just occurred to me a simple example would be Judge Prince. The allegation against Judge Prince is that Judge Prince had a personal bias against me when he ruled against me, okay? And that's it. That's the bare allegation. Let's make it a little bit more. And he demonstrated that on the hearing I appeared in front of him on June 1, and that's all the allegation is. Well, that's not very much, but we'll probably go ahead, and not probably, we will go ahead and listen to the recording. And so let's say that in the recording, I actually say something, you know, I don't like the look of you, and I'm not really listening to your argument. Well, that's a reasonable basis. There's some evidence and support. There's an allegation of bias. It's an allegation that's cognizable under the Code. That's kind of prima facie. So, there's a prima facie piece, there's a probable cause piece, because you've got to have evidence like you do at preliminary hearing, but it's higher than probable cause. Probable cause is still pretty low. But if we listen to the recording, and it sounds like an ordinary court case and absolutely nothing happened, and they don't point to anything else, then we'd say, well, there's no reasonable basis. Met prima facie, because the allegation of bias is sufficient, but they haven't given us a factual allegation that's supported by any evidence. So, I just thought I would try to offer one example that might help.


**Sen. Lee**

Ms Krupa. Sorry, Senator Gardner.


- 8 -

**Sen. Gardner**

Thank you. While we're asking questions about this. So, the intake and screening your rule allows for the Executive Director or the Commission to dismiss if there's no reasonable basis, and I fully understand you get it. And so there are a lot without reasonable basis. Are there standards, though, for the Executive Director to make that decision, as opposed to the Commission? Or how do you sort of do that? Because otherwise, it seems to me that Mr. Gregory may be the most powerful man in the Colorado judicial scheme, if you will.

**Sen. Lee**

Mr. Gregory.

**Christopher Gregory**

Thank you. Thank you. Mr. Chair, there is and actually, if you look at the Colorado Rules of Judicial Discipline. The basic rubric that we use is under Rule 13, and there's different criteria, I think, four, five parts to it, but really it's drawing this distinction between whether one of these requests for evaluation is just essentially trying to use the disciplinary process as an appeal, that is something that we have no power to do anything with. If the allegations are frivolous, so this would go to that question of probable cause or prima facie case, if there's just no colorable way to look at this and expect that you know the complaint has any merit as it would relate to a violation of a Code. That's one thing. And then more of kind of this, I guess, substance of the evidence question that, if you do read the whole thing together, is there really a reason for judicial disciplinary proceedings. And that, again, just ties into whether what's being alleged aligns with a potential violation of a Code. It is, I think a very, very liberal standard to being able to review these requests for evaluation. If they do seem colorable, then it really is for the Commission to decide if we want to move forward with greater degrees of investigation. But a typical one, like I think Judge Prince gave in his example. It's very generalized, but if you pull the record to see what was said during a hearing, that's kind of an investigation that I think the Commission often does when it's trying to screen out which of these requests would be dismissed or would move forward to either a much more in-depth investigation or formal proceedings. But there is a standard. It isn't, you know, boundless discretion on the part of the Executive Director on what is treated as a complaint or what is not. But those standards are in Rule 13 and Rule 14 of our Rules of Judicial Discipline.

**Sen. Lee**

Senator Gardner.

**Sen. Gardner**

Thank you. Following up, I mean, what I'm getting at is, it would seem to me that there may be cases with no reasonable basis that are something more, and maybe I'm just not understanding Mr. Gregory, but do you basically have the ability to find no reasonable basis on each and every case that comes in in front of you? I mean applying the standards and not applying the standards? Or internally is there some, is there some division between yourself as Executive Director, because I recognize there are cases that

- 9 -

are outside the jurisdiction of the Commission, and that's probably clearly a dismissal, but there may be those that require some additional judgment, right?

**Christopher Gregory**

And I think this . .

**Sen. Lee**

Mr. Gregory. Ms Krupa, Mr. Gregory.

**Elizabeth Espinosa Krupa**

Thank you, Senator Lee and Senator Gardner. So no, Mr. Gregory is not the most powerful man over the Judiciary.

**Sen. Gardner**

I doubt he thinks he is.

**Elizabeth Espinosa Krupa**

He reports to us, and we review every dismissal as a Commission. And there are times where we have concerns, and there are dismissal letters sent with concerns and pretty clear language about the concern. So, all of the dismissals are reviewed by the Commission. They're not solely at the discretion of our Executive Director.

**Sen. Gardner**

Okay.

**Sen. Lee**

Senator Gardner.

**Sen. Gardner**

Thank you. I appreciate you clarifying that, because it sort of looks like the Executive Director can dismiss a whole group of them without review, but what you're telling me is even those that he would recommend dismissal, they're going to be they're going to be reviewed by the Commission before that actually happens.

**Elizabeth Espinosa Krupa**

Correct. Sorry.

**Sen. Lee**

Mr. Gregory.

- 10 -

**Christopher Gregory**

And I would just add one small point to that. You know, while I was serving on the Commission, at least one or two instances through that review process, we did identify a dismissal that probably did deserve a little bit more consideration, and ended up reversing the decision and moving forward in a different direction. But yeah, in addition to just that process, I think what Judge Tow was describing in some of his testimony this morning. When the Executive Director does flag one of these requests for evaluation as something that could be colorable, we typically assign it to one of the Commissioners to engage in this more detailed investigation of what the request for evaluation is. That may be looking in detail at the register of actions from the court case, the recordings from what was said on the record, and then present a recommendation for the entire Commission to vote on as to whether they want to proceed with dismissal or pursue one of the other disciplinary mechanisms.

**Sen. Gardner**

Thank you.

**Sen. Lee**

Who's up? Ms. Krupa.

**Elizabeth Espinosa Krupa**

Thank you. In regard to the recommendations, the Commission prepares and transmits recommendations to the Supreme Court for discipline following proceedings, along with the record of the proceedings. Special Counsel as well can make recommendations. And if Special Masters are used, the Special Masters' recommendation is also provided to the Supreme Court. The proceedings are confidential unless and until the Supreme Court takes those recommendations and permits it to be public.

As far as the Supreme Court proceedings, once the Supreme Court receives the record, they have different options. They can conduct further proceedings to expand the record, if they have more questions or need more information. They can adopt or modify or just simply reject our recommendations or remand it for additional implementation. Once the Supreme Court makes a final decision, that decision is published, unless the Supreme Court decides to keep it confidential. So, the Commission has no authority to make public decisions. That all lies with the Supreme Court. In terms of our sanction authority, those are provided for in the Rules. The Supreme Court has the authority to do public discipline, removal, retirement, suspension, disability, either public reprimand or censure, or a public diversion or deferred. The Commission can impose private discipline only, which are the dismissals, disability, a type of diversion plan, private admonishment, a private reprimand or a private censure, and oftentimes by stipulation. There are times where, before we recommend formal proceedings, a judge will make an agreement with us, as long as it's a private agreement. Obviously, the Commission takes into consideration the conduct before it's willing to agree to a private measure. But there are those cases, as I said, where it doesn't arise to the level where we think public censure is warranted, and we do make those agreements, as well. I believe Judge Tow indicated that it is only the

- 11 -

Commission that decides whether or not a case or a complaint / request for evaluation goes into formal proceedings. That's actually inaccurate, the responding judge or judge accused of misconduct can make that request formally as well.

In terms of our confidentiality, the Constitution does set forth confidentiality. In 2021, the Supreme Court effectuated rules, adding to that confidentiality, but our examination of misconduct is confidential unless and until those recommendations are filed with the court. Individual investigations are all confidential, although we can discuss, as we did at the SMART hearing, where we need assistance to be able to conduct that, such as our hiring of Special Counsel to be able to conduct certain investigations. As far as any disclosures that we can make, we are allowed to make those as long as it's required for us to fulfill our mandate.

We talked a little bit about our annual requests for investigations or evaluations in terms of volume, the reports that are on the Commission's website do actually discuss more than just the 200 requests in 2020 or 2021. There is language without naming the judge that goes through specific instances of dismissals or dismissals with concerns, and also a history of recent disciplinary matters. So, it will talk about whether or not there's public censure or private discipline, including dismissals, and some of the information surrounding that, without naming the judge or the jurisdiction. In 2022 as I stated, it's projected that we will have 250 requests for evaluation from at least our current totals through the end of May, and then, on average, we have had typically 70 requests for evaluation that require evidence procurement. In terms of our public discipline cases, as you can see in the next slide, from 2004 to the present, there's been six judges that have been publicly disciplined. Three male judges, three female, five white judges, and one judge identifies as a person of color. If you contrast that to the chart to the right of it, the known individual recipients of misconduct, I would say either complaining party or victim, in terms of gender association or whether they are persons of color. Those numbers are pretty different. In terms of who usually makes the complaints, it's not always parties that appear before the judge. A lot of our public discipline cases have been people that work in the courthouse or have worked for the judges. It's not parties that are disgruntled. These are people that are directly affected day to day. And as far as the types of conduct resulting in public discipline, either abusive behavior or discriminatory behavior, if there's been criminal proceedings, a felony is a mandatory removal. But DUIs, those types of things, or multiple incidents of aggravating behavior, either to multiple staff or multiple instances towards one person. These are just some of the things we've heard from complainants or victims. We take the confidentiality of the complainant or the victim very seriously. We try to also consider if the conduct rises to the level of where we think there should be an immediate suspension pending formal proceedings, what that does to the District as well for us to recommend removal of a judge. Because of what that does for all of the other litigants cases that are pending in that court, and the overwhelming duties for other judges in that District.

- 12 -

**Sen. Lee**

Ms. Krupa, do you talk with the victims and find out what their preferred disposition might be, or discuss options with them?

**Elizabeth Espinosa Krupa**

Well, we don't have Senator Lee, while we don't have any Victims' Rights Act equivalent within the Commission, we do speak with victims, particularly about whether they feel safe. What we can do or what we can recommend, either to a Chief Judge or the HR administrator, working together to make sure that that person is taken care of. As well as if that judge, where that conduct may lie. There have been complainants that have requested transfers or have gone to work for another judge, but we do have discussions with them. We do interview them, we do try to consult with them. But there's not any equivalent where that's a required mechanism, and sometimes they don't really want to talk to us.

**Sen. Lee**

Sure, what I'm thinking about. It was alluded to by the Chief Justice and Justice Marquez, when they spoke to us that some victims prefer a more victim centered solution to the misconduct that they, you know, they really don't want to see the Judge sanctioned or some sort of severe penalty imposed. They just want to have a safe workplace. I'm reading the comments that you had up there from some of them, and it seems that they just want to do their job. They don't want to feel harassed, intimidated, sad, scared, anything. So, it would seem that it might be appropriate to be able to fashion a solution that involves counseling and training and more sensitivity oriented processes for the for the magistrate, than the sanctions that typically are imposed. So, I wonder, would it be helpful to you to have a wider panoply of alternatives, potentially restorative justice types of referrals that you could potentially send a judge if he's willing, and a victim, if she is willing to a restorative justice process to potentially work out a better method of repairing the harm? To enable the people to move on?

**Elizabeth Espinosa Krupa**

Well, I've heard the Court mention a type of restorative justice, or even mediation. Again, we have employed similar types of resolutions. Where we recommend certain trainings for judges, or we recommend different things to try to assist if they're going to remain on the bench and that employee is going to be anywhere near them or wants to be anywhere near them. Our experience has been either the staff member or complainant does not want to work with them, and oftentimes, depending on the position of that person, their entire life has been as a clerk or a law clerk, or something like that, and part of reporting to us or making anything public with us, there are some concerns for them about their futures moving forward as far as employment, things like that. So, we try to measure that. But I can tell you, Senator Lee, that in speaking with the Women's Bar Association about this very issue, they have a lot of concerns about it. That while there may be options for us, that telling complainants that there's going to be required mediation or required restorative justice, where they need to sit down with the judge that will quell. There's a concern, I think, by the Bar, and a concern, equally by the Commission, that we're not trying to quell complainants. There's a way to serve things so that the judge can have

- 13 -

remedial measures and a complainant feels heard and safe and we're doing what we can then, then I think we're meeting that goal. My concern is, if there's some kind of, let's make sure everybody mediates first, that that is going to have an impact, that that we don't necessarily intend.

**Sen. Lee**
I'm not proposing that. And we never, in the restorative justice world, use the term required restorative justice. It's always, always voluntary, subject to the discretion of the parties. So, I'm just proposing consideration of that as an alternative. To talk about with the victim, if they are interested. If they are not interested, off the table. But as a possibility to promote some healing and to reduce the tension that took place in the workplace, not required mediation, not anything mandatory. But just as an option for consideration. The victim would have to want it and agree to it, and the offending, responsible judge would have to be deemed suitable. So that person would have to go through an assessment to determine whether or not they're really suitable. I mean, if their attitude is well, I mean, that's just appropriate, she's too sensitive--not suitable. But if he says, you know, I really screwed up, I didn't realize it. It may be suitable. So, just something for consideration. Just wanted to put it on the table for discussion.

**Elizabeth Espinosa Krupa**
And thank you. I don't think we're opposed to that by any means.

**Sen. Gardner**
Mr. Chair.

**Sen. Lee**
Senator Gardner.

**Sen. Gardner**
Thank you. Thank you, Mr. Chair. Ms. Krupa, let me take a little different view on this, than the Chair. I served on the Legislative Workplace Interim Study Committee, and there are a lot of commonalities here dealing with a specific group that has a constitutional office. They don't report to anyone in the sense, they're responsible to everyone and report to no one, in some sense, and it's an awesome responsibility that judges have. One of the things we found, as we discussed this in the legislative workplace context, was, and this came from a lot of victims, was not the notion of restorative justice and so forth. But, rather, the notion was, I don't want anybody to be disciplined. I don't want anyone to lose their job, and it's not that serious. But I want this to change, and I need an avenue to do that. For someone to talk to the judge and say, really, it's not okay to hug me every morning when you come to work or, you know, depending on your generation, call me by some endearing name because I'm a female. And yet, here's the thing that I think we need to think about. We're moving to a system where an HR complaint will necessarily be handed over after an employee is safe, so forth. That is necessarily going to be handed to the Commission on Judicial Discipline for something to happen. And I just think that between the Judicial Department and the Commission on Judicial Discipline there might be some discussion about

- 14 -

what that particular thing looks like, because not every one of these situations of discomfort in the workplace, which is very legitimate, necessarily rise to the level of I need to publicly censure you. And so again, it's not even a restorative justice thing. It's just handling things at the level that they're at. And I don't think, maybe I'm wrong, but I don't think that's something that the Commission has actually sort of been challenged with doing in the past. Because I think we've had the problem of things not being reported to you that ought to be reported. Now, I think we're going to move to, if I understand where we're going, we're at a situation where, if an HR complaint is made against a judicial officer, against a judge, the Department HR is going to do very little on that, other than inquire, ensure the employee is safe, and then hand you a file. And your choice at that point may be somewhat limited, given where we are, so I don't know. You can comment or, probably, its a subject for a longer conversation offline.

**Sen. Lee**

Ms. Krupa.

**Elizabeth Espinosa Krupa**

Thank you. So, Senator Gardner, I think there was a lot of discussion before the bill whether or not mandating disclosure to us was going to be this huge, overwhelming job to the Judiciary, and it was just going to inundate us with HR complaints. That hasn't been the case. In fact, what it's done is had at least discussions between us and HR when there has been something that's come to their attention, where they do investigate, because they still have those responsibilities. We can't do it for them or make recommendations as far as employee relations and human resources issues. But we have coordinated and tried to coordinate so that we're not having three different people sit down with a very reluctant victim who is trying to process it on their own. So, as far as whether or not we're going to receive all these HR complaints, we haven't seen that. There seem to be some discussions between us and the reporter, at least of you know what that conduct is, and it has risen to those levels generally.

**Sen. Gardner**

Thank you.

**Elizabeth Espinosa Krupa**

So well . . .

**Sen. Lee**

Rep. Bacon.

**Rep. Bacon**

Were you going to continue or finish the thought? I don't want to interrupt you.

**Elizabeth Espinosa Krupa**

By all means. Go ahead.

- 15 -

**Rep. Bacon**

Thank you. I'm curious. So, when we had the opportunity to talk to the Judicial Branch, I asked some questions around culture, just in thinking about, what are the things that the Branch may look to accomplish or keep track of or progress monitor. And, so, when you put up the slide about all of the sentiments and the feelings, I think it was like a word cloud. My question for you is, formally and informally, what is your relationship to the Court, the Supreme Court, as kind of the arbiters of these things around these sentiments and feelings, right? Is it something that you report out regularly to them? Do you find yourselves in the position, and I don't even know if this is within the scope of what the Commission does as a matter of the Constitution, let alone any of their rules. But do you have conversations about what you see over time and if any of these words have changed, right? And what, perhaps any sort of authorities or opportunities that you might have to kind of keep up with them over time, as you take in these complaints? I think what I'm really curious about, too. Part of me just wants to know when you all have the opportunity to say, Hey, there's something going on here. And what role, if any, that you have to be able to change some of the outcomes of these words. I think, like on the restorative justice piece, I think generally, when it comes to that, people need to feel safe and secure in being able to do that. And so there needs to either be rules that are protections or laws that are protections as well as a demonstration that people are safe, as well. And so part of me wonders, this is like, again, what is your relationship with the Branch? What is it that you as a Commission can weigh in on or actually do to help create those rules or spaces, or even conversations on what it is that people need to feel safe? So that was kind of broad, but ultimately, I think the question is, what is it that you can do, or what's within the scope of the Commission in regards to these things that I may have named as culture, or where do you find there to be opportunity to really help change the sentiments of protection or security or safety?

**Sen. Lee**

Ms. Krupa.

**Elizabeth Espinosa Krupa**

Thank you. Senator Lee. So, I'll back up a little bit. In terms of the Commission's relationship with the Supreme Court. We make recommendations to them. Largely our authority is defined by what you've seen and what you've heard today. We don't have the authority to make recommendations to them based on different issues that we've seen. If there's one district, let's say that just is repeatedly in front of us and really needs more management and assistance. There's not a mechanism for us to go to Court and say, hey, you got to clean up this District. Similarly, if it's allegations by multiple employees about one judge, typically, that's us talking to the Chief of that District about certain things before it would be really to the Supreme Court, just in terms of initial safety measures. But again, that's all guided by our confidentiality. And that's all set forth by the Supreme Court. So, we can't always go to the Chief Judge and say, Hey, we have this complaint. Because we're not allowed to. There are impediments to some of that. And when we started this process, at least at the SMART hearings and initial conversations with Senator Gardner and Senator Lee about what we needed to be able to be independent and independent in

- 16 -

terms of being able to fulfill our mandate. Some of the recommendations we have for you are clearly just from obstacles that we've hit. We could go beyond that, and I would, I think we would all welcome that on the Commission. To have that opportunity to really not only take a reflective look back as you're suggesting, but to be able to make some of those recommendations. We don't have that authority or even ability at the current time. As far as conversations with the Supreme Court. Yes, we have had conversations with them in certain type case related investigations or recommendations. But largely not in terms of trends or protections, things like that. That's not exactly set in terms of the Rules. And in terms of affecting outcome, it's really our recommendations, and all we do is make a recommendation. We're not the final decision maker.

I think Judge Tow made it sound like as though the Commission has all this power and the Supreme Court only steps in at the end. I'm not sure that's 100% accurate. I think the Supreme Court is briefed pretty often and knows a lot about what we do. They basically are our controlling body. We don't do a lot without them. But in terms of affecting the outcome, at least with what we can tell you and this committee is really we're just trying to make sure that at least Colorado's Commission on Judicial Discipline meets the requirements that it should. That we truly are impartial and independent.

And as far as transparency, that we really take a look at that. I understand that the confidentiality rules, we all do in terms of you know, you don't want this process to be abused, so that judges are publicly shamed into retirement or performance evaluations that are unfair because of a complaint that really would have never gone anywhere. I don't think the Commission's advocating that.

What I do think the Commission advocates is really for us to be able to fulfill what we need to do, and a lot of the impediments that we had really started in that 2021 time-period. I don't think we had a lot of Supreme Court involvement in Commission business up to that point. And it really wasn't until the proverbial, issue in the room of the court investigating itself that a lot of this came up. So, we just want to be able to do our job where there's impediments, we're just trying to make sure that we have processes in place, such as, when there's a conflict with the Supreme Court, then who's the decision maker, things like that.

And as far as the investigations, the two investigations that the Supreme Court has initiated, I understand they had a committee that picked who is conducting the investigation, but they're the client. So to those investigators, that's who's going to get that unfettered report? And the Judiciary says that they want to be transparent and provide unfettered access. Well, I don't know that. That that's what's really going to happen. Whether the redaction comes from the Court before and you never see it, or what is released to the public, I don't know. And I don't think the Commission can tell you what the result of any investigation will be. I'm not sure, and I don't think any Commission member would say that you'll have that before you need to start making some decisions in August. But what we can tell you is what is preventing us right now from doing it, and what we need to be able to move forward. That's not blaming

- 17 -

Judicial. It's not saying that Supreme Court is protecting itself, but really to try to help us be as transparent and as responsible in our duties as we can, without hindrance.

**Sen. Lee**
Rep. Bacon.

**Rep. Bacon**
I just want to shift a little bit. Can you share with me again, if I missed it, I'm sorry. When something moves into the public discipline phase. Or what is the qualifier for a claim, or for a public discipline outcome? Does something move to that category, or does it start in that category?

**Sen. Lee**
Ms. Krupa.

**Elizabeth Espinosa Krupa**
Thank you. So, when the Commission does an investigation that really only advances into that trial or formal proceeding phase if there's a preponderance of the evidence. That trial or decision phase where we would have a special counsel that prosecutes, for lack of a better word, on behalf of the people of Colorado, either to the Commission or, historically, to Special Masters. That is still confidential. It will not become public up and until the court determines that that is the case.

**Sen. Lee**
Rep. Bacon.

**Rep. Bacon**
So part of my question in reading your document, it says, In the most serious cases. I'm on page six. In the most serious cases, the discipline will be public discipline. But then it says in the most serious cases, when an agreement cannot be reached between the responding judge and the discipline commission, the commission files formal proceedings. So, I guess what I'm just asking again, maybe you answered this. But I think what I was looking for is there something that qualifies either a claim, whether it's degree of something, whether it's severity of something, that would move the claim or case into a public discipline place where there needs to be formal proceedings? You all make private decisions, and there's public decisions. So, I'm just curious if there's something that, if there's qualifiers for that by way are these categories? Or is it about level of agreement or settling of a claim.

**Sen. Lee**
Ms. Krupa.

- 18 -

**Elizabeth Espinosa Krupa**

Thank you. So, in our rules, there are kind of those delineations of. And we can, I don't believe that's in our materials, but we can provide those factors that are considered before it would be made public or moved to that to that phase.

**Sen. Lee**

Okay, please continue. I did want to note it's 2:30. We're a half an hour behind schedule when we came back. We're supposed to have the Office of Attorney Regulation Counsel at 2:00. They presumably would be starting a couple of minutes from now. So, if we could sort of move it along a little bit, that would be appreciated. I don't want to curtail any magnificent disclosures that are forthcoming, but proceed. Senator Gardner.

**Sen. Gardner**

Yes, in defense of our witnesses, we're the ones asking all the questions.

**Sen. Lee**

I fully agree. It's all on us.

**Elizabeth Espinosa Krupa**

Thank you. Senator Lee, you'll be glad to know my portion of it is done, and Judge Prince is going to address the impediment that we've hit and our recommendations.

**Sen. Lee**

Very good. Judge Prince, impediments and recommendations.

**David Prince**

Thank you, Mr. Chair, Madam Vice Chair, and members of the committee. I'll dispense with the introduction. I'm one of the members of the committee. Some of you have been introduced to me before. Well, I guess I'll do a little introduction. So, I've been a practicing lawyer for over three decades. I am a sitting trial court judge in El Paso County. About half my career, I was a practicing lawyer. About half my career, I've been a trial court judge. I've served on the Commission now for about five years. As you hear, I moved into the spot of Judge Tow as he moved out, and I serve now as the Vice Chair. Couple of things before I get to my slides. Just a very quick follow up, because we've talked about it a lot, and I know we're worried about time. But a follow up on the issue two of our senators raised regarding restorative justice and maybe options. Just a couple of things.

One, more tools would be helpful. We do have a broad option of diversion programs or things by stipulation. So, when we're talking about, I don't want to minimize it, but a lower-level issue, such as the example you gave of you really shouldn't be calling me an endearment every morning or hugging me every morning, something like that. Those are issues where this is something that is probably education

oriented. We can talk, we hope. We can talk with this person and try to heal this relationship, as Senator Lee was talking about, and we've done some of that, but we could use better tools. And we've had ourselves in a position once or twice where we need something like that, and we don't really have access to it, and we just haven't had the staffing in the past to even know what resources may be in the community. And one of the plans we already have is that as we get that staffing that you have so kindly authorized to us, we will be looking for those resources and looking to improve upon that. The challenge, and something that Chair Krupa referenced, was that this idea of a of a diversion program for employees has been discussed in the context of Senate Bill 22-201 a couple of times, and also with some of the affinity bars. And it was raised as an alternative. It was presented as an alternative to going down the road of judicial discipline or an alternative to reporting, and that's what's got some people nervous and has us nervous. And an aspect and Chair Krupa has already talked a little bit about that, but an aspect of it that hasn't been talked about relates to our confidentiality. And a reminder that all of these pieces actually weave together quite a bit. So, when we do public discipline, or the discipline is made public by the judge in some fashion, but when we do public discipline, when it becomes public knowledge that a judge has been involved in some misconduct. Usually, it's going to be one of the more serious cases. Usually, that means it's going to involve some sort of personnel issue or some sort of abusive behavior, as you heard earlier. What then happens is, once it does become known publicly, is we start to get more complaints. We start to find out there are other people who have been adversely impacted by this judge, but were afraid to come forward. And so we get very worried about an idea that says that, instead of going through discipline, if somebody and the phrase that's been used in past has been "they just want the conduct to stop." Well, that's important, and it's important to be respected, and it's important to be evaluated as to level of seriousness. But if it is the type of conduct where there are likely to be other people adversely affected that we wouldn't necessarily know about, we worry about a program that's diverted to the person so that others never have the chance to come forward. Because, again, in our experience, they only come forward after we're done with our process, because we're so secretive. Nobody knows, oh, so and so already reported that judge. And so it would be a little safer for me to step forward and say something. So, it just has to be careful in the design.

And then another aspect is that we have actually had some discussions. One, I want to thank legislators for being a critical part of getting us to a point where we are now having meaningful discussions with the Judicial Branch on many of these issues. And one of the issues we've talked about was exactly those concerns, and at least I've received assurances in those very preliminary discussions that they're mindful of that, and that's not really what they're proposing. Even if it may have sounded like that to many audiences in the past. So, I just wanted to touch on that before we go much further.

Another issue I wanted to touch on is something that really is critical to I think our whole discussion today, and Chair Krupa mentioned it briefly. And as I listened to Judge Tow describe the process of judicial discipline in the way the Commission operates and its relationship with the Supreme Court. I would have given a very similar description in, at any time in the first three years of my five-year term on the Commission. And one of the phrases he used several times was the Supreme Court is not

- 20 -

involved in micromanaging the cases. The Supreme Court wouldn't even know about the case until you make recommendations. That has not been our experience in 2021 and 2022. Those have actually been where the challenges have arisen, where the Supreme Court and Judicial Leadership have become involved in the cases from the beginning. Making public statements about what facts are in the case, public statements about what facts should be found in the case, those kinds of things, and then becoming directly involved in deciding what information is released to the Commission, what resources are provided to the Commission, what scope of issues can be assigned to the Commission, Special Counsel, all of those kinds of things. I agree with Judge Tow that I doubt those things happened prior to about 2020 but they're the reasons that that bring us here. Is that this has been done differently now. And I think of that old Sesame Street exercise of one of these things does not look like the others, and we look at all the cases we've handled and how differently certain cases are handled compared to others, and that's where the challenges come that we're asking you to address. So, I just wanted to touch on that, because I agree with a lot of that description, except that that's not what's happening now. That's the difference.

The other aspect is also keep in mind that he's talking mainly when he says in the ordinary course of the case, from a case perspective, procedure perspective, the Supreme Court wouldn't be told about the case until recommendations. That's technically correct, and for the vast majority of cases, again, 80% plus, using his numbers, get dismissed and don't really go forward. And he's absolutely right, they probably would never even know about most of those cases. It just wouldn't come before them. Wouldn't go anywhere. Those aren't the cases we're worried about procedure-wise. We're worried about the serious cases that do go forward, and again, most of the serious cases, the way the structure works, the Supreme Court has been involved in those cases before it comes up for recommendations. And they'll get that involvement either because, as Judge Tow himself acknowledged, it might be a high-level personnel issue, so it comes before them. As Mr. Vasconcellos acknowledged, the Court as a whole in Colorado, a little bit different than other places, is essentially acting as a Board of Directors, or the C-suite, as the corporate people call it sometimes, running the organization. It's not just the Chief Justice doing the administrative job. And, so, most of these serious cases involve serious challenges to any organization, and so they've had to be involved in addressing it before it ever becomes a judicial discipline issue. Because also, remember, we are not first responders. We are generally last responders. Other people have to deal with the immediate challenge of a judge is not able to serve for some reason. And so we've got to figure out who's going to handle those kinds of things. So, those are the reasons that they come up. And then, of course, the Court announced last year that the Chief Justice is now being briefed on each and every misconduct allegation against a judge, every week. So, long before a case even comes to us, much less gets investigated, goes through formal proceedings, gets to the point of recommendations, at least one member of the Court has been briefed on a weekly basis, extensively for many, many weeks on what's been happening. So, they're exposed to a great deal of information, which creates challenges for the system.

- 21 -

So, anyway, returning to, kind of going back to slides, I decided I would try to walk through the same five phases that Ms Krupa described to talk about the issues that we've encountered. So, I start with the intake and screening level. Oh, I'm sorry, is there a question?

**Sen. Lee**

I hesitated based on the former comment that the delay of the committee is caused by the questions from the committee, but I will, I'll accommodate my own delay. When we're talking about the Supreme Court becoming involved in cases, and we talk about disqualification because of knowledge, etc. Doesn't the Chief becoming involved in cases and being briefed on cases on a weekly basis create a risk that he would have knowledge of the cases sufficient to disqualify him should that case proceed through a disciplinary process and reach the Supreme Court? He would have had prior knowledge of the case if he had been monitoring it as a Chief Justice along the way.

**David Prince**

We haven't crossed that bridge yet procedurally with a specific case. But what I can say more generally is that under both Rule 2.9 of the Code and Rule 2.11, assuming they apply to judicial discipline cases, and you heard earlier that that the Code does apply. But assuming those two apply, yes, they require that if a judge has knowledge of facts, a case, then, generally they need to disqualify themselves from the case. And a judge is allowed to consult staff under 2.9 I think it's (C). I forget. Under 2.9 a judge is allowed to consult courthouse staff in doing their duties, but they have to take reasonable steps to make sure that they're not exposed to facts relevant to the case. And so yeah, you have that issue, and I don't think we have a clear answer to it.

**Sen. Lee**

Okay, all right, thank you. Pardon the interruption, as they say.

**David Prince**

Certainly, thank you, Senator Lee. So, if we look at the intake and screening phase, some of this is a little bit of review for you. There was some talk about the new statute anticipates that HR complaints will be handed over to the discipline commission, and that's true. The explanation, or the context, is that that's been the case by agreement since 2010. So, that part of the statute actually is not new. There's been a requirement that the Judicial Branch basically provide to us allegations of judicial misconduct, or allegations that rise to a level of judicial misconduct that have to be reported to the Commission under an agreement since 2010 and that agreement gives us access to information and files held by the Judiciary. What we found, and what we've addressed in prior hearings, was that the 2010 agreement was not actually being fully implemented. There were instances where it had not been followed. And, so, one of the things that Senate Bill 22-201 did was basically codify that duty. Now there are some variations in it. It's not 100% the same language. So, I think there can be some argument that it's a little bit broader, but it's generally codifying that. The challenge that remains. So, hopefully that's largely addressed that issue.

- 22 -

The challenge that remains is that there's no enforcement mechanism for that duty in the statute. We have a codified obligation, but it would be helpful to also have some form of enforcement mechanism. Because that's the challenge we ran into with the 2010 agreement. We already had a duty of disclosure when we found that our requests for compliance were not fully effective. As a practical matter, we didn't really have an enforcement mechanism. Because our rules are not that clear on how you go about enforcing those duties, and to the extent you have paths to do it, they all lead through the top levels of the Judiciary. And they're the ones making the decisions on whether the information is being provided or not. So, it's not a very effective enforcement mechanism, and it's also kind of ambiguous. Because nobody really wrote those rules with the current situation in mind. So that's one of the things that we think need to be addressed.

I move on to the complaint investigation phase. There, the big challenges that we ran into were resourcing issues. Where we needed resources for the unique investigations that came up in 2021 through 2022. What we learned was that there was an opportunity that hadn't arisen previously. There was an opportunity for access to funds to be blocked, which just had not happened before, and to be blocked by those who had conflicts with respect to what was the investigation to be funded. And so happily, again, the Legislature got together and helped us with that. And part of Senate Bill 22 201, is to provide funding and personnel, so we were hopefully able to deal with those obstacles, and hopefully that's in a good position access to information in the complaint investigation phase. Again, we've already talked about one aspect of that, that's the disclosure obligation that was in the 2010 MOU didn't turn out to be very effective. The new statute addresses that.

But there's another aspect of that, and that's subpoena authority. So, part of what happened over the last couple of years was that we got invited to issue a subpoena in order to get information. Obviously, I can't talk about individual investigations, but I can talk about the processes that we use. And, so, we got invited to issue a subpoena, we issue a subpoena, and the lawyers representing the Leadership of the Branch advised us at that point that they didn't think that we had subpoena authority and that they didn't necessarily feel the need to comply with the subpoena. And, so, we talked about an enforcement mechanism. And again, there's some ambiguity in the Rules of what that enforcement mechanism would be. And, so, the position, at least taken by the counsel representing Judicial Leadership was, well, we'll just do it by an original proceeding before the Supreme Court. Which, under the circumstances, essentially is the body that's making the objection. So, the Supreme Court is going to rule on the validity of the Supreme Court's own objection was basically the way it was presented. And, so, I return to that issue of enforcement mechanisms. Now there's an added piece of it, and that is subpoena power. So we actually do have subpoena power under Rule 22. We think it's pretty clear, but there doesn't seem to be complete agreement on that. And, so, it would be helpful if the Legislature would actually codify subpoena power. And the aspect of the subpoena power that's in question is when we're actually doing the factual investigation, do we have subpoena power? Well, step back and think about it for a moment. Remember so the idea, the argument that's been made, is that you don't have subpoena power until formal proceedings. So, you don't have subpoena power prior to formal proceedings. Remember, you

- 23 -

can't have formal proceedings until you've already demonstrated the case by a preponderance of the evidence. In other words, you've got all the evidence you need to win a civil case before you can have formal proceedings. Well, it's hard to do an investigative phase without subpoena power, without the authority to require the production of evidence and reach that standard of already having gathered the evidence. There's a bit of a vicious cycle there. In other words, you don't have subpoena power until you have the evidence to show the claims. Well, wait a minute, if I already got the evidence to show the claims, why do I need subpoena power? And there's another technical issue that I won't get into, it's an argument as to whether the Commission's even a party to the formal proceedings, or whether the Commission has its own subpoena power, or only has the authority to issue subpoenas as requested by others. So, lots of detail in this.

Moving on to formal proceedings. In formal proceedings, another of the set of challenges we've had is the location of rulemaking authority. In Colorado, under the Constitution, rulemaking authority is assigned to the Supreme Court itself. In a survey across the country, there are about 20 other states that assign rulemaking authority to the discipline commission itself. In Colorado, we have the analogous Performance Commission. They have their own rulemaking authority. We found that some of the challenges were, quite frankly, that the rules as written were not always honored, and the rules as written sometimes leave things out. For example, you've heard both from Ms. Jenson's presentation and ours, that when you get to formal proceedings, the Constitution gives the Commission the discretionary authority to choose between two paths for those formal proceedings. Who will hear the trial? It can either be the Commission itself or the Special Masters. However, when the Supreme Court wrote the rules, they only addressed hearings before the three Special Masters, so there are no rules that permit or address if the Commission itself holds its hearing. There's some other quirks in those Rules, and then issues such as authority to hire Special Counsel, which came up and define the scope of Special Counsel's work. Well, there's an existing Rule for us. This is Rule 2(aa), and it quite clearly states that the discipline commission is the body that decides what Special Counsel does and the scope of their engagement. Well, according to Judicial Leadership in the last year or so, they actually have that authority, or at least the Commission's authority, to do so is subject to their review. The example that I can give you is one that's related to a discussion that you all had this morning, to some degree. You talked a lot about the recommendations for the discipline process that are anticipated from the privately hired counsel of the Judiciary. You recall that discussion? The discussion was mainly about concerns about the delay and the timing. And some discussion has been held several times about, well, the Legislature, the General Assembly, really needs to wait until you get those recommendations from the privately hired counsel. Well, if you go back and look at the public statement issued when we hired our private counsel, we actually followed the lead of the Judiciary, and we identified two broad topics that they were being hired to do. One, was to help with investigations, evaluations, etc. But the other was to make recommendations on the judicial discipline process. Well, and again it's very similar to what the Supreme Court released when they identified the scope of the engagement of the privately hired counsel. One of the points that Judicial Leadership has been very insistent on over the last year and a half has been that the Commission should not be permitted to have the authority to have its Special Counsel

make recommendations on the discipline process. So, we have not involved them, and we decided to live with that. So, even though that Rule says quite explicitly, it's the Commission that decides the scope, judicial leadership has said, no, that's not the way it works. We have ultimate authority to decide what issues your Special Counsel can look at, and they've been quite clear that they object to having our Special Counsel look at recommendations. So, we've had to do that part of it on our own, but they've also made the assertion that they have the authority to dictate certain issues being beyond the scope of what Special Counsel can look at. Certain arguments beyond the scope of what Special Counsel is allowed to make. We have resisted that aspect, and we have not agreed to that part of it. But that's a problem with, as far as we can tell, coming from rulemaking. Because the Rule is crystal clear, but it is not being honored as things are currently handled. And, so, a change in who has the rulemaking authority would probably be helpful with that.

Another issue that ended up being discussed a few times today are those rules of disqualification for judges. It was said in that context. Well, actually the rules for the decision makers involved in judicial discipline are fairly ambiguous at the moment, a bit vague, a bit of a patchwork, and some inconsistencies. It is not entirely clear that the Code governs the standard for when a judge is involved in judicial discipline as a decision maker. It's not entirely clear if the Code is what governs. In other words, to Rule 2.11 which usually governs a judge making a decision on disqualification. We would think that it does. What you heard this morning suggested that it does. But that's not entirely clear. The Constitution lays out some specific, just really two examples. Two specifics, of when a judge is a Supreme Court justice or a judge member of the Commission is required to disqualify themselves from judicial discipline. And it's really only when their own discipline is at issue or their own disability. And, so, there's a question as to do you follow what's written in the Constitution and only that, or do you supplement it with the Rule? There are several decision makers involved in judicial discipline. There are the members of the Commission. There are the special masters. Special Counsel also has significant decision-making authority. And then there's the Justices of the Supreme Court under the current system, as well. And, so, what our proposal is, and right now, we have Rules that were adopted last Fall, which define disqualification for members of the Commission only. They don't address the other categories. So, what our proposal is, is that you follow the lead of several other states and just enact a very simple, straightforward standard for disqualification. And just say all of the decision makers are governed by the same standards that govern when a judge recuses. So, that's really 2.11 under the Code. At the end of the day, a very simple and straightforward proposed solution to that challenge.

**Sen. Lee**
So, Judge Prince, that would apply to the Supreme Court if they have a conflict as well?

**David Prince**
Yes, sir, it would.

- 25 -

**Sen. Lee**

Okay.

**David Prince**

The way we propose it would apply to each of the decision makers involved in judicial discipline. The other issue we found is that there's kind of a definition of what does disqualification means. How far do we have to step back from involvement in the case? And that we've seen inconsistency, shall we say, in the way that's administered. If someone says they're disqualified, but they're still involved administratively. It talks about it a little bit more in the written report. But basically, the Rules that were adopted last Fall for disqualification of members of the Commission say clearly that if you disqualify as a member of the Commission, you will not be involved in the judicial discipline process of that case in any way. It strikes me as a very good standard. The Commission is absolutely okay with that, but that's not the standard that's applied with other decision makers involved in the process. And so that should be uniform, because it does make sense. It does seem to be an excellent standard.

Moving on to formal proceedings and the pool of Special Masters. One of the discussions this morning was a statement that the Special Masters, when they're appointed because they are judges. By the way, in answer to the question earlier, the Constitution does require they be judges or justices. You cannot be a non-judge or justice and be a Special Master in Colorado. And that, you know, you can debate that's not something we're making a recommendation on. That's fine with us, but you can debate whether there's value in a different perspective. But one of the things that was described was you want the judges because they have subject matter expertise. And that is partially true, but you have to be clear, they are subject matter experts in being a judge. In a judicial discipline case, there are other aspects of subject matter expertise that are pretty important. One is the relatively arcane and very rarely known or understood procedures of how judicial discipline actually works. You've now heard three presentations today, and I suspect we could quiz you and still trip you up, because it's very unusual. It's very different than other things. And you don't, you don't come encounter with it very often. Even we on the Commission, we're the, probably the greatest experts there are, because we do it the most. We still are constantly looking back at a relatively short set of rules to remind ourselves. Because it doesn't come up in everyday life. So, they're not subject matter experts in the procedure, because usually the Special Masters are appointed on an ad hoc basis. Usually, they don't have prior experience. They're not subject matter experts on the Code itself. Again, I realize that judges live by it, but most of us don't really spend a whole lot of time looking at it, except for the very obvious things. So frankly, our proposal is that, why don't you create a pool from which the Special Masters are drawn? You know, a normal panel. There's no magic to these numbers, but a normal panel is three special masters. So, let's create a pool of six or nine, whatever number you want, and have them become subject matter experts. We'll have them serve for several years, and so they'll get to know the discipline process and the standards. And importantly, we've got several questions on what really is the difference between this type of what's reasonable basis, what's the difference between private and public? Problem is those are like sentencing in a criminal case. There are some factors that help you in the statute, but they're pretty gray areas until you have some

- 26 -

experience. And there, I can't remember the number of factors, but in answering your question, Representative Bacon, it's called the *Deming* factors. It's a long list of them. I forget whether it's eight or 12, but quite a few that you go through to try and evaluate how serious is this? And it does require some experience and some expertise. So, our system would be better served, assuming we stay with Special Masters, as I assume we will, is to have a pool that starts to become genuine subject matter experts on all three categories, rather than just the issue of being a judge. And that also, you have them serve longer terms. It insulates them from any influence. It makes it less likely that you're hand picking a Special Master tailored for this case because you think they'll be favorable to your point of view. Something like that just insulates a lot of issues.

With respect to terms, if we are making changes at the constitutional level, another recommendation that we make for very similar reasons, is that you lengthen the term of the members of the discipline commission. Currently, our terms are four years. We would suggest you increase that. You can debate what's the exact right time, but you'll get better institutional knowledge and better subject matter expertise across those three categories if you make it a little bit longer. By way of comparison, a District Court Judge serves for six-year terms, and appellate judges serve for 10-year terms. And a large part of that is one, to insulate them from those political influences, and two, to give them expertise. Same thing really applies to the discipline commission members. So, we would suggest longer terms as well, there.

At the final decision phase. The final decision phase comes back, really, to the issue that Senator Gardner teed up. Which is this issue of conflict. And what do you do when the final decision maker has been somehow involved? And as was said this morning, we actually don't have a process for that. And it's not a purely hypothetical situation. It has actually happened in the United States. Just a few years ago, it happened in Wisconsin. And Wisconsin, I don't claim to be an expert on their system or even the facts of this. But in Wisconsin, there was a member of the Supreme Court who had a discipline case brought against them. If I recall, it was a laying on of hands alleged with another justice. So, it's interaction between two justices on the Supreme Court. Not surprisingly, a solid majority of the Supreme Court recused. And they had a system, for these purposes analogous to ours. It's a little different, but analogous. And the result was nothing. The constitutional body was disempowered. That's probably not a word was taken out of the equation because a majority, I don't know why. It wasn't all of them, frankly, but a majority of them recused, and so they had no power to act, and so nothing was done, and the discipline matter was never heard. And I think everybody would agree that that is a very poor result, and we wouldn't want that to happen here. But it again indicates that these are real issues. These are not purely academic, and they're not purely tied to whatever facts you're thinking are being reported in the newspaper right now. They exist over time, and in many different scenarios they come up. And, so, we do need to have a procedure. And I'm happy to say the Judicial Branch appears to agree with us on that, that we need to come up with some way to address it. And the problem is, the process is currently defined at the constitutional level, so you probably need a constitutional fix. Maybe we can argue about around the edges, somehow rulemaking authority allows us to address it. I don't know. Those get to be difficult issues, and you want to make sure you've got credibility in whatever you adopt.

But you really have to address them. And I've touched on this a little bit, but when we talk about conflicts at that final decision maker level, people immediately think of, just the example that was given, or the example in Wisconsin, an actual justice of the Supreme Court, current or retired, doesn't matter. An actual justice of the Supreme Court is alleged to have engaged in misconduct, and that's the case. That's as simple, straightforward an example as you could come up with. And, so, people can say, Okay, I see the conflict there. That the judge had, that the justice has, and so they shouldn't sit on their own case. And maybe they also know enough about the process and the concepts of judging that they say, Well, it's a collegial court, as the ABA calls it. It's a collegial court. And so maybe the other justices, because they know that judge so well, should step off. Maybe not. That's a kind of a debatable point. That's really only one narrow margin, narrow sliver of the conflict issues that arise. Remember that you heard this morning that Colorado conducts the business of the Judicial Branch a little differently than many other states. We don't assign all the administrative duties, what I call the corporate duties. At times, we don't assign all the assign all those duties to just the Chief Justice. Instead, the Justices, as a whole, started a few years ago acting as that Board of Directors, or that C-suite. So, they're actually involved in the decision making. And, so, you've got a couple of levels here. Let's assume that light fixtures. Let's assume that there's a contract let by the Judiciary to replace all of the light fixtures in all of the courthouses in the State. And let's assume that there's then an allegation that there was a bribery scheme, something clearly inappropriate with the letting of that contract and the contract itself was approved and let by the Supreme Court in their administrative roles. Well, what do we do with that? If we have a discipline case, who makes the final decision? It's not just the direct conduct, it can be the decisions. Or administratively, I'll use an example from another situation. Let's say that at the at what used to be called "busy corner" in Colorado Springs, at Tejon and I forget if it's Colorado or Pikes Peak. Pikes Peak. Tejon and Pikes Peak used to be called "busy corner." So at "busy corner", I'm standing there one day. I'm a final decision maker in judicial discipline, and I'm a judge locally, and there's a car accident. These two cars just come slamming into each other at the traffic light there, okay. As a regular judge, a civil case gets filed, personal injury case. Comes and gets assigned to my courtroom. What do you think? Should I, as a judge, having been a witness to the actual car crash, sit on that case? Of course not. And the rules, you don't have to know these rules. That's common sense, but our rules actually provide, No, you're a witness to critical events. You should not sit as a judge on that case. So, I have to disqualify. Okay, now let's assume same kind of scenario, but it's, well, let's use the judges. Oh, I forgot what state it was, but there's a famous case from a few years ago where some judges got a little inebriated an made an unfortunate choice of locations to go to in the middle of the night during judicial conference back in I don't know if it's Minnesota or Illinois. I think it's Illinois actually. And they got into an altercation with another customer at the place, one of the judges ends up getting shot in the altercation. There's quite a contra temp and lots of injuries. And not surprising that not only criminal charges arise out of it. I don't think any of them got criminally liable. I can't remember now if the judges got criminally liable, but then there becomes a discipline case, understandably. Because it doesn't necessarily make the judiciary look good to have three or four judges brawling on a street corner drunk as skunks. And so that became a judicial discipline case. Well, assume now that there was a fourth judge with them who was just standing around and who wasn't drinking and wasn't participating, but was a

- 28 -

witness to everything that happened, and assume that that judge is on the final decision-making body. Should they sit on the judicial discipline case? I would say it's exactly the same as the car crash case. They should not. So, when you factor in that administrative role, you end up seeing all these personnel issues. Again, the most serious cases are usually going to be personnel issues, and so in that administrative capacity, they end up being involved in some of the facts that come forward. And, so, you have those issues. All I'm trying to do is impress upon you is that the conflicts for the final decision maker don't arise only because the final decision maker is the one that was directly involved and who is accused of misconduct. There are many paths to conflict in our world of judging.

Couple of options, a few options that we suggest you consider. I think we're a little reluctant at this point to actually recommend a specific one, but I laid them out as the Illinois model. The Illinois model is where you actually create a separate body to make a decision. And you can make it a group of judges who aren't involved in that administrative chain. You can make it multi-perspective, like Colorado does on other oversight entities like us, frankly. They can be judge-perspective, lawyer-perspective, and citizen-perspective. So that's a model that seems to address a lot of those issues. Now, if you did that model, keep in mind, just like any other governmental body in our state that makes a decision, that decision is still subject to judicial review. But it's a review that is, we call it Rule 106. It's a limited review, really constitutional kind of process review. I'm being overly simplistic, but not trying to get into the weeds on that. Another model is the Pennsylvania model. Pennsylvania is probably a more popular model than the Illinois model. It's also the model adopted by the ABA code. And this is that shadow court, or that pro tem temporary court. So that you say, well, when the Supreme Court or the final decision maker has a conflict, then we'll create a totally separate court from whole cloth, one time only. And there's obviously some advantages of that, because they have no ties. The problem is it assumes, really only that model, that conflicts will arise because it's the individual judge's conduct, and so it'll be very rare. And the other part of the model is that they have no institutional knowledge, they have no background. They've never done it before. They haven't existed until this one time when they've been created. And then there's a kind of a variation on a New York model, and the New York model would have taken care of the Wisconsin issue, and that is, the discipline commission makes a decision, and you change the procedure slightly. And instead of saying the discipline commission makes a recommendation that goes up to the Supreme Court. You say the discipline commission makes a decision and it can only be overturned if there's a conflict-free court to set it aside. And that would be pretty novel. I'm not sure that it's a great idea, but it's one of the ones that's been kicked around in these discussions, and there are some others as well.

The last issue that I'll talk about is another big one for you, and frankly, I'll pretty much punt on it. I'll tell you right now, before I get there, and the Commission will pretty much punt on it. And that is the issue of transparency. It's come up a few times. And as Ms. Jenson described this morning, we actually all draw from the same source, a great chart that sounds like she circulated. A great chart from National Center for State Court's Center for Judicial Ethics. I think it's called, I always forget the name.  In Colorado, the reality is, there's a continuum of where discipline cases can be public. The real

- 29 -

maneuvering room is right there in the middle, in a very narrow band. There's not a lot of outliers. And it's that question, really it boils down to, do you make it public when you start the formal proceedings, when you start the trial? Or do you make it public only after the trial is done? I'm simplifying. In Colorado, we're in a minority, but it's a pretty good minority. We're 15. In 15 states, it's after the trial is done. In 35 states, it's before the trial starts. That's really the difference. There's a really unique system in Arizona where they actually publicize everything, but they redact the judge's name. So, every single complaint is posted, what we call an RFE, is posted online in Arizona. But they redact the judge's name. So that's another creative thing to do that strikes me as really quite odd. I think you ought to stick to the mainstream and decide between, is it before the trial, or is it after the trial, or some sort of hybrid in between. So, those are really the main topics that we were making recommendations on of issues to be addressed and to try and resolve through legislative action. And, so, I'd be happy to answer any questions.

**Sen. Lee**
Thank you, Judge Prince. Rep Weissman.

**Rep. Weissman**
Thank you Judge and Chair Krupa and Mr. Gregory, thank you all for being here. Backing up a few moments ago to the difficult question of access to information. Well, there were many difficult questions there, but maybe I'll just ask about one of them. If, in the normal course of say, civil litigation, something isn't happening, you do a motion to compel. You've pointed out the problem that the bodies that will be deciding the equivalent of such a motion, should it be made by the Commission, would be decided by those against whom it might be operating. I think we all see the problem there. You've pointed out some other states that offer models in terms of structure of final decision-making authority. I wonder if you have a recommendation to another state or otherwise on this question of I mean, I hope we don't even get here, but clearly we already have, and I think repeatedly so. In the event that there is this impasse, how do we structure? How do we create a decider? You the Commission are trying to get information of course out of constitutional duty. You can't get it. In my mind and if there's a better metaphor, please lay it out for us. But my mind is going to something like a motion to compel. But then I get to what body with authority to issue a ruling that might reach the Supreme Court, and the SCAO, for example. What does that body even look like? How do we constitute that authority?

**Sen. Lee**
Judge Prince.

**David Prince**
So, there are some options. I will tell you that there have been enough issues and enough different lines we could go down that I haven't done as much research on that as I would like to do and will do further. But we've also been having some discussions with the Judicial Branch of trying to work out some ideas of our own that we could enter by contract, for example, on an individualized basis. And, so, one of the

- 30 -

things we talk about is, well, let's try having an arbitrator. That's one of the ways to get decisions out of the Court, get subject matter expertise. There's a problem with doing that right now, as far as we understand, we actually couldn't do that right now, because there's a prohibition on at least certain government entities from entering arbitration agreements. So, you would probably need statutory authority to go down that road. The look on your face tells me that you realize there are pros and cons, like there will be for any solution. There are pros and cons to using an arbitrator. One of the issues, of course, is that, for all practical purposes, when you go to an arbitrator, the decision stops there. And there really isn't an appellate right. Yeah, there's some challenge in court, but not much. You're really looking at a decision right there. You could try to do a different version of that by designating an individual court. But you know, this is also one of the advantages of, if you get that pool of special masters, you can help define what will be their role. If you're rewriting some pieces of this. And, so, I have to admit my thought, and it struck me as so reasonable, I haven't really looked at more options, but I will. Is that if you restructure those Special Masters a little bit and have them be more insulated, so that you don't have as you have right now, the opportunity for a conflicted party to hand pick who the masters will be, and you come up with a selection process, a few safeguards. Why wouldn't you use the Special Masters just like you would for regular trial court, and that would be where you filed your motion to compel, even if it was before formal proceedings, which is kind of the challenge we have, is before formal proceedings. So, you don't have masters really to go to, and there's a process to get there, but it's a little vague, and then you're back to, well, who's going to actually choose them, and are they going to be conflicted, those kinds of issues. So, that's my thinking. I know that there are a couple of other models, but really, most of the models around the states don't really deal with this type of conflict issue very well, because it's just assumed that when it's going to be the final decision maker that's in conflict, that's going to be incredibly rare, usually would only be one member, and so it's fine still having the final decision maker do everything. We, like Wisconsin, are sort of looking at that potential of where you lose the functionality, in some fashion. Either practical or technical, of that final decision maker. And, so, you need to come up with a with an alternate model for the discovery issues.

**Sen. Lee**
Rep. Weissman.

**Rep. Weissman**
Thank you. In the vein of flow of information, which is necessary to all these matters, I guess, one comment, one question. It's come up, I think, with the Commission and other entities, including some we're going to hear from this afternoon. Concerns on the part of those from whom information is flowing about attorney client privilege and duty of attorney client confidentiality. It is in the bill, page 14 of the enrolled for a very good reason that, all other things equal, disclosure of information to the Commission does not work to waive those. I can't cite to a particular conversation from memory, but it's been suggested, is it the province of the Legislature to sort of say what the zone of protection could otherwise be construed to be a waiver of that privilege or confidentiality? And I guess we're getting into questions about the line between statutory prerogative and common law. I think for now, I just want to

say it emphatically is within the legislative prerogative to do what we have done in (e) on page 14 of the enrolled for a public policy reason. Put all of the other debates about attorney client privilege and confidentiality aside, and there are a lot of lawyers in this room. We don't take those things lightly. We shouldn't. But it, frankly has enraged me, the idea that concern about waiver of those in other contexts would operate to impede things that have been going on for years. So, I think that part of the bill is important, and if we need to make further such specifications in the public interest by defining limited circumstances where disclosure that we, the policy making body, want to happen for some public end. That alone doesn't work waiver. Now, if the entity in whom the privilege adheres screws something else up, okay, that's different. But I guess that's the end of the comment for the record. The next question was, there is a new, this is sort of the other half of the coin of a question that I put to judicial, hours ago. 106 (a)(2) of the bill provides that if the Commission makes the request for information about an investigation, you are to receive it within 35 days. Now it's right around 35 days since the bill was signed, and if you could not have made such a request that would operate under that section until after signature, and then the clock would start running. I guess my question is, has there been a new such request that would fall under that obligation on the Branch / right in hearing in you as the Commission, and how's that going so far?

**Sen. Lee**
Judge Prince.

**David Prince**
Thank you, Representative Weissman, for the question and topic. So, I'll go reverse. I want to comment on your comment and also answer your question. Obviously, this is one of those areas where constantly, we have to be very careful about not getting into the facts of allegations, et cetera. But you're asking a process question. How is our process working? Consistent with our other discussions? We're allowed to talk about process under our Rules and how it's working. I will tell you we have not made specifically a request, and think of it as for a practical reason. The bill just got enacted, and the policies I don't know for sure, but I'm fairly confident the bill requires policies to be adopted and prepared by each of the Districts within Colorado for compliance and for gathering, and I don't know, but I'm pretty sure, that process probably isn't very far down the road of creating those policies. And we are having productive discussions. And so, frankly, as a sign of good faith, we've not made that request and haven't felt the need to. I suppose that's pretty important, yet because we are having some productive discussions, and we assume that the Judicial Branch is probably going to involve us in trying to prepare those policies, and that hasn't happened yet. So, it's going to take some time, and I'm confident, though, that if it was a newly filed case going forward, we would probably have very good relationship in trying to get that kind of information. Circling back to your comment on waiver. Keep in mind that the provision that you've just identified in the statute, there's a very good argument that it's superfluous. It's not actually needed, because the Constitution itself provides exactly the same thing. The Constitution itself provides that giving information to the discipline commission does not waive privilege period full stop. Our rules provide that providing information to the discipline commission does not waive privilege full stop. It's

- 32 -

really that simple. The statute, so now we've got it by constitution, by rule, and by statute. So, hopefully, that will put that issue to bed. There is an exception that hasn't existed before for claim of federal privilege, privilege under federal law. And in the negotiations that occurred, the Commission did agree to that, even though you could argue that it's chipping away at what's the constitutional side of it, but it was an acceptable compromise. And federal law, one of the issues that got brought up before, federal law actually is quite deferential to state law when it comes to issues of privilege and the relatively new rule of evidence that deals with exactly this issue that's been cited a few times. It's 500 something. I always forget the other two digits because I'm getting old. But it says specifically in the in the comments that were approved by the U.S. Supreme Court that when you're looking at claims of privilege, in this case, to be claim of waiver, you were to apply whatever law state or federal is the most expansive in recognition of the privilege. So, there really is very, very little risk before the statute that there was going to be a waiver by production to us. It has been presented as one of the arguments quite extensively, but I hope that has finally been put to bed. The statute really wasn't necessary, but the statutory protections are there in case it helps. Related to that, I mean, there was some discussion of the Denver DA's Office and their challenges with an access agreement. And I know that it's been told to many lawmakers that there's an access agreement issue with the Commission on certain matters to be evaluated. The added context I add to you there, that's still going on, that's still being discussed. That's why Mr. Vasconcellos had to correct himself. Again. I'm not being critical of him in any way. I knew immediately that he had just misspoken, but he had to correct himself. Because in February, the Judiciary said we provided the executive summary of the last audit report, and they said we're working to provide that to all of the investigators. A commitment made very early in February. Well, we sit here today and we don't have it. The Denver DA got a redacted version. We didn't even get a redacted version. And it's this access agreement issue. But remember those other agencies, because what they like to say is, well, we've negotiated with all these other agencies other than the Denver DA and they've all agreed to it, and the Commission hasn't. Well, I don't know what agreement those folks signed, but the agreement that was presented to us would have prevented us from actually doing our job. We've made great progress on that. I'm confident that, frankly, in a matter of days, probably, if not just a few weeks, we will actually finally have that access agreement. But all those other agencies didn't already have an access agreement. We've already had an access agreement since 2010 that says that we get access to their files and that they provide information. And, then, you're also back to that Sesame Street exercise of one of these things does not look like the others. In the time I've been on the Commission, we've done factual investigation on more than 200 cases, literally a couple hundred cases. There's only one set of matters where an access agreement has ever been requested or demanded as a prerequisite to providing that information. So, our system has worked pretty good. The problem is that we've learned, in 2021 and 2022, it's vulnerable to being made not to work. And those are some of the examples we've been trying to give you today. And that's the important part of that enforcement mechanism by whatever means, whatever it ends up looking like.

**Rep. Carver**
Rep Weissman, done? Senator Gardner.

- 33 -

**Sen. Gardner**

Thank you, Madam Chair, I wanted to go back to something that you addressed earlier. Pardon me, and that was the change in 2021-2022 about what the Court knows about cases, and maybe I'm not saying that right, but as well as I think something Chair Krupa might have said about the Court being briefed on cases. I mean, is this change across the board for all cases involving a county judge or a district court judge, or is it just sort of the unique set of facts that bring us here today, and does the Court get a general briefing, or do they know that complaints been filed against Judge Smith or Jones out in the 17th or wherever? What is the state of that right now? Madam Chair.

**Rep. Carver**

I beg your pardon, Senator. Judge Prince.

**David Prince**

Well, I was trying. Thank you, Madam Chair, I was trying to look very quickly to see if I could find the actual quote. So, short version, thank you for the question. Short version is, I don't entirely know the answer, because it's not our policy. In February of 2021, the Court. Hang on. Actually, if you give me just a second, I'll actually find the language.

**David Prince**

I think it's the February 8 statement. Which one, the State of the Judiciary? Hang on, I think you and I are thinking about two different ones, though. Will get you to specific quote, my memory was that it was in February. My colleague tells me it was a little bit later. But the Supreme Court, I think, primarily speaking through the Chief Justice. That's what we're trying to remember. I remember it being a joint statement. He remembers it being the State of the Judiciary. Our memories are flawed. But the announcement, I recall, it wasn't actually the Chief Justice speaking. It was a statement by the Court itself, and so it spoke about him in third party. That's why I'm pretty sure he wasn't the one saying it. And it said that among the commitments were one, we're going to create an independent group of lawmakers and executive branch people to select investigators to look into this, and a couple of other things they were going to do. And one of the things they were instituting was that Chief Justice Boatright will now be briefed on a weekly basis on all and appear to be new claims of judicial misconduct. And so that's what we know. Beyond that, we don't know what's in the briefing. We don't brief them. We don't brief them on the cases. They are briefed on those cases. So, I'm handed something. So, it was in the State of the Judiciary, but I'm remembering a different statement. So, there actually is a different statement, but it's in that time frame. You know, whether it's February or March, I don't think it matters. And what he was explaining was that he is monitoring the cases to make sure they're properly handled. So that indicates a fair amount of exposure to information, and that it would be every week, that's all I know. Somebody.

**Sen. Gardner**

Please take it.

- 34 -

**Rep. Carver**

Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair. So, Judge Prince, you don't know if the Chief Justice is getting briefed or not briefed, and if he does get this information, he's not getting it from the Commission. Is that all accurate? I'll say that again if.

**Rep. Carver**

Judge Prince.

**David Prince**

I was still trying to, I see a reference to it. I'm still trying to find, there it is. Now I found it. Thank you. The statement I was looking for is actually February 16, 2021, and it speaks in the third party and says Chief Justice Boatright has directed that he be notified and receive weekly updates on all future misconduct complaints across the Department to ensure each incident is fully investigated and acted on as appropriate without delay. And that was to all of the personnel within the Judicial Department. And it actually was by Chief Justice Boatright directly. And so it gives the impression that it's talking about the substance of the case. This returns to then our experience with serious cases. So, when we get serious cases, we end up knowing something about how the case has been handled through the Judiciary before it comes to us, not always, and so we get to see some of that down the road. So, in the context of that experience, it sounds to me like there's a briefing that would let them know what are the allegations? What are we doing about it? How are we make sure it's being addressed and that the briefing in the context of that discussion was not just getting it to the judicial discipline commission, it was ensuring a safe workplace. It was making sure HR was handling it properly. It was all of the aspects of it. So, it certainly gave us the strong impression that it's talking about the merits of the case, the facts of the case.

**Rep. Carver**

Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair, but that information wouldn't be made available by the Commission at all. Is that right? And unless they'd reached the stage of the proceedings where the information was releasable?

**Rep. Carver**

Judge Prince.

- 35 -

**David Prince**

Correct, we do not participate in the briefing in any way. We do not provide the information in any way. If the case has progressed, or they have information through the Judiciary about well, we know discipline commission is already looking at it. We know they've got investigators, because their personnel can tell them those kinds of things. We know that they've been doing these interviews. I mean, lots of information that they can have from many have from many sources about what the discipline commission is doing, but the discipline commission does not provide them with any of that information.

**Sen. Gardner**

Thank you.

**Rep. Carver**

Other questions by committee members.

**Rep. Carver**

Thank you, panel, Mr. Chair, any questions, or are we ready for our next presentation?

**Sen. Lee**

Let's go to the next one.

**Rep. Carver**

Thank you very much for your presentation and the extensive Q and A. Very helpful, thank you.

# Appendix 27(s)(i)(5)

# Office of Attorney Regulation Counsel Presentation;

# Legislative Interim Committee on Judicial Discipline: June 14, 2022 Hearing—OARC Presentation

**Rep. Carver**

Chair any questions, or are we ready for our next presentation?

**Sen. Lee**

Go to the next one.

**Rep. Carver**

Thank you very much for your presentation and the extensive Q and A. Very helpful, thank you. We will next have the presentation from the Office of the Attorney Regulation Counsel, Margaret Funk, Chief Deputy.

**Rep. Carver**

Ms. Funk, welcome to the committee, and if you could state your name and position for the record. Although I think I've covered that, but just officially, and then proceed with your testimony. Thank you.

**Margaret Funk**

Good afternoon. My name is Margaret Brown Funk. I'm the Chief Deputy Regulation Counsel for the Office of Attorney, Regulation Counsel. Am I having microphone issues?

**Rep. Carver**

It's much better. Could you repeat please?

**Margaret Funk**

My name is Margaret Brown Funk. I am the Chief Deputy Regulation Counsel for the Office of Attorney Regulation Counsel. Little bit of background, the Office of Attorney Regulation Counsel regulates lawyers actually from cradle to grave. Our Office puts on the bar exam, admits lawyers to the practice of law here in Colorado, registers them through a process, mandatory process every year, collects attorney registration fees through that process. Also, supervises the Office of Continuing Legal Education, and we do attorney discipline, attorney disability. We also investigate and prosecute allegations of the unauthorized practice of law by non-lawyers here in our state. And when a lawyer dies or becomes disabled, we are allowed to go in as inventory counsel after an appointment by the Chief Judge of the District where the lawyer lived or worked, and actually take possession of client files, freeze client money, and make sure that their practice is wrapped up in a way where the public is not harmed.

- 1 -

**Rep. Carver**

Please proceed with your testimony.

**Margaret Funk**

Thank you for the invitation to come and speak today. I understand that you're interested in hearing a little bit about what OARC does in regard to our role in the past as Special Counsel for the Colorado Judicial Commission, as Judge Tow mentioned, for probably 20 to 30 years, the Commission has reached out to our Office and asked us to assist as Special Counsel on a variety of cases. We've acted as Special Counsel in probably most of the cases, maybe all but two or three in the last decade, I can tell you, just in the last five years, our Office has handled over 10 investigations / formal proceeding matters that have been generated by complaints to the Commission.

**Rep. Carver**

Questions from the committee. Rep Weissman.

**Rep. Weissman**

Thank you, because this is the first meeting. I'm just sort of thinking about record laying and clarification. As you noted, your jurisdiction is all attorneys, 25,000+ active status at any given point. Some of those attorneys are judges. So, there is a zone of, it would seem concurrent jurisdiction, possibly depending on who makes a complaint to what entity. You could be investigating somebody at the same time as the Commission is investigating that same somebody. Where that somebody is an attorney and a judge, I wonder if you could just unpack for all of us and those listening a little bit more about how that goes. Let's assume the complaint has gone to both of you. You are responding, let's just put the *sua sponte* initiation aside. A complaint has come to you, you have actual knowledge it's also going to the commission. What happens next? Please.

**Margaret Funk**

Sure. And I think there's some presumptions there that are not necessarily accurate.

**Rep. Weissman**

Okay.

**Margaret Funk**

So, our role in Special Counsel arises when the Commission has received a complaint, the Commission has vetted the complaint, and . . .

**Rep. Weissman**

I'm sorry, just for clarification, I am appreciating that you have had this historical Special Counsel role. My intent with the question is not acting in the role of Special Counsel for the Commission, but rather OARC possibly undertaking an investigation of judge qua lawyer, not judge qua judge, where you're

- 2 -

stepping into this other role. I appreciate you sort of have these two modes here. It's the more standard mode of OARC investigating lawyer qua lawyer while the Commission is investigating lawyer qua judge. I wanted to explore that.

**Margaret Funk**
Sure. Excuse me. May I?

**Rep. Carver**
Move forward, Ms. Funk. And, then, when Rep. Weissman is done, I have a follow up question, that same thing, please. Sure.

**Margaret Funk**
Sure, so there can be investigations into a judge who is also a lawyer. FYI, not all judges are lawyers, but for those that are lawyers, there can be parallel investigations going on if the misconduct invokes an allegation that not only the Judicial Code has been violated, but also the Rules of Professional Conduct that govern attorney discipline. So, it's not apples to apples. It's apples to fruit. And I say that because they're both fruit. But as a lawyer, I have no duty, and there is no rule of professional conduct that mandates that I'm impartial. On the contrary, I have a duty to be a zealous advocate for my client. Judges need to be impartial. Judges, there are different duties that apply to judges than lawyers. Increased duties, I would say, those duties of impartiality, fairness, not engaging in conduct that would even lead to the appearance of impropriety. So many allegations about judges and misconduct related to those allegations are made under rules that don't apply to attorneys. With the few exceptions of overlap that I'm going to tell you right now. Private misconduct. If I'm a lawyer and a judge and I get a DUI, I'm responsible to both sets of regulators to report my DUI and to deal with that issue with each agency. So as a lawyer, I'm responsible for reporting that I've been convicted of a DUI. As a judge, I'm also responsible. What the outcome will be, is different, most likely, for many reasons. As lawyer regulators, we have certain interests in how we can help protect the public and promote justice here in our State by regulating lawyer conduct. The judicial commission has additional interests, including protecting the judiciary, including making sure there's faith in the judiciary. So, there are different goals. There are some overlapping rules. Once in a while, there will be concurrent, parallel investigations, but that's actually not the norm.

**Rep. Carver**
Rep. Weissman.

**Rep. Weissman**
In the interest of time, and knowing that you have a follow up, Madam Chair, I'll leave it there for now.

- 3 -

**Rep. Carver**

Rep. Bacon, did I see your hand up? Because you can certainly go. All right. My follow up question is you referenced that you recalled 10 cases where your Office and the Commission was involved in investigation, that type of thing. Could you summarize the types of allegations? If that is something you can share with us, what types of cases in those 10 cases were you dealing with? Where both your Office and the Commission were involved in the investigation and determining a way forward. Ms Funk.

**Margaret Funk**

So, when I referenced 10 cases, those are 10 cases where someone from our Office, either myself or a deputy that I supervise, or an assistant regulation counsel, a trial attorney that I supervise was actually acting as Special Counsel for the Commission. So, I just want to make sure my reference to 10 plus cases doesn't mean that OARC was doing a lawyer investigation and the CJD was doing its investigation contemporaneously, just to make sure the record is clear. Those cases, the six that were up on the screen earlier for public discipline, I believe all of them were ours, but one. And the ones that didn't result in public discipline and resulted in private admonition, private censure or private reprimand, generally involved misconduct in the workplace, allegations, bias, harassment and then retaliation for complaints. Also, some in-temperament allegations, and I believe one of the privates might have been related to a DUI. Don't quote me on that.

**Rep. Carver**

And the Special Master from your office staff is that based upon an appointment that was initiated through your process, or this was where the Commission reached out to you because of the nature of the allegations and the status of the individuals, and requested that a Special Master come from your Office.

**Margaret Funk**

Our office has never served as a Special Master. I believe you're asking about Special Counsel.

**Rep. Carver**

Special counsel, excuse me.

**Margaret Funk**

So, we are only appointed as Special Counsel if the Commission reaches out to us, asks us if we are available to work as Special Counsel on their behalf. We vet their request and let them know yes or no. Very rarely have we ever said no. We do everything we can to try to accommodate the Commission.

**Rep. Carver**

Thank you. Further questions from the committee. Mr. Chair.

- 4 -

**Sen. Lee**
Thank you, Madam Vice Chair, could you tell me, were you involved as Special Counsel in the Mindy Masias case? Did you work with the Commission on that case?

**Margaret Funk**
We are not. We have never been appointed Special Counsel for any matter related to Mindy Masias that was in the press, and that's, I think, the best answer I can provide.

**Sen. Lee**
Okay, that's what I was trying to find out, because I had read that, and I assume everything I read in the press has to be accurate. Were you asked to serve as Special Counsel by the Commission in that case?

**Margaret Funk**
I don't think it's appropriate that I comment on that.

**Sen. Lee**
Could you explain why you don't think it's appropriate for you to comment?

**Margaret Funk**
Well, under the definition of Special Counsel as provided in the rules of procedure for judicial discipline, Special Counsel is listed as counsel for the Commission. So, a conversation between our Office and the Commission arguably may invoke a privilege at that stage. If, hypothetically, they had reached out and asked for us to pursue that matter on their behalf, and so not coming to a conclusion or making that assertion, I'll just tell you I don't think it's appropriate that I comment on that.

**Rep. Carver**
Mr. Chair.

**Sen. Lee**
No further questions.

**Rep. Carver**
Other questions from the committee. Ms Funk, thank you. Oh, Rep Bacon.

**Rep. Bacon**
All right, I'm probably going to ask this question as I process a little bit. I guess, since you're here, I'd like to maybe ask your thoughts within the scope of what your organization does, given what we're talking about here. Thank you for explaining the role of Special Counsel in these cases. But some of our conversations have really been lending itself to look into procedure as well as to looking into anything that we could do to build, I don't know whether it's procedural rules or whatnot, to get to a place where

- 5 -

we're preventing some of the things that obviously have brought us here today. And, so, part of me is just wondering, you know, if you do have any initial insights or thoughts on that, given your role, and just what you have seen, particularly around these six cases or all but that one was yours. Obviously, don't need you to go into spaces where you're violating privilege. But given some of the procedural things that we at least have raised today, or any insights that you may have, given your work. I am just wondering if you have any top lines to be able to share with us, you know, given what we're trying to look into, and I'm sorry, I just feel like I haven't gotten or and I you could have said it, and I'm sorry if I, if I didn't process that, but I'm wondering if you could share just a little bit more.

**Rep. Carver**
Ms. Funk.

**Margaret Funk**
So, recommendations about changes to the process, from my experience with the process?

**Rep. Bacon**
Sure, or if there are any I want to use regular words, and I'm trying to sound smart. So, I don't know if the words are necessarily criticisms or critiques, but I think it's clear what we're trying to solve for. And just in your experiences, I'm wondering if there are there any barriers or any insights, or anything that you're finding in your experiences that you know you can share with us so that we can figure out how to make things better. If that's helpful.

**Rep. Bacon**
Ms. Funk.

**Margaret Funk**
I appreciate the question. I can tell you that our Office, because of the many areas of regulation that we do, from admissions, to CLE, to discipline. Every five to seven years, we take a look at our procedural rules. We look at what other jurisdictions are doing in the country that are similar in culture and similar in size and geographic diversity and regular diversity, as we are. And we analyze whether or not we believe we should make changes to our procedural rules. And we would go through the same process, we do go through the same process that the Commission would do. You know, the Commission's Rules were significantly amended in 2012 after the Commission proposed the Rules to the Court for adoption, we would do the same. My biggest suggestion for my long answer is when you tweak only one part of a set of rules, there are unintended consequences. And what I've learned from many years of rule rewriting, is taking a holistic approach to the whole set and really crafting what you think will be the best for the future after talking to all sorts of different stakeholders, people who've been victimized by judges, people who work for judges, people who supervise judges, citizens who show up in front of judges, other regulators, attorneys who represent judges in proceedings with the with the CJD, they have a very interesting perspective, too. What we would do was it would be to invite a broad group of

stakeholders and say, what works, what doesn't work, what is your suggestion to do it better? I wish I could tell you there are two things that if you did, the Rules would be fixed, and I can't. It really is a dynamic process, and I think it involves the whole set, if done right,

**Rep. Carver**

Rep Bacon, okay? Questions from other committee members. Ms. Funk, thank you for being with us today. We appreciate your testimony.

**Margaret Funk**

Thank you and good luck.

**Rep. Carver**

Thanks.

# Appendix 27(s)(i)(6)

# Colorado Office of the State Auditor Presentation;

# Legislative Interim Committee on Judicial Discipline—
# June 14, 2022: Testimony of the Office of the State Auditor

**Michelle Colin**

And, so, I just wanted to start out and give you a little context around the impetus for the audit. I know, as you've talked about earlier today, throughout that you're all aware of that several years ago, our Office did receive allegations through the State's fraud hotline, which we oversee and administer related to the State Court Administrator's Office. There are some very strict confidentiality requirements around any fraud allegations that we receive, as well as any fraud investigations that we conduct. And those requirements do prohibit us from discussing the allegations or our investigation and the report and that any reports we issue publicly and releasing any information from those. However, given the issues that were brought up in the fraud allegations, the former State Auditor decided at that time that we would conduct a performance audit at the State Court Administrator's Office with the idea being that our performance audit results, our report is made public. And so that information would be available to you as legislators as well is just the general public. So just, I know many of you are aware of it. But our performance audits, they take a broader look at how an agency or a program operates to identify any systemic issues. We don't investigate specific people or specific instances as part of a performance audit, we will look at samples, we'll look at cases, those types of things in the audit. But the idea behind that, and the purpose of it is to help us make an overall assessment of how a system or a process is working, and whether or not we see any areas of concern or problems that should be addressed. And we can make a recommendation about that. So that is how we approach that performance audit. At this time, I would like to turn it over to Mr. Johnson. He's one of the audit managers in our office. And he was just going to give you a broad overview of the findings and recommendations that we made in that audit if that's okay with you, Madam Chair.

**Rep. Carver**

Yes, please proceed. Thank you.

**Derrick Johnson**

Thank you, Madam Chair. As Michelle stated, I'm Derrick Johnson, performance audit manager and I was the team lead on the audit. Before I get started, I will let you know that we did bring copies of the highlight sheet for the report, as well as a few copies of the full report itself. And if you would like electronic copy of that that's available on the State Auditor's website at any time. So, we conducted this performance audit of the state court administrator's office during 2021 or 2020, apologies, and released the report in December of that year. And the report contained six findings and recommendations and I'll summarize those briefly.

- 1 -

The first finding concerned voluntary separation incentives which the SCA offered to staff in fiscal year 2019. Because they had a planned reorganization in some positions were no longer necessary. The SCA executed 10 separation agreements with employees who had expressed an interest and rather than offering them lump sum payments for separation, the SCO awarded them paid administrative leave based on the number of years of service the employee had been with the SCAO. By offering administrative leave instead of a lump sum payment, the SCAO continued contributing to the employee's retirement benefits and health insurance during the admin leave period. Through the audit, we found that the SCAO couldn't demonstrate that the separation agreement incentives had received the required approvals. It also wasn't clear how the positions approved for the incentives were necessary for the reorganization. We found that the SCAO did not know the actual payout amounts for the agreements before they were put in place. Because the agreements didn't specify those amounts. In the end of these 10 employees received over $500,000 in salaries and benefits. This was more than would have been received if the judicial branch had used an approach similar to what's used in the executive branch. At the time of the audit, the SCAO did not have any formal rules or policies around VSIs. So, we recommended that the SCAO establish them and that they address issues such as determining who can get incentives, how they would be approved, and the method for determining incentives most more closely aligned with the Executive Branch.

Then the second finding concerned paid administrative leave. At the time of the audit, the SCAO routinely approved paid administrative leave in accordance with its personnel rules. And this leave could be granted for reasons determined to be for the good of the state. During fiscal years 2017 through 2020, so over four years, SCAO staff recorded over 25,000 hours of administrative leave. Some of the issues we found in this area were that it wasn't always clear that the leave was granted for the benefit of the state because there was no reason provided or that the reason was given indicated that it should have been some other form of leave the used instead of admin leave. Also, some employees received more administrative leave than what we calculated to be the norm across the organization. And in fact, two instances of two employees who got over 150 hours above the norm in a given year, we saw instances where employees were allowed to use admin leave in conjunction with work time in order to accrue compensatory time off and then large amounts of time used for investigations of employees and settlement agreements. The SCAO's use of administrative leave during this period we looked at cost the state more than $476,000. At the time of the audit, the SCAO and judicial personnel rules provided limited guidance on the appropriate use of admin leave and did not require staff to document the reason for using the leave and didn't have limits on how much could be used. So, we recommended that the SCAO define the appropriate use of administrative leave, require employees record the reason for using the leave, and then establish limits on how much leave could be used for certain purposes.

Third finding in this audit report concerned the SCAO to not retaining some key Human Resources records, including family medical leave records that were missing at least some of the required forms, and the SCAO could not demonstrate that employees were eligible for the amount of FMLA that was granted. Additionally, we found that some disciplinary cases did not have documentation showing that investigation actually took place. The Human Resources staff conducting those investigations were no longer employed with the SCAO, and the information was not stored on a shared drive. So, there was no record of what had happened. This area, we recommended that the SCAO to establish policies and procedures that require all human resources documents to be stored in a secure shared file, and also develop a contingency plan for when staff leave.

The fourth finding in the audit concerned sole source procurements of which there were 10 in our testing period. And sole source contracting is a method that is used when an agency determines that only one vendor is capable of meeting their needs, and therefore a normal competitive solicitation isn't worthwhile. And we found issues with six of the contracts that were entered into in this manner, some of which had more than one issue. The issues included one contract, where a former employee was awarded a sole source contract within days of their resignation. Although the contract was subsequently cancelled at the direction of the Supreme Court, the proximity of dates between when the employee resigned and when the sole source justification and contract were signed gave the appearance of impropriety. Additionally, the SCAO did not have a copy of one of the executed contracts, and another contract had division justification for using this method. We also identified contracts that did not have proof that the SCAO negotiated the price and terms as required by judicial purchasing rules. The SCAO spent over $1 million on the six sole source contracts for which we found issues. At the time of the audit, judicial fiscal rules did not explicitly prohibit former employees from contracting with the Department for a specified period after leaving employment. Additionally, the judicial fiscal rules and the SCAO did not have sufficient written policies around sole source contracts. So, we recommended that the SCAO establish those rules, policies and procedures to tighten those controls. And this would include prohibiting former employees from contracting with the SCAO for a specified period after separation, and then identifying specific information that would be required in justification and negotiations.

Our second to last finding in this report was about procurement cards which are used to make purchases that don't require a formal procurement process. Between July 2016 and April 2020, SCAO staff made about 10,000 P-card purchases totaling $3.5 million. We looked at a sample of these purchases and found problems, including purchases for which the person who made the purchase also later approved it, and purchases where there was no clear indication that it had been approved at all. Again, at the time of the audit, the SCAO did not have written policies for staff around the approval of P-card purchases. So, we recommended that they improve controls

- 3 -

by establishing written policies to indicate who can serve as budget authorities to approve purchases and how purchases should be documented, approvals should be documented.

And the sixth and final finding in this audit was largely the result of findings presented previously. This finding was based in part on the SCAO's own code of conduct. But we also considered principles established in the government standards for internal controls, which contains principles such as a commitment to integrity, establishment of clear responsibility and authority, and design and implementation of control activities. Over all the issues that we found during the audit raised questions about the oversight for its human resources and financial services functions, and its culture of accountability. Much of what is contained in the finding considers elements of the previous five findings and the culture that led to them.

Overall, these issues we found were due in part to a lack of an effective system of controls within the organization, including lack of written policies, rules and procedures and key areas. In addition, at the time of the audit, the SCAO had rarely used its internal audit function to monitor its own activities, but rather used internal audit to look at the districts. Therefore, we recommended that the SCAO implement an effective system of internal controls that fosters a culture of integrity, ethical values and accountability by updating rules to ensure that they provide clear direction to staff and implementing monitoring activities to ensure the controls are working properly. This would include using its internal audit function to monitor those controls. The SCAO agreed to implement all of the recommendations. And in November of 2021, we asked the SCAO for a status report of the recommendations. It reported that all of them were either implemented or partially implemented through updating or creating new rules, policies and procedures. The SCAO reported that the recommendations that had not been fully implemented should be implemented sometime this year. And if I heard Mr. Vasconcellos accurately earlier, I think he reported that they all had been implemented. And Madam Chair, that concludes my presentation.

**Rep. Carver**
Thank you for your testimony. And it would certainly be helpful to the committee, if the hard copies that you've brought of the highlights and report we'll certainly gather those. Questions from the committee?

**Rep. Carver**
Rep. Weissman.

**Rep. Weissman**
Thank you, Madam Chair. And thank you both for being here. Understanding that the systemic audit is fully public, you're allowed to talk about that openly. And thank you for doing so. I did want to ask questions that I hope are more about process than specifics of the fraud hotline

- 4 -

investigation. So, I believe that landed in the OSA's lap and kicked off the statutory process April of 2019. April 15th or so. Is that correct?

**Rep. Carver**

Please dialog.

**Michelle Colin**

Thank you, Madam Chair. Okay, thank you. Um, I'm looking for the date. Yes, you're correct. April 2019.

**Rep. Weissman**

Madam Chair.

**Rep. Weissman**

Okay. And then per the fraud hotline, statutes, your office reaches out to the entity complained of in this case, the judicial branch. And there is a threshold question whether that entity will undertake the investigation internally or defer to OSA? I think that was about May 19. Is that approximately correct? Sorry, May 19, 2019.

**Michelle Colin**

Yes, it was in May of 2019. Just maybe just a little point of clarification. So whenever we receive any fraud allegations, we have staff on our fraud hotline who review the allegations to determine whether it's within our jurisdiction, and if we find that it is then we will make a referral to the agency that's impacted by that. And then it's up to the agency to review the allegations and decide how they would like to proceed. One option is for the agency to request that we conduct an investigation on their behalf. And that is what happened in this situation. The Chief Justice at that time had asked our office to conduct the investigation on the judicial department's behalf.

**Rep. Weissman**

Okay, thank you. May 29 2019, I think was the date of that communication. I think stepping back and letting OSA proceed is exactly the right call that should have been made in that case. So, fair to say that OSA's fraud hotline investigation was underway, had commenced, by May 29 2019, If not previously. So, at that point, the other entity in this case the judicial department had deferred to OSA and you're then off and running. Is that a fair colloquial way of putting it?

**Michelle Colin**

The May date is when we received a letter asking us to conduct the investigation. I think let me refer to my document to see on. We had an entrance conference would judicial in July of 2019 to, I guess, kind of, you know, start the process at that point. Yes.

- 5 -

**Rep. Weissman**

Okay. My recollection of the fraud hotline statute is there aren't hard time parameters, you don't have a shot clock, you have a mission to do, and you may need time to do it. Not so many months after July 19, we had this unfortunate little virus thing happen, that we're still kind of all dealing with in some ways. I'm sure that didn't help. But I guess I'll sort of get to the end point of this process. And then I might want to back up and ask about access to information. You completed the report, and per statute transmitted it to the entity being investigated, in this case, the Judicial Department when?

**Michelle Colin**

February 4 of this year, 2022.

**Rep. Weissman**

Okay. So that is, in fact, the date on an executive summary document that I have that was all that was broadly public. So that was that date was coextensive with the completion of the final report, which has been less fully available 2/4/ 22.

**Michelle Colin**

Correct.

**Rep. Weissman**

Okay, thank you. I just wonder if you could, again, I know you can only talk about the process and not get into specifics. But and, you know, COVID is nobody's fault. How did your office? How did you find doing that mission that you are statutorily directed? To do? How easy or hard was it to proceed? Do you feel that you readily had access to the information that you needed to assess the claims made in the initial fraud hotline complaint, and subsequently put fully into your bailiwick? By the May 29, 2019 letter from the then CJ?

**Michelle Colin**

It I mean, I will start by just saying it was a very, there were extensive allegations that were made, there were many issues to consider and to look at. We received extensive documentation information from judicial and other sources, we conducted many interviews. I mean, we had, I think we got over 16,000, documents, lots of emails, then it was going through every one of those and taking a look at it. So, there was a lot of information to go through and consider. We did enter into a data access type of agreement with judicial and that was executed at the end of August of 2019. That set up some parameters around our access to the information. Our statute does say that we should have access to all of the information directly related to the scope of the investigation. And so that was part of our access agreement. With that said, I will say that the judicial department was concerned about privileged information that was relevant to the scope of the investigation, we did come up with a process for us to be able to view that privileged

- 6 -

information. Without it being considered a waiver of Judicial's privilege by sharing that with us. We did not have actual custody of those privileged documents and judicial is the one that determined what was privileged and what was not. Judicial staff and attorneys reviewed everything before it was provided to us to determine if it was within the scope of the investigation based on any search parameters or anything like that, that we had provided to them when they were looking for emails or certain documents. So, they did review all of that information prior to providing it to us and to determine: 1. Is it directly relevant to the scope? and 2. Is it privileged? If it was considered to be privileged, then we were given a list of those documents. You bring up COVID. Originally and I think we had some initial instances prior to COVID, and all of the quarantining, and just all the everything shutting down, where some of our staff did go over to the judicial building and look at documents there. Once COVID hit and that wasn't an option. And then as the process progressed, we were given electronic access to view the documents. But again, we didn't actually have physical custody of those documents. But we did receive the information that we needed to look at, or, and we did consider all of that information in those privileged documents as part of our investigation, and reaching our conclusions and such. So, we did have access to the information. I'm trying to think, if there were any other pieces, and if you have a follow up question, I'll pause a minute.

**Rep. Weissman**

I do. Thank you. That's all very helpful. I'd like to press a bit further. My recollection is that before my time serving here anyway, the state has had a fraud hotline for a while that used to be housed in DPA 2017, there's an audit bill that moved over to your office. If you have a ballpark number in your head, subsequent to that time, subsequent OSA being in charge of the fraud hotline, you've had about how many investigations that have proceeded to any extent.

**Michelle Colin**

I'm gonna turn around and refer to somebody who has more information on that. So just one second.

**Rep. Carver**

And, sir, if you could introduce yourself, and then proceed to answer the question. Thank you.

**Greg Fugate**

Thank you, Madam Chair, members of the committee. My name is Greg Fugate, and I'm an audit manager with the auditor's office. And I've been involved with our hotline operations, since we took it over from the state comptroller's office. Since we took over the hotline and the passage of the hotline bill that gave us kind of the statutory authority, I would say we've gotten about 100-150 allegations reported a year, most of those are outside of our jurisdiction, because they don't involve an allegation of occupational fraud against a state employee, current or former, or contractor. So, we get a lot of reports, but we have to kind of filter that out in terms of referrals to

- 7 -

state agencies, perhaps maybe a total of 15 to 20 over the course of the last several years. And then of those, we've only to this point, to my knowledge, we've only done two investigations on behalf of state agencies.

**Rep. Weissman**

Okay. The other ones having been done by the agency that was implicated.

**Rep. Weissman**

And, okay, appreciate that. But the purpose, there was to, if you will establish a denominator and what we're talking about now is the numerator. So, my question for any of you now that there are three of you here, how common is the practice Ms. Collin that you just described in terms of the access agreement? And sounds like the pretty painstaking review prior to information being turned over to your office in the first instance?

**Rep. Weissman**

Correct. That's right.

**Michelle Colin**

This was the only investigation where we had an access agreement.

**Rep. Weissman**

Okay, thank you. And you've so much spoken to this. But I just want to clarify, my eyes have fallen on some of the same language that you use cited 2-31-10.53 (c)(1), you have access to information directly related to the scope of the investigation. Well, what's directly related? I been aware of these concerns about privilege. It sounds like there was maybe also some contention about what is directly related. Would you say that both of those came into play and the process by which information was made available to your office?

**Michelle Colin**

Yes, I would.

**Rep. Weissman**

Alright, thank you. How much would you say that process extended your runway, your time period of pursuing the complaint that was raised up to you and the way that you felt you needed to pursue it per statute?

**Michelle Colin**

I would say the review process, extended our investigation timeline quite extensively. It was, as I said, you know, we over 16,000 documents that we received, or had access to more than that is you know, what had come up and searches and things and all of that information was reviewed

by judicial prior to being provided to us. And then we obviously had to do our review of that information as well.

**Rep. Weissman**

All right, thank you, Madam Chair, this depending on follow up, this may be my last question in this little dialog. Another part of the statute, we are now at 110.53 (c)(IV). This has been put into issue in the press recently, the investigation finds evidence of apparently illegal transactions, and lets us, the state auditor shall immediately report the matter to an LEA. Now, in a long sorry, to a law enforcement agency, appreciate my colleagues prompting me to unpack my acronyms. Fair senator. In an investigation like this, just depending on where the facts lead you, you might find evidence of apparently illegal transactions or misuse or embezzlement of public funds or public property and anywhere along the continuum of that investigation. And yet, so on the one hand, and just to sort of say, where I'm going for other members of the committee, I sort of wonder if maybe we haven't discovered a potential problem here that might be in the rearview mirror as to this possible investigation. But I think we, we as a general assembly, if not, we as this committee, maybe ought to put it on our list of things to clean up. On the one hand, in this (3)(c)(IV) there's this duty to immediately report the matter to one of the listed entities law enforcement agency, DA or AG as appropriate. And on the other hand, there are these requirements of confidentiality about the investigation ongoing, and in fact, a summary and executive summary is out there in the public space. I'm sure house judiciary, I don't even have a full report, because the statute says I am not entitled to it. I think maybe there's a tension here. What has been reported in the press and what I have independently verified through my own research is that by the time the matter went to, in this case, the Second Judicial District, the folks there consistently with their attorney, ethics obligations and heightened prosecutorial ethics obligations, felt that they no longer had enough time to proceed, given the prevailing statute of limitations for the offenses that might have been in the offing here. I'm not second guessing them. But I just think possibly there's a statutory tension and with an eye to possibly resolving that for the future, it would help me to understand how your office navigated this tension.  The duty to report, possibly criminal activity on the one hand confidentiality on the other, do you construe that duty to immediately report as attaching at the end of the process, in this case, 2/4/22. Or immediately upon discovery of some problematic facts upstream of finalizing the report or either or something else?

**Michelle Colin**

Our position is that our report was completed on February 4, 2022. When we completed it, and we issued it to the Chief Justice. And we immediately at that point upon after we sent it to the Chief Justice, we sent it to law enforcement. The question of immediate is, in our mind, we did that immediately upon concluding our investigation. I think I know I've testified I think before the Judiciary Committee earlier in the session that we take our responsibilities very seriously. And when making a report to law enforcement for criminal investigation, we feel it's our

- 9 -

responsibility to make sure that we feel confident in our conclusions and that we have done sufficient work to be able to confidently make that report to law enforcement. And that is what we did. I don't think it's appropriate to make because maybe we have suspicions or maybe we have some pieces of information that are indicating there might be something there. We did not feel it's appropriate to I guess prematurely make a report to law enforcement. And, so, when we were finalized that is when we made our report.

**Rep. Carver**
Rep. Weissman are you about wrapped up?

**Rep. Weissman**
That's very helpful. Thank you. I think it's very important that, that you on behalf of the office just laid that out very plainly, I'll just put out there for our collective consideration. And I appreciate the point you made about not wanting to make that criminal referral, casually. We're talking about people's rights on the other end of that. One doesn't want to be on the other end of any matter, much less criminal matter be on civil one. Just a really unfortunate intersection with some other operative deadlines. In this case, I have thought about something. And it may be without the scope of this committee, but we want these fraud hotline investigations to happen, you're the right office to do them. We don't want criminal referrals, if any have to be made to be made lightly. We also don't want people to escape consequences for actions that they might have perpetrated against the state in the public fisc. So that's something I've started turning over in my head is whether we ought to provide for a narrow tolling of statutes of limitations where your office has been doing one of these investigations and information might have flowed sooner, but for that, and the duties of completeness, and confidentiality, and so forth. I don't have that all the way through in my own head. But there are so many things that have popped out in the last three plus years of this. This is one of them. So, thank you for indulging me in that back and forth.

**Rep. Carver**
And Rep. Weissman, we will take that under consideration, check the scope. And well, I'm sure we're going to have many in depth discussions about many issues. Sir, you had a comment.

**Michelle Colin**
Thank you, Madam Chair, to sort of a comment to Representative Weissman. Certainly, the last three years have really stressed tested the fraud hotline statute as our Office has learned as well. I think one of the things for the committee and people to know is the statute of limitations is on the prosecutor side of things. Of course, we're not in the position of prosecutor. And, so, under the current hotline statute, if the allegation meets the criteria of it was an occupational fraud and the individual or individuals alleged to have committed the fraud were current or former, state employees or state contractors, we have an obligation to investigate and report out those results in accordance with the statute regardless of when those incidents occurred. So, it's very possible

- 10 -

that even on future investigations and other agencies, that we would go through the same investigation process, make a report to law enforcement and run into a similar circumstance where there's statute of limitations is extended. So, the hotline statute framework doesn't contemplate that as part of our role. So, it for us it was really not a not a material factor in driving the investigation.

**Rep. Weissman**
Understand, thank you.

**Rep. Carver**
Rep. Bacon.

**Rep. Bacon**
Thank you. And again, I'm doing one of those. My own checking for understood, checking for understanding. Sorry, so I had a question on tolling as well. But I guess I just want to understand the connection to, you know, any criminal charges, and I understand you all are not the local or the law enforcement agency. But is it required, you know, to pursue fraud cases, for these types of incidents instances for an investigation to happen by the auditor first, or is there a requirement? You know, even in pressing charges, for the auditor to have done an investigation? Is that required? And maybe anyone on this committee might know the answer to that?

**Rep. Carver**
Who on the panel wants to address that? Sir?

**Greg Fugate**
Thank you, Madam Chair, Representative Bacon, sorry, I can't see you. So, I will still be on the microphone. Under the hotline statute that really just prescribes what the OSA's responsibilities are for reporting after we do an investigation. But apart from that, an agency is free to contact law enforcement. So, in terms of our responsibility, we would not make a report to law enforcement unless we have conducted an investigation. So, the investigation is what triggers that potential reporting requirement on the back end that Representative Weissman referred to but again, state agencies sort of writ large are free to also contact law enforcement of their own their own action based on evidence that they have. So, the OSA's investigations are sort of a sliver of the larger process of how the state as an employer would look into allegations of fraud by its employees or contractors.

**Rep. Carver**
Rep. Bacon

- 11 -

**Rep. Bacon**

They can and I think, you know, the first thing my mind went to was if there's any HR issues, you know, it's like you gotta go through EEO before you get to court and so that's why I was curious. And, so, I'm wondering if you might just repeat this for me, you know, and just for the millions of people who are watching or watching this. We have an understanding of the statute of limitations being, you know, two to four years, mostly, you know, depending on what's happening. And, so, it's our understanding that some of these issues around this alleged fraud right occurred and 2018 2019. We are now in 2022. We heard from a district attorney say they didn't have enough time. So, we can assume for anyone that can do some math on what the statute of limitations might be. And, so, I guess we're just trying to understand because you said, I know, you may not be able to give us a particular amount of time. But you know, you said that it was, what was it a substantial delay? You know, I think what we're just trying to hear is, is there a potential for an agency, let alone the judicial department to take a lot of time to be able to interfere? If there could be any criminal charges brought against something if that's theoretically, what we're saying, we have three years to bring a crime, and they can take however much time they want, in theoretically vetting every document before you get it. And therefore, the statute is run, you know, is that a possibility? Is that kind of also what I'm hearing? I don't, and I, and I want to be really respectful, because I don't want to put you all in a position. You know, but it kind of sounds like they took a lot of time. And the clock is the clock. And I think we're just trying to figure out if that is something that is at risk, given these procedures. Does that make sense? And I will be completely respectful of what it is that how you want to answer that. But it's just for like the layperson to understand what the timing did. And also what was required to even file criminal charges, because we're at a place now where it seems like it's a couple of million dollars. And we can't hold anyone responsible for that. And at the very least, we get to write laws up here. So, we just want to be able to understand the risks.

**Rep. Carver**

Ms. Colin.

**Michelle Colin**

Thank you, Madam Chair. I will start and then Mr. Fugate may add to my comments. I can't speak, we can't speak to the Judicial Department's intent. I mean, throughout the process, we establish they provided information that we asked for. So, I can't speak to what their intent in in going through it. I know they were very concerned about privileged information and protecting that privilege throughout the process of what they provided to us, ultimately, knowing that we would have a final report when we started the investigation. I mean, we're not obligated to report to law enforcement unless we do find that there is an appearance of I'm not going to get the words right, but illegal activities and such. So going into it. Did we know we would end up making that report to law enforcement? No. That was something that we determined as we went along. Your theoretical question? Yes, I assume it would be possible that if if that was an intent

- 12 -

that that could happen. But I'm not commenting or saying that that was Judicial's intent in this specific. And I'll let Mr. Fugate add to that.

**Rep. Carver**

Mr. Fugate.

**Greg Fugate**

Thank you, Madam Chair. I'll also add on. Certainly, we're focused on the Judicial Branch, I want to step back a little bit from the broader fraud hotline framework. Part of the intent of how this was structured is we definitely want to prevent and detect fraud, we want to hold those accountable. In many cases of occupational fraud, the employee is still with the organization. And, so, a lot of times the fraud or the accountability comes through an administrative solution where the employee is terminated or disciplined or something to that effect, possibly could end up in criminal charges. But first and foremost, in an occupational fraud context, it might be more of an administrative employer, employee situation, action. And I think that's probably sort of the what the hotline statute contemplates, primarily, the judicial case was more of an extreme. Also, the allegations against individuals. None of them were employees of the State any longer either. So again, part of part of the difficulties in navigating any investigation is, is the employee still there? Those types of things. So, I just wanted to broaden the context a little bit and have us think of, yes, criminal charges could be an eventual outcome of an investigation, but more likely is going to be some sort of administrative discipline first, and then, you know, if you meet the criminal threshold again, we're also not criminal investigators. So that's not a call that we're, that we're making. So, if that's helpful or not.

**Rep. Carver**

Rep, Bacon are we all good? I noticed Senator Gonzales had a question.

**Sen. Gonzales**

And thank you for that. That was helpful. I just wanted to be sure I was hearing what I was hearing. But and if you've shared about this, I apologize as well. But in the scope of the work that you've done, this is just a broader question. And as understanding this audit, you know, in regards to executing it with particularly, or particularly with the judicial branch, you know, can you give me a sense of context in regards to either how many times you've looked into that space? And where are these questions around privilege common in your work? And, you know, looking into the judicial branch, or, more broadly with other government agencies, how would you place either the delays or the questions around privilege and so for some context, I, I get it, you know, I've run a large, and we had a billion dollar operating budget, we have work products and whatnot, I've been to the place where people have asked us for things, we've had to go into exec session and figure it out. And so, yes, that exists for any agency. But I'm curious if there

- 13 -

was something that may have felt like an outlier for you all, with this particular governmental entity.

**Rep. Carver**

And whoever wants to address the question.

**Greg Fugate**

Thank you, Madam Chair, Representative Bacon, I can't speak to the specifics of the judicial situation. But I'm going to speak more generally, in terms of sort of our performance audit kind of function. So I'm 21 years in as a performance auditor with the office. And we've always been aware of issues of privilege attorney with agencies, I would say those conversations have become more prevalent in our just general auditing function since the 2018 decision in Fox versus Alfine, from the Supreme Court. And so whether it's agencies, Attorney General representatives raising the attention, it's more of an overt conversation we're having just in the, in the course of performing our audit function, in addition to in this case, the investigation through the hotline, so it's kind of a newer development that both the OSA and agencies are trying to navigate around so that we're not, we're still privy to the information, because fundamentally, we can't do our jobs as auditors for the General Assembly if we don't have the access to the information about programs. But we also don't want agencies withholding information that could be beneficial to our conclusions about program functions or service delivery, things like that for the taxpayer. So, it is a new territory that we're navigating through our audit function if that's helpful.

**Rep. Carver**

Ms. Colin.

**Michelle Colin**

Madam Chair, I will say, just to expand on that slightly, and that on the performance audit side, we have had it come up where if it is privileged information, and the agency lets us know that, then we do have to ask them if it's information that we feel like we would want to include in the audit report, we do have to ask the agency, you know, are you willing to waive privilege for us to be able to report that and we have had agencies say no, we're not willing to do that. And in that case, we do include some language in our audit report. Just I guess, recognizing that limitation that we were provided, we're not allowed to disclose that as part of the audit. So, we've had to have had that come up. And as Greg said, it seems to be the whole privilege conversation does seem to have come up more frequently in recent years.

**Rep. Carver**

Rep. Bacon.

- 14 -

**Rep. Bacon**

And that's across agencies or I mean, I guess the question is with judiciary how do they place, okay,

**Michelle Colin**

Across agencies.

**Rep. Bacon**

Okay. Thank you.

**Rep. Carver**

And I saw both Senator Gonzales and Rep. Weissman had their hand up. Senator Gonzales first.

**Sen. Gonzales**

Thank you, Madam Chair. Part of what I'm trying to understand is just sort of the chain of events of who received what when. And, so, I was in receipt of an email from Mr. Terry Scanlon, forwarding the email from Chief Justice Brian Boatright on Monday, stating that on Friday evening that he had received the final investigation report and Executive Summary for the Office of the State Auditor's fraud hotline investigation. Was that report, was that a full report? Was that an Executive Summary that the Chief Justice received?

**Rep. Carver**

Ms. Colin.

**Michelle Colin**

Oops. Seems like it went off again. We provided a full report to the Chief Justice on February 4.

**Rep. Carver**

Senator Gonzales.

**Sen. Gonzales**

Thank you, Madam Chair. Is the Chief Justice the only entity within the Judicial Department who received the report? Have you all sent it to the Commission on Judicial Discipline?

**Rep. Carver**

Ms. Colin.

**Michelle Colin**

Madam Chair. No, the Chief Justice is the only one that we sent the full report to as well as we sent the Executive Summary to him as well. But our statute says that upon completion of our

- 15 -

investigation, we should submit it to the head of the affected agency. And in this case, that was the Chief Justice.

**Rep. Carver**
Senator Gonzales.

**Sen. Gonzales**
Thank you, Madam Chair, just as a as a wrap up. The Chief Justice then published that Executive Summary. And I think on the website but the full contents of the report are, are still remain sealed, for lack of a better word. Is that correct?

**Rep. Carver**
Ms. Colin.

**Michelle Colin**
Yes, that's correct. Okay, from our side? Well, I say that's correct. That's correct, from our side. The Chief Justice is the only individual that or organization that we sent the full report to. Know what has happened to it since then? I can't speak to that.

**Sen. Gonzales**
Thank you.

**Rep. Carver**
Rep. Weissman.

**Rep. Weissman**
Thank you, Madam Chair. And I was actually going in a very similar place to Senator Gonzales. Ms. Colin just to surface what I think is the black letter law to what you just said you. Again, the entity under investigation here was the judicial branch. That's why you sent the report there and nowhere else you're doing what the statute says I'm not doing what the statute says it doesn't say to do. Again, we're at 10.53 (c)(II), I think, "state auditor shall report the results of the investigation to the head of the affected agency." And then there's other language if it's a gubernatorial appointee. So, in the event that the General Assembly wanted some committee of reference, or the executive committee or some website or the whole public to get a copy, we would just have to go and amend that language. I think you are performing a strictly statutory function. Correct?

**Michelle Colin**
That's Correct.

- 16 -

**Rep. Weissman**

All right.


**Michelle Colin**

Sorry, madam chair.


**Rep. Carver**

That's fine. Mr. Fugate.


**Greg Fugate**

Thank you, Madam Chair. And this goes back to my earlier comments about when we're doing the investigation, we are doing it on behalf of the in the head of the agency affected. And, so, in effect, we're standing in their shoes, I think one of the individuals earlier use the term sort of client and so that if that's helpful, that's who were reporting to, which is different from our performance audit function, which is through the audit committee and those types of things. So, it is a different reporting framework than you would see through an audit where the audit committee and general assembly are kind of our audience, so to speak.


**Rep. Bacon**

Rep. Weissman.


**Rep. Weissman**

I appreciate that slightly different question now. So, the Executive Summary of the final report was available 2/4/22. The full report was available to the client, if you will, also 2/4/22. Not ever having been on the audit committee. I just truly don't know how this next part goes. What is the back and forth, if any, between the client in this case, the judicial department and your office prior to the finalization of the report? Or is there any? So, Ms. Colin per our prior exchange? There was a bunch of back and forth about obtaining the information you just needed to get to the point of even having a draft report. Was there a date in which you had something you considered a draft report? And then what's the process? Does it go through a red team inside the OSA? Is it draft shared with the client organization, in this case, the Judicial Department? What does that look like? What were the timelines there if you're allowed to say?


**Rep. Carver**

Ms. Colin.


**Michelle Colin**

Madam Chair, Representative Weissman. We followed the same basic process that we use on our audits and that yes, the agency, in this case, Judicial, we did provide a draft report earlier in the process. We wanted to give them an opportunity to review for privilege. We also had some

questions still, subsequent to judicial review of the draft, we continued to obtain some additional information, we made some further requests for information, they provided additional information we reviewed considered, we did go through that process several times before finalizing the report. That's the same basic process that we follow on our audits. We want to make sure that we have as complete and accurate of information as we can have. And, so, we did have that process through out I guess, you know, completing the investigation.

**Rep. Carver**
All good Rep. Weissman? Other questions by the committee? Mr. Chair?

**Sen. Lee**
Thank you, Madam Chair. Well, first, I want to commend all of you for this audit. I don't sit on the audit committee. But I've been around here for a while and seen a bunch of audits and read a lot of them. And this seemed and maybe I guess I'm asking this as a question. This one seemed to be a pretty big one. To me, you found a million dollars in leave and unsupported contracts that were let and a half a million dollars in voluntary separation incentives. Leaves granted with no records, staff granted 1016 hours of paid leave, $3.87 million of sole source contracts. When I read this, it seemed to me that these were pretty gross deviations from policy, is that a fair assessment? Or is this the normal sort of audit finding that you discern in an agency of three quarters of a billion dollars?

**Michelle Colin**
Thank you, Madam Chair. Mr. Chair, we did find some significant issues in the audit. I know, as Mr. Johnson had mentioned, that last finding and recommendation and our report, it was kind of a culmination of the various issues that we had had separate findings on and then we had some additional information in there. I would say in, in a lot of the cases, the findings that we had. In some cases, it wasn't just a matter of not following policy, what we found was in many instances, there were not policies, or they were very high-level general rules, but not a lot of specific policies for staff to follow. And exactly, you know how to implement those rules. And so that you saw a trend and as we were going through the findings and recommendations of I think in every recommendation, we had language around you need to develop policies and procedures and inform staff about how this should work and make sure that staff are following those throughout the process.

**Rep. Carver**
Ms. Colin.

**Rep. Carver**
Mr. Chair.

- 18 -

**Sen. Lee**

Thank you. So, I get that, I understand that there may not have been policies or policies existed, which were deviated from. I'm just trying to get a sense from you of how significant your monetary findings were, in this particular audit. Was this a big deal? Is this one, you go home and tell your spouse about and say, boy, you wouldn't believe what I found in this department today. When I read it, that's sort of the sense that I had, but again, I don't live in the world that you live in. You know, to me, this evinced a significant lack of oversight. I'm not suggesting. I mean, maybe incompetence, maybe gross incompetence, negligence at a high level, I think someone used the term lack of integrity. Give me a sense of how you viewed this.

**Rep. Carver**

Ms. Colin.

**Michelle Colin**

Thank you, Madam Chair. I would say it's hard for us to necessarily say it was this more significant than others. I think it's as far as the monetary value of what we found. It's somewhat relative when we have Medicaid audit findings that's off often really big dollar amounts, just because you're talking about big dollars to begin with. So, I don't know that I can say is this, you know, worse than other audits or recommendations and findings in that sense, from the monetary perspective? It's we definitely found issues and there were dollars associated with it, we questioned it. We did have information in the report about just the culture in the office, that, that there did not seem to be strong controls over the office operations, at least in the areas that we were looking at in the audit, and that we recommended that changes be made to improve that because there did seem to be a big lack there.

**Sen. Lee**

Yeah, I'm partially what . . .

**Rep. Carver**

Mr. Chair.

**Sen. Lee**

Partially what I'm getting at is we're trying to take an overall view of what's going on in a department where our focus is judicial conduct and judicial discipline. But this is a Department that is responsible for all of the judges, they, you know, the chief judge of the justice of the Supreme Court is responsible for the 22 Districts and to see this amount of malfeasance in the Department kind of brought my attention to the fact that this really was a Department that was out of control that wasn't being managed that was not being conscientiously operated by leaders with a sense of integrity, and conscientiousness. So that's the thrust of my questions to you. Am I off base and drawing those conclusions?

**Rep. Carver**

Ms. Colin or Mr. Fugate?


**Greg Fugate**

Thank you, Madam Chair. Mr. Chairman, this is a this is a good audit. And this isn't really a commentary on judicial. But if you look at sort of performance audits, you know, oftentimes we're making recommendations about policies and procedures or documentation or you know, Supervisory review all of our go to recommendations as auditors. What we're really trying to shore up is the control environment. And this is a good example of just for any organization that when you don't have that good control environment, things can get even further awry. And, so, I think as performance auditors, that's one of our primary goals is to say, okay, how do we make sure that system of internal control that agencies have to rely on to do their jobs for the citizens of Colorado are operating well and so this is a good example of what can happen when that environment breaks down. And you get larger dollars. We also try to quantify dollars whenever we can, we can't always but that also helps to drive home the effect of well so what if I didn't have documentation justifying that sole source contract? Well, this is what happens. We were relying on that documentation to give us assurances that it is an appropriate contract or that it is, you know, serving the state's interests and so auditors, we tend to focus on those documents and policies and procedures. But this is exactly why.


**Rep. Carver**

Mr. Chair.


**Sen. Lee**

Thank you, Madam Chair. So, you're focusing on the policy, the process and the procedures, and I'm focused on the people who implement the policies, practices and procedures, i.e. management. So, that's what I'm looking at it when you have, you know, in policies and procedures that either one don't exist, or two are not being followed. That, to me is a reflection on management, or mismanagement or incompetence. And so that's kind of where I was going. But I appreciate the fact of what you all do, because the audits that I've seen, you really bring people back to their roots, in terms of following appropriate internal accounting, policies and procedures and processes to ensure that what people are doing is, is justifiable and explainable and, and can be tracked. So again, part of what I wanted to say is thank you to you for the work that you did. And, yeah, we really appreciate what you do.


**Rep. Carver**

Mr. Fugate.




- 20 -

**Greg Fugate**

Thank you, Madam Chair. Thank you very much for that, Mr. Chairman. I would agree, I would agree with you I should step back and say fundamentally, any system of control is dependent on management, taking responsibility for implementing that. So, it's people who implement these processes and so yes, that that's why we direct our recommendations to the management of the divisions or departments that are responsible because they ultimately are the ones who have to act to put those in place. So, thank you.

**Rep. Carver**

Questions by the committee? Senator Van Winkle.

**Sen. Van Winkle**

Thank you, Madam Chair, or Madam Vice Chair. If I understand correctly, your office referred for people to the Denver District Attorney's Office for criminal investigations. But what the prosecutors said, I believe they said this in in the press, they were given highly redacted copies of the report. Why would a criminal referral be given a redacted copy? And how did that happen?

**Rep. Carver**

Ms. Colin.

**Michelle Colin**

Thank you, Madam Chair. We did provide a redacted version of the report to law enforcement when we issued that. I guess I would say it's still consistent with what I had said earlier is that the Judicial Department was concerned about waiving its privilege if that information was not redacted and provided to the Denver DA's office. And, so, we did provide them with the opportunity to redact any information that they felt was privileged or protected information. And that is the information that we provided to the Denver DA's office. And I think that was the basis for that.

**Rep. Carver**

Senator Van Winkle.

**Sen. Van Winkle**

Thank you, Madam Vice Chair. And if I guess the next question would be somewhat obvious if there's a criminal referral that needs to be given, why would in any case a redaction be allowed to be made?

**Rep. Carver**

Who wants to respond to that?

- 21 -

**Michelle Colin**

Thank you, Madam Chair.

**Rep. Carver**

Ms. Colin.

**Michelle Colin**

I will take a shot at that. Our statute does not direct us either way on that. Not to I guess just keep repeating ourselves. But we were conducting that investigation on behalf of the Chief Justice and Judicial Department. And, therefore, we did ask and have conversations with them about they were aware we would be reporting if we identified any appearance of fraud or illegal activity, that we would be required to report that we did have discussions about that. In the interest of protecting that privilege. We did allow them to redact that information. With that said, the Denver DA 's office could contact judicial and have that discussion with judicial about obtaining that information. It was not our privilege to waive, but it was Judicial's privilege to waive. And that was a conversation between judicial or that could have happened. I can't speak to whether it did happen. But that could happen between Judicial and the Denver DA 's Office.

**Rep. Carver**

All good? Any other committee members? Panel, thank you so much for your testimony and the extensive Q&A. Very helpful. Appreciate your time this afternoon. And with that, we'll move on. I'll turn it back over to Senator Lee, Mr. Chair on logistics and next steps.

- 22 -

# Appendix 27(s)(i)(7)

# Logistics and Next Steps;

# Legislative Interim Committee on Judicial Discipline:
## June 14, 2022 Hearing—Discussion of Committee Logistics

**Sen. Gardner**

I mean, I'm comfortable doing it remotely, but I'm just not sure I can do it at all that day. But I could do the 30th.

**Rep. Carver**

But could you do the 28th or 29th?

**Sen. Gardner**

No, 28th and 29th both are.

**Rep. Carver**

I can do the 30th.

**Juliann Jenson**

That's not 42 days. You've got to do the 28th or 29th.

**Sen. Gardner**

Can we do 28, 29, or 30?

**Sen. Lee**

That shouldn't be a long meeting. Should it?

**Juliann Jenson**

No, generally speaking, they're not long meetings.

**Sen. Lee**

Should we do that on the 30th? On Friday the 30th? Okay?

**Sen. Gardner**

So I may do it remotely, but I can do it.

**Sen. Lee**

Okay.

**Rep. Lynch**

Mr. Chair, I'm out, off grid for that entire week.

- 1 -

**Sen. Lee**

So you can't do anything on the 30th. So there's no . . .

**Rep. Lynch**

22nd to the 29th, I'm out.

**Sen. Lee**

So you couldn't get to a place where you could call in.

**Rep. Lynch**

No.

**Sen. Lee**

So, what do you think we okay doing it without them?  I'll let you figure that one out.

**Rep. Carver**

Excuse me. Rep Lynch, you said you were out through the 29th. Are you available on the 30th?

**Rep. Lynch**

Yes.

**Rep. Carver**

Okay, we're talking about the 30th.

**Rep. Lynch**

Oh, okay, okay.

**Rep. Carver**

Yeah.

**Sen. Lee**

All right, September 30. Continue. Ms. Jenson.

**Juliann Jenson**

So, we got the last two meetings.

**Sen. Gardner**

We have the last to the next to the last.

**Juliann Jenson**

Bill draft requests and we're going to vote on them. And you have two meetings in between. So that between now and August 17.

**Rep. Lynch**

Pardon me, Mr. Chair, I thought, I thought we were doing the July meeting, so I'm talking July not. I'm totally open in September. Sorry.

**Sen. Lee**

Yeah, we got a month, two months ahead of you. Okay, so now we're going back to July.

**Juliann Jenson**

We can do that anytime in July, depending how you guys want to space this out.

**Sen. Lee**

Anyone interested in something the week of the 18 to 22, July, 18 to July 22 anytime in there? Like maybe the 20th? July 20. Rep. Bacon.

**Rep. Bacon**

I think two of us won't be available on the 19th and 20th.

**Sen. Lee**

21st?

**Rep. Lynch**

Is it the 19th and 20th?

**Rep. Bacon**

I have the 19th and 20th.

**Rep. Lynch**

21st.

**Rep. Bacon**

Oh, 21st is good. Okay.

**Sen. Lee**

21st?

- 3 -

**Sen. Gardner**

Not a great day for me. But I can do it remotely.

**Sen. Lee**

Okay.

**Sen. Van Winkle**

I may be remote too.

**Sen. Lee**

7/21.

**Juliann Jenson**

I looked on the calendar there is the CSG West meeting in Boise during that week. But if no one's going, that's fine, so.

**Sen. Gonzales**

At least you know about it Ms. Jenson. It's on your calendar.

**Juliann Jenson**

21st?

**Sen. Lee**

Yeah, I think we're, we're fixing on 21 7/21.

**Sen. Gonzales**

Lucky number.

**Rep. Carver**

Mr. Chair. And this is an unknown at this point. Unfortunately, if we were able to get the ILG report early in July, then it might be useful to. I just throw out to the committee. Would we want a hearing date, earlier in July, prior to the 21st to hear from the investigators? As well as you know, and I am hopeful, that our urging today might produce that. Of course, we don't know that.

**Sen. Lee**

Well, I'm out the week of the 4th, but I'm available the week of the 11th through 15th. So, let me throw out, does the 13th work? July 13? This would be in lieu of 7/21.

- 4 -

**Sen. Gardner**
Okay, that would be remote, but it would still be better. I would just miss out on all of the exciting festivities for the Uniform Law Commission that day. I would have to sit in my . . .

**Sen. Lee**
What a difficult choice you would have.

**Sen. Gardner**
You know, I think what's that called a hobson's choice?

**Sen. Lee**
Hobson's choice, right. I think let's, should we pencil in the 13th? I'd like to see how that works. Rep. Lynch.

**Rep. Lynch**
I like that better than the 21st as well. That works okay, better for me.

**Rep. Weissman**
I'd like to make a similar point as Rep. Carver made. I mean, from memory, we're supposed to get one of the two reports, 6/29, the other 7/29. Thus, apart from speeding up the 7/29 delivery, which I hope we can do. I think it might be expedient to have a meeting relatively soon after 6/29. We want to bake in a few days for ourselves and others to digest that. Now, Mr. Chair, I heard you that you're out the week of the fourth. If we suppose we meet the. I think I just heard the 13th and then we were talking about the 21st to space things out. We could maybe bump that to the following week. I mean, I don't know that it's necessarily a bad thing to have meetings a week apart. That can be a long time in the arc of legislative business. So we could do 13th and 21st or 13th and sometime the week of the 25th. But these work.

**Rep. Lynch**
That's the week I'm out.

**Rep. Weissman**
Fox, goose, grain, thank you. Rep Lynch. 20th, that's what I said,

**Sen. Lee**
The week of the 13th, you're out, Mike?

**Rep. Lynch**
I'm out the 22nd through the 29th.

**Sen. Lee**

But week of the 13th, you could do the 13th. Yes, sir. So let's do that.

**Sen. Lee**

13 and 21, is that what you are saying? We don't know if we're going to get that other report.

**Rep. Carver**

Well, maybe we need to determine based upon when things flow, and then we're going to look at what Leg Council is going to provide us on research on what other states do. Do we do a meeting later in July or the first week in August?

**Sen. Lee**

Yeah, and I don't think that ILG or Troyer was going to take a whole day. That'll just be part of a presentation.

**Rep. Carver**

No whether or not  we expect that research to be done from NCSL. We're talking about the research that has been requested by our staff from NCSL, other states, that type of thing. And so would it be we could certainly cover that on July 13. But the thought process is, do we need to schedule now or wait and see how things go? Another hearing between July 13 and August 17? Whether we're going to need another working hearing?

**Sen. Lee**

Yes, Juliann.

**Juliann Jenson**

I would advise, if you think you want to have all five meetings, and we're all here today, I would advise this, penciling them in, because the interim schedule is going to fill up fast and there's going to be overlap. So that'd be my only recommendation.

**Sen. Lee**

What date should we pick? We've got the 13th and what could be the other one?

**Rep. Lynch**

Do the first week of August.

**Sen. Lee**

I can't hear you.

- 6 -

**Juliann Jenson**

The fourth or fifth after the NCSL meeting.

**Sen. Gonzales**

Mr. Chair, just for Representative Bacon and I, we both have conflicts on the afternoons of both August the 4th and August the 5th.

**Sen. Lee**

Want to go for the 10th?

**Sen. Gonzales**

10th is wide open.

**Sen. Lee**

Let's try August 10. Does that work?

**Sen. Gardner**

August 10th?

**Sen. Lee**

10 and we might be able to get the other independent investigator on that day.

**Sen. Gardner**

Let's do it.

**Sen. Lee**

August 10, we're all nodding.

**Juliann Jenson**

Do you want me to recap the dates? Say it again. Should I recap the dates? Okay, so I have July 13. Probably an all day meeting with, hopefully, the investigators and other what other states are doing. August 10, agenda to be determined. August 17 was when you will vote on your bill draft requests. Or request your bill draft request, I should say, and then, September 30 is our day we will vote on your bill draft requests.

**Sen. Lee**

All right. Rep. Bacon.

- 7 -

**Rep. Bacon**

And, so, I just want to be sure that we're holding the right amount of time. Do we have a start and end? Is it kind of like the 10 to four or just the whole day?

**Sen. Lee**

From breakfast to dinner.

**Rep. Bacon**

The hours matter to me. So, I'm just curious if we have a sense on when we would start.

**Sen. Lee**

Ms. Jenson what's?

**Juliann Jenson**

I'm just going to predict July 13 will probably be a full day. We're not sure what we're doing on August 10 yet, so.

**Sen. Lee**

We may get the other independent investigator's report.

**Juliann Jenson**

Typically, when the meeting is about requesting bill drafts and voting on the bill drafts are more of a half day affairs, or like a morning or an afternoon.

**Sen. Lee**

Does morning or afternoon work better for the August 17? Does anyone care? I'd call morning. Okay? Juliann, Kevin, Senator Van Winkle, I can't tell what your identity is.

**Sen. Van Winkle**

Mr. Chair, my sincere apologies. I was looking up another committee meeting that we have at the Capitol that day that I sit on and July 13 is their next meeting, from 10 to four.

**Sen. Lee**

Well, it knocks that out.

**Sen. Van Winkle**

I could always find a substitute, I suppose, the sales and use tax force, which I chair.

**Sen. Lee**

It's hard to sub out on that.

**Rep. Carver**
Can we do the 12th, Tuesday the 12th of July?

**Sen. Lee**
July 12th?

**Sen. Gardner**
As opposed to the 13th?

**Sen. Lee**
As opposed to the 13th.

**Sen. Gardner**
I'm sorry, I'm still at the Uniform Law Commission that doesn't do me any good at all, but I can do it.

**Sen. Lee**
Okay, so that'll be a full day on the 12th. The 10th might be a part day, the 17th might be a part day, and the 30th is. And if there's any topics or experts that you all want to hear from, chime in to Rep. Carver or myself, and we'll see if we can line them up, or we've been talking to people from the national state court group and others to find out how other people are solving this. So if you have any ideas. Yes, Rep. Carver.

**Rep. Carver**
Mr. Chair, I would expect we're going to need the bulk of a of the day to hear testimony from the bar association, the different bar sections. Potentially, local bar associations may want to come testify. Now we're also doing outreach, I believe, to all those groups requesting not just testimony, but written submittals. Again, focused on our 18 areas, and I'm wondering if doing that, the timing of that in one sense, they may raise issues that we have not heard about today, and that might help form our universe, or how we address these. On the other hand, I know that they may also have interest when we get to the point of doing draft legislation. Having input on that, but I suspect their testimony and submittals will bring forth additional issues beyond what we've heard from and of course, we don't know what the issues are that are going to be raised in the two investigatory reports. So, just a thought, Mr. Chair.

**Sen. Lee**
Good thought. So I would propose that we try to get bar associations in particular. You know, they're always invited for public testimony, but maybe to come in on 7/12. Schedule some on 7/12 and have them make presentations. Okay, all right. Any other comments? Thoughts on scheduling? Senator Gonzales.

- 9 -

**Sen. Gonzales**

I am stunned that it wasn't more painful than it was, and I'm grateful to all of the members for y'all's flexibility.

**Sen. Lee**

The scheduling process. Yeah, yeah. Okay, well, good. All right, so the next item on the agenda is public testimony.

# Appendix 27(s)(i)(8)

# Public Testimony and Adjournment;

# Legislative Interim Committee on Judicial Discipline: June 14, 2022 Hearing—Public Comment and Adjournment

**Sen. Lee**

All right, so the next item on the agenda is public testimony. We do have seven, eight people signed up, so let's begin public testimony. We have Chris Forsyth from the Judicial Integrity Project. Please join us. Mr. Forsyth.

**Sen. Lee**

So, we're going to be limiting testimony for three minutes if there are questions there after that we will not be putting limits on the testimony. But we would ask that the witnesses adhere to the standard three-minute protocol for the Judiciary Committee. Okay, Mr. Forsyth, welcome and thank you for staying with us all day and listening to the testimony. We appreciate your interest in the topic.

**Chris Forsyth**

My name is Chris Forsyth. I'm an attorney. I've practiced in Colorado for almost 30 years, and as part of that, I started the Judicial Integrity Project. 10 years ago, we proposed our first initiative to fix the judicial discipline system by pursuing a constitutional amendment. So, you're 10 years behind us at looking at this issue. It's been an issue for a long time. I've given you a handout that shows in evaluating a system of judicial discipline, these are the questions that you need to answer. If you answer these questions, you will have your system of judicial discipline. On page two, you'll see there's a chart that has the dismissed complaints filed with the Colorado Commission on Judicial Discipline. The source is the Annual Reports, which have been referred to repeatedly today. If you'll notice the dismissals start out in 1982 that was the oldest report I could find. And in 85 they hit a low. What happened in 1985? The Supreme Court adopted a rule for the Commission that created an Executive Director that reported not only to the Commission but to the Supreme Court. The Supreme Court also adopted a rule asking the Commission to dismiss complaints that are appellate in nature, was the language at that time. The dismissals immediately increased significantly and never went down after that point. For 18 years in a row, or 28 years straight, excuse me, 28 years straight. There wasn't a published case of judicial discipline in Colorado. 28 years straight, we started banging the drum in 2012. So, what happened? In 2014 the first case in 28 years appeared of judicial discipline. What was it? It was a misogynistic judge up north of Denver, I want to say, Weld, I forget. His name is Rand and he stipulated to leave the bench for his improper behavior towards jurors and court staff. There was no reason for the Supreme Court to make the court case public, except to make the point that it had a public case. The six other cases that have been given since then, that have been referred while the six includes him, those cases have been DUIs, two DUIs, a judge who pled guilty to a federal offense for tipping off his friends who were involved in a drug ring, a couple racist judges. And all of those situations became public in the media before they were revealed or dealt with by the discipline commission. So, before those cases became public, they were made public by the press. Page three of this handout is to show you the map of where

- 1 -

proceedings are confidential. Judge Prince testified, oh, there's not much difference when it's you know, there's not a huge difference here. There's a big difference over when cases become confidential or become public. Most cases, in most states--35 states, the proceedings are public once a complaint is filed. The problem in Colorado is, as you can see from the prior chart, not many cases have been filed. So, the Judicial Code of Conduct has it has not been enforced as a matter of history. And then, because my time is dwindling, on the last page, we have a comparison using those factors on the first page that you were handed. And it addresses, goes through are the proceedings public. And it compares California and Colorado. California actually checks all the boxes in the right manner. Colorado is exactly the opposite. I'm not exactly a fan of everything California, but on judicial discipline, they got it right. These referrals by judges and again, all you've heard from today, here are our judges, those with a conflict of interest. The standard that we should be looking at is the public's confidence in the judiciary. You shove the public's testimony to the last of this hearing, limited to three minutes after you listen to judges tell you what they want. This proceeding, this very proceeding, is an exact example of what is wrong with government, and in particular, what is wrong with a legislature holding any checks and balances over the Judicial Branch. You will let a judge talk forever about what a judge wants, but the true question is what the public's confidence is in the system, and you've made a precedent here today that you don't give a damn what the public really thinks and you're going to limit them to three minutes at the end of the long day. When the judges have done everything they can to limit strong conversation about what should be reformed. It's manipulative for a judge to get up here and the State Court Administrator to get up here and say, you know, we think that this is wrong, and there's no law about the Supreme Court, you know, having to recuse in this one specific instance. So, let's work on that. That's misdirection, that's leading you away from the overall picture that you need to look at, which is, who should be on the discipline commission? Who should be making the rules? All these broader questions that are brought on this first page that I give you. And these are the questions that ultimately need to be answered, because right now, we do not have an enforceable Code of Judicial Conduct. When you're making news out of DUIs and felony convictions, you're not sweating the small stuff in courts, like a judge not being fair, like a judge using federal law instead of Colorado law in a binding decision. The small stuff that is enforced in other states, and if you look at other states, searchable databases that they have you'll find case after case after case of judges who have been disciplined and they won't see the light of day. So, I agree with Senator Lee Colorado, is the gold standard. It's the gold standard at hiding information on judges. It's the gold standard at protecting bad judges, and we are the envy of bad judges in every other State in the Union, because nowhere are they more protected than the here, other than the federal judiciary. You need to make changes, and you need to look at this fresh and new. And you need to understand that all these organizations, you're talking about, the Institute for the Advancement of the American Legal System, that the Chair brought up, oh, they wrote a report. That's an entity of judges. Rebecca Love Korlis, a former Supreme Court Justice started that. What did Rebecca Love Korlis do? She wrote the initial opinion in Colorado that the Open Records Act does not apply to the Judiciary. That was her contribution, and that's the organization she started.

- 2 -

**Sen. Lee**

Mr. Forsyth, would you wrap up, please, sir.

**Chris Forsyth**

The bar associations, these other organizations that you're talking from hearing about, they have judges involved. They have judges steering, you know the thought process of those organizations. Again, you need to get back to the public's confidence and the appearance of impropriety. If you look at those two standards, those will guide your way properly through the question of what needs to be done in Colorado regarding judicial discipline.

**Sen. Lee**

Okay, thank you. Are there questions for Mr. Forsyth? You alluded to, I believe other states, Mr. Forsyth, that have applied their judicial commission to judges who what got a ruling wrong? Let's see, refusing to follow well established law or enforcing a rule related to a ruling. Do other states do that or do they?

**Chris Forsyth**

It's two different degrees. If you look at other states, you'll see a disparity. A different treatment of judicial conduct. And there are states where, if the law is well established, a judge can be disciplined for it. Colorado takes the opposite view on this broad thing, saying, if it's appellate in nature, meaning the discipline commission is taking that to mean, if there's anything merely related to an order or something that can be appealed, related to the conduct, they're not going to look at it. So that's a lot of judicial misconduct not getting looked at by the discipline commission. So other states have different standards. Furthermore, the burdens of proof. I was shocked to hear Judge Prince talk about the burden of proof to even proceed on a complaint against a judge meant you had to essentially win a civil proceeding before, that was his version of the burden of proof. So it's a much higher burden of proof than even I thought that the discipline commission was applying. And maybe that explains 28 years straight of no public judicial discipline. But other states, yes, look at enforcing the Code of Judicial Conduct in a different manner than Colorado.

**Sen. Lee**

Okay, any other questions from the committee? Seeing none. Thank you for your testimony.

**Sen. Lee**

Andrew Toft. Is Mr. Toft with us? Welcome, sir.

**Sen. Lee**

If you would identify yourself, tell us your affiliation and provide us with your testimony.

- 3 -

**Andrew Toft**

Yes, sir. Thank you. Mr. Chairman Lee, Madam Vice Chair Carver and members of the committee. My name is Andrew Toft. I was licensed to practice here in Colorado in 1982 most of my practice involves representing clients in the District and County Courts here in Colorado, predominantly along the I 25 corridor. I'm here today on behalf of the Colorado Bar Association. Vice Chair Carver, you've already made a number of the comments that I had in my prepared comments, but I'll go ahead and reiterate them. First of all, and foremost, the CBA is grateful for the opportunity to participate in this hearing and looks forward to participating further with the interim committee as the committee studies the issues identified in subject section (7) of 13-5.3-101 and SB 22-201, as well as any other aspects of Colorado's judicial discipline process, the interim committee decides to examine. The CBA believes the work that the committee will do to fulfill its duties under SB 22-201, is every bit as important as, if not more important than, the work that went into drafting, debating, amending and passing SB 22-201 so it could be signed into law, and the work of this committee could begin. When the committee drafts legislation in furtherance of the goals of SB 22-201, as authorized in that bill, the CBA looks forward to working with the committee in being used as a resource by the committee in drafting that legislation. CBA is fully aware that this committee will rely on the research and drafting skills of the Legislative Council staff and the Office of Legislative Legal Services, given the experience many CBA members have with Colorado State Courts, the administrative court system, including the disciplinary processes for a number of professions and the CBA's long standing involvement in the legislative process through its sections, in CBA's legislative policy committee, the CBA is certain it can make valuable contributions to the drafting of any legislation for the 2023 legislative session, as well as related research. The CBA is ready to provide assistance from reviewing and proofing drafts of the legislation to analyzing issues of due process, privacy and confidentiality, separation of powers issues that may impact this committee's final product. Colorado lawyers, whether CBA members or not, represent Colorado citizens in the courts of this state, from Julesburg to Cortez, in Springfield to Craig. Every day, the courts are open and in session. The CBA can ask for input on this committee's work from 26 local bar associations spread across the State as well as discuss the issues that will come up in these hearings with the diversity bars here in Colorado. Any improvements to the judicial system by the work of this committee, in that the CBA supports improvements to the judicial system and disciplinary process, will benefit not only CBA members by helping us better represent our clients, it will help every lawyer who practices in Colorado courts whether or not those lawyers are CBA members. One of my colleagues, Letty Maxfield testified at the previous committee hearings on the bill that the vast majority of judicial proceedings are adversarial, and we understand that the vast majority of requests for evaluation of conduct of a judge or justice are grounded in dissatisfaction with the court's disposition of particular matter or issue. The line between a complaint by disaffected litigant and potential allegations of misconduct needs to be more clearly drawn. This concern is not shared by all involved in this process, but the CBA hopes that this distinction between disaffected litigants and citizens with allegations of genuine misconduct is kept in mind as modifications to the judicial disciplinary process are considered so Colorado does not lose highly qualified jurists or highly qualified candidates from the increasingly diverse pool who want to become judges in the future. Improvements to the disciplinary system must be fair and equitable for all

- 4 -

to have confidence, and hopefully increased confidence in the judicial system, mainly the citizens here in Colorado. The CBA looks forward to working with this committee to increase that confidence.

**Sen. Lee**

Thank you Mr. Thank you, Mr. Toft, for your testimony. Any questions? Senator Gardner.

**Sen. Gardner**

Thank you, Mr. Chair, really, no question. Mr. Toft, just thank you for being here, thanks for being here on behalf of the Bar, and I really invite you and members of the Bar to communicate with me, especially about your concerns as we go forward. And I'm sure I speak for the entire committee on that. Thank you.

**Andrew Toft**

Thank you, Senator.

**Sen. Lee**

And I would affirm the comments of Senator Gardner that encourage your members to contact us and raise any issues of concern with us. We're vitally interested in getting input, so communicate that to them, and we look forward to hearing back. Thanks again for being here.

**Andrew Toft**

Thank you very much.

**Sen. Lee**

Rep Carver.

**Rep. Carver**

Thank you, Mr. Chair, and I'm sure you've heard this numerous times. I'm sure you read it in the bill, but it would be most helpful, given the substantive issues, 18 in total, listed out in 201 for the CBA, the different bar sections, the local bar associations, not just to think about testimony, but which we have to limit to a certain number of minutes, but to delve into those sections, and to submit written comments on any or all of those topics and get them to Juliann. Those are the types of input that the committee members can be digesting upon receipt. Given our short time frame, given our limited number of hearings, and obviously we're also looking at how we reach out beyond the bar associations to legal societies, the public, others. So that they know the topics which are our mandate from the legislature to address, and they know a way to submit that so that we can start hearing those comments and digesting that as soon as possible. So, thank you.

**Andrew Toft**

Thank you.

- 5 -

**Sen. Lee**

Thank you, Mr. Toft again. Appreciate it. Marilee McLean. Is Ms. McLean here? She is remote. Welcome. Thanks for joining us. If you would identify yourself and your affiliation and provide us with your testimony.

**Marilee McLean**

Yes, Mr. Chair and interim committee. My name is Marilee McLean. I'm the Executive Director for Mom's Fight Back, which is a nonprofit here in Colorado, 501 (c)(4) that works on legislation. And I just want you to know that I've been working 30 years on courtroom reform and the problems that we're having in the system with our judges. I've been speaking and writing on this issue to improve our family court. This is a national crisis, not just here in Colorado. But what's happening is you want to have legislation reform, and is it constrained by the Colorado constitution, which says that the Commission on Judicial Discipline must keep the majority of the discipline confidential, and gives the State, the Supreme Court the authority to set rules for the group. Under the Constitution, only the Colorado Supreme Court, not to the Commission and so they can censure, they can remove and suspend judges. Once again, leading judges to determine judge's discipline. The interim committee, you need to know that judges every day are silencing good, loving moms that are trying to protect their children. I live in this, every day. I have calls from all across the nation and right here in Colorado, hundreds. This year we passed legislation which is called Julie's law. HB 21-1238 which was to do with training for CFIs, PREs but judges were the main source that needed that training. They need training on domestic violence, specified training, child abuse, child sexual abuse, trauma, coercive control, and that is not happening. And when they're on a bench for two years and are rotating, they're not getting the education that they need, no five hours that they get a year that they can pick. They need specific training on these issues. Our children in this State are going to live with their abusers in epidemic numbers. They are children that have been murdered. So, we really need to take a look at this. Most of these cases are domestic violence cases. This year, I gave you the legislation that was passed. And the other thing I wanted to say, you know, there's an example. I just want to give you an example here. And I know you've heard about Judge Natalie Chase. But I was involved in that case where the protective mom, Natalie Chase sent her to jail. There was no First Amendment rights for that mother, the 14th Amendment, lack of due process. The behavior in the courtroom was abhorrent. I mean, if any of you could see how Natalie Chase treated this good, loving mother, that was just trying to protect her children. It was absolutely crazy. And there was least 15 other public outrage from people that have actually gone through the system and had the same problems. And this isn't a he said, she said. This is about abuse, and if they don't understand abuse, this is a huge problem. So anyway, Chase sentenced this mother to 18 months in jail. Recently, there was an appeal that just came out, went to the Supreme Court, and this is what I find, is amazing, and it's absolutely absurd. She would not allow this mother. She already spent $350,000 on legal fees. She would not allow this mother at the point that she had no representation, one month before she was going into court, couldn't find her an attorney, so she went pro se. She worked months. I mean, that whole month, just trying to pull together what she would say in court. The judge would not let her talk. She was not allowed to speak, so she ends up wanting to get an attorney, but Judge Chase said she had too

- 6 -

much money. She didn't she would not allow her to get his attorney to represent her. So, this woman had represented herself pro se, went to jail, and now, this is the latest. The Colorado Court of Appeals last week sent the mother back to finish a year of jail sentence for violating the judge's gag order issued by Judge Natalie Chase and under all the stuff that she's gone on with her and the misconduct of this judge, the Court of Appeals admitted that there was substantial constitutional issues with the gag order. However, they upheld it, and when the judges have shown to be unfit, their ruling should be reviewed, and that's what I'm asking bound by judicial canons. So, you know, that's not all of it. Because they are throwing out evidence. They have admissibility problems, admissibility standards. They can bring in information that they want to bring in, and they can throw out whatever they want. This needs to be looked at. And so I'm hoping this year, with you guys in the interim committee, that you can listen to other mothers or the women that I'm dealing with that are going through this, and our children are not safe, and the safety of the children come first. So, our judges need lots of training. That's my information for you guys. Thank you.

**Sen. Lee**
Thank you for your testimony. I would. Refrain from applause. This is a hearing. It's not a demonstration, but we appreciate your participation. You're certainly welcome to testify. Okay, next on the list is Mr. Robin Austin, remotely, is Mr. Austin with us? How about Ms. Luanne Fleming? Ariana Busby?

**Ariana Busby**
Yes, I'm here.

**Sen. Lee**
Hey, Ms. Busby, welcome to the Judiciary Committee. Thanks for joining us. If you would introduce yourself, tell us who you represent, if you're affiliated, and provide us with your testimony.

**Ariana Busby**
Yes, thank you Mr. Chair. Hello everyone, and thank you for your leadership on this committee. My name is Arianna Busby. I'm here on behalf of the Colorado Women's Bar Association, where I'm one of their Public Policy Co-Chairs. I'm a litigator in private practice, but many of you may know me from my time as a staffer in the Senate. I believe many of you also have the opportunity colleague, Alison, this morning, and our other representatives of the legislative section. We're not prepared at this time to provide any recommendations, but we would echo many of the sentiments offered by the Colorado Bar Association today by Andy, I'm sorry. Can you hear me?

**Sen. Lee**
If you could just slow down a little bit it might be easier to follow you.

- 7 -

**Ariana Busby**

Of course, I'm so sorry.

**Sen. Lee**

That's all right.

**Ariana Busby**

As I was saying, we're not prepared to offer any recommendations at this time. However, we would echo many of the sentiments offered by the Colorado Bar Association, and we would thank you for the opportunity to participate in this committee moving forward. Representative Carver, we greatly appreciate your comments about having the Bar Association to be involved in future presentations. If that is something that you guys do move forward with, we would just respectfully request that those presentations be scheduled for that third meeting after the independent investigations are scheduled. Thank you.

**Rep. Carver**

Thank you. This is Rep. Carver. We'll certainly keep you apprised through Juliann and certainly understand that would be useful, I think, for all the bar sections and CBA to have an opportunity to look at the investigators' report, and we appreciate that. We're hoping to get those reports soon. Thank you so much.

**Ariana Busby**

Thank you.

**Sen. Lee**

Thank you. Ms Busby, any other questions for Ms. Busby from the committee? Seeing none thank you again, and we look forward to hearing more from you.

**Ariana Busby**

Thank you.

**Sen. Lee**

Okay. Kathy Wilson, do we have submitted text from Ms. Wilson? Okay, did you want to testify? Come on up.

**Deborah Carroll**

Oh, Thank you.

**Sen. Lee**

Take your time.

- 8 -

**Deborah Carroll**

Thank you.

**Sen. Lee**

If you would, please introduce yourself, tell us your name, any affiliation that you may have, and please accept my appreciation for staying with us. You've been with us a good part of the day. So, thank you for that.

**Deborah Carroll**

Well, I appreciate you letting me speak without signing up. I do recognize the seriousness and the types of cases that judges deal with. The craziness that human beings can can demonstrate in times of weakness and vengeance. And, you know, the whole realm of human behavior.

**Sen. Lee**

Could you identify yourself, please? That's all right.

**Deborah Carroll**

My name is Deborah Carroll, and I am affiliated with the Judicial Integrity Project for 10 years, as well as numerous mothers and fathers rights organizations across the United States of America. A lot of them have been shut down by Facebook. So we're reestablishing connections. Anyway, I want to say I recognize the job. I recognize. I go to court and I watch what's happening. And my first experience was in family court, where a mother had two ex-husbands who were allowed to be ganged, she was allowed to be ganged up by Magistrate Christopher Bois Annette in Jefferson County Court, so that both fathers hearings were one after the other, and when they would restrict her with one one child, they would automatically restrict her with her three children. So, I was a school teacher for 33 years, and I had absolutely no idea about what was happening to the children in their families, and that started in 2011. I've joined every group I could since then, and I've expanded beyond family court to also be involved with a lot of the cases that Luanne Fleming and Robin Austin work within probate court, and I have been in juvenile court on many, many occasions, watching unbelievable, bad outcomes for children. What I want to say is, when did this happen? When did it happen that the American public is afraid of the courts? That is, we need a sea change. In the bill 22-201, I repeatedly read about the need to avoid the appearance of impropriety. I would add the avoidance of appearance of extortion, coercion, collusion and profiteering. And one of the things that I am asking for as part of a long term affiliation with the Judicial Integrity Project in the refusal of Colorado courts and judges to reveal their conflicts of interest and financial holdings, I have done research on CHAFA, and I would like to know how many legislators, judges and attorneys and Bar Association affiliates and others have bought real estate through their LLCs and their IRAs and other forms of hiding where their money is going. That houses players in the cottage industry of the courts, which includes the urine analysis and drug testing sites, the rehabilitation centers. How many of those are owned by legislators and the above the judges who have

- 9 -

received favorable financing to send court parties to receive child family investigators, parental responsibility evaluators, trauma bond therapists and other court ordered services being provided out of buildings owned by judges and others. Not only would I like to suggest that investigation to take place, I would like to start the ability of the public to respond to unfair treatment in the courtroom, questionable practices, not allowing their witnesses to be called, just unfavorable bias against them. And I would like to have the State of Colorado pay for a rogue judge hotline where people can call and tell what happened in their cases. Right now, the reporting, I don't know what's going on with my time. It's going up. I appreciate that. I don't need it.

**Sen. Lee**
That's all, right, you exceeded your limit, but I wanted to allow you to continue testifying, so we'll just turn it off and okay, just finish up if you would.

**Deborah Carroll**
I don't really. I mean, my ideas, I have many ideas, but I want you to know the bottom line for me is, what's happened to our children. I believe that a lot of what's going on in the craziness of these school shootings and others are related to decisions made or not made in the courtrooms, where to place the children, who to give them to, or where to leave them when they should be removed. So we have a big problem here. And I don't, I don't know about, you know all of this focusing on the scandal. There's a whole lot of information about what went wrong, but I'm telling you, it's much bigger problem than the scandal of paying off somebody to give them a contract to shut her up about filing a sexual harassment charge against a judge. There's a lot bigger problems. Mr. Forsyth talked about. It's not just about DUIs. It's about destroying families and what happens to the innocents. And I just want you to know this is about my 18th appearance in front of a legislative hearing or a committee, and I have a lot more to say, but I won't trouble you with that. I appreciate you listening to me.

**Sen. Lee**
Okay, well, we appreciate you coming to this hearing, and you're certainly welcome to come back and participate again at one of our other hearings, we're going to have four further hearings, and as I say, you're welcome to come back and testify and share your thoughts and ideas with us. So, thank you.

**Deborah Carroll**
Thank you.

**Sen. Lee**
Any questions? Seeing none? Are there any other witnesses who would like to testify before this committee? Come forward, please.

**Halina Topa**

Hello. My name is Halina Topa. I have an accent. I'm originally from Poland. In fact, I'm going to Poland in August.

**Sen. Lee**

Can you spell your last name?

**Halina Topa**

T,O,P,A, like Tom O, P, like Peter A, and I just wanted to say that I came in the United States in 1974 to escape possible Russian invasion. Both of my parents were Nazi fighters. My mother was shot by Nazis on three different occasions. Now, I'm not Jewish. Hitler attacked Poland, and on one occasion, a Nazi officer has saved her life. I've been a victim of and what I wanted to say, which is very, very important, that Poland is safest places for women and children, I make a joke, is because our government knows that Polish men run faster than Polish women. Okay, so what I have encountered in United States is absolutely disgusting, and I am an American citizen, and I am over here to bring positive criticism. I've been victim of domestic violence. I was basically sex trafficked. Okay? I have a child with what in Poland would call baby chaser, a man who wants a baby, but, you know, you he cannot go to the sperm bank or ovaries bank. Okay? So, I was beaten, kicks, strangled. I was left on the highway nine months pregnant for getting sick in the car. Then I was sued for custody. I was attacked after childbirth. I was involved from hospital. I know people who escaped from Auschwitz. Okay. Dr Bilinski, he's dead. I know the things that are happening to United States should be of very much concern. We have police who doesn't know the law. We have we have criminals in the uniforms, and when I see you people, my child was kidnapped by parental alienation, okay? And women are being sued for custody for the babies which I being Polish and the Polish joke. Your Honor, Your Honor, I impregnated around women. Please help me. I'm a I'm a red blooded American and a future president. You know, if men cannot pick a good woman for a mother, what's wrong with people? You even considering giving him? You know, what is wrong with you people? What is wrong with you people? I seen, I saw the movie with zombies, and that's when my child was kidnapped. K.J. Moore, when I testified in United States and in Colorado. Judge Palidori, when I testified around being kicked and beaten, you know, and you know it was, I was like stupid and, and the Judge Palidori in Jefferson County, Colorado, United States, she says, Halina has no ability to encourage love and affection towards the child's father. I don't have ability to encourage love and affection towards Stalin either or Hitler. Okay, what is, why do you why you allow stupid people, stupid cops being in the public? What are you doing? Maybe I don't know. I have a Polish joke, you know, and you know, maybe I'm very, very my son was kidnapped. He was self-mutilating himself in his father's custody. And Judge, K.J. Moore, who is, who is still, a judge, I filed for emergency custody, and she says the child is not in immediate danger. Well, you are because you went to the law school. Was it Harvard or yellow or where did you get so stupid? Stupid, you know, why Polish people are called dumb. Because we don't get stupid, and I'm accusing you in United States today, today of lacking heart, common sense and balls. Have some balls. Don't be diluted John Wayne's okay. We have

- 11 -

- 12 -

fought in Poland very much for freedom and Poland is a lot better than you. Shame on you. Get up and do something.

**Sen. Lee**

Thank you, Ms. Topa. Thank you for your testimony. Any other witnesses who would like to testify this afternoon, seeing none the testimony phase is concluded. Seeing no further business before the committee. The committee is adjourned. Thank you, members for your participation.

# Appendix 27(s)(i)(9)

# Relevant Exhibits and Hearing Materials:

# Appendix 27(s)(i)(9)(a)

# Interim Comm. on Jud. Discipline, Areas of Study, June 2022;

**Judicial Discipline Interim Committee Areas of Study**

Senate Bill 22-201, independent oversight of matters concerning judicial discipline, outlines the following topics for the interim committee to study:

- **Effectiveness.**  Effectiveness of investigating and addressing the allegations of mishandling judicial misconduct complaints published in 2021;

- **Independence.**  How to achieve a system of judicial discipline in which individual cases are investigated and determined independent of undue influence by the judiciary, to be overseen by the community, the bar, and the judiciary;

- **Balancing public confidence and judicial control**.  Whether a system of judicial discipline can be effective and inspire public confidence while retaining judicial control of final decision-making authority over judicial discipline cases;

- **Initial decisions.**  Whether the existing commission should be authorized to make initial decisions on discipline cases for public and private discipline that are then subject to appellate review before a separate review board that is independent of the judiciary;

- **Rulemaking authority**.  Best method of assigning rulemaking authority over the judicial discipline system to achieve effectiveness and independence while inspiring public confidence;

- **Supreme Court Justice misconduct.**  How to address judicial discipline effectively and credibly when members, actions, or decisions of the supreme court are being evaluated for potential judicial misconduct;

- **Judicial appointments.** Whether the supreme court should continue to control the appointment of the four judge members of the commission;

- **Disqualification standards.** The appropriate method for defining a consistent and clear set of disqualification standards for each of the decision makers, including supreme court justices, commission members, special counsel, and special masters, and for determining disqualification issues;

- **Confidentiality and transparency.** The best method of balancing the values of confidentiality and transparency for judicial discipline matters;

- **Accessing information**. How to ensure that the commission can obtain unfettered access to information and files in the custody or control of the department relevant to judicial misconduct complaints;

- **Screening misconduct complaints.**  Whether rule 13 of the rules, which assigns the role of screening misconduct complaints, should be modified to authorize the department to pre-screen judicial misconduct complaints before reporting them to the commission;

- **Victim -centered approach**. Benefits of a victim-centered approach to judicial misconduct complaints that allows the victim to have a voice in how complaints are handled and resolved;

- **Enforcement**. An effective enforcement mechanism for any disclosure obligation related to judicial discipline;

- **Funding**. How best to fund the system for judicial discipline;

- **Models**. Relative benefits of the models for achieving independent judicial discipline adopted by other states and the American Bar Association's model rules for judicial disciplinary enforcement or any other model addressing the final decision-maker conflict that arose in Colorado in 2021;

- **Recommendations**. Recommendations from the department, the commission, and any other stakeholders the interim committee deems appropriate; and

- **Amendments**. What amendments to constitutional, statutory, or rule-based law are advisable to address the interim committee's findings.

**Appendix 27(s)(i)(9)(b)**

**Staff Report for the Interim Comm. on Jud. Discipline, June 14, 2022;**



# Interim Committee on Judicial Discipline

Juliann Jenson

June 14, 2022

Senior Research Analyst

Legislative Council Staff

# Staff Introductions

## LCS

- Juliann Jenson
- Hamza Syed
- Will Clark
- Marie Garcia

## OLLS

- Conrad Imel
- Chelsea Princell

# Important Information

- 5 hearings

- Introduce up to a total of 3 bills, joint resolutions, and concurrent resolutions.


**Timeline:**

- **August 19:**  Last day to request bills

- **September 30:**  Last day to vote on bill draft requests (42 days between the bill draft request and voting)

- **October 14:**  Leg Council hearing

3

# Judicial Discipline Overview

- All 50 states and D.C. have an oversight agency or commission that investigates judicial misconduct complaints.

- No legal authority to reverse rulings or order new trials

- Review complaints about a judge's behavior and may pursue disciplinary actions, ranging from private reprimands to removal

4

# Other Oversight Entities

- **Office of Judicial Performance Evaluation**:  Evaluation of judges, periodic feedback, and publishes reports to the public during election years

- **Nominating commissions:**   Review judicial applicants

- **Attorney Regulation Counsel:** Disciplines lawyers not serving in a judicial capacity.

5

# Colorado Commission on Judicial Discipline

- Monitors the conduct of state court judges, including those from county and district courts, court of appeals, and justices of the Supreme Court.  It does not review judicial rulings or case outcomes.

- Authority and procedures are in Colorado Constitution - Article VI, Section 23 (3) - and the canons regarding judicial conduct found in the Colorado Code of Judicial Conduct.

- State Supreme Court promulgates rules governing commission procedures

- One-tier system that operates confidentially

6

# Structure – Commissions on Judicial Discipline

## Colorado operates as a one-tier commission that:

- Receives and investigates complaints

- Brings formal charges

- Conducts hearings

- Disciplines the judge or recommends disciplinary sanctions to the supreme court

## Two Tier Commissions (8 states)

- First entity receives and investigates complaints and determines to proceed or dismiss

- If proceed, first tier entity presents findings before a second body that has different name, membership, etc.

- Decision is reviewable by the state supreme court

7

# Confidentiality



## Fact-finding hearings

- All states require confidentiality in complaint investigation stage.

- Colorado is one of 15 states that conducts judicial disciplinary hearings in private until a recommendation for a public disciplinary sanction is made.  Other states allow proceedings to become public once charges are filed or judges have formally responded

## Document accessibility

- Some states post documents online as cases move through proceedings, including outcomes of private admonitions

- Colorado does not share any case-related information with the public, or on its website, except by reference in its annual report.

8

# Judicial Discipline Commission
## Members and Exec. Director

**10 members appointed by the Chief Justice of the Supreme Court and the Governor, serve 4 year terms and may be reappointed**

- 2 county court judges (Supreme Court)
- 2 district court judges (Supreme Court )
- 2 lawyers (Governor)
- 4 citizens (Governor)

**Executive Director**

 - Commission appoints the Executive Director who manages the office, oversees operations, and reviews initial complaints

**Meetings**

 - As needed to consider complaints and other business, generally bi-monthly

9

# Case Flow



## Complaints and Investigations

- Any person may file a complaint or request for evaluation of judicial misconduct

- Executive Director conducts a preliminary review and may forward to commission members for further review

- If complaint is deemed reasonable, judge is notified and asked to respond

- Commission conducts investigation – may use investigators and special counsel – advances only if preponderance of evidence is met.

## 2020 Stats

- High number of complaints are dismissed early
  - 126 out of 199 dismissed (63 percent)
  - 73 cases investigated
  - Of the 73, 64 dismissed because no violation could be established

10

# Findings of Judicial Misconduct  - Private Disciplinary Actions

## Examples of Private Disciplinary Actions

- Letter of admonition

- Reprimand

- Censure

- Training or counseling

- Docket management reports

- Medical treatment

- Initiate disability proceedings



11

# Findings of Judicial Misconduct  - Formal

## Formal Proceedings

- Trial to address misconduct
- Special counsel issues the formal complaint and acts as the "prosecutor"
- Hearing conducted by Commission or special masters appointed by the Supreme Court
- Case is dismissed or recommendation to the Supreme Court for removal, retirement, public reprimand, public censure.
- Confidential until recommendations filed
- 6 cases since 2014 (examples: discriminatory, criminal proceedings, multiple incidents)

12

# Questions?

## Juliann Jenson

Senior Research Analyst• Legislative Council Staff

juliann.jenson@state.co.us • (303) 866-3264

www.leg.colorado.gov/lcs



# Appendix 27(s)(i)(9)(c)

# Colo. Comm'n. on Jud. Discipline Presentation, June 14, 2022;

# JUDICIAL DISCIPLINE in Colorado

Interim Committee on Judicial Discipline Presentation

June 14, 2022

Elizabeth Espinosa Krupa,
Chair

David Prince,
Vice-Chair

Christopher Gregory,
Executive Director

# Merit Selection



**Colorado's Judicial Merit Selection System:**

**50 years of choosing judges based on merit. Not money. Not politics.**

In 1966, Colorado voters approved a merit selection system for judicial appointments. This citizen-involved process helps ensure that Colorado judges are highly-qualified, fair, and impartial. It is the gold standard that safeguards equal treatment for all Coloradans coming into court.

## How does it work?





RECOMMENDATIONS FOR
**JUDICIAL DISCIPLINE SYSTEMS**

IAALS
INSTITUTE for the ADVANCEMENT of the AMERICAN LEGAL SYSTEM
UNIVERSITY of DENVER

## PREFACE

Until the 1960s, the formal methods for addressing allegations of state judges' misconduct, such as legislative impeachment or recall elections, were cumbersome and time-consuming. These shortcomings were highlighted when scandals rocked several state judiciaries,[1] revealing a need for more efficient disciplinary procedures. Starting in 1960, California and eventually all states established variously named bodies (this Report uses the generic term "commission") to investigate allegations of judicial misconduct or disability and—where appropriate—prosecute, adjudicate, and either recommend discipline to the state's highest court or impose it, subject to appellate review.[2]

Effective judicial discipline is an important part of a trusted and trustworthy court system. The public must know that judicial ethics and violations of the Code of Judicial Conduct are taken seriously. Absent that assurance, the system appears self-serving, protectionist, and even potentially corrupt. And it is not just the reality of the existence of effective systems that matters; it is also the appearance. A wholly effective system with no transparency and no public confidence will not suffice.

> Effective judicial discipline is an important part of a trusted and trustworthy court system. The public must know that judicial ethics and violations of the Code of Judicial Conduct are taken seriously. Absent that assurance, the system appears self-serving, protectionist, and even potentially corrupt. And it is not just the reality of the existence of effective systems that matters; it is also the appearance. A wholly effective system with no transparency and no public confidence will not suffice.

another, although it offers some generalizations based in part on a May 2018 IAALS staff review of commission websites. Cynthia Gray, who directs the National Center for State Courts Center for Judicial Ethics, has highlighted some principal variations in her work.[4] And the Center publishes quarterly its very helpful *Judicial Conduct Reporter*, with summaries of commission activities and decisions, among other publications.[5]

Finally, we recognize that many of the practices that we endorse in this Report are already in place in many or even most states. In short, the system is already doing a good job in many areas. We also recognize that commission structure, jurisdiction, and operations may be beyond a commission's authority to change, based as they are in constitutions, statutes, and court rules. In this Report, we seek to identify some better practices that commissions, state supreme courts, and legislatures can review and identify as doable and advisable—or not. We also seek to identify concrete ways to improve the trustworthiness of the judiciary. This Report is a companion document to IAALS' report on its 2017 Judicial Recusal Convening,[6] and both reports seek to identify concrete ways to improve public confidence in the judiciary.

1   See, e.g., Note, *Court Scandal in Oklahoma Supreme Court*, 20 OKLA. L. REV. 417 (1967); Kenneth Manastar, *Illinois Justice, The Scandal of 1969 and the Rise of John Paul Stevens* (U. Chi. Press, 2001).
2   National Center for State Courts, State Court Organization, §1.9, *Judicial Discipline: Investigating and Adjudicating Bodies*, available at http://www.ncsc.org/microsites/sco/home/List-Of-Tables.aspx.
3   Keith Swisher, *Judicial Discipline in the States*, IAALS Judicial Discipline Pre-Convening Whitepaper (2018).
4   See, e.g., Cynthia Gray, *How Judicial Conduct Commissions Work*, 28 JUST. SYS. J. 405, 405 (2007).
5   National Center for State Courts, State Court Organization, *Judicial Conduct Reporter*, available at http://www.ncsc.org/Topics/Judicial-Officers/Ethics/Center-for-Judicial-Ethics/Judicial-Conduct-Reporter.aspx; see also National Center for State Courts, State Court Organization, *Center for Judicial Ethics Publications*, available at http://www.ncsc.org/topics/judicial-officers/ethics/center-for-judicial-ethics/cje-publications.aspx.
6   See Russell Wheeler & Malia Reddick, *Judicial Recusal Procedures, A Report on the IAALS Convening* (June 2017).

## Importance of Credible Ethics Oversight

***The primary purpose of [judicial discipline] systems is not to punish judges but to maintain and restore public confidence in the integrity, independence, and impartiality of judges and the judicial system …***

*Handbook for Members of Judicial Conduct Commissions*

*(NCSC Center for Judicial Ethics)*

# Judicial Discipline is the Only Non-Political Mechanism for Addressing Judicial Misconduct

| Judicial Discipline | Recall | Impeachment | Contested Retention Elections |

Unlike other paths to judicial removal, judicial discipline is confidential pending the announcement of public sanctions.





Commission on Judicial Discipline

Created in Art. VI, Sec. 23(3)

4 Judicial Members

2 Attorney Members

4 Citizen Members

Appointed by Supreme Court

Appointed by Gov / Sen

Serving a maximum of two terms of four years each

## Judicial Members

Hon. Rachel Fresquez

Hon. Sara Garrido

Hon. Bonnie McLean

Hon. David Prince

## Attorney Members

Elizabeth Espinosa Krupa

Mindy Sooter

## Citizen Members

Jim Carpenter

Bruce A. Casias

Yolonda Lyons

Drucilla Pugh

## Diversity of Commission

- **70% Female**
- **75% of Judges Female**
- **50% BIPOC**
- **20% White Male**

| Race / Ethnicity | CO Population | % of Judges | # of Judges |
|---|---|---|---|
| American Indian / Alaska Native | 1.6% | 0.3% | 1 |
| Asian | 3.5% | 1.8% | 6 |
| Black / African American | 4.6% | 3.0% | 10 |
| Hispanic / Latino | 21.8% | 9.5% | 32 |
| White, not Hispanic or Latino | 67.7% | 84.6% | 286 |
| Two or More Races - Not Hispanic or Latino | 3.1% | 0.9% | 3 |
| | | 100.0% | 338 |

| Race / Ethnicity | CO Population | % of Judges | # of Judges |
|---|---|---|---|
| Female | 49.9% | 40.8% | 138 |
| Male | 50.1% | 59.2% | 200 |
| | | | 338 |

SCAO Judicial Diversity Outreach

## COJD Staffing

- Executive Director
- Administrative Assistant, Attorney and Investigator pursuit

## Discipline Commission's Constitutional Mandate

- Protect the public from improper conduct of judges
- Preserve the integrity of the judicial process
- Maintain public confidence in the judiciary
- Create a greater awareness of proper judicial behavior
- Provide for the fair and expeditious disposition of complaints of judicial misconduct/disabilities

Colo. Rule Judicial Discipline ("RJD") 1(b)





## Intake and Screening
- **Governed by RJD 13**
- **Exec Dir or Commission may immediately dismiss if no <u>reasonable basis</u>**



## Complaint Investigation

- **Analogous to Grand Jury Role**
- **Governed by RJD 14**
- **Develop Factual Evidence**
- **May Use Investigators and Special Counsel**
- **Advances only if <u>preponderance of evidence</u> std. met**



## Formal Proceedings

- **Trial Phase**
- **Special Counsel "prosecutes"**
- **Hearing conducted either by Commission itself or through special masters**
- **Standard of proof is <u>clear and convincing</u>**



## Recommendations

- **Commission prepares and transmits recommendations to Supreme Court for discipline along with record of proceedings.**
- **Special Counsel may also make recommendations**
- **If used, special master recommendations included**
- **Proceedings confidential until recommendations filed**



## Supreme Ct Proceedings

- SC may conduct further proceedings and expand record, RJD 39
- SC may adopt, reject, modify, or remand Commission recommendations
- SC makes final decision, RJD 40
- Decision published unless decide to keep confidential

**Sanction Authority, RJD 35 & 36**

- Supreme Court (Public)
  - Removal
  - Retirement
  - Suspension
  - Disability
  - Public Reprimand or Censure
  - Diversion or Deferred

- Commission (Private)
  - Dismissal
  - Disability
  - Diversion Plan
  - Private Admonishment
  - Private Reprimand
  - Private Censure
  - Stipulation

## Confidentiality

- Confidentiality is set by the Constitution, Art. VI, Sec. 23(3)(g)

o The Disciplinary Commission's examination of misconduct allegations is confidential unless and until it files recommendations with the Colorado Supreme Court.

o While individual investigations are confidential, the Disciplinary Commission can discuss how it operates and how its processes are working.  See, e.g., RJD 6.5(h)

o RJD 6.5(d)(i) authorizes the Commission to make disclosures as needed to fulfill the Commission's mandate.



# Public Discipline Cases

| | Judges Disciplined (6)[1] | | Known Individual Recipients of Misconduct (14)[2] | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| Male | 3 | 50% | 1 | 7% |
| Female | 3 | 50% | 13 | 93% |
| | | | | |
| White | 5 | 83% | 11 ([3]) | 78% |
| BIPOC | 1 ([4]) | 7% | 3 | 12% |

[1] 2014 to Present

[2] Litigants, attorneys, other groups affected cannot be quantified and are excluded, only a person that was the individual target of the misconduct is included.

[3] Listed as white if race/ethnicity not known.

[4] Discipline process was after Judge had already resigned facing criminal proceedings.

## Types of Conduct Resulting in Public Discipline

- Behavior Abusive of Others, Usually Discriminatory—four cases
- Criminal Proceedings/Convictions—three cases
  - Felony is mandatory removal, RJD 36.5
- Multiple Incidents—all but one case
  - Aggravating components in single incident case

Can't risk angering him, clients in precarious positions

Uncomfortable appearing in front of him

Terrified

Afraid would get fired if told administration about this

Judge might retaliate and felt job was on the line

Tears

Threatened

Felt angry

Wanted to get out of the division

Appalled

Did not want to report to administration

Afraid of retaliation

Sweating, nervous, terrified, wanted to get out

Made [me] feel nauseated and scared

Scared to death might get fired, then angry

Not want to tell anyone just wait for a transfer

A stab through my heart each time

Uncomfortable

Shocked

Had to put up with it, could not hurt my clients

While Colorado's challenges are unique, they are not unusual nor are they as serious as other jurisdictions







# Impediments and Recommendations

*under current structure

## Intake and Screening Phase



- 2010 Disclosure and File Access Agreement
  - Compliance and Enforcement Issues
- SB 22-201 Codified Duty to Document and Disclose
- No Enforcement Mechanism Yet
  - Examples
  - Need conflict free mechanism

## Complaint Investigation Phase



- Resourcing Investigations
  - Conflicted Funding and Loaned Personnel
  - SB 22-201 Addressed Funding and Personnel
- Access to Information
  - SB 22-201 Duty to Document and Disclose
  - Subpoena Authority (Rule 22)
    - Need to be Codified, Confirm at All Phases
    - Need Conflict Free Dispute Resolution Mechanism (*See* Rules 4(e), 18.5(b))

## Formal Proceedings Phase



- Rulemaking
  - Challenges experienced
  - Place with Discipline Commission, Public Process
    - Colorado Performance Commissions hold this authority, C.R.S. 13-5.5-106
    - 20 other states assign to discipline commission
- Decision-Maker Disqualification Standards
  - Who are Decision Makers in Judicial Discipline?
  - Current rules patchwork of ambiguity, inconsistency, and uncertainty
  - Recommend Codify simple, straightforward and uniform disqualification standard, Code Rule 2.11
    - Legislative authority to do so

## Formal Proceedings Phase



- Special Masters
  - Ad hoc selection and appointment now
  - Recommend establishing a pool of potential masters
    - Gain subject matter expertise
    - Gain institutional knowledge with standards
    - Insulate process from influence
- Commission Member Terms
  - Four-year terms now
  - Longer terms provide greater subject matter expertise and institutional experience
  - Longer terms insulate from influence
  - District Court Judge term is four years, Appellate Court Judge Term is ten years

## Final Decision Phase



- Final Decision-Maker Conflicts
  - Decisional Conflicts, Code Rules 2.9, 2.11
  - Administrative/Corporate Role Conflicts, Rules 2.9, 2.11
- Model Options
  - Illinois, standing conflict free, multi-perspective final decision-making entity
  - Pennsylvania, pro tem supreme court
  - New York variation, recommendation of Commission is final unless overturned by quorum of conflict free members of highest court

## Overall

- Transparency
  - Initial evaluations and dismissals confidential in nearly every state (Arizona has unique approach)
  - Dividing line is whether full confidentiality ends before or after the "trial" (formal proceedings)
    - Recall, trial can only occur after charges already established by preponderance of evidence
  - 35 states make fact-finding hearing public
  - 15 states keep fact-finding hearing confidential
  - Colorado is one of the 15 states
  - Many policy pros and cons as to any line for confidentiality



# References

- ABA Model Rules of Judicial Disciplinary Enforcement, www.americanbar.org/groups/professional_responsibility/model_rules_judicial_disciplinary_enforcement/contents/

- Handbook for Members of Judicial Conduct Commissions, NCSC Center for Judicial Ethics

- Reuters, Teflon Robe Series, www.reuters.com/investigates/section/usa-judges/

- www.washingtonpost.com/politics/2022/03/17/court-workers-harassment-discrimination/

- IAALS Judicial Discipline Recommendations, 18-IAALS-104 Judicial Discipline Report R2.indd (du.edu)

- NCSC Center for Judicial Ethics report of confidentiality standards, Confidentiality_table.pdf (ncsc.org)

# Appendix 27(s)(i)(9)(d)

# Colo. Comm'n. on Jud. Discipline, Report of the Colorado Commission on Judicial Discipline to the Interim Committee on Judicial Discipline of the Colorado General Assembly: June 14, 2022 Initial Hearing, June 14, 2022;

# Report of the Colorado Commission on Judicial Discipline to the Interim Committee on Judicial Discipline of the Colorado General Assembly

# June 14, 2022 Initial Hearing

**PURPOSE OF JUDICIAL ETHICS OVERSIGHT**

The Center for Judicial Ethics was created by the National Center for State Courts as the leading source of information for judicial conduct commissions and about commissions.  The Center for Judicial Ethics has explained the purpose of the conduct commissions as follows:

> Every state has a judicial discipline system that reviews, investigates, prosecutes, and adjudicates complaints about judges. The primary purpose of these systems is not to punish judges but to maintain and restore public confidence in the integrity, independence, and impartiality of judges and the judicial system by:
> - Enforcing rigorous standards of judicial conduct on and off the bench,
> - Reassuring the public that the judiciary does not tolerate or condone judicial misconduct but recognizes and condemns it,
> - Deterring further misconduct by the respondent judge,
> - Deterring similar misconduct by other judges,
> - Impressing upon judges the significance of misconduct,
> - Making the public aware of what constitutes proper and improper judicial conduct,
> - Protecting judges from false or unfounded accusations, and
> - Maintaining the necessary balance between accountability and judicial independence.
>
> To accomplish those goals, judicial conduct commissions:
> - Assist judges who have committed minor ethical violations change their behavior,
> - Impose or recommend a public sanction when warranted, and
> - Secure the removal of a judge from office when necessary.

*Handbook for Members of Judicial Conduct Commissions* at 4.

Colorado's own Institute for the Advancement of the American Legal System ("IAALS") has explained the history and role of judicial conduct commissions as follows:

2

> Until the 1960s, the formal methods for addressing allegations of state judges' misconduct, such as legislative impeachment or recall elections, were cumbersome and time-consuming. These shortcomings were highlighted when scandals rocked several state judiciaries,[1] revealing a need for more efficient disciplinary procedures. Starting in 1960, California and eventually all states established variously named bodies (this Report uses the generic term "commission") to investigate allegations of judicial misconduct or disability and—where appropriate—prosecute, adjudicate, and either recommend discipline to the state's highest court or impose it, subject to appellate review.[2]
>
> Effective judicial discipline is an important part of a trusted and trustworthy court system. The public must know that judicial ethics and violations of the Code of Judicial Conduct are taken seriously. Absent that assurance, the system appears self-serving, protectionist, and even potentially corrupt. And it is not just the reality of the existence of effective systems that matters; it is also the appearance. A wholly effective system with no transparency and no public confidence will not suffice.

*Recommendations for Judicial Discipline Systems* at 1, IAALS (July 2018).

The director of the Center for Judicial Ethics, Cynthia Gray, has further explained,

> To maintain and restore public confidence in the integrity, independence, and impartiality of their judiciary, each of the fifty states, beginning with California in 1960, has established a judicial conduct organization charged with investigating and prosecuting complaints against judicial officers. Although punishment plays an "undeniable role" in judicial discipline (*Johnstone*, 2000, at 1234), protecting the public, not sanctioning judges, is the primary purpose of the judicial conduct commissions.
>
>> One way to protect the public is to remove the offending judge from office. . . . [A]nother way to protect the public is to keep it informed of judicial transgressions and their consequences, so that it knows that its government actively investigates allegations of judicial misconduct and takes appropriate action when these allegations are proved. Judicial discipline thus protects the public by fostering public confidence in the integrity of a self-policing judicial system (*Johnstone*, at 1234).
>
> In addition, sanctions deter further misconduct by the disciplined judge and other judges.

Gray, Cynthia, *How Judicial Conduct Commission Work*, 28 Justice System Journal 3 (2007).

The Colorado Supreme Court has adopted the following descriptions of the role of the Colorado Commission on Judicial Discipline (the "Discipline Commission"):

3

> The [Discipline] Commission is responsible for maintaining the integrity and independence of the judiciary.[1]
>
> …
>
> The Constitutional mandate of the [Discipline] Commission is to protect the public from improper conduct of judges; preserve the integrity of the judicial process; maintain public confidence in the judiciary; create greater awareness of proper judicial behavior on the part of the judiciary and the public; and provide for the fair and expeditious disposition of complaints of judicial misconduct or judicial disabilities.[2]

Credible systems for the oversight of judicial ethics allow the judicial branch of government to maintain its special position of trust in our society so that it may maintain decisional independence.  Without a credible system that ensures ethical behavior by judges, we run a high risk of losing the benefits of a judiciary whose decisions are insulated from popular politics, a judiciary where all stand equal before the law with cases decided on merit rather than influence.

**COLORADO'S ADOPTION OF A JUDIICAL DISCIPLINE COMMISSION**

In the middle of the 20th Century, Colorado had a highly politicized judicial system that relied on partisan elections to select judges.  The system had frequent problems with incompetent, corrupt, and biased judges.  In 1962, the Colorado General Assembly referred a constitutional amendment to reform the structure of Colorado's judiciary to the voters.  The measure passed with an overwhelming majority.

In 1966, the League of Women Voters used Colorado's initiative process to present a further amendment to Colorado voters.  With this amendment, Colorado would adopt a merit selection system for selecting judges (commonly called the "Missouri Plan") and for overseeing judges. This proposal was known as "Amendment 3."  The voters of Colorado adopted Amendment 3 through the initiative process.

As part of court reform, Amendment 3 created the Colorado Commission on Judicial Discipline (the "Discipline Commission").  Under the thinking of the era, Amendment 3's design for oversight of judicial ethics was progressive.  Instead of leaving judicial ethics wholly to the judiciary for opaque self-policing, Amendment 3 created an independent Discipline Commission. The Discipline Commission was created to have multiple perspectives and voices in overseeing judicial ethics, with representatives of the judiciary, the bar, and non-lawyer citizens.  As a further check, Amendment 3 diversified the appointment authority for commission membership. Before that era, judicial ethics was usually left exclusively to judges with no outside oversight and little accountability other than the election of judges.

Once adopted, Amendment 3 became Article VI, § 23(3) of the Colorado Constitution.  It has remained essentially unchanged for 65 years.

---

[1] Colorado Rules of Judicial Discipline, Rule 3.5(a).

[2] Colorado Rules of Judicial Discipline, Rule 1(b) (emphasis added).

4

**SCOPE OF AUTHORITY OF COLORADO'S DISCIPLINE COMMISSION**

The Discipline Commission's general authority and function are defined by Article VI, § 23 of the Colorado Constitution. The Discipline Commission has authority over justices and judges "of any court of record of this state." This has been interpreted to mean:

- Judges of the county court,
- Judges of the district court,
- Judges of the court of appeals, and
- Justices of the state supreme court.

The Discipline Commission does not have authority over federal judges sitting in Colorado, magistrate judges, municipal court judges, or non-judge personnel of the Colorado Judicial Department.

Colorado's Discipline Commission is to take actions within its powers regarding a judge or justice for:

- Willful misconduct in office,
- Willful or persistent failure(s) to perform duties,
- Intemperance, and
- Violation(s) of the Colorado Code of Judicial Conduct.

Within the context of its disciplinary powers, [3] the Discipline Commission is further authorized to:

- Conduct investigations,
- Order informal remedial action,
- Order a formal hearing before the Discipline Commission,
- Call for appointment of a panel of three special masters (who must be qualified judges or justices) to hold a hearing and issue a report to the Discipline Commission, or
- Recommend public discipline to the Colorado Supreme Court.

The Discipline Commission has direct authority to impose *private* discipline on a judge. However, with respect to *public* discipline, the Discipline Commission only has authority to make recommendations to the Colorado Supreme Court. Under the current system, only the justices of the Colorado Supreme Court have authority to impose *public* discipline on a justice or judge such as a public censure or removal from office.

The Colorado Constitution makes no provision for deciding judicial discipline cases when the members of the Colorado Supreme Court have conflicts of interest that would otherwise disqualify them for sitting on the case under the Colorado Code of Judicial Conduct.

---

[3] The Discipline Commission also has authority to take action in cases of judicial disability. The Discipline Commission's role in disability proceedings is not further discussed in this report as it is not central to the current discussion.

5

**THE CASELOAD—ALLEGATIONS, JUDGES, AND VICTIMS**

Pursuant to the Colorado Rules of Judicial Discipline ("Colo. RJD"), the Discipline Commission publishes an annual report with a detailed breakdown of the caseload it handles. These annual reports can be reviewed at http://www.coloradojudicialdiscipline.com/Annual_reports.html

The Discipline Commission receives allegations of misconduct by judges and requests to investigate possible misconduct. The Colo. RJD refer to these collectively as "Requests for Evaluation" or "RFEs." The Discipline Commission receives approximately 200[4] written RFEs alleging judicial misconduct per year.

A large majority of the allegations of misconduct received by the Discipline Commission are facially invalid. The largest portion of the allegations are simply complaints of disagreement with a ruling entered by a judge filed by a disgruntled litigant. The Discipline Commission does not act as an appellate court. The Discipline Commission also receives a large number of allegations of misconduct against professionals outside its authority, such as federal judges, magistrate judges, judicial administrative personnel, and personnel from other branches of government.

Over 90% of the allegations of misconduct received by the Discipline Commission are outside of the Commission's jurisdiction or don't meet the criteria for further action and do not progress beyond the initial "evaluation" stage, the initial screening stage assigned to the Discipline Commission. This ratio is consistent with judicial conduct commissions across the United States.

Of the misconduct allegations received by the Discipline Commission annually, approximately 70 require the Commission to undertake factual investigation, to develop a factual record through gathering and reviewing evidence.

In many cases that involve actual misconduct, the judge acknowledges error and the discipline matter is resolved by agreement. In the majority of cases involving actual misconduct, the judge's misconduct can be addressed and corrected, often through private discipline. In the most serious cases, the discipline will be public discipline.

In the most serious cases when an agreement cannot be reached between the responding judge and the Discipline Commission, the Commission files "formal proceedings." For the understanding of most people, this is essentially a trial.

As of the date of this writing, Colorado has had 6 instances of public discipline since 2014. Half of these cases have involved male judges, half have involved female judges. Five of the six have involved judges that were understood to be members of the racial/ethnic majority.

---

[4] The RFE's for 2022 are currently on a pace to increase by approximately 25% to the 250 level.

6



Cases involving public discipline are more likely than other cases to involve judicial misconduct that has one or more victims. The six cases of public discipline involved charges of misconduct victimizing 14 individuals.[5] The victims of this judicial misconduct were overwhelmingly female at 93%. Approximately 12% of these individual victims were known to be diverse members of the community and that diversity was related to the misconduct.[6] Most of these victims worked within the Judicial Department. Some were judge colleagues/peers of the responding judge, but most were non-judge personnel and at a lower level in the power structure.

Victims of serious judicial misconduct have described their experiences as follows:

- From different victims: **Terrified, threatened, tears, appalled, angry, shocked, uncomfortable, nauseated, scared, in a daze, humiliating incident, hoped would never resurface**
- **Afraid I would get fired if I told administration about this**
- **I can't risk angering him, my clients are in precarious positions**
- **The judge might retaliate, and I felt my job was on the line**
- **I wanted to get out of the division**
- **I did not want to report to administration**
- **I was sweating, nervous, terrified, wanted to get out**
- **Scared to death I might get fired, then angry**
- **I did not want to tell anyone, just wait for a transfer**
- **A stab through my heart each time**

---

[5] After discipline of a judge is made public the Discipline Commission will often receive reports of other instances of misconduct involving other victims. The figures reported here are limited to the victims involved in the charged conduct. Later identified misconduct and victims are not included in these figures as these alleged instances were not litigated in these cases.

[6] The reported figures are limited to individually involved victims and do not attempt to quantify those adversely affected by misconduct involving groups, whether groups of litigants or segments of society.

- **I had to put up with it, I could not hurt my clients**
- **I was uncomfortable appearing in front of him**
- **I was horrified by being told [xxx] by someone I trusted as a professional mentor.**
- **Removed me from the equation altogether, erased my agency, ignored the power dynamics at play, convinced myself that reporting would prove futile**

**HOW DOES THE DISCIPLINE PROCESS WORK?**

If one is familiar with the literature in judicial ethics, Colorado has a "two-tiered unified system." Colorado's system is "unified" rather than "bifurcated" because both the investigative and the adjudicative functions are combined in the Discipline Commission. The system is "two-tiered" because the Colorado Supreme Court, rather than the Discipline Commission, holds the authority to make the final discipline decisions and make final determinations of fact. This is not an uncommon mid-twentieth century model.

In Colorado, as in many states, the Discipline Commission acts largely as a form of grand jury. In general terms for the most typical serious cases, the Discipline Commission receives the allegation of misconduct, screens it, develops evidence, decides if a formal complaint should be opened, gets the position of the responding judge to the allegations, reviews more evidence, decides if the case should go to trial, and, after trial, recommends a sanction to the Colorado Supreme Court. The Colorado Supreme Court then reviews the record of prior proceedings, decides if further evidentiary hearings should be conducted, hears arguments, and decides whether a sanction should be imposed and, if imposed, what that sanction should be.

The Discipline Commission breaks this process down into 5 phases.



8

 **Intake and Screening**  In this initial phase, the Discipline Commission receives the allegation of judicial misconduct, the RFE.  Under Colo. RJD 13, it performs a screening process.  This process is designed, in part, to dispense with facially invalid and frivolous complaints as quickly as possible.  If an allegation of misconduct is dismissed at this stage, the judge at issue is not even told of the allegation to avoid unnecessarily creating potential conflicts of interest.

The Discipline Commission is directed that it "shall" dismiss an allegation of misconduct at this stage immediately if the allegation has no "reasonable basis."  Colo. RJD 13(c).

 **Complaint Investigation**  If, and only if, an allegation of judicial misconduct is found to have a "reasonable basis," the Discipline Commission is authorized to characterize the allegation as a "complaint" under Colo. RJD 14.  This decision, in turn, triggers the formal "investigation" of the allegation by the Commission (as opposed to the "evaluation" of an allegation in the Intake and Screening phase).  This Complaint Investigation is the second phase of Colorado's judicial discipline process.

The Discipline Commission sends to the accused judge a formal notice of the allegations and decision to investigate under Colo. RJD 14(a).  The Discipline Commission also pursues its investigation of the allegations, sometimes through the use of professional investigators and sometimes involving an attorney[7] for assistance known as "special counsel."  The Discipline Commission has the authority to recommend to the Supreme Court an immediate temporary suspension of the judge at this phase or pursue expedited proceedings when circumstances warrant.

As suggested, the Discipline Commission's primary role during the Compliant Investigation phase is to investigate the facts and gather evidence.  While Colo. RJD 22 provides the Discipline Commission with subpoena power (again, much like a grand jury), the Colorado Judiciary has recently taken the position that the Discipline Commission does not hold subpoena power or any other fact gathering authority at this phase.  Instead, the Colorado Judiciary has recently begun asserting that the Discipline Commission holds no authority to compel production of evidence.[8]

A case may advance out of this investigative phase and into the third phase if and only if the Discipline Commission finds that the available evidence proves the misconduct by a "preponderance of the evidence."  This is the familiar burden of proof applied by juries in civil trials such as personal injury cases and contract disputes.

---

[7]  Traditionally, these personnel have been provided by the Supreme Court's Office of Attorney Regulation Counsel.

[8] The Colorado Judiciary has only recently asserted that the subpoena power under the rules arises only after formal proceedings have been filed.  Separately, the Colorado Judiciary has asserted that the Discipline Commission is not a party to the formal proceedings.  Thus, whether they acknowledge that the Discipline Commission ever holds subpoena power is unclear.

 **Formal Proceedings**  This third phase is the equivalent of the trial for judicial misconduct.  Unlike a civil case in which a plaintiff needs only a good faith basis to file a case or a criminal case in which the People only need probable cause to file a criminal charge, formal proceedings in judicial discipline may only be filed if the charge has already been established by a preponderance of the evidence.  Thus, a discipline trial cannot even be scheduled until after the case has been proven by a preponderance of evidence.  This process is governed by Part C of the Colo. RJD.

Under Colorado's Constitution, the Discipline Commission has two choices in pursuing formal proceedings.  The Discipline Commission may hold the hearing itself or it may have the hearing held before three special masters who are judges.  Colo. Const. Art. VI, §23(3)(e).  However, when the Colorado Supreme Court adopted the Rules of Judicial Discipline, it omitted rules to govern formal proceedings held by the Discipline Commission.  The rules as designed by the Supreme Court only provide for judges to conduct constitutional formal proceedings.

The charges of misconduct are brought in formal proceedings in the name of the People of Colorado, just like a criminal case.  The People are represented by "special counsel" rather than a district attorney.  The special counsel is appointed by the Discipline Commission.  At the request of the Discipline Commission, the Supreme Court appoints a panel of three special masters to hear the formal proceedings.  The rules do not make clear who selects the judges that serve as the special masters.  Traditionally, the Supreme Court has selected the judges who will serve as special masters.

The standard of proof at formal proceedings requires the misconduct charges to be proven by "clear and convincing evidence."  If one or more allegations of misconduct are proven, the special masters, if used, enter formal findings and make recommendations to the Discipline Commission for sanction.  The special counsel that handled the formal proceedings also makes recommendations to the Discipline Commission for sanction.

 **Recommendations**  After formal proceedings, the Discipline Commission receives the record of the proceedings, the findings following trial, the recommendations of the special masters if special masters were used, and the recommendations of the special counsel.  The Discipline Commission then reviews these materials and formulates its recommendations for the Colorado Supreme Court.  *See* Colo. Const. Art. VI, §23(e).

The Discipline Commission files its recommendations with the Colorado Supreme Court accompanied by the record of the proceedings.

All of the disciplinary proceedings have been confidential under Colorado's Constitution until this phase.  The filing of the recommendations is not ordinarily confidential (though the Supreme Court appears to have the authority to make all or portions of the filings confidential).  The filing of the record with the recommendations does not deprive any confidential materials of their confidential status.  Therefore, any privileged or confidential materials examined in the disciplinary process retain their confidential or privileged status.  *See* Colo. Const. Art. VI,

§23(3)(g).  The recently enacted statute also confirms these continuing privilege/confidentially protections at C.R.S. § 13-5.3-106(6)(e).

 **Supreme Court Final Decision Proceedings**  The fifth and final phase of judicial discipline proceedings is held by the Colorado Supreme Court under Colo. RJD 39. The Supreme Court receives the record and recommendations from the Discipline Commission.  The Supreme Court may then conduct further proceedings as it deems fit, including gathering more evidence, before making a final decision on discipline, whether it should be imposed and what sanction to impose if any is warranted.

The path of an allegation of judicial misconduct through Colorado's current system of judicial discipline is depicted below.



## MEMBERSHP OF THE DISCIPLINE COMMISSION

The membership of Colorado's Discipline Commission is defined in our Constitution.  The commissioners are comprised of 10 uncompensated members.  The judiciary holds 4 positions, 2 district court judges and 2 county court judges.  These judge members are all appointed by the Chief Justice of the Colorado Supreme Court.  Of the remaining positions, 2 are required to be attorneys and 4 are non-attorney citizens.  The attorney and lay members of the Discipline Commission are selected by the Governor and confirmed by the Senate.  All Commissioners serve on a volunteer basis without compensation (other than necessary reimbursement for travel expenses incurred in performance of the Commissioners' duties).

The current members of the Discipline Commission are as follows:

| **Judges** | **Attorneys** | **Citizens** |
|---|---|---|
| Hon. Rachel Fresquez | Elizabeth Espinosa Krupa | Jim Carpenter |
| Hon. Sara Garrido | Mindy Sooter | Bruce Casias |
| Hon. Bonnie McLean | | Yolonda Lyons |
| Hon. David Prince | | Drucilla Pugh |

Colorado has followed a tradition of ensuring diversity of perspective and membership on the Discipline Commission.  The current membership is 70% female.  Of the judge members, 75% are female.  Half of the members are racially or ethnically diverse.  Only 20% of the members are majority males.  This compares to the Colorado population which is evenly divided by gender and is 67% white.  This compares to the Colorado judiciary which is 84% white and 59% male.

The special masters that preside over formal proceedings are required to be judges or justices but may include retired judges or justices.

**CURRENT CHALLENGES TO COLORADO'S SYSTEM OF JUDICIAL DISCIPLINE**

In February of 2021, the press reported allegations that the Colorado Judiciary had suppressed complaints of misconduct against judges.  The press reported allegations that the Colorado Judiciary had bought the silence of witnesses to judicial misconduct allegations.  The events and revelations that followed have illustrated structural impediments to the Discipline Commission fulfilling its Constitutional mandate.

The challenges facing Colorado's judicial discipline system are not unique to Colorado.  Other jurisdictions have faced analogous problems in recent years.  A series of articles by Reuters addressed similar issues and can be found at https://www.reuters.com/investigates/section/usa-judges/  The federal judiciary of the United States is facing analogous structural challenges.  *See* https://www.washingtonpost.com/politics/2022/05/16/judges-accused-discrimination-bullying/. Pennsylvania undertook its own examination of its system of judicial discipline in recent years. *See* https://www.pmconline.org/resources/2017-report-recommendations-improving-pennsylvanias-judicial-discipline-system

Colorado also is not alone in conducting the kind of review this interim committee is undertaking.  Montana recently enacted legislation, HJ40, creating an interim committee to study and audit its judicial discipline process.  *See* https://montanafreepress.org/2021/09/14/montana-republicans-question-judges-about-ethics/.  The NCSC's Center for Judicial Ethics reports that California is also pursuing a process for reviewing its judicial discipline system after an audit found shortcomings.  *See generally* https://www.courthousenews.com/california-auditor-calls-judicial-misconduct-probes-weak/ (discussing the audit results).  And, as the Washington Post article cited above discuses, the U.S. Congress is examining the system of judicial discipline in the federal court system.

While the factual situation bringing these issues to the forefront may be unique to Colorado, the issues and the need to update antiquated systems of judicial discipline are arising to one degree or another in jurisdictions across the country.

12

This Report will address the impediments to effective judicial discipline illustrated recently in Colorado's system using the five-phase structure discussed above and then discuss system-wide impediments.

 **<u>Intake and Screening</u>**  The Colorado Constitution created a single, multi-perspective, citizen-involved entity to examine allegations of judicial misconduct. That entity is the Discipline Commission.  However, the Discipline Commission cannot examine allegations of judicial misconduct that it does not know about.  The events of 2021-22 revealed that the Colorado Judiciary has not been disclosing some allegations of serious judicial misconduct.

The Colo. RJD assign to the Discipline Commission the task of screening for merit allegations of judicial misconduct.  *See* Colo. RJD 13.  The Discipline Commission is tasked with dismissing immediately misconduct allegations that are frivolous or otherwise unsupportable.  *See id.*  The Colorado Judiciary is not granted screening authority with respect to allegations of judicial misconduct.

In recognition of the Discipline Commission's screening and examination roles, the Discipline Commission entered a written contract with the Colorado Judiciary dated February 5, 2010.  The 2010 agreement is still in effect today.  The 2010 agreement requires the Colorado Judiciary to report to the Discipline Commission allegations of judicial misconduct that it receives.  If the Colorado Judiciary conducts a "preliminary investigation" of an allegation of judicial misconduct, the 2010 agreement requires it to provide to the Discipline Commission "all" of the "investigatory notes and findings that address the alleged judicial misconduct."  These duties of disclosure attach regardless of the merits of the allegation.

Until 2021, the Discipline Commission believed the Colorado Judiciary was complying with the 2010 agreement and relied on that compliance.  Events of 2021-22 have revealed that the Colorado Judiciary has not been complying with the 2010 agreement.  The Colorado Judiciary has not disclosed to the Discipline Commission allegations of judicial misconduct as well as the results of their investigations of such allegations in some cases.  Nondisclosure of judicial misconduct allegations and nondisclosure of file materials relevant to such allegations represent serious impediments to fulfillment of the Commission's mandate to examine such allegations for potential merit.

When the Discipline Commission asked the Colorado Judiciary in early 2021 what policies had been adopted to implement the obligations stated in the 2010 agreement, the Colorado Judiciary's response did not identify any comprehensive implementation efforts.  Moreover, the Colorado Judiciary's responses have indicated that it has entered one or more contracts with third parties that purported to block compliance with the disclosure requirements the Colorado Judiciary defined for itself in the 2010 agreement.

When the Discipline Commission learned that the 2010 contract obligations had not been honored, the Commission made requests for compliance.  The Discipline Commission was unable to obtain compliance.  The Colorado Judiciary declined to make the affirmative disclosures required by the 2010 agreement and asserted that it would only respond to specific questions.  When the Discipline Commission posed those specific questions, the Colorado Judiciary would answer some but not others.  The Colorado Judiciary would provide only limited information and few if any supporting documents.  In one example, the Colorado Judiciary

13

declined for several months even to identify the judge that was the subject of a publicly reported allegation of misconduct, also declining for nearly one year to identify the critical witnesses to the events at issue.

Faced with these challenges, the Discipline Commission concluded that it had no immediately available and practical means of enforcing the contractual disclosure obligations.

Newly enacted C.R.S. §13-5.3-106 addresses this impediment of nondisclosure by codifying the Colorado Judiciary's duty to disclose allegations of judicial misconduct to the Discipline Commission. *However,* the statute does not identify an enforcement mechanism in the event non-compliance is discovered. Thus, the practical situation may not have materially changed from 2021.

 **Complaint Investigation** As noted above, in this phase the Discipline Commission acts like a grand jury, investigating and gathering information. The Discipline Commission has been reliant on the Colorado Judiciary's cooperation in providing it with access to file materials, personnel, and resources to conduct these investigations. The events of 2021-22 revealed that this access to information and resources is dependent on the level of cooperation provided by leadership of the Colorado Judiciary.

Resourcing Investigations

In the past, the Discipline Commission has been primarily reliant on personnel loaned by the Colorado Judiciary (specifically, the Supreme Court's Office of Attorney Regulation Counsel) to conduct these investigations. In 2021-22, the leadership of the Colorado Judiciary acted to impede the Discipline Commission's access to conflict-free personnel and resources. The leadership asserted the authority to control the scope of the Discipline Commission's investigatory assignments to special counsel and the authority to control the Discipline Commission's retention of special counsel.

The leadership of the Colorado Judiciary also asserted the authority to block funding for investigatory special counsel. The Discipline Commission's primary objection to this asserted authority was that any financial oversight should be through a conflict-free decision-maker. The Discipline Commission did not, and does not, object to oversight of its finances but objected to having that financial oversight exercised by those involved in the conduct to be examined.

Additionally, the leadership of the Colorado Judiciary asserted that a number of unwritten and evolving rules would be used to limit and constrain the financing of the investigation at issue. The Discipline Commission objected strongly to use of unwritten and undisclosed "rules" to constrain an ongoing investigation. Again, these were asserted to provide control of the investigative resources to conflicted individuals and even individuals that had asserted publicly that they had disqualified themselves from participation in the relevant matters.

Newly enacted C.R.S. §§13-5.3-102 through 104 address these personnel and resource control impediments by codifying the Discipline Commission's prior authority to determine the scope of special counsel engagements, providing conflict-free funding to the Commission, and authorizing the Discipline Commission to hire its own personnel to conduct investigations.

14

Accessing Information/Evidence

A critical part of the complaint investigation phase is the Discipline Commission's ability to access information and files held by the Colorado Judiciary.  A large portion of the misconduct allegations investigated by the Discipline Commission involve facts and evidence held by the Colorado Judiciary.  Upon request, the Discipline Commission enjoyed open and free access to relevant files and information held by the Colorado Judiciary until 2021.  In the past, the Discipline Commission received this open access upon request in hundreds of examinations conducted in recent years.  As indicated, this open access to judicial records is consistent with the parties' 2010 agreement.

In 2021, the leadership of the Colorado Judiciary ended this open access to its records for some, but not all, discipline investigations.  As discussed in relation to the screening phase, the Discipline Commission did not receive information and files when requested on some, but not all, misconduct allegations.  Access to information and file materials has continued unimpeded on some analogous misconduct allegations.  This open access has continued for those cases that do not involve examining the conduct of individuals that also play a role in deciding how much information access will be permitted.

This inconsistency of information access itself illustrates a critical problem in the structure of judicial discipline.  If information access is not reliable and predictable but, instead, is subject to subjective standards and decision-making involving those whose conduct is at issue, the investigatory system is neither effective nor credible.

As noted above, the newly enacted statute codifies a duty of disclosure owed by the Colorado Judiciary relating to allegations of judicial misconduct.  The duty as stated is uniform in application to misconduct allegations made as to all Colorado judges regardless of position or stature.  But, as also noted, no enforcement mechanism has yet been defined.

Subpoena Power

Prior to 2021, the Discipline Commission enjoyed a remarkably high level of cooperation and candor in its affirmative information gathering efforts.  In the Discipline Commission's current institutional memory, it had not had a judge being investigated or third party record holder decline a request for information.  As noted, this changed in 2021 for a small category of matters.  An essential tool for an investigative agency is the subpoena power, the power to compel production of evidence when the evidence is not forthcoming on a voluntary basis.  The events of 2021 required the Discipline Commission to exercise subpoena power for the first time that can be identified in its history.

Under Colo. RJD 22, the Discipline Commission is granted subpoena power.  However, the rules do not provide a clear conflict free enforcement mechanism, particularly in the circumstance where the leadership of the Colorado Judiciary would be the defendant in an enforcement action—either as a party being investigated or the party declining to comply with the subpoena.

In 2021, the attorneys for the Colorado Judiciary took the position that the Discipline Commission has no subpoena authority in the investigation phase of judicial discipline.  The Colorado Judiciary further took the position that any dispute over the subpoena power would be addressed in an original proceeding held before the Colorado Supreme Court, the ultimate administrative decision-makers that originally invited, and later objected to, the subpoena that

15

would be at issue.  The Colorado Judiciary later expanded this asserted limitation of the subpoena power to all investigations of judicial misconduct.

**Recommendation:**  The Discipline Commission recommends that the General Assembly codify a subpoena power commensurate with other investigative entities and grand juries.  A conflict free enforcement mechanism should also be established.

**Formal Proceedings**  Rulemaking Authority.  The formal proceedings phase illustrates a structural problem that exists system wide for judicial discipline in Colorado, rulemaking authority.  The Colorado Constitution grants the Discipline Commission the discretionary authority to select between two mechanisms for formal proceedings, the Commission may hold the hearing itself or may have three special masters appointed to hold the hearing.  The Colorado Rules of Judicial Discipline adopted by the Colorado Supreme Court, however, make no provision for hearings before the Discipline Commission itself and appear to purport to eliminate this constitutional option.  *See* Colo. RJD 18.5(a) (phrasing use of special masters appointed by the Supreme Court as "shall" for this constitutionally optional mechanism of pursuing formal proceedings creating, at a minimum, ambiguity).

According to the NCSC's Center for Judicial Ethics, 20 jurisdictions in the United States place rulemaking authority with the entity that handles judicial ethics oversight, known in Colorado as the Discipline Commission.  An analogous entity in Colorado, the Commissions on Judicial Performance hold rulemaking authority for their proceedings.

Under the Colorado Constitution, the Colorado Supreme Court is granted the authority to adopt rules for judicial discipline proceedings.  The events of 2021 illustrated the problems that result when a conflicted entity holds rulemaking authority over the process for accountability and holds the authority to interpret those rules.

One of the challenges the Discipline Commission encountered with the current rulemaking system is a willingness by leadership of the Colorado Judiciary to set aside rules as written, presumably because of their authority to change or re-interpret those rules.  For example, Colo. RJD 2(aa) unequivocally grants the Discipline Commission the authority to determine the scope of assignments given to its special counsel.  However, the leadership of the Colorado Judiciary asserted in 2021-22 that it held the authority to determine the scope of special counsel assignments on certain matters.  Additionally, Colo. RJD 3(d) gives the Executive Director (with oversight by the Discipline Commission) the authority to determine the Commission's budget and administer the funds.  However, leadership of the Colorado Judiciary persistently asserted in 2021-22 that unwritten rules restrict and override this written grant of budget authority, at least in relation to certain investigations.

**Recommendation:**  The Discipline Commission recommends that the example of the Colorado Commissions on Judicial Performance and 20 other states be followed and rulemaking authority be placed with the Discipline Commission.  This will require amendment of Art. VI, §23(3)(h) of the Colorado Constitution.

16

Special Masters

All formal proceedings to date have been conducted through the panel of three special masters process.  The special masters are required to be judges.  The special masters are currently selected on an ad hoc bases when needed.  As a result, special masters are unlikely to have experience with or be familiar with the unique discipline procedures and decisional standards.

**Recommendation:**  The Discipline Commission recommends that a small pool of potential special masters, such as six, be established.  When an individual panel is needed, the appointment would then be made from this pool, selecting conflict free special masters that are available on the short timelines contemplated under the Colo. RJD.  The potential special masters would serve for a minimum number of years and would gain expertise in the proceedings and the decisional standards.  This could be accomplished by rulemaking authority rather than by statute.

Similarly, the Discipline Commission recommends that the four-year terms of commission members be extended to provide for greater institutional knowledge and greater insulation from political influence.  For example, district court judges serve six-year terms while appellate judges serve ten-year terms for these same reasons.  Members of the nominating commissions serve six-year terms.  The terms of commission members should be extended to a similar range, maintaining staggered terms.  The length of the membership terms is set in the Constitution and, therefore, an amendment to the Constitution would be required to implement this reform.

 **Recommendations and Final Decision Phases**  Among the significant impediments to credible judicial discipline illustrated by the events of 2021-22 is that Colorado's Constitution fails to provide for the functioning of a system when the members of the Colorado Supreme Court have conflicts that would ordinarily prevent their handling of a matter under the Colorado Code of Judicial Conduct (the "Code").

Conflicted Final Decision-Maker

**Personal Involvement or Decisional Conflicts**

As noted, under the current judicial discipline system in Colorado, the Colorado Supreme Court makes the final decisions on serious judicial discipline cases.  The Constitution and the Colo. RJD require an individual justice to recuse on a discipline case involving the justice's own possible sanction.  *See* Art. VI, §23(3)(h); Colo. RJD 9.  However, in 2021, allegations of misconduct arose that involved conduct of the Supreme Court as a whole, actions taken involving the Court as a whole such that all of its members are important factual witnesses.  Those allegations also involved allegations of individual misconduct instances involving more than one member of the Court.  These are, of course, merely allegations and the current discussion is not addressing whether the allegations have merit but, rather, a credible system for examining the potential merit of those allegations.

17

Additionally, after the allegations of misconduct became public, the Supreme Court then took collective actions in public[9] that would ordinarily raise questions of whether the justices would need to recuse under the Code on a related judicial discipline case.[10]

As the public statements of the Supreme Court raise disqualification issues for the justices as a whole and the current system makes no provision for functioning when the final discipline decision-maker has conflicts, the ability of the current system design to function on the conflict matters is in doubt.  More importantly, the system lacks credibility with the public.

**Administrative Conflicts**

Judicial officers in leadership positions within the judiciary have more extensive administrative roles than the public generally understands.  Justices of the Supreme Court act much like chief executives and a board of directors for a 4,000 personnel entity with an annual budget of over half a billion dollars.  The Colorado Supreme Court has announced in the past that administrative leadership duties for the Judicial Department are handled by the justices as a whole (some collectively and some by portfolio assignment) rather than delegating all these responsibilities to the Chief Justice alone.  *See* https://www.denverpost.com/2020/12/07/audit-colorado-supreme-court-administrators-office/; *and see, e.g.,* www.denverpost.com/2019/07/18/colorado-judicial-department-resignation/ (combining decisional conflicts with administrative conflicts, a Court spokesman was quoted as explaining that all of the justices approved the Masias contract at the center of the 2021 allegations of misconduct).  Thus, in addition to their roles as judges, the justices are at the head of the corporate chain of command in the judiciary.  Most cases involving serious judicial misconduct come before the justices in a corporate administrative or managerial role long before a judicial discipline case can progress to being filed in the Supreme Court.  They may be handling the matters as personnel matters, as docket coverage issues, as loss prevention matters, as contracting matters, or a myriad of other managerial roles.  At times, the justices become personally involved in trying to manage the purely administrative or corporate side of a situation that later develops into a discipline proceeding against another judge.

As a result, in most judicial discipline cases involving serious potential sanction, one or all of the justices has been involved to some degree and has direct knowledge of facts or ex parte exposure to facts or evidence that will be part of the discipline case.  Under Rule 2.11 of the Code, such firsthand knowledge and/or ex parte exposure to evidence would ordinarily require a judge to be disqualified from handling a related case.

As administrative leaders of the Colorado Judiciary, the justices of the Supreme Court must also protect the Judiciary from financial liability and otherwise protect the system-wide interests of the Judiciary.  This creates potential conflicts of interest if the justices are also involved in judicial discipline matters because the financial or other interests of the Judiciary may conflict with the interests of judicial discipline.  The justices can be put in the position of having to decide whether to put ethics or dollars first.  For example, when the Chief Justice stated to the Joint Judiciary Committee SMART hearing that the Judiciary was providing investigators with full access to files and information, the Chief Justice also indicated that a reason for withholding

---

[9] This report does not attempt to discuss any alleged conduct other than the public actions taken by the justices.

[10] See Code Rules 2.9, 2.10, and 2.11 and, by way of examples, the public statements issued by the Colorado Supreme Court on February 4, 2021, February 8, 2021, February 16, 2021, January 25, 2022, and February 7, 2022.

files and information by noting that sharing had to be limited to avoid "subject[ing] the branch … to financial liability."

In oral communications, non-judge leaders with the Colorado Judiciary have also asserted that concerns about the risks of incurring financial liability were driving part of the decisions to withhold files/information.  In the fall of 2021, a leader in the Colorado Judiciary asserted that the work of the Discipline Commission's special counsel had to be limited in order to protect the Colorado Judiciary from potential financial exposure to a civil claim for damages.

For these reasons, a judicial discipline model that designates the Supreme Court as the final decision-maker in discipline cases raises far more conflict situations than just those involving a justice acting as a judge and ruling on their own conduct or decisions.  The conflict situations are inherent in such a system design given the administrative or corporate roles of the justices of the Colorado Supreme Court.

**Recommendation:**  Colorado's discipline system should be revised to provide for a conflict free final decision-maker on serious discipline cases.  Several options are available to address this issue.

Under the process adopted in Pennsylvania, a "pro tem" supreme court is created to handle the discipline case if a member of the state's supreme court is the responding judge.  However, this system requires the creation of an entirely new court when such a situation arises, and the members of the "pro tem" court have no institutional knowledge or history.  It also does not, as adopted in Pennsylvania, address the administrative conflicts discussed above that arise in Colorado's approach to assigning corporate roles to the justices.

Given the scope of Rule 2.11 disqualifications that arise for members of Colorado's Supreme Court, another option is simply to change the final decision maker rather than creating a "back up" process that only applies when misconduct allegations are made directly against one or more justices.  The new final decision-making body for all discipline cases would be changed from the Supreme Court to a multi-perspective board that includes representatives of the judiciary, the bar, and the citizenry that minimizes the risk of conflict issues arising that would incapacitate the decision-maker as a whole.  The general structure of Colorado's existing system could be maintained with just the final decision-making body being reformed consistent with other judicial oversight entities in Colorado.

Given the impediments raised in 2021-22 by interested parties, the power to appoint the judicial members of the board should be diversified.  Membership should be comprised of judges representing the appellate judges as a whole, the district court judges, and the county court judges.  Each of these categories of judges should, as a whole, select from among their members the individual(s) to serve on the final decision-making board.

One member of the board should be selected by the Discipline Commission.  This member could come from any of the three main categories (bench, bar, citizen) but would be required to be a former member of the Discipline Commission.  Because the Discipline Commission itself handles, by far, the most judicial discipline matters, this position will provide subject matter expertise and experience to the final decision-making entity as a whole.  The person would not be permitted to sit on a matter if they had also seen the matter while a member of the Commission.

19

Consistent with due process, a final decision on discipline would still be subject to review by the courts (ultimately, a review by the Supreme Court) consistent with the standards found in C.R.C.P. 106 that apply when any other governmental body makes a decision.

The Colorado Constitution designates the Supreme Court as the final decision-maker in judicial discipline cases.  Changing this structure will require an amendment to the Colorado Constitution.

An alternative to amending the Colorado constitution would be to exercise the General Assembly's authority to enact a statute establishing a procedure on public policy grounds that provides for the recommendations of the Discipline Commission to become final unless overturned by a conflict free majority of the Colorado Supreme Court (which would be four justices).  This solution would not be ideal and should be considered primarily if amending the Constitution is unavailable or unsuccessful.

Disqualification Standards

The rules for disqualification of decision-makers in the judicial discipline process are spotty, ambiguous, and inconsistent.  For some decision-makers, such as the justice of the Colorado Supreme Court, substantial ambiguity exists as to what rules of disqualification are accepted as applicable.

In 2021, the Colorado Supreme Court exercised its rulemaking authority to amend the Colo. RJD and adopt a new Colo. RJD 3.5.  Rule 3.5 stems from a proposal made to the Supreme Court by the Discipline Commission in June of 2019 but rejected by the Supreme Court at the time.  The Supreme Court later made material changes to the proposal and adopted the revised version in late 2021 without prior notice to or consultation with the Discipline Commission.  When the Discipline Commission asked for the opportunity to provide input on the new rule, the Chief Justice advised in writing that "Feedback is not necessary."

As indicated above, the public allegations of judicial misconduct and allegations that these claims were suppressed by judicial leadership raised a number of serious disqualification issues for the Colorado Supreme Court regarding its roles in judicial discipline.  The Supreme Court responded to these issues by enacting the 2021 amendments that created extensive disqualification rules, but rules applicable solely to *Discipline Commission members*.  The new disqualification rules do not purport to apply to the other critical decision-makers in the discipline process such as the justices of the Supreme Court or special masters.  This has exacerbated rather than ameliorated the uncertainty in addressing conflicts of interest in judicial discipline.

Additionally, the meaning of disqualifying oneself from a judicial discipline matter has been inconsistently defined.  Under the new Rule 3.5, a disqualified member of the Discipline Commission must have "no involvement in any aspect of the proceedings after the date of recusal."  This is a reasonable and appropriate standard and the Discipline Commission has complied with this standard.  However, the Commission's experience is that other participants in the judicial discipline process from the Colorado Judiciary have declared a recusal but asserted a right to maintain active involvement in the proceedings at a substantive administrative level.  The meaning of disqualification or recusal should be uniform for all those involved in judicial discipline matters.

20

**Recommendation:**  The Discipline Commission recommends that the General Assembly set uniform, transparent, and reliable standards for disqualification of decision-makers in the judicial discipline system.  The General Assembly has the authority to effect this change by statute. *People v. Prophet,* 42 P.3d 61, 62 (Colo. App. 2001); *People v. Bobian,* 626 P.2d 1132, 1134-35 (Colo. 1981).

The Discipline Commission recommends the decision-makers in judicial discipline be defined as the members of the Commission, the members of the final decision-making body (whatever form may finally be chosen), and the special masters.  The standards should be set as the same standards that govern judge disqualification in cases as stated in the Code, primarily at Rule 2.11.

### System Wide Reform

#### Transparency

All judicial discipline systems in the United States recognize that allegations of judicial misconduct should be confidential during the initial screening process.  The variation among states is defining *when* judicial discipline proceedings become public to allow for transparency and oversight.  In Colorado, we draw this borderline between the confidential and public proceedings at the conclusion of the formal proceedings--the trial.  This is relatively late in the process as compared to other jurisdictions.  An issue for the Interim Committee is whether this borderline should remain as it is or be altered by constitutional amendment.  This requires a careful balancing of competing policies in the context of the unique needs of Coloradoans.

As the Center for Judicial Ethics explains,

## Confidentiality of complaints

In all states, commission proceedings are confidential at the initial stages after an individual files a complaint against a judge, and a commission cannot confirm or deny that a complaint has been filed against a judge, is being investigated, or has been dismissed, unless an exception applies. Confidentiality at this stage is intended:

- To encourage complainants to come forward without fear that the judge will learn and retaliate,
- To encourage witnesses to cooperate without fear that the judge will learn and retaliate,
- To reassure participants that the media or others will not contact them,

*How Judicial Conduct Commissions Work*  •  14

21

> - To allow a commission to encourage infirm or incompetent judges to resign before charges become public,
> - To allow a commission to warn a judge about minor misconduct without publicity, and
> - To protect a judge's reputation from unexamined allegations that may prove baseless.

Handbook for Member of Judicial Conduct Commissions at 14-15.

As to where the borderline is drawn, the Center goes on to explain as follows:

> ## Confidentiality after formal charges; public hearings
>
> A table showing when confidentiality ceases in formal judicial discipline proceedings in each state is available on the **Center for Judicial Ethics website**.
>
> In the majority of states (35), when formal charges are filed, confidentiality ceases, the charges and the judge's answer are public, and the subsequent hearing on the charges is also open to the public.

> - In 26 states, confidentiality ceases after formal charges are filed.
> - In seven states, confidentiality ceases when the judge files an answer to the complaint or when the time for filing an answer has passed.
> - In two states (Oregon and Rhode Island), confidentiality ceases at the beginning of the fact-finding hearing. The rule for the Oregon Commission on Judicial Fitness and Disabilities provides that the Commission shall issue "a public notice of the hearing not less than 14 days prior to the date of the hearing."

*Id*. at 27-28.

The Discipline Commission has experienced advantages and disadvantages of the confidentiality borderline currently governing in Colorado.  The Discipline Commission defers to the General Assembly on whether that borderline should be adjusted in Colorado but will be happy to discuss the options and relative merits as the Interim Committee may choose.

       An Insulated and Conflict-Free Funding Source

For the last decade and a half and pursuant to an agreement between the Disciplinary Commission and the Judiciary, the Disciplinary Commission's operating expenses have been funded through attorney registration fees.  The Disciplinary Commission's investigators and

22

attorneys have also been provided through the Colorado Supreme Court's Office of Attorney Regulation Counsel.  These funding mechanisms were formalized through amendments to C.R.C.P. 227.

Starting in 2021, problems arose that prevented the Disciplinary Commission from accessing funding and resources to pursue investigations.  The system proved to have insoluble conflicts.  Through SB22-201, these immediate challenges were overcome by providing for direct funding of the judicial discipline system with General Fund monies.

The prior funding mechanism using a specified, fee-based funding source under C.R.C.P. 227 had certain advantages of being politically/economically insulated as well as scalable to variable disciplinary needs.  Funding through attorney registration fees was also consistent with provision in Colo. Const. Art. VI, § 23(3)(c) that the Commission's expenses were "to be paid by the supreme court from its budget to be appropriated by the general assembly."

Under the new system of using General Fund monies, judicial discipline is left vulnerable to adverse economic conditions and changes in the political landscape.  To serve in its appropriate independent and non-partisan role, the Interim Committee should consider whether Colorado's discipline system should be funded through an insulated and non-discretionary funding source.

**Recommendation**:  The Discipline Commission's core operations should be funded through an economically insulated, non-discretionary funding source.  One possibility for such a funding source includes the direct appropriation of attorney registration fees by the Legislature, consistent with the authority provided through Colo. Const. Art. VI, § 23(3)(c) or new authority defined through a potential constitutional amendment.  Another possibility is the use of designated filing and other court fees, similar to the funding model for the Colorado Commissions on Judicial Performance.  *See* § 13-5.5-115, C.R.S. (creating State Commission on Judicial Performance Cash Fund through revenue generated by criminal and traffic case docketing fees).

**SUMMARY OF RECOMMENDATIONS**

- **Subpoena Authority:**  Codify subpoena authority for the Discipline Commission to investigate judicial misconduct allegations akin to other investigative bodies and grand juries.

- **Disclosure/Discovery Enforcement Mechanism:**  Codify a conflict free mechanism for addressing disputes with the Colorado Judiciary over claims of privilege or confidentiality as well as compliance with the statutory duties to document and disclose complaints of judicial misconduct.

- **Rulemaking Authority:**  Grant the Discipline Commission rulemaking authority over judicial discipline on the model of the Colorado Commissions on Judicial Performance.

- **Special Masters:**  By rule or statute, create a continuing pool of judges that are qualified to act as special masters in judicial discipline matters to foster institutional expertise.

- **Commission Member Terms:**  Extend the current four year terms of Commission members to provide greater subject matter expertise and greater insulation for political influence.  For similar reasons, District Court Judges serve six year terms and appellate judges serve ten year terms.

- **Conflict Free Final Decision Makers:**  Maintain the current two-tier judicial discipline system but change the final decision-maker to a conflict free, multi-perspective, citizen involved entity with representatives from the bench, bar, and citizenry.  Address appointment power and term lengths to assure insulation from undue influences.

- **Disqualification Standards:**  Codify clear, uniform, and consistent disqualification standards for all decision-makers involved in judicial discipline.  Apply same standards that have been previously established for judge disqualification and define meaning of disqualification.

- **Transparency:**  Evaluate the policy considerations and determine whether the border between confidentiality and transparency in Colorado's judicial discipline system should be altered.

- **Funding:**  Evaluate the viability of funding the judicial discipline system through a source that is insulated from politics and variations in the economy consistent with the model used for the Colorado Commissions on Judicial Performance.

# Appendix 27(s)(i)(9)(e)

# Colo. State Ct. Admin. Office, Background on the Independent Investigations, June 14, 2022;

 **STATE COURT ADMINISTRATOR'S OFFICE**

# Background on the independent investigations

*June 14, 2022*

Two independent investigations into allegations of misconduct are expected to be released in the coming weeks.  Both investigators were selected by a panel of legislative and executive branch leaders. The Governor's Office, Attorney General's Office, and General Assembly appointed the following leaders to serve on the panel that selected the investigators:

- Senate Judiciary Committee Chair Pete Lee
- House Judiciary Committee Vice-Chair Kerry Tipper
- Representative Adrienne Benavidez
- Senator Bob Gardner
- Representative Terri Carver
- Jacki Cooper Melmed, who then served as chief legal counsel for Governor Polis
- Kara Veitch, who then served as executive director of the Department of Personnel and Administration
- Maritza Dominguez Braswell, who then served as the Deputy Attorney General overseeing the Civil Litigation and Employment Law section at the Department of Law

That panel solicited an RFP and then interviewed prospective firms. The panel chose RCT ltd, a firm led by former United States Attorney Robert Troyer, to investigate the issues surrounding a leadership contract. The panel chose Investigations Law Group to conduct an investigation into the so-called "memo" as well as issues related to the culture of the workplace in Colorado's courts.

The following are key dates in the process of these investigations:

- February 19, 2021, panel named to recommend independent investigators
- February 25, 2021, first panel meeting
- August 5, 2021, panel recommends RCT Ltd (Robert Troyer) to investigate leadership contract; Investigations Law Group (ILG) to investigate allegations of workplace harassment
- October 12, 2021, Judicial Department executes $75,000 contract with RCT Ltd. Contract period is 6 months with option for a single 12-month extension.
- November 1, 2021, Judicial Department executes $250,000 contract with Investigations Law Group. Contract period is 5 months with the option of a single seven-month contract.
- April 2022, ILG granted an extension at its request.
- April 2022, RCT granted an extension at its request.
- June 2022, a second and final extension granted to ILG at its request. Extension runs through July 29.
- June 2022, a second and final extension granted to RTC at its request. Extension runs through June 29.

*For more information contact Terry Scanlon, legislative liaison, at terry.scanlon@judicial.state.co.us*

**Appendix 27(s)(i)(9)(f)**

**Chris Forsyth, Evaluating a System of Judicial Discipline, June 14, 2022;**

# Evaluating a System of Judicial Discipline

## Transparency

Are the proceedings public?
At what point in time do the proceedings become public?
Are discipline opinions published in a searchable, online database?
Is the budget for the commission public?
Should private discipline be abolished?
Should it still be a crime to reveal documents filed with the commission?

## Accountability

Who makes the judicial discipline rules?
Should some rules be prohibited?
Who can remove a judge from the bench or discipline a judge?
Is there an Executive Director who can undermine the commission?
Is the Code of Judicial Conduct enforced even if it relates to a ruling?
May a judge be disciplined for refusing to follow well-established law?

## Conflicts of Interest?

Who selects the members of the commission?
Who is on the commission?
Do citizens outnumber legal professionals?
Are legal professionals necessary?
Who makes the judicial discipline rules?
Who actually imposes discipline?
Should some commission rules be prohibited?
Should changes in the Code of Judicial Conduct need Senate confirmation?



judicialintegrity.org

# Dismissals of Complaints Filed with the Colorado Commission on Judicial Discipline

Source: Annual Reports of the Colorado Commission on Judicial Discipline

- In 1993, the rate that Colorado's Commission on Judicial Discipline dismisses complaints against judges hit 97%. The dismissal rate has averaged 97% ever since.

- From 1986 to 2014, there were no published cases of judicial discipline. That means for **28 years straight**, there were no published cases of judicial discipline.

- In 1985 the Supreme Court adopted a rule creating an executive director. The Supreme Court also gave power directly to the executive director to dismiss complaints.



The JUDICIAL INTEGRITY Project

judicialintegrity.org



Most states have public judicial discipline proceedings

▓ States with public judicial discipline proceedings

Created with mapchart.net ©

# What State Handles Judicial Discipline Best?

|  | California | Colorado |
|---|---|---|
| Proceedings public? | **YES**<br>When formal charges filed | **NO** |
| Discipline opinions published on commission's website? | **YES**<br>In a searchable database | **NO** |
| Private info accessible by other agencies? | **YES**<br>When judge is being considered for another judicial appointment | **Possibly**<br>Performance & nominating commissions, governor might get some info if they ask |
| Executive Director? | **NO** | **YES**<br>And pursuant to rule issued by the Supreme Court, he alone dismisses most complaints. |
| Who disciplines? | **Commission --**<br>with a petition to review to the Supreme Court | **Supreme Court –**<br>commission may privately admonish, censure, reprimand or institute a diversion plan |
| Is the budget for the commission public? | **YES**<br>And the budget shall be separate from the budget of any other state agency or court. | **NO** |
| Who makes the judicial discipline rules? | **Commission** | **Supreme Court** |
| Who is on the commission? | 3 judges<br>2 lawyers<br>6 citizens<br>**[Citizens outnumber legal professionals]** | 4 judges<br>2 lawyers<br>4 citizens<br>**[Legal professionals outnumber citizens]** |

Based on a 50-state survey conducted by:



The JUDICIAL INTEGRITY Project

**Appendix 27(s)(ii)**

**Hearing record for *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg. July 12, 2022:**

# Appendix 27(s)(ii)(1)

# Introduction and Presentation by Chris Forsyth / The Judicial Integrity Project;

# Colorado Legislative Interim Committee on Judicial Discipline—July 12, 2022 Hearing:
## Introductory Remarks and Presentation by Chris Forsyth

**Sen. Lee**

The Interim Committee on Judicial Discipline will please come to order. Ms. Jenson, call the roll.

**Juliann Jenson**

Representatives and Senators. Bacon.

**Sen. Lee**

Excused.

**Juliann Jenson**

Gardner.

**Sen. Gardner**

Good morning from Philadelphia.

**Juliann Jenson**

Gonzales.

**Sen. Gonzales**

Present, good morning.

**Juliann Jenson**

Lynch.

**Rep. Lynch**

Here.

**Juliann Jenson**

Van Winkle.

**Sen. Van Winkle**

Here.

**Juliann Jenson**

Weissman.

- 1 -

**Rep. Weissman**

Here.

**Juliann Jenson**

Carver.

**Rep. Carver**

Here.

**Juliann Jenson**

Mr Chair.

**Sen. Lee**

Here.

**Sen. Lee**

We do have a quorum, and we are ready to go. Thank you, members, for joining us. It seems like a long time since we were here a month ago. This is the second meeting of the Interim Committee, and just since there's been sort of a hiatus, I just wanted to remind people that we had a day-long hearing a month ago in which we had briefings by Leg. Counsel, Ms Jenson, and Mr Imel on the bill and the landscape. We heard from the Chair and Vice Chair of the Colorado Commission on Judicial Discipline. We heard from the State Court Administrator, Appeals Judge Tow. We heard from the Office of Attorney Regulation Counsel, the State Auditor, and public testimony, both from the Judicial Integrity Project, from the Colorado Bar Association, and the Women's Bar Association. One of the goals and purposes of these hearings is to be very public and invite the public, and we are trying to get that word out so as many people participate and provide input. So, we have public testimony scheduled at all of our meetings and invite people to either present their testimony in person or submit it to the committee and the members will read it. So today, we have a pretty full agenda which is available to you, and I encourage the committee to stay engaged with the issues that are the mandate of the committee. We really need to focus on what the committee is intended to do, looking at judicial discipline. So, with that, I'll turn it over to Madam Vice Chair.

**Rep. Carver**

Thank you, Mr Chair. Thank you to all who have joined us in person or remotely. As the Chair referenced, we have 18 specific subjects covering the broad array of issues on how the complaint process should work within the Judicial Branch. And there are many pieces to that, but that is our charter, as specified in SB 22-201. So, we appreciate all those who have testified thus far and who are going to testify today. Just a reminder, because of the broad scope of the job that this committee has to do, addressing these 18 subjects, we just want to remind everyone listening to this hearing or here in person, that you are always welcome to submit written comments referencing any of those 18 areas or

- 2 -

all of them. And I know that some organizations were waiting until the ILG report came out. That came out yesterday. So, I would encourage all of you who have interest in any or all aspects of those 18 subjects to put together your written comments, provide those to the committee, sending them to Juliann Jenson. Which, then, the committee can start digesting, because of our very compressed timeline to get this work done, we would encourage you to do that. We want to fully consider all your comments and perspectives in this important work that is being done. Thank you.

**Sen. Lee**

Thank you, Madam Vice Chair. Any other comments from any other committee members are welcome. One other note, I would specifically like to thank Senator Gardner for joining us, remotely from Philadelphia. He's doing the very exciting work of the Uniform Law Commission in Philadelphia, but at my urging and request, he's going to try to participate here and do both tasks. And having known him for over a decade, I know he's fully capable of performing more than two things at the same time. So, thank you, Senator Gardner, for being here with us today.

**Sen. Gardner**

Thank you, Mr Chair.

**Sen. Lee**

The other thing I'd want to note, and I guess this is sort of in the area of Chair's prerogative. When I was preparing for this hearing today, and I put on a suit I hadn't worn for a while because we haven't been in session for a while, I found that it was a suit that contained the Ukraine ribbon, and we were wearing those routinely during the legislative session. I just want to recognize, memorialize, and honor the people of Ukraine, who are fighting daily to preserve, protect, and defend their democracy. May the inspiration of the people in Ukraine inspire this committee as we do our work to form a more perfect union. And with that, I'll ask Mr Forsyth from the Judicial Integrity Project to join us. Thank you for being with us today, sir, if you would introduce yourself, tell us any organization you represent, and provide us with your testimony.

**Chris Forsyth**

Thank you. My name is Chris Forsyth with the Judicial Integrity Project. I'm an attorney who's practiced in Colorado for 30 years. We don't know where we're going, unless we know where we've been. If you can't see the forest for the trees, your chances of making a good decision are slim. One must understand Colorado's judicial system and its history to know what to do regarding the judicial discipline system. In short, you need to know the big picture. I do not stand before you alone. In your packet is a petition signed by almost 900 Coloradans. These are not parking lot signatures. This is an online petition where people put thought into it before they signed it. Colorado has a commission-based judicial system. We have nominating commissions that help decide who becomes a judge, a discipline commission that can recommend if a judge needs to be removed, and performance commissions that are to advise voters whether a judge should be retained. The system is dysfunctional. The commissions do not work

- 3 -

together. There are walls between all of them and the public. If a judge is actually disciplined, it most often is not public, because judicial discipline proceedings are confidential. Neither the nominating commissions nor the performance commissions know whether the potential nominees or judges up for review have been disciplined. The performance commissions lack information, and the nominating commissions are not transparent and lack public involvement. The state court system is often rightfully criticized for catering to the wealthy and connected and treating the poor and marginalized as second-class citizens.

This system is where this valid criticism begins. In 1966, it started then when nominating commissions and gubernatorial appointment to select judges was put forth to voters. Prior to that point, judges ran in contested elections. We are not in favor of contested elections, but the public is much more involved in such a process. The nominating-appointment process is not public and lacks public involvement. It is elitist. Nevertheless, in the Blue Book for the 1966 elections, as part of the arguments for the amendment, it was stated that, "The courts would be completely removed from politics. Judges would be free from the pressures of politics and campaigning, and would be able to devote their full time and attention to the conduct of judicial business." Freeing judges from politics is a laudable goal. We don't want judges accepting financial contributions from parties who may eventually end up in their courtroom. Allowing judges to devote their full-time and attention to being a judge is an important goal. If this is the result of the nominating-appointment process, this is definitely worth the loss of public contested elections. A commission to address judicial discipline was also contained in the 1966 initiative, the commission was called the Commission on Judicial Qualifications. The Blue Book for the 1966 election stated that "the Commission was patterned after the California system for removal of judges." The initiative barely passed. It received 53% of the vote. 47% voted against it. Under current law, the initiative would not have passed because it did not receive 55% of the vote. Since 1966, California's judicial system has been amended several times to make it more transparent, accountable, and remove conflicts of interest. Colorado's has not. The promise from 1966 was the judges would be completely removed from politics.

While it is good that judges aren't running in contested elections, to say judges have been completely removed from politics is incorrect. As a group, judges have become a powerful lobbying force at the Legislature. The Judicial Branch has a legislative liaison who's constantly in the Capitol during the legislative session. And judges are members of other lobbying groups such as the Colorado Judicial Institute, where judges are board members and members. The group's major fundraiser is an event where people pay to sit at a dinner with judges. The idea is that if you fund the organization that lobbies for what judges want, you might get an upper hand in a case. We've nicknamed the event "Want to buy a judge." Judges are also members of the Colorado Bar Association. The CBA is the only voluntary Bar Association west of the Mississippi. That means lawyers do not have to belong to it, and neither do judges. Yet, it's a very politically active group. Although it claims to be a membership organization, it has an executive council that runs the organization and a small legislative policy committee that takes positions on legislation. The policies they often lobby for are for what judges want, but most likely

- 4 -

would not be supported by a majority in the members of the organization. Then there is IAALS, the Institute for the Advancement of the American Legal System. It's another organization where judges are involved. A former Colorado Supreme Court Justice founded the organization. I've been in this building trying to improve the legal system with legislation. It was a simple measure, to provide more information to the judicial performance commissions. Who stood in the way? IAALS and its former Supreme Court Justice who wrote the initial opinion stating that Colorado's Open Records Act doesn't apply to the Judicial Branch. She was able to stop purely altruistic legislation on a party line vote.

So, politics have not been removed from the Judiciary. Indeed, what has been created is an incredibly powerful judicial lobby for what judges want. Judges' voices are multiplied by four when it comes to policies in Colorado, to legislators under the dome, this has proven very convincing over time. It looks to legislators like there's an overwhelming support for maintaining what judges want, but it's simply the powerful judicial lobby being very crafty. The promise from the 1966 Blue Book, that quote, "The courts would be completely removed from politics." That, obviously, has not occurred. We've even heard multiple judges speak in these hearings about what judges want, with more to come. As for the discipline of judges, the Commission on Judicial Qualifications worked for a while. But in 1982, the Legislature put forth a referendum changing the Commission on Judicial Qualifications to the Colorado Commission on Judicial Discipline. The referendum passed. Apparently at that time, the Supreme Court realized what it could do with its rule making power. Although the Justices on the Supreme Court are sworn to uphold the Constitution, the Rules the Supreme Court wrote undermine the Constitution. They often make rule changes. But here's a Rule that was in effect for many years. As you can see, the Rule regards screening of complaints. The Rule allows the Executive Director to act alone. It provides that the Executive Director, "Shall dismiss complaints that are based on disputed rulings under the jurisdiction of the trial or appellate courts." So, if a judge violated the Code of Judicial Conduct in an actual court case, and that violation affected his ruling, the Executive Director was required to dismiss the complaint. The Rule is directly contrary to the Constitution, which requires prosecution for any violation of the Code of Judicial Conduct. Here's the current Rule, which was written in 2017. This version still focuses on dismissing cases. The Rule now avoids the shall dismiss language, but still accomplishes the same thing by focusing on the absence of a reasonable basis for a complaint. The Rule now requires the Executive Director and members of the Commission to close matters that dispute a judge's rulings on motions, evidence, procedure, or sentencing or a judge's findings of fact. But it does now state without providing grounds for discipline. That sounds a little better, like they made an exception for violations of the Code of Judicial Conduct. But then there's this other reason: "The allegations involve subject matter that is not within the jurisdiction of the commission." So, even if a violation of the Code of Judicial Conduct is alleged, if the allegations involve a person claiming the judge's ruling was wrong, which the Commission has no jurisdiction over, the complaint must be dismissed. Why is the Supreme Court so focused on making sure cases are dismissed? It's because it has a conflict of interest. There should be serious consequences for what the Supreme Court has done. Did the Supreme Court have the power to draft rules regarding judicial discipline? Yes. Did the Supreme Court have the power to adopt rules that limited the violations of the Code of Judicial Conduct that could be enforced? No. The State

Constitution states judges can be disciplined for any violation of the Code of Judicial Conduct. The Supreme Court determined to not follow the Constitution they are sworn to uphold. The Supreme Court decided judges could not be disciplined for violations of the Code of Judicial Conduct when we expect to be protected by it the most: when we're in court, when judges are ruling on cases.

Malfeasance in office means an unlawful act committed willfully by an elected public officer or breach of an official duty enjoined by law. Was it not malfeasance for the Supreme Court to adopt Rules directly contrary to the Constitution? Was it not malfeasance in office for the Supreme Court to unilaterally determine that certain violations of the Code of Judicial Conduct cannot be prosecuted?

We can't see what's in any of those dismissals because the judicial discipline proceedings are confidential in Colorado. We are unable to validate all the dismissals because we cannot see them. Colorado has one of the least transparent judicial systems in the country. There is no support in Colorado, absent that of the Judiciary to maintain Colorado's current level of confidentiality regarding judicial discipline proceedings. Even the judicial performance commissions, which have repeatedly fought against receiving more information about judges, have stated that having discipline information would help. 35 states have public judicial discipline proceedings. So should Colorado.

And don't be confused about the language in Senate Bill 22-201, which created your committee. It does not change the status quo regarding the confidentiality of judicial discipline. Rule 6.5 of the Colorado Rules of Judicial Discipline still governs who can receive judicial discipline info. Unless you get the permission of the disciplined judge, a government agency has to jump through a bunch of hoops to possibly get the Supreme Court to enter an order requiring a release. That's not transparency.

Since the discipline system has started being criticized, they are prosecuting more judges. We started banging the drum in 2012. In 2014, the first published case of judicial discipline appeared. It involved a stipulation of a judge leaving the bench. This photo is of judges who have been prosecuted since that time. None of these cases are related to judicial orders. The Colorado Constitution states that a judge can be removed from office for any violation of the Code of Judicial Conduct. Yet we're 36 years and counting without a published case of judicial discipline related to a court case. The cases show us that if a judge gets a DUI, criticizes another judge is racist or misogynistic, or commits a federal offense, then the judge might receive public discipline. That's a pretty low standard for the governmental branch we're supposed to trust the most. The bottom line of all of this is that we're supposed to believe that for 36 years and counting, no judge deserves public punishment for anything he or she did related to his or her ruling on a case. 36 years and counting. And the dismissal rate of complaints against judges is 97% and has been 97% for almost 30 years. It's unbelievable. Possibly, the worst thing getting lost in all of this is that judges are not learning how to become better judges, because judges aren't being disciplined. Lawyers constantly learn from published judicial discipline proceedings. Lawyers discipline proceedings are public, yet judges who are public servants, have their proceedings in private, and there is a dearth of case law in Colorado on how to interpret the Code of Judicial Conduct. Judges desperately

- 6 -

want to keep the current system. That's why, since 2014 we've seen public judicial discipline cases after a 28-year drought. There are even new proceedings going on right now involving Judge Timbreza out on the Western Slope. The Supreme Court is attempting to put on a show to save the system that protects them. We must not be fooled.

All states have judicial discipline systems. You'll be hearing from some folks at the National Center for State Courts later today. So, I'm not going to go over what other states do, but it must be noted that all 50 states have judicial discipline systems. So, even in states where judges run in contested elections, which is in most states, there is a judicial discipline commission. That means a discipline commission isn't something unique to Colorado's so-called merit selection. That term is a very successful marketing term to describe our modified gubernatorial appointment process for judges. But it's hard to understand how such a system has merit when so much focus, time, and energy is used to hide facts from the public.

As for the scandal, it involves more problems with the Judicial Branch than simply the discipline system. A major component of the scandal is the inappropriate relationship between the Chief Justice and the State Court Administrator. The National Center for State Courts also addresses the principles of judicial administration. Hopefully, you'll hear from them about that later today, we agree with the National Center for State Courts that judges should focus on policy-level issues and administrative tasks should be handled by staff. We agree that there should be accountability and transparency. The RCT investigation makes proposals that are troubling. In regard to the situation involving the administrative functions, the investigation encourages the involvement of all justices on the Supreme Court in such functions. It encourages the Supreme Court to act as a board. We do not agree with this approach. The justices on the Supreme Court should solely focus on hearing and deciding cases. They are already rightfully criticized for not granting certiorari in enough cases. The RCT investigation would give them less time to hear cases.

We believe there should be a wall between the State Court Administrator and the judges in the Judicial Branch. The justices on the Supreme Court are not experienced in running a business or hiring employees. The people should hire the State Court Administrator. Then, if something goes wrong, the justices of the Supreme Court are not to blame. The State Court Administrator should be chosen through a contested election. There seems to be the thought that, since Chris Ryan is gone, everything will be okay, but the Supreme Court simply chose another insider after him, rather than hiring an outsider who has an MBA and experience running a large business. The State Court Administrator is a position that has been mired in scandal for a long time. It's a position that has too much authority without any checks and balances. The State Court Administrator directly affects justice. He places retired judges under contract and assigns them to cases. We already know they improperly used a contract to hire a former employee who had been disciplined. Imagine what he can do with the power to place certain judges under contract and assign them to cases. He has the power to ensure certain statewide policies are adopted with Court of Appeals. This must stop. We did not draft proposals for the bifurcation of the

- 7 -

judicial and financial functions of the Judicial Branch because this committee is solely focused on the discipline system. But we'd be happy to draft such proposals.

We do, however, have a proposed draft of a referendum to be put before the people. The referendum would be for a new judicial discipline system. It's the second document in your packet. It's behind the second blue sheet in the packet. The proposed new discipline system would contain eight citizens who are not lawyers or judges. The citizens would be elected in the same manner all of you were selected. If that selection was good enough for this committee, then it's good enough for the discipline commission. So we proposed two citizens chosen by the Majority Leader of the Senate, two by the Minority Leader of the Senate, two by the Speaker of the House, and two by the Minority Leader of the House. Three lawyers would join the citizens on the Commission. The lawyers would be appointed by the Governor and must have been registered as an independent for at least the last five years. The lawyers also need to have practiced law for 10 years. In a consulting, non-voting capacity, one judge would be on the Commission. The judge would be the Chief Judge of a judicial district, and selected in rotating order by the number of the Judicial District. Each voting member would serve a four-year term. The non-voting consulting Chief Judge would serve a one-year term. All discipline would be public. The Commission would be able to actually discipline a judge, including removing the judge the bench. The judge would have the right to appeal to the Supreme Court. Once at the Supreme Court, the Supreme Court can hold its own hearing if it wants.  If the Commission's order is not supported by the law or substantial evidence, it may dismiss the matter or impose discipline it deems more appropriate. The documents filed with the Commission would be public. The exception would be if a complainant wants to keep his or her name or the name of other witnesses confidential. If so, neither the complainant's name nor the witnesses' would be public unless and until the Commission initiates the process for a formal hearing. The Commission would be required to maintain an electronic copy of all records or documents and any orders or documents issued by the Commission in an electronic database that is accessible by the public. The documents shall be searchable under the judge's name. Many states already have this in place. The Commission, instead of the Supreme Court, shall adopt its own rules. The political activity of members of the Judicial Branch would be limited. With the exception of requests for Judicial Branch funding, no member of the Judicial Branch nor any agent thereof, may lobby or attempt to influence a member of the General Assembly or any agent thereof or appear in the Capitol during legislative session, unless subpoenaed by the General Assembly. If they do so, it's a violation of the Code of Judicial Conduct punishable under this section. The budget of the Commission would be public and separate from the budget of any other state agency. The Commission shall maintain an office that may include investigators, attorneys, and other support staff. The members of the Commission would be required to review all complaints and cannot delegate their decision making on any complaint to a staff member. The Code of Judicial Conduct may not be amended by the Supreme Court without consent of the Senate. The last time the Constitution was amended was 1982 there was a completely different Code of Judicial Conduct in effect on that date. The Supreme Court has assumed it can amend it many times since. But some curious things have occurred since that time. So, this committee may want to take a look at which Code of Judicial Conduct should be enshrined in the Constitution at this point in time. The statutory

provisions that make it a misdemeanor, a crime, to disclose the contents of the proceedings before the discipline commission would be repealed. At this moment, it's still a misdemeanor in Colorado for anyone to reveal the contents of the proceedings before the discipline commission. In these proceedings, so far, a two-tier system has been mentioned. Our proposal is for a one-tier system. Most states have a one-tier system. A second-tier in most systems makes it harder to discipline a judge. It's simply another obstacle to discipline. The judges who are arguing for this want to make it look like the Legislature did something. But the something would actually make the discipline system worse than it is. So, back to the big picture, the walls between the commissions and the public should come down. Walls between the Supreme Court and the Legislature and the State Court Administrator need to go up. We need a renovation. After the appointment of a judge, the public must become more involved, which should reduce the appearance that courts are for the wealthy and the elite. We believe this is the path to restoring the public's confidence in the Judiciary. This is the path towards Judicial Integrity. Thank you.

**Sen. Lee**
Thank you, Mr Forsyth, and I will note that the committee has received your packet with your proposals and petition et cetera. So, thank you. Are there any questions for Mr Forsyth? Seeing none. Thank you for your participation in our discussions.

# Appendix 27(s)(ii)(2)

# Presentation by former CCJD Member and former 10th Judicial District Court Chief Judge Dennis Maes;

# Legislative Interim Committee on Judicial Discipline—
# July 12, 2022 Hearing: Testimony of Hon. Dennis Maes

**Sen. Lee**

Now we have a presentation from Dennis Maes, former Chief Judge of the 10th Judicial District, former member of the Colorado Commission on Judicial Discipline. Your Honor, we are honored to have you with us today. Thank you for being here. Thanks.

**Dennis Maes**

Thank you and thank you for the opportunity to appear before this committee today. I'd like to share a few observations I have surrounding the Interim Committee's hearings on judicial reform. I retired May 21 of 2012, after 24 years as a district judge in Pueblo. I served as the Chief District Judge the last 17 years of that term. Before I begin, please allow me the opportunity to acknowledge the outstanding Pulitzer-level reporting by David Migoya from the Denver Gazette concerning this dark moment in the history of the Colorado Supreme Court. He relentlessly pursued the truth, despite formidable roadblocks placed in his way by several state agencies, including the Colorado Supreme Court. His work is a stark reminder of the importance of the press in a free, democratic society. For about a year before I was appointed to the district bench by Governor Roy Romer, I had the privilege of serving on the Colorado Commission on Judicial Discipline. The CEO at the time was Rick Wehmhoefer. I was impressed with the work and the efficiency of the Commission. It satisfied its responsibilities pursuant to the Colorado Constitution. The Commission on several occasions, during the Annual Judicial Conference, provided training sessions to the spouses of the judges to educate them with the workings of the Commission. In the interest of transparency, I would suggest that the Commission arrange similar educational opportunities for the public to inform them of the important work the Commission undertakes to ensure judicial accountability. I will say there has always been somewhat of a tension between the judges and the Commission because of the very nature of the Commission's charge. However, I never observed anything out of the ordinary that offered concern about the process. I and my colleagues recognize the importance of the work of the Commission and its credible oversight of us in the merit selection system of Colorado judges. It has worked well in the past and deserves to continue its work in the future without undue influence from others, including the Colorado Supreme Court. While I agree that systems should continually be reviewed and reformed when necessary, I would strongly submit that it is just as important to rely on those processes that have served as well in the past. In particular, I would point to the single most important principle that has provided the guiding light for the United States judicial system since its inception, a deep and abiding commitment to and belief in the rule of law, which holds that no person or entity is above the law. It is that principle that guides every judge, every single day in the exercise of their judicial responsibilities.

It is my belief that the Boatright Court lost its way concerning this sad and embarrassing moment in the history of the Colorado Supreme Court when it disregarded and disrespected long established principles,

rules, processes and ethical considerations that judges take an oath to obey. As the Interim Committee is well aware, the judicial commission has jurisdiction over all Colorado state judges, including the Colorado Supreme Court. Grounds for judicial discipline are found in Rule 5 of the Colorado Rules of Judicial Discipline.

It is necessary to identify specific instances when the Supreme Court chose to circle the wagons to protect the few, rather than to comply with established protocol, to illustrate the contempt it had for its own process. Fundamental to the American commitment to the rule of law is that cases be decided by neutral decision makers, the judge, the jury. All confidence in the system is lost if the public believes an outcome has been determined prior to the commencement of the case. Similarly, all confidence would be lost if the public believes the guilt or innocence of an individual is determined before the presentation of evidence. The same result occurs if the court determines the credibility of witnesses prior to the trial. That is what the Boatright Court did here. As early as February 4, 2021, Chief Justice Boatright issued a statement concerning an article that appeared in the Denver Post on February 3, 2021 denying the central allegation that Chief Justice Coats and his counsel, Andrew Rottman, whom he described as "both dedicated public servants" "would ever authorize court resources to silence a blackmailer." Chief Boatright went on to back Coats and Rottman with the weight of the credibility of the entire Supreme Court by declaring that any statement to the contrary was, "simply false." All of this before any investigation or trial. At the outset, the Colorado Constitution directs that any allegation of judicial misconduct should have been referred to the judicial discipline commission, but Boatright failed to do so and instead declared the outcome prior to the onset of an investigation. Secondly, Boatright ignored Rule 2.10 of the Colorado Code of Judicial Conduct, which prohibits interested judicial statements on pending or impending cases or issues that might come before the court. Mind you, these comments were made prior to the awarding of the Troyer contract. Boatright violated Rule 2.11(A)(4) by reaching a conclusion on the issue before the receipt of any evidence. Again, please keep in mind that it was distinctly possible the Supreme Court might be called upon to review the matters, whether in a civil setting, through a referral to the judicial commission, or a criminal proceeding against the principles involved in the investigation. It appears the court had little or no concern commenting on information that was being provided to it in an *ex parte* fashion, contrary to rule 2.9 of the Code. Boatright reaffirmed this standard of behavior on February 16, 2021 when he announced he would be briefed on a weekly basis on all "misconduct complaints across the department to ensure each incident is fully investigated and acted on as appropriate without delay." Presumably he was also referring to complaints of judicial misconduct that should rightfully be referred directly to the judicial commission, and under the present system, might be subject to review by the Supreme Court.

Does this process seem fair to the person or persons being investigated? I trust the answer is no. Such a process would likely require Justice Boatright and any other Justice who might be privy to the information to disqualify himself or herself pursuant to Rule 2.11(A) because the judge would have personnel knowledge of the facts in dispute in the proceeding. Yet another solid reason why any judicial misconduct concerns should be referred to the judicial commission, as required. Boatright's decision to

comment on the veracity of certain witnesses and/or participants compromised any investigation or proceeding that might ensue. He describes certain individuals as, "dedicated public servants" and that the justices had "full confidence" in a named judge alleged to have committed acts of alleged judicial misconduct. On what did the Chief Justice and the other Justices base their conclusions? Had they conducted their own investigation contrary to Commission rules? Did they base their conclusion on *ex parte* communications? Were they sending a subtle message to those who might disagree with the Court that their observations would not receive the same considerations as those who appeared to be in lock step with the Supreme Court? Whatever the perception, it was clear that certain decisions had already been made by the court in determining to hire private counsel to conduct an "independent investigation" to "clear those wrongly accused."

One aspect of the Troyer Report that rings true is the disconnect between the Supreme Court and the actual operation of the court system and the many dedicated employees that assure that the courts run smoothly. The now infamous memo clearly illustrates that the rank and file believed there were two separate tracks for discipline, those for higher-level administrators, their cronies, and the judges, and another system for those less situated. Any reform must address the behavior of those agencies which might be beholden to the Supreme Court. For example, the Office of Attorney Regulation Counsel, at one time, held certain authority over the judicial commission. The OARC had the authority to determine the office space of the Commission and the authority for funding for certain projects. In both instances, the OARC made it difficult for the Commission, presumably siding on behalf of the embattled Supreme Court. It is alleged that the OARC vacillated between recusing itself from the fray, only to decide at a later time to reassert itself, usually to the detriment of the judicial commission. It appears it might be appropriate to codify that once a recusal is declared, that the recusing party must withdraw from any further involvement in the proceedings. Although it appears the funding of the judicial commission has been resolved with recent legislation, it would be appropriate to prohibit an arm of the Supreme Court for any supervisory role over the Commission, as was the case with the OARC.

I am aware of the recommendations submitted by the Colorado Commission to the Interim Committee, as well as the recommendations in the Troyer Report. I am acutely aware that reform might require amendments to the Colorado Constitution and the complexity, cost, and perils inherent in offering constitutional amendments, but believe certain recommendations are absolutely necessary. First and foremost, the Colorado Commission on Judicial Discipline must be completely from free from interference from outside sources, including the Colorado Supreme Court as the final decision-making authority. Instead, the final decision-making authority should vest with an independent entity which is representative of the community. The Commission should be independently funded and required to follow established standards of financial accountability. The Commission should have full subpoena power, which is governed by existing law. Any disputes involving the subpoena power and discovery matters included therein should be resolved by an entity other than the Colorado Supreme Court. It has been suggested that a body consisting of attorneys, judges, citizens and other disciplines might be

- 3 -

considered. This might be discussed simultaneously with the recommendation concerning final decision-making authority in discipline cases.

The Commission has performed admirably, despite the roadblocks it has encountered. There needs to be a level of stability for the Commission to carry out any reform that might be adopted consistent with the rules surrounding the appointment of members to the Commission on Judicial Discipline, all eligible members who are subject to reappointment should be reappointed. I am disappointed to say that I am concerned that judges presently serving on the Commission might not be reappointed by the Supreme Court because of the strength and courage they have exhibited in addressing this turmoil. Such refusal to appoint would reflect poorly on the Supreme Court.

The Commission should have rulemaking authority similar to that enjoyed by the Commission on Judicial Performance. I have previously joined in an Op-Ed expressing various concerns about the Troyer Report and will not repeat them here, except to address its conclusion that a major portion of the report faulted the Colorado Judiciary for not preparing Chief Justice Coats for the job. I was astounded to hear this excuse, as it has been my experience in Colorado, at the time Coats was appointed, [Colorado] enjoyed an outstanding reputation throughout the country for the quality of training it provided its judges. Colorado was one of the few states that actually had leadership training for Chief Judges, which included the Chief Justice. Ironically, the Masias Contract, which has been at the center of this mess, was a contract to provide leadership training because the two outside professionals who had previously provided the training were retiring. I personally had the privilege of being appointed and serving as Chief Judge of the 10th Judicial District under the leadership of Chief Justices Anthony Vollack, Mary Mullarkey, and Michael Bender. Each provided outstanding administrative and ethical leadership and were progressive in moving the Colorado Judiciary to deep respect throughout the judicial community in the nation. I am unaware of any concerns the Judicial Department might have had concerning the leadership abilities of former chief justices to serve until the revelations contained in the Troyer Report, and only as they implicated Coats. It is one of the many questions left unanswered in the Report. More specific details concerning the specific knowledge of the then-serving Justices of what they knew when they learned it should have been addressed, including the specific knowledge of each individual Justice. Thank you for this enormous undertaking. While much damage has been done to the integrity of a once proud state judicial system, I am convinced that the resolve of this Committee and the deep respect our state has for the rule of law will restore it to the status it deserves. Thank you.

**Sen. Lee**
Thank you, Judge Maes for your service to the State of Colorado and for your presentation to the committee today, we have a question from Vice Chair Carver.

**Rep. Carver**
Thank you, Mr Chair. Thank you Judge for joining us today and making the trip north on the Interstate. We greatly appreciate it. I want to focus on the complaint system and the deficiencies that have been

- 4 -

revealed, significant deficiencies, since that is the bulk of our tasking under 201, and your experience on the Commission is invaluable. So, with the with the Chair's indulgence, I have three questions, if I may, dialog.

**Sen. Lee**
Fire away.

**Rep. Carver**
Thank you, Mr Chair.

**Sen. Lee**
Before you do that, let me acknowledge and welcome Rep. Bacon, who's been here for a while, but I didn't want to interrupt the Judge, thanks for being here. Go right ahead, Madam Vice Chair.

**Rep. Carver**
Thank you, Mr Chair. First, I want to ask you to comment, if you have a comment on some points that were raised in the prior testimony. There was the rule that was put up, the Commission rule, or the rule that has been promulgated by the Judiciary on what is and is with. Let me start again, what is to be excluded in the initial screening process. Do you have a view on whether complaints should be accepted for further investigation by the Commission if they involve the merits of a court's ruling on a motion or the merits of the case, or any other aspect. I have always believed, and perhaps will hear this from the National Conference of State Legislatures, that the ruling and all aspects of the judge's ruling on motions and other aspects are to be handled through the appeal process and not a complaint process. And I know you were here and heard the testimony. Would you address that, please?

**Sen. Lee**
Judge Maes.

**Dennis Maes**
Thank you, Madam Vice Chair, I think one of the things that's necessary to discuss in this process is, what kind of commission are you setting up? Are you going to commit to give the commission the resources it needs to do the thorough research that it needs to investigate certain complaints? And I guess what I'm talking about is, the short answer to your question is, I think if they are properly staffed, that the only time what might appear to be an appellate issue that should come before the Commission on Judicial Discipline is if there were some judicial misconduct that was involved during the same proceeding. But I was, and am, comfortable with at least the initial determination as to whether or not an issue is simply an appellate issue. But obviously, the Rules define what might be judicial misconduct. And if there is something within the ruling in the case that might have appellate issues as well as discipline, then it should be fully investigated. Absolutely.

- 5 -

**Rep. Carver**

Thank you for that. And, then, the testimony of the prior witness, indicating that violations of the Code of Judicial Conduct would not be within the realm of what claims are heard by the Commission. And perhaps I misheard the witness, but that is not my understanding. That, if there is violation, alleged judicial misconduct under the Code, that there is a pass, can you speak to that and perhaps clarify?

**Dennis Maes**

Well yeah, and I'm not sure exactly what the intent of that testimony was. I recall what you're speaking about. And once again, I would go back to what I mentioned at the outset: that when we start talking about reform, that sometimes we forget about all those things that have guided us through the processes and which have really served us well. And I mentioned some of the things like *ex parte* communication, commenting on pending or impending cases. Look to the rules that we already have. I mean, there are definitions in the in the Code that that talk to us about what appears might be in the realm of what the Colorado Commission on Judicial Discipline should be addressing. And let's go back to those. I think sometimes we try to make things much more complicated than they are. I mean, I always go back to a comment, one conversation we had, some judges had about in terms of recusals. I said, well, the first thing you do is go to the Rule that talks about recusals. That provides you with a lot of guidance on what you're going to do, then you have case law and the whole bit. So, once again, I think I would advocate for a fully staffed Commission to begin with, so that they can do as thorough job as they can in making determinations as to whether or not something should come before that body. Included in that might be an explanation why, even though there was, might have been, an allegation of misconduct. Why the commission chose not to accept the case and have that as a reporting requirement. You know, I know, there's a lot of concern, and I certainly don't have the answer as to when confidentiality should stop and when it should start and the whole bit. But I definitely believe it's an area that should be deeply explored, and there should be a point in time when the confidentiality shield is removed.

**Rep. Carver**

Thank you. Judge Maes and, then, my final question. And you may not have the Troyer Report in front of you, but their Recommendation 10 specifically addresses various aspects, and that's on its the title is under improving judicial officer complaint process, and it talks about, obviously, the deficiencies, starting with that many didn't know what the complaint process was, and then they didn't trust the complaint process. But the rules were vague. There was not specificity. Since you have been on the Commission, can you give me a sense of and obviously, these things are established by Rule. In your opinion, should it, are there aspects that should be statutory versus the more flexible leaving it to rule? So again, and that's on page 61 and 62 and perhaps you could provide, if you're interested, of course, provide some follow up comment in writing. But I'm interested in hearing, especially from former Commission members, and you are so invaluable being both a judge as well as a commission member of long standing, the structure of the complaint process. Understanding or we're developing an understanding of the deficiencies of that. Where it needs to be, by rule versus statute. And, also, on page 62 there is discussion about confidentiality. And I think that's another aspect where and both these points

- 6 -

are covered under our 18 items. But one aspect of our task is, what should be statutory, what should be rule? So that's a pretty deep question, and certainly would welcome your written comments, if you choose to provide them on those issues.

**Sen. Lee**
Judge Maes

**Dennis Maes**
Madam Vice Chair, if you would, I do have the Troyer Report with me, but if you would allow me to have the opportunity to review it, and I would be more than happy to get you some written comments on it. I had mentioned during my comments about some of the, as we all know, the problems with amending the Constitution, but it appears to me that there's certain things that could be codified. For instance, the rule on recusal. I don't think that there's anything that's really space science about that, that couldn't be written down. But if you would provide me the opportunity, I would be happy to provide you my comments on that. What particular portion of the Troyer Report was that?

**Rep. Carver**
It was in the . . . Mr Chair, if I may.

**Sen. Lee**
Go ahead.

**Rep. Carver**
It was in the recommendation section. It's recommendation 10 on pages, 61 and 62.

**Dennis Maes**
Thank you.

**Rep. Carver**
Thank you, sir,

**Dennis Maes**
And I will do that.

**Sen. Lee**
Senator Gardner had a question. He's remote.

**Sen. Gardner**
Thank you, Mr Chair. Judge Maes, thanks for being here. It's good to see you again. I wanted to ask you about the Troyer Report. I saw a newspaper Op-Ed that you co-authored that seemed to indicate that you

- 7 -

took issue with some of the factual conclusions of the Troyer Report. I don't know if you would want to expand on that or speak to what you had to say in the Op-Ed about that, but I read the Troyer Report closely and wondered what conclusions you, as an experienced factfinder yourself, may have taken away from that. Thank you.

**Sen. Lee**

Judge Maes.

**Dennis Maes**

Thank you, Senator Gardner, it's nice to see you again. I'm assuming you're having a good time, in addition to all the work that you're doing out there, but good to hear from you and see you. In a broad sense, I thought the Troyer Report was rather superficial, and I do have it with me, and I would, quite honestly, relish the opportunity to kind of go down it in detail at some point. I thought it was rather superficial. Senator, you're as a lawyer, you're well-aware of some of the court rules that we must abide by. And I'll just come straight out and say it. I, if you or I in a courtroom proceeding started calling somebody a liar or something like that, it'd be about 10 seconds before the judge came floating out of the chair and say, you're never going to say that again in here. You're not going to refer to it. I was really put aside by the fact that one, I thought the Troyer Report was very biased. I thought they took a great deal of liberty in in commenting on the veracity of certain witnesses. And let's don't play any games about it, particularly Chris Ryan. Although they never interviewed Chris Ryan. Now, I understand that they didn't interview him, probably because he didn't allow him to. But I thought some of the comments they said about, he was not truthful, he was lying about that. I was really offended by that. I did not know. Please provide me with the background information that you have to support that particular opinion. So, I just thought they skipped a lot of putting the dots together on some of their conclusions and stuff. And I don't have all of that with me right now. I do have it in my briefcase, but I just thought that there was way too much what I considered speculation and editorial comment. But there wasn't any backup support for it. Where's the evidence that you're telling me this. Did, and the lack of specificity and maybe it was the confidentiality in saying this, Justice said this or that Justice said that. You know, one of the things that we're very proud of in our system of justice in the United States is the opportunity to confront your accusers. Well, who was saying that Chris Ryan was a liar? Who was saying that this person was not telling the truth? How did you get that information? Where is it documented? How can we get the behind the scenes information that you have? You, Troyer, has to make those particular conclusions. Those are pretty damning conclusions that were reached in that Report, and they may very well, Senator, be true. I just didn't think there was any backup information for it. That I would have required if they would have been in my courtroom, telling me this is the evidence here. I would have said that's insufficient. I'm not interested in your opinion. I'm interested in the facts that got you to that opinion.

**Sen. Lee**

Senator Gardner.

- 8 -

**Sen. Gardner**

Thank you, that's all, and I appreciate that analysis. And as far as having fun in Philadelphia, the Uniform Law Commission is primarily sitting in a room with 300 other lawyers to draft law. So fortunately, unfortunately, my family can have fun while I sit in the room with lawyers.

**Dennis Maes**

Have a good one.

**Sen. Lee**

Representative Weissman.

**Rep. Weissman**

Thank you, Mr. Chair. And Senator Gardner, I'm shocked to hear that sitting in a room full of lawyers is not also a form of fun for you or any of us. Judge, thanks for being here. I wanted to drill in a little bit more specifically. Something that I think has bubbled up to the surface over the years here is when we were all in school, the simple, broad stroke of the function of the judicial-third of government is that judges decide controversies arising under the law. And you certainly do that. A lot of the problem here has come up from the fact that judges and Chief Judges and Chief Justices in particular are also administrators or bosses or employers, if you will, of large, complex organizations filled with humans and human imperfections and sometimes even human rivalries. The prior witness suggested one set of ways to separate that. We've seen other ways, maybe just by way of example. And of course, without getting any into anything individualized or revelatory of anyone's specifics. When you were a Chief Judge for quite a number of years, and there arose, to say, a situation that maybe I'm not putting the question right. I mean, within the Judicial Branch itself, you could have a situation that is both something that implicates judicial discipline and HR matters. Take kind of an extreme example, if a judge is just screaming racist stuff from the bench, clearly judicial conduct or misconduct is implicated, and nobody is the gatekeeper of that information, because the courtroom is full of a variety of folks. I think the problem comes in where sometimes conduct happens pretty deep down within the Branch itself. Employees, clerks, interns, and, thus, there's both an HR lens on it and there's a judicial discipline lens. I think it's pretty clear that the Constitution says that initial threshold determinations are to be made by the Commission, which is like the Branch itself, constitutionally created and charged. There have been implications that maybe that hasn't been happening consistently over the last couple of years. From your standpoint, having to be in the middle of this for one of our Judicial Districts. How did you navigate this, and how do you think that it should be navigated as we consider these matters statewide?

**Sen. Lee**

Judge Maes.

- 9 -

**Dennis Maes**

Thank you, Representative Weissman. And they do come up. They do come up as a Chief Judge. I took my responsibilities very seriously and sometimes ended up with less of a friendship than I had before I was a Chief Judge. But, for instance, once again I think we have guidance in what's the jurisdiction of the Colorado Commission on Judicial Discipline. And obviously, if I'm getting something that is clear to me, that is a matter, or was clear to me, that was clearly a matter of judicial misconduct, then that would be reported directly to the Commission on Judicial Discipline for them to deal with. You get into the HR problems. Let me give you an example. Judges that maybe just didn't put in a full day of work. Let's put it that way, I thought it was directly my responsibility to sit down with the judge and talk about, look, here's what your responsibilities are. You know, you don't have carte blanche just to come and go as you please. You have dockets to control. And, obviously, some of that is covered by the Rules under the Colorado Rules of Judicial Discipline. So, on those kinds of cases, where I didn't think there was any, where it was an administrative issue, you know, running the courts and all that. I didn't have any problems with that. I will tell you, Representative Weissman, that I had very regular meetings with my administrative staff. And the one thing I would caution them is, I know a million ways to get myself in trouble. I need you to keep me out of trouble, so you tell me. And, so, we would talk about things, and we would talk about the administrative part of it. Obviously, they were not privy to anything else that might have been, something that might be subject to the Colorado Commission on Judicial Discipline. The requirement is, if you believe there is, has been judicial misconduct, you report it. And you turn it over to the body that has the authority to deal with it and also has the resources to deal with it. It was not unusual for me, and we've heard about this, the somewhat tension sometimes between the State Court Administrator's Office, the Supreme Court, the trial courts. And it's there, believe me. But I would also refer to judicial counsel on this. Hey, I've got, I've got something going on here. What is your, what is your recommendation to me as my lawyer on how we handle these things? So, you know, the worst thing you can have is what's happened here in many instances, and that's just ignore it. Maybe hope it goes away, or something like that. It's not usually the most comfortable. I don't know that I've provided you with the answer you're looking for, but there is that tension between the HR part of it and where do we get into a judge's behavior that I might bring him in and say, I think we need to take a look at this, as opposed to, now you're committing judicial misconduct.

**Sen. Lee**

Rep. Weissman.

**Sen. Lee**

Thank you, appreciate the answer. To go a little bit further on some of that. So, if I'm an aggrieved party, and let's just say, a judge. I'm just making up an extreme, easy example here to use it as a foil. A judge screams inappropriate things at me from the bench, and I'm a litigant. I may have a claim in judicial discipline. I could go to the Commission. I don't have to, though, as a private individual out there. So, I guess two things I'd like to invite you to speak to a bit further. That's me as a hypothetical private citizen. If, however, I am another judge who becomes aware of something going on in the judicial

- 10 -

system, then I'm not a private individual. I am bound by attorney ethics, and I'm bound by the Code of Judicial Conduct, itself. And I think that you were alluding to this, but you know there are in those codes affirmative duties to report certain things if you become aware of them. So, I'd like to hear you say a little bit more about how you construed that in your time as Chief Judge, specifically in the context of affirmative duties that you felt to report things up to the Commission on Judicial Discipline, if you became aware of them. And, then, in terms of the balance of HR and letting the constitutional system work. Swirling around out there in the great blender of things that the committee here is needing to reduce, per the bill that scopes our work, are some notions of sort of legal liability. Well, what if something comes out and sees the light of day, and then there might be exposure to the State in the form of a civil judgment that would have to be ultimately paid by the State and the taxpayers. I didn't hear you speak to any of that. And I'll just, I guess I'll say plainly, and then invite you to agree or disagree. You know, if the State acting through any of its employees or agents has done wrong and given rise to a civil claim, then, frankly, I think we need to answer for that, just like anybody else does. And I don't think to me that cuts across the need for a constitutional mechanism for judicial discipline to function as set forth in the law. Backing all the way up on the Constitution and the provisions in Article VI. So, I'd invite you to speak more to both of those. please.

**Sen. Lee**
Judge Maes.

**Dennis Maes**
Representative Weissman, as a matter of fact, you bring up a good point. As the Chief Judge, when we would have civil matters involving judges, I generally had to sign off if there was some sort of an agreement that was reached on a civil lawsuit. So, you have the other concern is that even though I'm the Chief Judge, I have really no authority over any of the other judges. I mean, they are a constitutionally appointed judge, just like I am and I could sit down and have a chat with them about, hey, I really think, you know, maybe you ought to step it up in this way or that way, or the whole bit. But do I have any authority to enforce it? No, I didn't and I don't. And I don't know if that's a good thing or a bad thing, you know? I mean, the Constitution is the Constitution. But it's interesting that you put me on the spot right now, because now I'm thinking about those cases where I said, Yeah, I think we ought to settle these and what was the reason for the complaint to begin with? And should that have been also submitted to the Commission on Judicial Discipline? So, I guess I don't know the exact answer to that, other than to say that, at least when I was the judge, I would hope to be guided by the Rules, and I would be guided by whether or not this is something that's interfering with the operation of the courts as a whole, those sorts of things. I would like to try to take those into consideration in how I was going to handle a particular dispute. I will tell you that there were times when I would have a lawyer come into my chambers and say I was, by the way, my name's Representative Weissman. I was just up in judge so and so's courtroom, and, you know, yeah, I know my argument was pretty lousy and all that, but did he really have to scream at me or anything like that? I'd get those kinds of things. And I will tell you right now that one of the things I really believe in, and it all, you got to balance all of this stuff as well. You

- 11 -

know, I mean, on how egregious is something that's being reported to you? But I also felt like, hey, if I get something out of the ordinary, that's not my in my character, screaming at somebody. I would want somebody to tell me. To come up and say, hey, look what you're doing. I think, to prevent something from becoming much more of a problem. So, in a circumstance like that, I would bring the judge in. I'd say, look, I wasn't there. I don't know. All I can tell you is, this is what it is. You know, if the allegation is accurate, you might want to take a look at it. And I'm not certain, but I think it used to be the process that the Commission on Judicial [Performance] did interim evaluations, not just when the judge was up for retention, and, you know, took those kinds of issues into consideration. And I guess my whole point is, what can do if there's behavior out there that can prevent somebody from ending up being referred to the Commission on Judicial Discipline. I think we have those responsibilities, to do that. God knows, none of us are perfect, and I had my bad days. I will tell you the best lesson, Representative Weissman, I learned as a judge is my clerk. I hired my clerk. I was on the bench for 24 years. My clerk was with me for 23 years and 11 months. Now, I don't know how she put up with me for that long, but one of the most important lessons I ever learned is we walked off the bench one day and she says, you know your behavior, that's the way you are. You really kind of stepped over it this time. Well, that's the only time she ever told me that, but she knew how much I respected her and stuff. It was a valuable lesson for me. You know, yeah, you're absolutely right. So, some of these things are just common-sense things, too. I mean, how can we help each other be better human beings and correct something before it becomes a more serious issue?

**Sen. Lee**
Rep. Bacon.

**Rep. Bacon**
Thank you, and thank you for your testimony today. I'm wondering if I can ask you, perhaps some of your insights on, you know, being an administrator within this system. One of the recommendations from the Troyer Report was really about preparing the Chief Judge to be an administrator. But I think I'm just curious on what any sort of leadership training it is that any of you are provided, as well as what is it that you norm around by way of organizational culture, with handing anything from something that might be an HR issue to a misconduct issue? And particularly, as a Chief Judge within your District, so can you share a little bit on what may be happening in such leadership training? How perhaps you were trained, if any, formally by the agency? And what was your guidance, I guess maybe even outside of the CJD, in regards to you being an administrator in this organization?

**Sen. Lee**
Judge Maes.

**Dennis Maes**
Thank you for that question. Representative Bacon. And I'll speak about myself personally. When you are first appointed to the bench, we go to judge school. And I don't know how long it is now, whether it's

- 12 -

one or two weeks. But I will tell you this, that I thought it was very thorough, and I thought it was very intense, and it wasn't, hey, this is a week of let's all get to know each other and the whole bit. But here's what we're doing. And as a result of that, we would have individuals from the departments come and talk to us about that. About, you know, here's what the office of probation services does. Here's what the clerks do. And, of course, they had their own organizations, as well. And, you know the other thing Representative Bacon is. I don't want to be too critical, but if you're there for a while. I was on the bench for seven years before I became the Chief Judge. Well, I saw what was going on. We had judge meetings, we had meetings with staff. So, there was always that opportunity. When I mentioned that I thought the State Court Administrator's Office training program was really excellent. I really meant that. I thought that they provided us with a great background in terms of here's where the different divisions of work are and why and the whole bit, and getting to know what is the organization. The other thing, Representative Bacon, is I had a great deal of faith in the people I hired that were my administrators. And I was the first to admit, I don't know near as much as my district administrator knows about some of the administrative processes here. But I was never hesitant to go say, Would you please teach me, tell me about it. And, you know, communication is always the thing. It's always the thing. So, I mean, there was just a need for a lot of communication. When I was a Chief Judge, I implemented this what I called chat with the Chief. And what that was, is I would have quarterly meetings where we would have the entire court staff, obviously some skeleton staff, to take care of business and all that. But all the employees. And it was a come and hear what's going on. See what, hear what we're doing. And we would have reports from the directors. We would also have a social hour. So, the people after the reports were in could sit around and meet with their colleagues and talk about, you know, Dallas, or whatever the heck they wanted to talk about. But, so, just a constant way of trying to educate those around us. I mean, I was never ashamed to ask a question about something. God darn knows, you know, there's anybody that needs help, it's me. You know, ask my wife for 42 years, she'll confirm that. So, I just was surprised when I read that part of the Troyer Report about this individual jumping into a job with seemingly no experience. That was not my experience at all. And I will tell you that, as the Chief Judge, we had a Chief Judge's Council, and those were periodic meetings that we had that were actually run by the Chief Judges. It was our agenda. Now, at the Judicial Conference, when all the judges were together, we had a meeting of all the Chief Judges. That meeting was specifically called by the Chief Justice of the Colorado Supreme Court, and the agenda was set by that particular person. So, there was never an opportunity where I felt that I didn't have the resources to reach out to help me through a process. And when I mentioned earlier about consulting with counsel, what should I do with this particular case? You tell me you're my lawyer, you know. And of course, let them do their jobs. That doesn't necessarily mean that we were always in lockstep. At the end of the day, I'm the one that made the decision. But I wanted to hear from people about what are all the options that are out there. So, it was a real surprise to me when a suggestion came that our Chief Justices somehow were not prepared for the job. Those three that I mentioned, they were not only fabulous judges, but they were fabulous individuals. We had our spats, you know, but it was always the business part of the thing. And I was always very impressed with them and what they were doing and what they were trying to do to teach us. You know, we had our. . . Representative Bacon, I will tell you there was the tension between the state courts, individual state

- 13 -

courts, and the Supreme Court. Well, why do you have all of a sudden, $100,000 for that position? I can use three clerks down here in Pueblo. There's always that tension and there always will be that tension. And that's just the way the system works. But there was always communication about it.

**Rep. Bacon**
Rep Bacon.

**Rep. Bacon**
Thank you. And I guess what I'm curious about is. I'm sorry, I tend to process as I ask a question. So, I'm wondering if you'd give me a little bit of grace. But what I want to understand is, what sort of either public accountability measures or steps does the Chief Justice need to take in managing the organization, particularly around budget, right, hiring and so forth. You know, who's looking at overall, how many contracts were issued, all those procurement things. Because I think it just strikes me in many public institutions that one, a chief executive could say they don't know procurement policies and, also, just have something be signed without understanding the rules behind it. And, so, I don't know if there's sort of like these are just examples to kind of illustrate the point. But, are there annual reports? Are there this is the state of the court? Are there annual budget reviews? I mean, we look at them because of the funding pieces. But I'm curious what the organization does that perhaps isn't codified in the Code to set some sort of public learning knowledge and accountability around how the organization is run. I think, unfortunately, through reading the reports, we're not getting some of those details, and so we're kind of having to guess. So, for example, I'm like, Well, what is the actual syllabus of the leadership training, you know? I'm curious. Or, do you have to post things for all of the Chief Judges of all the Districts to know about? And, so, I guess, for me, I don't want you to perhaps explain the whole Department, but are there some things that you can come to regularly expect that you feel like should be happening as a matter of organizational policy or protocols that you have maybe seen from other Chief Justices over time? Right? That perhaps didn't happen here. If you have anything to share on that, that might be helpful. But, I guess we're just looking into the insights of how is the organization run. What is it that people can expect to see or know particularly about the things discussed here in regards to contracting and procurements and how much money we have, and any responsibility about the HR processes, any reporting out to you all. Are there any annual reports? This is how many complaints we've had. Do you get to be included in saying, as an organization, we want to lower this number, or just anything? How is it that you all are included in I call that organizational culture and organizational policies that aren't necessarily codified in statute or code. If that makes any sense?

**Sen. Lee**
And Judge Maes feel free to answer fully and completely, but I'll just note, we're 20 minutes behind schedule, and the role of this committee is to look at judicial discipline, not procurement rules and things of that nature. So, within that context, we appreciate your answer.

- 14 -

**Rep. Bacon**

Representative Bacon, let me break it down to the lowest common denominator. And we all had our, I'm in the 10th Judicial District. I had my budget. So, I was fully aware, because of the information given to me by my court administrator, what our budget was. What are our needs, what does it look like next year, what does it look like last year, here's what our stats are and the whole bit. On the larger picture, a general idea, you know, we would know that, hey, we're going to take a hit this year from the Legislature, or something like that, and so you need to prepare for it. But, we had audits. We constantly got figures concerning caseloads, that sort of thing. You know, it's one of the bases on how many judges are in each District. But just going back to me, I thought the information that I had from my staff was always very adequate for me to be able to say, here's where we are in terms of the state of the 10th Judicial District. And I just, again Representative Bacon. I trusted the people that I had in those positions, and I trusted them to tell me. Just to give you an example, we had an occasion where Chief Justice Michael Bender was coming down to Pueblo for a certain thing with the courts. And I decided that I would like to introduce him to the Pueblo Community. And, so, I arranged for a little get together, social get together, and I had the court system and the probation department pitch in to pay for that, and the auditors told me I better never do that again. So, you know, those are the kinds of things that you learn from. You know, that you don't do anything intentionally. And I never did something like that again, but I was always very comfortable in terms of the decisions that were being made locally. I can't imagine a half billion-dollar budget or anything. I couldn't tell you.

**Sen. Lee**

Okay, thank you Judge Maes, both for your service as a judge, a chief judge, and on the disciplinary commission. I can't help but noting that it must have taken some courage for your clerk to chide you about your approach, but it also took some humility from you for her to feel empowered to do that.

**Dennis Maes**

Yeah, we're just human.

**Sen. Lee**

We are indeed. Again, well, thanks for your testimony here today.

**Dennis Maes**

Thank you all.

- 15 -

# Appendix 27(s)(ii)(3)

# Presentation by the National Conference of State Legislatures;

# Legislative Interim Committee on Judicial Discipline—
# July 12, 2022 Hearing:
# Presentation by the National Council of State Legislatures

**Sen. Lee**

Next on the agenda, we have Michael Hartman from the National Council of State Legislatures, and he is online. We apologize for being a little bit behind schedule, but we appreciate your testimony. Mr. Hartman, I don't know if you're there. We see a slide up on our video, but we don't see you. Maybe, we do see you.

**Michael Hartman**

Are you able to see me now?

**Sen. Lee**

Very good. Thanks for joining us. If you would, introduce yourself and your organization. And again, appreciate you being with us.

**Michael Hartman**

Yeah. Well, hello. My name is Michael Hartman. I want to take a moment to thank Chairman Pete Lee and Madam Vice Chair Terry Carver for allowing me the time to speak today. I will be covering the issue of judicial conduct committees from a national lens, highlighting what other states may be doing that is innovative or just different, as well as larger trends. Hopefully, by the end of this I will have covered some of the topics of interest to this committee, and I'm happy to follow up on questions I'm unable to answer today.

But before I begin, I do want to take a brief second to tell you about NCSL and myself. NCSL is the country's most trusted bipartisan organization serving legislators and staff for more than 40 years. Our membership includes well over 7000 legislators and around 30,000 legislative staff. We promote policy innovation, create opportunities for lawmakers to share knowledge, and ensure state legislators have a strong, cohesive voice in the federal system. We do this because we believe in the importance of the legislative institution, and know that when states are strong, our nation is strong.

As I mentioned earlier, my name is Michael Hartman, and I am a Policy Associate at NCSL. I have a Bachelor's of Science in Psychology from The Ohio State University and a Juris Doctorate from Denver University here in Colorado.

So, without further ado, let's begin. On the screen, I've laid out what topics I'll be covering today. As you can see, we will start with model rules and end with confidentiality and transparency. Perhaps one of the

- 1 -

most debated topics, in my opinion. Along with those, we'll cover some of the other major aspects of judicial conduct commissions, or what I'll call JCCs, for short.

First up is the recommended model by the ABA. It's actually been some time since there has been a major recommendation for reform. Back in February of 1978, the American Bar Association first adopted the standards relating to judicial discipline and disability retirement as a national model for enforcement of judicial conduct codes. A little over a decade later, in 1990 the ABA set out to review the 78 rules with the following goals in mind: a shared conformity with the new ABA model judicial code of conduct to ensure prompt and fair discipline for judges, to enhance public confidence in the judiciary, in the judicial disciplinary system, to ensure the protection of the public, and to protect the independence of the judiciary and establish a model for states to use as a resource to establish improved judicial discipline systems. From these goals, following extensive amounts of research and discussions, the model rules were approved in 1994. Published in January 1995, the model rules end with the statement, "these model rules are presented with the understanding that each jurisdiction should determine for itself whether to accept or modify the individual rules." With that in mind, let's look at what those model rules entail. Rules 1 through 5 outline the organization and structure of JCCs. For example, they provide that the authority of JCCs should extend to any person performing judicial functions or exercising judicial powers in the state's judicial branch. The major exempt carve outs would be administrative law judges and federal judges. The rules also recommend membership to have an equal number of judges, lawyers, and public members. Rules three through five primarily address a singular concern, and that is whether it is appropriate for a single JCC board to act as the investigator, prosecutor, judge and jury for a disciplinary case. On a basic level, the model rule solution was to propose two independent panels, one which would handle the investigation and prosecutorial function, and a second which would handle fact finding and decision making. Rules 6 through 16 cover many of the general provisions, including defining the grounds for discipline as any conduct constituting a violation of the Code of Judicial Conduct, the Rules of Professional Conduct or other applicable professional codes. The only other ground for discipline is the willful violation of a valid order of the highest court, the commission, or a panel of the commission, such as those panels contemplated in rules 3 through 5. The rules establish clear and convincing evidence as the standard of proof, allow for state rules of civil procedure to apply generally, provide the right to counsel for the judge, prohibits *ex parte* communications, provides immunity to civil suit for communications with the Commission, provides service of process procedures, subpoena procedures, provides an emergency tool for the highest court to place a judge on interim suspension upon the filing of an indictment if the charge raises a substantial question as to the judge's fitness for office and provides other notice provisions, more broadly. Of particular interest is rule 11, which addresses confidentiality under the model rules prior to the filing of formal charges, all proceedings are confidential. If the complaint is dismissed without the filing of formal charges, the commission may never disclose it. If the matter proceeds the filing of formal charges, all proceedings are public, except incapacity proceedings. Rules 17 through 25 cover disciplinary proceedings generally. The process begins with the receipt of a complaint by the Commission and is broad enough to allow disciplinary counsel to initiate a complaint themselves, as

- 2 -

opposed to just outside sources. Many of these rules are procedural in nature and cover the filing and hearing process rules. Of note are Rule 18 and Rule 25. Rule 18 governs the use of dismissed complaints by the commission. It is intended to protect the judge from the use of unsubstantiated information years after the information was received. It provides that if a complaint has been dismissed prior to the filing of formal charges, the allegations made in that complaint are not to be used for any purpose in any future judicial or lawyer disciplinary proceeding against the judge. Rule 25 provides for the review process. It provides that dismissals and the recommendations for sanctions shall be reviewed by the highest court in the state, which may accept, reject or modify in whole or in part the findings and conclusions of the commission. The highest court may dismiss the charges, remand to expand the record, or impose sanctions. For the ABA, the requirement that any public sanction be imposed by the highest court and not the commission, is essential to the independence of the judiciary. Rules 26 and 27 actually cover two specific scenarios. The discipline of a member of the state's highest court. And the second scenario is cases involving allegations of mental or physical incapacity, respectively. So, Rule 26 provides that a complaint against a member of the highest court proceeds through the process in the same way as any other, except that a special supreme court is constituted to act in place of the highest court. The special court shall consist of a number of judges equal to the number of justices of the highest court, and may be composed of trial or appellate court judges, or a combination of the two. The special supreme court will act on interim suspension motions and serve as the appellate review body for the imposition of sanctions. Rule 27 covers both cases which incapacity is being brought against a judge, and cases where a judge actually pleads incapacity as a defense to other charges.

,Although that was very brief, let's now turn to look at what the states are actually doing nationally. So, the purpose of JCCs was to maintain and restore public confidence in Integrity, independence, and impartiality of their judiciaries. Beginning in 1960, California became the first state to establish such an organization. Now all 50 states have some form of a JCC. They have different names in different states, such as commission, board, council, court or committee. In 2007, Cynthia Gray, who you will be hearing from later, did a complete scan of state JCC laws and found differing sources of authority. As you can see from her work in Table 1, most states have passed constitutional provisions which allow for JCCs. As I'm sure you know, the Colorado Constitution provides that there shall be a Commission on Judicial Discipline comprised of certain membership with certain terms. It also defines the grounds for discipline. Of note are subsection E and G. Subsection E provides for the appointment of three special masters to act as fact finders for the Commission, who may then recommend to the Supreme Court the removal, censure, reprimand or discipline of a judge. This sort of addresses the concerns brought up earlier in the ABA Model Rules 3 through 5. Subsection G provides that prior to the filing of a recommendation to the Supreme Court, all papers filed with the Commission or masters are confidential and privileged. This firmly establishes Colorado's line in which confidentiality ceases. So, we will be discussing confidentiality a little bit more on a national lens in a second. On your screen, I've actually highlighted one example of a recent state change that has occurred constitutionally. Like Colorado, Texas has constitutional provisions. So, the reform was done through a ballot proposition. As you can

- 3 -

see from on screen, Texas passed a constitutional amendment expanding the scope of authority that their JCC has to candidates for judicial positions as well as judges themselves.

So, with that, let's next look at how states handle membership. So, I'm actually going to run through the next few topics quickly, as most of this information is from the Center for Judicial Ethics, and I noticed, since Cynthia Gray will be talking, she is the Director of the Center. So, their resources on these topics are extensive. If there is something not covered by one of us, feel free to reach out afterwards, and I'm sure we'll be able to get you an answer. With that said, commission memberships are designed to be representative of the vast interests within a state. As such, JCC membership is unique in each state. However, there are some commonalities. Many memberships include judges, attorneys, justices of the peace, public members, or clerks of the court. Within judges, states sometimes choose to further break down the membership of judges by the type of court they're in. For example, Tennessee requires two trial judges, one general session judge, one municipal court judge, one juvenile court judge, one court of appeals or court of criminal appeals judge, and two additional judges. Throughout the states, term limits range between three and six years. As for the selection of members, members come from a plethora of sources. Some states allow each member to be picked from amongst their peers. So, for example, Montana has two district judges selected by district judges, one attorney selected by the Supreme Court, and two public members selected by the Governor. Other states have all members selected by one body. For example, Ohio's seven judges, 17 attorneys, and four public members are all selected by the Supreme Court. However, many states have some form of both systems occurring. For example, North Carolina has one court of appeals judge, two superior court judges, and two district court judges selected by the Chief Justice, four attorneys selected by the State Bar, and four public members, two selected by the Governor and two selected by the General Assembly. Of particular note to an audience of legislators, is that Virginia is perhaps the only state which has all seven of its members selected by the General Assembly.

So, with that quickly covered, I'm going to move on to sanctions, as well. As far as public sanctions are concerned, most of the states have similar types of sanctions, ranging from warnings to complete removal. On your screen, you'll see three state examples of possible public sanctions. Between them, they cover all the common forms of public sanctions. The major difference in practice regarding sanctions is really concerning whether the supreme court directly sanctions individuals or if the court simply has review authority over the sanctions placed by a JCC. As you may know, Colorado sanctions judges through the Supreme Court after Commission recommendations. This is much like Florida. As an example, on your screen, taking the opposite approach, California is a state which allows the JCC to implement sanctions which are, then, reviewable by the Supreme Court. Interestingly, some states have taken a hybrid approach. For example, Texas allows several public sanctions to be implemented by the JCC with court review. However, removal and retirement are reserved for the court following recommendations from the Commission. Texas is an interesting example, because they have some technical nuances at play as well. For example, removal recommendations are heard by a seven-member Review Tribunal appointed by the Texas Supreme Court. Additionally, public admonition, public

- 4 -

warning, and public reprimand may all be done prior to formal charges and are not subject to court review.

With that quickly out of the way, let's move on to the delicate balancing act of confidentiality and public transparency. So, as a psychology major, I like to start this section out by first mentioning some psychology literature. As far back as the 80s, psychologists have been looking at the relationship between feelings of fairness and losing in court. Both in formal and in informal settings, the general rule of thumb is that people are more willing to accept loss in court if they feel the process was fair. Judges and court personnel, as well as legislatures, should be interested in procedural justice because studies indicate that it encourages decision acceptance and leads to positive views about the legal system, more broadly. For example, there was an observable reduction in recidivism for at least four years following an individual experiencing what they deemed a fair hearing. In other words, those individuals who experienced an unfair process were more likely to reoffend. If you are more interested in procedural justice literature, I would highly recommend Tom R. Tyler's work titled procedural justice and the court. The real reason I mention this is to highlight the importance of a fair procedure for all the parties involved. The trick is, what is considered fair is sometimes subjective. AKA, a political question. As such, states have all tried very carefully to develop what they deem to be a fair process when it comes to public transparency and confidentiality. With that said, they are not all the same. The last complete national scan of confidentiality laws surrounding JCCs, that I am aware of, was done in 2007 by Robert Tembeckjian in the Justice System Journal. On screen is Table 1 from his work, which covers when confidentiality ceases. As of 2007, 35 states have adopted sunshine laws or rules regarding formal judicial disciplinary hearings. Even in 2007, legal scholars such as Robert were arguing in favor of more transparency. For example, he argues, keeping judicial disciplinary proceedings private runs the risks of signaling to the public that judges are benefiting from special treatment. Particularly, by comparison with criminal defendants, parties to civil litigation, or an official of a company sued by shareholders for securities violations. The harm to a judge's reputation deriving from an as-yet unproved misconduct claim is surely no less than the harm to a defendant indicted for an as yet unproved crime. Moreover, from the very founding of the United States, the constitutional presumption has been that the accused, as well as the public, are better protected against government tyranny by open processes. Regardless, states must answer the political question, what is fair for all parties involved?

And with that, I will end my presentation. I want to thank you again for having me. If allowable, I can answer any questions you may have. If I am unable to answer now, please reach out by email, on screen, and NCSL will be sure to follow up as quickly as possible.

**Sen. Lee**
Thank you for your presentation, Mr. Hartman, we do have a question from Representative Weissman.

**Rep. Weissman**

Thank you, Mr. Chair. Thanks, Mr. Hartman, for talking with us, and very much appreciate the point about procedure and how folks feel about the outcome. I think that bears on all of our work here, as you noted. I think that you are familiar. Just to set the stage for the question. You're familiar with the VRA or Victim Rights Act in Colorado, at least somewhat? Okay, it was observed, I think very rightly, at our last hearing, that there really isn't any such VRA for procedural or substantive rights attaching to complainants in the Colorado judicial discipline system. I spoke to one person who has been a complainant in a matter, and the way that that person put it is, the system treats me as a witness. It does not treat her as a victim or survivor in the sense of having rights that attach under our framework or Marcy's Law in other states, and so on. The system needs to treat complainants as witnesses, no doubt. But I think the point is, can it not also treat them in another way? So, my question, and I realize you may need to pin this for follow up, but I'm very interested in it. Does NCSL have any comparative research into first, the threshold question, whether there is any such framework, whether by constitution, statute or court rule in any other state that orbits its judicial disciplinary function or system and vests rights. For example, just to be notified about what's going on every X days, or something like that, or rights that may move from procedural to substantive. And if the threshold question is clear that there is any such system, it would be useful to see kind of a breakdown of the elements across different states. So, as we consider what we're doing here for the balance of the interim, we could learn from that.

**Sen. Lee**

Mr. Hartman.

**Michael Hartman**

Thank you, Representative. That is actually a really interesting question. Unfortunately, NCSL doesn't currently have kind of a national scan on victims' rights, as they're associated with judicial misconduct themselves. Recently, we did do a little bit of research into victims' rights as extended beyond when a case is dismissed, generally. So how that typically works out is some states have effectively defined victims in their victims' rights act to be broad enough to continue victim status even following dismissal of a case. In some of those instances, though, that definition of a victim may expand into judicial conduct proceedings. However, I have not done a deep dive into those specific statutes to be able to speak clearly on whether that is true or not. But theoretically, some of those definitions are broad enough to encompass victims in all proceedings, which may include judicial misconduct proceedings, depending on how the state defines their victim's rights. What I can say is we can probably get you some more information. I am unfamiliar with any statute that currently exists expressly dealing with this.

**Rep. Weissman**

Okay, thank you, Mr. Hartman, I'll just say thank you now for the answer. Appreciate the point about you know, a suitable definition might do the job of invoking all of the general VRA. We are going to hear later from NCSC, and what I may do is reach out after the fact to you and them. Our nonpartisan staff may do the same. I would definitely like to avoid reinvention of any wheels or duplication of effort,

- 6 -

but I do think comparative work would help in the interest of time. I think I'll leave it there and maybe seek you out after the fact. Thank you.

**Sen. Lee**

Okay, any other questions from the panel? Madam Vice Chair.

**Rep. Carver**

Thank you, Mr. Chair. Thank you, Mr. Hartman, for your presentation. And in the interest of time, some of these questions or queries may be more appropriate for written follow up. So first, I think Rep. Weissman raises a very interesting point about procedures within our complaint process that recognize the concerns and interests of the complainant. And understanding that this is a civil process while the VRA is in a criminal setting here in Colorado. If I may, Rep. Weissman be so bold that, as you're perhaps looking into Rep. Weissman's query, that if you find in on the civil side, whether it's an existing judicial complaint process or analogous to HR processes, complaints filed within governmental agencies, what kinds of procedural steps are embedded or do you see that speak to the complainant's interests? And certainly that would include what is going on with the complaint, right? Retaliation, whistleblower, any other things that you might find that might be relevant to what we're looking at in the judicial complaint process. So if you wouldn't mind perhaps expanding your search to include those civil systems, I think that might be helpful. Second of all, Mr. Chair, if I may. And I think all of these are if you can respond in writing and send to Juliann to share with the committee. Given our full schedule here, I would also like to see, I think it would be helpful, given the vast expanse of what we're being called upon to do, again In this very short time frame. Is those states that utilize a commission system, if there is a way to perhaps hone in in a bit more detail? And perhaps Cynthia will do this this afternoon. I don't know. A bit more detail on how confidentiality is dealt with in those other similar commission states. Those states that use a commission but then have a second body. A second body that either reviews what the proposed disciplinary action is or a separate body apart from the commission, but not the court, in deciding what the proper punishment should be, disciplinary action. But those models in the states that utilize a commission but then utilize another body. I think that would also be helpful as part of our work. And again, if you haven't taken a look at Senate Bill 201, as you're looking at those areas, feel free to add material that would speak to those pertinent sections in 201. That's all I have. Thanks, Mr. Chair. And thank you, Mr. Hartman, so appreciate NCSL and your expertise and assistance to legislators.

**Sen. Lee**

Thank you, Mr. Hartman, and again, I'll echo the sentiments of my colleagues. We appreciate the assistance you provide us in sort of giving us an overview of what's going on elsewhere, and as we move into some of these more creative areas. As was alluded to, we have 18 specific areas that we're supposed to look at, and some of those areas focus on the goal of increasing public confidence in the judicial system. Over the past four years, we've had some things occur in Colorado which could easily undermine people's confidence, or mandate us to do things to ensure confidence. One of the things that

- 7 -

we're asked to look at is whether or not a judicial system, or, excuse me, a judicial conduct system that is controlled by judges, can inspire public confidence because it could feel like or have the optics of judges protecting judges. So, if you could just sort of respond academically to that idea, and then if there are any suggestions as to other ways to do it. You alluded to it when you. Well, I'll leave it at that.

**Michael Hartman**

Yeah, I guess looking at that is really a tough question, because it really brings up separation of powers issues and making sure that we're at least maintaining the independence of the judiciary. And that's why I think the ABA actually recommends that no matter what structure you really set up, there is a kind of review by the Supreme Court, if the Supreme Court isn't the one making the decision in the first place. Now that's where they kind of, in the ABA model rules, came up with that extra kind of special proceeding in which what happens in the scenario in which your highest court is actually the one being investigated. And, so, they made up sort of an additional court procedure that could be created to try to alleviate that and get rid of the bias within the system. I can't speak to the efficacy of that, as I don't know. However, that was one solution proposed. Other solutions may reflect in creating other special programs and potentially not having it be 100% led by the Judiciary. Some of the memberships for JCCs, especially, are much broader in terms of who can appoint. Like I said, it's a single governing body in Colorado, much like Florida, that appoints the membership for the JCC, whereas in other states, sometimes that's expansive. And even in I believe it was Virginia, it's actually put into the hands of the General Assembly to try to get a potentially more representative body put together. Again, I can't speak to the efficacy of that, but that is the idea that I think many states are pushing for and trying to make a more independent body.

**Sen. Lee**

So, we've done some of that in Colorado with the membership of our Commission. It's, you know, four judges and six non judges, four of whom are citizens. So, it's pretty diverse. In addition, who, under the ABA model, appoints the members of that special body?

**Michael Hartman**

So, here's why I may be a little bit, this is my personal opinion here, but there's why I'm a little skeptical about the efficacy of the ABA model. There is I believe they have it set up, and that the Supreme Court would then select that special panel of judges in equal size, number as themselves. I foresee the situation, if you have a situation in which you are fearful your Supreme Court is committing misconduct and maybe abusing the system, they may pick judges for that special proceeding that are friends of theirs or are otherwise potentially compromised in bias. So that's why I'm a little skeptical towards their model. However, I'm not exactly sure how you would create a different model that still maintains that independence of the Judiciary, because as soon as you take away their appointment role, that's sort of the last say that they would have.

- 8 -

**Sen. Lee**

Right. Okay, give me just a minute. There was a couple of other questions, and we're again running into our public testimony time. So, one of the tensions that we've had in Colorado is the pre-screening of complaints by the Judicial Branch before or coincidental with their referral to the Office of Judicial Discipline. What other models are there or recommendations are there to ensure that complaints about judicial misconduct aren't, for lack of a better term. This is an inartful one, but "hijacked" by the Judicial Department and not referred over. I mean, how can a human resources officer in a judicial branch do a preliminary investigation without appearing to and, then maybe dismiss it, without appearing to protect the judge and not get the case to the Commission. I didn't say that very well, but I think you get the idea.

**Michael Hartman**

I think I understand what you're getting at. In order to bring back some of the testimony from the previous speakers, we've had. Kind of that interesting balancing act of which situations of misconduct deserve a judge walking in and having a conversation, or even a law clerk recommending like, hey, You just weren't acting right today. That wasn't you. And which ones should follow the mandatory reporting, and that's maybe a hard line to find the perfect balance to. And perhaps a little bit outside of my expertise at the kind of national statutory level. Perhaps, Cynthia may have a little bit better recommendations for what maybe internal policy regulations could be put in place for enforcing kind of that mandatory reporting. So, that you're not obviously over reporting incidents that shouldn't be reported. But you're making sure to report all incidents that should be reported. So, I think that's a nice balancing act that I don't quite know from the top-level national thing, but hopefully Cynthia, from the National Center of State Courts, might have an opinion on that one.

**Sen. Lee**

Okay, well, thank you, Mr. Hartman, any other questions for the representative from the National Council? Seeing none. Thank you again, and we look forward to having some further dialog with you, sir.

**Michael Hartman**

Thank you so much for having me today.

- 9 -

# Appendix 27(s)(ii)(4)

# Public Testimony (Morning);

# Legislative Interim Committee on Judicial Discipline—
# July 12, 2022 Hearing: Morning Public Testimony

**Sen. Lee**

Okay, committee, that brings us to the public testimony portion of the hearing. We are, as usual, a little bit behind schedule. But let me, are there witnesses in the chamber who would like to testify in public testimony? I want to give people who are here the opportunity. Why don't the three of you with your hands up, come on up to the table. Thank you all for being here today. We appreciate it. We're moving up public testimony in respect of a request that it be done so that people do not have to wait until the end of the day. So, you're the beneficiaries of a request that was made to the committee. We are going to give you three minutes to make your remarks, and there could be questions from the committee, and we would ask that you identify yourselves, tell us any organization that you represent, and then provide us with your testimony. Who would like to begin? Okay.

**Tracy Ashmore**

Thank you. My name is Tracy Ashmore.

**Sen. Lee**

Click that button on the mic.

**Tracy Ashmore**

I see. Is that better?

**Sen. Lee**

Yep, okay.

**Tracy Ashmore**

Mr. Chair and Madam Vice Chair. My name is Tracy Ashmore, and I'm an attorney in private practice at a law firm in Denver, and I only am speaking for myself. I'm not identifying my firm. I wanted to call to your attention what I believe is one problem in the current system and that is, there's no remedy for judicial delay. And by the way, I think we've got a really strong system with a lot of, with the majority of terrific judges that are awesome, but we do have some problems. And I thank you for your time, and I can, just watching your faces this morning, it was very heartening. I can tell you're really committed to making changes that might improve the system, if possible. The disciplinary rule calls for judges to act with diligence. And it's not more specific than that. There is a statute, which I really appreciated. I believe it was your question, what could be done by statute? There is a statute at 13 C.R.S., 13-5-135, called Time Limit on Judgment, and it requires a court to rule within 90 days after the adjournment of court. So, 90 days is a specific number, a lot more specific than diligently. Some members of the Colorado Commission on Judicial Discipline recently spoke at my Inn of Court, and they said they don't

- 1 -

enforce this statute because the language is arcane. I disagree, but that and $5 might buy me a latte. At the end of every trial, the judge says court is adjourned. So, I don't think that the word adjourned is archaic, but the Commission on Judicial Discipline does and so this statute follows up with a procedure for someone to make a complaint to the Judicial Discipline Commission for enforcement of the 90-day rule and the process following certain steps in CRS 13-5-136 ultimately would allow for a judge's salary to be forfeited until the ruling is made. My request, and I know I'm just one person, and there's probably smarter people. Cynthia Gray, I've been following her work since I've been traumatized by delay. She's fantastic, and I would encourage you to know that lawyers in general really endorse her work.

**Sen. Lee**
Which is why we invited her to testify in front of our committee.

**Tracy Ashmore**
Yes, she's fantastic. And then I thought I would highlight my personal experience. I had an eviction case, which is an expedited proceeding in Vail. And after two days of hearing, 27 months later, we did not have a decision. I called Bill Campbell, and he discouraged me from making a complaint. I had another case in Aspen that finally went to trial five years after it was filed, and the judge got everything wrong and was reversed on appeal. But an eight-year long process for a basic civil dispute is, I think, objectively speaking, too long.

**Sen. Lee**
So, can you wrap it up?

**Tracy Ashmore**
Sorry.

**Sen. Lee**
It's all right.

**Tracy Ashmore**
If you look at the Colorado Judicial Discipline Commission's 2020 Annual Report, and by the way, they have not issued the 2021 report yet, even though it's July of 2022. Page 13, a judge was issued a private reprimand for a delay of three years in issuing a decision. The report further states it was based on the number of witnesses. In fact, what happened was, after the defendant in that case complained, about a year later, the judge signed. The State of Colorado, the State was the plaintiff's proposed order, and so we need we, I just think we can do better on the issue of delay. Thank you.

**Sen. Lee**
Okay, thank you for your testimony. Next.

**Sen. Lee**
We can hear you.

**Ruth Burns**
Okay, I'm Ruth Burns. I'm also an attorney, and I'd like to speak to you today on some issues that I've been seeing with some of the District Courts. Specifically, one District Court that I've been practicing in. I went ahead and sent you along a copy of the motion for recusal that I had filed in that case, which was denied by the judge. But it's about 11 pages long, and I lay out all of the perceived violations of the Rules of Judicial Conduct that took place in that case, and I include the evidence of where I think that came from. So, this is why I started talking to my state representatives. Back in September of 2020, I spoke with Representative Kennedy. He was very kind to me, and I'm assuming that's why I was invited to speak here today. I talked to him about, there are really two reasons that I can see why we have so much trouble with judicial discipline in Colorado. The first is a phrase called self-regulating profession. The second is a phrase called absolute immunity. These two phrases . . .

**Sen. Lee**
What was the second one?

**Ruth Burns**
Absolute immunity. And it's like qualified immunity, but it's absolute. It means you just can't be sued at all. It doesn't matter whether your conduct was reasonable or not. It just means, because you are who you are, you're free. And this is, specifically, you can't be sued in a civil case. You can still be prosecuted criminally, but the odds of anybody actually trying to take criminal prosecution against a judge are fairly slim. You're not going to see that unless there's extremely egregious conduct. Whereas most of the conduct that's violating the rules in most cases, I think, are of a lesser degree, but still really problematic for anybody who's appearing in those courts. The self-regulating profession issue is the fact that you expect lawyers to inform on each other and judges to inform on each other. I understand that that is an obligation that we all have, but I can tell you from my own experience that is not happening 99 times out of 100. The notion is that if you're going to inform on me, I will inform on you, and then we're all in trouble, and nobody has any fun, and we're all having a problem. So, the result of that is that there's a sort of conspiracy of silence in the profession, where the lawyers are keeping their mouths shut about what they see about other lawyers, also about what they see about judges. So, that's a situation where people are just afraid to speak up. And I think that that's a problem. With regard to some of the other things that had been brought up today, the delay issue, that's happening all the time. I've seen it. Some of that is in that motion for recusal, the absolute immunity doctrine, where nobody can be sued at all. Basically, what this does is you've got a situation where a judge can't be regulated or won't be regulated. You have a situation where the people can't regulate the judge because they can't sue the judge, and the only real option the people have is to try and un-elect the judge. But most people don't know enough about the judicial system to say whether they should keep or not keep a judge. So, most judges are getting retained by election. So, it's just not really a very viable system to actually keep

people safe. And I really feel that you ought to consider abolishing that absolute immunity doctrine. You also benefit from it, so does the court. But it's something where your self-interest is showing, and it's not really appropriate for anybody to try and say they are immune from the Constitution when they are working for our government. So, I guess I'll stop there.

**Sen. Lee**

Okay, sir.

**Jacob Bellinsky**

Good morning or good afternoon already. My name is Rabbi Jacob . . .

**Sen. Lee**

Press your button.

**Jacob Bellinsky**

Hello.

**Sen. Lee**

We hear you now.

**Jacob Bellinsky**

Good morning or what time is it? Almost afternoon. My name is Rabbi Jacob Bellinsky, and I moved to Colorado eight years ago from overseas. And before I get into the details quickly of my case, I just want to say it's quite unfortunate. It seems that not only is the judicial commission apparently ineffective and incompetent, but it seems to be set up that way. Because how do you enforce a system of judicial conduct that's only recommended professional conduct? There's no teeth to it. There's no there's no basis for actual statutorily prosecuting any of the criminality that might happen in court. The various things that happened today here, you know, talk about a criminal complaint or trying to pursue criminal complaint against a judge. This is 123 page complaint I sent to all of our state officials, to Governor Polis to Attorney General Weiser, to Chief Justice Boatright to U.S. Attorney Cole Finnegan and with copies to also Christopher Gregory, the Executive Director of the Judicial Commission and the local sheriff where the crimes occurred. My case is a very, very shocking, shocking situation, shocking case. I've been a father for 30 years. I have eight children, and we started with the court process. My ex wife decided she wanted to try and pursue custody of one of the children. That expanded into three years, three years of a nightmare. Three years where my family was entirely destroyed. I have contacted and spoken and tried to speak with various officials. I submitted recusal complaints. I submitted all kinds of complaints and information and motions for remedy. After a year and a half and two years of spending, having to spend my entire life savings, any equity I had. I had to start representing myself. Well, you know what? I researched the law. I filed a Rule 60(b) for fraud upon the court, and you know what? And there's no statute of limitations for fraud. There's a serious fraud upon the court, deprivations of rights,

- 4 -

criminal activity that's happening in our court system, okay. The judge in my case, Judge David Cooper Taylor and the attorney, Attorney Andrew Newton Hart, they conspired together. They essentially removed my rights. It is not a criminal case. It's not a dependency neglect case. There's nothing like that at all. And for just absolutely nothing, for no reason whatsoever, I've been reduced to having not seen my children in over a year for some of them, and over almost two years now for one of my daughters. This is the despicable situation that's happening in our government. And it is systemic. There's corruption. And I just wanted it to be clear, and I wanted to be on record that I have been waiting for months to receive any kind of information from Governor Polis or from any, any of those people I mentioned, and I have not. I've been ignored. I've been treated like, like I'm the criminal, when I'm the victim. Okay, my children are the victims. And I cited, I cited all the different statutes of what victim services I'm entitled to, and my children are entitled to. And basically you have, I'm entitled to crime victim services under CRS 24-4.1-100.1 to 24-4.1-305, and under Article II, section 16 of Colorado's constitution, under the federal crime victims rights act and 18 USC 3771 among many, many more. Okay, this complaint I have submitted has been ignored. Has been ignored for month after month after month, week after week, all of my complaints, all of my all of my attempts for remedy, to all the different state institutions. Have all been ignored. Have all been ignored. And I want to just the point I want to mention today, and I think it's very important, is that when I, when I tried to contact Chief Justice Boatright to ask for sua sponte action in my case, because my family has been separated, we have been persecuted, we have been harmed and injured, and we continue to be every single day that passes. Okay, Chief Justice Boatright ignored every single letter I had sent. Eight certified mailings in the last over the past month of March. Okay, from there, all of a sudden, I get a letter from the, from the from the Clerk of Court, suggesting that, oh, we sent off your information to Christopher Gregory at the at the judicial commission. I didn't ask for a, I didn't ask for a, for an ERD, or whatever they call it.

**Sen. Lee**
Rabbi, could you finish up please?

**Jacob Bellinsky**
Sure. I did not ask for an evaluation. But this is important, okay? Christopher Gregory is in this is involved in this whole Commission. Well, all of a sudden I receive a rejection letter or denial for an investigation I never even asked for. I asked for a sua sponte action, a criminal follow up to be to be conducted, and all of a sudden I get a letter from Christopher Gregory saying that they've dismissed my request for evaluation. There was never a request for evaluation. These are crimes. These are criminal these are because it's criminal activity, okay? And I would like the State of Colorado to understand that I'm going to be pursuing a RICO act, violation, civil, civil and further other, other act, unless some action is taken immediately. And anyone who hears my voice today, I beg of you to take action for my children and for my family. Okay, thank you.

**Sen. Lee**

Thank you for your testimony. Are there any questions from any of the committee members for any of these witnesses, Madam Vice Chair.

**Rep. Carver**

Just very quickly first. Thank you so much for bringing up the delay issue, and we'll certainly take a look at that and on the recusal. And this is something that we can follow up later on. But was, did you ever submit that to the Commission, or what is your understanding on whether that would fall within the Commission's jurisdiction, which it may not?

**Ruth Burns**

What I did was I went ahead and moved the court to recuse. It was, it's a long and tangled tale. There were two judges that were involved in my case at the court level. The first was the Chief Judge. The second was a brand new judge who had no civil experience at all. And the case that I was bringing forward was against a city government. It was a reasonably complex case. I sued the mayor and the city council as individuals, as well as in their official capacity. And there was a lot of shenanigans, in my view, from the court, and one of the shenanigans was the transfer of my case from the Chief Judge to this brand new judge. That was in the motion for recusal. I thought it was the Chief Judge who had done that. When I looked at that order, I realized it was not the Chief Judge. It was the Chief Judge of the judicial district who had actually made that order, and it's the judicial district where the city government sits. So, one of the things I was going to suggest to you folks as something you might do to make less of this happen is to make some kind of a ruling where, if a judge works for a city government, then they cannot later be a judge. You know, if they're a municipal court judge, then they can't later be a district court judge in that same judicial district where they're going to be making decisions about the organization that they worked for. Because that's what I was seeing, was that the Chief Judge of the judicial district used to work for the city. And I just have to question why that judge? I mean, you can understand why the Chief Judge of the judicial district would be involved in the creation of a new division within that district, you know, in the hiring of the new judge, in the procurement so that you can get the desks and the chairs hiring the personnel. But what I just don't really understand is why there would be any substantive ruling on a case that actually was involving an organization or an entity where that Chief Judge formally worked. That's a violation of the rules of judicial conduct, of the Rules of Professional Conduct, there should not have been any substantive ruling from that. So, coming back to your question, yes, I am going to put it in front of the Judicial Discipline Commission, but I haven't yet, because I only just got my ruling from the appellate court, and based on what we were hearing, you don't do that until you've got your ruling. Sorry, go ahead.

**Sen. Lee**

Rep Carver,

**Rep. Carver**

Thank you, Mr. Chair. And just to clarify, I do not have personal knowledge of whether recusal, while I've looked at the Commission rules, I don't have a memory sufficient to determine if that is within their jurisdiction or not. My initial thought as I heard your testimony was that it was an appellate issue. But I thank you for bringing that to our attention. And certainly there needs to be a path for that to be reviewed. My understanding is that through the appellate process, like other rulings by the judge. But appreciate the testimony that you brought here today. Thank you.

**Ruth Burns**

Thank you.

**Sen. Lee**

Seeing no further questions. We thank you for joining us today and providing us with your insights. Are there any other . . .

**Jacob Bellinsky**

May we leave some material with for the for the council, for the commission to review?

**Sen. Lee**

Sure, pass it to the staff.

**Ruth Burns**

And I was also going to ask if I could go ahead and send some more written testimony, as well. Just kind of clarifying, what I said, if that's okay, thanks.

**Sen. Lee**

Thank you, sir. Um, is there anyone else in the room who would like to testify, or is there anyone online who would like to testify? There is. Why don't we take . . . How many do you have up there?

**Sen. Lee**

We've got 15 witnesses signed up. We've just done three. We have witness testimony scheduled for now and for a little after four o'clock. I just wanted to knock out the ones that were here and available right now. So, let's get Jenny Lynn and Judy Atwood. Ms. Lynn, please join us. And I don't know if you were listening. Welcome. I just want, yeah, we can hear you. I just wanted to tell you that you have three minutes to testify, and there will be an opportunity for questions thereafter. So, if you would, we have your name, tell us if you represent an organization, and provide us with your testimony.

**Jenny Dees**

All right. My name is Jennifer Dees. I've been dealing with the Denver and Colorado courts since 2012 when me and my ex filed for divorce after 15 years of marriage. Judge Hood, who is now a justice on

the Colorado Supreme Court was the judge in our Denver case. Our divorce had settled with 50/50 parenting time with our twin, eight-year-olds and my two year old, who was with me 100% of the time, as my ex was not the file for the father, nor did he want the child for exception. My child was never made a party, the two year old, to the divorce case. Nor was he ever added as a child of the marriage. Within a week of Judge Hood granting the divorce, my ex hired his unethical attorney who had connections with Judge Hood. My ex had told Judge Hood on the record he wanted no parenting time or financial responsibility for my child. During the issuance of decree of divorce, and Hood issued the divorce decree without my child listed in the parenting plan or on the separation agreement. Within a month, my ex filed for paternity of this child into the divorce case, which was settled and closed. Judge Hood had no jurisdiction over my child, who lived in Arapahoe with me and the petitioner lived in Jeffco. Denver County had no jurisdiction. Judge Hood only heard one witness that my ex put on the stand before the hearing ended due to time. The paternity hearing was set out a few months. But instead of finishing the hearing, Judge Hood ordered without explanation, granting my ex was legal father to a biracial and Native American child. Without any due process, without ever having a full hearing on the paternity or being able to put my witnesses on the stand. Hood kidnapped our child. The bio father was asserting paternity, and came to court two times for Hood to refuse to allow him to speak because he was African American and my ex the petitioner, claiming he was bio dad, was white. My ex filed a fraudulent vital records form to get a falsified birth certificate naming him as bio dad to an African American child actor. He filed this paternity motion. He was never on the birth certificate before this. I have these illegally crossed out and altered vital records and docs that were accepted for a fraudulent birth certificate. Judge Hood used this action to claim my ex was the legal father and that we couldn't refute it because he was listed on the birth certificate. Hood was given the crossed-out forms and it just . . .

**Sen. Lee**

Ms. Lynn. Miss Lynn, let me stop for a minute. I appreciate your testimony. I appreciate the circumstances you're describing for us. This sounds like a custody and divorce dispute, and . . .

**Jenny Dees**

No, I think it goes further, because it goes to the Commission on Judicial Discipline and how you all have . . .

**Sen. Lee**

Well, if it's a matter that should be before the judicial discipline . . .

**Jenny Dees**

It went before them. They've denied it, and I have all of that evidence. I have everything recorded and everything. Like so I'm filing a 60(b)(3), to void out these orders with him, and it's going federally. It's 100 page motion with exhibits. It's coming to every single one of you. So, then we can file for

- 8 -

impeachment on Hood, because what he's done is illegal, and the other judges have covered it up, and you all have allowed it, and the Commission has covered it up.

**Sen. Lee**

Okay? Well, thank you.

**Jenny Dees**

I have all the reports. I have them recorded. I have the Commission Director threatening me on a recorded phone call that if I tell anybody about their report, that they'll hit me with criminal charges. How does that work?

**Sen. Lee**

Ms. Lynn, Ms. Lynn, we've heard your testimony.

**Jenny Dees**

No, you cut me off, but I do have it recorded and will show the people that I can't even state my testimony without being cut off by the representatives claiming they want to fix this.

**Sen. Lee**

You've exhausted your time before the committee, and I am going to cease your testimony at this point in time. Okay, did I see a Ms. Atwood?

**Jenny Dees**

They won't listen to what Judge / Justice Hood did.

**Sen. Lee**

Ms. Atwood? Are you? Can you hear us?

**Judy Atwood**

Good afternoon. Can you hear me now?

**Sen. Lee**

We can hear you now. You'll have three minutes to provide your public testimony. Please keep it within the scope of the issues that the committee is mandated to address. Thank you. Go right ahead.

**Judy Atwood**

Thank you. Good afternoon members of the interim committee, Mr. Chair, and Madam Vice Chair. My name is Judy Atwood, and I'm an advocate here for women who experience domestic violence. I want to be very blunt with you. Here it is. The family court system across the continent has become the moral equivalent of a slave trade. Mothers and children have no rights at all. The constitution is thrown out the

- 9 -

window. Millions of dollars are being made by professionals that deny domestic violence, sexual abuse of children and physical abuse of children. The court is willing to even let fathers who are confirmed and mothers who are confirmed to molest the children should have a relationship with your children. And if these things have, as if these things haven't happened. But a mother who told to shut up about abuse. That's a reason to cut her off from her child on the court side. Ignorance, I'm sorry to say, is not the problem. The problem is horrible mother hating attitudes combined with greed and court leave, and this means, unfortunately, that trainings for judges and other personnel are not the answer. Things are getting worse. Judges are imposing gag orders on Mothers, prohibiting them to discuss the custody evaluator's report and with anyone other than their own lawyer. So much for free speech. She's violating the court order if she asks someone whether they actually said what the evaluator claims they did. Speaking of which, evaluators are forbidding women to record their meetings with the evaluators. What excuse there be for this? Obviously, because they weren't able to make up what she supposedly said, and judges are citing evaluators who have this policy. There's a lot more. Judges are forbidden women to take their children to qualified sexual abuse evaluators. They are putting women into supervised visitation for disbelieving their children's disclosure. I'm afraid passing better laws don't help much either, because public court judges consider themselves above the law. So, they ignore it, except when they want to blame their bad actions on the law. Then, suddenly they claim that the law leaves them no choice. So, what's the solution? We're leaving that to you. Thank you.

**Sen. Lee**

Thank you for your testimony. Ms. Atwood, are there any questions for this witness Seeing none, you do have about 40 seconds left if you want to propose a solution to the issue you identified. We're prepared to listen.

**Judy Atwood**

The complexity of the family court system isn't straightforward. There's so many moving parts in a case, and that includes custody evaluators, judges, attorneys, sometimes PCDMs, and these cases are very complex. I suggest that we start by doing surveys for families. After family court, we find out where the trouble, where the communication problems are, where we have to identify what families need. Um, moving forward.

**Sen. Lee**

Okay, very good. Thank you for that. And if you have, if you want to elaborate that on that, or provide any further details, you can submit them to the committee on our website, and we'll certainly take a look at them again. Keep in mind that the mandate and charge of this committee is to address issues of attorney discipline and the processes and procedures for that. But again, thank you for your testimony.

**Judy Atwood**

Thank you.

- 11 -

**Sen. Lee**

I think that's all we have on for public testimony right now. If there's anyone else who wants to testify, please rejoin us at little after four o'clock this afternoon, so we are on lunch break. Please, committee members, if you would be back here at one o'clock to hear Cynthia Gray, the Director for the Center for Judicial Ethics. Thank you. The committee stands in recess.

# Appendix 27(s)(ii)(5)

# Presentation by Cynthia Gray /
# The National Center for State Courts;

# Legislative Committee on Judicial Discipline—
# July 12, 2022 Hearing: Testimony of Cynthia Gray

**Sen. Lee**

The Interim Committee on Judicial Discipline will come back to order. We have a presentation from Cynthia Gray, the Executive Director of the Center for Judicial Ethics of the National Center for State Courts. Is Ms. Gray on the screen?

**Sen. Lee**

She's on the screen.

**Sen. Lee**

Ms. Gray, thank you for joining us. It's an honor to have you participate in our Interim Committee on Judicial Discipline. Thanks for being here.

**Cynthia Gray**

Well, thank you for the invitation. I appreciate the opportunity. Should I just start right up?

**Sen. Lee**

Sure. Go right ahead.

**Cynthia Gray**

Okay, my name is Cynthia Gray. I'm Director of the Center for Judicial Ethics of the National Center for State Courts. And in October, it will be 32-years, as long as I've had that position. The National Center for State Courts does many, many things, providing information and support and research for the state court systems. The Center for Judicial Ethics is a national clearinghouse for information on judicial ethics and discipline. It means I spend my days gathering information, reading statutes, rules, constitutions, decisions, opinions, newspaper stories, and gathering that information. And, then, I use it in a lot of different ways. I answer questions, I write things. I make presentations to judges. I provide research support and information for the judicial conduct commissions. Every state has a judicial conduct commission. And DC has one too. And there's a system for the federal judiciary. Other than that generalization, it's difficult to make any statements that are true about all the commissions. Each one is different. And, so, it's hard to identify the best model, the best way of doing things. Just because there are so many moving parts it is hard to identify which is best. Some are created by Constitution, some by statute, some by court rule. They have different number of members, the numbers are broken up differently between judges, lawyers and public members. They're appointed by different folks there. They have different sanctions available, they have different structures, the supreme court's involvement varies from state to state. So, a lot of what day to day, or a lot of the answers to questions have to be well, it depends on the state. That said, I'll do my best to answer questions and to address some of the

- 1 -

issues. I must say many of the issues that you're looking at have been issues for the 32-years that I've been doing this job.

And, interestingly, there are currently you're one of three committees looking at state judicial discipline systems. That is certainly three more than have ever been existing at one time. I can't actually remember the last time there was one in the states, I mean states have had reforms but they haven't necessarily been preceded by legislative committees. The other committees are in California and Montana.

In California, it's an independent committee. It's established by the Legislature, but the members are not just legislators. They're representatives of different groups. It was created because a number of years ago, the Legislature was receiving complaints from their constituents that the commission was not pursuing many complaints. And on the other hand, they were receiving complaints from judges that the commission was pursuing too many. So, they set up an independent commission to look at that. And first there was the state auditor. It did an audit of the commission. And they did find some problems, make some suggestions and recommendations with respect to the structure and procedures of the commission. And now this committee is looking at it more closely, or maybe just from a different perspective.

Then in Montana, the Montana Legislature. This is mainly based on newspaper stories, but as I understand it, the Montana Legislature introduced legislation that would have changed the way district court judges would be chosen. And someone in the Administrative Office of the Courts sent out an email, asking the judges in the state what they felt about this legislation, and the legislators got wind of it. And they were concerned that this was a misuse of court resources, and staff for lobbying and working on behalf of a private organization. In this case, the Montana Judges Association. And they started an investigation. They issued subpoenas. The supreme court said you can't subpoena these records. Because if there's misconduct here, it needs to be investigated by the Judicial Standards Commission. And, so, that's why the Judicial Standards Commission is being reviewed.

I did sit in on this morning's proceedings. So, what I thought I'd do is, rather than just talk for an hour, which I can do on this subject with no problem, I could address some of the issues that came up or some of the things that were talked about and discuss them and provide information or promise to provide information after we're done here. And, then, I can spend as much time as you'd like, answering questions. The issue of the victims' rights act was raised. As far as I know, no state has a statute or rules or anything that applies, anything like that, to judicial conduct commission proceedings. But I can poke around a little bit and see if there's something I've missed. Commissions do try to keep complainants informed. Some I'm sure do a better job than others. On the issue of what happens when a supreme court justice is being investigated, or has proceedings filed against them. 13 states have rules that specifically address that issue. And the proceedings remain the same until the case, until the end, when there's a recommendation or a decision that would ordinarily be reviewed by the supreme court. And in those 13 states that have a specific rule, there's a variety of ways they have of creating the temporary court. In

- 2 -

some courts, the seven senior appellate court judges or the seven chief judges of the appellate courts or seven district courts, are chosen at random. I do have information on that. And I can provide that to you after the speech.

**Sen. Lee**
That would be helpful. Thank you.

**Cynthia Gray**
You're welcome. In 26 to 27 states, the rules for judicial discipline commissions are adopted by the state supreme court. In the other states, it's adopted by the commission itself. And if you want a list of those states, I can provide that as well. There are a couple that I couldn't figure it out from the rules who adopted them.

The issue of confidentiality. This is an area where Colorado is an outlier. Not by itself, but it is unusual in that most states, 35 states, the hearing on any formal charges of judicial discipline is public. That's not true in Colorado or 15 other states plus the District of Columbia. In those states, the confidentiality ceases at the end. In the 35 states, it ceases with the filing of the formal charges. In a couple of states, it's the filing of the answer. And so, the hearing is public. And it does not, and I can provide an up-to-date table of which states are which for you again at the end.

**Sen. Lee**
That would be helpful, too.

**Cynthia Gray**
It doesn't depend on the structure of the state, when confidentiality ceases. There are states that have different structures in each of the different categories of confidentiality. And confidentiality can be looked at from a couple of different ways. One is what does the commission have to disclose? And then the other is what complainants can't talk about. And confidentiality is a very controversial subject. The investigative stage is confidential in every state. So, the filing of the complaint, the investigation, the decision to whether to file formal charges, and possibly private discipline, all of that is confidential in all the states. And that's controversial. People want to know what the complaints are, when they've been dismissed, what did they say, and many people would like to the investigation to be open as well. And that way, Colorado is in line with all the other states. When it comes to the public hearing, Colorado is not unique, but it's in the definite minority. Mr. Hartman described the ABA Model Rules that were adopted in 1994, I guess. And what's unique about the Model Rules or the concept that the Model Rules introduced, was the idea of there being one commission with two panels. It would be a 12-member commission with four judge members, four attorney members, and four public members. And then the investigation would be overseen by a three-member panel, one from each of those categories. And then the hearing would be before a nine-member panel, three members from each of those categories. And then membership between the investigative panel and the adjudicative panel, or hearing panel would

- 3 -

switch back and forth rotating. The Model Rules don't specify how, they leave that up to the state to figure out the best way to divvy up the membership. But at any particular time or from state to state, case to case, month to month, year to year, a member might be sitting on an investigative panel or sitting on the hearing panel, depending on how they're assigned at that time. At the time the ABA adopted the Model Rules, no states have that structure in in effect. And currently, there are nine states that have a two-panel model, where their membership rotates between the different roles of investigative and hearing. No state has adopted the Model Rules completely. In that respect, none of these nine states have a 12-member commission with four judge members, four lay members, four attorney members, and, then, dividing up the roles depending on what they're doing at the time. So, that while some idea of rotation has been adopted by the states, the district, the numbers, the proportions, has not been adopted by any of the states. In addition, there are eight states that have what I can refer to as two-tiers. The difference there is that, instead of having rotating membership, one commission with members rotating roles, they have two separate bodies. And the membership is separate and they don't they don't change roles depending. So, for example, in Pennsylvania, there's the Pennsylvania Judicial Conduct Board, it has a set membership. And if they decide to file formal charges, they do so and then the case goes to the Court of Judicial Discipline. The staff of Judicial Conduct Board becomes the prosecutors there. The Court of Judicial Discipline has a separate membership, separate staff, separate address, and they hear the case. They decide whether the judge has committed misconduct, they decide what the appropriate sanction should be. Now, the decision of the Court of Judicial Discipline is final, but the judge can appeal it to the Pennsylvania Supreme Court. Although the Pennsylvania Supreme Court's review is limited, they can't make a different findings of fact, it's just pretty much questions of law and, maybe, the sanction. As I mentioned, there are 9 or 8 states that have something like that. But again, each of those is very different and depends very much on the state. The remaining states are often called unitary. Although some of those too have ways of breaking off the fact finder, the fact-finding process. One way or the other, many of them, the commission decides whether to file formal charges. But the hearing itself is held before one or more special masters. Special masters file a report with the commission and the Commission then decides whether to adopt the findings of the special masters. But the reason some states have gone to the two-tier or two-panel model is the argument that the unitary system violates due process. And that argument has been raised many, many times. And it's been rejected by every state supreme court that has addressed the issue, because they find that there is U.S. Supreme Court precedent, not in the context of judicial discipline proceedings, but other administrative proceedings. And they've pretty much followed that. Again, I have information on all this, if you're interested in it, that I can provide to you in writing. It's a little confusing to talk about. But I'm happy to do that, if you'd like to see it.

**Sen. Lee**
Sure, if you've got that available, we are interested.

- 4 -

**Cynthia Gray**

Okay. Since the issue of legal error in screening came up, . . . I'm going to get a drink of water. Most commissions, and this is another generalization I can make, dismiss most of their complaints without filing formal charges or without private discipline. You know, upwards of 90%. And many of those aren't investigated, they're screened out at the initial cut. And this is very, very controversial. People do not understand why that's the case. And the reason is that, often, the complaint represents a disagreement with the judge's ruling. And it doesn't present an issue of judicial conduct, judicial misconduct, or a violation of the Code of Judicial Conduct. But there are exceptions. Most states have some exceptions to the rule on legal error. Legal error is not reviewable as misconduct. The California Supreme Court, for example, has adopted a list of exceptions. I mean, a violation of the Code is one and it can also be articulated as even a legal error if it is in bad faith or if there's a pattern or there's a demonstration of bias and intentional legal error, or an abuse of authority or disregard of fundamental rights. That those also can be pursued by the commission. Again, they don't very often do it, but they do sometimes. It's definitely the exception, rather than the rule. And I looked at the rule that was identified for the Colorado Commission that says, complaints will be dismissed if they're based on disputed rulings under the jurisdiction of the trial or appellate court. And I don't know how that's being interpreted, if it's being interpreted as, you know, based in any kind of way or related in any kind of way to a disputed ruling, that would be broader than the case law in many states. But if it's interpreted more as based solely on disputed rulings, under the jurisdiction of the trial or appellate court, that would be more consistent with the case law. But as I say, I don't know how it's being interpreted by the Commission. There are other states, other states have provisions that are worded differently on what the exceptions to the legal error rule are or what the legal error rule is. And even calling it a legal error rule is an oversimplification. The issue of delay came up and it's not an issue you need to Colorado. I don't know if you find that reassuring. But it's handled all kinds of ways. It is something for which judges are disciplined. Across the country, a judge in Washington State just a couple weeks ago was disciplined for three substantial delays in cases, in small claims cases. An appellate judge in California, recently retired in pursuance to an agreement with the Commission and agreed to an admonishment, because of delays in appellate court cases, in the cases he was responsible for. Also, he was the presiding judge in that court. And there was also finding that there was chronic delay for other judges that he hadn't been addressing as presiding judge. But discipline for delay is not necessarily the best. You know, it's sort of a last resort, you sort of want, before the commission investigates, to hold it for public hearing, and then disciplines the judge, it would be better if the judge didn't delay in the first place. Or, if there were another way of drawing the problem to the judges attention and getting it taken care of administratively. And in that respect, states have lots of different processes in place. And I don't know what they are. I only know about them because when I read the discipline cases, they're often referred to it. In some states, judges have to file affidavits saying, I don't have any cases that have been under advisement for more than 60 days or the only cases I have under advisement are these. And if they don't follow the affidavit, they don't get paid. Others, if they go back and find the affidavit isn't accurate, that's another grounds for discipline. Sometimes, if a complaint is filed against a judge to the commission, the commission, it looks like sometimes they call up and that will nudge the decision out of the judge. But again, that's not necessarily

- 5 -

the best way to do it. In some states, the Chief Judge gets involved, they get all kinds of reports, and they're supposed to follow up on them. So, I don't know what the administrative process is for addressing delay, but it is definitely a ground for discipline in some states. And, in some states where it's a significant problem, sometimes the sanction can be significant, as well.

And then, the finding of the Troyer Report about the clarity of the rules, about how complaints are handled, complaints about judges. As I read, interpreted the report, and I might be wrong, and I'm going to stay online and listen to the testimony from the next folks. But the lack of clarity there was in how the HR department of the Judicial Department handles complaints, not how the Commission on Judicial Discipline handles complaints. And I may be wrong.

And in reading the Troyer Report on the issue of reporting, that does seem to be an issue of the relationship between with possible overlap between the HR responsibilities and Commission responsibilities. And, again, I'm not sure how other states handle it, because it's definitely a, it can be an HR problem. It's definitely a discipline problem, in some respects. Some of the remedies have to be undergone as an administrative issue. If someone feels they've been denied a promotion, they should have got because of gender bias. The commission can't do anything about that. They can sanction the judge, but they can't give them the promotion. So, there may need to be dual remedies in those cases. But maybe the court staff don't know about the multiple ways they can address this. That they need to be informed more about the Commission on Judicial Discipline, they need to be informed more about the other remedies. As you may know, the federal judiciary has faced a lot of complaints about sexual harassment and other workplace conduct. And they've undertaken some steps for that. And they've created multiple ways for court staff to complain about judges, and they've done a lot of education about what the what the remedies are, or what the avenues are for folks to complain. But I don't know how much of that involves complaining under the Federal Judicial Disability Act. And, so, I'm not sure what that is. But I guess the idea is that people might be uncomfortable complaining one way, so you give them another option to maybe even another option. And they also have mediation available as one of the options for employees who want to pursue a complaint against the judge for one reason or the other.

So, I may have overlooked something and so I'm sorry. From the notes I could make out, this is what I wanted to address. But, I'm happy to take any questions or make a list of things I should get back to you on in due time. Any questions?

**Sen. Lee**
Rep. Weissman.

**Rep. Weissman**
Thank you, Mr. Chair and Ms Gray. Thanks for making time to talk with us today. A couple categories, I think, probably just some requests that ought to be pinned and followed up offline, because although your knowledge of this is pretty encyclopedic, I know that some more research may be required. The

first, and you've already alluded to it, is the idea of a something like a VRA for complainants. Sounds like you have looked at that, you're not familiar with it. Rep. Carver, in our discussion this morning brought up I think, another useful source of potential analogy, which is notice provisions in administrative complaint processes. I'm thinking of various licensing boards, practice acts that oversee a regulated profession. Surely, there's some kind of complaint mechanism in there, you know, there could be others. But you know, it was it was brought up at our last hearing, there really is no such thing. And I think it's important that we grapple with that. So that was that was one. Let me think. Number two is escaping me right now. I'll move on to number three, possibly you could speak to this more in real time. I don't know if you were on this morning when Judge Maes was visiting with us. But I asked him about sort of affirmative duties, and it goes to this question of the HR function versus the judicial discipline function. And the way that that can get blurred sometimes, you know, I'll have to go back and look, but I think variously, Rule 1.113 sort of duties to an organization might say something about that. Rule 8.3, I think in terms of other duties placed upon an attorney, in this case, a judge qua attorney. I'll pause for a moment now. But I just wonder if you could speak to what you see as you survey states and judicial discipline systems in terms of affirmative duties on judges who are under a judicial code and also under an attorney code to come forward. In this case, to the judicial discipline commission, when they observe problematic conduct.

**Cynthia Gray**

The Code of Judicial Conduct does have a rule about that. I haven't looked up the Colorado version. But the Model Code. There's a Model Code version, I suspect it's something similar. Every time they've revised the Model Code, they've made the rule a little tougher, but it's still it's not enforced very often. And a lot of the advisory committee opinions on the topic, not necessarily Colorado ones, but from other states seem to bend over backwards to find reasons judges shouldn't report other judges. And I understand that that's hard, reporting on someone you know, but it's definitely a problem. If reports are not made. So, the rule says something like . . .  Again, this is a model, so I'm not sure if it's what Colorado follows, but it says if a judge has knowledge that another judge has committed a violation of his code that raises a substantial question regarding the judges honesty, trustworthiness, or fitness as a judge in other respects shall inform the appropriate authority. Then, the second part is that a judge who received information indicating a substantial likelihood that another judge has committed a violation of this code shall take appropriate action. And there are similar rules with respect to conduct by attorneys. So, what the rule says, what judges have to do, depends on how much they know and how serious the offense is, which makes sense. On the other hand, many of the violations of the of the Code that arise to misconduct, that arise to sanctionable offenses, and, particularly, the most serious are pattern offenses, where judges, you know, didn't lose their temper just once. They lost their temper over and over again, didn't make one inappropriate joke. They're consistently making inappropriate jokes. You know, weren't late to the court only once. But you know more days than they are on time. And while any single judge may only know of only one or two of that pattern, unless they report it to a central location, like the Commission on Judicial Discipline, the pattern may never appear. And, so, Colorado isn't alone in maybe it's a little fuzzy, and maybe needs to be enforced a little more strictly in order for the Code to be,

- 7 -

for the commissions to get the big picture that they need to address misconduct by judges. Does that answer your question?

**Sen. Lee**

Rep. Weissman.

**Rep. Weissman**

Thank you. That's helpful, then I'll certainly go do some more digging. And thank you, Mr. Chair, I guess one follow up in the obverse. So, from the standpoint of black letter requirements in the RPC, or the Code of Judicial Conduct, or, you know, officially adopted comments thereto, or model texts for that matter. So, you've spoken to requirements to disclose. Putting aside some of the things we've talked about in this committee today and last month, for example HR considerations. For example, concerns about minimizing litigation exposure? Are you aware of anything in the RPC or the CJC that would pull the other way on a judge, that would be a basis of a black letter requirement not to proceed to share information with the disciplinary authority?

**Cynthia Gray**

Certainly not. Black letter, no. I guess you could say, this could be an applied rule, not to spread rumors. But I don't think there's any black letter, because the idea is, when you make a complaint against a judge, particularly another judge. And it can be couched in terms of, I don't know if the judge did this or not, but this is what I heard. And then it's up to the commission to do the investigation to see if it took place. So, I don't know of anything, other than human nature, a reluctance to complain about people you know, that it's not there. And there is also the option of taking appropriate action. The other option people have, which might mean talking to the other judge and bringing it up. And, if I knew judges were doing that, instead of reporting to the commission, that would be reassuring. But it's not clear that that's happening either.

**Sen. Lee**

Rep. Lynch.

**Rep. Lynch**

Thank you, Mr. Chair. Thank you, Ms. Gray for being with us today. So, you have a more global look at these commissions across the country. We have a 97% dismissal rate of these complaints that come in, how does that compare with others around the nation?

**Sen. Lee**

Ms Gray.

**Cynthia Gray**

I think that's about the same, you know, give or take five, you know, 5-10%, I can look up some other states for you, if you want. Most have their annual reports online. Now, sometimes they count things differently, every state is different. Sometimes states count the complaints they receive against federal judges. And some states don't count those. Some states count the complaints they've received against former judges, but don't pursue. But some do. So, there's a lot of differences. But 97% is, is probably, I mean, it's not every state, every year but it's not. That figure doesn't surprise me.

**Sen. Lee**

Okay, thank you, Representative Carver.

**Rep. Carver**

Thank you, Ms. Gray for being with us and your in-depth knowledge is very helpful. There are three areas I want to mention. But this can all be addressed offline and perhaps in writing. First, from what you've seen across the country, do you see different complaint processes set up? One for parties to litigation who have a complaint against the judge versus judicial branch employees? Are those complaints typically handled by the same system? Or two separate systems?

**Sen. Lee**

Ms. Gray.

**Cynthia Gray**

As far as the judicial conduct commissions go, they would have the same system regardless of who the complainant is, what category of person that complaint is. I do think most state judicial departments also have a complaint system for their employees. Something like any large organization has an HR department, they would have something like that, too. So, a state employee would have to two options: go to the HR department, go to the Commission on Judicial Discipline. But if they went to judicial discipline, then the system would be the same.

**Rep. Carver**

Okay, and I'll make this quick, Mr. Chair.

**Sen. Lee**

Go right ahead.

**Rep. Carver**

What do you see across the different states, as far as anonymous reporting?

**Sen. Lee**

Ms. Gray.

**Cynthia Gray**

Most commissions do accept anonymous complaints. They don't particularly like them, because of course, they want a name and a phone number and an email address that they can follow up with. But they will accept them, because they understand why people want to file anonymously. That for people who see the judge a lot, and that the judge has a great power to retaliate against, might want to file anonymously. Court staff, particularly attorneys who appear before the judge, other judges, might want an anonymous route. So, most commissions will hear it. Some states have rules that explicitly allow it. Other states have a rule that says they can investigate information that comes from any source, and that includes anonymous complaints. But I think I have some articles, or at least one article on that as well that I'd be happy to send you.

**Rep. Carver**

That would be helpful. And obviously, part of the anonymous complaint is not just if you personally, as a judicial branch employee, you feel that you've been mistreated by a judge, but also somebody in the judicial branch who says, look, I've heard the talk around the watercooler something's not right in HR, something's not right in financial services. But they don't, perhaps they don't feel like they have a safe mechanism to report that. So, again, we can follow that up, offline. Final question. And on this, I'm referencing specifically, a topic under Senate Bill 201 where it talks about the committee needing to address the appropriate method for defining a consistent and clear set of disqualification standards for each of the decision makers in the judicial discipline system. So, I know you don't have that Senate Bill in front of you. It's 22-201. And it is on page 19. It is subsection (H). If you could have a look at that and if there are standards that other states are using that are different than Colorado, just a representative sample. It would be nice to see how other states are addressing that particular issue.

**Cynthia Gray**

Okay, I can do that.

**Cindy Gray**

Thank you.

**Sen. Lee**

Any other questions? Representative Bacon.

**Rep. Bacon**

Thank you. I'm curious if you can share any insights on any kind of theoretical basis, or perhaps even legal basis, around why states choose for proceedings to be confidential. I guess I'm just trying to understand what is it that they are trying to protect for by way of practices. Maybe that you've seen in the other states?

- 10 -

**Sen. Lee**

Ms. Gray.

**Cynthia Gray**

The investigative stage commissions keep confidential because they, I mean, partly because it required by law to do it, but partly because they feel that it helps in their investigation. It encourages complainants to complain. That they don't necessarily want the judge or the whole world to know that they've complained. And it just facilitates the investigation. The Commissions believe in and most investigative agencies do keep their investigations confidential. You know, grand juries do it. The law enforcement does it. Attorney General's offices do. So, that's why the investigation is kept confidential. I am not sure why, why the hearings are kept confidential. Excuse me, in states. I've never heard a justification for it. Now, most of these rules have been on the books for decades. So, partly it just they, you know, come from a time where there may have been less transparency, in general. From governments, and then what's it called, when you don't want to change? That just sets in so they don't change, or it's difficult to change. Constitutional changes, if it's in the Constitution, it's difficult to change. The New York State Commission on Judicial Conduct, their hearings are confidential. Only their decisions become public, and the Commission has worked for years and years to change that. The Commission does not like the confidentiality rule. They find it very hard to maintain after a certain point. You know they like their investigations to be confidential. They think that aids them. But after a certain point, when you're going to have a hearing, and people are being subpoenaed to appear at that hearing, it just, it just becomes a lot of work for them. A lot of additional work for it to become confidential. And they don't think that it helps with the system that the people can't sit in. They don't know about the charges. They don't know about the, you know, nobody can sit in on the hearing. So that's, I think, why, over time, states have gotten there. A few more states have gotten less and less confidential as time goes by, but it's been the majority rule for 30-40, years that the hearings be public in most states.

**Sen. Lee**

Okay, Ms, Gray, you were asked about disqualification standards, and I also noted in your testimony that you seem to have indicated that you read the Troyer Report, and I would suggest that's conscientiousness above and beyond the call. So, thank you for that. I think it became clear in that Report that the Judicial Branch felt like they were not sufficiently attuned to what was going on with regard to complaints around the State, and that as a result, the Chief Justice has said that he's going to get, as I understand it, regular reports on investigations so that he can be attuned to what's going on in the various courts. Would that prior knowledge serve as a disqualification for the Chief to participate in a decision later on, if he's been sort of monitoring a case as it was in its infancy.

**Cynthia Gray**

That's a good question. And I don't know what the answer to that is. I mean, if he's just, if it's just a procedural, you know, he's, you know, they're telling him what the steps are, rather than the results. But

you know, personal knowledge acquired outside the courtroom can be a disqualifying basis, but I hadn't thought of that before. So, I'm not, I can't give you a coherent answer. I'm afraid off the top of my head.

**Sen. Lee**

Well, you certainly hinted at a coherent answer, because procedural versus substantive is a significant and appropriate distinction. If he's getting briefed on, you know what the facts are as they are developed in the investigation, that would give him specific knowledge of what's going on, and that would seem to be. It would be, not seem to be, it would be a disqualifying factor. So, I think that's helpful clarification that you've provided. Any other questions from the committee? Seeing none. Ms Gray, thank you very much. Thank you for talking with us earlier on about this, and for your participation today and for your participation in our hearing. And your work to make the state court systems, the foundations of justice and democracy that they are. You're an icon.

**Cynthia Gray**

Well, thank you. You are very kind and I have lots of things to follow up with. And if you think of anything else, please let me know.

**Sen. Lee**

That's very gracious of you. Thank you. Okay, so the ever-efficient interim committee is 10 minutes ahead of schedule. So, we will take a brief recess.

# Appendix 27(s)(ii)(6)

# Presentation by Robert Troyer and Nicholas Mitchell / RCT, Ltd.;

# Colorado Legislature Interim Committee on Judicial Discipline—July 12, 2022 Hearing:
## Testimony of Robert Troyer and Nicholas Mitchell

**Sen. Lee**

The Interim Committee on Judicial Discipline will come to order. Old habits die hard. So, we have a presentation by the investigators of the contract issue, RCT limited--Robert Troyer and Nicholas Mitchell. So, we thank you for providing us with your report, and we would very much appreciate you to tell us what you learned.

**Robert Troyer**

The most important thing to clear up is that it should be called the Mitchell Report. You're asking about the Mitchell report? I don't know, Nick, you want to? Do you wanna talk about it, it's a very open-ended question. We had had a limited scope under our contract. The contract that was put out for public bid, we were the successful bidder. The contract that we then entered, subject to that bid, specifically, just asked us two things. It asked us to investigate facts that would help us reach conclusions concerning whether there was any misconduct or impropriety in the award of a $2.7 million contract with Mindy Masias. So, we focus specifically first on investigating the motives and intentions and actions behind the actual contract approval. And then the second thing we were tasked with was simply making recommendations for improvements to the judicial branch of government based on what facts we found, during this time period, from sort of the summer of 2018 until the summer of 2019.

**Sen. Lee**

So, some of us on this panel, were on the committee that made the selections, that sent out the RFP and made the selections. So, we're intimately familiar with your credentials, but maybe for the benefit of the rest of the panel, you could provide us with a little bit of background on who both of you are and what your qualifications are and what gives you the expertise to engage in this process.

**Robert Troyer**

Sure, we'll start with the less qualified of us first. I had been a lawyer for 32 years, private practice doing some high-end criminal defense work and investigative work at two different law firms, and then was in the federal government as a federal prosecutor for 15 years, including six years as the second in command at the U.S. Attorney's Office, five years as a line criminal prosecutor, and two years as the U.S. Attorney for Colorado. Since I stepped down from that job three and a half years ago, I've done numerous investigations, including two extensive investigations of the Catholic Church and the entire Colorado history seven-year history of Catholic clergy sex abuse in Colorado. I've worked with a variety of policing and other government agencies on internal affairs, specific matters as well as internal affairs, policy changes and training and procedural reviews. That includes Denver Police Boulder, Commerce City, the Denver Sheriff's and, and then other than the Catholic Church, a couple of other smaller investigations like this.

- 1 -

**Nick Mitchell**

Good afternoon, Nick Mitchell. And thank you for giving us an opportunity to be here with you this afternoon. I am also a lawyer and have I won't sort of recite my entire career history. But I think most relevant for this project is that I served as the independent monitor for the City of Denver for eight and a half years, overseeing the discipline system for the Denver Police Department and Denver Sheriff's Department. And making recommendations overseeing investigations into internal affairs matters and making recommendations for systemic reforms in the disciplinary systems for those two large public organizations. Experience, which I think is entirely relevant to the work of this committee and to perhaps a lesser extent, to our charter as the investigators of this contract. I'm currently the court appointed monitor of a federal consent decree between the United States Department of Justice and the County of Los Angeles for the reform of the jail system in Los Angeles County. So, I am reporting to a federal court in California and issue reports regarding necessary reforms in the jails in Los Angeles County.

**Sen. Lee**

And my understanding is that the Los Angeles County jail has more inmates than the entire Colorado Department of Corrections.

**Nick Mitchell**

You know, I don't know how many inmates are in the Colorado DOC, but the LA County jail system is the largest municipal jail system in the world. So, I would not I would not be at all surprised.

**Sen. Lee**

Do you know what number it is, just curious?

**Nick Mitchell**

The number fluctuates, and it came down substantially during the height of the pandemic, I think it was at about 18,000. It came down to about 13,000 at the height of the pandemic, and it's probably back up around 15 or 16,000 inmates in custody right now.

**Sen. Lee**

Same numbers here. Okay, thank you. All right. I just wanted to establish a little background and credentials before you provided your report. So, if you could tell us what you learned as you investigated the allegations of contract misconduct?

**Nick Mitchell**

Well, so, we did not prepare a presentation for you, we're happy to talk with you about our findings. Or if there's specific questions or topic areas you'd like us to speak to, We're happy to address, you know, any issues of concern to the committee.

- 2 -

**Sen. Lee**

What's the preference of the committee? Do you want to ask questions? Or do you want to get an overview or your conclusions or recommendations? Or what's the sense of the committee? Okay, how about a broad overview of what your findings were, and give us your conclusions? You did have some conclusions that you reach, but just a general overview, I think we understand the methodology, but the number of people you interviewed and the key players, any excluded players, things of that sort, and then.

**Robert Troyer**

Nick, do you want to do conclusions and recommendations? Okay, I'll take a shot at it. We reviewed just in terms of methodology. I guess I'll start with methodology. It was not just Nick and I who did this work. We had a retired judge from California, who's an expert and professor and trainer and teacher on judicial ethics. She was part of our team. We had former director of CBI Mike Rankin, former criminal Assistant Special Agent in Charge for the FBI also who's done a number of investigations with me. He was involved on our team. We also had Cindy Lombardi, the former Director of Procurement for the State of Colorado as a member of our team. So, we had those subject matter experts, Nick and I. And we interviewed 27 people total. We reviewed over 12,000 documents provided by the judicial department. And at our request, and with a number of follow-up requests. And we also reviewed documents that were part of the Office of State Auditor investigation that was completed while we were well into our work, but their findings came out I think in February. So, we reviewed those. And we were able to review transcripts of interviews they had done as well. Some of those overlap with the interviewees we talked to. There were three primary people who did not agree to talk to us, we didn't have subpoena power. And we didn't have any ability to force folks to cooperate and talk with us. One of those people, Chris Ryan, we did review both of his state auditor transcripts. He was interviewed twice by them. So, we were able to hear his side of the story through those transcripts, as well as numerous public statements he's made in the media. And, so, we had a sense of his accounts of various important facts. Through those things. We were not able to interview either Mindy Macias who was the Chief of Staff, to the State Court Administrator at the time. We were not able to talk to Eric Brown, who was the Director of Human Resources. At the time, both of them were at the center of this, and did not agree to talk to us for I'm sure a variety of reasons, but that'd be speculation on my part. And broadly, what we found is that, contrary to some speculation and some media reporting, that the contract that the Judicial Department entered with Mindy Masias to provide leadership training was not approved by then Chief Justice Coats in order to cover up what came to be referred to as dirt about the Department. That is salacious incidents of sexual harassment or other misconduct, both by judicial officers and staff at Judicial over the years. That that was not the motivation for approving this contract. We found instead, really, frankly, an alarming culture at the Judicial Department itself that facilitated a series of events that resulted in the approval of this contract. And we can talk more specifically about what that culture was. But we concluded that because the Chief Justice is the CEO of the Judicial Department, but isn't trained, and equipped, and supported by staff and other colleagues, to be a qualified and effective administrator, he was not. Chief Justice Coats was not keeping an eye on and using good intuition and support to

- 3 -

evaluate information and decision making from the Supreme Court Administrator. And as a result, the Supreme Court Administrator, Mindy Masias, who was the Chief of Staff and then Eric Brown, probably the next most powerful person at the State Court Administrator's Office, we're able to engineer this contract for Mindy Masias for their own reasons. I'll put it that way. So, there was mismanagement. There was misjudgment. There was misconduct. There was not, that we found, any motive or intent to approve this contract is some kind of payoff to hide misconduct at the Department.

**Sen. Lee**

Okay, we have a question from Senator Gardner on the virtual screen.

**Sen. Gardner**

Thank you, Mr. Chair and Mr. Troyer, Mr. Mitchell. As the Chair noted, several of us were on the selection committee for your contract and are very familiar with your background and appreciate your work. I asked a question of Judge Maes earlier because he has been publicly very critical with your work, and I hope you heard that or have been apprised so that you might respond. But I'm struggling with something. And by the way, I think your report is very thorough. It reaches some conclusions. But when I got done, I still struggled with the conclusion that this contract was not awarded to Mindy Masias as a payoff or a cover up.  And perhaps there's no evidence that the Chief Justice, then-Chief Justice approved the contract in order to use the phrase: shut her up. But it did seem to me that there was a strong implication that this contract was awarded for improper motivations, some of which may have been to make Mindy happy or, or to get Mindy on her way, or out the door, or, you know, if not to shut her up, pay her off, or something and that just still lingers out there. So, do you disagree with kind of my assertion altogether? Or are there elements but just not on the part of the Chief Justice? That's kind of a scattershot. But this is the core of, of a lot of the questions. And, by the way, just so I don't have to come back in and be recognized. I really appreciate the recommendations you made and the observations and recommendations that I have found them very useful, but to the question.

**Sen. Lee**

Sure.

**Sen. Lee**

Mr. Mitchell.

**Nick Mitchell**

Well, Senator, I appreciate that question. For the avoidance of doubt, this contract should never have been approved. I think we want to be extremely clear about that. We intended to be clear about that in the report, there is a heightened obligation. When you're talking about public monies being expended for public purposes. There were, as Bob mentioned earlier, there was both mismanagement and misconduct associated with the approval of that contract. And we want to be extremely clear about that point, it should not have been approved. No monies as we understand it, wherever paid under that contract, but

- 4 -

the contract itself was a serious breach of the public trust. You know, when we took this project, we had read all the media reporting, and we were aware of the facts as they had appeared in the press, and we were extremely diligent in pursuing the leads as we found them. And we have reached conclusions that we think are supported by the evidence that we found in the investigation. And we feel confident in the conclusions that we've reached. There may be other evidence that someone else may have and we that, you know, we were only able to find the evidence that we were able to find we feel confident in our conclusions. But we certainly want to be extremely clear that the contract should never have been approved, and both reflected mismanagement and misconduct in the approval of that contract.

**Robert Troyer**

I would just add, Senator, I'm sorry. Did I interrupt?

**Sen. Lee**

Go ahead. Mr. Troyer.

**Robert Troyer**

I would add your question is very good and gets to something. I think that it may be at the root of why some people are skeptical about this conclusion apparently. And that is the difference between Chris Ryan's motivation and Chief Justice Coats's motivation. The timing, the chronology, the consistency of the testimony that documentary support for the multiple witnesses who were able to comment with direct personal knowledge about Ben Coats's motivations, all line up to make our conclusion about his motivations very firm. I think you've, you're on the right track. When you say there's still something there's still something nagging that leads us to believe that the contract was a way to keep Mindy happy and get her out the door. That phrasing you used is precisely what we found Chris Ryan's motivation to be. And as the report lays out, he engaged in a bunch of actions and omissions in his communication of information to Coats about what was going on, that allowed him to accomplish that goal. But I think really that was Chris Ryan's goal, and not Ben Coats's goal.

**Sen. Lee**

Senator Gardner.

**Sen. Gardner**

Thank you. Gentlemen. Mr. Mitchell, Mr. Troyer, I appreciate that. I think I'll just leave it at that. I appreciate your explanation and clarification of that, because it does seem that your challenge was fairly daunting. As you went through this and did not have the benefit of testimony from several key witnesses for reasons of declining to testify. I would say, then, that the conclusion seems to be if I if I read your report correctly, that the Chief Justice failed to manage properly or was not able to manage properly and was misled by his senior staff. Is that a fair read of what you have to say in your report?

**Robert Troyer**

Yes.


**Sen. Lee**

Mr. Troyer.


**Robert Troyer**

Yes.


**Sen. Gardner**

That's all I have, Mr. Chair.


**Sen. Lee**

Okay, thank you, Senator Gardner. Representative Bacon.


**Rep. Bacon**

Thank you, I'd like to build a little bit off of Senator Gardner's kind of line of thinking, and perhaps I'll just make a statement and, and solicit your responses to that. You know, first, I was trying to understand the scope of your investigation and being able to make an assessment on behalf of the Judicial Department, let alone those individuals who lead it, and who were involved in the issue around this contract. And, so, while we may have found that, you know, Chief Justice Coats either mismanaged or, you know, didn't know, to have an administrator and some other people in senior leadership have these motivations. I guess what I'm just trying to understand is how does that transfer then, to the broader department, right? Even though the chief executive may not have known, that people who were the ones pushing for this contract did, and therefore the judiciary did execute a contract, if that makes sense. And, so, I guess that's what I'm just trying to understand, by way of your insights into that type of, I hope it's logical what I said, thinking, especially as it connects to the scope of what you were looking into. You know, was the scope because perhaps I didn't read all the details of the RFP, you know, looking at to particularly identifying culpability of individuals, or the Department as a whole. And then therefore, if the motivation for one or two people who were responsible for pushing this contract was to, quote unquote, be in the best interest of the Department, which I still don't understand what that actually means. Or I would love to know if you have any insights of what that is. And then it was executed. Therefore, right. So curious, your thoughts on that? If I seem off base, but also as it pertains to the scope of what you were looking into, in regards to this contract?


**Sen. Lee**

Mr. Mitchell.


- 6 -

**Nick Mitchell**

Thank you. And thank you for that question. I think there are a lot of layers to that. One of them that kind of comes out for me is the notion that a department, any government agency is ultimately made up of its leadership and its employees. And, so, to the extent that we have identified through our investigation and this report that we've issued, that some of the leaders of the Department engaged in misconduct in the award, or obtaining of that contract, that does bind the Department given that they were leaders of the branch. And I think that's a fair point and a fair assessment. I think a corollary to that is the fact, Bob alluded to the organizational culture that we uncovered as we did this investigation, which was. Perhaps among the most troubling facts, if you will, that we found during this investigation was that there were multiple employees within the Department who had concerns about the contract. But given the climate of fear and intimidation that had been created by certain people in leadership positions, those employees never came, never voiced their concerns. And, so, I think, baked into your question, I think, and correct me if I'm wrong, is this notion of culture and leadership. And we certainly were extremely concerned by the toxic organizational culture that we uncovered, and have made recommendations at the end of the report that we think will help to get the Department on a path to addressing that toxic organizational culture that caused employees to feel fear, and be unwilling to come forward with their concerns about the contract.

**Sen. Lee**

Rep. Bacon.

**Rep. Bacon**

Thank you for that. I think, what I'm also curious about in your experience, particularly with all the other agencies that you've named, and also, I want to respect any sort of, you know, like indictments by way of quote unquote, criminal culpability. But, you know, when it comes to the responsibilities of a chief executive, in regards to what they did, and didn't know about rules, you know, ultimately, have you found they're still responsible for it? Right. And I think I think that's kind of where we're also going with this. So the first point to my questions were, you know, regardless of who it was, the fact is, it was a motivation. Right. And therefore, it seems like the department is responsible for that. But the second piece is, as well, in regards to the chief executive, and thinking what they've known or should have known or didn't know, there's still a sense of responsibility there of what's going out the door. And so what I'm curious about, I asked earlier, to Judge Maes, if you found if you can expand upon as well, what actually was happening in any sort of leadership trainings? You know, I saw a lot of references to it. Um, but I didn't actually see what was happening there, you know, like, what are the agendas or syllabi, or whatever it is, when it comes to training? And then did you find that there was any sort of culture around generally training all of the other judges in the organization, particularly as compared to what may have happened before this Chief Justice? I think the only other thing I'm saying there, too, is like, I'm not sure how to contrast right. Before, you know, Judge Coats came into leadership, if there was any discernible difference that was building upon this culture, perhaps even for 20 years. Right. Were there any contrasts if you saw any? So, what was in the leadership type of training that you found

- 7 -

was happening? Did you see anything else? By way of leadership training in the culture of the organization? And do you have a sense perhaps have any contrast of what may have been different in this administration than ones before?

**Sen. Lee**
Who wants that one?

**Robert Troyer**
I'll try

**Sen. Lee**
Mr. Troyer.

**Robert Troyer**
Thank you, Senator. Let me see if I can handle that. We looked at the actual leadership trainings that had been given The program started in 2006. It was developed and they actually rolled it out and started doing trainings in 2009. There were one or two very small sort of sub vendors but primarily from 2009 forward for 10 years it was two particular vendors who did all of that training. And Chief Justice Coats and Chris Ryan and others thought that that training had become a little bit rote, had become a little threadbare. And, so, we talked to a number of interviewees about their impressions of the trainings and got a sense of it. We didn't study their curriculum. We attempted to talk to those two prior vendors who were not willing to talk to us. So, we got a sense of what that training was, it was not specific to the job duties of executives at a district level, or at the Supreme Court level. It was, what are your personality traits? And what color are you according to these psychological profiles and personality/behavioral profiles? And what does that mean? If you're yellow? Do you get along with someone who's blue? And how can you maximize the, you know, working relationship, given the contrast and personality colors, it was that kind of stuff. And that's why I think some people we talked to, one person in particular, who's a real student of leadership training said, there's some value in that. And it was presented pretty well. But that's as far as it went, it didn't get into a chief executive, for example, must sit down with the top administrator, the first day on the job. And they need to hash out who's responsible for what, what the expectations are, those need to be written down, there needs to be a performance review, based on the five things that are going to they are going to set together as expectations. It was not, let alone here's how the Financial Services Division works. Here's how the Human Resource Division works, et cetera. So, there was no training like that. At the district level, I'm not sure. So, we didn't look at that it didn't become relevant to our scope, we would have looked at it if it had, but what does the Chief, like Judge Maes when he was the Chief in Pueblo in the 10th, what if any training did he get as Chief in terms of working with his top administrator? And, also, what relationship would he have with the SCAO? So, we didn't see evidence of any of that stuff. I think there were three parts to your question. But now I've talked long enough. I can only remember the second part. But I think the second part was about whether

- 8 -

over time this had changed in terms of both the lack of training and also the CEO oversight, if you will, is that fair?

**Sen. Lee**
Rep. Bacon.

**Rep. Bacon**
Yeah.

**Sen. Lee**
You're on track.

**Robert Troyer**
Okay. It's a surprise. And the answer is each Chief Justice, we learned has her or his own personality. And there's a lot of discretion in that CEO position within how you express that profile. So, we heard Justice Malarkey was a certain way and might have been more hands on. Chief Justice Rice was a little bit different, maybe a little bit more closed circle, maybe less collaborative, maybe a little bit different expectation from Counsel to the Chief Judge, Andy Rottman and from Chris Ryan, or Jerry Maroney, the prior administrator. And Chief Justice Coats's personality was different. And one of the flaws that we found was that all of this broke, before that personality really ever got expressed. And I mean, you might say, not just drinking from a firehose, but knocked down, throw against the wall and blown down the sidewalk by a firehose starting the second week on the job. Not to, by any means, excuse his failures in managing this.

**Sen. Lee**
Representative Bacon.

**Rep. Bacon**
Thank you. Where I'm going is how someone or people who've been with an organization for a long period of time, grow into a space or place where they know they can behave a certain way. And, so, it kind of sounds like this department. The culture on the one hand could be determined by whoever the Chief Justice is, but then there's some sort of component of trying to figure out what we need to do by way of training or insights or whatever, over time so that people don't go 10-20 years, thinking they can behave a certain way. Right. And so that's, that's what I think I was just trying to understand, by way of the contrasting questions, you know, how much of this, how much did you find by way of the organizational culture really comes down to actually who the Chief is? Or is it lack of actual systems and protocols that can withstand time so that people can't go a couple of decades, taking particular licenses. So perhaps that was just a little bit more of my own narrative. It just seems like subtext that I wasn't able to really pull out of the report. And so I just want to be able to leave it there. So, I'll pause. I'll stop there. Thank you.

- 9 -

**Sen. Lee**

Mr. Troyer, would you want to respond to that?

**Robert Troyer**

I do quickly that that's very well-articulated. And Mr. Mitchell might want to weigh in on this, too. But I think the answer is pretty clear cut in this situation. These problems were not driven by the personality and the skills of individual Chief Justices over time. These were deeply embedded forces, deeply embedded culture of the CEO leaving the state court administrator's office to do its thing. And the personality of that that administrator changed over time. And when that person was too busy, or focused on other tasks, like building a new building, you had a circumstance where the people at the next level, the people right below. The Director of the Human Resources Department, the Chief of Staff, maybe others, right at that next level of management, were allowed to create what we found, which was a culture of fear, intimidation, and silence, and real punishment and retaliation, if you were going to do something like, say, this contract doesn't seem right to me. So, I think it really was along the norms that go to your point about what's acceptable in this place, when I am at my job, eroded over time, not because of personality, but because of lack of attention.

**Sen. Lee**

I thought it was Rep. Weissman and then Rep. Gonzales, but I'll defer to either. Senator Gonzales, sorry.

**Sen. Gonzales**

Thank you, Mr. Chair.

**Rep. Carver**

And make it quick. Mr. Chair, since we got a reprieve from the fire drill evacuation. I think we were talking about anonymous reporting, and, and how to factor that in and again, if, and you may not have heard any of the earlier commentary. But, you know, another issue that we have is what to make statutory versus what needs to be left to rulemaking because certainly you don't want a structure that is so detailed, so prescriptive in the statutory scheme, that does not provide sufficient flexibility. And, you know, the judicial branch is the third branch. So that is a factor. Any particular thoughts based on what you have seen and heard in this investigation as well as your other work?

**Sen. Lee**

Mr. Mitchell.

**Nick Mitchell**

Yes. And thank you for the thoughtful question, because anonymous reporting certainly does come up in any workplace, any public workplace in which certain employees are afraid of potential retaliation. The issue of anonymous reporting comes up. And I guess I would, I would distinguish, I would say, systems

- 10 -

should permit anonymous complaints to be filed. Any complaint system that wants to be legitimate and wants to be perceived as legitimate, should be willing to take in allegations of misconduct, no matter what format they come in, whether they're filed online, filed by phone, going to your supervisor. And whether they're filed with a person's name attached or anonymously, if someone in a position of authority has engaged in misconduct, it is the institution's interest to find out about that, to investigate it, and take appropriate action if necessary. So, I think anonymity should not be a factor that would prohibit someone or prevent someone from being able to file a complaint. As a realist and an investigator, I will say that anonymous complaints are often extremely hard to investigate. Any investigation needs to have witnesses, you need to identify who to talk to, what documents, if any, to obtain, what video, if any to obtain. And when someone has filed an anonymous complaint, it's often very hard to bring that complaint investigation to a satisfactory or a definitive conclusion. Anonymous complaints, generally speaking, are more likely to result in not-sustained indeterminate investigative outcomes. But that's not a reason that a system should not accept or receive anonymous complaints. It should. There are standards that relate to that issue in a law enforcement context and that encourage law enforcement agencies to accept anonymous complaints. I'm not aware of equivalent standards in a judicial context, though, there may be some such standards out there that I just don't know about.

**Rep. Carver**
Thank you for that. And looking on page 62 of your report. I think there has been discussion about complaint intake and how that information should be shared, at least at an aggregate level. I do wonder about, in the system that you found. Did you see any aspect of the complaint system or during your interviews that was working?

**Sen. Lee**
Mr. Mitchell.

**Nick Mitchell**
Well, I'll say, as we've already discussed here today, we were not able to interview Mindy Masias or Eric Brown, two individuals who would have had a significant amount of information about the complaint system and how it worked. So there may be information that we were not able to obtain that reflects certain aspects of a functional complaint process. The information that we obtained, generally reflected a dysfunctional complaint process. And as I sit here today, there's nothing that comes to mind about that process that seems particularly strong or robust. I am aware as we commented on in the report, there have been some improvements or changes implemented by the Department after the events in question. But during the period of our investigation, or the period that we were investigating, I can't think of any part of the complaint process that was working particularly well.

**Rep. Carver**
Thank you for that. And then the final question is more of a perception question. You know, there's been some media reports that have raised the issue about whether the investigation was conducted

- 11 -

independently without influence by the Judicial Branch, all that type of thing. And as Chair Lee mentioned, the whole point of the investigation, and the way it was done was to try and keep the selection, both the task of the investigation what was to be investigated, as well as the selection of the teams, independent of Judicial. But there has been some concern expressed in various media articles. And can you just address whether you experienced any influence from Judicial in how you conducted your investigation?

**Sen. Lee**
Mr. Mitchell.

**Nick Mitchell**
Thank you. We did not. The conclusions reflected in this report are our conclusions that we've formed using our independent judgment, shaped by our decades of legal and investigative experience. Our conclusions do not reflect improper or undue influence from any party, including employees of the Judicial Department. They are our conclusions. And we were not subjected to any improper or undue influence during the investigation.

**Sen. Lee**
Representative Weissman.

**Rep. Weissman**
Thank you, Mr. Chair, thank you both for being here. I have a couple of different questions, which are a mix of procedural and substantive. And I'll try to not plow ground that our colleagues have plowed before. So just getting back to the nature of the investigation itself, I guess, by reference to your document, you say a little bit about methodology starting at page seven for anybody who's following along. So, there was this process that I was not part of, but some of my colleagues were in terms of scoping the RFP, and causing that to be put out, and you and others bid into it. And here you are. My Records reflect that the contract was signed on are about the 11th or 12th of October of 21. Work began thereafter. You mentioned talking to folks. In terms of access to let's just say written information. How did that go? Did? How did you decide what writings you needed? How did you pursue those writings? Did you feel that you were able to get timely access to those writings? Specifically, did you strike an access agreement or any other document by that name pursuant to CRE 502 in order to obtain information in writing?

**Sen. Lee**
Mr. Troyer.

**Robert Troyer**
Thank you, Chairman Lee. We didn't sign an access agreement. There's a term in the contract that expressly says we have, first of all, we had a relationship with judicial that allowed us to get unfettered

- 12 -

access at our request. And they had an obligation to provide us what we asked for. We asked for broad categories of documents at the beginning, based on what we what we knew, the general sort of time period, and also what subject matters were going to be and we got a very large volume of documents in response to that, I would say, overinclusive. We then had and I can't remember off the top of my head how many times we did this, but we had a number of specific follow-up requests over the course of the investigation. We would learn something from an interviewee and say, can we also see such and such can we see so and so's emails? Can we see the policies on this subject matter? Can we see for example, can we see the five prior contracts entered with the prior vendors? And can I see the prior vendor RFP that goes all the way back to 2015? Some of those materials were already in the what became over 12,000 documents. Others we asked for specifically, and they're provided in separate smaller responsive tranches, if you will.

**Sen. Lee**
Rep. Weissman.

**Rep. Weissman**
Okay. Thank you. So, in short, access to information that you felt you needed was essentially per contract. It was part of the same writing that defined scope of work and compensation and timelines. There was not a separate writing and there were no specific references to CRE 502.

**Robert Troyer**
That's correct.

**Rep. Weissman**
Okay, shifting to another method of gathering information. You certainly refer to this, we've spoken of it. As you noted, no subpoena power, but three key personalities here declined to talk: Ms. Masias, Mr. Brown, Mr. Ryan. I wonder if you could to unpack just a little bit more how that went. You reached out to them and never heard back at all. You reached out to them, perhaps through counsel and they simply stated not going to talk. Specifically, if the latter of those two, did they allude to, and I guess depending on exactly when you tried to contact them. You know, my understanding as the auditor wrapped up around February, criminal referral was at that time, the Second Judicial District then had a pretty brief amount of time under the prevailing statutes of limitation, my understanding is when OSA pursuant to statute makes a criminal referral that goes to the law enforcement authority, there is no notification to the individuals being referred under the statute. That's kind of what one would expect. I truly do not know what contact if any personnel at the Second Judicial District or Denver PD or otherwise had with any of these three individuals. So I don't know as a factual matter, if at what point they came to know that they were being investigated. At any rate, I would be interested if, bringing it back to sharpen the question, if the three folks in question in any way in the course of registering their disinclination to speak with you referred to pendency of a criminal investigation?

**Sen. Lee**

Mr. Troyer.

**Robert Troyer**

Thank you. Well, our contact with all three of those individuals was through counsel.

**Robert Troyer**

They all have separate counsel. And, in one case, multiple counsel. The nature of all those. In one case, counsel simply never responded. In the two other cases, counsel, again, I can't remember precisely because these are telephone conversations in which I'm making a request. And in a couple of those conversations, the response was, we'll get back to you. And then that didn't happen. In a couple of conversations, there were multiple reasons. To my recollection, there was never in any of those conversations, a specific statement that we are concerned about criminal prosecution, and Fifth Amendment privilege, or any other concern related being the subject or target of a criminal investigation. There was some articulation of you seem like a nice guy, but judicial is paying you. So, we don't trust the process.

**Sen. Lee**

Rep. Weissman.

**Rep. Weissman**

Thank you, I think two more, Mr. Chair, and then I see Senator Van Winkle, I'm gonna have to get used to saying that has some questions. Jumping now into the middle of the report. And, you know, we circled around this before, I'm on page 24. Now, we're sort of in the guts of how the contract happened. Again, you reach the conclusions you reach. I left with an uneasy feeling. As you know, as you noted, as I think some of my colleagues affirmed to. You state that Morrison, one of the employees knew that a contract was not the consideration for the resignation agreement. So that stated pretty definitively. And interestingly here we use a term of art from contract law, the negativing of which I think is very consequential. And then, you know, that part of the discussion of the facts as bracketed both before and after by the findings that nonetheless are difficult for a concerned reader to digest. I guess I'll put it that way. So, I just wonder if you could elaborate a little bit more on how that part of your interrogations went. I use that term, figuratively, sorry. And how you come to be so sure of that conclusion as to the mental state of that one individual. I have to be clear, I've never spoken to her, at least not that I can recollect. But that part of the report just jumped out to me as interesting.

**Sen. Lee**

Mr. Troyer.

**Robert Troyer**

Sorry, Senator. As you can tell I'm not adept at the procedural format sometimes.

- 14 -

**Sen. Lee**

It's a unique sort of Kabuki show that we engage in here to ensure that people on the outside know who's speaking. So, it goes through the Chair.

**Robert Troyer**

I appreciate it. I'm trying to learn. Thank you, Mr. Chair. The answer is that is based on interviewing Terri Morrison, interviewing several other people in her legal department, comparing and assessing the credibility of those interviews against emails and documents that we reviewed that reflect the chronology, statements made among employees about what they were trying to accomplish with the resignation agreement. And it's all of that evidence that that supported the firm conclusion about the contract consideration.

**Sen. Lee**

Rep. Weissman.

**Rep. Weissman**

Okay, thank you. So, analogously to how you reached certain conclusions about Mr. Ryan. You talked to a bunch of folks and you weighed at all against itself and applied your best judgment. Okay. One, one more sort of small question about procedure, you were talking about the document transfers? I guess, as a matter of timing, when. So, your contract was finalized in let's just say mid-October 21. How soon did information start flowing? And then, at what point did you feel that you had everything that you needed? And when did you when did you basically get the last of the information that you ever asked for? And such that, past that, point it was kind of just chewing over what you had?

**Sen. Lee**

Mr. Troyer.

**Robert Troyer**

Thank you, Chairman Lee, we got, my recollection, I don't have the date in front of me. But we got the first large set of documents provided in a secure database called Relativity that we were given access to and basic training on the use of. We're familiar with that from other investigations already. And that was within approximately a month of signing contract. I think a little bit less actually. In terms of when the last thing was provided. That's a tougher question to answer, because there's a tapering. So as the investigation is winding up, interviews are winding up, report drafting starts. There were all the way down to that stage. All the way down to the spring of this year. There were things that we thought, let's just make sure we didn't miss something. An example that comes to mind is, one last chance Judicial Department, do any of these people have job descriptions? Before we reached the conclusion that none of them had what we would consider a job description, which I'm familiar from my government service should say, your job is this. Your expectations this year are these five things. These are your goals. This

- 15 -

is our relationship as supervisee/supervisor. We were shocked to find those didn't exist. And, so, we asked one last time.

**Sen. Lee**
Amazing.

**Robert Troyer**
So, there were some things there were some things like that down to the end. But the vast majority of the documents were provided in the first month or so.

**Rep. Weissman**
Okay, that's helpful. Still in the procedural lane, there's a contractual relationship between your firm and the judicial branch per the procurement process. Did anybody in the branch see any draft, any segment of the final report prior to your wrapping up your work and delivering the finished product to them were upon you know it was made public relatively quickly. What was the, I guess, was there any back and forth? Or was the nature of the agreement such that you are here doing your work? They are over here to provide information as you requested. But otherwise, there's not a bridge.

**Sen. Lee**
Mr. Troyer.

**Robert Troyer**
Thank you, Chairman Lee. The contract specifically addresses this and we went to some lengths in the negotiation process of that contract to ensure what I'm about to describe. Which is that we, for purposes of making the report as accurate as possible to make sure we've made no factual errors, no, no typos, no errors in people's titles or something, something of that nature, that we would give the Judicial Department a draft that we considered final. That they would then have a period of time and I can't remember off the top of my head, if we gave them two weeks, what the time period was defined as. They were, then have time to review that and provide any comments or corrections they wanted. And the contract specifically said, we have no obligation whatsoever to accept a single one of those edits, comments, suggestions, etc. And, so, we went through that as the contract required, provided them what we considered a final, gave it to judicial, had a conversation with the Supreme Court Administrator and the Chief Justice relatively quickly after that. I believe we accepted three or four, two or three typo-type corrections and otherwise did not change the report at all in response. After accepting those two or three typo-type comments, we then put a date on it and issued it to them as final, completing our contract.

**Rep. Weissman**
Thank you that discussion is helpful. Last one, Mr. Chair, appreciate your indulgence. I didn't see a ton of discussion in here squarely on this point. So, I think I know the answer. But for the record. Part of what makes this committee's work challenging is just the, you know, the years of stuff that's been

- 16 -

swirling out there and the press and, you know, frankly, the degrees of germaneness are not of all of that to what we are specifically charged to do. What I do not believe you were setting out to do is to squarely answer the question whether any action or omission of anyone in particular, might have constituted a violation of the Code of Judicial Conduct. That is outside the scope. Is that correct?

**Sen. Lee**
Mr. Troyer.

**Robert Troyer**
Thank you. Yes, that is correct.

**Rep. Weissman**
Thank you, Mr. Chair.

**Sen. Lee**
Did you not? I'm sorry, what was your answer to that?

**Robert Troyer**
The answer is that is correct. That was specifically not in our scope.

**Sen. Lee**
Okay.

**Robert Troyer**
It was not in our scope. We were not asked to make a determination whether anyone violated the Judicial Code of Conduct, the code of attorney conduct, any employee code of conduct, or any criminal law. So, we were specifically not asked to do an assessment of either state or federal potential criminal violations. So, we did not do those things.

**Sen. Lee**
Okay. and your contract was specifically to investigate contract, fraud, misconduct, etc. And not these other areas. Okay. Thanks for that. Representative Van Winkle. Senator Van Winkle.

**Sen. Van Winkle**
Good catch.

**Sen. Lee**
Time passes and I forget.

**Sen. Van Winkle**

Missed it myself. Thank you, Mr. Chairman. And allow me to piggyback on some of Rep. Weissman's earlier questions and something I heard, I don't know maybe a full hour ago. So, allow me to connect some dots and take it specifically to the key events surrounding the contract and the possible quid pro quo. Those appear to come from a single meeting where the alleged memo was read. And the report concludes that Coats did not agree to the deal in an effort to silence a lawsuit. But how were you able to assess the truth of what actually happened in that meeting, specifically, the Chief Justice's involvement trying to cut a deal or not, when two of the four people in that meeting refused to speak to you. And those two could have recalled those events in that meeting very differently than the other two, correct?

**Sen. Lee**

Mr. Troyer.

**Robert Troyer**

Thank you, Mr. Chair. Well, one of the other people in that meeting has given many accounts of what happened in that meeting. Chris Ryan has given publicly many accounts, including transcribed interviews with the State Auditor. So, we looked at exactly what he said happened based on those statements. And of course, we interviewed Chief Justice Coats, we interviewed Andy Rottman, the two other participants in that in that meeting. We're also aware of a deposition transcript given by Eric Brown in the context of an unrelated federal lawsuit, in which he said he didn't recall what happened in the meeting, and he wasn't sure who wrote the talking points list. And said something to the effect of it might have had multiple authors. So, we had some sense of what, incomplete of course, but some sense of what Mr. Brown might have said. And, so, the conclusions about what happened in that meeting, come from those sources and are stacked up against the chronology. Undisputed events that had preceded, numerous events that preceded the meeting. And that events after the meeting that reflect the conduct of all the participants in that meeting. Suffice to say, as the report explains, that chronology and those events are entirely inconsistent with the version of that meeting presented by Chris Ryan.

**Sen. Lee**

Senator Van Winkle.

**Sen. Van Winkle**

Thank you, Mr. Chairman. Just one more question along these lines. Did you learn in your investigation whether the other Justices were aware of the contract whether did any of the Justices happen to ask like, why is it being given in light of the firing?

**Sen. Lee**

Mr. Troyer.

- 18 -

**Robert Troyer**

Thank you, Mr. Chair. No, as the report, as the report explains, this is one of the cultural problems that we identified for reasons of fear of recusal in potential litigation that may result from employee matters, that may end up in litigation that may end up in front of the Supreme Court. There was a lack of collaboration and real information sharing between the Chief and the other Justices. And, so, the nature of those communications, as surprising as this may sound, it was surprising to us was more of a--the Chief Justice is going down a road with the Supreme Court Administrator toward what they perceived was a proper solution to what they called the Mindy problem. And the Chief would simply report to his colleagues periodically, things like if we find there's no other mis-reimbursement or other financial misconduct by Mindy Macias, which Chris Ryan has been told to look into, we might ask Mindy to resign and come back and do a contract. And it wasn't even presented based on our interviews as: Are you okay with that? It was the Chief just saying this is where we're headed. And other Justices saying, okay, thanks for letting us know, kind of thing. That was the nature of the relationship.

**Sen. Lee**

Any further questions? Okay. Rep. Bacon.

**Rep. Bacon**

I have two questions. Or probably rather a set. So, I want to go back to that the meeting that we were just talking about, I think, where Rottman, Coats, Brown, and Ryan were in regards to allegedly rattling off this list of things that she knew. And, so, you all had the opportunity to talk with Justice Coats. And I'm curious about what your assessment is, you know, actually about his awareness because I'm looking at I'm not sure what page this. But I'm looking at a page where there was just a paragraph where Justice Coats turned to Ryan and asked, Do I need to hear more of this? Ryan shrugged da da da. But then it says Coats went on to ask a few questions. And he asked about her health, which means I'm curious if he knew about the FMLA piece, right? He asked or he said that he did not care what dirt Masias had on the Department. Then he said that the Department was not going to make any concessions to her about the termination. And then three, neither he nor the Department was trying to do anything to harm Masias. So what I'm trying to understand there was, even though he may not have been aware of this list, he was aware that it seems like he was aware that there was something going on with Masias enough to want to say I don't care about what kind of dirt, what's going on with your health, right, or anything around this termination. And so I'm asking, I guess what I'd like to know perhaps is a little bit more insight on where you feel his awareness was, particularly to the place where he would still think it's okay to contract with her. After saying things like this. And so honestly, I'm trying to sound like a legislator. And I want to just say, you know, y'all need to just tell me what was going on. But I'm trying to figure out how to sound like a person who went to law school. So, I'm sorry. But for me, I just want to know if there any insights there because you shared what he said in the meeting. But I'm curious your thoughts in having interviewed him? What kept coming up by way of some sort of awareness and some sort of assessment. So, whether or not he didn't know these things, he still knew that there was some sort of something going on with dirt or concessions around, right, her termination. That even later, it was okay to sign a

contract that was above market, you know, with this woman. So, I guess my lay question is, like, did it sound like he was picking up on something and sure it might be any sort of assumptions, but I don't see anything else to kind of understand any sort of indications of processing? What was happening in this whole scope? Does that make sense? If I see you outside, I'll give you the real talk version of this. So, thank you.

**Sen. Lee**
Mr. Troyer.

**Robert Troyer**
Thank you, Chairman. I'll try to answer that. I think I see what you're getting at. And yes, we interviewed both Andy Rottman and Ben Coats in a lot of detail about what exactly is going on in the meeting, and what different people's mindsets were. I think the best way to get to the heart of what you all want to know is, from the beginning, the Chief Justice's attitude is: You're telling me it's a problem to have her gone completely? You're telling me it's in the best interest? You being Chris Ryan, that it's in the best interest of this Department that we have her around, we have her do this training, we reach this solution? Why are you reading this to me? What is all this other stuff? Let's get this back on track. You told me this is about getting her in a contract so you can effectively institute a reorganization plan that you said is your priority. Why is this guy talking about this stuff? Meaning Eric Brown? I'm gonna bring this meeting back to its purpose. Where are we with this contract? How is her health? Everybody knew she was out on FMLA. And the understanding, I don't know what the facts are. I can tell you the understanding was that it was very serious. So, he's saying first how she doing? Is she okay? Second, this stuff has nothing to do with how we make these decisions. This stuff. I don't even know why Eric Brown is reading this. Okay, we're doing this for the reasons we talked about doing this way back in October. And that's really, you know, obviously Nick and I have picked up on the skepticism that that you guys have about this conclusion. But it's, it's just one of those things where sometimes we want a story to be sexy and dramatic and we've been told before we read the report or the actual investigation that it's going to be. And actually, it's much more common circumstance, which is just poor human behavior, deficient, regrettable. Really, really disappointing human behavior, especially for a Judicial Department, any public service organization. But that is really what's going on from way back when this reimbursement stuff hits the fan in the Fall. And that's why in our conclusion, we feel, still feel, and felt in the report very firm in that conclusion that things didn't change in this meeting where the dirt memo was read. Motivations didn't change. A contract for silence didn't spring out of someone's forehead. Instead, the simple fact that way back in July, Coats and Ryan had talked about needing a new training program, then they have a reimbursement problem with Masias. And Chris Ryan starts talking way back then, way back in October, about getting Mindy Masias on a leadership contract. That's undisputed. And it's confirmed in every interview, and all the Chris Ryan stuff and everything else and all the documents that this was under discussion and being propelled forward months before this meeting where dirt was discussed. As a result, when this starts with Eric Brown, there's frankly confusion and irritation from Rottman and Coats. Why are we talking about this? We've already been talking for two and a half, three

months about the contract. First of all, is she okay? Second of all, where are we with this? Like where are we with moving the contract forward that we've been talking about for a long time. This stuff doesn't have anything to do with that. So, that's probably more of a narrative version of my own on the fly summary of what's already in here. Already in the report.

**Sen. Lee**
Rep. Bacon

**Rep. Bacon**
Thank you for that. And, you know, quite honestly, I was trying to figure out what I made of the chronology as well, you know, not having spent the time. It was noted, when she went on FMLA, for example, you know, like the day around the termination conversations. And, so, I was just curious about that. But I just want to shift a little bit to the complaint processes. And I'm curious, your insights. I know the scope of your work, was not to look into any particular judicial or attorney violations or even criminal culpability. But it struck me in here that there was a lot of conversation about people theoretically, could have been made aware of harassment. And so while we're talking about people don't know what the complaint system is, did you also see something around the culture of people's responsibilities once they become aware of something, as well? And potentially, in this conversation, do you see that there should be any tangible touch points, or spotlights on particular pieces of statute? I mean, for the lay people, it's like, what does EEOC say about stuff like this? Right, in education, we have mandatory reporters, but like, is there any certain scenarios that you saw throughout this, that people were also not supported? As a matter of, you know, once becoming aware of how people or staff may have felt, that there may have been some other steps even outside of the agency that could have been taken to protect those people? So, you know, again, we're talking a lot about the complaint process. But I think I have another set of questions around what is staff supposed to do when they become aware of things and what are their responsibilities either as a matter of departmental procedure, let alone law, and is there any anything that you see from this that we need to pay particular attention to, by way of existing law? If that makes sense.

**Sen. Lee**
Mr. Mitchell.

**Nick Mitchell**
Thank you for that insightful question. I think, you know, this ties for me to the issue that was raised earlier about what should be in statute versus what should be in procedural rules. And I think that this issue may be appropriate to be handled within the procedural rules of the agency. As a sort of best practice with complaint processes, I can say that when a person is in a supervisory position, and becomes aware of any misconduct, any serious misconduct within the agency, they should have an obligation to report that through the proper channels to address fears that the victim may have about coming forward themselves. And there should be a process in place within the organization to protect

- 21 -

the victim in case they are not willing to come forward. But the supervisor who becomes aware of allegations of serious misconduct must be under an obligation to report that up the chain through those processes, upon pain of potential discipline themselves if they fail to take action. Willful blindness, turning your eye if you're in a supervisory position, is not acceptable. It should not be condoned, it should be explicitly repudiated in the agency's rules. And one of the obligations of being a supervisor within a public organization like the Department should be an obligation to protect employees who have been victimized by any kind of misconduct. So, I think that was an issue that we were attuned to, as we did this investigation. We thought about all of the potential decision points at which these kinds of issues could have been resolved. And making sure that supervisors within the chain of command are bringing issues to the attention of the appropriate authorities is one way that organizations can kind of clean up when there is a culture of fear of retaliation and even misconduct. That's one of the steps that organizations can take to begin to clean up that culture.

**Sen. Lee**
Any other questions from the committee? I must echo my Co-Chair or my Vice Chair's comments. I too, was shocked and horrified when I read this report, and I appreciate the way you all have characterized it. What this report did for me was pull back the screen to reveal a Department mired in a toxic environment with lax oversight by senior management, legal staff making grave mistakes--not reporting and fulfilling their legal obligations to senior management. Led by, I have to say an incompetent, uninvolved, in-curious Chief Justice Coats, who was characterized by one reporter, as more bumbling, incompetent than nefariously, intentionally engaging in a conspiracy to pay for silence. But I was just shocked. I've worked for two Fortune 500 companies. And Mr. Troyer when you told me that they didn't have job descriptions. I mean, that's a fundamental basic component of any human resources system. Eric Brown was a human resources manager. That's unconscionable incompetence or malfeasance, not to have job descriptions. How do you know who reports to who, who supervises who? You describe a department where the leader is turning a blind eye to things being said to him. If I'm in a meeting, and someone's telling me something about misconduct, or about potential sex harassment, I'm not going to put up my hand and say don't tell me any more about that. I'm going to call with my legal counsel and get a full explanation. Let me just read you what one reporter said when he was having read your report, where it said in there:

**Sen. Lee**
That the contract was not given to buy silence but the Chief knew that the person he was considering was under a disciplinary suspension for engaging or disciplinary action. She couldn't sign contracts, she couldn't authorize expenses, she couldn't travel. And then he asked for is there any more, and there were 40 more instances where her personal expense account showed variations from policies and procedures. The report was just as Coats suddenly okay, giving her the contract, so long as she did not commit additional fraud. Does that mean a little fraud is acceptable? As long as the dollar amounts aren't too high? This is the leader of this department granting a how many million-dollar contract was that, 5 million? He didn't know the amount of the contract. He didn't know how long the contract was lasting.

And quite frankly, for your report to say while he didn't get sufficient training, I thought was shocking. Did he not ask for training? Had he not been in that Department for X amount of years sitting as a justice? There's only seven of them. It isn't like the other Chief that preceded him was invisible. He saw what that person was doing. He must have known. I'm shocked at what this Chief Justice Coats didn't do as a leader of that Department. And, so, the question I have now under the leadership we have now, you've made 16 recommendations. Have any of those 16 recommendations been implemented by the new Chief Justice? Do they have a complaint procedure? Do they have procurement processes? Do they have job descriptions? Do they have training programs which will prevent this thing from going forward? This stuff is so toxic that you described that I would think leadership would immediately sit down with senior management and go through the list and hire outside consultants. Do you know what they have done to implement any of the 16 recommendations? Mr. Mitchell.

**Nick Mitchell**

Well, when the report was issued, we received a memorandum from the current Chief Justice which outlines certain steps that had already been taken by the Department to implement some of the recommendations either in part or in whole. But as you'll note, our final recommendation in the report, which again relates to the issue of transparency, is that Bob and I have called on the Department to report to the Legislature, the Governor, and the public with greater specificity than what we've received in that memo what specific steps the Department plans to take or has taken to implement these recommendations, including with timetables, where appropriate. So we firmly believe that there is a public interest in knowing exactly what steps are being implemented, we've called on the Department to provide that information periodically. You know, it's not our view that this is a this is not a one-time fix, make some changes to policy and then this is all finished. This will be an ongoing process to reform the culture that we've described in this report. And we anticipate continued reporting. Or we hope and we believe that the Department has committed to continual reporting on the steps that it's taking to implement these recommendations and fix the culture described in this report.

**Sen. Lee**

Well, in Justice Boatright's letter accompanying your report, he said, the Judicial Branch has already made substantial improvements over the last year. Do you know what those substantial improvements are? With specificity?

**Nick Mitchell**

May I?

**Sen. Lee**

Sure. Mr. Mitchell.

**Nick Mitchell**

Thank you. Being sensitive to the issue that Bob has come across here. We learned during the investigation about certain internal changes that had been made by the Department. For example, in many of our interviews, interviewees talked about the significant gap, the divide between Justices of the Supreme Court and administrative personnel in the SCAO that existed at the time of the events in question. That the Court was not generally aware that the SCAO sort of administered itself, if you will, and Justices of the Court, we're not aware of these cultural issues that we describe in this report. We were told many, many times in our interviews that the Justices of the Supreme Court now serve on administrative committees and have much more frequent contact with employees in the SCAO so that when these issues arise, they can be addressed by members of the Court, we learned about other changes to the complaint process. For example, the creation, as we discussed in the report, the creation of an online complaints portal that employees can use to provide notifications, or file complaints of sexual harassment or other misconduct, which was a change, an innovation if you will, after the events in question. We still had substantial questions about the efficacy of that system. So, when I said before that some of the recommendations had been implemented in part, that one related to the complaint process probably has been implemented, in part with certain internal changes, including that new complaints portal, but not in whole. So, I think there are, we learned about some steps that have been taken. But we still have lots of questions about what specific plans the department has to implement the balance of our recommendations.

**Sen. Lee**

Mr. Troyer.

**Robert Troyer**

Thank you, Mr. Chair, just a quick addition to that. One of those recommendations that Mr. Mitchell was describing that we're not sure the status of that I think is, is essential, and it's around the edges of a bunch of questions that have been asked this afternoon. And that is the creation of an ethics officer position. The creation of that position and creation and definition of that position in a way that that person is truly independent, reporting directly to someone so that that person doesn't fear retaliation, that ethics officer doesn't fear, retaliation or undue influence, that can be a person that somebody in this circumstance, somebody like Terri Morrison, or the lawyers who drafted the contract, or anyone below Eric Brown, who was concerned could go to and pull the alarm. So that's an essential one, we don't know the status of. On the bright side, one, just supplement to what Mr. Mitchell said that occurred to me. Obviously, we've talked a little bit about the complete mishandling in May 2017, of the Supreme Court administrator's selection process. My understanding is that that has been changed. And in a very thorough, careful, laudable way, was determined collaboratively by the Justices. How we're going to pick Chris Ryan's replacement. How they went about it in terms of townhall meetings, in terms of actually asking the person they selected and really drilling down on qualifications and preparedness to fulfill that role. That process came out in a number of our interviews and really sounded to us like a gold standard process that certainly would have avoided the problems that happened in May 2017. And now

- 24 -

has been, it's our understanding, has been codified, so to speak. So, there are some things like that, that we don't have full access to it. But we understand some things have been done. The one that I remain concerned about, simply because I don't know, is that ethics officer position. I think really is important.

**Sen. Lee**

And I realized all of that is somewhat outside the scope of your engagement. But I know you've been deeply involved with the Department over the last months and months. So, I just thought you might know what of the recommendations. I echo the comments of a prior colleague who expressed great appreciation, I forget who said that, for the recommendations. I think they were right on. And I think they would be a path towards reformation and bringing the Department into the maybe the 20th century, they got a ways to go to get to the 21st. But I think your recommendations will be most helpful guidelines. So, thanks for that. Any further comments? Senator Gonzales.

**Sen. Gonzales**

Thank you, Mr Chair. I am curious. If you all have any insight as to how to proceed. We've been talking over the course of today and also during our last meeting, about trying to think through sort of victim centered processes for repairing harm, or whether victim centered approaches for accountability in these types of issues of misconduct. You both have spoken to, while this report is focused on sort of procurement and this contract and the misconduct surrounding that aspect. I'm just curious if you all have any insights into this potential victim centered approach in terms of the recommendations that you've offered in terms of a portal or a mechanism to submit complaints, just given your expertise and the and the work that you both have engaged in, if you have any thoughts on that question.

**Sen. Lee**

Mr Mitchell.

**Nick Mitchell**

Well, my first thought is that I appreciate the question and the focus on protecting potential victims. I would say that any system for receiving complaints and investigating allegations of misconduct has to balance multiple competing interests. You have the rights and the needs of potential complainants and potential victims. You have employment laws that govern how complaints, how employment complaints, need to be handled under state law, you have due process rights of persons who are accused of misconduct. And, so, for a system to be functional, all of those kind of issues need to be addressed in the architecture and the structure of the system, and none of them excludes the other. You can have a system that is focused on victims while also maintaining due process protections for people who are accused of misconduct. You can do that. I don't know that there's an easy way to do it. I think I would suggest, if you haven't had testimony from people who've experienced misconduct in the department or have attempted to file complaints, or have feared retaliation or faced retaliation, they might be sources of insight and information into what might have made them more comfortable coming forward, or how would they have felt safe if they didn't feel safe before, what could have been done by the institution to

- 26 -

help them feel safe in coming forward? Sometimes people who have actually had the lived experience have, you know, a great deal of insight into how, into what fixes are necessary. So, I might make that as a process suggestion. If you haven't had that testimony yet, it might be very productive.

**Sen. Gonzales**
Thank you.

**Rep. Carver**
All done, Senator, any other questions?

**Sen. Lee**
Seeing no other questions. I guess the final comment I would like to make is one of you made a comment about the light of day being the best disinfectant. Maybe the silver lining that we can take out of this is that all of this nonfeasance, misfeasance, malfeasance that's gone on in that department has been exposed to everyone, and that there now is motivation and incentive to fix it. I think there's a recognition that it can't go on the way it has gone on. So, from that standpoint, it's worthwhile to have the report and your investigation has contributed to that disinfecting process. So, thanks very much from the committee and the people of Colorado for doing it.

**Nick Mitchell**
Thank you very much.

**Robert Troyer**
Thank you.

# Appendix 27(s)(ii)(7)

# Logistics and Next Steps;

# Legislative Interim Committee on Judicial Discipline—
## July 12, 2022 Hearing: Logistics and Next Steps

**Sen. Lee**

Sure. Okay, that concludes our substantive presentations. The agenda says logistics and next steps. Ms. Jenson, what are our logistics and next steps?

**Juliann Jenson**

I put that on there in case you wanted to discuss the next meeting and your expectations.

**Sen. Lee**

Okay, very good. I'll take the lead on that. First, any of the committee members, if you have people that you think we should invite to testify to this committee, to inform these proceedings, get a hold of the Vice Chair or myself. And tell us who they are and why you think they'd be helpful to the committee. I think experts can help inform our discussions. We also want to get input from bar associations and other affiliated lawyers per the mandate in Senate Bill 201. So, to the extent that you have contacts with any of those folks, tell them to submit their information to us in writing, and we will look forward to their testimony. If they want to testify live, they can get a hold of Ms. Jenson to make that happen. Madam Vice Chair.

**Rep. Carver**

Thank you, Mr. Chair. And just to follow up on that point and for reminder and clarification. We do have August 10 to hear input from all of you on the ILG report. But also, we would invite all of those interested in the committee's work to look at documents that are filed on the website. The Commission has recommendations, whatever discussion that comes out of looking at the recommendations by Judicial and the Commission. Our hope is that will be filed with the committee by the first. We also very much want, now that the ILG report has come out for, the CBA and the bar sections and the affinity bars and others, to read that report. Look again at the areas spelled out in 201, and where possible, get us your written comments by August 1. August 17 is when this committee has to be in a position to put forward requests for bills to be drafted covering our work in these 18 areas. So, to the maximum extent possible, when you're testifying on the 10th, if you intend to do so, that is your opportunity to look at everything that has been submitted by other stakeholders in response to ILG or anybody else on proposed changes. What needs to be changed, what needs to be put in the request for legislation on the 17th. And so, I appreciate the Chair's indulgence in letting me go into that a little bit deeper. But we are on a very, very compressed timeline, and so we appreciate all of the participation and input of everybody we've heard from and that we expect to hear from and value your input. Thank you.

**Sen. Lee**

Any comments from the committee? Okay? Thank you, Madam Vice Chair.

# Appendix 27(s)(ii)(8)

# Public Testimony (Afternoon) and Adjournment;

# Legislative Interim Committee on Judicial Discipline—
# July 12, 2022 Hearing:
# Afternoon Public Testimony and Adjournment

**Sen. Lee**

Next on our agenda is public testimony. I believe we have some people signed up and ready to present. Is there anyone in the chamber who would like to present? If so, please come forward. Come on up. Have you signed up perchance?

**Marty Powers**

I have not. I was listening at my computer this morning, and then I came in for the afternoon.

**Sen. Lee**

Okay, there should be a sign-up sheet in the back of the room do it on the way out the door.

**Marty Powers**

Perfect. Thanks.

**Sen. Lee**

So, thank you for being here. Thanks for paying attention to our committee. And the protocol is just to identify yourself and tell us any organization that you may represent and provide us with your testimony. You'll have three minutes to tell us what you think we need to know, and the lights will go green to start you, yellow when I think 30 seconds, and red when you've reached your time limit. Obviously, you can finish the sentence, but please adhere to that schedule, if you would, And there may be questions, so don't run off after you've spoken. Thank you.

**Marty Powers**

Okay, I have a gray button?

**Sen. Lee**

It's on the microphone.

**Marty Powers**

Okay, I got it. Okay. Thank you for the opportunity to speak. My name is Marty Powers. I had an opportunity to speak at the conservatorship and guardian issues that you guys were discussing in a different committee with Ms. Ransom and her bill, and a little unfortunate that that has not progressed in terms of just notification process. My name is Marty Powers, I'm just a person that has been in the probate process for six years, being destroyed by the judges and by the Attorney Regulatory Counsel and by the elder law community. And, so, it's good timing in the sense that yesterday, I filed a 26

- 1 -

approximately $26 million claim against the Attorney Regulatory Counsel and the Supreme Court and the 18th Judicial District, the Denver probate court, and some other organizations relating to the justice malfeasance and the malfeasance of the Attorney Regulatory Counsel. Briefly, my case resulted in a conspiracy and long story short, back in 2016 11,500 documents were not shared with me by the personal representative and the elder law attorneys during the course of the proceedings. I did not know this at the time, but one of the attorneys for my sister was a member of the Attorney Regulatory Counsel Committee for judicial review, not judicial review, but attorney review. I did not find that out until six years later, January of this year, and that was the basis of this claim. So, there's approximately, and I'll leave a copy with Ms. Jenson. I believe that's who the person would take this for you if you want to review. But, over the course of six years, there's about 30 attorneys, three Assistant Attorneys General came on to the case. I think there's list of 45 attorneys, 20 administrators. My father's estate was worth $300,000. He had real estate worth 4 million. They ran up a $3 million bill and legal fees. I had a $500,00-600,000 bill. I've had to go pro se for the last two years because I don't have any more money. There's a million and a half dollars sitting in our account. The judge won't release it because, for the last four years, we've been on a fees hearing for a corrupt personal representative who's also the deputy probate officer for Denver County. They interfered with another judicial. They did, I believe jury tampering on another case of mine, and so what I'm what I'm here today, is not to discuss my case, but I have thought a lot about the opportunities of what to do. And there's a PPP program that you could do where you institute financial, the court records, all the activities that are associated with the probate process and the judicial review process. And you make it a statistical machine, or everything in the background. So, like the NFL, when you watch the NFL and football, they have all the statistics. You do the same thing with the court system is that you have who has been in front of who? How all these attorneys interact because the probate system and the elder law is so corrupt that they're all. It's basically one team. And I know personally my attorneys are conspiring or coordinating with the personal representative and the opposite attorneys.

**Sen. Lee**
Could you wrap it up Sir?

**Marty Powers**
Sure. So, I'll give you this document. My information is on it. I'd be happy to discuss it with any of you in the terms of the greater aspects of it. And I do have ideas and concepts that I think would be beneficial to your programs. And once you see this, I mean it addresses. Oh, one last comment, someone made the comment about the light of day, you know, putting light to splash on the judicial system. They are, they are not afraid of the light. They are stealing in the open. So, if I had a way to fix this, I would walk this up to the Governor and tell him to pay this and then the next time it happens that it's coming out of the judicial or the pensions or the or their paychecks, because this type of corruption must be stopped. But I appreciate your time. Thank you.

- 2 -

**Sen. Lee**

Sure. Thanks for testifying. Who's next?

**David Wells**

Thank you, Mr. Chairman. My name is David Wells. I'm self employed. I'm part of the judicial system, the corrupt probate system. I have a power of attorney that was contested in the criminal courts. We found that power of attorney to be validated in the criminal courts, and also in a different court in Jefferson County. The probate system has completely wiped out $5 million of assets in the last four years. They completely wiped away the power of attorney and the trust, as Greg, my brother, we are the trustees of the estate. So every time we come on up. We, you know, we get a little bit of money, and we say, Okay, we're going to hire Steinberg. We're going to hire these guys. Well, we get it, we get an order from the judge, okay, we can move Sharon Wells to a different facility, or we can move her out of state. And then once we get into a different state or judicial process, the Bar Association, which should run this office, the Bar Association should not run this office. Come up with an idea the run us out of money, and where you don't have enough assets to save my mother. So, basically, this is about saving the assets of my mother and putting her into a different place. And then when we come and make a complaint to the ARC or, you know, Attorney Regulatory Commission, it turns out that they're in bed with the probate system. So we, even if we do, even if we get into the Court of Appeals, which we've done constantly, into the Court of Appeals, they believe the probate system. The probate system, is corrupt and it's not good for. We have four children willing to take care of our mother, take her to California, live at her own property. They decide, no, we'd rather sell. We'd rather spend $150,000 a year, not including the care of her. The last thing they ever mentioned is the care of Sharon Wells, or the best interest of Sharon Wells. We're here for the best interest of the ward. Now, she's a ward of the State, and we can't even get any progress. And it seems like the corruption runs on down from the ARC, to the judge, to Colorado state Court of Appeals. Thank you very much your time, Mr. Chairman. My name is David Wells, if you have any questions, I'll be available here.

**Sen. Lee**

Okay, thank you, sir. Again, you need to sign up so we can get your information.

**David Wells**

Thank you.

**Sen. Lee**

Sure.

**Gregory Wells**

Thank you, Mr. Chairman. Same stories, these guys. I'm not a lawyer. My family.

- 3 -

**Sen. Lee**

Please state your name.


**Gregory Wells**

Gregory Wells, Denver, Colorado. I have my own business, an auto bass company. I have the same stories these guys. My mom was kidnapped in the middle of the night. No due process was handled towards our case. We proved our case. They called it frivolous power of attorney and trust and will, and they proceeded not to follow the criminal case. Instead, went and afforded Marcy McCormick and her office proceeded become conservators over my mother's estate and domestic terrorism is what I call it. We get terrorized every day by hate mail, threatening letters of bodily harm to my family, my family members. I have proof of it in paperwork. Just I want to see that it starts with the Governor. The Governor appoints the Supreme Court Justice. The Supreme Court Justice appoints the public administrator and the judge that is on this case. And, we're just trying to fight for truth, justice, and the American way. Sorry, I'm just winging it here. Usually I have something written down. I had something written down for the state representatives. Phil something I forget. But anyways, all I would like to see is some action taking care of the way this system and the corrupt system has been portrayed. We have been on the news four or five times. We do have a show Wednesday nights. And if I could sum it up so you could wrap your head around it, you watch the movie, "I Care a Lot," and that's how you could wrap your head around it and see how everybody's in bed with everybody else. Thank you, Mr. Chairman.


**Sen. Lee**

Thank you for your testimony. So, let me just say that, you know, the mission of this committee today is to look into Colorado's judicial discipline system. It's a system that's in place that has specific powers to address certain forms of misconduct by judges. It doesn't deal with lawyers the way OARC does. The Office Attorney Regulation Counsel is the body that deals with misconduct by lawyers. So, I'm not sure that, you're certainly welcome, and we appreciate you sharing your stories. And, as senators and representatives, we want to know the issues being faced by members of the community. I'm not sure that we're the forum that is just and appropriate to provide any redress.


**David Wells**

To that point is that the problem is the familiarity. And one of the people brought it up in the beginning, is the conspiracy of silence. The woman said earlier, is that everyone knows each other in this state, if you. It is almost impossible to get an attorney because you have so many conflicts of interest. So, one of the concepts that I thought on the way down here is that if you co-op this process to four states, let's just say the four corner states and judicial review was the same for all four states. You could have people in Utah or New Mexico that would handle a Colorado case, because then there's not a bias. It is extremely difficult to find an unbiased situation, because they all know each other. They all socialize with each other. And so a concept is to regulate it on a co-op basis, if you will, of multiple states, so that the review process isn't done by people in your own backyard.

- 4 -

**Sen. Lee**

I get it. Okay. Thank you, gentlemen.

**David Wells**

If I could go one more, the judge my case, Elizabeth Dembard Leith, she acts as judge, jury and prosecution. No jury trial, no witnesses, a closed door ceremony, and then she acts as if that. I asked her about the Constitution, I read the Constitution to her, and she says, we don't recognize that book in our, in this courtroom. I said, Well, that's capital felony treason. And she and she goes, well, not in this court. And I said, Do you have an oath of office? You're here to defend this Constitution, foreign and domestically, against all enemies.

**Sen. Lee**

Thank you. Mr. Wells.

**David Wells**

You're welcome. Case in point when we . . .

**Sen. Lee**

I'm sorry, gentlemen.

**David Wells**

Thank you very much.

**Sen. Lee**

We've given you the opportunity and testimony, and I can't let it keep going on. So, thanks very much.

**David Wells**

Thank you for your time. Mr. Chairman,

**Marty Powers**

Thank you.

**Sen. Lee**

Who's up on the screen? Jerry? Is that Jerry Greene?

**Jerry Greene**

Hello, yes it is. Can you hear me?

- 5 -

**Sen. Lee**

We can hear you. Welcome to the Interim Committee on Judicial Discipline. You'll have three minutes to present your testimony, and please give us your name and any affiliation. Go right ahead, sir.

**Jerry Greene**

Jerry Greene, I have no affiliation. I've had a lot of experience with dealing with the officials of judiciary. So recently, I filed a judicial discipline complaint about a Denver District Judge making false statements in her order and taking six months to rule on an issue that could have been decided in 20 minutes. I filed this to Chris Gregory, and he, of course, dismissed it, and the only statement he made was actually false. So, I requested to the discipline commission to have a hearing, you know, no more than say 40 minutes where I can address both the false statement by Chris Gregory and the false statements by the Denver District Judge, and they haven't replied to that request. I've also contacted the Office of Brian Boatright, and he said he has no authority over that. So, that's the Chief Justice of the Colorado Supreme Court, who's the Supreme Court Chair of the judicial discipline commission, who's pledged to your general assembly that he's going to do what he can to increase transparency and accountability. Who's refusing to comment or refusing to take any action. So, what I would like is a hearing before the judicial discipline commission to address the false statements by both their Director and the Judge in question. That's my request.

**Rep. Carver**

Thank you for your testimony. Any questions? Thank you so much for giving us your input. We appreciate it.

**Jerry Greene**

So, who on your committee would be interested in advocating for me to actually have a hearing before the discipline commission, in line with the pledges of Brian Boatright for more transparency and accountability?

**Rep. Carver**

Sir, that would not be within the scope of the Interim Committee. We're looking at the different parts of the judicial discipline system, but not specific ongoing cases or disputes.

**Jerry Greene**

So, does it concern you that the discipline commission won't allow me a hearing? And apparently, would not allow anyone with a hearing?

**Rep. Carver**

We are not chartered to intervene in active, ongoing cases. That's not within the scope of the Interim Committee. We're looking at what possible changes in the law may be necessary with regards to the judicial discipline system, but not individual cases.

- 6 -

**Jerry Greene**

So, if Chris Gregory won't comment, or the only comment he's made is a false statement, and Brian Boatr likewise won't comment, what's my avenue? What do you think my Avenue should be?

**Rep. Carver**

Sir, I don't know that. Sir, your time is up, and we don't have any further Q and A, as I've described. Your specific dispute is not something that is within the scope of the committee. Thank you so much for your testimony. Next witness. Next witness. Any more witness? Witnesses online, anybody else in the committee room that wishes to testify? Then, subject to any additional comments by the Chair. First of all, any comments by members of the committee? I think we have covered logistics and next steps. So, with that, the committee is adjourned. Unless Mr. Chair has anything further.

**Sen. Lee**

Are there any other witnesses?

**Rep. Carver**

No.

**Sen. Lee**

Okay, we're done.

**Rep. Carver**

Committee is adjourned. Thank you.

- 7 -

# Appendix 27(s)(ii)(9)

# Relevant Exhibits and Hearing Materials:

# Appendix 27(s)(ii)(9)(a)

# Nat. Conf. of State. Leg., Judicial Conduct Commissions., July 12, 2022;



## Judicial Conduct Commissions



### Introduction

The establishment of judicial conduct commissions (JCC) was to maintain and restore public confidence in the integrity, independence, and impartiality of their judiciary. Beginning in 1960, California became the first state to establish such an organization. Now all fifty states have some form of a JCC. They have different names in different states, such as commission, board, council, court, or committee. For a broad overview and historical comparison, please see Cynthia Gray's work entitled How Judicial Conduct Commissions Work from 2007. Her work, although dated now, covered JCC membership, grounds for discipline, bifurcated systems, and supreme court review. Table 1 from Cynthia Gray's work provides the authority in each state to establish a JCC. For links to each States' JCC, please see here. The American Bar Association has published their 2018 Model Rules for Judicial Disciplinary Enforcement, which covers JCC organization and authority.

### JCC Membership

Although the composition of JCCs are unique in each state, there are some commonalities. The National Center for State Courts continues to track the membership of state JCCs with their most recent chart being revised August 2019. Most states have term limits between 3 and 6 years. Many include members such as judges, attorneys, justices of the peace, public members, or clerks of court. Many states choose to further break down the membership of judges by the type of court they are in. For example, Tennessee requires 2 trial judges, 1 general sessions court judge, 1 municipal court judge, 1 juvenile court judge, 1 court of appeals or court of criminal appeals judge, and 2 additional judges.

#### Table 1
#### Establishment of State Judicial Conduct Commissions

| By State Constitution | By State Statute | By State Court Rule |
|---|---|---|
| Alabama Constitution, Article VI, §§ 157, 158 | Connecticut General Statutes, § 5151k | Hawaii Supreme Court Rules, Rule 8 |
| Alaska Constitution, Article IV, § 10 | Idaho Code, Chapter 21, § 12101 | Kansas Supreme Court Rules, Rules 602-627 |
| Arizona Constitution, Article VI.I, § 1 | Iowa Code, Title XV, Subtitle 2, Chapter 602, Article 2, Part 1 | New Hampshire Supreme Court Rules, Rule 38-A |
| Arkansas Constitution, Amendment 66 | Maine Statutes, Title 4, § 9 B | New Jersey Supreme Court Rules, Rule 2:15 |
| California Constitution, Article VI, §§ 8, 18, 18.1, and 18.5 | Massachusetts General Laws, Chapter 211C | South Carolina Appellate Court Rules, Rule 502 |
| Colorado Constitution, Article VI, § 23 | Minnesota Statutes, § 490.15 | Vermont Supreme Court Rules for Disciplinary Control of Judges |
| Delaware Constitution, Article IV, § 37 | North Carolina Statutes, Article 30, § 7A-374.1 | West Virginia Rules of the Judicial Disciplinary Procedure, Rule 1 |
| Florida Constitution, Article V, § 12(b) | North Dakota Code, 27-23-01 | |
| Georgia Constitution, Article VI, § 7, ¶ VI | Ohio Code, § 2701.11 | |
| Illinois Constitution, Article VI, § 15 | Oklahoma Statutes, Title 20, § 1651 | |
| Indiana Constitution, Article 7, § 9 | Oregon Revised Statutes, §§ 1.410 through 1.480 | |
| Kentucky Constitution, § 121 | Rhode Island General Laws, Title 8, Chapter 16 | |
| Louisiana Constitution, Article V, § 25 | Tennessee Statutes, § 17-5-101 | |
| Maryland Constitution, Article IV, 4A | Utah Code, Title 78, Chapter 8 | |
| Michigan Constitution, Article VI, § 30 | Virginia Code, § 17.1-901 | |
| Mississippi Constitution, § 177A | District of Columbia Code, § 11-1521. | |
| Missouri Constitution, Article V, § 24 | | |
| Montana Constitution, Article VII, § 11 | | |
| Nebraska Constitution, Article V, § 28 | | |
| Nevada Constitution, Article VI, § 21 | | |
| New Mexico Constitution, Article VI, § 32 | | |
| New York Constitution, Article VI, § 22 | | |
| Pennsylvania Constitution, Article V, § 18 | | |
| South Dakota Constitution, Article V, § 9 | | |
| Texas Constitution, Article 5, § 1-a | | |
| Washington State Constitution, Article IV, § 31 | | |
| Wisconsin Constitution, Article VII, § 11 | | |
| Wyoming Constitution, Article 5, § 6. | | |





## Available Sanctions

Depending on the conduct being disciplined, JCCs use plethora of private and public disciplinary sanctions. NCSC has continued to track this information most recently in their 2019 document, Available Sanctions in Judicial Discipline Proceedings. When making public disciplinary sanctions, JCCs will either be subject to supreme court review for their actions or be limited to making recommendations for public sanctions to the supreme court to approve or deny.

## Confidentiality

Confidentiality of the work JCCs oversee has continued to be a discussion of debate. For example, in Robert Tembeckjian's 2007 work Judicial Disciplinary Hearings Should Be Open, he argued "citizens have a right to know when a judge's integrity has been seriously questioned, and opening the process to public scrutiny would help to ensure that the process is and appears to be honest, which is a special concern whenever a profession polices itself." As of 2007, thirty-five states had already adopted sunshine laws or rules regarding formal judicial disciplinary hearings. Table 1 from Robert's work provides when confidentiality ceases.

### Table 1
### When Confidentiality Ceases

| Formal Disciplinary Charges Are Instituted (After Investigation) | | Disciplinary Commission or State Supreme Court Renders Discipline |
|---|---|---|
| Alabama | Nevada | Colorado |
| Alaska | New Hampshire | Delaware |
| Arizona | New Jersey | District of Columbia |
| Arkansas | North Carolina | Hawaii |
| California | North Dakota | Idaho |
| Connecticut | Ohio | Iowa |
| Florida | Oklahoma | Louisiana |
| Georgia | Oregon | Maine |
| Illinois | Pennsylvania | Mississippi |
| Indiana | Rhode Island | Missouri |
| Kansas | South Carolina | New Mexico |
| Kentucky | Tennessee | New York |
| Maryland | Texas | South Dakota |
| Massachusetts | Vermont | Utah |
| Michigan | Washington | Virginia |
| Minnesota | West Virginia | Wyoming |
| Montana | Wisconsin | |
| Nebraska | | |

Source: American Judicature Society.

### NCSL Contact

Michael Hartman
Policy Associate, Civil & Criminal Justice
303-856-1507
Michael.hartman@ncsl.org

**NCSL's Civil & Criminal Justice Program is in Denver, Colorado, at cj-info@ncsl.org**
Statutes & bills may be edited or summarized; full text can be retrieved through:
http://www.ncsl.org/aboutus/ncslservice/state-legislative-websites-directory.aspx
Information is provided for representative purposes; this may not be a complete list or analysis.

# Appendix 27(s)(ii)(9)(b)

# Michael Hartman, State Judiciary Conduct Committees Presentation, July 12, 2022;



# How NCSL Strengthens Legislatures













| Policy Research | Connections | Training | State Voice in D.C. | Meetings |
|---|---|---|---|---|
| NCSL provides trusted, nonpartisan policy research and analysis | NCSL links legislators and staff with each other and with experts | NCSL delivers training tailored specifically for legislators and staff | NCSL represents and advocates on behalf of states on Capitol Hill | NCSL meetings facilitate information exchange and policy discussions |

○ Model Rules

  • ABA

○ Authority to Establish

○ Membership

○ Available Sanctions

○ Balancing Confidentiality & Transparency



# Presentation Overview

Judicial Conduct Commission(s) – JCC(s)

3

1. Conformity with ABA Model Code of Judicial Conduct

2. Prompt and fair discipline for judges

3. Improving public confidence

4. Protecting the public and judiciary

5. Protecting judicial independence

6. Establishing a model for states



## Model Rules for Judicial Disciplinary Enforcement

Goals of the 1994 Model Rules

4





## Rules 1 - 5

**Organization & Structure**

## Rules 6 - 16

**General Provisions**

## Rules 17 - 25

**Disciplinary Proceedings**

## Rules 26 - 27

**Special Proceedings**

## Model Rules

Overview

# Authority to Establish

Recent Minor Expansion of Authority

Texas Proposition 5, State Commission on Judicial Conduct Authority Over Candidates for Judicial Office Amendment (2021)

Passed: 59% to 41%

Added the following:

*"The Commission may accept complaints or reports, conduct investigations, and take any other action authorized by this section with respect to a candidate for an office named in Subsection (6)(A) of this section, in the same manner, the Commission is authorized to take those actions with respect to a person holding that office."*

**Table 1**
**Establishment of State Judicial Conduct Commissions**

| By State Constitution | By State Statute | By State Court Rule |
|---|---|---|
| Alabama Constitution, Article VI, §§ 157, 158 | Connecticut General Statutes, § 5151k | Hawaii Supreme Court Rules, Rule 8 |
| Alaska Constitution, Article IV, § 10 | Idaho Code, Chapter 21, § 12101 | Kansas Supreme Court Rules, Rules 602-627 |
| Arizona Constitution, Article VI.I, § 1 | Iowa Code, Title XV, Subtitle 2, Chapter 602, Article 2, Part 1 | New Hampshire Supreme Court Rules, Rule 38-A |
| Arkansas Constitution, Amendment 66 | Maine Statutes, Title 4, § 9 B | New Jersey Supreme Court Rules, Rule 2:15 |
| California Constitution, Article VI, §§ 8, 18, 18.1, and 18.5 | Massachusetts General Laws, Chapter 211C | South Carolina Appellate Court Rules, Rule 502 |
| Colorado Constitution, Article VI, § 23 | Minnesota Statutes, § 490.15 | Vermont Supreme Court Rules for Disciplinary Control of Judges |
| Delaware Constitution, Article IV, § 37 | North Carolina Statutes, Article 30, § 7A-374.1 | West Virginia Rules of the Judicial Disciplinary Procedure, Rule 1 |
| Florida Constitution, Article V, § 12(b) | North Dakota Code, 27-23-01 | |
| Georgia Constitution, Article VI, § 7, ¶ VI | Ohio Code, § 2701.11 | |
| Illinois Constitution, Article VI, § 15 | Oklahoma Statutes, Title 20, § 1651 | |
| Indiana Constitution, Article 7, § 9 | Oregon Revised Statutes, §§ 1.410 through 1.480 | |
| Kentucky Constitution, § 121 | Rhode Island General Laws, Title 8, Chapter 16 | |
| Louisiana Constitution, Article V, § 25 | Tennessee Statutes, § 17-5-101 | |
| Maryland Constitution, Article IV, 4A | Utah Code, Title 78, Chapter 8 | |
| Michigan Constitution, Article VI, § 30 | Virginia Code, § 17.1-901 | |
| Mississippi Constitution, § 177A | District of Columbia Code, § 11-1521. | |
| Missouri Constitution, Article V, § 24 | | |
| Montana Constitution, Article VII, § 11 | | |
| Nebraska Constitution, Article V, § 28 | | |
| Nevada Constitution, Article VI, § 21 | | |
| New Mexico Constitution, Article VI, § 32 | | |
| New York Constitution, Article VI, § 22 | | |
| Pennsylvania Constitution, Article V, § 18 | | |
| South Dakota Constitution, Article V, § 9 | | |
| Texas Constitution, Article 5, § 1-a | | |
| Washington State Constitution, Article IV, § 31 | | |
| Wisconsin Constitution, Article VII, § 11 | | |
| Wyoming Constitution, Article 5, § 6. | | |

## Commission Membership

- Representation

- Term
  - 3-6 years

- Selection
  - By Peers
  - By One Governing Body
  - Hybrid





# Available Public Sanctions



Sample Laws

| Florida | California | Texas |
| --- | --- | --- |
| By Supreme Court:<br>• Public Reprimand<br>• Fine<br>• Suspension with or without Pay<br>• Removal<br>• Retirement for Disability<br>• Lawyer Discipline | Subject to Supreme Court Review:<br>• Public Admonishment<br>• Public Censure<br>• Retirement for Disability<br>• Bar Former Judge from Service with Censure | By Supreme Court:<br>• Removal*<br>• Retirement<br><br>Subject to Supreme Court Review:<br>• Public Admonition*<br>• Public Warning*<br>• Public Reprimand*<br>• Public Censure<br>• Public Order of Additional Education |

### Table 1
### When Confidentiality Ceases

| Formal Disciplinary Charges Are Instituted (After Investigation) | | Disciplinary Commission or State Supreme Court Renders Discipline |
|---|---|---|
| Alabama | Nevada | Colorado |
| Alaska | New Hampshire | Delaware |
| Arizona | New Jersey | District of Columbia |
| Arkansas | North Carolina | Hawaii |
| California | North Dakota | Idaho |
| Connecticut | Ohio | Iowa |
| Florida | Oklahoma | Louisiana |
| Georgia | Oregon | Maine |
| Illinois | Pennsylvania | Mississippi |
| Indiana | Rhode Island | Missouri |
| Kansas | South Carolina | New Mexico |
| Kentucky | Tennessee | New York |
| Maryland | Texas | South Dakota |
| Massachusetts | Vermont | Utah |
| Michigan | Washington | Virginia |
| Minnesota | West Virginia | Wyoming |
| Montana | Wisconsin | |
| Nebraska | | |

Source: American Judicature Society.



# Confidentiality & Transparency

Procedural fairness encourages decision acceptance and leads to positive views of about the legal system, even for those with "losing" outcomes – Procedural Justice and the Courts (Tom R. Tyler).

Questions?

Comments?

Reach Out!



Contact Information:
Michael.Hartman@ncsl.org

Statutes & bills may be edited or summarized; full text can be retrieved through:
http://www.ncsl.org/aboutus/ncslservice/state-legislative-websites-directory.aspx
Information is provided for representative purposes; this may not be a complete list or analysis.

10

# Appendix 27(s)(ii)(9)(c)

# Chris Forsyth, Petition and Proposal Regarding Judicial Discipline in Colorado, July 12, 2022;

# Petition and Proposal

Regarding Judicial Discipline in Colorado

Submitted to: The Legislative Interim Committee on Judicial Discipline

July 12, 2022

By:



Chris Forsyth, Esq.
Executive Director
951 20th St., #8854
Denver, CO 80201
Phone: 720-324-1036

# Colorado needs judicial reform. Support The Judicial Integrity Project.

*Published by The Judicial Integrity Project on 28th Jul 2017*

Colorado's judicial branch lacks accountability and transparency. It is filled with conflicts of interest.

Colorado's Commission on Judicial Discipline dismisses 97% of complaints against judges. The rate is so incredibly high because Colorado's Supreme Court writes the rules for the commission, and the executive director of the commission reports to the Supreme Court. The proceedings before the commission are confidential. Proceedings before a commission that disciplines judges should be public in Colorado like they are in 35 other states.

Voters receive insufficient information about judges. The commissions on judicial performance that make recommendations to voters about judges don't know whether the judges they're recommending have been disciplined. The commissions have no investigative power and do not receive background checks on the judges. The commissions are not required to hold public hearings. And judges do not receive annual reviews by the commissions. The infrequency of reviews and the commissions' lack of information ultimately turns into the public's lack of information regarding judges.

We, the undersigned, call on the Colorado government to make the judicial branch more transparent and accountable. We demand that conflicts of interest in the judicial branch be removed.

Judges are public servants. The public has the right to know about proceedings regarding the discipline of judges. Judicial discipline proceedings must be public. Judges should not write the rules for the judicial discipline commission. The executive director of the judicial discipline commission should not report to a judge.

Voters need more information about judges. Background checks of judges should regularly be performed and include motor vehicle histories, criminal histories and a review of the financial disclosures filed by a judge. No rules should be made limiting the information a judicial performance commission can receive about a judge. Performance commission members should be free to vote their conscience. Performance commissions should hold public hearings where the public can comment about a judge. Reviews of judges should be more frequent and made public at the time the review is complete. The state performance commission, which makes the rules for all performance commissions to follow, should be representational and include one member of each judicial district.

We support the efforts of The Judicial Integrity Project to increase transparency, enhance accountability and remove the conflicts of interest in the judicial branch. Colorado needs judicial reform.

---

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 1 | Synthia | Morris | Colorado Springs | Colorado | Jul 29, 2017 |
| 2 | Regan | Benson | | CO | Jul 30, 2017 |
| 3 | Larry | Wolfe | Arvada | Colorado | Jul 30, 2017 |
| 4 | Mary | Molitor | Aurora | Colorado | Jul 30, 2017 |
| 5 | Luanne | Fleming | Aurora | Colorado | Jul 30, 2017 |
| 6 | Denny | Benton | Delta | Colorado | Jul 30, 2017 |
| 7 | marvin | sandoval | Boulder Co. | Colorado | Jul 30, 2017 |
| 8 | faith | daron | ft lauderdale | florida | Jul 31, 2017 |
| 9 | Chris | Forsyth | Wheat Ridge | Colorado | Jul 31, 2017 |
| 10 | Rosemary | Van Gorde98trq +r | Fort Collins | Colorado | Jul 31, 2017 |
| 11 | donald | lampson | Arvada | , COLO | Aug 02, 2017 |
| 12 | Norman | Beecher | Aurora | Colorado | Aug 03, 2017 |
| 13 | Nancy | gilbert | LOVELAND | Colorado | Aug 03, 2017 |
| 14 | Peter | Coulter | Evergreen | Colorado | Aug 03, 2017 |
| 15 | Ruth | Sadler | Aurora | Colorado | Aug 03, 2017 |
| 16 | Michael | Sanchez | Denver | Colorado | Aug 03, 2017 |
| 17 | Angie | Layton | Louisville | CO | Aug 04, 2017 |
| 18 | Joleen | Sanchez | Henderson | CO | Aug 04, 2017 |
| 19 | Jared | Sanchez | Denver | CO | Aug 04, 2017 |
| 20 | Valery | Hasselbrink | Salida | Colorado, Chaffee County | Aug 04, 2017 |
| 21 | Francene | Stonebraker | Englewood | Colorado | Aug 08, 2017 |
| 22 | Joe | Shippley | Arvada | Colorado | Aug 10, 2017 |
| 23 | James | Bertini | Denver | Colorado | Aug 11, 2017 |
| 24 | Jim | Welker | LOVELAND | CO | Aug 12, 2017 |
| 25 | DB | Brown | Loveland | CO | Aug 12, 2017 |
| 26 | Gilbert | Tso | Denver | CO, Denver | Aug 17, 2017 |
| 27 | Lisa | Romanek | Loveland | Colorado | Aug 18, 2017 |
| 28 | Velma | Williams | Colorado Springs | CO | Aug 19, 2017 |
| 29 | Gregg | Leverett | Limon | Colorado | Aug 20, 2017 |
| 30 | Amber | Talbot | 81242 | Colorado | Aug 21, 2017 |
| 31 | Cynthia | Long | Salida | Colorado | Aug 21, 2017 |
| 32 | James | Long | Salida | Colorado | Aug 21, 2017 |
| 33 | Ashley | Gove | Poncha Springs | Colorado | Aug 21, 2017 |
| 34 | Marissa | Roberts | Salida | Colorado | Aug 21, 2017 |
| 35 | Marche | DePriest | Manassa | Colorado | Aug 22, 2017 |
| 36 | Mark | Sowards | La Jara | Colorado, Conejos | Aug 22, 2017 |
| 37 | Alisha | Smith | Salida | Colorado | Aug 22, 2017 |
| 38 | David | Platt | SALIDA | Colorado | Aug 22, 2017 |
| 39 | Brook | Epperson | Torrance | Ca | Sep 09, 2017 |
| 40 | James | Lewis | | Colorado | Sep 09, 2017 |
| 41 | Cheryl | Murten | Loma | Colorado | Sep 09, 2017 |
| 42 | David | Skudneski | Cherry Hills Village | CO | Sep 09, 2017 |
| 43 | Dawn | Kirk | Loveland | Colorado | Sep 10, 2017 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 44 | Johnathon | Twining | Colorado Springs | Colorado | Sep 10, 2017 |
| 45 | Cathy | Mollendor | Denver (Adams county) | Colorado | Sep 10, 2017 |
| 46 | Amber | Bucy | Loveland | CO | Sep 11, 2017 |
| 47 | Randy | Maizland | Fort Collins | Colorado | Sep 12, 2017 |
| 48 | Dale | Pierce | Westminster | Colorado | Sep 12, 2017 |
| 49 | judi | beltz | Longmont | Colorado | Sep 13, 2017 |
| 50 | Justin | Hands | Aurora | Colorado, Arapahoe | Sep 15, 2017 |
| 51 | Piper | Wood | Fort Collins | Colorado | Sep 15, 2017 |
| 52 | Roy | Leon-Guerrero | Colorado Springs | Colorado | Sep 16, 2017 |
| 53 | Selinda | Costa | Denver | Denver Colorado | Sep 16, 2017 |
| 54 | chris | sedgwick | Colorado Springs | Colorado | Sep 16, 2017 |
| 55 | Debra | Kelly | Centennial | Colorado | Sep 16, 2017 |
| 56 | Priscilla | Rose | Colorado Springs | Colorado | Sep 20, 2017 |
| 57 | Jeff | Wilson | Aurora | Colorado | Sep 26, 2017 |
| 58 | Eileen | McGinley | Telluride | Colorado | Sep 29, 2017 |
| 59 | Jill | Eisenberg | fort collins | Colorado | Oct 09, 2017 |
| 60 | Travis | Anderson | Brush | Colorado | Oct 11, 2017 |
| 61 | James | Heiberg | Commerce city | Colorado | Oct 15, 2017 |
| 62 | Beth | Savacool | Longmont | Colorado | Oct 15, 2017 |
| 63 | Tarref | Simon | New Orleans | Louisiana | Oct 15, 2017 |
| 64 | Karen | Kalavity | Westminster | CO | Oct 15, 2017 |
| 65 | Edward | Starski | Colorado Springs | CO | Oct 16, 2017 |
| 66 | Amanda | Graves | Aurora | Colorado | Oct 16, 2017 |
| 67 | Lori | Faulk | Denver | Colorado | Oct 16, 2017 |
| 68 | Joslyn | Medrano | Commerce city | Colorado | Oct 16, 2017 |
| 69 | D~ | Tapia-Gonzales | Arvada | Co | Oct 16, 2017 |
| 70 | Steve | Williams | Colorado springs | Colorado | Oct 16, 2017 |
| 71 | Eileen | Birosh | Golden | Jefferson | Oct 16, 2017 |
| 72 | Craig | Tyacke | Denver | Colorado | Oct 17, 2017 |
| 73 | Pam | Leland | Longmont | Colorado | Oct 17, 2017 |
| 74 | Brian | Sieben | Henderson | Colorado | Oct 17, 2017 |
| 75 | Adela | Lupu | Bucharest | Romania | Oct 17, 2017 |
| 76 | W Greg | Bell | Pueblo West | Pueblo County Colorado | Oct 17, 2017 |
| 77 | Nanci | Brown | Battlement Mesa | Colorado | Oct 17, 2017 |
| 78 | Lynne | Bigelow | Loveland | Colorado | Oct 17, 2017 |
| 79 | Cheryl | Ingram | Denver | Colorado | Oct 17, 2017 |
| 80 | jm | fay | arapahoe county | co | Oct 17, 2017 |
| 81 | Amber | Scott | Colorado Springs | Colorado | Oct 17, 2017 |
| 82 | Jeff | Cash | Morrison | co | Oct 18, 2017 |
| 83 | Favid | Purcell | Littleton | Co | Oct 18, 2017 |
| 84 | Asia | Zanders | Colorado Springs | Colorado | Oct 18, 2017 |
| 85 | Cheryl | Murten | Loma | Colorado | Oct 18, 2017 |
| 86 | David | LaVeau | Lakewood | Colorado | Oct 18, 2017 |

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 87 | Tom | Doudy | Parachute | Co. | Oct 19, 2017 |
| 88 | Patricia | Zimmerman | Pueblo | CO | Oct 19, 2017 |
| 89 | Bonita | Gana | Battlement Mesa | Colorado | Oct 19, 2017 |
| 90 | Jason | Griffith | Canon City | CO | Oct 19, 2017 |
| 91 | Harry | Bovard | Florissant | Colarado | Oct 19, 2017 |
| 92 | Sandy | Lard | Dolores | Colorado | Oct 19, 2017 |
| 93 | Bill | Gottschalk | 81147 | Colorado | Oct 19, 2017 |
| 94 | Tresha | Davenport | Colorado Springs | Colorado | Oct 20, 2017 |
| 95 | Melba | Schultz | La Junta | Colorado | Oct 20, 2017 |
| 96 | CLAUDIA | PARKER | FORT COLLINS | CO | Oct 20, 2017 |
| 97 | Anna | Hodges | Colorado Springs | Colorado | Oct 21, 2017 |
| 98 | Jo | Quinn | Golden | Colorado | Oct 21, 2017 |
| 99 | Carlos | Martinez | Frederick | Colorado | Oct 21, 2017 |
| 100 | Linda | Maes | Cedaredge | Colorado | Oct 23, 2017 |
| 101 | Dayna | Ross | Colorado Springs | Colorado | Oct 23, 2017 |
| 102 | Jose | Rodriguez | Sedalia | Colorado | Oct 23, 2017 |
| 103 | Barbara | Mattison | Pueblo | Colorado | Oct 23, 2017 |
| 104 | Jim | Adams | Palmer Lake | CO | Oct 24, 2017 |
| 105 | Stacie Rae | Trujillo | Broomfield | Colorado | Oct 29, 2017 |
| 106 | Bridget | Lieggi | Pueblo | Colorado | Oct 29, 2017 |
| 107 | Derek | Nossal | Arvada | Colorado | Oct 29, 2017 |
| 108 | Jeff | Welch | Colorado Springs | Colorado | Oct 29, 2017 |
| 109 | Mark | Struckmeyer | Colorado Springs | CO | Oct 29, 2017 |
| 110 | John | Mullins | Denver | Denver | Oct 29, 2017 |
| 111 | Daniel | Ilgenfritz | denver | Colorado | Oct 29, 2017 |
| 112 | brian | simmering | | avondale | Oct 29, 2017 |
| 113 | Jennifer | Misquadace | Mancos | Colorado | Oct 29, 2017 |
| 114 | Jean | Dwyer | Greeley | Colorado | Oct 29, 2017 |
| 115 | Colby | Clements | Thornton | Colorado | Oct 29, 2017 |
| 116 | JP | Serve | Delta | Colorado | Oct 29, 2017 |
| 117 | Phillip | Serve | Delta | Colorado | Oct 29, 2017 |
| 118 | steve | fleischer | monument | co | Oct 29, 2017 |
| 119 | Cynthia | Navarreye | Denver | Colorado | Oct 29, 2017 |
| 120 | Rene | Garcia | Denver | Colorado | Oct 30, 2017 |
| 121 | Stacie Rae | Trujillo | Broomfield | Colorado | Oct 30, 2017 |
| 122 | Ryan | Parkinson | Fountain | Colorado | Oct 30, 2017 |
| 123 | Bev | Beaufait | Louisville | CO | Oct 30, 2017 |
| 124 | Richard | Beaufait | Louisville | Colorado | Oct 30, 2017 |
| 125 | Evan | Ravitz | Boulder | CO | Oct 30, 2017 |
| 126 | Ryan | Collins | Colorado Springs | Colorado | Oct 30, 2017 |
| 127 | Gerald | John | Ault | Colorado | Oct 30, 2017 |
| 128 | Brad | Imer | Grand jct | Colorado | Oct 30, 2017 |
| 129 | Gregor | Gable | Millcreek | Utah | Oct 30, 2017 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 130 | Richard | Lewis | Loveland | Colorado | Oct 30, 2017 |
| 131 | Thomas | Stimbert | Fruita | Colorado | Oct 30, 2017 |
| 132 | Linda | Mackety | Lakewood | Jefferson | Oct 30, 2017 |
| 133 | Jody | Estok | | colorado | Oct 30, 2017 |
| 134 | Heather | Burnett | Colorado Springs | Colorado | Oct 30, 2017 |
| 135 | Cathy | Mitchell | Centennial | Colorado | Oct 30, 2017 |
| 136 | Cory | Johnson | Colorado Springs | Colorado | Oct 30, 2017 |
| 137 | Robert | Chase | Denver | Colorado | Oct 30, 2017 |
| 138 | Rebecca | Moreland | Denver | Colorado | Oct 30, 2017 |
| 139 | Brad | Clay | Castle Rock | CO | Oct 30, 2017 |
| 140 | Caleb | Ball | Lakewood | Colorado | Oct 30, 2017 |
| 141 | Nad | Weyer | Centennial | CO | Oct 30, 2017 |
| 142 | Edward | Loehr | | Colorado | Oct 30, 2017 |
| 143 | Barbara | Moore | Lakewood | Colorado | Oct 30, 2017 |
| 144 | Derrick | Hart | Delta county | Colorado | Oct 30, 2017 |
| 145 | Lynne | Benedict | Westminster | CO | Oct 30, 2017 |
| 146 | Jeffery | Price | Fort Collins | Colorado | Oct 30, 2017 |
| 147 | Judy | Keller | Arvada | Colorado | Oct 30, 2017 |
| 148 | Joshua | Cordova | Pueblo | Colorado | Oct 30, 2017 |
| 149 | Anthony | Zwolinski | Arvada | Colorado | Oct 31, 2017 |
| 150 | Justin | Barbee | Del Norte | CO | Oct 31, 2017 |
| 151 | Jade | Davis | Pagosa Springs | Colorado | Oct 31, 2017 |
| 152 | Jodi | Bowersox | Colorado Springs | Colorado | Oct 31, 2017 |
| 153 | Devanny | Tapia | | Arvada, Jeffco | Oct 31, 2017 |
| 154 | Sergey | Buettner | Colorado Springs | Colorado | Oct 31, 2017 |
| 155 | Cleo | Hunt | Hotchkiss | Colorado | Oct 31, 2017 |
| 156 | Sam | Mcgrrw | Aurora | Colorado | Oct 31, 2017 |
| 157 | David | Henderson | Lakewood | Colorado | Oct 31, 2017 |
| 158 | Thomas | Markus | Denver | Arapahoe | Oct 31, 2017 |
| 159 | Coral | Stevenson | Parker | Douglas | Oct 31, 2017 |
| 160 | Mariellen | Galbreath | Denver | CO | Oct 31, 2017 |
| 161 | Susan Heather | George | Colorado Springs | CO - El Paso | Oct 31, 2017 |
| 162 | Laurel | Bucholz | Parker | Colorado | Oct 31, 2017 |
| 163 | Colten | Tobin | Thornton | CO | Oct 31, 2017 |
| 164 | Alisha | Lewis | Dacono | Colorado | Oct 31, 2017 |
| 165 | Brenda | Sugar | Bennett | Colorado Arapahoe | Oct 31, 2017 |
| 166 | Carolyn | Minnich | Walsenburg | Colorado | Oct 31, 2017 |
| 167 | Joshua | Arbour | Morrison | Colorado | Oct 31, 2017 |
| 168 | Gary | Gosney | Colorado Springs | Colorado | Oct 31, 2017 |
| 169 | Jaimy | Thomason | Denver | Colorado | Oct 31, 2017 |
| 170 | Samuel | Boldon | Englewood | CO | Oct 31, 2017 |
| 171 | Emily | Love | Highlands Ranch | Colorado | Oct 31, 2017 |
| 172 | Crystal | Pacheco | Denver | Colorado | Oct 31, 2017 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 173 | Joseph | Vanegad | Colorado springs | Colorado | Oct 31, 2017 |
| 174 | Candi | CdeBaca | Denver | Colorado | Oct 31, 2017 |
| 175 | Darren | O'Connor | Boulder | Colorado | Oct 31, 2017 |
| 176 | Samantha | Ladd | Ellicott | Colorado | Oct 31, 2017 |
| 177 | Katherine | Cornwell | Denver | Colorado | Oct 31, 2017 |
| 178 | Christine | Fidler | Denver | CO | Nov 01, 2017 |
| 179 | Robert | Fidler | Denver | CO | Nov 01, 2017 |
| 180 | Lisa | Mitchell | Littleton | CO | Nov 02, 2017 |
| 181 | robin | brown | Nucla | Colorado | Nov 02, 2017 |
| 182 | Paul | Cummings | El Paso County. | Colorado | Nov 02, 2017 |
| 183 | Michelle | Trimarco | Fort Collins | Colorado | Nov 02, 2017 |
| 184 | Kristen | Hiatt | Aurora | Colorado | Nov 07, 2017 |
| 185 | Joe | Cohen | Littleton | CO | Nov 07, 2017 |
| 186 | Amos | Lovenberg | Pueblo West | Colorado | Nov 14, 2017 |
| 187 | Tamara | Pitchford | Elizabeth | CO | Nov 18, 2017 |
| 188 | Joseph | Tafoyà | Denver | Colorado | Nov 19, 2017 |
| 189 | Cathy | Gardino | Peyton | El Paso, Colorado | Nov 19, 2017 |
| 190 | Cheryl | Stibbs | Aurora | Colorado | Nov 19, 2017 |
| 191 | Chelsee | Chavez-Barreras | Brush | Colorado | Nov 22, 2017 |
| 192 | Gregory | Fermanich | Henderson | Colorado | Nov 23, 2017 |
| 193 | Egon | Kazmer | Littlton | Co | Nov 23, 2017 |
| 194 | Pam | Leland | Longmont | Colorado | Nov 23, 2017 |
| 195 | Lanell | Allmer | LaSalle | Colorado | Nov 23, 2017 |
| 196 | Michelle | Leuenberger | Highlands ranch | Colorado | Nov 23, 2017 |
| 197 | Bridget | Sargent | Louisville | Boulder | Nov 23, 2017 |
| 198 | john | varn | broomfield | colorado | Nov 23, 2017 |
| 199 | Kathleen | Scafidi | Colorado Springs | Colorado | Nov 24, 2017 |
| 200 | Dustin | Rockney | Commerce city | Colorado | Nov 25, 2017 |
| 201 | Lynn | Taylor | Carr | Colorado | Nov 26, 2017 |
| 202 | Doris | Whitaker | Simla | CO | Nov 26, 2017 |
| 203 | Sheri | Orback | LaSallr | Colorado | Nov 26, 2017 |
| 204 | Michelle | Schultz | Greeley | Colorado | Dec 04, 2017 |
| 205 | denise | hohl | denver | colorado | Dec 19, 2017 |
| 206 | Leah | Fleming | Aurora | Colorado | Dec 24, 2017 |
| 207 | Halina | Topa | Lakewood | Colorado | Dec 24, 2017 |
| 208 | Marcia | Friedman | Hialeah, Florida | Florida | Dec 24, 2017 |
| 209 | Katherine | Musgrave | Craig | Colorado | Dec 27, 2017 |
| 210 | Bobby | Martin | Commerce city | Colorado Adams | Dec 28, 2017 |
| 211 | Michelle | Shewmake | Elizabeth | Colorado | Jan 06, 2018 |
| 212 | Brenda | Maro | Colorado Springs | Colorado | Jan 07, 2018 |
| 213 | Ephraim | Tooley | Westminster | Colorado, Jefferson | Jan 07, 2018 |
| 214 | William | Groh | Golden | Colorado | Jan 09, 2018 |
| 215 | Janet | Van Vliet | Canon City | Colorado | Jan 24, 2018 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 216 | Rico | Garcia | Castle Rock | Colorado | Jan 28, 2018 |
| 217 | Tamara | Pitchford | Elizabeth | CO | Jan 28, 2018 |
| 218 | Kelly | Ganzerla | Littleton | Colorado | Jan 29, 2018 |
| 219 | James | Takeda | Castle Rock | Colorado, Douglas County | Jan 29, 2018 |
| 220 | Lou | Patterson | Longmont | Colorado | Jan 29, 2018 |
| 221 | Judi | Atwood | Longmont | Colorado | Jan 29, 2018 |
| 222 | Stephen | Keno | Pagosa Springs | CO | Jan 29, 2018 |
| 223 | Karen | Federighi | | CA | Jan 29, 2018 |
| 224 | Angela | Chavez | Colorado springs | Colorado | Jan 29, 2018 |
| 225 | Robin | Austin | Aurora | Colo | Jan 29, 2018 |
| 226 | Riley | Easler | Colorado springs | Colorado | Jan 29, 2018 |
| 227 | Caleb | Sweezy | Loveland | CO | Jan 29, 2018 |
| 228 | Debra | Trew | Lodi | California | Jan 30, 2018 |
| 229 | Ron | Waterman | Grand Junction | Colorado | Jan 30, 2018 |
| 230 | Edye | Posey | Meeker | Colorado | Jan 30, 2018 |
| 231 | Melinda | McVay | Alma | Colorado | Jan 30, 2018 |
| 232 | John | Scott | Albany | New York | Jan 31, 2018 |
| 233 | Laura | Wright | Pueblo west | Colorado | Feb 04, 2018 |
| 234 | Everything | Question | Colorado Springs | Colorado | Feb 05, 2018 |
| 235 | Sharon | DeWitt | Colorado Springs | CO | Feb 05, 2018 |
| 236 | James | Williams | Pueblo | Colorado | Feb 05, 2018 |
| 237 | Carole | Morain | Mancos | CO, Montezuma | Feb 06, 2018 |
| 238 | Sandra | Jordet | Fort Morgan | Colorado | Feb 06, 2018 |
| 239 | Deborah | Steinau | Beulah | CO | Feb 06, 2018 |
| 240 | Douglas | Adler | Colorado Springs | Colorado | Feb 10, 2018 |
| 241 | Craig | Buckley | Longmont | Colorado | Mar 23, 2018 |
| 242 | Michelle | Balenseifen | Yukon | Oklahoma | Mar 24, 2018 |
| 243 | Kathryn | Mahaffey | Fort Collins Co | Co | Mar 24, 2018 |
| 244 | Maria | Ehrnstein | Strasburg | Adams County | Mar 24, 2018 |
| 245 | Beverly | Crabill | Akron | Colorado | Mar 25, 2018 |
| 246 | Alex | Cresswell | Thornton | CO | Mar 29, 2018 |
| 247 | Crystal | Olsen | Lakewood | Co | Mar 29, 2018 |
| 248 | Lorie | Rinke | Coal Creek | Colorado | Mar 30, 2018 |
| 249 | Mary | Winter | | Colorado | Apr 14, 2018 |
| 250 | Krystall | Beck | Lasalle | CO | Apr 15, 2018 |
| 251 | Deanna | Hurtado | Grand Junction | Colorado | Apr 29, 2018 |
| 252 | Martie | Palser | Centennial | CO | Apr 29, 2018 |
| 253 | Evette | Stark | New York | New York | Apr 29, 2018 |
| 254 | Norman | Konzelman | Lakewood | Colorado | Apr 29, 2018 |
| 255 | Mary | McNinch | Longmont | Colorado | May 06, 2018 |
| 256 | Tanya | Hathaway | Springfield | New Hampshire | May 06, 2018 |
| 257 | Gwendolyn | Ekhoff | Loveland | Colorado | May 07, 2018 |
| 258 | Bijan | Ganji | Commerce city | Colorado | May 07, 2018 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 259 | Keri | Rusthoi | Rangely | Colorado | May 07, 2018 |
| 260 | Jack | Lee | Paradox | Colorado | May 09, 2018 |
| 261 | Patricia | Dekal | Elbert | Colorado | May 09, 2018 |
| 262 | Thomas | Berry | Louviers | Colorado,Douglas | May 10, 2018 |
| 263 | Jesus | Rodriguez | Greeley, Co. | United States | May 11, 2018 |
| 264 | Ronnie | Hall | | Colorado | May 11, 2018 |
| 265 | Victoria | McGrath | Jupiter | FL | May 12, 2018 |
| 266 | Nicholas | Mitchell | Colorado springs | Colorado | May 12, 2018 |
| 267 | Amy | Craig | Castle Rock | Douglas | May 12, 2018 |
| 268 | Amy | Stavans | Lakewood | CO | May 13, 2018 |
| 269 | Drew | Schaefer | Del Norte | Colorado | May 13, 2018 |
| 270 | Angela | Melillo | Littleton | CO, Jefferson County | May 13, 2018 |
| 271 | Natasha | Mitchell | Henderson | Colorado | May 13, 2018 |
| 272 | Kelly | Strole | Broomfield | Colorado | May 13, 2018 |
| 273 | Charles | Corry | Colorado Springs, CO 80906 | Colorado, El Paso County | May 13, 2018 |
| 274 | Kit | Parrish | Fort Collins | Colorado | May 13, 2018 |
| 275 | Doris | Alarid | Pueblo | Colorado | May 13, 2018 |
| 276 | Carrie | Danville | Aurora | Colorado | May 13, 2018 |
| 277 | Robert | mcclanahan | Denver | Co | May 13, 2018 |
| 278 | Patricia | Rodgers | Shreveport | Louisiana | May 13, 2018 |
| 279 | Dale | Gustafson | Fort Collins CO | Colorado | May 13, 2018 |
| 280 | Egon | Kazmer | Highlands ranch | Colorado | May 14, 2018 |
| 281 | Dora | Mease | Calhan | Colorado | May 14, 2018 |
| 282 | Jodi | MacTavish | Grand Junction | Colorado | May 14, 2018 |
| 283 | Dennis | Gamet | M | Marlette | May 14, 2018 |
| 284 | Donald | Smith | Greeley | Colorado | May 14, 2018 |
| 285 | alex | kogod | Vail | Colorado | May 15, 2018 |
| 286 | Gerardo | Trujillo | Denver | Colorado | May 15, 2018 |
| 287 | Melita | Ring-Kidd | Colorado springs | Colorado | May 15, 2018 |
| 288 | Mark | Nemmers | Englewood | Colorado | May 15, 2018 |
| 289 | Patrick | King | Cañon City | Colorado | May 15, 2018 |
| 290 | Daniel | Hackett | Englewood | CO | May 15, 2018 |
| 291 | Matthew | Ricks | Aurora | Colorado | May 15, 2018 |
| 292 | Theodore | Wilson | Grand Junction | Colorado | May 15, 2018 |
| 293 | Neal | Pashman | Centennial | Colorado | May 15, 2018 |
| 294 | Nicholas | Weaver | Fountain | CO | May 16, 2018 |
| 295 | Cynthia | Martin | Arvada | CO | May 27, 2018 |
| 296 | Deana | DeWitt | Englewood | CO | Jun 11, 2018 |
| 297 | Teresa | Mesple | Brighton | co, Adams County | Jun 11, 2018 |
| 298 | Nic | Conroy | Bayfield | CO | Jun 14, 2018 |
| 299 | Matt | Clark | Denver | Colorado | Jun 16, 2018 |
| 300 | Pradeep | Bhanot | | India | Jun 25, 2018 |
| 301 | Delilah | Colin | Greeley | Colorado | Jul 17, 2018 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 302 | Dianne | Archuleta | Pueblo | Colorado | Jul 20, 2018 |
| 303 | Kathy | Doherty | Parker | Colorado | Jul 29, 2018 |
| 304 | Cindy | Christensen | Littleton | Colorado | Jul 29, 2018 |
| 305 | Louise | Hughes | Wheat Ridge | Jefferson County | Jul 29, 2018 |
| 306 | John | Thich | Lakewood | Colorado | Jul 29, 2018 |
| 307 | Priscilla | Nelson | Estes Park | Colorado | Jul 30, 2018 |
| 308 | Janet | Draper | Denver | Colorado | Aug 04, 2018 |
| 309 | Shawn | Terrell | Ft Collins | Colorado | Aug 13, 2018 |
| 310 | Margie | Cooley | 81226 | Colorado | Aug 15, 2018 |
| 311 | Kimberly | Smith | Denver | CO | Aug 19, 2018 |
| 312 | Cindy | Brand | MONTROSE | COLORADO | Aug 23, 2018 |
| 313 | Paul | Hester | Denver | CO | Aug 28, 2018 |
| 314 | Tammy | Gray | Highland | Ca | Aug 31, 2018 |
| 315 | Tracy | Harbin | Co Springs | El paso | Sep 01, 2018 |
| 316 | Marci | Anderson | Golden | Co | Sep 01, 2018 |
| 317 | K | Jones | Fort Collins | Colorado | Sep 05, 2018 |
| 318 | Frank | Gross | Fort Lupton | Colorado | Sep 09, 2018 |
| 319 | esteban | martinez | mead | colorado | Sep 13, 2018 |
| 320 | Randall | Weiner | Boulder | Colorado | Sep 13, 2018 |
| 321 | Tina | Scarborough | Elberton | Georgia | Sep 24, 2018 |
| 322 | Elizabeth | Rutledge | Denver | Colorado | Sep 25, 2018 |
| 323 | Kenneth | DeBacker | Denver | Colorado | Sep 25, 2018 |
| 324 | Bradley | Higgins | Erie | Colorado | Sep 25, 2018 |
| 325 | Belinda | Groner | lamar | co | Sep 26, 2018 |
| 326 | Christine | Krumholz | Centennial | Colorado | Sep 29, 2018 |
| 327 | Corrine | Arellano | Pueblo | Colorado | Sep 30, 2018 |
| 328 | Josh | Walen | Denver | Colorado | Sep 30, 2018 |
| 329 | Kate | Merlin | Boulder | Colorado | Sep 30, 2018 |
| 330 | Myeisha | Delouth | Aurora | Colorado | Sep 30, 2018 |
| 331 | beverly | martinez | lakewood | colo | Oct 01, 2018 |
| 332 | Rebecca | Albano | Denver | Colorado | Oct 04, 2018 |
| 333 | David | Webster | Colorado Springs | CO | Oct 04, 2018 |
| 334 | Rebecca | O'Rourke | Colorado Springs | Colorado | Oct 04, 2018 |
| 335 | Marisela | Uribe | Denver | CO | Oct 06, 2018 |
| 336 | V | P | CoSp | Co | Oct 06, 2018 |
| 337 | Jennifer | Gracin | Colorado springs | Colorado springs, CO el paao8 | Oct 08, 2018 |
| 338 | Amanda | Green | Littleton | CO | Oct 08, 2018 |
| 339 | Judith | Shively | Erie, Colorado | Weld | Oct 08, 2018 |
| 340 | Joseph | Fraser | Golden | CO | Oct 08, 2018 |
| 341 | Chris | Hoffman | Denver | Colorado | Oct 08, 2018 |
| 342 | Indra | Lusero | ARVADA | CO | Oct 09, 2018 |
| 343 | Sandra | Lucero | Denver | Colorado | Oct 10, 2018 |
| 344 | Deborah | Bradford | Aspen | Colorado | Oct 12, 2018 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 345 | Shawn | Bkair | Pueblo | Colorado | Oct 14, 2018 |
| 346 | Ricardo | Lopez | Colorado Springs | Colorado | Oct 14, 2018 |
| 347 | Leah | Parry | Lakewood | Colorado | Oct 14, 2018 |
| 348 | Maya | Baca | Aurora | Colorado | Oct 14, 2018 |
| 349 | Lori | Dasko | Loveland | CO | Oct 14, 2018 |
| 350 | Cristie | Durland | Broomfield | Colorado | Oct 14, 2018 |
| 351 | debra | hudnall | Grand Junction | CO - Colorado (U.S. State) | Oct 14, 2018 |
| 352 | Sharon | Rogenmoser | Colorado Springs | CO | Oct 14, 2018 |
| 353 | Jennie | Hurrieta | Denver | Colorado | Oct 15, 2018 |
| 354 | shannon | kelly | Glenwood Springs | Colorado | Oct 16, 2018 |
| 355 | Steven | Spackman | Aurora | Colorado | Oct 17, 2018 |
| 356 | Justin | Taylor | Denver | CO | Oct 17, 2018 |
| 357 | Barbra | Shearer | Golden | CO | Oct 18, 2018 |
| 358 | Melodee | Rodriguez | Broomfield | CO | Oct 19, 2018 |
| 359 | Linda | Gonzales | Fort Collins | CO | Oct 19, 2018 |
| 360 | Tanessa | Cole | Strasburg | Colorado | Oct 19, 2018 |
| 361 | Jeffrey | ingram | Arvada | Colorado | Oct 20, 2018 |
| 362 | Teri | ORourke | Crested Butte | Colorado | Oct 20, 2018 |
| 363 | anthony | gardner | colorado springs | colorado | Oct 20, 2018 |
| 364 | brian | tunheim | Ken Caryl | Colorado | Oct 21, 2018 |
| 365 | Stephen | Dunning | Yoder | Colorado | Oct 21, 2018 |
| 366 | Jason | Lewis | Golden | Co | Oct 21, 2018 |
| 367 | Suzanne | Patterson | Bethany | OK | Oct 21, 2018 |
| 368 | Alan | Stump | Las Animas | CO | Oct 22, 2018 |
| 369 | David | Clark | Thornton | Colorado | Oct 22, 2018 |
| 370 | karen | Donelson | Silt | CO | Oct 22, 2018 |
| 371 | Elizabeth | Moura | Broomfield | Colorado | Oct 22, 2018 |
| 372 | Lee | O'Brien | Fort Collins | CO | Oct 23, 2018 |
| 373 | Settie | Phillips | Colorado Springs | Colorado | Oct 23, 2018 |
| 374 | Valarie | Kalish | Fort Collins | Colorado | Oct 23, 2018 |
| 375 | Mark | Deck | Colorado Spgs | Colorado | Oct 24, 2018 |
| 376 | David | Brick | Castle Rock | Douglas | Oct 24, 2018 |
| 377 | Melanie | Spears | Castle Rock | CO | Oct 25, 2018 |
| 378 | Betty | Blanco | La Junta | Colorado | Oct 25, 2018 |
| 379 | David | Rodriguez | Pueblo | Colorado | Oct 25, 2018 |
| 380 | Beth | Maciolek | Westminster | CO | Oct 26, 2018 |
| 381 | lee | toni | Aurora | CO | Oct 28, 2018 |
| 382 | Rick | Black | Charlotte | NC | Oct 29, 2018 |
| 383 | Anthony | Sanchez | Centennial | Colorado | Oct 31, 2018 |
| 384 | Juliet | Roth | Colorado Springs | CO | Nov 01, 2018 |
| 385 | Anne | Conner | Craig | Colorado | Nov 01, 2018 |
| 386 | Donna | Starr | Fort Collins | CO | Nov 01, 2018 |
| 387 | Maria | Mantas | Arvada | Colorado | Nov 02, 2018 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|------------|-----------|------|-------|------|
| 388 | Earl | Rendon | Fort Collins | Colorado | Nov 03, 2018 |
| 389 | rebecca | bishara | colorado springs | colorado, el paso | Nov 03, 2018 |
| 390 | Ben | Bleichrodt | Littleton | CO | Nov 04, 2018 |
| 391 | Jason | Kirkfield | | Colorado | Nov 04, 2018 |
| 392 | Dona | Bhavani | Boulder | CO | Nov 04, 2018 |
| 393 | Kush | Desai | LOVELAND | CO | Nov 05, 2018 |
| 394 | Nick | Schendzielos | Denver | COLORADO | Nov 05, 2018 |
| 395 | Kaarl | Hoopes | Thornton | CO | Nov 05, 2018 |
| 396 | Daniel | Rule | Pueblo | Colorado | Nov 05, 2018 |
| 397 | Jesse | Wilson | BERTHOUD | CO | Nov 06, 2018 |
| 398 | Sean | Thul | Englewood | CO | Nov 06, 2018 |
| 399 | Rachel | Shockley | Bayfield | CO | Nov 06, 2018 |
| 400 | Tracey | Fisch | Castle Rock | Douglas | Nov 06, 2018 |
| 401 | Albert | Rogers | Golden | Colorado | Nov 08, 2018 |
| 402 | Nicole | Wilson | Henderson | Nv | Nov 18, 2018 |
| 403 | Rebekah | Van Epps | DENVER | co | Nov 18, 2018 |
| 404 | Martha | Every | Aurora | Colorado Arapahoe | Nov 19, 2018 |
| 405 | Scott | Pedersen | Denver | co | Nov 19, 2018 |
| 406 | ed | harris | Aurora, COLORADO | Arapahoe | Dec 01, 2018 |
| 407 | Julie | Yovankin | Littleton | CO | Dec 01, 2018 |
| 408 | Thomas | Watson | Denver | CO | Dec 04, 2018 |
| 409 | Karin | Liljestrand | Denver | CO | Dec 11, 2018 |
| 410 | Jay | Loyo | Newark | New jersey | Dec 17, 2018 |
| 411 | Shelly | Wilson | Aurora | CO | Dec 19, 2018 |
| 412 | Judicial | Reform | Denver | Colorado | Dec 24, 2018 |
| 413 | Andrea | Metz | grand junction | colorado | Dec 26, 2018 |
| 414 | Jenny | Dees | Denver | CO | Dec 26, 2018 |
| 415 | laura | hetrick | Steamboat Springs | CO | Dec 30, 2018 |
| 416 | Lisandro | Vostatek | Mesa | Colorado | Jan 06, 2019 |
| 417 | Charles | Brosky | Longmont | CO | Jan 12, 2019 |
| 418 | Zachary | Argabrite | Conifer | Colorado | Jan 12, 2019 |
| 419 | Paulette | Dyon | Lakewood | Colorado | Jan 12, 2019 |
| 420 | Trisha | Rush | Colorado Springs | Colorado | Jan 12, 2019 |
| 421 | alice | minch | sun city | arizona | Jan 14, 2019 |
| 422 | Benjamin | OBarr | Evans | Colorado | Jan 16, 2019 |
| 423 | Mark | Cortez | Pueblo | ST | Jan 19, 2019 |
| 424 | Peter | Arnold | Steamboat Springs | Routt County, State of Colorado | Jan 21, 2019 |
| 425 | David | Gibbs | Steamboat Springs | CO | Jan 22, 2019 |
| 426 | Tara | Novotny | Colorado Springs | Colorado | Feb 09, 2019 |
| 427 | Kevin | Cimo | Fort collins | Co | Feb 09, 2019 |
| 428 | Leona | Hemmerich | Dinosaur | Colorado | Feb 09, 2019 |
| 429 | John Mark | Hentges | Madison Lake | Minnesota | Feb 10, 2019 |
| 430 | Aubrey | Hickman | Aurora | Colorado | Feb 15, 2019 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 431 | Cindy | Brand | Montrose | Colorado | Feb 15, 2019 |
| 432 | John | Panko | Chicago | Illinois | Feb 15, 2019 |
| 433 | Dominick | Ryken | Wheatridge | Colorado | Feb 15, 2019 |
| 434 | Jimi | McFarland | Wheat Ridge, Colorado | United States | Feb 15, 2019 |
| 435 | Carrie | Hargrave | Bailey | Colorado | Feb 15, 2019 |
| 436 | Adam | Michels | Loveland | Colorado | Feb 17, 2019 |
| 437 | rachel | zimmerman | aspen | pitkin country | Feb 26, 2019 |
| 438 | Joyce | Reynolds | Brighton | Colorado | Mar 02, 2019 |
| 439 | Felicia | Simpson | Centennial | Colorado | Mar 03, 2019 |
| 440 | Philip | Henke | Aurora | CO | Mar 03, 2019 |
| 441 | Brian | Murphy | BROOMFIELD | CO | Mar 09, 2019 |
| 442 | Christina | Wodiuk | CO | Pueblo | Mar 17, 2019 |
| 443 | Laurin | Desso | | Colorado | Mar 18, 2019 |
| 444 | Thomas | Gilley | Greeley | Colorado | Apr 06, 2019 |
| 445 | RChris | Eikenberg | DENVER | COLORADO | Apr 14, 2019 |
| 446 | Camille | Abboud | Denver | Colorado | Apr 22, 2019 |
| 447 | Thomas | Strickland | Aurora | CO | Apr 27, 2019 |
| 448 | Donna | Newland | ELIZABETH | Colorado | Apr 27, 2019 |
| 449 | Paula | Polumbus | Aurora | Colorado | Apr 28, 2019 |
| 450 | Melissa | Roarty | Colorado Springs | Colorado | Apr 28, 2019 |
| 451 | James | Jordan | Englewood | Colorado | Apr 28, 2019 |
| 452 | Alexandria | Talbot | Northglenn | Colorado | Apr 28, 2019 |
| 453 | Curtis | Lewton | Bennett | Colorado | Apr 28, 2019 |
| 454 | Kaycee | Heid | Fort collins | Co | Apr 28, 2019 |
| 455 | Michael | Corcoran | Divide | Colorado | Apr 28, 2019 |
| 456 | Michelle | wilson | englewood | co | May 01, 2019 |
| 457 | Linda | Sears | Centennial | Colorado | May 04, 2019 |
| 458 | Brian | Murphy | Westminster | CO | May 04, 2019 |
| 459 | Gregory | Harman | Westminster | CO | May 05, 2019 |
| 460 | Brian | Sutton | Florissant | Colorado | May 05, 2019 |
| 461 | Jon | Mccoin | Aurora | CO | May 14, 2019 |
| 462 | Jennifer | Larsen | Fort Collins | Colorado | Jun 06, 2019 |
| 463 | Adam | Michels | Fort Collins | Colorado | Jun 08, 2019 |
| 464 | James | Pitchford | Colorado springs | Colorado | Jun 22, 2019 |
| 465 | Kevin | Fan | Davenport | Iowa | Jun 22, 2019 |
| 466 | Dottie | Williams | Canon City | Colorado | Jun 22, 2019 |
| 467 | Flora | MCCarty | Aurora | Colorado | Jun 22, 2019 |
| 468 | Katheryn | Parrack | Cañon City | Colorado | Jun 22, 2019 |
| 469 | Derek | Harris | LAKEWOOD | CO | Jun 30, 2019 |
| 470 | Diane | Tipton | Denver | CO | Jul 06, 2019 |
| 471 | Summer | Lindsey | Westminster | Co | Aug 03, 2019 |
| 472 | Michelle | Medina | Brighton | Colorado | Aug 13, 2019 |
| 473 | Bill | Blossom | Aurora | Colorado | Aug 14, 2019 |

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 474 | Emily | Somervill | Denver | Colorado | Aug 27, 2019 |
| 475 | Drew | Vicary | denver | colorado | Aug 27, 2019 |
| 476 | Alyson | Robbins | WESTMINSTER | Colorado | Aug 31, 2019 |
| 477 | Gabriel | Schwartz | Denver | Colorado | Sep 05, 2019 |
| 478 | Katherine | Merlin | Boulder | Colorado | Sep 09, 2019 |
| 479 | MeLisa | Haynes | | Texas | Sep 11, 2019 |
| 480 | Rick | Houk | Colorado Springs | El Paso | Sep 12, 2019 |
| 481 | Jose | Clark | Pueblo | Colorado | Oct 27, 2019 |
| 482 | Kathy | Mohan | Colorado Springs | Colorado | Oct 28, 2019 |
| 483 | Kate | Merlin | Boulder | CO | Nov 05, 2019 |
| 484 | Maggie | McClure | Boulder | CO | Nov 05, 2019 |
| 485 | Warren | Menges | Alamosa | Colorado | Nov 05, 2019 |
| 486 | Christine | Many | Eckert | Co | Nov 06, 2019 |
| 487 | Sean | Manzanares | Grand junction | Colorado | Nov 06, 2019 |
| 488 | Joan | Kavanaugh | Glenwood Springs | Colorado Garfield | Nov 06, 2019 |
| 489 | Donna | Newland | Elizabeth | Colorado | Nov 09, 2019 |
| 490 | Michael | Erickson | Thornton | CO | Nov 10, 2019 |
| 491 | Ann | Hamilton | Broomfield | Colorado | Nov 11, 2019 |
| 492 | Mike | Lynch | Cortez | Montezuma | Nov 12, 2019 |
| 493 | Melissa | Martinez | Thornton | CO | Nov 14, 2019 |
| 494 | Jan | Weipert | Englewood | Colorado | Nov 23, 2019 |
| 495 | David | Lee | windsor | weld | Nov 23, 2019 |
| 496 | Judi | Atwood | Longmont | CO | Nov 27, 2019 |
| 497 | Rachel | Ciccateri | Colorado Springs | CO | Dec 04, 2019 |
| 498 | Laurie | Forsyth | | Colorado | Dec 05, 2019 |
| 499 | Evan | Haakenson | Longmont | Colorado | Dec 06, 2019 |
| 500 | Nancy | Scott | Pritchett | Colorado | Dec 23, 2019 |
| 501 | Leah | Fleming | Colorado | Aurora | Dec 24, 2019 |
| 502 | Carl | Pitchford | Elizabeth | Colorado | Dec 24, 2019 |
| 503 | Glenda | Bellio | Craig | Colorado | Dec 24, 2019 |
| 504 | Jamie | Cook | Fort Collins | Colorado, Larimer County | Jan 07, 2020 |
| 505 | Derek | Lindquist | Ayer | Massachusetts | Jan 11, 2020 |
| 506 | Alana | Plummer | Pueblo West | Colorado | Jan 18, 2020 |
| 507 | Jennifer | Damelio | Trinidad | Colorado | Jan 28, 2020 |
| 508 | Lorie | Rinke | Coal Creek | Colorado | Feb 09, 2020 |
| 509 | Sherilyn | Kirchoff | Denver | Colorado | Feb 11, 2020 |
| 510 | Carrie | Gray | COMMERCE CITY | Colorado | Feb 26, 2020 |
| 511 | Rebecca | Moore | San Dimas | California | Feb 28, 2020 |
| 512 | Nancy | Fingerhood | Westminster | Colorado | Mar 08, 2020 |
| 513 | Amy | Smith | Fort Collins | Larimer | Mar 09, 2020 |
| 514 | Laura | Brown | Heber Springs | AR | Apr 14, 2020 |
| 515 | Steve | Blakely | Denver | Colorado | Apr 15, 2020 |
| 516 | Brenda | Nystrom | Denver | CO | May 15, 2020 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 517 | Dianne | Archuleta | Pueblo | Colorado | Jun 13, 2020 |
| 518 | derek | smith | Conifer | CO | Jun 13, 2020 |
| 519 | Darin | Smith | DENVER | Colorado | Jun 13, 2020 |
| 520 | Jenny | Dees | Denver | Colorado | Jun 13, 2020 |
| 521 | Jeremy | Dean | Thornton | Colorado | Jun 13, 2020 |
| 522 | Timothy | Mortrud | Grand Forks | North Dakota, Grand Forks | Jun 14, 2020 |
| 523 | Peggy | Lapp | Littleton | Colorado | Jun 14, 2020 |
| 524 | Rebecca | Hult | Longmont | Colorado | Jun 15, 2020 |
| 525 | Logan | Shelton | Denver | Colorado | Jun 20, 2020 |
| 526 | Stacy | Gregory | Upland | Indiana | Jul 02, 2020 |
| 527 | Devon | Neill | Lakewood | CO | Jul 16, 2020 |
| 528 | Matt | Olson | Cortez | CO | Aug 02, 2020 |
| 529 | Adela | Madrid | Colorado | Colorado adams | Aug 04, 2020 |
| 530 | James | McFarland | fort collins | colorado | Aug 05, 2020 |
| 531 | Kenneth | Rucker | Cañon City | CO | Aug 08, 2020 |
| 532 | Aymee | Winchel | Lakewood | Wa | Aug 15, 2020 |
| 533 | Stephen | Branstetter | Hot Sulphur Spring | Colorado | Aug 22, 2020 |
| 534 | Settie | Phillips | Colorado Springs | CO | Sep 05, 2020 |
| 535 | THOMAS | LYSKO | Brighton | Co | Sep 28, 2020 |
| 536 | Elizabeth | Parker/Chacon | Loveland | CO | Oct 04, 2020 |
| 537 | Rachelle | Costello | Fort Collins | Colorado | Oct 11, 2020 |
| 538 | rich | molnar | Falcon | El Paso, CO | Oct 11, 2020 |
| 539 | Gena | Welk | Denver/Boulder | Colorado | Oct 12, 2020 |
| 540 | Sarah | Egolf | BROOMFIELD | CO | Oct 12, 2020 |
| 541 | Lynne | Charles | Denver | Denevr | Oct 13, 2020 |
| 542 | Stephen | Salazar | Englewood | Colorado | Oct 13, 2020 |
| 543 | Amy | Takken | Loveland | Colorado | Oct 13, 2020 |
| 544 | Miriam | Stohs | Denver | CO | Oct 13, 2020 |
| 545 | Majalisa | Avery | Aurora | Colorado | Oct 13, 2020 |
| 546 | Veronica | Pinnecoose | Ignacio | CO | Oct 14, 2020 |
| 547 | Sofia | Castaneda | Fort Collins | CO | Oct 14, 2020 |
| 548 | robert | mulqueen | monte vista | colorado rio grande county | Oct 14, 2020 |
| 549 | Nick | Masny | Brighton | Colorado | Oct 14, 2020 |
| 550 | Christina | Walker | Littleton | COLORADO | Oct 14, 2020 |
| 551 | William | Martin | Erie | CO | Oct 14, 2020 |
| 552 | William | Rivett | Colorado Springs | CO | Oct 14, 2020 |
| 553 | Eric | Lubbers | Centennial | Colorado | Oct 15, 2020 |
| 554 | Adina | Ackerman | Durango | CO | Oct 15, 2020 |
| 555 | Douglas | Olivas | Denver | CO | Oct 15, 2020 |
| 556 | Kim | Schiavone | Fort Collins | Colorado | Oct 15, 2020 |
| 557 | John | kindel | Elizabeth | Elbert | Oct 15, 2020 |
| 558 | Louis | Brown | Commerce City | Colorado | Oct 15, 2020 |
| 559 | Naomi | Fothergill | Denver | Colorado | Oct 15, 2020 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 560 | Ralph | Gregory | Boulder | CO | Oct 15, 2020 |
| 561 | Robert | Storey | Denver | Colorado | Oct 15, 2020 |
| 562 | Sarah | Wilson | Avon | Colorado | Oct 16, 2020 |
| 563 | Chris | Sydoriak | Longmont | CO Boulder county | Oct 16, 2020 |
| 564 | Callie | Walsh | Englewood | Colorado | Oct 16, 2020 |
| 565 | Joseph | Williams | Colorado Springs | Colorado | Oct 16, 2020 |
| 566 | Daniel | Meyer | Arvada | Colorado | Oct 16, 2020 |
| 567 | Chris | Gauvain | Denver | Colorado | Oct 16, 2020 |
| 568 | Barbara | Babin | Denver | co | Oct 16, 2020 |
| 569 | Sara | Howatt | Denver | Co | Oct 16, 2020 |
| 570 | Naomi | Ironwing | Colorado Springs | Colorado | Oct 16, 2020 |
| 571 | Nicole | Wilson | Fort Collins | CO | Oct 16, 2020 |
| 572 | Jason | Fay | Arvada | CO | Oct 16, 2020 |
| 573 | Melanie | Hockley | Denver | Denver | Oct 16, 2020 |
| 574 | Allison | Albright | Littleton | CO | Oct 17, 2020 |
| 575 | kirsten | saunders | centennial | COLORADO | Oct 17, 2020 |
| 576 | Elizabeth | Kain | LITTLETON | CO | Oct 17, 2020 |
| 577 | Ronald | Zaik | Littleton | CO | Oct 17, 2020 |
| 578 | Raymond | Zuniga | Colorado Springs | CO | Oct 17, 2020 |
| 579 | Soni | Miedema | Broomfield | CO | Oct 17, 2020 |
| 580 | Anne | Barrow | Denver | CO | Oct 17, 2020 |
| 581 | Paul | Shaffer | Walsenburg | Colorado | Oct 17, 2020 |
| 582 | Joy | Thomasma | Arvada | CO | Oct 17, 2020 |
| 583 | Kelly | Pearce | Denver | Colorado | Oct 17, 2020 |
| 584 | Jessica | Russell | DENVER | CO | Oct 17, 2020 |
| 585 | Dan | Niebuhr | Colorado Springs | Colorado | Oct 17, 2020 |
| 586 | Misha | White | Denver | Colorado | Oct 17, 2020 |
| 587 | Meghan | ODonnell | Fort Collins | Larimer | Oct 17, 2020 |
| 588 | Mischa | Samson | Boulder | Colorado | Oct 17, 2020 |
| 589 | Conner | Toennis | Thornton | CO | Oct 17, 2020 |
| 590 | Micaela | Naranjo | Denver | CO | Oct 17, 2020 |
| 591 | Анастасия | Зыкова | Киев | Киевская область | Oct 17, 2020 |
| 592 | Rachel | Crowe | Denver | CO | Oct 17, 2020 |
| 593 | Andrew | Lipman | Boulder | Co | Oct 17, 2020 |
| 594 | joy | om | Boulder | Colorado | Oct 17, 2020 |
| 595 | Beverly | Bell | BOULDER | CO | Oct 18, 2020 |
| 596 | Roy | Segura | Boulder | Colorado | Oct 18, 2020 |
| 597 | Jennifer | Mccormick | Denver | Colorado | Oct 18, 2020 |
| 598 | Mary | Hostetter | Boulder | Colorado | Oct 18, 2020 |
| 599 | Nancy | Nicholson | Boulder | CO | Oct 18, 2020 |
| 600 | Rebekah | Van Sweden | Boulder | CO | Oct 18, 2020 |
| 601 | Julie | Sutter | Fort Collins | Colorado | Oct 18, 2020 |
| 602 | Mona | Mirmortazavi | Lone tree | Colorado | Oct 18, 2020 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 603 | Royla | Rice | COLORADO SPRINGS | Colorado | Oct 18, 2020 |
| 604 | Blake | Stone | Boulder | Colorado | Oct 18, 2020 |
| 605 | Emmorette | Strand | Boulder | Colorado | Oct 18, 2020 |
| 606 | Cary | Seston | Boulder | Colorado | Oct 18, 2020 |
| 607 | Kay | Stumbo | Severance | Colorado | Oct 18, 2020 |
| 608 | Allen | Wat | Centennial | Colorado | Oct 18, 2020 |
| 609 | Chris | Harker | Denver | Colorado | Oct 18, 2020 |
| 610 | Jill | Vidas | Boulder | Colorado | Oct 18, 2020 |
| 611 | Ira | Liss | Erie | CO | Oct 18, 2020 |
| 612 | Mindy | Hernandez | Denver | Colorado | Oct 18, 2020 |
| 613 | Damian | Nuckles | Ft. Lupton | Colorado | Oct 18, 2020 |
| 614 | D L | Gundling | centennial | co | Oct 18, 2020 |
| 615 | Jenna | Kirk | Durango | colorado | Oct 18, 2020 |
| 616 | Karen | Sattler | Boulder | Colorado | Oct 18, 2020 |
| 617 | Rachel | Snow | Westminster | Colorado | Oct 18, 2020 |
| 618 | Ingrid | Thompson | Elizabeth | Colorado | Oct 18, 2020 |
| 619 | Gini | Fortier | Boulder | Co | Oct 18, 2020 |
| 620 | Alisha | Lopez | Aurora | Colorado | Oct 18, 2020 |
| 621 | Julia | Wingert | Boulder | CO | Oct 18, 2020 |
| 622 | Kate | White | Boulder | CO | Oct 18, 2020 |
| 623 | Marci | Bagley | Windsor | Colorado | Oct 18, 2020 |
| 624 | Tagna | Waldschmidt | Rye | Pueblo | Oct 19, 2020 |
| 625 | Brian | Rezac | Longmont | Colorado | Oct 19, 2020 |
| 626 | Nicholas | Byrne | Aspen | Colorado | Oct 19, 2020 |
| 627 | Sarah | Miller | ASPEN | CO | Oct 19, 2020 |
| 628 | Brian | Rossetti | Denver | Colorado | Oct 19, 2020 |
| 629 | Tifini | Scarcella | Colorado Springs | Colorado | Oct 19, 2020 |
| 630 | Leighanne | Jenkins | Denver | CO | Oct 19, 2020 |
| 631 | George | Brush | Lakewood | Colorado | Oct 19, 2020 |
| 632 | John | Bryant | Colorado Springs | Colorado | Oct 19, 2020 |
| 633 | braden | baker | idk | idk | Oct 19, 2020 |
| 634 | P | Welch | Glenwood Springs, Co | Colo | Oct 19, 2020 |
| 635 | Stephen | Lodwick | Denver | Colorado | Oct 19, 2020 |
| 636 | Mo | Coghlan | Denver | CO | Oct 19, 2020 |
| 637 | Scott | Lindsey | Basalt | CO | Oct 20, 2020 |
| 638 | Sharon | Hartman | Colorado Springs | CO | Oct 20, 2020 |
| 639 | Nathaniel | McMullen | Elizabeth | Elbert County, Colorado | Oct 20, 2020 |
| 640 | Michael | Cochran | Denver | CO | Oct 20, 2020 |
| 641 | SHELLEY | HUCKABAY | AURORA | CO | Oct 20, 2020 |
| 642 | JENNIFER | LIFFICK | AURORA | CO | Oct 20, 2020 |
| 643 | Kara | Szymanski | Littleton | CO | Oct 20, 2020 |
| 644 | Richard | Trapp | Westminster | Colorado | Oct 20, 2020 |
| 645 | Anne Marie | Pewterbaugh | Broomfield | Colorado | Oct 20, 2020 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 646 | Maria | Rainsdon | Grand Junction | CO | Oct 20, 2020 |
| 647 | Samantha | Moreno | Denver | CO | Oct 20, 2020 |
| 648 | Katie | Tanaka | Englewood | CO | Oct 21, 2020 |
| 649 | Hillary | Roland | Evergreen | CO | Oct 21, 2020 |
| 650 | john | nash | Evergreen | Colorado | Oct 21, 2020 |
| 651 | Claire | Carren | Frisco | Colorado | Oct 21, 2020 |
| 652 | Ryan | Tanner | denver | colorado | Oct 21, 2020 |
| 653 | Deb | Ellis | Lithleton | CO | Oct 21, 2020 |
| 654 | Daniel | Baril | Boulder | Colorado | Oct 21, 2020 |
| 655 | Liahna | Duran | Aurora | Colorado | Oct 21, 2020 |
| 656 | Sheryl | Martin | Colorado Springs, 80910 | Colorado | Oct 21, 2020 |
| 657 | laura | kupperman | Boulder | CO | Oct 21, 2020 |
| 658 | Judith | Dickson | Centennial | CO | Oct 21, 2020 |
| 659 | charles | adams | Lakewood | Colorado | Oct 21, 2020 |
| 660 | Victoria | Hunt | Fort Collins | CO | Oct 21, 2020 |
| 661 | Peter | Cantwell | GRAND JUNCTION | CO | Oct 21, 2020 |
| 662 | Corbin | Bishop | Palmer Lake | Colorado | Oct 21, 2020 |
| 663 | Bethany | Phillips | Aurora | CO | Oct 21, 2020 |
| 664 | Blair | Bacon | Fort Collins | Colorado | Oct 22, 2020 |
| 665 | Jane | Tucker | Colorado Springs | Colorado | Oct 22, 2020 |
| 666 | Blaine | Horner | DENVER | CO | Oct 22, 2020 |
| 667 | Grayson | sander-olhoeft | Boulder | Boulder | Oct 22, 2020 |
| 668 | Daniel | McGee | Denver | CO | Oct 22, 2020 |
| 669 | Priscilla | Gibbons | Brighton | Colorado | Oct 22, 2020 |
| 670 | Colin | Campbell | | CO | Oct 22, 2020 |
| 671 | Angela | Walker | Lakewood | Colorado | Oct 22, 2020 |
| 672 | Joe | Toves | Lakewood | Colorado | Oct 22, 2020 |
| 673 | Tara | wachsmann | | Larimer | Oct 22, 2020 |
| 674 | Christopher | Fairbanks | Evergreen | Colorado | Oct 22, 2020 |
| 675 | megan | jewell | silt | colorado | Oct 22, 2020 |
| 676 | Isabelle | Forstmann | Denver | CO | Oct 23, 2020 |
| 677 | Christopher | Lamb | Fort Collins | CO | Oct 23, 2020 |
| 678 | Bronwyn | Van Wyhe | Denver | Colorado | Oct 23, 2020 |
| 679 | Sandi | Cummings | Greeley | Colorado | Oct 23, 2020 |
| 680 | Robert | Jones | Colorado Springs | CO | Oct 23, 2020 |
| 681 | Madeline | Boliver | Denver | CO | Oct 23, 2020 |
| 682 | Justus | Brown | Denver | Colorado | Oct 23, 2020 |
| 683 | Daniel | LOPEZ | Colorado Springs | CO | Oct 23, 2020 |
| 684 | Alex | Chapin | Wheat Ridge | CO | Oct 23, 2020 |
| 685 | Heather | Conway | Denver | CO | Oct 23, 2020 |
| 686 | Lacy | Saenz | Wheat Ridge | CO | Oct 23, 2020 |
| 687 | Jeffrey | Williams | Wheat Ridge | CO | Oct 23, 2020 |
| 688 | VITA | SHANNON | Boulder | CO | Oct 23, 2020 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 689 | Jennifer | Dooley | Aurora | CO | Oct 24, 2020 |
| 690 | Margaret | Crowley | Boulder | Colorado | Oct 24, 2020 |
| 691 | Peter | Nash | Fort Collins | CO | Oct 24, 2020 |
| 692 | David | Condry | Sedalia | CO | Oct 24, 2020 |
| 693 | Rachel | Henderson | Denver | Co | Oct 24, 2020 |
| 694 | Sabrina | Eddens | Colorado Springs | Colorado | Oct 24, 2020 |
| 695 | Caroline | Hastings | Aurora | CO | Oct 24, 2020 |
| 696 | Melanie | Reiser | Longmont | CO | Oct 24, 2020 |
| 697 | Randy | Pierce | Loveland | Colorado | Oct 24, 2020 |
| 698 | Landon | Correia | Littleton | Colorado | Oct 24, 2020 |
| 699 | Colleen | White | Palmer Lake lake | Colora | Oct 24, 2020 |
| 700 | Samantha | Pugliese | Denver | CO | Oct 24, 2020 |
| 701 | Bryce | Vowell | Colorado Springs | Colorado | Oct 24, 2020 |
| 702 | Richard | Evans | Broomfield | CO | Oct 24, 2020 |
| 703 | Carrie | Goldwsorthy | Arvada | CO | Oct 24, 2020 |
| 704 | Kelly | Shea | Fort Collins | Colorado | Oct 24, 2020 |
| 705 | Allyson | Mills | Lakewood | Co | Oct 24, 2020 |
| 706 | Jason | Owens | Lakewood | CO | Oct 24, 2020 |
| 707 | Hillary | Barrett-Osborne | Denver | CO | Oct 24, 2020 |
| 708 | Rachel | Harding | Denver | Colorado, Denver County | Oct 25, 2020 |
| 709 | Marshall | Thompson | Denver | CO | Oct 25, 2020 |
| 710 | Derek | Schmeh | Westminster | CO | Oct 25, 2020 |
| 711 | Emelia | Emanuel | Denver | CO | Oct 25, 2020 |
| 712 | Brandon | Lord | Denver | CO | Oct 25, 2020 |
| 713 | mark | klarenbach | edmonton | alberta | Oct 25, 2020 |
| 714 | Lauren | Russell | Evergreen | CO | Oct 25, 2020 |
| 715 | Cody | Miller | Aurora | Colorado | Oct 25, 2020 |
| 716 | Tiffany | Phu | Denver | Colorado | Oct 25, 2020 |
| 717 | Cindy | Braun | Fort Collins | Colorado | Oct 25, 2020 |
| 718 | Melissa | Leal | Denver | Colorado | Oct 25, 2020 |
| 719 | Traci | McDonald | Broomfield | CO | Oct 25, 2020 |
| 720 | Laura | Kottlowski | Golden | Colorado | Oct 25, 2020 |
| 721 | Larissa | Cory | Longmont | CO - Colorado | Oct 25, 2020 |
| 722 | Joel | Newbraugh | Littleton | Colorado | Oct 25, 2020 |
| 723 | Stephanie | Krause | Denver | CO | Oct 26, 2020 |
| 724 | Courtney | McDonnell | Denver | Colorado | Oct 26, 2020 |
| 725 | Jaimie | Brunner | Aurora | CO | Oct 26, 2020 |
| 726 | kelly | wawrzynek | boulder | co | Oct 26, 2020 |
| 727 | Noel | Merket | Golden | Colorado | Oct 26, 2020 |
| 728 | Jessie | Dudley | Pueblo West | CO | Oct 26, 2020 |
| 729 | Walter | Stewart | Pueblo West | Colorado | Oct 26, 2020 |
| 730 | Billie | Wright | Commerce City | CO | Oct 26, 2020 |
| 731 | ELIZABETH | PERNA | Fort Collins | CO | Oct 26, 2020 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 732 | Tasha | Safford | Denver | CO | Oct 26, 2020 |
| 733 | Josh | Taylor | Centennial | Colorado | Oct 26, 2020 |
| 734 | Diane | Harmon | Divide | Colorado | Oct 26, 2020 |
| 735 | Amber | Ball | Monument | Colorado | Oct 26, 2020 |
| 736 | Maris | Harmon | Denver | Denver | Oct 26, 2020 |
| 737 | Sandra | Coalson | Fountain | Colorado | Oct 26, 2020 |
| 738 | Patricia | Barkley | Monument | Colorado | Oct 26, 2020 |
| 739 | Leslie | Estes | Boulder | Colorado | Oct 27, 2020 |
| 740 | Daniella | Cavaliere | Colorado Springs | CO | Oct 27, 2020 |
| 741 | Adam | Bailon | lafayette | colorado | Oct 27, 2020 |
| 742 | Elizabeth | Setelin | Arvada | Colorado | Oct 27, 2020 |
| 743 | Rachel | Machina | Ramah | CO | Oct 27, 2020 |
| 744 | David | Olguin | Northglenn | CO | Oct 27, 2020 |
| 745 | Josh | Direen | Denver | Colorado | Oct 27, 2020 |
| 746 | Virginia | Lynch | Severance | Colorado | Oct 27, 2020 |
| 747 | Sally | Banghart | Wheat Ridge | Colorado | Oct 27, 2020 |
| 748 | Andra | Ferrara | Denver | CO | Oct 27, 2020 |
| 749 | Tyler | Michael | Denver | Colorado | Oct 27, 2020 |
| 750 | April | Gallo | Wheat Ridge | CO | Oct 27, 2020 |
| 751 | Tim | Isert | Castle Pines | CO | Oct 27, 2020 |
| 752 | Emily | Engle Bailon | | Colorado | Oct 27, 2020 |
| 753 | Nancy | Chabica | Colorado Springs | Colorado | Oct 28, 2020 |
| 754 | Kristen | Hiatt | Aurora | CO | Oct 28, 2020 |
| 755 | Joan | Borchardt-Ingmanson | Greeley | Colorado | Oct 28, 2020 |
| 756 | Lenora | Hamilton | Thornton | Colorado | Oct 28, 2020 |
| 757 | james | gresham | littleton | Colorado | Oct 28, 2020 |
| 758 | Michael | Kennedy | Golden | COLORADO | Oct 28, 2020 |
| 759 | Susan | Squyer | Lone Tree | CO | Oct 28, 2020 |
| 760 | Victor | Russelavage | Colorado Springs | Colorado | Oct 28, 2020 |
| 761 | Leslie | Ehmer | Greenwood Village | Co | Oct 28, 2020 |
| 762 | Margo | Kotulak | Littleton | CO | Oct 28, 2020 |
| 763 | Cheryl | Clarkson | Aurora | Colorado, Arapahoe County | Oct 28, 2020 |
| 764 | Avery | Renberg | Northglenn | Colorado | Oct 28, 2020 |
| 765 | S | Kumar | Colorado Springs | Colorado | Oct 28, 2020 |
| 766 | Chris & Bonni | Brooks | Windsor | Colorado | Oct 28, 2020 |
| 767 | T | Bull | Golden | Colorado | Oct 28, 2020 |
| 768 | Jeff | Kennedy | Centennial | CO | Oct 29, 2020 |
| 769 | Judy | Kennedy | Centennial | CO | Oct 29, 2020 |
| 770 | Brittany | Winkler | Boulder | Colorado | Oct 29, 2020 |
| 771 | Scot | Donato | Denver | CO | Oct 29, 2020 |
| 772 | David | Read | Highlands Ranch | CO | Oct 29, 2020 |
| 773 | Sandra | GINTHER | ALAMOSA | Colorado | Oct 29, 2020 |
| 774 | lee | falstrom | manitou springs | Colorado | Oct 29, 2020 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 775 | Linda | Newell | Colorado Springs | CO | Oct 29, 2020 |
| 776 | Mark | Zimmer | Castle Rock | CO | Oct 29, 2020 |
| 777 | Brent | Arnold | Vail | CO | Oct 29, 2020 |
| 778 | Jesse | Sebestyen | Denver | CO | Oct 29, 2020 |
| 779 | Veronica | Toon | Colorado Springs. | Colorado | Oct 29, 2020 |
| 780 | Carl | Meilahn | PARKER | Colorado | Oct 29, 2020 |
| 781 | Martha | yohannes | Denver | Colorado | Oct 29, 2020 |
| 782 | Jackie | Eubank | JOHNSTOWN | CO | Oct 29, 2020 |
| 783 | Maureen | Richardson | Colorado Springs | Colorado | Oct 30, 2020 |
| 784 | Robert | Graiko | Denver | Denver | Oct 30, 2020 |
| 785 | Vanessa | Vaile | Yuma | CO | Oct 30, 2020 |
| 786 | Timothy | Weddington | Loveland | Colorado | Oct 30, 2020 |
| 787 | Amy | Chalifoux | Boulder | CO | Oct 30, 2020 |
| 788 | Alvin | Knott | Boulder | Colorado | Oct 30, 2020 |
| 789 | BRIAN | FIELD | DENVER | CO | Oct 30, 2020 |
| 790 | Stephanie | Spomer | Greenwood Village | Colorado | Oct 31, 2020 |
| 791 | Liz | Marnell | Broomfield | CO | Oct 31, 2020 |
| 792 | Jason | Williams | Parker | Colorado | Oct 31, 2020 |
| 793 | Geraldine | Smith | Denver | CO Colorado | Oct 31, 2020 |
| 794 | Kristen | Cavanaugh | Lone Tree | Colorado | Oct 31, 2020 |
| 795 | Cheri | Good | Littleton | Colorado | Oct 31, 2020 |
| 796 | Leah | Dyer | Fort Collins | Colorado | Oct 31, 2020 |
| 797 | Mark | Sprenger | Fort Collins | Colorado | Oct 31, 2020 |
| 798 | Ian | Cowart | AURORA | CO | Oct 31, 2020 |
| 799 | Jacob | Williams | Denver | Colorado | Oct 31, 2020 |
| 800 | Hayley | Bubb | FORT COLLINS | CO | Oct 31, 2020 |
| 801 | Beverly | Hill | Fort Collins | Colorado | Oct 31, 2020 |
| 802 | Debra | BigWolf | Parker | Colorado | Nov 01, 2020 |
| 803 | Anna | Ferrell | Durango | Co laplata county | Nov 01, 2020 |
| 804 | Clint | McBride | Fort Collins | CO | Nov 01, 2020 |
| 805 | Lindsay | Humphreys | Denver | CO | Nov 01, 2020 |
| 806 | Michael | La Breche | Lakewood | CO | Nov 02, 2020 |
| 807 | Mystery | Skelton | Colorado Springs | Colorado | Nov 02, 2020 |
| 808 | Carina | Tennessen | DENVER | CO | Nov 02, 2020 |
| 809 | Nikita | Singh | Denver | CO | Nov 02, 2020 |
| 810 | al | fi | CO Springs | Colorado | Nov 02, 2020 |
| 811 | hayden | ripple | Denver | CO | Nov 02, 2020 |
| 812 | Crystal | Ferreira | Denver | CO | Nov 02, 2020 |
| 813 | Denise | Guadian | Denver | CO | Nov 02, 2020 |
| 814 | Adam | Amorastreya | Boulder | Colorado | Nov 02, 2020 |
| 815 | James | Gable | Colorado Springs | CO | Nov 02, 2020 |
| 816 | Kimberly | Wagner | Brighton | CO | Nov 02, 2020 |
| 817 | Gabriel | Lincoln | Lakewood | Colorado | Nov 02, 2020 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 818 | Brenda | Marceau | Thornton | Colorado | Nov 03, 2020 |
| 819 | Madeline | Forrester | Denver | CO | Nov 03, 2020 |
| 820 | Bronwyn | Van Wyhe | Denver | CO | Nov 03, 2020 |
| 821 | patricia | hake | Boulder | Colorado | Nov 03, 2020 |
| 822 | Gerardo | Santiago | Longmont | Colorado | Nov 03, 2020 |
| 823 | Cordelia | Edison | Denver | CO | Nov 03, 2020 |
| 824 | Caryn | Bolander | Monument | Colorado | Nov 03, 2020 |
| 825 | Carol | Davy | Laporte, Colorado | Larimer County | Nov 03, 2020 |
| 826 | Michael | Moubarek | Aurora | COLORADO | Nov 04, 2020 |
| 827 | Jennifer | Melvin | BOULDER | CO | Nov 05, 2020 |
| 828 | Wendy | Littlepage | Boulder | CO | Nov 05, 2020 |
| 829 | Philip | Tobias | Boulder | CO | Nov 05, 2020 |
| 830 | Adam | Sirkus | Boulder | CO | Nov 06, 2020 |
| 831 | Lindsay | Christopher | Boulder | Colorado | Nov 06, 2020 |
| 832 | Stephanie | Brown | Lafayette | Colorado | Nov 06, 2020 |
| 833 | Michele | Kelly | Naples | Florida | Nov 06, 2020 |
| 834 | Karlene | Stange | Durango | Colorado | Nov 07, 2020 |
| 835 | Natalie | Geer | Boulder | CO | Nov 07, 2020 |
| 836 | Gabe | Powell | Durango | La Plata County, Colorado | Nov 08, 2020 |
| 837 | Adam | Howell | Durango | Colorado | Nov 08, 2020 |
| 838 | Kisha | gibson | Aurora | CO | Nov 21, 2020 |
| 839 | Gary | Brannon | Golden | Jefferson County, Colorado | Dec 13, 2020 |
| 840 | Mistina | Sarvari | Aguilar | Co | Dec 14, 2020 |
| 841 | Kimra | DOUGLASS | PARKER | Colorado | Jan 04, 2021 |
| 842 | Alex | Chernoff | Greeley | Weld | Jan 17, 2021 |
| 843 | Lisa | Moir | Broomfield | Co | Jan 22, 2021 |
| 844 | Shannon | Strich | Littleton | Colorado | Jan 29, 2021 |
| 845 | Joe | Miller | O4Z1UMFH | QL7P88A1 | Jan 31, 2021 |
| 846 | Nancy | Mitchell | Merrimack | NH | Jan 31, 2021 |
| 847 | Tom | Remy | NORTHGLENN | Colorado | Feb 04, 2021 |
| 848 | Sandra J | Harmon | Hartsville | South Carolina | Feb 07, 2021 |
| 849 | Elizabeth | Steiner | Greenwood Village | Colorado | Feb 12, 2021 |
| 850 | David | Forel | Littleton | Colorado | Feb 15, 2021 |
| 851 | Christine | Morrison | Center Line | Michigan | Feb 22, 2021 |
| 852 | Taya | Matoy | Boulder | CO | Mar 19, 2021 |
| 853 | Orion | Barnes | Greeley | Colorado | Apr 01, 2021 |
| 854 | Diana | Reale | Colorado Springs | CO | Apr 26, 2021 |
| 855 | Iesha | Wood | Denver | Colorado | Apr 28, 2021 |
| 856 | Tee | Tate | Aurora | CO | May 24, 2021 |
| 857 | Penny | Peery | Payson | AZ | Jun 03, 2021 |
| 858 | teoxiuitl | greer | ALAMOSA | Colorado | Jun 05, 2021 |
| 859 | Misty | Callahan | CASTLE ROCK | CO | Jun 08, 2021 |
| 860 | Craig | Buckley | Longmont | BOULDER | Jun 09, 2021 |

*Powered by GoPetition*

| # | First name | Last name | City | State | Date |
|---|---|---|---|---|---|
| 861 | Michael | Kryka | Aurora | Arapahoe | Jun 16, 2021 |
| 862 | Amy | Copeland | Jefferson County | Colorado | Jun 29, 2021 |
| 863 | Eliane | Haddad | Milan | Milan | Aug 04, 2021 |
| 864 | Janet | McKenzie | Denver | Colorado | Oct 03, 2021 |
| 865 | Crystal | Hathaway | Littleton | CO | Oct 12, 2021 |
| 866 | Ellington | Chase | Lakewood | Colorado | Oct 25, 2021 |
| 867 | robert | pritsker | Weston | CT | Oct 30, 2021 |
| 868 | Gary | Miller | Canon city | CO | Nov 07, 2021 |
| 869 | Janine | Nazzise | Caucasian/White (not Hispanic) | Colorado | Nov 12, 2021 |
| 870 | Ken | Sorak | Littleton | Colorado | Nov 15, 2021 |
| 871 | Jessica | Sweeney | Fruita | CO | Nov 16, 2021 |
| 872 | Meleaha | Glapion | Aurora | Colorado | Feb 17, 2022 |
| 873 | christopher | Stone | Colorado Springs | co | Mar 25, 2022 |
| 874 | Gary | Gary | Canon city | Colorado | Apr 13, 2022 |
| 875 | Jacob | Bellinsky | Black Hawk | Colorado | May 09, 2022 |
| 876 | Mary | Mansfield | Denver | CO | Jun 18, 2022 |
| 877 | Todd | Bovo | Denver | Colorado, Arapahoe | Jun 24, 2022 |
| 878 | Fredricka | Brown | Arvada | Colorado | Jul 09, 2022 |
| 879 | Debra | Carroll | Littleton | Colorado | Jul 09, 2022 |
| 880 | Charles | Soupios | Lakewood | Colorado | Jul 09, 2022 |
| 881 | Arlette | Haddad | Knoxville | Tennessee | Jul 09, 2022 |
| 882 | Kenneth | Padilla | Denver | CO | Jul 09, 2022 |
| 883 | Travis | Weiner | Greeley | Colorado | Jul 09, 2022 |
| 884 | Don | Trinen | Aurora | CO | Jul 09, 2022 |
| 885 | shari | shink | Wheat Ridge | CO | Jul 09, 2022 |
| 886 | Mark | Ohlsen | Pueblo | co | Jul 09, 2022 |
| 887 | Jeff | Emberton | Boulder | Colorado | Jul 09, 2022 |
| 888 | charles | sutton | Loveland | Colorado | Jul 09, 2022 |
| 889 | dinah | land | Aurora | CO | Jul 09, 2022 |
| 890 | Russell | Haas | Golden | CO | Jul 10, 2022 |
| 891 | William | Hineser | ARVADA | Colorado | Jul 10, 2022 |
| 892 | Carl | Luppens | Denver | CO | Jul 11, 2022 |
| 893 | Carrie | Fini | Colorado Springs | El Paso | Jul 11, 2022 |
| 894 | Nathan | Silver | Denver | Colorado | Jul 11, 2022 |
| 895 | Carl | Roberts | Arvada | CO | Jul 11, 2022 |

PROPOSED CONSTITUTIONAL AMENDMENT AND STATUTORY REPEALS
REGARDING THE JUDICIAL DISCIPLINE COMMISSION

DRAFT 7-8-22 by The Judicial Integrity Project


In the constitution of the state of Colorado, section 23 of article VI, AMEND paragraph (3) as follows:

(a) There shall be a commission on judicial discipline. It shall consist of: ~~Two judges of district courts and two judges of county courts, each selected by the supreme court; two citizens admitted to practice law in the courts of this state, neither of whom shall be a justice or judge, who shall have practiced in this state for at least ten years and who shall be appointed by the governor, with the consent of the senate; and four citizens, none of whom shall be a justice or judge, active or retired, nor admitted to practice law in the courts of this state, who shall be appointed by the governor, with the consent of the senate.~~ EIGHT CITIZENS NONE OF WHOM SHALL BE A JUSTICE OR JUDGE, ACTIVE OR RETIRED, NOR ADMITTED TO PRACTICE LAW IN THE COURTS OF THIS STATE, TWO OF WHOM ARE APPOINTED BY THE MAJORITY LEADER OF THE SENATE, TWO OF WHOM ARE APPOINTED BY THE MINORITY LEADER OF THE SENATE, TWO OF WHOM ARE APPOINTED BY THE SPEAKER OF THE HOUSE OF REPRESENTATIVES AND TWO OF WHOM ARE APPOINTED BY THE MINORITY LEADER OF THE HOUSE OF REPRESENTATIVES; THREE CITIZENS ADMITTED TO PRACTICE LAW IN THE COURTS OF THIS STATE, NONE OF WHOM SHALL BE A JUSTICE OR JUDGE, WHO SHALL HAVE PRACTICED IN THIS STATE FOR AT LEAST TEN YEARS, WHO HAVE BEEN REGISTERED AS INDEPENDENT VOTERS FOR AT LEAST THE LAST FIVE YEARS WHO SHALL BE APPOINTED BY THE GOVERNOR; AND ONE CHIEF JUDGE OF A DISTRICT COURT WHO SERVES ON A ROTATING BASIS IN SEQUENTIAL NUMERICAL ORDER OF THE JUDICIAL DISTRICTS, BEGINNING WITH THE FIRST JUDICIAL DISTRICT, WHO SHALL SERVE IN A NON-VOTING, CONSULTING CAPACITY. IF SUCH CHIEF JUDGE IS THE SUBJECT OF A COMPLAINT FILED WITH THE COMMISSION, OR BELIEVES HE OR SHE MUST RECUSE FROM THE CASE, THEN THE CHIEF JUDGE OF THE NEXT JUDICIAL DISTRICT IN THE NUMERICAL SEQUENCE SHALL SERVE AS THE CONSULTANT ON SUCH COMPLAINT.

(b) Each VOTING member shall be appointed to a four-year term; except that one-half of the initial membership in each category shall be appointed to two-year terms, for the purpose of staggering terms. Whenever a commission membership prematurely terminates or a member no longer possesses the specific qualifications for the category from which he was selected, his position shall be deemed vacant, and his successor shall be appointed in the same manner as the original appointment for the remainder of his term. A member shall be deemed to have resigned if that member is absent from three consecutive commission meetings without the commission having entered an approval for additional absences upon its minutes. If any member of the commission is disqualified to act in any matter pending before the commission, the commission may appoint a special member to sit on the commission solely for the purpose of deciding that matter. THE NON-VOTING, CONSULTING CHIEF JUDGE OF A DISTRICT COURT SHALL SERVE A ONE-YEAR TERM.

(c) No member of the commission shall receive any compensation for his services but shall be allowed his necessary expenses for travel, board, and lodging and any other expenses incurred in the performance of his duties, to be paid by the supreme court from its budget to be appropriated by the general assembly.

(d) A justice or judge of any court of record of this state, in accordance with the procedure set forth in this subsection (3), may be removed or disciplined for ~~willful~~ misconduct in office, ~~willful or persistent~~ failure to perform his duties, intemperance, or ANY violation of ~~any canon of~~ the Colorado code of judicial conduct, or he OR SHE may be retired for disability interfering with the performance of his OR HER duties which is, or is likely to become, of a permanent character.

(e) The commission may, after such investigation as it deems necessary: ~~, order informal remedial action;~~ DISMISS ANY MATTER; REACH A SETTLEMENT AGREEMENT WITH THE JUSTICE OR JUDGE FOR REMOVAL, RETIREMENT, SUSPENSION, CENSURE, REPRIMAND, OR DISCIPLINE; OR order a formal hearing to be held before it concerning the removal, retirement, suspension, censure, reprimand, or other discipline of a justice or a judge~~; or request the supreme court to appoint three special masters, who shall be justices or judges of courts of record, to hear and take evidence in any such matter and to report thereon to the commission~~. After a formal hearing ~~or after considering the record and report of the masters~~, if the commission finds good cause therefor, it may ~~take informal remedial action, or it may recommend to the supreme court the removal, retirement, suspension,~~ remove, retire, suspend, censure, reprimand, or discipline, as the case may be, ~~of~~ the justice or judge. The commission may also recommend that the costs of its investigation and hearing be assessed against such justice or judge.

(f) ~~Following receipt of a recommendation from the commission,~~ ANY JUDGE WHO HAS RECEIVED AN ORDER OF REMOVAL, RETIREMENT, SUSPENSION, CENSURE, REPRIMAND, OR DISCIPLINE FROM THE COMMISSION MAY APPEAL THE ORDER TO THE SUPREME COURT. THE ~~the~~ supreme court shall review the record of the proceedings on the law and facts and in its discretion may permit the introduction of additional evidence and shall order removal, retirement, suspension, censure, reprimand, or discipline, as it finds just and proper, or IF THE ORDER OF THE COMMISSION IS NOT SUPPORTED BY THE LAW OR BY SUBSTANTIAL EVIDENCE, ~~wholly reject~~ REVERSE the recommendation AND DISMISS THE MATTER OR IMPOSE DISCIPLINE IT DEEMS MORE APPROPRIATE. Upon an order for retirement, the justice or judge shall thereby be retired with the same rights and privileges as if he retired pursuant to statute. Upon an order for removal, the justice or judge shall thereby be removed from office, and his salary shall cease from the date of such order. On the entry of an order for retirement or for removal of a judge, his office shall be deemed vacant.

(g) ~~Prior to the filing of a recommendation to the supreme court by the commission against any justice or judge, all~~ ALL papers filed with and proceedings before the commission on judicial discipline ~~or masters appointed by the supreme court,~~ pursuant to this subsection (3), shall be ~~confidential~~ PUBLIC UNLESS, AT THE REQUEST OF THE COMPLAINANT, THE COMPLAINANT WANTS HIS OR HER NAME TO NOT BE DISCLOSED. IF THE

COMPLAINANT REQUESTS CONFIDENTIALITY OF HIS OR HER NAME OR OTHERS WHO ARE WITNESSES OR VICTIMS THEN SUCH NAME OR NAMES SHALL NOT BECOME PUBLIC UNLESS AND UNTIL THE COMMISSION INITIATES THE PROCESS FOR A FORMAL HEARING REGARDING THE JUDGE. ~~and the filing of papers with and the giving of testimony before the commission or the masters shall be privileged; but no other publication of such papers or proceedings shall be privileged in any action for defamation; except that the record filed by the commission in the supreme court continues privileged and a writing which was privileged prior to its filing with the commission or the masters does not lose such privilege by such filing.~~ THE COMMISSION SHALL MAINTAIN AN ELECTRONIC COPY OF ALL PAPERS OR DOCUMENTS FILED WITH THE COMMISSION AND ANY ORDERS OR DOCUMENTS ISSUED BY THE COMMISSION IN AN ELECTRONIC DATABASE THAT IS SEARCHABLE UNDER THE JUDGE'S OR JUSTICE'S NAME. THE SEARCHABLE ELECTRONIC DATABASE MUST BE ACCESSIBLE BY THE PUBLIC. THE WORK PRODUCT OF THE COMMISSION SHALL BE PRIVILEGED.

(h) ~~The supreme court shall by rule provide for procedures before the commission on judicial discipline, the masters, and the supreme court.~~ The rules shall also provide the standards and degree of proof to be applied by the commission in its proceedings. A justice or judge who is a member of the commission or supreme court shall not participate in any proceedings involving his own removal or retirement. THE COMMISSION IS INDEPENDENT OF THE SUPREME COURT. THE COMMISSION SHALL ADOPT PROCEDURAL RULES FOR JUDICIAL DISCIPLINE PROCEEDINGS. THE BURDEN OF PROOF IN SUCH PROCEEDINGS SHALL BE A PREPONDERANCE OF THE EVIDENCE AND THE COLORADO RULES OF EVIDENCE APPLY IN SUCH PROCEEDINGS.

(i) Nothing contained in this subsection (3) shall be construed to have any effect on article XIII of this constitution.

(j) Repealed.

(K) WITH THE EXCEPTION OF REQUESTS FOR JUDICIAL BRANCH FUNDING, NO MEMBER OF THE JUDICIAL BRANCH, OR ANY AGENT THEREOF, MAY LOBBY OR ATTEMPT TO INFLUENCE ANY MEMBER OF THE GENERAL ASSEMBLY, OR ANY AGENT THEREOF, OR APPEAR IN THE CAPITOL DURING A LEGISLATIVE SESSION, UNLESS SUBPOENAED BY THE GENERAL ASSEMBLY OR ANY MEMBER THEREOF. IF ANY MEMBER OF THE JUDICIAL BRANCH, OR ANY AGENT THEREOF, VIOLATES THIS SECTION, IT SHALL BE DEEMED A VIOLATION OF THE CODE OF JUDICIAL CONDUCT THAT IS PUNISHABLE UNDER THIS SECTION.

(L) THE BUDGET OF THE COMMISSION SHALL BE PUBLIC AND SHALL BE SEPARATE FROM THE BUDGET OF ANY OTHER STATE AGENCY OR COURT.

(M) THE COMMISSION SHALL MAINTAIN AN OFFICE TO SUPPORT THE EXERCISE OF ITS DUTIES. THE OFFICE MAY INCLUDE INVESTIGATORS, ATTORNEYS, AND OTHER SUPPORT STAFF NECESSARY TO RECEIVE AND INVESTIGATE COMPLAINTS FILED AGAINST JUDGES.

(N) THE COMMISSION MUST REVIEW ALL COMPLAINTS FILED AND VOTE ON WHETHER TO PROCEED ON ANY COMPLAINT. THE COMMISSION MAY NOT DELEGATE ITS DECISION MAKING ON ANY COMPLAINT TO A STAFF MEMBER.

(O) THE CODE OF JUDICIAL CONDUCT MAY NOT BE AMENDED BY THE SUPREME COURT WITHOUT THE CONSENT OF THE SENATE.


In the Colorado Revised Statutes, REPEAL section 24-72-401 as follows:

§ 24-72-401. Commission on judicial discipline - confidentiality of records and procedures

The record of an investigation conducted by the commission on judicial discipline or by masters appointed by the supreme court at the request of the commission shall contain all papers filed with and all proceedings before the commission or the masters. The record shall be confidential and shall remain confidential after filing with the supreme court. A recommendation of the commission for the removal or retirement of a justice or judge shall not be confidential after it is filed with the supreme court.

In the Colorado Revised Statutes, REPEAL section 24-72-402 as follows:

§ 24-72-402. Violation - penalty

Any member of the commission, any master appointed by the supreme court, or anyone providing assistance to such commission or such masters who willfully and knowingly discloses the contents of any paper filed with, or any proceeding before, such commission or such masters, or willfully and knowingly discloses the contents of any recommendation of the commission before such recommendation is filed with the supreme court is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than five hundred dollars. This section shall not apply to any necessary communication between the members of the commission or the masters appointed by the supreme court or anyone employed to aid such commission or such masters in the filing or documentation of any paper filed with, or any proceedings before, such commission or such masters or the preparation of the recommendation of such commission.

# Appendix 27(s)(ii)(9)(d)

# Cynthia Gray, Anonymous Complaints to Judicial Conduct Commissions, July 12, 2022;

## Anonymous complaints to judicial
## conduct commissions

Prepared by Cynthia Gray, Director
Center for Judicial Ethics, National Center for State Courts
https://www.ncsc.org/cje
July 2022

Most judicial conduct commissions have the authority to initiate a complaint on their "own motion."  For example, Rule 12 of the Colorado Rules of Judicial Discipline provides:  "The commission on its own motion may initiate a complaint against a judge."  Commissions interpret that provision to allow them to investigate anonymous complaints.

In addition, some states have rules, policies, or internal operating procedures that specifically address anonymous complaints.  Those provisions are copied below.

**Arkansas**
Rule 8A
https://www.jddc.arkansas.gov/wp-content/uploads/2020/05/Rule-8.-Procedures-Of-Commission-Regarding-Conduct-Of-A-Judge.pdf
A. Initiation of Inquiry. In accordance with these rules, any sworn or verified complaint brought to the attention of the Commission stating facts that, if true, would be grounds for discipline, shall be good cause to initiate an inquiry relating to the conduct of a judge. The Commission on its own motion may make inquiry with respect to the conduct of a judge. All complaints shall bear the name of the complainant, unless anonymous or based upon media reports. If the complaint is anonymous or based upon a media report, it shall be signed by the Executive Director, but not sworn. If the Executive Director, an individual staff member, Commissioner member or Alternate files, solicits, or initiates a complaint, he or she shall sign the sworn complaint. All contacts with potential witnesses shall be in accordance with these Rules.

Operating procedure
https://www.jddc.arkansas.gov/operating-procedure/
When after initial investigation and inquiry it appears that there is sufficient cause to proceed, the complainant is asked to file a sworn complaint. If a sworn complaint is not received, the inquiry is regarded as closed unless the Executive Director determines that the matter nevertheless warrants Commission attention. A complaint may also be triggered by an anonymous contact, a media report, or a referral from another agency. The Commission does not accept oral complaints. If an individual comes to the Commission offices and needs assistance to file a complaint, appropriate assistance will be provided. The Commission reviews all the closed inquiries to insure that they have been properly handled by the staff.

**California**
Policy declarations
https://cjp.ca.gov/wp-content/uploads/sites/40/2017/12/CJP_Policy_Declarations.pdf
1.1 Anonymous Complaints
Staff will evaluate anonymous complaints for merit; if a complaint is deemed sufficiently
meritorious, it will be placed on the oversight agenda for consideration by the commission as to
whether or not it should be docketed.

**Georgia**
https://gajqc.gov/wp-content/uploads/sites/13/2021/06/Final-Rules-of-the-JQC-Updated-10-
25-18.pdf
Rule 17, Comment [2]
The term "complaint" includes information received by telephone, news items, and any other
source and includes complaints initiated by either the Director or the Investigative Panel or the
Director on their own motions. See the definition of "Complaint" in the Terminology Section.
The Director and the Investigative Panel may consider complaints submitted anonymously or
confidentially in the same manner as other complaints in order to ensure that lawyers, court
personnel, or litigants can bring misconduct and incapacity to the attention of the Commission
without the fear of retaliation.

Terminology
Complaint means information in any form from any source received by the Investigative Panel
that alleges or from which a reasonable inference can be drawn that a judge committed
misconduct or is incapacitated. If there is no written complaint from another person, the
Director's written statement of the allegations constitutes the complaint.

**Louisiana**
Supreme Court Rule XXIII §3(a)(2)
https://www.lasc.org/Supreme_Court_Rules?p=RuleXXIII
(2) An anonymous complaint is a complaint submitted without a name and contact information.
An anonymous complaint may not be the subject of a preliminary inquiry unless it states facts,
not mere conclusions, that can be independently verified and the Chair authorizes a preliminary
inquiry to be made.  If the Chair declines to authorize a preliminary inquiry, the complaint is
processed pursuant to the Commission's internal rules.

Judiciary Commission Rules
https://www.lasc.org/Supreme_Court_Rules?p=RulesJudiciaryCommission
RULE III. FORM OF COMPLAINTS AND SELF-REPORTED MISCONDUCT.
Complaints made to the Commission concerning the misconduct or disability of a judge shall be
in writing, or reduced to writing, and shall specify the misconduct or disability complained of,
and should be signed by the complainant.  A judge may self-report potential misconduct, which
may serve as mitigating evidence if the Commission later determines that conduct was
unethical.  If a judge chooses to self-report, to qualify as a "self-report" the information must
(1) be communicated in writing, (2) specifically identify conduct that the judge suspects is

2

potential misconduct, and (3) be sent to the Commission's Chief Executive Officer, Commission Counsel, or Special Counsel.

The Commission, however, may consider alleged misconduct or disability of any judge from whatever source, including anonymous complaints and news reports, and may do so on its own motion.

**Massachusetts**
Rules of the Commission on Judicial Conduct
https://www.mass.gov/professional-conduct-rules/commission-on-judicial-conduct-rule-6-commission-proceedings-initial-stages-general-provisions#f-anonymous-complaints
F. Anonymous complaints
Following the docketing of an anonymous complaint pursuant to Rule 6(C)(2), the Executive Director shall not conduct any inquiry or investigation of it unless the Commission, upon the recommendation of the Executive Director, determines by majority vote that the allegations of the anonymous complaint would, if true, constitute misconduct or disability within the jurisdiction of the Commission, and the seriousness or the notoriety of the misconduct alleged outweighs the potential prejudicial effect of an investigation into the merits of the complaint. If the Commission does not make such a determination, the complaint shall be dismissed, and the Executive Director shall promptly notify the judge of both the complaint and its dismissal. If the Commission does make such a determination, except as provided in Rule 6(G), the Executive Director shall promptly notify the judge of the anonymous complaint in accordance with Rule 6(C)(3).

**Michigan**
Internal Operating Procedures
http://cms1files.revize.com/revize/mjtc/legal_authority/docs/IOPs.pdf
IOP 9.207(A)-8 – Treatment of Anonymously Submitted Grievances or Other Information. The Commission occasionally receives anonymous information but generally does not consider it. If such information is received, it is circulated among the Commissioners.  A Commissioner may then place a "hold" on the item, causing it to be placed on the next agenda for discussion. Similarly, if a matter has been reported in the media, that item may be circulated among the Commissioners, who may then place the item on the next agenda for discussion.  The Commission may elect to open its own investigation pursuant to MCR 9.207(A).

**New York**
https://cjc.ny.gov/Legal.Authorities/NYSCJC.PolicyManual.pdf
State Commission on Judicial Conduct Policy Manual
(G) The Commission may authorize investigation of anonymous complaints that are sufficiently detailed and allege conduct that, if true, would constitute misconduct. An anonymous complaint authorized for investigation shall be treated as a complaint brought by the Commission on its own motion pursuant to Judiciary Law §44(2).

3

**Pennsylvania**
Judicial Conduct Board Operating Procedures
http://judicialconductboardofpa.org/wp-content/uploads/JCB-Operating-Procedures-Amended-August-6-2018.pdf
OP 3.01 – OPENING A COMPLAINT
Except when acting on its own initiative or at the written request of the Supreme Court of Pennsylvania, or the State Court Administrator, the Board shall not initiate any preliminary inquiry or investigation without having first received a complaint.  Use of the prescribed Confidential Request for Investigation (CRI) form is the preferred method of receiving complaints and allows for the prompt communication of facts relevant to the investigation. However, anonymous complaints shall not be barred.  All complaints shall be entered into the case management system.

OP 3.02 – ANONYMOUS COMPLAINTS
Anonymous complaints in whatever form shall be entered into the case management system. All such anonymous complaints received must be presented to the Board at its next regularly scheduled meeting for review and approval in advance of either opening a file or initiating a preliminary inquiry or investigation. If the source of the anonymous complaint is known, such information shall be recorded by Chief Counsel for purposes of any ensuing preliminary inquiry or investigation as well as for advising the complainant of the ultimate disposition of the Board. If the Board approves the opening of a file based on an anonymous complaint, Chief Counsel will open a file and assign it to counsel, who will conduct a preliminary inquiry. If the preliminary inquiry reveals facts that corroborate the anonymous complaint, it will remain open and investigation will move forward in its normal course to final disposition by the Board. If the preliminary inquiry does not reveal facts that corroborate the anonymous complaint, the anonymous complaint will be presented to the Board for dismissal with a notation that the preliminary inquiry did not corroborate the complaint.

**Tennessee**
https://www.tncourts.gov/rules/court-judiciary/5
Rule of the Board of Judicial Conduct
Rule 5: Complaints & Responses, Section 2. Other Sources
Disciplinary Counsel is authorized to investigate anonymous complaints or information coming from sources other than a written complaint, provided Disciplinary Counsel deems the information sufficiently credible or verifiable through objective sources.

**Washington**
https://www.cjc.state.wa.us/index.php?page=governing_provisions&section=rules_of_procedure
Commission on Judicial Conduct Rules of Procedure
Rule 17. Screening and Investigation
General. An investigative officer employed by the commission will conduct the investigation aided by disciplinary counsel if deemed appropriate by the commission.
Screening.

4

Any named or anonymous organization, association, or person, including a member of the commission or staff, may make a complaint of judicial misconduct or incapacity to the commission. A complaint may be made orally or in writing.

The investigative officer shall evaluate all complaints to determine whether:

The person against whom the allegations are made is a judge subject to the disciplinary authority of the commission; and either

The facts alleged, if true, would constitute misconduct or incapacity; or

The investigative officer has grounds to believe that upon further inquiry such facts might be discovered. If not, the investigative officer shall recommend to the commission to dismiss the matter or, if appropriate, refer the complainant to another agency.



# Appendix 27(s)(ii)(9)(e)

# Cynthia Gray, BIFURCATED JUDICIAL DISCIPLINE SYSTEMS, July 12, 2022;

## Bifurcated judicial discipline systems

Prepared by Cynthia Gray, Director
Center for Judicial Ethics, National Center for State Courts
https://www.ncsc.org/cje
July 2022

Judges frequently argue that state judicial discipline systems violate their constitutional due process rights if the commission both investigates and prosecutes complaints and makes the decisions.  Based on the U.S. Supreme Court's decision in *Withrow v. Larkin*, 421 U.S. 35 (1975), that argument has been rejected by every state supreme court that has considered it for over 50 years, including as recently as 2022.  *See, e.g., In re Hanson*, 532 P.2d 303 (Alaska 1975); *In the Matter of Flournoy*, 990 P.2d 642 (Arizona 1999); *Adams v. Commission on Judicial Performance*, 897 P.2d 544 (California 1995); *In re Zoarski*, 632 A.2d 1114 (Connecticut 1993); *In re Kelly*, 238 So. 2d 565 (Florida 1970); *In the Matter of Vaughn*, 462 S.E.2d 728 (Georgia 1995); *In the Matter of Holien*, 612 N.W.2d 789 (Iowa 2000); *In re Rome*, 542 P.2d 676 (Kansas 1975); *Allred v. Judicial Conduct Commission*, 395 S.W.3d 417 (Kentucky 2012); *In re Bowers*, 721 So. 2d 875 (Louisiana 1998); *In re Diener*, 304 A.2d 587 (Maryland 1973); *In re Morrow* (Michigan Supreme Court January 13, 2022); *Commission on Judicial Performance v. Russell*, 691 So. 2d 929 (Mississippi 1997); *In re Elliston*, 789 S.W.2d 469 (Missouri 1990); *Mosley v. Commission on Judicial Discipline*, 22 P.3d 655 (Nevada 2001); *Friedman v. State of New York*, 249 N.E.2d 369 (New York 1969); *In re Nowell*, 237 S.E.2d 246 (North Carolina 1977); *In re Schenck*, 870 P.2d 185 (Oregon 1993); *In re Pirraglia*, 916 A.2d 746 (Rhode Island 2007); *In re Brown*, 512 S.W.2d 317 (Texas 1974); *In re O'Dea*, 622 A.2d 507 (Vermont 1993); *In re Deming*, 736 P.2d 639, as amended by 744 P.2d 340 (Washington 1987).

Although bifurcation of investigative and adjudicative functions is not required by due process, some states have adopted it as a matter of policy.

For purposes of this memorandum, a judicial discipline system is "bifurcated" if (1) the group that decides to investigate a complaint and to file formal charges has different members than (2) the group that makes findings of facts and conclusions of law and sanctions a judge or makes a recommendation to the state supreme court.

Judicial discipline systems may be bifurcated in a variety of ways.  This memo divides the systems into 2 categories:  2-tiered states and 2-panel states.  Even within a category, the method for bifurcation varies as described below.

**2-tiered states**.  There are 8 two-tier states – **Alabama, Delaware, Georgia, Illinois, Ohio, Oklahoma, Pennsylvania,** and **West Virginia**.  In those states, complaints against judges are investigated by one body (the first tier), and that tier decides whether to file formal charges; the formal charges are heard by a second body that has a different membership (the second tier).  The exact structures and procedures vary considerably from state-to-state among those 8 states.

**2-panel states**:  9 states – **Arizona, Arkansas, Florida, Kansas, North Carolina, South Carolina, Tennessee, Vermont,** and **Wyoming** – have bifurcated commission functions so that investigative and adjudicative roles are handled by different panels of the commission.  This "2-panel" structure differs from the "2-tier" structure because members may play different roles in different cases depending on whether they are assigned to an investigative or an adjudicative panel for that case.  The use of 2 panels is based on the American Bar Association *Model Rules for Judicial Disciplinary Enforcement* adopted in 1994, although no state has adopted the precise structure suggested by the model rules and each state's system is different.  The model rules propose a commission comprised of an equal number of judge, attorney, and public members (4 each), divided into a 3-member investigative panel and a 9-member hearing panel with rotating membership with an equal number of judge, attorney, and public members on each panel.  Under the model rules, Disciplinary Counsel screens complaints, conducts preliminary investigations, and makes recommendations to the investigative panel.  The investigative panel authorizes Disciplinary Counsel to conduct full investigations and file formal charges that are heard by the hearing panel, which makes a report and recommendation to the state supreme court.

- Note that, depending on the state, procedures may be different in cases in which the judge receives a private sanction, in which the judge consents to discipline, in which there are allegations of a disability, or in which the charges are against a supreme court justice.
- Note that in most states, there is also supreme court review so there are more than 2 levels.
- Note that the list does not include states in which the commission has a unitary structure, but the supreme court review may be de novo or allow for the admission of additional evidence, which could be considered a second level.
- Note that in some states, oversight of the investigation is delegated to one commission member (called a presenter in Colorado, for example) or a separate body (the Judicial Inquiry Board in Maryland, for example), but the decision whether to file formal proceedings and, subsequently, whether to sanction or recommend a sanction following a hearing remains with the entire commission and, therefore, the structure is not bifurcated as defined by this memo.
- Note that this list does not include states that bifurcate proceedings by having 1 or more masters, who are not members of the commission, appointed to conduct the hearing each time formal proceedings are commenced against a different judge; following the hearing, the masters file a report with the supreme court, and the commission and judge can file objections to the report with the court, which makes the final decision.
- Note that this list does not include several states where proceedings are bifurcated in some circumstances in a way that does not fit within any of the other categories or is similar to any other state.

**2-tier states**

**Alabama**

The **Judicial Inquiry Commission** has 9 members:  4 judges, 2 attorneys, and 3 public members.  The Commission investigates complaints and, if "a reasonable basis exists," files a formal complaint that is heard and decided by the **Court of the Judiciary**.  The Court of the Judiciary has 9 members:  4 judges, 2 attorneys, 3 public members.  Following a public hearing, the Court of the Judiciary may remove, suspend with or without pay, or censure a judge.  Decisions of the Court of the Judiciary are final unless appealed to the **Alabama Supreme Court**, which "review[s] the record of the proceedings on the law and the facts."  Under its precedent, if the Supreme Court concludes that misconduct was proven by clear and convincing evidence, it will not change the sanction imposed by the Court of the Judiciary.  The Judicial Inquiry Commission and the Court of the Judiciary were created by an amendment to the constitution in 1973.

**Delaware**

The **Court on the Judiciary** has 10 members, all judicial officers:  the Chief Justice, the 4 other justices of the Supreme Court, the Chancellor, the President Judge of the Superior Court, the Chief Judge of the Family Court, the Chief Judge of the Court of Common Pleas, and the Chief Magistrate of the Justice of the Peace Court.  The Court on the Judiciary designates a Clerk, who reviews each complaint and provides the Chief Justice with those that comply with the rules.  The Chief Justice, with the unanimous agreement of a panel of the Supreme Court, may dismiss any complaint that is frivolous, is not filed in good faith, is based on a litigant's disagreement with the ruling of a judge, or is a matter subject to appellate review.  If a complaint is not dismissed, the Chief Justice refers the complaint to a panel of the **Preliminary Investigatory Committee**.  The Committee has 12 members who are appointed by the Chief Justice with the concurrence of a majority of the members of the Court.  8 members are attorneys, and 4 members are non-lawyers.  The Chief Justice refers a complaint to a panel of 1, 2, or 3 members; if the panel has 2 or 3 members, at least 1 person must be a non-lawyer.  If after a preliminary investigation the panel finds that there is probable cause to believe that the judicial officer may be subject to sanction or if the Chief Justice sua sponte determines that there is probable cause, the Court on the Judiciary appoints a **Board of Examining Officers** with 1 or more members who are active or retired judge.  The Board issues a "show cause order why the judicial officer should not be sanctioned or retired" and appoints a presenting counsel who conducts an investigation and presents evidence on the formal charges at a non-public hearing.  If the Board finds no misconduct, the matter is concluded, and the complaint is dismissed unless the Court on the Judiciary, sua sponte, requires further proceedings.  If the Board finds misconduct or if the Court on the Judiciary requires further proceedings, the Court on the Judiciary designates an attorney to uphold the report or the Court's determination to proceed sua sponte.  The Court on the Judiciary holds a non-public hearing, takes evidence, and disposes of the case.  The Court on the Judiciary may censure, remove, or retire a judge.  All proceedings are confidential except a final order of removal or retirement.  The Court on the Judiciary was created by the state constitution in 1979; the Preliminary Investigatory Committee and the Board of Examining Officers were created by rules adopted by the Court on the Judiciary.

3

**Georgia**

The **Judicial Qualifications Commission** has a 7-member investigative panel comprised of 2 judges, 3 attorneys, and 2 citizen members and a separate 3-member hearing panel that consists of 1 judge, 1 attorney, and 1 citizen member.  If the Executive Director of the Commission determines that information in a complaint or from other sources would constitute judicial misconduct if true, the Director conducts a preliminary investigation and makes a recommendation to the investigative panel.  The investigative panel may dismiss the complaint or authorize a full investigation by the Executive Director.  After a full investigation, if the investigative panel finds that there is reasonable cause to believe the judge committed misconduct, it may, with the judge's consent, privately admonish the judge, implement a deferred discipline agreement or an agreement to resign or retire, direct the Director to dismiss the complaint, or direct the Director to file formal charges.  If formal charges are filed, a public hearing is conducted by the hearing panel, and that panel decides whether to dismiss the charges or file a recommendation with the Supreme Court.  The Court may accept, reject, or modify in whole or in part the findings and conclusions of the hearing panel, dismissing the case or reprimanding, censuring, suspending without pay, or removing the judge.  The bifurcation was established by statute in 2017 after a constitutional amendment abolished the commission then in place and gave the legislature the authority to create a new commission.

**Illinois**

The **Judicial Inquiry Board** has 9 members:  2 judges, 3 attorneys, and 4 public members.  The Board investigates complaints against judges and, if it determines a reasonable basis exists, files and prosecutes complaints with the **Courts Commission**.  The Commission has 5 judge members (including a supreme court justice) and 2 citizen members.  The Commission holds a public hearing on a complaint filed by the Board and has the authority to remove, suspend with or without pay, censure, or reprimand a judge.  The decision of the Commission is final.  The Board and the Commission were created by the state constitution in 1971.

**Ohio**

Grievances against judges can be filed with either the **Disciplinary Counsel** or **Certified Grievance Committees** organized by the state bar or local bar associations.  If either Disciplinary Counsel or a committee determines that there is substantial credible evidence of misconduct by a judge, a draft formal complaint is presented to a probable cause panel of the **Board of Professional Conduct**.  The Board has 28-members (7 judges, 17 attorneys, and 4 public members).  The Board has 2 **probable cause panels** with 3 members each, designated by the chair.  If the panel determines that there is probable cause, the formal complaint becomes public and is filed with the Board.  Hearings are then conducted by a 3-member **hearing panel** of the Board selected at random.  If the hearing panel finds a violation, it makes a recommendation to the **Ohio Supreme Court**, which makes the final decision regarding misconduct and issues the sanction.  The same procedures are used for grievances against attorneys.  The Board of Commissioners on Grievances and Discipline was established by court rule in 1957 and renamed the Board of Professional Conduct in 2014.

**Oklahoma**

The **Council on Judicial Complaints** has 3 members:  2 attorneys and 1 public member.  If the Council finds that a complaint should be the subject of proceedings, the Council forwards its findings and all information to the Supreme Court, the Chief Justice, the governor, the attorney general, the board of directors of the Oklahoma Bar Association, or the House of Representatives.  That person or entity, in its discretion, may file a petition invoking the jurisdiction of the **Court on the Judiciary**.  The Court on the Judiciary has both a trial and an appellate division.  The **Trial Division** has 9 members:  8 judges and 1 attorney.  The Trial Division conducts a hearing on the petition.  The Trial Division's judgement can be appealed by the judge or the prosecutor to the 9-member **Appellate Division** (8 judges and 1 attorney).  The decision of the Appellate Division is final.  The only sanctions available to the Court on the Judiciary are removal or permanent retirement.  However, if the Council on Judicial Complaints finds evidence of misconduct that does not warrant removal or retirement, it may refer the matter to the **Chief Justice** who may forward the investigative report to the other members of the Supreme Court, and, after considering the complaint and judge's response, the Court may impose appropriate discipline.  The Council was created by statute in 1974, following a scandal in the Oklahoma Supreme Court.  Originally, the Council was an office within the judicial branch, but it became an executive branch agency in 1999.

**Pennsylvania**

The **Judicial Conduct Board** has 12 members:  3 judges, 3 attorneys, and 6 public members.  If the Board finds probable cause, it files formal charges with the **Court of Judicial Discipline**.  The Court of Judicial Discipline has 8 members:  4 judges, 2 attorneys, and 2 public members.  The Court holds a public trial and renders a decision.  The Court may dismiss the charges or reprimand the judge, suspend the judge with or without pay, or remove the judge from office.  A judge may appeal a decision to the **Pennsylvania Supreme Court**; "on the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and, as to sanctions, the scope of review is whether the sanctions imposed were lawful."  The Board may appeal the dismissal of charges to the **Supreme Court**, but the appeal is limited to questions of law.  The Board and the Court of Judicial Discipline were created by an amendment to the state constitution in 1993, succeeding the Judicial Inquiry and Review Board.

**West Virginia**

The **Judicial Investigation Commission** has 9 members:  6 judges and 3 public members.  Complaints filed with the Commission are referred to **Judicial Disciplinary Counsel**, who initially reviews each complaint and refers the matter to an investigator, asks the judge to respond, or sends it directly to the Commission for consideration.  If the Commission determines that there is probable cause but that formal discipline is not appropriate, the Commission publicly admonishes the judge unless the judge timely objects.  If the Commission determines that there is probable cause and formal discipline is appropriate or if the judge objects to the notice of public admonishment, the Commission files formal charges with the **Judicial Hearing Board**.  The Board has 9 members:  6 judges and 3 public members.  Following a public hearing, the Board files findings of fact, conclusions of law, and a recommended disposition with the **Supreme Court of Appeals**.  The Court can admonish, reprimand, censure, suspend without pay

5

for up to 1 year, fine up to $5,000, or involuntarily retire a judge.  The Commission and the Board were created by court rule in 1976.

## 2-panel states

### Arizona

The **Commission on Judicial Conduct** has 11 members:  6 judges, 2 attorneys, and 3 public members.  After a preliminary investigation, a 3-member **investigative panel** appointed by the chair determines whether to conduct a full investigation; the panel is "whenever possible" comprised of 1 judge member of the Commission, 1 attorney member, and 1 public member.  If the investigative panel authorizes formal charges after a full investigation, the public hearing is held before a **hearing panel** comprised of the 8 members of the Commission who were not on the investigative panel or before a **hearing officer**.  The hearing panel can impose an informal sanction; recommend censure, which is final unless the judge or disciplinary counsel files a petition; or recommend other formal sanctions that are subject to review by the **Arizona Supreme Court**, by petition or on the Court's own motion.  The Commission was created by the state constitution in 1970; the bifurcation was accomplished by rule amendments adopted by the Court effective 2002.

### Arkansas

The **Commission on Judicial Discipline and Disability** has 9 members:  3 judges, 3 attorneys, and 3 public members; each member also has an alternate.  The Commission chair appoints 3 **investigation panels** from the 9 members and 9 alternates; each investigation panel has 1 judicial member, 1 attorney member, and 1 public member.  All complaints that are not summarily dismissed by the executive director are presented to an investigation panel; the investigation panel dismisses a complaint or directs the staff to investigate.  After an investigation, the investigation panel dismisses a complaint or directs the filing of a formal statement of allegations.  The hearing on the formal charges is before a 9-member **hearing panel** comprised of the members of the Commission – 3 judges, 3 attorneys, and 3 public members – who did not serve on the investigation panel for the complaint.  If the hearing panel finds misconduct, it may admonish the judge, direct professional treatment, counseling, or assistance, or impose conditions on the judge or recommend to the **Arkansas Supreme Court** that the judge be reprimanded, censured, suspended, or removed.  The Commission was created by constitution in 1989; bifurcation was accomplished when the Court amended the Commission's procedural rules in 2008.

### Florida

The **Judicial Qualifications Commission** has 15 members:  6 judges, 4 attorneys, and 5 public members.  Each year, Commission members are assigned to either a 9-member **investigative panel** (composed of 4 judges, 2 attorneys, and 3 public members) or a 6-member **hearing panel** (2 judges, 2 attorneys, and 2 public members).  The investigative panel conducts investigations and then dismisses the complaint or submits formal charges to the hearing panel.  The hearing panel holds a public hearing on the formal charges and makes a recommendation to the **Florida**

6

**Supreme Court**. The Commission was created in 1966 by the state constitution; the bifurcation was accomplished through a constitutional amendment effective in 1996.

### Kansas

The **Commission on Judicial Conduct** has 14 members: 6 judges, 4 attorneys, and 4 public members. The Commission is divided into two 7-member panels (designated **Panel A** and **Panel B**), each consisting of 3 judges, 2 attorneys, and 2 public members. Complaints are assigned to either Panel A or Panel B for initial review and inquiry. Sitting as an inquiry panel, a panel may dismiss complaints, issue letters of caution or informal advice, issue a cease-and-desist order to a judge, or refer the complaint for formal proceedings. If one panel refers a complaint for formal proceedings, the other panel sits as the hearing panel. Following a public hearing, the hearing panel may terminate the proceedings, admonish the judge, issue a cease-and-desist order, or recommend that the **Kansas Supreme Court** censure, suspend, remove, or retire the judge. The Commission was created by Court rule in 1974; the bifurcation was accomplished by a court rule effective 1999.

### North Carolina

The **Judicial Standards Commission** has 13 members: 5 judges, 4 attorneys, and 4 non-public members. The chair (who is the court of appeals member of the Commission) divides the members into two 6-member panels (designated **Panel A** and **Panel B**), each comprised of 2 judges, 2 attorneys, and 2 citizens. The panels meet in alternating months. The Commission chair chairs both panels. Complaints are assigned to either Panel A or Panel B for initial review and investigation. The assigned panel may dismiss the complaint or authorize a preliminary or formal investigation. After an investigation, the panel may dismiss a complaint, issue a private letter of caution, or file a statement of charges if it finds that there is probable cause to believe that the judge engaged in conduct that warrants public reprimand, censure, suspension, or removal. A non-public hearing is held before the panel that did not act as the investigation panel. After the hearing, the hearing panel can dismiss the charges (which may include a private letter of caution) or recommend that the **North Carolina Supreme Court** reprimand, censure, suspend, or remove the judge. The Court independently reviews whether the Commission's findings of fact are supported by clear and convincing evidence and whether the findings support the conclusions of law and exercises its independent judgment about the sanction. The Commission was created by statute in 1973; bifurcation was accomplished by rules adopted by the Commission in 2007. In 2013, the statute was amended to make all proceedings confidential unless and until the Supreme Court publicly sanctions, suspends, or removes the judge; prior to that amendment, hearings on statements of charges were public.

### South Carolina

The **Commission on Judicial Conduct** has 26 members: 14 judges, 4 attorneys, and 8 public members. The chair divides members (other than the chair, the vice chair, and the public members) into 4 panels with 6 members each (3 judges, 1 attorney, 2 public members). The chair designates whether a panel will serve as an investigative panel or a hearing panel; if the panel is assigned to serve as an investigative panel, the chair adds either the chair or the vice chair to increase its membership to 7. **Disciplinary Counsel** screens complaints. After an

investigation, if Disciplinary Counsel believes there is evidence supporting the allegations against a judge, Disciplinary Counsel may propose an agreement for discipline by consent to the judge; recommend to an investigative panel that the matter be concluded with a letter of caution or a confidential admonition; or recommend to an investigative panel that formal charges be filed.  If the investigative panel directs Disciplinary Counsel to file formal charges, a public hearing is held before a panel designated as a hearing panel.  The hearing panel submits a report to the **South Carolina Supreme Court**, which can accept, reject, or modify in whole or in part the findings, conclusions, and recommendations of the hearing panel and dismiss the case, issue a letter of caution, publicly reprimand or admonish a judge, or remove or suspend a judge.  The Commission was created by court rule in 1976; bifurcation was accomplished by a court rule effective 1997.

**Tennessee**
The **Board on Judicial Conduct** has 16 members:  8 current or former judges, 2 attorneys, and 6 public members.  The presiding judge divides the court into 3-member **investigative panels** and 5-member **hearing panels**.  After Disciplinary Counsel conducts a preliminary investigation, an investigative panel reviews their recommendation and dismisses the complaint or authorizes a full investigation.  After a full investigation, the investigative panel reviews Disciplinary Counsel's recommendation and may direct the filing of formal charges or propose to the judge a private reprimand, a deferred discipline agreement, a public reprimand, suspension with pay, or imposition of limitations and conditions on the performance of judicial duties, including a cease-and-desist order.  If the judge does not consent, the investigative panel may direct the Disciplinary Counsel to dismiss the complaint or file formal charges.  If formal charges are filed, a public hearing is held by one of the hearing panels.  After the hearing, the hearing panel may dismiss the charges, publicly reprimand or censure the judge, or recommend removal.  The judge may appeal a decision to impose a sanction to the **Tennessee Supreme Court** where the review is de novo on the record with no presumption of correctness of the judgment or the findings of the hearing panel.  If the Court affirms a removal, the matter is referred to the legislature for removal proceedings; neither the Court of the Judiciary nor the Supreme Court may remove a judge.  The Judicial Standards Commission was created by statute in 1971 and replaced by the Court of the Judiciary in 1978; the statute was amended to bifurcate proceedings in 1995.  The Court of the Judiciary was replaced by the Board on Judicial Conduct in 2012.

**Vermont**
The **Judicial Conduct Board** has 9 members:  3 judges, 3 attorneys, and 3 lay persons.  Following a preliminary investigation, a recommendation is presented either to the Board or to a 3-member **investigative panel** consisting of 1 judge, 1 attorney, and 1 lay member, appointed by the chair.  If the Board or the investigative panel believes that there is probable cause, a formal complaint is filed, and a public hearing is held before a **hearing panel** of at least 5 members of the Board, at least 1 of whom is a lay member.  The hearing panel may impose limitations or conditions on the performance of judicial duties, issue a public reprimand, or suspend a judge.  If no appeal from a hearing panel order is filed within 30 days, and the **Vermont Supreme Court** does not order review on its own motion, an order of the panel other than an order imposing a

8

suspension becomes final; even if no appeal is filed, an order of suspension becomes final only upon issuance of an order of the Court.  Neither the Board nor the Court may remove a judge.  The Board was created by a court rule in 1978; the bifurcation was accomplished by an amendment to the rule effective 2002.

**Wyoming**

The **Commission on Judicial Conduct and Ethics** has 12 members:  3 judges, 3 attorneys, and 6 public members.  The executive director establishes investigatory panels of 3-5 members and adjudicatory panels of 3-5 members, with each panel including members from each category of membership.  Membership rotates between the 2 types of panels, but no member may sit on both the investigatory and adjudicatory panel in the same proceeding.  If after an investigation, an **investigatory panel** finds reasonable cause to support a finding that the judge engaged in misconduct, the investigatory panel may issue a letter of correction, enter a deferred disciplinary agreement, issue a stipulated private censure, or institute formal proceedings before an **adjudicatory panel**.  Following a non-public hearing, if the adjudicatory panel finds misconduct, it submits its findings to the **disciplinary panel**, that is, "all members of the Commission with the exception of the investigatory panel on any proceeding."  The disciplinary panel imposes private discipline or makes a recommendation of censure, removal, or retirement to the **Wyoming Supreme Court**.  The Commission was created by the state constitution in 1973; the bifurcation was accomplished in a constitutional amendment adopted in 1996.



# Appendix 27(s)(ii)(9)(f)

# Cynthia Gray, WHEN CONFIDENTIALITY CEASES IN FORMAL JUDICIAL DISCIPLINE PROCEEDINGS, 2020;

# When confidentiality ceases in formal judicial discipline proceedings

Revised 2020



**NCSC**
NATIONAL CENTER FOR STATE COURTS
*Center for Judicial Ethics*

| Fact-finding hearing is public (35 states) | | | Fact-finding hearing is confidential (15 states + D.C.) | |
|---|---|---|---|---|
| Proceedings public when formal charges are filed (26) | Proceedings public when answer to formal charges is filed or due (7) | Hearing is public (2) | Proceedings confidential until recommendation for public discipline is filed (12) | Proceedings confidential until court orders public discipline (4) |
| Alabama | Arizona | Oregon[2] | Colorado | Delaware |
| Alaska | Kentucky | Rhode Island | Idaho | D.C. |
| Arkansas | Louisiana | | Iowa | Hawaii |
| California | Maryland | | Maine | North Carolina |
| Connecticut | Massachusetts | | Mississippi | |
| Florida | Minnesota | | Missouri | |
| Georgia* | South Carolina[1] | | New Mexico | |
| Illinois | | | New York | |
| Indiana* | | | South Dakota | |
| Kansas | | | Utah | |
| Michigan | | | Virginia | |
| Montana | | | Wyoming | |
| Nebraska | | | | |
| Nevada | | | | |
| New Hampshire | | | | |
| New Jersey* | | | | |
| North Dakota* | | | | |
| Ohio | | | | |
| Oklahoma | | | | |
| Pennsylvania | | | | |
| Tennessee | | | | |
| Texas | | | | |
| Vermont* | | | | |
| Washington* | | | | |
| West Virginia* | | | | |
| Wisconsin | | | | |

**\* Public after service of charges on the judge**

1. **South Carolina:** "When formal charges are filed regarding allegations of misconduct, the formal charges and any answer shall become public 30 days after the filing of the answer or, if no answer is filed, 30 days after the expiration of the time to answer . . . ."
2. **Oregon:** Press releases are issued 14 days before the public hearing on formal charges.

# Appendix 27(s)(ii)(9)(g)

# Cynthia Gray, RULEMAKING AUTHORITY FOR JUDICIAL DISCIPLINE PROCEEDINGS, July 22, 2022;

# Rulemaking authority for judicial discipline proceedings

Prepared by Cynthia Gray, Director
Center for Judicial Ethics, National Center for State Courts
https://www.ncsc.org/cje
July 2022

**States in which the state supreme court adopt the rules for the judicial conduct commission.**

1. Alabama
2. Arizona
3. Arkansas
4. Colorado
5. Georgia
6. Hawaii
7. Indiana
8. Kansas
9. Kentucky
10. Louisiana
11. Maine
12. Maryland
13. Michigan
14. Minnesota
15. Missouri
16. New Hampshire
17. New Jersey
18. North Dakota
19. Ohio
20. Oklahoma
21. Rhode Island
22. South Carolina
23. Texas
24. Vermont
25. West Virginia
26. Wisconsin

**States in which the judicial conduct commission adopts its own rules.**

1. Alaska
2. California
3. Connecticut
4. Delaware
5. Florida
6. Idaho
7. Illinois
8. Iowa
9. Massachusetts (subject to approval of supreme judicial court)
10. Mississippi (approved by supreme court)
11. Montana
12. Nebraska
13. Nevada
14. New Mexico
15. New York
16. North Carolina
17. Oregon
18. Pennsylvania
19. Tennessee
20. Utah
21. Washington
22. Wyoming

**Jurisdictions in which rulemaking authority could not be determined  D.C., South Dakota, and Virginia.**



# Appendix 27(s)(ii)(9)(h)

# Cynthia Gray, Judicial Discipline Proceedings Involving State Supreme Court Justices, July 22, 2022;

# Judicial discipline proceedings involving state supreme court justices

Prepared by Cynthia Gray, Director
Center for Judicial Ethics, National Center for State Courts
https://www.ncsc.org/cje
July 2022

In most states, at least absent an agreement, the supreme court makes the final decision regarding whether a judicial officer will be publicly disciplined, reviewing a recommendation of the judicial conduct commission or a commission decision at the judge's request.

If a supreme court justice is the respondent in a judicial discipline case, in at least 13 states, the provisions governing judicial discipline provide for the creation of a substitute court comprised of temporary justices to hear the case.  Depending on the state, the substitute court is comprised of appellate court judges, trial court judges, or both, chosen by seniority, randomly, and/or by position (chief or presiding judge).  Some states use the same procedure for choosing pro tempore justices in discipline proceedings that would be used to replace justices disqualified from any type of case.

1. In **Alaska**, when the commission recommends a sanction for a supreme court justice, the chief justice appoints "a panel from among the court of appeals and superior court judges as justices pro tempore to review the proceedings."
2. In **California**, the review is "by a tribunal of 7 court of appeal judges selected by lot."
3. In **Florida**, a recommendation involving a supreme court justice is reviewed by the 7 "chief judges of the judicial circuits of the state of Florida most senior in tenure of judicial office as circuit judge."
4. In **Georgia**, a 9-judge special supreme court is "selected from the list of judges maintained by the Supreme Court and routinely used to select replacement Justices when a Justice is disqualified from or not participating in a case."
5. In **Indiana**, all supreme court justices except the chief justice are required to recuse from review of a discipline case involving a justice; the clerk of the supreme court and court of appeals randomly select 6 members of the court of appeals to join the chief justice on the panel, and the commission and the respondent justice each strike 1 judge from that selection, so the final panel consists of the chief justice plus 4 judges.  If the commission or the justice does not strike a judge, the clerk strikes 1 "at random in their stead."
6. In **Massachusetts**, the substitute supreme court is comprised of "the chief justice and the six most senior justices of the appeals court."
7. In **Minnesota**, review is "heard by a panel consisting of the Chief Judge of the Court of Appeals or designee and six others chosen at random from among the judges of the Court of Appeals by the Chief Judge or designee."

8. In **Mississippi**, a commission recommendation involving a supreme court justice is considered by a tribunal of 7 "judges selected by lot from a list consisting of all the circuit and chancery judges at a public drawing by the Secretary of State."

9. In **Ohio**, the proceedings for grievances against supreme court justices are handled differently from the beginning, with the chief judge of the court of appeals appointing a 3-judge panel to review the grievance, a special disciplinary counsel, and a special probable cause panel comprised of 3 former members of the Board of Professional Conduct.  A special hearing panel of 3 full-time trial court judges is selected by lot.  If, following a hearing, the hearing panel determines that the justice committed misconduct and a disciplinary sanction is merited, a 13-member adjudicatory panel comprised of the chief judge and the presiding judge of each appellate district holds a hearing on any objections to the hearing panel's report and issues a final order, with no review by the supreme court.

10. In **Pennsylvania**, an appeal from a decision involving a supreme court justice by the Court of Judicial Discipline is heard by "a special tribunal composed of seven judges, other than senior judges, chosen by lot from the judges of the Superior Court and Commonwealth Court who do not sit on the Court of Judicial Discipline or the [judicial conduct] board, in a manner consistent with rules adopted by the Supreme Court."

11. In **Vermont**, 5 judges are appointed to a special supreme court "by the Administrative Judge for Trial Courts, or the next senior trial judge if the Administrative Judge is unavailable, under the process established by the Administrative Judge for the appointment of pro tempore judges to the Supreme Court in cases where a justice of the Court is disqualified."

12. In **Washington**, there is a substitute panel of 9 judges comprised of the presiding chief judge of the court of appeals and 8 justices pro tempore chosen by the supreme court clerk "by lot from all remaining active Court of Appeals judges."

13. In **Wyoming**, the supreme court designates 5 "district judges who are not members of the Commission to act in the place of the supreme court . . . ."



**Alaska**

Alaska Rules of Appellate Procedure

https://courts.alaska.gov/rules/docs/app.pdf

Rule 406. Review of Commission on Judicial Conduct Recommendations for Discipline.
(f) When the proceedings involve a supreme court justice, no justice may participate in
the review, and the chief justice shall appoint a panel from among the court of appeals
and superior court judges as justices pro tempore to review the proceedings.  If the
proceedings involve the chief justice, the justice having the longest tenure on the
supreme court who has not participated in the proceedings shall appoint the panel.

**California**

California constitution Article VI, §8

https://cjp.ca.gov/wp-content/uploads/sites/40/2016/08/CA_Constitution.pdf

(f) A determination by the Commission on Judicial Performance to admonish or censure
a judge or former judge of the Supreme Court or remove or retire a judge of the
Supreme Court shall be reviewed by a tribunal of 7 court of appeal judges selected by
lot.

**Florida**

Florida constitution, article V, §12

http://www.leg.state.fl.us/statutes/index.cfm?submenu=3#A5S12

(e) Notwithstanding any of the foregoing provisions of this section, if the person who is
the subject of proceedings by the judicial qualifications commission is a justice of the
supreme court of Florida all justices of such court automatically shall be disqualified to
sit as justices of such court with respect to all proceedings therein concerning such
person and the supreme court for such purposes shall be composed of a panel
consisting of the seven chief judges of the judicial circuits of the state of Florida most
senior in tenure of judicial office as circuit judge.  For purposes of determining seniority
of such circuit judges in the event there be judges of equal tenure in judicial office as
circuit judge the judge or judges from the lower numbered circuit or circuits shall be
deemed senior.  In the event any such chief circuit judge is under investigation by the
judicial qualifications commission or is otherwise disqualified or unable to serve on the
panel, the next most senior chief circuit judge or judges shall serve in place of such
disqualified or disabled chief circuit judge.

**Georgia**

Rules of the Judicial Qualifications Commission

https://gajqc.gov/wp-content/uploads/sites/13/2021/06/Final-Rules-of-the-JQC-
Updated-10-25-18.pdf

Rule 26. Complaint Against a Justice of the Supreme Court
A. Proceedings Generally. A complaint against a Justice of the Supreme Court, including
a complaint alleging incapacity, shall proceed in the same manner as a complaint against
any other judge, except as set forth in this Rule.

3

B. Special Supreme Court. Upon either a motion by the Director or the Supreme Court's own motion for interim suspension of a Justice pursuant to Rule 15.A, or a finding of reasonable cause to believe a Justice committed misconduct or has an incapacity by the Investigative Panel under Rule 17.B (2), a special supreme court shall be constituted. The special supreme court shall consist of nine judges selected from the list of judges maintained by the Supreme Court and routinely used to select replacement Justices when a Justice is disqualified from or not participating in a case.  See Supreme Court Rule 57.

Commentary
[1] The Supreme Court is a collegial body. Granting it the authority to discipline its own members would create appearances of impropriety and of conflicts of interest.  This Rule provides for the selection of a special supreme court to serve in this situation, comprised of judges who have been deemed qualified to decide other Supreme Court cases when Justices are disqualified.
[2] As in other cases, the Investigative Panel and the Justice may agree to a deferred discipline agreement, private admonition, or agreement to resign or retire.  See Rule 17.D.
[3] Nothing in these Rules is intended to preclude the General Assembly from initiating impeachment proceedings against a Justice under its constitutional authority.

**Indiana**
Indiana Rules of Court
Rules for Admission to the Bar and the Discipline of Attorneys
https://www.in.gov/courts/rules/ad_dis/
Rule 25, §VIIIF(4)
4) In the event the notice [of formal proceedings] filed under Rule VIIIF(1) is directed toward a member of the Supreme Court, the provisions of this paragraph shall apply.
(a) At the time the notice is filed, all Justices of the Supreme Court, except the Chief Justice, shall recuse themselves from the proceedings.  Should the Chief Justice, for any reason, be unable to participate in such proceedings, the most senior member of the Supreme Court, not otherwise disqualified, shall continue to serve.  The Chief Justice or the member of the Supreme Court continuing to serve under this provision shall be the presiding member of the Supreme Court for all proceedings relating to the notice.
(b) The vacancies on the Supreme Court created by the above procedure shall be filled for the limited purpose of the judicial disciplinary proceedings by members of the Indiana Court of Appeals chosen pursuant to this provision.  Six Judges of the Court of Appeals shall be randomly selected by the Clerk of the Supreme Court and Court of Appeals.  Advisement of the members of the Court of Appeals selected under this procedure shall be given to the Commission and the judicial officer.  Within seven days after advisement of the selection is issued, the Commission shall strike one judge selected and within seven days after the judge is stricken by the Commission, the judicial officer shall strike one judge.  If the Commission or the judicial officer fails to

4

strike a judge under this procedure, the Clerk of the Supreme Court shall strike at random in their stead.

(c) In the event all members of the Supreme Court are unable to participate in a judicial disciplinary proceeding, the Clerk of the Supreme Court and Court of Appeals shall randomly select seven members of the Indiana Court of Appeals to serve in such proceedings and each side shall strike one judge under the procedure set forth in Rule VIIIF(4)(b) above.

## Massachusetts

Massachusetts General Law, Part III, Title 1, chapter 211C

https://malegislature.gov/Laws/GeneralLaws/PartIII/TitleI/Chapter211C/Section9

§ 9: Charges against supreme judicial court member

Section 9. The chief justice and the six most senior justices of the appeals court other than the chief justice shall serve in the place of the supreme judicial court when charges are brought against a member of the supreme judicial court.

## Minnesota

Rules of the Board on Judicial Standards

https://www.revisor.mn.gov/court_rules/pr/subtype/stan/id/14/

Rule 14(g) Charge Against Supreme Court Justice.

When any Formal Complaint or Formal Statement of Disability Proceeding has been filed against a member of the Supreme Court, the review under Rule 14 shall be submitted to and heard by a panel consisting of the Chief Judge of the Court of Appeals or designee and six others chosen at random from among the judges of the Court of Appeals by the Chief Judge or designee.

## Mississippi

Mississippi constitution, §177A

https://www.alcorn.edu/uploaded/files/oaa/Mississippi_Constitution.pdf

A recommendation of the Commission on Judicial Performance for the censure, removal or retirement of a justice of the Supreme Court shall be determined by a tribunal of seven (7) judges selected by lot from a list consisting of all the circuit and chancery judges at a public drawing by the Secretary of State.  The vote of the tribunal to censure, remove or retire a justice of the supreme court shall be by secret ballot and only upon two-thirds (2/3) vote of the tribunal.

## Ohio

Supreme Court Rules for the Government of the Judiciary Of Ohio

https://www.supremecourt.ohio.gov/LegalResources/Rules/government/GOVJUD.pdf

Rule II, §4

Section 4. Grievances Against Supreme Court Justices.

(A) Initial review.

(1) Upon receipt of a grievance from disciplinary counsel, the Chief Judge of the Courts of Appeals shall select, by lot, a three-member review panel from among the judges

5

designated pursuant to division (A)(3) of this section.  The review panel shall contact the justice named in the grievance for a written response within fourteen days to the allegations contained in the grievance.  Upon request, the review panel may grant a reasonable extension of time for the justice to provide a response.

(2) Upon receipt of the response, or if no response is received, the review panel shall review the grievance and any response to determine whether good cause exists for further investigation of the grievance.  Within thirty days of the receipt of the response or expiration of the fourteen-day response time if no response is received, the review panel shall report its determination in writing to the Chief Judge.  Upon request of the review panel and for good cause shown, the Chief Judge may extend the time for reporting its determination.  If the review panel determines that good cause does not exist for further investigation, the Chief Judge shall notify the justice named in the grievance and the grievant of the determination and of the dismissal of the grievance.

(3) In January each year, the administrative judge of each appellate district shall designate the appellate judge senior in service and one additional appellate judge from the district, neither of whom shall be the presiding judge of that district or the Chief Judge, to be eligible for service on a review panel pursuant to division (A)(1) of this section.  The administrative judge shall advise the Chief Judge, in writing, of the designation.  Appointments shall be for a calendar year, and a judge may be reappointed to subsequent terms on the review panels.

(B) Appointment of special disciplinary counsel; time limits.

(1)(a)(i) If the review panel determines that good cause exists for further investigation, the Chief Judge shall appoint a special disciplinary counsel to conduct further investigation of the allegations contained in the grievance and any other misconduct discovered during the course of investigating the grievance.  The special disciplinary counsel shall possess the qualifications set forth in division (B)(3)(a) of this section and shall be appointed from the list maintained by disciplinary counsel pursuant to division (B)(3)(c) of this section.

(ii) When appointing a special disciplinary counsel, the Chief Judge may communicate with the prior Chief Judge to determine whether special disciplinary counsel has been appointed to investigate another grievance against the same justice.  If special disciplinary counsel has been appointed, the Chief Judge may appoint the same special counsel to investigate the new grievance.

(b) The investigation of a grievance by special disciplinary counsel shall be concluded within sixty days from the date the grievance is transmitted to special disciplinary counsel, and a decision on disposition of the grievance shall be made within thirty days after the conclusion of the investigation.  The Chief Judge may extend the time to complete an investigation, not to exceed one hundred fifty days in total, in the event of pending litigation or appeals, an unusually complex investigation, including the investigation of multiple grievances, time delays in obtaining evidence or testimony of witnesses, or for other good cause shown.  No investigation shall extend more than one hundred fifty days from the date the grievance is transmitted to special disciplinary counsel.

6

(c) The time limits set forth in this rule are not jurisdictional.  No investigation or complaint shall be dismissed unless it appears that there has been an unreasonable delay and that the rights of the respondent to a fair hearing have been violated.  An investigation that extends beyond one hundred fifty days from the date the grievance is transmitted to special disciplinary counsel is prima facie evidence of unreasonable delay.

(2)(a) Upon completion of the investigation, special disciplinary counsel shall either report to the Chief Judge that the grievance should be dismissed or prepare and file a formal complaint with the Chief Judge, in the name of special disciplinary counsel as relator, alleging that substantial, credible evidence exists to believe that the justice named in the grievance engaged in misconduct.  The complaint shall be submitted with investigatory materials sufficient to demonstrate the existence of substantial, credible evidence to support the allegations of the complaint.  The materials shall include any response filed by or on behalf of the respondent and may include other reports, summaries, depositions, statements, exhibits, or any other relevant material.

(b) If the special disciplinary counsel recommends the grievance be dismissed, the Chief Judge shall notify the grievant and the justice named in the grievance of such determination in writing.

(c) Unless the justice against whom the grievance has been filed agrees otherwise, the matter shall remain private unless and until a formal complaint is filed.  Nothing shall prohibit a special disciplinary counsel from communicating with another special disciplinary counsel who has been appointed to investigate a grievance against the same justice.

(3)(a) The special disciplinary counsel shall be an attorney admitted to the practice of law in Ohio, or an attorney licensed and in good standing in any other state and admitted pro hac vice by the Chief Judge.  The special disciplinary counsel shall not be an employee or appointee of the Supreme Court or have any interest in a case pending before the Supreme Court while serving as the special disciplinary counsel.  The special disciplinary counsel shall have the power to issue subpoenas and cause testimony to be taken under oath.

(b) The special disciplinary counsel shall be paid expenses and reasonable compensation, upon approval of the Chief Judge, from the Attorney Services Fund.  The rate and method of compensation, including the payment of compensation while the investigation is ongoing, shall be established by the Chief Judge in the appointment letter or order.  The Chief Judge may authorize the special disciplinary counsel to employ support staff as necessary to assist in the investigation and any subsequent proceedings and may authorize payment of fees, compensation, and expenses from the Fund.

(c) Disciplinary counsel shall maintain and provide to the Chief Judge in January each year a list of attorneys who satisfy the qualifications for appointment as special disciplinary counsel and who are otherwise available to accept such appointment.  Disciplinary counsel may supplement the list with additional special disciplinary counsel, as necessary.

7

(C) Proceedings on the formal complaint; probable cause review; appointment of hearing panel.

(1) Upon receipt of a formal complaint filed by the special disciplinary counsel, the Chief Judge shall appoint a probable cause panel, unless the justice named in the complaint has executed a written waiver of an independent probable cause determination. The probable cause panel shall consist of three former commissioners of the Board of Professional Conduct, none of whom was appointed or reappointed to the Board by the justice named in the complaint. Upon review solely of the complaint and the investigatory materials submitted pursuant to division (B)(2)(a) of this section, the probable cause panel shall make an independent determination whether probable cause exists for the filing of the complaint. Within thirty days of the appointment of the probable cause panel, the panel shall issue an order to the Chief Judge certifying the complaint, in whole or in part, or dismissing the complaint and investigation in its entirety.

(2) If the order dismisses the complaint and investigation in its entirety, the Chief Judge shall notify the grievant, justice, and special disciplinary counsel. If the order certifies the complaint in part, the Chief Judge shall provide a copy of the order to the special disciplinary counsel with instructions to prepare and file a new complaint that conforms to the determination of the probable cause panel. If the order certifies the complaint in its entirety, or upon receipt of a new complaint prepared as a result of a partial certification of the probable cause panel, the Chief Judge shall do both of the following:

(a) Appoint a hearing panel of three fulltime trial court judges selected, by lot, from the list of judges developed and maintained pursuant to division (C)(6) of this section. The judges chosen shall be from separate appellate districts and shall not be from the district in which the respondent resides. The Chief Judge shall designate one of the judges to serve as the chair of the hearing panel.

(b) Immediately forward the formal complaint to the director of the Board of Professional Conduct, who shall send a copy of the formal complaint by electronic service address or certified mail to the respondent. The complaint shall be accompanied by a notice requiring the respondent to file, within twenty days after the mailing of the complaint, the respondent's answer and serve copies of the answer on special disciplinary counsel and the Chief Judge. For good cause shown, the Chief Judge may grant an extension of time to file the answer.

(3) With reasonable notice to the parties, the hearing panel shall hold a hearing on the complaint. The hearing panel chair may grant requests for continuances for good cause shown.  All hearings shall be recorded by a court reporter and a transcript included in the record of the proceedings.

(4) If at the end of the evidence presented by the relator, a unanimous hearing panel finds that the evidence is insufficient to support a charge or count of misconduct or a finding of disability, the panel may order the complaint or count be dismissed. If at the end of all evidence, a majority of the hearing panel finds that the evidence is insufficient to support a charge or count of misconduct, the panel may order the complaint or count be dismissed. The hearing panel chair shall give written notice of the action taken to the

8

director who shall notify the Chief Judge, relator, and respondent. There shall be no appeal from an order dismissing the complaint or count of misconduct.

(5) If a majority of the hearing panel determines, by clear and convincing evidence, that the respondent is guilty of misconduct and a disciplinary sanction is merited or that the respondent has a mental or physical disability that makes the respondent unable to discharge the duties of office, the hearing panel shall file a certified report of the proceedings, its findings of fact, conclusions of law and recommended sanction with the director. The report shall include the transcript of testimony taken and an itemized statement of the actual and necessary expenses incurred in connection with the proceedings. The director shall send a copy of the hearing panel's report and recommendations to the Chief Judge and serve a copy of the report and recommendations, by electronic service address or certified mail, on the relator and respondent.  At the conclusion of all proceedings before the hearing panel, the director shall file the record of such proceedings with the Clerk of the Supreme Court as provided in division (E)(1) of this section.

(6) In January each year, the administrative judge of each appellate district shall designate two fulltime trial judges from within the appellate district to be eligible to serve on a hearing panel appointed pursuant to division (C)(2)(a) of this section. In selecting the trial judges who shall be eligible for appointment to hearing panels, the administrative judge shall consider legal and judicial experience, gender, race, ethnicity, and other relevant factors. Before designating a judge as eligible for selection to serve on a hearing panel, the administrative judge shall contact the judge to determine the judge's availability for potential service. The administrative judge shall advise the Chief Judge, in writing, of the designations.

(D) Appointment of adjudicatory panel; proceedings before the panel.

(1) Upon receipt of the hearing panel's report and recommendations, the Chief Judge shall convene an adjudicatory panel of thirteen appellate judges to review the report and recommendations.  The adjudicatory panel shall consist of the Chief Judge, who shall serve as chair of the panel, and the presiding judge of each appellate district. If a presiding judge of an appellate district is unavailable to serve on the adjudicatory panel, the appellate judge of the district who is senior in service on the court of appeals shall replace the presiding judge.

(2) The adjudicatory panel shall issue the respondent an order to show cause why the report and recommendation of the hearing panel shall not be confirmed and a disciplinary order entered. The Clerk shall serve notice of the show cause order by electronic service address or certified mail on relator and respondent.

(3) Within twenty days after issuance of the show cause order, the respondent or relator may file objections to the report or recommendations of the hearing panel with the Clerk. The objections shall be accompanied by a brief in support of the objections and proof of service of copies of the objections and the brief on all counsel of record. Twelve copies of the objections and brief in support shall be filed. Answer briefs and proof of service shall be filed within fifteen days after briefs in support of objections have been filed. Twelve copies of the answer briefs shall be filed.

9

(4) If objections are filed, the adjudicatory panel shall promptly schedule oral argument on objections. After the hearing on objections, or if no objections are filed, the adjudicatory panel shall issue an order as it finds proper. Unless otherwise ordered, any disciplinary order or order related to the respondent's mental or physical disability shall be effective on the date the order is announced. The order may provide for reimbursement to the Attorney Services Fund of costs and expenses incurred by special disciplinary counsel, the panels appointed pursuant to this section, or the Secretary.

(5) The Clerk shall mail certified copies of the order to the parties. The Supreme Court Reporter shall publish the disciplinary order in the Ohio Official Reports.

(E) Miscellaneous provisions.

(1) Upon the filing of a formal complaint, the director of the Board of Professional Conduct shall serve as clerk for the Chief Judge and the hearing panel. The relator and respondent shall file all pleadings, motions, documents, and other material with the director, who shall transmit the documents and materials to the Chief Judge and the appropriate panel. The Chief Judge and panels shall transmit all orders, opinions, and other materials to the director for service on or distribution to the parties. The director shall maintain a complete record of the proceedings and, upon conclusion of the proceedings before the hearing panel, certify the record, including exhibits, to the Clerk of the Supreme Court who shall maintain the certified record. The Clerk shall serve as clerk for any adjudicatory panel appointed pursuant to division (D) of this section, and all proceedings before the adjudicatory panel shall be conducted as provided in this section and the Rules of Practice of the Supreme Court of Ohio. Upon request, the director and Clerk shall assist the Chief Judge, hearing panel, and adjudicatory panel with ministerial matters such as scheduling a location for hearings and securing a court reporter.

(2) Any matter, a procedure for which is not specifically set forth in this rule, shall be handled in the manner set forth in Gov. Bar. R. V.

(3) If a judge selected to serve on any panel appointed pursuant to Section 4 of this rule is unable to serve because of the existence of a disqualifying factor, the judge shall notify the Chief Judge and provide written justification of the grounds for disqualification.

(4) The Chief Judge and any judge appointed to serve in any capacity pursuant to Section 4 of this rule shall continue to serve in the appointed capacity until the conclusion of the matter as long as the judge continues to hold judicial office. If the Chief Judge leaves judicial office while a matter commenced under this rule during the Chief Judge's tenure remains pending, the successor Chief Judge shall assume responsibility for that matter. If a judge appointed to serve in any capacity under this rule leaves judicial office while a matter to which the judge was assigned under this rule remains pending, the Chief Judge shall designate a judge to replace the former judge in the same manner as the original appointment was made.

(5) A party may allege the existence of bias, prejudice, or other disqualifying factor on the part of a judge appointed to serve on a panel pursuant to Section 4 of this rule by filing a timely motion with the Chief Judge. If the Chief Judge finds the existence of bias, prejudice, or other disqualifying factor, the judge named in the motion shall be

10

disqualified, and the Chief Judge shall designate a judge to replace the disqualified judge in the same manner as the original appointment was made.

(6) Any judge selected to serve on any panel appointed pursuant to Section 4 of this rule shall be reimbursed from the Attorney Services Fund for travel expenses incurred in association with the judge's service on the panel. Reimbursement for travel expenses shall be made as provided in the Supreme Court Guidelines for Travel by Court Appointees. A judge shall request reimbursement by submitting a signed Travel Expense Report form and required receipts to the Chief Judge. The Chief Judge shall indicate approval of the reimbursement and submit the approved form to the Administrative Director of the Supreme Court.

(7)(a) The Chief Judge, any former commissioner of the Board of Professional Conduct, or any judge appointed to serve on a panel pursuant to Section 4 of this rule may contact the director of the Board of Professional Conduct for procedural guidance relative to responsibilities set forth in this rule. Special disciplinary counsel may contact disciplinary counsel for procedural guidance relative to responsibilities set forth in this rule.

(b) To assist in the execution of these responsibilities, the director and disciplinary counsel shall prepare and make available education materials that provide general procedural guidance to the individuals identified in division (E)(7)(a) of this section. The education materials may include written guidance, sample correspondence, orders, and entries, and information regarding the retention of records pursuant to Section 8 of this rule.

**Pennsylvania**
Pennsylvania constitution
http://judicialconductboardofpa.org/constitutional-provisions/
Article V, §18(c)

(c) Decisions of the court [of judicial discipline] shall be subject to review as follows:
(1) A justice, judge or justice of the peace shall have the right to appeal a final adverse order of discipline of the court.  A judge or justice of the peace shall have the right to appeal to the Supreme Court in a manner consistent with rules adopted by the Supreme Court; a justice shall have the right to appeal to a special tribunal composed of seven judges, other than senior judges, chosen by lot from the judges of the Superior Court and Commonwealth Court who do not sit on the Court of Judicial Discipline or the board, in a manner consistent with rules adopted by the Supreme Court.  The special tribunal shall hear and decide the appeal in the same manner in which the Supreme Court would hear and decide an appeal from an order of the court.
(2) On appeal, the Supreme Court of special tribunal shall review the record of the proceedings of the court as follows: on the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and, as to sanctions, the scope of review is whether the sanctions imposed were lawful.  The Supreme Court or special tribunal may revise or reject an order of the court upon a determination that the order did not sustain this standard of review; otherwise, the Supreme Court or special tribunal shall affirm the order of the court.

11

(3) An order of the court which dismisses a complaint against a judge or justice of the peace may be appealed by the board to the supreme court, but the appeal shall be limited to questions of law.  An order of the court which dismisses a complaint against a justice of the supreme Court may be appealed by the board to a special tribunal in accordance with paragraph (1), but the appeal shall be limited to questions of law.
(4) No justice, judge or justice of the peace may participate as a member of the board, the court, a special tribunal or the Supreme Court in any proceeding in which the justice, judge or justice of the peace is a complainant, the subject of a complaint, a party or a witness.

**Vermont**
Rules for the Disciplinary Control of Judges
https://www.vermontjudiciary.org/sites/default/files/documents/RulesforDisciplinaryControlofJudges_May2011.pdf
RULE 13. COMPLAINT AGAINST A MEMBER OF THE SUPREME COURT
(1) A complaint against a member of the Supreme Court shall proceed in the same manner as a complaint against any other judge, except as set forth in this rule.
(2) Upon a motion of the Board or the Court for the temporary suspension of a member of the Supreme Court under Rule 5, a Special Supreme Court shall be constituted to hear the matter.  The Special Supreme Court shall consist of five judges appointed by the Administrative Judge for Trial Courts, or the next senior trial judge if the Administrative Judge is unavailable, under the process established by the Administrative Judge for the appointment of pro tempore judges to the Supreme Court in cases where a justice of the Court is disqualified.
(3) The Special Supreme Court shall hear any appeal from a decision of a hearing panel involving a complaint against a member of the Supreme Court.

**Washington**
Discipline Rules for Judges
https://www.courts.wa.gov/court_rules/pdf/DRJ/GA_DRJ_13_00_00.pdf
Rule 13 SUBSTITUTE PANEL
(a) Generally. If a justice of the Supreme Court is the subject of commission discipline or recommendation for retirement that is reviewed by the Supreme Court, a substitute panel of nine judges shall be selected as provided in this rule to serve as justices pro tempore to consider the commission decision.
(b) Selection of Justices Pro Tempore.  The presiding chief judge of the Court of Appeals shall be one member of the substitute panel and shall be the chief justice pro tempore unless the judge disqualifies himself or herself or is otherwise disqualified by section (c). The clerk of the Supreme Court shall select the balance of the justices pro tempore by lot from all remaining active Court of Appeals judges.  If there are fewer than nine judges of the Court of Appeals who are not disqualified, the panel shall be completed by the clerk by selecting by lot from the active superior court judges until a full panel of nine justices pro tempore has been selected.

12

(c) Disqualification.  A judge may disqualify himself or herself without cause.  No judge who has served as a master or a member of the commission in the particular proceeding or who is otherwise disqualified may serve on the substitute panel.  No judge against whom a formal charge is pending before the commission shall serve on the panel.

(d) Chief Justice Pro Tempore. If the presiding chief judge of the Court of Appeals is not a member of the substitute panel, the substitute panel shall select one of its members to serve as chief justice pro tempore.

**Wyoming**

Wyoming constitution

https://sos.wyo.gov/Forms/Publications/WYConstitution.pdf

Article 5, §6(3)(iv)

(e) The supreme court shall adopt a code of judicial conduct applicable to all judicial officers and adopt rules governing:

(i) The election of judges to the commission;

(ii) The staggering of terms, and the removal and filling of vacancies of commission members;

(iii) The appointment of a special supreme court composed of five (5) district judges who are not members of the commission, to act in the place of the supreme court in any case involving the discipline or disability of a justice of the supreme court; and

(iv) Procedures for the operation of the commission including exercise of the commission's disciplinary powers.

Rules Governing the Commission on Judicial Conduct and Ethics

https://judicialconduct.wyo.gov/establishment-of-commission/commission-rules

Rule 20(e)    Special supreme court.  Upon the occurrence of a circumstance necessitating the appointment of a special supreme court, the Wyoming Supreme Court will designate five district judges who are not members of the Commission to act in the place of the supreme court for the limited purposes contemplated by Wyo. Const. art. 5, § 6(e)(iv). Filings shall be made with the Clerk of the Court.

13

# Appendix 27(s)(ii)(9)(i)

# Cynthia Gray, COMPOSITION OF JUDICIAL CONDUCT COMMISSIONS, 2019;

# Composition of judicial conduct commissions

Revised August 2019



| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Alabama** | | | | |
| Judicial Inquiry Commission | 1973 by constitution | 4 years | 1 appellate judge | By supreme court |
| | | | 2 circuit judges | By circuit judges association |
| | | | 1 district judge | By governor subject to senate confirmation |
| | | | 2 attorneys | By state bar |
| | | | 3 public members | By governor subject to senate confirmation |
| Court of the Judiciary | 1973 by constitution | 6 years | 1 appellate judge | By supreme court |
| | | | 2 circuit judges | By circuit judges association |
| | | | 1 district judge | By district judges association |
| | | | 2 attorneys | By state bar |
| | | | 3 public members | By governor subject to senate confirmation |

*The Judicial Inquiry Commission determines whether to file a formal complaint that is adjudicated by the Court of the Judiciary.*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Alaska** | | | | |
| Commission on Judicial Conduct | 1968 by constitution | 4 years | 3 judges | By judges |
| | | | 3 attorneys | By governor upon recommendation by state bar with approval by legislature |
| | | | 3 public members | By governor with approval by legislature |

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Arizona** | | | | |
| Commission on Judicial Conduct | 1970 by constitution | 6 years | 2 court of appeals judges | By supreme court |
| | | | 2 superior court judges | By supreme court |
| | | | 1 municipal court judge | By supreme court |
| | | | 1 justice of the peace | By supreme court |
| | | | 2 attorneys | By state bar |
| | | | 3 public members | By governor subject to confirmation by senate |

*A 3-member investigative panel determines whether to file a formal complaint that is adjudicated by the other 8 members.*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Arkansas** | | | | |
| Judicial Discipline and Disability Commission | 1988 by constitution | 6 years | 3 judges | By supreme court |
| | | | 3 attorneys | 1 by attorney general |
| | | | | 1 by president of senate |
| | | | | 1 by speaker of house |
| | | | 3 public members | By governor |

*9 alternates are selected in the same manner as members. The 9 alternates are appointed to 3 investigation panels with 3 members each (1 judge, 1 attorney, 1 public member) that may file a formal statement of allegations that is adjudicated by a 9-member hearing panel that does not include any member of the investigation panel.*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **California** | | | | |
| Commission on Judicial Performance | 1960 by constitution | 4 years | 1 court of appeals justice | By supreme court |
| | | | 2 superior court judges | By supreme court |
| | | | 2 attorneys | By governor |
| | | | 6 public members | 2 by governor |
| | | | | 2 by senate rules committee |
| | | | | 2 by assembly speaker |

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Colorado** | | | | |
| Commission on Judicial Discipline | 1967 by constitution | 4 years | 2 district court judges | By supreme court |
| | | | 2 county court judges | By supreme court |
| | | | 2 attorneys | By governor with consent of senate |
| | | | 4 public members | By governor with consent of senate |

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Connecticut** | | | | |
| Judicial Review Council | 1977 by constitution | 4 years | 3 superior court judges | By governor with approval of general assembly |
| | | | 3 attorneys | By governor with approval of general assembly |
| | | | 6 public members | By governor with approval of general assembly |

2 alternate judges, attorneys, and public members are selected to serve in lieu of a judge, attorney, or public member, respectively, who is absent or disqualified. A compensation commissioner or a family support magistrate serves in lieu of a superior court judge member when the subject of a complaint is a compensation commissioner or family support magistrate, respectively.

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Delaware** | | | | |
| Preliminary Investigatory Committee | 1979 by constitution | 3 years | 3 attorneys | By chief justice with concurrence of supreme court |
| | | | 4 public members | By chief justice with concurrence of supreme court |
| Board of Examining Officers | | Ad hoc | 1 or more active or retired judges | By Court on the Judiciary |
| Court on the Judiciary | | | Chief justice | By virtue of office |
| | | | 4 associate justices | By virtue of office |
| | | | Chancellor | By virtue of office |
| | | | President judge of superior court | By virtue of office |

*A panel of the preliminary investigatory committee determines whether there is probable cause; the board of examining officers conducts the hearing and prepares a report that the Court on the Judiciary reviews.*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Florida** | | | | |
| Judicial Qualifications Commission | 1966 by constitution | 6 years | 2 court of appeal judges | By court of appeal judges |
| | | | 2 circuit court judges | By circuit court judges |
| | | | 2 county court judges | By county court judges |
| | | | 4 attorneys | By state bar |
| | | | 5 public members | By governor |

*The commission is divided into 2 panels:  the 9-member investigative panel decides whether to file a formal complaint that is adjudicated by a 6-member hearing panel.*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Georgia** | | | | |
| Judicial Qualifications Commission | 1972 by constitution, amended effective 1/1/2017 | 4 years | 3 judges of court of record | By supreme court, confirmed by senate |
| | | | 4 attorneys | 1 by governor, 1 by senate president, 1 by house speaker, 1 by supreme court, all confirmed by senate |
| | | | 3 public members | 1 by senate president, 1 by house speaker, 1 by governor, all confirmed by senate |

*The commission is divided into a 7-member investigative panel (2 judge members, 3 attorneys members appointed by governor, senate president, and house speaker, and 2 public members appointed by senate president and house speaker) and a 3-member hearing panel (1 judge member, 1 attorney member appointed by supreme court, and 1 public member appointed by governor).*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Hawaii** | | | | |
| Commission on Judicial Conduct | 1979 supreme court rule | 3 years | 3 attorneys | By supreme court |
| | | | 4 public members | By supreme court |

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Idaho** | | | | |
| Judicial Council | 1967 by statute | 6 years | Chief justice | By virtue of office |
| | | | 1 district judge | By state bar with consent of senate |
| | | | 2 attorneys | By state bar with consent of senate |
| | | | 3 public members | By governor with consent of senate |
| **Illinois** | | | | |
| Judicial Inquiry Board | 1971 by constitution | 4 years | 2 circuit judges | By supreme court |
| | | | 3 attorneys | By governor |
| | | | 4 public members | By governor |
| Courts Commission | 1971 by constitution | No provision | 1 supreme court justice* | By supreme court |
| | | | 2 appellate court judges* | By appellate court |
| | | | 2 circuit court judges* | By supreme court |
| | | | 2 public members* | By governor |

*The Judicial Inquiry Board determines whether to file a complaint that is adjudicated by the Courts Commission.*

*2 supreme court justices, 3 appellate court judges, 3 circuit court judges, and 2 public members are selected as alternates in the same manner.

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Indiana** | | | | |
| Commission on Judicial Qualifications | 1970 by constitution | 5 years | Chief justice | By virtue of office |
| | | 3 years | 3 attorneys | By other attorneys |
| | | 3 years | 3 public members | By governor |
| **Iowa** | | | | |
| Commission on Judicial Qualifications | 1972 by constitution | 6 years | 1 district judge | By chief justice |
| | | | 2 attorneys | By chief justice |
| | | | 4 public members | By governor subject to confirmation by senate |
| **Kansas** | | | | |
| Commission on Judicial Conduct | 1974 by court rule | 4 years | 6 active or retired judges | By supreme court |
| | | | 4 attorneys | By supreme court |
| | | | 4 public members | By supreme court |

*The commission is divided into 2 panels; a formal complaint filed by one panel is adjudicated by the other panel.*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Kentucky** | | | | |
| Judicial Retirement and Removal Commission | 1976 by constitution | 4 years | 1 court of appeals judge | By court of appeals |
| | | | 1 circuit judge | By circuit judges |
| | | | 1 district judge | By district judges |
| | | | 1 attorney | By state bar |
| | | | 2 public members | By governor |

An alternate for each judge member and each attorney member is chosen at the time and in the same manner as the members.

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Louisiana** | | | | |
| Judiciary Commission | 1968 by constitution | 4 years | 1 court of appeal judge | By supreme court |
| | | | 2 district judges | By supreme court |
| | | | 3 attorneys | By court of appeal judges |
| | | | 3 public members | By district judges |

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Maine** | | | | |
| Committee on Judicial Responsibility and Disability | 1978 by court rule | 6 years | 1 superior court justice | By supreme judicial court |
| | | | 1 district court judge | By supreme judicial court |
| | | | 1 probate court judge | By supreme judicial court |
| | | | 2 attorneys | By supreme judicial court upon recommendation of governor |
| | | | 3 public members | By supreme judicial court upon recommendation of governor |

1 superior court justice, 1 district court judge, 1 lawyer, and 1 public member are selected as alternates.

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Maryland** | | | | |
| Commission on Judicial Disabilities | 1966 by constitution | 4 years | 1 appellate judge | By governor with advice and consent of senate |
| | | | 1 circuit court judge | By governor with advice and consent of senate |
| | | | 1 district court judge | By governor with advice and consent of senate |
| | | | 3 attorneys | By governor with advice and consent of senate |
| | | | 5 public members | By governor with advice and consent of senate |
| Judicial Inquiry Board | | 4 years | 2 judges | By commission |
| | | | 2 attorneys | By commission |
| | | | 3 public members | By commission |

*Complaints are considered first by the Judicial Inquiry Board, which files a report and recommendation with the commission.*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Massachusetts** | | | | |
| Commission on Judicial Conduct | 1978 by statute | 6 years | 3 judges | By supreme judicial court |
| | | | 3 attorneys | By chief administrative judge of the trial court |
| | | | 3 public members | By governor |

1 or more alternate judge, attorney, or public members are selected in the same manner as regular members.

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Michigan** | | | | |
| Commission on Judicial Tenure | 1968 by constitution | 3 years | 1 court of appeals judge | By court of appeals judges |
| | | | 1 circuit court judge | By circuit court judges |
| | | | 1 probate judge | By probate judges |
| | | | 1 limited jurisdiction judge | By limited jurisdiction judges |
| | | | 1 judge | By state bar |
| | | | 2 attorneys | By state bar |
| | | | 2 public members | By governor |

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Minnesota** | | | | |
| Board on Judicial Standards | 1971 by statute | 4 years | 1 court of appeals judge | By governor |
| | | | 3 trial judges | By governor |
| | | | 2 attorneys | By governor with advice and consent of senate |
| | | | 4 public members | By governor with advice and consent of senate |

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Mississippi** | | | | |
| Commission on Judicial Performance | 1979 by constitution | 6 years | 1 circuit court judge | By chief justice on recommendation of governor |
| | | | 1 chancellor | By chief justice on recommendation of lieutenant governor |
| | | | 1 county court judge | By chief justice on recommendation of speaker of house |
| | | | 1 justice court judge | By chief justice |
| | | | 1 attorney | By chief justice on recommendation of state bar |
| | | | 2 public members | By chief justice |

An alternate for each member is selected at the time and in the manner as the initial appointments.

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Missouri** | | | | |
| Commission on Retirement, Removal, and Discipline | 1972 by constitution | 6 years | 1 court of appeals judge | By courts of appeals judges |
| | | | 1 circuit court judge | By circuit court judges |
| | | | 2 attorneys | By state bar |
| | | | 2 public members | By governor |
| **Montana** | | | | |
| Judicial Standards Commission | 1973 by constitution | 4 years | 2 district judges | By district judges |
| | | | 1 attorney | By supreme court |
| | | | 2 public members | By governor |
| **Nebraska** | | | | |
| Commission on Judicial Qualifications | 1966 by constitution | 4 years | Chief justice | By virtue of office |
| | | | 1 district court judge | By chief justice |
| | | | 1 county court judge | By chief justice |
| | | | 1 judge of any other court | By chief justice |
| | | | 3 attorneys | By bar association |
| | | | 3 public members | By governor |
| **Nevada** | | | | |
| Commission on Judicial Discipline | 1976 by constitution | 6 years | 2 district judges | By supreme court |
| | | | 3 attorneys | By state bar |
| | | | 3 public members | By governor |

An alternate for each member is selected in the same manner.

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **New Hampshire** | | | | |
| Committee on Judicial Conduct | 1977 by court rule | 3 years | 1 active or retired superior court judge | By supreme court |
| | | | 1 active or retired district court judge | By supreme court |
| | | | 1 active or retired probate court judge | By supreme court |
| | | | 1 clerk of court or retired clerk | By supreme court |
| | | | 1 attorney | By bar association |
| | | | 6 public members | 1 by bar association |
| | | | | 1 by supreme court |
| | | | | 2 by governor |
| | | | | 1 by president of senate |
| | | | | 1 by speaker of house |

An alternate for each member is selected in the same manner.

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **New Jersey** | | | | |
| Advisory Committee on Judicial Conduct | 1974 by court rule | 3 years | At least 3 retired justices or judges of supreme or superior court | By supreme court |
| | | | No fewer than 3 attorneys | By supreme court |
| | | | No more than 5 public members | By supreme court |
| **New Mexico** | | | | |
| Commission on Judicial Standards | 1967 by constitution | 4 years | 2 justices or judges | By supreme court |
| | | | 1 magistrate | By supreme court |
| | | | 1 municipal court judge | By supreme court |
| | | | 2 attorneys | By state bar |
| | | | 7 public members | By governor |
| **New York** | | | | |
| State Commission on Judicial Conduct | 1974 by constitution | 4 years | 1 appellate division justice | By chief judge |
| | | | 1 judge of court other than court of appeals or appellate division | By chief judge |
| | | | 1 town or village court justice | By chief judge |
| | | | 1 judge | By governor |
| | | | 1 attorney | By governor |
| | | | 2 public members | By governor |
| | | | 4 non-judges | 1 by assembly speaker |
| | | | | 1 by assembly minority leader |
| | | | | 1 by senate majority leader |
| | | | | 1 by senate minority leader |
| **North Carolina** | | | | |
| Judicial Standards Commission | 1973 by statute | 3 years | 1 court of appeals judges | By chief justice |
| | | | 2 superior court judges | By chief justice |
| | | | 2 district court judges | By chief justice |
| | | | 4 attorneys | By state bar |
| | | | 4 public members | 2 by governor |
| | | | | 2 by general assembly, (1 on recommendation of president pro temporare of senate, 1 on recommendation of speaker of house) |

*The commission is divided into 2 panels; a formal complaint filed by one panel is heard by the other panel.*    1 or more alternate members are selected in the manner prescribed for initial appointments in each class of membership.

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **North Dakota** | | | | |
| Commission on Judicial Conduct | 1975 by statute | 3 years | 2 judges | By judges' association |
| | | | 1 attorney | By state bar association |
| | | | 4 public members | By governor |
| **Ohio** | | | | |
| Board of Professional Conduct | 1957 by court rule | 3 years | 7 judges | By supreme court |
| | | | 17 attorneys | By supreme court |
| | | | 4 public members | By supreme court |

*A probable cause panel of the board determines whether to file a formal complaint that is adjudicated by the board. The board hears complaints against both attorneys and judges.*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Oklahoma** | | | | |
| Council of Judicial Complaints | 1974 by statute | 5 years | 2 attorneys | Speaker of house, president pro tem of senate, and bar president each appoint 1 member |
| | | | 1 public member | |
| Court on the Judiciary – Trial Division | 1966 by constitution | 3 years | 8 district judges | Most senior in service under age 60 |
| | | | 1 attorney | By state bar |
| Court on the Judiciary – Appellate Division | 1966 by constitution | 3 years | 2 supreme court justices | By supreme court |
| | | | 1 court of criminal appeals judge | By court of criminal appeals |
| | | | 5 district judges | Most senior in service under age 65 |
| | | | 1 attorney | By state bar |

*If the Council on Judicial Complaints finds that a complaint should be the subject of proceedings, the Supreme Court, chief justice, governor, attorney general, bar association, or House of Representatives may file a petition invoking the jurisdiction of the Court on the Judiciary; the trial division holds a hearing; its judgment may be appealed to the appellate division.*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Oregon** | | | | |
| Commission on Judicial Fitness and Disability | 1967 by statute | 4 years | 3 judges | By supreme court |
| | | | 3 lawyers | By state bar |
| | | | 3 public members | By governor, confirmed by senate |

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Pennsylvania** | | | | |
| Judicial Conduct Board | 1993 by constitution* | 4 years | 1 court of common pleas judge | By governor |
| | | | 1 superior or commonwealth court judge | By supreme court |
| | | | 1 justice of the peace | By supreme court |
| | | | 3 attorneys | 1 by supreme court |
| | | | | 2 by state bar |
| | | | 6 public members | 3 by supreme court |
| | | | | 3 by governor |
| Court of Judicial Discipline | 1993 by constitution | 4 years | 2 judges from common pleas, superior, or commonwealth court | By supreme court |
| | | | 1 judge from common pleas, superior, or commonwealth court | By governor |
| | | | 1 magistrate district judge | By supreme court |
| | | | 2 attorneys | By governor |
| | | | 2 public members | 1 by supreme court |
| | | | | 1 by governor |

*The board determines whether to file a formal complaint that is adjudicated by the Court of Judicial Discipline*

\* Replacing Judicial Inquiry and Review Board created in 1968.

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Rhode Island** | | | | |
| Commission on Judicial Tenure and Discipline | 1974 by statute | 3 years | 1 superior court judge | By supreme court |
| | | | 1 family court judge | By supreme court |
| | | | 1 district court judge | By supreme court |
| | | | 1 workers' compensation judge | By supreme court |
| | | | 1 traffic tribunal judge | By supreme court |
| | | | 1 additional judge | By supreme court |
| | | | 4 attorney or public members | 1 by president of Senate |
| | | | | 1 by Senate minority leader |
| | | | | 1 by speaker of house of representatives; |
| | | | | 1 by House minority leader |
| | | | 3 attorneys | By governor from list provided by state bar ass'n |
| | | | 3 public members | By governor with advice and consent of senate |

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **South Carolina** | | | | |
| Commission on Judicial Conduct | 1976 by court rule | 4 years | 14 judges | By supreme court |
| | | | 4 attorneys | By supreme court |
| | | | 8 public members | By supreme court |
| **South Dakota** | | | | |
| Commission on Judicial Qualifications | 1972 by constitution | 4 years | 2 circuit court judges | By judicial conference |
| | | | 3 attorneys | By state bar commissioners |
| | | | 2 public members | By governor |

*Members are divided into panels; an investigative panel decides whether to file formal charges, which are adjudicated by a hearing panel.*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Tennessee** | | | | |
| Board of Judicial Conduct | 1979 by statute | 3 | 2 trial judges* | By trial judges association |
| | | | 1 general sessions court judge* | By general sessions judges conference |
| | | | 1 municipal court judge* | By municipal judges conference |
| | | | 1 juvenile court judge* | By council of juvenile and family court judges |
| | | | 1 court of appeals or court of criminal appeals judge* | By supreme court |
| | | | 1 judge* | By speaker of senate |
| | | | 1 judge* | By speaker of house |
| | | | 2 attorneys | By governor |
| | | | 3 public members | By speaker of house of representatives |
| | | | 3 public members | By speaker of senate |

*Members are divided into hearing panels of 6 members and investigative panels of 3 members.*    * Current or former    ** From list of 6 recommended by judicial conference

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Texas** | | | | |
| State Commission on Judicial Conduct | 1965 by constitution | 6 years | 1 court of appeals justice | By supreme court with advice and consent of senate |
| | | | 1 district court judge | By supreme court with advice and consent of senate |
| | | | 1 judge of county court law | By supreme court with advice and consent of senate |
| | | | 1 justice of the peace | By supreme court with advice and consent of senate |
| | | | 1 municipal court judge | By supreme court with advice and consent of senate |
| | | | 1 judge of constitutional county court | By supreme court with advice and consent of senate |
| | | | 2 attorneys | By state bar** |
| | | | 5 public members | By governor with advice and consent of senate |

** Under regulations prescribed by supreme court with advice and consent of senate

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Utah** | | | | |
| Judicial Conduct Commission | 1984 by constitution* | 4 years | 2 judges | By supreme court |
| | | | 2 attorneys | By supreme court |
| | | | 3 public members | By governor with consent of senate |
| | | | 2 members of house of representatives | By speaker of house |
| | | | 2 members of senate | By president of senate |

*  Previously established in 1968 by statute.

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Vermont** | | | | |
| Judicial Conduct Board | 1978 by court rule | 6 years | 3 judges | By supreme court |
| | | | 3 attorneys | By supreme court |
| | | | 3 public members | By supreme court |

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Virginia** | | | | |
| Judicial Inquiry & Review Commission | 1971 by constitution | 4 years | 3 judges | By general assembly |
| | | | 2 attorneys | By general assembly |
| | | | 2 public members | By general assembly |

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Washington** | | | | |
| State Commission on Judicial Conduct | 1980 by constitution | 4 years | 1 court of appeals judge | By court of appeals |
| | | | 1 superior court judge | By superior court judges |
| | | | 1 limited jurisdiction court judge | By limited jurisdiction court judges |
| | | | 2 attorneys | By state bar association |
| | | | 6 public members | By governor |

An alternate is also selected for each member

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **West Virginia** | | | | |
| Judicial Investigation Commission | 1976 by court rule | 3 years | 3 circuit court judges | By supreme court of appeals |
| | | | 1 magistrate | By supreme court of appeals |
| | | | 1 family court judge | By supreme court of appeals |
| | | | 1 mental hygiene commissioner, juvenile referee, special commissioner, special master, or former judge or justice, state or federal | By supreme court of appeals |
| | | | 3 public members | By supreme court of appeals |
| Judicial Hearing Board | 1976 by court rule | 3 years | 3 circuit court judges | By supreme court of appeals |
| | | | 1 magistrate | By supreme court of appeals |
| | | | 1 family court judge | By supreme court of appeals |
| | | | 1 mental hygiene commissioner, juvenile referee, special commissioner, special master, or former judge or justice, state or federal | By supreme court of appeals |
| | | | 3 public members | By supreme court of appeals |

*The Judicial Investigation Commission determines whether to file a formal complaint; the hearing is before the Judicial Hearing Board.*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Wisconsin** | | | | |
| Judicial Commission | 1978 by statute* | 3 years | 1 trial court judge | By supreme court |
| | | | 1 court of appeals judge | By supreme court |
| | | | 2 attorneys | By supreme court |
| | | | 5 public members | By governor with senate approval |

*The commission determines whether to files a formal complaint; a 3-judge panel is appointed to conduct the hearing*

*Replacing a commission created in 1971 by the supreme court.

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **Wyoming** | | | | |
| Commission on Judicial Conduct and Ethics | 1973 by constitution | 3 years | 2 district court judges | By district court judges |
| | | | 1 circuit court judge | By circuit court judges |
| | | | 3 attorneys | By state bar |
| | | | 6 public members | By governor confirmed by senate |

*For each case, the commission is divided into an investigative panel of 3 or more members and an adjudicative panel of 3 or more members; if the investigative panel determines that a formal complaint should be filed, the hearing is before the adjudicative panel.*

| State | Establishment | Term | Membership | Selection of membership |
|---|---|---|---|---|
| **District of Columbia** | | | | |
| Commission on Judicial Disabilities and Tenure | 1970 by statute | 6 years | 1 federal judge serving in D.C. | By Chief Judge of U.S. District Court for D.C. |
| | | | 3 attorneys | 2 by D.C. bar |
| | | | | 1 by mayor of D.C. |
| | | 5 years | 1 attorney | By President of U.S. |
| | | 6 years | 2 public members | 1 by D.C. city council |
| | | | | 1 by mayor of D.C. |

# Appendix 27(s)(ii)(9)(j)

# Dennis Maes and Frances Koncilja, Perspective: Colorado's Judicial Integrity in Question, COLORADO SPRINGS GAZETTE, July 2, 2022;

 Fentanyl family: Colorado's deadly overdose siege had mom and pop roots  SP

https://gazette.com/opinion/perspective-colorado-s-judicial-integrity-in-question/article_a319d072-f8aa-11ec-ad4c-e747649eb207.html

# PERSPECTIVE: Colorado's judicial integrity in question

Dennis Maes and Frances Koncilja
Jul 2, 2022

The justices on the Colorado Supreme Court and all the judges in the state of Colorado are the beneficiaries of battles decades ago to create a merit system for the selection of judges as opposed to a partisan political system in which judges would be elected. Our judges can focus on their jobs as opposed to raising money and campaigning. Our judges do not have to fear that an unhappy litigant might fund a judge's opponent in an election.

This fight for merit selection of judges in Colorado started in 1945. In 1966, when the General Assembly once again refused to put merit selection on the ballot, the League of Women Voters, the Colorado Bar Association, the Colorado Medical Association, and numerous citizens gathered over 47,000 signatures to place merit selection of judges on the ballot and then worked for its adoption. Finally, in November 1966, Colorado voters approved adding Article VI to the Colorado Constitution. The late Colorado Supreme Court Justice Gregory Hobbs compiled a detailed history of these efforts which was published in The Colorado Lawyer in April 2006 titled "Colorado Judicial Merit Selection — a Well-Deserved 40th Anniversary Celebration".

Article VI also created the Colorado Commission on Judicial Discipline ("Discipline Commission") — a commission of 10; four judges, two lawyers and four non-attorney citizens — that has the responsibility and authority to investigate and discipline judges, including Supreme Court justices.

In 1994, there was another attack on merit selection with Amendment 12 that would have destroyed the independence of judges and put them back into politics with recall elections. Once again, the Colorado Bar was at the forefront in defeating Amendment 12.

Merit selection and independence of judges, balanced with the authority of the Discipline Commission to investigate and discipline judges, have served the public interest of all Coloradans for over 50 years.

## Commission subverted

We are concerned that Chief Justice Brian Boatright and Justice Monica Marquez, who appear to be the faces of the current leadership at the Supreme Court, are in the process of torching and burning down the merit selection system by their stubborn and misguided refusal to allow the Discipline Commission to do its work. The commission has been attempting to investigate a scandal swirling around the Supreme Court since 2019: Did then-Chief Justice Coats encourage, authorize and or approve a $2.75 million contract for Mindy Masais, the former chief of staff of the Supreme Court Administrative Office ("SCAO"), to keep her from going public with "dirt" she allegedly had on some Colorado judges and the Colorado Judicial Department?

Rather than allowing the Discipline Commission to do its work, Justice Boatright has insisted that the Supreme Court should hire the investigators and control the scope of the investigation. The court waited over two years after this scandal went public to hire investigators, which effectively prohibited the Discipline Commission from doing its

work. In October 2021, the court hired a company set up by former United States Attorney Robert Troyer to conduct the investigation into whether Coats was willing to take $2.75 million in funds from the Judicial Department to essentially buy the silence of Masais ("Troyer Report"). Judge Boatright, we assume with the blessing of the other justices, at the same time hired another company and will pay them $225,000 to investigate the culture at the Judicial Department. That investigation was supposed to be concluded in June but has been delayed because of the voluminous number of employees who have asked to be interviewed.

The effect of these late and expensive investigations — remember, the complaints occurred back in 2019 — is that there still is no accountability and there likely will be none. Instead, the delays, caused primarily by, we are reluctant to say it, Justice Boatright, have had the effect of insuring there will be no criminal charges against anyone because the statute of limitations has run. It is mind-boggling that the Colorado Supreme Court, the attorney general and the Denver district attorney allowed the statute of limitations to expire in a matter of such importance.

The state auditor has already investigated many of these items that Troyer investigated and made recommendations in her performance audit dated November 2020. The state auditor commenced the audit because of the media reports in 2019 that there was wasteful spending, excessive use of paid leave and potential fraud at the Judicial Department. In addition, the state auditor had received an anonymous complaint on April 15, 2019, through the fraud hotline alleging fraud at the Judicial Department.

## Undue delays

The state auditor's report on the fraud hotline complaint came out last Feb. 4 and recommended criminal investigations. One might ask why the report took so long. It appears that the Judicial Department, under the leadership of Justices Boatright and Marquez, made the process burdensome by insisting on controlling access to the data and evidence; asserting confidentiality over many of the documents, and providing the information under an "access" agreement, meaning it would be kept confidential.

The state auditor's executive summary of the fraud hotline investigation recommended a criminal referral to investigate possible crimes committed by Masias, Eric Brown (the administrator of the SCOA) and Chris Ryan the head of Human Services at SCOA). The full investigation contained so many redactions when it was given to the Denver district attorney, and came so close to the expiration of the statute of limitations, that the Denver DA said she could not prosecute anyone for anything.

The Troyer Report issued last week paints a picture of Coats as incompetent and ignorant of the facts and therefore concludes, wrongly, in our opinion, that Coats did not commit any acts of official misconduct and this mess is not his fault. The Troyer Report ignores numerous uncomfortable facts; fawns over the justices as being very co-operative and forthcoming, and ignores the auditor's report and the recent report of the Discipline Commission to the interim legislative committee looking into these issues. The deficiencies in the Troyer Report are perfect examples of why this investigation should have been conducted by the Discipline Commission.

## Dubious report

The Troyer Report concludes that Coats was not made aware of the memo with the dirt in it until sometime in 2019, and that he could not have agreed to it to cover up this memo with the $2.75 million contract because — are you ready for this? — Coats wanted to fire Masias in the fall of 2018 for financial improprieties and was considering giving her a "leadership training" contract to encourage her to resign. Why would anyone, let alone the chief judge, even consider a multimillion-dollar "leadership training" contract for someone accused of financial improprieties at the court unless Coats was trying to buy her silence? The Troyer Report concluded that the financial services division of the SCAO was refusing to sign a management representation letter required for the completion of statewide audit unless Masias was fired. The Troyer Report states at page 12:

"Ryan and Coats were reluctant to terminate Masias but believed that their options were limited because the department needed a signed management Representation Letter. They were also concerned about the optics of terminating the highest-ranking female

employee at the SCAO, who had also recently been denied the SCAO position. Masias was well-regarded in many of the department's 24 judicial districts. Both Ryan and coats therefore preferred demoting Masias for her dishonesty, placing her in a position to oversee leadership training and removing her spending and signature authorities."

The Troyer Report further concludes that Coats never read or even allowed the memo with the "dirt" to be read to him and so Coats could not have been involved in any cover up because he did not know the details. The Troyer Report also states that Coats failed to review the leadership contract for $2.75 million; never asked about its terms, including the duration (five years) or the amount to be paid, and therefore there was no coverup by Coats because he did not know the details. (These leaps of "logic" make one's head hurt.)

The Troyer Report then goes on to make the jaw-dropping allegation that somehow this mess is not the fault of Coats, because no one trained him to be the chief justice; there were no manuals or training material, and he had no experience managing an organization, especially a large organization such as the Judicial Department that has almost 4,000 employees and a budget of over a half billion dollars a year. In its desperate search for another "reason" to exonerate Coats, the Troyer Report concludes that this mess was also caused by the other justices of the Supreme Court because they did not offer to assist Coats in his supervisory duties as well as the design of that stunning new Supreme Court building that cost taxpayers over $750 million — because the employees of the Judicial Department were in the office tower next to the courts, and Coats was not aware of the toxic environment among the employees. We guess Coats was not trained to walk over to the next building to meet with the actual people who work for the Judicial Department, and he needed a manual to instruct him to do that.

## Absurd findings

If this sounds like rubbish to you, you are correct. Assuming for the for the sake of argument, as we lawyers say, that it is true that Coats was worried about the gender bias claim and that is why he agreed to a "leadership training" contract for Masias, how is

that a defense to a charge of official misconduct? There was still a quid pro quo — no public complaint, no lawsuit and you get a multimillion-dollar contract.

The Troyer Report does not even mention, let alone analyze, the criminal statutes that Coats might have violated: conspiracy to commit bribery and or official misconduct under CRS18-8-404 and 405 if a public servant "refrains from performing a duty imposed upon him by law."

There is no legal analysis in this $75,000 report other than to a reference to the state procurement code. There is no legal analysis of what obligations the other six justices had under the Code of Judicial Conduct if it is true that Coats was incompetent. There is no reference, let alone analysis of Coats' obligations under the Code of Judicial Conduct, 2.5, 2.12 or 21.5 or Disciplinary Rules 4 and 5, which prohibit a judge from handling a matter he is not competent to handle and require a judge to discharge his supervisory duties diligently. There is no mention or analysis of the obligation of Coats or the other justices to turn over to the Discipline Commission claims of wrongdoing by a judge.

While heaping praise on the court for its open and transparent co-operation with the Troyer group, the report does not even mention that the delay of Chief Justice Boatright in hiring Troyer means the statute of limitations has run and there can be no criminal prosecution.

No one held a gun to Coats' head to force him to be the chief justice. His colleagues voted for him, most likely after he lobbied for the position. He had been a judge on that court for 18 years before he became the chief. What did he think being the chief involved? Just giving speeches and acting important? He was elected to be the chief executive officer of the Colorado Judicial Department, which has almost 4,000 employees and a budget of over a half billion dollars. If he did not think he was qualified, he should not have asked for the job.

Justice Boatright has taken the incredible position at the legislature that the reason he has not provided access to all the documents and data involving this mess is because he is protecting the court from financial liability. We guess the evidence must be pretty damning, but that is what evidence is about — establishing liability. If either of us made an argument to a federal judge in a discovery dispute with that kind of "logic," we would be cooling our heels in the holding cells of the federal marshal and stripped of our privileges to practice law. How can the Supreme Court have any credibility in decisions involving discovery disputes when it applies a different standard to itself? The Troyer Report omits any of this in fawning over the court's transparency and co-operation.

## Credibility in question

In summary, the Troyer Report is rubbish and clearly establishes why the court should have turned this mess over to the Discipline Commission three years ago.

The leadership of the court, Justices Boatright and Marquez have, in our opinion, lost all credibility and legitimacy.

Colorado owes a huge debt to the courage and independence of the Discipline Commission for standing up to the unprincipled refusal of the Supreme Court to allow the commission to do its job. To force a vote on another constitutional amendment will encourage someone to put election of judges on the ballot at the same time.

We have no confidence in Justice Boatright and Marquez as the leaders of the court and request that they resign and that the rest of the justices rethink this dangerous and improper fight with the Discipline Commission.

Forcing the Discipline Commission to request amendments to the constitution to "clarify" what is already clear — the commission is independent and has the authority and obligation to investigate complaints concerning judge — is outrageous and dangerous and could burn the whole place down.

Dennis Maes served for 24 years as a judge in Colorado's 10th Judicial District in Pueblo — and as the district's chief judge for 17 of those years — before retiring from the bench in 2012. He also served on the state's Judicial Discipline Commission. Frances Koncilja is an attorney who served on the Colorado Supreme Court and Court of Appeals Nominating Commission and was the Tenth Circuit's representative on the American Bar Association Judicial Review Committee. She also served on the judicial advisory committees recommending federal judge candidates for U.S. Sens. Ken Salazar, Michael Bennet and John Hickenlooper. Koncilja also is a former commissioner on Colorado's Public Utilities Commission.

**Appendix 27(s)(i)(9)(k)**

**Dennis Maes, Written Comments to the
Legis. Interim Comm. on Judicial Discipline,
July 12, 2022;**

# Dennis Maes

# Interim Committee On Judicial Discipline Of The Colorado General Assembly

# July 12, 2022

GOOD MORNING. MY NAME IS DENNIS MAES AND I APPRECIATE THE OPPORTUNITY TO SHARE A FEW OBSERVATIONS SURROUNDING THE INTERIM COMMITTEE'S HEARINGS ON JUDICIAL REFORM.

I RETIRED MAY 31, 2012, AFTER 24 YEARS AS A DISTRICT JUDGE IN PUEBLO. I SERVED AS THE CHIEF DISTRICT JUDGE THE LAST 17 YEARS OF THAT TERM.

BEFORE I BEGIN PLEASE ALLOW ME THE OPPORTUNITY TO ACKNOWLEDGE THE OUTSTANDING PULITZER LEVEL REPORTING BY DAVID MIGOYA FROM THE DENVER GAZETTE CONCERNING THIS DARK MOMENT IN THE HISTORY OF THE COLORADO SUPREME COURT. HE RELENTLESSLY PURSUED THE TRUTH DESPITE THE FORMIDABLE ROADBLOCKS PLACED IN HIS WAY BY SEVERAL STATE AGENCIES INCLUDING THE COLORADO SUPREME COURT. HIS WORK IS A STARK REMINDER OF THE IMPORTANCE OF THE PRESS IN A FREE DEMOCRATIC SOCIETY.

FOR ABOUT A YEAR BEFORE I WAS APPOINTED TO THE DISTRICT BENCH BY GOVERNOR ROY ROMER, I HAD THE PRIVILEGE OF SERVING ON THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE. THE CEO AT THE TIME WAS RICK WEHMHOEFER. I WAS IMPRESSESSED WITH THE WORK AND THE EFFICIENCY OF THE COMMISSION. IT SATISFIED ITS RESPONSIBILITIES PURSUANT TO THE COLORADO CONSTITUTION. THE COMMISSION ON SEVERAL OCCASIONS DURING THE ANNUAL JUDICIAL CONFERENCE, PROVIDED TRAINING SESSIONS TO THE SPOUSES OF THE JUDGES TO EDUCATE THEM WITH THE WORKINGS OF THE COMMISSION IN THE INTEREST OF TRANSPARENCY. I WOULD SUGGEST THAT THE COMMISSION ARRANGE SIMILAR EDUCATIONAL OPPORTUNITIES FOR THE PUBLIC TO INFORM THEM OF THE IMPORTANT WORK THE COMMISSION UNDERTAKES TO ENSURE JUDICIAL ACCOUNTABILITY.

I WILL SAY THERE HAS ALWAYS BEEN SOMEWHAT OF A TENSION BETWEEN THE JUDGES AND THE COMMISSION BECAUSE OF THE VERY NATURE OF THE COMMISSION'S CHARGE. HOWEVER, I NEVER OBSERVED ANYTHING OUT OF THE ORDINARY THAT OFFERED CONCERN ABOUT THE PROCESS. I AND MY COLLEAGUES RECOGNIZED THE IMPORTANCE OF THE WORK OF THE COMMISSION AND ITS CREDIBLE OVERSIGHT OF US IN THE MERIT SELECTION SYSTEM OF COLORADO JUDGES. IT HAS WORKED WELL IN THE PAST AND DESERVES TO CONTINUE ITS WORK IN THE FUTURE WITHOUT UNDUE INFLUENCE FROM OTHERS, INCLUDING THE COLORADO SUPREME COURT.

1

WHILE I AGREE THAT SYSTEMS SHOULD CONTINUALLY BE REVIEWED, AND REFORMED, WHEN NECESSARY, I WOULD STRONGLY SUBMIT THAT IT IS JUST AS IMPORTANT TO RELY ON THOSE PROCESSES THAT HAVE SERVED US WELL IN THE PAST.

IN PARTICULAR, I WOULD POINT TO THE SINGLE MOST IMPORTANT PRINCIPLE THAT HAS PROVIDED THE GUIDING LIGHT FOR THE UNITED STATES JUDICIAL SYSTEM SINCE ITS INCEPTION...A DEEP AND ABIDING COMMITMENT TO AND BELIEF IN THE RULE OF LAW WHICH HOLDS THAT NO PERSON OR ENTITY IS ABOVE THE LAW. IT IS THAT PRINCIPLE THAT GUIDES EVERY JUDGE EVERY SINGLE DAY IN THE EXERCISE OF THEIR JUDICIAL RESPONSIBLITIES.

IT IS MY BELIEF THAT THE BOATRIGHT COURT LOST ITS WAY CONCERNING THIS SAD AND EMBARRASSING MOMENT IN THE HISTORY OF THE COLORADO SUPREME COURT WHEN IT DISREGARDED AND DISRESPECTED LONG ESTABLISHED PRINCIPLES, RULES, PROCESSES AND ETHICAL CONSIDERATIONS THAT JUDGES TAKE AN OATH TO OBEY.

AS THE INTERIM COMMITTEE IS WELL AWARE, THE JUDICIAL COMMISSION HAS JURISDICTION OVER ALL COLORADO STATE JUDGES, INCLUDING THE COLORADO SUPREME COURT. GROUNDS FOR JUDICIAL DISCIPLINE ARE FOUND IN RULE 5 OF THE COLORADO RULES OF JUDICIAL DISCIPLINE.

IT IS NECESSARY TO IDENTIFY SPECIFIC INSTANCES WHEN THE SUPREME COURT CHOSE TO CIRCLE THE WAGONS TO PROTECT THE FEW RATHER THAN TO COMPLY WITH ESTABISHED PROTOCOL TO ILLUSTRATE THE CONTEMPT IT HAD FOR ITS OWN PROCESSES.

FUNDAMENTAL TO THE AMERICAN COMMITMENT TO THE RULE OF LAW IS THAT CASES BE DECIDED BY NEUTRAL DECISION-MAKERS, THE JUDGE AND JURY. ALL CONFIDENCE IN THE SYSTEM IS LOST IF THE PUBLIC BELIEVES AN OUTCOME HAS BEEN DETERMINED PRIOR TO THE COMMENCEMENT OF THE CASE. SIMILARLY, ALL CONFIDENCE WOULD BE LOST IF THE PUBLIC BELIEVES THE GUILT OR INNOCENCE OF AN INDIVIDUAL IS DETERMINED BEFORE THE PRESENTATION OF EVIDENCE. THE SAME RESULT OCCURS IF THE COURT DETERMINES THE CREDIBILITY OF WITNESSES PRIOR TO TRIAL. THAT IS WHAT THE BOATRIGHT COURT DID HERE.

2

AS EARLY AS FEBRUARY 4, 2021, CHIEF JUSTICE BOATRIGHT ISSUED A STATEMENT CONCERNING AN ARTICLE THAT APPEARED IN THE DENVER POST ON FEBRUARY 3, 2021, DENYING THE CENTRAL FACTUAL ALLEGATION THAT CHIEF JUSTICE COATS AND HIS COUNSEL, ANDREW ROTTMAN, WHOM HE DESCRIBED AS "BOTH DEDICATED PUBLIC SERVANTS" WOULD EVER AUTHORIZE COURT RESOURCES TO SILENCE A BLACKMAILER. CHIEF JUSTICE BOATRIGHT WENT ON TO BACK COATS AND ROTTMAN WITH THE WEIGHT OF THE CREDIBILITY OF THE ENTIRE SUPREME COURT BY DECLARING THAT ANY STATEMENT TO THE CONTRARY WAS "SIMPLY FALSE." ALL OF THIS BEFORE ANY INVESTIGATION OR TRIAL.

AT THE OUTSET, THE COLORADO CONSTITUTION DIRECTS THAT ANY ALLEGATION OF JUDICIAL MISCONDUCT SHOULD HAVE BEEN REFERRED TO THE JUDICIAL DISCIPLINE COMMISSION BUT BOATRIGHT FAILED TO DO SO AND, INSTEAD, DECLARED THE OUTCOME PRIOR TO THE ONSET OF AN INVESTIGATION.

SECONDLY, BOATRIGHT IGNORED RULE 2.10 OF THE COLORADO CODE OF JUDICIAL CONDUCT WHICH PROHIBITS ISSUING JUDICIAL STATEMENTS ON PENDING OR IMPENDING CASES OR ISSUES THAT MIGHT COME BEFORE THE COURT. MIND YOU, THESE COMMENTS WERE MADE PRIOR TO THE AWARDING OF THE TROYER CONTRACT. BOATRIGHT VIOLATED RULE 2.11(A)(4) BY REACHING A CONCLUSION ON THE ISSUE BEFORE THE RECEIPT OF ANY EVIDENCE.

AGAIN, PLEASE KEEP IN MIND THAT IT WAS DISTINCTLY POSSIBLE THE SUPREME COURT MIGHT BE CALLED UPON TO REVIEW THE MATTERS WHETHER IN A CIVIL SETTING, THROUGH A REFERRAL TO THE JUDICIAL COMMISSION OR A CRIMINAL PROCEEDING AGAINST CERTAIN OF THE PRINCIPALS INVOLVED IN THE INVESTIGATION.

YET, IT APPEARS THE COURT HAD LITTLE OR NO CONCERN COMMENTING ON INFORMATION THAT WAS BEING PROVIDED TO IT IN AN EX PARTE FASHION CONTRARY TO RULE 2.9 OF THE CODE. BOATRIGHT REAFFIRMED THIS STANDARD OF BEHAVIOR ON FEBRUARY 16, 2021, WHEN HE ANNOUNCED HE WOULD BE BRIEFED ON A WEEKLY BASIS ON ALL "MISCONDUCT COMPLAINTS ACROSS THE DEPARTMENT TO ENSURE EACH INCIDENT IS FULLY INVESTIGATED AND ACTED ON AS APPROPRIATE WITHOUT DELAY." PRESUMABLY, HE WAS ALSO REFERRING TO COMPLAINTS OF JUDICIAL MISCONDUCT THAT SHOULD RIGHTFULLY BE

3

REFERRED DIRECTLY TO THE JUDICIAL COMMISSION, AND, UNDER THE PRESENT SYSTEM, MIGHT BE SUBJECT TO REVIEW BY THE SUPREME COURT. DOES THIS PROCESS SEEM FAIR TO THE PERSON OR PERSONS BEING INVESTIGATED? I TRUST THE ANSWER IS NO.

SUCH A PROCESS WOULD LIKELY REQUIRE JUSTICE BOATRIGHT AND ANY OTHER JUSTICE WHO MIGHT BE PRIVY TO THE INFORMATION TO DISQUALIFY HIMSELF OR HERSELF PURSUANT TO RULE 2.11(A) BECAUSE THE JUDGE WOULD HAVE PERSONAL KNOWLEDGE OF FACTS IN DISPUTE IN THE PROCEEDING. YET, ANOTHER SOLID REASON WHY ANY JUDICIAL MISCONDUCT CONCERNS SHOULD BE REFERRED TO THE JUDICIAL COMMISSION AS REQUIRED.

BOATRIGHT'S DECISION TO COMMENT ON THE VERACITY OF CERTAIN WITNESSES AND/OR PARTICIPANTS COMPROMISED ANY INVESTIGATION AND/OR PROCEEDING THAT MIGHT ENSUE. HE DESCRIBED CERTAIN INDIVIDUALS AS "DEDICATED PUBLIC SERVANTS" AND THAT THE JUSTICES HAD "FULL CONFIDENCE" IN A NAMED JUDGE ALLEGED TO HAVE COMMITTED ACTS OF JUDICIAL MISCONDUCT.

ON WHAT DID THE CHIEF JUSTICE AND OTHER JUSTICES BASE THEIR CONCLUSIONS? HAD THEY CONDUCTED THEIR OWN INVESTIGATION CONTRARY TO COMMISSION RULES? DID THEY BASE THEIR CONCLUSIONS ON EX PARTE COMMUNICATIONS? WERE THEY SENDING A SUBTLE MESSAGE TO THOSE WHO MIGHT DISAGREE WITH THE COURT THAT THEIR OBSERVATIONS WOULD NOT RECEIVE THE SAME CONSIDERATION AS THOSE WHO APPEARED TO BE IN LOCK STEP WITH THE SUPREME COURT? WHATEVER THE PERCEPTION, IT WAS CLEAR THAT CERTAIN DECISIONS HAD ALREADY BEEN MADE BY THE COURT IN DETEMINING TO HIRE PRIVATE COUNSEL TO CONDUCT AN "INDEPENDENT" INVESTIGATION TO "CLEAR THOSE WRONGLY ACCUSED."

ONE ASPECT OF THE TROYER REPORT THAT RINGS TRUE IS THE DISCONNECT BETWEEN THE SUPREME COURT AND THE ACTUAL OPERATION OF THE COURT SYSTEM AND THE MANY DEDICATED EMPLOYEES THAT ASSURE THAT THE COURTS RUN SMOOTHLY. THE NOW INFAMOUS MEMO CLEARLY ILLUSTRATES THAT THE RANK AND FILE BELIEVED THERE WERE TWO SEPARATE TRACKS FOR DISCIPLINE...THOSE FOR HIGHER LEVEL ADMINISTRATORS, THEIR CRONIES AND THE JUDGES AND ANOTHER FOR THOSE LESS SITUATED.

4

ANY REFORM MUST ALSO ADDRESS THE BEHAVIOR OF THOSE AGENCIES WHICH MIGHT BE BEHOLDING TO THE SUPREME COURT. FOR EXAMPLE, THE OFFICE OF ATTORNEY REGULATION AT ONE TIME HELD CERTAIN AUTHORITY OVER THE JUDICIAL COMMISSION. THE OARC HAD AUTHORITY TO DETERMINE THE OFFICE SPACE OF THE COMMISSION AND FUNDING FOR CERTAIN PROJECTS. IN BOTH INSTANCES, THE OARC MADE IT DIFFICULT FOR THE COMMISSION PRESUMABLY SIDING ON BEHALF OF AN EMBATTLED SUPREME COURT. IT IS ALLEGED THAT THE OARC VACILLATED BETWEEN RECUSING ITSELF FROM THE FRAY ONLY TO DECIDE AT A LATER TIME TO REASSERT ITSELF USUALLY TO THE DETRIMENT OF THE JUDICIAL COMMISSION.

IT APPEARS IT MIGHT BE APPROPRIATE TO CODIFY THAT ONCE A RECUSAL IS DECLARED THAT THE RECUSING PARTY MUST WITHDRAW FROM ANY FURTHER INVOLVEMENT IN THE PROCEEDINGS.

ALTHOUGH IT APPEARS THE FUNDING OF THE JUDICIAL COMMISSION HAS BEEN RESOLVED THROUGH RECENT LEGISLATION, IT WOULD BE APPROPRIATE TO PROHIBIT AN ARM OF THE SUPREME COURT FROM ANY SUPERVISORY AUTHORITY OVER THE COMMISSION AS WAS THE CASE WITH THE OARC.

I AM AWARE OF THE RECOMMENDATIONS SUBMITTED BY THE COLORADO COMMISSION TO THE INTERIM COMMITTEE AS WELL AS THE RECOMMENDATIONS IN THE TROYER REPORT.

I AM ACUTELY AWARE THAT REFORM MIGHT REQUIRE AMENDMENTS TO THE COLORADO CONSTITUTION AND THE COMPLEXITY, COST AND PERILS INHERENT IN OFFERING CONNSTITUTIONAL AMENDMENTS BUT BELIEVE CERTAIN RECOMMMENDATIONS ARE ABSOLUTELY NECESSARY.

FIRST AND FOREMOST, THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE MUST BE COMPLETELY FREE FROM INTERFERENCE FROM OUTSIDE SOURCES, INCLUDING THE COLORADO SUPREME COURT.

THE COMMISSION SHOULD BE INDEPENDENTLY FUNDED AND REQUIRED TO FOLLOW ESTABLISHED STANDARDS OF FINANCIAL ACCOUNTABLITY.

THE COMMISSION SHOULD HAVE FULL SUBPOENA POWER WHICH IS GOVERNED BY EXISTING LAW. ANY DISPUTES INVOLVING THE SUBPOENA POWER AND DISCOVERY MATTERS INCLUDED THEREIN SHOULD BE RESOLVED BY AN ENTITY

5

OTHER THAN THE COLORADO SUPREME COURT. IT HAS BEEN SUGGESTED THAT A BODY CONSISTING OF ATTORNEYS, JUDGES, CITIZENS AND OTHER DISCIPLINES MIGHT BE CONSIDERED.

THE COMMISSION HAS PERFORMED ADMIRABLY DESPITE THE ROADBLOCKS IT HAS ENCOUNTERED. THERE NEEDS TO BE A LEVEL OF STABILITY FOR THE COMMISSION TO CARRY OUT ANY REFORM THAT MIGHT BE ADOPTED. CONSISTENT WITH THE RULES SURROUNDING THE APPOINTMENT OF MEMBERS TO THE COMMISSION ON JUDICIAL DISCIPLINE, ALL ELIGIBLE MEMBERS WHO ARE SUBJECT TO REAPPOINTMENT SHOULD BE REAPPOINTED. I AM DISAPPOINTED TO SAY THAT I AM CONCERNED THAT JUDGES PRESENTLY SERVING ON THE COMMISSION MIGHT NOT BE REAPPOINTED BY THE SUPREME COURT BECAUSE OF THE STRENGTH AND COURAGE THEY HAVE EXHIBITED IN ADDRESSING THIS TURMOIL. SUCH REFUSAL TO REAPPOINT WOULD REFLECT POORLY ON THE SUPREME COURT.

THE COMMISSION SHOULD HAVE RULE MAKING AUTHORITY SIMILAR TO THAT ENJOYED BY THE COMMISSION ON JUDICIAL PERFORMANCE.

I HAVE PREVIOUSLY JOINED IN AN OP-ED EXPRESSING VARIOUS CONCERNS ABOUT THE TROYER REPORT AND WILL NOT REPEAT THEM HERE EXCEPT TO ADDRESS ITS CONCLUSION THAT A MAJOR PORTION OF THE REPORT FAULTED THE COLORADO JUDICIARY FOR NOT PROPERLY PREPARING CHIEF JUSTICE COATS FOR THE JOB.

I WAS ASTOUNDED TO HEAR THIS EXCUSE AS IT HAD BEEN MY EXPERIENCE THAT COLORADO, AT THE TIME COATS WAS APPOINTED, ENJOYED AN OUTSTANDING REPUTATION THROUGHOUT THE COUNTRY FOR THE QUALITY OF TRAINING IT PROVIDED ITS JUDGES. COLORADO WAS ONE OF THE FEW STATES THAT ACTUALLY HAD LEADERSHIP TRAINING FOR CHIEF JUDGES WHICH INCLUDED THE CHIEF JUSTICE. IRONICALLY, THE MASIAS CONTRACT WHICH HAS BEEN AT THE CENTER OF THIS MESS WAS A CONTRACT TO PROVIDE LEADERSHIP TRAINING BECAUSE THE TWO OUTSIDE PROFESSIONALS WHO HAD PREVIOUSLY PROVIDED THE TRAINING WERE RETIRING.

I PERSONALLY HAD THE PRIVILEGE OF BEING APPOINTED AND SERVING AS CHIEF JUDGE OF THE TENTH JUDICIAL DISTRICT UNDER THE LEADERSHIP OF CHIEF JUSTICES ANTHONY VOLLACK, MARY MULLARKEY AND MICHAEL BENDER. EACH

6

PROVIDED OUTSTANDING ADMINISTRATIVE AND ETHICAL LEADERSHIP AND WERE PROGRESSIVE IN MOVING THE COLORADO JUDICIARY TO DEEP RESPECT THROUGHOUT THE JUDICIAL COMMUNITY IN THE NATION.

I AM UNAWARE OF ANY CONCERNS THE JUDICIAL DEPARTMENT MIGHT HAVE HAD CONCERNING THE LEADERSHIP ABILITIES OF FORMER CHIEF JUSTICES TO SERVE UNTIL THE REVELATIONS CONTAINED IN THE TROYER REPORT AND ONLY AS THEY IMPLICATED COATS. IT IS JUST ONE OF THE MANY QUESTIONS LEFT UNANSWERED IN THE REPORT. MORE SPECIFIC DETAILS CONCERNING THE SPECIFIC KNOWLEDGE OF THE THEN SERVING JUSTICES OF WHAT THEY KNEW AND WHEN THEY LEARNED IT SHOULD HAVE BEEN ADDRESSED INCLUDING THE SPECIFIC KNOWLEDGE OF EACH INDIVIDUAL JUSTICE.

THANK YOU FOR THIS ENORMOUS UNDERTAKING. WHILE MUCH DAMAGE HAS BEEN DONE TO THE INTEGRITY OF A ONCE PROUD STATE JUDICIAL SYSTEM, I AM CONVINCED THAT THE RESOLVE OF THIS COMMITTEE AND THE DEEP RESPECT OUR STATE HAS FOR THE RULE OF LAW WILL RESTORE IT TO THE STATUS IT DESERVES.

7

# Appendix 27(s)(ii)(9)(l)

# Dennis Maes, Addendum to Testimony, July 12, 2022;

ADDENDUM TO TESTIMONY BY DENNIS MAES ON JULY 12, 2022.

REPRESENTATIVE TERRI CARVER REQUESTED THAT I PROVIDE MY THOUGHTS CONCERNING THE RECOMMENDATIONS CONTAINED IN THE TROYER REPORT IN PARAGRAPH 10, PAGES 61 AND 62, **IMPROVING THE JUDICIAL-OFFICER COMPLAINT PROCESS.** THE FOLLOWING ARE MY SUGGESTIONS:

IT IS NECESSARY TO HAVE AN ADEQUATELY FUNDED STAFF TO ENSURE THAT THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE IS PERFORMING ITS RESPONSIBILITIES PURSUANT TO THE COLORADO CONSTITUTION AND THE RULES GUIDING ITS DELIBERATIONS.

EVERY COMPLAINT/ALLEGATION OF JUDICIAL MISCONDUCT SHALL BE REFERRED DIRECTLY TO THE EXECUTIVE DIRECTOR OF THE JUDICIAL DISCIPLINE COMMISSION.

EVERY COMPLAINT/ALLEGATION OF JUDICIAL MISCONDUCT SHALL BE REVIEWED BY 3 STAFF MEMBERS.

IF AT LEAST 2 STAFF MEMBERS BELIEVE THERE IS "PROBABLE CAUSE" TO BELIEVE JUDICIAL MISCONDUCT HAS OCCURRED BASED ON THE CODE, THE COMPLAINT/ALLEGATION SHALL BE REFERRED TO THE COMMISSION FOR A FORMAL INVESTIGATION. ALL INVESTIGATIONS SHALL BE CONDUCTED AND CONCLUDED WITHIN A REASONABLE TIME BASED ON THE COMPLEXITY OF THE ALLEGATION(S) BEING INVESTIGATED.

IF 2 OR MORE STAFF MEMBERS FIND THAT "PROBABLE CAUSE" DOES NOT EXIST TO BELIEVE JUDICIAL MISCONDUCT HAS OCCURRED, THE COMPLAINT/ALLEGATION SHALL BE DISMISSED WITH AN EXPLANATION WHY IT WAS DISMISSED. THE EXECUTIVE DIRECTOR SHALL BE PROVIDED WITH THE FINDINGS AND DULY DOCUMENT SAID FINDINGS.

THE COMPLAINANT SHALL BE PROVIDED WITH A WRITTEN REPORT CONCERNING THE COMMISSION'S DETERMINATION WITHIN 30 DAYS 0F THE COMMISSION'S FINDINGS. THE REPORT SHALL BE SUBMITTED UNDER THE SIGNATURES OF THE EXECUTIVE DIRECTOR AND THE CHAIR OF THE COMMISSION AND/OR HER/HIS DESIGNEE.

THE EXECUTIVE DIRECTOR OF THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE SHALL MAKE ANNUAL VISITS TO EACH JUDICIAL DISTRICT, THE COLORADO COURT OF APPEALS AND THE COLORADO SUPREME TO PROVIDE AN UPDATE AND/OR OTHER INFORMATION CONCERNING THE OPERATIONS OF THE COMMISSION. MULTI DISTRICT TRAININGS SHOULD BE ENCOURAGED FOR CONVENIENCE AND EFFICIENCY. THE REPORTING SYSTEM SHALL BE A PART OF EVERY EMPLOYEE'S INITIAL TRAINING AND ORIENTATION.

THE JUDICIAL WEBSITE SHALL BE AVAILABLE TO ALL DEPARTMENT PERSONNEL PROVIDING BASIC INFORMATION ON THE JUDICIAL MISCONDUCT COMPLAINT PROCESS. THEWEBSITE SHALL INCLUDE AN OPTION TO FILE AN ANONYMOUS COMPLAINT.

THE ENTIRE JUDICIARY SHALL BE REQUIRED TO ATTEND A TRAINING SESSION BY THE COMMISSION AT THE ANNUAL MEETING OF THE STATE JUDGES.

THE COMMISSION SHALL ATTEMPT TO PROVIDE PUBLIC SERVICE INFORMATION TO THE COLORADO CITIZENRY CONCERNING THE OPERATION OF THE COMMISSION.

THE COMMISSION SHALL ENGAGE THE SERVICES OF A DATA COLLECTING ENTITY TO THOROUGHLY DOCUMENT THE ACTIVITIES OF THE COMMISSION AND PROVIDE AN ANNUAL REPORT TO THE STATE.

SB22-201 SHALL BE STRICTLY ENFORCED.

**Appendix 27(s)(ii)(9)(m)**

**Letter from Steven Vasconcellos to the
Interim Comm. on Jud. Discipline,
July 11, 2022;**

# OFFICE OF THE STATE COURT ADMINISTRATOR



**Steven Vasconcellos**
*State Court Administrator*

**Terri Morrison**
*Judicial Legal Counsel*

**DIRECTORS**

**Brenidy Rice**
*Court Services*

**Marty Galvin**
*Financial Services*

**Amy Burne**
*Human Resources*

**Glenn Tapia**
*Probation Services*

**ACTING DIRECTOR**

**Carrie Mast**
*Information Technology
Services*

July 11, 2022

Members of the Legislative Interim Committee on Judicial Discipline,

Based upon the materials provided to the Interim Committee and the discussions that took place in its first meeting on June 14, 2022, the Judicial Department feels compelled to respond to a number of issues that were raised.

The situation that has developed over the past year and a half is novel and unprecedented. We are working to navigate some very difficult issues in areas that are uncharted. We have done our best to balance many competing interests and proceed deliberately and thoughtfully to minimize unintended consequences and liability to the state. We are all learning as we go through this. I want to make this clear up front – the Judicial Department and the Supreme Court *want* each investigator to have all the information and resources necessary to do their job.

While a back and forth between the Department and the Judicial Discipline Commission is something that we have tried to avoid, we must respond to some of the comments from the Commission and statements in the report it provided to the Interim Committee on June 14. Many of the Commission's statements about recent events are missing important background and context and are not consistent with the Department's understanding of events. Up to now, the Department has viewed these matters as confidential under the Constitution and related state law and has felt unable to respond. The Commission clearly interprets the law differently, and it is now a disservice to the Department, the supreme court, the bar, and the public to not address some of the Commission's statements. We will not comment on the nature or substance of any investigation, but we feel obligated to provide procedural details to inform this Committee's work. We have worked to develop and improve the Department's relationship with the Commission over the past few months. My intent in providing these responses is not to attack the Commission or say who is right or wrong in these matters. However, to the extent that the Interim Committee is identifying problems in the system that need to be fixed, it is important to present additional context and explanation.

**Subpoena and Document Production**

Not surprisingly, the investigations related to the public accusations of misconduct involve requests for privileged and confidential information of the Judicial Department. Depending on the investigation, this may include information that is confidential pursuant to federal law, state law, and the Department's binding legal agreements, and can include privileged discussions with internal and external legal counsel. In the course of producing documents

for the various investigations, the Department has two basic options. First, the Department can produce documents without regard to whether doing so violates the law or a contract, or waives a privilege, thus potentially subjecting the state to financial liability.  Alternatively, the Department can work with the investigators to produce the same documents in a manner that renders the documents protected, thus minimizing potential liability to the state.  We have chosen the latter.

Perhaps there is some fair criticism that I and the supreme court have cared too much about compliance with the law and protection of privileges.  However, in my view, if the Department can provide the same information to investigators and at the same time protect the state, that is the right decision.  Through the course of the various investigations, the Department has developed an understanding that two things allow the Department to provide external investigators with access to privileged and confidential information while minimizing potential liability for the state: 1) a subpoena, and 2) an agreement under Colorado Rule of Evidence ("C.R.E.") 502 or its federal counterpart, which we have called an Access Agreement or Access and Confidentiality Agreement.  The need for a subpoena stems from prior agreements of the Department that do not permit disclosure of information to any third party "absent a valid subpoena or court order."  With a subpoena, that information can be shared more freely while minimizing liability to the state.  Similarly, C.R.E. 502 allows, in some circumstances, attorney-client privileged information to be shared among governmental agencies without waiving the protections of the privilege. An agreement under C.R.E. 502 memorializes the parties' understanding of how privileged and confidential information will be treated in the investigation process. The basic provisions of the Department's C.R.E. 502 agreements are:

- A recitation of the purpose and scope of the investigation;
- A recognition by the parties that the Department is producing privileged and confidential information;
- A commitment by the parties to treat the information as privileged and confidential;
- A process for the Department to assert its privileges in subsequent proceedings; and
- A process to resolve disputes arising under the agreement.

Although C.R.E. 502 agreements can take different forms, it requires more than just a promise or requirement of confidentiality for the entity receiving the privileged information.  The provisions of an agreement look slightly different for the different investigations, and the Department has been open to negotiating the provisions of the agreement to address individual concerns of the investigators.

Here is how that has played out with the other external investigations.

For the investigation by the external investigators hired by the Office of Attorney Regulation Counsel, the Department requested a subpoena and worked with the investigators to enter into a C.R.E. 502 agreement that was acceptable to both parties. The investigators then received the Department's confidential and internally privileged documents that were responsive to their subpoena.

For the investigation by the F.B.I., the Department again requested a subpoena and worked with investigators to enter into a C.R.E. 502 agreement that acceptable to both parties.  The F.B.I. and U.S. Department of Justice very quickly acknowledged the Department's concerns.  In the span of just a few brief conversations, the agreement was finalized and document production began immediately.

For the investigation by the Denver District Attorney's Office arising out of the State Auditor's Fraud Hotline Investigation, the State Auditor provided the D.A. with a report that had attorney-client

2

privileged information redacted. When we were contacted by the D.A.'s investigator, we responded the same day, explaining both the redactions and proposing a process for the D.A.'s office to obtain an unredacted report and all relevant documents.  Our attorneys drafted a C.R.E. 502 agreement that same day and the D.A.'s office indicated they understood the need for and purpose of the agreement.  The next day, the D.A.'s office notified us that they had decided not to pursue the case.  We remained ready and willing to work with the D.A. to provide complete information.  I will discuss the Office of the State Auditor's ("OSA's") investigation separately and in more detail below.

In contrast to the above, discussions with the Judicial Discipline Commission have been more challenging.  Last summer, the Department produced a large number of documents to the Commission and identified some documents that could be produced only with a subpoena.  To protect the state from financial liability in the form of a lawsuit from former employees and to honor the Department's preexisting agreements, in June 2021 we asked the Commission to issue a subpoena for those records we could not immediately produce.  As the Commission stated, we invited a subpoena. Similarly, in August 2021, we proposed that the Department and the Commission enter into an Access and Confidentiality Agreement so that the Department could produce privileged and confidential records. We made it clear at that point that an access agreement could not circumvent the agreements to which the Department is bound, so some records may still require a subpoena. We urged the Commission to speak with the Attorney General's Office if it needed assistance in drafting a subpoena.  I do not know whether that discussion occurred, but the Commission did not respond initially to the Department's suggestion of an Access and Confidentiality Agreement.  Throughout this process, the Department asked that the Commission work cooperatively to address legal concerns so that the requested documents and information could be shared thoughtfully and responsibly.

In November  2021, the Department proactively sent the Commission a proposed C.R.E. 502 agreement so that it could provide privileged records to the Commission.  The Department made clear that it was open to discussing any of the Commission's concerns with the proposed agreement.  Without first receiving a response to the draft agreement, the Department received a subpoena from the Commission in January 2022.  The Department immediately accepted and waived service of the subpoena, began discussions with the Commission's counsel regarding the manner and timing of production, and sought clarification of date ranges for the subpoena requests.  At the same time, the Commission and the Department *agreed* that the production of any privileged documents under the subpoena would be stayed pending the approval and signing of a C.R.E. 502 agreement.  The Department received a response to its November draft C.R.E. 502 in February 2022.

Within two weeks of receiving a subpoena, the Department produced nearly 1,600 records  and continued to supplement the production of documents through May.  These records are in addition to the numerous records produced in 2021 prior to any subpoena.  The Department also had queued up many hundreds more records that could be immediately produced upon execution of a C.R.E. 502 agreement.

The Department tried numerous times, and through numerous channels, to develop a C.R.E. 502 agreement acceptable to the Commission. We exchanged around 10 different drafts of a C.R.E. 502 agreement with the Commission between November 2021 and June 2022, sometimes through counsel and at other times directly between the Chief Justice and the Commission's Executive Director.

3

Throughout these discussions, the Department emphasized the critical components of the agreement, which are reflected in S.B. 201's requirements for a C.R.E. 502 agreement.

On June 29, the Department and the Commission signed an acceptable C.R.E. 502 agreement, and the Department immediately produced over 1300 additional records. The Department is now producing additional documents requested by the Commission.  Just as it has always done, the Department will continue to honor its obligations to provide the Commission with information relevant to its evaluations of potential judicial misconduct.

Contrary to the Commission's Report and testimony, the Department is not aware of any discussion or communication in which the Department questioned or challenged the Commission's subpoena authority or indicated it would not comply with a subpoena.  I'm perplexed by the Commission's statement to this Committee on June 14 that the Department did not "feel the need to comply with the subpoena."  This statement and the resulting media reports clearly left the Committee and the public with the impression that the Department directly ignored a subpoena from the Commission.  Arguably, that's not what the Commission stated, but the media reports that the Department ignored a subpoena are wholly inaccurate, as indicated above.   If the Commission believes more clarification is necessary in the Rules regarding its subpoena authority and an enforcement mechanism, the Court is more than willing to discuss those topics directly with the Commission.


**Funding**

S.B. 22-201 thankfully provides independent funding for the Commission.  We have supported this idea since late last year and fully agree it is appropriate for the Commission to manage its own budget independent of the Judicial Department.

Last summer, the Commission raised concerns about resources.  Chief Justice Boatright offered the Department's assistance in resolving questions about resources, and I met personally with the executive director of the Commission in August of 2021 to discuss the resource needs of the Commission.  At that time, I was told that the Commission had the resources it needed and did not need the Department's assistance.  Subsequently, the Commission decided to enter into a contract with a private law firm to serve as special counsel.  Without delving too deeply into details regarding the funding for special counsel, what I will say is that the Office of Attorney Regulation Counsel's ("OARC") concerns raised with the Commission's hiring of special counsel had nothing to do with an intent to interfere with or impede an investigation.  OARC harbored legitimate concerns with the Commission's failure to follow defensible procurement processes and the Commission obligating an unknown (and unbudgeted) amount of attorney registration fee revenue at hourly rates nearly double the reduced government rates typically used, without any cap or other cost containment measures.  OARC's concerns were borne solely from its fiduciary obligation over attorney registration fees, not any intent to control the Commission's investigation.  Indeed, it would make no sense for OARC, which had commissioned its own independent investigation into the same public allegations of misconduct (and which is being paid from the same pool of attorney registration fee revenue), to impede the Commission's investigation. Earlier this spring, the Department and the Commission agreed on interim funding for the remainder of FY 22 and delegated fiscal oversight to the Executive Director of the Commission over expenditures of special counsel, with the OSA having ultimate oversight over these Commission expenditures.

4

The Commission has asserted that the Department limited or attempted to limit the scope of special counsel assignments.  Again, this is not accurate.  OARC, which has a fiduciary obligation over attorney registration funds, raised concerns that the scope of engagement with the Commission's special counsel extended to undefined recommendations for process improvements.  This undefined and unlimited engagement exceeded the purpose of special counsel in Commission investigations and created the potential for a conflict of interest in special counsel's recommendations.  None of these discussions implicated the scope of an investigation.

In light of the untenable position the Court was in related to approving Commission's expenditures on special counsel, the Department, through the Chief Justice, reached out to the Commission and expressed support for independent funding through the legislature.  In the SMART hearing in January, we emphasized the need for the Commission to have its own funding.  We have continued to fully support independent funding, and I appreciate the funding created by S.B. 22-201.

### The 2010 Memorandum of Understanding ("MOU")

In 2010, the Commission and the SCAO's Human Resources Division entered into a MOU that provided for the Department to conduct investigations and to refer judicial misconduct to the Commission.  The 2010 MOU requires the HR Division of the SCAO to provide the Commission the HR Division's "investigatory notes and findings" related to the alleged misconduct. The documents requested by the Commission go well beyond what is contemplated in the 2010 MOU, and we are aware of no other investigations by the Commission that have requested information subject to privilege or confidentiality concerns (whether statutory or contractual). That is why we have asked to work with the Commission on a subpoena and C.R.E. 502 agreement.  In every other investigation by the Commission, these steps have simply not been necessary. So in that sense, this investigation has proceeded differently than others.

### The Role of the Supreme Court in Judicial Discipline Proceedings

A number of statements in the last hearing overstated the Supreme Court's current role in judicial discipline proceedings.  For all but a very few complaints, the Court never sees them or knows anything about them.  The Commission, comprised of a majority of non-judges, evaluates the complaint and decides whether action on the complaint is warranted.  The Court has no role in this evaluation process. Only if the Commission itself determines to institute formal proceedings and requests the appointment of special masters does the Court, through the Chief Justice, become involved.  The Chief Justice alone selects three conflict-free judges to serve as special masters in the case.  The Chief has only very limited information about the allegations and the subject judge.  The special masters then hold a hearing, similar to a trial, and make a recommendation to the Commission itself.  The Commission then decides whether to follow that recommendation, make a different recommendation, or dismiss the complaint. Again, the Supreme Court has no involvement in these decisions.  It is only when the Commission recommends formal, public discipline, or when the Commission recommends a temporary suspension pending an investigation, that pleadings are filed with the court.  The vast majority of disciplinary proceedings never make it to this stage.  And the court is not aware of any public discipline recommended by the Commission that the Court rejected as being too harsh.

5

More specifically, in the last interim committee hearing, the Commission stated that the Supreme Court is briefed often on the proceedings pending before the Commission. That is inaccurate. In Chief Justice Boatright's State of the Judiciary Address, he stated that he had requested all allegations of harassment or discrimination to be brought to his attention. This statement was made to assure the Department and the public that allegations would be taken seriously and properly handled or referred. When a complaint involves a judicial officer, the Chief Justice is briefed on the situation, the HR response, and whether the proper referrals have been made. After a matter is referred to the Commission, the Chief Justice has no more information or control over the disciplinary proceedings and does not brief the full Supreme Court on these matters. The rest of the Court learns of these allegations only if a recommendation from the Commission for public discipline or request for temporary suspension is filed with the Court.

**Supreme Court Recusal**

The Supreme Court believes that its recusal obligations under the Code of Judicial Conduct applies in judicial discipline proceedings and understands that one or more of the justices may need to recuse in any given case. The Court has acknowledged its recusal obligation to the Commission on multiple occasions and on June 28 proposed a rule amendment to the Commission to address this issue now. The Commission asked for more time to respond to the proposed rule chance; to accommodate the Commission's request, the Court has delayed publication of the proposed rule.

**OSA Fraud Hotline Investigation**

In the previous Interim Committee hearing, questions were raised about the timeline for the OSA's Fraud Hotline Investigation. The Committee's questioning suggested that the Department delayed the investigation so that the statute of limitations would run on any potential criminal charges arising from the investigation. I can say unequivocally that is false. At the start of the investigation, the OSA and the Department agreed that the OSA would conduct onsite review of privileged documents and not retain custody of them. We worked with the AG's office to establish multiple workstations for onsite review and accommodated the OSA's schedule for reviewing documents. Onsite review was proceeding until the COVID-19 pandemic began, at which point onsite review became much more difficult, but we worked with the OSA to provide an isolated workstation for onsite review. When Chief Justice Boatright took over as Chief Justice, he agreed with the previous State Auditor to hold weekly status meetings to move the investigation along as quickly as possible. Through those discussions, we prioritized document production, modified how the OSA could access privileged documents offsite, and responded promptly to any request from the State Auditor or her staff.

There was never any discussion between the Department and the OSA about what potential charges might be brought, any statute of limitations, or when a referral to law enforcement should be made. The Department was not even aware of which law enforcement agency the matter would be referred to. Prior to the referral to law enforcement, the Department was provided an opportunity by the OSA to propose redactions of privileged information as well as information protected by federal law that was not part of the law enforcement referral. My understanding was that once the matter was referred, we would be able to quickly enter into a C.R.E. 502 agreement with the law enforcement agency receiving the referral and provide all requested information. As stated above, when we were contacted by the

6

Denver District Attorney's Office, we responded immediately and provided a quick path for the D.A. to receive complete information.

In the category of "lessons learned," I will note that the process the Department and the OSA agreed to at the start the Fraud Hotline Investigation turned out to be clunky and largely unworkable.  During the early stages of the investigation, we engaged with the legislature, identified the privilege concerns, and spoke of the need for a statutory fix that would allow full production of privileged information without the risk of waiving privilege.  Our understanding is that those discussions progressed at the legislature when we raised this issue years ago, but work on a statutory fix was later abandoned.

Even with this context and explanation, I have no doubt the Department and OSA would handle the investigation, production, and review issues quite differently if they were presented today.


**Commission Recommendations**

Aside from the Commission's characterization of events, the Department believes that the Commission's recommendations to the Interim Committee are important and should be thoroughly discussed.  The Commission's recommendations are in bullet points and the Department's initial thoughts follow.


- **Subpoena Authority: Codify subpoena authority for the Discipline Commission to investigate judicial misconduct allegations akin to other investigative bodies and grand juries.**


Department Response: The Department supports the Commission's subpoena authority and, as stated above, has not challenged the Commission's authority to issue subpoenas. If subpoena authority is codified, the legislation should also clarify the forum for dispute resolution so as to preserve due process for any subpoena disputes or issues.  If the Commission has specific suggestions for a rule change related to a subpoena that could become effective more quickly than legislation, the Court is certainly open to them.


- **Disclosure/Discovery Enforcement Mechanism: Codify a conflict free mechanism for addressing disputes with the Colorado Judiciary over claims of privilege or confidentiality as well as compliance with the statutory duties to document and disclose complaints of judicial misconduct.**


Department Response: The Department supports an independent dispute resolution mechanism that provides due process.


- **Rulemaking Authority: Grant the Discipline Commission rulemaking authority over judicial discipline on the model of the Colorado Commissions on Judicial Performance**.


7

Department Response: In reviewing the rules for Judicial Discipline in other states, the rules are remarkably similar regardless of which entity holds rulemaking authority.  The Department is in the process of reaching out to other states with varying rulemaking authorities to understand the benefits and detriments of moving rulemaking authority away from the Supreme Court. The Department does not have a position on this recommendation at this point.

> **• Special Masters: By rule or statute, create a continuing pool of judges that are qualified to act as special masters in judicial discipline matters to foster institutional expertise.**

Department Response: The Department is concerned that a pool of special masters will be too small to handle the workload involved in these cases, which is on top of the judges' other responsibilities.  The Department sees value in maintaining the ability to ensure geographic, gender, and racial diversity depending on the nature of the proceeding.  The Department further sees merit in ensuring that the judges serving as special masters are familiar with the work of the judge being investigated.  For example, an appellate judge may not be the best choice for evaluating the conduct of a part-time rural county court judge.  The considerations at play for selecting special masters lend themselves to a broader pool of judges who can effectively and impartially evaluate the case.  The Department is open to more discussions about the issue attempting to be addressed with this recommendation.

> **• Commission Member Terms: Extend the current four year terms of Commission members to provide greater subject matter expertise and greater insulation for political influence. For similar reasons, District Court Judges serve six year terms and appellate judges serve ten year terms.**

Department Response: Commission members can already serve for a period of eight years on the Commission.  These are volunteer assignments, and it can be difficult to convince potential appointees to commit to longer terms.  It is unclear whether the Commission is seeking to extend the terms of the current Commissioners through this proposal.  The Department does not understand the basis for concerns about the current term length, but it is open to further discussions on this issue.

> **• Conflict Free Final Decision Makers: Maintain the current two-tier judicial discipline system but change the final decision-maker to a conflict free, multi-perspective, citizen involved entity with representatives from the bench, bar, and citizenry. Address appointment power and term lengths to assure insulation from undue influences.**

8

Department Response: The Department and the supreme court are mindful that conflicts can and will arise with special masters or with the supreme court itself.  It recently submitted a proposal to the Commission for a rule change that would address conflicts of the supreme court.   The Department believes strongly that judges are an integral voice in the disciplinary process and are trained to act impartially and objectively in applying facts to the law and ensuring appropriate burdens are met and legal standards are clearly applied.  The Department agrees that the final decision-making body should be free of real or perceived conflicts.  However, the Department believes further discussion is necessary about the appropriate final decisionmaker and has concerns if constitutional violations by a new decision-making entity would need to be resolved by additional proceedings in the supreme court.  Any changes to the system must include appropriate checks and balances

> **• Disqualification Standards: Codify clear, uniform, and consistent disqualification standards for all decision-makers involved in judicial discipline. Apply same standards that have been previously established for judge disqualification and define meaning of disqualification.**

Department Response: The standards in the Code of Judicial Conduct already apply equally in judicial discipline matters, whether a judge is serving as a special master or a judge.  A conflicted judge has a duty and obligation to disqualify in a matter.  If the disqualification rules need to be clarified to explicitly state that the Code of Judicial Conduct applies in judicial discipline proceedings, the court and Department are open to that.

> **• Transparency: Evaluate the policy considerations and determine whether the border between confidentiality and transparency in Colorado's judicial discipline system should be altered.**

Department Response: This decision involves significant policy decisions that have to be made thoughtfully to balance accountability, transparency, and to ensure that the discipline process is not used as a political or retaliatory tool.    The Department is open to discussions about how to make the current process more transparent, the various points in the process where transparency can be increased, and the information that is shared between judicial oversight entities.

> **• Funding: Evaluate the viability of funding the judicial discipline system through a source that is insulated from politics and variations in the economy consistent with the model used for the Colorado Commissions on Judicial Performance.**

Department Response: There is no funding source that is insulated completely from an economic downturn or the checks and balances experienced by any state agency.  The Department supports fully independent funding for the Commission, with no ties to the Department, as with any other agency of

9

the state.  The Department does not have a position on where this funding should come from, other than that if it comes from the Department's budget in any way, it will renew arguments that the Commission is dependent on the Department for its operations.

Sincerely,

Steven Vasconcellos
State Court Administrator

10

# Appendix 27(s)(iii)

# Hearing record for *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., August 10, 2022:

# Appendix 27(s)(iii)(1)

# Introduction;

# Legislative Interim Committee on Judicial Discipline— August 10, 2022 Hearing: Introduction

**Rep. Weissman**

The Legislative Interim Committee, pursuant to Senate Bill 201, concerning judicial discipline, will come to order. Ms Jenson, if you would kindly call the roll.

**Juliann Jenson**

Representatives and Senators. Bacon.

**Rep. Weissman**

Excused.

**Juliann Jenson**

Gardner.

**Sen. Gardner**

Here.

**Juliann Jenson**

Gonzales.

**Sen. Gonzales**

Present.

**Juliann Jenson**

Lynch.

**Rep. Lynch**

Here.

**Juliann Jenson**

Moreno.

**Sen. Moreno**

Here.

**Juliann Jenson**

Van Winkle.

- 1 -

**Sen. Van Winkle**

Here.

**Juliann Jenson**

Carver.

**Rep. Carver**

Here.

**Juliann Jenson**

Mr. Chair.

**Rep. Weissman**

Here.

**Rep. Weissman**

All right. Quorum is present. Members and those present and listening online. We have a robust agenda in front of us today for anybody listening online that is posted to the website for you to review. If you haven't already had a chance to see that. We have invited a number of folks to speak with us today on a variety of matters pertinent to the charge of the committee, and out of respect for their time, I'll do my best with the assistance of the Vice Chair to keep us on schedule. And then we'll have some logistical updates for next steps near the bottom of our agenda. The record can note we are joined by Rep. Bacon. To the first point on the agenda, concerning introductory statements, the only thing I wanted to say was just to remind everybody that we are in meeting three of the five that we are authorized for. This is our last sort of wide-open meeting, at which we'll be hearing a variety of perspectives as we are today. One week from today, is a meeting where we have to vote to approve concepts to be drafted, and then we have the time between 8/17 and 9/30 to work on those and 9/30 is when we have to send things forward to Leg Council for final review prior to the commencement of the 23 regular session. As a reminder, we are approved for three measures, bills or concurrent resolutions. Thus, we are allowed to draft not more than six that multiple of two is to cause us to contain our ambition. And to be fair to our nonpartisan staff, who have a lot of drafting work in the summer, sometimes. Senator Van Winkle, I know that you have another committee also meeting today. Sometimes unavoidable, if you wanted to just say anything briefly about that.

**Sen. Van Winkle**

Thank you, Mr. Chair, and just for the listening audience, I maybe in and out, at least during the morning session. It's not that I'm being lazy. I'm deploying double duty in the Capitol today.

- 2 -

- 3 -

**Rep. Weissman**

Thank you. So, with that, I'll just see if the Vice Chair wanted to add anything by introductory way before we commence?

**Rep. Carver**

No, Mr. Chair, you covered it.

**Rep. Weissman**

All right. Thank you. Okay. With that, the first item on our agenda is to hear from Professor Geyh with Indiana University, who will provide kind of a comparative perspective on things. We appreciate the work of the Vice Chair in reaching out and others in reaching out to line up this presentation. Give it a sec for the Professor to get connected.

**Rep. Weissman**

All right, members, Ms. Jenson is trying to contact the Professor. In the interest of keeping us moving, we may have to proceed a little bit out of order. We'll see if we can raise the Professor, and maybe come back to that segment of our agenda. I think, since they are here waiting for us, we will go right to the 10:15, segment, which is to hear from the Institute for the Advancement of the American Legal System, or IAALS. Ms. Kauffman, Justice Kourlis, if you'd like to join us up front.

# Appendix 27(s)(iii)(2)

# Presentation by Professor Charles Geyh;

# Legislative Interim Committee on Judicial Discipline—
## August 10, 2022 Hearing: Testimony of Professor Charles Geyh

**Rep. Weissman**

Please reserve some time at the end, I imagine members will have questions for you. Please go ahead.

**Charles Geyh**

Okay, sure, and I'm sorry to get in the way of, was that Becky Kourlis who was there ahead of me? Her organization is terrific, and I pay a lot of attention to what they have to say. My name is Charlie Geyh. I'm on the faculty of the law school at the Indiana University, Mauer School of Law, my work on judicial ethics and discipline began in the late 1980s when I served as counsel to the House Judiciary Committee and then continued in my role as consultant to the National Commission on Judicial Discipline and Removal, then special counsel to the impeachment and removal of a Pennsylvania Supreme Court Justice, an expert witness at the Senate impeachment trial of a federal district judge, reporter to the American Bar Association Commission that promulgated the 2007 Model Code of Judicial Conduct, which Colorado has adopted, and the author of the treatise *Judicial Conduct and Ethics*, which is widely used by judicial conduct commissions as a desk reference. Now, I am reminded of New Jersey Chief Justice Arthur Vanderbilt, who once wrote that judicial reform is no sport for the short-winded and sitting through days of testimony to the end of improving Colorado system of judicial discipline requires an abiding commitment to the administration of justice, an open mind, and an iron butt. And I salute you for all of those now. Cindy Gray, who chatted with you folks before, supplied this committee with some detailed information concerning systems of discipline employed by different states, and I take her information to the bank. Her *Judicial Conduct Reporter* is extraordinary and is a primary resource for my colleagues and I when we were writing our treatise on *Judicial Conduct and Ethics*. My role in distinction to Cindy's is just to step back and supply a framework within which to situate the details that Cindy supplied.

And, so, I want to sort of do a quick, sort of three-minute dog and pony show, sort of setting the stage for where Colorado finds itself. 100 years ago, judicial misconduct was regulated informally, if at all. There were literally no codes of judicial conduct. There were no disciplinary processes. Impeachment was and remains a more or less dead letter because of the difficulties associated with ginning up the mechanism. And while elections were out there and available, they really were only suited to addressing misconduct that rose to the level of highly publicized scandal. And then, of all things, what made things change was the 1919 World Series, when the Chicago White Sox, known colloquially as the Black Sox, threw the World Series. Major League Baseball, got thrown into a crisis and decided what we need is a Commissioner of Baseball. And they decided to select the guy with the best name in the history of judges, Kennesaw Mountain Landis, who was not only a federal district judge, but happened also to be a minor league ball player in his youth. And, so, all good, except that the salary they were proposing to pay him as Commissioner was $45,000. His salary as a full-time federal judge was $5,000 and from

- 1 -

Landis's perspective, the combined total yielded a nice round figure of 50,000. And, so, he decided that he would retain his job as a full-time judge whilst moonlighting as Commissioner of Baseball, which didn't sit well with Congress. And, so, they ginned up the impeachment mechanism and investigated and really struggled to come to a resolution, because what they discovered was, yeah, it's bad behavior, but it really doesn't rise to the level of an impeachable crime. And, so, really what we need is something else, something besides impeachment, to deal with problems like this. And, so, they tapped Chief Justice William Howard Taft to chair a commission that the ABA created, that developed the Canons of Judicial Ethics that were promulgated in 1924. Now, the good news is that most state supreme courts adopted those. But the problem is that they were bound for obscurity, because they were advisory only. They were basically there to appeal to the hearts and minds of individual judges, things for them to keep in mind and were otherwise, toothless. And, so, they puttered along for decades, and were occasionally referenced in case law, but otherwise ignored.

And then, you know, things start changing in 1960 when California establishes the first judicial conduct commission. And then later, in the 60s, all hell starts to break loose. Justice Fortas, Justice Douglas, and Chief Justice Warren were all called the task for alleged ethical lapses. And in the Supreme Court nomination proceedings of Judge Clement Haynsworth, he was rejected in part over presiding in cases involving conflicts of interest. And, so, with this newfound sort of concern in place, in 1972 the ABA went back to the chalkboard and promulgated the first Model Code of Judicial Conduct. That was formulated for the express purpose of creating standards of conduct suitable in disciplinary proceedings instituted by these judicial conduct organizations that by this point, were popping up all over the country. And, so, by 1980, all 50 states had judicial conduct organizations in place. In 1990, the ABA overhauled its Code of Conduct, replacing all of the shoulds in the Code with shalls. And in 2007, the Code project I was involved with, the ABA revised its Code, again. Reorienting its focus from Canons to Rules to emulate the Model Rules of Professional Conduct applicable to lawyers, which further aided judicial conduct organizations in regulating judicial misconduct. So, by 2008, all 50 states have adopted codes of conduct that judicial conduct organizations relied upon to varying degrees when investigating judicial conduct. Now, what I'm describing here, and that's the end of my little summation.

What I'm describing here are developments that are sort of a one-way ratchet, that have served to make state judicial systems increasingly accountable for misconduct. Now at the same time, state constitutions have tended to be quite respectful of the Judiciary's institutional independence, and so these developments increasing judicial accountability have happened alongside state constitutions that really are seeking to preserve an independent judiciary that gives the judiciary, oftentimes exclusive authority to regulate court practice, procedure, and administration. And because the supreme court is on top of the judiciary's organizational chart, responsibility for judicial self-administration has fallen largely to the state's high courts. So accordingly, codes of conduct have been promulgated by the supreme courts themselves. Judicial conduct organizations have been situated within the judicial branch, and in the vast majority of states, the supreme court has had the final word on whether to discipline a judge within the jurisdiction. In this way, states have struck a balance between the institutional independence of the

- 2 -

judiciary and the accountability of judges to a disciplinary process. And, on the whole, I'm pretty comfortable with these structural arrangements as they have evolved. In a government comprised of separate and independent branches, it strikes me as appropriate for each branch of government to be in charge with regulating the conduct of its own members, subject to limited checks and balances. Thus, there's nothing intrinsically problematic about judges judging judges any more than there is with legislators judging legislators for purposes of censure or expulsion from a general assembly. I'm therefore at peace with retaining the state supreme court at the apex of the disciplinary process, as is done in almost every state.

Now, I've read the combined memorandum of the Commission and the Judicial Branch, which you've received. The Commission appears to be less sanguine than I about retaining the Supreme Court's traditional role, owing, I am guessing, to recent developments in which the Supreme Court stands accused of mishandling a disciplinary matter involving a member of that court. The Commission proposes a model that takes the Supreme Court out of the equation and vests final adjudicative authority over disciplinary matters in a separate tribunal. The Commission proposal is loosely based on the Illinois model, which is an outlier among the states, but the proposal honestly goes further than Illinois does. In Illinois, the Supreme Court retains an important role in relation to the Illinois Courts Commission that adjudicates misconduct cases. It selects three of that Commission's seven members, one of whom is a Supreme Court justice, whereas the Colorado Commission proposal excludes Supreme Court participation altogether. I understand and sympathize with the concern that is driving the Commission's proposal, but I worry that it may be a bit of an overreaction to recent developments. In the vast majority of cases, retaining final Supreme Court review over the conduct of lower court judges, as almost every state does, strikes me as a sensible approach that respects the traditional hierarchy of the independent Judicial Branch.

When a member of the Court is the target of an investigation, however, the analysis has got to change. Putting the Supreme Court in the position of disciplining, and if warranted, removing a colleague on the collegial court with whom the Justices share the bench and work on a daily basis, calls the impartiality of the Court and the legitimacy of its rulings into question. I mean, in my way, the way I'm conceptualizing it, it's the difference between having the Supreme Court preside over the misconduct of lower court judges but not preside over their own fellow Justice. This is akin to the difference between a small-town judge presiding over the cases of people he happens to meet or know in passing, which is inevitable and okay, and presiding over the case involving his next-door neighbor, which raises concerns. And, so, I take issue with the Judicial Department's statement that, "No investigation has revealed that this basic structure of Colorado's current system is deficient." The scandal that resulted in the establishment of this committee could have been avoided if Colorado's disciplinary process were structured to disqualify members of the Supreme Court from any involvement in that process when a fellow member was under investigation.

Other states have likewise encountered problems when the supreme court is given the final word on regulating the conduct of its own justices. I really do want to emphasize that Colorado is hardly alone here, and I do want you to consider the example of Wisconsin, and when you do, it might be worth your time to pause and grab some buttered popcorn, because Wisconsin is quite a rocket. In 2008, Justice Annette Ziegler on the Wisconsin Supreme Court was reprimanded for presiding over cases as a Court of Appeals Judge in which her husband had an interest. Which court critics characterized as a slap on the wrist. An ethics complaint against Justice Michael Gableman charged him with running misleading campaign commercials. And Justice David Prosser was investigated for allegedly trying to choke Justice Rebecca Bradley during a meeting of the Justices in chambers. On a related front, the campaign support that the Justices received, the alleged bias manifested in Judge Gableman's campaign commercials and other purported conflicts formed the basis for a flurry of disqualification requests over succeeding years, all of which the members of the Court denied. With this series of events came a debilitating and divisive devolution of collegiality. I'm reading here. This is a dramatic reading from one of my books, and I'm just going to get through it rather than extemporizing. "Justice Prosser called Chief Justice Shirley Abramson 'a bitch' amid the deliberations over Gableman's ethics complaint, and later accused his colleagues of leaking the incident to embarrass him. When Justice Bradley dissented from the Court's revised disqualification rule, it drew a sharp rebuke from the majority for being announced prematurely. The press reported that Justices Abramson and Bradley were fearful of Justice Prosser and had received additional security, while Justice Patience Roggensack dismissed such reports and the underlying concerns as unfounded. Resolution of the disciplinary action arising out of the Prosser-Bradley bout was thwarted by mass recusals that left the Court without a quorum. As collegiality norms collapsed, members of the Court retreated to ideologically assigned camps and split along ideological lines over the Court's disqualification standards, whether Justice Gableman's campaign commercials warranted discipline, whether Justice Prosser put Justice Bradley in a chokehold or was defending himself when Bradley charged at him with her fists balled, and whether the court should seek professional help to overcome its dysfunction." So, you got that.

In Pennsylvania, where I served as special counsel to the first impeachment and removal of a state supreme court justice in 200 years, our group was activated because the State Judiciary was simply failing in its efforts to discipline Justice Larson via the existing disciplinary process. The failure of that process resulted in constitutional reform in Pennsylvania that I would encourage this body to at least consider as a possible template. In Pennsylvania, the state situates the investigatory function in one body. It then situates the adjudicatory function in a separate body, and finally, it authorizes final appeals from the adjudicatory body to the state supreme court except when a supreme court justice is under investigation. In which case, a specially constituted court is created to hear the appeal. Two things worth at least considering about this that I like about it. First, it relieves the high court of responsibility to discipline its own members. And second, I kind of like the two-tier structure, so that you don't have the prosecutor and the adjudicative roles being occupied by the same body. And about eight or so jurisdictions employ that system. Now, that's really what I've got to say about basic structure.

- 4 -

Just a couple more points, and then I will subside. Apart from the issues of basic structure, I did want to comment briefly on transparency. Now, at one level, I'm a little jaded in the sense that transparency is like puppies and rainbows, and nobody can be against it without looking like a jerk. But you know, I think in the context of judicial discipline, there can be too much of a good thing in the sense that most disciplinary complaints are filed by disgruntled litigants with bad dreams, and going public with groundless complaints threatens to undermine court legitimacy, unjustifiably, by creating the misimpression that the Judiciary is more trouble than it is. And, so, to that extent, I think transparency should not be complete or absolute. Conversely, and this is the more important point, waiting until discipline is imposed, as Colorado has done, has can have the opposite effect. By understating the extent of the enforcement activity, discouraging complaints from being filed. Because it looks like you're throwing things down, down the well and by creating the suspicion that the Judiciary is protecting its own by keeping the public in the dark. In 2020, Reuters reporters wrote a multi-part series on judicial misconduct and discipline across the states, looking at 1,500 cases. To the end of showing that widespread judicial misconduct was either ignored or treated to leniently by judicial conduct organizations across the states. The reporters' work was complicated by the fact that so much of the disciplinary process is in a black box, which led them to assume the worst. Which, I think, is oftentimes unfair. In other words, they just simply pointed out that so few judges were removed from office. You know, when having looked at a lot of these situations, many times the infraction does not warrant removal, it warrants a serious reprimand, and only something more serious if the conduct is repeated. In other words, there are reasons, but unless those are explained and clear and evident, you're left to assume the worst. And Colorado, I think, relative to the rest of the nation, is behind the curve. Most jurisdictions disclose disciplinary activity earlier in the process, and so I would support a change endorsed by the Commission, and I think the Judicial Branch, and most jurisdictions around the country, that requires meaningful disclosure of judicial conduct investigations at the point where formal proceedings are filed. And I agree with the Commission that identifying the respondent judge, and offering a brief but meaningful recitation of the alleged misconduct without naming victims or witnesses, is the appropriate tack. Now, I've not had a chance to look at what information the states present to the public after discipline is imposed, but including a brief explanation for the sanction and why the sanction was deemed appropriate under the circumstances strikes me as desirable in order to essentially take advantage of the good work that the Commission is doing, and to convey the impression that someone is watching, is minding the shop and is imposing discipline that makes sense for reasons given.

My final thought, and this is just a thought in passing, because I'm offering it out of an abundance of caution. Final thought relates to the role of non-lawyers and what role they should play in the disciplinary process. I am 100% behind including non-lawyer participation in the disciplinary process. Doing so helps to keep that process honest, and doing so helps to promote public confidence in the integrity of the disciplinary process. But in deciding how extensive non-lawyer participation should be, I did want to drop one asterisk. The Colorado Constitution declares that discipline is imposed with reference to violations of the Code of Judicial Conduct. Rule 1.2 of the Colorado Code of Judicial Conduct characterizes the Code itself as a body of law that judges must follow. The Code then in turn,

- 5 -

includes rules that courts around the country interpret, which give rise to a body of precedent that Cindy Gray synthesizes in her *Judicial Conduct Reporter,* and that Jim Alfini, Jane Sample, and I analyze in our *Judicial Conduct* treatise. The task of applying the law reflected in a body of rules and interpretive precedent to the facts of specific cases is a task that lawyers are specially trained to undertake. And research by a political science colleague here at Indiana University has shown that lawyers and non-lawyers think about legal issues differently, with lawyers acculturated to justify their conclusions with greater resort to text and precedent. And, so, I support non-lawyer participation in the process, but urge the Commission to be mindful of the central role that law does indeed play in the disciplinary process. It is not all about perspective when addressing what level of non-lawyer participation is optimal. And with that, I genuinely appreciate your willingness to juggle the schedule, and I am sorry to Judge Kourlis for treading on her toes and sort of cutting her off in order for you to accommodate me. Happy to take any questions that you folks may have.

**Rep. Weissman**
All right, Professor, thank you, and we apologize for maybe getting zoom links mixed up and not being able to connect you at the time that we had initially promised. Committee, are there questions for Professor Geyh? Madam Vice Chair.

**Rep. Carver**
Thank you, Mr. Chair. I have two questions. Professor, you referenced Illinois and that, in your opinion, the Colorado Commission that their proposal goes further than Illinois. And this is something you know, if you wanted to provide the information offline, that would be great. Could you go into a little more detail on why you think. Let me just throw in, I am not aware, and if you are, I would greatly appreciate it. Is any state doing what the Commission is proposing, as far as no role for the supreme court in deciding discipline. I have heard Illinois referenced and, also, in another article Oklahoma, but that's why your comment that Illinois system is actually different than what the Commission's proposal is piqued my interest. So, could you speak to that please?

**Charles Geyh**
Sure can. And I think one of the things I want to be careful about is that I really found both the Commission's position and the Judicial Department's response to be thoughtful. They are both. They disagree. But what we're really engaging in is a Goldilocks exercise here between judicial independence and accountability. And we're trying to reach something that's just right. When there isn't really a just right answer. There are varying gradations of good to okay. The short answer your question is this. Illinois is unusual in that it takes final disposition of all judicial disciplinary matters out of the hands of the Supreme Court and assigns it to a specially created tribunal. What it does do there is give the Supreme Court the opportunity to have one of the seven members be a member of the Supreme Court and two other members being named by the Supreme Court, itself. In addition, there are two other lower court judges involved, but for purposes of my point, three of the seven members are selected by the Supreme Court itself. And, so, while they don't have final control, they have meaningful say over the

- 6 -

selection of the tribunal and include in their numbers a member. The Illinois proposal, as I understand it, does not include the Supreme Court in that way. I mean, it is. It keeps them out of the loop. And my only point, honestly, is that I think that keeping the Supreme Court out of the loop makes a lot of sense when the Supreme Court is investigating its own folk and that's why I kind of like the Pennsylvania model. But I'm not sure that starting from the traditional notion, the traditional hierarchy is justified in other situations. Unless we have and if you acquire a lot more information suggesting bungling by the Supreme Court of cases involving lower court judges, that would certainly affect, influence my thinking. As far as what other jurisdictions are doing, I am not aware of other jurisdictions that go as far as Illinois. As I was sort of saying, most jurisdictions have a judiciary that is institutionally independent, more so than the federal system. What's one of the interesting things is that the state judiciaries are less independent in decisional independence, because most of them are subject to election or re-election. Whereas the federal system doesn't have that. But the federal system, Congress can regulate court jurisdiction. They can regulate court administration. They can regulate court practice and procedure. Whereas in many states, that's not the case. That the tradition and the sort of center of gravity is, we let them regulate their own affairs. And, so, to my way of thinking, having the Supreme Court at the apex of that system is the default. It's an appropriate default. And you should move off of it only if you have good reason to do so.

**Rep. Weissman**
Professor.

**Rep. Weissman**
Madam Vice Chair.

**Rep. Carver**
Thank you for that. That's helpful. And most of the references that I've seen analogous to the Commission proposal in some regard has been Illinois. There's one reference I saw to Oklahoma. Do you have knowledge of Oklahoma's situation with regards to the role of the Supreme Court?

**Rep. Weissman**
Professor.

**Charles Geyh**
I wish I did, and this is where I think Cindy Gray is the encyclopedia. I am kind of the style guide, and, so, I would encourage folks to reach out to her with Oklahoma based information. My work does not take me in the direction of looking in a granular way at what individual commissions are doing around the country.

**Rep. Carver**

Thank you, Professor and the sterling Ms. Gray did provide us with a list of 13 states that create a separate special tribunal when there is alleged misconduct by a supreme court member. So, she did provide us that. Thank you so much.

**Rep. Weissman**

I'm impressed with your very metallic pun there, Madam Vice Chair. Rep. Bacon, did you have a question or was that already answered?

**Rep. Bacon**

It was answered. I had very similar questions. Thank you.

**Rep. Weissman**

Okay, I have one more. Professor, about midway through your comments. And you know, you've spoken to this again just now. It sounds like you were advocating to the question of what should be the final decision-making entity, where lower judges, county court, district court, even court of appeals judges are implicated. Then, I believe that you support the idea that the state high court, our Supreme Court, would be the final decision-making entity there. However, I believe I also heard you strongly urge that where a Supreme Court justice is implicated, then there should be a different final deciding structure. You've spoken favorably about, or somewhat favorably, at least. I don't mean to put words in your mouth. About the Illinois model, where you have seven of whom the Supreme Court has some role in choosing. What from your style guide, research. How might you advise this committee as to structuring an alternate decider, specifically where supreme court justices are implicated?

**Charles Geyh**

Terrific. And what I can do after this is send a copy. My closest experience is with Pennsylvania. We just heard from someone else that Cindy has 13 options in play, and I'd be happy to send you the one that I have the most familiarity with. I mean, essentially, what it comes down to is that it is a body of lay folk, lawyers, and judges that are selected by different constituencies. And is it that far different from the one that Illinois is using? I should say that my hesitation with Illinois is that I worry a little bit about taking all power out of the Supreme Court's hands when that is sort of the standard operating procedure without good reason to move off of it. And that reflects my own institutional conservatism. When the Supreme Court is misbehaving, when it is self-dealing, we got to do something. And on the other hand, when we are talking about rank-and-file discipline of lower court members, having the high court involved doesn't bother me. And, so, going to what I would regard as the extreme of taking things away from them and putting it in a separate body, strikes me as unnecessary. That said, if the Illinois model. It is not a bad model in terms of identifying who all would be on this body, with the exception that I don't think. Yeah, I think the Illinois model is perfectly fine in the sense that it does not include any supreme court involvement, which I think would be good if we're talking about limiting that body's role to ruling in cases where the supreme court is involved. And note that it would be an ad hoc thing. I don't think

- 8 -

you'd have a standing group of people tapping their toes for years at a time, waiting for a supreme court justice to get in trouble. That you would constitute it ad hoc, specially when you had one of those cases coming up. And I think using Illinois' method of selection strikes me as perfectly sensible. I just wouldn't go as far as Illinois to extend it, not only to Supreme Court cases, but to cases involving lower court judges.

**Rep. Weissman**

Okay, Professor, appreciate that. So, one bright line I'm hearing is that, provided we're constituting an alternative panel, if you will. Specifically, to pass on supreme court justices, you would have, unlike Illinois now, you would have the Supreme Court have zero role into the constitution or composition of such a panel. I wonder, if you wanted to offer any further thoughts on what is an upper and lower bound on size, of how many people should be on such a panel, what different mix of entities would be making appointments to this panel.

**Charles Geyh**

Sure, I think that, first of all, I want to just reiterate that that I am on board with, I'm not on board with Illinois creating a separate panel independent of the Supreme Court for purposes of regulating the behavior of judges off the Supreme Court. But, when it comes to Supreme Court justices, I'm cool with that. As far as membership numbers go, the only thing I'm tapping into is analogous data, where it looks as though the smaller the number. Cat here. This is the problem with home Zoom. The smaller the number. Let's put it this way. There comes a point when you reach a number that is so high that each person sort of feels as though they can hide behind the votes of their colleagues, and they are more inclined to sort of go further than they might otherwise. So that, for example, larger courts are more likely to overturn their own precedent than smaller ones. So that I think that if you're looking at a body of somewhere in the neighborhood of seven people, the same kinds of considerations you would be looking at in constituting a high court, 5-7-9. Somewhere in that zone and where you want judges represented, you want lawyers represented. You do want lay representation on that group. And whether you have, and I can, again, follow up with some suggestions on who should be doing the appointing. But I think you are looking at a diverse group of people appointing, a diverse group of people who are I would say 5-7-9, is kind of the zone. Nine strikes me as a little high for this kind of purpose.

**Rep. Weissman**

All right, Professor, thank you. I believe that you have the email address from Ms. Jenson on our staff here. We would certainly invite you to send anything else that you think would be relevant for our consideration subsequent to today's discussion, and Ms Jenson can get that to all members of the committee and the public as well. Senator Gonzales had a question.

**Sen. Gonzales**

Thank you, Mr. Chair. Thank you, Professor for your presentation. I am curious if in your scan of the structures of the judicial discipline processes across the country, if you have insight to share with us

regarding whether and when the complaints or the rulings around judicial discipline of a particular judge become public or not, or whether they remain confidential throughout.

**Rep. Weissman**
Professor.

**Charles Geyh**
Yeah, I mean, I did sort of poke at that in my prepared remarks, in the sense that from where I sit, I join both the Commission and the Judicial Branch, in the view that at the point where a decision is made to proceed with an adjudication. At the point where an indictment in effect is made, that is the magic moment when the name of the judge and a description of their conduct goes public. Prior to that point, my concern is that as much as I like transparency, 90% of these cases are nonsense. They're unhappy litigants, who are basically envisioning corruption that isn't there. There's not a shred of anything. And we don't want those just polluting the pool, because it creates the misimpression that the judiciary is peopled with corrupt folk, when that is simply not the case. That wait until you reach a magic moment where the commission has investigated and concluded that proceeding is necessary, and that is the point at which the proceedings, from that point forward, really, I think, need to be a matter of public record. And I should say that part of the reason is, part of it is, if this works the way it should, you're going to see some more disciplinary activity and some more legitimate complaints filed. And that isn't a sign of a problem. That's the sign of a system in good repair. People who point to a deficit of disciplinary activity may try to turn that into a good thing, but it really, really isn't. And, so, I think that you will see a healthy and modest change that way, and the legitimacy of the Judiciary will be improved. Because you won't have people muttering to themselves about private reprimands and knowing nothing or public reprimands and knowing nothing about why. Why didn't you suspend him? Why didn't you remove him? And I think that's where becoming increasingly transparent, beginning with the moment that you proceed from the commission deciding to go forward, is where I would draw that line.

**Rep. Weissman**
Senator.

**Sen. Gonzales**
Thank you. And, so, you would, thank you for that, Professor. And, so, the line that you're drawing would be at the point when the complaint is found to be grounded and not at the conclusion of the discipline process. You're saying a bit earlier than that. Thank you.

**Charles Geyh**
Absolutely. And again, just to be clear, I think I'm joining the . . . I was really heartened by the fact that I think the Commission and the Judicial Branch are on board with that, that they're on board with moving it up. Colorado is an outlier. The majority rule is to open the door up a little earlier in the process. And, so, I think that's a wise thing.

**Sen. Gonzales**

Thank you.

**Rep. Weissman**

Okay, Professor, one more question, at the risk of going a little bit into the weeds. In sorting out what is a grounded complaint to use Senator Gonzales's term, what is substantiated and thus, what would proceed to formal proceedings? Access by our judicial discipline commission to relevant information is important, and how that's going has been the subject of rather a bit of contention around here. Do you have any sort of guideposts from your looking at other states? What we need to make sure . . . Sorry, I was just to finish that thought real quick, anything that you think is particularly important in terms of making sure that the Commission on Judicial discipline, or whatever other name it goes by in other states, can get the information that it needs, including by subpoena if necessary.

**Charles Geyh**

Right. It seems to me that when you're in the middle of an adjudication, once you reach the point of saying yes, there is reason to proceed, and we're now in front of a special master or an adjudicatory body, that body ought to have the power to enforce discovery rules as needed. Where it gets dicey, I think, and I think this is what you're referring to, is prior to that point where the commission is trying to investigate whether there is something there. Now, and to which I have sort of two partial answers, none of them satisfactory. Because again, this may be worth a consultation with Cindy to see whether she is aware of specifics. But there are two points I do want to make. One, is that the Code itself makes it a violation of the Code not to cooperate in the disciplinary process. And to some extent, I think sandbagging discovery when you are under investigation is itself a Code problem, and so I would not hesitate to wield that provision as a way to extract a little bit of cooperation when it comes to gathering information from the target of an investigation. If that is unavailing, I do think that it is going to be necessary to explore options of consulting or of having the adjudicative bodies, be it special masters or otherwise, who are ordinarily hearing formal proceedings, also be available to resolve discovery disputes at pre-litigation. I mean subpoenas, in other words, I'm reminded here less of the civil litigation process than I am of the January 6 Commission and its efforts to subpoena folks to gather information, to see whether there's any there, there, and having to go to courts in order to resolve unwillingness to comply with that kind of discovery at the earliest stage. So, part of it, I think, is the stick of saying uncooperative behavior is itself a Code problem, and, then, if it's legitimate, discovery disputes, finding, creating a mechanism whereby the special masters or the adjudicative body, even though they haven't been activated yet, is available to manage subpoena questions, for example. It would strike me as being one avenue worth exploring subject to what Cindy can tell you, off the top of her head.

**Rep. Weissman**

All right, thank you, committee. We have time for maybe one more question for the Professor before we ought to get back to IAALS. All right, seeing none. Professor, thank you for your time. This has been

- 11 -

- 12 -

very helpful. Again, feel free to send us anything by way of follow-up you would like to sort of supplement the record, and we might possibly reach out to you.

# Appendix 27(s)(iii)(3)

# Presentation by the Institute for the Advancement of the American Legal System (IAALS);

# Legislative Interim Committee on Judicial Discipline—
# August 10, 2022 Hearing: Institute for the Advancement of the
# American Legal System Presentation

**Rebecca Love Kourlis**

Is he available?

**Rep. Weissman**

I think, since they are here waiting for us, we will go right to the 10:15, segment, which is to hear from the Institute for the Advancement of the American Legal System, or IAALS. Ms. Kauffman, Justice Kourlis, if you'd like to join us up front and please go ahead as though we're at 10:15. Yeah, Justice, I apologize.

**Rebecca Love Kourlis**

Thank you, Chairman Weissman, if you would like to interrupt us at any point in time in order for Professor Geyh to chime in, we can certainly step back and he can take the floor. We are here for the morning, at your disposal. So, whatever is convenient for you. So, did you want to hand those out when it's your turn? Okay. Chairman Weissman and members of the committee, thank you very much for the opportunity to testify today, and most importantly, thank you for the time and attention you are devoting to this matter.

Once I started to dig into your website, I realized the volume of materials that are being submitted to you and the depth of the testimony. So, thank you for taking this as seriously as you obviously are. Let me introduce myself a bit. My name is Rebecca Love Kourlis. I'm a former judge, both a trial court judge and a member of the Colorado Supreme Court. In 2006, I left the Supreme Court to found IAALS, the place with the terrible acronym, which stands for the Institute for the Advancement of the American Legal System at the University of Denver. The mission of IAALS is to improve the legal system and to develop through a process of research, convening of experts and stakeholders, practical implementable solutions to real problems.

And you will hear more about the process that was used for the development of the IAALS recommendations as they relate to judicial discipline. In 2017 and 18, and I was still at IAALS at the time. I have since left IAALS and Ms. Kauffman has taken over. IAALS turned its attention to judicial discipline systems around the nation and developed some pretty robust recommendations. You have heard mention of those recommendations in some other testimony, and they've shown up in attachments to some other materials that have been submitted to you. But Ms. Kauffman will speak to them in detail in just a moment. So, for four decades, I have been in and around the Colorado justice system and justice systems around the nation, actually. And I have some observations that I would like to offer for your

consideration before we dig into the specifics of the recommendations for change in our particular discipline system.

First, I want to tell you with every bit of my heart that I continue to believe that the Colorado Judiciary is peopled with really good judges and good people whose intent is to serve the law and the public. I hope you do not take from this inquiry a sense that the system has persistent, pervasive, and corrosive problems. I don't believe that. I do think that the merit selection system works beautifully, that the judicial performance evaluation system works, and that most judges behave appropriately. On the other hand, I also believe that even one instance of serious misconduct is too many, and that accountability and transparency are very, very important. To that end, there are indeed changes that can and should be made in the discipline process. In service of those goals and in furtherance of public trust and confidence. Ms. Kauffman will talk to you about some of those specific recommendations as they line up with IAALS's work. I would also commend to you what I think is an excellent summary of possible changes, which is the summary presented by the Colorado Women's Bar Association. It's a one-and-a-half-page summary of their more fulsome filing with you, but I think it captures many of the things that both appear in the IAALS work and that have come from other portions of the testimony here. But I want to offer a slightly broader take on these questions before we hone in on specifics.

It seems to me that your inquiry has touched on three categories of conduct that have become the subject of various reports and testimony and that have caused you to begin this deep dive examination of the discipline system. The first category of conduct is workplace misconduct by non-judges, such as employees of the Judicial Branch, in the State Court Administrator's Office, or otherwise. There have been references in some of the materials to conduct by non-judges and a culture that discourages complaints and permits bystanders to do nothing, perhaps. I don't think that conduct, no matter how isolated or how prevalent is your primary focus here today, and I think sometimes it gets swept in with the balance of the inquiry or focus. The second category is workplace misconduct by judges with employees of the Judicial Branch. This seems to be the nub of the issue, and I will come back to it in just a moment. The third is misconduct of judges in their official capacity, on the bench, or in their adjudicative capacity, or in the community with members of the public. Some of the comments that I have read that have been submitted to you come from people, for example, involved in family cases. They refer to the misconduct of judges in actual pending litigation, judges acting in their formal capacity. Those, for the most part, and certainly not all, but for the most part, those are the kinds of complaints that may well be more properly appellate in nature that need to be raised through the court system with an appeal to the Court of Appeals. There are differences between the second and third categories. That is judges who are acting in the workplace and judges who are acting in their adjudicative capacity. This category over here, which is the workplace misconduct, has historically been looked at as more of a human resources issue, an employment issue. The third has been looked at as an issue falling more clearly under the Code of Judicial Conduct and the jurisdiction of the discipline commission. It's arguable that the discipline commission process is currently better suited for that category. And part of the struggle here is in adapting it appropriately also to cover workplace

- 2 -

misconduct. For example, the nature of the complaint and the identity of the complainant are different between categories two and three, and the solutions may be different. When a complainant is a Judicial Department employee complaining about a judge, that person may have a greater interest in anonymity and quick resolution of the matter than in transparency. When the complainant is a litigant, the balance may well shift. You have to balance all of that as you wend your way through these recommendations. Additionally, in the third category, as I just mentioned, complaints against judges in their official capacity are disproportionately about issues that are properly the subject of appeal and not of discipline. And that complicates things too, because it can make the numbers skew in a way that looks very suspicious, but may not be.

When we turn our attention to the workplace conduct of judges with judicial employees, I want to remind you that there are some emerging themes across the country which extend beyond the discipline system. Discipline system changes may be necessary, but not ultimately sufficient. As I'm sure you know, this question of workplace misconduct by judges has sprung into the national consciousness in the last few years, partially in relationship to the MeToo movement, primarily in the context of sexual harassment allegations. To that end, there have been various study groups and a number of reports, chief among them being a report or two reports, actually, to Chief Justice Roberts on the United States Supreme Court about the federal judiciary. There's also a pending piece of [legislation] in Congress called the Judiciary Accountability Act. I want to tell you a little bit about what those recommendations embrace, because I think it informs the kinds of issues you are looking at.

In response to the reports, the Judicial Conference of the Federal Judiciary created a new national Office of Judicial Integrity. The national office, "Serves as a resource outside of the court's chain of command, providing confidential help, information and referral, answering questions and providing guidance on informal and formal complaint options for addressing workplace harassment, abusive conduct or other wrongful conduct." The model employment dispute resolution plan for the Federal Judiciary was also updated in 2019 to include different pathways for resolving employment disputes and very enhanced training requirements, among other components. You will see, I assume, some parallel lines here between those actions and recommendations and some of the recommendations of the report by the Investigative Law Group to the Judiciary, The report by Rita and McCord. That Report recommends the creation of an Office of People and Culture in the Judicial Branch charged with developing the structure and programs necessary to improve the workplace culture throughout the Branch. Those recommendations include an impartial ombudsman.

**Rep. Weissman**

We may take you up on your offer after all.

**Rebecca Love Kourlis**

Absolutely. I will pick right back up again when you're ready for us.

- 3 -

**Rep. Weissman**

All right, thanks for understanding as we work out the kinks here.

* * *

**Rep. Weissman**

All right. Justice Kourlis, Ms. Kauffman, please rejoin us and resume where you were sorry for the bifurcation.

**Rebecca Love Kourlis**

It was definitely worth it. Let me stand on Professor Geyh's shoulders a little bit in terms of what he was just talking about, and try to pull some threads together from my presentation.

First of all, I think there is a great deal of consensus around the notion that transparency is an issue in the Colorado judicial discipline system and that proceeding should be transparent when the formal complaint is filed. The problem that has always haunted the Judiciary, and parenthetically I have taken this position for a very long time, but it's constitutional. So, that the roadblock that you all run up against is the extent to which you choose to tangle with the Constitution. I think it is worth it, but it has its own Pandora's Box implications, of course.

The two-tiered system, investigative and adjudicative. I think those themes run throughout all of the recommendations that have come before you. Brittany will speak to that, and that's very well grounded in the research. And then having a separate system when a Supreme Court justice is at issue also flows through almost all of the recommendations, and I agree with Professor Geyh that taking the process entirely out from under the jurisdiction of the Supreme Court because of the possibility of that kind of case is actually not warranted and will cause more problems than it solves over the long run. The points that I would pick up from my own sort of frolic and detour in this area is that workplace misconduct should not always be handled in a formal way, requiring the filing of a formal complaint with the judicial discipline commission when the allegation relates to workplace misconduct by a judge may, in fact, disserve the ultimate objective of a quick, effective, and appropriate resolution to whatever the complaint may be. So, I would, I would hate to see you require that any complaint against a judge that is received through any process would automatically be referred to the discipline commission.

But by the same token, I think it is imperative that the system within the Judicial Branch be amped up, including many of the recommendations that are set forth in the Rita and McCord report. And although those are not within your purview here. Within this committee's process, I hope you will support, encourage the Judicial Branch to implement those recommendations, and that you will support new resources for those purposes. For training, maybe regular employment climate surveys, which are also sort of state of the art, and for the role of an ombudsman who can truly triage these complaints with a

- 4 -

view toward the victim's interests as well as the interests of due process, a fair system, and transparency, I would refer you, just as some of my recap to the particular language in the Rita and McCord Report, talking about an ombudsperson who would be, "empowered to provide a confidential space for reporting, ideas and advice, information about policies and procedures, resources for informal resolution, including mediation and restorative justice, and referrals for formal investigations within Judicial and to the Colorado Commission on Judicial Discipline, when necessary. This person should retain sufficient autonomy in their interactions with employees, staff, and judges to maintain credibility and independence in the eyes of all stakeholders. So as a sort of intermission recap, what I would tell you is that the objective here is to establish a culture of excellence. And to achieve that, to get the proverbial horse drawn cart down the road, sticks only go so far. Carrots are necessary too. As is an odometer to measure the miles covered by the cart. And I would suggest to you that a culture of excellence relies upon much more than just a robust disciplinary system, although that is certainly central.

I'm going to hand the floor to Ms. Kauffman to tell you more about IAALS's work and IAALS's recommendations. But of course, I am available either now or after her presentation for any questions you may have Mr. Chair.

**Rep. Weissman**
All right, thank you. Committee, maybe we'll see if Ms. Kauffman can get through her material. Then we'll go to questions for both at the end. All right, let the curtain rise on Act Two.

**Brittany Kauffman**
Thank you, Mr. Chair and members of the committee. My name is Brittany Kauffman and I am the interim CEO of IAALS, the Institute for the Advancement of the American Legal System. And it's a wonderful opportunity to speak with you all today. So, thank you so much for having both of us. I will be providing additional background on how we developed the IAALS recommendations. To provide you that context. I will also speak to the recommendations themselves and where Colorado's judicial discipline system aligns with those recommendations and where there may be some opportunities for improvement. So IAALS entered into the space of judicial discipline back in 2017 and 2018 starting with some background research. Really digging into judicial discipline commissions around the country, and starting with that research and then building to an in-person convening. So, in March 2018, IAALS convened a group of 21 people from around the country that included commissioners, commission staff, judges, lawyers, and scholars. All around the country for a multi-day in person meeting to talk about the functioning of judicial conduct commissions around the country. We hoped to identify opportunities for improvement, as well as develop a set of best practices to the extent we could. And I will note a few things here in terms of that group. It included Cynthia Gray, who has been mentioned several times already today, and who you already have heard testimony from. It also included William Campbell, former Executive Director of the Colorado Commission on Judicial Discipline. So, we had a representative from the Colorado system as well, and that was part of our convening. And we were able

to send those recommendations back to Colorado, as well. And I will also note there's a great variety, as you've heard from already today and in the past, testimony of approaches around the country. So, there is no single approach, no single model. But our goal was really to identify some better practices that commissions could take and implement in their own systems, based on their own structure. The report and recommendations that we have, and I'll share hard copies after we speak, are from IAALS. So, they are IAALS's recommendations, but they very much draw on the wide-ranging comments from the convening and our partners in that discussion, as well as our extensive literature and an organizational model review. So, in addition to identifying some best practices for commissions, I also wanted to share that our goal was to highlight concrete ways to improve trustworthiness in our Judiciary. The recommendations build off the goal of today's judicial discipline system to protect the public and the integrity of judicial proceedings, to deter future misconduct, and to promote public confidence in our judicial system. The report recognizes that the commissions have multiple objectives, some inherent tensions in them, which have already come up today, and our recommendations really seek to take these into account while achieving those goals. I know these goals are very relevant to this committee's efforts, and they've been at the forefront of your work, and I appreciate the opportunity to highlight a few of these key recommendations here today that I think will be most relevant.

So, I won't in any way cover all the recommendations in here. I'm just going to highlight a few that I think are most helpful. So, starting with commission independence, impartiality, and integrity. That is really at the forefront of your focus. We have a number of recommendations that focus in on commission independence and impartiality. First, we know, as in Colorado, commissions are established by state constitution, and we recommend that, rather than by statute or court order. So, in that way, Colorado is consistent with our recommendations. We also note the importance of the composition of the commission, and our recommendations are that they follow the ABA Model Rule recommendation for an equal tripartite set of appointees, equal number of judges of various court types, lawyers appointed by the state bar, and governor appointed public members. So, Colorado's Commission is generally consistent with this recommendation in the sense that it includes judges, lawyers, and public members, and they're appointed by the Supreme Court and the Governor. There's a little bit of difference in terms of the numbers there, but that representation across all those groups is really key. And I agree with Professor Geyh's remarks about the importance of having all of those different perspectives there. I also want to emphasize that diversity and representation is very important in the makeup of the commission. Robust demographic, vocational, and geographic diversity helps assure the public that those who judge the judges fairly represent their community. And I think that's really important in this moment where we're talking about public trust and confidence. I note that one of the most recent Annual Reports from the Commission notes its diversity and notes that this is a really important goal. So, I would just emphasize that this needs to be continued to be prioritized going forward as new commissioners are appointed. That representation really matters, and it matters to public trust and confidence.

- 6 -

As to funding to ensure this independence, impartiality, and integrity, the Legislature, not the Judiciary, should fund the Commission. And the Commission should prepare its own budget requests, separate from the Judicial Branch budget request, and the commission should administer the funds provided free of supervision of the court systems, administrative machinery. And I will note that Senate Bill 22-201, provides that the Commission will prepare its own budget, administer its own money and resources, and creates that special cash fund. And this really does bring Colorado in line with these recommendations, and I commend that.

Regarding structure, we talked a little bit about structure already today, most commissions are one-tier. They have a single body that performs investigative, prosecutorial, and adjudicative functions. A growing number of commissions have separated that out. To separate out investigative and adjudicative functions. Colorado still falls within this one-tier approach, and whether it be through a more formal structure of moving to a two-tier or just internal checks, it's important to separate that investigative and prosecutorial function from the adjudicative functions. And clarity about the Commission's approach in this regard, will help externally in terms of public trust and confidence, as well as its internal organization.

As to the Commission Rules. Thorough rules that are available online are essential, particularly today, when people are online, they need to be able to access those rules. Commissions should have significant control over amending and maintaining their own rules. That's a key part of our recommendations. And while the Colorado Constitution gives control to the Supreme Court, the recent legislation does create greater opportunity for objection and engagement with the Commission, despite that that's controlled by the Constitution. And I think this is a really important step into making sure the Commission has more independence. So that, I think is a really positive step forward in terms of the Commission's Rules and procedures and ultimate independence.

Finally, on this point, another way to ensure these key goals is to have a Code of Conduct for the Commission itself, and I will note that IAALS recommended such a Code of Conduct. And following our convening and our report and recommendations, Colorado brought that recommendation back, and has since adopted a Code of Conduct for its members. And that's in place, and that is an important improvement over the last few years that we commend.

Moving to fairness and efficiency in commission operations, this is another key focus of our recommendations. It is essential to make information clearly available online. I mentioned this a little bit before, but information needs to be accessible, easy to understand, available to the public. We need to decrease barriers to accessing this process. The Commission has a website with information, links to the rules and additional explanation, which is very positive. There's also a form with instructions for submitting a request for evaluation of judicial conduct. And, also, Colorado Rules allow any type of submission, so it doesn't have to just be the form. So that's also, I think, a very positive approach by the Commission. One additional improvement could be to submit that online versus just by mail. So, that is

- 7 -

an additional place that it could be improved. And, also, always thinking about plain language and easily accessible information online. While there's quite a bit there, it's also heavy and dense and hard to dig through for the average citizen, and that's really important to make this process accessible for all. We recommend that commissions need not wait for complaints when there's evidence of misconduct and disciplinary counsel themselves can serve as a complainant. And here again, Colorado is consistent. Colorado and the Commission itself need not wait for a complaint and can initiate an inquiry on its own. That's a positive aspect of this Commission. Anonymous complaints should also be processed as fully and as routinely as possible. And while commissions generally interpret the ability for themselves to initiate an inquiry as being able to take an anonymous complaint, there's not a lot of clarity in the rules, on the website, in the forms that an anonymous complaint is allowed. Having that signature, having the name, having the line for that, suggests that that's required. And while, of course, commissions would like to have as much information as possible for follow up, and that's a positive thing, we also don't want to deter complaints, and that's important for public trust and confidence.

Turning to the ombuds person that Justice Kourlis already referenced. One recommendation that we talked about at the convening was the idea of creation of an ombudsperson. The goal of that person or group would be to provide a place within the system that lawyers and litigants could go if they're reluctant to file a complaint, even anonymously. Or where they're distressed by problematic conduct that might not be within the Commission's jurisdiction. As I noted, it could be a single ombudsperson or perhaps a committee of senior members of the bar who are unlikely to be intimidated. This person would receive and try to resolve non punitively judicial behavior that may be concerning, but not necessarily within the purview of the Commission. They would be able to receive complaints and take them to the appropriate person within the system. But I would note, there would need to be great clarity around this person's role and how they fit into the system. And, so, there's more work to be done there, but the creation of such a role would be particularly valuable here in Colorado, and really aligns, as Justice Kourlis said, with the recommendations of the investigation.

Turning to transparency and confidentiality that has already come up as well today and in some of the past testimony. I'll just highlight this briefly. IAALS's recommendation focuses on the transparency and confidentiality of proceedings. And while we recognize the inherent tension here, finding the right balance is key to public trust and confidence, and this is in particular a challenge for commissions. All commissions hold their initial investigative activity confidential. That's consistent here in Colorado and across the nation, but 35 states make their fact-finding hearings public, and you have a very helpful chart I'll just make the connection to from Cynthia Gray here that outlines the different state models. Colorado's approach keeps those proceedings confidential, as you know, until a recommendation for public discipline is filed. And in this way, just reiterating the prior conversation. Colorado just does not line up with best practices in this regard, and it would be much better to have that happen at an earlier point in time in the process.

And finally, shifting to education and information, we recognize that a trusted and well-functioning system requires public education and information to everybody involved. These recommendations are bolstered by our research in the area of public trust and confidence, which highlight the importance of communication, understanding, and clear public information. This includes not just the Commission, the judges, the public, the staff of the Judiciary all around in a 360-way. It would be helpful to have more information to help bolster all of these goals. Particularly in Colorado, where more of the proceedings are confidential. I think that's even more important. Public information, including information online about proceedings, statistics, and having that very clearly available on the website versus potentially buried deep in the information of Annual Reports.

So, to sum up, many of these recommendations have already been put in place, but there are still opportunities for improvement. And thank you for the opportunity to highlight these recommendations, and we look forward to your questions.

**Rep. Weissman**
Thank you both very much. Committee questions? Senator Gardner.

**Sen. Gardner**
Thank you, Mr. Chair, and with your permission, I'd like the opportunity to dialog a bit with Justice Kourlis. Justice Kourlis, thank you so much, and as well, Ms Kauffman, your recommendations are organized and cogent, as I would expect, but very helpful because of that. I have as I've dealt with this whole set of issues over the past year and a half, struggled with a couple of things. Not exclusively these two things, but a couple of things.

One is for the adjudicative function, who will do that in the system? The evidence would be that the recommendations that have come from the Commission on Judicial Discipline to the Supreme Court have been adopted almost universally, the one exception being when the Commission made a recommendation that was somewhat less than the Supreme Court thought appropriate, and they thought that something harsher was in-line. So that's the evidence. The perception of my constituents, however, is that we have a system in which judges judge judges, and that, as citizens, that's not to them very accountable. So, I have thought a lot about, how would we create a system that was somewhat different than, essentially in our special master process right now, you have three judges appointed to do that. How we might in the adjudicative function, perhaps, have, as we do in the Commission, a judge, a lawyer, and a citizen with a lot of very stringent qualifications for both the lawyer and the citizen. But there's some tension here from where I sit, perhaps not from where members of the Judicial Branch sit, but from where I sit. There's some tension here between what I think are the facts of the system and what the people of Colorado have as a perception and hold.

And part of what I think our job here is, is to ensure the confidence of citizens in the system. And, so, do you believe to come to the question, Do you believe that the adjudicative function for discipline, and

let's set aside the Supreme Court for a moment, needs to be done by judges, as opposed to some mixed adjudicative jury fact finder?

**Rep. Weissman**
Justice Kourlis.

**Rebecca Love Kourlis**
Thank you, Mr. Chair. So, Senator Gardner, I absolutely understand the tension that you are referring to, both because of the appearance and the reality of possible conflicts when judges judge judges. If we look at the discipline commissions, not necessarily just Colorado, but if we look at discipline commissions, they really have three functions, right? They have an investigative function. They're supposed to dig into the complaint and decide if it has merit. They have a prosecutorial function, because once they decide that the complaint has merit, then they become the prosecutors. And then there is an adjudicative function built into all of that, where they have to make a decision about whether or not to recommend discipline, be it private, public. And I mean, that's the whole different question of transparency and the point at which the public is invited into the process.

I agree with you that asking one group to do all of those functions creates some inherent inconsistencies, and I also agree with you that the ultimate recommendation is more legitimate and credible if made by a group of adjudicators, rather than an adjudicator who may be a special master, and to whom does that special master answer and what is his or her qualification to be making that decision? So, I would err on the side of a process that has a clear appearance of impartiality and balance, rather than a process that is easier to administer.

I would, however, not give up the notion that the Supreme Court has the ultimate vote, the ultimate determination, in terms of administering or approving the discipline. Particularly if it's a public process, I think the Supreme Court's role is less suspect. It will be out in the open, but I think it is important for the Supreme Court to maintain that leadership role in terms of policing conduct, as it does with the attorney regulation system. As you know, with the attorney regulation system, the recommendation is made to the Court from the fact finder within the attorney regulation process. And the Supreme Court ultimately makes the decision and issues an opinion in many cases. So, I think that the functions should be separated. The investigative, prosecutorial, and adjudicative functions should be separated within the discipline process, and the ultimate adjudicative function should be performed by, as you say, perhaps three extremely well qualified people whose only role is that, is adjudication. Or perhaps, I think, is as you referred to, Mr. Chair in dialog with Professor Geyh. Perhaps resolving discovery disputes prior to the actual adjudicative function. But that all gets sort of swept in.

- 10 -

**Sen. Gardner**

But if I understood you correctly, you come down on the side that ultimately and again, setting aside the Supreme Court, itself. Ultimately, the final decision as to discipline should be made by the Supreme Court?

**Rebecca Love Kourlis**

With the caveat that you interposed, pardon me, Mr. Chair, with the caveat that you interpose, namely, when it pertains to a Supreme Court justice. Yes.

**Sen. Gardner**

Ok, thank you. And then the other thing that I've dealt with. The Judiciary, the Judicial Branch gets 1,000s of complaints. I get hundreds, as a member of the Judiciary Committee. Of the cases you describe that involve a ruling that someone doesn't agree with and feels that they weren't treated fairly, though the record would indicate they do, and I always agree with the court when it finds in my favor, and I tend to disagree when they don't. So, lay people I know, as I receive these are dissatisfied and bring this complaint, and they may send it to the State Court Administrator. They may send it to a Chief Judge.

We have, and I guess there's this other category of that you've described, of the judicial employee who may have a workplace and maybe a workplace harassment situation or something. I've been of the notion that what needs to happen with each and every one of those is that it needs to be referred to the Commission on Judicial Discipline. Now, perhaps not. That's probably too strong a word to say referred. I often get these complaints and respond to them and say that's an appellate matter, or if it sounds like it is something that ought to be addressed to judicial discipline, whether true or not, is to say that's where it goes. Otherwise, the Branch does not engage on those. I got the sense that maybe you had a different view of that, but maybe not. I just wanted to understand that.

**Rebecca Love Kourlis**

I would hate to see a system where you had to sort of exhaust your remedies. So, my suggestion is that when it pertains to workplace misconduct, that no process within the Judicial Branch would be forestalled by virtue of the complaint having been referred to the discipline commission. I'm not opposed to the discipline commission being made aware of that complaint. I am suggesting that it could, actually, interfere with a prompt and appropriate resolution if jurisdiction of the complaint is ceded to the Commission and the employment aspects of it are interfered with or halted while the discipline commission process is going on. So, if a complaint comes in from an employee who maintains that the judge with whom he or she is working has treated him or her inappropriately, I see no reason for that information not to be passed along to the discipline commission. But, I also vest primary responsibility for dealing with that in the Judicial Branch and the Judicial Branch can keep the discipline commission aware, made aware of what they are doing and how it's being handled. But I do not believe that a

- 11 -

complaint that is filed concerning workplace misconduct should be exclusively handled by the discipline commission.

I want to make one other point in that context, if I may, which is this notion of an ombudsman. One of the reasons, I mean you act as an ombudsman, in some respects, for the complaints that you get from your constituents. You do sort of a preliminary review about whether they actually are an appellate matter or whether they should be referred elsewhere. Somebody needs to be in that role, in my view, because it's hard to figure out. As Ms. Kauffman says, wending your way through the rules and the processes, even for those of us who are lawyers, can sometimes be difficult, and if we want a people-centered system that actually serves the needs of the people who may have been negatively impacted by something a judge does, it has to be understandable and navigable. And an ombudsman could really help in that regard.

And then, at the risk of Christmas treeing, I want to hang one last point on that tree, because we haven't talked about it. And that is the notion that the Judicial Performance Commission and the discipline commission ought to be able to share information. That shows up in almost all of the recommendations, and I think that's very important as well. Thank you.

**Sen. Gardner**

If I may continue, thank you, Mr. Chair. Let's talk about complaints involving members of the Supreme Court. Do we need to have a separate process for that level, for the high court, and what does that look like, exactly? And I know that could go awhile, but just sort of in a sense, and that's for you or Ms. Kauffman, either one.

**Rep. Carver**

Do you want to take that one?

**Rep. Weissman**

Ms Kauffman.

**Brittany Kauffman**

Yes, thank you Mr. Chair and for the question, Senator. I think that in this particular circumstance, like other complaints, you might get complaints of all sorts, and having a single process where the complaints come to and are screened that's consistent across the commission as a first, just as the baseline, as the default, is probably what I would suggest. Then, if it meets the standards of moving on, then, as we've talked about, a different process would be appropriate. But, I think funneling everything through a consistent process and approach makes the most sense, because that's probably not the most common complaint that will come in. It's going to be the rare occasion. It makes sense to have a common process at the start.

- 12 -

**Sen. Gardner**

So, would you, I hate to use the word advocate, but I mean, would you recommend a separate process for the Court with, with the caveat that that you had, Miss Kaufman, about intake?

**Rep. Weissman**

Justice Kourlis.

**Rebecca Love Kourlis**

Thank you, Mr. Chair, for the adjudicative aspect of it, absolutely.

**Sen. Gardner**

Ok, thank you. Thank you very much,

**Rep. Weissman**

Senator, good for now. Okay, madam Vice Chair.

**Rep. Carver**

Thank you, Mr. Chair, and I know you won't be shocked to say I have several questions, but I'll try and be as succinct as possible. First, Ms. Kauffman, to you. I was very impressed with the 2018 report which you provided and note you, of course, the convening was in the best possible place at El Pomar down in Colorado Springs. But, we move on. I want to explore a bit more the separation of the investigatory function and the adjudication. And your report, as well as materials provided by Ms. Gray, and the Professor referenced this, is that when you have a commission one-tier versus two-tier, that that is usually where this issue is being addressed. And in looking over the more detailed information on states that have moved to a two-tier, which I agree with. I think those functions absolutely need to be separated and done by different groups of individuals. Some of the states will take the commission and set up two separate panels and then presumably build some kind of firewall between the two of them to handle those separate functions. And of course, except for Illinois, in whether it is separate panels within the commission, or a body separate from the commission. One doing investigatory, the other doing adjudicative. That in all states but Illinois, there is some type of appellate review on the final disciplinary action by the Supreme Court. Some *de novo*, some purely appellate at that level. What would your recommendation be for Colorado in moving from their one-tier to a two-tier, separating out investigatory and adjudicative. Would you recommend that be done within the Commission, and separating out the two panels, or a completely separate body from the Commission in doing the adjudicative and the Commission doing the investigatory, prosecutorial.

**Brittany Kauffman**

Thank you for the question, Representative. I would look to, and so this is not an exact recommendation today. I would look to the models, and Justice Kourlis might have one, but I would look at those models and explore them. I think there is actually another chart that might not yet have been provided to all. I

- 13 -

will take a look at that. That is kind of a breakdown of every state's approach. I know you do have materials from Cynthia Gray, but I think there's another one that would be helpful to answer that question. We do recommend in our recommendations to default to that two-tier as a recommendation, as a best practice. And, the question about where those two tiers reside, I would want to look further into what has been found to be most effective in the other states, because we have such different models across the country. So, I would look to that, and wouldn't have a recommendation today, on what's the best model. But I think we can look to what's been most effective around the country. I don't know if you have a specific recommendation.

**Rep. Weissman**
Justice Kourlis.

**Rebecca Love Kourlis**
Representative Carver, this was a subject of a lot of conversation at El Pomar, because some of the participants come from states in which those two functions are totally different groups of people. Other participants came from states in which they kind of switched off roles depending upon the case. There was pretty robust discussion. The people who switched off roles believed that it made them better participants in the system. But in a particular case, they were on a panel that had the investigative and prosecutorial function. And in another case, they were on a panel that had the adjudicative function, and they felt that it made them better able to understand the whole system and to operate within that system. They also took the position that it was economically much more feasible, that you needed fewer people, and you needed less turnover of appointees than in a system that was totally bi-furcated. But I believe actually, your background is in JAG, right?

**Rep. Carver**
It is.

**Rebecca Love Kourlis**
And, so, you probably come to this with a pretty clear perception that they ought to be separate.

**Rep. Carver**
Exactly.

**Rebecca Love Kourlis**
And I see that. I see that absolutely as well, particularly from an appearance perspective. So, I agree with Ms. Kauffman that if that's a question that you would allow IAALS and I to look into in a little more depth, we'll give you information about the way other states have comprised those tiers in terms of actual membership, and any research that we can find on the pros and cons.

- 14 -

**Rep. Carver**

Thank you. That would be, I'm sorry, did you have something further?

**Brittany Kauffman**

Yes, thank you so much for the opportunity to add one more thing. I do. I have it on me, a breakdown from the National Center for State Courts of that composition, and it really shows the wide variety around the country. So, this is another resource that we can provide.

**Rep. Carver**

Thank you. And I now want to move to anonymous versus confidential. I actually see those two ways of offering both. And here's how I see the difference, but I invite your more educated background and experience around these. I think confidential reporting, is critical, and a path needs to be created for that. Whether it is through the ombudsman. Whether it is through, I know ILG had some thoughts on that. But for an individual who is the victim? Is the person who is suffering the alleged misconduct by a judge or perhaps by another employee, the supervisor. In order to provide some mechanism where they are not so fearful of retaliation, that they can report confidentially. But with the understanding that if those allegations are substantiated, and now you want to go to a higher level of assessing a penalty, there may be some due process, confrontational clause type of issues, where that victim may have to decide if they're willing to go public. So, we absolutely need to create that process, whether that is done in statute or by rulemaking. I would invite your comment on that. But I also believe anonymous reporting is also critical. You come into an office and you see things, practices, comments, whether it is sexually inappropriate remarks or other type things, or favoritism, or things being done in violation of regulation, approval of reimbursement reports, if that's a pattern. But it's not misconduct directed to you. You don't like what you're seeing. You think it's wrong, but now you're looking for a mechanism to report that that doesn't get you fired or bad performance reports for the rest of your life. And so that kind of reporting, is also critically important. And again, how that is structured, and if that, can you give me your thoughts in anything in more detail on, do you think just confidential or both confidential and anonymous? What are your thoughts? And I know that Ms. Gray provided us. She is the fountain of all knowledge on this. 10 states provisions on anonymous complaints. So, whatever your response.

**Rebecca Love Kourlis**

I agree with you that confidentiality is paramount. I also agree with you that there has to be a mechanism for filing anonymous complaints that are truly anonymous. I mean, for example, as Ms. Kauffman says, I'm not sure you would feel comfortable filing an anonymous complaint online, because you have an address, right, and a footprint irrespective of whether you sign it or not. So, the anonymity filter has to be used at every stage. But I also think, Representative, that, and this is true, as you well know in many of the victims' rights discussions. That there may come a point at which the proceeding can't go forward unless the anonymous person is willing to actually be not anonymous, to step forward and testify or appear in some fashion or another. And I think that the way that other systems have handled this. Most recently, I think the way the Federal Judiciary, this new office that they have set up, is there is an

- 15 -

ongoing duty for the investigative body to keep this person engaged and informed and to allow him or her the option about whether to come forward, if that should be, if there should come a point at which there's a watershed, and things cannot proceed without testimony. So, Ms. Gray's advice about the actual statutory wording is something to which I would absolutely defer and I think a good portion of it can be in the rules, but I think a statute would have value here as well. To comport it with other victims' rights kinds of approaches, and to assure that there is, again, that overwhelming sense that the system is designed for the people who need to use it, and the objective is public trust and confidence in the Judiciary. The objective is not to hide things that shouldn't be hidden.

**Rep. Carver**

Ms Kauffman, anything further on that one?

**Brittany Kauffman**

Thank you. The one thing I would add there is that I really appreciate your separating out or noting the distinction between anonymous and confidential, because when a complaint or a request for review is filed anonymously, there's no way to circle back to who provided that if that comes in the mail. There's no connection back to the person, and having some type of mechanism where they can provide it, say, through an ombudsperson, where that is then filed anonymously with the commission. But there's a loop there, but at some point they can be connected back in. It can be made so it's confidential, but not anonymous. In that sense, they can be looped back in and brought into the process in a non-anonymous way, if they choose at that point. I think it's a helpful distinction to think through as rules and statutes are created, because there are two different scenarios there. And if it's just discussion of anonymity, there won't be that link back to the person to bring them in at the appropriate point.

**Rep. Carver**

Thank you. And then a final point, which I am more than glad to pursue offline. You know, as I was reading through kind of our list of topics to look at and what might go forward. I thought it was interesting that on the very first page of the IAALS report, there was a reference to difficulties that are being seen in Illinois with their judicial discipline, and it's on page one, with a quote. And so that is something that I would like to follow up with you further. And would appreciate that. Thanks so much.

**Rep. Weissman**

And Madam Vice Chair, maybe we can treat that as a pin for maybe brief commentary now. And I was going to say, and as the Vice Chair already said, we certainly invite further submissions by email. I think you know how to find all of us. We're coming to the key phase of the committee's work. So, the more written material we can all chew on, I think will help. But if you'd like to say anything for now.

**Rebecca Love Kourlis**

Thank you, we will follow up with you. Perfect.

- 16 -

**Rep. Carver**

Thank you very much.


**Rep. Weissman**

Members, in the interest of getting us back on time. All right, sorry Rep. Bacon. I just saw a hand. You'll have the last question.


**Rep. Bacon**

I was wondering if, well, I have two, but I'm sorry. I am curious about if you could go back to a reference. Senator Gardner asked about if all harassment issues should be referred to the Commission, and you made a reference to any sort of HR work being halted or kind of stalled. And I guess what I'd like to understand, truly, is, if the work couldn't actually be done in a way where it coincides with processes, and that they're not necessarily mutually exclusive. And I'm also curious about that, for what it's worth, for when something is referred to an ombuds office. An ombuds office is created for that space of safety. However, they're still going there with theoretical complaints. So, what does that mean by way of regular HR process? I mean, ultimately, what I'm thinking about is a report is made to HR. They can look into their processes as a matter of policy, and then there's also processes as a matter of actual ethical code violations and/or law and so why couldn't those things be happening at the same time? Why does it necessarily mean that something is halted and then, even if something went over to the Commission, how could the Commission then not be in a place to provide insights for HR processes for purposes of policy, if that makes sense. I mean, ultimately, I don't understand why they're mutually exclusive in time frame, and also why that wouldn't be a case with an ombuds office. Unless we're saying the ombuds should come to some sort of determination. Theoretically, an ombudsperson doesn't necessarily have power, but they have the safety if I'm getting that right, given, you know, some other experiences that I have there. So, I really did want to think through that. I just also want to, I'm just going to drop my other question. It could be more rhetorical, but also, in regards to what he shared about judges judging judges, if the Supreme Court has the ultimate decision even over itself, what are some of these external mechanisms? I'm starting to put together how processes kind of help with trust. But what are some external measures that even the Legislature could take, even if they're not rooted in actual consequence, to help keep an eye on or to have that check, if you will, about self-interest supporting self-interest. For example, we have SMART hearings here. Quite honestly, I have five questions. I want them to report on us every year after all of this. You know, I may not have statutory power to remove a Supreme Court justice, but I am curious about that. I mean, at the end of the day, we have [seven] people who know each other well. We can even talk about politics and how that may even turn out to supporting, quote, unquote misconduct, especially in the DEI spaces. And, so, I am curious your thoughts on that, on external ways to keep an eye out if we do not have a natural space of power. And, so, I will say, Mr. Chair, if we don't have the time here, I did want to ask those on record and figure out if we can find some time and then whatever you might allow by way of grace for timing.

- 17 -

**Rep. Weissman**

Okay, just a note for timing. And again, I do want to be respectful of outside individuals who we have asked to come here. So, I want to keep us to hearing from the Judicial Institute at one o'clock. We have an hour that I think it's worth the full hour to hear from the folks who put the ILG report together for us. So, at this point, we're going to be cutting a 60-minute lunch break down to 30 and it will go down further than that if it needs to. So, if you'd like to speak briefly, to Rep. Bacon's question. And again, I think there's lots of room for off record follow up. And I encourage members on your own time to access folks who are coming here before us. I think they'd be happy to keep talking with us about these issues. And then I wanted to get quickly to Rep Lynch. But if you'd like to speak briefly to Rep. Bacon's question.

**Rebecca Love Kourlis**

Thank you, Mr. Chair. But the position you're putting me in, I get is that every word I speak compacts your lunch time.

**Rep. Weissman**

I did not mean that to be directed to you or to other witnesses, more for other members up here.

**Rebecca Love Kourlis**

Okay, so briefly, I agree with you completely, Representative Bacon, that the two processes need not be mutually exclusive, and that the HR process can proceed in tandem with the disciplinary process. It makes me a little uncomfortable to think that the disciplinary process is sort of going to be looking over the shoulder of the HR process at every step of the way, but I think that would work out over time. What I do want to avoid, or would want to avoid, is that the HR process couldn't go forward while the discipline process was going forward. I think that would be a really bad idea, but as you say, they are not mutually inconsistent, and they need not be seen as such. They could go forward simultaneously.

Your question about an ombudsman, I think that the ombudsman, and I think you inferred this, the ombudsman, could both take in information and give out information. In other words, if the ombudsman receives a complaint that should be an HR complaint, the ombudsman can also funnel it to the discipline commission. The ombudsman would be in a position, again, as you say, not of power, but being kind of a traffic director at the outset of the system, and also having some ability to recognize when something looks really egregious, and making sure that attention is paid to it immediately. So, I see the ombuds role as being very facilitative and appropriate within this two-juncture approach.

In terms of your question about, How do we measure this? How do we get a sense of whether things are going better or not going better? You'll note, and this is analogous, I think, to SMART but, but not entirely. You'll note in the Rita and McCord Report that they talk about two things, 360-degree evaluations of Chief Judges every year. They talk about increased judicial performance evaluation processes being more frequent. And I think that would be wonderful if the funding were available for

- 18 -

that, rather than just, when a judge or justice is up for retention. And then they also talk about climate surveys. And I think the climate survey idea has real legs. There is a survey now that has established, sort of a baseline that you have and asking the Judicial Branch to engage in that kind of survey on an annual basis so that you could begin to assess whether the employment climate was getting better makes sense to me. I think it is. I mean, there's a separation of powers issue here in terms of you telling them how to maintain their employees, but if it is part of this whole establishment of a system or an office that could indeed be part of the role of the Ombudsman, I could see that as working, as well. So, that that is a very cursory response, and as we have all indicated, I remain available for whatever follow-up might be useful to you.

**Rep. Weissman**
Okay, thanks again. Rep. Lynch.

**Rep. Lynch**
Thank you, Mr. Chair, and with the risk of my lunch hour being cut short, well, I'll ask a very simple question, what do you see as the qualifications? So, we talk a lot about this ombudsman, right? But we're talking about ombudsman with Supreme Court justices potentially. What do you see as the criteria for that person? I mean, how are we going to select this person? Are they going to be from the Court? Are they going to be from the public? Are they going to be from the . . .

**Rebecca Love Kourlis**
I think the person could be someone who has served in it? Excuse me, I apologize. The person could be someone who has served in a judicial capacity, but I don't think need be. I do think the person should be a lawyer, just because he or she knows the in and outs of the system, but I actually think that the people skills and the commitment to a well-functioning process might be paramount, in my view. And I would hope that would not be a terribly difficult position to fill. It's important and the person would have a big role in assuring public trust and confidence. But, as has already been pointed out, doesn't have a great deal of power to make decisions about what should or shouldn't happen. Rather, they would be able to help people understand what their options are and get the information to the right place in the right form. So, I mean, there's, there's kind of an analogy in the attorney discipline system. There are people who man the hotlines in the attorney regulation system, and those people are lawyers within the system. So that isn't necessarily the right model, but they need training. They need willingness to do it, and then they need to understand that their ultimate commitment is to the public, not to the system. So, I don't think it would be really hard, certainly not a sitting judge.

**Rep. Weissman**
Good question. Thank you. Rep Lynch, All right, last word by Madam Vice Chair.

- 19 -

**Rep. Carver**

Thank you, Mr. Chair. And I erred, the reference to the difficulties with Illinois are on page two, and citation at the bottom footnote 15. I did also want to offline. Cynthia Gray did give us a handout of 13 states that set up a separate tribunal when there is misconduct allegations against a member of the supreme court. So, if you would have recommendations on which model of those 13 you would recommend, that would be helpful. Thank you, Mr. Chair.

**Rep. Weissman**

Thank you. And committee, thanks to Ms Jenson everyone now has in your inboxes via forward from me. A document from NCSC called Composition of Judicial Conduct Commissions in table format that'll get posted on the website for anybody in the public who wants to take a look as well. With that, thank you both for your time and for indulging us in all the Q and A. And again, we invite follow up. And it sounds like there will be follow up originating from some members of the committee as well.

# Appendix 27(s)(ii)(4)

# (Renumbered 27(s)(ii)(12) Below)

# Presentation by ILG, LLC and
# SCA Vasconcellos Comment;

# Appendix 27(s)(iii)(5)

# Presentation by the
# Colorado Judicial Institute;

# Legislative Interim Committee on Judicial Discipline—
## August 10, 2022 Hearing:
## Presentation by the Colorado Judicial Institute

[Recording malfunction during initial portion of testimony].

**Marilyn Chappell**

On the question of who should be the final-decision makers of formal disciplinary sanctions. The committee has heard testimony about what other states do. And those states include Illinois and Pennsylvania. I want to point out that those states have partisan elections to select judges. We don't have that in Colorado. In Colorado, in 1966 our voters rejected that in favor of our judicial merit selection system, which involves nominating commissions made up of volunteers that can't be a majority of any given party and involve non attorneys and attorneys. So, that is our gold standard system for selecting judges. So, when you look at other states systems for disciplining judges, CJI would urge that you consider the context in which those judges are selected in the first place. And I would add that Wisconsin also elects judges in direct elections. So, CJI submits that the final decision makers should be the justices of the Colorado Supreme Court. Those justices, again, have been selected through our merit selection system. They have extensive experience with adjudicating disputes, and our justices are accountable to voters in retention elections, our justices are the best qualified individuals to make decisions on the final, formal, serious sanctions of judges. Decisions that affect lives and livelihoods. Those decisions should not be made by panels of individuals who are not selected through the exacting system our justices are selected by and are not accountable to voters. And I know there's been discussion about, well, what if there's a situation where the person being investigated is a Supreme Court justice? Well, as you heard Ms. Kauffman from IAALS say, earlier, that is rare. And as you heard Professor Geyh say earlier, for the most part, the system does not involve that sort of discipline and he is fine with the highest, state, Supreme Court making final determinations. We would submit at CJI again, being cautious about amending the Constitution, that if there's a need for some sort of off ramp for that rare situation that can be accomplished by rule.

Third, on the authority to make rules on judicial discipline. Again, these formal disciplinary proceedings are trial-like. They, again, affect people's livelihood. They are not the same sort of proceeding, for example, that the judicial performance evaluation commissions have in considering evaluating judges. The disciplinary formal proceedings should adhere to due process, and they should be governed by rules written by people with experience in adjudicating disputes, and again, those people are the Justices of the Colorado Supreme Court. Now, in Senate Bill 22-201 there was a statute added, section 13-5.3-107 that said the Supreme Court makes the rules with conferral with the state judicial discipline commission, CJI submits that is the right balance and it does not need to be changed. In closing, again, Mr. Rupp and I would like to thank the committee for considering the input of CJI. We trust that the committee will

- 1 -

take a long, hard, careful look based on the facts, and whatever is decided will be in the best interest of our State. Thank you.

**Rep. Weissman**

Okay, thank you, Mr. Rupp, I wasn't sure if you wanted to add more? Okay. We'll see if there are questions, committee questions for either of our witnesses. Madam Vice Chair.

**Rep. Carver**

Thank you for being here today. Appreciate your comments and your perspective. I was wondering if you had any thoughts, if you heard the discussion with some of the previous panels where we talked about, or if you're familiar with the IAALS report and the content of that. But a great deal of discussion on investigatory versus adjudicative and dividing those functions either by doing two panels within the Commission or setting up a separate group. And of course, the vast majority of states, when there is a final decision by the Supreme Court still has, many of them have the two-tier system. And, so, we were talking about structuring that. Do you have any comment on one tier versus two-tier on investigatory versus adjudicative with, of course, the Supreme Court still having the final say on what the disciplinary action is.

**Rep. Weissman**

Ms. Chappell.

**Marilyn Chappell**

Mr. Chair. Thank you, Representative Carver, we were here for that discussion. CJI does not, at this point have a position on the separation of function between the investigative, prosecutorial, and adjudicative functions. Other than, as I said earlier, that we support the Supreme Court being the final decision maker. So, to answer your question, we do not have a position at this point. However, we would be happy to discuss that further internally at CJI and request to submit further statements, if that would be appropriate,

**Rep. Carver**

If that is something that you care to provide comment on, I think that would be most helpful. The other piece, just based upon some of the comments that you made, the three areas that you wanted to comment on. You talked about if, as 13 states have done, when there is an allegation of misconduct against a supreme court judge. In those 13 states, they have set up a process for a special tribunal, and because that has been, and hopefully in future, will be, a relatively rare occurrence, that it is an ad hoc measure. You seemed, I just wanted to make sure I understood. You would be in support of that, but would like, if possible, not to have that be caught up in a constitutional change. I mean, I do agree with you, and we see this. We debate this on, you know, what should we put in statute versus what needs the flexibility of being in rules. And of course, it's just one degree more when you are putting it in the Constitution. Can

you speak a little more to again, my takeaway is that you're not opposed to a special tribunal in those circumstances.

**Marilyn Chappell**

Representative Carver, Mr. Chair, thank you for your question, and thank you for the opportunity to clarify. On behalf of CJI, I would not say that we support a separate tribunal. What we do support is a concept of some sort of rule provision that would pertain to the rare situation where a current or former Colorado Supreme Court Justice is being investigated and is subject to potential formal sanctions. We're not saying that we would agree that a separate tribunal is the correct answer. It could well be that something more limited, for example, not the entire membership of the court, would need to be recused. It could be that fewer than the entire balance of the court could be recused, and that sort of thing involves a case by case analysis, and should be able to be addressed in some sort of rule and should not require the formal establishment of an entirely separate tribunal. That would be our position.

**Rep. Carver**

Thank you, and you know, I know you heard the testimony. Just one more question, Mr. Chair, I know you heard the testimony that Colorado is an outlier with regards to the scope of confidentiality, and that the majority of states do limit confidentiality once a formal proceeding is initiated. Some of those at when charges are filed, others at some time later in the process. Just on the merits. And again, just to clarify, make sure I understood your point. You are, on the merits for that, but your concern is it would involve a change in the constitution which you're cautious of. Am I summarizing your position correctly?

**Marilyn Chappell**

Mr. Chair, Representative Carver. Yes, we agree with I think everybody else who said that once formal charges are filed, that that is a point at which confidentiality can cease. So, we agree with that concept. But yes, as you point out, that will that should involve caution, because it would require a constitutional amendment. And as Justice Korlis said earlier, you want to be careful about opening a Pandora's box once you open that possibility. But yes, CJI does support that change.

**Rep. Carver**

Thank you.

**Rep. Weissman**

Thanks. Other questions for either of our CJI witnesses? Senator Gonzales.

**Sen. Gonzales**

Thank you, Mr. Chair, and thank you both for joining us this afternoon. I appreciate you kind of walking us through the mission and structure of the organization. Can you give us a sense of how many judges are current members of your organization, and also judges are members of your board of directors?

- 3 -

**Jeff Rupp**

There are a handful. What would the number be? There are maybe, I think, two or three active judges who are on the Board, and there are probably a similar number who are emeriti board members, former board members. In terms of membership, I don't know the exact breakdown, but it's a good number. I mean, ultimately, our mission is to promote the excellence of the courts, and so it's in their interest. So even as even as they are members, and they are board members, in some cases, they recuse themselves in appropriate ways during board meetings, when business comes up that might compromise or that they feel that they should leave the room, and so we pride ourselves on being independent. But of course, we work on their behalf to some degree, and they're interested in that.

**Sen. Gonzales**

Thank you. Is that a . . . Well, I'm not going to get into your organization's recusal process, because I think it might be. That's a different conversation to have. But I will say that we, one of the things that we're struggling with right now is how and when a recusal happens, and how best to ensure that impartiality when it comes to issues of misconduct for justices themselves, right? And which is why I think this would potentially require or necessitate a constitutional change. Okay, I am here in receipt of the written comments that you submitted previously as well. I want to just disagree with the idea that there are not serious problems with or need for major changes to the judicial discipline system. I think that the survey that we have, we were just discussing around workplace culture demonstrates that there are a lot of people who feel that the Judicial Branch is a great place to work, but also a number of people, a concerning number of staff members and participants, employees of the judicial branch who disagree. And I think that that cause for and that cry for changes to culture demonstrate that there actually is work to be done. And so, I suppose that that's more of a comment than a question. But I just wanted to appreciate you all coming forward. I appreciate the request for us to proceed with caution, which is why I think that we didn't move this work forward during the legislative session. I think it's why we're doing this work here to be iterative in our work, to hear from as many perspectives as we could, and to proceed thoughtfully and carefully. More of a comment than a question. But I just wanted that to put that on the record.

**Jeff Rupp**

And we appreciate that. This has been a very deliberative process, and as you point out, the work continues. So, we appreciate that. If anything, it's just a gentle reminder,

**Marilyn Chappell**

Mr. Chair, may I respond further to Senator Gonzales. Thank you, Senator Gonzales, for your comments. And we understand that, and we take that to heart. I would go back to what Justice Kourlis said this morning, as far as dividing the issues into separate categories, some of them involving the workplace, some of them involving Judicial Department employees who are not judges, and so forth and so on. I would just refer back to that and to the concept that, yes, the system is not perfect. Yes, more resources could be devoted to education and training, including on managerial issues, and again, CJI

- 5 -

supports providing the courts with the resources that they need to accomplish adequate training and education.

**Rep. Weissman**
Comment noted. Senator, we have time for maybe one more question before we need to move with our agenda. Committee? All right, seeing none. Thank you for being with us.

**Jeff Rupp**
Thank you.

**Marilyn Chappell**
Thank you.

**Rep. Weissman**
And, again, apologize for the slippage in time at the top of the hour.

# Appendix 27(s)(iii)(6)

# Presentation by the Colorado Coalition Against Sexual Assault (CCASA);

# Legislative Interim Committee on Judicial Discipline—
# August 10, 2022 Hearing:
# Colorado Coalition Against Sexual Assault

**Rep. Weissman**

Okay, next on our agenda is to hear from CCASA, the Colorado Coalition Against Sexual Assault. We are joined by CCASA's Policy Director, Elizabeth Newman. And it looks like another member of the CCASA team. All right, however you'd like to proceed, thanks for being with us, and sorry we're a little bit past the printed time.

**Elizabeth Newman**

Thank you, Mr. Chair and members of the committee. I'm Elizabeth Newman, Public Policy Director for the Colorado Coalition Against Sexual Assault. CCASA is a statewide membership organization of rape crisis centers, law enforcement, colleges, survivors, and others who are committed to preventing and addressing sexual violence. We were invited here to speak today about a victim-centered approach to judicial misconduct complaints. One of our primary tenants is to be victim-centered in our work. And with that in mind, I'd like to ask the committee to allow my colleague Natalie Seils, to read testimony from a person who was a victim.

**Rep. Weissman**

Sure. Ms. Seils, go ahead.

**Natalie Seils**

Thank you. My name is Natalie Seils. I'm here with CCASA. The following is a letter written from a victim, written for the committee.

I was sexually harassed by a judge while working as an intern during law school. I can tell you that it was an absolutely horrible experience. I reported the harassment, which went to the judicial commission. They interviewed me a month later and told me it could be months before I heard anything back. They requested I speak to no one about the investigation and warned me that doing so could result in a misdemeanor charge. Lastly, they told me that they did not represent me, but the people of Colorado. I was on my own.

With that, I was released back into society, expected to go to school, carry on with my life, and keep my mouth shut. I began to have terrible anxiety. I was in the dark, and no one would give me updates or explain anything. No one was able or willing to guide me. I was scared to tell anyone what was happening and risk a misdemeanor. I started having nightmares about the judge. The anxiety began to manifest in hideous ways. I was so worried that the judge was going to ruin my career and dirty my reputation. I got to the point where I thought he could show up at my school or work and physically hurt

me to keep me quiet. I would walk to the parking garage every day and have trouble breathing, and would break into sweats. I felt like I was thrown to the wolves. I continued to spiral as I waited in silence, not knowing if my claim was being taken seriously or an investigation was moving forward. The anxiety paired with something I had never experienced before, a deep depression. I began to hate law. I felt that it all was corrupt, that judges could do as they please with no consequences, and, that as a woman, these things would continue to happen to me, and no one would bat an eye. The judge that I reported was still on the bench, and I had heard nothing about what was happening. It became physically painful to get out of bed and go to class. I started crying every night when I got home and seriously contemplated dropping out of school. Everything felt so hopeless, and I no longer felt like myself. My friends approached me and begged me to go to therapy. I knew that I was not okay, but I did not have the energy to figure out how to enroll in therapy, or, more importantly, how to pay for it. Then I hit the lowest point in my life. I was driving home from a class, and I remember being so hopeless and tired that I wanted it all to end. I let my hands hover off of the wheel for a few seconds, and thought about how easy it would be to let go. I know I had never had thoughts of killing myself or wanting to die before this.

I spoke to someone at my university and told them a little bit of what was going on. This individual put me in contact with CAPE, an organization that acts as a resource coordinator for students who have been sexually harassed or assaulted. I finally had someone to talk to where I felt safe and heard. The CAPE officer organized everything to get me into therapy. It was quite literally a lifesaver.

However, the process with the Commission did not end there. Almost six months later, I got a call that they needed personal evidence for me, I was on Christmas break with my family, and I felt the anxiety hit again. Then more silence. Months later, they reached out, and I was told that I needed to schedule a time to be deposed in the next couple of weeks, right around the time of final exams. This involved my harasser sitting across the table from me as his attorney interrogated me. I was a witness and did not have rights as a victim. I was powerless to do anything. With finals looming, I had to scramble to get an attorney and find a way to pay for my own representation as a student, living off of student loans.

When I reported, I was scared. But I was told it was the right thing to do. Now I feel failed by the system, and I do not blame others for not reporting. The process has been re-traumatizing, to say the least. I have wanted to die. I have cried myself to sleep. I have been boiling with anger. I have been numb, scared, worried. I have been all of the emotions that no victim should go through without support.

The reality is, it is not that hard to do better, and I have some suggestions. First, there should be someone to explain the process in more detail at the beginning, maybe provide some written information and help victims understand that they have the rights of a witness and that they should get their own representation. Second, having someone as a point of contact. If a victim wants an update or is confused about how the process works, someone they can feel safe and comfortable contacting to learn more. Third, no one who reports should have to mentally suffer and have no resources to help. Having some

- 2 -

sort of stipend for mental wellness in this process should be a given, and it should not be an added stress on the victim to figure out how to find a therapist and how to pay. Fourth, victims should have the right to an attorney at no cost, whether this is paid for by the state or at minimum, attorneys volunteer pro bono. Someone should coordinate this and cover expenses, instead of throwing this responsibility and financial burden on a victim who is typically a lower-level employee and does not have the same bucket of finances to dip into as a judge. Next, possibly creating a hotline or a neutral person for victims to report to would be helpful. It can be terrifying to know that your harasser is five steps down the hall from the person you are supposed to report to. Finally, little things need to be insured too, such as making sure a victim is able to transfer or leave the job with the judge, change their phone number, etc.

If we care about this profession, if we want to foster young students into incredible lawyers, if we want courthouse employees or people standing before a judge to feel safe and not objectified, then we must do better. I am a first generation law student. I have experienced a lot of hardship in my life. I have fought hard to be here, but this process almost made me give up and walk away from it all. I never want another person who is doing the right thing to have such a terrible experience. I don't want this profession to be seen as corrupt and a letdown. I ask you to help change it, to help victims who have already suffered feel like everything is going to be okay. We can and must do better. Thank you.

**Rep. Weissman**
Okay. Thank you for reading the letter. We appreciate that the person whose story that is not in a position to tell it directly. Ms. Newman, however you want to proceed to this point.

**Elizabeth Newman**
Thank you, Mr. Chair. I do have copies of our recommendations with me that I also submitted electronically. And I wanted to start with the testimony from the victim, because I feel like it really centers a lot of the recommendations that we put together. I will say, in addition to hearing from someone directly impacted, we did speak with other state and national groups who work in this space, and looked at other processes for handling sexual misconduct in institutions that are atypical, such as Title IX at the higher ed level, as well as in legislative bodies. And what's happened with the federal judiciary, with the Judiciary Accountability Act that was introduced last year. Our primary goal with these recommendations are to return some power to victims, to ensure their safety, to support their healing, and to prevent further harm. While our lens is around sexual misconduct, all forms of harassment, discrimination, and offensive conduct in the workplace are pervasive and harmful. There is significant harm to the individual, as you've heard, and as we document. The research shows this is incredibly harmful to their well-being, but it also harms the entire work group. People who witness the harassment, people who see that nothing is being done. And it also harms the employer. You know, we have reputational harm. We have costs, financial burdens, and society at large.

Depending on how you ask the question, at least a quarter, if not up to 85% of women experience sexual harassment in their lifetime. And what I want to highlight are a couple reasons that the Judiciary is at

high risk for sexual misconduct in the workplace and other forms of workplace harassment. There are significant power disparities among the people involved in this system. Obviously, at the top, the judges who represent both a formal and informal sense of power. There's a lot of control over careers. There are relationships, there are networks, and there is a real chance that someone reporting something can really be detrimental to their career. And then there are the decentralized workplaces, as we heard from ILG, their report, you have these different districts that are operating in their own way and not as a cohesive system.

We have highlighted some recommendations that are consistent with what you've heard, but what I want to talk to you about today are some that are maybe unique or haven't been mentioned at this point yet. In particular, as we talk about safe reporting, it's important that victims have a choice in what happens and how they report, that that power is not taken away from them, their story is not taken away from them. And so as we talk about formal and informal, anonymous complaints, those are all ways that we can ensure that someone has some decision making in what's moving forward for them in making and raising an issue. The other thing I want to mention is permitting reports from current and former employees as well as volunteers, people in the courtroom. There should not be a limit to who can be filing a complaint or the time frame. I also want to mention whistleblower complaints. I think that as we talk about harassment and discrimination, those are incredibly important. But the retaliation provisions, the opportunities for filing a complaint, should also be incorporating whistleblowers as well. When we talk about investigations, we really are looking at a lot of the similarities with Title IX. There really can be a very lengthy process, and we do want to ensure that there is due process, that there is a fair and impartial investigation. But for Title IX, one thing that's been a really significant change and development is having different people for receiving the complaints, for investigating the complaints, and for making the decision on and adjudicating the complaints. Going back to the retaliation piece. There really must be clear procedures and policies that are communicated broadly around how to determine whether retaliation has occurred, and if so, what remedies there are for the victim and as well as for disciplinary action for those who have retaliated. You know, the investigative reports really highlighted retaliation as a major concern among employees, and given the risk factors within the Judicial Branch, we think that's incredibly important. As well as ensuring the independence of either an investigatory unit or a third party to conduct investigations.

I also want to highlight the importance of prompt investigations. That's something that we've seen as a real challenge with Title IX, that these drag out. And as you hear, it is harmful to the victim to continually be left in the dark about what's happening, to not know things are progressing, and to be wondering when they're going to hear more. And oftentimes they might be in the same space, the same physical space as the person who harmed them, and so having a prompt investigation can be very important in that process. And even further continuing investigations after someone has retired or resigned. That should not be the end of the complaint. That is something that also comes from Title IX. For us, we know a student graduates, the complaint and the investigation still moves forward. I want to spend a little time on how we feel like support for victims could be best implemented. And I know

- 4 -

there's been discussion about an ombuds office or person, and I don't think this is necessarily an and/or situation or an either/or situation, but we really feel like there needs to be someone there for the victims. And that would probably be a different role than an ombuds. An ombuds is more there to make sure that the system is working properly, to make sure that things are progressing. We're suggesting an Office of Employee Advocacy, which is how it's framed in the Federal Judiciary Accountability Act. As we hear from interns, volunteers, others who are in the space, maybe also would benefit from such an advocate. Someone who can provide confidential support and information about the process of reporting, as we heard from the victim, you know, really needing some help on what are supportive measures that could be in place? What are some of the corrective measures that might come down the line for the accused, if it's found to be substantiated? Referrals for care, for medical or mental health care, community, advocacy services, therapy, other resources, some guidance in navigating what are your options. Which I do believe was referenced with regard to the ombudsperson. However, there are more opportunities and ways that this advocate can be a support. The role of an advocate is really to help the person define what is best for themselves, and giving them the information so that they can make their own choice. And the most critical piece, I think, as was mentioned by the victim, is that legal representation, and that is part of what was developed in the Federal Judiciary Accountability Act. Is that this office would be able to provide legal representation in matters relating to the proceedings of a complaint. And then, as well as regular status updates are informing the victim of the result of critical stages in the process.

I also want to mention really having the supportive measures in place. We see that a lot with Title IX, letting people know they could change their phone number, they could change their e-mail address, they could change their schedule, things like that that allow someone to feel safer. Allow them to not have contact with the person who harmed them. There can even be no contact orders. Security services, temporary leave, those types of options. People might not know what's available to them. And as we heard, a lot of people are in the dark about the process of reporting. They're certainly also probably in the dark about what types of supports they can get in the workplace.

And lastly, on sort of support for victims. I want to mention that interns, volunteers, people, who are entering the legal profession are often starting at a courthouse. Often, they see the opportunity to work for a judge as a critical step forward in their career. And this kind of experience can really derail them. Not only because they might be turned off by the profession, but also because they need that letter of recommendation, they need that endorsement, that reference from whom they worked for, in order to move forward in their career. And especially at a young stage. You don't have a lot on your resume, and so creating some kind of process for employees, volunteers, interns, to get some kind of acknowledgement of their work and some kind of endorsement of them to ensure that this doesn't derail their professional career. In terms of accountability and transparency, it was mentioned a little bit about having some consistency in what types of actions will result in what types of consequences. There are things such as a corrective action matrix that ensure that consistency, that spell it out, to eliminate some of that implicit and explicit bias. If you have a body that is connected to the people that they are regulating, they might be a little bit informed by who they know, what they perceive to be, maybe the

- 5 -

scenario of how something came about, and so having more standardized procedures can be really helpful to eliminate some of those biases creeping in.

Another piece that was brought up forward for us in our research was, if a lawyer is bringing forward a complaint against a judge, what happens when they have a case before that Judge again? Currently, my understanding is judges make their own determination of whether to recuse themselves, if they have a conflict of interest. Could we have a process that maybe lays out some steps to ensure that either there's a recusal or reassignment in those types of cases. And lastly, I really want to highlight prevention. A history of silence and misconduct must be addressed by shining a light, and this cannot be done without training and awareness and communication across the entire organization. So, there must be policies, and they must be communicated and they must be followed. But also, we must have training and research on effective training really shows that it should be customized to the environment, so people see scenarios that are relevant to them.

We also feel like, judges or leadership should have their own specialized training so they're not next to someone that reports to them and are asking questions that maybe show a little bit of ignorance or a lack of understanding. And, so, they have that space to ask questions, to learn. And, also, to make sure that everyone is treated as bystanders, as allies, instead of as perpetrators and victims, so that we're in this together. Right, that cohesive core mission that is shared and values that are shared across the organization. And then just another endorsement for workplace assessments. The data that comes from anonymous feedback can be incredibly enlightening, and can really show some areas where there is a lack of or hot spots, as were referred to earlier. I think those are really important, and we've seen the increasing use of them in the private sector, and really encourage the public sector to jump on board. I'm happy to answer more questions or expand on anything further, but I really do want to respect your time this afternoon.

**Rep. Weissman**
All right, Ms. Newman, thank you. I did take a look at the document before today when it went around electronically, and just want to express my thanks to you and the organization for putting it together. I think it's a very good taxonomy of some of the issues we have to continue to grapple with here questions. Rep Bacon.

**Rep. Bacon**
I'm sorry, I actually missed one of the recommendations from the letter that you read, and I'm wondering if you could share it with me. It was the last one. The fifth one. It was after the attorney, right to an attorney.

**Natalie Seils**
The hotline?

**Rep. Bacon**

The hotline, okay. Thank you.


**Natalie Seils**

Yes, a hotline or neutral person for victims to report.


**Rep. Bacon**

Yes, thank you.


**Rep. Weissman**

Rep. Bacon good for now? Okay, I did have one question. So, years ago, this institution, this branch of government, stood up the Office of Legislative Workplace Relations, and at the time, CCASA had been pretty heavily involved in commenting to and sort of advising on processes that ended there, among other places. The OLWR includes a formal resolution track and an informal resolution track. And the preference of the individual going through the situation is to be given a lot of weight in that process. By analogy, we have less severe sanctions that are considered informal in nature here in judicial discipline, and we have more formal ones that tend to be more severe and go public. And as we're all hearing, they may go public sooner than they now do. I just wonder if you could elaborate a little bit further how you would advise us from CCASA's perspective on what we should be thinking about, and what, if anything, we should be careful about when it comes to the role of informal processes here.


**Elizabeth Newman**

Thank you for the question, Mr. Chair. You know when we talk about informal resolutions, that is a piece of it that is important for the victim to decide how they want to move forward. But I think the institution also has a responsibility to follow to the degree that they feel like the severity of the conduct needs to be responded to. And, so, an informal complaint doesn't necessarily mean an informal resolution. On the other hand, we do want to protect and respect the wishes of the victim in terms of how things move forward. So, in that regard, I would say that informal complaints and informal resolutions do need to understand the power dynamics that are before them. For example, someone who's very concerned about retaliation might be more likely to provide an informal complaint, and really wanting to see themselves protected more so than the person who harmed them protected. And, so, I just want to make that note that when we talk about things like alternative resolutions or that the federal judicial branch has employee dispute resolutions, that we're really acknowledging the power differential. That someone is going into something like that willingly, and that if we think about restorative justice practices or transformative justice, that those really have to be something that both parties come to with an equal understanding of what the harm is that's happened and a willingness to take accountability and to have full discussions about it. And so just in this scenario, if we're talking about judicial discipline, I think those, those can be more concerning because of that power differential. Thinking through those resolution processes, however, it can be really healing. So, it's just a delicate situation where there cannot be a hard line drawn, I think. And more so can benefit from the types of advocacy or roles of an

- 7 -

office such as OLWR to really allow people to kind of think through what the different options are and how it will play out, rather than having a specific process that's applied to everyone equally.

**Rep. Weissman**
Thank you for that. Committee, Madam Vice Chair.

**Rep. Carver**
Thank you, Mr. Chair. And thank you both for being here. I wanted to follow up on, quite frankly, the shocking, beg your pardon, victim's letter and how that played out once she had contacted the Commission. You know that's inexcusable. So here, this young lady has drummed up the courage to file a complaint. She's then told, don't say anything, or you're going to be potentially liable criminally with a misdemeanor. Six months go by, hasn't heard a thing. You know, this individual could have also sought relief and recourse through the HR system, but now she's under threat. Does this include her going to HR? She's not allowed to talk to them? And so, you've heard the discussion with confidential or anonymous. Routing that through the ombudsman. But I'm seeking clarification. If this isn't what you meant, just let me know. When we're talking about a victim-centric process. My thought and some of this is based upon labor processes I've done, as well as criminal justice. Is, in both worlds, my experience has been that when a victim comes forward, that there is a set process and set personnel to keep the victim apprised of the status of the investigation. Somebody that she could go to and say, hey, they told me, if I tell anybody, it's a misdemeanor. Does that mean I can't talk to HR? What does that mean? And, so, my thought, and ideally, this should be done by rule and budget, whether it's the Commission and/or HR, is that there should be an individual, a process within the Commission that is victim centric, and whose job it is to be that point of contact for the victim and be providing them information about the process. When they could expect you know, we're behind. We've got this many complaints. We think we'll get to you in five months, six months. Just let them know. But I think that function, once a complaint has been filed within the Commission or HR is more properly done within those organizations by dedicated personnel, as opposed to having that function be done by an ombudsman. Do you have any thoughts on that?

**Rep. Weissman**
Ms. Newman.

**Elizabeth Newman**
Yes, thank you for the question, Vice Chair. In this particular case, this person reported to the courthouse HR, which then forwarded the complaint to the Commission, so they did not seek out and report directly to the Commission. And the Commission informed them that it might be several months before they hear anything. That's not enough, though they did have their workspace transferred. But again, it's an internship. It's not a formal employment. How much is HR? I think from the perspective of a lot of people working in the sexual violence movement, HR is not there to represent the victim. They are there to represent the employer. They are there to do their due diligence on behalf of the

- 8 -

organization, not on behalf of the victim. So, my personal feeling and CCASA overall supports ideas that separate the victim advocacy piece from HR. We see that in Title IX many, many universities have, well, they all have Title IX coordinators. If they get federal funding, they should. The Title IX coordinator is there to facilitate the process, provide information. But they are really not there to be the victim's advocate. They are there for the system, for the institution, and many, many universities have an office for advocacy. They have some places, it's called a resource center. In some places they provide trauma services. But they're there to be an advocate for the individual who's been victimized. Could that be performed within the Commission, or within HR, if they had independence? Potentially, potentially. But I think you have to also take a look at what is the perspective of the person who's been harmed, and are they going to see them as truly independent and there for them, or are they going to see them as a part of the system who's only furthering, you know, the interests of the system?

**Rep. Weissman**
Madam Vice Chair.

**Rep. Carver**
No, and I appreciate that. And while it's not apples to apples as a JAG, I was involved when the Air Force created and put into place the victim witness assistance program. Which was a dedicated, independent, confidential set of employees whose sole job was to provide support and assistance to victims and witnesses. And most critically, or at least a core part of that was keeping them fully apprised of the timeline, the steps involved, what they should expect, clarification on staying quiet or not. I mean just, it was there, it was separate and it was independent. So, now granted that was in a criminal context, but I think there is, at least in the HRs I advised, you know as JAG, we kind of float around doing a little bit of everything. There in our HR department, we had personnel whose task it was to stay in contact with the victim, the complainant, and the witnesses. And keep them up to date on the process. That was their job. So again, I don't know that this is a statutory matter. It should be something that could be properly taken care of by rule, and if you need more personnel to do it, then put it in your budget and ask the General Assembly to fund it right, Mr. Chair, who will be back in 2023. So, I really appreciate the recommendations and how your organization does really focus on the victim and the reality of the situation they face. Which it's difficult to come forward, and then when you do come forward, you find the whole process is a challenge. So, thank you.

**Rep. Weissman**
Thank you. And you know, members, I think we're all aware that we may be talking about things here that would drive needs for appropriations. We can't do that ourselves, but we can advocate with those who can. And our newest member of the committee has a particular history, I think, with that aspect of legislative work. All right, members, I think we're at time, unless there are any other. I'm sorry, all right, Senator Gonzales, last question.

**Sen. Gonzales**

Thank you, Mr. Chair. I just want to extend my appreciation to the victim who summoned the courage to share their perspectives with us as a committee, as we are grappling with some really big issues. I think that their experience really grounds us. If you all feel and if the person themselves feels it appropriate. I would welcome receiving a written copy of their comments. Furthermore, and this is a piece that I would just request written follow up if you're so able to provide this. On each recommendation, if you all have models of who is doing this work well, whether that's in Title IX, whether that's in the work that this body did a few years ago, whether that's just in universities or other places where you can point to. This is a model of what recommendation three, subsection B looks like, or so on and so forth. Any of that sort of model, language or model example would be most welcome. I'd like to particularly request any sort of model, corrective action matrix that you may have seen in other circumstances and situations. Because I think we've been trying to really understand. I think we all appreciate that not everything needs to rise to the level of a formal reprimand or corrective action, but there are sometimes informal steps that can be taken. And if that corrective action matrix lays out options of those types of informal actions, I think that would really be helpful for us to think about. Understanding that that may not rise to the level of statutory change or what have you, but as something that we can then figure out how to make recommendations around. I'd welcome any of that follow up by submitting that to Ms. Jenson. But again, I just want to really express my gratitude for these recommendations.

**Rep. Weissman**

Likewise, and thank you, Senator Gonzales. You know it was really difficult to hear that read. I don't think any of us wants that to be the experience of anybody in our Judicial Branch of government. To the Senator's latter points. We had previously inquired of NCSL, a research organization, are there any models out there in other states for something like a VRA for the judicial discipline complaint process. The answer was no. So, I would also appreciate sort of good metaphors, but I think it will be necessary, and in this case, appropriate, to go outside of the immediate context. I mean, I just dug up the PDF from ILG on their reports. I think that was 200 plus pages. I know there was a pretty lengthy document that CCASA compiled in what was going on around here in 2018. Maybe you would call our attention to some of that. Maybe you just know, or a partner organization knows of some company that's doing this really well, or some nonprofit organization. I think we would appreciate sort of metaphors and positive examples from any source that they could be found. And again, feel free to email that directly to any of us, or Ms. Jenson can forward it to all members. And it could also be made part of the ongoing record on the website for this committee, if you like. All right, thank you with that for testifying with us today and for giving voice to the experience of somebody who survived something that she should not have had to.

- 10 -

# Appendix 27(s)(iii)(7)

# Presentation by Various Colorado Bar Associations;

# Legislative Interim Committee on Judicial Discipline— August 10, 2022 Hearing: Bar Association Presentations

**Rep. Weissman**

Committee, the next item on our agenda is to hear from various bar associations. We have a couple wrapped up in here. The first one will be from several representatives of the Women's Bar, and we'll invite them up as a panel, and then we will have one representative of the El Paso County Bar who will be with us on Zoom a little bit later. So, with that, we'll welcome Ms. Connaughty, Ms Garrison and Ms. Busby, if you'd like to please join us.

All right. Thank you all for joining us and for being patient as we're trying to control the agenda here. Whatever order you'd like, please proceed. We do have via your prior email transmission. We have the written comments and the summary of those and, personally, I found them helpful. So, feel free to elaborate on that however you'd like.

**Emma Garrison**

Thank you, Mr. Chair, members of the committee. We appreciate the opportunity to provide testimony to you all today. My name is Emma Garrison. I'm the President Elect of the Colorado Women's Bar Association, or CWBA for short. Here with me are my colleagues, Alison Connaughty, our Vice President, and Ariana Busby, Co-Chair of our Public Policy Committee. All three of us have prepared comments. We're going to be sharing the mic back and forth, but feel free to interrupt us with questions. The CWBA is an organization of over 1500 attorneys and legal professionals with chapters across the state. Our mission is to promote women in the legal profession and the interests of women generally. Each year, our public policy committee actively engages with the General Assembly and advocates for legislation that will promote and protect the interests of women and children. The CWBA is also actively engaged in the Governor's Judicial Appointment process. We conduct due diligence on every shortlisted candidate and present endorsement recommendations to the Governor, taking into account the goals of advancing justice, creating a diverse bench and ensuring fair treatment of women, people of color and other historically marginalized groups, and we create programs and initiatives throughout the year that support diversity, equity and inclusion within the legal profession. Our members include judges, judicial law clerks and staff within the Colorado State Judicial Branch. We estimate that about 10% of our membership is employed by the Colorado State Judicial Branch, and of course, hundreds of our members practice before the Colorado State Courts. Our theme for this year is you uniquely belong. We want women to know that they belong in the legal profession and that they are equal citizens under the law. The allegations and revelations we have heard over the last year and a half have been profoundly demoralizing to our members. Confidence in Colorado's Judicial System is of the utmost importance to our organization. We are grateful for this opportunity to influence meaningful change. I'm going to turn things over to Vice President Alison Connaughty.

- 1 -

**Alison Connaughty**

Thank you. When the revelations about complaints of sexual harassment within the Judiciary were brought to light in February of 2021, we called a town hall so our members could discuss the impact that it had on their practice and on the legal community overall. We also formed an internal committee to press reforms forward and to closely engage with this problem on behalf of our membership. We've engaged with various stakeholders, and we've also testified in support of SB 22-201. I'd like to tell you all a little bit about the process that we went through to put together the written comments, the lengthy written comments that we submitted for the hearing today. First, we reached out to our fellow diversity bars, through the President's Diversity Council and through other means, and we invited their participation. And we were able to gain some research volunteers. We identified which of the 18 areas are a priority to our membership. And those nine areas that we commented on are the areas that you all have received in our written comments. And I'm sure that you've noticed there's a lot of overlap between a lot of the areas that are important to us. And with our research efforts, we reviewed resources that we thought were pertinent through the National Center for State Courts, the Institute for the Advancement of the American Legal System. We also consulted with members of IAALS and with the leadership at their organization. We met with leaders from the judicial community. We met with the judicial discipline commission. We also identified states that have recently undergone legislative changes and constitutional amendments that we think Colorado should look to in terms of the changes that we should be prioritizing throughout this process. And we have identified states that improve upon Colorado's current model and compared resources, statutory language, relevant rules and constitutional provisions. And we've divided our recommendations that we're going to be covering in our testimony today in three areas. The first area Ariana Busby will discuss: administrative and access recommendations. I will cover the recommendations that we have pertaining to ensuring the judicial discipline process is victim centered, and Emma Garrison will discuss our recommendations relating to confidentiality and transparency. Then it will come back to me, because we have been listening, and we know you're going to ask us for examples from other states. So, I'm going to make sure that we have covered and highlighted everything that we want you all to be looking at. With that I will turn it over to Ariana Busby.

**Ariana Busby**

Thank you, committee. So, the CWBA has a number of recommendations regarding the administration of the judicial discipline commission, as well as access. There's going to be six that I go over today. First and foremost, the complaint process needs to be modernized. In looking at this, we looked at examples such as our own Department of Regulatory Agencies, where you can file a complaint online. You can also submit that complaint in writing if you need to. That's also something that you can see through the Office of Attorney Regulation Counsel, where you're able to submit your comments online. So, modernizing that complaint process, we feel would have a large impact on access to the Commission. But it's also more efficient for staff. And so that's really a twofold recommendation. The second one is one that you heard from IAALS earlier today, and really many of the speakers today, and that's clarifying whether or not complaints can be made anonymously. It appears that anonymous complaints

are allowed, but that's not mentioned anywhere in statute or in the rules or in our Constitution. And if you review even the instructions on filing a complaint, there's no mention of how to do an anonymous complaint. And, so, we would recommend clarification on that aspect. In New York, for example, they have a separate form for anonymous complaints, and those complaints are then treated as though they were initiated by motion by the Commission. And, so, that's one state that we looked at as an example for anonymous complaints. Third, we would recommend statutory and even rule updates regarding the Commission's annual reporting to the Legislature and to the public to include more detailed information, including the statistics on number of complaints filed, the disposition of those complaints, the content of the complaints, what type of courts those complaints were impacting, for example, if they are all in family court, that was something we would love to know. And the demographics in terms of who the complaints are being filed against and who's filing the complaints. This can help us identify trends, that can help Judicial identify trends for need for training, as well as to identify areas where we need to provide more information to the public. For example, if there's many complaints that are dismissed as being outside the jurisdiction of the Commission.

In terms of constitutional changes, we would recommend a modification to the requirements on the makeup of the Commission. We're not going to discuss specifically the number of people that need to be on the Commission, etc. However, if you look at other language for boards and commissions in the State of Colorado, there's generally language pertaining to geographical diversity, gender diversity, cultural diversity, etc. And that's something that's really missing here. There's a requirement for geographical diversity, and that is something that you do see on the Commission currently, but we would ask that that be modified to include gender, race, disability and geography to allow for a more diverse makeup of the Commission.

And then, lastly, we have two recommendations regarding conflicts. First, we would recommend added recusal provisions and disqualification standards for Commissioners and judges who review the Commission's recommendation, including a process for challenging a recusal decision. There's not currently a process in place to challenge if a Commissioner does not recuse, and we feel that that is an area that must be addressed. Second, there needs to be an objective mechanism for replacing judges who are conflicted out of a proceeding. You've heard several recommendations on how to address this. Our report provides examples from several states, but we'd like to more particularly point to the State of California, which has a rotating tribunal of appellate judges, and specifically makes it so that the Chief Judge would need to recuse himself or herself if the complaint is against a member of the Supreme Court. And, also,' Minnesota, which would have the complaint go to the Chief Judge of the Court of Appeals and six random judges from the Court of Appeals. With that, I'm going to turn to Alison to talk about our victim centered approach.

**Alison Connaughty**
Thank you. A process that keeps victims informed and that provides victims with some autonomy throughout that process is of utmost importance to the CWBA. We unfortunately were not successful in

- 3 -

finding a judicial discipline model on how to handle victims, either. But we did provide a few examples in our written comments that we think serve as models we can look to in making sure that these rights are codified. First of all, Colorado Victims' Rights Act at Colorado Revised Statute sections 24-4.1-300.1 through 303 provides some helpful guidelines and a successful model. First, the term victim must be properly defined. That term must be properly defined for a number of reasons. First of all, because it serves as a very important trigger as to when someone is entitled to notice and entitled to participation in the process. We, as attorneys, really like notice as an opportunity to be heard. We also want to ensure that in creating these processes, we are not creating a way for people to abuse the processes. So that's another reason why that definition, with respect to disciplinary proceedings, must be clear. We submit that the term should apply, the term victim, should apply to subjects who are reporting harassment in the workplace and discrimination in the workplace, at a minimum. And it should also be considered for reporting parties whose pending cases are potentially impacted by the outcome of a disciplinary proceeding in a dispositive way. And like the Colorado Victims' Rights Act, once someone receives that designation, they should be provided with information on how the process will proceed. They should be provided with information on the number of different potential outcomes of that process. And there should be a requirement that they are consulted if they want to be consulted. With Colorado Victims' Rights Act victims, they get an opportunity to opt in or out of notifications. And we think this is important for that autonomy piece, in terms of giving victims back some of the power that our colleagues at CCASA talked so much about during their presentation. I can't think of a better organization to follow up after talking about victims' rights. And then the scope of the victims' rights in the disciplinary proceeding must be clearly defined. I've talked a lot about notice. I've talked about ensuring that they are fully informed, and we provided a couple examples in our written comments of where this happens in non-criminal settings. One of them is university systems. The University of Wisconsin System campus disciplinary process provides an example. And it articulates how students who report misconduct by a university employee are protected. It provides that students must be informed. It provides guidance on how students can submit an anonymous complaint, and it provides students with the opportunity to opt in or out. And it makes sure that students have the opportunity to provide input on what they would like to see happen with their proceedings. We think that's another really important part of ensuring that this is a victim centered process. With these new rules and regulations, victims should be given an opportunity to give input. That input does not be need to be dispositive on the outcome, but just giving them that opportunity and making sure that it happens gives them back some of the power that they lose in a harassment situation or discrimination situation. We also provided two other examples, one in the Code of Federal Regulations, 25 CFR Section 42. Again, pertaining to schools, requiring schools to consider victims' rights when appropriate, and it lists those victims' rights, and that citation is in our written comments. And, also, the Louisiana Supreme Court made several substantive changes as the result of an extensive study and review of their legal structure pertaining to judicial discipline. And the Louisiana Supreme Court has good language on when proceedings need to be expedited. CCASA also talked about the impact that a long proceeding that's dragging out may have on a victim's mental health, especially when a situation is related to not only a person's self-confidence, but their workplace. It just is touching on so many different facets of a person's

- 4 -

life. I would encourage the interim committee to also look at the language for Louisiana, and we have provided that citation in our written comments as well. And my colleague, Ms. Busby, talked about New York and the anonymous complaints. And I would just say, if someone submits a complaint and asks to do so anonymously, they also need to be informed about if and when their identity is going to be revealed. And they need to be given some autonomy on if and when that happens as well. With that, I will turn it over to Emma Garrison.

**Emma Garrison**

Thank you. The CWBA is also in favor of an amendment to the Constitution that would remove the confidentiality protections upon the filing of a formal proceeding. As has been discussed earlier today, this is how most other states approach judicial discipline, and it would also bring judicial discipline proceedings in line with criminal proceedings and most civil proceedings. We did provide sample language from several other states in our written comments. We also refer you to the work of IAALS, who presented earlier today a study from the National Center for State Courts, and also the ABA Model Rules for Judicial Discipline. We believe that this additional transparency would help promote public confidence and would make the process less mysterious. Someone earlier referenced trial by headline, I think, to avoid the media sort of being able to control the story and having less focus beyond rumors, is to keep these formal proceedings public. And while Colorado does not have judicial elections in the traditional sense, we do vote for judges in terms of retention, and having public proceedings would allow the public and voters to be more informed on their retention decisions. We also believe that this would serve as a deterrent function for other judges. Particularly if the judicial discipline opinions are easily accessible and searchable online. Another recommendation that we endorse from IAALS is a requirement that the Commission study all complaints that are filed, even ones that are not actionable but don't go anywhere, to identify emerging patterns of problematic behavior, to alert and educate those specific judges, but also potentially find broader areas that require education and reform. We further recommend allowing for information sharing between the Commissions on Judicial Performance and the Commission on Judicial Discipline. This would further increase transparency in the judicial discipline proceedings and our state retention process. We provided examples from a few other states in our written comments, and particularly highlight Alaska, Arizona, and Utah. Along those same lines, we recommend information sharing with the judicial nominating commissions for judges who maybe want to seek a higher-level court. Move on to the Court of Appeals or from County Court to District Court. There may be cases when past misconduct that came out in the judicial discipline process may be relevant to the nominating commission. Massachusetts is one state that allows the judicial discipline commission to share relevant information with its nominating commission. And I will turn things back over to Alison.

**Alison Connaughty**

Thank you. I think we have hit a lot of the specific examples, but just to reiterate. For confidentiality and when that confidentiality needs to be removed, we would urge the committee to look at California and also to Georgia, which is another good model. Georgia has a provision allowing for confidentiality when

- 5 -

the incapacity of a judge is at issue, and we agree with that exception, but overall, are advocating for our confidentiality bar to be moved up in the proceedings. For recusal, California and Minnesota. We like the fact that both of those states contemplate random panels of judges when there is a conflict of interest amongst the reviewing court. For accessibility of information, we would urge the committee to look at New York's model. They have a great determination database, and the information is organized in a very clear way. And thank you, and I think we are happy to take questions as a panel.

**Rep. Weissman**

All right, thank you. Committee questions for any of our CWBA witnesses on anything we've heard? There never, aren't questions in Judiciary. All right, well, goes perhaps to the thoroughness of your presentation, both just now and in writing. You know, we can tell a lot went into the written comments. I've given them a once through, and expect I'll be spending more time with them. As we've said before, if in hearing anything you've heard today, you wish to submit further, please feel free to do so, either to any of us or to Ms. Jenson. We're coming to the key part of the committee's work here next week, and then between next week and the 30th. So, time is very ripe for further input. Should you care to offer any. All right, you might be off the hook run away while you can.

**Emma Garrison**

Thank you all so much for your time and attention.

**Rep. Weissman**

I believe we have Mr. Kay from the El Paso County Bar Association, if we can get him connected on the Zoom, please.

**Daniel Kay**

Thank you. Can you hear me?

**Rep. Weissman**

We can hear you. We can see you. Please, go ahead.

**Daniel Kay**

Thank you. I'd first like to thank the committee members for their very important work on this bill. Specifically, I would like to thank the El Paso County delegation with Chairman Pete Lee, Co-Chair Carver, and Senator Gardner, who are all attorneys, and we believe they really understand this proceeding to its fullest extent. As you may know, El Paso County is the largest and the busiest Judicial District. As such, I'm proud to represent the El Paso County Bar Association's interests that are outlined in our letter to Representative Carver that I believe everyone has a copy of. First and foremost, the El Paso County Bar agrees with your work, and in so doing, we believe that the independent and transparent judiciary is of utmost importance, and we would recommend adopting the judicial disciplinary commission's recommendations. We've set forth three bullet points in our letter that mirror

- 6 -

the recommendations of the judicial commission. In addition to the recommendations of the judicial commission, we also believe, like the last speaker, that there should be communication between the judicial performance commissions and the judicial disciplinary commission and the judicial nominating commissions. I was on the judicial performance commission for 10 years, and we had two judges that were accused of serious sexual misconduct, and we had no idea that these allegations were out there. And, as a consequence, in both cases, the judges chose, after our recommendations that we retain them. They chose not to stand for retention, but we had no idea why they didn't, weren't standing for retention. And we had no idea about the allegations other than rumors, and we find out later what happened. So, we always would interview the Chief Judge, the District Attorney and the Public Defender, and there's no reason that there shouldn't be a representative from the judicial discipline commission that also should give their input, or we could ask questions to. We believe the judicial disciplinary commission needs to be independent and free of all constraints from the Supreme Court to restore the integrity of our judicial system that has been tainted recently. The El Paso County Bar Association asks you to adopt all of the recommendations of the judicial disciplinary commission. Do you have any questions of me?

**Rep. Weissman**
All right. Mr. Kay, thank you. We had a little glitch in getting a letter around, but we're remedying that now, so all members of the committee will have the letter from the El Paso Bar Association that the speaker just referenced. Questions of Mr. Kay concerning his testimony? Senator Gardner.

**Sen. Gardner**
Thank you. No real question of Mr. Kay, I just wanted to thank you for appearing today. We've been colleagues in the El Paso County Bar for some years, and I appreciate the Bar's participation.

**Daniel Kay**
We felt that was very important. I don't know if any other bar associations contributed, but we felt, as the largest bar association and the busiest bar association, we should weigh in on this matter, because of its utmost importance, and we appreciate you, Senator Gardner.

**Rep. Carver**
And Mr. Kay, this is Rep. Carver. Just my appreciation for the work that the El Paso Bar has done. And we know your diligence. We know how active the bar is down there, and the different sections are. So many thanks to you. And thanks to your new president elect, Paul Hurcomb, and if I may just say, ex Air Force JAG. Thank you.

**Daniel Kay**
Thank you. And Paul is on, as well. He's just listening.

- 7 -

- 8 -

**Rep. Weissman**

All right. Sorry, Mr. Kay, I was just going to say likewise. Thank you for taking the time to testify with us today. We're a few counties away, but we've, we've also spoken over the years, and we will all have a look at the official comments from the county bar association. And I'm sorry I didn't mean to step on you just now. Anything else that you wanted to add for us?

**Daniel Kay**

I don't. I just appreciate this committee's work. I think it's extremely important, and we hope that you do adopt the judicial disciplinary commission. We have been following this very closely in El Paso.

# Appendix 27(s)(iii)(8)

# Combined Presentation by the State Court Administrator and the Colorado Commission on Judicial Discipline;

# Legislative Interim Committee on Judicial Discipline: August 10, 2022 Hearing—Joint Presentation of the Colorado Judicial Department and the Colorado Commission on Judicial Discipline

**Rep. Weissman**

All right, the next element on our agenda is a joint presentation from representatives of the Judicial Branch and the Commission on Judicial Discipline. We will invite back up Mr. Vasconcellos and also David Prince and Elizabeth Krupa, the Chair of the Commission. Now for this part of the discussion, the Vice Chair and I have talked a little bit about a good way to organize this. Members of the committee are probably in receipt of a lot of documents over the past week from both entities setting out various positions. What I thought I would do is reference an August 1 document in which the Judicial Department lays out its responses to matters previously raised by the Commission, and then for the record on August 2, the Commission sent us another document, kind of replying to those responses. Not that this is the only organization of the material that we have in front of us. But it is one such. So, what I thought I would invite our witnesses at this point to do is just kind of move through the document in order. Example, Commission recommendation concerning accountability and core conflicts, and then we have some discussion. I think it would be helpful for us to hear. As we look at all of this, there are some areas where there seems to be substantial agreement. For example, that we need to go public earlier in the process than we do now. You know, it's heartening to see that kind of agreement, and we know that there's not agreement on all matters. Understanding that this will be an ongoing conversation, maybe we could just sort of invite two or three minutes from each of the Department and the Commission on each matter, as to where you believe that things stand based on conversations. What you think we should be thinking about going forward, and we'll just try to move through the entire list that way. Does that sound fair?

**Elizabeth Espinosa Krupa**

Yes, if I may.

**Rep. Weissman**

Chair Krupa.

**Elizabeth Espinosa Krupa**

Chair Weissman, thank you. What I believe that we have tried to do is go through our recommendations and start where we have agreement. That seems to be, at least in our meetings, the easier way to start is where we've agreed and move on from there. If I may, I'd like to just start with the areas that we agree. I think those would be easy and quick.

- 1 -

**Rep. Weissman**

Yeah, look, I think that would be great. And I've attempted to organize this in a similar way. I was only referring to the 8/1 document, just because it's in it's in writing, it's before everybody. I assumed it would be before all of you. If you have already conferred and sort of agreed to proceed in that fashion, I think that's also useful and am pleased to go ahead that way.

**Elizabeth Espinosa Krupa**

The areas that we have agreed. One to start is obviously the transparency. The Department and the Commission agree, as you've heard from many people today, that the confidentiality of our process should cease when formal proceedings are filed. There's agreement to that. I think what the Commission and the Department would ask is for the interim committee to consider confidentiality in terms of identification of victims and any information that might identify them. And a specific example is if you speak of a law clerk or something like that. It may not name the alleged victim, but it would provide details that would be easy to determine that. So, while formal proceedings would require disclosure, it may require disclosure of the respondent judge and perhaps a summary of the allegation of misconduct, but for the Commission to keep in mind confidentiality issues of the alleged victim and within the District that it is encompassing. I think we have agreement on that.

The second area that there's agreement between the Department and the Commission would be that there is a need for a pool of Special Masters. The Department had suggested that the pool be larger than nine. The Commission has no opposition to that. I think where we differ is whether the pool should consist of anyone, outside of judges. The Commission would encourage the interim committee to consider a pool of special masters that consists of judges, lawyers and citizens, and to consider an opportunity and evaluation process to where similar to striking a juror or preemptive challenge that either side, the respondent judge or the commission, could ask for a recusal or to strike a member of that Special Master's pool if an apparent or perceived conflict existed.

**Rep. Weissman**

Thank you. Just to put a question while we're on that subject, has there been any discussion about the number of just to use the analogy peremptory strikes that each side would be allowed in that context, or haven't you gotten to that detail yet?

**Elizabeth Espinosa Krupa**

Thank you, Chair Weissman. We didn't discuss numbers of preemptory challenges that way it would depend on the panel that would sit. If it was a three-judge panel, or three hearing member panel, you would be able to try to strike if there were conflicts perceived from any or all three of them by each party. But we did not specifically address preemptory challenges, like there are in criminal cases.

**Rep. Weissman**

Mr. Vasconcellos, on this same point. Not to answer, but I was taking your head nod on the last one to mean full agreement with the way that Ms Krupa stated things. But my intent here is that you each have the ability to speak to each point that's coming up.

**Steven Vasconcellos**

Thank you, Mr. Chair. As these things continue to evolve, and particularly in light of this morning's conversation, I think the Department is absolutely open to a conversation about the composition of the special masters, particularly around one judge, one lawyer, one citizen. I think there needs to be. And this was discussed earlier at length, so I won't belabor the point a good investment in how to identify particularly appropriate citizens who are capable, but I think that's definitely worth discussion, and it gets a little bit into a separate issue, which we'll talk about later. But we think that sort of one judge, one lawyer, one citizen construct probably works better if we take heed of suggestions from groups like IAALS to have greater separation between the investigative and prosecutorial functions from the adjudicatory functions. I think this composition of special masters that we're talking about probably works better in that context.

**Rep. Weissman**

Thank you. Please go ahead.

**Elizabeth Espinosa Krupa**

Thank you. Chair Weissman, another area, I think, where there is some agreement would be to changing the appointment term of Commission members. The Commission had recommended a larger range of perhaps six to eight. The Department is fine to extend the period of appointment of Commission members. They suggested a four-year term with the possibility of reappointment. So, a total term would be eight years. So, I think there is consensus on that issue.

**Steven Vasconcellos**

Mr. Chair, certainly a lot of good discussion around extending the terms. We talked about a number of things, longer, single terms. I know we are not exactly in lockstep with the Commission on this. I think the current terms of office are four years, with the opportunity to extend for another four. We talked about possibly two, fives, a single eight something longer for a single term, we tend to favor a six-year term, which is in parallel with appointments to judicial performance commissions. But again, I think there is at least conceptual agreement about term length.

**Elizabeth Espinosa Krupa**

Thank you. Another area that there appears to be agreement would be to codify the subpoena power of the discipline commission to evaluate potential misconduct. Where I think some of that disagreement as to where limitations might be placed, the Department had requested that there only be the ability to subpoena after a full investigation, which kind of negates the need for the subpoena power. The

Commission had also asked that the subpoena power include basically any examination undertaken pursuant to the Rules of Judicial Discipline 13(f), because that's the mechanism by which we can address even anonymous complaints for evaluation.

**Steven Vasconcellos**

And just to clarify, yes, agreement about codifying subpoena power. I think we just want to ensure that the subpoena is tethered to a specific complaint, not necessarily just an open ended we're just checking to see if there happens to be anything wrong. I don't think that's their intent, but I'd like it tethered to a specific complaint. And for guidance, the Department prefers the structure that's currently in statute for the Colorado Civil Rights Commission in Title, 24 for reference, 24-34-206, we think that's probably the most workable structure, in our mind.

**David Prince**

And to chime in just on the subpoena issue, this is one where there may be some hopefully small wording issues when we actually get down to language, but I think we're in general agreement. And the basic concept is the rules currently recognize subpoena power. The Department has some concern to make sure it's tied to, I have to use the language of the Rules, a request for evaluation, because the complaint has a technical meaning we don't need to get into and the Commission is okay with that. And, so, it's really just codifying what's already in the Rule, because there's been some confusion over it. So, I think we're in agreement with that. The one addition from just changing the Rule right now would be to say that it's somehow tied to a request for evaluation, which the Commission is fine with.

**Rep. Weissman**

Thank you. Please go ahead.

**Elizabeth Espinosa Krupa**

Another area of agreement between the Department and the Commission is a victim's rights consideration. Hearing the Women's Bar's considerations, and we did discuss that with them. I think we are all in agreement that there needs to be a victim's rights component. But again, as the Women's Bar said, in terms of identifying what victim means, and at some point, even if it's an anonymous complaint, there may be information that we need to disclose to the respondent judge, a process by which we can do that. I believe the Department and the Commission were in agreement that there might be some rules along the way that as we go through this could help us, but ultimately to make sure that victims are informed. Which we would just have a way to not discourage people from reporting. So, something that was clear about their confidentiality, but also clear that there may be a point where we would have to make disclosures. They would be notified, and we would give plenty of opportunity for that.

**Rep. Weissman**

Thank you. On that point, it's struck me reading through the comments from CCASA, from the Women's Bar. This may amount to asking the Commission to take on certain work and functions that aren't there.

To the extent that that drives a need for more FTE or software resources, please let all of us here in the appropriating branch know that as early as possible. And I think we want to make good on the need for those resources so it can get done.

**Elizabeth Espinosa Krupa**

Thank you. Chair Weissman, just in response to that, I do think in most of the victim centered programs that are codified, such as with the District Attorney's Office, they have Victim Rights Advocates. There's plenty of task forces by the state that have victim advocates that are able to assist with resources. It is something that we were hoping we could work with, and have worked with either chief judges or the Department to be able to provide some information to victims, where they can get some resources to assist them, whether it's trauma therapy or otherwise. We don't have a budget to pay for that. But if we come to that, and as we progress from this interim committee to either the House or the Senate to a bill or constitutional change, we will definitely keep in mind that we may need additional employment.

**Rep. Weissman**

Thank you.

**Steven Vasconcellos**

If I may, Mr. Chair, just briefly. I think we heard some powerful testimony already today to inform why it's so important that victims are notified at critical stages in the process, that they understand how this process works, that the process does not re-victimize. Incredibly important, I think, strong areas of agreement between us and the Commission.

**David Prince**

I'm pausing to see if this is the right time to raise the issue or to wait a little bit, but I think this is as good a time as any as I listen to Mr. Vasconcellos. I think he's referring to the victim letter that we heard, and that was incredibly powerful testimony, incredibly shocking. I think to everybody who heard it, and it illustrates some of the issues with the structure going into this year. I haven't really thought out how to phrase this, I have to admit. Parts of it were particularly disturbing. One part was, what we've just talked about is the keeping the complaining person or potentially victim or someone else who's worried about retaliation, they may only be a witness in a proceeding, keeping them advised of the process is critical. And one of the challenges we have under the current system is our Rules don't actually authorize that. We have provided some update, but it's been inadequate, and we learned from a particular case a couple of years ago about this problem, and started changing the way we did things to the extent we thought we could in the Rules. I'm glad to see that we have agreement on what we've been short handing as a Victims Rights Act aspect of the proposal to you, because, particularly the three members here that were sponsors of 201, through the process, know that the first couple of drafts had a Victims Rights Act portion of it that was specifically authorizing exactly this kind of update information to the victim. And for whatever reason that wasn't worked out in the original version of 201 probably because it needed further development in a process exactly like this. So, it is a critical part. Another aspect that 201

addressed that was certainly unintended at the time, is that you will recall that the Commission traditionally has been dependent on others to provide staffing when you get to the point of investigation and pursuit of an actual complaint. And that process addresses another aspect of reading that victim statement, which is the victim statement that well, when I was interviewed, the first thing they told me was that there's criminal liability if I tell anybody about this. That was shocking to hear. But it's not the first time I've heard it. The first time I heard it was about two, three weeks ago, actually, and I don't know if it's a practice in more than one case. I don't know if it's just one case. Part of what Senate Bill 201, did was it allowed the Commission to move to bring in its own personnel to handle investigations, and one of the great advantages of doing that is that we now have, we haven't hired that position yet, but as we hire that position, we'll have more control over what the person does, how they're trained, how they learn from prior experiences. But in the transition of moving away from our old provider, we learned in one case that that was the standard practice in at least in that case, I don't know if it extends beyond that one case, because I obviously don't know if the Anonymous was the same case or a different case, but that was the standard practice of the outside personnel that did those investigations on sexual assault claims. Was to start the interview by telling folks, if you tell anybody about this, you risk criminal liability. We were shocked at the Commission when we found out about that, we did not know that had been happening in our name. We don't know if it happened beyond one case, but we immediately decided to make sure that does not happen again, because it is shocking, it clearly has a chilling effect on anybody's willingness to cooperate and provide information. So, I just wanted to share that with you, with respect to the victim's letter that we all heard earlier this afternoon.

**Rep. Weissman**
Okay, thank you. As you've noticed, we've been departing from prior practice and are kind of taking questions as we go here, just because we know you're going to be touching on so many different subjects in the next half hour or so, rather than asking you to rewind to wherever we were. With that, Madam Vice Chair.

**Rep. Carver**
Thank you, Mr. Chair. And just a question for clarification, do you believe what you have just discussed in having personnel and processes to provide the information to the victim, keep them updated on status. Is that something that you think requires further statutory language, or that you could do by Rule? What's your thought on that?

**David Prince**
I think it would require a combination. So, in theory, where we started with the statute in the Senate Bill was a little more modest than what's being talked about today. And today's discussion of what I shorthand as a VRA is a shining example of the value of this process, because it was a fairly naive level that was proposed earlier this year during the general session. And that did little more than authorize the Commission to actually provide updates, because there was ambiguity in the Rules. Could have been done by Rule, wasn't. So, as long as there's a statute, let's go ahead and have the statute make it clear.

There's actually a question. There's a legitimate question, given the strict confidentiality under the Constitution, whether the current rule provisions that allow the Commission to make certain disclosures are valid, and you can even make an argument about the statutory provisions that now allow information sharing. I see some nodding heads. So, I think part of it could be done by rule, but part of it needs to be done by statute, because in part, what we're talking about is actually hiring personnel. Because we're talking about something more ambitious. And it illustrates another point that I know the three of us have talked about and agree on, and that is the different components as we walk through these points are all inextricably intertwined. And this is one example. Depends on what you do with the ombudsperson position. I have the impression from the flow of discussion today, and I know that all three of us support it, even though we didn't specifically discuss it. An ombudsperson position or entity is a fabulous idea. Will be a great improvement. But there are different models under which it could happen, and actually they could provide I know that the more recent discussion sort of rejected that and said it should be person within, probably the Commission, which is fine too, but that also could be housed in the ombudsperson entity. And, so, it kind of depends, but I think a statute is going to be required to set that up and at least a rule, but preferably statute or addressing transparency in the Constitution is going to be required to give some clear authority for the Commission to be able to provide update information on how the case is proceeding. If you change transparency, it sounds like transparency is likely to change to say, okay, we're going to we're going to make it transparent with certain exceptions at the point of filing of formal proceedings. Well, we want to make sure that we're able to update that victim or complaining witness or at-risk witness before we get to that point, and tell them what's going on in the case and how far we're proceeding and a likely timeline. Some of that, we can probably push the rule a little bit now and disclose But technically, the Constitution reads like we can't tell them anything. Our rules read that we tell them when we decide to file formal proceedings. I made a mistake there. We tell them when we decide to treat it like a complaint, which is a step above a request for evaluation that's still in that confidentiality zone, but our rules allow us to tell them that, but that's about all that expressly authorizes. So yes, it would be helpful to have a statutory base of authority. It would be better, if the Constitution, when you define transparency, acknowledges that there will be some rules that are carve outs on both sides, one being at the formal proceeding size, we can have rules that protect confidentiality of the complaining witness, so it's not absolute transparency at that point, and that it's not absolute secrecy before the point of formal proceedings, so that we can keep the victim or complaining witness, or otherwise at risk witness, up to date on what's happening in the process. Does that make sense?

**Rep. Carver**
It does. Thank you very much, and a point for later. What immediately popped into my head as you were talking Judge Prince is whether or not we need an AG memo on how far we can go statutorily on confidentiality and still be within the Constitution, and at what point might we then have to put something together for a constitutional change? So just a thought, but this has been most helpful. Thank you.

- 7 -

**Rep. Weissman**

All right. Thank you, Senator Moreno.

**Sen. Moreno**

Thank you, Mr. Chair. I just want to clarify, because you've gone over areas in which you've reached agreement, and maybe it's just wording or phrasing that I've misconstrued a bit. When are you proposing that confidentiality cease? Is it when the complaint is filed or when formal proceedings begin because are those the same or are those two different?

**David Prince**

I'm sorry, those are close. What happens in our process is person sends to us, we call it an RFE, a request for evaluation, and they ask us, Hey, look at this thing that the judge did. And then we do an initial review. And if you're right, they're different. If we say that it is, it's not frivolous. Let me just use a simple phrase. If we say it's not frivolous, then we make a decision at the Commission that says we will treat this like a complaint. And that starts a phase called the investigation phase. And we are not proposing, not proposing, that transparency start then. Instead, you finish the investigation phase. We do the investigation phase, and then we make a decision, is there evidence in our hands that shows by a preponderance of the evidence that there is a violation here? If the Commission decides by a preponderance of the evidence, it's demonstrated that there is a misconduct incident, then we file formal proceedings. I think it's called a statement of charges. I think the actual document is something like that, rather than a complaint. It's confusing. The terminology is quite confusing. And that's the point at which we would say confidentiality ends. Filing of formal proceedings, not the complaint. People often say complaint because they're thinking of civil litigation or criminal litigation.

**Rep. Weissman**

Senator Moreno.

**Sen. Moreno**

Thank you, Mr. Chair, and thank you for that response. So, would that transparency include when informal remedial actions are specified or dictated?

**David Prince**

So that would be something that still needs to be worked out. The usual practice is that you only go to formal proceedings if the anticipated plan is to go to public discipline. If it is going to be private discipline, the Commission has the authority to turn to Judge Prince and say, Judge Prince, we've decided, based on the investigation only that it's private sanction. Here's what we're proposing, here's what we've decided to impose, and then the judge has the authority to say, I don't agree with that. And, so, under our process, they don't go immediately as an appeal to the Supreme Court on private discipline. Instead, they say, the way they want to challenge that is, they say, I want formal proceedings. Now, we've not ever had that actually happen, but that's the way the Rule works. So, that's a point we

- 8 -

haven't actually talked about or thought about. So, you just put your finger on a key issue that at least I didn't think about, which is, if you go to formal proceedings, and the recommendation, or the decision that's being challenged was for private sanction. What do you do with transparency? I hadn't thought about that. I don't think my other two colleagues had thought about that. It's something that needs to be addressed. But it so rarely happens that we didn't think about it. I would suspect a year ago, most of us didn't even recall that there was this option of private sanction going through formal proceedings, because it's sort of hidden in the Rules.

**Rep. Bacon**

I don't want to necessarily be presumptuous of what you were asking, but I guess part of the question is for clarity, if your procedure is what you defined, right, like RFE, investigation, you find preponderance, and then you bring a statement of charges. Where does that live within the informal and formal sanctions? Do you do that process for? Where is it that you get to the place where you know you want to do formal or informal sanctions, and then, if they are informal, does that mean that they are all kept confidential? I think we're just trying to find the line of where that transparency starts or stops.

**Sen. Moreno**

Thank you.

**David Prince**

And good question. And I described the process originally, if you're going all the way through the process, and I tried to backtrack a little bit with Senator Moreno. But where that usually lives is, literally, you have the request for evaluation, you have the initial look, decision to be treated like a complaint, and then there's investigation. And as a practical matter, what happens is the factual investigation is undertaken. Sometimes it's using an investigator, sometimes it's only a member of the Commission who is looking into court records, say, for example, just listing the recording. And then the Commission considers it, and at that point they decide, do we think this is appropriate for private sanction in formal proceedings, or do we think it's appropriate for formal proceedings? That's the decision point. And so, if you are looking at public, you go down the formal path, and the transparency everybody's talked about today would be the way it worked. However, if the Commission says no, this is really appropriate for private sanction, the private sanction means, by definition, that it's not going to become public. And the other phrase we use for that sometimes is informal proceedings. So, we would continue, usually, at that point is going to be negotiation. We would continue in negotiations with the person, and that would all remain confidential under the current system. And I don't think any of us are suggesting a change to that, because it defeats the purpose of private sanction. And I think Ms Krupa actually wanted to weigh in on this point as well.

**Elizabeth Espinosa Krupa**

Go ahead and ask your question.

**Rep. Weissman**
Rep. Bacon.


**Rep. Bacon**
I think also it's important to know the difference between. Well, I guess what we're all talking about by transparency versus confidentiality. So, I guess the other piece is then what is shared in the private spaces, not I guess it could be anything from the sanctions to literally, was there an investigation or the some of the things that we've heard today. What are we keeping track of that we're sharing. But I would love to hear your thoughts on the confidentiality around the informal spaces, and then, what are any sort of tangible connections to transparency about what was going on with informal sanctions? Does that make sense?


**Elizabeth Espinosa Krupa**
Yes, the informal or private discipline is usually a letter. It can be a letter of admonition or private censure, different language for the same kind of thing. And that determination is usually based upon either the harm mitigation that the judge has done to correct the issue, no prior discipline. There's many factors that go into that decision, but it is similar, I would say, or akin to, perhaps, like a performance plan. There are times that we will defer and let a judge work on something, and then we hold off on making a decision to see if and when the judge complies with some of those options. Those I think we would, the Department and the Commission, would agree should stay confidential. Because the judge is taking steps to remediate something that did not cause harm either to a party, to the public, to the to the bench itself. Where public discipline is usually entertained, or where taking it to a formal proceeding is entertained is typically where the harm is larger, or the respondent judge just refuses to accept responsibility, or an offer of resolution to the proceeding. The confidentiality portion of that isn't necessarily to try to protect the judge from anything other than it's more of a kind of single instance. It's not something that rises to the level where there's a concern that the public needs to be aware of. So, I'm not sure that's answering your question, but in terms of the transparency of it, when formal proceedings are brought, that's more akin to as we've talked about, either criminal or civil cases, the respondent judge would be known and brief description of the conduct. But then after that, even if the hearing panel said, you know, this could have been private, but you pushed it, or we ended up here, it's, you know, the least they could do as a public censure.


**David Prince**
And there is a bit of transparency. You asked about, is there transparency as to well, telling someone there was an investigation? There's limited bit of transparency there. But obviously, if we're keeping the judge's identity a secret and the outcome a secret, there's not a whole lot of transparency. And that's in the form of our annual report. And in our annual report, we routinely say an anonymous judge was accused of doing X, and this is the result.



- 10 -

**Rep. Weissman**

Rep. Bacon, let's do one last follow up here. I think there's six or eight more items that we need our witnesses to hit on. Okay, all right, thanks for that extended discussion. However, you'd like to keep proceeding from a continuum of agreement or not.

**Elizabeth Espinosa Krupa**

So, I think the last area of agreement would be that the Department and the Commission agreed to keeping some kind of or tracking metrics. What those are, I think, is where we're having discussions, and that may need to continue. But in terms of tracking the data, in terms of, again, do we need more personnel to be able to do that, or software systems to do such would depend. We do in our annual report say the number of requests that we got, which ones we actually investigated, the types of cases that we investigate. I think where this idea of metrics or tracking came up was actually Representative Bacon, several hearings back, where she asked that question, do you keep track? And apart from our annual report, that was it, I think what we have discussed with the Department, and where the Department does agree, is instances where we have repeated conduct, either out of the same district, or just similar issues that keep cropping up within different districts. To be able to share that with the Department and say, you know, there needs to be some education. With some of the funding and employment resources that we've received from the most recent bill, the Executive Director from the Commission can resume going out to different districts and presenting, we get a lot of delay cases where a judge just has an issue with one particular case and gets way far behind. And those are easy ways to educate and train. But what we have talked about with the Department is really ways that we can notify them either of particular issues within a district, and we have had those where the judges are very divided, and they start kind of complaining against each other, and it's just a little bit of a toxic environment, and we need some assistance from the Department at that point. It doesn't rise to the level of perhaps discipline, but it's something that the house needs to be looked at. So, we have talked about that, as well as identifying areas of training or education for judges, things like that. So, I do think those are important. Now, whether or not we're able to track or ask complaining witnesses, victims, witnesses, or ascertain information demographics, as far as the judges is, you know, cultural, ethnic, how they identify things like that. I'm not sure that that's something that we think we can actually do, or how we would go about that in terms of privacy issues, but we are welcome and open to suggestions on that.

**Rep. Weissman**

Okay, please go ahead.

**Elizabeth Espinosa Krupa**

One area of disagreement is the Commission's recommendation that we codify a verification or similar process to ensure that the Department complies with its statutory disclosure duties. Obviously, there's been an obligation under a MOU since 2010 but there is a continuing duty of disclosure, and the commission is asking for some verification penalties or enforcement mechanisms under that. And I'll let Mr. Vasconcellos respond to how the Department disagrees.

- 11 -

**Steven Vasconcellos**

Thank you, Mr. Chair, and certainly not a disagreement with the concept of verification. Initial proposals focused on a single verification on behalf of the Department, which you know, if I think about someone in my role doing that on behalf of 4000 people. I don't know how I sign that in good faith. That's too broad of a brush, and I think there's openness to discussing different ways of addressing verification. It's not completely off the table, but not a big fan of too few a points for too many people trying to even just do it on behalf of the State Court Administrator's Office, which is far more reasonable. Which would be me on behalf of, say, 250 people, would still require a fair amount of groundwork to be able to sign that verification in good faith, because of the statutory duties to report, there's a lot of places, and this is a good thing, there's a lot of places and lots of pathways for concerns to get to the Commission. We want that to happen, but then to certify everything has gone over. We want to make sure that we're setting that up in a way that promotes success, frankly, and minimizes sort of gotcha moments. I don't think that's the Commission's intent at all. Not ascribing that to them, but that's the thing the Department's concerned about.

**David Prince**

If I may just following up on that. And I'm glad to hear the description, which is consistent with the discussion we've had. A big advancement, one of the biggest advancements in Senate Bill 22-201, was codifying this duty of disclosure by the Department. And I don't want to get into the history, but you know that we've had some dissatisfaction with the way disclosures have been made, and we had a contractual obligation in the past. And so what we're talking about is some sort of, it's really two components, and we've talked about this, we've just focused on one of them for a moment, though. There's really two components of this bullet point, and that is, first, some sort of verification system. There are other examples out there. One example is simply rule 26(g) of the Rules of Civil Procedure. Now that's case by case rather than company by company, but it requires an actual certification that says I have made all the disclosures that are required. But that's in the context of an individual case. That's one level of verification. We were really looking for some verification at a higher level. I understand, and we understand the Department's concerns on sort of the original proposal, which was, let's have, we were saying a judge, because they're subject to consequence. Let's have one judge just certify that. Let's have them be the point person to make sure these things are going to happen. I don't know if there's another mechanism out there to do it. Maybe Legislative Council has some ideas. Maybe, if there's a central clearing house, I'm not sure how. One of the things the Department is required to do under the statute is to develop some policies on how they're going to handle the disclosures. So, depending on how they go about doing that, there may end up being a central clearinghouse in the Department that provides everything, and so they could provide a certification. The other component that we haven't talked about is just the enforcement mechanism. And I don't think we were very far apart on that. I think we were actually in agreement, which would really be just a court proceeding. It raises some other issues in connection with, you know, how you interact with some of the other pieces that were talked about this morning, but I think I'll leave those and see if we get to them.

- 12 -

**Steven Vasconcellos**

Mr. Chair, I would agree in terms of the method for resolving disputes, the proposed three judge panel, I think we're substantially on the on the same page. We have some, I think minor, disagreements about the precedential value of the of the findings, but in large concept, I think we're very close.

**Rep. Weissman**

Senator Gardner.

**Sen. Gardner**

Thank you. Just so I'm clear. I mean the certification that we're talking about, that over which there's disagreement, is conceptually a certification from the Judicial Department that they have reported everything that they were required to report to the Commission. Is that, and I see, see an affirmative nod. And the problematic part is, there's, as you say, 4000 people, and how do you know? And if, if one judge or one court administrator in the 25th Judicial District, to make one up, decides to stonewall something and not report it at all, you will have filed a false certification. I guess, is that the concern now you've done on best of your knowledge and belief, like all of us do, every affidavit we do. What would be the enforcement idea? I mean, how do we deal with that? I mean, everybody agrees that. I think everybody agrees that the Department should report all of those things, make them known to the Commission, the things that we've defined. What is the enforcement mechanism, or what is it that we know because I've made a lot of certifications in my government life based on the best that I know. And we make certifications in the discovery world based on what our clients tell us, you know. And we always take a deep breath and ask them three more times and say, Are you sure? And only for them to go, oops, there was one more thing. So again, pardon me for rambling a bit, but I'm trying to wrestle with this problem with you about, what would we do? What would we suggest?

**David Prince**

And this is part of that. Each piece is dependent on the other piece and the interaction. So, I would tell you that when we started this process with the bullet points, this was much more important in the absence of something like the ombudsman process, because then you've got. What the request was for was some sort of verification process, and if you have a genuinely independent neutral who is available to members, particularly of the Department, because I think the concern is more internal issues, rather than an external report. When you've got someone who's available to people within the Department and has been publicized within the department, and they're not under the thumb of the Department, to put it crassly. The need for verification starts to go away, because now you have a verification process, which is, you know, no offense intended, Bob Gardner is the ombudsperson, and everybody knows Bob Garner is out there, and he's not somebody asked earlier, who's the boss? The boss is not in the Department, and so Bob Gardner has credibility. And so now we've got a verification process. We know that people will know that they can go to him or her and make sure they have the information they need, and then that person is a professional who can make sure it gets passed on to us. More broadly, if we don't have something like that, then we're struggling. And Mr. Vasconcellos raises very legitimate concerns about,

- 13 -

how do you do that? I fall back to yeah, it's just like Rule 26(g) you do it on your best knowledge and belief. If there's a violation, and there's been a legitimate system in place, there's no risk. But I understand, and I would be nervous about it, too. The ombudsman concept is a much better approach to providing that very verification.

**Sen. Gardner**

I'm more concerned, and I think you address that, Judge Prince, but I'm more concerned that that we do the reporting that we need, not that we get some good faith and belief and statement at the end of the year that everybody goes well, it's as good as we know. So, I appreciate the comment. I mean, I think that gets to the nub of the problem.

**Rep. Weissman**

Madam Vice Chair.

**Rep. Carver**

Yeah, and just real quickly, I am a bit troubled by the verification proposal that's been put out because, as the Senator said, the verifications that many of us do, or that we do in an individual case, is, in fact, knowledge that we have, as an individual or as an attorney responsible for a case, and we better darn well know, right? Or we've got more problems and just verification. We will be before the bar, but when you are verifying subject to sanction, what over 4000 people have done or not done, particularly if there is any gray area or subjectivity or judgment call on what is encompassed in this information disclosure requirement and what isn't, I think that does raise some concerns, and I appreciate very much Judge Prince saying that the ombudsman could help us solve this problem. I do also think, and we can discuss this offline, but between the information disclosure requirements in SB 201, and the subpoena power that we're talking about, properly defined, that those mechanisms working together, should provide the kind of institutional assurances that there is proper information flow. And cognizant of the time and all the other issues we need to discuss. So, I simply throw that out there, perhaps for some follow up discussion. Thank you.

**Rep. Weissman**

All right, thank you. I think there's still a fair bit more that you want to unpack for us, so let me invite you to return to that.

**Elizabeth Espinosa Krupa**

Thank you. The next area would be the Commission's recommendation to make the standards uniform and clear requiring disqualification. And asking that we codify in statute the Judicial Code, Rule 2.11, governing disqualification of decision makers at every level of judicial discipline. And the primary concern, obviously, is just with respect to the current disqualification standards is the level of inconsistency that's been applied so far. So, we would just like it uniformly applied.

- 14 -

**Steven Vasconcellos**

Thank you, Mr. Chair the Department views this and this is not fatal, but it's a bit of a belt and suspenders approach. Rule 2.11, applies. The obligations under 2.11 apply already when a judicial officer is serving in a decision-making role in the disciplinary process. Adding it to statute doesn't enhance the power. Doesn't change it. It's arguably a belt and suspenders approach, and from that perspective, it may not be the worst thing in the world. But I'm not sure that it's actually accomplishing anything new. Those obligations are there today. One other consideration, and this is just something that can probably be worked out. As we introduce potentially non judicial officers into decision making roles, I think we need to look at 2.11 to understand whether that fits, that language fits for non-attorney, non-judicial officer, again, not necessarily fatal, but something I think we need to tick and tie along the way.

**David Prince**

I don't disagree with anything that Mr. Vasconcellos just said. The intent here, it's another one. What's twofold, and generally, I'll tell you that I think the Women's Bar did an excellent job of addressing this very issue, the two pieces of it. One, is the disqualification standards, which we've just talked about. And the issue is a little less at this stage whether 2.11 applies to judges there is some ambiguity in our law on that. It's more the uniformity that Ms. Krupa was talking about, which is we want essentially uniform standards, because the Commission's view is that currently Rule 3.5 of the Commission that was adopted for the Commission applies a very different standard for disqualification to Commission members than applies to judges. I certainly agree and accept that there may need to be some tinkering to address issues that may be different between a judge making a decision and a lawyer or civilian making a decision in the process, but we want to achieve as much uniformity as possible when the issues are essentially the same. The other component is some process for determining disqualification, and that ties into what you're going to do with the overall structure and who's going to be final decision makers, and when there's going to be the bigger question of disqualification. For example, if we use the ABA model, we haven't got here yet, but we use the ABA model, and we say that when a current or former member of the Supreme Court's conduct is at issue and the entire Supreme Court is therefore disqualified, then leaving in place the final decision maker as the one who makes decisions on disqualification challenges is fine. But if the disqualification decisions are made by the Supreme Court, and they continue to be made by the Supreme Court when it's the Supreme Court making their own decisions about whether they're disqualifying or not, that's a bit problematic. So, we're looking at uniformity, but we're also looking at what is the process for deciding disqualification and that interacts with the other structural changes you may or may not make.

**Rep. Weissman**

Okay? Thank you. Let's invite you to keep going.

- 15 -

**Elizabeth Espinosa Krupa**

Next would be rulemaking authority. The Commission has recommended that the interim committee place rulemaking authority with the discipline commission, which is consistent with the judicial performance commission and a majority of other states. I'll let Mr. Vasconcellos respond to that.

**David Prince**

Minority, a large minority.

**Elizabeth Espinosa Krupa**

Minority, sorry.

**Steven Vasconcellos**

Thank you, Mr. Chair the Department would, again, this is an area where I think that's ripe for some change, and the Department would propose creating what I think we would recognize as a traditional rulemaking body, no different than Civil Rules Committee, Criminal Rules Committee, and create a rules committee specifically for judicial discipline with, of course, robust participation by the Commission, public hearing, public comment in front of the Supreme Court, sort of the process that is used in other rulemaking endeavors.

**David Prince**

We've largely addressed this issue before you previously, so I don't want to repeat it too much. But this also, again interacts with what you do with the overall structure. If the Supreme Court continues as the final decision maker, we have issues with the way rulemaking has been done in the past, and so our recommendation would be consistent with those other jurisdictions that have said judicial discipline is different, and so the judicial discipline commission itself should make the decisions on rules, should have rulemaking authority. But if you end up changing who the final decision maker is, then you essentially create a new final decision maker in the discipline process, and it would make sense that whoever that is have rulemaking authority. So, we think that growing group that is still a minority, but Cindy Gray mentioned is a fairly large minority, and is really more the modern trend says rulemaking authority for judicial discipline ought to be in judicial discipline. Whether it's the Commission itself at the commission stage, or if there's another body like there is say in Illinois.

**Sen. Gardner**

Thank you, Mr. Chair, more of a comment, but in the my discussions that I've had, both with the Department and the Commission, I think it's fair to say that this is one of the issues on which there's fairly strong disagreement. It may be resolved by change of process in some way, but I just say that for the benefit of everybody on the committee, I think this is one of the hard ones for us to kind of figure out and do, and there's two different approaches. So, thank you.

- 16 -

**Elizabeth Espinosa Krupa**
Thank you. Chair Weissman, that's why I started with the ones we agreed on, and we get to the harder ones towards the end. The next would be the accountability and core conflicts. The Commission recommendation was to maintain the existing structure in terms of a unified system with two tiers of decision making. The discipline commission would remain the same with its investigatory and adjudicatory role, but change the final decision maker from the Supreme Court to a multi perspective board comprised of judges, lawyers, and citizens. We made a number of recommendations about how that would be comprised and who would have appointment authority, and Mr. Vasconcellos can respond to that.

**Steven Vasconcellos**
Thank you, Mr. Chair. Except in the instance when a Supreme Court member is the subject of the inquiry, the Department does believe that the Supreme Court should be the final decision-making body. And then in the case of the subject of the inquiry being a member of the Supreme Court, an alternate body should be used, obviously, devil in the details, but we do believe an alternate body should be used in that instance. And I think this ties in and as both Ms. Krupa and Judge Prince have mentioned so many of these things are interleaved and braided together, but we see this in concert with changes to the special master process that I mentioned earlier that have been discussed throughout the day. I think we're very open to a discussion about the composition of the special masters. It's a very intriguing discussion that happened earlier, around one judge, one lawyer, one citizen member. And I think that's a more powerful, more meaningful change touches a greater volume of cases. And you know, in that regard, then the Supreme Court is largely performing again. Let's also separate the investigative slash prosecutorial role from the adjudicatory role. Have the have the special masters, have an adjudicatory role. And the Supreme Court, in general terms, is the final review in a sort of an appellate fashion, except when they are the subject of, one or more members are subject to the inquiry, and then let's focus on creating a separate body in that instance.

**David Prince**
So, deep in the weeds, I agree with actually, a lot of what Mr. Vasconcellos just said. This is one of those where I think we had a productive start of discussions that, given more time, might have been more productive. But we live in the world we do, of time limits. As we've all said now, more than once, there's a great deal of interconnectedness in all of this. So, I'm going to get into the weeds for a moment, but you're used to me doing that, I think, at this point. So, there's a problem with terminology, and there was a lot of discussion this morning about the two tiers and let's set aside the two tiers, because it's really three tiers, no matter what you're talking about. But nobody uses that language. So, you have the investigatory work, and that's the grand jury kind of stuff. Looking into it in the first place, deciding if there. Let's just use the most serious stuff. Let's set aside private. Let's just go with public for a moment. You have the initial investigation, the investigatory function, then you have formal proceedings, that's the adjudicatory function, and then you have appellate review. That's the third phase. Nobody talks about it as the third phase of the third tier, but that's really the simplest way to do it, if I were teaching a

- 17 -

class. In Colorado right now, we actually do have all three of those separated, and that's where that language gets confusing. In many jurisdictions, they talk about a bifurcated or a unified system, which makes it even more confusing, because that's different than the two tier and the one tier. And that just means whether the Commission as a whole, as an umbrella organization, handles both the adjudicatory function and the investigatory function, and that's been approved subject to many legal challenges around the country, and Ms Gray talked about this. So, in Colorado, the way it's done, is that those two are separate, but it's unified, to use that other buzzword, because the Commission handles, in a sense, both of them. The Commission itself actually does the investigatory phase, the way it actually works, and the way it works under our rules is that special masters then come in and do the adjudicatory phase. They are the adjudicators. They decide the facts on the serious cases. Okay, so it is separate. The Commission doesn't make the decision. That's what you hear in the debate in other states where they're concerned. It's where the Commission itself is the decision maker in investigation, and the decision maker is the trial judge. It is the DA and the trial judge. That's actually a theoretical possibility in Colorado, because the Constitution says that the Commission can hold its own hearing instead of using special masters. Our rules were never drafted to address that. We actually talked about that previously, and it's never been done. So, that's one of those things that if you're going to address it in the Constitution, you ought to think about what you want to leave in the Constitution. Let me finish. So, you've got the adjudicatory you've got the investigatory phase which the Commission handles in Colorado. You have the adjudicatory phase that's done by special masters as a matter of practice and rule, but not constitutional requirement, because the Constitution allows two options. One is the special masters, that's authorized in the Constitution, or the Commission itself holds its hearing. Now the if the Commission itself were to hold its hearing, it would need to do like other states do. It would need to divide itself into the different panels and all that stuff, and we just don't have the infrastructure to do that, frankly. And then you have the appellate role of the or the review role, or final decision making, however you want to phrase it, of the Supreme Court. So now we come back to the intertwinedness. So, if what the committee wants to do is consistent with the joint recommendation of at special master phase. Our phrase would be a little different than the Department's, but let's limit Supreme Court control of the special masters, because right now, the Supreme Court selects the special masters. In one of their statements they actually said it's the Chief Justice, but that's not quite the way the rule is worded. It's not a big deal. The Supreme Court, as a practical matter, selects who the special masters are, and that can be a problem in a conflict situation. If you change to this pool and you have multi perspectives on the special masters, then suddenly having multi perspectives on the final decision makers is just not as important. That's the challenge with some of these things. You make the proposal somewhat in isolation, because you don't know how it's going to fall. But from the Commission standpoint, if you actually change the way special masters are done, and this idea actually comes from Senator Gardner, if you were to approach that change, and there's some independence, or some randomness, if you want to call it that, there's a selection process for selecting those special masters, so you don't have just one group that controls it. Then, suddenly the appellate level gets a lot easier, and you follow the way we would say it is, you would follow the ABA model. And I think I actually heard Mr. Vasconcellos essentially adopt that concept, I don't want to put words in his mouth. Essentially adopt that concept, which says, not just

- 18 -

if one justice's decisions are at issue, then only that one justice recuses. Instead, it's if any current or former member of the Supreme Court's conduct is at issue, the entire Supreme Court steps aside and you bring somebody in to replace them. That's the ABA model. That's the essentially, I'll leave it at that. That's the ABA model and list that both CWBA and Cindy Gray provided. So, our recommendation is still because we don't know what's going to happen elsewhere. Our recommendation was originally only that the special masters be a kind of a specialized group instead of ad hoc each time, not that we change their composition, and not so much the selection process. And, therefore, you should change the final decision maker to have that multi perspective unit. If you change that middle step, I actually agree with Mr. Vasconcellos and we had this discussion. So, we know we agree. That that affects more cases and is more commonly occurring and probably has a bigger impact, and in the long run, is probably more important. And then you preserve that final decision-making authority by the Supreme Court, and you address the issue of but what do we do when the Supreme Court has a conflict. Another advantage of that system is part of that system, the final piece of that system that we just described, adopt the CWBA proposal and the ABA model. You can do by statute, because it's not really addressed in the Constitution, and there's pretty good case law about what you as a legislature can and can't do. And so you could actually do that part by statute. Could also be done by rule. That middle part, though, of changing the special masters will require constitutional help, I think, ask the AG, but because the Constitution says the three special masters will be three judges, and it even defines what kind of court they are, I forget what it says, though. So, just be aware of that. One change in recommendation is based on another being made, and the one in the middle requires amending the Constitution. Did I confuse you entirely now?

**Sen. Gardner**

I don't know me how many times I've wanted to say to a judge, let me finish your honor, but thank you. Thank you so much, Judge Prince, because I'm trying to digest all of that, and I always appreciate it. Let me throw a curveball, just an idea that has sort of developed in our conversations has been that for the adjudicative role, we might go to the model or the process that would allow or would say that the Commission, and it might need to be expanded, but roughly the makeup in proportions, it is now. That the Commission would have two tiers, and there would be the investigative and I guess that conflates with the prosecutorial function together. And that then the adjudicative function would be done by members of the Commission, and it would be an adjudicative panel, so that we don't, we don't have to create some new set of appointments and pools. But the Commission, and then there are, as I've learned over the past several weeks, there is a model of, there really are two panels, and the other is, well, there's different panels, but they're the same people, and sometimes you're an investigator and sometimes you're a fact finder. The reactions to that kind of model to do the adjudicative function, but do it within the Commission, and then we'd have to figure out what to do about the Supreme Court kind of the thing. But what does anybody think about that? Again, I'm throwing the curveball to everybody.

**Rep. Weissman**

Senator Gardner.

- 19 -

**David Prince**

I'll give an initial reaction, and I haven't talked about this with the other members of the Commission or even our legislative subcommittee, so Ms. Krupa may be surprised.

**Sen. Gardner**

You can disclaim that these are not the views of the Commission, but only of Judge David Prince.

**David Prince**

That's correct. That's a that's a good phrasing, and I would expect nothing less, but a good curveball from you, Senator Gardner, which I appreciate. It's really the same analysis, from my perspective, same analysis I just laid out. I think you can. You're then addressing the concerns that we have at the adjudicatory phase. And so my humble opinion is it makes it easier at the final decision maker the appellate review phase, and you can stick with the ABA model instead of, again, of our recommendation of an entirely new entity. And, you know, the first time I heard this, I was a little concerned about the logistics, and I sort of looked at the sizes of the states and wondered if we really have the infrastructure and financial support to do that, but you really wouldn't have to expand the Commission by much. It would be wise. So conceptually, I'm on board. It would be wise to amend the Constitution, because the Constitution defines how many members of the Commission there are. However, it already provides authority actually to do this. And so in theory, you actually could do this by statute and rule. And I think what you could do, this is really just thinking off the top of my head, so I'm scaring the two people next to me. I think in this, I think you could find statutory authority if you didn't try to completely mix the two panels, and we heard that there's value in doing that, having transitional people. But you could, by statute, you could expand, you could add, you would only need to add, like, two people. I think you could expand two more members that could only serve on the adjudicatory panel, for example, that really is, off the top of my head. It may not, may not pass constitutional muster. But if you're trying to come up with a pathway that doesn't require constitutional change on this point, you might be able to get there. But there seems to be agreement by everybody that transparency ought to change, and that requires a constitutional change. So, you're probably already down that path, so you might as well take the safer route.

**Steven Vasconcellos**

Mr. Chair, Senator Gardner, probably a curve ball that I can't adequately hit at this point. It does leave me a little cool, not because of the process itself. This is just first impression. I'm thinking back to testimony earlier today about sort of public perception of process and seeding too many of the functions well-intended even well-executed in one body, and they're being merit and having more separation there.

**Rep. Weissman**

Madam Vice Chair.

- 20 -

**Rep. Carver**

Thank you, Mr. Chair. And first of all, Judge Prince, I really appreciate the clarification following on the discussion this morning from one tier versus two tier, and clarification of while the constitutional provisions might have read thus and so that the system that is currently in play is investigatory by the Commission and then special masters. Two concerns which we may be able to handle either by rule or statutory. And again, I think we'll have a number of questions for the AG to answer on when we're over the line and we've got to do constitutional.

First of all, let's say we stayed with Special Masters and we expanded the pool. Is there any concern that in the kind of truly independent firewall that you need between the investigatory function and the adjudicative function that you would also need separate support staff? And I'm just throwing stuff out. Don't, don't require a comment at this point. But is there sufficient if we stayed with the current construction and just expanded the pool of special masters, how we would codify that? How we could ensure that, in fact, it was two independent functions that were in operation from support staff and everything else?

The second piece, and I'm just throwing this stuff out for you to comment on or not. The second piece is, there have been a number of bodies that have talked about, in the adjudicative function, and including if you're using special masters. And for what it's worth, I agree to expand the pool, potentially, at least, I'm open to it beyond judges and then who selects them. So if you go a judge, lawyer, citizens, but caution in some of the literature I've read against having a single hearing officer that this adjudicative function needs to be done by a panel. Whether it is a panel of judges, whether it is a panel that now reflects judge, lawyer, citizen. And, then, obviously you have to determine who's going to select those folks to serve. So, comments on any of that, and to the extent you think that's the right direction to go, what would require a statutory change?

**Elizabeth Espinosa Krupa**

In terms of staffing that would kind of depend. If you increase the pool and you have the special masters or a hearing panel. That's what attorney regulation does. It's a three-member panel with one presiding disciplinary judge, and that's just because the judge knows the procedures and language and the other two hearing members aren't necessarily sitting judges. But if you move it to a three-person hearing panel, so there's not just one decision maker, and it has to be kind of a collective effort. The issue of staffing might be more of a resource for that hearing panel or the special master's pool to get information, copies. A staff member that does only that formal proceeding phase with the Special Masters pool. Some of the discussions that we've had with the judicial department about a Special Masters pool and how those members are selected is really, how do you make sure it's random? What kind of software, or how do you do you have one person that kind of randomly selects out of that pool? Is there a requirement that there is one judge, one lawyer and one citizen on each of those three panels? Or is it just randomly drawn? Where you could get a three judge member panel? So, there's, there's some considerations there that I think we had talked about in terms of if there was a special masters pool and

- 21 -

you were getting a three-member panel to sit how you would do that? That does require staffing. It requires IT funds, software funds, things that weren't necessarily contemplated in the current bill. So, it would affect staffing. To the extent of whether that's a part time FTE or a full time FTE, it would really depend. But in terms of a Special Masters pool being increased and how that works, who appoints them? I think we've all made recommendations. You've heard some recommendations about that. I think the bigger concern is really that random selection process to ensure that it's not one person or one entity picking who those sitting members are.

**David Prince**

And just one practical follow up before the Department speaks, Mr. Vasconcellos. Just a practical issue. On the staffing, I agree with your concept, and I agree that that gives true separation. The practical issue is that formal proceedings, we're in an unusual time frame at the moment, but historically, formal proceedings don't even happen once a year. So, to have completely separate staff is probably not practical, because they'd be like firefighters. You know, it's critical to have them on and available. This is not quite that position, but they really aren't doing anything for a long period of time in this instance. So even if you did it as a part time person, it would be more well, they're not going to do anything for six months, and now I need them 12 hours a day for such and such a time, and the obvious solution is, well, then you borrow personnel. But we've already been down that road, and that hasn't worked so well. And I think Mr. Vasconcellos would agree that we probably don't want to do that. So, there's just a practical issue there.

**Steven Vasconcellos**

Mr. Chair, Representative Carver, Ms. Krupa brings up a good concern around randomness. I think it'd be a highly problematic situation if we had, for example, three categories of membership on the special masters, say, judge, attorney, citizen, and then we were drawing a random three from a unified pool. Where we could end up with three judges, we could end up with three citizens. I think the randomness is you designate one seat for each on the special master pool, and the randomness is within the judge selection and within the citizen selection and within the lawyer selection, and not across. We could end up with some fascinating special master pools.

**David Prince**

Agreed, and just another practical point on the interconnectedness. Remember the starting point of expanding the pool, not perspective, but just the numbers, was at a time when it was just judges, and we wanted to build some institutional knowledge, and so then you talked about randomly selecting, or some process for selecting from among a pool. But if the model is shifted to say we're actually going to have these three perspectives on it. Well, then it starts. My insight, we haven't discussed this, but my insight is, you would worry less about a pool and more about what we're going to get people to serve for so many years. We're going to give them some training. They will be the panel, and there'll be a backup, you know, an alternate, for each position, and then they have the authority to choose someone if they run through their alternate. Very unlikely to happen, but could happen. Something like that. You don't need

to focus quite as much on the selection from a pool at that point, because the big pool idea is not quite as important. And then you asked, I'm reminded, that you asked about, could you do this by constitution or by statute, this idea of the true separateness. I haven't looked at that issue, but my memory of what's stated in the Constitution, I would think the odds are you're probably going to need to change the Constitution to have complete separation between adjudicative and investigatory functions, because the Constitution is written with a unified system where the Commission sort of theoretically does both, even though we have the option for special masters. So, I haven't really thought that one through.

**Rep. Weissman**
Rep. Carver.

**Rep. Carver**
Thank you. And I guess in this I'm not acting for a comment, because we need to move on. But just food for thought. You know, some states that have formally gone down a true two tier, two independent groups, organizationally, the public perception may be stronger on the independence of investigatory versus adjudicative in that scenario, as opposed to keeping it all under the commission umbrella, and then just by flow chart and personnel assignment, they're independent. So just something to think about. Thank you.

**Rep. Weissman**
On this subject, I have one quick question, then I'll invite you to move on. A few moments ago, Mr. Prince, I think you posited, and I see this point if we, if we add diversity of perspective to the special master panel, and the fact that we are still appealing from that panel to the Supreme Court, perhaps matters a bit less. Which gets me wondering, what is the standard of review on that appeal, including, what is it now? In looking at the end of the rules, I would sort of expect to find some recitation of that in rule 40 or thereabouts, not actually finding it. The force that the point you made has is a little bit different if it's de novo versus if it's something like abuse of discretion.

**David Prince**
Excellent question. And thank you for raising it, because I had it in the back of my mind, but I know I would have forgotten to raise it. Here's an interesting point that we haven't talked about, where there is some ambiguity because little known fact, there's some old case law, and I can get you the case citation. I don't know it off the top of my head, Mr. Gregory probably does. There's actually some case law in Colorado from quite a while ago that does set the standard of review, and it's a basic appellate review, not de novo review. The Rule and the Constitution, the way they're written, have always suggested to me that it's de novo review, and I've always approached this de novo review I didn't find out about this case law until the last year when we started looking at these issues, but there is some case law that suggests it actually states, I shouldn't say suggests. It states that it's appellate review and not de novo. And I haven't had a chance to talk with the Department, I assume the Department would say off the cuff

- 23 -

that they would see it as de novo review. So, you should assume that. But there's actually case law on it. There's so little case law in Colorado on this issue. It's shocking that there happens to be one on this.

**Rep. Weissman**

Would appreciate the cite. Mr. Vasconcellos, if you wanted to say anything.

**Steven Vasconcellos**

Mr. Chair, this may be wholly unsatisfying. I think the best answer is make no assumptions about what we assume at this point. I probably need to go back and talk with folks a little more about where we are on this.

**Rep. Weissman**

I will resist the logic puzzle embedded in that statement.

**Steven Vasconcellos**

Thank you.

**David Prince**

We would propose appellate review to the extent there's any question in terms of going forward, and that's why I phrased it as appellate review. But yes, there's a difference between truly being just the final decision maker and somebody sends me recommendations versus I'm only doing appellate review.

**Rep. Weissman**

Let me invite you to move on down the list.

**Elizabeth Espinosa Krupa**

And there's only one last one on the list, and it's just the funding recommendation that the Commission is seeking, a source of funding that's insulated from politics and performance of the economy and more consistent with that of the judicial performance commission. We don't need a lot of discussion with that. I think the Department believes the current funding is ideal and doesn't need any changing.

**Steven Vasconcellos**

Mr. Chair. Well said, Ms. Krupa. I think Senate Bill 201, addressed the long-standing problem of an independent funding source, and that was the key challenge to be addressed. This is just one policy geek's opinion, I think that general funding into a cash fund is the gold standard. That's a nice place to be in funding. So, I'm not abundantly clear on what problem there is left to solve. It was important that the fund source be outside of the control, either pragmatically or by appearance of the Supreme Court. That has been done. I think it's a very solid fund source. I think, having been in state government for almost 27 years and seen numerous up and down cycles, no part of state government can wholly be insulated from the vagaries of the budget, nor is the Commission on Judicial Discipline large enough to make any

- 24 -

serious inroads on balancing the budget in difficult times, and given the dramatic importance of their work, I don't know that folks will be coming to their doorstep very quickly during budget cuts. So, I personally feel like and the Department in general, feels like the current funding that was created by 201 was the right move, and don't see a need for further change.

**Rep. Weissman**

Okay, thank you. All right, members, unless there are truly burning questions, I feel like we should move on and try to recover some time on the agenda. All right, thank you all for being with us and for the robust discussion.

**David Prince**

Can I add one narrow point, and that's I tried to make a list of some of the other recommendations that have been made today, and we can submit in writing if we want to. Many of them we endorse, and they just weren't things that we put on our list. Some things are things that are already being done. One or two of them actually were addressed by 201. But one that I did want to just mention very briefly is the idea of anonymous complaints. And I just wanted to clarify for you, our current rules actually do not expressly permit anonymous complaints. Ms. Gray actually explained this process. That's consistent with many states. And, so, there's a work around. We do accept anonymous complaints, and we use the authority of the Commission to self-start a complaint as a way of getting around a rule that requires people to sign. So that is something that really should, it can be addressed by rule, but it really should be addressed by statute to make it clear. And it is not publicized, people don't know it. If they just read the rule, they would think there's no way I can make an anonymous report. So that's a very legitimate criticism. It does need to be fixed one way or another.

**David Prince**

Okay, thank you, and thank you again.

- 25 -

# Appendix 27(s)(iii)(9)

# Presentation by former State Court Administrator Christopher Ryan;

# Legislative Interim Committee on Judicial Discipline—
# August 10, 2022 Hearing: Testimony of Christopher Ryan

**Rep. Weissman**

All right, next. And, sir, thanks for being patient with us. We have scheduled Mr. Ryan, the former State Court Administrator, to present some perspectives to us. He did transmit in writing, some comments which were circulated via Ms. Jenson.

**Rep. Weissman**

All right, Mr. Ryan, thanks for being with us. Appreciate your patience as we've veered a bit off our time. Please go ahead.

**Christopher Ryan**

Thank you, Mr. Chair. Mr. Chair, Madam Vice Chair. Sorry, Senator Gonzales, it's been three years since I've testified before a committee, and I'm a little not familiar with the light of procedures any longer. Mr. Chair, Madam Vice Chair, members of the committee. As I begin, I'd like to offer the following quote from John Wooden that's been particularly meaningful for me as of late. "Be more concerned with your character than your reputation. Character is what you really are. Reputation is what people say you are. Reputation is often based on character, but not always." I want to thank you for the opportunity, inviting me here to share my perspectives and recommendations concerning the judicial discipline process in Colorado. While I would like to respond to the personal denigration inflicted by the Judicial Branch in detail, especially since watching this afternoon and where time can get away, I realize this committee has a monumental task at hand. And this, coupled with the tight time frame for developing policy recommendations for legislative action, does not lend itself easily to the vetting of the totality of circumstances. So, my commentary will be brief. Hopefully, in the roles that you all perform, you'll have an opportunity at some point to personally review all of the underlying information, not just the portions that the Judicial Branch deems fit to publish, and you'll be in a position to make determinations for yourselves.

Over the course of my almost 30-year career, I worked exclusively for judges in one manner or another, and always, always performed my duties, understanding the roles and responsibilities with which I was tasked. Given that most of the written work that I produced over the course of my career was issued under someone else's name, I clearly knew who was in charge. My duties from the time I was a bailiff, when I was 21 years old all the way forward, were always performed with the advice and consent of the judicial officers for whom I worked. In broad response to the structural changes, the Judicial Branch has taken the position that no investigation thus far has revealed that the basic structure of Colorado's current system of judicial discipline is deficient. This justification for making a significant and novel change to the current system is conspicuously lacking. In light of that statement, I'd ask you to take a look at the role the Branch played in the investigations that have reported findings thus far. Remember,

judicial controlled the timing, execution, and terms of the contracts with RCT and ILG, including the conditions concerning the retention of materials after their publication. Further, the Judicial Branch and its attorneys were granted multiple opportunities to review the State Auditor's Report, their Executive Summary, and redact information they identified as privileged, attorney work product, or subject to other legal protections. In this respect, although they were not the primary actor, judicial was in full control of the investigations.

My personal experience with what's happened since departing the Branch aligns entirely with the following statement made by the Commission on Judicial discipline to this committee in its recent letter of August 7, there have been ongoing efforts by the Leadership of the Judiciary, specifically the Colorado Supreme Court, to endorse a specific narrative relating to the Masias Contract related issues. The Department's Leadership has promoted a vision of disputed facts, endorsed the credibility of some witnesses, denigrated the credibility of other witnesses, while also subverting a system of judicial discipline charged by the Colorado Constitution with the task of impartially and independently investigating these same facts and witnesses. The overt actions of the Leadership of the Department to promote publicly a specific narrative and avoid an impartial judicial discipline investigation themselves illustrates the depth of the flaws and the functionality and credibility of Colorado's current system of juridical discipline. That needs to be remedied.

I didn't actually have access to that until today, and I thought it was important to include that in my statement, so let me be clear in my actions, my devotion over the course of my entire career has always been to the institution, not to any individual concerns, including my own. I was a true believer and always a supporter of trusting in the process. In retrospect, it seems I was blind to motivations of individuals and what I believed was an appropriate personal sacrifice to make on behalf of the Branch was ill advised. Yet, despite what's transpired with me, I think it's important to say that I hold nearly all the judicial officers and staff in Colorado's courts in the highest regard, any spillover from the actions of the Chief Justice, the Supreme Court and key senior staff members onto those individuals makes me extremely sad. Their already challenging jobs have been made more difficult by the taint of the Branch's responses thus far.

I do not believe, and this is important to me to say, that there is, now, or ever has been, wide-ranging systematic corruption or bias at work in the state's trial courts. With that in mind, I'd like to address the areas, in my opinion, where the interim committee should focus its efforts. I also had some other ideas while I was sitting and listening to some of the questions you had of the individual members of some topics. It's been my experience that in addressing policy matters that impact the particular areas of interest to the Judicial Branch, and I had a front seat at the table for a long time, there's a broad, sweeping application of the concept of separation of powers and the use of the umbrella of judicial independence as cover to keep, "outsiders out of judicial business." While I am not advocating for violating constitutional principles, given the actions of the Court to control access to information, to define the narrative, and to obfuscate in order to protect the actions of those who wear the robes, the

- 2 -

time has come to look with particular scrutiny on the motivations behind those self-protectionist actions and the resulting difficulties they inflict. It's been my experience, the judges and courts themselves are insular beings. And as a former insider, I never really appreciated the degree to which that shaped their actions. Now, having spent a significant time outside of the circle, I have a new sense of what it's like to draw their ire. And the degree to which they're focused on self-protection has become an area of extreme awareness for me, personally. When it comes to judicial discipline, the Supreme Court and the Judicial Branch have controlled all processes from start to finish, beginning in the 1960s with the large scale change that reshaped Colorado's Judiciary until the changes in the last legislative session that gave rise to this committee.

The first priority, in my opinion, this committee should consider is, once again, taking up the topic of the Judicial Department's lack of inclusion under CORA. Access to information is essential to garnering any ability to evaluate the actions and behaviors in question, and, as a result, should not be at the discretion of the Branch. Mr. Chair, Representative Weissman, I know this was a particular interest of yours some years ago when legislation was passed which provided limited inclusion of judicial records regarding sexual harassment under CORA, which was set to sunset in 2021. I haven't followed what's happened since, but I remember a lengthy exchange between you and I about those processes when that was being developed. From my first-hand seat, I can tell you, it's essential that the opportunity for meaningful review of the issues that involve administrative actions and access to information that can shed light on them should not vary based on the institutional actor in question. If the records that would provide some ability for an outside entity to evaluate what's occurred happened in the Legislative Branch, in the Executive Branch, or the Judicial Branch, the ability of that investigative entity to access that information should not be compromised and should be uniform.

In making further amendments and adjustments to the discipline process, the committee should next focus on minimizing the appearance of impropriety. Based on the lengthy discussion I just heard, hopefully, that's something that can happen. It needs to be, in my opinion, either through institutionalization of a more formalized recusal process or the formation of a separate tribunal, entity, or panel who would oversee the process and act as the ultimate decision-making authority. Especially, when matters involving the state's highest court are in question. Of the people in the room, of the three parties who are here, I'm probably the only person who's participated in actually helping select a panel, even though they didn't sit in judicial discipline actions in Colorado. I don't know what's happened since I left. I've tried not to follow the actions of the Judicial Branch, and I've tried to kind of keep to myself. But I do know a lot about that process, at least what's happened and how it has worked.

Finally, the committee should consider making the processes more transparent. And this is important to me. While I can appreciate first-hand the concerns about having to deal with unfounded accusations and untruths about one's behavior being banded about publicly, the process should nevertheless be structured in such a manner that provides an opportunity for public access about the proceedings, while balancing

- 3 -

the interest of fairness and due process. I think that can be achieved. There are a number of models that you can look at to do that.

In Colorado's system, the way it works today, and Judge Prince talked about it, the private admonishments or the private disciplines that occur. Most meritorious complaints and the sanctions ultimately imposed remain cloistered. This does nothing but generate additional questions about the ability of the disciplinary process to receive any real accountability for misdeeds. Representative Bacon, you asked some particular questions. ILG is one of the few things I've actually listened to and how you can make sure that things are actually followed through. The suggestion I would have is, whatever changes you make, make them specific, use precise language, especially when you're coming to the actions of the Judicial Branch. That you are looking to make sure it adheres to those sections that are drafted. I worked for years and understand the length to which the parsing of precise language occurs and what can turn on a phrase, the location of a comma, an improperly precisely placed and/or in one location, can lead to a dramatically different interpretation than what may or may not have been intended by the committee. Judicial independence, which I think is an important foundation of our country, is one thing. But complete autonomy, is another. Judicial independence does not extend to self-determination, its review of its own internal actions by the Judiciary.

In closing my opening statement, I want you to all take a moment ask yourself, what I have to gain from any of this? I'm an unemployed 53-year-old with zero prospects for the future given the results of a Google search of my name. I no longer have the ability to serve the public and work in the field of public policy, which gave my career meaning. I can tell you, just as a policy wonk, just sitting back and listening to the questions, things are going off in my head that I would love to be able to respond to, but I no longer have a seat at the table. It's important for you, for me, to make sure that you understand I'm doing this, because I believe that this committee's opportunity to address the deficiencies of the disciplinary process can improve the environment of Judicial and correct the extreme imbalance of power between the staff and those who wear the black robes. This needs to have the best chance of success and that's why this was important for me to come and address you today. I remain hopeful that some chance for meaningful review of these type of actions and corresponding improvement in the conditions of those who've been affected by them or who choose to report them, are able to result from me coming forward more than a year and a half ago. Thank you.

**Rep. Weissman**
All right, Mr. Ryan, thank you for testifying with us. Senator Gardner,

**Sen. Gardner**
Thank you. Thank you for appearing today. Mr. Ryan, I know it was probably a difficult decision, and I have the deepest respect for you in appearing and making judicious but candid remarks. The first thing I want to ask is you mentioned that you had heard several things today that you wanted to respond to and I think you probably inserted some in your pre-prepared remarks. But are there other things that, without

- 4 -

taking all afternoon or what's left of it, are there other things you'd like to get on the record and on the table?

**Christopher Ryan**

Mr. Chair. Thank you, Senator Gardner, there are few. I was sitting back and listening as Ms. Krupa, Mr. Vasconcellos, and Judge Prince were talking about what they could do in coming up with the right kind of panel of arbiters to do this, and questions about random selection and how do those pieces work. There are examples in Colorado law that would probably lend themselves to working very well. I mean, looking at eminent domain and how that's handled in this State, you have a committee of three freeholders that are appointed, and then you've got a trial judge sitting with them. They're the fact finders, but the trial judge is the one there, calling balls and strikes, dealing with any objections that get raised, questions about admissibility of evidence, how that evidence is presented. There are simple solutions that exist elsewhere, but they have not been applied in this area. The other one, one of the questions was, how do we deal with this mixed issue of special masters? Do we do this with true randomness? I was the clerk for the state grand jury for three years. The state grand jury is selected from six separate counties. The 12 jurors that come up, there's a selection criterion that two have to come from each county. You can define that criteria easily about how this has to be done. The more it's bantered about of, oh, we don't know how we're concerned about this. The world of imaginary terribles and slippery slopes that I've dealt with over the course of my career can be handled through concrete solutions, and there are myriad examples to look at that would allow that to happen. The other piece, in talking about appellate review, it really should be error correction. Especially if you're not going to change the ultimate fact finder to be the Supreme Court. If you're going to allow *de novo* review and allow them to interpret the facts their own way and come up with a separate conclusion, that throws the whole system of the special masters making those determinations out the window. So, I'm glad Judge Prince did the research to find that, and I think that is really important that that's codified somewhere.

**Rep. Weissman**

Senator Gardner.

**Sen. Gardner**

Thank you, and something else that I think is within your realm of experience, and I only briefly alluded to it in another committee meeting. Under our Constitution, the Chief Justice is the executive for the judicial branch and that model. When you were the State Court Administrator, and your predecessor, and your successor, are all ultimately responsible to the Chief Justice. That's one model of how to run a judicial branch in its administration. Another, and there may be multiple ones, but another one generally, is something that the Administrative Office of the United States Courts does, and some other states, which is to have a governing panel of sorts made up of a very broad based group of the Chief Justice and other judges and so forth, and the State Court Administrator, that office, and all of the non-judicial employees are responsible. The State Court Administrator is responsible to this board or panel, the Administrative Conference. Without getting too far into it, it has struck me over the course of

- 5 -

discussions over the past year and a half or two years, that perhaps that that model, the other model that the Administrative Office of the U.S. Courts, and I think state of Texas uses may have avoided some of the things that we've seen here. Give me your thoughts on the State Court Administrat[or's] Office, responsibility and so forth.

**Rep. Weissman**
Mr. Ryan.

**Christopher Ryan**
Thank you, Mr. Chair. Senator Gardner, I do think that's a very valid concept, and I think it has a lot of merit in terms of how you would approach that. You still in those systems have a Chief Justice that serves as the *ex officio* Chair of whatever those entities are, but those do ensure that you garner a wider perspective in terms of what's important. It helps to ameliorate some of the issues and some of the challenges that I dealt with in changing of Chief Justices, where you get changing agendas, or the abilities just between different Chiefs to actually execute the job as Chief of the Branch. I think that's an excellent suggestion, and one definitely worth continuing to explore. You can come up with a variety of things.

You know, the State Court Administrator could have a set term that they're appointed for. You know, that's what happens with the public defender. There's a set term for the state public defender, and they're reappointed by the Commission. I was shocked to learn from reading some of the ILG reports that Chief Justice Rice strong-armed the rest of the court into giving me the job. If I had known that was the case, I wouldn't have wanted it. I didn't want the job to begin with.

But I think that kind of concept, you can extend broadly to ensure that you've got consistent management of the Judicial Branch. You've got a number of eyes looking at any decision that happens. There have been examples in the past with previous Chief Justices in Colorado, where they have used the 22 Chief Judges around the state, plus the judge of the Denver Probate Court and Denver Juvenile Court to sit with them and give advice on certain things. It's been formal, it's been informal, depending on who the particular Chief was. But I think you can institutionalize such a process and have outside appointed entities as well, who are there being able to view what's happening with judicial business. If there are things that need to be discussed in Executive Session, it's no different than a board of county commissioners or city council members when those items have to be discussed. Those can be done in private and report out what occurs in public. I think that would be a very workable system and should not provide any difficulty. In fact, I think it would enhance the operation of the state's trial courts, given especially the structure of what happened in the 1960s in Colorado and some of the benefits of the system we have. Unified funding. You don't have individual courts fighting each other for the right amount of money from the Legislature, that entity would help to make sure that those things continue operating as smoothly as possible. And I think that's actually an excellent suggestion.

- 7 -

**Sen. Gardner**

Thank you very much.

**Rep. Weissman**

Members. Other questions for Mr. Ryan? All right, seeing none. Again, thank you for testifying with us today.

**Christopher Ryan**

Thank you.

# Appendix 27(s)(iii)(10)

# Public Testimony;

# Legislative Interim Committee on Judicial Discipline—August 10, 2022 Hearing: Public Comment

**Rep. Weissman**

All right, committee, I think out of respect for members of the public who've been waiting quite a while already, I'm going to mix up the last few items on our agenda. We have a long-time block really, just for sort of administrative next steps, and I don't think that we'll need all of that time block. But so that we can approach our next meeting on the 17th with some clarity on how much detail we need to bring in order to actually vote and get things drafting, Mr. Imel will be available to speak to us about that. But first we'll go to public testimony, I believe, from Ms. Jenson we do have some folks signed up. We're printing the list now. Just quick show of hands if you're here, if you're wanting to testify, could you please just raise a hand? Okay, ma'am, please come on up. And then, do we have anybody on the Zoom for public testimony? Okay, maybe we could just connect them in a panel. We will go to our physically present witness first. All right, ma'am. Thanks for waiting with us throughout the afternoon. Go ahead, let us know your name and affiliation, if any for the record, and please go ahead. Little gray button on the bottom of the table.

**Ruth Burns**

This one.

**Rep. Weissman**

There we go.

**Ruth Burns**

Thank you very much, Mr. Chairman and Madam Vice Chair and members of the committee for letting me speak again. My name is Ruth Burns. I am a licensed attorney. My number is 38055, but I am not an attorney, like most attorneys who have been coming and speaking with you today. I am actually a poor person with a license to practice law. I rarely take cases anymore, but I have been kind of drawn into a case that was going through the First Judicial District, the Jefferson County District Court, where I saw some things that I thought were very questionable. And that led me to speaking with Representative Kennedy, and he and I spoke fairly extensively on this. I sent him some documents on my thoughts, which I have also provided to you last night about nine o'clock, so I don't imagine you've had a chance to look at them yet. But I sent you an affidavit that I had attached to a motion which sort of breaks down my perspective on what I was seeing from a factual basis in the Jefferson County District Court, and just kind of who I am and why I was doing it in the first place. And then the attachment, the motion for recusal, that I had provided to you the last time I spoke. I had intended that mostly just to be an example. Between that and the affidavit, the Affidavit talks about the facts and the motion talks about what I believe were the violations that I was seeing by those judges in that court. So, I just wanted to clarify that for you, and coming to speak again. Mostly, I wanted to talk with you about what I think maybe

- 1 -

could be some solutions, looking at this mostly from the perspective, yes, of a lawyer, but mostly just of a member of the public who kind of got drawn into this sideways, as it were. And I think that there are probably some good things that have been suggested today by a lot of these esteemed people who have testified today. A lot of what I was hearing kind of goes right along with what I've got on my little list. More transparency is really important. I'm looking at this from the perspective of how ordinary people are going to look at actions by the court. Because I know you're going to have a hard time convincing me that what I saw was not shenanigans, no matter how many kinds of excuses you come up with. And I'm a lawyer. So, it seems to me we need definitely more transparency. I love the idea of having the courts actually be subject to CORA, or, you know, at least the administration of the courts to be subject to CORA. I think that's incredibly important, to actually be able to see the evidence of whatever issue you think you need to look at. And I don't think it's appropriate that any part of any governmental branch should be able to be above that. They should definitely be subject to it. I think it would be really helpful for a lot of people if we had some kind of a program that would talk about just the concept of judicial discipline and attorney discipline at the high school level, maybe. If we could, you know, start working with some people who actually teach in the schools, because I know that I didn't even know that there was such a thing as attorney regulation or judicial discipline until I got into law school. So I went all the way through high school, all the way through college. Still had no idea it was out there. I think if people actually knew that there was such a possibility, that right there, would make people feel a little more comfortable with the notion that there is a court who has this sort of power over all aspects of their lives. That at least they have some avenue that they could pursue. The other document that I gave you talked about the absolute immunity doctrine, which I had mentioned the last time, and why I think it's a really terrible doctrine that should go. I hope you have a chance to look at that. Obviously, that's about beyond the purview of this committee, but it's a conversation I think maybe we should be having, because I don't think it's right for any portion of our government to think that they're above our Constitution. But having said that, if we can't, you know, just do away with the absolute immunity doctrine, it seems to me that we're not actually going to get compliance with whatever rules or statutes that you make in the courts. Because they are so able to just conduct their business and not have people generally looking at them. I think that on a day to day basis, there really must be some sort of teeth in whatever rules or statute you put out so that if there's a violation of those rules, that there is some consequence, some actual consequence. Maybe a system of fines. I don't know. I'm just throwing out some ideas. Because you can't sue a judge, but at least the judge should not feel like they can just do any sort of action that disregards the rules, disregards the law, and just walk away. Even if they get publicly admonished, publicly to whom? Right now, public admonishments are published in *The Colorado Lawyer*. Nobody reads that, but lawyers so the public is not getting that. I like the idea that there should be more public disclosure about if there are disciplinary actions against a judge, I think that would really make a difference when people are looking at whether they want to retain a judge or not. Because most folks, they look at you know what's in the Bluebook, but that's all they know. And, so, if there's nothing else, they don't know whether that's a good judge or a bad judge. So, I just think that's a really important aspect to consider.

**Rep. Weissman**

Ms. Burns. I haven't been strictly enforcing time today, but if you could maybe take one more minute and just conclude.

**Ruth Burns**

Absolutely and, yeah, I'll totally get out of your hair after that. There was, let's see education, transparency, accountability. You know, that was really mostly what I wanted to say. I think that a lot of other people have covered it pretty thoroughly. I just, I did want to throw out there the transparency being extremely important, and there being some actual method by which a judge could actually have some consequence for real violation of the rules. So anyway, thank you very much for listening. I really appreciate it.

**Rep. Weissman**

Thank you. Please hold the table. In case there are questions. We'll go first to our online witnesses. Ms, Fleming, looks like you've got your camera on and you're ready, so we'll go to you first. Let us know your name and affiliation, if any. And please go ahead. Please aim for about three minutes.

**Luanne Flemming**

Yes, hello. My name is Luanne Fleming. I am an advocate with families against court embezzlement and ethical standards, FACES. Thank you for the opportunity to speak in front of you today. We spent many hours speaking in front of the Supreme Court, the judicial performance commission, public meetings, spent the last seven years in front of legislators. And many of you who are present here today will remember me. There is a very serious problem with integrity and accountability in Colorado courts and across the nation. As a national blog talk radio show host on the hidden truth reveal channel, we have covered stories weekly for five and a half years. Our organization has received over 300 complaints from families in probate courts in Colorado who have come forward, and 1000s nationally. We and many other families have been forced into an unethical probate court system here in Colorado. We put in complaints against attorneys where no actions were taken against them. This is a true violation for the probate victims in Colorado. We picketed a judge Arapahoe County because we have nowhere to complain to. The Code of Judicial Conduct is supposed to protect the public from inappropriate acts of judges and judges are supposed to enforce the rules of professional conduct over attorneys. When all this fails, our democracy is in jeopardy. This is what's happening. For many years in Colorado, the focus has been spent on protecting judges and attorneys when everybody should be protecting the elderly, the disabled, our families from the abusive court appointed guardians who isolate, medicate, and steal their estates for their own gain. The problem in Colorado is that judges really don't have such constraints, because the judicial discipline system allows them to violate all the above without fear of any discipline. We desperately need to protect integrity in our judicial system. There has been recent reports by the Denver Gazette. Reform advocates testify that Colorado's current method of investigating by discipline judges should be scrapped for a more independent and transparent process, the walls between the commission and the public should come down. Chris Forsyth, executive director

- 3 -

of the judicial integrity project told lawmakers and now another report by David Migoya, The Denver Gazette. Judicial Discipline Commission says State Supreme Court, lied, misinformed the public during probe. Now Senator Pete Lee, head of the Judicial District Discipline Interim Committee, allegedly indicted. And the hundreds of complaints in our organization, not one family has reported a proper or reasonable remedy through the judicial discipline process. So we do favor a system such that proposed by Chris Forsyth with the judicial integrity project, is a step in the right direction. And I just want to say to you, when is this embarrassment going to end for Colorado? We do these weekly radio shows, and the stories keep coming into us and there's nowhere else to go to. So whatever you can do to remedy situation would be greatly appreciated. Thank you.

**Rep. Weissman**

All right. Ms. Fleming, thank you. Please hold in case there are questions I see. Ms. McLean, you have your camera on. Please go ahead.

**Marilee McLean**

Mr. Chair and interim committee. My name is Marilee McLean, and I'm the author of *Prosecuted but Not Silent: Courtroom Reform for Sexually Abused Children*. I'm also the Executive Director for Moms Fight Back, which is a nonprofit here that works on legislation here in Colorado. Last year, we passed a law, HB 21-1228 which was in honor of my daughter Julie. And I find it amazing. I love the things you guys said today. I would say it was really good work, and it was perfect testimony coming forward and with ADA, everybody. But really what is missing in this picture is the fact that all the people that are working within the system, except for the few that just testified now. What about the litigants? What about the attorneys? When the litigant has an attorney that won't fight that judge because he's got to go up against that Judge again? What about cases? And I have, literally, I work nationally, so I have 1000s of cases. So it isn't just here in Colorado. This is about systemic failure, and I'm seeing it every single day. What you're talking about isn't what we're talking about in public. Or what I'm getting, all the cases that I'm getting. And what I see are lack of training for judges. There's no training in domestic violence, child abuse, child sexual abuse, trauma. They sit on the bench two years and rotate and come off, and then, once again, these children are being subjected to be living with their abusers, and it's in epidemic numbers. I'm not making this up. I have the documentation to prove it. So, if you think our judges are doing a good job, they're not. Because they aren't trained in these areas. And if they're not trained these areas, you're not going to get due process. You're not going to not going to get your first amendment rights protected. They're sealing the courtrooms. There's no accountability and transparency out there, so they can do whatever they want. They have discrimination. So, in family court, if they don't want to allow the evidence in they can throw it out. And I have so many children, so we're talking children. You guys are talking billions of dollars getting spent and illegal things going on with judges. This is billions of dollars being spent because families are not being protected in our family court, children are not being protected. They're being abused and sent to their abuser because our judges are not trained. So, I'm really just out here to tell you, I love what you're doing. But I've been on that commission trying to get them to get it written in the Blue Book. The public needs to know what these judges are doing. We need

- 4 -

to see what these judges are doing. And that information is not getting out there. And when a woman has lost her children and the judge, this is what this judge said to her. Wait till your children turn 18. They're being abused. And she's in court because they're being abused. Wait till your children turn 18, and they will look at you and they will say, bye, bye, I'm done with you. Is that proper? Is that a code of ethics? I've seen way more, way more. Kicking people out of the courtroom, not allowing people to testify, not allowing people, not allowing a woman that's trying to testify or talk about her children or what's going on, the judge doesn't even let her talk. She ends up out in the hallway broken down, sobbing like a child, and she's an educated woman. She's lost her three daughters. On what grounds? Because she tried to protect them. This is what I see every day. And until we educate these judges and train them, we're going to see more of this. And that's billions of dollars that are being spent yearly on these children, when they have to go through the ACE study, adverse childhood experiences, and then they have all these mental health issues and heart issues and all kinds of other issues. So, it's time we really look at it. I love what you're doing. It's great. I hope it works. But please, the real reason we're here is for the litigants, the people that are trying to protect their children. What's happening in the courts and where judges are doing illegal things, and believe me, it's happening every day. I've witnessed it for 30 years. Thank you. If you have any questions, I'm here to answer.

**Rep. Weissman**
All right. Thank you. We have a few more witnesses to hear from. Please hold we'll see if there are questions. Mr. Austin, I don't know if you can hear us, I see you've been on a little while now. All right. Well, there he is. Okay. Mr. Austin. I think you're off mute. Can you hear us?

**Robin Austin**
I can hear you. I can't get my camera working, but thank you.

**Rep. Weissman**
Okay, you're coming in pretty faintly. Please lean into the microphone as long as we can hear you. Please go ahead. We don't need to worry about the camera.

**Robin Austin**
All right. Can you hear me now?

**Rep. Weissman**
It's a bit better. Please continue.

**Robin Austin**
My name is Robin Austin, and I am with FACES, families against court embezzlement and ethical standards. Our organization came to exist precisely because many of our courts, in fact, operate organized crime organizations, embezzling from victims through application of unethical standards. Judicial discipline is the heart of justice, is it not? Attorneys favored by the court are given carte blanche

- 5 -

protections against prosecution for acts that are crimes in any other context. Our families, loved ones, and we ourselves have been victimized by these crimes. We've often seen judges collude to block evidence, violate God given and constitutionally protected rights, and tacitly endorse criminal elements to enrich a circle of co-conspirators. We are not talking about a few disgruntled litigants, angry because a judge ruled unfavorably to their position. We are talking about systematic denial of justice. We have interviewed hundreds of Coloradans and 1000s nationwide during five years on blog talk radio.com/hidden truth revealed. We are, in fact, a go to resource who many legislators refer victims of court abuses to, because there is no meaningful recourse in place in the present lack of oversight system. Our probate courts, family courts, divorce courts and criminal courts, all have been affected and because the judiciary hides behind confidentiality of the discipline process. It is likely none of you are aware how serious and prevalent these problems are. Now, this is compounded by legislator Pete Lee, who scoffed at us when we raised concerns in the past, being charged with leading this committee only to be compromised by charges of unethical behavior. We've heard many hours addressing workplace ethics and almost none addressing how unethical judges affect victims in court. I hope efforts to address one do not overshadow the other in deliberations. Judges fail miserably at policing their own. They seem powerless to enforce rules of ethics for themselves or attorneys. But that is merely theater to convince litigants they are not collusive. Our concern is that in listening to all these attorneys with their talk about integrity, you may forget they are human and humans are not trustworthy. Do them the kindness of creating meaningful oversight. There are many models and obstacles. One of the best models, in my opinion, is Chris Forsyth. He's been studying the problem as we have fought beside him to create more just courts. He's been telling us all for years what needs doing. I think it's time we listen to him and other advocates. In any case, thank you for working to correct these serious, long-standing problems.

**Rep. Weissman**
All right, Mr. Austin, thank you. And again, please hold the line. We have a few more witnesses to hear from. All right. Rabbi Bellinger, I hope I'm . . . Bellinsky, I'm sorry. All right, your name is showing up very small on the screen. Rabbi Bellinsky, please go ahead, Sir, you're on mute.

**Jacob Bellinsky**
Hello. Can you hear me?

**Rep. Weissman**
We can hear you now. Please continue.

**Jacob Bellinsky**
Thank you. So yes, my name is Rabbi Jacob Bellinsky. I just want to start off real quick by just thanking Representative Amabile's office and her legislative aide, Robin Noble, because she's the only one who has reached out to me to try and help with my specific case. And I'm not here necessarily to talk about my specific case, although I think it could be used as an example and a springboard for hopefully some change and some real direct examples with evidence of how bad the system really is and how bad the

- 6 -

judicial discipline commission system is. Because with what I've gone through, with what my children and I have gone through over the past three years. It is just really appalling, and it's just really unconscionable. And I have so much evidence that the one thing I wanted to really discuss here today was the difference between the fact that they claim this is a civil matter versus a criminal matter. Okay, I was here at the last committee hearing back on, I think it was, when was it? One second. It was on July. What was last hearing, July 19 or no, I'm sorry, July 12. So, on July 12, I appeared before this committee, and I presented a 123, page document, 50 pages of attached state and federal criminal complaints, largely detailing the crimes and misconduct of those judges and court officers involved in my case and like with my kids. So here I am, over a month later, no questions were asked of me following the testimony. No one from your committee reached out to me in the weeks following, and so I'm here today to basically return and further access the public record with additional testimony, and I would like to submit additional written testimony and make a written submission. But basically, you know, last time I was reduced to three minutes. How can I sit here and tell you all the information and evidence we need to tell you in three minutes time? So, I don't know how much time I'm given today, but I would like to actually invoke, you know, three minutes for each of my eight children who are crime victims here. So when can I have a presentation? When can I actually speak and speak to your committee for more than three minutes, or get more and more time to actually present my evidence, present all of the evidence. So, this 123, page letter went out back in April. So, and from the Governor's office to the AGs office. The DA has got involved, the local sheriff, the Commission on Judicial Discipline, Chief Justice Boatright was involved. And nobody, not a single agency, except for Representative Amabile, got back to me in the following months, in the following weeks. Every single agency wanted to claim that this is just a civil matter. You're just an upset person from you know, upset with the judicial rulings. No, this, this is so, so esteemed. What this Court has done, what the system has done to loving fit parents and with children, okay. That nobody wants to look at the evidence. I mean . . .

**Rep. Weissman**
Rabbi, excuse me. Couple things for your and others information. Previously, in response to some comments that this committee has heard in prior hearings. Vice Chair Rep. Carver and Senator Lee did send a letter to the Judicial Branch summarizing the significant concerns that have been registered to this committee about issues arising out of family court and probate court and urging heightened attention to those matters. What this committee cannot do is act to adjudicate any individual matter, whether yours or anybody else's. We are here to grapple with structural issues. That's been the nature of the testimony previous to today. You are welcome to continue to send us things in writing. We would urge that that written testimony be focused on the committee's charge in Senate Bill 22-201.

**Jacob Bellinsky**
I understand that, but you have to understand, recognize that I am just one case of many. Okay, I actually just put out a post recently in my local county asking for people's stories that I could bring to the judicial commission to discuss at this particular hearing, I was reached. 10 different people contacted me immediately to tell me about these, all these different egregious stories about how they were

victimized by the local court system or the district court system. Okay. So this is, this is, I'm not asking for your specific help in my case, okay. I think that this is a matter that is so, so important to the public, the public good and the public interest, that we need to totally reform the system, okay.

**Rep. Weissman**
Rabbi, we've given you about five minutes here. The Vice Chair, would like to, would like to add something, and we have at least one other witness signed up, from whom we need to hear as well. Madam Vice Chair, please go ahead.

**Jacob Bellinsky**
I listened for eight hours to your hearing today, eight hours. Now, they don't tell you when you're going to testify, when the public comment is going to be. So please give me a few more minutes to finish my commentary. Because you know what, I listened here for eight hours to your committee, today,

**Rep. Weissman**
Sir, sir, you've had five or six or seven minutes already. That's twice what we usually do. Please be respectful. Please be respectful, Madam Vice Chair, please go ahead.

**Rep. Carver**
Rabbi, if I could just make this comment to those that have presented during public comment, and I know several of you testified at the last hearing. After the testimony at the last hearing, Chair Lee and I did the email to the Judicial Branch, and it was a broad range of concerns. That although many of the comments were concerns about probate, family court, concerns that court appointed guardians or officers were abusing their authority, were not acting properly. You know, I think some of the issues that were brought up could very well require changes in the statutory law for family law / probate. Some of the concerns that were brought up about court appointed conservators and allegations of embezzlement, misconduct, failure to notify family members, that is a different issue. And then to add to the complexity in this whole range of issues that you folks have brought forward. All valid issues, all valid issues. The path of recourse to have your concerns addressed may be different, and sometimes it may be back to the Judicial Branch. It may also involve an aspect where a Canon of Judicial Conduct has been allegedly violated that would also generate a complaint to the Commission. So one of the things that we've been discussing. And I don't know if you heard it as part of our discussion today, is the possibility of creating an ombudsman just for litigants, so that when these concerns arise and you believe that there has been misconduct by the judge or by a court appointed conservator, misconduct. That the ombudsman who has knowledge of, okay, this is an appellate issue, and that's how you have to resolve it. This is alleged misconduct by a court, court appointed conservator, and it may involve a couple of avenues to challenge that conduct, and here's how you need to proceed.  And to provide some clarity to litigants on what their recourse is. Now, sometimes what the ombudsman may tell you is that what was done was part of current statute, and the statute needs to be changed. So, I just wanted to make that generic statement after talking with Chair Weissman to know that the comments you made last time and the comments that

- 8 -

you're making this time. We are looking at a systemic change to help address the concerns that have been raised. Although some of those concerns, quite frankly, may involve a change in the Family Code, right? So then that would go back to the legislature. So, I just wanted to provide that information to all of you and know that that is an aspect we're looking at that would be part of a structural change. Thank you.

**Rep. Weissman**

Sir, no, I'm sorry. We need to move on to other witnesses who signed up and to other matters on the agenda. Again, we have over 100 pages from you. You have testified at a couple hearings now. You have the right to continue to send us things in writing, and we will have two additional hearings of this committee. And you have every right to sign up if you have comments pertinent to what we're doing. But we need to move on for now. On the sign-up sheet from the side table here, there was a Deborah Carroll. Okay, ma'am, please come on up. Thanks for waiting.

**Jacob Bellinsky**

A fraud, a big fraud,

**Rep. Weissman**

Please let us know your name and affiliation, and we'll make sure that you can speak uninterrupted.

**Deborah Carroll**

Okay, my name is Deborah Carroll, I want to thank you for listening to us today. My affiliations are about 11 years of working as an advocate by going into courtrooms and watching what's going on in the family, juvenile, and probate courts. I have no legal training, and I have a heart of gold for the children of this country. What I want to make sure you get from what has happened, including the scandal with the Supreme Court, and the pain of the people that are out crying to any avenue that they think will listen. So, what I'm going to ask you today is to stop protecting judges who are violating laws with impunity. Who are breaking families apart for decades, if not for the rest of the parents' lives. This is the reality that many people have to face every morning they wake up. I spoke in June and talked about a hotline. I don't know if the ombudsman office can simply provide an avenue for the HR issues and an avenue for families in crisis. I think, I don't know, I can't remember if, when a case is opened, whether or not there is a handout at that time about where to go if you need help with what the judge is doing. Or the magistrate, who falls under a completely apparently lawless code. That's an issue. That the magistrates in the family courts do not even fall under this code of ethics. As far as I can tell, they answer to their judges. So I just want to remind you that Rebecca Love Korlis mentioned a hotline today, and I am the one who brought this up to you two months ago. The people don't know where to go for help. They cry. Rabbi is crying. Ms. Fleming's families are crying. They need your help. They need help from every quarter that you can imagine, and you're sitting here representing a ray of hope. There needs to be sunshine into these courtrooms. I have witnessed in Donna Schmalberger's courtroom, a 12 year old mother in a foster group home and a 13 year old father's parents try to get the infant that was

conceived in the foster group home under lack of supervision. And I have witnessed 25 court officials on one side of the courtroom, and 20 including the parents and grandparents, guardians ad litem, and caseworkers, and caseworker managers and the other. We're talking millions of dollars for court cases to remove people's children from their homes. And there's federal funding for this, and nobody's looking at the larger picture, but the money is flowing into our state, but not for the families. That's all I have to say.

**Rep. Weissman**

Thank you. I'll just say one thing briefly, which is that both Judiciary Committees have heard and understandably so over the years about the increasing number of people in civil matters, generally, family law matters in particular, who are having to go pro se due to there not being enough attorneys in Colorado practicing that kind of law, or simply the cost of representation. There is an ongoing kind of licensing matter, court rules matter. Now, I don't believe it's resolved. That the court is undertaking to allow paraprofessionals who are not lawyers to, in fact, work with families in family law matters in a limited way. Which is one avenue to try to address this. There are more paraprofessionals on top of lawyers, the hourly rate would probably be lower. You know, I don't think any of us up here who are lawyers would want to go pro se, you know, ourselves. So, we appreciate that. And just to let you know that there is one effort going on to try to help people not have to go through these matters entirely with representation and that that is, that's not final. It's kind of without the scope of this committee. But I thought I would mention it because it is an attempt to respond to some of what you're raising here.

**Deborah Carroll**

Well, in 2012 I was representing the Divorce Corp, and they put a film together, and we were, we were talking about it, and one of the appellate judges came to the showing of the divorce court movie and talked about, how DU is putting together this experimental pilot program with 24 families. And they're cutting down on the red tape and getting, they're supporting them, but what's happened with that? That was nine years ago, 10 years ago. What's happened? How long does it take for these children to be saved? These children are broken in these families. They lose a parent who's fighting and then his bad mouthed through the courts and separated. How long do we have to wait before we're going to actually see immediate change? I used to post on Facebook judge so and so could do the right thing on Monday morning? Well, Facebook shut me down, of course. Do the right thing. Stop charging $10,000 out the gate for a PRE who knows that the family were co-parenting successfully for seven years, until the mother brought in a boyfriend who's not getting enough child support. Come on.

**Rep. Weissman**

Ms. Carroll matters like PREs and CFIs and their role in family court proceedings are statutory matters. I have actually talked with other folks about that. That is not what this committee is allowed.

**Deborah Carroll**

I understand that.

- 10 -

**Rep. Weissman**

But I hear what you're saying.

**Deborah Carroll**

I'm glad that you hear what I'm saying. I hope that you all hear that.

**Rep. Weissman**

We are going to ask you to hold there. We'll see if there are questions for you or any of our other witnesses from the committee. Rep. Bacon, I see a thought forming over there.

**Rep. Bacon**

And I'm wondering. I don't necessarily want to open a door wide open. But I think what the public testimony has really highlighted for us is kind of the question of, where can people go if they're struggling with trusting an institution. For us, there is this separation of powers. It is very real. I wish I could tell courts what to do and how to do it better. And I think the scope of what we're talking about here, as a matter of discipline. Part of what we've been talking about here, as well is what kind of pieces of information can be made transparent, and thinking about what we can control by way of external accountability measures, if that makes sense. Or what is it that we can make public? And so I do want to just ask a very limited scope question on an example and kind of hear your feedback. You know, part of what we've been talking about today is keeping track of claims, right. To be able to look at longitudinal data or trends to shift in that culture. And I'm wondering if, because that seems like something we can at least advise on, we're trying to figure out what we can actually do as a matter of law in the Constitution. But if we got to a place where we were keeping data regularly, a number of complaints and X, Y. I want to presume it would then be able to help not only us, but just the public and the Judiciary put spotlights in particular places. Because as a side note, I will find time to speak with many of you about probate, about all these other courts outside of the space, I will provide that space. It is my duty, as you say. But for purposes of this committee, I think what I'd like to understand, if you have any thoughts, and maybe from the women here at the table, because I'm looking at both of you. And as an attorney, what do you think about this notion of this transparency and tracking the types of cases and what not to be able to support with us? If that makes sense. And we don't need everybody's answer, I wrote down your name. I'm so sorry.

**Ruth Burns**

Ruth Burns.

**Rep. Bacon**

Thank you.

- 11 -

**Ruth Burns**

Thank you, Representative Bacon. I would say that you do have to consider where it is, where it is appropriate to draw a line. I think that the statistical information should obviously be made public, and I think that it should be tracked. How much of that tracking needs to specifically be made public is something that you'll have to decide. And I was hearing earlier testimony from some of the folks who were here that they think that if you have a specific judicial discipline matter, that it needs to stay not public until there's an actual claim, an actual complaint filed. I think there's something to that, because I think you do have to consider employee confidentiality. HR issues, those obviously exist. But I do think that it would be really helpful for the public as far as trusting the judiciary more. I think it would be helpful for us to know that there are these, these actions going on. I mean, some sort of a reporting of the fact that we've had so many complaints, and we're doing so many hearings about them. Just this kind of overarching statistical data, at least, would be helpful to know that there's something going on. And I do think that the point about being subject to CORA that Mr. Ryan brought up was very well put. I think that that's extremely important, because that's a big part of how the Judiciary is doing its business behind closed doors, as it is, because they're not subject to CORA. So, we just don't get the opportunity to see that stuff. So, I think that would be really an important thing. I think it's a tough question. It is. And I do think that there may be, should be, at the least. I would like to say that if there is, well, definitely, if there's a complaint filed, that there should be some sort of public reporting of this judge had a complaint filed. And the reason I think that, and I think it should be public, and not just in the Colorado Lawyer, is because that helps to inform the public, and that gives us a better opportunity to decide, do we want to keep this judge on the bench, or don't we? Because I think that's a big problem that the people in general have. Is that the judges are subject to retention elections, but they don't know whether they want that judge to stay or not. And that kind of leads to a very uninformed public not being able to make good decisions about who they want. So I think that's really important. I love the idea of an ombudsman. I thought that was a fantastic idea that Justice Korlis brought up. I think that in my own personal case, which I'm not asking you to do anything about. Again, just for illustration, this is what I saw. But I think that if there had been an ombudsman available to me, and I had been able to find that person, I could have gone and talked to that person about what I was seeing without feeling the need to start, you know, filing motions for recusal, maybe, or filing the complaint that I'm going to have to, seven complaints that I'm going to have to file with the regulators over three judges and four lawyers that I was seeing in just this one case. So, I think that that would be a very well received sort of move on your part to put something like that in place for litigants, specifically. Obviously you have one for the HR issue, but I think that all of us would be greatly relieved to know that there was at least somebody who was going to listen. Because I think that's a big part of where the Judiciary has some problems. Because when you go in there, you think you're looking for justice, and what you find is lawyer gameplay. You have privileges and immunities and causes of action, and, oh, this isn't really you can't, you know. And it's law, and the judges have to listen to that, but it results in people not having really an avenue to be heard. And that's something that really hurts people, to not even have someone listen. So, I think the ombudsman is a really well thought out idea. I like the idea of a hotline where people could call just for getting resources. You know, this is what I'm seeing. Where can I go? What can I do? So, I love that idea. I think that

would really help a lot with improving the perception, or excuse me, the perspective, of people and what they think of their judiciary. I think that a large part of the problem is just that they're way up here, and we're way down here, and never the twain shall meet. And we need to find a way to make them meet, or else we're never going to see what they're doing up there. Thank you.

**Rep. Weissman**

Ms. Burns, thank you. There are 20 years of Annual Reports on the Commission on Judicial Discipline website. They're in PDF format. I think what we've talked about today and other days is there are ways to service that data better, and I think that a lot of members of this committee are going to grapple with that in the time that we have. But just, you know, pulling one up by example, there are some summary data that is hopefully or at least partially responsive to the points that you're making. You know, 2020 there were 199 RFEs, or requests for evaluation. And then it goes on to break down how many properly alleged something within the Canons, and how do those go? And, so on. Again, maybe that's buried in the text. And I think we're all going to try to work to surface that a little bit better.

**Ruth Burns**

And I think that as this Committee continues with the incredibly important and valuable work that you're doing, I think that we will start to see more ways that you can consolidate these kind of issues and start addressing them as much as you can within the scope of what you're supposed to be addressing here. So yeah, we appreciate you.

**Rep. Weissman**

Rep. Bacon, good for now? Okay, all right, committee, other questions for any of our witnesses? Alright. Thanks for testifying with us today and for being patient through a long day's agenda.

**Ruth Burns**

Thank you all very much.

# Appendix 27(s)(iii)(11)

# Committee Discussion re: Logistics and Future Actions; Adjournment;

# Legislative Interim Committee on Judicial Discipline—
# August 10, 2022: Committee Discussion and Adjournment

**Rep. Weissman**

All right, Mr. Imel, maybe I could invite you up front. All right. So, committee the next hearing is the one where, under our joint rules, deadlines for interim work, we need to have a series of votes as to what we're actually going to ask LLS to draft. In conversations with Ms. Jenson going back to last week, I had this, we're getting a handout here. I had the question, just as a member, you know, what quantum of information do we need to have on the table as of the 17th or shortly thereafter in order to properly frame a drafting request. So, I thought I'd invite Mr. Imel to speak for the office as to how that should go next week.

**Conrad Imel**

Thank you, Mr. Chair Conrad Imel with the Office of Legislative Legal Services. When you make your bill requests next week. Sorry, you can request bills, joint resolutions, or concurrent resolutions. You can request up to six next week. You can forward 3 to Legislative Council on September 30. When you make your requests, you can make them by subject as broad as possible, similar to submitting a usual bill request to our office. It doesn't require that you submit all of the information with that request. Within three days of the bill request meeting, we will need sufficient information to begin working on the draft. The specific amount of information would depend on what you want your bill to be. I think it's okay for there to certainly be some gaps or some unanswered questions at that point. But we would need to be able to start working on bill drafts so that we can get that out to you in time for you to give feedback and have subsequent drafts. This interim committee process is a relatively fast drafting process. The deadline to finalize your bill draft is just over three weeks later, on September 9. So, in order for us to draft, get a draft out to you, get feedback from you, any work you'd like to do with stakeholders, send back changes and get new drafts to you. As you can imagine, that process is going to move pretty quickly over the 23 available days.

**Rep. Weissman**

Okay. Mr. Imel, thank you. Just to clarify one other thing. So, 9/9 is the deadline. There's been fiscal analysis, and this committee set its final meeting to approve three, or up to three of the six, on 9/30. My understanding is that we have those drafts in front of us. They are properly the subject of amending, just like any other bill that is in committee. I think that those amendments would need to be reduced to writing. Maybe you could say a bit more about timing of that and how your office, how you would like us as members to engage with you between the 9th and the 30th as to amending texts after they are locked on that interim deadline.

- 1 -

**Conrad Imel**

Yes, thank you. You're correct. So, the bill drafting will be finalized on the 9th for fiscal notes, the fiscal analysis process occurs over the next few weeks. So, we cannot change the bill draft at all until the meeting on the 30th. And on the 30th, you would make any changes by amendment that we will draft for you. Again, the preference would be, as soon as you know about amendments, the more time we have, the better the drafting process will be. Just like any committee hearing during the usual legislative session, we could draft them very quickly the day of or during the meeting, depending on how that meeting's process works. It's just however much time we would need to draft it. So, the bill request, like any other bill request, would have a drafter, and any member could reach out to the drafter and request an amendment be drafted.

**Rep. Weissman**

Thank you. Committee. Any other process questions of Mr. Imel. Senator Gardner.

**Sen. Gardner**

I am just looking up? I shut my computer down too quickly. What are our next meeting dates week from today?

**Rep. Weissman**

So, the next meeting where we need to vote, so it'll take five votes, assuming we're all here to send a bill downstairs for drafting, is one week from today, August 17, and then our final meeting is September 30.

**Sen. Gardner**

But we have a September 9 deadline?

**Conrad Imel**

Thank you, Mr. Chair. Yes, so when the bill request is made next week, one member of the committee will be designated to shepherd that bill through the process, kind of like a sponsor would be. So that member would approve finalizing the bill draft on September 9. That's not a committee action, it's a member.

**Rep. Weissman**

And Mr. Imel, is it one, or is it proper to sort of designate more than one member until that point on the 9th.

**Conrad Imel**

Our preference would be to designate one member, one single point of contact. If you are that person, you can designate other people for us to work with, which could include other committee members or other stakeholders. Just like any bill process. On any bills that are forwarded to Leg Council on the 30th,

- 2 -

you can designate prime sponsors for both the House and the Senate and additional co-sponsors at that time.

**Rep. Weissman**

Okay, Madam Vice Chair.

**Rep. Carver**

Thank you, Mr. Chair and Mr. Imel. Just to make sure I'm clear. On the 17th, we will put forward up to six bill ideas that we want drafted. But the bill drafters actually need some level of detail within three days of the 17th.

**Conrad Imel**

That is correct.

**Rep. Carver**

And, so, and obviously, we're not restricted to as we're looking at all these issues, and we're looking at perhaps changing Colorado law in how another state has done it. But, certainly I think that would to the extent that we are and we've gotten recommendations about different states that have good provisions based upon what our witnesses have recommended. So, I just, I just throw that out, and obviously, Mr. Chair, we can have further discussion. I would definitely appreciate, and I don't know if I'm alone in this, in having the AG's Office address how far we could go statutorily on confidentiality and perhaps some other issues without triggering a constitutional change. And I don't know if other committee members have any thoughts on some additional staff work or supporting work that we would like to have available to the committee on the 17th as we're working our way through this.

**Rep. Weissman**

Yeah. So, Rep. Carver, I have put it on my list to reach out to Mr. Morrison on behalf of the AG's Office on that question that came up earlier. One technical but important question for Mr. Imel. Three days is calculated how? We should consider that deadline Friday the 19th, Monday, the 22nd? We have a weekend intervening. I don't know if the first day counts.

**Conrad Imel**

I believe it is calendar days, not working days, so technically it would be Saturday, the 20th. I can't speak. I don't know who your bills will be assigned to. I don't, I can't speak for all of our drafters. I don't think anyone's running in on Sunday to get working on that. So, you may have an extra day there. Again, I would, I would stress anything you have earlier, that would be helpful.

**Rep. Weissman**

And to the last point, the Vice Chair and I had talked about folks who might helpfully be present for our discussions on the 17th. We're thinking about reaching back out to Ms. Gray with NCSC, she is a good

- 3 -

source of comparative knowledge. So, if there are questions on the fly that we want to get into as late as the 17th, although I second Mr. Imel's point earlier. It is probably better for all of us, please let us know, and we'll see what we can do to have folks available on the 17th to help us with any final deliberations, Senator Gonzales and Senator Gardner.

**Sen. Gonzales**

Thank you, Mr. Chair and Madam Vice Chair, I think to your point around needing to come with as much information as we can to the 17th. I'd really support to the extent that we individually, after having had several meetings in which we've been able to receive an extraordinary amount of content from different stakeholders and perspectives related to this issue, to the extent that we have concepts or even like bullet points that we would like to, ideas that we'd like to propose for bill drafting, I'd really like to just put that forward. Because I think that this is such a, there have been so many points that we have discussed as a committee, and as we begin to then narrow down into what we will actually put forward to our amazing staffers to actually then translate into bill language. To the extent that we have paragraphs or bullet points or some sort of something that is fleshed out. I would just, you know, encourage us all to do that.

**Rep. Weissman**

Thank you, Senator. I would second that. I mean, I think we're all familiar with the one pager or the fact sheet, you know, that we all do, or others do. I very much want to encourage members as we're all thinking about things, and it doesn't need to be any more formal than an email, and bullet list and complete sentences is even fine if the press of time is great, which it always is. I think the more that we come into the 17th, or even better, have shared with each other before the 17th, sets of concepts reduced to writing that will help our discussions next week, that will help the drafting office. Senator Gardner.

**Sen. Gardner**

A couple of things. One, with respect to the Vice Chair and requesting opinions from the Attorney General, I get my advice as a legislator from the Office of Legislative Legal Services, and so. Who will always give me an opinion concerning my most aggressive stance on what my powers as a legislator are, but also with the necessary caveats. The second thing, I have been sitting here all afternoon thinking about this, and I just throw this out in everybody's thought process. Not exclusively, but it does seem to me that there's a concurrent resolution out there and there's a bill out there. I don't know if the eight of us, by the necessary majority, will be able to agree on a concurrent resolution and a bill. And maybe they're going to be alternative versions. But it's hard to imagine that. But it seems to me that those are the components of this, of our work here. And maybe I'm going to be thinking in that way of what are the components of a concurrent resolution that we could get consensus around, and what are the components of a bill. Is a bill necessary, probably is. It may be a bill that has triggers so that if the concurrent resolution passes in November of 2024, imagine this, it would go into effect. That's just some thoughts about what does this thing look like.

- 4 -

**Rep. Weissman**

Senator, thank you. I mean, I think I broadly agree with that taxonomy. I think that we have to consider things that are constitutional in nature. I think we've talked about some subject matters that would be a bill and would not pose issues vis a vis the current constitutional text. Then a second flavor of bill is that which would ride along with a referred measure pursuant to Article 19, I think of our state constitution, we can't put that on the 23 Ballot. The 23 Ballot is reserved for fiscal matters, so the people would be voting on this not until November of 24. Madam Vice Chair.

**Rep. Carver**

Thank you, Mr. Chair, I stand corrected by the eminent Senator Gardner, you are quite right, sir. It would be the most able staff that can research the constitutional issues. I just see some fudge factor there, especially on confidentiality and perhaps some other issues. So however, we get that legal advice by whatever method I would find it helpful to have that before. I don't know that we need it by the 17th, but certainly, as we're thinking about drafts, to have it before the 30th. And the 17th would be better, actually.

**Sen. Gardner**

And I certainly appreciate the input of the Attorney General's Office. I think I have a far better chance of getting something by the 17th from our own counsel.

**Rep. Weissman**

So, updating my to do list accordingly. And of course, I think all of us should feel free to reach out to Director Eubanks. And I don't know actually who in the office would be assigned to this particular question, but we won't ask Mr. Imel to jump on it right now, it might take a bit of research. Okay? Committee, any other questions of Mr. Imel about our next steps? All right, thank you, and thanks for being with us till a late afternoon here. All right. Committee, I think that concludes our work. Unless there are any other thoughts anyone wants to share for the record again, plan on a pretty robust day next Wednesday, August 17. We'll be in some room in this building. It may depend. Okay, Ms. Jenson already has it figured out. Plan to be here in 357 next week, not the room downstairs. We'll see everybody on the 17th. Sorry, Senator Gonzales.

**Sen. Gonzales**

Thank you, Mr. Chair. Just for the committee's awareness, I will be here in person for the majority of the day. At some point in the mid-afternoon, I'll have to join you all remotely to catch a flight, so. But appreciate this work, and we'll see y'all then.

**Rep. Weissman**

All right. Thank you. And again, the remote option is available for members who need it. Depending on how focused we can be in framing our drafting requests, next week is not necessarily an eight-hour day.

- 5 -

- 6 -

It could be considerably less, that's up to us. So, we have our work cut out for us. Until next week, the Interim Committee on Judicial Discipline is adjourned.

# Appendix 27(s)(iii)(12)
# Presentation by Investigations Law Group, LLC and Steven Vasconcellos;

# Colorado Legislative Interim Committee on Judicial Discipline—August 10, 2022 Hearing: Testimony of Liz Rita, Ann McCord, and Steven Vasconcellos

**Rep. Weissman**

50 minutes from Ms. Rita and Ms. McCord to discuss the report and their findings, and then some questions from members of the committee, and then five or 10 minutes from Mr. Vasconcellos, separately to sort of inform us on what changes might already be underway or at least pending on the part of the Branch in response to the issues raised by the report. But for now, Ms. Rita, Ms McCord, thanks for being with us. Sorry for having run over time here a little bit. In whatever order you'd like, please dive in. You know, we have had the report for a while and I'm sure that all members of the committee have read through it. It's pretty exhaustive. So, I guess feel free to pick a median between brevity and thoroughness. Please proceed.

**Liz Rita**

Well, good morning. Thanks for having us. And it is our pleasure. And in deference to your lunch hour, I will probably shorten the introduction just a little bit. I'm Liz Rita. And this is Ann McCord. And we are with Investigations Law Group. Chair Weissman and Vice Chair Carver, thanks for having us. And committee members, as well. On April 22, you might remember, the Colorado Judicial Branch issued the request for proposals. It seems like it was yesterday in our world because we've been living and breathing this for so long, but it was some time ago. We answered that RFP and were selected to do the investigation of the many individual instances of misconduct identified in what we call in our report, the Eric Brown Memo. As you know, Mr. Troyer's firm was selected to do the investigation of the contract procurement piece. Our deadline was initially April 15. But it was extended to July 29, because we had such a volume of people interested in speaking with us, and we recommended to the Judicial Branch. You don't want to tell these people that they can't talk to the investigator. This is too important. So, we extended our time, so we could make sure everyone who reached out to us received an interview and everybody did. And in terms of our scope, we really were looking at three things. We were looking at the individual instances of misconduct, some in the judicial branch, allegedly, some in the finance department and some of the probation department. We were also asked to conduct a comprehensive survey of the workplace, which we did, and we were asked for recommendations. All told, we interviewed 168 people, we reviewed 1,000s of pages of documents, and we sent a survey to 4,133 employees of the judicial branch. Voluntary interviews, as I mentioned, were also conducted. I think I can I can skip this part for time's sake, if you would like or I can talk about a brief sort of methodology of how we went about the investigations. But it seems to me that the interest here today is primarily in sort of the workplace and recommendations. So, I'll defer to your decision on that.

**Rep. Weissman**

Thank you. You know, I think the matters that you were charged to investigate here are certainly all of public interest. And I think we all have opinions about all of that. Our charge under the statute that set up this interim committee is really structural issues of how judicial discipline processes go. And to the extent that there's a workplace matter that does not involve judicial officers. That's without the scope of the commission. And that's really without our scope. To the extent that you did get into matters involving judges. Now, the scope of the Commission, as well as internal matters to the Department are implicated. And thus, I think there is more tangency to what we all have to grapple with here. If that helps.

**Liz Rita**

It does. I think in terms of the investigations, I think it suffices to say, you know, we relied on our years of experience in doing workplace investigations in drafting our approach to those, I want to assure you that we approach those the same way we approach every investigation we do, we didn't shorten it up, we didn't make some sort of abbreviated process. Each of those was treated as a separate, full investigation. And so, we feel good about the fact that we gathered enough data to reach firm findings in those investigations that we did. We did the same thing in terms of our cultural assessment. And Ms. McCord is going to speak to that in a moment. But we do these for clients all the time, we use tested resources, including PhD statisticians to make sure that our data is statistically sound. And we made sure that we heard from everyone that was our primary goal. We really wanted to help. I think, you know, we've talked a lot about public trust in the agency, but to really help some of the employees regain some trust in their employer that they were going to be heard through this process. So, I think what we should probably do is talk a little bit about the workplace assessment, because I think that our recommendations should be the focus of our time here today.

**Rep. Carver**

Ms. McCord.

**Ann McCord**

Thank you. Thank you so much for having us here today. Again, it was a pleasure to work on this project. It was quite meaty. But I think we felt like we were very thorough and came up with some very good data for you to consider in the future and good methodology for you to build upon in the future when you look at the Judicial Branch. So as Ms. Rita mentioned, we conducted a survey, we sent out a survey to over 4,100 individuals, those who worked at the Judicial Branch and appointed officials, our survey had two different bases, one for those who are appointed officials. And the other was for those who are employees of the Branch, we collected all of that data we had about a 63% participation rate, which is great. And so, we feel like the data was really statistically relevant. As Liz mentioned, we did use a statistician on the project to ensure that we were looking at things through a statistical lens, and that we could feel confident in our findings. We had 103 people reach out to participate in voluntary interviews. Of those, 97 agreed to interview with us and six provided documented information instead of

- 2 -

participating in the interviews. We collected all that data and created the report that you have. That you've hopefully had a chance to look at. And some of the key things that we identified in that assessment was that there really is not a systemic issue, because there's not a system in place to drive consistency in how the different Districts are run or how they engage with their employees. So that was a bit of an aha moment for us. And for that reason, we dug into specific Districts to look at where were some findings that would be helpful to look at what's working well. And where are some districts that might be struggling? We mentioned in the report that we only looked at Districts with 80, or more participants in the survey when we called them out in the report, because we felt like that was most statistically relevant. There were some districts that had 30 participants, for example, and might have had some either really high scores or low scores. But for the purposes of the report, we focused only on those Districts that had a significant number of people who participated so that we, you know, felt good about providing that information to you. The good news, as we highlighted is that a majority of the people have a good experience working for the Judicial Branch, 72%. So, they were satisfied with their job. And that is higher for appointed officials at 89%. And then most individuals felt good about their work environment and about the work relationships. So, on the whole, the survey was positive. However, 14 to 21% of the participants gave negative responses to questions, and there was a lot of discussion within the survey about concerns of reporting misconduct and concerns about retaliation. So, while there are some positive things to build upon, when we dug into the specific districts that were struggling, we felt like that was an important place to focus efforts on, how to build better cultures within those districts.

**Ann McCord**

Some of the themes that came up from the survey were, of course, as I just mentioned, fear of retaliation for reporting misconduct, specifically, if it was judicial, misconduct by appointed officials need for transparency and accountability, which sounds like you've talked about a fair amount today, the absence of shared cultural values across the Districts. And so, for that reason, you know, again, there wasn't a system to say, you couldn't look at it holistically, you had to look at it District by District. There were some insufficient avenues for safe and confidential reporting, and handling of complaints, which it sounds like you've talked about a fair amount today. And, with respect to employee complaints about concerns about appointed officials, there was feedback that when those reports were made, there was kind of a absence of feedback to the complainant of what happened. So, it went into the judicial disciplinary process and the person who had expressed concerns was still wondering am I going to have to walk down the hall with this person who I feel has treated me differently based on my gender or fill in the blank. So, you know, there is this gap of how to handle the workplace, as was discussed previously, and then how to focus on the judicial discipline. So that was something that caused a lot of consternation for folks that we talked to and also led to the perspective of why report it, nothing's going to be done. So those were some of the highlights of the areas of improvement that we found. Happy to talk about some of our recommendations, but if you'd like to dig in at all on the survey, happy to answer questions.

**Rep. Weissman**

Members questions on the survey. Senator Gardner.

**Sen. Gardner**

Thank you. More in the nature of a comment Thank you for your work. Your task that you undertook and the results of your report are somewhat reminiscent, not on all fours by any means, but somewhat reminiscent of the legislative workplace, the uniqueness of those who are appointed judicial officers in our branch, those who are elected and so forth. You don't even need to comment on that. I think it was very good that you were able to build on that kind of experience with a unique branch of government with a different category of people. So, thank you.

**Sen. Gardner**

Thank you. Yes, we felt like that provided a nice foundation for us to build upon.

**Rep. Weissman**

Still have the 2018 report on my shelf at home Senator, I think it's a fair point.

**Sen. Gardner**

Do you read it? You read it like nightly or . . .

**Rep. Weissman**

Maybe not quite nightly. It was a challenging time for this place. Committee, any other questions at this point? Rep. Lynch.

**Rep. Lynch**

Thank you, Mr. Chair. So, in my mind, I've compartmentalized the two issues here. One is the judicial discipline so that those are the officials in the office. But there's also this big bureaucracy, if you will. Can you comment about the findings within that bureaucracy versus the findings of those officials that are serving in an official capacity? I mean, can you kind of separate those two? Is that fair to do? Or can you comment on that a little bit?

**Ann McCord**

Thank you, Chair. Yes, I think that, you know, in terms of the survey, we did separate out the feedback we got from SCAO, as well as the feedback we got from the various Judicial Districts. And we found that in terms of processes, such as what we're talking about today, places where people can go and confidentially report, for example. The absence of a structured, anonymous reporting system, which is possible to put into place and the feeling that nothing is going to be done. And the feeling that I am afraid to come forward with a complaint were universal across sort of both of those groups of employees. So, within SCAO, we found demonstrated and expressed examples of fears of coming forward and reports of retaliation. We also found on the SCAO side, lots of reports of toxic relationships

- 4 -

between leaders at the top of different organizations and those relationships impacting how well those groups were working together. And that was something we looked at more and heard more about in the sort of administrative side than we did on the judicial side. I think that there's opportunity for improvement in the processes on both sides. So judicial discipline on the one hand, but also how complaints are handled and appropriately managed internally. And appropriately investigated internally, are also areas that where some improvement would be, I think, helpful.

**Rep. Weissman**
Madame Vice Chair.

**Rep. Carver**
Thank you, Mr. Chair. And first, let me commend you for the thoroughness, in which you investigated the listed allegations on the Eric Brown Memo, that was truly impressive, and especially how old some of those allegations were and some of them being somewhat cryptic. I did have a couple of things I wanted to ask you on your recommendations. The creation of an ombuds person and other safe reporting mechanisms, and especially given the wide range of experience that you have had not just here, but the Legislature and you know, other entities. How would you structure the ombuds person? First does it need to be in statute? Second, how do you structure it so that it is truly independent and able to provide that safe space, safe reporting space? And perhaps managing the traffic based upon the types of complaints that come in? If it's repeated delays in their case? Is that an appellate issue or has it now reached the point where it's a violation of a Canon and could go to the Commission and I'm just wondering if you have a bit more structure on that. And, you know, you could provide it to the committee offline. But I do think that that is so important and whether or not in your mind, you see a difference between confidential and anonymous, and how should both be done by the ombudsman? And again, in the interest of time, feel free to provide that offline. But I think that's a critical recommendation, whether it is done by rule or statute, and I'm somewhat leaning statute on that. Any, I mean, go ahead.

**Liz Rita**
I'm happy to say a few words about that. And then we are also very happy to provide additional information as well offline. We hadn't anticipated or really thought about having the ombudsperson available to individuals other than employees and judicial officers. We hadn't thought about litigants the way it's been described and discussed a little bit here today. That's an interesting idea. I'm not opposed to that. But I'd have to think a little bit about how that might work. Because that does require person who has a much broader understanding and skills base, I think, if you're dealing with litigants, versus knowing, you know, the employment rules and the personnel rules and the employment law and those parameters when it's an employee. But the way that we look at the ombuds person, and I will, I'm going to say a few words, and then let and let Ms. McCord add because Ms. McCord's decades of experience in HR surpass, you know, she's forgotten more about this than I have ever learned in terms of how to set these kinds of things up. But, I think it's important that that our focus is that this has to be a safe place

- 5 -

for people to go with the caveat, there are some claims that might come forward, that are going to trigger some kind of reporting. So, it's a little different than what we ordinarily see, in a private employer, where the employer can say, this is a confidential resource, this person isn't required to report what you bring to them. They're there for your support to help you figure out what to do. And to determine next steps. Here, it has to be structured a little bit differently, because you have the concurrent obligation and interest of the Commission in dealing with allegations against judges. And to your point, Representative Bacon, the whole issue of whether HR things can be going forward at the same time as judicial commission hearings concerns us greatly, too. And there's got to be a way to thread the needle. My concern is that there are two investigations going on at the same time, because that is always difficult in the investigative sort of phase of things to have witnesses interviewed twice about the same set of facts. This does happen to us occasionally, when we have concurrent criminal matters going forward with our investigations, but it's difficult. And then back to your point, Vice Chair, in terms of the anonymous versus confidential, there are great anonymous reporting systems that allow you to connect and discuss a complaint with an anonymous complainant, like Conversant there, just one I happen to know about that you can have that dialogue with the anonymous complainant without them revealing their identity. And it tracks the complaints and it tells you where they're coming from. So, you can take a look to see if there's clusters in certain judicial districts or certain departments within SCAO, you can track that from a global perspective. There's robust reporting that comes out of those systems. I think Ms. McCord has more experience with those. And if she may add a few words to that. Thank you.

**Ann McCord**

Yeah, I think that I'd say first about the ombuds given that the judicial branch has more than 4,000 employees, I think an ombuds person for the judicial branch for employee and appointed official concerns, that person is going to be really busy. You add in if there were, you know, litigants who are feeding into that office, and I just don't know how it could be successful. It seems as though that that would be a really big workload and prioritization would be difficult. So, I'll put a pin in that. And so again, to Liz's, to Ms. Rita's point, we were looking at the workplace and working at the experience of appointed officials working with one another, employees working with appointed officials and employees working with employees. When we made the recommendation that we made. With respect to anonymous reporting, you know, that is common in what we see in businesses, public, private, you know, across the country. That they have anonymous reporting tools, that somebody can submit an anonymous complaint, there's a safe place that you can ask questions. You can get more details who was there what with who were the witnesses, can you point me in the right direction? Many times the anonymous complainant becomes a confidential complainant and they're comfortable doing so because you've build that trust with them through this anonymous tool. What we've seen in our investigative work, and that we investigate anonymous complaints pretty routinely, and many times we think during the course of the investigation, we've probably talked to the person who submitted the complaint. Generally, it's bigger than a one-person issue when someone decides to go anonymous, but it certainly can be, you know, a personal experience. So one of our recommendations was, in addition to the ombuds person, that there is an anonymous reporting tool that's, you know, that's embraced by the

- 6 -

judicial branch, how that is set up, how that's managed, really does take care of a lot of the process and the gray areas that we saw in the system when we were talking to the folks and looking at the survey results. So, we think that those are two important elements to a successful culture. All of this is predicated on the idea that you're going to have somebody who's looking at culture across the board, because building trust, building consistency, shared values, and those sorts of things are what are going to bring people forward and make them more comfortable not being anonymous. So, I think, you know, again, our focus was on the workplace, but happy to, you know, think about how this would be applied in a broader context.

**Rep. Weissman**

Thank you. Just a quick note, while we're building our follow up list, anything you could share based on professional experience on the universe of anonymous reporting softwares, tips on successful implementation, and management and whatnot, that's going to be sub-statutory, I think, but I would personally be interested to see that and I think we'd want to share it with other folks in the room who are parties to this discussion. So, thank you, Madam Vice Chair.

**Rep. Carver**

Thank you, Mr. Chair. And going to Ms. Gray. And in this is in our inbox and available, she does point out, in fact, did a cut and paste on 10 states that have provision statutory or by rule on anonymous filings. And so, your recommendation, if you wouldn't mind looking through those and your recommendation on which ones based on your experience would be the most useful? And I agree with you and your comment, Ms. McCord, really crystallized. I think we are talking about two completely separate functions for an ombudsperson. One for the employees within the Judicial Branch, and the other, maybe even attached to the court system in some way or physically located there, to provide that advice on what a proper path is for somebody who has a complaint. I do think and that was helpful to me, thank you. And then I'll just go offline. It has been, two things have been really startling to me. Over and over again, the people who have made the complaints and have this feeling like so what happened, did anything happen? To me, that's astounding. And so, certainly in our conversations with the Commission later on, to get clarification on that, but it's not just the complainant. It's the public trust factor. So the recommendations that we've received from some quarters, that there be a summary of what happened with a complaint, substantiated or not substantiated, and that that be made available to the public and at a minimum, that should go to the complainant. And whether that is certainly HR should have that if they don't already, but the Commission in their process should have that function. And, you know, perhaps we've been so focused on other issues that we haven't really explored that aspect with the Commission. But your expertise in this area, I think, would also be I think that's a huge issue of transparency, accountability, and public trust and trust for those making the complaints. That if they knew what happened, they might be perfectly satisfied. Unfortunately, that doesn't seem to be happening in a systemic way. So, thank you.

- 7 -

**Rep. Weissman**

Rep. Carver, did you want a response on that point?

**Rep. Carver**

If you have a few words, but again, simply to follow up offline, and which you could then share with members of the Committee and in writing and up to the Chair, whether we bring you back on the 17th for more Q&A.

**Liz Rita**

I will make one comment. Thank you. I think that I want to make sure it's known that leadership at SCAO also feels that stress and strain around not having the information to go back to the employee. So, it wasn't something that as an outsider, we were, like, scratching our head about, that was something that in our interviews that we had with individuals. It's a frustration and stress for them as well, you know, they're struggling to ensure that this person has a safe workplace, how to manage that. And in many times, they were doing so without much of any feedback on where things stood within the judicial discipline process. So, I just want to make sure that it's known that they're aware of the concerns they're equally interested in trying to find a resolution there.

**Rep. Weissman**

Rep. Bacon.

**Rep. Bacon**

Thank you. I have a few questions. And if I wanted to turn back to the survey, just to gather further insights. So, there were some pieces in here and looking through your graphs that were disaggregated by gender. And I'm curious, if you if you do still have some data. In some of the questions that you've asked that could be disaggregated by data that aren't shared by gender that aren't shared here, so I definitely want to have a sense of, you know, workplace, that was one of them that you put by male and female, but there were a lot of places that weren't. Just to see if there's something there. And if you have that, is that something you could share with us? Some of these charts?

**Liz Rita**

Thank you. Yes. So, what in working with our statistician, what we did is, looking at the data, we called out anything in the survey where there was a difference in experience or answers with respect to gender. So those that were statistically relevant are in the survey, but certainly we can break down every question by gender, that's not a problem.

**Rep. Bacon**

I'd be interested in that. And then can I continue? I'm also curious about what you may have found by way of understanding procedures, you know, some of the questions said, I feel like I know what the policies are. But did they articulate what they think those policies are? And we've been talking a lot, for

- 8 -

example, because I do have an extension on the relationship to the Commission. Do people know that there are certain things that are supposed to trigger? You know, the Commission's sort of investigation? So, were you able to further assess people's articulation of what these policies are? And if they felt like they were effective, and I'm curious if you have any particular insights on when complaints, or types of complaints are supposed to be referred to the Commission? And if there's any sort of general feedback on if folks within the branch feel like that's even happening? And the reason why I'm asking that is because there were some places in your report that I questioned, when did this go to the Commission? Did this go to the Commission? And, so, I'm curious if you have kind of like a global answer on that.

**Ann McCord**

So, I think that the answer to the first part of the question is that there is a lot of opportunity to educate around what the process is how to submit a complaint, what happens after a complaint is submitted? I don't think that that is well known among the 4,000 plus employees of the judicial branch. So, there's a lot of opportunity there. As we talk about respectful workplace training and the office of people and culture, we see that one of the first things that should happen, there is some robust education around. This is what a complaint looks like. This is what you do when a complaint comes to you. This is how they're processed. If you have a concern, here are the different ways that you can submit that complaint. So, there's opportunities there, I would say, because the survey was yes, no, and sometimes comments. We didn't get to dig into each like, yes, question. Do you really know what that is? But in our almost 100 interviews, we were able to have some conversations around that. So, it's a bit anecdotal. But based on the information we received in the investigations that Miss Rita conducted in the survey, there's an opportunity there to improve the knowledge base.

**Rep. Weissman**

Ms. Rita

**Liz Rita**

And, and I can add a little bit to that Representative Bacon in terms of what I heard in interviews, and again, it wasn't in a survey sense. So more anecdotally, that the previous memorandum of understanding between the Commission and the HR office where there was this delegation of investigative authority to HR, created some opportunity for obstacles for information to be passed back to Commission, and people didn't understand necessarily, you know, what had to be reported and when and there were instances that I investigated, that should have been reported to the Commission. And from our investigation from the Commission's review of its files, we didn't find any evidence that those matters had been reported. So, to add on to Ms. McCord's point, it's it was unclear, I think, for some frontline employees about what the process is, I think it was also unclear, and perhaps still is unclear at some of the higher-level offices at SCAO as to how those things are supposed to proceed.

- 9 -

**Rep. Bacon**

So my last two questions are, you know, outside of the I don't, it's not hearsay. But have you heard from the Commission in regards to what they may have learned from you? Or this report in regards to what should have been reported to them? And then the other question that I have, it is a little bit of a shift, just putting them out here for response, is it in the ombuds space? Has there been conversation and I didn't get to ask this of IAALS as well, about who the ombuds person actually reports to, whether it is the Supreme Court for matters of, you know, within the judiciary, or to the Commission, if it's, for example, if it's matters dealing with the Supreme Court, I haven't actually seen recommendations, or I'm sorry, a description of you know, where the ombuds person actually reports to. Also, should the ombudsperson have a narrow scope. And, you know, it's 4,000 employees, and there's an HR department, particularly when it comes, for example, to discipline. And so, I'm curious if you can elaborate on your thoughts on that. So again, my first question was, by chance, have you heard from the Commission of things that they may have learned through your investigation, but the other piece is on the ombuds office, and who that person should actually report to. And if there's any room to narrow scope of what the ombuds person does, because of that reporting?

**Rep. Weissman**

Ms. Rita.

**Liz Rita**

I can begin in terms of my thoughts about that. I spoke with folks at the Commission and they were very helpful in terms of giving me access to information I needed to do my job. So, in order for me to investigate some of these allegations about misconduct against judges, I needed to get information about whether there had been something filed and if there had been something filed, but it was, and they were very helpful and expressed some frustration about learning about some of these instances from me, and finding that there was no record of these things being reported. Now, with the caveat, some of these things were very old, right, some of the matters we looked at were 20 years old, or there abouts are 10 years old. So, the record keeping, in some sense, you know, perhaps contributed to some of this confusion. But we didn't have any specific conversations with them about other than, you know, my interviews with them in terms of our investigation from that, that standpoint. And then in terms of the structure of the ombuds, I think, inherent in your question is sort of two separate questions. One is where does the person actually sit in the organization? Who is their boss? And who are they accountable to? And then who do they give information to? So, kind of two separate things, both of those things have to be very clearly delineated to maintain objectivity. So, you know, the problem with objectivity starts to happen when there are subjective components along that decision tree. Right, I might report it to judicial discipline, if in my judgment, you know, something happens, or here are a list of criteria that I have to report to the Commission on Judicial Discipline, I prefer the latter, where there's less subjectivity for that person, to perhaps exercise their own judgment in a way that could be seen as biased, you know, if there was some relationship or so forth. So, there's got to be some clear delineated areas where the ombuds person has to report. And again, this is different than in the private sector, it's not something that

I think there's a great sort of out there in the box model for. You'll have to think through what those criteria should be. But that person is going to have to have the ability to report things, I think directly to the Commission on Judicial discipline, if we're to keep them independent. And there may be instances you might consider where that person has to report something back to SCAO to HR, if something is happening in the workplace that needs to be attended to that rises to the level of let's say, you know, any EO violation, so it can be difficult. In that world, you still have to build trust that this is a person that people can go to and feel safe. So, this is not an easy needle to thread in in the Judicial Branch, I don't think.

**Rep. Weissman**
Rep. Bacon, good for now? Okay, Senator Gonzales.

**Sen. Gonzales**
Thank you, Mr. Chair. We've been having this discussion around whether complaints, how to investigate complaints once they arrive and whether the survey that you conducted is very helpful to help grow the understanding of employees of the Judicial Branch around the different processes. I'm curious, given your professional experience, if you have recommendations on how long substantiated versus unsubstantiated allegations or complaints should be retained. Because I'm wondering if there are instances where there's a complaint and then there's another complaint, and then there's another complaint? If those three things are happening, if those three complaints are being say, investigated, concurrently? Is there any process for hey, look, are these are flagged in the same way? I'm just curious. Yeah, like, I'm curious what your, from your professional expertise and kind of taking a step outside and then looking in, if you have recommendations on how long the retention policies of those complaints should remain, in effect, whether they are confidential, or anonymous.

**Liz Rita**
Thank you, Mr. Chair, I do. Again, back to this anonymous reporting tool, one of the great uses of that is to document any complaint that comes in. And what I've seen work really well in the private sector is to use that tool to document and, you know, give it a numeric code, this complaint came in on this date, this was who was assigned to investigate it, here are the witnesses, this is what happened. And this was the determination. From that, if you use a centralized source like that, to document this information, you can look at it globally and say, gosh, we have some hotspots here, or we have these are the types of things that are coming forward, we really need to focus our training around that, because it seems like people are unaware. Or, you know, this is, again, this idea of the Office of People and Culture and a focus on DEI and, you know, culture. The point is, you take that data to help inform training, not as a club, but as an informative piece of information to come up with your plans. So, I've seen that work really well. As far as retention. You know, I would say that that's something that should be talked about within each entity. My experience has been that seven years is kind of a nice number. But when it's in an electronic format, sometimes we never purge that information anyway. And it's there. But especially as you know, the cycles of culture go having three to five years of good information at your fingertips

- 11 -

rolling seems to really help inform what's happening in your workplace culture. And having a tool like that. A separate group who manages the investigations, documents it within this tool, and then, you know, looks at it and reports back. That these are the types of things we're seeing in the organization can help inform time, budget, training, you know, where we're going to focus our efforts.

**Rep. Weissman**
Rep. Bacon I'm sorry, Rep. Lynch.

**Rep. Lynch**
Thank you, Mr. Chair. So, I'm, I may have missed it somewhere. But is it possible for me to get a copy of the actual survey? And maybe it's in maybe it's in there somewhere. Is it on the website? Okay, cool. All right. Moving on. So, I'm just kind of curious, as I'm reading through the statement from Chief Justice Boatright, I was just wondering if you guys had any comments on what I call the Cliff Notes version of this of this report. And if you just give me any feedback on how you feel that response went.

**Rep. Weissman**
And Ms. Rita you've seen the Chief Justice's letter or a statement that issued concurrently with your report or no?

**Liz Rita**
I did read it, I didn't study it, but I glanced at it. So, in all honesty, I haven't really, I think, interpreted it at any depth. But I will say, you know, we always like to have the shortest, sweetest report we can and this, you know, what we provided was the shortest sweetest report we could to document a lot of work. So, I think anytime there's a summary of a page or two summarizing that much work, you know, there's a lot that can be said that's omitted from that kind of a summary. I didn't see anything that was inaccurate in it. I could say that. I saw a lot of things that I would have added if it were me doing the summary but he didn't ask my opinion about it. So, yeah.

**Rep. Weissman**
I apologize. I might have inadvertently cut you off mid answer to a prior question. and wanting to make sure.

**Liz Rita**
I only just had for help, just as a helpful additional fact, what was McCord added? When you use that anonymous reporting tool as the repository of all complaints, so not just the anonymous ones, but any other complaint that comes in is fed into the same tool, then you have this global perspective of all the complaints. So, it can be used to manage not only the anonymous complaints, but everything else as well. Yep.

- 12 -

**Rep. Weissman**

Okay. Committee time check, we have about 10 more minutes with these witnesses, including both questions and presentation. Was there more in the way of this sort of summation that you wanted to put on the record for us? I feel like we might have sort of jumped into questions midstream in your opening presentation.

**Liz Rita**

No, and that's fine. You know, we were going to be summarizing something you've all read. So that's not necessary. We did note that there was a question about our recommendation about escalation criteria for matters that come to the Judicial Commission on Discipline as to whether they become public or not. That may not end up being an important point if the system is changed, so that there's more public oversight or more public opportunity to see what's happening. But we think something that's missing in that chain is an assessment about what kinds of criteria should matter in the decision about whether something becomes public or not public. As it stands now, it's, it's left in the discretion of the Commission. And I'm not suggesting they haven't exercised it wisely, but they've exercised it without any parameters around discretion. And so having some list of criteria that would assist them in making that decision, would make it more objective. And I think, you know, might result in things being handled in the public setting that ought to be in today's world that are considered important enough, that might be about harassment or discrimination on the basis of a protected class, which we believe implicate the Judicial Code of Conduct.

**Rep. Weissman**

Okay, thank you, Rep Bacon. And I think you have some questions.

**Rep. Bacon**

I just, I'm sorry, if I didn't want you to have to go back through a summation. But I did want to know if you could also just kind of give me a sense in a lot of the findings. And I'm going to jump over to the list of allegations. The conclusions were that there wasn't necessarily direct cover ups or intentional acts, by the Justices. But I am curious about how you would articulate your thresholds in regards to what would need to be required, particularly in relationships to other employees or subordinates, or particularly the HR team, that if there needed to be, for example, either direct collusion, is there anything to be said about should have known that's wrapped up into some of those findings? So, for example, in the I think it was the third one, with the law clerk, it's like, while the Justice may not have, how much did you see that maybe other people did have intentions? And therefore, what is the connection to the Chiefs who are making decisions? You know, what is that threshold? And then even from, you know, some of those findings as well, I know, since there are a lot of recommendations around culture. Seems to me that there is this emerging theme of should have known? I don't I mean, it's not like we're talking about criminal negligence. But you know, what does that mean, in the workplace? And then to what extent should we then hold, you know, the chiefs responsible? And I do understand that this will be like your, this may be a little bit more of commentary than your direct findings, but I have you all in front of me,

and I was really just looking for the in between in the subtext on those types of connections. You know, what are we talking about? Like, if you were tasked to investigate the Chiefs? It's okay, if the number fours, you know, may have had these intentions, but we don't see that in some of these reports. And again, why is that? Is it because the standard is like should have colluded, you know, to this outside of directly being held responsible? And then what do you make by way of this should have known space, beyond culture? If there's anything that we can tangibly assign to that? If it's policy or even statute like to what extent is someone responsible? And I know there's a little bit of this in harassment statute, but like, for this type of culture to persist. So, if you have a little bit. I know we don't have any time. And next time I'm buying family, because I'm the one that pushes us through to lunch, but I'm wondering if you could just shine a little light on that.

**Liz Rita**

Yeah, I think I can. I think I can shine some light in pretty direct way, I think that the question that you're asking is, should anyone at the Judicial Department sort of be above the law or above the policy or above the rule? And I think, in some of these cases, there was less attention to the regular process than I would have expected from folks in high levels. And that's both, you know, in the court side, and on the SCAO side, that it's somehow there is an understanding that those rules don't apply to me in this role. I don't have to do an investigation. I don't have to go through a process for hiring that is sort of standard and allows everybody the opportunity to compete for a position for example, I think the bottom line should be that everyone should be subjected to the same rules when it comes to workplace behavior when it comes to complaints of misconduct when it comes to matters of hiring and promotion. I think it's that simple.

**Ann McCord**

I have one other comment. I think the other thing that we heard and saw as a theme is that in some cases, the Chief Justice or the not the Chief Justice.  Chief Judge, thank you, would look to their Court Administrator to kind of manage what was happening within their District. And we noted a need for training across the board about what is the requirement to have a workplace that's free from harassment or discrimination or bullying or you know, whether it's driven by Title VII or otherwise. And I think there's an opportunity there because folks who are in sitting as judges don't necessarily have backgrounds working in the employment setting, working in businesses where they see, they get training that people tend to get when you're working in the private sector. And so, we think that there's an opportunity for training for judges to understand this is the expectation of conduct. Again, what does a complaint look like? What's my responsibility when I see something or hear something? What am I supposed to do with that? And so, I think we did talk about that a little bit on the training and culture side, as well.

**Rep. Weissman**

Rep. Bacon.

- 14 -

**Rep. Bacon**

The last thing that I just want to say to this is, because I think we found this a little bit. I went there with the Troyer Report, too. And I think the question is, if you are a chief, you're responsible for everyone. So, you can't not read an email, you can't not know that the HR chief was acting in a certain way, and then get a finding say that you were not deliberate. And somehow that absolves of responsibility. So, part of what I'm getting at is, if anyone is found responsible and being intentional in their behavior then the chiefs are responsible. And I feel like some of the ways that we are reading this is separating the two between what someone actually did versus what they're fully responsible for. And that's what I was getting at, you know, what is the standard, either through law or through these ethical canons, that connects those two, other than just saying there is criminal collusion, or this criminal definition of negligence? That's what I'm trying to get at if we're actually finding this. I'm also stating this as a comment more of a question. Because I, I have to really, also try to understand the investigators. In one what were they asked to actually find? Right? Not any sort of assessment, but two the lines that we have to walk in talking about a whole branch of government, you know. But I'm a legislator, and someone gave me a microphone. So, I can say these things, right. Like, I think the reason why I'm putting out this, this out there as well, is also to perhaps help you all to, you know, give me a hypothetical of what are those tangible connections that we may need to say in spaces that are struggling with culture like this? Do we need to create a statute? Do we need to write a particular rule? Do we need to say if your chief of HR does these things, and because you didn't read an email you were sent does not mean you're not responsible? It means also, what are you doing to read emails? What are you doing for your surveys are 360s and all of those things there? There doesn't seem to be a narrative of culpability that way. But that's just my thoughts. Please feel free to, to comment. You know, I think we just need to hear from HR professionals and people who do workplace work to make to help us make those connections, if that makes sense.

**Liz Rita**

I'm just going to make an introductory comment and then I think Ms. McCord should answer in part because I think what you're driving at is what we saw as the critical problem of this system, such as it is, even though we've said there's not one system. There's 24 or 25 systems, and that is the absence of a culture, there's the absence of shared cultural values that drive things like accountability and drive things like responsibility. And when you don't have that, I mean, perhaps you can legislate it, by statute, but I'm not certain that it will take if there's not the effort and the investment in building the culture of accountability.

**Ann McCord**

And that's why, you know, we recommended to continue the culture surveys, you know, to continue doing those and making them public on an annual or biannual basis annual might be a little difficult, but annual or biannual basis, make it public. Are things improving, we've identified some districts that not only were they ones that did not perform well in the survey or had opportunities, but that's where we heard from a lot of people who were struggling with, I don't know how to, you know, file a complaint,

- 15 -

I'm afraid I'm concerned. So, using the surveys, and then the 360s, for the judges, I think, creates a system of accountability. And it's going to have the optics on it, where you'll know, geez, you know, these we see improvements here, we don't see improvements over here, what's happening. So, we believe that those tools are helpful and necessary to kind of change the dynamic and bring the different districts together so that people who work within the judicial branch have a consistent experience. And we can move the 70-63%, who like to work there up to 83%.

**Rep. Weissman**
Okay, thank you. I have one last question, which is back in all the way up and it's really procedural as to how your work went? Page 8 or so of your report talks about how you accessed information and navigated claims of privilege or confidentiality? Could you just summarize briefly, so you needed to access a lot of information from within the Branch to put this together? And we have summaries here that were fit for public consumption, or whatever the words were? I'm interested in how, regardless of the final product, how you felt was or wasn't the thoroughness of what you were in fact able to access versus what you would have liked? Did you receive things subjected to redaction? Did you become aware of the existence of certain documents which you then sought out, could not get because of an asserted claim of privilege or confidentiality, etc.?

**Liz Rita**
I can respond to that, I think primarily, we were able to access the documents that we asked for. That's a simple answer. It's got a complicated, you know, sub narration, they were provided to us in a format where we had to search and that isn't terribly typical in the work that we do, we were able to get some assistance in sort of getting buckets, around 1,000s of pages of documents. And, frankly, I just looked through almost everything because I didn't want to miss anything, I wanted to make sure we were being thorough.  We were not, we were not thwarted in our gathering of data by any argument of privilege or receipt of redacted materials. In fact, I received a lot of materials that, you know, I couldn't put in the report, because they, for example, were records from the Judicial Discipline Commission, you know, which are confidential under state law. So, I didn't feel that we personally for our investigation ran into those roadblocks. And so that's to answer your question about documentation. And were we able to get what we needed. It took a little longer than we had hoped to get information. But let's face it, we were we were really looking at a very broad set of issues. And it's not surprising, it took a long time for people to compile the data that we needed. In terms of how we assessed what we could and couldn't put in the report. I'm not sure if this is responsive to your question. But we're really careful to try not to include things in the report that would identify individuals who had come to us and participated in this process on our promise to keep their participation as confidential as we could. And we were also really conscious about not putting in documentation that we knew shouldn't be disclosed under Colorado law. Other than that, I didn't make any sort of assessment that something was too controversial, for example, or something to appear. We just put it in there and the Department was invited, if anything in their in their view was privileged or it shouldn't appear for some reason that they would redact it and to my knowledge, they didn't redact anything. It just went forward as our draft.

**Rep. Weissman**

Okay. Thank you. I think in the interest of time, we should let you go there or we can let Senator Gonzales have the last word.

**Sen. Gonzales**

Thank you, Mr. Chair for your indulgence. I want to echo Vice Chair Carver's commendations to you all for the thorough investigations of the 16 allegations. I'm curious if, in the course of your investigation and report, other allegations that were not reported came up. And whether I'm just curious how you treated those. Sort of as following up from Chair Weissman's process question.

**Liz Rita**

Yes, the answer to the question is yes, other allegations came up. I wouldn't say, I don't know the number from the top of my head. A number came up and we handled them in, I think two ways. We included the data that was raised as part of our culture assessment. So, that data fed into the culture assessment piece of the report. We also offered people to recommend that those be investigated separately. And if somebody agreed that they wanted it investigated, we forwarded that back to SCAO for their investigation. And that was sort of the end of our involvement in it.

**Sen. Gonzales**

Thank you.

**Rep. Weissman**

Okay. Again, thank you both for being available, especially as we ran a little bit over our original time. We appreciate your presentation.

**Liz Rita**

Thank you for having us.

**Rep. Weissman**

All right. Last thing before a short lunch break will be Mr. Vasconcellos on behalf of the Judicial Branch to kind of let us know the status of ongoing responses to the matters in the report.

**Rep. Weissman**

All right. Thanks for being patient with us. Please dive in however you like.

**Steven Vasconcellos**

Thank you. Excuse me. Thank you, Mr. Chair. Good afternoon committee. I will keep this under five minutes. Happy to answer any questions either in real time that you'd like to ask, over the lunch hour, or offline. For the record, my name is Steven Vasconcellos. I'm the State Court Administrator for the Colorado Judicial Department. I did want to take a brief moment to thank the principal's at ILG, Ms.

- 17 -

Rita and Ms. McCord for their thorough, thoughtful report, and the recommendations on how to improve the Judicial Department's workplace culture. Their insights are incredibly important, as we work to critically examine and modernize our workplace, its policies, and practices. I am grateful that their investigation did not identify widespread judicial misconduct. At the same time, no one should have to endure workplace harassment, be unclear how to report it, or have to fear retaliation. I will tell you from my own personal perspective, the degree to which folks expressed concerns about the availability of safe reporting, and to the degree to which folks had personally observed retaliation was extraordinarily troubling. The cornerstone of our work ahead is building a strong culture based on shared values that are flexible enough to work in 22 different Judicial Districts, along with the appellate courts and the State Court Administrator's Office. A culture that shares at its core, zero tolerance for harassment and retaliation. Updated policies and training are important, but not nearly enough on their own. Our ultimate goal is to repair the foundations of a safe workplace, increase public trust and confidence in the judiciary. And to increase trust within the judicial department among its 4,000 employees. Transparency and accountability will be necessary to meet these goals. Our success will turn on several factors. Our ability to build a strong shared workplace culture, to have safe reporting mechanisms to hold perpetrators of misconduct accountable, to regularly report on our progress, as we continue to invest in the health of the Judiciary, and maybe most importantly, for everyone in the organization, regardless of position to demonstrate and be held to the same standard of excellence. The branch has 4,000 hardworking employees and judicial officers and in turn the people and communities they serve deserve no less.

I'd like to move briefly into our preliminary efforts and what we've done since we've received the report. Obviously, we've done some follow up work with both RCT and ILG, asking additional questions about their recommendations of how the recommendations might work together in concert. Chief Justice Boatright, Justice Marquez, and myself have already met with key leadership constituencies around the State. Court executives, Chief Probation Officers and Clerks of Court both to describe the report, answer questions about the report and solicit feedback on moving forward. We are scheduled to meet next week with the Chief Judges in the four Judicial Districts that were highlighted in the ILG culture survey. We are scheduling, actively scheduling listening sessions for our 4,000 employees to give them multiple opportunities to tell us their thoughts, to give us their feedback. It's very important that this process not be some sort of top down only initiative. This there needs to be a strong grassroots element to what we're doing here. I think if the staff across the state don't see their fingerprints on this work, they're not going to have a connection to it in a meaningful way. And we won't be able to sustain the changes that we need to make. I apologize for my voice.

Additionally, at the Judicial Conference next month in September, Chief Justice Boatright and Justice Marquez will be speaking at a plenary session to all of the judges in the State to help set expectations about why the investment in culture is so critically important. And the key role that judges as leaders will play in moving forward. As I look ahead, there's sort of three main categories of operational components to our implementation work in the near term. One is policies and procedures. If you've read

- 18 -

both the ILG and RCT reports, you know that there's several areas identified in policy and procedure that either need to be updated, substantially reworked, or created from scratch. That work has already begun. And that work will take some time. But that is sort of in the category of low hanging fruit that can be done out of the gate. There are also structural enhancements.

Particularly I'd like to point to the creation of the Office of People and Culture that ILG has recommended, along with better tools around safe reporting pathways for both confidential and anonymous reporting. And, you know, there's been a lot of really good discussion and questions and debate about the role of an ombuds. And how big is their scope? Who should they report to? I think it's challenging to have a single ombuds person fielding inquiries from a body of 4,000 people that cover the range from concerns about how to address an issue with a coworker, to allegations of misconduct by a judicial officer. And so, as already been mentioned, nothing new here, having really laser like clarity, in the role and scope of the position, who they report to. It is going to be incredibly important. Because, you know, by volume, I think the most common area of, I'm not saying it's the most important, but certainly the most common area that ombudsman is going to come into play is sort of the well called basic personnel action that doesn't involve a judge and help having guidance and a place to land when they don't know where to go. That doesn't get us away from a very profound need to clarify our processes, better market our processes, so folks understand where to go for complaints in a formal setting with if they want to make a formal complaint. What the life of that complaint looks like? How they expect to be treated through that process? All of that work needs to be done. But there will still be people who are not sure where to go and want to engage with an ombudsman. The most common place that's going to be is on a kind of employee-to-employee conflict level, that's probably our most common thing that our HR department has to address. I think in that context. I don't see a problem, per se, with the ombudsman being part of you know, the Judiciary being part of the Judicial Department itself.

But, you know, our organization has statutory reporting obligations that were clarified in Senate Bill 201, this last session around judicial misconduct to the Commission on Judicial Discipline. And one thing I want to be very careful about, there was a lot of discussion about, you know, HR investigation in parallel with commission reporting and investigation. How does that all tie together? I think they're, I think when we're talking about judicial officer involved events, we're talking about something slightly different. Well, not slightly different, very different than what we're talking about with, say something employee on employee. When it's a judicial officer involved allegation. There's a timeline in which once say, for example, I'm made aware of information. There's a timeline statutorily now that I have to report to the Commission on Judicial Discipline. That has to be met. I have a statutory obligation. Our organization, every member of our organization shares that statutory obligation. There is not a traditional HR investigation, vis-a-vis the violation of personnel rules. We are not a regulatory body over judges. The Commission on Judicial Discipline is, and to a different degree, the Office of Attorney Regulation Counsel. Those processes need to be honored. And they are separate from HR, our HR teams role in an incident that involves a judge is to help ensure complainant safety. Is the complainant in a position where they are safe to perform their job. If they are not, what do we need to do to help ensure

that employee safety? And then information gathering, not investigation. What information do we need to gather to be compliant with our statutory obligations? And so I see that on the kind of the HR / Commission, you know, do they parallel. I think they're separate processes. I think our HR Department has a different obligation, a different set of duties as it relates to an incident with judges versus if it's staff on staff. So, anyway, the implementation of Office of People and Culture, some really profound need for modernization around complaint handling, particularly as it relates to employee complaints. And we're very open and have had extended discussion with the principals at ILG about kind of those modern reporting tools.

And it may not surprise you that we will be asking for the General Assembly support for some additional resources to help implement, fully implement successfully, these recommendations. Not everything will require new resources but I think particularly standing up an Office of People and Culture and some of the reporting tools that we need to invest in are not things we have within our existing resources. More to say, in the interest of time, I'll cut it short. Plus, I think you guys have more time with me this afternoon. So, I'm happy to answer any questions that committee might have at this point.

**Rep. Weissman**
All right, thank you. Um, one quick question. We heard previously, that a lot of the employees the 4,000 plus folks who work for the branch, may not be aware of exactly how to raise up a complaint to the Commission if they feel that they need to. I would imagine that the Branch has an employee handbook, maybe several for different positions. A bailiff is not the same as a PO, isn't the same as a clerk etc. And I would also imagine there's some kind of new hire orientation or orientations. Is there any reference in either of those to the fact of the CJD to how to report to it in the event that an employee has an incident with a judicial officer that might implicate the jurisdiction of the Commission?

**Steven Vasconcellos**
Thank you, Mr. Chair. No, and that's one of our key gaps right now. I mean, I think if you look at our personnel rules, our employee handbooks, the supporting documentation, it just does not at all adequately address what happens when I mean, I think it's more clear, and then we can do a better job than we're doing today. But I think it's more clear about what happens when you're having difficulties with a coworker. It is not at all adequate. When it comes to what happens if you are say experiencing maltreatment from a judicial officer.

**Rep. Weissman**
I appreciate your candor and answering. I urge a speedy rectification of that that absence. Committee other questions? All right. And as you noted, sir, we will hear more from Mr. Vasconcelos in conjunction with members from the Commission on another part of our agenda at 2:30. If there are no questions, we will take a recess. Members, we have 15 or 20 minutes to go find a quick lunch. I do want

- 21 -

to get us going at one o'clock so we can keep the time out of respect for our witnesses. Until then, the interim committee will be in recess.

# Appendix 27(s)(iii)(13)

# Relevant Exhibits and Hearing Materials:

**Appendix 27(s)(iii)(13)(a)**

**Letter from Thomas Neville to the Interim Comm. on Jud. Discipline, July 29, 2022;**



# STATE COMMISSION ON JUDICIAL PERFORMANCE
www.ojpe.org

July 29, 2022

Members of the Legislative Interim Committee on Judicial Discipline,

**Thomas D. Neville, Chair**

**Richard Benenson**

**Jan Burton**

**Lindsay Daugherty**

**Bart Dorscheid**

**Mark Fogg**

**Ledy R. Garcia-Eckstein**

**Barbora Hurd**

**Alan Loeb**

**Keith Massey**

**Dennis K. Obduskey**

*Commissioners*


**Kent J. Wagner**
*Executive Director*

**1300 Broadway**
**Suite 220**
**Denver, Colorado 80203**
**(303) 928-7777**

Colorado's Commissions on Judicial Performance ("JPCs") were created by the legislature to establish a comprehensive system of evaluating judicial performance to provide persons voting on the retention of judges and justices with fair, responsible, and constructive information about individual judicial performance C.R.S 13-5.5-101(2)(b) (2019). One of the other important roles the JPCs serve is to provide initial and interim evaluations to assist judges in improving their performance which helps ensure the quality of Colorado's judiciary. Interim evaluations provide judges with valuable feedback on how to better meet the statutory criteria C.R.S. 13-5.5-109 (2019). This feedback helps judges who are already meeting standards excel and can help struggling judges improve via a performance improvement plan C.R.S. 13- 5.5-110 (2019). In evaluating individual judges, commissioners review survey reports of collected responses from attorneys and non-attorneys who have appeared before the judge, case management data, review written opinions and orders, conduct courtroom observations, review information provided to the commission by interested individuals either in writing or through interviews, and conduct an interview with the judge. JPCs are limited to evaluating statutorily defined criteria: integrity, legal knowledge, communication skills, judicial temperament, administrative performance, and service to the legal profession and the public by participating in service-oriented efforts designed to educate the public about the legal system and improve the legal system C.R.S 13-5.5-107 (2019). Current statutory language and rules governing JPCs are silent on the use of disciplinary information from the Colorado Commission on Judicial Discipline in the evaluation process.

The evaluation narratives published for use by voters have long been criticized for not providing information about a judge or justice's disciplinary record, if any. This criticism is understandable where disciplinary issues relate to the statutory criteria JCPs apply in evaluating judges. Colorado Rules of Judicial Discipline Rule 6.5(d)(4) provides, that under certain circumstances, confidentiality does not apply to disclosures:

> In response to an inquiry by the Office of Judicial Performance Evaluation ("Judicial Performance") if the Commission determines, in its discretion, that disclosure to Judicial Performance is consistent with its Constitutional mandate under Rule 1(b) and on the condition that Judicial Performance will not publicly disclose such information or its source without independent verification by Judicial Performance.

While this rule permits the Commission on Judicial Discipline to provide some information to JCPs, it severely limits how JCPs could use non-public information ves. In early 2022 the State Commission sought cooperation from the Commission on pline to develop joint rules that would expand sharing information regarding judicial

discipline records between the two commissions.  In part, because of the current investigations addressing judicial misconduct, these discussions were postponed until there is some resolution of the issues currently before the Interim Legislative Committee on Judicial Discipline.

To better fulfill their statutory and constitutional obligations, JCPs should have access to information of judicial discipline maintained by the Colorado Commission on Judicial Discipline. Providing JCPs access to disciplinary information bearing on statutory retention criteria can only enhance public confidence in the narrative evaluations prepared by JCPs and the value of interim evaluations for improving judicial performance. Access to that information under the current rules will require careful study and consideration by the two commissions because disciplinary information only becomes public once the Commission on Judicial Discipline files a recommendation for "removal, retirement, suspension, censure, reprimand, or discipline" with the supreme court. As a result, any new rules governing how JCPs use disciplinary information must ensure that non-public disciplinary information remains confidential while providing guidance on how JCPs can take such information into account in evaluating whether judges meet the statutory criteria. However, if the Constitution were amended so disciplinary information became public at an earlier stage in the Commission on Judicial Discipline's work—at the end of the investigation phase or beginning of the formal proceedings stage for example—JCPs would be able to access and use that information as part of their evaluation process, perhaps without complex rules and procedures defined by the two commissions. In most cases under the current rules, by the time disciplinary information becomes public and JPCs can directly refer to disciplinary information in their evaluations, the issue is moot. By that point, the judge has either decided not to stand for retention or resigned, and judicial performance evaluations are not conducted or not published.

The Commission on Judicial Discipline did not provide a recommendation to the Interim Committee for when discipline proceedings/information should become available (CCJD Report page 21). JCPs also do not have a specific recommendation as to the "borderline" between when information remains confidential and is available to the public.  Colorado's Judicial Performance Commissions ask that discipline information be made available to the public at an earlier stage in the Colorado Judicial Discipline process.  If that occurred, JPCs would be able to use the information at a stage in their evaluations to better assist the judge with performance improvement recommendations or making decisions regarding retention. Again, it would be unlikely that any additional rules or legislative changes would be required if the information was public and accessible at an earlier stage.


 On behalf of the State Commission,

/s/ Thomas Neville

Thomas Neville, Chair

2

# Appendix 27(s)(iii)(13)(b)

# Colo. Women's Bar Assoc., RECOMMENDATIONS ON THE JUDICIAL DISCIPLINE INTERIM COMMITTEE AREAS OF STUDY SENATE BILL 22-201, August 3, 2022;



## Executive Summary
## CWBA Comments to the Interim Committee on Judicial Discipline

- Modernize the complaint process to allow filing online and to eliminate unnecessary barriers like notarization.

- Clarify the Commission's ability to accept anonymously filed complaints and explain the Commission's process when an anonymous complaint is filed.

- Make judicial discipline opinions publicly accessible and searchable online.

- Require the Commission to prepare annual reports with statistics about complaints filed, including information regarding disposition, subject matter, and demographics.

- Add recusal provisions and disqualification standards for Commissioners and judges who review the Commission's recommendations, including a process for challenging a recusal decision.

- Create an objective mechanism for replacing judges who are conflicted out of a proceeding.  For example, if a Supreme Court Justice is the subject of a judicial investigation, statute should clearly identify how a new panel of judges is selected to review the recommendation of the Commission. Several examples of statutory language from other states are provided in our comments.

- Require that the disciplinary process be made public upon the initiation of a formal proceeding. This change would allow for greater transparency and bolster the deterrent effect of disciplinary proceedings. Several examples of statutory language from other states are provided in our written comments.

- Require that the Commission create a system to identify emerging patterns of problematic behavior as reflected in received complaints (even non-actionable complaints) and alert the respective judges of those patterns for educational and reform purposes.

- Allow information sharing between the Commission on Judicial Performance and the Commission on Judicial Discipline when there has been misconduct relevant to both bodies. The recommendation from the Institute for the Advancement of the American Legal System discussed in our comments provides several state models on this topic.



- Adopt a process that keeps victims informed and protected throughout the disciplinary proceeding, including notification rights, the option to participate in the proceeding, and the right to provide input. The Colorado's Victim Rights Act (VCRA), (CRS 24.4.1-300.1-303) provides a useful framework for defining the term "victim" and centering the needs of victims in this kind of process. Certain university disciplinary processes discussed in our comments are also useful models for a victim-centered approach.

- Revise the requirements regarding the makeup of the Commission's membership to ensure that there is gender, racial, cultural, and disability diversity, in addition to the current requirements ensuring geographic representation and participation from judges, lawyers, and non-lawyers.



Date: August 3, 2022

To: The Interim Committee on Judicial Discipline

From: The Colorado Women's Bar Association

Regarding: Recommendations on the Judicial Discipline Interim Committee Areas of Study Senate Bill 22-201, independent oversight of matters concerning judicial discipline

---

The Colorado Women's Bar Association ("CWBA") thanks the Interim Committee for the opportunity to provide comment on several areas of study pursuant to Senate Bill 22-201.  The CWBA reviewed the eighteen areas of study presented to this Committee in Senate Bill 22-201 and has identified nine areas that are priority to its membership:

- Section One
    - Effectiveness
    - Balancing public confidence and judicial control
- Section Two
    - Independence
    - Supreme Court Justice misconduct
    - Disqualification standards
- Section Three
    - Confidentiality and transparency
- Section Four
    - Victim-centered approach
- Section Five
    - Judicial appointments
    - Recommendations

As there is substantial overlap between these topics, some are addressed together in a single section.  The CWBA also thanks the contributors to this product; Ariana Busby, Megan Cronin, Alison Connaughty, Becky Crotty, Emma Garrison, Brooke Meyer, and Carlos Romo. Please consider the following written research-based commentary, and attachments, for the position of the CWBA on these areas.

Though this memo contains CWBA's position, the recommendations in this memo were informed by input from a broad range of affected stakeholders, including CWBA membership, the Colorado Commission on Judicial Discipline, the Colorado



Judicial Branch, and the various diversity bar associations that comprise the CBA/DBA Presidents' Diversity Council, some of whom assisted with our research.

## I.    Effectiveness and Balancing Public Confidence and Judicial Control

- **Effectiveness.** Effectiveness of investigating and addressing the allegations of mishandling judicial misconduct complaints published in 2021;[1]
- **Balancing public confidence and judicial control.** Whether a system of judicial discipline can be effective and inspire public confidence while retaining judicial control of final decision-making authority over judicial discipline cases;

Several available measures could make the Judicial Discipline Commission Process more effective and readily available to those who might seek its process and, in turn, increase public confidence in the system.  These measures include:

1. Complaint Process
   a. First, modernization.  The commission should eliminate unnecessary barriers to complaint filing (called a Request for Evaluation of Judicial Conduct), such as notarization, and provide for online filing.  The current complaint form has to be downloaded and printed, filled out, then signed, and mailed or emailed. A form can also be mailed or faxed to the victim or reporting party upon request.  An online complaint submission (similar to what the Department of Regulatory Agencies does for other professions, or the Office of Attorney Regulations Counsel does for attorney complaints), with the option of a handwritten form, would increase efficiency and accessibility.

      i. Please see examples of the DORA complaint forms here: https://dora.colorado.gov/file-complaint

      ii. Please see examples of the Office of Attorney Regulation Counsel complaint form here: https://coloradosupremecourt.com/Complaints/FAQ.asp#:~:text=To%20file%20a%20complaint%20against%20an%20attorney%2C%20contact,registration%20number%2C%20address%2C%20law%20firm%2C%20and%20phone%20number.

---

[1] Bulleted and underlined text taken from Senate Bill 22-201.

2



      iii.   Please see an example of an online complaint form for judicial misconduct on the New York State Commission on Judicial Conduct website: https://cjc.ny.gov/

2. Anonymous Complaints
    a.  Second, the complaint rules or instructions should clarify whether the commission will accept anonymous complaints. Commission websites should advise complainants of the extent of their legitimate expectation of anonymity. It is the CWBA's understanding that anonymous complaints are allowed.  However, that process is not clearly set out on the website and it is not mentioned in the Rules of Judicial Discipline.  Further, the Commission should review any policies that restrict complainants or subject judges from discussing complaints publicly, consistent with the First Amendment.

       i.   Please see an example of New York's anonymous complaint procedures at page 4 of the New York State Commission on Judicial Conduct: https://cjc.ny.gov/Legal.Authorities/NYSCJC.PolicyManual.pdf ("The Commission may authorize investigation of anonymous complaints that are sufficiently detailed and allege conduct that, if true, would constitute misconduct. An anonymous complaint authorized for investigation shall be treated as a complaint brought by the Commission on its own motion pursuant to Judiciary Law §44(2).")

      ii.   Please see the Arizona Commission on Judicial Conduct's FAQ section on its website, explaining the complaint process and other questions, including confidentiality: https://www.azcourts.gov/azcjc/Frequently-Asked-Questions ("Section 2.f.  Is My Complaint Confidential? . . [A]ll complaints become public at some point. The degree and timing of the public disclosures depend on how a complaint is resolved. . . . Most information that is available to the public is available on th[e] website.") *See* AZ ST J COND COMM Rule 9 (2021).

3. Accessibility of information
    a.  The decisions of the Judicial Discipline Commission should be more readily available online and detailed statistical information about decisions should be made available.  Please see Section Three on confidentiality for further discussion on the contents of those orders. The Judicial Discipline Commission does not appear to make its orders

3



readily available online. Though the Commission mentions both private and public discipline in its annual report, little information is disclosed. The 2020 report has a bulleted list of examples of previous discipline, but not how often it occurred or the nature of the outcome. No aggregate disciplinary record is available. While some numbers are reported (number of complaints, etc.), the report contains little statistical analysis.  Commission orders—at least in non-dismissed cases—should be available online, searchable, and with guides or filters to identify different types of orders. The Commission should provide summary statistics on Commission activity and consider posting judges' aggregate disciplinary record, as state bars generally do as to lawyers.

b. Statutory amendments could require these reports; for example, the CWBA recommends amendment of Colorado Revised Statute § 13-5.3-103(2)(b)(VII)-(VIII), which presently requires the Executive Director to maintain Commission Records and Statistics.  The CWBA also recommends an amendment to Colorado Revised Statute § 13-5.3-102, which governs the Commission on Judicial Discipline's powers and duties, to codify this information sharing.

   i. Please see the New York State Commission on Judicial Conduct website as an example of a searchable database and easily accessible aggregated data: https://cjc.ny.gov/Determinations/all_decisions.html

   ii. Please see the Pennsylvania website on Judicial Discipline for another example of a searchable database: https://www.pacourts.us/courts/court-of-judicial-discipline/court-cases.

   iii. Please also see the Arizona Commission on Judicial Conduct's website, public discipline is searchable by year: https://www.azcourts.gov/azcjc/Public-Decisions

   iv. Texas statute requires that an annual report be prepared and submitted to the legislature each year regarding the number of complaints finalized within a statutory period of filing. Tex. Gov't Code § 33.040.  A provision like this should be adopted, specifying statistical information including (1) number of complaints filed, (2) number of complaints deemed frivolous, (3) how complaints were ultimately disposed, (4) general subject

4



matter of complaints, and (5) demographic information regarding the complainants and the investigated judicial officers for each category complaints discussed.

v. Further, a Texas statute – effective only September 2022 to September 2023 – requires the judicial conduct commission to prepare a report for the legislature with "recommendations for statutory changes that would improve the commission's effectiveness, efficiency, and transparency in filing, investigating, and processing any complaint filed with the commission." Tex. Gov't Code § 33.041. Something similar could be considered to keep the dialogue on this issue going beyond this Interim Committee and could also include request for an analogous report from the judicial branch.

## II.    Independence, Supreme Court Justice Misconduct, and Disqualification Standards

- **Independence.** How to achieve a system of judicial discipline in which individual cases are investigated and determined independent of undue influence by the judiciary, to be overseen by the community, the bar, and the judiciary;
- **Supreme Court Justice misconduct.** How to address judicial discipline effectively and credibly when members, actions, or decisions of the supreme court are being evaluated for potential judicial misconduct;
- **Disqualification standards.** The appropriate method for defining a consistent and clear set of disqualification standards for each of the decision makers, including supreme court justices, commission members, special counsel, and special masters, and for determining disqualification issues;

The CWBA recommends adding recusal provisions and disqualification standards to the current framework of rules, statutes, and constitutional provisions to improve the present disqualification process for all parties to the Judicial Discipline Commission process.

1. Disqualification Rules for Commissioners
    a. With respect to disqualification rules for commissioners: Recusal rules should address "recurring issues, such as when judge-commissioner sits on the same, collegial court as the respondent-judge or knows or believes some good or bad fact about the respondent-judge." *Recommendations for Judicial Discipline Systems*, IAALS, July 2018, p. 7.  The Colorado Rules of Judicial Discipline Rule 3.5(d) and 3.5(g)

5



set out rules regarding appearances of impropriety and disqualification.  These rules appear comprehensive but do not contain a provision for challenging a Commission member's recusal decision.  If a Commission member does not recuse on a particular matter, there should be a mechanism for review of that decision, possibly by the Executive Director or, alternatively, a rotating Supreme Court Justice.

2.  Disqualification Rules for Judiciary Participants
    a.  With respect to disqualification rules for judiciary participants: Colorado Code of Judicial Conduct Rule 2.11 sets out disqualification standards that judges must follow.  While this rule should naturally and automatically extend to judges' review of the Commission's work, the CWBA recommends application of the specific recusal and disqualification scenarios of Colorado Rules of Judicial Discipline Rule 3.5(d) and 3.5(g) to any judges who are reviewing the work of the Commission.  Likewise, the CWBA recommends implementing a mechanism to challenge a judge's decision not to recuse from a particular proceeding.

3.  Creation of a replacement panel of judges for when one judge is conflicted off a proceeding
    a.  Upon a judge's recusal from a proceeding, a codified mechanism must exist to replace that judge in the disciplinary process.  Several other states provide models that Colorado can look to for writing these new recusal standards.

        In Indiana, all supreme court justices, except the chief justice, are required to recuse from review of a discipline case involving a justice. Upon the justices' recusal, the clerk of the supreme court and court of appeals randomly select six court of appeals' members to join the chief justice on the panel. The commission and the respondent justice each strike one judge from that selection, so the final panel consists of the chief justice plus four judges. If the commission or the justice does not strike a judge, the clerk strikes one "at random in their stead."

        In Minnesota, review is "heard by a panel consisting of the Chief Judge of the court of appeals or designee and six others chosen at random from among the judges of the court of appeals by the Chief Judge or designee."

6



In California, a tribunal of seven court of appeals' judges selected by lot reviews a Commission on Judicial Performance's determination to admonish or censure a judge or former justice of the supreme court or remove or retire a justice of the supreme court. Ca. Const. Article VI section 8.

In Massachusetts, there is a default roster in place when a supreme court justice is being investigated: "[t]he chief justice and the six most senior justices of the appeals court other than the chief justice shall serve in the place of the supreme judicial court when charges are brought against a member of the supreme judicial court." (https://malegislature.gov/Laws/GeneralLaws/PartIII/TitleI/Chapter21 1C/Section9).

## III.    <u>Confidentiality and Transparency</u>

- **Confidentiality and transparency.** <u>The best method of balancing the values of confidentiality and transparency for judicial discipline matters;</u>

The CWBA recommends modifying the present constitutional provision (by introducing a referred measure) that mandates confidentiality until the conclusion of formal proceeding. An amended constitutional provision should remove confidentiality upon a formal proceeding's filing.  The current constitutional provisions undermine the potential deterrent effect of disciplinary proceedings. Further, modification of the current confidentiality provisions would allow for greater transparency of the overall process.

The CWBA cites the *IAALS Recommendations for Judicial Discipline Systems*, published in 2018. (Attached as Exhibit One). Colorado has already incorporated a lot of the recommendations contained in the IAALS white paper. The CWBA endorses IAALS' recommendation to amend Colorado Constitution Article VI, Section 23(3)(a) to include recommendations and best practices on diversity of power and authority, separation of the commission's investigation powers from its adjudicatory powers and making proceedings public upon a formal complaint's filing.

To promote greater transparency, the CWBA endorses IAALS' recommendation that the Commission look for emerging patterns of problematic behavior as reflected in received complaints (even non-actionable complaints) and alert the respective judges of those patterns for educational and reform purposes.

7



Additionally, administrators of judicial performance evaluations should share misconduct as appropriate with disciplinary authorities. While records concerning attorney discipline are made available to the judges who oversee the judicial appointment process, the CWBA recommends extending this information-sharing to Judicial Discipline Commission actions concerning judges who apply for a position in a higher court. The CWBA also recommends implementation of additional measures to promote transparency, such as listing Judicial Discipline opinions in a readily available and searchable database.

The CWBA also cites *Judicial Disciplinary Hearings Should Be Open*, by Robert H. Tembeckjian. Tembeckjian argues that judicial disciplinary hearings should be public based on (i) the Sixth Amendment's "guarantee that criminal trials shall be public;" (ii) most civil proceedings are public under federal and state laws; and (iii) debates that shaped the drafting of the Constitution. *Judicial Disciplinary Hearings*, p. 419. Of the 35 states with public judicial disciplinary hearings, the majority's proceedings become public upon conclusion of the investigation phase and the filing of formal charges. In the remaining 15 states, the proceeding does not become public until imposition of discipline on the theory that a public proceeding would cause a judge who may eventually be exonerated [to] suffer irreparable harm[.]"*Id.* pg 420. On the flipside, however, non-public proceedings make the process seem "sudden and mysterious," and undermine the public's confidence. *Id.* pg 421.

Tembeckjian draws a parallel between disciplinary hearings and the criminal process, and in doing so, he argues the filing of charges (or the initiation of a disciplinary proceeding) is the proper removal of confidentiality. At the time the article was published, the ABA Model Rules for Judicial Disciplinary Enforcement recommended confidential investigations but public formal disciplinary proceedings; the American Judicature Society took a similar position in 1996. *Id.* pg 424.

Finally, the CWBA cites the National Center for State Courts Study on Judicial Discipline Sanctions. At the time of publication, more than 80% of complaints investigated by judicial conduct committees were dismissed without filing formal charges. *NCSC Study on Judicial Discipline,* pg 3. The "general purpose of judicial discipline proceedings is preserving the integrity of the judicial system and public confidence in the system." *Id.* pg 3. In one instance in California, a judge who was sanctioned by the California Supreme Court was reelected to the bench because the public "has only limited knowledge of her improprieties" since the disciplinary proceedings had remained confidential until after the election." *Id.* pg 5. The study suggests that confidential proceedings lead to an uninformed public that consequently and unwittingly reelects an unfit judge. The study also found that most removal cases "involve more than one act of misconduct or a continuing failure

8



to act." *Id.* pg 60.  In Colorado, the public could potentially be asked to vote on the retention of a judge who has faced disciplinary proceedings when that public is not fully informed on a judge's performance.

Overall, the article underscores that a number of factors—some obvious, others less so—are considered in a judicial disciplinary proceeding (see a specific list of factors on pages 81 though 82).  "There is no magic formula for balancing aggravating and mitigating factors that would reduce the sanction decision in all cases to a science, resulting in sanctions with which no reasonable person could disagree." *Id.* pg 83.  Public proceedings would inform the public that "judges are held to a higher level of scrutiny than are ordinary lawyers" (pg 79, citing *In re Inquiry Concerning a Judge*, 788 P.2d 716, 723 (Alaska 1990).  The study contends that "part of the purpose of judicial discipline is to deter other judges and to reassure the public that the judiciary does not tolerate judicial misconduct . . . and should be treated as other important decisions by the court and be made available on a web-site, in the court's official reporter, and in the regional reporter." *Id.* pg 83.

Please see below for language from other states that make proceedings public upon filing of charges and not the conclusion of a proceeding:

| Alabama | • Proceedings of the Judicial Inquiry Commission are kept confidential except the fact that a complaint has been filed with the Court of the Judiciary; confidentiality is maintained during the Commission's investigation; Commission is to act as an impartial investigator.<br>• https://judicial.alabama.gov/appellate/jic |
|---|---|
| Alaska | • "All investigative records, files, and reports of the commission are confidential and no disclosure may be made except as permitted by AS 22.30.060. All confidential documents acquired in the course of a commission investigation shall be accorded the same confidentiality as commission-generated documents."<br>• When Commission has finished its investigation, it discloses either (i) that no basis for action was found against the judge; (ii) appropriate corrective action that cannot be disclosed has been taken; or (iii) Committee has filed a formal charge against the judge.<br>• Judge can choose to waive confidentiality.<br>• Alaska Jud. Cond. Comm. R. 5 (current through July 14, 2022) |
| Arkansas | • All investigatory records, files, and reports of the Commission shall be kept confidential except: (a) upon written waiver of judge; upon inquiry by an appointing authority in connection with the selection or appointment of judges; upon inquiry in connection with the assignment or recall of a retired judge to |

9



| | |
|---|---|
| | judicial duties; or (b) if, after the investigation, the Commission reasonably believes that there has been a violation of any rules of professional conduct or a violation of criminal law.<br>• To note, the show cause portion of the hearing is not open to the public, only the formal disciplinary hearing is open to the public.<br>• https://www.jddc.arkansas.gov/wp-content/uploads/2020/05/Statement_of_Confidentiality.pdf |
| California | • "Under the California Constitution and the commission's rules, complaints to the commission and commission investigations are confidential. The commission ordinarily cannot confirm or deny that a complaint has been received or that an investigation is under way. Persons contacted by the commission during an investigation are advised regarding the confidentiality requirements. After the commission orders formal proceedings, the charges and all subsequently filed documents are made available for public inspection. Any hearing on the charges is also public."<br>• https://cjp.ca.gov/complaint_process/ |
| Connecticut | • "Any investigation to determine whether or not there is probable cause that conduct [prohibited under statute/rule]has occurred shall be confidential and any individual called by the council for the purpose of providing information shall not disclose his knowledge of such investigation to a third party prior to the decision of the council on whether probable cause exists, unless the respondent requests that such investigation and disclosure be open, provided information known or obtained independently of any such investigation shall not be confidential . . . If a preliminary investigation indicates that probable cause exists that the judge, compensation commissioner, or family support magistrate is guilty of [prohibited] conduct . . ., the council shall hold a hearing concerning the conduct or complaint. All hearings held pursuant to this subsection shall be open[.]"<br>• https://portal.ct.gov/JRC/Left-Nav/statutes/Governing-Statutes |
| Georgia | • Before formal charges are filed, "all information regarding a disciplinary or incapacity matter of a judge shall be kept confidential by the Investigative Panel and Commission staff before formal charges are filed and served; provided, however, that if prior to filing formal charges the judge and the Investigative Panel agree to a satisfactory disposition of a disciplinary matter other than by a private admonition or |

10



| | |
|---|---|
| | deferred discipline agreement, a report of such disposition shall be publicly filed in the Supreme Court[.]"<br>• Once the formal charges are filed, all pleadings and information shall be subject to disclosure to the public.<br>• However, "with respect to an incapacity matter of a judge, all pleadings, information, hearings, and proceedings shall remain confidential[.]"<br>• https://casetext.com/rule/georgia-court-rules/rules-of-the-judicial-qualifications-commission-of-georgia/section-ii-general-provisions/rule-11-confidentiality |
| Louisiana | ● The Louisiana Supreme Court adopted several substantive amendments to its Judicial Discipline Rules, in 2020 and 2021, including hearings on allegations of judicial misconduct that have been investigated will now be public, as will the record and results of the formal proceedings. LA ST S CT Rule 23, § 23 (2020).<br>● If a judge is admonished, any additional admonishments within a judge's term of office (ten years for appellate court judges and six years for district court and other judges) shall now be public.<br>● Information will be made available about confidential non-disciplinary dispositions on the supreme court's website and in supreme court publications. |
| Texas | Tex. Gov't Code § 33.032 (https://statutes.capitol.texas.gov/Docs/GV/htm/GV.33.htm#33.0321)<br>• The formal hearing and any evidence introduced during the formal hearing, including papers, records, documents, and pleadings filed with the clerk, shall be public.<br>• The disciplinary record of a judge, including any private sanctions, is admissible in a subsequent proceeding before the commission, a special master, a special court of review, or a review tribunal.<br>  • A voluntary agreement to resign from judicial office in lieu of disciplinary action by the commission shall be public on the commission's acceptance of the agreement. |

Additionally, Massachusetts – which generally does not allow any information to be disclosed –allows its Commission on Judicial Conduct to share

11



information deemed relevant with its judicial nominating body simply by providing written notice to the judge. The pertinent statute provides the commission with the authority to create procedures to divulge information when "any federal agency, the judicial nominating council, or any like agency for screening candidates for judicial appointment . . . seeks information or written materials from the commission concerning a judge, in connection with his selection or appointment as a judge." (http://malegislature.gov/Laws/GeneralLaws/PartIII/TitleI/Chapter211C/Section5).

The Massachusetts Commission's current rule provides that

[T]he Commission may:

(a) divulge whatever information is a matter of public record; and

(b) after obtaining the judge's signed waiver, divulge other relevant information; or

(c) divulge other relevant information after giving written notice to the judge affected of its intention to do so and allowing the judge seven (7) days to respond.

(https://www.mass.gov/professional-conduct-rules/commission-on-judicial-conduct-rule-5-confidentiality.)

Finally, the CWBA recommends reinforcing the sharing of information between the Commission on Judicial Performance and the Commission on Judicial Discipline.  This would also increase transparency in discipline proceedings and in our state judicial retention process.

As part of IAALS 15 Recommendations: Recommendation 3 says in part: "Administrators of judicial performance evaluations should share misconduct as appropriate with disciplinary authorities."  Some states that share disciplinary information with performance evaluations are:

·Alaska Performance evaluation tracks public files from the state Commission on Judicial Conduct, as well as recusal filings, peremptory challenge filings, and conflict-of-interest forms.

·Arizona requires its Commission on Judicial Performance Review (JPR) to obtain information from the state's Commission on Judicial Conduct about any discipline that has been imposed on any evaluated judge. The language on Arizona's website says:

The Commission on Judicial Performance Review shall carefully consider:

12



(1) statistical reports of the survey results;

(2) comments from public hearings, Rule 6 (d);

(3) written comments from the public, Rule 6 (d);

(4) written or oral comment to the Commission submitted by the judge being reviewed, Rule 6 (e);

(5) its own factual report relating to a judge, Rule 6 (e);

(6) the information obtained from the Commission on Judicial Conduct;

(7) the assignment of the judge (civil, criminal, domestic relations, juvenile, administrative, probate, special assignment, etc.); and

(8) a comparison of the judge's scores with the mean scores of all judges reviewed, Rule 6 (e).

· Utah performance standards, require that judges "not be the subject of more than one public reprimand issued by the Judicial Conduct Commission for the current term; . . . Utah Supreme Court. Utah Code Section 78A-12-205 (2022)

https://le.utah.gov/xcode/Title78A/Chapter12/78A-12-S205.html?v=C78A-12-S205_2022021120220211

## IV.    Victim-centered Approach

- **Victim -centered approach.** <u>Benefits of a victim-centered approach to judicial misconduct complaints that allows the victim to have a voice in how complaints are handled and resolved;</u>

A process that keeps victims informed throughout the disciplinary process is of great importance to the CWBA.

The CWBA could not locate a model in another state that codifies victims' rights in judicial discipline proceedings.  Such a model would apparently make Colorado a vanguard of judicial discipline reform.

Colorado's Victim Rights Act (VCRA), codified at Colorado revised Statute section 24.4.1-300.1-303, provides helpful guidance.  First, the term "victim" must be properly defined with respect to disciplinary proceedings and who is entitled to be considered as that title.  At the very least, the term should apply to the subjects of harassment and discrimination.  The term should also be considered for reporting parties whose pending cases are potentially impacted by judicial misconduct

13



findings.  And, as with VCRA victims, judicial discipline victims must be entitled to notice and an opportunity to be heard in the disciplinary process.

Second, the scope of victim's rights in judicial discipline proceedings must be clearly defined. The VCRA and administrative university disciplinary proceedings offer guides of defining victims' rights. For example, the University of Wisconsin System campus disciplinary process articulates students' right to know the range of possible sanctions the accused faces, to receive notice that their report might be included (in anonymized form) in an annual crime statistic report, and to consent to sharing of information among campus offices and with third parties. UWS 17.10(1). Victims are also provided with notice that their report can result in a report as an annual crime statistic with the victim's name withheld, and campus offices must have a waiver signed by the student in order to share information among one another or with any third party, including parents. https://docs.legis.wisconsin.gov/code/admin_code/uws/17

The Code of Federal Regulations provides another example of language that could apply in judicial discipline proceedings.  Schools are commanded to "consider victims' rights when appropriate," and lists rights such as participating in disciplinary proceedings in writing or in person, providing a statement concerning the impact of the incident on the victim, and having the outcome explained to that victim. 25 CFR section 42.0. https://www.law.cornell.edu/cfr/text/25/42.9.

The Louisiana Supreme Court also made several substantive changes to Louisiana Supreme Court Rule XXIII in 2021 after extensive study, review and deliberation, with an eye towards being more victim-centered in its discipline process.  While the potential scenarios Louisiana's new language addresses are extreme (alleged criminal conduct), it provides another example of how victim rights can be addressed by expediting proceedings and putting consequences in place for aggravated disciplinary issues.  See the press release regarding additional changes to the Judicial Discipline Rules: https://www.lasc.org/Press_Release?p=2021-34. Among the changes, "judges who have been charged and convicted of a felony or lesser crime that reflects adversely on the judge's honesty, trustworthiness, or fitness as judge may now be required to repay the costs of appointing a judge to cover their dockets while they are suspended from performing judicial functions during the pendency of criminal and judicial discipline proceedings. LA ST S CT Rule 23, § 22 (2021).  There is a monetary cost for judges who want to resign during a formal proceeding. "[J]udges who retire or resign prior to the conclusion of public judicial discipline proceedings may now be required to repay the costs incurred in the Commission's investigation and litigation of the matter." LA ST S CT Rule 23, § 22 formal proceedings (2021).  To expedite matters, such as those  involving possible



criminal conduct, the Commission must provide the hearing officer with instructions regarding the expediting of the matter. LA ST S CT Rule 23, § 4 (2021).

The impact of harassment or other misconduct on a victim can be profound, especially in the context of the workplace.  The CWBA urges legislators to ensure that victims of judicial misconduct receive notification rights, the option to participate in proceedings, and a guaranteed right to provide input.  While a victim's input does not need to be dispositive, it must be considered.

## V.    Judicial Appointments and Recommendations

- **Judicial appointments**. Whether the supreme court should continue to control the appointment of the four judge members of the commission;
- **Recommendations.** Recommendations from the department, the commission, and any other stakeholders the interim committee deems appropriate.

The CWBA recommends this Interim Committee revisit the Constitutional Provisions and Rules identifying the makeup of the Judicial Discipline Commission. The Commission should aim to have a diverse membership.  The current composition of Judicial Discipline Members focuses on geographic diversity as well as having judges, lawyers, and non-lawyers on the Commission.  The CWBA recommends that an amendment to the Colorado Constitution Article VI, Section 23(3)(a) include a requirement that the governor consider the overall makeup of the Commission's representation of geographic location, gender, racial, cultural, and disability diversity in his or her appointments.  A similar amendment would need to be made in the Colorado Rules of Judicial Discipline Rule 3.

## VI.    Conclusion

Overall, the CWBA sees this Interim Committee as an excellent opportunity to improve upon Colorado's existing rule, statutory, and constitutional framework for judicial discipline.  The CWBA recommends the aforementioned changes to ensure Colorado's judiciary is accountable to the citizens it serves, to ensure the Judicial Discipline Commission is adequately structured and supervised, and to make Colorado is a leader in judicial discipline efforts overall.

# Appendix 27(s)(iii)(13)(c)

# Colo. Jud. Inst., STATEMENT OF THE COLORADO JUDICIAL INSTITUTE, August 10, 2022;

## STATEMENT OF THE COLORADO JUDICIAL INSTITUTE
### Legislative Interim Committee on Judicial Discipline
### August 10, 2022 Hearing

The Colorado Judicial Institute (CJI) – an independent, nonpartisan, nonprofit organization – has for over 40 years worked to preserve Colorado judges' ability to fairly and impartially decide cases, free from partisan politics. CJI respectfully submits:

- **CJI has supported the full and fair investigation of recent allegations of judicial misconduct.**

- **The facts are now in from thorough, independent judicial investigations.**

- **The facts do not match allegations of judicial misconduct that were widely reported before the facts were in – unfortunately and unfairly compromising public trust in Colorado's judiciary.**

- **The facts do not substantiate lack of reporting of judicial misconduct to disciplinary authorities.**

- **The facts do not demonstrate serious problems with or need for major changes to Colorado's judicial discipline system.**

- **Any changes to the system should be carefully designed to ensure they improve the system and do not create unintended adverse consequences.**

- **If anything, the facts support making further education and training resources available to Colorado's judiciary, including pertaining to managerial issues – and CJI stands ready to assist with that effort.**

## WHAT CJI IS AND WHY WE'RE INVOLVED

- CJI is an independent, nonpartisan, nonprofit organization, established in 1979 and comprised of non-attorney and attorney members from throughout Colorado.

- Our mission is to promote excellence, equity, impartiality, and public trust in Colorado's courts through outreach, education, and engagement.

- CJI programs include providing scholarships for continuing education of judges; annually recognizing outstanding judges; supporting the Diversity on the Bench initiative that helps ensure the courts reflect the diversity of the communities they serve; and sponsoring public education about the judicial system, merit selection, and the rule of law.

- We believe CJI's mission and programs help ensure that litigants have their day in court with dignity and respect.

## COLORADO'S MERIT SYSTEM FOR SELECTING, EVALUATING, RETAINING, AND DISCIPLINING JUDGES

An overview of Colorado's judicial merit system is in order to place the Interim Committee's work in context. In 1966, Colorado's citizens adopted Colorado's merit judicial system, rejecting partisan judicial

elections.  Colorado is one of more than 30 states that do not elect judges to the bench.  Our system is a "four-legged stool," consisting of the following:

**Selection**:  Bipartisan nominating commissions, made up of volunteer non-attorneys and attorneys, recommend qualified candidates to the Governor for appointment.

**Performance Evaluation**:  Bipartisan evaluation commissions, made up of volunteer non-attorneys and attorneys, review information about judges' performance from multiple sources and make recommendations to voters.

**Retention**:  Judges stand for retention in general elections.

**Discipline**:  The Colorado Commission on Judicial Discipline (Commission), created by Colorado's constitution Art. VI, § 23(3), made up of volunteer commissioners, non-attorneys, attorneys, and judges, address allegations of judicial misconduct.

Colorado's judicial merit system is widely admired and a model for those of other states.

**CJI'S INPUT ON THE INTERIM COMMITTEE'S WORK AND PROPOSALS FOR CHANGES**

CJI respectfully submits the following comments on the Interim Committee's work.

**The facts do not show serious problems with, or need for major changes to, Colorado's judicial discipline system.**

- The facts now available to the Interim Committee and public through RCT and ILG investigative reports do not support widely-reported judicial misconduct allegations.  They reveal no failure to report alleged judicial misconduct to judicial disciplinary authorities.

- What, if any, changes are needed based on the facts?  While Colorado's system is not perfect and can always be tweaked for improvement, there is no serious problem to be "fixed" warranting any major overhaul.

- If anything, the facts show Colorado's judiciary could benefit from additional education and training resources, including pertaining to managerial issues.  CJI stands ready to assist in generating such resources.

**Changes, if any, to Colorado's system should be carefully designed to ensure they result in improvements.**

CJI offers the following comments on proposals to modify Colorado's system.

- **Caution in amending Colorado's Constitution:**  Potential changes to the Colorado Constitution's provision on judicial discipline, Art. VI, § 23(3), should be thoughtfully considered, given the expenditure of resources required to change the constitution and possibility of unintended negative consequences through changes.  For example, while CJI supports the concept of expanding transparency of judicial disciplinary proceedings, changes to confidentiality should be designed to maintain confidence in the system on the part of complainants, judges under investigation, the judiciary and other stakeholders, and of course the public.

- **Final decisionmakers of judicial discipline – Colorado Supreme Court:**  The members of the Colorado Supreme Court are chosen through Colorado's gold-standard judicial merit selection system.  They have extensive experience with the litigation process, and they are accountable to voters in retention elections.  They are the best-qualified individuals to make critically important final decisions on judicial discipline.  Such decisions should not be made by panels of individuals not selected through such exacting standards and who are not accountable to voters.

- **Rulemaking authority – Colorado Supreme Court, with conferral with Commission:**  Judicial disciplinary proceedings are adjudicative proceedings – that is, litigation-like in nature – with substantial potential impact on individuals' livelihoods.  They should adhere to due process requirements.  They are more formalized proceedings than those used, for example, in judicial performance evaluations.  The rules for disciplinary proceedings should be written by judicial officers with experience in adjudicating disputes. Colorado's Constitution provides for rulemaking by the Colorado Supreme Court, Art. VI, § 23(3)(h).  C.R.S.  § 13-5.3-107, enacted as part of SB 22-201, strikes the right balance in leaving rulemaking authority with the Colorado Supreme Court, with conferral with the Commission.

- **Appointment of members to the Commission – leave as stated in Colorado's Constitution:**  Colorado's Constitution, Art. VI, § 23(3)(a), specifies the membership of the Commission, with appointments made by the Colorado Supreme Court and Governor with the consent of Colorado's Senate.  The selection process has served Colorado well for decades, and no need for change has been shown.  In particular, no need has been shown to remove Colorado's judiciary from a role in appointing members of the Commission.

- **Recusal/disqualification – provide clear conflict rules for all involved in process**:  Clear, uniform standards on recusal and/or disqualification of disciplinary process decisionmakers at every level – not just judges – should be implemented.  The best means to do so is through rulemaking.

CJI thanks the Interim Committee for consideration of CJI's input.

<div align="center">3</div>

# Appendix 27(s)(iii)(13)(d)

# Colo. Jud. Dep't, RESPONSES TO RECOMMENDATIONS FROM THE COLORADO COMMISSION ON JUDICIAL DISCIPLINE, August 1, 2022;

Judicial Department Responses to Recommendations from the Colorado
Commission on Judicial Discipline

August 1, 2022

_____

Members of the Interim Committee on Judicial Discipline,

Since the last Interim Committee hearing on July 12, 2022, representatives from the Judicial
Department and the Commission met and discussed the full list of recommendations put forward
by the Commission in its June 14, 2022, report and subsequent summary.  The meeting was
productive, and the discussion covered many questions and concerns.  The Department and the
Commission found common ground on several of the Commission's recommendations, although
a number of details need to be addressed regarding their implementation.  Although we do not
agree with all of the Commission's recommendations, the Department and the Commission are
not and should not be adversaries in this process.  It is clear that both parties want a robust, fair,
and more transparent system of judicial discipline, which is essential to Colorado's merit
selection and retention system.

The Judicial Department's positions, reasoning, and remaining questions are discussed below.
Where there are areas of disagreement, the Department's comments reflect its overarching
concerns about creating a system that injects politics into judicial discipline proceedings, as well
as its goal of ensuring that any reforms to the system retain appropriate checks and balances so
that no entity involved the process has unchecked power or is unaccountable for its decisions.

**Commission Recommendation Regarding Accountability and Core Conflicts:**

Maintain existing structure that is unified system with two tiers of decision-making.  Discipline
Commission remains the same as it is with same investigatory/adjudicatory roles.  Final
decision-maker change from Supreme Court to multi-perspective board comprised of judges,
lawyers, and citizens.

- o   Judges shall be majority/minority of members (policy issue for decision)
  - o   Consider 3 judges, 3 lawyers, 4 citizens, and a person with prior judicial
    discipline experience discussed below.
- o   Judge members divided between appellate courts, district courts, and county courts.
- o   Appointment power of judge members also divided between the representative groups so
  that no single group of judiciary exercises control of member selection.  Appeals judges
  as a whole select appellate judge member, district court judges as a whole select district
  court judge member, county court judges as a whole select county court judge member.
- o   One lawyer position reserved for affinity bars and selected by those groups collectively in
  a system of their design.

1

- o   Lawyer and citizen members otherwise appointed by governor and confirmed by senate.
- o   One additional member appointed by the Discipline Commission from its former (not current) members to provide institutional knowledge. This person would recuse on any individual cases in which the person participated while on the Commission.
- o   Final discipline decisions could remain subject to due process review by court system (equivalent of C.R.C.P. 106 review) but this board's decision is otherwise final.

**Response from the Judicial Department:**

A system like the one proposed here does not exist in any other state.  Under the current constitutional structure, the Court reviews the Commission's recommendation where the Commission seeks public discipline of a judge.  (The Court has no reviewing role where the Commission resolves a matter by informal remedial action such as a private censure.)  This structure is consistent with the Court's inherent power and ultimate responsibility to regulate the practice of law and the judicial branch.   The ABA Model Rules for Judicial Disciplinary Enforcement similarly provide for final review of discipline decisions by the highest court of the state because "[t]he highest court has the inherent power and final responsibility to regulate the judicial branch of government."  No investigation has revealed that this basic structure of Colorado's current system is deficient.  Thus, the justification for making such a significant and novel change to the current system is conspicuously lacking.  To the extent the concern stems from the possibility of future conflict-of-interest issues, case-by-case recusal pursuant to the Code of Judicial Conduct (which applies to participation in judicial discipline proceedings) ensures that any action by the Court is free from conflict.  Although the Rules of Judicial Discipline do not specifically address recusal processes for the Supreme Court in judicial discipline proceedings, the Court has proposed a rule for the Commission's consideration that would expressly address recusal through a fair and transparent process that ensures that the Court's review is conducted by conflict-free judicial officers.

If the Interim Committee is considering the creation of a final decision-making Board similar to the Commission's proposal, several details and novel issues will need to be considered.  The Department is concerned that the proposed structure could politicize the discipline process, which is currently apolitical.  Many details of this proposal remain unclear, such as term length, oversight over the Board, an applicable code of conduct and recusal provisions, and the process, if any, to challenge the impartiality of a member on the panel, among many others.

Additionally, requiring the Commission, which functions as the investigator and prosecutor of judicial discipline cases, to appoint one of its former members to the final decision-making Board is fraught with potential conflict and diminishes procedural fairness. It would be analogous to a system permitting a District Attorney to appoint a former member of its office to the jury in a criminal case it was prosecuting.  Such a system would present the appearance of bias and immediately raise questions of conflicts and fundamental fairness for a criminal defendant.

2

The Department further believes that allowing groups of judges to pick their own representatives could lead to inappropriate internal politicking and create the public appearance of protectionism inherent in groups of judges selecting the individuals that could decide discipline against them.

In light of these continuing questions, the Department does not support this proposal.

**Commission Recommendation Regarding Special Masters Pool:**

Create pool of individuals to supply special masters for formal proceedings.  Set a number, at least 6 maybe up to 9.  Serve in pool for several years, choose a district court or appellate court length, to gain subject expertise and institutional knowledge.  Stagger terms.  Draw from this pool when formal proceedings undertaken.  Commission or new Board to select, or combined selection process.

At hearing, an Interim Committee member raised the idea of having the special masters be a multi-perspective group rather than exclusively judges.  The Commission finds this to be a reasonable proposal.

**Response from the Judicial Department:**

The Department agrees that it would be beneficial to have a pool of special masters who understand the disciplinary rules and process.  The Department believes a pool larger than 9 would be necessary to ensure that diverse perspectives are available in each disciplinary matter and that there are available special masters should there be issues with conflicts or availability. If non-judges will serve as special masters, there must be a defined process for identifying and appointing those special masters that is free from political influence.

The Department indicated to the Commission that it is also open to a selection process for the special masters in which a larger list of special masters is generated (perhaps randomly drawn from the pool or chosen by the Chief Justice); the Commission and respondent judge could then strike a set number of special masters from that larger list to arrive at the final panel.

The Department is also open to a somewhat different proposal, under which the pool of special masters would include judges, attorneys, and citizens, each with different appointing authorities. Under this approach, a panel of three special masters would be randomly selected for a case and would include one judge, one attorney, and one citizen.

**Commission Recommendation Regarding Commission Member Terms:**

Set terms of Commission Members at same length as pool members and Board members, range of 6-8 so that gain greater expertise and insulate from influence.  Can make single full term in light of longer term length.

Change appointment authority for judge members from Supreme Court to be consistent with the suggestion above to limit influence of single, small group.

**<u>Response from the Judicial Department:</u>**

The Department and the Commission representatives discussed various terms and discussed the possibility of two five-year terms for commission members. The Department remains concerned that, the longer the term of appointment, the more difficult it is to find volunteers for these appointments.  The Department believes a four-year term with the possibility of reappointment, allowing for a total of eight years on the Commission, is appropriate and matches the ABA Model Rules for Judicial Disciplinary Enforcement.  Alternatively, the Department would support a single six-year term, which is consistent with the term for judicial nominating commissions.

Both the IAALS Report and the ABA Model Rule recommendations support varied appointing authorities, with the judge members appointed by the highest court of the state, lawyers appointed by the state bar, and governor-appointed public members. The Department supports the current appointment process in which the Governor appoints a majority of the Commission, with the consent of the Senate, and the Supreme Court appoints a minority number of district court and county court judges.  However, the Department sees merit in the position taken by IAALS and the ABA that attorney members be appointed by the state bar association.  As stated above, the Department is opposed to any appointment system that politicizes the appointment process. Along these lines, the Department is concerned that having categories of judges select their own representatives could lead to inappropriate politicking for a position or give the public appearance of judges trying to protect their own constituency.

**<u>Commission Recommendation Regarding Transparency</u>**:

Consider changing confidentiality border from conclusion of formal proceedings to filing of formal proceedings.  Changes on this issue will require constitutional amendment.

**<u>Response from the Judicial Department:</u>**

The Department agrees that full confidentiality should cease when formal proceedings are filed. Representatives from the Department and the Commission discussed details about what information would be public and when, the need to protect victim and witness information, and designing a system that encourages victims and witnesses to come forward.  The Department believes this issue merits further consideration, and that some of these areas could be addressed through rulemaking.  The Commission raised the issue of confidentiality in disability proceedings, where the Commission may institute proceedings to retire a judge or justice due to a disability.  This issue is worthy of discussion now and in the adoption of any future rules.

**<u>Commission Recommendation Regarding Disqualification Standards</u>**.

4

Make standards uniform and clear.  Codify in statute that Judicial Code (e.g., Rule 2.11) governs disqualification of decision makers at every level of judicial discipline.  Prior legislative draft can be reviewed on this issue.

**Response from the Judicial Department:**

Rule 2.11, which governs a Judicial Officer's obligation to disqualify in a judicial proceeding, already governs the judge members of the Commission, the special masters, and the Supreme Court in judicial discipline proceedings. The Department is not opposed to Rule 2.11 applying to all individuals in the disciplinary process (including attorneys and citizen members).  However, the Department has some concerns that Rule 2.11 may not be an ideal fit for the attorney or citizen members involved in the process, as much of the language in Rule 2.11 addresses the judicial function of a judge and may not contemplate conflict scenarios that would apply to attorneys or citizen members.  Further, unlike judicial officers, an attorney or citizen member who violates 2.11 is not inherently subject to any supervision or consequence related to that violation.

The IAALS report on judicial discipline emphasizes that "Commissioners and staff members should be governed by a written, detailed, mandatory, and enforceable code of conduct."  All members of the Commission are currently subject to a Code of Conduct contained in RJD 3.5, which the Court adopted (with certain additions and modifications) based on a proposal that the Commission presented to the Court.  It is unclear why the Commission wants to move away from the existing Code of Conduct, which more closely tracks the specific nature of the work of the Commission, but the Court is open to further discussions about the disqualification standards and the applicability of Rule 2.11.  The Department has asked the Commission to propose changes to RJD 3.5 consistent with its proposal above.

Pursuant to the constitutional authority of the court, and consistent with SB22-201, the Supreme Court has proposed an amendment to the Rules of Judicial Discipline to address potential conflicts and disqualifications for Supreme Court justices.  The Department will share more information on the proposal and rules process with the Interim Committee in the coming days.

**Commission Recommendation Regarding Rulemaking Authority:**

Place rulemaking authority with Discipline Commission, consistent with Judicial Performance Commissions and majority of other states.

**Response from the Judicial Department:**

Under article VI, section 2 of the Colorado Constitution, the Supreme Court has general superintending authority over all courts of the state, and as such, is responsible for developing rules for judicial proceedings.  Consistent with that general authority, article VI, section 23(3)(h) vests the supreme court with rulemaking authority for procedures before the Discipline Commission. The Court's rulemaking process in other areas involves tasking a diverse committee with reviewing and discussing proposals and making recommendations to the Court

5

for rules changes.  Significant proposed changes are then published for comment, and the Court holds a public hearing.  This kind of structure has been lacking for proposed amendments to the Rules of Judicial Discipline.  The Department is considering a more formal committee structure similar to that used for proposed amendments to other court rules. Such a committee structure should include representation by the Commission.  The Department nevertheless believes the Supreme Court remains the appropriate rulemaking authority.  As the Commission highlights, the Judicial Performance Commission (JPC) has its own rulemaking authority.  The JPC, however, is a statutory creation that does not adjudicate disputes but instead serves to inform voters about the performance of judges.  In contrast, the Discipline Commission functions within the court system, using court processes, and decides disputed matters impacting judges' careers and livelihoods.  The Court's role in rulemaking remains an appropriate check on the disciplinary system to ensure due process, particularly if the Court's authority in other areas of the disciplinary process is diminished or eliminated.  Unlike the Commission, the Court is accountable to the voters.


**Commission Recommendation Regarding Subpoena Power**:

Codify in statute subpoena power of Discipline Commission effective and available from decision to evaluate potential misconduct forward.

**Response from the Judicial Department:**

The Commission's current subpoena authority is addressed in Rules of Judicial Discipline 4 and 22.  The Department supports further clarification of the Commission's subpoena authority, either through rule amendments or statutory changes.  The Department is reviewing whether the Commission's subpoena authority is appropriate to address in statute under the current constitutional structure.

To the extent that the Commission seeks such broad subpoena power, the Department worries that would enable the commission to issue subpoenas untethered to specific complaints.  Naturally, the Commission's subpoena authority should be related and limited to its constitutional charge.

If the Commission's subpoena authority is codified in statute, the legislature should look to other entities with statutory subpoena and consider how that power is typically circumscribed.  The Colorado Civil Rights Commission, for example, has statutory subpoena authority under section 24-34-206, C.R.S. Unlike the Commission's proposal, that statute does not allow for subpoena authority based merely on a decision to evaluate potential misconduct.  Rather, it specifies that, after a charge is filed alleging discrimination and after a determination that the alleged discrimination or unfair practice imposes a significant societal or community impact, the Civil Rights Commission may issue a subpoena limited to matters directly related to the charge.  Such a subpoena is enforceable through the district court for the district in which the alleged discrimination has occurred.

6

Similarly, the ABA Model Rules for Judicial Disciplinary Enforcement state that the disciplinary body should have subpoena authority only after a full investigation is authorized (which occurs after screening and a preliminary investigation) and the subject judge is notified of the investigation.  The Model Rules also specify the mechanism for enforcement or quashing of subpoenas.

The Department believes that any proposed statutory or rule change needs to address the extent and limits of the Commission's subpoena authority, and the venue for challenging or enforcing a subpoena from the Commission.

**Commission Recommendation Regarding Verification and Enforcement Mechanism:**

The Commission proposes a verification method to ensure compliance with the SB 22-201 duty of disclosure placed on the Department and a means of enforcement if a dispute arises.

- o  In prior draft legislation, a verification system was proposed in which a member of the judiciary would certify compliance with the duty of disclosure annually.  The Commission is open to other ideas for a mechanism of verification.
- o  For dispute resolution, the parties continue to discuss ideas with no specific points of dispute at this time.  One idea is to create enforcement mechanism for discovery/disclosure disputes for pre-formal proceedings phase.  Use three judge panel drawn from trial judges not of the district involved in the matter.  Judicial selects one, Commission selects one, those two select the third.  Decisions, subject to redactions to conceal identities, are public and have precedential value.

**Response from the Judicial Department:**

The Department opposes an annual certification process as impractical given the size of the Department; it is impossible for any individual to certify compliance by 4,000 judges and employees.  The Department believes that the statutory disclosure obligation is sufficient to compel compliance.  The Department will work with the Commission to ensure the Department's reporting and disclosure obligations are clear and that routine and consistent training is provided on these obligations.

There may be times when the Commission, the subject judge, the Department, or a third party are not in agreement on issues of disclosures, document production, or something else in the disciplinary process.  For resolving these disputes, the Department agrees with the idea of a three-judge panel.  The Department has reservations about the decisions resolving disclosure disputes being public, given that the proceedings at that stage generally would be confidential.  It is also unclear what is meant by stating that such decisions have precedential value.  The Department is open to the decisions of the three-judge panels being available in subsequent judicial discipline proceedings, whether related or unrelated.  The Interim Committee should

give additional consideration to an appellate process and enforcement mechanism for decisions of the panels.

## Commission Recommendation Regarding Funding:

Set source of funding that is insulated from politics and performance of the economy, consistent with funding for Judicial Performance Commissions.

## Response from the Judicial Department:

The current independent funding is ideal because it includes a mixture between general fund direct sourcing and the new special cash fund.  General Fund revenue is widely recognized as the most reliable and sustainable source of revenue in the state.  The Department does not agree with any proposal in which the legislature would appropriate attorney registration fees assessed by the Supreme Court pursuant to its independent constitutional authority to regulate the practice of law.  Funding the Commission with fees that are within the Supreme Court's purview undermines the General Assembly's progress in providing financial independence to the Commission via SB 22-201.

## Commission Recommendation Regarding Victim's Rights Act:

Probably best to handle by rule, but enact a version of a VRA for discipline and authorize Commission to protect identity of complaining witnesses to the extent practical to limit retaliation risks.

## Response from the Judicial Department:

The Department and the Commission agree that legislative direction for the disciplinary process to keep complainants informed and take reasonable steps to protect their privacy is appropriate.  The specifics are likely best addressed by rule.  The Department wants to ensure that any legislation does not foreclose restorative justice or similar processes that would encourage victims to report; that it keeps victims reasonably informed throughout the process; that it provides victims a voice in the complaint and resolution process; and that it does not discourage victims from reporting misconduct.

## Commission Recommendation Regarding Metrics:

Under SB 22-201, the Commission will track demographic statistics in addition to its existing tracking of trends in misconduct complaints that it reports annually.  The Commission is to report this information in the SMART process.  The Judiciary's SMART process reporting should be amended to include a report on what actions it has taken in response to these trends.

## Response from the Judicial Department:

8

This Department believes this concept needs further definition and specificity regarding the statistics and trends that are being tracked.  Data collection may prove useful to provide more information to the public and inform public policy.  At times, data collection proves to be more challenging than anticipated, so it would be helpful to have discussions now about the data to be tracked and limits or hindrances that aren't immediately apparent.  The Department agrees that the Commission should share workplace trends and perceived culture problems.  The Department agrees with the Commission that periodic conferral regarding the trends and concerns would be helpful.

# Appendix 27(s)(iii)(13)(e)

# Colo. Comm'n on Jud. Discipline, RECOMMENDATIONS TO INTERIM COMMITTEE, August 2, 2022;

**COMMISSION ON JUDICIAL DISCIPLINE RECOMMENDATIONS TO INTERIM COMMITTEE**

Reply of Colorado Commission on Judicial Discipline
To Response of Judicial Department to Recommendations
August 2, 2022

Members of the Interim Committee on Judicial Discipline,

Representatives of the Colorado Commission on Judicial Discipline (the "Commission") and the leadership of the Colorado Judicial Department (the "Department") met on July 22nd and 25th to discuss potential reforms to Colorado's system for judicial discipline.

The Commission on Judicial Discipline and the Department have the same goal:  Ensure that any reforms to the system retain appropriate checks and balances so that *no entity involved in the process has unchecked power or is unaccountable for its decisions*.

The parties discussed submission of a joint report to the Interim Committee and circulated a draft joint report. However, the Department has separately filed its Response on August 1, 2022. The Commission replies (in blue font) to the Department's comments as follows:

1.    **ACCOUNTABILITY AND CORE CONFLICTS**

Commission Recommendation:

Maintain existing structure that is unified system with two tiers of decision-making. Discipline Commission remains the same as it is with same investigatory/adjudicatory roles. Final decision-maker change from Supreme Court to multi-perspective board comprised of judges, lawyers, and citizens.

- Judges shall be majority/minority of members (policy issue for decision)
- Consider 3 judges, 3 lawyers, 4 citizens, and a person with prior judicial discipline experience discussed below.
- Judge members divided between appellate courts, district courts, and county courts.
- Appointment power of judge members also divided between the representative groups so that no group of judiciary exercises control of member selection.
- Appellate judges select appellate judge member, district court judges select district court judge member, county court judges select county court judge member.
- One lawyer position reserved for affinity bars and selected by those groups collectively in a system of their design.
- Lawyer and citizen members otherwise appointed by governor and confirmed by senate.
- One additional member appointed by the Discipline Commission from its former (not current) members to provide institutional knowledge. This person would recuse on any individual cases in which the person participated while on the Commission.

- Final discipline decisions could remain subject to due process review by court system (equivalent of C.R.C.P. 106 review) but this board's decision is otherwise final.

<u>Response from the Judicial Department</u>:

A system like the one proposed here does not exist in any other state. Under the current constitutional structure, the Court reviews the Commission's recommendation where the Commission seeks public discipline of a judge. (The Court has no reviewing role where the Commission resolves a matter by informal remedial action such as a private censure.) This structure is consistent with the Court's inherent power and ultimate responsibility to regulate the practice of law and the judicial branch. The ABA Model Rules for Judicial Disciplinary Enforcement similarly provide for final review of discipline decisions by the highest court of the state because "[t]he highest court has the inherent power and final responsibility to regulate the judicial branch of government." No investigation has revealed that this basic structure of Colorado's current system is deficient. Thus, the justification for making such a significant and novel change to the current system is conspicuously lacking. To the extent the concern stems from the possibility of future conflict-of-interest issues, case-by-case recusal pursuant to the Code of Judicial Conduct (which applies to participation in judicial discipline proceedings) ensures that any action by the Court is free from conflict. Although the Rules of Judicial Discipline do not specifically address recusal processes for the Supreme Court in judicial discipline proceedings, the Court has proposed a rule for the Commission's consideration that would expressly address recusal through a fair and transparent process that ensures that conflict-free judicial officers conduct the Court's review. If the Interim Committee is considering the creation of a final decision-making Board similar to the Commission's proposal, several details and novel issues will need to be considered. The Department is concerned that the proposed structure could politicize the discipline process, which is currently apolitical. Many details of this proposal remain unclear, such as term length, oversight over the Board, an applicable code of conduct and recusal provisions, and the process, if any, to challenge the impartiality of a member on the panel, among many others. Additionally, requiring the Commission, which functions as the investigator and prosecutor of judicial discipline cases, to appoint one of its former members to the final decision-making Board is fraught with potential conflict and diminishes procedural fairness. It would be analogous to a system permitting a District Attorney to appoint a former member of its office to the jury in a criminal case it was prosecuting. Such a system would present the appearance of bias and immediately raise questions of conflicts and fundamental fairness for a criminal defendant. The Department further believes that allowing groups of judges to pick their own representatives could lead to inappropriate internal politicking and create the public appearance of protectionism inherent in groups of judges selecting the individuals that could decide discipline against them. In light of these continuing questions, the Department does not support this proposal.

Commission Response:

The Department is incorrect in stating that the independent decision-maker design proposed is without precedent. The proposed design is inspired by the system adopted by Illinois. Most states have designs that are half a century old. Several states are reconsidering their discipline system designs currently. Colorado has long played a role in leading the nation to promote best practices through structural legal reforms. Colorado should not shy away from addressing the problems demonstrated in our current judicial disciplinary structure.

Moreover, good reason exists to approach the discipline system differently than most states, the Colorado Supreme Court has defined its role differently than the high courts of other states. The Colorado Supreme Court has created a unique role for itself in the operations of the Colorado Judiciary. As explained in the Troyer/RCT, Ltd. Report, the Colorado Supreme Court has expanded its role dramatically beyond that of neutral and detached judicial officers, the justices now operate as the "board of directors" for the Colorado Judiciary. This setting aside of the traditional judicial role creates inherent conflicts of interest for the justices in judicial discipline that are unique. The Colorado Supreme Court cannot ask to continue to be viewed solely as disinterested judicial officers when they no longer operate solely in that role. These are challenges that require a uniquely designed system.

The board of directors makes contract decisions and must be concerned about incurring liability for the company. This makes them ill-suited to credibly exercise independent decision-making about the ethics of the same company--decisions that inherently carry the risks of creating civil liability for the company. The Chief Justice himself has illustrated this problem when he explained to the General Assembly that one of the reasons he withheld records from Colorado's constitutional discipline system was to protect the Department from potential civil liability. In effect, the Department proposes that the board of directors themselves be designated as the final decision-maker for claims of misconduct made against their own personnel.

To be credible, a neutral, detached, and objective decision-maker must oversee a system of judicial discipline. To be credible, that decision-maker cannot be a corporate board of directors that may prioritize the risks of incurring financial liability over the necessities of enforcing ethics rules. To be credible, that final decision-making body cannot be the same entity that also controls access to evidence and decides whether misconduct allegations are reported in the first place.

The Department also states that "No investigation has revealed that this basic structure of Colorado's current system is deficient."  The Commission disagrees with this characterization and notes the problems detailed in the testimony before the SMART Committee Hearing process from January of 2022, before the Senate Judiciary Committee, and before this Interim Committee as well as incidents reported in the press.

The current system in Colorado provides the leadership of the Department with various avenues for exerting improper influence over an unwanted evaluation of potential judicial misconduct. In the last few years, the Department's leadership has exercised many of those avenues. One recent

example is from the Troyer Report. Mr. Troyer testified that the Department produced approximately 12,000 documents related to the Masias contract within approximately one month of Mr. Troyer's engagement in October 2021. Though the Department had the ready ability to produce those records to Mr. Troyer during the fall of 2021, the Department withheld all but about one dozen such records from the Judicial Discipline Commission over a 10-month period in 2021 that included the period in which the disclosures to Mr. Troyer occurred. As of the date of this writing, and after the General Assembly codified an affirmative obligation for the Department to produce these records within 35 days, the Department continues to withhold most of these materials from the constitutional judicial discipline process. As further testified by Mr. Troyer at this Interim Committee's July 12, 2022 hearing, the Department provided him with access to its records through its Relativity software database. The Department has never offered to provide the Judicial Discipline Commission with similar access to these records (in the form in which they are maintained by the Department). The leadership of the Department has exercised its practical control over the process to withhold access to resources, personnel, funding, information, cases, and evidence.

These are signs that our system has serious deficiencies that need to be addressed.[1]

In the closing paragraphs of the Department's comments, the Department notes concerns about conflicts of interest if Colorado adopts a multi-perspective final decision-making body on judicial discipline. The Department states two primary examples. Both can be evaluated on their own merits, and consideration will reveal that the concerns raised can be readily resolved. The ideal solution will address the *demonstrated* problems in the current system first while it can also minimize the risk of speculative potential problems for the future.

In our current system, a small group of judges exercises ultimate and unreviewable control over final decisions on judicial discipline as well as practical control over many aspects of the system preceding a final decision. The events of the last few years have demonstrated the inherit conflicts and temptations of self-interest that have made this system unworkable and undermined its credibility. While potential conflicts will inevitably exist in any system design, the current system is an "all or nothing" system in which a distinct group of judges (the Justices of the Supreme Court), who are not subject to practical oversight, have final and near complete control of the system that extends to even the foundational rulemaking functions. As a result, when a conflict arises for the Supreme Court, the system fails at most levels and is deprived of

---

[1] The Department's description of the Supreme Court's review role in the current system also includes an error. The Department states that the Supreme Court "has no reviewing role" when private discipline is imposed. The Colorado Rules of Judicial Discipline provide the respondent judge with the opportunity to challenge a decision imposing private discipline through a request for formal proceedings, the results of which are then reviewed by the Supreme Court. *See* Colo. RJD 35(i).

credibility. A multi-perspective system that separates practical system control from substantive decisional control. Moreover, such a system will exist through both diversified composition and a diversified selection process. The diversity of this system, itself provides a source of credibility and functionality. When a conflict arises, that conflict will affect only one aspect of the multi-faceted decision-making body so that the body can continue to function and do so with legitimate authority and credibility. A multi-perspective decision-making body is far more durable and resilient than the current "monocultural" design.


2.        **SPECIAL MASTERS POOL**

Commission Recommendation:

Create pool of individuals to supply special masters for formal proceedings. Set a number, at least 6 up to 9. Serve in pool for several years, choose a district court or appellate court length, to gain subject expertise and institutional knowledge. Stagger terms. Draw from this pool when formal proceedings undertaken. Commission or new Board to select, or combined selection process. At hearing, an Interim Committee member raised the idea of having the special masters be a multi-perspective group rather than exclusively judges. The Commission finds this to be a reasonable proposal.

Response from the Judicial Department:

The Department agrees that it would be beneficial to have a pool of special masters who understand the disciplinary rules and process. The Department believes a pool larger than 9 would be necessary to ensure that diverse perspectives are available in each disciplinary matter and that there are available special masters should there be issues with conflicts or availability. If non-judges will serve as special masters, there must be a defined process for identifying and appointing those special masters that is free from political influence. The Department indicated to the Commission that it is also open to a selection process for the special masters in which a larger list of special masters is generated (perhaps randomly drawn from the pool or chosen by the Chief Justice); the Commission and respondent judge could then strike a set number of special masters from that larger list to arrive at the final panel. The Department is also open to a somewhat different proposal, under which the pool of special masters would include judges, attorneys, and citizens, each with different appointing authorities. Under this approach, a panel of three special masters would be randomly selected for a case and would include one judge, one attorney, and one citizen.

Commission Response:

The Commission and Department agree there is a need for a pool of special masters. The Commission does not agree to the proposal that the pool must consist only of persons who "understand the disciplinary rules and process."  The entire purpose of a pool of special masters is to allow specialization, experience, and training in these areas of knowledge. The Commission

has no opposition to a pool larger than 9 but the pool should consist of judges, lawyers, and citizens and be drawn randomly, not by one person. The Colorado Constitution Article VI, § 23(3) provides that special masters "shall be justices or judges of courts of record." Traditionally, this provision has been interpreted to include Senior Judges. The provision also arguably allows the appointment of special masters from municipal courts of record, Federal courts, and the Denver County Court. The Commission agrees there should be a process to evaluate and strike a potential special master based on bias or other conflicts, with all parties having the ability to assert for cause or preemptory challenges like jury selection.

3.       **COMMISSION MEMBER TERMS**

Commission Recommendation:

Set terms of Commission Members at same length as pool members and Board members, range of 6-8 so that gain greater expertise and insulate from influence. Can make single full term considering longer-term length. Change appointment authority for judge members from Supreme Court to be consistent with the suggestion above to limit influence of single, small group.

Response from the Judicial Department:

The Department and the Commission representatives discussed various terms and discussed the possibility of two five-year terms for commission members. The Department remains concerned that, the longer the term of appointment, the more difficult it is to find volunteers for these appointments. The Department believes a four-year term with the possibility of reappointment, allowing for a total of eight years on the Commission, is appropriate and matches the ABA Model Rules for Judicial Disciplinary Enforcement. Alternatively, the Department would support a single six-year term, which is consistent with the term for judicial nominating commissions. Both the IAALS Report and the ABA Model Rule recommendations support varied appointing authorities, with the judge members appointed by the highest court of the state, lawyers appointed by the state bar, and governor-appointed public members. The Department supports the current appointment process in which the Governor appoints a majority of the Commission, with the consent of the Senate, and the Supreme Court appoints a minority number of district court and county court judges. However, the Department sees merit in the position taken by IAALS and the ABA that attorney members be appointed by the state bar association. As stated above, the Department is opposed to any appointment system that politicizes the appointment process. Along these lines, the Department is concerned that having categories of judges select their own representatives could lead to inappropriate politicking for a position or give the public appearance of judges trying to protect their own constituency.

Commission Response:

The Supreme Court's existing exclusive authority to appoint judicial members of the Commission is a critical point of control and a mechanism of substantial influence over the judicial discipline process. The importance of control over the selection process and the credibility of that selection process is ripe for change.

The Supreme Court's control over the appointment of judge members of the Commission and any other body to be created is markedly different from the appointment authority to be exercised for non-judge members, such as an appointment authority placed with the Governor and subject to Senate confirmation. The Supreme Court is the ultimate "boss" of the judge members. Once on the Commission, the Supreme Court continues to exercise considerable authority and influence over the judge members. For those judge members, the Supreme Court can influence career advancement, docket assignment, resource provision, desirable committee assignments, staffing assignments, and/or work assignments. In contrast, when the Governor appoints a citizen member to the Commission, the Governor usually has no further tools to influence the decisions of that member. Nevertheless, there are reasons to consider modification of term lengths so that a single Governor may not have a disproportionate impact on the composition of the Commission and (as shown necessary in other states) the Commission is insulated from improper politicization. Given the lessons of the last few years, this critical avenue of applying pressure to judge members of the Commission should not be left un-addressed. Diversifying the appointment authority, placing it in the hands of appointing authorities that do not influence the future careers and the daily professional work of Commission members, is the best approach.

4.      **TRANSPARENCY**

Commission Recommendation:

Consider changing confidentiality border from conclusion of formal proceedings to filing of formal proceedings. Changes on this issue will require constitutional amendment.

Response from the Judicial Department:

The Department agrees that full confidentiality should cease when formal proceedings are filed. Representatives from the Department and the Commission discussed details about what information would be public and when, the need to protect victim and witness information, and designing a system that encourages victims and witnesses to come forward. The Department believes this issue merits further consideration, and that some of these areas could be addressed through rulemaking. The Commission raised the issue of confidentiality in disability proceedings, where the Commission may institute proceedings to retire a judge or justice due to a disability. This issue is worthy of discussion now and in the adoption of any future rules.

Commission Response:

There is apparent agreement for confidentiality to cease when formal proceedings are filed. The Commission does not oppose specifics regarding the details of what information would be made public and to protect victims and witnesses to be addressed through rulemaking if there is notice and opportunity for public comment prior to adoption of such rules. The name of the respondent judge and a brief recitation of the alleged misconduct without identifying victims or witnesses should be made public.

5.        **DISQUALIFICATION STANDARDS**

Commission Recommendation:

Make standards uniform and clear. Codify in statute that Judicial Code (e.g., Rule 2.11) governs disqualification of decision makers at every level of judicial discipline. Prior legislative draft can be reviewed on this issue.

Response from the Judicial Department:

Rule 2.11, which governs a Judicial Officer's obligation to disqualify in a judicial proceeding, already governs the judge members of the Commission, the special masters, and the Supreme Court in judicial discipline proceedings. The Department is not opposed to Rule 2.11 applying to all individuals in the disciplinary process (including attorneys and citizen members). However, the Department has some concerns that Rule 2.11 may not be an ideal fit for the attorney or citizen members involved in the process, as much of the language in Rule 2.11 addresses the judicial function of a judge and may not contemplate conflict scenarios that would apply to attorneys or citizen members. Further, unlike judicial officers, an attorney or citizen member who violates 2.11 is not inherently subject to any supervision or consequence related to that violation. The IAALS report on judicial discipline emphasizes that "Commissioners and staff members should be governed by a written, detailed, mandatory, and enforceable code of conduct." All members of the Commission are currently subject to a Code of Conduct contained in RJD 3.5, which the Court adopted (with certain additions and modifications) based on a proposal that the Commission presented to the Court. It is unclear why the Commission wants to move away from the existing Code of Conduct, which more closely tracks the specific nature of the work of the Commission, but the Court is open to further discussions about the disqualification standards and the applicability of Rule 2.11. The Department has asked the Commission to propose changes to RJD 3.5 consistent with its proposal above. Pursuant to the constitutional authority of the court, and consistent with SB22-201, the Supreme Court has proposed an amendment to the Rules of Judicial Discipline to address potential conflicts and disqualifications for Supreme Court justices. The Department will share more information on the proposal and rules process with the Interim Committee in the coming days.

Commission Response:

The Commission's primary concern with respect to the current disqualification standards is the high level of inconsistency being applied by leadership within the Department. The standards being applied by the Department to those outside the Department is simply not the same standard being applied to Department leadership. Two years ago, this was not a known difficulty. However, it is now a demonstrated problem. Commission members have been held to, and have been following, more stringent standards of disqualification and non-interference than the leadership in the Department have followed. The most public example is the Supreme Court's continuing endorsements of a specific factual narrative and specific witnesses in a potential judicial discipline matter since February of 2021 despite the requirements of Rule 2.10 of the Colorado Code of Judicial Conduct. This system of double standards is inappropriate and undermines the validity as well as credibility of the judicial discipline system. Uniform standards should apply.

The Department notes that it considers "unclear" the Commission's desire to move away from the revised Colo. RJD 3.5 adopted by the Supreme Court in October of 2021. The Commission explained its concerns to the Department. Experience since that time has added several examples to the problems with the inconsistent standards imposed that can be discussed with the Interim Committee to the extent the Committee wishes.

The simple bottom line as to disqualification standards is that Colorado should dispense with the double standard that holds members of the judiciary, the most directly self-interested participants in the discipline system, to a lower standard of conduct than lawyers or members of the public. If any disparity is necessary, it should hold the judge members to a higher rather than lower standard on issues of this importance.

6.      **RULEMAKING AUTHORITY:**

Commission Recommendation:

Place rulemaking authority with Discipline Commission, consistent with Judicial Performance Commissions and majority of other states.

Response from the Judicial Department:

Under article VI, section 2 of the Colorado Constitution, the Supreme Court has general superintending authority over all courts of the state, and as such, is responsible for developing rules for judicial proceedings. Consistent with that general authority, article VI, section 23(3)(h) vests the supreme court with rulemaking authority for procedures before the Discipline Commission. The Court's rulemaking process in other areas involves tasking a diverse committee with reviewing and discussing proposals and making recommendations to the Court 6 for rules changes. Significant proposed changes are then published for comment, and the Court holds a

public hearing. This kind of structure has been lacking for proposed amendments to the Rules of Judicial Discipline. The Department is considering a more formal committee structure similar to that used for proposed amendments to other court rules. Such a committee structure should include representation by the Commission. The Department nevertheless believes the Supreme Court remains the appropriate rulemaking authority. As the Commission highlights, the Judicial Performance Commission (JPC) has its own rulemaking authority. The JPC, however, is a statutory creation that does not adjudicate disputes but instead serves to inform voters about the performance of judges. In contrast, the Discipline Commission functions within the court system, using court processes, and decides disputed matters impacting judges' careers and livelihoods. The Court's role in rulemaking remains an appropriate check on the disciplinary system to ensure due process, particularly if the Court's authority in other areas of the disciplinary process is diminished or eliminated. Unlike the Commission, the Court is accountable to the voters.

Commission Response:

The Commission stands by its recommendation to place rulemaking authority with Discipline Commission as is consistent with the majority of other states and incorporates its other responses as to why this is necessary.

7.    **SUBPOENA POWER**

Commission Recommendation:

Codify in statute subpoena power of Discipline Commission effective and available from decision to evaluate potential misconduct forward.

Response from the Judicial Department:

The Commission's current subpoena authority is addressed in Rules of Judicial Discipline 4 and 22. The Department supports further clarification of the Commission's subpoena authority, either through rule amendments or statutory changes. The Department is reviewing whether the Commission's subpoena authority is appropriate to address in statute under the current constitutional structure. To the extent that the Commission seeks such broad subpoena power, the Department worries that would enable the commission to issue subpoenas untethered to specific complaints. Naturally, the Commission's subpoena authority should be related and limited to its constitutional charge. If the Commission's subpoena authority is codified in statute, the legislature should look to other entities with statutory subpoena and consider how that power is typically circumscribed. The Colorado Civil Rights Commission, for example, has statutory subpoena authority under section 24-34-206, C.R.S. Unlike the Commission's proposal, that statute does not allow for subpoena authority based merely on a decision to evaluate potential misconduct. Rather, it specifies that, after a charge is filed alleging discrimination and after a determination that the alleged discrimination or unfair practice imposes a significant societal or community impact, the Civil Rights Commission may issue a subpoena limited to

matters directly related to the charge. Such a subpoena is enforceable through the district court for the district in which the alleged discrimination has occurred. Similarly, the ABA Model Rules for Judicial Disciplinary Enforcement state that the disciplinary body should have subpoena authority only after a full investigation is authorized (which occurs after screening and a preliminary investigation) and the subject judge is notified of the investigation. The Model Rules also specify the mechanism for enforcement or quashing of subpoenas. The Department believes that any proposed statutory or rule change needs to address the extent and limits of the Commission's subpoena authority, and the venue for challenging or enforcing a subpoena from the Commission.

Commission Response:

There appears to be agreement that the Commission's subpoena power should be codified. However, the Department seems to suggest that the authority should be limited to applying only after a "full investigation." The Commission does not know what is meant by "full" investigation being authorized. The current rules do not use this term. Such a limitation, however, would undermine the basic utility of a subpoena as a necessary investigative tool. This is particularly true given that the Commission does not have law enforcement authority to seek warrants.

The current rules provide that the Commission's initial evaluation of a request may include examination of documentation under Colo. RJD 13(a). Thus, the subpoena power is inherently needed to conduct that initial evaluation. So long as the codification of the subpoena power authorizes subpoenas starting with this step of needing to review documentation in the hands of third parties with reliable means of enforcement, the Commission's concerns would be satisfied.

The subpoena power must also include any examination undertaken pursuant to Colo. RJD 13(f). In part, this is a necessity because this is the mechanism by which Colorado's Commission, like other commissions, addresses anonymous requests for evaluation.

8.    **VERIFICATION AND ENFORCEMENT MECHANISM**

Commission Recommendation:

The Commission proposes a verification method to ensure compliance with the SB 22-201 duty of disclosure placed on the Department and a means of enforcement if a dispute arises. In prior draft legislation, a verification system was proposed in which a member of the judiciary would certify compliance with the duty of disclosure annually. The Commission is open to other ideas for a mechanism of verification. For dispute resolution, the parties continue to discuss ideas with no specific points of dispute currently. One idea is to create enforcement mechanism for discovery/disclosure disputes for pre-formal proceedings phase. Use three judge panel drawn from trial judges not of the district involved in the matter. Judicial selects one, Commission selects one, those two select the third. Decisions, subject to redactions to conceal identities, are public and have precedential value.

Response from the Judicial Department:

The Department opposes an annual certification process as impractical given the size of the Department; it is impossible for any individual to certify compliance by 4,000 judges and employees. The Department believes that the statutory disclosure obligation is sufficient to compel compliance. The Department will work with the Commission to ensure the Department's reporting and disclosure obligations are clear and that routine and consistent training is provided on these obligations. There may be times when the Commission, the subject judge, the Department, or a third party are not in agreement on issues of disclosures, document production, or something else in the disciplinary process. For resolving these disputes, the Department agrees with the idea of a three-judge panel. The Department has reservations about the decisions resolving disclosure disputes being public, given that the proceedings at that stage generally would be confidential. It is also unclear what is meant by stating that such decisions have precedential value. The Department is open to the decisions of the three-judge panels being available in subsequent judicial discipline proceedings, whether related or unrelated. The Interim Committee should give additional consideration to an appellate process and enforcement mechanism for decisions of the panels.

Commission Response:

There is a clear need to codify a verification or similar process to ensure the Department complies with its statutory disclosure duties. The Department has been under an obligation to disclose allegations of judicial misconduct and relevant evidence to the Commission since 2010. It is beyond dispute that the Department has consistently failed to honor this duty of disclosure.

The simplest illustration of the continuing need for a verification or similar system to require compliance or to create consequences for non-compliance is derived from the Troyer report. As noted above, Mr. Troyer's testimony established that the Department had approximately 12,000 documents readily available for disclosure to him in the fall of 2021. However, despite the requirements of the 2010 MoU and repeated requests from the Commission, the Department produced only about 1/1,000th of those documents to the Commission in 2021. Earlier this year, the General Assembly took the unprecedented step (as far as the Commission knows) of codifying the Department's disclosure obligations. Nonetheless, as of this writing, the Department still has only produced about one-third of the documents disclosed to Mr. Troyer in the fall of 2021. Both these contractual and a statutory duties of disclosure continue to be inadequate without defined verification, penalties, and enforcement mechanisms.

9.    **FUNDING**

Commission Recommendation:

Set source of funding that is insulated from politics and performance of the economy, consistent with funding for Judicial Performance Commissions.

Response from the Judicial Department:

The current independent funding is ideal because it includes a mixture between general fund direct sourcing and the new special cash fund. General Fund revenue is widely recognized as the most reliable and sustainable source of revenue in the state. The Department does not agree with any proposal in which the legislature would appropriate attorney registration fees assessed by the Supreme Court pursuant to its independent constitutional authority to regulate the practice of law. Funding the Commission with fees that are within the Supreme Court's purview undermines the General Assembly's progress in providing financial independence to the Commission via SB 22-201.

Commission Response:

The Commission incorporates its prior discussion of this issue.


10.    **VICTIM'S RIGHTS CONSIDERTIONS**

Commission Recommendation:

Best to manage by rule but enact a version of a VRA for discipline and authorize Commission to protect identity of complaining witnesses to the extent practical to limit retaliation risks.

Response from the Judicial Department:

The Department and the Commission agree that legislative direction for the disciplinary process to keep complainants informed and take reasonable steps to protect their privacy is appropriate. The specifics are likely best addressed by rule. The Department wants to ensure that any legislation does not foreclose restorative justice or similar processes that would encourage victims to report; that it keeps victims reasonably informed throughout the process; that it provides victims a voice in the complaint and resolution process; and that it does not discourage victims from reporting misconduct.

Commission Response:

The Commission incorporates its prior discussion of this issue.


11.    **METRICS**

Commission Recommendation:

Under SB 22-201, the Commission will track demographic statistics in addition to its existing tracking of trends in misconduct complaints that it reports annually. The Commission is to report this information in the SMART process. The Judiciary's SMART process reporting should be amended to include a report on what actions it has taken in response to these trends.

<u>Response from the Judicial Department</u>:

This Department believes this concept needs further definition and specificity regarding the statistics and trends that are being tracked. Data collection may prove useful to provide more information to the public and inform public policy. At times, data collection proves to be more challenging than anticipated, so it would be helpful to have discussions now about the data to be tracked and limits or hindrances that are not immediately apparent. The Department agrees that the Commission should share workplace trends and perceived culture problems. The Department agrees with the Commission that periodic conferral regarding the trends and concerns would be helpful.

<u>Commission Response:</u>

The Commission agrees that this topic needs further development.

# Appendix 27(s)(iii)(13)(f)

# Letter from Christopher Gregory to the Interim Comm. on Jud. Discipline with Appendices 1-2, August 7, 2022;

# COLORADO COMMISSION ON JUDICIAL DISCIPLINE



August 7, 2022

Members of the Colorado Legislative Interim Committee on Judicial Discipline

On July 11, 2022, the Colorado Judicial Department, through State Court Administrator Steven Vasconcellos, wrote to you with a description of the Department's interactions with the Colorado Judicial Discipline Commission regarding the Discipline Commission's efforts to examine the allegations flowing from the Masias contract. That narrative leaves the reader with several misimpressions. I am writing to correct those misimpressions on behalf of the Commission.

In this response to the Department's July 11th letter, the Discipline Commission attempts to limit its statements to objective facts, minimizing the characterizations or commentary, so that the Interim Committee may reach its own conclusions about the functioning of the current system of judicial discipline. As it has done in the past, the Discipline Commission also limits itself to correcting inaccurate statements made by the Department.

There are significant details in both this correspondence and in the appendices. But the bottom line is this: members of the Colorado Supreme Court, directly and through its senior staff, made a series of decisions and took a series of actions throughout 2021 and 2022 that limited the ability of the Commission –- made up of citizens and legal professionals who volunteer their time and energy – to do its Constitutionally mandated work. The Court chose to share documents and information with 3 other investigations, but not with the Discipline Commission. It chose delay, mixed messages, and obfuscation.

The justifiable concerns of the legislature and the legal community about these choices have led us to the work of this Interim Committee. We hope this level of detail is helpful as you continue your work.

<u>Subpoena and Document Production</u>

Attached as Appendix 1 is a chronology of the Discipline Commission's interactions with the Department related to the disclosure and production of Department records regarding the Masias contract and related issues. The Department has previously released much of the

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 501-1143

Page 2

correspondence addressed in Appendix 1.  The Department released this correspondence through its Public Access to Information and Records Rules (P.A.I.R.R.) starting in January of 2022.  Other than an initial notice, the Department released the correspondence between the Discipline Commission and the Department on these issues without consulting the Commission.

The Production

At page 3, Mr. Vasconcellos characterizes the Department as having produced to the Discipline Commission "a large number of documents" "last summer" and, later on the page, referring to "numerous records produced in 2021."

The Discipline Commission conducts many evaluations that require it to review Department records.  On average in recent years, it reviews records in approximately 70 evaluations per year.  It is accurate to state that the Department gave the Discipline Commission access to "a large number documents" on various topics in 2021.  As to evaluation of the Masias contract related issues, however, the Department provided the Discipline Commission with 10 documents comprising 60 pages.  These individual productions are identified in Appendix 1.

By way of context, Robert Troyer testified on July 12, 2022 that the Department provided him with approximately 12,000 documents for the RCT, Ltd. investigation.  His testimony implies that this material was provided without the need of an initial request, but this was not clear.  The scope of the RCT, Ltd. investigation was factually narrower than that of the Discipline Commission.  For example, Mr. Troyer stated that RCT, Ltd. did not examine the misconduct allegations stated in the "Memo."  Mr. Troyer also testified that RCT, Ltd. was hired by the Department in mid-October of 2021 and that he had received the vast majority of these 12,000 records within one month, or by mid-November.

In contrast, the Discipline Commission made its first affirmative request for the Department's records on these issues no later than February 8, 2021.  Further requests followed as detailed in Appendix 1.  The Discipline Commission's requests for records resulted in production of 10 documents over the next 10-11 months (until the end of 2021).  In other words, in the same time frame, the privately hired investigator received one thousand times as many documents and received them in one tenth of the time as the Discipline Commission.

For further context, the Executive Summary of the State Auditor's report that the Department posted on February 27, 2022, stated that the Department had provided it with access to 16,000 documents.

Mr. Vasconcellos asserts that by the time of his July 11th letter, the Department had produced to the Discipline Commission approximately 1,600 documents.  This means that after approximately one- and one-half years of making requests, the Discipline Commission received approximately one tenth of the materials provided to each of these two investigations.

Page 3

The Discipline Commission stands by its prior statements to legislators that the Department did not provide – and still has not provided -- the Discipline Commission with "unfettered access" to its relevant files as was represented to legislators by Department leadership on January 25, 2022.

Access Agreement

Appendix 1 includes the primary events material to the "access agreement," though not every piece of correspondence is listed.

The July 11th letter proposed an explanation of the Department's delay in producing its records to the Discipline Commission. Mr. Vasconcellos offered that the Department believed that it needed an agreement under C.R.E. 502 addressing 5 bullet points in order to produce records. The letter gives the impression that the Department stated this belief to the Discipline Commission in August of 2021 and that the Discipline Commission resisted the Department's straightforward request for agreement on these five bullet points. This impression is objectively inaccurate.

On August 18th, the Chief Justice wrote to the Discipline Commission addressing various aspects of the Discipline Commission's ongoing requests for information and the Discipline Commission's concerns about the perceived inadequacy of the Department's document production to date. At the end of the letter, starting at the bottom of page 3, the Chief Justice stated, "One possible approach to *addressing the Discipline Commission's concerns* is for the Discipline Commission to enter into an Access Agreement with the Judicial Department" (emphasis added). The Chief Justice did not describe the purpose of an "access agreement" as addressing the issues listed in Mr. Vasconcellos' recent July 11th letter as the Department's needs. Instead, the Chief Justice asserted that the purpose of such an agreement would be to address the "*Commission's concerns*." At that time, the Discipline Commission's concern was that the Department did not appear to be complying with its existing contractual obligation under the February 5, 2010 Memorandum of Understanding (the "MOU") [1] to provide access to its records. If the Chief Justice intended to convey the concepts and conditions on future production indicated by Mr. Vasconcellos' recent July 11th description, the letter he sent did not do so.

---

[1] The scope of the February 5, 2010 MOU includes disclosure of information related to general and criminal complaints of misconduct involving judges. Through a separate October 1, 2012 MOU with the State Court Administrator's Office (SCAO), the CCJD had further contractual expectations for disclosure of general court and case records with mechanisms for the disclosure of enumerated "protected records."

Page 4

In his July 11th letter, Mr. Vasconcellos implied that the Discipline Commission could have received the 12-16 thousand withheld documents if the Discipline Commission had simply drafted an agreement to address the Department's terms and signed it.  However, the actual language of the Chief Justice's letter delivered a different message.  The Chief Justice explained in the same August 18th paragraph quoted above that an "Access Agreement, however, cannot circumvent the agreements to which the Department is bound."

The Department was citing the "agreements" as a basis for withholding records from the judicial discipline system.  The "agreements" that the Chief Justice said could not be "circumvented" were not identified or explained further.  What these "agreements" are remains unknown.  The message of the Chief Justice's letter at the time was that, even with an "access agreement," the Department would continue to withhold requested materials.

By August 18, 2021, the Discipline Commission had negotiated with the Chief Justice for six months to obtain records that should have been ministerially disclosed to the Commission under the 2010 and 2012 MOU's.  Right or wrong, the primary message the Discipline Commission received from the Chief Justice's August 18th letter was that no further progress could be expected without the involvement of Special Counsel.  The Discipline Commission turned its energies to getting an attorney onboard who could pursue the discovery dispute further.  Conversely, the Department's leadership appears to have turned its energies to blocking that engagement as shown in Appendix 2.

The Department's July 11th letter also gives the impression that the Department was waiting for the Discipline Commission to draft an agreement addressing the Department's bullet points.  The Department, however, had not expressed this expectation to the Discipline Commission and had not disclosed its expectation for required terms (i.e., the five bullet points from the July 11, 2022 letter).

The Department provided its first draft of an "access agreement" in November of 2021, nine months after the Discipline Commission began requesting disclosures from the Department.  The Commission defers to the actual correspondence to address the back and forth of negotiations.  The Discipline Commission would welcome working with the Interim Committee to find a procedural path that would allow it to share this correspondence if it is deemed of value.

The draft "access agreement" did not commit the Department to providing access to its relevant files.  To the contrary, the draft agreement authorized the Department to withhold records from the Discipline Commission and, critical to the Discipline Commission, do so without disclosing or explaining the legal basis for such withholding.  In other words, the draft agreement authorized the Department to withhold material records without the Discipline Commission ever knowing that anything had been withheld, without knowing that a claim of confidentiality was being asserted as to a pivotal record, and without knowing the basis for such claims of confidentiality or

Page 5

privilege.  This was not acceptable to the Discipline Commission.  If the Department's privately hired investigators agreed to the terms proposed to the Discipline Commission, one must ask how they know whether they were given full access to the Department's records.

The Chief Justice requested that the full Discipline Commission meet with him, Justice Monica Marquez, and other Department leaders at the Ralph J. Carr Judicial Center on January 28, 2021.  During this meeting, the Chief Justice raised the issue of the "access agreement."  He represented to the Discipline Commission that the Department needed only an assurance that production of records to the Discipline Commission would not waive the Department's potential claims of confidentiality or privilege.  The Discipline Commission reminded him that it had already provided an unequivocal assurance of this point in writing (through the terms of the subpoena itself stating that a responsive production would not be a waiver of such claims) and stated that this assurance could also be put in the form of an agreement if so desired.

After the meeting, the Department's counsel persisted in pursuing an "access agreement" on very different terms than those stated by the Chief Justice.  As a result, the CCJD proposed a draft agreement on March 10, 2022, which directly acknowledged that disclosure to the CCJD did not waive claims of confidentiality or privilege held by the Department, the terms defined by the Chief Justice at the January 28th meeting.  The Department, nevertheless, declined to accept the Commission's draft agreement.

A final agreement was not reached until after the General Assembly legislatively mandated the Department's information sharing through SB22-201.  Even after enactment of SB22-201 and the CCJD proposing another draft "access agreement" in conformity with CRE 502, the Department continued to argue, *inter alia*, over including a provision confirming the Department's obligations to fully comply with its disclosure obligations.  The final agreement did not include such a commitment by the Department.

Subpoena

In his July 11th letter, Mr. Vasconcellos stated, "the Department is not aware of any discussion or communication in which the Department questioned or challenged the Discipline Commission's subpoena authority or indicated that it would not comply with a subpoena."  Mr. Vasconcellos may be unaware of the operative facts.

On February 24, 2022 at 1 p.m., Special Counsel met with the Department's counsel handling discovery.  The Department's counsel asserted that the Discipline Commission did not have subpoena authority until formal proceedings are filed under Rule 18.  The Department's counsel advised that if the parties could not reach agreement on the "access" terms proposed by the Department, the Department would seek to quash the Discipline Commission's subpoena, and the Department's counsel expressed confidence that their client, the Colorado Supreme Court, would sustain their objection.

Page 6

This followed a meeting between the full Commission and the Supreme Court's Office of Attorney Regulation Counsel ("OARC") on December 17, 2021. In a case wholly unrelated to the Masias matters, the Supreme Court's OARC advised the Discipline Commission of this new view that the Discipline Commission holds no discovery or subpoena authority until formal proceedings are filed and, therefore, has no such authority during its investigation phase. These events are confirmed by two witnesses.

The Discipline Commission is relieved to learn that the Department has reversed its expressed position and now affirms that the Discipline Commission has subpoena authority during its investigation phase. Nevertheless, the statement by Mr. Vasconcellos is not enforceable. A need still exists to codify the scope of the Discipline Commission's authority to issue, and its means of enforcing, subpoenas.

## Funding

Under the heading "Funding," the Department's July 11th letter addressed the Discipline Commission's funding and the issues related to the Discipline Commission's retention of Special Counsel for the Masias matters. Appendix 2 provides a chronology of events on these topics. As with Appendix 1, the Department purports to have already released the correspondence addressing these issues months ago through P.A.I.R.R.2 responses. Both appendices address the context for communications the Department previously chose to make public.

The issues of funding for the Masias matter and the Discipline Commission's general funding are properly addressed together. The Discipline Commission's pursuit of funding for its investigation of the Masias matter led to the Supreme Court's actions that, in turn, required the Discipline Commission to obtain substitute general funding from the General Assembly.

The Department's July 11th letter notes that the new legislation provides for "independent funding for the Discipline Commission" and went on to state the Department's claimed support "for the Discipline Commission to manage its own budget independent of the Judicial Department." The letter fails to note, however, that the black letter law governing Commission funding prior the SB22-201 provided for exactly the same independent financial management. The funding access problem did not arise because of a flaw in the existing law. The problem arose because the leadership of the Judiciary sought to use its practical control over funding access to override existing law's grant of independent financial management authority to the Discipline Commission. SB 22-201 affirmed prior budget authority but substantially reduced the Judiciary's practical ability to subvert that authority.

Rule 3 of the Colorado Rules of Judicial Discipline ("Colo. RJD") authorized "the Discipline Commission to manage its own budget independent of the Judicial Department," to use

Page 7

Mr. Vasconcellos' phrase.  Prior to SB 22-201, Colo. RJD 3 provided the Discipline
Commission's Executive Director with budget authority subject to oversight by the Discipline
Commission itself.  This type of budget structure, a chief executive addressing the budget subject to
oversight by a board-like entity, is commonplace in the private and public sectors.  The Discipline
Commission's financial management was subject to further oversight by the State Auditor.  Thus,
the Executive Director's decisions were subject to two layers of financial oversight.

Colorado Rule of Civil Procedure 227 separately identifies the source of the Discipline
Commission's funding through attorney registration fees.  Rule 227 is, itself, consistent with
Colorado's Constitution Article VI, § 23(3)(c) which recognizes that the Discipline Commission's
expenses are "to be paid by the supreme court from its budget to be appropriated by the general
assembly."

The blackletter law provided the Discipline Commission with independent financial
management authority prior to SB 22-201.  Problems arose because Judicial leadership asserted
unwritten authority to control, and ultimately terminate, the Discipline Commission's access to its
funding.

The Department's July 11th letter referred generally to communications about resources in
the summer of 2021.  The reader is referred to Appendix 2 for specifics.  Mr. Vasconcellos stated
that in one meeting, he was told "that the Discipline Commission had the resources it needed"
regarding special counsel.  This is an accurate statement but omits key context.

Mr. Vasconcellos appears to be referring to a meeting he had with Commission Executive
Director William Campbell on or about August 31, 2021.  By the time of that meeting, the
Supreme Court's OARC had approve the Discipline Commission hiring private sector Special
Counsel with an accepted budget estimate of up to $100,000.  By the date of that meeting, the
Discipline Commission was finalizing its retention of counsel on these terms discussed with the
Supreme Court's OARC.  Based on its discussions with Judicial leadership, the Discipline
Commission believed that there were no unresolved resource needs to be addressed.  Only in the
months that followed did the Discipline Commission learn that the Colorado Supreme Court and
OARC were moving to prevent the Commission's access to the contemplated funding.

In his letter, Mr. Vasconcellos next stated that the Discipline Commission "fail[ed] to
follow defensible procurement processes" in retaining counsel and characterizes the financial
conditions of the retention of counsel.  This statement is false.

The Discipline Commission welcomes the opportunity finally to address the Department's
claims in the open.  Judicial leadership has spread these unfounded stories within the legal
community for several months.  The Discipline Commission has received persistent questions
about these misstatements from lawyers throughout the year, with the most intensity following the

Page 8

appearances of Justices at the Colorado Bar Association in March of 2022. The most common versions of the narrative being circulated are that a) the Discipline Commission hired its Special Counsel without competing bids and without obtaining permission from the Department or the Court and b) that the Discipline Commission agreed to pay full market rates. These are both objectively false, as demonstrated in Appendix 2. The notion that the Discipline Commission would need permission from the Department or the Court to conduct an investigation is itself reflective of the significant structural conflicts presented through the Masias matter.

Procurement Process

The Discipline Commission asked the Supreme Court's OARC (still an apparent collaborative partner at that time) what procurement process for retention of private counsel was required in July of 2021. The Supreme Court's OARC represented to the Discipline Commission that no procurement process was required. OARC further advised the Discipline Commission that it would only have to enter a written engagement letter agreement and provide a copy for the contracting file. The Discipline Commission later learned that the Supreme Court's OARC had (and has) no written procurement code. The Department likely presumes that the Discipline Commission did not follow a procurement process because the Court, through OARC, had itself advised the Discipline Commission that none was required. The Discipline Commission, however, did not view the recommended course to be responsible in this situation. Therefore, the Commission solicited bids from the market.

Confidentiality restrictions made the solicitation process challenging. The Supreme Court's OARC provided recommendations of individual firms for the Discipline Commission to consider hiring. The vast majority of the firms the Discipline Commission approached declined to submit a bid once they learned that the Judicial Department itself could be an adverse party (recall, the first task contemplated for Special Counsel was overcoming the Department's objections to disclosing documents). Three firms were courageous enough to submit proposals. The Discipline Commission studied the three private sector proposals and that of the AG's office, balanced the pros and cons of each, and selected one firm. The Department's persistent representation that no procurement or bidding process was followed by the Discipline Commission is simply false.

Budget Approval

As highlighted in the Department's July 11th letter, the expense of hiring Special Counsel was not in the Discipline Commission's original 2021-22 budget. The need to hire counsel was not known to the Discipline Commission at the time the budget was prepared. The Discipline Commission traditionally accessed its funding through the Supreme Court's OARC and they provided administrative support for the budgeting process. After initial discussion in June, the Discipline Commission sought further guidance from the Supreme Court's OARC in July of 2021. OARC advised the Discipline Commission that no budget approval was required, only notice of the expenditure to allow coordination among those entities sharing the same funding source. They asked for a budget estimate, and the Discipline Commission provided the figure of up to

Page 9

$100,000.  (At the time, the Discipline Commission did not anticipate the degree of resistance it would ultimately encounter from the Department in producing its records).  As described in Appendix 2, the Supreme Court's OARC accepted the estimate and confirmed that no formal budget process was required.

These discussions were handled informally as the Supreme Court's OARC was seen as a collaborative partner at the time.  The Discipline Commission continued exploring the possibility of sharing an investigator with OARC but few primary source documents exist.  However, a small number of email exchanges detailed in Appendix 2 confirm the material points.  Contemporaneous secondary source documentation also exists confirming these facts.

Rates

The more common version of the narrative promoted by Judicial leadership has been that the Discipline Commission is paying full market hourly rates for its private sector Special Counsel.  This is inaccurate.

When the Discipline Commission asked what procurement requirements existed, it was told that none existed.  It was not informed of any requirement to obtain discounted hourly rates.  Nonetheless, the Discipline Commission thought it reasonable to request discounted rates despite the unusually high degree of professional risk any lawyer would be taking in this engagement.  The Discipline Commission obtained discounted rates.  When requested by the Supreme Court's OARC, the Discipline Commission documented that the rates were discounted in early October of 2021.  Also in October, the Colorado Solicitor General approved, in writing, the rates being charged in this matter as reasonable for private sector lawyers retained by the State of Colorado.  The Attorney General's Office further approved the terms of the engagement of Special Counsel.

Despite these prior approvals, the Supreme Court's OARC refused to release funds for the Discipline Commission's Special Counsel once the Discipline Commission identified the firm hired.  The Supreme Court's OARC also raised objections to the engagement of counsel itself.  On April 22, 2022, after public pressure was applied, the Department (through the Supreme Court's OARC) finally entered a written agreement to allow the Discipline Commission access to funds to pay Special Counsel.  The agreement simply implements the authority the Discipline Commission has always held under its Rules 2(aa) and 3(d).  Mr. Vasconcellos personally participated in the creation of that agreement.  Thus, the persistence in asserting objections to that engagement based on erroneous facts is difficult to understand.

The term of that agreement has now expired.  The Discipline Commission's Special Counsel has billed a total of less than one-tenth of the amount budgeted by the Department for the same time frame for the Colorado Supreme Court's privately hired counsel.  This comparison does not account for the taxpayer dollars also spent on the team of AG's representing the Supreme Court, the team of inhouse counsel for the Department, the work of the State Auditor's office

Page 10

undertaken for the Chief Justice, or the work of the Denver District Attorney's office. The focus on Special Counsel's hourly rates and circulation of misinformation about those rates is misplaced in this context.

### Control

The Department's July 11th letter asserts that the Department leadership did not attempt to "control" or limit the scope of the Discipline Commission's investigation of the Masias matters. It also asserts that the Supreme Court's OARC had no reason to "impede" the Discipline Commission's investigation.

The Attorney Regulation Counsel, Jessica Yates, was directly appointed by the Supreme Court and serves at its pleasure. At various times, Ms. Yates has been presented as the Court's designated "fiduciary" of attorney registration fees held on behalf of specifically listed beneficiary under C.R.C.P. 227, including the Discipline Commission as well as the OARC itself. No legal authority for this asserted authority has ever been provide in response to requests.

When Ms. Yates met with members of the Discipline Commission on September 27, 2021, she explicitly stated that the Commission's outside Special Counsel could not address certain issues unless the Discipline Commission obtained prior approval from the Colorado Supreme Court. Ms. Yates also stated, as the chief attorney-ethics-enforcement officer in Colorado, that the Special Counsel would be violating ethical rules if Counsel asserted positions that contradicted the positions of the Department. These are examples of efforts by Judicial leadership to exercise direct control over the investigation and the work of Special Counsel.

### Other

The July 11th letter includes several statements that create misimpressions beyond those listed here. Some have been addressed by prior materials or can be corrected by review of the governing rules. Correcting each and every misstatement does not appear to be productive or fully necessary at this time. Therefore, the Discipline Commission will not attempt to do so here.

### Conclusion

The Department's July 11th letter reflects a broader context of ongoing efforts by the leadership of the Judiciary, and specifically the Colorado Supreme Court, to endorse a specific narrative relating to the Masias contract related issues. The Department's leadership has promoted a version of disputed facts, endorsed the credibility of some witnesses and denigrated the credibility of other witnesses while also subverting the system of judicial discipline charged by the Colorado Constitution with the task of impartially and independently investigating these same facts and witnesses. The overt actions of the leadership of the Department to promote publicly a specific narrative and avoid an impartial judicial discipline investigation themselves illustrate the depth of the flaws in the functionality and credibility of Colorado's current system of judicial discipline that need to be remedied.

Page 11

The events of 2021-2022 illustrate the many conflicts of interest that are deeply ingrained at several levels of Colorado's current structure for judicial discipline.  Nevertheless, the basic overall structure remains sound and the avenues of improper influence can be restricted with a small number of relatively straightforward reforms, such as those the Discipline Commission has proposed.

Chief Justice Boatright represented to the General Assembly in early 2022 that the Court's primary goal was to get Judicial "out of the business" of judicial discipline.  This is the central challenge to be addressed.  The Discipline Commission has proposed that the Interim Committee recommend granting the Chief Justice's request and creating a new multi-perspective, citizen and bar involved entity to replace the Colorado Supreme Court as the ultimate decision-maker in judicial discipline cases.  The Discipline Commission has further recommended mechanisms to reinforce reliable information disclosure and stable, conflict-free funding of the judicial discipline process.

Sincerely,

Christopher S.P. Gregory
Executive Director

Appendices (2)

# Appendix 27(s)(iii)(13)(g)

# Press release from Colo. Jud. Dep't re: Colo. Comm'n. on Jud. Discipline August 7, 2022 Letter, August 8, 2022;

"The Commission's response to the Department's July 11 letter to the Interim Committee underscores the Department's longstanding concern that a public back and forth characterizing previous discussions benefits no one, and in fact damages the Department and the Commission. The Commission's response, which includes a timeline of events and discussions, omits many relevant statements, ignores important context, in some instances misstates discussions, misquotes language from the Department's written communications, modifies quotes to imply something other than what was stated (in some cases not indicating the quote has been modified), and falsely attributes ill-intent to many members of Department leadership.  The Commission's communication is disheartening. Obviously, we disagree with the Commission's characterization of events.

Additionally, the Commission again asserts that the Judicial Department is withholding documents and information from the Commission related to its investigations. That is not true.  The Judicial Department is cooperating with all document requests from the Commission. On July 12 – three weeks prior to the recent allegation from the Commission – attorneys for the Department notified the Commission's counsel that it had fully complied with the Commission's subpoena, including production of privileged and confidential information.  The Department recently received five broad new requests for documents that require the collection, labeling, and production of what will likely comprise nearly 30,000 documents.  Department attorneys and the Attorney General's Office are working as quickly as possible to provide these documents to the Commission in the manner agreed to with the Commission's Special Counsel.  Thus, it is entirely inaccurate for the Commission to state that the Department is "withholding" documents when in fact the Department is working feverishly to comply with these requests in a timely manner.

Despite the course of communications over the past few months, the Department has been and continues to be willing to engage with the Commission, identify issues, and propose solutions."

# Appendix 27(s)(iii)(13)(h)

# Colo. Coalition Against Sexual Assault, RECOMMENDATIONS FOR PREVENTING AND RESPONDING TO SEXUAL MISCONDUCT IN THE STATE JUDICIAL BRANCH, August 9, 2022;



August 9, 2022

Interim Committee on Judicial Discipline

Colorado General Assembly

RECOMMENDATIONS FOR PREVENTING AND RESPONDING TO

SEXUAL MISCONDUCT IN THE STATE JUDICIAL BRANCH

**BACKGROUND:**

The Colorado Coalition Against Sexual Assault (CCASA) works to prevent and end sexual violence in our state, including sexual harassment and assault. Sex-based harassment is pervasive, making up nearly half of all harassment complaints received by the Equal Employment Opportunity Commission (EEOC). Studies have found between a quarter to 85 percent of women experience sexual harassment in their lifetimes and up to 94% of people do not report it.[i] According to the EEOC, Black women are the most likely of all groups to have filed a sexual harassment charge, often reporting racial discrimination as well.

Workplace harassment, discrimination, and other offensive conduct based on one's identity is detrimental to an employee's performance, professional advancement, and/or physical and mental health. Research correlates experiencing workplace harassment with career interruptions, lower earnings, discouragement from professional advancement, and restricted access to learning or mentoring opportunities, thereby leading to unemployment, financial stress, wage loss, economic instability, and leaving their fields entirely.[ii] Additionally, victims of sexual harassment are more likely to report symptoms of depression, general stress and anxiety, post-traumatic stress disorder (PTSD), increased use of alcohol and drugs, disordered eating, self-blame, reduced self-esteem, emotional exhaustion, anger, fear, and lower satisfaction with life in general.[iii] Further, there are high costs for employers with turnover, decreased victim and workgroup productivity, reputational damage, and direct payouts or settlements.

Moreover, the Judicial Branch contains several of the risk factors identified by the EEOC Task Force Study on Workplace Harassment:

- Significant Power Disparities – High-status workers can feel emboldened to exploit low-status workers, who may be more economically vulnerable and less likely to understand internal complaint processes. Studies find that when these power disparities are gendered, more harassment may occur. Judges represent both a formal and informal power in the Judicial Branch. Extreme power imbalances without clear protections and accountability measures can disempower victims.
- Control over Careers – Fear of and actual adverse job repercussions leave employees to reasonably conclude that not reporting is the best course of action. Clerks and interns/externs

are dependent upon judges for recommendations that can open or close career doors depending on the judge's recommendation, creating a massive power imbalance and giving judges too much control over a clerk's career. Attorneys may fear hostility, negative bias, and/or unfair rulings.

- Decentralized Workplaces – Limited communication or supervision between organizational levels can allow harassment to go unchecked.

Senate Bill 22-201 created the Legislative Interim Committee on Judicial Discipline to study a range of issues, including a victim-centered approach to judicial misconduct complaints. CCASA offers the following recommendations to address risk factors for workplace harassment and changes to protect and support victims and complainants.

**RECOMMENDATIONS:**

**1. SAFE REPORTING**

According to investigative reports, Colorado Judicial Branch employees report strong distrust in the existing reporting structures in place. A safe reporting system offers multiple avenues for reporting with transparent processes, communication, and timely follow-up. Further, it must avoid conflicts of interest and generate trust in the system for complainants.

A. Maintain an accessible, clearly explained process for confidential formal and informal reporting options that are communicated at least annually to all employees throughout the organization.
B. Explicitly permit anonymous complaints that can be investigated and provide the option to be informed if other complaints are made against same person to allow for a change to formal reporting.
C. Permit complaints to be reported out of chain of command.
D. Permit complaints from former employees, interns, and volunteers.
E. Establish strong and enforceable protections from retaliation or continued abuse or harassment.
F. Establish an independently managed hotline/helpline (separate from Human Resources) to accept complaints and provide confidential information about the process for filing a complaint for all state employees.

**2. TIMELY INDEPENDENT INVESTIGATIONS**

The Court must improve the legitimacy of the process for handling complaints against employees and reports of fraud, waste, abuse, or other misconduct within the State Judicial Branch, including judicial officers, court employees, clerks, and interns. Conducting prompt, thorough, and independent investigations assures employees and others who make complaints that they are being taken seriously and will be resolved in a fair and impartial manner.

A. Assure complainants, witnesses, and others who participate in the investigation that they will be protected against retaliation. Establish policies and practices to determine whether retaliation

has occurred, and if so, what remedies are available for the victim and what disciplinary action may be applied to those who retaliated.

B. Ensure the independence of staff within the investigatory unit or utilize a third-party to conduct investigations. Provide the resources, access to information, and authority to effectively investigate complaints.

C. Establish clear rules for how, when, and by whom investigations will occur and communicate that information to employees, clerks, volunteers, and interns.

D. Conduct prompt investigations and inform complainants of process and timelines throughout the investigation.

E. Continue investigations even after a complainant or accused employee resigns or retires.

## 3.  SUPPORT FOR VICTIMS/COMPLAINANTS

When a victim of harassment or misconduct makes a report, they enter into a system shrouded in secrecy. There are no support mechanisms in place, no one working on their behalf, providing guidance or resource referral, and no way of accessing information on the status of their complaint. The current system makes it difficult and professionally risky to report harassment and misconduct, and then leaves complainants isolated, uninformed, and unsupported. Further, victims are deposed as witnesses, where legal advice or counsel may be appropriate, but are on their own to find and pay for it.

A. Create an Office of Employee Advocate modeled after that in the Federal Judicial Accountability Act[iv] to provide:

    i.  Confidential support and information about the process of reporting, investigations, supportive measures for complainants, and corrective measures for the accused;

    ii.  Referrals to medical and mental health care, community-based advocacy services, and other resources;

    iii.  Guidance in navigating options, such as formal and informal complaints, and law enforcement reporting and medical reporting for sexual assault;

    iv.  No-cost, privileged legal assistance, consultation, and representation in personal civil legal matters related to the initiation of or participation in proceedings either through staff attorneys or pro-bono program;

    v.  Regular status updates on cases and inform victim of results at critical stages.

B. Define and communicate supportive measures for victims and witnesses, even if a complainant does not pursue formal reporting, including:

    i.  Individualized services to protect complainant safety or deter further harassment or discrimination;

    ii.  Transfers, reassignments, or changes in work location, phone number, email address, supervision, or parking spot both during and after investigations;

    iii.  A one-way no-contact order to prohibit the harasser from directly communicating with the victim;

    iv.  Escort or security services when walking to parking lots, through buildings, or other spaces where the accused may be encountered;

> v. Temporary leave for employees, clerks, volunteers, or interns with a guarantee to return at the same level and pay.

C. Create a system to issue letters of recommendation or provide references for clerks, interns, volunteers, or employees who have made a complaint, especially if it was against a supervisor.

## 4. ENSURE ACCOUNTABILITY AND TRANSPARENCY

Inconsistent accountability measures communicate that harassment, discrimination, and other misconduct are tolerated. Accountability is not only an acknowledgement of harm and an accepting of responsibility, but also a change of behavior and repair of harm. Sanctions must be proportionate to the inappropriate conduct that had been substantiated and standardized to avoid implicit or explicit bias.

A. Establish a Corrective Action Matrix to ensure consistency in corrective action including for people in positions of power. Lay out and communicate throughout the organization the type of disciplinary actions that each type of misconduct would warrant and who decides the sanctions.

B. Develop a process for judicial recusal or reassignment of district in cases where an attorney or party to the case has reported the judge for misconduct.

C. Require the Colorado Commission on Judicial Discipline to establish a publicly accessible and searchable judicial misconduct database.

D. Track anonymized data on complaints (formal and informal), investigations, and remedies, including district locations, patterns, and themes and report publicly on an annual basis. Require an annual report to the Governor, Legislature, and the public from the Chief Justice on steps taken to address and prevent judicial misconduct and harassment and discrimination in the Courts.

## 5. PRIORITIZE PREVENTION

Regaining public and employee trust must come through a commitment to transparency, accountability, and prevention efforts. A history of silence must be addressed by shining a light on issues of harassment, discrimination and misconduct through policies, trainings, and assessments.

A. Establish or update workplace misconduct policies to be comprehensive and communicate a commitment to maintaining a workplace that encourages ethical conduct, mutual respect, professionalism, and collegiality throughout the organization.

> i. Apply policies and communicate them to all individuals working within the courts, including interns, clerks, and volunteers.
> ii. Explicitly state that confidentiality policies do not apply to misconduct or unethical behavior.
> iii. Include abusive and bullying behavior as prohibited conduct.

B. Require annual training for all Judicial Branch employees on workplace behavior and interventions. Successful anti-harassment training must be:

> i. Comprehensive and customized to the Judicial Branch, including hypothetical scenarios and workplace realities that employees may actually witness;

      ii.      Standardized to communicate consistent mission, values, policies, and procedures across the organization;

      iii.      Treating all participants as allies and bystanders, rather than perpetrators and victims, and encourages participants to stand up for each other and create a culture that is safe;

      iv.      Hybrid or self-guided interactive modules with check-in points to ensure engagement and retention.

C. Establish separate training specifically for judges to demonstrate positive workplace culture and create a safe space to ask questions and learn.

D. Conduct anonymous workplace culture assessments to help to identify potential areas of risk and underreporting and build employee trust in the commitment of the leadership to changing the culture.

      i.      Results should be shared with employees and included in reports to the legislature, Governor, and public.

      ii.      Include responses from current and former employees, including a mix of focus groups, interviews, and surveys.

      iii.      Utilize a third-party to administer to minimize distrust and fear of retaliation.

**CONCLUSION:**

Sexual violence and other misconduct thrive in systems with secrecy, power disparities, and a lack of oversight. The Judicial Branch, like many other workplaces and institutions, has reckoned with its inadequacies and now has an opportunity to create an environment and climate that enables respect, accountability, and credibility within the organization and to the broader public. We urge the Interim Committee and the Judicial Branch to implement these recommendations to create a more victim-centered process for responding to and preventing misconduct, including sexual harassment and discrimination.

---

[i] Select Task Force on the Study of Harassment in the Workplace, "Report of Co-Chairs Chai R. Feldblum and Victoria A. Lipnic" June 2016.

[ii] Institute for Women's Policy Research, "Sexual Harassment and Assault at Work: Understanding the Costs" October 2018.

[iii] Cortin, L.M. and Leskinen, E.A., "Workplace Harassment Based on Sex: A Risk Factor for Women's Mental Health Problems" 2013.

[iv] Judiciary Accountability Act of 2021, SEC. 7. OFFICE OF EMPLOYEE ADVOCACY.

# Appendix 27(s)(iii)(13)(i)

# Colo. Coalition Against Sexual Assault, Anonymous Letter from a Victim to the Legis. Interim Comm. on Jud. Discipline, August 10, 2022;

## Letter from a Victim for the Interim Committee Hearing:

I was sexually harassed by a judge while working as an intern during law school. I can tell you that it was an absolutely horrible experience.

I reported the harassment, which went to the Judicial Commission. They interviewed me a month later and told me it could be months before I heard anything back. They requested I speak to no one about the investigation and warned me that doing so could result in a misdemeanor charge. Lastly, they told me that they did not represent me, but the People of Colorado. I was on my own. With that, I was released back into society—expected to go to school, carry on with my life, and keep my mouth shut.

I began to have terrible anxiety. I was in the dark with no one to give me updates or explain anything, no one able or willing to guide me. I was scared to tell anyone what was happening and risk a misdemeanor. I started having nightmares about the judge. The anxiety began to manifest in hideous ways. I was so worried that the Judge was going to ruin my career and dirty my reputation. I got to the point where I thought he could show up at my school or work and physically hurt me to keep me quiet. I would walk to the parking garage every day and have trouble breathing and would break into sweats. I felt like I was thrown to the wolves.

I continued to spiral as I waited in silence, not knowing if my claim was being taken seriously or an investigation was moving forward. The anxiety paired with something I had never before experienced, a deep depression. I began to hate law. I felt that it was all corrupt, that judges could do as they please with no consequences.  and that as a woman, these things would continue to happen to me and no one would bat an eye. The judge that I had reported was still on the bench, and I had l heard nothing about what was happening. It became physically painful

to get out of bed and go to class. I started crying every night when I got home and. seriously contemplated dropping out of school. Everything felt so hopeless, and I no longer felt like myself my friends approached me and begged me to go to therapy. I knew that I was not okay, but I did not have the energy to figure out how to enroll in therapy, or more importantly, how to pay for it.

Then I hit the lowest point in my life. I was driving home from a class and I remember being so hopeless and tired that I wanted it all to end. I let my hands hover off of the wheel for a few seconds and thought about how easy it would be to let go.

I had never had thoughts of killing myself or wanting to die before this. I spoke to someone at my university and told them a little bit of what was going on. This individual put me in contact with CAPE, an organization that acts as a resource coordinator for students who have been sexually harassed or assaulted. I finally had someone to talk to where I felt safe and heard.  The CAPE officer organized everything to get me into therapy. It was quite literally a lifesaver.

However, the process with the Commission did not end there. Almost 6 months later, I got a call that they needed personal evidence from me. I was on Christmas break with my family, and I felt the anxiety hit again. Then more silence. Months later, they reached out and I was told that I needed to schedule a time to be deposed in the next couple of weeks right around the time of final exams. This involved my harasser sitting across a table from me as his attorney interrogated me. I was a witness and did not have rights as a victim. I was powerless to do anything, With finals looming, I had to scramble to get an attorney and find a way to pay for my own representation as a student living off of student loans.

When I reported, I was scared, but I was told it was the right thing to do. Now I feel failed by the system and I do not blame others for not reporting. The process has been re-traumatizing, to say the least. I have wanted to die, I have cried myself to sleep, I have been boiling with anger, I have been numb, scared, worried, and I have been all of the emotions that no victim should go through without support.

The reality is it is not that hard to do better and I have some suggestions.

First, there should be someone to explain the process in more detail at the beginning, maybe provide some written information, and help victims understand that they have the rights of a witness and that they should get their own representation.

Second, having someone as a point of contact. If a victim wants an update, or is confused about how the process works, someone they can feel safe and comfortable contacting to learn more.

Third, no one who reports should have to mentally suffer and have no resources to help. Having some sort of stipend for mental wellness in this process should be a given, and it should not be an added stress on the victim to figure out how to find a therapist, and how to pay for one.

Fourth, victims should have the right to an attorney at no cost. Whether this is paid for by the state, or at minimum attorneys volunteer pro bono, someone should coordinate this and cover expenses instead of throwing this responsibility and financial burden on a victim, who is typically a lower-level employee and does not have the same bucket of finances to dip into as a judge.

Next, possibly creating a hotline or a neutral person for victims to report to would be helpful. It can be terrifying to know that your harasser is 5 steps down the hall from the person you are supposed to report to.

Finally, little things need to be ensured too, such as making sure a victim is able to transfer or leave the job with the judge, change their phone number, etc.

If we care about this profession, if we want to foster young students into incredible lawyers, if we want courthouse employees or people standing before a judge to feel safe and not objectified, then we must do better. I am a first-generation law student; I have experienced a lot of hardship in my life. I have fought hard to be here. But this process almost made me give up and walk away from it all. I never want another person who is doing the right thing to have such a terrible experience. I don't want this profession to be seen as corrupt and a let-down. I ask you to help change it, to help victims who have already suffered feel like everything is going to be okay. We can and must do better.

# Appendix 27(s)(iii)(13)(j)

# Am. Bd. of Trial Advocates, OUR SUPREME COURT UNDER SIEGE, August 10, 2022;



**American Board**
**of Trial Advocates**
COLORADO CHAPTER

**OFFICERS 2022**

**PRESIDENT**
Richard Kaudy

**VICE PRESIDENT**
Tom Overton

**TREASURER**
Angela McGraw

**Secretary**
Jim Chalat

**PAST PRESIDENTS**
1977 Stu Blunt
1976 Pete Watson
1977 Paul Renner
1978 Ray Connell
1979 Lee Wills
1980 George Ashen
1981 Ralph Harden
1982 Mike Hilgers
1983 Will Browne
1984 Bob Montgomery
1985 Harry Balaban
1986 Bill DeMoulin
1987 Rick Everstine
1988 Mike Williams
1991 David Little
1992 Dan Sparr
1993 Jim Lyons
1994 Mike Ludwig
1995 Carol Welch
1996 Gil Dickinson
1997 Fern Black
1998 Ron Pred
1999 Greg Kanan
2000 John Rodman
2001 Frank Patterson
2002 Mike Jones
2003 Bill Gray
2004 Tina Habas
2005 Dennis Brown
2006 Gary Blum
2007 Liz Starrs
2008 Steve Wahlberg
2009 Al Avery
2010 Gary Jackson
2011 Brian McConaty
2012 Cliff Beem
2013 Michelle Prud'Homme
2014 Rich Caschette
2015 Jeff Villanueva
2016 Sonny Flowers
2017 Bruce Montoya
2018 Jerry Pratt
2019 Pete Ramirez
2020 Jan Spies
2021 Brad Ross-Shannon

## Our Supreme Court Under Siege

No bribery. No payoffs. No cover-up. The headline should be "We were wrong. We're sorry."

It's time to set the record straight.

For a year and a half, the press has attacked the Colorado Supreme Court repeating mere allegations to try to find a scandal.

There were two allegations. One was that a leadership contract was granted to hush former employee Mindy Masias. The second was that there was a secret list of allegations of improper conduct by state court employees, including some judges.

The Court, transparent at every turn, publicly released the document that contained the allegations. It called for independent investigations with investigators to be picked by the legislative and executive branches. The Court promised to make the results of the investigations public, and it did so.

There were separate investigations into each allegation. The first investigation concluded that allegations of hush money were false. The second investigation concluded that virtually every one of the allegations on the "secret" list, which goes back 20 years, were "unsubstantiated," "unfounded," and "misleading." As the investigator's report noted: "many of the allegations leave out important context or misstate facts."

The independent investigators found nothing criminal or unethical. – but suggested ways that the Judicial Branch can manage its nearly 4000 employees so the judiciary can better address and resolve employee issues.

**The judicial process in Colorado is safe and fair.**

**American Board of Trial Advocates**

COLORADO CHAPTER

OFFICERS 2022

**PRESIDENT**
Richard Kaudy

**VICE PRESIDENT**
Tom Overton

**TREASURER**
Angela McGraw

**Secretary**
Jim Chalat

**PAST PRESIDENTS**
1977 Stu Blunt
1976 Pete Watson
1977 Paul Renner
1978 Ray Connell
1979 Lee Wills
1980 George Ashen
1981 Ralph Harden
1982 Mike Hilgers
1983 Will Browne
1984 Bob Montgomery
1985 Harry Balaban
1986 Bill DeMoulin
1987 Rick Everstine
1988 Mike Williams
1991 David Little
1992 Dan Sparr
1993 Jim Lyons
1994 Mike Ludwig
1995 Carol Welch
1996 Gil Dickinson
1997 Fern Black
1998 Ron Pred
1999 Greg Kanan
2000 John Rodman
2001 Frank Patterson
2002 Mike Jones
2003 Bill Gray
2004 Tina Habas
2005 Dennis Brown
2006 Gary Blum
2007 Liz Starrs
2008 Steve Wahlberg
2009 Al Avery
2010 Gary Jackson
2011 Brian McConaty
2012 Cliff Beem
2013 Michelle Prud'Homme
2014 Rich Caschette
2015 Jeff Villanueva
2016 Sonny Flowers
2017 Bruce Montoya
2018 Jerry Pratt
2019 Pete Ramirez
2020 Jan Spies
2021 Brad Ross-Shannon

Sincerely,

Richard M. Kaudy
Chapter President

Gilbert A. Dickinson,
Chapter National Delegate

Thomas J. Overton,
Chapter Vice President

The American Board of Trial Advocates consists of lawyers that practice in the civil trial courts. We represent the entire spectrum of clients in non-criminal matters, both plaintiffs and defendants. Our dual mission is to preserve civil jury trials and preserve the independent judiciary.

# Appendix 27(s)(iii)(13)(k)

# Christopher Ryan, Written Testimony, August 10, 2022;

Mr. Chair, Madame Co-Chair, and Members of the Committee:

As I begin, I offer the following quote from John Wooden that has been particularly meaningful for me as of late, "Be more concerned with your character than your reputation. Character is what you really are.  Reputation is what people say you are. Reputation is often based on character – but not always."

I want to thank you for the opportunity to share my perspectives and recommendations concerning the Judicial Discipline process in Colorado.  While I would like to respond to the personal denigration inflicted by the Judicial branch in detail, I realize this Committee has a monumental task at hand. This coupled with a tight timeframe for developing policy recommendations for legislative action, does not lend itself to the vetting of the totality of circumstances.  So, my commentary will be brief.   Hopefully, in the roles you perform you will have an opportunity, at some point, to personally review all the underlying information, not just the portions that the Judicial Branch deems fit to publish and will be in a position to make determinations for yourselves.

Over the course of my almost thirty-year career, I exclusively worked for judges in one manner or another and always performed my duties understanding the role and responsibilities with which I was tasked.  Given that most of the written work I produced over the course of my career was issued under someone else's name, I clearly knew who was in charge. My duties from the time I was a Bailiff forward were always performed with the advice and consent of the judicial officers for whom I worked.

The Branch has taken the position that "No investigation has revealed that this basic structure of Colorado's current system [of judicial discipline] is deficient," Thus, the justification for making such a significant and novel change to the current system is conspicuously lacking." In light of that statement, I would ask you to look at the role the Branch played in the investigations that have reported findings thus far.   Remember, Judicial controlled the timing, execution, and terms of

the contracts with RCT and ILG, including the conditions concerning retention of materials after their publication.  Further, the Judicial Branch and its attorneys were granted multiple opportunities to review the State Auditor's report and executive summary and redact information they identified as privileged, attorney work product, or subject to other legal protections. In this respect, although not the primary actor, Judicial was in full control of these investigations.

Let me be clear, my devotion was always to the institution, not to any individual concerns including my own.  I was a true believer, and always a supporter of trusting in the process.  In retrospect, it seems that I became blind to motivations of individuals, and what I believed was an appropriate personal sacrifice to make on behalf of the Branch was ill advised.

Despite what has transpired, I hold nearly all the judicial officers and staff in Colorado's courts in the highest regard. Any spillover from the actions of the Chief Justice, the Supreme Court, and key senior staff members onto them makes me extremely sad.  Their already challenging jobs have been made more difficult, by the taint of the branch's responses thus far.  I do not believe there is now, or has ever been, wide-ranging systematic corruption or bias at work in state's trial courts.     With that in mind, I would like to address the areas, in my opinion, where the interim committee should focus its efforts.

It has been my experience that, in addressing policy matters that impact areas of particular interest to the branch, there has been a broad sweeping application of the concept of separation of powers and the use of the umbrella of judicial independence as cover for keeping outsiders "out of judicial business".  While I am not advocating for violating constitutional principles, given the actions of the Court to control access to information, to define the narrative, and to obfuscate in order to protect the actions of those who wear the robes, the time has come to look with particular scrutiny on the motivations behind those self-protectionist actions and the resulting difficulties they inflict.  It has been my experience that Judges, and Courts themselves, are insular beings, and as a former insider, I never really appreciated the degree to which that shaped their actions.  Now, having spent significant time

outside of the circle, I have a new sense of what it is like to draw their ire, and the degree to which they are focused on self-protection.

When it comes to Judicial Discipline, the Supreme Court and the Judicial Branch have controlled all the processes from start to finish, beginning in the 1960's until the changes in this last legislative session that gave rise to this committee. The first priority the committee should consider is, once again, taking up the topic of the Judicial department's lack of inclusion under CORA.  Access to information is essential to garnering any ability to evaluate the actions and behaviors in question and, as a result, should not be at the discretion of the branch. Representative Weismann, I know this was a particular interest of yours some years ago when legislation was passed which provided some limited inclusion of judicial records regarding sexual harassment under CORA, which was set to sunset in 2021.  The opportunity for meaningful review of issues that involve administrative actions, and access to information that can shed light on them, should not vary based on the institutional actor in question.

In making further adjustments to the Judicial Discipline process, the committee should next focus on minimizing the appearance of impropriety, through either institutionalization of a more formalized recusal process or the formation of a separate tribunal, entity, or panel who would oversee the process and act as the ultimate decision-making authority when matters involving the State's highest court are in question.

Finally, the Committee should consider making the proceedings more transparent.  While I can appreciate firsthand the concerns about having to deal with unfounded accusations and untruths about one's behavior being bantered about publicly, the process should nevertheless be structured in such a manner that provides the opportunity for public access to the proceedings, while balancing the interests of fairness and due process.  In Colorado's system, most meritorious complaints and the sanctions ultimately imposed remain cloistered.  This does nothing but generate additional questions and concerns about the ability to of the disciplinary process to achieve any real accountability for misdeeds.

Judicial independence is one thing, but complete autonomy is another.  Judicial independence does not extend to self-determination in review of its own internal actions.

In closing, take a moment to ask yourself what I have to gain from any of this. I am an unemployed 53-year-old, with zero prospects for the future given the results that come from a Google search of my name.  I no longer have the ability to serve the public and work in the field of public policy, which gave my career meaning. It is important for you to understand that I am doing this because I believe that this opportunity to address the deficiencies of the disciplinary process, improve the environment at judicial, and correct the extreme imbalance of power between the staff and the black robes, has the best chance for success.  I remain hopeful that some chance for meaningful review of these type of actions and a corresponding improvement in the conditions of those who have been affected by them, is able to result from my coming forward more than a year and 1/2 ago.

Thank you.

# Appendix 27(s)(iii)(13)(l)

# Inst. for the Advancement of the Am. Legal System, Recommendations for Judicial Discipline Systems, July 2018;

# RECOMMENDATIONS FOR
## JUDICIAL
## DISCIPLINE SYSTEMS



INSTITUTE *for the* ADVANCEMENT *of the*
AMERICAN LEGAL SYSTEM

UNIVERSITY *of*
DENVER



# RECOMMENDATIONS FOR JUDICIAL DISCIPLINE SYSTEMS

REBECCA LOVE KOURLIS

**Executive Director**
Institute for the Advancement of the
American Legal System

KEITH SWISHER*

**Professor of Legal Ethics and Director**
University of Arizona, James E. Rogers
College of Law

RUSSELL WHEELER*

**Visiting Fellow, Governance Studies**
The Brookings Institution

July 2018

PART OF IAALS' JUDICIAL
DISCIPLINE PROJECT

SPONSORED BY:

THE STURM FAMILY
FOUNDATION

For reprint permission please contact IAALS.
Copyright © 2018 IAALS, the Institute for the
Advancement of the American Legal System.
All rights reserved.



**IAALS—Institute for the Advancement of the American Legal System**

John Moye Hall, 2060 South Gaylord Way, Denver, CO 80208

Phone: 303-871-6600

http://iaals.du.edu

IAALS, the Institute for the Advancement of the American Legal System, is a national, independent research center at the University of Denver dedicated to facilitating continuous improvement and advancing excellence in the American legal system. We are a "think tank" that goes one step further—we are practical and solution-oriented. Our mission is to forge innovative and practical solutions to problems within the American legal system. By leveraging a unique blend of empirical and legal research, innovative solutions, broad-based collaboration, communications, and ongoing measurement in strategically selected, high-impact areas, IAALS is empowering others with the knowledge, models, and will to advance a more accessible, efficient, and accountable American legal system.

# TABLE OF CONTENTS

Preface . . . . . . . . . . . . . . . . . . . . . . . . 1 . . .

Introduction: Mission & Overview of Judicial Disciplinary Systems . 2

Protecting Impartial Judicial Decision-Making . . . . . . . . 4 . . .

Promoting Commission Independence, Impartiality, and Integrity . . 5 .

    Creating Commissions in Constitutions, Not Statutes
    or Court Orders . . . . . . . . . . . . . . . . . .5 . . .

    Appointment and Removal of Commissioners . . . . . . .5 . .

    Funding Sources and Methods . . . . . . . . . . . 6 . . .

    Structure that Separates Investigation from Adjudication . . . 6 . .

    Recusal . . . . . . . . . . . . . . . . . .7 . .

    Written and Thorough Procedural Rules and Codes of Conduct . 7

    Orientation and Continuing Education for
    Commissioners and Staff . . . . . . . . . . . . . 8 . . .

Sanctions . . . . . . . . . . . . . . . . . . . .9 . . .

    Private Dispositions . . . . . . . . . . . . . . 9 . . .

    Suspensions Without Pay . . . . . . . . . . . . .10 . . .

    Allocating Costs . . . . . . . . . . . . . . .10 . .

    Informal Measures and Remedial Steps . . . . . . . 10 . . .

    Judicial Performance Evaluations . . . . . . . . . .11 . .

Fairness and Efficiency in Commission Operations . . . . . . . 12 . . .

    Jurisdiction . . . . . . . . . . . . . . . .12 . . .

    Initiating Complaints . . . . . . . . . . . . . 12 . . .

    Ombudsmen . . . . . . . . . . . . . . . . .13 . . .

    Staff Screening . . . . . . . . . . . . . . 14 . . .

    Transparency and Confidentiality of Proceedings . . . . . .14 . . .

    Orders . . . . . . . . . . . . . . . . . .15 . . .

Advisory Opinions . . . . . . . . . . . . . . . . .16 . . .

Education and Dissemination . . . . . . . . . . . . . 17 . . .

    Describing and Explaining Commission Activities . . . . .17 . . .

    Summary Statistics . . . . . . . . . . . . . .17 . . .

    Educating Judges, Others about Commission Work . . . . . 18 . . .

Concluding Considerations . . . . . . . . . . . . . .18 . . .

Recommendations . . . . . . . . . . . . . . . . 19 . . .

Appendix A: Convening Participants . . . . . . . . . . 21 . . .

Appendix B: Convening Agenda . . . . . . . . . . . .22 . . .

# PREFACE

Until the 1960s, the formal methods for addressing allegations of state judges' misconduct, such as legislative impeachment or recall elections, were cumbersome and time-consuming. These shortcomings were highlighted when scandals rocked several state judiciaries,[1] revealing a need for more efficient disciplinary procedures. Starting in 1960, California and eventually all states established variously named bodies (this Report uses the generic term "commission") to investigate allegations of judicial misconduct or disability and—where appropriate—prosecute, adjudicate, and either recommend discipline to the state's highest court or impose it, subject to appellate review.[2]

Effective judicial discipline is an important part of a trusted and trustworthy court system. The public must know that judicial ethics and violations of the Code of Judicial Conduct are taken seriously. Absent that assurance, the system appears self-serving, protectionist, and even potentially corrupt. And it is not just the reality of the existence of effective systems that matters; it is also the appearance. A wholly effective system with no transparency and no public confidence will not suffice.

To explore the functioning of judicial conduct commissions, in March 2018, IAALS convened a 21-person group of commissioners, commission staff, judges, lawyers, and scholars (identified in Appendix A). They, along with IAALS Executive Director Rebecca Kourlis and a small number of IAALS staff, worked through the agenda in Appendix B. This Report draws on that Convening.

IAALS is grateful to Colorado's El Pomar Foundation and to the Sturm Family Foundation for the financial support that enabled this Convening to occur and to reach its full potential.

Although the Convening participants reached at least general consensus on several matters, IAALS, not the participants or their organizations, is solely responsible for this report and its recommendations. Opinions and recommendations are those of IAALS. This Report nevertheless draws from the wide-ranging comments during the Convening and on the extensive literature and organizational models offered by the American Bar Association and others. Observations attributed in the Report to Convening participants are paraphrases drawn from notes that two IAALS staffers compiled. The Report cites secondary sources lightly, but the white paper prepared for the Convening (available on IAALS' website[3]) is rich with references to the literature. The Report does not try to describe the many nuanced differences that distinguish commissions from one another, although it offers some generalizations based in part on a May 2018 IAALS staff review of commission websites. Cynthia Gray, who directs the National Center for State Courts Center for Judicial Ethics, has highlighted some principal variations in her work.[4] And the Center publishes quarterly its very helpful *Judicial Conduct Reporter*, with summaries of commission activities and decisions, among other publications.[5]

Finally, we recognize that many of the practices that we endorse in this Report are already in place in many or even most states. In short, the system is already doing a good job in many areas. We also recognize that commission structure, jurisdiction, and operations may be beyond a commission's authority to change, based as they are in constitutions, statutes, and court rules. In this Report, we seek to identify some better practices that commissions, state supreme courts, and legislatures can review and identify as doable and advisable—or not. We also seek to identify concrete ways to improve the trustworthiness of the judiciary. This Report is a companion document to IAALS' report on its 2017 Judicial Recusal Convening,[6] and both reports seek to identify concrete ways to improve public confidence in the judiciary.

---

1    *See, e.g.*, Note, *Court Scandal in Oklahoma Supreme Court*, 20 Okla. L. Rev. 417 (1967); Kenneth Manastar, Illinois Justice, *The Scandal of 1969 and the Rise of John Paul Stevens* (U .Chi .Press, 2001) .

2    National Center for State Courts, State Court Organization, §1 9, *Judicial Discipline: Investigating and Adjudicating Bodies*, *available at* http://www ncsc org/microsites/sco/home/List-Of-Tables aspx .

3    Keith Swisher, *Judicial Discipline in the States, IAALS Judicial Discipline Pre-Convening Whitepaper* (2018) .

4    *See, e.g.*, Cynthia Gray, *How Judicial Conduct Commissions Work*, 28 Just. Sys. J. 405, 405 (2007) .

5    National Center for State Courts, State Court Organization, *Judicial Conduct Reporter*, *available at* http://www ncsc org/Topics/ Judicial-Officers/Ethics/Center-for-Judicial-Ethics/Judicial-Conduct-Reporter.aspx; *see also* National Center for State Courts, State Court Organization, *Center for Judicial Ethics Publications*, *available at* http://www.ncsc.org/topics/judicial-officers/ ethics/center-for-judicial-ethics/cje-publications aspx .

6    *See* Russell Wheeler & Malia Reddick, *Judicial Recusal Procedures, A Report on the IAALS Convening* (June 2017) .

# INTRODUCTION: MISSION & OVERVIEW OF JUDICIAL DISCIPLINARY SYSTEMS

Today's disciplinary systems seek to protect the public and the integrity of judicial proceedings, deter future misconduct, and promote public confidence in the judicial system.[7] The Texas State Commission on Judicial Conduct accordingly says its mission is "to protect the public, promote public confidence in the integrity, independence, competence, and impartiality of the judiciary, and encourage judges to maintain high standards of conduct both on and off the bench." It does so "through its investigation of allegations of judicial misconduct or incapacity" and, pursuant to the Texas constitution, takes "appropriate disciplinary action, including issuing sanctions, censures, suspensions, or recommendations for removal from office."[8]

As an additional example, the California Supreme Court says its state disciplinary system's purpose is "not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system."[9] Although some other states articulate their systems' purpose with more particularity—e.g., "[r]eassuring the public that judicial misconduct is not tolerated or condoned" and "[f]ostering public confidence in the self-policing system"—their aims are generally consistent.[10]

The American Bar Association's 1994 Model Rules for Judicial Disciplinary Enforcement state in essence that the primary grounds on which to discipline a judge are: violating the state judicial conduct code or other applicable codes and violating a valid order of the state's highest court or the commission.[11] Not every such violation warrants discipline, however. Instead, the commission (and perhaps later the supreme court) must consider the violation in the context of the system's purposes, including the seriousness of the violation, the presence of a pattern of improper activity, and "the effect of the improper activity on others or on the judicial system."[12] (For a full breakdown of the investigative, prosecutorial, and adjudicatory process leading to dismissal or discipline, see Prof. Swisher's accompanying whitepaper.[13])

There is a general sense that these bodies are functioning well, although some pervasive, if not always well-grounded, concerns persist. For example, discipline commissions frequently face conflicting charges of unreasonably high dismissal rates and of a reticence about impeding judges' independence or privacy. In 2017, a court watchdog group in Pennsylvania critically detailed events leading to the conviction of a state supreme court justice for campaign irregularities, justices' involvement in a "porngate" scandal, and an unusual attempt to settle, outside the disciplinary process, serious misconduct charges against another justice. The incidents, said the report, "shed light on our judicial disciplinary culture."[14] In 2015, another watchdog group charged that "[i]t commonly takes years [for the Illinois Judicial Inquiry Board] to act against judges who violate the Illinois Code of Judicial Conduct, and the punishment seldom is more than a public reprimand."[15] In late 2017, the California Supreme Court refused to intervene in a case in which critics charged that state's commission with a conflict of interest as to an oft-reprimanded judge.[16] The same commission was the subject of heated pro and con debate after it declined to discipline a judge for what many decried was a too-lenient sentence for a student convicted of sexual assault[17]; voters later recalled the judge for his decision, making him "the first

---

7    *See, e.g.*, Cynthia Gray, *A Study of State Judicial Discipline Sanctions* 3 (2002); Cynthia Gray, *How Judicial Conduct Commissions Work*, 28 Just. Sys. J. 405, 405 (2007) .

8    Tex. St. Comm'n on Judicial Conduct, Mission Statement, *available at* http://www scjc texas gov/about/mission-statement/ .

9    *Adams v. Comm'n on Judicial Performance*, 897 P 2d 544 (Cal .1995) .

10   Cynthia Gray, *A Study of State Judicial Discipline Sanctions* 3 (2002) .

11   Model Rules for Judicial Disciplinary Enforcement R .6 (1994) .

12   Model Rules for Judicial Disciplinary Enforcement R .6 cmt .(1994) .

13   *See* Keith Swisher, *Judicial Discipline in the States, IAALS Judicial Discipline Pre-Convening Whitepaper* 11-17 (2018) .

14   Pennsylvanians for Modern Courts, *Report and Recommendations for Improving Pennsylvania's Judicial Discipline System*, April 2017, at 2, *available at* https://www pmconline org/uploads/1/0/8/8/108820081/2017_pmcreport_errata pdf .

15   Emily Hoerner & Zoe Rosenbaum, *In Illinois, punishment is slow and lenient for errant judges*, Injustice Watch, Dec .4, 2015, *available at* https://www injusticewatch org/projects/2015/illinois-court-commission-judge-punishment/ .

16   Bob Egelko, *State high court will let commission consider judge's discipline*, SFGate, Dec .20, 2017, *available at* https://www . sfgate com/bayarea/article/State-high-court-will-let-commission-consider-12445882 php .

17   Rebecca Hersher, *Calif. Judge Cleared of Misconduct After Sentence in Stanford Assault Case*, NPR, Dec .19, 2016, *available at* https://www npr org/sections/thetwo-way/2016/12/19/506183605/calif-judge-cleared-of-misconduct-after-sentence-in-stanford-sexual-assault-case .

judge recalled in California in more than 80 years."[18] And in 2016, John Grisham published a fanciful but not completely unrealistic novel about a fictitious Florida disciplinary body.[19]

In short, the trustworthiness of judicial disciplinary systems is a subject that matters and continues to generate controversy. Most recently, but not a subject of this Report, the federal judiciary has reacted to law clerk and court employees' charges of judges' sexual misconduct—and to legitimate concerns that the system's disciplinary system is inadequate in addressing such misconduct—by establishing a Working Group on Workplace Conduct.[20]

In reviewing state discipline commissions, it is clear that there often is no one-size-fits-all organizational arrangement and set of procedures for commissions. Small states with relatively few judges and misconduct complaints may go about their work differently than will commissions with many more judges, complaints, and actions in response to them. But all commissions face multiple objectives, some of them with inherent tensions, including:

- Describing the commission's work transparently and publicly without unduly invading judges' and complainants' privacy and expectations of confidentiality;

- Rejecting complaints that are end-run appeals of judicial decisions while being receptive to claims of biased behavior, chronic delay, and other on-bench misconduct;

- Making the public aware of the complaint process and avoiding barriers to filing complaints without encouraging frivolous or otherwise unmeritorious complaints;

- Promoting objectivity within the often single body that investigates, prosecutes, and adjudicates complaints without creating large and slow-moving bureaucracies;

- Processing complaints promptly but with the thoroughness they deserve;

- Maintaining commissions' structural and operational independence from the other branches of government and from, at times, state supreme court overreaching, without eliminating commission accountability;

- Memorializing commission procedures and conduct codes and holding commissioners and staff to them and providing commissioners continuing education about their work, without imposing unduly on the time of busy commissioners who volunteer to serve on the commission; and

- Using a range of informal ways to deal with errant behavior, including voluntary resignation, without letting judges who have committed serious misconduct avoid their just deserts by walking away from the bench.

This report offers basic recommendations and a range of options in six areas:

- Promoting impartial judicial decision-making

- Promoting commission impartiality

- Sanctions

- Fairness and efficiency in commission operations

- Advisory opinions

- Education and dissemination

A final section summarizes the key recommendations that commissions and creating and appointing authorities may wish to consider.

---

18    Maggie Astor, *California Voters Remove Judge Aaron Persky, Who Gave a Six-Month Sentence for Sexual Assault*, N.Y. TIMES, June 6, 2018, https://www nytimes com/2018/06/06/us/politics/judge-persky-brock-turner-recall html .

19    JOHN GRISHAM, THE WHISTLER (2016) .

20    Joan Biskupic, *Chief Justice Roberts Calls for Review of Procedures for Protecting Court Employees from Misconduct*, CNN, Dec .20, 2017, *available at* https://www cnn com/2017/12/20/politics/roberts-judicial-misconduct/index html; www uscourts . gov, *Judicial Conference Receives Status Report on Workplace Conduct Review*, March 13, 2018, *available at* http://www . uscourts gov/news/2018/03/13/judicial-conference-receives-status-report-workplace-conduct-review; Andrew Hamm, Report on judiciary procedures to address workplace misconduct, SCOTUSBLOG (Jun .8, 2018), http://www scotusblog com/2018/06/ report-on-judiciary-procedures-to-address-workplace-misconduct/ .

# PROTECTING IMPARTIAL JUDICIAL DECISION-MAKING

The discipline process is not—and cannot be—another means of appealing an outcome in a case. Judges need to be able to make judicial decisions without fear of administrative or substantive interference, and the appellate process is in place to correct legal errors. Nevertheless, allegations of judges' adjudicative legal errors clog the disciplinary systems and pressure commission members and staff to review high numbers of non-cognizable complaints.[21] It is a problematic area in part because, as one Convening participant said, judicial independence does not have a "good connotation with the public," especially, said another, in some minority communities in which "judicial independence" is code for "judges can do whatever they want—put people in jail for ten years for stealing bread—and be answerable to no one." Convening participants cited several examples of commissions' recruiting bar groups to try to explain commission decisions involving judges' proper but unpopular merits decisions. Commissions must not become another appellate body, but that is a difficult concept to communicate and implement.

Commissions risk discouraging meritorious complaints in their understandable efforts to deter complainants alleging pure legal errors—website postings or complaint instructions, for example, asserting that the commissions have "no power to review a judge's decision" (even if, as one participant said, most would-be complainants ignore such admonitions). If, for instance, the judge ordered a defendant to drink "toxic sludge," duct-taped shut a defendant's mouth, or unlawfully jailed defendants (all actual examples[22]), the defendant likely has a cognizable misconduct complainant, even though the complaint centers on the judge's decision or order. Similarly, while delay in one case may reflect a judge's prioritizing the matters on her docket (perhaps due to speedy trial mandates), evidence of a judge's chronic delay is often a meritorious basis for a complaint, as might be a pattern of decisions always finding for or against the claims of an identifiable category of litigants. Thus, commissions should review their online materials and their screening procedures to ensure that meritorious complaints are not being deterred or dismissed based on the misperception that judges' decisions and orders are categorically untouchable. To assist in separating the wheat from the chaff, commissions could consider placing word count or page limits on complaints and directing complainants to identify the alleged judicial misconduct with as much particularity as possible.

In addition, several Convening participants encouraged commissions to intervene informally but proactively when they see—or receive from lawyers or bar surveys—evidence of a judge's developing a pattern of problematic demeanor (such as visible exasperation with new lawyers), for example. Early and proactive intervention should be considered even when the problematic behavior does not yet warrant significant discipline.

---

21    *See, e.g.*, Keith Swisher, *The Judicial Ethics of Criminal Law Adjudication*, 41 Ariz. St. L.J. 755 (2009); Cynthia Gray, *The Line Between Legal Error and Judicial Misconduct: Balancing Judicial Independence and Accountability*, 32 Hofstra L. Rev. 1245 (2004) .

22    *See* In re Benoit, 487 A 2d 1158, 1165 (Me .1985) (suspending a judge after he jailed three defendants either without any legal authority or without following necessary procedural protections against unwarranted incarceration); Texas Practice Series, Handbook of Texas Lawyer and Judicial Ethics § 26 4 n 68 (2008) (citing discipline of Texas judge who sentenced one defendant to "jail with three days of bread and water" and another defendant "convicted of illegally dumping toxic torts to drink toxic sludge"); Brian Kumnick, *Judge Silences Defendant with Duct Tape*, Legal Grounds, Sept .2, 2009, *available at* https://blogs.findlaw.com/legalgrounds/2009/09/judge-silences-defendant-with-duct-tape.html.

# PROMOTING COMMISSION INDEPENDENCE, IMPARTIALITY, AND INTEGRITY

Judicial discipline commissions indisputably must strive to treat all complaints, complainants, and respondent judges impartially. Commission structure, membership, and procedures can influence that goal.

## CREATING COMMISSIONS IN CONSTITUTIONS, NOT STATUTES OR COURT ORDERS

Although most commissions are established in their state constitution, some still are not. We agree with the ABA model rules that constitutional creation is preferable—"essential" said one Convening participant—so as to lessen undue interference in commission activities.[23] Several Convening participants described requests by legislators to "go after" particular judges, with the implicit threats of legislative retribution toward the commission, and instances in which state supreme court justices or the court as a whole seemed to retaliate against a commission for attempting to discipline a top state judge.

## APPOINTMENT AND REMOVAL OF COMMISSIONERS

In 2018, commissions range in size from three (Oklahoma) to 28 (Ohio), and the median size is nine (not including alternate members).[24] In most commissions, no member category judge, lawyer, public member) maintains a majority.

Although the Convening reached no consensus, we agree with the ABA Model Rule recommendation for equal-tri-partite appointees—equal numbers of judges of various court types appointed by the courts, lawyers appointed by the state bar, and governor-appointed public members.[25] In particular, populating a commission with a majority or super-majority of judges (which still characterizes a handful of commissions) heightens the concern that judges are unlikely to deal impartially with complaints about fellow judges[26] and deprives commissions of an adequate representation of public members, who can provide the system with insight from the community and non-technical critiques and perspectives of judicial conduct and culture. For all commissioners, furthermore, institutional memory and independence come in part from staggered terms and rules permitting removal only by the appointing entity and only for cause, making it more difficult for an appointing authority to summarily remove all commissioners for whom that authority is responsible.

Finally, robust demographic, vocational, and geographic diversity will help assure the public that those who "judge the judges" fairly represent the community. The varied appointing authorities require coordination to ensure that all appointing authorities keep diversity in mind when considering prospective commissioners. One commission member spoke of reaching out to appointing authorities to describe the commission's need at any particular moment in terms of diverse membership.

---

23    MODEL RULES FOR JUDICIAL DISCIPLINARY ENFORCEMENT R .2 cmt .(1994) .
24    Based on review of commission websites accessed through the National Center's Center for Judicial Ethics, *available at* http://stage.ncsc.org/Topics/Judicial-Officers/Ethics/State-Links.aspx .
25    MODEL RULES FOR JUDICIAL DISCIPLINARY ENFORCEMENT R .2(C) (1994) (recommending a 12-member commission) .
26    *Cf.* BENJAMIN H. BARTON, THE LAWYER-JUDGE BIAS IN THE AMERICAN LEGAL SYSTEM (2011) .

## Funding Sources and Methods

We agree with the ABA model rule that the legislature, not the judiciary, should fund the commission, and that the commission should prepare its own budget requests, separate from the judicial branch budget request.[27] Further, the commission should administer the funds provided, free of supervision of the court system's administrative machinery. Just as the judicial branch should not be the budgetary ward of the executive branch, the judicial discipline commission should not be the budgetary ward of the judicial branch whose members' conduct it investigates. One participant noted the downside—in legislative debates over funds, the commission does not have "the clout [it] would have if the supreme court advocated on their behalf." On the other hand, nor does the commission have "the clout to combat an unhappy supreme court bent on reducing commission funding."

Budgetary independence, of course, will not by itself ensure legislative appropriations sufficient to operate and staff a vibrant commission. States may wish to explore supplementary sources, such as judge-paid or lawyer-paid fees (several states' lawyers pay a portion of their registration fees to cover judicial discipline system costs). Colorado, for example, now follows this model.[28]

## Structure that Separates Investigation from Adjudication

Most commissions are "one-tier": a single body performs the investigative, prosecutorial, and adjudicative functions. Judges argue that this arrangement violates due process given a commissioner's likely difficulty during the adjudicative stage of ignoring problematic evidence submitted during the investigative stage. Nevertheless, the twenty or so supreme courts that had considered the due process objection as of 2007 rejected it, primarily because appellate review in the supreme court is available to correct conflict-of-interest-related errors.[29]

A few commissions separate the investigative and adjudicative functions through a bifurcated structure—either two panels within the same commission, or two separate bodies (a "two-tier" structure), each tier with its own membership, offices, and staff. Bifurcated structures can promote objectivity and the appearance of objectivity, and not all complainants have the resources to pursue appeals to the state's court of last resort.

Several Convening participants argued that bifurcated structures are unnecessarily costly and may take longer to reach a resolution—causing delay that is "agonizing for judges who have their reputations up in the air"—and that internal structural checks can seemingly overcome one-tier threats to objectivity.

Two additional structural issues warrant mention. First, many commissions appoint a single hearing officer to serve as the initial fact-finder. This practice means that important issues, at least initially, are decided by a single, often-retired judge, rather than with the diverse input from lawyer, public, and sitting-judge members. Because this practice is inconsistent with the wise design of commission bodies, we recommend that states resort to it as little as possible.

Second, most commissions have an executive director and disciplinary counsel. States should establish clear rules barring executive directors from performing both investigative- and adjudicative-stage functions for the commissions.[30] In addition, the independence of disciplinary counsel can vary significantly from state to state, including counsel's reporting relationships as to the commission and its executive director. States should ensure that disciplinary counsel have sufficient independence to ensure full and fair investigations and, as appropriate, prosecutions.

---

27    Model Rules for Judicial Disciplinary Enforcement R .2(F) (1994) .
28    *See, e.g.*, Colo. Comm'n on Judicial Discipline, Annual Report 2015 .
29    *See* Cynthia Gray, *How Judicial Conduct Commissions Work*, 28 Just. Sys. J. 405, 414 (2007) .
30    Model Rules for Judicial Disciplinary Enforcement R .4 cmt .(1994) .

## Recusal

States should also adopt and enforce recusal provisions to protect impartiality and its appearance.[31] For example, recusal rules and procedures should address recurring issues, such as when a judge-commissioner sits on the same, collegial court as the respondent-judge or knows or believes some good or bad fact about the respondent-judge. One commission reported each year giving a list of all judges in the state to each commissioner with instructions to check off those from whose matters they should be recused; they receive no information about complaints about those judges. States should all employ conflict-checking procedures.

Commissioners typically should recuse themselves to the same extent as a judge presiding over a (non-disciplinary) case, but appearances of partiality and subconscious biases can arise even when recusal is not strictly required.[32] Recusal of commissioners and staff members should be rigorous, and recusal rules should be clearly articulated to commissioners and staff. A small number of states provide for alternate commissioners, thereby lessening the potential disruption to the commission's work when a member has to recuse from the investigation or hearing. In that instance, of course, it is important that the commission member who recuses has no contact with the alternate commissioner as to the case at issue.

## Written and Thorough Procedural Rules and Codes of Conduct

Convening participants agreed, given the spotlight that often shines on commissions, that they cannot be governed by an attitude of "it's just the way we do things." That is why all commissions have adopted written rules and most have posted them on their websites. Still, many Convening participants acknowledged many "practices" that to date have not been included in their commissions' procedural rules; while not every practice must necessarily be codified, most should be to promote fairness and transparency to all. Commissions should also have significant control over amending and maintaining their own rules. The Convening participants recounted troubling instances in which a state high court adversely reacted to the potential or actual discipline of its members and retaliated by restricting the commission's jurisdiction and impeding its work through amendments to the rules governing the commissions' procedures.

Commissioners and staff members should be governed by a written, detailed, mandatory, and enforceable code of conduct, similar to IAALS' *Model Code of Conduct for Judicial Nominating Commissioners*.[33] The code, whether integrated into a procedures handbook or standing alone, should cover work expectations (e.g., attendance), confidentiality (including social media), campaigns or endorsements, appropriate behavior in hearings, ex parte communications, among other topics. One participant, for example, recalled being unaware, until consulting a code, that members should not communicate with their respective appointing authorities. The code should regulate the use and admission of extraneous material (e.g., to define clearly how, if at all, investigations and prosecutions may take cognizance of anecdotal or general impressions of the respondent-judge, gained outside of an investigation). Finally, the code should also reinforce the independence of disciplinary counsel from undue staff or commissioner influence.

---

31    Model Rules for Judicial Disciplinary Enforcement R .3(1) (1994) .
32    *See* Russell Wheeler & Malia Reddick, *Judicial Recusal Procedures, A Report on the IAALS Convening* (June 2017), *available at* http://iaals.du.edu/sites/default/files/documents/publications/judicial_recusal_procedures.pdf.
33    *See* Rebecca Love Kourlis & Malia Reddick, *Model Code of Conduct for Judicial Nominating Commissioners* (2016), *available at* http://iaals.du.edu/sites/default/files/documents/publications/model_code_of_conduct_for_ judicial_nominating_commissioners pdf .

## ORIENTATION AND CONTINUING EDUCATION FOR COMMISSIONERS AND STAFF

Commission members, busy people as they are, nevertheless need orientation—preferably, a personal session with top commission staff—and continuing education about their roles, including education about recognizing and correcting for implicit bias,[34] and guidance in discerning and processing matters involving mental health or substance abuse. Commissioners and staff should know about available programs in which respondent judges might receive help for mental health or substance abuse issues; where such programs do not exist, the commission can play a role in requesting that the state judiciary provide them. New public members also need an introduction to the state's judicial process.

Convening participants referred to occasional problematic behavior—for example, "some new members rarely come to meetings" and "quorums have been difficult, embarrassingly so"—and how commissioners deal with such problems. An executive committee, for example, may meet with errant members, but if internal corrective action does not work, the committee may turn to the appointing authority to explain the grounds for removing the members for cause. Consistent with our recommendations above, several Convening participants emphasized the value of written expectations, procedures, and codes in efforts to correct behavior: "When something goes bad, and you don't have a code or policies, it really goes bad."



---

34    *Cf., e.g.*, Athena D . Mutua,*Disparity in Judicial Misconduct Cases: Color-Blind Diversity?*, 23 .1J. OF GENDER, SOCIAL POLICY, AND LAW 23 (2014), *available at* http://digitalcommons .wcl .american .edu/cgi/viewcontent .cgi?article=1652&context=jgspl .

# SANCTIONS

To varying degrees, states have available a variety of disciplinary sanctions: removal, retirement, suspension, censure, public or private reprimand or admonishment, lawyer discipline, and diversion/deferred discipline arrangements. A minority of states impose fines or costs. In addition, the applicable court or commission may generally impose interim suspension when the judge has been charged with a criminal offense or poses a serious a risk of substantial harm to the public.[35] States without a clearly and publicly articulated range of sanctions should adopt them, along with standards for their application. One Convening participant put it simply—"if there's no articulated standards, no one can walk away with any sense of fairness." Some states list very few standards for the imposition of one sanction over the other, and several other states rely on somewhat lean or incomplete factors previously announced by other state supreme courts.[36]

Each state should consider adopting a full array of sanctions and remedies seeking an optimal fit between conduct and remedy. For example, the availability and even preponderance of private remedies (over public ones) in a particular state may consciously or subconsciously drive commissions toward more private sanctions, even when a public sanction would be more appropriate. The few states that do not allow commissions to remove or suspend judges[37]—or at least recommend the same to the highest court—should reconsider that limitation. On the other end of the sanction spectrum, states without diversion arrangements or judicial assistance programs should consider them.

Participants said that those members of the public who follow the commission's work tend to regard admonishments, reprimands, or censures as mere "hand slaps," but judges see them differently, especially when the sanction is public. Some commissions or courts read aloud a censure order to the judge, in public, and many courts and commissions are now commendably distributing public disciplinary sanctions to the media in press releases or news items online.

## Private Dispositions

One participant warned "it will be hard for IAALS to come up with a recommendation" about private dispositions. Some questioned their utility—"why would you censure someone privately?" It is no deterrent to similar behavior by other judges, and it does not enhance public confidence in any way. Others distinguished between a private "admonishment"—okay—and a private reprimand—not okay. Others thought commissions should summarily publish such reprimands or retain and release them if a judge aspires to higher office. There was general agreement that commissions need the authority to send warnings—in various formulations ("heads-up" or "advisory" letters)—to give the judge the opportunity to change what appears to be an emerging pattern of problematic but not yet serious or prejudicial misbehavior. Other participants thought private reprimands were, or could be seen as, a way to sweep difficult matters under the rug, and, at the least, should be governed by well-articulated standards for their application so that they are used only when truly appropriate (as we recommend above).

Because the issue of "if and when" to use private dispositions is so thorny, we recommend that states review their treatment of private dispositions to ensure their appropriate and consistent treatment. They can be appropriate in certain circumstances (e.g., when a judge has committed a single, non-prejudicial error for which a private communication will likely remedy the issue), but there is a risk of abuse (e.g., when a judge has received one or more prior private dispositions or when the misconduct is egregious or prejudicial).

---

35    MODEL RULES FOR JUDICIAL DISCIPLINARY ENFORCEMENT R .6 and R .15 (1994); *see also* National Center for State Courts, *Available Sanctions in Judicial Disciplinary Proceedings* (2015), *available at* http://www.ncsc.org/~/media/files/pdf/topics/center%20for%20judicial%20ethics/sanctions_tables_2015 ashx .

36    *See In re Deming*, 736 P 2d 639 (Wa .1987) (adopting ten, non-exclusive factors to guide the imposition of judicial disciplinary sanctions); *In re Brown*, 626 N W 2d 403 (Mich .2001) (listing seven factors); *In re Brown*, 625 N W 2d 744, 745 (Mich .2000) .

37    Cynthia Gray, *A Study of State Judicial Discipline Sanctions* 7 (2002) .

## Suspensions Without Pay

Suspension without pay is a useful alternative, particularly in cases of serious misconduct in which there are significant mitigating factors such as the judge's lack of a disciplinary record, and we thus recommend that states ensure that commissions and supreme courts have suspension without pay as an available sanction in appropriate cases. The length of suspension is a debatable topic, however, partly because lengthy suspensions burden other judges. One participant said the commission's or supreme court's job should be to remove someone if warranted, not to suspend the judge for a long time and hope for a resignation. Although we do not here recommend a specific maximum or minimum length, we recommend that states review this issue and consider it in context of their other available sanctions.

## Allocating Costs

States and commissions should consider whether judges who consent to discipline or are found to have committed misconduct should be forced to pay some or all of the commissions' or courts' costs—at least if the judge was deceptive or obstructionist during the proceedings. Avoiding the embarrassment of a misconduct finding may be a strong deterrent to misconduct. An added deterrent is the financial pressure of having to pay some or all of the investigative or prosecutorial costs. On the other hand, assessing costs could strap respondent-judges with potentially inflated or otherwise inaccurate estimates of disciplinary costs and accomplish little except excessive punishment. Assessing costs might also discourage sanctioned judges—with arguably valid cases but limited financial resources—from pursuing an appeal after paying or facing the risk of paying for some or all of the disciplinary proceeding costs. These costs, of course, tend to rise the longer the proceeding is disputed—to fold is cheaper.

States and commissions should also consider whether to provide respondent-judges with appointed counsel or later reimburse them for the costs of retaining counsel. When a commission concludes that a misconduct complaint, fully investigated or adjudicated, was not meritorious, it would carry a lot of weight with the judiciary if the commission were to reimburse the costs of that defense. This recommendation probably should be considered in tandem with the recommendation above, as paying for non-misbehaving judges' counsel might appear more publicly palatable if misbehaving judges have to pay disciplinary costs.

## Informal Measures and Remedial Steps

Informal measures are often appropriate for cases involving a temporary disability that creates an inability to perform the duties of the judicial office. These are difficult, often wrenching situations, and commissions should have available the greatest spectrum of measures possible, from training, counseling, and diversion through suspension, retirement, and removal. Substance addiction cases are particularly perplexing, in which a less typical and more rehabilitative approach may be warranted. In permanent disability cases, moreover, commissions and courts need solutions, such as a retirement path, that do not necessarily utilize the typical disciplinary sanctions, such as censure or removal.

The Convening's discussion of sanctions highlighted differences over the use of informal sanctions, with general agreement that beyond the standard sanctions, commissions should be empowered to recommend or require corrective action, including "remedial measures, making apologies, and undergoing education, counseling, or mentoring."[38] The latter types of remedies—such as alcohol abuse counseling, stress management counseling, or anger management programs—often get closer to the root cause of the misconduct. Deferred discipline agreements, for example, are confidential agreements, entered prior to formal charges, allowing the judge to take some form of corrective action but imposing consequences if the judge does not comply.[39]

---

38    Cynthia Gray, *How Judicial Conduct Commissions Work*, 28 Just. Sys. J. 405, 416 (2007); *see also generally* Charles Gardner Geyh, *Informal Methods of Judicial Discipline*, 142 U. Pa. L. Rev. 243, 311 (1993) .
39    Model Rules for Judicial Disciplinary Enforcement R .6 cmt .(1994) .

10

## Judicial Performance Evaluations

Several Convening participants volunteered that their states have judicial performance evaluation programs in place, and said they thought a benefit was fewer complaints: "judges get evaluated, criticized, and have a chance to correct problems." In fact, the dual purposes of judicial performance evaluation are to provide information to voters in retention elections and to give the judge feedback that he or she would not otherwise get. Where egregious or uncorrected patterns of misconduct are uncovered through judicial performance evaluation, states should ensure that the commissions receive such information.

# FAIRNESS AND EFFICIENCY IN COMMISSION OPERATIONS

## Jurisdiction

Most commissions' jurisdictions extend at a minimum to all non-federal judges in the state. Commission jurisdiction should also reach misconduct of resigned or retired judges that occurred before the judge stopped hearing cases. Most convening participants agreed with that scope of jurisdiction, as does the ABA model rule (at least for complaints filed within a specified period after termination of service).[40] Removal from office obviously has much less practical consequence to a retired judge (who might no longer hear any cases after retirement or might do so only on a sporadic and pro bono basis), but commissions and courts should also have the authority to issue public reprimands, censures, or admonishments (depending on the state's range of available sanctions), order loss of benefits, impose monetary fines, disqualify judges from holding other public offices, or refer them to attorney disciplinary authorities. Alternatives to post-service commission action are parallel procedures for lawyer discipline, which may not be well-suited to deal with judicial misconduct, or commission authority, where appropriate, to refer alleged misconduct to prosecutorial authorities.

The deterrent effect of a potential misconduct finding is mitigated if a judge may resign to avoid the sanction, and some judges surely leave the bench for that reason. Recently, for example, a court employee alleged that a state judge committed sexual harassment, and according to the press, "[n]othing was made public, and the judge has announced that he plans to retire . . . apparently ending the state investigation. He probably will receive full retirement benefits."[41] Certainly, as many but not all states have provided, judges should be unable to remove themselves from commission sanctions simply by leaving the bench, at least in situations involving egregious misconduct.

Commissions vary in their authority to investigate allegations of misconduct by judges before they assumed office. Some states allow it, at least for allegations of serious misconduct that may bear on the judge's fitness to hold judicial office. Others disallow pre-judge investigations on the basis that the commission's charge is to deal with misconduct by judges, and that other authorities, such as bar discipline committees or criminal prosecutors, should explore such allegations. In any case, there should be some authority to act on such misconduct, either in the bar or the commission.

## Initiating Complaints

The commission should post prominently on its website, as almost all do, the judicial ethics rules enacted by the state supreme court in the state's code of judicial conduct and any additional statutory or constitutional provisions. Given the headwinds that may discourage filing complaints against powerful figures like judges, we also encourage commission openness in receiving complaints—such as providing complaint forms online and with filing and appellate instructions, in English, Spanish, and other languages depending on the state's population mix. We encourage jettisoning unnecessary prerequisites to submission (e.g., notarization); displaying notices in the clerk's office and courthouse generally advising litigants of the complaint mechanism's availability; and accepting electronic submissions. On this last recommendation, although e-tax and court filings are now commonplace, most commissions still accept complaints only through mail or hand-delivery; we encourage commissions to consider accepting electronic submission of complaints and correspondence about complaints. In addition, chatbots and other forms of artificial intelligence may be potentially efficient

---

40     Model Rules for Judicial Disciplinary Enforcement R .2 (1994) .

41     Editorial Board, *Justice Undercut After a Complaint of Sexual Harassment*, Wash .Post, April 17, 2018, available at https://www washingtonpost com/opinions/justice-undercut-after-a-complaint-of-sexual-harassment/2018/04/17/8ea94e20-41bf-11e8-8569-26fda6b404c7_story html?noredirect=on .The editorial was based on this news story: Lynn Bui, "Md . Judge was Reprimanded after a Sexual Harassment Complaint .His Discipline Remains Secret," Wash .Post, March 24, 2018, *available at* https://www washingtonpost com/local/public-safety/a-md-judge-was-reprimanded-after-a-sexual-harassment-complaint-his-discipline-remains-secret/2017/03/23/979d9d52-0a65-11e7-93dc-00f9bdd74ed1_story . html?utm_term= c383c400e124 .

ways to help potential complainants understand the process and weed out complaints solely about the merits of judicial decisions.

As recommended earlier, commissions imposing word or space limitations on the complaint forms might reduce the burden on staff and commissioners in wading through large numbers of long-winded complaints. One participant suggested requiring complainants to cite the canon or other ethical rule (from the corpus of rules posted on the commission website) that they claim the judge violated. But, the bottom line is that commissions are there to deal with complaints, and they need to focus on public access to the process.

Commissions, especially those facing large caseloads, are concerned that greater openness to receiving complaints and greater ease in submission procedures will encourage meritless complaints, which abound already. The concern can be acute as to online submissions. Some convening participants reported no increase in filings once their commissions accepted online complaints while others said "the number of cases opened increased tremendously as did hours processing them but the number of full investigations and discipline imposed did not." Participants generally opposed responding to complaints in cyberspace because of confidentiality concerns. On balance, we nevertheless recommend permitting electronic submission of complaints and as appropriate electronic communications concerning complaints, coupled of course with good cybersecurity practices. Eight commissions now accept complaints filed online and generally report favorably on the practice, noting that any increase in filings is outweighed by more legible and comprehensive information and lower processing costs. Said one commission: "'It's the way of the future and nice to deal with less paper.'"[42] But commissions should also permit complainants, such as prisoners without online access, to submit complaints in paper. Following these dual recommendations will modernize and increase access to the disciplinary system.

Commissions furthermore need not wait for complaints when there is evidence of misconduct. A news piece can form the basis of a complaint, and disciplinary counsel can serve as the complainant. Anonymous complaints should be processed as fully and as routinely as possible. Most commissions require the complainant to identify him or herself on the complaint and sign it. Some require complainant identification but agree not to reveal the identity to the subject judge. Although total anonymity precludes asking questions of, or providing feedback to, complainants, it protects vulnerable complainants, such as court employees, who fear career-threatening retribution were a judge to learn that an employee had alleged sexual or other misconduct. Convening participants brought forth numerous examples of court personnel and even some attorneys who have been unwilling to complain without anonymity or, at a minimum, an assurance of confidentiality in the early stages of the investigation.

## Ombudsmen

The Convening discussion broadened toward the end into how to accommodate lawyers and litigants and others who think the court system is in one way or the other giving them a raw deal but who are reluctant to file a complaint, even anonymously, or are distressed by problematic conduct that may not be within the commission's jurisdiction. One cited a judge's taking a vacation in the middle of a trial, which may not violate a code provision but still seems irresponsible. Participants warmed to the idea of an ombudsman, or perhaps a committee of senior, unlikely-to-be-intimidated members of the bar—who could receive complaints and take them to a chief judge, court administrator, or perhaps the discipline commission chair who could seek a non-punitive resolution of the problem.

---

42    Cynthia Gray, "On-Line Complaints," posted May 22, 2018, *available at* https://ncscjudicialethicsblog org/2018/05/22/on-line-complaints-2/ .

## Staff Screening

Encouraging filing through openness and treating all complaints with respect does not preclude screening procedures. Disciplinary counsel generally have great responsibility and discretion in screening complaints. However, commissions, as a whole or as a panel, should review staff-proposed dismissals. (Many do, although the timing and attention differs across states.) It is, said one participant, "important to be able to say that the membership made these decisions." Commission and staff must resist the understandable tendency to regard some categories of complaints—by prisoners, for example—as inherently suspect, or the tendency to assume that complaints alleging a form of legal error cannot, by that fact alone, be meritorious.

## Transparency and Confidentiality of Proceedings

While all commissions hold confidential their investigative activity, 34 states make the proceedings public once the commission brings formal charges. Twenty-six do so when charges are brought, four when the subject judge answers, and two when the hearing itself begins.[43] Commissions inform the complainant and the subject judge once they dismiss a complaint, but only a few states publicly disclose dismissed complaints.[44] Keeping confidential the initial stages of complaint processing can encourage people to file complaints and witnesses to cooperate by guarding against retaliation, protect judges and the judiciary as a whole from unfair publicity stemming from frivolous complaints, encourage judges to resign or retire rather than fight legitimate complaints in public proceedings, and, in the case of minor problems, allow corrective action without the glare of publicity.[45]

Publicizing complaints that commissions dismiss can give rise to unfair "adverse inferences"[46] if the judge's name becomes public, although it is speculative how wide or deep this "adverse inference" from a dismissal cuts. (A different question is whether, in the interests of transparency, to post routine dismissal orders without the judge's name. If it posts such outright dismissals, the commission should identify them as such, as does Arizona,[47] rather than oblige researchers to sift through haystacks of complaints to find the few meritorious needles.)

Convening participants were divided over whether a complaint should be kept confidential from the subject judge until the commission dismisses the complaint or needs to request a response or explanation. Participants generally saw little point in alerting a judge to all pending complaints, because most are dismissed after initial review. And a policy of initial complaint confidentiality may encourage complainants who would otherwise be reluctant to file. On the other hand, in one participant's words, "if judges knew how many complaints get dismissed, they would have more faith in the process." There is a transparency issue here, too, in that the public deserves to know that the commission is doing its work—and needs to understand the basis upon which complaints are dismissed. Otherwise, the appearance is that the system rarely disciplines judges despite the high number of complaints. Perhaps it would be wise to develop a particular kind of dismissal order titled so as to highlight that the issues raised were appellate in nature and not appropriately handled through the discipline process.

There are, however, exceptions to the rule of confidentiality in the investigative stage. First, commissions should be permitted to call possible misconduct to the attention of bar authorities, prosecutors and bodies considering a judge's appointment or reappointment to judicial or other public offices. Second, we do not think that the First Amendment permits states to prohibit complainants from disclosing that they have filed complaints or describing their content, to prohibit judges from responding at all in such situations, or at least to prohibit complainants to describe alleged misconduct without disclosing the filed complaint itself.[48] A Convening participant said that complainants who believe a judge committed serious misconduct should not be forced to decide between filing a complaint under rigid confidentiality rules or eschewing a complaint to

---

43    Center for Judicial Ethics, *When confidentiality ceases in judicial discipline proceedings*, *available at* http://www ncsc org/~/media/files/pdf/topics/center%20for%20judicial%20ethics/when-confidentiality-ceases.ashx.

44    Cynthia Gray, *How Judicial Conduct Commissions Work*, 28 Just. Sys. J. 405, 411 (2007) .

45    *Landmark Communications, Inc. v. Virginia*, 435 U S .829, 835-36 (1978) .

46    Model Rules for Judicial Disciplinary Enforcement R .11 cmt (1994).

47    *See* Ariz. Comm'n on Judicial Conduct, public decisions summary 2018, *available at* http://www azcourts gov/azcjc/Public-Decisions/2018 .

48    Cynthia Gray, *How Judicial Conduct Commissions Work*, 28 Just. Sys. J. 405, 410-411 (2007) .

be able to describe the alleged misconduct publicly. Besides, some said, prosecuting complainants who violate confidentiality rules is a "lost cause" given everything else on commissions' plates and the First Amendment.

Third, there should be a rule of reason allowing a commission to confirm that it is investigating a complaint when the news media alleges that a complaint has been submitted or describes a judge's reported conduct that reasonable people believe would merit investigation. For one example, the state constitution authorizes the Texas commission to issue "a public statement concerning any proceeding when sources other than the Commission cause notoriety concerning a judge or the Commission itself and it determines that the best interests of a judge or of the public will be served by issuing the statement." According to the commission website, it has issued nine such statements, starting in 2000, the most recent in 2013.[49]

## Orders

Putting aside dispositions by stipulation, commission and court orders explaining disciplinary decisions often contain less analysis than do standard judicial opinions. To the extent possible, commission orders and court decisions should summarize the allegations, explain why they do or do not describe cognizable misconduct, and explain how any sanction imposed is appropriate. Collectively, such orders can clarify broadly worded codes of conduct by making clear to judges and potential complainants what behavior constitutes misconduct. Orders can clarify what facts are necessary to establish misconduct, or why various sanctions are appropriate. In doing so, the detailed orders convey the message that the state takes seriously allegations of misconduct and disability, and when published, they contribute to the development of the state's common law of judicial misconduct.



49    *See* Tex. Comm'n on Judicial Conduct, Public Statements, *available at* http://www .scjc .texas .gov/public-information/public-statements .

# ADVISORY OPINIONS

As of 2011, 43 states,[50] through the disciplinary commission or more often some other entity,[51] provided advisory opinions to judges requesting guidance about whether some contemplated action would run afoul of the code of conduct or other rule. Separating the advice-giving entity from the discipline commission lessens the demands on commission staff, who are busy enough simply processing complaints. Creating a separate body, however, makes it all the more important that commission orders are clear and explanatory, so that the advisory opinions can speak with confidence about the state of the disciplinary law. States should make clear whether a judge's reliance on an advisory opinion approving some course of conduct may serve as a defense to misconduct allegations or mitigate discipline. Procedures for requesting and writing advisory opinions, the opinions themselves (or a link to a separate website if applicable—and with names, if any, redacted) and the effect of such opinions should be embodied in written rules and available online.

Many commissions offer informal advice by telephone or otherwise. That advice should be committed to some written record, should a judge later rely on it as a defense in a misconduct proceeding.



---

50    Jennifer M . Perkins, *Current Developments in Arizona Judicial Ethics*, 4 Phoenix L. Rev. 667, 667 & n .2 (2011) .
51    *See* Geyh et al., Judicial Conduct and Ethics § 1 .13, at 38 (5th ed 2013) .

# EDUCATION AND DISSEMINATION

## DESCRIBING AND EXPLAINING COMMISSION ACTIVITIES

Commissions vary in whether and how they make their discipline orders public. It appears that about half the states post online at least some final discipline-imposing orders issued by the commission or the supreme court, usually identifying the judge by name and sometimes briefly characterizing the nature of the disposition (e.g., "Informal Sanction (Public Reprimand)"). As noted earlier, only a few states appear to post routine dismissal orders.

Simply posting orders by date and number or even name of judge puts a time-consuming burden on scholars, news media, and watchdog groups that want to know and report what types of judges have been disciplined, for what action, and with what sanctions. (CNN recently faced this significant challenge in attempting to research and analyze how the federal judicial conduct system handles sexual misconduct claims.[52])

By contrast, the New York and Washington commissions post all determinations imposing some kind of discipline and provide filtering mechanisms to let users sort the orders by type of determination (e.g., admonition, censure, etc.), year, county, and judge type.[53] Of course, some states may not have the resources to provide this type of availability, and small states that produce a handful of determinations each year probably have no reason to do so. Nevertheless, posting information about orders and providing a search function are fairly easy and inexpensive tasks in light of today's technology.

States should also consider listing judges' aggregate disciplinary records, thus keeping up with state bar programs that allow clients or employers to look up a lawyer's disciplinary record, if any, on the state bar's or supreme court's website.

## SUMMARY STATISTICS

Transparency also requires commission websites to provide summary statistics on the operation of the disciplinary system—data should at least include the number of complaints filed by type of allegation, against what type of judge, with what disposition, the time from filing to commission disposition (and separately, the time from appeal to the supreme court or other appellate body and its disposition), as well as available or easily obtainable demographic information about complainants and subject judges. Most commissions provide some type of information—directly on the website or through a link to the commission's annual report—and when they do, the data are usually well categorized. Transparency is not the only reason to provide clear explanations of a commission's work. Because the percentage of complaints resulting in actual discipline strikes many observers as low—usually in the one to five percent range—commissions need to document and routinely explain that such numbers are mainly the result of high numbers of collateral attacks masquerading as misconduct complaints.

## EDUCATING JUDGES AND OTHERS ABOUT COMMISSION WORK

In addition, commissions and staff should—as many do—educate judges (or educate the court system's continuing education body) about common judicial ethical issues and educate the public about the disciplinary system to promote confidence that judges are not above the law.

In addition, most commissions indeed regularly offer outreach and trainings to judges and court staff so that common judicial ethics pitfalls are avoided; these outreach and training opportunities also foster a more

---

52  *See* Joan Biskupic, *CNN Investigation: Sexual misconduct by judges kept under wraps*, CNN, Jan .26, 2018, *available at* https://www cnn com/2018/01/25/politics/courts-judges-sexual-harassment/index html .

53  *See* N.Y. COMM'N ON JUDICIAL CONDUCT, COMMISSION DECISIONS, *available at* http://www cjc ny gov/Determinations/all_decisions . htm; *see also* WASH. COMM'N ON JUDICIAL CONDUCT, *available at* https://www cjc state wa us/index php?page=search_discipline .

proactive, rather than reactive, approach to judicial discipline. Convening participants referred to press releases about annual reports and high visibility cases, commission presence at annual bench-bar and other conferences, regular interactions with reporters and editorial boards as ways of keeping the media and the public informed about how commissions operate, what they do and how to understand their determinations.

# CONCLUDING CONSIDERATIONS

To repeat, there is no one-size-fits-all ideal organizational structure or set of procedures for all disciplinary commissions. Variations in size and resources mean that what might work in one state would be impractical or impossible in another. Similarly, the extent to which a commission is operating under constitutional, statutory, or court rule mandates also dictates what it can change and what it cannot.

Accordingly, this Report is not an all-inclusive, best-practices guide, and this final section is not a compilation of recommended practices. Rather, we submit here observations and suggestions that commissions and, as appropriate, legislative, executive, and judicial branches might consider in assessing commission structure and procedures. We realize that many of these suggestions reflect arrangements and practices already adopted in many if not most states.

# RECOMMENDATIONS

1. The commission should clearly explain the difference between conduct that is appropriate for an appeal and conduct that is appropriate for a discipline complaint, and commissions should carefully screen for the latter, even when the conduct complained about is a judicial decision.

2. The commission is more secure from easy manipulation if based in the state constitution.

3. The commission should pay attention to emerging patterns of problematic behavior reflected in complaints (even non-actionable complaints) and other sources and alert the respective judges to its awareness of those patterns. Administrators of judicial performance evaluations should share misconduct as appropriate with disciplinary authorities (and states that do not have judicial performance evaluation should consider adopting it).

4. The commission should have a diverse membership—demographically, vocationally, and geographically. Appointing authorities should be able to remove commissioners only for cause.

5. The commission should be able to assess its budgetary needs and present them unfiltered to the legislature, with appropriate autonomy to administer its funds. Commissions should consider seeking alternative or supplementary sources of funding, such as bar fees, fines, and orders recovering costs.

6. The commission should, through its structure or internal checks, separate the investigative and prosecutorial functions from the adjudicative functions. The commission executive director should not perform investigative and adjudicative functions in tandem, and disciplinary counsel should be given sufficient independence to assure full and fair investigations and as appropriate prosecutions.

7. The commission should have written rules of procedure and a code of conduct binding commissioners and staff. Commissioners' breach of the conduct rules, including such violations as failure to attend meetings, should be actionable by the appointing authorities. States should employ conflict-checking procedures that flag when commissioner recusal may be warranted.

8. The state's code of judicial conduct, other ethical rules and applicable sanctions should be clear and publicly available on commission websites. The commission and the court should consider adopting a wide array of potential sanctions and should develop standards for discerning what sanctions to impose.

9. The commission should eliminate unnecessary barriers to complaint filing, such as notarization, and provide for online filing.

10. The rules or instructions should be clear as to whether the commissions will accept anonymous complaints. Commission websites should advise complainants of the extent of their legitimate expectation of anonymity. And the commission should review any policies that restrict complainants or subject judges from discussing complaints publicly, consistent with the First Amendment.

11. States should consider establishing a forum—perhaps an ombudsman—to receive and try to resolve non-punitively judicial behavior that may be concerning or irresponsible but not necessarily unethical.

12. The commission should operate under rules that balance the need for confidentiality in the early stages of proceedings and for transparency about complaints with potential merit. Its procedures should shield judges from complaints unless there is a need for a response or the commission decides to bring charges. Its confidentiality rules must be consistent with the First Amendment.

13. Judges should be able to receive advice in various forms, either from the commission, its staff or a separate body, about whether contemplated actions are consistent with applicable conduct rules. Such advice should be duly recorded, and there should be clarity about what protection, if any, judges have from misconduct complaints if they conform conduct to advice provided. The body of advisory opinions should be readily available and searchable online.

14. Commission orders, aside from stipulated dispositions, should adequately describe the underlying complaint, explain why the commission did or did not give credence to the complaint, why the conduct alleged does or does not constitute misconduct, and describe and justify the appropriate sanction. The orders should contribute to a common law of judicial discipline, including defining the meaning of ambiguous or general conduct codes. Commission orders—at least in non-dismissed cases—should be available online, searchable, and with guides or filters to identify different types of orders. The commission should provide summary statistics on commission activity, and consider posting judges' aggregate disciplinary record, as state bars generally do as to lawyers.

15. The commission should operate under rules that limit the ability of judges to use resignation or retirement from the bench as a means of avoiding investigation for allegations of serious sexual and other misconduct, and sanctions for documented misconduct.



20

# APPENDIX A

## Convening Participants*

**James J. Alfini**, Professor of Law and Dean Emeritus, South Texas College of Law Houston

**Hon. Federico C. Alvarez**, Alvarez ADR, LLC; Denver District Court (Ret.)

**Joyce E. Bustos,** Public Member, New Mexico Judicial Standards Commission

**Reiko Callner**, Executive Director, Washington State Commission on Judicial Conduct

**William J. Campbell**, Executive Director, Colorado Commission on Judicial Discipline

**Zachariah DeMeola,** Manager, Institute for the Advancement of the American Legal System

**Hon. Margaret H. Downie**, Executive Director, Arizona Commission on Judicial Conduct; Arizona Court of Appeals (Ret.)

**Keith Fisher**, Principal Court Management Consultant, National Center for State Courts

**Thomas M. Fitzpatrick**, Partner, Talmadge Fitzpatrick Tribe

**Hon. Jeremy D. Fogel**, Director, Federal Judicial Center; U.S. District Court for the Northern District of California

**Cynthia Gray**, Director, Center for Judicial Ethics, National Center for State Courts

**Mark I. Harrison**, Member, Osborn Maledon

**Hon. Rebecca L. Kourlis**, Executive Director, Institute for the Advancement of the American Legal System; Colorado Supreme Court (Ret.)

**Hon. Martha Minot,** Judge, La Plata County Court, Colorado (Ret.)

**George A. Riemer,** Member, Arizona Supreme Court Attorney Regulation Advisory Committee; Attorney Discipline Hearing Panel

**Randall D. Roybal**, Executive Director & General Counsel, New Mexico Judicial Standards Commission

**Michael L. Schneider**, Executive Director and General Counsel, Florida Judicial Qualifications Commission

**Judie Stanton**, Public Member, Washington State Commission on Judicial Conduct

**Keith Swisher**, Prof. of Legal Ethics, University of Arizona James E. Rogers College of Law

**Nicole VanderDoes**, Chief Counsel, ABA Standing Committee on the American Judicial System

**Dorothy M. Webster,** Alternate Commissioner, Washington State Commission on Judicial Conduct

**Russell R. Wheeler,** Visiting Fellow, Governance Studies, The Brookings Institution

**Seana Willing**, Executive Director, Texas Ethics Commission

---

\*    Participants' affiliations are provided for informational purposes and do not denote the affiliated organization's support for this report .

# APPENDIX B

## Convening Agenda

*March 1-2, 2018 | The Penrose House | 10 Lake Circle | Colorado Springs, CO 80906*

### Thursday, March 1

| | |
|---|---|
| 10:00am – Noon | Welcome & Introductions<br>*Hon. Rebecca Love Kourlis*<br>Impartiality<br>*Keith Swisher* |
| | **- BREAK -** |
| 1:00 – 5:15pm | Independence<br>*James J. Alfini*<br>Integrity<br>*William J. Campbell* |
| | **- BREAK -** |
| | Fairness and Efficiency<br>*Cynthia Gray* |
| 5:15pm | Cocktails & Dinner |

### Friday, March 2

| | |
|---|---|
| 8:30 – 11:30am | Transparency and Promoting Public Confidence<br>*Russell R. Wheeler* |
| | **- BREAK -** |
| | Synthesis of Discussion<br>Identification of Discipline System Reform Proposals<br>*Hon. Rebecca Love Kourlis* |

### Topic Outlines:

Impartiality (*Swisher)*:
- Disciplinary System Structure
- Disciplinary Counsel

Independence *(Alfini)*:
- Treatment of Adjudicative Legal Errors
- Budget/Funding
- Standards of Review

[This grouping addresses both the independence of the judiciary and the independence of the commissions to review judicial conduct and, where appropriate, to hold judges accountable.]

Integrity *(Campbell)*:
- Code of Conduct or Best Practices for Commission Members and Staff
- Diversity of Commission Members

Fairness and Efficiency *(Gray)*:
- Efficient, Yet Thorough Ca se Screening
- Available Sanctions
- Handling Substance Abuse Cases
- Investigative and Disciplinary Defense  Costs
- Advisory Opinions

Transparency and Promoting Public Confidence *(Wheeler)*:
- Timing and Extent of Public Disclosure of Investigations and Dispositions
- Public and Judicial Education
- Reporting Disciplinary Sanctions

22



Institute for the Advancement of the American Legal System

University of Denver

John Moye Hall, 2060 South Gaylord Way

Denver, CO 80208

Phone: 303.871.6600    http://iaals.du.edu

# Appendix 27(s)(iii)(13)(m)

# Letter from Paul Hurcomb to Legis. Interim Comm. on Jud. Discipline, August 10, 2022;



# EL PASO COUNTY
## BAR ASSOCIATION
P.O. Box 0429
Colorado Springs, CO 80903

The Honorable Terri Carver
200 E. Colfax Rm 307
Denver, CO 80203
VIA E-mail terri@terricarver.org

### RE: Judicial Discipline Committee

Dear Representative Carver:

I am writing on behalf of the El Paso County Bar Association ("EPCBA"). The lawyers of the EPCBA work daily in the 4th Judicial District, the largest and busiest judicial district in Colorado. Because of our daily work in the courts, we understand and value the importance of maintaining an independent and exemplary judiciary. An essential component of both those values is an effective and credible system for examining and resolving allegations of ethical misconduct by judges.

We at the EPCBA have been following the work of your bipartisan committee on Judicial Discipline closely. We have met and discussed the issues revealed through your committee's work and the various recommendations available to us. We focused on the report of the CWBA and the joint statement of positions from the Judicial Department and the Judicial Discipline Commission. We appreciate your comments and request that the committee also consider opinions of local bar associations like the EPCBA on the changes to Colorado's system of judicial discipline.

First and foremost, we have concluded that **the status quo is no longer acceptable**. The testimony before your committee reveals that the system is not working and is not credible with the public or the legal community. We believe the primary goals for reform to the system are ensuring genuinely independent review of judicial misconduct allegations and transparency for the public to have confidence in our judiciary.

To these ends we support the recommendations set forth by the CWBA and the Judicial Discipline Commission that are before you.

- For the final decision-making body, we support the establishment of a citizen-involved body that has representatives of the bench, the bar, and citizenry to provide genuine independence and public accountability for resolving allegations of judicial misconduct. There should be meaningful diversity on the body, including gender, age, racial, cultural, disability and geographic diversity to ensure that the body is not Denver-centric. The judges on the body should not hold leadership positions in the judiciary to avoid conflict situations. We also believe that the majority of the

decision-making body should be judges to address separation of powers concerns and honor their unique insights on the role of the judge.

- In support of independence, the Colorado Supreme Court should no longer hold rulemaking authority over judicial discipline. If a new final decision-making body is created, it should hold rulemaking authority. If not, the Discipline Commission should hold rulemaking authority.

- On the issue of transparency, we need to protect the judiciary from being damaged by publicizing meritless claims of misconduct. We understand these are the large majority of complaints made. We also must end the secrecy that deprives the current system of investigating misconduct complaints of credibility with the public. In Colorado, formal proceedings cannot be filed until a claim is found to be supported by a preponderance of the evidence. Therefore, the interests of confidentiality and transparency are best balanced by ending confidentiality at the time formal proceedings are filed, when the allegation has been found to be supported by a preponderance of evidence. Formal proceedings should be as transparent as any other litigation such as a criminal, civil, or domestic relations case.

In addition, the EPCBA recommends the Judicial Disciplinary Commission be permitted and encouraged to communicate with the local Judicial Nominating Committees and Judicial Performance Committees.

We believe these are the most important reforms. While we believe the final decision-making body should be reformed, until that constitutional amendment can take effect, we agree with the CWBA's critical point that when a current or former member of the Colorado Supreme Court is the subject the misconduct allegation, the full Court should be disqualified and replaced by a random selection of conflict-free judges. This can be enacted by statute as an interim measure on disqualification.

We appreciate your committee's work. One of our board members, Dan Kay, will be available for any questions at the committee hearing on August 10th, 2022 at 1:50 p.m. We encourage you to seek his input.

Sincerely,

Paul W. Hurcomb
EPCBA President-Elect

cc: Board of Trustees, EPCBA

# Appendix 27(s)(iv)

## *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., August 17, 2022;

# Colorado Legislature Interim Committee on Judicial Discipline: August 17, 2022 Hearing

**Rep. Weissman**

Good morning, everyone. The Interim Committee on Judicial Discipline subject to Senate Bill 22-201 will come to order Ms. Jenson, if you would kindly call the roll.

**Juliann Jenson**

Representatives and Senators. Bacon.

**Rep. Bacon**

Present.

**Juliann Jenson**

Gardner.

**Sen. Gardner**

Present.

**Juliann Jenson**

Lynch.

**Rep. Lynch**

Here.

**Juliann Jenson**

Moreno.

**Sen. Moreno**

Here.

**Juliann Jenson**

Van Winkle.

**Sen. Van Winkle**

Here.

**Juliann Jenson**

Carver.

**Rep. Carver**

Here.

**Juliann Jenson**

Mr. Chair.

**Rep. Weissman**

Here.

**Rep. Weissman**

All right, everyone, thanks for being present. So, our agenda today is three items, we have opening remarks, which will be brief, we will invite public comments, and then we will proceed to consideration of bill draft requests. The only opening thing I was going to say was just information only for members of the public who might be here or listening online. So, every interim committee is approved for a specific number of hearings, this one was set for five. Per legislative rules at the penultimate meeting, which is this one because we've had three meetings prior to today, we need to agree on sufficient detail for drafting. So that that process may commence and we can timely meet the successive deadlines that are stacked up after today. So, that is the core of today's agenda. And that's what we'll come to following public comment. By very rough analogy. You know, this is equivalent to submitting a drafting request. We are not required to have all the details page and line fleshed out nor at this point really, can we, but we have to give the nonpartisan drafting office enough detail to be able to proceed, and then there'll be a pretty intensive process to bash out the details. We are subject to an interim deadline of September 9, at which the bill drafts that we agree to send for today have to be finalized, we could analogize that to bill paper, although it's not quite the same in this interim context. And then we will have additional time between September 9 and September 30 to consider and have drafted amendments that we could run. If we want to on those drafts at our final 9/30 hearing, the work of this committee is done after whatever votes we take on 9/30. And the bills go forward in the process. Just wanted to note that for everyone's understanding of today, and how it situates in the greater arc of things. And I'll invite Vice Chair Carver to make any opening comments if she'd like.

**Rep. Carver**

Thank you, Mr. Chair. And my only opening comments is really a sincere and truly heartfelt thank you to all the stakeholders, all those who have testified, your input and insights have been invaluable. I think you'll see so many of those concerns addressed in the draft proposals that are coming forward. And, so, thank you for your dedication and time to this process.

- 2 -

**Rep. Weissman**

Likewise, we've had a lot of thoughtful input from a lot of entities. And that has certainly helped us get to where we've gotten to today. Okay, we'll proceed to public comment. I'm inclined to hear first from folks who have made the effort to be physically present in the room so that you can leave after that if you'd like. I think both of you folks are here for public comment. Please come up. Join us at the table. Ms. Debuque and Ms. Pelham, I think we see that you've signed in here. We'll come to online witnesses after you. Go ahead and let us know your name, and if you're speaking in connection with any organizational affiliations, whose proxy you have, and please proceed. We aim to keep it to about three minutes each and then we'll see if the committee have any questions for either of you. Please go ahead.

**Kimberly Debuque**

Kimberly Debuque. I'm here just representing myself. And I would like to get my time over to Tamara to speak on behalf of both of us.

**Rep. Weissman**

Please go ahead.

**Tamara Pelham**

Hello, thank you very much for hearing my testimony. Mr. Chairman, committee members, I have emailed you a boatload of documentation, and I also emailed the staffers for this committee. But what I'd really like to communicate today is that I feel there is a disconnect, or maybe not a disconnect, maybe a I'm just gonna start it over. Is it unreasonable for anybody to expect that when you go into a trial, that you have been compelled to attend in a civil matter, that the judge would have read the entire court docket, that they would be educated about the body of law that they are being asked to interpret and apply to a civil matter? In our case, a contract law matter, an HOA contract law matter. I would contend that it is not only a reasonable expectation, but that it is required by the judicial code that a judge that is sitting and adjudicating a case hearing and deciding a matter would actually know the court docket as well as the body of law that they are adjudicating under. That didn't happen for us. We were assigned our case, our court date got assigned to a senior judge four days before our hearing. Four days, on a Friday, the 18th Judicial Court was notified that a senior judge would be available to hear not just our case, on October 6 of last year, but four days' worth of cases. And that was a Friday, it's not beyond reason to expect that a senior judge who's been retired for 15 years, probably didn't spend 15 minutes over that weekend preparing not just for our case, which had 100 pages of narrative, original text in the filings, 44 references to different case law citations, as well as up to 300 pages of exhibits. But our case and every other case that was heard by this senior judge over four days. Ours is an example of what's happening with this senior judge program. Unfortunately, the senior judge did not see it our way. But he went into the trial and said, I've read the trial briefs. And he agreed with the defense's trial brief. Okay, that's fine, except that he had read nothing else. And it's all throughout. There's examples scattered throughout the court transcript. We left, we paid, we're done. That was another $60,000 adventure to go to court. Our judge that had been assigned to our case, our sitting judge had already read everything in

- 3 -

our docket, had already ruled in July of 2021 on both the defense as well as the plaintiffs' motions for summary judgment. Saying nope, we can't decide this in summary judgment, we have to go to trial to hear extrinsic evidence to consider just extrinsic evidence outside and beyond 100 pages of arguments. And yet, he didn't get to hear and adjudicate our case. Now, if you look at the canons and the rules, it is in strict violation of rule 2.6 and 2.11, which states that a judge shall hear and decide a case to which he is assigned. And the only reason that they don't hear and decide it is if they're disqualified under Rule 2.11, which is not, does not list reasons that are just timely, or are their absence. It's they have a conflict of interest. Our case was terribly mismanaged. And we approached the Commission on Judicial Discipline. We submitted an RFE on May 31 of this year. And within about an hour by July 28, we got a response back from the Commission that were just sore because we lost. That's effectively what they said we can't act on anything that you put in a 21 page letter to the Supreme Court listing at least a dozen instances in our court transcripts, where the judge clearly indicates says that he didn't read the court docket didn't know that CIOA was an acronym for the Colorado Common Interest Ownership Act, asked the defense attorney during our court case, how certain statutes that we hired him to actually interpret how they comported. That's what the judge asked a defense attorney, which to me is in violation of rule 2.6 soliciting bias from attorneys. You can't do that and have a fair trial. We are we were denied a fair trial. And then we were denied a fair review of our RFE, the way I see it, the fact that Christopher Gregory was the one that preliminarily reviewed our RFE, and then said, oh, well, sorry, you fail on the merits, you're just upset that you didn't win is in violation of the intent of the actual Constitution. There's nothing in the Constitution that says that your executive secretary gets to make a decision on an RFE that you supply to a commission of at least 10 people, and I thought it was 11. But I think it's 10. Regardless, that's not fair. It that's not to be his decision. It should be a subset of committee members at a minimum, commission members at a minimum, and then we should know what they did or didn't do. We don't even get the benefit of knowing whether they asked the senior judge, did you read the dang docket, before you went in there, not just our docket, but all of the dockets. And the reason I believe the reason that they can't take action on our RFE is because if they did take action on RFE, if they did find that that senior judge was in violation of the judicial code, lots of them, I have a half a dozen of them listed and substantiated in my documentation with the evidence, then it would imply and it would implicate the senior judge program at large, that has been on an operation under the Supreme Court Directive 95-03 since 1995. There are probably 1000s of litigants that have been denied a fair trial, because senior judges are allowed to just sit in at the will or the discretion of the district that puts them in.

**Rep. Weissman**

Alright, Ms. Pelham. Thank you. I was gonna, we haven't been keeping strict time. I was going to ask you to conclude. It seems like maybe that's the point you wanted to land on.

**Tamara Pelham**

I'm sorry, I can't hear ya.

- 4 -

**Rep. Weissman**

Sorry, the siren is loud. I was going to ask you to conclude and it sounds like you maybe you got to the end of the points that you wanted to make. We do all have your written testimony. I do have an email from you as well, I'm sure that other committee members do. I think you just laid a lot on the table. I mean, I can really only hit a few points right now. I appreciate that CIOA is a source of frustration for homeowners, sometimes that is outside the scope of this committee, but it is something that comes to the attention of the full General Assembly, I would say on an annual basis. And there are often bills to go into some aspect of CIOA, so the frustrations that that law can generate for homeowners aren't lost on us. I would also say as to the role of initial review of complaints. You know, the Commission, like a lot of constitutional bodies has some degree of latitude in setting up its internal procedures by rule. We are going to talk more about how those rules are formulated, today and beyond, you know, to the question of sort of the judicial capacity and senior judges, I mean, again, that's beyond the scope of this committee, but it is something the full General Assembly grapples with here and there. A couple years ago in recognition of increasing population in our state increasing need for Judge hours, basically, to hear matters. This General Assembly, changed the statutes and allowed there to be more judges hired in a variety of fast growing districts. You know, my recollection is the 18th was one of them. I live in the 18th myself. We're growing quickly. You know, that is something that can continue to come to the attention of the full, General Assembly. We are not able to get into the guts of your individual matter today at the court level or the commission level, nor anyone else's. I don't mean to say it's specific about your matter with CIOA. But I do think that a lot of the points you've made about how cases are heard, and you know, the subject matter out of which this arose, are things potentially within the orbit of the entire General Assembly that will reconvene next January for all 100 legislators to grapple with.

**Tamara Pelham**

How can the Commission on Judicial Discipline, ignore the fact that the Senior Judge Program inherently violates judicial code. And it puts every judge that is either sitting and usurped by a senior judge or the senior judge himself in a position that he must violate judicial code. This is not that deep. It's not that hard to read these words and recognize that the Senior Judge Program, if you can insert a senior judge, for a sitting judge into a case that has been ongoing for a year, and they do not fully come up to speed on absolutely every nuance that has already been adjudicated. That is a violation of code. And it fails me to understand how Christopher Gregory or anyone else on that Commission says, no, that's not the case. You're just upset about the determination.

**Rep. Weissman**

Ms. Pelham. Thank you, I need to let Vice Chair Carver, ask a question or make a comment, Madam Vice Chair.

**Rep. Carver**

First of all, thank you for being here today. And also reducing that to writing, very important. The Constitution clearly says that the scope of the Commission, when there's allegations against a judge,

include violation of the Canons of judicial conduct. So, while I, I'm not in a position as a member of this committee, nor are my committee members, in a position to speak directly of whether the Commission properly assessed your complaint. Let me just tell you, that in other public comments, we have heard about judges doing delay after delay after delay. And to the point that it raises an issue on whether the Canons have been followed. There are issues that have come up on failure to recuse when there is a perceived conflict of interest. And this, I think, is another aspect. And I thank you sincerely, for bringing this to light. Because this is what you are describing is certainly not in alignment with how we expect the public expectations or the rules as written for cases to be managed. So, let me just say that, you know, your testimony, we have a wide range of stakeholders that are either here present or listening in. And as they heard the other public comments they have heard yours. And, so, it is a matter of record it as part of our administrative record, that it is a serious matter. And I think we can't, it's already covered in a general rule of the canons. So, with that, I just want to thank you for coming forward. And I know that individuals in the audience have been taking notes, I would think that hope and expect that there might be some appropriate follow up to look at this. We expect litigants going into a court that the judge is in fact prepared, even if they're substituting. And, so, enough said. Thank you.

**Tamara Pelham**
May I add one.

**Rep. Weissman**
I'm sorry Ms. Pelham, I need to allow discussion from members of the committee. Senator Gardner.

**Sen. Gardner**
Thank you, Mr. Chair, Ms. Pelham is it?

**Tamara Pelham**
It is.

**Sen. Gardner**
Thank you and I I've been reading your written testimony while you were speaking. Your oral testimony has pretty much followed that. And I have not reviewed all of your written submission nor taken a look at the case and the pleadings and so forth. And so there may well be things about the case that raised questions and caused one some concern. I don't know. I'll have to look at it. I am troubled by your, and I'm going to be very candid with you. Your blanket condemnation of the Senior Judge Program. I think I alone sitting here am the one person who, for their livelihood appears in the courts of Colorado as well as the federal courts from time to time. And I have to tell you, my experience with the Senior Judge Program has been overall quite good. I've also had the occasion to arrive at the courthouse on a Monday morning and be called into a judge's chambers and told that my case, which is scheduled has been assigned to a judge down the hall so that we don't have to reschedule, because another case has carried over in the docket. And this happens, my experience with that, and I will let you in on a lawyer secret.

- 6 -

Sometimes when called into the chambers to say well, I can't hear your case this week, because my case that I'm hearing is carried over, but Judge so and so had it, I've actually sort of walked out and gone, that's great. Or I have walked out and said you know, I'm not so sure. Because judges and that might be just because of the kind of case I have, and, and so forth. But I think a blanket condemnation of the of the Senior Judge Program that somehow the they've they're not able or would not prepare themselves or review the pleadings or be able to decide a case has not been my own experience of 35 plus years in Colorado courts. Nevertheless, I you know, I've walked out of the courtroom, sometimes thinking I don't know how that Judge reached that conclusion. And sometimes I've walked out of the courtroom and thought, I'm really glad that the judge understood the case, the way I understood the case. And my colleague across on or I want to say on the on the other side of the courtroom has walked out and said I just don't know how he or she arrived at that conclusion. So again, I want to look at your material here. And I appreciate that. But the sort of blanket and sweeping condemnation of senior judges again, I know of very fine district and appellate court judges who have continued to serve as senior judges. And I thought, I'm really glad that's the case because that judge is a really fine judge. And I think that's the goal of the Senior Judge Program, to fill a need. We certainly in this last legislative session, made some extensions to the Senior Judges Program because of the extreme backlog we have as a result of COVID. And that was not without some controversy. But again, my confidence in the senior judges that we have is such that I thought this was a good issue. There is a body of thought, not very large, that somehow that Senior Judges Program is unconstitutional. I think anyone who sits in front of a case before a senior judge who wishes to raise that, and it may have been raised to the Colorado Supreme Court, I think unsuccessfully and ultimately, one can hold the view that something is unconstitutional, even though the state Supreme Court has decided it is and all that becomes is a matter of disagreement. I often disagree with decisions of the Court but they are the law and we accept them as such. So, thank you, you may wish to respond. And that's up to the chair.

**Rep. Weissman**
Ms. Pelham. I want to hear from our other witnesses on before we get into more back and forth, Ms. Debuque, I want to make sure you're here in a supportive role. Do you want to make any comments? You're free to.

**Kimberly Debuque**
Thank you Chair. Senator Gardner, no disrespect. I don't think that we were trying to file a complaint or state that we were against the Senior Judge Program as a whole. Our experience with our case, and that's all that we can speak on, is it was not, there were violations based off of the codes that we presented to the judiciary committee for review. And in that turn, we did not feel that we were even, that our complaint was not read. The case was not reviewed. And that's where it comes from. I'm sure there are senior judges out there who are phenomenal. Right. And just like any other regular judge, we can agree or disagree whether we think their verdict was good or bad. We understand that our verdict was against us. We have no issue with that. It was the manner in which our case was handled is what we have the issue with. Thank you.

- 7 -

**Sen. Gardner**

If I may Mr. Chair.


**Rep. Weissman**

Sure, Senator, go ahead.


**Sen. Gardner**

Thank you, Mr. Chair. I appreciate that. And appreciate the response. I think my understanding of the written document and the testimony I heard, and your correction of how I should have taken it with regard to the Senior Judges Program simply points out the difficulties of advocacy before the courts and what any fact finder, or decision maker in an appellate context might understand the case to be. And so, I appreciate your clarification that it wasn't a condemnation of the Senior Judges Program, because I certainly, however, incorrectly took that as part of the implication. Thank you, ma'am.


**Rep. Weissman**

And Ms. Debuque, the only thing I would add to your and Ms. Pelham's comments, something that this committee has heard before, as recently as last week that you'll hear us grapple with today. And going forward. What we have is a process dating basically to the 1960s. That's kind of when the Commission as it now stands was first constituted and the broad strokes of its functioning were set up. And that basically involves two adversarial parties, the complainant and the judge. There wasn't really a consideration at that point of what we now talk about pretty regularly. And, for example, a criminal context, excuse the analogy, which is essentially victim rights and victim notifications, to use the parlance from that other domain of lawmaking. Where we set forth in text, including constitutional text, maybe in statute, the idea that people who found yourselves in your position, you know, have affirmative rights to be kept apprised not to say that we're going to put our thumb on the scale of the outcome, that would be inappropriate, but you want to know what's going on. And we are aware that maybe the process as we inherit it today could do a better job as far as letting people know what's going on. We're aware that the Commission may need more FTE more resources in order to make good on that for the people who bring complaints to the Commission. That is part of what we've been actively grappling with how to do that. So, that one may not like the outcome, but at least there's better understanding about what's going on along the way. That is something you'll hear us grapple with. I do want to get to our witnesses online. We have at least two. Mr. Hart if you could please connect Ms. Dees and Ms. Havilland on the Zoom.


**Rep. Weissman**

Alright, looks like Kelly Havilland might be getting connected first. Screen says your audio is still connecting. At the point when you can hear us feel free to activate your camera and please go ahead with your testimony. Again, please try to keep it to about three minutes.

**Rep. Weissman**

Okay, so we don't have Ms. Dees on there it seems.

**Rep. Weissman**

Members, we did have two folks who signed up online in the usual way in advance. If we're not able to connect with them, we might just move on with our agenda and we could possibly come back here. It looks like Mr. Hart is trying to communicate with the witnesses.

**Rep. Weissman**

All right, Ms. Havilland it looks like you have managed to connect. If you can hear us, please let us know your name and affiliation for the record. And please go ahead.

**Kelly Havilland**

My name is Kelly Havilland. I am not affiliated with anybody.

**Rep. Weissman**

Please continue.

**Kelly Havilland**

I am very interested and very interested in the hearing today because there's been so much going on that I wanted to share my experience with you. I'll make it very short, very sweet. We've had an experience in court. That my granddaughter was abused and neglected by the same person or persons that a caseworker perjured to get the child placed into that house. Anyway, in court, I needed to tell the judge what I needed to tell her to help my granddaughter. And the judge was so wrapped up and believed everything that the Department of Human Services was saying. She believed everything. And the child is still stuck in this environment. After Natalie Chase was removed from her spot in that case, and I had a conversation with her personally, I called her phone. I booked an hour and spoke with her and let her know that I had already been approved in that District I'd already been approved by her personally two years prior. There's so much going on in the courts, that as a normal citizen who needs to be able to help their child or their grandchild is not able to. Do these things violate the Constitution? And you do the best that you can even with attorneys they can't, they can't help because they risk being disbarred for going against the State. I have had to learn that the hard way. When I did speak with Natalie Chase after the fact she said that this does constitute both a state and federal lawsuit. And instead of chasing a lawsuit and making people be accountable for the destruction and the abuse that my daughter had to endure or is still enduring, I'm in court trying to help her still, for the same continuous behavior that the caseworker had perjured in court for. I don't know how in the State of Colorado, this is acceptable. And I'm hoping that this action in court for judicial discipline. Like, I like Natalie Chase, she's already approved me. But all it takes is one deceitful caseworker and they can ruin it. That would be the same thing as caseworker says to you, oh, that so and so must need a mental health evaluation, get a mental health evaluation just to prove that you're okay. And they still don't listen to you. I mean, it's every right

was violated in that court. And nothing can be done. I don't know how this is acceptable to children, or in my case, granddaughter is still getting abused, still to thisday. Accountability needs to happen. There needs to be a whistleblower. For people who do catch CPS purgering in court or falsifying information. There's there's no protection for us. And I need change.

**Rep. Weissman**

All right, Ms. Havilland. Thank you. We'll see if the committee has any questions. We're seeing no questions here. Again, we can't get into the guts of an individual matter. But I think all of us who've been here for whatever number of years appreciate that the child and family law domain can be adversarial at times, can be very difficult for those going through it. And that sometimes folks have difficulty accessing an attorney to help them go through it. You know, I know that that latter aspect is something that our Supreme Court is currently working on, in terms of scope of practice rules for paraprofessionals. And the broader domain of all of the family code is, you know, something that can and probably will come up in some fashion here next year, again, by the full General Assembly, it's not something that this committee is empowered to grapple with. I guess I just wanted to sort of make that comment. I don't have a specific question for you. Members, questions, comments? We're seeing none here. Thank you for testifying with us today. As always, if you want to submit more in writing, you're free to do so. There is a contact email address on our committee webpage, you should also be able to upload, you know, through the website, if you want to submit comments that way. Thank you. Okay, thank you. Mr. Hart, no sign of Ms. Dees on the Zoom. Alright, and nobody else signed up. Okay, last call for anyone in the room who wanted to make public comments at today's hearing. All right, we'll close that phase.

**Rep. Weissman**

And we'll proceed to the next phase of the agenda, which is discussion of the bill draft requests, which is the core work in front of us today. I guess by way of opening comments, again, members, as a reminder, the bill that set up this interim committee approved us to send forward not more than three measures, concurrent resolutions, or bills into the 23 regular session, by operation of the joint rules. We could approve as many as six today. And there would then be some kind of winnowing process. You know, a thought that I had somewhere between last week and here, is that this interim committee is potentially a little bit different than a lot of other ones in that are our subject matter is narrower. We're not talking about all of wildfire prevention, or all of transportation, or all of water, or things like that. And Rep Lynch, I know you have experience with a wildfire committee. I was on a sentencing interim. And five years ago, all of sentencing is broader than three or six or 100 bills. In this case, we've set up a pretty narrow charge. And I think, as we've heard, witnesses over the many hearings now. I think the issues before us have actually been pretty well framed. Now, is there a perfect agreement on every detail? No. And there doesn't need to be at this point. But my thought and something I've discussed at length with Vice Chair Carver and others is that today instead of going forward in more of a branched way and having four or five or six things under consideration, and there being a little bit of uncertainty on our part and everyone else's part about where we're going to land including on issues of constitutional

- 10 -

nature, that it might be possible to proceed from here in a little bit more of a consensus way. Especially, and not limited to the question of a concurrent resolution, which Senator Gardner noted last time, we need to take up. I don't believe we're discharging all that we're all here to do if we don't grapple with putting a properly framed, referred measure in front of the people to update the constitutional backdrop of all of this. So, you know, I've had discussions with members about that. I know that there have been a lot of discussions. What the Vice Chair and I have put together and distributed and we'll proceed to talk about here is some framing notes on all of that. Again, not that this is exhaustive of every detail, but my thought and hope is that we can find broad agreement on what we're about to set forth, and proceed in that way. And we have a deadline of the 9th and then we have the final deadline of the 30th. You know, from the get go, I have appreciated that there are very consequential questions here. Philosophical questions, but that things needn't necessarily and shouldn't and hopefully wouldn't break down along a party line way. You know, this Interim Committee is set up evenly four-four, drawing inspiration from an interim committee on a different subject that met last year. Because some issues ought to be bigger than party divides. Not that there aren't disputes. But issues like this, ought to be able to find support across the spectrum for the sake of transparency and accountability and public confidence in government, which is something that, you know, we all, I think both depend on as public officeholders, and ought to work hard to protect. So, with that, I'll see if Vice Chair Carver wants to make any opening comments. Otherwise, we can proceed to read for the record, the notes that everybody has, and then we'll, we'll just get that out there. And then we'll open up for discussion by any members. Madam Vice Chair.

**Rep. Carver**
Thank you, Mr. Chair. And I may have overall comments later. But if this is an appropriate time to put forth draft proposals, is that agreeable to the Chair?

**Rep. Weissman**
Sure, we can reserve any more general comments. But Madam Vice Chair, if you'd like to proceed to frame a measure that we would consider, please go ahead.

**Rep. Carver**
Thank you, Mr. Chair, and a draft proposal that would be the subject of changes to the Constitution. So, a concurrent resolution, those changes would be to Article XXIII. And, excuse me, Article VI, section 23, I beg your pardon. And the changes would start on paragraph (3)(e). And, so, the other parts the previous parts of Section 23 paragraph (1) unchanged, (2) unchanged, (3)(c) unchanged, (3)(d) unchanged, and then moving to (3)(e). And I am simply for the record going to read this and I may have just some brief narrative to give the context. So, in (3)(e), we are creating, again, based upon a lot of the discussion we heard from stakeholders, we are creating an independent adjudicative body to adjudicate that is for the prosecution and the initial decision on was there misconduct or not? And if so, what is the appropriate disciplinary action? That independent adjudicative entity would be a separate body, separate from the Commission which would retain the investigatory functions as described in the Constitution. It

- 11 -

would have an equal number of judges, lawyers, and citizens. And, so, with that, I'm just going to read this into the record.

(3)(e): create an independent adjudicative entity to conduct formal hearings. The independent adjudicative entity shall have an equal number of judges appointed by the Supreme Court, lawyers appointed by the Governor confirmed by the Senate, members of the public appointed by the Governor confirmed by the Senate. Of the members within those three pools, there shall be a random selection of one judge, one lawyer, and one member of the public to conduct the hearing. So, again, the idea is there should be representatives from these three groups just like there are representatives at the commission level of judges, lawyers, and citizens doing the investigatory function. Same thing at the adjudicative level. And the pool is to make sure that we have members in case there is a disqualification conflict of interest with any of the members, given the specific judge involved, so that we can proceed forward. And obviously, the initiation of the formal hearing is when the Commission has done its work and recommended that a formal proceeding be initiated, because the evidence and the level of misconduct takes it beyond an informal remedial action or private discipline. So, the terms, we are still going to determine that.

So, next topic, but related to (3)(e), we are changing the standard of review by the Supreme Court. In the current constitutional language, when the Supreme Court reviews / after the adjudication is done, which used to be by judges alone, right. So, the current constitution provided for a panel of judges to decide the adjudicative thing. We are moving away from that to a panel, not just judges. In fact, where the judge is just 1/3 of the panel. But now, we're also changing the standard of review for the Supreme Court to review what the adjudicative body has brought forth. Current language is de novo review on facts and law. We are changing this to a more appellate standard of review. That is narrower than a full blown de novo review, where the court can open up fact finding and all of that. That is changed to a more limited appellate role. And the review that we're talking about is scope of review on the law is plenary. On the facts, scope is limited to if it's clearly erroneous. And as to sanctions, the scope of review is whether the sanctions imposed are lawful. We are also creating or proposing to create for the first time an opportunity for the Commission to be able to appeal to the Supreme Court if the charges are dismissed at the adjudicative stage. And we have looked at what other states have done, this was a feature that other states have used and we thought it appropriate. So, we have added that language as well, to subsection (3). Moving on to changes to confidentiality. And let me just say, in both of the sections that we just heard from, we are trying to move to a more balanced approach where it moves away from a judges only process to go much more with the two components at the bottom: investigatory and adjudicative. Being judge, lawyer, citizen. We believe that is appropriate. And then we are limiting the Supreme Court's scope of review to an appellate review, not de novo. So just to summarize.

Moving on to (3)(g)--changes to confidentiality. The current provision in the Constitution has a sweeping confidentiality to include the formal proceedings so that it was only at. The public could not see what was going on in formal proceedings. And we heard many, many stakeholders testify that

Colorado was really an outlier in this. We are one of the very few states that does not allow the formal proceeding to be public. We have changed that. Our substitute language changing that section will provide that once formal proceedings are initiated, there is no longer the requirement of confidentiality. Two other areas that we are and, potentially three, that we wanted to address specifically for confidentiality, because it is absolutely critical that the complainant victims be kept apprised of what is going on with their case in the Commission, where the confidentiality would still pertain under this proposed change. Because remember, we're saying when formal proceedings are initiated, which then goes to this new adjudicative, independent body. So that still leaves the cover of confidentiality on the commission work, which we believe is appropriate. However, we want to make crystal clear that the complainant victim must be kept apprised of what is going on in their case, and there was some question about the ability of the Commission or should there be legislation in this area to do that, without clarifying language in the Constitution. So, we are doing the exceptions to confidentiality in that case. We are also making it clear that when there has been a substantiated finding against a judge, that there has been some level of wrongdoing, violation of Canon, etc. And that that substantiated finding has resulted in either private or public discipline. That information must be shared with the judicial performance commission for purposes of retention. And with the judicial nominating commissions, if a district court judge perhaps is seeking a higher level or a county judge or whatever, that, as part of that process in being considered for another judicial position. They must know if the judge in question has been disciplined. And then we have also, because the OARC and OPDJ provides similar judicial oversight evaluations, that that is also appropriate information for those groups to receive in order to properly do their job. And then the final one is just to provide clarification. Right now, and you'll see in the second bill particularly, how critical it is that we, as part of our public transparency and accountability, that we provide data to the public on key metrics on how this process is working. And, in order to predict confidentiality in some of these areas, the way you do that is you aggregate the data. So, you know, number of cases that involved, that were rejected because they were outside the Commission's jurisdiction, they were a matter of law, number of cases involving this type of alleged misconduct, number of cases. We'll get to that in the second bill. That will detail all those out. But the bottom line is, there was concern about, if we do a much more robust data collection and sharing with the public, are we clashing with the constitutional confidentiality rules? So, on this one, we have a placeholder for that as a potential exception to confidentiality in the Constitution. But our expectation in working with our bill drafter and legal staff, that we're going to drill down on that, and, if legally, we are fine to aggregate that data and share it and do it without a change to the Constitution, then that provision would be unnecessary. So just wanted to make that clear.

The change in rulemaking authority, which resides in paragraph (h), paragraph (3), subsection (h), we are doing a change to this, that we believe takes into account the very important interests of the Commission and the Judicial Branch. So, a rulemaking committee would be formed to work on rules regarding the Commission, that would be chaired by a member of the Commission. Membership, the number has yet to be determined, the size of the committee. But we also wanted to point out that the Supreme Court which their role on the Rules would be obviously as they do with all rulemaking

- 13 -

committees, would be a review and approval process. And we know that, you know, there may be, there's a lot of details still to be worked out on this. But that is the basic structure. Other areas that we want to make changes in the rulemaking language, we want to specifically include references in the rulemaking in this area, again, regarding commission operations, to really point out encourage, or perhaps direct, we'll see, rulemaking around complainant, victims' procedural rights in the process. And with regards to confidential reporting, we believe it is appropriate, as you know, get down into the details in those two areas. That that is the kind of, if you're fleshing it out in depth, that that really should be done by rule. And with a thorough discussion by commission by this rulemaking committee that is going to have commission and judicial membership. And, so, we wanted to call that out. We think that's important. We think that belongs, that should be called out in the Constitution, because those are such critical elements to what--encourage and provide a space for safe reporting, and a process that is fair and respectful and without reducing any barriers for complainant victims to move forward. We also would include language that makes it clear, removes any legal issue, that these two areas--confidential reporting and procedural rights of complainant victims--is an area where the Legislature can also take action. In those two areas we wanted to eliminate any potential legal argument that where it's called out in rulemaking, that that would somehow be a separation of powers blockage to the Legislature. Because of the importance in this area.

And then the final change in the Constitution would deal with the situation where the allegation is against a Supreme Court Justice. The appellate step cannot be the Supreme Court itself. And, so, we set up a new special tribunal just for this purpose. And we looked at other states which have many models. But there are a number of states that have utilized courts of appeal judges and to make them a pool, excluding all court of appeals judges that have any disciplinary action. So, if they've got private or public disciplinary action in their background, they are not part of the pool. But, then, in the remaining pool of court of appeals justices, we would do a random selection of seven. Now, obviously, in all of these areas, whether it's commission members or independent adjudicative body, or now this special tribunal, there is always the process of disqualification because of conflict of interest. We didn't feel like we needed to put that in the Constitution. That is an automatic standing procedure. So, that's why we only called out Court of Appeals judges that have disciplinary actions in their background, they would not be part of the pool, from which the seven drawn randomly or by lot. And everything else would remain the same. If it's an allegation against a Supreme Court Justice. So, you would still have the investigation by the Commission, you would still have the step of the independent adjudicative body, but then the appellate review function would be done not by the Supreme Court, but by this special tribunal of Court of Appeals judges. The same standard of review at the appellate level for the special tribunal would mirror the narrowed standard of review that the Supreme Court has in the other judge cases, right, not de novo, but a true appellate review standard that would also be utilized by the special tribunal. And with that, Mr. Chair, that is the first draft proposal, which would be a concurrent resolution.

**Rep. Weissman**

All right, Madam Vice Chair, thank you for setting that forth and detail. Committee I think before we go on to any other ideas, there's enough there that we should pause, we should see if there's any questions or discussion about what Vice Chair Carver has just set forth. And then, you know, we'll proceed to other measures. So, members, you've heard, you've heard the suggestions as put forth by Vice Chair Carver. Everybody has the written document. Any questions or discussion on any of the elements for the first measure that the committee would move forward? Senator Gonzales.

**Sen. Gonzales**

Thank you, Mr. Chair, Madam Vice Chair, I want to appreciate the work that has gone into this proposal, recognizing that it's a culmination of several conversations that we informally have had over the iterative process of these different committee hearings. I'd like to just lift up that I'm very appreciative of the changes to confidentiality and also the exceptions that you've outlined. And I'd like to lift up the I am also just appreciative of that new subsection (3)(i) that you've walked us through. I think that I will, I may have questions once it's drafted about specifics. But the outline that you've put forward today, in order to give Mr. Imel and the rest of the team in all or less are the guidelines to move forward, I think is correct. So, I'm just appreciative of the conversation and where we're at thus far.

**Rep. Weissman**

Okay, thank you, committee. Any other comments, Rep. Bacon.

**Rep. Bacon**

Thank you. And I also truly appreciate your diligence. And, quite frankly, the people on this committee and helping us all get to this place. I do also want to talk about the piece around confidentiality, particularly in sharing the reporting on trends. I actually think this may show up in a couple of other places. And it might actually be something that we can really do to strengthen not only internal but external accountability, on the things that we have been seeing by way of culture. And you know, there is something to be said about figuring out what could be identifiable or non-identifiable information in that space. But to the extent that we can really figure out how to put a spotlight on the patterns, I think will strengthen a lot of the concerns we've had from community as well. That's kind of like this ancillary narrative to transparency, to understanding, you know, what is the culture like? What are the problem areas or potential for adjustments, and quite frankly, to ask what will be done about that over time that people can keep track of. So, I do believe we've been pulling data in different ways, and the Commission has been pulling data in different ways. So, I'm also curious around if there are any boundaries on confidentiality, although I might suspect that that may not be the case, since we're doing some of these things. But yes, I just wanted to flag that and to figure out how that could be consistent in other spaces. And thinking about which data pieces we'd like to be consistent across the Branch across the Commission, and any other kind of office or procedures that we set up.

- 15 -

**Rep. Weissman**

Thank you. And on the point of confidentiality, and really to the existing language, I mean, what Rep. Carver has framed as our invitation as a General Assembly to invite the People of the State to update the Constitution. There is some research that Mr. Imel and the office had begun to do, interpreting the existing language, which, even if I think we were to change the Constitution, as we seek to do here, with voter approval would be informative about how everybody would be thinking about that kind of language going forward, we need to get some things in writing, and cases pulled from Lexis and sent to us by way of follow up, but that's something that we can share with members of the committee who want to go deeper on that point. Committee, any other comments about the proposal, the one that Rep Carver has set forth? Senator Gardner.

**Sen. Gardner**

Thank you. Let me just second the comments with my colleagues. And thank the Chair and Vice Chair for what it is to get to and we'll talk about the other proposals, but a single page front and back of legislative proposals that we have, I hope, and I think have developed some consensus around for all of us, a majority of us in any case, and that was no small task. And, so, thank you for doing that. And I look forward to the next proposal.

**Rep. Weissman**

Thank you, committee. Any other comments on proposal one? If there are none, we can consider that submitted. I know that Mr. Imel has been taking notes, and we will get him more detail. The next step would be a draft from LLS and we would then all look at that and go from there.

**Sen. Van Winkle**

Was that a motion?

**Rep. Weissman**

Not needed at this point per guidance from Ms. Jenson. With that I can proceed to propose, I'll just call it measure 2. What Rep. Carver proposed was in the way of a constitutional amendment. And this would be a regular old bill, in all the subject matter that we've grappled with, you know, there's the question, is it more appropriately set forth in the Constitution? Or is it more appropriately set forth in the statutes? The answer is, we need a bit of both. And the architecture of what I'm going to propose here, will really ride along with what the Vice Chair Carver has just laid out. As I think about it, the Constitution is the place to speak broadly, and to set down fundamental principles that will stand up to time. And the statutes are the place to flush out details. Because of what we're inheriting in Section 23, it is necessary to update some of those provisions. But we don't want to bury so much detail there that some successor committee to ours is back at this in a few years. So, with that, I'll read out a series of elements that I think could go into a bill, but I'll just call it measure 2. And then I might, as the Vice Chair did say a little bit about, the why for each.

- 16 -

The first element and we've heard testimony, and this would be to codify the subpoena power of the Commission. We've heard about this. It's in the rules now. It's important enough that it should be set forth statutorily that subpoena power would be tied to individual cases, there wouldn't be any free-floating inquiry, but where a specific matter has come to the Commission, in the usual process would be proper to issue a subpoena. So, that that could be fleshed out. In current parlance, you know, we could talk in terms of a request for evaluation. Specifically, this would also include a request instituted by the Commission itself, we might say sua sponte. For those who love Latin, that that's important because that may be how a matter comes to the Commission and the ball gets rolling. We would clarify that both the Commission and the new adjudicative entity, the separate entity that our Vice Chair Carver spoke of that would find its origin in the Constitution. Both entities have subpoena authority. We realize and we heard some testimony about this over the prior hearings, that there may be disputes about the scope of or compliance with the subpoena. We would need to flesh that out. But for now, we just want to notice that we need some process for that. That's the first element.

The second element would be under the broad theme of safe reporting. This ties into a lot of what Vice Chair Carver spoke of in terms of measure 1, we need either to invite the voters to pass updated constitutional text or resolve through legal research that there isn't any issue, even with the existing language. But the point here is really, we've heard powerfully, especially last hearing, that confidential reporting and anonymous reporting, if that is the wish of the complainant are integral to a functioning process. So, we need to set that forth in statute. We've also heard and this was set forth in detail in writing, particularly by the comments from the Women's Bar and the other associations with which they worked, that there's room to have a more modern process. There are, complaints should be accepted online. Somebody wants to mail in a complaint or fax in a complaint, you know, that's okay, too. But we can we don't need the formalities of the mail or notarization or such. We even heard and we don't need to get into this detail in the statute. But there's even specific software out there in the world. That is purpose built for receiving and handling anonymous complaints. We heard about that last time. So, those are the broad strokes of number 2, on safe reporting.

The next element would be closely related to that. And this goes to my point to our witnesses from a little bit earlier this morning. It is important that we set forth in statute specific rights that complainants or victims, if you will, have throughout the complaint process. And again, we either need clarity in the constitutional text by means of the concurrent resolution that Vice Chair Carver spoke of, or at least to determine by exhaustive legal research that we don't need that constitutional textual backdrop. But the point is to make sure that the complaint process is fully explained at the beginning to each complainant, including the right of confidential reporting. And related to that requirement to maintain confidentiality. Even as we have talked about moving that point where we go from confidential to public, there is still going to be a zone of confidentiality, and where complainants are apprised of what's going on in their life. We do need that to still respect the broad requirements of confidentiality, that's important for due process reasons. We will call on the Commission to have points of contact. We realize they may need more FTE for this fiscal process will surface that, but the Commission should have points of contact to

- 17 -

keep complainants apprised of the status and where they are. And these things can take time. We've heard today, we've heard previously that there can be just frustration or confusion on the part of complainant when they don't know what's going on. And we want the Commission to have the resources to keep folks apprised. And in particular, that would include ongoing updates and, specifically, notice of outcomes and sort of specific turning points if you will, in both the investigative and the adjudicative processes. And finally, where a complaint is rejected because the Commission determines that it's outside of its jurisdiction, it's not raising an issue. One of the ones set forth in the Constitution, but maybe it's appellate in nature, or the remedy is to us here at the General Assembly to change the underlying laws that should be explained clearly to each complainant. So that's the substance of the third element.

The next one. And we've spoken about this, and I believe this is important, is broadly data collection. Again, we need to make sure that this is consistent with the constitutional provisions or to have legal guidance that that we can proceed without constitutional change. So, we want the Commission to collect certain data elements and be sure to include them in their annual reporting. And to put this data online in a more contemporary, searchable way. We appreciate the Commission may need resources for website overhaul, it's on us to provide those resources. Fundamentally, this will involve documented compliance with the complainant. Procedural rights that we just talked about in the prior element. And we would like to see aggregated data without personally identifying characteristics. For the following: where complaints were dismissed due to lack of jurisdiction, when complaints were not dismissed and were investigated, what results, you know, grouped by outcomes, when complaints went to the adjudication phase, how many, as much as possible, what outcomes, broad numbers of inquiries that were substantiated versus not. And then summary data on disciplinary outcomes. And we know that the Commission can render some things like that. So, we've heard repeatedly from members of the committee from interested organizations and the public that we want to see more aggregate data about what's going on. We appreciate that there is some in the Commission's reports, but we want to build on that. And of course, all of this has to comport with the rules of confidentiality, and must respect the desires of complainants or victims to remain confidential. That's important. So, we will have some details here to work out. But those are the broad elements. One thing that we want to continue to grapple with, and all members of the committee can weigh in on this. We have existing language at 24-72-401 and 402. That actually sets forth a misdemeanor penalty for revealing information about a Commission matter. That is a criminal penalty. We certainly appreciate that. The confidentiality is important. And I believe that we can find within attorney ethics and judge ethics provisions to enforce that. But we appreciate the concern, including civilians who wouldn't be under either of those ethics codes. No firm resolution here, but we want to grapple with it. Because I think we heard last week that there is potentially a powerful disincentive, operating here by the mere fact of this. So TBD where that lands, but it would be looked at in this measure.

And, then, finally, and our drafting office can help with this. We have set forth in 201 and all the other parts of 201 that other than creating this interim committee, a statutory framework. And the last point

- 18 -

here is just that we're aware that we might need conforming amendments with what was laid down in the statutes from that bill. So, it syncs up with what we're talking about here. And we would invite the input from Mr. Imel and other drafters to help us with that. So, those would be the elements of what I'm calling measure 2. And I'll open to questions.  Madam Vice Chair.

**Rep. Carver**
Thank you, Mr. Chair. And I just want to make a few comments because you're seeing issues repeated. First addressed in the concurrent resolution, and then in the statutory language. And as we were, as the Chair and I were working through this, and then, you know, going out and consulting with our other committee members and stakeholders. We wanted to ensure a clear legal path to be able to keep the complainant / victim apprised. So, with or without the concurrent resolution, if you read the scope of confidentiality that is currently in the Constitution, there is a legal question there about keeping, to the extent to which, the complainant could be kept apprised with any level of detail during the Commission process. And this has led to complainant victims feeling like they're left, left out in the cold, left in the dark, don't know what's going on. It's very frustrating. The Commission understands that frustration, but is concerned about that legal issue, flowing from the confidentiality provision in the Constitution. We also believe that the interest in this issue, which is a passion of mine personally, that we wanted to not only have a clear legal path to address this in a robust way. But we recognize that this is the kind of issue that should be addressed, we hope will be addressed, in some detail by the rulemaking committee. But also is a proper subject for the Legislature. And, so, the language which at first may seem a bit confusing in this measure 2. So, what does it mean upon passage of the CR or resolution of separation of powers? Well, of course, the CR will not go to the voters until 2024, correct? So, there was differing views on the committee on what the current state of the law is, does, in fact, the current language on confidentiality in the Constitution bar the Legislature from going forward in this area. Gray area. So, that is why the language is upon passage of the CR or if our legal staff are able to determine that, in fact, there is no legal barrier. I mean, we have rulemaking under the now Commission and Judicial Branch. And if the Legislature took it up, is there a separation of powers issue? So that's what we're saying, if there is a legal issue there, which I personally believe there is, some of us believe there is. But you know, out of 100 lawyers, you might get a lot of different opinions, right? That we put that in there so that if the legal research comes down, says, look, there is no barrier to the Legislature going forward in 2023. If they're so inclined, they don't have to wait for the CR. But, if in fact, there is a legal issue, we wanted to ensure that sufficient language was put in the Constitution that clears that issue up totally. And we believe the importance of these issues, that it is proper to put that in our fundamental law, the Constitution, as a proper subject for rulemaking in and of itself. But these are, in fact, fundamental issues, both confidential reporting, which then you see reflected in the statutory measure under safe reporting. It's the same to a certain extent, it's the same issue. If it is a subject of a rulemaking by the now proposed rulemaking committee. And now the Legislature wants to flesh that out. Do we have a separation of powers issue? Well, let's just fix that right now. Right, that's the idea. So that we clear away any concern. And so, even though this language that we've read and have in writing, because even as detail oriented as the Chair and I tend to be, and our colleagues can attest to the annoyance of that.

- 19 -

We wanted to make sure we got the language right. And so obviously, we are reading. And, so, I don't know if that was a question or an issue for any members of the committee, how we were trying to work these two measures together, and why you're seeing this kind of contingent language written in. And same thing with on data collection, which I think is that and making the formal proceedings public. Those are the two biggest elements for public accountability and transparency. So, the public knows what's going on, right? The public knows this process, once you go to formal proceedings, and this data collection piece, that the complainants' rights are in fact being complied with. See above section and again, we welcome the committee and stakeholders' further discussion in all of these areas. But then aggregate data, what are the key metrics that we need for the Legislature but more importantly, the public to know how this process is working? What is happening? And we think we've hit the key metrics. There may be more that is subject to discussion. But how else do you accomplish public accountability and transparency if you do not provide a window that is data based into how this process is working and reaching back to the Constitution. Remember, we put that placeholder provision also under exceptions to confidentiality. Do we need to put something in the Constitution to be able to provide this robust data collection and providing it to the public? We don't believe, well let me speak for myself. I don't think the current confidentiality provisions of the Constitution as currently written or as proposed, bar us from doing aggregate data, as with personal identifying information blocked, so that it's a judge and a victim. And this was the nature of the complaint, this is what happened. Especially for those complaints that end at the Commission stage, right? Once it goes into formal proceeding, then that's public. And their identities potentially are public, although we're also looking at is there a method, you know, as discussed, what does due process require at the formal proceeding? So, if it looks like we're being somewhat redundant, that's not by accident, it's by design, identifying the issues where there's legal uncertainty, establishing the appropriate language in the Constitution to make it absolutely clear, as well as the legislative authority. Although if we don't find an independent legal basis to go forward on safe reporting and victims' rights, that that runs into confidentiality, until we get the CR passed, right, then that obviously, would affect the timing of when the Legislature can take up these matters. So, I don't know if any of that was clarifying or helpful, but the language is somewhat cryptic. And I just wanted to kind of explain the broader context, in these different areas, subject areas that are appearing in both measures.

**Rep. Weissman**

Alright, thank you, committee. Other questions or comments on this? Rep. Bacon.

**Rep. Bacon**

Thank you, and thank you for that Rep. Carver. I just wanted to be able to at least share a few thoughts on the point I made earlier about sharing as well as collecting data. I am curious when we get to a place in drafting, how we'll talk about where the data is reported, and to whom. Not only how can we perhaps think through any language on accessibility via a website, and all of those other issues, perhaps around language for those who need some support with accessibility? But, also, I am curious in and I will say

- 20 -

for some other reasons dealing with the culture within Judiciary, on how they might be able to report to the Legislature. Oh, go ahead.

**Rep. Carver**
No, I beg your pardon. Go ahead.

**Rep. Bacon**
No, I mean, the finishing thought there was even thinking through SMART, you know, what kind of information could we also support with as the Legislature and looking through the data and also in supporting with the transparency of what's going on? The last thing I will just say before, as well, I was hoping that we could also think through data around judicial districts and complaints. And I do know that we really have to think through disaggregated data by way of some of those confidentiality issues. You know, for example, in schools, we don't put data out of this less than 15 Kids, right, I do think that there might be something that might be helpful, around disaggregated data, particularly when it comes to gender identity, or some of the issues that we've identified through the reports on when it comes to the broader issues of feeling safe, who feels safe, who doesn't feel safe? Who knows? What policies and procedures are and whatnot, if there's any way to think through any possible spaces in which data could be disaggregated in the broadest of sense, at the same time to be able to help identify some of the potential culture issues, if that makes sense. So just wanted to start there and hear some thoughts.

**Rep. Weissman**
Madam Vice Chair.

**Rep. Carver**
Thank you, Mr. Chair. And my apologies for interrupting Rep. Bacon. On the data collection piece. The very first sub-bullet is this data is done in the Annual Report, but it must also be posted on the web in a searchable format. So, that and, you know, we heard that during testimony, I think you perhaps made a comment as well, to make the data truly useful to the public. It needs to be in a searchable format, instead of people having to sit down with Annual Reports for the last 10 years and pull the data out and do their own collation of statistics to see what is happening with this type of complaint by subject, what is happening with discipline, what is happening with complaints being rejected. And, so, again, an area I care about, I know you care about deeply, as do the other committee members, that if we're going to have true accessibility and accountability, we have to provide the data in a manner that facilitates that. Right. And so certainly, if there are further thoughts from you and the other committee members or stakeholders on language beyond what's in the draft proposal, we would welcome that. To get to that goal, as best as we can. Thank you.

**Rep. Weissman**
Okay, thank you committee. Further discussion on what I'm calling measure 2, Senator Moreno?

- 21 -

**Sen. Moreno**

Thank you, Mr. Chair. This may be worked out in drafting, but is measure 2 contemplated to be that if sections of measure 2 would be effective only if the Concurrent Resolution is adopted, and then other pieces go into implementation sooner than that or I just wasn't sure if the measure in its entirety, takes effect only if the Concurrent Resolution is adopted.

**Rep. Weissman**

Thank you. And I think that's a great question and goes to the core of what Vice Chair Carver was speaking to, to some extent, I think what effective clauses attached to what substantive elements of measure 2 is going to be as TBD pending a little bit more legal input from LLS we've begun that conversation with Mr. Imel, and we may want a verdict memorialized into a more formal memo from the office. My hope as to the substance of measure 2 is that we can proceed as quickly as possible for all the reasons that we've heard. However, if it is the legal judgment of our nonpartisan staff that it is not proper to do so until the CR is passed and proclaimed effective, then the bill will still reflect if it is a legal judgment, that we have the space for at least some of these elements to proceed on the foundation of the existing constitution, then I'm imagining something like a more regular, you know, a petition clause, maybe a safety clause TBD. On that where we have guidance to support that. And frankly, the answer may be a little bit mixed. I think these are important subjects that we're dealing with, I would want to see them spring into effect as quickly as possible. But we need a little bit more guidance on exactly when there could be. Members other questions or discussion on Measure 2? Rep. Bacon.

**Rep. Bacon**

I did want to know, perhaps, where you may think about the conversations around anonymity and anonymous reporting, if it may be here, or elsewhere. So, perhaps, you know, we don't have necessarily the answers here, but it was raised. I think it'd be helpful if we could provide clarity, at some point to our community since we talked about the differences between anonymity and confidentiality.

**Rep. Weissman**

Maybe I'll speak to that as I think I can, and I'll invite the Vice Chair to do the same. I think we heard powerfully that anonymous reporting is really important. And I think that we need a system to support that, you know, sounds like their software can go out and buy and fiscal will surface that but I want to say very plainly, I believe we need to be explicit that anonymous reporting is allowed if that's what the person making the report wants to do. You know, right now, that is, it's allowed. It's more implied in the Rules, I think. We want to shift from implied to express. You know, I will point out there's an issue. And I think we need to resolve this down the road. If an anonymous complaint gets all the way to the adjudicative phase, and now we're public now there's a tension between anonymity and the declaration we're making here and measure one that that adjudicative phase should be public. And I think there's due process issues and the respondent having to confront an anonymous complainant. I don't know how we sort all of that out. But on the front end, the idea that one should be explicitly empowered by all of what we're doing here, constitution, statute, and rules that may follow. I think that it's very important that

- 22 -

there be anonymous reporting, and then where something is anonymous. I mean, there's almost by definition, no issue of breaking that anonymity in terms of surfacing that in an aggregate way. So, that's kind of what's on the top of my head, Madame Vice Chair, if you wanted to say anything further.

**Rep. Carver**

I think you covered it. An obvious place where it could be included is under safe reporting. And certainly, we did discuss both. So, but for purposes here, we wanted to lead off with confidential and, and perhaps another bill, next bill may or may not touch on this area as well. So, more discussion, I think.

**Rep. Weissman**

Rep. Bacon, further comments, good for now? Okay. Committee, any further discussion? All right. Seeing none. Again, I know Mr. Imel has been taking notes. If there's no further discussion or questions we can consider Measure 2 submitted for drafting. Mr. Imel question, comment?

**Conrad Imel**

Thank you, Mr. Chair. Conrad Imel, Office for Legislative Legal Services. We do need approval of the committee for drafts. So, majority of the members of the committee, Ms. Jenson can perhaps advise you on if you need a formal vote or without objection.

**Rep. Weissman**

We can just see if there's objection. Committee objection to measure 2 as it's been discussed? Alright. Seeing no objection, we'll consider that approval to proceed with measure 2, as discussed. Senator Gardner.

**Sen. Gardner**

Did we need to designate points of contact for the two drafts?

**Rep. Weissman**

I believe that we do. My thought was that Vice Chair Carver and I would be the nominal points of contact with Mr. Imel. Of course, everybody will be involved as soon as there's a draft to start looking at. But for the purposes of the office, if it's okay with the committee Vice Chair Caver and I will run point on both of these.

Okay, so, members, that's two. I wanted to float one more thing and I think it's worth a little bit more discussion here, because the following subject, although important, I think we just haven't had as much occasion to chew on. And that's the idea of an Ombuds Office. This came up pretty powerfully last week. Maybe wasn't talked about as much in the writings that have been before us and in prior hearings but I think this is an important element of an overall functional system. And I would like to see us grapple with it. I don't have as much to read into the record or in writing you know, to handout. So, I

- 23 -

want to frame this and I hope the committee would support the idea, and we can see what members want to run point on it going forward. It may be that we have to get more detail to Mr. Imel. I believe that we've given the office enough to proceed with the first two. We'll see where the discussion goes, what your notes are, we may need to use the three day follow up window here. But to me, this writes along with safe reporting. I don't consider myself an Ombuds pro. But you know, such as I've been exposed to testimony and the survivor advocacy space. I mean, this concept in workplaces of all stripes, I think is pretty important. It was testified to, I think very aptly last week, that there are power disparities. And we've grappled with that in our workplace. It's true in the Judicial Branch as well. So, the proposal for what I'll just call measure 3 here would be that we have an ombuds function that is accessible to, at the very least, employees of the Judicial Branch, and we'd have to define the scope there a little bit. There would be information provision, would be one core function, there would be receipt of complaints, and then there would be a requirement, and we'd flush out the details to pass that to the Commission on the question whether it's a proper complaint, whether it's within the jurisdiction. That wouldn't really be for the ombuds to make, I think they need to err on the side of getting the information out the door to the people who are charged with figuring that out. And it may be that, you know, they have a co-equal portal to some anonymous reporting software, and so forth. This is where I think we'd really want to lean in with some of our witness groups, like the Women's Bar, like CCASA, like others who have grappled with these issues and how to frame them to get it right. I do believe that this function, just call it an ombuds function, is within our scope. I think it goes to questions of public confidence. Accessibility of information goes to safe reporting. Where it's housed, FTE levels, budget levels are things we have to work out. But I'll stop there for now. But my hope is that the committee would agree to at least take the next step forward from today, see how far we can get by the 9th and then see if we can bash something out by September 30 that we can all agree on. And I'll turn it to Senator Gardner.

**Sen. Gardner**
Thank you, Mr. Chair. And I agree that, based on the testimony we've heard and the concerns expressed that we need for lack of a better lack of a better term, someone or some set of persons to perform this Ombuds function. I think one of the reasons we don't have a proposal on the table right now is that in all of that discussion, it was never clear to me exactly who the ombudsperson would serve. What did members of the committee think? I think I heard you indicate that that was someone that would serve employees and would be an internal personnel function. But then I've heard some discussion of maybe there's a different person at the Commission that would serve complainants and so we need to get some clarity around that going forward, and I'll just stop there. And maybe people can say what their thoughts are on this?

**Rep. Weissman**
Yeah, thank you, Senator. I agree, we do need some clarity. I think that we need to have a personnel function, half an FTE, an FTE who knows at the Commission to make good on, and this goes back to Measure 2 to make good on complainant procedural rights. And that, you know, that's a small subset, we have maybe hundreds per year flowing. And the purpose of that personnel function at the Commission is

- 24 -

to serve those ends that we've discussed. In terms of the universe of people who might flow to this ombuds person. I think the first core universe is current, possibly recently, former judicial employees. Everyone from probation officers, bailiffs, clerks, everybody. That's a more defined universe. That's several 1000 people. We had some talk last week. And my recollection is we kind of move fluidly back and forth between an ombuds function to the whole public and an ombuds function within the Branch itself. I think both are worthy of grappling with. I think the more important of the two, and probably the easier to wrestle to the ground, in the relatively limited time we have is the function visa vie employees. We know that complaints can arise from there, we want those to be sort of received and trapped and dealt with in an appropriate way. You know, folks from the Branch have pointed out to us that there are some attempts, maybe not quite at ombuds service provision, but at least at public information and demystifying the litigation process, via Sherlocks, which is an acronym for something I can't remember right now, but self-help folks, particularly who are there for unrepresented litigants. There's a Chief Justice Directive on that that goes to the tune of a couple of pages and it was sent. I don't know if all members have it, but I think I got it. I think the Vice Chair got it. We can certainly share that. That's public record. We'd have to grapple with how a public ombuds aspect would relate to that. Certainly, we'd be in conversations with Judicial about it. But if we had to narrow our scope for this first step, I think that personally speaking for nobody else, I think it should revolve around employees based on what all we've heard. So, that's where I'm at for now. I want to see if any other members want to weigh in on the idea of an ombuds. Rep. Bacon.

**Rep. Bacon**

So I am, I am interested in doing this work, I've had the, I'm going to call it privilege of trying to set up an ombuds office for another department. And I do think that, you know, the thing that we should orient around with the ombuds office is, again, the problems that we're trying to solve for, which we have named, which we've had constituents name, we've had ILG name, particularly around the culture pieces, and finding safety in a space to be able to come forward. And, so, the way an ombuds office supports that is by creating a neutral space or a space that feels at least freer of fear, and that having to report to the people that one may have harmed you or to the system that may have harmed you, but also being able to collect and again, the data pieces. So, part of the reason why I was asking is that the ombuds, also in their neutrality could also help as well shed some sort of light spotlights on key areas and organizational culture that may need to be shared. And, so, in regards to what you shared, Senator Gardner, I agree. You know, the first two questions are, who does ombuds serve? Internal or external? And then who do they report to? And that reporting piece is also critical to that neutrality. And, so, I think we have to think about particularly, not only connection to agency, but were kind of the management of that office as a function when it comes to budget lines. And all of those things sit as well. I do think key questions are where does the ombuds work fall as a matter of procedural timeline, when it comes to complaints? What are the investigatory lanes? What kind of information can or cannot be shared? And what kind of powers does the Ombuds office have? So, if we're talking about subpoena in one place? What does that mean in another, and then the last piece is really figuring out as well. What you can do afterwards, you know, after an ombuds, office is up and running? Where is the authority that

- 25 -

the Ombuds Office has not only in sharing some cultural pieces, but might be able to actually have a touch point in changing culture within an agency? So, you know, this could be the space in which they also can report out on how is confidentiality working? How is anonymity working? Is there a space for people to provide that feedback on those procedures, to then create another, another iterative cycle for the agency to make some sort of adjustments. So, I just wanted to be able to share a few of those insights that might be helpful to organize the conversation just as a as a starting point. But also, I think it's just been made clear that our constituencies, feel like they need a place. And so, for what it's worth, you know I've also seen setting up an ombuds office, perhaps not forever, but it's an integral part of culture shift for a particular timeline, until you can be ensured the space is safe. So, I do think that it would be incredibly responsive of us to figure this out. I do think regard that, I think where we decide, or for whom the ombuds serves, determines the scope of this office. And, so, if we want to also think about potential depth of resources or capacities, that's critical. Especially when it's dealing with external or litigants or complainants, you have to clearly define the scope. But I think that might be a lot of people, compared to X number of employees. So, I'll stop there.

**Rep. Weissman**
Thank you, Rep. Bacon. I appreciate all those comments, particularly as to scope you know, employees let's round up and call it 5000, maybe closer to 4000. You know, we're about 6 million in the whole State. So, several orders of magnitude there. Committee other questions, discussion on what I'll call Measure 3, an ombuds function? Rep. Lynch.

**Rep. Lynch**
Thank you Mr. Chair. So, how I think makes more sense to proceed with this is to kind of see what shakes out on Measure 2 sub 3. Because that it seems like, you know, I would like to see some structure around what that looks like, and then we fill in the gaps with an ombudsman program. Does that make sense? And I will be glad to work with Rep. Bacon on getting to the bottom of that.

**Rep. Weissman**
Thank you. I appreciate that. I see personally, I see these things rolling in the same direction, at least. As we move forward to drafting I think, you know, for the sake of the office and you know, for our own division of the considerable labor in front of us. Different folks will be point on different bills. We definitely will need to stay in touch and the drafts as they and move forward have cognizance of each other. Vice Chair Carver's point and a discussion previously was, compared to everything else we've laid out, there's just the most conceptual work to do here. So, maybe have it in its own bill, and we'll see how far we can get. We do have the deadline of the 9th after which the text has to lock, we can continue to work. I hope we do continue to work particularly on this concept subsequent to the 9th and see if we can make more progress. And if we have to effectuate that by amendment, so be it. Alright, so I'm hearing interest both from Rep. Bacon and Rep. Lynch to run point on this. I appreciate that. Members other discussion on Measure 3 concerning an ombuds? Alright, if not, seeing no objection to proceeding in this fashion. Mr. Imel, Rep. Bacon, Rep. Lynch will be the points of contact on this measure. We can

- 26 -

consider that submitted. That is 3. Members, did anyone else want to raise any other issues as far as going forward from this point? Question or comment, Rep. Bacon.

**Rep. Bacon**

Okay. I was curious, I did want to put this kind of on the record just for us to maybe circle back to with some ancillary issues that we've heard throughout this. One of which particularly is around looking at tolling and some of the statutes of limitations on some of these issues. We heard this, I think, in our first couple of committee meetings around delay of investigation or length of investigation that aligns to statutes of limitations. So, I just wanted to raise that and figure out if that may fit here, if that might, not for us to necessarily discuss now, but later and figure out where they may land because I didn't see us come across that. And we have a lot of reports that mentioned that issue. So, thank you.

**Rep. Weissman**

All right. Thank you. Senator Gardner.

**Sen. Gardner**

Thank you. Just to comment. I, as we've gone through this process, I have pondered whether the system we have, in Colorado of the Chief Justice acting as the executive of the Judicial Department, which is the model that we've had and have used for quite some time, is the appropriate one, or whether the model that is used by the Administrative Office of the U.S. courts, where there's an administrative council made up of judicial officers and so forth, who, to whom, the state court administrator or the court administrator, and all of those folks report is the right model. I don't think that it is that that question and issue was particularly within the purview of this committee in the scope. But I am going to, providence willing, be around for a couple more years. And I'm interested in that issue and thinking about it. And I just found people who are interested in these things are paying attention. I wanted to put that on the record that I'm thinking about it and looking at it and asking if we have the best model or whether we need to change which would require a concurrent resolution as well. But I don't want to get it mixed up in this.

**Rep. Weissman**

Thank you, Senator. You know, I guess I've grappled with similarly, if only in my own head. And I think I don't mean to put words in anybody's mouth. But I think the Supreme Court itself, and at the SCA level, they've had discussions about that, you know, a reality. We all go through school, we learn about the three branches of government. You know, we think of judges and justices as deciders in black robes. The reality is, they're also bosses, their employers, they are fountains of organizational culture. It's really that that we're talking about here. So, I agree. I think that's without what we're about here. But I will just second that. I've been turning those things over in my mind as well. I'll be without resolution at this point. Committee. Any other questions or comments? All right, if there's nothing else for today, so we have come to the end of our agenda. We have three measures that have been framed for Mr. Imel. Points of contact are identified. As a reminder, our next meeting will be September 30. We'll keep in

- 27 -

touch as to exactly what room and exactly what time and whatnot. Our mission at that point is for more recorded votes on advancing things forward. Amendments would be proper at that point. Our interim deadline, and there won't be a meeting on the 9th, but we have an internal drafting deadline for this purpose of September 9, we will need to work aggressively with Mr. Imel and other drafters who are assigned to these matters. To get the text into the best shape that we can, we will keep in touch with each other and external stakeholders. The text does have to lock from the point of September 9 on. nd at that point, it's just amendments in the usual fashion. And we should all keep in touch on that too. With that, if there's nothing further. One last chance. Sorry, Mr. Imel, please go ahead.

**Conrad Imel**
Thank you, Mr. Chair. I'm just want to remind Representative Bacon, Representative Lynch. They have three days to provide drafting information for the ombudsman bill. So, please send that over. You can send that to me. We'll get drafters assigned today. I'm not sure exactly who it will be. But if nothing else, you can send it to me. And I'll forward it to the right person. For all of the folks who are serving as point of contacts on the bills. The September 9 deadline is a little different than the bill paper deadline. We of course would like you to approve the drafts. If you don't, by the end of the day on September 9, they will be deemed finalized, we'll remove any questions, finalize it for fiscal notes and send it. It will be made public at that point. Also, a reminder that once those drafts are finalized, there, the fiscal notes staff does have the authority to share those with agencies so they will not remain confidential at that point. All right.

**Rep. Weissman**
Mr. Imel, thank you understanding we probably need a bit more on Ombuds. Do you have enough for present purposes for measure 1 and measure 2?

**Conrad Imel**
Yes, I think so. Yes.

**Rep. Weissman**
Okay. Very good. All right. So, everybody, we should look for more from Mr. Imel or others in the drafting office. If there are no further comments, again, we'll keep in touch about details for our next hearing on 9/30. Senator Gardner is wondering if we'd like to spend another couple hours chewing on things after lunch, but maybe we won't put that one to a vote. All right with that, members, thank you for the discussion this morning. You know, I don't know if we're at the end of the beginning or what but we know that we have work in front of us and we will apply ourselves to it. Until then, the interim committee on judicial discipline is adjourned.

# Appendix 27(s)(v)

# [No Hearing  Held]

# Transcript of *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., August 30, 2022;

# Appendix 27(s)(vi)

# Transcript of *Hearing before the Interim Comm. on Jud. Discipline*, Colo. Leg., September 30, 2022;

# Colorado Legislature Interim Committee on Judicial Discipline: September 30, 2022 Hearing

**Rep. Weissman**

The interim committee on judicial discipline created pursuant to Senate Bill 22-201 will come to order.

Ms. Jenson, if you would please call the roll.

**Juliann Jenson**

Senators and Representatives. Bacon.

**Rep. Bacon**

Present.

**Juliann Jenson**

Gardner

**Sen. Gardner**

Here

**Juliann Jenson**

Gonzales

**Sen. Gonzales**

Present

**Juliann Jenson**

Lynch

**Rep. Lynch**

Here

**Juliann Jenson**

Moreno

**Sen. Moreno**

Here

**Juliann Jenson**

Van Winkle

**Sen. Van Winkle**

Here

**Juliann Jenson**

Carver

**Rep. Carver**

Here

**Juliann Jenson**

Mr. Chair

**Rep. Weissman**

Here

**Rep. Weissman**

All right, everyone is present. Just for those listening online, we'll briefly just situate where we are. This is the fifth and final meeting of this Interim Committee. At our previous meeting in mid-August, we discussed drafting and approved, three measures to proceed to drafting and members of the committee have been working intensively on those in the intervening weeks. Our mission and our primary agenda item here today is to vote on the draft measures that have been public since the 9th of September, those were posted to the Interim Committee website. We know that many folks here and others have been spending a lot of time with those drafts. As with any other bills are in this case, pre-bills, amendments are in order. And we will get to motions and discussion of amendments in due course. Downstream after this, like any other interim committee measures that come out of here are approved by the Legislative Council Committee. That meeting is in a few weeks. And then all of these will read over across the desk and either the House or the Senate, like any other measure in the 2023 Regular Session and go through the full legislative process. So, with that, I did not intend to make any other opening remarks. I will see if Madam Vice Chair wanted to add anything.

**Rep. Carver**

No, Mr. Chair. All right.

**Rep. Weissman**

Thank you. Okay, we will just proceed to our primary work, which is consideration of Measures 1, 2, and 3. We will go in order. The first of those is what some of us are calling Measure 1. LLS 150, sorry. Senator Gardner.

- 2 -

**Sen. Gardner**

Mr. Chair, I thank you for indulging me. But before we get started on this, I wanted to and I'm sure I speak on behalf of all of the members of the committee, I want to thank the Chair and the Vice Chair for endless, endless hours, because I know, I've been on the phone with you quite a few hours as well to work through all of the issues in bringing these bills forward. So, thank you both for the amount of time. It's life consuming, but it's very, very important. So, thank you.

**Rep. Weissman**

Thank you, Senator, I really appreciate that. It is a good thing that the cellphone companies of the world have long since moved to unlimited plans or Rep. Carver and I would both be in trouble. Madam Vice Chair.

**Rep. Carver**

Thank you, Mr. Chair. And thank you, Senator Gardner. It is we have truly exercised our cell phone minutes in this process. Thank you.

**Rep. Weissman**

Okay. So, members will deal first with Measure 1, which is the proposed concurrent resolution, also known as LLS-0150. Everybody has the draft dated 9/9. And I guess without further ado, I move the 9/9 draft LLS-0150. And ask for a second?

**Rep. Carver**

Second.

**Rep. Weissman**

All right. The motion is for the September 9 draft of Measure 1 by the Chair, seconded by the Vice Chair. Okay. So, members, Rep Carver and I and there been a lot of other conversations as well, have been working pretty assiduously on an amendment here, which hopefully everybody now has. What we propose to do is talk through this amendment in considerable detail, what's going on in the multi-page amendments, and why. And then we'll see if there are any questions from members or other discussion and then we'll come to appropriate votes. So, with that, I move L.002 to LLS-0150. And ask for a second.

**Rep. Weissman**

Okay. Amendment is moved by the Chair, seconded by the Vice Chair. All right. So, members, you have what spills just a little bit onto the fourth page. I will talk sort of section by section through what's going on. And why. I'm just going to start from the top of page one. What lines 3 to 14 are doing. You'll see some new language is added at the end of that existing paragraph. A point was made to us which we think was a valid point that there shouldn't be any overlap between membership of the Commission and the adjudicative board. The whole work here is to separate those two functions of the overall process of

- 3 -

judicial discipline. At least, in my mind, I don't think anybody had contemplated that. But it was not specifically foreclosed as a textual matter. So, what we do here is to say that nobody shall be appointed to the board, who's on the Commission. Moving down the next lines 17 to 20, are really just meant to be clarifying. The two key points here are that one of the functions of the adjudicative board is to hear appeals from informal remedial action. And that because we're still in the informal phase that that remains confidential. There was some commentary to the effect that the language in the 9/9 draft maybe wasn't as clear as it could have been. What we're trying to do is make that more clear. At lines 21 and 22, we clarified that the four judges to be appointed should be District judges, not Court of Appeals, not County Court, but specifically District judges. Given the trial-like nature of this phase, we think that's appropriate. In the next lines, 23 to 25. We're trying to do two things. This is sort of the other book end of the first lines that we spoke about higher up on this page one, there shall be no overlap between membership of the Commission and the Board. And, also, just clarify something that's previously been implicit, which is we want to stagger terms here. This is standard and setting up a variety of boards and things throughout government. It was implied we wanted to make it express why some of the terms are going to be shorter upfront. Line 25 is really just clarifying. We mean the respondent justice, that was a suggestion that was made and we think is very reasonable. In lines 26 through 28, we provide a standard of review for the adjudicative panel upon taking an appeal from the Commission's order of informal remedial action of the standard is abuse of discretion. This parallels the standard of review that we've set forth later, where an appeal is taken in the formal process, we think that's the appropriate standard of review at lines 29 to 30. This is really just meant to be clarifying. There was a concern raised that, on the one hand, we need to set forth confidentiality. On the other hand, later on in sub (g) of the section (3), we have set forth carefully delineated exceptions to that information being reported to the complainant. Aggregate information, you know, for the sake of transparency of the process. By adding the words consistent with subsection (3)(g) of the section, we really just mean to say that those are both on the level that we really do mean what we say in sub (g) in terms of information flowing, consistent with the otherwise important framework of confidentiality. The next couple of lines are essentially conforming, you know, we need to get rid of some references to masters who exist in the current process, and will not exist in the new process, because of the changes that we're making. Related to that on line 2 of page 2 recommend is no longer the appropriate word, rather, what what's really happening is an order. Again, because we're changing the process a little bit, lines three to five, on page two, just moving down the page. This is to clarify the instances in which the tribunal will take appeals rather than the Supreme Court. There was some concern about the scope of the word involves. So, instead, we're just citing to the relevant subsection (3)(f)(II), and there's more on that below. The next lines 6 through 8 are in a similar vein. We're just trying to be clear that here we meet all the circumstances where the tribunal consisting of a Court of Appeals would be invoked. Next on lines 98 through 15, we're relocating this paragraph due to some other changes. So, you'll see this language occur further down. So, it's being relocated, not struck entirely. Next, and I won't go through every subsection, but starting at page 2, line 16. And continuing over. As far as page 3 line 15 of the amendment. We're doing two things. We're both adding some substantive reasons why the tribunal would sit to take an appeal from the adjudicative board rather than the Supreme Court. Because we've added some text for drafting reasons, we're splitting it up into

- 4 -

the capital lettered subsections instead of having an even bigger chunk of text. There was some discussion with various interested parties over the course of the last weeks. We think it's appropriate to somewhat broaden the list of reasons why the Supreme Court would not sit to take an appeal, but rather why the replacement tribunal would do so. So, that's all of what's going on from page 2, line 16 to page 3, line 15. Moving further down, we're now at page 3, line 17. This is some language that we've worked on as recently as this week. As we stared at the existing drafting of Section (3)(G)(I), we realized it lacks a little bit of clarity in terms of what has come down to us from history. So, I'll say a little bit more about this. And I think the Vice Chair might also want to unpack it for the record. There were really three different principles going on in this paragraph. And they're all important. One, again, is confidentiality. We have a confidential process up to the point where it becomes formal in our proposed new construct. We are changing some of the terminology in this part of the amendment, I think without trying to change the meaning. The existing language from long ago uses the word privilege, which has been glossed to mean absolute privilege in the sense that one cannot be sued in defamation for what you say, in the context of this process. We want there to be full and open communication from both parties. And the system will test all of that against the standards that we've set forth. And the result will be whatever it is. But if there's a defamation action, coming out on the other side, because one party doesn't like what the other party said, that's a chilling effect on the entire thing. And we don't want that. And the drafters of the prior language didn't want that either. But we're trying to use more clear terminology, which is why we simply say what we think has long been meant, a person is absolutely immune from any action for defamation dot, dot, dot. I won't, I won't read the rest of it. At the at the end of that paragraph, as amended, we still see the use of the word privilege. In a more maybe typical legal sense, for example, attorney client privilege, there might be privileges about medical records, psychiatric records, spousal communications, all manner of other privileges that the law has recognized. Where those privileges attached to a writing that was taken up into the record what the current section (3)(G)(I) says those privileges remain, even once they're rolled up into the record, and we're leaving that part intact. We think that's, that's important. So, that's the intent of all of that language, page 3 lines 28 to 29, is really kind of just cleaning up some terminology. Instead of private discipline we're speaking of informal remedial action. Things could happen in the informal stage that maybe aren't even disciplinary, as some of us would think of that word. It might be some advice about better managing a docket. So that's the reason for that change. Page 3, lines 30 to 32. We're clarifying one of the reasons where otherwise confidential information may flow, and that is for the important purpose that appointments to the adjudicative board must be made with knowledge of whether a potential appointee judge has any kind of disciplinary history. So, the appointing authority needs to know that so we add that to the existing list. Coming to the bottom of page 3, lines 34 to 37. This is mostly relocating an existing I'm sorry, better to really say that what we mean here is again, trying to balance we have a great importance on confidentiality, we also have reasons where information needs to move. What Rep. Carver and I talked about is the need to say very plainly and even at the constitutional level that the various entities, for example, nominating commission, performance commission, and so forth, who would get information for limited carefully set forth purposes, can't then go on and do anything else with that, and you'll see the general reference to sanctions for violation of confidentiality as may be provided by law. It's kind of a

standard reference in constitutional text to the ability of the General Assembly to speak further as a statutory matter. We'll come to that question in Bill 2. And finally, we're now at the end of the Amendment. Going over to the top of Page 4. This is really a conforming amendment. In the current structure, we speak of the Commission but we're creating the new Adjudicative Board and the Special Tribunal and we need to list those here as well. So, thank you for the indulgence. That is, that Amendment 2 to LLS 0151. Madam Vice Chair.

**Rep. Carver**
Thank you, Mr. Chair, just a couple of comments, and especially wanted to emphasize and affirm what the Chair said, on (3)(g)(I). As we were reading through that, and I think, you know, as happens many times we've read through the current constitution, the draft proposal, and then all the comments is, as we were rereading (g)(I), we realized that the language was not crystal clear. It was and so we reached out to stakeholders. And through that process, they put forth kind of the history of this section, and that the core of the provision is to establish the principle of absolute immunity, absolute privilege for individuals that testify to the Commission and the process and authors of papers that are considered in this process. And that, of course, if the individuals that testify in the Commission or produce a paper that is considered by the Commission, if they were to make those same statements outside the judicial discipline process, then that would be a different matter for purposes of defamation tort. But we absolutely, as we were reporting this section, wanted to make it clear, which is why we're putting it in the record, that the intent of this modified language is to absolutely preserve the meaning and legal intent of the existing constitutional provision with regards to absolute immunity. Nothing is changed on that, even though we have some of the players, the new adjudicative board, the additional appellate board by the special tribunal in cases involving the justices. So, we wanted to put that on record to ensure that the meaning of that section fully encompasses all the past legal effect of the existing provision on absolute immunity.

**Rep. Carver**
Second.

**Rep. Carver**
Thank you, Committee, any questions or discussion on Amendment 2. Senator Gardner.

**Sen. Gardner**
Thank you, Mr. Chair. I'm going to be and this is more in the nature of a comment, but I'm going to be supporting Amendment 2 because it consists of a variety of consensus amendments. Legislation is never to everyone's satisfaction. And we need to move this forward. But I do want to comment, and I suppose in the nature of preserving the appellate issue, as it were, with respect to private remedial action or informal remedial action, I was surprised and found it curious that I think it was the Judicial Department had concerns about informal remedial action not being appealable. As well as if it were to be appealable than it needed to be the confidentiality around that action needed to be preserved. And the reason I find

- 6 -

that curious is because for many years, I've had clients sit across the table from me and when I did a lot of misdemeanor criminal work, I would have to explain to a client that you know, this is kind of take it or leave it. You know, what's been offered to you is, maybe it doesn't seem fair to you, but if you want put all the chips on the table, then you do that in front of the judge and you take all the consequences that go with that. And by the way, you have to give away your right of appeal most generally when you accept that agreement, and I find it even more curious, because the Office of Attorney Regulation Counsel sort of regularly offers informal remedial action to attorneys on a kind of a take it or leave it basis. And, so, it surprised me that Judicial in dealing with the Commission, where in formal remedial action might be proposed and offered, as it were, that. And I understand why they do, but that the judges in that situation might well want to appeal to the adjudicative panel for abuse of discretion and protect their confidentiality when they put everything on the on the line and reject the deal as it were. And I guess I'm more troubled by the fact that over the years, I've had clients in both of those fora that I just discussed to, I've had to say, you know, you got to take this deal, or put everything up on the table. But when it came to Judicial, they, they'd like to preserve the right of appeal and confidentiality, as well. So I'm not real satisfied with that piece. But overall with the amendment, I'm supportive, and I may revisit that issue come the session. So, I thank you for your indulgence, Mr. Chair.

**Rep. Weissman**
Thank you, Senator. Committee, any other comments or questions? Senator Moreno.

**Sen. Moreno**
Thank you, Mr. Chair. And thank you, Senator Gardner, for sharing some of that, because I think I have some similar concerns around the maintenance of confidentiality, when informal actions are appealed to the independent adjudicative board. So, we should talk further about that. But I had a couple of questions. So, in this bill, and sorry, I know we're on the amendment phase. But my questions may cross into both. There are potentially now four entities involved in judicial discipline: the Commission, the independent adjudicative, board, the Supreme Court and the tribunal. And all those have different. I was just joking that actually having putting a flowchart in statute or the Constitution might actually be helpful in this circumstance, but I was wondering, the commission itself will still be able to engage in both informal and formal, disciplinary? I just want to make sure I'm understanding that piece correctly.

**Rep. Weissman**
Okay. Thank you, Senator. Good, good opportunity to clarify. So, right now from the structure that we have from long ago, formal and informal are kind of all mashed up in the same Commission. The new construct, preserves the role of the commission at the preliminary phase, they do the investigative work, they are in charge of ordering informal remedial action, and we're trying to be more consistent in using that term. At the point when formal proceedings commence. Now, if the people approve this on the 24 ballot, what kicks off formal proceedings is a ordering of a panel of the adjudicative board to commence. At that point, things are now no longer confidential. That's a key move that we're making as the formal part of the process is vastly more open. And we join a lot of other states that way. So, right

now, it is correct to speak of the Commission as handling informal and formal matters. Going forward, it would be more correct to speak of the commission as handling informal and the adjudicative board, operating through its three member panels to handle formal matters. Senator Moreno.

**Sen. Moreno**

Thank you, Mr. Chair, and thank you for that that is super helpful. And, so, the independent adjudicative board will simply handle formal complaints or appeals of informal actions.

**Rep. Weissman**

Yes, I think that's a correct statement really, as going forward. There are, it's one adjudicative board 12 People appointing authorities, as we've discussed, will operate in panels of three one judge one lawyer, one civilian, but they now they will have two different roles. They will sit in appeal from informal remedial action. They will in the first instance, hear a formal matter. So, they're operating in an appellate way as to informal matters, and they're operating more like, excuse the analogy, but like a three judge, trial court or a three number trial court for formal matters.

**Sen. Moreno**

Thank you.

**Rep. Weissman**

Members other questions or discussion? Senator Gonzales.

**Sen. Gonzales**

Thank you, Mr. Chair. I just wanted to go back to page three, line 37. And the violations of confidentiality as may be provided by law. And those will attach in different sections of statute, but not within the sort of broader recommendation for the constitutional change that we're providing here. In this Bill 1, is that correct? I just want to ensure that I'm understanding that aspect correctly.

**Rep. Weissman**

I'll speak to that as I understand the question. And if I, even if I haven't answered, please, please ask again. So as provided by law simply means that there's, there's a delegation, if you will, from the Constitution, to the General Assembly to by statute, provide sanctions for violation of confidentiality, there is no specific sanction within the constitutional text. And in fact, when we turn to Bill 2, we'll have a lot more to say about the challenges and arriving at the right sanctions for violating confidentiality and some of the very consequential case law that has to inform our work in that.

**Sen. Gonzales**

Thank you.

**Rep. Weissman**

- 8 -

Committee other questions or discussion? If there are no further questions or discussion on L.002 to LLS 150, it's been moved and seconded. I will ask if there was any objection to L.002. Seeing none, L.002 is passed. I have no further amendments to LLS 150. Madam Vice Chair, any the other members? Madam Vice Chair.

**Rep. Carver**

No, Mr. Chair.

**Rep. Weissman**

Seeing none, LLS 150 has been moved. And Ms. Jenson, should we restate it as a motion to Legislative Council? Okay. So just for the sake of clarity, I move LLS 150 as amended by amendment 2, to the Committee on Legislative Council.

**Rep. Carver**

Second.

**Rep. Weissman**

Okay. Motion was by the Chair, seconded by the Vice Chair. Ms. Jenson, if you would call the roll on the motion.

**Juliann Jenson**

Senators and Representatives. Bacon.

**Rep. Bacon**

Yes.

**Juliann Jenson**

Gardner.

**Sen. Gardner**

Aye.

**Juliann Jenson**

Gonzales.

**Sen. Gonzales**

Aye.

**Juliann Jenson**

- 9 -

Lynch.

**Rep. Lynch**

Yes.

**Juliann Jenson**

Moreno.

**Sen. Moreno**

Aye.

**Juliann Jenson**

Van Winkle

**Sen. Van Winkle**

Aye.

**Juliann Jenson**

Carver.

**Rep. Carver**

Yes.

**Juliann Jenson**

Mr. Chair.

**Juliann Jenson**

Yes.

**Rep. Weissman**

Okay. The vote is 8-0 to Legislative Council. Now, members at this point we need to discuss sponsorship and Chamber of origin in the ultimate legislative session. Ms. Jenson do we do we need recorded votes on this or? Okay. So, I would like to be one of the house co-primes. Rep. Lynch has offered to be the other co-prime for the House. Senator Gardner and Senator Gonzales will take the baton in the Senate. And we will start this as a House Concurrent Resolution. Okay, it is proper. Senator Gardner.

**Sen. Gardner**

- 10 -

Thank you and Senator Gonzales and I find that quite acceptable that it start in the House with the understanding that all issues will be resolved in the House and things will be quite smooth and the Senate. I'm sure you can provide those assurances to us, Mr. Chair.

**Rep. Weissman**
Senator Gonzales.

**Sen. Gonzales**
We expect a perfect bill. It's going to be great.

**Rep. Weissman**
It'll be easy. Okay, Ms. Jenson has clarified it is proper at this point for other members to sign on as nonprime co-sponsors. Okay, Senator Van Winkle. Further members, Majority Leader Moreno, Rep. Bacon would you like to be a co-sponsor? Okay. Rep. Bacon is in. Rep. Carver, we would we'd love to have you but we understand that term limits are having their way with you. Okay.

**Sen. Moreno**
No glory.

**Rep. Weissman**
All right. I think that was everyone. So, thank you. Committee. We'll move to. Oh, I'm sorry. Mr. Imel, please go ahead.

**Conrad Imel**
Thank you. Conrad Imel, Office of Legislative Legal Services. Do we have your permission to make technical changes to the bill as we finalize it for Legislative Council?

**Rep. Weissman**
Senator Gonzales suggests that it's already perfect. Sure, Mr. Imel, maybe you could just sort of say for the record, what is meant by technical. I think you mean things like the bill summary and the topic perhaps?

**Conrad Imel**
Yes, the bill, the bill summary, we will probably change to reflect what's in the amendment. I think because you've done in the house. You're okay. That part of the different clauses in the bill refer to where it's starting in case the editors find any technical issues that we've made, as we finalize it for Legislative Council. I'll also remind you now Mr. Chair that you've set the co-prime sponsors for the bill but at Legislative Council it's tradition that the chair of the committee would present all three bills.

**Rep. Weissman**

- 11 -

Understood. And I have been in communication with Ms. Mullis about that process. So, thank you. Okay. Mr. Imel, do you have everything you need for Measure 1? Okay. We will proceed to Measure 2, also known as Bill 2 or LLS 0151. I will move Bill 2 and ask for a second.

**Rep. Carver**
Second.

**Rep. Weissman**
Okay. The motion is by the Chair. Second by the Vice Chair. All right, members, everybody should have LLS 0151, amendment number 1. I see extra copies are being brought around. Now, as before, we'll talk through this in detail. I'm going to turn it over to Rep. Carver. Madam Vice Chair, if you'll explain the amendment.

**Rep. Carver**
Thank you, Mr. Chair. Starting at, this is on page 1, lines 2 through 8. Because we are creating in this process, a new entity, the independent adjudicative board, independent adjudicative panel. And in specifically referencing the panel later on in this bill. We thought it prudent to provide a definition, a statutory definition for panel, which obviously as the board consists of three pools, district court judges, lawyers, and citizens. And then when a formal proceeding is initiated, members will be drawn. One member will be drawn from each of the three pools to constitute the panel, which will then hear that specific case. And, so, this is just clarifying that by definition. In the rulemaking section, and this is 9 and then going to the bottom of the page. In Senate Bill 22-201, we created or directed that APA procedures need to be followed for rulemaking in other words and opportunity for public comment. And, so, this is just to ensure that that is clarified as well for this new rulemaking committee that we are creating in the CR, that for the Commission rules and then for the adjudicative board, that in both instances, public participation is necessary as far as public notice and comment. There is special outreach to the entity that the rules apply to. Again, remembering that we have made the adjudicative panel a separate and independent process from the Commission. We decided that in looking at what the other states had done, and there's various models, that in order to do the kind of process where we truly have independence of the investigatory function and then a separate and independent body, basically hearing the allegations and acting analogous to a trial court. This would be the adjudicative panel, and then setting up more clearly on the appellate review standards that are clearly appellate and not, not the broader provisions that we currently have. So, this is just capturing the procedures in 201 and applying them across the board. Going to page two. Then 6 through 11 is basically just doing some cleanup. But I do want to make comments on two critical issues that we had hoped to include in this bill, but found that there were additional issues that still needed to be discussed and resolved. First, the process for resolving subpoena disputes. And in the first instance modifying subpoena power for the commission and the adjudicative panel, which is critical. But there are also venue questions, other questions that came up associated with subpoena while we were able to get partway there, we could not get all the way there on all the issues. And, so, we believed it was better to reserve the subpoena issue, for should this

- 12 -

committee, pass this bill, reserve it for the legislative session, with the commitment and full intent that there will be a subpoena provision in this bill to address all those issues. So that is the first thing that I wanted to put on record and that reflects Chair Weissman and my absolute commitment on the necessity of a subpoena provision in this bill. The second provision that we ended up deleting from this bill was on criminal penalties. As we've discussed in this committee, the current criminal penalty for sanction of breach of confidentiality is a misdemeanor penalty, a criminal penalty. In speaking for myself, and I believe chair Wiseman, we believe that that criminal misdemeanor penalty was not the appropriate penalty, at least applied broadly to everyone. We believe that they're, as we dug into this, and again, we very much wanted to have in this bill, a criminal penalty or whatever penalties civil, there's a range of options on what the appropriate penalty should be, perhaps dependent on whether it is the complainant or a witness, or a commission member who has breached confidentiality and violation of their duty. So rather than give the impression, which we were fearful, the draft proposal would give by including in the bill, provision on criminal penalty, updating it to include the current legal entities operating but not changing the criminal penalty, that we would give an impression that we were satisfied or agreed with the existing criminal misdemeanor penalty. We do not. But we're not able to get to a fully vetted alternative sanction for breach of confidentiality. That is why we decided the better course was to delete out that section. But put on the record our full commitment and statement that this must be addressed in this bill in 2023. And that is the strong feeling of both the Chair and I. So just to explain that. And then moving on, again, on page two lines 12 through 19. The existing statutory Bill draft proposal that was published on September 9, contained provisions about mandatory complainant rights, that is that the commission has an absolute legal duty to keep the complainant apprised of the status of the case, including periodic updates. No more, we hope. Will we hear testimony or read in the as we read in the ILG report, that a complainant files a complaint and then months pass, they hear from no one, they don't know what's happened. And then all of a sudden, they get a notice months later about an interview. And then it goes silent again, they have no idea what happened. This is not a process that inspires confidence. And so that is in the draft proposal. But then in hearing from our stakeholders, they pointed out in addition to what we had in the draft proposal, these additional steps in the process that they wanted to call out specifically for keeping the complainant updated. And we thought that content was right on the money. And we were glad to add it. And that's what those lines do. And then at the bottom of page two, lines 20 through 35. Again, this is just there was an issue that was raised. And again, we are as part of this process, we are, we are trying to address ensuring that these bodies are acting independently, without conflict of interest, and there was concern about staff, and how do we determine what staff will be tagged to support a formal proceeding in front of the adjudicative panel. And we thought the best way to resolve that, that since the trial court judge who will be selected from the pool has to run the conflicts list right? Before they are selected to hear that specific case, that in those circumstances, the judge selected for the panel would choose the staff with the hard restriction that it cannot be staff from the district of the respondent judge. And that is what that section does. And then over on page three, these are, again, cleanup items. And that covers the substance of the amendment.

**Rep. Weissman**

- 13 -

Thank you, Madam Vice Chair, I wanted to add just a little bit more on the two key points that the Vice Chair spoke to subpoena and sanction. You know, the idea that there is access to information through subpoena for both the entity doing the investigation, the Commission and the respondent is not new. It's not unique here. In fact, it's been in Rule 22, specifically promulgated by the Supreme Court for some time. It is my understanding based on information from the Commission, subpoenas aren't even issued very often. Nonetheless, when they are it's important that there be solid process for issuance and for resolution of disputes about issuance, and we have grappled with this mightily haven't quite landed to a specific resolution. So, the Vice Chair and I did agree that rather than try to lay down text by amendment that that might not be broadly agreed on or might need to be subject to a lot of further revision. We would be silent in this bill as to the question of subpoena. That silence doesn't mean that there is entirely no law on point. The law on point remains the Commission Rule and whatever gloss there is on that, and we do fully intend to return to that in the regular legislative process. Sometime starting next January. I did also want to speak to the sanctions issue because this has come up powerfully in testimony. You know, we have inherited specifically 24-72-401 and 402, from I think they turned 40 years old next year. Those are the misdemeanor provisions that the Vice Chair spoke of. We have, from a policy standpoint, we have heard that those can have a chilling effect. We've heard that very powerfully here. That kind of chilling effect. Even the prospect of it is in my view inimical to this process working as it is supposed to work. We have had a fair bit of legal research, appreciate the work of our nonpartisan staff and LLS to help us dig on that. National Center for State Courts has also sent us some material to the effect that as applied in some circumstances, at least, these types of criminal provisions may in fact be unconstitutional. There is a very recent 10th Circuit case not dealing with judicial discipline, but dealing with another question of transparency for policy reasons and the First Amendment right to speak on matters grounded in one's own experience. That I think is suggestive. Policy considerations and legal research do suggest that the analysis can be different for in my mind system actors, members of the Commission, staff of the Commission. In those cases, the test on point is sometimes called the Pickering, Garcetti test. That's a slightly different First Amendment rule concerning freedom of speech. And what we realized, you know, as we grappled with this further, is that we do need to do more work to set in place a replacement. Confidentiality in the early stages is important, we've discussed all of that. The existing misdemeanor penalty, as written is not appropriate and does need to be modified. In the earlier draft, we had made conforming changes to it. It was the Vice Chair's idea that we should not even run the risk of blessing, the continuance of that by minor change and having it roll forward out of this interim committee, in a bill that the regular session would see, hence, the decision to strike any amendment to those provisions out of this bill. We know that those provisions remain on the books. We intend to take this question up. Again in 23, I think that's one of the most important ongoing pieces of work that we have to do with this bill. So, committee if there are questions or discussion for amendment 1 to Measure 2. That is all fair game. Seeing no hands shooting skyward, I'll ask if there is. The amendment has been moved and seconded. Is there any objection to amendment 1 for Measure 2, LLS 0151. Seeing none, the amendment has passed. Any further amendments to Measure 2? Seeing none, amendment phase is closed. I guess Ms. Jenson as before, I'll

- 14 -

restate the motion for clarity. I move Measure 2, LLS 0151, as amended by amendment 1 to the Committee on Legislative Council. And I ask for a second.

**Rep. Carver**

Second.

**Rep. Weissman**

Motion by the Chair second by the Vice Chair. Committee, any closing comments? Wasn't sure if I saw hands. Okay. Ms. Jenson, if you could kindly call the roll.

**Juliann Jenson**

Senators and Representatives. Bacon.

**Rep. Bacon**

Yes.

**Juliann Jenson**

Gardner.

**Sen. Gardner**

Aye.

**Juliann Jenson**

Gonzales.

**Sen. Gonzales**

Aye.

**Juliann Jenson**

Lynch.

**Rep. Lynch**

Yes.

**Juliann Jenson**

Moreno.

**Sen. Moreno**

Aye.

- 15 -

**Juliann Jenson**
Van Winkle.

**Juliann Jenson**
Aye.

**Juliann Jenson**
Carver.

**Rep. Carver**
Yes.

**Juliann Jenson**
Mr. Chair.

**Rep. Weissman**
Yes.

**Rep. Weissman**
Okay. Measure 2 as amended passes to Legislative Council by a vote of 8 to 0. As before we need to settle sponsorship and Chamber of origin. Rep. Lynch and I will start Measure 2 in the House. Senator Gardner and Gonzales have agreed to take the baton in the Senate. As before, perfection is assured. Committee, who else would like to be a co-sponsor of Measure 2 upon introduction, Senator Van Winkle. Rep. Bacon and Senator Moreno. And Madam Vice Chair will be there with us in spirit. Okay. So that brings us to Measure 3. I'm sorry, Mr. Imel, as before please go ahead. Chamber to which.

**Rep. Weissman**
Yeah, so we'll start this in the House. I'm sorry.

**Conrad Imel**
Then permission for technical changes. I didn't want to because you had mentioned this earlier on the technical changes. I won't because the amendments fall within what the current bill topics are for each of these bills. I won't change the bill topic. If there's a desire to change it, let me know now and I can but otherwise, I wouldn't consider that a technical change for bills one and two. If you want to mention specifically constitutional changes, statutory changes, something like that.

**Rep. Weissman**
Thank you, Mr. Imel. Let me look, looking at Measure two. I think the topic seems fair.

**Conrad Imel**
Yeah.

**Rep. Weissman**
No need to change.

**Conrad Imel**
Right.

**Rep. Weissman**
Okay. Committee that brings us to, to Measure three. We'll take a short recess before we jump into Measure 3. So, the interim committee on judicial discipline will stand in recess.

**Rep. Weissman**
All right, the Interim Committee on Judicial Discipline, we'll come back to order. So, we had discussed and voted on Measures 1 and 2, which brings us to Measure 3, LLS 0152 on the agenda, and we'll recognize the sponsors first, who would like to who'd like to start to speak to Measure 3. Rep. Bacon.

**Rep. Bacon**
So, we had the wonderful privilege of being able to work on this bill. Before we move forward, we just want everyone to still be able to look at the posted draft. And to keep that as language in which we'd like to continue to move forward. So today, we've asked myself and Representative Lynch, have asked to talk a little bit about this bill, why it's important. And in particular, why we think working on it is critical to all the people who have been spending time with us, let alone to the people who work for the judicial department, and our neighbors and taxpayers. So ultimately, we have decided to not bring the bill forward for committee today, and that we need to do some additional work. But we would like to be able to welcome some of our comments and feedback from our colleagues. And then I'd be more than happy to kind of get us started in giving a little bit of an overview of what the bill is in its draft form and where it is that we hope to go. If I might have the Chair's indulgence.

**Rep. Weissman**
Rep. Bacon, please go ahead.

**Rep. Bacon**
Wonderful, thank you. So, we set out, we were. . . Sorry, I chuckle, assigned this bill. But ultimately, Representative Lynch and I really wanted to be sure that we were able to take into account the voices of people who came before us, particularly in the experiences they've had with trying to navigate, quite frankly, making complaints. The bill that you see as draft that was posted suggests that we create an ombuds office. And the role of an ombudsman is to be a neutral space that provides safety for people to not only try to figure out if they want to file a complaint, but how they can be supported in doing so. The

ombuds office also can serve in that capacity, where that person, the ombuds office as an entity would act as an advocate for the complainant in the sense of helping the complainant make decisions that are best for the complainant and not the system. And whether it's their job or any judicial proceedings. Ombuds offices in general tend to be one of three things, we tend to see them mostly in support of people out in the community in trying to figure out how to navigate a complex bureaucratic space. Ombuds offices also are neutral spaces to do investigations, where there comes complaints. And then we have the ombuds offices that provide that safe space and become the advocate, as I just mentioned, for those bringing complaints. So, what we do agree on is that there needs to be something like that. We heard from people talking about, we heard even in reference to bills 1 and 2 with the referred Measure and bill 2 that people may not hear back when they file a complaint. But it's been made plain that people need support. So, the bill that you see outlines the scope and role of an ombuds office, we don't anticipate that the ombuds office would act as HR in the sense of resolving the issues for Judicial, but we do expect that there would be an office where people can feel safe and going in learning how they can be protected through any complaints. The rest of, the remainder of the bill creates a what we would call nonpartisan board to manage an ombuds person, because the way that we proposed it is that the ombudsperson should not, you know, be managed by judges in the sense of especially when it comes to judicial discipline. And, so, we created in the bill, a nonpartisan board with appointees who have experience in the space. And then the last part of the bill talked about the scope and role of what the ombuds person could do. And we'd like to put a spotlight on what it looks like to support complainants, not only by creating an anonymous place to report which we heard was critical. But to be able to support those who are complaining with finding resources and referrals to legal counsel and referrals to mental health supports. So that's the scope of the bill as written. I'd like to just add, you know, my personal thoughts on the need to continue this work. You know, we just went through kind of all the jurisprudence and you know, I'm sure the people in this room can appreciate a good highlighter in the Constitution. But I do think that we heard a lot in this committee, about culture within this Department. The overwhelming bulk of the Troyer Report, talked about how people felt like they were compelled to behave a certain way because of management. ILG also reported in the sense that, hey, you actually have to do something about your culture. We're trying to figure out what that means, as a matter of judicial discipline. But what is clear to me, that I think is very unique about at least the court's department is that, you know, misconduct isn't, you know, so, I guess overt or clear, when judges are also managers, we have to figure out how judges can contribute to safety of an office or toxicity within an office. And there isn't a bright line to necessarily talk about that. However, this Department is unique in that sense. And there is something to be said about people feeling like they need to go to the Denver Post instead of people within the office to figure out how to remain safe. We heard from stakeholders, we heard the letter from a young woman who really struggled to be supported in all the things that were at stake not only for her mental health but for her career. And we think it is critical that that is addressed. I will say for me, I also you know we will come it to continuing to do this work, because there is real urgency around it. And having listened to those reports and all the stakeholders on this culture issue, you know, there are a few things that kind of behoove me, when we hear from Chief Justice Marquez in January, that will be now the third Chief Justice that is involved with these issues, which means we're

- 18 -

talking about over five years, the statute has run so long that we can't prosecute someone for allegedly stealing from the state. We have, you know, the notion that now we're going to have to work with the Judicial Department. And this is with all due respect, but to follow a supplemental request, follow, you know, how the department wants to build an office, I think about the additional time spent on top of our lovely summer mornings here, to be able to follow this. But you know, I cannot get over how there may be a request that, you know, we want to support, to find millions of dollars to be able to build an office, but a lot of people struggle to bat an eye to find $5 million to pay one person. And so, you know, they gave me a microphone, and I've said this before, but I want to make it clear that this is of interest to the Legislature. We owe it to staff who work for the State and the Department, we owe it to our neighbors who are taxpayers. And we it is part of our dual duties to be financial stewards for the state. And for what it's worth, I think we have to be beyond hoping it's going to change even with the utmost faith, faith that it will, to knowing it will. And the way we can know it will change is by this body, or this branch of government putting a stake in the ground and saying that it must. And, so, we know between today, and the end of session, which is a year from now, that there's a lot of work that needs to be done. But the legislature is willing to put things to paper to be sure that it does. And, so, we need to continue to work in partnership with the Judicial Branch. However, we have a year, we have, we have a year, we cannot extend these issues any longer. We know that the culture is critical. And I want to reiterate, there will be a space for people to be able to talk about the things that intimidate them. Because we know in practice and organizational culture, it takes a couple of years to shift that. But there needs to be something that people can rely on so that they can trust the process, feel safe, and change that culture. So, you will see for me a commitment to talk about this through session. I do want to ask Mike, any of my colleagues Rep. Lynch, to speak as well. But lastly, I do want to thank everyone who has been working so diligently on this issue in this gray space, at least for this committee, but it is not gray in the sense of what we hope to accomplish. So, for all of you who have been writing me pages of emails, like hey, can you call me today, I want to say thank you, especially to our drafter. But please know, we have a great starting point. And we hope to continue and get something down that we know we can rely on. So, thank you so much.

**Rep. Weissman**
Thank you, Rep. Bacon. Rep. Lynch, go ahead.

**Rep. Lynch**
Thank you, Mr. Chair. And I want to say it's been a real honor working with Representative Bacon on this. We, you know, we kind of opened a can of worms here and then that this happens a lot, as I'm discovering is that once we start going down the road, we discover well there's these other issues and there's these other issues. And are we really addressing what we initially set out to and then we discover that that through stakeholder involvement, we discover that this needs to be expanded. And I think that's where we came to with this bill on something that seemed really simple, which is to just create a real simple ombuds office, it's no big deal, we discovered that there's other there's more scope in that office than we initially thought. I want to say that you can count on there definitely being an ombuds office by

- 19 -

the end of next session, I'm pretty confident that we'll be able to get that done. I feel that taking the additional time to put into this is prudent to make sure that we cover all the bases from all of the information that we received through this process. And I will gladly let that be one of my bill titles if that needs to happen. So that is my commitment to make sure that we continue this process and get this done. We just, we just weren't to a to a place where I felt it was comprehensive enough right now. We also need to hear more from the Judicial Department what you know what, what are their plans and where their gaps and where their, their areas where we can legislatively encourage them to do the right thing. One of the things we we've discovered is that this is a very essential part of judicial discipline, because you have people that that are put into very uncomfortable positions, and that that oftentimes subverts their feedback into what's going on around them. And we want to make sure that that does not exist within the judicial department. So, I look forward to the continued conversations with all the stakeholders. And thank you so much for all the work that you all have put into this, we're not done, we've got a good starting point. And that's the good, the good news, we've got a good base. And we're going to continue to build that over the next few months to make sure that we have something that is completely comprehensive and in providing the best place for folks that have issues to go to without feeling any sort of pressure, or, or the public, quite frankly, thinking that there's some sort of, there's some sort of influence in that office that that that we want to ensure does not exist. So, thank you so much Representative Bacon for your work on this. And I look forward to continuing the conversation.

**Rep. Weissman**

Thank you both. I'll see if any other members of the committee want to comment on this subject. Senator Garner.

**Sen. Gardner**

Thank you, Mr. Chair, I appreciate the work that both of you have put into this. Thank you. And the commitment because this is an important matter, having an appropriate office and staff to deal with shepherding for lack of a better term, and navigating for judicial personnel in this system is important. And I with your consent, would like to be the Senate prime or coprime on the bill, in the hopes that we do what I think is the second thing Representative Bacon I think that this interim committee work has ultimately there's a whole list but I think it's ultimately been about the judicial discipline process as well as department culture and processes for employees and others who interact with the department to know how they can make a concern known. Final complaint, if that's the appropriate thing, or just have a conversation and raise a concern all of that. So, thank you both. I know this has been to this point, a really hard, heavy lift and conversations, I think sometimes process is much easier than culture. Thank you so much.

**Rep. Weissman**

Senator Gonzales.

- 20 -

**Sen. Gonzales**

Thank you, Mr. Chair, and thank you, to the stakeholders who have been offering their comments, sharing their perspectives and the need for this. For this work on culture, and people to proceed, thank you to Representatives Bacon and Lynch, for your leadership in drafting what I saw to be a stack of amendments to acknowledge right the ongoing conversations that are continuing to unfold. I also want to express my support and willingness to continue to engage in this drafting process and effort as we head towards the 2023 regular session in January. Knowing that in many ways, during every public comment session, we heard people who were frustrated and unable to find the appropriate manner to navigate the issues that they've that they've that they found themselves in through the existing processes, right and being able to provide the opportunity in the space for them to go and receive the support that they need in order to have their complaints be addressed or their concerns be addressed. And then also providing that same space for internally, right, externally in terms of individuals who are navigating the court process, but also internally within the staff and the people who work within the department, it's going to be really important. I look forward to continuing that work. Thank you.

**Rep. Weissman**

Thank you, Madam Vice Chair.

**Rep. Carver**

Yes, I want to just recognize and commend the hard work of Representative Bacon and Representative Lynch and the passionate stakeholders who know these issues, bring their expertise. See a problem, which was certainly highlighted and documented extensively in the ILG report. I mean, nothing could be more clear about the need for change, and better support and information for complainants in this process. And I do want to just personally say and I know, I've mentioned it earlier, but I feel so strongly about it. In an earlier job that I had. We, I saw the difference occur in a process involving complaints of misconduct that were about to be adjudicated, investigated and adjudicated, when the complainants did not have a designated support system to go to for information, for advice for a sounding board, other than the two parties formally involved in two or more in the other functions, doing their official duties. And, so, I personally witnessed the change that that made for victims and complainants to have that Ombudsman's function. And it was a meaningful and significant change for the victims and complainants in that process. So, I commend your work. I don't know that you particularly need people's spirits hovering around in 2023. But this is certainly one where I am with you in spirit. It is something that needs to be done. And I commend your work. Thank you.

**Rep. Weissman**

And thank you. Committee. Did anyone else want to comment on the subject? I'll, um, I'll add my two cents. I mean, I think the broad why, on top of being capably set forth by several of the members of this committee just now are very concisely summarized in the legislative declaration of the draft. Where are their power disparities? I think that we should all be able to relate to that because, frankly, all of us with our black name tags on here are everyday we walk in here we are on, whether we realize it or not, we're

- 21 -

on one end of a power disparity as to just about everybody else we interact with. And I think that we need to be mindful of that and what it means and what impact it can have on others we deal with, even if we don't mean it to. I think that is also true of judicial officers in particular. You know, it has struck me in the now years of grappling with this subject. I mean, I think all of us particularly lawyers, are accustomed to thinking of judges as folks in black robes who decide what the law means, and grapple with disputes about where the facts meet the law. But in the cases in which we've been talking about here, and had been the subject of these extensive reports, a judge is also a boss, a judge is somebody from whom an organizational culture emanates. To the broader point that both Rep. Lynch and Rep. Bacon have made. Others are also fountains of organizational culture within the 4000 or so employees of the branch. So, I don't mean to make that solely about judges. It has been my personal view that ombuds legislation should encompass both issues arising as to judicial officers and issues arising as to others, understanding that they might be dealt with differently. I think another key purpose is also set forth in the legislative declaration. The proximate beneficiaries are, as you both said, those who are working in the branch or possibly others who have contact with our courts, but ultimately, it is even broader than that it is the entire public in their function as payers of tax dollars that support our government, and as people who deserve to be able to look at what we in government do and have some confidence in it. You know, that confidence has been shaken. I think that we're here among many other reasons to try to help put that back together. And I think this is part of that work. You know, I set myself to the exercise earlier this week of looking back at our charge, our formal charge set forth in SB 201. And how that connects specifically to this question of ombuds work. And I just wanted to note points of connection that I personally see now, as a formal matter, the charge of this interim committee stops mattering after today. But the broader point is, these are things that all of us, collectively in the whole legislature set forth to call out in statutory text. And I think that they continue to have for us the interim committee shall study the following issues and so be on that list was, how to achieve a system of judicial discipline in which individual cases are investigated and determined, independent of influence by the judiciary and overseen by the community, the bar and the judiciary. Questions of culture are not totally separable from that, in my mind, I think even more to the point, the bill, our charge set forth, that we should study the benefits of a victim centered approach to judicial misconduct complaints, that allows the victim to have a voice in how complaints are handled and resolved. And I think ombuds offices are even more squarely connected to that point. So again, that was the formal charge of this committee, those words take on another meaning down the road, but I thought it was worth mentioning that. Last, you know, of all the things that we've grappled with a lot of them have a considerable history, certain things I've been thinking about probably since 2019, a lot of the issues that were in Measures one and two that Rep. Carver and I grappled with go back at least as far as the regular session, the subject of an ombuds office, and how that would fit into the broader work arose a lot later, in the game here on you know, kind of came up in August, I think we all felt it come up very powerfully, which is why we decided even though there wasn't a lot of framework to approve, and go ahead with drafting and Rep. Bacon and Rep. Lynch, I really do appreciate your willingness to take that up slash be voluntold into taking it up. You know that the work that you've done, I don't think stops here. I appreciate your on record commitment that it doesn't stop here you have my on record commitment that I will lean into this

because I also think it's very important. You know, a few other examples come to mind in 2017. I served on an interim committee and an idea came up that did not arise as an interim bill. But I had commitment from other folks. And it became a bill in the next regular session in a bipartisan way. More recently, Rep. Lynch and I were co-sponsors of a bill that didn't quite make it this past year. It was an almost interim bill out of a different interim committee last year. Rep. Lynch picked it up, I joined him in that effort, and we didn't make it out of appropriations, but I'm informed that it is now going to actually come out of the interim wildfire committee. Point being, this process is multi-phase sometimes that is frustrating to all of us on some occasion. I certainly include myself in that. But I think the starting points that the sponsors have laid down and that key stakeholders have helped them lay down, put us in pretty good shape for moving forward. I'm eager to see ongoing work, and I will be as much a part of that as I can be. So, with that, those were the three measures that we had before us. I'll turn now and to see if any members of the committee want to make any broad kind of concluding comments on our work for the summer. Rep. Lynch.

**Rep. Lynch**
Thank you, Mr. Chair. And as this is one of representative Carver's potentially last official duties, I want you to know that there is an opportunity for public service moving forward with the drafting of this ombudsman bill. So, thank you for your service for the last eight years as your time is coming to a close, but you're not out of the woods.

**Rep. Weissman**
The tradition of voluntolding continues in the interim committee. Any other comments? Madam Vice Chair.

**Rep. Carver**
I just wanted to take this opportunity. And some I've expressed personally, but on the record the stakeholder involvement, the depth to which stakeholders have been willing to dig in on very difficult and challenging issues and sometimes with very short suspenses. I know as we were getting through the process, you were probably counting down the days to September 30. Before you got yet another issue with we really need to hear back from you in a couple of hours. And it's an issue of, you know, significance. But all of you have come through. And of course, the great Cynthia Gray, with her responsiveness to every research request we made, to give us an overview of what other states are doing. And to delve into the details, that the whole point of this interim committee as it was set up in 201 was to provide a forum and a venue for us to give these very important issues thoughtful consideration and vetting. And, and that is what we have tried to do to our utmost. And I just want to touch very briefly on three points that I want to emphasize that I think are reflected in the concurrent resolution. That is the change to the constitutional provision, as well as the underlying statutory bill, and to be supported and added on by the ombudsman bill, which, again, I believe is critical. But first and foremost, we needed a change in process for greater public accountability and transparency. Colorado was an outlier in making these judicial disciplinary processes confidential, really, up until the very last stage of decision making.

That really was unacceptable. And, so, we have now moved confidentiality back to where I believe it belongs where the vast majority of states have it to still have confidentiality at the investigatory stage. But once the process moves forward with formal proceedings, recommended disciplinary action by the Commission, then the public needs to have full view of that process at the trial level and at the appellate level. And that's one of the very important changes we've made. And in addition to supporting that public accountability and access, the critical comments, very important comments brought to us by stakeholders on better data collection. With all due respect to keeping private personal identifying information, how can the public know how this process is working? And they must have an ability to see how this process is working at the Commission stage. And then of course, the other stages are public. And so having that what we believe to be robust data collection, on an aggregate level that is made available to the public. Facilitating that with the appropriate provisions in the constitution to make clear that there is not a confidentiality issue with that approach, and then laying that out in a separate subsection in the statutory bill. So just as we have tried to address the serious issues with complainants. We have also tried to use this forum as a method to absolutely ensure public accountability and transparency. After all, the people are who we all work for, and our three independent branches of government. And, so, we believe that is absolutely critical. I also want to make just a couple of more points on how we have moved and we have moved significantly from the structure in the current constitutional provisions on judicial discipline. It has been quite frankly, again informed by what other states have done and our excellent stakeholder input. In our current system, the Commission in its work when they believe discipline is warranted, other than an informal remedial action would take that to Special Masters made up of judges. And then the Special Masters would review and put forth recommendations to the Supreme Court. The Supreme Court had de novo review on both law and facts, as well as determining the sanction. What we are proposing in the CR, to be taken up by the Legislature and then we hope, passed by the Legislature and submitted to the voters is a drastically different system.

First, we keep the good work of the Commission on their investigatory function, critically important, and the fine work that they have been doing for decades. But we have now proposed to eliminate the Special Masters function. Instead, we replace it with more of a trial-like process, and not just judges. In fact, the judge is one of three members on the adjudicative panel, to hear the facts, look at the law, look at the recommendation for proposed sanction. It will be a judge, a trial judge--district trial judge, an attorney and a citizen. And they will do that de novo review and make their determinations on facts and law and sanction.

And then at the appellate level, of course, if it is a judge, the appellate level remains the Supreme Court. If it is a justice involved or not just a justice involved as the respondent the subject of the complaint. But when a justice is involved in any meaningful way, as a complainant, as a witness, their staff, their family members, all of those cases now move to the special tribunal as the appellate level. In addition, the catch all provision that if there were some other fact scenario where the justices believed, even if they their family and staff were not engaged, but a matter where the justices are seeing more than two of their members, having conflicts where they need to recuse that this also would go to the special tribunal.

- 24 -

And finally, a much more limited in scope standard of review at the appellate level, no more de novo review on the facts and discretion in choosing the sanction. Instead, a much more narrowly prescribed and traditional appellate review standard for both the special tribunal and the Supreme Court. Yes, de novo on the law, whether it is due process concerns or others. But on the facts, they take the facts as established at the lower level and only if the factual determinations are clearly erroneous can there be action at the appellate level? In addition, on the sanction before the Supreme Court had broad discretion to substitute its own judgment on what the sanction should be against the judge no more. Now, the sanction that is ordered by the adjudicative panel that now goes up for review, whether it is special tribunal or the Supreme Court can only be changed if there is an abuse of discretion. So, I hope with these changes, that the people of Colorado, we'll see how we have, again, I think in the interest of public accountability, but also for the complainants involved and the other parties. That we have, I truly believe, strengthened the judicial discipline process in a way that takes full account of due process, which does our best to minimize conflicts by having judges, trial judges at the adjudication panel stage, a Court of Appeals judges that special tribunal, but also excluding those within a disciplinary history, that we are really strengthening modernizing reforming our judicial discipline process in some pretty significant ways.

And then finally, but to me, a very personal and important issue. The dysfunction of and dysfunction, maybe not when you read the words on paper, but dysfunction in reality, or on how complainants felt in having faith and trust in a process that they could go to in the first instance to file the complaint, huge amount of distrust. Who knows what the actual number of complaints would be if it was a process that had greater trust and transparency and greater follow through. And so, again, we commend our stakeholders, the very, very strong section in the statutory Bill supported and enabled by the concurrent resolution to make absolutely clear that complainants must be kept apprised at every appropriate stage. They are to have an understanding upfront about the process. And that has to be followed through by the Commission. And that is a mandatory duty, not if you feel like it not if you get around to it, it is mandatory in every complaint that is filed. And we have made absolutely sure, in our concurrent resolution by an exception to confidentiality, whatever gray area there was in that law, to ensure that that information could be provided to the complainant without any legal issue or cloud. And I believe that is such a critically important reform that was needed that the ILG report called out for. And, so, I'm very glad that as part of the process. And with that, Mr. Chair, again, just commend you for your leadership. I don't know if we counted the minutes, the hours, probably best that we didn't, on the amount of time that we spent discussing these but it was time on these issues, informed by the stakeholders, informed by everybody who participated. And I commend your leadership and appreciate the process that has gotten us to these two bills. Thank you, Mr. Chair.

**Rep. Weissman**
Thank you, Madam Vice Chair. Committee, any other closing comments? I'll um, I just a few of my own really, which are in the vein of thank you to a number of folks. You know, we did have support

from a number of outside organizations in particular, the National Center for State Courts, whose comparative research I think, helped throw into relief, how out of sync we are with the weight of authority and as to how these things are structured in other states, and there were a lot of initial summary documents to digest and then many times over the summer, you know, one or both of us had further questions of Cynthia Gray I'm sure other members of the committee might have as well. She never failed to have an answer and sometimes it was within an hour. Their work has been very helpful. I did want to specifically acknowledge the Colorado Women's Bar Association, who for over a year have provided multiple sets of written comments which have been very helpful, have also volunteered their own research. And we know it takes a lot hours to dig and put together the things that you've shared with us. And that's on top of all of your active members having a day job, too. So, I want to acknowledge that. I also want to specifically acknowledge CCASA, the Colorado Coalition Against Sexual Assault, which I think uniquely here is the one organization whose mission is centered around the experience of survivors of things. And I think that perspective has been and will continue to be helpful. Also, I try to never fail to acknowledge our nonpartisan staff for what they do to keep this place running. Mr. Syed and Ms. Jenson, for all manner of scheduling support, keeping straight on the rules, our earlier discussions where a lot of folks had to be scheduled to be brought in, were very helpful in framing how we went forward. We know that's a lot of work. So thank you, Ms. Princell, Mr. Imel, we've put you through a lot of research requests on top of the drafting, that's also been very helpful, and I know it's gonna continue to be and then members, you know, we all volunteered for this, and on top of everything else going on, and I just want to thank everybody for that time. I also want to suggest our work is not quite done, even beyond the respects in which, you know, we've all spoken of, you know, our colleagues will see some bills issue into the system. And I think it's on us to help them understand the context. Eight of us have been here all summer, the other 92 have not. So, we have some perspective that I think that we should share, even more importantly than that going forward and 24, when the question of amending the Constitution, to really make the big structural changes that we know that we need to is before the voters, we are going to be natural advocates of that that change, shall we say? That seems like a long time away. I mean, it is kind of a long time away. But there will be people asking there will be members of the press asking, you know, well, why? I think that we need to lean in and help answer that question. Why when the time comes? And then, you know, Madam Vice Chair, thank you in particular. You know, we're probably at least 10 hours on the phone this week. But like you said, I haven't been counting. It has been an interesting process. I mean, we very intentionally set this committee up to the bipartisan that we have tried to work in in that consensus way, because some things are bigger than party. And this isn't the normal interim committee. We're not just talking about bills, we're talking about our foundational document. And some very core structure of government trust and government separation of powers issues here. And then that goes beyond regular disputes and philosophy that may arise. So, we have worked together, I think very constructively to bring us to where we are. My hope was always that we could pass things out of here as broadly as possible. I think 8-0 on two key Measures speaks loudly to our colleagues downstream of this moment, and I know that we'll continue to work on a successor to Measure 3 as well. So, you know, thank you, everyone. You know, I look forward to our continuing to do this work into the next session. Senator Gardner? No. All right. Committee if there's no

further business, then for the last time, I will declare the Interim Committee on Judicial Discipline Adjourned.

# Appendix 27(t)

## *Hearing before J. Budget Comm.*, Colo. Leg., December 15, 2022 (Colo. Comm'n. Jud. Discipline budget request presentation):

**Appendix 27(t)(i)
Transcript;**

# Colorado Legislature Joint Budget Committee—December 15, 2022 Hearing: CCJD

**Sen. Zenzinger**

Our next presentation is the Commission on Judicial Discipline, so I will welcome up Mr. Christopher Gregory.

**Christopher Gregory**

Good afternoon, Madam Chair, Members of the Committee. I'm Christopher Gregory, Executive Director of the Colorado Commission on Judicial Discipline. The purpose of the Colorado Judicial Branch is to ensure that Colorado has a reliable forum to decide disputes and resolve social harms through application of the rule of law. The importance of this role is reflected in the size and the resources provided to the Department, which includes roughly 339 active judges, 85 magistrates, 40 senior judges, and more than 3,500 supporting employees. The Department has a budget of approximately $660 million. Within our system, the judges are responsible for performing the branch's basic function, as well as managing the department's overall administration and operation.

I offer this context to reinforce the critical importance of the Commission on Judicial Discipline and our Office of Judicial Discipline in ensuring that judges perform their intended functions in an ethical manner. As far as a general description of our Commission, we were created in 1966 as part of some larger reforms that changed the methods in which judges are selected in the State of Colorado. Prior to that, we had a rather inconsistent judicial system that was selected through elections. Through those changes, we now have an appointive system. But the basis for the change was that there were great public perceptions that the Judiciary was having difficulties with corruption and was not performing the ultimate purposes for which it was created.

The Commission itself is composed of 10 members who are all serving without pay. This includes two District Court judges, two County Court judges, two attorneys, and four citizen members. The Commission itself is constitutionally charged with enforcing the Colorado Code of Judicial Conduct. Broadly explained, the Code recognizes that judges need to ensure fairness, accuracy, timeliness, and avoid even the appearance of impropriety when they're performing their basic functions. As expressed through Rule of Judicial Discipline 1(b), the Commission's mandate is to protect the public from improper conduct of judges, to preserve the integrity of the judicial process, to maintain public confidence in the Judiciary, to create public awareness of proper judicial behavior on the part of the Judiciary and the public, and to provide for the fair and expeditious disposition of complaints of judicial misconduct or judicial disabilities.

- 1 -

I highlight the mission, the importance of the Commission in the context of where we are presently situated, and that is, in the past two years, there have been public concerns as to the decisions made by the Judicial Branch's leadership, failures in reporting incidents of judicial misconduct or allegations of judicial misconduct to the Commission, and the overall general culture that has been found in the Department. Out of these concerns, it has become apparent that the Commission needs independence and autonomy to perform its constitutionally mandated function. The Legislature addressed this as part of Senate Bill 22-201, which was passed and enacted in the past session. And one of the primary purposes of that was to move the Commission away from its prior funding and resourcing structure, where we were completely dependent upon the Supreme Court and its Office of Attorney Regulation Counsel. I will highlight just a few parts of that legislation that passed, including the fact that it requires that the Department continue to provide in an indefinite manner, office space and facilities for the Commission to operate. It also required that both the Department, itself, and the Office of Attorney Regulation Counsel provide administrative support for the Commission pending its transition to internal or other external resources. However, in the statute as exists right now, that's supposed to sunset at the beginning of this next fiscal year. I'll get to that in a moment. The statute had created a $400,000 ongoing cash fund, which was intended to allow the Commission to address variability in the complexity and needs of its investigation and litigation of cases. It also created the Office of Judicial Discipline, which has 4 FTE: myself--the Executive Director, a legal assistant, an attorney acting as special counsel, and an investigator. The resources for general counsel and other miscellaneous support is provided through the statute for the Office of the Attorney General to do that. I will note that the statute contemplated other things that are non-monetary, including cooperation and sharing of information between the Department, the Colorado Supreme Court, and the Commission. There's also an expectation that when the Colorado Supreme Court is engaging in rulemaking, it must do so in a public way and with consultation through the Commission as to any rules that would relate to judicial discipline.

All of this brings me to what we are requesting this year, and as detailed in what I had submitted, we are seeking salary adjustments in the amount of $178,977. The whole point of these salary adjustments is that there were mistaken assumptions when the financial or the fiscal request was made as part of Senate Bill 22-201. At that time, we were unaware of the compensation levels that were being paid to the existing counsel that we had at the Office of Attorney Regulation Counsel. After further research and additional information, it appears that those same attorneys that had represented us on cases in the past as Special Counsel were being paid somewhere close to the range of what a County Court Judge receives in the State of Colorado. Consequently, our request reflects adjusting the funding for that position so it is reflective of that salary level. But not just that, just the importance of what that attorney is entrusted to do. And I would note in that context too, that our statutes, the constitutional provisions, allow the Commission to seek a recovery of attorney's costs and fees if we do prevail in judicial disciplinary proceedings. And that would be a way that, well, in essence, that position can fund itself to some degree, or at least support our Special Cash Fund to deal with more complicated cases. As to our Executive Assistant / Office Manager position, when it was originally proposed, the scope of it was anticipating that that person would not have to take on additional scopes of work, including looking at

- 2 -

some of our accounting functions, managing other aspects of our office, including coordinating IT services. And as it has become more apparent over the course of this last year, there really is a need for that person to do much more. When we recruited for the position, we did so on the assumption that we would have someone that is qualified to do all of those things. And all this does is ask to equate her salary to what we would be paying an investigator, which is the last position that we have yet to fill through our agency.

As part of our request, we have also asked for $25,000 to consult with an outside, nationally recognized organization to propose revisions to the existing Colorado Rules of Judicial Discipline. I think that this is very important, just in the context of what Senate Bill 22-201 requires, which is this consultation and cooperation between the Supreme Court and the Commission in the development of rules. Through a lot of the public controversy, it has become apparent that there are some structural changes that need to happen in our system, and the best way to do this would be through the recommendations of outside entities. And this had been done previously. Back in 2008, the American Bar Association had come in and done an evaluation of our system and made some recommendations, which, incidentally, have informed some of the recommendations that were made as part of the interim committee process.

The other item that we were asking $25,000 for is just to support our IT systems. Again. This was something that wasn't fully anticipated when we made our budget request as part of this last session. Once the change of the fiscal year occurred, the Commission has had to go out and contract with an outside vendor to maintain its computer hardware, software, those systems, and that was an unanticipated expense as part of last year's budget request.

I will note that, in addition to what I have submitted as our financial request, we will be submitting a budget amendment. And as part of that, we are requesting the addition of an additional 4 FTE with an expected overall cost of $339,073. The reason for this is that the Commission had been operating with an assumption that SCAO was going to be providing many of our administrative resources. And recent events have made clear that that's not something that we can rely on. On November 18, I received a letter from the Colorado Supreme Court explaining that they were announcing a change to Rule of Civil Procedure 227, which is what had provided our agency with its resources prior to the passage of Senate Bill 22-201. And it also had provided the resources for OARC, in conjunction with SCAO, to provide the administrative support according to the statute. Interestingly, in that letter, they said that our support will terminate on the beginning of this next fiscal year. Essentially, we're headed towards a cliff if we don't do something, and we would need to either get these resources internally or have been provided elsewhere. I'll note also, in conjunction with that, we had been negotiating a Memorandum of Understanding with the Department. To date, we don't have anything signed from them. What has been proposed is not in line with what the statute expected, which would have been them providing us the same terms as the Judicial Performance Commissions. And we also don't have a signed lease that confirms what the statute also requires with them providing our office space and facilities within the Carr Building.

- 3 -

Ultimately, that leads to, I think, the basic question that's been asked throughout this process, what is our position as to an independent administrative unit? I would say that we wholeheartedly appreciate that proposal and support it. It is absolutely absurd that we would be requesting administrative staffing that equals what our operational staffing is and not have that resource be available to other agencies or entities. I think Mr. Ioannides had brought up some good points, that there's probably some details to be worked out with this. Our concern is the same, I think, as his, that no matter what happens, even if your committee, the Legislature does fund this request for the $300,000 for our Office to internalize some of these resources, or this administrative unit is going to be created. By the time that any of that would come online, we're going to have a gap and the Commission absolutely needs greater assurances that the Department will be doing what it is promising to do in providing these services in the interim. I don't know what we would do without having budget support in an off year before that would be online. I have no idea how we could manage our payroll or provide any of these other things, including the accounting function.

So that said, I would just ask, if you have any questions? I'm happy to answer.

**Sen. Zenzinger**
Members. Do we have any questions for Mr. Gregory? We do. Senator Kirkmeyer.

**Sen. Kirkmeyer**
Thank you, Madam Chair, I just want to make sure I heard correctly. So, the SCAO is supposed to be providing certain things like leases for office space and certain other administrative responsibilities per statute, and they sent you a letter and told you that they're not going to. Did I hear that right? Or am I getting it wrong?

**Sen. Zenzinger**
Mr. Gregory.

**Christopher Gregory**
Yes, I'm happy to clarify. Under 13- 5.3-103 (3), C.R.S., the expectation of the Legislature was that the Office of Attorney Regulation Counsel, which is part of the Supreme Court using attorney registration fees, and the State Court Administrator's Office would continue supporting our Commission over the course of this fiscal year as we sought to find a way to either make some of these things independent or to be able to continue having those supports provided in that way. What the Supreme Court did with that letter. Number one, they violated the other statute, which relates to our rulemaking, 13-5.3-107, C.R.S. which expects them to give us notice and give us an opportunity to discuss a rule with them before they would have to propose that rule change publicly. They didn't do that here. They just announced that they're changing a rule that would have taken away the source of funds for the Commission, and they did that just automatically. Shortly after that happened, I think the practical issue that we had. The Office of Attorney Regulation Counsel deactivated our access to Westlaw, which is an essential resource

- 4 -

that we have to perform our function. Fortunately, I was able to speak with the State Court Administrator and he was able to get that resource through the Department. However, it just illustrates an ongoing history where we have been having to fight over our basic resources. We've been facing threats of being essentially evicted from our office space because the Office of Attorney Regulation Counsel no longer wants us there. There's a whole history that was presented to the Interim Committee about these issues, but there is a difficulty with the Department essentially doing what they're obligated to do and what they're promised to do under our existing statutory structure.

**Sen. Zenzinger**

Thank you for that. Clarification. Members, any questions.

**Sen. Kirkmeyer**

I think we have lots of questions

**Sen. Zenzinger**

That we might not be able to dig into fully today, but it does give really good context for your budget request today, and so we appreciate that. Senator Bridges.

**Sen. Bridges**

I was going to say that all seems pretty messed up. Wouldn't you agree?

**Christopher Gregory**

I've been living it.

**Sen. Zenzinger**

Thank you. So, I hear, then, that you would be supportive of the Independent Administrative Services item and that that would provide some essential functions that you need. Are there any other needs that are not included in your budget request as a result of some of these actions that have been taken? Mr. Gregory.

**Christopher Gregory**

Thank you, Senator. One thing that I think does likely need to be addressed, particularly if this administrative support would occur through our Office. We would need adequate office space to have that kind of staffing, and it's not clear who would be paying for the remodeling or the capital improvements to make that happen or to assure that the space is truly adequate. In addition to that, I think one thing that doesn't directly impact us, but may come up as far as what occurs across the street during session, during the interim committee process, there was a proposal to create an independent ombudsman office to address, at least on a minimal level, the needs of employees within the Judiciary to understand their employee policies, but also if there were issues of judicial misconduct that needed to be reported, that ombudsman office could be a go between that could help those referrals be made in

- 5 -

anonymous ways. So that the people that are kind of in the middle of this, that could be victimized by it, aren't so exposed. As I understand it, there's been pushback from the Department about having that ombudsman office being external. That they would want to have it be part of something that they're internally doing. Respectfully, I think that that degrades the entire purpose and function of that office. But when it was proposed, the suggestion was they would need to depend wholly on us for these administrative supports. But we, of course, didn't have them. So, the fiscal note that was attached to that interim proposal reflected this same request that we have for over $300,000 added to the budget. But if an independent administrative unit were approved and moved through this process, I think it creates great possibilities to create that ombudsman office or other similarly situated entities that need independence from the Department itself to perform their functions.

**Sen. Zenzinger**

Thank you for that. That's some good additional context for that request. Members we are at the end of our hearing time. Any last questions or thoughts before we move on to our next hearing with the Department of Military and Veterans Affairs. All right. Thank you very much, Mr. Gregory, for your time and attention today. And congratulations on standing up a brand new department more or less. And it was really good to hear the update on your progress. So, thank you. Thank you very much.

- 6 -

# Appendix 27(t)(ii)
# Written Submissions of the Colo. Jud. Dep't and the Colo. Comm'n on Jud. Discipline;

# JUDICIAL DEPARTMENT
## FY 2023-24 JOINT BUDGET COMMITTEE HEARING AGENDA

### Thursday, December 15, 2022
### 9:00 am – 2:30 pm

**9:00-10:00    COURTS AND PROBATION (C&P)**

Main Presenters:
- Chief Justice Brian D. Boatright, Colorado Supreme Court
- Steven Vasconcellos, State Court Administrator

Topics:
- Introduction and Opening Comments
- Common Questions: Page 1, Questions 1-4 in the packet
- General Questions: Page 5, Questions 5-12 in the packet
- Admin Services for Independent Agencies: Page 16, Question 13 in the packet
- Bridges Program RFI: Page 17, Question 14 in the packet
- Counties Special Funding Request for 23rd JD: Page 19, Question 15 in the packet

**10:00-10:30    OFFICE OF STATE PUBLIC DEFENDER (OSPD)**

Main Presenters:
- Megan Ring, State Public Defender

Supporting Presenters:
- Veronica Graves, Human Resources Director
- Matthew Blackmon, Director of Finance

Topics:
- Introduction and Opening Comments
- Common Questions: Page 1, Questions 1-4
- Requests: Page 2, Questions 5-6

**10:30-10:45    BREAK**

**10:45-11:00    OFFICE OF ALTERNATE DEFENSE COUNSEL (OADC)**

Main Presenters:
- Lindy Frolich, Director

Supporting Presenters:
- Darren Cantor, Deputy Director
- Daniel Nunez, Chief Financial Officer

Topics:
- Introduction and Opening Comments: Slides 1-9
- Common Questions: Pages 1-4, Slides 15-18
- Requests: Questions 5-9 in the packet, Slides 10-17
- Admin Services for Independent Agencies: Pages 3-4, Question8
- Increased Flexibility Court-appointed Counsel: Page 4 Question 9 in the packet, Slide 17

**11:00-11:15    THE DEPENDENCY AND NEGLECT JUDICIAL PROCESS (OCR AND ORPC)**
Main Presenters:
- Chris Henderson, Executive Director, Office of the Child's Representative
- Melissa Michaelis Thompson, Executive Director, Office of Respondent Parents' Counsel

Topics:
- The Dependency and Neglect Judicial Process: Page 2, Slides 2-9

**11:15-11:30    OFFICE OF THE CHILD'S REPRESENTATIVE (OCR)**
Main Presenters:
- Chris Henderson, Executive Director
- Ashley Chase, Staff Attorney and Legislative Liaison

Supporting Presenters:
- Mark Teska, Chief Operating Officer

Topics:
- Introduction and Opening Comments: Slides OCR-1 – OCR-4
- Common Questions: Pages 2-3, Questions 1-4 in the OCR responses
- Requests: Pages 3-4, Questions 5-6 in the packet, Slides OCR-5 – OCR-10
- Admin Services for Independent Agencies: Pages 4-5, Question 7 in the packet, Slide OCR-4
- Increased Flexibility Court-appointed Counsel: Pages 5-7, Question 8 in the packet, SlideOCR-11
- Additional Items: Legal Contractor Rate Increase, please see joint ADC/OCR/ORPC response

**11:30-11:45    OFFICE OF THE RESPONDENT PARENTS' COUNSEL (ORPC)**
Main Presenters:
- Melissa Michaelis Thompson, Executive Director

Supporting Presenters:
- Linda Edwards, Chief Financial Officer
- Ashlee Arcilla, Deputy Director

Topics:
- Introduction and Opening Comments: Page 12, Slides 12-21

- Common Questions: Pages 2-3, Questions 1-4 in the packet, Slide 22
- Requests: Pages 3-5, Question 1 in the packet, Slides 24-29
- Admin Services for Independent Agencies: Pages 5-6, Questions 1 in the packet, Slide 22
- Increased Flexibility Court-appointed Counsel: Pages 6-8, Questions 1 in the packet, Slides 22
- Additional Items: Page 8-11, Question 1 in the packet, Slide 22

### 11:45-12:00    LEGAL CONTRACTOR RATE INCREASE (OADC, OCR, AND ORPC)

Main Presenters:

- Lindy Frolich, Director, Office of the Alternate Defense Counsel
- Chris Henderson, Executive Director, Office of the Child's Representative
- Melissa Michaelis Thompson, Executive Director, Office of Respondent Parents' Counsel

Topics:

- Legal Contractor Rate Increase: Page 2, Slides 2-14

### 12:00-1:30    LUNCH BREAK

### 1:30-1:45    OFFICE OF THE CHILD PROTECTION OMBUDSMAN (OCPO)

Main Presenters:

- Stephanie Villafuerte, Colorado Child Protection Ombudsman
- Jordan Steffen, Deputy Ombudsman

Topics:

- Introduction and Opening Comments: Slides 1-8
- Common Questions: Pages 1-4, Questions 1-4 in the packet, Slide 9
- Requests: Pages 4-20, Question 5 in the packet, Slides 9-16
- Admin Services for Independent Agencies: Page 22, Question 6 in the packet, Slide 17
- Additional Items: Slides 18-24

### 1:45-2:00    INDEPENDENT ETHICS COMMISSION (IEC)

Main Presenters:

- Dino Ioannides, Executive Director

Topics:

- Introduction and Opening Comments
- Common Questions: Page 1, Questions 1-4 in the packet
- Requests: Page 2, Question 5 in the packet
- Admin Services for Independent Agencies: Page 3, Question 6 in the packet
- Additional Items: None

**2:00-2:15**        **OFFICE OF PUBLIC GUARDIANSHIP (OPG)**

Main Presenters:

- Sophia M. Alvarez, Executive Director
- Deb Bennett-Woods, Chair – OPG Commission

Topics:

- Introduction and Opening Comments: Slide 1
- Common Questions: Pages 1 - 2, Questions 2-5 in the packet
- Admin Services for Independent Agencies: Page 1, Question 1 in the packet
- Additional Items: Slides 2 -4

**2:15-2:30**        **COMMISSION ON JUDICIAL DISCIPLINE (CJD)**

Main Presenters:

- Christopher Gregory, Executive Director

Topics:

- Introduction and Opening Comments:
- Common Questions: Pages 1-2
- Requests: Pages 2-3
- Admin Services for Independent Agencies: Page 3
- Additional Items: none

JUDICIAL DEPARTMENT – COURTS AND PROBATION
FY 2023-24 JOINT BUDGET COMMITTEE HEARING AGENDA

**Thursday, December 15, 2022**
**9:00 am – 2:30 pm**

COMMON QUESTIONS FOR DISCUSSION AT DEPARTMENT HEARINGS

1.  **Please describe the implementation plan for new programs added to the Department from one-time stimulus funds (such as the CARES Act, ARPA, and one-time General Fund), as well as any challenges or delays to program implementation.**
    **Diversion Program**

    Senate Bill 22-196 (Health Needs of Persons in Criminal Justice System) appropriated $4.0 million of American Rescue Plan Act (ARPA) funds for use by adult diversion programs. Of this amount $1.8 million is to be used for grant programs with the intent of diverting individuals with behavioral health disorders from the criminal legal system and into community treatment programs, as specified in S.B. 22-010 (Pretrial Diversion for People with Behavioral Health).

    History of Diversion Funding
    The General Assembly appropriated $400,000 annually for Diversion Program operations beginning in FY 2014-15 to support programs in four judicial districts. By FY 2019-20, this same funding amount supported programs in ten districts as the interest and commitment to offering pre-trial diversion options expanded. Appropriations to the Program were reduced to $100,000 in FY 2020-21 and FY 2021-22 as budget balancing measures, thereby limiting allocations to existing programs and inhibiting expansion of new ones. The number of programs funded in FY 2021-22 fell to ten (down from twelve districts in FY 2020-21), as the 9th Judicial District did not apply for funding and the 6th Judicial District obtained alternative county-based funding to support its program operations.

    Fiscal year 2022-23 was the eighth consecutive year in which Adult Diversion grant requests exceeded available funds. In FY 2022-23, the number of programs funded returned to twelve, with the return of the 9th Judicial District and the addition of the 8th Judicial District. The infusion of the $4.0 million federal ARPA funds provided a secure source of two-year funding for program expansion. The Adult Diversion Funding Committee elected to administer half of the federal funding in FY 2022-23, with the remainder reserved for FY 2023-24.

    The table below describes the changes in Adult Diversion sites, funding requests, and awards by fiscal year from FY 2014-15 through FY 2022-23:

| Overview of Adult Diversion Programs: Funding Requests, Awards and Participant Enrollment | | | | | | |
|---|---|---|---|---|---|---|
| Fiscal Year | # Applicants for Adult Diversion Funding | # Programs Awarded Funding | Adult Diversion Funding[1] Requested | Adult Diversion Funds Awarded | # Participants Enrolled | % Change in Participant Enrollment (from Prior Year) |
| FY23 | 12 | 12 | $2,031,657 | $1,900,000 | Unknown | Unknown |
| FY22 | 11 | 9 | $852,620 | $100,000 | 801 | -37% |
| FY21 | 14 | 11 | $1,137,954 | $100,000 | 1,275 | + 1% |
| FY20 | 11 | 9 | $890,762 | $400,000 | 1,259 | -17% |
| FY19 | 9 | 9 | $748,455 | $400,000 | 1,518 | -5 % |
| FY18 | 9 | 9 | $694,653 | $400,000 | 1,592 | + 90% |
| FY17 | 6 | 6 | $570,324 | $400,000 | 837 | + 67% |
| FY16 | 5 | 5 | $277,923 | $277,923 | 502 | + 68% |
| FY15 | 4 | 4 | $240,060 | $240,060 | 299 | NA |

Future of Adult Diversion

As demonstrated above, requests for funding have exceeded the Adult Diversion Program's budget each year representing the overwhelming demand for these programs. Even with variations in the resource environment, the number of programs seeking funding has tripled in just eight years, and the number of participants has increased from just under 300 at the Program's inception to almost 1,600 at its peak utilization. With the budget expansion of $2.0 million dollars in FY 2022-23, the State Court Administrator's Office (SCAO) is expanding staff capacity of the Adult Diversion Program to include a Program Specialist, through a contract using ARPA administrative funds. When ARPA funds are expended after FY 2023-24, the replacement of the federal funds with a General Fund appropriation will be necessary to maintain the future success of the program and expand its impact to additional sites.

**Information Technology:**

The Department has developed a four-year IT infrastructure plan identifying projects to support an increase in virtual, cloud, and remote technology options. A FY 2021-22 supplemental request for ARPA funds was submitted to support this plan. With the Long Bill appropriation, the plan began in FY 2021-22 and is targeted to be completed in FY 2024-25. Key projects updates:

- SDWAN Project –provides increased network bandwidth and backup capabilities to each court location. The implementation of this project is in the first year of a 3-year plan. The largest schedule challenge with this project is its dependence on third-party vendors that provide local internet circuits needed to complete the implementation. The project is being kept on schedule by adjusting the schedule to match when the internet circuits can be delivered.
- Audio/Visual (A/V) Upgrades – upgrades four hundred and fifty plus (450+) courtrooms and proceedings spaces throughout the state. The overall implementation plan involves the creation of an eight-year replacement lifecycle schedule for all A/V equipment in order to provide the most reliable audio and video experience. Significant supply chain issues have affected delivery dates from the start of the project that impacts the overall schedule. The project is being kept on schedule by installing A/V systems in phases as equipment arrives.

The Department anticipates slowly improving supply chain issues throughout the life of the project.

- Other projects on target to be completed by the end of FY 2024-25:
  - Disaster Recovery – upgrade and replace end-of-life hardware that is fundamental to the Department's ability to recover access and functionality of business-critical systems;
  - Data Center Refresh – upgrade and replace end-of life hardware and improve our information security architecture;
  - Network Infrastructure Upgrades – upgrade networking equipment that is local to each court location.

Most elements of this implementation plan will require additional spending authority from the Judicial Department Information Technology Cash Fund beginning in FY 2024-25. Both the implemented hardware and software will have on-going maintenance costs and will need to be replaced on a regular lifecycle schedule. This includes equipment such as A/V, networking, and data center hardware, as well as video conferencing (Webex) and information security software. The Department is still preparing the FY 2024-25 impact to the budget; however, we anticipate the Judicial Information Technology Cash Fund will cover these costs.

## Victim Assistance

House Bill 21-292 (Federal COVID Funding for Victim's Services) appropriated $3.0 million of ARPA funds to the Department for distribution to Local Victims Assistance and Law Enforcement (VALE) Boards in the 22 Judicial Districts throughout the State. The implementation of this legislation required educating stakeholders on the program, holding training sessions, awarding and sub-awarding funds, establishing procedures, forms, workflows, accounting, reporting and monitoring protocols. In FY 2021-22, all of this was done before subrecipients began serving their constituents, leaving approximately five months for local project implementation. This initial funding was only appropriated for a one-year period. Despite this time limitation, the Local VALE programs successfully spent 93 percent of the available funds. Senate Bill 22-183 (Crime Victims Services) provided a second round of funding, allowing for the APRA funds to be spent through December 31, 2024. The Department anticipates that this funding will be fully expended.

2. **Please identify how many rules you have promulgated in the past year (FY 2021-22). With respect to these rules, have you done any cost-benefit analyses pursuant to Section 24-4-103 (2.5), C.R.S., regulatory analyses pursuant to Section 24-4-103 (4.5), C.R.S., or any other similar analysis? Have you conducted a cost-benefit analysis of the Department's rules as a whole? If so, please provide an overview of each analysis.**
   The Judicial Department does not promulgate rules.

3. **How many temporary FTE has the Department been appropriated funding in each of the following fiscal years:  FY 2019-20, FY 2020-21, FY 2021-22, and FY 2022-23?  For how many of the temporary FTE was the appropriation made in the Long Bill?  In other legislation?  Please indicate the amount of funding that was appropriated.  What is the department's strategy related to ensuring the short-term nature of these positions?  Does the department intend to make the positions permanent in the future?**

The Department was appropriated $185,846 to fund 1.5 FTE in FY 2022-23 to assist with the administration, monitoring, and reporting of the federal ARPA funds that were received by the Department.  It is anticipated that once the ARPA reporting requirements are completed in FY 2024-25, the positions will be eliminated.

4.  **Please provide a description, calculation, and the assumptions for the fiscal impact of implementing the provisions of the Partnership Agreement, including but not limited to changes in annual leave accrual, holiday pay, and paid family and medical leave.  If your department includes employees who are exempt from the Partnership Agreement, please indicate whether or not you intend to implement similar benefit changes as those required for covered employees.  Please provide a breakdown of the fiscal impact of implementing the provisions of the Partnership Agreement for:  a) employees who are subject to the Agreement, and b) employees who are exempt from the Agreement.**

The Judicial Branch is exempted from the COWINs Partnership Agreement, however, in an effort to avoid disparity for Judicial Branch employee compensation, portions of the agreement tied to salary, will be similarly implemented. Specifically, Articles:

- 12: Job Classifications and Position Descriptions
- 30.2: Holiday Pay
- 31.1: Across the Board Increases
- 31.2: Pay Equity Study
- 31.6: Step Placement in Pay Plan Based on Time in Job Series

Beginning in January of 2023, the Judicial Department will embark on a Compensation and Classification Renovation project. This project is long overdue and aims to update all 250+ job descriptions to reflect the work currently being performed. Based on the outcomes of the updated job descriptions, a pay plan and salary structure will be created and assigned to each job description. The anticipated outcomes will create symmetry with the work being done in the Executive Branch System Maintained Study outlined in *Article 12 Job Classifications and Position Descriptions of the COWINs Partnership Agreement.*

During the Compensation and Classification Renovation project, the Judicial Department will analyze the data to implement a plan that mirrors the 31.6 Step Placement in Pay Plan Based on Time in Job Series proposed int the COWINs Partnership Agreement. The Executive Branch is requesting 26 FTE to complete the analysis. Based on similar ratio of number of employees to required FTE to complete the analysis, the Judicial Branch would need 4.0 additional FTE. We anticipate the analysis could be completed by the end of 2024. It is not possible to predict the financial impact of this endeavor until the analysis is complete.

Additionally, during the Compensation and Classification Renovation project, a Market Study Analysis will be completed each fiscal year, to keep the Judicial Department compensation competitive and avoid turnover due to salary misalignment. This can result in pay range movement, and individual compensation movement, accordingly. Of note, similar to the Executive Branch, the Judicial Department currently recognizes and addresses salaries that lag the market on an annual basis.  Funding requests related to these adjustments are either identified in the Department's total compensation template or addressed in the system maintenance budget request.  The Judicial Department contracts with a third-party vendor to conduct a market analysis of individual job position compensation.  The Judicial Department uses that analysis to addresses salaries that lag the market by at least 6 percent.  Unlike the Executive

Branch, current practice in the Judicial Department also includes moving incumbents of the effected job classes an equal percentage within the pay range, to proactively abate compression issues.

The Executive Branch currently recognizes and addresses salaries as lagging the market beginning at 15 percent below the market. The Judicial Department's approach of addressing a smaller margin of market lag has allowed us to do smaller incremental movements with lesser financial impact each fiscal year, allowing the Department's compensation to stay more competitive. Further, the Compensation and Classification Renovation project starting in 2023 will modernize our Compensation and Classification branch-wide, with built in sustainability measures for future changes and growth.

Finally, once the Compensation and Classification foundational work identified above, is complete, in order to further ensure symmetry and avoid disparity, the Judicial Department will complete a department-wide Pay Equity Study mirroring the *31.2 Pay Equity Study*, listed in the COWINs Partnership Agreement.  The Department anticipates the cost of the study to be approximately $350,000.  Necessary individual salary adjustments will be made based on recommendations from the study.  The fiscal impact of implementing recommendations of both the Compensation and Classification project and the Pay Equity Study will be determined upon completion of each.

In an effort to further avoid disparity for employees, the Judicial Department also plans to mirror Article 30.2 Holiday Pay.

## GENERAL QUESTIONS

5. *[Sen. Kirkmeyer]* **Please describe, explain, and justify the Compensation Plan Maintenance request. Please describe how the Judicial Branch has addressed compensation plan adjustments historically and how compensation plan maintenance, salary range adjustments, and associated salary increases differ from the compensation approach and outcomes in the Executive Branch.**

   Every year, the Judicial Department's third-party vendor identifies job classifications that lag the market by at least 6 percent.  The Department then uses the vendor's data to support funding requests to increase those salaries and salary ranges to be within market ranges.  Similarly, the Executive Branch's total compensation salary survey adjustments increase salaries for classified employees when they lag the market by 15 percent or more.  These salary adjustments are reflected in the Department's pots templates.  The Compensation Plan Maintenance request is for funding to address the annual adjustments to salaries required in order to proactively address compression pay that results when an employee salary that is determined to lag the market by 6 percent or more is adjusted upward.  For more information concerning the Judicial Department's processes related to employee salary analysis, please see question 4, above.

6. *[Sen. Kirkmeyer]* **If not previously addressed in the common question, please explain whether the collective bargaining/partnership agreement applies to Judicial Branch employees.**

   The Judicial Branch is exempted from the COWINs Partnership Agreement, for additional information please see question #4.

7. *[Sen. Kirkmeyer]* **Please explain and justify the need for the R2 and R5 requests for an additional 7.0 FTE of HR staff and an additional 6.0 FTE of contract management and purchasing staff. Please provide context of the Courts' need for significant additional HR and admin/fiscal support services staff as it relates to the creation of an independent administrative services unit for the independent agencies.**

The concept of an administrative services agency to provide support to the independent agencies in the Judicial Branch has been discussed for some time as the balance of providing efficient services and meeting the needs of all stakeholders has been challenging. As we describe below (and in previous decision items), there is a gap between the administrative capacity and the needs of the Judicial Department. As discussed below, the additional administrative staff requested for the Judicial Department are needed to be able to meet the operational and fiduciary obligations of the Department, excluding the needs of the independent agencies.

The administrative services agency will enable the independent agencies to have more of a connection with the entity fulfilling their administrative needs. The briefing issue narrative provided by the JBC staff outlined some examples of delays in providing support to the independent agencies. These issues are expected to continue even with the addition of the new human resources and financial staff at SCAO.

**Human Resources**

The success of courts and probation in Colorado is dependent upon the capacity of the organization to fulfill its statutory obligations. Courts and probation are comprised of over 4,000 FTE supported by a Human Resources Division of 31.0 FTE (not including the Director). The Bloomberg BNA's HR Department Benchmarks and Analysis report identifies a benchmark ratio of 1.5 full-time HR staff per 100 employees. Further, the workload has increased in key areas of HR, such as compensation and employee relations due to employment law changes. Therefore, to be fully staffed the HR Team would need a total of 60 FTE, to reach 100 percent capacity.

Stated another way, each SCAO HR Analyst supports an average of 667 employees in widespread geographic locations. Of specific concern, is the potential for agency harm and litigation that can result when employee relations are not able to be addressed in a timely manner due to lack of adequate FTE. The requested FTE would bring the HR Division's total capacity to 61.67 percent. Ostensibly, the services in the areas of employee relations, mandatory training and first point of contact for HR would increase by 50 percent by adding 3.0 FTE and would reduce the service area per Analyst from an average of 667 employees to an average of 444 employees, increasing focused attention and services for each district.

HR workload metrics are influenced by employee turnover, specifically related to the time it takes to process a retirement/separation and to develop and post job descriptions. As of May 2022, the average turnover rate for the Judicial Branch was approximately 14 percent. In FY 2021-22, the HR Division processed 502 retirement/separations, excluding contracts, judges, and law clerks who are generally expected to leave after one year. Additionally, the Colorado Equal Pay for Equal Work Act requires thorough analysis of each pay change and new hire salary offer, which is critical to avoid potential litigation. There are 2.5 FTE who do this analysis, one of which is a Total Compensation Manager who is responsible for leading half of the HR Division's day-to-day functions, including payroll, benefits, and compensation.

It is important to note that, while the above data is specific to organizational turnover and vacancies, it is not reflective of additional responsibilities of the HR Division. In addition to supporting the SCAO in hiring and onboarding new employees, it is also responsible for SCAO Total Compensation and Business Analysis. A portion of the 31.0 FTE identified above are responsible for these functions, which include payroll and legal support.

Finally, while the Judicial Department is not subject to the COWINS Partnership Agreement and uses a system maintenance plan and methodology independent of the Executive Branch, ensuring that disparity is not created within the State of Colorado will require an in-depth analysis of Judicial Department total compensation for each employee. To accomplish this for those in the classified system, the Department of Personnel has requested 26.0 FTE. Judicial

salary analysis will begin in January 2023 and with a similar ratio would require an additional 4.0 FTE.  While the 7.0 FTE requested in the Department's R2 budget request is not specific to the upcoming total compensation salary analysis, it is essential for increasing the HR Division capacity from the current 51.66 percent.

**Contract and Vendor Management**

As the Department addresses the lack of overall administrative functions and capacity, the need to appropriately engage and manage vendors continues.  The Department believes that the actions of the last few years to increase this capacity have been valuable, but there is still more needed to adequately uphold the operational and fiduciary responsibilities in these areas.

The Contracts Management Unit (CMU) addresses the full range of contracting needs for the SCAO and the 22 Judicial Districts.  This includes drafting more than 800 contracts annually, in addition to providing other compliance and support services.  The CMU is still very early in its development and assessing the total contracts needed for the Department.  There is a substantial unmet need for contracts resulting from the high volume of vendors the Department uses across the state.  In addition to the current annual contract load, the CMU has identified an additional 680 vendors with 1,500 existing relationships that are operating without an agreement and require a contract as soon as possible.  The CMU is applying new efficiency measures and contractual approaches to manage the impact of this currently unmet contract demand. While these changes will mitigate some of the impacts of this additional demand, additional drafting resources are needed.  The two additional drafting-focused Contracts Specialist (CS) positions will increase the number of these roles from four to six.  The two additional CS2 positions will most directly respond to the work associated with these additional contracts.

As the Contracts Management Unit has increased its capacity to create contracts, it has become apparent to the Department that there is a need for better coordination and collaboration with its vendors.  Specifically, there are approximately 1,000 vendors used by the Department to provide services to probationers and other services for individuals in the court system.  There are basic administrative aspects associated with the vendor relationship that are critical to procuring, contracting and managing these vendors.  There are currently no staff dedicated to these functions within the Department.  Instead, the function has fallen on administrative staff, Chief Probation officers, Deputy Chief Probation Officers, Court Executives, SCAO Division Directors and Managers and various other staff.  These staff have other functions that make up their full-time work and none are trained or experienced in contract and vendor management. The four purchasing staff will perform several aspects of working with the Department's vendor community in an effort to ensure efficient and excellent services are provided to stakeholders. In addition, the new staff will focus on collecting and monitoring insurance, certifications, background checks and the requirements of the contract itself.  These are critical elements of vendor management that have been fully implemented.

8. *[Rep. Bird]* **Please discuss the Courts' intentions to create a judicial ombudsman position, role, or office.**

Organizational ombuds are employed by both public and private sector organizations across the United States to provide a safe place for employees to navigate workplace challenges and to assist the leadership of the organization in identifying trends in the workplace and recommend systematic improvements.  Currently, no state court system in the country employs an organizational ombuds. Within Colorado, the University of Colorado, Colorado State University, and the Denver Public Schools employ organizational ombuds.

A report prepared by Investigations Law Group found that a disproportionately high number of employees did not feel comfortable reporting complaints of discrimination, harassment, or retaliation.  In response to this information, the State Court Administrator's Office (SCAO) engaged three national ombuds experts to discuss the benefit of providing an ombuds service to the organization's employees. Organizational ombuds function independently, impartially, informally, and confidentially. Unlike independent ombuds, organizational ombuds are not mandatory reporters, meaning that employees can discuss matters confidentially with the ombuds and then the employee decides the best path to move forward. After consultation with these national experts, it was determined an organizational ombuds is the only appropriate model for navigating Judicial Department employee-to-employee issues. An organizational ombuds serves employees and the organization most effectively when it is housed within the organization it serves. By providing a safe place for employees to discuss concerns and consider options, the national experts say that the organizational ombuds will bolster the formal reporting structures and provide leadership of the organization a better understanding of the concerns facing workers across the state.

The Judicial Organizational Ombuds will report to the State Court Administrator and will be supported by an advisory committee made up of a cross section of Judicial Department leaders from around the state. The responsibilities of the Judicial Organization Ombuds will be defined in a charter and include being available to serve staff in courts, probation, and the SCAO.  The Judicial Organizational Ombuds will:

- In accordance with statute, refer all matters involving Judicial Officers directly to the Commission on Judicial Discipline;
- Listen to employees and work to understand issues while remaining neutral with respect to the facts;
- Assist employees in navigating issues and developing and helping individuals evaluate options;
- Guide or coach individuals to deal directly with other parties, including the use of formal resolution resources of the organization;
- Refer individuals to appropriate resolution resources;
- Assist in elevating issues to formal resolution channels;
- Facilitate informal resolution processes; and
- Identify new issues and opportunities for systemic change in the organization.

The organizational ombuds will not do the following:

- Participate in formal investigations or play any role in a formal issue resolution process;
- Serve in any other organizational role that would compromise the neutrality of the ombuds role;
- Receive notice for the organization; or
- Make binding decisions or mandate policies.

An important tool utilized by the Judicial Organizational Ombuds is the Safe Reporting System. The Safe Reporting System is a vendor-developed system that will provide an alternative method for Judicial Department employees to report concerns about the behavior of other Judicial Department employees.  It will also allow the staff at the SCAO to receive, track, and report on complaints in a systemic manner that will support the goals of the workplace culture and

organizational development investment.  In addition to providing another reporting mechanism for employees, the system would collect key data indicators on types, frequency, and location of concerns that will be analyzed to identify trends and areas of focus to ensure a healthy and safe workplace environment. The central repository of complaints, facilitated by the software system, would also create the opportunity to analyze longitudinal data trends and demonstrate progress of the efforts of the office.

9.  *[Rep. Bird]* **Please provide an overview of the Problem-solving Courts, including history, experience, results or outcomes, and future initiatives.**

Problem-Solving Courts (PSCs) are specialized court dockets heard by judicial officers that attempt to address issues like substance addiction and untreated mental health challenges in order to reduce recidivism rates.  Problem-Solving Courts (PSCs) integrate treatment and community resources with case processing. Using multidisciplinary teams, PSCs streamline court dockets, integrate wrap-around services, and improve social determinants of health[1] for participants.  PSCs are substantially more resource intense than the traditional approach to docket management.

The State Court Administrator's Office (SCAO) Problem-Solving Court (PSC) Unit (the Unit) currently supports over 700 team members from approximately 80 programs and specialty dockets across 20 judicial districts, which actively serve approximately 3,500 participants.[2] The programs include criminal and civil courts with specializations of adult and juvenile, DUI, mental health, veterans, domestic violence, family treatment (dependency and neglect), and truancy.

**History**

The first PSC in Colorado was implemented in Denver in 1994. Since then, Colorado PSCs have grown exponentially. The first family treatment court (FTC) began operating in 2003 and the first veterans' treatment court (VTC) in 2009. Each of Colorado's PSCs started and continue to be sustained through grassroots efforts and strong local leadership using existing resources and limited involvement from state government.

Statewide coordination of PSCs started in approximately 2007. The PSC Advisory Committee was established by the Supreme Court on April 9, 2008 and charged with the task of developing effective procedures and strategies for implementing evidence-based practices in Colorado Problem Solving Courts.  Since its inception, committee members have met on a quarterly basis under the direction of the Committee Chair.

In 2009, Colorado was the recipient of a two-million-dollar American Recovery and Reinvestment Act grant. This grant provided the first statewide funding stream specifically dedicated to PSCs. The Colorado Judicial Department requested and successfully obtained permanent state funding for PSCs in 2011.

**Experience of a PSC for Participant**

Colorado's PSCs use a variety of operational procedures based on location. Participants are identified and referred from a variety of referral sources including attorney representation, probation, treatment, law enforcement, child welfare, and self-referral. PSC programs use validated risk assessments, such as Level of Supervision Inventory (LSI), to identify which participants are at risk for committing new crimes or failing standard probation.[3] After a referral

---

[1] Social Determinants of Health (SDOH)
[2] Point in time data from July 1 – September 30, 2021 shows 3,511 participants in that quarter
[3] NADCP Best Practices Manual, Volume 1, page 5.

is received by the program the potential participant is screened using objective program eligibility criteria. PSC participants have a variety of needs related to housing, employment, and education substantiated by statewide program data.

Many participants have extensive criminal history, a history of non-compliance on probation, a diagnosed substance use disorder, or previous child welfare involvement. Once referred and accepted, a participant can expect a sentence to the PSC program as a condition of probation or their adjudicated in a civil matter. On average, criminal PSC programs are 12-24 months in duration, and probation may be extended. Due to the strict and swift timeline requirements of the Adoption and Safe Families Act (ASFA), family treatment courts average closer to 12 months in duration.

PSCs use American Society of Addiction Medicine's (ASAM) criteria to determine treatment level of care.[4] Participants are referred to local treatment providers for services based on their assessed ASAM level of care and their individual treatment plan.  Treatment can include, but is not limited to, Inpatient or Residential, Enhanced Outpatient, Intensive Outpatient, group counseling, and individual counseling.  The majority of Colorado's PSC Participants (89.7 percent, N=1375) are in outpatient treatment with the remaining in residential treatment (5.4 percent) or inpatient (4.9 percent).

At the start of the program, participants meet with their probation officer or case manager at least every other week and attend court at least two times a month. For every participant, substance testing occurs at a minimum of two times per week on a random schedule, including weekends and holidays.  Throughout the program, PSC Teams use behavior modification techniques through sanctions, incentives, and therapeutic adjustments to respond to participant behavior.

As participants progress in the program, they gain stability in the community by securing housing and employment and in their recovery. Participants move closer to program completion, and they attend court and meet with their probation officer or case manager less frequently (once per month). They continue substance use testing at a minimum of two times per week. When a participant completes the program phases and requirements, they celebrate with the PSC team through a graduation ceremony.

In a statewide evaluation of Colorado's PSC programs, NPC Research found that while cost per participant varies widely across our PSC programs, program participation results in reduced use of prison resources, including fewer days in prison.[5]  Additionally, NPC's study found that drug court graduates are less likely to reoffend.  Compared to the control population after 1 year, they are:

- 9 percent less likely to be rearrested for any offense and
- 4 percent less likely to be rearrested for a drug offense
- Cost per day in a problem-solving court is three times less than the cost per day of incarceration.

---

[4] ASAM Criteria
[5] NPC - CO Statewide Evaluation 2020 of PSCs

Nationally, PSCs result in up to a 58 percent reduction in recidivism.[6] In a multistate evaluation, the National Institute of Justice (NIJ) found that PSC participants reported less engagement in criminal activity and fewer rearrests than a comparison group. The evaluation also found that PSC participants had lower levels substance use and were less likely to test positive for substances in substance screening tests. While treatment costs were high, PSCs saved an average of $6,000 per participant.[7] In a 2022 review of research, the National Drug Court Resource Center (NDCRC) stated that PSC "programs have been consistently linked to positive outcomes such as decreased recidivism, substance use, and cost to the community."[8]

**Priorities and Initiatives**

The Unit is focused on six statewide technical assistance (TA) priorities to adequately support district-level operations, enhance participant outcomes, and guide future initiatives:

1. Accreditation Program and Certification Process
   - Colorado is 1 of 10 states nationally that certifies programs through a process that evaluates and ensures compliance with research-based standards.[9]
   - The Unit reviews program operations, provides coaching, and leads application reviews with the Statewide Advisory Committee.
   - Through a Bureau of Justice Assistance FY22 grant, the Unit will ensure accreditation or reaccreditation of 85 percent of Colorado's problem-solving courts (50 total).
2. Equitable Access to Programs, Treatments, and Services
   - The Unit is at the forefront nationally in developing Diversity, Equity, and Inclusion (DEI) Standards that comply with National Association of Drug Court Professionals (NADCP) best practice standard II. DEI training opportunities are provided to teams statewide. The goal of the DEI standards is to provide PSC teams guidance in understanding how their programs are performing through an equity lens.
   - In year two of the Equity Mentor Courts (EMC) program, the Unit provides training and program improvement support to participating district teams. Two teams (1st and 2nd JD) are the current EMC cohort. Two DUI courts (2nd and 5th JD) completed EMC last year and continue to support the new cohort. The expansion of EMC curriculum to other programs through on-demand training and expanded live trainings is anticipated over the next several years.
3. Statewide Training Plan
   - The Unit assesses training needs for the state, districts, and programs and customizes training to include annual conferences, in-person, virtual, and hybrid statewide and local trainings, and on-demand via Learning Management Systems (LMS).
   - The Unit implements a multi-tiered statewide training and technical assistance (TTA) program that assists PSC practitioners around the state in acquiring the education, skills, and support they need to adhere to evidence-based best practices shown to improve participant outcomes and reduce recidivism.
4. Program Data Visibility, Evaluation, and Quality Improvement
   - From 2008 to June 30, 2021, PSC Data Drives Dollars (PSC3D) was used as a data collection and analysis tool. In 2018, a grant was awarded to purchase a robust

---

[6] Drug-Court-Fact-Sheet-2020.pdf (nadcp.org)

[7] Drug-Court-Fact-Sheet-2020.pdf (nadcp.org) and Drug Courts (ojp.gov)

[8] View of Fall 2022: Equity and Inclusion (ndcrc.org)

[9] Best Practice Standards provide courts with consistent, measurable, and predictable guidelines and operational practices that research establishes as effective and impacting positive participant outcomes for the problem-solving court model.

management information system (MIS), and NPC Research created a temporary MIS (which has been used from July 1, 2021 to present). The procurement process for the new system is complete and will begin the build phase this year.

- To sustain program evaluation, the Unit is collaborating with institutions of higher education and developing an aggregate, live data dashboard.
- Through BJA FY20 grant, a performance measurement tool is in production. The tool will measure compliance and increase PSC adherence with Best Practice Standards.

5. Peer Specialist Site Funding and Support

- A grant awarded to the Unit in 2020 allowed six judicial districts to implement peer specialist programs, including direct peer support, mentoring, and alumni peer coach training, which enhance recovery and aftercare.[10] The Unit is collecting and analyzing the outcomes of their implementation. This information will be essential to the continuation and sustainability of peer programs at the local level.
- The Unit collaborates with American University on a study of the state's veterans' peer mentor services. When funding was awarded in 2018, this was a first-of-its-kind study.

6. Resource Development and Mapping

- The Unit reduces barriers to multidisciplinary team member participation in dedicated PSC dockets by developing solutions to address workload and availability concerns.
- Using focus groups, the Unit identified statewide programmatic needs and collaborates with district-level staff to develop community partnerships, establish alumni and recovery events, and increase availability of and modalities used for training.
- Through BJA FY20, the Unit will continue to build partnerships with institutions of higher education by creating regional Centers of Excellence (COE). Each COE will work with the Unit and stakeholders in their area to address the resource needs of PSCs in their region.

10. *[Rep. Bockenfeld]* **How many rejected community corrections diversion placements ended up on probation, as opposed to incarcerated? How do pre-COVID data compare to current data?**

The Judicial Department does not collect data regarding local community corrections board screening outcomes and the degree to which those outcomes impact judges' sentencing decisions. The Judicial Department is only able to report on how many community corrections screens occur but do not know the outcome or purpose of those screening referrals, whether for revocation or for new sentence considerations. Additionally, the Office of Community Corrections in the Division of Criminal Justice (DCJ) collects aggregate information about the number of screenings that are done and which of those are accepted or rejected. This information may be available through the Department of Public Safety or in the Community Corrections Annual Report. Due to those factors and some variation at the local level for community corrections screening boards (e.g., screenings may be done presentence, post-sentence, or upon revocation as part of a re-sentence), we can neither report nor estimate with any reliability the degree to which rejected cases are sentenced to probation (in lieu of prison).

11. *[Sen. Zenzinger]* **Please discuss recent trends in restitution payments, especially child support.**
The Judicial Department does not collect child support payments. Pursuant to Title 26, payments for child support and maintenance are handled through the Family Support Registry within the Department of Human Services.

---

[10] The Mission Educate grant supports funding and technical assistance for the 1st, 4th, 16th, 17th, 20th, and 22nd Judicial Districts.

The Collections Program in the Judicial Department is a statewide, cash funded program focused on the collection of revenue and restitution.  Over the last four fiscal years, the Department has collected an average of approximately $35 million per year in restitution for victims.

The chart below shows total restitution principal and interest collected for FY 2018-19 through November 30, 2022.  During the COVID-19 pandemic, collections decreased slightly during FY 2019-20 but have since returned to pre-pandemic levels.  While the chart shows a slight decrease in restitution collections in FY 2021-22, collections in FY 2020-21 included a one-time, lump sum restitution payment of $3.4 million for a single case.

Restitution collections in FY 2022-23 are on pace to exceed FY 2021-22, largely due to intercepts of the TABOR refund authorized by S.B. 22-233 (TABOR Refund Mechanism for FY 2021-22 Only).  As of November 30, 2022, the Department has already collected a total of over $24 million in restitution principal and interest.



The Department is currently in the process of implementing the Office of Restitution Services created by S.B. 22-043 (Restitution Services for Victims).  This Office will further assist victims in navigating the entire judicial system to recover restitution due to them by:

- Receiving requests from victims regarding semi-annual statements of their restitution;
- Answering questions and providing assistance to victims with case-specific questions related to court-ordered restitution;
- Creating and maintaining a web page on the Judicial Department website with resources and information;
- Assisting with training related to the administration of restitution; and
- Collaborating with victim advocacy programs.

12. *[Sen. Bridges]* **Please explain how Probation measures recidivism, including any recent changes. Also, please update the Committee on any recent efforts to align definitions for recidivism across multiple departments (Judicial, Corrections, Public Safety).**

Colorado probation has conducted an annual recidivism study since 1996. In reports published from 1996 through 2020, probation measured and reported on pre- and post-release recidivism.

Pre-release recidivism was defined as termination from probation for a new felony or misdemeanor criminal act or technical violations, and post-release recidivism was defined as a new misdemeanor or felony filing within one year of successful termination from probation. This definition was consistent with the one used by DCJ to measure recidivism in Community Corrections.  In 2019, the Colorado State Legislature passed S.B. 19-108 creating a Juvenile Justice Reform Committee tasked with implementing comprehensive juvenile justice reform throughout the state. One of those reform elements was the creation of a common definition of recidivism for juvenile justice agencies. The Juvenile Justice Reform Committee decided to adopt the definition of recidivism used by the Division of Youth Services (DYS), which necessitated a change in the definition of recidivism used by the Division of Probation Services for juvenile probationers. To maintain consistency in how Colorado reports recidivism for probationers, the definition of recidivism for adult probationers was also changed to that required by the implementation of S.B. 19-108. The new definitions for juvenile pre- and post-release recidivism were implemented in 2021: <u>Pre-release recidivism</u> is defined as a new deferred agreement, adjudication, or conviction while under probation supervision. <u>Post-release recidivism</u> is defined as a new deferred agreement, adjudication, or conviction one, two, and three-years post-release from probation regardless of whether that release is considered successful.

This definition is a departure from previous definitions in several ways. First, pre-release recidivism is now defined by a new deferred agreement, adjudication, or conviction rather than a termination from probation for a new criminal act or technical violations.  It is not uncommon for a probationer to have some new criminal activity and still successfully complete probation. This change allows us to identify criminal behavior separate from the ultimate resolution of the probation sentence. Second, the post-release portion of the definition moves away from the filing of charges to a finding of guilt on the case. The use of a conviction (or an adjudication for juveniles or the presence of a deferred agreement for adults and juveniles) is consistent with criminal justice reform practices that emphasize the importance of admissions or findings of guilt and not relying solely on the filing of charges (that may be dismissed or have a not reached guilty findings) to make assumptions about continued criminal conduct. Finally, the new definition is not limited to those probationers who have successfully completed probation. Capturing long-term outcomes for individuals regardless of how they ended their time on probation provides a more complete picture of the outcomes of individuals sentenced to probation. Table 1, below, compares the two definitions. While this shift in definition may generate slight changes in the recidivism rates reported, general trends in probation outcomes should remain consistent.

Table 1: Comparison of 1997 to 2021 Definition of Recidivism

| Comparison of Recidivism Definitions | | | | |
|---|---|---|---|---|
| | Previous Definition (1996-2020) | | Current Definition (2021-Current) | |
| | Pre-Release | Post-Release | Pre-Release | Post-Release |
| Who? | All negative probation terminations-no lifetime SO | All successful terminations | All probation terminations-all probationers | All probation terminations-all probationers |

| What? | An adjudication or conviction for a felony or misdemeanor, or a technical violation relating to a criminal offense | New filing for a felony or misdemeanor | New deferred agreement, adjudication, or conviction for a felony or misdemeanor | New deferred agreement, adjudication, or conviction for a felony or misdemeanor |
|---|---|---|---|---|
| When? | Based on probation termination status | Within 1 year of successful termination | During probation supervision-from initial sentence date to termination date | Post termination from probation for 1, 2, and 3 years |

Currently, Probation, the Division of Youth Services (DYS), and Diversion have a common definition. Of note, in the last year, Denver County has agreed to share conviction data with Judicial that can, in turn, be shared with other criminal justice agencies for recidivism study purposes. DCJ continues to use criminal filings post-release for Community Corrections cases and, according to the Colorado Department of Corrections website, parole defines recidivism as "a return to prison or offender status in Colorado within three years of release for new criminal activity or a technical violation of parole, probation, or non-department community placement."

## ADMIN SERVICES FOR INDEPENDENT AGENCIES

13. *[Staff]* **Please provide the Courts' perspective on creating an administrative services unit for independent agencies.**
The Department supports the creation of the Administrative Services for Independent Agencies office as a solution for the human resources and financial-related functions needed by the independent agencies. Over the years, the creation of independent agencies has produced additional workload that was absorbed by the State Court Administrators Office (SCAO). There is currently an existing gap between the administrative capacity of the Department and the needs of the Judicial Branch. This issue is magnified when combined with the administrative needs of the independent agencies.

## BRIDGES PROGRAM RFI

14. *[Staff]* **Please discuss the Bridges Program RFI and staff's issue brief to better inform the Committee's understanding of the RFI recommendation.**
Establishing Bridges as an independent agency facilitates the growth needed to most effectively serve participants, courts, and communities. While the program is successful in meeting the overall mission in its current location within the State Court Administrator's Office, independence supports the role of the court liaison to fully meet all statutory obligations.
Located in the Judicial Branch, the Bridges Program carries an inherent tension for court liaisons between maintaining judicial neutrality in a case and meeting legislative expectations to effect equitable and positive outcomes for participants. Courts — and by extension the Bridges Program in its current location – are expected to maintain a neutral position regarding legal decision making. Court liaisons hold neutrality regarding the behavioral health best interests of participants. However, advocacy for the behavioral health best interests of the participant has the potential to effect outcomes in key decision-making points in a case. Information provided to the courts frequently points to a specific legal outcome, such as dismissal, sentencing, custody status, or whether to issue a warrant for arrest. The program would therefore function better

as an independent agency clearly guided by the legislative directives to promote positive outcomes for participants and to ensure fair and humane treatment within the criminal justice system.[11]

As the program has matured, the role of the court liaison has become more defined, with liaisons functioning as court appointed mental health advocates both in and out of the courtroom. As outlined above, Judicial officers depend on information provided by liaisons to make critical and complex case decisions. Liaisons also work as advocates in the community, both challenging and collaborating with systems to ensure the participant's mental health needs are met and stability factors are addressed. Sometimes the mental health needs of a participant necessitate that the liaison facilitate second opinions or make recommendations to the court that differ from a course of action occurring with a third party (often within the behavioral health system). Often, court liaisons identify barriers within systems that they or the court help to address.

The Bridges Program therefore needs the ability to advocate for any appropriate resource that is in the best behavioral health interests of the participant and is best positioned as an independent agency to fulfill this role.

**RECOMMENDATION**

Expand the program to meet the administrative and infrastructure requirements of becoming an independent agency and fully meet the competency need in the State of Colorado by adding 7 administrative staff and 16 court liaisons to the program in FY24, 33 liaisons in FY25, and 18 liaisons in FY26, bringing the total to 96 court liaisons by June 30, 2026.

Creating an independent office will require at least seven administrative staff to include: executive director, staff assistant, legal program director, clinical program director, director of administrative services,

DEI program director and an office manager. The executive director position is the only position that will require funding for the entire fiscal year. The remaining positions will need partial funding as they will be hiring in the second or third quarter of the year.

With the program at full capacity, the existing 29 court liaisons are only meeting 35 percent of the competency need. Annually, this leaves approximately 4,400 new competency cases unserved each year. Proposed expansion would enable the program to fully meet the competency need in the state. Expansion also enables the program to serve more non-competency cases, enhancing the ability of the Bridges Program to divert individuals from the competency process altogether by providing earlier intervention.

As the program experiences success in its service to courts and participants (refer to Annual Report for detailed outcomes), demand for services continues to increase exponentially. In FY22, liaisons were appointed to approximately 2,000 new competency cases (not including the previous year's carryover) and another 800 non-competency cases. In addition to providing direct service to participants, liaisons file approximately 6,000 reports to the court and make almost 8,000 court appearances annually.

These numbers represent a 107 percent increase in participants over the previous two years. Many liaisons carry upwards of 60 participants on their caseloads at any one point in time. Participants are also considered high acuity in terms of their mental health needs. In the previous fiscal year, court liaisons collaborated in 93 mental health crisis interventions and facilitated cross-agency responses that resulted in 45 successful suicide interventions.

---

[11] The General Assembly, in SB 18-251, stated as its legislative intent that, "Colorado must make a commitment to ensure that all individuals within the criminal justice system are treated fairly and humanely, regardless of their behavioral health history or mental state," and directed that the program, "promote positive outcomes for individuals living with mental health or co-occurring behavioral health conditions."

Expansion of service capacity would enable the Bridges Program to bring the benefits of the program to more defendants, thereby supporting long-term stability for participants and positive outcomes for both individuals and communities.

**RECOMMENDATION**

Over three years, increase the annual budget to $14 million for the Bridges Program to fully support individuals engaged in the competency system and expand services to create universal access within the criminal justice system to the Bridges Program.  Add 67 additional court liaisons.  Create and sustain a participant services fund of $500,000 annually.  And provide the necessary administrative and infrastructure support for the program.

The Bridges Program recommends a phased expansion over four years as follows:

|  | Current | FY24 | FY25 | FY26 | FY27 |
|---|---|---|---|---|---|
| **Liaisons** | 29 | 45 | 78 | 96 | 96 |
| **Supervisors** | 1 | 14 | 14 | 14 | 14 |
| **Admin Staff** | 2 | 7 | 9 | 9 | 9 |
| **Participant Capacity** | 2393 | 3690 | 6396 | 7872 | 7872 |
| **New Case Capacity** | 2838 | 4410 | 7644 | 9408 | 9408 |
| **Service Fund** | $0 | $0 | $500K | $500K | $500K |
| **Annual Budget** | $2.77M | $4.93M | $10.48M | $13.55M | $14.02M |

Supporting participants successfully out of custody and into community-based services represents potentially significant cost avoidance across systems.  The target population served by Bridges is most costly in terms of services provided in custody, in the competency evaluation and restoration process, and in terms of recidivism.  Creating alternative interventions, particularly those designed to address long-term stability, can avoid each of the above-listed costs.

Regarding custody-related cost avoidance alone, according to a report by Vera Institute of Justice, in 2015 it cost $39,303 annually to jail one person in Colorado (which breaks down to $108 per day).  Competency cases have an average case length of more than 450 days.  For each Bridges competency participant who is released from custody, there is a jail cost avoidance of $108/day, totaling $48,600 over 450 days.  Compared to an average Bridges Program cost of $3/day ($1,350 for 450 days), rough estimates show a potential jail cost avoidance upwards of $47,000 per competency participant who is released from custody.

At current service levels and rate of release from custody (35 percent), the program supports approximately 350 competency participants to transition out of custody each year, projecting jail cost avoidance at upwards of $13 million annually, as compared to the current program cost of $2.8 million.  It is expected that the program would see a proportionate increase in cost benefits with expansion and that the initial investment in the program would more than pay for itself by reducing process and cost burdens on jails and on the court and competency systems.

## COUNTIES SPECIAL FUNDING REQUEST FOR 23RD JD

**15.** *[Staff]* **Please provide as much detail as possible, by fiscal year and task, on the Judicial Department's expenditures and anticipated expenditures related to the transition for the creation of the 23rd Judicial District. To the extent possible, please provide context to the special funding request submitted by the counties as it relates to all anticipated state expenditures by the Judicial Department. Are there items in their request that will be addressed by the Judicial Department? Based on the traditional split of responsibility for funding in the state court system, in the Judicial Department's opinion, which items included in the special request might be considered for additional state funding? If the**

**State were to provide additional funding for the counties for any portion of the transition through a bill, please describe the possible appropriation or funding mechanisms for providing additional funding to the counties and district attorney's offices.**

House Bill 20-1026 removes Douglas, Elbert, and Lincoln Counties from the 18th Judicial District and creates a 23rd Judicial District composed of those counties beginning in 2025. The Judicial Department is required to submit a report with its annual budget request detailing the implementation costs of the creation of the 23rd Judicial District. Section 13-5-123.2 C.R.S. (b) states:

(b) For state fiscal years 2020-21 to 2024-25, a part of its annual budget request to the Joint Budget Committee of the General Assembly, the judicial Department shall include details about any budget requests related to the preparation for and creation of the twenty-third Judicial District.

The Department is complying complied with statute and has submitted or will submit this report in its annual budget submission for FY 2020-21 through FY 2023-24.

The costs incurred in FY 2022-23 and FY 202-24 are for alterations required in the numerous computer systems (over 50) including the court case management system.

In FY 2024-25 the costs shift from programming to staffing in anticipation of the 23rd Judicial District starting on January 7, 2025. The creation of a new district requires numerous positions including a Court Executive, a Chief Probation Officer and support staff for those positions as well as an additional Judicial Officer. The Department's FY 2024-25 budget submission will include a detail listing and cost of all new positions required for the new District.

The chart below summarizes the cost estimates for implementation.

| 23rd Judicial District Judicial Department Costs | | | | |
|---|---|---|---|---|
| | **FY23** | **FY24** | **FY25** | **FY26** |
| IT Transition Costs | $740,000 | $1,100,000 | $200,000 | $0 |
| | | | | |
| Staffing/Administrative Cost | $0 | $0 | $1,200,000 | $1,200,000 |
| | | | | |
| New Judge and Associated Costs | $0 | $0 | $400,000 | $500,000 |
| **Total Costs:** | **$740,000** | **$1,100,000** | **$1,400,000** | **$1,200,000** |
| **Total FTE** | | | **12.1** | **14.5** |

The numbers listed above and identified in the fiscal note for HB20-1026 do NOT include any costs anticipated to be incurred by the counties for implementation of the 23rd Judicial District. However, the Department did submit with its budget request a report prepared by the counties with an estimate of costs to be incurred by them for creation of the 23rd Judicial District.

The counties report identified an estimated $10.3 million cost primarily to split the District Attorney's Office into two separate ones for the 18th and the new 23rd Judicial Districts. The chart below comes from this report:

| Summary of Funding Requested for FY 2023-24 | |
|---|---|
| Arapahoe, Douglas, Elbert and Lincoln Counties and the 18th JD District Attorney Office | |
| 1. IT – Infrastructure, equipment, software, implementation costs, domain creation, integration and modification, data preservation, data separation, data migration, transition staffing (not recurring) | $3,600,000 |
| 2. Consultant Fee | $193,600 |

| | |
|---|---|
| 3. Transition Contractor/ Project management | $475,000 |
| 4. Forensic Accounting | $200,000 |
| 5. Casefiles and Records | $1,850,000 |
| 6. HR Staffing for Transition | $60,000 |
| 7. Finance Staffing for Transition | $60,000 |
| 8. Targeted DA Office Personnel | $1,175,000 |
| 9. Personnel Benefits | $2,000,000 |
| 10. DA Personnel – Retention bonuses | $400,000 - $640,000 |
| 11 and 12. Additional IT, HR, Finance and personnel costs related to transition, dependent on implementation decisions. | Unknown |
| **Total Funds** | **$10,013,600 - $10,253,600** |

The decision concerning funding the above identified expenditures, which by statute are traditionally borne by the counties, is within the purview of the General Assembly.  If the State were to provide funding for any of these costs, the Department would recommend an appropriation to the proposed Administrative Services Unit discussed at the briefing.

## JUDICIAL DEPARTMENT –COMMISSION ON JUDICIAL DISCIPLINE
## FY 2023-24 JOINT BUDGET COMMITTEE HEARING AGENDA

### Thursday, December 15, 2022
### 9:00 am – 2:30 pm

## COMMON QUESTIONS FOR DISCUSSION AT DEPARTMENT HEARINGS

Please describe the implementation plan for new programs added to the Department from one-time stimulus funds (such as the CARES Act, ARPA, and one-time General Fund), as well as any challenges or delays to program implementation.

As part of SB22-201, the Commission and the Office of Judicial Discipline were budgeted a limited amount of funds through the General Fund for Information Technology set up, furniture purchases, etc.  The Commission is using these funds as intended and to purchase hardware to support the implementation of an electronic case management system.  The Commission also had to unexpectedly arrange for on-going IT support through an outside vendor (rather than through the Department as contemplated through § 13-5.3-103(3), C.R.S.).  Challenges to this program implementation have included identifying vendors and verifying the terms of contracts.  The Commission has found cost savings in implementing this electronic case management system by working directly with the software provider.  In addition, through a referral by Legislative Staff, the Commission is implementing a new website with significant cost savings through the State Internet Portal Authority (SIPA).

Please identify how many rules you have promulgated in the past year (FY 2021-22). With respect to these rules, have you done any cost-benefit analyses pursuant to Section 24-4-103 (2.5), C.R.S., regulatory analyses pursuant to Section 24-4-103 (4.5), C.R.S., or any other similar analysis? Have you conducted a cost-benefit analysis of the Department's rules as a whole? If so, please provide an overview of each analysis.

The authority to promulgate rules is a current issue in the discussion of pending legislation.  Under Colo. Const. Art. VI, § 23(3)(h):  "The supreme court shall by rule provide for procedures before the commission on judicial discipline, the masters, and the supreme court."  Colo. RJD 11 further provides authority for the Commission to petition the Colorado Supreme Court to amend the Rules of Judicial Discipline "as may be necessary to implement the Commission's Constitutional mandate."  Under Colo. RJD 4(f), "The Commission may adopt administrative policies, procedural rules, or forms for its internal operation or proceedings that do not conflict with the provisions of these Rules."  Enacted through SB 22-201, § 13-5.3-107, C.R.S. now requires the supreme court to provide the Commission with reasonable notice of proposed rule changes, to negotiate differences over these proposed changes in good faith, and to adopt any changed rules through a public notice and comment process.  It is in this context that the Commission is requesting funding to consult with nationally recognized organizations to propose overall revisions to the Colorado Rules of Judicial Discipline.  As part of the Colorado Supreme Court's pending proposal to add a rule governing the court's own recusal, the Commission has responded with its own proposal.  Other than presenting this proposal and raising objections, however, the Commission has not promulgated any rules in the past year.  Because of the structure currently provided through Colo. Const. Art. VI, § 23(3)(h), the Committee's questions above are generally inapplicable to the Commission.

How many temporary FTE has the Department been appropriated funding in each of the following fiscal years:  FY 2019-20, FY 2020-21, FY 2021-22, and FY 2022-23?  For how many of the temporary FTE was the appropriation made in the Long Bill?  In other legislation?  Please indicate the amount of funding that was appropriated.  What is the department's strategy related to ensuring the short term nature of these positions?  Does the department intend to make the positions permanent in the future?

The Commission and Office first received legislative funding in FY 2022-23.  As part of that budget, 4.0 FTE were approved.  All of these FTE are permanent positions created in conjunction with SB 22-201 and with 100% of the funding being appropriated.

Please provide a description, calculation, and the assumptions for the fiscal impact of implementing the provisions of the Partnership Agreement, including but not limited to changes in annual leave accrual, holiday pay, and paid family and medical leave.  If your department includes employees who are exempt from the Partnership Agreement, please indicate whether or not you intend to implement similar benefit changes as those required for covered employees.  Please provide a breakdown of the fiscal impact of implementing the provisions of the Partnership Agreement for:  a) employees who are subject to the Agreement, and b) employees who are exempt from the Agreement.

The Commission understands that these questions are generally inapplicable to the Judicial Department and, by extension, to the Commission.

REQUESTS

*[Staff]* Please describe and explain the Agency's request items.

When the Office of Judicial Discipline was created earlier in 2022, the expectation was that it would have the same resources available to it as previously provided to the Commission through the Colorado Supreme Court's allocation of attorney registration fee funding and other support provided through the Colorado Supreme Court's Office of Attorney Regulation Counsel.  The Commission's funding request for FY 2021-23 was based upon assumptions that the salary levels for its special counsel and office manager positions were equivalent to similar positions and the level of representation previously provided through the Office of Attorney Regulation Counsel.  After receiving additional information, the Commission now recognizes that salary adjustments are necessary to reflect the gravity and nature of the work involved and to both recruit and retain qualified staff.  The Commission's budget request reflects setting the salary for its special counsel as equivalent to that of a county court judge, which is also equivalent to the salaries paid to the Office of Attorney Regulation Counsel's senior staff attorneys.  The adjustment requested for the Commission's office manager position makes it equivalent to the salary allocated for the Commission's investigator.  Ultimately, the Commission is merely requesting the same resources that were previously provided to it through direct funding from the Colorado Supreme Court and resources shared by the Office of Attorney Regulation Counsel.

In addition to its core request for salary adjustments, the Commission has requested a $25,000 appropriation to allow it to review and propose overall revisions to the Colorado Rules of Judicial Discipline, as recommended through consultation with a nationally recognized organization. Finally, the Commission has requested $25,000 to continue its transition to independent IT services and infrastructure.

## ADMIN SERVICES FOR INDEPENDENT AGENCIES

*[Staff]* Please provide the Agency's perspective on creating an administrative services unit for independent agencies. Please provide additional context related to the Agency's need for administrative services support after June 30, 2023.

The Commission is supportive of the proposal for creating an independent administrative services unit to support the Commission as well as other independent agencies affiliated with the Judicial Department. Because of the Commission's critical role as a regulator of judicial conduct, independence from the judges and justices subject to its oversight is essential for the Commission to perform its Constitutional mandate.

The incomplete nature of the Commission's current independence and autonomy is evident through the yet to be fulfilled expectations of SB 22-201. § 13-5.3-103(3), C.R.S. recognizes that the Department and the Office of Attorney Regulation Counsel have concurrent obligations to provide the Commission with administrative support equivalent to that provided to the Colorado judicial performance commissions through June 30, 2023. Although a draft memorandum of understanding has been circulated, the Commission does not have a current agreement defining the support provided to it. Similarly, even though § 13-5.3-103(3), C.R.S. requires that the Judicial Department house the Commission in the Ralph L. Carr Judicial Center indefinitely, the Department has not yet presented the Commission with a lease or other agreement ensuring the stability of its current office location and access to other facilities. The Colorado Supreme Court has further announced a rule change to Colorado Rule of Civil Procedure 227 (effective December 1, 2022) that removes the Commission as a beneficiary of attorney registration fees (either directly or through assistance provided through the Office of Attorney Regulation Counsel).

Within this context, the Commission expects to submit a budget amendment requesting the addition of 4 FTE (an Accountant II, a HR Analyst II, an IT Support Tech I, and a Payroll Analyst). The cost of the budget amendment is estimated to be $339,073. The Commission recognizes the absurdity of having to create an administrative staff that would be the same size as the Office of Judicial Discipline, itself. The creation of the proposed independent administrative services unit would address the same needs and allow support for other similarly situated agencies, including a prospective judicial discipline / human resources ombudsman office that is independent from the Judicial Department (as was proposed before the Interim Committee on Judicial Discipline).

Regardless of whether the Commission's administrative support occurs through a newly created administrative services unit or the funding of additional FTEs within the Commission itself, there is a need for a legislative provision requiring continuing administrative support through the Department until the unit or positions can be filled and operational.

# Appendix 27(u)

# Brian D. Boatright, *State of the Judiciary Address*, 2023 Colo. House Journal, pp. 78-88 (January 13, 2023);

Page 78                                House Journal--5th Day--January 13, 2023

Pursuant to House Rule 26(f), the House stood in recess to allow the following former House members to speak on the resolution: Senators Buckner, Fields, Exum, and Coleman.

_____

House in recess for Joint Session.

_____

**JOINT SESSION**

The Joint Session was called to order by the Speaker of the House, Julie McCluskie.

On motion of Senate Majority Leader Moreno, the morning roll call of the Senate was made the roll call of the Joint Session.

Present--32.
Excused--3.

On motion of House Majority Leader Duran, the morning roll call of the House was made the roll call of the Joint Session.

Present--62.
Excused--2.
Vacant--1.

The Speaker declared a quorum present and as is customary presented the gavel to the President of the Senate to preside over the Joint Session.

President Fenberg requested the Joint Committee, composed of Senators Marchman, Chair, and Gardner, and Representatives Daugherty, Chair, Mabrey, and Evans to escort the Honorable Brian D. Boatright to the rostrum.

Chief Sergeant-at-Arms Jon Judson announced the arrival of the Honorable Brian D. Boatright, Chief Justice of the State of Colorado.

The Joint Committee escorted the Chief Justice to the rostrum where he addressed the Joint Session.

_____

**ADDRESS BY THE HONORABLE**
**Chief Justice Brian D. Boatright**

Each year in September, judicial officers from around the state – magistrates, county court judges, district court judges, appellate judges, and even some tribal judges – come together for three days to receive training and to exchange ideas. During this year's conference, I had the opportunity to address all of the judicial officers in the state. I asked them to think back to when they first decided they wanted to become judicial officers. I asked them why. Why did you want to become a judicial officer? We had the ability to immediately look at their responses. The top answer was to help people, followed by the desire to make a difference, and third, to serve the community. While there were a lot of ways to express their why, the overarching themes reflect a genuine desire to serve our communities because they care about people who come into their court.

Every day around the state, in every court, our judicial officers take the bench committed to uphold the rule of law. We handle over a half million cases every year in 70 courthouses. Throughout the state, we have approximately 400 trial court judges and magistrates presiding over small claims to first degree murder cases. The criminal cases make up about 50% of the cases and garner most of the headlines. But from my experience as a trial court judge, every day our judges make decisions about families, children, our elderly, small businesses, and the important topic of water. Every case we handle affects people, and that's why having judges who care and want to serve is critical.

In my two years as chief justice, I have received calls and letters asking me to intervene in cases. Parties to cases and even members of the public want me to tell a judge how to handle a specific case, to remove a judge from a case, or to undo a judge's ruling. They forget or don't understand that our judges are independent constitutional officers, just like you all are. In other words, I do not have any authority over a specific case until it comes to our court on appeal, and I do not have any control over a judge's docket or case management decisions.

But let me tell you about how we are organized. The supreme court, as the head of the judicial branch, has authority over the practice of law. We also have administrative authority over the branch, which includes approximately 4,000 employees. Our judges are appointed by a merit selection system. Briefly, each judicial district, of which there are 22 and soon to be 23, has a nominating commission of seven people, four of which are non-lawyers. When we have a judicial opening, the nominating commission reviews applications, conducts interviews, and then selects two or three applicants to send to the Governor for his selection. Political affiliation is not disclosed in the application process, and, in my experience, it is not a consideration for the nominating commissions. The Governor then has 15 days to appoint one of the candidates nominated by the commission. A judge appointed by the Governor then stands for an initial retention election after serving two years and retention elections for each subsequent term, which varies in length from four years to ten years depending on the court. Our system of selecting, evaluating, and retaining judges is the best in the country. I will give you two examples why. First, when we have a vacancy in our trial courts or appellate courts, our constitution requires that it be filled within 45 days. In the federal system, vacancies are sometimes not filled for months or even years due to the politics inherent in that system. Second, of the current seven justices on the supreme court, three of us were appointed by a republican governor to the trial court, and then the three of us were later appointed by a democrat governor to the supreme court. As you can see, one goal of merit selection is to de-politicize the judiciary and I think that demonstrates its success.

I now want to turn to a topic that I dedicated much time to in my last State of the Judiciary Address. Two years ago, I stood before you at a time when our branch was the subject of public allegations of misconduct. At that time I, on behalf of the supreme court and the entire Branch, committed to thorough and transparent investigations. We have lived up to those commitments. In so doing, we asked for the help of several of you here today and members of the Executive Branch in selecting not only the investigators for the allegations but also defining the scope of the investigations. The investigations were completed last summer, and the results are posted in their entirety on the court's website. If you have not read them, I urge you to do so. But today, I do not want to dwell on the past. Instead of treading back through history, I want to tell you what we learned and what we are doing in the future.

As I stand before you today, I am excited and energized by the meeting of the minds and hearts of the Judicial Branch. We are reflecting, learning, acting, and committing to a future that supports our conviction to assure the Branch is a great place for our employees to work, provides the best service to the state of Colorado, and maintains systems to enhance public trust.

As a result of the engaged participation with the Branch's leadership and staff, we have three strategic priorities for our emerging future. First, we are improving our operations to better serve Colorado. We are building operational excellence and strong oversight into our business operations. As such, the public and you will have confidence in our business-related decisions. Second, we are empowering our employees. We commit to making the Branch a place where employees and staff feel engaged and empowered. We recognize the importance of having a sense of deep connection to our organization's purpose, and having employees know their contributions are making a difference to those we serve; and third, we are listening to all stakeholders. We continue to have our ears wide open and are building a continuous, welcoming, and safe feedback loop with our staff and stakeholders. To our staff, to you, we hear you, and we are taking your feedback and communication seriously.

In the spirit of looking forward and improving our workplace and operations, we asked the investigators to make concrete recommendations for improving our operations and our culture.

Former U.S. Attorney Bob Troyer was the lead on the first investigation. Following the investigation, his group had recommendations for improving our operations. The Troyer report contained recommendations for strengthening the Branch's fiscal rules, ensuring that the leadership receives adequate support and training, and improving transparency in decision-making and communication. Consistent with the recommendations, the Branch is revising its rules, better defining leadership roles, improving training, and emphasizing more detailed ethical expectations. To that end, in our budget request you will see a request for additional resources for training. These training resources will be used to help staff and judges.

Investigations Law Group, led by Liz Rita, conducted the second investigation. A large part of that investigation scrutinized the Branch's workplace culture. ILG found that the Judicial Department has a positive workplace culture and, by and large, our employees are proud to work for us. ILG, however, also found areas for improvement. Women make up about 77% of our non-judge work force and about 44% of our judge population. But overall, women were less positive about our culture. Most upsetting to me was learning that some of our employees did not feel comfortable reporting unacceptable behavior or workplace concerns for fear of retaliation or because they didn't believe it would be taken seriously. That is not acceptable, and we will do better. One step we are taking to address that concern is contained in our budget request. We are asking for an Organizational Ombudsperson. Our Organizational Ombudsperson would provide a safe place for our employees to get assistance, support, and resources for workplace issues involving non-judge staff, while maintaining an independent complaint and investigation process for the Office of Judicial Discipline when a complaint concerns a judicial officer. That Organizational Ombudsperson would act as a guide for our employees when they have concerns.

A second step is to bring our HR Department up to modern standards. If you read the ILG report, you will see references to an Office of People and Culture. In my view, what that is recommending is the modernization of our HR practices and increased support resources for our employees and judges. In a nutshell, we want our new Office of People and Culture to be proactive, not reactive. We want an office that can help recruit, onboard efficiently and effectively, train our new employees, and provide continuous training for all employees. And importantly, proactive work around diversity, equity, and inclusion will be a significant priority of this office. We are moving forward with this office not simply to implement a recommendation, but because we believe that it is the right thing to do. How we treat our employees is of critical importance to how we best serve the public.

At an even higher level, we are re-examining our mission, vision, and values as an organization, both internally and to the public we serve. This will help us move forward together and ensure that our work is tethered to what we value as an organization. In sum, we want to empower our employees and truly make the Branch an excellent place to work and one where employees will see our work as a career and not just a job. This will allow us to best serve the public.

Implementation of these recommendations is not just an exercise in checking boxes. What we have learned from the investigators, from other courts, and from experts in organizational change management, is that true organizational change cannot be mandated. When change comes in the form of a top-down policy or mandate, it will fail. We need every judge and employee to understand our strengths and our deficiencies, our goals, and to have a voice in how we move forward. We want engagement from all employees around the state.

With that goal in mind, the seven justices decided that we needed to go to each of our courthouses and talk with our 4,000 employees and 300 plus judges, and we needed to do that in person. So, we did. From September through the end of December we divided up the state amongst the seven of us and, many times accompanied by a Court of Appeals judge, hit the road with the goal of meeting and hearing from every judicial branch employee. And while we didn't count heads for attendance, we were largely successful. Our goals were to listen to the concerns and issues that are important to our employees and judges and hopefully convey that we sincerely care about each and every one of them.

In these discussions, we heard certain themes: Compensation is a real issue for our employees. Many of our employees are really struggling financially. We have a large number of employees working two jobs to make ends meet. As one probation officer put it, I supervise sex offenders by day and wait tables by night. This is also true for many of our judicial assistants. The branch has employees in every county of the state, and these compensation issues are compounded by the extremely high cost of living in many of our communities. Because we are required to have courthouses and court operations in every county, we cannot just say it is too expensive to do business in certain parts of the state. For instance, our courthouse in Pitkin County has been understaffed by 40% for the last two years.

Suffice it to say that in many parts of the state we are simply not paying a livable wage. We are losing good employees everyday to higher paying jobs. Staff turnover and training were discussed extensively. We need to do a better job of onboarding and training our staff. Failing to properly support our employees right from the start and provide continuous training can lead to frustration, performance issues, and more turnover. In the simplest of terms:

frequent turnover leads to training issues and inadequate training leads to turnover. Frankly, we heard that it is difficult to have a shared mission and a culture of excellence when staff are constantly turning over.

Interestingly, the investigations were not an important topic to most Branch employees. While the supreme court has been significantly involved with the investigations for the last two years, our employees have just been doing their jobs while confronting COVID, inflation, remote hearings, turnover, increased demands, understaffed human resources support, and trying to make ends meet. We heard from many of our employees that what happened over 3 years ago involving people who are no longer with the branch was not important to them, and they have confidence that the right steps are being taken for our future.

On the positive side, in our listening sessions, we also found that employees all around the state are deeply committed to doing the work of the Judicial Branch. I could not be prouder of our employees. The branch survived some trying times during COVID. The courts managed to stay open and avoided large outbreaks of COVID, and we are continuing to emerge from the backlog of jury trials. Our judicial officers, court executives, clerks of court, court staff, and probation officers are front line heroes. They innovated, they collaborated, and they should be commended.

I want to touch on two legislative matters that have been important to the Judicial Branch and our operations. I earlier referenced that we will soon have a 23rd judicial district. In 2020, a new law was enacted that split the current 18th Judicial District in two. Beginning in 2025, Arapahoe County will be the 18th Judicial District, and Douglas, Elbert, and Lincoln Counties will comprise the new 23rd Judicial District. The law created some uncertainties in how judges from the 18th would be assigned to the new 23rd. Thankfully, with the help of Representative Weissman, Senator Gardner, Senator Fields, Senator Van Winkle, and Representative Kennedy, the legislature passed a concurrent resolution to clarify the mechanics of the judge assignments. The voters overwhelmingly approved Amendment D this past November, and this will ensure a smooth transition and no disruption in services for the courts in the new 23rd Judicial District. Thank you all.

This past summer, the legislature convened an interim committee to look at possible legislative and constitutional changes to the disciplinary process for judges in Colorado. At the end of a thorough and lengthy process, the Committee proposed one legislative bill and one concurrent resolution to amend the constitution to change the judicial discipline process. The proposed changes improve transparency of the process, ensure due process for judges, and bring Colorado in line with modern judicial discipline systems. The legislation reflects a true bipartisan effort and are good, common-sense changes. I want to thank Representative Mike Weissman and former Representative Terri Carver for chairing the interim committee and, through their leadership, ensuring that the process was not politicized. I also want to thank the other Committee members for their hard work and dedication during this process.

I will now move to something that is frequently misunderstood and overlooked —the work of our probation departments. I served as the liaison justice to our probation departments for many years, and I was always bothered by the false assumptions about the work of probation. I want our probation staff to know that they are not overlooked by me or by our court, and I want to clear up any misimpressions that the public may have about the mission, work, and values of our probation officers. Our probation officers are the unsung heroes of not

only the Judicial Branch, but of the entire criminal justice system. Probation remains the most cost-effective method for supervising offenders. This fiscal year an offender incarcerated in the Department of Corrections will cost the state approximately $57,000, an offender in the Community Corrections program approximately $14,000, and an offender on parole approximately $7,700. An offender on probation, by contrast, will cost the state about $1,900 – a fraction of the cost of any of the alternatives. And when you consider that at any given time throughout the year that the probation department is supervising approximately 70,000 people, you can clearly understand the monetary value of our probation officers. But what they do to help their clients is much more important than the monetary cost of supervision.  I want to emphasize that probation is not punitive. Probation is intended to rehabilitate an offender, reintegrate them into the community, and to provide tools to help the offender successfully complete a probation sentence.  From my 30-plus years of working in the criminal justice system, I know that our probation officers want their probation clients to succeed.

I have three stories to share that speak to the human side of probation. This fall in the Westminster Office of the 17th Judicial District in Adams County, probation officer Bill Benson was entering the men's restroom and found a man on the floor unconscious and not breathing. Bill saw drug paraphernalia on the floor. He asked the front office to call 911. He returned to the bathroom and administered one dose of Narcan to the man. The man did not respond, and Bill began chest compressions. Shawn Doyle next responded. The man remained unconscious. Bill then administered a second dose of Narcan. Bill continued compressions and Shawn (utilizing a shield from an emergency bag) began rescue breaths. Shane Stockley arrived and immediately retrieved the Automated External Defibrillator (AED). Shane and Dmitri Medoff applied the AED. The AED located a pulse, instructed responders to continue CPR and advised against emergency shock. Bill, Shawn, Shane, and Dmitri positioned the man on his side as instructed by the AED. The man began taking periodic breaths but was still unresponsive. Paramedics arrived and soon thereafter, and the man regained consciousness. It was determined that he was a probationer who had overdosed on fentanyl in the restroom. The client was transported by ambulance and survived.  This group adhered to the Narcan and First Aid/CPR training protocol and their textbook response was exemplary. Simply stated, the heroic actions of these individuals saved that man's life.

In Douglas County, the 18th Judicial District, Probation Officer Miranda Shepherd went to the waiting room of the probation department and discovered one of her clients seemingly asleep. She was not able to wake him by calling his name. After touching his arm, she got him to wake up and gave him some water. She then realized that the client was in distress. She notified her supervisor, Kathy Krick, of the situation. They called for help, and the client was transported to the hospital. On the way to the hospital, paramedics administered two doses of Narcan to save his life. It is not difficult to think what would have happened if Miranda and Kathy had waited even a few minutes to act. By Miranda and Kathy's keen observation and quick actions, they too saved that client's life. Everyone involved in these to situations are heroes.

The final probation story is about a woman I will call Sara and her probation officer, Cassie Korse. Sara grew up in a tumultuous family and began using drugs with her mother at a young age. In 2018, she was sentenced for felony drug possession. When she was placed on probation, she was using illegal drugs and alcohol. She had a young son and was in an abusive relationship with her

husband. Initially, she tried outpatient treatment, but she continued to use illegal drugs. She was then referred to a short-term intensive residential treatment program. She was discharged, however, because she was suicidal. The situation with her husband continued to escalate and Human Services became involved. Her son was eventually placed in foster care. Her probation officer and human services then worked together to get Sara back on track. Despite the team effort, Sara's probation was revoked and regranted, meaning that she was given another chance to succeed on probation instead of going to prison. This was the third time she was granted probation. Her Probation Officer and caseworker were then able to get her into Sobriety House where she was prescribed and regularly took her mental health medication, received medically assisted treatment called suboxone, and became involved in Narcotic Anonymous meetings. Sara finally had a positive support system around her. Despite that, she continued to have positive drug tests, and she was discharged from Sobriety House. Nevertheless, Cassie, her probation officer, did not give up on her. Cassie was able to get her into a sober living house called David's House, which was paid for by probation. Sara continued her treatment, and something clicked for her. She eventually became the house manager. She got her son back. She stayed sober and her probation was successfully terminated. She is now a Peer Support Specialist at a treatment provider. Recently, she wrote her probation officer: "Hi Cassie! Not sure if you remember me but this is Sara. I am working as a Peer Support Specialist and working with a problem-solving court. I am still sober, 3 1/2 years!!! I have my son back and I am doing fantastic. I really just wanted to say thank you. I really think that you went above and beyond for me and it seriously changed my life. Between you and Child Protective Services, you saved my life. I will be four years clean on May 20[th]. I could not be more thrilled with how my life has turned around. I now get to help others in their addictions and really get to spread the word that recovery is possible. "

I share this story with the hope that it dispels any idea that probation is anxious to revoke probation and jail their clients. Sara repeatedly violated her probation, but her probation officer did not give up on her. Hopefully this story demonstrates how our probation officers are deeply committed to their clients' success.

I asked Bill Benson, Shawn Doyle, Shane Stockley, Dmitri Medoff, Miranda Shepherd, Kathy Krick, and Cassie Korse to join us here today so that I could publicly thank them for their heroism. I ask you to join me in thanking them all for their service to their public, their dedication, and their commitment.

These stories are examples of the extraordinary work of our probation officers. And I can assure you that if we had the time, I could recount story after story of our probation officers in each and every judicial district in the state going above and beyond. I am extremely proud to have the probation department as part of the Judicial Branch, and we should all be thankful for the work that they do.

We have been working extremely hard as a branch to diversify our bench. Our efforts have caused other judicial departments around the nation to look to us for guidance. As a result, Justice Márquez was invited to speak to congress. As Justice Márquez testified at a Congressional hearing in 2021, "Property, livelihoods, reputations, family relationships, or even life and liberty can be on the line [for the litigants]. A litigant who has confidence that the judge deciding her case has some sense of her life experience eases some of that stress and enhances her trust that the decision rendered will be fair—even if the judge ultimately rules against her."

As we head into the third year of our judicial diversity outreach program, we are seeing its positive impact. As I mentioned at the beginning, we gathered in person for Judicial Conference last fall. It was the first time since 2019. The room looked and felt different; we saw more women and more diverse colleagues among us. As I look out today and see a legislature that has more women than men and is so diverse, I imagine you all know that feeling that I am describing. Diverse law students entering the legal profession have shared with us how inspiring it is to see judges who look like them. Today, 17% of judges on the Colorado state court bench are judges of color, whereas we only had 10% judges of color four years ago. More strikingly, in 2018, we had just one Black District Court judge serving our state. Today, we have 15 Black judges—19 including Denver County Court—taking the bench each day.

This progress has been possible through the collective efforts of many. Thanks to the efforts of our broader legal community, the diligence of our citizen judicial nominating commissions, and the thoughtful appointments by Governor Polis (who has now appointed more than 40% of all state court judges in Colorado), our bench today better reflects the many diverse communities across the state that we serve. Initiatives such as the Dream Team 2.0 Coaching Program and the Colorado Hispanic Bar Association's Judicial Task Force help develop viable candidates for judicial vacancies and provide invaluable resources to diverse and first-time judicial applicants. Our pipeline efforts extend to college and law students, who will be tomorrow's lawyers and judges. Many of our judges serve as mentors in the Law School Yes We Can program (led by Executive Director Dr. Kimberle Jackson-Butler), which helps diverse college students prepare for law school through networking opportunities, leadership training, and LSAT preparation. We provide experiential learning opportunities for diverse law students through our Judge Lorenzo Márquez internship program and offer networking opportunities with our judges through our popular "virtual coffeehouse" called Java with Judges. We are also encouraging diverse law students to consider legal opportunities in parts of greater Colorado through a new summer externship program. We are able to invest in these important programs because you (the legislature) recognized the need and empowered us to do more. Thank you again for creating a judicial diversity program that is the first of its kind in the nation. It is making a difference. And so do you. I want to recognize that this legislature is the second in the nation to have a majority of women in the legislature.

This work is so important, and our work continues. Now we must accelerate the work of fostering inclusion and well-being in the workplace to ensure that all of our employees – judges and staff – have the training and support they need to flourish. To solidify the foundational work we have done, we are now asking the legislature to help us create a lasting legacy with true transformational change.

I started out talking about our judges' why. To me that is the most fundamental question of who we are as judges. I want to share with you all the justices' whys. I think it is important for you all to know who we are and why we are going to see the changes that we have started through to completion. I will start will our most senior justice and our next chief justice.

Justice Monica Márquez's family roots lie in the San Luis Valley. She grew up on the western slope and graduated from Grand Junction High School. All her life, she has felt called to serve. After college, she joined the Jesuit Volunteer Corps, where she worked as teacher and community organizer in Camden, NJ and West Philadelphia. Her multi-year immersion experience as a Jesuit

Volunteer exposed her to the complexities of urban poverty and inspired her to go to law school.  Early in her legal career, that same call to service drew her to the Colorado Attorney General's Office, where she worked under Ken Salazar and John Suthers, both of whom cultivated in her a deep respect for the workings of state government and the Colorado state court system. Over time, she discovered that what she loved most about her work was figuring out the "right" answer to a legal issue – the answer that reflected commitment to the rule of law, not a particular outcome in a given case.  Her call to serve has continued in her role as a justice.  She loves the work of solving complex legal issues, she is devoted to state government, and each day for her is both a gift and an opportunity to serve all of the people of Colorado and its many diverse communities.

After spending many years pounding his fist on both sides of the aisle as a trial lawyer in civil and criminal cases, Justice Hood was drawn to the idea of becoming the neutral in the courtroom. He describes himself as a devoted "law nerd," who has always enjoyed legal research and writing more than just arguing facts.  Becoming a trial judge in Denver gave him an opportunity to be a neutral law nerd focused on getting to what seemed to be the correct answers to legal problems, rather than simply arguing one side or the other.  He likes the view of the capitol from our courthouse across the street because it reminds him of how those of us in state government work together to give life to the rule of law, which he sees as the glue that binds our society together.  He values and respects the role you play as our elected representatives in creating laws that the governor's executive agencies then work hard to implement and enforce.  He enjoys being part of a non-partisan judiciary that strives to resolve disputes by honoring legislative intent and constitutional requirements.

Justice Gabriel is of the first generation in his family to go to college, and growing up, money was always a struggle for his family.  He did not think that he would be able to afford to attend any top-flight schools, but he was blessed with great teachers who encouraged him. They told him that good schools would offer support to students who needed it, and they pushed him to dream big. Fortunately, he listened, and he attended very good schools, with the help of massive financial aid.

After graduating from law school and clerking for a federal judge, he began his career working for large, prestigious law firms, first in New York and then in Denver. He never forgot, however, where he came from, and because he received so much from his practice of law, he always felt a strong moral obligation to give back. So, throughout his time in practice, he served on many nonprofit boards and as a municipal prosecutor, and he provided hundreds of hours of pro bono service, representing abused and neglected children for almost 20 years, an Oklahoma death row inmate for 9 years, prison inmates referred to him by the 10th Circuit Court of Appeals, and civil rights litigants referred to him by the ACLU, among others. It was this sense of obligation to give back that ultimately led him to the bench, his thought being that there can be no higher calling for a trial lawyer, and no greater way to give back, than to be a judge. And so, he applied and was fortunate enough to be appointed first to the Colorado Court of Appeals and then to his current court.  It has been, and continues to be, the honor and privilege of his life to get to serve the people of Colorado as a judicial officer.

Justice Hart has been passionate about civil access to justice – making the legal system accessible, understandable, and fair for civil litigants regardless of their economic status – for as long as she has been a lawyer.  She realized (in part

House Journal--5th Day--January 13, 2023    Page 87

through teaching legal ethics for two decades) that state supreme courts have a central role in protecting and promoting access to justice through regulation of the legal system and the practice of law.  She decided that she wanted to be a member of the Colorado Supreme Court, if given the opportunity, so that she could advocate for a focus on the needs of poor people in the civil justice system and the importance of making the system work for those who have to navigate the law without lawyers.

She loves the parts of the job that involve studying hard legal questions and providing clear answers through written opinions – the black robe parts of the job.  But what inspired her to seek out this role was the behind-the-scenes administration of the courts with the aim of best serving the public.

Justice Samour was born and raised in El Salvador. He and his family fled El Salvador when he was 13 years old during a time of political upheaval. Years earlier, Justice Samour's father had been ousted from his judicial position and their family home had been riddled with bullets because he stood by his conviction to faithfully apply the law in a murder case, despite pressure from a high-ranking military official to do otherwise. When the family received an anonymous death threat, they immediately packed what they could fit in their van and left for the capital to apply for visas to come to the U.S. A week later, with all the necessary paperwork in hand, they made the five-day journey to Colorado. When they arrived here, they slept on a relative's basement floor until they could find housing. They could not speak English, were in culture shock, and did not have access to most of their possessions or savings. Because the situation in El Salvador deteriorated, they decided to apply for, and later obtained, their permanent residency and eventually their citizenship.

This ordeal taught Justice Samour firsthand about the perils that ensue when the judiciary is improperly used as a vehicle for personal or political gain and left him with a profound respect for the rule of law and the sacred role that a fair, impartial, and independent judiciary plays in a democratic society. His family's unplanned departure from El Salvador, along with his father's heroism, inspired Justice Samour to become a judicial officer and to fight for a system of equal and impartial justice.

Justice Berkenkotter knew she wanted to be a judge from the time she was in third grade, which is a little unusual because her family didn't know any lawyers or judges. They also didn't have a TV, so it is hard to know where she got the idea or what she even thought it meant to be a judge.

As time passed and she grew to understand that trial court judges help people resolve their disputes—she was hooked. After being appointed to the Boulder District Court in 2006, she was delighted and more than a little relieved to learn that her third-grade self had set her on a path to the best and hardest job she'd ever had.

During her time as a trial court judge and chief judge in Boulder, Justice Berkenkotter had the opportunity to work with her colleagues and stakeholders in the 20th JD to modernize and streamline many of the court's practices. There are many reasons why Maria wanted to join our court: to preserve the rule of law, to serve the entire state in the midst of the turmoil caused by the pandemic, and to work with our court and staff and judges from across the state to modernize the branch. She knew from her time as a chief judge that effecting certain statewide changes could help not only the people who work in our courts, but also the many people we serve. For the past six months, that has

meant working with her colleagues to examine the needs of the districts in order to intentionally shape our priorities and directing the implementation of the various recommendations in the ILG and Troyer reports.

As for myself, I have shared this before, but it is my why. I have always known that I wanted to be a lawyer. My dad was a lawyer, and I wanted to follow in his footsteps. Being a judge was never the plan. That changed when I was a young lawyer. I was trying a serious case, and I had a judge treat me very intemperately. I remember thinking that even if the judge was right on the law, there was a better way to handle that situation. That was the first day I thought of becoming a judge. A few years later, I had another experience that cemented that desire. I prosecuted a murder case that dragged on for about two years due to the defendant's significant mental health issues. Ultimately, the jury convicted the defendant of first-degree murder. As a result, the only sentencing option available to the judge was life in prison. I should note that this took place before the Victim's Rights Act was enacted. When I asked the judge if the victim's family could speak prior to sentencing, the judge – who happened to be an excellent judge – unfortunately denied the request, announcing that the court did not have any discretion regarding the sentencing. I will never forget the faces of the victim's family. They had waited two years to talk about the victim, and they never got the chance. That day, I decided that I wanted to become a judge, and I promised myself that if that ever happened, I would do everything in my power to let people know that I cared and that I truly listened. A few years later, I was appointed to the district court in Jefferson County. That was twenty-three years ago. And treating everyone with dignity and respect to the very best of my ability has been the cornerstone of my judicial philosophy, and becoming Chief Justice didn't change that.

I thought it was important for you all to hear about the seven of us. I am proud to serve with each of them. While we frequently disagree on the difficult legal issues that come before us, we are of one mind in our dedication to the branch. We are the leaders of the branch, and we are all committing to our emerging future. And we are lucky to have a partner in our State Court Administrator – Steven Vasconcellos. Steven is the right person at the right time.  He is a transformational leader, and he is committed to our vision. It is a shared vision.

I am not here today to declare mission accomplished, but I am here to say that we have a vision and a plan. Let me remind you of our strategic priorities:

We are improving our operations to better serve Colorado;
We are empowering our employees;
And we are listening to all stakeholders.

There remains work to be done. But we have a path forward to which we are committed. Two years ago, I committed to the idea that we would "think anew and act anew." We have lived up to that commitment. With your help we will continue our work.

The last two years have not been easy. But it has also been a time where leadership has been presented with an opportunity. Honestly, the difficulties have allowed us to really examine how we work and who we are. We are in a much better place than we were two years ago at this time, and because of the lessons learned our future is bright.

Thank you for the opportunity to talk with you today.

# Appendix 27(v)

**Transcript of *Hearing before the J. Judiciary Comm.*, Colo. Leg., February 1, 2023 (SMART Act presentations of Colo. Jud. Dep't and Colo. Comm'n on Jud. Discipline);**

# Colorado Legislature Joint Judiciary Committee—
# SMART Act Hearing February 1, 2023

**Sen. Gonzales**

At this point, we are right on time. And I want to shift our attention now. We are joined by the Chief Justice of the Supreme Court and our State Court Administrator. And so, we want to give them a few moments to get set up. Looks like we're going to change seats, get a PowerPoint pulled up, and get some information out to members. So, we will take a few minutes here to let folks get situated.

**Sen. Gonzales**

The Joint Judiciary Committee will come back to order. Colleagues, we are having a bit of technical difficulties in pulling up the presentation. But I do want to extend my appreciation to the State Court Administrator, Mr. Vasconcellos, for giving members of the Committee hard copies of the presentation that we will be reviewing and walking through today. And I also, for members of the public who are listening in, you can go to leg.colorado.gov, click on the committee's tab, scroll down to either the House or Senate Judiciary Committee, and then click on SMART Act, the orange SMART Act button, and that will take you to the materials associated with today's presentation. Those have been posted and available so that you can follow along if you're listening in as a member of the public as well. With that, I'll turn it over to Chief Justice Boatright. Thank you for joining us this afternoon. Please proceed.

**Chief Justice Boatright**

Thank you, Madam Chair. appreciate everybody's time and attention here today. I want to introduce myself. I'm Brian Boatright. I'm currently the Chief Justice of the Court. Been with the Court since 2011. And I've been a judge since 1999. Seated next to me is Mr. Vasconcellos. He's our State Court Administrator. And Mr. Vasconcellos really grew up in the Judicial Branch. I think he said he's 27 years now in started as a, we didn't call them CJAs at the time, but he started in a clerk's office and has worked his way up. Also with us is Justice Monica Márquez, who's seated behind me, Justice Márquez is here, because she has some subject matter expertise if we get into some questions, number one, and number two, she is going to be the next Chief Justice. So, we want to let her know what she's in for. So, with that, we've got a number of topics that we want to cover today. If you look at page two, it kind of lays out our little roadmap. I don't need to go through that in detail.

But I do want to spend some time on the next slide which talks about the Colorado Judicial Districts, because I think it's important for people to understand that the breadth really of what we do, we are in every county in in the state. We have 22 Judicial Districts. We have 64 counties, we have over 4,000 employees and 337 judges. A lot of people don't realize this, but Denver County Court is not a part of the Judicial Department. It's its own constitutional entity. Although we do have their Chief Judge sit on our Chief Judge Council to participate. Each Chief Judge or each Judicial District has a Chief Judge that has the administrative authority over his or her District. Our Court along with the State Court

- 1 -

Administrator have administrative authority over the Judicial Department as a whole. At times, it's talked about as judicial leadership. And there's been a suggestion that the Office of Attorney Regulation or as it's known as OARC, is part of the Department leadership on administrative matters, and that simply is not accurate. OARC is an independent office that's tasked with regulating the practice of law. While it serves a very vital function in ensuring attorneys' competence, compliance with continuing education requirements and mandating a robust disciplinary process for attorneys, it does not have administrative authority over the Branch. We set the budget for OARC, but OARC's day-to-day operations are entirely independent of the Supreme Court and the State Court Administrator's Office. And this is important because matters that come before OARC could end up before the Supreme Court so we don't have any control over their day-to-day operations.

Turning to the next page, one of the highlights that I talked about at the state of the judiciary has been our efforts to diversify Colorado's bench. If you look at the slide that's it's titled Diversifying Colorado's Bench. You'll see that starting in 2019, we had a judge bill that was passed that gave us a diversity outreach coordinator. And that program has made great progress obviously There's still work to be done. But interestingly, of the 99 judges appointed in the past three years, through June 30, of 2020, 12 had been African American. But, and this is an area that we need to continue to work on, just 11 had been Latin X or Hispanic. And by the way, during that same period of time, 57 of those 99 judges have been female. And now females represent more than 42% of the bench statewide. At this time, I want to give a shout out to the Hispanic Bar Association, they've been an excellent partner with us in working towards recruiting and providing good candidates for the bench that can address that deficit as compared to the Colorado population. We have a number of programs I talked about at the State of the Judiciary, Java with Judges, we have what's called a Dream Team. We have the Judge Lorenzo Márquez diversity internship program to try and bring diverse students into the into the building so that they can get familiar, because a lot of what we're realizing is this is not just something that we can go out and and fix overnight. It's really a pipeline problem that we are committed to in the long term. But I think we are really pleased with the progress we've made over the last three years. Now, I'll turn it over to Mr. Vasconcellos with regard to the staff demographics.

**Sen. Gonzales**
Thank you. Mr. Vasconcellos. Please proceed.

**Steven Vasconcellos**
Thank you, Madam Chair. We also had to provide some similar information to what the Chief just provided about our bench, about our employee population at large. And currently, our our trial court, appellate court and probation staff are approximately 68% White, 23% Hispanic or Latin x, 3%. Black, with the remaining percentage made up of folks of Asian descent, Native Americans, or folks who identify with more than one race.

- 2 -

**Chief Justice Boatright**

If I may proceed, madam.

**Sen. Gonzales**

Please proceed.

**Chief Justice Boatright**

I waited till you took a bite. So, thank you. The next slide, you'll see just basically our caseload, we are a busy entity, we have 548,000 cases every year. And again, as I said, at the State of the Judiciary, I think criminal gets a lot of attention, as it should. There's 122,000 criminal cases. But I think what frequently is overlooked is that we have approximately 50,000 cases that involve domestic and probate, which are really our children and most vulnerable people in our population. And at any given time, we have somewhere between 68 and 70,000 probationers that we are currently, that we are supervising. We're going to talk about probation here in a moment. But again, I want to emphasize that probation is not is not viewed as a punitive sanction. Rather, it's designed for community safety, and rehabilitation. And we'll get into some of those statistics here in a moment. And I'll hand off again to Mr. Vasconcellos, with the Chair's permission.

**Sen. Gonzales**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair, I'd like to move on to a discussion of changes that we've experienced in the Judicial Department. And of course, it probably goes without saying the past four years have been a time of great change for the Colorado Judicial Department. And we'd like to highlight a couple of key areas of change that we believe would be of interest to the Committee. I'm on slide number seven currently. And I'd like to start by highlighting some administrative changes. When I was selected to be the State Court Administrator in October of 2019. There were several areas of organizational policy and procedure that required attention. And these changes have ranged from anything like curtailing the use of non-disclosure agreements in employee settlements, completely reworking our procurement rules from scratch, bringing ourselves into parallel with executive branch procurement rules, focusing specifically on restricting the use of sole source contracting, providing other strengthened fiscal controls, amending state policies on administrative leave. Several of these issues emanated from November 2020 Performance Audit that the State Auditor's Office conducted of our Office that started at the beginning of my tenure. Additionally, recently, the Supreme Court amended the Judicial Code of Conduct expressly prohibiting harassment, retaliation, and other inappropriate forms of behavior by judicial officers. So, really, right out of the gate, during my tenure, it has been really focused on what I like to think of as the plumbing and electric of the organization, basic policies, basic controls, and oversights.

**Sen. Gonzales**

Thank you for that. I want to pause here and see if there are questions thus far from members of the committee. Seeing none, please proceed. Chief Justice, please proceed.

**Chief Justice Boatright**

Thank you. I next want to turn to the issue of judicial discipline. During this Summer, there was an interim committee that was put together to look at changes for judicial discipline. I know that we have a number of the committee members here today. I want to start out by thanking former Senator Lee and Representative Weissman, for their bi-partisan approach to setting the interim committee, it was set up with an even number of Republicans and Democrats. And that's appreciated because de-politicizing anything around the Judiciary is greatly appreciated. And echoing what I said at the State of the Judiciary, I also want to thank Representative Weissman again, and former Representative Carver for their leadership and making sure that this was a bi-partisan bill. It was a thorough and lengthy process, the Commission came to some common-sense changes that improve transparency, and ensure due process for judges and brought Colorado in-line with the modern judicial discipline. And we are supportive of the changes that have been made.

We also, aside from that have made some additional changes, we adopted what's called Rule 41, which is a recusal rule for the Court in the event that the entire court needs to recuse if a former Justice or current Justice, or a staff member or family member was a witness a complainant or subject of the judicial discipline, we set up a procedure by which the court can recuse and we can appoint members of the Court of Appeals to act as an interim Supreme Court to preside over that matter. In doing that we really mirrored what the Interim Committee did. As you probably know, the changes that are being recommended, some of them are constitutional changes, that can't take place at the very earliest until late 2024. And we wanted to make sure that there was an interim solution to that problem should it arise in the interim. And as I said, we just felt like mirroring what the Interim Committee did. It didn't make sense to us to have one process for the next two years, and then shift to a different process starting in 2025.

In addition, we also amended Rule 227. That was the rule that provided for funding to judicial discipline. As you may recall, last year, the Legislature provided for independence of the Commission, provided for independent funding. And we eliminated any type of confusion around potential funding that the Branch might provide. We supported the independence of the judicial discipline to have their own funding. And I will say that during this budget process, I think judicial discipline recognized that. They didn't submit any budget line items to us. And it really became superfluous. So, we've eliminated that from the Rule. Also in line with the legislation that was passed last year, and Mr. Vasconcellos can talk to this a little bit more in detail, we've been providing support to judicial discipline, as you probably are aware, judicial discipline will be standing on its own effective June of 2023, because of the legislation, and we've been tasked with providing interim administrative support, I will venture to guess that there will be some grumbling about the services that have been provided. I don't think it's surprising

- 4 -

to us because we are short-staffed. And we've been providing services, I think, to the best of our ability, trying to balance the needs of 4,000 employees with the needs of judicial discipline. And I'll turn it over to Mr. Vasconcellos, because he's been really spearheading that.

**Sen. Gonzales**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. I would just say briefly that the Chief and I recognize how important a good clean launch for a new agency is, particularly in agencies such as the Office of Judicial Discipline, and so I'm personally committed to providing the support needed while they're in this sort of takeoff phase in creating their Office from scratch. As the Chief mentioned, we are struggling to meet our Judicial Districts' administrative needs, whether that's IT, HR, other areas, finance, and you'll see in our 2024 budget request some of those needs reflected. We have at times put aside the needs of our Judicial Districts to help support the Office of Judicial Discipline. Because it is so important that they have a successful launch. And I remain committed to this successful transition period. And even supporting them as needed beyond the statutory timeline, I don't want any sort of surprise and you sort of light switch moment where things drop. We are committed to a successful launch for the Office.

**Sen. Gonzales**
Thank you. Colleagues, questions thus far? I see two, I'll go to Representative Woodrow.

**Rep. Woodrow**
Thank you, Madam Chair. And thank you both so much for being here. Chief Justice Boatright, I appreciate so much of the work that the Department has done with respect to the Interim Committee to make right you know, a lot of the issues that had been highlighted publicly. And I think that speaks to your leadership, and also just the tremendous strides we're trying to take to ensure that the public has faith in our Judiciary. And, so, I just want to say thank you for that. I do want to note that in my read of, of sort of where things went sideways, one of the main issues was that when it came to judicial discipline, ultimate decision making was vested in the hands of a very small group of people who were then able to use that or leverage that authority in ways that, you know, were counterproductive. You've mentioned that the changes being proposed, both legislative and constitutional, will lead to transparency and greater due process. And that sounds great. I just want to be sure. Do you feel that the proposals being put forward address the root underlying issues that were highlighted in the Department and that we can be confident going forward? And when we talk to our constituents, that this is the right way to do this? And these are the answers?

**Sen. Gonzales**
Chief Justice Boatright.

**Chief Justice Boatright**

Thank you, Mr. Woodrow, for that question. Yeah, I do believe and I think in conjunction with the legislative changes that were made last year, where judicial discipline was set up as an independent office and provided independent funding. As part of the changes, we've gone from eliminating judges as being the Special Masters to go to a judge, a lawyer and a citizen to be the ultimate decision makers on that. And then the Supreme Court would sit as just an appellate body without any of the final say with regard to that. So, I do think that we've decentralized that for lack of a better phrase. And I do think that these are really productive changes that have been suggested. Thanks so much.

**Sen. Gonzales**

Mr. Vice Chair.

**Rep. Weissman**

Thank you and colleagues, just to the point that the Chief Justice mentioned. House Members may already know this, because they're starting in the House, but the Interim Committee that a lot of us were involved with, did vote forward one concurrent resolution, one bill. We will all first in the House, then in the Senate, deal with these in the due course it's HCR 1001 and HB 1019, which represents the work of the interim committee. So, we'll grapple with that as it comes up to the subjects, then, that both the Chief and the State Court Administrator have been speaking to, and you largely covered it. But I did want to ask and, in transparency, I will ask the Commission the same question. Interested to sort of hear what you know what is working, what is not working? We're well into the transition timeline, we have a few months left in terms of the launch Mr. Vasconcellos, as you called it, and then I would also like to hear how things are going as to another substantive element of HB, sorry, SB 201. Last year, the information sharing in Section 106 of that new article laid down again, what's what's working, what's what's maybe stuck from your perspective?

**Sen. Gonzales**

Chief Justice Boatright

**Chief Justice Boatright**

Thank you, Representative Weissman, for that question. I do think that the information flow is going very well. I've not received any feedback that judicial discipline has not been receiving the documents that they've requested. It's my understanding that they've been been given all of the documents that were provided to the independent investigators. We've also consented to the release of the Office of Attorney Regulation Counsel report that came out. I've not seen it because it is confidential, but we have authorized the release of that to judicial discipline. So, we're trying to be as forthcoming as we possibly can in all of this. I have not received any information that people are dissatisfied with the flow of information. That's not risen to me at this point. With regard to sort of the administrative piece, Mr. Vasconcellos, I think probably is better to address that.

- 6 -

**Sen. Gonzales**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Representative Weissman, I think in terms of what's working well, on the administrative front, I have made it a priority to basically have, I mean this virtually, but an open door for Mr. Gregory and his concerns. And, you know, he is able to he has contact information, including personal cell phones for most of my Division Directors. So, we're trying to help put him in a position where he doesn't have to navigate a staff of 250 when he has questions, when he has a particular need that needs to be addressed. He can work with me directly or can work with my senior team. So, I think that line of communication that access to us is working well. And I think anytime you stand-up a new independent entity, there are growing pains. I think there's a pain period for new any new agency. I don't know that this is any better or any worse. I don't really have a ton of personal experience. I will admit that Mr. Gregory and I don't always agree on solutions. But I remain committed to working with him and collaborating on solutions so that he can be successful.

**Sen. Gonzales**

Seeing no further questions.

**Chief Justice Boatright**

Can I just add one thing?

**Sen. Gonzales**

Please proceed.

**Chief Justice Boatright**

One additional thing, Representative Weissman, just looking at my notes, is we've also given them permission to talk to the investigators Liz Rita and Bob Troyer. So, like I said we're trying to be as forthcoming. I think they've also been provided with all of the documents. I think it gets lost in in sort of the history of all of this that the State Auditor also did an investigation with regard to the contract. That took a period of time and we provided them with all the information that we provided to the State Auditor as well.

**Sen. Gonzales**

Seeing no further questions at this time, we will go ahead and proceed. Chief Justice Boatright. Mr. Vasconcellos, please.

**Steven Vasconcellos**

If you don't mind. I'll take it from here. Continuing on with the broad theme of change. And I'm on slide number nine at this point. And I think while we've discussed some of this before, we really cannot

- 7 -

overstate the impact to both court and probation operations from the COVID-19 pandemic. You know, in the span of a few short weeks, we in the spring of 2020, we went from what we used to know as business as usual, with in person business, to empty courthouses to conducting the majority of our business virtually. And while our judges and staff did display tremendous resilience, and adapted quickly, it was not without challenges. And of course, now that we are doing this on paper and not with the presentation, I can't make the I am not a cat joke, but that's what you see on number 10. We did not have that level of challenge in Colorado. Some of you may remember the "I am not a cat: incident in a Texas courtroom. Where an attorney had a filter over their face accidentally that was a kitty cat. So, moving right along. I do want to talk about the.

**Sen. Gonzales**
Now the problem, Mr. Vasconcellos is that we are not on a screen. So, it's all good. Please proceed.

**Steven Vasconcellos**
Thank you, Madam Chair. Moving to slide 11. I want to give a sense of scale when we're talking about virtual proceedings. How big is this? How is this proliferating? What does this look like? To give you a sense of size in calendar year 2020, the Judicial Department was averaging about 17,500 events on WebEx, which is the platform we use every month. And across those 17,000 plus events. We had 125,000 participants every month. The majority of those were court hearings. But some of those were also probate, virtual probation visits, and the like. Virtual hearings were a tremendous boon for us during a very difficult period where it was just simply not safe to have business in person. They've been a tremendous convenience to citizens. It has also been an increase in workload for our staff. We have about two years of experience now, with virtual proceedings. We've learned quite a bit. We've learned what seems to work well in the virtual environment. We've seen certain types of proceedings that don't work well. And it doesn't always cut across specific types of cases. Sometimes it's down to the circumstance of an individual case. But I think it goes without saying that we've reached a point where we realize that it's in the best interest to promote standardized practice for virtual proceedings. We have a virtual proceedings committee that has been meeting regularly. And they are right now focused on considering two separate but related policy issues. One, recommendations on uniformity for broadcasting hearings online. And two, when should participants be allowed to participate virtually? Drafts of these policies, we hope, will be ready for comment by both internal and external stakeholders within the month. And we hope that the General Assembly will agree that it's best for a policy like this to be managed by the courts. Virtual proceedings are an extension of courtroom operations, a space that is the responsibility of judges, judges have a duty to ensure fair and impartial proceedings. And that can often be done virtually, I've mentioned this before to this committee, we are at a space where virtual proceedings are here to stay, there's so much merit, I don't see us going backwards. It's a tremendous tool in the toolbox. Just to give a brief example, if you've got a 15-minute status conference in the case, some of our Judicial Districts, as you well know, from your own experience, some of our Judicial Districts are geographically very large, sometimes with very geographically interesting features that make travel challenging. Having folks travel 90 minutes, two hours, one way for a 15-minute status

conference makes no sense. This is this is where the benefit to the citizenry, I think, is felt the greatest. There are other types of cases and sometimes, again, not by case, but sometimes the circumstances of the case lends itself better to an in-person processing. We want our policies to have space for judges to have discretion to make decisions about how to conduct hearings, based on each individual case.

**Sen. Gonzales**

Excellent. Colleagues, any questions in regards to this aspect? Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair, um, with respect to the virtual courtroom, and the two different aspects. I, as you can imagine, have certainly used the the new technology and participating as counsel in proceedings and that, I think, in its own way has progressed through the years and judges, and court personnel, and parties and their counsel are, are getting there, if you will. The thing that I think we in the General Assembly have heard from citizens is that they really like the ability to sit in on a proceeding, if you will, by going on WebEx and, and watching and listening. And I know there's a committee meeting and my own Chief Judge is working. I think they're working diligently. But I really do want to ask here today, whether we're making progress, do you feel like we're making progress? And is there general agreement in the judiciary that the presumption should start with all court proceedings should be open and available? And yes, there are going to be many, many exceptions with respect to juveniles and victims and sequestration of witnesses, but but the starting point ought to be that we have the technology and any citizen ought to be able to sign on and observe that proceeding without going to the courthouse and going through security and so forth. So, please, I invite your thoughts and appreciate the work that's being done there.

**Sen. Gonzales**

Chief Justice Boatright.

**Chief Justice Boatright**

Thank you, Senator Gardner for that question. I do think progress is being made. I think that where I would say that we all are in agreement in is that the more that people can watch what happens in our courtrooms, the more confidence they'll have in our process. I think, because I as a trial court judge presided well over 100 jury trials, and every time I talked to the jury, it was almost uniform that they walked out thinking that the system was way better than what they thought when they walked in. So, I do think that it is very much a positive. I will say that we have differing degrees of comfort level with technology amongst our judges, to be honest with you, because we have 337 judges and I mean, we were accused of shambolic chaos at one point with regard to different uses, but we are trying to come up with the standardized practice, but we, as you just touched on something, we want to be really sensitive to victims, to sequestration issues. We want to make sure that we can have as open a process as we can have in our courtrooms without jeopardizing due process. And, so, I do think you what you touched on was exactly right. There are going to be exceptions. And hopefully the judges, because we have some

judges right now that are doing in broadcasting them, they're very comfortable with them. We have some judges that are very resistant to it. But we are looking at putting together a Chief Justice Directive, that's going to start out with the presumption that we do have broadcasting and then looking at what works with exceptions. But I also want to emphasize that we want to talk to our stakeholders with regard to this, because there's going to be some victims' groups, I think that are going to be able to bring some insight to this. I think the DAs is in conjunction with that. The defense attorneys may have a perspective on some of these. But I do think we want to take all into account when we're trying to identify those exceptions, and be able to give courts factors to look at in deciding whether to make something broadcast or not. So again, to that leads to consistency, if that makes sense. Thank you. Thank you.

**Sen. Gonzales**
Excellent. Representative Epps.

**Rep. Epps**
Thank you, Madam Chair. I have a few questions. Can you orient us, remind us? When did our Colorado, our District Courts start using WebEx?

**Sen. Gonzales**
Mr. Vasconcellos?

**Steven Vasconcellos**
Thank you, Madam Chair. Thank you, Representative Epps. It was in the Spring of 2020. Probably the very first pilot locations, late April, early May.

**Sen. Gonzales**
Representative Epps.

**Rep. Epps**
Sir, what? What I want to know is how many of our courtrooms are already operating on a default of having the WebEx on and broadcasting on? So, whether that's a percentage or whether that's a number of the Judicial Districts. What's your understanding right now? I feel it's weird to ask for a percent. But what's your understanding of out of the then or now 22 Judicial Districts? How many of them? It's the default to have it on? And then within those, how many of the judges just. What's your understanding of that?

**Sen. Gonzales**
Mr. Vasconcellos?

- 10 -

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Representative Epps. I don't have that data at hand, I'd be happy to work with my staff to get the best information on both at a district level and by judge level if we have it and share that with you and the committee.

**Sen. Gonzales**

Representative Epps.

**Rep. Epps**

I can offer that I'd be glad to share it with you too, if we can connect offline. I heard, and I'm sorry, I looked away. So, I missed which speaker said this, but I heard one of you say directly looking at a Chief Justice Directive. And I wanted to clarify by way of what sort of policy you may enact. How certain are you that it would be a Chief Justice Directive versus some other sort of policy? What do we mean when we say looking at?

**Sen. Gonzales**

Chief Justice Boatright.

**Chief Justice Boatright**

Thank you, Madam Chair. Thank you, Representative Epps. We're in the process of developing it right now. But I think I'm fairly confident that we will have a Chief Justice Directive around virtual proceedings and broadcasting. I just don't know, right now what. We're trying to flesh out and we also want to get stakeholder input before we make a final decision on what that looks like. But I do think that to avoid vast inconsistencies, it's better to have a Chief Justice Directive. With that said, again, we have independent constitutional officers and I can't fire them if they don't. But I do think that I think we all of a mindset that this is as Mr. Vasconcellos said, this is what we're going to have for the future. And we're committed to doing it. But I'll give you a small example. One of the things that we are looking at is FED hearings. And, so, we did a survey of the County Court judges and the County Court magistrates who are doing FED hearings, and the disparity of kind of how they handle things with regard to people saying please don't make them all virtual because we have a really good diversion program. And if people don't come in, then it's going to affect our diversion program. So, we want to have some flexibility for our judges to be able to implement things that are really best practices, because different judges run their courtrooms differently and have different technology, have different capabilities. But I'm confident in saying that we will have a Chief Justice Directive around broadcasting and around virtual proceedings.

**Sen. Gonzales**

Representative Epps.

- 11 -

**Rep. Epps**

I think I just have two more questions, sir. One is, again, just appreciating clarification on the phrase within the month and likely within the month. Are you? Will it be within the month that we will see the Chief Justice Directive, as in February?

**Sen. Gonzales**

Mr. Vasconcellos?

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Representative Epps. The best information I have available right now is within the month, the committee is working hard. This is primarily a committee of judges, they're meeting before work, they're meeting after work, and they're meeting regularly. This is an extraordinarily high priority that the Chief Justice has identified for them. So, folks are working diligently, I don't think a month is going to turn into nine months. That would be ridiculous. Might a month be five weeks? It might, it might. The folks are working very hard. And the goal is within a month.

**Sen. Gonzales**

Representative Epps.

**Rep. Epps**

So, I'm at two and a half more. But that will be it. Thank you for that, sir. With apologies for just being a straight up legal question. I really want to understand what do you all understand to be the legal basis that sets the foundation for the expectation of open court? Is it just constitutional? Is it the federal Constitution? Is it the state Constitution? Not asking for a cite, but what do you understand to be the basis of open court?

**Sen. Gonzales**

Chief Justice Boatright.

**Chief Justice Boatright**

We've written a number of cases on court closure and it's a federal constitutional right.

**Sen. Gonzales**

Representative Epps.

**Rep. Epps**

Thank you. With regard to the, I mean, I'm sure other people are super excited to read the Chief Justice Directive coming out in a month. And I mean that not sarcastically very seriously. For those of us who are looking forward to it, will you consider, I'm just asking you to consider that those two policies might

not need to roll out at the same time. One of them seems to me to be much more straightforward than the other. And trying to quickly turn it into a question versus a statement, Madam Chair, but what would it take for us to be sure that working out the nuances of exceptions around when folks can appear doesn't hold up the process of issuing a policy and a directive around virtual court access for non-participants?

**Sen. Gonzales**
Chief Justice Boatright.

**Chief Justice Boatright**
Thank you, Madam Chair. Thank you, Representative Epps. Yeah, we're not going to let the pursuit of perfection out do good. So, if we are able to put something together with and I don't know that one would get ahead of the other, you kind of said that. It can't remember what you said broadcasting may get ahead of virtual proceedings are virtual appearances. I'm not sure which gets out in front of the other. But I think that they are interrelated, but they are not completely dependent on each other. And if we're able to come up with a Chief Justice Directive on one or the other and roll it out, we'll do that.

**Rep. Epps**
Thank you.

**Sen. Gonzales**
Thank you, Representative Epps. Colleagues, any further questions on this point? Representative Sharbini.

**Rep. Sharbini**
So, I just want a little bit of clarification. Thank you, Chair. And thank you guys for being here. So, you're saying that you think a Chief Justice Directive would be more effective at getting courts to broadcast and then eventually allow virtual appearances permanently versus anything that we do here?

**Sen. Gonzales**
Chief Justice Boatright.

**Chief Justice Boatright**
Thank you, Representative Sharbini, I appreciate the question. I do because it's going to be an internal thing. It's going to come from us. And I think that we're going to have a lot less pushback from some of our judges who are very strong and believing in the separation of powers. So, I do think that if it is something that comes from internally, that there is a percentage of people that will be more responsive to that than a legislative mandate, to be just really direct with you.

**Sen. Gonzales**
Seeing no further questions, let us proceed.

- 13 -

**Steven Vasconcellos**

Thank you, Madam Chair. Moving on to discussing performance measures in courts. I'm on slide 13 now. I want to start with another area that was tremendously impacted by the COVID 19 pandemic and that was jury trials. The chart which is probably in the handout, tragically small, outlines trial activity and trial volume since from just prior to the start of the pandemic, through the end of last calendar year. And what you'll see just briefly from a narrative fashion is, in January of 2020, jury trials are cooking along at historically normal levels. And then you see that draw down to zero in the spring of 2020 through the summer, with some fits and starts through the fall of 2020. And then we start building what I, we don't have enough trend information to call this the new reality. But it's starting to look that way. Where we have a different kind of seasonality to trials than we used to. So, for example, last calendar year in in 2022, we are back to and actually slightly above historic norms on trial volumes. So, we're doing we did more jury trials in 2022, than we did in 2019. So, we're back up to just beyond historic norms. But the Chief Justice can talk a little bit about this, from his own experience as a trial judge. But the seasonality is different in each of the last two years. I don't have data yet for January of 2023. But in each of the last two years because of COVID spikes, and it being unsafe to bring in jurors, that post-holiday season, January-February timeframe, which is usually a very busy time historically, for jury trials has been almost fallow very few trials, almost no, no trials, some locations, no trials, because it hasn't been saved because of COVID outbreaks. So overall, we are back to normal in volume and a little higher even. But the way they're spread out over the year is looking different than they used to. I don't know, Chief if you want to talk about that.

**Sen. Gonzales**

Chief Justice, please proceed.

**Chief Justice Boatright**

Thank you. Yeah, just anecdotally, as a trial court judge, I found that we did most of our trials from September through Thanksgiving, and then right after the first of the year to Memorial Day. And that was true for my time as a trial lawyer and as a trial judge. And now we're seeing just because of people getting inside and being internal that January is not is one of our slower months again, just for safety reasons.

**Steven Vasconcellos**

Thank you, Madam Chair. Moving on to slide 14 and related to jury trials, we wanted to take a moment to thank the General Assembly for the passage of House Bill 21 1309, which allowed continuances for jury trials during the period of COVID. That legislation expired in April of 22. But it allowed courts to delay criminal trials up to six months for with in cases with defendants that were out of custody three months for cases with defendants that are in custody without creating permanent impacts to speedy trial issues. Again, that legislation expired in April of last year. We believe that legislation made a difference not just in providing more space to conduct trials, but also gave our trial courts different tools to hold parties accountable in cases. In felony criminal cases, only approximately one and a half to 2% of cases

- 14 -

actually go to trial, the overwhelming majority settle. Sometimes parties need a little extra motivation to settle. Certainty of trial dates helps promote that settlement. The COVID Continuance Bill helped provide flexibility. And flexibility and certainty were needed so that trial court business could be done. So, we just wanted to take a moment to thank you, from a data perspective we're required to report out on the volume, and there were 262 COVID continuances ordered statewide, under House Bill 1309. Little over half of those were in misdemeanor cases, the remaining and felony cases. Madam Chair, I'm just going to continue to roll unless the committee has questions.

**Sen. Gonzales**
Please proceed. Thank you.

**Steven Vasconcellos**
Moving on to slide 15. On our trial court performance measures. We have reported on these same measures annually for many years now. This is these are measures that are established under Chief Justice Directive 08-05. What you see on slide 15 are the performance of our district courts in the major case areas. Just briefly how to read that, if you look at civil the target at 90% means we want 90% of our active civil cases less than a year old. Currently we are at 81% Another example criminal we'd like to see 95% of our active felony criminal cases less than a year old. Currently we have 91 percent. Timeliness is an area that's been impacted by the pandemic. Prior to the pandemic, we are substantially compliant with all of the standards both in district court and in County Court. Those timeliness measures took a fairly large hit, not only the jury trials, pretty much dried down to nothing. During the spring of 2020, most court business overall, particularly while we were transitioning and standing up our ability to do virtual proceedings, nothing much was happening for several for a handful of months. On any type of case, are 2022 data that you'll see in the handout represents an improvement over 21, we still have a little work to do. But I'd like to highlight that we are either really close, or they're in many important areas, including juvenile delinquency, dependency and neglect cases, domestic relations cases, etc.

**Sen. Gonzales**
Chief Justice.

**Chief Justice Boatright**
Thank you, Madam Chair. And I think one of the things that I would highlight here is civil is continuing to lag because unfortunately, they took a little bit of a backseat to the need to get the criminal trials done. But going back really to what Representative Epps was talking about with regard to virtual proceedings, you'll see domestic is very much right on track, because that's one that lends itself very nicely to virtual proceedings, the D&Ns the same way, and the expedited permanency permanent placement cases all lend themselves nicely to, to the virtual proceedings. And, so, we're very close to being on target with those.

- 15 -

**Sen. Gonzales**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you. Thank you, Madam Chair. On slide 16, you'll see similar information for our County Courts, principally same issues there. I don't intend to belabor unless the committee has questions. Moving on to the next slide on our court user survey. Once upon a time, when I was line-staff, I got to be part of a team that helped implement this project. And for almost 20 years, we went on site to our courts around the state, trying to hit every location every other year, and do on site user surveys to get feedback from court users on the quality of their experience. As you can imagine, this is an area that COVID interrupted, it's also been an opportunity for us to revamp this survey, and change our service delivery approach. And we are now actively piloting an online survey that folks can either access on site through QR codes that are posted throughout the courthouse, or through an email link that they're provided with after their proceeding. But we're doing that in five locations. Right now, the plan is to expand that to the entire state, that approach will replace our old in person survey approach. The single biggest reason why we wanted to replace it is we, if we do a little math based on the pilot locations, we're getting five times the number of survey responses through the QR codes and through the email length than we were getting in person. And more information in our mind is better in this regard. And so hopefully, fingers crossed next year at the presentation, if I'm lucky enough to join you, I'll be talking about some more detailed information from the pilot locations. We also have kind of a star rating, we're getting an average of four out of five stars on procedural fairness and service quality, which I like to think is not too bad, given the adversarial nature of many of our cases. And, so, I think historically, our data has been strong. I think there's a tendency for folks to think that courts are going to get poor feedback, because in many cases, there's a sense of a winner and a loser. And if you think about the concept of procedural fairness, what's really most important is that we provide that neutral opportunity for folks to be heard. And I think what other jurisdictions outside of Colorado have struggled with is that when that perception isn't there, that's when you get more negative feedback. We have historically gotten really positive feedback on our on our user surveys, and it appears to be continuing under our new pilot approach, hopefully more complete data next year. Moving on.

**Sen. Gonzales**

We do have a question, Mr. Vasconcellos, from Representative Soper.

**Rep. Soper**

Thank you, Madam Chairman. Thank you, Mr. Vasconcellos. So, on this, I just want to ask a two-part question. Is this for both civil and criminal cases? And then is it tied into the judicial performance evaluations as well?

**Sen. Gonzales**

Mr. Vasconcellos.

- 16 -

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you Representative Soper. The feedback is agnostic to case type. You could be there for any type of case. You could be there at the courthouse, because you thought that's where sometimes you would get your driver's license. We're asking everybody who's coming in the door, even if they ended up in the wrong location. So, all types of cases, all civil, all criminal. And in terms of a tie to judicial performance evaluation, there isn't one, because we're not asking questions at a granular by Judge level, we're asking about more globally about their experience in that court location, not necessarily their experience in front of Judge X, although their experience in front of Judge X might be driving their feedback. We're not asking for that level of detail.

**Sen. Gonzales**

Representative Sharbini.

**Rep. Sharbini**

Thank you, Madam Chair. Thank you, gentlemen. I've just been trying to go in my mind about these. You called them continuances ordered because of COVID. And stuff we've done here. I was working at the Public Defender's Office when COVID hit. We didn't call them continuances. They gave us mistrials. They literally told us, we don't care about your defendant's rights. We're going to keep pushing you back because we don't think it's safe. No efforts were ever taken to see if there was anything safe we can do or anything like that. And, so, I guess my question to you is, you know, what sort of things did you guys discuss as far as defendant-side dealing with mistrials and what you call continuances?

**Sen. Gonzales**

Chief Justice.

**Chief Justice Boatright**

Thank you Representative Sharbini. I want to push back a little bit. I think we explored every possible way from having plexiglass in the courtroom to considering having trials in county fair locations. You know, I think that we really explored a wide variety. Some of it was just set up, depending on the nature of the courthouse, some some courthouses didn't have a jury room large enough to have a jury venire come in, that could separate safely. You know, for example, in Pueblo, we had one case where they went to whatever their convention center is, and helped select a jury. So, I think that really, this was kind of a last gasp effort for us. I think, all of us were very, very mindful of the delay that this was causing for everybody in trying not to tread on people's rights. But recognizing that it was an incredibly difficult situation at the time. But I want to say, and I said this at the State of the Judiciary, our Chief Judges were incredibly creative about plexiglass and how they set up their courtrooms and how they met weekly to prioritize trials. And, you know, one of the things that I'm most proud of during all of this is we didn't have a major outbreak in any of our courthouses, which I mean, we had a number of cases where somebody tested positive and there was an actual mistrial caused. But, you're right, there were some that

we just couldn't get the trial heard. And they called it a mistrial because they couldn't safely bring in a jury. So, but I do think that we were very, very mindful of it. And you know, did our absolute best.

**Sen. Gonzales**

Representative Sharbini.

**Rep. Sharbini**

Just a follow up comment. Thank you for that. I appreciate that. I mentioned I was up in Weld County, and it felt like they didn't really do anything. So, it's nice to hear that there were other places that people tried to do things. So, I appreciate that.

**Sen. Gonzales**

Let's go ahead and proceed Seeing no further questions from members of the committee. Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. I am moving on to probation performance measures starting on slide 19. I want to give it just a sense of probation population size. Chief Justice Boatright mentioned it at the head of the presentation. But we have nearly 70,000 folks on probation as a daily population, which is substantially larger than any other component of the criminal justice system. In Colorado, we also represent the least expensive option for supervision in Colorado. An offender for a year in the Department of Corrections costs approximately $57,000 to the state and offender in community correction, corrections $14,000 and offender on parole about $7,700. An offender on probation, by contrast, costs the state on average about $1,900 per year. Our adult population in probation is 20 times larger than community corrections, four times larger than DOC, five times larger than parole. Moving on to slide 20. This shows success rates over the last decade, and this is all probationers, adults and juveniles combined. Over the last handful of years, the probation successful completion rate has been stable. It is slightly lower today than it was 10 years ago. The last 10-year period also represents a period of large public policy change in the criminal justice arena, particularly around around charging around sentencing. And I think the overall stability over the last 10 years is relatively impressive given the span of change in policy that we've seen that impacts probation. Moving on to the next slide and focusing on juvenile probation for a moment, are the chart on slide 21 focuses on the size of the juvenile probation population over the last decade, which 10 years ago, was just north of 4,000 juveniles, and today is approximately 1,500 juveniles so that population has decreased dramatically over the years. Again, I think it's reflective of the cumulative cumulative policy changes, both at a state and local level as it relates to juvenile justice. Moving on to recidivism, pardon me on the next slide, this is normally would be the point where I would have a 10-year chart focusing on recidivism rates historically. But thanks to some legislation from the General Assembly, specifically Senate Bill 19-108, we have changed our recidivism definitions. You may recall that Senate Bill 19-108 focused on juvenile justice specifically. And it tasked a juvenile justice committee to come up with a unified definition of recidivism that all

- 18 -

state criminal justice entities would use, because unfortunately, everybody had a different definition, which made our collaborative work together difficult. And as policymakers I can only imagine would be extremely frustrating for all of you. So, in the last year, we now have a unified definition for recidivism for juveniles. We have also adopted that same definition for adults so that we have a single recidivism definition. And on the top of the slide, the definitions laid out, if an offender gets a new deferred agreement, new adjudication or conviction, while under court supervision within one year of release from probation, then they are determined to have recidivated. The big difference for us in our old version of the definition between that and today is previously just receiving a new charge would count against recidivism. Even if you were found subsequently the case was dismissed. You were found innocent at trial. And so that is no longer an artifact of the statewide shared definition. I don't have historic information. We only have the most recent year now using the new definitions. Adult post-release recidivism is just under 6%. Juvenile post release recidivism is at about 8%.

**Sen. Gonzales**
Thank you, Mr. Vasconcellos. Can you give me that stat, the legislative bill number that you referenced in regards to that common definition of recidivism?

**Steven Vasconcellos**
Madam Chair, it's Senate Bill 19-108. Now, the bill itself did not have the definition in it. What it asked to do, what the bill directed, was to have the Juvenile Justice Reform Committee come up with a shared unified definition. That work took some time it took a little over, took over well over a year. But once they developed the new definition, of course, we adopted it as contemplated by the law.

**Sen. Gonzales**
Thank you. And and so now, given that statute and the working groups work, there is a common definition as it does that pertain both to juveniles and adults are solely juveniles? Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you. Thank you, Madam Chair. It only pertains to juveniles, Senate Bill 108, focused on juvenile justice specifically. And so the juvenile justice reform commission's work was just juvenile related. We think the definition developed by the JJRC is a good definition not just for juveniles, but for adults as well. I think the same concepts and principles and considerations are underlying so we have chosen to adopt it for adults as well. Plus, it didn't make sense for us to have two separate recidivism definitions within the organization. So that's the direction we have chosen. So, we have uniformity on the juvenile side, and admittedly, the adult side still there are different definitions across different agencies and we are supportive for what it's worth to have a unified definition.

**Sen. Gonzales**
May I ask, in regards to the agencies that worked on the juvenile definition was that only? Well, perhaps we can find time, outside of the context of this meeting to dig a little bit deeper there. Because I have

- 19 -

seen in a number of different policies that we consider, certainly over the context of these hearings, different agencies that have presented different definitions. So, would love to just dig in a bit more about that. But I'm appreciative of sort of the further explanation of how 19-108 translated into what you're presenting on today. Please proceed, Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair, and parenthetically, always happy to make time to meet. I'd like to go ahead and proceed into a discussion of the Department's fiscal year 2024 budget request. And the Chief Justice will talk about our first initiative.

**Sen. Gonzales**
Chief Justice Boatright.

**Chief Justice Boatright**
Thank you, Madam Chair. I talked about this at the State of the Judiciary, we went out and visited all of the employees around the State. And I think we were largely successful in communicating with almost everybody that was there, we would spend days in a district breaking it up into small groups. And having the opportunity to talk with our employees, we made sure our employees were separated from the supervisors and from the administration. So, we can try to get as candidate of feedback as possible. And I will say that the number one issue that everybody talked about with salaries, we are not paying a livable wage for a number of our people in several of our districts. We have more than one district where the judges have set up a food pantry for probation officers and for their CJAs. It is not part of our budget request, because we could not justify it in terms of a market survey. But we are in supportive of the governor's request for a 5% salary increase for all of the employees around the state. This is incredibly important to you know, we talk about our mission vision values, we talk about continuity, we talk about service, we're losing one of every five employees this year. And it's because we're losing them to fast food restaurants and to different places. So, the staff salaries was absolutely the number one concern for our employees. I know you're not the Joint Budget Committee, but it is something that we heard loud and clear from all of our employees over and over again, from all of our meetings.

**Sen. Gonzales**
Senator Gardner.

**Sen. Gardner**
Thank you. And Chief Justice, Mr. Vasconcellos. This is a matter of concern, I think, to all of us in state government. Do you have any sense as these employees leave. Is it about pay? Is it about working conditions? Are they are they just leaving the workforce? This is a conundrum for for all of us, even in the commercial sector? For sure. And maybe it's just anecdotal. But I'm, I'm interested in knowing what you do know yourself.

**Sen. Gardner**

Chief Justice Boatright.

**Chief Justice Boatright**

Thank you, Madam Chair. Thank you, Senator Gardner. If I have the magic answer for that it would be it would be monumental, but I will say in talking to our employees, we had a number of long-term employees who said they just couldn't afford to stay. The municipalities were paying more, private agencies were paying more, private industry was paying more. So, we were we not only have sort of the short-term churn of our new people, which I think is part of sort of the great resignation. But we're losing long term people. And again, I go back to my time as a former trial court judge, one of the things that was alarming, shocking, amazing to me, was how many division clerks that when I called them that that worked directly with the judges had been there for four to five months. I mean, those were always the people that had been in the courthouse for seven, eight, ten, twelve years. But now they're there at five or six months because of just the turnover. But I think what I will say is, in part of our budget requests, we're asking for additional resources for training, because the turnover creates training issues and training issues creates turnover, because of the stress and we're asking our returning veterans to do more. And so those that have the ability to retire, I think are taking advantage of that. And so we're losing a lot of experienced people. But the answer your question is yes. I mean, it goes across a broad spectrum. But, you know, when I took the privilege of going back out to Jeffco, where I was a district court judge, and we had a woman that had been there, from the time that I was a district court judge for a number of years, just in tears, sobbing that she just couldn't afford to stay. And she'd been with the Branch for 20 years, she couldn't retire. But she said, I just can't do it. I can't work two jobs for my family. I just, I've got I loved what I do here. But it just got to do this for my family.

**Sen. Gardner**

Thank you.

**Sen. Gonzales**

Thank you for for providing that perspective. It's something that I think across the board, I think we're all collectively navigating and appreciate that insight. Seeing no further questions, Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Moving on to our next item. We're asking for six FTE to bolster our HR department in judicial three new positions that would be regional staff placed out in the districts. We currently have six, supporting approximately 4000 people. We're way off industry norms in terms of the number of HR generalists. These are these are the kind of the first line folks that staff are talking to about a whole range of HR related issues. And our service turnaround times are just not acceptable. As noted in our decision item, we have about 50%. In this particular area of our service delivery. On employee relations, we have about 50% of the staff that industry standards would recommend. So, we're asking for three regional HR generalists. We're also asking for three positions regarding class and

- 21 -

compensation. With an organization our size, there's a lot of individual compensation and classification requests, whether that's new hires, whether that's promotions, whether that's other salary increases under our personnel rules, and it is a huge, huge bottleneck, it's taking 6, 8, 10 weeks for folks, 12 weeks for folks to get responses. It's not acceptable. And at some level, it is also driven some of the turnover that the Chief has referred to because even folks who are in line for promotion, we can't get the class and compensation work done in a timely fashion. We currently have one designated FTE for this in our office, we are pulling people from other areas within HR to help out. But you know, this is a little like the elephant eating itself. When we pull from one area to help out in HR, we're suffering in another area, so six FTE overall to improve our services to the entire department in HR. On slide 26, we have a request around an investment in the culture of the judicial department. This has several components, which I'll go over. But given what we've learned, given just my lived experience in the Department, given what I've learned, since I've been in this position, given the information that we've taken from a whole host and variety of investigations, there's just a different sort of ongoing investment that we need to make in the health of the Judicial Department. And that's what this request represents. That includes modernizing HR, that includes having an institutional infrastructure around inclusion, diversity, equity and access. That includes overhauling training in several ways as the Chief Justice referred to already. And it also includes something that I will be honest, that two years ago, I didn't even know what it was, but I feel passionately about now. And that's an organizational ombudsman. There's been a lot of discussion about this between ourselves and stakeholders between ourselves and members of the General Assembly. Representative Bacon has been an excellent partner in these discussions throughout. But the notion that there be a place a safe, neutral place where staff can go to understand what their options are, what their formal options are. When they're faced with what they perceived to be an HR issue, and have that place be informal, so that they understand options before them before they get into a formal process. I'm kind of expecting some questions on this. So why don't we just go ahead and pause there.

**Sen. Gonzales**
Mr. Vice Chair.

**Rep. Weissman**
Thank you. And, you know, channeling the spirit of my good colleague, Rep. Bacon. Honestly, I think this is the most important subject of the entire afternoon, at least in terms of what is approximately before us or soon to be approximately before us and the General Assembly. I appreciate the branch wanting to try to right the ship from within. I think there is a threshold design question, if you will, as between what is variously called an organizational ombuds, or an internal ombuds on the one hand, and an external ombuds, on the other hand. And I feel like the the ombuds aspect of all of what we talked about all summer, is the prong that probably arose relatively latest in the game, and unfortunately, had the benefit of least discussion as against the many issues that rolled up into the resolution and the bill. But nonetheless, I feel like the center of gravity around all of that was around the external conversation. I think all of us, as members of the committees of reference need to grapple with the seriousness of that

- 22 -

design choice, what one loses in one or the other, particularly the idea that there is an option of an informal process, it is consistent with our processes around here, that arose after some matters that this institution had to deal with in 18. And some of the same organizations that testified to and informed the discussions over the summer, we're very involved in that process work around here, organizations that advocate for survivors, I think the option of informality is, is pretty key to have a survivor centric system. And I also think that there has to be, you know, a more serious path if that's what's indicated. And that's what what the survivor wants. And I think, another key tension point, and then I'll shut up and I'll hand it over to Madame Vice Chair, and she can add to this. We have a constitutional requirement for certain things to happen when information becomes known to the commission. And, you know, whatever else we are doing. In the resolution, and the bill, we're not changing that, if anything, we're trying to fortify that. So how the idea of informality with an internal ombuds squares with what would remain what is now on what would remain in the Constitution as an independent body charged with oversight. To me that is a profound tension that has not begun to be grappled with, at least not by those of us up here. So, I would invite your response, maybe after Madame Vice Chair has her chance to add what she would add again, as before, I would like us to talk about that here as time allows. And I'll invite the folks on the commission to go on to the same thing.

**Sen. Gonzales**
Representative Bacon.

**Rep. Bacon**
Sorry. And yes, I apologize for having to step out. And please forgive me if any of this is duplicative. But just to add, you know, I think we've all been in ongoing conversations. Since this summer, you all saw drafts of the bill. That quite honestly, I think we're still planning to continue to run. And I think what, you know, first, generally it did have a question on, if I'm looking at the presentation, just what are some of the critical issues that still need to be worked out? So sorry, if you shared that already. And then, you know, it's my understanding that you may need some shifts and some rules to execute the ombuds as proposed, you know, from the branch to work, and to pick up also on kind of like the survivor centric system. I recognize that the way my bill and the bill comes from myself and Representative Lynch, we were the ones tasked to look into this. It may not have created an ombuds in either a traditional space, but the importance of it was to figure out how now that the issue is in front of the legislature how we can support in building back this confidence that we spent a summer listening to, quite quite honestly, had been shattered in some ways. One of the comments that I made during committee was that we are now on the third Chief Justice in talking about the span of the issues from when they went back to the investigation from the Troyer report and the ILG report. We've been talking about amount of time to get some of these things resolved. And we've been talking about, what does it mean to have to allow the solution to kind of be derived in the space that had the challenges, and is there a need for an external space to help not only bridge that trust, but to be sure the culture shifts in the way that you want to go. And so to be, to be fair, the things that you have shared with us by way of the steps that you are taking to make the changes are strong, and they're moving in the right direction. But the

- 23 -

truth is, now that the Legislature even had to have a committee kind of feels like we're in the space of, you know, fool me once. Okay. But fool me twice, we are in the fool me twice space as the Legislature. And, so, we have been asked by survivors, and quite frankly, from people who have had similar experiences, to say we need a space separate from the place that has caused harm, to be able to trust that the issue will be resolved. And that is where we are coming from. The other thing that I want to understand is the relationship between your Office and the Commission, and how we can find stronger assurances that complaints will be transferred or initiated or sent to the Commission. And any sort of step that would relax that, quite frankly, causes a little bit of anxiety, because right now, we only have one constitutional place to take on these issues. And, so, I'm curious if you have any thoughts on that, if that is part of your consideration for an internal ombuds role. But again, allowing the place that caused harm to be the creator of the solution does in and of itself, create additional anxiety, right. And, so, we want to be a part of we are all invested in all of our branches of government. For the people that we serve here across the state, even if it is, and this is the last thing I'll say, for just a few years, because we put that on the table, by all accounts takes two or three years to not only shift culture, but for people to believe that there has been a shift in culture. And so even if we're talking about a short period of time, we need to figure out how do we confront that tension of the place that causes anxiety, being the being able to find its own solution. So that was a little bit of a of a soliloquy, if you will, again, just stepping back into it. But there were a few things in there that I thought, you know, might, you might want to either respond to you or have some answers for as well.

**Sen. Gonzales**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. Thank you, Representative Bacon. And I did want to start by acknowledging what a thoughtful partner you've been in these discussions, I do appreciate it. Even when we don't always agree. I've appreciated the collaboration. You know, speaking to the tension of us being at the helm of the solution, I think there's a couple of issues at play there. One, I feel it's important for the organization to take direct responsibility for their own organization for the health of their organization, and, and for the care of their employees. And I also think it's most appropriate for a separate branch of government to be given the opportunity to demonstrate that responsibility. Or, you know, I want to gently push back about the notion of, you know, fool you twice. The incidents themselves, I can appreciate why you say fool me once. But my direct experience in this role, my direct experience working for the Supreme Court has there's been nothing but focused effort on making this an exemplary workplace. There are arguably different paths to get there and reasonable minds can disagree. But I don't think this is a situation where we tried, failed spectacularly. And now you're coming in saying, I don't think you guys can handle it. And now we need to step in. I think we'd love to be given that opportunity to have responsibility ourselves. Candidly, we looked to the General Assembly and the solutions that they created for themselves, you solved your own problem. You created your office, you structured it within your organization. From that perspective, now, the details of an organizational ombuds. And what

we're proposing are in many key areas different it's not a kind of a copy and paste of the of the General Assembly's employment office. But we did wrestle with that tension, and what's most appropriate. And some of our thoughts are based in how the General Assembly addressed their own challenges on this issue. You know, in terms of and I'm happy to answer any other structural questions you might have. In terms of, you know, the relationship between our office, the Department generally, and the Commission, you know, I mentioned briefly sort of on the administrative front, the relationship between myself as State Court Administrator and Mr. Gregory, as Director of the Office of Judicial Discipline, on the whole, I think, is a positive working relationship. We don't always agree. But as I mentioned to the committee earlier, I'm absolutely because if, at the most sort of base selfish level, it's the right thing to do. If I don't take that relation seriously, where am I going to be here in front of you, explaining why I did strange things, why I put up roadblocks or what have you, I have no interest in that. I've dedicated my entire career to public service. I want to do the right thing. Mr. Gregory and I don't always agree on matters of administrative support for his office. But we have thus far been able to productively work through those issues. So, there is a base of working well together. And at the same time, I would be foolish not to acknowledge a fair amount of tension between the Commission that oversees Mr. Gregory's Office and Leadership of the Department. It's there, it's the relationship is not where we would prefer to be, frankly, we'd be even open to mediation, to help invest in a different kind of relationship moving forward, because of the importance of the work that the Commission on Judicial Discipline does. Because of the importance of the work that the Judicial Department does, we need to have a high-functioning business relationship. I'm not talking about friendship. That's not what's the issue here. I'm talking about a high functioning business relationship. We are working toward that. I'm hoping that my engagement with Mr. Gregory can help start building bridges in that regard. But that's sort of the current state of that relationship. Chief.

**Sen. Gonzales**
Chief Justice.

**Chief Justice Boatright**
Thank you, Madam Chair. And thank you, Representative Bacon. What's important to understand about the organizational ombudsman is we're not talking about judicial complaints. We're talking about staff on staff. And, so, we're not looking for any kind of an end round around filing judicial complaints. What we're looking for is a safe place for people to go and be able to report staff on staff and you think just mathematically, we have 4,000 employees, and we have 350 judges, it's going to be much more related to staff on staff. And so that's what the organizational ombuds is really focused on. It's not an attempt to do an end run, I think that we would have to have conversations with the ombudsman, with judicial discipline, to discuss how we handle if someone inadvertently comes to the organizational ombudsman and reports judicial discipline, we're not going to do anything without consulting with judicial discipline themselves with regard to how that would function. You have that, my commitment on that we are looking at a place. Again, in talking to going out and doing our listening tours. People just feel it felt like it didn't do any good to complain. And we had a 20% rate of people who feared retaliation, that was not

about judicial retaliation, that was about supervisory staff or somebody higher up. So, we're trying to address that staff-on-staff complaint with this organizational ombudsman.

**Sen. Gonzales**
Representative Bacon.

**Rep. Bacon**
Thank you for that explanation. You know, I am curious about the critical issues and from what you just shared, you know, the commitment to consulting with the judicial with the Commission, I think is critical because I just want to be sure that two things are understood but not inadvertently overlooked. By potentially even relaxing any rules in regards to reporting to the Commission. The first thing is, you know, your department is unique because and you've heard me say this before, because the judges are managers, and they manage the supervisors in a lot of ways. Some of the issues that we saw in the reports were about even stated, you know, the supervisor's manager was the judge who didn't think this kind of behavior or was supported in this kind of behavior, or was complicit in this kind of behavior, some of those themes popped up. And that's, that's what I'm curious about, given the structure of your organization where those lines are between supervisor behavior, and then their managers if they are judges who, you know, judge the I'm sorry, manage the judicial districts. I think part of the challenge when we wrestled with this challenge over the summer, right. And we became we came to call it the culture issues. Went so far as to say judges need better training on how to be managers and investments there. And so that blur is actually a critical space. Because what I think where we came to the conclusion was the people who work in the department see the judges as the leadership. Right. And unfortunately, there was a culture in the department where critical mass of people felt like they can't make these reports. And I just, I, we just have not been shaken away from this notion as to who allows this culture to permeate. If particularly we look, as the judges of the leader of the organization, you know, if branch, right was an organization, I think the second thing too, is running the risk of not being able to look deeply if the staff-on-staff issues actually do come from, you know, a judge. And then where will we find the importance of looking into that? And then again, where does that line come? Right? And, so, it's one thing about the culture, it's another on what could we understand from you by way of the investigator? How deep would you go into an investigation to understand where some of this behavior comes from, particularly given judges as managers, and the way that we're seeing this right now, you know, for that to live in the department, that is where the concern comes from, just to be sure, there aren't biases there, whether they're implicit or not, on understanding about the culture and where it may come from. If it's an internal space, at the end of the day, a lot of things might stop with the ombuds person that's still within department that may not see the light of day, and we don't want to run that risk. And, so, I just want to say briefly to to your point, you know, I don't't, I'm not saying you fooled us twice, per se. But what I do hope that you can understand is that we cannot, we have to find the assurances, and this is what I said in July to that we, we cannot be in a place where it does happen again. And even though different departments or branches may have taken on some of these issues, I think what's unique about this, is that the issue from your department has now found its way in a whole different branch of

- 26 -

government, for particularly that to be able to find the assurances that is what we have been asked to do, as the legislature with this with this issue. So, I'll stop there, you know, please, any responses again, I'll just raise the critical issues just because I didn't hear them. And again, your thoughts on relaxing some of these rules to be able to be sure complaints are investigated?

**Sen. Gonzales**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. Thank you, Representative Bacon. You know, you'd mentioned that there are, you would be concerned about things going to an ombuds that might never see the light of day. In fact, an ombuds role is not an advocate, it is not an investigator, an ombuds role is not a prosecutor. And when we take agency away from survivors, when you walk into that room, and you say, anything you tell me has to go forward. My concern for my staff across the state right now is where is that safe place they can go that's not a formal structure. Our HR team is exemplary. They do a fantastic job with a tiny staff. But that's a formal structure. And if staff goes to process their options on a say they're receiving ill treatment from a non judge supervisor. If they go to that formal structure for guidance on options, the HR team has an obligation to move forward. That's agency taken away from the survivor. The whole beauty of the ombuds space is that it is informal, it is confidential. It's an opportunity for that person to be educated, you've got some pathways ahead of you. These are the pathways you could choose, as Chief mentioned previously, we're not looking to, I realize it can get complicated. But the overwhelming when we're talking about volume, the overwhelming volume of issues are coworkers, and a staff member and their first line non judge supervisor. If it turns out that, you know, they go to an ombuds. And that situation, let's say it's a staff member and a non judge supervisor, and they go to the ombuds. They understand what their options are, they choose to file a complaint with HR against their supervisor, through HR's investigation, it becomes revealed, it's actually not the supervisor, it's a judge. That's an immediate statutory trigger to report to the Commission on Judicial Discipline. The entire department, every single employee in the department has a very clear obligation around reporting under the statute. And so it's there, there may be actually some things that come to the ombudsman, that don't see the light of the day, because that is the choice of the survivor. And I want to honor those survivors' choices, we want to educate, we want to make sure that they are comfortable with the options that are in front of them, but it should be them who select the option. You know, we're not talking about if we were successful in gaining a resource for an organizational ombuds, we're not talking about a huge span of changes, it would be an exception under the current statute for one position. And that would be the ombuds themselves, because everyone else from the line staff person who started down the street in the Denver District Court today, all the way up to my position. All the way to my boss next to me, we're all mandatory reporters, every single member by statute of the judicial department is a mandatory reporter on allegations of judicial discipline. So, if we bring an ombuds on with no change, they are a mandatory reporter to judicial discipline, that, in my opinion, and based on feedback, I have been in the position now to have some outreach from some survivors, and specifically survivors on judicial discipline

- 27 -

incidents and gain some feedback from them about the process. And the notion that there's no safe space to inquire about options before they go into a formal process is chilling for folks. And I don't want us to create inadvertently with the best of intent, a system that chills reporting. And I think if we are able to have an organizational obmbuds or even if the ombuds is outside, and it's under a model that you've been contemplating, and that ombuds is a mandatory reporter. I'm not sure you're gonna get all the folks coming to that ombuds that we would hope.

**Sen. Gonzales**
Chief Justice.

**Chief Justice Boatright**
Thank you, excuse me, Representative Bacon. The final thing I'll say about this is I hope we can have an ongoing conversation. We're not making this up, it this is a model based on national experts are telling us that this is the model that works best and gives the opportunity for people to safely come forward. That, you know, we can talk about the reports, but the the statistic that stood out to me was the people who felt like reporting wouldn't do any good. And this is the answer to that, to that complaint, so to speak, no pun intended. But I just hope that we can have an ongoing conversation around this and, and we can give you access to the same people that we talk to. I'm not an ombudsman expert. But that's what that's what the model is that we're basing this on is the only thing. I'd say, I know we're over time. So, thank you.

**Sen. Gonzales**
Representative Bacon, did you have a . . .

**Rep. Bacon**
Yeah, I would just say thank you, you know, I don't necessarily want to litigate the legislation. But I just wanted to put on the table that we are not having, we're having this conversation with very particular context. And while we think about solutions solutions may need to be molded towards that context, which even includes the role of the ombuds person, you know, many of us were on the interim committee. We know what the report says we did have questions about some incidents not being reported to the Commission given mandatory report. And, so, what I will end by saying I think we all share the same interest by in providing that security to your employees. And I think though, that if we have the ability to, try to find the flexibilities, even if it means to do something differently to prepare it provide as much of that security as we can than we should. And it just may come in a form that either maybe you might not like or or I might not, but always willing, I'm going to all the conversations and talking to all the people. But hopefully we can have, again, this discussion more broadly, because I think we're on the other side now of being more solution oriented than discovering what the issues were. So, thank you for your time.

**Sen. Gonzales**

Thank you, for that conversation, very appreciative of it. And I think for those of us who did serve on the interim committee, these conversations are ongoing, but for those members who did not serve on that committee over the summer, this gives you but a preview of the work ahead. I want to in being cognizant of time, I want to ensure that we have the ability to move through the rest of this presentation. And, so, I'm going to turn it back to Mr. Vasconcellos to proceed.

**Steven Vasconcellos**

Thank you, Madam Chair. My intent if it pleases the committee, is to just briefly go over the remaining issues at a high level. I'm more than happy to slow down if there are questions. But I just want to touch on some other key elements briefly of our budget request, legislative initiatives. I think there's possibly one or two more required SMART Act reporting elements in there that I'm happy to skip and follow up if the committee has questions if that approach works for you, Madam Chair.

**Sen. Gonzales**

Let us proceed quickly and then we will see what questions remain from members of the committee.

**Steven Vasconcellos**

Thank you, Madam Chair. We are asking for a $10 per hour rate increase for our language contract language access interpreters. Recently, the Denver County Court which the Chief mentioned at the beginning of the presentation is a constitutionally distinct entity raised their rates by $10 at the beginning of this year, they were good partners. They were very communicative us this did not surprise us. However, we have basic market competitiveness problems. And not just our world moving to virtual proceedings, but many industries moving to virtual proceedings, the medical industry, other industries, there is a greater demand on language access interpreters than there was prior to the pandemic and the pressures are different. As we sit here today, we are not competitive with the Denver County Court we're not asking to have a higher rate than them. We just are asking to match that rate. We are also asking for two additional staff to make a greater investment in our judicial education programs, specifically education for judges. Judge education is essential to upholding public trust and confidence. And we've spent a lot of time and effort in judicial education. Chief Justice Boatright is still the liaison to our judicial education committee. We haven't asked for additional resources in judicial education in over 15 years. And as even just some snippets of prior topics coming up, we have great education needs. Moving on slide 31. Now, weekend bond hearings. Members may remember that in 2021, the General Assembly passed House Bill 1280, which required defendants to receive a bond hearing within 48 hours of arrest. This essentially pushed bond hearings into a weekend activity as well. We received some resources at the time this bill was passed. We created two regional bond hearing offices one based out of Sterling one based out of Steamboat to conduct the weekend bond hearings for the locations primarily rural, that were eligible under the statute. We got the estimates of the anticipated caseload wrong. And we are in a position where we are working staff seven days a week. We feel this has been a successful endeavor overall. But I am concerned about sustainability. I cannot continue to ask folks to work seven days a

- 29 -

week to support this program. The request would stand up a third region. We also have a judicial district that is statutorily eligible. It has six counties and is statutorily eligible to join the program and I have no capacity. So, this would help relieve that pressure as well. And moving briefly to our legislative agenda. The Chief Justice will talk to you about licensed legal paraprofessionals.

**Sen. Gonzales**
Chief Justice Boatright.

**Chief Justice Boatright**
Thank you, Madam Chair. I'll be very brief. We're asking for some small changes to allow for licensed legal paraprofessionals. As you probably are aware, our domestic area has about 75% pro se parties representing and we're looking at licensing paraprofessionals to be able to assist people in bringing these cases to the court, not not representing them in court. But we do need some statutory changes. We're we're in the process of doing some pilot programs. But we do need some statutory changes to get that up. This is really a key part of access to justice.

**Steven Vasconcellos**
Madam Chair, if I may.

**Sen. Gonzales**
Mr. Vasconcellos.

**Steven Vasconcellos**
Moving on to the final legislative initiative I would mention and that is creating an independent office for our Bridges Liaison Program. Our Bridges staff serve as court liaisons, and they advocate for the best interest of the mental health of defendants in criminal cases. That program has grown tremendously over the last five years with the generous support of the General Assembly. But they have grown to the point and their interests given that they are advocating for defendants, it no longer makes sense for them to be part of the judicial department, which is tasked with being a neutral entity. And, so, we are seeking legislation to create the Bridges Program as an independent agency. Within the Judicial Department. I would mention briefly we are making on time and making good progress in the creation of the 23rd Judicial District which is slated to go which would be our newest Judicial District, taking the South Metropolitan Area, 18th Judicial District: Arapahoe Douglas Elbert Lincoln Counties and keeping Arapahoe County as the 18th and the remaining counties becoming the 23rd. We are meeting all of our development timelines. In our budget requests this year, you will see a request for money from the counties themselves not for state costs, but for the county-based costs related to the creation of the district. So, we've included that in our budget request as a courtesy. Moving through here, quickly.

- 30 -

**Steven Vasconcellos**

I think I'll end this afternoon with extreme risk protection orders one of our required reporting elements under for this SMART act. This is the last slide informational slide on page 39. You'll see the volume since programmings. Since inception of extreme risk protection orders, which was mid fiscal year 2020. This is our fiscal year 22 was our second full year, and we've reached a relatively stable place in terms of volume in terms of number of requests, number of temporary extreme risk protection orders granted, number denied permanent extreme risk protection orders granted, etc. And with that, Madam Chair, unless there are specific questions, happy to wrap it up.

**Sen. Gonzales**

Colleagues questions? Mr. Vice Chair.

**Rep. Weissman**

Thank you. And thanks, Mr. Vasconcellos. For, you know racing through in the interest of time, I did want to rewind briefly to what a slide 38 In the handout and the deck on automated record sealing. I obviously have a strong interest in this having been one of the prime movers with Rep. Bacon of 1214 and was about as involved in 099 as one can be without being on the front of the bill. There were new demands made of the Department; we're not going to hide that. And you know, when this Legislature makes demands of agencies with implementation of duties, you know, we want to have a clear understanding of resources needed for that. And if there are hiccups and burdens and whatnot. There were deliberately phase timelines there was, you know, some runway provided would just appreciate briefly hearing how you feel that the necessary basically IT and other systems work to effectuate those policy statements, how that work is going and then I guess just an open invitation if if there are problems, all of us here would like to hear about that sooner rather than later so that we may grapple with them and so that all of this may happen for all the reasons for the most bills.

**Sen. Gonzales**

Mr. Vasconcelos.

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Representative Weissman. I think within the confines of Senate Bill 99. We're on track and we have no concerns about meeting the timelines. Bigger picture, I think we might be interested in a conversation there are many flavors of sealing and we asked a lot of staff have to know the different pathways and different flavors of sealing. If there are any efforts that could be made to simplify, not just, of course, it's important that this process be simplified for the participants themselves. I have an interest in trying to simplify it for the staff around the state as well. And there are enough flavors of sealing right now that we are asking a lot of folks be open to a conversation about what my simplification could look like in the future on our side.

- 31 -

**Sen. Gonzales**
Mr. Vice Chair.

**Rep. Weissman**
Thank you, you know, Mr. Vasconcellos, I appreciate that point. It is a complicated statute. That is, to some extent, a result of the very tough conversations that have been had around here and in this room, on the subject in terms of waiting periods in eligibility and being very, very surgical about which offenses are eligible and which are not and how the process goes. I will just say for myself, I'm very open to that conversation. And maybe one of the things that happens after sine die. But I continue to think about the subject and I would invite some, I don't need a response now, in the interest of time. But we I think one operational challenge here is not being a unified registry state. There was model legislation proposed out of the Uniform Law Commission by the wonderful acronym of the UCRA, Uniform Criminal Records Accuracy Act, which we have not adopted here that had various sort of procedural rights. But I think, in relevant part here called for a unified registry. This would be an IT capital project of not insignificant nature. But I do think if we and CBI and others could get over the hump, it would amount to smoother pavement going forward. So, let's pin that as well. And Madam Chair, just want to raise my hand a third time, I will just say in closing here appreciate both of you and Justice Márquez and Mr. Scanlon being here and taking time to talk with us about these things. There's never enough time in SMART hearings, but you know, we've at least dropped a few pins for follow up. Thank you.

**Sen. Gonzales**
Thanks. Thank you, Mr. Vice Chair. Mr. Vasconcellos. Care to respond?

**Steven Vasconcellos**
No, ma'am.

**Sen. Gonzales**
Representative Snyder.

**Rep. Snyder**
Thank you, Madam Chair. Thank you both for being here. On your slide 39, you have a total statewide ERPO protection orders. I want to you have that broken down by county. And if you do if you'd be willing to send that after the meeting to the committee.

**Sen. Gonzales**
Mr. Vasconcellos.

- 32 -

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Representative, we'd be happy to provide more detailed information on the locations of the data that you see in the in the chart. I'll have staff put that together and share it with the Committee.

**Sen. Gonzales**

Thank you. Seeing no further questions. I do want to extend our appreciation for you joining us this afternoon. And talking us through the myriad issues that your department is navigating. I'm sure that this conversation will continue over the course of this legislative session. But thanks, again, for your time.

**Rep. Snyder**

Thank you.

**Steven Vasconcellos**

Thank you committee.

**Sen. Gonzales**

All right. We do at this point before we shift over to our next presentation from the Commission on Judicial Discipline. I do want to open this up for public testimony. And we do have a few individuals who have signed up to testify. So, I want to welcome your comments and thoughts. I will invite members of the public to testify for three minutes. I will invite you to state your name any organization you represent. If you do pertain to an organization if not, that's cool. And then proceed to testimony. For individuals who are participating either in person or remotely. You will see that on the witness desk there is a little black box that has a green light, a yellow light and a red light. Green means go, yellow means you have about 30 seconds remaining, and the red blinking light is your invitation to wrap up your comments. We will go ahead and hear from the, I believe, two individuals who have signed up to testify thus far and will open up for questions from members of the committee after we've heard from both witnesses. And, so, with that, I'd like to welcome Dennis Jan followed by Jessalyn Houk.

**Sen. Gonzales**

Welcome, sir, to the joint judiciary committee meeting if you can please state your name and the organization you represent and proceed. There. I'm sorry, sir. There is a little gray button right at the base of the microphone that'll turn it on so that folks listening online can hear.

**Sen. Gonzales**

Can you hear me now.

**Sen. Gonzales**

We can, go right ahead.

**Dennis Jan**

My name is Dennis Jan, and I'm representing myself. Let me start by saying that I am a participant of the PRA pension retirement fund, of which I contributed 32 years of service. In 2010, I was served with a divorce. And at that time, I had very poor legal counsel. And at the time, they instructed me that I needed to sign the divorce decree because it was as good as it was going to get. And, so, I did and come to find out the paperwork was not filled out properly. So, I went back to court to try to get it straightened out. And I went with a different lawyer this time. And the court was not very understanding about the PERA rules or the changes that were allowed. And, so, nothing was changed. And in the meantime, my ex-spouse had remarried. So, I went back to court a second time with a different attorney. But I got the same magistrate. And same situation occurred, only this time there was two extensions to the hearing. And when we reconvened the plan had been explained to the magistrate by the PERA organization during a recess phone call. But there again, it was the same thing it was that you signed the divorce decree, it is what it is, and I'm not going to allow any changes. So, I found a another lawyer that was going to take the case of malpractice, but come to find out that during the extension of the second hearing, I missed malpractice lawsuit to the first lawyer by three days, I had two years to reopen the case, but it was two years and three days, and the lawyer would not accept the case because it was over extended. PERA benefits, I'm sorry, and divorce rule book states that and all the appropriate boxes of the forms must be completed. This is in regards to the DR or domestic relations orders. And in the domestic relation order, it says that the alternative payee was named as the participant's co-beneficiary at the time of retirement, the participant is allowed to change or delete the code beneficiary and that box is blank. In the PERA handbook for changing code beneficiary and benefit option. Under divorce, it says you are ordered or allowed via District Court to the jurisdiction under the divorce action to remove your former spouse as co-beneficiary.

**Sen. Gonzales**

Mr. Jan, if you'd like to wrap up your your testimony, please thank you.

**Dennis Jan**

I'm asking for the legislature to adopt the rules and regulations of one of the biggest employers the United States Government Department of Defense all the military's people. And let me quote, As a general rule of former military spouse remarries is not eligible for survivors' pensions under the VA rules. And their rules of the PERA changes. It says, remember, that the Colorado legislature sets benefits and periods to execute the rules and implement these benefits. Can I interject one more thing?

**Sen. Gonzales**

Sir, I'd be happy to accept any written materials that you have in regards to your individual situation. And I would also be happy to follow up with you directly offline. Because this testimony is, it pertains to the Judicial Branch overview. And I want to make sure that you're able to get the the the assistance and the support that you need in your individual case. But I invite you to conclude your your testimony here, sir.

**Dennis Jan**

I appreciate your time.

**Sen. Gonzales**

Thank you very much. Colleagues, I want to see if you have any questions for Mr. Jan. Thank you very much. Sorry. Thank you very much. Mr. Jan, will follow up directly,

**Dennis Jan**

I appreciate it.

**Sen. Gonzales**

Thank you. Our next individual who's going to sign up to testify is Jessalyn Hauk.

**Sen. Gonzales**

Please state your name and the organization you represent and proceed to testimony, you'll have three minutes

**Jessalyn Hauk**

My name is Jessalyn Hauk, and I'm just here for myself. I apologize. I'm nervous. And I'm gonna read my speech mostly off my I want to first thank you for taking the time to afford us this opportunity. I haven't had a voice in a long time. And, so, it's nice to get at least three minutes. I'm here today because for almost two years, I've been living this experience that quite frankly, is suffocating. This experience is an allocation of parental responsibilities case through the Colorado family courts. It's currently ongoing. So, I won't be getting into the specifics of my case, I'm just going to speak broadly on a few things I believe need to be addressed. The ability for a former spouse to use the courts as an extension of their prior abuse, once a relationship has ended, needs to really be looked into. It's especially dangerous when children are involved because they too may be used by that same parent for abuse by proxy. There's no statutory language surrounding this and I really believe there needs to be. Abusing the legal system, also is just flooding the courts with frivolous findings against their former spouse and it isn't in the best interest of anybody. These tactics tie up the courts, its administrative staff, and it comes out of considerable cost to the courts and the respondent in terms of time and money. And it ultimately delays the resolution and obscures the facts of the case. And tragically, sometimes overly broad judicial discretion that judges possess in family courts sometimes facilitates this abuse. The consequences. bog down the system even more parents have to fight even harder to have their constitutional rights recognized. We have to find opportunities to reduce that discretion in order to improve the process and/or outcome for families. I've witnessed an APR case allocation of parental responsibilities be initiated through an emergency motion to restrict parenting time, where the petitioner testified and presented evidence for the entirety of the hearing against the multiple objections from counsel for respondent. Respondent was not able to present evidence, testimony, witnesses, or conduct cross examination. The outcome of that hearing was heartbreaking for the respondent. Sorry. Alongside that,

- 35 -

statutory language requiring proof of precedent for person to claim psychological parent needs to be raised. Testimony from the non biological parent and judicial discretion, discretion alone should not be enough. Additionally, the ability for a judge to deny a party especially respondent, a family investigator is negligent, negligent and not in the best interest for the child. The language and that statute needs to be changed for me to shall. That being said, a family investigator is not a substitute for due process. They're the equivalent of a public defender in family court. They're overworked, underpaid. Which brings me to my next point, judges can and do look at domestic relation parties and say 20 minutes each sum it up. The gross violations of due process in family court is just inhumane. I mean, the whole world will stop and watch Amber Herd and Johnny Depp hash it out for four weeks straight. But when it comes to a family's fighting for our children, this is what we get. We need to ask ourselves where our priorities lie. I know that Chief Justice touched briefly on this point earlier with the pilot program to help pro se parties in domestic relations cases. However, I don't see it as enough. In criminal matters, you're guaranteed the right to counsel of found indigent. We don't get that in family court. You're just thrown to the wolves You, somebody can go in and massacre an entire elementary school and they should have someone in their corner. But so should we.

**Sen. Gonzales**

Ms. Houck, I invite you to conclude your comments, thank you.

**Jessalyn Hauk**

I'm here, I will continue to be here. But I shouldn't be. I should be at home with my kids making their lunch, painting with them cleaning up their mess, not this one. Thank you.

**Sen. Gonzales**

Thank you, Ms. Hauk. Colleagues. I see that Mr. Vice Chair has a question.

**Rep. Weissman**

Yes, thank you. And thank you for being here. It's clearly not easy to be here. Understanding there's an ongoing matter, there's going to be limits on what you you can speak to. I'm curious if this APR matter, involved a child family investigator and or a parental responsibility evaluator? And if so, what you would say, as a general matter, about the role of those two types of individuals that are statute permits to have a role in family court.

**Sen. Gonzales**

Ms. Hauk.

**Jessalyn Hauk**

I'm sorry, can you say that one more time?

**Rep. Weissman**

Yeah. So, there are entities and they become involved in APR matters, sometimes a CFI?

**Jessalyn Hauk**

You mean the investigators.

**Rep. Weissman**

Yeah, a child and family investigator or CFI. And/or a PRE parental responsibility evaluator. I'm wondering if either of those sorts of individuals were involved in the situation you're speaking of and anyway.

**Jessalyn Hauk**

They were denied multiple times until after an appeal was filed.

**Rep. Weissman**

Okay, thank you.

**Jessalyn Hauk**

Did you have a second part to that original question I thought I heard?

**Rep. Weissman**

Well, yeah, sorry, and I don't want to press you to say more than you're comfortable with here. But we hear a lot about those two types of individuals. There's been legislation sometimes, and there's been, frankly, some pretty prominent articles in the press about somethings going wrong. And others. I wonder if I'm just inviting you to speak to your experience having those individuals in your in the situation you're speaking of if you're comfortable to do.

**Sen. Gonzales**

Ms. Hauk.

**Jessalyn Hauk**

Speaking generally, and hypothetically. One is involved, there is no conclusion. But I know before, it's even over that. They don't have the time and the resources, because I would just--to properly evaluate my case. And it could be hypothetically said that they stated that themselves. And it's not enough. A CFI, a PRE, it's not enough, their training isn't enough. Their time allotment is not enough. It's just not enough. None of it. This is enough.

**Sen. Gonzales**

Seeing no further questions, I want to thank you. I want to thank you both for coming in sharing your perspectives with our joint judiciary committee, as we continue to address these issues around the Judicial Branch. Thank you.

**Jessalyn Hauk**

That concludes I would like to know, I do know there's someone else here who would like to testify. He signed up online.

**Sen. Gonzales**

Excellent. That was gonna be my next question. That concludes the list of individuals I have signed up to testify. But if there's anyone in the audience or online who wishes to testify here regarding the Judicial Branch, please proceed. Are you by chance Jordan Scott? Yes, I am. Excellent. I wasn't sure whether you had signed up on this one or the next one. Welcome. Please state your name and proceed. You will have three minutes.

**Jordan Scott**

I did both. Thank you.

**Sen. Gonzales**

Got it.

**Jordan Scott**

I've been in family court for about five years now. Apparently on one family of 30,000 per year. So it's pretty big numbers that are happening here. I've have had a CFI appointed in my case, the CFI broke the rules. I filed a complaint. The judge said the CFI did a good job. The complaint went to the court administrator they were found to have had bias and for the court administrator to actually find a problem. It's a pretty significant problem. So now that PREs are also supervised by the court administrator. I don't see any actual solution to CFI or PRE improvement. There is a 20% turnover rate in the in the courthouses because not salary. It's the toxic workplace. It's the fear of reporting. I report a judge. The judge gets to just keep doing what he's doing, there's no there's no accountability, there's no responsibility. I report an attorney violating the rules. The judge ignores the attorney violating the rules. I've seen an attorney actually not show up to a hearing they were ordered to attend. I pointed it out and the judge was like, oh, well, that's okay. But if I don't show up, I get a bench warrant. There is that paraprofessional approach. We don't need that we just need judges to do their job and to hold people accountable. If the judges aren't being held accountable, I don't I don't know what to do with that. The guy before me said I can't fire them if they don't want to follow the CJDs. That's not leadership, that's not oversight. And he said, believe in the separation of powers. Cool, except the law is what the judges should be following. Right? I don't understand why he would have said that. But it leads to the culture of they do what they want. They're making money. They're making money off of families, they're taking

- 38 -

hundreds of thousands of dollars from the 30,000 families a year we're talking a million and billion dollar industry. There's racketeering, so the court charges to get transcripts, they don't want to put them online because then people don't have to pay for transcripts. The court appoints mediators, who are then hiring their attorney friends as the mediators, the court appoints experts like PCDMs, CFIs, and PREs, who are then caught with fraud and bias and cheating and just breaking rules. And there's no accountability. It's to the point of I want to say there's 1000 complaints on CFIs. As a year, maybe 90 get investigated, maybe three have some sort of discipline. That's not a discipline process. That's not a process with oversight at all. So, I think it's like a mafia, to be honest. I think our family court system is a mafia. And I'm asking that we really evaluate how to kind of improve that.

**Sen. Gonzales**

Mr. Scott, thank you for your testimony. Colleagues, do you have any questions for this witness? Seeing none, I want to thank you for joining us and sharing your perspective today. I do just want to state to everyone who offered their public comment this afternoon, that I hope that you all recognize that we heard your testimony. And we also heard the comments from both the State Court Administrator and the Chief Justice and that yours carry for us and in this body as the joint judiciary, equal weight. And so, I just really want to extend our appreciation to members of the public for coming and joining and sharing your your comments with this body this afternoon. With that, it is 4:15 And I want to welcome our third presentation this afternoon. We will welcome the Commission on Judicial Discipline presentation pursuant to the SMART Act hearing. We'll give Judge Prince and Mr. Gregory an opportunity to get set up.

**Sen. Gonzales**

Judge Prince.

**David Prince**

Good afternoon. Thank you, Madam Chair. Thank you to all the members of the Joint Committee for having us here today. My name is David Prince and I am the Vice Chair of the Colorado Commission on Judicial Discipline. With me is Mr. Gregory who is our Executive Director. First, I just want to note that our Chair, Ms. Espinosa Krupa, sends her apologies that she's not the person talking to you, but she's tied up defending someone in a murder trial out on the Western Slope. So, I think she has a good excuse for not being here, but she sends her apologies. We also want to thank you for the opportunity to talk with you. Many of you know that this is only our second time appearing before the SMART committee. Last year was our first experience. And at the time, frankly, the future for judicial discipline looked fairly dark, fairly bleak. And because of the questions asked by this body and the work of the General Assembly after that, what a difference a year makes. It is certainly a much more optimistic view of the future of truly neutral and independent judicial ethics oversight in Colorado. So, first, I just want to try and orient some of you who may be new to the Commission with where we come from and what our role is. We were created in the middle of the 20th century, along with merit selection system. That was when there was a major reform to the way state court systems were populated and overseen. Our system

- 39 -

was adopted hand in hand with the merit selection system. At that time, Colorado set aside the idea of accountability for judges using political elections, and instead adopted merit selection for appointing judges. And, then, for their review. Hand in hand with that, though, they had to create a system of ethical accountability for judges. And that's the Colorado Commission on Judicial Discipline. And that is our role, it is to provide that outside independent review and accountability for judicial ethics. The whole idea was to end the practice of internal, purely internal self policing of judicial ethics. That's why we have the commission movement, I understand that you have hard copies of the slides we're going through, I'm moving. . . Oh, it's actually up now. Well, that makes life a lot easier.

So I've moved on to Slide three at this point to give you just an overview of the membership of the Commission. These are the Commission members. As you can see, we divide them into three categories, our members, our citizens from the community, attorney, members, and judge members as well. Each and every one is a busy professional, who volunteers their time for this public service to serve on the Commission.

I want to give you an overview of our process? Last year, we spent a lot of detail on this, and we won't put you through that, again. In the big picture scheme, we operate much like a grand jury. Our role is to receive allegations of judicial misconduct, then to provide that neutral and independent examination of those. There's a screening process. If they survive the screening process, we then go to an investigatory phase, where we actually do factual development. If the case or the complaint is viable, it actually has to meet the standard of proof by preponderance, in other words, the standard for winning a case in the civil system. If and only if that standard is met, we then file a case. And those are called formal proceedings in our world. Formal proceedings go forward. It's a lot like a trial. And then you have appellate review and final decision. And under the traditional system that we have, it's the Supreme Court who ultimately makes the final decision. They don't exactly play an appellate role. And as you've heard, that's likely to change under the reforms created by the Interim Committee.

In terms of our staffing historically, we've had 1.5 FTE, to do the job of the Commission. An Executive Director and a half time administrative assistant. In 2022, thanks to the work of again, this joint committee. Under the reforms of Senate Bill 22-201, we were able to increase that staffing, we now have hired an in-house attorney to act as our Special Counsel. We have been authorized an investigator and getting ready to hire that investigative position. And then we were able to bring the administrative position up to a full-time person.

I want to talk to you a little bit about the caseload that the judicial discipline commission handles historically, because the numbers most easily available go through 2021. Historically, with 1.5 administrative people we handled over the last 20 years, just under 4,000 complaints, we call them RFEs. There was some discussion during the interim committee about sort of the level in suggesting that there are very few complaints against judges. Well, under the same timeframe that was discussed the ILG report, the numbers actually is just under 4,000. Of that 4,000 RFEs, in the last 20 years, just under

- 40 -

400 proceeded to the next stage of factual investigation and workup. So that's about 90% go away in screening and only 10% move on to further investigation. That number, that ratio is very consistent with the numbers from commissions across the United States. So that's pretty much an industry standard. It's usually 90%, up to 95% that gets screened out. Because on their face, they're not a valid complaint. Usually, it's because it's an appellate challenge, say I don't like the judge's ruling. And we're not the place that handles those kinds of things. In terms of the cases that we get, so those 400 are just under 400 cases. You see that approximately 70 of those cases, when the judge has been facing an investigation or review of an ethics complaint, about 70 stepped away from their judicial duties. Some of those stepped away voluntarily some of those stepped away involuntarily. And of those just under 400 cases, there are about 250 cases during that period of time, where we issued what we call corrective action. In other words, we've taken some corrective action with the judge, who was the subject of the disciplinary complaint. What we're seeing today, in 2022, is an increase in the raw number of those complaints, again, what we call RFEs. We've seen about a 25% jump in the last year. So, we've closed out the calendar year with 250 RFEs, recent averages for those other categories of the actions that we take, I've also seen an increase, we're now taking, on average, seven corrective actions involving a judge every year. And we're seeing two judges step aside on an average basis each year when they're faced with a an ethics complaint. So, as you've heard talked about, and many of you already know, there was a pretty significant event in the last year, there was a joint Interim Committee. Oh, excuse me, I'm sorry, I've skipped ahead of myself. So, what I wanted to move on to was not only, because the raw number of RFPs and raw number of complaints, I honestly don't think it tells you a whole lot. There's been some variation, it's been more in the press, maybe that has something to do with the raw number going up. That's not the critical part. Their critical part is that what we've been seeing is an increase in the serious allegations, an increase in the cases that we have to actually work up because they're credible when they're presented. And that's actually a much larger increase than you see just in the RFEs. I'll give you an idea of it. In the past. What should I say, in the past. If we look at the historical rate, we used to measure the number of formal proceedings that's that essentially trial proceeding, we used to measure the number of years between filings of those cases. Now, we measure the number of cases per year. In the last 12 months, we've had to file as many formal proceedings, as we did at the historic rate over 12 years. In other words, that's more than a 10-fold increase we've seen just in the last year. So, like I say, we're having a significant increase more than that 25% in those serious and credible complaints, not just the raw complaints that come from the public. So, I think that's a pretty important number to have in mind, you got to think about that for a moment, the same number in 12 months as in 12 years under the old standard. Okay.

Now, let's turn to the reforms that occurred last year. So as a result of the work of this committee, again, that we greatly appreciate, Senate Bill 22-201 was enacted, I don't really know that we need to go through each and every one of the reforms that were adopted. This slide also doesn't go through each one of them, but it does hit the highlights. Most importantly, when we came before you last year, we were being told that we were about to be cut off from our traditional source of funding. And as you'll recall, that was all tied up in a particular investigation and the events as they unfolded from that.

- 41 -

Happily, the General Assembly decided to provide us with substitute funding. And that went into effect in July. We greatly appreciate that. And that's what allowed us to hire those internal staff, and do some other things.

One of the most important reforms that's already been adopted was creation of this duty of disclosure that actually requires the Judiciary in Colorado to report to the discipline commission, allegations of judicial misconduct. As far as we can tell, Colorado is a leader in the country on that, because at the time, we looked and checked with some of the national experts to see if anybody else had ever done that, and we couldn't find an example. So, Colorado, you folks led the way by creating, as far as we can tell, the first statutory definition of that duty of disclosure. Now, we were actually already ahead of the head of the curve, because we had that same duty of disclosure in place by a contractual arrangement that was more than a decade old. But we had found that that was ineffective and was not being followed. And so that's the reason it was codified. Colorado also banned the use of non-disclosure agreements entered by the judiciary as a means of avoiding that disclosure obligation. And it also bars the assertion of various types of confidentiality and privilege claims to avoid those disclosures. And Colorado can do that because we have constitutional level confidentiality for the judicial discipline process. So that disclosure to the discipline commission does not eliminate that confidentiality at those early stages. You also authorized information sharing because at that time, the major components of Colorado's judicial oversight: the nomination commission process, the performance commission process, and the discipline commission process, were all very separate silos. And, so, you gave us authority for those three entities to work more collaboratively together and share their information.

And then, of course, what's been the topic of discussion today, you also created an Interim Committee that spent the summer looking specifically at the judicial discipline process, and how Colorado could do a better job with it. So, let's move on to the Interim Committee, because that's what's going to be important for this session, I think. It was a robust discussion through the summer, a lot of good evidence taken. We were hearty advocates of the process and active participants throughout, let's talk about some of the things that we learned through that process. We, oh, I'm sorry, generally, we support the. My attention is divided between trying to decide whether to look at my notes or look at the screen, and I really just need to choose one. So first and foremost, we at the discipline commission fully support the draft legislation that came out of the Interim Committee, we think there are some very important advancements that are being proposed and support them. We do have some suggestions for some ways to tweak and improve certain aspects of it now give you a brief overview of that today, knowing that there'll be future hearings where those really get reviewed.

But let's turn our attention for a moment to the lessons that we learned about the functioning of the judicial discipline system in Colorado, based on what was testified to the to the Interim Committee. The sad truth of the matter is that what we learned is the judicial ethics oversight system in Colorado has not been working. If you read the Troyer Report and the ILG Report together, what you learn is that there's been a toxic environment. That's the phrase that used a lot. Troyer talked to us about these non-

- 42 -

disclosure agreements that were being used, employees even being compensated for not telling about misconduct allegations and keeping them secret. From the ILG Report, they looked at a selection of six sample allegations of judicial misconduct spread over a 20-year period. And one of the important things that seems to get overlooked is that what they found was that none of those were fully disclosed or fully submitted to Colorado's system of judicial ethics oversight, independent judicial ethics oversight. Of those six examples, one and only one was reported. And they acknowledged that it was only half reported to the discipline process. The discipline commission actually did issue a sanction in that one case. But the other examples were not identified as having been reported or submitted to that process.

One of the big problems is that cultural piece of it. Because think about it for a moment, the whole purpose half a century ago of creating the discipline commission, whether it's in Colorado, or any of those created all across the country, was to get neutral and independent oversight, independent review and evaluation of an allegation of judicial misconduct--to end that we handle this in house, we keep it within the family, we follow self-policing. That was the whole point of the process. But yet, we see that for that 20-year history where it was looked at. That was continuing commonly. The part that's disturbing is that the ILG report, the investigator hired by the Judiciary presents in their Report that that's appropriate. That that's the way the system is supposed to work, that these complaints are handled in-house and not submitted to the judicial discipline commission. That is a fundamental problem. That's not the system design. That's not what was intended. The whole purpose is to assure the public that there is credible, independent, neutral, impartial review of those judicial misconduct allegations. Not that self policing decided there wasn't anything there. And of course, we also saw that of the six examples that were presented for ILG to examine, in two of those, the Judiciary itself said you can't look into these involving sitting members of the Supreme Court. Said these two, even though the independent panel assigned these cases to be examined, they were held to be off limits. Another aspect that was a little bit concerning was that the independent panel, many of you may recall that those investigators were hired with the help of an independent panel to decide who would be hired and decide what would be the scope of their examination. That independent panel called for the investigators to look at the last five years of all discrimination and harassment complaints and whether they were submitted to the judicial discipline commission or not. And we've never heard the results of that examination. We at the Commission know that while the six examples show that many cases, more than 83% of the examples that were presented, don't show as having been submitted to the discipline commission. There are other cases that have not been submitted to the discipline commission that we've ended up learning about. But they end up coming through a different route or something like that. And we find out during our investigation that judicial knew about them, but didn't pass them along. And that's not ancient history. That's as recently as 2022. That's as recently as last year that that continues to happen. So, it's a continuing problem. It's not old history.

Let's move on to the reforms. So, the proposed reforms fall into some broad categories. First, there's the draft bills include structural reform. We, as you heard earlier, we change what happens when the Supreme Court or a member of the Supreme Court is somehow involved in the allegations of judicial

- 43 -

misconduct, we follow the ABA model, which the commission has been advocating for some time. And that's create a separate, special tribunal / special Supreme Court basically, to hear and oversee that case. There's also structural reform to more formally separate the investigative phase from the adjudicated phase from the appellate phase, the Supreme Court is no longer going to be the final decision maker. Instead, they will play a traditional appellate role and really play not much more than that role. There are, on a structural level, there's also a change, very big change, in when confidentiality ends in these systems. And the reforms would bring us into alignment with majority position in the United States. There's also some changes to the way rulemaking is handled. And we'll come back to that in just a moment. There's new data reporting requirements so that there's a little more transparency, a little better ability to track what's happening with these complaints. And the people who are raising concerns. The current Rules actually do not authorize someone to make an anonymous complaint. There's a workaround, so anonymous complaints can be made. But if you're a layperson, just reading the Rules, trying to figure out can I make an anonymous complaint because I'm afraid of retaliation. The Rules tell you can't do that, says you have to sign your name to it. So, part of the reform is that anonymous complaint systems will be put in place and authorized. And still in progress, the ombuds bill that you've already heard some discussion about, and we'll come back to, we talked at the Interim Committee about the repeal of the criminal penalty on confidentiality, because we've seen some abuses of that in the past as a way of suppressing or intimidating people who might seek to raise misconduct complaints against a judge. And then codification of the subpoena power. Those were the major issues as I saw them anyway.

So, let's move on to the issues where we are suggesting some targeted amendments to the draft legislation. First on our list is rulemaking authority. HCR 1001 divides a case into two different parts for purposes of rulemaking. It creates two rulemaking schemes. It basically says when you're at the investigatory phase, we'll have a committee structure of the main stakeholders, which is the Supreme Court and the Commission. And they will propose rules and then the Supreme Court gets to decide if they adopt them or not. And then when you move to the actual case, there's a different rulemaking scheme. And that's similar to what we have right now, which is the Supreme Court has plenary rulemaking authority. Our suggestion is that that be changed and instead you create one rulemaking system. A singular rulemaking system is more consistent with, as far as I know, every other approach to rulemaking for a process or a case. And our suggestion is that you should not give one of the participants one of the parties and groups sole rulemaking authority. Instead, it should be you know, I heard praise earlier, and I joined in it for the Interim Committee having been bi-partisan. Well, let's do the equivalent of a bi-partisan committee for the rulemaking process. In this case, it's tri-partisan, because you have the investigatory organization, you have the adjudicatory organization and the appellate organization. So, let's make a rulemaking committee that's made up of those three. That way, no single entity dominates it. No single entity can control the outcome. And that's going to facilitate compromise, collaboration, and frankly, better quality.

Next, we're suggesting a change in the way that the Special Tribunal, that special Supreme Court is created. We had been discussing this with the Supreme Court prior to the interim committee. We'd been

in negotiations with them before the Interim Committee got started. And what we were advocating for was that'd be drawn from a large pool. So, it minimizes the risk that we see that exercise of undue influence that there's been some history of. And, so, we call on it to be a pool of all statewide judges. The Supreme Court preferred to narrow that pool and remove County Court judges. So, it would only the district court judges, and appellate court judges, and we were okay with that we negotiated that compromise with them, we still stand by that compromise. And we think that's what you ought to do. We can talk in more detail if you want about why there are problems that carry over from the old system, if you keep it to this narrow, small group of the Court of Appeals, as the pool. That's what I call it, the pool from which the special tribunal is drawn. Okay.

Next, this, I don't remember this actually being discussed during the Interim Committee, but it is in the final legislation. And I'm just not sure how intentional it was. It created a right of appeal, but it only allows the judge who is, we call them the respondent judge, the judge who is accused of misconduct, only they have a right of appeal from the adjudication phase. We don't think that's appropriate, we think you should authorize appeals from both sides. The Commission side is really the victim side, the victim should be given a right of appeal. It's only fair, frankly, it's unfair to say only one side gets a right of appeal. And, so, we're proposing that that be bilateral.

Next, something that's been talked about an awful lot today is the ombuds. We are fully supportive of the idea of the ombuds. Candidly, I will tell you, if a truly independent ombuds gets created, it's an incredible practical check on the ability to screen out allegations against judges of misconduct before they ever reach the discipline commission. And, so, it kind of solves some of those other issues that we talked about. At the Interim Committee, for example, we're a lot less worried about the fact that right now, while there is an obligation, a duty of disclosure by the Judiciary to the discipline commission, there's no enforcement mechanism. And even since that law has been enacted, we've run into challenges for the lack of an enforcement mechanism. But if we have the ombuds, that's a practical check in the classic sense of American history of checks and balances in government. That's a very practical check that really limits someone's ability to control that flow of information. And, so, I'm not as worried about the fact that we don't have an enforcement mechanism for the existing duty if we have an ombuds. But what we want to emphasize to you is that it's critical that the ombuds be genuinely independent. If the ombuds is under the control, direct or indirect, of Judicial Leadership, the truth of matter is past is prologue, we're probably going to recreate exactly the HR system that we had before, where we had a handful of people who, as the ILG report tells us, for 20 years, received complaints and didn't forward them on to discipline commission. It'll just be by a different name. So, let's not make the same mistake again. So those are the major amendments that we propose. Those are the major things I wanted to talk with you about. I'm now going to unless you want to pause here for questions on those. I'll turn it over to Mr. Gregory to talk about the budget side.

- 45 -

**Sen. Gonzales**

Thank you, Judge Prince for your presentation and walking members who did not serve on the Interim Committee, sort of through what we tackled over the summer. Colleagues, questions? Mr. Vice Chair.

**Rep. Weissman**

Thank you. And just a parallel line of questioning earlier this afternoon, you've already spoken to the last of them, I would invite you to comment a bit more briefly on how two of the charges set up in 201 are proceeding. One is sort of provision of support upstream of the pivot, middle of this year to a more fully independent structure for the office as codified in the bill. And then you did speak to this next one a bit. But flow of information is obviously critical to the whole mechanism working if you could speak to that. I just want everyone here to hear, you know, a little bit from both sides. So, I'm putting the questions to as well, as I said that I would and I think the third one was going to be the ombuds structure question, but you've spoken to that. So, thank you, Judge.

**Sen. Gonzales**

Judge Prince.

**David Prince**

Thank you, Madam Chair. And thank you, Mr. Vice Chair for the questions and the opportunity to respond to the same issues that were addressed by the Judiciary earlier. I'll try to take them in the order you provided.

The first question is about support. The Senate Bill 22-201 did provide us with our own independent funding for the future. Impossible really to have that happen like that? I think I heard earlier the phrase to turn the switch on or turn the switch off, so one of the things we negotiated with the judiciary and that the General Assembly passed was a one-year period through this summer of transition. I think I would agree with the State Court Administrator's description earlier that there there are a lot of successes to point to. There's also some friction and some problems that have occurred in that support. I would say that there are some examples of some really great work that the State Court Administrator's Office has done in trying to help us with that transition. I'm thinking of the example see, we've been on their computer system through OARC in the past, and the State Court Administrator's IT system has been working with us, as babes in the woods, trying to understand what kind of software do we need? What kind of hardware do we need? How are we going to handle all the confidential, you know, all kinds of issues that you never would think about setting up your home or even an office system, and they've been just fabulous working with us. And we're still in that process. It's not done yet, but I can't even remember really a hiccup on that one. There have been other areas where there have been some some disagreements. But there have been some some real challenges as well. Candidly, the Troyer Report talked to us a lot about the toxic environment at the Judiciary, we experienced that on occasion with some of this stuff, because some monkey wrenches get thrown at us that, really we're able to deal with we're able to get around. But for example, the Governor signed this Bill into law in May. 21-days later,

- 46 -

the Supreme Court's Office of Attorney Regulation Counsel announced to us without prior warning, they were providing no more attorney or investigator support, effective immediately. We literally were in the midst of cases. And they just announced one day, we're dropping everything. And frankly, we then had to kind of fight with them to get our own litigation file in one of those cases, near in a case at that time. And, so, we've had some challenges.

That takes me into the information sharing. We were in a pretty bad position when we were in front of you a year ago. When we were with you a year ago. There was one particular case that ended up getting talked about. The Chief Justice at that time said that the investigators were being provided with unfettered access. And I think to information, I think we can all agree that that is absolutely the goal for something as important as judicial ethics oversight. That the Judiciary itself should be providing unfettered access to information so that we can have credible review of any allegations of misconduct. Unfortunately, we weren't even close to that last year, not trying to avoid characterizations, let's work with real numbers. The Judiciary itself had assembled 12,000 documents they considered relevant on one of the examinations we were doing. At the end of 2021, they had given us about a dozen. By the time we got to the SMART hearing, they'd given us about 1,000. So, a little less than 10%. The Legislature then signed into law Senate Bill 22 201, and actually required them to provide us with records. And it took a while, but we got a lot of that. So, I'd say the ratio now is more like 80/20, we probably have 80% of the information we seek. There is probably 20%. And it's hard to come up with a number on this one because I don't have a control set where I can compare the numbers, or I could a year ago or eventually after I got the numbers from Troyer, could last summer. So, at this bit of an estimate, but an overwhelmingly better position. Still a lot of information on various cases that we asked for and we don't get. I'll tell you one of those files that we got when the Supreme Court's OARC stopped doing work on our cases. One of the files we got we found that they had not disclosed to us additional allegations of misconduct against the judge in an ongoing matter and had not disclosed to us some evidence of those allegations. They were serious, they resulted in sanction. And, so, those are not ancient history. That's 2022. That's the last 12 months, but we're in an infinitely better position than we were in about a year ago. Let's see. I think that's flow of information.

And then the ombuds I think you're right, I think I probably addressed that. So, I don't think there's anything else to add there. We just focus on gotta be independent.

**Sen. Gonzales**
Thank you, Judge Prince for that overview. I see a question from Representative Snyder.

**Rep. Snyder**
Thank you, Madam Chair. And thank you both for being here. And thank you Judge Prince for your service on the Commission and for making the trip up from El Paso County today to present to the joint committee. I've had one, one clarification. We talked about the ombuds. I think it's very clear why it could not be housed in Judicial. So, I think we'd be looking for another home for it. But how about the

- 47 -

Commission? The Commission is doing some great work, you've disciplined three judges? Is that not an option for perhaps where we could locate an ombuds?

**Sen. Gonzales**
Judge Prince.

**David Prince**
Thank you, Madam Chair. And thank you, Representative Snyder. Thank you all. So, for making the drive up from El Paso County. Representative Bacon, as you've heard other people say, has been an excellent negotiating partner or discussion. Negotiating is probably the wrong one on this one, because we're not negotiating this one. We're just involved in the discussions occasionally. But Representative Bacon and I had exactly that discussion, probably in July, I think, I forget when it was, at some length. Yeah, there is a challenge, where to put it? And there are options. And I, my personal opinion, is that the Commission may not be the best place for it, because you want somebody who is, it's like housing the victim advocate with the police. That can work. But sometimes they might be seen as part of the police. And, so, someone might be nervous about it. We have told everyone that we're happy to have it housed with us and do think that can work if, if you can't find a good place for it. That's fine. But I can see, I can see someone thinking, you're like the policeman. And so I'm not sure I really want to go to a place that's housed with you. But, that's just my personal opinion.

**Rep. Snyder**
Thank you.

**Sen. Gonzales**
Senator Gardner.

**Sen. Gardner**
Thank you, Madam Chair. And, again, thank you both for being here. And Judge Prince. Good to see you again. And thanks for making the trip and drive safely home.

**Sen. Gonzales**
It's an El Paso County love fest.

**Sen. Gardner**
Well, we're so lonely here. Madam Chair. When we we see one of our own, we're just ecstatic. I was struck early in the presentation by the information you provided about the numbers of serious, credible complaints being as many in the past 12 months as the previous 12 years. And I have asked questions like this for and sort of asking for impression because I don't think you've probably done a study. But what do we attribute that to? Is it because things are now being reported? Is it because we have more and more misconduct? Is it more serious? Is the public more aware of the process? It's really alarming unless

there's some context that says maybe we're doing something right. I don't know. I'm just asking either of you.

**Sen. Gonzales**

Judge Prince.

**David Prince**

Well, thank you, Madam Chair. And thank you, Senator Gardner for the question. I've thought quite a lot about that too. And and also, good luck in your drive home.

**Sen. Gardner**

Mine's on Friday Judge Prince.

**David Prince**

Oh, ok. No, we haven't done a study. So, I can't give you any scientific answer. And keep in mind that the numbers are pretty small, still. For the one you're talking about the last 12 months, in the last 12 years. And so that that percentage can end up looking very, very dramatic. And it's still an important number to look at and consider. But the raw number is still relatively modest. You know, it used to be we did one case every three, three and a third years. And now we've done I think it's 4 cases in the last 12 months, 3 cases last calendar year. We have seen more serious allegations, I think. I don't think there's a backlog. I mean, there actually is a case that that's from quite a while ago, where people within the judiciary had made a decision not to report it. And it ended up getting to us anyway. And so that's that's a bit of just backlog, I'll call it. But it doesn't really apply to the others. They are current. And I suspect it's more reporting. I suspect that's primarily it. I see no reason to think that judges are suddenly misbehaving at a higher level than they did in the past. So, I'm tending to think that there's better reporting. I tend to think it's a little early to say that it's attributable to Senate Bill 22-201. I would love to give the Legislature credit for that. I'm sure that's part of it. But I also think part of it is a heightened awareness of some of the publicity. In other words, really the issues that you just mentioned. I think those are factors altogether that probably cause it. I think there's a heightened awareness of the discipline commission itself. I don't mean to be disrespectful to anybody, but I suspect two and a half years ago, a much smaller percentage of the members of the General Assembly knew that the discipline commission existed than know today, much less the general public.

**Sen. Gardner**

Thank you.

**Sen. Gonzales**

I will just speak from my own experience. That is correct, sir. Representative Bacon.

**Rep. Bacon**

Thank you, I want to switch over quickly to just ask about the data you collect, and you report out. We know every year you create kind of like an annual report. And I'm curious if you keep cumulative data, particularly on judges, to understand the types of complaints that are brought to them. And if there are any barriers, quite honestly, to making that information, a little bit more transparent, I think. Well, when we hear people come to us, this is another question, but maybe not we mostly hear about troubles with rulings, right. But I will say that I tend to hear a theme on which courts sometimes that these come from, and so it'd be helpful to understand not only what is made transparent but where you feel like there might be some room to increase that transparency, with any sort of reference to rule would be helpful as well.

**Sen. Gonzales**

Judge Prince.

**David Prince**

Thank you, Madam Chair. And thank you Representative Bacon. I wasn't smart enough to bring my Rules with me for a rule reference, but there is a Rule. It was number, Mr. Gregory will know and tell you in a moment, because he's that kind of person. Probably where we are required to present an annual report. And we provide statistical information. You're right, though it's it's it's somewhat opaque to the public, because they're posted as glorified hardcopy documents, obviously, they're PDFs, but they're posted as hardcopy documents, and there actually is data available, but it's not cumulative. So frankly, one of the discussions Mr. Gregory and I've been having, as well as the rest of the Commission, has been implementing the new reporting requirements under Senate Bill 22-201, which we fully embraced, adopted, and recommended. And part of that is to make it more accessible, part of the specific request we were getting from members of this joint committee was to make it downloadable, and in a digitally manipulatable form, if that's that phrase. And that is our plan, probably not going to happen for year 22, because we're just getting underway. But frankly, the earlier slide where I gave you cumulative for the last 20 years, 2001 to the present, that is the period for which we have Annual Reports. And I personally went through and just calculated those and built my little Excel spreadsheet, and did cumulative totals, one of the requests that you were centering on was, it would be helpful if I could see the types of complaints as well as where the complaints geographically in the State are coming from or the courts, and actually all that is in our Annual Report. It's just not that accessible. And, so, one of the things that they did very early on in those Annual Reports, the first ones, excuse me, they would actually give cumulative numbers. And we kind of fell away from that practice. I don't know why we did, it happened a long time ago. But we kind of fell away from that practice. And one of the things Mr. Gregory and I have been talking about is we'll go back to that practice. And, so, we will prepare some cumulative things, whether that's going to be for 2022, I don't know. And we'll have it in a downloadable format in the future. One of the things that you have in your packet is the new, at least as best we could do it, the new demographic type statistics, which you didn't specifically mention, but I know you have in mind. And, so, we don't have those historically, because that data was not collected. And there's just no way

for us to go back and create it, at this point. So, that'll be from this point going forward. And we're frankly, still transitioning our system. So, we don't really have the systems in place to truly track it today. But we're going to have them in place fairly soon. And, so, I can turn it over to Mr. Gregory to see if he has some additional comments on the stats, because he's really our statistician.

**Sen. Gonzales**
Mr. Gregory.

**Christopher Gregory**
The statute that's involved is of course 13-5.3-108, which was part of Senate Bill 22-201. There we go. That's better. And I did try to go through and meet each one of those elements that were listed in the statute with the handout that you have before you. Given, you know, you had brought up this idea, I think, as part of the Interim Committee process, in our Annual Report from 2022, we did make an effort to go through those statistics and break them down District by District to try and show if there was a cultural problem in a particular geography. And, hopefully, that's helpful. That will go into our Annual Report for 22, which should be released in a much sooner course of things than it was last year. And that was just largely because of some of the transition that was going on with the agency. But I think as part of your question, you'd also asked for kind of that breakdown on what the type of complaint was, and as it has been testified to. The vast majority of the things we get relate to disputed rulings. And that number shows up here, there were 110 out of the roughly 249 total RFEs that we got that all related to a disputed ruling. And these statistics, if you take it even further, it breaks it down to an additional 21 35(c) post conviction relief, disputed rulings that that added into that. So, that's always going to be a pretty significant statistic in what our reports are.

**Sen. Gonzales**
Excellent. Colleagues, any additional questions? Seeing none, let's go ahead and proceed.

**Christopher Gregory**
So, the one final part of this is just to give you a general overview of sort of what we have requested for our budget for fiscal year 24. And in our original budget, it was very limited, it was just asking for salary adjustments, that would put the commission sort of in line with where it was before this funding shift had happened. We would have salaries that were equivalent to the resources that we had before we were legislatively funded. And as I understand, that's now moving his way through the joint budget process.

After we had submitted that, however, it came to our attention that there was perhaps greater ambiguity over this interim support that we were receiving under the statutes, 13-5.3-103(3). This notion that the Office of Attorney Regulation Counsel and the State Court Administrator's Office would be providing administrative support to the Commission through this fiscal year, it was our understanding that some of that would have continued indefinitely. And with different events that happened, all of a sudden, we had greater worry that that funding was going to cease at the end of this fiscal year. And, so, we updated our

- 51 -

budget to request that administrative support. And as it's presented, it's 4.0 FTE to handle different tasks, HR, IT, payroll, those sorts of things. In all candor, that budget request is seeking, a great deal of redundancy that I don't think the Commission feels is necessary. And in that context, we're actually much much more supportive of a proposal through JBC Staff to set up an independent administrative unit that would be able to serve the Commission, but also other similarly situated small entities that are affiliated with the Judicial Department. So, that we could have that benefit of an independent resourcing, but yet not have to double the size of our Office to really support something that wouldn't require full-time staffing. I think one of the huge advantages of that administrative unit that's being proposed is also this notion of an external ombudsman. When it was originally proposed to be with the Commission, we would have had to provide all that administrative support. If there's an independent administrative unit to do this, that ombudsman could stand on its own. This essentially, is where it would be housed, it would have the administrative unit support, and really make something possible that wasn't really there I think when we were having these discussions before the Interim Committee.

Finally, as it would relate to budgetary issues in House Bill 23 1019. There is this proposal for more dynamic statistical reporting, more contact between complainants that we have that have serious cases before the Commission, and our Staff so that we can better explain how that process is proceeding. That they really have more input and, also, more information available to them. But in order to do that, it's our perception that we would need to add an additional staff member to provide that support as well as to reinforce some of the paralegal needs that we have in our Office. So, that in total, is essentially what we're asking for, for a budget.

Just one additional note, though, as I think Judge Prince alluded to, we are in the process of implementing a lot of things. And with the monies that were provided to us through the last budget cycle, some of those things are we have hired our internal Special Counsel, we now have a full-time Office Manager, we're still looking to fill and, are making progress and doing this, to have an internal investigator. But our IT infrastructure is also growing. And we're in the process of purchasing a server, developing a case management software program that would allow us to track a lot of this data in a much more dimensional way. You can note how many complaints come in, based on different bases. We would be able to look at some of these demographics, and just have a more organized approach to things. But all of those things are in process. I think it's going to take a bit of time, but we really are using the State's resource to improve what we're doing. And, hopefully, that will show itself in the next fiscal year.

**Sen. Gonzales**
Thank you so much, Mr. Gregory. I wanted to see if colleagues have questions regarding any of the information that we have heard thus far. Seeing none, I want to thank you so much for walking us through the issues that you all have been navigating over the past year, as well as some of the budgetary items that we'll be navigating, as well here in the Legislature. Thank you again.

**David Prince**

Thank you, Madam Chair. And thank you to all members of the Joint Committee.

**Sen. Gonzales**

Thank you.

**Sen. Gonzales**

Okay. At this point, we are going to shift over to public comment and testimony. So close there, so close. And I want to welcome. I believe we have three people who have signed up to testify. And I want to welcome Mr. Jordan Scott. We'll follow the same process as we did earlier this afternoon. We welcome any member of the public to come and share their comments. We'll invite you to testify for three minutes. If you could please state, your name, any organization you represent, and then proceed to testimony. We will go ahead and welcome your comments and then we will open it up for questions.

**Jordan Scott**

Yeah, I'm Jordan Scott. I represent myself. The one thing I didn't hear in that presentation was that there is a professional code of conduct for attorneys and a Colorado code of judicial conduct. And the term misconduct doesn't mean serious case. So, there's a lot of smaller misconduct that's kind of fallen through the cracks. Some examples of that is a judge told me that they don't need to follow the judicial ethics advisory board's opinions. And, so, for a judge to not have to follow ethics advisory board opinions is terrible. I had a judge tell me that an attorney hiring her client as a paralegal when she was in $70,000 of debt to the attorney wasn't a conflict of interest. So, there's a significant misunderstanding of what conflict of interest means in any other any in any other industry that would have been like, whoa, red flag. I had a judge tell me that they won't report attorney misconduct. But when I call to file a complaint against an attorney, the complaint process tells me that they only really investigate complaints if they come from a judge. So, the misconduct isn't necessarily judges getting drunk and going downtown and getting in fights. It's judges not doing what they're supposed to be doing. I had an attorney make fun of my autism in a courtroom. The judge ignored it and then penalized me for having a disability. So, it's gotten a little crazy. I found out that a judge rented his commercial real estate property to a law firm practicing in the county that he was a judge in. I don't know how that's okay. And I even had a judge retire. And I don't think they're retiring because they're innocent. I think they're retiring so they can keep their pensions. That's all I have to say. Thank you.

**Sen. Gonzales**

Thank you, Mr. Scott, for sharing your your perspective. Colleagues, do we have any questions for this witness? Mr. Vice Chair.

**Rep. Weissman**

Thank you, sir. More of a comment in response to some of what you said than a question. A lot of what we've been talking about the last hour plus here was a specific Interim Committee that we had that had a

specific charge about the judicial discipline process. The scope of that committee, the back half of which I chaired and was very involved in, were Senator Gardner, Rep. Bacon, and Senator Gonzales. It simply did not, was not authorized to get into the attorney half of the equation, it was only looking at the judge half of the equation. That said, some folks did reach out and contact us about issues of attorney misconduct. Historically, that's been something that's been handled internally at the Judicial Branch. I happen to think, it's a matter within the ability of the General Assembly to say something about if we decide that we need to, again, that's separate from the legislation that we've talked about here. And judges are a little bit unique in that they are still attorneys, and they're also judges, and they're actually subject to both of those functions, attorney discipline and judge discipline. So, we happen to be a lot farther down the road of looking at the system for resolving complaints against judicial officers than complaints against attorneys writ large. Because that's what events have sort of brought us to in the last number of years. But I just want to say, we hear what you're saying, I think all of us on the Judiciary Committees in particular, probably get more of that sort of thing than our colleagues on other committees, because people know, it's under the committee that we we serve on or at least it might be. And just speaking for myself. I mean, so I am an attorney, I keep my license active, even though I don't practice right now, because I'm a full-time legislator. Those kinds of things bother me because I think as in any profession that wants to hold itself to a high standard, we need to police our own. And frankly, sometimes we don't always succeed in that. I'll leave it there. But thank you.

**Sen. Gonzales**
Seeing no further questions, I want to thank you again for sharing your perspectives with us. Our next witness or I'm sorry, our next person who will be testifying is Chris Forsyth.

**Sen. Gonzales**
Welcome, please state your name the organization you represent and proceed. You'll have three minutes.

**Chris Forsyth**
Thank you. My name is Chris Forsyth. I'm an attorney whose practiced 30 years in Colorado. I formed the Judicial Integrity Project. We've been formed for about 12 years now, when we started speaking out 12 years ago, if you had adopted our recommendations, there would be no judicial scandal. When we started about 12 years ago, there hadn't been a published case of judicial discipline in 24 years. Two years after we started banging the drum published cases of judicial discipline started appearing. And they have increased to the point that we've recently seen. I have such little time, I want to point you to one of the glaring conflicts of interest that shows everything that's wrong, and it was right before you all along today. That was when Mr. Vasconcellos was in this chair right here. And Justice Boatright was in this chair that I'm sitting in right beside each other, appearing together a joint team. The legislation that's being proposed for the discipline commission would have Mr. Vasconcellos select the panel that would adjudicate Justice Boatright. I think anyone with a single, one intelligence cell in their body can see the conflict of interest in that proposal. That's what's written currently written into the legislation. One of the problems in the Judicial Branch is that the State Court Administrator is not separated from the Judicial

Branch. That was the genesis of the judicial scandal, along with the hiding of information. If there's one thing that the scandal should have taught us, it's that the hiding of information is more dangerous than disclosing the information. So, if you look at the judicial scandal, your first question should be well, why are we hiding any information surrounding judicial discipline? I have yet to see anyone asked that question, let alone have an answer. There is no reason to hide any complaint regarding a judge on judicial discipline. The functions of the State Court Administrator and the judicial functions should be separated, that would also correct a lot of the staffing issues you're talking about, because the staff would work for the State Court Administrator, not the judge, it'd be like an old-fashioned secretarial pool. My time is very limited. So, I will end with a couple things that are in this proposed legislation. One, is that when they have the panels that are going to select the judges, or are going to adjudicate the judges, twice this legislation does it. It says that the adjudicators cannot have any disciplinary history. So, there's a huge hypocrisy in that because you're saying, well, when they adjudicate judges, they can't have a disciplinary history. But when your constituents go before a judge, they're going before judges that have disciplinary histories, and they don't know it. So, you're treating judges better than you're treating your constituents. And you have to remember your constituents are the people in your district that elected you, even when you're on Judiciary Committee, your constituents do not become judges. And the last question I want to pose for you is how does it benefit your constituents to have criminalized speech in Colorado? How does it benefit your constituents that if any one of them files a complaint with a Commission, and then releases that fact to the newspapers, that that person can be, you know, convicted of a misdemeanor? It doesn't benefit your constituents. And the current legislation, as written does not correct that. It leaves in place, the criminal penalty for speech in Colorado, we have a very troubled system and this legislation does not correct it. The Interim Committee, struggled at a minimum to address what is wrong with judicial discipline in Colorado.

**Sen. Gonzales**
Thank you. Mr. Forsyth. Colleagues, any questions for this witness? Mr. Vice Chair.

**Rep. Weissman**
Thank you, not a question for the witness but kind of a comment for the record. There is a provision that's been long in our statutes that provides for misdemeanor criminal penalty where the requirement of confidentiality as to judicial discipline proceedings is violated. I do happen to believe that that is problematic on the authority of the 10th Circuit Case, interpreting not that particular statute but a pretty similar provision in another section of Colorado law, I also believe that the provision on the books is pretty likely unconstitutional for the First Amendment reasons that were stated. I think members of this committee know any Interim Committee is authorized for a certain number of meetings and a certain amount of time, and we face legislative deadlines upstream of going to Legislative Council, and so on. We did kind of run out of time, I think to fully wrestle all of the issues to the ground that were raised over the course of the Summer and Fall, this issue being one of them. The thing about Interim Committee legislation is the conclusion of the Interim Committee is really only, maybe it's the end of the beginning. And as I've noted, we have both of the measures now before us first in the House, then in

- 56 -

the Senate. These are bills, or in one case a resolution, subject to amendment, like anything else that we do here for further improvement of the the work started by those of us who were grappling with it in the interim, and I would just suggest that this question remains worthy of our attention.

**Sen. Gonzales**

Seeing no further questions, thank you, Mr. Forsyth, for your testimony. Our next witness is Jacob Belinsky, who I believe is online. Although I do not believe he is here with us on the internet at this time. Given that I want to see is there anyone else in the audience or online who wishes to testify at this point? Seeing none, we will go ahead and close out that phase of public comment.

# Appendix 27(w)

## *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the H. Judiciary Comm., Colo. Leg., March 15, 2023:*

# Appendix 27(w)(i)

# Transcript;

# House Judiciary Committee Hearing—March 15, 2023:
## HCR 23-1001, HB 23-1019, and HB 23-1205

**Rep. Weissman**

Okay, the House Judiciary Committee will come to order on the 15th of March, Wednesday. Mr. Pogue, kindly call the roll.

**Staff Pogue**

Representatives. Armagost.

**Rep. Armagost**

Here.

**Staff Pogue**

Daugherty.

**Rep. Weissman**

Excused. Nope.

**Staff Pogue**

Daugherty.

**Rep. Daugherty**

Here.

**Staff Pogue**

Epps.

**Rep. Epps**

Here.

**Staff Pogue**

Evans.

**Rep. Evans**

Here.

**Staff Pogue**

Garcia

- 1 -

- 2 -

**Rep. Bacon**

Excused.

**Staff Pogue**

Lynch

**Rep. Lynch**

Here.

**Staff Pogue**

Marshall

**Rep. Marshall**

Here.

**Staff Pogue**

Sharbini.

**Rep. Sharbini**

Here.

**Staff Pogue**

Snyder.

**Rep. Snyder**

Here.

**Staff Pogue**

Soper.

**Rep. Soper**

Here.

**Staff Pogue**

Woodrow.

**Rep. Weissman**

Excused.

**Staff Pogue**

Bacon

**Rep. Bacon**

Here.

**Staff Pogue**

Mr. Chair.

**Rep. Weissman**

Here

**Rep. Weissman**

All right. Quorum is present. Everyone, today we have three items on our agenda. In this order, they are House Concurrent Resolution 1001 followed by House Bill 1019, finally, House Bill 1205. I will be co-presenting the first two measures with Rep. Lynch, Mr. Minority Leader. So, I'm going to give the gavel over to Madam Vice Chair to preside over the first two thirds of our hearing.

**Rep. Bacon**

Okay, we will go ahead and get started. Mr. Chair.

**Rep. Weissman**

All right, thank you, Madam Chair and committee. I should make this close enough. Thank you for hearing House Concurrent Resolution 1001 today. This is half of the work of last summer's Interim Committee on Judicial Discipline, of which Minority Leader Lynch and I were both members and, of course, colleagues. The Vice Chair was part of this journey as well with us. Just to provide a little bit of groundwork, and because not everybody was part of that, the prior phases of the journey that lead us to where we are today, I thought I'd say just a little bit about it, and then we'll make some comments that are more directly to the measure. Excuse me, really, I wanted to start briefly with a bill that the legislature passed last spring, House Bill, or rather, I'm sorry, Senate Bill 22-201. Among other things, that measure, for the first time, codified in statute the Commission on Judicial discipline and the Office of Judicial Discipline. Previously, those had existed in court rule. They specified information sharing responsibilities between what were in that Bill called judicial discipline agencies, so the Commission and things like Attorney Regulation Counsel and otherwise. Because we knew that there would be some even bigger changes to have to grapple with, including changes of the constitutional nature that we really couldn't deal with in the last weeks of session, part of that bill last year created the interim committee that begat the legislation that we're here to talk about today. I want to note that 201, was bipartisan and bicameral. I was one of the four sponsors of that and it passed. The final recorded votes in both chambers by a combined vote of 94 to 6. Moving then to the Interim Committee, I wanted to observe a little bit about how that was set up, and intentionally so. It could have been a majoritarian

interim committee. Those happen sometimes. Senator Lee and I last year decided that this particular committee should not be majoritarian, because what we're talking about here is even bigger than party identities. We drew inspiration from HB 21-1325 that set up an evenly 4-4, so 2 each House Dems, Senate Republicans interim committee to grapple with school finance, which is also a big question, that is something else that doesn't need to be purely party line. So, Senator Lee began chairing. I then took over Chairship midway. And Rep. Carver, who is not with us, because she was term limited, was Vice Chair. And she was a great partner to work with throughout the summer. I wanted to note that, because it's not every interim committee that is like that, and that was an integral part of all of our work, the legislation, and you can see the list if you'd like at 13-5.3-110(7), the legislation charged the interim committee to study 17 specific areas or aspects of judicial discipline. We took testimony over the course of multiple hearings from a variety of folks, bar associations, heavily the Colorado Bar Association and the Colorado Women's Bar Association, variety of outside organizations, and I want to specifically acknowledge the National Center for State Courts, which as an entity that kind of studies judicial branch operations across the 50 states, survivor advocacy organizations, and I want to specifically mention CCASA (the Colorado Coalition Against Sexual Assault) and various members of the public. Process wise, in talking with Rep. Carver near the end of our work, we decided to try to operate in a consensus way. Sometimes, what will happen in an interim committee is both sides might go to their respective corners. The blue team will draft over here, the red team will draft over here. You'll see what happens. What I proposed to Vice Chair Carver was that we not do that. Was that we bring forward one set of measures that we could agree to. And ultimately we did. Measure A, which was the parlance from the interim, is now this concurrent resolution. Measure B from the interim is the companion bill that we'll turn to next. And of course, Mr. Minority Leader and Madam Vice Chair will speak about the ombuds aspect, which is the third and last thing on our docket. With that setup, I'm going to turn it over to Minority Leader Lynch.

**Rep. Bacon**
Minority Leader Lynch.

**Rep. Lynch**
Thank you, Madam Chair. And thank you, Mr. Chair, for all of your work that you did on this. For those of you that are new, the fun can continue into the Summer, just so you know, and this is one of those opportunities where you can get back together, get the gang back together with your judicial friends that you've made over the first session. So, I hope that that you all take advantage that. As representative Weissman discussed, this is good legislation because it really did occur not in a partisan way. This was folks that really rolled up their sleeves and got serious about some serious issues that ran into kind of this, oftentimes, the separation of powers, issues that go along with us trying to tell another Branch or give them guidance. But over the course of the Summer that got dealt with and we really did dig into this. I will tell you that of all the legislation I've been involved in, very rarely have I seen something that has been as well stakeholded this was done. I will say painfully, stakeholded at some points. And the discussions and the deliberations that primarily occurred with my former colleague, Representative

- 4 -

Carver and Representative Weissman, was arduous, to say the least, and I'm glad that I was not involved in all of those conversations. Because I did have other things to do this Summer. So, please feel free to dig into this all you want, but I will tell you this has been gone over as, no pun intended, judiciously as it as could be. And I believe this is good legislation. So, thank you.

**Rep. Bacon**
Mr. Chair.

**Rep. Weissman**
Thank you. And Rep. Lynch, I think you should take credit for that pun, and you should call it intended. So, members, Mr. Pogue is passing out at my request, just a few things. I'm not going to go through the handouts in much detail at all, but just to kind of say what they are, there's a stapled packet here. The first page of that is a really simple side by side, kind of element by element comparison that was prepared by nonpartisan staff to just try to summarize the work that we did. The next couple of pages, starting with the heading Committee Charge were taken from the report, again by nonpartisan staff about the work of this Interim Committee. Members may know when an interim committee wraps up, our nonpartisan staff put together a report just sort of saying what was done, how it was done, who was heard from, and so forth. The whole thing is more than I wanted to spend paper reproducing, but I did pull just the relevant couple of pages out of it, if you care to look through that. Then, at the end of the packet was actually something that Vice Chair Carver and I did together. This is just a simple sort of op ed that the Denver Post was nice enough to run for us, setting forth the what and the why. I'm also handing out L.001 which we intend to move when the time comes. As Rep. Lynch said, we grappled arduously with every line and every word, because when we are inviting the voters to update our Constitution, it matters to be that careful. We did sort of run out of runway. You know, every interim committee is set up for a specific amount of time. And we thought that there are a few more things to grapple with just a bit further. So that's what L.001 is about. We'll get there later. I just wanted to sort of, with all that wind up, walk briefly through the measure itself to hit some highlights. So, we are in the Colorado Constitution. Here we are in specifically Article VI, Section 23(3). That's what we're working in here.

On page 4 of the measure, in C.5, which spans most of that page. This is where we set up the new judicial discipline, adjudicative board. In the course of this hearing, we might just refer to it as the adjudicative board, or the board for short. This is to start to bifurcate what we'll call the investigative phase, or the informal aspect, and the adjudicative phase, or the more formal aspect. This is really modern best practice, and what we have from the 60s is a bit of an outlier, and then it's all combined together. I guess I'll note that as we move through the different letter subsections of (3), we're roughly tracking the process through the system. From informal to formal and appeal and so forth. So that may be a helpful architecture to sort of arrange the substance in one's mind.

- 5 -

In (e), we're updating the language about how the formal proceedings go. Here we see the role for the adjudicative board that we just set up that replaces what the current law calls special masters, which are appointed by the Court.

Moving on to (f), this discusses how an appeal goes from the adjudicative board panel, typically by the Supreme Court. On page 7 now in that (II), part of what we grappled with is what happens if there are facts present that create the appearance of conflict. Need to conflict out the Supreme Court at the very top of this sort of pyramid. How does that go? That's what (II) is about.

Moving on to (g), which begins on page 8 and goes beyond that. This is another really important aspect that we grappled with, because since the last time we laid this down in our Constitution, almost 60 years ago, we've kind of gotten out of sync. What (g) is grappling with is, is confidentiality, and where is the line between the public's right to know what's going on and the fact that before things are substantiated, you know, there is, if you are the respondent here, there is an interest in due process and not everything being all the way out there in the light of day, impacting one's name and reputation before it is adequately proven. So, what we set forth here, which is really kind of the majority rule around the country, is that confidentiality ceases when formal proceedings commence. In other words, when we have gone from the phase that is handled, or would be handled with the changes we propose here, by the judicial discipline commission over to the adjudicative board. The board is sort of acting like a court here. And as we know, with limited exceptions, proceedings of courts are open because there's a public interest in that. Couple of other key things that we set forth in (g) and the confidentiality language are a constitutional textual basis for sharing of information with complainants, with those who believe they have been aggrieved by a judicial discipline matter. This is a pretty sore lacking that we have right now. We're all familiar with the VRA, the Victim Rights Amendment, or the act that effectuates it, that doesn't apply to judicial discipline. And some of what we heard over the summer was very troubling in terms of what it feels like to be a complainant and how you are treated, what you don't know and when you don't know it. So, in statute, we create some VRA like mechanisms, and we update those in the bill, but we need to make sure there's a crystal clear foundation under that that's part of what's going on in (g). Likewise, in (g), we want to provide for the sharing of some aggregated information. Consistently with individual confidentiality, but there's a public interest in knowing sort of aggregated data about what's going on, and that's fleshed out a bit more in the companion bill as well.

Finally, in (k), we're on page 10, almost at the end of the measure now. We update the rulemaking provisions. Right now, rules for handling judicial discipline proceedings are really just handled by the Supreme Court. What the Interim Committee came up with was a different way of doing that. And the most substantial and important thing, I think, that is addressed in L.001 is a little bit of a revision to that process to integrate it and unify it a bit. It's possible that some witnesses will speak to that, and we'll speak more to it when the time comes for amendments. But with that, I will stop, and we'll invite questions.

- 6 -

**Rep. Bacon**

Members. Actually first, let's note that Representative Woodrow has joined us, and members, do you have any questions for the sponsors. Okay, no questions. All right, we will now move on to the witness phase. Was there a particular order?

**Rep. Weissman**

Thanks for asking Madam Chair. Don't think so. I mean, I'm not aware that anybody has any particular time constraint, but if there is, let's try to honor that.

**Rep. Bacon**

Okay, I will call who I see first on the list, Chris Forsyth, Terry Scanlon, Jared Scurlock, and Jenny Trujillo. If you are in person, please come up to the table and we'll check to see if anyone's online. I see one person might be remote.

**Rep. Bacon**

Okay, I'll just take a moment. Is there anyone online? Okay. Let's see is Elizabeth Newman? Elizabeth, are you here? Yeah, come on up. Since you're in person, we'll have in person. Every other witness is supposed to be remote, so when we get a chance to check online. Okay, thank you all so much for coming to testify today. You have three minutes to share your testimony. I think most of us have been here before, and I will go ahead and get started with who's first on the list. Mr. Forsyth.

**Chris Forsyth**

My name is Chris Forsyth. I'm an attorney who's practiced for 30 years in Colorado. I'm with the Judicial Integrity Project. We urge a no vote on this measure. The first mistake it makes is to keep the current Commission on Judicial Discipline. The Commission has been ineffective for many years, and continues to be ineffective. For 28 straight years, the Commission failed to publicly discipline any judge. We started banging the drum in 2012. In 2014, a published case of discipline finally appeared. The Commission has been in existence for more than 50 years, but only recently realized it did not have sufficient subpoena power. It requested documents from the Supreme Court and has not received all the requested documents. The Code of Judicial Conduct requires the cooperation of the justices. It would appear the Supreme Court's actions are not consistent with the Code, but the Commission has failed to file a formal complaint against any justice. Why? The Supreme Court uses its rulemaking power over the Commission to ensure complaints against judges are not prosecuted. This will not change with this proposal. The Supreme Court is still in charge of the rules. Granted, I don't have whatever amendment has been shown. So, I cannot address that. We have a rule that distinguishes misconduct from error. Arizona actually got rid of such a rule in 2001. Only 13 states, including Colorado, even have a rule on the topic of errors in rulings. It's an unnecessary rule. A violation of the Code of Judicial Conduct is a violation of the Code period. The rule, however, strongly encourages that if the alleged violation of the Code filed with the discipline commission has anything to do with a case in court, then the complaint must be dismissed. It's been 38 years since we've had a published case of judicial discipline related to a

case in court. Colorado is the only state in the country where the discipline commission must determine a complaint is supported by preponderance of the evidence to file a formal complaint. Preponderance of the evidence is a burden of proof at the end of a civil action. It has to be proven before even the filing of a formal complaint. It's an unfairly high standard that benefits bad judges. Indeed, there are 10 states where an ultimate violation of the Code of Judicial Conduct only has to be proven by a preponderance of the evidence. Who should be telling you this? The Commission on Judicial Discipline. But they're not. They're not doing their job. Most states have one commission that investigates and adjudicates. Such a system reduces potential conflicts of interest. Colorado should maintain such a system, just with a commission that works. The adjudicatory panels are unnecessary bureaucracy that insert more conflicts of interest into the process. More judges judging judges is not what Colorado needs. When it comes to the adjudicatory panels and the Court of Appeals panels, the measure requires the judges to have no disciplinary history and no current disciplinary investigation. When judges are to be judged, they don't want there to be any disciplinary history. But when people are to be judged by judges, judges don't want people to be aware of a judge's discipline history, it's a hypocrisy that undermines the humility we rightfully expect from the Judiciary.

**Rep. Bacon**
Thank you. I will move next to Mr. Scanlon.

**Terry Scanlon**
Thank you, Madam Chair. My name is Terry Scanlon, on the legislative liaison for the Judicial Department. That's our state court system. As Chief Justice Boatright said two months ago, in the State of the Judiciary, we support the constitutional amendment that is referred by the judicial discipline interim committee. As representative Weissman indicated it was indeed a thorough process. Many stakeholders were heard. We were among those who were heard. We had many discussions with the bill sponsors. Bipartisanship is often a goal of legislation. It's often a goal across an issue type down here, and I understand why. It's really sort of extra important that measures that change the structure of state courts be done in a manner that is not partisan. We see this unfold occasionally in other states, and it can undermine confidence in the judiciary. And the willingness and sort of the importance that the bill sponsors, Senator Lee, Representative Weissman, Representative Carver. If you're listening, thank you to all of you for the work that you did. And I don't mean to leave out other members of interim committee or the other bill sponsor. Thank you for keeping this something that is above partisanship. You know during the interim committee process, it really quickly became pretty clear that our process of judicial discipline is outdated, and this effort, this measure, will help make us more consistent with more current practices that are occurring in other states. It will help ensure that we have appropriate independence for every entity that is involved in the disciplinary process. We will have separate prosecutorial, adjudicative, and appellate bodies. The changes will help promote public confidence by ensuring that judges who violate their ethical obligations are held accountable. And the changes also ensure greater due process for judges subject to these complaints. In addition, the changes improve transparency in the discipline process, so the public can more easily see and appreciate how our system

works. There's been some reference about an amendment L.001 that was shared with us yesterday afternoon. We're reviewing that. We don't have thoughts on that today, but we'll be sharing that with the committee and the bill sponsors going forward. Thank you.

**Rep. Bacon**
Thank you. Elizabeth Newman, please share your testimony.

**Elizabeth Newman**
Thank you. Thank you to the members of the committee and Vice Chair Bacon. I'm Elizabeth Newman. I'm the Public Policy Director with the Colorado Coalition Against Sexual Assault. CCASA was invited to be a part of the Interim Committee's work, and I really want to thank the Interim Committee members and the Commission and Department for their collaboration with us on this process. CCASA remains neutral on all three of these bills, but I would like to make some general comments about them, and then I am available to answer questions on the other bills. The Colorado Coalition Against Sexual Assault works to prevent and end sexual violence in the state, including sexual harassment. Sexual harassment is incredibly pervasive. Up to 85% of women have experienced sexual harassment in their lifetimes, and black women are the most likely of all groups to have filed a sexual harassment charge, often reporting racial discrimination as well. Sexual harassment is detrimental to an employee's performance, to their professional advancement, and to their physical and mental well-being. And it's also incredibly harmful to employers. They face turnover, decreased victim and work group productivity, reputational damage, and sometimes direct payouts or settlements. I really want to highlight some of the issues that we shared with the Interim Committee related to the specific factors in the Judicial Branch that are risk factors for sexual harassment and other workplace misconduct. There are incredibly significant power disparities within the Judicial Branch, and that is one of the top contributors to any form of sexual violence, but particularly sexual harassment. Studies find that when these power imbalances are also gendered, there's even greater harassment that may occur. And with these extreme power imbalances, without clear protections and accountability measures, this really disempowers victims. There's also control over careers, so you have fear of actual or just the fear of job repercussions for employees to leave a field and that leads them to conclude that reporting is probably not the best course. And I also, you know, want to highlight that a lot of lawyers start out in the court system as an intern, as a clerk, which really has a lot of control over their future. Attorneys may also fear hostility, negative bias or unfair rulings. And then also in the Judicial Branch, we have decentralized workplaces. So, if there's limited communication or supervision between organizational levels that can also allow harassment to go unchecked. Overall, we feel that these bills are a step in the right direction. They are making progress on this issue. However, culture change takes time. And as it was noted by one of the previous witnesses, there are significant challenges in our current systems. And CCASA has felt that there's just not enough here to really make the change that we need to see. We are pleased to see stronger protections and more resources for those who do report. But what we heard both in the testimony and in the reports, is there's an incredible fear of retaliation, fear of coming forward and without strong and enforceable protections that will continue. There's also a need for timely and independent investigations. And lastly, we really urge the Judicial

- 9 -

Branch to consider how they are prioritizing prevention, to prevent this from happening in the future. Thank you so much for your time. I'm happy to answer any questions.

**Rep. Bacon**

Thank you, members. Are there any questions for this panel. Representative Epps.

**Rep. Epps**

Ms. Newman, I was wondering if you could just clarify why it is that you are neutral. Is it because of a distance from your usual work, or is because the bill doesn't go far enough? Or I'll stop putting words in your mouth.

**Rep. Bacon**

Ms. Newman.

**Elizabeth Newman**

Thank you and thank you, Representative Epps. I will clarify two points. One is that CCASA has many priorities, and the number of survivors of sexual violence in the State have many needs. And so we wear a lot of hats. We're in a lot of different committees, and we're in this committee on a lot of different topics. So just bandwidth is one issue. The second thing is, though, that we don't feel it has gone far enough. And I think that's really, both what we hope to see the Judicial Branch bring forward in their internal work and what they've been promising to be working on. But, also, in the bills that have come forward. There's a real need to change overall the judicial branch in many ways. And these are steps to get there, but not the significant change that we had hoped to see.

**Rep. Bacon**

Are there any additional questions for this panel? Okay, seeing none, we will excuse you. Thank you all so much for testifying today. We do have additional witnesses who signed up to testify remotely. Do we see anyone online? No one online? Okay, I'll call the names just in case. I'm sorry. Okay, so I have Jared Scurlock, Jenny Trujillo, Ariana Busby. Come on up. Alison Connaughty, MJ Coleman Jackson, online? Okay, great. Who's online? Okay. Okay, we will start with our witnesses here in front of us. Who would like to start? Okay, thank you. You have three minutes.

**Alison Connaughty**

Thank you members of the committee. Thank you so much for the opportunity to be to provide testimony to you all today. I'm Allison Connaughty. I'm here in my capacity as the Vice President of the Colorado Women's Bar Association, and with me is Arianna Busby, who is the Co-Chair of the Public Policy Committee with the CWBA. We are an organization of over 1500 attorneys and legal professionals with chapters across the state, and our mission is to promote women in the legal profession and the interests of women generally. And our members include judges, law clerks, members of the Judicial Branch, staff within the Colorado Judicial Branch, and even a few legislators. Each year, the

- 10 -

CWBA actively engages with the General Assembly and advocates for legislation that will further the interests of our organization. This summer, we had the privilege of working with Representative Weissman, Representative Bacon and Representative Lynch. Over the course of the judicial discipline interim committee. We submitted research and presented recommendations that were ultimately condensed into the three bills that you all will be hearing today. And we want to extend our gratitude to the Interim Committee for allowing us to be a part of that process and for their work on this difficult issue and their receptiveness to our recommendations. HCR 23-1001 is an important step in modernizing our judicial discipline processes. First, this constitutional amendment would establish an independent adjudicatory board for formal disciplinary hearings or to appeal from informal disciplinary actions of the Commission. This is important because it separates the investigative and the adjudicatory functions of the judicial discipline process, and this is consistent with the majority of other states and also with the recommendations of the Institute for the Advancement of the American Legal System. Additionally, a panel of appellate judges is established to hear recommendations from the adjudicatory board of appeals if they involve a Supreme Court justice as a party or witness. This is also consistent with other states' systems, and removes any actual or appearance of conflicts that exist under the current system where the Supreme Court is the last stop. This constitutional amendment also makes crucial changes for transparency and communication. This amendment brings Colorado in line with the majority of other states to make judicial discipline complaint information public when formal charges are commenced. Current law keeps this confidential until the conclusion of the case. There's also language that specifies that a victim or complainant in a case can be kept updated on the case while it is in the confidential investigative stage. We've also received the proposed amendment related to HCR 1001 to unify the rulemaking process, expand the pool for replacement judges and provide parity and appellate opportunities. And we support these amendments. Thank you.

**Rep. Bacon**

Thank you. Go ahead.

**Ariana Busby**

I would just reiterate our gratitude to the sponsors, to the Interim Committee, and this committee here today. We're available if you have any questions.

**Rep. Bacon**

Great. Thank you. I'm going to next go to our witness online. Ms. Coleman Jackson. You have three minutes to share your testimony.

**MJ Coleman Jackson**

Hello. Good afternoon, Chair and members of the committee. Thank you for the opportunity to speak with you today as yet another independent citizen just out here doing her thing, trying to make things right for the future. A couple of things about this bill. I'm a I'm a 75% yes, not necessarily 100% yes, only because of the Commission on Judicial Discipline. So, things are heavily involved. I personally had

- 11 -

issues with them before where I have submitted complaints on a judge and they simply denied it without even pulling an audio file or even speaking to another one of the court staffs or anything like that. So that's number one for me. That's a huge chunk. However, the 75% yes comes from this independent board that would be appointed. You know, we are held accountable behind our vehicles every day when we get behind that car. You know, every so often we got to go back up there. We got to get our license renewed, things like that. You know, we get a ticket. It goes on our public record. I feel like you know, as a judge, someone that's driving the wheels of the law should be held to those same standards. Where, if something has happened, a questionable situation has occurred, not only should the public be aware of it, but it should be readily available knowledge. You know, I can't count the amount of people and calls that I got during this last election season, when people were going through the judges that were on that list, because a lot of people are like, I don't vote before judges. I don't get in trouble. So, but they also don't know who to vote for. And, so, when they go online to read the information or get the information necessary, it's not readily made available to them, and all it says is, yes, this judge has been disciplined before, or no, the judge has not. And yes, you can go through and submit the surveys but are the surveys falling on deaf ears? Because the surveys are going right to the same commission that's supposed to be listening to people that isn't even conducting proper investigation. You know, one of the biggest things for me on this bill, though, is the transparency. No, it's not everything that I'd love to see, but it is a huge step in that transparency, so that the voters of Colorado can continue to have an educated, well-rounded opinion of the elected officials that they are choosing to put in these chairs, in these seats that are driving the law. You know, we've already seen how the Supreme Court of United States has already put the integrity of being a judge in question, and this bill will help restore that integrity for the judges that we elect here in Colorado. So, for that, I will urge a strong Yes, and I'm here if you have any questions, thank you.

**Rep. Bacon**

Thank you, members. Do we have any questions for this panel? Representative Snyder.

**Rep. Snyder**

Thank you, Madam Vice Chair, thank you both, all three of you, for being here today. Ms. Connaughty, I had a question. Maybe I misheard you, but seemed like you indicated that all three of the bills were hearing today were referred out of the Interim Committee, and maybe I misheard you.

**Rep. Bacon**

Ms. Connaughty.

**Alison Connaughty**

Thank you. Representative Bacon. Thank you, Representative Snyder. I misspoke. My apologies. Two of the three.

**Rep. Snyder**

Okay. Thank you.

**Alison Connaughty**

Thank you.

**Rep. Bacon**

Thank you. Members, are there additional questions? Representative Epps.

**Rep. Epps**

I had a similar question for the representatives of the Women's Bar. Do you think that this first bill, goes far enough, and if not, where would be the priority places that you would want to see expansion?

**Rep. Bacon**

Ms. Connaughty.

**Alison Connaughty**

Thank you very much, Representative Bacon. That is an excellent question. We submitted several examples from other states in our draft comments to the interim committee. The states that we pointed out are. . . We're on a spectrum of removing the confidentiality provisions. And if you could just give me just a moment to refer to the states that we modeled. Perfect. Okay, yeah, we provided examples from. . . So, Colorado was in a group of 13 states in their confidentiality protections that they afforded prior to this interim committee and the proposed amendments to the constitutional provisions. And this would bring Colorado in line with the majority of other states. With the 23 other states that we surveyed. We liked the language from, I'm not finding my notes, but Massachusetts, New York, California. And this is not exactly modeled after those states, but it's close enough. And we think, let's not let perfect be the enemy of the good.

**Rep. Bacon**

Representative Epps.

**Rep. Epps**

I'm not going to press you too much further, because I'm going to let y'all be the excellent lawyers that you are. But I went to a big, fancy, overpriced law school, and I know when it was time to apply for clerkships, we were sat down and told which judges to not apply for because we might get picked. And, I mean, there were very blunt conversations about that. And, so, I'm really just leaning here on both, not just us in Colorado but in relation to other states, right? Because we should always want to be first in the good rankings of things. So not just where we are in relation to those but just wondering if, if you think that what we're doing with this resolution goes far enough.

**Rep. Bacon**

Ms. Busby.

**Ariana Busby**

So yes, I think there's always room to do better. I think that we with this resolution, we find ourselves in a much, much better place than what we have been. It is much needed modernization to our Constitution, particularly as it relates to confidentiality. It's really about a balance of weighing, your victim centric approach and also public transparency. And, so, I think that this strikes a nice balance. I would also note, I represent healthcare providers. I spent a lot of time working in the Department of Regulatory Agencies, and it's really similar to something like this. For those types of complaints, they're confidential until there's a disciplinary action decided or a notice of charges is filed. So, formal disciplinary proceedings are pursued. And, so, for me, when I when I saw this. It brings it in line with so many other professions. It seems like a very, very nice next step for us

**Rep. Bacon**

Ms. Connaughty.

**Alison Connaughty**

May I add one, one other thought that I had while Ms. Busby was speaking. Thank you, Representative Bacon. One other consideration that we were balancing when we were making our suggestions to the interim committee was not going so far that these amendments could become a vehicle that would harm judges and that would have a disproportionate impact on judges who could be targeted by reports as well. So, we were thinking . . .

**Ariana Busby**

Female judges.

**Alison Connaughty**

Yes, female judges, judges of color, judges that could be targeted by complaints, and so we thought this was a middle ground that addressed some of the issues that we're trying to address.

**Rep. Epps**

That additional context was really very helpful. Thank you both.

**Ariana Busby**

Thank you.

**Rep. Bacon**

Members. Are there additional questions for this panel? Wonderful. Thank you all for testifying today. We'll see you back soon. Thank you online as well to Ms. Coleman Jackson. Are there any additional

- 14 -

witnesses that weren't able to sign up? Okay. Please come forward to the table, and then here at the table, while I do know your names, please share your names and any additional info. We'll also be sure to actually circle back around to get you all signed up. Okay, who would like to begin you have three minutes. Thank you. Please go ahead.

**Elizabeth Espinosa Krupa**
Thank you, Madam Vice Chair.

**Rep. Bacon**
One second, I think the microphone is off, so right in front of you that little box, there we go. Thank you. Go ahead.

**Elizabeth Espinosa Krupa**
Mr. Chair. Madam Vice Chair, members of the committee. My name is Elizabeth Espinosa Krupa. I am the chair of the Commission on Judicial Discipline. With me today is Vice Chair, his Honorable District Court Judge David Prince from El Paso County. We're honored to be invited to speak to the committee on the bills. I will provide brief testimony, and we've prepared a longer letter that we would appreciate being included in the record. As you know, the Commission on Judicial Discipline is responsible for investigating and making recommendations for discipline of judges. We're part of the system of judicial selection, evaluation, and discipline that was established in the 1960s. Our Commission is made up of four judges, two attorneys, and four citizen members that all serve voluntarily. I think it's fair to say that the Commission operated in relative obscurity for decades, until very recently. I also think it's fair to say that most of us on the Commission had no idea what we'd be dealing with in recent years, including significant systemic and procedural reforms, legislative testimony, state budgets, and SMART hearings. These are all new experiences for the Commission, and we appreciate the support of this committee, the entire legislature, as we work through these critical issues and changes. We also are grateful to the JBC staff and the staff of this committee for their guidance and support. We also appreciate the Legislature through statute and practice supporting the frank and full exchange of views and perspectives free from reprisal. As you're undoubtedly aware, our testimony at the joint SMART committee elicited a response that we believe to potentially punish honest testimony. A move that we and others strongly reject. Events of the past several months have made it clear that Colorado's half century old system for independent oversight of judicial ethics was falling short of fulfilling its purpose and needed to be updated. Last year, the legislature enacted some important changes, and the interim committee, over the summer, with significant involvement from a myriad of stakeholders proposed some additional reforms that are before you today. The Commission on Judicial Discipline fully supports the proposed legislation, the resolution, and recommendations that have been presented by the interim committee. We believe that some narrowly focused refinements to the legislation as currently drafted are appropriate. It would make the reforms even stronger. The Commission supports, we haven't seen all of the amendments, but we do support simplifying the dual path, the dual authority making structure to a single rule making committee whose members are representative of the major system stakeholders. Expanding

- 15 -

the pool from which the Special Court is drawn to provide a statewide as well as rural court perspective, which can be done by implementing the pool to include District Court judges. To clarify that both parties to a judicial misconduct case, both complainant and judge have the right to appeal, not just respondent judges. And to repeal the Constitutionally suspect section 402 that established criminal penalties for breaching confidentiality. And to amend CRS 13-5.3-105(3) to clarify that once requested by the Commission, records held by an oversight agency related to a claim of judicial misconduct are to be provided. The Commission strongly supports the interim committee recommendation that a judicial misconduct ombuds office be established to provide complainants a safe place for reporting judicial misconduct. We emphasize the need for the judicial misconduct ombuds to be fully independent. As I mentioned, we have presented more of a detailed discussion in our letter. The Colorado system for selecting, evaluating, and, where necessary, disciplining judges is absolutely critical to ensuring public confidence in our judicial system.

**Rep. Bacon**
Sorry, I'm going to ask you to wrap up shortly.

**Elizabeth Espinosa Krupa**
Thank you again to the members of the committee for your service and your support in this process. Judge Prince, and I are happy to answer any questions that you have.

**Rep. Bacon**
Thank you so much. Who would like to go next? Judge Prince, thank you.

**David Prince**
Thank you, Madam Chair, or temporary Chair, I'm not sure how to refer to you. My name is David Prince. I am Vice Chair on the Commission, and I serve on the District Court bench. I'm one of the judge members of the Commission, and I'm here to help answer questions. So that's all I had to say.

**Rep. Bacon**
Please share your testimony.

**Jessica Yates**
Hi, my name is Jessica Yates. I'm Attorney Regulation Counsel. I did sign up, but apparently I didn't quite make the cut. So, sorry that I didn't get on that list. I really just wanted to introduce myself to you. I don't really show up at these hearings, because the way our office is structured, we're an independent office within the Judicial Branch. Mr. Scanlon, you heard from him today. You've heard from other individuals from SCAO. We're not within SCAO, so I wanted to make sure that you knew who I was and that I'm available. If you have questions or concerns, please let me know. We are not a black box. There's a lot that we do that is confidential, but there's a lot of information that I can share about the way we operate, sometimes even about specific cases. If it has come to a public stage or some public

- 16 -

information that I can provide. We have an annual report online that describes what we do. I also wanted to let you know that we are not providing any services at this time to the Commission on Judicial Discipline relating to investigations or any of their legal work. And, so, I have just a completely neutral position on the legislation that is being discussed today. We do have some administrative services that we continue to provide, and we also are providing at this point some office space. So, at some time in the future when resource discussions come up, that is relevant to the stuff that we do. Again, I just wanted to make sure that you knew who I was, that I am independent from the Judicial Department. I operate independently from the Supreme Court. Sometimes when there are questions about records. Are we getting records? I'm the custodian of records for our Office, and so those questions need to be directed to me. I've tried to encourage the Commission to direct those questions to me. Thank you so much for allowing me to testify today.

**Rep. Bacon**

Thank you so much. Members. Are there any questions for this panel? Okay, seeing none. Thank you for testifying here today. Like I said. I'm sure we'll see you a little bit later, as well. Thank you so much. I will ask again, if there's anyone in the room who was unable to sign up to testify, who would like to. Is there anyone additionally online? Nope, okay. Thank you for coming in today and before or as you get started, can you just share your name? You have three minutes to testify. Let's just be sure the microphone is on before you start. It will help you out. There you go. Okay. All right, go ahead.

**Megan Augustine**

Thank you. Hello, members of the committee. My name is Megan Augustine, and I was born and raised in Colorado. Today I encourage you to vote no on HCR 23-1001, HB 23-1019, and HB 23-1205. The Adams County Courthouse needs to rename their name to the Adams County Injustice Center. When I was 20 years old in 2004 I met a guy named Damian Gallegos, and he lied about his age and having kids. Then I found out that he had four kids, and one of his daughters is deceased. Damian's daughter, Amanda Gallegos, was killed in 2001 and one of her sisters almost shared the same fate. Amanda's case is still open and unresolved. I know in my heart that Amanda's dad killed her and hasn't seen a day in jail. So just know this, that the Adams County Courthouse is quicker to sentence people to jail for traffic violations and let some people who sexually abuse their children walk freely. I took one of my traffic cases to trial at the Adams County Courthouse, and when I subpoenaed the detective in on my case that was working on Amanda's case, I was ignored. I was trying to explain why I was doing what I was doing. We got two Senate bills passed that go after institutions that cover up child sexual abuse. Thank you.

**Rep. Bacon**

Thank you for coming in today. I'll ask quickly members, are there any questions for our witness? Representative Marshall.

- 17 -

**Rep. Marshall**

I understand your stories, but I'm a little confused then why you would be against all three of the bills we're looking at today and the resolution.

**Megan Augustine**

I just want them just like, look into like the courthouse is what the judge is doing. Because, like, there's a lot of like, the judges ignore, like, some of the stuff that comes up in front of them, and just they shouldn't ignore it like they we should be heard in the courthouse.

**Rep. Bacon**

Do we have any? Is that good for now? Okay, are there any additional questions for the witness? Okay, thank you very much for coming in today. Your testimony is noted here and put on our record. Thank you. All right, I'll ask again, are there any additional witnesses, any online? Great. Okay, members, we're going to now close the witness phase and move into the amendment phase. We'll invite the sponsors back up to the table.

**Rep. Bacon**

Okay, Mr. Chair.

**Rep. Weissman**

Thank you, Madam Chair. Hopefully everyone already has L.001 via Mr. Pogue a little bit ago. If everyone has it, I move L.001 and I ask for a second, and then I'm happy to walk through it.

**Rep. Bacon**

I'm gonna go with the sponsor, as it is tradition. Okay, all right, L.001 has been moved by Representative Weissman and seconded by Representative Lynch. To the amendment, please.

**Rep. Weissman**

All right, so members, I'll go through this in a bit of detail. I guess, moving down from the top, beginning of page 6 of this is a small thing that just tries to create a little bit more parity, or bilaterality, if that's a word in how an appeal might go from up to the court or the replacement court, the next number of lines really from line 3 to line 8 of the amendment are to make some changes to broaden the pool of the replacement court. If you want to call it that again. The process here is, you go to the Commission, there may then be a hearing before a panel of the Adjudicative Board. There is a right of appeal, as we are used to in an adversarial process. In most cases, to the Supreme Court on a now more limited standard of review that you can read on page 6.

In cases that are set forth in pages 7 to 8, we need the Supreme Court to not sit as the final reviewing authority. We have this kind of replacement court. The question then is, how is that constituted? The judgment of this part of the amendment is that we should broaden that a little bit. There should be a little

- 18 -

bit more diversity of perspective, including geographic diversity. I mean what is justice might mean a different thing in, say, Montezuma County versus Denver County versus elsewhere in the Front Range area. One thing I would note is that district judges do, it may depend on their docket, are not entirely without appellate experience. You know, you might take an appeal from County Court. Honestly, this conflict court, I hope, is invoked maybe once a decade. You know, if we really think about how well this goes, but it does matter how it is constituted, when it is invoked. And we think it's appropriate to broaden it a little bit.

The rest of the amendment down, at least down to line 22 is, I really think, the most important part, which is to unify how rulemaking goes. Right now we think of the Rules of Criminal Procedure, the Rules of Evidence, the Rules of Civil Procedure, other rules. The Supreme Court is the ultimate authority for those they pull together these committees, various folks from the legal community advise, the rules are promulgated by authority of the Supreme Court, backing up on the Constitution, itself. Here, we have a process that is possibly a little bit adversarial with members of the Judiciary. So, the judgment of the interim committee, which we now seek to polish a little bit, is that there should be different rulemaking processes. Where we landed in the interim was really two separate lanes. We have one lane for Commission rules, one lane for Adjudicative Board rules. They really need to fit together. By rough analogy, imagine if you had one group setting forth the Rules of Criminal Procedure, one group setting forth the Rules of Evidence. There needs to be some cognizance of the other half there. So, what we do here is propose an integrated rulemaking body that has appointments by the Commission and by the Board and by the Supreme Court, itself. I want to be clear, we don't mean, and I don't, personally don't think it should be the case that five people from the Commission are going to become the Commission appointees onto the rulemaking committee. They get five picks, and maybe they mean judges. Maybe they mean retired judges. Maybe they mean a professor of law at one of our law schools. Maybe they mean somebody at a place like the National Center for State Courts. Maybe they mean a very long-standing attorney on 17th Street. They get to make those picks, but this rulemaking committee will then be responsible for the rules for both the Commission and the Adjudicative Board, so that they fit together. Lines 20, I'm sorry, 19 through 22 are really conforming.

The last part is just something that arose in post introduction or really post interim discussion. It's just to provide a date certain for the application of rules that are set up about the Adjudicative Board. Again, the Adjudicative Board doesn't exist right now. We are hoping the voters will allow it to come into being. The reason we pick April 1, 2025, if the voters approve this, we hope they do. The governor issues a proclamation that sort of makes it official. That's about December of 24 then there's a couple of months for the Board to convene and start this process. And for the sake of certainty, for everybody involved down the road, it makes sense for there to be a specific date for those rules. So, that's the last part of L.001. I'm happy to take questions and ask for the committee's support.

**Rep. Bacon**

Members, are there any questions on L.001? Are there any objections to L.001? Okay, L.001 is passed. Sponsors, do you have additional amendments? Members, do you have additional amendments? Okay, we will close the amendment phase. Onto our closing statements from sponsors. Representative, I'm sorry, Mr. Minority Leader.

**Rep. Lynch**

Thank you, Madam Chair, once again, it's hard to wrap up what went on over a whole lot of work here that went into this. This is good. This is good work. One amendment, which will be refreshing after you get through the rest of this day. But this is good. This is this is good work. I would strongly encourage a yes vote. Thank you.

**Rep. Bacon**

Mr. Chair.

**Rep. Weissman**

I was going to sound a similar note, and I think that's because we had a very similar experience over the Summer. The process of going through this was probably the most intensive process that I've had in preparing legislation. And when we're talking about something this fundamental, that is constitutional in nature. You know, it probably should have been. I appreciate those who've come here today. The brief testimony. Just take our word for it that there was a whole lot more over many, many, many months. But we're grateful for folks who were here today and who were very, very involved in the interim, as well. We speak sometimes of the three-legged stool of how public confidence in our judiciary is sustained. I am personally glad that we do not elect judges in this state. I would not want to live in a state where civil and criminal justice are on the other end of electoral processes. Instead, we have the judicial nominating process, and we have the judicial performance process, and then we have the judicial discipline process. Again, experience has shown that that third, last leg needs some updating, needs some strengthening. In the nearly 60 years that have passed since we first put this language on the books and since a lot of other states did. You know we weren't acting uniquely at that time. I think when the chips are really down around here, I think about how our power and authority as elected officials, however much of that we think that we have, ultimately flows from the public's trust and confidence in us. Okay, and approximately maybe it flows from Article V of the Constitution and from the election certificates that the Secretary of State issues. But really, at the end of the day, it is about public trust and confidence in who we are and what we do. That is what this work is about, is shoring up public trust and confidence in our Judicial Branch of government by having a more modern, robust process for resolving these allegations if they arise. I think this is one of the more important things this committee will do all year, and we're asking for your support.

**Rep. Bacon**
Thank you. Members, do we have any closing comments? Okay, great job. Members, the motion is to send the resolution to appropriations. Can we entertain a motion? Mr. Minority Leader.

**Rep. Lynch**
Thank you, Madam Chair, I would like to move House Concurrent Resolution 23-1001, as amended to appropriations.

**Rep. Bacon**
Thank you.

**Rep. Weissman**
Second.

**Rep. Bacon**
Okay, it has been moved by Representative Lynch, seconded by Representative Weissman. Mr. Pogue.

**Staff Pogue**
Representatives, Armagost.

**Rep. Armagost**
Yes.

**Staff Pogue**
Daughtery.

**Rep. Daugherty**
Yes.

**Staff Pogue**
Epps.

**Rep. Epps**
Yes.

**Staff Pogue**
Evans.

**Rep. Evans**
Yes.

**Staff Pogue**

Garcia.

**Rep Garcia**

Yes.

**Staff Pogue**

Lynch

**Rep. Lynch**

Yes.

**Staff Pogue**

Marshall

**Rep. Marshall**

Yes.

**Staff Pogue**

Sharbini.

**Rep. Sharbini**

Yes.

**Staff Pogue**

Snyder.

**Rep. Snyder**

Yes.

**Staff Pogue**

Soper.

**Rep. Soper**

Yes.

**Staff Pogue**

Woodrow.

**Rep. Woodrow**

Yes.

**Staff Pogue**

Weissman.

**Rep. Weissman**

Yes.

**Staff Pogue**

Madam Chair.

**Rep. Bacon**

Yes.

**Rep. Bacon**

The resolution passes, 10 to 0. Sorry, was it 10?

**Staff Pogue**

Thirteen.

**Rep. Bacon**

I was way off. Sorry, 13 to 0. So I'm like, wait a minute, 123. All right, thank you so much. Sponsors, I do believe you have the next one. Let us know if you need a minute or two. Okay, we're getting your amendments passed out. Okay, Mr. Chair, you want to get us started?

**Rep. Weissman**

Yes, thank you. All right, committee Act Two of the three act, I would say play, but that understates the seriousness of what we're dealing with here today. Anyway, second of our three items on the agenda, House Bill 1019, is the companion statutory enactment that rides along with the concurrent resolution that we just discussed. It became pretty clear to us early in the work of the interim committee that we would be grappling with issues that needed to be dealt with in the Constitution. And that was the CR just now and, then, issues that could be and were more appropriately dealt with as a statutory matter. 1019, is, I think, the easier of the two of these things to grapple with, just to walk through it briefly. And I should say, by way of a note, we are in 13, sorry, Title 13, Article 5.3, here. That's the whole framework that was laid down by the bill. I started out by talking about. Senate Bill 201 of the 2022 Session codified the Commission and the Office, set up how it operated, talked about funding, provided some things about flow of information. So, we are in that place, amending it and adding some new things now.

- 23 -

Section 1, we simply set forth some definitions. Again, there hasn't been, to this point, a judicial discipline adjudicative board or panels of it, so we need to say what that means.

Section 2 is really kind of conforming or enabling, maybe is better language, about the rulemaking process that we spoke of. And one of the amendments you'll see relates to that.

Section 3 makes some enhancements to the surfacing of data about these processes in connection with SMART Act hearings. This sort of fits together with the provision of Article VI Sec. 23(3)(g) about confidentiality that we spoke of. We'll protect confidentiality at the individual level up to the point of formal proceedings, but we have provision for aggregate data to be made public.

Section 4 just repeals the Interim Committee now that it has wrapped up its work.

Section 5 is just to provide a little bit more of a clear directive about online reporting as a way in which what's called an RFE, or request for evaluation. We might think of that as a complaint, but the proper term in the process and the rules is an RFE. To make clear that, you know, it's 2023. We want that to be able to happen online.

Section 6 sets forth VRA-like responsibilities. These are duties for a complainant or one who files an RFE to be informed what's going on. You know, this is core stuff that we grapple with in the criminal justice process here. The lack of it was really made manifest to us over the Summer, so we've grappled with that and that's what we set forth here.

Finally, Section 7 is really sort of logistical support. When a panel of the Adjudicative Board is convened to do what it may be called to do, there's the question, Who or what is going to support its work? We talked about this a fair bit over the Summer. Where we landed was the idea that any judge has a fair bit of staff support to do what they do in our court system. Where a judge who is part of the adjudicative board and has been tapped for a panel. Where that judge is tapped for this duty, he or she has some support that could be invoked for that purpose. It's probably not going to be such a big lift as to get too much in the way of the rest of the judge's docket and duties. So that's Section 7, and then our standard petition clause, Madam Chair, if you'd like, we could get a little bit into the amendments, or we could save that.

**Rep. Bacon**
You can give us an overview.

**Rep. Weissman**
Okay, so the committee should have L.001 and L.002. L.001 really does one thing and the rest is technical. This was grappled with a lot over the Summer. We didn't land in a specific place. Further thought, I think has just kind of clarified that. What you see here, what struck through 24-72-401 and

- 24 -

402 is existing statutory language we have creating misdemeanor penalties if you basically talk about what's been going on in the Commission. This language is decades old. Two problems with it, very fundamental problems. One, there is a chilling effect on complainants. One of the first meetings that I personally took over the summer when the interim committee was getting going, was with a young woman who was a survivor of something that happened in this process. And at some point, when she was being talked to about how all that was going was, was hit with this prospect of criminal sanction. This is somebody who was going through law school, you know, in her younger 20s. That's a lot to get hit with. We don't want that kind of chilling effect on people going through these experiences, which are already hard enough. The other fundamental problem is that these sections are very likely unconstitutional. In 2022, I think August. There was a case handed down by the 10th Circuit, *Peck v. McCann* that dealt with pretty similar provisions. We have somewhere in our child welfare reporting code language that creates a misdemeanor penalty for divulging certain information. That was challenged on First Amendment grounds. You cannot criminalize with misdemeanor sanction what amounts to speech. And the 10th Circuit struck that down. On that authority, which I think is very, very close to what's going on here, I am, personally of the opinion that if these sections were squarely challenged, they would not stand up. That's the second reason. From line 30 to 36, that's really just a conforming amendment that LLS supplied. And, then, the very bottom lines were kind of just writing in the correct number for the resolution. This is one of these things that gets introduced. It's not numbered. We have to fill that in. So that's L.001. L.002 is really just to conform with the changes we made to the rulemaking process in the statute, 13-5.3-107, it's the part of that framework that talks about how the rules go. We laid down certain things in the bill last year. The committee proposes the changes that are in the introduced. To make this match what we just did in the CR, we need to do the changes that are in L.002. So, those are the amendments. Madam Chair.

**Rep. Bacon**

Thank you. Members, are there any questions for the sponsors? Okay, we don't see any questions, so we'll move into the witness phase. Okay. All right, so I think we have, we can have a few panels. So, for the first witnesses, we will call up Mr. Chris Forsyth, Terry Scanlon, Jessica Yates, Jenny Dees, and MJ Coleman Jackson. We also have Elizabeth Newman present for questions only. So, if we have any questions of CCASA, we'll include it in this panel. Okay, again, so Mr. Forsyth, Mr. Scanlon, Ms. Coleman Jackson, Ms. Yates, Ms. Jenny Dees, and questions only. Is Ms. Yates still present? She's not. Okay, all right. Everyone again, welcome back. You'll have three minutes. I will start with Mr. Forsyth. Are you ready to proceed? Would you like me to . . .

**Chris Forsyth**

Not at this . .  I'm looking at, I was not provided a copy of the amendments.

**Rep. Bacon**

Okay.

**Chris Forsyth**

And its important to what I want to say.

**Rep. Bacon**

Sure. I'll go to other witnesses. Is that okay? All right, Mr. Scanlon, are you ready to proceed?

**Terry Scanlon**

I am indeed.

**Rep. Bacon**

Okay. Thank you. Go ahead,

**Terry Scanlon**

Madam Chair, members of the committee again. I'm Terry Scanlon. I'm here on behalf of Colorado Courts. Everything that I said on the first bill applies to this one. It was a really productive process at the Interim Committee. We had the opportunity to engage on this. This supports the constitutional amendment. We support the introduced version of this bill. We received the amendments yesterday. We're reviewing them. We'll provide feedback to the bill sponsors and the committee here in the coming days.

**Rep. Bacon**

Thank you. I will go next to Ms. Copeland. I'm sorry. Ms. Coleman Jackson, are you ready to testify?

**MJ Coleman Jackson**

I can be ready.

**Rep. Bacon**

Thank you so much. It would be helpful.

**MJ Coleman Jackson**

Not a problem, alrighty. Well again, good afternoon, Chair, members of the committee. I'm Ms Coleman Jackson, just another independent citizen here, native to Colorado. A couple of things about 23-1019, that I support are number one is getting the people involved. The public commentary to the Supreme Court is huge for me, because this will actually make people feel like they actually do have a voice. Because right now, I'm sure that most of the people that are present here, that can hear me and see me, know that, you know, there's a declining involvement in the political and judiciary system. So, people being able to go in there and voice their opinions or voice similar things would also be helpful in getting these things out, because a lot of these things, they do go unnoticed, and they do go unrecorded because people do not know their rights. Which brings me to my second point, which is the informative piece, and having the Commission on Judicial Discipline, inform people on that process, and have that

- 26 -

engagement with them so that they, it won't feel so one sided. They won't feel like, you know, this person's just going to run back and tell this judge on me. Which brings me to my third point, being able to submit anonymously and privately. You know, if you have got an open case going with a judge, and this judge has maybe made an inappropriate comment, as I've seen, personally to other defendants in the courtroom, or towards staff, anything that might be inappropriate. You know, a lot of the time counsel will tell you not to. Roscoe. Sorry, my dog thinks its play time. A lot of judiciary staff or lawyers and counsel will tell you to wait until your case is closed before you pursue any of that to avoid retaliation. Now, for a person that sits, that's an elected person that sits on their feet, that's expected to be fair and impartial. I should not be afraid to report them for something that I deem is inappropriate to have them sit under investigation, because the same thing would happen to me in my place of employment, or if I committed a crime in the city. Also, I do have to say, and the final thing is being able to finally submit a complaint in my own words. You know, I've submitted complaints twice to this Office. And no disrespect to the sweet lady that answers the phone. She is socially, very helpful, but she sounds like she has been there since the Commission was started 60 years ago. And you know. So, I'm wondering if you know just, you know, just me being able to only orally submit that over the phone, if the true emotion of what I'm feeling and how I feel is being portrayed effectively. So being able to email or send that even by mail, I think, is extremely helpful. So, you know, for those four reasons, I urge a yes on House Bill, 23-1019, and I'll stick around for any questions. Thank you.

**Rep. Bacon**

Thank you so much. Thank you for helping us out, too. I really appreciate it. Okay, I'm gonna make one more call to see if Ms. Jenny Dees is online. Nope. Okay. Okay, Mr. Forsyth, are you ready to testify? Okay, go ahead. Thank you.

**Chris Forsyth**

My name is Chris Forsyth, an attorney who's practiced 30 years. I'm part of the Judicial Integrity Project. We urge a no vote on this measure. The adjudicative panels that are mentioned in the bill come from the previous matter we addressed, and the panels are an unnecessary bureaucracy that add more conflicts of interest in the judicial discipline process. Most states do not have this bifurcated system. Most states have one panel that adjudicates and disciplines. The rulemaking section in this bill is confusing. The rulemaking committee's rules can be accepted or rejected by the Supreme Court, but you wouldn't know that by reading the section. That's in the Constitution, the Supreme Court would continue to control the rules regarding judicial discipline, which is a conflict of interest the Supreme Court has continuously exploited. The reporting requirements in section three of the bill don't really do anything. All of this information is already provided in annual reports of the discipline commission. The section references requests for evaluation. The phrase was coined by the judicial discipline commission in an attempt to make it look like it doesn't dismiss as many complaints as it does. We thought the language was eliminated when the legislature adopted a definition of complaint, which became effective in May of 2022. The definition is stated in 13-5.3-101 which says complaint means any information in any form from any source that alleges or from which a reasonable inference can be drawn that a judge committed

- 27 -

misconduct or is incapacitated. The use of the phrase request for evaluation is inconsistent with that definition. Members of the public file complaints. The Commission decides whether to file a formal complaint, the RFE or request for evaluation language is not consistent with the law and is the Commission's disregard for the law. The searchable format is misleading. The only information that would be available in general numerical information is that already provided in the annual reports. Other states have searchable databases where discipline can be researched by typing in a judge's name. This section states that cannot be done. This section is a disingenuous attempt for the commission to claim it has a searchable database when the database is not searchable in the manner anyone would suspect. It would allow the Commission and the Judicial Branch to claim it has something that it really doesn't. And then the criminal section was my last portion of the bill. It is finally a relief to see an amendment. We've been asking for the amendment. I asked for amendments from representative Weissman. He would not accept them from me, which was the general tenor of the judicial Interim Commission. The Interim Commission was bipartisan in the membership of Republicans and Democrats. It was not bipartisan in the manner of what judges want. The Interim Committee listened to a ton of people. 85 to 90% was judges, groups that have judges, groups that want to appease judges. 85 to 90%. They would not listen to a contrary point of view. Combine that with the criminal penalty. He already admitted, the criminal penalty has a chilling event on people's voices. People won't speak up. Did not speak up during the Interim Committee because of the criminal penalty. People are scared, so your actions here today are dubious under a cloud of uncertainty, because this criminal penalty exists right now, right here, as we're all talking to you, people are afraid to talk to you because the criminal appeal exists regarding disclosing proceedings before the discipline commission. And see my times about up.  So, I would encourage a no vote. I would encourage on the floor you reconsider the resolution. Everything you're doing is about as valid as Vladimir Putin saying, let's put a war on Ukraine. Because he outlaws speech against the war in Russia.

**Rep. Bacon**
Thank you.

**Chris Forsyth**
It's the same thing, just a different matter.

**Rep. Bacon**
Thank you for sharing your testimony and your thoughts. Members, are there any questions for this panel? I would also note that we will have available, if we have questions for her, Ms. Newman from CCASA. If there are any questions? Okay, thank you. We'll call up our second panel of witnesses. I'd also like to note that I was on the Committee, and I certainly had intent to hear from anyone who presented to us. So, I will call up our second panel. First, we have the Honorable Judge David Prince, Dr. Malia Reddick, if you're in the room, Arianna Busby, Alison Connaughty, and I believe that's it. Do we have anyone else online? Okay, great. Thank you. So, if you are in the room, please come up to the

table. I'm sure we're all familiar at this point, it's been a long time since we've seen you. And I will get us started. I will start with Judge Prince. You have three minutes. Thank you.

**David Prince**

Good afternoon again, Madam Chair. Thank you for the opportunity to speak with the committee. Our chair, Ms. Krupa, actually already gave the overview on all three bills, and so I'm really here just to answer any questions. So, that was less than three minutes.

**Rep. Bacon**

That was well worth the wait. No, I'm kidding. Thank you so much. I'll move next to Dr. Reddick.

**Malia Reddick**

Madam Vice Chair Bacon, members of the committee, thank you for the opportunity to speak to you today. My name is Malia Reddick, and I'm the Director of Research at the Office of Respondent Parents' Counsel. Before joining the ORPC, I spent much of my career working for court improvement organizations to develop and implement recommendations for selecting, evaluating, and disciplining judges who are highly qualified and impartial and who inspire public trust in the Judiciary. I'm here to support this bill. In Federalist Number 78, Alexander Hamilton wrote that the judiciary has no influence over either the sword or the purse. What he meant was that courts and judges lack the authority to enforce their own decisions. For acceptance of and compliance with those decisions, they rely on the public's trust in their legitimacy and integrity. Colorado's judiciary has come under the microscope in the last few years, and I think it's fair to say that public faith in our state courts has been compromised. The bills this committee is considering today come at just the right time. Members of the public and especially individual litigants need to know that judges are held to the highest ethical standards, that the process for doing so is impartial, and that they can participate in the process in a way that feels safe to them. HB, 23-1019 addresses these needs. In particular, it brings significantly more transparency to the process for investigating complaints of judicial misconduct. This increased transparency will enhance the public's confidence in the impartiality and integrity of the process. It is for this reason that the ORPC urges the committee to vote yes on 1019. The ORPC also supports HCR 23-1001, especially the recent amendment that vests rulemaking authority for the judicial discipline process in a committee, rather than in the state Supreme Court. This brings Colorado in line with 22 other states, many of which are our Western neighbors. We would like to make one suggestion regarding the jurisdictional scope of the Commission on Judicial Discipline. From the ORPC's perspective, including magistrates in the Commission's jurisdiction would provide more consistency in enforcing judicial ethics rules. This is relevant to our organization, because magistrates often hear dependency and neglect cases. Thank you for your time today, members of the committee. I'm happy to answer any questions.

**Rep. Bacon**

Thank you so much. We'll move next to Ms. Busby.

- 29 -

**Ariana Busby**

Thank you, Madam Chair. Do you mind if I pass my testimony over to Alison midway through?

**Rep. Soper**

Please, go ahead.

**Ariana Busby**

Okay, thank you all. Wonderful to see you again. My name is Arianna Busby with the Women's Bar Association. I've got Alison Connaughty here with me as well. We support House Bill 23-1019. This is another bill that came out of the interim committee process and provide some key modernizations to our judicial discipline process, such as allowing an individual to file a complaint online and to proceed throughout the complaint process anonymously. Additionally, this bill brings us in line with states like New York, which do have online, searchable databases for information related to judicial misconduct. This also brings us in line with, as I mentioned, many other professions that we have in our state here. For example, the Department of Regulatory Agencies maintains a database of discipline, and you can look up actions on individuals' licenses if they are regulated by the Department of Regulatory Agencies. And so, we see this as a very positive step forward on that front.

**Rep. Bacon**

Thank you.

**Alison Connaughty**

One thing that we heard throughout the interim committee process was a lack of complainant understanding about the process and a lack of communication after a complaint was filed. And this bill would require the Commission to provide information about the process to a complainant upon receipt of a complaint, and then again, the anonymity and assigning a point person to any complainant for regular status updates on their case and to provide an explanation to a complainant if their case is dismissed due to lack of jurisdiction. This was important to the CWBA because of the profound impact that suffering judicial misconduct or sexual harassment in the workplace has on the individuals that report judicial misconduct. And it's our understanding that the sponsors will also be amending the bill today to remove that misdemeanor penalty for violating confidentiality. We support this amendment as well, and we believe that 23-1019 greatly improves access to the Commission and a potential complainant's comfort with utilizing the Commission and with reporting. It also improves transparency that hopefully will restore justice in the judicial system. And paired with the ombudsman proposed in HB 23-1205, we are thrilled as an organization to see a proposal that's so victim centered, while also being geared towards public access and transparency. Thank you to the sponsors into the committee. And we are available for questions.

- 30 -

**Rep. Bacon**

Thank you all for your testimony today and your availability for questions. Members, do we have any questions for this panel? Okay, I will see you again in five minutes. Sorry, family. Thank you so much for testifying today. Okay, is there anyone in the room who would like to testify that wasn't able to sign up? Is there anybody online? No one online. Okay, all right. Thank you everyone again for signing up as witnesses. We will close the witness phase. Okay. And so, thank you for sharing about your amendments earlier as we move into the amendment phase, who would like to move your amendments? Mr. Minority Leader.

**Rep. Lynch**

Thank you, Madam Chair, I'd like to move L.001 to House Bill, 1019.

**Rep. Weissman**

Second.

**Rep. Bacon**

I saw that look over your shoulder. L.001 has been moved by Representative Lynch and seconded by Representative Weissman. Is there anything else you'd like to share about the amendment? Mr. Chair.

**Rep. Weissman**

Not to repeat everything from earlier. This is important. You know, you just heard in witness testimony the chilling effect. I really wish I could more fully reproduce the nearly two-hour conversation I had with somebody who went through exactly this over the summer. But for confidentiality reasons, I cannot. It's important that we get that misdemeanor penalty out of there. So, thank you.

**Rep. Bacon**

Thank you. Members. Do you have any questions on L.001? Questions or comments on L.001? Representative Epps.

**Rep. Epps**

I had one comment related to the misdemeanor provision. I just wanted to raise and to have it on the record that not dismissing anyone's reflections on the chilling effect, but that there are others of us who just don't think it's appropriate to criminalize this specific sort of behavior, period. So, I'm glad that it's removed, but that's it.

**Rep. Bacon**

Any other questions or comments on L.001? Are there any objections to L.001? Seeing none, L.001 is adopted. Mr. Minority Leader.

**Rep. Lynch**

Thank you, Madam Chair. I'd like to move amendment L.002, to House Bill 1019.

**Rep. Weissman**

Second.

**Rep. Bacon**

L.002 is moved by Representative Lynch, I'm so sorry. And seconded by Representative Weissman. Sponsors, do you have anything you'd like to share on L.002? Mr. Chair.

**Rep. Weissman**

Again, just to summarize, this is essentially conforming with the change. To rules that we we made in the CR a few minutes ago, section 107, of the article we're talking about here is the article that wraps around the rulemaking. It just needs to stay in sync with what we've just done.

**Rep. Bacon**

Thank you, members. Are there any questions or comments on L.002? Is there any objection to L.002? Seeing none, L.002 is passed. Members, and actually, well, sponsors, do you have any additional amendments? Members, do we have any additional amendments? Okay, the amendment phase is closed. Sponsors, do you have any closing statements? Mr. Minority Leader.

**Rep. Lynch**

Thank you, Madam Chair. I feel it's my job as the non-lawyer in the room here to explain some of what we've heard. But basically this, assuming that the voters see favor to this, this is really the how it's going to get done. And I would just like to reiterate that the work that went into this caused words like panel to be discussed for quite some time, comments about adjudicative board, which got really beat up well and was very well pounded out. So once again, this, this did not come without a lot of work. And I think it's, once again, good work. And I would encourage a yes vote.

**Rep. Bacon**

Thank you, Mr. Chair.

**Rep. Weissman**

Thank you. You know, I can confirm there were probably some weeks where I spent 10 or 20 hours on the phone over the course of several days with Vice Chair Carver, but it was important to get us here. I also want to note there were a lot of other folks, and some of them are in the room today, who also spent a ton of time participating in these discussions. And you know, we're here. We're elected to do this work. Some of these other folks who have been involved also have full time jobs, and then they somehow carved out time to do this in addition. And I just want to say we appreciate that. We ask for your support of 1019.

- 32 -

**Rep. Bacon**

Thank you, sponsors. Members. Are there any closing comments? Okay, Mr. Pogue, oh, sorry. I will entertain a motion that this be sent to appropriations. Mr. Minority Leader.

**Rep. Lynch**

Thank you, Madam Chair, I'd like to move house. Bill 23-1019 to the Appropriations Committee with a favorable recommendation, as amended.

**Rep. Weissman**

Second.

**Rep. Bacon**

Okay, the Bill has been moved by Representative Lynch and seconded by Representative Weissman. Mr. Pogue.

**Staff Pogue**

Representatives. Armagost.

**Rep. Armagost**

Yes.

**Staff Pogue**

Daugherty.

**Rep. Daugherty**

Yes.

**Staff Pogue**

Epps.

**Rep. Epps**

Yes.

**Staff Pogue**

Evans.

**Rep. Evans**

Yes.

**Staff Pogue**

Garcia.

**Rep Garcia**

Yes.

**Staff Pogue**

Lynch.

**Rep. Lynch**

Yes.

**Staff Pogue**

Marshall.

**Rep. Marshall**

Yes.

**Staff Pogue**

Sharbini.

**Rep. Sharbini**

Yes.

**Staff Pogue**

Snyder.

**Rep. Snyder**

Yes.

**Staff Pogue**

Soper.

**Rep. Soper**

Yes.

**Staff Pogue**

Woodrow.

**Rep. Woodrow**

Yes.


**Staff Pogue**

Weissman.


**Rep. Weissman**

Yes.


**Staff Pogue**

Madam Chair.


**Rep. Bacon**

Yes.


**Rep. Bacon**

The bill passes unanimously. Not sure of that number. No, I'm kidding. All right, thank you so much. Okay, we will get set up for our next bill.


**Rep. Weissman**

All right, we will give Mr. Minority Leader Lynch and Madam Vice Chair a few minutes to get set up. We are coming up for the last part of the Rep. Lynch, Interim / 23 Regular Session hat trick.


**Rep. Weissman**

All right, we've been getting some amendments handed around in advance for when we come to that phase of House Bill 1205 that when they're ready to get going. And we will invite Madam Vice Chair and Mr. Minority Leader to begin their opening presentation for 1205 who'd like to start? Mr. Minority Leader Lynch, go ahead.


**Rep. Lynch**

Thank you, Mr. Chair. So, reflecting back on how these summer committees work for those that are new, this is what happens when you don't pay enough attention in the committee, and then as they're wrapping up, they volunteer somebody to take on yet another bill. All joking aside, this is a serious component, I think, to how you make really the rubber meet the road with the implementation of this. And really I don't know that this committee went into our meetings thinking that we are going to need something like this, but it became pretty evident pretty quickly when we started seeing the complaints and where needs were not met by folks that had complaints that we needed to come up with a real world solution for folks to be able to not feel threatened, not feel like they were going to have repercussions for simply asking a question, to be honest with you. Some of these folks may not have had a legitimate issue that could have turned into a legitimate issue simply because of the process they went through to

- 35 -

discover if they had an issue. I don't know if that makes sense. But that led to the discovery in my world of what an ombudsman is. And I thought it was maybe somebody that wore a funny cloak and a funny hat and went around with a staff or something. But I quickly figured out that that is not the case, and an ombudsman office was I think exactly what was appropriate for this scenario, and the intent behind this is that we have an impartial, really, to simplify it, a gatekeeper that will say, this complaint should potentially go to HR or this should be moved up the chain. The goal is not for this person to do anything beyond advise on a very confidential matter. So, if you were to approach this office and have a concern, it could be taken care of in that office one way or another, but you didn't leave that office with legal counsel right behind you, paperwork helping you out, but you knew the direction to go. And it truly felt as a safe place, as a place that you could go and not feel that you would be made to feel stupid for asking a question that may not have even been relevant to what's going on here, or that you were elevating an issue that needed further action. That sounds like a fairly simple thing to craft, but as we discovered, it was not. It was, once again, a lot of work to figure out what that looks like, how we can really create that impartiality. A lot of discussion, and we'll discuss this more in the amendments is, where do you put this? How do you have somebody that's impartial, that reports to that actual department, that their livelihood, their funding for that department, their paycheck, all comes from, from the department of which they're complaining. That is a tough, tough debate that we went through. We tried a bunch of different things. A bunch of different places that this office should potentially be housed, who should fund it, how it should go about doing its job of truly being the gatekeeper that will either say go this direction up to judicial discipline, or this is maybe an issue that you should take somewhere else. Once again, this took a lot of work. This happened. At the end of that committee is really when we really determined that this is a direction we should go. And so this bill is technically not one of the product from that committee, but I will tell you, its impetus comes from the conversations that were had during that committee, and the stakeholding that went on from there. And then it led to more conversation and work with my co-prime, who did an awesome job of filling in the blanks when I wasn't able to. And I really appreciate her helping this. This is a kind of a tricky deal. I mean, we, we just discussed changing the Constitution of the State of Colorado, because this issue is so important. And we want to make sure that that is taken seriously, and that we are providing the tools necessary for those very serious steps to be taken and made effective, and for us to move forward without having the sort of issues that we've seen from Judiciary moving forward. So, this is a great bill.

**Rep. Weissman**

All right, thank you. Madam Vice Chair.

**Rep. Bacon**

Thank you. And I would like to thank my co-prime sponsor. We love the word voluntold, but it was worth it. You know, having spent time in committee, one of the things that popped up was, how do we as the legislature now because the issue had been moved into our hands, really support our community and building back culture and trust within the Judicial Department. And, so, I want to share a few things

with you to build the context for why we have this office, but also a little bit more on what an ombuds does.

So, we are bringing this bill to address the culture of trust and safety within the Judicial Department. And I do want to start off by saying, the Legislature is a different branch of government than the Judiciary, and we're different from the Executive. However, we do want to be able to have these conversations in a way where we're not furthering the indictments, if you will, of Judiciary, but rather putting on the record what it is that we heard from our neighbors and community members and how we all have been able to norm on the notion that there is work to do, and that we're all committed to doing that work.

And for those of us who were around in 2021 you know, many of us heard then from our Supreme Court Justice Boatright a vow to reform the state's Judicial Branch in the wake of the allegations that had been brought forth by the Denver Post. And, so, some of those allegations were about judicial misconduct, but they were also about a culture, unfortunately, of sexism and harassment. And then there was also an issue in regards to a very highly paid contract that went out to a single person in a manner which was single provider, kind of procurement policies. And so around then, a couple of years ago, Judicial, you'll hear from them if they'd like to share, put out requests for proposals to have someone independent investigate the issue around the contract, as well as the issues in workplace culture. And, so, we also noted as well that then Chief Boatright's commitment is to really look into and determine if there is wrongdoing, to address it.

So, the independent investigation, there were a few. The independent investigation done by the Investigation Law Group, or ILG, this is what they were looking into. They were looking into allegations, 16 separate misconduct allegations, general allegations of hostile work environment for women, and an allegation related to the procurement of a contract for services awarded to the former Chief of Staff that was in total of $2.5 million or $532,000 a year. We also had a report done by the Troyer law firm, but they went on to describe why the investigation was important. And again, that is context. "The Department's mission is to provide a fair and impartial system of justice as such, its greatest asset is its credibility. The collective trust of the Colorado residents is premised on our belief that the courts and the Department as a whole are administered with fairness in the public good as their highest goals. Thus, while allegations of corruption, self-dealing, and cover up are problematic in any organ of government, they are particularly damaging when they arise from the Department." And, so, we lay that out to help us understand why it's important to not only investigate this, but to re-foster that sense of trust.

And, so, the Troyer Report did not expressly find that the Chief Justice was responsible for issuing a contract as a cover up. However, they also found in their conclusions. First, the internal culture of the State Court Administrator's Office was characterized by toxic relationships, factionalism, and a lack of accountability for key leaders. Second, the Department's procurement rules were overly permissive and

- 37 -

did not sufficiently deter procurement misconduct, including the unethical behavior demonstrated in the approval of that large contract. And, then, third, several Department leaders made critical errors in judgment or engaged in outright misconduct. So, we want to be sure, again, that we're addressing that.

So, what does an ombuds do? Well, if you didn't know, it is a Swedish word, and according to the International Ombuds Association, it literally means representative. So, an ombudsperson assists individuals or groups in the resolution of conflicts or concerns. They have four different types, and the type that we're going to propose today, it might be something that people are familiar with or not. We do believe there are particular guardrails, because we're talking about an additional branch of government. And to not go into the separation of powers, we did not direct this ombuds to direct judicial staff to do anything, and they do not necessarily have investigative powers, which means they could go into a space and demand information or files. But rather, as my co-prime said, the ombuds is in this space a representative and someone who can help anyone with questions or concerns navigate what they are experiencing. Whether it should be reported to the Commission, whether it should go to HR, or whether someone should file a lawsuit. And, so, we note that in this practice, again, if you have not heard about ombudspersons, according to the International Association, a reason to have one, amongst others, is to build and improve workplace culture. To provide informal and confidential space to identify and address issues. To support efforts to mitigate social injustices. To support those impacted by harassment. To prevent bias and harassment issues from escalating. And to uncover and address systemic issues to create healthier organizations.

And, so, what this bill does, is it creates an ombuds office that is externally managed. And, so, when we say external, while it will be also an independent office, it will be housed in the Judicial Department. However, it will be functionally independent in that they have their own budget line item and their own infrastructure. They will not also be managed by anyone in the Judicial Department, but instead, they'll be managed by a board of five. If you have not seen them elsewhere, there are independent offices. We talk a lot, for example, the Child Protection Ombuds Office is an independent office within the Secretary of State. The Commission is an independent office within the Judiciary. The ombudsperson also, again I'll repeat, is not directing staff to do anything, but much of the language in the bill is how they are to support those who come in with claims, not only helping represent them anonymously, if they'd like to, by being a stand in, but also to direct people to resources, to direct people to help and support and then, of course, to direct people who can help resolve their problem.

The scope of this ombuds office is not only between personnel who would like to report on judicial misconduct and therefore, ultimately be able to provide insight in cases to the Commission, but also on employee-to-employee issues. And this may be a point of difference between some of us. However, I read to you earlier why we're bringing this forward, if you all did not follow the reports, the issues around the large contract being issued to a single person, included people in the report and testifying, who said, as a clerk, as someone in the procurement office, or even as an attorney, we did not feel like we had anyone to talk to stop this contract from going out. And that includes, because HR was involved

- 38 -

in creating this contract. And, so, we're creating this space in which people can come externally to ask about or to raise any concerns and be supported through that. Again, what's important about this too is that the ombudsperson, as you read and as we have amendments for, is supposed to be led by the complainant.

But, more importantly, what they're also going to be able to do is report back to us through SMART, as well as the Commission, and the Judicial Department, what we call an aggregated data on what kind of complaints that they're getting. So that we can understand, have that curtain lifted up, what is going on as a matter of culture and culture change within the Department. What this bill will also do is be sure that those who come into the ombuds office are protected by way of their information and confidentiality.

And lastly, we are talking about this Department as being external, perhaps for a fixed amount of time so that the Judicial Department can strengthen their culture. By all accounts, there are many articles in organizational behavior. It takes, unfortunately, anywhere between two to five years to change a culture of an organization. One that can be trusted by the employees. And, so, while we do not think that this office should probably exist into perpetuity, we do know that they need time to train, as one of the recommendations from these reports did mention how judges are also managers, and they need to train and figure out how to be better administrators. So, while they are doing that, we are creating an external space that can provide on its face safety, that people can come to as that culture shifts within the Department. And, so, I'll stop there, because there's a lot more to talk about, but hopefully that provides a clear overview of why we're bringing this bill and how we have structured it to be able to meet those concerns.

**Rep. Weissman**
Thank you. Rep. Lynch.

**Rep. Lynch**
Thank you, Mr. Chair. And to follow on that excellent recount of where we came from. Here it is, it is truly the intent of this to be a tool to be utilized by judiciary than not, not a tool for any for us to beat them up with this. This really is intended for a tool that will be taken up to solve the problems that we've seen in the past. And we'll also discuss that a little more in amendments. But I just want to make that point really clear, that this is not the one branch overseeing the other. This is truly helping and aiding and providing as best we can within our lane, a tool that that we hope will be utilized by the Judiciary.

**Rep. Weissman**
All right, thank you. Committee, questions for our sponsors? Seeing none, all right, sponsors, we have about a dozen witnesses, one against, several amends, several for, one questions only. How would you like to proceed? Okay, looks like most folks are in person. I'll just go in order, perhaps. All right, Mr.

- 39 -

Forsyth, Mr. Prince, Ms. Krupa. And okay, we'll stop there, and then we'll do another panel. Thank you for sticking with us. Whoever would like to start. Mr. Forsyth.

**Chris Forsyth**

My name is Chris Forsyth, attorney, Judicial Integrity Project. We urge a no vote on this. When the Commission on Judicial Discipline is so bad that we need an ombudsman, then the better course of action is to change the Commission and make it more accessible, rather than to create more bureaucracy with an ombudsman. It's difficult to understand that if an ombudsman is necessary, why wouldn't everyone have access to the ombudsman, as opposed to just Judicial Branch employees, lawyers and other legal professionals rightfully fear retaliation from judges and would benefit from an ombudsman as much as judicial branch employees. Lawyers aren't employees of the Judicial Branch, but we are subject to oversight by the Judicial Branch. It's a similar relationship, and I have a hard time telling you that countless attorneys contact me and tell us we're doing what's right. They have told me they don't file discipline complaints anymore because they know they won't be prosecuted. They fear retaliation. They won't come speak up for reform. So, the ombudsman, if it's necessary, would help attorneys as much as employees. We do not doubt the sincerity behind this measure. It's not like the other two measures on today's docket. This measure at least admits that we have a problem in the process. The measure, however, is ill advised, because the appropriate action is to correct the discipline commission and the discipline process. If conflicts of interest are moved from the discipline process and there is more transparency, then the argument for the ombudsman evaporates. The judicial scandal involved Mindy Masias, who worked in Human Resources, it was just referenced, for the Judicial Branch. She basically played the role of an ombudsman in a very informal manner. According to the investigation, she was referred to as the fixer, because complaints against judges wouldn't make it past her. She apparently kept the information to herself. Indeed, it allegedly became the basis for her to attempt to extort $2.5 million under the guise of a contract. This proposal would be a codification of something that is already backfired. It's naive. Finally, I would like to say we've been at this for 11 years, moving for reform. The first thing on our agenda was making judicial discipline proceedings more transparent and removing the criminal penalty for those who speak out regarding reforms. So, this is not an unsuccessful day for us. We've achieved the primary two first objectives in the legislation that you're trying to move forward. The problem is we've realized that more needs to be done. Hopefully, when I'm back here 11 years from now, you'll be up to speed with where we are now, but I appreciate your time today. Thank you.

**Rep. Weissman**

Thank you, Mr. Forsyth, whoever would like to go next.

**Elizabeth Espinosa Krupa**

Thank you. As I indicated previously in my remarks, the Commission does support this bill. Two of the things that I think we have highlighted and discussed at most is one, that it truly be independent. And just for those reasons that we all uncovered over the Summer, and over the testimony, and hearing people that have been victims of conduct by judges, of that of that power dynamic. It's very different

- 40 -

than just your normal boss, when it's somebody wearing a robe and somebody with the power that they have and the lack of transparency that existed previously. So, our appreciation for that independent drive and initiative in this bill. The second is reporting. We came here, and how we got here was really the lack of the Commission being able to be independent, and the lack of reporting to the Commission, even though there was an agreement to do so. So, we do emphasize that reporting to the Commission and understanding that victims should have a central role in whether or not they want things to move forward or where they want to go, that that reporting really needs to stay consistent in terms of the codification of reporting to the Commission. And we're here for any questions you might have. Thank you.

**Rep. Weissman**
All right. Thank you, Mr. Prince.

**David Prince**
Thank you, Mr. Chair. Again, I'm David Prince. I'm the Vice Chair of the discipline commission. Primarily, I appreciate the opportunity you give us to talk on each of the bills. I'm thinking ahead to the amendments and, candidly, I know the amendments are evolving, and so we haven't really had a chance to fully study all of them.

I want to echo the second point that Ms. Krupa made on the confidentiality issue. We're very supportive of the bill as it currently exists with respect to the confidentiality issue. Some of the discussion that was had during the interim committee process identified kind of three categories of how things could get passed on to the discipline commission from an ombuds. It could be confidential reporting, that's where the person has to tell us their name and the information and trust us that it'll be kept confidential. There's some, clearly, some problems with that, and it requires an awful lot of trust.

Next is anonymous reporting, that's where the ombuds can facilitate that we get information, but the person's identity is held back so that they can be genuinely secure. But the third option is no reporting. And, so, what we're concerned about is codifying a system that would tie the hands of the ombuds so that there would be no reporting, and in fact, they would be prevented from reporting. So, our strong preference is that middle path, which is what's drafted here, which is an anonymous reporting process. Our concern from that is something that was discussed in the Interim Committee, and that is, in our experience, when there is a judge who is engaged in misconduct, and it's the kind of misconduct where there is a victim. It's not an isolated incident, in our experience. There are other victims. There are other incidents. And in our experience, one person comes to us, only one person comes to us, and we find out what's going on, we start our investigation, and that investigation then leads to finding out that there are other victims out there. And, so, I would worry about a system of confidentiality that so tied the hands of the ombuds that they weren't able to let the Commission know there's an issue, and this is the kind of conduct where there are likely to be other victims, so we need to look at it. So, the Commission needs to know about it, so they can investigate. My concern is that if we say that Ms. Krupa, for example, makes

- 41 -

a complaint to the ombuds and says, but I'm nervous and I don't want the Commission to know about this yet. I just want the conduct to end. Well, that's not taking into account the other victims that are likely out there, again in our experience.

And so, if there is going to be a change, and I don't know if there will be, but if there's going to be a change in the confidentiality, please, you're setting up a process to get a good, independent ombuds. Trust the ombuds. Give them some discretion to decide whether it's the kind of thing that needs to be passed along anonymously, but passed along so that we make sure there aren't other victims. Thank you.

**Rep. Weissman**
Okay, thank you. Committee questions for those panel witnesses? Rep. Epps.

**Rep. Epps**
I have a question each for two of the witnesses. Ms, Krupa. I think the way that makes the most sense for me to frame this is I want to share with you something that is my observation and the question is to invite you to comment on it if you agree, disagree, or the reflections resonate. Does that make some sense?

**Elizabeth Espinosa Krupa**
Yes, ma'am.

**Rep. Epps**
So, there's been testimony. The bills are running together. There's been testimony this afternoon, lots of mentions of retaliation, and the context in which it's been shared has been framed as if a reporting party, maybe a clerk or a lawyer may make a complaint about their own experience, or an employee, and that the retaliation would be to that person.  Perhaps something, you know, some impediment to their progression with their job, but something related to their work experience. I have considered that there's been times where I didn't report something, and that my concern was much more about my clients. I mean, I cared about myself, too. But it was much more thinking about how will the next client be received if I complain that this client was misgendered or that I fill in the blank. So that's my comment, and just being familiar somewhat with your work outside of this important work, I just wonder if you have any reflections on if that. If what I'm thinking is isolated, or if that's valid, or if others might share it.

**Rep. Weissman**
Ms. Krupa.

**Elizabeth Espinosa Krupa**
Thank you, Mr. Chair and Representative Epps. I understand and I appreciate your question. I'm a criminal defense attorney by practice, and not often in the same position you know, of agreeing with a

- 42 -

judge or necessarily receiving treatment that perhaps is appropriate. What I can tell you is, at least in my experience from serving with the Commission, an employee that works at a courthouse, or a law clerk or division clerk, whatever the position may be, there is that fear of retaliation, and sometimes the chief judges of the district get involved and say, okay, yeah, we can try to move them. We can do this. We can do that. There is a lot of work with the chief judges to be able to try to make sure that people coming forward are kept safe. Through the experiences that the Commission has had in the past several years, really trying to make sure that there is a more victim centered approach, very similar to the VRA type of compliance that's codified. I do think that there will be, and continue to be, again, as I mentioned before, just from the power dynamic, a concern of retaliation. And that is something that the Commission looks at. It's something that Commission has seen and takes very seriously. We work very hard to keep that from happening. If there's anything that we can do about it, or that the district can do about it. It's harder in rural areas where there's fewer staff, fewer places to put people. There's not a big courthouse, things like that. But we have tried that. As far as attorneys that are concerned about appearing in front of that judge or even in that judge or even in that district, if that's where they tend to practice. That is a concern. And there are plenty of attorneys that have to make that choice. You know, I hear Mr. Forsyth say there should be an ability for the ombuds to have complaints from lawyers or outside of the Judicial Department. There are lawyers that do make complaints. We have received letters from multiple lawyers that wish to remain anonymous in their complaints, and there is a process for doing so. However, it's hard if you're pulling records and asking questions. It's going to identify the victim sometimes. We are cognizant of that as a Commission, and we are working very hard to make sure that we do everything that we can to protect any confidentiality when it's requested of us. But I do think that those are valid questions. I do think the ombuds would provide a lot of help with that. Also, just because I don't know that the districts so far, even if we do get the chief judges involved, have resources. And the Commission itself, we don't, we don't always, we can't tell somebody. Well, if this is what you're going through, you should seek this kind of counseling, or you should. These are the people that you could talk to. And the hope would be that the ombuds would have a little bit more in terms of resources available through HR, other ways to try to help people that feel that they need a little bit more assistance than just telling somebody about their complaint.

**Rep. Weissman**
Rep. Epps good for now?

**Rep. Epps**
Thank you for that. Judge Prince. This is me working to be my most delicate in trying to think of the phrasing. I wonder, given that you and your colleagues have faced some criticism related to the exercise of this responsibility that you've taken on. I'm including, perhaps, suggestions about allegedly unethical behavior or related to the testimony and things like that. What I wonder is, and I acknowledge that making assumptions about what I have perceived about you, that if with the relative power and privilege that you have, whether it's demographically, educationally, financially, these ways that you are relatively positioned within the community, I wonder if you have any reflections on how, as compared to you and

your colleagues, recipients in certain letters, you all being able to withstand this criticism. How that may invite us to consider how someone with significantly less privilege, comparatively, may be able to navigate challenges in the judicial system, specifically connected to how what this bill is proposing may or may not help someone who's within the system. I not trying to say you're the king of privilege, but within the system, you may be the king of privilege. So, within the system, someone who has less privilege, there, right? Is there a way in which this bill may afford greater opportunities for them? I wonder if you have any comments on that.

**Rep. Weissman**
Mr. Prince.

**David Prince**
Thank you, Mr. Chair, and thank you Representative Epps for the question. As you can imagine, this is something. You don't know me, and I agree. I am a person that has had the luxury of many privileges in our society. Of course, my own insecurity requires me to say, but not the ultimate levels of privilege. But I am privileged in many ways, and had a leg up in many ways to have a very successful career and come to where I am, and I'm aware of that. And I've been involved in my career in implicit bias training. Giving it, I mean, not receiving it, and addressing procedural fairness issues. I feel like I have been cognizant of those issues throughout my career, and I'm very proud of that. But to understand it on an intellectual level is one thing. To have close contact with folks who are going through service on the discipline Commission has me in close contact with people who are in great fear, and that helps you understand better what their experience is like. And you are accurately describing that I and the other members of the Commission who received the letter you're referencing, who all have law licenses. We're among the most privileged in our society. We're all lawyers, whether we're judges or not. That's a highly privileged position, as you yourself know, and so gives us a sophistication for dealing with issues. A lot of the people we're dealing with on the Commission obviously don't have that experience. I'm fumbling around because I don't really know how to answer your question other than to say that it is a significant challenge and what. And I have a better understanding, having now gone through it, of what it's really like.

And one of the things you can look at that was produced in the interim committee process is the CCASA survivor letter. That person was, as far as I can tell from the letter, pushed to the brink of suicide. By the way they were treated. You also see the involvement of the same personnel that were involved in that that were involved in our letter, that were involved in what happened with Senator Lee. There's a pattern here, and something like the ombuds can help with that. And, with despite all my privilege and all my ability to fight and the fact that I have a statutory privilege for testimony that others don't have in whatever they're doing. Despite all of that, when I received that letter, my wife's in tears for a couple of nights, my blood pressure hit a 15-year high. I had some other health issues. Went and saw my doctor. I feared for my career. I effectively have to give up what were my plans for retirement because of the way things have gone.

- 44 -

Because we came forward and testified, and it's not just me, it was every lawyer on the Commission. And these are, as I think you can understand, volunteers who are doing their best. Nobody asked to be on the discipline commission. I've never heard of anyone who asked to be on the discipline commission. We get recruited. We get asked to do it. We know it's an incredibly important task, and it's an incredibly difficult one, because you are dealing with holding accountable the most powerful people and privileged people in our society, judges. And, so, you know it's going to be difficult when you go in, but you have no idea that you're going to be under this constant onslaught that we've been under for the last two years.

So yes, if someone is privileged as us, is affected as deeply as we are. And then you look and see what happened with the CCASA survivor, and then you look and see what happened with Senator Lee. And then I know, because people come up to me, just like Mr. Forsyth was saying, frankly, people come up to me, and I know cases and people say, thank you for what you're doing. What shocks me is the number of people who do that, who are judges. And at Judicial Conference, I couldn't go anywhere at conference without judges coming up saying that, but it was always in a quiet hallway near a dark corner, in a whispered voice. I made a joke at one point with my wife. They became urinal conversations. I couldn't go to the bathroom without people coming up to me in a quiet place telling me how much they appreciate what we did. And I've also had judges contact me, and other commission members have, too. Judges, again, the most privileged people in our society, to explain I've been the victim of harassment, abuse, unethical conduct by another judge. And I thank you that you're talking because I wasn't able, I wasn't willing to come forward on mine. I've had more than one judge who's a retired judge, tell me I stepped down, one of these people, particularly I was shocked, because I knew they're standing and could never imagine, and you've heard this story if you're in the world of sexual harassment at all, I could never imagine that person being victimized in any way. Because they are so powerful, so strong. And they explained to me, you know, I actually left the bench early because of the level of harassment I was getting from leadership, and I was ready to come down and testify last fall, not last fall, last spring, in the General Assembly session like this. And I got a friendly warning that it was too dangerous for me to do it and not to do it. They told me this after it had happened and had other people talking to me about other judges talking about deciding whether to come forward, who ultimately did not.

All I have to do is look at that CCASA victim. What bravery. But in terms of a system, that CCASA victim said I cannot testify and give my name. Is that really the third branch of government that we want? That that Branch, according to Troyer and ILG, has a 20-year history of essentially suppressing these complaints. And it's not ancient history. The examples I've given are all 2022 and 2023 and I'm not allowed to talk about cases, but if I could talk about cases, I could start giving you lots of examples of lawyers, of lawyers who are under what I would think would be inappropriate pressure right now, because they came forward about a judge.

So yes, your question is very well focused. I, David Prince have the luxury of great privilege, great resources. Senator Lee had to pay for his own lawyer. I don't have to pay for my own lawyer. I got lucky because the Legislature created a fund last year for the Commission who could pay for a lawyer for me

- 45 -

and my colleagues, every lawyer member of the Commission, to defend us. Other people in the system don't have that. And this is where I think CCASA talked earlier about, we wish this went further, in response to one of your questions. And part of that further, it would be nice to have some legal representation that would be available to these folks. So, I've rambled a little bit. I apologize for that, but I hadn't really thought through what to say. I suppose, in hindsight, I should have. But I honestly didn't really think this would come up today, so I apologize for rambling a bit.

**Rep. Weissman**
Rep. Epps, good for now? Committee, other questions of this panel. All right, thank you all for speaking with us.

**Rep. Weissman**
Okay, next panel, Mr. Scanlon, Ms. Busby and Ms. Newman, please.

**Rep. Weissman**
All right, whoever would like to start us off. Mr. Scanlon.

**Terry Scanlon**
Mr. Chair and members of the committee. My name is Terry Scanlon, here again, here again, on behalf of Colorado Courts. Mr. Chair, with your indulgence, may I go a little bit beyond the three minutes today, or is the three minutes pretty tight?

**Rep. Weissman**
Start off, and we'll see how we do. Mr. Scanlon.

**Terry Scanlon**
I appreciate that. We have a lot of concerns, we have a lot of questions, and there's a lot of confusion from what I've heard and from what I see in the bill. And about two o'clock today, I was given eight amendments that amend the bill, and I've been trying to get an understanding of that as the committee has the discussion on the other two bills. We're in an amend position because we believe very strongly that there's an opportunity to make significant changes to the bill that would create a resource for the staff. I want to say a couple things that I don't want to lose sight of early on.

This creates an independent agency. It is an expansion of state government to create an agency that is unprecedented in Colorado. There is no independent agency that second guesses the work of another state agency. And I know I just said second guesses the work, because the bill does not limit it to the things I heard described. It is broader than that, and maybe the language gets cleaned up. I don't see that entirely in the eight amendments that are drafted today. And I may be wrong, because I've been trying to piece that together. It is an independent agency that, for the first time, would second guess the work of

- 46 -

another state agency. There's no precedent in Colorado. There's no precedent for another state court system in the country.

We're advocates for a proposal for something called an organizational ombuds. And this is a good point to say, the ombuds is a term that means very different roles in state government across the country and in Colorado. And my friend, Representative Lynch has I think. I'm sorry, Representative Bacon has been reading the work of Chuck Howard, the leader in this area, with the reference to the Swedish term. I'm pleased to hear that. The International Association of Ombuds has a model for an organizational ombuds. It has a standards of practice and code of ethics for an approach that has been proven to work in other states. The language in this bill is something that is unique and has not been tested anywhere. We're committed to eventually having an organizational ombuds that's consistent with the model advocated by the International Association of Ombuds.

So, a lot of language in this bill that isn't very clear. That we hope you'll pay attention to the definition of Department, it is probably not what is intended by the bill sponsors. The definition of Department refers to a section that I would be unable to accurately characterize as I sit here. The definition of judicial personnel lists a number of different folks who work in and around a courthouse, and it says, but not limited to. So, it is actually everybody. The bill gives them authority to initiate a request for a resolution, whatever that might be. It gives the ombudsman authority to respond to questions or concerns from judicial personnel. That term is unlimited, so it's not just staff, as we might think personnel means. To respond to questions or concerns about misconduct within the Department, not limiting that to misconduct of judges, but misconduct. So, this is potentially something that might be attempting to second guess the decision of a supervisor of clerks in the courthouse. It might be something that is designed to address concerns about litigants who are unhappy with how they're treated when they're in the courthouse. Because, again, the people who can go to this ombudsman are not limited. So, it could be someone who goes to the courthouse is unhappy with their experience there, which is more than half of the people who go to the courthouse on any given day. Because these are really, everything that comes before the courthouse is a really significant deal in someone's life. And at least half of the people leave with great anxiety about how things have turned out. So, it's not uncommon to have people, to have people express concern and complaints about how they're treated at the courthouse, or how things were, how things turned out.

I'm past my time, and I just want to ask the members of the committee who were in the room ask me as many questions as you can think of related to everything that has been said here today. I hope you will ask me about everything uncomfortable, every accusation, the definitions in the bill, all aspects of language of the bill and our proposal on an organizational ombuds. I'm happy to have that conversation, and I look forward to it.

**Rep. Weissman**
All right. Thank you. Whoever would like to go next.

- 47 -

**Ariana Busby**

Hello again. We are excited to talk to you guys today about House Bill 1205, regarding the judicial discipline ombudsman. As you're aware, the concept of an ombudsman for judicial discipline and even for employee-to-employee type issues came up this summer, this last summer, over the Interim Committee. We were so grateful to work with Representative Bacon and Representative Lynch to develop much of the concept that you see in the introduced bill, today. However, this bill didn't succeed in the interim committee, and so our work with the stakeholders on this topic, notably the Commission and with Judicial. With CCASA, who you see here today, as well. It continued, and it still continues. First and foremost, I think it's important for us to set a baseline about what the purpose is for this ombudsman. And the way that we see this is an ombudsman should be an independent and safe place for someone to turn for information about a complaint process, to receive referrals to community resources like low-cost attorneys or pro bono attorneys that are willing to assist in this area, or mental health resources. And for assistance in filing an anonymous complaint. This office therefore cannot be a mandatory reporter, as contemplated in the introduced language. It's our understanding that the committee is going to be offering amendments to establish the ombudsman as an independent office under the umbrella of judicial and to remove the mandatory reporting requirement. We support these amendments. It's also our understanding that amendments are forthcoming regarding a core exemption, or to clarify that exemption and to include a concept regarding sun setting this ombuds. We are supportive of the core exemption, and we also support the concept of a sunset on this bill. However, we've heard that the timeframe is around five years, and we would ask the committee and the sponsors to consider adjusting this to at least seven years to allow for sufficient data collection. Returning to our work with the stakeholders on this bill, we've had conversations with the sponsors of the bill about an alternative amendment to House Bill 1205, and we'll present this to you broadly today. This proposal is a marriage of sorts of the introduced bill, the amendments proposed by the sponsor today. And a strike below that Terry just described to you and has circulated to at least some of you guys. In that sense, after workshopping some language and these concepts with both the Commission and Judicial we make the following proposals, and I know I'm running up on time. I'm happy to pass it to Alison, if you'd like.

**Rep. Weissman**

Maybe take another minute. And well, because this is the bill that had the least discussion in the interim, we know that it is the one that there's been most ongoing discussion about we let Mr. Scanlon go over. I'll be a little bit more flexible here. I do think it's important that the committee grapple with this. So please go ahead and have another minute or so.

**Ariana Busby**

I appreciate it, Mr. Chair, thank you. So, in essence, what we're looking at is first, the inclusion of definitions of judge, justice, and judicial misconduct. Citing back to the definitions that were utilized in Senate Bill 22-201, to provide additional clarity on the scope of what the ombudsman does and the types of people that it is meant to service. Second, we would advocate for limiting the scope of the judicial discipline ombudsman to matters involving concerns related to judicial misconduct, and not to include

- 48 -

employee to employee concerns. I'll touch on this a little later. We're not saying those shouldn't be addressed. By limiting the scope, we offer that the judicial discipline ombudsman could be available for any person to access if they had concerns about judicial misconduct. Finally, we support Judicial's concept to bring forth an organizational ombuds as proposed, with that individual being independent of the Judicial Department and responsible to an advisory board.

We've worked with Judicial to modify their proposed language to specify that a direct referral will be made to the judicial discipline ombudsman if there was any indication a judge was involved in the concern, and to provide the concerned individual with information about the Commission. We believe, however, that Judicial has taken reasonable steps to ensure that the independence and efficacy of an organizational ombuds for workplace issues not involving a judge. We understand there's been concerns raised and some confusion for potential complainants having two ombudsman and with housing employee complaints within an organizational ombuds.

First, we would remind the committee that the purpose of the ombuds is to educate and be a resource of information for individuals. We would offer that there's no harm in allowing people access to more information.

Second, for concerns about efficacy, if judicial is housing an organizational ombuds, we would note that like the ombuds contemplated in the introduced bill, the organizational ombuds is independent, appointed by and answers to an advisory board, who will have to report to the Legislature on the success or lack thereof each year at SMART hearings. Additionally, if an individual does not feel they receive the information they need from the organizational ombuds, nothing in our proposal would limit that individual from seeking the advice and assistance from the judicial discipline ombuds. And I believe we would know about that quickly if employees were refusing to utilize our organizational ombuds, or if they were reporting issues to the other available ombudsman and could reevaluate with legislative changes, if that were necessary.

We deeply appreciate your work on this issue, your time and your consideration. We are available for questions.

**Rep. Weissman**
Okay, thank you. Who would like to go next?

**Alison Connaughty**
I donated my three minutes to Ms. Newman.

**Rep. Weissman**
Okay, Ms. Newman, over to you.

**Elizabeth Newman**

Good afternoon, Mr. Chair and committee members. I was here in questions only availability, but I did want to just make a few comments and response. The ombuds concept is probably the one that CCASA finds most significant in the importance of changing the culture within the Judicial Branch. And that's partly because the people that we heard from, both in the reports and the articles, as well as the victim we heard from, had a lot of fear and had nowhere to turn to get information, to get support. The most critical thing, I think, in trying to reform this culture is to provide that safe space where confidential conversations can be had about what the options look like, what can be done, where they can seek resources. We don't expect Judicial to provide, you know, everything. But in an ideal world, we'd love for people who have experienced misconduct to be able to be supported with legal advice. Right? Because they're often those who are most vulnerable in lower income positions, in workplace or students, volunteers, those such lower status and lower income roles. And I want to also say that, in my personal opinion, having two different directions for people to go is confusing and will dilute the effectiveness of such an ombuds role. And, so, I really do appreciate the consideration that Representative Bacon and Lynch put into creating a space, a single place for people to go and get support and information and then be directed in the appropriate direction, whether that's to the judicial commission, discipline commission to HR, any other place. So, I think those were just all the comments I wanted to make. But I am also available for questions. Thank you.

**Rep. Weissman**

All right, thank you. Now committee, we will go to questions. Rep. Marshall, do I see a question forming up? Rep. Marshall.

**Rep. Marshall**

Mr. Scanlon, you pointed out several deficiencies in the bill itself, but have you brought any amendments in particular to the sponsors to limit those issues?

**Rep. Weissman**

Mr. Scanlon.

**Terry Scanlon**

Thank you, Mr. Chair. Representative Marshall. So, the deficiencies were highlighted in an email and some conversations with one of the sponsors, and I haven't really had conversations with the other sponsors about them. I have talked to a number, many of the members of the committee, about an alternative proposal we have, which, by the way, I was delinquent in my initial remarks. I want to thank the Women's Bar Association for working on helping find some common ground on this bill. They've been really open minded to the things we've been working on, and especially thank you to Ms. Busby. You know, we've been offering to many of the members of the committee this proposal for an organizational ombuds. The organizational ombuds is a term that's defined by the International Association of Ombuds. You know, there's several models, several roles, for what this can be. Their

- 50 -

website talks about it. One of the bill sponsors was referencing that. Really the work of their site, sort of promotes and advocates for this organizational, ombuds. It's got four tenets to this idea. One is that it's confidential, it's independent, it's impartial, and it's informal. And they've got a standards of practice. They've got a code of ethics that are defined and that sort of guide the work of these organizational ombuds. I've called the executive director of that association and talked to Chuck Howard, the leading expert on this in the country, who's written the two books on what an organizational ombuds is and what they do and what they don't do. We talked to the organizational ombuds who works at CU Boulder, the one who works at Colorado State University, and one of the two organizational ombuds who works for Denver Public Schools. They all advocate that when the organizational ombuds adheres closely to those principles, that it bolsters morale, it helps the organization as a whole, suss out issues. More importantly, it provides, and this is truly our leading reason, a safe place for employees to go and talk about any issue, and they all say definitively that having that place for people to go when they have concerns and they don't know who to turn to, very often, those folks end up being people who go to the formal reporting route when they went into the office of the organizational ombuds, unsure of what to do or inclined not to do that because they had some fear or misconception about the process. I sort of went beyond the scope of your question to get a little speech in. So I let you.

**Rep. Weissman**
Rep. Marshall.

**Rep. Marshall**
You mentioned in your response a key, one of the four key parts, being independent. Why would not being an external agency be an absolute key part of being independent?

**Rep. Weissman**
Mr. Scanlon.

**Terry Scanlon**
Thank you, Mr. Chair. Representative Marshall. I will agree that an external agency would be independent. It's also fundamentally going to be more likely to be adversarial when it's outside of the organization. The organizational ombuds, the model that's promoted by the national folks, say that it should be sort of at the highest level of authority within the organization that is reasonable. So, in the private sector, they'll talk about it's someone who would report to, say, the CEO. At CU it's a position that reports to a triumvirate, CU Boulder, the president, the chancellor, and another high ranking official, three folks. Three high ranking officials in the organization. We initially, when we first shared this idea with the stakeholders, and I think sponsors was we were talking about it's something our highest-ranking authority is Colorado, Supreme Court, and that wouldn't be appropriate.

We talked about having it at the State Court Administrator's Office, and the reaction that we got was predictable. If we'd been more thoughtful about this, was that the State Court Administrator, not the

- 51 -

current one, but his predecessor, was at the center of the contract that initiated all of this. And Representative Bacon is accurate that the Troyer Report highlighted that there was a toxic culture in the State Court Administrator's Office, that's the office where I work, and that the three senior staff who were at the center of that contract were part of that toxic culture. And that toxic culture, by the way, is is gone. It's been gone for three or four years, however, long since those three folks resigned and we had a change in leadership. I was there before and during the transition, and of course, I still work there. Having it at the State Court Administrator, having an organizational ombuds that would report to that person, proved to be an initial misstep, because the previous State Court Administrator was involved in that contract.

And the idea is, is that the employees in the Branch need to have confidence that if they go to this person and talk about an issue, it's going to be something really sensitive. It might not be high level like discrimination, harassment, or retaliation, but it's going to be something that's a really big deal to this person, that's unresolved, that has them uncomfortable in their workplace. And if they go to this person, they have to have confidence that they're not talking to HR, they're not talking to judicial discipline, they're not making a commitment about how they're going to proceed. They're going there so they can have a conversation about what their options are.

Currently, at Judicial after last year's Bill 201 passed, every employee of the Department is a mandatory reporter. So, if someone whispers in my ear in the committee room that you know Judge Joe Jones did something unethical, I have an obligation under the statute to go report it to the discipline commission. If one of my colleagues tells me that a judge or a justice is involved in something unethical. We've got an obligation, so we're all mandatory reporters of these discipline systems. Not everything that's going on in the workplace involves a judge. The conversations can lead to a judge. People could be concerned about, you know, they could be unsure about whether it would be something that leads mandatory. This creates an option for them to have a conversation where they can do it in a safe space.

And one last thought about the independence. So, we created this, in our proposal, this advisory committee that would hire and oversee to the extent that their supervision of this position, and it would help this person understand how to navigate the organization in a system in whatever way they need. We would have a charter that would define the work of the ombuds and hopefully provide a greater degree of protection for that job. It's more structure and more independence than the response that the Legislature had to its workplace issues five or six years ago. The Office of Workplace Relations was created in the General Assembly after the episode that involved the Representative from Adams County who was expelled. And the General Assembly created this Office of Workplace Relations that doesn't have protections for the person who serves in that role, in the statute or in any sort of rule. But everyone who works in this workplace, if I understand this properly, can go to that person and talk about anything that goes on here, any concern, without it necessarily creating a formal action. So, the General Assembly created for the people in this workplace a safe place for people to go. That's essentially what we're trying

- 52 -

to create in Judicial but with more guardrails to ensure that that person works without pressure from the leadership of the organization. Thank you.

**Rep. Weissman**
Rep. Marshall.

**Rep. Marshall**
In 30 seconds or less, can you tell me what would stop the Judiciary at this point from basically having its own internal HR ombudsman and to carry out this and increase their culture of accountability already so it makes it less likely anyone would want to go to the external agency?

**Rep. Weissman**
Mr. Scanlon.

**Terry Scanlon**
Absolutely. So, I mean, we could theoretically create a position. But we wouldn't be able to do the part where the person is exempt from being a mandatory reporter without the General Assembly changing the statute. And that's really a critical part of creating that safe place for an employee to go, the one person in the organization, where they could go and have a conversation without committing a reporting violation. 24 seconds. Thanks.

**Rep. Weissman**
All right, committee. Other questions?

**Rep. Weissman**
I have one. And I'll ask each of you, or maybe Ms. Connaughty or Ms. Busby one of you can speak for the Women's Bar. I think the key thing here, as we grapple with structure and how this fits with the Commission, which, of course, is constitutional in nature. And you know, before we started talking about this, a friend of mine who is deep in the survivor space as a professional matter, pointed me in the direction of Mr. Charles Howard before I heard of him in these conversations. So, he is legitimate in that space. I trust in that. However, my suspicion is, my belief is that in most of the context in which we speak of an ombuds there is not this other thing out here, which is a constitutionally created body charged with its own function, an oversight function, a disciplined function. That, I mean frankly, we spoke to measures ago of the three-legged stool. The three-legged stool replaces elections. I mean, thank God judges are not elected, but they're accountable to the discipline commission because they're not accountable to an electorate like we all are. Is how I think about it, speaking for nobody but myself. So, this question of, on the one hand I understand it to be integral to the ombuds concept, that the person coming to the ombuds, complainant, survivor, whatever word we're going to use, has to be in control of what happens. And then if we have a requirement of mandatory report out, we're departing from that concept. On the other hand, depending on how we structure this, the lack of mandatory report onward to

- 53 -

the Commission, for example, is potentially a real problem in my mind, given you know what, I'm now four and a half years into. I would invite each of you to speak to that from your respective perspective. Ms. Newman, I know you have a time constraint. Maybe I'll let you start.

**Elizabeth Newman**

Thank you, Mr. Chair, and thank you for that question and for really highlighting the importance of a survivor, a complainant, having a choice in what happens. And I think the other piece that was not mentioned but is really the importance of establishing trust in the process. As it relates to protecting the office from mandatory reporting, I think that there are examples in other places of where an ombuds, or you know someone in a sort of supportive role, could provide information that there was another complaint, right, against a similar person or in a similar place, without sharing details that disclose who they are or violate confidentiality. But to allow someone who may want to then choose and give them information that might take them from an informal complaint to a formal complaint, and thereby initiating those other investigatory processes. So, there are recommendations within what the federal judiciary was considering in a similar situation to this that did suggest that the sort of neutral party, this independent party, be allowed to provide information should there be kind of multiple complaints against a single person. The other issue is, I think some of the amendment language will speak to some concerns around imminent physical threat or harms that may need to then override that limit on mandatory reporting.

**Rep. Weissman**

Okay, thank you.

**Ariana Busby**

I agree with everything that was just said. I would add, if you consider for our friends, for example, in more rural districts, even if you consider Mesa County, if there was a mandatory report that had to be made by this ombudsman because they received information from someone, even providing that anonymously, you may not be able to do that in such a way where you're not identifying who that person is. We have very, very rural courts in the state with very few staff, very few attorneys practicing in that area, very few people coming through the door. And, so, while it might not be easy to identify in Denver or in Jeffco or in an Adams County Court, in many of our court systems, it could be. And so that becomes complicated. If you were to require that person to report, even if it was anonymously, things that came through the door. One thing that we've been kicking around, and we've heard the Commission's concerns. You know, sometimes you find out, you discover a bigger issue, because one person came to talk to you about something, and if that person doesn't actually report, what do we do? And you know, I think that's something that we need to continue having conversations about. And Alison and I kind of informally between meetings yesterday, trying to figure this out. We're contemplating whether or not there should be a mechanism for this ombudsman. Specifically, if you have a second person come in with a similar complaint against a similar person, informing that person that a similar complaint or a similar concern has been raised. Maybe you're reaching out to that previous

- 54 -

person, seeing if they filed a complaint, seeing if they would like to be connected with this person. Would they like to share their identity? Do they want to share contact information? And then you've got allies to move forward. And you know, particularly now that there's no misdemeanor penalty, that's something that could happen. So, I think it's essential to build trust. I think as somebody that is potentially you know about to embark on one of the most difficult decisions of their life, of their career, to file a complaint against their employer, a very powerful judge. I think it's important to have autonomy and not feel forced upon them, for them to be able to take it in their own time, and maybe they come back to that ombudsman after they've sought out the community resources that were provided to them, and they then choose to make that report. But that's why we feel that the mandatory report is a little, that's difficult for us.

**Rep. Weissman**
Appreciate that. And Mr. Scanlon, I'm going to invite you to respond to the same thing in a moment. What's interesting to me is that both of your organizations, the Women's Bar and CCASA have been about as involved in this whole thing as anybody's been able to be. And I'm hearing some differences, and I appreciate that. Ms. Busby, an analogy. So, there was a statutory duty of confidentiality running between our Office of Legislative Legal Services and each of us individually in the drafting process, until a bill gets to where it is introduced. It sometimes happens that, let's say I'm working on a bill on cats. I always use silly examples, and Rep. Garcia is also doing a bill on cats, and the drafters kind of figure out, hey, we're going to introduce the same bill. They're going to step on each other. It's kind of a mess. There's this process we have around here where drafters have to obtain bilateral permission, but then we consistently with or as a limited and consented to exception to that duty of drafting confidentiality. That's a chance for us to sort of sort things out. That sounds like a little bit like that last point that you made, and it strikes me maybe there's something in there that we could all continue to grapple with. I know that Ms. Newman had to leave, but that last part about what are the fact circumstances. A repeat complaint, imminent danger. You know, there could be others, that would work an exception to the exception to mandatory reporting. That seems like a really key thing for us all to continue to grapple with. I'm not going to claim to have an answer, but I just want to underline that. Mr. Scanlon, if you'd care to speak to the same thing.

**Terry Scanlon**
Yes, thank you, Mr. Chairman, I appreciate another opportunity. Just a couple things. The proposal that we envision about an organizational ombuds would, of course, include some exception for. If a visitor, it's the term of art in the organizational ombuds field. If a visitor mentions something about harm to themselves or others that doesn't stay confidential, that gets addressed. And I should have said that. The other thing is if a visitor mentioned something, and this would be unique to us. If a visitor mentioned something that gets close to, suggests, or could be related to misconduct regarding a judge, the ombuds that we propose would be obligated, by statute, to notify the visitor about the judicial discipline commission, help them understand who to contact, how to contact them, how that process works, stopping short of doing that on their behalf. So those two things.

- 55 -

Another really interesting thing that has come out in this process. You know, someone mentioned earlier, I think it was one of the bill sponsors about the contract and the senior staff. And you know that really hits close to home for me, because I knew all three people and was friendly with one of them. And I mentioned this to check out in conversation with him, and I joked that I might be, you know, calling him about my own supervisor, and he might be listening, and I'm joking about that, by the way, guys. But I might call him about my own supervisor. And he said, you know, what we often get is people who are sort of in a senior staff position, who aren't sure where to go in the organization, but they know that there's something really important, there's an important tension, friction that needs to be addressed, and they can't figure out how to navigate it. And the ombuds will help them figure out how to have a conversation, how to mediate an issue. They do a lot more than deal with these sort of high profile issues of harassment, discrimination and retaliation, and they would do a lot more than stuff that's related to judges. And if we had had this position, you know, six, eight years ago, the ombuds, the organizational ombuds and judicial, would have been busy with complaints because of the toxic culture part. They would have been busy with sort of senior staff contacting them saying, we got a problem. We got a problem. And a good organizational, ombuds finds a way to elevate that issue to the leadership of the organization and say you've got a problem. I don't want to violate the confidentiality. I don't want to tell you who brought this to me, and I'm not going to tell you exactly who they're talking about, but you've got a problem.

In a leading example that Chuck Howard uses is a private sector company that had an employee who did expense reports for a supervisor, and the supervisor, a high ranking VP in the company, would ask the employee to submit fraudulent expense reports so he could benefit financially. And she didn't want to continue to do that, but she didn't want to report him to anybody, because she would be outed as a rat in the organization. So she goes to the ombuds, and the ombuds goes to the CEO of the organization and says, I need you to audit the expense reports of all your VPs. Didn't say who we're looking at. Didn't say which VP. The CEO does that, audits the expense reports of all the VPs. Three VPs were filing fraudulent reports and three VPs were dismissed because of that. They identified a systemic problem. The employee who raised the concern had her concerns addressed and she wasn't outed as somebody who was telling on her supervisor, or sort of the myriad of things that someone might have go through their head that would cause them to have pause. It can really serve to help the organization, as well as the employees.

**Rep. Weissman**

All right, committee, we are closing in on the 40-minute mark here. Any other burning questions of this panel? All right, seeing none. Thank you all for being with us. Okay, Melanie Jordan and Melissa Thompson, please. And is there anyone else physically present who wanted to speak to 1205? Mr. Stevens, anyone online? Okay, all right, thanks for being patient with us. Whoever would like to start off.

**Melanie Jordan**

Thank you, Mr. Chair. Thank you, members of the committee. My name is Melanie Jordan. I'm testifying on behalf of the Office of Respondent Parents' Counsel in support of 1205. I want to highlight the role, some of the issues that our agency has faced with regards to judicial discipline, and how I think this bill would help. In the last five years, juvenile practitioners have been uniquely impacted by some of the judicial misconduct that I think this committee is likely aware of. Judge Kamada and Weld County was primarily a juvenile judge, and in addition to leaking news of a warrant to his friend, he also texted friends inappropriate comments about litigants in his courtroom, including parents in dependency and neglect cases. Then, in 2021 during the midst of the pandemic, Judge Natalie Chase admitted to using a racial slur in a conversation with a black judicial employee, but she also made earlier actions that are highlighted in the statement of charges that a judicial employee could have come forward with, and perhaps highlighted some of the issues that were happening in her courtroom in a way that families would have been less impacted. So, one of the things was that in 2019 she asked people who were appearing in front of her who had written unfavorable reviews of her on her judicial performance reviews. The situation with Judge Chase resulted in over 20 parents having limited remands and cost our office hundreds of thousands of dollars. But more importantly, we had parents who were wondering whether the court terminated their parental rights because Judge Chase was biased against them based on their race or the race of their attorneys. No family should live with that worry. We have lost multiple contractors, particularly women of color who practiced in that courtroom, who stopped taking appointments, who stopped representing parents as a result of the toxic nature of that courtroom. Attorneys practicing in toxic environments like the one that was present in Judge Chase's courtroom had to make difficult decisions about whether to file for recusal, make a judicial discipline complaint, or continue on their case to avoid angering someone whose behavior was unpredictable and vindictive. We might avoid the harm to some families and the harm to attorneys who sacrifice a great deal to represent parents and families in these cases, if we empower employees and contractors to be able to come forward to an independent, neutral agency ombuds with their concerns. Things might be addressed before they blow up into the types of harms caused by former Judge Kamada and Judge Chase. Judges hold a unique level of power in our system and our democracy depends on all of us trusting that judges are impartial and agreeing to follow their orders. This is a time to err on the side of transparency, not a time to protect those with so much power from scrutiny. We urge a yes vote.

**Rep. Weissman**

All right, thank you, and please hold for questions. Ms. Thompson, please go ahead.

**Melissa Thompson**

Thank you, Mr. Chair and members of the committee. My name is Melissa Thompson. I'm the Director of the Office of Respondent Parents' Counsel. I'm an attorney, and part of why I'm an attorney is because 20 years ago, I was a victim of sexual harassment in the workplace. I complained to the owner of the company I worked for, and I was fired. I hired a lawyer to help me, and he did a poor job. I ultimately received a settlement. But I decided that point that I was never going to let another client feel like I felt.

Where I was unheard, didn't know what was happening. He didn't return my calls, and so I have committed my career to ensure that people, especially poor folks, have access to excellent counsel. And in my role, I oversee nearly 200 lawyers across the State of Colorado, I have the opportunity to meet with Chief Judges across the entire state when my lawyers raise concerns. And I'll tell you that my lawyers are concerned. And that they are fearful of what it would mean for them to make a complaint. I've had lawyers cry in my office. Lawyers explain the impact to their mental health, and it really, really matters to me. It really matters to me, because when I was a trial attorney, a friend of mine in my office, also a trial attorney, lost a trial. During that trial, the judge was awful to her, and she went to the bar afterwards, and then she went home and she killed herself. So, this. You need to get this right. People need access to a place that is safe, where they can ask questions like, Is this my fault? Am I doing something wrong? Because when I was in my early 20s, those are questions I had. Like, have I done something wrong? Is this my fault? And I had nowhere to go. And we cannot put employees in the judicial system in the same position when we have the opportunity to do better. And when I hear some things like a sunset on the ombudsman, I want to laugh out loud, because the idea that culture is good in seven years, and we're done here is naive. Because culture changes. Culture changes with leadership changes. And judges are changing and personnel changes, and culture is in a constant state of flux. I know that because I oversee so many lawyers in an office, and culture is something that I care about and I ask about, and I've seen it change in the seven years I've been in this role. Don't dilute this bill with amendments that make it weaker, that lessen the independence an ombudsman can offer, and that would ever create an opportunity for someone who's fearful of a judge to make a phone call and say, Hey, I'm fearful of the judge. Can I talk this through with you? We need that access for people in the court, including the contractors from my office. We need that safe place. And I'd ask for you to support this bill.

**Rep. Weissman**
Thank you. Committee questions for either witness? Seeing none. Thank you for sharing. All right, last call for witnesses wanting to speak to House Bill 1205. All right, seeing none. We'll close the witness phase. Sorry, Mr. Stevens, confirming one last time, nobody online. Okay, we'll close the witness phase. We will give the sponsors a minute to come back up to the table. All right, Committee, Mr. Pogue was hard at work earlier. I want to confirm everybody has 1, 2, 3, 4, 5, 6, 7, & 8. Sponsors, so we have 1 through 8 sequentially. Do you intend for us to have anything else? Rep Lynch? Okay, all right. So committee what's happening here? L.002 is being superseded at the request of the sponsors. It is a corrected 2, so it's still numbered 2 up top. So just crumple up your existing 2 and make sure you're looking at the right one a minute from now. Alright, sponsors will give it just a sec for that updated 2 to get around. Sponsors, however you'd like to proceed, we could go in number order. We could go in some other order. Just in the interest of clarity, you'll have both of the motion and the second. Mr. Minority Leader Lynch.  There will be ample opportunity Rep. Garcia. Rep. Lynch.

**Rep. Lynch**
Thank you. Mr. Chair, I'd like to move amendment L.001, to House Bill 1205.

**Rep. Bacon**

Second.

**Rep. Weissman**

All right, L.001 is moved by Rep Lynch, seconded by Madam Vice Chair Bacon. It looks like some of these are somewhat brief, but we'll certainly give you a moment to sort of walk us through what each is doing and the why, if you like. Rep Lynch.

**Rep. Lynch**

Thank you, Mr. Chair. This is a response to a lot of the concerns that you heard here earlier from testimony and that was evolving even as we were sitting there. So, I just want to say that before we get going here. But L.001, if you will turn to page 4, strikes out that we're not requesting data from this Commission. This Commission has no particular data gathering function, and so we wanted to get that out of the bill so that we understood that we would just be wanting data from the actual ombudsman itself.

**Rep. Weissman**

Okay, thank you. Madam Vice Chair, if you wanted to add anything. No, okay. Committee, questions or discussion to L.001. Objection to L.001? L.001 is passed. Rep. Lynch or Madam Vice Chair.

**Rep. Bacon**

Okay, I move L.002.

**Rep. Weissman**

All righty, L.002 has been moved by Madam Vice Chair, seconded by the ever-eager Rep. Woodrow. All right, Madame Vice Chair to speak about L.002.

**Rep. Bacon**

The first portion of this just clearly states in the legislative dec, the purpose of the Ombuds Office. We just again want to be clear. You know, it does take on different functions that we may have seen in different places. So, we wanted to lay out what they do. The second part of it just makes clear. Again, you'll see a few amendments about the ombudsperson not being a mandatory reporter or being bound to any other laws in which they have to kind of share information. And what this does is say the Ombuds Office has the discretion over whether or not they'll engage with other agencies. Not anything pursuant to statute. And again, you'll see other language through the amendments to conform to that.

**Rep. Bacon**

All right, thank you. Committee, questions or discussion on L.002. Objection to L.002. Oh sorry, Rep. Lynch.

**Rep. Lynch**

Thank you, Mr. Chair. I also just wanted to add in there, this is a direct result of stakeholding where this language came directly from the International Ombudsman information that we received from stakeholders in an attempt for us to include whatever we could, to make this as compliant, if you will, with the desire of the Judicial Branch.

**Rep. Weissman**

Thank you. Committee, questions or discussion.

**Rep. Weissman**

Is there objection to L.002? Seeing none, L.002 is passed. Okay. Next, amendments. Rep Lynch.

**Rep. Lynch**

Thank you, Mr. Chair. I would like to move amendment L.003, to House Bill 1205.

**Rep. Bacon**

Second.

**Rep. Weissman**

L.003 is moved by Mr. Minority Leader Lynch, seconded by the Vice Chair. Rep. Lynch.

**Rep. Lynch**

So, this is in response to. I mean, one of the biggest things we heard in committee on this is that this must be separate. The folks were just not comfortable with this Department falling directly in line with that model that we heard about earlier in testimony, where, you know, they report directly to the CEO. Well, the CEO is the person that potentially they're complaining about. So, this bounced back and forth and came with a great bit of work to figure out where we actually would put this office. And this was also stakeholded. I would say, very well. It also clarified the Department of Personnel. If you look on page 5, lines 4 and 5, Department of Personnel. And instead of letting there be some vague language with just the word Department.

**Rep. Weissman**

Okay, Madam Vice Chair.

**Rep. Bacon**

So, this is where we pull the Office out of Department of Personnel. We will put it back as an independent office under Judiciary. But the bottom part, we made a note, and this came from some folks who came to talk to us who were victims, and saying, even though it will be an independent office within Judiciary, we do not want the office in the same building. And that is so that people are not seen walking into the Ombuds Office as a matter of preventing retaliation.

- 60 -

**Rep. Weissman**

Okay, thank you. So, sponsors, you know we've heard of the separation of powers concern. DPA is in the Executive Branch. You're creating a new independent office, but still within the Judicial Branch. So hopefully that that settles that concern. All right.

**Rep. Lynch**

Yes, that was one of the places this was parked. Or there was a bunch of different options. And really, I mean, the second part of this amendment, really was the crucial part, is that it not physically exist in that Building. Because people would know what that office was. They'd see people walking in there. And I think we figured out a way to at least meet our stakeholders from the Judiciary halfway on this and be able to say it's still in this Department, but not physically in the building.

**Rep. Lynch**

Okay, Rep. Snyder.

**Rep. Snyder**

Thank you, Mr. Chair. And I understand the reasoning. I fully support that, but just give me a brief outline how the process will go, who will make the decision, where the Office is going to be located, and when (as we go through the process outlined in this bill), when will that Office be expected to be stood up.

**Rep. Snyder**

Madam Vice Chair.

**Rep. Bacon**

So, we also expect the Managing Board to be a part of this conversation, to make the recommendation after the hire. So, the Board is the manager of the independent office, so that'll be part of their purview. In addition to managing their budget and managing the ombudsperson. So, we have not set a particular date by which they need to find an office, but we have said that that they need to have that to operate. So, before they can set up shop, they need to have this figured out. We do expect conversations with the JBC, as well, as how to manage that. You may have heard from Alfredo Kemm about other small offices and needing to find efficiencies. So, we imagine that the conversation would happen there as well. But because we are setting this up as independent, we're also expecting an independent line item on budget. And, therefore, they would have conversations with our budget staff as well.

**Rep. Snyder**

Thank you.

- 61 -

**Rep. Weissman**

Okay. Committee, other questions or discussion for L.003? Any objection to L.003? L.003 is passed. Okay, next amendment. Madam Vice Chair.

**Rep. Bacon**

I'd like to move L.004.

**Rep. Lynch**

Second.

**Rep. Weissman**

L.004 is moved by Madam Vice Chair, seconded by Rep. Lynch. Go ahead.

**Rep. Bacon**

Members, L.004 restructures the Managing Board. It makes it from seven to five. And then, therefore, we needed to restate who appoints the members of the Board. So that is what this amendment does. We say the Governor has an appointment. The Senate and the House have the ability to appoint members of this Board, and we also name what kind of experiences they should have, those board members should have. So personnel management, human resources, any professional experience as an ombuds person, we thought should at least be the baseline of the people who are selected to be on the Board.

**Rep. Lynch**

I would also like to highlight that this is a selection board and doesn't have really much purview outside of making sure that we get the appropriate person in that ombuds office. It's not they're not making decisions, they're not directing traffic. They are purely there for the selection of the ombuds.

**Rep. Weissman**

Okay, committee questions or discussion on L.004? Rep. Garcia.

**Rep Garcia**

Thank you, Mr. Chair. My question here is on lines 8 and 9 and 10, line 10, really, where it requests that the Colorado judge, or former Colorado judge, is in good standing. And so my question there is more, mostly about process that I'm not fully familiar with. And so I understand that if there's a complaint brought forward against a judge and it's not found, or no matter how many complaints and they're not found, they're still considered in good standing. Is that correct?

**Rep. Weissman**

Madam Vice Chair.

- 62 -

**Rep. Bacon**

I believe so. I think there needs to be found, and I'm not. There might be witnesses in this room who can answer that. I think what we were trying to say is that they had not been publicly admonished, nor had their licenses removed from them, if they were an attorney or anything else from judicial discipline that was formal, but if there's someone. I do believe that was the case, I'd be happy to phone a friend, if I have any.

**Rep. Weissman**

And sponsors, I might just note for discussion, we struggled a little bit with this aspect in the CR and the formulation that we landed on, for example, who's eligible to be appointed to the independent adjudicative board, we say judges without any judicial or attorney disciplinary history, was the formulation there. So, we later, after today, we might, we might consider that kind of parlance. Rep. Soper.

**Rep. Soper**

Thank you, Mr. Chair, and I actually had this same question with the retired Colorado judge, and former Colorado judge in good standing. Just because the way I read that, I mean, I understand why you put former Colorado judge, because you could have been a judge, say, for four years, decided it's not for you, but you didn't retire, per se. But it does seem like you really ought to have some sort of language that does link good standing to both. Because the way I would read this is the only the former judge would need to be in good standing. And I think that Mr. Chair made a really good point that there's a better way to phrase that. Otherwise, you do kind of get into a position where it's like, I guess if you served your 20 years as a judge, you probably had a good history. But it's good to make it clear.

**Rep. Weissman**

Rep. Soper, appreciate that point. You're capably channeling the spirit of Rep. Luck today. I actually didn't have that concern, but you're right. You could read it either way. Here, the words good standing, I think, are meant to apply to a retired Colorado judge or a former Colorado judge. Then there's a separate question, is that to Rep. Garcia's point. Is that the formulation that we want to use, or do we want to express it  in some other ways? I'm personally not so concerned about this amendment right now, but maybe we should just pin this so it's something to be further considered and polished subsequently. Madam Vice Chair.

**Rep. Bacon**

Oh sorry, we'd welcome that. I guess I was looking for the language if it was small enough to conceptually do, but if not, we'd certainly be willing to rewrite this formally. The remainder of the amendment does shrink that Board, but would very much welcome suggested language. We'd be happy to clarify and to add it.

- 63 -

**Rep. Weissman**

Okay, Rep. Garcia.

**Rep Garcia**

Thank you, Mr. Chair, and thank you both for your consideration of looking at this further. The concern, just to state for the record that I have with the term good standing, is knowing all the testimony that we've heard today that the system doesn't work. There's judges that have not acted in good faith. And that doesn't necessarily mean that they have gone through the disciplinary process, and that doesn't necessarily mean that they haven't been acting in harassing behavior. And, so, I just want to make sure that we're not inadvertently selecting a judge who does not stand to what I assume all of us on this committee would consider good standing.

**Rep. Weissman**

Madam Vice Chair.

**Rep. Bacon**

Thank you for that insight. I really appreciate it. I think the only thing we would add is that we were trying to find a way to still include, given the feedback that we've heard, that judges aren't a part of this, we were trying to find a judge who, to your point, right, doesn't have that record, but still would include a judicial voice. So again, I'd like to state if at least that spirit makes sense. We're open and willing to rewriting it to make it clear to your point, because we do need this Board to have a pinnacle understanding of safe space.

**Rep. Weissman**

Rep. Epps, question?

**Rep. Epps**

Yes, I just liked where it was one step back. In terms of good standing, I would not want us to rely on the definition that you suggested, sir. Like someone having had judicial discipline is not something I would want to preclude them. That doesn't mean they should be picked, but I don't think it having occurred, especially given how we know, in every single context, everywhere, in any way, certain groups are more likely to be disciplined. I don't want to blanket exclude anyone who's had it.

**Rep. Weissman**

Understood. Rep. Epps,  I hear the point you're making, and that's, I think, a bit of a different point than was just made a minute ago, which is totally fine. I'm personally comfortable, you know, adopting this amendment in furtherance of what the sponsors are trying to do today, with the understanding we have many opportunities for members of this committee and the sponsors and others to continue to grapple with this subject. And procedurally, there are many opportunities to polish this language as soon as the next committee, certainly second reading in the House. Madam Vice Chair.

- 64 -

**Rep. Bacon**

Yeah, we will certainly do that. I want to repeat back perhaps what I heard. We're not necessarily saying a complaint is a preclusion, but I think we will need to further define what good standing is by way of informal or formal findings, if that makes sense. So, it's not necessarily having gone through it. It's just clear on what the findings were on those issues. The question before, when I said phone to friend was to be sure we did also understand what good standing means, and we could further define that by way of findings, but not necessarily saying that no one has never had a question. If that makes sense, so our commitment is to get to the bottom of that and to circle back with all of you. I think to Rep. Soper, we figured out how to address your concern. And I think we can figure out how to address or how to clearly state what we're trying to accomplish.

**Rep. Weissman**

Okay, thank you. Committee, further discussion on L.004 at this point? Is there objection to L.004? L.004 is passed. All right. Next amendment, sponsors.

**Rep. Lynch**

Thank you, Mr. Chair. I would like to move amendment L.005, to House Bill 1205.

**Rep. Soper**

Second.

**Rep. Bacon**

Oh.

**Rep. Weissman**

L.005 moved by Rep. Lynch, will give a second to Madam Vice Chair Bacon.  Chivalry prevails. All right, the record may reflect that Rep. Bacon has the second. Rep. Lynch, if you wanted to, or Madam Vice Chair if you want to speak to the amendment. Rep Lynch.

**Rep. Lynch**

Thank you, Mr. Chair. This simply takes care of the mandatory reporting that we brought that was brought up in testimony and was of concern.

**Rep. Weissman**

Okay, committee questions or discussion on L.005? Is there objection to L.005? Seeing none, L.005 is passed. Next amendment, sponsors. Madam Vice Chair.

**Rep. Bacon**

I'd like to move L.006.

**Rep. Weissman**

Second.

**Rep. Weissman**

All right. Motion for L.006 by Madam Vice Chair, second by Rep. Lynch.

**Rep. Bacon**

Thank you. We just wanted to be sure in this section. Again, we want to be able to name what kind of communication is happening for this portion. So, we went to be clear and say between the ombudsperson and the complainant, there were just questions on who is the ombuds talking to? Again, this is part of the language further down the line that is being able to center the victim and centering power around the complainant and to just to be clear and where the communication lies.

**Rep. Weissman**

All right. Thank you. Committee questions or discussion concerning L.006? Seeing none, is there objection to L.006? L.006 is passed. All right, Rep. Lynch.

**Rep. Lynch**

Thank you, Mr. Chair, I would like to move amendment L.007 to House Bill 1205.

**Rep. Bacon**

Second.

**Rep. Weissman**

All right. L.007 has been moved by Rep. Lynch, seconded by Madam Vice Chair Bacon.

**Rep. Weissman**

Rep Lynch.

**Rep. Lynch**

Yes, so this just clarifies and expands that who the ombudsman shall be available to, and just add some more clarity to that.

**Rep. Bacon**

We heard earlier about, there's another section of the bill where we define personnel. You heard their conversation about this being open to anyone, and it's not. The way that we define it is particularly that people who work with the judicial system. And so that may include, we want to be sure that people understand personnel is not just State Court, Administrative Staff. It could also be attorneys, volunteers, interns, bailiffs in that section. And so, here, this helps us define the scope of the Ombuds Office that it is available to taking complaints related to other staff, not just related to judges.

- 66 -

**Rep. Weissman**

All right, thank you. Now I'm going to try to channel the grammatical ghost of Rep. Luck here, looking back at the definition on page 4, I think I see the concern that was stated previously by Mr. Scanlon, but I'm hearing sponsors your statement of contrary intent. So, in the middle of that definition, we see persons who work with judicial employees, and includes, which could be equivalent to including, but not limited to bailiffs, litigating attorneys, interns, and volunteers. So, you intend the kind of the last part of that definition to be illustrative of persons who work with judicial employees and staff, but still limited by it. Is that fair? Madam Vice Chair.

**Rep. Bacon**

I'm going to say it a different way, but I'm not sure if this addresses your question. The part that we are looking at for the definition of judicial personnel. It says, and persons who work with judicial employees and staff. So that's what we wanted to limit personnel to. Then when it comes to complaints, what we're saying is, if an attorney has an issue with the bailiff, if the HR person has an issue with someone in procurement, that the ombuds person is open to taking complaints or to helping people through navigating those issues. The ombuds's scope is not only limited to navigating issues solely of judicial misconduct, but rather of also personnel misconduct. In the issue that we saw in the Troyer Report, for example, the issues lied between attorneys and people in the procurement team with the Chief of HR and the State Court of Administrator. There was not a judge involved with that. And, so, we wanted to say, you are open to coming to talk to us about complaints, if you are a clerk, or if you're like, even someone who's doing administrative work, and you have an issue with your clerk, you are open to coming to talk to the ombuds about that, as well.

**Rep. Weissman**

Thank you. Committee, other questions or discussion concerning L.007? Any objection to L.007? L.007 is adopted. All right. Last one, sponsors. Rep. Lynch.

**Rep. Lynch**

Thank you, Mr. Chair. We are going to not ask that we move L.008.

**Rep. Weissman**

Okay. So, with that sponsors, any other amendments that you intend at this point?

**Rep. Lynch**

We have L.009.

**Rep. Weissman**

Madam Vice Chair.

- 67 -

**Rep. Bacon**

I'm going to move L.009.

**Rep. Weissman**

I think we need L.009 up here.

**Rep. Bacon**

Wait a minute, we're not going to move L.009.

**Rep. Weissman**

Okay, very good.

**Rep. Bacon**

Never mind.

**Rep. Weissman**

All right, so sponsors that's it? That's it for now?

**Rep. Bacon**

Yes.

**Rep. Weissman**

Okay, committee amendments at this point? Rep. Epps.

**Rep. Epps**

Actually, seriously like. This is really important to me. I do want to move L.008. Can I?

**Rep. Weissman**

Strictly speaking, you may. Okay, L.008 has been moved. Is there a second?

**Rep. Epps**

You can get on the record, just don't second it.

**Rep. Weissman**

Is there a second?

**Rep. Evans**

Second.

**Rep. Weissman**

All right, so sponsors go ahead and respond.

**Rep. Bacon**

Was it seconded?

**Rep. Weissman**

Yeah, we've had, there's a proper motion and a, let me get this. We've had a motion and a second for L.008. Madam Vice Chair.

**Rep. Bacon**

We drafted L.008 as a repeal, you know, often called a sunset. We heard testimony today that perhaps, you know, some people are opposed to that. We also heard from the Women's Bar that they think it should be seven to 10 years out. So, we thought we would continue to work on it. We wanted to offer it for a notion to saying, okay, if there's a road to rebuilding culture, we could pull it off the table. But that's why we decided to not offer it today. I just would just be curious to see where the vote goes. But for what it's worth, we just wanted to be able to share with you why we decided to pull it today.

**Rep. Weissman**

Rep. Lynch.

**Rep. Lynch**

Thank you, Mr. Chair. I would also like to add that that that came from conversations with our sponsors in the Senate, as well. Where there was more passion for that amendment than we might have had. So, I would let the Senate do some work if they really feel that that's necessary.

**Rep. Weissman**

Madam Vice Chair.

**Rep. Bacon**

I have an actual question. We thought we would see if the Senate can, if we can work this out by the Senate. It was brought up by one of our Senate sponsors. I just curious, if we vote it down today. That doesn't settle anything? Okay.

**Rep. Weissman**

And for that matter, if it were to get approved, it still could be amended in the Senate later. All right, so members, there's been a, you've heard. Sorry, Rep. Soper.

- 69 -

**Rep. Soper**

Thank you, Mr. Chair. And I mean, can we have comments today after phasing it in the form of a question?

**Rep. Weissman**

I guess I'll allow comments on this.

**Rep. Soper**

Thank you. Actually, I quite like this. I feel like it's good to be able to go back and look at legislation from time to time. And in five years, it is long enough out to make sure that what we're doing here is the right path. It's something that will force the legislature to come back and look at it. So, I certainly do like the sunset piece, and I appreciate that that you were bringing it. So, I was a little bit disappointed when I heard you say you were withdrawing it, and was excited again when it came back.

**Rep. Weissman**

All right, Rep. Snyder.

**Rep. Snyder**

Thank you, Mr. Chair. And I kind of like this, too. I actually thought it was too short a time. And so I understand and I have full confidence in our wonderful colleagues in the Senate, but I just don't like having this left open ended. So, I just wanted to tell you that.

**Rep. Weissman**

Thank you. Rep. Epps, Rep. Marshall.

**Rep. Epps**

So, I'm extremely comfortable deferring to what the sponsors ultimately want on this. I was excited, excited is a strong word for an amendment. I was really pleased and relieved to see it in flipping through the packet. I tend to think it's a little bit too long. Three to four is plenty, but I just want to name why. The reservations that I had about this bill, that were not things that are going to be things that were likely to make me a no, are deeply embedded in the fact that the system writ large, is really good at replicating its worst parts. Right? We call it a new thing. We move it out, we do something else that it's just further entrenching something that might not be working. And so having an end date made me much more optimistic. Not because I want it to be wrapped up, but because we're not just committing to something that we don't know. Are folks really more comfortable going to another place? Like, are we seeing better outcomes, whatever the ways it is measured? So, I think this is really, really important with respect to our colleagues in the Senate or seconds, or whatever. I just would really ask that you would think about it, if not now, then seconds or something. But to me, it's a huge deal. My discomfort with the bill is totally wrapped up in the fact that if the idea was having an end date on it.

**Rep. Weissman**

Madam Chair.


**Rep. Bacon**

Members, thank you for the conversation. I'm okay with entertaining the motion. I will also add, you know, to your point of efficacy. We made it a point that for the first two years of this Office, they actually report back to us on how it's working and any data, as well as any insights on how to make it better. So, between that, between the urgency and between what we may hear from Judicial, right, and being able to make some of the adjustments. That's also why we were okay with the time limit. So, for what it's worth, I don't entirely find this to be hostile. So, I'd entertain a vote on it. I might vote for it myself. So, I just want to put it out there.


**Rep. Weissman**

Rep. Marshall.


**Rep. Marshall**

I wouldn't normally have said something, but since we have such a unanimity that at least in comments, that it would be a good idea to put a sunset, I'd have to be the contrarian on that for an independent body to have a sunset on it. That it just is going to the credibility of the organization, that it's ephemeral. If this body is doing its responsibilities, we will always be looking at the possibility of revising or revoking some agency's powers. Or existence, if necessary. I know that may be, you know, Mr. Smith Goes to Washington view of the world, but I think it does undermine the credibility from the get go of the organization, if you put a sunset on it.


**Rep. Weissman**

Thank you, committee. Other comments? You know, Rep. Marshall, I sort of find myself agreeing with your last point. Every regular session of this General Assembly is a chance to sunset something. Personally, I don't know. I think that putting the time period aside, there are arguments on both sides. I'm going to be voting no on the amendment, because I think between what I've heard the sponsor say and what I've heard folks who engage in this professionally say, and what I've observed over many, many, many years now, and frankly, countless hundreds of hours of time spent on the subject, we are talking about organizational culture change. And that is slow, and I don't know if five years is the right amount of time for that to happen. Absolutely, this is a subject within the subject worthy of continued conversation. I don't favor the five-year time limit at this point in this first committee's work. Rep. Snyder.


**Rep. Snyder**

Thank you, Mr. Chair. But to be clear, if this amendment were to pass, it could be amended in the Senate or at a later stage.


- 71 -

- 72 -

**Rep. Weissman**
Procedurally, yes. Rep. Snyder, I mean anything this committee does is subject to further amendment if the votes are there in a later committee, or the floor of the House, or the floor of the Senate? It's more, in my view, anyway, what message that we are sending by what all we do here. As this committee, in particular, the strict scrutiny committee of the General Assembly, if I may. All right, committee, if there are no further comments, there's been objection. Okay, Mr. Pogue. So, members, the question is the adoption of L.008 which has the five-year repeal?

**Staff Pogue**
Representatives, Armagost.

**Rep. Armagost**
Yes.

**Staff Pogue**
Daugherty.

**Rep. Daugherty**
No.

**Staff Pogue**
Epps.

**Rep. Epps**
Yes.

**Staff Pogue**
Evans.

**Rep. Evans**
Yes.

**Staff Pogue**
Garcia.

**Rep Garcia**
No.

**Staff Pogue**
Lynch.

- 73 -

**Rep. Lynch**

Yes.

**Staff Pogue**

Marshall.

**Rep. Marshall**

No.

**Staff Pogue**

Sharbini.

**Rep. Sharbini**

No.

**Staff Pogue**

Snyder,Snyder.

**Rep. Snyder**

Yes.

**Staff Pogue**

Soper.

**Rep. Soper**

Yes.

**Staff Pogue**

Woodrow.

**Rep. Woodrow**

No.

**Staff Pogue**

Bacon.

**Rep. Bacon**

Can I go yes for today? I mean, I don't even know what the count is, but sure.

**Staff Pogue**

Mr. Chair.

**Rep. Weissman**

No.

**Rep. Bacon**

Did it fail?

**Rep. Weissman**

The vote is six to seven, fails.

**Rep. Weissman**

All right, committee, are there any other amendments?

**Rep. Bacon**

I am grateful for the discussion.

**Rep. Weissman**

I am closing the amendment phase. Sponsors, wrap up comments please.

**Rep. Bacon**

Oh, sorry. All seriousness, thank you. I just want to say we are family. I love everybody on this committee. I learned something new every day. God bless America. Okay, so members, thank you again for listening today.

I'll bring us back to the point of this bill. I really also want to say thank you to those who came to testify. You know, I just wanted to point out that I do believe an organization in pursuing its health is an ongoing process, but somebody actually mentioned the case in Arapahoe. And for what it's worth, that censure came down in 2021. That wasn't like eight years ago. But part of the things that we also learned about that from just reading through the paperwork, as well as talking to people who were around it. I just want to share with you some insights we got from the experience of going through that process. You know, all of this isn't necessarily about a Supreme Court judge, right? And all of this isn't necessarily about, because I'm sure we won't see someone get another $5 million contract, you know, over a couple of years. But I want to talk about that experience in the process that that folks really saw. You know, the report in regards to the judge in Arapahoe actually had enough information that it could identify the person who made the complaint. People who go through these processes don't also know what to expect in these processes. Some people could be talked to one time and not heard from again until the censure comes out. Some people could be talked to multiple times, but not having someone there to help someone navigate that issue is what we're talking about here. The issue again is not just about something

- 74 -

happening at the highest level. It is about 20-some-odd Districts who have different Chiefs. To be sure that that we can find some unifying practices and unifying access, to be able to help all the staff not only make a complaint, know how to get resources, have someone stand in for them if they want to feel protected, be able to have some sort of anonymity where someone would stand in their place, and so much more. And so again, the fact that this issue is before the Legislature only goes to show how many hurdles that community and neighbors had to go through to have somebody say, We need to figure out what is going on behind the curtain.

Again, the fact that we are talking about it as the Legislature, means that these issues became so notorious that people turned to the folks that they publicly elect every couple of years to say, Hey, help us get to a place in which we can rebuild our confidence. We're not going to say that we don't have confidence in the Branch in working on this too, as they have received the same scrutiny and, in fact, more pointedly so. But we do need to step in to be sure we have somebody who is not paid by, not managed by the agency to report to us and the Commission and the Department what kind of trends they're seeing. We did build this in a way that is victim centered. And we do know that the ombuds people will advise people about their anonymity in reporting. But we also know this ombuds would be able to collect the data and actually hear what's going on through the complaints, if they're reported or not, and report that back to us, as well as the Commission, as well as the Department.

So members, this may not be the traditional ombuds office. What is required, from what we heard as a definition of a traditional ombuds office would mean we would need to relax laws that someone within the Department who is again either managed or paid by it, may or may not report cases to the Commission, and that is exactly what we were trying to stop. And so, while we may have different facets, we are not precluded from creating them. Again, we have made this office that can operate within the scope of separations of power. Again, it's not investigating and it's not directing the Judicial Department to do anything which you might find in a traditional ombuds role but would be precluded because of separation issues.

So again, thank you for listening. Thank you for coming on this journey with us. Again, we have been talking about it since the Summer. I think we're all going to learn about stakeholdering, for what it's worth, my out of office is, if you have an amendment, but it's after 24 hours, I'm not taking it. But that being said, we just want to be sure that everybody knows how willing we are to have these conversations, to include the voices from our stakeholders, and to be able to make the changes so that this can work. We just hope that we continue to have these conversations in a way that is urgent, but also in a way that is clear and concise, so that by the time we get to vote on this, because when it leaves our chamber, if it comes back, we are all in a solid place. So, thank you for listening. Thank you for your help. Thank you for your discussions.

**Rep. Weissman**
Thank you. Mr. Minority Leader, for closing comments.

**Rep. Lynch**

Thank you, Mr. Chair, and I'd like to thank the committee for helping us write that bill. No, this is such an important issue and such a touchy issue, and so it was really weird to be on that interim because here we are looking across to another branch, and that that feels wrong, and, you know, maybe a little dirty, that we're, are we doing the right thing here? But the conclusion I came to is that if we in some way, are contributors to there being a lack of faith in our Judiciary, shame on us. That is an essential part of the success of our government, and this work that we did, I believe, helps shore that up, for what it's worth. And not everybody likes this process necessarily, but that's what I kept centering back on, is that if what we're doing is going to restore some faith in this State, in our Judiciary, then we've done good work. And thank you so much for your time today. And I can't match my co-prime's, eloquent words, but please vote yes.

**Rep. Weissman**

Alright. Thank you. Committee closing comments? Rep. Marshall.

**Rep. Marshall**

Yeah, I apologize for keeping us here longer, but I was just going to emphasize to some of our witnesses, especially Mr. Scanlon, since I know he's so passionate. Again, it may not seem like it, but this is meant to help the Judiciary. In fighting this external versus internal is going to be a losing battle, I think, and you need to you know as I've expressed to you before, that's a non-starter. This will be external, but I would be totally open to you molding that external agency to make it as good as possible. And again, it does not stop the Judiciary from doing their own internal processes so that the culture improves and people are not going to the external agency. So again, just to emphasize those points.

**Rep. Weissman**

All right, thank you. Committee, any other closing comments? Just, sponsors, thank you. You know for this, this was kind of the last of the three core subject areas that arose in our considerable work last Fall. Madam Vice Chair, I seem to remember voluntolding you specifically on this. Very grateful for the work that you both put in last Summer and have continued to put in. And again, thank you to everybody else who has leaned in and contributed a lot of ideas and brainstorming and hours that are not plentiful in life. You know, understanding that discussion is going on about this, I do believe that it is an important adjunct to the other work that we've talked about and have approved of earlier in this afternoon. I think it helps to be informed by what are core ombuds concepts from professional organizations like the one that we've heard about. This is this is a bit different, though, I think. So, I am personally not going to be dissuaded from forming what I think is the best structure here and to grapple with the circumstances that have been handed to us as the people's branch of government, even if that does look a little bit different than sort of what is canonical in the ombuds space. So, I'm again, thank you for your work, and I'm certainly supportive today. We're going to the Appropriations Committee. Motion, and second are yours to make.

**Rep. Bacon**

I move House Bill 1205, as amended, to the Appropriations Committee.

**Rep. Lynch**

Second.

**Rep. Weissman**

All right, good motion by Madam Vice Chair. Second by Mr. Minority Leader, Lynch. Mr. Pogue.

**Staff Pogue**

Representatives, Armagost.

**Rep. Armagost**

Yes.

**Staff Pogue**

Daugherty.

**Rep. Daugherty**

Yes.

**Staff Pogue**

Epps.

**Rep. Epps**

Yes.

**Staff Pogue**

Evans.

**Rep. Evans**

Yes.

**Staff Pogue**

Garcia.

**Rep Garcia**

Yes.

- 78 -

**Staff Pogue**

Lynch.

**Rep. Lynch**

Yes.

**Staff Pogue**

Marshall.

**Rep. Marshall**

Yes.

**Staff Pogue**

Sharbini.

**Rep. Sharbini**

Yes.

**Staff Pogue**

Snyder.

**Rep. Snyder**

I'd like to say yes.

**Staff Pogue**

Soper.

**Rep. Soper**

Yes.

**Staff Pogue**

Woodrow.

**Rep. Woodrow**

Yes.

**Staff Pogue**

Bacon.

**Rep. Bacon**

- 79 -

No. I'm kidding, yes.

**Staff Pogue**

Mr. Chair.

**Rep. Weissman**

Yes.

**Rep. Weissman**

All right, the vote is 13 to 0. Thank you and congratulations, sponsors. Okay, committee that concludes our work for the day and the week. Thank you. We have quite a calendar in front of us next week, so bring the coffee. Until next week. Judiciary is adjourned.

# Appendix 27(w)(ii)

# Exhibits and Hearing Materials:

# Appendix 27(w)(ii)(1)

# Letter from Elizabeth Espinosa Krupa to Michael Weissman with summary, March 14, 2023;

# COLORADO COMMISSION ON JUDICIAL DISCIPLINE



March 14, 2023

Rep. Mike Weissman, Chair
House Judiciary Committee
200 East Colfax Avenue
Denver, CO 80203

Re:  March 15th Hearing on HCR23-1001, HB 23-1019, and LLS 23-0724

Dear Mr. Chairman:

I am writing as the chair of the Colorado Commission on Judicial Discipline to provide our input on the legislation proposed by the Legislative Interim Committee on Judicial Discipline. The Commission commends the Interim Committee for its extensive work and fully supports adoption of the legislation the Interim Committee Proposed along with LLS 23-0724.  The Commission proposes narrow refinements as discussed at the SMART hearing and discussed below.

## EXECUTIVE SUMMARY

The purpose of Colorado's constitutional system of judicial discipline is to ensure that allegations of ethical misconduct against a judge are investigated and addressed by impartial representatives of the community and to assure the public that Colorado has an ethical and professional judiciary.  All states have some discipline process; Colorado's was adopted in the 1960s as part of a broad effort to change how judges are selected, evaluated and, as necessary, disciplined.  In 2022, for the first time in years, the legislature enacted changes to the judicial discipline process, and formed the Interim Committee to dig deeper into issues raised and to recommend, as appropriate, additional changes.  The information presented to the Interim Committee revealed that Colorado's judicial discipline system is falling short of fulfilling its purpose.  The Interim Committee prepared draft legislation and recommendations to improve our system of judicial discipline.

The Colorado Commission on Judicial Discipline supports the Interim Committee's proposals and recommendations.  They provide for greater transparency of the discipline system, greater independence from influence by the judiciary of the adjudication of discipline cases, and a narrowed role for the Colorado Supreme Court limited to a more traditional appellate function.

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 501-1143

Page 2

The draft legislation provides greater information to complainants and an express anonymous reporting option as well as provides a conflict free system for addressing misconduct claims that involve the Supreme Court.  While a specific bill has not yet been drafted, the recommendations include creation of an independent ombuds to provide a robust system of safe reporting for complaints of judicial misconduct.

The Commission supports passage of the draft legislation with narrow amendments simplifying rulemaking, broadening the "pool" for the special tribunal, confirming victim appellate rights, and assisting victims.  The Commission also supports the establishment of the recommended ombuds and emphasizes the need for the ombuds office to have the independence from the Judicial Department it will require to serve its function of facilitating the presentation of judicial misconduct complaints to Colorado's judicial discipline system.

**INTERIM COMMITTEE PROPOSALS/RECOMMENDATIONS**

The Interim Committee prepared two draft bills and made recommendations for one or more additional pieces of legislation.  A broad summary of the proposed reforms is as follows:

- <u>Structural Reform</u>  While the overall design of the current system is not changed, the structure of two of its components will be revised.

  - <u>Trials</u>  The trial or "adjudicative phase" of the discipline system is currently controlled by the judiciary with judges who are selected by other judges primarily making the decisions.  Under the proposed legislation, the trials would be held before a three person panel with citizen, lawyer, and judge members.  By this change, the legislation creates a new and more independent adjudicative entity that handles the trial phase of discipline cases.
  - <u>Supreme Court Review</u>  Under the current system, the Supreme Court has the role of final decision-maker after a trial is conducted by judges the Supreme Court itself selects.  Under the proposed legislation, the Supreme Court will be limited to a traditional role of appellate review.  As with criminal and civil trials, the trial "court" will make the decision and that decision will govern unless found legally invalid on appeal.
  - The Commission fully supports these proposed changes.

- <u>Confidentiality</u>  Colorado has an unusually high level of confidentiality in its current system.  The proposed legislation has Colorado join the majority of states and make the trial phase of judicial discipline public to allow greater public accountability.

  - Related to confidentiality, the proposed legislation includes other measures to enhance transparency including data reporting requirements and information sharing with complainants.

Page 3

- o The Commission fully supports the proposed changes to provide for greater transparency and public oversight of the discipline process.

- Rulemaking Authority  Colorado's current system assigns rulemaking authority to the Supreme Court.  The proposed legislation creates a rulemaking committee with appointees from the Supreme Court and the Discipline Commission.  The current proposal has the new committee draft rules only for the initial phase of the discipline process, the "investigative phase."  For the rest of the system, such as the portion handled by the new adjudicative body, the current draft assigns rulemaking authority to the Supreme Court.  **Thus, the current draft legislation divides the rulemaking authority for a single case among two different systems**.

    - o **The Commission proposes that this portion of the bill be amended. The draft system is overly complicated and is likely to cause friction between the two rulemaking paths by splitting the rulemaking authority in the middle of a case.**
    - o Additionally, the judiciary is given rulemaking authority over courtroom litigation such as civil and criminal cases because it is a *neutral* in those proceedings.  In the judicial discipline system, the judges are the defendants.  The *judiciary is a partisan* in the judicial discipline system rather than a neutral.  By way of analogy, assigning the judiciary rulemaking authority is like assigning the criminal defense bar rulemaking authority in criminal cases or the plaintiff's personal injury bar rulemaking authority in civil cases.
    - o The Commission proposes that rulemaking authority be held by a single neutral entity, as in other areas and in 23 other states.  The Commission proposes that rulemaking be handled by a committee comprised of membership representative of the process stakeholders. That mix will facilitate collaboration and compromise since no single stakeholder can dictate terms to the others.  **Giving a single non-neutral stakeholder final authority over rulemaking is not conducive to collaboration or compromise.**

- Conflict-Free Final Review  Colorado's current system has no mechanism for handling a case on a conflict free basis when a member of the supreme court's conduct is at issue or conflicts otherwise arise at that level.  The proposed legislation implements the mechanism recommended by the ABA Model Rules for Judicial Disciplinary Enforcement for addressing this situation.  The proposed legislation defines a collective approach to disqualification standards and provides for a substitute supreme court to be created for a discipline case when the justices are disqualified.

Page 4

- o The Commission has supported this model from the outset of this process and strongly supports the proposed legislation.
- o The current draft of the legislation draws the replacement judges from the Court of Appeals.  The Commission supports amending the definition of this "pool" for substitute judges to a statewide "pool."  This can be done by simply including district and county court judges.
- o Understanding the difference between large urban courts and lightly resourced rural courts is a critical perspective in judicial discipline.  Drawing exclusively from the Court of Appeals eliminates perspectives from most of Colorado and from rural courts.
- o Additionally, drawing judges solely from the Court of Appeals does not fully address the conflict issues experienced in the past and anticipated in the future.
- o **The Commission and the Supreme Court negotiated the definition of this "pool" in July and reached a compromise**.  While the Commission had proposed that substitute judges be drawn from all conflict-free judges in the state, the Supreme Court proposed that county court judges be excluded from the "pool."  The Commission accepted this compromise so that substitute judges would be drawn from a broad, statewide "pool" of Court of Appeals and District Court judges.[1]  The Commission continues to support the compromise negotiated with the Judiciary.  This compromise pool would still adequately address the conflict issues this overall model is designed to address.

- Victims' Rights  At the request of the Commission, an early version of SB 22-201 that enacted initial reforms in the discipline system included a form of "victim's rights act" for the discipline process.  This was stricken from the final bill.  The Interim Committee's proposed legislation includes a new set of authorizations and requirements to assist and inform judicial misconduct complainants and victims.

  - o The Commission fully supports the proposed legislation.
  - o The Commission also supports repeal of C.R.S. 24-72-402. This statute purports to impose a criminal penalty on any person, including victims of judicial misconduct, breaching the confidentiality of discipline proceedings.  Recent case law has cast doubt on the constitutionality of this statute.

- SB22-201 Disclosure Issue  Last year, the General Assembly enacted initial reforms of the discipline process that included information sharing among

---

[1] The pool was to be further limited to judges that had been retained at least one time and that had not been the subject of a disciplinary proceeding.

Page 5

agencies found, in part, at C.R.S. 13-5.3-105.  An issue has arisen with the wording of Subsection (3).  The intent was to create a system that did not require OARC to make immediate disclosure of all potential cases to the Commission and, instead, identify allegations but not produce materials unless asked to do so.  However, the wording of the statute "the Commission may request further material."  Because the statute does not go on to state that the requested material will be provided, a disagreement has arisen as to whether the statute authorizes anything more than a request. The Commission proposes the language be amended to implement the original intent that responsive materials need not be automatically disclosed but must be disclosed when requested.

- Judicial Misconduct Ombuds  The Colorado Coalition Against Sexual Assault ("CCASA"), the Institute for the Improvement of the American Legal System ("IAALS"), and the ILG report recommended to the Interim Committee that an independent ombuds be established to provide a "robust system of safe reporting options" for victims of judicial misconduct to find help and information as well as interact with the judicial discipline system.  The judicial misconduct ombuds would also facilitate anonymous reporting of judicial misconduct allegations for the protection of whistleblowers and victims.  This judicial misconduct ombuds is separate and distinct from the internal ombuds office being contemplated by the Judicial Department to address personnel issues that do not involve judicial officers.  The Interim Committee did not complete a draft bill for the judicial misconduct ombuds, but one is expected during the general session.

    o The Commission fully supports the creation of a judicial misconduct ombuds that will facilitate judicial misconduct complaints and assist complainants as they work their way through the system.
    o **The Commission wishes to emphasize that the judicial misconduct ombuds office must be fully independent of the Judicial Department.** To create a judicial misconduct ombuds that is answerable, directly or indirectly, to the judiciary recreates the dangers of abuse in our current system illustrated by the victim letter that CCASA read or the information suppression tactics reported by RCT, both described below.
    o The Commission also supports the creation of the judicial misconduct ombuds as a practical means of addressing another problem.  As noted below, the public ILG report illustrated that the Judicial Department has not been submitting misconduct complaints to the discipline system.  The reforms enacted by SB 22-201 included a duty of disclosure imposed on the Judicial Department.  **However, that duty has no enforcement mechanism and the Commission continues to encounter difficulties obtaining compliance with that duty.  If a truly independent and trusted judicial misconduct ombuds is created, this will limit the ability of the Judicial Department to prevent misconduct complaints from being submitted to the discipline process.**

Page 6

**CONCLUSION**

  The Interim Committee process revealed that Colorado's half-century old system for independent oversight of judicial ethics is falling short of fulfilling its purpose and needs to be updated.  The Colorado Commission on Judicial Discipline fully supports the proposed legislation and recommendations that have been presented by the Interim Committee.  The Commission proposes only the narrowly focused refinements to the legislation as currently drafted.

  Please do not hesitate to contact any member of the Commission's legislative subcommittee if we can provide any additional information or insights.  The members are Liz Espinosa Krupa (krupae@live.com), Jim Carpenter (jimcarpenter.colorado@gmail.com), Chris Gregory (c.gregory@jd.state.co.us), or David Prince (david.prince@judicial.state.co.us).

         Sincerely,

         *Elizabeth Espinosa Krupa*

         Chair, Colorado Commission on Judicial Discipline

# COLORADO COMMISSION ON JUDICIAL DISCIPLINE



House Judiciary Committee 3/15/23 Hearing Re: HCR23-1001, HB23-1019, and LLS23-0724

- The Commission supports passage of the Interim Committee's draft legislation.

- The Commission proposes the following narrow amendments:

  o Simplify the dual path, dual authority rulemaking structure to a single rulemaking committee whose members are representative of the major system stakeholders.

    ▪ If rulemaking is amended, the prior focus on codifying subpoena power is of less importance.

  o Expand the "pool" from which the special court is drawn to provide a statewide as well as rural court perspective. This can be done by implementing the compromise negotiated between the Commission and the Supreme Court to include district court judges.

  o Clarify that both parties to a judicial misconduct case (complainant and judge) have rights of appeal, not just the respondent judge.

  o Repeal the constitutionally suspect C.R.S. 24-72-402 that established criminal penalties for breaching confidentiality.

  o Amend C.R.S. 13-5.3-105(3) to clarify that, once requested by the Commission, records held by an oversight agency related to a claim of judicial misconduct are to be provided to the Commission.

- The Commission strongly supports the Interim Committee's recommendation that a judicial misconduct ombuds office be established to provide complainants a safe space for reporting judicial misconduct and support through the process. The Commission emphasizes the need for the judicial misconduct ombuds to be fully independent of the Judicial Department to serve its purpose.

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 501-1143

# Appendix 27(w)(ii)(2)

# HCR 23-1001, Amend. L.001;

HCR1001_L.001
HOUSE COMMITTEE OF REFERENCE AMENDMENT
Committee on Judiciary.
HCR23-1001 be amended as follows:

Amend printed resolution, page 6, line 5, strike "DISMISSAL," and substitute "DISMISSAL OR DISCIPLINARY ORDER,".

Page 7, line 4, strike "COURT OF APPEALS JUDGES" and substitute "JUDGES OF THE COURT OF APPEALS AND DISTRICT COURT".

Page 7, line 10, after "ALL" insert "DISTRICT JUDGES AND".

Page 7, line 15, after the period insert "A TRIBUNAL MUST NOT INCLUDE MORE THAN ONE MEMBER WHO IS A COURT OF APPEALS JUDGE AND NOT MORE THAN ONE DISTRICT JUDGE FROM ANY ONE JUDICIAL DISTRICT.".

Page 10, strike lines 15 through 24 and substitute:
"(k) (I)  THERE IS CREATED A RULE-MAKING COMMITTEE TO ADOPT RULES FOR THE JUDICIAL DISCIPLINE PROCESS. THE RULE-MAKING COMMITTEE CONSISTS OF THREE MEMBERS APPOINTED BY THE SUPREME COURT, FIVE MEMBERS APPOINTED BY THE ADJUDICATIVE BOARD, AND FIVE MEMBERS APPOINTED BY THE COMMISSION. MEMBERS SERVE AT THE PLEASURE OF THEIR APPOINTING AUTHORITY. THE RULE-MAKING COMMITTEE SHALL ELECT A CHAIR WHO IS A MEMBER OF THE COMMITTEE AND COMMISSION. THE RULES MUST INCLUDE THE STANDARDS AND DEGREE OF PROOF TO BE APPLIED IN JUDICIAL DISCIPLINE".

Page 11, line 2, strike "SUPREME COURT" and substitute "RULE-MAKING COMMITTEE".

Page 11, line 6, strike "SUPREME COURT" and substitute "RULE-MAKING COMMITTEE".

Page 11, line 7, after the period add "RULES PROMULGATED PURSUANT TO THIS SUBSECTION (3)(k)(II) APPLY TO FORMAL PROCEEDINGS INITIATED ON OR AFTER APRIL 1, 2025.".

** *** ** *** **

LLS: Conrad Imel x2313

# Appendix 27(x)

# Transcript of *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the H. Appropriations Comm.*, Colo. Leg., March 24, 2023;

# House Appropriations Committee—March 24, 2023 Hearing: HCR 23-1001, HB 23-1019, and HB 23-1205

**Rep. Sirota**

We are all here. Thank you for joining us this morning. We have four bills on our agenda. We will start with House Bill 1019, with Representative Weissman and Minority Leader Lynch. Thank you so much for joining us. Members, do you have any questions for bill sponsors? All right, seeing none. Sponsors, do you have any amendments? Okay. Madam Vice Chair.

**Rep. Bird**

I move amendment, J.001.

**Rep. Velasco**

Second.

**Rep. Sirota**

Seconded by Representative Velasco. Any questions, any objection? Seeing none. J.001, is adopted. Committee, any further amendments? Seeing none. The amendment phase is closed. Madam Vice Chair.

**Rep. Bird**

I move House Bill 1019, as amended, to the Committee of the Whole with a favorable recommendation.

**Rep. Velasco**

Second

**Rep. Sirota**

Seconded by Representative Velasco. Any discussion? Seeing none.  Mr. Brakke, please call the roll.

**Justin Brakke**

Representatives, Amabile.

**Rep. Amabile**

Yes.

**Justin Brakke**

Bottoms.

**Justin Brakke**

Bradley.

- 1 -

- 2 -

**Rep. Bockenfeld**

Yes.

**Justin Brakke**

Frizell.

**Justin Brakke**

Boesenecker.

**Rep. Boesenecker**

Yes.

**Rep. Frizell**

Yes.

**Justin Brakke**

Bockenfeld.

**Rep. Bottoms**

Yes.

**Justin Brakke**

Herod.

**Rep. Herod**

Yes.

**Justin Brakke**

Jodeh.

**Rep. Jodeh**

Yes.

**Rep. Bradley**

 Yes.

**Justin Brakke**

Velasco.

- 3 -

**Rep. Velasco**

Yes.

**Justin Brakke**

Madam Vice Chair.

**Rep. Bird**

Yes.

**Justin Brakke**

Madam Chair.

**Rep. Sirota**

Yes.

**Rep. Sirota**

That passes unanimously. You're headed to the Committee of the Whole. I wonder, while we are on this same subject, we might proceed out of order to HCR 23-1001. Since we have the same sponsors here. I'll just give you a second to look at your packet, if you need to rearrange. Members, any questions for the bill sponsors? All right, seeing none. Bill sponsors, any amendments? All right, seeing none. Committee, any amendments? Seeing none. The amendment phase is closed. Madam Vice Chair.

**Rep. Bird**

I move HCR 1001, to the Committee of the Whole with a favorable recommendation.

**Rep. Sirota**

I don't know who seconded that. Jodeh, you. She's seconded by Representative Jodeh. Committee, any discussion? All right, seeing none. Mr. Brakke, please call the roll.

**Justin Brakke**

Representatives, Amabile.

**Rep. Amabile**

Yes.

**Justin Brakke**

Boesenecker.

**Rep. Boesenecker**

Yes.

**Justin Brakke**

Bottoms.

**Rep. Bottoms**

Yes.

**Justin Brakke**

Bradley.

**Rep. Bradley**

Yes.

**Justin Brakke**

Frizell.

**Rep. Frizell**

Yes.

**Justin Brakke**

Herod.

**Rep. Herod**

Yes.

**Justin Brakke**

Jodeh.

**Rep. Jodeh**

Yes.

**Justin Brakke**

Velasco.

**Rep. Velasco**

Yes.

**Justin Brakke**

Madam Vice Chair.

- 4 -

**Rep. Bird**

Yes.

**Justin Brakke**

Madam Chair.

**Rep. Sirota**

That passes unanimously. That, too, is headed to the Committee of the Whole. Thank you, very much. I think next up we've got House Bill 1205 with minority leader Lynch and Representative Bacon. Though I do not see Representative Bacon. Are you? You're good?

**Rep. Sirota**

Yes.

**Rep. Lynch**

I'm good.

**Rep. Sirota**

Okay. All right. Questions for our bill sponsor, committee? All right. Seeing none. Minority Leader Lynch, do you have any amendments?

**Rep. Lynch**

No, Madam Chair.

**Rep. Sirota**

All right. Madam Vice Chair.

**Rep. Bird**

I move amendment J.001.

**Rep. Amabile**

Second.

**Rep. Sirota**

Seconded by Representative Amabile. Any discussion? Any objection? J.001, is adopted. Any further amendments, Committee? Seeing none. The amendment phase is closed. Madam Vice Chair.

**Rep. Bird**

I move House Bill 1205, as amended, to the Committee of the Whole with a favorable recommendation.

- 5 -

- 6 -

**Rep. Jodeh**

Second.

**Rep. Sirota**

Seconded by Representative Jodeh. Committee, any discussion? All right, seeing none. Mr. Brakke, please poll the committee.

**Rep. Amabile**

Yes.

**Justin Brakke**

Bockenfeld.

**Justin Brakke**

Representatives, Amabile.

**Rep. Bockenfeld**

Yes.

**Justin Brakke**

Boesenecker.

**Rep. Boesenecker**

Yes.

**Justin Brakke**

Bottoms.

**Rep. Bottoms**

Yes.

**Justin Brakke**

Bradley.

**Rep. Bradley**

Yes.

**Justin Brakke**

Frizell.

**Rep. Frizell**

Yes.

**Justin Brakke**

Herod.

**Rep. Herod**

Yes.

**Justin Brakke**

Jodeh.

**Rep. Jodeh**

Yes.

**Justin Brakke**

Velasco.

**Rep. Velasco**

Yes.

**Justin Brakke**

Madam Vice Chair.

**Rep. Bird**

Yes.

**Justin Brakke**

Madam Chair.

**Rep. Sirota**

Yes.

**Rep. Sirota**

That passes 10 to 1. You are headed to the Committee of the Whole.

**Rep. Lynch**

Thank you. Madam Chair. Thank you, committee.

- 8 -

**Rep. Sirota**

Thank you.

**Appendix 27(y)**
*Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the S. Judiciary Comm., Colo. Leg., April 19, 2023:*

**Appendix 27(y)(i)**

**Transcript re: HCR 23-1001
and HB 23-1019;**

# Senate Judiciary Committee Hearing—April 19, 2023: HCR 23-1001 and HB 23-1019

**Sen. Gonzales**

Buenos tardes, good afternoon, everyone. The Senate Judiciary Committee, the friendly, intimate version, will come to order. Ms. Jensen, will you please take attendance?

**Juliann Jenson**

Senators, Gardner.

**Sen. Roberts**

Here.

**Juliann Jenson**

Roberts.

**Sen. Gardner**

Here.

**Juliann Jenson**

Van Winkle.

**Sen. Van Winkle**

Here.

**Juliann Jenson**

Rodriguez.

**Sen. Gonzales**

Excused.

**Juliann Jenson**

Madam Chair.

**Sen. Gonzales**

Present.

**Sen. Gonzales**

We do have a number of bills under consideration today, and I will state at the onset that we have gotten to that point in session where we may have members popping in and out to present policies in other

committees, and so please do not take that as a sign of our lack of interest or disrespect. It is just that time of year. We do have a number of policies on our calendar for consideration today, and a couple of changes. And, so, we'll first be hearing HCR 23-1001, which is the referred measure. Then, we'll hear House Bill 1019. Then we'll hear House Bill 1205. Then we will hear Senate Bill 282, Jury Appreciation Day. And House Bill 1192 which was on your calendar for action only, I'm gonna lay that guy over one more time to Monday. Ms. Jenson, I appreciate your patience. Thank you for that. So, with that, we're now joined by Senator Rodriguez, Vice Chair. We do have a number of witnesses who will be joining us on this policy and so we will begin. I'll turn over the gavel to Mr. Vice Chair as we're starting with 1001 first. So, with that, I will turn it over to Mr. Vice Chair to chair this hearing.

**Sen. Rodriguez**

Thank you. It's nice not to have a microphone, except for we're always live. So, we're here to hear House Bill 1001 Senator Gonzales, Senator Gardner, who would like to start? Senator Gardner.

**Sen. Gardner**

Thank you, Mr. Chair. I don't want to take too too long in the introduction of this bill. We have a number of witnesses and policy issues to consider. This bill is the food, if you will, of an interim committee concerning the judicial discipline process in Colorado. It is a concurrent resolution to amend Section 23 of Article VI of the Constitution relating to judicial discipline. Existing law is such that the Commission on Judicial Discipline investigates compliance of judicial conduct, conducts the proceedings and proceedings from there dismiss, impose sanctions, or recommend the Supreme Court impose informal sanctions, or recommend that the Court impose formal sanctions. There's a special master proceeding currently. The resolution starts, excuse me, with clarifying that the Commission's authority, it does have authority to dismiss complaints. Repeals the authority of the Commission to conduct formal judicial disciplinary proceedings, and revises or changes the special masters process that we currently have. It creates an independent adjudicative board to conduct formal proceedings and hear appeals of the Commission's orders on informal sanctions. Significantly, this board is going to be comprised of four judges, four attorneys, four citizens. It prohibits a member of the Commission from being appointed to the board and prohibits a member of the board from being appointed the Commission. The resolution sets standards of review to be used by the Supreme Court when it reviews a panel decision. The resolution also requires a tribunal of seven randomly selected Court of Appeals judges and, as amended, District Court judges to review the panel's decision when the proceeding involves complaint against a Colorado Supreme Court justice. Another significant thing dealt with here is that under existing law, commission proceedings are confidential until the Commission files recommendations with the Supreme Court. The resolution makes those proceedings public at the commencement of formal proceedings and clarifies that appeals to the board of informal remedial sanctions are confidential. That's just kind of a thumbnail sets resolution creates a rulemaking committee to propose rules and notes that the rules of evidence, the Colorado Rules of Evidence and the Rules of Civil Procedure apply to those proceedings. There is, while it is not overly long, there's a lot here to

digest, and I'm sure the witnesses will have comment about them, so I'll stop there. Look to my co-prime sponsor for any further comment, and we'll answer questions and proceed on to testimony.

**Sen. Rodriguez**

Senator Gonzales.

**Sen. Gonzales**

Thank you, Mr. Chair, and thank you colleagues for your consideration of this concurrent resolution to submit this to the voters of this state. I think we've all seen the headlines. We will recall the bill that was passed last year to establish the judicial discipline interim committee. And many of us were up to our eyeballs in that work over the course of some of the Summer. To really dig in on how best do we update and modify our practices and procedures. And, as a result of that work, we have before us this afternoon, a concurrent resolution and two statutory policies in order to restore trust and ensure that that every Coloradoan, when they come to court, can have a fair day and that everybody is treated with dignity and respect in our Judicial Branch. And so that's the work. And I'm appreciative to my colleague and co-prime, Senator Gardner, for walking through the contours of the concurrent resolution. And think that we have a number of witnesses here who bring a variety of perspectives, having been steeped in this work now for not days, not weeks, not months, but years at this point. And, so, I'm grateful for their service, for their insight, for their perspectives, and want to certainly respond to members of the committee, should you have questions, but also know and recognize that the folks who are here to testify and offer their perspectives will be able to respond quite well to the questions that this committee may have, as well. So, thank you, Mr. Chair.

**Sen. Rodriguez**

Thank you. Colleagues. Are there any questions for the bill sponsors? I have an order from the sponsors of witnesses to call. The first two I'm going to call up is Chief Justice Boatright and Justice Marquez. Welcome to our little cozy room. It's not quite as formalized. Should we go in order of seniority? Mr. Chief Justice, you're up.

**Chief Justice Boatright**

All right. Thank you. Thank you both or thank you all for having us. We are here to testify on the House Bill 1001, as you mentioned, and as Senator Gardner said, they're both products of the summer minimum committee. The committee process was robust, included testimony and perspectives of local and national experts, and we are grateful to have a voice in that process. And I believe that we were able to offer constructive suggestions to the Interim Committee. And I'm here to state that we are in support of House Bill, 1001. The concurrent resolution brings us in line with other states. I think we came to realize that we were an outlier with regard to transparency and maybe some of the other procedures. And I think the move to the two-tier discipline structure more clearly defines the prosecutorial function, the hearing function, and the appellate function in the judicial discipline proceedings. We appreciate the work of the Interim Committee. And as I stated at the State of the Judiciary and at the SMART Act

- 3 -

hearing, these are just good, common-sense changes to the disciplinary process. And again, we are in support. The House adopted a couple of amendments to the concurrent resolution, and with a couple of modifications, we understand that may be proposed as amendments L.002 and L.003, we are in support of the concurrent resolution. We are in favor of the amendments. One of them is to make the rulemaking committee more balanced. And I think that that is just, again, good common sense. The way that the amendment was made is we would have five people from judicial discipline, which is the equivalent of the prosecution community. There would be three from the tribunal board and three from the Supreme Court. And I don't think that we would set up any type of a committee, rulemaking committee like that, because, first of all, there's not anybody that would be from the defense community or representing the respondent judges. And I think that those need to be added. And I also think just a balance of people on that committee is a good common-sense change. And then the second is, when the Supreme Court recuses. There was an amendment to include District Court judges, which we completely support. We think that that makes sense. The way it's set up right now is it would restrict to one per Judicial District, and I think that just becomes a weighted way of doing it. It should just be truly random. So, we're in support of that amendment, but overall we're in support of this resolution. Thank you for your time. I'm happy to answer any questions.

**Sen. Rodriguez**
Thank you. Justice Marquez.

**Justice Marquez**
I have nothing to add on this Bill.

**Sen. Rodriguez**
Even easier. Welcome to our little, cozy, little committee room. Colleagues, do we have any questions or anything for the judges?

**Sen. Gonzales**
I want to thank you both for joining us and offering that perspective.

**Sen. Rodriguez**
It's been nice to have you in the Supreme Court chambers. Senator Gardner.

**Sen. Gardner**
Thank you. Justice Boatright, Chief Justice Boatright, Justice Marquez.  Thank you very much for being here today. Thank you to the Court for what has been a long, arduous, at times for all of us, painful process. I think that's just the nature of something that is this broad in its scope. But I think we're in a very good place. I do just for the Committee's edification, I have the two amendments that Chief Justice referred to, and I think we'll leave it at that. Thank you very much. Appreciate your work, and thank you for what you do on behalf of the people of Colorado.

- 4 -

**Chief Justice Boatright**

Thank you.


**Justice Marquez**

Thank you.


**Sen. Rodriguez**

All right, next I have up Joe Dawson and Jim Browski. They're both online. Just Browski? Okay.


**Sen. Rodriguez**

Mr. Browski, if you can hear us, you need to accept the promotion to testify.


**Mr. Browski**

Yeah, sorry, I stepped away again. I can hear you. Thanks for calling on me. I appreciate it. Can you please tell me how long you have?


**Mr. Browski**

Oh, three minutes. Okay, I better get going. I appreciate everyone here spending the time on this issue. The reason I'm here today is because I've seen the case of a loved one in the family court go just completely sideways. And I think one of the issues here is, I'd say, pretty much no one in their right mind would file a complaint against the judge that's presiding over their case, simply because that judge is in a position to retaliate against them. So I've got a suggestion, or a couple suggestions here. So one would be is I kind of think about the appeals court serving it as a natural kind of check on the district courts. I think one idea you know whereby you could start to investigate you know potential misconduct, would be if a judge has X number of appeals against him in any given year, I think that that should initiate an investigation into him, him or her, and whether or not they're fit to serve as a judge. That way, you know, it's not the person in their court filing a complaint against them. You would then have, you know, experts who are on the appeals court that have actually looked at what the judge did, kind of serving to kick the process off. And, then, also a couple other quick points. I noticed on the makeup of the COJD, you got two district court judges, two county court judges, two attorneys, and four citizens. I think the number of judges on the panel's a bit high. As everyone in the room knows, judges run in the same circles. They're friends with each other. I find a little bit unlikely that they're going to want to fully investigate their colleagues. So, I think there should be more citizens and more attorneys on board. Same thing with the adjudicator board. And then on, let's see, on kind of the appeals review panel board, I notice it's comprised of seven judges, randomly selected. I think if the defendant in the proceeding is a District Court judge, then the process should be set up such that a majority of the judges presiding over the appeal are appeal judges, and then vice versa. I think that you all have done good work, but there are a couple of things you could potentially do to iron out some of the inherent conflicts of interest. I think it would be naive to think the judges are going to be hard on each other. That's all I have. Thanks for the chance.

- 5 -

**Sen. Rodriguez**

Three minutes.

**Sen. Rodriguez**

Thank you, colleagues. Is there any questions for this gentleman? Any comments? Thank you for being here and thank you for your testimony. Next up, I have in person. I have three people. I'm going to call them up.  Emma Garrison, David Prince, and Elizabeth Espinosa Krupa.  All right, guys who would like to go first? You have three minutes.

**Emma Garrison**

Thank you. Mr. Chair, members of the committee. My name is Emma Garrison, and I am the President Elect of the Colorado Women's Bar Association. She was not called up with this panel, but one of my colleagues is logging in on zoom from Pueblo. That's Ariana Busby, who's the Co-Chair of our Public Policy Committee. She's been heavily immersed in the specific language of the Bills and conversations with stakeholders, and I'm hoping to have her on hand as phone a friend if there are questions that I may not be able to answer. The CWBA is an organization of over 1500 attorneys and legal professionals with chapters across the state. Our mission is to promote women in the legal profession and the interests of women generally. Our members include judges, judicial law clerks, and staff within the Colorado State Judicial Branch. About 10% of our membership is employed by the Judicial Branch, and hundreds of our members practice before Colorado state courts. We even have a few legislators in our membership. Every year, our Public Policy Committee actively engages with the General Assembly, and we advocate for legislation that promotes and protects the interests of women and children. We are also actively engaged in the Governor's judicial appointment process and conduct due diligence on every short-listed candidate and present endorsement recommendations that take into account the goals of advancing justice, creating a diverse bench, and ensuring fair treatment of women, people of color and other historically marginalized groups. We also create programs and initiatives that support diversity, equity, and inclusion within the legal profession. This Summer, we had the privilege of working closely with Senators Gardner and Gonzales on the judicial discipline interim committee. We submitted research and proposed recommendations that were ultimately condensed into the three bills you will be hearing today. We again want to extend our gratitude for your receptiveness to our recommendations. HCR 23-1001 is an important step in modernizing our judicial discipline process. First, this constitutional amendment would establish an independent adjudicatory board for formal disciplinary hearings or to appeal from informal disciplinary actions of the Commission. This is important because it separates the investigative and the adjudicatory functions of the judicial discipline process. This is consistent with the majority of other states and with the recommendations by IAALS. Additionally, the panel of appellate judges is established to hear recommendations from the Adjudicatory Board of Appeals if they involve Supreme Court justices as a party or witness, and this removes the actual or appearance of any conflicts. The constitutional amendment also makes crucial changes for transparency and communication, and brings Colorado in line with other states to make judicial complaint information public when formal charges commence. Currently, that information is confidential until the conclusion of the case. There's also

- 6 -

language that specifies that a victim in a case can be kept updated while the confidential investigation is going on. I see my time is up. I am available for any questions. Thank you again.

**Sen. Rodriguez**
Thank you. Ms. Espinosa Krupa.

**Elizabeth Espinosa Krupa**
Yes, thank you. Good afternoon. My name is Elizabeth Espinosa Krupa. I'm an attorney licensed in the State of Colorado and the Chair of the Commission on Judicial Discipline. We fully support the bill. We have not seen any amendments, so I can't speak to those. I can tell you that we got here from an unprecedented conflict. We have appreciated all of the Interim Committee's time, everyone that's listened to the Commission and the opportunity for a full review of the Commission to help our process be stronger and more transparent, as well. We are very appreciative of the support that we've received and fully support the bill. I will defer any questions on amendments when I know what exactly those are. Thank you.

**Sen. Rodriguez**
Judge Prince.

**David Prince**
My name is David Prince. I'm one of the judicial members of the discipline commission, and I serve currently as the Vice Chair. I echo what the two preceding me said about the quality of the interim committee process, the amount of work that's gone into 1001. We on the Commission fully support it. I heard some discussion again, we haven't actually seen amendments. The first I heard the amendments was when Judiciary talked about it a couple of minutes ago. I heard some discussion about the rulemaking body. So, I thought I would just clarify. I think the membership was a little off. There are five members that are appointed by the judiciary. There are five members that are appointed, excuse me, I said that wrong. So, I just said it off. There are five members that are appointed by the adjudicatory board, the new adjudicatory entity. There are five members that are appointed by the Commission, and then there are three members that are appointed by the Judiciary through the Supreme Court. So, that's the mix that is in the existing bill, and I believe that was chosen to make sure that the judges did have representation. So, our understanding is the reason those three members of the Judiciary are on there is to provide that representation of what was called respondent judges a moment ago. The other issue that I heard talked about, again, I'm not familiar with the amendment, but what I heard talked about was in the selection of the judges who serve on the special tribunal. That's the one that kicks in when there's a conflict for the Supreme Court. What I understood was the pending request is that, right now, it's a requirement that no more than one member of that seven-member special tribunal comes from an individual district. And the request was that it be just an open lottery, instead. What are the reasons for the design that it currently has? One, it is an open lottery. It's a random selection, but the limitation of one per district is to try and make sure that there's going to be statewide representation. Because you

- 7 -

find in judicial discipline, a very important distinction is that perspective between an urban area and a rural area. And the numbers alone just tell us, if we just do an open lottery with no parameters on it, the odds are it's going to be heavily stacked with large jurisdiction perspective. And we're not likely to see an urban jurisdiction perspective on the court, on the special tribunal. So that's the reasoning for it.

**Sen. Rodriguez**

Colleagues. Is there any questions? Senator Van Winkle.

**Sen. Van Winkle**

Thank you, Mr. Chair. Thank you so much for being here today. I'm having flashbacks to last Summer. But I know this is a somewhat of a compromise bill to make everyone mostly happy. If you could just wave a magic wand and get whatever amendment you wanted. Is there one that you have in mind?

**Sen. Rodriguez**

Anybody you are directing that to?

**Sen. Van Winkle**

No, no. Would anybody like to answer that?

**Sen. Rodriguez**

You don't have to.

**David Prince**

I'm willing to answer. It is excellent, and it is a compromise bill. And would there be differences if we were starting from scratch and I got to draft it myself, or the Commission itself got to draft it? Yeah, there probably would be. The one that strikes me that's the most important is the challenge that the judge members of the Commission are appointed by the Supreme Court. That appointment power is a challenge, and so in my ideal world, you would change that appointment authority. In fact, there was a draft that existed a year ago that had a different approach to that appointment authority. Reason for that is it's a little bit different. Let's say the Governor appoints Ms. Krupa as a member of the Commission. Well, frankly, the Governor has no continuing influence over Ms. Krupa once she's appointed. She's not an employee of the Governor. She doesn't work for some administrative agency that's influenced by the Governor. The judge member's relationship with their appointing authority the Supreme Court is a lot different. They have continuing authority over us, they have authority over dockets. They have authority over staff. They have authority and influence over the performance commission process. They have authority, one of the authorities we saw in the last several months, was that authority over our licenses. They have authority and the ability to influence whether judges get what are considered perquisites in terms of desirable committee assignments and those kinds of things. So, there's a lot of opportunities to apply pressure to a judge member. One of the issues. Actually, I didn't look back at this, but my memory for the judge appointments on the adjudicatory board, remember if this is the final or if it was just one

- 8 -

that was considered. But it was actually broken up so that the different groups appointed different categories. So, it wasn't just judges appointing judges. Again, I can't move that's the final, we talked about it. It would be the Judiciary would appoint a citizen, a lawyer and a judge and the Governor's office, I suppose, but a representative, maybe of the legislative branch would appoint a citizen, a judge, a lawyer, a representative of the Executive Branch would appoint not just executive folks. I'm winding down and getting a little confused at this point. But if I could wave my magic wand, the one thing I would do would improve the appointment authority, so that you insulate the members of the Commission from undue pressure or undue influence. And I think we have seen some history of that, so it's not just an academic issue.

**Sen. Van Winkle**
Thank you very much, and I appreciate that.

**Sen. Rodriguez**
Thank you. Colleagues, any other questions for this panel? Thank you guys for the work you did. Senator Garner.

**Sen. Gardner**
Thank you, not a question, but just in the same way, I want to thank the Commission, Judge Prince, Ms. Krupa, Mr. Gregory, all of you members, as well as the Women's Bar, for your participation and going down the road with us, if you will, in this process. And I think, as I said, I think it's been long, it's been arduous. It's been very important. It has been painful for all of us, at times, all of us. And I think that's just the nature of change in the process. I don't think there's anything. What I mean by that, other than so many times when we do things that are that are hard work, and make tough choices, tough decisions it requires a great deal of reflection. So thank you very much, and we appreciate it, and whatever minor refinements we do or don't do. I think we've got a great product here and it's because of everyone's participation. Thank you.

**Sen. Rodriguez**
Thank you guys for your work on the panel and for being here. All right, next I'm going to call up. I have two more, Ariana Busby and Alison Connaughty. They're both remote.

**Emma Garrison**
So, Alison is actually not here. She signed up to tag me out in case this hearing ended up going well into the evening.

**Sen. Rodriguez**
But we have Ms. Busby. It's all you Ms. Busby.

**Ariana Busby**

Hi Senators. Thank you for having me. Ariana Busby on behalf of the Women's Bar Association. Alison Connaughty, is also on behalf of the women's Bar Association, and we're just available for questions.

**Sen. Rodriguez**

Great. Any questions? Shows all the work you guys did in the Interim. Thank you for being here. We have no questions. Is there anybody in online or in the audience that would like to testify on the bill? Please proceed up here.

**Sen. Rodriguez**

Good afternoon.

**Sen. Rodriguez**

Come on down. You'll have three minutes. Introduce yourself.

**Deborah Carroll**

It's really hard to hear when there's no microphone in here. So, it's difficult to be able to catch everybody who's not speaking clearly.

**Sen. Gardner**

The microphone is that little green light in front of you.

**Deborah Carroll**

This one here?

**Deborah Carroll**

Okay, well, they weren't sitting there. All right. My name is Deborah Carroll. I testified two times to the Interim Committee, and my message is really, you know, I keep being told by everybody, focus on the bill. Focus on the bill. But I don't think focusing on the bill is the point. I think focusing on the culture and the protections that the Supreme Court has woven around itself in its own writing, of its own support, in its bills and all of its judicial officials coming forward to support what they're doing is the real issue. I think the State is hiding a lot of secrets. And I want to let you know that I presented to the legislative hearing committee about four or five years ago. I'm old. I'm still working. I still go to court. I should have gone to a court hearing today for a mom whose four-year-old daughter told the principal that her mother slapped her 20 times in the face. And the kid can't even count to 20. Let that sink in. And they took more pictures. And she has a hearing today for pretrial, and she's never been arraigned. She's never been told she has a right to a jury. There's serious problems with our system of governance. And in that hearing that I presented, I handed the memorandum of procedures commissioned by this Colorado Supreme Court, which pays for the all the Guardians ad litem in their Office of the Child

- 10 -

whatever. The memorandum of procedures returns a child to a parent with history of sexual abuse against the child, if the parent admits to it.

**Sen. Rodriguez**

Yes.

**Sen. Rodriguez**

Ma'am, you need to address the bill.

**Deborah Carroll**

Yeah, right. Let's worry about proper procedure. I don't know if you people have hearts or souls, if you are going to stand up for this. This is more protection for judges. I've got to put my glasses on so I can read my notes. They're disciplined in private. They control the investigations. They control the privilege. They don't give subpoenas. They use the laws to protect themselves. That's all I really have to say. I don't need any more time.

**Sen. Rodriguez**

Thank you for your testimony. Does anybody have any questions? Alright, please come up. I don't know if we got you the link, but we do need you to sign up so we have your names on record for the testimony.

**Halina Topa**

I took a picture, and I'm 69. I'm a baby boomer, and I still use the rotary dial, you know. Have some mercy. Thank you. My name is Helena Topa, Excuse me, I have to have some water. Four children died last year, and hundreds are suffering. Nazi Germany is not the time and a place, but attitude and experience. Both of my parents were Nazi fighters. My mother was shot by Nazis on three different occasions, and one occasion, a Nazi officer saved her life. My daughter recently was asked by United Nations to be a leader in global development of resilience, the certification from Desert and infrastructure. So kudos to me, because in the end, is how your mother raised us. My son mutilated himself in his father's custody, there's no place to go. Jeff Timlin, Judge. KJ Moore, Chris Bassinet, Doris Waters, there's nobody. There is nobody here. Okay, I being Polish. I heard a lot of Polish jokes, and the only thing I can come up to, because I recently went to Poland that that I'm dumbfounded, not dumb. Okay, this is what is happening in this country when it comes to children. There's no trial for divorces. There's no trial for CPS, trial by jury for CPS and for parents accused of child abuse. There's no. One doesn't have to be stupid. One has to be evil in order not to understand that in a in a contest of intimate relationship, it's a breeding ground for human trafficking. Human trafficking is to enticing somebody. So there are gold diggers. In case of women. In my case, there was a gold digger and baby chaser. I was sexually assaulted. Littleton police, your only just a woman. I'm not just a woman, the whole, the whole Constitution of United States, by the way, I graduated from Ivy League sort of high school, and I knew Polish Constitution, which American Constitution was fashioned after the Polish

- 11 -

Constitution. This is kind of my story. But this is a shame. This is, this is not stupid. This is not oversight. You have judges, and they're flying monkeys. Like, why is Jeff Timlin still working when my son have self mutilated himself in the father's fathers? You know, we don't call them fathers. They are rapists and there are fathers, okay, there's a difference. But I don't think that so Rice is still working. I read a little poem, America, the beautiful. In America, a country that is great. You've got it made my dearest mate for everything here is for sale. You can even steal a child. If you are a male, find a girl and love you pretend, tell him some stories of honorable intent. There was a little, you know, but I'm not going to say that we actually it was, do not ask you for logic, for this is no China. Just say you accidentally fall into her vagina. To have honor, courage, responsibility, you don't have to bother for whatever you do or don't. They'll call your father. This is America. You are free to choose. You can indulge in all kinds of abuse, financially, physically, physically, sexually and legally. Don't worry, you will not be judged criminally. And you know for sure that you are a master if you and you know for sure, you are a master. If you put her in position.

**Sen. Rodriguez**

You need to kind of wrap up, you have exceeded your three minutes.

**Halina Topa**

Okay, it's another five minutes, and you're gonna get a point. That's about the point, right? Okay, I'm sorry, yes, okay, whether she stays or go with you, for the life she has to choose is the life of hardship or life of abuse. And if you want to be really cute. You can throw a custody suit. American police and American tribute Tribunal will not bring to justice the criminal. For they say you had the relation, therefore they pretend not to see the experimentation, to comfortably bring the victim home and hide these crimes under domestic problems down. They take Nazi favor or crime, but for you Auschwitz, you get no dime. Shame on us all, there are children suffering. And here's my goal for all of you.

**Sen. Rodriguez**

Thank you. We'll put it in the record. Is there any questions?

**Halina Topa**

Let's put it to the heart, because we are just below caveman.

**Sen. Rodriguez**

Thank you for your testimony. Is there anybody else online or here would like to testify? Seeing none, the testimony phase is concluded. Sponsors, are there any amendments? Senator Gonzales.

**Sen. Gonzales**

Thank you, Mr. Chair. I think the testimony that we've heard today, I think demonstrates the breadth and the breadth of perspectives, and also the result of a lot of work that this committee has taken over the course of many, many months, I understand that there are amendments that have been drafted. But

because I do want to make sure that all parties have the opportunity to review the amendments. And because I do see these, I think we see these as a package, as well. It's our intent today to lay over the bills, hear testimony, and then make sure that everyone is able to review the proposed amendments. So that prior to us voting on what this what these amendments may be, so that as they head to the floor, that all parties have had the opportunity. We're in a different room, and so it's a little different for all of us. So that's all. Mr. Chair.

**Sen. Rodriguez**
So, there are no amendments?

**Sen. Gonzales**
Mr. Chair, we're gonna lay the bill over.

**Sen. Gardner**
We would request you lay the bill over until Monday's meeting of the Judiciary Committee.

**Mr. Browski**
What is that date?

**Juliann Jenson**
The 24th.

**Sen. Rodriguez**
The 24th. Okay, the bill, as requested by the sponsor, will be laid over till the 24th, on Monday. All right, sorry, I got sidetracked with the technology.

**Sen. Gonzales**
Thank you.

**Sen. Rodriguez**
So, the next bill we have up is our concurrent resolution. No, no, that's what we just did. House Bill 1019. Senator Gardner or Senator Gonzales, who would like to start?

**Sen. Gonzales**
Thank you, Mr. Chair. So, the first policy that we considered is a concurrent resolution that would submit a constitutional amendment to the voters of the State of Colorado. House Bill 1019, makes the accompanying statutory changes to the policy. I'm sorry, that accompany, I guess I should say, the concurrent resolution. And let me just state that this is also the result of the Interim Committee's work that requires the rulemaking committee to propose rules for the Commission on Judicial Discipline and promulgates another set of rules, as well. This is, as you can see, the result of iterative, multiple

- 13 -

conversations. And I will also note that for the record, our colleagues in the House, even following that work, made amendments. Because we are trying to, again, be thoughtful and intentional as we are bringing forward this policy for this committee's consideration today. I'll turn it over to my co-prime sponsor to add on any additional comments that he wishes to share at this point.

**Sen. Rodriguez**
Senator Gardner.

**Sen. Gardner**
Thank you, Mr. Chair and members of the committee. As Madam Chair has stated, this is the companion statutory component of the House Concurrent Resolution. It is an implementing bill in that sense. It sets up a process for the rulemaking surrounding the judicial discipline process. It establishes a committee to propose rules to the Commission and Judicial Discipline Adjudicative Board. And, as was mentioned, there were some refinements in the House, but it still closely tracks what came out of the Interim Committee. I do not know of any amendments to House Bill 1019, at this time, and it seems that the implementing bill has less concern or less disagreement remaining. So, we ask for an aye vote on House Bill 1019.

**Sen. Rodriguez**
Senators, questions for the sponsor? Senator Van Winkle.

**Sen. Van Winkle**
Yes, Mr. Chair. And I am very familiar with the bill that came out of the interim committee. Did the house make any dramatic changes or belts and suspenders?

**Sen. Gardner**
I'm trying to remember the sequencing of this. That it did end up with a combined rulemaking process. I don't know that that's dramatic. But I think it's fair to say that when we finished the interim committee, we had some things that we all knew needed refinement and further discussion. But I wouldn't say there's anything dramatic.

**Sen. Van Winkle**
Thank you.

**Sen. Gonzales**
Thank you, Mr. Chair. I agree with Senator Gardner's perspective on the amendments that the House Judiciary Committee made. They appear to me to be refinement, as opposed to a dramatic departure from the work of our interim committee. Certainly would welcome from anyone who's here to testify, if their perspective departs from our impressions as the sponsors of the policy. But I think we've all been really trying to ensure that this is practicable and workable for all parties involved. I will also just state

- 14 -

for the record that we are joined by the Chief Justice and Justice Marquez, who have not signed up to testify but are in support of the policy. And at this point, if there are no further questions from members of the committee, we welcome the testimony portion of the hearing.

**Sen. Rodriguez**
Any other questions for the sponsors, colleagues? All right, seeing none. I've got a few remote. I'll call up smaller groups based on the seating arrangement in here. But I have one person, in person, Wendy Sellers. And then I have 1,2,3 online, which are Jenny Dees, Kelly Havilland and Andrew Lip. They are online.

**Sen. Rodriguez**
Is Wendy Sellers?

**Juliann Jenson**
No. No Andrew lip.

**Sen. Rodriguez**
No Andrew Lip. Wendy Sellers, in here, in person? No Wendy Sellers, all right. Jenny Dees, do we have Jenny Dees? There we go. Ms. Dees, can you hear us? Nope you're muted.

**Jenny Dees**
Okay, can you hear me?

**Sen. Rodriguez**
We can hear you. Please introduce yourself and who you represent. You have three minutes of testimony.

**Jenny Dees**
Okay. I'm Jennifer Dees, and I'm here representing myself and many other parents that have dealt with the Judiciary. Each of you have received an email, each of you representatives have received an email with the transcripts that I highlighted and a copy of the emails from the Commission on Judicial discipline. So each of you should have these already. I have learned that. There is no oversight in the Colorado courts whatsoever. Every complaint that is filed with the Attorney Regulation Commission or the Commission on Judicial Discipline is closed without investigation. And I have multiple cases that I can show you. In March 2022, Jeffco Judge Sergeant tampered with my jury for protection order violation for sending an email about my child to a court ordered email address. On a protection order that was never served, and all the court records proved this. Judge Sargent felt appropriate to answer the jury's questions during jury deliberations without the defense or the prosecution or myself there, as the law demands. Judge Sargent answered all the jury's questions and never turned in the written jury questions for the record, for the appeal. Judge Sargent was arrogant enough to admit to tampering with

- 15 -

the jury the next day, on the record, after the jury came back guilty. This is because every judge in Colorado knows they can commit fines and violate our rights at will, and no one, absolutely no one will hold them accountable, especially our legislature. Right after my complaints were closed by the Commission on Judicial Discipline, Judge Sergeant put in for retirement, but not before staying on my case to tamper with my jury. In the same the same sentence where he refused to recuse off my case, he admitted he had hostility for me, and that's in your transcript, when I filed a complaint for tampering with the jury with the Commission with all the transcripts. The judicial commission sent this back to me, and it says, Mr. Gregory, Executive Director of the Colorado Commission on Judicial Discipline mailed you a letter in January of 2022. Mr. William Campbell, who was the prior director, issued your letter March of 21. There will be no further action taken on your request, your cases is considered closed by our office. They didn't care to investigate, and I just listened to Justice Boatright claim that they want transparency, yet he's covering for William Hood, who is a Justice on the Colorado Supreme Court with him, who has been bartering and pandering to you legislators personally to get these laws passed. Justice Hood is controlling all the judges on the lower court like a puppet. He is coming to you to protect himself. There are motions in the appellate court right now on Hood's orders where he kidnaps my child under color of law. All these judges continue to cover for him. In 10 years, they not granted one hearing, not one. Every motion I file in the Denver Court has been similarly denied, even when my ex doesn't respond. These judges have violated my due process and my children's due process, and to have the Supreme Court part of any of these commissions is going to be a failure. I have already served Justice Hood and the State and other judges with data preservation litigation notices and notice of claims. They've all been served. They know this is going federal. And I think that the representatives you all to start looking into this more and investigate.

**Sen. Rodriguez**
Ms. Dees, I need you to wrap up.

**Jenny Dees**
Well, I was just about done when you cut me off. But thank you. None of you have been willing to reach out, even though I've sent multiple emails. I have called your offices. The only one that would reach out was Lynch, so I appreciate him. But none of the rest of you are willing to talk to your constituents at all about this, and that's why this will continue until you do.

**Sen. Rodriguez**
Thank you for your testimony. Colleagues, do we have any questions for Ms. Dees? Seeing none, thank you Ms. Dees for being here and for your testimony. Ms. Havilland, can you hear us?

**Kelly Havilland**
I can, thank you.

- 16 -

**Sen. Rodriguez**

Please introduce yourself. You have three minutes please proceed to testimony.

**Kelly Havilland**

Hello. I'm Kelly Havilland. I am the grandmother of a child in Colorado. We've been involved with court, and as you can tell from a lot of the parents, there's been a lot of harm done, a lot. And I will tell you that when I read this and testified previously, I can see that there's been edits which don't meet people friendly on 23-1205, it says that only judicial personnel can report to the judicial ombudsman. So I'm not sure where the disconnect happens, but it needs to happen for everybody. I also would like to see a timeframe included into these actions. There is a very small window of when you need help from some judicial misconduct or whatever is happening. You need help by sending there. It's not something that you can just let it slide and the child get removed for no reason or for an age event or anything, and the child get harmed. The relation gets behind. And then parents are put into situations where they can't afford to file and wait five years and hire for a state case or an appeals case. Like people just cannot afford that. I will tell you that in my personal case, I was vetted by Natalie Chase in 2017 and 18. In 2020, Arapahoe County lied to Natalie Chase. Those are all kinds of stories. Lied about what my TRAILS report consisted of. Natalie Chase ignored me. Natalie Chase, was removed off of her chair, and she was an attorney. I called Natalie Chase, and she says, Oh, my God, you actually had a copy of the CPS report that has all of that information. Well, yes, why do you think I intervened like my rights were completely, completely decimated, and there was no way, no way to stop what was happening. And you know, it is now a part of a class action lawsuit against Colorado Department of Human or Arapahoe County Department of Human Services. Like just the fraud happening, the people need a way to stop it in its tracks. Ask for help. Get the help. Whatever that help consists of, it needs to be able to happen right then and there. Not five years down road. Thank you so much, and I appreciate every one of you.

**Sen. Rodriguez**

Thank you. Colleagues. Is there any questions for Ms. Havilland? Seeing none, thank you both for your testimony.

**Sen. Rodriguez**

Is there anybody else that wants to speak in amend or opposition to the bill online or in person? Alright, I am moving. I'm getting to that now. And the way I messed up last time is to separate you. I'm just gonna try to keep you a group. So, I'm going to call up Judge David Prince and Elizabeth Espinosa Krupa. Who would like to start?

**David Prince**

Apparently, I'm starting. I introduced myself a moment ago. David Prince, Vice Chair of the Colorado Commission on Judicial Discipline. I just reiterate that the interim process was thorough. The House Judiciary Committee hearing was also very thorough and extensive. I agree with the characterization

- 17 -

that there were a few iterations, a few refinements, I think is the word I was looking for. A few refinements. Other than that, we fully support 1019, and are here to answer any questions.

**Sen. Van Winkle**
Ms. Espinosa Krupa.

**Elizabeth Espinosa Krupa**
I would just say ditto.

**Sen. Rodriguez**
Colleagues, do we have any questions for this panel on the process? Sen. Gonzales.

**Sen. Gonzales**
Thank you, Mr. Chair. Not a question, just an expression of gratitude for all of your participation and diligence over this very long process. Thank you.

**David Prince**
I appreciate all your work too.

**Sen. Rodriguez**
Okay, trying not to make the mistake I made on the last panel. I have Emma Garrison, Ariana Busby online. And is Alison Connaughty not here again?

**Emma Garrison**
Alison's not here.

**Sen. Rodriguez**
Okay, so if you and Ms. Busby. Try to pair it up correctly,

**Emma Garrison**
Thank you so much for your attention to that detail. Again. I'm Emma Garrison. I am the president elect of the Colorado Women's Bar Association. And HB 23-1019 is another bill that we were fortunate to work on in the interim process this Summer. This bill allows an individual to submit a judicial discipline complaint online and also to file a complaint anonymously. It really modernizes our judicial discipline process. This bill also brings us in line with states like New York that have searchable online data available regarding judicial discipline and. Sorry, and in line with other licensed professionals like we have for attorneys with Attorney Regulation and healthcare providers through the Department of Regulatory Agencies. One thing that we heard throughout the interim committee process was that complainants did not always understand how the process worked and that there was a lack of communication once a complaint was filed. So, this bill would require that the Commission provide

- 18 -

information about the process to a complainant, including the ability to make their complaint anonymous, to assign to point person for regular status updates on their case, and to provide an explanation if their case is dismissed due to lack of jurisdiction. That last part can be particularly helpful for complainants, because we know from the data that's available that many complaints received are non jurisdictional and are related to things like disappointment over a judge's findings. And explaining something like this to a complainant who may be a pro se party, enables them to understand their other options, like filing an appeal. So we believe that this bill greatly improves access to the Commission and a potential complainant's comfort when engaging in the process. Paired with the ombudsman bill, which is proposed in the next bill we'll be discussing, we're thrilled to see a proposal that's so victim centric while also being geared towards public access and transparency. We thank you again, and we're available for any questions.

**Sen. Rodriguez**
Thank you. Ms. Busby, can you hear us?

**Ariana Busby**
Yes, I can hear you.

**Sen. Rodriguez**
You're up.

**Ariana Busby**
Hi again. Thank you so much for having us. Ariana Busby on behalf of the Women's' Bar Association. We have Emma there in person. I am here for any questions. So, ask away if there's anything that comes up.

**Sen. Rodriguez**
Thank you very much. Colleagues, is there any questions for this panel? Seeing none, thank you guys for being here. We'll probably see you on the next bill.  All right, I think I have Dr. Malia Reddick.

**Malia Reddick**
Malia.

**Sen. Rodriguez**
Malia, sorry.  Welcome to the Judiciary Committee. Please introduce yourself, who you represent, and you will have three minutes.

**Malia Reddick**
Mr. Chair, members of the committee, thank you for the opportunity to testify before you today. My name is Malia Reddick, and I'm the Director of Research at the Office of Respondent Parents' Counsel.

- 19 -

I'm here to support HB 23-1019, and I also want to make a few comments on HCR 23-1001. In Federalist Number 78, Alexander Hamilton wrote that the judiciary has no influence over either the sword or the purse. What he meant was that courts and judges lack the authority to enforce their own decisions. For acceptance of and compliance with those decisions, they rely on the public's trust in their legitimacy and integrity. Colorado's Judiciary has come under the microscope in the last few years, and I think it's fair to say that public faith in our state courts has been compromised. The bills this committee is considering today come at just the right time. Members of the public, and especially individual litigants, need to know that judges are held to the highest ethical standards, that the process for doing so is impartial, and that they can participate in the process in a way that feels safe to them. HB 23-1019 addresses these needs. In particular, it brings significantly more transparency to the process for investigating complaints of judicial misconduct. This increased transparency will enhance the public's confidence in the impartiality and integrity of the process. It is for this reason that the ORPC urges the committee to vote yes on 1019. The ORPC supports HCR 23-1001, as well. And in particular, the amendment made by the House of Representatives that vests rulemaking authority for the judicial discipline process in a committee, rather than solely in the state Supreme Court. This would bring Colorado in line with 22 other states, many of which are our Western neighbors. We would make two suggestions regarding the jurisdictional scope of the Commission on Judicial Discipline and the selection of its members. From the ORPC's perspective, including magistrates in the Commission's jurisdiction would provide more consistency in enforcing judicial ethics rules. This is relevant to our agency, because magistrates often hear dependency and neglect cases, and we believe ethical. standards for these judges should be consistently enforced. In addition, as Judge Prince mentioned, vesting the selection of the judge members of the judicial discipline commission in entities other than the Supreme Court would enhance the integrity and impartiality of the judicial discipline process in the eyes of the public. There are 18 states that use a different selection process for the judge members of the commission than we currently do in Colorado. There are 13 states, including Wyoming and Washington, where the Supreme Court has no involvement in selecting the judge members or any members of the Judicial Discipline Commission. Thank you for your time today, members of the committee, I'm happy to answer any questions.

**Sen. Rodriguez**
Thank you. Colleagues, do we have any questions on this testimony? Thank you for your testimony.

**Malia Reddick**
Thank you so much.

**Sen. Rodriguez**
I believe that concludes who I have signed up to testify. Or is there anybody online? Nobody online? Anybody in the audience who would like to testify? That concludes the testimony phase. Sponsors or Senator Gonzalez.

**Sen. Gonzales**

Thank you, Mr. Chair. Again, because we think that this, these policies should be considered as a package of bills. We would request that this bill be laid over to Monday, as well, along with the other bill.

**Sen. Rodriguez**

Senator Gardner.

**Sen. Gardner**

Thank you, Mr. Chair. And before you do, and I assume you will. In light of the testimony today, I wanted to make some comments before we lay it over. First of all, the judges and lawyers who have appeared before us today have belied the myth that lawyers are verbose. I think it's only lawyer legislators that are verbose because they have been brief and to the point with their testimony.

**Sen. Van Winkle**

You should be like them.

**Sen. Gardner**

I do want to say that having appeared in the courts of the state and before the judges and Senator Roberts is the other among us who has that privilege. I leave the courthouse sometimes very happy with the outcome that I get. I leave the court sometimes very unhappy with the outcome that I've gotten. As often as not, I leave it with mixed feelings. Turns out, it's not a lot different than leaving committee here in the Colorado Legislature. But in my professional career, I have universally believed and see that our Judiciary in Colorado is of the highest quality.

**Halina Topa**

Please, please. I need to leave.

**Sen. Gardner**

Withstanding the testimony. Again, whether I agree with the particular ruling and so forth. That we have a Judiciary that is characterized by its honesty, its integrity, its forthrightness and its willingness to rule according to the law and in accord with due process. Again, I don't purport that they're perfect. I don't purport that out of the, I think 300 plus, that they're just as with any other institution or legislator, that there may be some outliers. But I have been in the past several weeks, grateful, as a Coloradoan that we have the judiciary we have appointed with a process that is not subject to politics, is not subject to the whims of the day. And our efforts and the efforts of the bench and the Commission on Judicial Discipline, I think all of us has been to ensure that same kind of culture going forward. I think we have work to do. What has impressed me is that the bench itself, as has the Commission, has been committed to that work and committed to that discussion. So with that, I renew our request to lay the bill over, and then we'll go to the more difficult bill in that process. Thank you. For your indulgence, Mr. Chair.

- 21 -

- 22 -

**Sen. Rodriguez**

Thank you. At the sponsor's request, the bill will be laid over to match the concurrent resolution. So, the next bill is 1205. Sponsors.

**Sen. Gonzales**

Yes, for this one, it might make sense to ping the Majority Leader as a co-sponsor? Yes, we'll stand in a brief senatorial five in order to.

**Sen. Gardner**

Retrieve the Majority Leader.

**Sen. Gonzales**

Yeah, our prime sponsor.

# Appendix 27(y)(ii)

# Transcript re: HB 23-1205;

# Senate Judiciary Committee Hearing—April 19, 2023: HB 23-1205

**Sen. Gonzales**

Following our senatorial 90 seconds, we will come back. And at this point, we'll take up the third bill on our docket today, House Bill 1205, the Office of Judicial Ombudsman. This is a policy that also was initially contemplated, although was not a referred policy from our judicial discipline interim committee process. And with that, I will turn it over to Senator Gardner to tell us about this bill, as it stands now here today.

**Sen. Gardner**

Thank you, Madam Chair, it's not often that the Majority Leader says you can proceed without me, Senator Gardner.

**Sen. Gonzales**

You've got to take the joy we you can.

**Sen. Gardner**

I'm going to run with it. So, House Bill 1205, as Madam Chair noted, did not as a product come out of the Interim Committee. Rather, it was a concept. And I think that that reflected the fact that everyone on the committee believed that there was a good deal more work to be done on this concept of the Office of Judicial Ombudsman, as an independent office in the Commission. But it's here now. The whole bill, to some extent, is a work in progress. And if you look at the summary, it's somewhat different than the bill as it's gone through the process. The Ombudsman is going to be an independent, impartial, neutral, confidential resource for the organization. The bill creates that office, and I guess I would say right now, the Office of the Ombudsman means the Office of the Judicial Discipline Ombudsman. And the process is that the independent Office of the Judicial Discipline Ombudsman is an independent agency for purpose of ensuring the greatest protections for judicial personnel. I think there's some controversy around how we scope out the duties or the purview of the office. But it will act independently and neutrally. And there should be, there's a memorandum of understanding and appointments of various people. Because it is a work in progress, I think I'll stop right there. Rather than put stakes in the ground, to be quite honest with you, and take any questions about the concept as I understand it. And I will say the Majority Leader may have different notions, as well. I know Madam Chair and I have had discussions about it, and we opted to take testimony to get a sense of what our constituents in the public feel about the bill. As well as the most certainly the Judicial Department and the Commission on Judicial Discipline. So, I'll stop right there. If it seems somewhat tentative in my remarks, it's because that that reflects where we are with this bill.

**Sen. Gonzales**

Thank you, Senator Gardner, colleagues. Do you have questions for our bill sponsor about the policy? I think Senator Gardner, I will step back and recall my time, prior to my service in the Legislature, as a

- 1 -

paralegal. When people, either in my life or in the course of my work at the law office, would ask me, Hey, I want to tell you about this situation that happened. And as a paralegal, like I'm not an attorney, I'm not going to give anybody legal advice as to what they can or should do, or what they can or cannot do, right? It was, Oh, here is the resource if you want to go and lodge a complaint. Here is where you would go and do that, or here is where you would go and navigate this process, or here is this resource. Whether you go and do that, that is your decision. That is one approach. Another approach would be to say, here is the resource. Now, what is your name, and when did the incident happen? And how can I help you to navigate and fill out this complaint? And then, you know, work alongside you as that process unfolds. Be the decision in the case adjudicated as it may be, I am here to accompany you through this process. I am curious for your perspective because I think the language of the bill. I read it to be not entirely clear as to which process this Office would seek to establish. And I'm curious for your thoughts, or if you have any direction or guidance, and what it should be.

**Sen. Gardner**

Thank you, Madam Chair. Well, my own thought about the Office of Judicial. And I'm a little troubled by the use of the wording that comes to us from the House of "judicial discipline ombudsman." I think it's more like "judicial ombudsman," because it seems to imply that this has to do with the Commission, when in fact, the rest of the language in the bill is talking about protections for judicial personnel. Those of us on the committee are familiar with the Office of Legislative Workplace Harassment, which is our own, not really an HR function, but I may have said that wrong. The Office of Legislative Workplace Relations. That provided an independent office, as independent as it could be, but within our Branch, for legislators, staff, partisan staff, nonpartisan staff, aides, interns, for that matter, anyone who encounters folks within the Legislative Branch to go and say that they have a potential complaint, they have a concern. The structure of that Office is such that they take compliance about both workplace harassment, discrimination, and so forth, as well as under a different set of rules and guidelines. Simple civility in the workplace. I shouldn't say simple but straightforward, people not being courteous. They may be discourteous on an equal opportunity basis, but that's not a good place to work. I have always conceived of this as something along those lines, rather than something along the lines of being a part of the judicial discipline process. Because within the Judicial Department, it may be a judge. But given the raw numbers of people, it could just as likely be a probation supervisor, a court administrator, a supervising clerk, any number of people who might be the subject of a complaint, or, for that matter, that the person who has a concern. One of the areas of disagreement about this bill has been where this would be housed. The bill right now, as I understand, where we are coming out of the House, is that it will be an independent office in the Judicial Branch. I have been strongly opposed, since you asked and we're talking, And transparency being the rule of the day, we'll just talk about it right here. I have been opposed to the notion that it would be in some Executive Branch Agency. I think that presents both separation of powers issues as well as a simple institutional organizational adoption and buy in of the process. Judicial has expressed to me support for an ombudsman of some sort. And I think a lot of the discussion that we've had and the back and forth has been about the location of the ombudsman. The one thing I would like to accomplish here in in our chamber, is a better definition around what the Office is,

- 2 -

and be clear that it's. And I think there will be those that disagree, and so I invite this testimony. I think there are some who would like an ombudsman that would help people navigate the judicial discipline process. I think that's a different thing and a different question about whether or not a citizen, and we've had some testify today who have concerns about judges and wanted assistance in navigating the process for judicial discipline. Whether there's a role for someone. But from the outset, in the Interim Committee, I think there's been this difficulty in getting people to focus on those two functions. One, an organizational function of ombudsman regarding the Judicial Department. And then this other thing of who, who is going to assist citizens, or should we do that? I think that's a discussion different day with the Commission on Judicial Discipline about what would that look like, and how we do that, and should we fund that position? I don't think it takes a constitutional amendment for the Commission on Judicial Discipline to have that kind of an office. Every time we talk about these however, the question then comes to what is its independence? That's enough stream of consciousness for the moment, but I appreciate the conversation, Madam Chair.

**Sen. Gonzales**
Senator Gardner. I very much appreciate this as well, because in the scenario that I proposed, both of the scenarios were external participants. Actors were coming to the courts to navigate some issue what have you. And the question was, how? Was it just guidance of like, Hi, here are your options. Or assistance to navigate the process, and thank you for also naming that the question that I think that this bill is also trying to grapple with is for actors within, employees within the Judicial Branch itself. How do they participate or navigate or have a neutral space to understand what their options may be? So, thank you for that. I think that I'd like to see if there are questions from members of the committee. And seeing none, I want to shift over now to our witness list. And with that, I want to just say here at the onset that we welcome your testimony. We invite you to share your comments for three minutes. You'll see both online and here in the room, the little black box with three lights. Green means go. Yellow means you got 30 seconds left, and red is an invitation to conclude your remarks. Usually, we bring folks up in panels of four. But given the cozy little circumstances today in this fun room, I'll call folks up one at a time and see if members of the committee have questions. And, then, we will go from there. We'll begin. I'm going to also speak in this semi artificially loud voice in a hope that folks at the back of the room can hear me. And with that, I will welcome up Melissa Thompson. Thank you for joining us. If you could please state your name, any organization you may represent, and then proceed to testimony. Thanks for being here.

**Melissa Thompson**
My name is Melissa Thompson. I'm the Director of the Office of Respondent Parents' Counsel, an independent agency housed within the Judicial Branch. I'm also an attorney. And 20 years ago, I worked for an employer. I was sexually harassed. I complained and I was fired. I hired a lawyer to represent me in that lawsuit, and he wasn't a great lawyer. He didn't return my calls. I was very confused about the process, what was happening, and, ultimately, I did receive a settlement. And decided that I would go to law school and dedicate my career to ensuring that no one feels like I did. In making sure that people

have access to excellent counsel. In that capacity, I'm now overseeing nearly 200 lawyers across the entire State of Colorado, in every single Judicial District. I'm hearing from them that they are experiencing issues, going through mental health crises, and they're scared to tell anyone, because they don't necessarily want to hurt their clients. And these are professionals who are fearful to talk about what's going on in our courthouses across the state. This matters to me, because when I was a trial attorney, a friend in my office went to trial. The judge was awful to her. That night, she went to the bar, she sat next to my husband. In the way that we did at that time, going through how bad the day was. And that night, she committed suicide. And I wonder what could have happened if there had been a safe place for her to go to say, I'm experiencing something in the courthouse that I shouldn't be experiencing. What do I do? How do I get help? I think that judicial employees, litigating attorneys, deserve that safe space in our State, and it is our obligation to give it to them through a system. To ask questions like I thought when I was in my early 20s, Is this my fault? Is what's happening wrong? How do I handle it? I don't know. An Ombudsman can serve that role and be a resource for people who may not know where to go and what to do. Don't dilute this bill with amendments that make it less independent, that make it less available to litigating attorneys, and thus attorneys that I serve as the Director of my agency. Because I believe that there are amendments on the table that could do that. I would ask for your support of this bill. Thank you.

**Sen. Gonzales**
Thank you, Ms. Thompson for your testimony and in also sharing for us, your perspective and how these things have changed over time. I'm curious, colleagues, if you have any questions? Senator Gardner.

**Sen. Gardner**
Thank you. Ms. Thompson, I think, as you gathered from my discussion with Chair Gonzales, I think one of the things around this bill has been, what is the scope of its responsibility. I hear you talking about an internal agency responsibility, although not one, let me hasten to add, not one, perhaps that is within the agency, but we're talking about judicial personnel, not necessarily members of the general public. And if you followed my earlier remarks, do you have thoughts on what the scope of the judicial ombudsman ought to be in terms of who it serves?

**Sen. Gonzales**
Ms. Thompson.

**Melissa Thompson**
Thank you, Madam Chair. And thank you. Yes, I have thoughts I usually do. So, I think that it's really important that judicial employees and currently under the definition of the bill judicial personnel, includes litigating attorneys, interns, and volunteers. I think that that is essential. I am a little concerned about opening it up to members of the public. I think that perhaps the Commission should be handling those because I don't want to take what at this point is one potential small agency with a small staff and hand them the public. Because I worry that it will dilute their impact and ability to serve this group of

- 4 -

people. Because if you throw in the public, you're going to hear a lot of things that probably aren't relevant to what the ombudsman does. A complaint about, I don't like a ruling. You know, I think that if those people, members of the public, have those concerns, typically, they're going to have a lawyer who can also raise those concerns. And legal means, motions to recuse the court in that way. So, I don't think that members of the public. Currently, I don't believe that it covers those according to the definition of judicial personnel. And I just think that it's too broad.

**Sen. Gardner**
Okay, thank you. Thank you very much.

**Sen. Gonzales**
Thank you. Seeing no further questions, I want to thank you so much for joining us and sharing your perspectives with us today. Thank you. Next, I'd like to welcome Emma Garrison. Welcome back, Ms. Garrison. Please state your name, the organization you represent, and proceed to testimony. Thanks for being here.

**Emma Garrison**
Thank you, Madam Chair and members of the committee. Again, I'm Emma Garrison, President Elect of the Colorado Women's Bar Association. We're very excited to be here today to talk about HB 1205, regarding the judicial discipline ombudsman. As you're aware and has been discussed, this concept of an ombudsman for judicial discipline issues and even employee to employee complaints, came up during the interim process last summer. We were grateful to work with Senator Gardner, along with Representatives Bacon and Lynch to develop much of the concept that has made it into the bill. However, this bill did not succeed in the Interim Committee, so our work with stakeholders on this topic has continued and still continues.

First and foremost, it's important to be clear about the purpose of the ombudsman. It's our vision that the ombudsman be independent and be a safe place that someone can turn to for information about the complaint process, referrals to community resources, and for assistance in filing anonymous complaints. We believe that the judicial ombudsman's scope should be limited to matters involving concerns related to judicial misconduct and not include employee to employee concerns. By limiting the scope, we offer that the judicial discipline ombudsman should be available for any person to access if they have concerns about judicial misconduct.

Finally, I believe there is an amendment that is in the works. We support the Judicial Department's Proposal for an organizational ombudsman as well. We've been working with Judicial to specify that a direct referral should be made to the judicial discipline ombudsman if there's any indication that a judge is involved in the concern, and to provide the concerned individual with the information about the Judicial Discipline Commission. We believe that Judicial has taken reasonable steps to ensure the independence and efficacy of an organizational ombudsman for workplace issues that are not involving

- 5 -

a judge. We understand that there's been some concerns and confusion about having two ombudsman, an external and an internal. We just want to remind the committee that the purpose of an ombudsman is to educate and serve as a resource, and we believe there's no harm in having more resources available to potential complainants, multiple avenues for information and support may be better.

I'm going to defer to my colleague, Ariana Busby, on sort of more details about the internal process and our position on them, but I'm happy to take any questions.

**Sen. Gonzales**
Thank you so much. Ms. Garrison. Colleagues, do we have questions for Ms. Garrison? Senator Gardner.

**Sen. Gardner**
Yes, thank you, Madam Chair. And Ms. Garrison, just so I'm clear. The Women's Bar conception of the ombudsman is not only an external ombudsman, but the one that focuses on judicial officer misconduct. Do I have that right?

**Emma Garrison**
Yes.

**Sen. Gardner**
And would that be judicial officer misconduct that is toward a judicial employee? Or judicial officer misconduct toward the public generally? Or both of those? Or how does that work in your mind?

**Emma Garrison**
Yeah, I mean, I would, and Ariana can correct me if I get anything wrong. But yes, I think if it is a judicial officer with disciplinary issues, whoever the complainant is, I think the external ombudsman is the place for them. Or that's how I see the external office working.

**Sen. Gardner**
If I may, Madam Chair.

**Sen. Gonzales**
Please dialog.

**Sen. Gardner**
Okay, from the beginning of this process on the HCR and the whole judicial process, one of the discussions I have had, I think, along with colleagues at the Judicial Department was, Okay, how do we deal with judicial misconduct once the Department receives knowledge of that. I think there was pretty strong agreement at this point. I don't know that that was true a year ago or two years ago. I just don't

know. That the appropriate thing to do if someone in the Judicial Department, whether it be from an email from one of the citizens who appears that says a judge did something grossly wrong, sexually harassing, made a comment from the bench that was inappropriate, or approached me in the hallway and made an inappropriate advancement. That it was the responsibility of the Judicial Department to just simply want to make sure that person felt safe and so forth. But that was to be referred to the Commission on Judicial Discipline then and there, immediately. Even if it was an internal situation of a clerk versus a judicial officer. I guess where I'm going with that is that it would seem as if the judicial officer issue of how to then navigate that situation is a function for the Commission on Judicial Discipline. To have someone that might tell a citizen or a judicial employee, how to navigate the process. I mean, do you see that person as being and that office as being something different than that? Because it seems to me that it invokes the judicial discipline process immediately. And I don't know, ask me a question. If you're wondering what I'm asking, there's a lot there to unpack.

**Sen. Gonzales**

Senator Gardner, I am curious because Ms. Garrison had spoke that Ms Busby might be interested in responding as well. Would that be okay? Oh, sure, absolutely, okay. We'll go ahead and bring up Ms. Ariana Busby, who is participating remotely. Just in case, so that we're having like a conversation between the three of y'all, just to not miss anything. And, so, with that, Ms. Busby, if you'd like to weigh in on this at any point, just raise your hand, and then I'll acknowledge you. At this point, I'll turn it back over to Ms. Garrison to respond to the question.

**Emma Garrison**

Sure, I guess I'm a little confused as to what the harm is, and having this independent office that's separate from the Branch and separate from the Commission for someone who's confused about the process and just kind of wants to talk through and understand options. I mean that is what we see as the role of the ombuds. It's just to be a safe space and to help make it a more victim centered approach.

**Sen. Gardner**

Ms. Garrison, I don't mean to imply that there's any harm whatsoever. I'm just trying to understand. To be quite honest with you, I'm just really trying to understand where the Colorado Women's Bar Association concept of this ombuds or two ombudsman or whatever. How it differs from others that people discuss. And, so, I'm just trying to get the parameters around it. Because it seems to me that if we're talking about the function of assisting those who may have complaints against judicial officers, whether they be an employee, or whether they be a litigant, or just someone who encounters a judge in the community. Because that's potentially there, too. I don't know whether that should be independent of the Commission, or whether that could be within the Commission, but independent. My perception of the Commission is that it doesn't turn away complaints. It screens complaints and doesn't screen them out necessarily. But I mean they run as you know, and as I know. And as prior witnesses said, they run from I'm unhappy about the ruling to something was said from the bench that indicated a bias. So again,

- 7 -

then you talk about a departmental ombudsperson. Now, is that something for which you advocate, or just something that which the Women's Bar says is okay by them?

**Emma Garrison**

Yeah, I mean, we care very much about the external one, and we think the internal one doesn't, in no way conflicts with our goals, with the external one. And as I said, more avenues may be better.

**Sen. Gonzales**

I do also see. Thank you, Ms. Garrison. I do also see Ms Busby has her hand raised, and so I'll invite you, welcome you to the conversation, and invite you to respond.

**Ariana Busby**

Thank you, and thank you, Senator Gardner, for those questions. We support the ombuds as it's currently written, where it would enable employee to employee type complaints and, also, complaints by judicial officers to this external ombuds. However, Judicial has been working on this proposal for an internal ombuds within their Office of People and Culture, and we've spent many, many months with them since kind of hearing about their concept and working with them to develop what this would look like moving forward. And we, at this point, we have a lot of faith that their internal ombuds concept could work. And, so, what we are advocating for here is, you know, if you pass the bill on this form today, we're super pleased. We're super thankful for all the work that happened, and we're thankful that people will have an outlet to be able to receive information and resources about these types of complaints. But we would also support adding an internal ombuds office within the Judicial Department specifically tailored for those employees to employee type complaints, because that does. Well, it'd be an independent ombuds that is more of an HR role, and by doing that, that would enable you to open up that external ombuds to really be available to anyone that is interacting with the judge. Rather than just this narrow, not narrow, but a narrow definition of judicial personnel that's currently in the bill. And, so, by opening it up, you could have, for example, complaining litigants upset about a ruling, they can go to this ombuds, you know, receive information and find out. You know, maybe a complaint to the Commission isn't the right avenue for me, but here's information about filing an interlocutory appeal. And, so, we see that as a way to really help streamline the processes in the Commission, and also weed out some of those complaints that are non-jurisdictional. Thank you.

**Sen. Gardner**

Thank you.

**Sen. Gonzales**

Thank you for that response, Ms. Busby. And I'm curious if there are any further questions for Ms. Busby or for Ms. Garrison. Ms Busby, I brought you up in sort of a backwards order in that I usually would invite you to share your testimony and comments, and so at this time, I'll invite you to do so. See if there are any further questions.

**Ariana Busby**

Thank you, Senator. Ms. Garrison read all of her comments today, and so I'm just here for additional questions.

**Sen. Gonzales**

Ah, sweet, Here we go. Are there any further questions for either Ms. Garrison or for Ms. Busby? Seeing none. I want to thank you both for helping us to understand where the Women's Bar Association is at in regards to this policy and sort of the intent behind this concept. Thank you.

**Emma Garrison**

Thank you.

**Sen. Gonzales**

Next, I will welcome Judge Prince. Welcome back. You know the drill. Please state your name, the organization you represent, and proceed.

**David Prince**

My name is David Prince. I'm Vice Chair of the Colorado Commission on Judicial Discipline. In a sense, we came somewhat late to the ombuds idea. It was during the interim committee that it first arose on our radar screen. We embraced it quite immediately. Once we saw it, we could really see the value. Don't know that it's much worth talking about today, but part of that value just some of the practical issues that were occurring with what is now 1019, and creation of a safe space for complainants to go or people seeking information related to judicial misconduct, particularly resolves a lot of the practical issues that we were dealing with at the time. We support the ombuds. As you heard an earlier person testify, our point of view is that the independence of that ombuds is critical, and it's to create that safe space. The whole point is to create a safe space. We have said in the past, and we'll reiterate today, that we think that creating multiple ombuds where they're in different lanes is probably more confusing to people than helpful. Because you already have, let's say it's a judge. Do I go to OARC because it's a magistrate? Do I go to the Denver County because it's a Denver County judge? Do I go to the judicial discipline commission, which most of them never heard of. Do I go to the Judicial Department? Do I go to the District Administrator? It's really quite confusing. To have one place that can be easily marketed so that people can become aware of it and go to that place to find out what they need to do and where to go would be extremely helpful. I'd like to talk about some of the amendments, but I'll sort of leave those for questions. In listening to some of the discussion, I think one of the issues that may have gotten overlooked a little bit is if we're talking about a task where you want to make sure that a member of the public. So, not a member of the Judiciary, a member of the public has information about the discipline commission process. And that's part of what I've heard we want to achieve. We already actually have that. That's in 1019, it's 13-5.3-112, point of contact. So, one of the things that we are now creating, and I don't understand that to be the least bit controversial, is that the discipline commission itself will have what I'll call a public information officer who will already be doing that very simple task of just telling

- 9 -

people, this is how it works, this is what happened in your case. I mean no offense when I say, and hold their hand through the process so that they can advise them of it. So, that part is addressed. The ombuds does something more in terms of the two paradigms that the Chair laid out. It's really the second paradigm. They do a bit more than just, I am your Google substitute to tell you what's going on. I see my time is up, so I will address questions.

**Sen. Gonzales**
Thank you, Judge Prince. Senator Gardner.

**Sen. Gardner**
Thank you. Thank you, Judge Prince. Thanks for making the trip again today. Always good to see you. Maybe it's just I'm the only one in the room that's struggling with this, but the bill right now is pretty well confined for the ombuds to provide services to judicial personnel. Judges, magistrates, clerks, probation officers, all the staff, clerks, deputy clerks, everybody there. For that branch, a good deal, like our Office of Legislative Workplace Relations. What I hear, a sense or a flavor of is that this ombuds ought to be a person to whom members of the public could go and say, I didn't like the way I was treated at the courthouse. The clerk was rude to me, and I asked a simple question, and got thrown aside. That that ought to be included in the ombuds office. And I mean, that's one way to do it. And then there's this thing of is the ombudsperson supposed to be ombudsperson for the Commission on Judicial Discipline? And you say there's already something created in 1019, that that does some of that. So, I'm just looking for your views about all of those things and those pieces. And maybe I ought to have a white board and draw them out. But we don't usually do that in committee. We've had enough conversations. I imagine you can unpack that.

**Sen. Gonzales**
Judge Prince, I'll invite you to the dialog.

**David Prince**
I will try to unpack as best I can. I wish I'd taken notes now. First and foremost, the Commission supports the bill as drafted. We think a great deal of work went into it, as many people in the room know, in the interim committee it wasn't quite ready for prime time when we got to the end, and that's in part because the idea came up as we went along. I don't think there were very many that were considering it before the interim committee process started, and so it didn't quite have the chance for people to cogitate on it by the end of the interim committee process that the other bills did, but it was the primary focus, though, like today, of the House committee meetings, and there were some very good insights offered on its role in some of these issues, and I think they've done an excellent job of balancing them in terms of, should the Ombuds office be open to the public? The Commission's very neutral on that. It would be fine with us if it were open to the public. I'm not so worried about them being overwhelmed as others. My personal opinion would be that it's probably better to start with the current definition of scope and then see what the volume is there, see how well it's working before opening it up

- 10 -

to the public. And there is an interim solution in place, which is, there's a point of contact. They're not an ombuds. That's why they're not they're not called an ombuds, but there's at least a point of contact for anybody in the general public. So, I would suggest you take an initial step and focus on the members of the judicial department, and then lawyers are also involved. And that really comes from looking at the statistics that we've seen to the extent we have them, and at least the anecdotal, anecdotal experience of the Commission, which is most of the judicial discipline issues, the judicial misconduct issues that arise that really need that safe space, are complied comprised of potential complainants who are members of the judiciary, usually judicial personnel, clerks and such, and sometimes lawyers, and that's a large majority of those where it appears that there really is a need for safe space. And so that's why that part of it is so important and so important to get launched. But that's also why it's so important that you have that independence piece, and that's where I'm concerned about several of the amendments. It didn't get talked about too much yet, and you didn't exactly raise this in your dialog, but I'll press forward unless you want me to please come back to what you've already asked. I don't know if I answered your question.

**Sen. Gardner**

You've done a very good job, Judge.

**David Prince**

Well, I tried, I tried.

**Sen. Gardner**

I get to ask the questions here, it's kind of fun.

**David Prince**

Point out anything I didn't cover, because I may have missed something. But the independence part really is quite key. And there you've got to keep in mind that past is prolog. The whole point here is to create a safe space for people who are on the low end of the power dynamic to be able to come forward and get information. One of the scenarios you were raising earlier was, well, if somebody comes forward and makes the complaint, and you were talking about a citizen, but that part, I'll leave it to the side. Somebody makes a complaint within the Judiciary about a judge's conduct. That has to be reported immediately under the reforms from last year. And you're right. The ombuds's role I think, for the most part, is going to come before that report because of the fear and intimidation and uncertainty of the person who's considering do I raise a complaint? I think that's where the role of the ombuds is primarily. It's before that decision is made, and it's probably that large group that haven't been willing to come forward so far. We look back at the, I pulled the page from the ILG report. You know, in one District, they found that there were 53% of the employees that responded that had experienced mistreatment, and they said of those who observed mistreatment. So, whether they were the victim or not. Of those who observed mistreatment, 86% chose not to report it. That's on page 104, of ILG. That's really who we're trying to get at from the Commission's standpoint. And we have a 20-year history of various obstacles

- 11 -

put in the way, mechanisms put in place that end up suppressing those complaints and dealing with them separately, and that's what the ILG report and the Troyer Report tell us about in great detail. The experience of the last two years tell us that there are obstacles and pressure points on people who work within the Judiciary or lawyers that make it very intimidating to come forward and raise a complaint against someone in power at the Judiciary, whether they're a judicial officer or otherwise. Just that, the judicial officers are sort of the sexy part that gets talked about so much. So that independence is key, and some of these amendments are saying, Really, let's bring it back in house. Okay, well, we had that in the past. We've had that with the HR Department under Masias. We've had a degree of that under the OARC, as it works. We've seen what that looks like. We've seen what appointees of Carr Building Leadership view their role as and what to do, whether they are facilitating complaints or not. That's what's been happening now. Whether you're talking about the very dramatic testimony we heard from the anonymous complainant that CCASA presented during the interim committee. Whether we're talking about the experiences we've had in the last few months, even if you talk about what happened with the former Chair of this committee, that's what happens under that power structure. So, the House very carefully structured this so that the board who oversees the ombuds is truly independent and will be perceived to be independent. Some of these amendments are saying, well, let's take some of that back, and let's move back towards allowing Judicial Leadership to be appointing board members so that they will have influence over what happens in the process, those kinds of things. Lots of parts of these amendments are really restricting what this ombuds can do. I mean specifically prohibiting them from asking questions, at least in the drafts or the notes I've seen of the amendments. Specifically prohibiting them from offering certain types of help. Those are all concerning. This needs to be genuinely a safe space, and it needs to be perceived as a safe space. So that it needs to be structured, that there's a clear break with the last two decades. And if we simply create a new structure where we are allowing the same influences to create and staff and oversee it, we're likely to get the same result that we're trying to move away from.

**Sen. Gardner**
Thank you.

**Sen. Gonzales**
Thank you, Judge Prince. I'd like to see if there are any other questions from members of the committee. I want to thank you for challenging us to think deeply about how we proceed forward. Grateful for your insights and your comments, as always. Thank you.

**David Prince**
Thank you. Thank you for your time and attention.

**Sen. Gonzales**
Ms. Espinosa Krupa. For the record, if you could state your name, the organization you represent, and proceed. Thanks for joining us.

- 12 -

**Elizabeth Espinosa Krupa**

Again, Elizabeth Espinosa Krupa, Chair of the Commission on Judicial Discipline. I echo the comments made by Judge Prince. I can add when we discuss perception throughout this process, whether it was the SMART hearing. Most of this began at the Interim Committee meetings, House meetings, or here. You have all heard this perception that the Commission on Judicial Discipline, even now, even with the changes that are proposed, is still protecting judges. The Commission is comprised of judges, lawyers, and non-attorney members. And our non-attorney members have been amazing. They're HR professionals, they're rural community members. But it's also been incredibly valuable to have judges on the Commission. Lawyers appear in front of judges, but we don't always understand when there's a complaint of timeliness, issues with how long a judge is taking the issue an order, or in a parenting case, certain decisions. It's nice to have a judge to be able to provide that background. The perception that the Commission, as long as there's judicial members on it, as long as there's some perception that Supreme Court has some hand in it, is not going to be perceived as being very transparent, or a venue where people that are aggrieved by a judge can go if that judge may be protected somehow. And that perception will continue to exist, unfortunately, until either time passes or the new process demonstrates some different accountability. The perception that an ombudsman within Judicial is just going to do the same thing is valid. The Commission shares a concern that if he ombuds is not external, that nothing's really going to change. Even with the Commission, we didn't have, well known at least, a way to make an anonymous complaint. But it's hard when you're making a complaint about a judge similar to a lawyer, to not identify who the complainant is, particularly if they work for that judge, or if the facts would dictate any information about the complainant and reveal identity. And external ombuds would provide that ability to be anonymous. It would provide somebody to say, you know, I think that's a procedural rule that's been violated, not a judicial rule. I think you have an appellate issue versus a judicial misconduct issue. And I think that would be incredibly valuable for our public and for those employees that really do feel that they are being mistreated. Thank you.

**Sen. Gonzales**

Thank you, Ms, Espinosa Krupa. Colleagues, questions? I'm sort of instinctually looking towards Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair. You heard my dialog with Judge Prince, and you indicated general agreement with that in terms of scope and so forth. Do you have any other comment about that? Again, I think it's probably clear by this time from my comments, I'm really trying to find the scope of the ombudsperson. There are references in the bill that came from the House about the judicial discipline ombudsman, and yet, really it's a Judicial Department, although not a creature of the Department. It's the judicial ombudsman. And it seems to be kind of that name implies that somehow it's involving the Commission on Judicial Discipline. When, in fact, I don't have that sense that that's what we're doing. And I think, if I understand Judge Prince correctly, his suggestion was, we already have this point of contact in the Commission on Judicial Discipline that is a is a good first step on how to navigate judicial discipline

- 13 -

complaints. And the ombuds office ought to be something for judicial personnel, at least as a first step. Now, do you have anything, do you disagree with that? Any span, any way that you would vary from that. Because, again, I'm trying to figure out how to amend or not amend this bill so that it works and everybody you know, even if you vote no on it, you walk away and know what it is that is supposed to be doing. And I don't think we're there yet. I think we're close.

**Sen. Gardner**
Ms. Espinosa Krupa.

**Elizabeth Espinosa Krupa**
Thank you. Senator Gardner, what I think I would urge you to think about, and all the members to think about, is that you're basically creating something that's new. So, you can write a scope. But I promise you, whether it's SMART hearings or somewhere down the line, there's something about that scope that will need to be amended or changed or reviewed. Just as the Commission on Judicial Discipline in the way Colorado has been doing judicial discipline was ultimately reviewed and being revised. And even some of those changes may need to be made. I think if the scope is really we want to provide, as everybody has said, and I think all of the stakeholders unanimously agree, a safe place for people to go. That is not just judicial discipline. It may be HR personnel issues, it could be anything that somebody has a safe person to talk to that isn't housed within the Judicial Department, is not housed with the Commission, but somebody that is a resource as much as it is a safe place to talk. I think that's the best way. I would encourage you to look at it. As far as you know, there is somebody at the Commission on Judicial Discipline, again, I would just go back to that perception that the Commission, regardless of the changes and even the testimony and some of the history that's been there, is still trying to protect the judges. There's nothing that the Commission can do about that.  Our meetings aren't open, as opposed to other commission meetings that are open for a reason. But there are new transparency rules that are going to change some of that and maybe some confidence is built. In the interim, you really do want somebody that can hear these people so that what we've heard throughout the past few years isn't going to continue to occur.

**Sen. Gardner**
Thank you.

**Sen. Gonzales**
Thank you for your testimony this afternoon. Next, I welcome Melanie Jordan.

**Melanie Jordan**
Thank you, Madam Chair members the committee. My name is Melanie Jordan with the Office of Respondent Parents' Counsel, where I'm a staff attorney and the legislative liaison. I am the liaison for two of our districts, Arapahoe and Weld County, that have been uniquely impacted by judicial misconduct in the last five years. I am testifying in support of this bill, because I think this bill would

- 14 -

have been helpful in those circumstances to the attorneys that were appearing in those courtrooms. So I'm speaking specifically of former Judge Ryan Kamada in 2018 who held primarily a juvenile docket. I'm sure that everybody on this committee knows that he leaked news of a warrant, and that is why he is no longer on the bench and has been disbarred. But he was also texting with his friends about the litigants that were appearing in his courtroom, and surely a judicial employee and attorney appearing in front of his court, in his courtroom, probably knew that some of those things were happening and was scared to come forward or didn't know how to come forward. And I think the ombudsman's office would assist. And then this committee has already heard today about former Judge Natalie Chase. She resigned in 2021 and of course, most people know that she used racial slurs, and that is why she's no longer a district court judge. She is a municipal court judge again, but she also asked about people who wrote unfavorable reviews about her. Was trying to figure out who was writing unfavorable reviews about her. Was trying to get more information about that process. And again, people knew that was happening, that came out in the investigation, and perhaps if they had a way to access an ombudsman's office earlier on in the process, the 20 families that had their cases remanded because of concerns about bias. Because they were worried that perhaps Judge Chase had terminated their rights because of her bias. Those families wouldn't have been put through that process of wondering, did this judge terminate rights because she didn't like my race or she didn't like the race of my attorney? During that process, we lost three women of color who were respondent parent counsel in Arapahoe County, who will not take respondent parent counsel appointments any longer in that jurisdiction. We have a jurisdiction right now where we've lost five female attorneys because of the culture in that jurisdiction, and it is very challenging as an attorney to figure out how to navigate this process. I have been involved in a judicial discipline investigation. It's a terrifying process. When I was a practicing attorney, I had no idea what that process looked like. It's terrifying to even tell you today that I was involved in that process, and so I think to have an ombudsman's office to be able to talk about what that process would look like before making that complaint. To talk about what other options there are would feel less like flailing. And the last thing that I want to say is that we do have a child protection ombudsman, and that process has been so effective at handling complaints about that system that there's a bill that's going through right now, Senate Bill 210 that is eliminating another grievance process, the individual county grievance processes. Because we don't need them anymore. Because the ombudsman process is working and people are able to access it more easily than those county processes. So, I would urge your support on this bill.

**Sen. Gonzales**

Thank you so much. Ms. Jordan, for your comments. I'd like to see if there any questions. Senator Gardner.

**Sen. Gardner**

Thank you. I think I know the answer, but I want to assume this. Are you an employee of the Judicial Department in your position? Even though your agency is independent of the bench? Anyway, I will let you answer.

**Sen. Gonzales**

Ms. Jordan.

**Melanie Jordan**

Thank you, Madam Chair. Thank you, Senator Gardner. Yes, I am an employee of the Office of Respondent Parents' Counsel, which is an independent judicial agency within the Judicial Branch of the State of Colorado.

**Sen. Gardner**

So that's what I thought the answer was. But so under the current conception of the bill, your office, your staff, would be people included that could go to the ombuds person and say, How do I navigate this issue? What do I do?

**Sen. Gonzales**

Ms. Jordan.

**Melanie Jordan**

Thank you, Madam Chair. Thank you Senator Gardner, yes, our Office and our attorney contractors would all be able to access that office. If I could just give a brief example of where I think that would really be helpful. We sometimes have issues that we struggle to know whether it's a judicial complaint, whether it is a motion for recusal. What we should be doing. Our attorneys struggle with that. Often. They feel like if they file motions for recusal or file a judicial discipline complaint, it will be held against their clients. And I think they're right in a lot of circumstances. So, our Office does things like meet with judges, chief judges, juvenile judges and jurisdictions. We do everything we can informally to try to navigate across that process. And I think having that ombudsman would really aid our Office. Would aid attorneys in feeling like that process is less scary, and it would hopefully result in fewer, you know actual judicial discipline processes, because it would allow us to address those problems before they become huge issues.

**Sen. Gardner**

Thank you very much. Appreciate it.

**Melanie Jordan**

Thank you.

**Sen. Gonzales**

Thank you, Senator Gardner. Are there any other questions from members of the committee? Seeing none. Thank you so much for helping us understand your perspectives. It's helpful.

- 16 -

**Melanie Jordan**

Thank you.


**Sen. Gonzales**

Next, I welcome Alison Connaughty. Not here. Elizabeth Newman. Welcome Ms. Newman, if you can please state your name, any organization you may represent, and proceed to testimony. Thank you for being here.


**Elizabeth Newman**

Thank you and good afternoon, Madam Chair and committee members. I am Elizabeth Newman, Public Policy Director for the Colorado Coalition Against Sexual Assault. CCASA is a statewide membership organization that works to prevent and end sexual violence in our state, including sexual harassment. We are neutral on this bill, but we were involved in the work of the Interim Committee and providing recommendations, and therefore appreciate the opportunity to speak to you today. Sex based harassment is pervasive, making up nearly half of all harassment complaints received by the EEOC. And approximately 85% of women experience sexual harassment in their lifetime, and 94%, up to 94% do not report it. Sexual harassment is also costly for the victim. There are effects to their work, professional advancement, physical and mental health, and economic stability. And there are costs to their colleagues, who suffer when employees leave, have frequent absences or have declining productivity. There are also costs to the employers in turnover, reputational damage, direct payouts and settlements. Particularly with regard to the Judicial Branch, the ILG and Troyer investigations highlighted a widespread fear of reporting misconduct, facing intimidation and retaliation, and a lack of accountability and transparency. And there are several risk factors that the EEOC has identified for sexual harassment that are present in the Judicial Branch. These include significant power disparities, control over careers, and decentralized workplaces. So, for these reasons, we strongly encourage the Judiciary Committee to maintain the provisions in this bill to allow for the ombudsman office to serve all judicial personnel with concerns about potential misconduct in the Judicial Branch. First, it is confusing for the reporting party to know which ombudsman to bring their concern to if there were both an internal and external ombudsman's office. Secondly, it's also duplicative of efforts and resources. It's two sets of staff to compile information and find services to refer to complainants to. Two office suites and sets of computers. And thirdly, if information about misconduct is being spread across two offices that are not working together, it would seem to allow misconduct to flourish because it would take longer to catch on to and identify those areas where there is a significant issue in a culture or courthouse. The primary request from the interim committee to CCASA was to help inform a victim centered approach to judicial misconduct. We urge the creation of a system for safe reporting, strengthening protections against retaliation, and, related to this bill, providing support through resources for victims that are both internal and external to the Judicial Branch. It is crucial that an ombuds office remain independent, outside of the influence of the State Court Administrator's Office, and available for all in order to correct the culture and restore trust and accountability in the Judicial Branch. And thank you for your time today, and I'm open to any questions you may have.


- 17 -

**Sen. Gonzales**

Thank you so much Ms. Newman, for your testimony. Colleagues, do you have any questions that you wish to ask of Ms. Newman? Seeing none, I want to thank you for your perspectives as we continue to navigate this policy. Next, I'll welcome Kelly Havilland. Who is not here with us. I'd like to see, Is there anyone else in the room or online who wishes to testify regarding House Bill 1205? Justice Marquez. Welcome, Justice. If you could state your name, and I guess the organization you represent, and proceed to testimony,

**Justice Marquez**

Thank you. My name is Monica Marquez. I am a Justice on the Colorado Supreme Court. Let me start by saying that the Court and the Department very much support the idea, the concept of an ombuds. With respect to this bill, I think we are in an amend position. I'd like to walk through some of the reasons for that. But let me provide a little context for my statements today. Being the Senior Associate Justice and I'm also the incoming Chief Justice. And I mentioned those two things for two reasons.

One, as the Senior Justice on the Court, I've been here 12 and a half years. Longer than any other sitting Justice on the Court at this point. And I've seen extraordinary change across those 12 years, and particularly in the last three. We are currently undergoing a branch-wide, truly generational shift in our workforce. What does that look like? I'm serving now with an entirely different group of Justices than I started with in 2010. I've never seen a more committed group of individuals who are going daily above and beyond their regular duties to implement the recommendations of the Troyer and the ILG Report. We have committed hundreds and hundreds of hours, early mornings, after hours, weekends, road time, crisscrossing the State, talking with our 4,000 employees, and working to implement these recommendations. We have entirely new leadership at SCAO. We have a new State Court Administrator, we have a new HR Director, we have new Division Directors in Financial Services, IT, and Court Services. All of them are excited about these opportunities. Roughly half of our Chief Judges across the State have turned over since 2020. Close to a third of our current judges have come on board since 2020. And roughly 50% of our core workforce has turned over since 2020. I mention these stats because this has actually given us a really wonderful opportunity to do a real, solid, fundamental, transformational reset of the culture in the Branch.

Second, because I am the incoming Chief, the changes that the Branch and the Court are committed to making and are already making are going to take sustained effort, and that means that this will both a struggle both for a remainder of current Chief Justice Boatright's tenure, but also my time as Chief. I'm going to be responsible for leading and continuing that effort. The Workplace Culture Initiative is well underway. We have had, as I mentioned, the listening sessions. We've amended the Code of Judicial Conduct. We have completely rewritten Personnel Rule 20, which deals with our employee Code of Conduct, anti-harassment, anti-retaliation policies, and so forth. We're undergoing a mission, vision and values process right now that includes employee voices across the Branch. We brought in outside assistance for the four Metro Districts who were called out in the ILG Report. We're overhauling our

- 18 -

complaint process to increase the number of avenues for raising concerns, to make that process more transparent. We've requested and received funding from the JBC for FTE to implement all of these recommendations, including with a focus on DEI. We're developing training modules for Chief Judges, our District Leadership. Both nuts and bolts management training, policy, training. And we're ultimately developing a public facing website to communicate all of these changes across the Branch. And the list goes on.

But the ombuds is a really key component of that overall effort. As you've heard, some key feedback we received from those reports is employees expressed a lack of trust in the complaint process. I also need to pause here and emphasize just how much I personally care about making this a more victim-centric process. One that gives employee voice along the way and employee agency and decision making in that process. I have spoken directly with employees who have been through this process, and I understand directly just how terrifying it can be.

There's a key piece of that, and this came up in some earlier dialog with you, Senator Gardner and another witness. That there are mandatory reporting obligations pretty much across the Branch. If an employee raises an issue with their direct supervisor, with someone in HR, with a supervising judge, with any other judge, any of those employees has an immediate obligation, assuming that the conduct in question concerns the judicial officer, to relay that to the judicial discipline commission. And, then, all of a sudden, that victim is pulled into that process, whether they're ready for it or not. And that is the value of having an ombuds. It would be a safe place for those individuals to land before they make their next move. To say, here's my concern, here's what I have experienced, what are my options? And have that all laid out for them in a neutral, confidential way, and then allow that person to make an informed decision about how to proceed. I see tremendous value in that concept for our employees.

And I want to talk about two scope issues that I've heard talked about today. Because I think there are actually two issues around scope. The first scope issue is, who does this serve? And is it just Judicial Branch employees? Is it more broadly Judicial Department employees, so inclusive of the independent agencies. Some of the testimony you've heard from today. Does it include also litigating attorneys? Is it as broad to include everyone in the public? So, that's one scope issue.

But the second scope issue is, what is the nature of the conduct that we're talking about. And I would say 95% of the testimony that I've heard today is really focused on misconduct by judicial officers. And a great deal of the language in the bill reflects what I think at least started out as the heart of the bill, the fact that this position is called the Judicial Discipline Ombudsman, which, by the way, I think is a vestige of the fact that it was originally, in an original draft, it was housed in the discipline commission. So, I think that's where we got that name. But the legislative declaration speaks of promoting the judicial discipline process. It speaks of assisting judicial personnel impacted by judicial misconduct. And on page 10 of the bill, which really gets into the meat of what this ombuds is supposed to do, it talks exclusively about judicial misconduct. It requires the ombuds to collect and report data on the number

- 19 -

and allegations of judicial misconduct, the types of judicial misconduct complaints, the demographics of the judges about whom complaints are brought. And then it goes on to say that the ombuds shall explain options for filing the complaint with the judicial discipline commission, and I shall explain the judicial discipline process. So, my concern about the scope here is, as we as a Department have been trying to implement recommendations of the ILG report. We're trying to separate. At least, I'm going to describe conceptually where we have approached this. Separate the concerns about judicial misconduct, and saying those are appropriately external to the to the Department. But when we're talking about ordinary workforce issues, employee on employee, our research, working with the International Association of Ombuds tells us that the organizational ombuds is the appropriate model for that.

So, when we're talking, when we speak of an internal organizational ombuds, I am speaking about staff-on-staff complaints. Frontline probation officer has a concern about their frontline probation supervisor or court judicial staff having concerns about a Court Executive. If the scope of this bill intends to cover that type of workplace concern, I feel like substantial amendments need to be made to reflect that. That are not currently present in this bill, because there's nothing in the meat of the bill talking about what the ombuds is supposed to do that actually addresses that. It doesn't say how? How is the ombuds supposed to help them navigate the HR process, if, in fact, that is what this is intended to do? So, I feel like I've gone way past my three minutes. I'll pause here and see if I can entertain some questions.

**Sen. Gonzales**
Thank you, Justice Marquez. Colleagues? Senator, Gardner.

**Sen. Gardner**
Thank you. Thank you, Justice Marquez. I appreciate that perspective, because I'm still trying to wrap my head around where we need to take this bill. And your perspective seems to be yeah, I think this may well be the case that it started about judicial officers, and yet the Department itself is just like any other employer. I think we experienced this in the legislative workplace when we did all of that. There are legislators who are constitutionally ordained for lack of a better term and work for their constituents. Judicial officers, similarly, are appointed pursuant to the Constitution. And the public often doesn't know they don't work for the Chief Justice.

**Justice Marquez**
The Chief Justice has no supervisory authority.

**Sen. Gardner**
The District Court judge is a District Court judge, and they hold their position independent of that. And, so, it seems that you're suggesting. Again, stop me, if I get this all wrong, that maybe there are two things this bill needs to do. I mean, the Women's Bar sort of talked about this as well. That we need to deal with judicial officers and the scope of that. And, then, the Department itself has the same kinds of issues that the Legislative or Executive Branch or corporate America has. And then they need to create

- 20 -

that safe space. But that's a different animal, if you will. And I don't know. I think it's the Judicial Department's suggestion that if that's the case, then you need your own ombuds to deal with the clerk who has a supervisor, and that's an internal ombuds situation. Help me understand kind of what, if you were going to draft this bill and you had the power to go down to the drafter as a sponsor and say, I got it all wrong. Let's, let's do it this way. What's that look like?

**Sen. Gonzales**
Justice Marquez.

**Justice Marquez**
Thank you, and I apologize for interrupting you.

**Sen. Gardner**
No, no.

**Justice Marquez**
Respect the rules of decorum.

**Sen. Gardner**
It doesn't work quite that way over here. So, it's okay.

**Justice Marquez**
Let me answer your question by thinking about this sort of outside the legislation from the perspective of trying to implement the recommendations of the Report. So, thinking about what is of most value to our 4000 employees and the workplace concerns that were reflected in the ILG Report, is that organizational ombuds. And after reaching out to the International Association and sort of learning what the key principles are that govern that type of organizational ombuds, what we heard over and over again is that, as its name implies, it's part of the organization. It is inherently internal, and it is also independent. And I want to stress that part too, because this position cannot maintain independence unless it is independent. Does not report to the State Court Administrator, does not report to the Chief Justice, does not report to the head of HR, does not report to the Supreme Court. The oversight for that individual instead resides in an advisory board that is comprised of people who have some knowledge of the workings of the Branch. So, hopefully, it will include probation officers and probation supervisors and court executives and judges along the way. But to understand kind of unique culture we have within the Branch, the fact that life looks very different in Sterling than in Durango, than in the Metro Area. So, the ombuds would report to that advisory board comprised of employees. It would be governed by a charter that sets forth clear lines, ethical duties, the types of information that would be gathered. To the extent that the ombuds is seeing trends, say, in a particular district, that's a type of data, aggregate data, that could be forwarded to people who need to know that information. A Chief Judge in a District, the Chief Justice, him or herself. That kind of information. But we really are focused in that regard on

ordinary workplace culture concerns. Inevitably, someone is going to walk in the door and say, I know you're the organizational ombuds, but I have a concern about a judge. Right, that's going to happen. What we would propose in that instance, if a version of this bill were to pass, to have an external ombuds dealing with complaints about judicial officers. Is that the charter for this organizational ombuds will be required to direct that person over to the judicial discipline ombuds, for lack of a better term. I see much value in the CWBA's, the Colorado Women's Bar's concerns that their lawyer constituents could not take advantage of our internal organizational ombuds because they are not employees of Judicial So there does need to be some place for those folks to land. But separating those functions, I think it creates the bright line that avoids the overlap that I'm talking about, and would allow for an immediate cross reference for the person who comes in with a concern about a judge. You've landed in the wrong place, let me send you over to the correct place. But both serve as safe places to land for an individual, whether an employee or a lawyer, or a member of the public to understand their options and then make an informed decision about what happens next. If the person then decides to file a complaint, say, with judicial discipline, you are correct. There are now requirements for the Commission to sort of walk the person through the process, outline, keep them informed as the process unfolds. But the ombuds serves as that landing space before they make that decision.

**Sen. Gonzales**
Senator Gardner. You all dialog, this has been fascinating.

**Sen. Gardner**
Doing the dangerous thing, thinking out loud.

**Sen. Gonzales**
Oh, now it's going to get really interesting.

**Sen. Gardner**
I mean, it occurs to me that, and this just sort of rewrites the bill a strike below, as we refer to it. But that we might say to the Judicial Department, fine, you want it to have an internal ombuds for your ordinary workplace culture kinds of issues. Whether they be discrimination, harassment, or just people being uncivil, and you know, difficult to work with. That that's within your Department, and that is reporting at a very high level or to an advisory panel that has independence from from the Chief Justice or the State Court Administrator, and so that it's a safe space. And that we then create a different and probably smaller office that is independent within the Department as a place where almost anyone, including litigating attorneys. Almost anyone, could go and say, I appear regularly in front of Judge so and so and he or she says things that indicate that they hold a particular bias or prejudice. I don't know what to do about that. If I file a motion to recuse, I'm kind of done for. But there's stuff on the record that sort of shows that it's not just rulings. Let me stop sort of there. I mean, what about that kind of a concept of two offices? Does that work in your mind, or does it set off warning bills?

- 22 -

**Justice Marquez**

I think that would work just fine. And in fact, it's my understanding, that the long Bill has allocated a number of FTE for us to implement these Workplace Culture Initiatives. I don't think it would create any fiscal impact to create the internal ombuds, because we would just prioritize one of those FTE for this purpose. I hope that answers your question.

**Sen. Gardner**

No. that's helpful. At that point, I'm not sure you know, interestingly enough, I'm not sure that we need to tell you how to run your Department. I mean, I kind of have a bias with this, even with respect to the Executive Branch. Sometimes I say, well, we get into the business of trying to micromanage what you do. I mean, I think maybe they say there's someone in Judicial that is the ombudsperson, and maybe we set up the parameters of advisory but you might do that by judicial directive. I don't know what your thoughts are on that.

**Justice Marquez**

I think the most flexible way to go about it would be to place it, if you're going to mention this in statute, is to just say, go forth and put together a CJD, a Chief Justice Directive to implement this. That provides some flexibility. But I think we feel strongly enough and excited enough about this idea, it's okay if it winds up in statute. The parameters of it, or key components of a charter, or something to that effect. f I could respond to your question by flipping the answer around. What would be potential problems with converging the two concepts or making a single ombuds responsible for both? My concern about that is at least certainly the way this bill is drafted. As I mentioned earlier, the meat of the bill does not lay out what the ombuds is supposed to do for the staff on staff, ordinary workplace concerns. More importantly, the selection board, which I think is technically more of an advisory board, does not contain any appointments on it of persons who have any knowledge of the Branch itself. So, if this ombuds is intended to help the probation officer deal with a concern about a Court Executive or Chief Probation Officer, there's no one on that advisory board who has any idea how Judicial operates. It doesn't contain probation officers or court executives or active district court judges or anything to that effect. So I think if you are going to merge the two at a minimum, this board has got to have some knowledge of how the organization operates. I think the Department's first preference would be to separate the two functions. But if, if that's not feasible for whatever reason, then I think we need to go thoughtfully about this so that that employee workplace piece, which we see such value in for 4000 employees, is fully fleshed out. I hope that makes sense.

**Sen. Gardner**

No, no, that's helpful. Because I share your concern. I mean, in every organization I've been at. And that's from the United States Military, to corporate America, to the Legislature, if you don't understand the organization and you don't have buy in from the organization, then the program probably just doesn't work. Or it doesn't work the way it's intended to. And so I appreciate that. Is there anything else?

- 23 -

**Justice Marquez**

If I might just add a sentence or two to that. It's my strong sense that the purpose of the bill is not intended to be adversarial. It's intended to help. It's intended to help. And if that's the case, then you really do need to have, it would be helpful to add language to that effect that this is not an investigative body. This is a body that is intended to be a safe space, simply to help provide information, layout options, help an individual navigate the judicial discipline process, or if these two are converged, the HR process, whatever that looks like. But if you are going to fold them all together, then it's under the standards. This isn't me making this up. This is the International Organization of Ombuds saying the best practice is to make sure that members of the organization are part of that advisory board.

**Sen. Gonzales**

Thank you, Justice Marquez This was an interesting dialog. Before you go, I want to see if there are any questions from members of the committee for Justice Marquez. And seeing none, I want to thank you again for joining us this afternoon and sharing your perspective.

**Sen. Gardner**

Thank you.

**Justice Marquez**

Thank you very much.

**Sen. Gardner**

Thank you.

**Sen. Gonzales**

That concludes the list of individuals who had signed up. Is there anyone else, either in the room or online, who wishes to testify regarding House Bill 1205? Seeing none, the witness portion of this hearing is concluded. Senator Gardner or Senator Moreno. Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair. Consistent with our treatment of the earlier two bills, I would request that House Bill 1205 be laid over until Monday, April 24. And the meantime, maybe we can get a lot of work done. Hopefully, that's long enough.

**Sen. Gonzales**

Thank you, at the sponsors' request, that bill will be laid over.

- 24 -

# Appendix 27(z)

## *Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the S. Judiciary Comm., Colo. Leg., April 26, 2023:*

# Appendix 27(z)(i)

# Transcript;

# Senate Judiciary Committee Hearing—April 26, 2023:
## HCR 23-1001, HB 23-1019, and HB 23-1205

**Sen. Gonzales**

We will come back to order. We are taking up House Bill 1019 for action only. We are in the amendment portion of this hearing. With that, I move L.003 to 1019. This amendment is in regards to information sharing between the judicial oversight entities and the Commission and I ask for an aye vote. Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair, and you and I have had this discussion. With respect, as your co-prime sponsor, I urge a no vote. And just so I'm clear I'm holding L.003, to 1019. Okay, this is a provision to deal with what is a, I think, a one-time dispute between the Commission on Judicial Discipline and the Court about information sharing between the two entities. Frankly, when we hammered out 1019 back during the Interim Committee, the intent was not to revisit a lot of these issues that we did not revisit. The one that we did have was rulemaking with respect to the HCR, but not so. I think this is an attempt by judicial discipline. I say this with respect, to take another bite at the apple after this bill got formulated in the Interim Committee and went through the House. And it will upset, since I'm talking about apples, it will upset the apple cart a good deal. So, thank you very much, Madam Chair, and let's take a vote.

**Juliann Jenson**

Ms Jenson.

**Juliann Jenson**

Senators, Gardner.

**Sen. Gardner**

No.

**Juliann Jenson**

Coleman.

**Sen. Coleman**

Aye.

**Juliann Jenson**

Van Winkle.

- 1 -

**Sen. Van Winkle**

No.

**Juliann Jenson**

Rodriguez.

**Sen. Rodriguez**

Aye.

**Juliann Jenson**

Madam Chair.

**Sen. Gonzales**

Aye.

**Sen. Gonzales**

L.003 to 1019, passes or is adopted. I move L.004 to 1019. L.004, is in regard, it adds to the powers and duties for the Commission on Judicial Discipline, the ability to evaluate potential misconduct by magistrates in the same manner that it would for judicial misconduct by judges. I ask for an aye vote. Is there discussion? Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair, again with respect, I actually believe that we need comprehensive reform of the magistrate system, and I've said as much and said so made clear that I thought adding magistrates to the Commission on Judicial Discipline Jurisdiction at this point is premature. Not because it might not eventually need to happen, but rather because we need to deal with that in a separate bill next year, and I would like to do that, and made that clear to the House sponsors as well, and I think that's why it's not in the bill. I am somewhat surprised that the Commission on Judicial Discipline wants to get in the magistrate business. I had always thought they wouldn't want to, but seems like they do. Because I think they requested this amendment, but I asked for a no vote.

**Sen. Gardner**

I will withdraw L.004.

**Sen. Gonzales**

I move L.005. L.005, this outlines, and you'll see in a later amendment when we take up 1001, this is the process of nominating. This shifts the process of nominating members to the Commission on Judicial Discipline to. Currently, the way that it's drafted. Or currently the way that the process works is the Supreme Court nominates the judicial members to the Commission on Judicial Discipline. This would shift that to a nominating process that would be convened by the statewide associations of District and

- 2 -

County Court judges to determine and lay out a process to nominate these members to the Judicial Discipline Commission. I ask for an aye vote. Senator Gardner.

**Sen. Gardner**

Okay, thank you.

**Sen. Gardner**

Not to break the chain, Madam Chair. I suggest a no vote. This was not something that we sought to do. And there's a paired amendment in 1001, that would go with this. The state Supreme Court has made the appointments to the Commission forever. It is not something that in the Interim Committee, we suggested doing and if there is concern that the state Supreme Court should not be appointing members to the Commission on Judicial Discipline, although they have since 1960 or something like that, then I suggest we find another appointing authority. Whether that be a legislative appointing authority or whatever. This suggestion that the statewide association of District and County Court judges, the trial judges association should come up with rules, I think would lead to a scenario where there would be people lobbying within the trial court judges association for the appointment. And that looks an awful lot to me like, at best, a trade association trying to maneuver for places on a task force or working group, and this is the Commission on Judicial Discipline. Again, if the concern continues to be that the Supreme Court shouldn't make the number of appointments there on the Commission, even though, by the way, they appointed the current members of the commission, I would think we ought to look at another solution. An actual governmental, elected official or body that would make this rather than an association. So I, with respect, I urge you no vote.

**Sen. Gonzales**

Further discussion? Ms. Jenson.

**Juliann Jenson**

Senators, Gardner.

**Sen. Gardner**

No.

**Juliann Jenson**

Coleman.

**Sen. Coleman**

Aye.

**Juliann Jenson**

Van Winkle.

**Sen. Van Winkle**

No.

**Juliann Jenson**

Rodriguez.

**Sen. Rodriguez**

Aye.

**Juliann Jenson**

Madam Chair.

**Sen. Gonzales**

Aye.

**Sen. Gonzales**

L.005 passes on a vote of three to two.

**Sen. Gonzales**

Any further amendments on 1019? Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair, a matter that did actually remain unresolved during our interim committee, and that we talked about was the rulemaking authority. Under HCR 1001 and the re-engrossed version. And this has been in the bill. If you go to page 10, line 21 this is actually language that got changed over in the House. So, it is not as if this was language that came out of the Interim Committee and ought to remain stable. There was a creation of a rulemaking committee, and rather than there being two rulemaking committees, we had a determination over in the House that there ought to be one. Right now, and this is important for other members to understand. Right now, the rule making committee, and this is for the adjudicative process and other things of this judicial discipline process. The committee consists of three members appointed by the Supreme Court, five members appointed by the adjudicative board itself, and five members appointed by the Commission. That because the Supreme Court ultimately is an appellate authority with very limited appeal authority, but nevertheless, an actor in the system, the Court is seeking some balance. I move L.002 and L 002.

**Sen. Gonzales**

Senator Gardner?

- 4 -

- 5 -

**Sen. Gardner**

I'm looking at the wrong. In fact, I think I may be ahead of myself. I'm ahead of myself on the bill. Disregard, never mind, it's late.

**Sen. Gonzales**

Thank you, Senator Gardner, totally understand.

**Sen. Gardner**

Nothing else on 1019.

**Sen. Gonzales**

Are there any further amendments on 1019?

**Sen. Gardner**

They go together.

**Sen. Gonzales**

Thank you very much. The amendment portion of the hearing has concluded. Senator Gardner, would you like to make a motion?

**Sen. Gardner**

Thank you, Madam Chair. I move House Bill 1019, as amended to the Committee of the Whole.

**Sen. Gonzales**

Appropriations.

**Sen. Gardner**

Appropriations. Okay, we'll appropriate some money.

**Sen. Gonzales**

That is a proper motion. Ms, Jenson.

**Juliann Jenson**

Senators, Gardner.

**Sen. Gardner**

Aye.

**Juliann Jenson**

Coleman.

**Sen. Coleman**

Aye.

**Juliann Jenson**

Van Winkle.

**Sen. Van Winkle**

Aye.

**Juliann Jenson**

Rodriguez.

**Sen. Rodriguez**

Aye.

**Juliann Jenson**

Madam Chair.

**Sen. Gonzales**

Aye.

**Sen. Gonzales**

1019 passes on a vote of five to zero. Next, we'll take up 1001, for action only. Senator Gardner.

**Sen. Gardner**

Thank you. At this time, I'll move L.002. And I'd already started looking at the wrong document, and was reading to you from 1001. This is the question of the rulemaking committee, and this would be part of the Constitution. That is what the Concurrent Resolution is about. And I note to the members of the committee, while it requires only a majority vote here this evening and a majority vote on seconds, it will require two thirds vote at third reading. As I said, this is an attempt to get some balance between the Court, the Adjudicative Board, and the Commission itself, because these are three different actors in the judicial discipline system now. Whereas or will be once the HCR is adopted and passed by the voters. So, what it does is, at page 10, line 21 we strike the five members of the Adjudicative Board and make it three.  As I was saying, Madam Chair. So, to back up just a little bit on page 10, line 21. There will be on the rulemaking committee. This amendment would make it three members appointed by the Adjudicative Board, three members appointed by the Commission. That would be three, three and three. And then this would add three attorneys who have experiences respondent counsel in judicial discipline proceedings, and they would be appointed by the Governor and one representative of a victims' right organization appointed by the Governor, because there's some concern there. And then the amendment would. Right now, again, this was new in the House. The rulemaking committee is to elect a chair, but

- 6 -

the chair is not only a member of the committee, but the Commission seems to think that it ought to also be a member of the Commission. The Commission is the prosecutorial body here in the new system, not an adjudicative body, and that seems inappropriate. So, we would just let the committee elect its chair from among the members. So, if I haven't moved it, L.002, I move that and ask for an aye vote.

**Sen. Gonzales**
Thank you, Senator Gardner. Is there any further discussion? Seeing none. Ms. Jenson.

**Juliann Jenson**
Senators Gardner.

**Sen. Gardner**
Aye.

**Juliann Jenson**
Coleman.

**Sen. Coleman**
Aye.

**Juliann Jenson**
Van Winkle.

**Sen. Van Winkle**
Aye.

**Juliann Jenson**
Rodriguez.

**Sen. Rodriguez**
Aye.

**Juliann Jenson**
Madam Chair.

**Sen. Gonzales**
Aye.

**Sen. Gonzales**
L.002 to 1001, passes on a 5-0 vote.

**Sen. Gardner**

Thank you, Madam Chair. I have no further.

**Sen. Gonzales**

In that case, I move L.004 to 1001. This amendment, similar to the discussion that we had on 1019, would shift the appointment authority from the Supreme Court to the active district judges and county court judges of the state as provided by law. This would be the accompanying language in the recommendation to the constitutional change, and I ask for an aye vote. Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair. Consistent with my position on 1019, I ask for a no vote. I would note that if the provision that was placed in 1019 is to work and be authorized by statute that L.004 would have to pass.

**Sen. Gonzales**

That is correct. That is correct. Is there any further discussion? Seeing none. Ms. Jenson, please poll the members.

**Juliann Jenson**

Senators, Gardner.

**Sen. Gardner**

Aye, or no, no.

**Juliann Jenson**

Coleman.

**Sen. Coleman**

Aye.

**Juliann Jenson**

Van Winkle.

**Sen. Van Winkle**

No.

**Juliann Jenson**

Rodriguez.

- 8 -

- 9 -

**Sen. Rodriguez**

Aye.

**Juliann Jenson**

Madam Chair

**Sen. Gonzales**

Aye.

**Sen. Gonzales**

L.004 to 1001, passes on a vote of three to two. Are there any further amendments? Seeing none, the amendment portion of the hearing has concluded. Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair. I move HCR 1001 to committee on appropriations. That again.

**Sen. Gonzales**

Fascinating, that a concurrent resolution would go to the aprobs, but it's fine, we can send them all.

**Sen. Gardner**

I don't want to go there. I don't want to go there if I don't have to,

**Sen. Gardner**

Okay, I move HCR 1001 to the Committee on Appropriations.

**Sen. Gonzales**

That is a proper motion.

**Sen. Gardner**

As amended.

**Sen. Gonzales**

As amended. Ms Jenson.

**Juliann Jenson**

Senators, Gardner.

**Sen. Gardner**

Aye.

**Juliann Jenson**

Coleman.

**Sen. Coleman**

Aye.

**Juliann Jenson**

Van Winkle.

**Sen. Van Winkle**

Aye.

**Juliann Jenson**

Rodriguez.

**Sen. Rodriguez**

Aye.

**Juliann Jenson**

Madam Chair.

**Sen. Gonzales**

Aye.

**Sen. Gonzales**

That passes on a vote of five to zero.

**Sen. Van Winkle**

Appropriations on consent vote.

**Sen. Gonzales**

There you go.

**Sen. Gonzales**

Senator Moreno.

**Sen. Van Winkle**

What is happening?

- 10 -

**Sen. Gonzales**

Glad for you to join us.


**Sen. Gonzales**

Our last bill, our last bill up is House Bill 1205. Senator Gardner.


**Sen. Gardner**

Thank you, Madam Chair, and I move house bill 1205 to the committee on appropriations. And if we're open for amendments, I will begin moving amendments. By way of explanation, before I start doing this, Madam Chair and I, along with the Majority Leader asked the Women's Bar Association, the Colorado Bar Association, CCASA, the judicial discipline commission, and the Judicial Department to get in a room and deal with the uncertain situation or status of the ombuds bill. That has produced a whole series of amendments, which I am told, and I'll note where otherwise, but I am told are consensus amendments, and that there will be some need, on seconds to do some refinement of these amendments. But having said that, let me start. I move L.015. This is a simple one-word change. Changes the word report to submit. The new language says the ombudsman duties and function includes to submit complaints to the appropriate entity only at the discretion and to consider the complainant rather than to report complaints.


**Sen. Gonzales**

Is there any further discussion on L.015? Is there opposition to L.015? L.015, is adopted. Senator Gardner.


**Sen. Gardner**

Thank you. I move L.016. L.016, is a series of changes. At its core, it says the ombuds office needs to be in a building that's not managed by the Judicial Department for independence, the qualifications for the appointing authorities to consider in potential board members for the ombuds office. In other words, its board should include people with experience in employee harassment, experience as an employment attorney, or experience as a victim's right advocate. So, it kind of refines the understanding of who would be the board for the ombuds office, which has the important duty of oversight of the ombudsman, him or herself. I ask for an aye vote.


**Sen. Gonzales**

Thank you for the overview, Senator. If you want to jump in, Senator Moreno, feel free. Okay, yeah, exactly. Is there any further discussion on L.016? Is there objection to L 016? Seeing none, L.016, is adopted. Senator Gardner.

- 11 -

**Sen. Gardner**

Thank you, Madam Chair. I move L.021. This is a really important amendment. Right now, in 1205, the Ombuds Office statute. It's enabling statute is in Title 50, which all other Judicial Branch agencies, organizations, and businesses are in Title 13, and that's all it does. I ask for an aye vote.

**Sen. Gonzales**

Thank you. Is there further discussion on L.021? Is there opposition? Seeing none? L.021 is adopted. Senator Gardner.

**Sen. Gardner**

Thank you. I move L.025. I jumped all the way to 25. This adds language that encourages the new office to adopt best practices of an organizational ombudsman. This is reference to the standards of practice and code of ethics established by the International Ombuds Association for an organizational ombudsman with four key principles: confidentiality, independence, informality, and impartiality. This was a consensus amendment as well. I ask for an aye vote.

**Sen. Gonzales**

Is there further discussion? Is there opposition? Seeing none, L.025, is adopted. Senator Gardner.

**Sen. Gardner**

Thank you, I move L.026. This was some changes designed for the purpose of promoting confidentiality and informality in the Ombuds Office. Lines 1 through 7 of the amendment adds a data reporting section of the bill, and basically says the office shall report any data that could be presented in a manner that would violate confidentiality of anyone, is not to be included in that report. So it's it's a guarantee of confidentiality. Line 10 and 11 of the amendment strike a paragraph from the bill that would have required the ombudsman to report certain information to the discipline commission. Overall, the package has amendments that removes any mandate of reporting to formal discipline bodies and gives the ombudsman the option to do that if the plaintiff, the complaint consents. As Senator Moreno, Mr. Majority Leader and I will recall when we served on the legislative workplace interim committee together, one of the major concerns was when a complainant goes to and in this case, in the legislative it was to that office, the complainant needed to have control over whether their complaint went forward or whether they preferred to have it handled informally, or whatever. This this is the same concept, and I ask for an aye vote.

**Sen. Gonzales**

Thank you for the overview, Senator Gardner. Colleagues, do we have further discussion? Is there opposition? Seeing none, L 026 is adopted. Senator Gardner.

**Sen. Gardner**

I move L.028. This This changes the term . .

- 12 -

**Sen. Gonzales**

Senator Gardner, did you mean to move L.027?

**Sen. Gardner**

I do not. Oh, I don't have an explanation for L.027. We're not doing L.027, that's why.

**Sen. Gonzales**

Senator Gardner.

**Sen. Gardner**

Thank you. I move L.028. And the bill has the term judicial personnel, is a description of who would be affected, but in fact, that reference ought to be to the complainant in other places in the bill, and that cleans up the language. I ask for an aye vote.

**Sen. Gonzales**

Thank you for the overview. Is there any discussion? Is there opposition? Seeing none, L.028, is adopted. Senator Gardner.

**Sen. Gardner**

Thank you. I move L.029. This refines some language about the role of the ombuds to better reflect a shared understanding of the role amongst all those stakeholders. It says that the ombuds facilitates communication, rather than initiating contact with someone or initiating resolution. That's for others to do. The ombuds is to assist the complainant in however they wish to proceed. And as an additional provision concerning confidentiality, I ask for an aye vote.

**Sen. Gonzales**

Is there any further discussion? Is there opposition? L.029 is adopted. Senator Gardner.

**Sen. Gardner**

Madam Chair, I move L.030. This amends the legislative declaration to clarify that the ombudsperson In that office is not an investigative office. It's not adversarial. It doesn't replace any investigative body, such as the Commission, but provides resources from complainants to access those bodies. Again, it's, dare I say it's a navigator, among other things. And so I ask for an aye vote on L.030.

**Sen. Gonzales**

Thank you. Senator Gardner, do you have,  is there any discussion? Is there opposition to L.030? Seeing none, L.030 is adopted. Senator Gardner.

- 13 -

**Sen. Gardner**

I move L.031. This cleans up the SMART Act obligations in the bill. This was just not bolded on my sheet to ensure that the proper department, the Judicial Department is identified. And the introduced version of the bill included an executive branch department when that department is no longer in the bill, so they will be part of the Judicial like other independent agencies, part of the Judicial SMART Act hearings I ask for an aye vote on L.031.

**Sen. Gonzales**

Thank you, Senator Gardner. Is there further discussion? Is there opposition? Seeing none, L.031 is adopted. Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair. I move L.032, so I can talk about it, first and foremost. This amendment was not a consensus amendment amongst the stakeholders. There's consensus about the concept. But the specific language is kind of in dispute, and I guess, having said that, what it's about, just to acquaint the committee, is about a liaison to serve the office of the ombudsman, and at least one liaison to serve the board. And having said that, I'm going to withdraw L.032 because there's not consensus.

**Sen. Gonzales**

L.032 is withdrawn. Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair, and I need to look at L.033, a moment here. It's also a liaison amendment, and I think it's a different approach to that that I will not offer this evening either.

**Sen. Gonzales**

L.033 is not moved.

**Sen. Gardner**

Not moved. And we probably will visit that issue on second reading.

**Sen. Gonzales**

Thank you, Senator Gardner. Colleagues, are there any further amendments? Going once? Seeing none, the amendment portion of the hearing has concluded. Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair. I move House Bill 1205 to the Committee on Appropriations, as amended with favorable recommendation.

- 14 -

**Sen. Gonzales**

That is a proper motion. Colleagues, any discussion?

**Sen. Gardner**

Offer the majority leader a wrap up.

**Sen. Gonzales**

Mr. Majority Leader. I will just say that I am grateful to all of the people who have, the stakeholders following the hearing that we had. Just a few days ago, that feels like a very long time ago. And the ways that people have been able to come together and find many points of consensus. There are still points of disagreement, but there are lots of points of consensus, and so I am appreciative of everyone who has been engaged in that work. And thank you, Senator Gardner, for preparing all of those amendments. Ms. Jenson, or Senator Gardner.

**Sen. Gardner**

Thank you. I just wanted to echo your expression of gratitude to those stakeholders. I think these aren't easy meetings. I think they're stressful. I think people have very entrenched positions, and they have to find their way through that, and when we ask them to do it, I appreciate the fact that they respond and do the really, really hard work that needs to be done here. I do want to thank the Majority Leader for being my co-prime sponsor and helping shepherd this through. We've got work to do on the floor. I understand he has some influence on the floor of the Senate, and with that, thank Madam Chair. And I thank the drafter and the stakeholders for putting together my cheat sheet, frankly, of the amendments they agreed upon and ask for an aye vote.

**Sen. Gardner**

Ms Jenson.

**Juliann Jenson**

Senators, Gardner.

**Sen. Gardner**

Aye.

**Juliann Jenson**

Coleman.

**Sen. Coleman**

Aye.

- 15 -

- 16 -

**Juliann Jenson**

Van Winkle.

**Sen. Van Winkle**

No for today.

**Juliann Jenson**

Rodriguez.

**Sen. Rodriguez**

Aye.

**Juliann Jenson**

Madam Chair.

**Sen. Gonzales**

Aye.

**Sen. Gonzales**

That bill passes on a vote of four to one. It wasn't 15 minutes, but it was really, I think, speedy for Judiciary. Thank you all. We stand in adjournment. Get home safe.

# Appendix 27(z)(ii)

# Exhibits and Hearing Materials:

# Appendix 27(z)(ii)(1)

# Amendments;

HCR1001_L.002
SENATE COMMITTEE OF REFERENCE AMENDMENT
Committee on <u>Judiciary</u>.
<u>HCR23-1001</u> be amended as follows:

Amend reengrossed resolution, page 10, line 21, strike "FIVE" and substitute "THREE" and strike "AND".

Page 10, line 22, strike "FIVE" and substitute "THREE" and strike "COMMISSION." and substitute "COMMISSION, THREE ATTORNEYS WHO HAVE EXPERIENCE AS RESPONDENT COUNSEL IN JUDICIAL DISCIPLINE PROCEEDINGS APPOINTED BY THE GOVERNOR, AND ONE REPRESENTATIVE OF A VICTIMS' RIGHTS ORGANIZATION APPOINTED BY THE GOVERNOR.".

Page 10, lines 24 and 25, strike "COMMITTEE AND COMMISSION." and substitute "COMMITTEE.".

** *** ** *** **

LLS: Conrad Imel x2313

HCR1001_L.004
SENATE COMMITTEE OF REFERENCE AMENDMENT
Committee on <u>Judiciary</u>.
<u>HCR23-1001</u> be amended as follows:

Amend rengrossed resolution, page 3, line 14, strike "the supreme court;" and substitute "~~the supreme court;~~ THE ACTIVE DISTRICT JUDGES AND COUNTY COURT JUDGES OF THE STATE, AS PROVIDED IN LAW;".

** *** ** *** **

LLS: Conrad Imel x2313

HB1019_L.003
SENATE COMMITTEE OF REFERENCE AMENDMENT
Committee on <u>Judiciary</u>.
<u>HB23-1019</u> be amended as follows:

Amend reengrossed bill, page 3, after line 7 insert:

"**SECTION 2.** In Colorado Revised Statutes, 13-5.3-105, **amend** (3) as follows:

**13-5.3-105. Information-sharing with judicial oversight entities - legislative declaration.** (3)  When a judicial oversight entity receives information indicating or alleging potential judicial misconduct, the entity shall share the portion of the complaint alleging judicial misconduct with the commission within a reasonable time. Thereafter, the commission may request further material or information that the oversight entity holds relating to the allegation of judicial misconduct. THE JUDICIAL OVERSIGHT ENTITY SHALL PROVIDE THE REQUESTED MATERIAL OR INFORMATION TO THE COMMISSION WITHIN FOURTEEN CALENDAR DAYS AFTER THE COMMISSION'S REQUEST. THE JUDICIAL OVERSIGHT ENTITY MAY NOT WITHHOLD REQUESTED MATERIAL OR INFORMATION THROUGH A CLAIM OF PRIVILEGE OR CONFIDENTIALITY THAT IT HOLDS OR A CLAIM OF CONTRACTUAL RIGHT OR OBLIGATION ARISING AFTER MAY 20, 2022, NOT TO DISCLOSE, INCLUDING A NON-DISCLOSURE AGREEMENT. Any information or materials received from the entity are subject to the commission's rules of confidentiality.".

Renumber succeeding sections accordingly.

Page 9, line 9, strike "2, and 7" and substitute "3, and 8".

Page 9, line 14, strike "2, and 7" and substitute "3, and 8".

** *** ** *** **

LLS: Conrad Imel x2313

HB1019_L.005
### SENATE COMMITTEE OF REFERENCE AMENDMENT
Committee on <u>Judiciary</u>.

<u>HB23-1019</u> be amended as follows:

Amend reengrossed bill, page 3, after line 7, insert:

"**SECTION 2.** In Colorado Revised Statutes, 13-5.3-102, **amend** (2) as follows:

**13-5.3-102. Commission on judicial discipline - powers and duties.** (2) (a)  Members of the commission are appointed and serve pursuant to section 23 (3)(a) and (3)(b) of article VI of the Colorado constitution.

(b)  PURSUANT TO SECTION 23 (3)(a) OF ARTICLE VI OF THE COLORADO CONSTITUTION, THE MEMBERS OF THE COMMISSION WHO ARE JUDGES OF THE DISTRICT COURTS AND JUDGES OF COUNTY COURTS ARE APPOINTED BY THE ACTIVE DISTRICT JUDGES AND COUNTY COURT JUDGES OF THE STATE. THE STATEWIDE ASSOCIATIONS OF DISTRICT AND COUNTY COURT JUDGES SHALL JOINTLY DETERMINE THE PROCESS FOR APPOINTING THE JUDGE MEMBERS OF THE COMMISSION BY THE DISTRICT AND COUNTY COURT JUDGES OF THE STATE AND SHALL JOINTLY ADMINISTER THE APPOINTMENT PROCESS. THE ASSOCIATIONS SHALL REPORT TO THE COMMISSION WHEN A DISTRICT OR COUNTY COURT JUDGE IS APPOINTED TO THE COMMISSION.".

Renumber succeeding sections accordingly.

Page 9, line 9, strike "and 7" and substitute "3, and 8".

** *** ** *** **

LLS: Conrad Imel x2313

# Appendix 27(aa)

*Hearing on HCR 23-1001, HB 23-1019, and HB 23-1205 before the Senate Appropriations Comm.*, Colo. Leg., April 28, 2023:

**Appendix 27(aa)(i)**

**HCR 23-1001 Transcript;**

# Senate Appropriations Committee Hearing—April 28, 2023: HCR 23-1001

**Sen. Bridges**

Yes, we're going to do HCR 23-1001, Senator Gardner.

**Sen. Gardner**

Thank you, Mr. Chair, I move House Concurrent Resolution 23-1001 to the Committee of the Whole. This is our concurrent resolution associated with judicial discipline procedures and confidentiality that came out of the Interim Committee, and I request an aye vote. It will require two-thirds on thirds.

**Sen. Bridges**

Good to know. Any further discussion? Seeing none. Please poll the committee.

**Comm. Staff**

Senators, Coleman.

**Sen. Coleman**

Aye.

**Comm. Staff**

Gardner.

**Sen. Gardner**

 Aye.

**Comm. Staff**

Hansen.

**Sen. Hansen**

Aye.

**Comm. Staff**

Kirkmeyer.

**Sen. Kirkmeyer**

Aye.

- 2 -

**Comm. Staff**

Liston.

**Sen. Liston**

Aye.

**Comm. Staff**

Madam Vice Chair.

**Sen. Zenzinger**

Aye.

**Comm. Staff**

Mr. Chair.

**Sen. Bridges**

Aye.

**Sen. Bridges**

That bill passes a vote of 7-0.

**Appendix 27(aa)(ii)**

**HB 23-1019 Transcript;**

# Senate Appropriations Hearing—April 28, 2023:
## HB 23-1019

**Sen. Bridges**
Next up is House Bill 1019. Senator Gardner.

**Sen. Gardner**
Thank you, Mr. Chair. Well, the exception that proves the rule about good things happening, I move House Bill 1019 to the Committee of the Whole.

**Sen. Bridges**
You're breaking your principle here, just like 10 minutes after you made it. All right. So, any discussion of House Bill 1019? Seeing none, please poll the committee.

**Comm. Staff**
Senators, Coleman.

**Sen. Coleman**
Aye.

**Comm. Staff**
Gardner.

**Sen. Gardner**
Aye.

**Comm. Staff**
Hansen.

**Sen. Hansen**
Aye.

**Comm. Staff**
Kirkmeyer.

**Sen. Kirkmeyer**
Aye.

- 1 -

- 2 -

**Comm. Staff**

Liston


**Sen. Liston**

Aye.


**Comm. Staff**

Madam Vice Chair


**Sen. Zenzinger**

Aye.


**Comm. Staff**

Mr. Chair.


**Sen. Bridges**

Aye.


**Sen. Bridges**

That bill passes a vote of seven to zero. Senator Gardner.


**Sen. Gardner**

No.


**Sen. Bridges**

No consent calendar.

**Appendix 27(aa)(iii)**

**HB 23-1205 Transcript;**

# Senate Appropriations Committee Hearing—April 28, 2023: HB 23-1205

**Sen. Bridges**

Next up, we've got House Bill 1205. Senator Gardner.

**Sen. Gardner**

Thank you, Mr. Chair. I move House Bill 1205, to the Committee of the Whole and there is no amendment.

**Sen. Bridges**

Is there any discussion? Seeing none, please poll the committee.

**Comm. Staff**

Senators, Coleman.

**Sen. Bridges**

Aye.

**Comm. Staff**

Gardner.

**Sen. Gardner**

Aye.

**Sen. Hansen**

Aye.

**Comm. Staff**

Hansen.

**Comm. Staff**

Kirkmeyer.

**Sen. Kirkmeyer**

Aye.

**Comm. Staff**

Liston.

- 1 -

- 2 -

**Sen. Liston**

Aye.

**Comm. Staff**

Madam Vice Chair.

**Sen. Zenzinger**

Aye.

**Comm. Staff**

Mr. Chair

**Sen. Bridges**

Aye.

**Sen. Bridges**

That bill passes a vote of seven to zero. Is there? Senator Gardner.

**Sen. Gardner**

No.

**Sen. Bridges**

Did this pass unanimously out of committee?

**Sen. Gardner**

Yes, but we have further refinement.

**Sen. Bridges**

Ah, this will not go on the consent calendar. Trying to figure out how to not make this bounce.
Apologies that that last one was super loud.

# Appendix 27(bb)

## *Hearing on HCR 23-1001 and HB 23-1019 before the J. Colo. Legis. Conf. Comm., Colo. Leg., May 8, 2023:*

# Appendix 27(bb)(i)

# HCR 23-1001 Transcript;

# Colorado Legislative Conference Committee on HCR 23-1001—May 8, 2023

**Sen. Gardner**

The first conference committee on House Concurrent Resolution 1001 will come to order. Mr. Pogue, please call the roll.

**Staff Pogue**

Representative Bacon.

**Rep. Bacon**

Here.

**Staff Pogue**

Lynch.

**Rep. Lynch**

Here.

**Staff Pogue**

Senators, Moreno.

**Sen. Moreno**

Here.

**Staff Pogue**

Senator Gonzales.

**Sen. Gonzales**

Present.

**Staff Pogue**

Representative Weissman.

**Rep. Weissman**

Here.

**Staff Pogue**

Mr. Chair.

- 1 -

**Sen. Gardner**

Here.

**Sen. Gardner**

We are all present. We just a couple of moments ago, had the conference committee on House Bill 1019, which was the implementing legislation from our interim committee. House Concurrent Resolution 1001, again, is the product of a great deal of work, and here at the end, we had questions about how the Rules Committee for the process would be made up. We think we've reached an acceptable compromise on that. As well as doing a corresponding piece with respect to appointment of judges to the Commission on Judicial Discipline. Actually, I'll handle that first. As you know, we created a process in 1019, the corollary to that in the HCR, it simply will say that the members of the Commission will be chosen by the Supreme Court as provided by law, and the 1019 provision is the law. With respect to the membership of the Rules Committee for the adjudicative process. We settled on four members appointed by the adjudicative board, four members appointed by the Commission, one victim's advocate, as defined by law or as defined in law, and appointed by the governor. And then we had 4-4-4, as well. And with that, are there questions or questions for Mr. Imel? Representative Weissman.

**Rep. Weissman**

Thank you, Mr. Chair. No questions. Just on the latter point of the rulemaking committee, I feel that we've landed in an appropriate place. I considered it a bit of unfinished work from the interim process that we had two different rule structures. I think it's important that we've unified them here. I think the 4-4-4 membership is fair and appropriate, glad to see, and I think it was the Senate that first introduced this concept, that we refined just a bit here. I think it makes sense to add the one victim advocate appointed by the Governor. That, first of all, keeps us from having an even number, which we generally don't want to have. And it adds an important perspective. I think we heard throughout the interim and this year, that given that we just didn't think about those considerations dating back decades ago. But we know that we now need to. This is an appropriate way to bring that perspective to the rules that will inform the process that involves complainants or victims, if you will. I think the phrasing here is appropriate, a victim's advocate as defined by law. We already have an existing definition of that in 13-90 that's well understood by the relevant stakeholders, and I think that provides clear direction to the Governor. So, thank you.

**Sen. Gardner**

Thank you. Anyone else? I want to express my gratitude for everyone's work on HCR 1001, as well as 1019, it has not been easy at all. A lot of thought has gone into where we are today and what the compromises are to ensure an accountable and transparent Judicial Branch. I appreciate their joining in that effort and the Commission as well. And with that, I will entertain a motion. Representative Weissman.

- 2 -

- 3 -

**Rep. Weissman**

Thank you. I move for the adoption of CL HR 1001.001 draft conference report dated 5/7.

**Sen. Gardner**

That's a proper motion. Any discussion? Mr. Pogue, please call the roll.

**Staff Pogue**

Representatives, Bacon.

**Rep. Bacon**

Yes.

**Staff Pogue**

Lynch.

**Rep. Lynch**

Yes.

**Staff Pogue**

Senators, Moreno.

**Staff Pogue**

Aye.

**Staff Pogue**

Gonzales.

**Staff Pogue**

Aye.

**Staff Pogue**

Representative Weissman.

**Staff Pogue**

Yes.

**Staff Pogue**

Mr. Chair.

- 4 -

**Sen. Gardner**

Aye.

**Sen. Gardner**

And that passes six zero. Anything further from anyone? With that, saying nothing further, the first conference committee on HCR 23-1001 is adjourned.

- 4 -

# Appendix 27(bb)(ii)

# HB 23-1019 Transcript;

# Colorado Legislative Conference Committee HB 23-1019—
## May 8, 2023

**Rep. Weissman**
All right, the conference committee for House Bill 1019 will come to order, if Mr. Pogue would kindly start us off by calling the roll.

**Staff Pogue**
Representative Bacon.

**Rep. Bacon**
Here.

**Staff Pogue**
Senator Gonzales.

**Sen. Gonzales**
Present.

**Staff Pogue**
Representative Lynch

**Rep. Lynch**
Here.

**Staff Pogue**
Senators, Moreno.

**Sen. Moreno**
Here.

**Staff Pogue**
Gardner.

**Sen. Gardner**
Here.

**Staff Pogue**
Mr. Chair

**Rep. Weissman**

Here.

**Rep. Weissman**

Everyone is present. So, members, this is the companion bill that accompanies the concurrent resolution, which will be the next conference committee. This is the bulk of the work of the judicial discipline interim committee, I think members have the 5/7 draft of CL HB 1019.001. This draft conference committee report rolls up some conversations that a number of us have been having. It closely kind of fits with an amendment that I believe is going to be considered in the next conference committee, but what we have in front of us is some new proposed language to address the question of how judge appointees are made to the Commission. I'll leave off talking about the concurrent resolution, because that's not really before us. But what we have here is essentially a compromise approach that's been worked out. And just to sort of state it briefly for the record, there is a semi-random process by which there will be an administrative or ministerial selection from all of the district judges in the state of 10 unless any who may have a disciplinary history, we've used language already used in the concurrent resolution for that purpose. And, then, the Supreme Court will pick two of that 10. Likewise, for the county judge appointments to be made to the Commission, there will be a ministerial random selection of 10 from all serving county judges, again, less those with any disciplinary history. The Supreme Court will pick two. We have language also to make sure that there's only one county judge from any of our 64 counties and one district judge from any of our judicial districts. Is there any questions or discussion about the draft conference report? Senator Gonzales.

**Sen. Gonzales**

Thank you, Mr. Chair. No questions, but just gratitude for the many conversations between us as the conference committee and then also with the many stakeholders that led to this first report, thank you.

**Rep. Weissman**

Thank you, Senator. A lot of us have put a great deal of time in and appreciate everyone. Senator Gardner.

**Staff Pogue**

Are you ready for a motion? Yeah, sure. Senator Gardner.

**Sen. Gardner**

Thank you, Mr. Chair, I move the first report of the first conference committee that's denominated as CL HB 1019.001.

**Rep. Weissman**

All right, the draft conference committee report has been moved. Members. Any last discussion? Seeing none. Mr. Pogue kindly call the roll on the adoption of the conference committee draft report.

- 3 -

**Staff Pogue**

Representative Bacon.

**Rep. Bacon**

Yes.

**Staff Pogue**

Senator Gonzales.

**Sen. Gonzales**

Aye.

**Staff Pogue**

Representative Lynch.

**Rep. Lynch**

Yes.

**Staff Pogue**

Senators, Moreno.

**Sen. Moreno**

Aye.

**Staff Pogue**

Gardner.

**Sen. Gardner**

Aye.

**Staff Pogue**

Mr. Chair.

**Rep. Weissman**

Yes.

**Rep. Weissman**

All right, the draft report is adopted by a vote of six to zero. Members, that concludes our business. Mr. Imel will walk us through signing the report, as we need to. With that, the conference committee on House Bill 1019, will be adjourned.

- 3 -

**Appendix 27(cc)**

*Hearing before the J. Budget Comm.*, Colo.
Leg., December 18, 2023:

# Appendix 27(cc)(i)

# ASIA Bd. Presentation Transcript;

# Legislative Joint Budget Committee—December 18, 2023 Hearing: Presentation of the Administrative Services for Independent Agencies (ASIA) Board

**Sen. Zenzinger**

The Joint Budget Committee will now come back to order. Welcome back from lunch, everyone. We will get right to it and begin our afternoon agenda with a hearing for the Administrative Services for Independent Agencies. And welcome Board Chair. Ms. Villafeurte.

**Stephanie Villafeurte**

Thank you very much. And members of the committee, it's a pleasure to see you today. I am going to just take the next several minutes to update you on where we are in terms of our progress on the Administrative Services for Independent Agencies Board. As all of you know, last year in Senate Bill 23-228, this committee created, if you will, and established the Office of Administrative Services for Independent Entities. The idea was to try to consolidate, really, in terms of cost and efficiency, services that are provided to independent agencies, which tend to be relatively small and or moderate sized compared to its larger state counterparts. The purpose, again, is to provide centralized services and administrative support. I do want to extend my thanks from the Board to Mr. Kemm, as well as to members of this committee for setting this in motion. I believe it's an imperative service that will be offered to all of the agencies involved. I'm going to skip straight to just really the mandates that the statute created for this Board.

**Stephanie Villafeurte**

Great. Thank you. And it'll be brief. Essentially, there are two statutory requirements for the Board, immediately, if you will. And the first one was to secure a human resource consultant to aid the Board in the development and the recruitment process for an Executive Director for this group. We in fact, did hire that consultant in July of 2023, and that individual is a consultant with Coach Craft, Inc. She also, Ms. Mahlin, has extensive experience, human resource experience with the Judicial Department. In particular, prior to establishing her own consulting business almost a decade ago, I've listed all of the steps that we have gone through with her assistance in helping us recruit the next Executive Director. So, that was our first charge. The second charge was to hire the Executive Director by October of 23 we are in the process of concluding that process now, with final interviews this week. We hope that we will have an Executive Director hired by the end of this month and onboarded by January. There were delays in this process, which, again, I have cited to in my letter. But I am happy to go through those in more detail, if the committee requires. But essentially, where we are today is we are a working Board. We have met over a dozen different times. The Ombudsman Office staff has dedicated countless hours to this process, and we're all hoping for a successful outcome at the end of this month. And I'll be happy to take any questions.

- 1 -

**Sen. Zenzinger**

And Ms. Villafeurte. Chair Villafuerte, before you go, I want to first check in with the committee, since we only have 15 minutes for this portion of the hearing, and find out as we begin, are there any questions you want to make sure get answered that you thought of that aren't addressed in the written materials and you want to bring up now? Okay, seeing none, we'll carry on with your presentation.

**Stephanie Villafeurte**

Committee, do we have any questions?

**Sen. Bridges**

[Inaudible] this week?

**Stephanie Villafeurte**

Our final interviews are this week, correct.

**Sen. Kirkmeyer**

Perfect timing for your hearing. That's great. .

**Stephanie Villafeurte**

Yes, yeah, I wanted some good news for everybody.

**Sen. Zenzinger**

I'm seeing no questions. I'm bringing it back to you, Chair Villafeurte.

**Stephanie Villafeurte**

Great. Thank you. That would conclude my presentation at this time. And we can move to our next segments, if that's okay?

**Sen. Zenzinger**

That sounds great. Okay, so we will move, then, to the Office of the Child Protection Ombudsman, again with Ombudsman Villafeurte.

- 2 -

# Appendix 27(cc)(ii)

# Colo. Comm'n Jud. Discipline Presentation Transcript;

# Legislative Joint Budget Committee—December 18, 2023:
# Presentation of the Colorado Commission on Judicial Discipline

**Sen. Zenzinger**

The Joint Budget Committee will now come back to order. I guess we're two minutes earlier than I said I would be. We'll go slow here. Just one member who's missing. Right, it does depend on which clock. We are with the Commission on Judicial Discipline. Welcome, if you would, for the record, please introduce yourself and the floor is yours.

**Christopher Gregory**

Good afternoon, Madam Chair and committee members. I am Christopher Gregory, Executive Director of the Colorado Commission on Judicial Discipline. And as presented in our written materials and our responses, the Commission is requesting a continuation of its current funding at fiscal levels for Fiscal Year 2025. At this time, we believe that we have adequate resources to perform our constitutional mandate. And I'm here merely to answer any questions that you may have.

**Sen. Zenzinger**

That is about the most efficient presentation, ever. Committee members, do we have any questions for Executive Director Gregory? I know, we feel like we have to do something to justify your trip to the committee. I don't know that we do. How are things going? Has anything changed that we should know about? How have you been? Yes, you did. So hopefully things have improved since last year.

**Christopher Gregory**

Yeah, and I think they have, and largely because of the funding mechanisms this committee had created. I can share. I had gone to some conferences earlier this year with sort of my counterparts from other commissions around the country. And I think, universally, everyone was sort of amazed at what we were able to accomplish. To have essentially a rainy-day fund, or that Special Cash Fund. If any exigency ever arises, that we're able to immediately take action on those sorts of things. I think that that may be a model nationally for what other commissions are going to be doing as they look for funding. The resources that we have gotten, I do appreciate. Also, just information and Mr. Kemm, as part of our last budget request, directed me to communicate with SIPA, the State Internet Portal Authority. And, through that, we were able to redo our website without charge. A great example of how I think efficiencies come out of good government and some of the structures that have come from over here. If there is anything that, I guess, still needs to be done, we continue our conversations with the Judicial Department about our facility. We still don't, after two years, have a lease, sort of confirming where we're at right now. There is a process within the Carr Building to do a space needs assessment. And I'm optimistic that, with the constitutional proposal, we will have a space that will meet both of our needs and the new adjudicatory board that's being proposed to perform one of the functions right now, that's kind of in house. But there's, I guess, creative things that can be done on a capital front to do that. And

- 1 -

I'm sure, once those plans are there, we will be back asking for money to build it. But, apart from that, everything has just been going wonderful as far as our resources and our ability to function.

**Sen. Zenzinger**

That is fantastic news. Senator Bridges.

**Sen. Bridges**

Thank you, Madam Chair, that's it's great to hear. I know last year there was. It was not quite so rosy a presentation. So, you've got your location squared away. You feel secure about that for the moment?

**Christopher Gregory**

It would help if we had a lease and we had some of the security concerns that we've raised addressed. But yes, I think with the statute saying they have to keep us there in the Carr Building, somewhat secure, where we're at.

**Sen. Bridges**

Great.

**Sen. Zenzinger**

All right. Well, this is wonderful. It's great to have the opportunity to touch base with you. And what a great surprise to hear that things are going well. It's a marked difference from last year. So, very nice to see you again, and thank you for making the time to come and visit with us, as briefly as you did.

**Christopher Gregory**

Thank you.

**Sen. Zenzinger**

All right.

**Christopher Gregory**

I hope everyone has a good afternoon.

**Sen. Zenzinger**

Thank you, you as well. So, that concludes our hearing for the Commission on Judicial Discipline.

- 2 -

**Appendix 27(cc)(iii)**

**Colo. Jud. Dep't Presentation Transcript;**

# Legislative Joint Budget Committee—December 18, 2023 Hearing: Presentation of Colorado Judicial Department

**Rep. Bird**

The Joint Budget Committee will now come to order. Good morning, everyone. Happy Monday. We have a packed agenda, as usual. And today, we get to begin with Courts and Probation. Just as a housekeeping matter, before we dive into our agenda, I want to call to members attention that our order of the day doesn't break out all of the topics that we'll be discussing. So, I'm going to be letting us know at the beginning of each hearing about the time that has been allotted for each subject. That said, if we have pressing questions, I want to make sure that those get answered. And for our presenters, we definitely want to get through the content of your presentations, but want to make sure members questions get answered that had arisen during the hearings. I think that will add the most value for all of us. So, just judging how things are going, we might prioritize questions. I might check in with members first to see if we have questions, before we dive into the substance of the presentations. And I think that's it. And right now for the Courts and Probation, we are scheduled to be here through 10:30 so we have an hour and a half for this part of the presentation. And with that, who would like to begin? Chief Justice Boatright.

**Chief Justice Boatright**

Good morning and thank you for having us. I brought this up at the State of the Judiciary speech last year, and the Court went out to all of the jurisdictions in our State. And we're one of the few entities I think, that literally has somebody in every county in the entire State. And the Justices went out really met nose to nose with every employee, and it became very clear that compensation and an opportunity for advancement within the Judicial Branch are the priorities for our employees. I said this in the State of the Judiciary speech, but it's something that really resonated with me. Is, we had one probation officer who said, "I supervise sex offenders by day and wait tables by night." Another story is, and one of my jurisdictions that I went out to was Jefferson County, where I was a trial court judge for 12 years, and had a meeting. And we were talking with the clerks that worked directly with the judges. And one of the clerks broke down and started crying and said, "I've been with my judge for over 10 years." And she said, "I'm leaving, and it's not because I don't love my judge." She said, "I just can't work two jobs and keep this pace up anymore." And she was leaving to go to a municipal court. So, our primary ask, and we are doing this with the blessing of all of our judges around the State. I mean, we have needs with regard to judges, and that's going to be a conversation for another day. Really, a desperate need for judges. For example, our weighted caseload study showed that Arapahoe County needs eight new District Court judges. Colorado Springs said they need 10 new District Court Judges. But all of our judges around the State agreed that we would postpone that request because we want to take care of our employees. And part of that is it leads to dramatic turnover in the Branch. And it's not good for the citizens of the State of Colorado to have people constantly turning over that, then, need to be trained. And, so, our primary ask is around compensation and a step plan. It's very similar to what the Executive

- 1 -

Branch is doing through the WINS program. There are some slight variations with regard to when we're looking at an initial bump, albeit smaller than the Executive Branch. We want to do that at year-one and a smaller bump at year-three, I think they have a larger bump, possibly at year-five. And that's because we're losing people. We studied it, and we're losing people at year-one and year-three, primarily our probation officers. And, so, that's our primary ask. That's our number one—compensation. Or, our number one issue is compensation and this step plan. Because we also want to give our employees the feeling and the opportunity to advance within the Branch. I think that's just good business for government and it's best for the citizens. I will turn it over to Mr. Vasconcellos, our State Court Administrator, to address other [issues].

**Rep. Bird**
Welcome. Mr. Vasconcellos.

**Rep. Bird**
I think that's perfect.

**Steven Vasconcellos**
Thank you, Madam Chair. Good morning, committee. My name is Steven Vasconcellos. I'm the State Court Administrator for the Colorado Judicial Department, and, if it pleases the committee, I will dive into our hearing document. Starting on page 1 with the common questions, first question asking us to describe one time state and federal stimulus dollars that are not currently expended, along with plans for expending those funds by December of 24. I think the committee already knows this, but by way of reminder, federal guidance allows ARPA funds to be spent through December of 2026, as long as those funds are encumbered by December of 24. The majority of ARPA funding that was appropriated to the Department has been used, an overwhelming majority has been used in information technology. We've discussed this with the committee previously. The marquee item within information technology has been strengthening and expanding our network infrastructure statewide and also improving local Wi-Fi access in courthouses and probation. There is a detailed list of projects within our written response to other areas. I would highlight from ARPA spending our funding for the Eviction Legal Defense Fund and funding for crime victim services. In order to fully utilize the stimulus funds within the time frames allowed, we will be submitting a supplemental budget request for the current fiscal year and a budget amendment to our FY 25 request for additional spending authority for the same projects. No change, no change in scope, expansion, no new projects, just additional spending authority so that we can spend down the funds by the Federal deadline of December of 26. Madam Chair, I'm just going to continue to roll unless the committee has questions.

**Steven Vasconcellos**
Moving on to page 2 of our hearing document and Question 2: Describe budget requests that replace one-time general fund or ARPA funding with ongoing appropriations. Our 11 request includes an ongoing request for about $675,000 in cash fund spending authority from the Department's Information

Technology Cash Fund for ongoing maintenance costs associated with our software-defined wide area network, SD WAN project. We are essentially done with the initial installation That was a key area of spending with ARPA funding. I believe we're down to a couple of locations where we're working with counties on building permissions. You may remember that the counties are responsible for providing the courthouse space. So, we are guests there, and there's a high level of coordination when we're doing network cabling. We're down to working with the 20th Judicial District--Boulder, and particularly the La Plata County--Durango Location, in the southwest corner of the State. But, essentially, we are done with the SD WAN project. The ongoing funding is for basically maintenance and running the SD WAN system. Moving on to pages 2 and 3 of the agenda.

Question 3: Describe the impacts of implementing the compensation provisions of the WINS Partnership Agreement. The Chief mentioned this briefly earlier, but the Judicial Department, strictly speaking, is not subject to the partnership agreement. But statute does clearly guide us to take into account the compensation and personnel structure of both the Executive and Legislative Branches, and to match as closely as reasonably possible. It would be foolish for us not to match the compensation approach, in large measure, presented by the other two Branches. We want to be competitive within the state governmental sphere. We are losing folks currently to municipal government, county government, in some cases, service industry. So, you know, in terms of the key provisions of the WINS agreement, 3% across the board. Yes, please. And we are also submitting, as the Chief mentioned, our version of a step agreement. And there's a question later in our hearing document, asking for more specifics about that. I'll get to that at that point. I'll just take a quick, deep breath and pause before I move on.

**Rep. Bird**
Of course, feel free to breathe as you present. [Laughing] of course.

**Steven Vasconcellos**
I'm still on page 3 of our hearing document. Question number 4: Please provide a list of budget reductions the Department would propose if there were a 10% General Fund reduction. Approximately 90% of the Department's General Fund budget goes to personal services. The first dollar reduced in our General Fund budget implicates staff cuts. By way of comparison, the 10% General Fund cut that the Department experienced during the Covid-era budget reduction resulted in a loss of over 200 FTE statewide. And that was including significant cash fund refinancing to keep the number of positions lost that low. I can't say with absolute accuracy, what 10% would mean today. But just a couple of years ago, it was 200 people, likely larger. We don't have the same cash fund posture for refinancing today that we did then. So, it would be a fairly substantial negative impact to Branch operations and statewide. Obviously, if the Joint Budget Committee feels it's necessary to reduce by 10%, we will work as close as possible with the committee and your staff to try to minimize impacts to direct services to citizens statewide. Moving on to the issue around R-2, the Department's case management system. I'm on pages 3 and 4 of our hearing document. Representative Taggart, you had asked whether this case management system will be developed internally or by a third-party vendor. You had questions about the accuracy of

- 3 -

the cost estimate, and also asked us to discuss broadly timelines and the budget. The Department is requesting funding with a multi-year spending authority to design, develop, and implement a new case management system. Our current system is approximately the same age as my career, about 28 years. It was developed in a language on a platform that folks are no longer trained. It is essentially a dead programming language. Procuring assistance, currently, to make repairs and small changes based on legislative changes, is extraordinarily expensive. The time has come, needless to say. We will not be developing this system in-house. Running a software development shop is not our area of strength, and so we will be going out to bid through, as you might imagine, a robust public procurement process with requests for proposals to select a third-party vendor. The cost estimate, Representative Taggart, we believe is as accurate as we can make it, with an asterisk. We've surveyed the current vendor environment. There are some limits to the level of depth of discussions that we can have with vendors without violating state procurement rules, but we have surveyed the current vendor environment. We've also talked to several peer states around the country who have a similar, roughly similar, court structure statewide as we do. To get their sense of impacts and cost. And, so, this is as best as we can do at the moment, understanding it may change along the way. We have been in, for the last couple of years, regular discussions with the Joint Technology Committee, with your committee about this. We intend to be transparent at every step of the way to minimize surprise, particularly about cost.

**Sen. Zenzinger**

We do have a question. Senator Bridges.

**Sen. Bridges**

Thank you, Madam Chair. For a lot of statewide programs. For instance, like sales tax, just income tax, things like that. I've been surprised at how few vendors there are nationally serving these kinds of needs, even HR. So, curious what the landscape looks like for potential vendors on this.

**Sen. Zenzinger**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you. Senator Zenzinger. Senator Bridges, there are probably half a dozen to eight vendors in this space. So, we are anticipating competitive, robust feedback. There are three, probably two or three marquee names that a lot of folks use. However, there are more than three who are capable of delivering a system. So, we'll see where it all ends up.

**Sen. Bridges**

Great. Thanks.

- 4 -

**Steven Vasconcellos**

Senator Zenzinger. Representative Taggart, in our answer, we laid out in a fair amount of detail the main project steps along with timelines. I will spare you a detailed recitation of that unless you have specific questions. And I'll move forward. I'm on page 5 currently of our hearing document. Senator Kirkmeyer, you had asked us to describe the use and revenue sources for the Judicial IT Cash Fund. Additionally, you asked when the last time fees that support the fund were raised? The purpose of the cash fund, per statute is for expenses related to the Department's information technology needs, broadly. So, that's everything from network infrastructure, hardware costs, software costs, a limited amount of FTE. We've tried to, as much as reasonably possible, keep our staff general funded, but there are some cash funded personnel within that fund. We've provided a table in our answer, highlighting the main areas of use and expenditure out of the fund. The last time. There were couple of areas of fee increases and public access fees were increased by 10% back in 2019. And, then, during the budget downturn, during the pandemic, we raised e-file transaction fees by 50 there was a category of fees that were raised by 50% there were another category of fees that were raised by 100%. You can imagine these transactional fees were not incredibly large to begin with. It's not like we were taking a $500 fee and making it 1,000 it was more like taking a $7 fee and making it $15. But those were the most recent increases to the fees that drive the cash fund.

**Sen. Zenzinger**

Senator Kirkmeyer.

**Sen. Kirkmeyer**

Thank you, Madam Chair. I notice we had the State Auditor here week or so ago. And I notice that this is one of the funds that's out of compliance. So, my question would be, are you going to ask for a waiver? I mean, understand, I think we heard even during our briefing, the reason why you're building up our reserve in here. But you do need to ask for a waiver to be in compliance with the statute.

**Sen. Zenzinger**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Senator Zenzinger. Thank you, Senator Kirkmeyer. We, in fact, have already asked the JBC for a waiver. Senator Zenzinger sent a letter to the State Controller indicating that we have a waiver to the end of Fiscal Year 2026. So, as we sit here today, we are in compliance. I can provide staff.

**Sen. Kirkmeyer**

[Inaudible] the audit committee. Sorry, thank you. It's possible they did.

**Sen. Zenzinger**

Okay, great. Good to know. Any other questions? All right, Mr. Vasconcellos.

- 5 -

**Steven Vasconcellos**

Thank you, Senator Zenzinger. I am on pages 5 and 6 of our hearing document. Staff asked us to provide a history of fiscal note impacts in appropriations from the Judicial IT Cash Fund over the last three years. And, specifically, hone in on the impacts from those two possible case management system funding options. Long Bill appropriations for the IT Cash Fund have varied over the past three years. The Fiscal Year 21 cash fund appropriation totaled approximately $16 million. That number increased significantly to almost $25 million when ARPA funding was transferred to the IT Cash Fund and made available for specific projects. We've provided a table for FY 24 for our Long Bill appropriation. In the last three fiscal years, four bills have impacted the cash fund, reducing the amount available that could possibly be used to fund the case management system. Those bills and their impacts are highlighted. I'm happy to go through them in as much detail as the committee would want. But unless there are questions, I will continue to move.

**Rep. Bird**

We have a question. Representative Taggart.

**Rep. Taggart**

Thank you, Madam Chair. I apologize. I just want to go back to 2 for a second. I guess I would just encourage another increase in fees this year to avoid having to do those 50 and 100% increases. I realize it's on a small amount of dollars, but those kinds of increases shock people. So, I always encourage folks to try to do it incrementally, so you don't have to hit them again with that large of an increase.

**Rep. Bird**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Representative Taggart. It is under the category of lessons learned, even on small dollar amounts. It certainly got folks' attention and raised the ire of some. And we're always in a better position if we're doing ongoing maintenance rather than putting things on a dusty shelf for a while and then having gigantic changes. I appreciate the feedback. All righty. Committee, moving forward, I am on now page 6 of our hearing document and issue related to our request. R-7, the Carr Judicial Center. Question 1: Senator Kirkmeyer, you had asked if this was a request for general fund backfill, also to describe the policy intention and history of General Fund support for the Judicial Center. This request is for restoration of General Fund dollars that were cut from the Department's. budget during the FY 21 budget balancing, during Covid The revenue for the Judicial Center Cash Fund consists of fees, filing fees, lease payments from the majority of agencies that occupy the Building. Not every agency receives funding for lease payments and parking fees that are paid by employees and members of the public that use a parking lot on 1255, Lincoln that's next to History Colorado. Per statute, the cash fund is used for expenses related to design, construction, maintenance,

- 6 -

and operation of the Building. The big piece there are our COP payments that we make, essentially our mortgage payments for the Center. While not expressly identified in statute, I believe it was the intent of the General Assembly that filing fees and the other revenue sources discussed above would cover all the necessary costs. Unfortunately, in FY 15-16, filing fees did not come through as anticipated. Only about three or four years into the life of the cash fund. And, at that time, the General Assembly gave the Department a General Fund appropriation of approximately half a million dollars. That appropriation was ratcheted down 2% every year subsequently, and replaced by higher lease payments by the other agencies and ourselves within the Building until the Covid budget downturn. At which point, that funding was cut.

Moving on to page 7 of our agenda, staff asked us to speak to Judicial Center Cash Fund sustainability issues, the history of the cash fund, when the last time fees were increased and by how much, also to provide a 10-year history of revenue and expenditures. To be clear, the filing fees that primarily feed that fund are set by the General Assembly. So, that is not a fee that we can unilaterally raise on our own. The fees that feed that fund have not been changed since the fund was created in 2009. We provided almost three pages of details on the different areas of filing fees that are touched by the Judicial Center Cash Fund. And in terms of sustainability, our next COP payment in March of 2024. We believe we are on track to make without concern. However, the COP payment after that in September of 2024 may be in jeopardy if the General Fund supplement is not restored to pre-Covid levels.

Committee, moving on to page 10 of our hearing document and Question Number 3. Senator Zenzinger, you had asked us about the need for the request for legislation to repeal the current controlled maintenance reserve in statute, and, additionally, asked us how we seek to address controlled maintenance, in its place. Essentially, what we're asking for this year is a direct appropriation to the Judicial Center Cash Fund line for controlled maintenance. The current Controlled Maintenance Fund no longer receives funding. It originally received funding via the Judicial Center Cash Fund. So, money was taken. There's no independent revenue source for controlled maintenance. It just drew money from the main Judicial Center Cash Fund. And, then, that tie between the two funds was cut during the Covid budget balancing in order to free up some revenue. So, as we sit here today, we do not have an incoming revenue source for controlled maintenance. We have money in controlled maintenance, but we'll be drawing that down until it is fully depleted. So, we're asking to reestablish funding for controlled maintenance and in what we believe, in our opinion, is a slightly more simplified structure.

**Rep. Bird**
And we have a question, Madam Vice Chair.

**Sen. Zenzinger**
And are you separate, then from CDC in the existing controlled maintenance categories that we utilize for the rest of the State?

**Rep. Bird**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Senator Zenzinger. Statute does require CDC review of our controlled maintenance. There's actually a question later I believe in our document from Senator Kirkmeyer. I'll just kind of jump to that as well. We're more than happy to have a capital development committee review our controlled maintenance request. Nothing is scheduled at this time, but more than happy to go through that. We have required reporting that is intended for the CDC. That shows up in our annual budget request, that we provide. So, happy to go through CDC.

**Rep. Bird**

Madam Vice Chair.

**Sen. Zenzinger**

So, if you are a part of it, are you just struggling to get the attention of the committee in order to get your controlled maintenance items prioritized? Or, what's the emphasis for doing a separate request in that ordinary process?

**Rep. Bird**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Senator Zenzinger. Here, I think really two things to be candid. One, we've had the good fortune based on the cash fund sources that were created by the General Assembly and the General Fund supplement over the years to be in a really stable position and not need to ask for money with any regularity. So, that's been nice. We are no longer in that process. And I will readily admit that I, speaking for myself, am in a posture of learning more about the CDC process. That has not been my area of expertise. So, I have more to learn.

**Rep. Bird**

Representative Taggert.

**Steven Vasconcellos**

Thank you, Madam Chair, maybe this is more a question internally. Do we need to initiate legislation on these fees that haven't been increased in over 10 years?

**Rep. Bird**

Mr. Vasconcellos.

- 8 -

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Representative Taggart. Yep, that would be the General Assembly's purview, to raise those fees. That has not, by observation, been an area of interest for the General Assembly in recent years. But that would be a General Assembly initiated effort. We would be, of course, very desirous of collaboration. Not all fees, as you imagine, are created equally. There are some that are higher value, some that have different impacts to our communities. And we'd be happy to work closely with you and your staff if the JBC is seriously considering fee increases.

**Rep. Bird**

Follow up Representative Taggart?

**Rep. Taggart**

No, that's helpful. Thank you.

**Rep. Bird**

Okay, thank you. Back to you, Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. I am now on to page 11 of our hearing document. I believe we've answered that. Senator Kirkmeyer, that was your question about CDC. I'm going to just breeze through that, unless you have follow up.

Moving on also to page 11 of our document. Representative Sirota, you had asked us to describe the fees and revenue sources for our Court Security Cash Fund, and to provide a brief description of how the grant program distributes funding statewide. The cash fund consists of revenues from a $5 surcharge that is assessed on a variety of initial docket fees in civil, probate, and water cases, along with a $5 surcharge assessed on criminal convictions, adult criminal convictions and traffic infraction penalties. By statute, there is created a Court Security Cash Fund Commission. That membership is made up of two county commissioners appointed by the Governor, two county sheriffs appointed by the Governor, two Judicial Department personnel appointed by the Chief Justice. It's usually one Court Executive and one Chief Probation Officer. And one member of the general public, also appointed by the Chief Justice. That Commission makes recommendations to the State Court Administrator on annual funding based on requests. Grant funds may be used by counties for security staffing, which is the highest priority identified in statute, also for the purchase of security equipment like magnetometers and structural security improvements. Sometimes, there's some small capital improvements to entryways that can be made under the fund to improve security. While statutorily, all counties in the State do qualify for funds, a series of priority criteria are identified in statute, and money shall go to the counties who make requests that meet the most of the priority, that meet the highest number of the priority criteria. There are four criteria in statute. I won't go over them. They're listed in our answer. I will tell you historically, counties that receive money regularly meet three or all four of the criteria. We're not, for example, not to

pick on the city I live in, here in Denver, but we're not providing money to the City and County of Denver. As an example, while they're statutorily eligible, they don't really meet any of the four criteria. So, the more affluent counties are not really receiving, and nor were they really intended to receive, these dollars.

Okay. Moving on to page 13 of our hearing document. Senator Kirkmeyer, regarding our R-6 security request. You asked, What does $2 million buy in terms of additional security? It's fair to note that requests from eligible counties who meet priority criteria every year far exceed the amount that the fund has to distribute annually. An additional $2 million would go a long way toward funding personnel requests at courthouses and satellite probation offices that either lack security personnel or have inadequate security personnel. And while personnel is the highest priority for funding in statute, it's also our hope that an additional $2 million would make some headway into material cost requests, such as replacement of X-ray machines and magnetometers. Chief?

**Rep. Bird**
Chief Justice Boatright.

**Chief Justice Boatright**
Thank you, Madam Chair. One thing that is kind of been moving in this direction is that our probation officers are being moved off site, out of the courthouses. And that's presenting a lot of security issues. I talked at the State of the Judiciary about two different instances where our probation officers had to revive somebody because they had a drug overdose. We've had bathrooms closed because people are bringing drugs into the probation offices. We've had a barricade situation, a situation where a client hid in the bathroom until after hours and then was found sleeping in the office. A probation officer was accosted leaving the probation office, and there wasn't any security around. So, through the last few years, probation has been taking on more and more serious clients. And that's the prerogative of the Legislature. But it is bringing up some additional security concerns for our probation officers who are off-site. And the reluctance of the counties or the inability of the counties to provide adequate security.

**Rep. Bird**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Madam Chair. Moving on to page 14 of our hearing document, JBC staff asked us to summarize the process for and considerations given to the development of our compensation step plan. The step plan, as you may have noticed, is included as part of our larger total compensation request this budget cycle. Prior to the work leading up to this comp request, the Department's compensation system had not received a thorough review or significant updates of any sort in over a decade. The compensation step plan was developed in concert with a private vendor, Siegel Consulting, who we identified through a competitive bid process. Siegel Consulting has national experience on compensation

- 10 -

issues with both municipal, state, and federal level court systems. The Department's step plan has some key elements that are very similar to the Executive Branch. For example, trying to reach midpoint in the range at 10 years of service. But as Chief Justice Boatright mentioned in his opening, there are a couple of areas of difference between our proposal and the Executive Branch. The Executive Branch has fewer step movements in their plan, but the individual step movements are much higher than ours. We have more movement, but each individual movement is smaller. And, again, we're really trying, based on our analysis of our turnover data, trying to hone in on where our pain points are for turnover. And it is in early career before folks reach 10 years. And so we're trying to create some incentive for folks to stay. Turnover is incredibly disruptive to operations. It's expensive from a training standpoint, I think there are still a lot of folks who want to make the choice of service, but they don't want the choice of service to also be a vow of poverty. So, we're trying to target those key turnover years with littler bumps. Smaller bumps, I should say, in our plan.

Committee, I'm now moving on to page 15 of our hearing document. Between the next two questions, staff has asked us to review and describe R-10 main decision items. We've provided written information, written summaries. Obviously, you have the full write ups in our November 1 request. We have distilled summaries in our hearing document. Madam Chair, I don't know that you want me to go through all 10 of those in any great detail. I might just highlight a few of them. I'm happy to slow down go through all of them if the committee wishes, take questions on any of them.

But I will just highlight a few of those and call them out by number as I go through them. I will start with request R-3. That is a request for court resources. I think if we had to sort of drill down the three main spokes of the stool that represents our budget request this year, we've talked about class and compensation. We've talked about addressing our IT debt via a new case management system.

But the final area I'd like to highlight through this part of the discussion is the need for additional training resources. Since the pandemic era, we have experienced in both courts and probation unprecedented turnover levels. It is just in the last fiscal year that we dropped below 20% annual turnover year to year. We had been above 20% for the previous three, I believe, four years. That has incredible impacts on training. My gray hair may give you some indication of how long ago it was when I started off as an entry level clerk in the trial courts in the 4th Judicial District. But the kind of, sort of what I would describe as training wheels, and ramp up period that I was able to experience as an entry level staff person, simply isn't available today. And some of that is just sort of the evolution and change of the work. But a lot of it in recent years has been the turnover. And we don't have the luxury of bringing folks along. And, so, they are working in higher risk, higher exposure areas. Whether that's supporting a judge in the courtroom on protection orders or criminal sentencing. Whether that's working at the front counter, back in my day. Sorry, for the joke. But back when I was a young man, you were a decade in before you were working face to face at the public counter, because you never know what the next request for services could be. It could be any of the two dozen case areas that the Department is responsible for. Now, we have folks within their first year, sometimes within the first six months, on the

public counter, out of necessity. So, our training needs are different than they used to be. Training figures significantly into our staff requests across R-3, R-4, and R-5 for both trial courts and probation. Pardon me, while I take a quick drink of water.

**Rep. Bird**
Of course.

**Steven Vasconcellos**
One other request I'd like to highlight across our decision items is request R-10. That is a Department request, but strictly speaking, is not for courts and probation. I am also, for the purposes of R-10, here on behalf of the Office of Judicial Performance Evaluation. They are, and while their budget is part of our budget from an operational standpoint, they are an independent entity. They have a separate commission that oversees their operations. Kent Wagner is their Executive Director. And we provide a certain level of administrative support, including budget support and accounting and financial support for the Office of Judicial Performance Evaluation. So, when they need additional resources, that comes through our request. And I want to make sure I give their request due attention in this discussion. That is request R-10. They're asking for some cash fund spending authority for an additional FTE. They are currently a two-FTE shop. On election years, the main area of focus is preparing information for the Blue Book. In election years and the majority of time in the off years, their time is spent training and educating and supporting the local Judicial District commissioners in each of the 22 soon to be 23 Judicial Districts around the State. They believe that they need, and we support this request on their behalf, an additional training staff person so that they can spend more time training commissioners. There's kind of a constant level of turnover in commission membership statewide. It is a volunteer position. Folks don't necessarily do it for years on end. And, so, they are looking to actually double the amount of training and support with this additional FTE that they are requesting cash fund spending authority for. As I mentioned, Madam Chair. I'm more than happy to spend time on the other six or seven decision items that we have in there, but I believe we've got solid write ups. Happy to answer questions that you may have or follow up questions that may come from the committee via staff down the road. But, unless there are questions right now, I'd like to move to the final issue in our hearing document, and that is the JBC staff presentation at the briefing on competency. And the staff questions regarding kind of the current activities in the trial court and at the State Court Administrator's Office. And, also, for us to comment on JBC staff recommendations on additional resources. Chief, would you like to just kick us off generally?

**Rep. Bird**
Chief Justice Boatright.

**Chief Justice Boatright**
Thank you, Madam Chair. I think one of the misleading things or misperceptions is that Judicial drives competency numbers. I was a trial court judge for 12 years, and I can't think of a single time where I was the one who called for a competency evaluation. It's done by the people who know the defendants best.

- 12 -

It's the lawyers. And my sense of it is, is this is not a gamesmanship thing. I just think that we have a real mental health crisis that is occurring. I can't imagine that any defense attorney would ever raise competency and kind of put somebody in, drop them into neutral, for the length of time that they are currently being housed in the jail. You know, the jails are not an appropriate place. And in terms of the evaluation that the JBC staff put together, one thing that I would say with absolute confidence, that I agree with, is that the competency procedure is not the place for holistic healing. With regard to our people who are suffering through mental health issues, it is a very narrow focused, get them ready to be able to go to trial and assist their attorney. And it's not a broad ranged, How do we make sure this person stays competent and can function in society? We have a number of Judicial Districts that have created a competency court. It's sort of a specialty court. I talked to Judge Susan Blanco, who's been a leader in this area. She's the Chief Judge up in the 8th, which is Larimer County. She personally has taken responsibility for the competency docket. And the way I would describe it, and she used this phrase, but I think it's true. Is every Thursday morning, it's like a resource fair in her office. They're bringing in people with regard to housing and mental health treatment and substance abuse treatment. But it takes buy in from all of the stakeholders, the DAs and the PDs. Bridges is in the room helping to navigate these things. You know, it's having people on misdemeanor counts being held for competency. Many times, low level stuff is not very functional. And, so, they're trying to find ways to divert those programs. And I would say that we're making a lot of progress in the Districts that are using the competency court, and I think it's a model that is going to see more use throughout the State. Because what we're doing, and I say we as a system, not we as just the courts, isn't working in terms of getting people adequate treatment and getting them competent, at the very least. So, we support the judicial process recommendations, agree to the identification of the need, and are willing partners as we go forward to see how we can improve how we're dealing with our mentally ill people that come into court. We end up being, Mr. Vasconcelos uses this phrase a lot. We end up being the catcher's mitt with regard to where people end up when they have mental health problems. And we're really not set up to be a mental health program for people. So, I do support the opportunity for us to look at how that is being done, and we're willing partners in executing that plan.

**Rep. Bird**
We have a question. Madam Vice Chair.

**Sen. Zenzinger**
So, I had asked during the Human Services briefing if I could get a list of where those competency courts are taking place, because I'm curious about geographically, where they're positioned in the State. Are they? Do we have any in the rural areas? Although I understand that the greater drivers are probably in the urban areas. And, so, I'm imagining that it's important to have a number along the Front Range. But I think either you just said it, or they said it, that we have like eight of those competency courts. And I think based on the write up and your last bullet point here about the importance of looking to invest in long term sustainability of this concept, I would just be interested in that. In how we would go about doing that in the next couple of years. Because, from the Human Services side of things, they spoke very

highly of it. They think that that is one area that seems to be working with regard to this problem. So, how do you envision unrolling those in the next couple of years, and how do we go about that?

**Rep. Bird**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Senator Zenzinger. Of course, this is a much larger societal challenge. We can by no means solve this on our own. But our courts statewide have very much reached a place where doing the same old, same old, we can't expect a better or sustainable outcome. We currently have nine. We are two weeks away from our 10th docket. Those locations are highlighted in our response. However, I think to help with your question about sort of regional reach, we have programs. Well, as of January 1, we will have a program in the 1st Judicial District, Jefferson County. We have current programs here in Denver, the 2nd Judicial District, in Colorado Springs, the 4th Judicial District, in the 5th Judicial District, which is the I-70 mountain corridor, Summit, Lake, Eagle Counties. We have a program, as the Chief mentioned, in the 8th Judicial District, Larimer County, Fort Collins, in the 10th Judicial District, Pueblo, the 12th Judicial District, which encompasses the San Luis Valley, the 16th Judicial District, the Arkansas Valley in southeast Colorado, the 18th Judicial District, South Metro here, and the 19th Judicial District, Weld County. This is really a grassroots effort, and the leadership of our Chief Judges from around the State has been key. Sometimes I feel like the best expression of our Office is when my Office is running to keep up to support the good ideas in the trial courts and probation. And this is another one of those areas. Yes, by in terms of numbers, the volume is here on the Front Range. But the challenges are just as pointed in rural Colorado as they are in urban Colorado. And, so, that's where we're at. We currently are serving about 350 clients. We also have four more Districts beyond those I mentioned, in a planning stage. That would bring us to over half of our Judicial Districts statewide. This was alluded to earlier, but we have sustainability and funding challenges. Sort of the roots of how this is coming up reminds me a lot of where we were 15 years ago with problem solving courts. With us sort of banging our heads against the wall, same old, same old approach. You know, just kind of focusing solely on the four corners of adjudicating cases. We were seeing some of the same folks with substance abuse issues, over and over again. And the courts took the leadership to engage in slightly differently. Yes, we're still going to perform our statutory and constitutional function. But we have to also invest in the folks in front of us differently to help them have a sustainable outcome, and not just a revolving door. We're in a very similar spot here. Which means we're starting with already strapped existing funds, or short-term funding from the fines subcommittee that was established in the federal settlement. And so those monies are not permanent, so we've got a little patchwork of existing funding, fine settlement committee money, none of which is probably sustainable in the long term. But we also are not in a position where we feel it's wise to lose the good in search of the perfect.

- 14 -

**Rep. Bird**

And Madam Vice Chair.

**Sen. Zenzinger**

So, I missed the second and the fourth. I'm not familiar with the numbers and their associated Districts. I was trying to write down very quickly 2nd and the 4th.

**Rep. Bird**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Senator Zenzinger. I apologize. I'm also a fast talker. The 2nd Judicial District is here, the City and County of Denver, and the 4th Judicial District is the Pikes Peak region, El Paso County and Teller County.

**Sen. Zenzinger**

Thank you.

**Rep. Bird**

I have a question, and this might be in your written documents, and I might have missed it. But is there, it sounds like a lot of what's happening in the competency space, and the innovation is kind of, these are green shoots that are happening pockets of innovation around the state. And is your Office aware of any concerted effort for Districts to collaborate and kind of think about, how do we share best practices and spread this out? Is there a working group, or how is this being coordinated so that more Districts are hearing what's happening and what good ideas there might be?

**Steven Vasconcellos**

Thank you, Madam Chair, so our Office, the State Court Administrator's Office, also has received funding from the fine subcommittee, and we have short term funding for basically a Program Analyst, a program manager. And to tie together our Chief Judge's Council, which is made up of our Chief Judges from around the State, is a highly engaged, highly collaborative body. They speak at least monthly. There are individual conversations happening almost every day among Chief Judges. So, there is a rich sharing of experience and information. And folks trying to like, here's what I'm struggling with in my part of rural Colorado. Other Chiefs in different areas of rural Colorado, How are you addressing this? So that set of relationships is very beneficial. But we're also getting organized in our Office to tie Districts together, to tie the good ideas together, to start gathering data, too. The problem solving court experience informed us that sometimes the thing that feels good in our gut to do isn't supported by research, always. And, so, learning from that experience, trying to gather good information. We're in the process of seeking out grant funds, this is mentioned in our response. Seeking out grant funds to do some evaluation work up front, so we don't get quite as far down the road maybe as we did in the

- 15 -

problem solving court experience, before. We're doing a better job of identifying what the best research-based practices are.

**Rep. Bird**

Chief Justice Boatright.

**Chief Justice Boatright**

Thank you, Madam Chair. One additional thing that I would add is I think that the reason that you're seeing it kind of pop up in different areas in the State is because all of our different Judicial Districts have such different resources available. And, so, it's got to be a localized program. I mean, when I came from Jeffco down to the Supreme Court, I was really struck at the different cultures and different amount of resources that were available in different Districts. So, what works in Denver probably isn't going to work in Steamboat, for example. So, it's got to be kind of locally driven. But I think that, you know, having personally started a problem solving court in Jeffco when I was the juvenile judge out there. It takes a local person to have sort of the ability to bring people to the table and have that conversation and to begin to examine what the resources are, to collaborate. You know, the good news is in talking to Judge Blanco, the PD of the year and the DA of the year both came from her competency court. And, so, I think that that is an indication that there's large endorsement. From really two of the primary shareholders, so to speak, with regard to this, are the PDs and the DAs. Without their engagement and cooperation, the competency court is not going to be a successful program.

**Rep. Bird**

That's really helpful. Senator Kirkmeyer.

**Sen. Kirkmeyer**

Thank you, Madam Chair. So, can you on page 23 you did start listing there's four items that you're working on. Can you tell us the amount that you're asking for in the grant proposal? I mean, I don't know if you've developed it quite that far yet. And then you say you're also exploring alternative funding sources. Can you give an idea of what those are? Especially, given the comments just made about it needing to be driven locally.

**Rep. Bird**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Senator Kirkmeyer. I will check in with my team on the amount we're seeking in the grant proposal. I don't have that information readily with me. I'm not sure if we're developed to that point, yet. But I will follow up and have information provided to Mr. Kemm to share with the committee. And you know, not to sound flip, but other sources. This again, reminds me of my own experience supporting problem solving courts statewide. We're just turning over every rock to find

- 16 -

available funding at this point. Because our Districts are taking the leap before they have adequate resources. Because they just can't wait. The impact of competency being what it is on operations in the criminal justice portion of our business. And, so, that's all kinds of. What grant funding is available? Some localities, I will use an example. Just principally, I don't know on the competency front specifically, but some counties, such as Boulder County, have resources that they've been happy to share in other programmatic areas, like problem solving courts. So, exploring those local resource options, as well, is part of this consideration.

**Rep. Bird**
Senator Kirkmeyer.

**Sen. Kirkmeyer**
Thank you, Madam Chair. And, if I could follow up then with item number 4 you talk about is that in the Summer of 2024 you're hosting a two-day convening of folks? Is that every Judicial District are they all invited, along with PDs and DAs and everybody else?

**Steven Vasconcellos**
Key stakeholders.

**Rep. Bird**
Mr. Vasconcellos.

**Sen. Kirkmeyer**
Great. Thank you.

**Steven Vasconcellos**
Sorry, Madam Chair, thank you. Thank you, Representative or Senator Kirkmeyer. Man, I'm getting tired, I put you in the wrong house. Thank you, Senator Kirkmeyer. Yes, all Districts will be invited. It is our and all the key stakeholders from those District teams, which are multidisciplinary. It is fair to say that the number of programs by the time we get there will be different than today. So, it's going to be open to all comers.

**Rep. Bird**
So, I'm just wondering. So, Mr. Kemm, I think, put together such a nice briefing, and really a great distillation of some of his findings and observations through review of the challenge. Do you see those ideas as complimentary to some of the work that's already happening? You know, as budget writers, I think about, we have limited resources. And would that money? Could that money be best, maybe to fund some of the ideas Mr. Kemm had? Or would it make sense to have more of these resources available for ideas that emerge from, say, your summer convening? Do you expect there to be ideas that could be supported by grant dollars? And are there are efforts already underway that have emerged from

- 17 -

the court system, itself. I mean, it seems like it through the grant programs. But just in an era of limited resources, where do you see the most bang for the State's buck? So to speak. Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. This is the art of statewide budgeting, of course. Selfishly, I'm very concerned about sustainability. Again, having lived through the ramp up of problem solving courts statewide, really starting intensely about 13 to 15 years ago. The quality of the programs, the intent to a court was always very good, very high. But without the right resources and without sustainability, sometimes you can do more harm than good. And, so, we would never counsel our Judicial Districts to wait when they have a problem that is right in front of them locally. And we have, again, we've sought money from the fine subcommittee. We are looking at grant opportunities. We are looking at local funding opportunities. At some point, though, I do think the question gets called, is this a statewide policy priority of the General Assembly, and can you provide us with sustainable funding? It's also fair to say that some of the things that we're doing today are probably going to be not things we do 2-3-5 years from now, because we will learn through this experience. I'm just again looking back to that problem solving court experience. We will refine our processes. We will learn new ways of engaging successfully. I'm sure the first round of evaluation will provide surprises, some things that we thought were absolutely the best thing were counter indicated. And, instead, pointing us to things that we're not doing. So, this is going to be an evolutionary process, including on the budget front. We are supportive of Mr. Kemm's recommendation for funding, particularly for the programs who have been out there, sort of in that leadership posture, taking those first steps, willing to take the risk, to try to do something better, something different, to provide better outcomes for folks who have mental health challenges. But it's always, this little game of budget chicken that collectively we're playing in what is always a limited resource environment. I don't need to tell the JBC that you guys always, every year, have more meritorious requests across all the agencies than you have funding for. We're just going to try to stitch it together until you please say yes to more sustainable permanent funding. And we will continue to share what we're learning with you and with other agency stakeholders. And continue to refine as we learn.

**Rep. Bird**

Senator Bridges.

**Sen. Bridges**

Thank you, Madam Chair. And this is maybe more of like a backup big picture philosophical question about behavioral health care. I know that we have changed a lot in healthcare, to address the behavioral health crisis, we in the Executive Branch created the Behavioral Health Administration. There are a lot of different structural changes we're making across government to address this behavioral healthcare crisis. In part to make sure that people don't end up in the courts and then in our prisons. Both because the cost as a budget committee is very high, but more importantly, the cost to those people is very high. If there's some way to sort of intervene earlier on the front end. So, the question is, given that you are, as you put it, the catcher's mitt for a lot of these things, is there some kind of structural change that's more

- 18 -

fundamental that needs to be adopted, sort of across the Judiciary on this? And I know you sort of mentioned this, that it's a budget challenge, maybe it does need to be a statewide solution. Is there some other like way of thinking about how these cases come to you and what the first step is? And is there some kind of sieve to help sort folks into the right areas? I think more importantly, is someone else in the Country getting this right? Has someone else in the Country recognized this? Is putting the resources to it and is really sort of on the right path? That we could at least look to best practices for something like that.

**Rep. Bird**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, Senator Bridges. Is someone else getting it right? It's arguable. There are definitely jurisdictions that are doing a variety of different things and that have a more mature engagement, a longer term engagement, than we do. And with respect, I'll probably sidestep a little bit of the policy issues. That is generally not our purview as the Judiciary. But there are interesting questions around charging practices. At what point should diversion take place? Is that a pre-filing activity? Is that a post-filing activity? Ultimately, the policy makers of this State will give us the guidance on what works well, there. We have seen everything. I've seen examples. I've had an opportunity to engage with peers in other states. You know, in Cook County in Illinois, there's just been a generalized agreement, for better or for worse, that the Cook County Jail will be the marquee mental health care facility in the County. Because they house the largest number of folks experiencing mental illness in the County. While it's no one's ideal solution, that's just the choice they made. Dade County in Miami, Judge Leifman gets a lot of press nationally. I've been to talks with him, and have met him. Miami is doing some dynamic things that are dramatically different than Cook County. And, so, you know, I think the mindset of what I've experienced in Colorado. We are at our best when we have consensus at a 30,000 foot level. This is particularly true in the Judiciary, where we're a loosely coupled organization, the Chief Justice is not the boss of other judges. They don't report to me at the State Court Administrator's Office. The Chief does give a grant of authority and selects Chief Judges for each Judicial District, but they are the administrative authority for their Judicial District. And, as you well know, the resource considerations, the community considerations, are just so different. You just draw a line diagonally from Durango through Denver to Sterling. The solutions, the principles. We are at our best in the Judiciary when we share principles and outcomes, but the path getting there is very unique based on the resources and needs of that community. So, statewide funding solutions make a lot of sense. I like to use an analogy of like drawing a playing field, boundaries. Like this is the playing field that we all want to be in with our shared goals and outcomes. But how you navigate that playing field from Judicial District to Judicial District necessarily needs to be different. What works in Weld County isn't necessarily what's going to work in Mesa or in Denver and Arapahoe County, etc, etc.

- 19 -

**Sen. Bridges**

Very helpful. Thank you.


**Rep. Bird**

Senator Kirkmeyer.


**Sen. Kirkmeyer**

Thank you, Madam Chair. And just to add on to that, I think you're right on target. There's a very unique relationship and partnership that occurs between the Judicial District, Board of County Commissioners, or boards of County Commissioners, the Sheriff's Office, and the District Attorney's Office. And I've seen a lot of programs in our own Judicial District in Weld County, which is a single county District, which is different than those multi-county Districts. But really a lot of things where they just kind of bubble up from the local level, where the Chief Judge is literally sitting there with the Board of County Commissioners, the Sheriff and the DA going, but if you just gave us this much money, it would impact you over here in the jail this way. It would impact the DA's cases in this way. And we learn this, because Jeffco County has done this, you know, the Judicial District in Jeffco or El Paso, or up in the mountains. And, then, everybody kind of builds on it before we come to a statewide solution. We need to let it bubble up, I think. And merge up from the local level. Everybody's agreed. So, I didn't really have a question. But it's just a comment. Just from my experience being a County Commissioner, it really does work. The Judicial Districts have conferences or meetings or whatever across the State. I mean, I can remember the discussions about drug court and about diversion and about how to improve all of these different things. And they came. Again, somebody in the local level says, Wow, we saw this. It was working there. We want to try it here. Here's what the impacts will be. And you just let it keep working its way up. Till then, maybe there are some guide rails or guardrails or guides that need to be put in from a 30,000 foot view. But it's got to be determined at the local level first and work out all the kinks. And it seems to me that like these four steps that you're taking here that are on page, 23 and 24 are really a good first step on how do we start getting there. And before we just start throwing money at something that we don't know exactly what we're throwing money at. Let's let the locals throw their money at it.

**Rep. Bird**

Chief Justice Boatright.


**Sen. Kirkmeyer**

Because they will. And they'll make it work.


**Chief Justice Boatright**

Thank you, Madam Chair. And Senator Kirkmeyer, thank you for those comments. I agree 100%. And that's how, for example, I referenced the fact that we started a specialty court in Jeffco. We went down to Colorado Springs and stole their idea and we modified it to what resources and what fit our District. But there were basic concepts that we took from them. And I think that's exactly what's happening

- 20 -

around the State. Things are kind of popping up in different places. I will say in the Judiciary, politely, we're all about stealing good ideas. So, there's no pride in ownership with regard to that. And I think all of our judicial officers are excited to have and use good ideas to address it. Because I think one unmistakable thing across the State that's a frustration for everybody is how long people are being held in custody and waiting for competency evaluations. We just have to find different ways. There are certainly going to be ones that are dangerous and that's going to be reality. But my sense is, when we're holding people on low-level misdemeanors and waiting for them, there are different ways we can do business. So, I agree. I guess that was long way saying. I agree, 100%.

**Rep. Bird**
That's great. Mr. Vasconcellos.

**Steven Vasconcellos**
Madam Chair and committee, unless there are further questions, that completes our formal presentation.

**Rep. Bird**
Okay, we do have something. Senator Kirkmeyer.

**Sen. Kirkmeyer**
Thank you, Madam Chair. A month or so ago, a couple of us went with House Minority Leader, Majority Leader, I'm sorry, Representative Duran to a safe house. And, afterwards, we were having the discussion. It was commented that the fees or the fines, I guess, that are, through the courts for Victim Assistance. Are being waived, like in the bill grant area and those types of things. And I'm wondering if you have any insight into that, that you can send to us to let us know. But, I think we promised that we would bring this issue up when we had the Judicial hearing and had you both here. Because, again, it's an issue. We're now getting asked in several areas of public safety, and there's different bills that are being passed to put General Fund into victims' assistance. And part of that is because the federal victim assistance dollars are decreasing. But at the same time, what we heard is that judges are waiving those fines in their courts. And, so, if we could get some information with regard to that, we would greatly appreciate it.

**Rep. Bird**
Yes, Mr. Vasconcellos.

**Steven Vasconcellos**
Madam Chair, Senator Kirkmeyer. I'll convene with my team and see what we can provide on that front.

**Sen. Kirkmeyer**
All right, thank you.

- 21 -

- 22 -

**Rep. Bird**

Are there any final questions or comments? Seeing none. Gentlemen, thank you so much for your time and your presentation today. This was great. And very illuminating and eye opening for what your team is dealing with. And greatly appreciated. So, thank you.

**Steven Vasconcellos**

Thank you, Madam Chair. Thank you, committee.

**Rep. Bird**

So, this concludes this portion of today's agenda, which is our hearing with courts and probation.

**Appendix 27(dd)**

*Hearing before the J. Judiciary Comm.,*
**Colo. Leg., January 12, 2024
(annual SMART Act reports):**

# Appendix 27(dd)(i)

# Transcript of Colo. Jud. Dep't Presentation;

# Joint Judiciary Committee—January 12, 2024 Hearing:
## Colorado Judicial Department Annual SMART Act Reporting

**Rep. Weissman**

All right, Chief Justice Boatright, Mr. Vasconcellos. If you're ready to go, however, you'd like to start off. We will try to not keep you here too long. Feel free to compress some parts of the initial presentation, if you'd like. Maybe to the tune of 20-25 minutes. And then, we'll see what questions members have. We'll plan to wrap this segment by three.

**Chief Justice Boatright**

Thank you, Mr. Chair, you stole my opening line, which was we, in the interest of time will try to condense our presentation. We're not trying to rush through anything. So, if there are questions, please let us know. My name is Brian Boatright. I'm currently the Chief Justice. In July, I'll be rotating out and you guys are gonna get a huge upgrade with Justice Monica Marquez, who will be our next Chief. Let's start out with most recent events. Last week, on a Monday into Tuesday morning, we had a gunman that entered the Ralph Carr Building. Shot through a window. Was able to enter into the Building and set a fire on the seventh floor. And there was extensive damage. The sprinkler system went off and ran for a couple of hours. The one thing I would say is, all the information we have, we are confident that this was a really random act. It had nothing to do with any of our recent court cases that we have had. I told people we could have been a Walmart, and it wouldn't have mattered. They just, that the gentleman just picked that building. I'm going to have Mr. Vasconcellos kind of talk about some of the specifics with regard to that. And I also want to say publicly that Mr. Vasconcellos has been on 24-hour duty since then, basically, our tenant. He's basically the landlord of the Building. Our tenants being everybody from the Attorney General to the PD, to Alternate Defense Counsel. I could list all of them. They have really had a very difficult thing thrown their way. But I'll turn it over to Mr. Vasconcellos to talk a little more of the detail.

**Rep. Weissman**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Mr. Chair. Thank you, committee. Good afternoon. My name is Steven Vasconcellos I'm the State Court Administrator for the Colorado Judicial Department. Just a brief update. And then, of course, happy to entertain any questions you may have about the status at the Carr Center.

First and most importantly, no one was hurt in the incident and the State Patrol security officer who was confronted at gunpoint is healthy and well. Has had some time away and is getting full support from his team at the State Patrol. We're extraordinarily grateful for our partners at the State Patrol.

- 1 -

Significant damage to several floors of the Building. The seventh floor where the fire was started and where the sprinkler system went off. Resulting in, when our building engineers were able to gain access to the floor after it was no longer a crime scene, ankle deep water. Which, subsequently, went down all the way to the basement. But the seventh floor, the sixth floor, and the fifth floor will have to be substantially rebuilt from scratch. Significant damage to the third floor. And, then, as you go down from there, there is damage but it's spottier from there.

As you might imagine, one of our very first phone calls was to our partners in the Executive Branch at Risk Management they have been walking side by side with me at every important decision. They have a whole team of resources that they're able to bring to bear. Including the representative for the insurance companies that the claims will be made through, construction consultants. So, that we can be good consumers of services along the way. Obviously, my procurement team has been implicated along the way.

The initial damage estimate. And I want to caveat this, because the Building is not dry yet. Where we're at now is major water mitigation, major sort of material mitigation like carpets are up, ceilings are down, drywall is down, just the worst of the worst has been addressed. There will be more demolition. That's necessary. We have industrial hygienists on site assessing like the safety of the air quality, the safety of the just the smoke from the fire, the particulate from the fire department's mitigation efforts. The perpetrator, himself spent some time on several floors with handheld fire extinguishers, unrelated to the fire. Shooting them off. All of that got into the HVAC system and was spread all over the tower side of the complex. So, no one is working in the building. State Risk, understandably will not approve anyone being in there right now. I don't want anyone in there right now. It is a disaster recovery site and not a workplace, at the current moment. Our initial damage estimate is based on what we know so far. This will change. This is not based on a construction estimate that I have. We've got a procurement coming in the next couple of weeks related to planning about the rebuild. But based on the experts from Risk, their experts from the insurance companies, the construction consultants that support the insurance companies, were looking at approximately $35 million. I imagine that with most construction projects, that will change. In terms of timelines to reoccupy the facility. For the floors that were substantially undamaged or lightly damaged, all they require for reoccupation is a substantial cleaning. The carpets need to be vacuumed and deep cleaned, to sort of industrial hygienist level. The walls need to be wiped. Desks, other surfaces need to be wiped, because there is sort of a fine dust of not good stuff on every floor. That's the technical term, the not good stuff. We're anticipating somewhere in the neighborhood of March 1. That's four floors that are lightly or undamaged. For the substantially damaged floors, if everything goes well. And again, this is an initial estimate, we have to figure this will change: 12 months. So, the Attorney General on the sixth and seventh floor, and the Office of Attorney Regulation Counsel on the fifth floor, were probably the most impacted. Best case scenario, they're coming back, starting to come back on site. That's not turnkey ready in 12 months. That's starting to come back on site in 12 months. So, you can imagine, this is still, no pun intended, a very fluid situation.

- 2 -

We're happy to provide updates to the General Assembly, as this project continues to move forward. As we sit here right now, I do not anticipate requesting supplemental dollars from the General Assembly. We are working very closely with our Joint Budget Committee Analyst, we may need to ask for some spending authority related to insurance dollars that will start flowing here very soon. But, that is my quick update. I'll happy to pause for any questions on that matter.

**Rep. Weissman**

All right, maybe just. I do want to keep up our tempo, members. But this is obviously a unusual segment of the SMART Act presentation. Maybe we'll take one or two questions here, then we'll let the Chief Justice and Mr. Vasconcellos proceed. All right, and this will be it. Madam Vice Chair, Rep. Herod, and Rep. Soper. In that order.

**Sen. Gonzales**

Thank you, Mr. Chair. Chief Justice, Mr. Vasconcellos. It's great to see you both. Having just driven by and seeing, you know, the construction operators who have I think, like sort of air vents and devices, what have you, to try to air out the building. I guess my question. The number that you shared and the timelines just seems extraordinary. And I am curious about the insurance and whether and how this is going to impact some of the budget requests that had been in process prior to this incident taking place around controlled maintenance. So, I guess it's a two-part. One, just the insurance, like what the policy looks like. And then, two, how this will impact and whether this will impact the controlled maintenance request. Thank you.

**Rep. Weissman**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Mr. Chair. Thank you, Senator Gonzales. At this point, and this is still we're on like, day 10. So, it's still very early. We're not anticipating an impact to our controlled maintenance request or, frankly, to any of our budget requests. At this point. We've had a very strong partnership with State Risk out of the gate. Strong partnership with the State's insurance carriers. They're on site every day. We have daily meetings. I'm also meeting with the tenants, daily, for status updates. State Risk is hopefully going to be either in a position, because we do have some costs related to the initial site mitigation that will start coming in. State risk believes that they will either be in a position to advance us some money that they have continuously appropriated for this purpose. So, we can start paying bills. Or that the insurance company will be able to start paying very quickly. So, again, we're not anticipating a major budget impact as we sit here right now. Obviously, if that changes, our first call is to our Joint Budget Committee Analyst and the JBC members. But I'm cautiously optimistic. I'm looking for something to knock on. But no wood nearby. But I'm cautiously optimistic, as we sit here.

**Rep. Weissman**

All right. Rep. Herod.

**Rep. Herod**

Thank you, Mr. Chair. And, in the interest of time, I'll just make a quick, quick statement. Which is, thank you for all of the commitment and the work that you both are doing. And so many of you all are doing for Coloradans, especially in this time of heightened threat, danger, and attacks against you all. The incident that happened is quite terrifying, honestly. And I know there was also someone that else in the Building who was just there working or whatnot. And that could be any night any day with many other people in the Building. And, so, I look forward to future conversations about how we can ensure that folks can do their job safely, while also ensuring that we're doing what we need to do for the people. And so, I have a lot of respect for the work that y'all are all doing. And just want to commend your efforts. And if there are other requests that you will need to make around ensuring that y'all are safe. I look forward to having that discussion. So, thank you.

**Rep. Weissman**

Likewise, and I think there are some slides on that subsequently in the deck. I wasn't sure if you wanted to speak to that? Chief or Mr. Vasconcellos.

**Steven Vasconcellos**

Mr. Chair. Just one thing I want to emphasize particularly on continuity of services for the public. It was high priority while, on the one hand, that we're managing this mess that we support continuity of services for the appellate courts and for all of the agencies as much as reasonably possible. Particular to our operations. my team at the State Court Administrator's Office has essentially gone to COVID-style remote work, and will be for the next couple of months. But we were able to get, as of Tuesday this week. The court side of the complex has separate electrical, separate HVAC, separate plumbing. We did need to do some system load testing to make sure everything was safe, some air testing, some other material testing, just to make sure it was a safe workplace. But as of Tuesday, this week, we were able to open the court side of the complex on a soft opening to justices, judges, and staff. If all goes to plan, and right now, as I sit here, there are no concerns. On Tuesday next week, to coincide with Supreme Court oral arguments, we will be opening the court side of the facility, only, back open to the public.

**Rep. Weissman**

Okay. Rep. Soper.

**Rep. Soper**

Thank you, Mr. Chair. Thank you, Mr. Chief Justice and Mr. Vasconcellos for being here and giving us an update. This is just horrible, what has happened. But the question that I wanted to ask of you, certainly, continuity of workflow is really around data, and computers and files that might have been damaged or lost. Was everything backed up in a remote location, or was there any sort of court records

- 4 -

or case files or other work product that might have been damaged in such a way that it hurt cases or hurt the agency's ability, in your case, the tenants' ability, to be able to serve justice?

**Rep. Weissman**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Thank you, Representative Soper. The honest answer is it's too early to know. It's too early to know. Our number one priority right now is drying the facility out. That is complicated by our below zero temperatures this weekend. But we're estimating two to three weeks before it is fully dry. And, we should also, that should roughly coincide with some feedback from industrial hygienists about the just the general safety of the environment. So, there has not been a comprehensive for every. Some agencies have a better sense of their own materials. I can tell you that, on behalf of the appellate courts and my Office at the State Court Administrator's Office, there was either no damage or no significant damage to records. That's not going to be the case for some of the tenants, I imagine. I don't want to get too speculative here. But I imagine with everybody operating network-based systems that there was a lot of network-based backup. But the fair answer is it is just too early to know.

**Rep. Soper**
Thank you.

**Rep. Weissman**
Okay. We'll invite you to continue with the presentation.

**Chief Justice Boatright**
Thank you, Mr. Chair. Events over the last few years led the Court to do a couple of things. Number one, is we have and I've talked about this before, we've taken a much more active role in the leadership around the State and what the State Court Administrator's Office. Second thing that it caused us to do, which actually has turned into a tremendous positive, is we've gone out on listening tours in each of the last two years, to all 22 of our Districts. The Justices split the State up and we went out and we called them just our listening tours. And by far, the number one issue that our employees are talking about is pay. We are continually hearing that all across the State. And we are one of the few state agencies that literally have people in every county in the State. But the number one message was we are not paying a livable wage. And, so, our ask this year is going to be around employee pay. We do have a need for judges. We've already done the weighted caseload for the District Court. The County Court is in progress. But, after talking with our judges at Judicial Conference, they all conceded that our number one thing needs to be to take care of our employees, in terms of getting them pay. The quote that stands out for me from one of our probation officers was, "I supervise sex offenders by day and wait tables by night." And we just should not be asking our employees to work two or three jobs. And we'll talk about our budget request here in just a minute.

- 5 -

But one of the other things that it caused us to do was to look at our workforce. And I think you'll find it interesting that, in the last four years, 40% of our judges are new, 50% of our staff is new, and 1/3 of our Chief Judges are new. So, we've had tremendous turnover over the past year.

The other thing that our listening tour caused us to realize, was that we really have 22 individual Judicial Districts with their own distinct culture and values. And that we really didn't have a common mission. And so I asked Justice Marquez and Mr. Vasconcellos, to chair an initiative to look at workplace culture and initiative goals. And this was not something that happened at the Ralph Carr Center. It was something that happened through our employees. That we came up with a set of a mission, vision and values to try and tie a common goal, a common purpose for our employees. Our mission is our day-to-day work. Our vision is our North Star, what we aspire to be. And our values are how we ingrain all of those in our day-to-day operation. And, again, this is part of where we've cut back our presentation. Happy to answer your questions. But we are excited that this has been something that has come out. And the committee that worked on this was over 40 employees from every part of the State, every level of the of the organization. And it was really our employees that came up with these mission, vision and values. And we've launched that. We have a website. And I will leave it at that.

The next project that we are going to engage in is what I call all things magistrates. The magistrates have kind of been a hidden engine that helps judicial run. It is an immensely challenging job. They handle everything from probate to criminal advisements to preliminary hearings. A lot of domestic relations cases. And, so, I just charged a committee to look at the well-being and support for magistrates. I want to look at how we can have more transparent training, support, and get feedback opportunities for our magistrates. And so, we are creating a committee that's going to be statewide. It's going to have all levels of the Branch involved in it. It's just started. We don't even have the committee formed. But we are going to look at all things magistrate from recruitment to rules to training, evaluation in public records. So, we're excited to be able to assist our magistrates in their well-being in the Branch. This morning, we had our final meeting for a taskforce that the Legislature created to look at judicial education around violence issues involving women. I want to start out by thanking my co-chair Kelly Kissel, from the Department of Public Safety. She was a fantastic co-chair. I could not have done it without her. I don't want to get ahead of the taskforce findings. We had our final meeting this morning. We approved the report that will be provided on time to the Legislature. At this point, I don't think that there's any anticipated legislative changes that we're going to ask for. But we have committed to partnering with a number of our stakeholders to create subcommittees to look at how we're doing training, how we're doing onboarding. With regard to our judges from domestic relations and criminal cases, trauma informed training, training around child abuse issues. And I'm excited about where we're headed with that. It was a lengthy process, but we were able to reach consensus on all of our recommendations. And very proud about that.

**Steven Vasconcellos**

Mr. Chair, if I may proceed.

- 6 -

**Rep. Weissman**

Sure. However, you'd like to divide up and we'll invite you to kind of race through the rest of the deck. I was going to ask that we hold further questions till the end of the opening. Go ahead.

**Steven Vasconcellos**

I would like to proceed on to discuss our top priorities in our fiscal year 25 budget request. And as Chief Justice Boatright mentioned a moment ago, our marquee request is around salary for the employees of the Department. Really the rank and file, who are the heart of the organization. And the most simple explanation is really what we're asking for are the same tools that already exist in the Executive and Legislative Branches. Particularly, a predictable funded way to move through a job series based on your years of service. Which is a mechanism that we currently don't have, that the other branches do. And that is our number one request in the 25 budget. I would also note that Chief Justice Boatright mentioned our turnover numbers. Which are, although I guess we're all getting used to them in this post-pandemic environment, are still eye popping to me and have had a tremendous impact on operations. And while there is some opportunity on a culture building front with such a young and new workforce, we have huge training needs. And so, one of our other key requests is around training. We spoke some about this last year.

But I want to mention again that we need to replace our 27-year old case management system. It is in a programming language that is obsolete. And the care and maintenance of this system is no longer either fiscally a good idea, nor is it an operationally sound approach. And, so, we are on the pathway toward procuring a new case management system. Our sort of approach, as you might imagine, over the course of a quarter of a century, toward how we do these things has changed. 27 years ago, we developed in-house our own system. We have no interest in doing that today. My team's expertise is not as a software development shop. There are plenty of entities in the private marketplace who are better suited to doing that. So, this will be a vendor developed system. We are currently in a discovery and planning phase. You might imagine that, again, over 27 years, we've accumulated an enormous amount of data. Some of which is critical to day-to-day operations. Some of it is critical to policy discussions, as we've discussed with both House and Senate Judiciary, in the past. And some of it, frankly, we question the value. So, we are doing a comprehensive, as part of this discovery process. Right now, there's some obvious things like functionality needs. But, also, what data do we bring forward? What data do we need for operations? What data do we need that informs good policy discussions around the State? And what can we let go of, moving forward? And we have a request in our 25 budget to take the next big step in the project.

**Chief Justice Boatright**

Mr. Chair. Our next item on our legislative agenda are around licensed legal paraprofessionals. And you probably aren't going to be surprised but the number is stark. 76% of our litigants in domestic relations cases are self-represented. And that presents a tremendous strain not only on our system, but really to the Access to Justice for all the people that appear in court. One of the answers that we've tried to come

- 7 -

up with is to have licensed legal paraprofessionals They are designed to fit into the type of case that right now is unrepresented. So, those are the lower asset cases, they are designed to have people who have operated generally as paralegals. It's going to be licensed. It's going to be monitored, regulated through our Attorney Regulation. It's been many years in the making. I think we're excited to see where it goes. But we will need some conforming legislation. I don't think it's going to be controversial. It's going to be things to say, "and licensed legal paraprofessionals can do this type of work." It's mostly going to be the front end of filling out forms, making sure that proper documentation is presented. But it, also, is going to have some limited courtroom attendance and participation. But it's something that many states are doing. And we're excited to see if this can help address our self-represented litigation issues.

**Steven Vasconcellos**
Mr. Chair, I have two other items from our 2024 legislative agenda that I'd like to cover. The first is a change to the language that was passed in Senate Bill 2375, which protects information in court records related to child witnesses, and child victims. And there were some unintended consequences. I think all of the stakeholders involved ourselves included missed the language in its current form. Unfortunately, attorneys lost access to key records that they had access to previously through our electronic filing system. And, so, we are partnering with the Office of the State Public Defender and the Office of Alternative Defense Counsel to find a very narrow, simple fix that honors the original intent of the General Assembly. But gives attorneys access to these cases through our e-filing system, again.

**Rep. Weissman**
And members before we move off that slide, I'll just note. I've been involved in discussions with SCAO since before Christmas. I know, also, that Senator Gonzales has. Also, Senator Gardner. I think, also, Rep. Soper. Other members are probably aware to different extents. The hope is that a bill to do what the issue that Mr. Vasconcellos spoke to will be introduced next week. Expect that, you know, we may get it as we had the underlying bill. More on that to come. Please continue.

**Steven Vasconcellos**
Thank you, Mr. Chair. The other legislative item that I'd like to talk about is related to court security. This fiscal year, the General Assembly was generous to give us two additional positions to flesh out our security administration in the Department. Let me be clear, this is not a police force. But our current security administrator is a POST certified position by statute. And they focus primarily in two areas. One, consulting with judges around the State who are facing an ever-increasing tide of credible physical threats to their and their family's safety. And that ultimately led to our request for two additional positions. Because we had more work than one person could drive around the State and reasonably address. Additionally, they will consult with local law enforcement on site security related to high profile cases at county courthouses. So again, this fiscal year, we received two additional positions. Those positions are not POST certified. We would really love those for those positions to be POST certified. It makes a tremendous difference in gaining access to sensitive intelligence for safety and security planning. And, so, that is the last of our 2024 legislative agenda items. There are a couple of

other important issues we'd like to cover, including bench diversity, the 23rd Judicial District, and a new website related to appellate court opinions. But I'll pass it over to Chief Justice Boatright for the first topic.

**Chief Justice Boatright**
Yeah, and I just want to supplement the security question. That's not directly related to recent events. We've had a shooting outside of the courthouse in Colorado Springs. We had another shooting outside of a probation office in Arapahoe County. And we need to simply need to have active shooter training, for example, all around the State so that we're better prepared to deal with these types of things.

On a more positive note, we continue to see the court, the bench diversifying. And again, thank you to Representative Herod for her work and in getting us a position to be able to reach out and try to increase our pipeline. As the slide will show that we have done much better with our Black and African American communities. We continue to lag behind in the Hispanic Latino group, unfortunately. But, but we are making progress. Unfortunately, our outreach coordinator was so good that the Governor hired her away. And so, we're having to replace her. I know. Let me turn it to Mr. Vasconcellos for the 23rd.

**Steven Vasconcellos**
Thank you, Mr. Chair. Thank you, committee. As you are aware of back in 2020, House Bill 1026 was passed. That will split as of January one to 2025. But it's currently our most populous Judicial District, the 18th Judicial District. Which is Arapahoe, Douglas, Elbert, and Lincoln Counties into two Judicial Districts. With Douglas, Elbert, and Lincoln becoming the 23rd Judicial District. The Reader's Digest version is that we are on time, on schedule, on budget. And don't anticipate from a Judicial Department perspective, any major hurdles in the opening of the District. Again, all along our goal for the Department. Our goal in collaboration with our county partners, has been a no surprise affair where the citizens of the impacted counties don't have to care what Judicial District number they're in. They get the same services on the Friday before that they receive on the Monday after. And I'm pleased to report that we are on schedule in that endeavor.

**Rep. Weissman**
And thank you, Mr. Vasconcellos. Quick note for members, you'll see the reference to a bill to make a conforming change. I believe that is House Bill 1013, which has been introduced assigned to House Judiciary. Members, we are anticipating to hear that on the 23rd of this month. So, the week after this coming week. Senate Judiciary, it will likely make its way to you not long thereafter. Please continue.

**Chief Justice Boatright**
Thank you, Mr. Chair. Next thing I want to talk about is House Bill 22-1091 update. That creates a searchable site for the public for all Supreme Court and Court of Appeals opinions whether they are officially published or not. I want to thank Representative Soper for his work on that. It's scheduled to launch on March 1. We're, again, as Mr. Vasconcellos on time, on budget. As he said.

- 9 -

**Steven Vasconcellos**

Mr. Chair, this moves into our final slides on performance measures. We have a more extensive discussion of performance measures in our official SMART Act reporting. I'm going to proceed through these in the interest of time very quickly. Of course, happy to pause for any questions that the committee may have.

But, in terms of timeliness standards, both in the District Court and the County Court for the age of our active cases. On both benches, there have not been substantial changes in the last year. I think we are still navigating a little bit of a post pandemic hangover in the civil arena. Our criminal arena has largely recovered. There's still work to do. But I think the biggest impacts are in the civil arena, both in District Court and County Court. But our performance has not changed substantially since we spoke to you last year.

On the probation front, our probation success rate. And the slide that is up is both adults and juveniles combined. Our success rate in probation has been stable for a number of years now. Largely the same since fiscal year 17. Which I would note is remarkable. Simply for the fact that, based on policy changes, the number and type of offenses that have become eligible for probation have evolved and changed. Which has meant we have needed to evolve and change, as well. And so, we're pleased that we've been able to have stability in success rates in that time period. And the last thing I would just note is I don't know if it's the start of a trend or not. But we have had a slight year over year increase in the size of our juvenile probation population. But that, Mr. Chair and Committee, is the end of our formal presentation. Of course, if there are and I know I acknowledge we've gone very quickly today in the interest of time. I am happy to make myself available. Mr. Terry Scanlon, our legislative liaison is happy to make himself available. For any questions of greater depth and to make time to answer any questions the committee may have.

**Rep. Weissman**

All right. Chief Justice, Mr. Vasconcellos. Thank you for the quick trip through the slide deck members, that and other materials are available in Box. We'll go to questions. I'll start off with a brief one, then I'm going to go in the order that I've seen hands. That will be Rep. Soper, Rep. Garcia, Rep. Mabry, and then Rep. Bacon. Rep. Herod was that a question? Okay, not yet. Concerning the 1091 website and, again, my thanks to Rep. Soper for that work over the years. Will that include appellate opinions not designated for publication per 35(f), or those would not be included? Chief Justice.

**Chief Justice Boatright**

Yes, yeah. That includes ironically published opinions and unpublished opinions that will be available for search.

**Rep. Weissman**

Okay. I'm actually very glad to hear that I've often scratched my head about 35(f). I'll take the substance of that offline. With that, Rep. Soper.

**Rep. Soper**

Thank you, Mr. Chair. I also want to thank you for being on time and on budget. This website is pretty cool and exciting. One, that I know many people have been looking forward to. And, hopefully, when we launch it, so we can do something together. But my question for you is more in terms of just the turnover. I mean, 40% of the judges from 2022 to date have changed. 50% of staff and 1/3 of the Justices is what you had testified to a few moments ago. That's a significant change in personnel. And I wondered what, what sort of reasons have you identified for that change? I could speculate, but I'd love to hear what you believe is the reason.

**Rep. Weissman**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Mr. Chair. Thank you Representative Soper. And of course, it's a complicated matter. But I think as an employer, we are no different than the job market at large. Which has seen some dramatic shifts, including folks making different priority changes about how they want to approach their career. I will say that our salary, particularly for the core of our staff, for clerks, for probation officers, has been a deep challenge and a driver of turnover. So, it is many layered and complicated, and I don't think we're unique, fortunately or unfortunately, in the job market with regard to our turnover.

**Chief Justice Boatright**

Yeah, as far as the judges. If I said, a third of the Justices have been replaced, I misspoke. It's our Chief Judges. We've had a third of our Chief Judges have been replaced over the last four years. As far as our judge turnover, I think that the demands that we're placing on our judges have become very difficult. And the caseloads have gotten higher. As I indicated, we are in need of new judges. We do want to come to you with specific plans. I would anticipate in the near, not obviously this year, but in the near future. And I will say the other thing that we've noticed is our number of people applying to be judges is significantly down. It's kind of anecdotal. But you know, in Jefferson County where I was a district court judge for 12 years, we would routinely get 25 to 30 people applying for a District Court opening. This last District Court opening, we had seven.

**Rep. Weissman**

Rep. Soper.

- 11 -

**Rep. Soper**

Thank you. And thank you, Mr. Chief Justice. I couldn't agree more with your last comment there. And as you and I both know, I served on the judicial nominating commission when you were an Associate Justice, and you came over to the Western Slope. And some of those interviews only had four or five applicants to become a judge. And we were sending two or three names to the governor. On that same line, what is being done to try to encourage more people to apply to become judges. Because to me, it's just like being a legislator. This is a noble calling. Particularly being a judge, it can be a very long career. But why aren't there more attorneys wanting to make the transition to the Judiciary?

**Rep. Weissman**

Chief Justice.

**Chief Justice Boatright**

Mr. Chair, thank you. Thank you, Representative Soper. That's a great question. And if I could pinpoint why, maybe we could cure it. But we are doing a lot of recruitment efforts. The outreach coordinator, for one. Especially in the smaller jurisdictions, will go out and try to advertise the position. We've done kind of town halls to talk about what positions are like. One of the things that I have kept it even since I've become Chief. And I've done it for about the last 15 years. Is do new judge training. And we are really trying to make sure that our new judges know what they're getting into. I mean, the worst-case scenario is someone gets appointed and they say, I didn't realize what the job was. But we're doing a lot of recruiting. We're doing coffees. They call it Java with Justices or Java with Judges to sit down and talk with judges about what the position is like. We're doing townhall meetings when we know we have an opening coming up. We're trying to have the local Judicial District put together a presentation on what the job is. So, we're trying to recruit as best we can. And, as far as the diversification, that continues to be a tremendous pipeline problem that we continue to work with the schools and trying to encourage that, as well. So, we're not very passive about it. I guess I'll be really honest, we are actively recruiting. Especially, when we know we'll have an opening.

**Rep. Weissman**

All right, we'll go to Rep. Garcia, Rep. Mabry, and then Rep Bacon.

**Rep Garcia**

Thank you, Mr. Chair. I want to hang on to this topic, actually. And I'm curious if you all are conducting exit interviews with those that do leave. And if you're able to identify any sort of through line. I know that, I understand that it's complicated. Every judge decides to leave on their own, for their own reasons. But just curious what data collection is happening to be able to try and identify commonalities.

**Rep. Weissman**

Chief Justice.

- 12 -

**Chief Justice Boatright**

Thank you, Mr. Chair. And thank you for the question, Representative Garcia. We talk with all of the judges when they leave. We don't do a formal, they have to send me a letter. And I've been reaching out to them and talking with them about senior judging. Interestingly, the majority of our judges who leave do asked to become senior judges. So, I think it continues to be an ageing workforce problem for the most part. I do know that there have been other judges who have left, because their kids are just about to get into college, and they've had to go out and make more money, type of things. But I do think that the volume and the demands are impacting the number of people that are applying. And maybe causing some people to think about retiring when they can a little bit earlier.

**Rep. Weissman**

Rep. Garcia, follow up?

**Rep Garcia**

Yeah. And I also I just had a question from the very first slide of your presentation discussing workplace culture. You mentioned the words, respect and dignity. And I'm wondering if there is a written and shared definition and understanding amongst your Department of what respect and dignity mean.

**Rep. Weissman**

Mr. Vasconcellos.

**Steven Vasconcellos**

Thank you, Mr. Chair. Thank you, Representative Garcia. That sort of engagement where we're at in this process, now. The creation of our mission and vision and values is relatively new. And, so, we're really in that transitional phase and how do we bring this home in a meaningful way, with shared definitions, shared understanding across the entire State. At the Judicial District-level, we have 4,000 employees across every county. As you can imagine, it is a large effort. But that's, what you're describing the need for is where we're at in the process, right now.

**Rep. Weissman**

Okay. We'll go to Rep. Mabry and then Bacon and then we'll come back to Rep. Soper.

**Rep. Mabry**

Thank you, Mr. Chair. I do have three questions, but I'll stick to this one topic and then I'll go to the back of the line for the next round. Thank you, Mr. Vasconcellos and Chief Justice Boatright for the presentation. The first thing I want to focus on is to note that there is a conflict between the Chief Justice Directive 23-22 and Colorado Revised Statute 13-1-132 (3.5). That was as enacted in House Bill 23-1182. Which I was one of the House co-prime sponsors on that legislation. Specifically, subsection 3.5 of the law requires the live streaming of criminal court proceedings unless one of four exceptions apply. And judges are to make findings about these exceptions on the record. It's my understanding that the

- 13 -

directive conflicts in that there are seven factors that judges are allowed to consider and there's no requirement that their decision be made on the record or that they point to which of the factors. So, the directive gives judges more discretion than the law. And I'll also note that it is my understanding that the directive came about in an attempt to avoid the need to pass House Bill 23-1182. So, my question is, what is State Judicial doing to manage this conflict and ensure statewide compliance with the law, as enacted under House Bill 23-1182.

**Rep. Weissman**
Chief Justice.

**Chief Justice Boatright**
Thank you, Mr. Chair. And thank you Representative Mabry. We have a committee that helps me put together the Chief Justice Directives. And we're going to take a look. Quite frankly, I wanted to see in practice for a while to see if there was an actual conflict and how it was working. And so, it's something that's on our radar, and we're continuing to look at. And we'll probably have an amended Chief Justice Directive, at some point.

**Rep. Weissman**
Follow up on the same thing, Rep. Mabry?

**Rep. Mabry**
Yeah, follow up. One, could you give me a timeline on when that updated Chief Justice Directive will be put out. And, two, is the goal to conform with what explicitly is in the law?

**Rep. Weissman**
Chief Justice.

**Chief Justice Boatright**
Thank you, Mr. Chair. And thank you Representative Mabry. I don't have a timeline. Because I do think, again, we want to see a little bit about how things work in practice. It's not going to be a year. But it'll probably be at least a couple of months. Because I think we want to get a little bit of practice and see how things are working. And certainly, we're going to look at conforming to what the statute requires.

**Rep. Weissman**
Okay, we'll go to Rep. Bacon Then we'll come back to Rep. Soper. Then we'll come back to Rep. Mabry.

**Rep. Bacon**
Thank you. So sorry, I took a bite. Thank you both for being here. Thank you both for sharing the progress on your goals. I know we've had many conversations over the last couple of years. And I also

- 14 -

want to say to you, particularly the Chief Justice, you know, you standing in, and really taking the lead on that. And a lot of the cultural changes that you have shared, that you want to address. I can see over the last couple of years, your dedication to that. As well as, you know, the insights you have gained from it have become very helpful. And I hope that we can continue to do some of this work on transparency and building culture. So, I just want to say this is my fourth time having the opportunity to sit across from you. I know, we've had many conversations, but I want to be able to say that you certainly stepped in, in a challenging time. And I want to thank you before you transition out, you know, for your grace, and really wanting to lead in that space. So, thank you for that. I wanted to kind of ask about. I do have a question, particularly about your case management systems around the conversations that you're having about how to navigate data internally and externally, I do know that there is interest from the public to be able to understand a lot of your data. And you know, just in looking at the slide and kind of the timeline, I am curious of your thoughts and how you're talking about an external facing system. And, then, also just kind of as an aside. We have spent a lot of time, and I know we will hear from judicial discipline. But when I was looking through your presentation and talking about the stakeholder work, I think there was something maybe on judicial education and talking to external folks. I am curious how the Branch might be thinking about getting external data, or external insight from our neighbors on what their interactions are like with the judicial system. For what it's worth, we get a lot of people, and don't get me wrong, it's hard to litigate cases. And it's hard to receive judgments that you don't like. But we get a lot of people sometimes that don't understand how they can navigate the system, whether it's, you know, on the pro se side and trying to figure out everything on how to do an appeal to how do they manage potential, and I'll say conflicts, but not necessarily legal ones that they may have with judges. And, so, this committee has been thinking a lot about different court systems. We talk a lot about family court. But I am curious, your thoughts on what might you see in the future, and how to receive some feedback. Especially in that building the trust component with community on how folks can better access information. Better talk about their experience in the judicial system. Are there any insights there and that you want to share that you might set any potential goals on.

**Rep. Weissman**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Thank you, Representative Bacon. A wide-ranging question. So please, if I leave something out, bonk me on the head. I will come back to it. With regard to the case management system, and specifically, stakeholder engagement, when we're thinking about stakeholder engagement, there are some obvious players. But there are also some maybe for some, some less obvious players. And some folks who have lived experience and getting their feedback on what it's been like to engage with on sort of the data side, if you will. Because ultimately, this is still public information. In large measure, there are some areas that are statutorily protected, etc. But the work of the Court is public work. And the information of the Court is largely public. And so having. Of course, we're going to have, you know, the legal community, and law enforcement partners and all the obvious folks. But from the very beginning,

we've been planning to have when we get to that stakeholder engagement component of this planning, we want some folks from the public, folks with lived experience, to share what has worked, what hasn't worked? What would you like to see? That is part of our planning for this new case management system? As it relates to getting feedback on the organization. One of the things I think that we've been historically in the vanguard of agencies in Colorado, is going to our customer base directly that we serve every year. And ask them, How are we doing? And that is information that we have consistently put in our SMART Act report. We did a substantial overhaul. It's not in my slide deck today, but it is in the formal submission as part of our performance measure information. We did a substantial overhaul. We were still sort of running our feedback surveys circa 1995, if you will. For a long time doing them in person. Talking to folks outside of courthouses. As you might imagine, the pandemic stopped that and stopped it permanently. And gave us some space to really reimagine a modern way of doing it. And so now, folks are being handed out QR codes in the courthouse. They can do it live right there. They don't have to have an in-person engagement with someone. And what we are. We did a pilot rollout in approximately a dozen Districts, we're getting ready to go statewide. But the early returns. We're getting way higher volume of responses. It has been really positive out of the gate. We share that information with local Judicial District leadership. They take it seriously. And so, we have been committed to getting direct public feedback, we remain committed to getting direct public feedback. And the last note I would add on that issue is, you correctly identified the adversarial nature of our justice system. And even given that, we run mid to upper 60% of satisfied or very satisfied with the experience, overall with the citizens that we serve. Which I think, given the circumstances, as the Chief often says short of adoptions, not many people are excited about their appearance at court. Given the nature of that, I think our feedback continues to be strong. That's not by way of avoiding taking hard looks in the mirror when we need to. But direct public feedback is very important to us.

And you also talked a little bit I think about accessibility, navigating the process. Whether it is our effort over the years to have self-represented litigant coordinators, colloquially known as Sherlocks, in every Judicial District to help guide folks on procedural matters. Or our own internal access to justice committee to the branch partnering with the statewide access to justice committee to look at where are the meaningful areas? Can we suggest simplified processes? Make forms and instructions in plain language? That work is constant and ongoing. And it's a strong commitment from our organization?

**Rep. Weissman**
Rep. Bacon, good for now?

**Rep. Bacon**
Yes. I think it might be helpful. And I'll speak for myself. I do get a lot of outreach from folks. We are the Judiciary Committee. I think a lot of people think that we have separation of branches of government. But I think it might be helpful for us to know if you have anything to share with us on how people can connect, right, provide that feedback. I think for us. I am curious and how you all on the management side, in the organizational culture, really kind of keep track of what some potential. This

sounds terrible, but like potentially, if there are the same feedback over and over again, in particular Judicial Districts. If you do have that information, if there's some way or interest in sharing with us. So, we can understand, too. And I think. So, the question overall is just what have you systematized to be able to use, right, for growth? I think that's the asset way of saying that, right? If there's particular themes that come up in particular Districts. Because some of us hear about Districts regularly and it's not just the ones in which we serve the same constituents. But it would also help us in being able to communicate with you to understand what the tools are. And how we can share that feedback. But also know how you're using the feedback, if that makes sense. Thank you.

**Rep. Weissman**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Thank you, Representative Bacon. I'd be happy to set aside time and bring some of the experts from my team over to talk about, at a high level, the tools. How we can put you in a position to share the availability of those tools. And, also, to talk to you about high-level themes that we are seeing.

**Rep. Weissman**
All right, we'll go to Rep. Soper. Then, back to Rep. Mabry.

**Rep. Soper**
Thank you, Mr. Chair. Thank you very much for answering your questions. To follow up a little bit with what Rep. Bacon was asking with the new case management system. Representative Evans, who's not here anymore, but he wanted me to ask a question of you. In December of 2023, Colorado Politics published an article in which they talked about the cash reserves being an excess of the statutory limits. And several state agencies were listed as having been in excess. One of those is the Judicial Department. And what the article went on to talk about was how $12.8 million, which was set aside for IT in a cash fund, was part of what was in excess of the statutory limits. My question for you is, how is it that you could have, I guess, both a set aside for a new case management system, at the same time that the State Auditor found that it was in excess of the cash reserves and the spending restrictions? And if you could clarify that for us.

**Rep. Weissman**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Thank you, Representative Soper. For the committee's edification, we are no longer out of compliance. We were out of compliance for a matter of months, which is not acceptable. But we did the appropriate course. This was part of our case management funding plan. The cash fund in

- 17 -

question is not focused simply on the case management system. It is the global IT infrastructure cash fund, which pays for everything from laptops, to routers, to helping. It will not be able to cover the entire cost, but to helping fund the case management system. And approximately three years ago, we started working with our JBC Analyst and the members of the committee to say that we want to start building the reserves up so that we can contribute, if you will, to this cost. And not have it be just a straight general fund ask. So, we did exceed the reserve. We weren't timely in asking for a waiver from the Joint Budget Committee. But that waiver has been secured. It's been in place for almost a year now. The finding is not a new finding, as if we're sitting here right now out of compliance. I've been in compliance for over a year now. The Chair of the Joint Budget Committee wrote the State Controller's Office and said, we have a waiver. And that is in place for a couple of more years. So, I think we're in good stead on that front.

**Rep. Soper**
Thank you.

**Rep. Weissman**
Okay, Rep. Mabry. Then, I have a question. Then, back to Rep. Mabry.

**Rep. Mabry**
Thank you, Mr. Chair. So, as you both know, there has been reform in initial bond hearings over the past few years. In fact, on one of the more recent bills before I was elected, my mother and I testified about the need for 48-hour bond hearings. I am curious if you have an update on out-of-county 48-hour bond hearings, how that process is rolling out, and how close we are to full statewide compliance.

**Rep. Weissman**
Mr. Vasconcellos.

**Steven Vasconcellos**
Thank you, Mr. Chair. Thank you, Representative Mabry. I'm probably not in a position to give you a fully fleshed out answer. Other than, our Districts have put in a tremendous amount of work. We have two regionalized locations that handle the overwhelming majority of bond hearings for rural Colorado, including out of county. And then, most of the larger jurisdictions handle their bond hearings for themselves. I am happy to, if you've got detailed questions or want to spend some time offline. I'm more than happy to bring my team who work in this area, share data, answer any questions that you may have at length.

**Rep. Mabry**
Yeah, great. We'll follow up.

- 18 -

**Rep. Weissman**

Okay. Two sort of general statute- type questions, I guess. Mr. Vasconcellos, maybe for you. One is recently the legislature created, it's sort of an odd acronym, ASIA, Administrative Support for Independent Agencies, to achieve some economies of scale and scope and HR and IT functions in the independent offices. I wonder if you could tell us where we are in the arc of that. What's working? What maybe is stuck for whatever reason?  Also, last year, Rep Snyder and, also, Rep. Soper here had the bill for the court data sharing taskforce with a pretty quick turnaround. My understanding was that entity was to have wrapped up, actually by this past Monday. So, just days ago. And I wonder if you could tell us what we should expect about the work of that group.

**Steven Vasconcellos**

Thank you, Mr. Chair. And I apologize. I missed a little bit of the second issue.

**Rep. Weissman**

Sorry to go on about the question. Number two was, if you could report out on the work of the court data sharing task force pursuant to HB 23-1132. Thanks.

**Steven Vasconcellos**

Thank you, Mr. Chair. First on ASIA. We have not been directly involved other than as an interested observer. Because of the impact, a positive impact potentially, on the State Court Administrator's Office. I just learned last week that it sounds like our Joint Budget Committee Analyst is going to recommend that the effort be disbanded. They've had some difficulty in hiring an Executive Director. That has not been finalized. But I think that's been the direction. There's been some deep concern from Joint Budget Committee staff, it'd be better for him to speak on his own behalf. But it was relayed to me directly that the recommendation is going to be to disband the effort because it cannot find an Executive Director. And the initial proposal was to give the State Court Administrator's Office the FTE. And I, to be candid, neither Chief Justice Boatright nor myself are in favor of that approach. I can appreciate the difficulty in standing up a new agency, it is never a simple or linear affair. And hiring in this environment sometimes can be very difficult. So, I'm sure it has been challenging. But as we've discussed in other hearings, other venues, it is not simply a workload issue that that drove this. In some cases, I would argue statutorily, it is inappropriate for us to be providing the administrative support for some of these agencies. And so, even if we have all of the proper resources, I don't think it's acceptable. To just to pick an obvious example, for us to be the direct administrative support for the Office of Judicial Discipline. I think that should be separate from us. There are other agencies in a substantially similar posture. And so, you know, I'm happy to do whatever we can. Like I said, we have not, we're not on the ASIA Board. We are interested observers. Happy to do whatever we can to support that effort. We are still, in the interim, providing administrative support to many of the agencies. But if this goes ultimately the direction of undoing ASIA, I think the resources should go to the individual agencies themselves, rather than the Department.

- 19 -

**Rep. Weissman**

Thank you. I will say I'm pretty shocked to hear of this. And I think I agree with you as to the backstop. I also hope that we can try a little bit harder to hew to the original concept. Looks like you might be getting some late news from Mr. Scanlon. So, Mr. Vasconcellos, if you wanted to add more on that or feel free to pivot to court data sharing.

**Steven Vasconcellos**

Mr. Chair, I want to talk just very briefly about the court data sharing taskforce. I will admit that normally I would have been up to speed but since they just wrapped up their work and the timing related to the hearing. And just, candidly, I've been focused on Carr Center mitigation efforts. That's on me. I apologize. Normally, I'd be prepared for that question, but I'm happy to give an update. I know the work is wrapped up. But I haven't had a chance to circle back. Report is coming. I did want to circle back, if it's okay, to a question from Representative Mabry. And again, this is not to foreshorten any offline conversations that you would like to have. But we were able to confirm with my team while we're sitting up here, that we're fully compliant statewide, on out-of-county warrants.

**Rep. Weissman**

And understanding when we passed the bill and set the timeline, nobody saw what was going to happen to the Ralph Carr Building. Imagining that there's a report largely done. If you could send it to members of the committee, I think we're interested in where that landed. Okay. Rep. Mabry, was there one more question you had? Go ahead.

**Rep. Mabry**

Thank you, Mr. Chair. Thank you, Mr. Vasconcellos and Chief Justice Boatright for hanging in there and answering all our questions. My next question has to do with pretrial reform. So, across the country, many states are stepping up to reform a system that I believe is fundamentally inequitable. I think many people in this room would believe that our pretrial system isn't equitable. The poor are unfairly punished and held in jail without facing conviction. Simply because they cannot afford to post bond. I raise this in our conversation with your Office because, in other states, Judicial Departments have engaged in or even led efforts to reform unfair pretrial systems. And so, my question for you is, does State Judicial have plans in engaging in or leading in pretrial reform here in Colorado? And if not, why?

**Rep. Weissman**

Mr. Vasconcellos

**Steven Vasconcellos**

Thank you, Mr. Chair. Thank you, Representative Mabry. From my vantage point, we have been important partners and stakeholders in that conversation. So, I think that leadership is very important. Particularly, by Chief Judges at the local level. Chief Judges can get folks in a room, to a table, to discuss matters. I think one of our biggest challenges, and there have been efforts made, so I want to

- 20 -

recognize those. But I think one of the biggest challenges on pretrial reform is the availability of pretrial services in most local communities. I think that is a challenging local funding matter that might implicate challenging state funding matters. But our Chief Judges are willing and engaged partners at the table in these discussions. And as always, it is not just the leadership that the Department's showing, there are also some very real access to resource issues, locally.

**Rep. Weissman**

Okay, members, I know that we have at least one person signed up for public comment. So, I think we'll wrap questions here. Everyone knows where to find Mr. Scanlon for follow up purposes. Chief Justice, thank you for being with us. Good luck. And Mr. Vasconcellos, the real estate problem over there, it's quite grave. We appreciate. You can take leave, and we'll just call through names of folks who might have signed up for public comment, here.

**Chief Justice Boatright**

Thank you.

**Rep. Weissman**

Okay. In person, I believe we have Alan Higbie.

**Rep. Weissman**

All right, Mr. Higbie. Thanks for being patient with us. Let us know your name and any affiliation. Please go ahead.

**Alan Higbie**

Very well. Thank you. Good afternoon. Is it on? Green is on. Thank you. Good afternoon. And thank you very much for an opportunity. Mr. Chair and Madam Vice Chair. My name is Alan Higbie. I'm from Colorado Springs. And I am not here on behalf of any organization and don't represent anybody, any clients or anything like that. I'm here for myself. I'm here to speak to you about the lessons learned from the, as a Chief Justice just referred to it, the events of the past few years. And I'm talking about the judicial corruption scandal that consumed things for quite a while. The beginning of it I would say was when it first came forward in the media. And I would put the book end on it with the public censure of the former Chief Justice that occurred August of 2023. I'm a retired attorney. I practiced for 42 years. I served for eight years on the judicial performance commission in El Paso County, 4th Judicial District. I retired six years ago. And, so, that's why I have time to look into the events of the past few years.

I prepared a report, which I've put into the record. I entitled it Preparing for the Next Scandal: Valuable Insights from the 2019 to 2023 Judicial Corruption Scandal. There are lots of lessons to learn, but I'm only going to mention a couple of the bottom line ones that we've gotten. When the scandal first broke, according to news reports, then House Speaker Alec Garnett called for the appointment of a special prosecutor. And the editorial board of The Denver Post also called for the appointment of a special

- 21 -

prosecutor. And one wasn't appointed. There were referrals by the Office of State Auditor to law enforcement, but they came too late and very little. There were lots of redactions. And I don't know the details. I haven't seen what was sent over or anything like that. But it appears to me that something, the ball got dropped. There were no prosecutions. In what to me, and this is my opinion, the acts that were alleged to have occurred fit the definition of corruption. And, so, we had what looked like a ball that got dropped. And we also had about 9 or 10 different investigations going on from various agencies. Some were administered by the Judicial Department, itself. Which is probably not a great practice, if the Department is under investigation, for them to manage those. And there are probably differences of opinion about that, but it just didn't have a good look, as far as I was concerned. Anyway, I started to look into the RCT and the ILG reports. Because, if at least those on the interim committee, recall that Judge Maes from Pueblo came and critiqued those quite heavily. I shared that. But as I got through it, I ended up seeing that there was a lot more to it than just those reports. And I've set all that out in my report.

So, in the interest of time, I'll just get to the bottom line. I think that we should have a. Well, I looked at the idea of in Colorado, do we have a special prosecutor that's easy to access without a lot of friction, and, and so on? And I think that I would propose, I don't have specific legislation. But I would propose an idea that we have something that when the next scandal comes up, and there will be. Not from this Department, probably. I don't know, scandals are inevitable. Corruption is inevitable. I asked myself the question, Are there best practices for investigating and prosecuting and dealing with corruption? And it didn't take long before I came up with the United Nations Office of Drugs and Crime has a set of standards that have been in effect for 20 years. And they've been peer reviewed. They've been used. They're worldwide. So, I would suggest that. Well, what my report did. I went through and compared what we did in this scandal, the totality of all the efforts, how does that compare to the UN recommended best practices? And a lot of these things had been done, looking internally at the agencies re-educating people and so on. But the one thing that failed was the number one best practice, it was prosecutions. We didn't have one. And so, you got to ask yourself, why didn't we? And if the early calls, right, in the very beginning. If early calls for special prosecutor had been enacted or implemented, I think we would have had a more satisfying, more satisfactory result. And it would have been a lot more efficient. There were lots of fragmented efforts all over the place to get to the bottom of this. We didn't, as far as I could tell, anybody with subpoena power to compel the production of documents and testimony and the ability to prosecute where necessary. The timeline on this thing could have been shortened a lot. It would have been a lot more efficient. And I think it could be probably done. I haven't drafted anything. But it looks like we could probably add just something to that. The other fast thing is something that came up during the interim committee. Was the State Auditor's timeline for making the referral to law enforcement? And probably some wording or clarification in that when did they have a duty to make that referral? That was a big problem. But fundamental, was the idea of was the idea of having the investigated agency do the investigation. So, that is all I have.

- 22 -

**Rep. Weissman**

Mr. Higbie. Thank you. I will let you know Mr. Pogue has confirmed to me that your testimony and your report had been uploaded. Members, if you go into your box, there's the Joint Judiciary folder go within that to the testimony sub-folder, you'll see the documents that Mr. Higbie has for us. I think you've probably seen our agenda, sir. The very next presentation that we're gonna proceed right away to is from the Commission on Judicial Discipline. Possibly, they will have some comments that are in the same theme as you've been speaking of. Thanks for coming up here to speak to us on this occasion.

**Alan Higbie**

And my email addresses is on the bottom front page of the report.

**Rep. Weissman**

Thank you. So, members, I think that your engagement has been invited by our witness, if you'd like to follow up. Thank you, sir.

**Alan Higbie**

Thank you.

**Rep. Weissman**

All right. We're gonna keep marching onward. The next segment is to hear from the Commission on Judicial Discipline. We see that Executive Director Gregory is with us and at least one other individual with the Commission.

- 23 -

**Appendix 27(dd)(ii)**

**Transcript of Colo. Comm'n on Jud. Discipline Presentation;**

# Joint Judiciary Committee—January 12, 2024 Hearing: Colorado Commission on Judicial Discipline SMART Act Presentation

**Rep. Weissman**
All right, Mr. Carpenter. Mr. Gregory, thanks for being with us. However you would like to proceed. I wasn't sure if you need to hook up a laptop for presentation or if you're just gonna be going off notes, whatever you like.

**Jim Carpenter**
Yeah, we had sent over a PowerPoint. But we can probably proceed without that.

**Rep. Weissman**
Okay. We are getting hard copies handed out here. We also have your memo of compiled stats.

**Jim Carpenter**
Great.

**Rep. Weissman**
However you'd like to proceed.

**Jim Carpenter**
Perfect. Well, we'll get started.

**Christopher Gregory**
Maybe just a couple minutes.

**Jim Carpenter**
They've got them.

**Christopher Gregory**
Okay.

**Jim Carpenter**
The committee has them.

**Christopher Gregory**
I can log into Zoom is what they've said.

**Jim Carpenter**

With that, thank you. My name is Jim Carpenter. I'm Vice Chair of the Colorado Commission on Judicial Discipline. I'm really happy to be here today. Christopher Gregory is the Executive Director of the Commission. And on behalf of all of the other members of the Commission, thank you for inviting us to present today and to have this conversation. I also want to thank the Joint Committee for their great work over the last year in enacting significant and meaningful reforms to the judicial discipline process. This process will be better, fairer, more transparent because of the actions of this Committee and the General Assembly, as a whole. I want to quickly review a couple of things related to our process, and talk about some of the things that we have focused on in the past year. And then, Chris will review our at least preliminary statistics for the cases that we managed over the past year. And then, of course, we will take your questions.

So, on your first slide, the constitutional and statutory mandates of the Commission. Just as a quick reminder they are to protect the public from improper judicial conduct, preserve the integrity of the process, maintain public confidence in the Judiciary, create greater awareness of judicial behavior, and provide for the fair and expeditious disposition of complaints of judicial misconduct or judicial disabilities. We have a prescribed process through both the Constitution and the statutes that you all have enacted for intake and evaluation, identifying [reasonable] grounds for the proceedings. The complaint and investigation stage. The determination and the preponderance of evidence stage. Formal proceedings, if we get that far. Recommendations and, then, the Supreme Court, or in certain circumstances special tribunal review. Fact finding and legal determinations with the final order. Just as a quick background on sort of how we operate.

I want to talk a minute about performance measures, but first a couple of things. We've had an incredibly active year, both with our traditional responsibilities and following up on the good work of this committee and the Legislature. We had a record number of inquiries, referrals, we call them RFEs, requests for evaluation, 346 of them in 2023, up from 250 in 2022. And Chris will go through all of the particular stats and data that we have compiled. In the year, we I notably came to a sound resolution in the *Coats* matter.

I want to note that we're a very new Commission. We have 4 new members of the 10 in the last six months, there's one current vacancy and only two of us have served more than three years. Chris has been Executive Director two years, now. So again, thanks to the Legislation, we have a full-time staff of three plus adequate and additional resources on an ad needed basis for investigation and research. We are working to transition to the Office of Judicial Discipline which was set up in statute last year. The Executive Director, Special Counsel, Office Manager, investigative services provided through independent contracts, and anticipated hiring of a paralegal or public information officer in 2024 to support our operations and all the complainant notifications under the statute. We have worked very hard on public information, like the improved website, more information sharing and training about

what the rules and expectations and our processes are. And then, the Annual Reports which have new requirements. I think for additional statistics and information.

We've undertaken a rules revision process, both based on the on the statute, and then, in anticipation of the potential approval of the joint resolution passed last year that voters will act on this Fall, and funding approved for FY 23. The Commission is negotiating to consult with the National Center for State Courts to propose some revisions into those rules.

We have worked very hard to establish the Office of Administrative Support for Independent Agencies, I think there was some conversation about that in the last presentation. We strongly believe that that will help and ensure that the Office of Judicial Discipline and other independent agencies operate more effectively and efficiently.

And finally, a key goal for us in 2024 is more education for judges about ethics, the discipline process, changes in statute, potential constitutional changes. We really want to be more proactive, focused on heading off issues, while maintaining a robust discipline process when necessary. And with that, I will turn it over to our Executive Director, Christopher Gregory to go through some of the core statistics and data from the past year. Thank you.

**Christopher Gregory**

Good afternoon, committee members. As our statistics are kind of summarized here, in our presentation, probably the most significant is the greater increase in number of requests for evaluation of judicial conduct that we received in 2023, as compared to any prior year. We had 346 requests for evaluation of Judicial Conduct, which, if you compare it to even 2022, there were 250 that year. So, quite a significant change from what had happened previously. The majority of those requests for evaluation that were dismissed, is typical, however, with prior statistics. It was about 50%. And then, with that, we get probably about 7% of our requests coming from either sovereign citizens or folks that just perceive a generalized conspiracy. And those, of course, are dismissed. That there would need to be a greater showing of bias or discrimination or that sort of thing. 2023 was also unique in the fact that about 20.8% of the requests for evaluation of the cases that we considered arose from 73 cases that are being investigated through the records of the Secretary of State's Office as it would relate to judges' financial disclosures. So, that is sort of an outlying figure here that will later kind of impact some of the demographic statistics and other things that were required as part of our reporting here today, under Section 13-5.3-108 of the Colorado Revised Statutes.

In addition to just the regular RFEs that we processed, we had 114 jurisdictional denials. These are cases where someone might be complaining about an attorney, they might be complaining about a magistrate, municipal court judge. Things that the Commission just doesn't have any authority to consider. So, that's also significant in addition to the 346 number I provided.

- 3 -

There were 84 investigations performed in 2023. And by investigations that includes more in-depth review of public records, court records, that sort of thing, and are inclusive of the cases involving the Secretary of State's records that I've mentioned previously. In 62 cases or approximately 18% of the total requests for evaluation that we received in 2023, they were processed as complaints. And as Mr. Carpenter had explained in his kind of overview of the process, a complaint is recognized when there are reasonable grounds for judicial disciplinary proceedings. So, it's sort of the request for evaluation of the circumstances that pass sort of a frivolousness test. And so, these are the things that are substantial that we've looked at in the last year. In two of those cases, because of our investigation, the complaints were either partially or completely recognized as being unsubstantiated. So, our investigative process was able to find additional information and rule out those complaints that we had processed. Other court statistics include the formal proceedings that we had initiated in two cases. This is essentially filing a statement of charges or complaint with the anticipation that, if necessary, there'd be an adjudicative phase. And indeed, in one of those cases, although it was from a prior year, we did have a formal adjudicatory hearing that was completed earlier this year. So, that's essentially a full trial in the judicial disciplinary world.

As far as the dispositions and sanctions that were imposed into 2023. Three dismissals with concern or some sort of diversion and deferral agreement were reached. In three cases. We had one private reprimand, two private censures, three public disciplinary opinions, and four cases that resulted in resignations from office. I would caveat all these statistics on being preliminary as we are still completing our annual report for the year. But I do think that they are indicative of just how much our both volume and significance of the cases that we handled in the past year had increased from prior years.

As far as the different demographic information that was expected through House Bill 23-1019. What we had was subject judges with recognized complaints, that's what these figures would relate to. And I've excluded any consideration of the financial disclosure cases, just because of the size of that number would render the rest of these statistics sort of irrelevant or useless. So, to give you the statistics we had. 73% of the cases that were considered involved male subject judges, 27% female subject judges. Of those judges, as a group, 77% were white, non-Hispanic, 9% were black or African American, 18% were Hispanic or Latino, and 1% identified as being part of the LGBTQ plus community. When looking at the statistics of persons that were impacted, on the other side of these cases. 44% were male, 56% were female, 87% were white, non-Hispanic, 4% black or African American, Asian or Hispanic respectively, so 4% 4% 4% And then finally 4% of that group was also identified as being part of the LGBTQ plus community. With that, I'll defer back to Mr. Carpenter on our legislative priorities.

**Rep. Weissman**

Mr. Carpenter.

- 4 -

**Jim Carpenter**

Thank you, Mr. Chair. Members of committee, we have just a couple of, unlike last year. We have just a couple of items that we wanted to bring to the attention of the committee and the Legislature. Chris has mentioned the personal financial disclosure cases. That has brought up to us a need we see to clarify those obligations. I think that others, members of the bench could speak better to this, but I think there are. There is confusion about requirements. There are some requirements for changes in financial situations or particular incidences, it's not entirely clear. The Secretary of State captures this data, it's not exactly clear what they do with that. It there's just a number of things around that. And we think that it's an important area of investigation, and probably requires a legislative fix.

The second one is, again, I'm a non-lawyer on the commission. So, I hope I get this language right. But there's the senior judge program for judges who have retired, but who can still actively engage in hearing cases and doing and performing some duties. And that's a significant and important part of the judicial system overall, in a number of areas. There is an absolute prohibition on anyone moving into the senior judge program, who has any discipline history, at all. And our point of view about this is that that ought to be a factor but not a sole determinative factor in moving into the senior judge program. I think particularly in light of some of the things that, you know, we're seeing with the with the financial disclosure issues. And, again, it's an outright prohibition, it ought to be a factor in our view, but not the factor. Chris, do you have anything to add to that?

**Christopher Gregory**

I think I would just add that part of the reason that we want this statutory change is that judicial discipline is multifaceted. And on one hand, yes, there's a punitive component. On the other hand, however, in the vast majority of cases, you have well-meaning judges who may have made a mistake. And the whole point would be, how can we provide them the rehabilitative resources so that they can continue to make a positive contribution, both to their work and the judicial system, in general. And if we have this categorical bar, it interferes with our ability to do that. It also creates a collateral consequence, as we are trying to negotiate resolutions to these cases where a judge to avoid being excluded from the senior judge program would not consider a stipulation or something of that sort. And it's just highly problematic to our function to have these types of categorical bars.

**Jim Carpenter**

And with that, our presentation is finished. And we certainly welcome questions.

**Rep. Weissman**

Thank you. I know there are questions. All right. Rep. Herod, Rep. Bacon, and Vice Chair Gonzales.

**Rep. Herod**

Thank you, Mr. Chair, and good to see my former boss here. Thanks for not firing me all those years back as the Chief of Staff for Governor Ritter. I have got some concerns about your legislative priorities,

- 5 -

however. And particularly around the prohibition against judges with disciplinary histories from serving as senior judges. And I think Mr. Chair and I worked on this years ago, a little bit. There were some conversations around senior judges. And, you know, I think it's really hard when we lean in so heavily on the senior judges more recently, to deal with some of the gaps in delivery or access to say that those senior judges who have discipline actions can then come back and work on the bench as a senior judge. It seems a bit problematic to me. Particularly, as someone who served on the judicial performance commission. A lot of folks don't stand for retention, if they know they're going to get a bad review from the performance commission. And so, then they move over to becoming a senior judge, would be the concern. And so, how do we right that? I guess is the question. In a way that we're not allowing for judges who do have does discipline action against them to then just become senior judges? And then can you give me some specific, very specific incidents so I have a better understanding of who these types of judges are. What types of disciplinary actions they had faced. And why we believe that they should be eligible to be a senior judge now.

**Rep. Weissman**
I guess whoever like to take that. And then Rep. Herod, while we're on this line of questioning, maybe you could speak to the Commission doesn't have the ability to emit bills. I don't know if you're stating these in a general way if sponsors have been secured. I know you may not be in a position to get away confidences. But, I'm interested in what specifically we should be expecting. And then as far as number two, I mean, I sort of see the point being made. But there's the more minor discipline that's resolved informally, and then there are the more severe things. Where, frankly, maybe there should continue to be a categorical bar. Maybe we could, if we're gonna go forward at all draw a line there. But with that, whoever like to field the question from Rep. Herod.

**Jim Carpenter**
I'll start. Thank you, Mr. Chair. Representative Herod, I was very pleased that we were able to hire you into the Governor's Office and certainly wouldn't have fired you from the Governor's Office. But thank you very much. I will turn it over to Chris, for an answer as well. And, Mr. Chair, we have not gotten so far as to begin the formal process of requesting legislation. And these are these are just two items that had kind of come up in the Commission's conversations. And I certainly hear the concerns about allowing a judge with some discipline history to become a senior judge. And our concern and point is that it ought to be a factor. So that, and as I understand it, not everybody who wants to be a senior judge can just become a senior judge. They can't automatically move into that position. There is there is some criteria for that there is a process for acceptance into that program. And our point is that, if there's a minor issue, that that shouldn't necessarily be a bar. It could be a factor in the determination, but not the prohibition. I think one of the concerns is, as we work our way through these financial disclosure reports, whereas Chris said, there could have just been a mistake or an oversight, should that automatically bar somebody from that program. We think there's a way to work through those issues.

**Christopher Gregory**

I'd only add, I think if something were developed on the senior judge program side, similar to a nominating commission. Where whomever is applying for that program is vetted in a particular way. A lot of what has happened with the legislation over the last couple of years, has been to improve the ability for information sharing between the judicial oversight entities. And what I would expect here is that, if somebody's applying for the senior judge program, just as occurs right now. We receive a letter asking about their disciplinary history, we respond, yes or no. If there's an issue here, they either have pending discipline, or they don't. They either have a disciplinary past or not. And if more information was requested of us, we would be happy to explain the circumstances of what that prior discipline may have been or, if there was pending discipline, that could also be explained through the judge that would be applying for whatever this position was. But Representative Herod to your question, what types of things are we talking about here? The difficulty is right now that bar is categorical. So, it's anything other than a dismissal with concerns, which isn't recognized as a disciplinary action. And so, what that would incentivize is that everything's going to have to be sort of a diversion agreement, rather than a way of imposing one of these private dispositions that we have, at different levels. At the very base level, there's a private admonition. Which means that a judge, they didn't even violate the Code, which are our ethical standards, but that their actions kind of came to a degree that they just created an appearance of impropriety. We can't impose that level of discipline if there's an interest in the judge serving in the senior judge program. The next level would be a private reprimand, which is conduct that just doesn't meet the minimal requirements of the Code. And that's kind of the middle level. And then the next level would be a private censure where a judge has substantially departed from the standards under the Code. Separate from that, the Commission also has to determine whether or not discipline would be imposed privately or whether we would be proceeding with formal proceedings where you would have a public discipline. And at least in my interpretation, that decision isn't necessarily based upon the severity of the conduct, but more of the nature of it. And if a judge, for instance, had a minor criminal conviction, whether that would be, I guess a first time DUI, it could be, I don't know, trespass or something that wasn't a crime involving moral turpitude. A felony is automatically going to prohibit a judge from serving. But minor things that could be rehabilitative in nature. Having that just be a complete bar from the judges participating in the senior judge program. It really does, you know, create some problems and complexity. Even in the Commission's decision making, as far as what the sanction should be.

**Rep. Weissman**

Thank you. So, we'll go to Rep. Bacon, and then we'll go to the Vice Chair, and then we'll go to Rep. Garcia, and then members, that may be all the time that we have. Rep Bacon.

**Rep. Bacon**

I think thank you for sharing your response to Rep Herod's questions. I think, similarly, for me, it was just we've spent a lot of time talking about discipline. What the public has access to, even understanding what some of the histories and records are. And so, I was just curious on how we circumvent that, to be

able to support or to be able to consider this proposal. Just given the confidentiality is given the internal versus external facing documents. And just for what it's worth, you know, we spent a lot of time last year just talking about transparency, particularly around judicial discipline. So, there's some curiosities there. And no need to necessarily reply here. I am curious, your thoughts. I did not see much between this presentation in the last about anything around the judicial ombuds program. So, I'm curious if I know, we wrote into the bill to have to present at SMART. However, this is the building year. So, I was just curious, any thoughts or any insights on how the work is going, given the goals of the bill, and kind of like the goals that we set out through legislation? If there's anything that you'd like to share there?

**Rep. Weissman**

Mr. Gregory

**Christopher Gregory**

I'm sorry, Mr. Chair. Representative Bacon, I'm uncertain what has happened with the ombuds program, because we were not added as part of their board. And they're in sort of a formative stage, much like the ASIA Office that was mentioned at the end of the last presentation. In that vein, yeah, I would like more information as far as what progress has been made. I do think that that office is absolutely essential, particularly given that this scandal over the last couple of years. Even just the reporting and the investigations that were done, revealed a problem with retaliation and folks being concerned that if they come forward, it's going to be a wall. And the Ombuds Office provides a wonderful facilitation tool, so that those concerns can be brought up in an anonymous way. But the person that's interested, would still, you know, have that information. So, at least from our Office, and our Commission's perspective, we remain 100% committed to the success of that office and are very supportive of it.

**Rep. Weissman**

Rep Bacon, go ahead.

**Rep. Bacon**

I'm sorry, I haven't a chance to go back through the website. Just in looking through your investigations. Do you also track which Judicial Districts? If so, that'd be helpful to share? I mentioned it to the Judicial Department. If we can also have a sense, and I can probably search on your website, I do know through the Annual Report. But just any insights you might be able to share, thank you for the demographic breakdown. That is incredible for us to understand, also, you know, on one side to figure out how to mitigate any potential bias and the other for accountability. But I do think it would be interesting for us to hear breakdowns by judicial districts, as well. Just to kind of understand, to be able to give us a high-level picture of potential issues around culture. So, thank you.

**Rep. Weissman**

Mr. Gregory.

**Christopher Gregory**

And Representative Bacon, I think you bring up a good point as to one of the things that's still in progress, the statute asks for us to provide this data in a searchable way on our website. What I have been able to do with the website thus far is post the Annual Reports. That District-by-District breakdown is contained, at least in the last two Annual Reports and I think in some of the prior ones. But the technological issues. We are trying to find a better way. I know some of the other commissions nationally. Yeah, they just have a pull down: year, Judicial District, and then it produces a number. But we will continue to work with, I think it's the contractor through the State Internet Portal Authority, Tyler Technologies, that helps with the website, to see what options we have available for that. But the breakdown is in the Annual Reports.

**Rep. Weissman**

Rep. Bacon good for now. Okay, so we will go to the Vice Chair, then Rep. Garcia.

**Sen. Gonzales**

Thank you, Mr. Chair, I am very interested in reading that Annual Report, and will look forward to reviewing it once it is released. My first question is, if you have a timeline on when you expect that to be completed? I am appreciative of the statistics that you have prepared and shared with us thus far. My second question actually pertains to ASIA. Because while I was subbing in on the Joint Budget Committee, there was actually a briefing issue on this. On, I don't know how to say it, other than extraordinarily slow walking of the implementation of that. And I want to just ask and better understand whether that has impacted your ability to operate as an office? And if so, how to hear the State Court Administrator say that, potentially, they're just going to. I forget the word he used, but walk back the implementation of the ASIA Board altogether is incredibly concerning. And so, I just want to understand how this is impacting y'all.

**Christopher Gregory**

If I can respond.

**Rep. Weissman**

 Mr. Gregory.

**Christopher Gregory**

So as the agency head for the Commission, I'm part of the ASIA Board. And it's, frankly, very troubling that I, you know, that I've learned this information today. I think I can provide you with some context, as to maybe what's going on. That I don't know whether or not it was expressed to the Joint Budget Committee when that briefing had happened. But we did encounter some substantial issues, the ASIA Board, out the gate. We tried to initiate this hiring process as quickly as possible. There were, for whatever reason, disagreements over the composition of the ASIA Board. For some reason, the Attorney General's Office provided an opinion, essentially saying the larger agencies that would just be

- 9 -

essentially receiving remora status, for lack of a better description here, where they would have their payroll handled by the ASIA Office. The AG's Office took the opinion that they needed to be part of the governing board for ASIA, which was very troubling to us smaller agencies. Where the way that this legislation was intended, we were supposed to be the priority and, therefore, have the decision-making authority and the ability to control things. That was a very intensive and complicating argument that happened, I think, right at the beginning, when we were trying to form our hiring committee, make some of these decisions. It was resolved when, actually the JBC sent over a memo saying, This is not what was intended. And either these larger agencies can give up their internal FTEs and take the full gambit of what's being offered through the ASIA Office. And, therefore, have a stake in and a say in things. But none of this piecemeal, it's all or nothing. That was resolved. And then after that was resolved, we did get our announcement out for the ASIA Director position. Out of the applicant pool, there were some issues that also created legal questions that we had to resolve before, finally, doing the initial sorting to narrow things down to a panel of finalists. However, what we then experienced, was a number of those finalists dropped out, or had indicated that the pay range that was posted for the position wasn't adequate for what they were looking at. And finally, when we had actually made an offer to have someone come in as the Director, the candidate replied that they were asking for a salary significantly above what that posted range was. The response from the ASIA Board, then, was to file a budget amendment, which is now before the JBC. That is essentially asking to equalize the pay scale of sort of these Director and the equivalent of what SCAO would have as sort of a unit manager or a controller. To equalize those salaries. And there was a significant difference between what had been appropriated for ASIA through the original bill and what SCAO was paying people doing similar jobs. So, out of that, that's kind of the problem. And I don't know where it'll all end up. But we really do need sort of that equal and adequate resource provided through this Office.

**Jim Carpenter**
If I may.

**Rep. Weissman**
Mr. Carpenter.

**Jim Carpenter**
Yes. Mr. Chair, Madam Chair, thank you for that question. I think that the Commission feels very strongly that, despite the challenges in the setting up and the hiccups, this is an incredibly important office for our operations and our independence and our ability to do what we need to do. And so we, you know, are, again, a little surprised to hear this. And hopeful that we can work through this and get it set up, established, and doing what it needs to do, quickly.

**Rep. Weissman**
Follow up, Madam Vice Chair.

- 10 -

**Sen. Gonzales**

I very much appreciate all of that information and context. It's incredibly helpful. I did just want to circle back to my initial question in regards to when that annual report will be available, because I will read it with interest. Thank you.

**Rep. Weissman**

Mr. Gregory.

**Christopher Gregory**

And I'm sorry, I lost track of the questions there. The Annual Report, I've already started working on it. I had hoped that I would have it out before this hearing, on an annual basis. However, what I've realized this last year, is that we're still in the midst of processing a substantial number of the RFEs that we received at the end of the year. And to be able to finalize those numbers as to what we ultimately recognized as a complaint, what actions kind of came out of that statistical grouping. It may take a couple of weeks into January before we can finalize those numbers. My expectation is that we have our next Commission meeting at the beginning of February. That perhaps after that, in short, short order, we would be able to publish the Annual Report.

**Sen. Gonzales**

Thank you very much. I very much appreciate all that context.

**Rep. Weissman**

And Mr. Gregory, when that is available, if you could send to Mr. Pogue and Ms. Jenson. And so, that they can circulate it to all members in both committees. All right. Last question will be to Rep. Garcia, and then we will have to move on to the next segment.

**Rep Garcia**

Thank you, Mr. Chair. I have one clarifying question, then a question. So, based on your response to Rep. Herod's initial questions to you, when you were talking about the different ways in which an REF can be responded to. What I understood is, that the REF will be filed and then you have these options of how you respond. But all those options are what is categorized under disciplinary history, is that correct?

**Christopher Gregory**

Yes. So, and I guess there's another response, too. We receive the RFEs. And, you know, that's essentially an evaluation process, where the threshold is whether something in that RFE provides a reasonable ground for the judicial disciplinary proceedings. It's only after that complaint is recognized that you would get into a determination, which is one of the phases that Mr. Carpenter had talked about in our proceedings, where it's then up to the Commission to investigate what was presented in the RFE. One of the commissioners then presents to the whole Commission as to what the recommendations would be. But out of those recommendations, it spans anywhere from, you know, we don't have

- 11 -

evidence, and this is appropriate to dismiss. This is something that's problematic, so we're going to dismiss it with concerns or educational language. Or those other options that I mentioned, which are also listed in it's Rules of Judicial Discipline 35 and 36. And it goes anywhere from some sort of diversion-type agreement up to the removal or required retirement of a judge.

**Rep Garcia**
So, I guess, then my question is, is it the RF the REF that ends up being part of the disciplinary history? Or is it the action that's taken if any findings are found from the evaluation, then that is what becomes a disciplinary history?

**Christopher Gregory**
Right. And actually, it's an excellent question, they are requests for evaluation. So, RFE is the acronym. But it is only things that happen after that determination stage and it's at that determination stage, if it's going to be private discipline, the standard for evidence is more likely than not, or a preponderance. If it's public discipline that would need clear and convincing evidence. So, it's not as if these outcomes, I guess just happen out of the air. It's some proof that we've developed through our investigations.

**Rep. Weissman**
Rep. Garcia.

**Rep Garcia**
So, here's my question. Based on that, I guess my question then is looking at the different categories listed here of what an RFE could be requested. And this might even just be rhetorical. But I'm just curious of all of these which ones you find are appropriate to excuse, to say that a judge could then become a senior judge when they've been found to have acted on these bases?

**Christopher Gregory**
I'm sorry. I think it would kind of equate to the same like spectrum that you'd look at for criminal conduct or even, you know, tort liability, that it is really sort of the, you know, negligence, kind of that lower level culpability that would kind of fit into these categories. And quite honestly, when we do look at like sort of a delayed ruling, many factors are considered in that situation. And oftentimes, judges have unrealistic workloads, there's a lot of mitigating circumstances in what happens. In one of our cases, a family member has a medical issue and that gets the judge's attention distracted for a period of time, and that is considered in whether or not that would be a diversion type case or something different. But on the other end, if there's retaliation, if there's sexual harassment, if there's discriminatory conduct. Those types of offenses are much more serious and wouldn't provide a basis for the judge to continue into the senior judge program, or at least I would hope not.

**Rep. Weissman**
Mr. Gregory.

- 12 -

- 13 -

**Rep. Weissman**

And as members, I'll note, the website for the Commission may be found at ccjd.colorado.gov and has been redesigned within the last few years a little bit more built out and informative than in prior years. There is a copy of the full Rules of spending 80 Plus pages if anybody wants some light reading this weekend. We will wrap there. Thank you both Mr. Gregory and Mr. Carpenter for being with us. And for presenting the information again. Members, I'm sure e-copy can be found in the box.

# Appendix 27(dd)(iii)

# Relevant Hearing Materials and Exhibits:

# Appendix 27(dd)(iii)(1)

# Alan Higbie, PREPARING FOR THE NEXT SCANDAL: VALUABLE INSIGHTS FROM THE 2019-2023 JUDICIAL CORRUPTION SCANDAL, January 4, 2024;

# **Preparing for the Next Scandal**: Valuable Insights from the 2019-2023 Judicial Corruption Scandal

### Abstract

The Colorado Judicial Department scandal broke in July 2019. It stemmed from multiple allegations of governmental corruption. The scandal was entirely confined to that department.

Since then, various entities have investigated the corruption: its nature; extent; and root causes. A long list of proposed reforms was proposed, with many adopted.

This report compares these responses to the accepted best practices for the investigation and prosecution of governmental corruption, and suggests anti-corruption strategies for the inevitable future corruption scandals (including a discussion of special prosecutor options).

Alan Higbie
alan.higbie@gmail.com

January 4, 2024

## What is Corruption?

The Colorado General Assembly's Office of State Auditor summarizes its working definition of corruption as:

> *"Corruption involves state employees or officials using their influence in a business transaction, contrary to their duty to the State or the rights of another, in order to procure some benefit for themselves or another person.*
>
> *Common examples include:*
>
> *Soliciting or accepting a bribe or kickback*
> *Bid rigging*
> *Illegal gratuities*
> *Extorting funds from third parties*
> *Engaging in transactions where a conflict of interest is present." 1*

The United Nations anti-corruption agency defines governmental corruption as the

> *"use of public office for private gain." 2 3*

## Investigating and Prosecuting Corruption - Best Practices

Nearly 20 years ago, The United Nations Office on Drugs and Crime (UNODC) adopted and published guidelines and best practices for investigating and prosecuting corruption. The purpose was to assist governments in dealing with corruption.

The United Nations Handbook on Practical Anti-Corruption Measures for Prosecutors and Investigators identifies these four key responses to governmental corruption:

> *1. **Criminal** or **administrative prosecutions**, leading to possible imprisonment, fines, restitution orders, or other punishment;*
> *2. **Disciplinary actions** of an administrative nature, leading to possible employment-related measures such as dismissal or demotion;*

---

1 HTTPS://LEG.COLORADO.GOV/AGENCIES/OFFICE-STATE-AUDITOR/WHAT-FRAUD

2 UNITED NATIONS HANDBOOK ON PRACTICAL ANTI-CORRUPTION MEASURES FOR PROSECUTORS AND INVESTIGATORS (2004), 23.

3 WORLD BANK GROUP, *HELPING COUNTRIES COMBAT CORRUPTION: THE ROLE OF THE WORLD BANK*, (ENGLISH)(WASHINGTON, D.C., 1997), 8.

1

> *3. __Civil proceedings__ in which those directly affected (or the State) seek to recover the proceeds of corruption or ask for civil damages; and*
> *4. __Remedial actions__, such as the retraining of individuals or restructuring of operations in ways that reduce or eliminate opportunities for corruption (but without necessarily seeking to discipline those involved). [4]*

The UNODC handbook is a compilation of peer-reviewed anti-corruption methodologies. [5]

## Basic Facts

Colorado's court system is administered by the Judicial Department, which is centrally managed by the Chief Justice of the Supreme Court. To assist the Chief Justice, the Supreme Court appoints the State Court Administrator (SCA). The Department has more than 300 judges and 3,600 support staff members.[6]

We learned in 2022 that the Colorado Judicial Department had, for many years, covered up allegations of judicial misconduct.[7]

Colorado had established the existing system of investigating and resolving allegations in 1966. Judicial misconduct complaints were to be referred to the Colorado Commission on Judicial Discipline ("CCJD"). The Judicial Department's systemic failure to do so formed the foundation of this scandal.

This scandal emerged after years of covering up complaints of wrongdoing from within the Judicial Department. For example, of the 6 judicial misconduct complaints referenced in the "Memo" and sampled by the Investigative Law Group, the Department had referred only 1 to the Commission on Judicial Discipline. [8]

---

[4] THE UNITED NATIONS HANDBOOK ON PRACTICAL ANTI-CORRUPTION MEASURES FOR PROSECUTORS AND INVESTIGATORS (2004), 45); HTTPS://WWW.UNODC.ORG/DOCUMENTS/TREATIES/CORRUPTION/HANDBOOK.PDF

[5] PROFESSIONAL PEER REVIEW OF THE UNODC RESEARCH FUNCTION, FINAL REPORT, MAY 2018. HTTPS://WWW.UNODC.ORG/DOCUMENTS/DATA-AND-ANALYSIS/PPR_REPORT.PDF

[6] ARTICLE VI, COLO. CONST.; JUDICIAL DEPARTMENT, FISCAL YEAR 2024 PERFORMANCE PLAN, NOVEMBER 1, 2023), 3. HTTPS://WWW.COURTS.STATE.CO.US/USERFILES/FILE/ADMINISTRATION/PLANNING_AND_ANALYSIS/SMART%20ACT/FY23-24%20SMART%20ACT%20REPORT.PDF

[7] ROBERT C. TROYER & NICHOLAS E. MITCHELL, INDEPENDENT INVESTIGATION INTO THE LEADERSHIP SERVICES CONTRACT AWARDED BY THE COLORADO JUDICIAL DEPARTMENT TO THE LEADERSHIP PRACTICE, LLC (2022)[HEREINAFTER TROYER REPORT], 42-43.

[8] INVESTIGATIONS L. GRP., COLORADO JUDICIAL BRANCH INVESTIGATION REPORT AND ASSESSMENT OF WORKPLACE CULTURE (2022) [HEREINAFTER ILG REPORT], 9. https://www.courts.state.co.us/userfiles/file/announcements/ILG—Colorado%20Judicial%20Branch%20Final%20Report—7-11-2022.pdf

**The Masias affair**

Senior Judicial Department officials withheld those complaints. The senior Department official who became most closely associated in the public mind with withholding the misconduct allegations was the Department's chief of staff, Mindy Masias. She served at the pleasure of the Supreme Court and was slated to be terminated from her chief of staff position "for cause."

She worked in the Department for many years. In early 2019, through another colleague, she approached the supreme court's Chief Justice with a threat and a proposal. They presented the chief justice, in his role as administrative head of the Department, with the threat that the senior employee was prepared to go public with past judicial misconduct allegations and other "dirt" that had been covered up over the years. The document listing examples of past allegations suppressed became known as the "Memo." As an alternative to disclosure, she offered to resign and keep quiet if she was awarded a $2.75 million contract and given additional benefits.

Rather than being terminated for cause as planned before the "Memo" threat, the chief of staff was allowed to quickly resign on her own terms. She signed a nondisclosure agreement promising to keep secret information about her employment, which included the "Memo" topics. They gave her the benefits she requested and assured her of a good recommendation. A short time later, she was also awarded the $2.75 million contract previously requested.

The contract award violated Judicial Department procurement rules. As the state auditor explained, senior Department officials attempted "to influence the [Request for Proposals], sole source contract, and related processes in favor of [the chief of staff], and ultimately resulting in the award of a sole source contract to [the chief of staff]."[9] While some details remain disputed, even the Department's investigator concluded that the Department's senior leaders entered this contract to silence the chief of staff and buy her happiness.[10]

Investigative findings support the notion that the events fit within the definition of "corruption." This is what corruption looks like. We next ask if there was a "cover-up" of this corruption.

**Cover-up**

A "cover-up" is an attempt, whether or not successful, to conceal evidence of wrongdoing, error, incompetence, or other embarrassing information. [11]

---

[9] COLO. STATE AUDITOR, *EXECUTIVE SUMMARY OF FRAUD HOTLINE INVESTIGATION REPORT* (FEBRUARY 4, 2022), 5-6; HTTPS://LEG.COLORADO.GOV/SITES/DEFAULT/FILES/IMAGES/LCS/OSA_EXECUTIVE_SUMMARY.PDF ; *SEE ALSO* CHIEF JUSTICE'S LETTER TO JUDICIAL DEPARTMENT PERSONNEL, COLORADO JUDICIAL BRANCH (FEB. 7, 2022), 3.

[10] HEARING BEFORE THE LEGIS. INTERIM COMM. ON JUD. DISCIPLINE HEARING ON JUNE 12, 2022, 73RD GEN. ASSEMB. (COLO. 2022) [HEREINAFTER LEGIS. INTERIM 6/12/22], STATEMENT OF RCT, LTD., AT TIME STAMP 04:43.

[11] TIMOTHY KUNDRO, *UNDERSTANDING WHEN AND WHY COVER-UPS ARE PUNISHED LESS SEVERELY*, 64 ACADEMY OF MANAGEMENT JOURNAL 120 (2021).

A list of classic cover-up methods has been compiled from famous cover-ups such as the Watergate Scandal, Iran-Contra Affair, My Lai Massacre, Pentagon Papers, the cover-up of corruption in New York City under Boss Tweed and the tobacco industry cover-up of the health hazards of smoking. [12]

There is evidence of a long-lasting and extensive practice of covering-up and not reporting instances of misconduct within the Judicial Department. The Department's own investigators found a culture of not reporting misconduct and gathering "dirt" on people to be used as leverage for personal power and gain at a later time.[13]

It also should come as no surprise that there was evidence of continued cover-ups after the scandal broke into public view in July 2019.

**An example of ongoing cover-up: withholding the "Memo"**

The "Memo" provides an important focal point.

First, the "Memo" is a smoking gun in the classic sense of the term. It was written by people with personal knowledge of the events it described. And, it documented facts, the disclosure of which formed one side of an alleged quid pro quo scheme. Second, its gradual and grudging disclosure shows how the Judicial Department attempted to cover up its existence, even as details of the scandal unfolded.

The Supreme Court's seven members comprised a "collegial court" which had a close working relationship among themselves and with the Department's chief of staff. It is reasonable to infer that, most likely, the justices would have known of her pending termination and her threat to disclose "dirt" about the court itself. Probably this would have been a topic of some discussion. Whether the justices had physically viewed the "memo" they likely had learned of its contents. Ultimately, these inferences were confirmed to be the case.

**Table I - The "Memo" Timeline - from Creation to its Disclosure**

| January 2019 | Eric Brown reads "Memo" to Chief Justice Coats (who, eventually, asks him to stop reading). The "Memo" references information Mindy Masias had secretly recorded during meeting and enumerates Masias's grievances.[14] |
|---|---|
| Sometime in 2019 | Justice Hart was quoted in the media as testifying under oath in 2021 that she and other justices knew about the "Memo" sometime in 2019. [15] |

---

[12] HTTPS://EN.WIKIPEDIA.ORG/WIKI/COVER-UP

[13] TROYER REPORT, 39.

[14] ILG REPORT, 7.

[15] DAVID MIGOYA, COLORADO SUPREME COURT JUSTICES KNEW ABOUT MEMO ALLEGING MISCONDUCT 2 YEARS BEFORE IT BECAME PUBLIC, THE GAZETTE (DEC. 15, 2021).

4

| July 18, 2019 | First media story about Leadership Contract [16] |
|---|---|
| Nov. or Dec. 2020 | Publicly released audit report determined that the contract award violated rules and had an appearance of impropriety. [17] |
| February 3, 2021 | "Memo" mentioned first time in media. Judicial Dept. initially refuses to disclose (claiming privileged as work-product). [18] |
| February 4, 2021 | Judicial Dept. issued cease and desist order re: disclosure of "Memo." [19] |
| February 5, 2021 | Office of State Auditor publicly asked to include additional contract into the investigation it has been doing for the last 1-1/2 years. Judicial Department refuses to release "Memo." [20] |
| February 7, 2021 | Media reports a litigant will seek production of "Memo" in her ongoing EEOC against Judicial Dept. [21] |
| February 8, 2021 | "Memo" released to the media. [22] |
| February 9, 2021 | In an email to all Justices, Judges and all Judicial Personnel, the Supreme Court states: "Today, we met as a court and viewed the memo for the first time." [02-08-2021] [23] [24] |
| December 15, 2021 | Media reports Justice Hart's testimony that the justices knew of "Memo" in 2019, contradicting court's narrative that it only learned of the "Memo" in February 2021.[25] |

This appears to be an attempt to cover up the Memo's existence and the allegations which it contained. Throughout this saga there are multiple reported instances of the Judicial Department controlling the investigations, stonewalling requests for information, limiting access to evidence, and causing unexplained delays, i.e. classic tactics of a "cover-up."

---

[16] DAVID MIGOYA, *COLORADO'S CHIEF COURT ADMINISTRATOR RESIGNS AMID DENVER POST INVESTIGATION INTO CONTRACT,* THE DENVER POST (JULY 18, 2019). HTTPS://WWW.DENVERPOST.COM/2019/07/18/COLORADO-JUDICIAL-DEPARTMENT-RESIGNATION/

[17] OFFICE OF STATE AUDITOR, PERFORMANCE AUDIT OF THE STATE COURT ADMINISTRATOR'S OFFICE PERFORMANCE AUDIT, (NOVEMBER 2020), 59

[18] DAVID MIGOYA, *COLORADO JUDICIAL DEPARTMENT GAVE $2.5 MILLION CONTRACT TO PREVENT TELL-ALL SEX-DISCRIMINATION LAWSUIT ABOUT JUDGES*, THE DENVER POST (FEB.3,2021).

[19] DAVID MIGOYA, *COLORADO JUDICIAL DEPARTMENT SAYS CONTRACT-FOR-SILENCE ALLEGATIONS BY FORMER TOP OFFICIAL ARE FALSE - CHRISTOPHER RYAN, FORMER STATE COURT ADMINISTRATOR, STANDS BY HIS STORY*, THE DENVER POST (FEB.3, 2021).

[20] DAVID MIGOYA, *COLORADO AUDITOR TO INVESTIGATE ALLEGATIONS OF CONTRACT FOR SILENCE AT JUDICIAL DEPARTMENT LEGISLATORS CONSIDERING OWN INDEPENDENT INQUIRIES,* THE DENVER POST (FEB.5, 2021)

[21] CHRISTOPHER OSHER, *LAWSUIT MAY SHED LIGHT ON MISCONDUCT ALLEGATIONS IN STATE'S JUDICIAL DEPARTMENT*, THE GAZETTE (FEB.7, 2021).

[22] DAVID MIGOYA, *COLORADO SUPREME COURT RELEASES MEMO CITING EXAMPLES OF SEX-DISCRIMINATION, JUDICIAL MISCONDUCT THAT LED TO ALLEGED CONTRACT FOR SILENCE: MEMO BEHIND $2.5 MILLION CONTRACT RELEASED AND HIGH COURT MAINTAINS THERE WAS NO QUID-PRO-QUO*, THE DENVER POST (FEB.9, 2021).

[23] BRIAN BOATRIGHT, C.J., *SUPREME COURT MESSAGE TO THE DEPARTMENT*, COLORADO JUDICIAL BRANCH (FEB.8, 2021);

[24] In light of the later disclosure at Justice Hart's deposition, this statement appears to have been carefully crafted to leave the incorrect impression that the supreme court justices had never heard of the allegations contained in the memo, when they most likely knew of them from the outset, nearly 2 years earlier.

[25] *See* Footnote 14, *supra*.

5

## Why corruption should be investigated.

The contract for silence allegation represents an issue going to the very heart of judicial integrity and public confidence in our judicial system. As the Chief Justice stated in early 2021, the existence of the allegations caused a "crisis of confidence" in Colorado's judiciary. In our system, the judiciary is the most trusted branch of government. By the same token, it is also the branch whose effectiveness is most dependent on maintaining that public trust.

*Consider the implications:* If a sitting supreme court justice does not report a clear extortion attempt regarding a $2.75 million *administrative* decision, how would the justice respond to a similar attempt if it involved a $2.75 million *judicial* decision? If the Department covers up for a colleague accused of succumbing to extortion, how is the public to have confidence that our judges are protected from extortion or bribery? Extortion attempts should be reported and dealt with promptly.

## Special Prosecutor—suggested at the outset

As the allegations first came to light, there were multiple calls that a special prosecutor be appointed to investigate and prosecute any criminal violations. The Denver Post Editorial Board urged the appointment of a special prosecutor "to get to the bottom" of the contract-for-silence question. [26]

Similarly, Alec Garnett, Speaker of the Colorado House of Representatives, said: "I support the call for a special prosecutor to look into the specific allegations of inappropriate contracts that were issued with taxpayer money at the Judiciary," [27]

Others called for any investigation "to be totally independent of the state's legal ecosystem." [28]

Ultimately, no special prosecutor was appointed to investigate and prosecute potential criminal charges. Unlike our federal system, Colorado does not have a readily available mechanism for a special prosecutor. As a consequence, several separate and uncoordinated investigations each addressed only small portions of this scandal. As events unfolded, the Judiciary kept control of nearly all of these efforts.

The highest profile investigators who looked into this case did so without subpoena power to compel testimony or production of documents. Their much publicized findings and conclusions (about the contract-for-silence allegations) are based on limited information from fewer than

---

[26] DENVER POST EDITORIAL BOARD, *EDITORIAL: HIRE A SPECIAL PROSECUTOR TO ROOT OUT THE BAD APPLES IN THE JUDICIAL DEPARTMENT*, THE DENVER POST (FEB. 12, 2021), HTTPS://WWW.DENVERPOST.COM/2021/02/12/COLORADO-JUDICIAL-DEPARTMENT-MEMO-SUPREME-COURT-SCANDAL

[27] DAVID MIGOYA, *COURT: BRANCHES CAN PICK AUDITORS POSSIBLE INVESTIGATORS WOULD EXPLORE ALLEGED EFFORT TO KEEP JUDICIAL MISCONDUCT QUIET*, THE DENVER POST (FEB. 16, 2021).

[28] SHELLY BRADBURY, *LAWYERS WANT PROBE TO BE MODELED AFTER THE MCCLAIN INQUIRY*, THE DENVER POST (MARCH 3, 2021).

all the "key players." In fact, for the main allegations, they appeared to have been provided only one side of the story.

The most serious misconduct related to the contract occurred from November 2018 through March 2019. No criminal information or indictment was filed before the applicable felony statute of limitations probably ran out in March 2022. The highest profile investigations did not release until after this date. [29]

Compare how California recently investigated another legal system scandal. That scandal involved a prominent personal injury attorney who had avoided discipline because of an inappropriately special relationship with certain employees within California's attorney regulatory body. The scandal investigators were "empowered under the [California's] Business & Professions Code to issue subpoenas, take testimony of witnesses, and compel the production of documents." [30]

In Colorado, the target agency controlled the investigations of its own conduct. The corruption allegations were entirely centered within one agency, i.e. the Judicial Department. Thus, it was that agency which was the target of all the investigations.

While, the target agency was the Colorado Judicial Department, confusion is understandable because the Chief Justice of the Colorado Supreme Court oversees that agency. Unlike, say, for example, the Department of Transportation, this agency has a unique aura. We are accustomed to seeing the Supreme Court as incorruptible and as the last word on contested matters. But, in fact, the Supreme Court performs dual roles: both as judicial decision maker and as administrator of the judicial system's bureaucracy.

Throughout the ensuing investigations, these agency roles were blurred and confused. This probably contributed to the inadequacy of the response to this corruption scandal.

When this scandal was first exposed to the public in July, 2019, the Supreme Court jumped out in front of calls for a special prosecutor and proposed "independent" investigations into the alleged wrongdoing. The Court issued a press release: "[T]he Colorado Supreme Court today announced it has invited the state's other government branches to select external investigators who will independently examine allegations of sexual harassment and gender discrimination within the Judicial Branch, and of claims that a training services contract was awarded improperly to a former senior administrator." [31]

---

[29] TROYER REPORT (PUBLISHED ON 06-22-2022); ILG REPORT (PUBLISHED ON 07-11-2022); STATE AUDITOR'S FRAUD HOTLINE EXECUTIVE SUMMARY (PUBLISHED 02-04-2022).

[30] HALPERN, MAY, YBARRA, GILBERT LLP , *INDEPENDENT INVESTIGATION FOR THE STATE BAR OF CALIFORNIA: REPORT OF INVESTIGATION* BY (FEBRUARY 4, 2023) HTTPS://WWW.CALBAR.CA.GOV/PORTALS/0/DOCUMENTS/REPORTS/MAY-REPORT-AND-ADDENDUM-REDACTED.PDF

[31] COLORADO JUDICIAL DEPARTMENT, *PRESS RELEASE: COLORADO SUPREME COURT REQUESTS OUTSIDE PANEL TO SELECT INDEPENDENT INVESTIGATORS* (FEB.16, 2021). HTTPS://WWW.COURTS.STATE.CO.US/MEDIA/RELEASE.CFM?ID=1962

The state's other government branches organized a special panel which then issued a request for investigation proposals. The panel then *selected* two law firms to conduct investigations into some of the allegations. It is important to note that, these investigations were only independently *selected*.

The investigators were RCT, Ltd. and ILG. Describing these investigations as "independent" is wrong because they remained under the employing agency, the same agency being investigated. Even though the request for proposals described questions to be investigated, the agency changed the scopes of these investigations; placed certain issues off limits; negotiated and administered the contracts; kept fiscal control; had ultimate and unreviewable control of the information to be provided; failed to enforce important compliance with the RFP; and most importantly, controlled the timing and content of criminal referrals to law enforcement.

Because of the Supreme Court's dual role, i.e. as final word on privilege claims and as the target agency, it had unreviewable control over the investigators' access to information. This was a fundamental conflict of interest.

Prior statements by those at the top of the Judicial Department made it clear how the Supreme Court intended the "contract-for-silence" investigation to come out: "The Judicial Department *categorically denies* that the contract for leadership training was awarded to The Leadership Practice in June 2019 due to blackmail or to keep information about the Department quiet." (emphasis supplied) [32]

This scandal and ensuing calls for investigations broke at the beginning of the 2021 legislative session, when legislators were busy with the usual press of legislative business. When the Judicial Department stepped forward, proposing what sounded like full cooperation and investigations, the public outcry subsided.

The public and the media then focused their attention on the eventual outcome of these investigations. Few realized the degree of control that the subject of the investigation would exert over the investigations.

## Various investigations of the scandal

The following table lists and summarizes the various investigations into the Judicial Department scandal. It lists them in the order in which they began and shows the dates when they were active.

---

[32] COLORADO SUPREME COURT, LETTER TO "ALL JUDGES AND COURT PERSONNEL" (FEB.4, 2021).

**Table II: Investigations prompted by Judicial Department scandal**

| Investigating agency | Start Date | End Date | Scope of Investigation | Result |
|---|---|---|---|---|
| State Auditor Fraud Hotline Investigation | 05-29-2019 [33] | 02-04-2022 | Four (4) instances of occupational fraud | Referred the Judicial Department's Chief of Staff, head of Human Resources Division and Court Administrator to law enforcement authority. |
| State Court Administrator | Approx. 04-30-2019 | Unknown | Unknown | Referred to by Chief Justice Boatright during testimony at SMART hearing. [34] |
| State Auditor Performance Audit | March 2020[35] | 11-18-2020 | Performance audit of State Court Administrator's Office. Started because of the Fraud Hotline report. [36] | Many deficiencies noted, including appearances of impropriety in violation of the Judicial Code of Conduct, including a sole source contract. |
| FBI and US Attorney [37] | at least before 09-30-2021 | unknown | 4 people questioned regarding the contract award. | Unknown |
| RCT, Ltd. | October 2021 | 06-22-2022 | Whether contract-for-silence | No contract-for-silence on part of Coats, but in testimony RCT said contract given by the Judicial Department for silence[38] |
| Investigations Law Group (ILG) | 11-03-2021 | 07-11-2022 | Incidents listed in memo - and institutional culture at Judicial Department. | Mixed - culture was toxic - recommendations |

---

[33] SUPRA AT FN 8, PAGE 1

[34] *Hearing of Reference* (statement of Brian Boatright, Chief Justice of Colo. Sup. Court, January 25, 2022, at time stamp 12:05:20).

[35] OFFICE OF STATE AUDITOR, PERFORMANCE AUDIT OF THE STATE COURT ADMINISTRATOR'S OFFICE, NOVEMBER 2020, 6

[36] *HEARING OF REFERENCE* (TESTIMONY OF MICHELLE COLIN, DEPUTY STATE AUDITOR, LEG. INTERIM COMM. 06-14-2022, AT TIME STAMP 05:44-:45)

[37] DAVID MIGOYA, *FBI STARTS OWN PROBE OF CONTRACT,* THE DENVER POST (SEPT. 30, 2021).

[38] TROYER REPORT, 43

| Denver District Attorney | Approx. 02-04-2022 | 05-30-2022 | Potential criminal charges against SCAO officials arising out of "Leadership Contract" | Declined prosecution - too close to statute of limitations & evidence withheld by Judicial Department.[39] |
|---|---|---|---|---|
| Interim Committee on Judicial Discipline | 05-20-2022 | 12-2022 | Consider legislative remedies to restore public confidence in the judicial discipline system | Change funding for judicial discipline commission; Change discipline procedures and reporting obligations. Limit uses of nondisclosure agreements, provide Ombudsman for complainants. Amend state constitution |
| Office of Attorney Regulation Counsel | Unknown | 01-20-2023 | Investigated whether former CJ Coats should be professionally disciplined. | Declined to discipline. |
| Colorado Commission Judicial Discipline | Unknown | 05-04-2023 | Potential violations of Code of Judicial Conduct by former Chief Justice Coats. | C.J. Coats agreed he violated the Code of Judicial Conduct. He was publicly censured. |

**Office of State Auditor - Fraud Hotline Investigation**
This was the first of the approximately ten (10) investigations spawned by this scandal. Notably, while it began first, it was among the last to finish.

Of the two OSA investigations, this was the first. It was in response to an anonymous tip that carried a statutory mandate to investigate. Under statute, the target agency, in this case the Judicial Department, elected to have the OSA conduct this investigation on behalf of the Department. From the beginning, the Judicial Department knew this audit could result in criminal referrals to law enforcement.

---

[39] SHELLY BRADBURY, *NO CRIMINAL CHARGES IN WAKE OF AUDITOR'S REPORT OF FRAUD, MISUSE OF PUBLIC FUNDS BY COLORADO JUDICIAL DEPARTMENT EMPLOYEES: DENVER DA'S OFFICE SAYS IT WAS UNABLE TO ACT ON STATE AUDITOR'S REPORT BEFORE STATUTE OF LIMITATIONS EXPIRED*, THE DENVER POST (JUNE 1, 2022)

10

How much time is needed for a complete investigation? The OSA Performance Audit of the State Court Administrator's Office was completed within 8 months. The "Leadership Contract" investigation by RCT, Ltd. required 8 months. Similarly, the Investigations Law Group, LLC (ILG) investigation, also lasted 8 months.

For further comparison, the OSA Performance Audit evaluated the time to complete the Judicial Department's nine (9) internal investigations occurring during Fiscal Years 2017 through 2020. They lasted between 27 and 60 days. [40]

Despite the Fraud Hotline investigation beginning shortly after the alleged occupational fraud in March-April 2019, the final report was not completed and sent to law enforcement until just before the 3-year statute of limitations ran, i.e. more than 2-1/2 years. This was over 4 times as long as the 3 other investigations into the same set of circumstances.  The auditor's delay in referring for possible criminal charges to Denver DA was attributable to slow-walking by the Judicial Department, until it was too late for the DA to investigate and file within the statute of limitations.

**Office of State Auditor - Performance Audit**
The anonymous tip which triggered the OSA Fraud Hotline investigation, which in turn prompted a separate audit ("Performance Audit") of conduct and practices within the Judicial Department. [41]

Unlike the Fraud Hotline investigation, this audit was independent of the agency being audited and was not hindered by confidentiality claims. The investigation began in March 2020 and completed with a public report issued on November 18, 2020. [42]

Among many other adverse findings, the audit specifically found the $2.75 million sole-source contract award by the Judicial Department had been attended by an "appearance of impropriety."

There has been no sign that either the Judicial Department or the OSA reported this official audit finding to law enforcement or ethics oversight entities for further investigation or consideration of criminal charges. [43]

**RCT, Ltd—"Contract Investigation"**
The Judicial Department tasked RCT investigators to fulfill the RFP that the special panel had issued. However, the firm's actual contract for its work was negotiated, administered, controlled, and paid by the target agency itself.

---

[40] COLO. STATE AUDITOR, PERFORMANCE AUDIT JUDICIAL DEP'T, STATE COURTS ADMIN. OFFICE (2020), 32. HTTPS://LEG.COLORADO.GOV/SITES/DEFAULT/FILES/DOCUMENTS/AUDITS/2052P_STATE_COURT_ADMINISTRATORS_OFFICE_PERFORMANCE_AUDIT_NOVEMBER_2020.PDF.

[41] SEE FOOTNOTE 35, SUPRA.

[42] SEE FOOTNOTE 35, SUPRA.

[43] ID

11

A vital part of administering this contract was insuring that the investigators actually answered the question posed by the RFP, i.e.:

> *(2) Contract Investigation: an independent investigation into circumstances surrounding the award of a contract for leadership services to a former Chief of Staff in the Office of the State Court Administrator, Attachment 2 (the "Leadership Services Contract"), <u>including allegations that the contract was approved in order to keep confidential alleged misconduct in the Judicial Department</u>. Additionally, the Contractor shall make recommendations to the Colorado Supreme Court and State Court Administrator regarding process improvements to its procurement and contracting processes for accountability, fairness, and transparency. (emphasis supplied)*[44]

RCT's report concluded: **"**We found no credible evidence that [Chief Justice] <u>Coats's</u> attitude, conduct, or motive <u>was influenced by a desire to hide the alleged misconduct in the Judicial Department</u>.**" [45]**(emphasis supplied)

But this conclusion addresses only part of the broader question posed by the RFP, i.e. Was the leadership contract approved in order to keep confidential alleged misconduct in the Judicial Department?

During testimony before a legislative committee, the RCT investigators conceded that:

> *" [the Department's] three most senior and powerful officials were able to engineer this contract for Mindy Masias for their own reasons.*
> *. . .*
> *There was mismanagement. There was misjudgment. There was misconduct."[46]*

The Judicial Department's most senior and powerful civilian official, former State Court Administrator Chris Ryan, stated that the Judicial Department awarded the contract to Masias in order to keep her silent. **[47]**

---

[44] REQUEST FOR PROPOSAL - INDEPENDENT INVESTIGATION SERVICES, EXHIBIT A, SCOPE OF WORK, A-1 (2), PAGE 24.

[45] TROYER REPORT, 46.

[46] HEARING BEFORE THE LEGIS. INTERIM COMM. ON JUD. DISCIPLINE HEARING ON JUNE 12, 2022, 73RD GEN. ASSEMB. (COLO. 2022) [HEREINAFTER LEGIS. INTERIM 6/12/22] (STATEMENT OF RCT, LTD., AT TIME STAMP 04:43).

[47] DAVID MIGOYA, DENVER GAZETTE, *WHISTLEBLOWER TESTIFIES OF EFFORT TO "PROTECT … THOSE WHO WEAR THE ROBES."*(AUGUST 10, 2022)

The assigned question had been whether the contract was awarded to cover up threatened disclosure of misconduct allegations. RCT's written report sidestepped answering the question, but ultimately, RCT's oral testimony confirmed that the answer was: Yes. [48]

Several members of the Interim Committee and other critics viewed RCT's written conclusion skeptically. Given the limitations of the process and the report, this skepticism was inevitable.

**Investigations Law Group (ILG)—relevant findings from its "workplace investigation"**
The RFP required the Investigations Law Group (ILG) to perform a fair, objective and neutral investigation into alleged discrimination, sexual harassment and hostile work environment ("Work Environment Investigation"); consider referrals of violations of the code of judicial conduct to the Colorado Commission on Judicial Discipline and process for such referrals and to develop a comprehensive record of allegations and evidence supporting and refuting the allegations to enable the Colorado Supreme Court and Judicial Department to make informed decisions regarding the matters in the allegations. [49]

> *This investigation shall include but not be limited to alleged incidents described in the Memorandum and incidents of alleged discrimination including but limited to, sex discrimination, sexual harassment, and a sexually hostile work environment, alleged to have occurred within the past 5 years as follows:*
>
> *Sex-based discrimination and harassment–both individual incidents and systemic patterns–<u>pertaining to</u> any judicial district, the Colorado Court of Appeals, <u>the Colorado Supreme court</u> and all employees of the Colorado Judicial Branch.* [50]

> *The investigation shall consider the following:*
>
> *1. <u>All allegations from the Memorandum of discrimination</u> including but not limited to sex discrimination, sexual harassment, sexually hostile work environment or other misconduct alleged in recently released documents, even if more than 5 years old, including the extent to which such allegations were reported, known, and/or investigated; . . ..[51]*

---

[48] ID.
[49] RFP, 25
[50] RFP, 25
[51] RFP, 25, A-2

13

ILG made findings regarding the alleged incidents of misconduct against judges. While ILG investigated many other allegations, this report focuses only on those of judicial misconduct. They are:

*INCIDENT: Anonymous letter alleging misconduct of then-Chief Justice Rice.*

The "Memo" alleged that several members of leadership received a written complaint alleging "potentially unlawful behavior" against the Chief Justice and an IT leader.[52] It alleged the director of the Human Resources division was instructed not to investigate the allegations. Importantly, the "Memo" also alleged that the HR director was instructed to destroy the complaint.

ILG's investigation found that, despite several copies of the complaint existing and several of the justices recalling seeing it, no copies (paper or digital) survived. It concluded that the complaint should have been investigated under the Judicial Department's Anti-Harassment and Anti-Discrimination policy but that it was not. [53]ILG found leadership discounted the letter.[54] Without talking to the HR director, ILG could not determine if the HR director had been instructed to destroy the missing letter.

ILG rightfully takes issue with the failure to investigate this anonymous discrimination complaint. In doing so, ILG quotes from then-subsection (3) of Chief Justice Directive [CJD] 08-06. But, ILG did not to refer to that CJD 08-06's duty to report the allegation to the Colorado Commission on Judicial Discipline. No such referral appears to have been made.

While ILG's written report discounted the characterization in the "Memo," the objective facts discovered by ILG appear to support its allegations that (a) leadership directed that the complaint not be investigated and (b) that the records of the complaint be destroyed.

*INCIDENT: Complaint against two supreme court justices*

Among other things, ILG was publicly tasked with investigating all the incidents described in the "Memo." One such incident was the "EEOC Complaint against two Justices." This referred to what became the case of *Brown and Maikovich v. Colorado Judicial Department[55].* This was a claim of racial and age discrimination implicating, among others, two sitting Supreme Court justices. "ILG was directed to remove this item from the scope of work because the matter was in current litigation."[56] Even though the matter was in litigation at the time the scope of work was defined and when ILG was tasked with investigating it, there should have been some

---

[52] ILG REPORT, 10-11
[53] ILG REPORT, 15
[54] ILG REPORT, 15
[55] 1:16-CV-03362-MEH)(D.COLO.)(FILED 09/17/2018); DISMISSAL AFFIRMED 10TH CIR. CT. OF APPEALS, 22-1065 (07/23/2023).
[56] ILG REPORT, 8.

14

attempt to look into this matter. Or, a request to change the Judicial Department's earlier directive should have been made. Multiple depositions had occurred in this case and would have provided evidence from which to evaluate the allegation.

> *INCIDENT: Harassment Complaint against Court of Appeals judge, now justice of the Supreme Court*

Another of the "Memo's" allegations was that a court of appeals judge had been accused of sexual harassment by a female member of his staff. Coincidentally, the accused was applying for a position on the Supreme Court. The "Memo" alleged that "per the chief justice," HR was directed to negotiate a release agreement to protect that judge from negative consequences and particularly to protect him in his application for higher office. Although the Judicial Department's HR division investigated the staff member's complaint, ILG determined that the required HR file was incomplete and lacked important documentation.[57]

HR did not refer the allegation against the court of appeals judge to the Colorado Commission on Judicial Discipline. A nondisclosure agreement was negotiated with the staff member. While three people know what happened, without subpoena power, ILG could only get the accused judge's version of events.

As with the complaint against the chief justice, the objective facts ILG uncovered appear to support the core allegations that a cover-up occurred here.

> *ILG not permitted to investigate all incidents of alleged discrimination from the past 5 years.*

As the scandal first came to light, the Chief Justice announced the Judicial Department would hire investigators to conduct the investigations defined by the special panel's scope of work. Request for Proposal No. 21022, Colo. Jud. Dep't, 25–26 (Apr. 20, 2021) [hereinafter RFP] (on file with the Colo. Jud. Dep't) ("This investigation shall include . . . incidents of alleged discrimination . . . [which] occurred within the past 5 years . . . .").[58] However, the Judicial Department does not appear to have allowed all of this part of the promised investigation.

RCT's report showed that the Department has engaged in suppressing allegations of judicial misconduct for many years. The failure of the Department to implement the special panel's scope of work with ILG means we do not know the extent of, types of misconduct involved in, or tactics used in that suppression of all complaints.

Despite limitations placed on ILG's work, its investigation discloses a pattern of protecting those in leadership positions or on the Supreme Court.

---

[57] ILG REPORT, 22.

[58] RFP, 26.

- **Denver District Attorney**

The Fraud Hotline investigation resulted in a referral of 3 people for possible criminal charges. It made the referral to the Denver DA. However, the Judicial Department withheld from the Denver DA the evidentiary support for the allegations made. The Judicial Department delayed the referral until the eve of the statute of limitations expiration. As a result, the Denver DA could not take action or investigate. [59]

- **Interim Committee on Judicial Discipline**

Senate Bill 22-201 established clear rules for the Judicial Department to follow in providing information about judicial misconduct complaints to the CCJD. The bill was designed to prevent the withholding of information, and established a separate funding source for the CCJD so the minimize the Judicial Department's influence over the commission.

Additionally, SB22-201 established an Interim Committee on Judicial Discipline to review Colorado's system of judicial discipline. The committee conducted hearings in the Summer and Fall of 2022, and issued a report which proposed legislation and constitutional changes to restructure Colorado's system of judicial discipline.

These legislative proposals have now been enacted as law. A proposed constitutional amendment awaits a vote of the people in November, 2024.

The Interim Committee only considered legislative changes to the judicial discipline system. The Interim Committee was not tasked or empowered to investigate the facts of the Judicial Department's corruption scandal.

- **Office of Attorney Regulation Counsel (OARC)**

Attorney Regulation Counsel serves at the pleasure of the Colorado Supreme Court. [60][61]The OARC has authority over enforcing the code of ethics for lawyers.

The OARC has been implicated in enabling the ill-fated felony prosecution of Sen. Pete Lee with a false affidavit.[62] The OARC was also implicated in a series of efforts to block the investigation by the Colorado Commission on Judicial Discipline including its issuance of written threats of

---

[59] DAVID MIGOYA, DENVER GAZETTE, *NO CHARGES IN COLORADO JUDICIARY SCANDAL INVESTIGATION; PROSECUTORS CITE DELAYED REPORT*, (MAY 26, 2022), HTTPS://DENVERGAZETTE.COM/PREMIUM/NO-CHARGES-IN-COLORADO-JUDICIARY-SCANDAL-INVESTIGATION-PROSECUTORS-CITE-DELAYEDREPORT/ARTICLE_AE2125AC-DAE0-11EC-9D16-E7FD1239AF2E.HTML

[60] C.R.C.P.251.3(A); *IN RE CHESSIN V. OFFICE OF ATTORNEY REGULATION COUNSEL*, 19SA118, 2020 CO 9 (FEBRUARY 10, 2020), ¶13.

[61] HTTPS://WWW.COLORADOSUPREMECOURT.COM/ABOUTUS/ABOUTUS.ASP

[62] HTTPS://WWW.CPR.ORG/2022/10/21/JUDGE-DISMISSES-THE-CASE-ALLEGING-COLORADO-STATE-SEN-PETE-LEE-VOTED-OUTSIDE-THE-DISTRICT-HE-LIVES-IN-AND-REPRESENTED/

sanctions to members of the Colorado Commission on Judicial Discipline.[63] It is difficult to imagine these OARC actions taking place without the foreknowledge and approval of the Chief Justice.

OARC engaged private counsel to investigate a portion of the judicial corruption scandal. Like the Judicial Department, OARC did not relinquish control over the outside investigation. While OARC had authority to examine the conduct of all the lawyers involved, it limited its outside counsel to reviewing just the former chief justice as a lawyer. After finding a violation of lawyer ethics, the outside counsel recommended no action be taken. In addition, the report indicated that two unnamed lawyers also acted unethically. [64]

- **Colorado Commission on Judicial Discipline (CCJD**)

The CCJD has authority over enforcement of judicial ethics. The CCJD pursued an investigation of the judicial corruption scandal. Media reports indicate the Department raised a series of obstacles to the CCJD's work. Many of these appear to be addressed in the reform package approved by the legislature and need not be addressed further here.

Ultimately, a special tribunal of the Colorado Supreme Court publicly sanctioned the former chief justice for failing to "perform judicial and administrative duties competently and diligently," as required by Canon Rule 2.5(A) of the Colorado Code of Judicial Conduct. [65]

- **Federal Bureau of Investigation (FBI)**
The Denver Post reported in September 2021 that the FBI had questioned at least 4 persons regarding the leadership contract award. No further developments have been made public since.

## Anti-corruption Best Practices were not followed in this case

**Target agency was allowed to control the investigations**

Here is a summary of the major investigations. Notes show which agency had control over each, the investigation's scope, and the basic outcome of each.

---

[63] DAVID MIGOYA, DENVER GAZETTE, COLORADO DISCIPLINE COMMISSION ACCUSES LEGAL SYSTEM'S CHIEF OF ILLEGAL INTIMIDATION(MARCH 9, 2023).

[64] STATEMENT OF THE LEGAL REGULATION COMMITTEE, DATED 1/20/2023. HTTPS://WWW.COLORADOSUPREMECOURT.COM/PDF/1.20.23%20%20REV%20STATEMENT%20OF%20THE%20LEGAL%20REGULATION%20COMMITTEE.PDF

[65] IN THE MATTER OF THE PEOPLE OF THE STATE OF COLORADO AND NATHAN B. COATS, 2023 CO 44 (AUGUST 7, 2023)

**Table III—Summarizing Control, Scope and Outcomes of various investigations**

| Investigating Agency | Controlled by: | Scope | Outcome |
|---|---|---|---|
| RCT, Ltd. | Supreme Court | Narrow, Coats's role in contract | Report did not state whether the Judicial Department had traded contract for silence. |
| Investigations Law Group | Supreme Court | Broad: Memo allegations and departmental culture | Found multiple workplace problems and multiple judicial misconduct allegations unreported to Judicial Discipline Commission |
| OSA Fraud Hotline | Chief Justice<br>- as head of agency being investigated. | Narrow, Employee Fraud | Found corruption within the Judicial Department and referred to law enforcement, but critical delay by the Department |
| Office of Attorney Regulation Counsel | Supreme Court | Narrow, Coats' ethics as a lawyer | |
| Commission on Judicial Discipline | Supreme Court partially, but partially independent | Narrow, Coats' ethics as a judge | Recommended public censure of Chief Justice Coats. |
| OSA Performance Audit | Independent | Narrow, financial controls | Found appearance of impropriety surrounding award of contract |
| Denver Dist. Attorney. | Independent | Narrow, 3 person criminal referral without evidence | Unable to prosecute before statute of limitations because of Judicial Department withholding of information |

18

**Piecemeal investigations lacked comprehensive strategy or coordination**

There was no strategic coordination of these investigations or anti-corruption measures. They each had limited scope and tools with which to gather information. The department being investigated controlled most of the investigations.

**Silencing of critics**

The Supreme Court's Office of Attorney Regulation Counsel (OARC) issued a false affidavit which was the basis of felony charges brought against a key legislative critic. Hearings looking into the Supreme Court's corruption scandal were underway when the convening committee's chair, Senator Pete Lee voluntarily withdrew from the committee because of the felony charges. The charges were eventually dismissed but not until after this key critic had been silenced.[66]

The Court's OARC similarly threatened action against attorney and judge members of the Colorado Commission on Judicial Discipline (CCJD) in response to testimony about the Court's hindering of CCJD's investigation into the scandal.[67]

During the Interim Committee proceedings, the Colorado Coalition Against Sexual Assault presented the written testimony of a victim of judicial sexual harassment. The victim's testimony explained that in 2022, long after the corruption scandal allegations became public, she was subjected to intimidation tactics when she made a complaint against a judge. These tactics, employed by OARC personnel, were so severe the victim reported she contemplated suicide rather than move forward with her complaint against an abusive judge.

**Use of Nondisclosure Agreements from Key Witnesses**

The Judicial Department routinely procured nondisclosure agreements from employees being terminated.[68] Such agreements likely impeded the investigators' ability to interview witnesses investigating various aspects of this scandal.

Since this scandal, the use of NDA's by state agencies is now generally prohibited under similar circumstances. [69]

---

[66] Marianne Goodland, *Indictment Against State Sen. Pete Lee Dismissed*, Denver Gazette (Oct. 21, 2022), https://denvergazette.com/politics/elections/indictment-againststate-sen-pete-lee-dismissed/article_8107e8bb-b15e-55ae-9137546e79cddb92.html

[67] David Migoya, Denver Gazette, *Colorado discipline commission accuses legal system's discipline chief of illegal intimidation*, (May 9, 2023)

[68] Troyer Report, 39-40.

[69] Senate Bill 23-053 (signed into law June 2, 2023) which enacted sections 22-1-1355, 24-50.5-105.5 and 29-1-1601, C.R.S.; ILG Report, 9.

**Slow-Walking the State Auditor's Fraud Hotline investigation and its referrals to law enforcement**

The Judicial Department appears to have "slow-walked" the Office of State Auditor's Fraud Hotline investigation. Drawn out negotiation over extensive claims of privilege, scope and demands for review and redactions were such that ultimately the referrals for prosecution came with too little too late. An auditor testified before the Interim Committee:

> *"I would say the [Judicial Department's] review process extended our investigation time line - quite extensively."[70]*
>
> *Michelle Colin, Deputy State Auditor*

As listed at **Table II**, above, the Fraud Hotline Investigation took more than 2 years, 7 months to complete. This was 4 times longer than any of the other investigations. The Judicial Department, reportedly demanded that the final Fraud Hotline Report contain major redactions of certain content—before it could be disclosed to law enforcement. [71]

By the time prosecutors got the cases, they could not proceed before the 3-year statute of limitations would run.[72] Regardless of the Judicial Department's motivation, its conduct effectively hindered law enforcement investigation and prosecution of the Department's officials.

**Delayed referrals to Colorado Commission on Judicial Discipline**

The ILG investigation of judicial misconduct allegations revealed that, despite an obligation to do so, the Judicial Department failed to refer complaints to the Colorado Commission on Judicial Discipline. ILG found that of a sample of 6 complaints, only 1 had been referred to CCJD.

Colorado has time limitations for bringing a judicial misconduct complaint. So, the longer the Judicial Department delayed reporting to CCJD or providing requested discovery materials, the greater the likelihood that the complaint would never see the light of day.

---

[70] HEARING BEFORE THE LEGIS. INTERIM COMM. ON JUD. DISCIPLINE HEARING ON JUNE 14, 2022, 73RD GEN. ASSEMB. (COLO. 2022) [HEREINAFTER LEGIS. INTERIM 6/14/22] (STATEMENT OF MICHELLE COLIN, DEPUTY STATE AUDITOR, AT TIME STAMP 15:08).

[71] Shelly Bradbury, *No criminal charges in wake of auditor's report of fraud, misuse of public funds by Colorado Judicial Department employees: Denver DA's Office says it was unable to act on state auditor's report before statute of limitations expired*, The Denver Post (June 1, 2022)

[72] DAVID MIGOYA, *NO CHARGES IN COLORADO JUDICIARY SCANDAL INVESTIGATION; PROSECUTORS CITE DELAYED REPORT*, DENVER GAZETTE (MAY 26, 2022), HTTPS://DENVERGAZETTE.COM/PREMIUM/NO-CHARGES-IN-COLORADO-JUDICIARY-SCANDAL-INVESTIGATION-PROSECUTORS-CITE-DELAYEDREPORT/ARTICLE_AE2125AC-DAE0-11EC-9D16-E7FD1239AF2E.HTML

20

## Mistakes made at start of scandal investigation

- Failure to recognize why the Judicial Department quickly stepped forward with a plan to hire and control *its own* law firms to investigate *its own* alleged corruption.

- No one appointed with subpoena power to compel testimony and document production.

- Failure to anticipate that the Judicial Department would ultimately control the flow of information to the investigators.

- Failure to recognize the Supreme Court's dual role which gave it the final say on what testimony and documents could be investigated. Unlike other state agencies, the Colorado Judicial Department is administered by a judicial officer, the Chief Justice of the Colorado Supreme Court. The Supreme Court also serves in a judicial function which gives it the power to decide disputes over its claims of privilege or scope. Making any decision to withhold evidence unreviewable.

- The Office of State Auditor lacked a deadline for completion of its Fraud Hotline examination. It lacked any mechanism to prevent slow-walking of its investigation by the Judicial Department.

- The Fraud Hotline statute [73] does not specify a trigger date for when the OSA must make a law enforcement referral. But the OSA believed it needed to wait until it completed its report and the Judicial Department finally signs off.[74]

- There has been no inquiry into the apparent failure of officials at the Judicial Department to approach law enforcement for investigation and prosecution of governmental corruption. Neither are we aware of any investigation of the obstruction and delay of investigations that occurred after 2021.

- RFP process used to hire the outside investigators (RCT and ILG) was deficient because:

  - It provided no mechanism allowing the retained investigators to compel testimony and document production;

  - There was no restriction upon the Judicial Department being investigated from changing the scope of the investigation;

---

[73] SECTION 2-3-110.5, C.R.S.

[74] LEGIS. INTERIM 6/14/22] (STATEMENT OF MICHELLE COLIN, DEPUTY STATE AUDITOR)

21

- o There was no mechanism for contesting and resolving Judicial Department objections information requests;

- o The investigators were to be paid by the Judicial Department, thereby creating an appearance of dependence;

- o The RFP failed to specify the legal relationship between law firm investigators and the Judicial Department, i.e. not attorney-client;

- o The RFP failed to require that the investigators cite standards of conduct applicable to the various scandal participants, i.e. Judicial Department employees, attorneys, judicial officers.

## Summary of How Anti-corruption Best practices were applied

*1.  **Criminal** or **administrative prosecutions**: No special prosecutor was appointed. No formal criminal investigation or prosecution was instituted. The target agency, i.e. Judicial Department, controlled the timing and scope at critical stages.*

*2. **Disciplinary actions of an administrative nature**: The Judicial Department's chief executive head, the Chief Justice, was publicly censured for his involvement in the scandal.*

*3. **Civil proceedings seeking recovery of the corruption proceeds**: The leadership contract was unilaterally canceled, without litigation. No public funds were paid under this contract.*

*4. **Remedial actions:** The legislature instituted wide-ranging reforms of the judicial discipline system. Multiple investigations recommended wide sweeping reforms at the Judicial Department, which has assured the public that these recommendations have or will be adopted.*

22

## Conclusion and Recommendations

Conspicuously absent from this corruption scandal is a criminal prosecution. This is despite multiple indicators of criminal wrongdoing. The State Auditor's Performance Audit found multiple appearances of impropriety in violation of Judicial Code of Conduct, including the procurement of a multimillion dollar sole source contract. The Fraud Hotline investigation made multiple referrals for criminal prosecution.

There has never been closure on the scandal. In February 2021, the Chief Justice acknowledged a "crisis of confidence" in the judiciary. The lack of a complete or credible investigation of the corruption allegations and the cover-up during the investigations themselves have stoked rather than eased that crisis.

Was everyone (all agencies) relying on someone else to get to the bottom of this scandal? i.e. divided uncoordinated response?

This happens when the target agency may control the investigation. From the denials and slow disclosure of the "Memo" throughout the investigative process to the slow-walking of the final Fraud Hotline Report, it appears that cover-ups dominated from beginning to end.

Colorado needs to develop a mechanism capable addressing the next governmental corruption scandal. The mechanism needs to be effective and able to demonstrate its credibility to the People of Colorado. We need to enact a mechanism for appointing a truly independent entity to investigate allegations whether aimed at the judiciary or leadership in any other branch of government. This investigator needs the authority to follow the evidence wherever it leads and have the tools to do so. The investigator also must authorized to pursue whatever criminal or ethical consequences are warranted.

Colorado currently lacks a standing mechanism for appointing a special prosecutor under circumstances like this.

### Special Prosecutors for Public Corruption Cases

The appointment of a special prosecutor at the outset of this scandal would have resulted in a more thorough, quicker, and efficient investigation. Having independent investigators with power to subpoena information and to prosecute where appropriate would have preserved faith in the outcome.

We normally would expect corruption and potential crimes to be investigated and prosecuted by either the attorney general's office or a local district attorney. But in cases of governmental corruption it is not always so simple. For instance, in Colorado the attorney general is "legal counsel and advisor of each department, division, office, board, commission, bureau, and

23

agency of state government . . ..”[75] Therefore, the attorney general would have an inherent conflict of interest in cases involving investigation and prosecution of corruption within state agencies and departments. For example, several lawyers from within the attorney general's office were witnesses to events at the heart of this recent judicial scandal.

**Definition and Authority of Special Prosecutors**

A special prosecutor is " [a] lawyer appointed to investigate and, if justified, seek indictments in a particular case."[76]

The need for a special prosecutor may arise because the original ''prosecuting attorney is legally precluded from proceeding due to a conflict of interest"; because she or he "is faced with a difficult case beyond [her or] his investigative and legal abilities"; or because there "is corruption within the judicial/governmental system, and public confidence requires an 'uninvolved' outsider to investigate and prosecute." [77]

The need for a special prosecutor may also come from the "common sense realization that the continued integrity of the system demands one." [78]

We usually reserve special prosecutors for rare situations where a law enforcement gap or crisis renders the ordinary process defective.[79] [80]

Depending on state law, a judge, governor, attorney general, or legislature may appoint a special prosecutor. [81]

**Colorado Special Prosecutor Options**

Current Colorado law allows the appointment of a special prosecutor only under limited circumstances. Those are when a judge determines that (1) a district attorney has a conflict of interest or (2) the refuses to prosecute a case without justification.[82]

---

[75] *See* Section 24-31-101 (1)(A), C.R.S.

[76] *Special Prosecutor*, BLACK'S LAW DICTIONARY (10TH ED. 2014). A TERM SOMETIMES USED INTERCHANGEABLY WITH "SPECIAL PROSECUTOR" IS "INDEPENDENT COUNSEL," WHICH IS DEFINED AS "AN ATTORNEY HIRED TO PROVIDE AN UNBIASED OPINION ABOUT A CASE OR TO CONDUCT AN IMPARTIAL INVESTIGATION." INDEPENDENT COUNSEL, BLACK'S LAW DICTIONARY (10TH ED. 2014).

[77] 4 WAYNE R. LAFAVE, ET AL. *CRIMINAL PROCEDURE,* § 13.3(F) (4TH ED. 2015).

[78] LAWRENCE TAYLOR, *A NEEDED SPECIALTY: THE SPECIAL PROSECUTOR*, 61 JUDICATURE 220, 223 (1977).

[79] LAWRENCE T. KURLANDER & VALERIE FRIEDLANDER, *PERILOUS EXECUTIVE POWER - PERSPECTIVE ON SPECIAL PROSECUTORS IN NEW YORK,* 16 HOFSTRA L. REV. 35, 35(1987).

[80] SABRINA G. SINGER, *EMBRACING FEDERALISM IN SPECIAL PROSECUTION MODELS: AN ANALYSIS OF EXPERIMENTATION IN THE STATES*, 51 COLUM. J.L. & SOC. PROBS. 431, 434-435 (2018).

[81] SINGER, 435.

[82] *See*, Sections 20-1-107, and 16-5-209, Colo. Revised Statutes.

Neither of these existing options would likely facilitate the investigation, grand jury proceedings or other steps necessary to investigate and prosecute high-level government corruption.

**Special Prosecutor Options Available in Other States**

For example, New York law provides for the appointment of a special prosecutor by a criminal trial court judge, the legislature, or the governor.[83]

"As presently codified in section 63 of New York's Executive Law, the duties of the attorney general identify several specific areas of criminal law enforcement in which the attorney general may have direct involvement. In addition to the prosecutorial power defined under Executive Law section 63(2), they also include several other broad investigative or prosecutorial powers often associated with the office of a so-called state special prosecutor: the power, at gubernatorial or state agency request, to investigate and prosecute criminal offenses which occur within the authority or business of state agencies; the power, also upon gubernatorial direction or approval, to investigate matters involving public peace, public safety, and public justice; and the power to prosecute cases of perjury committed during the course of any such investigations or prosecutions. In addition, under section 63, the attorney general has authority to prosecute offenses in several specifically defined areas of law: the corruption of members of the Legislature and criminal violations of anti-discrimination laws; and to investigate, review complaints, or take civil action in cases involving misappropriation of public funds and fraudulent or illegal business activities." [84] [85]

In New Jersey, the attorney general has jurisdiction over all criminal matters. [86]In New Jersey, as in Connecticut and Maine, when the local prosecutor may have a conflict of interest, such as a use-of-force incident involving a police officer, the attorney general may appoint a prosecutor from a different jurisdiction, order a prosecutor's recusal, or take any "other actions as may be needed to ensure the impartiality and independence of the investigation." [87]

**Factors Related to Enabling Legislation**

The Singer law review article compares various mechanisms for enabling special prosecutor functions at the state level. Although focused on New York, the analysis is instructive.[88] The author highlights issues that are commonly addressed by enabling legislation. Such factors are:

---

[83] KURLANDER & FRIEDLANDER, 35.

[84] KURLANDER & FRIEDLANDER, 37-39

[85] *See*, NY Exec L § 63 (2022).

[86] *See,* N.J.S.A. 52:17B-98.

[87] *N.J. ATT'Y GENERAL SUPPLEMENTAL LAW ENFORCEMENT REGARDING UNIFORM STATEWIDE PROCEDURES AND BEST PRACTICES FOR CONDUCTING POLICE-USE-OF-FORCE INVESTIGATIONS*, 4 (JULY 28, 2015), HTTP://WWW.NJDCJ.ORG/AGGUIDE/DIRECTIVES/2006-5_SRT-OIS.PDF [HTTP://PERMA.CC/6W55-YT2S].

[88] SINGER, 435.

### *TRIGGERING CONDITION*

A request for a special prosecutor may be made by the legislature, the governor, the state's attorney general, a local district attorney or a court. Some states automatically trigger special prosecutor appointments in certain types of cases, for example, police shootings.

### *APPOINTMENT AND TENURE*

The appointing authority should narrowly define the special prosecutor's authority. The options are whether to provide for ad hoc appointments to address specific scandals, versus, permanent special prosecution units with unlimited tenure. Some states such as New York and New Jersey may have more corruption scandals than a smaller state like Colorado - and therefore need a permanent unit for special prosecution. The ad hoc model seems more appropriate for Colorado.

### *SELECTION*

The variables in the selection process are whether to have a pre-approved list of attorneys to act as special prosecutors, as opposed to individuals selected by the appointing authority. Scandals will involve different varieties of subject matter. We should tailor appointments to allow for selecting special prosecutors with appropriate expertise for the particular case. Colorado does not yet have enough need to warrant the maintenance of a pre-approved panel of special prosecutors. Thus, the ad hoc model would seem more appropriate here.

### *FUNDING*

The source of funding for a special prosecutor often depends on which entity made the appointment and whether that entity has its own appropriation available.

### *ADDITIONAL CONSIDERATIONS*

Additional considerations relative to adopting special prosecution mechanisms, include (1) the degree of a special prosecutor's independence from voters; (2) disclosure and transparency, and (3) legal and political feasibility.[8990]

---

[89] SINGER, 464-468

[90] ABOUT THE AUTHOR: Alan Higbie retired in 2017 after 42 years of practicing law. He served for 8 years on the 4TH JUDICIAL District Judicial performance commission.

# Appendix 27(dd)(iii)(2)

# Colo. Comm'n on Jud. Discipline PowerPoint Presentation;



January 12, 2024 Joint Judiciary Committee State Measurement for Accountable, Responsive, and Transparent Government (SMART) Act Hearing

Jim Carpenter, CCJD Vice Chair

Christopher Gregory, CCJD Executive Director



# Constitutional and Statutory Mandates

- Protect the Public from Improper Judicial Conduct

- Preserve the Integrity of the Judicial Process

- Maintain Public Confidence in the Judiciary

- Create Greater Awareness of Proper Judicial Behavior

- Provide for the Fair and Expeditious Disposition of Complaints of Judicial Misconduct or Judicial Disabilities



# Stages of a Judicial Discipline Proceeding & Standards of Proof

- Intake / Evaluation—Reasonable Grounds for Discipline Proceedings

- Complaint / Investigation—Judge's Response / Evidence Gathering

- Determination—Preponderance of Evidence (Dismissal, Informal Discipline, Decision to Initiate Formal Proceedings)

- Formal Proceedings / Adjudication—Clear and Convincing Evidence

- Recommendation--Agency Review

- Supreme Court / Special Tribunal Review—Fact Finding (Clearly Erroneous Review) / Legal Determinations (*De Novo*) with a Final Written Disciplinary Order



# Performance Measures

- Office of Judicial Discipline Operations
  - Current Employees: Executive Director, Special Counsel, Office Manager
  - Investigation Services are Provided through Independent Contracts
  - Anticipated hiring of a paralegal / public information officer in 2024 to support office operations and expanded compliance with complainant notification requirements under

    § 13-5.3-112, C.R.S.

- Improved Website
  - RFE Form Available Online--§ 13-5.3-112, C.R.S.
  - Contains the Commission's Annual Reports from 1980-Present with Statistical Information Relevant to the Data Enumerated in § 13-5.3-108, C.R.S.

- Rules Revision Project—In anticipation of the potential approval of HCR23-1001 by Voters and funding approved for FY23, the Commission is negotiating to consult with the National Center for State Courts to propose revisions to the Colo. RJD



# Performance Measures (Continued)

- Working to establish the Office of Administrative Support for Independent Agencies (ASIA), which will help the OJD and other independent agencies operate more efficiently and independently.

- Key goal for 2024 is more education for judges about ethics, the discipline process, changes in statute and potential constitutional changes.



# Core Statistics for 2023

- 346 RFEs Received (Compared with 250 in 2022)
  - Majority of Dismissed RFEs Involved Disputed Rulings (49.4%)
  - Significant # of RFEs Generalized Conspiracies or Sovereign Citizen Theories (6.9%)
  - 2023 was unique with 20.8% or 73 cases investigated through the Secretary of State's Records of Judges' financial disclosures
- 114 Jurisdictional Denials
- 84 Investigations Performed or in Process
- 62 Cases (or approximately 18% of the total RFEs received in 2023) were processed as Complaints
  - In 2 Cases, complaints were either fully or partially unsubstantiated following investigation



# Core Statistics for 2023 (Continued)

- Formal Proceedings Initiated in 2 Cases
- 1 Case was fully litigated through a Formal Adjudicatory Hearing

- Dispositions / Sanctions
  - 3 Dismissals with Concern / Deferred Disciplinary Action
  - 1 Private Reprimand
  - 2 Private Censures
  - 3 Public Disciplinary Opinions
  - 4 Cases Resulting in Resignations from Office



# Demographic Information

- Subject Judges in Cases with Recognized Complaints (Excluding Financial Disclosure Cases)
  - 73% Male / 27% Female
  - 77% White / Non-Hispanic
  - 9% Black or African-American
  - 18% Hispanic or Latino
  - 1% LGBTQ+

- Directly Impacted Persons
  - 44% Male / 56% Female
  - 87% White/ Non-Hispanic
  - 4% Black or African-American, Asian, or Hispanic (Respectively)
  - 4% LGBTQ+



# 2024 Legislative Priorities

- Clarify Judges' Financial Disclosure Obligations under §§ 24-6-202 and 24-6-203, C.R.S.

- Repeal Categorical Prohibition Against Judges with Disciplinary Histories from Serving in the Senior Judge Program-- § 24-51-1105, C.R.S.



# Questions?



January 12, 2023

Joint Judiciary Committee SMART Act Hearing

**2023 Colorado Commission on Judicial Discipline Statistics[1]
Compiled According to § 13-5.3-108, C.R.S**

<u>Case Data:</u>

Requests for Evaluation (RFEs) of Judicial Conduct Received (inclusive of allegations received in any form under Colo. RJD 12)—346 (As compared to 250 RFEs in 2022)

Breakdown of RFEs Evaluated[2]:

Abuse of Contempt Powers / Coercion: 3 (0.9%)
Bias / Discrimination: 13 (3.8%)
Conflict of Interest: 9 (2.6%)
Courtroom / Courthouse Management: 3 (0.9%)
Demeanor and Decorum: 6 (1.7%)
Diligence / Delay / Competence: 13 (3.8%)
Disputed Competency Determination:  7 (2.0%)
Disputed Rulings--Legal / Factfinding Error:  163 (47.1%)
Disputed Rulings--Legal / Factfinding Error (Crim. P. 35):  8 (2.3%)
Financial Disclosures:  73 (20.8%)
General Impropriety or Appearance of Impropriety:  5 (1.4%)
Harassment / Inappropriate Behavior:  2 (0.6%)
Intoxication / Substance Abuse:  1 (0.3%)
Judicial Performance Concerns:  3 (0.9%)
Opportunity to be Heard:  1 (0.3%)
Personal / Extra-Judicial Conduct:  3 (0.9%)
Prohibited Expression / Breach of Confidentiality:  3 (0.9%)
Sovereign Citizen / Generalized Conspiracy:  24 (6.9%)
Supervisory Duties: 5 (1.4%)

---

[1] The Executive Director is in the process of completing the Commission's 2023 Annual Report. Accordingly, the statistics provided here are preliminary and subject to finalization of the Annual Report.

[2] Some of the RFEs received by the Commission include multiple categories of allegations.  The primary category is used for this statistical breakdown.

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 457-5195

Page 2

Jurisdictional Denials—114

Colo. RJD 14 Investigations Performed or in Process—84

Total Financial Disclosure Cases Investigated--73

Cases with Complaint Fully or Partially Unsubstantiated after Investigation—2

Formal Proceedings Initiated (including cases begun in prior years)—2

Cases Litigated Through a Formal Hearing—1

**Dispositions / Sanctions:**

> Dismissals with Concern / Deferred Disciplinary Action (including cases begun in prior years):  3

> Private Reprimand:  1

> Private Censure (including cases begun in prior years):  2

> Public Disciplinary Opinions (including cases begun in prior years):  3

> Cases Resulting in Resignations from Office:  4

**Total Cases Processed as Complaints** (including cases carried over from 2022)—62 (approximately 18% of the total RFEs received in 2023)

Demographic Data (Excluding Financial Disclosure Cases[3])—16 Cases:

> **Subject Judges**:

> Gender:

>> Male: 16
>> Female: 6

---

[3] The Commission is working through issues relating to financial disclosures that could impact a relatively large number of judges.  These cases are based upon public records and do not allow for identification of directly impacted persons.  Inclusion of these cases would render the demographic data for other cases processed by the Commission irrelevant.

Page 3

Race/Ethnicity:

White: 17
Black or African-American: 2
American Indian or Alaska Native: 0
Asian: 0
Native Hawaiian or Pacific Islander: 0
Hispanic or Latino: 4

LGBTQ+:  2

**Directly Impacted Persons**:

Gender:

Male:  10
Female:  13

Race/Ethnicity:

White: 20
Black or African-American: 1
American Indian or Alaska Native: 0
Asian: 1
Native Hawaiian or Pacific Islander: 0
Hispanic or Latino: 1

LGBTQ+:  1

# Appendix 27(ee)

*Confirmation Hearing for Colo. Comm'n on Jud. Discipline appointees Ingrid Barrier and Stefanie Trujillo before the S. Judiciary Comm., Colo. Leg, March 6, 2024:*

# Appendix 27(ee)(i)

# Transcript;

# Senate Judiciary Committee—March 6, 2024 Hearing: Confirmation Hearing for Colorado Commission on Judicial Discipline Members Ingrid Barrier and Stefanie Trujillo

**Sen. Gonzales**

Are we ready? All right. Buenas tardes. Good afternoon. The Senate Judiciary Committee will come to order this Wednesday, March, the 6th. Ms. Jenson, will you please take attendance?

**Juliann Jenson**

Senators, Gardner.

**Sen. Gardner**

Here.

**Juliann Jenson**

Michaelson Jenet.

**Sen. Michaelson Jenet**

Present.

**Juliann Jenson**

Pelton, B.

**Sen. Byron Pelton**

Present.

**Juliann Jenson**

Roberts.

**Sen. Gonzales**

Excused.

**Juliann Jenson**

Madam Chair.

**Sen. Gonzales**

Present.

**Sen. Gonzales**

Senator Roberts, Mr. Vice Chair, is in another committee presenting a bill. Colleagues, it is that time of the year. We have two confirmation hearings for the Commission on Judicial Discipline that we will hear. And, then, we will take up Senate Bill 118. I want to welcome everybody who is here to share their perspectives. And I would invite you, if you are in the room and haven't already signed up, to say hello to Mr. Trujillo, yeah, our Sergeant here in the back. Who can get you signed up to testify, if that is something that you are interested in doing. With that, I'd like to welcome our appointees for the Commission on Judicial Discipline. And would like to bring them up here to the dais. And, then, we can begin that discussion. Excellent. Who would like to get us started today? Mr. Walsh.

**Jeff Walsh**

Yeah.

**Sen. Gonzales**

Okay, welcome. Before you begin, if you could please state your name, the organization that you represent, and then proceed. Colleagues, there is at the neck of your microphone a little gray button that I will invite you to press in order to ensure that the folks who are listening in online will be able to hear you. Mr. Walsh, welcome to the Senate Judiciary Committee.

**Jeff Walsh**

Thank you, Madam Chair. You wanted me to push this button? Testing [laughter]. There we go. Good afternoon, Madam Chair. Thank you for having us here. My name is Jeff Walsh. I am the Interim Executive Director at the Commission on Judicial Discipline. I'm also the Commission's Special Counsel. I've been employed with the Commission for almost 16 months, at this point. Just by way of a quick summary, the Commission on Judicial discipline is charged. Its charter, per the Colorado Constitution, is to investigate and prosecute, when appropriate, allegations of ethical misconduct against state court judges. Our Commission is comprised of 10 individuals, four judges, two lawyers, and four non-lawyers. We frequently refer to them as citizen members. Even though every member of the Commission is, in fact, a citizen. We just refer to them as citizen members, meaning that they're not a judge, they're not a lawyer. Probably the lay person would be the better way to go about saying it. The four judicial members are appointed by the Chief Justice of the Supreme Court. The two lawyer members and the four non-lawyer members are appointed by the Governor's Office. So, we have today before you for confirmation Ingrid Barrier, who is an attorney, and Stefanie Trujillo, who is a non-attorney [but] who never the less works at a law firm. And, so, they're up for confirmation. And they've already been doing work with the Commission. And, so, I'll let them tell you more about themselves and their background. What I will tell you, having worked closely with them so far over the last couple months, is that they, along with all the other members of the Commission, are very engaged, very interested in working hard on behalf of the mandate of the Commission, and have been a great addition so far.

- 2 -

**Sen. Gonzales**

Thank you, Mr. Walsh. And I would be remiss if I didn't acknowledge that this is your first appearance before this body as the Interim Executive Director. And, so, I also want to acknowledge Mr. Jim Carpenter, who is here with us. Do you have any comments that you'd like to offer to the committee before we get started?

**Jim Carpenter**

Thank you, Madam Chair. I just wanted to be here today. I'm the Vice Chair of the Commission, and wanted to come with my colleagues and our new Acting Executive Director, and in case you or the committee had any questions that we could answer. So, I appreciate the opportunity. Thank you.

**Sen. Gonzales**

Thank you so much. I will, at this point, turn it over to our appointees. And, so, I'd like to extend a welcome to Ms. Trujillo and Ms. Barrier. I'd like to get things started by thanking you for stepping up to serve on this critically important board. And, I'm sorry, commission. And would like to understand a little bit about. And Ms. Barrier, we will begin with you. If you can tell us what drew you to apply to the position and how long you've been serving.

**Ingrid Barrier**

Thank you, Madam Chair. Thank you members of the committee here. I'm happy to be here. My name is Ingrid Barrier, and I have been a lawyer since 2000. I'm currently working as the Chief Human Resources Officer at the Colorado Department of Public Safety. I worked after law school for Justice Rebecca Love Kourlis on the Colorado Supreme Court, and she taught me the value and importance of the Judiciary as an institution. And she also taught me that judges have so much power over you know, property, lives, your liberty, interests, your kids, your business. And her ethos was always to push the highest ethical standards, and that's what she expected of judges. That's what she expected of her clerks. And it stuck with me. I was a trial lawyer for many years and spent time in front of a lot of judges across the State. And she's right. We hold judges to somewhat of a higher standard for ethical conduct. And we have a great bench in Colorado. We're lucky. But there has to be a check and a balance. So, you have to have people that are committed to preserving ethics, good behavior, and doing the right thing for the folks that are appointed by the Governor to be judges in Colorado. I had the opportunity to serve on a judicial nominating commission many years ago, and that was fantastic. This is a little bit of the flip side of that work, but extremely important. Both of those roles are really important for preserving good work getting done in Colorado. I'm happy to entertain any questions.

**Sen. Gonzales**

Thank you so much. And Ms. Trujillo.

- 3 -

**Stefanie Trujillo**

Good afternoon, Madam Chair. It is a pleasure to be here. I am a non-attorney appointee of the Commission. And I come with a unique background in that. Well, first, I'm a citizen. And I have served in the legal community for over 20 years, as a paralegal and, also, as a nonprofit executive. I have done a lot of work to advance, you know, the legal community access to justice initiatives. And, so, I have also, you know, sat in many courtrooms throughout my career and understand the importance and impact that judges have on our community. And, so, this is very important to me. I know that the Judiciary is a very critical component to our government. And, as Ms. Barrier said, there has to be checks and balances. So, I'm happy to be here and to have this opportunity to serve in this capacity.

**Sen. Gonzales**

Thank you, so much, for both of your introductions. I'd like to see if there are questions for either of our nominees from members of the [committee]. Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair. And thank you all for being here. And thank you for your willingness to serve. I think it's well known that there has been a. I want to choose my words carefully, but I don't know of any other word other than adversarial atmosphere between the bench and the Commission on Judicial discipline the past few years. I just wonder if the two of you, and Mr. Walsh, Mr. Carpenter, as a serving member as well, wouldn't mind sharing whatever thoughts you have about your role, concerning your independence, that relationship of the of the Commission vis-a-vis the Supreme Court and the rest of the bench and what your responsibilities are to the citizens. And I'll tip you off here a little bit. I have been concerned over these past two or three years that, as we've had testimony about bills to refine the judicial discipline process and so forth, that members of the bench come and testify on one side. From the Commission, the other. And there are disagreements. And to me as a lawyer, they're very interesting. Sometimes they're emotional. And, yet, the public testimony has almost universally not been for one or the other of them. I have described it, and I'm on the record, but I don't mind saying it. That public testimony has been sort of torches and pitchforks for all of us in the legal profession. So, we need to restore confidence. And at the same time, that's a really tough job for you, because you, you have the responsibility to do something that judges. I have learned over the past two or three years, judges are really as sensitive as any of the rest of us about criticism of them and their livelihood and all. I'll just stop there and say comments thoughts about this and your role and all of that? And if you want to decline, that's okay as well. Ms. Trujillo, I'll start with you.

**Stefanie Trujillo**

Sure. I'd be happy to comment. I am aware of, especially since serving on the [Commission]. I think it starts internally first, right? With this Commission. I know all of us are dedicated to fixing, you know, a multitude of issues that we may or may not have. Right? I'm still fairly new to the Commission, but I'm very confident in my colleagues. I know that just in the short time on serving on this [Commission], that all of us are very committed to restoring that confidence in the in the community and ensuring that we

- 4 -

are holding the entire Judiciary to a higher standard. You know, all I can say is, give us six months [laughter]. I am that confident in this Commission.

**Sen. Gardner**

Thank you. Ms. Barrier.

**Ingrid Barrier**

I agree. I think that the tone of the Commission is one where we recognize the value of building trusting relationships within the bounds of the confidentiality mandates that we have constitutionally. And I don't think this Commission in its current makeup is interested in any surprises. I think that we're interested in doing the right thing. I think we're interested in getting feedback. The judges that are currently on the Commission are outstanding and are helpful to those of us that aren't judges, about what it's actually like to be a judge, what the pressure is, what it means when the Commission comes knocking at your door to suggest that potentially there's some wrongdoing. And having a trusting, you know, having really a reputation for being competent and dealing with challenging matters fairly and efficiently is where we want to be. And like Ms. Trujillo, I think we can get there. We have outstanding leadership with Mr. Carpenter and Ms. Sooter.

**Sen. Gonzales**

Senator Gardner.

**Sen. Gardner**

Mr. Carpenter, you've served for a good while, and you've been through all of this challenging time. Any thoughts on that and where the Commission is today with our new appointees and so forth? I'd appreciate it.

**Sen. Gonzales**

Mr. Carpenter.

**Jim Carpenter**

Thank you, Madam Chair. Senator Gardner, appreciate the opportunity. I agree with, with my fellow Commissioners, that, we on the Commission have a very strong commitment to a couple of things. One is to appropriately implementing the changes that this Legislature has put forward in the in the statutes. And the voters have a chance to weigh in this fall. And to implement the new ways that business needs to get done in judicial discipline. So, that's one thing. The second is to really focus on what the individual challenges are and the individual cases that come before us. And, you know, we take very seriously. I mean last year, I think we had almost 350 RFEs, which is requests for evaluation. Which is up significantly from the year before. And which was up from the year before that. So, these have been very challenging times, with the Commission in terms of a workload, in terms of the nature of some of the cases that have come before us. So, what I would say, is that the Commission is just absolutely

- 5 -

committed to looking at those individual cases, making the best possible determination that we can on the facts of each of those things. And, as appropriate, holding members of the Judiciary accountable. But at the same time, trying to sort through a lot of chatter, a lot of accusations about judges that just don't rise to a level that means we should impose any kind of discipline on it. So, just in quick summary, I think the Commission is just very committed here to going through the cases that are brought before us and making the best possible determination. And we have a lot of new members. I mean, I think it's no secret that I think there's 6 new members from last year. And everyone's a volunteer here. Everybody has day jobs, at least one. And we are a very cohesive unit at the moment, and doing the good work that that we were assigned to do.

**Sen. Gardner**

Mr. Walsh, I want to give you a chance.

**Jeff Walsh**

Sure. Thank you, Senator Gardner. I've had the interesting role of having witnessed much of the period that you described in the last several years of acrimony, if you will, between the Commission and the Judicial Department. I've witnessed both as an outsider, and I've also then witnessed it once hired by the Commission as an insider. And the observation I would make, having been a litigator for 23 years, is that it's not surprising to me that things, at times, became acrimonious, because that is just the nature of litigation. It's an adversarial process. The Commission is an investigatory body. And as you know, as an attorney, the adversarial process is designed to, in theory, develop the truth through the discovery process. And both sides are frequently digging in their heels to protect their interests. And the Commission, I think, deserves a lot of credit for having the backbone during the last several years, which has been very challenging, to zealously pursue the truth, and that can be very uncomfortable at times. On the other hand, the Commission also recognizes, now, that it has a constitutional mandate to do education, to educate judges on the Canons, we have a relatively junior bench of state court judges around the State. And that one of the Commission's main roles is to go out and educate judges on what not to do, so that they can avoid getting into trouble. And the Commission cannot do that without the cooperation of the Judicial Department. So, I will tell you I believe, what I am perceiving is that this Commission and the Judiciary, now, are very much looking to move forward and, frankly, begin a new relationship that is going to be more cooperative. And, so, that the role of the Commission of helping educate judges on the Canons, on the ethics, how to stay out of trouble, how to do their job better, can go forward. And, so, basically, what I would say, what I have observed, is that the Commission. We're very lucky with the folks that we have on the commission right now, they are willing to. They're volunteers, but they're like stepping up and working hard. They're very committed public servants, and we need that. And because there is a lot of work to do. And it's refreshing to see folks, especially the new folks, come in with the eagerness to do good work and to help. But, also, that have the courage to say, hey, if there is ethical misconduct that is serious, that needs to be addressed, that needs to be called out. They have the courage to do it and will do it. They also recognize the other side of the coin, which is, look, we have a job to do, which is to help educate the Judiciary. If we can't get along with the

- 6 -

Judicial Department, we can't do our job. And, so, the Commission, in my opinion, is fast approaching, walking that fine line, very successfully.

**Sen. Gonzales**

Senator Gardner.

**Sen. Gardner**

Thank you. I appreciate all of your responses. I don't think the task you have is by any means easy, and I wouldn't want my earlier questions or comments to reflect that. I believe that either side of the acrimony is the better word. Mr. Walsh. I appreciate that. That either side was particularly wrong, but it seemed to me that it was damaging to all of us, the bench, the Commission, those of us in the bar, everyone who absolutely relies upon public confidence in the judicial system. Because for those of us who practice law, we're dependent. When we sit in front of our clients and we tell them we're going to court. If they don't have any confidence in the system, it makes our job a lot harder. I don't know if I have any other question. I just appreciate all of your [being] willing to serve. I guess I will. I'll ask Mr. Walsh. You know, 1 in 6 judges in this State weren't filing their personal financial disclosures. And I have to tell you, I do it every year. It's painful. It's required by law. I tend to pull up the last one and say, what's different, and just move on and do it. So, I was kind of astounded. And, yet, I think there were some, well, based on anecdotal things, I think there were some pretty good judges in my experience that were part of that. I was interested to hear you talk about the education aspect of this. And I wonder, I mean, it seems like there's a lot of things going on. I don't want to say a lot, but there are some of these things going on that the press. And I'm not critical of them for doing their job. But the press says, What's going on here? Are you all stepping up your education role? And, if so, how? And how can we help you?

**Jeff Walsh**

Sure.

**Sen. Gonzales**

Mr. Walsh.

**Jeff Walsh**

So, that issue particularly. That is just one example of one of the things that the Commission can do in front of a room of judges. To say, Hey, this is a really simple, everybody read about it last year, you know. This is a really simple thing to do. Don't screw this up. You know, make sure you file on time. It's just like your taxes. It's a pain, but it needs to be done. As far as the Commission's going to address those cases, each and every single one on a case-by-case basis. Because all of them are different. You know, some judges were late by a day. Other judges just sent it to the wrong email addresses. Other judges may have multiple years of non-filings, And, so, the Commission will be addressing and evaluating all those on a case-by-case basis. As far as your last question about what the Commission is doing. We have already begun discussions with the Judicial Department about how we can begin getting

- 7 -

out in front of the judges and start an education process. I won't go into a whole lot of detail about that, but those discussions have already begun. And it's been somewhat, I will also say, without revealing too much detail, therapeutic for both sides to get in the same room together and talk it out. And to some degree, acknowledge that everybody has to be an adult. Bygones need to be bygones. We need to learn to work together. And the Commission. It's in everybody's interest that this Judiciary gets well educated, well prepared, and engenders the respect it deserves.

**Sen. Gardner**
Thank you. Thank you so much. And let me just say once again, thank you all for your willingness to serve and what is a extremely important position for the confidence of citizens in the judicial process and the Judiciary as well. So, thank you very much. Thank you, Madam Chair.

**Sen. Gonzales**
Thank you, Senator Gardner. I'd like to follow up, actually, on that question in regards to the personal financial disclosures. Because I think for those of us who are elected officials, that is. You do it, you incur a $50 per day fine if you don't. And there are processes that can result in an administrative complaint resulting in civil penalties or criminal sanctions. I'd like for you all as appointees to this Commission. Certainly Mr. Walsh, I understand and respect where it's like, okay, let's navigate this on a case-by-case basis. But also, I'm curious for what your perspectives would be as appointees to serve on this Commission to ensure that judges and members of the Judiciary, along with those of us in the Legislature. Or, I guess, like those of us in the Legislature are comporting with those requirements and obligations. And I guess I will turn first to Ms. Trujillo.

**Stefanie Trujillo**
Madam Chair. Yes, I'm happy to address that. I think in addition to the educational piece, because I think there are some statutory requirements as well as other rules that kind of might be a little bit conflicting. So, the educational piece is very important. But in addition, I like the idea of, Hey, if you don't get this done, these are the penalties. I'm not opposed to that by any means. And I don't know if we do that by way of legislation, or how do we? I'd be happy to entertain that. So, thank you.

**Sen. Gonzales**
Ms. Barrier.

**Ingrid Barrier**
Thank you, Madam Chair. Having a trusted and collaborative relationship doesn't mean that there's not an investigative authority that means business. And the Commission means business. And some of these tasks that maybe folks would say that just seems kind of ministerial. It's not. They, our judges, have an obligation. You know, granted to them via statute, to do this kind of reporting. And our body is the one that needs to make sure it gets done. And, so, I agree a case-by-case examination is important, and education is vital, and us turning these cases around with more speed than has happened in the past.

Recent history, from my understanding, is also really important. Because I think it just shows that the Commission is committed to executing on the on the Canons and the expectations for judges around the State.

**Sen. Gonzales**

Thank you. I do appreciate that. Because, as I have been following. For those of us in the Legislature and in the political sphere, that is an important piece to ensure. It is an important piece of the process in the statute that is, again, not fun to do. But it's important for us to comport with and to adhere to. I want to understand, if you all have any conflicts of interest for which you may need to step aside. Knowing that you are currently facing, if I'm understanding correctly, 350 requests for evaluation. Do you believe that either of you as appointees would have any conflicts of interest that may lead to you needing to step aside in any of those evaluations? Ms. Barrier.

**Ingrid Barrier**

Thank you, Madam Chair. I have only had the opportunity to attend one regularly scheduled meeting. And before we address any kind of complaint, there is a call for determination of any conflict of interest. And it's a robust discussion where people that, you know, if there's someone that you have a personal relationship with, or you're friendly with, or you have family dinner with, or whatever the case may be. Those are exactly the kind of conflicts. You know, you're appearing in front of a judge in an active proceeding. So, that discussion. And I would have to defer to Mr. Carpenter and Mr. Walsh, but I think that discussion is standard and critical.

**Sen. Gonzales**

And, so, having participated in one full meeting. Would you feel comfortable disclosing your conflict? If you were to have a conflict, would you feel comfortable disclosing it?

**Ingrid Barrier**

Absolutely, yes. Madam Chair.

**Sen. Gonzales**

Thank you, and for you, Ms. Trujillo?

**Stefanie Trujillo**

Thank you, Madam Chair. As Ms. Barrier mentioned, we do go through a complex check before we address any RFE. It's, you know, an open dialog. We talk as a Commission. There have been certain matters in which some of the Commissioners have to step aside because there is a conflict. And it's never really been an issue. It's a very well thought out process. And that we have also received guidance from the Attorney General's Office on this, as well. So, I'm very confident in that process. And would be, you know, it's the right thing to do if there is a conflict, to step aside. So that we can, you know, look at matters from impartial lens.

- 9 -

**Sen. Gonzales**

Certainly. I will say that with 350 RFPs. And it seems like, if to interpret the numbers, to interpret that the numbers are growing. I'm curious for your perspective, do you think that that's encouraging? That the system is working? That you're seeing more requests for evaluation, or is that a sense of growing distrust in the system and in the process? I'm just curious, given the fact that the numbers of requests seem to be increasing pretty dramatically. Ms. Barrier.

**Ingrid Barrier**

One of the things that we see are requests for an evaluation that are outside our pretty narrowly tailored jurisdiction. Because when you look about how do I disagree with a judge, my loved one got an unfair sentence in a criminal case, you think. We get cases like that, and those are not within our jurisdiction. So, I think while our numbers are enormous, the work that really relates to violations of the Canons is a much, much smaller percentage of the RFEs. And I'd ask Mr. Walsh or Mr. Carpenter to weigh in on that.

**Sen. Gonzales**

Mr. Carpenter.

**Jim Carpenter**

Thank you, Madam Chair. Um, yeah. I you know the numbers are, are large. I do think that the attention to the Commission in the legislative process the last few years have, you know, raised the visibility of all of this and have led to some increase in the numbers. Which I think is a good thing. The number of cases that require a deep investigation, and, you know, a lot of staff time and a lot of investigator time. You know, those are also increasing a little bit. You know, we've had more public discipline cases in the last couple of years than had you know happened before. And those certainly take a lot of time and resources. This Legislature, thankfully, has given us, the Commission and the Office of Judicial Discipline additional resources. And additional independent resources that we didn't have before to manage the workload. So, I do think it's a. You know, of course, we get a lot of cases as Ms. Barrier mentioned, of, you know, disagreeing with the judge's ruling. And you know that. And wanting us to be sort of an appeals court. Which is obviously not our role. But I do think that. I do think there's a greater recognition of the Commission and its work. And that has led to at least an increase in visibility and an increase in number of cases. Even, you know, it goes up and down. I mean, it's, you know, there, there was a time last year where we had, I think, two or three sort of public, you know, big, high visibility kinds of cases in trial. And, you know, at this point we don't have that. But, you know, that could change depending on circumstances. So, what we do have now is the flexibility and the resources, I think, to manage the workload as it goes up and down in any given period of time.

**Sen. Gonzales**

Thank you. I am appreciative of that. Filtering through number of complaints, issues that you can not address versus the narrow, limited issues that you are able to address. What's your perspective in terms

- 10 -

of how to navigate? I think, with that inherently sort of adversarial relationship of investigating judges or ensuring that they are following the guidelines of proper conduct. How do you all as non-judges, as a head of a paralegal association? As a former paralegal, myself, shout out and appreciative. And as an attorney, how do you all anticipate your process will be in engaging in these evaluations and investigations?

**Stefanie Trujillo**
Sure, Madam Chair, thank you. You know, being a paralegal, I have the opportunity and I have the experience of kind of viewing these as I view the cases that come across my desk, right? And so you're looking at allegations, and you're looking at this, at these matters, on an individual basis. From an impartial lens. You know, you have the discovery process, and then you go to trial, right? And, so, I view these types of matters in the same way. As far as kind of going back to your other question, if I may. I think we're kind of living in this era right now of folks really holding people accountable. And we should. And, so, whether that's distrust or whatever it might be, it's critical that we as a Commission, address each and every one of these matters that's within our scope. But as far as myself, I mean, I have amazing fellow, you know, Commissioners who I can have conversations with. We may not agree. We, you know, might agree, you know. So having that collaboration is also very critical to this process, I think, as well. So, did that answer your question?

**Sen. Gonzales**
Yes. Ms. Barrier.

**Ingrid Barrier**
I think that's a hard question and hard circumstances. And I know that having the Commission come to a judge's door is not welcome. And I think that, you know, our obligation is to do the right thing. Follow the guidance that we are given. And do a robust, impartial, unbiased and fair investigation without, you know, sort of saying, Oh, how's this going to how's this going to play in the media? How's this going to play here? It's really important that we come with a neutral lens. And that's hard. It's hard when you're, you know, coming to someone's door and potentially impacting their livelihood. But it's a critical function. Because we have to hold judges accountable for compliance with the laws and with the Canons and with the rules of ethics. But I think that coming without bias is our goal. We don't want to have a reputation like, Gotcha. That's not where we want to be.

**Sen. Gonzales**
No, I very much appreciate that. And I'm curious, because there has been so much scrutiny. And I think we grapple with these issues here in this body, as well. Where there are tensions. And sometimes they are partisan, and sometimes they are not. They're just philosophical or policy rooted and yet, how do we rise? Whether that's rise above or get through it, depends on the day. But how do we, at the end of that remain focused on the work that we're here to do? I have seen in. Certainly, just in the past few months, media reports that call into question. And I think, again, raise up concerns around. I want to be

- 11 -

thoughtful about how I phrase this. There have been news reports that I think underscore the importance of an impartial and mission-focused Commission on Judicial Discipline. I, being a representative, a Senator from Denver, read with interest the articles in regards to a judge's behavior, who is not subject to the evaluation from the Commission on Judicial Discipline because he's a Denver judge. The broader public may or may not understand that nuance. But in light of systems and trust being critically important and yet often fraying, how will you all proceed? It's something that we grapple with. Senator Gardner and I grapple with this. Because sometimes we disagree incredibly strongly, and yet we also have to find ways to rise above and do the work. And, so, I'm just curious for your perspectives, given the challenges I think that we're all grappling with. Ms. Barrier.

**Ingrid Barrier**

Thank you, Madam Chair. One of the things that I think is critical for this Commission is the makeup of the Commission. You have the judges, you have citizen members, and you have lawyers. And this is a group of folks with very different perspectives, very different practices, very different backgrounds. And every single person's perspective is valued and examined and listened to when we talk about these issues. And those Commissions that are sort of built, I guess, in some ways, like your role, right? It's not partisan in away, like we say, you know, politically partisan. But a layperson may have a completely different opinion than a judge. They may have a completely different opinion than a lawyer about the right thing to do. And that's where the work is. That's where the collaboration has to be. And, you know, and I don't know, but I think that one of the goals moving forward is to do everything we can with consensus on the Commission. And I think, you know, I think that that is a lofty goal, I hope that we can make that happen. But in some ways, you try to build consensus. But at some point, if you can't. We're going to have to take a majority rules position. But that being said, my observation of the folks on the Commission is that their perspectives are really meaningful. To look at what a violation might be. Here's the Canon, here's the behavior, and then there's this really interesting input from people with very different lived experience and knowledge about how the process works. So, for me, I think that it brings me a lot of hope that we're going to do stuff thoughtfully and well. Looking at different perspectives. Not everyone's going to be happy all the time. I think that's the reality.

**Sen. Gonzales**

Same here, same here. Thank you. Ms. Trujillo.

**Stefanie Trujillo**

Yes. Thank you, Madam Chair, that's an excellent question. I think, ultimately we have to stay grounded with our mission. We, you know, are going to have disagreements. In the best of the world, we would all agree. But that's just not what happens. Especially, in these kinds of matters. But thankfully, we have rules. We have laws that are in place that we have to follow. And I know, just again serving, just in the short amount of time, we are all committed to the mission of this Commission. And, so, when we have those moments, I think sometimes maybe just redirecting each other. Hey, let's get back to what our mission is. That's very critical to this process,

- 12 -

**Sen. Gonzales**

If there were to be a lack of consensus within the Commission. You had judges on one side and non-judges, lay people, and attorneys on the other. How would you all proceed? In the case of looking for an evaluation of misconduct for a judge. Hypothetical scenario. How would you proceed forward? Ms. Trujillo.

**Stefanie Trujillo**

Sure. Thank you, Madam Chair. It would come down to the majority vote, and I think that at the end of the day, even if we don't agree, we have to respect that decision and support the decision. You know you can disagree to disagree. You know, agree to disagree. And sometimes it's just again, going back to what are we here for? You know.

**Sen. Gonzales**

Thank you. Ms. Barrier.

**Ingrid Barrier**

Thank you, Madam Chair. I think it's critical that we have that kind of dialog. People say what their position is. No one is going rogue. No one is out, not outside the bounds of what our charge is. And there are times, some group may be on the minority side. But we need to present as a united front. You know, we have a giant confidentiality bubble. And, you know, the worst thing that can happen is to have that pierced, have media interest on squabbling or allegations of rogue behavior. We want to follow our mandate, and we want to do it like pros.

**Sen. Gonzales**

I appreciate that, because I think that part of. As someone who has been on this committee for several years, and also been engaged in some of the, on many of the conversations around judicial discipline. The interim committee, the discussion around a constitutional amendment, and other statutory policy changes. We've been grappling as well on what the appropriate path forward is. And I echo Senator Gardner in saying that this is no small task. But thank you, and also, we're sorry, for the work that you're going to engage in. And know that this is deeply important. You face no small task. I would be remiss if I didn't take this opportunity to also just make an inquiry of Mr. Walsh, since you are here before us. I am curious on when we can expect the 2023 end of year report. I have been looking forward to that report, and the last time that we had the pleasure of chatting with you all. At the beginning of the legislative session, it was then, now former, Director Gregory, who said that the report was forthcoming. It's my understanding that he is no longer the Director and that you are now the Interim Director. One, do you have any insight that you can offer us in terms of his departure? And, two, that end of session, or that end of year report, when we might be able to review it?

- 13 -

**Jeff Walsh**

Sure. So, the end of your report is like on the one yard line. And I expect it to be on the website, probably by Friday, if not sooner. So, and we can email it to you directly, if you'd like. So, that's going to be very soon. That didn't previously fall within my portfolio of responsibility. So, there has been a little bit. You know, I had to take that over. And Mr. Carpenter's been really helpful with that, as well. So we're very, very close. We're going to have that published imminently. As far as Mr. Gregory, there's not much we can say, because it involves a personnel matter, other than to say he's no longer employed by the Commission. His last day was January 19. And other than that, for legal reasons, we can't comment further.

**Sen. Gonzales**

I respect that. And thank you for the update. I will look forward to reading it with interest. I'd like to see if there's any other questions for either of our nominees. Seeing none. Is there a motion? Senator Gardner.

**Sen. Gardner**

Thank you, Madam Chair. I think I can do this from memory. Madam Chair, I move for the confirmation of the appointments of Ingrid Barrier and Stephanie Trujillo to the Commission on Judicial Discipline with a favorable recommendation and for consideration of the full Senate.

**Sen. Gonzales**

That is a proper motion. Thank you, Senator Gardner. I want to thank you again for coming and chatting with us today. And for the service that it sounds like you already have begun. It is incredibly important. And like I said, no small task. And, so, as we continue this work, continue to view us as a resource for the important work ahead. Thank you. Senator Gardner.

**Sen. Gardner**

Thank you. Let me just endorse the remarks of Madam Chair. Observe that this has been one of the most probing confirmation hearings I've had. But not of you as questioning your commitment or responsibility. But given the importance of the role you have undertaken. And I want to express our appreciation to you for your willingness, and Mr. Carpenter for your service, Mr. Walsh for your work with the Commission. And we are grateful. We're grateful. Thank you.

**Sen. Gonzales**

Thank you. Ms. Jenson. Will you please poll the members?

**Juliann Jenson**

Senators, Gardner.

- 14 -

**Sen. Gardner**

Aye.

**Juliann Jenson**

Michaelson Jenet.

**Sen. Michaelson Jenet**

Aye.

**Juliann Jenson**

Pelton, B.

**Sen. Byron Pelton**

Aye.

**Juliann Jenson**

Roberts, excused.

**Juliann Jenson**

Madam Chair.

**Sen. Gonzales**

Aye.

**Sen. Gonzales**

Those pass. And congratulations and welcome. You will go on to the full Senate for that confirmation hearing.

**Sen. Gardner**

Madam Chair, may we put this on the consent calendar?

**Sen. Gonzales**

Let's go ahead and do that. Thank you very much. We look forward to that full confirmation hearing. Thank you again.

**Appendix 27(ee)(ii)**

**Email from former Committee Chair Pete Lee to Chair Julie Gonzales and Ranking Minority Member Bob Gardner re: topics for inquiry.**

**Sent:**                    Wednesday, March 6, 2024 6:40 AM

**To:**                      julie.gonzales.senate@coleg.gov; dafna.michaelson.jenet.senate@coleg.gov;
dylan.roberts.senate@coleg.gov; bob.gardner.senate@coleg.gov;
kevin.vanwinkle.senate@coleg.gov

**Subject:**            CCJD Nominee Ratifications Questions

Dear Judiciary Committee Members;

I apologize for a lengthy email amidst a busy session, but the gravity of the matter compels it.

I urge you to carefully evaluate the proposed members to the Colorado Commission on Judicial Discipline  who are scheduled for Senate confirmation today.  Recent news stories last weekend about obstruction by the Supreme Court to requests for information by the CJD, the non- appointment of Judge Prince  and the firing of Director Chris Gregory are concerning indications of a commission that may not zealously carry out its statutory functions to consider judicial misconduct and which may acquiesce to pressures from the Supreme Court.   To ensure public trust in the courts and judicial branch, we need a commission which is independent and undeterred in its mission to investigate wrongdoing and ethical violations by judges.

Please consider asking the nominees questions about whether they have any conflicts of interest serving on the CCJD based on their prior employment, and have they disclosed any conflicts prior to their nomination?  Are there any conflicts at this time that require disclosure?

What was their role in the dismissal of Director Chris Gregory?  Was there any correlation between the decision to dismiss Director gregory and the assertions in the Sunday Gazette editorial by Chief Judge Maes?

What are their views about recent reports of judge's failure to complete mandatory financial disclosure forms and do they plan on initiating any investigations or file any complaints against judges who failed to file those required reports?  Do they consider it an ethical violation to fail to file and, if so,  what is the appropriate sanction.  (In an August 13, 2023 article, the *Denver Gazette* reported that 1 in 6 judges had failed to submit required annual financial disclosure statements under a statute that makes such non-reporting a misdemeanor.  Among the judges listed, the *Gazette* reported that Commission member 18th Judicial District Court Judge Bonnie McLean had not filed her disclosure statements since 2019.) Is it  a conflict of interest for a judge who may be in violation of a financial disclosure requirement to sit on the CCJD charged with assessing judicial misconduct?

Three stories in the Gazette by David Migoya on Sunday March 3, suggested that cases of judicial misconduct are not being expeditiously referred to the CCJD by the Supreme Court . Two of the instances involved retaliation by a judge against an employee and another incident involved the Chief Justice allegedly having knowledge of misconduct but not referring it to the commission.   Are you aware of those stories and, if accurate, do you plan to commence an investigation of the alleged misconduct?

**Best wishes,**

**Pete Lee**

1

# Appendix 27(ff)

# *Hearing on the ballot analysis of HCR 23-1001 / Amendment H before the Legis. Council, Colo. Leg., September 4, 2024:*

# Appendix 27(ff)(i)

# Transcript;

# Legislative Council Hearing—September 4, 2024:
# Ballot Analysis for Amendment H / HCR 23-1001

**Speaker McCluskie**

Members, we are moving on to Amendment H and Juliann Jenson. Amendment H is the Judicial Discipline Procedures and Confidentiality. Ms. Jenson, please proceed when you're ready.

**Juliann Jenson**

Thank you, Madam Speaker, Mr. President and members of the committee. I'm Juliann Jenson with Legislative Council staff, and I'm here to present Amendment H, which asks voters about judicial discipline procedures and confidentiality. This amendment is also known as House Concurrent Resolution 23-1001, which I believe is located in the second tab of your binder. And, first, I want to thank my writing team, Aaron Carpenter and Adam Alemzada and review team members, Natalie Castle, Katie Ruedebusch, Jessika Shipley and Erin Reynolds. This truly was a team effort.

And, now, I'll briefly walk you through our analysis of the measure. Some of you may remember the judicial discipline Interim Committee from 2022. I know Senator Gardner was on the committee and probably remembers it well. The Interim Committee held extensive hearings about judicial discipline with stakeholders, experts, and the public, and recommended three pieces of legislation from it. One bill made statutory changes about complaint filing, reporting and data collection, and another created a judicial ombudsman office in the Judicial Branch to assist Judicial employees with workplace complaints. Both of those measures passed in 2023. The third bill, the amendment before you today, proposes to change Colorado's constitutional provisions on judicial discipline, and that's why it's before you today. The amendment creates an independent adjudicative board to preside over ethical misconduct hearings involving judges, and it allows for increased public access to judicial discipline proceedings and records, earlier. At the time when formal charges are filed, instead of when public sanctions are recommended at the end of the process.

Continuing on to the Summary and Analysis section, we covered judicial misconduct and discipline generally, including what it is and what the current process is. We also outlined changes that Amendment H makes to judicial discipline. Of course, covering the adjudicative board and the confidentiality issues, we also touched on tribunals, rulemaking, appointments, Supreme Court role, and the appeals process.

On page three of our analysis, you'll find a table with a side-by-side comparison to better show these differences between the current process and Amendment H. The table goes into greater detail about this complex process and the changes being proposed.

In the Argument section, you'll find one argument for and one argument against. The argument for focuses on renewing public confidence in the courts and how the new process enhances transparency, integrity, and independence. It also argues in support of removing judges from overseeing themselves. It also notes that this was compromised legislation supported by the Legislature and the Judicial Branch, and was widely supported. The argument against the measure discusses that the current system works. It argues basically for the status quo. Judges understand how to run hearings and make impartial and hard decisions, and they can easily transfer these skills when disciplining one of their own colleagues. We also mention that other checks and balances are in place, such as retention elections and the nomination process.

And that about wraps up our analysis, and I'm happy to take any questions at this time.

**Speaker McCluskie**
Members, any questions? Seeing none, we will move on to public testimony. We have several individuals signed up for today. I will invite the following four forward for our first panel. Mr. Chris Forsyth, Mr. Jeff Rupp, Ms. Marilyn Chappell, and Mr. Christopher Gregory, three of which are participating remotely. Great. Mr. Rupp, please introduce yourself. Let us know who you are representing, and you have three minutes for your testimony.

**Jeff Rupp**
Thank you, Madam Chair. Good morning, everyone. I would like to thank the Joint Legislative Council and the staff for the opportunity to share input about Amendment H. My name is Jeff Rupp. I'm the Executive Director of the Colorado Judicial Institute, or CJI. CJI is an independent, nonpartisan, nonprofit organization with the mission to promote excellence, impartiality, and public trust in Colorado's courts. As part of its work, CJI advocates on behalf of Colorado's Judicial System, and that includes advocating for smart change that makes the system better. And CJI believes that Amendment H is this sort of SMART change. I would like to turn it over to my colleague, Marilyn Chappell, a Denver attorney and board member at CJI, who will share some additional specific input about the amendment H ballot draft. Thank you.

**Speaker McCluskie**
Mr. Rupp. Does that conclude your testimony?

**Jeff Rupp**
Yes, it does. Thank you, Madam Chair.

**Speaker McCluskie**
Thank you. Ms. Marilyn Chappell, please proceed.

- 2 -

**Marilyn Chappell**

Thank you, Madam Chair. Thank you Mr. Rupp, and thank you members of the Council and committee. I am here. I'm an attorney in private practice in Denver, but I'm here as a volunteer, as an emeritus board member of CJI. And we are very grateful to be part of this very important process. As Mr. Rupp told you, CJI has really a vital interest in this measure. And CJI also was involved in the Interim Committee process and the legislative process in 2022 on this matter that has become Amendment H. And that is part of a long tradition of CJI being involved in legislative testimony on a number of measures. Our comments on behalf of CJI on Amendment H, have focused on the two main features, as were outlined to you earlier: creating an independent adjudicative board to preside over judicial dispute proceedings and providing public access to the proceedings at an earlier stage. CJI's only comments on the third draft of this measure are on the arguments for Amendment H portion. And respectfully, we submit that CJI comments on that portion of this measure, on Attachment C page 4, really closely adhere to those two main features of this measure, in a neutral manner. And, so, our request on behalf of CJI, would be to delete the first and third sentences of the argument for Amendment H portion of the third draft, again, in the interest of neutrally presenting these issues to Colorado's voters. Thank you very much.

**Speaker McCluskie**

Thank you. Ms Chappell. Mr. Gregory.

**Christopher Gregory**

Thank you, Madam Speaker and committee members. My name is Christopher Gregory. I am the former Vice Chair, Chair, and Executive Director of the Colorado Commission on Judicial Discipline. I appear before you in my individual capacity as a Colorado citizen.

The importance of Amendment H cannot be understated. Through our existing constitutional structure, the Colorado Supreme Court has plenary authority to appoint judge members to the Colorado Commission on Judicial Discipline, to select and appoint the Special Masters who hear formal judicial discipline proceedings, to adopt both the Colorado Code of Judicial Conduct and the Colorado Rules of Judicial Discipline, and to make the ultimate decisions as to the public discipline of judges. Former Senate Judiciary Committee Chair Pete Lee and the Commission publicly raised concerns about this structure, where the Justices choose the investigators, the prosecutors, the judges who hear formal proceedings, and the appellate panel that ultimately determines sanctions, including as to allegations of the Justices' own misconduct. This structure exists upon the backdrop of the Justices acting as their own legislature or rulemaking body. Amendment H corrects this fundamentally flawed system, and the Blue Book needs to explain the importance of this to voters.

I acknowledge the excellent job that Legislative Council Staff has done in drafting a concise and understandable ballot analysis, while requesting that this committee adopt some short but critical edits. Although I have provided you with a written explanation and draft language for an amendment, the edits I am requesting can be summarized, as follows.

- 3 -

First, the impacts of Amendment H should specifically include explanation that the amendment will reduce the Colorado Supreme Court's control and influence over the judicial disciplinary process.

Second, the description of what constitutes judicial misconduct should clearly explain that judges are held to a higher standard. Judges must avoid both actual improprieties and even conduct that creates the appearance of impropriety.

And third, it is important that voters understand the context through which the structural changes in Amendment H are being proposed to them. This includes explaining the robustness of the legislative process followed in drafting Amendment H. Specifically, voters need to know about the bipartisan, bicameral Legislative Interim Committee on Judicial Discipline process, the universal buy-in by the primary stakeholders, and that Amendment H is being referred to them after unanimous votes in both Chambers on Third Reading and all but one Representative approving the final conference committee report for this measure.

Amendment H is a model for what the legislative process should be and what is necessary to reinforce good government in Colorado. Do not diminish the reasons why voters should approve Amendment H. I ask you to consider the edits I have proposed, and I invite your questions.

**Speaker McCluskie**
Thank you, Mr. Gregory. Mr. Forsyth. Mr. Forsyth.

**Chris Forsyth**
All right.

**Speaker McCluskie**
Nope, there you go. Thank you.

**Chris Forsyth**
The Draft Analysis presented by Legislative Council Staff is not fair and it is not impartial. I don't have time on the 3 minutes to read all my comments. The word independent is used repeatedly throughout this analysis. Independent is an unnecessary adjective that is not needed for describing this measure. It implies that both the current Commission on Judicial Discipline and this adjudicatory board are independent of the Supreme Court. That is not true. The Supreme Court selects members of the judicial discipline commission at present, and will select members of the adjudicatory board, if it's adopted. The Supreme Court hires the Supreme Court Administrator who would select the panels that hear the cases regarding discipline. The Supreme Court would select members on the rulemaking committee. The Supreme Court would still have an appellate function. The word independent used repeatedly in this measure is misleading and inaccurate, unfair and biased. It should be removed in its entirety. A fair and impartial judge would not allow an attorney, to use the word independent in court in arguing this matter.

- 4 -

So, because Legislative Council has to act in a fair and impartial manner, they should not be allowed to use it.

On page 2, lines 2 through 3 say that formal hearings are conducted by a panel of judges selected by the Supreme Court. Under the current system, the Commission does not have to refer a case to Special Masters to be heard, the Commission can make its own determination. And that's what Amendment H was trying to correct, was that adjudicatory and prosecutorial function is one thing. And that's something this analysis completely fails to convey. Lines 9 through 17 on page 2 are completely misleading because they make it sound like an entire adjudicative board hears the discipline case. That's incorrect. Only a panel of three members. And those three members are selected by the State Court Administrator, the position that behaved corruptly, that caused all the chaos that led to the legislative hearings. This amendment puts that position, the State Court Administrator directly in a position of power over judicial discipline. It's ridiculous.

The flow chart, it says it's applying the new discipline process. That's our current discipline process. It's completely misleading.

When you get to the arguments against, the arguments are not arguments against. The argument against should read, Amendment H makes minimal changes to the judicial discipline process when much more substantial change is needed. Having judges in roles on the discipline commission, on adjudicatory panels, and on the rulemaking board leaves too many conflicts of interest in the process.

The current judicial discipline process does not work, and Amendment H will not make it work. History shows that the procedures in Amendment H affect less than 1% of complaints against judges and are not worthy of a constitutional amendment. If Amendment H passes, it will almost be impossible . . .

**Speaker McCluskie**
Mr. Forsyth, thank you for your testimony.

**Chris Forsyth**
for necessary reforms, because legislators will allege they did the job with Amendment H. Empowering the State Court Administrator with a role . . .

**Speaker McCluskie**
I'll ask you to wrap up your testimony, now.

**Chris Forsyth**
is a mistake.

- 6 -

**Speaker McCluskie**

Thank you. For the record, could you please introduce yourself and the organization that you're representing today?

**Chris Forsyth**

I didn't have time. My name is Chris Forsyth. I'm an attorney licensed to practice in Colorado for 30 years, and I represent the Judicial Integrity Project, where we're a non-partisan non-biased entity trying to seek improvements in the justice system.

**Speaker McCluskie**

Thank you, Mr. Forsyth. Members, any questions for our witnesses? Seeing none. Thank you to all of you for your testimony today. Do we have anyone else in the room who is interested in testifying on Amendment H? Seeing none. The public testimony phase is closed. Members. Are there any amendments? Seeing none, the amendment phase is closed. We will now move on to Amendment I.

- 6 -

# Appendix 27(ff)(ii)

# Exhibits and Hearing Materials:

# Appendix 27(ff)(ii)(1)

# Ballot Analysis Drafts and Written Submission.

1st Draft

# HCR23-1001: Judicial Discipline Procedures and Confidentiality

*Placed on the ballot by the legislature • Passes with 55 percent of the vote*

**HCR23-1001 proposes amending the <u>Colorado Constitution</u> to:**

- reduce the Colorado Supreme Court's role in ethical misconduct cases involving judges; and

- allow for increased public access to information about judicial discipline proceedings.

**What Your Vote Means**

## YES

A "yes" vote on HCR23-1001 changes how judicial misconduct cases are handled by reducing the Colorado Supreme Court's involvement in the disciplinary process and allowing for more information to be shared with the public and other judicial oversight agencies.

## NO

A "no" vote on HCR23-1001 means that the Colorado Supreme Court will continue to have a direct role in disciplining judges for misconduct and will keep judicial discipline cases confidential until the final stages of the proceeding.

## Summary and Analysis of HCR23-1001

**What is judicial misconduct and discipline?**

Judicial misconduct occurs when a judge acts unethically or in ways that discredit the courts. Common misconduct complaints include improper demeanor, alcohol and drug use, conflicts of interest, and inappropriate communication, among others. Any person may file a complaint, and judges found to have violated judicial ethics may be disciplined publicly or privately, depending upon the seriousness of the misconduct.

**How are judicial discipline cases currently handled?**

The Commission on Judicial Discipline (commission), an independent state agency charged with investigating allegations of misconduct against judges, screens and investigates complaints. The screening process eliminates complaints that ask to review a judge's ruling or order a new trial. Complaints found to have merit are investigated. Thereafter, the commission either issues a private reprimand, dismisses the complaint, or forwards findings about the more serious cases to the Colorado Supreme Court. The forwarded cases are reviewed further and tried by independent judges appointed by the Colorado Supreme Court. After the trial, the Colorado Supreme Court receives disciplinary recommendations and agrees on a final ruling.

1st Draft

Misconduct cases are made public only in the final stage of proceedings when judges are publicly punished. Otherwise, complaints and informal punishments are not shared with the public, the person who filed a complaint, and other judicial oversight agencies, such as nominating and judicial performance commissions that evaluate judges.

**What changes does HCR23-1001 make to the judicial discipline process?**

HCR 23-1001 establishes the Independent Judicial Discipline Adjudicative Board (board), separate from the commission and the Colorado Supreme Court, to decide judicial discipline cases. The board consists of four district court judges, four attorneys, and four citizens. The new board's decisions are considered final, and the Colorado Supreme Court's role is limited to appeals.  If a case involves a Colorado Supreme Court justice, the appeal is heard by a tribunal made up of randomly selected appellate and district court judges. The flow chart below summarizes this new process.

**Figure 1**

**Judicial Discipline Proceedings Under HCR23-1001**



In addition to this new hearings process, complaints are made public earlier. The commission may provide status updates to the person who filed the complaint, share information with judicial oversight agencies about public and informal disciplinary actions, and report aggregate information about trends or patterns in complaints.

A summary of the major changes proposed in HCR23-1001 can be found in Table 1 below.

1st Draft

**Table 1**

**Current Judicial Discipline Proceedings Under Current Law Compared to HCR23-1001**

| Current Judicial Discipline | Judicial Discipline Under HCR23-1001 |
|---|---|
| **Formal Disciplinary Hearings** | |
| The Colorado Supreme Court appoints judges to hear cases and make disciplinary recommendations, and determines sanctions against judges. | The Independent Judicial Discipline Adjudicative Board, made up of an equal number of attorneys, judges, and citizens, conducts judicial discipline hearings and determines sanctions. |
| **Discipline Cases Involving State Colorado Supreme Court Justices** | |
| The Colorado Supreme Court justices may discipline their own members. | Seven randomly selected Colorado Court of Appeals and District Court judges review any appeal made by a Colorado Supreme Court justice who has been disciplined. |
| **State Colorado Supreme Court Role** | |
| The Colorado Supreme Court is the final arbiter of cases after receiving disciplinary recommendations and makes rules about the process. | Colorado Supreme Court role is limited to appeals. Rules for the process are established by an independent body. |
| **Public Access to Information** | |
| Formal judicial disciplinary hearings are held privately until the announcement of public sanctions, and reporting requirements and communication with the person who filed the complaint is limited. | Upon the start of proceedings, the commission may share case information with complainants, judicial oversight agencies, and the general public. Case information may also be included in aggregate data used for required reports on complaints against judges. |
| **Appointments** | |
| Colorado Supreme Court nominates members for the Commission on Judicial Discipline and appoints judges to hear discipline cases. | Commission members and the new adjudicative board are appointed by the Supreme Court and the Governor and confirmed by the Senate. The State Court Administrator randomly selects judges for the tribunal. |

**Why is HCR23-1001 on the ballot?**

In 2023, the Colorado legislature passed three bipartisan bills about judicial discipline procedures and workplace culture, including HCR23-1001. The other two bills address confidentiality, complaint filing and reporting, and data collection, as well as created a new office to assist judicial employees with workplace and other complaints.

- 3 -

1st Draft

> For information on those issue committees that support or oppose the measures on the ballot at the November 5, 2024, election, go to the Colorado Secretary of State's elections center web site hyperlink for ballot and initiative information:
>
> https://coloradosos.gov/pubs/elections/Initiatives/InitiativesHome.html

## Arguments For HCR23-1001

1) Colorado judges should not have direct influence and oversight over their own discipline. HCR23-1001 aims to enhance the autonomy, transparency, and independence of the judicial discipline process.  Historically, judicial discipline has largely been self-regulated, facing challenges in oversight and self-protection. This amendment serves to enhance public confidence and trust in the courts.

## Arguments Against HCR23-1001

1) Judges understand how to review cases, hold hearings, and make impartial and hard decisions. As a result, they are well-suited to hear judicial discipline cases. The amendment transfers this authority to attorneys and citizens, who cannot fully understand judicial ethics and the unique challenges of being a judge. The judiciary's existing system of checks and balances, such as nomination and retention elections, ensures only the best become and remain judges.

## Fiscal Impact of HCR23-1001

The fiscal impact will be included in the second draft.

2nd Draft

# Amendment H: Judicial Discipline Procedures and Confidentiality

Placed on the ballot by the legislature • Passes with 55 percent of the vote

**Amendment H proposes amending the <u>Colorado Constitution</u> to:**

- create an independent board separate from the Colorado Supreme Court to preside over ethical misconduct hearings involving judges; and

- allow for increased public access to information about judicial discipline proceedings.

**What Your Vote Means**

## YES

A "yes" vote on Amendment H changes how judicial discipline cases are handled by creating an independent board to conduct hearings, reducing the Colorado Supreme Court's role in these hearings, and allowing more information to be shared earlier with the public.

## NO

A "no" vote on Amendment H means that the Colorado Supreme Court will continue to select the judges who preside over judicial discipline misconduct hearings, and cases remain confidential unless punishment is publically issued at the end of the process.

### Summary and Analysis of Amendment H

**What is judicial misconduct and discipline?**

Colorado judges must follow a code of conduct. Judicial misconduct occurs when a judge acts unethically or in ways that discredit the courts. Common misconduct complaints include improper demeanor, alcohol and drug use, conflicts of interest, inappropriate communication, and mistreatment or harassment of staff. Any person may file a complaint, and judges found to have violated judicial ethics may be disciplined publicly or privately, depending upon the seriousness of the misconduct.

**How are judicial discipline cases currently handled?**

Pursuant to the Colorado Constitution, the Commission on Judicial Discipline (Commission), an independent state agency charged with investigating allegations of misconduct against judges, screens and investigates complaints. Members of the Commission are appointed by the Colorado Supreme Court and the Governor. The screening process eliminates complaints that ask to review a judge's ruling or order a new trial, and those found to have merit are investigated. Thereafter, the Commission either issues a private reprimand, dismisses the complaint, or forwards findings about the more serious cases to the Colorado Supreme

2nd Draft

Court. The forwarded cases are reviewed further and tried by judges appointed by the Colorado Supreme Court. After the trial, the Colorado Supreme Court receives disciplinary recommendations and agrees on a final ruling.  Misconduct cases are made public only in the final stage of proceedings when judges are publicly punished.

**What changes does Amendment H make to the judicial discipline process?**

Amendment H establishes the Independent Judicial Discipline Adjudicative Board (independent board) to preside over judicial discipline hearings and make disciplinary recommendations. The independent board consists of four district court judges appointed by the Supreme Court, and four attorneys and four citizens appointed by the Governor. The new independent board's decisions are considered final unless there is proof of a legal or factual error. If a case involves a Colorado Supreme Court justice, the appeal is heard by a tribunal made up of randomly selected appellate and district court judges. Formal charges against judges are also made public at the beginning of the hearing.

The flow chart below summarizes the new discipline process.

**Figure 1**
**Judicial Discipline Proceedings Under Amendment H**



- 2 -

2nd Draft

Table 1 compares current practices with those proposed in Amendment H.

**Table 1**

**Current Judicial Discipline Proceedings Compared to Amendment H**

| Current Judicial Discipline | Judicial Discipline Under Amendment H |
|---|---|
| **Formal Disciplinary Hearings** | |
| The Colorado Supreme Court appoints judges to hear cases, make disciplinary recommendations, and determine sanctions against judges accused of misconduct. | The independent board, made up of an equal number of attorneys, judges, and citizens, conducts judicial discipline hearings and determines sanctions. |
| **Discipline Cases Involving Colorado Supreme Court Justices** | |
| A tribunal made up of seven randomly selected Court of Appeals judges hear cases involving Colorado Supreme Court justices. If the proposed sanction recommended by the tribunal is rejected by the accused judge, the Colorado Supreme Court makes the final decision. | The independent board hears discipline cases for Supreme Court justices. Seven randomly selected Colorado Court of Appeals and District Court judges review any appeal made by a Colorado Supreme Court justice who has been disciplined. |
| **Colorado Supreme Court Role** | |
| The Colorado Supreme Court is the final arbiter of cases after receiving disciplinary recommendations and makes rules about the process. | Colorado Supreme Court role is limited to appeals. Rules for the process are established by an independent body. |
| **Public Access to Information** | |
| Formal judicial disciplinary hearings are held privately until the announcement of public sanctions. | Charges against a judge can be made public upon the start of proceedings |
| **Appointments** | |
| Commission members are appointed by the Colorado Supreme Court and the Governor and confirmed by the Senate. Colorado Supreme Court appoints special master judges to hear discipline cases. The State Court Administrator selects judges for the tribunal that hears cases involving Supreme Court justices. | Commission members and the new adjudicative board are appointed by the Colorado Supreme Court and the Governor and confirmed by the Senate. The State Court Administrator randomly selects judges for the tribunal to hear appeals from Supreme Court justices. |

**Why is Amendment H on the ballot?**

In 2023, the Colorado legislature passed three bipartisan bills about judicial discipline procedures and workplace culture, including Amendment H. The other two bills address confidentiality, complaint filing and reporting, and data collection, as well as created a new office to assist judicial employees with workplace and other complaints.

- 3 -

2nd Draft

> For information on those issue committees that support or oppose the measures on the ballot at the November 5, 2024, election, go to the Colorado Secretary of State's elections center web site hyperlink for ballot and initiative information:
>
> https://coloradosos.gov/pubs/elections/Initiatives/InitiativesHome.html

## Arguments For Amendment H

1) Colorado judges should not have direct influence and oversight over the discipline of their colleagues. Amendment H aims to enhance the autonomy, transparency, integrity, and independence of the judicial discipline process.  Historically, judicial discipline has largely been self-regulated, facing challenges in oversight and self-protection. This amendment serves to enhance public confidence and trust in the courts. Finally, this measure is a compromise recommended by nearly all members of the General Assembly and the Judicial Branch.

## Arguments Against Amendment H

1) The current system works. Judges understand how to review cases, hold hearings, and make impartial and hard decisions. As a result, they are well-suited to hear judicial discipline cases. The amendment transfers this authority to attorneys and citizens, who cannot fully understand judicial ethics and the unique challenges of being a judge. The judiciary's existing system of checks and balances, such as nomination and retention elections, ensures only the best become and remain judges.

## Fiscal Impact of Amendment H

**State spending.** The measure will increase state costs by about $50,000 per year. This funding provides compensation and training to members of the newly created judicial discipline board and rulemaking committee.

# Amendment H: Judicial Discipline Procedures and Confidentiality

Placed on the ballot by the legislature • Passes with 55 percent of the vote

**Amendment H proposes amending the <u>Colorado Constitution</u> to:**

- create an independent adjudicative board to preside over ethical misconduct hearings involving judges; and
- allow for increased public access to judicial discipline proceedings and records.

**What Your Vote Means**

| YES | NO |
|---|---|
| A "yes" vote on Amendment H creates an independent adjudicative board made up of citizens, lawyers, and judges to conduct judicial misconduct hearings and impose disciplinary actions, and allows more information to be shared earlier with the public. | A "no" vote on Amendment H means that a select panel of judges will continue to conduct judicial misconduct hearings and recommend disciplinary actions, and cases remain confidential unless public sanctions are recommended at the end of the process. |

## Summary and Analysis of Amendment H

### What is judicial misconduct and discipline?

Colorado judges must follow a code of conduct. Judicial misconduct occurs when a judge acts unethically or in ways that diminish public confidence in the integrity of the courts. Misconduct complaints may include improper demeanor, alcohol and drug use, dishonesty, retaliation, conflicts of interest, inappropriate communication, and mistreatment or harassment of staff. Any person may file a complaint, and judges found to have violated their ethical duties may be disciplined publicly or privately, depending upon the nature of the misconduct.

### How are judicial discipline cases currently handled?

Pursuant to the Colorado Constitution, the Commission on Judicial Discipline (commission), an independent judicial agency charged with investigating allegations of misconduct against judges, screens and investigates complaints. Members of the commission are appointed by the Colorado Supreme Court and the Governor. The screening process eliminates complaints that are outside the commission's jurisdiction, such as those that ask to review a judge's rulings or order new trials. The commission further investigates complaints when there is sufficient evidence of misconduct.

Thereafter, the commission can do one of the following: 1) dismiss the complaint; 2) impose private discipline; 3) hold an informal hearing; or 4) initiate formal hearings. Formal hearings are conducted by a panel of judges selected by the Colorado Supreme Court. When the hearing is over, the commission reviews the panel's findings and forwards disciplinary recommendations to the Colorado Supreme Court for a final determination. Misconduct cases are made public upon the commission filing its recommendations for public discipline. Complaints that result in informal punishments are not disclosed to the general public.

**What changes does Amendment H make to the judicial discipline process?**

Amendment H creates the Independent Judicial Discipline Adjudicative Board (adjudicative board), separate from the Colorado Supreme Court and commission, to preside over judicial discipline hearings and impose sanctions. The adjudicative board consists of four district court judges, four attorneys, and four citizens appointed by the Colorado Supreme Court and the Governor. The new board's decisions are considered final unless there is proof of a legal or factual error upon appeal to the Colorado Supreme Court. If an appeal involves a Colorado Supreme Court justice, it is heard by a tribunal made up of randomly selected appellate and district court judges. Formal disciplinary charges against judges are also made public at the beginning of the hearing.

Figure 1 below summarizes the new discipline process.

**Figure 1**
**Judicial Discipline Flow Chart**



● Complaint can be dismissed at these stages

● Informal punishment can be issued at these stages

Table 1 compares current practices with those proposed in Amendment H.

**Table 1**

**Current Judicial Discipline Proceedings Compared to Amendment H**

| Current Judicial Discipline | Judicial Discipline Under Amendment H |
|---|---|
| **Formal Disciplinary Hearings** | |
| Judges selected by the Colorado Supreme Court hear cases and make disciplinary recommendations to the commission, who in turn makes recommendations to the Colorado Supreme Court for a final discipline ruling. | The independent adjudicative board, made up of an equal number of attorneys, judges, and citizens, conducts judicial discipline hearings and makes the final discipline ruling. |
| **Independent Tribunals** | |
| In cases involving a Colorado Supreme Court justice, their family members, or staff, the entire Colorado Supreme Court must disqualify themselves and be replaced with a tribunal composed of seven randomly selected Colorado Court of Appeals judges. The tribunal hears the case and is the final decision-maker on sanctions. | The tribunal is composed of randomly selected District and Appeal Court judges representing different districts and only hears cases that involve Colorado Supreme Court justices, their staff or family members, or any other case where two justices have recused themselves. A tribunal will also hear appeals from the independent adjudicative board. |
| **Colorado Supreme Court Role** | |
| The Colorado Supreme Court is the final arbiter of cases after receiving disciplinary recommendations and makes rules about the process. | Colorado Supreme Court role is limited to appointments and appeals. Rules for the process are established by an independent committee. |
| **Public Access to Information** | |
| Formal judicial disciplinary hearings are held privately until the commission files a formal recommendation for public sanctions with the Colorado Supreme Court. | The proceedings against a judge and the related record become public when formal charges are filed. |
| **Appointments** | |
| Commission members are appointed by the Colorado Supreme Court and the Governor with Senate confirmation. Colorado Supreme Court appoints special master judges to hear discipline cases. The State Court Administrator randomly selects judges for the tribunal in cases where the Colorado Supreme Court is disqualified. | Commission members and the new adjudicative board are appointed by the Colorado Supreme Court and the Governor with Senate confirmation. The State Court Administrator randomly selects Court of Appeals and District Court judges for the tribunal to hear Colorado Supreme Court related appeals. |

Legislative Council Draft

**Why is Amendment H on the ballot?**

After extensive hearings involving experts, stakeholders, and the public, the Colorado legislature passed three bipartisan bills in 2023 that change judicial discipline procedures and workplace culture, including Amendment H. Because this amendment would change Colorado's constitutional provisions on judicial discipline, it requires voter approval to become law. The other two bills address confidentiality, complaint filing and reporting, and data collection, as well as creating a new office to assist judicial employees with workplace and other complaints.

> For information on those issue committees that support or oppose the measures on the ballot at the November 5, 2024, election, go to the Colorado Secretary of State's elections center web site hyperlink for ballot and initiative information:
>
> https://coloradosos.gov/pubs/elections/Initiatives/InitiativesHome.html

## Argument For Amendment H

1) Colorado judges should not have direct influence and oversight over the discipline of their colleagues. Amendment H is an important change that aims to enhance the transparency, integrity, and independence of the judicial discipline process. Historically, judicial discipline has largely been self-regulated, facing challenges in oversight and self-protection. This amendment serves to enhance public confidence and trust in the courts. Finally, this measure is a compromise recommended by nearly all members of the General Assembly and formally by the Judicial Branch.

## Argument Against Amendment H

1) The current system works. Judges understand how to review cases, hold hearings, and make impartial and hard decisions. As a result, they have the experience to hear judicial discipline cases. The amendment transfers this authority to attorneys and citizens, who cannot fully understand judicial ethics and the unique challenges of being a judge. The judiciary's existing system of checks and balances, such as nomination and retention elections, ensures only the best become and remain judges.

## Fiscal Impact of Amendment H

**State spending.** The measure will increase state costs by about $50,000 per year. This funding provides compensation and training to members of the newly created judicial discipline board and rulemaking committee.

- 4 -

3rd Draft

# Amendment H: Judicial Discipline Procedures and Confidentiality

Placed on the ballot by the legislature • Passes with 55 percent of the vote

**Amendment H proposes amending the <u>Colorado Constitution</u> to:**

- create an independent adjudicative board to preside over ethical misconduct hearings involving judges; and

- allow for increased public access to judicial discipline proceedings and records.

**What Your Vote Means**

## YES

A "yes" vote on Amendment H creates an independent adjudicative board made up of citizens, lawyers, and judges to conduct judicial misconduct hearings and impose disciplinary actions, and allows more information to be shared earlier with the public.

## NO

A "no" vote on Amendment H means that a select panel of judges will continue to conduct judicial misconduct hearings and recommend disciplinary actions, and cases remain confidential unless public sanctions are issued at the end of the process.

## Summary and Analysis of Amendment H

**What is judicial misconduct and discipline?**

Colorado judges must follow a code of conduct. Judicial misconduct occurs when a judge acts unethically or in ways that diminish public confidence in the courts. Misconduct complaints may include improper demeanor, alcohol and drug use, conflicts of interest, inappropriate communication, and mistreatment or harassment of staff. Any person may file a complaint, and judges found to have violated their ethical duties may be disciplined publicly or privately, depending upon the nature of the misconduct.

**How are judicial discipline cases currently handled?**

Pursuant to the Colorado Constitution, the Commission on Judicial Discipline (commission), an independent judicial agency charged with investigating allegations of misconduct against judges, screens and investigates complaints. Members of the commission are appointed by the Colorado Supreme Court and the Governor. The screening process eliminates complaints that are outside the commission's jurisdiction, such as those that ask to review a judge's rulings or order new trials. The commission further investigates complaints when there is sufficient evidence of misconduct.

3rd Draft

Thereafter, the commission can: dismiss the complaint, impose private discipline, hold an informal hearing, or recommend formal hearings. The formal hearings are conducted by a panel of judges selected by the Colorado Supreme Court. When the hearing is over, the commission reviews the panel's findings and forwards disciplinary recommendations to the Colorado Supreme Court for a final determination. Misconduct cases are made public only if a judge receives a public punishment order at the end of the process. Complaints and informal punishments may not be shared with the persons who filed the complaints or the general public.

**What changes does Amendment H make to the judicial discipline process?**

Amendment H creates the Independent Judicial Discipline Adjudicative Board (adjudicative board) to preside over judicial discipline hearings and impose sanctions. The adjudicative board consists of four district court judges, four attorneys, and four citizens appointed by the Colorado Supreme Court and the Governor. The new board's decisions are considered final unless there is proof of a legal or factual error upon appeal to the Colorado Supreme Court. If an appeal involves a Colorado Supreme Court justice, it is heard by a tribunal made up of randomly selected appellate and district court judges. Formal charges against judges are also made public at the beginning of the hearing.

Figure 1 below summarizes the new discipline process.

**Figure 1**

**Judicial Disciple Flow Chart**



● Complaint can be dismissed at these stages

● Informal punishment can be issued at these stages

Table 1 compares current practices with those proposed in Amendment H.

3rd Draft

**Table 1**

**Current Judicial Discipline Proceedings Compared to Amendment H**

| Current Judicial Discipline | Judicial Discipline Under Amendment H |
|---|---|
| **Formal Disciplinary Hearings** | |
| Judges selected by the Colorado Supreme Court hear cases and make disciplinary recommendations to the Colorado Supreme Court for final discipline ruling. | The independent adjudicative board, made up of an equal number of attorneys, judges, and citizens, conducts judicial discipline hearings and makes final discipline ruling. |
| **Independent Tribunals** | |
| In cases involving a Colorado Supreme Court justice, their family members, or staff, the entire Colorado Supreme Court must disqualify themselves and be replaced with a tribunal composed of seven randomly selected Colorado Court of Appeals judges.  The tribunal hears the case and is the final decision-maker on sanctions. | The tribunal is composed of randomly selected District and Appeal Court judges representing different districts and only hears Colorado Supreme Court justice-related appeals. |
| **Colorado Supreme Court Role** | |
| The Colorado Supreme Court is the final arbiter of cases after receiving disciplinary recommendations and makes rules about the process. | Colorado Supreme Court role is limited to appointments and appeals. Rules for the process are established by an independent committee. |
| **Public Access to Information** | |
| Formal judicial disciplinary hearings are held privately until the commission files a formal recommendation for public sanctions with the Colorado Supreme Court. | The proceedings against a judge and the related record become public when formal charges are filed. |
| **Appointments** | |
| Commission members are appointed by the Colorado Supreme Court and the Governor with Senate confirmation.  Colorado Supreme Court appoints special master judges to hear discipline cases.  The State Court Administrator randomly selects judges for the tribunal in cases where the Colorado Supreme Court is disqualified. | Commission members and the new adjudicative board are appointed by the Colorado Supreme Court and the Governor with Senate confirmation. The State Court Administrator randomly selects Court of Appeals and District Court judges for the tribunal to hear Colorado Supreme Court related appeals. |

**Why is Amendment H on the ballot?**

After extensive hearings about the judicial discipline process, the Colorado legislature passed three bipartisan bills in 2023 that change judicial discipline procedures and

- 3 -

3rd Draft

workplace culture, including Amendment H. Because this amendment would change Colorado's constitutional provisions on judicial discipline, it requires voter approval to become law. The other two bills address confidentiality, complaint filing and reporting, and data collection, as well as creating a new office to assist judicial employees with workplace and other complaints.

> For information on those issue committees that support or oppose the measures on the ballot at the November 5, 2024, election, go to the Colorado Secretary of State's elections center web site hyperlink for ballot and initiative information:
>
> https://coloradosos.gov/pubs/elections/Initiatives/InitiativesHome.html

## Argument For Amendment H

1) Colorado judges should not have direct influence and oversight over the discipline of their colleagues. Amendment H is an important change that aims to enhance the transparency, integrity, and independence of the judicial discipline process. Historically, judicial discipline has largely been self-regulated, facing challenges in oversight and self-protection. This amendment serves to enhance public confidence and trust in the courts. Finally, this measure is a compromise recommended by nearly all members of the General Assembly and formally by the Judicial Branch.

## Argument Against Amendment H

1) The current system works. Judges understand how to review cases, hold hearings, and make impartial and hard decisions. As a result, they are well suited to hear judicial discipline cases. The amendment transfers this authority to attorneys and citizens, who cannot fully understand judicial ethics and the unique challenges of being a judge. The judiciary's existing system of checks and balances, such as nomination and retention elections, ensures only the best become and remain judges.

## Fiscal Impact of Amendment H

**State spending.** The measure will increase state costs by about $50,000 per year. This funding provides compensation and training to members of the newly created judicial discipline board and rulemaking committee.

# Last Draft Comments from Interested Parties

**Amendment H**
**Judicial Discipline Procedures and Confidentiality**

**Christopher Forsyth, representing The Judicial Integrity Project:**

I am in receipt of the third draft analysis. There is little changed from the previous analysis which was alarmingly insufficient. Therefore, my comments regarding the previous draft are being provided again because they are also pertinent to this draft. I also drafted a better ballot analysis and encourage you to adopt that analysis for the Blue Book. It is attached.

The judical scandal involved the state court administrator behaving improperly.    What does Amendment H do? It incrases the state court administrator's power and gives him or her direct power in judicial discipline proceedings. Voters need to know that.

The draft analysis provided by your office fails to provide sincere arguments against Amendment H. It fails to accurately describe the current process or Amendment H. It is confusing and misleading.

It is troubling enough that the judicial branch hoodwinked the legislature into proposing Amendment H. The amendment contains a lot of words but changes very little in the process. It affects less than one percent of complaints filed against judges. Why would you add to that conundrum by putting forth this inaccurate and lazy misleading ballot analysis? I implore you to accurately state the current system and what Amendment H would do.

The attached proposed draft is more accurate and does not mislead the public regarding the current system or what Amendment H would do. I encourage you to adopt it.

Thank you for your time and attention to this matter. The analysis in the Blue Book should be accurate. Voters have the right to expect it to be accurate. The current draft analysis is not accurate. It is not helpful to voters.

*Mr. Forsyth also submitted marked-up copy of the analysis with recommended language (Attachment A).*

**Christopher Gregory, representing himself:**

I appreciate legislative staff's efforts to incorporate many of my previous editing suggestions for this ballot analysis. Consistent with the instructions provided in the

# Last Draft Comments from Interested Parties

August 12, 2024 letter from Legislative Council, I have included some of my previous requests for edits in the attached document.

Overall, I believe that this draft language is fairly close to what it should be. Consequently, my comments focus on three primary points: 1) the ballot analysis should at least note that this amendment will limit the Colorado Supreme Court's control/influence over the judicial disciplinary process, 2) the description of what constitutes judicial misconduct should be more robust and acknowledge that judges are held to a higher standard (which includes avoiding even the appearance of impropriety), and 3) the explanation of Amendment H being on the ballot should emphasize the robustness of the Interim Committee on Judicial Discipline's process and how the final version of HCR 23-1001 passed unanimously through both houses on its third reading. As I note, I am unaware of other prior constitutional amendment referrals with such a level of universal support.

Although I do not know if it is helpful to the drafters, I was struck by how well Rep. Weissman summarized HCR 23-1001 when it was introduced in the House Judiciary Committee (3/15/23). Rep. Weissman stated:

All right, thank you, Madam Chair and committee. I should make this close enough. Thank you for hearing House Concurrent Resolution 1001 today. This is half of the work of last summer's Interim Committee on Judicial Discipline, of which Minority Leader Lynch and I were both members and, of course, colleagues. The Vice Chair was part of this journey as well with us. Just to provide a little bit of groundwork, and because not everybody was part of that, the prior phases of the journey that lead us to where we are today, I thought I'd say just a little bit about it, and then we'll make some comments that are more directly to the measure. Excuse me, really, I wanted to start briefly with a bill that the legislature passed last spring, House Bill, or rather, I'm sorry, Senate Bill 22-201. Among other things, that measure, for the first time, codified in statute the Commission on Judicial discipline and the Office of Judicial Discipline. Previously, those had existed in court rule. They specified information sharing responsibilities between what were in that Bill called judicial discipline agencies, so the Commission and things like Attorney Regulation Counsel and otherwise. Because we knew that there would be some even bigger changes to have to grapple with, including changes of the constitutional nature that we really couldn't deal with in the last weeks of session, part of that bill last year created the interim committee that begat the legislation that we're here to talk about today. I want to note that 201, was bipartisan and bicameral. I was one of the four sponsors of that and it passed. The final recorded votes in both chambers by a combined vote of 94 to 6. Moving then to the Interim Committee, I wanted to observe a little bit about how that was set up, and intentionally so. It could have been a majoritarian interim committee. Those happen sometimes. Senator Lee and I last year decided that this particular committee should not be majoritarian, because what we're talking about here

– 2 –

## Last Draft Comments from Interested Parties

is even bigger than party identities. We drew inspiration from HB 21-1325 that set up an evenly 4-4, so 2 each House Dems, Senate Republicans interim committee to grapple with school finance, which is also a big question, that is something else that doesn't need to be purely party line. So Senator Lee began chairing. I then took over chairship midway. And Rep. Carver, who is not with us, because she was term limited, was Vice Chair. And she was a great partner to work with throughout the summer. I wanted to note that, because it's not every interim committee that is like that, and that was an integral part of all of our work, the legislation, and you can see the list if you'd like at 13-5.3-110(7), the legislation charged the interim committee to study 17 specific areas or aspects of judicial discipline. We took testimony over the course of multiple hearings from a variety of folks, bar associations, heavily the Colorado Bar Association and the Colorado Women's Bar Association, variety of outside organizations, and I want to specifically acknowledge the National Center for State Courts, which as an entity that kind of studies judicial branch operations across the 50 states, survivor advocacy organizations, and I want to specifically mention CCASA (the Colorado Coalition Against Sexual Assault) and various members of the public. Process wise, in talking with Rep. Carver near the end of our work, we decided to try to operate in a consensus way. Sometimes, what will happen in an interim committee is both sides might go to their respective corners. The blue team will draft over here, the red team will draft over here. You'll see what happens. What I proposed to Vice Chair Carver was that we not do that. Was that we bring forward one set of measures that we could agree to. And ultimately we did. Measure A, which was the parlance from the interim, is now this concurrent resolution. Measure B from the interim is the companion bill that we'll turn to next. And of course, Mr. Minority Leader and Madam Vice Chair will speak about the ombuds aspect, which is the third and last thing on our docket. With that setup, I'm going to turn it over to Minority Leader Lynch.

In any event, I appreciate all the work that you and other members of legislative staff have put into this. I humbly request further consideration of the additional edits and comments that I am submitting here.

As I have previously explained, my participation in this process has been as an individual without speaking on behalf of any third party or organization.

I hope that you have a pleasant week. If there are any questions about my comments or suggested edits, please do not hesitate to let me know.

*Mr. Gregory also submitted a marked-up copy of the analysis with recommended language (Attachment B).*

– 3 –

# Last Draft Comments from Interested Parties

**Jeff Rupp, representing Colorado Judicial Institute:**

To the Legislative Council:

I'm writing to submit comments from the Colorado Judicial Institute (CJI) about the 3rd draft ballot analysis for Amendment H – Judicial Discipline Procedures and Confidentiality. See the attached document with our redline edits and comments. The submitters are Marilyn Chappell, emerita board member, CJI; and Jeff Rupp, Executive Director, CJI.

CJI is grateful for the opportunity to provide this input. CJI is an independent, nonpartisan, nonprofit organization, established in 1979. CJI's mission is to promote excellence, equity, impartiality, and public trust in Colorado's courts. As part of its work, CJI advocates on behalf of Colorado's judicial system and that includes advocating for smart change that makes the system better.

Amendment H is vitally important to CJI.    It addresses Colorado's judicial discipline process – part of our merit system for selecting, evaluating, and retaining judges, adopted by voters in 1966.    CJI participated in 2022 legislative hearings on judicial discipline bills and in the 2022 legislative interim committee process producing what is now Amendment H.

CJI's comments on the Amendment H analysis have emphasized the two main features of the amendment:    creating an independent adjudicative board to preside over judicial discipline proceedings, and providing public access to such proceedings at an earlier stage.    CJI's current comments on the analysis are based on those two features, and on the importance of reminding voters of the context of Amendment H – a proposed change to Colorado's Constitution that should be thoughtfully undertaken.

CJI plans to participate in the upcoming September 4 hearing.    We welcome any further questions or comments.    Thank you.

*Mr. Rupp also submitted a marked-up copy of the analysis with recommended language (Attachment C).*

**Terry Scanlon, representing the Judicial Branch:**

I have three things I would like to highlight:

1.  In Table 1, under "formal disciplinary hearings" the draft says "judges selected by the Supreme Court … make recommendations."   That's a reference to the special masters. But the special masters do not make a recommendation to the Court in the current

– 4 –

## Last Draft Comments from Interested Parties

model. The Special Masters do not make recommendation. The Commission makes a recommendation to the Court.

It seems it would be more accurate to say: "In cases involving a Colorado Supreme Court justice, their family members, or staff, the entire Colorado Supreme Court must disqualify themselves and be replaced with a tribunal composed of seven randomly selected District Court Judges and Court of Appeals Judges.   The tribunal reviews appeals from cases from the independent adjudicative board."

2. The section on independent tribunals under Amendment H, the language says the tribunal "only hears supreme court justice-related appeals." The language could be more clear. The tribunal will serve as the Court instances where a Justice is involved in a case, a family member of a justice, a staff member of a justice, or two or more justices recuse from the case. It might be more fair to say "the tribunal will hear appears on cases that involve justice as a respondent or a witness, or in cases where the justice has a family member or staff member involved in the case, or in cases where two justices have recused."

3. There's a spelling error in the word "discipline" in the header of Figure 1.

Thank you for considering my feedback yet again,

– 5 –

Attachment A



August 14, 2024

Legislative Council
State Capitol
200 East Colfax, Room 29
Denver, CO 80203

     Re:     Amendment H Draft Analysis

To whom it may concern.

     I am in receipt of the third draft analysis. There is little changed from the previous analysis which was alarmingly insufficient. Therefore, my comments regarding the previous draft are being provided again because they are also pertinent to this draft. I also drafted a better ballot analysis and encourage you to adopt that analysis for the Blue Book. It is attached.

     The judicial scandal involved the state court administrator behaving improperly. What does Amendment H do? It increases the state court administrator's power and gives him or her direct power in judicial discipline proceedings. Voters need to know that.

     The draft analysis provided by your office fails to provide sincere arguments against Amendment H. It fails to accurately describe the current process or Amendment H. It is confusing and misleading.

     It is troubling enough that the judicial branch hoodwinked the legislature into proposing Amendment H. The amendment contains a lot of words but changes very little in the process. It affects less than one percent of complaints filed against judges. Why would you add to that conundrum by putting forth this inaccurate and lazily misleading ballot analysis? I implore you to accurately state the current system and what Amendment H would do.

     The attached proposed draft is more accurate and does not mislead the public regarding the current system or what Amendment H would do. I encourage you to adopt it.

     Thank you for your time and attention to this matter. The analysis in the Blue Book should be accurate. Voters have the right to expect it to be accurate. The current draft analysis is not accurate. It is not helpful to voters.

Attachment A

Sincerely,

Chris Forsyth, Esq.
Executive Director
Phone: 303-892-3894
Email: cforsyth@judicialintegrity.org

Attachment A



July 30 2024

Legislative Council
State Capitol
200 East Colfax, Room 29
Denver, CO 80203

      Re:    Amendment H Draft Analysis

To whom it may concern.

      This letter is to respond to the draft analysis as requested. Overall, the draft analysis is confusing because it fails to effectively communicate how the current process works. Therefore, it also fails to effectively communicate what Amendment H does. This letter provides a critique of the draft analysis. Because the analysis is so problematic, however, a complete draft analysis proposal is also being submitted. It is attached to this letter.

**The first section**

In the first sentence under "Amendment H Proposes amending the Colorado Constitution to," "create an independent board separate from the Colorado Supreme Court . . ." This is inaccurate for two reasons. First, the board is not independent of the Colorado Supreme Court. The Supreme Court selects members of the adjudicative board. The state court administrator, who is hired by and works for the Supreme Court, picks the members of an adjudicative panel from the entire board, and the Supreme Court maintains appellate functions over the adjudicative board. Although the resolution passed by the General Assembly which resulted in Amendment H uses the word "independent," it is nothing more than a catchphrase or a marketing term and Legislative Council should not be using the word in its analysis of the measure.

Second, what Amendment H really does is create a separate panel from the Colorado Commission on Judicial Discipline to preside over judicial discipline hearings. Lines 2 and 3 of page one of the draft analysis are not correct and mislead the public.

In addition, it must also be noted that a separate panel to adjudicate judicial discipline is nothing new. Under current law, the discipline commission can ask the Supreme Court to appoint three special masters to hear a judicial discipline case. All Amendment H does is require a separate

panel if a case actually proceeds to formal proceedings. And Amendment H changes the makeup of the panel. Amendment H also makes the findings of the panel final unless appealed. Under the current system, the findings of the panel aren't final and are a recommendation to the Supreme Court.

In the second bullet under the title, the vagueness of the writing oversells what the measure really does. If formal proceedings are initiated, which historically has happened in less than one percent of cases handled by the commission, the proceedings become public. At present such proceedings are not public unless the proceeding concludes with a finding of misconduct and that recommendation for discipline is submitted to the  Supreme Court. It would be much more clear to simply state exactly what Amendment H does: if a judicial misconduct case goes to a formal proceeding, such proceeding shall be public.

**The second section**

In the "yes" position, it states "creating an independent board." What does independent mean? The board is not independent of the Colorado Supreme Court as the paragraph implies. The Supreme Court selects members of the adjudicative board. Although the referendum uses the word "independent" in its language, the word is nothing more than a catchphrase or marketing copy. It is inaccurate because the board is not independent of the Supreme Court.

What the referendum does is create a separate – as opposed to independent – panel to hear and decide judicial discipline cases. The current system can have the prosecution and adjudicative functions in the same office if the Commission does not request a panel of special masters. Amendment H changes that by requiring a separate panel.

Under Amendment H, the Supreme Court still selects members of the panel that hears cases. Therefore, the adjudicatory board does not reduce the Supreme Court's role in judicial discipline hearings. So, the "yes" position is inaccurate.

What a "yes" vote does is require a separate adjudicative panel to preside over judicial discipline proceedings. In regard to transparency, the measure will provide more information to the public only if a case proceeds to formal proceedings which, historically, happens in fewer than one percent of complaints with the commission. This statistic comes from the annual reports of the Colorado Commission on Judicial Discipline.

The "no" position is also inaccurate. If Amendment H is adopted, and in the current system, the Colorado Supreme Court selects judges who preside over judicial discipline hearings. Amendment H does not change that. Amendment H allows the governor to appoint some members of the adjudicatory board who end up on a hearing panel. A "no" vote means a separate adjudicatory panel will only be provided if the Commission requests one. The statement regarding confidentiality is also incorrect. Confidentiality currently ceases when the Commission recommends discipline to the Supreme Court. As it reads, the paragraph state discipline does not become public until the Supreme Court issues discipline. This is not correct.

Attachment A

**Under the Summary and Analysis of Amendment H**

What is judicial misconduct and discipline?

Lines 25-26 are too vague to be helpful to a voter. Judges can be disciplined if they violate the Code of judicial Conduct. What may seem unethical or what may seem to most people as something that discredits the courts may not actually be a violation of the Code. Line 30 is inaccurate and should be removed. The section should end on line 29 with a period after "privately." The phrase "depending upon the seriousness of the misconduct" is not an accurate description of the law.

How are judicial discipline cases currently handled?

In line 33, the phrase "independent state agency" is used. It is inaccurate and should not be used by Legislative Council in its analysis. What does "independent" mean? It is misleading. The commission is not independent of the Supreme Court in any way, shape, or form. The Supreme Court selects judges to be on the Commission, writes the rules for the Commission, and ultimately what, if any, discipline is issued. The word "independent" should be removed.

Line 35 on page 1 through line 4 on page 2 are misleading the therefore very problematic. The description of the screening process is inaccurate. The Colorado Constitution does not provide for the screening of complaints as alleged in lines 32-34. Screening is created by a rule promulgated by the Supreme Court. A lot of complaints are dismissed in the controversial screening process of the commission. Often the complaints are dismissed by the executive director without involvement of the entire commission. And the basis used to dismiss complaints in the screening process are much more numerous than those stated. The statement regarding merit in line 36 is also misleading. A complaint can have merit, but if it's in a complaint related to an order or an action in court that could be appealed, it will be dismissed in the screening process. Likewise, the description regarding what the commission does is inaccurate and misleading. Private discipline can take different forms. And the description about what the commission does is grossly inaccurate, especially considering that this is what Amendment H is about. The pertinent section in the constitution reads as follows:

> The commission may, after such investigation as it deems necessary, order informal remedial action; order a formal hearing to be held before it concerning the removal, retirement, suspension, censure, reprimand, or other discipline of a justice or a judge; or request the supreme court to appoint three special masters, who shall be justices or judges of courts of record, to hear and take evidence in any such matter and to report thereon to the commission.

Colo. Const., Art. IV, Sec. 23. Para (3)(e).

The same procedure in Amendment H, with a separate adjudicatory panel, can happen under present law. Current law says either the commission can proceed to a formal hearing and make its own ruling, or a separate panel can have a hearing and make the ruling if requested by the

commission. In both instances, the Supreme Court appoints members to the adjudicatory panel. Under current law, the determination after hearing, if it recommends discipline, becomes a recommendation to the Supreme Court. Under Amendment H, the determination becomes final unless it is appealed to the Supreme Court. So how different is Amendment H from current law? It simply requires the separate panel, changes the membership of the panel, and requires an appeal to get to the Supreme Court. It's essentially the same system.

The statement that the forwarded cases are reviewed further and tried by judges appointed by the Colorado Supreme Court, on lines 1 and 2 of page 2, is simply not correct. It can happen that way under the current system, but it doesn't always happen that way. At this point, the Colorado Supreme Court can basically do whatever it wants, including dismiss the case. The last sentence of this section is also misleading. Current law is that until the commission files a recommendation with the Supreme Court, the proceedings are confidential. The statement written in the draft on lines 3 and 4 of page 2 is very misleading because it is vague and implies judges receive discipline. The phrase "when judges are publicly punished" is not correct. If it reads in this manner, which it should not, it should read "if" judges are publicly punished. The paragraph as written is very confusing and incorrect.

<u>What changes does Amendment H make to the judicial discipline process?</u>

Lines 6-16 on page 2 are incorrect, misleading, and need to be changed. Again, the word "independent" is used on lines 6, 8, 10, and in the chart in line 16. The word "independent" is a catchphrase or marketing term. The board is not independent of the Supreme Court, which is the improper selling tactic that is being attempted. The word "independent" should be removed from the draft analysis. It is not helpful. Amendment H replaces the current three special masters with an adjudicatory board. Lines 10-11 are incorrect because the Supreme Court reviews legal issues de novo.

This section is also confusing because it fails to describe the two appellate paths. In most instances an appeal of the adjudicatory panel's decision will be heard by the Colorado Supreme Court. If a complaint relates to a Supreme Court Justice, however, then an appeal is heard by a special tribunal comprised of six district court judges and a Court of Appeals judge.

The chart is misleading because it fails to show where the changes are in the system. Furthermore, the first two sections of the chart, from left to right, are not created for or provided for by Amendment H. Those two sections are created by current rules. If it is insisted that this particular chart be used, it should contain a separate circle, possibly half filled, to show that this is the way the system currently works. So, the first figure regarding screening would have a half-filled circle showing that this is currently the process. The second figure regarding full commission review would also have a half-circle. Under both Amendment H and current law the executive director can dismiss cases on his own without full involvement of the commission. The chart is misleading.

The third figure regarding the "independent" board is also allowed under current law. As stated above, the word "independent" should be removed. This third figure should also contain a half-circle. Amendment H requires, as opposed to allows, the separate panel and changes the

Attachment A

membership of the panel which is not reflected in the chart. The figures in the 4th column, going left to right, are also misleading. The top box should be the Supreme Court for appeals. Below should be a box relating that a tribunal hears appeals that relate in any way to a Supreme Court Justice. The fifth column again improperly uses the word "independent." The word should be removed and replaced with "adjudicatory." Furthermore, the entire board does not hear an appeal. Only the panel of three would hear an appeal.

The current system works as this chart, only the Supreme Court would not remand a case back to a panel under current law. This chart is not helpful. It is misleading because it implies the current system does not work this way.

**Page 3**

The table on page three is problematic. What is missing from the beginning of this page is glaring. If comparing the current judicial discipline proceedings to Amendment H in this manner, it needs to be stated that complaints are still filed with the Commission on Judicial Discipline where they can be dismissed. Amendment H only changes judicial discipline if there are formal proceedings. **Historically, formal proceedings have happened in less than one percent of cases filed with the commission. Actually, it's a fraction of that one percent. So, it needs to be made clear that Amendment H will affect very, very few cases.** This should be stated in the first paragraph in this section.

Under the current first paragraph, "Formal Disciplinary Hearings" the Supreme Court appoints judges both currently and under Amendment H. Amendment H simply adds a lawyer and citizen appointed by the governor to a three-person panel. The three-person panel is selected from the entire adjudicatory board. The state court administrator, who is hired by and reports to the Supreme Court, puts the adjudicatory panel together for each case. This section is misleading because it makes it look like the Supreme Court isn't involved in the adjudicatory board or panel when the Supreme Court is still very much involved. The state court administrator is hired by and works for the Supreme Court.

The current second paragraph, "Discipline Cases Involving Colorado Supreme Court Justices" is also confusing and misleading. Under Amendment H the word "independent" is again used. As stated previously, that word is not helpful to voters and is misleading. Therefore, Legislative Council should refrain from using it for the language that ends up in the ballot book. Furthermore, a Supreme Court justice does not have to be the respondent in the judicial discipline hearing for this special tribunal to be used.

The current third paragraph, "Colorado Supreme Court Role," is misleading and oversells Amendment H. The Colorado Supreme Court's role both currently and under Amendment H is limited to appeals. Under the current system, a judge can accept discipline at any time. Historically 97% of cases against judges are completely dismissed. This statistic is calculated from the annual reports of the Colorado Commission on Judicial Discipline. Of the remaining 3%, private discipline is most often issued which does not involve the Supreme Court. In other words, the current Commission issues discipline without Supreme Court involvement. Judges accept private and public discipline without the involvement of the Supreme Court.

Under current law, only if there are formal proceedings (the accused judge and the commission don't agree on discipline) which result in a recommendation of discipline does the matter get to the Supreme Court. Stating the Supreme Court is the "final arbiter "makes the Supreme Court sound much more involved in individual cases than it is. The Supreme Court's role under Amendment H is very similar. It has the ability to overturn the commission's finding both currently and under Amendment H. Saying the rules under Amendment H are established by an "independent body" is misleading. The Supreme Court appoints members of the rulemaking board. Again, the word "independent" should not be used. It is not helpful.

The "Public Access to Information" is also incorrect. Under current law, the proceedings become public when a recommendation is filed with the Supreme Court for discipline. Under Amendment H, the proceedings become public when formal disciplinary proceedings are commenced.

<u>Why is Amendment H on the ballot?</u>

This section should not be in the draft analysis. If it is included, it should relate the judicial scandal wherein a state court administrator and chief justice offered a contract to a former employee who was angry she was passed over for the state court administrator position. The employee threatened to expose acts of judges that should have been disciplined. The contract was offered as a way to shut her up. This was exposed and made news all around the state. The legislature felt forced to do something. But unfortunately, the legislature worked closely with the judicial branch. Supreme Court justices actively spoke out to ensure any changes would not harm them. The judicial branch, where judges are not term-limited like legislators, is very skilled and took advantage of legislators. The result is Amendment H along with other measures passed by the General Assembly. That's why H is on the ballot. What is written in the draft analysis does not explain why H is on the ballot, nor is it helpful in understanding what Amendment H does or whether voters should vote for it.

Furthermore, understanding the state court administrator's role as the impetus for Amendment H shows how Amendment H is truly a bad policy. Amendment H puts the state court administrator in control of who is on the adjudicatory panel to determine judicial discipline. The very position that was used corruptly is given more power in the judicial discipline process under Amendment H.

**Argument For Amendment H**

This paragraph is wrong, misleading, and not fair. It oversells Amendment H with its misleading language. The first sentence improperly leads the reader to believe H removes the direct influence of judges over the discipline process. It does not. It cannot even be argued that it does remove such influence. The Supreme Court appoints judges to the adjudicative board. The Supreme Court appoints members of the rulemaking committee. The Supreme Court appoints judges to the discipline commission. The argument that states what Amendment H aims to do is irrelevant and misleading because Amendment H fails to do what it allegedly aims to do – miserably. There is absolutely nothing in this paragraph related to what Amendment H actually

Attachment A

does. It is irrelevant mumbo jumbo. The argument in the paragraph needs to state why the proposals in Amendment H should be adopted. The argument for should be revised to specifically address why the minimal changes proposed in Amendment H are worthy of a constitutional amendment.

**Argument Against Amendment H**

The current paragraph is not acceptable and is insulting to attorneys and citizens. The nomination and retention process is irrelevant to Amendment H. This paragraph is written to make people vote for Amendment H.

We propose the following argument against:

Amendment H makes minimal changes to the judicial discipline process when much more substantial change is needed. Having judges in roles on the discipline commission, on adjudicatory panels, and on the rulemaking board leaves too many conflicts of interest in the process. The current judicial discipline process does not work, and Amendment H will not make it work. History shows that the procedures in Amendment H affect less than one percent of complaints against judges and are not worthy of a constitutional amendment. If Amendment H passes, it will be almost impossible to obtain necessary reforms because legislators will allege they did the job with Amendment H. Empowering the state court administrator with a role in the judicial discipline process is a mistake.

**Conclusion**

Thank you for allowing us to comment regarding Amendment H. The draft analysis is so problematic, we are submitting our own analysis which is a rewrite of the draft analysis. It more clearly explains the current process and the effect Amendment H has on the process.

If you have any questions, please feel free to contact me.

Sincerely,

Chris Forsyth, Esq.
Executive Director
Phone: 303-892-3894
Email: cforsyth@judicialintegrity.org

Attachment A

*Proposed draft analysis*

# Amendment H: Judicial Discipline Procedures and Confidentiality

Placed on the ballot by the legislature . Passes with 55 percent of the vote

## Amendment H proposes Amending the Colorado Constitution to:

- require a separate panel from the Colorado Commission on Judicial Discipline to preside over ethical misconduct hearings involving judges: and
- make proceedings public if a judicial misconduct case goes to a formal proceeding.

## What Your Vote Means

| YES | NO |
|---|---|
| A "yes" vote on Amendment H requires judicial discipline cases that proceed to a formal proceeding be decided by a panel separate from the Colorado Commission on Judicial Discipline. The Supreme Court and the governor select members of an adjudicatory board of judges, attorneys, and citizens from which three members are selected to hear a judicial discipline case. Formal proceedings in judicial discipline proceedings become public when they are commenced. | A "no" vote on Amendment H means that the current system remains in place where the Colorado Commission on Judicial Discipline can preside over formal proceedings in a judicial discipline case or upon the commission's request, the Supreme Court can select three special masters to determine a judicial discipline case. Formal proceedings in judicial discipline proceedings remain confidential unless a case is referred to the Supreme Court with a discipline recommendation. |

## Summary and Analysis of Amendment H

### What is judicial misconduct and discipline?

Colorado judges must follow the Code of Judicial Conduct which is adopted by the Supreme Court. Judicial misconduct occurs when a judge violates the code. Any person may file a complaint with the Colorado Commission on Judicial Discipline alleging a judge violated the code. If a violation is found by the commission, the commission may recommend private or public discipline to which the accused judge may agree. If the judge does not agree, then the matter may proceed to formal proceedings.

### How are judicial discipline cases currently handled?

The Colorado Commission on Judicial Discipline receives complaints regarding judicial misconduct. Members of the commission are appointed by the Colorado Supreme Court and the governor. Pursuant to rule, a screening process is used to dismiss complaints for various

8/29/2024, 2:21 PM

Attachment A

reasons. If a case proceeds to the full commission, the commission may dismiss the complaint or proceed with an investigation. The Commission may issue private discipline. If a judge disagrees with the Commission's stance regarding discipline, the matter may proceed to formal proceedings. Historically, this happens in less than one percent of cases filed with the Commission. The Commission may preside over formal proceedings or request that the Colorado Supreme Court select three special masters to preside over the case. If formal proceedings result in a finding of discipline, the matter is referred to the Supreme Court with a recommendation for discipline. Once a matter is referred to the Supreme Court, it becomes public. Only the supreme Court can discipline a judge against the judge's will.

**What changes does Amendment H make to the judicial discipline process?**

If a judicial discipline case proceeds to formal proceedings, Amendment H requires the case to be heard by a panel separate from the Colorado Commission on Judicial Discipline. The Commission will only prosecute the case. The three-member panel that hears a case is selected by the state court administrator from an adjudicative board comprised of four district court judges appointed by the Supreme Court, and four attorneys and four citizens appointed by the governor. The three-member panel will consist of one judge, one attorney, and one citizen. The determination by the panel is considered final unless an appeal is filed. The Colorado Supreme Court would hear most appeals. If a case relates to a Supreme Court Justice, however, an appeal will be heard by a tribunal comprised of six district court judges, each from a different judicial district, and one Court of Appeals judge. If a judge does not appeal a panel's determination, then the judge can be disciplined against the judge's will without Supreme Court involvement.

The flow chart below summarizes how the discipline process would work if Amendment H passes.

## Figure 1
## Judicial Discipline Proceedings Under Amendment H



X – This is the same procedure as current law
O – complaint can be dismissed at these stages
V – informal punishment can issue at these stages

Attachment A

## Table 1
## Current Judicial Discipline Proceedings Compared to Amendment H

| Current Judicial Discipline | Judicial Discipline Under Amendment H |
| --- | --- |
| **Prior to Any Formal Disciplinary Hearing** | |
| Amendment H does not change the procedure before a formal disciplinary hearing. As shown by the annual reports of the Colorado Commission on Judicial Discipline, the vast majority of complaints (97%) filed with the Commission are dismissed by the Commission either through a screening process or through a vote of the entire commission. Of the remaining 3% of cases, most are resolved with private discipline. Less than one percent of cases filed with the Commission get to the point of formal proceedings. The procedures provided in Amendment H only apply if a case proceeds to formal proceedings. | |
| **Formal Disciplinary Hearings** | |
| Either the Commission on Judicial Discipline or a panel of three special masters selected by the Colorado Supreme Court preside over formal disciplinary hearings. If discipline is recommended, the recommendation is provided to the Supreme Court and the recommendation can be accepted, modified, or rejected. | A panel of three members (one judge, one lawyer, one citizen) preside over formal disciplinary hearings. The decision is final unless an appeal is filed. Most appeals will be heard by the Supreme Court. If a case relates to a Supreme Court justice, however, a tribunal of six district court judges and one Court of Appeals judge hear the appeal. |
| **Public Access to Information** | |
| Judicial discipline proceedings are confidential until a recommendation for discipline is filed with the Supreme Court. Cases sometimes, however, can become public before this point. No publication of papers filed with or proceedings before the commission are privileged in any action for defamation except that the record filed by the Commission in the Supreme Court continues to be privileged. | Judicial discipline proceedings are confidential until the commencement of formal proceedings. Cases sometimes, however, can become public before this point. A person is immune from defamation based on papers filed or testimony given, but no other publication, such as a newspaper, has absolute immunity in any action for defamation filed by a judge. |
| **Appointments** | |
| Commission members are appointed by the Colorado Supreme Court and the governor with consent of the Senate. Colorado Supreme Court appoints special master judges to hear discipline cases. The state court administrator selects judges for the panel that hears cases relating to Supreme Court justices. | Commission members and adjudicative board are appointed by the Colorado Supreme Court and the governor with Senate confirmation. The state court administrator selects from adjudicative board the panel members to hear cases. The state court administrator selects judges who serve on appeal panel if case relates to Supreme Court justice. |

| Rules | |
|---|---|
| Supreme Court makes the rules regarding judicial discipline. | A rulemaking committee comprised of four members appointed by the Supreme Court, four members appointed by the adjudicative board, four members appointed by the Commission, and one victim's advocate appointed by the governor determine the rules regarding judicial discipline. |

## Arguments For Amendment H

Requiring a separate panel from the discipline commission to decide judicial discipline cases is an important change even though such process is allowed by current law. Allowing an attorney and a citizen to be on an adjudicatory panel along with a judge is an important change. Making the proceedings public when formal proceedings are commenced provides additional and sufficient transparency in the process. Amendment H is approved by the judicial branch and that is important because judges must approve their disciplinary process. The state court administrator should have an important role regarding the selection of who is placed on an adjudicatory panel. Judges should be involved in making the rules for the judicial discipline system.

## Arguments Against Amendment H

Amendment H makes minimal changes to the judicial discipline process when much more substantial change is needed. Having judges in roles on the discipline commission, on adjudicatory panels, and on the rulemaking board leaves too many conflicts of interest in the process. The current judicial discipline process does not work, and Amendment H will not make it work. History shows that the procedures in Amendment H affect less than one percent of complaints against judges and are not worthy of a constitutional amendment. If Amendment H passes, it will be almost impossible to obtain necessary reforms because legislators will allege they did the job with Amendment H. Empowering the state court administrator with a role in the judicial discipline process is a mistake.

Attachment B

3rd Draft

# Amendment H: Judicial Discipline Procedures and Confidentiality

Placed on the ballot by the legislature • Passes with 55 percent of the vote

**Amendment H proposes amending the <u>Colorado Constitution</u> to:**

- <mark>reduce the Colorado Supreme Court's role and control over Colorado's judicial discipline system;</mark>
- create an independent adjudicative board to preside over ethical misconduct hearings involving judges; and
- allow for increased public access to judicial discipline proceedings and records.

**What Your Vote Means**

## YES

A "yes" vote on Amendment H creates an independent adjudicative board made up of citizens, lawyers, and judges to conduct judicial misconduct hearings and impose disciplin~~ary actions~~e, <u>reduces the Colorado Supreme Court's role in judicial discipline,</u> and allows more information to be shared earlier with the public.

## NO

A "no" vote on Amendment H means that a select panel of judges will continue to conduct judicial misconduct hearings and recommend disciplinary actions, and cases remain confidential unless public sanctions are ~~issued~~ <u>recommended</u> at the end of the process.

**Commented [CG1]:** As reflected in the first draft of this Blue Book statement, the structural changes of Amendment H in reducing the Colorado Supreme Court's ultimate control of the judicial discipline process and other aspects of it (i.e. absolute authority to appoint members of the Commission on Judicial Discipline and to conduct *de novo* review of disciplinary recommendations) is a critical part of what Amendment H does.  Adding this bullet point seems essential to inform voters of the purpose of Amendment H.

**Formatted:** Font: Segoe UI

**Summary and Analysis of Amendment H**

**<mark>What is judicial misconduct and discipline?</mark>**

Colorado judges must follow a code of conduct. Judicial misconduct occurs when a judge acts unethically or in ways that diminish public confidence in the <u>integrity of the </u>courts. Misconduct complaints may include <u>failure to perform judicial duties competently and diligently, abuse of the prestige of judicial office, </u>improper demeanor, alcohol and drug use, conflicts of interest, inappropriate communication, ~~and ~~mistreatment or harassment of staff<u>, criminal or other unlawful conduct, dishonesty, and retaliation. Judges are prohibited from engaging in actual impropriety or even conduct that creates appearances of impropriety. </u> Any person may file a complaint, and judges found to have violated their ethical duties may be disciplined publicly or privately, depending upon the nature of the misconduct.

**Commented [CG2]:** The additional suggested language (also suggested as to the second draft) is important.  Under the Code of Judicial Conduct, judges are held to a higher standard (i.e. preventing even appearances of impropriety) that is critical to understanding the meaning of "judicial misconduct." Much of the public criticism raised during the Interim Committee process related to perceptions that judicial discipline should apply to judges' decision making.  In reality, the Code does allow for enforcement of misconduct that compromises a judge's decisions (i.e. the judge's failure to perform duties competently and diligently or retaliation that occurs against parties/attorneys).

3rd Draft

**How are judicial discipline cases currently handled?**

Pursuant to the Colorado Constitution, the Commission on Judicial Discipline (commission), an independent judicial agency charged with investigating allegations of misconduct against judges, screens and investigates complaints. Members of the commission are appointed by the Colorado Supreme Court and the Governor. The screening process eliminates complaints that are outside the commission's jurisdiction, such as those that ask to review a judge's rulings or order new trials. The commission further investigates complaints when there is sufficient evidence of misconduct.

3rd Draft

Thereafter, the commission can: dismiss the complaint, impose private discipline, hold an informal hearing, or ~~recommend~~ initiate formal ~~hearings~~proceedings. ~~The f~~Formal hearings are conducted by a panel of judges selected by the Colorado Supreme Court. When the hearing is over, the commission reviews the panel's findings and forwards disciplinary recommendations to the Colorado Supreme Court for a final determination. Misconduct cases are made public ~~only if a judge receives a public punishment order at the end of the process~~upon the commission filing its recommendation for public discipline and its record of proceedings. Complaints ~~and~~that result in informal punishments ~~may not be~~are not ~~shared with the persons who filed the complaints or~~disclosed to the general public.

**What changes does Amendment H make to the judicial discipline process?**

Amendment H creates the Independent Judicial Discipline Adjudicative Board (adjudicative board) to preside over judicial discipline hearings and impose sanctions. The adjudicative board consists of four district court judges, four attorneys, and four citizens appointed by the Colorado Supreme Court and the Governor. The new board's decisions are considered final unless there is proof of a legal or factual error upon appeal to the Colorado Supreme Court. If an appeal involves a Colorado Supreme Court justice, it is heard by a tribunal made up of randomly selected appellate and district court judges. Formal disciplinary charges against judges will become public upon filing with the disciplinary hearing and other proceedings also open to the public. ~~are also made public at the beginning of the hearing.~~

Figure 1 below summarizes the new discipline process.

**Figure 1**

**Judicial Disciple Flow Chart**

● Complaint can be dismissed at these stages

● Informal punishment can be issued at these stages

Table 1 compares current practices with those proposed in Amendment H.

> **Commented [CG3]:** This statement is inaccurate. By recommending a public sanction, the commission currently determines whether discipline is made public (regardless of whether the Colorado Supreme Court ultimately rejects the commission's recommendation).

> **Formatted:** Left, Indent: Hanging: 0.42", Line spacing: Exactly 13.2 pt

> **Commented [CG4]:** "reviews" should be stricken from the third arrow. The adjudicatory panel (like a trial court) will hear the disciplinary case. The Colorado Supreme Court or the Special Tribunal will "review" the adjudicatory panel's decision on appeal. It is probably simpler to combine the arrows for the CSC / ST appellate review, too. I suggest: "Appellate review by Supreme Court or Special Tribunal"

Attachment B

3rd Draft

**Table 1**

**Current Judicial Discipline Proceedings Compared to Amendment H**

| Current Judicial Discipline | Judicial Discipline Under Amendment H |
|---|---|
| **Formal Disciplinary Hearings** | |
| Judges selected by the Colorado Supreme Court hear cases and make disciplinary recommendations to the Colorado Supreme Court for final discipline ruling. | The independent adjudicative board, made up of an equal number of attorneys, judges, and citizens, conducts judicial discipline hearings and makes the final discipline ruling. |
| **Independent Tribunals** | |
| In cases involving a Colorado Supreme Court justice, their family members, or staff, the entire Colorado Supreme Court must disqualify themselves and be replaced with a tribunal composed of seven randomly selected Colorado Court of Appeals judges. The tribunal hears the case and is the final decision-maker on sanctions. | The tribunal is composed of randomly selected District and Appeal Court judges representing different districts and only hears Colorado Supreme Court justice-related appeals. |
| **Colorado Supreme Court Role** | |
| The Colorado Supreme Court is the final arbiter of cases after receiving disciplinary recommendations and makes rules about the process. | Colorado Supreme Court role is limited to appointments and appeals. Rules for the process are established by an independent committee. |
| **Public Access to Information** | |
| Formal judicial disciplinary hearings are held privately until the commission files a formal recommendation for public sanctions with the Colorado Supreme Court. | The proceedings against a judge and the related record become public when formal charges are filed. |
| **Appointments** | |
| Commission members are appointed by the Colorado Supreme Court and the Governor with Senate confirmation. Colorado Supreme Court appoints special master judges to hear discipline cases. The State Court Administrator randomly selects judges for the tribunal in cases where the Colorado Supreme Court is disqualified. | Commission members and the new adjudicative board are appointed by the Colorado Supreme Court and the Governor with Senate confirmation. The State Court Administrator randomly selects Court of Appeals and District Court judges for the tribunal to hear Colorado Supreme Court related appeals. |

**Why is Amendment H on the ballot?**

Following passage of Senate Bill 22-201, the bi-partisan Interim Committee on Judicial Discipline held a series of public hearings to evaluate and propose reforms to Colorado's judicial disciplinary system. The hearings included extensive engagement with experts,

- 4 -

3rd Draft

stakeholders, and the general public.  After extensive hearings about the judicial disciplineWith recommendations and draft legislation from the Interim Committee process, the Colorado legislature passed three bipartisan bills in 2023 that change judicial discipline procedures and

> **Commented [CG5]:** The thoroughness and deliberation that occurred through the 2022 Legislative Interim Committee on Judicial Discipline is perhaps the strongest argument for why Amendment H is good legislation and reflects sincere engagement with the public / voters to improve Colorado's governmental systems/structure.

Attachment B

3rd Draft

workplace culture, including Amendment H. Because this amendment would change Colorado's constitutional provisions on judicial discipline, it requires voter approval to become law. The other two bills address confidentiality, complaint filing and reporting, and data collection, as well as creating a new office to assist judicial employees with workplace and other complaints.

> For information on those issue committees that support or oppose the measures on the ballot at the November 5, 2024, election, go to the Colorado Secretary of State's elections center web site hyperlink for ballot and initiative information:
>
> https://coloradosos.gov/pubs/elections/Initiatives/InitiativesHome.html

## Argument For Amendment H

1) Colorado judges should not have direct influence and oversight over the discipline of their colleagues. Amendment H is an important change that aims to enhance the transparency, integrity, and independence of the judicial discipline process. Historically, judicial discipline has largely been self-regulated, facing challenges in oversight and self-protection. This amendment serves to enhance public confidence and trust in the courts. Finally, this measure is a compromise recommended ~~by nearly all members of~~unanimously by the General Assembly and formally by the Judicial Branch.

> **Commented [CG6]:** It is critical to emphasize that HCR 23-1001 passed both Houses unanimously on its Third Reading. I am unaware of other constitutional amendments with similar universal support.

## Argument Against Amendment H

1) The current system works. Judges understand how to review cases, hold hearings, and make impartial and hard decisions. As a result, they are well suited to hear judicial discipline cases. The amendment transfers this authority to attorneys and citizens, who cannot fully understand judicial ethics and the unique challenges of being a judge. The judiciary's existing system of checks and balances, such as nomination and retention elections, ensures only the best become and remain judges.

## Fiscal Impact of Amendment H

**State spending.** The measure will increase state costs by about $50,000 per year. This funding provides compensation and training to members of the newly created judicial discipline board and rulemaking committee.

Attachment C

3rd Draft

# Amendment H: Judicial Discipline Procedures and Confidentiality

Placed on the ballot by the legislature • Passes with 55 percent of the vote

**Amendment H proposes amending the <u>Colorado Constitution</u> to:**

- create an independent adjudicative board to preside over ethical misconduct hearings involving judges; and
- allow for increased public access to judicial discipline proceedings and records.

**What Your Vote Means**

## YES

A "yes" vote on Amendment H creates an independent adjudicative board made up of citizens, lawyers, and judges to conduct judicial misconduct hearings and impose disciplinary actions, and allows more information to be shared earlier with the public.

## NO

A "no" vote on Amendment H means that a select panel of judges will continue to conduct judicial misconduct hearings and recommend disciplinary actions, and cases remain confidential unless public sanctions are issued at the end of the process.

## Summary and Analysis of Amendment H

**What is judicial misconduct and discipline?**

Colorado judges must follow a code of conduct. Judicial misconduct occurs when a judge acts unethically or in ways that diminish public confidence in the courts. Misconduct complaints may include improper demeanor, alcohol and drug use, conflicts of interest, inappropriate communication, and mistreatment or harassment of staff. Any person may file a complaint, and judges found to have violated their ethical duties may be disciplined publicly or privately, depending upon the nature of the misconduct.

**How are judicial discipline cases currently handled?**

Pursuant to the Colorado Constitution, the Commission on Judicial Discipline (commission), an independent judicial agency charged with investigating allegations of misconduct against judges, screens and investigates complaints. Members of the commission are appointed by the Colorado Supreme Court and the Governor. The screening process eliminates complaints that are outside the commission's jurisdiction, such as those that ask to review a judge's rulings or order new trials. The commission further investigates complaints when there is sufficient evidence of misconduct.

3rd Draft

Thereafter, the commission can: dismiss the complaint, impose private discipline, hold an informal hearing, or recommend formal hearings. The formal hearings are conducted by a panel of judges selected by the Colorado Supreme Court. When the hearing is over, the commission reviews the panel's findings and forwards disciplinary recommendations to the Colorado Supreme Court for a final determination. Misconduct cases are made public only if a judge receives a public punishment order at the end of the process. Complaints and informal punishments may not be shared with the persons who filed the complaints or the general public.

**What changes does Amendment H make to the judicial discipline process?**

Amendment H creates the Independent Judicial Discipline Adjudicative Board (adjudicative board) to preside over judicial discipline hearings and impose sanctions. The adjudicative board consists of four district court judges, four attorneys, and four citizens appointed by the Colorado Supreme Court and the Governor. The new board's decisions are considered final unless there is proof of a legal or factual error upon appeal to the Colorado Supreme Court. If an appeal involves a Colorado Supreme Court justice, it is heard by a tribunal made up of randomly selected appellate and district court judges. Formal charges against judges are also made public at the beginning of the hearing.

Figure 1 below summarizes the new discipline process.

**Figure 1**
**Judicial Disciple Flow Chart**



● Complaint can be dismissed at these stages

● Informal punishment can be issued at these stages

Table 1 compares current practices with those proposed in Amendment H.

3rd Draft

**Table 1**

**Current Judicial Discipline Proceedings Compared to Amendment H**

| Current Judicial Discipline | Judicial Discipline Under Amendment H |
| --- | --- |
| **Formal Disciplinary Hearings** | |
| Judges selected by the Colorado Supreme Court hear cases and make disciplinary recommendations to the Colorado Supreme Court for final discipline ruling. | The independent adjudicative board, made up of an equal number of attorneys, judges, and citizens, conducts judicial discipline hearings and makes final discipline ruling. |
| **Independent Tribunals** | |
| In cases involving a Colorado Supreme Court justice, their family members, or staff, the entire Colorado Supreme Court must disqualify themselves and be replaced with a tribunal composed of seven randomly selected Colorado Court of Appeals judges. The tribunal hears the case and is the final decision-maker on sanctions. | The tribunal is composed of randomly selected District and Appeal Court judges representing different districts and only hears Colorado Supreme Court justice-related appeals. |
| **Colorado Supreme Court Role** | |
| The Colorado Supreme Court is the final arbiter of cases after receiving disciplinary recommendations and makes rules about the process. | Colorado Supreme Court role is limited to appointments and appeals. Rules for the process are established by an independent committee. |
| **Public Access to Information** | |
| Formal judicial disciplinary hearings are held privately until the commission files a formal recommendation for public sanctions with the Colorado Supreme Court. | The proceedings against a judge and the related record become public when formal charges are filed. |
| **Appointments** | |
| Commission members are appointed by the Colorado Supreme Court and the Governor with Senate confirmation. Colorado Supreme Court appoints special master judges to hear discipline cases. The State Court Administrator randomly selects judges for the tribunal in cases where the Colorado Supreme Court is disqualified. | Commission members and the new adjudicative board are appointed by the Colorado Supreme Court and the Governor with Senate confirmation. The State Court Administrator randomly selects Court of Appeals and District Court judges for the tribunal to hear Colorado Supreme Court related appeals. |

**Why is Amendment H on the ballot?**

After extensive hearings about the judicial discipline process, the Colorado legislature passed three bipartisan bills in 2023 that change judicial discipline procedures and

Attachment C

3rd Draft

workplace culture, including Amendment H. Because this amendment would change Colorado's constitutional provisions on judicial discipline, it requires voter approval to become law. The other two bills address confidentiality, complaint filing and reporting, and data collection, as well as creating a new office to assist judicial employees with workplace and other complaints.

> For information on those issue committees that support or oppose the measures on the ballot at the November 5, 2024, election, go to the Colorado Secretary of State's elections center web site hyperlink for ballot and initiative information:

> https://coloradosos.gov/pubs/elections/Initiatives/InitiativesHome.html

## Argument For Amendment H

1) ~~Colorado judges should not have direct influence and oversight over the discipline of their colleagues.~~ Amendment H is an important change that aims to enhance the transparency, integrity, and independence of the judicial discipline process by creating an independent adjudicative board to preside over judicial discipline proceedings and increasing information available to the public about judicial discipline proceedings. ~~Historically, judicial discipline has largely been self-regulated, facing challenges in oversight and self-protection.~~ This amendment serves to enhance public confidence and trust in the courts. Finally, this measure is a compromise recommended by nearly all members of the General Assembly and formally by the Judicial Branch.

**Formatted:** Space Before: 4.3 pt, Line spacing: Exactly 13.85 pt, Tab stops: 0.45", Left + Not at 0.7"

**Commented [MC1]:** This recommended change goes back to the primary features of Amendment H – creating an independent adjudicative board and increasing information available to the public.

## Argument Against Amendment H

1) ~~The current system works.~~ Judges ~~understand how to~~ have experience in reviewing cases, holding hearings, and making impartial and hard decisions. As a result, they ~~are well suited~~ have the experience needed to hear judicial discipline cases. The amendment transfers this authority to attorneys and citizens, ~~who cannot fully understand judicial ethics and the unique challenges of being a judge~~. The ~~judiciary's~~ existing system of checks and balances, such as nomination and retention elections, ~~ensures only the best~~ governs who becomes and remains judges. The system has been in place for a long time and is based on the Colorado Constitution. Changing the Constitution is a complex process and cannot easily be undone if the new process does not work as intended.

**Commented [MC2]:** The recommended language emphasizes that voters are being asked to change the Colorado Constitution, which should be thoughtfully undertaken.

## Fiscal Impact of Amendment H

**State spending.** The measure will increase state costs by about $50,000 per year. This funding provides compensation and training to members of the newly created judicial discipline board and rulemaking committee.

**Amendment H**

**Judicial Discipline Procedures and Confidentiality**

**Contact List**

| Interested Party | Organization Name | Email Address |
|---|---|---|
| Amadia Al-Amin | House Majority | amadia.alamin.house@gmail.com |
| COLE ANDERSON | Common Sense Institute | cole@csinstituteco.org |
| Joshua Barnett | | eoval75@gmail.com |
| Michael Beasley | 5280 Strategies | mike@5280strategies.com |
| Kaitlin Begin | Colorado House Majority Office | kaitlin.begin.house@gmail.com |
| Angie Binder | | angiebinder@msn.com |
| Gary and Annette Budd | | annettelbudd@gmail.com |
| Jim Carpenter | Commission on Judicial Discipline | jimcarpenter.colorado@gmail.com |
| Bronwen Cartwright | | bronwen.cartwright.house@gmail.com |
| Terry Carver | | repcarver20@gmail.com |
| NATALIE CASTLE | | natalie.castle@coleg.gov |
| Marilyn Chappell | Colorado Judicial Institute | mchappell@grsm.com |
| Onnastasia Cole | | onnastasia@ccasa.org |
| Soledad Diaz | Violence Free Colorado | sdiaz@violencefreeco.org |
| Mallory Feeney | House Dems | mallory.feeney.house@gmail.com |
| Luanne Fleming | FACEUS | faceusradio@hotmail.com |
| Chris Forsyth | The Judicial Integrity Project | cforsyth@judicialintegrity.org |
| Logan Fry | Brownstein Hyatt Farber Schreck | lfry@bhfs.com |
| Cory Gaines | CTG | corytgaines@gmail.com |
| Erik Gamm | Common Sense Institute | erik@csinstituteco.org |
| Bob Gardner | Colorado State Senate | senbobgardner@comcast.net |
| Christopher Gregory | The Gregory Law Firm, LLC | cspgregory@thegregorylawfirm.net |
| Kathryn Hallahan | | kthhllhn@gmail.com |
| kimberly hanson | | kimberlyjane1603@gmail.com |
| Kiera Hatton | Cobalt | kiera@cobaltadvocates.org |
| BallotAccount HCR23-1001 | | judicialdiscipline2024@coleg.gov |
| Alex Jordan | Larimer County Government | jordanac@co.larimer.co.us |
| James Karbach | Office of the Colorado State Public Defender | james.karbach@coloradodefenders.us |
| Suzanne Keim | | suzanne.keim@coleg.gov |
| Cathy Kipp | Colorado House of Representatives | cathykipp52@gmail.com |
| Katie Kolupke | LCS | katie.kolupke@coleg.gov |
| Rebecca Kourlis | | rlkourlis@gmail.com |
| Andrea Kuwik | | kuwik@bellpolicy.org |
| Pete Lee | Retired | PeteLeeColorado@gmail.com |
| Deborah Lively | LeadingAge Colorado | deborah@leadingagecolorado.org |
| Meghan MacKillop | Nexus Policy Group | meghan@nexuspolicygroup.com |

**Amendment H**

**Judicial Discipline Procedures and Confidentiality**

**Contact List (Cont.)**

| Interested Party | Organization Name | Email Address |
|---|---|---|
| Anne Mangiardi | Commission on Judicial Discipline | amangiardi@jd.state.co.us |
| Rich Mauro | Denver Regional Council of Governments | rmpeoplespalate@gmail.com |
| Sophia Mayott-Guerrero | ACLU-CO | smayott-guerrero@aclu-co.org |
| Jean McAllister | JGM Consulting, LLC | jeangmcallister@aol.com |
| N Menten | self on some issues (also a board director for the Taxpayer's Bill of Rights Foundation) | coloradoengaged@gmail.com |
| Erin Meschke | none | mrs_meschke@hotmail.com |
| Kurt Morrison | Office of the Attorney General | kurtis.morrison@coag.gov |
| Josh Murphy | Colorado Office of Public Guardianship | josh.murphy@colorado-opg.org |
| Elizabeth Newman | | elizabeth@ccasa.org |
| Cynthia Ophaug-Johansen | www.ColoradoJudicialInstitute.org | cynthia@coloradojudicialinstitute.org |
| chae park | | chae@slpublicaffairs.com |
| Catherine Perrone | League of Women Voters | lwvcovote411@gmail.com |
| David Prince | Colorado Judiciary and formerly of the Colo Commission on Judicial Discipline | david.prince@judicial.state.co.us |
| David Prince | Colorado Judiciary and formerly of the Colo Commission on Judicial Discipline | shaunadavid@msn.com |
| Frances Rinard | Splash 2.0/Na/wab3 blackchane Facebook mata | rinardfrances@yahoo.com |
| Anaya Robinson | ACLU of CO | arobinson@aclu-co.org |
| Nancy Rodgers | City and County of Broomfield | nrodgers@broomfield.org |
| Alec Romero | | alec@capitolsuccess.com |
| Jeff Rupp | Colorado Judicial Institute | jeffrupp66@gmail.com |
| Jeff Rupp | Colorado Judicial Institute | jeff@coloradojudicialinstitute.org |
| Sonia Russo | None | soniarusso09@gmail.com |
| Bennett Rutledge | Colorado by Consent of the Governed | rutledges@peoplepc.com |
| Stacy Sager | Temu | stacysager80@gmail.com |
| Feliz Sanchez Garcia | CO House Dems | feliz.sanchezgarcia.house@gmail.com |
| Paula Sarlls | Paula Sarlls | paulasarlls@comcast.net |
| Terry Scanlon | | terry.scanlon@judicial.state.co.us |
| David Schultheis | Self | dave@schultheisforcolorado.com |
| Jeremy Schupbach | Colorado Municipal League | jschupbach@cml.org |
| Cat Simons | | csimons1995@gmail.com |
| Ken Sparks | HopeChest.org | ken.sparks.co@gmail.com |
| Kim Sporrer | Colorado Women's Bar Association | execdir@cwba.org |
| Brett Stewart | City of Loveland | brett.stewart@cityofloveland.org |

**Amendment H**

**Judicial Discipline Procedures and Confidentiality**

**Contact List (Cont.)**

| Interested Party | Organization Name | Email Address |
|---|---|---|
| David Stiver | Team Strategy Inc. | team@teamstrategy.org |
| Courtney Sutton | COVA | courtney@coloradocrimevictims.org |
| Mark Turner | Colorado Department of Human Services | mark.turner@state.co.us |
| Rosemary Van Gorder | | rosevango50@gmail.com |
| Brittany Vessely | Colorado Catholic Conference | bvessely@cocatholic.org |
| Anne Wallace | | anne.wallace@denvergov.org |
| Jeff Walsh | Colorado Commission on Judicial Discipline | j.walsh@jd.state.co.us |
| Carol Ward | Self | cjward_11@comcast.net |
| Geoff Withers | League of Women Voters Colorado | geoff@gwithers.com |
| | | keyonnavolunteerautism@yahoo.com |
| | | dmvanewsletter@gmail.com |
| | | conrad.imel@coleg.gov |
| | | jsamano@aclu-co.org |
| Ken | | ken@dreamofgolf.com |

## Amendment H
## Judicial Discipline Procedures and Confidentiality

**Ballot Title:**

Shall there be an amendment to the Colorado constitution concerning judicial discipline, and, in connection therewith, establishing an independent judicial discipline adjudicative board, setting standards for judicial review of a discipline case, and clarifying when discipline proceedings become public?

**Text of Measure:**

*Be It Resolved by the House of Representatives of the Seventy-fourth General Assembly of the State of Colorado, the Senate concurring herein:*

**SECTION 1.**   At the election held on November 5, 2024, the secretary of state shall submit to the registered electors of the state the ballot title set forth in section 2 for the following amendment to the state constitution:

In the constitution of the state of Colorado, section 23 of article VI, **amend** (3)(a), (3)(e), (3)(f), (3)(g), and (3)(h); and **add** (3)(c.5) and (3)(k) as follows:

**Section 23. Retirement and removal of justices and judges.** (3) (a) There shall be a commission on judicial discipline. It shall consist of: Two judges of district courts and two judges of county courts, each selected by the supreme court, AS PROVIDED BY LAW; two citizens admitted to practice law in the courts of this state, neither of whom shall be a justice or judge, who shall have practiced in this state for at least ten years and who shall be appointed by the governor, with the consent of the senate; and four citizens, none of whom shall be a justice or judge, active or retired, nor admitted to practice law in the courts of this state, who shall be appointed by the governor, with the consent of the senate. AN APPOINTING AUTHORITY SHALL NOT APPOINT A MEMBER OF THE INDEPENDENT JUDICIAL DISCIPLINE ADJUDICATIVE BOARD ESTABLISHED IN SUBSECTION (3)(c.5) OF THIS SECTION TO THE COMMISSION.

(c.5) (I) THERE IS CREATED THE INDEPENDENT JUDICIAL DISCIPLINE ADJUDICATIVE BOARD AS AN INDEPENDENT AGENCY WITHIN THE JUDICIAL DEPARTMENT. THE ADJUDICATIVE BOARD SHALL CONDUCT FORMAL JUDICIAL DISCIPLINARY PROCEEDINGS. THE ADJUDICATIVE BOARD ALSO SHALL HEAR APPEALS OF THE COMMISSION'S ORDERS OF INFORMAL REMEDIAL ACTION. APPEALS TO THE ADJUDICATIVE BOARD ARE CONFIDENTIAL. THE ADJUDICATIVE BOARD CONSISTS OF FOUR DISTRICT COURT JUDGES WITHOUT ANY JUDICIAL OR ATTORNEY DISCIPLINARY HISTORY, APPOINTED BY THE SUPREME COURT; FOUR ATTORNEYS WITHOUT ANY JUDICIAL OR ATTORNEY DISCIPLINARY HISTORY WHO ARE LICENSED TO PRACTICE LAW IN COLORADO AND WHO RESIDE IN COLORADO, APPOINTED BY THE GOVERNOR AND CONFIRMED BY THE SENATE; AND FOUR CITIZENS WHO ARE NOT JUDGES OR ATTORNEYS LICENSED TO PRACTICE LAW IN COLORADO, APPOINTED BY THE GOVERNOR AND CONFIRMED BY THE SENATE. AN APPOINTING AUTHORITY SHALL NOT APPOINT A MEMBER OF THE COMMISSION TO THE ADJUDICATIVE BOARD. FOR THE PURPOSE OF STAGGERING TERMS, WHEN MAKING THE INITIAL APPOINTMENTS TO THE ADJUDICATIVE BOARD, THE APPOINTING AUTHORITY SHALL DESIGNATE TWO MEMBERS FROM EACH CATEGORY TO A FIVE-YEAR TERM AND TWO MEMBERS FROM EACH CATEGORY TO A THREE-YEAR TERM. ALL SUBSEQUENT APPOINTMENTS ARE FOR A TERM OF FIVE YEARS; EXCEPT THAT IN THE EVENT OF A VACANCY ON THE ADJUDICATIVE BOARD, THE ORIGINAL APPOINTING AUTHORITY SHALL APPOINT, IN THE SAME MANNER AS AN ORIGINAL APPOINTMENT, A REPLACEMENT TO SERVE THE REMAINDER OF THE TERM.

(II) UPON ORDER OF A FORMAL HEARING PURSUANT TO SUBSECTION (3)(e) OF THIS SECTION, A PANEL OF THE ADJUDICATIVE BOARD SHALL CONVENE TO CONDUCT THE HEARING. A PANEL CONSISTS OF ONE JUDGE, ONE ATTORNEY LICENSED TO PRACTICE LAW IN COLORADO, AND ONE CITIZEN. THE STATE COURT ADMINISTRATOR, OR THE ADMINISTRATOR'S DESIGNEE, SHALL RANDOMLY SELECT THE PANEL FROM AMONG THE ADJUDICATIVE BOARD'S MEMBERSHIP. THE RANDOM SELECTION OF A PANEL IS A PURELY ADMINISTRATIVE FUNCTION.

(e) (I) The commission may, after such investigation as it deems necessary, DISMISS A COMPLAINT, order informal remedial action, OR order a formal hearing to be held before ~~it~~ A PANEL OF THE ADJUDICATIVE BOARD concerning the removal, retirement, suspension, censure, reprimand, or other discipline of a justice or a judge. ~~or request the supreme court to appoint three special masters, who shall be justices or judges of courts of record, to hear and take evidence in any such matter and to report thereon to the commission.~~ THE RESPONDENT JUSTICE OR JUDGE MAY APPEAL THE COMMISSION'S ORDER FOR INFORMAL REMEDIAL ACTION TO A PANEL OF THE ADJUDICATIVE BOARD. THE ADJUDICATIVE PANEL SHALL REVIEW THE COMMISSION'S INFORMAL REMEDIAL ACTION ORDER FOR ABUSE OF DISCRETION. AN APPEAL OF AN INFORMAL REMEDIAL ACTION ORDER IS CONFIDENTIAL CONSISTENT WITH SUBSECTION (3)(g) OF THIS SECTION.

(II) After a formal hearing, ~~or after considering the record and report of the masters, if the commission finds good cause therefor, it~~ THE ADJUDICATIVE PANEL may DISMISS THE CHARGES BEFORE IT; take informal remedial action; or ~~it may recommend to the supreme court~~ ORDER the removal, retirement, suspension, censure, reprimand, or OTHER discipline, as the case may be, of the justice or judge. The ~~commission~~ ADJUDICATIVE PANEL may also ~~recommend~~ ORDER that the costs of ~~its~~ THE investigation and hearing be assessed against such justice or judge. THE JUSTICE OR JUDGE MAY APPEAL AN ADJUDICATIVE PANEL'S DISCIPLINARY ORDER, AND THE COMMISSION MAY APPEAL AN ADJUDICATIVE PANEL'S DISMISSAL OR DISCIPLINARY ORDER, TO THE SUPREME COURT OR, WHEN THE CIRCUMSTANCES DESCRIBED IN SUBSECTION (3)(f)(II) OF THIS SECTION ARE PRESENT, TO THE TRIBUNAL DESCRIBED IN SUBSECTION (3)(f)(II) OF THIS SECTION.

(f) (I) ~~Following receipt of a recommendation from the commission, the supreme court shall review the record of the proceedings on the law and facts and in its discretion may permit the introduction of additional evidence and shall order~~ ON APPEAL OF AN ADJUDICATIVE PANEL'S ORDER FOR removal, retirement, suspension, censure, reprimand, or OTHER discipline, ~~as it finds just and proper, or wholly reject the recommendation~~ OR A PANEL'S DISMISSAL OF CHARGES, THE SUPREME COURT, OR THE TRIBUNAL DESCRIBED IN SUBSECTION (3)(f)(II) OF THIS SECTION IF THE TRIBUNAL IS HEARING THE APPEAL, SHALL REVIEW THE RECORD OF THE PROCEEDINGS ON THE LAW AND FACTS. WHEN REVIEWING THE ADJUDICATIVE PANEL'S DECISION, THE SUPREME COURT SHALL REVIEW MATTERS OF LAW DE NOVO, REVIEW FACTUAL MATTERS TO DETERMINE WHETHER THE ADJUDICATIVE PANEL'S DETERMINATION IS CLEARLY ERRONEOUS, AND REVIEW ANY SANCTIONS IMPOSED BY THE ADJUDICATIVE PANEL FOR ABUSE OF DISCRETION. ~~Upon an order for retirement, the justice or judge shall thereby be retired with the same rights and privileges as if he retired pursuant to statute. Upon an order for removal, the justice or judge shall thereby be removed from office, and his salary shall cease from the date of such order. On the entry of an order for retirement or for removal of a judge, his office shall be deemed vacant.~~

(II) IN PROCEEDINGS IN WHICH THE CIRCUMSTANCES DESCRIBED IN THIS SUBSECTION (3)(f)(II) ARE PRESENT, A TRIBUNAL COMPRISED OF SEVEN JUDGES OF THE COURT OF APPEALS AND DISTRICT COURT SHALL REVIEW THE DECISION OF THE ADJUDICATIVE PANEL OR HEAR ANY OTHER APPEAL IN THE SAME MANNER AND USE THE SAME STANDARDS OF REVIEW AS THE SUPREME COURT WHEN IT REVIEWS DECISIONS AND HEARS APPEALS AS DESCRIBED IN SUBSECTION (3)(f)(I) OF THIS SECTION. THE STATE COURT ADMINISTRATOR, OR THE ADMINISTRATOR'S DESIGNEE, SHALL RANDOMLY SELECT MEMBERS OF THE TRIBUNAL FROM AMONG ALL DISTRICT JUDGES AND COURT OF APPEALS JUDGES WHO DO NOT HAVE A CURRENT DISCIPLINARY INVESTIGATION OR PROCEEDING PENDING BEFORE THE COMMISSION OR ADJUDICATIVE BOARD; HAVE NOT RECEIVED A DISCIPLINARY SANCTION FROM THE COMMISSION, ADJUDICATIVE BOARD, OR SUPREME COURT; AND ARE NOT OTHERWISE REQUIRED BY LAW, COURT RULE, OR JUDICIAL CANON TO RECUSE THEMSELVES FROM THE TRIBUNAL. A TRIBUNAL MUST NOT INCLUDE MORE THAN ONE MEMBER WHO IS A COURT OF APPEALS JUDGE AND NOT MORE THAN ONE DISTRICT JUDGE FROM ANY ONE JUDICIAL DISTRICT. THE RANDOM SELECTION OF TRIBUNAL MEMBERS IS A PURELY ADMINISTRATIVE FUNCTION. THE TRIBUNAL SHALL REVIEW DECISIONS AND HEAR ANY OTHER APPEALS IN THE FOLLOWING CIRCUMSTANCES:

(A) WHEN THE PROCEEDINGS INVOLVE A COMPLAINT AGAINST A COLORADO SUPREME COURT JUSTICE;

(B) WHEN A COLORADO SUPREME COURT JUSTICE IS A COMPLAINANT OR A MATERIAL WITNESS IN THE PROCEEDING;

(C) WHEN A STAFF MEMBER TO A COLORADO SUPREME COURT JUSTICE IS A COMPLAINANT OR MATERIAL WITNESS IN THE PROCEEDING;

(D) WHEN A FAMILY MEMBER OF A COLORADO SUPREME COURT JUSTICE IS A COMPLAINANT OR MATERIAL WITNESS IN THE PROCEEDING; OR

(E) WHEN ANY OTHER CIRCUMSTANCES EXIST DUE TO WHICH MORE THAN TWO COLORADO SUPREME COURT JUSTICES HAVE RECUSED THEMSELVES FROM THE PROCEEDING.

(III) UPON A DETERMINATION THAT A SANCTION IMPOSED BY THE ADJUDICATIVE PANEL IS AN ABUSE OF DISCRETION, THE SUPREME COURT OR, IF APPLICABLE, THE TRIBUNAL, SHALL REMAND THE PROCEEDINGS TO THE PANEL THAT IMPOSED THE SANCTION WITH DIRECTIONS THE COURT OR TRIBUNAL DEEMS NECESSARY.

(IV) UPON AN ORDER FOR RETIREMENT, THE JUSTICE OR JUDGE IS RETIRED WITH THE SAME RIGHTS AND PRIVILEGES AS IF THE JUSTICE OR JUDGE RETIRED PURSUANT TO STATUTE. UPON AN ORDER FOR REMOVAL, THE JUSTICE OR JUDGE IS REMOVED FROM OFFICE AND THE JUSTICE'S OR JUDGE'S SALARY CEASES FROM THE DATE OF THE ORDER. ON THE ENTRY OF AN ORDER FOR RETIREMENT OR FOR REMOVAL OF A JUSTICE OR JUDGE, THE JUSTICE'S OR JUDGE'S OFFICE IS DEEMED VACANT.

(g) (I) Prior to the ~~filing of a recommendation to the supreme court by the commission~~ COMMENCEMENT OF FORMAL DISCIPLINARY PROCEEDINGS against any justice or judge, all papers filed with and proceedings before the commission on judicial discipline ~~or masters appointed by the supreme court, pursuant to this subsection (3), shall be~~ ARE confidential, ~~and the filing of papers with~~ and the giving of testimony before the commission ~~or the masters shall be privileged; but no other publication of such papers or proceedings shall be privileged in any action for defamation; except that the record filed by the commission in the supreme court continues privileged~~ IS CONFIDENTIAL. A PERSON IS ABSOLUTELY IMMUNE FROM ANY ACTION FOR DEFAMATION BASED ON PAPERS FILED WITH OR TESTIMONY BEFORE THE COMMISSION, THE ADJUDICATIVE BOARD, THE SUPREME COURT, OR THE TRIBUNAL, BUT NO OTHER PUBLICATION OF THE PAPERS OR PROCEEDINGS HAS ABSOLUTE IMMUNITY IN ANY ACTION FOR DEFAMATION and a writing ~~which~~ THAT was privileged prior to its filing with the commission ~~or the masters~~ does not lose such privilege by such filing.

(II) NOTWITHSTANDING THE CONFIDENTIALITY REQUIREMENT DESCRIBED IN THIS SUBSECTION (3)(g), THE COMMISSION MAY:

(A) RELEASE INFORMATION ABOUT THE STATUS OF AN EVALUATION, INVESTIGATION, OR PROCEEDING TO THE VICTIM OF MISCONDUCT OR THE COMPLAINANT;

(B) RELEASE INFORMATION ABOUT A COMPLAINT THAT RESULTED IN INFORMAL REMEDIAL ACTION OR PUBLIC DISCIPLINE OF A JUDGE OR JUSTICE TO THE STATE COURT ADMINISTRATOR AS NECESSARY FOR THE SELECTION OF A TRIBUNAL PURSUANT TO SUBSECTION (3)(f)(II) OF THIS SECTION; ANY RELEVANT COMMISSION ON JUDICIAL PERFORMANCE OR JUDICIAL NOMINATING COMMISSION, THE OFFICE OF ATTORNEY REGULATION COUNSEL, AND THE OFFICE OF THE PRESIDING DISCIPLINARY JUDGE, OR SUCCESSORS TO EACH COMMISSION OR OFFICE; THE OFFICE OF THE GOVERNOR, FOR THE PURPOSE OF JUDICIAL APPOINTMENTS; THE JUDICIAL DEPARTMENT, FOR THE PURPOSE OF REVIEWING APPLICANTS FOR THE SENIOR JUDGE PROGRAM AND APPOINTMENTS TO THE ADJUDICATIVE BOARD PURSUANT TO SUBSECTION (3)(c.5)(I) OF THIS SECTION; AND OTHER LIMITED RECIPIENTS CONSISTENT WITH THE PURPOSES OF THIS SECTION ALLOWED BY RULE; AND

(C) MAKE PUBLICLY AVAILABLE AGGREGATE INFORMATION ABOUT TRENDS OR PATTERNS IN COMPLAINTS MADE TO THE COMMISSION, BUT THE COMMISSION SHALL NOT MAKE PUBLIC ANY INFORMATION THAT IDENTIFIES ANY SPECIFIC PERSON OR COMPLAINT.

(III) A RECIPIENT OF CONFIDENTIAL INFORMATION PURSUANT TO SUBSECTION (3)(g)(II)(B) OF THIS SECTION SHALL PRESERVE THE CONFIDENTIALITY OF THE INFORMATION SUBJECT TO ANY SANCTIONS FOR VIOLATION OF CONFIDENTIALITY AS MAY BE PROVIDED BY LAW.

(IV) THE GENERAL ASSEMBLY MAY PROVIDE BY LAW FOR CONFIDENTIAL REPORTING AND COMPLAINANT RIGHTS CONSISTENT WITH SUBSECTION (3)(g)(II) OF THIS SECTION.

(h) ~~The supreme court shall by rule provide for procedures before the commission on judicial discipline, the masters, and the supreme court. The rules shall also provide the standards and degree of proof to be applied by~~

~~the commission in its proceedings.~~ A justice or judge who is a member of the ~~commission~~ COMMISSION, ADJUDICATIVE BOARD, TRIBUNAL, or supreme court shall not participate in any proceedings involving ~~his~~ THE JUSTICE'S OR JUDGE'S own removal or retirement.

(k) (I) THERE IS CREATED A RULE-MAKING COMMITTEE TO ADOPT RULES FOR THE JUDICIAL DISCIPLINE PROCESS. THE RULE-MAKING COMMITTEE CONSISTS OF FOUR MEMBERS APPOINTED BY THE SUPREME COURT; FOUR MEMBERS APPOINTED BY THE ADJUDICATIVE BOARD; FOUR MEMBERS APPOINTED BY THE COMMISSION; AND ONE VICTIM'S ADVOCATE, AS DEFINED IN LAW, APPOINTED BY THE GOVERNOR. MEMBERS SERVE AT THE PLEASURE OF THEIR APPOINTING AUTHORITY. THE RULE-MAKING COMMITTEE SHALL ELECT A CHAIR WHO IS A MEMBER OF THE COMMITTEE. THE RULES MUST INCLUDE THE STANDARDS AND DEGREE OF PROOF TO BE APPLIED IN JUDICIAL DISCIPLINE PROCEEDINGS; CONFIDENTIAL REPORTING PROCEDURES; AND COMPLAINANT RIGHTS DURING THE EVALUATION, INVESTIGATION, AND HEARING PROCESS. THE GENERAL ASSEMBLY MAY PROVIDE BY LAW FOR CONFIDENTIAL REPORTING AND COMPLAINANT RIGHTS.

(II) THE RULE-MAKING COMMITTEE MAY PROMULGATE SPECIFIC RULES GOVERNING PROCEEDINGS BEFORE A PANEL OF THE ADJUDICATIVE BOARD. THE COLORADO RULES OF EVIDENCE AND COLORADO RULES OF CIVIL PROCEDURE, AS AMENDED, APPLY TO PROCEEDINGS BEFORE A PANEL OF THE ADJUDICATIVE BOARD UNTIL AND UNLESS THE RULE-MAKING COMMITTEE PROMULGATES RULES GOVERNING PANEL PROCEEDINGS. RULES PROMULGATED PURSUANT TO THIS SUBSECTION (3)(k)(II) APPLY TO FORMAL PROCEEDINGS INITIATED ON OR AFTER APRIL 1, 2025.

**SECTION 2.** Each elector voting at the election may cast a vote either "Yes/For" or "No/Against" on the following ballot title: "Shall there be an amendment to the Colorado constitution concerning judicial discipline, and, in connection therewith, establishing an independent judicial discipline adjudicative board, setting standards for judicial review of a discipline case, and clarifying when discipline proceedings become public?".

**SECTION 3.** Except as otherwise provided in section 1-40-123, Colorado Revised Statutes, if at least fifty-five percent of the electors voting on the ballot title vote "Yes/For", then the amendment will become part of the state constitution.

# The Gregory Law Firm, LLC

Christopher S.P. Gregory
Attorney at Law

cspgregory@thegregorylawfirm.net

September 3, 2024

The Legislative Council
Colorado General Assembly
200 E. Colfax Avenue
Denver, CO 80203

Dear Committee Members:

The Blue Book explanations for various ballot measures (including HCR 23-1001 / Amendment H) are scheduled for consideration by the Legislative Council on September 4, 2024.  Amendment H corrects some fundamental deficiencies in Colorado's judicial discipline system and is the product of a thorough interim committee process that considered extensive input from stakeholders, experts, and the general public.  Ultimately, the reforms proposed through HCR 23-1001 were referred to voters through unanimous votes on Third Reading in both Houses (63-0 in the House and 35-0 in the Senate).  Upon closer analysis, I now recognize that after Third Readings, the final conference committee report was unanimously adopted by the Senate and adopted by the House with Representative Bockenfeld casting the sole no vote.

Although I commend and appreciate all of the work that Legislative Staff has put into drafting a concise and understandable ballot analysis, I think that the final published version would benefit from a few additional edits.  In particular, I think that it is important to acknowledge that a primary purpose of Amendment H is to reduce the control and influence that the Colorado Supreme Court currently has over the judicial discipline process.  Additionally, it seems important to provide the public an accurate explanation as to the scope of what constitutes "judicial misconduct." Specifically, judicial misconduct includes both actual impropriety and conduct that creates the appearance of impropriety.  The Legislative Council Draft of the ballot analysis understates the robustness of the interim committee process and does not explain how that that process and the reforms adopted through SB 22-201 arose from the novel and unique circumstances presented through *Matter of Coats*, 2023 CO 44 (i.e., disciplinary issues / conflicts involving multiple Justices of the Colorado Supreme Court).  It seems important to explain this context and to emphasize the nearly unanimous support that HCR 23-1001 / Amendment H has in the Legislature.

Earlier today, reporter Bente Birkland of Colorado Public Radio re-published a summary of the various ballot measures for November 2024 that includes the following description of Amendment H:

> Lawmakers want to change the rules for how Colorado handles misconduct within the judicial branch. This amendment would set up a new independent judicial discipline board, made up of judges, attorneys and members of the public. The board would conduct disciplinary hearings and hear appeals of informal remedial sanctions handed down by the Commission on Judicial Discipline.

201 Coffman St., #1822, Longmont, CO 80502
● 970-648-0642 ● Fax: 970-648-0643 ●

Christopher S.P. Gregory, esq.
September 3, 2024
Page 2 of 2

> This proposal follows extensive reporting by David Migoya of the Colorado Springs Gazette into a string of scandals in the judicial branch. Those revelations led lawmakers to push for a new way to handle judges accused of wrongdoing independent of the state Supreme Court.
>
> The referred constitutional measure cleared the legislature with only one no vote.
>
> Megan Verlee and Bente Birkeland, *Here Are the 14 Questions on Colorado's Ballot this November*, CPR NEWS, September 3, 2024.

As recognized by Colorado Public Radio, the context of *Matter of Coats* and the various subsidiary scandals within the Judicial Branch are relevant to Amendment H, but not mentioned in the current version of the ballot analysis.

Apart from actual edits, I am concerned about how opposition to HCR 23-1001 has been presented.  Of those who participated in the drafting process, Chris Forsyth / The Judicial Integrity Project appears to oppose HCR 23-1001 simply because he perceives approval of Amendment H as making it more difficult for him to later argue for his proposals for other reforms that were rejected through the Interim Committee and legislative processes.  While presenting his organization as supporting HCR 23-1001, Jeff Rupp of the Colorado Judicial Institute (CJI) requested that the arguments against Amendment H include a statement that: "The system has been in place for a long time and is based on the Colorado Constitution. Changing the Constitution is a complex process and cannot easily be undone if the new process does not work as intended."  CJI's position, however, exists in the context of CJI's membership and advocacy revolving around individual judges and justices.  Moreover, CJI's previous public statements have expressed unqualified support for Amendment H.  https://coloradojudicialinstitute.org/news-events/newsroom/cji-blog.html/article/2023/01/27/where-does-colorado-s-judicial-discipline-legislation-go-from-here-.  Legislative Staff has appropriately rejected proposed language from both Mr. Forsyth and Mr. Rupp.

Amendment H is good public policy and reflective of the best application of full deliberative processes.  The ballot analysis, in turn, should fully inform voters as to the primary purposes of Amendment H and the nearly universal support that the measure has from the Legislature and the principal stakeholders.  I respectfully request that Legislative Council consider the edits to the ballot analysis that I propose in the accompanying draft amendment.

Sincerely,

Christopher S.P. Gregory
Enclosure

HCR23-1001 / Amendment H: Judicial Procedures and Confidentiality_L.00_.
LEGISLATIVE COUNCIL AMENDMENT
<u>Legislative Council</u>

The ballot analysis / Legislative Council Draft for Amendment H: Judicial Procedures and Confidentiality be amended as follows:

Amend Legislative Council Draft, page 1, line 2, add "• reduce the Colorado Supreme Court's role and control over Colorado's judicial discipline system;"

Page 1, line 11, strike "disciplinary actions" and substitute "discipline, reduces the Colorado Supreme Court's role in judicial discipline,".

Page 1, line 26, after "include" add "failure to perform judicial duties competently and diligently, abuse of the prestige of judicial office,".

Page 1, line 27, after "communication," strike "and".

Page 1, line 28, after "staff" add "and criminal or other unlawful conduct".

Page 1, line 28, after the added "conduct." add "Judges are prohibited from engaging in actual impropriety or even conduct that creates the appearances of impropriety."

Page 2, line 16, after "against judges" strike "are also made public at the beginning of the hearing." and substitute "will become public upon filing with the disciplinary hearing and other proceedings also, then, open to the public."

Page 2, Figure 1, consolidate arrows and strike "Tribunal for Supreme Court Justice Appeals" and "Supreme Court for all other appeals" substitute a single arrow that states "Appellate review by Supreme Court or Special Tribunal".

Page 4, line 2, before "After" insert "Following passage of Senate Bill 22-201 (which addressed novel circumstances arising from *Matter of Coats*, 2023 CO 44), the bi-partisan / bi-cameral Legislative Interim Committee on Judicial Discipline held a series of public hearings to evaluate and propose reforms to Colorado's judicial discipline system.  The hearings included extensive engagement with experts, stakeholders, and the general public.".

Page 4, line 2, strike "After extensive hearings involving experts, stakeholders, and the public," and after the added "general public." substitute "With recommendations and draft legislation from the Interim Committee,".

Page 4, line 15, strike "recommended by nearly all members of" and substitute with "referred to voters by all but one member of the General Assembly".

Page 4, line 16, after "formally" add "recommended".

** *** ** *** **

# Appendix 28

# Transcripts from the Colorado Supreme Court's *Workplace Culture Initiative* Videos— August 22, 2023.

# Colorado Supreme Court Workplace Culture Initiative Videos—August 22, 2023

## Introduction to the Workplace Culture Initiative

**Justice Hood**

All right, we're here to talk about the Workplace Culture Initiative. I'm joined by my colleague, Justice Monica Marquez. Why don't you start by just introducing yourself to people who may not be so familiar with you?

**Justice Marquez**

Sure. I'm Monica Marquez. I am a justice on the Colorado Supreme Court. I was appointed in 2010 and I love being here. This is a project that I'm very excited about and invested in.

**Justice Hood**

And my name is Will Hood. I've had the privilege of being your colleague for almost a decade now. So why don't we just dive in with an overview of what the workplace culture initiative is and what the overarching goals are.

**Justice Marquez**

Sure, so the Chief Justice gave at the State of the Judiciary speech, talked about wanting to foster an exemplary workplace at judicial. And the Workplace Culture Initiative is that effort. It's a statewide effort to bring about branch wide, statewide changes to foster an exemplary workplace. So, our mission is to move forward with shared vision, mission values, shared cultural values, shared priorities, and to emphasize a workplace that obviously does great work for the public but also allows our employees to flourish.

**Justice Hood**

So even before the court undertook this Workplace Culture Initiative, there were some discrete projects that occurred in advance of it. Can you tell folks about that briefly.

**Justice Marquez**

Certainly, we had a number of discrete projects that started even before the Workplace Culture Initiative began. For example, we overhauled our procurement rules to bring them more in alignment with the Executive Branch procedures and processes. So, we started there. The Court acted unilaterally to make some changes to the Code of Judicial Conduct to more clearly prohibit harassment and retaliation. So, those are two specific examples of things that we took care of even before we started the workplace culture initiative.

- 1 -

# Changes and the Supreme Court

**Justice Marquez**

Another major change that the court has undertaken in the last couple of years is transforming the role of the Court as sort of a board of advisors or a board of directors. In the past, we've always had this strong chief model where the Chief Justice alone handled all administrative decisions and the other six justices on the court concerned themselves strictly with case processing, researching and writing opinions and dealing with oral arguments and kind of the everyday day job of being a justice. A major change that we've made is to make sure that each of the justices is involved in some way in the administration of the Branch, and that has, I think, opened lots of new avenues to bringing in new voices. It's given our employees greater access to the Justices than they had before. It's given each of the individual Justices greater insight into all of the many things that happen in the administrative branch, everything from HR to finance to budgeting to it, liaison roles with our Court Execs, liaison roles with our Chief Probation Officers, liaison roles with our Clerks of Court statewide. And it's given the seven of us, I think, greater insight into all of the unique issues that confront the branch. I think it has led to more robust conversations about our priorities and how we make decisions that concern the administration of the branch. And most importantly, as we've also changed to a rotating chief model, I think it has better prepared each of the justices to transition into that role. It's sort of shortened the learning curve, if you will. And in connection with that, we're also developing an official Chief Justice onboarding process that will hopefully assist me as I take over that role about a year from now. So, I'm excited about that.

**Justice Hood**

Well, now that you've mentioned that, I have to follow up. Do we know exactly when you'll be taking the helm?

**Justice Marquez**

Yes, we're aiming to do that next summer. So, Summer of 2024

**Justice Hood**

And your discussion of the Board of Directors model makes me wonder whether the intention is to have the Board of Directors the Court as a whole, somehow replace the Chief Justice as the Chief Administrative Officer for the Branch. Or, if that's not the case, what is the relationship?

**Justice Marquez**

Sure, it's been an evolving dialog about exactly what that role concerns, but I think where we're headed with this is that the other six Justices function as additional eyes and ears out in the Branch, connections to what's happening on the ground, and filtering that information and bringing it back to the Chief to allow the Chief to make better informed decisions about the administration of the Branch. I think that the more communication, the more input, and the more voices that we hear, the better the decisions that

- 3 -

come out at the end of that process. So, I see our role in this supporting role to help inform the Chief as he makes those decisions.

# The Listening Tours

**Justice Marquez**

Again, the Workplace Culture Initiative is an outgrowth of our efforts as a Branch to implement the reports that came out of the Troyer Report and the ILG Report, and the first thing the court decided to do in responding to both of those reports was a series of listening sessions, and all seven Justices divided up the State and went to each of our 22 Judicial Districts in person and met individually with judicial officers, with Court Execs, with CPOs, with frontline court staff and probation staff out in each of the Districts and hundreds of hours and 1,000s of road miles crisscrossing the State, some of our jurisdictions, as I know you know, are huge in terms of geography, and so this meant multiple conversations and multiple courthouses across many different counties. That feedback then provided a lot of helpful information and guidance to us. I think overarching themes that came through from those conversations were things like improving compensation for our frontline employees, training just an incredible need for additional training at every level, and then greater communication across the Branch, between Districts, between the Districts and SCAO, just sort of throughout the Branch. And those top three themes then drove the evolution of what we're calling the Workplace Culture Initiative. So, what's the structure of that Workplace Culture Initiative? We have a steering committee that is comprised of a cross section of Chief Judges from around the State, some Court Executives from around the State, and Chief Probation Officers from around the State. That steering committee functions as a sounding board and final check on recommendations that bubble up to the steering committee from our working groups, and it's the individual working groups that craft recommendations for the steering committee. The steering committee vets those recommendations and then passes those on to the Court for final approval. So that's the overarching structure.

**Justice Hood**

And we'll talk about some of the recommendations. Roughly how many have there been to this point in time?

**Justice Marquez**

At this point, we've had about a half dozen formal recommendations that have passed through the steering committee. I'm anticipating at least another half dozen to dozen more between now and the end of calendar 2023.

**Justice Hood**

And has the court embraced the recommendations to this point?

**Justice Marquez**

Yes, and that's it's been a really valuable process. I think each time we have gone through a layer, either the steering committee or the Court, with additional eyes and ears and thoughtful input, those

- 4 -

- 5 -

recommendations have become further refined. But I think we're coming up with really good examples of suggestions that we can implement statewide.

**Justice Hood**

So, there was a survey that was done in connection with a listening tour as well. Is that right? So, some data collection. Can you tell folks about that?

**Justice Marquez**

Yeah. So, in connection with the listening tours, we did pre and post surveys of all of our employees. These surveys were anonymous. We wanted to encourage candid feedback for the justices about what what's on employees' minds. What are their needs? What are their concerns? And then we've collected that data in a systematic way to guide the recommendations of the steering committee and also guide the formation of the working groups themselves.

# Mission, Vision and Values

**Justice Hood**

So, let's talk about some of the particular working groups. There's a mission, vision, values working group. Can you start with that one and tell us about any recommendations that have come from them?

**Justice Hood**

So, you talked about the 22, soon to be 23, Judicial Districts. I think sometimes people lose track of just how large the overall organization is. Can you talk about that briefly and maybe use that as a way to help people understand why it's important to have mission, vision, values.

**Justice Marquez**

Certainly. Our mission, vision, values working group is one of our core, foundational keystone groups, if you will. We're working with an outside consultant and employees from across the branch to fashion a vision statement for the branch. This is a statement that says, Where do we want to be if we could be the best Judicial Branch in the country? What would that look like? And, so, we're creating a vision statement to coalesce around that. We're creating then a mission statement, which is, how do we get there to that vision? And then we're creating a series of value statements, what are the core values that bind us as a statewide judicial branch? And what's been really fun and challenging about the value statement in particular is that we are not a centralized culture. We are 22 unique Judicial Districts, about to be 23. Each of those is grounded in their own unique geography, workforce, local culture and so recognizing those unique differences, how do we nonetheless identify common values that bind us as a Branch? So that's been a really wonderful process that has engaged employee voices at every level from all across the State as we coalesce around those three components. We're hoping to wrap that work up at the end of July. It will go before the steering committee at the end of July and ultimately to the Court. The goal from there, once we finalize the vision statement, the mission statement and those value statements, is to come up with specific ways to implement that. To bake those concepts into everything that we do. And, ideally, these will be ways that we recruit employees into the Branch, how we onboard them, how we evaluate their performance, how we execute the work that we do each and every day.

**Justice Marquez**

Absolutely. We are the third co-equal branch of government. We have 4,000 employees statewide. Roughly 400 of those are judicial officers, but the other 90% are our non-judicial officer employees. So, we work both in courts and probation across the State. We work with civil, domestic, criminal, I mean, across all of these things. So, we touch lives all across the State. I think that those challenges are both opportunities for a lot of potential. How do we leverage our strengths across the State? How do we leverage the unique service mindset that we all have to provide those services to our citizens across Colorado?

- 7 -

**Justice Hood**

And, as you said, ultimately providing a set of unifying principles, even though we exist in local communities that we try to respect the autonomy of, right, but, but we have these principles that serve to bring us together, even as an organization with 4,000 employees.

**Justice Marquez**

Exactly.

# Training

**Justice Marquez**

A huge theme that came out of the listening tours was the need for training top to bottom, at every level, on every front. So, nuts and bolts training, onboarding, training for everyday frontline employees. Management training, nuts and bolts training for managers, how to supervise employees. Nuts and Bolts training for our district chiefs. For example, the work that a trial court judge does on the bench looks very different than the work that a chief judge does as an administrator of a specific judicial district. And to date, we really have not had formal training for that nuts and bolts kind of management. So, when we talk about training, we're talking about all of it. Some specific things that we have already begun to roll out that have come before the steering committee.

**Justice Hood**

It's almost like you anticipated my next question.

**Justice Marquez**

The first thing that we have done is to launch and roll out online, on demand module training for Code of Conduct and anti-harassment, anti-retaliation. The kind of onboarding training that ought to happen very quickly, and so we've got that now deployed and in place so that every employee who comes in can get that training and be up to speed on those kinds of fundamental workplace requirements, immediately. We're in the process of developing a new Chief Judge training module that's been spread out over 2023 and into the Spring of 2024. We've got some district leadership training plans that will bring district leadership teams together, so Chief Judges, Chief Probation Officers, and Court Executives, as well. We're also again developing onboarding for the incoming Chief Justice. So, as we plan my transition here in early 2024, we're plotting that out right now so that that handoff is as smooth as it can be. But yes, nuts and bolts training all across the board. And one of the things that Justice Berkenkotter has been working on is developing a training group that is thinking about how we deploy that training, whether it is in person in the regions, whether it is online modules, some combination thereof. So, we're really thinking, rethinking training, top to bottom.

**Justice Hood**

As long as we're giving a shout out to Justice Berkenkotter, I feel we'd be remiss if we didn't at least mention Judge Roman. He's been involved in some of this as well. Is that right?

**Justice Marquez**

Absolutely. So actually, all of the Justices have been deeply involved in this entire Workplace Culture Initiative, devoting hundreds of hours to this effort. So, I appreciate the work that you've done, and all of our colleagues have done in this space, including Justice. Hart on mission, vision, values, Justice Berkenkotter on the training, Chief Judge Roman from the Court of Appeals, has been instrumental in our training working group. Chief Judge Roman also serves on the steering committee.

- 9 -

**Justice Hood**

Good. All right, anything else we should touch on with training?

**Justice Marquez**

No, stay tuned. We're just very excited about all of the opportunities that we're going to be bringing to our employees. I guess the last thing I would say is that it ties in with our class and comp overhaul. We've been doing some massive restructuring and rewriting of job descriptions top to bottom of our frontline employees, court judicial assistant positions and our probation officer positions. These are things that have not been updated in a long time. And as you can imagine, during the pandemic, job descriptions have changed. I mean, what people are actually doing on the ground doesn't necessarily align with job descriptions, so we're trying to realign that and then rerun market studies that hopefully then better reflect the work that we're actually doing.

- 9 -

# Class and Compensation

**Justice Hood**

You mentioned that one of the major themes to emerge from the listening tours was compensation, sort of like location, location, location. It's compensation, compensation, compensation. For folks outside the Branch, who may be less familiar with the challenges that we faced with job classification and compensation, can you just give a thumbnail sketch of that and why it's so important to those many employees we've been talking about?

**Justice Marquez**

Absolutely, I think the Judicial Branch has not been spared some of the challenges that other industries and private corporations have experienced during the pandemic. A great resignation would have a huge amount of turnover in that time. Worse, we're constrained by the kinds of salaries that we can offer by the amount of state funds that are available to pay our employees. So, we have to work within those constraints to be able to provide compensation. So, our compensation structure, I think over time, has limited some of the promotional opportunities and sort of long-term vision that an employee who comes into the Branch can say, I can see myself here in five years, and this is, this would be the promotional path that I can follow. We're trying to reintegrate those kinds of structures to create those promotional opportunities, and, hopefully, then retain the great employees that we have and keep them here for the longer term. To be perfectly honest, we have employees right now across the State who are struggling to make ends meet. During the listening tours, we learned about food pantries that have been set out for some of our frontline employees out in the Districts who cannot otherwise make ends meet. That's a problem that we're working very hard to fix. Obviously, we'll be working with the Legislature as well and requesting certain budget increases to accommodate those changes. But, first step is to align job descriptions with the work that's actually being done. From there, we run market studies so that we can then present data to the legislature and say, this is what our employees ought to be receiving.

**Justice Hood**

So, I appreciate all that. And of course, the reference to food pantries is alarming. But, and hopefully those instances are more rare, but one of the things that appears to be fairly common among probation officers, court judicial assistants is the need to work more than one job in order to make ends meet. Can you very briefly, just talk about the anecdotes that we heard during the listening tour to that effect?

**Justice Marquez**

Well, I'm sure you heard some of the same anecdotes that I did, which is exactly that, that you've got wonderfully mission oriented, public service minded people who want to serve the Branch who cannot afford to stay because the salaries are insufficient to make ends meet, and they're doing extra work on nights and weekends just to pay the rent. That's unsustainable, so we really must address that.

- 10 -

# DEI, Changes in HR, and the Ombuds

**Justice Hood**

You've talked about some of the changes to workplace conduct policies, anti-harassment, anti-retaliation policies, and training associated with that. One of the things I don't believe we've touched on at this point is efforts to promote DEI. Can you can you talk about that as well?

**Justice Marquez**

Certainly. I mean, a theme that has run through all of this work has been the need to incorporate principles of equity, inclusivity, and diversity across the branch. We have received money from the Legislature for the upcoming fiscal year to hire a couple of people who will be focused on those efforts. We have a number of people that reached out to us during the listening tour, saying, as soon as that launches, let me know they want to be a big part of it. So, we've got a whole small army of folks here in the branch ready to jump as soon as we bring those, those directors on board. But we're hoping to launch this in a really thoughtful way that is both sustainable and ultimately successful. So, stay tuned. That's still a project that's in development.

**Justice Hood**

So now that you've touched on what I think is referred to as the Office of People and Culture, can you tell us a little bit more about that, the FTE that will be involved in bringing that into existence, and where exactly those folks will live in an institutional sense.

**Justice Marquez**

Yes, so these are conversations that are happening now. We did receive funding from the Legislature again for some diversity, equity, inclusivity work to help with Sumi Lee, who's our head of Judicial Diversity Outreach, who's been doing terrific work in pipeline building for diverse judicial officers. So, bringing in a person who can help expand the work that Sumi Lee is doing. Someone who will be able to assist with we're setting up with essentially a third party, anonymous reporting system for employees that have workplace concerns. This anonymous reporting system will need someone on our end to sort of manage the data that comes out of that, but that's again, with an eye toward responding to some of the concerns raised in the ILG report, that employees have multiple avenues to raise workplace concerns so an employee doesn't feel comfortable going to their supervisor or going directly to HR, they can then call this anonymous reporting service. So, we needed an FTE to help manage that piece. We'll have, in addition to that, a manager of all of these new positions. And right now it looks like this will be folded into what will be a completely transformed, revamped HR Division that is focused on the employee experience at Judicial. Like thinking focused on employee from the time they come in, through training, through promotional opportunities, but one that is very centered on that employee experience. So that's ultimately the goal.

**Justice Hood**

Do these changes to Human Resources at the State Court Administrator's Office in in the Department, replace the Judicial Discipline Commission or the Office of Attorney Regulation Counsel?

**Justice Marquez**

No, not in any sense. I mean, those obviously remain those own independent agencies. Nothing that we're doing here supplants or transplants any of that work. It hopefully will support that work. We're trying to do this on our own.

**Justice Hood**

So, if there is a complaint about a judicial officer, for example, and I know that we've been talking about a scheme that envisions dealing with issues well beyond just judicial officers, but if there is a complaint specifically about a judge or magistrate, how does the work that you were just describing internally interface with these other organizations, like the Judicial Discipline Commission and the Office of Attorney Regulation Counsel.

**Justice Marquez**

So, if an employee has a concern about a judge, obviously they can go to their supervisor. They can go to HR directly. The Judicial Discipline Commission now will have its own anonymous reporting system. So, a system is run by the Commission itself. Our anonymous reporting system would help route those concerns also over to the Judicial Discipline Commission.

**Justice Hood**

In fact, there's an obligation to funnel that information to the Judicial Discipline Commission.

**Justice Marquez**

And this is about what I was about to say, which is that every one of those touch points are mandatory reporters. So, if a supervisor hears a concern, they are required to pass that information on to judicial discipline. A judge is as well. There's another route that the legislature passed legislation on this year, which will be an ombuds for the judicial department. This will be an outside ombuds who will serve as a resource to all of our judicial branch employees for workplace concerns across the board. So, it doesn't need to necessarily be a concern about a judge. It could be a concern about a fellow employee or supervisor. It's going to take a minute for that program to get stood up. There are a number of appointments that need to be made for an advisory board, and then the advisory board will hire that ombuds. But I expect to see that office get launched here in the next 12 months or so.

# Communications

**Justice Marquez**

Can I turn around and throw the interview back to you Justice Hood and talk a little bit about the communications group?

**Justice Hood**

Well, the communications effort at this point has largely been trying to come up with a website that we can use as a repository for information about different developments and hopefully some information about what's going on in the Districts that will make it of potentially greater interest to employees and maybe to folks across the state. So, we have a platform for the website set up. Drew Alderson, who deserves a shout out as well, is on the other side of this camera is helping us bring this thing to life, and we will be taking things like this interview and putting them on the website. In the interim, we've been doing occasional outreach, primarily through the Chief to send messages about what's been going on. We also have been making other efforts to message through continued visits to the Districts. We'll all be doing, we on the court, will be doing more of that this Summer. And so that's largely it, with respect to communications right now. One of the things that we're hoping to do with the Office of People and Culture is to have one of those FTE assume responsibility for the communications piece. Someone who hopefully has more training and experience with that than we do and so that'll be a big help. Yeah, so what am I overlooking with communication?

**Justice Marquez**

Oh, I think, and you probably saw this too. Again, a key thing that came out of the listening tours was the need for greater communication.

**Justice Marquez**

And how do we foster that? There are lots of different places where that communication breaks down, either between SCAO and the field or between districts, or even just at different levels, between staff and management. How do we, and this is something actually, that the mission, vision, values, implementation portion is going to be focused on. How do we come up with a system that that improves that flow of communication across the board?

**Justice Hood**

And, at the risk of sounding a little sort of self-congratulatory as part of the Court, and I don't mean it to be that, but I do feel like we've made some strides in terms of transparency. And at least my experience on the listening tours that I've conducted has been that people are just grateful to have the opportunity to speak with us directly and feel like their voices are being heard. And it's interesting to me, because in many instances, given, for example, the budget cycles, we can't just make change happen as quickly as we might want to. But there is a lot to be said for just allowing people the opportunity to express their thoughts and feel like they matter so.

- 13 -

**Justice Hood**

Right.

**Justice Marquez**

Absolutely.

**Justice Hood**

And I feel like some of that's already been happening, and people are grateful for that. They might be more grateful for better income and other things. But the listening tours have been a positive just on their own. I think because of that improved communication and what people perceive, I hope rightly, is greater transparency.

**Justice Marquez**

I totally agree. And I think one of the most inspiring aspects of this whole Workplace Culture Initiative effort has been the opportunity to hear from employees from all across the State at every level. And we have such an amazing, inspiring group, such a dedicated group of public employees who care so much about doing good work for the people of Colorado. And it makes me proud to be part of this Branch. I'm excited to incorporate those voices into our vision as we move forward.

# Judicial Wellbeing

**Justice Marquez**

The one other working group that we haven't mentioned is the well-being working group. And well-being, employee well-being is a huge theme that came out as part of our listening tours. I had served in 2018 through 2021 as the Chair of the Colorado Task Force on lawyer well-being. That task force resulted in a statewide report that came out in November of 2021. A portion of that report focused on the well-being of judicial officers, and that piece ended up turning into a couple of discrete projects that have now evolved into now a well-being working group. The two pieces that came out of the task force was a creation of our standing committee on judicial well-being, which we've had now up and running a couple of years. It has done some wonderful work. And also the creation of a judicial well-being website that is just chock full of resources, both for judicial officers, but frankly, any employee who might want to take advantage of them. So, we've got those two pieces running. But well-being, as you can imagine, became a hot topic during the pandemic, as we've all been impacted by that in various ways, and just if nothing else, even if you haven't contracted covid, the stress and anxiety that the pandemic has created across the board has been really challenging. So, what are we doing to deal with that? We've created an employee well-being working group that is coming up with some recommendations for the steering committee. The first recommendation that has been already given the green light is on that judicial well-being website, we're now creating a button that will collate all of the employee specific well-being resources in one location. So, for all of our staff, we're about to launch that in July. In connection with that, we're also deploying an icon on everyone's desktop, so everyone will be able to do a one click, one stop shopping for well-being resources that will take them straight to the website. We also did a statewide survey in November asking employees about the status of their mental health and well-being, sort of pre pandemic and post pandemic. We were looking to see what impact the pandemic had, and then also start gleaning some ideas from employees about how we as a branch can work to improve employee well-being. We're about to release a report that gives some overview of the themes of that survey that will go out in July, as well. And then the again, the working group is digging really deep into that data. We had 41% response rates, over 1,600 responses from across the state. Lots of rich narrative data and comments to sort of dig around in and try to discern some themes. But we're coming up with some great ideas for what we can do, branch wide to improve employee well-being. So, stay tuned there.

**Justice Hood**

So, certainly our employees can appreciate the significance of these well-being efforts, but for folks outside the branch, can you speak to some of the challenges that our employees face, not just during the pandemic, but even post pandemic, just day to day and beyond the logistics of the courts. For example, secondary trauma issues, things of that sort that folks who don't live this day to day may not appreciate as fully.

**Justice Marquez**

Yeah, so secondary or vicarious trauma is just sort of the psychological impact, even if I'm not directly experiencing a traumatic event, I'm witnessing one unfold in front of me. And that can have its own almost PTSD type of impact on folks. And if you think about it, our frontline employees, along with our judges, day after day after day, are seeing and hearing and experiencing traumatic testimony, graphic photographic evidence, say, in a murder case. I mean, you name it, it's sort of the repeat nature of it and the intensely emotional or stressful nature of that experience In the courtroom can have secondary trauma type impact, vicarious trauma impact on both our judicial officers, for sure, and our employees and our probation staff as well.

# Probation

**Justice Marquez**

Our probation staff actually is working with some ever increasingly challenging populations. There have been some policy decisions made at the legislature that have shifted certain defendant populations away from incarceration and more toward the probation side of things, which is great because they're no longer incarcerated. But it does make for more challenging work for our probation officers. We're also seeing, I heard terrifying stories honestly from our probation officers out in the field who are dealing with fentanyl situations where probationers are using fentanyl, which is obviously dangerous to the probationers. And it can be dangerous to the probation officers, if they come into contact with some of that material. Security concerns for how do you calm down a probationer who is high or in some other ways not in control of themselves. Our probation officers are not armed and so they're just going out there on their own. And these can be really challenging security situations, as well. So, lots of, lots of well-being issues.

**Justice Hood**

So just to sort of add to the gloomy picture.

**Justice Marquez**

Yeah, sorry.

**Justice Hood**

No, no, I'm sure that probation officers appreciate the recognition of the difficult work that they do. Particularly, when they have to do home visits of the sort that you were describing in an environment where more high risk, high need probationers or folks are just, you know, falling under their purview. So, it's very challenging.

- 17 -

# Wrap-Up

**Justice Hood**

We should also just touch on the growth of the dockets. I know that some jurisdictions are in desperate need of more judges, but those may not be forthcoming in the next legislative cycle, probably not going to be. So, can you speak to that issue a little?

**Justice Marquez**

Certainly, and of course, all this follows a weighted caseload study. So, these things take time. How do you crunch the data? How do you then, sort of present the data that is necessary to the Joint Budget Committee to say, we need x number of new judicial officers or magistrate positions or staff attorney positions in a given location. So, all of this is a delicate balance budgeting processes, none of which is speedy, so there's always going to be a lag time, and you're never going to be fully staffed in any one location. So, it's just a sort of a chronic understaffing that we experience.

**Justice Hood**

At the risk of digressing a bit from what we were initially talking about now that we've touched on the issue of additional judges, as I understand it, the court is prioritizing the class and comp work, classification and compensation work in the upcoming budget cycle, but then the year after that, we'll try to prioritize getting additional judges in jurisdictions that most desperately need them. Is that right?

**Justice Marquez**

I believe that to be true. That's probably a better question answered by Steven who has a better group on the budget process. But one of the things that we're trying to do more proactively is some long-term budget planning so two or three cycles out so that we can lean into this in a more effective way.

**Justice Hood**

And that's most important with, particularly, when we're talking about new judges, because when you have new judges, then you need a host of other things in order to give those judges a place to do their work, the staff to assist them. New judges also typically mean new DAs, PDs, so there's a ripple effect that requires a lot of advanced planning.

**Justice Marquez**

Absolutely.

**Justice Hood**

All right, is there anything else you would like to share before we stop?

- 18 -

- 19 -

**Justice Marquez**

I don't think so. I think this is a great program. We're excited to continue this video series as part of the public facing website that we want both of our employees and the public to understand the work that we do. This is an effort toward improving transparency and accountability and hopefully improving public trust in the Judicial Branch.

**Justice Hood**

Well, thank you for your work with the Workplace Culture Initiative and all the other work you do for the Court.

**Justice Marquez**

Thank you so much.

# Appendix 29

# Correspondence re: Responses by Governor Jared Polis's Office to Colorado Open Records Act Requests as to Documentation of Colo. Comm'n on Jud. Discipline Appointments.

# STATE OF COLORADO

**OFFICE OF THE GOVERNOR**
Office of Legal Counsel
121 State Capitol Building
Denver, CO  80203
(303) 866-2471
(303) 866-2003 fax



**Jared S. Polis**
**Governor**

**VIA EMAIL TO**:

September 3, 2024

Dear            :

On July 9, 2024, the Governor's Office (the "Office") received your Colorado Open Records Act request seeking records pertaining to the Colorado Commission on Judicial Discipline, including:

- Communications from third-parties commenting on the applicants;
- Written comments about the applicants by any member of the governor's staff, including those in which staff members recommended whom to appoint;
- Applications reviewed in 2021 from those other than the two applicants who were appointed;
- Communications about the reappointment of Commission members, including any applications they submitted, communications in which they indicated their interest in reappointment, and comments from staff members about the reappointments.

On July 24, 2024, the Office responded to your CORA request with 218 pages of public responsive records. On August 23, 2024, you requested the Office conduct searches to locate additional records responsive to your original request. The searches included:

- "judicial.state.co.us" and "jd.state.co.us";
- The names of the Commissioners who were replaced through the Governor's Office since 2021: Christopher Gregory, Elizabeth Krupa, Bruce Casias, Drucilla Pugh, Yolanda Lyons, Gina Lopez, and Marisa Pacheco;

- Current officers and staff of CCJD: Mindy Sooter (who uses mindy.sooter@whilmerhale.com), James Carpenter, Mariana Vielma, and Jeff Walsh.

The Governor's Office reviewed responsive records generated from the above searches. There are no additional public records responsive to your request.

Sincerely,

*/s/ Colleen Morey*

Colleen Morey
Deputy Legal Counsel

# STATE OF COLORADO

**OFFICE OF THE GOVERNOR**
Office of Legal Counsel
121 State Capitol Building
Denver, CO  80203
(303) 866-2471
(303) 866-2003 fax



**Jared S. Polis**
**Governor**

**VIA EMAIL TO**:


July 24, 2024




Dear          :

On July 9, 2024, the Governor's Office (the "Office") received your Colorado Open Records Act request seeking copies of applications and communications pertaining to the Colorado Commission on Judicial Discipline.

In compliance with C.R.S. § 24-72-203(3)(b), the Office responded to you within three working days of receiving your request. On July 12, 2024, the Office extended the response period by up to seven working days. Today, we are producing 218 pages of public responsive records to your request. As a courtesy, we are providing these documents free of charge.


Sincerely,

*/s/ Colleen Morey*

Colleen Morey
Deputy Legal Counsel

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) Anderson, Jason A | County Denver | Cong. District 1 | Senate District 31 | House District 6 |
|---|---|---|---|---|

| Home Address ▮▮▮▮▮▮ | City Denver | State Colorado | Zip Code 80203 |
|---|---|---|---|

| Mailing Address | City | State Colorado | Zip Code |
|---|---|---|---|

| Date of Birth ▮▮▮ 1979 | | Gender Male | Registered Voter? Yes Party Affliation? Democrat | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title City & County of Denver - Denver District Attorney's Office/Victim Advocate | Business Phone # (720) 913-9208 | Home Phone # |
|---|---|---|
| | Cell Phone # | E-mail ▮▮▮▮▮▮ |

| Business Address 201 W Colfax Ave #801 | City Denver | State Colorado | Zip Code 80202 |
|---|---|---|---|

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Grand Junction Central High School | Grand Junction, CO | | 1997 | |
| **College** | Metropolitan State College of Denver | Denver, CO | | 2005 | Criminal Justice & Ciminology |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Courtney Johnston | Friend/Colleague | ▮▮▮▮ |
| Bonnie Benedetti | Mentor | ▮▮▮▮ |
| Maggie Conboy | Friend/Colleague | ▮▮▮▮ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Part Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Jason A Anderson    **DATE:** 6/27/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Anderson, Jason A | Denver | 1 | 31 | 6 |

*Please explain why you wish to serve on a board or commission.*

I feel like given my almost 20 years experience in city and local government/criminal justice work this committee would be a good fit for me.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Jason A Anderson        **DATE:** 6/27/2023 12:00:00 AM

# Jason A Anderson

Victim Advocate

**Employment Experience:**

**Denver District Attorney's Office**                                          April 2011-Present
Denver, Colorado
Victim Advocate
Specialize in working with victims and the families of victims of domestic violence, organized crime, child abuse, sexual assault and careless driving involving death or serious bodily injury cases in Denver.  Assist Deputy & Chief Deputy District Attorneys both inside and outside of the courtroom to help facilitate the prosecution of defendants and the pursuit of justice.  Experience with misdemeanor and felony level cases.  Interaction with victims includes explanation of process and procedures to help navigate the criminal justice system, outreach to victims for help, support and other resources to community agencies for counseling and other services, face to face support at arraignment, pre-trial and trial hearings.  Participate in extensive interaction with victims by many different modes including in person, written, electronic and over the phone contact.  Help to ensure that the victims of crimes are treated with fairness, dignity and respect throughout the case and making sure that the Rights that they are afforded under the Colorado Victim's Rights Act are not infringed upon. Worked in multiple units within the office including: County Court Divison, Juvenile Unit, Family Violence Unit, District Court & currently the Organized Crime Unit.

**Denver City Attorney's Office**                                          February 2005-April 2011
Denver, Colorado
Victim Advocate
Responsible for contacting victims to provide support, explain the criminal justice process, as well as answer questions and address concerns victims may have as it relates to these municipal code violation cases.  Help victims by providing information about protection orders, keep them updated on case progression and resolution. Prepare the victims for court appearances in necessary.  Participated extensively in the Triage Program which is a multi-agency response program that responds to all cases of Domestic Violence in Denver.  The program consists of agencies from the local City & County as well as State agencies and community non-profit organizations to assess and ensure the proper handling of DV cases to determine the best resources for the victim as well as help to make sure there is a successful prosecution of the cases.  Hired as a fulltime Victim Advocate in June 2007, prior to that interned/volunteered as a Victim Advocate.

**Denver County Court**                                          August 2005-June 2006
Denver, Colorado
Administrative Support Assistant
Worked within the Traffic Division and General Sessions Division of the Clerks Office of the Denver County Court.  Main job responsibilities included customer service, processing of payments on tickets, scheduling court dates, maintaining accurate minutes and court records, verification and quality control of data input made by court clerks in multiple courtrooms.  Spent significant amount of time on special projects assigned by managers and supervisors in the Traffic Division.

Denver Police Department                                    May 2004-August 2005
Denver, Colorado
<u>Volunteer</u>
Sole coordinator and producer of specific case related correspondence between the City Attorney's Office
and the Denver Police Department's officers related to Municipal Code Violation Cases.  Developed and
maintained comprehensive and functional method of communication on Domestic Violence cases filed
with the City Attorney in the City and County of Denver.  Responsible for processing all Domestic Violence
cases, writing letters concerning procedural errors and reporting on the outcome of cases to District
Commanders as well as Officers.
Volunteered with the Sexual Offender Registry Section of the Denver Police Department. Responsible for
data integrity and proper case file management.  Worked with Detectives to manage case files as
convicted sex offenders updated and initiated registry with the Department.


First United Bank                                          October 2001-April 2004
Aurora, Colorado
<u>Operations Supervisor/Assistant Branch Manager</u>
Responsible for the operational and sales functions of new account representatives and tellers employed
at the branch.  Oversaw daily customer service and cross selling activities, including in person and over
the phone sales.  Conducted cash audits including daily balancing of the Automated Teller Machine and
Cash Vault, monthly audits of teller drawers, vaults and cash items.  Assisted with manager duties
throughout the branch network as needed, often traveling to different bank locations.  Promoted to
Operations Supervisor/Assistant Branch Manager within 3 years after holding position of Teller and Senior
Teller.


Denver District Attorney's Office                          May 2000-October 2001
Denver, Colorado
<u>Intern</u>
Interned in the Juvenile Unit and Drug Court Unit of the Denver District Attorney's Office.  Assisted
Deputy District Attorneys both in and out of court with cases against defendants between the ages on
10-17 while in the Juvenile Unit.  While in the Drug Court Unit, attended review hearings for Drug Court
defendants as a representative of the DA's Office.  Also responsible for other duties or special projects as
assigned by various Deputy & Chief Deputy District Attorneys.



Education:

Metropolitan State College of Denver                 Bachelor of Science – December 2005
Major Concentration: Criminal Justice & Criminology
Denver, Colorado

Community College of Aurora                    Associate of General Studies – August 2004
Concentration: Criminal Justice
Aurora, Colorado

Community Involvement:

| | |
|---|---:|
| Colorado Organization of Victim Assistance<br>Conference Program Committee Member<br>Volunteer | 2022-Present |
| Community Corrections Board of Denver<br>Board Member<br>Position: Victim Services Representative | 2017-2021 |
| Colorado Complete Count Campaign<br>Statewide 2020 Census – Appointed by Governor John Hickenlooper<br>State Committee Member | 2018-2020 |
| Partners Mentoring Association<br>Board of Directors Member<br>Past President & Board Member | 2013 – 2019 |
| The Blue Bench,<br>Formerly RAAP-Rape Assistance and Awareness Program<br>Board of Directors Member | 2010 - 2016 |
| Metro Denver Partners<br>Board of Directors Member<br>Past Vice-President & Board Member | 2008-2019 |
| Denver Citizens Police Academy Alumni Association<br>Board Member Representing District 3 | 2005-2006 |
| Denver Citizens Police Academy<br>Graduate | 2005 |
| United States Presidential Volunteer<br>Bronze Medal Recipient | 2005 |

**Denver District Attorney's Office – Internal Program Involvement**:

| | |
|---|---:|
| **Courtrooms to Classrooms Program**<br>Participant - Park Hill Elementary | 2011-Present |
| **Training Committee**<br>Committee Member | 2019-Present |
| **Employee Engagement & Recognition Committee**<br>Committee Member | 2020-Present |
| **LGBTQ Affinity Group**<br>Co-Chair | 2021-Present |

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**OFFICE USE ONLY**

DB _____

SLOT _____

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Workforce Development Council

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Artis, Eric | Arapahoe | 6 | 27 | 61 |

| Home Address | City | State | Zip Code 80016 |
|---|---|---|---|
| ▓▓▓▓▓▓▓▓ | Aurora | Colorado | |

| Mailing Address | City | State | Zip Code |
|---|---|---|---|
| | | Colorado | |

| Date of Birth | Gender | Registered Voter? Yes | Ethnicity |
|---|---|---|---|
| ▓▓▓▓▓▓1964 | Male | Party Affliation? Democrat | African American |

| Present Employer/Title | Business Phone # | Home Phone # |
|---|---|---|
| Mile High United Way/Chief Human Resources Officer | (720) 388-2026 | ▓▓▓▓▓▓ |
| | Cell Phone # | E-mail |
| | ▓▓▓▓▓▓ | ▓▓▓▓▓▓ |

| Business Address | City | State | Zip Code |
|---|---|---|---|
| 711 Park Avenue West, Denver, CO, 80205 | Aurora | Colorado | 80016 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Bernie High School | Bernie, Missouri | | 1982 | |
| **College** | Regis University | Denver, Colorado | | 1997 | Business |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | Colorado State University | Fort Collins, CO | | 2001 | Organizational Leadership/Human Resources |
| | | | | | |

| Memberships in Organizations And Offices Held(Indicate if | U.S. Commission on Civil Rights - Wy Advisory Council<br>Centennial Lodge #4 - Member(Mbr)<br>Kappa Alpha Psi, Fraternity Inc - Mbr<br>Lincoln Hills Cares Foundation - Past Bd Mbr |
|---|---|

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Daniel Brown | Professional | ▓▓▓▓▓▓ |
| James Coleman | Professional | ▓▓▓▓▓▓ |
| Richard Lewis | Professional | ▓▓▓▓▓▓ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Eric Artis    **DATE:** 7/18/2022 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
### Workforce Development Council

| Name (Last, First Middle)<br>Artis, Eric | County<br>Arapahoe | Cong. District<br>6 | Senate District<br>27 | House District<br>61 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

I've been committed to serving my country, state and community for my entire adult life. From my time with the U.S. Air Force until now, the skills I have to offer in leadership and management have more value now more than ever. I want to offer the Workforce Commission the best of what I have to offer and feel the Commission's mission is directly aligned with my passion to serve.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Eric Artis    **DATE:** 7/18/2022 12:00:00 AM

# Eric D. Artis, SPHR

C:
Email:                              LinkedIn: linkedin.com/in/eric-d-artis-m-ed-sphr-a143841

An accomplished senior human resources executive with a demonstrated track record of success in leading team development, coaching, strategic planning, and goal setting. Excellent strategic and process improvement abilities with an emphasis on human resource practices in conjunction with diversity equity and inclusion initiatives. Ability to implement and manage change within large diverse organizations and engage with executives and staff at all levels. A consistent strategic partner with excellent data analysis, interpretation, and presentation skills. Employs current human capital practices that attract and retain high potential talent. Develops S.M.A.R.T.I.E (Specific, Measurable, Actionable, Realistic, Time-Specific, Inclusive and Equitable) and executable strategies that motivate teams, both individually and financially, to exceed organizational objectives through various economic cycles. Recognized for executing with agility, high integrity and initiative. Highly skilled at prioritizing multiple challenges in a demanding environment with key strengths in:

- Enhancing strategic position & organizational capability
- Earning trust through achieving results
- HR Innovation & Integration
- Initiating Change
- Driving Performance

## Education/Certifications

M.Ed. Human Resources & Organization Development | Colorado State University
BS   Business Administration | Regis University
Senior Professional in Human Resources (SPHR) | SHRM
Diversity Equity & Inclusion Certificate Program | Cornell University

## Professional Experience

**Mile High United Way |** Chief Human Resources/Diversity Officer                **01/2020 – Present**

Reporting to the Chief Executive Officer. Responsible for all aspects of strategic/operational HR leadership which includes the development of organization-wide HR strategic initiatives in the area of workforce planning, talent management, performance management, organizational development, employee relations, compensation and benefits and regulatory compliance. Functions as a strategic business advisor to the Executive Team regarding key organizational, management, and human capital issues. Ensures Diversity & Inclusion strategy and practices are embedded throughout the organization's purpose, values and employee experience.

*HCA/HealthONE | Continental Division*                                      *05/2004 – 10/2019*

**The Medical Center of Aurora |** Vice President, Behavioral Health                **01/2018 - 10/ 2019**

Reporting to the COO, responsible for the executive leadership of hospital operations, Inpatient Clinical Services, Partial Hospitalization, Intensive Outpatient programs. Also responsible for community relations, coordinating legislative efforts by working with state, local, and federal government agencies, Buckley Air Force Base, Aurora Municipal Court,18th Judicial Court wellness programs. Responsible for helping the organization meet established goals through the strategic planning process and meeting specified growth initiatives. Responsible for hospital integration, market research and environmental analysis to include

# Eric D. Artis, SPHR

C:
Email:                                                    LinkedIn: linkedin.com/in/eric-d-artis-m-ed-sphr-a143841

competitive intelligence. Provided leadership for community outreach and supported physician recruitment, labor management, and organizational development and training.

**The Medical Center of Aurora** | Director, Human Resources                        **07/2008 – 04/2012**
                                | Vice President, Human Resources                   **04/2012 – 12/2018**
Provides strategic HR and talent consulting/advising to Hospital CEO and Executive management team. Charged with creating the desired workplace culture and an engaged and productive workforce through HCA's policies, programs and practices.

- Evaluated and advised executive leadership on the impact of long-range planning of new programs/strategies and regulatory action.
- Participated actively in enterprise network of Facility Human Resources and diversity officers.
- Monitored facility climate and national trends relevant to diversity and provided responsive leadership.
- Ensured that all initiatives are integrated with and support the overall mission, goals, and hospital objectives.
- Partnered with executive leadership team to cultivate a unified, value-based & high reliability culture.
- Using Finance & HR Analytics data to drive decision making and evaluate key Finance/HR results and deliverables.
- Developed staffing strategies and implementation plans and programs to identify internal & external talent for positions of responsibility.
- Analyzed and prioritized critical business challenges faced by the organization, and deploy appropriate HR interventions in collaboration with appropriate Centers of Excellence (COEs)
  - Developed and implemented strategic retention strategies reducing nursing turnover from >30% to 10% and overall turnover from 25% to <15
  - Created efficiency by designing and implementing new performance review tool
  - Executed leadership work plans yielding positive employee participation & overall engagement trends YOY
  - Reduced YOY overall vacancy rate from 18% to <9%
- Ensured operational excellence by measuring the effectiveness and efficiency of the hospital, Leadership and HR team.
- Provided periodic feedback and support to the Regional/Group VP of HR, the Centers of Excellence and Service Centers to help proactively shape OneHR model policies, programs and practices for maximum business effectiveness.

**Presbyterian/St. Luke's Medical Center** | Vice President, Human Resources        **05/2004 – 07/2008**

Provided all aspects of strategic/operational HR leadership with an impeccable record for delivering positive results. Developed leadership development program (Mastering Excellence) curriculum that aligned key strategic/operational indicators with management performance goals. Led all Healthy Work Environment initiatives which include, Employee Engagement, Leadership Effectiveness, Culture, Rewards and Recognition and staffing. Acknowledged for aligning HR with organizational business model.

- Developed and implemented plans, programs and activities that educate and engage hospitals staff in adopting Inclusive Excellence as a core institutional value.
- Assisted with the development of progressive and proactive compensation and benefits programs to provide motivation, incentives and rewards for effective performance and to provide programs which

# Eric D. Artis, SPHR

C:
Email:                                                    LinkedIn: linkedin.com/in/eric-d-artis-m-ed-sphr-a143841

utilized an employee and company partnership for the short and long-range health and welfare protection of the employees.

- Analyzed and prioritized critical business challenges faced by the organization, and deploy appropriate HR interventions in collaboration with appropriate Centers of Excellence (COEs)
  - o Developed and implemented strategic retention strategies reducing overall/nursing
  - o Created efficiency by designing and implementing new performance review tool
  - o Executed leadership work plans yielding positive employee participation & overall engagement trends YOY
  - o Reduced YOY overall vacancy rate
- Developed human resource planning models to identify competency, knowledge and talent gaps and developed specific programs to address identified the gaps.
- Monitored talent management/succession planning programs for key contributor and management positions, training and development programs.
- Development programs/action plans to enhance employee knowledge and understanding of the business of the organization
- Collaborated on a strategic and tactical level with operating leaders on a variety of human resource and business-related initiatives to support organization and operational goals.
- Helped drive change within the organization, to include adoption of new technologies, integration of key new growth businesses and workflows, staffing models, and organization structures.

**Affordable Management Services, Inc. (REIT) |** Director, Human Resources          **07/1998 – 05/2004**
Recruited to serve as the Senior HR Business Partner with a wide range of operational responsibilities for 100 Dealership locations, over 300 properties with 2000 employees nationwide. Worked with regional operational leaders in support of new business strategy development, and recruitment.

**Sedgwick Claims Services |** Claim's Analyst          **09/1997 – 07/1998**
Responsible for determining liability and evaluating property damages and bodily injury claims. Negotiate settlements utilizing Alternative Dispute Resolution (ADR) and litigation management techniques, which minimized legal exposure.

**Wyoming Professional Teaching Standards Board |** Certification Coordinator          **02/1995 – 06/1997**
Reliable and highly skilled Credentialing Specialist with broad and deep knowledge of the Education system. Extraordinary professional with impeccable ccommunication skills with staff, teachers and relevant government regulators. Responsible for workforce readiness and credentialing of all certified school teachers (K-12) and substitute teaching pool. Assisted with employee relations and policy implementation.

**Wyoming Department of Commerce |** Records Specialist          **01/1994 – 02/1995**
Highly focused and meticulous Records Management Specialist with an exceptional record of customer satisfaction. Adept at working well independently with little or no supervision or as part of a records management team. Administered all records management program components. Performed all work in accordance with records management work practices and procedures. Managed inventory of all archived records and updated same on a regular basis.

**United States Air Force |** Logistics Supervisor          **12/1983 – 12/1992**
Decorated leader dedicated to enhancing & executing combat support capabilities for the Air Force and joint logistic/services missions. Evaluated organizational structure for effectiveness and efficiency. Performed strategic organizational analysis to develop functional order to support operational contingencies, planning and execution.

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**OFFICE USE ONLY**

DB _____

SLOT _____

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Barrier, Ingrid Carlson | County<br>Denver | Cong. District<br>1 | Senate District<br>31 | House District<br>6 |
|---|---|---|---|---|
| Home Address<br>███████ | City<br>Denver | State<br>CO | Zip Code 80230 | |
| Mailing Address | City | State<br>Colorado | Zip Code | |

| Date of Birth<br>████ 1971 | | Gender<br>Female | Registered Voter? Yes<br>Party Affliation? Democrat | Ethnicity<br>Caucasian |
|---|---|---|---|---|

| Present Employer/Title<br>Colorado Department of Public Safety/Chief Human Resources Officer | Business Phone #<br>(720) 863-8984 | Home Phone #<br>████████ |
|---|---|---|
| | Cell Phone #<br>████████ | E-mail<br>████████ |

| Business Address<br>700 Kipling Street | City<br>Lakewood | State<br>Colorado | Zip Code<br>80215 |
|---|---|---|---|

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Kent Denver School | Englewood, CO | | 1989 | |
| **College** | Bowdoin College | Brunswick, ME | | 1993 | Art History |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | University of Denver College of Law | Denver, CO | | 2000 | Law |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Please see attached resume. | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Michelle Brissette Miller | Former colleague at Attorney General's Office | ████████ |
| Jennifer Hunt | Former colleague at Hill&Robbins and AG's office | ████████ |
| Jana Locke | Current Supervisor at CDPS | ████████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing?*:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Ingrid Carlson Barrier    **DATE:** 12/8/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) Barrier, Ingrid Carlson | County Denver | Cong. District 1 | Senate District 31 | House District 6 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

The best volunteer job I ever had was serving on the Second Judicial District Judicial Nominating Commission. It gave me invaluable perspective into the critical role of boards and commissions in Colorado as adjacent partners to the workings of government, the importance of citizen participation in their own governmental systems, and emphasizing value of different political, professional and personal opinions about decisions that are key to our system of governance. The Commission on Judicial Discipline builds confidence in our court system by carefully vetting concerns about judges in a measured, thoughtful, and precise manner. I am well suited to this work - I am pragmatic, organized, attentive to detail, curious and solution oriented. I work well with a diverse group. I am fair and will build rapport with commissioners, staff and members of the judiciary (as appropriate). I strive to do the right thing.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Ingrid Carlson Barrier    **DATE:** 12/8/2023 12:00:00 AM

Ingrid C. Barrier



December 8, 2023

Please consider me as an attorney member on the Colorado Commission on Judicial Discipline.
I have been a lawyer for 23 years and a Denver, Colorado resident my whole life. I care deeply
about our important governmental institutions, the courts being paramount. We deserve high
functioning courts at every level in every Judicial District in Colorado. Without a principled forum
to address complaints about our judges, we jeopardize the system that resolves so many
challenges in our communities.

I am a staunch supporter of Colorado's selection, retention, performance review and
investigative processes including censure or potential discipline related to our judges. I served
on the Second Judicial Nominating Commission to vet candidates for the governor's
consideration and appointment. This role feels like the flip side – it ensures that judges, once
appointed, continue to fulfill the mandates of the Judicial Rules, the Judicial Canon, and uphold
Colorado law on the bench and in their own lives.

Each complaint (no matter who generates it) must be considered carefully and investigated
ethically when investigation is merited. This Commission must ensure that it protects
confidentiality, moves swiftly, and relies on its robust constitutional and statutory governance
structure to tightly frame its investigations. There is no room for error in evaluating judicial
conduct.

I will bring my intellect, my collaborative nature, my good humor, efficiency, and ease in tackling
challenging topics to the Commission and will professionally address every appropriate
complaint that comes before the Commission.

I look forward to discussing this exciting opportunity with you.

Sincerely,


Ingrid Carlson Barrier

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only one per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle)<br>Brodbeck, Josh | County<br>Denver | Cong. District<br>1 | Senate District<br>31 | House District<br>6 |
|---|---|---|---|---|
| Home Address<br>▉▉▉ | City<br>DENVER | State<br>CO | Zip Code 80206 | |
| Mailing Address | City | State<br>Colorado | Zip Code | |

| Date of Birth<br>▉▉▉ 1972 | | Gender<br>Male | Registered Voter? Yes<br>Party Affliation? Democrat | Ethnicity<br>Caucasian |
|---|---|---|---|---|

| Present Employer/Title<br>Self/Founder, Management Consultant | Business Phone #<br>(303) 668-9351 | Home Phone #<br>▉▉▉ |
|---|---|---|
| | Cell Phone #<br>▉▉▉ | E-mail<br>▉▉▉ |
| Business Address<br>▉▉▉ | City<br>DENVER | State<br>Colorado | Zip Code<br>80206 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Douglas County High School | Castle Rock, CO | | 1991 | |
| **College** | University of Denver | Denver, CO | | 1995 | Political Science & Classical Voice |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | See Resume. | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Marcia Waters | Div. Dir. for CO State Div. I served. | ▉▉▉ |
| Rico Munn | Frequent client, Fmr. DORA Exec. Dir. | ▉▉▉ |
| Kim Day | Frequent client, Fmr. CEO Denver Int'l Airport. | ▉▉▉ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Josh Brodbeck     DATE: 4/2/2024 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Brodbeck, Josh | Denver | 1 | 31 | 6 |

*Please explain why you wish to serve on a board or commission.*

Having recently served on the Colorado Real Estate Commission as a public member, it was nothing short of an honor to serve, and was a fulfilling experience.  It was also a lot of hard work; I honestly had no idea going into it how much work it would be!  But in hindsight, I'm more than glad I did it and it was a true pleasure.  I also saw first hand how important the work of Colorado's Boards and Commissions is, and that they need to be served by Commissioners and Members that take the work seriously and are willing to commit the time and effort required for these Boards and Commissions to properly function.  And I want to continue to serve on another Commission, if possible.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Josh  Brodbeck       **DATE:** 4/2/2024 12:00:00 AM

# THE OFFICE OF JOSH BRODBECK

## Professional

**The Office of Josh Brodbeck**
**Management/Organizational Consulting in Private Practice**   (8/2003-Present)

- *See attached for services and client list.*

**Colorado Real Estate Commission**
**Public Commissioner**   (4/2023-4/2024)

**Somerville Partners, Inc.\***
**Industrial & Organizational Psychology**   (7/1995-4/1998 Contract Services, 4/1998-8/2003 Full Time Employment)

- *Management/Organizational Consultant*

  ███████████

  - Organizational Development
  - Work Process Development
  - Sales Operations Consulting
  - Executive Coaching/Strategic Planning
  - Personality-Based Employee Selection Systems
  - Structured Behavioral Interviewing and Training
  - Analysis of Adverse Impact in Hiring Practices
  - Large-Scale Project Management
  - Personality Assessment &
    Survey Administration

  \*In approximately 2012, Somerville Partners wound down its operations and no longer functions as a stand-alone consulting firm.

**Five Star Affiliates, Inc.**   (3/1997-5/1998)

- *Director of Operations*
  David P. Herskovits, CEO

  ████████████████

  - Directed complex contract negotiation and purchasing of raw materials.
  - Oversaw safe chemical handling, storage practices, and training.
  - Accountable for inventory management of $1 million-plus raw material and finished product inventory.
  - Conducted efficiency analysis and assessment of work processes and chemical production practices.
  - Enforced OSHA and EEOC compliance.
  - Directed production scheduling for $5 million-plus production facility.

**American Golf/Golf Enterprises, Inc.**   (3/1994-3/1997)

- *Operations Management*
  Danny Cline

  ████████████

  - Oversight of $1 million-plus annual revenue-generating facilities.
  - Turnaround management.
  - Management of 50-200 member staff.

## Education

**The University of Denver & Lamont School of Music**

- *B.A., 1995*
- *Political Science*
- *Classical Voice*
  Dr. Gregg Kvistad, Provost (ret.)
  Dr. Ronald Worstell (ret.)

  ████████████

---

OFFICE: 303-831-0967 . MOBILE: ████████████
E-MAIL: █████████████████

# THE OFFICE OF JOSH BRODBECK

## Personal and Professional References

**Ms. Marcia Waters**
Director, Colorado Div. Of Real Estate



**Ms. Barbara Kelley**
Fmr. Executive Director
Colorado Dept. of Regulatory Agencies (DORA)



**Mr. Robb Caseria**
CEO, Juanita's Foods
Fmr. CEO, Natural Food Works, Castor & Pollux Petworks



**Mr. Zac Jacobson**
VP, Member Support
Peloton
Fmr. Director of Organizational Development, eBay Inc.

**Mr. Pete Lansing**
Founder, President & CEO, Universal Lending

**Mr. David Solomon**
Founder and Managing Partner
Meritage Private Equity Funds

**Ms. Kim Day**
Fmr. CEO, Denver International Airport
Board Member, Greater Toronto Airports Authority

**Mr. Rico Munn**
Fmr. Superintendent of Schools Aurora Public Schools,
Fmr. Exec. Dir Colorado DORA
Chief of Staff, Colorado State University



**Mr. Art Zeile**
CEO, DHX Group; Fmr. CEO, HostMySite.com, Fmr. CEO
Inflow



**Mr. Charlie Wooley**
CEO, St. Charles Town Company



**Mr. Josh Berlo**
Vice Chancellor for Athletics
University of Denver

**Mr. Christopher Benyo**
CEO, Lift & Store Inc.
Fmr. Executive Vice President, NuVox Communications



**Ms. Amy Thrall**
Principal, Talent Architecture, Ltd.
Fmr. Vice President of Human Resources
Jones International

**Ms. Shannon Rowley**
CHRO
MWH Global Constructors

Additional references readily available upon request.

OFFICE: 303-831-0967 . MOBILE:
E-MAIL:

# The Office of Josh Brodbeck

## The Office of Josh Brodbeck

Josh Brodbeck has been consulting to organizations of all industries and sizes since 1998, practicing as a sole proprietor since 2003.   His background in management in manufacturing, then with a large, multi-national organization, and followed by 5 ½ years as a consultant with an industrial psychology firm has given him the best of both worlds in consulting skill -- the scientific ability to assess and diagnose organizational issues combined with the practical know-how to make effective changes quickly.  He has worked in all functional areas and at all levels within his client organizations, making him well equipped to work effectively with boards, senior executives, middle-management, and front-line personnel.  Josh has expertise working in the following industries/niches:

- **High Technology**
- **Mortgage Lending/Banking/Finance**
- **Venture Capital/Private Equity**
- **Multi-Location Retail – Food and Beverage, and Convenience Retail**
- **State, Municipal, and County Governments**
- **Commercial Aviation/Airports & Airline Services**
- **Outdoor Industry**
- **Pharmaceutical Manufacturing**
- **Financial/Investment Services**
- **Energy – Extraction, Refining, and Retail**
- **Health Care/Insurance**
- **Software Development**
- **Telecommunications**
- **Real Estate Development**
- **NCAA Div. I Collegiate Athletics**
- **Multi-Location/National Law Firms**
- **Electronic Commerce – Retail and Business-to-Business**
- **Large Scale Industrial Construction**

Although Josh's services are customized to each client's needs and run the gamut of organizational development, they can most easily be organized into the following categories:

- **Executive Coaching and Assessment:**
  - Executive Assessment
  - Executive Coaching – Developmental & Interventional
  - Executive Profiling & Job Package Development
  - Hiring Techniques and Interview Training
- **Organizational Forensics**
  - Post Crisis/Operational Failure Organizational Assessments
  - Change Management Organizational Assessments (M&A Planning, M&A Integration, Downsizing, Centralizing, Expansion & Growth, etc.)
  - Due Diligence Organizational Study (Pre, During, and Post Transaction)
  - Crisis Communications
- **Strategic Planning**
  - Executive Retreats
  - Organizational Strategic Reviews
  - Strategic Planning Retreats
- **Board Management**
  - Board Formation, Assessments & Environmental Reviews
  - Planning, Coordination & Facilitation of Board Meetings/Events
  - Board Communications & Counsel

References, case studies/samples, or additional information about any of Josh's services are available upon request.

# The Office of Josh Brodbeck

## Clients Include:
















City and County of Denver










**Office: 303-831-0967 . Mobile:**
**E-Mail**

# THE OFFICE OF JOSH BRODBECK































OFFICE: 303-831-0967 . MOBILE:
E-MAIL:

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

OFFICE USE ONLY

DB _____

SLOT _____

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

### Judicial Discipline, Commission on

| Name (Last, First Middle) Czelatdko, Lisa | County El Paso | Cong. District 5 | Senate District 11 | House District 16 |
|---|---|---|---|---|

| Home Address ▓▓▓▓ | City Colorado Springs | State Colorado | Zip Code 80915 |
|---|---|---|---|

| Mailing Address | City | State Colorado | Zip Code |
|---|---|---|---|

| Date of Birth ▓▓ 1970 | | Gender Female | Registered Voter? Yes  Party Affliation? Republican | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title / | Business Phone # | Home Phone # ▓▓▓▓ |
|---|---|---|
| | Cell Phone # ▓▓▓▓ | E-mail ▓▓▓▓ |
| Business Address | City | State | Zip Code |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | | | | | |
| **College** | | | | | |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | Eastern Illinous University | Charleston Illinois | | 2004 | School counseling |
| | Uccs | Colorado Springs | | | Business administration |
| **Memberships in Organizations And Offices Held(Indicate if** | See bio. Too many to list | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Sherry lynn boyles | Friend | ▓▓▓▓ |
| Kathleen voss | Friend | ▓▓▓▓ |
| Angie outlaw | Friend | ▓▓▓▓ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Lisa  Czelatdko    **DATE:** 5/22/2022 12:00:00 AM



# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Czelatdko, Lisa | El Paso | 5 | 11 | 16 |

*Please explain why you wish to serve on a board or commission.*

Contribute to betterment of state, be a voice for others, make sure justice and ethics are protected

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Lisa  Czelatdko      **DATE:** 5/22/2022 12:00:00 AM

Lisa Czelatdko (sa-lot-ko)

██████████████

Philanthropist, businesswoman, former Legislator, and advocate for amplifying the voices of women.

Lisa Czelatdko grew up in the Midwest. The oldest of three daughters, Lisa learned the core values of being authentic and hard working. She is always nuturing new and existing relationships, and finding ways to make a difference in people's lives within her community. Lisa has been a volunteer for many organizations. Some including are CASA/GALA, TESSA, American Heart Association, March of Dimes, COS Historic Preservation Board, Pikes Peak Opera League, The Woman's Club of Colorado Springs, and the Colorado Springs Philharmonic Guild.

Lisa is a commercial broker specializing in land acquisitions and disposition of sites sized from 0.5 to 200+ acres.
She brings her honest and creative approach, education, expansive networking and commitment to deliver valuable services to clients.

Lisa has had a diverse background in government relations and legislative policies. Lisa held positions in the Colorado Springs City Council, the Board of Directors for the Colorado Springs Utilities, Pikes Peak Area of Council Governments and Colorado State Transportation Advisory Committee. Her tenure with City Council garnered her specialized knowledge of the inner workings of the City as well as large number of associations through her many multiple board positions and community work.
The oldest of three children, Lisa grew up in Chicago, Illinois. She earned a Bachelor degree in Clinical Counseling Psychology from Saint Xavier University, Chicago, IL and a Master of Science degree in School Counseling from Eastern Illinois University, Charleston, IL.

Other education and certificates include El Paso County Citizens College, Leadership Pikes Peak, the Center for Creative Leadership, the Air Force Space Command Community Relations program, Fort Carson Leadership for the Day, Colorado State Capitol Legislative Internship, and Colorado Candidate School. She has worked as a substitute School Counselor and Teacher in Cheyenne Mountain School District 12 having created and partially funded, a bibliotherapy section for her children's elementary school library.

Lisa is a single mother to four daughters, ████████████████████████████. She has two fur babies, Stanley and Ollie.

She loves running, attending concerts, and traveling. Lisa has visited thirty-two countries and has a growing list to see more. Lisa strives to live her life filled with passion, faith and volunteerism.

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) Forsyth, Chris | County Jefferson | Cong. District 7 | Senate District 22 | House District 23 |
|---|---|---|---|---|

| Home Address | City Wheat Ridge | State CO | Zip Code 80214 |
|---|---|---|---|

| Mailing Address | City | State Colorado | Zip Code |
|---|---|---|---|

| Date of Birth ■■ 1965 | | Gender Male | Registered Voter? Yes<br>Party Affliation? Unaffiliated | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title City of Aurora/Assistant City Attorney | Business Phone # (303) 739-7810 | Home Phone # ■■■ |
|---|---|---|
| | Cell Phone # ■■■ | E-mail ■■■ |

| Business Address 14999 E Alameda Pkwy | City Aurora | State Colorado | Zip Code 80012 |
|---|---|---|---|

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Erie High School | Erie, Kansas | | 1983 | |
| **College** | Neosho County Community College | Chanute, Kansas | | | Liberal Arts |
| | University of Kansas | Lawrence, Kansas | | 1988 | Journalism |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | The Judicial Integrity Project (present), Colorado Bar Association (present), Colorado Trial Lawyers Association (past), Workers' Compensation Education Association (past) | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Norman Beecher | friend as judicial reform advocate/lawyer | ■■■ |
| Fredricka Brown | family friend | ■■■ |
| Rosemary Van Gorder | friend as judicial reform advocate | ■■■ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Part Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Chris  Forsyth     **DATE:** 9/2/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Forsyth, Chris | Jefferson | 7 | 22 | 23 |

*Please explain why you wish to serve on a board or commission.*

I care deeply about judicial integrity. That's why I started The Judicial Integrity Project. Colorado's Commission on Judicial Discipline is one of the worst discipline commissions in the country. It needs to be improved. The judiciary must be trusted, and the people of Colorado have concrete reasons for not trusting the judiciary. That's a problem that needs to be fixed. Violations of the Code of Judicial Conduct must be prosecuted. Changes proposed by the current commission would slightly change the process. But the changes benefit district court judges and not the people. We need to improve the system.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.*
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.*

**SIGNATURE**: Chris Forsyth     **DATE:** 9/2/2023 12:00:00 AM

# CHRIS FORSYTH

## ATTORNEY

## CONTACT

**Email:** ▮▮▮▮▮▮▮▮

**Phone:** ▮▮▮▮▮▮▮

**Address:** ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮

## ESSENTIALS

**Licensed/Bar:** Colorado, #22608

**Citizenship:** USA

**Selective Service:** Registered

## EDUCATION

**Juris Doctorate: July 1992**
University of Kansas
School of Law
AmJur: Advanced Litigation
Staff Member: Journal of Law
and Public Policy
Colorado Bar: May 1993

**Bachelor of Science, 1988**
University of Kansas
School of Journalism
Awarded:
Outstanding Achievement in Major

## GOVERNMENT SERVICE

**Attorney**
Office of Legislative Legal Services
Colorado General Assembly
1999-2000 legislative session

**Deputy District Attorney**
Colorado 4th Judicial District
1993-1997

**Judicial Law Clerk**
Denver Juvenile Court
Hon. Orrelle Weeks
1992-1993

## PROFESSIONAL PROFILE

An effective litigator with 25+ years of experience. Proven success in handling complex legal issues, managing large projects, and overseeing investigations. Excellent research, writing and presentation skills. A tenacious trial lawyer who is also adept at handling appellate work. A zealous advocate who most often achieves advantageous settlements.

## EXPERIENCE

### ATTORNEY/OWNER

*Colorado Law Company*

05/05/2006 – present (40+ hours per week)

- Advise clients orally and in writing regarding legal strategy in workers' compensation cases
- Negotiate with employers and insurers to reach resolutions that benefit clients and avoid unnecessary litigation
- Coordinate investigations to obtain evidence
- Issue discovery requests and answer discovery
- Determine and prepare exhibits for hearing
- Interrogate witnesses at hearings and depositions
- Draft motions, briefs, and settlement documents in compliance with rules and statutes

### ASSOCIATE

*Riggs, Abney, Neal, Turpen, Orbison & Lewis PC*

06/15/2004 – 05/04/2006 (40+ hours per week)

- Evaluated workers' compensation, civil, and criminal cases to determine appropriate legal representation
- Litigated a variety of cases to resolution or conclusion

### IN-HOUSE COUNSEL

*Joel N. Varnell & Associates*

08/09/2001 – 09/30/2003 (40+ hours per week)

- Analyzed and advised insurer of financial exposure and legal strategy orally and in writing
- Handled a varied caseload of approximately 120 cases including workers' compensation, personal injury, and property damage
- Represented clients in jury trials and administrative hearings

### ASSOCIATE

*Treece, Alfrey, Musat & Bosworth*

05/25/2000 – 08/08/2001 (40+ hours per week)

- Calculated and evaluated financial exposure for various insurers
- Deposed medical and vocational experts
- Performed legal research regarding workers' compensation

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

OFFICE USE ONLY

DB _____

SLOT _____

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) Friesen, Daniel Ernest | County Arapahoe | Cong. District 6 | Senate District 26 | House District 37 |
|---|---|---|---|---|

| Home Address ▓▓▓▓▓▓ | City Englewood | State Colorado | Zip Code 80111 |
|---|---|---|---|

| Mailing Address | City | State Colorado | Zip Code |
|---|---|---|---|

| Date of Birth ▓▓▓▓, 1959 | | Gender Male | Registered Voter? Yes  Party Affliation? Democrat | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title / | Business Phone # | Home Phone # ▓▓▓▓ |
|---|---|---|
| | Cell Phone # ▓▓▓▓ | E-mail ▓▓▓▓ |
| Business Address | City | State |  Zip Code |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Cherry Creek Senior High | Greenwood Village, CO | | 1977 | |
| **College** | Williams College | Williamstown, MA | | 1981 | Philosophy |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | University of California at Los Angeles | Los Angeles | | 1984 | Law |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | See resume attached with cover letter. | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Christine Lamb | Former Law Partner | ▓▓▓▓ |
| Scott Bechler | Chair of non-profit board on which I serve | ▓▓▓▓ |
| Patrick Downing | Former client and friend | ▓▓▓▓ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Daniel Ernest Friesen    **DATE:** 5/6/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
### Judicial Discipline, Commission on

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Friesen, Daniel Ernest | Arapahoe | 6 | 26 | 37 |

*Please explain why you wish to serve on a board or commission.*

   As set for in the attached cover letter, I am deeply committed to the fair and effective administration of our judicial system and to protecting the public's perceptions of that system.  I am a retired employment lawyer, with a life-long commitment to public service, and I believe my background and experience would be helpful to the Commission.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

   No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.*
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.*

**SIGNATURE**: Daniel Ernest Friesen    **DATE:** 5/6/2023 12:00:00 AM

Daniel E. Friesen



May 8, 2023

Chief Justice Brian D. Boatright
Colorado Supreme Court
2 East 14th Avenue
Denver CO 80203

      Re:    Application Colorado Commission on Judicial Discipline

Dear Chief Justice Boatright,

      Please accept my application for the Colorado Commission on Judicial Discipline.  I am applying for this position because I believe the Commission is doing work vital to our legal system, and my background and skills could be helpful to its mission.

      The legal and practical experience most relevant to the Commission's charge seems to be in the area of employment law.  I am a retired attorney, on inactive status, with 30 years of experience focused primarily on employment litigation and counselling.  I was the Chairman of the Employment Law Group at Davis, Graham & Stubbs and then later at my own mid-sized firm.  I have litigated hundreds of cases and given dozens of seminars on workplace issues such as sexual harassment, discrimination, accommodating disabilities, substance abuse, and other forms of misconduct by high level professionals in positions of power.  I have received recognition for my legal work through various lists and awards.  See resumé.

      I believe strongly in the importance of public service, and I have, for many years, been deeply committed to Colorado.  I have served on 12 non-profit boards, including three as chairman and several involving our legal system.  My interest in the integrity of our judiciary is also a family value.  My father, Ernest C. Friesen, was one of the founders of the field of court administration.  He started the Institute for Court Management and the National College for State Trial Judges, among other accomplishments.  Although he is now 94, he remains sharp, and we continue to discuss his experiences training judges, creating judicial ethics codes across the country and related issues.

      In today's political environment, it is particularly important to protect both the fair and effective operation of our legal system and the public's confidence in that system.  I believe that my relevant legal experiences and my long-standing commitment to the broader Colorado legal community would be helpful to the Commission.  Thank you for considering my application.

      Sincerely,

Daniel E. Friesen

# DANIEL E. FRIESEN

████████████████████████

████████████████████████

## WORK EXPERIENCE

**Friesen Lamb, LLP**:  March 2010 to May 2014.  Founding member of 8-lawyer litigation firm, focusing on employment law and commercial litigation.

**Hale Friesen, LLP:** March 2002 to March 2010.  Founding member and managing partner of 20-lawyer litigation firm.  Practice emphasized employment law, land use litigation and public policy.

**Davis, Graham & Stubbs:** 1985-2002.  Executive Committee Member, 1999-2000; Chairman Employment Law Group, 1996 to 2002; Partner, Trial Department, 1991-2002.  Emphasis on employment law, complex commercial litigation, and constitutional law.

**United States District Court for the District of Colorado:** Law clerk to Hon. Jim R. Carrigan. August 1984 to August 1985.

## EDUCATION

**UCLA School of Law**, J.D., June 1984
 Distinguished Advocate, UCLA Moot Court Honors Program
 Managing and Comments Editor, UCLA-Pacific Basin Law Journal
 Member, UCLA-Alaska Law Review (published case note)

**Williams College**, B.A. Philosophy, June 1981
 Phi Beta Kappa selection          Captain Varsity Soccer
 Cum Laude                President Armstrong House
 Dean's List every semester          Fox Award for Leadership

## HONORS AND AWARDS

Chambers USA, selected as leading Labor & Employment Lawyer 2007-2014
Colorado Super Lawyer selection 2006-2014
5280 Magazine Top Lawyers in Colorado 2012- 2014
Fortune Magazine "Go To" Law Firm for Nations Top 500 Companies 2011-2014
Best Lawyers in America 2013, 2014
Denver Post Top Rated Lawyers Colorado 2013, 2014
Colorado Storm Soccer Association Hall of Fame, 2014
Lawyers World, Colorado Labor and Employment Attorney of the Year 2012, 2013
Labor and Employment Attorney of the Year Colorado 2011, 2012, 2013
Peer Review Rating AV Martindale Hubbel 1990 to present
9-News 1999 Leader of the Year Finalist
Denver Business Journal 1998 Forty under 40 Business Leaders Award
Outstanding Young Man of America Award, 1996

Leadership Denver Class of 1995
Young Lawyer of the Year 1992, Denver Bar Association
Civil Litigator Award 1991, Colorado Bar Association
Colorado Lawyer for the Arts Award 1991

## COMMUNITY SERVICE

Colorado United Soccer Club Board Member 2018 to present
KIPP Board Member, 2014 to 2018.  Board Chairman 2018
Colorado Common Cause, Board Member 2013-2014
Colorado Youth for Change, Board Member 2012-2013
The Children's Hospital of Colorado.  Board Member 1999-2010, Secretary and Executive
    Committee 2001-2007, Chairman Professional Affairs Committee 2000-2007, Compensation
    Committee 2001-2010
Colorado Storm Soccer Association.  Board Member 1992-2007, President and Board Chair
    1996-2002, Vice President 2002-2007, Competitive Soccer Coach 1992-2009, Planning
    Committee 2012-2014.  Outreach Program Director 2017-2019
Qualistar founding Member Board of Directors and General Counsel 1998-2001
Family Futures Chairman 1993-1997
Mile High Child Care Association Board Member 1988-1996, Vice President 1990-1994
Colorado Lawyers Committee, Board Member 2010-2014, Board Member and Task Force
    Chairman 1993-1997
Second Vice President, Denver Bar Association, 1993-1994
Board of Trustees, Denver Bar Association, 1993-1994
Association of Senior Citizens Board Member 1991-1994
Mayfair Neighbors Board Member 1987-1990
Pro Bono Coordinator for Davis, Graham & Stubbs, 1991-1997
Diversity Committee, Davis, Graham & Stubbs, 1998-99
Policy Committee Chairman, Dick Frees for Attorney General, 1994
Democratic Party Precinct Committee person 1986-1992

## LEGAL TEACHING

Trial Advocacy Instructor, National Institute for Trial Advocacy, 1997-1998
Contracts Professor, University of Colorado 1985.

## PUBLICATIONS

"Investigating Sexual Harassment," Vol. 21:9 Colorado Journal, § II 4 (February 1997)
"Enjoining Former Employees from Taking Software," 24 Colorado Lawyer 1771 (1995)
"New Shield Law Protects Reporters from Subpoenas," 20 Colorado Lawyer 891 (1991)
"Drug Testing in Colorado:  Problems and Advice for Private Employers," 19 Colorado Lawyer
413 (1990)
"Challenging Alaska's Ban on the Fluctuating Work Week," 12 UCLA-Alaska Law Review 183
(1983-84)

## SEMINARS AND SPEECHES

"Fake News and the First Amendment," University of Dayton School of Law, March 2021

"What Can We Do to Protect the Election," National Webinar Series, University of Dayton School of Law, October 2020

"Marijuana in the Workplace after Legalization," Lorman, February 2012

"Medical Marijuana in the Workplace" Colorado Safety Association, April 2011

"When Should Human Resources Call Legal Counsel: a guide to use of outside counsel in managing difficult human resources issues," Hale Friesen Seminars, October 2009.

"Exit Check Lists, Wage Claim Act Issues, and Other Administrative Considerations When Terminating Employees," Colorado Bar Association, spring 2009.

"New Developments in Employment Law: FMLA, ADA, and Discrimination Law," Employment Seminars, October 2008

"Fair Labor Standards Act – New Developments in Compliance Issues and Class Actions," Sterling Education, April 2008

"Why Plaintiffs Sue: Identifying High Risk Employees in the Areas of Harassment, Wrongful discharge and Discrimination," HF Employment Seminars, October 2006

"Employee Handbooks and At-Will Employment," National Business Institute, January 2006

"Discrimination Basics – How Companies get it Wrong," Employment Seminars, 2005

"Recent Development in Discrimination, Harassment and Sabanes-Oxley," Employment Seminars, November 2004

"Motions in Limine," National Employment Lawyers Association, June 2003

"Handling Employees with Bad Attitudes," Employment Seminars, September 2002

"Opening Statement in Employment Cases," Lorman, April 2002

"Employment Law for Small Businesses," National Business Institute, March 2002

"Family Medical Leave Act," American Bar Association, October 2001

"How to Win Employment Litigation," Employment Seminars, September 2001

"Trade Secrets and Non-Compete Agreements," Colorado Bar Association, September 2001

"Employment Law Overview," Colorado Business Association, July 2001

"Privacy in the Workplace," National Business Institute, December 2000

"Protecting Intellectual Property in the Workplace," Employment Seminars, October 2000

"The ADA, FMLA and Workers Compensation," Council on Education in Management, October 1999

"New Developments in Employee Handbooks," Employment Seminars, September 1999

"Employment Law – An Intermediate to Advanced Level Seminar," Colorado Bar Association, CLE, April 1999

"Recent Developments in Employment Law," Colorado Bar Association CLE, October 1998

"Fundamentals of Mergers & Acquisitions and Ethics of the Transactions," Colorado Bar Association CLE, October 1998

"Fundamental Issues in Colorado Human Resources Law," National Business Institute, October 1998

"New Developments in Sexual Harassment," Employment Seminars, September 1998

"Employee Testing," Council on Education in Management, August 1998

"Current Issues in Privacy in the Workplace," Colorado Legal Education, Inc., March 1998

"Colorado Labor and Employment Law," National Business Institute, January 1998

"Domestic Violence in the Workplace – What Employers Must Do," Colorado Bar Association, August 1997

"Privacy in the Workplace in Electronic Era," Continuing Legal Education in Colorado, Inc., April 1997

"Top 10 Disabilities Under the ADA and How to Accommodate Them," Counsel on Education in Management, February 1997

"Employee Reviews in Discrimination Cases," Colorado Human Resources Association Legislative Law Conference, January 1997

"Ethical Issues for In-House Counsel," American Corporate Counsel Association, December 1996

"Employment Law – An Overview," Restaurant Hospitality & Gaming Conference, Las Vegas, November 1996

"Legal Issues in Managing Your Unworking Workforce," Council on Education in Management, October 1996

"New Developments in ERISA Litigation," Employment Law Seminar, September 1996

"Employment Issues in Mergers and Acquisitions," Cambridge Institute, May 1996

"Sexual Harassment – The Most Difficult Problems," Employment Seminars, April 1996

"Employment Law Update," Boulder Area Human Resources Institute, January 1996

"Theft of Trade Secrets," Labor and Employment Seminars, September 1995

"Discharging Employees," Japan-America Society, January 1995

"Labor and Employment Law Issues for Corporation Counsel," Continuing Legal Education in Colorado, Inc., October 1994

"Controlling Litigation Expenses," National Business Institute, September 1994

"Family and Medical Leave Act," Labor and Employment Seminars, May 1994

"Colorado Labor and Employment Law," National Business Institute, January 1994

"Litigation Discrimination Clams Before Administrative Agencies in Colorado," Colorado Bar Association Convention, October 1993

"Family and Medical Leave Act," Housing and Development Law Institute, Fall 1993

"The Americans With Disabilities Act," Colorado Bar Association Convention, September 1992

"Fair Labor Standards Act," Council on Education in Management, June 1993

"Sexual Harassment," Colorado Human Resources Association, January 1993

"Privacy in the Workplace," Colorado Human Resources Association, January 1993

"Employment Contracts," Boulder Human Resources Association, August 1992

"The Civil Rights Act of 1991," Council on Education Management, July 1992

"The Eroding Doctrine of Employment at Will," National Business Institute, March 1992

"Employment Contracts," Labor and Employment Seminars, January 1992

"Employee Theft," Labor and Employment Seminars, January 1991

"Drug Testing: Problems and Advice for Private Employers," Drug Free Workplace Seminar, Colorado Chamber of Commerce, June 1990

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

OFFICE USE ONLY

DB _____

SLOT _____

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle)<br>Herlik, Edward Charles | County<br>El Paso | Cong. District<br>5 | Senate District<br>9 | House District<br>20 |
|---|---|---|---|---|

| Home Address | City<br>Monument | State<br>CO | Zip Code 80132 |
|---|---|---|---|

| Mailing Address | City | State<br>Colorado | Zip Code |
|---|---|---|---|

| Date of Birth<br>█████ 1958 | | Gender<br>Male | Registered Voter? Yes<br>Party Affliation? Unaffiliated | Ethnicity<br>Caucasian |
|---|---|---|---|---|

| Present Employer/Title<br>/ | Business Phone # | Home Phone #<br>████████ |
|---|---|---|

| | Cell Phone #<br>████████ | E-mail<br>████████ |
|---|---|---|

| Business Address | City | State | Zip Code |
|---|---|---|---|

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| High School | Friendly Senior High School | Oxon Hill, MD | | 1976 | |
| College | US Air Force Academy | Colorado Springs, CO | | 1980 | Engineering & Political Science |
| | California State University | San Bernardino, CA | | 1984 | Political Science |
| Graduate Studies -or- Trade/Business/ Correspondence | | | | | |
| | | | | | |
| Memberships in Organizations And Offices Held(Indicate if | Veterans of Foreign Wars (present)<br>Mensa (present)<br>AF Academy Association of Graduates (present)<br>El Paso County Sheriff's Citizens Advisory Committee (past) | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Michael Boatner | Service Academy graduate peer | ████████ |
| Trevor Cofer, Esq. | Attorney | ████████ |
| Vance Forepaugh | Former military commander | ████████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Edward Charles Herlik    DATE: 3/25/2024 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Herlik, Edward Charles | El Paso | 5 | 9 | 20 |

*Please explain why you wish to serve on a board or commission.*

Please see the cover letter.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Edward Charles Herlik     **DATE:** 3/25/2024 12:00:00 AM

# Ed Herlik

Application Cover Letter
Commission on Judicial Discipline                                                25 March 2024

Dear Governor Polis,

Our judiciary has been in the media for a number of ethical lapses over the past few years. My family has personal experience with failed judicial ethics that reinforces those stories for me. We share the understandable public distrust. That's very concerning because Colorado certainly needs a trusted judiciary as the very foundation for trust in state government generally.

I do my best to offer solutions when I point out problems and to also serve my community where I have something to contribute. Therefore, *I hope you'll appoint me to the Commission on Judicial Discipline* as a step toward rebuilding trust in our judiciary. I'll contribute in two relevant ways on top of the professionalism and dedication that I'm sure all appointees bring.

I graduated from the Air Force Academy, became a third-generation combat officer, and later volunteered as an honor and ethics instructor and mentor in the Academy's character program for about 25 years. I held very significant government security clearances for decades, meaning I was routinely investigated for trustworthyness. I've easily passed the periodic background checks as a school teacher and as a volunteer with county government. Therefore, I'll bring a demonstrated personal integrity to your team that the public will both recognize and appreciate. I'll also bring that broadening perspective on standards of conduct to compliment the many members of the legal profession who sit on that Commission.

My family's experience with judicial ethics led me to contact the Commission. I'm one of the few citizens who has experienced the Commission's process from the outside, which I'm happy to discuss with you. It's a dissapointing and cautionary story, despite the fact that the problem judge resigned under pressure. That rare perspective will contribute to improving the Commission's process and implementing the change that's very likely to come after November's vote on the relevant ballot issue.

That contact also left me familiar with the Rules of Judicial Discipline. They're very clear and similar to other codes of conduct I've abided by in my professional life.

You're welcome to my resume and any other background information you like. Please just specify what more detail you want.

So, again, I ask that you appoint me to the Commission on Judicial Discipline as a valuable public service in my retirement. I promise integrity, discretion, conscientiousness and loyalty. You'll never be surprised.

Sincerely,

*Ed Herlik*

Note: the application form does not have enough space for all the Coloradoans who want to be **references**:

| | |
|---|---|
| Michael Boatner | West Point Graduate |
| Bill Byars | Veteran |
| Trevor Cofer, Esq. | Attorney |
| Rich Crawford | Veteran |
| Vance Forepaugh | Former Commander |
| Dennis Jones | Academy Classmate |
| Brandon LaValley | Former University Student |
| Doug Laird | Social Group Friend |

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

**Judicial Discipline, Commission on**

| Name (Last, First Middle) Hupfer, Levon | County Adams | Cong. District 8 | Senate District 21 | House District 32 |
|---|---|---|---|---|

| Home Address ███████████ | City Brighton | State CO | Zip Code 80601 |
|---|---|---|---|

| Mailing Address | City | State Colorado | Zip Code |
|---|---|---|---|

| Date of Birth ██████ 1979 | | Gender Male | Registered Voter? Yes Party Affliation? Unaffiliated | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title Adams County Health Department/Deputy Executive Director | Business Phone # | Home Phone # ███████████ |
|---|---|---|
| | Cell Phone # ██████████ | E-mail ███████████ |
| Business Address | City | State / Zip Code |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | North High School | Denver Co | | 1998 | |
| **College** | Liberty University | Lynchburg VA | | 2003 | Religion |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | Liberty University | Lyncburg VA | | 2010 | Human Services - Marriage and Family ~~Studies~~ |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | 2022-2023 Attorney General's Opioid Settlement Regional Council. Appointed by elected DA ~~2017-2023~~ | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Senator Michaelson Jenet | Colleague | ███████████ |
| Lewis Brown Jr | Friend and former Colleague | ███████████ |
| Brian Mason | Colleague | ███████████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Part Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Levon Hupfer    **DATE:** 1/18/2024 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
## Judicial Discipline, Commission on

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Hupfer, Levon | Adams | 8 | 21 | 32 |

*Please explain why you wish to serve on a board or commission.*

I have just completed two terms on TGYS and it was an honor so I have some capacity.

I want to use my skills and experience to serve my state and improve my community.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Levon Hupfer    **DATE:** 1/18/2024 12:00:00 AM



# LEVON HUPFER, MA, LAC

## CONTACT

Cell:

## BOARDS/PAPERS/AWARDS

**2022**
Attorney General's Opioid Settlement Regional Council. Appointed by elected District Attorney

**2017-Present**
Tony Grampsas Youth Services Board (CDHS), Board Chair. Appointed by Governors Hickenlooper and Polis

**2019**
Colorado Association of Addiction Counselors (CAAP) President's Award

**2014, 2018 & 2019**
International Winter Symposium on Addictive Disorders, Behavioral Health & Mental Health

**2016**
National Symposium on Juvenile Services, Invited Faculty

**2011-2013**
State Board of Addiction Counselor Examiners, Member. Appointed by Governor Hickenlooper

## EDUCATION EXPERIENCE/CREDENTIALS

**Cornell University**
Certificate of Strategic Human Resources Leadership
Graduate Certificate of Executive Leadership

**Liberty University**
Master of Arts in Human Services – Marriage & Family Studies

**Colorado Department of Regulatory Agencies**
LAC – Licensed Addiction Counselor #216

**Lean Six Sigma**
Green Belt Certification – Rocky Mountain Partnership

## RECENT EXPERIENCE

**Adams County Health Department**      **Deputy Executive Director**
November 2023 – Present
Lead over 130 staff in 3 Divisions: Public Health Nursing, Environmental Health and Nutrition and Family Health

**17th District Attorney's Office**      **Director of Diversion, Health & Legislation**
2013 – 2023

**Colorado State University Grad Dept of Psychology**      **Adjunct Lecturer**
2019 – Present

**Galvanize Counseling Private Practice**      **Owner & Therapist**
2017 – Present

**Colorado Department of Human Services**      **Program Director**
2008 – 2013
Decisively directed all operations of a youth residential center on a 22-acre campus with 50 staff, 50 clients, and a $4M budget

## REFERENCES

- Senator Dafna Michaelson Jenet
- District Attorney Brian S. Mason, Colorado's 17th Judicial District
- Lewis Brown, Jr., Vice President of Talent, Comcast, West Region

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

OFFICE USE ONLY

DB _____

SLOT _____

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) Kramer, Daniel Evan | County Larimer | Cong. District 2 | Senate District 15 | House District 49 |
|---|---|---|---|---|
| Home Address ██████████ | City Estes Park | State Colorado | Zip Code 80517 | |
| Mailing Address | City | State Colorado | Zip Code | |

| Date of Birth ████████ 1983 | | Gender Male | Registered Voter? Yes Party Affliation? Democrat | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title Town of Estes Park, CO/Town Attorney | Business Phone # (970) 577-4761 | Home Phone # ████████ |
|---|---|---|
| | Cell Phone # ██████ | E-mail ████████ |
| Business Address 170 MacGregor Ave., P.O. Box 1200 | City Estes Park | State Colorado    Zip Code 80517 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Nova High School | Davie, FL | | 2001 | |
| **College** | Duke University | Durham, NC | | 2005 | Public Policy Studies |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | University of California, Berkeley, School of Law | Berkeley, CA | | 2011 | Law |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Member, Conservation Colorado (present) Member, Estes Valley Land Trust (present) Treasurer, Boulder Ensemble Theatre Company (past) Board Member, Boulder Food Rescue (past) | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Kate Greenberg | Personal | ████████ |
| Shoshana Lew | Personal; Some intergovernmental work | ████████ |
| Wendy Koenig | Mayor of Estes Park (employer) | ████████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Part Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Daniel Evan Kramer    **DATE:** 5/31/2022 12:00:00 AM

STATE OF COLORADO
APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Kramer, Daniel Evan | Larimer | 2 | 15 | 49 |

*Please explain why you wish to serve on a board or commission.*

My mentor, Justice Gregory J. Hobbs, Jr. of the Colorado Supreme Court, recently passed away. Justice Hobbs was a tireless advocate for Coloradans his entire career, fighting for water justice, clean air, and the rights of ordinary people. While I work on some of these issues in my day job in local government, Justice Hobbs' passing has inspired me to get more active at the state level. My background is in environmental, municipal, and administrative law. Please feel free to consider me for any volunteer appointment if my skills might be useful.

Please let me know if you plan to get in touch with my references.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Daniel Evan Kramer    **DATE:** 5/31/2022 12:00:00 AM

# Daniel Evan Kramer

███████████████████████████████████

## ATTORNEY EXPERIENCE

**Town of Estes Park**, CO                                            *2019-present*
*Town Attorney*
Advise and represent the Town on all legal matters, and draft all legal documents.  Guide the Town through TABOR litigation, vacation home rental regulation, water negotiations, workforce housing requirements, and emergency response authority, among other issues.  Oversee prosecutor and special counsel for municipal broadband, eminent domain, water, bond finance, intellectual property, employment, capital project support, tort claims, civil rights, and other litigation.  Participate on the Town's leadership team, making staff-level decisions for the organization.

**Longmont City Attorney's Office**, Longmont, CO                    *2012-2019*
*Assistant City Attorney II*
Directly advised the City Council and City administration, drafted ordinances, and represented the City on a wide range of public-facing matters including land use, planning and zoning, affordable housing, public works, natural resources, parks and open space, oil and gas, water and wastewater utilities, water rights and resources, marijuana regulation and licensing, homelessness, special districts, and eminent domain.

**Colorado Supreme Court**, Denver, CO                               *2011-2012*
*Law Clerk to Justice Gregory J. Hobbs, Jr.*
Drafted opinions and wrote memoranda to the Court, including on municipal, water, and natural resources law.

## EDUCATION

**University of California, Berkeley, School of Law,** Berkeley, CA
J.D., Order of the Coif (Top 10%), May 2011
Certificate of Specialization in Environmental Law

     Honors:      William C. Jones Scholarship (as one of the top five students in
                Class of 2011, and awarded for exceptional service and original work)
             Ellis J. Harmon Prize (best student paper on environmental law & policy)
             Prosser Prize in Constitutional Law (from Justice Goodwin Liu)
             Prosser Prize in Water Law (from Professor Antonio Rossmann)
     Activities:   Editor in Chief, *Ecology Law Quarterly*
             Committee Chair, Graduate Assembly of UC Berkeley
             Moot Court Team (nationally competitive)
             Berkeley Law Student Association Representative
             Strategic and financial management courses, Haas School of Business

**Duke University,** Durham, NC
B.A., *magna cum laude*, Public Policy Studies, May 2005 (Dean's List, 6 semesters)

## PRIOR EXPERIENCE

**California Attorney General's Office,** Oakland, CA                 *Summer 2010*
*Legal Intern; Environment, Land, and Natural Resources Sections*

**Center for Biological Diversity,** San Francisco, CA               *Summer 2009*
*Legal Intern*

**Montana Wilderness Association,** Livingston, MT                    *2007-2008*
*Outreach Coordinator*
Organized grassroots support for wilderness protection campaigns.

**AmeriCorps**                                                        *2005-2006*
*Crew Leader & Member*
Built trails, restored streams, killed invasive weeds, etc., throughout Alaska, Maryland, and Utah.

## PUBLICATIONS AND PRESENTATIONS

Daniel E. Kramer, *Springtime for Home Rule over Oil and Gas*, Colorado Lawyer, July 2019, at 36.

Daniel E. Kramer, *The Evolving Definition of "Conflict" in Colorado Preemption Law*, Colorado Lawyer, April 2019, at 38.

*Panhandlemonium - How to Move Your Ordinances Along*, Colorado Municipal League Attorney Seminar, Fall 2017.

*The Death (or Rebirth) of Colorado Preemption Law*, Colorado Municipal League Attorney Seminar, Fall 2014.

Daniel Kramer, Comment, *United Voices: An Open Proposal for Smart and Fair Growth in the Central Valley*, 39 Ecology L.Q. 193 (2012) (Harmon Prize-winning article).

Daniel Kramer, In Brief, *Gray Wolves Face Delisting, Again, and Why the Courts Will Force Relisting, Again*, 36 Ecology L.Q. 583 (2009).

## INTERESTS

Backpacking, biking, bluegrass, gardening, kombucha, meditation, sewing masks, skiing and ski touring, softball, theater, trail running, vegan cooking, yoga.

## BAR ADMISSIONS
Colorado

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Mix, Kristen Louise | Denver | 1 | 33 | 8 |

| Home Address | City | State | Zip Code 80238 |
|---|---|---|---|
| ▮▮▮▮▮ | Denver | CO | |

| Mailing Address | City | State | Zip Code |
|---|---|---|---|
| | | Colorado | |

| Date of Birth ▮▮▮, 1958 | | Gender Female | Registered Voter? Yes  Party Affliation? Unaffiliated | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title | Business Phone # | Home Phone # |
|---|---|---|
| Judicial Arbiter Group/Arbiter | (303) 572-1919 | ▮▮▮▮▮ |

| | Cell Phone # | E-mail |
|---|---|---|
| | ▮▮▮▮▮ | ▮▮▮▮▮ |

| Business Address | City | State | Zip Code |
|---|---|---|---|
| 1601 Blake St., Ste. 500 | Denver | Colorado | 80202 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Nichols School | Buffalo, NY | | 1976 | |
| **College** | Middlebury College | Middlebury, VT | | 1980 | English |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | University of Colorado | Boulder, CO | | 1985 | Law |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Please see attached biography. | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Hon. Kato Crews | former colleague | ▮▮▮▮▮ |
| Hon. Kathryn Starnella | friend and mentee | ▮▮▮▮▮ |
| Hon. Nancy E. Rice | friend, mentor, colleague | ▮▮▮▮▮ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Part Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Kristen Louise Mix      **DATE:** 3/18/2024 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Mix, Kristen Louise | Denver | 1 | 33 | 8 |

*Please explain why you wish to serve on a board or commission.*

I previously served on the Governor's Commission on Family Medicine and found it to be very rewarding.  Having retired from service as a judge, I would like to use my experience to contribute on matters relating to judicial discipline.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Kristen Louise Mix    **DATE:** 3/18/2024 12:00:00 AM

Biography of Kristen L. Mix

Kristen L. Mix graduated from Middlebury College, *cum laude*, with a degree in English.  She obtained her J.D. from the University of Colorado School of Law and practiced law in Denver until 2007, when she was appointed to the federal bench. Magistrate Judge Mix's expertise prior to her appointment was in labor and employment law.  In 2006 and 2007, Judge Mix was recognized as a top employment lawyer by *Chambers U.S.A.* and named one of the top twenty-five women lawyers in Colorado by *5280 Magazine.*  She retired from active judicial service on August 5, 2023 and joined the Judicial Arbiter Group in Denver, where she works as a mediator, arbitrator and special master.

Magistrate Judge Mix served on the United States District Court for the District of Colorado's Local Rules Committee throughout her tenure on the federal bench.   Post-retirement, she continues to serve as Co-Chair of the court's Pro Se Prisoner Task Force, which is developing methods to assist with its extensive prisoner caseload. She led the project to establish the Federal Pro Se Clinic in the District of Colorado, which opened in the Alfred A. Arraj United States Courthouse in June of 2018, and to expand services to pro se prisoner litigants in 2023.   From 2012 to 2018, Judge Mix served on the Judicial Conference of the United States' Committee on the Administration of the Magistrate Judge System. Judge Mix also served as a member of the Federal Magistrate Judges Association's Executive Committee from 2017 to 2021 and as President of the FMJA in 2021-2022.   She is the past Chair of the Colorado Judicial Coordinating Council, where she created and planned conferences to facilitate sharing of views and ideas between Colorado state and federal judges on matters of common interest.   Judge Mix served on the Colorado Access to Justice Commission from 2019-2022.   As a member of the Sedona Conference, Judge Mix assisted in drafting the *Commentary on Possession, Custody and Control* of documents under Fed. R. Civ. P. 34 and the *Social Media Primer*.   She serves on Sedona's Advisory Board as well.   In 2023, Judge Mix was appointed to the Global Advisory Council of EDRM, the Electronic Discovery Research Module.

Magistrate Judge Mix has served as an adjunct professor at the University of Colorado School of Law and University of Denver Sturm College of Law.    She was the judicial co-founder of the Colorado Intellectual Property American Inn of Court and served on the Executive Committee of the Sonia Sotomayor American Inn of Court.    In 2013, Judge Mix created an annual public-service externship program for local, diverse second and third-year law students to obtain externships with public employers and non-profits in the Denver metropolitan area.    As of her retirement from the court, more than 350 law students had completed externships through the "MixDIP" program.

In 2006, Judge Mix was appointed by Governor Bill Owens to serve on the Colorado Commission on Family Medicine.    She served as Chair of the Commission from 2013-2017, and also served as a member and Chair of the Board of Directors of the Colorado Institute of Family Medicine from 2013 to 2018.

Judge Mix accepts appointments as a mediator, arbitrator and special master in a wide variety of civil litigation and has particular expertise in labor and employment law. She is a frequent writer and speaker on the law.

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

OFFICE USE ONLY

DB _____

SLOT _____

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle)<br>Nunez, Anthony | County<br>Pueblo | Cong. District<br>3 | Senate District<br>3 | House District<br>46 |
|---|---|---|---|---|
| Home Address | City<br>Pueblo | State<br>Colorado | Zip Code 81006 | |
| Mailing Address | City | State<br>Colorado | Zip Code | |

| Date of Birth <br>1947 | | Gender<br>Male | Registered Voter? Yes<br>Party Affliation? Democrat | Ethnicity<br>Caucasian, Native American, Hispanic |
|---|---|---|---|---|
| Present Employer/Title<br>/ | Business Phone # | | Home Phone # | |
| | Cell Phone # | | E-mail | |
| Business Address | City | | State | Zip Code |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | South High School | Pueblo, CO | | 1965 | |
| **College** | | | | | |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Present: Director Lower Arkansas Water Conservancy Board, Pueblo Regional Building. Past: 10 Judicial Performance Commission, Pueblo County Commissioner (2 term), Pueblo County Democrat Party, Chairman (3 terms), VP/Trustee City-County Library Foundation | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Garrison Ortiz | Acquittance | |
| Dennis Maes | Acquittance | |
| Jeff Chostner | Acquittance | |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing?*:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Anthony  Nunez    **DATE:** 7/24/2023 12:00:00 AM



# STATE OF COLORADO
APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Nunez, Anthony | Pueblo | 3 | 3 | 46 |

*Please explain why you wish to serve on a board or commission.*

For the betterment of State, Community and Social environments, one must be an active participant. Accountability

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Anthony Nunez     **DATE:** 7/24/2023 12:00:00 AM

# Anthony Nunez
## Community Activist/Retired Businessman

## Experience

**2000 - Current**
**Retired Businessman/Community Activist**
Currently involved education improvement movement, advocate for local businessman needing guidance in navigating through licensing and permit issues. Active board member, Lower Arkansas Water Conservancy District

**1990 - 2000**
**Pueblo County Commissioner**
Manage the County budget and oversee all operations of County projects. Maintain State guidelines, manage and direct all department heads and address the needs and concerns of all Pueblo County Residents. Chairman, Pueblo Democrat Party.

**1965 – 1989**
**Corporate Businessman/Independent Business Owner/Board Member**
Successfully managed the accounting, personal and general everyday operation of my catering, retail liquor store and residential rental businesses. Served on numerous private schools, civic and state boards, to include the 10 Judicial Performance Commission being appointed by Governor Roy Romer and Governor Bill Owens. Management team Safeway Stores Inc.

## Education

**1961 – 1965**
**General Curriculum**
Pueblo South High

## Skills

- Leadership
- Organization
- Problem Solving
- Negotiation
- Teamwork

## Contact



# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

OFFICE USE ONLY

DB _____

SLOT _____

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

**Judicial Discipline, Commission on**

| Name (Last, First Middle) Pacheco, Marisa Lee | County Pueblo | Cong. District 3 | Senate District 3 | House District 62 |
|---|---|---|---|---|

| Home Address ▉▉▉▉▉ | City Pueblo | State Colorado | Zip Code 81006 |
|---|---|---|---|

| Mailing Address | City | State | Zip Code |
|---|---|---|---|

| Date of Birth ▉▉▉▉ 1973 | | Gender Female | Registered Voter? Yes / Party Affliation? Unaffiliated | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title City of Pueblo/Human Resources Director | Business Phone # 719-553-2665 | Home Phone # ▉▉▉▉ |
|---|---|---|
| | Cell Phone # ▉▉▉ | E-mail ▉▉▉▉▉ |
| Business Address 301 West B Street | City Pueblo | State Colorado / Zip Code |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | William Mitchell High School | Colorado Springs | | 1992 | Genearl |
| **College** | University of Colorado | Colorado Springs | | 1996 | Psychology/Gerontology |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Society of Human Resources Management - Senior Professional Certified International Public Management Association  - Senior Professional Certified | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Nick Gradisar | | ▉▉▉▉ |
| Laura Solano | | ▉▉▉▉ |
| Troy Davenport | | ▉▉▉▉ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:I am capable of committing as much time as necessary to fulfill the duties of this position. It would be an honor to be selected.

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Marisa Lee Pacheco    **DATE:** 7/31/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Pacheco, Marisa Lee | Pueblo | 3 | 3 | 62 |

*Please explain why you wish to serve on a board or commission.*

I am a Colorado native and dedicated public servant with deep local government expertise.   This board opportunity provides a way to serve in a meaningful way at a state level, beyond my immediate community. This is very exciting and of great interest to me both professionally and personally.    I have nearly twenty-five years of Human Resources experience, have held management positions for sixteen of those years, mostly working in local government.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Marisa Lee Pacheco        **DATE:** 7/31/2023 12:00:00 AM

# MARISA PACHECO
## IMPA-HR SCP, SHRM-SCP

███████████ | ███████████ | ███████████

███████████

_____

**Dynamic, accomplished human resources leader with 24 years of achievement and success in providing strategic human resources leadership in both public sector (union and non-union) and private sector environments. Core competencies and skills include:**

- Compensation and classification system design and management
- Budgeting and forecasting
- Benefits administration, cost containment
- Public Safety and civilian union experience
- HR Audits, process improvement, change management
- Worker's compensation and risk management

- Executive and line recruitment
- Program management experience
- Labor relations/union experience
- Training design, development, and delivery
- Employee relations and investigation expertise
- Extensive policy development experience

## PROFESSIONAL EXPERIENCE & SELECTED ACHIEVEMENTS

### Human Resources Director, City of Pueblo, 4/2010-Present

One of the largest employers in the Pueblo market with approximately 800 regular FTEs and 1300 total employees including seasonal temporaries, the City of Pueblo is a full-service city.  General Fund annual budget is approximately 98 million with 70% in personnel costs.  In the Human Resources Director role, responsible for all facets of the Human Resources function reporting to the elected Mayor:

- Directed the work of a combination of professional, paraprofessional, technical and administrative support staff

- Serve as policy advisor to the City Manager for 8 years, then following conversion of government to Mayor and Directors.

- Management negotiations team member on annual contract negotiations for International Association of Firefighters (IAFF Local #3), International Brotherhood of Police Officers (IBPO Local #537), Pueblo Association of Government Employees (PAGE affiliate of AFSCME Local #1712) and Amalgamated Transit Union No. 662

- Extensive labor relations experience, representing the City on union grievance issues and disciplinary matters in conjunction with legal counsel

- Deep expertise in employee relations matters to include investigations and mediation

- Manage the compensation and classification systems performing annual market compensation studies, including general market analysis and comprehensive benchmark studies in advance of labor contract negotiations to develop recommendations to the Mayor

- Developed Pueblo Leadership Academy a year-long comprehensive supervisory academy for City staff members starting in 2012 and Director's Informational Workshops in 2020

- For the first time in the City's history, established zero cost positive insurance broker relationship keeping premium changes in line with national trend despite high utilization of plans

- Managed the transition of the City's approximately $13 million dollar per year medical insurance program from fully insured to self-insured in 2020.  Manage all benefit plans including fully insured programs, RFP and selection activities

- Moved organization to streamlined web-based platform for benefits open enrollment, served as key operational leader on major ERP system conversion and lead the City's implementation of a new online learning platform

- Manage self-insured workers' compensation and risk management activities

- Developed credibility and strong relationships with senior management and employees

- Performance ratings of exceeds expectations during tenure with City organization

## Co-Owner/Principal of Human Capital Group, LLC, 1/2009-4/2010

Co-owner and Principal of innovative human resources management consulting firm specializing in employment lifecycle solutions for private and public sector organizations.

- Provided customized solutions to clients in the core areas of human resources management to include comprehensive audit, administrative review oversight, compensation and classification strategy, recruitment and selection, investigations and fact finding, employee relations, training and facilitation, legal compliance, policy and procedure review and development, training and facilitation, succession planning design and talent and management as well as reduction in force management and career transition services

- Developed nationally certified Human Resources University curriculum

- Shared responsibility for sales and marketing, financial management, and company operations

## Human Resources Director – Pueblo City-County Library District, 6/2008–2/2009

Director level position, part of the senior management team reporting directly to Chief Executive of the Library District responsible for all areas of human resources management including the management of volunteer coordination staff.

- Managed all Human Resources functions for the Pueblo City-County Library District (PCCLD) for approximately 120 employees

- Traditional responsibilities included compensation, classification, recruitment, employee relations, EEO compliance, ADA, FMLA, FLSA review and administration, worker's

compensation, human resources information systems, manage/oversee volunteer function, budget administration, general program management

▪ Project management and process improvement projects include the development of a succession planning program, overhaul of policies and procedures for entire district, identification of ways to enhance efficiency and effectiveness of all HR procedures and practices

## Human Resources Manager – City of Colorado Springs, 2/2000-6/2008

Human Resources Manager – Colorado Springs Fire Department 5/2007-6/2008
Human Resources Manager – Colorado Springs Police Department 11/2005-11/2007
Human Resources Manager – Central Human Resources 1/2004-11/2005
Principal Human Resources Analyst - 1/2003 – 1/2004
Senior Human Resources Analyst – 8/1/2000-4/2002
Human Resources Analyst II –2/2000-8/2000

At the time of service, the City of Colorado Springs was and remains one of the largest employers in the local market, with approximately 2,700 employees serving a City population of nearly 500,000. The City's budget was approximately 300 million dollars annually, of which approximately 60% of the annual budget was dedicated to total compensation costs.

Focused expertise and responsibilities in compensation, classification, executive recruitment, employee relations, benefits administration, human resources information systems program management and strategic process improvement project experience:

• Only Human Resources Manager in the City to have worked in central Human Resources administration and both public safety departments

▪ Managed all Human Resources functions for Colorado Springs Fire Department (CSFD) for an employee population of 500

▪ Prior to being recruited by CSFD, served as the Human Resources Manager for the Colorado Springs Police Department managing all Human Resources functions for an employee population of 1,200

▪ In all Human Resources Manager positions have managed a combination of professional, paraprofessional, technical and administrative support staff

▪ During six-year tenure with central City Human Resources, managed the compensation and classification systems performing annual market compensation studies, including general market analysis and comprehensive benchmark studies

▪ Responsible for the development of recommendations for annual market increases and compensation system realignment for inclusion in the City Manager's annual budget

▪ Participated in the development of appointed position compensation packages

▪ Developed credibility and strong relationships with senior management and employees which lead to recruitment to public safety departments

▪ Developed cost-effective executive recruitment strategy resulting in high-quality hires and is now a model being used by other local public sector agencies

▪ Facilitated senior management task force to develop succession planning program

- Performance ratings of exceeds expectations during tenure with City organization

- Selected for numerous City-wide and department committees and task forces including, Minority Recruitment Task Force (2005-2008, Chair 2008), Leadership Development Series Executive Steering Committee (2007-2008), PeopleSoft Time and Labor Executive Committee (2007-2008), Promotional Process Committee (2007-2008), City Wellness Committee (2005-2007), City Manager's Budget Analysis Team (2003), Leadership Development Action Team (2003-2005), Customer Service Quality Council (2000-2002) and Diversity and Inclusion Training Team (2001-2005). First civilian recipient of Community Above and Beyond Award (2004).

**Human Resources Generalist and National Recruiter, 12/1996-2/2000**
**Arthur Andersen LLP – Denver, CO, and Chicago IL**

Arthur Andersen LLP, formerly one of the largest financial services firms in the world with approximately 60,000 employees worldwide provided assurance, contract accounting, and human capital services to client companies.

During my tenure with Arthur Andersen, I held several professional human resources positions with an emphasis on recruiting within the Assurance and Business Advisory practice, at the local level in Denver and at the national level out of the firm's Chicago headquarters.

National Recruiter, 2/1999-2/2000
Recruiting Coordinator, 10/1997-3/1999
Assurance and Business Advisory (ABA) National Recruiting Team
Chicago, IL

Human Resources Generalist, 12/1996-12/1998
Business Process Outsourcing (BPO) Practice
Denver, CO

## EDUCATION & CERTIFICATIONS

**Bachelor of Arts (BA), Psychology, academic minor in Gerontology**
University of Colorado – May 1996
Graduated magna cum laude with GPA of 3.9

**Center for Creative Leadership (CCL) – Colorado Springs**
Graduate of Leadership Development Program – 2005

**National Incident Management System (NIMS) – Advanced Certification**
Certified - ICS 100, ICS 200, ICS 300, ICS 400, ICS 700, ICS 800

**International Public Management Association – IMPA-HR Senior Certified Professional**

**Society for Human Resources Management Senior Certified Professional, SHRM-SCP**

## PROFESSIONAL MEMBERSHIPS

**Society for Human Resources Management (National)**
2000-present

**Colorado Springs Society for Human Resources Management**
2000-2010

**Colorado Springs Human Resources Association**
Elected Board Member: Vice President, Secretary and Education/Certification Director 2009-2010

**IPMA-HR (International Public Management Association)** 2010-present

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

OFFICE USE ONLY

DB _____

SLOT _____

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle)<br>Powell, David Daniel | County<br>Denver | Cong. District<br>1 | Senate District<br>31 | House District<br>2 |
|---|---|---|---|---|
| Home Address | City<br>Denver | State<br>Colorado | Zip Code 80209 | |
| Mailing Address | City | State<br>Colorado | Zip Code | |

| Date of Birth ███████ 1958 | | Gender<br>Male | Registered Voter? Yes<br>Party Affliation? Democrat | Ethnicity<br>African American |
|---|---|---|---|---|

| Present Employer/Title<br>Garnett Powell Maximon Barlow/Partner | Business Phone #<br>(720) 252-7947 | Home Phone # |
|---|---|---|
| | Cell Phone # | E-mail |
| Business Address<br>1512 Larimer St. , Suite 950 | City<br>Denver | State<br>Colorado    Zip Code<br>80202 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Salinas High School | Salinas, California | | 1976 | |
| **College** | University of Santa Clara | Santa Clara, California | | 1980 | |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | UCLA School of Law | Los Angeles, California | | 1983 | Law |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Board of Directors, Denver Dumb Friends League, Board of Directors, Colorado Alzheimer's Association, Sam Cary Bar Association, International Society of Barristers, National Employment Law Council, College of Labor and Employment Attorneys | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Stan Garnett | Colleague/Partner | |
| Alvin LaCabe | Friend and mentor | |
| Natalie Hanlon-Leh | My former supervisor | |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: David Daniel Powell     **DATE:** 6/12/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Powell, David Daniel | Denver | 1 | 31 | 2 |

*Please explain why you wish to serve on a board or commission.*

I believe my background as an attorney and the leadership roles I've held in various boards and other organizations make me well qualified to serve on a commission.  I also believe that as an attorney, I have an obligation to give back to my community and serving on a commission provides me with an ideal opportunity to serve my community,  I am particularly interested in serving as a member of the Judicial Disciplinary Commission because our judiciary is the backbone of our civil and criminal justice system.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**:  David Daniel Powell       **DATE:** 6/12/2023 12:00:00 AM

**DAVID D. POWELL, JR.**

---

## PROFESSIONAL EXPERIENCE

**Equity Partner, Garnett Powell Maximon Barlow**
Denver, Colorado
April 2023-present

Founding member of trial boutique with a practice focused primarily on employment litigation, advice and investigations.

**Deputy Attorney General, State Services**
**Colorado Attorney General's Office**
Denver, Colorado
April 2019-April 2023

Supervised the State Services section of the Colorado Attorney General's Office – comprised of eight separate legal units responsible for representing the state's key elected officials and providing legal services in the areas of health care, human services, K-12 and higher education, state contracts and procurement, labor, and public utilities.

**Equity Shareholder, Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
Denver, Colorado
January 2011-April 2019
Member, Board of Directors (January 2014 – April 2019)

Practice was primarily focused on the representation of employers in litigation matters filed in both state and federal courts.  Practice also included advising employers on compliance with local, state, and federal employment laws.

**Equity Shareholder, Brownstein Hyatt Farber Schreck, LLP**
Denver, Colorado
2002-2010
Chair, Employment Practice Group
Member, Diversity and Inclusiveness Committee

Lead counsel on numerous litigation matters involving federal employment and civil rights statutes, including but not limited to Title VII, the Fair Labor Standards Act, the Americans With Disabilities Act, and the Age Discrimination in Employment Act.  Many of the same matters were tried to verdict in both state and federal district courts.  Practice also included providing advice to individual executives and employers on a variety of business transactions and other matters arising from the employer-employee relationship.

**Associate and Partner, Holland & Hart, LLC**
Denver, Colorado
1990-2002
Member, Labor and Employment Practice Group

Conducted legal research, prepared memoranda and briefs, conducted and defended depositions.  As a senior associate and partner, practice became primarily focused on employment and civil rights litigation in both federal and state district courts.  Served as first and second chair on employment cases tried to verdict in both state and federal district courts.

**Deputy District Attorney, Denver District Attorney's Office**
Denver, Colorado
1986-1990
Investigated and prosecuted misdemeanor and felony criminal cases.  Tried to verdict numerous cases in county, juvenile, and district courts in the City and County of Denver.

**Law Clerk**
1984-1986
**Overton, Lyman & Prince, PC**
Los Angeles, California

Conducted research and prepared memoranda on various legal issues related to commercial litigation matters.

**Law Clerk for the Honorable John L. Kane, Jr.**
**United States District Court for the District of Colorado**
Denver, Colorado
1983-1984

Conducted research, prepared memoranda and preliminary opinions on various legal issues presented in cases pending before the Court.

**EDUCATION**

**UCLA School of Law**
Los Angeles, California
Juris Doctorate, 1983
Managing Editor, Vol. 30 of the UCLA Law Review
Member, Black Law Students Association

**University of Santa Clara**
Santa Clara, California
Bachelor of Arts in History, 1980
Member, Phi Alpha Theta, History Honor Society
Member, Black Students Union

2

**REFERENCES**

Available upon request.

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

**OFFICE USE ONLY**

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Ridge, John H. | Larimer | 2 | 14 | 53 |

| Home Address | City | State | Zip Code 80524 |
|---|---|---|---|
| ▉▉▉▉▉ | FORT COLLINS | CO | |

| Mailing Address | City | State | Zip Code |
|---|---|---|---|
| | | Colorado | |

| Date of Birth | | Gender | Registered Voter? Yes | Ethnicity |
|---|---|---|---|---|
| ▉▉ 1964 | | Male | Party Affliation? Democrat | Caucasian |

| Present Employer/Title | Business Phone # | Home Phone # |
|---|---|---|
| Colorado Department of Law/Senior Assistant Attorney General II | (206) 919-6708 | ▉▉▉▉▉ |

| | Cell Phone # | E-mail |
|---|---|---|
| | ▉▉▉▉▉ | ▉▉▉▉▉ |

| Business Address | City | State | Zip Code |
|---|---|---|---|
| 1300 Broadway | Denver | Colorado | 80203 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Christ the King Academy | Poulsbo, WA | | 1982 | |
| **College** | Northwest University | Kirkland, WA | | 1988 | Philosophy & Religion |
| | University of Washington | Seattle, WA | | 1990 | Philosophy |
| **Graduate Studies -or- Trade/Business/ Correspondence** | Boston College | Newton, MA | | 1995 | Law |
| | Boston College | Chestnut Hill, MA | | 2004 | Philosophy |
| **Memberships in Organizations And Offices Held(Indicate if** | See attached resume. | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Noah Patterson | Supervisor | ▉▉▉▉▉ |
| Robert Dodd | Supervisor | ▉▉▉▉▉ |
| Suzan Kobashigawa | Former Colleague | ▉▉▉▉▉ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Part Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: John H. Ridge    **DATE:** 11/8/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Ridge, John H. | Larimer | 2 | 14 | 53 |

*Please explain why you wish to serve on a board or commission.*

I believe in civic virtue and the role of serving my community to promote the common good. When we play an active role in our communities by serving on boards and commissions, we better our communities and make them more open and inclusive places.  As a person with disabilities, I understand the need for greater inclusivity.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: John H. Ridge      **DATE:** 11/8/2023 12:00:00 AM

**John Hiski Ridge**

██████████████████████

████████████████████

███████████

## EDUCATION

**BOSTON COLLEGE**                                    Chestnut Hill and Newton Centre, MA
  Ph.D. – Philosophy: Political and Legal Theory, Greek Philosophy, Lonergan Studies
  J.D. – Articles Editor, Boston College Environmental Affairs Law Review
  M.A. – Philosophy: History of Philosophy

**UNIVERSITY OF WASHINGTON**                                    Seattle, WA
  Post-Baccalaureate B.A. – Philosophy, *Magna Cum Laude*

**NORTHWEST UNIVERSITY**                                    Kirkland, WA
  B.A. - Religion and Philosophy, *Magna Cum Laude*

## OTHER RELATED EDUCATION

**UNIVERSITY OF WASHINGTON**                                    Seattle, WA
  Tax LL.M. Program, classes pursued for continuing education

**NATIONAL SECURITY LAW INSTITUTE**                    Washington D.C. & Virginia
  Certificate – The Institute is operated by the National Security Law Center located at the University of
  Virginia Law School.

**NATIONAL COUNCIL FOR BEHAVIORAL HEALTH**                    United States
  Certificate – Adult Mental Health First Aid
  Certification valid until June 9, 2024

## RELEVANT WORK EXPERIENCE

**COLORADO ATTORNEY GENERAL'S OFFICE**                    August 2017 to Present
  *Senior Assistant Attorney General II*: Represent the state of Colorado in tax matters, including property
  tax matters and other tax controversies before administrative bodies and various courts of law.
  Represent the Colorado Dept of Revenue Hearings Division as general counsel and assist hearings
  officers with hearings and other matters. Represent various government clients such as the Mobile
  Home Park Operating Program and others in trial and appellate work.

**WYOMING ATTORNEY GENERAL'S OFFICE**                    December 2016 to August 2017
  *Supervising Attorney General*: Supervise and manage civil rights litigation and tort litigation.

**CITY OF CHEYENNE, WYOMING**                    January 2012 to December 2016
  *Deputy City Attorney*: Represent the Board of Public Utilities on a variety of matters, including water
  issues, wastewater issues, environmental issues, and tax issues.  Represent the City Treasurer's Office
  on municipal finance, budgeting, and tax matters. Represent various government clients in trial and
  appellate work. Supervise Assistant City Attorneys.

**STOEL RIVES, LLP,** Seattle, WA                    September 2003 to January 2012
  *Partner*, Trial and Tax Groups: Represent clients in regulatory hearings, federal and state court
  litigation, and before various tax forums on a variety of matters, including telecommunications issues,

1

right-of-way issues, utility relocation issues, state and local tax issues, contract disputes, and benzene exposure matters. (Worked for the City of Bellevue, Washington from May 2007 to May 2008 as an Assistant City Attorney, representing the City Utility and Finance Departments on a variety of matters.)

**DORSEY & WHITNEY, LLP**, Seattle, WA                    May 2001 to September 2003
*Associate Attorney*, Trial Group:  Represented various clients in regulated industries in federal and state courts.

**NORTHWEST UNIVERSITY**, Kirkland, WA                    August 1995 to December 2011
*Associate Professor, then Adjunct Associate Professor*, Law and Philosophy

Related Courses Developed and Taught:
Constitutional Law I & II (Powers of Government; Civil Rights and Liberties)
Business Law and Ethics
International Human Rights
Jurisprudence/Philosophy of Law
History of Political Philosophy I & II (Ancient and Medieval; Modern)
History of Philosophy I, II, III, & IV (Ancient; Medieval; Modern; Contemporary)
Symbolic Logic and Critical Reasoning

## PROFESSIONAL AND COMMUNITY ACTIVITIES AND AWARDS, PAST AND PRESENT

Present:  Colorado Disability Bar Association, Board Member, Treasurer.
Colo. Dept of Law, Disability Employee Resource Group, Member.
Dream Team 2.0 Participant, 2022-2023 (judicial training program operated by the Center for Legal Inclusiveness).
Colorado Lawyer, Board Member.
Colorado Lawyer, Coordinating Editor, "As I See It" series.
Colorado Lawyer, Creative Works Committee Member.
Wyoming Lawyer, Co-Author, "Write On" series.
Denver University Law School Mentoring Program, Mentor.
Lawyers with Disabilities, Mentor.
St. Socrates Society, Founding Member.

Past:    Wyoming Lawyer, Author, "Friends of the Bar" series.
Hands In Harmony (youth sign language performance team), Board Member, Treasurer.
University of Washington, Dept. of Philosophy, Advisory Board Member.
Washington State Bar Association, Special Disciplinary Counsel.
New Horizons (homeless youth shelter), Pro Bono Counsel.
Government Finance Officers Association (GFOA), Member.
American Bar Association, Member.
American Political Science Association, Member.
American Philosophical Association, Member.

Significant Awards:   2022 Colo. Dept of Law DE&I Achievement and Contribution Award
2010 Regius Award

## ACADEMIC AND PROFESSIONAL WRITINGS

John Hiski Ridge and John Broadbent, *The Time Is Now: A Conversation on Disabilities and Change*, Colorado Lawyer (January 2022).

John H. Ridge and Suzan Kobashigawa, *Promoting an Inclusive Workplace by Holding Space*, Colorado Lawyer (November 2021).

John H. Ridge and Suzan Kobashigawa, *The Job Market Has Declined – What Now?*, Colorado Lawyer (October 2020).

John H. Ridge, *Managing Relational Space in a Diverse Workplace*, Colorado Lawyer (October 2019).

John H. Ridge, *Fees or Taxes: Rethinking the Bidart Test as Applied to Telecommunication Right-of-Way Charges*, Journal of Multistate Taxation and Incentives (September 2009).

John Hiski Ridge, *A Philosophical Analysis of the Fundamental Law of Marriage in American Jurisprudence*. Thesis for the degree of PhD, 2004, Boston College. Advisers: Thomas Kohler and Arthur Madigan.  Publicly Available.

John Hiski Ridge, *Dionysus or Apollo: Observations on the Need for a Redefined Pentecostal Epistemology*, Kirkland, WA: Proceedings of the 29th Annual Meeting of the Society for Pentecostal Studies, 2000.

John Hiski Ridge, *Deconstructing the Clean Air Act:  Examining the Controversy Surrounding Massachusetts's Adoption of the California Low Emission Vehicle Program*, 22 B.C. Envtl. Aff. L. Rev. 163 (1994).


**WRITINGS ABOUT WRITING**

John H. Ridge, *Simplifying Our Writing: Using Active Voice*, publication in writing series of The Wyoming Lawyer, October 2023 edition.

John H. Ridge, *Simplifying Our Writing: Choosing Common Words*, Reprint, Colorado Lawyer (September 2023).

John H. Ridge, *Simplifying Our Writing: Choosing Common Words*, publication in writing series of The Wyoming Lawyer, June 2023 edition.

John Hiski Ridge, *Top 10 Writing Tips from Our Top Writers*, Reprint, Colorado Lawyer (April 2023).

John H. Ridge, *Top 10 Writing Tips from Our Top Writers*, publication in writing series of The Wyoming Lawyer, February 2023 edition.

John H. Ridge, *Parentheses, Brackets, and Braces*, publication in writing series of The Wyoming Lawyer, October 2022 edition.

John Hiski Ridge and Suzan Kobashigawa, *Editing Other Lawyers' Work: The Six Stages of Effective Editing*, Colorado Lawyer (July 2022).

John H. Ridge, *Developing Effective Editing Skills, Part 3*, publication in writing series of The Wyoming Lawyer, October 2021 edition.

John H. Ridge, *Developing Effective Editing Skills, Part 2*, publication in writing series of The Wyoming Lawyer, June 2021 edition.

John H. Ridge, *Developing Effective Editing Skills, Part 1*, publication in writing series of The Wyoming Lawyer, February 2021 edition.

John H. Ridge, *Spot the Errors: A Writing Analysis, Part 3*, publication in writing series of The Wyoming Lawyer, October 2020 edition.

John H. Ridge, *Spot the Errors: A Writing Analysis, Part 2*, publication in writing series of The Wyoming Lawyer, June 2020 edition.

John H. Ridge, *Spot the Errors: A Writing Analysis*, publication in writing series of The Wyoming Lawyer, February 2020 edition.

John H. Ridge, *A Grammar Q & A: Part 3*, publication in writing series of The Wyoming Lawyer, October 2019 edition.

John H. Ridge, *A Grammar Q & A: Part 2*, publication in writing series of The Wyoming Lawyer, June 2019 edition.

John H. Ridge, *A Grammar Q & A: Part 1*, publication in writing series of The Wyoming Lawyer, February 2019 edition.

John H. Ridge, *Writing for Your Audience*, publication in writing series of The Wyoming Lawyer, October 2018 edition.

John H. Ridge, *Common Writing Rules I Commonly Forget, Part Three*, publication in writing series of The Wyoming Lawyer, June 2018 edition.

John H. Ridge, *Common Writing Rules I Commonly Forget, Part Two*, publication in writing series of The Wyoming Lawyer, February 2018 edition.

John H. Ridge, *Common Writing Rules I Commonly Forget, Part 1*, publication in writing series of The Wyoming Lawyer, October 2017 edition.

John H. Ridge, *Civility in Writing*, publication in writing series of The Wyoming Lawyer, June 2017 edition.

John H. Ridge, *Five Punctuation Mistakes We Commonly Make*, publication in writing series of The Wyoming Lawyer, February 2017 edition.

John H. Ridge, *Write to Write*, publication in writing series of The Wyoming Lawyer, October 2016 edition.

John H. Ridge, *Read to Write*, publication in writing series of The Wyoming Lawyer, June 2016 edition.

John H. Ridge, *Confusing Word Pairs, Part Deux*, publication in writing series of The Wyoming Lawyer, February 2016 edition.

John H. Ridge, *Unraveling Some Confusing Word Pairs*, publication in writing series of The Wyoming Lawyer, October 2015 edition.

John H. Ridge, *Towards an Understanding of Verb Tenses*, publication in writing series of The Wyoming Lawyer, June 2015 edition.

John H. Ridge, *Helping Your Verbs Find Their Voice*, publication in writing series of The Wyoming Lawyer, February 2015 edition.

John H. Ridge, *Writing With Integrity*, publication in writing series of The Wyoming Lawyer, October 2014 edition.

4

John H. Ridge, *That Wonderfully Difficult Subjunctive Mood*, publication in writing series of The Wyoming Lawyer, June 2014 edition.

John H. Ridge, *The Versatile and Emphatic Em Dash*, publication in writing series of The Wyoming Lawyer, February 2014 edition.

## FICTION

John Hiski Ridge, *Athen's Sin Against Philosophy*, Colorado Lawyer (March 2023).

## FRIENDS OF THE BAR SERIES

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: December 2021 edition featured Robert R. Rose III.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: October 2021 edition featured Christopher Hawks.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: August 2021 edition featured Austin Huff.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: June 2021 edition featured Denise M. Freeman.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: April 2021 edition featured Brad McKim.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: February 2021 edition featured Ashli Tomisich.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: December 2020 edition featured Kristen Reeves Jones.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: October 2020 edition featured Teresa Thybo.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: August 2020 edition featured Sarah Chavez.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: June 2020 edition featured Harvey Gelb.

H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: April 2020 edition featured Brad Bonner.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: February 2020 edition featured Debora Person.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: December 2019 edition featured Brooke M. Barney.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: October 2019 edition featured Bailey K. Schreiber.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: June 2019 edition featured John Knepper.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: April 2019 edition featured Scott Ortiz.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: February 2019 edition featured Alessandra McCoy Fakelman.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: December 2018 edition featured Richard Mulligan.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: October 2018 edition featured Lauren McLane.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: August 2018 edition featured Melissa Mulligan Owens.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: June 2018 edition featured Christopher M. Brennan.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: February 2018 edition featured Maryt Fredrickson.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: December 2017 edition featured David Singleton.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: October 2017 edition featured Ryan Jardine.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: August 2017 edition featured Tyler Renner.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: June 2017 edition featured Jacquelyn Bridgeman.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: April 2017 edition featured Ashley Guritza.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: February 2017 edition featured Anna Reeves Olson.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: December 2016 edition featured Jesse K. Fishman.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: October 2016 edition featured Benjamin J. Rowland.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: August 2016 edition featured Blake A. Klinkner.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: June 2016 edition featured Jason Johnson.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: April 2016 edition featured Amberley Goodchild Baker.

John H. Ridge, *Friends of the Bar*, a series published in The Wyoming Lawyer: February 2016 edition featured J. Mark Stewart.


## ADVENTURE WRITINGS

John H. Ridge, *Walking on Old-Man Legs*, Adventures NW (Fall 2009).

John H. Ridge, *It Only Took Me Four Years to Summit the Grand*, www.Climbing.com, Above & Beyond section (September 2008).

## LINKEDIN ARTICLES

John H. Ridge, *Genetically Diverse Employees: On Educating Leaders*, Published on LinkedIn on December 16, 2018.

John H. Ridge, *Eliminating a Sense of Otherness in Genetically Diverse Employees*, Published on LinkedIn on November 3, 2018.

John H. Ridge, *Teaching Job Skills to Genetically Diverse Students through Job Shadowing*, Published on LinkedIn on July 22, 2018.

John H. Ridge, *The New Discrimination (Its Just the Old Discrimination)*, Published on LinkedIn on January 30, 2018.

John H. Ridge, *Establishing Internships and Fellowships for Genetically Diverse Students*, Published on LinkedIn on January 24, 2018.

## BLOG ARTICLES

John H. Ridge, *Maggie and Me: a Philosophical Dialogue* (a Science and Philosophy Blog), Published on johnhiskiridge.com.

## POETRY

John H. Ridge, *Choice of Two*, Second Place Prize, Washington State Creative Composition Contest, 1982.

## ARTICLES EDITED

Gabrial Kalousek, *Introducing the Colorado Disability Bar Association*, Colorado Lawyer (September 2023). Coordinating Editor – John Ridge.

Tim Shannon, *The State of the NCAA's Name, Image, and Likeness Rules in Colorado*, Colorado Lawyer (July/August 2023). Coordinating Editor – John Ridge.

Martine Wells, Airina Rodrigues, Kayla Dreyer, *Colorado's Non-Compete Statute Q&A*, Colorado Lawyer (March 2023). Coordinating Editor – John Hiski Ridge.

Julie Stermasi, *Bar None*, Colorado Lawyer (December 2022). Coordinating Editor – John Ridge.

Casey Frank, *Doing Away with Dogmatic Medical Directives*, Colorado Lawyer (May 2022). Coordinating Editor – John Ridge.

Marilyn S. Chappell, *Think Before You Send*, Colorado Lawyer (February 2022). Coordinating Editor – John Ridge.

Sara Scott, *Know Their Names*, Colorado Lawyer (November 2021). Coordinating Editor – John Ridge.

Larry R. Daves, *Reconciling Our Past: Longstanding Policy of Indian Child Separation Calls for Reparations for Native Americans*, Colorado Lawyer (October 2021). Coordinating Editor – John Ridge.

Murray I. Weiner, *It's Time to Put a "Governor" Back in Our Discourse*, Colorado Lawyer (March 2021). Coordinating Editor – John Hiski Ridge.

## OTHER AUTHOR'S WRITINGS ON WHICH I ASSISTED

Betram E. Snyder and Susan F. Drogin, *The Appeals Court, The "Trade or Commerce" Clause in Chapter 93A*, Boston Bar Journal (January/February 1995).

Wesley S. Chused and Lisa Sternchuss, *Insurance Law: Refining the Insurer's Duty to Settle Claims*, Boston Bar Journal (January/February 1995).

Robert C. Barber, *Americo Lopes v. City of Peabody: The SJC Interprets and Applies the Lucas Decision*, Boston Bar Journal (January/February 1995).

Paul R. Tremblay, *The Role of Casuistry in Legal Ethics: A Tentative Inquiry*, Clinical Law Review (Fall 1994).

## PRESENTATIONS

Presenter, *Understanding the Colorado Open Records Act*, Colorado Dept of Revenue, Audit and Conferee Divisions, September 12, 2023.

Presenter, *Understanding the Colorado Open Records Act*, Colorado Dept of Revenue, Hearings Division, August 17, 2023.

Presenter, *Parenting to Empower Children with Disabilities: from Early Intervention to the Division of Vocational Rehabilitation*, Colorado Dept. of Law University, February 23, 2023.

Invited Guest, *Raising Children with 22q11.2DS*, Meeting with Colorado Governor and Disability Advisor, February 16, 2023.

Guest Speaker, *On the Publishing and Editing Business*. NW University English Course, Writing and Publishing, February 14, 2023.

Presenter, *Disabilities and the ADA*. Minoru Yasui Inn of Court CDBA CLE, February 8, 2023.

Presenter/Interviewee, *Parenting a Child With a Rare Diagnosis*, Exploring Different Brains with Hackie Reitman, M.D., Different Brains Episode 253, November 7, 2021.

Presenter, *Neuro-Diversity, 22q11.2D.S., and Young Adults*. HCA Biology Class, Spring Semester, 2019.

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle)<br>Trujillo, Stefanie | County<br>Adams | Cong. District<br>8 | Senate District<br>21 | House District<br>32 |
|---|---|---|---|---|
| Home Address<br>████████ | City<br>Commerce City | State<br>CO | | Zip Code 80022 |
| Mailing Address | City | State<br>Colorado | | Zip Code |

| Date of Birth<br>████1982 | | Gender<br>Female | Registered Voter? Yes<br>Party Affliation? Unaffiliated | Ethnicity<br>Hispanic |
|---|---|---|---|---|

| Present Employer/Title<br>Otten Johnson Robinson Neff + Ragonetti/Litigation Support Coordinator/Senior Paralegal | Business Phone #<br>(303) 575-7566 | Home Phone #<br>████████ |
|---|---|---|
| | Cell Phone #<br>████████ | E-mail<br>████████ |
| Business Address<br>950 17th Street | City<br>Denver | State<br>Colorado | Zip Code<br>80202 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Pomona High School | Arvada, Colorado | | 2000 | |
| **College** | Community College of Denver | Denver, Colorado | | 2002 | Paralegal/General Studies |
| | University of Colorado | Denver, Colorado | | 2005 | Political Science, Law Studies Minor |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Michelle Maynard | Current Direct Supervisor/Firm Administrator | ████████ |
| Cheralyn Stevenson | Former Direct Supervisor | ████████ |
| David Hutchinson | Firm Mentor/Attorney | ████████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Stefanie Trujillo     **DATE:** 12/12/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Trujillo, Stefanie | Adams | 8 | 21 | 32 |

*Please explain why you wish to serve on a board or commission.*

Being a part of Colorado's legal community for over 20 years has given me the insight needed to create change and help right the wrongs in our community. I see serving on this commission as an opportunity to continue doing this work while ensuring there is accountability in the Judiciary. As a non-lawyer who has a lot of experience in the legal community, I see myself as a rather unique candidate. I understand our legal community well, yet I am also able to serve in this role through the lens of a non-lawyer. I truly believe that service is an essential part of every government and I would be honored to serve on the Commission of Judicial Discipline.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Stefanie Trujillo    **DATE:** 12/12/2023 12:00:00 AM



# STEFANIE TRUJILLO
## She/Her/Ella

### Visionary Paralegal | Legal Ambassador | Author and Coach

### 👤 PROFILE SUMMARY

A multi-faceted legal executive with over 20 years of experience providing leadership, operations and project management, and motivational expertise to ensure streamlined processes, and increased efficiency. Possess in-depth knowledge of legal terminology and principles. Enjoys challenges and able to switch-task in a fast-paced environment.

### 💼 PROFESSIONAL EXPERIENCE

**Otten Johnson Robinson Neff + Ragonetti, PC, Denver, Colorado**                 10/2018–Present
*Litigation Support Coordinator| Senior Litigation Paralegal*

- Coach litigation support staff and provide guidance on their daily projects.
- Oversee the daily operation of the Litigation Department including human resource management, staff development, and ensure that department projects and milestones are met while adhering to approved budgets.
- Identify cost-effective processes and technology solutions for the firm by maintaining a deep understanding of trending legal technology, market competitors, and tools used to support the legal industry.
- Manage complex discovery projects, including evaluation of case eDiscovery needs to determine appropriate eDiscovery tool(s) for collection, processing, and production.
- Prepare Electronically Stored Information (ESI) projects for review, develop review protocols and analyze data.
- Draft pleadings and other legal documents, including but not limited to, motions, briefs, and proposed orders, Rule 26 initial and expert disclosures.
- Attend trials and hearings and present electronic trial exhibits, assist with jury selection, coordinate and prepare witnesses and provide input for witness examinations.
- Co-chair of the Diversity, Equity and Inclusion Committee.
- Serve on the firm's Technology Committee.

**Various Law Firms**                 03/2002–10/2018
*Law Firm Administrator | Senior Litigation Paralegal*

- Worked for public and private sector law firms.
- Responsible for overall day-to-day operations, including but not limited to, general office coordination, organization, and management to ensure the office is run efficiently.
- Human Resource management including recruitment and new hire interviews.
- Identified cost-effective processes and technology solutions through the entire case lifecycle.
- Prepared, analyzed, and distributed monthly client billing.
- Recorded daily cash receipts and maintained firm books (A/P and A/R).
- Responsible for training and mentoring new associates, junior-level paralegals, and other support staff.
- Provided transactional assistance with regulatory filings, corporate document production, and corporate maintenance, including but not limited to, minute books, processing of annual reports, and license renewals.
- Maintained document databases for all cases, including but not limited to, loading, organizing, coding, and search strategies.
- Oversaw all aspects of ESI including identification, preservation, harvesting, processing, culling, reviewing, and producing the e-discovery.
- Responsible for document management and production, including Bates labeling, redacting, and indexing documents.
- Drafted pleadings and other legal documents, including but not limited to, briefs, motions, and proposed orders, Rule 26 initial and expert disclosures, EEOC position statements, and responses to requests for information.
- Served on various firm committees.

**EDUCATION**

**Community College of Denver**                                                                    **2003**
*A.A., Paralegal Studies*

**University of Colorado**                                                                          **2005**
*B.A., Political Science (Law Studies minor)*

**RELEVANT SKILLS**

Microsoft Office Suite, Adobe Acrobat Professional, LexisNexis Products (Research, LAW, File & Serve), Clio, CaseMap, TimeMap, Westlaw, PACER (CM/ECF), Sanction, Summation, Relativity, Catalyst (Certification), Concordance, TrialDirector, TrialPad,, Everlaw, Smokeball, Elite Enterprise, FileSite Document Management System, Predictive Coding Applications, Practice Manager, Timeslips, Siemens, Quickbooks, Kronos, Tussman, Legal Math, Salesforce

**AFFILIATIONS**

- President/CEO, The Rocky Mountain Paralegal Association 2021 - Present
- Vice President, The Rocky Mountain Paralegal Association 2019-2021
- Chapter Membership Director, Women in eDiscovery 2018- 2022
- Colorado Supreme Court Outreach and Working Group Committee, LLP Initiative 2021 – 2023

2

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Windmoeller, Kathryn | Denver | 1 | 32 | 2 |

| Home Address | City | State | Zip Code 80210 |
|---|---|---|---|
| ████████████ | Denver | Colorado | |

| Mailing Address | City | State | Zip Code |
|---|---|---|---|
| | | Colorado | |

| Date of Birth ████ 1988 | Gender Female | Registered Voter? Yes  Party Affliation? Unaffiliated | Ethnicity Caucasian |
|---|---|---|---|

| Present Employer/Title | Business Phone # | Home Phone # |
|---|---|---|
| Dentons/Senior Manager, Proposals | | ████████ |

| | Cell Phone # | E-mail |
|---|---|---|
| | ████████ | ████████████ |

| Business Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Conestoga Highschool | Berwyn, PA | | 2007 | |
| **College** | Lehigh University | Bethlehem, PA | | 2011 | Marketing |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | N/A | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Catherine Austin | Former boss | ████████ |
| Liz Paspalas | Coworker | ████████ |
| Jenni Dubman | Former coworker | ████████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Kathryn Windmoeller    **DATE:** 6/27/2023 12:00:00 AM

# STATE OF COLORADO
APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Windmoeller, Kathryn | County<br>Denver | Cong. District<br>1 | Senate District<br>32 | House District<br>2 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

I'm interested in getting involved in something outside of my day-to-day job and personal life. I think this would be a great opportunity to serve Denver in a unique and meaningful way. I would love to undertake a new opportunity and feel I have a unique background having worked in legal my entire career (without being a lawyer!).

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Kathryn Windmoeller    **DATE:** 6/27/2023 12:00:00 AM

# KATIE WINDMOELLER

SENIOR PROPOSAL MANAGER

Denver, Colorado

 ███████████████

 ███████████

## WORK EXPERIENCE

**DENTONS**
Denver
2017-present

### SENIOR PROPOSAL MANAGER

In my current role, I am responsible for leadership and management of the global and US specific proposal life cycle, regional proposal standards and training and cross functional go-to-market strategy.

My leadership responsibilities for proposal execution include defining strategic operations, oversight of development and design of responses, engagement management with lawyers and key stakeholders, delivery of submissions, and management of delivery against KPIs including follow-up, win rate, etc. I have oversight and responsibility for setting firm-wide standards, developing and defining processes, allocating resources and ensuring proper training of firm staff. I am a central point of contact for all functions, and I drive and deliver a succinct go-to-market strategy for all cross-functional and multi-region proposals (300+ proposals per year). I am a recognized expert in legal marketing and proposal development and I have spoken on panels internally and externally regarding proposal best practices and trends in the legal market (including best practices, obstacles to avoid and ideas on how to prepare a response to best position for selection).

Key highlights and accomplishments in my current role:

- Created and implemented global proposal process for 200+ locations utilizing step-by-step process and templates customized to the firm. Implementation led to streamlined operations, increased efficiency, enhanced go-to-market standards, newly established KPIs and increased effectiveness in global RFP responses.
- Deploying a groundbreaking advisory program for Fortune 500 companies on key topics such as convergence programs, RFP leading practices and issuing proposals.
- Created, implemented and deployed a toolset utilized throughout the region to establish standardized metrics and go/no-go criteria by identifying, scoring and weighing opportunities. Program resulted in an increase in win rate and more effective utilization of proposal staff.
- Implemented a client feedback and debrief process which generates new insights and a better way to understand the result of proposals.
- Created a formal proposal tracking system and established KPIs, measurement of which is communicated to firm leadership.

**HOLLAND & HART LLP**
Denver | 2014-2017

### STRATEGIC PITCHES & PURSUITS MANAGER, BD

**MORRISON & FOERSTER LLP**
San Francisco | 2012-2014

### BUSINESS DEVELOPMENT COORDINATOR

**MORRISON & FOERSTER LLP**
New York | 2011-2012

### CAPITAL MARKETS PRACTICE ASSISTANT

**MORRISON & FOERSTER LLP**
New York | Summer 2010

### MARKETING INTERN

**VERIZON CORPORATION**
New Jersey | Summer 2009

### INTERNAL AUDIT INTERN

## ABOUT ME

Katie Windmoeller is a Senior Manager of Proposals at Dentons, where she leads the business development strategy and execution of hundreds of RFP opportunities annually. Katie has over a decade of experience in the proposal and convergence field, where she has helped law firms build deeper relationships with their clients across dozens of different practice areas and industries. Katie has also advised general counsel and legal operations professionals to help them better understand convergence programs and issuing proposals and how to manage the process effectively and efficiently.

## EDUCATION

Lehigh University, College of Business and Economics Bethlehem, PA (2007-2011), Bachelor of Science, Marketing (Focus: Business Information Systems)

| From: | Sooter, Mindy on behalf of Sooter, Mindy ▮▮▮▮▮▮▮ |
|---|---|
| To: | Jeff Walsh; Hayes - GOVOffice, Shannon; Rachel Kurtz-Phelan; Horojah Jawara |
| Cc: | Patel - GovOffice, Niketa; Jennifer Ferrall - GOVOffice; Savannah Martel-Valdez - GOVOffice; Jim Carpenter |
| Subject: | RE: Commission on Judicial Discipline New Appointees |
| Date: | Wednesday, April 10, 2024 6:21:56 AM |
| Attachments: | image001.png |

Yes, thank you so much!

**Mary (Mindy) V. Sooter | WilmerHale**
1225 Seventeenth St.
Suite 2600
Denver, CO 80202 USA

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

**From:** Jeff Walsh <j.walsh@jd.state.co.us>
**Sent:** Friday, April 5, 2024 8:18 AM
**To:** Hayes - GOVOffice, Shannon <shannon.hayes@state.co.us>; Rachel Kurtz-Phelan <rachel.kurtz-phelan@coleg.gov>; Horojah Jawara <horojah.jawara@coleg.gov>
**Cc:** Patel - GovOffice, Niketa <niketa.patel@state.co.us>; Jennifer Ferrall - GOVOffice <jennifer.ferrall@state.co.us>; Savannah Martel-Valdez - GOVOffice <savannah.martel-valdez@state.co.us>; Jim Carpenter ▮▮▮▮▮▮▮▮▮▮ Sooter, Mindy ▮▮▮▮▮▮▮▮

**Subject:** Commission on Judicial Discipline New Appointees

**EXTERNAL SENDER**

Nikki and Shannon:

On behalf of the Commission, thank you so much to you and your team for making these appointments happen. Both appointees look great, and I'm sure they'll be strong additions to the Commission.

Best,

**Jeffrey M. Walsh**
**Special Counsel**



**COLORADO**
Office of Judicial Discipline

P: 303-457-5131 | F: 303-457-5195
1300 Broadway, Ste. 210, Denver, CO 80203

ccjd.colorado.gov

This e-mail transmission contains information from the Colorado Commission on Judicial Discipline which may be confidential or otherwise protected by Colo. Const. Art. VI, § 23(3)(g) and § 24-72-401, C.R.S.  Unlawful disclosure of confidential records outside of necessary/authorized parties is punishable according to § 24-72-402, C.R.S.  If you are not the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is prohibited.  If you have received this transmission in error, please notify us immediately by e-mail and delete the original transmission.

---

**From:** Hayes - GOVOffice, Shannon <shannon.hayes@state.co.us>

**Sent:** Thursday, April 4, 2024 3:13 PM

**To:** Rachel Kurtz-Phelan <rachel.kurtz-phelan@coleg.gov>; Horojah Jawara <horojah.jawara@coleg.gov>; Jeff Walsh <j.walsh@jd.state.co.us>

**Cc:** Patel - GovOffice, Niketa <niketa.patel@state.co.us>; Jennifer Ferrall - GOVOffice <jennifer.ferrall@state.co.us>; Savannah Martel-Valdez - GOVOffice <savannah.martel-valdez@state.co.us>

**Subject:** A 2024-076 Judicial Discipline Commission

Hello,

Please find attached the executive order with redacted applications, updated roster page, and original senate letter. Thanks!

--

Shannon Hayes
**Deputy Director**
**Boards and Commissions**
**Pronouns: she/her**



C 303.725.5584
136 State Capitol, Denver, CO 80203
shannon.hayes@state.co.us | www.colorado.gov/governor

*Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.*

| From: | Jeff Walsh on behalf of Jeff Walsh <j.walsh@jd.state.co.us> |
|---|---|
| To: | Hayes - GOVOffice, Shannon; Rachel Kurtz-Phelan; Horojah Jawara |
| Cc: | Patel - GovOffice, Niketa; Jennifer Ferrall - GOVOffice; Savannah Martel-Valdez - GOVOffice; Jim Carpenter; Mindy Sooter |
| Subject: | Commission on Judicial Discipline New Appointees |
| Date: | Friday, April 5, 2024 8:18:07 AM |
| Attachments: | image001.png |

Nikki and Shannon:

On behalf of the Commission, thank you so much to you and your team for making these appointments happen.  Both appointees look great, and I'm sure they'll be strong additions to the Commission.

Best,

Jeffrey M. Walsh
Special Counsel



COLORADO
Office of Judicial Discipline

P: 303-457-5131 | F: 303-457-5195
1300 Broadway, Ste. 210, Denver, CO 80203
ccjd.colorado.gov

This e-mail transmission contains information from the Colorado Commission on Judicial Discipline which may be confidential or otherwise protected by Colo. Const. Art. VI, § 23(3)(g) and § 24-72-401, C.R.S.  Unlawful disclosure of confidential records outside of necessary/authorized parties is punishable according to § 24-72-402, C.R.S.  If you are not the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is prohibited.  If you have received this transmission in error, please notify us immediately by e-mail and delete the original transmission.

**From:** Hayes - GOVOffice, Shannon <shannon.hayes@state.co.us>
**Sent:** Thursday, April 4, 2024 3:13 PM
**To:** Rachel Kurtz-Phelan <rachel.kurtz-phelan@coleg.gov>; Horojah Jawara <horojah.jawara@coleg.gov>; Jeff Walsh <j.walsh@jd.state.co.us>
**Cc:** Patel - GovOffice, Niketa <niketa.patel@state.co.us>; Jennifer Ferrall - GOVOffice <jennifer.ferrall@state.co.us>; Savannah Martel-Valdez - GOVOffice <savannah.martel-valdez@state.co.us>
**Subject:** A 2024-076 Judicial Discipline Commission

Hello,

Please find attached the executive order with redacted applications, updated roster page, and original senate letter. Thanks!

--
Shannon Hayes
Deputy Director

Boards and Commissions
Pronouns: she/her



C 303.725.5584
136 State Capitol, Denver, CO 80203
shannon.hayes@state.co.us | www.colorado.gov/governor

*Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.*

| | |
|---|---|
| **From:** | Hayes - GOVOffice, Shannon on behalf of Hayes - GOVOffice, Shannon <shannon.hayes@state.co.us> |
| **To:** | Rachel Kurtz-Phelan; Horojah Jawara; j.walsh@jd.state.co.us |
| **Cc:** | Patel - GovOffice, Niketa; Jennifer Ferrall - GOVOffice; Savannah Martel-Valdez - GOVOffice |
| **Subject:** | A 2024-076 Judicial Discipline Commission |
| **Date:** | Thursday, April 4, 2024 3:17:36 PM |
| **Attachments:** | A 2024-076 Judicial Discipline Commission.pdf |
| | Judicial Discipline (BIBLE).docx |
| | Judicial Discipline Commission (SENATE 2024-076).docx |

Hello,

Please find attached the executive order with redacted applications, updated roster page, and original senate letter. Thanks!

--
Shannon Hayes
Deputy Director
Boards and Commissions
Pronouns: she/her



C 303.725.5584
136 State Capitol, Denver, CO 80203
shannon.hayes@state.co.us | www.colorado.gov/governor

*Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.*



# A 2024 076

## E X E C U T I V E   O R D E R

MEMBERS

## COLORADO COMMISSION ON JUDICIAL DISCIPLINE

ORDERED:

That the following named persons be and are hereby appointed to the:

COLORADO COMMISSION ON JUDICIAL DISCIPLINE

for terms expiring June 30, 2027:

Courtney Sutton of Colorado Springs, Colorado, to serve as a non-attorney, occasioned by the resignation of Gina Lopez of Towaoc, Colorado, appointed;

Emily Tofte Nestaval of Evergreen, Colorado, to serve as a non-attorney, occasioned by the resignation of Marisa Pacheco of Pueblo, Colorado, appointed.



GIVEN under my hand and the Executive Seal of the State of Colorado, this fourth day of April, 2024.

Jared Polis
Governor

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**OFFICE USE ONLY**

DB _____

SLOT _____

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| **Name (Last, First Middle)** Sutton, Courtney | **County** El Paso | **Cong. District** 5 | **Senate District** 10 | **House District** 15 |
|---|---|---|---|---|
| **Home Address** ▮▮▮▮▮ | **City** Colorado Springs | | **State** CO | **Zip Code** 80923 |
| **Mailing Address** | **City** | | **State** Colorado | **Zip Code** |

| **Date of Birth** ▮▮▮▮▮ 1990 | | **Gender** Female | **Registered Voter?** Yes **Party Affliation?** Democrat | **Ethnicity** Caucasian |
|---|---|---|---|---|

| **Present Employer/Title** Colorado Organization for Victim Assistance/Public Policy Director | **Business Phone #** (720) 322-4611 | **Home Phone #** ▮▮▮▮▮ |
|---|---|---|
| | **Cell Phone #** ▮▮▮▮▮ | **E-mail** ▮▮▮▮▮ |
| **Business Address** 1325 S. Colorado Blvd Suite 508B | **City** Denver | **State** Colorado   **Zip Code** 80222 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Henry County High School | Paris, TN | | 2008 | |
| **College** | University of Tennessee | Knoxville, TN | | | |
| | University of Tennessee, Martin | Martin, TN | | 2012 | Psychology |
| **Graduate Studies -or- Trade/Business/ Correspondence** | University of Colorado Colorado Springs | Colorado Springs | | 2016 | Clinical Psychology |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Current: board member and Policy and Advocacy Chair for Citizens Project Current: task force member of Judicial Training Task Force | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Mari Dennis | Supervisor | ▮▮▮▮▮ |
| Cynthia Romero | Colleague | ▮▮▮▮▮ |
| Jordan Rhodes | Colleague | ▮▮▮▮▮ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing?*:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Courtney Sutton    **DATE:** 10/10/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Sutton, Courtney | County<br>El Paso | Cong. District<br>5 | Senate District<br>10 | House District<br>15 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

I would like to bring the victim and survivor's voice to judicial discipline decisions. I believe it is critical to bring a victim's perspective to all elements of the judicial system.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Courtney Sutton     **DATE:** 10/10/2023 12:00:00 AM

# Courtney Sutton, MA

Colorado Springs, CO | Email:

## PROFESSIONAL HIGHLIGHTS

- 8+ years of developing collaborative and strategic community partnerships
- 9+ years of providing trauma informed services to survivors of intimate partner violence, sexual violence, & stalking
- 8+ years of educating community partners and key stakeholders

## WORK EXPERIENCE

**PUBLIC POLICY DIRECTOR**                                                                 2023 – Present
Colorado Organization for Victim Assistance (COVA)

- Analyze and monitor legislation and policy initiatives impacting crime victims
- Collaborate with legislators and stakeholders on legislation and policy initiatives
- Provide testimony at legislative hearings
- Create marketing and communication materials to raise awareness on current policy initiatives
- Draft grant proposals
- Contribute to the Judicial Training Task Force and Children Impacted by Violence working group
- Foster and cultivate collaborative relationships with community partners

**ASSISTANT DIRECTOR, ANNUAL GIVING**                                               2021 – 2023
Colorado College

- Plan and execute Senior Class Gift and Young Alumni programs including event planning, multichannel communication plan, and fundraising strategy
- Supervise student run Mutual Aid program and student employees
- Recruit, develop, and implement the college's crowdfunding projects
- Review and propose budget for fiscal year 2023

**SAFETY AND SUPPORT MANAGER**                                                         2018 – 2021
TESSA

- Supervised team of staff advocates, volunteers, and interns in multiple programs, responsible for hiring, retaining, evaluating, overseeing policy and procedure implementation, budgeting, researching and drafting grant proposals, and adapting advocacy protocols during COVID-19 pandemic
- Fostered and built relationships with the judicial system, hospital, law enforcement, legal agencies, rural communities, and other community partners
- Strategized and collaborated with agency leadership for how to improve services and outcomes for survivors with organization and community partners
- Developed All Advocacy meeting with community partners to increase collaboration across agencies
- Significantly contributed to 4th Judicial Domestic Violence Problem Solving Court, No Excuse for Abuse Campaign, Adult Sexual Assault Task Force Meetings, and other community meetings
- Created and delivered trainings for staff, volunteers, and community members, including trainings at Domestic Violence Summit, EMS Institute with Penrose Hospital, Confidential Victim Advocate Training Academy, and more
- Analyzed qualitative and quantitative data for grant reporting on a monthly, quarterly, and yearly basis
- Led, supervised, and cultivated advocates with TESSA's trauma informed policies and best practices

**ADJUNCT PSYCHOLOGY PROFESSOR**                                                     2018 – 2018
Pikes Peak Community College

- Instructed two Introduction to Psychology college level courses
- Conceptualized teaching materials, assignments, and exams
- Recorded and verified grades for approximately 80 students

# Courtney Sutton, MA

Colorado Springs, CO │ Email: ██████████

LEAD COURT ADVOCATE
FLEX ADVOCATE AND INTERN                                                                2014 – 2018
TESSA

- Provided confidential victim advocacy to intimate partner violence, sexual violence, stalking, and human trafficking survivors in a variety of avenues at protection order court, local hospitals, 4th Judicial Domestic Violence Court, and local offender treatment provider
- Trained, supported, and guided court volunteers during temporary and permanent protection order process
- Optimized statistical tracking method for court data
- Court advocacy accompaniment to criminal, divorce, and protection order cases with clients
- Facilitated psychoeducational groups for children of intimate partner violence

## SELECT EDUCATION & PROFESSIONAL DEVELOPMENT

| | | | |
|---|---|---|---|
| University of Colorado │ Master of Arts – Clinical Psychology │ Colorado Springs | | | 2016 |
| University of Tennessee │ Bachelor of Science - Psychology │ Martin | | | 2012 |

| | |
|---|---|
| COVA │35th Annual COVA Conference │Keystone | 2023 |
| Anti-Racism I, II, III │ University of Colorado │Boulder | 2022 |
| STAFF │STAFF 36th Annual Conference │Worcester | 2022 |
| State of Colorado │Child and Family Investigator Training │Denver | 2021 |
| CCASA │Colorado SART Institute │Denver | 2021 |
| EVAWI │Trauma Informed Sexual Assault Investigations │Colorado Springs | 2020 |
| NSAC │National Sexual Assault Conference │Philadelphia | 2019 |
| CCAW │Conference on Crimes Against Women │Dallas | 2019 |
| State of Colorado │Colorado Collaborative Justice Conference │Denver | 2017 |
| State of Colorado │Colorado Collaborative Justice Conference │Denver | 2016 |
| TESSA │Domestic Violence and Sexual Assault Confidential Training │Colorado Springs | 2014 |

## SELECT PRESENTATIONS & PUBLICATIONS

Sutton, C.E. & Fite, C. (2023, October). Trauma Informed Practice. Family Law Conference. El Paso County Bar Association.

Sutton, C.E., Landon, G., Dougherty, M., Drake, J. (2023, October). 2023 Colorado Legislative Update. 35th Annual COVA Conference.

Sutton, C.E. & Lopez, I. (2021). Trauma Informed Care. El Paso County Bar Association.

Sutton, C.E. & Rhodes, J. (2020). Intimate Partner Violence and Trauma Informed Care. Emergency Medical Services Institute with Penrose Hospital.

Sutton, C. E. (2018, October). Manipulation & System Abuse by Abusers. 17th Annual Pikes Peak Regional Domestic Violence Summit.

Sutton, C. E. (2016, October). Domestic Violence Court. 15th Annual Pikes Peak Regional Domestic Violence Summit.

Sutton, C. E. (2016, July). Comorbidity of Personality Disorders in a Prison Sample. Thesis Defense, The University of Colorado, Colorado Springs.

Coolidge, F. L., & Sutton, C. E. (2015, February). Assessment of DSM-5 Neurocognitive Disorder in 3,090 Adult Prison Inmates. Poster presented to the International Neuropsychological Society 43rd annual convention.

Gentry, J. D., Sutton, C. E., Doffing, M., Qualls, S., Davies, D., & Stock, S. (2014, March). Acceptance of Mobile Wellness Technology in a Frail Senior Home Health Population. Poster presented to Gerontological Society of America 67th annual convention.

Merwin, M. M., & Sutton, C. E. (2012, November). YOLO (You only live once): Relevance of May's 1953 Writing. Poster presented to the American Psychological Association 121th annual convention.

Merwin, M. M., Gathers, A. D., Steele, J. J., Smith, B. D., & Sutton, C. E. (2012, August). The Effects of Acute Cardiovascular Exercise on Generative Fluency Tasks. Poster presented at the American Psychological Association 120th annual convention.

Sutton, C. E. (2016). Comorbidity of Personality Disorders in a Prison Sample. (Thesis. University of Colorado Colorado Springs. Kraemer Family Library).

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Tofte (Nestaval), Emily | County<br>Jefferson | Cong. District<br>7 | Senate District<br>20 | House District<br>7 |
|---|---|---|---|---|
| Home Address<br>▉▉▉▉▉ | City<br>Evergreen | State<br>CO | Zip Code 80439 | |
| Mailing Address | City | State<br>Colorado | Zip Code | |

| Date of Birth<br>▉▉▉▉, 1982 | | Gender<br>Female | Registered Voter? Yes<br>Party Affliation? Unaffiliated | Ethnicity<br>Caucasian |
|---|---|---|---|---|

| Present Employer/Title<br>Rocky Mountain Victim Law Center/Executive Director | Business Phone #<br>(303) 295-2001 | Home Phone #<br>▉▉▉▉▉ |
|---|---|---|
| | Cell Phone #<br>▉▉▉▉▉ | E-mail<br>▉▉▉▉▉ |
| Business Address<br>899 Logan Street, Suite 512 | City<br>Denver | State<br>Colorado | Zip Code<br>80203 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Red River High School | Grand Forks, ND | | 2001 | |
| **College** | University of North Dakota | Grand Forks, ND | | | Criminal Justice & Psychology |
| | Indiana University - Bloomington | Bloomington, IN | | 2005 | Criminal Justice & Psychology |
| **Graduate Studies -or- Trade/Business/ Correspondence** | University of Michigan | Ann Arbor, MI | | 2007 | Social Work |
| | | | | | |

| Memberships in Organizations And Offices Held(Indicate if | Executive Director, Rocky Mountain Victim Law Center (present)<br>Colorado Coalitional Against Sexual Assault (former Public Policy co-chair) |
|---|---|

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Kazi Houston | Colleague | ▉▉▉▉▉ |
| Brie Franklin | Collaborative Partner | ▉▉▉▉▉ |
| Michael Dougherty | Collaborative Partner | ▉▉▉▉▉ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Part Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Emily Tofte (Nestaval)    **DATE:** 10/16/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Tofte (Nestaval), Emily | Jefferson | 7 | 20 | 7 |

*Please explain why you wish to serve on a board or commission.*

I have had the privilege of serving as the Executive Director of the Rocky Mountain Victim Law Center for over 9 years. RMvlc provides direct legal services to crime victims across Colorado. The founding program of RMvlc was its Victims' Rights Legal Services Program. Since its inception 13 years ago, RMvlc has been providing representation to victims as they navigate the criminal legal system. Through my experience in this role, I have the unique opportunity to understand the barriers victims face in seeking justice through the criminal legal system. Similarly, I have the unique perspective of how changes to the criminal legal system have a direct impact on crime victims. Judges play a crucial role in that system and the voices of victims should be considered in the judicial discipline process.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE:** Emily Tofte (Nestaval)    **DATE:** 10/16/2023 12:00:00 AM

# Emily Tofte Nestaval, MSW

## HIGHLIGHTS OF QUALIFICATIONS

- 20+ years of experience providing direct services to victims of violent crime;
- 9 years' experience in nonprofit law firm management.

## WORK EXPERIENCE

## ROCKY MOUNTAIN VICTIM LAW CENTER (RMvlc) | DENVER, COLORADO

### EXECUTIVE DIRECTOR | FEBRUARY 2016 - PRESENT

- Provides direct services to victims of crime.
- Serves as lead on all public policy initiatives through meaningful collaboration with other victim services coalitions.
- Provides key leadership, management, and oversight of organization including program development, program evaluation, financial management, fundraising, and staff supervision.
- Manages and writes all state, foundation, and federal grants.
- Key spokesperson for organization including media contact and manages all strategic communications.
- Works in collaboration with Board of Directors to ensure proper fiscal oversight and governance.
- Implements nonprofit best practices to ensure longevity and sustainability of the organization.
- Provides key participation on various public policy to ensure victim rights are at the forefront of policy change.
- Provides direct services to crime victims including advocacy and court accompaniment.

### EXECUTIVE DIRECTOR | DECEMBER 2012 – MARCH 2014

- Created first organizational fundraising program and increased unrestricted funds by 175% in one year.
- Provided key leadership, management, and oversight of organization including program development, program evaluation, financial management, fundraising, and staff supervision.
- Managed and wrote all state, foundation, and federal grants.
- Worked in collaboration with the Board of Directors to ensure proper fiscal oversight and governance.
- Implemented nonprofit best practices to ensure longevity and sustainability of the organization.
- Responsible for all staff supervision and human resources.
- Provided key participation on various public policy committees.

## MINNESOTA COALITION AGAINST SEXUAL ASSAULT | ST. PAUL, MN

### SEXUAL VIOLENCE JUSTICE INSTITUTE PROGRAM DIRECTOR | OCT 2015 – MARCH 2016

- Oversee program budget of $1.3 million comprised of eight grant-funded projects.
- Resources and tools to improve team leadership and the multidisciplinary response to sexual violence.
- Oversee legal resources and criminal justice system response to sexual assault victims.
- Provide leadership on multidisciplinary forums for providing guidance on emerging issues in the field.
- Provide training and technical assistance to multidisciplinary teams across the nation.
- Manage four OVW funded technical assistance projects and ensure strategic implementation and compliance.

### FINANCIAL MANAGER | JULY 2014 – OCTOBER 2015

- Provide oversight of all financial aspects of organization and its $2.2 million budget.
- Ensure budget management and grant compliance with all federal and state funding streams.
- Prepare & distribute financial reports for the Board of Directors, programs, grants, & other areas as required.
- Prepare organizational and program financial projections for strategic planning and sustainability.

## MOVING TO END SEXUAL ASSAULT (MESA) | BOULDER, COLORADO

### ASSISTANT DIRECTOR | JUNE 2010 – DECEMBER 2012

- Provide key leadership for county-based Sexual Assault Response Council (multidisciplinary team), Sexual Assault Review Team (case review team), and various other community collaborations.
- Provided project management to federally funded OVW Disabilities Grant Program.
- Responsible for developing policies and procedures, and ensuring compliance by staff and volunteers.
- Oversee Client Services Program including support group, individual therapy, case management, 24-hour crisis hotline services, & 50+ volunteers.
- Oversee the Prevention Education program & other special projects.

### INTERIM EXECUTIVE DIRECTOR | APRIL 2009 – JUNE 2010

- Managed organizational annual budget of $550,000 and all state, federal and foundation grants.
- Coordinated two annual fundraisers and increased funds raised from each event by 50% over prior year.

### NOVEMBER 2008 – APRIL 2009 | CLIENT SERVICES AND OUTREACH DIRECTOR

- Supervised one professional staff member and over 50+ hotline volunteers.
- Created, implemented, & supervised cost-effective clinical intern program.
- Provided individual and support group therapy for sexual assault survivors.

## THE NETWORK AGAINST SEXUAL & DOMESTIC ABUSE (now HAVEN) | BOZEMAN, MONTANA

### EXECUTIVE DIRECTOR | SEPTEMBER 2007 – NOVEMBER 2008

- Supervised five professional staff members and more than 15 volunteers.
- Managed and wrote all grants including federal, state, and local grants.
- Developed new gala fundraising event, raising over $4,000 in its first year.
- Developed and implemented best practices for nonprofit board governance.

## EDUCATION

### MASTERS' OF SOCIAL WORK (MSW) | UNIVERSITY OF MICHIGAN
### ANN ARBOR, MICHIGAN | APRIL 2007

- Emphasis on Community Organization and Non-Profit Management
- Selected as guest commencement speaker

### BACHELOR OF ARTS | INDIANA UNIVERSITY – BLOOMINGTON | BLOOMINGTON, INDIANA | MAY 2005

- B.A. Psychology & B.A. Criminal Justice

## AWARDS & ASSOCIATIONS

2021 – 2023 Co-Chair of Colorado Coalition Against Sexual Assault's Public Policy Committee
2017 Victim Rights Award Recipient | 20th Judicial District Attorney's Office
2015 Change Maker Award Recipient | Colorado Coalition Against Sexual Assault
2012 Women Who Make a Difference Award Recipient | University of Colorado Boulder, Women's Resource Center
2009 – 2013 Chair of Colorado Coalition Against Sexual Assault's Board of Directors



**COLORADO**
Governor Jared Polis

April 4, 2024

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of
Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the
following:

<div align="center">

MEMBER OF THE
<u>COLORADO COMMISSION ON JUDICIAL DISCIPLINE</u>

</div>

for terms expiring June 30, 2027:

 Courtney Sutton of Colorado Springs, Colorado, to serve as a non-attorney, occasioned
 by the resignation of Gina Lopez of Towaoc, Colorado, appointed;

 Emily Tofte Nestaval of Evergreen, Colorado, to serve as a non-attorney, occasioned by
 the resignation of Marisa Pacheco of Pueblo, Colorado, appointed.

Sincerely,

Jared Polis
Governor

| 10 Members (6 appointed by Governor) | **COMMISSION ON JUDICIAL DISCIPLINE** |

10 Members (6 appointed by Governor)
2 Attorneys, 4 Non-attorneys
4 Year Terms
**SENATE CONFIRMATION**

**COMMISSION ON JUDICIAL DISCIPLINE**

| | **Appointed** | **Confirmed** | **Expires** |
|---|---|---|---|
| **Attorney Members** | | | |
| Mary (Mindy) Sooter, Boulder (D)<br> repl. Gregory, appt. | 07-01-21 | 03-08-22 | 06-30-25 |
| Ingrid Barrier, Denver (U)<br> appt. | 12-21-23 | 03-11-24 | 06-30-27 |
| **Non-Attorneys** | | | |
| James Carpenter, Englewood (D)<br> repl. Bolling, reappt. | 07-01-21 | 03-08-22 | 06-30-25 |
| Courtney Sutton, Colorado Springs (D)<br> repl. Lopez, appt. | 04-04-24 | | 06-30-27 |
| Emily Tofte Nestaval, Evergreen (U)<br> repl. Pacheco, appt | 04-04-24 | | 06-30-27 |
| Stefanie Trujillo, Commerce City (U)<br> appt | 12-21-23 | 03-11-24 | 06-30-27 |

C.R.S. 24-72-401                                      Updated:  04-04-24

1300 Broadway, Ste. 210
303.457.5134



**COLORADO**
Governor Jared Polis

April 4, 2024

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of
Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the
following:

<div align="center">

MEMBER OF THE
<u>COLORADO COMMISSION ON JUDICIAL DISCIPLINE</u>

</div>

for terms expiring June 30, 2027:

Courtney Sutton of Colorado Springs, Colorado, to serve as a non-attorney, occasioned
by the resignation of Gina Lopez of Towaoc, Colorado, appointed;

Emily Tofte Nestaval of Evergreen, Colorado, to serve as a non-attorney, occasioned by
the resignation of Marisa Pacheco of Pueblo, Colorado, appointed.

Sincerely,

Jared Polis
Governor

| **From:** | Hayes - GOVOffice, Shannon on behalf of Hayes - GOVOffice, Shannon <shannon.hayes@state.co.us> |
|---|---|
| **To:** | Rachel Kurtz-Phelan - GA; Horojah Jawara; Christopher Gregory |
| **Cc:** | Patel - GovOffice, Niketa; Jennifer Ferrall - GOVOffice; Savannah Martel-Valdez - GOVOffice |
| **Subject:** | A 2023-365 Judicial Discipline Commission |
| **Date:** | Wednesday, December 20, 2023 4:40:15 PM |
| **Attachments:** | A 2023-365 Judicial Discipline Commission.pdf |
| | Judicial Discipline Commission (SENATE2023-365).docx |
| | Judicial Discipline (BIBLE).docx |

Hello,

Please find attached the executive order with redacted applications, updated roster page, and original senate letter. Thanks!

--
Shannon Hayes
Deputy Director
Boards and Commissions
Pronouns: she/her



C 303.725.5584
136 State Capitol, Denver, CO 80203
shannon.hayes@state.co.us | www.colorado.gov/governor

*Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.*



# A 2023 365

## EXECUTIVE ORDER

MEMBERS

## COLORADO COMMISSION ON JUDICIAL DISCIPLINE

ORDERED:

That the following named persons be and are hereby appointed to the:

COLORADO COMMISSION ON JUDICIAL DISCIPLINE

for terms expiring June 30, 2027:

Ingrid Barrier of Denver, Colorado, to serve as an attorney, appointed;

Stefanie Trujillo of Commerce City, Colorado, to serve as a non-attorney, appointed.



GIVEN under my hand and the Executive Seal of the State of Colorado, this twenty first day of December, 2023.

Jared Polis
Governor

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

**Judicial Discipline, Commission on**

| Name (Last, First Middle) Barrier, Ingrid Carlson | County Denver | Cong. District 1 | Senate District 31 | House District 6 |
|---|---|---|---|---|

| Home Address ▮▮▮▮▮▮ | City Denver | State CO | Zip Code 80230 |
|---|---|---|---|

| Mailing Address | City | State Colorado | Zip Code |
|---|---|---|---|

| Date of Birth ▮▮▮ 1971 | | Gender Female | Registered Voter? Yes Party Affliation? Democrat | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title Colorado Department of Public Safety/Chief Human Resources Officer | Business Phone # (720) 863-8984 | Home Phone # ▮▮▮▮▮▮ |
|---|---|---|
| | Cell Phone # ▮▮▮▮ | E-mail ▮▮▮▮▮▮ |

| Business Address 700 Kipling Street | City Lakewood | State Colorado | Zip Code 80215 |
|---|---|---|---|

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Kent Denver School | Englewood, CO | | 1989 | |
| **College** | Bowdoin College | Brunswick, ME | | 1993 | Art History |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | University of Denver College of Law | Denver, CO | | 2000 | Law |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Please see attached resume. | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Michelle Brissette Miller | Former colleague at Attorney General's Office | ▮▮▮▮ |
| Jennifer Hunt | Former colleague at Hill&Robbins and AG's office | ▮▮▮▮ |
| Jana Locke | Current Supervisor at CDPS | ▮▮▮▮ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing?*:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Ingrid Carlson Barrier        **DATE:** 12/8/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Barrier, Ingrid Carlson | Denver | 1 | 31 | 6 |

*Please explain why you wish to serve on a board or commission.*

The best volunteer job I ever had was serving on the Second Judicial District Judicial Nominating Commission. It gave me invaluable perspective into the critical role of boards and commissions in Colorado as adjacent partners to the workings of government, the importance of citizen participation in their own governmental systems, and emphasizing value of different political, professional and personal opinions about decisions that are key to our system of governance. The Commission on Judicial Discipline builds confidence in our court system by carefully vetting concerns about judges in a measured, thoughtful, and precise manner. I am well suited to this work - I am pragmatic, organized, attentive to detail, curious and solution oriented. I work well with a diverse group. I am fair and will build rapport with commissioners, staff and members of the judiciary (as appropriate). I strive to do the right thing.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Ingrid Carlson Barrier     **DATE:** 12/8/2023 12:00:00 AM

Ingrid C. Barrier



December 8, 2023

Please consider me as an attorney member on the Colorado Commission on Judicial Discipline. I have been a lawyer for 23 years and a Denver, Colorado resident my whole life. I care deeply about our important governmental institutions, the courts being paramount. We deserve high functioning courts at every level in every Judicial District in Colorado. Without a principled forum to address complaints about our judges, we jeopardize the system that resolves so many challenges in our communities.

I am a staunch supporter of Colorado's selection, retention, performance review and investigative processes including censure or potential discipline related to our judges. I served on the Second Judicial Nominating Commission to vet candidates for the governor's consideration and appointment. This role feels like the flip side – it ensures that judges, once appointed, continue to fulfill the mandates of the Judicial Rules, the Judicial Canon, and uphold Colorado law on the bench and in their own lives.

Each complaint (no matter who generates it) must be considered carefully and investigated ethically when investigation is merited. This Commission must ensure that it protects confidentiality, moves swiftly, and relies on its robust constitutional and statutory governance structure to tightly frame its investigations. There is no room for error in evaluating judicial conduct.

I will bring my intellect, my collaborative nature, my good humor, efficiency, and ease in tackling challenging topics to the Commission and will professionally address every appropriate complaint that comes before the Commission.

I look forward to discussing this exciting opportunity with you.

Sincerely,


Ingrid Carlson Barrier

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

**Judicial Discipline, Commission on**

| Name (Last, First Middle) Trujillo, Stefanie | County Adams | Cong. District 8 | Senate District 21 | House District 32 |
|---|---|---|---|---|

| Home Address | City Commerce City | State CO | Zip Code 80022 |
|---|---|---|---|

| Mailing Address | City | State Colorado | Zip Code |
|---|---|---|---|

| Date of Birth 1982 | | Gender Female | Registered Voter? Yes Party Affliation? Unaffiliated | Ethnicity Hispanic |
|---|---|---|---|---|

| Present Employer/Title Otten Johnson Robinson Neff + Ragonetti/Litigation Support Coordinator/Senior Paralegal | Business Phone # (303) 575-7566 | Home Phone # |
|---|---|---|
| | Cell Phone # | E-mail |

| Business Address 950 17th Street | City Denver | State Colorado | Zip Code 80202 |
|---|---|---|---|

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Pomona High School | Arvada, Colorado | | 2000 | |
| **College** | Community College of Denver | Denver, Colorado | | 2002 | Paralegal/General Studies |
| | University of Colorado | Denver, Colorado | | 2005 | Political Science, Law Studies Minor |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Michelle Maynard | Current Direct Supervisor/Firm Administrator | |
| Cheralyn Stevenson | Former Direct Supervisor | |
| David Hutchinson | Firm Mentor/Attorney | |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Stefanie Trujillo    **DATE:** 12/12/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
### Judicial Discipline, Commission on

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Trujillo, Stefanie | Adams | 8 | 21 | 32 |

*Please explain why you wish to serve on a board or commission.*

Being a part of Colorado's legal community for over 20 years has given me the insight needed to create change and help right the wrongs in our community. I see serving on this commission as an opportunity to continue doing this work while ensuring there is accountability in the Judiciary. As a non-lawyer who has a lot of experience in the legal community, I see myself as a rather unique candidate. I understand our legal community well, yet I am also able to serve in this role through the lens of a non-lawyer. I truly believe that service is an essential part of every government and I would be honored to serve on the Commission of Judicial Discipline.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.*
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.*

**SIGNATURE**: Stefanie Trujillo      **DATE:** 12/12/2023 12:00:00 AM



# STEFANIE TRUJILLO
### She/Her/Ella

▮▮▮▮▮▮▮▮▮▮▮▮ | Commerce City, Colorado

## Visionary Paralegal | Legal Ambassador | Author and Coach

## 👤 PROFILE SUMMARY

A multi-faceted legal executive with over 20 years of experience providing leadership, operations and project management, and motivational expertise to ensure streamlined processes, and increased efficiency. Possess in-depth knowledge of legal terminology and principles. Enjoys challenges and able to switch-task in a fast-paced environment.

## 💼 PROFESSIONAL EXPERIENCE

**Otten Johnson Robinson Neff + Ragonetti, PC, Denver, Colorado**          **10/2018–Present**
*Litigation Support Coordinator| Senior Litigation Paralegal*

- Coach litigation support staff and provide guidance on their daily projects.
- Oversee the daily operation of the Litigation Department including human resource management, staff development, and ensure that department projects and milestones are met while adhering to approved budgets.
- Identify cost-effective processes and technology solutions for the firm by maintaining a deep understanding of trending legal technology, market competitors, and tools used to support the legal industry.
- Manage complex discovery projects, including evaluation of case eDiscovery needs to determine appropriate eDiscovery tool(s) for collection, processing, and production.
- Prepare Electronically Stored Information (ESI) projects for review, develop review protocols and analyze data.
- Draft pleadings and other legal documents, including but not limited to, motions, briefs, and proposed orders, Rule 26 initial and expert disclosures.
- Attend trials and hearings and present electronic trial exhibits, assist with jury selection, coordinate and prepare witnesses and provide input for witness examinations.
- Co-chair of the Diversity, Equity and Inclusion Committee.
- Serve on the firm's Technology Committee.

**Various Law Firms**          **03/2002–10/2018**
*Law Firm Administrator | Senior Litigation Paralegal*

- Worked for public and private sector law firms.
- Responsible for overall day-to-day operations, including but not limited to, general office coordination, organization, and management to ensure the office is run efficiently.
- Human Resource management including recruitment and new hire interviews.
- Identified cost-effective processes and technology solutions through the entire case lifecycle.
- Prepared, analyzed, and distributed monthly client billing.
- Recorded daily cash receipts and maintained firm books (A/P and A/R).
- Responsible for training and mentoring new associates, junior-level paralegals, and other support staff.
- Provided transactional assistance with regulatory filings, corporate document production, and corporate maintenance, including but not limited to, minute books, processing of annual reports, and license renewals.
- Maintained document databases for all cases, including but not limited to, loading, organizing, coding, and search strategies.
- Oversaw all aspects of ESI including identification, preservation, harvesting, processing, culling, reviewing, and producing the e-discovery.
- Responsible for document management and production, including Bates labeling, redacting, and indexing documents.
- Drafted pleadings and other legal documents, including but not limited to, briefs, motions, and proposed orders, Rule 26 initial and expert disclosures, EEOC position statements, and responses to requests for information.
- Served on various firm committees.

**EDUCATION**

**Community College of Denver**                                                                                              **2003**
*A.A., Paralegal Studies*

**University of Colorado**                                                                                                        **2005**
*B.A., Political Science (Law Studies minor)*

**RELEVANT SKILLS**

Microsoft Office Suite, Adobe Acrobat Professional, LexisNexis Products (Research, LAW, File & Serve), Clio, CaseMap, TimeMap, Westlaw, PACER (CM/ECF), Sanction, Summation, Relativity, Catalyst (Certification), Concordance, TrialDirector, TrialPad,, Everlaw, Smokeball, Elite Enterprise, FileSite Document Management System, Predictive Coding Applications, Practice Manager, Timeslips, Siemens, Quickbooks, Kronos, Tussman, Legal Math, Salesforce

**AFFILIATIONS**
- President/CEO, The Rocky Mountain Paralegal Association 2021 - Present
- Vice President, The Rocky Mountain Paralegal Association 2019-2021
- Chapter Membership Director, Women in eDiscovery 2018- 2022
- Colorado Supreme Court Outreach and Working Group Committee, LLP Initiative 2021 – 2023



# COLORADO
## Governor Jared Polis

December 21, 2023

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO 80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the following:

<div align="center">

MEMBER OF THE
<u>COLORADO COMMISSION ON JUDICIAL DISCIPLINE</u>

</div>

for terms expiring June 30, 2027:

Ingrid Barrier of Denver, Colorado, to serve as an attorney, appointed;

Stefanie Trujillo of Commerce City, Colorado, to serve as a non-attorney, appointed.

Sincerely,

Jared Polis
Governor

10 Members (6 appointed by Governor)                              **COMMISSION ON JUDICIAL DISCIPLINE**
2 Attorneys, 4 Non-attorneys
4 Year Terms
**SENATE CONFIRMATION**

| | Appointed | Confirmed | Expires |
|---|---|---|---|
| **Attorney Members** | | | |
| Mary (Mindy) Sooter, Boulder  repl. Gregory, appt. | 07-01-21 | 03-08-22 | 06-30-25 |
| Ingrid Barrier, Denver (U)  appt. | 12-18-23 | | 06-30-27 |
| **Non-Attorneys** | | | |
| James Carpenter, Englewood (D)  repl. Bolling, reappt. | 07-01-21 | 03-08-22 | 06-30-25 |
| Gina Lopez, Towaoc (U)  appt. | 08-11-23 | | 06-30-27 |
| Marisa Pacheco, Pueblo (U)  appt | 08-11-23 | | 06-30-27 |
| Stefanie Trujillo, Commerce City (U)  appt | 12-18-23 | | 06-30-27 |

C.R.S. 24-72-401                                                  Updated:  12-15-23

Christopher Gregory, Exec. Director
1300 Broadway, Ste. 210
303.457.5134

December 22, 2023

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of
Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the
following:

MEMBER OF THE
COLORADO COMMISSION ON JUDICIAL DISCIPLINE

for terms expiring June 30, 2027:

Ingrid Barrier of Denver, Colorado, to serve as an attorney, appointed;

Stefanie Trujillo of Commerce City, Colorado, to serve as a non-attorney, appointed.

Sincerely,

Jared Polis
Governor

| | |
|---|---|
| **From:** | Patel - GovOffice, Niketa on behalf of Patel - GovOffice, Niketa <niketa.patel@state.co.us> |
| **To:** | Rachel Kurtz-Phelan - GA; Dan Graeve - GA |
| **Cc:** | Shannon Hayes - GOVOffice; Ferrall - GOVOffice, Jennifer; Savannah Martel-Valdez - GOVOffice; c.gregory@jd.state.co.us |
| **Subject:** | Re: 2023-203 Judicial Discipline Commission |
| **Date:** | Friday, August 11, 2023 4:58:02 PM |
| **Attachments:** | Judicial Discipline (BIBLE) (1).docx |
| | Judicial Discipline Commission (SENATE2023-214).docx |
| | A 2023-214 Judicial Discipline Commission.pdf |

Hello,

Attached please find the executive order with redacted applications, original senate letter and updated roster page.  This executive order rescinds Executive Order A 2023 203.

Thank you!

Best,
Nikky Patel
**Director of Boards and Commissions**
**c: (303) 957-8054**

Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.

On Fri, Aug 4, 2023 at 2:01 PM Ferrall - GOVOffice, Jennifer <jennifer.ferrall@state.co.us> wrote:

> Hello,
>
> Attached please find the executive order with redacted applications, original senate letter and updated roster page.
>
> Thank you,
> --
> **Jennifer Ferrall**
> Boards and Commissions Coordinator
> Office of Boards and Commissions
>
> O: 303.866.5232 C: 720.331.9941
> 136 State Capitol, Denver, CO 80203
> jennifer.ferrall@state.co.us | www.colorado.gov/governor
>
> *Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.*

10 Members (6 appointed by Governor)          **COMMISSION ON JUDICIAL DISCIPLINE**
2 Attorneys, 4 Non-attorneys
4 Year Terms
**SENATE CONFIRMATION**

|  | **Appointed** | **Confirmed** | **Expires** |
|---|---|---|---|
| **Attorney Members** | | | |
| Elizabeth Espinosa Krupa, Evergreen repl. Alvarez, reappt. | 06-20-19 | 02-03-20 | 06-30-23 |
| Mary (Mindy) Sooter, Boulder repl. Gregory, appt. | 07-01-21 | 03-08-22 | 06-30-25 |
| **Non-Attorneys** | | | |
| Yolanda Regina Lyons, Colo. Spgs. reappt. | 06-20-19 | 02-03-20 | 06-30-23 |
| James Carpenter, Englewood repl. Bolling, reappt. | 07-01-21 | 03-08-22 | 06-30-25 |
| Gina Lopez, Towaoc (U) appt. | 08-11-23 | | 06-30-27 |
| Marisa Pacheco, Pueblo (U) appt | 08-11-23 | | 06-30-27 |

C.R.S. 24-72-401                                          Updated:  08-11-23

Christopher Gregory, Exec. Director
1300 Broadway, Ste. 210
303.457.5134

August 11, 2023

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of
Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the
following, which rescinds Executive Order A 2023 203:

MEMBER OF THE
COLORADO COMMISSION ON JUDICIAL DISCIPLINE

for terms expiring June 30, 2027:

Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.

Sincerely,

Jared Polis
Governor



**COLORADO**
Governor Jared Polis

# A 2023 214

**E X E C U T I V E   O R D E R**

MEMBERS

## COLORADO COMMISSION ON JUDICIAL DISCIPLINE

ORDERED:

That the following named persons be and are hereby appointed to the:

COLORADO COMMISSION ON JUDICIAL DISCIPLINE

for terms expiring June 30, 2027:

Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.

This Executive Order shall rescind Executive Order A 2023 203 pertaining to the Colorado Commission on Judicial Discipline.



GIVEN under my hand and the Executive Seal of the State of Colorado, this eleventh day of August, 2023.

Jared Polis
Governor

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) <br> Lopez, Gina Josey | County <br> Montezuma | Cong. District <br> 3 | Senate District <br> 6 | House District <br> 59 |
|---|---|---|---|---|

| Home Address | City <br> Towaoc | State <br> Colorado | Zip Code 81334 |
|---|---|---|---|

| Mailing Address | City | State <br> Colorado | Zip Code |
|---|---|---|---|

| Date of Birth ▮▮▮▮▮ 1982 | | Gender <br> Female | Registered Voter? Yes <br> Party Affliation? Unaffiliated | Ethnicity <br> Native American |
|---|---|---|---|---|

| Present Employer/Title <br> Colorado Coalition Against Sexual Assault/Systems Response Program Director | Business Phone # <br> (720) 728-8379 | Home Phone # <br> ▮▮▮▮▮ |
|---|---|---|
| | Cell Phone # <br> ▮▮▮▮▮ | E-mail <br> ▮▮▮▮▮ |

| Business Address <br> 1330 Fox Street, Suite 2 | City <br> Denver | State <br> Colorado | Zip Code <br> 80204 |
|---|---|---|---|

## EDUCATION  AND  GENERAL  QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Sherman Indian High School | Riverside, CA | | 2000 | |
| **College** | Metropolitan State University | Denver, CO | | 2011 | Criminal Justice/Criminology, minor Philosophy |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Advocate member of Coalition to Stop Violence Against Native Women, member of Montezuma Youth Pride | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Kara Napolitano | Friend/Colleague | ▮▮▮▮▮ |
| Kimberly Multine | Friend/Colleague | ▮▮▮▮▮ |
| Kia Whiteskunk | Friend | ▮▮▮▮▮ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Gina Josey Lopez    **DATE:** 6/14/2023 12:00:00 AM



# STATE OF COLORADO
APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Lopez, Gina Josey | County<br>Montezuma | Cong. District<br>3 | Senate District<br>6 | House District<br>59 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

I hope to represent our member agencies across Colorado that work to provide advocacy services to victims of sexual violence in their communities and our role in supporting that work is to stay updated with what legislative changes might impact their work and provide training to make sure they are carrying out those requirements that works to be survivor driven. Our member agencies represent many different communities with different accesses to resources and all are tasked with adhering to these legislative requirements and our team is working to support those efforts with innovative practices.

My prior experience working in a rural, Tribal community in Colorado as well as my continued partnership with anti-trafficking organizations and workgroups like the Laboratory to Combat Human Trafficking and the Denver Anti-Trafficking Alliance is my continued commitment to understanding impacts and responses to trafficking. Our training and technical assistance values the work of community systems and programs that may not be direct services advocacy but still have a role to play in the network of care of survivors, those resources have proven to be the best community innovative ways to address gaps in care. CCASA continues to support those community innovations and learn from them to inform and strengthen existing training curriculum that is made better with what we learn from our members and their communities. It is my hope and intention to continue to be that supportive component and collaborator in working to confront trafficking in Colorado. It is my goal to keep this communication and effort strong across our agencies and best represent our coalition engaging with this Human Trafficking Council.

I have worked for CCASA and our member agencies for almost 5 years now and in my role, I have worked to provide training and technical assistance to our advocates who serve their communities. We have provided culturally specific advocacy and rural community advocacy and training support to strengthen existing services. We work hard to understand and know our member agencies' community needs and honor their commitment to survivors' needs as well. I believe that we have a valuable perspective and relationship in Colorado communities that can help this council achieve its goals and collaborative efforts. I am honored to be of assistance and hope to also learn ways to do better in our work so that together, we are nurturing a safer Colorado.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Gina Josey Lopez    **DATE:** 6/14/2023 12:00:00 AM

▶Gina Lopez



## Objectives

My objective upon leaving my tribal work was to strengthen bridges between communities by stepping into important roles as a bearer of information through training and technical assistance. The experiences I've had in my tribal community victim services allowed me to grow important relationships with neighboring communities and open more options for survivors. I have many years of work experience within a tribal organization and tribal business entities giving me a developed resourcefulness and insight to provide informed guidance. I strive to work for organizations that utilize my voice to further the visibility and space for Indigenous and other silenced communities.

## Education

**Bachelor of Science Criminal Justice/Criminology, Minor in Philosophy** (December 2011)
▶ Metropolitan State University of Denver | Denver, CO

## Experience

**Systems Response Program Director (10/2018) –(Present)**
**Colorado Coalition Against Sexual Assault (P.O. Box 40350 |  1330 Fox Street, Denver, CO 80204)**
Training and technical assistance to agencies that provide services and resources to rural and indigenous communities as well as statewide agencies. Provide cross-systems work to inform from cultural and geographical perspectives in order to enhance training and advocacy for all survivors of sexual violence. I work in many multi-disciplinary work groups, task forces and collaboratives that confront issues like sexual violence, trafficking, IPV (inter-personal violence) and cultural education. I also co-chair a multi-Tribal, multi-disciplinary coalition that encompasses all four states called the Navajo, Apache, Ute, Hopi, Zuni Coalition Against Sexual Assault and Family Violence wherein we meet monthly to discuss, support and promote justice on all of our tribal lands. The work of coalition building and sustaining led to the organized grassroots effort of co-found the Missing and Murdered Indigenous Relatives of Colorado Taskforce. We successfully, with bipartisan support, passed SB22-150; Colorado's first-ever missing and murdered response and data gathering effort and just this year, assisted in the implementation and branding of the State's first ever Missing Indigenous Person Alert system. The work in this position has only just begun and will continue to broaden the understanding of Colorado providers, funders and systems to work towards better relationships and understanding.

**Victim Support Services Program Coordinator (9/2016) –(10/2018)**
**Ute Mountain Ute Tribe (P.O. Box 189 |  124 Mike Wash Road, Towaoc, CO 81334)**
Program coordination, budget and grant management, victim advocacy, supervision of prevention coordinators that covered domestic violence, sexual assault and stalking as well as suicide prevention work. The funding provided for comprehensive victim services for all victims of all crime in Towaoc and White Mesa. We worked in mutually respectful cooperation with federal BIA, FBI and county law enforcement, courts and victim specialists. We also worked with health providers in clinics, hospitals, shelters and child advocacy centers in our state and in other states as well.

**Analyst II (5/2015) –(9/2016)**
**Ute Mountain Ute Tribe (P.O. Box 189 |  124 Mike Wash Road, Towaoc, CO 81334)**
Production analysis and revenue reporting of Tribe's oil and gas resources. Communication with companies to reconcile production reporting. Credential through DOI, ONRR (Office of Natural Resources Revenue for database verification and compliance. Review and compliance with natural resource contracts, tribal resolutions and rights-of-way documentation. Completed mandated training for oil and gas production accounting, database use, compliance, and understanding components of oil and gas contracting, landmen, etc.

**Revenue Auditor (8/2012) –(5/2015)**
**Ute Mountain Ute Casino (P.O. Box 268 | 3 Weeminuche Drive, Towaoc, CO 81334)**
Daily financial reconciliation and close out of revenue throughout casino departments. Verification of jackpot wins, end-of-month audits of each department inventory, slot meter reading. Training in slot play database, tax verification, cage/vault end-of-month inventory and balance sheets. Daily spreadsheet reconcile with each auditor's entries to balance at end of each day. Resolving accounting and/or POS disputes and issuing correction documentation to each department and employee.

## Skills

▶ Tribal grant reporting and coordination, supervision of prevention staff, 40-hour advocacy training (State-Colorado, NM, Arizona, OVC, BIA – Bureau of Indian Affairs), CO VRA, danger assessment certified, computer: excel, word, PowerPoint, email/outlook, fax, 10-key, online platforms (zoom, GoTo meetings) and I-LED coursework training for online teaching skills advancement

▶ Train in the following focus areas: Sexual Assault/Domestic Violence in Indigenous/Tribal communities; Visibility and enrollment impacts in Tribal communities and survivorship; Sexual Assault advocacy; Anti-Oppression; SART/MDT/CRT development; Trafficking in Indigenous/Tribal communities; MMIR CO TF and policy development

▶ Successful remote/hybrid work environment since 2018 including the passage of critical Indigenous led State legislation

▶ Manage an emergency fund with trauma-informed advocacy for Native/Indigenous sexual assault and child sexual abuse survivors and their families

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) Pacheco, Marisa Lee | County Pueblo | Cong. District 3 | Senate District 3 | House District 62 |
|---|---|---|---|---|

| Home Address ████████ | City Pueblo | State Colorado | Zip Code 81006 |
|---|---|---|---|

| Mailing Address | City | State | Zip Code |
|---|---|---|---|

| Date of Birth ████, 1973 | | Gender Female | Registered Voter? Yes Party Affliation? Unaffiliated | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title City of Pueblo/Human Resources Director | Business Phone # ████████ | Home Phone # ████████ |
|---|---|---|
| | Cell Phone # ████████ | E-mail ████████████ |

| Business Address 301 West B Street | City Pueblo | State Colorado | Zip Code |
|---|---|---|---|

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | William Mitchell High School | Colorado Springs | | 1992 | Genearl |
| **College** | University of Colorado | Colorado Springs | | 1996 | Psychology/Gerontology |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Society of Human Resources Management - Senior Professional Certified International Public Management Association  - Senior Professional Certified | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Nick Gradisar | | ████████ |
| Laura Solano | | ████████ |
| Troy Davenport | | ████████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:I am capable of committing as much time as necessary to fulfill the duties of this position. It would be an honor to be selected.

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Marisa Lee Pacheco     **DATE:** 7/31/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Pacheco, Marisa Lee | County<br>Pueblo | Cong. District<br>3 | Senate District<br>3 | House District<br>62 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

I am a Colorado native and dedicated public servant with deep local government expertise.   This board opportunity provides a way to serve in a meaningful way at a state level, beyond my immediate community. This is very exciting and of great interest to me both professionally and personally.    I have nearly twenty-five years of Human Resources experience, have held management positions for sixteen of those years, mostly working in local government.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Marisa Lee Pacheco        **DATE:** 7/31/2023 12:00:00 AM

# MARISA PACHECO
## IMPA-HR SCP, SHRM-SCP

███████████ ██████████ █████████

███████████████████

___

**Dynamic, accomplished human resources leader with 24 years of achievement and success in providing strategic human resources leadership in both public sector (union and non-union) and private sector environments. Core competencies and skills include:**

- Compensation and classification system design and management
- Budgeting and forecasting
- Benefits administration, cost containment
- Public Safety and civilian union experience
- HR Audits, process improvement, change management
- Worker's compensation and risk management

- Executive and line recruitment
- Program management experience
- Labor relations/union experience
- Training design, development, and delivery
- Employee relations and investigation expertise
- Extensive policy development experience

## PROFESSIONAL EXPERIENCE & SELECTED ACHIEVEMENTS

### Human Resources Director, City of Pueblo, 4/2010-Present

One of the largest employers in the Pueblo market with approximately 800 regular FTEs and 1300 total employees including seasonal temporaries, the City of Pueblo is a full-service city.  General Fund annual budget is approximately 98 million with 70% in personnel costs.  In the Human Resources Director role, responsible for all facets of the Human Resources function reporting to the elected Mayor:

- Directed the work of a combination of professional, paraprofessional, technical and administrative support staff

- Serve as policy advisor to the City Manager for 8 years, then following conversion of government to Mayor and Directors.

- Management negotiations team member on annual contract negotiations for International Association of Firefighters (IAFF Local #3), International Brotherhood of Police Officers (IBPO Local #537), Pueblo Association of Government Employees (PAGE affiliate of AFSCME Local #1712) and Amalgamated Transit Union No. 662

- Extensive labor relations experience, representing the City on union grievance issues and disciplinary matters in conjunction with legal counsel

- Deep expertise in employee relations matters to include investigations and mediation

- Manage the compensation and classification systems performing annual market compensation studies, including general market analysis and comprehensive benchmark studies in advance of labor contract negotiations to develop recommendations to the Mayor

- Developed Pueblo Leadership Academy a year-long comprehensive supervisory academy for City staff members starting in 2012 and Director's Informational Workshops in 2020

- For the first time in the City's history, established zero cost positive insurance broker relationship keeping premium changes in line with national trend despite high utilization of plans

- Managed the transition of the City's approximately $13 million dollar per year medical insurance program from fully insured to self-insured in 2020.  Manage all benefit plans including fully insured programs, RFP and selection activities

- Moved organization to streamlined web-based platform for benefits open enrollment, served as key operational leader on major ERP system conversion and lead the City's implementation of a new online learning platform

- Manage self-insured workers' compensation and risk management activities

- Developed credibility and strong relationships with senior management and employees

- Performance ratings of exceeds expectations during tenure with City organization

## Co-Owner/Principal of Human Capital Group, LLC, 1/2009-4/2010

Co-owner and Principal of innovative human resources management consulting firm specializing in employment lifecycle solutions for private and public sector organizations.

- Provided customized solutions to clients in the core areas of human resources management to include comprehensive audit, administrative review oversight, compensation and classification strategy, recruitment and selection, investigations and fact finding, employee relations, training and facilitation, legal compliance, policy and procedure review and development, training and facilitation, succession planning design and talent and management as well as reduction in force management and career transition services

- Developed nationally certified Human Resources University curriculum

- Shared responsibility for sales and marketing, financial management, and company operations

## Human Resources Director – Pueblo City-County Library District, 6/2008–2/2009

Director level position, part of the senior management team reporting directly to Chief Executive of the Library District responsible for all areas of human resources management including the management of volunteer coordination staff.

- Managed all Human Resources functions for the Pueblo City-County Library District (PCCLD) for approximately 120 employees

- Traditional responsibilities included compensation, classification, recruitment, employee relations, EEO compliance, ADA, FMLA, FLSA review and administration, worker's

- compensation, human resources information systems, manage/oversee volunteer function, budget administration, general program management

- Project management and process improvement projects include the development of a succession planning program, overhaul of policies and procedures for entire district, identification of ways to enhance efficiency and effectiveness of all HR procedures and practices

## Human Resources Manager – City of Colorado Springs, 2/2000-6/2008

Human Resources Manager – Colorado Springs Fire Department 5/2007-6/2008
Human Resources Manager – Colorado Springs Police Department 11/2005-11/2007
Human Resources Manager – Central Human Resources 1/2004-11/2005
Principal Human Resources Analyst - 1/2003 – 1/2004
Senior Human Resources Analyst – 8/1/2000-4/2002
Human Resources Analyst II –2/2000-8/2000

At the time of service, the City of Colorado Springs was and remains one of the largest employers in the local market, with approximately 2,700 employees serving a City population of nearly 500,000. The City's budget was approximately 300 million dollars annually, of which approximately 60% of the annual budget was dedicated to total compensation costs.

Focused expertise and responsibilities in compensation, classification, executive recruitment, employee relations, benefits administration, human resources information systems program management and strategic process improvement project experience:

- Only Human Resources Manager in the City to have worked in central Human Resources administration and both public safety departments

- Managed all Human Resources functions for Colorado Springs Fire Department (CSFD) for an employee population of 500

- Prior to being recruited by CSFD, served as the Human Resources Manager for the Colorado Springs Police Department managing all Human Resources functions for an employee population of 1,200

- In all Human Resources Manager positions have managed a combination of professional, paraprofessional, technical and administrative support staff

- During six-year tenure with central City Human Resources, managed the compensation and classification systems performing annual market compensation studies, including general market analysis and comprehensive benchmark studies

- Responsible for the development of recommendations for annual market increases and compensation system realignment for inclusion in the City Manager's annual budget

- Participated in the development of appointed position compensation packages

- Developed credibility and strong relationships with senior management and employees which lead to recruitment to public safety departments

- Developed cost-effective executive recruitment strategy resulting in high-quality hires and is now a model being used by other local public sector agencies

- Facilitated senior management task force to develop succession planning program

- Performance ratings of exceeds expectations during tenure with City organization

- Selected for numerous City-wide and department committees and task forces including, Minority Recruitment Task Force (2005-2008, Chair 2008), Leadership Development Series Executive Steering Committee (2007-2008), PeopleSoft Time and Labor Executive Committee (2007-2008), Promotional Process Committee (2007-2008), City Wellness Committee (2005-2007), City Manager's Budget Analysis Team (2003), Leadership Development Action Team (2003-2005), Customer Service Quality Council (2000-2002) and Diversity and Inclusion Training Team (2001-2005). First civilian recipient of Community Above and Beyond Award (2004).

**Human Resources Generalist and National Recruiter, 12/1996-2/2000**
**Arthur Andersen LLP – Denver, CO, and Chicago IL**

Arthur Andersen LLP, formerly one of the largest financial services firms in the world with approximately 60,000 employees worldwide provided assurance, contract accounting, and human capital services to client companies.

During my tenure with Arthur Andersen, I held several professional human resources positions with an emphasis on recruiting within the Assurance and Business Advisory practice, at the local level in Denver and at the national level out of the firm's Chicago headquarters.

National Recruiter, 2/1999-2/2000
Recruiting Coordinator, 10/1997-3/1999
Assurance and Business Advisory (ABA) National Recruiting Team
Chicago, IL

Human Resources Generalist, 12/1996-12/1998
Business Process Outsourcing (BPO) Practice
Denver, CO

## EDUCATION & CERTIFICATIONS

**Bachelor of Arts (BA), Psychology, academic minor in Gerontology**
University of Colorado – May 1996
Graduated magna cum laude with GPA of 3.9

**Center for Creative Leadership (CCL) – Colorado Springs**
Graduate of Leadership Development Program – 2005

**National Incident Management System (NIMS) – Advanced Certification**
Certified - ICS 100, ICS 200, ICS 300, ICS 400, ICS 700, ICS 800

**International Public Management Association – IMPA-HR Senior Certified Professional**

**Society for Human Resources Management Senior Certified Professional, SHRM-SCP**

## PROFESSIONAL MEMBERSHIPS

**Society for Human Resources Management (National)**
2000-present

**Colorado Springs Society for Human Resources Management**
2000-2010

**Colorado Springs Human Resources Association**
Elected Board Member: Vice President, Secretary and Education/Certification Director 2009-2010

**IPMA-HR (International Public Management Association)** 2010-present



**COLORADO**
Governor Jared Polis

August 11, 2023

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of
Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the
following, which rescinds Executive Order A 2023 203:

MEMBER OF THE
COLORADO COMMISSION ON JUDICIAL DISCIPLINE

for terms expiring June 30, 2027:

      Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

      Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.

Sincerely,

Jared Polis
Governor

| | |
|---|---|
| **From:** | Ferrall - GOVOffice, Jennifer on behalf of Ferrall - GOVOffice, Jennifer <jennifer.ferrall@state.co.us> |
| **To:** | Sarah Stoddard Cameron - GOVOffice Intern |
| **Subject:** | Fwd: 2023-203 Judicial Discipline Commission |
| **Date:** | Monday, August 7, 2023 9:03:42 AM |
| **Attachments:** | A 2023-203 Judicial Discipline Commission.pdf |
| | Judicial Discipline Commission (SENATE 2023-203).docx |
| | Judicial Discipline (BIBLE).docx |

--

**Jennifer Ferrall**
Boards and Commissions Coordinator
Office of Boards and Commissions

O: 303.866.5232 C: 720.331.9941
136 State Capitol, Denver, CO 80203
jennifer.ferrall@state.co.us | www.colorado.gov/governor

*Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.*

---------- Forwarded message ---------
From: **Ferrall - GOVOffice, Jennifer** <jennifer.ferrall@state.co.us>
Date: Fri, Aug 4, 2023 at 1:57 PM
Subject: 2023-203 Judicial Discipline Commission
To: Rachel Kurtz-Phelan - GA <rachel.kurtz-phelan@state.co.us>, Dan Graeve - GA <dan.graeve@state.co.us>, Niketa Patel - GovOffice <niketa.patel@state.co.us>, Shannon Hayes - GOVOffice <shannon.hayes@state.co.us>, Savannah Martel-Valdez - GOVOffice <savannah.martel-valdez@state.co.us>, <c.gregory@jd.state.co.us>

Hello,

Attached please find the executive order with redacted applications, original senate letter and updated roster page.

Thank you,
--
**Jennifer Ferrall**
Boards and Commissions Coordinator
Office of Boards and Commissions

O: 303.866.5232 C: 720.331.9941
136 State Capitol, Denver, CO 80203
jennifer.ferrall@state.co.us | www.colorado.gov/governor

*Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.*



# A 2023 203

### E X E C U T I V E   O R D E R

MEMBERS

## COLORADO COMMISSION ON JUDICIAL DISCIPLINE

ORDERED:

That the following named persons be and are hereby appointed to the:

COLORADO COMMISSION ON JUDICIAL DISCIPLINE

for terms expiring June 30, 2027:

David Powell of Denver, Colorado, to serve as an attorney, appointed;

Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.



GIVEN under my hand and the
Executive Seal of the State of
Colorado, this fourth day
of August, 2023.

Jared Polis
Governor

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

**Judicial Discipline, Commission on**

| Name (Last, First Middle) Powell, David Daniel | County Denver | Cong. District 1 | Senate District 31 | House District 2 |
|---|---|---|---|---|

| Home Address ▮▮▮▮▮. | City Denver | State Colorado | Zip Code 80209 |
|---|---|---|---|

| Mailing Address | City | State Colorado | Zip Code |
|---|---|---|---|

| Date of Birth ▮▮▮▮, 1958 | | Gender Male | Registered Voter? Yes  Party Affliation? Democrat | Ethnicity African American |
|---|---|---|---|---|

| Present Employer/Title Garnett Powell Maximon Barlow/Partner | Business Phone # (720) 252-7947 | Home Phone # ▮▮▮▮ |
|---|---|---|
| | Cell Phone # ▮▮▮▮ | E-mail ▮▮▮▮ |
| Business Address 1512 Larimer St. , Suite 950 | City Denver | State Colorado / Zip Code 80202 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Salinas High School | Salinas, California | | 1976 | |
| **College** | University of Santa Clara | Santa Clara, California | | 1980 | |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | UCLA School of Law | Los Angeles, California | | 1983 | Law |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Board of Directors, Denver Dumb Friends League, Board of Directors, Colorado Alzheimer's Association, Sam Cary Bar Association, International Society of Barristers, National Employment Law Council, College of Labor and Employment Attorneys | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Stan Garnett | Colleague/Partner | ▮▮▮▮ |
| Alvin LaCabe | Friend and mentor | ▮▮▮▮ |
| Natalie Hanlon-Leh | My former supervisor | ▮▮▮▮ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: David Daniel Powell        DATE: 6/12/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Powell, David Daniel | Denver | 1 | 31 | 2 |

*Please explain why you wish to serve on a board or commission.*

I believe my background as an attorney and the leadership roles I've held in various boards and other organizations make me well qualified to serve on a commission.  I also believe that as an attorney, I have an obligation to give back to my community and serving on a commission provides me with an ideal opportunity to serve my community,  I am particularly interested in serving as a member of the Judicial Disciplinary Commission because our judiciary is the backbone of our civil and criminal justice system.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**:  David Daniel Powell     **DATE:** 6/12/2023 12:00:00 AM

# DAVID D. POWELL, JR.

████████████████████████
████████████

---

## PROFESSIONAL EXPERIENCE

**Equity Partner, Garnett Powell Maximon Barlow**
Denver, Colorado
April 2023-present

Founding member of trial boutique with a practice focused primarily on employment litigation, advice and investigations.

**Deputy Attorney General, State Services**
**Colorado Attorney General's Office**
Denver, Colorado
April 2019-April 2023

Supervised the State Services section of the Colorado Attorney General's Office – comprised of eight separate legal units responsible for representing the state's key elected officials and providing legal services in the areas of health care, human services, K-12 and higher education, state contracts and procurement, labor, and public utilities.

**Equity Shareholder, Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
Denver, Colorado
January 2011-April 2019
Member, Board of Directors (January 2014 – April 2019)

Practice was primarily focused on the representation of employers in litigation matters filed in both state and federal courts.  Practice also included advising employers on compliance with local, state, and federal employment laws.

**Equity Shareholder, Brownstein Hyatt Farber Schreck, LLP**
Denver, Colorado
2002-2010
Chair, Employment Practice Group
Member, Diversity and Inclusiveness Committee

Lead counsel on numerous litigation matters involving federal employment and civil rights statutes, including but not limited to Title VII, the Fair Labor Standards Act, the Americans With Disabilities Act, and the Age Discrimination in Employment Act.  Many of the same matters were tried to verdict in both state and federal district courts.  Practice also included providing advice to individual executives and employers on a variety of business transactions and other matters arising from the employer-employee relationship.

**Associate and Partner, Holland & Hart, LLC**
Denver, Colorado
1990-2002
Member, Labor and Employment Practice Group

Conducted legal research, prepared memoranda and briefs, conducted and defended depositions.  As a senior associate and partner, practice became primarily focused on employment and civil rights litigation in both federal and state district courts.  Served as first and second chair on employment cases tried to verdict in both state and federal district courts.

**Deputy District Attorney, Denver District Attorney's Office**
Denver, Colorado
1986-1990
Investigated and prosecuted misdemeanor and felony criminal cases.  Tried to verdict numerous cases in county, juvenile, and district courts in the City and County of Denver.

**Law Clerk**
1984-1986
**Overton, Lyman & Prince, PC**
Los Angeles, California

Conducted research and prepared memoranda on various legal issues related to commercial litigation matters.

**Law Clerk for the Honorable John L. Kane, Jr.**
**United States District Court for the District of Colorado**
Denver, Colorado
1983-1984

Conducted research, prepared memoranda and preliminary opinions on various legal issues presented in cases pending before the Court.

**EDUCATION**

**UCLA School of Law**
Los Angeles, California
Juris Doctorate, 1983
Managing Editor, Vol. 30 of the UCLA Law Review
Member, Black Law Students Association

**University of Santa Clara**
Santa Clara, California
Bachelor of Arts in History, 1980
Member, Phi Alpha Theta, History Honor Society
Member, Black Students Union

2

**REFERENCES**

Available upon request.

3

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**OFFICE USE ONLY**

DB _____

SLOT _____

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Lopez, Gina Josey | Montezuma | 3 | 6 | 59 |

| Home Address | City | State | Zip Code 81334 |
|---|---|---|---|
| ▮ | Towaoc | Colorado | |

| Mailing Address | City | State | Zip Code |
|---|---|---|---|
| | | Colorado | |

| Date of Birth ▮ 1982 | | Gender Female | Registered Voter? Yes Party Affliation? Unaffiliated | Ethnicity Native American |
|---|---|---|---|---|

| Present Employer/Title | Business Phone # | Home Phone # |
|---|---|---|
| Colorado Coalition Against Sexual Assault/Systems Response Program Director | (720) 728-8379 | ▮ |
| | Cell Phone # ▮ | E-mail ▮ |

| Business Address | City | State | Zip Code |
|---|---|---|---|
| 1330 Fox Street, Suite 2 | Denver | Colorado | 80204 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Sherman Indian High School | Riverside, CA | | 2000 | |
| **College** | Metropolitan State University | Denver, CO | | 2011 | Criminal Justice/Criminology, minor Philosophy |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Advocate member of Coalition to Stop Violence Against Native Women, member of Montezuma Youth Pride | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Kara Napolitano | Friend/Colleague | ▮ |
| Kimberly Multine | Friend/Colleague | ▮ |
| Kia Whiteskunk | Friend | ▮ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Gina Josey Lopez    **DATE:** 6/14/2023 12:00:00 AM



# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Lopez, Gina Josey | County<br>Montezuma | Cong. District<br>3 | Senate District<br>6 | House District<br>59 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

I hope to represent our member agencies across Colorado that work to provide advocacy services to victims of sexual violence in their communities and our role in supporting that work is to stay updated with what legislative changes might impact their work and provide training to make sure they are carrying out those requirements that works to be survivor driven. Our member agencies represent many different communities with different accesses to resources and all are tasked with adhering to these legislative requirements and our team is working to support those efforts with innovative practices.

My prior experience working in a rural, Tribal community in Colorado as well as my continued partnership with anti-trafficking organizations and workgroups like the Laboratory to Combat Human Trafficking and the Denver Anti-Trafficking Alliance is my continued commitment to understanding impacts and responses to trafficking. Our training and technical assistance values the work of community systems and programs that may not be direct services advocacy but still have a role to play in the network of care of survivors, those resources have proven to be the best community innovative ways to address gaps in care. CCASA continues to support those community innovations and learn from them to inform and strengthen existing training curriculum that is made better with what we learn from our members and their communities. It is my hope and intention to continue to be that supportive component and collaborator in working to confront trafficking in Colorado. It is my goal to keep this communication and effort strong across our agencies and best represent our coalition engaging with this Human Trafficking Council.

I have worked for CCASA and our member agencies for almost 5 years now and in my role, I have worked to provide training and technical assistance to our advocates who serve their communities. We have provided culturally specific advocacy and rural community advocacy and training support to strengthen existing services. We work hard to understand and know our member agencies' community needs and honor their commitment to survivors' needs as well. I believe that we have a valuable perspective and relationship in Colorado communities that can help this council achieve its goals and collaborative efforts. I am honored to be of assistance and hope to also learn ways to do better in our work so that together, we are nurturing a safer Colorado.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Gina Josey Lopez      **DATE:** 6/14/2023 12:00:00 AM

▶Gina Lopez

## Objectives

My objective upon leaving my tribal work was to strengthen bridges between communities by stepping into important roles as a bearer of information through training and technical assistance. The experiences I've had in my tribal community victim services allowed me to grow important relationships with neighboring communities and open more options for survivors. I have many years of work experience within a tribal organization and tribal business entities giving me a developed resourcefulness and insight to provide informed guidance. I strive to work for organizations that utilize my voice to further the visibility and space for Indigenous and other silenced communities.

## Education

**Bachelor of Science Criminal Justice/Criminology, Minor in Philosophy** (December 2011)
▶ Metropolitan State University of Denver | Denver, CO

## Experience

**Systems Response Program Director (10/2018) –(Present)**
**Colorado Coalition Against Sexual Assault (P.O. Box 40350 |  1330 Fox Street, Denver, CO 80204)**
Training and technical assistance to agencies that provide services and resources to rural and indigenous communities as well as statewide agencies. Provide cross-systems work to inform from cultural and geographical perspectives in order to enhance training and advocacy for all survivors of sexual violence. I work in many multi-disciplinary work groups, task forces and collaboratives that confront issues like sexual violence, trafficking, IPV (inter-personal violence) and cultural education. I also co-chair a multi-Tribal, multi-disciplinary coalition that encompasses all four states called the Navajo, Apache, Ute, Hopi, Zuni Coalition Against Sexual Assault and Family Violence wherein we meet monthly to discuss, support and promote justice on all of our tribal lands. The work of coalition building and sustaining led to the organized grassroots effort of co-found the Missing and Murdered Indigenous Relatives of Colorado Taskforce. We successfully, with bipartisan support, passed SB22-150; Colorado's first-ever missing and murdered response and data gathering effort and just this year, assisted in the implementation and branding of the State's first ever Missing Indigenous Person Alert system. The work in this position has only just begun and will continue to broaden the understanding of Colorado providers, funders and systems to work towards better relationships and understanding.

**Victim Support Services Program Coordinator (9/2016) –(10/2018)**
**Ute Mountain Ute Tribe (P.O. Box 189 |  124 Mike Wash Road, Towaoc, CO 81334)**
Program coordination, budget and grant management, victim advocacy, supervision of prevention coordinators that covered domestic violence, sexual assault and stalking as well as suicide prevention work. The funding provided for comprehensive victim services for all victims of all crime in Towaoc and White Mesa. We worked in mutually respectful cooperation with federal BIA, FBI and county law enforcement, courts and victim specialists. We also worked with health providers in clinics, hospitals, shelters and child advocacy centers in our state and in other states as well.

**Analyst II (5/2015) –(9/2016)**
**Ute Mountain Ute Tribe (P.O. Box 189 |  124 Mike Wash Road, Towaoc, CO 81334)**
Production analysis and revenue reporting of Tribe's oil and gas resources. Communication with companies to reconcile production reporting. Credential through DOI, ONRR (Office of Natural Resources Revenue for database verification and compliance. Review and compliance with natural resource contracts, tribal resolutions and rights-of-way documentation. Completed mandated training for oil and gas production accounting, database use, compliance, and understanding components of oil and gas contracting, landmen, etc.

**Revenue Auditor (8/2012) –(5/2015)**
**Ute Mountain Ute Casino (P.O. Box 268 | 3 Weeminuche Drive, Towaoc, CO 81334)**
Daily financial reconciliation and close out of revenue throughout casino departments. Verification of jackpot wins, end-of-month audits of each department inventory, slot meter reading. Training in slot play database, tax verification, cage/vault end-of-month inventory and balance sheets. Daily spreadsheet reconcile with each auditor's entries to balance at end of each day. Resolving accounting and/or POS disputes and issuing correction documentation to each department and employee.

## Skills

▶ Tribal grant reporting and coordination, supervision of prevention staff, 40-hour advocacy training (State-Colorado, NM, Arizona, OVC, BIA – Bureau of Indian Affairs), CO VRA, danger assessment certified, computer: excel, word, PowerPoint, email/outlook, fax, 10-key, online platforms (zoom, GoTo meetings) and I-LED coursework training for online teaching skills advancement

▶ Train in the following focus areas: Sexual Assault/Domestic Violence in Indigenous/Tribal communities; Visibility and enrollment impacts in Tribal communities and survivorship; Sexual Assault advocacy; Anti-Oppression; SART/MDT/CRT development; Trafficking in Indigenous/Tribal communities; MMIR CO TF and policy development

▶ Successful remote/hybrid work environment since 2018 including the passage of critical Indigenous led State legislation

▶ Manage an emergency fund with trauma-informed advocacy for Native/Indigenous sexual assault and child sexual abuse survivors and their families

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

OFFICE USE ONLY

DB _____

SLOT _____

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

**Judicial Discipline, Commission on**

| Name (Last, First Middle) Pacheco, Marisa Lee | County Pueblo | Cong. District 3 | Senate District 3 | House District 62 |
|---|---|---|---|---|

| Home Address ██████████ | City Pueblo | State Colorado | Zip Code 81006 |
|---|---|---|---|

| Mailing Address | City | State | Zip Code |
|---|---|---|---|

| Date of Birth ████████ 1973 | | Gender Female | Registered Voter? Yes / Party Affliation? Unaffiliated | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title City of Pueblo/Human Resources Director | Business Phone # ███████ | Home Phone # ███████ |
|---|---|---|
| | Cell Phone # ███████ | E-mail ██████████ |

| Business Address 301 West B Street | City Pueblo | State Colorado | Zip Code |
|---|---|---|---|

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | William Mitchell High School | Colorado Springs | | 1992 | Genearl |
| **College** | University of Colorado | Colorado Springs | | 1996 | Psychology/Gerontology |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Society of Human Resources Management - Senior Professional Certified<br>International Public Management Association  - Senior Professional Certified | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Nick Gradisar | | ███████ |
| Laura Solano | | ███████ |
| Troy Davenport | | ███████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:I am capable of committing as much time as necessary to fulfill the duties of this position. It would be an honor to be selected.

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Marisa Lee Pacheco    **DATE:** 7/31/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Pacheco, Marisa Lee | Pueblo | 3 | 3 | 62 |

*Please explain why you wish to serve on a board or commission.*

I am a Colorado native and dedicated public servant with deep local government expertise.   This board opportunity provides a way to serve in a meaningful way at a state level, beyond my immediate community. This is very exciting and of great interest to me both professionally and personally.    I have nearly twenty-five years of Human Resources experience, have held management positions for sixteen of those years, mostly working in local government.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Marisa Lee Pacheco     **DATE:** 7/31/2023 12:00:00 AM

# MARISA PACHECO
## IMPA-HR SCP, SHRM-SCP

███████████ ██████████ ██████████
████████████████

_____

**Dynamic, accomplished human resources leader with 24 years of achievement and success in providing strategic human resources leadership in both public sector (union and non-union) and private sector environments. Core competencies and skills include:**

- Compensation and classification system design and management
- Budgeting and forecasting
- Benefits administration, cost containment
- Public Safety and civilian union experience
- HR Audits, process improvement, change management
- Worker's compensation and risk management

- Executive and line recruitment
- Program management experience
- Labor relations/union experience
- Training design, development, and delivery
- Employee relations and investigation expertise
- Extensive policy development experience

## PROFESSIONAL EXPERIENCE & SELECTED ACHIEVEMENTS

### Human Resources Director, City of Pueblo, 4/2010-Present

One of the largest employers in the Pueblo market with approximately 800 regular FTEs and 1300 total employees including seasonal temporaries, the City of Pueblo is a full-service city.   General Fund annual budget is approximately 98 million with 70% in personnel costs.  In the Human Resources Director role, responsible for all facets of the Human Resources function reporting to the elected Mayor:

- Directed the work of a combination of professional, paraprofessional, technical and administrative support staff

- Serve as policy advisor to the City Manager for 8 years, then following conversion of government to Mayor and Directors.

- Management negotiations team member on annual contract negotiations for International Association of Firefighters (IAFF Local #3), International Brotherhood of Police Officers (IBPO Local #537), Pueblo Association of Government Employees (PAGE affiliate of AFSCME Local #1712) and Amalgamated Transit Union No. 662

- Extensive labor relations experience, representing the City on union grievance issues and disciplinary matters in conjunction with legal counsel

- Deep expertise in employee relations matters to include investigations and mediation

- Manage the compensation and classification systems performing annual market compensation studies, including general market analysis and comprehensive benchmark studies in advance of labor contract negotiations to develop recommendations to the Mayor

- Developed Pueblo Leadership Academy a year-long comprehensive supervisory academy for City staff members starting in 2012 and Director's Informational Workshops in 2020

- For the first time in the City's history, established zero cost positive insurance broker relationship keeping premium changes in line with national trend despite high utilization of plans

- Managed the transition of the City's approximately $13 million dollar per year medical insurance program from fully insured to self-insured in 2020.  Manage all benefit plans including fully insured programs, RFP and selection activities

- Moved organization to streamlined web-based platform for benefits open enrollment, served as key operational leader on major ERP system conversion and lead the City's implementation of a new online learning platform

- Manage self-insured workers' compensation and risk management activities

- Developed credibility and strong relationships with senior management and employees

- Performance ratings of exceeds expectations during tenure with City organization

## Co-Owner/Principal of Human Capital Group, LLC, 1/2009-4/2010

Co-owner and Principal of innovative human resources management consulting firm specializing in employment lifecycle solutions for private and public sector organizations.

- Provided customized solutions to clients in the core areas of human resources management to include comprehensive audit, administrative review oversight, compensation and classification strategy, recruitment and selection, investigations and fact finding, employee relations, training and facilitation, legal compliance, policy and procedure review and development, training and facilitation, succession planning design and talent and management as well as reduction in force management and career transition services

- Developed nationally certified Human Resources University curriculum

- Shared responsibility for sales and marketing, financial management, and company operations

## Human Resources Director – Pueblo City-County Library District, 6/2008–2/2009

Director level position, part of the senior management team reporting directly to Chief Executive of the Library District responsible for all areas of human resources management including the management of volunteer coordination staff.

- Managed all Human Resources functions for the Pueblo City-County Library District (PCCLD) for approximately 120 employees

- Traditional responsibilities included compensation, classification, recruitment, employee relations, EEO compliance, ADA, FMLA, FLSA review and administration, worker's

compensation, human resources information systems, manage/oversee volunteer function, budget administration, general program management

▪ Project management and process improvement projects include the development of a succession planning program, overhaul of policies and procedures for entire district, identification of ways to enhance efficiency and effectiveness of all HR procedures and practices

## Human Resources Manager – City of Colorado Springs, 2/2000-6/2008

Human Resources Manager – Colorado Springs Fire Department 5/2007-6/2008
Human Resources Manager – Colorado Springs Police Department 11/2005-11/2007
Human Resources Manager – Central Human Resources 1/2004-11/2005
Principal Human Resources Analyst - 1/2003 – 1/2004
Senior Human Resources Analyst – 8/1/2000-4/2002
Human Resources Analyst II –2/2000-8/2000

At the time of service, the City of Colorado Springs was and remains one of the largest employers in the local market, with approximately 2,700 employees serving a City population of nearly 500,000. The City's budget was approximately 300 million dollars annually, of which approximately 60% of the annual budget was dedicated to total compensation costs.

Focused expertise and responsibilities in compensation, classification, executive recruitment, employee relations, benefits administration, human resources information systems program management and strategic process improvement project experience:

- Only Human Resources Manager in the City to have worked in central Human Resources administration and both public safety departments

▪ Managed all Human Resources functions for Colorado Springs Fire Department (CSFD) for an employee population of 500

▪ Prior to being recruited by CSFD, served as the Human Resources Manager for the Colorado Springs Police Department managing all Human Resources functions for an employee population of 1,200

▪ In all Human Resources Manager positions have managed a combination of professional, paraprofessional, technical and administrative support staff

▪ During six-year tenure with central City Human Resources, managed the compensation and classification systems performing annual market compensation studies, including general market analysis and comprehensive benchmark studies

▪ Responsible for the development of recommendations for annual market increases and compensation system realignment for inclusion in the City Manager's annual budget

▪ Participated in the development of appointed position compensation packages

▪ Developed credibility and strong relationships with senior management and employees which lead to recruitment to public safety departments

▪ Developed cost-effective executive recruitment strategy resulting in high-quality hires and is now a model being used by other local public sector agencies

▪ Facilitated senior management task force to develop succession planning program

- Performance ratings of exceeds expectations during tenure with City organization

- Selected for numerous City-wide and department committees and task forces including, Minority Recruitment Task Force (2005-2008, Chair 2008), Leadership Development Series Executive Steering Committee (2007-2008), PeopleSoft Time and Labor Executive Committee (2007-2008), Promotional Process Committee (2007-2008), City Wellness Committee (2005-2007), City Manager's Budget Analysis Team (2003), Leadership Development Action Team (2003-2005), Customer Service Quality Council (2000-2002) and Diversity and Inclusion Training Team (2001-2005). First civilian recipient of Community Above and Beyond Award (2004).

**Human Resources Generalist and National Recruiter, 12/1996-2/2000**
**Arthur Andersen LLP – Denver, CO, and Chicago IL**

Arthur Andersen LLP, formerly one of the largest financial services firms in the world with approximately 60,000 employees worldwide provided assurance, contract accounting, and human capital services to client companies.

During my tenure with Arthur Andersen, I held several professional human resources positions with an emphasis on recruiting within the Assurance and Business Advisory practice, at the local level in Denver and at the national level out of the firm's Chicago headquarters.

National Recruiter, 2/1999-2/2000
Recruiting Coordinator, 10/1997-3/1999
Assurance and Business Advisory (ABA) National Recruiting Team
Chicago, IL

Human Resources Generalist, 12/1996-12/1998
Business Process Outsourcing (BPO) Practice
Denver, CO

## EDUCATION & CERTIFICATIONS

**Bachelor of Arts (BA), Psychology, academic minor in Gerontology**
University of Colorado – May 1996
Graduated magna cum laude with GPA of 3.9

**Center for Creative Leadership (CCL) – Colorado Springs**
Graduate of Leadership Development Program – 2005

**National Incident Management System (NIMS) – Advanced Certification**
Certified - ICS 100, ICS 200, ICS 300, ICS 400, ICS 700, ICS 800

**International Public Management Association – IMPA-HR Senior Certified Professional**

**Society for Human Resources Management Senior Certified Professional, SHRM-SCP**

## PROFESSIONAL MEMBERSHIPS

**Society for Human Resources Management (National)**
2000-present

**Colorado Springs Society for Human Resources Management**
2000-2010

**Colorado Springs Human Resources Association**
Elected Board Member: Vice President, Secretary and Education/Certification Director 2009-2010

**IPMA-HR (International Public Management Association)** 2010-present



August 4, 2023

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of
Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the
following:

<div align="center">

MEMBER OF THE
<u>COLORADO COMMISSION ON JUDICIAL DISCIPLINE</u>

</div>

for terms expiring June 30, 2027:

David Powell of Denver, Colorado, to serve as an attorney, appointed;

Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.

Sincerely,

Jared Polis
Governor

10 Members (6 appointed by Governor)
2 Attorneys, 4 Non-attorneys
4 Year Terms
**SENATE CONFIRMATION**

**COMMISSION ON JUDICIAL DISCIPLINE**

| | Appointed | Confirmed | Expires |
|---|---|---|---|
| **Attorney Members** | | | |
| David Powell, Denver (D) repl. Krupa appt. | 08-04-23 | | 06-30-27 |
| Mary (Mindy) Sooter, Boulder repl. Gregory, appt. | 07-01-21 | 03-08-22 | 06-30-25 |
| **Non-Attorneys** | | | |
| Gina Lopez, Towaoc (U) appt. | 08-04-23 | | 06-30-27 |
| Marisa Pacheco, Pueblo (U) appt | 08-04-23 | | 06-30-27 |
| James Carpenter, Englewood repl. Bolling, reappt. | 07-01-21 | 03-08-22 | 06-30-25 |

C.R.S. 24-72-401                                          Updated:  08-04-23

Christopher Gregory, Exec. Director
1300 Broadway, Ste. 210
303.457.5134

August 4, 2023

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of
Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the
following:

<div align="center">

MEMBER OF THE
<u>COLORADO COMMISSION ON JUDICIAL DISCIPLINE</u>

</div>

for terms expiring June 30, 2027:

David Powell of Denver, Colorado, to serve as an attorney, appointed;

Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.

Sincerely,

Jared Polis
Governor

| | |
|---|---|
| **From:** | Ferrall - GOVOffice, Jennifer on behalf of Ferrall - GOVOffice, Jennifer <jennifer.ferrall@state.co.us> |
| **To:** | Rachel Kurtz-Phelan - GA; Dan Graeve - GA; Niketa Patel - GovOffice; Shannon Hayes - GOVOffice; Savannah Martel-Valdez - GOVOffice; c.gregory@jd.state.co.us |
| **Subject:** | 2023-203 Judicial Discipline Commission |
| **Date:** | Friday, August 4, 2023 2:02:05 PM |
| **Attachments:** | A 2023-203 Judicial Discipline Commission.pdf<br>Judicial Discipline Commission (SENATE 2023-203).docx<br>Judicial Discipline (BIBLE).docx |

Hello,

Attached please find the executive order with redacted applications, original senate letter and updated roster page.

Thank you,

--
**Jennifer Ferrall**
Boards and Commissions Coordinator
Office of Boards and Commissions

O: 303.866.5232 C: 720.331.9941
136 State Capitol, Denver, CO 80203
jennifer.ferrall@state.co.us | www.colorado.gov/governor

*Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.*



# A 2023 203

## E X E C U T I V E   O R D E R

MEMBERS

## COLORADO COMMISSION ON JUDICIAL DISCIPLINE

ORDERED:

That the following named persons be and are hereby appointed to the:

COLORADO COMMISSION ON JUDICIAL DISCIPLINE

for terms expiring June 30, 2027:

David Powell of Denver, Colorado, to serve as an attorney, appointed;

Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.



GIVEN under my hand and the
Executive Seal of the State of
Colorado, this fourth day
of August, 2023.

Jared Polis
Governor

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) Powell, David Daniel | County Denver | Cong. District 1 | Senate District 31 | House District 2 |
|---|---|---|---|---|

| Home Address ▇▇▇▇▇▇ | City Denver | State Colorado | Zip Code 80209 |
|---|---|---|---|

| Mailing Address | City | State Colorado | Zip Code |
|---|---|---|---|

| Date of Birth ▇▇▇▇ 1958 | | Gender Male | Registered Voter? Yes Party Affliation? Democrat | Ethnicity African American |
|---|---|---|---|---|

| Present Employer/Title Garnett Powell Maximon Barlow/Partner | Business Phone # (720) 252-7947 | Home Phone # ( ▇▇▇▇ |
|---|---|---|
| | Cell Phone # ▇▇▇▇ | E-mail ▇▇▇▇▇▇ |

| Business Address 1512 Larimer St. , Suite 950 | City Denver | State Colorado | Zip Code 80202 |
|---|---|---|---|

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| High School | Salinas High School | Salinas, California | | 1976 | |
| College | University of Santa Clara | Santa Clara, California | | 1980 | |
| | | | | | |
| Graduate Studies -or- Trade/Business/ Correspondence | UCLA School of Law | Los Angeles, California | | 1983 | Law |
| | | | | | |
| Memberships in Organizations And Offices Held(Indicate if | Board of Directors, Denver Dumb Friends League, Board of Directors, Colorado Alzheimer's Association, Sam Cary Bar Association, International Society of Barristers, National Employment Law Council, College of Labor and Employment Attorneys | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Stan Garnett | Colleague/Partner | ▇▇▇▇ |
| Alvin LaCabe | Friend and mentor | ▇▇▇▇ |
| Natalie Hanlon-Leh | My former supervisor | ▇▇▇▇ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: David Daniel Powell    DATE: 6/12/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Powell, David Daniel | County<br>Denver | Cong. District<br>1 | Senate District<br>31 | House District<br>2 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

I believe my background as an attorney and the leadership roles I've held in various boards and other organizations make me well qualified to serve on a commission.  I also believe that as an attorney, I have an obligation to give back to my community and serving on a commission provides me with an ideal opportunity to serve my community,  I am particularly interested in serving as a member of the Judicial Disciplinary Commission because our judiciary is the backbone of our civil and criminal justice system.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**:  David Daniel Powell    **DATE:** 6/12/2023 12:00:00 AM

# DAVID D. POWELL, JR.

████████████████████████
████████████

---

## PROFESSIONAL EXPERIENCE

**Equity Partner, Garnett Powell Maximon Barlow**
Denver, Colorado
April 2023-present

Founding member of trial boutique with a practice focused primarily on employment litigation, advice and investigations.

**Deputy Attorney General, State Services**
**Colorado Attorney General's Office**
Denver, Colorado
April 2019-April 2023

Supervised the State Services section of the Colorado Attorney General's Office – comprised of eight separate legal units responsible for representing the state's key elected officials and providing legal services in the areas of health care, human services, K-12 and higher education, state contracts and procurement, labor, and public utilities.

**Equity Shareholder, Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
Denver, Colorado
January 2011-April 2019
Member, Board of Directors (January 2014 – April 2019)

Practice was primarily focused on the representation of employers in litigation matters filed in both state and federal courts.  Practice also included advising employers on compliance with local, state, and federal employment laws.

**Equity Shareholder, Brownstein Hyatt Farber Schreck, LLP**
Denver, Colorado
2002-2010
Chair, Employment Practice Group
Member, Diversity and Inclusiveness Committee

Lead counsel on numerous litigation matters involving federal employment and civil rights statutes, including but not limited to Title VII, the Fair Labor Standards Act, the Americans With Disabilities Act, and the Age Discrimination in Employment Act.  Many of the same matters were tried to verdict in both state and federal district courts.  Practice also included providing advice to individual executives and employers on a variety of business transactions and other matters arising from the employer-employee relationship.

**Associate and Partner, Holland & Hart, LLC**
Denver, Colorado
1990-2002
Member, Labor and Employment Practice Group

Conducted legal research, prepared memoranda and briefs, conducted and defended depositions.  As a senior associate and partner, practice became primarily focused on employment and civil rights litigation in both federal and state district courts.  Served as first and second chair on employment cases tried to verdict in both state and federal district courts.

**Deputy District Attorney, Denver District Attorney's Office**
Denver, Colorado
1986-1990
Investigated and prosecuted misdemeanor and felony criminal cases.  Tried to verdict numerous cases in county, juvenile, and district courts in the City and County of Denver.

**Law Clerk**
1984-1986
**Overton, Lyman & Prince, PC**
Los Angeles, California

Conducted research and prepared memoranda on various legal issues related to commercial litigation matters.

**Law Clerk for the Honorable John L. Kane, Jr.**
**United States District Court for the District of Colorado**
Denver, Colorado
1983-1984

Conducted research, prepared memoranda and preliminary opinions on various legal issues presented in cases pending before the Court.

**EDUCATION**

**UCLA School of Law**
Los Angeles, California
Juris Doctorate, 1983
Managing Editor, Vol. 30 of the UCLA Law Review
Member, Black Law Students Association

**University of Santa Clara**
Santa Clara, California
Bachelor of Arts in History, 1980
Member, Phi Alpha Theta, History Honor Society
Member, Black Students Union

**REFERENCES**

Available upon request.

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**OFFICE USE ONLY**

DB _____

SLOT _____

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) Lopez, Gina Josey | County Montezuma | Cong. District 3 | Senate District 6 | House District 59 |
|---|---|---|---|---|

| Home Address ██████ | City Towaoc | State Colorado | Zip Code 81334 |
|---|---|---|---|

| Mailing Address | City | State Colorado | Zip Code |
|---|---|---|---|

| Date of Birth February 8, 1982 | | Gender Female | Registered Voter? Yes Party Affliation? Unaffiliated | Ethnicity Native American |
|---|---|---|---|---|

| Present Employer/Title Colorado Coalition Against Sexual Assault/Systems Response Program Director | Business Phone # (720) 728-8379 | Home Phone # (██████ |
|---|---|---|
| | Cell Phone # ██████ | E-mail ██████ |

| Business Address 1330 Fox Street, Suite 2 | City Denver | State Colorado | Zip Code 80204 |
|---|---|---|---|

## EDUCATION  AND  GENERAL  QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Sherman Indian High School | Riverside, CA | | 2000 | |
| **College** | Metropolitan State University | Denver, CO | | 2011 | Criminal Justice/Criminology, minor Philosophy |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Advocate member of Coalition to Stop Violence Against Native Women, member of Montezuma Youth Pride | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Kara Napolitano | Friend/Colleague | ██████ |
| Kimberly Multine | Friend/Colleague | ██████ |
| Kia Whiteskunk | Friend | ██████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Gina Josey Lopez    **DATE:** 6/14/2023 12:00:00 AM



# STATE OF COLORADO
APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
### Judicial Discipline, Commission on

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Lopez, Gina Josey | Montezuma | 3 | 6 | 59 |

*Please explain why you wish to serve on a board or commission.*

I hope to represent our member agencies across Colorado that work to provide advocacy services to victims of sexual violence in their communities and our role in supporting that work is to stay updated with what legislative changes might impact their work and provide training to make sure they are carrying out those requirements that works to be survivor driven. Our member agencies represent many different communities with different accesses to resources and all are tasked with adhering to these legislative requirements and our team is working to support those efforts with innovative practices.

My prior experience working in a rural, Tribal community in Colorado as well as my continued partnership with anti-trafficking organizations and workgroups like the Laboratory to Combat Human Trafficking and the Denver Anti-Trafficking Alliance is my continued commitment to understanding impacts and responses to trafficking. Our training and technical assistance values the work of community systems and programs that may not be direct services advocacy but still have a role to play in the network of care of survivors, those resources have proven to be the best community innovative ways to address gaps in care. CCASA continues to support those community innovations and learn from them to inform and strengthen existing training curriculum that is made better with what we learn from our members and their communities. It is my hope and intention to continue to be that supportive component and collaborator in working to confront trafficking in Colorado. It is my goal to keep this communication and effort strong across our agencies and best represent our coalition engaging with this Human Trafficking Council.

I have worked for CCASA and our member agencies for almost 5 years now and in my role, I have worked to provide training and technical assistance to our advocates who serve their communities. We have provided culturally specific advocacy and rural community advocacy and training support to strengthen existing services. We work hard to understand and know our member agencies' community needs and honor their commitment to survivors' needs as well. I believe that we have a valuable perspective and relationship in Colorado communities that can help this council achieve its goals and collaborative efforts. I am honored to be of assistance and hope to also learn ways to do better in our work so that together, we are nurturing a safer Colorado.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Gina Josey Lopez    **DATE:** 6/14/2023 12:00:00 AM

▶Gina Lopez

## Objectives

My objective upon leaving my tribal work was to strengthen bridges between communities by stepping into important roles as a bearer of information through training and technical assistance. The experiences I've had in my tribal community victim services allowed me to grow important relationships with neighboring communities and open more options for survivors. I have many years of work experience within a tribal organization and tribal business entities giving me a developed resourcefulness and insight to provide informed guidance. I strive to work for organizations that utilize my voice to further the visibility and space for Indigenous and other silenced communities.

## Education

**Bachelor of Science Criminal Justice/Criminology, Minor in Philosophy** (December 2011)
▶ Metropolitan State University of Denver | Denver, CO

## Experience

**Systems Response Program Director (10/2018) –(Present)**
**Colorado Coalition Against Sexual Assault (P.O. Box 40350 |  1330 Fox Street, Denver, CO 80204)**
Training and technical assistance to agencies that provide services and resources to rural and indigenous communities as well as statewide agencies. Provide cross-systems work to inform from cultural and geographical perspectives in order to enhance training and advocacy for all survivors of sexual violence. I work in many multi-disciplinary work groups, task forces and collaboratives that confront issues like sexual violence, trafficking, IPV (inter-personal violence) and cultural education. I also co-chair a multi-Tribal, multi-disciplinary coalition that encompasses all four states called the Navajo, Apache, Ute, Hopi, Zuni Coalition Against Sexual Assault and Family Violence wherein we meet monthly to discuss, support and promote justice on all of our tribal lands. The work of coalition building and sustaining led to the organized grassroots effort of co-found the Missing and Murdered Indigenous Relatives of Colorado Taskforce. We successfully, with bipartisan support, passed SB22-150; Colorado's first-ever missing and murdered response and data gathering effort and just this year, assisted in the implementation and branding of the State's first ever Missing Indigenous Person Alert system. The work in this position has only just begun and will continue to broaden the understanding of Colorado providers, funders and systems to work towards better relationships and understanding.

**Victim Support Services Program Coordinator (9/2016) –(10/2018)**
**Ute Mountain Ute Tribe (P.O. Box 189 |  124 Mike Wash Road, Towaoc, CO 81334)**
Program coordination, budget and grant management, victim advocacy, supervision of prevention coordinators that covered domestic violence, sexual assault and stalking as well as suicide prevention work. The funding provided for comprehensive victim services for all victims of all crime in Towaoc and White Mesa. We worked in mutually respectful cooperation with federal BIA, FBI and county law enforcement, courts and victim specialists. We also worked with health providers in clinics, hospitals, shelters and child advocacy centers in our state and in other states as well.

**Analyst II (5/2015) –(9/2016)**
**Ute Mountain Ute Tribe (P.O. Box 189 |  124 Mike Wash Road, Towaoc, CO 81334)**
Production analysis and revenue reporting of Tribe's oil and gas resources. Communication with companies to reconcile production reporting. Credential through DOI, ONRR (Office of Natural Resources Revenue for database verification and compliance. Review and compliance with natural resource contracts, tribal resolutions and rights-of-way documentation. Completed mandated training for oil and gas production accounting, database use, compliance, and understanding components of oil and gas contracting, landmen, etc.

**Revenue Auditor (8/2012) –(5/2015)**
**Ute Mountain Ute Casino (P.O. Box 268 | 3 Weeminuche Drive, Towaoc, CO 81334)**
Daily financial reconciliation and close out of revenue throughout casino departments. Verification of jackpot wins, end-of-month audits of each department inventory, slot meter reading. Training in slot play database, tax verification, cage/vault end-of-month inventory and balance sheets. Daily spreadsheet reconcile with each auditor's entries to balance at end of each day. Resolving accounting and/or POS disputes and issuing correction documentation to each department and employee.

## Skills

- Tribal grant reporting and coordination, supervision of prevention staff, 40-hour advocacy training (State-Colorado, NM, Arizona, OVC, BIA – Bureau of Indian Affairs), CO VRA, danger assessment certified, computer: excel, word, PowerPoint, email/outlook, fax, 10-key, online platforms (zoom, GoTo meetings) and I-LED coursework training for online teaching skills advancement
- Train in the following focus areas: Sexual Assault/Domestic Violence in Indigenous/Tribal communities; Visibility and enrollment impacts in Tribal communities and survivorship; Sexual Assault advocacy; Anti-Oppression; SART/MDT/CRT development; Trafficking in Indigenous/Tribal communities; MMIR CO TF and policy development
- Successful remote/hybrid work environment since 2018 including the passage of critical Indigenous led State legislation
- Manage an emergency fund with trauma-informed advocacy for Native/Indigenous sexual assault and child sexual abuse survivors and their families

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**OFFICE USE ONLY**

DB _____

SLOT _____

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only one per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Pacheco, Marisa Lee | Pueblo | 3 | 3 | 62 |

| Home Address | City | State | Zip Code 81006 |
|---|---|---|---|
| ███████████ | Pueblo | Colorado | |

| Mailing Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Date of Birth ████, 1973 | | Gender Female | Registered Voter? Yes Party Affliation? Unaffiliated | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title City of Pueblo/Human Resources Director | Business Phone # ██████████ | Home Phone # ████████████ |
|---|---|---|
| | Cell Phone # ███████████ | E-mail ███████████████████ |

| Business Address 301 West B Street | City Pueblo | State Colorado | Zip Code |
|---|---|---|---|

## EDUCATION  AND GENERAL  QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | William Mitchell High School | Colorado Springs | | 1992 | Genearl |
| **College** | University of Colorado | Colorado Springs | | 1996 | Psychology/Gerontology |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Society of Human Resources Management - Senior Professional Certified International Public Management Association  - Senior Professional Certified | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Nick Gradisar | | ██████████ |
| Laura Solano | | ██████████ |
| Troy Davenport | | ██████████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:I am capable of committing as much time as necessary to fulfill the duties of this position. It would be an honor to be selected.

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Marisa Lee Pacheco          **DATE:** 7/31/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Pacheco, Marisa Lee | Pueblo | 3 | 3 | 62 |

*Please explain why you wish to serve on a board or commission.*

I am a Colorado native and dedicated public servant with deep local government expertise.   This board opportunity provides a way to serve in a meaningful way at a state level, beyond my immediate community. This is very exciting and of great interest to me both professionally and personally.    I have nearly twenty-five years of Human Resources experience, have held management positions for sixteen of those years, mostly working in local government.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Marisa Lee Pacheco        **DATE:** 7/31/2023 12:00:00 AM

# MARISA PACHECO
### IMPA-HR SCP, SHRM-SCP

_____

**Dynamic, accomplished human resources leader with 24 years of achievement and success in providing strategic human resources leadership in both public sector (union and non-union) and private sector environments. Core competencies and skills include:**

- Compensation and classification system design and management
- Budgeting and forecasting
- Benefits administration, cost containment
- Public Safety and civilian union experience
- HR Audits, process improvement, change management
- Worker's compensation and risk management

- Executive and line recruitment
- Program management experience
- Labor relations/union experience
- Training design, development, and delivery
- Employee relations and investigation expertise
- Extensive policy development experience

## PROFESSIONAL EXPERIENCE & SELECTED ACHIEVEMENTS

### Human Resources Director, City of Pueblo, 4/2010-Present

One of the largest employers in the Pueblo market with approximately 800 regular FTEs and 1300 total employees including seasonal temporaries, the City of Pueblo is a full-service city.  General Fund annual budget is approximately 98 million with 70% in personnel costs.  In the Human Resources Director role, responsible for all facets of the Human Resources function reporting to the elected Mayor:

- Directed the work of a combination of professional, paraprofessional, technical and administrative support staff

- Serve as policy advisor to the City Manager for 8 years, then following conversion of government to Mayor and Directors.

- Management negotiations team member on annual contract negotiations for International Association of Firefighters (IAFF Local #3), International Brotherhood of Police Officers (IBPO Local #537), Pueblo Association of Government Employees (PAGE affiliate of AFSCME Local #1712) and Amalgamated Transit Union No. 662

- Extensive labor relations experience, representing the City on union grievance issues and disciplinary matters in conjunction with legal counsel

- Deep expertise in employee relations matters to include investigations and mediation

- Manage the compensation and classification systems performing annual market compensation studies, including general market analysis and comprehensive benchmark studies in advance of labor contract negotiations to develop recommendations to the Mayor

- Developed Pueblo Leadership Academy a year-long comprehensive supervisory academy for City staff members starting in 2012 and Director's Informational Workshops in 2020

- For the first time in the City's history, established zero cost positive insurance broker relationship keeping premium changes in line with national trend despite high utilization of plans

- Managed the transition of the City's approximately $13 million dollar per year medical insurance program from fully insured to self-insured in 2020.  Manage all benefit plans including fully insured programs, RFP and selection activities

- Moved organization to streamlined web-based platform for benefits open enrollment, served as key operational leader on major ERP system conversion and lead the City's implementation of a new online learning platform

- Manage self-insured workers' compensation and risk management activities

- Developed credibility and strong relationships with senior management and employees

- Performance ratings of exceeds expectations during tenure with City organization

## Co-Owner/Principal of Human Capital Group, LLC, 1/2009-4/2010

Co-owner and Principal of innovative human resources management consulting firm specializing in employment lifecycle solutions for private and public sector organizations.

- Provided customized solutions to clients in the core areas of human resources management to include comprehensive audit, administrative review oversight, compensation and classification strategy, recruitment and selection, investigations and fact finding, employee relations, training and facilitation, legal compliance, policy and procedure review and development, training and facilitation, succession planning design and talent and management as well as reduction in force management and career transition services

- Developed nationally certified Human Resources University curriculum

- Shared responsibility for sales and marketing, financial management, and company operations

## Human Resources Director – Pueblo City-County Library District, 6/2008–2/2009

Director level position, part of the senior management team reporting directly to Chief Executive of the Library District responsible for all areas of human resources management including the management of volunteer coordination staff.

- Managed all Human Resources functions for the Pueblo City-County Library District (PCCLD) for approximately 120 employees

- Traditional responsibilities included compensation, classification, recruitment, employee relations, EEO compliance, ADA, FMLA, FLSA review and administration, worker's

compensation, human resources information systems, manage/oversee volunteer function, budget administration, general program management

▪ Project management and process improvement projects include the development of a succession planning program, overhaul of policies and procedures for entire district, identification of ways to enhance efficiency and effectiveness of all HR procedures and practices

## Human Resources Manager – City of Colorado Springs, 2/2000-6/2008

Human Resources Manager – Colorado Springs Fire Department 5/2007-6/2008
Human Resources Manager – Colorado Springs Police Department 11/2005-11/2007
Human Resources Manager – Central Human Resources 1/2004-11/2005
Principal Human Resources Analyst - 1/2003 – 1/2004
Senior Human Resources Analyst – 8/1/2000-4/2002
Human Resources Analyst II –2/2000-8/2000

At the time of service, the City of Colorado Springs was and remains one of the largest employers in the local market, with approximately 2,700 employees serving a City population of nearly 500,000. The City's budget was approximately 300 million dollars annually, of which approximately 60% of the annual budget was dedicated to total compensation costs.

Focused expertise and responsibilities in compensation, classification, executive recruitment, employee relations, benefits administration, human resources information systems program management and strategic process improvement project experience:

• Only Human Resources Manager in the City to have worked in central Human Resources administration and both public safety departments

▪ Managed all Human Resources functions for Colorado Springs Fire Department (CSFD) for an employee population of 500

▪ Prior to being recruited by CSFD, served as the Human Resources Manager for the Colorado Springs Police Department managing all Human Resources functions for an employee population of 1,200

▪ In all Human Resources Manager positions have managed a combination of professional, paraprofessional, technical and administrative support staff

▪ During six-year tenure with central City Human Resources, managed the compensation and classification systems performing annual market compensation studies, including general market analysis and comprehensive benchmark studies

▪ Responsible for the development of recommendations for annual market increases and compensation system realignment for inclusion in the City Manager's annual budget

▪ Participated in the development of appointed position compensation packages

▪ Developed credibility and strong relationships with senior management and employees which lead to recruitment to public safety departments

▪ Developed cost-effective executive recruitment strategy resulting in high-quality hires and is now a model being used by other local public sector agencies

▪ Facilitated senior management task force to develop succession planning program

- Performance ratings of exceeds expectations during tenure with City organization

- Selected for numerous City-wide and department committees and task forces including, Minority Recruitment Task Force (2005-2008, Chair 2008), Leadership Development Series Executive Steering Committee (2007-2008), PeopleSoft Time and Labor Executive Committee (2007-2008), Promotional Process Committee (2007-2008), City Wellness Committee (2005-2007), City Manager's Budget Analysis Team (2003), Leadership Development Action Team (2003-2005), Customer Service Quality Council (2000-2002) and Diversity and Inclusion Training Team (2001-2005). First civilian recipient of Community Above and Beyond Award (2004).

**Human Resources Generalist and National Recruiter, 12/1996-2/2000**
**Arthur Andersen LLP – Denver, CO, and Chicago IL**

Arthur Andersen LLP, formerly one of the largest financial services firms in the world with approximately 60,000 employees worldwide provided assurance, contract accounting, and human capital services to client companies.

During my tenure with Arthur Andersen, I held several professional human resources positions with an emphasis on recruiting within the Assurance and Business Advisory practice, at the local level in Denver and at the national level out of the firm's Chicago headquarters.

National Recruiter, 2/1999-2/2000
Recruiting Coordinator, 10/1997-3/1999
Assurance and Business Advisory (ABA) National Recruiting Team
Chicago, IL

Human Resources Generalist, 12/1996-12/1998
Business Process Outsourcing (BPO) Practice
Denver, CO

## EDUCATION & CERTIFICATIONS

**Bachelor of Arts (BA), Psychology, academic minor in Gerontology**
University of Colorado – May 1996
Graduated magna cum laude with GPA of 3.9

**Center for Creative Leadership (CCL) – Colorado Springs**
Graduate of Leadership Development Program – 2005

**National Incident Management System (NIMS) – Advanced Certification**
Certified - ICS 100, ICS 200, ICS 300, ICS 400, ICS 700, ICS 800

**International Public Management Association – IMPA-HR Senior Certified Professional**

**Society for Human Resources Management Senior Certified Professional, SHRM-SCP**

## PROFESSIONAL MEMBERSHIPS

**Society for Human Resources Management (National)**
2000-present

**Colorado Springs Society for Human Resources Management**
2000-2010

**Colorado Springs Human Resources Association**
Elected Board Member: Vice President, Secretary and Education/Certification Director 2009-2010

**IPMA-HR (International Public Management Association)** 2010-present



August 4, 2023

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the following:

<div align="center">

MEMBER OF THE
COLORADO COMMISSION ON JUDICIAL DISCIPLINE

</div>

for terms expiring June 30, 2027:

David Powell of Denver, Colorado, to serve as an attorney, appointed;

Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.

Sincerely,

Jared Polis
Governor

10 Members (6 appointed by Governor)                  **COMMISSION ON JUDICIAL DISCIPLINE**
2 Attorneys, 4 Non-attorneys
4 Year Terms
**SENATE CONFIRMATION**

| | Appointed | Confirmed | Expires |
|---|---|---|---|
| **Attorney Members** | | | |
| David Powell, Denver (D) repl. Krupa appt. | 08-04-23 | | 06-30-27 |
| Mary (Mindy) Sooter, Boulder repl. Gregory, appt. | 07-01-21 | 03-08-22 | 06-30-25 |
| **Non-Attorneys** | | | |
| Gina Lopez, Towaoc (U) appt. | 08-04-23 | | 06-30-27 |
| Marisa Pacheco, Pueblo (U) appt | 08-04-23 | | 06-30-27 |
| James Carpenter, Englewood repl. Bolling, reappt. | 07-01-21 | 03-08-22 | 06-30-25 |

C.R.S. 24-72-401                                      Updated:  08-04-23

Christopher Gregory, Exec. Director
1300 Broadway, Ste. 210
303.457.5134

August 4, 2023

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of
Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the
following:

MEMBER OF THE
COLORADO COMMISSION ON JUDICIAL DISCIPLINE

for terms expiring June 30, 2027:

David Powell of Denver, Colorado, to serve as an attorney, appointed;

Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.

Sincerely,

Jared Polis
Governor

| **From:** | Ferrall - GOVOffice, Jennifer on behalf of Ferrall - GOVOffice, Jennifer <jennifer.ferrall@state.co.us> |
|---|---|
| **To:** | Rachel Kurtz-Phelan - GA; Dan Graeve - GA; Niketa Patel - GovOffice; Shannon Hayes - GOVOffice; Savannah Martel-Valdez - GOVOffice; c.gregory@jd.state.co.us |
| **Subject:** | 2023-203 Judicial Discipline Commission |
| **Date:** | Friday, August 4, 2023 1:57:16 PM |
| **Attachments:** | A 2023-203 Judicial Discipline Commission.pdf |
| | Judicial Discipline Commission (SENATE 2023-203).docx |
| | Judicial Discipline (BIBLE).docx |

Hello,

Attached please find the executive order with redacted applications, original senate letter and updated roster page.

Thank you,

--

**Jennifer Ferrall**
Boards and Commissions Coordinator
Office of Boards and Commissions

O: 303.866.5232 C: 720.331.9941
136 State Capitol, Denver, CO 80203
jennifer.ferrall@state.co.us | www.colorado.gov/governor

*Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.*



# A 2023 203

**E X E C U T I V E   O R D E R**

MEMBERS

## COLORADO COMMISSION ON JUDICIAL DISCIPLINE

ORDERED:

That the following named persons be and are hereby appointed to the:

COLORADO COMMISSION ON JUDICIAL DISCIPLINE

for terms expiring June 30, 2027:

David Powell of Denver, Colorado, to serve as an attorney, appointed;

Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.



GIVEN under my hand and the
Executive Seal of the State of
Colorado, this fourth day
of August, 2023.

Jared Polis
Governor

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)
## Judicial Discipline, Commission on

| Name (Last, First Middle)<br>Powell, David Daniel | County<br>Denver | Cong. District<br>1 | Senate District<br>31 | House District<br>2 |
|---|---|---|---|---|
| Home Address<br>▓▓▓▓▓▓ | City<br>Denver | State<br>Colorado | Zip Code 80209 | |
| Mailing Address | City | State<br>Colorado | Zip Code | |

| Date of Birth<br>▓▓▓▓, 1958 | | Gender<br>Male | Registered Voter? Yes<br>Party Affliation? Democrat | Ethnicity<br>African American |
|---|---|---|---|---|

| Present Employer/Title<br>Garnett Powell Maximon Barlow/Partner | Business Phone #<br>(720) 252-7947 | Home Phone #<br>▓▓▓▓▓▓ |
|---|---|---|
| | Cell Phone #<br>▓▓▓▓▓▓ | E-mail<br>▓▓▓▓▓▓ |
| Business Address<br>1512 Larimer St. , Suite 950 | City<br>Denver | State<br>Colorado    Zip Code<br>80202 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Salinas High School | Salinas, California | | 1976 | |
| **College** | University of Santa Clara | Santa Clara, California | | 1980 | |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | UCLA School of Law | Los Angeles, California | | 1983 | Law |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Board of Directors, Denver Dumb Friends League, Board of Directors, Colorado Alzheimer's Association, Sam Cary Bar Association, International Society of Barristers, National Employment Law Council, College of Labor and Employment Attorneys | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Stan Garnett | Colleague/Partner | ▓▓▓▓▓▓ |
| Alvin LaCabe | Friend and mentor | ▓▓▓▓▓▓ |
| Natalie Hanlon-Leh | My former supervisor | ▓▓▓▓▓▓ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

  *Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: David Daniel Powell        DATE: 6/12/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Powell, David Daniel | County<br>Denver | Cong. District<br>1 | Senate District<br>31 | House District<br>2 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

I believe my background as an attorney and the leadership roles I've held in various boards and other organizations make me well qualified to serve on a commission.  I also believe that as an attorney, I have an obligation to give back to my community and serving on a commission provides me with an ideal opportunity to serve my community,  I am particularly interested in serving as a member of the Judicial Disciplinary Commission because our judiciary is the backbone of our civil and criminal justice system.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**:  David Daniel Powell       **DATE:** 6/12/2023 12:00:00 AM

**DAVID D. POWELL, JR.**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

## PROFESSIONAL EXPERIENCE

**Equity Partner, Garnett Powell Maximon Barlow**
Denver, Colorado
April 2023-present

Founding member of trial boutique with a practice focused primarily on
employment litigation, advice and investigations.

**Deputy Attorney General, State Services**
**Colorado Attorney General's Office**
Denver, Colorado
April 2019-April 2023

Supervised the State Services section of the Colorado Attorney General's Office
– comprised of eight separate legal units responsible for representing the state's
key elected officials and providing legal services in the areas of health care,
human services, K-12 and higher education, state contracts and procurement,
labor, and public utilities.

**Equity Shareholder, Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
Denver, Colorado
January 2011-April 2019
Member, Board of Directors (January 2014 – April 2019)

Practice was primarily focused on the representation of employers in litigation
matters filed in both state and federal courts.  Practice also included advising
employers on compliance with local, state, and federal employment laws.

**Equity Shareholder, Brownstein Hyatt Farber Schreck, LLP**
Denver, Colorado
2002-2010
Chair, Employment Practice Group
Member, Diversity and Inclusiveness Committee

Lead counsel on numerous litigation matters involving federal employment and
civil rights statutes, including but not limited to Title VII, the Fair Labor Standards
Act, the Americans With Disabilities Act, and the Age Discrimination in
Employment Act.  Many of the same matters were tried to verdict in both state
and federal district courts.  Practice also included providing advice to individual
executives and employers on a variety of business transactions and other
matters arising from the employer-employee relationship.

**Associate and Partner, Holland & Hart, LLC**
Denver, Colorado
1990-2002
Member, Labor and Employment Practice Group

Conducted legal research, prepared memoranda and briefs, conducted and defended depositions.  As a senior associate and partner, practice became primarily focused on employment and civil rights litigation in both federal and state district courts.  Served as first and second chair on employment cases tried to verdict in both state and federal district courts.

**Deputy District Attorney, Denver District Attorney's Office**
Denver, Colorado
1986-1990
Investigated and prosecuted misdemeanor and felony criminal cases.  Tried to verdict numerous cases in county, juvenile, and district courts in the City and County of Denver.

**Law Clerk**
1984-1986
**Overton, Lyman & Prince, PC**
Los Angeles, California

Conducted research and prepared memoranda on various legal issues related to commercial litigation matters.

**Law Clerk for the Honorable John L. Kane, Jr.**
**United States District Court for the District of Colorado**
Denver, Colorado
1983-1984

Conducted research, prepared memoranda and preliminary opinions on various legal issues presented in cases pending before the Court.

**EDUCATION**

**UCLA School of Law**
Los Angeles, California
Juris Doctorate, 1983
Managing Editor, Vol. 30 of the UCLA Law Review
Member, Black Law Students Association

**University of Santa Clara**
Santa Clara, California
Bachelor of Arts in History, 1980
Member, Phi Alpha Theta, History Honor Society
Member, Black Students Union

## REFERENCES

Available upon request.

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle)<br>Lopez, Gina Josey | County<br>Montezuma | Cong. District<br>3 | Senate District<br>6 | House District<br>59 |
|---|---|---|---|---|

| Home Address | City<br>Towaoc | State<br>Colorado | Zip Code 81334 |
|---|---|---|---|

| Mailing Address | City | State<br>Colorado | Zip Code |
|---|---|---|---|

| Date of Birth<br>         1982 | | Gender<br>Female | Registered Voter? Yes<br>Party Affliation? Unaffiliated | Ethnicity<br>Native American |
|---|---|---|---|---|

| Present Employer/Title<br>Colorado Coalition Against Sexual Assault/Systems Response Program Director | Business Phone #<br>(720) 728-8379 | Home Phone # |
|---|---|---|
| | Cell Phone # | E-mail |

| Business Address<br>1330 Fox Street, Suite 2 | City<br>Denver | State<br>Colorado | Zip Code<br>80204 |
|---|---|---|---|

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Sherman Indian High School | Riverside, CA | | 2000 | |
| **College** | Metropolitan State University | Denver, CO | | 2011 | Criminal Justice/Criminology, minor Philosophy |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Advocate member of Coalition to Stop Violence Against Native Women, member of Montezuma Youth Pride | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Kara Napolitano | Friend/Colleague | |
| Kimberly Multine | Friend/Colleague | |
| Kia Whiteskunk | Friend | |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Full Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Gina Josey Lopez    DATE: 6/14/2023 12:00:00 AM



# STATE OF COLORADO
APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Lopez, Gina Josey | Montezuma | 3 | 6 | 59 |

*Please explain why you wish to serve on a board or commission.*

I hope to represent our member agencies across Colorado that work to provide advocacy services to victims of sexual violence in their communities and our role in supporting that work is to stay updated with what legislative changes might impact their work and provide training to make sure they are carrying out those requirements that works to be survivor driven. Our member agencies represent many different communities with different accesses to resources and all are tasked with adhering to these legislative requirements and our team is working to support those efforts with innovative practices.

My prior experience working in a rural, Tribal community in Colorado as well as my continued partnership with anti-trafficking organizations and workgroups like the Laboratory to Combat Human Trafficking and the Denver Anti-Trafficking Alliance is my continued commitment to understanding impacts and responses to trafficking. Our training and technical assistance values the work of community systems and programs that may not be direct services advocacy but still have a role to play in the network of care of survivors, those resources have proven to be the best community innovative ways to address gaps in care. CCASA continues to support those community innovations and learn from them to inform and strengthen existing training curriculum that is made better with what we learn from our members and their communities. It is my hope and intention to continue to be that supportive component and collaborator in working to confront trafficking in Colorado. It is my goal to keep this communication and effort strong across our agencies and best represent our coalition engaging with this Human Trafficking Council.

I have worked for CCASA and our member agencies for almost 5 years now and in my role, I have worked to provide training and technical assistance to our advocates who serve their communities. We have provided culturally specific advocacy and rural community advocacy and training support to strengthen existing services. We work hard to understand and know our member agencies' community needs and honor their commitment to survivors' needs as well. I believe that we have a valuable perspective and relationship in Colorado communities that can help this council achieve its goals and collaborative efforts. I am honored to be of assistance and hope to also learn ways to do better in our work so that together, we are nurturing a safer Colorado.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Gina Josey Lopez    **DATE:** 6/14/2023 12:00:00 AM

▸Gina Lopez

## Objectives

My objective upon leaving my tribal work was to strengthen bridges between communities by stepping into important roles as a bearer of information through training and technical assistance. The experiences I've had in my tribal community victim services allowed me to grow important relationships with neighboring communities and open more options for survivors. I have many years of work experience within a tribal organization and tribal business entities giving me a developed resourcefulness and insight to provide informed guidance. I strive to work for organizations that utilize my voice to further the visibility and space for Indigenous and other silenced communities.

## Education

**Bachelor of Science Criminal Justice/Criminology, Minor in Philosophy** (December 2011)
▸ Metropolitan State University of Denver | Denver, CO

## Experience

**Systems Response Program Director (10/2018) –(Present)**
**Colorado Coalition Against Sexual Assault (P.O. Box 40350 |  1330 Fox Street, Denver, CO 80204)**
Training and technical assistance to agencies that provide services and resources to rural and indigenous communities as well as statewide agencies. Provide cross-systems work to inform from cultural and geographical perspectives in order to enhance training and advocacy for all survivors of sexual violence. I work in many multi-disciplinary work groups, task forces and collaboratives that confront issues like sexual violence, trafficking, IPV (inter-personal violence) and cultural education. I also co-chair a multi-Tribal, multi-disciplinary coalition that encompasses all four states called the Navajo, Apache, Ute, Hopi, Zuni Coalition Against Sexual Assault and Family Violence wherein we meet monthly to discuss, support and promote justice on all of our tribal lands. The work of coalition building and sustaining led to the organized grassroots effort of co-found the Missing and Murdered Indigenous Relatives of Colorado Taskforce. We successfully, with bipartisan support, passed SB22-150; Colorado's first-ever missing and murdered response and data gathering effort and just this year, assisted in the implementation and branding of the State's first ever Missing Indigenous Person Alert system. The work in this position has only just begun and will continue to broaden the understanding of Colorado providers, funders and systems to work towards better relationships and understanding.

**Victim Support Services Program Coordinator (9/2016) –(10/2018)**
**Ute Mountain Ute Tribe (P.O. Box 189 |  124 Mike Wash Road, Towaoc, CO 81334)**
Program coordination, budget and grant management, victim advocacy, supervision of prevention coordinators that covered domestic violence, sexual assault and stalking as well as suicide prevention work. The funding provided for comprehensive victim services for all victims of all crime in Towaoc and White Mesa. We worked in mutually respectful cooperation with federal BIA, FBI and county law enforcement, courts and victim specialists. We also worked with health providers in clinics, hospitals, shelters and child advocacy centers in our state and in other states as well.

**Analyst II (5/2015) –(9/2016)**
**Ute Mountain Ute Tribe (P.O. Box 189 |  124 Mike Wash Road, Towaoc, CO 81334)**
Production analysis and revenue reporting of Tribe's oil and gas resources. Communication with companies to reconcile production reporting. Credential through DOI, ONRR (Office of Natural Resources Revenue for database verification and compliance. Review and compliance with natural resource contracts, tribal resolutions and rights-of-way documentation. Completed mandated training for oil and gas production accounting, database use, compliance, and understanding components of oil and gas contracting, landmen, etc.

**Revenue Auditor (8/2012) –(5/2015)**
**Ute Mountain Ute Casino (P.O. Box 268 | 3 Weeminuche Drive, Towaoc, CO 81334)**
Daily financial reconciliation and close out of revenue throughout casino departments. Verification of jackpot wins, end-of-month audits of each department inventory, slot meter reading. Training in slot play database, tax verification, cage/vault end-of-month inventory and balance sheets. Daily spreadsheet reconcile with each auditor's entries to balance at end of each day. Resolving accounting and/or POS disputes and issuing correction documentation to each department and employee.

## Skills

- Tribal grant reporting and coordination, supervision of prevention staff, 40-hour advocacy training (State-Colorado, NM, Arizona, OVC, BIA – Bureau of Indian Affairs), CO VRA, danger assessment certified, computer: excel, word, PowerPoint, email/outlook, fax, 10-key, online platforms (zoom, GoTo meetings) and I-LED coursework training for online teaching skills advancement
- Train in the following focus areas: Sexual Assault/Domestic Violence in Indigenous/Tribal communities; Visibility and enrollment impacts in Tribal communities and survivorship; Sexual Assault advocacy; Anti-Oppression; SART/MDT/CRT development; Trafficking in Indigenous/Tribal communities; MMIR CO TF and policy development
- Successful remote/hybrid work environment since 2018 including the passage of critical Indigenous led State legislation
- Manage an emergency fund with trauma-informed advocacy for Native/Indigenous sexual assault and child sexual abuse survivors and their families

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

### Judicial Discipline, Commission on

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Pacheco, Marisa Lee | Pueblo | 3 | 3 | 62 |

| Home Address | City | State | Zip Code 81006 |
|---|---|---|---|
| ▮▮▮▮▮ | Pueblo | Colorado | |

| Mailing Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Date of Birth ▮▮▮▮ 1973 | | Gender Female | Registered Voter? Yes  Party Affliation? Unaffiliated | Ethnicity Caucasian |
|---|---|---|---|---|

| Present Employer/Title | Business Phone # | Home Phone # |
|---|---|---|
| City of Pueblo/Human Resources Director | ▮▮▮▮▮ | ▮▮▮▮▮9 |

| | Cell Phone # | E-mail |
|---|---|---|
| | ▮▮▮▮▮ | ▮▮▮▮▮ |

| Business Address | City | State | Zip Code |
|---|---|---|---|
| 301 West B Street | Pueblo | Colorado | |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | William Mitchell High School | Colorado Springs | | 1992 | Genearl |
| **College** | University of Colorado | Colorado Springs | | 1996 | Psychology/Gerontology |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | Society of Human Resources Management - Senior Professional Certified  International Public Management Association  - Senior Professional Certified | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Nick Gradisar | | ▮▮▮▮▮ |
| Laura Solano | | ▮▮▮▮▮ |
| Troy Davenport | | ▮▮▮▮▮ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:I am capable of committing as much time as necessary to fulfill the duties of this position. It would be an honor to be selected.

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE<u>:</u> Marisa Lee Pacheco     **DATE:** 7/31/2023 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) Pacheco, Marisa Lee | County Pueblo | Cong. District 3 | Senate District 3 | House District 62 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

I am a Colorado native and dedicated public servant with deep local government expertise.   This board opportunity provides a way to serve in a meaningful way at a state level, beyond my immediate community. This is very exciting and of great interest to me both professionally and personally.    I have nearly twenty-five years of Human Resources experience, have held management positions for sixteen of those years, mostly working in local government.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Marisa Lee Pacheco        **DATE:** 7/31/2023 12:00:00 AM

# MARISA PACHECO
## IMPA-HR SCP, SHRM-SCP

███████████ █████████ ███████████
██████████████████

---

**Dynamic, accomplished human resources leader with 24 years of achievement and success in providing strategic human resources leadership in both public sector (union and non-union) and private sector environments. Core competencies and skills include:**

- Compensation and classification system design and management
- Budgeting and forecasting
- Benefits administration, cost containment
- Public Safety and civilian union experience
- HR Audits, process improvement, change management
- Worker's compensation and risk management

- Executive and line recruitment
- Program management experience
- Labor relations/union experience
- Training design, development, and delivery
- Employee relations and investigation expertise
- Extensive policy development experience

## PROFESSIONAL EXPERIENCE & SELECTED ACHIEVEMENTS

## Human Resources Director, City of Pueblo, 4/2010-Present

One of the largest employers in the Pueblo market with approximately 800 regular FTEs and 1300 total employees including seasonal temporaries, the City of Pueblo is a full-service city.  General Fund annual budget is approximately 98 million with 70% in personnel costs.  In the Human Resources Director role, responsible for all facets of the Human Resources function reporting to the elected Mayor:

- Directed the work of a combination of professional, paraprofessional, technical and administrative support staff

- Serve as policy advisor to the City Manager for 8 years, then following conversion of government to Mayor and Directors.

- Management negotiations team member on annual contract negotiations for International Association of Firefighters (IAFF Local #3), International Brotherhood of Police Officers (IBPO Local #537), Pueblo Association of Government Employees (PAGE affiliate of AFSCME Local #1712) and Amalgamated Transit Union No. 662

- Extensive labor relations experience, representing the City on union grievance issues and disciplinary matters in conjunction with legal counsel

- Deep expertise in employee relations matters to include investigations and mediation

- Manage the compensation and classification systems performing annual market compensation studies, including general market analysis and comprehensive benchmark studies in advance of labor contract negotiations to develop recommendations to the Mayor

- Developed Pueblo Leadership Academy a year-long comprehensive supervisory academy for City staff members starting in 2012 and Director's Informational Workshops in 2020

- For the first time in the City's history, established zero cost positive insurance broker relationship keeping premium changes in line with national trend despite high utilization of plans

- Managed the transition of the City's approximately $13 million dollar per year medical insurance program from fully insured to self-insured in 2020.  Manage all benefit plans including fully insured programs, RFP and selection activities

- Moved organization to streamlined web-based platform for benefits open enrollment, served as key operational leader on major ERP system conversion and lead the City's implementation of a new online learning platform

- Manage self-insured workers' compensation and risk management activities

- Developed credibility and strong relationships with senior management and employees

- Performance ratings of exceeds expectations during tenure with City organization

## Co-Owner/Principal of Human Capital Group, LLC, 1/2009-4/2010

Co-owner and Principal of innovative human resources management consulting firm specializing in employment lifecycle solutions for private and public sector organizations.

- Provided customized solutions to clients in the core areas of human resources management to include comprehensive audit, administrative review oversight, compensation and classification strategy, recruitment and selection, investigations and fact finding, employee relations, training and facilitation, legal compliance, policy and procedure review and development, training and facilitation, succession planning design and talent and management as well as reduction in force management and career transition services

- Developed nationally certified Human Resources University curriculum

- Shared responsibility for sales and marketing, financial management, and company operations

## Human Resources Director – Pueblo City-County Library District, 6/2008–2/2009

Director level position, part of the senior management team reporting directly to Chief Executive of the Library District responsible for all areas of human resources management including the management of volunteer coordination staff.

- Managed all Human Resources functions for the Pueblo City-County Library District (PCCLD) for approximately 120 employees

- Traditional responsibilities included compensation, classification, recruitment, employee relations, EEO compliance, ADA, FMLA, FLSA review and administration, worker's

compensation, human resources information systems, manage/oversee volunteer function, budget administration, general program management

▪ Project management and process improvement projects include the development of a succession planning program, overhaul of policies and procedures for entire district, identification of ways to enhance efficiency and effectiveness of all HR procedures and practices

## Human Resources Manager – City of Colorado Springs, 2/2000-6/2008

Human Resources Manager – Colorado Springs Fire Department 5/2007-6/2008
Human Resources Manager – Colorado Springs Police Department 11/2005-11/2007
Human Resources Manager – Central Human Resources 1/2004-11/2005
Principal Human Resources Analyst - 1/2003 – 1/2004
Senior Human Resources Analyst – 8/1/2000-4/2002
Human Resources Analyst II –2/2000-8/2000

At the time of service, the City of Colorado Springs was and remains one of the largest employers in the local market, with approximately 2,700 employees serving a City population of nearly 500,000. The City's budget was approximately 300 million dollars annually, of which approximately 60% of the annual budget was dedicated to total compensation costs.

Focused expertise and responsibilities in compensation, classification, executive recruitment, employee relations, benefits administration, human resources information systems program management and strategic process improvement project experience:

• Only Human Resources Manager in the City to have worked in central Human Resources administration and both public safety departments

▪ Managed all Human Resources functions for Colorado Springs Fire Department (CSFD) for an employee population of 500

▪ Prior to being recruited by CSFD, served as the Human Resources Manager for the Colorado Springs Police Department managing all Human Resources functions for an employee population of 1,200

▪ In all Human Resources Manager positions have managed a combination of professional, paraprofessional, technical and administrative support staff

▪ During six-year tenure with central City Human Resources, managed the compensation and classification systems performing annual market compensation studies, including general market analysis and comprehensive benchmark studies

▪ Responsible for the development of recommendations for annual market increases and compensation system realignment for inclusion in the City Manager's annual budget

▪ Participated in the development of appointed position compensation packages

▪ Developed credibility and strong relationships with senior management and employees which lead to recruitment to public safety departments

▪ Developed cost-effective executive recruitment strategy resulting in high-quality hires and is now a model being used by other local public sector agencies

▪ Facilitated senior management task force to develop succession planning program

- Performance ratings of exceeds expectations during tenure with City organization

- Selected for numerous City-wide and department committees and task forces including, Minority Recruitment Task Force (2005-2008, Chair 2008), Leadership Development Series Executive Steering Committee (2007-2008), PeopleSoft Time and Labor Executive Committee (2007-2008), Promotional Process Committee (2007-2008), City Wellness Committee (2005-2007), City Manager's Budget Analysis Team (2003), Leadership Development Action Team (2003-2005), Customer Service Quality Council (2000-2002) and Diversity and Inclusion Training Team (2001-2005). First civilian recipient of Community Above and Beyond Award (2004).

**Human Resources Generalist and National Recruiter, 12/1996-2/2000**
**Arthur Andersen LLP – Denver, CO, and Chicago IL**

Arthur Andersen LLP, formerly one of the largest financial services firms in the world with approximately 60,000 employees worldwide provided assurance, contract accounting, and human capital services to client companies.

During my tenure with Arthur Andersen, I held several professional human resources positions with an emphasis on recruiting within the Assurance and Business Advisory practice, at the local level in Denver and at the national level out of the firm's Chicago headquarters.

National Recruiter, 2/1999-2/2000
Recruiting Coordinator, 10/1997-3/1999
Assurance and Business Advisory (ABA) National Recruiting Team
Chicago, IL

Human Resources Generalist, 12/1996-12/1998
Business Process Outsourcing (BPO) Practice
Denver, CO

## EDUCATION & CERTIFICATIONS

**Bachelor of Arts (BA), Psychology, academic minor in Gerontology**
University of Colorado – May 1996
Graduated magna cum laude with GPA of 3.9

**Center for Creative Leadership (CCL) – Colorado Springs**
Graduate of Leadership Development Program – 2005

**National Incident Management System (NIMS) – Advanced Certification**
Certified - ICS 100, ICS 200, ICS 300, ICS 400, ICS 700, ICS 800

**International Public Management Association – IMPA-HR Senior Certified Professional**

**Society for Human Resources Management Senior Certified Professional, SHRM-SCP**

## PROFESSIONAL MEMBERSHIPS

**Society for Human Resources Management (National)**
2000-present

**Colorado Springs Society for Human Resources Management**
2000-2010

**Colorado Springs Human Resources Association**
Elected Board Member: Vice President, Secretary and Education/Certification Director 2009-2010

**IPMA-HR (International Public Management Association)** 2010-present



August 4, 2023

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the following:

<div align="center">

MEMBER OF THE
<u>COLORADO COMMISSION ON JUDICIAL DISCIPLINE</u>

</div>

for terms expiring June 30, 2027:

David Powell of Denver, Colorado, to serve as an attorney, appointed;

Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.

Sincerely,

Jared Polis
Governor

August 4, 2023

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of
Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the
following:

<div align="center">

MEMBER OF THE
<u>COLORADO COMMISSION ON JUDICIAL DISCIPLINE</u>

</div>

for terms expiring June 30, 2027:

David Powell of Denver, Colorado, to serve as an attorney, appointed;

Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.

Sincerely,

Jared Polis
Governor

| | **COMMISSION ON JUDICIAL DISCIPLINE** |
|---|---|
| 10 Members (6 appointed by Governor) | |
| 2 Attorneys, 4 Non-attorneys | |
| 4 Year Terms | |
| **SENATE CONFIRMATION** | |

| | Appointed | Confirmed | Expires |
|---|---|---|---|
| **Attorney Members** | | | |
| David Powell, Denver (D)<br>  repl. Krupa appt. | 08-04-23 | | 06-30-27 |
| Mary (Mindy) Sooter, Boulder<br>  repl. Gregory, appt. | 07-01-21 | 03-08-22 | 06-30-25 |
| **Non-Attorneys** | | | |
| Gina Lopez, Towaoc (U)<br>  appt. | 08-04-23 | | 06-30-27 |
| Marisa Pacheco, Pueblo (U)<br>  appt | 08-04-23 | | 06-30-27 |
| James Carpenter, Englewood<br>  repl. Bolling, reappt. | 07-01-21 | 03-08-22 | 06-30-25 |

C.R.S. 24-72-401                                              Updated:  08-04-23

Christopher Gregory, Exec. Director
1300 Broadway, Ste. 210
303.457.5134

August 4, 2023

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of
Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the
following:

<div align="center">

MEMBER OF THE
<u>COLORADO COMMISSION ON JUDICIAL DISCIPLINE</u>

</div>

for terms expiring June 30, 2027:

David Powell of Denver, Colorado, to serve as an attorney, appointed;

Gina Lopez of Towaoc, Colorado, to serve as a non-attorney, appointed;

Marisa Pacheco of Pueblo, Colorado, to serve as a non-attorney, appointed.

Sincerely,

Jared Polis
Governor

| | |
|---|---|
| **From:** | Patel - GovOffice, Niketa on behalf of Patel - GovOffice, Niketa <niketa.patel@state.co.us> |
| **To:** | Rachel Kurtz-Phelan - GA; Luisa Altmann - GA |
| **Cc:** | Haley Fried - GovOffice |
| **Subject:** | Re: A 2021-118 Commission on Judicial Discipline |
| **Date:** | Wednesday, July 7, 2021 9:58:41 AM |
| **Attachments:** | Commission on Judicial Discipline (BIBLE).doc |
| | Judicial Discipline Commission (SENATE 2021-118).docx |
| | A 2021-118 Commission on Judicial Discipline.pdf |

See the attached revised EO for Commission on Judicial Discipline with Mindy's last name spelt correctly.

Best,

**Nikky Patel**
**Deputy Director, Boards and Commissions**
**c: (303) 957-8054**

Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.

On Thu, Jul 1, 2021 at 8:00 AM Patel - GovOffice, Niketa <niketa.patel@state.co.us> wrote:

Hello,

Please find the EO with the redacted applications, senate letter, and the updated roster page attached.

Let me know if you have any questions!

Best,
**Nikky Patel**
**Deputy Director**
**Boards and Commissions**

**P 303.866.5232     C 303.957.8054**
**136 State Capitol, Denver, CO 80203**
**Niketa.Patel@state.co.us | Learn more about Boards and Commissions**

*Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.*



# A 2021 118

## E X E C U T I V E   O R D E R

MEMBERS

## COLORADO COMMISSION ON JUDICIAL DISCIPLINE

ORDERED:

That the following named persons be and are hereby reappointed to the:

COLORADO COMMISSION ON JUDICIAL DISCIPLINE for a

for a term expiring June 30, 2025:

James Carpenter of Englewood, Colorado, to serve as a non-attorney, reappointed;

Mindy Sooter of Boulder, Colorado to serve as an attorney, appointed.



GIVEN under my hand and the Executive Seal of the State of Colorado, this first day  of July, 2021.

Jared Polis
Governor



# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

OFFICE USE ONLY

DB _____

SLOT _____

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Carpenter, James | Arapahoe | 6 | 27 | 3 |

| Home Address | City | State | Zip Code 80111 |
|---|---|---|---|
| ███████████ | Englewood | Colorado | |

| Mailing Address | City Englewood | State | Zip Code |
|---|---|---|---|
| ███████████ | | Colorado | 80111 |

| Date of Birth | | Gender | Registered Voter? Yes | Ethnicity |
|---|---|---|---|---|
| ███ 1960 | | Male | Party Affliation? Democrat | Caucasian |

| Present Employer/Title | Business Phone # | Home Phone # |
|---|---|---|
| Freestone Strategies/Co-Founder | 303-358-6581 | |

| | Cell Phone # | E-mail |
|---|---|---|
| | ███████ | ████████████████ |

| Business Address | City | State | Zip Code |
|---|---|---|---|
| 1415 Park Avenue West | Denver | Colorado | |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Carpenter | Middle Park High School | 4 | 1978 | |
| **College** | Carpenter | Georgetown University | 3 | | Government |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Alan Salazar | | ████████ |
| Danielle Radovich Piper | | ████████ |
| Hon. Bill Ritter, Jr. | | ████████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:I am prepared to commit the time necessary to serve effectively on the Commission.

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: James  Carpenter    **DATE:** 2/20/2020 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Carpenter, James | County<br>Arapahoe | Cong. District<br>6 | Senate District<br>27 | House District<br>3 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

I have recently completed my term as a member of the Supreme Court Nominating Commission.  That was a tremendously worthwhile and rewarding experience, which I will miss.  I believe is our state's system for selecting and reviewing judges, including the roll of non-attorney community members.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: James  Carpenter     **DATE:** 2/20/2020 12:00:00 AM

# James F. Carpenter

██████████████████████
██████████████
████████████████████

## Profile

Experienced consultant and leader of complex organizations operating in the public arena.  Skilled at leading teams of professionals; developing and implementing organizational strategies and priorities; building coalitions to achieve results; acting as liaison with community leaders and diverse stakeholders; speaking and presenting to the public; dealing with the media; fundraising and donor relations; writing; managing crises and unexpected events; balancing multiple priorities and tasks; and overseeing operations, budgets and human resources.

## Professional Experience

### Freestone Strategies, LLC
*Co-Founder, September, 2016 to Present*
Owner and co-founder of a public affairs consulting firm. Provide strategic public affairs, communications, government relations and other services to a wide array of corporate and NGO clients focused on energy, technology, healthcare, conservation and public lands.  www.freestone-strategies.com

### Stratton-Carpenter & Associates
*Principal, January, 2011 to September, 2016*
Principal in a diverse, state, national and international public affairs consulting firm.  Provide strategic public affairs, communications, government relations and other services to private, public and non-profit sector clients.

### Colorado Governor Bill Ritter, Jr.
*Chief of Staff, November, 2006 to January, 2011.*
Recruited after the 2006 General Election to lead Governor's staff and Cabinet.  Senior advisor to Governor on all policy, government, state budget, political and operational issues.  Direct oversight of state agency executive directors and senior staff.  Within the Governor's office, responsibility for overseeing all operations, including offices of legal counsel, legislative affairs, communications, media, budgeting and planning, policy and initiatives, boards and commissions, correspondence and constituent relations, administration, and personnel.  Key liaison to Colorado's Congressional Delegation and staff, the National Governors Association and diverse stakeholders, including business and myriad community organizations throughout the state.  Coordinate activities with Lt. Governor and First Lady.  Oversaw transition team from previous Administration, including recruitment and selection of Cabinet members and senior staff.

**James F. Carpenter**
Page two

## U.S. Senator Ken Salazar
*State Director, December, 2004 to November, 2006.*
Served as senior Colorado based advisor to Senator Salazar.  Led staff of 18 in Denver and 8 regional offices across Colorado.  Represented Senator at events and in front of constituent groups.  Key liaison with Washington, D.C. staff, and with diverse stakeholders throughout the state.  Developed and implemented regional plans.

*Campaign Manager, Salazar for US Senate, March to November, 2004*
Recurited to manage U.S. Senate campaign.  Led team of consultants and staff in all aspects of a high profile, national campaign, including strategy development, paid and earned media, polling, research, field operations, administration and fundraising.  Oversaw campaign budget of nearly $10 million, all raised and spent in about 8 months.  Salazar was the only Democrat to win an open seat in a so-called "red state" and became one of only two newly elected Democrats in the U.S. Senate (the other: Barack Obama).

## National Jewish Medical and Research Center (now National Jewish Health)
*Director of Public Affairs, October, 1999 to March, 2004*
Oversaw all media, public, government and community relations activities, and in-house graphic design and publications production studio.  Responsible for enhancing National Jewish's visibility and reputation among the media and community as a whole, and for developing and implementing communication efforts to complement overall strategic plans, marketing goals and development activities.  Served on 10-member Senior Executive Management Committee, and the Ethics Committee.  Managed professional staff of seven and $1.5 million annual budget.

## Gonzales Consulting Services
*Director, GCS Public Strategies, January to October, 2009*
Provided corporate communications, and public, media and government relations services to help clients meet their goals in the public arena.

## Colorado Governor Roy Romer
*Chief of Staff, August, 1998 to January, 1999*
Directed all operations of Governor's office, including personnel, budget and project management.  Coordinated activities with Members of the Cabinet.  Managed transition process to new governor.
*Director of Communications and Press Secretary, January, 1995 to August, 1998*
Directed media relations and served as chief spokesman for Governor Roy Romer.  Oversaw Governor's office communications with public, including press and public events, speeches, correspondence, press releases, and opinion pieces.

**James F. Carpenter**
Page three

## Public Affairs Consultant
***January, 1993 to January, 1995***
Managed grassroots campaigns and other public affairs projects for various corporate, non-profit and political clients, including acting as communications director and media spokesman for the 1994 re-election campaign of Governor Roy Romer.

## U.S. Senator Timothy E. Wirth
***Deputy State Director / Campaign Manager, October, 1988 to January, 1993***
As Deputy State Director, oversaw Colorado press and communications, scheduling, community relations and political activities.  As campaign manager, directed staff and planning for U.S. Senate re-election effort (Wirth ultimately did not seek re-election).

## National Strategies
***Administrator/Associate, January, 1987 to September, 1988***
Served as Administrator and Associate for a public affairs consulting firm in Washington, DC, representing corporate, non-profit and political clients and organizations.

## U.S. Representative Timothy E. Wirth
***Staff Member, 1978-1986***
Held various positions with increasing levels of responsibility, both in Washington, DC, and Colorado, including legislative assistant in the U.S. House of Representatives, and Operations Director for Wirth's successful 1986 U.S. Senate campaign.

## Education
B.A., Political Science, University of Colorado, Boulder, 1985.
Attended Georgetown University, Washington, DC, 1978-1981.

## Selected Affiliations, Activities and Accomplishments

Colorado Supreme Court Nominating Commission, Gubernatorial Appointee, 2013-2019
Bright By Three, Member of the Board of Directors, Past Board Chair
Colorado Non-Profit Association Leadership Advisory Council
Denver Metro Chamber of Commerce Leadership Exchange Trip, 2008
Denver Post "Colorado Voices" Columnist, 2002
Member, 18th Judicial District Nominating Commission, 1998 to 2004
Democratic National Convention Host Committee Executive Committee, 2007 to 2008
Member, Public Relations Society of America and of Colorado, 2000 to 2004
Member, Colorado Healthcare Communicators, 2000 to 2004
Member, Who's Who in North America and Who's Who in the West
Member, Board of Directors of the Colorado Tobacco Education and Prevention Alliance, 2001 to 2004.  Treasurer, 2003
Member, Mile High United Way Leadership Development Committee, 2002 to 2004
Participant, Aspen Institute Executive Seminar, 1996

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

OFFICE USE ONLY

DB _____

SLOT _____

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)

## Judicial Discipline, Commission on

| Name (Last, First Middle)<br>Sooter, Mary (Mindy) Virginia | County<br>Boulder | Cong. District<br>2 | Senate District<br>18 | House District<br>13 |
|---|---|---|---|---|

| Home Address<br>████ | City<br>Boulder | State<br>Colorado | Zip Code 80305 |
|---|---|---|---|

| Mailing Address | City | State<br>Colorado | Zip Code |
|---|---|---|---|

| Date of Birth<br>████ 1967 | | Gender<br>Female | Registered Voter? Yes<br>Party Affliation? Democrat | Ethnicity<br>Caucasian |
|---|---|---|---|---|

| Present Employer/Title<br>Wilmer Cutler Pickering Hale and Dorr/Partner | Business Phone #<br>(720) 274-3164 | Home Phone #<br>████1 |
|---|---|---|
| | Cell Phone #<br>████ | E-mail<br>████ |
| Business Address<br>1225 17th St., Ste 2600 | City<br>Denver | State<br>Colorado   Zip Code<br>80202 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Smithsburg High School | Smithsburg, MD | | 1985 | |
| **College** | Texas A&M University | College Station, TX | | 1990 | Electrical Engineering |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | University of Colorado | Boulder, CO | | 1999 | Telecommunications |
| | University of Colorado | Boulder, CO | | 2003 | Law |

| **Memberships in Organizations And Offices Held(Indicate if** | Partner-in-Charge of WilmerHale's Denver Office<br>Former chair of the IP Section of the Colorado Bar Association<br>Former chair of the board of Impact on Education |
|---|---|

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Ken Salazar | Law Partner | ████ |
| Phil Weiser | Mentor | ████ |
| Jacki Cooper Melmed | Classmate | ████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Part Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: Mary (Mindy) Virginia Sooter     **DATE:** 6/23/2021 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle) | County | Cong. District | Senate District | House District |
|---|---|---|---|---|
| Sooter, Mary (Mindy) Virginia | Boulder | 2 | 18 | 13 |

*Please explain why you wish to serve on a board or commission.*

Two reasons.  First, I would like to dedicate some of my time to public service, and this is a perfect opportunity to give back to the state of Colorado and the community in a way that fits well with my skills and my passion.  Second, above all else in our legal system, I value the reputation of our judiciary.  It must be unbiased, ethical, and moral, both in perception and reality.  This requires a judiciary with the appropriate work ethic, demeanor, and temperament, as well as strong moral and ethical values.  While the vast majority of judges are upstanding and well-meaning, issues inevitably occur, and since the judicial system is fragile, I would be honored to help protect it.

I very much look forward to

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.*
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.*

**SIGNATURE**: Mary (Mindy) Virginia Sooter    **DATE:** 6/23/2021 12:00:00 AM





# Mary (Mindy) V. Sooter

**PARTNER**
Partner-in-Charge, Denver Office

DENVER

Mindy Sooter is a trial lawyer focusing on patent, trade secret, and other high-stakes commercial litigation. Ms. Sooter represents large clients, such as those in the medical device, telecommunications and technology sectors, as well as emerging businesses, in a variety of jurisdictions across the country. She has led and co-led many cases to verdict in federal and state courts across the country, and argues post-grant proceedings at the Patent Trial and Appeal Board. With a background in engineering, Ms. Sooter focuses on cases involving telecommunications, electrical engineering, computer science and medical devices. Ms. Sooter also focuses on bringing highly technical subject matter to a jury in an accessible and persuasive manner.

Before law school, Ms. Sooter worked for a large management consulting firm, and then led the engineering group at a startup software company.

## Professional Activities

Ms. Sooter is an adjunct professor teaching patent litigation at the University of Colorado School of Law.

## Solutions

Litigation                    Intellectual Property Litigation        Trials

## *Experience*

- In recent years, Ms. Sooter's work has prevailed in or successfully resolved numerous cases, including:
  - Led the litigation and successful settlement of a high-stakes trade secret case on behalf of two companies and an individual pending in the District of Colorado.
  - Obtained a dismissal of a trademark case on behalf of a multinational banking company, pending in the District of Colorado.
  - Obtained a dismissal of a patent infringement suit pending in the Western District of Wisconsin on behalf of Medical device company, based on improper venue.
  - Achieving a victory for Akamai Technologies, Inc. when the Delaware Supreme Court affirmed the dismissal of a lawsuit brought by Limelight Networks, Inc., a competitor, asserting breach of a settlement agreement between the parties.
  - Serving as co-lead counsel for Comcast Cable Communications in a ten-patent infringement matter in the Northern District of California involving interactive television patents, which resulted in granting summary judgment of non-infringement in favor of our client.
  - Successfully obtaining dismissal and an award of attorneys' fees of more than $425,000 in a patent case involving optical network design and components.
  - Successfully obtaining a $12 million jury verdict after a jury found that a competitor had engaged in willful patent infringement, willful trade dress infringement and intentional false advertising.
  - Successfully obtaining a summary judgment of non-infringement, and subsequent affirmance by the Federal Circuit, in a patent case involving more than 100 asserted claims and two patents relating to multidimensional database technology.
  - Successfully obtaining dismissal on behalf of a software company in a multi-jurisdictional case involving mapping software.
  - Successfully obtaining a dismissal on behalf of a medical corporation in a case involving the technical performance of distributed computer systems.
  - Successfully obtaining a summary judgment and complete dismissal of a $20 million licensing claim on behalf of a healthcare diagnostics company.

## *Recognition*

- Recognized in the 2021 edition of *Chambers USA: America's Leading Lawyers for Business* as a top intellectual property lawyer in Colorado
- Recognized by the University of Colorado Law School as a Distinguished Alumni for her contributions to the legal profession, service to her community and dedication to the school
- Recognized by *Law Week Colorado* as a Top Women Attorney in 2017 and 2020

and named to its 2018 Top Litigators list

- Recognized as the Outstanding Intellectual Property Litigator in Colorado by *Managing IP* in 2018 and 2019

- Recognized by *Colorado Super Lawyers* for intellectual property litigation in 2016, 2019–2021

- Named among the Top 250 Women in IP and a 2018–2020 IP Star by *Managing IP*, a guidebook that identifies leading IP lawyers in the United States

- Selected by peers for inclusion in the 2019–2021 editions of the *Best Lawyers in America*

- Recognized in the 2014–2020 editions of *IAM Patent 1000: The World's Leading Patent Practitioners*

- Named 2014 IP Supporter of the Year by the Silicon Flatirons Center at the University of Colorado Law School

- Named a "Rising Star" by *Colorado Super Lawyers* in 2012

- Selected as an "Up and Coming Lawyer" in 2008 by *Law Week Colorado*

---

## *Credentials*

### EDUCATION

JD, University of Colorado Law School, 2003

*Editor, Law Review, Order of the Coif, top grades of any 3L*

ME, Telecommunications, University of Colorado at Boulder, 1999

BS, Electrical Engineering, Texas A&M University, 1990

*magna cum laude*

*Phi Kappa Phi, Tau Beta Pi, Eta Kappa Nu*

### ADMISSIONS

Colorado

United States Patent and Trademark Office

### CLERKSHIPS

The Hon. Ferdinand F. Fernandez, US Court of Appeals for the Ninth Circuit, 2004 - 2005

The Hon. Mary J. Mullarkey, Colorado Supreme Court, 2003 - 2004

Wilmer Cutler Pickering Hale and Dorr LLP is a Delaware limited liability partnership. WilmerHale principal law offices: 60 State Street, Boston, Massachusetts 02109, +1 617 526 6000; 1875 Pennsylvania Avenue, NW, Washington, DC 20006, +1 202 663 6000. Our United Kingdom office is operated under a separate Delaware limited liability partnership of solicitors and registered foreign lawyers authorized and regulated by the Solicitors Regulation Authority (SRA No. 287488). Our professional rules can be found at www.sra.org.uk/solicitors/code-of-conduct.page. A list of partners and their professional qualifications is available for inspection at our UK office. In Beijing, we are registered to operate as a Foreign Law Firm Representative Office. This material is for general informational purposes only and does not represent our advice as to any particular set of facts; nor does it represent any undertaking to keep recipients advised of all legal developments. Prior results do not guarantee a similar outcome. © 2004-2021 Wilmer Cutler Pickering Hale and Dorr LLP



**COLORADO**
Governor Jared Polis

July 1, 2021

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the following:

<div align="center">

MEMBER OF THE
COLORADO COMMISSION ON JUDICIAL DISCIPLINE

</div>

effective July 1, 2021 for a term expiring June 30, 2025:

James Carpenter of Englewood, Colorado, to serve as a non-attorney, reappointed;

Mindy Scooter of Boulder, Colorado to serve as an attorney, appointed.

Sincerely,

Jared Polis
Governor



10 Members (6 appointed by Governor)   COMMISSION ON JUDICIAL DISCIPLINE
2 Attorneys, 4 Non-attorneys
4 Year Terms
SENATE CONFIRMATION

|  | Appointed | Confirmed | Term Expires |
|---|---|---|---|
| **Attorney Members** | | | |
| Elizabeth Espinosa Krupa, Evergreen<br>  repl. Alvarez, reappt. | 06-20-19 | 02-03-20 | 06-30-23 |
| Mary (Mindy) Sooter, Boulder<br>  repl. Gregory, appt. | 07-01-21 | | 06-30-25 |
| **Non-Attorneys** | | | |
| Yolanda Regina Lyons, Colo. Spgs.<br> reappt. | 06-20-19 | 02-03-20 | 06-30-23 |
| Bruce Casias, Lakewood<br>  repl. Kenney, reappt. | 06-20-19 | 02-03-20 | 06-30-23 |
| Drucilla Pugh, Pueblo<br>   repl. Negrete-Winn, reappt. | 06-20-19 | 02-03-20 | 06-30-23 |
| James Carpenter, Englewood<br>  repl. Bolling, reappt. | 07-01-21 | | 06-30-25 |

C.R.S. 24-72-401                                           Updated:  07-01-21

William J. Campbell, Exec. Director
1300 Broadway, Ste. 210
303.457.5134
w.campbell@jd.state.co.us

June 25, 2021

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the following:

## MEMBER OF THE
## <u>COLORADO COMMISSION ON JUDICIAL DISCIPLINE</u>

effective July 1, 2021 for a term expiring June 30, 2025:

James Carpenter of Englewood, Colorado, to serve as a non-attorney, reappointed;

Mindy Sooter of Boulder, Colorado to serve as an attorney, appointed.

Sincerely,

Jared Polis
Governor

| From: | Patel - GovOffice, Niketa on behalf of Patel - GovOffice, Niketa <niketa.patel@state.co.us> |
|---|---|
| To: | Rachel Kurtz-Phelan - GA; Luisa Altmann - GA |
| Cc: | Kate Siegel Shimko - GOVOffice; Haley Fried - GovOffice; w.campbell@jd.state.co.us |
| Subject: | A 2021-118 Commission on Judicial Discipline |
| Date: | Thursday, July 1, 2021 8:00:00 AM |
| Attachments: | Commission on Judicial Discipline (BIBLE).doc |
| | Judicial Discipline Commission (SENATE 2021-118).docx |
| | A 2021-118 Commission on Judicial Discipline.pdf |

Hello,

Please find the EO with the redacted applications, senate letter, and the updated roster page attached.

Let me know if you have any questions!

Best,
Nikky Patel
Deputy Director
Boards and Commissions



P 303.866.5232     C 303.957.8054
136 State Capitol, Denver, CO 80203
Niketa.Patel@state.co.us | Learn more about Boards and Commissions

*Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.*



# COLORADO
## Governor Jared Polis

# A 2021 118

### E X E C U T I V E   O R D E R

MEMBERS

## COLORADO COMMISSION ON JUDICIAL DISCIPLINE

ORDERED:

That the following named persons be and are hereby reappointed to the:

COLORADO COMMISSION ON JUDICIAL DISCIPLINE for a

for a term expiring June 30, 2025:

James Carpenter of Englewood, Colorado, to serve as a non-attorney, reappointed;

Mindy Scooter of Boulder, Colorado to serve as an attorney, appointed.



GIVEN under my hand and the Executive Seal of the State of Colorado, this first day of July, 2021.

Jared Polis
Governor



# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only <u>one</u> per application, your application will not be processed if left blank.)

**Judicial Discipline, Commission on**

| Name (Last, First Middle) Carpenter, James | County Arapahoe | Cong. District 6 | Senate District 27 | House District 3 |
|---|---|---|---|---|
| **Home Address** ████████ | **City** Englewood | **State** Colorado | **Zip Code** 80111 |
| **Mailing Address** ████████ | **City** Englewood | **State** Colorado | **Zip Code** 80111 |

| Date of Birth ██ 1960 | | **Gender** Male | **Registered Voter?** Yes **Party Affliation?** Democrat | **Ethnicity** Caucasian |
|---|---|---|---|---|

| Present Employer/Title Freestone Strategies/Co-Founder | Business Phone # 303-358-6581 | Home Phone # |
|---|---|---|
| | Cell Phone # ████ | E-mail ████████ |
| Business Address 1415 Park Avenue West | City Denver | State Colorado | Zip Code |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Carpenter | Middle Park High School | 4 | 1978 | |
| **College** | Carpenter | Georgetown University | 3 | | Government |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | | | | | |
| | | | | | |
| **Memberships in Organizations And Offices Held(Indicate if** | | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Alan Salazar | | ████ |
| Danielle Radovich Piper | | ████ |
| Hon. Bill Ritter, Jr. | | ████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:I am prepared to commit the time necessary to serve effectively on the Commission.

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: James  Carpenter    **DATE:** 2/20/2020 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Carpenter, James | County<br>Arapahoe | Cong. District<br>6 | Senate District<br>27 | House District<br>3 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

I have recently completed my term as a member of the Supreme Court Nominating Commission.  That was a tremendously worthwhile and rewarding experience, which I will miss.  I believe is our state's system for selecting and reviewing judges, including the roll of non-attorney community members.

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

**SIGNATURE**: James Carpenter      **DATE:** 2/20/2020 12:00:00 AM

# James F. Carpenter

████████████████████████████
███████████████
████████████████████████

## Profile

Experienced consultant and leader of complex organizations operating in the public
arena.  Skilled at leading teams of professionals; developing and implementing
organizational strategies and priorities; building coalitions to achieve results; acting as
liaison with community leaders and diverse stakeholders; speaking and presenting to the
public; dealing with the media; fundraising and donor relations; writing; managing crises
and unexpected events; balancing multiple priorities and tasks; and overseeing
operations, budgets and human resources.

## Professional Experience

### Freestone Strategies, LLC
*Co-Founder, September, 2016 to Present*
Owner and co-founder of a public affairs consulting firm. Provide strategic public affairs,
communications, government relations and other services to a wide array of corporate
and NGO clients focused on energy, technology, healthcare, conservation and public
lands.  www.freestone-strategies.com

### Stratton-Carpenter & Associates
*Principal, January, 2011 to September, 2016*
Principal in a diverse, state, national and international public affairs consulting firm.
Provide strategic public affairs, communications, government relations and other services
to private, public and non-profit sector clients.

### Colorado Governor Bill Ritter, Jr.
*Chief of Staff, November, 2006 to January, 2011.*
Recruited after the 2006 General Election to lead Governor's staff and Cabinet.  Senior
advisor to Governor on all policy, government, state budget, political and operational
issues.  Direct oversight of state agency executive directors and senior staff.  Within the
Governor's office, responsibility for overseeing all operations, including offices of legal
counsel, legislative affairs, communications, media, budgeting and planning, policy and
initiatives, boards and commissions, correspondence and constituent relations,
administration, and personnel.  Key liaison to Colorado's Congressional Delegation and
staff, the National Governors Association and diverse stakeholders, including business
and myriad community organizations throughout the state.  Coordinate activities with Lt.
Governor and First Lady.  Oversaw transition team from previous Administration,
including recruitment and selection of Cabinet members and senior staff.

**James F. Carpenter**
Page two

## U.S. Senator Ken Salazar
*State Director, December, 2004 to November, 2006.*
Served as senior Colorado based advisor to Senator Salazar.  Led staff of 18 in Denver and 8 regional offices across Colorado.  Represented Senator at events and in front of constituent groups.  Key liaison with Washington, D.C. staff, and with diverse stakeholders throughout the state.  Developed and implemented regional plans.

*Campaign Manager, Salazar for US Senate, March to November, 2004*
Recurited to manage U.S. Senate campaign.  Led team of consultants and staff in all aspects of a high profile, national campaign, including strategy development, paid and earned media, polling, research, field operations, administration and fundraising.  Oversaw campaign budget of nearly $10 million, all raised and spent in about 8 months.  Salazar was the only Democrat to win an open seat in a so-called "red state" and became one of only two newly elected Democrats in the U.S. Senate (the other: Barack Obama).

## National Jewish Medical and Research Center (now National Jewish Health)
*Director of Public Affairs, October, 1999 to March, 2004*
Oversaw all media, public, government and community relations activities, and in-house graphic design and publications production studio.  Responsible for enhancing National Jewish's visibility and reputation among the media and community as a whole, and for developing and implementing communication efforts to complement overall strategic plans, marketing goals and development activities.  Served on 10-member Senior Executive Management Committee, and the Ethics Committee.  Managed professional staff of seven and $1.5 million annual budget.

## Gonzales Consulting Services
*Director, GCS Public Strategies, January to October, 2009*
Provided corporate communications, and public, media and government relations services to help clients meet their goals in the public arena.

## Colorado Governor Roy Romer
*Chief of Staff, August, 1998 to January, 1999*
Directed all operations of Governor's office, including personnel, budget and project management.  Coordinated activities with Members of the Cabinet.  Managed transition process to new governor.
*Director of Communications and Press Secretary, January, 1995 to August, 1998*
Directed media relations and served as chief spokesman for Governor Roy Romer.  Oversaw Governor's office communications with public, including press and public events, speeches, correspondence, press releases, and opinion pieces.

**James F. Carpenter**
Page three

## Public Affairs Consultant
***January, 1993 to January, 1995***
Managed grassroots campaigns and other public affairs projects for various corporate, non-profit and political clients, including acting as communications director and media spokesman for the 1994 re-election campaign of Governor Roy Romer.

## U.S. Senator Timothy E. Wirth
***Deputy State Director / Campaign Manager, October, 1988 to January, 1993***
As Deputy State Director, oversaw Colorado press and communications, scheduling, community relations and political activities.  As campaign manager, directed staff and planning for U.S. Senate re-election effort (Wirth ultimately did not seek re-election).

## National Strategies
***Administrator/Associate, January, 1987 to September, 1988***
Served as Administrator and Associate for a public affairs consulting firm in Washington, DC, representing corporate, non-profit and political clients and organizations.

## U.S. Representative Timothy E. Wirth
***Staff Member, 1978-1986***
Held various positions with increasing levels of responsibility, both in Washington, DC, and Colorado, including legislative assistant in the U.S. House of Representatives, and Operations Director for Wirth's successful 1986 U.S. Senate campaign.

## <u>Education</u>
B.A., Political Science, University of Colorado, Boulder, 1985.
Attended Georgetown University, Washington, DC, 1978-1981.

## <u>Selected Affiliations, Activities and Accomplishments</u>

Colorado Supreme Court Nominating Commission, Gubernatorial Appointee, 2013-2019
Bright By Three, Member of the Board of Directors, Past Board Chair
Colorado Non-Profit Association Leadership Advisory Council
Denver Metro Chamber of Commerce Leadership Exchange Trip, 2008
Denver Post "Colorado Voices" Columnist, 2002
Member, 18th Judicial District Nominating Commission, 1998 to 2004
Democratic National Convention Host Committee Executive Committee, 2007 to 2008
Member, Public Relations Society of America and of Colorado, 2000 to 2004
Member, Colorado Healthcare Communicators, 2000 to 2004
Member, Who's Who in North America and Who's Who in the West
Member, Board of Directors of the Colorado Tobacco Education and Prevention
Alliance, 2001 to 2004.  Treasurer, 2003
Member, Mile High United Way Leadership Development Committee, 2002 to 2004
Participant, Aspen Institute Executive Seminar, 1996

# STATE OF COLORADO

APPLICATION − **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

OFFICE USE ONLY

DB _____

SLOT _____

*Please be adviced that applications will not be processed if unsigned or resume is not attached and a board or commision is not specified*

BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING: (Only one per application, your application will not be processed if left blank.)

**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Sooter, Mary (Mindy) Virginia | County<br>Boulder | Cong. District<br>2 | Senate District<br>18 | House District<br>13 |
|---|---|---|---|---|
| Home Address<br>███████ | City<br>Boulder | State<br>Colorado | Zip Code 80305 | |
| Mailing Address | City | State<br>Colorado | Zip Code | |

| Date of Birth<br>████ 1967 | | Gender<br>Female | Registered Voter? Yes<br>Party Affliation? Democrat | Ethnicity<br>Caucasian |
|---|---|---|---|---|

| Present Employer/Title<br>Wilmer Cutler Pickering Hale and Dorr/Partner | Business Phone #<br>(720) 274-3164 | Home Phone #<br>████████ |
|---|---|---|
| | Cell Phone #<br>██████ | E-mail<br>██████████ |
| Business Address<br>1225 17th St., Ste 2600 | City<br>Denver | State<br>Colorado | Zip Code<br>80202 |

## EDUCATION AND GENERAL QUALIFICATIONS

| LEVEL | NAME OF SCHOOL | LOCATION | No. Years Attended | Did You Graduate? | Major Course of Study |
|---|---|---|---|---|---|
| **High School** | Smithsburg High School | Smithsburg, MD | | 1985 | |
| **College** | Texas A&M University | College Station, TX | | 1990 | Electrical Engineering |
| | | | | | |
| **Graduate Studies -or- Trade/Business/ Correspondence** | University of Colorado | Boulder, CO | | 1999 | Telecommunications |
| | University of Colorado | Boulder, CO | | 2003 | Law |
| **Memberships in Organizations And Offices Held(Indicate if** | Partner-in-Charge of WilmerHale's Denver Office<br>Former chair of the IP Section of the Colorado Bar Association<br>Former chair of the board of Impact on Education | | | | |

## REFERENCES (List three persons, not related to you, who you have known for at least one year.)

| NAME | RELATIONSHIP | PHONE # |
|---|---|---|
| Ken Salazar | Law Partner | ██████ |
| Phil Weiser | Mentor | ██████ |
| Jacki Cooper Melmed | Classmate | ██████ |

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?* (On Pg. 2 if applicable)

*If appointed, you are expected to attend fully to the duties of the position. How much time are you capable of committing*?:Part Time

*Please explain why you wish to serve on a board or commission.* (On Next Page)

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.

SIGNATURE: Mary (Mindy) Virginia Sooter    DATE: 6/23/2021 12:00:00 AM

# STATE OF COLORADO

APPLICATION – **2020**
BOARDS AND COMMISSIONS
OFFICE OF GOVERNOR  Jared S. Polis
**Please attach a resume and fill ALL fields.**

FOR OFFICE USE ONLY

DB _____

SLOT _____

*Please be advised that applications will not be processed if unsigned or resume is not attached and a board or commission is not specified.*

**BOARD OR COMMISSION FOR WHICH YOU ARE APPLYING**: (Only <u>one</u> per application, your application will not be processed if left blank.)
**Judicial Discipline, Commission on**

| Name (Last, First Middle)<br>Sooter, Mary (Mindy) Virginia | County<br>Boulder | Cong. District<br>2 | Senate District<br>18 | House District<br>13 |
|---|---|---|---|---|

*Please explain why you wish to serve on a board or commission.*

Two reasons.  First, I would like to dedicate some of my time to public service, and this is a perfect opportunity to give back to the state of Colorado and the community in a way that fits well with my skills and my passion.  Second, above all else in our legal system, I value the reputation of our judiciary.  It must be unbiased, ethical, and moral, both in perception and reality.  This requires a judiciary with the appropriate work ethic, demeanor, and temperament, as well as strong moral and ethical values.  While the vast majority of judges are upstanding and well-meaning, issues inevitably occur, and since the judicial system is fragile, I would be honored to help protect it.

I very much look forward to

*Have you ever been a party to or the subject of or otherwise involved in any legal proceeding that might adversely affect your qualifications to serve on this board or commission? Is there anything in your background that might be an embarrassment to the Governor or you if it were to become public?*

No

*I certify that the facts contained in this application are true and correct to the best of my knowledge. I authorize investigation of all statements contained herein and the references listed above to obtain any and all pertinent information, personal and otherwise. I further authorize the Office of the Governor to conduct a criminal background check, including requesting a criminal history from the Colorado Bureau of Investigation. I release all parties for all liability for any damage that may result from furnishing such information.*
*I understand that the Colorado Open Records Act may require that certain information contained in this application be available for inspection by the general public.*

**SIGNATURE**: Mary (Mindy) Virginia Sooter       **DATE:** 6/23/2021 12:00:00 AM





# *Mary (Mindy) V. Sooter*

**PARTNER**
Partner-in-Charge, Denver Office

DENVER

Mindy Sooter is a trial lawyer focusing on patent, trade secret, and other high-stakes commercial litigation. Ms. Sooter represents large clients, such as those in the medical device, telecommunications and technology sectors, as well as emerging businesses, in a variety of jurisdictions across the country. She has led and co-led many cases to verdict in federal and state courts across the country, and argues post-grant proceedings at the Patent Trial and Appeal Board. With a background in engineering, Ms. Sooter focuses on cases involving telecommunications, electrical engineering, computer science and medical devices. Ms. Sooter also focuses on bringing highly technical subject matter to a jury in an accessible and persuasive manner.

Before law school, Ms. Sooter worked for a large management consulting firm, and then led the engineering group at a startup software company.

## *Professional Activities*

Ms. Sooter is an adjunct professor teaching patent litigation at the University of Colorado School of Law.

## *Solutions*

Litigation                    Intellectual Property Litigation      Trials

## *Experience*

- In recent years, Ms. Sooter's work has prevailed in or successfully resolved numerous cases, including:
  - Led the litigation and successful settlement of a high-stakes trade secret case on behalf of two companies and an individual pending in the District of Colorado.
  - Obtained a dismissal of a trademark case on behalf of a multinational banking company, pending in the District of Colorado.
  - Obtained a dismissal of a patent infringement suit pending in the Western District of Wisconsin on behalf of Medical device company, based on improper venue.
  - Achieving a victory for Akamai Technologies, Inc. when the Delaware Supreme Court affirmed the dismissal of a lawsuit brought by Limelight Networks, Inc., a competitor, asserting breach of a settlement agreement between the parties.
  - Serving as co-lead counsel for Comcast Cable Communications in a ten-patent infringement matter in the Northern District of California involving interactive television patents, which resulted in granting summary judgment of non-infringement in favor of our client.
  - Successfully obtaining dismissal and an award of attorneys' fees of more than $425,000 in a patent case involving optical network design and components.
  - Successfully obtaining a $12 million jury verdict after a jury found that a competitor had engaged in willful patent infringement, willful trade dress infringement and intentional false advertising.
  - Successfully obtaining a summary judgment of non-infringement, and subsequent affirmance by the Federal Circuit, in a patent case involving more than 100 asserted claims and two patents relating to multidimensional database technology.
  - Successfully obtaining dismissal on behalf of a software company in a multi-jurisdictional case involving mapping software.
  - Successfully obtaining a dismissal on behalf of a medical corporation in a case involving the technical performance of distributed computer systems.
  - Successfully obtaining a summary judgment and complete dismissal of a $20 million licensing claim on behalf of a healthcare diagnostics company.

## *Recognition*

- Recognized in the 2021 edition of *Chambers USA: America's Leading Lawyers for Business* as a top intellectual property lawyer in Colorado
- Recognized by the University of Colorado Law School as a Distinguished Alumni for her contributions to the legal profession, service to her community and dedication to the school
- Recognized by *Law Week Colorado* as a Top Women Attorney in 2017 and 2020

and named to its 2018 Top Litigators list

- Recognized as the Outstanding Intellectual Property Litigator in Colorado by *Managing IP* in 2018 and 2019

- Recognized by *Colorado Super Lawyers* for intellectual property litigation in 2016, 2019–2021

- Named among the Top 250 Women in IP and a 2018–2020 IP Star by *Managing IP*, a guidebook that identifies leading IP lawyers in the United States

- Selected by peers for inclusion in the 2019–2021 editions of the *Best Lawyers in America*

- Recognized in the 2014–2020 editions of *IAM Patent 1000: The World's Leading Patent Practitioners*

- Named 2014 IP Supporter of the Year by the Silicon Flatirons Center at the University of Colorado Law School

- Named a "Rising Star" by *Colorado Super Lawyers* in 2012

- Selected as an "Up and Coming Lawyer" in 2008 by *Law Week Colorado*

---

## Credentials

### EDUCATION

JD, University of Colorado Law School, 2003

*Editor, Law Review, Order of the Coif, top grades of any 3L*

ME, Telecommunications, University of Colorado at Boulder, 1999

BS, Electrical Engineering, Texas A&M University, 1990

*magna cum laude*

*Phi Kappa Phi, Tau Beta Pi, Eta Kappa Nu*

### ADMISSIONS

Colorado

United States Patent and Trademark Office

### CLERKSHIPS

The Hon. Ferdinand F. Fernandez, US Court of Appeals for the Ninth Circuit, 2004 - 2005

The Hon. Mary J. Mullarkey, Colorado Supreme Court, 2003 - 2004

Wilmer Cutler Pickering Hale and Dorr LLP is a Delaware limited liability partnership. WilmerHale principal law offices: 60 State Street, Boston, Massachusetts 02109, +1 617 526 6000; 1875 Pennsylvania Avenue, NW, Washington, DC 20006, +1 202 663 6000. Our United Kingdom office is operated under a separate Delaware limited liability partnership of solicitors and registered foreign lawyers authorized and regulated by the Solicitors Regulation Authority (SRA No. 287488). Our professional rules can be found at www.sra.org.uk/solicitors/code-of-conduct.page. A list of partners and their professional qualifications is available for inspection at our UK office. In Beijing, we are registered to operate as a Foreign Law Firm Representative Office. This material is for general informational purposes only and does not represent our advice as to any particular set of facts; nor does it represent any undertaking to keep recipients advised of all legal developments. Prior results do not guarantee a similar outcome. © 2004-2021 Wilmer Cutler Pickering Hale and Dorr LLP



July 1, 2021

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of
Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the
following:

<div align="center">

MEMBER OF THE
COLORADO COMMISSION ON JUDICIAL DISCIPLINE

</div>

effective July 1, 2021 for a term expiring June 30, 2025:

James Carpenter of Englewood, Colorado, to serve as a non-attorney, reappointed;

Mindy Scooter of Boulder, Colorado to serve as an attorney, appointed.

Sincerely,

Jared Polis
Governor



COMMISSION ON JUDICIAL DISCIPLINE

10 Members (6 appointed by Governor)
2 Attorneys, 4 Non-attorneys
4 Year Terms
SENATE CONFIRMATION

|  | Appointed | Confirmed | Term Expires |
|---|---|---|---|
| **Attorney Members** | | | |
| Elizabeth Espinosa Krupa, Evergreen<br> repl. Alvarez, reappt. | 06-20-19 | 02-03-20 | 06-30-23 |
| Mary (Mindy) Scooter, Boulder<br> repl. Gregory, appt. | 07-01-21 | | 06-30-25 |
| **Non-Attorneys** | | | |
| Yolanda Regina Lyons, Colo. Spgs.<br> reappt. | 06-20-19 | 02-03-20 | 06-30-23 |
| Bruce Casias, Lakewood<br> repl. Kenney, reappt. | 06-20-19 | 02-03-20 | 06-30-23 |
| Drucilla Pugh, Pueblo<br> repl. Negrete-Winn, reappt. | 06-20-19 | 02-03-20 | 06-30-23 |
| James Carpenter, Englewood<br> repl. Bolling, reappt. | 07-01-21 | | 06-30-25 |

C.R.S. 24-72-401                                        Updated:  07-01-21

William J. Campbell, Exec. Director
1300 Broadway, Ste. 210
303.457.5134
w.campbell@jd.state.co.us

June 25, 2021

To the Honorable
Colorado Senate
Colorado General Assembly
State Capitol Building
Denver, CO  80203

Ladies and Gentlemen:

Pursuant to the powers conferred upon me by the Constitution and Laws of the State of Colorado, I have the honor to designate, appoint, reappoint, and submit to your consideration, the following:

MEMBER OF THE
COLORADO COMMISSION ON JUDICIAL DISCIPLINE

effective July 1, 2021 for a term expiring June 30, 2025:

James Carpenter of Englewood, Colorado, to serve as a non-attorney, reappointed;

Mindy Scooter of Boulder, Colorado to serve as an attorney, appointed.

Sincerely,

Jared Polis
Governor

# Appendix 30

# Correspondence re: P.A.I.R.R. 2 (Public Records) Requests to and Responses from the Colo. Jud. Dep't.



## Records Request

2 messages

Mon, Sep 9, 2024 at 3:49 PM

To: brian.boatright@judicial.state.co.us
Cc: terri.morrison@judicial.state.co.us

Dear Justice Boatright,

Attached, please find a request under P.A.I.R.R. 2 for administrative records that should be in your custody and control. Please respond as requested, including with an explanation of any refusal to waive confidentiality as otherwise allowed by Colo. RJD 6.5(d)(9).

Sincerely,

Enclosure (1)

Cc: Terri Morrison, esq.

📄 **001 240711 PAIRR2 Rqst BDB Corresp re Maes RFE.pdf**
223K

---

**Mailtrack Reminder** <reminders@mailtrack.io>                    Thu, Sep 12, 2024 at 3:49 PM
Reply-To: brian.boatright@judicial.state.co.us, terri.morrison@judicial.state.co.us

You've not received a reply yet.  Snooze for <u>24H</u>, <u>48H</u> or <u>72H</u>

Date: 9/9/24

**P.A.I.R.R.2 Request # 1**

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. The December 2023 Colo. RJD 14(a) notice sent to Chief Justice Brian Boatright in connection with a published request for evaluation of judicial conduct submitted by former 10th District Court Chief Judge Dennis Maes;
2. Chief Justice Boatright's January 2024 response to the Colo. RJD 14(a) notice; and
3. The Colorado Commission on Judicial Discipline's June 2024 letter dismissing the complaint against Chief Justice Boatright with "an expression of concern."

If this request is denied as relating to records deemed confidential according to Colo. Const. Art. VI, § 23(3)(g), I request that Justice Boatright confirm in writing that he is refusing to waive confidentiality as allowed by Colo. RJD 6.5(d)(9) and the reasons for his refusal.

Signature:                                                                                    Date: 9/9/24



---

## PAIRR 2 Request #1 dated 9/9/24 - response

1 message

---

**márquez, monica** <monica.marquez@judicial.state.co.us>          Thu, Sep 12, 2024 at 8:50 AM
To:
Cc: "morrison, terri" <terri.morrison@judicial.state.co.us>

:

As the custodian of records pursuant to P.A.I.R.R. 2, §1(c)(1) for the Colorado State Courts which necessarily includes the Supreme Court, I'm writing to you in response to your P.A.I.R.R. 2 request #1 submitted on September 9, 2024.

The Colorado Supreme Court does not have any administrative records that are responsive to your request.

Sincerely,

**Chief Justice Monica M. Márquez** (she/her)

Colorado Supreme Court

2 East 14th Ave.

Denver, CO 80203

(720) 625-5450

monica.marquez@judicial.state.co.us

Website: www.coloradojudicial.gov



**Email Delivery Certificate generated by Mailsuite**

| | |
|---|---|
| **From** | |
| **Subject** | Records Request |
| **Message ID** | <CAG9LdbYVGxofJW14XLnB1+qKmm4eKbjo6zerFdAMYNpmUiTGLg@mail.gmail.com> |
| **Delivered on** | 9 Sep, 2024 at 5:49 PM |
| **Delivered to** | <brian.boatright@judicial.state.co.us>, <terri.morrison@judicial.state.co.us> |

**Tracking history**

👁 **Opened** on 1 Oct, 2024 at 1:02 AM by one of the recipients

👁 **Opened** on 1 Oct, 2024 at 12:58 AM by one of the recipients

👁 **Opened** on 1 Oct, 2024 at 12:57 AM by one of the recipients

👁 **Opened** on 1 Oct, 2024 at 12:51 AM by one of the recipients

👁 **Opened** on 1 Oct, 2024 at 12:51 AM by one of the recipients

👁 **Opened** on 24 Sep, 2024 at 11:46 AM by one of the recipients

👁 **Opened** on 20 Sep, 2024 at 10:28 AM by one of the recipients

👁 **Opened** on 20 Sep, 2024 at 10:27 AM by one of the recipients

👁 **Opened** on 19 Sep, 2024 at 3:54 PM by one of the recipients

👁 **Opened** on 18 Sep, 2024 at 12:31 PM by one of the recipients

👁 **Opened** on 13 Sep, 2024 at 12:01 PM by one of the recipients

👁 **Opened** on 13 Sep, 2024 at 11:54 AM by one of the recipients

👁 **Opened** on 13 Sep, 2024 at 11:54 AM by one of the recipients

👁 **Opened** on 12 Sep, 2024 at 4:35 PM by one of the recipients

👁 **Opened** on 12 Sep, 2024 at 3:23 PM by one of the recipients

👁 **Opened** on 12 Sep, 2024 at 10:44 AM by one of the recipients

👁 **Opened** on 12 Sep, 2024 at 10:21 AM by one of the recipients

👁 **Opened** on 12 Sep, 2024 at 10:20 AM by one of the recipients

👁 **Opened** on 12 Sep, 2024 at 10:20 AM by one of the recipients



2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

**Email Delivery Certificate generated by Mailsuite**

👁 **Opened** on 11 Sep, 2024 at 10:37 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 9:22 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 8:49 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 8:38 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 8:38 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 7:38 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 7:36 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 6:31 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 5:37 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 4:20 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 4:15 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 4:15 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 4:14 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 4:14 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 4:09 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 4:09 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 3:14 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 3:13 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 3:13 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 3:07 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 3:07 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 3:06 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 2:59 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 2:59 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 2:59 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 2:40 PM by one of the recipients



2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

**Email Delivery Certificate generated by Mailsuite**

👁 **Opened** on 11 Sep, 2024 at 2:34 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 2:33 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 2:33 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 2:30 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 2:28 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 2:16 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 2:15 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 1:12 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 1:12 PM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 11:48 AM by one of the recipients

👁 **Opened** on 11 Sep, 2024 at 11:40 AM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 9:45 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:27 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:23 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:16 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:13 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:05 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:02 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:02 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:01 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:00 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:00 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:00 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:00 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 7:00 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 6:14 PM by one of the recipients



2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

**Email Delivery Certificate generated by Mailsuite**

👁 **Opened** on 10 Sep, 2024 at 6:13 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 6:12 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 6:12 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 6:12 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 6:11 PM by one of the recipients

👁 **Opened** on 10 Sep, 2024 at 5:10 PM by one of the recipients

👁 **Opened** on 9 Sep, 2024 at 8:04 PM by one of the recipients

👁 **Opened** on 9 Sep, 2024 at 6:57 PM by one of the recipients

👁 **Opened** on 9 Sep, 2024 at 6:41 PM by one of the recipients

👁 **Opened** on 9 Sep, 2024 at 6:38 PM by one of the recipients

👁 **Opened** on 9 Sep, 2024 at 6:32 PM by one of the recipients

👁 **Opened** on 9 Sep, 2024 at 6:25 PM by one of the recipients

👁 **Opened** on 9 Sep, 2024 at 6:22 PM by one of the recipients

👁 **Opened** on 9 Sep, 2024 at 6:22 PM by one of the recipients

👁 **Opened** on 9 Sep, 2024 at 6:14 PM by one of the recipients

mailsuite

2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España



# Records Request

16 messages

Mon, Sep 9, 2024 at 3:49 PM

To: terri.morrison@judicial.state.co.us

Ms. Terri Morrison, Chief Legal Counsel

Colorado State Court Administrator's Office

1300 Broadway, Ste. 1200

Denver, CO 80203


Dear Ms. Morrison,


Attached to this email, please find (20) separate requests for public records according to P.A.I.R.R. 2.  An additional separate request is submitted directly to Justice Brian Boatright and copied to you.  That request seeks administrative records that would be within Justice Boatright's personal custody or which were received by him while he was still serving as the Chief Justice and the recognized custodian of records according to P.A.I.R.R. 2 § (1)(c)(1).


If you are not the designated custodian of records for any request(s), please re-direct that/those request(s) to the correct person.  P.A.I.R.R. 2 § (1)(c).  For the logistics of processing the attached requests, I respectfully ask that you treat each request as separate and stand alone.  This is consistent with the Judicial Department's self-acknowledged expectation that: "The custodian must take reasonable measures to locate any specific administrative record sought and to ensure public access to the administrative record without unreasonable delay or unreasonable cost." P.A.I.R.R. 2 § 2(b).  The deadlines for each respective response should be followed as set forth in P.A.I.R.R. 2 § 4(b).


If the scope of any of these requests can be further refined to reduce the resources necessary to respond, please do not hesitate to contact me with any questions or suggestions that you might have.  Thank you for your assistance in processing these requests as provided through PA.I.R.R. 2.


Sincerely,


Enclosures (20)

**20 attachments**

**002 240711 PAIRR2 Rqst CSC COI & Disqual.pdf**
184K

**004 240711 PAIRR2 Rqst Ryan C&D Ltr.pdf**
203K

**005 240713 PAIRR2 Rqst 3-3-24 DG Art re Woods.pdf**
221K

**006 240713 PAIRR2 Rqst Comm & Listening Sessions.pdf**
218K

**003 240711 PAIRR2 Rqst Gabriel NDA.pdf**
201K

**007 240713 PAIRR2 Rqst Cost of WCI.pdf**
201K

**009 240715 PAIRR2 Rqst 2018 OSA Audit Mang Rep Ltr.pdf**
201K

**010 240722 PAIRR2 Rqst re Org Ombuds Budget Rqst.pdf**
201K

**008 240713 PAIRR2 Rqst Gleason CLE.pdf**
201K

**011 240723 PAIRR2 Rqst JES Salary Calc.pdf**
201K

**012 240729 PAIRR2 Rqst CJD-CCJD MOU.pdf**
202K

**014 240815 PAIRR2 Rqst Recds re 230206 JY Ltr.pdf**
204K

**013 240815 PAIRR2 Rqst MM Ltr Amend CRCP 227.pdf**
202K

**016 240819 PAIRR2 Rqst EEK Recusal & RJD 3.5.pdf**
189K

**015 240815 PAIRR2 Rqst Recds re PL Pros.pdf**
202K

**017 240819 PAIRR2 Rqst Emls re 210204 & 210208 Pub Stmts & WilmerHale.pdf**
205K

**018 240824 PAIRR2 Rqst Leg Comm HCR 23-1001 HB1019 HB 23-1205.pdf**
183K

**021 240904 PAIRR2 Rqst OSA Transcripts.pdf**
247K

Date: 9/9/24

*P.A.I.R.R.2 Request # 2*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. Letters from the Colorado Commission on Judicial Discipline to the individual Justices of the Colorado Supreme Court on June 13, 2022 or thereafter that advised the Justices of conflicts of interest and requested their disqualification.  These letters were reported on in the press.  David Migoya, *Discipline Commission told Supreme Court Justices They Had Conflict of Interest in Investigation and Should Recuse; They Haven't*, DENVER GAZETTE, October 8, 2022;
2. Any communications about these letters or expressed impressions by the Justices, including responsive letters sent by Chief Justice Brian Boatright and State Court Administrator Steven Vasconcellos on or abut June 16, 2022 or thereafter;
3. All correspondence and communications between the Justices and the Commission regarding conferral, public comment, promulgation, and adoption of Colo. RJD 41, including any subsequent requests to conform Colo. RJD 41 to HCR 23-1001;
4. Copies of written public comments submitted as part of the promulgation of Colo. RJD 41;
5. Communications between the Justices, Department Lobbyist Terry Scanlon, State Court Administrator Steven Vasconcellos, and/or Colorado Supreme Court Staff and outside organizations (i.e. the National Center for State Courts, the Colorado Judicial Institute, the Colorado Bar Association, the American Bar Association, and the Institute for the Advancement of the American Legal System) as such communications relate to promulgation, public notice and comment, and adoption of Colo. RJD 41; and
6. Drafting notes and other internal documents generated by the Colorado Supreme Court as part of its promulgation and adoption of Colo. RJD 41.

If this request is denied in part as relating to records deemed confidential according to Colo. Const. Art. VI, § 23(3)(g), please confirm that the Justices are individually refusing to waive confidentiality as allowed by Colo. RJD 6.5(d)(9) and the reasons for their individual refusals.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4.  To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01.  Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person.  PAIRR2 § 1(c).

Signature: _____    Date: 9/9/24

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 3*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. The (approximately 2013 or 2014) separation agreement with a general release and non-disclosure provision between the Judicial Department and then-Court of Appeals Judge Richard Gabriel's female law clerk.  This separation agreement is generally referenced in Investigations Law Group, LLC's Report at pp. 21-26.
2. Documentation related to the Judicial Department's approval/authorization of the law clerk's separation agreement; and
3. An accounting of public funds spent as part of the separation agreement.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4.  To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01.  Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                              Date: <u>9/9/24</u>

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 4*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. Communications including SCAO employees, Counsel to the Chief Justice Andrew Rottman, and/or the Justices of the Colorado Supreme Court with regard to PAIRR2 requests received from either *The Denver Post* or *The Denver Gazette* in December 2020-February 2021;
2. Communications including SCAO employees, Counsel to the Chief Justice Andrew Rottman, and/or the Justices of the Colorado Supreme Court reacting to former State Court Administrator Christopher Ryan providing interviews to *The Denver Post* during the same time period; and
3. Communications and documentation related to the drafting and authorization of a cease-and-desist letter (with a copy of the letter itself) sent to Ryan on or about December 30-31, 2020.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4.  To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01.  Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                                               Date: 9/9/24

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 5*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the
following:

1. On March 3, 2024, *The Denver Gazette* published an article reporting that Chief Justice
   Boatright, Denver Juvenile Court Judge Laurie Clark, and former Court of Appeals Judge
   Karen Ashby were aware of a judicial employee/courthouse manager raising concerns
   about then-Presiding Denver Juvenile Court Judge D. Brett Woods's habitually
   intemperate alcohol use (including at the workplace and as part of work-related
   functions) and the employee then being retaliated (fired) for reporting their concerns.
   David Migoya, *Top Judges Ignored Colleague's Drinking*, DENVER GAZETTE, March 3,
   2024.  Please provide all documentation and communications related to any of the
   Justices', Counsel to the Chief Justice Andrew Rottman's, or SCAO employees' reactions
   to the *Gazette* article, including public / non-public comments made by Chief Justice
   Boatright and State Court Administrator Steven Vasconcellos;
2. Any communications with/from Chief Justice Boatright, Judge Clark, and/or former
   Judge Ashby that confirm their respective contemporaneous awareness of Judge Woods'
   intemperance and/or retaliation against the employee;
3. The termination notice provided to the employee who was retaliated against for reporting
   Judge Woods' unfitness;
4. The separation agreement (including any general waiver and non-disclosure provisions)
   with the employee and records of the agreement's negotiation;
5. Records of public funds paid as part of the separation agreement;
6. Any documentation of relevant Judicial Department records (in the custody of SCAO or
   the Denver Juvenile Court) being withheld from / not reported to the Colorado
   Commission on Judicial Discipline;
7. Any correspondence/communications between the Commission and Chief Justice
   Boatright, any of the other Justices, former Judge Ashby, and/or Judge Clark as to
   suspected violation of their duties under Canon Rules 2.15 and 2.16 to self-report and to
   report the judicial misconduct / judicial disability of others; and
8. Communications between the Commission, the Colorado Supreme Court / SCAO, and/or
   former Judge Woods relating to either pending or concluded judicial disciplinary
   proceedings as to Judge Woods.

If this request is denied in part as relating to records deemed confidential according to Colo.
Const. Art. VI, § 23(3)(g), please confirm that Chief Justice Boatright, Judge Clark, former Judge

Woods, and/or former Judge Ashby are individually refusing to waive confidentiality as allowed by Colo. RJD 6.5(d)(9) and the reasons for their individual refusals.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4.  To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01. Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                                      Date: 9/9/24

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 6*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. Communications or documentation related to the formation of a "Steering Committee" and working groups for the Colorado Courts Workplace Culture Initiative (including the appointment orders/documentation for the members of the Committee and its working groups and the authorization of public funds for the Committee and the broader Initiative);

2. In its description of "listening sessions," the Court states:

> In October-November 2022, Justice Márquez and Chief Judge Román also hosted a series of listening sessions with the diverse bar associations about the Troyer and ILG Reports and the Supreme Court's Workplace Culture Initiative. These sessions included meetings with the Asian Pacific American Bar Association (APABA), the Colorado Disability Bar Association (CDBA), the Colorado Hispanic Bar Association (CHBA), the Colorado Women's Bar Association (CWBA), the Colorado LGBT Bar Association, the South Asian Bar Association (SABA), and the Sam Cary Bar Association (SCBA). Justice Márquez also presented on these topics at the CWBA Legislative Breakfast.

   Please provide copies of Justice Márquez and Chief Judge Román's presentations, presentation notes, and/or recordings from these "listening sessions";

3. Copies of or access to "learning modules" developed through the Workplace Culture Initiative to train judges and judicial employees as to the Judicial Department's anti-harassment, anti-retaliation, and mandatory judicial misconduct reporting policies;

4. Justice Márquez and Chief Justice Boatright have described the "listening sessions" as typically including a Colorado Supreme Court Justice accompanied by a Colorado Court of Appeals Judge. Please provide an inventory of the "listening sessions" that occurred, when they occurred, and which Justice and/or Court of Appeals Judge were involved in specific courthouse site visits;

5. Copies of presentations, presentation notes, and/or recordings from the "listening sessions" that occurred as part of courthouse site visits throughout the State;

6. Copies of presentations, presentation notes, and/or recordings from the Judicial Department's 2021-2023 annual judicial conferences in which the merits of the Masias

Controversy, the Office of the State Auditor's findings, the Troyer-Mitchell Report, the ILG Report, and/or the Workplace Culture Initiative were discussed;

7. Copies of presentations, presentation notes, and/or recordings of the Judicial Department's 2021-2023 new judges' trainings; and

8. Copies of the agendas for the 2021-2024 the Colorado Judicial Department's annual judicial conferences.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4. To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01. Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person. PAIRR2 § 1(c).

Signature:                                                                                    Date: <u>9/9/24</u>

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 7*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. A full accounting of public funds expended (through mileage reimbursement, travel costs, production costs, or any other direct costs) on the Colorado Supreme Court's Workplace Culture Initiative and "Listening Tours."

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4. To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01. Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person. PAIRR2 § 1(c).

Signature:                                                                                    Date: 9/9/24

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 8*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1.  As part of his testimony to the Senate Judiciary Committee on April 14, 2022, Chief Justice Boatright stated:

    > I will say, quite honestly, we had a training recently, and there was a lawyer who works in this area. And I think he scared everybody to death about nothing, I don't think there's been any bad acts by judicial discipline. This isn't intended as a criticism at all, but people . . . I mean, there's a psychological impact if you just send somebody's name to judicial discipline, and that is a scary proposition, you could lose your career.

    Please identify the lawyer who presented the referenced training and who (specifically which Justices and/or other judges) attended the training.
2.  Please provide copies of the referenced presentation, presentation notes, and/or the recorded presentation.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4. To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01. Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person. PAIRR2 § 1(c).

Signature:                                                                 Date: <u>9/9/24</u>

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 9*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the
following:

1.  A copy of the fully executed December 2018 single statewide audit management
    representation letter from the Colorado Judicial Department to the Colorado Office of the
    State Auditor referenced in *Matter of Coats*, 2023 CO 44, ¶ 4(11).

This request is made according to PAIRR2 with the 3-business day timeframe for an initial
response provided through PAIRR2 § 4.  To the extent that you, as custodian of records,
characterize any of the records requested as "court records" rather than "administrative records,"
any such records should be processed / produced according to PAIRR1 and CJD 05-01.
Likewise, if you are not the custodian of any of these records, this request should be re-directed /
copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                    Date: 9/9/24

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 10*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. A copy of the Judicial Department's supplemental 2023 budget request seeking funding for an internal "Office of People and Culture" and an internal "Organizational Ombuds Office"; and
2. Correspondence/communications between the Justices of the Colorado Supreme Court, the Chief Justice's Counsel Andrew Rottman, and/or SCAO employees and the Colorado Legislature regarding the supplemental 2023 budget request.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4.  To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01.  Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                                    Date: 9/9/24

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 11*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. A calculation and full accounting of the salary and benefits paid to former 18th Judicial District Court Judge John E. Scipione from his suspension from judicial duties by the Colorado Supreme Court, effective August 3, 2022, until his actual separation from employment by the Colorado Judicial Department in January 2023.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4.  To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01. Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                              Date: 9/9/24

**Date: 9/09/24**

*P.A.I.R.R.2 Request # 12*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1.  A copy of the 2010 Memorandum of Understanding for the exchange of information between the Colorado Judicial Department and the Colorado Commission on Judicial Discipline, as referenced by Chief Justice Brian Boatright during remarks to the Senate Judiciary Committee on April 14, 2022.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4.  To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01. Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                                    Date: 9/9/24

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 13*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the
following:

1. A copy of a letter sent by Justice Monica Márquez to the Colorado Commission on
   Judicial Discipline in November/December 2022 that announced the Colorado Supreme
   Court's amendment of C.R.C.P. 227 to remove the Commission as a recipient of
   funding/resources through attorney registration fees.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial
response provided through PAIRR2 § 4.  To the extent that you, as custodian of records,
characterize any of the records requested as "court records" rather than "administrative records,"
any such records should be processed / produced according to PAIRR1 and CJD 05-01.
Likewise, if you are not the custodian of any of these records, this request should be re-directed /
copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                                   Date: 9/9/24

**Date: 9/9/24**

***P.A.I.R.R.2 Request # 14***

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. Communications between one or more Justices of the Colorado Supreme Court, Andrew Rottman, and/or SCAO employees and Attorney Regulation Counsel (ARC) Jessica Yates regarding a February 6, 2023, disciplinary letter sent by Yates to Vice Chair David Prince, the judge and attorney members of the Colorado Commission on Judicial Discipline, and the Commission's Executive Director Christopher Gregory;
2. A copy of ARC Yates's February 6, 2023, letter and the Commission's response authored by appointed Special Assistant Attorney General (SAAG) David Kaplan;
3. Communications between any Justice of the Colorado Supreme Court, ARC Jessica Yates, Andrew Rottman, and/or SCAO employees (including lobbyist Terry Scanlon) and the Colorado Legislature regarding ARC Yates's February 6, 2023, and/or Kaplan's response.
4. Correspondence also dated February 6, 2023, from the Commission to Chief Justice Boatright requesting further discovery relating to *Matter of Coats*, 2023 CO 44; and
5. Records of any internal communications (amongst the Justices of the Colorado Supreme Court, Andrew Rottman, SCAO employees, OARC employees, members of the Legal Regulation Committee, and/or members of the Advisory Committee on the Practice of Law) and any communications with the Colorado Legislature responding to Yates's February 6, 2023 letter, SAAG Kaplan's response (which included allegations that Yates had violated criminal prohibitions in § 8-2.5-101(1.5), C.R.S.), or contemporaneous press reporting about either/both of the letters.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4.  To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01. Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                                           Date: <u>9/9/24</u>

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 15*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. All communications between the Office of Attorney Regulation Counsel (OARC) and the 4th Judicial District Attorney's Office related to the prosecution of Former Senate Judiciary Chair Pete Lee;
2. Any communications to/from any of the Justices of the Colorado Supreme Court that verify their awareness of the prosecution of Senator Lee (including OARC's communications with the 4th Judicial District Attorney's Office) and/or the ultimate dismissal of the charges against Senator Lee due to OARC having provided false information to law enforcement; and
3. Records from Senator Lee's criminal case that were communicated to OARC and/or the Justices of the Colorado Supreme Court including but not limited to Senator Lee's motion to dismiss the indictment (with accompanying affidavits from OARC) and 4th Judicial District Court Judge Eric Bentley's ultimate order granting the motion for dismissal.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4. To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01. Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person. PAIRR2 § 1(c).

Signature:                                                          Date: <u>9/9/24</u>

*Date: 9/9/24*

*P.A.I.R.R.2 Request # 16*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1.  *The Denver Gazette* reported on then-Chair of the Colorado Commission on Judicial Discipline, Elizabeth Espinosa Krupa recusing herself from proceedings in *Matter of Coats*, 2023 CO 44 because of her limited representation of someone involved in the Masias Controversy.  David Migoya, *Bill to Fund Independent Judicial Discipline Commission Heads to Polis, Chairwoman Recuses from Investigation*, DENVER GAZETTE, May 11, 2022.  With this context, provide communications (occurring approximately during the Fall of 2022) between any of the Justices of the Colorado Supreme Court, Andrew Rottman, SCAO employees, and/or attorneys within the Colorado Attorney General's Office with the Colorado Commission on Judicial Discipline regarding the reported basis for seeking then-Commission Chair Elizabeth Espinosa Krupa's recusal from proceedings in *Matter of Coats*, 2023 CO 44; and
2.  Internal and/or external communications that include any Justices of the Colorado Supreme Court, Andrew Rottman, SCAO employees, and/or the Colorado Attorney General's Office regarding the Court's adoption of Colo. RJD 3.5 on October 12, 2021 (Rule Change 2021-20), including any consultation that occurred/did not occur with the Commission on Judicial Discipline.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4.  To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01.  Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                                          Date: 9/9/24

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 17*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. Email chains from February 4, 2021, February 8, 2021, and February 16, 2021, between (but which are not limited to) Chief Justice Brian Boatright, Assistant AG LeeAnn Morrill, Assistant Solicitor General Grant Sullivan, Steven Vasconcellos, Andrew Rottman, and/or Terri Morrison regarding contemporaneous public statements to be made by the Colorado Supreme Court. Drafts of the February 8, 2021, public statement include reference to the Justices of the Colorado Supreme Court / the Judicial Departments intentions to enter a sole-source investigation contract with former U.S. Attorney John F. Walsh and his law firm WilmerHale; and
2. Communications between the Justices of the Colorado Supreme Court, Counsel to the Chief Justice Andrew Rottman, attorneys within the Colorado Attorney General's Office acting on the Justices' behalf, and/or SCAO employees with employees / partners at WilmerHale regarding the sole source contract contemplated on February 8, 2021 and/or WilmerHale's later bid in response to the Judicial Department's RFP process for similar "outside" investigations through a multi-agency selection panel. A search for these communications should include searching for emails that include the email domain "wilmerhale.com."

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4. To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01. Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person. PAIRR2 § 1(c).

Signature:                                                                                       Date: 9/9/24

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 18*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the
following:

> Records of communications and the drafting of communications (including but not
> limited to memoranda, emails, text messages, and internal/external correspondence)
> between the Justices of the Colorado Supreme Court, Counsel to the Chief Justice
> Andrew Rottman, employees of the State Court Administrator's Office (SCAO)
> (including but not limited to SCAO legislative liaison Terry Scanlon) and/or employees
> of the Court's Office of Attorney Regulation Counsel and with members and/or staff of
> the Colorado Legislature regarding House Concurrent Resolution 23-1001, House Bill
> 23-1019, and/or House Bill 23-1205.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial
response provided through PAIRR2 § 4.  To the extent that you, as custodian of records,
characterize any of the records requested as "court records" rather than "administrative records,"
any such records should be processed / produced according to PAIRR1 and CJD 05-01.
Likewise, if you are not the custodian of any of these records, this request should be re-directed /
copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                                      Date: 9/9/24

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 19*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. Records of communications and the drafting of communications (including but not limited to memoranda, emails, text messages, and internal/external correspondence) between the Justices of the Colorado Supreme Court, Counsel to the Chief Justice Andrew Rottman, employees of the State Court Administrator's Office (SCAO) (including but not limited to SCAO legislative liaison Terry Scanlon) and/or employees of the Court's Office of Attorney Regulation Counsel and with members and/or staff of the Colorado Legislature regarding Senate Bill 22-201; and
2. Specifically, records within the scope of this overall request that have already been produced to the press as referenced in the following newspaper articles:

   a. Shelly Bradbury, *After Judicial Scandal, Colorado Supreme Court Justices Privately Sought to Delay Reform Bill: Members of High Court Publicly Proclaimed Support for Reform, but Privately Raised Objections with Lawmakers*, DENVER POST, April 13, 2022; and
   b. David Migoya, *Justices Lobbying Against Judicial Discipline Bill*, DENVER GAZETTE, April 14, 2022.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4.  To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01.  Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                                    Date: 9/9/24

**Date: 9/9/24**

*P.A.I.R.R.2 Request # 20*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1.  Copies of the requests for proposals (RFPs) issued by the Colorado Judicial Department for the two "outside" investigations referenced in Chief Justice Brian Boatright's 2021 State of the Judiciary Address and a February 16, 2021 press release; and
2.  Copies of the contracts ultimately awarded through the RFPs to RCT, Ltd. and Investigations Law Group, LLC, including any subsequent amendments made to the contracts.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4.  To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01. Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person.  PAIRR2 § 1(c).

Signature:                                                                                    Date: 9/9/24

**Date: 9/9/24**

***P.A.I.R.R.2 Request # 21***

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. As referenced in his July 12, 2022 testimony to the Legislative Interim Committee on Judicial Discipline, attorney Robert Troyer described his investigation as including a review of deposition testimony compiled as part of the Colorado Office of the State Auditor's (OSA) fraud hotline investigation. Please provide the transcripts of these depositions generated through the OSA's fraud hotline investigation.

In submitting this request, I understand that the agency subject to a fraud hotline investigation controls the confidentiality of the OSA's working papers under § 2-3-110.5, C.R.S. or can otherwise disclose records in the agency's own possession. To the extent that the Judicial Department is asserting confidentiality as to these records, please provide a written explanation why Chief Justice Márquez (as the principal custodian of the Judicial Department's records is not waiving confidentiality).

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4. To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01. Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person. PAIRR2 § 1(c).

Signature:                                                                                          Date: 9/9/24

**020 240902 PAIRR2 Rqst RFPs & RCT-ILG Ks.pdf**
201K

**019 240824 PAIRR2 Rqst Leg Comm SB 22-201.pdf**
207K

---

**Mailtrack Notification** <notification@mailtrack.io>                          Tue, Sep 10, 2024 at 9:19 AM
Reply-To: terri.morrison@judicial.state.co.us

Hot conversation: terri.morrison@judicial.state.co.us opened it many times in a short period or forwarded it.
View all 9 opens | turn off hot conversations

---

**Mailtrack Notification** <notification@mailtrack.io>                          Thu, Sep 12, 2024 at 11:42 AM
Reply-To: terri.morrison@judicial.state.co.us

Hot conversation: terri.morrison@judicial.state.co.us opened it many times in a short period or forwarded it.
View all 26 opens | turn off hot conversations

---

**morrison, terri** <terri.morrison@judicial.state.co.us>                          Thu, Sep 12, 2024 at 11:48 AM
To:

Good morning                    ,

I am writing in response to the P.A.I.R.R. 2 requests you submitted to me on September 9, 2024. As all twenty requests were received on the same day they are being treated as one request pursuant to our practices and policy. Pursuant to P.A.I.R.R. 2, §4(c)(1) there is a charge for research and redaction, if necessary, of $30.00 per hour after the first hour. In addition, if the total number of responsive records exceeds 20 pages there is a charge of $.25 per page for all responsive records.

For this request, we will need up to an additional 7 business days to respond pursuant to P.A.I.R.R. 2, §4(b)(3)(C).

For the aspects of your request numbered 4, 10, 14, 16, 18, and 19 you have indicated you are seeking records involving correspondence/communications with or by the employees of the State Court Administrator's Office (SCAO).  There are 354 employees at the SCAO. You will be charged for employees to research and determine if they have responsive records. This will increase the cost of the request. If you would like to amend your request to narrow the scope of employees you are seeking records from, please let me know.

For number 4 of the request at paragraph 1, it is unclear from the wording of the request if you are seeking communications responding to P.A.I.R.R. 2 requests or communications about P.A.I.R.R. 2 requests from the Denver Post or the Denver Gazette for the time periods stated. Please clarify this aspect of your request.

The following parts of the request have been forwarded:

- To Office of Attorney Regulation Counsel, numbers 14 and 15.
- To Sheri King, Clerk of Court for El Paso County, court records sought in paragraph 3 of number 15.

I anticipate that this request is going to take numerous hours to fulfill and thus the cost estimate is likely to be very high. If you would like to narrow any aspect of the request beyond what I have suggested regarding the 354 employees of SCAO, please let me know. Thank you.

*Best Regards,*

*Terri*

*Terri S. Morrison (she/her)*

Legal Counsel, Colorado Judicial Department

1300 Broadway Suite 1200 | Denver, CO  80203

**(o) (720) 625-5817**

---

**From:**
**Sent:** Monday, September 9, 2024 3:49 PM
**To:** morrison, terri <terri.morrison@judicial.state.co.us>
**Subject:** [EXTERNAL] Records Request

**EXTERNAL EMAIL:** This email originated from outside of the Judicial Department. Do not click links or open attachments unless you recognize the sender and know the content is safe.

[Quoted text hidden]

---

Thu, Sep 12, 2024 at 3:57 PM

To: "morrison, terri" <terri.morrison@judicial.state.co.us>

Good afternoon Ms. Morrison,

Thank you for your response to my P.A.I.R.R. 2 requests (#s 2-21).  As you are aware, P.A.I.R.R. 2 requires the custodian(s) of records within the Colorado Judicial Department to perform their duties "without unreasonable delay or unreasonable cost," particularly when a request relates to a specific administrative record.  An "administrative record" is defined as "a record maintained for the purpose of managing the business or performing the duties of the Judicial Branch that is not defined as a court record in P.A.I.R.R. 1 and Chief Justice Directive 05-01."  P.A.I.R.R. 2 § 1(a).  In other words, records related to the function of the courts (other than actual court case records) are within the scope of a P.A.I.R.R. 2 request.  With regards to the Judicial Department's obligations to provide a reasonable response, P.A.I.R.R. 2 § 2 states:

(a) All Judicial Branch administrative records shall be available for inspection by any person at reasonable times, except as provided in this rule or as otherwise provided by federal statute or regulation, state statute, court rule, or court order.

\* \* \*

(b) The custodian must take reasonable measures to locate any specific administrative record sought and to ensure public access to the administrative record without unreasonable delay or unreasonable cost.

Nowhere in P.A.I.R.R. 2 is the custodian of records authorized to combine multiple separate, stand-alone records requests in order to obstruct the production of reasonably specific records through excessive estimates of production costs. The records requests that I have submitted are separated so that you can respond immediately to those requests that ask for specific documents or otherwise easily identifiable groups of documents. To the extent that some individual requests ask for a broader range of documents or scope of production, cost estimates should be provided specific to each request. I will, then, be able to decide which of these requests I would like to pursue and, if any, of the requests might be held in abeyance. P.A.I.R.R. 2 is not intended to make requesting the Judicial Department's administrative records an all or nothing proposition. In this context, I respectfully request that you respond to my requests separately with the immediate production of specifically identified documents and by accounting for cost estimates to produce larger groupings of documents according to the respective request number.

Your email references the Judicial Department's "practices and policy" as the basis for your aggregation of my requests but does not cite or provide such a written policy. If a written policy exists, please provide it.

To the extent that you believe that responding to these requests requires each SCAO employee to personally search their email accounts / records and that you will be aggregating the time spent for the purposes of your cost estimates, please provide a listing of all 354 SCAO employees, their positions, and their dates of service. I am happy to collaborate with you on ways of potentially narrowing specific requests to only those employees who likely possess relevant records.

You have asked for clarification as to my Request #4. As written, Request # 4 states, in relevant parts:

1. Communications including SCAO employees, Counsel to the Chief Justice Andrew Rottman, and/or the Justices of the Colorado Supreme Court with regard to PAIRR2 requests received from either *The Denver Post* or *The Denver Gazette* in December 2020-February 2021;

2. Communications including SCAO employees, Counsel to the Chief Justice Andrew Rottman, and/or the Justices of the Colorado Supreme Court reacting to former State Court Administrator Christopher Ryan providing interviews to *The Denver Post* during the same time period[.]

Put more plainly, through these elements, Request #4 is asking for 1) the Judicial Department's internal correspondence discussing/deciding how to respond to the media's P.A.I.R.R. 2 requests regarding the Masias Matter (including when the media presumably began requesting access to the Masias Memo) and 2) the internal communications that predicated the Judicial Department sending former State Court Administrator Christopher Ryan a cease and desist letter after persons involved learned that Ryan had provided interviews to *The Denver Post*. The scope of Request #4 likely includes PAIRR 2 requests (if related to the Masias Matter) and the ultimate responses provided by the Department (including any discussion about cost estimates). But, the scope is not necessarily limited to that correspondence. To your question, Request #4 should be interpreted to include both directly responsive communications and communications commenting on or "about" the P.A.I.R.R. 2 requests (as any requests/discussions were relevant to the Masias Matter). I am not seeking communications as to P.A.I.R.R. 2 requests unrelated to the Masias Matter (i.e. other high-profile criminal or civil cases, contemporaneous Covid-19 issues, etc.).

I appreciate your cooperation in responding to my P.A.I.R.R. 2 requests and, as now requested, to present distinct cost estimates so that we can move forward with this process. If I can provide further clarification or (with the list that you will provide) help narrow the scope of SCAO employees who may possess relevant records, please do not hesitate to let me know how we can achieve constructive solutions. Please let me know, however, if there are any impediments to you immediately producing those records that are specifically and distinctly identified in my requests.

Sincerely,

[Quoted te t hidden]

---

**Mailtrack Notification** <notification@mailtrack.io>                                    Fri, Sep 13, 2024 at 2:54 PM
Reply-To: terri.morrison@judicial.state.co.us

Hot conversation: terri.morrison@judicial.state.co.us opened it many times in a short period or forwarded it.
View all 63 opens | turn off hot conversations

---

**Mailtrack Notification** <notification@mailtrack.io>                                    Sun, Sep 15, 2024 at 9:06 AM

Reply-To: terri.morrison@judicial.state.co.us


Hot conversation: terri.morrison@judicial.state.co.us opened it many times in a short period or forwarded it.
View all 73 opens | turn off hot conversations

---

**Mailtrack Notification** <notification@mailtrack.io>                                    Wed, Sep 18, 2024 at 10:19 AM
Reply-To: terri.morrison@judicial.state.co.us


Hot conversation: terri.morrison@judicial.state.co.us opened it many times in a short period or forwarded it.
View all 83 opens | turn off hot conversations

---

**morrison, terri** <terri.morrison@judicial.state.co.us>                              Wed, Sep 18, 2024 at 11:24 AM
To:


Good morning                 ,


Under PAIRR2, § 2(a), the custodian of any administrative record is authorized to "make policies governing the inspection of administrative records that are reasonably necessary to … prevent unnecessary interference with the regular discharge of the duties of the custodian or the custodian's office."  As explained in my preliminary response, all twenty of your requests that were received on the same day are being treated as one request pursuant to our practice and policy.


The policy about treating seriatim requests as a single request has not been reduced to writing and PAIRR2, § 2(a) does not impose any such requirement.  Rather, all that is required is that the policy be "reasonably necessary … to prevent unnecessary interference with the regular discharge of the duties of the custodian or the custodian's office."  As you know, most of your seriatim requests seek multiple records that are responsive to broad search parameters.  Just to search for and retrieve the universe of records that may be responsive to such requests requires searches to be performed by multiple individuals (sometimes hundreds) of voluminous records (sometimes thousands), which is laborious work that greatly interferes with the regular discharge of the duties of the custodian and the custodian's office.  As a result, it is "reasonably necessary" for your seriatim requests to be treated as a single request.


The custodians continue to research and retrieve records for the completion of the estimate for this request. To date, the custodians have spent 39 hours on the request. From this work so far, we estimate that it will take an additional 197 hours to complete research, retrieval, and redaction if necessary. With no charge for the first hour, the cost estimate so far (with work continuing) at $30.00 per hour is $7,050. This is only a preliminary estimate and the final estimate may be more or less than the final cost for completion on the request.


In connection with aspects of your request numbered 4, 10, 14, 16, 18, and 19, I have attached a list showing the 349 SCAO employees as of August's payroll. The five other employees included in the 354-count started in September.  The column indicating "Judicial employment date" represents the employee's time with the Department not necessarily time with SCAO. If based on this information, you would like to narrow the scope of these aspects of the request, please let me know


Finally, I also forwarded #19 of the request to the Office of Attorney Regulation Counsel.


*Best,*

*Terri S. Morrison (she/her)*

*Legal Counsel Colorado Judicial Department*

*State Court Administrator's Office*

*O*: 720-625-5817

*Cell*: 303-522-7425

---

**From:**
**Sent:** Thursday, September 12, 2024 3:58 PM
**To:** morrison, terri <terri.morrison@judicial.state.co.us>
**Subject:** [EXTERNAL] Re: [EXTERNAL] Records Request

> **EXTERNAL EMAIL:** This email originated from outside of the Judicial Department. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good afternoon Ms. Morrison,

Thank you for your response to my P.A.I.R.R. 2 requests (#s 2-21). As you are aware, P.A.I.R.R. 2 requires the custodian(s) of records within the Colorado Judicial Department to perform their duties "without unreasonable delay or unreasonable cost," particularly when a request relates to a specific administrative record. An "administrative record" is defined as "a record maintained for the purpose of managing the business or performing the duties of the Judicial Branch that is not defined as a court record in P.A.I.R.R. 1 and Chief Justice Directive 05-01." P.A.I.R.R. 2 § 1(a). In other words, records related to the function of the courts (other than actual court case records) are within the scope of a P.A.I.R.R. 2 request. With regards to the Judicial Department's obligations to provide a reasonable response, P.A.I.R.R. 2 § 2 states:

> (a) All Judicial Branch administrative records shall be available for inspection by any person at reasonable times, except as provided in this rule or as otherwise provided by federal statute or regulation, state statute, court rule, or court order.

<div align="center">* * *</div>

> (b) The custodian must take reasonable measures to locate any specific administrative record sought and to ensure public access to the administrative record without unreasonable delay or unreasonable cost.

Nowhere in P.A.I.R.R. 2 is the custodian of records authorized to combine multiple separate, stand-alone records requests in order to obstruct the production of reasonably specific records through excessive estimates of production costs.  The records requests that I have submitted are separated so that you can respond immediately to those requests that ask for specific documents or otherwise easily identifiable groups of documents.  To the extent that some individual requests ask for a broader range of documents or scope of production, cost estimates should be provided specific to each request.  I will, then, be able to decide which of these requests I would like to pursue and, if any, of the requests might be held in abeyance.  P.A.I.R.R. 2 is not intended to make requesting the Judicial Department's administrative records an all or nothing proposition.  In this context, I respectfully request that you respond to my requests separately with the immediate production of specifically identified documents and by accounting for cost estimates to produce larger groupings of documents according to the respective request number.

Your email references the Judicial Department's "practices and policy" as the basis for your aggregation of my requests but does not cite or provide such a written policy.  If a written policy exists, please provide it.

To the extent that you believe that responding to these requests requires each SCAO employee to personally search their email accounts / records and that you will be aggregating the time spent for the purposes of your cost estimates, please provide a listing of all 354 SCAO employees, their positions, and their dates of service. I am happy to collaborate with you on ways of potentially narrowing specific requests to only those employees who likely possess relevant records.

You have asked for clarification as to my Request #4.  As written, Request # 4 states, in relevant parts:

> 1.  Communications including SCAO employees, Counsel to the Chief Justice Andrew Rottman, and/or the Justices of the Colorado Supreme Court with regard to PAIRR2 requests received from either *The Denver Post* or *The Denver Ga ette* in December 2020-February 2021;
>
> 2.  Communications including SCAO employees, Counsel to the Chief Justice Andrew Rottman, and/or the Justices of the Colorado Supreme Court reacting to former State Court Administrator Christopher Ryan providing interviews to *The Denver Post* during the same time period[.]

[Quoted te t hidden]
[Quoted text hidden]
[Quoted te t hidden]

 **Copy of 08.2024 JUDPRFRM All SCAO Employees.xlsx**
75K

Thu, Sep 19, 2024 at 10:10 AM

To: "morrison, terri" <terri.morrison@judicial.state.co.us>

Dear Ms. Morrison,

I respectfully disagree that PAIRR2 § 2(a) gives the custodian of records license to combine separate, reasonably specific stand-alone records requests for the purposes of creating cost barriers and indefinitely delaying the production of specifically requested records.  As quoted in my prior email, the scope of the custodian's discretion is limited by PAIRR2 § 2(b).  Again, § 2(b) provides:

> The custodian must take reasonable measures to locate any specific administrative record sought and to ensure public access to the administrative record without unreasonable delay or unreasonable cost.

By refusing to break your cost estimate down according to the individual requests, you are not taking "reasonable measures" to locate "specific administrative record(s)" and to ensure access "without unreasonable delay or unreasonable cost."  One of the remedies available to address actions by a custodian of records that constitute an abuse of discretion is to seek judicial review under PAIRR2 § 5(a) with the possibility of an award of costs and reasonable fees to the prevailing party.  Asking you to process these requests individually and to provide cost estimates broken down according to each the specific request seems reasonable as a means of facilitating the immediate production of specific administrative records (as contemplated by PAIRR2 § 2(b)) and in reducing the overall time and expense needed to respond.  Again, a break down of the cost estimates according to each request will allow me to prioritize which requests / parts of requests should be addressed first.

The overall time estimate that you have provided and the time you describe as having already been expended are difficult to understand without an itemized breakdown.  The estimate of 234 hours also raises significant concerns about how long it will take for you to produce _any_ records responsive to my separate, specific, and stand-alone requests.  Please provide an itemization of your estimate that explains specifically who all has expended 39 hours (and how much time has been applied individually) responding to these requests since their submission, who is expected to conduct the additional record processing (again broken down by person), and an inventory of the documents to be produced (i.e. categories, sources, total pages per document, total number of documents in categories, etc.).  Ultimately, however, the reasonable solution would be for you to break the estimated costs of production down by Request #s and by parts of those requests if certain documents are easily retrievable and can be produced immediately while identifying other parts of the requests that may require additional processing, review, etc.  As presented, your estimate of $7,050 is grossly unreasonable and appears to be a constructive denial of access to the requested records in violation of PAIRR2 §§ 2(b), 5(a).  It deserves emphasis that all the relevant fees under CJD 06-01 (document review/processing and per page costs) are discretionary in that the custodian "_may_" charge the fees.  You have the ability to waive these fees and to prioritize your response to any of my specific, stand-alone requests (including their sub-parts).  It remains unclear why you are unable to immediately produce records responsive to those parts of my requests that ask for specific documents or well-defined groups of documents.

I appreciate you providing a list of current SCAO employees.  In order to provide a meaningful opportunity to refine the focus of parts of my PAIRR2 requests, however, it is important to have a list of SCAO employees who may have been working at any time from 2019-Present.  Is it possible for you to provide an updated list that includes the dates of service and job titles for SCAO employees who were present during times relevant to my requests, but who have since left the Department?

It will be to our mutual benefit if we can approach these requests rationally and in a way that allows for meaningful choices as to how resources will be expended.  Again, I ask you to please reconsider your position regarding the amalgamation of my requests and your arbitrary imposition of an accompanying significant/unreasonable tollgate ($7,050) before you will produce of _any_ of the requested records.  I thank you in advance for your willingness to cooperate and explore constructive solutions as you process my requests.

Sincerely,

[Quoted text hidden]

---

**Mailtrack Notification** <notification@mailtrack.io>                                  Thu, Sep 19, 2024 at 11:29 AM
Reply-To: terri.morrison@judicial.state.co.us

Hot conversation: morrison, terri opened it many times in a short period or forwarded it. View all 8 opens | turn off hot conversations

---

**morrison, terri** <terri.morrison@judicial.state.co.us>                                  Fri, Sep 27, 2024 at 8:01 AM

Good morning,                .


The standard set by PAIRR2, § 2(b) for what type of records a custodian must take "reasonable measures to locate … without unreasonable delay or unreasonable cost" is not "reasonably specific" as stated in your below email, but rather is "any specific administrative record," which means a single record that is readily located because the request specifically identifies its contents.  For example, a request for a copy of an email from Terri Morrison to                dated September 27, 2024, regarding the latter's PAIRR 2 records requests. In contrast, most of the 20 requests that you submitted on September 9th contain several subparts that seek multiple records that are responsive to broad search parameters and therefore require a search of voluminous records to locate.  Cf. PAIRR2, § 4(b)(3) (authorizing the custodian to take an additional 7 business days to respond to "[a] broadly stated request … that encompasses all or substantially all of a large category of records and is without sufficient specificity to allow custodian reasonably to prepare or gather the records within the three-day period" or "[t]he request involves such a large volume of records that the custodian cannot reasonably prepare or gather the records within the three-day period without substantially interfering with the custodian's obligations to perform other responsibilities.").  And even if a few subparts across your 20 requests sought a single, specifically identified record, any work to-date spent locating potentially responsive records and preparing a cost estimate has not been broken down by each request, much less by each subpart of each request.


Rather, as I informed you on September 12th, all 20 of your seriatim requests are being treated as one request pursuant to our practices and policy.  That position stands and therefore only one cost estimate will be provided for this combined request.  With respect to the cost estimate, please note that the custodians have continued to work on searching for and locating potentially responsive records, so here is an updated cost estimate that supersedes the one I sent you on September 18th.  To date, the custodians have spent 114 hours on the request. From this work so far, we estimate that it will take an additional 281 hours to complete the review, research, and any required redaction.  With no charge for the first estimated hour for research and any redaction, the updated cost estimate at $30.00 per hour is $11,820.00.  If you approve the cost estimate and the production of more than 20 pages of documents is required to fulfill this request, you will also be charged $.25 per page ($.50 if double-sided) for all documents photocopied, scanned, or produced.  This is only an estimate and the final, actual cost to complete work on this combined request may be more or less than this estimate.  Payment of the actual cost must be received before delivery of any responsive record(s) that are required to be produced under PAIRR 2.


Please note that you may submit a new PAIRR 2 request that seeks only the production of one or more specifically identified administrative record(s).  If you elect to do so, then I will evaluate whether the new request is sufficiently specific and notify you whether the custodian(s) will be able to locate and produce the specifically identified record(s) within 3 business days and whether there is any cost estimate to fulfill the new request.


Regarding your request to have additional information about SCAO employees wherein specifically you stated: "it is important to have a list of SCAO employees who may have been working at any time from 2019-Present.  Is it possible for you to provide an updated list that includes the dates of service and job titles for SCAO employees who were present during times relevant to my requests, but who have since left the Department?"  I have been working on finding an answer to this question and have learned that to create a report of the people who have left SCAO from the HR data warehouse that is the state's payroll system would require a year-by-year analysis, and any report would not provide the title of the person as does the list I provided you from the active payroll list. It would only show the year they left.  In addition, for the most part when an employee leaves, their records with the department, including email are deactivated and no longer available after 90 days.  Therefore, the list that was easily produced is the only data we can provide and as I indicated that data only reflects the employee's time with the Judicial Department, not necessarily just SCAO.

[Quoted te t hidden]

---

**Mailtrack Notification** <notification@mailtrack.io>                Fri, Sep 27, 2024 at 8:41 AM
Reply-To: terri.morrison@judicial.state.co.us

Hot conversation: morrison, terri opened it many times in a short period or forwarded it. <u>View all 46 opens</u> |
<u>turn off hot conversations</u>

---

Mon, Sep 30, 2024 at 10:18 AM

To: "morrison, terri" <terri.morrison@judicial.state.co.us>

Dear Ms. Morrison,

I received your September 27, 2024 email in which you state your position that the expectations of reasonableness contained in PAIRR2 (2)(b) only relate to requests for specific documents (rather than specific groupings of documents).  In your email you further adjust the estimate provided by the Judicial Department to now require payment of an $11,820.00 deposit before you will produce *any* of the requested records.  Again, it is unclear why you cannot break this estimate down according to the individual PAIRR2 requests that I have submitted or to discuss how specifically identified documents can be produced immediately without unreasonable cost barriers.

Your email further provides me with the option of submitting an additional / separate PAIRR2 request for specific documents.  As I understand your suggestion, such a request will be addressed separately from my previous requests and that you will provide a stand-alone cost estimate for this additional / new request.

Accordingly, I have attached a new request that seeks additional public records while also identifying certain documents specifically by date, recipients, etc.  Please provide a stand-alone cost estimate for production of records responsive to the attached PAIRR2 request.  Again, to the extent that documents/records that I have identified with specificity can be immediately located and produced, please do so without further delay.

Sincerely,

[Quoted te t hidden]

---

 **022 PAIRR2 Rqst CSC Weekly Conference Recds.docx**
31K

---

**Mailtrack Notification** <notification@mailtrack.io>                     Mon, Sep 30, 2024 at 2:35 PM
Reply-To: terri.morrison@judicial.state.co.us

Hot conversation: morrison, terri opened it many times in a short period or forwarded it. <u>View all 5 opens</u> |
<u>turn off hot conversations</u>

---

**morrison, terri** <terri.morrison@judicial.state.co.us>                     Thu, Oct 3, 2024 at 4:59 PM

,

We will need an additional 7 business days pursuant to P.A.I.R.R. 2, §4(b)(3)(C) for your latest request submitted September 30, 2024.

[Quoted te t hidden]

*P.A.I.R.R.2 Request # 22*

Please provide all "writings" as defined under § 24-72-202(7), C.R.S. and relevant to the following:

1. Documentation of the reasons for then-State Court Administrator Jerry Marroney's retirement announced on or about February 23, 2017 and effective June 30, 2017;
2. From October 2018 through August 2019, communications between the Justices of the Colorado Supreme Court, Counsel to the Chief Justice Andrew Rottman, employees of the State Court Administrator's Office, and/or other involved persons (including employees of the Attorney General's Office) that relate to the Justices' contemporaneous awareness of negotiations, approval, and cancellation of the Masias Contract (executed April 11, 2019 and re-ratified June 3, 2019);
3. More specifically, an October 15, 2018 email chain copied to Chief Justice Nathan B. Coats and Rottman that informed the OSA of the results of the David Powell and Tracy Griffith (internal SCAO audit) investigations and the status of disciplinary actions being taken against Mindy Masias. This email chain is referenced in *Matter of Coats*, 2023 CO 44, ¶ 4(7);
4. An April 4, 2019 email chain between State Court Administrator Christopher Ryan and SCAO Legal Counsel Terri Morrison confirming (through Andrew Rottman) that Ryan had authority from Chief Justice Coats and the Court to proceed with the execution of the Masias Contract;
5. An April 2019 email chain between Chief Justice Coats and Justice Melissa Hart discussing circumstances where Mindy Masias had applied to become the Utah State Court Administrator. These circumstances are generally referenced in the Colorado Supreme Court's February 4, 2021 public statement commenting on the Masias Contract;
6. Records of a meeting between SCAO procurement officer John Kane and the Justices on or about July 17, 2019, during which meeting Kane discussed the RFP process that occurred before a sole-source determination was made to allow the Masias Contract. The meeting with Kane and an extended special conference of the Justices was described in Chief Justice Coats's testimony to the Legislative Joint Budget Committee on December 13, 2019;
7. A copy of Ryan's March 25, 2019 approval of the sole-source determination allowing the Masias Contract and any communications/documentation related to that sole-source determination;
8. Masias's announcement of her resignation, emailed with the Court's authorization to all judges and employees of the Judicial Department in April 2019 (referenced in *Coats*, ¶ 4(19). This request includes documentation of the Court's authorization for and awareness of Masias's system-wide email;
9. Records of communications between Chief Justice Coats, any of the other Justices, SCAO employees, and/or Rottman and Attorney General Phil Weiser and/or other employees of the Attorney General's Office relating to the anonymous fraud hotline report submitted April 15, 2019, consideration of the Masias Contract, and/or the existence of the Masias Memo. This request specifically includes email communications on July 19, 2019 between 1st Assistant Attorney General LeeAnn Morrill and Rottman acknowledging possession of the Masias Memo and its materiality to the Office of the State Auditor's then-pending fraud hotline investigation;

10. As disclosed in the April 15, 2019 anonymous fraud hotline report, records of communications between Chief Justice Coats, any of the other Justices, and/or Rottman and Attorney General Phil Weiser and/or other employees of the Attorney General's Office relating to the employment separation agreement negotiated with then-Ralph L. Carr Judicial Center Building Manager Jane Hood;

11. Records of the Justices' meeting(s) on or about July 17, 2019 with Ryan during which meeting(s) Ryan offered his resignation or was asked to resign;

12. Records of communications / meeting(s) with SCAO HR Director Eric Brown on or about July 17, 2019 that resulted in Brown's resignation;

13. Records of meetings and communications between one or more of the Justices, Rottman, Office of Attorney Regulation Counsel (OARC) employees, and/or SCAO employees and members/employees of the Colorado Commission on Judicial Discipline (CCJD) where the resourcing of the CCJD (including the CCJD's administrative/investigative/legal resources, its housing in the Ralph L. Carr Judicial Center, and/or its security needs) were discussed;

14. Records of the Justices' weekly conferences (or other specially scheduled conferences) from January 2017 through the present as such records relate to the discussion of administrative matters relevant to former State Court Administrator Jerry Marroney's departure from the Judicial Department, Christopher Ryan's subsequent appointment as State Court Administrator, the Masias Contract, the Masias Memo, and the Justices' response to the Masias Controversy (including control over the OSA's fraud hotline investigation, the "independent" investigations commissioned by the Court, the appointment of Steven Vasconcellos as State Court Administrator, public statements made by the Court regarding the merits of the Masias Controversy, the Court's "Workplace Culture Initiative" / "Listening Tours", the Court's oversight of its OARC in relation to the Masias Controversy, and decisions to release or withhold information/records from the CCJD).  These administrative matters include, but are not limited to:

    a. the circumstances of and reasons for then-State Court Administrator Jerry Marroney's retirement, effective June 30, 2017;

    b. the decision to appoint Chirstopher Ryan as the interim State Court Administrator and the subsequent decision to make that appointment permanent (rather than re-opening a second recruitment / hiring process);

    c. the investigations into Masias's suspected financial misconduct and the contemporaneous reporting of information to the Office of the State Auditor (OSA),

    d. disciplinary actions taken and the decision to terminate Masias,

    e. contemplation of allowing Masias to continue working for the Judicial Department in a training role (as either an employee or as an independent contractor),

    f. obligations to disclose information to the OSA as part of its single statewide audit, its 2020 performance audit of SCAO, and/or its requested fraud hotline investigation,

    g. Chief Justice Coats's meeting(s) with FSD staff, including Myra Dukes and David Kribs, where concerns about Masias's suspected financial misconduct, tone at the

top, and/or the 2018 single statewide audit / Colorado's Annual Comprehensive Financial Report were discussed,

h. Chief Justice Coats and the SCAO's Division Heads' disclosure obligations when verifying the Judicial Department's internal controls as part of a management representation letter sent to the OSA in December 2018,

i. obligations to disclose information to the CCJD under a 2010 Memorandum of Understanding, Canon Rules 2.15 and 2.16, and, more recently, §§ 13-5.3-105 and 13-5.3-106, C.R.S.,

j. the authorization of an RFP for the Judicial Department's leadership education contract,

k. the disciplinary action (termination) taken against SCAO Financial Services Director David Kribs,

l. the settlement of Kribs' retaliation claims through a general waiver, non-disclosure agreement, and voluntary separation incentive,

m. the authorization of Masias's separation agreement (with general waiver and non-disclosure provisions),

n. the authorization of the sole-source determination allowing the Masias Contract,

o. approval of the Masias Contract,

p. discussion of the substance of the 2017 surreptitious recording of then-Chief Justice Nancy Rice (and possibly Andrew Rottman) by Mindy Masias,

q. cancellation of the Masias Contract,

r. discussion of and/or the request for SCA Ryan's resignation,

s. discussion of and/or the request for SCAO HR Director Eric Brown's resignation,

t. discussion of the decisions to appoint Steven Vasconcellos as the interim State Court Administrator and to, later, make the appointment permanent,

u. discussion of reasons for, the substance of, and whether to collaborate with the CCJD on adoption of Colo. RJD 3.5 on October 12, 2021;

v. discussion of the plan for the Court to commission "outside" or "independent" investigations of the Masias Controversy (including an originally contemplated sole-source contract with former U.S. Attorney John F. Walsh and his law firm WilmerHale) and to use public funds for such investigations,

w. discussion of the Court's authorization / denial of funding for the CCJD's investigation / hiring of outside Special Counsel,

x. discussion of resources provided to the CCJD through OARC,

y. discussion of messaging / presentation of OARC to the Legislature as being "independent" from the Court (contrary to C.R.C.P. 242.5),

z. discussion of / awareness of OARC providing false information to law enforcement with regards to the prosecution of Senate Judiciary Committee Chair Pete Lee and causing his resignation from the Legislative Interim Committee on Judicial Discipline in August 2022,

aa. discussion of / awareness of Attorney Regulation Counsel Jessica Yates sending a February 6, 2023 disciplinary letter to CCJD Vice-Chair David Prince and the attorney / judge members of the CCJD threatening them with attorney discipline for legislative testimony critical of OARC that was presented at the Joint Judiciary Committee's February 1, 2023 SMART Act Hearing (including the

CCJD's later expressed position that Yates committed a misdemeanor criminal offense according to § 8-2.5-101(1.5), C.R.S.),

bb. discussion of the handling and responses to the CCJD's requests for information and records related to *Matter of Coats*, 2023 CO 44, including records requests made by the CCJD on or about February 23, 2021, April 6, 2021, May 18, 2021, July 23, 2021, July 12, 2022, February 6, 2023 and the CCJD's issuance of subpoena(s) for Judicial Department records on or about January 5, 2022,

cc. discussion of Chief Justice Coats and State Court Administrator Vasconcellos's preparations for testimony to the Joint Budget Committee on December 13, 2019

dd. discussion of the findings and recommendations made in the OSA's 2020 performance audit and the Judicial Department's response,

ee. discussion regarding preparations for and the substance of Chief Justice Coats's, SCA Vasconcellos's, and the OSA's presentations to the Legislative Audit Committee on December 7, 2020,

ff. discussion of Chief Justice Coats's and SCA Vasconcellos's preparations for testimony to the Joint Budget Committee on December 17, 2020,

gg. discussion about the OSA's testimony at the Joint Judiciary Committee's January 25, 2021 SMART Act hearing,

hh. discussion of Chief Justice Boatright and SCA Vasconcellos's preparations for the Judicial Department's January 28, 2021 SMART Act hearing before the Joint Judiciary Committee,

ii. discussion of Chief Justice Boatright's preparations for his two State of the Judiciary addresses, the first on February 18, 2021 and the second on January 13, 2023,

jj. discussion of the Court's approval of public statements as to the merits of the Masias Controversy, including but not limited to public comments made on December 13, 2019, December 7, 2020, January 28, 2021, February 4, 2021, February 8, 2021, February 16, 2021, February 18, 2021, and January 13, 2023 as well as Chief Justice Boatright's commentaries on the OSA's Fraud Hotline Investigation Report, the RCT, Ltd. Report, and the ILG, LLC Report. The scope of this request specifically includes two email chains from February 4, 2021 and February 8, 2021 that discuss drafts of the respective public statements and which have been requested separately through P.A.I.R.R.2 Request #17,

kk. discussion of individual Justices' outreach efforts contemporaneous with the Court's February 2021 public comments, including an email sent by Justice Richard Gabriel to the Colorado Judicial Institute on February 4, 2021 at 11:51 a.m. in response to publication of an article in *The Denver Post*. A copy of the email chain should also be provided within the scope of this request,

ll. discussion of control of the OSA's fraud hotline investigation,

mm. discussion of disclosure of records to the OSA and any of the other investigations into the Masias Controversy,

nn. discussion of / coordination of / the substance of the Court's "Listening Tours" with Colorado Court of Appeals Judges,

oo. discussion of the Court's plan to use its "Workplace Culture Initiative" as a response to the Masias Controversy and in conjunction with the Court's "independent" investigations,

pp. the approval of public funds and resources for the "Workplace Culture Initiative" and its "Listening Tours,"

qq. discussion related to the promulgation and adoption of Colo. RJD 41,

rr. discussion of the Court's announced amendment of C.R.C.P. 227 through a letter to the CCJD dated November 17, 2022,

ss. discussion of the Judicial Department's cooperation / non-cooperation with efforts to create and stand up the Administrative Support for Independent Agencies (ASIA) Office established through SB 23-228,

tt. discussion / awareness of Andrew Rottman's efforts to intervene in *Coats*,

uu. discussion of the Court's continued appointment of judge members to the CCJD despite the pendency of the Masias Controversy,

vv. any discussion of direct or indirect communications with the Governor's Office regarding the appointment of attorney and citizen members to the CCJD,

ww. any discussion of correspondence from the CCJD questioning the Court's authority to commission its "independent" investigations or raising grounds for the Justices' and the Court's disqualification,

xx. discussions of the Justices' responses to this and other public records requests (under PAIRR2 or otherwise and including this series of requests) relating to the Masias Controversy,

yy. discussions about any Justice's contact with the media regarding issues related to the Masias Controversy, including responding to PAIRR2 requests and requests for comment,

zz. discussions or impressions in reaction to the stipulation(s) and the final disciplinary opinion issued by the Special Tribunal in *Coats*;

aaa. any messaging or planning by the Justices (including coordination with legislative liaison Terry Scanlon) to respond to the stipulation(s), opinion, and/or outcome in *Coats*;

bbb. discussion regarding the nomination of individual Justices for honors and awards through outside legal interest groups, including but not limited to the Colorado Judicial Institute, the Colorado Bar Association, the Colorado Women's Bar Association, the American Board of Trial Advocates, and the American Inns of Court,

ccc. discussion of the Justices' responses to and authorization for State Court Administrator Steven Vasconcellos to publicly comment on two articles and one op-ed published in *The Denver Gazette* on March 3, 2024 (which describe the suppression of allegations of retaliation within the Colorado Judicial Branch by Chief Justice Boatright with the assistance of the other Justices and other judges), and

ddd. discussion of the reasons for the individual Justices' refusals to waive confidentiality and allow public disclosure of communications with the CCJD as otherwise permitted according to Colo. RJD 6.5(2)(d).

The Justices' administrative actions (including contracting decisions, personnel actions, the release of records to the public / to investigating entities, press releases/public statements, and decisions not to disqualify themselves from such matters) are outside the scope of the judicial deliberative privilege and judicial immunity. *Forrester v. White*, 484 U.S. 219, 228 (1988). Because these requested administrative records relate to the use of

public funds, they should be recognized as public records within the scope of disclosure under PAIRR2.  To the extent that the records requested (i.e. documentation of the Court's weekly and other conference discussions) do not exist, please explain why not.

This request is made according to PAIRR2 with the 3-business day timeframe for an initial response provided through PAIRR2 § 4.  To the extent that you, as custodian of records, characterize any of the records requested as "court records" rather than "administrative records," any such records should be processed / produced according to PAIRR1 and CJD 05-01.  Likewise, if you are not the custodian of any of these records, this request should be re-directed / copied to the appropriate person.  PAIRR2 § 1(c).

**Email Delivery Certificate generated by Mailsuite**

| | |
|---|---|
| **From** | |
| **Subject** | Records Request |
| **Message ID** | <CAG9LdbYO-rc0q+2juyOF8Ax7djyN5eH6j2-qH=kgjzBTE+n9bA@mail.gmail.com> |
| **Delivered on** | 9 Sep, 2024 at 5:49 PM |
| **Delivered to** | <terri.morrison@judicial.state.co.us> |

## Tracking history

👁 **Opened** on 3 Oct, 2024 at 6:14 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 3 Oct, 2024 at 1:04 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 1 Oct, 2024 at 11:02 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 1 Oct, 2024 at 1:27 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 1 Oct, 2024 at 1:20 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 1 Oct, 2024 at 1:19 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 30 Sep, 2024 at 12:36 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 27 Sep, 2024 at 2:59 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 27 Sep, 2024 at 2:58 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 27 Sep, 2024 at 2:11 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 27 Sep, 2024 at 2:11 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 27 Sep, 2024 at 1:55 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 24 Sep, 2024 at 1:29 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 24 Sep, 2024 at 12:28 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 24 Sep, 2024 at 11:46 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 24 Sep, 2024 at 11:46 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 23 Sep, 2024 at 11:24 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 23 Sep, 2024 at 11:21 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 5:25 PM by terri.morrison@judicial.state.co.us



2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

**Email Delivery Certificate generated by Mailsuite**

👁 **Opened** on 20 Sep, 2024 at 4:43 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 4:35 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 4:34 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 4:34 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 4:33 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 4:32 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 4:31 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 4:16 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 3:58 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 3:51 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 3:51 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 3:49 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 3:48 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 10:44 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 10:29 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 10:23 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 9:56 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 9:36 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 9:33 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 20 Sep, 2024 at 9:32 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 19 Sep, 2024 at 11:20 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 19 Sep, 2024 at 5:18 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 19 Sep, 2024 at 5:16 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 19 Sep, 2024 at 12:54 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 19 Sep, 2024 at 12:42 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 11:53 PM by terri.morrison@judicial.state.co.us



2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

👁  **Opened** on 18 Sep, 2024 at 10:18 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 8:07 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 8:02 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 5:55 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 4:26 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 4:25 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 4:25 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 4:25 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 4:13 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 3:52 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 3:48 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 3:20 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 3:20 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 3:11 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 3:11 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 3:11 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 2:47 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 2:47 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 2:47 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 2:42 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 2:27 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 2:17 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 2:15 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 2:12 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 2:08 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 18 Sep, 2024 at 2:05 PM by terri.morrison@judicial.state.co.us



2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

**Email Delivery Certificate generated by Mailsuite**

👁 **Opened** on 18 Sep, 2024 at 2:04 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 2:04 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 2:02 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 2:01 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 2:01 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 1:58 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 1:53 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 1:52 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 1:52 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 1:46 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 1:42 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 1:34 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 1:26 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 1:24 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 1:19 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 1:14 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 12:31 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 12:09 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 11:38 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 11:37 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 10:20 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 10:19 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 12:34 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 18 Sep, 2024 at 12:33 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 15 Sep, 2024 at 5:21 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 15 Sep, 2024 at 12:03 PM by terri.morrison@judicial.state.co.us



2024 © **Mailsuite, S.L.**

C/ Córcega 301, At. 2.

08008 Barcelona - España

**Email Delivery Certificate generated by Mailsuite**

👁 **Opened** on 15 Sep, 2024 at 11:08 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 15 Sep, 2024 at 10:56 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 15 Sep, 2024 at 10:56 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 15 Sep, 2024 at 10:29 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 15 Sep, 2024 at 8:58 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 15 Sep, 2024 at 8:57 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 14 Sep, 2024 at 4:17 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 14 Sep, 2024 at 3:39 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 8:30 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 8:08 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 5:06 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 4:44 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 4:44 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 4:44 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 4:44 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 4:33 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 3:21 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 12:22 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 12:16 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 12:13 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 11:52 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 11:34 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 11:34 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 11:04 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 11:02 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 13 Sep, 2024 at 10:57 AM by terri.morrison@judicial.state.co.us



2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

**Email Delivery Certificate generated by Mailsuite**

👁  **Opened** on 13 Sep, 2024 at 10:50 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 10:46 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 10:46 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 10:43 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 10:32 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 10:24 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 10:18 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 10:18 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 10:17 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 10:16 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 10:09 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 9:48 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 9:48 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 13 Sep, 2024 at 9:29 AM by terri.morrison@judicial.state.co.us

👁  **Opened** on 12 Sep, 2024 at 6:23 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 12 Sep, 2024 at 6:02 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 12 Sep, 2024 at 5:58 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 12 Sep, 2024 at 5:57 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 12 Sep, 2024 at 5:52 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 12 Sep, 2024 at 5:50 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 12 Sep, 2024 at 1:55 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 12 Sep, 2024 at 1:49 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 12 Sep, 2024 at 1:32 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 12 Sep, 2024 at 1:29 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 12 Sep, 2024 at 1:17 PM by terri.morrison@judicial.state.co.us

👁  **Opened** on 12 Sep, 2024 at 11:36 AM by terri.morrison@judicial.state.co.us



2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

**Email Delivery Certificate generated by Mailsuite**

👁 **Opened** on 12 Sep, 2024 at 11:36 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 11 Sep, 2024 at 2:07 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 11 Sep, 2024 at 2:06 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 11 Sep, 2024 at 11:43 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 6:35 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 4:49 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 4:00 PM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 11:43 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 11:23 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 11:22 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 11:20 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 11:19 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 11:19 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 11:16 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 11:10 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 11:09 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 11:09 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 10:49 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 10:39 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 10:35 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 10 Sep, 2024 at 9:47 AM by terri.morrison@judicial.state.co.us

👁 **Opened** on 9 Sep, 2024 at 6:15 PM by terri.morrison@judicial.state.co.us



2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

**Email Delivery Certificate generated by Mailsuite**

| | |
|---|---|
| **From** | |
| **Subject** | [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Records Request |
| **Message ID** | <CAG9LdbZa-NQu8pdDUNUA=Ke-LMieoYNuWo3OJ6XqXqFHRbeYdg@mail.gmail.com> |
| **Delivered on** | 30 Sep, 2024 at 12:18 PM |
| **Delivered to** | morrison, terri <terri.morrison@judicial.state.co.us> |

## Tracking history

👁 **Opened** on 4 Oct, 2024 at 8:15 AM by morrison, terri

👁 **Opened** on 4 Oct, 2024 at 8:01 AM by morrison, terri

👁 **Opened** on 4 Oct, 2024 at 6:57 AM by morrison, terri

👁 **Opened** on 4 Oct, 2024 at 6:32 AM by morrison, terri

👁 **Opened** on 4 Oct, 2024 at 6:31 AM by morrison, terri

👁 **Opened** on 4 Oct, 2024 at 2:34 AM by morrison, terri

👁 **Opened** on 3 Oct, 2024 at 11:21 PM by morrison, terri

👁 **Opened** on 3 Oct, 2024 at 11:07 PM by morrison, terri

👁 **Opened** on 3 Oct, 2024 at 7:24 PM by morrison, terri

👁 **Opened** on 3 Oct, 2024 at 7:20 PM by morrison, terri

👁 **Opened** on 3 Oct, 2024 at 7:20 PM by morrison, terri

👁 **Opened** on 3 Oct, 2024 at 7:05 PM by morrison, terri

👁 **Opened** on 3 Oct, 2024 at 6:59 PM by morrison, terri

👁 **Opened** on 3 Oct, 2024 at 6:59 PM by morrison, terri

👁 **Opened** on 3 Oct, 2024 at 6:53 PM by morrison, terri

👁 **Opened** on 3 Oct, 2024 at 6:52 PM by morrison, terri

👁 **Opened** on 2 Oct, 2024 at 3:50 PM by morrison, terri

👁 **Opened** on 1 Oct, 2024 at 12:20 PM by morrison, terri

👁 **Opened** on 1 Oct, 2024 at 12:20 PM by morrison, terri



2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

**Email Delivery Certificate generated by Mailsuite**

👁 **Opened** on 1 Oct, 2024 at 12:20 PM by morrison, terri

👁 **Opened** on 1 Oct, 2024 at 12:19 PM by morrison, terri

👁 **Opened** on 1 Oct, 2024 at 12:11 PM by morrison, terri

👁 **Opened** on 1 Oct, 2024 at 11:35 AM by morrison, terri

👁 **Opened** on 1 Oct, 2024 at 11:29 AM by morrison, terri

👁 **Opened** on 1 Oct, 2024 at 9:56 AM by morrison, terri

👁 **Opened** on 1 Oct, 2024 at 9:42 AM by morrison, terri

👁 **Opened** on 30 Sep, 2024 at 4:24 PM by morrison, terri

👁 **Opened** on 30 Sep, 2024 at 3:19 PM by morrison, terri

👁 **Opened** on 30 Sep, 2024 at 3:04 PM by morrison, terri

👁 **Opened** on 30 Sep, 2024 at 2:41 PM by morrison, terri

👁 **Opened** on 30 Sep, 2024 at 2:34 PM by morrison, terri

mailsuite

2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España

 Gmail

## P.A.I.R.R. 2 Request 15

1 message

**king, sheri** <sheri.king@judicial.state.co.us>                                Thu, Sep 12, 2024 at 5:08 PM
To:

,

Your request labeled "P.A.I.R.R. 2 Request 15" was forwarded to me as it pertains to paragraph 3 of the request and you seeking court records of "Senator Lee's motion to dismiss the indictment (with accompanying affidavits from OARC) and 4th Judicial

District Court Judge Eric Bentley's ultimate order granting the motion for dismissal."

I'm writing to inform you that there are no court records responsive to this request.

Sheri King

Clerk of Court

El Paso County Combined Courts

4th Judicial District

270 S. Tejon Street, Colorado Springs, CO 80903

Colorado Judicial Branch



Judicial recognizes the need for digital document accessibility. If you experience inaccessible content and require assistance, please contact us by replying to this email or by submitting a request to 4thjdaccessibilityrequests@ judicial.state.co.us.



# Cost estimate

13 messages

---

**April McMurrey** <a.mcmurrey@csc.state.co.us>                    Wed, Sep 18, 2024 at 4:45 PM
To:
Cc: Nicolette Chavez <n.chavez@csc.state.co.us>

,

The cost estimate for the records request you submitted is $370, including time to review and redact, per page cost and time already expended.

If you would like to proceed with the request, please make payment to our office tomorrow. I've cc'd Nicole Chavez here. She will be available to take payment between 8 am and 4 pm.

Sincerely,

April M. McMurrey
Deputy Regulation Counsel
Colorado Supreme Court
Office of Attorney Regulation Counsel
1300 Broadway, Suite 500
Denver, CO 80203
303-928-7866

---

**Nicolette Chavez** <n.chavez@csc.state.co.us>                    Thu, Sep 19, 2024 at 8:28 AM
To: April McMurrey <a.mcmurrey@csc.state.co.us>,

Good morning                    ,

My direct phone number is (303) 928-7872.  Please give me a call when you are available, and I will take this payment in.

Thank you,

Nicolette Chavez

Colorado Supreme Court

Office of Attorney Regulation Counsel

Phone: (303) 928-7872

Fax: (303) 501 1144

[Quoted te t hidden]

---

Thu, Sep 19, 2024 at 8:33 AM

To: April McMurrey <a.mcmurrey@csc.state.co.us>
Cc: Nicolette Chavez <n.chavez@csc.state.co.us>

Dear                   ,

If you could break down this cost estimate further, I would greatly appreciate it.

In your email the other day, you provided a rough estimate that this PAIRR2 request would take approximately 3 hours to process.  With the clarification that I provided regarding the press reporting in Request #19 (Item 2), the scope of the request was reduced (rather than expanded).  According to CJD 06-01, a $30 per hour charge should apply (with the first hour provided without charge).  Consistent with your estimate, this records request should cost approximately $60.  Please provide a breakdown and explanation of the actual time required to respond to this request if there is now a significant upward departure from your previous estimate of 3 processing hours involved.  Your updated cost estimate of $370 equates to approximately 12 hours of time required to process this request. This seems excessive and contrary to PAIRR2 Sec. 2 (b), which provides:

> The custodian must take reasonable measures to locate any specific administrative record sought and to ensure public access to the administrative record without unreasonable delay or unreasonable cost.

CJD 06-01 further provides that the $0.25 per-page copy charge is discretionary.  The per page charge is not intended to supplement the hourly processing charges under CJD 06-01.  If this request had related to a case within the Colorado Courts E-Filing system, there would have been a $15 flat fee for 14-days access with full download capabilities.  If OARC is now assessing a $0.25 per page charge, please explain if/why that charge will exceed $15, particularly with the documents being provided in an electronic format.  It will also be helpful if you can specify the total number of pages that will be produced in response to this/these request(s).

Thank you for your assistance with this process. From your email, I understand that your Office will accept payment by check or credit card?

[Quoted te t hidden]

---

**April McMurrey** <a.mcmurrey@csc.state.co.us>                    Thu, Sep 19, 2024 at 4:26 PM
To:
Cc: Nicolette Chavez <n.chavez@csc.state.co.us>

,

Thank you for your patience hearing back. I was out of the office for a training today.

I think there is some confusion regarding our prior correspondence. Our final time estimate was not three hours; rather, three hours was how much time we had already spent at the time I wrote you. As of yesterday, we have spent additional time on this request.

I anticipate there are approximately 220 pages (this is an estimate) of pages to review and produce.

With that:

6 hours at $30 an hour already spent= $180

220 pages to review/redact=4.5 x $30=$135

220 pages at .25 per page=$55

Totally cost estimate of $370. Please note that in accordance with our policy, we track time. If the review takes longer, we will ask for additional payment; if the review takes less time, then we will refund that portion of the cost deposit.

Note that regarding fees, PAIRR2 provides:

(c) *Fees.*

(1) A custodian may impose a fee in response to a record request if the custodian has, before the date of receiving the request, either posted on the custodian's website or otherwise made publicly available a written policy that specifies the applicable conditions and fees for research, retrieval, redaction, copying, and transmission of a record. Assessment of fees shall be consistent with Chief Justice Directive 06-01. Where the fee for a certified copy or other copy, printout, or photograph of a record is specifically prescribed by federal statute or regulation, state statute, court rule, or court order, the specific fee shall apply.

(2) The custodian may notify the requestor that a copy of the record is available but will only be produced once the custodian either receives payment or makes arrangements for receiving payment for all costs

associated with records research, retrieval, redaction, copying, and transmission and for all other fees lawfully imposed.

I'm including a link to our policy again:

https://coloradosupremecourt.com/AboutUs/OpenRecordsPolicy.asp

We do accept credit cards and checks.

As I mentioned in earlier correspondence, I'm happy to speak to you to discuss any questions, if you like.

Best,

April M. McMurrey
Deputy Regulation Counsel
Colorado Supreme Court
Office of Attorney Regulation Counsel
1300 Broadway, Suite 500
Denver, CO 80203
303-928-7866

---

**From:**
**Sent:** Thursday, September 19, 2024 8:33 AM
**To:** April McMurrey <a.mcmurrey@csc.state.co.us>
**Cc:** Nicolette Chavez <n.chavez@csc.state.co.us>
**Subject:** Re: Cost estimate

[Quoted te t hidden]

---

Fri, Sep 20, 2024 at 8:55 AM

To: April McMurrey <a.mcmurrey@csc.state.co.us>
Cc: Nicolette Chavez <n.chavez@csc.state.co.us>

Dear Ms. McMurrey,

Thank you for your response and clarifications.  With the information that the anticipated production will total 220 pages, I hope that you can provide a further breakdown of this estimate.  I am not understanding how it took 6 hours to collect these records, and how it will take an additional 4.5 hours to review and redact.  Also, your assessment of a per page charge does not respond to my question of

why, as the custodian of records with discretion to waive fees, that cost is not being limited to $15 for the production of electronic files.

Please provide further itemization regarding the processing hours as well as a response to my question regarding your discretion to cap the per page costs.  Under CJD 06-01, you also have discretion to limit and/or partially waive charges for research and processing.  As I understand the intent of P.A.I.R.R.2, Sec. 2(b), the custodian of records is obligated to make reasonable efforts to minimize the time and expense involved in responding to these requests.  The $370 cost estimate seems unreasonable/excessive for only 220 pages and is effectively a constructive denial of this request subject to judicial review under P.A.I.R.R.2, Sec. 5(a).

Sincerely,

[Quoted te t hidden]

--

[Quoted te t hidden]

---

**April McMurrey** <a.mcmurrey@csc.state.co.us>                    Mon, Sep 23, 2024 at 12:14 PM
To:

,

Our estimate, as I detailed below, is consistent with our written policies and procedures that I previously sent, but include here again, as well as PAIRR2.

https://coloradosupremecourt.com/AboutUs/OpenRecordsPolicy.asp

The subparts of the request have compound questions. In our effort to be responsive, we reviewed numerous emails. The emails that are responsive (gathered for purposes of the cost estimate) have been converted to PDF format so that I may now review and redact in accordance with PAIRR2.

If you would like to modify the request to narrow the records you're requesting, that may lower the cost estimate.  Also, as I previously mentioned, we also keep time when we review and redact. If the actual review and redaction time is less than the cost estimate anticipated, funds will be returned to you.

Please let me know how you would like to proceed.

Sincerely,

April M. McMurrey
Deputy Regulation Counsel
Colorado Supreme Court
Office of Attorney Regulation Counsel
1300 Broadway, Suite 500
Denver, CO 80203
303-928-7866

**From:**
**Sent:** Friday, September 20, 2024 8:56 AM
**To:** April McMurrey <a.mcmurrey@csc.state.co.us>
**Cc:** Nicolette Chavez <n.chavez@csc.state.co.us>
**Subject:** Re: Cost estimate

Dear Ms. McMurrey,

Thank you for your response and clarifications. With the information that the anticipated production will total 220 pages, I hope that you can provide a further breakdown of this estimate. I am not understanding how it took 6 hours to collect these records, and how it will take an additional 4.5 hours to review and redact. Also, your assessment of a per page charge does not respond to my question of why, as the custodian of records with discretion to waive fees, that cost is not being limited to $15 for the production of electronic files.

Please provide further itemization regarding the processing hours as well as a response to my question regarding your discretion to cap the per page costs. Under CJD 06-01, you also have discretion to limit and/or partially waive charges for research and processing. As I understand the intent of P.A.I.R.R.2, Sec. 2(b), the custodian of records is obligated to make reasonable efforts to minimize the time and expense involved in responding to these requests. The $370 cost estimate seems unreasonable/excessive for only 220 pages and is effectively a constructive denial of this request subject to judicial review under P.A.I.R.R.2, Sec. 5(a).

Sincerely,

[Quoted text hidden]

Mon, Sep 23, 2024 at 3:02 PM

To: April McMurrey <a.mcmurrey@csc.state.co.us>

Dear Ms. McMurrey,

Thank you for your email. From what you describe, 220 pages of emails have been collected for further redaction. It is still unclear to me how the collection of this limited amount of records took 6 hours to complete or why it is anticipated to take another 4.5 hours to redact information (particularly when certain

redactions such as email addresses and repeated names may be automated).  You again note that you keep time when responding to P.A.I.R.R. 2 requests. But you have not provided the requested breakdown of the 6 hours described as already spent processing these records.  As explained in my prior email, it will be helpful if you can respond to two basic questions:

1. What is the specific breakdown of time spent and expected to be spent to process this request (preferably in 0.1 hour increments with identification of the staff who have spent / will spend the time listed)?, and
2. Why, as custodian of records, are you not exercising your discretion to cap the per page charges for the production of electronic records (consistent with the fees charged to access court records through the E-File system)?

Again, without specificity and answers to the above questions, the fees estimated for this production appear unreasonable and excessive.  The intent of P.A.I.R.R. 2 and CJD 06-01 is to make public records as accessible as possible through reasonable rates and production timelines.  Without further context, the $370 estimate for only 220 electronic pages (which likely includes repeatedly duplicated email chains) appears unreasonable, excessive, and contrary to public interests.

[Quoted text hidden]

---

**April McMurrey** <a.mcmurrey@csc.state.co.us>                                        Mon, Sep 23, 2024 at 4:58 PM
To:

,

Given the breadth of the request (and its many subparts), our internal search yielded numerous emails that had to be reviewed to determine whether they were responsive. Thereafter, those emails were sorted by category and converted to PDF files. That work comprised the 6 hours already spent.

I have provided an estimate to review those pages and potentially redact information. Again, this is an estimate, done in accordance with our policy and PAIRR2.

As I noted earlier today, to decrease the estimate, you could narrow the request.

[Quoted te t hidden]

---

Tue, Sep 24, 2024 at 9:14 AM

To: April McMurrey <a.mcmurrey@csc.state.co.us>

Dear Ms. McMurrey,

It is fair to ask you to provide a more specific breakdown of the 6 hours that you describe as having been applied to this request as well as explanation of why it is estimated to take 4.5 hours to apply redactions to only 220 pages.  This request is especially reasonable given your explanation that your Office tracks time when responding to these requests.  If you could provide this requested information, I would greatly appreciate it.  The explanation will help inform my decision to either provide the deposit for processing this request or to seek judicial review as allowed under PAIRR2 Sec. 5(a).

Thank you in advance for responding to my questions and addressing my concerns.

[Quoted text hidden]

---

**April McMurrey** <a.mcmurrey@csc.state.co.us>                    Tue, Sep 24, 2024 at 1:25 PM
To:

,

Among my many duties as a deputy for OARC, I have been in charge of OARC's responses to PAIRR2 requests since 2017, and have ample experience estimating redactions or withholdings needed pursuant to PAIRR2, as well as redactions or withholdings under any applicable Chief Justice Directive, protective order, statute or court rule.  My per-page estimate is based on that extensive experience, and the fact that in any given records production, some redactions are needed for the public interest or required by PAIRR2.  See PAIRR2 Section 3(b) and 3(c).  As I have explained, you would receive any excess if it turns out that I over-estimated the amount of time, so it is not clear to me what exactly you would be asking a court to review at this point.  With respect to the hours already spent, I previously explained that we reviewed voluminous emails and then converted the responsive emails to PDFs.

Please let me know if and when you are ready to make a deposit and we'll organize with Ms. Chavez to take payment.

Sincerely,

April M. McMurrey
Deputy Regulation Counsel
Colorado Supreme Court

Office of Attorney Regulation Counsel
1300 Broadway, Suite 500
Denver, CO 80203
303-928-7866

---

**From:**                                                              >
**Sent:** Tuesday, September 24, 2024 9:14 AM
**To:** April McMurrey <a.mcmurrey@csc.state.co.us>
**Subject:** Re: Cost estimate

Dear Ms. McMurrey,

It is fair to ask you to provide a more specific breakdown of the 6 hours that you describe as having been applied to this request as well as explanation of why it is estimated to take 4.5 hours to apply redactions to only 220 pages.  This request is especially reasonable given your explanation that your Office tracks time when responding to these requests.  If you could provide this requested information, I would greatly appreciate it.  The explanation will help inform my decision to either provide the deposit for processing this request or to seek judicial review as allowed under PAIRR2 Sec. 5(a).

Thank you in advance for responding to my questions and addressing my concerns.

[Quoted te t hidden]

[Quoted te t hidden]

---

Wed, Sep 25, 2024 at 11:06 AM

To: April McMurrey <a.mcmurrey@csc.state.co.us>

Good morning Ms. McMurrey,

Please explain what is preventing you from providing an accounting and breakdown of the 6 hours that you describe as already having been spent to compile these records.  That portion of your estimate for a deposit relates to fees your Office should have already recorded and broken down by person, task, and time.

I am sorry, but I am not understanding why you are unable to respond to this reasonable request for an explanation of your calculations.  Again, thank you in advance for your cooperation in responding to my request.

Sincerely,

[Quoted text hidden]

---

**April McMurrey** <a.mcmurrey@csc.state.co.us>                    Wed, Sep 25, 2024 at 11:48 AM
To:

,

As I have previously explained, multiple times now, the request had multiple subparts. We searched our email to discern whether we had responsive communications. That search yielded multiple emails that had to be reviewed. Those emails were then converted to PDFs. The time reviewing/analyzing the requests, searching for responsive documents and then pulling those and converting them is what comprised the 6 hours.

In my many years of doing this, I have never had so much back and forth regarding a cost estimate. I have tried my best to explain to you what comprises the estimate. You'll recall I also offered to speak by phone (multiple times) to discuss our process. You declined. At this point, I don't think it's productive to continue to debate the deposit, nor does PAIRR2 require that we do so.

If you wish to proceed with making the deposit, please let me know.

[Quoted te t hidden]

---

                                                                    Wed, Sep 25, 2024 at 3:50 PM
To: April McMurrey <a.mcmurrey@csc.state.co.us>

Ms. McMurrey,

As part of my contracts with other government agencies, i.e. the Office of Alternative Defense Counsel and the Office of Respondent Parents' Counsel, I am required to provide itemized estimates and to obtain pre-approval in order to be reimbursed for CORA, PAIRR2, CCJRA, medical records, and other document requests, when the estimated costs exceed nominal amounts. With this standard practice, I am not understanding why your Office is unable to provide a more detailed breakdown of persons, tasks, and time spent as to your estimate.

[Quoted text hidden]

**Email Delivery Certificate generated by Mailsuite**

| | |
|---|---|
| **From** | |
| **Subject** | records request |
| **Message ID** | <CAG9LdbY5_EG6kx0DdyUEgPixcgzEZPKgO453qOOof8_xLFsOEQ@mail.gmail.com> |
| **Delivered on** | 17 Sep, 2024 at 4:19 PM |
| **Delivered to** | April McMurrey <a.mcmurrey@csc.state.co.us> |

**Tracking history**

👁 **Opened** on 17 Sep, 2024 at 7:48 PM by April McMurrey

👁 **Opened** on 17 Sep, 2024 at 7:07 PM by April McMurrey

👁 **Opened** on 17 Sep, 2024 at 6:51 PM by April McMurrey

👁 **Opened** on 17 Sep, 2024 at 6:03 PM by April McMurrey

👁 **Opened** on 17 Sep, 2024 at 6:02 PM by April McMurrey

👁 **Opened** on 17 Sep, 2024 at 6:02 PM by April McMurrey

👁 **Opened** on 17 Sep, 2024 at 5:56 PM by April McMurrey

👁 **Opened** on 17 Sep, 2024 at 5:55 PM by April McMurrey

mailsuite
2024 © **Mailsuite, S.L.**
C/ Córcega 301, At. 2.
08008 Barcelona - España



## Records Request

**morrison, terri** <terri.morrison@judicial.state.co.us>                    Tue, Oct 15, 2024 at 2:16 PM
To:

Good afternoon,                    .

I write in response to the "P.A.I.R.R.2 Request #22" that you submitted on September 30, 2024.  At the outset, I would note that it seeks the production of all "writings" as defined by C.R.S. § 24-72-202(7), which is a provision of the Colorado Open Records Act, not PAIRR 2, and therefore does not apply to your request.  I would also note that, contrary to the suggestion in my September 27th email that you submit a new PAIRR 2 request that seeks only the production of one or more specifically identified administrative record(s), the September 30th request did not seek *only* that type of record.  Rather, the six-page, single-space request contains 70 discrete subparts many of which seek multiple administrative records that are responsive to broad search parameters and therefore require a search of voluminous records just to search for and preliminarily review records to identify those that are responsive.

As a separate but related matter, we have been corresponding since September 9th about the 20 PAIRR 2 requests that you submitted on that date, for which I prepared and provided you with a single cost estimate for the work needed to fulfill them as a combined request on September 18th, that was superseded by an amended cost estimate that I provided to you on September 27th.  The amended cost estimate explained that between September 9th and 27th, I and the custodians of the administrative records sought by the combined request had spent 114 hours—which is the equivalent of nearly 3 work weeks—just searching for and locating the universe of records that may be responsive to that request and, based on the thousands of records in that universe, estimated that it will take an additional 281 hours to complete their review, research, and any required redaction.  With no charge for the first estimated hour for research and any redaction and based on a rate of $30.00 per hour, the updated cost estimate to complete work on your September 9th combined request was $11,820.00.

As you know, you have not yet approved the updated cost estimate and agreed to pay the actual costs to fulfill work on your September 9th combined request, which as explained in my September 27th email may be higher or lower than estimated.  Instead, you disputed the ability to treat the 20 PAIRR 2 requests that you submitted on September 9th as a combined request for which a single cost estimate may be issued and then submitted the September 30th request that indisputably seeks numerous records many of which are responsive to broad search parameters and therefore require multiple searches of voluminous records.  We estimate that it will take at least 80 hours just to search for and preliminarily review records to identify those that are responsive to your September 30th request and, based on our work to-date on your September 9th combined request, it is likely that our search will generate thousands of records that then must be reviewed and evaluated for redaction or production in compliance with PAIRR 2 such that the cost estimate to fulfill all work on that request likewise will total thousands of dollars. In short, to fulfill your September 30th request will require time-consuming work by many individuals that in turn will substantially interfere with their obligations to perform other responsibilities.

Accordingly, we are invoking the provision of PAIRR 2, § 2(a) that authorizes the custodian of any administrative record to "make policies governing the inspection of administrative records that are reasonably necessary to … prevent unnecessary interference with the regular discharge of the duties of the custodian or the custodian's office" to bifurcate the cost estimate for work on your September 30th request as follows: (1) To search for and preliminarily review records to identify those that are responsive to that request, we estimate that it will take 80 hours, with no charge for the first hour at a rate of $30.00 per hour for a total of $2,370, which you are required to pay in full before any further work is undertaken.  Please note that if the actual number of hours to complete the search for and preliminary review of records is lower than estimated, you will be refunded the difference, and if it is higher than estimated, we will stop work and ask you to approve and pay the estimated difference to continue and complete the work; and (2) Once the search for and preliminary review of records has been completed, we will present you with a separate estimate for the cost to review, research, and make any required redaction of the administrative records that were identified as responsive. If you approve

the second cost estimate and the production of more than 20 pages of documents is required to fulfill the September 30th request, then you will also be charged $.25 per page ($.50 if double-sided) for all documents photocopied, scanned, or produced.  Payment of the actual cost must be received before delivery of any responsive record(s) that are required to be produced under PAIRR 2.

Please let me know within 7 business days from today whether you approve the first cost estimate for work on your September 30th request and, if so, please mail a check payable to The Colorado Judicial Department in the amount of $2,370 to the Colorado State Court Administrator's Office, 1300 Broadway, Suite 1200, Denver, CO 80203. You may address the envelope to my attention.  If no such response is received, your September 30th request will be deemed abandoned and administratively closed.

Best,

Terri S. Morrison (she/her)

Legal Counsel Colorado Judicial Department

State Court Administrator's Office

O: 720-625-5817

[Quoted text hidden]

# Appendix 31

# Colo. Comm'n Jud. Discipline Posting for 2024 Executive Director Vacancy.

Sign In

**'GLASSDOOR'**

☰

⚠  **Job expired**  The job listing posted on Mar 28, 2024 is no longer available

 **Colorado Judicial Branch**  3.7 ★

# Courtesy Posting: Executive Director, Colorado Commission on Judicial Discipline

•••

Denver, CO

**Courtesy Posting: Executive Director, Colorado Commission On Judicial Discipline**
JOB CODE
**EU00426**
LOCATION
**Denver / Denver County**
DEPARTMENT
**Other**
POSTED
**28-Mar-2024**
CLOSES
**27-Apr-2024**
POSITION INFORMATION
**\*\*\*This is a courtesy posting for the Colorado Commission on Judicial Discipline\*\*\***
Monthly Salary: $16,084.00
Click here for information on employee benefits.
**MISSION STATEMENT**
The Commission is accepting applications from attorneys in good standing in the state of Colorado to serve as Executive Director. The Commission's office is located in the Ralph Carr Judicial Center.
The Commission is charged with assessing allegations of misconduct by the judges of the state courts of Colorado, including judges of County and District Courts, judges of the Court of Appeals, and justices of the Supreme Court. The Commission is a constitutional body created in Article VI, Section 23(3) of the Colorado Constitution. The Commission evaluates and addresses allegations that a judge's conduct violates the Colorado Code of Judicial Conduct (the "Code").
Operations of the Commission are funded by a portion of the annual license fees paid by Colorado attorneys and judges to the Supreme Court which are administered by the Office of Attorney Regulation Counsel. The Commission is an independent agency that oversees compliance with the Code.
**STATEMENT OF DUTIES**
The Executive Director is responsible for the management of the Commission's office, including the employment of staff, responding to the public, support of the Commission's website, the maintenance of files in accordance with appropriate record retention and confidentiality policies, preparation and

’GLASSDOOR’

public and the judiciary about the Commission.

An ideal candidate will have demonstrated good judgment and discernment in previous positions. The Executive Director is required to develop a timely and responsive initial review of Requests for Evaluation of Judicial Conduct to determine whether the allegations are within the jurisdiction of the Commission and whether there is a reasonable basis for the Commission to commence disciplinary proceedings. The Executive Director provides each complainant with a written response, explaining either that there are no plausible grounds for commencing disciplinary proceedings or that the Request for Evaluation has been referred to the members of the Commission as a complaint. The Executive Director conducts a preliminary investigation of the allegations; assembles and distributes information about the complaint to the members of the Commission for their consideration; and provides each complainant with a written explanation of the status of the complaint and the Commission's decisions.

The Executive Director is required to take appropriate measures to ensure the confidentiality of the Commission's proceedings in accordance with the Colorado Constitution and Colorado Rules of Judicial Discipline ("Colo. RJD") 6.5.

The Executive Director shall attend and participate in the meetings and other activities of national organizations which focus on judicial ethics and judicial discipline.

The Executive Director is a full-time position.

**ADDITIONAL COMMENTS**

**How to Apply:**

Please submit your resume, at least 3 references, and a cover letter to the Commission to Gina Cannan at gina.cannan@coag.gov and Mindy Sooter at Mindy.Sooter@wilmerhale.com.

**Reports To:**

This position is appointed by the Commission on Judicial Discipline under Colo. RJD 2(j), 3(d). The Executive Director reports to the members of the Commission and manages the operations of the Commission in accordance with Article VI, Section 23, of the Colorado Constitution and the Colo. RJD. The Executive Director also helps the Commission prepare an annual report to the public of the Commission's activities.

The employment policies of the Colorado Judicial Branch apply to the conduct of the Executive Director, in addition to the provisions of Colo. RJD. This is an at-will position, subject to appointment, renewal, and termination on such terms as may be determined by the Commission.

**ESSENTIAL FUNCTIONS**

The Executive Director handles the administrative and budgeting support for the Commission as discussed above. The Executive Director interacts extensively with members of the public in relation to requests for evaluation of potential judicial misconduct and must have outstanding interpersonal communication skills and positively represent the work of the Commission. The position involves substantial writing obligations to be executed in a clear and concise manner, analyzing potential misconduct claims and explaining those analyses to a professional and lay audience. The position requires objectivity to allow the Commission to make its determinations and effectively build consensus, when possible. The position requires an unbiased commitment to efficient disposition of all matters before the Commission, emphasizing transparent communication to the Commission. The Executive Director is also the primary point of contact for the Commission with other state entities such as the Office of Attorney Regulation Counsel, the State Court Administrator's Office, the Office of the Attorney General, the Judicial Department, and others. The position must cultivate and maintain trusted professional relationships with these entities and must represent the Commission with discretion and professionalism. Preference will be given to candidates with an established reputation within the Judicial Branch of good judgment, an ability to consider other perspectives, and an ability to build relationships.

**'GLASSDOOR'**

practice in Colorado for a minimum of ten years, have no disciplinary history of their law license or other licenses held in Colorado or other states, and have extensive experience with the courts and/or the administrative functions of the judicial branch to understand and oversee the compliance of judges with the Colorado Code of Judicial Conduct.

**Specialized Knowledge:**

The successful candidate will have strong legal analysis and writing skills, oral communication skills, an understanding of and experience with the operations of courts, capacity for detail work, administrative and organizational skills, budgeting skills, basic technology skills, and the ability to work in relative isolation.

**Preferred qualifications:**

While not required, knowledge of the Colorado Code of Judicial Conduct and the Colorado Rules of Judicial Discipline is preferred. Prior experience working for or with a professional regulatory or oversight entity will be valued. Applicants with experience addressing or litigating a variety of types of matters in courts (preferably in Colorado state courts) and addressing personnel and employment issues as well as handling personnel or other factual investigations are preferred. Experience managing confidentiality requirements for information and files is preferred. Prior experience working with self-represented litigants or analogous customer service experience is also preferred. Conflict de-escalation experience as well as press relations experience are also valued.

Show less ⌄

## Base pay

**$16K**/mo (Employer est.)

Denver, CO

ⓘ If an employer includes a salary or salary range on their job, we display it as an "Employer Estimate". If a job has no salary data, Glassdoor displays a "Glassdoor Estimate" if available. To learn more about "Glassdoor Estimates," see our **FAQ** page.

## Related pages

Courtesy Posting: Executive Director, Colora... jobs in Denver, CO →

Jobs at Colorado Judicial Branch in Denver, CO →

Courtesy Posting: Executive Director, Colora... salaries in Denver, CO →

Reviews at Colorado Judicial Branch →