

# The Gregory Law Firm, LLC

Christopher S.P. Gregory
Attorney at Law

cspgregory@thegregorylawfirm.net

September 30, 2025

Colorado Judicial Discipline Rulemaking Committee
Ralph L. Carr Judicial Center
1300 Broadway, Suite 210
Denver, CO 80203

*Re: Third Supplement to Public Notice and Comment as to Proposed Colo. RJD Amendments and Request for Evaluation of Judicial Conduct; Appendices 1-4*

Dear Committee Members:

Not only does the emperor wear no clothes, the emperor is so delusional as to believe the world will be entertained by a striptease.

On August 25, 2025, I submitted my dually-filed public comments and request for evaluation (RFE) of judicial conduct as to the Justices of the Colorado Supreme Court, the members of the Colorado Judicial Discipline Adjudicatory Board (CJDAB), the judge members of the Colorado Commission on Judicial Discipline (CCJD), and the judge members of this Committee.  I directly called for the disqualification of all these judicial discipline oversight entities and for their re-composition through conflict-free appointments.  Instead of giving my public comments and RFE any meaningful consideration, this Committee, the Colorado Supreme Court, the CJDAB, and the CCJD have intentionally disregarded the issues raised.  The Colorado Office of Judicial Performance Evaluation and the State Commission on Judicial Performance have also failed to take any action in response to my public comments, RFE, and supplements notwithstanding their continuous and ongoing obligations to verify the integrity of all Colorado justices and judges.[1]

Despite their awareness of my public comments and RFE through Justice Richard Gabriel's membership on this Committee, the Justices proceeded to issue their opinion in *Matter of Stanley*, 2025 CO 51 on September 8, 2025.  The CCJD, after initially refusing to accept the RFE, initiated formal judicial discipline proceedings in *Matter of MacLaren*, CCJD Case No. 25-071, also on September 8, 2025.  This Committee responded to my August 25th public

---

[1] *Contra* § 13-5.5-107(1), C.R.S. (performance commissioners "shall evaluate each justice and judge in Colorado" for "(a) Integrity, including but not limited to whether the justice or judge: (I) Avoids impropriety or the appearance of impropriety; (II) Displays fairness and impartiality toward all participants; and (III) Avoids ex parte communications[.]"); *see also* the Code, Terminology ("Integrity means probity, fairness, honesty, uprightness, and soundness of character."); Canon Rule 1.1 ("A judge shall comply with the law, including the Code of Judicial Conduct."); Canon Rule 1.2 ("A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and avoid impropriety and the appearance of impropriety.").

PLAINTIFF'S EXHIBIT 1-7

EXHIBIT 7

201 Coffman St., #1822, Longmont, CO 80502
● 970-648-0642 ● Fax: 970-648-0643 ●

Christopher S.P. Gregory, esq.
September 30, 2025
Page 2 of 7

comments, RFE, and additional supplements submitted on September 12, 2025 by refusing to accept the submissions and clumsily applying presumptively invalid prior restraints. Indeed, this Committee's attempts to impose prior restraints are transparent efforts to avoid its obligations to respond to public comments on the record. § 13-5.3-107(2), C.R.S.; *Cf.* § 24-4-103(4)(a), C.R.S. (Colorado Administrative Procedures Act (APA) requires agencies to respond to public comments as part of rulemaking; "The agency shall consider all such submissions."); § 24-4-106(4), (7)(b) (authorizing judicial review of agency rulemaking with grounds to invalidate agency actions made contrary to procedural requirements, including agency's obligations to respond to public comments).

As relevant to this supplement, this Committee further intentionally disregarded my August 25th public comments and RFE by refusing to recuse itself while quietly announcing additional interim and proposed rule changes to Colo. RJD 35 and Colo. RJD 36 on the CCJD's website.[2] The additional proposed rule changes announced on September 10, 2025 will gut the long-standing constitutional and statutory authorization for assessment of both attorney's fees and costs in judicial discipline proceedings. Moreover, the proposed changes to Colo. RJD 35 and Colo. RJD 36 omit any express mechanism for recoupment of a suspended judge's salary and benefits upon the adjudication of judicial misconduct. In other blatant efforts to protect subject judges (rather than holding them accountable consistent with the CCJD's constitutional mandate as recognized by Colo. RJD 1(b)), this Committee's proposed rule changes leave diversion plans and dismissals with concerns in the absolute discretion of the CCJD while walking back catchall remedies so that they are "not punitive." As proposed, informal diversion plans will now *require* deferred discipline (i.e. an ultimate dismissal upon successful completion). For no explained reason, this Committee also proposes removing the CCJD's authority to impose private admonition(s) (where misconduct is limited to the creation of appearances of impropriety). Additionally, this Committee's proposed changes to Colo. RJD 35(d)-(f) distort the definitions of admonition, reprimand, and censure while further confusing the imposition of such dispositions/sanctions with determinations whether a disciplinary response should be public versus private. The distinction between private and public discipline, however, should not depend upon the severity of the conduct but, instead, should depend upon the nature of the

---

[2] Even though I had submitted my August 25th public comments followed by two supplemental submissions on September 12th, this Committee intentionally failed to inform me of its promulgation of additional amendments to Colo. RJD 35 and Colo. RJD 36. In my August 25th public comments, I called for the amendment of Colo. RJD 35 and Colo. RJD 36 to recognize the CCJD's ability to recover reasonable attorney's fees in all proceedings (informal or formal) as a prevailing party with reciprocal protections for subject judges to recover the costs of defense upon proof that the CCJD's prosecution was "frivolous, vexatious, or groundless." In its proposed rule changes, this Committee would remove the availability of attorney's fees in informal proceedings and would shift the burden to the CCJD to prove that a subject judge's defense was "substantially frivolous, substantially groundless, or substantially vexatious" for the CCJD to recover attorney's fees following formal proceedings. According to this Committee's proposed amendments, it is hard to imagine under what circumstances the CCJD would ever receive an award of attorney's fees. The proposed rule change serves the Justices' self-interests by preventing the possibility of the CCJD recovering approximately $100,000 of attorney's fees and costs from them for the investigation and prosecution of *Matter of Coats*, 2023 CO 44, when the other Justices were complicit in the same judicial misconduct admitted to by former Chief Justice Coats.

Christopher S.P. Gregory, esq.
September 30, 2025
Page 3 of 7

conduct (such as whether the conduct occurs in open court or on the record, involves a public duty (i.e. personal financial disclosures), and/or involves a publicly charged criminal offense).

The rule change proposals announced on September 10, 2025 (with interim rules made effective September 9, 2025) appear to have been coordinated with the Colorado Supreme Court's issuance of its opinion in *Stanley* and the CCJD's initiation of formal proceedings in *MacLaren*, both on September 8, 2025.  When presented with constitutional amendments, the voters' consistent intent in 1966, 1982,[3] and 2024 was to recognize that taxpayers should not subsidize judicial misconduct and/or any incentives to delay or otherwise blunt accountability through the judicial discipline process.  The voters' intent was reinforced by the Colorado Legislature's passage of SB 22-201, which included authorization for the CCJD to recover attorney's fees and costs into its special cash fund.  § 13-5.3-104(3), C.R.S.  Unfortunately, this Committee is hijacking the rulemaking process to blatantly protect subject judges and to obstruct the public's, the CCJD's, and victims' access to full remedies.

As explained in my August 25th public comments, when Amendment H was ratified by a 73% majority, Colorado voters mandated reforms designed to bring transparency and accountability to Colorado's judicial discipline structure by removing the Colorado Supreme Court's control over that structure.  This Committee was created and authorized by Colo. Const. Art. VI, § 23(3)(k)(I), which requires the Committee to promulgate rules that define burdens of proof, "confidential reporting procedures," and "complainant rights."  Instead of conforming to this constitutional mandate, this Committee has only promulgated proposed rule changes that further insulate subject judges, prevent transparency, and facilitate public fraud through secretive backroom deals.  This Committee's proposed rule changes (particularly amendments to Colo. RJD 34) seek to maintain the Colorado Supreme Court's control over critical aspects of judicial disciplinary proceedings, including determining when sufficient grounds exist for a subject judge's temporary suspension.  This Committee offers no proposed rules to consistently enforce disqualification obligations across judicial oversight entities according to the standard defined by Canon Rule 2.11 of the Colorado Code of Judicial Conduct (the Code).  Likewise, this Committee does not propose any rules to recognize complainant rights, including rights to be informed and rights of appeal.  This Committee's rule changes disrespect the voters' will and victims' interests in judges being held accountable for unethical conduct.

This Committee's intentional disregard of my public comments appears to be part of a broader strategy to suppress all public criticism of the Justices and the malfeasance of individuals

---

[3] Authorization for the CCJD to recover attorney's fees and costs was originally added to the Colorado Constitution through approval of Amendment 3 in 1982.  Prior to Amendment H, Colo. Const. Art. VI, § 23(3)(g) provided, in relevant part: "The commission shall have the authority to . . . seek attorney fees and costs as provided by rule."  Colo. Const. Art. VI, § 23(e)(II) now provides that (in either the appeal of an informal remedial action or in formal proceedings): "The adjudicative panel may also order that the costs of the investigation and hearing be assessed against such justice or judge."  Moreover, nothing in Colo. Const. Art. VI, § 23(k) diminishes or restricts this Committee's authority to define remedies (either informal dispositions or formal sanctions) and to maintain/expand the CCJD's authority to seek awards of reasonable attorney's fees and costs.  *See also Matter of Scipione*, 2024 CO 23, ¶¶ 26, 35-36 (affirming standard for awarding attorney's fees to CCJD calculated at market rate and as authorized under Colo. RJD 36(g)).

Christopher S.P. Gregory, esq.
September 30, 2025
Page 4 of 7

responsible for enforcing ethical standards through Colorado's judicial oversight systems.  In addition to seeking accountability through this Committee and the CCJD, I filed a complaint with the Colorado Division of Civil Rights alleging retaliation in violation of the Colorado Anti-Discrimination Act, Title 24, Art. 34, C.R.S.  Through a faceless and nameless bureaucrat, the Division responded with a jurisdictional dismissal coupled with assertions that the dismissal is not appealable to the Colorado Civil Rights Commission.  Appendix 1.  The Statement of Discrimination and supporting evidence that I submitted to the Division is attached as Appendix 2.  These materials are relevant to this Committee's refusal to address my public comments, requests for this Committee's disqualification, and my requests for conflict-free consideration of my dually filed RFE and request for enforcement of the CCJD's Code of Conduct.  For their part, the Justices have continued to deploy a public relations strategy through which they hide behind expressed commitments to "judicial independence" and "the rule of law" as a means of excusing the Justices' own substantial departures from their duties under the Code.[4]

The keystone of the Masias Controversy and the Colorado Judicial Scandal is that the Justices, Counsel to the Chief Justice Andrew Rottman, State Court Administrator's Office (SCAO) Legal

---

[4] Rather than acknowledging the merits and importance of the issues raised in my dually filed August 25th public comments and RFE as reinforced by my September 12th supplements, the Justices have persisted in leaning into journalistic puff pieces and other public "outreach."  Examples of news articles published since August 25th, include:

> Michael Karlik, *"I can help open doors": Colorado Supreme Court Justice, Judges Speak About Obligation to Mentor*, COLORADO POLITICS, September 4, 2025;
>
> Michael Karlik, *Why is Colorado's Chief Justice Now the Chief Dissenter*, COLORADO POLITICS, September 18, 2025.
>
> Michael Karlik, *Colorado's Chief Justice Describes Threats, Invasions of Privacy After Trump Disqualification Decision*, COLORADO POLITICS, September 26, 2025.

It is extremely troubling that, with awareness of the August 25th public comments and RFE, reporter Michael Karlik penned the above articles without reporting on publicly-asserted concerns about the Justices' ethics and conduct, including the politicized announcement of their opinion in *Anderson v. Griswold*, 2023 CO 63 despite a then-pending judicial discipline complaint against them.  Beyond the existing press coverage, Justice Richard Gabriel is scheduled to give a presentation on legal ethics and professionalism to the Minoru Yasui Inn of Court on October 8, 2025.

The Justices have a history of coopting the assistance of federal judges as part of their conflicted legislative engagement (i.e. former Chief Justice Brian Boatright testifying to a "reach out" from former 10th Circuit Chief Judge Timothy Tymkovich during legislative testimony on April 14, 2022) and their pursuit of self-serving awards (i.e. Justice Richard Gabriel's receipt of the American Inns of Court 2024 10th Circuit Court Professionalism Award).  On October 29, 2025, Chief Justice Monica Márquez is scheduled to participate in a panel discussion titled *The Rule of Law Beyond Politics: A Judicial Conversation*.  The panelists are 10th Circuit Senior Judge Timothy Tymkovich, U.S. Magistrate Judge Cyrus Chung, Chief Justice Monica Márquez, and 8th Judicial District Chief Judge Susan Blanco.  The panel is being jointly sponsored by the Faculty of Federal Advocates, the Colorado Bar Association, and the University of Denver Strum College of Law.  The Justices' indirect responses to my August 25th public comments and RFE through misleading public engagement only continues to create appearances of impropriety in violation of Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 3.1, and 4.1 of the Code.

Christopher S.P. Gregory, esq.
September 30, 2025
Page 5 of 7

Counsel Terri Morrison, Attorney General Phil Weiser,[5] Chief Deputy Attorney General Natalie Hanlon Leh, Court of Appeals Judge (previously Assistant Solicitor General) Grant Sullivan, and 1st Assistant Attorney General LeeAnn Morrill knowingly concealed material information from the Colorado Office of the State Auditor (OSA) while the OSA performed its federally required single statewide audit and related fraud investigations.  These circumstances are probable cause to suspect the commission of multiple felony-level federal crimes, including but not limited to obstruction of justice (18 U.S.C. § 1503), false statements (18 U.S.C. § 1001), and obstruction of a federal audit (18 U.S.C. § 1516).  When federal law enforcement was presented with evidence of these suspected crimes, however, attorneys within the Department of Justice—Denver Office failed to disqualify themselves and their Office from the investigation and potential prosecution, as otherwise required by federal law and the DOJ's internal policies.  *See* 18 U.S.C. § 208 (prohibiting and criminalizing official actions taken when the federal official or their spouse has financial interests in the outcome); 5 C.F.R. § 2635.501-503 (defining general grounds for disqualification to ensure appearances of impartiality); 28 C.F.R. § 45.2 (defining conflicts of interest in criminal investigations including political and personal relationships).  In addition to other conflicts of interest, the principal conflict is that Justice Melissa Hart's husband, Kevin Traskos, is Chief of the DOJ—Denver Office's Civil Division (which oversees civil fraud enforcement in coordination with the Criminal Division).  These basic facts are elaborated upon in the attorney discipline complaints attached as Appendix 3 and concurrently filed with both the U.S. District Court for Colorado and the U.S. Court of Appeals for the 10th Circuit.  It deserves emphasis that a criminal conviction is not required for judicial discipline and/or attorney discipline.  *See, e.g., In re Cruikshanks*, 648 S.E.2d 19, 23 (W. Va. 2005) (neither conviction nor criminal charge prerequisite to judicial discipline where state supreme court had inherent authority and duty to "promote and protect the honor, integrity, dignity, and efficiency of the judiciary and the justice system"); *People v. Parsley*, 109 P.3d 1060 (Colo. PDJ 2005) (criminal conviction not predicate to attorney discipline under Colo. RPC 8.4(b), (c); "Disbarment is the presumptive sanction for the commission of a serious crime involving dishonesty.").

Finally, it is important to recognize that the judge and attorney members of this Committee are overtly violating the Code and the Colorado Rules of Professional Conduct by failing to take appropriate action (including self-reporting misconduct) and by refusing to disqualify themselves.

Canon Rule 2.15 provides, in relevant parts:

> **(A)** A judge having knowledge* that another judge has committed a violation of this Code that raises a substantial question regarding the judge's honesty, trustworthiness, or fitness as a judge in other respects shall inform the appropriate authority.*

---

[5] Despite Attorney General Weiser running for Governor, the Colorado Democratic Party, the Colorado Republican Party, and Attorney General Weiser's opponents are failing to raise significant concerns about his integrity and involvement in the Masias Controversy.  Appendix 4 (emails to Senator Barbara Kirkmeyer, Colorado Democratic Party Chair Shad Murib, and Colorado Republican Party Chair Brita Horn highlighting historic press coverage of Weiser's part in negotiating non-disclosure agreements and his refusal to respond as to whether he was aware of the Masias Memo and contemplation of the $2.66-2.75 million sole-source, *quid pro quo* Masias Contract).

Christopher S.P. Gregory, esq.
September 30, 2025
Page 6 of 7

> **(B)** A judge having knowledge that a lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question regarding the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate authority.

Canon Rule 2.16 further provides:

> **(A)** A judge shall cooperate and be candid and honest with judicial and lawyer disciplinary agencies.

> **(B)** A judge shall not retaliate, directly or indirectly, against a person known* or suspected to have assisted or cooperated with an investigation of a judge or a lawyer.

According to Colo. RPC 8.3, attorneys (regardless of whether they are also serving as judges) similarly have obligations to do the right thing. Colo. RPC 8.3 provides, in relevant parts:

> **(a)** A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct . . . that raises a substantial question as to that lawyer's . . . honesty, trustworthiness or fitness as a lawyer . . . in other respects, shall inform the appropriate professional authority.

> **(b)** A lawyer who knows that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judge's fitness for office shall inform the appropriate authority.

Colo. RPC 8.4(a)-(d), (f), (h) also expressly prohibit attorneys from obstructing justice, including by knowingly assisting judges violate their ethical duties under the Code. Colo. RPC 8.4 provides, in relevant parts:

> It is professional misconduct for a lawyer to:

> **(a-1)** violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
>
> * * *
>
> **(b)** commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

> **(c)** engage in conduct involving dishonesty, fraud, deceit or misrepresentation, except that a lawyer may advise, direct, or

Christopher S.P. Gregory, esq.
September 30, 2025
Page 7 of 7

supervise others, including clients, law enforcement officers, and investigators, who participate in lawful investigative activities;

**(d)** engage in conduct that is prejudicial to the administration of justice;

\* \* \*

**(f)** knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law;

\* \* \*

**(h)** engage in any conduct that directly, intentionally, and wrongfully harms others and that adversely reflects on a lawyer's fitness to practice law[.]

Instead of doing the right thing, abandoning their proposed rule changes, and disqualifying themselves, the members of this Committee have re-doubled their efforts to assist the Justices of the Colorado Supreme Court avoid *any* accountability for the most significant public corruption Colorado has seen since the 1920s, when the KKK took control of Colorado's State Government and some local governments.  It is both unethical and unlawful for this Committee to proceed with promulgation of its proposed rule changes.

Again, I call upon the Colorado General Assembly to exercise oversight authority through the Colorado State Auditor's appointment of another state's attorney general as a Special Assistant Attorney General (SAAG) and/or by opening a direct conflict-free investigation into the Colorado Judicial Scandal.

Sincerely,

Christopher S.P. Gregory
Enclosures (4)

Cc: The Colorado Commission on Judicial Discipline
The Colorado Office of the State Auditor / the Colorado Fraud Hotline
The Colorado Office of Judicial Performance Evaluation
Members of the Colorado General Assembly
The Denver Gazette
The Denver Post
The Durango Herald
9News
CBS Colorado



**COLORADO**
Department of
Regulatory Agencies
Colorado Civil Rights Division

Christopher Gregory
201 Coffman St., #1822
Longmont, Colorado 80502

September 17, 2025

RE: CCRD Intake Inquiry No. E-31792x - <u>Gregory v. The Colorado Commission on Judicial Discipline</u>

Dear Christopher Gregory,

The Colorado Civil Rights Division is in receipt of your above-referenced employment discrimination intake questionnaire. Upon review of the information that you provided, it appears that the Division lacks jurisdiction over your allegations pursuant to the Colorado Anti-Discrimination Act (CADA), and therefore, the Division is unable to investigate this matter. Specifically, the allegations fail to assert any actionable claim of a violation of Colorado's employment anti-discrimination statute, as defined and required by the provisions of CADA. C.R.S. § 24-34-402. Moreover, the claims at issue would nonetheless be barred as untimely per C.R.S. § 24-34-403.

Accordingly, the Division is closing this matter and will take no further action. You may want to consult with an attorney in order to determine other legal options available to you.

Sincerely,

Colorado Civil Rights Division

1560 Broadway, Suite 825, Denver, CO 80202    P 303.894.2997    1-800.866.7675    www.colorado.gov/dora



Appendix 1

## Christopher Gregory

| | |
|---|---|
| **From:** | Christopher Gregory |
| **Sent:** | Wednesday, September 24, 2025 4:27 PM |
| **To:** | 'CCRD Intake - DORA, DORA' |
| **Subject:** | RE: Notice of Appeal Form |

Good Afternoon,

Please explain how a jurisdictional dismissal is any different from a "no probable cause" determination as an adjudication subject to appeal under the Colorado Administrative Procedures Act § 24-4-102(2)-(3), (10), § 24-4-105(14)(a)(II), C.R.S.  The Colorado Civil Rights Commission may ultimately affirm the Civil Rights Division's jurisdictional dismissal but the Civil Rights Division does not have authority to prevent the filing of an appeal from either a formal or an informal adjudication to the Colorado Civil Rights Commission.  The unavailability of agency/commission review through your interpretation of § 24-34-306(2)(b)(I)(A), C.R.S. and 3 CCR 708-1 Rule 10.6 is a violation of due process and rights to be heard under the 14th Amendment to the U.S. Constitution, Colo. Const. Art. II, § 25, and § 24-4-105(1), C.R.S.

I have separately submitted a CORA request for the Notice of Appeal form.  Please provide a copy of the form so that I can file it with you and allow the Civil Rights Commission to address this issue as well as the merits of an administrative appeal.

Sincerely,

Christopher Gregory



The Gregory Law Firm, LLC

Christopher S.P. Gregory
Attorney at Law

201 Coffman St., #1822, Longmont, CO 80502

● Phone:  970.648.0642 ● Fax:  970.648.0643 ●

This e-mail transmission contains information from the Gregory Law Firm, LLC which may be confidential or protected by the attorney-client privilege.  If you are not the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is prohibited.  If you have received this transmission in error, please notify us immediately by e-mail and delete the original transmission.

**From:** CCRD Intake - DORA, DORA <dora_ccrdintake@state.co.us>
**Sent:** Wednesday, September 24, 2025 3:51 PM
**To:** Christopher Gregory <cspgregory@thegregorylawfirm.net>
**Cc:** CCRD <dora_ccrd@state.co.us>
**Subject:** Re: Notice of Appeal Form

Good afternoon,

Thank you for your email.  Please note that the right to an appeal as discussed in C.R.S. 24-34-306(2)(b)(I)(A) and Commission Rule 10.6 (3 CCR 708-1) applies only to a "no probable cause" determination following an investigation into a formalized, jurisdictional complaint.  In this circumstance, the governing laws do <u>not</u> provide for any right to an appeal as the allegations are not jurisdictional and cannot be formalized into a valid complaint for investigation.

---------- Forwarded message ---------
From: **Christopher Gregory** <cspgregory@thegregorylawfirm.net>
Date: Sun, Sep 21, 2025 at 4:20 PM
Subject: Notice of Appeal Form
To: dora_ccrd@state.co.us <dora_ccrd@state.co.us>

Good Afternoon,

I received notice that the Civil Rights Division dismissed my retaliation claim filed in Inquiry No. E-31792x and brought according to § 24-34-402(1)(e), C.R.S., as further defined by 3 CCR 708-1 Rule 85.1(D).  I dispute this determination as well as the conclusion that the inquiry is untimely given that the retaliation against me is ongoing through barriers to seeking remedies via my former employer's own internal processes/rules.  I understand that I am entitled to appeal this dismissal to the Colorado Civil Rights Commission under 3 CCR 708-1:10.6.  Unfortunately, the CCRD and the CCRC's website does not appear to contain the required notice of appeal form.  Please provide the form or direct me to where I might find it on the website.  The status of my case in CaseConnect has changed from "intake" to "on hold."  I am assuming that the next step is for me to file the notice of appeal form with your office.

I appreciate your assistance with this request.

Warmest regards,

Christopher Gregory

 The Gregory Law Firm, LLC

Christopher S.P. Gregory

Attorney at Law

201 Coffman St., #1822, Longmont, CO 80502

● Phone:  970.648.0642 ● Fax:  970.648.0643 ●

This e-mail transmission contains information from the Gregory Law Firm, LLC which may be confidential or protected by the attorney-client privilege.  If you are not the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is prohibited.  If you have received this transmission in error, please notify us immediately by e-mail and delete the original transmission.

--

Intake Unit
Colorado Civil Rights Division



1560 Broadway Street, Suite 825, Denver, CO 80202
(303) 894-2997  |  dora_ccrdintake@state.co.us
https://ccrd.colorado.gov

CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not an intended recipient you are not authorized to disseminate, distribute or copy this e-mail. Please notify the sender immediately if you have received this e-mail by mistake and delete this e-mail and any attachments from your system.

I was appointed to the Colorado Commission on Judicial Discipline (the CCJD) on May 15, 2017 by Governor John Hickenlooper.  Subsequently, I was elected by the CCJD to serve as Vice-Chair and, then, Chair.  My tenure on and working for the CCJD reflects my steadfast commitment to protecting victims of judicial misconduct and enforcing prohibitions against discrimination, retaliation, and harassment.  *Matter of Booras*, 2019 CO 16; *Matter of Kamada*, 2020 CO 83; *Matter of Chase*, 2021 CO 23; *Matter of Thompson*, 2022 CO 39; *Matter of Timbreza II*, 2023 CO 16; *Matter of Thompson II*, 2023 CO 21; *Matter of Coats*, 2023 CO 44; *Matter of Kiesnowski*, 2024 CO 12; *Matter of Scipione*, 2024 CO 23; *Matter of Woods*, 2024 CO 72.

On April 15, 2019, an anonymous Fraud Hotline complaint was personally sent to each Justice of the Colorado Supreme Court, Attorney General Phil Weiser, and Governor Jared Polis.  The April 15th Fraud Hotline complaint alleged widespread corruption within the Colorado State Court Administrator's Office (SCAO), particularly alleging financial misconduct by SCAO Chief of Staff Mindy Masias.  At the time, Masias was being fired for altering financial records but, instead, negotiated a voluntary separation.  On June 3, 2019, the Justices of the Colorado Supreme Court collectively re-approved a $2.66-2.75 million sole-source leadership training contract with Masias that was pre-conditioned upon a non-disclosure agreement.  When the existence of the Masias Contract became public and the Justices cancelled the contract, Attorney General Weiser and Governor Polis did nothing to inquire as to the validity of the April 15th Fraud Hotline complaint and whether there was broader judicial, attorney, and official misconduct within the Colorado Judicial Department.

In early 2021, news broke that, as part of negotiating the Masias Contract, Masias's colleague and SCAO HR Director Eric Brown presented a memorandum (the Masias Memo) describing judicial, attorney, and official misconduct that Masias had allegedly covered up in her roles as the Chief of Staff and as the prior HR Director.  The existence of the Masias Memo (and its allegations of various forms of historic discrimination, sexual harassment, workplace harassment, and general toxicity in the Judicial Department) had been hidden from the State Auditor by the Justices and the Colorado Attorney General's Office (including attorneys Grant Sullivan and LeeAnn Morrill).[1]

In response to public allegations made by former State Court Administrator Christopher Ryan and a November 2020 SCAO Performance Audit Report from the Colorado State Auditor that found that the Masias Contract created "appearances of impropriety," I exercised my authority as Chair to begin seeking records and resources to investigate the Justices.  Chief Justice Boatright was uncooperative and, with the other Justices, sought to deflect the allegations by commissioning outside self-investigations paid for with taxpayer funds.  According to Canon Rule 2.9(C) of the Colorado Code of Judicial Conduct (the Code), however, judges are prohibited from investigating cases that might come before them.  As became clear through later developments, Chief Justice Boatright apparently conspired with others to have Governor Jared Polis retaliate against me and not renew my appointment to the CCJD on June 30, 2021.  Instead, Governor Polis appointed attorney Mindy Sooter, who was closely aligned with Attorney

---

[1] There are many examples of the reported "toxic," discriminatory, and abusive workplace culture within the Colorado Judicial Department.  One former Judicial Department employee summed it up well: "Judicial is the ex-boyfriend that abuses you, and when you say something about how they're abusing you, they tell you you're the crazy one[.]" Shelly Bradbury, *Women Describe Pervasive Sexism, Toxic Work Environment in Colorado's Judicial Branch: Seven Current, Former Employees Spoke to The Denver Post About Experiences Working in Judicial Department*, DENVER POST, April 2, 2021.

Appendix 2    -1-

General Phil Weiser and her then-law partner John F. Walsh (who had been initially retained to perform the Justices' self-serving and ethically prohibited "independent investigations"). When other investigators were ultimately chosen through an inter-branch panel, the Attorney General's Office would be used as a go-between to supervise the investigations on behalf of the Justices.[2]

I was then hired back as the CCJD's Executive Director on December 17, 2021 and started work on January 3, 2022. During the spring of 2022, with the Commissioners and Senate Judiciary Chair Pete Lee, we managed to pass the most significant reforms to the Colorado judicial discipline system in approximately 40 years through SB 22-201. Part of the reforms included the creation of the Legislative Interim Committee on Judicial Discipline. As the Interim Committee's process began, the CCJD sent the Justices individual letters (dated June 13, 2022 and July 1, 2022) requesting their disqualification from judicial discipline related matters, including control over the disclosure of records in the investigation of the Masias Controversy, hearing other judicial discipline cases, and participation in the legislative and rulemaking processes. Although each of the Justices received the disqualification letters, they uniformly ignored the CCJD and continued to appoint conflicted members to the CCJD and other judicial/attorney oversight boards and commissions. While the Interim Committee's process moved forward, the Justices retaliated against Chair Pete Lee by endorsing Attorney Regulation Counsel Jessica Yates's provision of fabricated evidence to support a felony charge brought against Chair Lee. Throughout my tenure as Executive Director, ARC Yates would retaliate against me by taking away my secured parking space and continually threatening to have the CCJD evicted from its office space, which adjoins the Office of the Presiding Disciplinary Judge. *See* § 13-5.3-103(3), C.R.S. (requiring the Judicial Department to continue providing office space to the CCJD in the Ralph L. Carr Judicial Center). The Interim Committee (without Senator Lee continuing to participate) ultimately recommended reforms that would become HCR 23-1001, HB 23-1019, and HB 23-1205.

As the legislative process continued into the 2023 legislative session, ARC Yates's retaliation and intimidation efforts also continued. Following CCJD Vice Chair David Prince and my testimony at the Joint Judiciary Committee's February 1, 2023 SMART Act hearing, ARC Yates sent a disciplinary letter to Vice-Chair Prince and copied to all judge and attorney members of the CCJD accusing Vice Chair Prince of making false statements to the Legislature. Ms. Yates's letter, however, is indisputable evidence that she committed the crime and civil offense of intimidating a legislative witness. § 8-2.5-101, C.R.S. After receiving Ms. Yates's letter, the CCJD voted to recognize a request for evaluation (RFE) of judicial conduct as to all the Justices as a complaint. The RFE had been submitted in November 2022 by former 10th Judicial District Court Chief Judge Dennis Maes.

When I proceeded to draft Colo. RJD 14(a) letters to notify the Justices of the complaints against them, Commissioner Bonnie McLean (who had voted against recognizing the

---

[2] The CCJD's current Executive Director, Anne Mangiardi, reporting to Attorney General Phil Weiser and Chief Deputy Attorney General Natalie Hanlon Leh, supervised one of the investigations (the ILG, LLC investigation of the Masias Memo) as a Senior Assistant Attorney General. By knowingly assisting the Justices' in violating Canon Rule 2.9(C), Mangiardi herself violated Colo. RPC 8.4(f). By then applying to replace me after my retaliatory termination as Executive Director in 2024, Mangiardi further violated Colo. RPC 8.4(f) by assisting the Justices and the other judges involved violate Canon Rules 2.3 and 2.16. Mangiardi continues to retaliate by refusing to disqualify herself from complaints about her and her co-conspirators' conduct as well as by obstructing the public filing of my August 25, 2025 public comments on proposed rule changes and RFE as to the Justices, judge members of the CCJD, and other judges. After an unnecessary email exchange, my RFE was filed and docketed as CCJD Case No. 25-310.

complaints) began asserting that (because of Yates's disciplinary letter) all the Commissioners and I had conflicts of interest requiring our disqualification from the Justices' disciplinary proceedings.  At around this same time, McLean (with one or more other unidentified Commissioners) contacted CCJD Chair Elizabeth Espinosa Krupa and threatened my continued tenure as Executive Director if I did not start acceding to Yates's pressures and disqualify myself from the Masias Controversy.  Chair Krupa, however, contacted me and notified me of the circumstances.  In turn, this caused me to begin looking for alternative employment.  At the April 2023 CCJD meeting, Mindy Sooter moved to rescind recognition of the Maes complaint.  Sooter's motion was approved through an invalid vote (4-3) of the non-recused Commissioners.  Importantly, at the April 2023 meeting, it was announced that the pending case involving former Chief Justice Nathan Coats's role in the Masias Controversy was going to be resolved through a stipulation.  That stipulation (which provided the basis for the final disciplinary opinion) was publicly filed in May 2023.  The final disciplinary opinion was published on August 7, 2023.  *Matter of Coats*, 2023 CO 44.

On June 9, 2023, I applied for a posted position as a Supervisory Staff Attorney at the U.S. District Court for the District of Colorado.[3]  I was keenly aware that exercise of the Justices' and the Governor's powers to appoint commissioners placed my continued employment in jeopardy.  Although I had requested the CCJD evaluate my performance at its June 16, 2023 meeting, the evaluation did not occur as planned.  While the meeting was happening, Chief Justice Brian Boatright (through his attorney Andrew Rottman) emailed notice that Commissioner Sara Garrido was reappointed for another term while Vice-Chair David Prince was replaced by Judge Jill Brady (a vocal critic of the CCJD).[4]  At the reception following the June 16, 2023 meeting, I openly expressed my concerns that the Justices and others were creating a hostile workplace and that I had applied for another position.  I also openly expressed my apprehensions that I was being retaliated against to the CCJD's Office Manager Sherri Hammerly and Special Counsel Jeff Walsh.  Following the June 16, 2023 CCJD meeting, the press reported on the Justices' retaliatory use of their appointment powers to remove Judge Prince.[5]

Instead of using his authority to reappoint those members of the Commission who were willing to continue serving until the Masias Controversy was resolved, Governor Jared Polis first attempted to appoint attorney David Powell to the Commission.  Powell had previously

---

[3] As I explained in my cover letter: "[U]ncertainty caused by public controversy involving the Colorado Judicial Branch and an appointment cycle that will replace 6 of our existing 10 Commissioners on July 1, 2023 has caused me to explore other employment opportunities."

[4] The CCJD had previously sent Judge Brady a dismissal letter with educational language in response to her having heard a domestic relations case in which a magistrate (subject to Judge Brady's supervision) testified as a character and fact witness (which implicates Canon Rules 1.1, 1.2, 2.11, and 3.3).  In response to the dismissal letter, Judge Brady confronted CCJD Chair Elizabeth Espinosa Krupa when Chair Krupa was part of a panel at the 2022 annual Colorado judicial conference.  The CCJD had also received an anonymous complaint that alleged that Deputy Chief Judge Brady and then-Chief Judge William Bain had facilitated the discriminatory forced resignation of District Court Judge Barbara Hughes (who is a member of the LGBTQ community).  When Judge Hughes sought to testify to the legislature about her experience in 2022, she was discouraged from doing so by 18th Judicial District Court Judge and then-CCJD member Bonnie McLean.

[5] David Migoya, *New Members to Colorado's Judicial Discipline Commission Could Mean New Direction*, DENVER GAZETTE, June 30, 2023; *see also* Dennis Maes, *Opinion: Slow Burn for Colorado Supreme Court Scandal*, COLORADO POLITICS, July 28, 2023.

investigated Masias' financial misconduct on behalf of the Judicial Department and had just left his position as Deputy Attorney General overseeing Phil Weiser's State Services Division (which had represented the Justices in connection with the Masias Controversy and their "independent" investigations). After I raised objections, the Governor's Office withdrew its appointment order while maintaining the appointments of two new citizen members, Gina Lopez and Marissa Pacheco (who replaced Commissioners Drucilla Pugh and Bruce Casias).

In early October 2023, while reviewing discovery in the *Coats* case, I found an email that confirmed the Justices had originally retained the law firm WilmerHale (where Mindy Sooter works as the "Partner-in-Charge" of the Denver Office) and WilmerHale Partner / former U.S. Attorney for Colorado John F. Walsh to conduct the Justices' ethically prohibited "independent investigation" of the Masias Controversy. When I raised this conflict with the CCJD's members and Sooter specifically, James Carpenter responded by angrily confronting me over the phone. Carpenter asserted that if Sooter had conflicts, so did he. Carpenter went on to assert that the Coats case was over and the CCJD had no authority to examine the potential misconduct of Attorney General Phil Wieser, Chief Deputy Attorney General Natalie Hanlon Leh, or John Walsh / WilmerHale. I took Carpenter's communications as a threat and reported the conversation to CCJD members Gina Lopez and Marissa Pacheco and to former Vice Chair David Prince. I also contacted the U.S. Department of Justice's Public Integrity Section on October 6, 2023. While I attended the Colorado Bar Association's *Ethics and Professionalism: Bench Bar Conversations* CLE program that same day, I spoke with U.S. DOJ Senior Litigation Attorney Edward P. Sullivan. In turn, and despite my explanation that another DOJ office might need to be brought in, Sullivan referred me back to Assistant U.S. Attorney Bryan Fields in the DOJ-Denver Office. Mr. Fields and I spoke on October 19, 2023 while I attended the National College on Judicial Ethics at the Omni Shoreham Hotel in Washington, DC. Mr. Fields promised to put me in contact with the FBI agent assigned to issues involving the Masias Controversy once I could provide a transcription of the CCJD's interview of Justice Coats. When I followed up with an email explaining the process for information sharing under Colo. RJD 6.5, however, Mr. Fields ignored me and refused to communicate further.

In response to my call with Carpenter, I also made the fateful decision to have the CCJD's General Counsel through the Attorney General's Office, Gina Cannan, meet with Sooter and Carpenter to evaluate whether they had conflicts requiring their disqualification. Rather than discussing the conflict issue at the next October 13, 2023 CCJD meeting, Cannan decided that neither Sooter nor Carpenter's connections with the Attorney General's Office and John Walsh required their disqualifications. Consequently, the issues were not discussed by the full CCJD and Sooter and Carpenter continued to refuse to disqualify themselves or allow for the appointment of special commissioners. In various conversations with Ms. Cannan, I openly and repeatedly expressed my apprehension of Commissioners McLean, Sooter, and Carpenter seeking to retaliate against me for my pursuit of accountability in the Masias Controversy.

In early November 2023, I also had an extended telephone conversation with CCJD member Sara Garrido in which I explained my apprehensions that Mindy Sooter, James Carpenter, and Jill Brady were obstructing my work in drafting notice letters and other correspondence (which I methodically circulated to the full CCJD) as a pretext for my termination. I also explained to Judge Garrido my perceptions that external pressures from the Justices, the Attorney General's Office, and the Office of Attorney Regulation Counsel were creating a hostile work environment. Judge Garrido acknowledged our conversation in an email

-4-

and attempted to assist me by focusing her suggested edits to a pending Colo. RJD 14(a) notice letter.

Following the CCJD's December 8, 2023 meeting, Governor Polis appointed Ingrid Barrier and Stefanie Trujillo to the CCJD.  Like David Powell, Barrier had significant ties to Attorney General Phil Weiser.  Stefanie Trujillo, likewise, had significant connections with the Justices through her prior service on the Colorado Supreme Court's Outreach and Working Group Committee for the Licensed Legal Paraprofessional (LLP) Initiative.  With the re-composition of the CCJD and CCJD member Gina Lopez's resignation, CCJD Chair Mindy Sooter, CCJD Vice-Chair James Carpenter, CCJD Secretary Mariana Vielma, and CCJD General Counsel Gina Cannan proceeded with a scheme to terminate my employment as Executive Director.  As part of this scheme, Chair Sooter (after obstructing my efforts to define the criteria for staff performance reviews, to adopt personnel rules, and to develop an employee handbook) scheduled my performance review for January 10, 2024.

Anticipating the retaliation, I met with Stefanie Trujillo in-person on January 9, 2024. During my meeting with Ms. Trujillo, I explained my apprehension of retaliation in the context of my seeking accountability for the Justices' roles in the Masias Controversy (including various examples of public fraud) and newly discovered evidence that Justice Brian Boatright had concealed Denver Juvenile Court Presiding Judge D. Brett Woods's habitual intemperance (alcohol abuse) and retaliatory termination of female court staff who had internally reported Judge Woods's unfitness.  I further explained to Ms. Trujillo that Chair Sooter and Vice Chair Carpenter were obstructing the investigation of the Justices and that I intended to publicly submit an anonymous RFE to force the CCJD to, in turn, publicly address the judicial misconduct involved.  During our discussion, which concluded with a conference call with Vice Chair Carpenter, I also informed Ms. Trujillo that I had emailed Chair Sooter with a January 8, 2024 memo that detailed my accomplishments as Executive Director and goals for the next year. Special Counsel Jeff Walsh was also aware of the memo, its importance to my continued tenure, and its relevance to my apprehensions of retaliation.  As predicted, the CCJD met on January 10th and proceeded to vote to terminate my employment in retaliation for my seeking to hold the Justices accountable for their part in the Masias Controversy and in concealing Judge Woods's misconduct.

The decision to terminate my employment was concealed from me until a week after I made the CCJD's 2024 SMART Act presentation to the Joint Judiciary Committee on January 12, 2024.  I was informed of my summary dismissal at a regular weekly meeting that I had scheduled with Chair Sooter (in anticipation of her retaliatory objectives) on January 19, 2024. Upon being informed of my termination, I attempted to copy my records (including preserving a copy of my email account) as I had a right to do as a whistleblower under § 24-31-1204(8)(a), C.R.S. and as a former CCJD member and Executive Director under Colo. RJD 3.5(3), (5). Chair Sooter, Vice Chair Carpenter, General Counsel Cannan, and Assistant Solicitor General Alison Kyles responded by threatening me with civil and criminal prosecution in response to my expressed intentions to deposit the copied data with the FBI.  Consequently, I was pressured into surrendering the copied records to Ms. Cannan with assurances that she (and the Attorney General's Office) would not alter or destroy the records pending my bringing a civil employment action for wrongful/retaliatory termination.  The records remain in the custody of the Attorney General's Office, are relevant to the continued retaliation against me, and should be obtained as part of any meaningful investigation.  The copied records are also relevant to many other examples of the CCJD's members and its Special Counsel Jeff Walsh committing First Degree

-5-

Official Misconduct (§ 18-8-404, C.R.S.) by knowingly disregarding legitimate allegations of judicial misconduct, intentionally minimizing sanctions, and failing to perform the CCJD's constitutional mandate under Colo. RJD 1(b).

The retaliation against me was further aggravated by Justice Monica Márquez and Justice Richard Gabriel sitting on judicial nominating commissions when I applied for judgeships in the 7th and 19th Judicial Districts in May 2024. The records from those nominating commissions will likely provide additional evidence that I am being blackballed for seeking to enforce the Code as to the Masias Controversy and the concealment of Judge Woods's judicial unfitness. The non-disqualification of Justice Márquez and Justice Gabriel, however, is only one more fact that establishes the retaliation against me is ongoing and in violation of § 24-34-402(1)(e), C.R.S., as further defined by 3 CCR 708-1 Rule 85.1(F).

A much more detailed explanation of the underlying allegations of judicial misconduct and retaliation can be found in the uploaded October 20, 2024 anonymous RFE and accompanying Fraud Hotline complaint. During the Colorado Senate Judiciary Committee's April 28, 2025 hearing, it was revealed that the CCJD had refused to disqualify itself from consideration of the October 20th RFE and, instead, had summarily exonerated the CCJD's members, the CCJD's Staff, and the Justices by dismissing the RFE without public explanation. A description of subsequent non-disqualification, retaliation, and obstruction of justice is contained in the uploaded August 25, 2025 public comments on proposed rule changes and duly filed RFE.

My efforts to report the public corruption and public fraud involved in these circumstances have been universally and systematically ignored, including by the U.S. Department of Justice and the FBI. The obstruction that has occurred within the U.S. DOJ includes Justice Melissa Hart's husband, Kevin Traskos, working as the Chief of the U.S. DOJ—Denver Office's Civil Division (which oversees fraud investigations, including under the federal civil False Claims Act). Despite Mr. Traskos's position, the DOJ—Denver Office did not disqualify itself from investigation of the Masias Controversy and, instead, approved no-file decisions. During my October 13, 2023 telephone call with him, Assistant U.S. Attorney Bryan Fields failed to disclose any conflicts within the DOJ—Denver Office, including Mr. Traskos's position as Civil Division Chief. Recently, I received information that Mr. Traskos had directly contacted President Donald Trump's personal attorney, Peter Ticktin, to lobby for the DOJ to internally suppress my allegations at the highest levels.

Upon information and belief, I further understand that, earlier in 2025, the Justices and their co-conspirators within SCAO continued their pattern of retaliation and enforced silence by terminating or otherwise forcing the separation of SCAO HR Director Amy Burne. Like me, Ms. Burne had a history of working to enforce the Judicial Department's Personnel Rules, including prohibitions against discrimination and retaliation.

The Colorado Civil Rights Commission has jurisdiction over these issues because the retaliation against me and other reporters of judicial misconduct is ongoing. *Accord* § 24-34-403, C.R.S. (employment discrimination charges must be filed within 300 days after the alleged discriminatory or unfair employment practice occurred; no limitation on use of historic discrimination / unfair employment practices as *res gestae* evidence); *see also* 3 CCR 708-1, Rule 10.4(C)(1)(d) (describing charges based upon claimed retaliation); 3 CCR 708-1 Rule 85.1 (further defining retaliation as a discriminatory or unfair employment practice). By continuing to refuse to take action in response to legitimate reports of non-disqualification, intimidation, discrimination, harassment (including sexual harassment), public fraud, and retaliation, the

-6-

Justices and their co-conspirators (who include the members of the Colorado Commission on Judicial Discipline, its Executive Director and Special Counsel, and the members of other judicial oversight boards and commissions) are engaged in a conspiracy to interfere with civil rights prohibited by 42 U.S.C. § 1983, 42 U.S.C. § 1985(2), (3), and 42 U.S.C. § 1986. *But see* § 24-34-308, C.R.S. (Civil Rights Division and Civil Rights Commission prohibited from directly enforcing federal law).

I have now repeatedly sought remedies through the CCJD's own processes only to have the CCJD and its Staff refuse to disqualify themselves and to, then, summarily dismiss the complaints. The self-exoneration and denial of opportunities to be heard that have occurred are, themselves, forms of retaliation within the definition provided by § 24-34-402(1)(e), C.R.S. and 3 CCR 708-1 Rule 85.1(F). The issues raised in this statement of discrimination go beyond my personal circumstances to include patterns of discrimination, harassment, intimidation, and retaliation that pervade Colorado State Government. At least with respect to the Colorado Judicial Department, however, this "toxic" culture has been universally acknowledged (even by the Justices who are personally responsible for it).[6] Action on my complaint is necessary to address the patterns of discrimination and other unlawful employment practices that continue to thrive within the Judicial Department and within other Colorado state agencies.

Attorney General Phil Weiser is directly involved in the retaliation against me, in the pervasive use of illegal NDAs,[7] and in the Justices' broader coverup of a spectrum of judicial, attorney, and official misconduct. Accordingly, Attorney General Weiser and his Office have conflicts of interest that make them unable to provide the Civil Rights Division and the Civil Rights Commission with investigative or attorney services. To finally have an independent, legitimate, and conflict-free investigation, the Civil Rights Commission (either on its own or in consultation with the Colorado State Auditor) should invoke its authority to appoint another state's attorney general as a Special Assistant Attorney General (SAAG) under § 24-31-111(5), C.R.S. Preferably, the SAAG would be from a state that has a counterpart to Colorado's False Claims Act, Title 24, Art. 31, Pt. 12, C.R.S.

With the Civil Rights Commission's authority limited to enforcement of the Colorado Antidiscrimination Act and its regulations (which include reinstatement or re-hiring as potential remedies), I recognize that I will need to pursue collateral civil, criminal, and administrative proceedings to obtain full remedies for the unlawful conduct involved in my wrongful termination. The labor and employment practices (including cultures of enforced silence) within the Colorado Judicial Department and other state agencies, however, must be corrected.

Through this statement of discrimination, I request consideration of the following potential remedies available according to 3 CCR 708-1 Rule 10.5(D)(3):

> (a) Cease and Desist from [the] discriminatory practice[s];
> (b) Back pay;
> (c) Hiring of employee(s), with or without back pay;

---

[6] The Justices' strategy in stacking the various oversight entities, manipulating rulemaking, and refusing to disqualify themselves is directly analogous to the strategy followed by Arkansas Chief Justice Karen Baker (who also faces potential suspension and judicial discipline proceedings for retaliation). *See, e.g.,* Andrew Mobley, *AR Supreme Court Updates Rules on Suspending Judges Amid Tension with Chief Justice Baker*, KATV, June 19, 2025.

[7] David Migoya, *Nondisclosures Under Fire: State Confidentiality Agreements Cost Millions, Silence Whistleblowers*, DENVER GAZETTE, November 13, 2022

-8-

(d) Reinstatement of employee(s), with or without back pay;

(e) Upgrading or promoting of employee(s), with or without back pay;

* * *

(j) Public and private apologies;

(k) Posting of anti-discrimination notices;

(l) Remedial affirmative activities to overcome a discriminatory practice;

(m) Policy and procedure modifications;

(n) Education and training of Respondent management and staff; [and]

(o) Reporting to and monitoring by the Division as to the manner of compliance[.]

Christopher S.P. Gregory
201 Coffman St., #1822
Longmont, CO 80502


June 9, 2023


United States District Court
District of Colorado
Alfred A. Arraj U.S. Courthouse
901 19th Street
Denver, CO 80294

Re:  Supervisory Staff Attorney—Vacancy Announcement # 2023-12-USDC

Dear Sir or Mme:

I write to express my interest in your posted vacancy for a Supervisory Staff Attorney.  The
description of duties for the posted position align with my current job duties, which include
providing administrative support for a multi-member commission, developing policies/procedures,
and processing disciplinary complaints.   I believe that I have been effective in my current role as
Executive Director of the Colorado Commission on Judicial Discipline.  Nevertheless, uncertainty
caused by public controversy involving the Colorado Judicial Branch and an appointment cycle
that will replace 6 of our existing 10 Commissioners on July 1, 2023 has caused me to explore
other employment opportunities.  Given the comparable duties of the Supervisory Staff Attorney, I
feel that I am well-suited to assist this Court in its continued efforts to reinforce public and attorney
engagement while also elevating levels of practice before the court.

Please do not hesitate to contact me if you have any questions about my background or interest in
this position.


Sincerely,

Christopher S.P. Gregory
Enclosures (2)



## Memorandum

To:     Colorado Commission on Judicial Discipline
From:  Christopher Gregory
Re:      Initial ED Performance Evaluation--Summary of 2022-23 Accomplishments and Goals
Date:   January 8, 2024

## EXECUTIVE SUMMARY

### Primary Achievements of the Executive Director

Administrative Responsibilities
- Performed all statutorily and administratively required duties;
- Stood up an effectively new agency, the Office of Judicial Discipline (COJD), and have begun the process of helping establish another new agency, the Office of Administrative Support for Independent Agencies (ASIA);
- Implemented a secured, cloud-based paperless office;

Improvement of Internal Processes
- Improved Office efficiency to process and litigate a historically large volume of significant cases;
- Increased visibility and transparency in the Office's day-to-day operations and consequential actions;
- Improved and expanded orientation training available to new Commissioners;
- Developed and implemented internal policies and standardized forms;
- Purchased and began implementing an online case management system;
- Implemented a cost-conscious contract-based system for hiring investigators;

Legislative Engagement
- Contributed to the Commission's advocacy for legislative reforms, including a constitutional amendment referred to voters for the 2024 general election.  The legislative reforms include:
  - Creation of the COJD, the Office of the Judicial Ombudsman (COJO), and the ASIA Office;
  - Mandatory information sharing by the Judicial Department and other judicial oversight entities notwithstanding claims of privilege/confidentiality;
  - Independent legislative funding with the creation of a special cash fund to ensure ready access to resources as necessary to address exigent circumstances;
  - Potential constitutional changes that will:

1300 Broadway, Suite 210 • Denver, Colorado 80203 • Telephone (303) 457-5131 • Facsimile (303) 457-5195

Page 2

- Make the Commission's proceedings public upon the filing of formal charges;
- Separate adjudicatory functions in formal proceedings to occur through adjudicatory panels composed of a judge, an attorney, and a citizen;
- Define grounds for the disqualification of the Colorado Supreme Court and the composition of a Special Tribunal through Court of Appeals and District Court Judges, none of whom serve on the same court;
- Specify the standards of review applicable before the Colorado Supreme Court or a Special Tribunal;
- Allow the Legislature to statutorily define the Colorado Supreme Court's process for selecting members of the Commission;
- Provide for rulemaking to occur through a committee with members chosen by the Supreme Court, the Commission, the Adjudicatory Board, and the Governor;

Outreach
- Redesigned the Commission's Annual Reports and website to make significantly more relevant information publicly available; and
- Increased public and judicial awareness of the Commission, the Code, and the Rules through Annual Reports, the Commission's website, presentations, interviews, and case outcomes;

## Goals for 2024

Legislative Engagement—Propose and advocate for the following legislative priorities:
- Clarification of judges' financial reporting obligations under §§ 24-6-202 and 24-6-203, C.R.S.;
- Amendment of § 24-51-1105, C.R.S. to remove categorical prohibitions against judges with judicial disciplinary histories from participating in the Senior Judge Program;
- Extension of the Commission's jurisdiction to include oversight of magistrates, so that all judicial officers that perform equivalent functions are subject to the same standards, same limitations periods, and same oversight entity;
- In conjunction with a sub-committee or ad hoc committee and the National Center for State Courts (NCSC), present proposed revisions to the Rules of Judicial Discipline to the Colorado Supreme Court in anticipation of the potential passage of the constitutional amendment referred to voters and to address other recommended reforms;

Administrative Improvements
- Further develop internal Office policies and procedures, including standardized investigation procedures and templates for Staff reports to inform Commission

Page 3

> presentations and determinations according to Colo. RJD 16;
> - Improve the efficiency of collaborative editing;
> - Continue to implement the online case management system with internal policies that require the recording of Staff time in relation to specific cases and activities;
> - Clearly define job duties to develop objective criteria for evaluating Staff performance;
> - Continue developing orientation/training opportunities for new and continuing Commissioners;
>
> Outreach
> - Create and develop educational materials, including accredited CLE programing, that can be made available on-demand through the Commission's website;
> - Work with Colorado and national agencies/entities to identify resources available to assist subject judges with docket management plans, rehabilitative judicial education, and access to other productivity/demeanor/process improvement resources;
> - Expanded engagement with Colorado and national organizations to develop educational and comparative programing; and
> - Further engagement with non-legal related civic organizations and media to promote greater awareness of the importance of judicial independence and the application of the Code.

## INTRODUCTION

From January 3, 2022, when I began serving as the Commission's Executive Director, the Commission has experienced remarkable structural reforms and a significant increase in the volume and seriousness of its cases.  In order to assist the Commission in its initial evaluation of my performance as Executive Director, I appreciate the opportunity to highlight what we have collectively accomplished since I started in this role as well as areas/goals for continuing progress and reforms.

Apart from generally highlighting what the Commission and our Office have accomplished, it is also useful to compare this progress to general recommendations that have been made at different times to improve Colorado's judicial disciplinary system.  The recommendations from a 2009 study of the Colorado judicial disciplinary system completed by the American Bar Association and a criticism of the Commission presented through the 2022 Investigations Law Group (ILG) report relating to the Masias Controversy are relevant benchmarks.  § 13-5.3-103, C.R.S. and Colo. RJD 3(d) define the legally required duties of the Executive Director.

With all of the challenges that the Commission has encountered since 2021, it is important to recognize that the Executive Director has effectively stood up a newly conceived agency/Office, is in the process of helping establish a separate agency to serve the Commission's administrative needs, and that the Commission remains in the midst of perhaps the most transformational moment in its history.  The scope of the Executive Director's role has expanded and remains to be

Page 4

re-defined by the Commission as part of this ongoing transformation.  Out of the challenges faced, there are unique opportunities for the Commission and the Executive Director to further develop this role and the functions of the Office of Judicial Discipline as structural models for objectively recognized best practices.

## CONTEXT OF THE COMMISSION'S PROGRESS

From its creation in 1966 through 2014, the Commission handled a relatively small volume of cases, which resulted in a total of three published Colorado Supreme Court disciplinary opinions.  During the initial 50 years of its existence, most of the Commission's disciplinary actions were characterized by informal/private agreements with limited disclosure of those outcomes to the public.  Since 2019, however, there has been a significant shift in the philosophy through which the Commission operates, including the manner in which it has meaningfully responded to serious examples of judicial misconduct.  Since 2019, cases before the Commission have resulted in nine published Colorado Supreme Court disciplinary opinions (or three times the number of published opinions from the preceding 50 years).  The disciplinary opinions issued in 2023 included *Matter of Coats*, 2023 CO 44, which marked the first ever discipline of a justice or former justice of the Colorado Supreme Court.

In addition to the significance of disciplinary outcomes, the volume of requests for evaluation has also substantially increased.  As an example, in 2010, the Commission received 170 total RFEs.  In 2022, the Commission received 250 RFEs.  Although extraordinary circumstances are involved, in 2023, the Commission received 345 RFEs and self-initiated complaints (including approximately 74 cases involving the alleged non-filing of personal financial disclosure statements (PFDs)).  The Commission received an additional 113 RFEs that involved jurisdictional dismissals with a significant number of requests to reconsider dismissal decisions in all case types.

Beyond the volume and ultimate outcomes of cases, the Commission has benefited from significant legislative/administrative reforms and pending reforms (detailed below) that are essential to ensuring the Commission's status and legitimacy as a permanent regulatory agency/watchdog.  One observer has recognized that a legitimate regulatory agency/watchdog has six essential characteristics:

1.  It must be a permanent institution, with authority beyond that of its charging members,
2.  It must be nonpartisan and independent of [the Legislature, the Judiciary it oversees, and the Governor], and seen to be so,
3.  It must explain its conclusions publicly, not advise in secret,
4.  It must have some fact-finding procedures if facts are decisive,
5.  It must maintain a long view, beyond the exigencies of the immediate case, and
6.  It must have enough other work so that a constitutional case is the exception rather than its *raison d' etre*.[1]

---

[1] Hans A. Linde, *"A Republic . . . If You Can Keep It"*, 16 Hastings Const. L.Q. 295 (1989).

Page 5

When the immediately preceding Executive Director, Bill Campbell, was hired, the Commission contracted with the American Bar Association to conduct a study and provide a report with recommended reforms to the Colorado judicial discipline system.  The report, dated August 26, 2009, contained the following eight recommendations, which are consistent with the characteristics of legitimacy listed above:

1.  The Commission should be adequately resourced;
2.  The Commission should increase outreach and accessibility to the public and the judiciary;
3.  Commissioners should receive mandatory formal training;
4.  Confidentiality requirements should be revised;
5.  A written protocol for investigating complaints should be developed;
6.  The Commission should propose a rule for deferred discipline agreements;
7.  The Commission should examine how to retain jurisdiction where a judge resigns with full benefits pending the filing of formal charges; and
8.  The Commission should propose a rule that provides for discipline on consent.[2]

Many of the reforms recommended in the August 26, 2009 ABA report were finally realized through the legislative reforms that occurred in 2022-23.  Some of the reforms continue to be implemented, including opportunities for further public/judicial outreach, the development of internal procedures, and prospective rulemaking.

The 2022 ILG report included findings that the Colorado Judicial Department had not provided the Commission critical information as it related to a then-active judge who later participated in the Senior Judge Program.  The Commission had previously imposed a private admonishment for the male judge's alleged sexual harassment of a female subordinate. Notwithstanding the Commission being unaware of later additional allegations of misconduct by the judge, the ILG report criticized the Commission for not having a written standard to distinguish which cases are resolved through private/informal discipline and which cases are resolved through a public/formal discipline process.[3]

> There should be a set of agreed-upon criterion for escalating matters of formal judicial discipline to public proceedings. Presently, discretion about whether discipline proceedings will be private or public rests in the Commissioners and the Executive Director of the

---

[2] *Colorado Report on the Judicial Discipline System*, ABA Ctr. Prof. Resp., August 2009 (available and on-file).

[3] Elizabeth Rita and Anne McCord, *Colorado Judicial Branch Investigation Report and Assessment of Workplace Culture*, July 11, 2022, 27-29, 129 (describing underlying allegations and making recommendation).

Page 6

CCJD with no written guidance for its exercise. This discretion
should be informed by written guidance, with a focus on escalating
credible reports of harassment or misconduct based upon a
protected class to public proceedings.

The criticism and recommendation for reform presented through the ILG Report remains
unaddressed.

§ 13-5.3-103(c), C.R.S. defines the Executive Director's duties to include:

(I) Establish and maintain a permanent office;
(II) Respond to inquiries about the commission or the code;
(III) Advise the commission on the application and interpretation of
the code and the rules;
(IV) Process requests for evaluation of judicial conduct;
(V) Conduct or supervise evaluations and investigations as directed
by the commission;
(VI) Advise the commission as to potential dispositional
recommendations as may be requested by the commission;
(VII) Maintain commission records;
(VIII) Maintain statistics concerning the operation of the
commission and make them available to the commission;
(IX) Prepare the commission's budget and, once approved by the
commission, submit it to the joint budget committee of the general
assembly;
(X) Administer commission money and resources, including money
in the commission on judicial discipline special cash fund;
(XI) Supervise commission staff;
(XII) Notify the appropriate appointing authority of vacancies on
the commission;
(XIII) Assist the commission in preparing an annual report of the
commission's activities for presentation to the commission, the
supreme court, and the public;
(XIV) Supervise special counsel, investigators, other experts, or
personnel as directed by the commission, as they investigate and
process matters before the commission and before the supreme
court; and
(XV) Perform such other duties as required by the rules, this article
5.3, the rules promulgated by the commission, or the commission.

As defined by Colo. RJD 3, the Executive Director is similarly required to:

(1) Establish and maintain a permanent office;
(2) Respond to inquiries about the Commission or the Canons;
(3) Process requests for evaluation of judicial conduct;

Page 7

(4) Conduct investigations;

(5) Recommend dispositions;

(6) Maintain Commission records;

(7) Maintain statistics concerning the operation of the Commission and make them available to the Commission and to the Supreme Court;

(8) Prepare the Commission's budget and administer its funds;

(9) Employ the Commission's staff;

(10) Prepare an annual report of the Commission's activities for presentation to the Commission, to the Supreme Court, and to the public;

(11) Employ special counsel, investigators, or other experts as necessary to investigate and process matters before the Commission and before the Supreme Court; and

(12) Perform such other duties as these Rules, the Commission, or the Supreme Court may require.

## SUMMARY OF THE EXECUTIVE DIRECTOR'S / THE COMMISSION'S ACCOMPLISHMENTS

The Executive Director has performed all of the statutorily and administratively defined duties described above, in addition to taking on other responsibilities as needed to satisfy the Commission's constitutional mandate and function under Colo. RJD 1(b).  Through the assistance of Commissioners, former Commissioners and Staff, the Executive Director and the Commission were able to accomplish the following since January 2022:

1.  Performance of Administrative Functions

   a.  <u>Establishment of a Permanent Office</u>—According to both Colo. RJD 3 and § 13-5.3-103(c)(I), C.R.S., the Executive Director has maintained the Commission's physical office, business systems, and staffing, as expanded by SB22-201 and its creation of the Office of Judicial Discipline.  Establishing the Office has required the Executive Director to take on an expanded role in the legislative budgeting process and in administering the Commission and the Office's money and resources.

   b.  <u>Obtained "Adequate Resources"</u>—Consistent with the 2009 ABA Report's recommendation (1) that the Commission be "adequately resourced", the Executive Director successfully worked with the Commission's legislative sub-committee, the Joint Budget Committee (JBC), and JBC staff to obtain an independent source of legislative funding that includes a contingency or special cash fund with a $400,000 renewable balance (intended to address any special needs or projects that the Commission might find necessary).  The funding structure provided through SB22-201 is unique nationally and presents a model that other states are considering to ensure the ready availability of adequate and independent

Page 8

resources to perform their judicial disciplinary functions.

c.  <u>Successful Implementation of a Secure and Remotely Hosted Paperless Record Keeping System</u>—Through recommendations and a subscription obtained by the Commission and the Office of Attorney Regulation Counsel's IT division, the Executive Director was able to transition the Office to a securely hosted cloud-based file sharing system, Citrix ShareFile.  The ShareFile system makes it possible to share documents and other files with Staff, Commission members, and third-parties with the opportunity to control access on a folder or file level.  The ShareFile system has allowed the Office to replicate an e-file type system in formal proceedings that allows the parties and the special masters to upload documents directly.  The ShareFile system also provides a secure means for third-parties to upload files.  The Executive Director is exploring whether it will be possible to allow the online submission of RFEs by integrating a ShareFile portal with the Commission's website.  On January 2, 2024, an armed man shot his way into the Ralph L. Carr Judicial Center and proceeded to damage various parts of the building, including setting a fire/causing the sprinkler system on the 7th Floor to activate.  As a consequence, there was significant damage to the building that impacted the ability of various state agencies, including the Judicial Department to utilize their IT systems.  Because of the Office's use of the ShareFile system, the Commission's business has continued without interruption.  The ShareFile system has also made it possible for the Commission to employ its remotely-based Special Counsel, Jeff Walsh.

d.  <u>Separation from OARC's IT and Telephone Systems</u>—Over the course of the *Coats* matter, the Commission learned of potential vulnerabilities in the confidentiality of its proceedings because of IT and telephones maintained through outside agencies (including OARC and SCAO).  Accordingly, steps were taken to provide the Office with its own fiberoptic internet access, its own Microsoft email hosting, and its own VOIP and virtual meeting hosting services.  Establishing these services further required the reassignment of domain addresses through the assistance of the Governor's Office of Information Technology.  The Executive Director was personally responsible in the involved process for setting up and contracting for these services.

e.  <u>Establishment of an Independent Administrative Support Office</u>—Through their legislative outreach, the Executive Director and the Commission were able to ensure the provision of adequate and independent administrative resources for the Office (accounting, HR, payroll, and budgeting support) through the creation of the Administrative Office for Independent Agencies (ASIA).  As a member of the ASIA Board, the Executive Director is effectively responsible, with the other Board members, for starting up another new office and agency.  Recently, with the assistance of the State Court Administrator's Office, the Executive Director drafted a budget amendment to equalize the projected salaries of the ASIA Office's staff with SCAO and market rates.  The Executive Director has taken an active role in

Page 9

helping recruit candidates and to select the ASIA Director.  The initial compensation levels set by the Legislature have required the ASIA Board to restart its hiring process.  Like the Commission's special cash fund, the ASIA Office is novel and has attracted the attention of regulatory commissions/agencies in other states.  Again, the legislative reforms realized by the Commission present Colorado as a model for best practices nationally.  During the time that it has taken to set up the new ASIA Office, however, the Executive Director has had to find work-around solutions after otherwise statutorily guaranteed administrative services have been denied by OARC and SCAO.  Most notably, the Executive Director has had to track employee leave through a subscription to timesheets.com.  Once the ASIA Office is operational, it should be able to provide assistance in developing/providing employee handbooks, fiscal rules, leave tracking systems, and other essential administrative support functions for its included agencies.  At this time, however, the Commission has been significantly limited in its ability to implement needed HR, financial, and other internal procedures for the Office.

f.  <u>Establishment of a Contract-Based Investigation System</u>—Because the Commission's caseload varies and the Commission handles cases statewide, a decision was made in consultation with the Commission and JBC Staff to use the Commission's 1.0 FTE appropriation for an investigator to, instead, fund the position on a contractual basis.  The Executive Director, with the assistance of the Office of Alternate Defense Counsel (ADC) and the Attorney General's Office drafted a contract for these services.  Through Special Counsel Walsh, the Commission was able to contract with a highly skilled investigator, Natasha Powers at the $55 per hour ADC rate.

g.  <u>Training and Supervision of Staff</u>—With the approval of the Commission, the Executive Director has been able to purchase training programs and materials to increase Staff's competency in using technology (including the production of documents/media through Microsoft Word, Excel, and PowerPoint).  Through the funding provided by the Legislature, Special Counsel has also accompanied the Executive Director to continued legal education programs provided by the Association of Judicial Disciplinary Counsel (AJDC) and NCSC.

2.  Improvement of the Commission's Internal Processes

a.  <u>Increased the Efficiency of Evaluating RFEs and Processing of Complaints</u>—By leveraging technology that includes an electronic record keeping system, software, and a secure cloud-based dictation system, the Office has been able to handle significant increases in the volume of RFEs.  As this trend appears to be continuing, the Executive Director will look for ways of better utilizing the Office's Special Counsel and its prospective paralegal/public information officer to generate draft responses to ordinary correspondence.  Again, it is notable that the Commission's volume of RFEs increased from 250 in 2022 to 325 in 2023.  Moreover, because the Commission's volume of cases recognized or considered as potential

Page 10

complaints in 2023 increased to approximately 100, the attention required to address these cases was also disproportionate to the Commission's experience in any previous year. In order to provide the Commission with an continuous opportunity to review the Office's work, case files are available through the Office's online file sharing system and through the meeting packets compiled prior to each regular Commission meeting. The meeting packets, which have become increasingly voluminous, are prepared with an extensive bookmarking system in pdf form. The bookmarking system allows the meeting packet to be used primarily as a reference. Per suggestions from the Commission's Chair, the meeting packets now include cumulative summaries of ongoing and new cases with decision items.

b. <u>Increased Visibility / Transparency as to Day to Day Operations</u>─Through the ShareFile system, the Executive Director has provided Commissioners with real-time access to pending RFEs, ongoing, and closed cases. In addition to making case materials available, the Executive Director suggested and begun meeting with the Commission's Chair to discuss the status of pending cases and action items. Special Counsel Walsh is anticipated to participate in these meetings in the future to provide regular litigation and other status updates. As was a prior practice in the *Coats* matter, the Commission may choose to form litigation sub-committees in particularly complex cases.

c. <u>Collaboration with the Commission as to all Consequential Actions</u>─Prior to my becoming the Executive Director, there was some frustration over dispositive actions occurring without consultation with the Commission. I have made a priority of presenting all Colo. RJD 14(a) letters, letters dismissing cases with concerns, and letters imposing informal discipline to the Commission in real-time for its approval prior to mailing. Ordinary dismissal letters issued according to Colo. RJD 13(c) continue to be included in the meeting packets for the Commission's periodic review. Similarly, all stipulations, recommendations, and other dispositive actions are taken in full consultation with the Commission. The annual report is still presented to the full Commission for its final approval before publication. This collaborative process has been greatly beneficial as the Commission has needed to respond to controversial issues with a unified voice. The collaborative process has also expanded the opportunity to discuss/consider dissenting viewpoints (which at times have ultimately become the Commission's official position).

d. <u>Development of Internal Policies and Procedures</u>─Upon former Commissioner Yolanda Lyons's suggestions, the Executive Director encouraged the Commission to adopt bylaws (which are still under consideration) and to begin looking at other means for developing internal guidelines/procedures, such as the drafting of an employee handbook, fiscal rules specific to our Office, and an investigations manual. In addition to defining procedural standards, the Executive Director has spent significant efforts developing standardized templates for the Commission's correspondence (i.e. Colo. RJD 14(a) letters, Colo. RJD 13(c) dismissal letters,

Page 11

letters denying requests for reconsideration, letters advising complaints of case status as required by § 13-5.3-112, C.R.S., motions, Colo. RJD 38 recommendations, etc.). Many of the recommendations for internal policies and procedures are being developed in consultation with the Commission's assigned general counsel from the Attorney General's Office, Gina Cannan.

e. Improvements to Commissioner Orientation—With the assistance and input of former Commissioner Yolanda Lyons, the Executive Director re-drafted the Commission's Orientation Manual. The Executive Director has circulated the current Orientation Manual to the full Commission and to Gina Cannan for feedback/supplementation. Also, consistent with recommendations in the 2009 ABA Report, the Executive Director was able to utilize the Commission's funding to have those Commissioners who were able attend the biennial National College on Judicial Conduct and Ethics presented by NCSC.

f. Implementation of a Case Management System—As part of its Recommendation 1, the ABA noted that the Commission lacked a "computerized caseload management system and investigative software." Until the Executive Director was able to begin implementing a secure online case management system at the end of 2023, this deficiency remained. Since prior to 2008, the Commission's primary means of managing RFEs and cases has been through an Excel spreadsheet that has been prone to becoming corrupted and overwriting data. The Executive Director continues to work on implementing the new system, MyCase, which allows Staff to track time and log communications in connection with specific cases. The ability to track time is important so that the Commission can justify its staffing levels to the Legislature and so that the Commission can recoup attorney's fees and costs as allowed under Colo. RJD 35 and 36 and § 13-5.3-104, C.R.S. In 2023, the Commission was able to recoup approximately $20,000 with fees assessed at market rate in the *Timbreza* matter. An online case management system generally promotes a better functioning remote work environment and, as noted in the ABA's Recommendation 1, will allow for more meaningful performance evaluations of the Office's Staff, including the Executive Director. In addition, the Office is able to use the MyCase system to better track statistics required as part of the Commission's SMART Act reporting requirements under § 13-5.3-108, C.R.S. (requiring the Commission to provide demographic and other information).

3. Substantive Legislative Reforms and Pending Constitutional Reforms—Through the assistance of the Commission's legislative sub-committee and the cultivation of relationships with legislators and staff, the Executive Director and the Commission were able to achieve significant reforms and prospective reforms to Colorado's judicial disciplinary structure.

a. SB 22-201—In response to challenges that the Commission faced in connection with the *Coats* matter, the Legislature approved meaningful statutory reforms with significant majorities in both houses. The reforms can be summarized as follows:

Page 12

    i. Created the COJD with independent legislative funding for ordinary operations (which include the employment of the Executive Director, an Office Manager, Special Counsel, and an Investigator) and a special cash fund to ensure the ready availability of resources when exigent circumstances arise. As expressed in the legislative declaration to SB22-201: "The efficacy of the [Commission] depends upon the existence of conflict-free, secure, stable, and defined funding that allows the [Commission] to maintain independence and respond to disciplinary issues without delay and being subject to improper influence by those being overseen.";

    ii. Mandates the Judicial Department's automatic disclosure and sharing of information notwithstanding claims of privilege and confidentiality;

    iii. Requires the Colorado Supreme Court to engage in its rulemaking function through a public process with obligations to notify and consider objections raised by the Commission;

    iv. Formalizes the Commission's authority to utilize legal services through the Attorney General's Office;

    v. Created a processes and authorized the 2022 Legislative Interim Committee on Judicial Discipline to consider additional reforms and propose legislation for the 2023 regular session.

b. <u>HB 23-1019</u>—Along with HCR 23-1001, HB 23-1019 was originally proposed through the Interim Committee. Subject to voter approval of the constitutional amendment proposed by HCR 23-1001, HB 23-1019 will:

    i. Provide a system through which the Colorado Supreme Court chooses members of the Commission through shortlists initially drawn from District or County Court Judges statewide;

    ii. Establish a public rulemaking process for the rule making committee created through HCR 23-1001; and

    iii. Enable the provision of administrative support to adjudicative panels composed according to HCR 23-1001.

In addition to anticipated constitutional changes, HB 23-1019 makes statutory changes that include expansion of the Commission's statistical reporting obligations, a required process for the submission of anonymous complaints, and requirements that the Commission update complainants on the status of proceedings. HB 23-1001 further repealed §§ 24-72-402 and 24-72-403, C.R.S. (which had criminalized disclosure of the Commission's records).

c. <u>HB 23-1205</u>--Created the COJO, which is intended to provide complainants (broadly defined to include contractors and others with regular business before the Judicial Department) with a confidential resource to navigate the Judicial Department's personnel system and the judicial disciplinary/disability process. HB 23-1205 authorizes the ombuds to act as an intermediary and facilitate anonymous reporting to the Commission.

Page 13

    d.  <u>SB 23-228</u>—Created the ASIA Office to provide independent administrative support (including accounting, HR, payroll, and budget services) to the Commission and other small independent agencies affiliated with the Judicial Department.  SB 23-288 directly addressed problems that the Commission experienced with the Judicial Department and the Office of Attorney Regulation Counsel withholding administrative support otherwise required by SB22-201 (as codified in § 13-5.3-103(3), C.R.S. (2022)).

    e.  <u>HCR 23-1001</u>—Proposes an amendment to the Colorado Constitution that will be voted on as part of the 2024 General Election.  The constitutional amendment would significantly change the structure and process of judicial disciplinary proceedings as well as the Commission's role in those proceedings.  These prospective changes include:

        i.  The Commission's proceedings becoming public upon the filing of formal charges;

        ii.  Separating adjudicatory functions in formal proceedings to occur through adjudicatory panels composed of a judge, an attorney, and a citizen;

        iii.  Defined grounds for the disqualification of the Colorado Supreme Court and with the composition of a replacement Special Tribunal through Court of Appeals and District Court Judges, none of whom serve on the same court;

        iv.  Specified standards of review applicable before the Colorado Supreme Court or a Special Tribunal;

        v.  Authorization for the Legislature to statutorily define the Colorado Supreme Court's process for selecting members of the Commission;

        vi.  Provision for rulemaking to occur through a committee with members chosen by the Supreme Court, the Commission, the Adjudicatory Board, and the Governor;

4. Public/Judicial Outreach

    a.  <u>Redesign of the Commission's Website</u>—Although the Legislature allocated approximately $10,000 for website development as part of HB23-1019, the Executive Director learned through JBC Staff of complementary website services provided by the Colorado State Internet Portal Authority (SIPA).  In conjunction with these services, the Executive Director also learned of graphic design support also provided without charge by Integrated Document Solutions (IDS).  Through the support provided by SIPA and IDS, the Executive Director was able to re-design the Commission and the Office's logos and to publish an updated website that utilizes the colorado.gov domain.  The redesigned website contains an overview of the Commission, a list of current members, a downloadable RFE form with instructions, public records and legal authority including all published Colorado judicial discipline opinions, and all of the Commission's Annual Reports from 1980 to the present.  The website also includes links to official statements from the Commission and Colorado Matters/Colorado Public Radio (CPR)

Page 14

interview with the Executive Director about the history of judicial discipline in Colorado and judges' general financial disclosure obligations.

b. Augmentation of the Commission's Annual Report—The Executive Director has prepared two Annual Reports (2021 and 2022) and is currently in the process of drafting the Commission's 2023 Annual Report. Efforts have been made and continue to be made to standardize the categories and data contained in these reports. As with the Commission's prior Annual Reports, the Executive Director's Annual Reports contain a narrative explanation of cases resulting in Commission action, including dismissals with concern, informal dispositions, and public disciplinary outcomes. According to Colo. RJD 3.5 (Starting with the 2022 Annual Report), the Annual Reports include a summary of Commission member recusals. The Annual Reports now further contain a hyperlinked table of contents with a breakdown of statistical information in tables that align with the Commission's reporting obligations under § 13-5.3-108, C.R.S. An effort has also been made to put the current year's statistical information in the context of cumulative data described in prior Annual Reports since 2001.

c. Educational Presentations / Responses to Judge Inquiries / Media Presence—In 2022, the Executive Director participated in a panel discussion with the Doyle Inn of Court. In 2023, the Executive Director participated in panel discussions at the annual AJDC Conference and the biannual National College on Judicial Ethics that focused on Commissions (including those Texas, California, and Colorado) which have responded to extraordinary challenges and have been involved in legislative changes. On April 28, 2023, the Executive Director participated in an interview with Chadra Thomas Whitfield as part of the Colorado Matters program on CPR. The Colorado Matters interview provided a historic overview of Colorado's judicial disciplinary system and answered general questions about judges' financial reporting obligations. Broadcast portions of the interview are available on the Commission's website. Periodically, the Executive Director has responded to requests for advice raised by judges regarding potential application of the Code and the Rules.

STATEMENT OF GOALS / INITIATIVES FOR 2024

With the assistance of the Commission, Staff, and outside agencies (including the new ASIA Office), the Executive Director aspires to meet the following goals and to implement the following initiatives in 2024:

1. Legislative Engagement

   a. Clarify Judges' Financial Reporting Obligations—Because of overlapping expectations under the Code and §§ 24-6-202 and 24-6-203, C.R.S. (which apply to judges as well as elected public officials), there is a need to clarify to whom statutory financial disclosure obligations apply (i.e. how a judge is defined) and when such disclosures are due (i.e. whether a provision should be

Page 15

added for initial financial disclosures for judges and other officials appointed between filing deadlines).  In addition, it should be made clear that compliance with statutory obligations also satisfies related filing obligations under the Code.

b. <u>Remove Categorical Prohibitions Against Participation in the Senior Judge Program</u>—Currently, § 24-51-1105, C.R.S. prohibits a judge with any history of judicial discipline (whether informal/private or formal/public) from serving in the Senior Judge Program.  This categorical bar on participation presents a collateral effect that inhibits the Commission's ability to resolve judicial disciplinary cases by stipulation.  Moreover, the categorical bar prevents the application of judicial discipline as a rehabilitative response that allows a judge to demonstrate progress and correction of problematic behaviors over time.

c. <u>Expand the Commission's Jurisdiction to Include Magistrates</u>—By modifying statutory definitions, the Legislature can expand the Commission's jurisdiction to include magistrates.  The policy justification for such a jurisdictional expansion arises from the fact that magistrates perform substantially the same functions as judges, yet are subject to oversight in the attorney discipline system (which may involve the application of differing interpretations of the Code, a different limitations period, and a different adjudicative/appellate review process).

d. <u>Colo. RJD Rules Revision Project</u>—The Executive Director continues to negotiate a contract with NCSC to consult on drafting proposed revisions to the Colorado Rules of Judicial Discipline in anticipation of the potential passage of the constitutional amendment proposed through HCR 23-1001.  It will be helpful if the Commission is able to create a sub-committee to assist in this drafting project.  Having a proposed rule revision prior to the 2024 General Election will avoid potential gaps in the Commission's processes (i.e. what happens in pending cases with the shift from appointed special masters to a hearing panel composed through the proposed adjudicatory board).  The legislatively funded rules revision project will also provide the Commission with the opportunity to address other recommendations for reform, including the recommendation for written standards to differentiate private and public discipline presented in the ILG Report.

2. Administrative Improvements

a. <u>Further Development of Internal Policies and Procedures</u>—The development of bylaws, Commission and Staff orientation materials, an investigation procedures manual, an employee handbook, performance review standards, form templates, and other internal governance/operational guidelines will ensure that the Commission and the Office perform their functions in a transparent, predictable, and uniform manner.  Such materials will also help further define the expectations, duties, and functions of the Commission, the

Page 16

Office, and Staff.   Because of the transformative opportunities possible through the development of these policies, it would be helpful to form a sub-committee or an ad hoc committee (that could include outside stakeholders) to develop this additional policy guidance.  Once it is established, the Executive Director further anticipates that the ASIA Office will be a substantial resource able to assist in the drafting of many of these policies.

b.  <u>Increase the Efficiency of Collaborative Editing</u>—While the benefits of the Commission's collaborative environment are undeniably important, the editing of documents often generates considerable email traffic and does not always present the best forum for discussing differences in drafts.  It remains essential that the Executive Director, as the Commission's advisor on the application and interpretation of the Code and the Rules, have opportunities to raise objections and/or advise on courses of action consistent with Colo. Const. Art. VI, § 23(3), Title 13 Art. 5.3, C.R.S., the Code and the Rules.   I view the Commission's collaborative process and open forum as one of its most significant achievements while also recognizing that we can improve upon its efficiency and relevance through further changes in the process itself.  For example, greater efficiency is possible by adopting a defined process for circulating drafts, having direct live discussions between interested Commissioners/Staff providing feedback and the drafter (typically the Executive Director or Special Counsel), and, ultimately, the full Commission voting on any remaining points of disagreement.

d.  <u>Expansion of Commissioner Orientation and Training Opportunities</u>—The Executive Director, in consultation with the Commission and others, will continue to expand upon the new Commissioner Orientation Manual.  The Executive Director will also continue to seek legislative funding sufficient to allow both Staff and Commissioners to attend the biennial National College for Judicial Conduct and Ethics.  Because of delays in the appointment of new Commissioners in 2023, a virtual orientation and training that had been planned with NCSC in August was postponed.  Now that nearly all of the Commission's vacancies have been filled, the Executive Director would like to reschedule the orientation based upon topics that the Commission might find useful.  The Executive Director will also explore other virtual training and educational opportunities available through NCSC.

3.  Expand Public and Judicial Outreach

a.  <u>Creation of Educational Materials Available through the Commission's Website</u>—The Executive Director has purchased video/audio production software and will work with Special Counsel Walsh to develop educational materials, including accredited CLE programing that can be made available on-demand through the Commission's website.  Because judges are appointed on an on-going basis with orientation training offered by the Judicial Department

Page 17

only once per year, an on-demand overview of the Code and the Commission's role will be greatly beneficial to new judges. In addition to judicial and legal education content, the Executive Director would also like to explore potential topics for presentations to the general public.

b. <u>Identify Rehabilitative Resources Available to Judges and Develop More Formal Structures for Diversion Plans</u>—As part of its dispositional options, Colo. RJD 35(c) allows the Commission to impose a diversion plan as informal discipline, either with or without deferral of final disciplinary proceedings. Although Colo. RJD 35(c) provides examples of potential diversion methods, the Commission has not compiled lists of treatment providers, defined uniform requirements for docket management plans, or identified potential educational programing. The Executive Director understands that the OJPE is working on expanding its preventative/educational function and that there may also be resources available through SCAO's judicial training programs. NCSC is also working on educational programs that specifically address issues with demeanor, sexual harassment, etc. The Executive Director hopes to work with Colorado and national agencies/entities to better identify resources available to judges offered or required to participate in diversion plans.

c. <u>Expanded Engagement with Colorado and National Organizations to Cultivate Opportunities for Comparative Educational Programing</u>—The ability for the Executive Director and Special Counsel to engage with both local organizations (such as Inns of Court, the Colorado Bar Association, specialty Bars, etc.) remains important as members of the legal community become more aware of the Commission's existence. Likewise, the connections that are possible through the AJDC, NCSC, and the ABA provide opportunities to remain current on national and comparative issues involving judicial discipline. The Executive Director hopes to continue engaging with various organizations and to promote greater awareness of the Commission's purpose/function.

d. <u>Public Outreach / Engagement</u>—The Executive Director's April 28, 2023 Colorado Matters interview provided a unique opportunity to provide an educational overview of the history and function of Colorado's judicial discipline system, accessible to the general public. The Executive Director would like to pursue similar engagement with non-legal related civic organizations and media to promote greater awareness of the importance of fairness, judicial independence, and the role/application of the Code.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Attorney Complaint No(s).:

CHRISTOPHER S.P. GREGORY,

      Complainant,

v.

MARIA BERKENKOTTER,
NATHAN B. COATS,
BRYAN FIELDS,
RICHARD GABRIEL,
NATIALIE HANLON-LEH,
MELISSA HART,
WILLIAM HOOD, III,
MONICA MÁRQUEZ,
LEEANN MORRILL,
ANDREW ROTTMAN,
CARLOS SAMOUR,
GRANT SULLIVAN, AND
KEVIN TRASKOS,

      Respondent(s).

---

**ATTORNEY MISCONDUCT COMPLAINT;
EXHIBITS 1-8**

---

INTRODUCTION

"There is no kind of dishonesty into which otherwise good people more easily and frequently fall than that of defrauding the Government."–Benjamin Franklin

Regretfully, this attorney misconduct complaint and invocation of this Court's disciplinary jurisdiction under D.C.COLO.LAttyR 1(c) has become necessary because the Justices of the Colorado Supreme Court have systematically undermined and obstructed Colorado's judicial disciplinary and attorney regulation structures.  The ongoing Colorado

Appendix 3

Judicial Scandal began in 2018 and its coverup has continued through the cascading misconduct of numerous judges, attorneys, and public officials/employees. The breadth of the conspiracy and the protection racket involved makes regulation of the underlying misconduct unwieldy. Consequently, this attorney misconduct complaint is intended to initiate the process of seeking accountability by focusing upon the keystone of the Colorado Judicial Scandal—attorneys admitted to practice before this Court and/or the U.S. Court of Appeals for the 10th Circuit knowingly withheld material information from the Colorado Office of the State Auditor (OSA) as the OSA performed its continuous, ongoing, and federally-required single statewide audit. Through uncontroverted evidence, probable cause exists to suspect that the involved judges and attorneys committed various federal felony-level crimes, including but not limited to obstruction of justice (18 U.S.C. § 1503), false statements (18 U.S.C. § 1001), and obstruction of a federal audit (18 U.S.C. § 1516). *See also United States v. Jones*, 41 Fed. Appx. 220, 223 (10th Cir. 2002) (recognizing private contractor performing required federal audit as a federal auditor completing an "official investigation"); 31 U.S.C.. §§ 7501-7507 (the federal Single Audit Act).

The involved attorneys, include but are not limited to the following individuals, who are admitted to practice before either or both this Court and the U.S. Court of Appeals for the 10th Circuit:

> Maria Berkenkotter (D. Colo. Atty. Reg. # 596763; admitted to 10th Circuit),
> Nathan B. Coats (D. Colo. Atty. Reg. # 591795, admitted to 10th Circuit),
> Richard Gabriel (D. Colo. Atty. Reg. # 682419; admitted to 10th Circuit),
> Natalie Hanlon-Leh (D. Colo. Atty. Reg. # 704484; admitted to 10th Circuit),
> Melissa Hart (D. Colo. Atty. Reg. # 1980828; admitted to 10th Circuit),
> William Hood, III (D. Colo. Atty. Reg. # 688626; admitted to 10th Circuit),
> Monica Márquez (D. Colo. Atty. Reg. # 799305; admitted to 10th Circuit),
> LeeAnn Morrill (D. Colo. Atty. Reg. # 1828438; admitted to 10th Circuit),
> Andrew Rottman (D. Colo. Atty. Reg. # 1896776; admitted to 10th Circuit),
> Carlos Samour (D. Colo. Atty Reg. # 703570),

-2-

Grant Sullivan (D. Colo. Atty. Reg. # 1850542; admitted to 10th Circuit), and Philip Weiser (Admitted to 10th Circuit).

At all times relevant, Maria Berkenkotter, Brian Boatright, Nathan Coats, Richard Gabriel, Melissa Hart, William Hood III, Monica Márquez, and Carlos Samour were justices of the Colorado Supreme Court (referred to herein collectively as the "Justices"). Brian Boatright, however, is not admitted to practice before this Court or the 10th Circuit. Consequently, Justice Boatright is not listed as an attorney / respondent in this Complaint.

The attorney misconduct at issue has been further complicated by the failure of Assistant U.S. Attorney Bryan Fields, Assistant U.S. Attorney Kevin Traskos, and other federal attorneys to disqualify themselves and the Department of Justice (DOJ)—Denver Office from the investigation of and prosecution decisions made as to the Colorado Judicial Scandal. Mr. Traskos is Colorado Supreme Court Justice Melissa Hart's husband and currently serves as Chief of the DOJ-Denver Office's Civil Division (which oversees civil enforcement of public fraud and public corruption cases). In addition to violating the DOJ's internal disqualification standards, there is probable cause to suspect criminal violations of 18 U.S.C. § 208. *See also* 5 C.F.R. § 2635.501-503 (defining general grounds for disqualification to ensure appearances of impartiality); 28 C.F.R. § 45.2 (defining conflicts of interest in criminal investigations including political and personal relationships). Bryan Fields and Kevin Traskos are admitted to practice before both this Court and the U.S. Circuit Court of Appeals for the 10th Circuit.

A criminal conviction (or a criminal charge) is not a prerequisite for judicial discipline and/or attorney discipline. *See, e.g., In re Cruikshanks*, 648 S.E.2d 19, 23 (W. Va. 2005) (neither conviction nor criminal charge prerequisite to judicial discipline where state supreme court had inherent authority and duty to "promote and protect the honor, integrity, dignity, and efficiency of

the judiciary and the justice system"); *People v. Parsley*, 109 P.3d 1060 (Colo. PDJ 2005)

(criminal conviction not predicate to attorney discipline under Colo. RPC 8.4(b), (c);

"Disbarment is the presumptive sanction for the commission of a serious crime involving

dishonesty."). The criminal conduct involved here, however, supports recognition that the

involved attorneys subject to this Court's and/or the 10th Circuit Court of Appeals' disciplinary

jurisdiction have further violated other standards of conduct as adopted by this Court through the

Colorado Rules of Professional Conduct. D.C.COLO.LAttyR 2(a); *accord* 10th Cir. R. Add. III,

§ 2.3 (10th Circuit's disciplinary jurisdiction includes enforcing "the Code of Professional

Responsibility adopted by the highest court of any state to which the attorney is admitted to

practice").

Ultimately, the Colorado Judicial Scandal involves a broader pattern of intimidation,

retaliation, and an enforced culture of silence facilitated through publicly-funded hush money /

non-disclosure agreements (NDAs), self-controlled "independent" investigations, and self-

serving public relations strategies. The Colorado Judicial Scandal continues to wrongfully cost

taxpayers tens of millions of dollars.

This Complaint is also related to a separate judicial misconduct proceeding pending

before the U.S. Court of Appeals for the 10th Circuit. The parallel judicial discipline proceeding

has been docketed as Judicial Complaint No. 10-25-90048 and is subject to a petition for review

according to 10th Circuit JCD Rule 18(b). Because of circumstances described in Judicial

Complaint No. 10-25-90048 and in the accompanying materials,[1] this Complainant respectfully

---

[1] A former member of this Court's Committee on Conduct, John F. Walsh III, was directly involved in the alleged attorney misconduct. A current member of this Court's Committee on Conduct, Kathyrn Stimson, is, likewise, a material witness as to the allegations of misconduct

-4-

requests that this Court and the U.S. Court of Appeals for the 10th Circuit address both apparent

and actual conflicts of interest within the membership of this Court's Disciplinary Panel, this

Court's Committee on Conduct, and the 10th Circuit's Judicial Council.  D.C.COLO.LAttyR 6(a),

---

asserted through this Complaint.  There are also acknowledged grounds for the disqualification of this Court's entire Disciplinary Panel, including Chief District Court Judge Philip Brimmer. Exhibit 8 further provides grounds for 10th Circuit Court of Appeals Chief Judge Jeffrey Holmes to disqualify himself from consideration of this Complaint according to the procedures defined in 10th Cir. R. Add. III, § 4.3, 5.3. Because of circumstances described in Exhibit 2, it would also be "clearly inappropriate" for the 10th Circuit to appoint the Colorado Office of Attorney Regulation Counsel as disciplinary counsel in this case.  10th Cir. R. Add. III, § 4.4.

The Complainant further notes that during the fall of 2023, while still serving as the Executive Director of the Colorado Commission on Judicial Discipline (CCJD), he had applied for appointment to this Court's Committee on Conduct expressly because of the breakdown of Colorado's attorney regulation system.  At the time, the Complainant was rightfully apprehensive of imminent retaliation for having internally raised the issues presented in this Complaint.

The following Exhibits are filed with this Complaint and incorporated by reference:

- Exhibit 1—Anonymous Fraud Hotline complaint submitted by the Complainant on October 20, 2024 and supplemental anonymous Fraud Hotline complaint submitted by the Complainant on November 4, 2024;
- Exhibit 2—Anonymous request for evaluation (RFE) of judicial conduct submitted by the Complaint to the CCJD on October 20, 2024;
- Exhibit 3—Appendices to the October 20, 2024 RFE;
- Exhibit 4—Dually filed public comments to the Colorado Judicial Discipline Rulemaking Committee (CJDRC) and RFE with appendices submitted to the CCJD on August 25, 2025;
- Exhibit 5—First supplement to combined public comments and RFE submitted on September 12, 2025;
- Exhibit 6—Second supplement to combined public comments and RFE with appendix submitted on September 12, 2025;
- Exhibit 7—Third supplement to combined public comments and RFE with appendices submitted on September 30, 2025; and
- Exhibit 8—Complainant's email correspondence with the American Inns of Court and request for clarification as to 10th Circuit Chief Judge Jeffrey Holmes's involvement in the decision to award Justice Richard Gabriel the 2024 AIC 10th Circuit Professionalism Award.

(d); *see also* D.C.COLO.LAttyR 7(h) (addressing conflict mechanism for complaints brought against a sitting member of the Committee on Conduct); 10th Cir. R. Add. III, § 4.3 (Chief Judge or designee authorized to appoint Disciplinary Panel); *Cf.* 10th Cir. JCD Rules 25 (disqualification) and 26 (transfer to another Judicial Council).

RELEVANT BACKGROUND

On July 15, 2018, Colorado State Court Administrator's Office (SCAO) Controller Myra Dukes discovered and internally reported evidence that SCAO Chief of Staff Mindy Masias had intentionally altered a receipt as part of a request for personal reimbursement. State Court Administrator Christopher Ryan immediately recognized Masias's suspected conduct as material to a continuous, recurring annual single statewide audit of the Judicial Department's internal controls conducted as a component for certification of the State of Colorado's Annual Comprehensive Financial Report (ACFR). Like other states and governments, Colorado is required to produce its ACFR as a condition of receiving federal funding and for its federally granted authority to issue bonds. Following internal and external investigations, the Justices of the Colorado Supreme Court collectively decided to terminate Masias's employment. As part of the notice provided to Masias, State Court Administrator Ryan explained the materiality of Masias's financial misconduct to the OSA's single statewide audit and the ACFR. Instead of accepting her termination or agreeing to the severance offer made by the Colorado Judicial Branch, Masias instead activated leave under the Family Medical Leave Act (FMLA).

In December 2018, Masias's colleague and successor as SCAO Human Resources Director, Eric Brown, began negotiating a multi-million-dollar, sole-source contract for Masias to provide leadership training services to the Judicial Department. As part of these negotiations,

-6-

Brown met with then-Chief Justice Nathan Coats, Counsel to the Chief Justice Andrew Rottman, and State Court Administrator Ryan to essentially present an ultimatum that Masias would release compromising information about the Department and the Justices if an agreement could not be reached.  Brown's talking points (including Masias's allegations of covered up judicial, attorney, and employee misconduct) were reduced to writing in a document later referred to as the Masias Memo.  SCAO Legal Counsel Terri Morrison was also contemporaneously aware of the Masias Memo and the meeting that occurred between Brown, Coats, Rottman, and Ryan.

Masias remained on FMLA leave until March 15, 2019, when she executed a separation agreement, effective March 19, 2019, that allowed her to keep her income from paid leave in exchange for a general release of claims and a non-disclosure agreement.  Masias executed her separation agreement with the expectation of a 5-year, $2.66-2.75 million sole-source contract to provide leadership training services.  To provide some perspective, under this contract Masias would have been paid approximately three-times the salaries of the individual Justices (i.e. $532,000 per year).  Before State Court Administrator Ryan signed the sole-source determination on March 25, 2019, Chief Justice Coats informed all the other Justices of Masias' resignation and her proposal for the leadership training program.  Through an April 4, 2019 email chain between Chief Justice Coats and Justice Melissa Hart about Masias applying to become the Utah State Court Administrator, Coats explained that Masias had signed an NDA and was negotiating the Masias Contract.  With Coats's approval, State Court Administrator Ryan then circulated the $2.66-2.75 million Masias Contract for its first execution on April 11, 2019.  On April 15, 2019, however, an anonymous complaint was submitted to the OSA's Fraud Hotline that alleged widespread occupational fraud within the SCAO and specifically involving additional financial

misconduct by Masias.  The anonymous Fraud Hotline complaint was personally sent to each of

the Justices, to Attorney General Phil Weiser, and to Governor Jared Polis.  Upon receiving a

letter from State Auditor Dianne Ray inquiring as to how the Judicial Department wished to

proceed in response to the Fraud Hotline complaint, Chief Justice Coats confirmed that he had

"look[ed] into th[e] allegations . . . in consultation with the Attorney General . . . and the

Attorney General's Staff."  In his response dated May 29, 2019, Chief Justice Coats, however,

did not inform the State Auditor that the $2.66-2.75 million sole-source Masias Contract had

already been approved or that the Masias Contract would be executed a second time three

business days later—June 3, 2019—and one business day after SCAO Controller Myra Dukes

retired.  Chief Justice Coats further knowingly concealed the existence of the Masias Memo and

its significance in negotiations of the Masias Contract from the OSA.

In July 2019, the existence of the Masias Contract became public and the Justices

accepted State Court Administrator Ryan's offer to resign.  At the time, the Justices, through an

official statement made by the Colorado Judicial Department, confirmed that they had

collectively approved and made the decision to cancel the Masias Contract.  As part of his

debriefing, Ryan met with 1st Assistant Attorney General LeeAnn Morrill and Assistant Solicitor

General Grant Sullivan to discuss and turn over his copy of the Masias Memo.[2]  At that time,

SCAO Legal Counsel Terri Morrison also had access to a copy of the Masias Memo.  In a

July 19, 2019 email exchange with Andrew Rottman, Morrill acknowledged possession of the

Masias Memo, its materiality to the OSA's Fraud Hotline investigation, and the need to preserve

---

[2] David Migoya, *Colorado Attorney General's Office Lawyers Knew About Judicial Misconduct Memo: Whether they could, should or did tell Attorney General, other authorities is unclear*, DENVER POST, February 22, 2021.

-8-

the document.  Despite this email and later deposition testimony from Justice Melissa Hart confirming that the Justices were aware of the Masias Memo in 2019, the Masias Memo was intentionally withheld from the OSA (and from the CCJD) for over 1 ½ years until then-former State Court Administrator Ryan came forward and publicly revealed the document's existence. In the meantime, the OSA issued a December 2019 management letter as part of the ACFR audit and a November 18, 2020 SCAO Performance Audit Report that both recognized the breakdown of SCAO's internal controls and appearances of impropriety created by the Masias Contract.

In response to State Court Administrator Ryan's revelation of the Masias Memo's existence, the Justices and the other attorneys listed in this Complaint collaborated on damage control that included the Justices issuing separate public statements on February 4, 2021 and on February 8, 2021.  The collaboration between the Justices, the attorneys listed in this Complaint, other public officials, and former U.S. Attorney for the District of Colorado John F. Walsh, III (who was then a partner at the national law firm WilmerHale) is documented through internal Judicial Department email chains created concurrently with the drafting of the public statements. The public statements, in turn, confirmed that the Justices and the other attorneys were fully informed by former Chief Justice Coats and were complicit in knowingly concealing material information from the OSA as it performed a federal function through its ACFR audit, its 2020 Performance Audit of SCAO, and its Fraud Hotline Investigation.   These circumstances have been further proven through Chief Justice Coats's admissions and judicial discipline.  *Matter of Coats*, 2023 CO 44, ¶¶ 4(9)-(14), (20)-(23), 6.  A separate, though only partially disclosed, attorney regulation investigation of former Chief Justice Coats concluded with findings (upon

clear and convincing evidence) that he had failed to report the misconduct of subordinate attorneys, as required by Colo. RPC 5.1 and 8.3.[3]

When the OSA finally issued its Fraud Hotline Investigation Report on February 4, 2022 with referrals for prosecution, interference, obstruction, and delay of the Fraud Hotline investigation caused state statutes of limitations to lapse. The Justices, Andrew Rottman, Terri Morrison, Attorney General Phil Weiser, Chief Deputy Attorney General Natalie Hanlon-Leh, LeeAnn Morrill, and Grant Sullivan were all directly involved in this interference, obstruction, and forced delay.

At various times, the Complainant reported these circumstances to federal law enforcement (specifically Bryan Fields, the DOJ—Denver Office, the DOJ Public Integrity Section, and the FBI) and to the CCJD only to be intentionally ignored. Exhibits 4-6 further document how these circumstances are now being intentionally disregarded or suppressed by the Colorado State Commission on Judicial Performance, the Colorado Civil Rights Division, the Colorado Judicial Discipline Rulemaking Committee, and the CCJD. Moreover, there appears to be cultural resistance within the press, Colorado's political parties, and the Colorado General Assembly to holding the attorneys listed in this Complaint (particularly Attorney General Weiser) and others involved in the Colorado Judicial Scandal accountable.

---

[3] The Colorado Legal Regulation Committee's public statement dated January 20, 2023, states, in relevant part:

> "Based on the evidence provided by outside counsel, the Committee believes that there is clear and convincing evidence that the former Chief Justice violated the rules with respect to his duty to report what appeared to be improper conduct of other lawyers which contributed to the ongoing consideration of awarding the [Masias] contract."

-10-

ANALYSIS

Attorneys admitted to practice before this Court are expected to abide by standards of professional conduct defined through the Colorado Rules of Professional Conduct. Under the Colo. RPC, the Colorado Code of Judicial Conduct (the Code), and the Code of Conduct for United States Judges (the federal Code), both judges and attorneys are required to report judicial or attorney misconduct and/or to otherwise take "appropriate action." Colo. RPC. 8.3; Canon Rules 1.1, 1.2, 1.3, 2.2, 2.3, 2.5, 2.6, 2.12, 2.15, 2.16 of the Code; Canons 1, 2(A)-(B), and 3(B)(6) of the federal Code. Similarly, non-compliance with the law (whether criminal, civil, or ethical rules) also violates the respective codes of conduct. In proceedings before this Court and the 10th Circuit, violations of the standards of professional conduct are proven through a preponderance of evidence. D.C.COLO.LAttyR 7(e)(1), (f). As previously noted, neither a criminal conviction nor even a criminal charge is prerequisite to recognizing violations of Colo. RPC 8.4(a-1), (b)-(d), (f), (h), Canon Rules 1.1 and 1.2 of the Code, and/or Canon 2(A) of the federal Code.

Despite a complex history of ancillary judicial, attorney, and employee misconduct, there are clear grounds for discipline of the respondent attorneys. The Justices and those who helped them were aware of information material to the OSA's federally required single statewide audit / ACFR audit (including the contemplation of the $2.66-2.75 sole-source Masias Contract and the existence of the Masias Memo) and, yet, intentionally withheld/concealed the material information from the OSA and the CCJD (which had exclusive constitutional authority to investigate judicial misconduct).

-11-

There is probable cause to suspect that the Justices and those helping them committed the crimes of obstruction of justice, false statements, and obstruction of a federal audit.

The elements of obstruction of justice (18 U.S.C. § 1503) are:

1. The defendant corruptly,

2. Endeavored to influence, obstruct, or impede the due administration of justice,

3. With knowledge and specific intent to obstruct.

The elements of False Statements (18 U.S.C. § 1001) are:

1. The defendant, in a matter within the jurisdiction of the federal government,

2. Falsifies,

3. Conceals, or

4. Covers up by any trick, scheme, or device,

5. A material fact.

The elements of Obstruction of a Federal Audit are (18 U.S.C. § 1516) are:

1. The defendant,

2. With the intent to deceive or defraud the United States,

3. Endeavors to influence, obstruct, or impede a federal auditor,

4. In the performance of official duties relating to an entity receiving in excess of $100,000, directly(a) or indirectly in any 1-year period.

"'Federal auditor' means any person employed on a full- or part-time or contractual basis to perform an audit or a quality assurance inspection for *or on behalf of* the United States." 18 U.S.C. § 1516(b)(1) (emphasis added).

-12-

The intentional withholding of material information from the OSA and the CCJD by the Justices and those helping them violated Canon Rules 1.1 (Compliance with Law), 1.2 (Promoting Confidence in Judiciary), 1.3 (Abusing Prestige of Office), 2.2 (Impartiality and Fairness), 2.3 (Bias, Prejudice, and Harassment), 2.5 (Competence and Cooperation), 2.6 (Ensuring the Right to be Heard), 2.9(C) (Ex Parte Communications), 2.11 (Disqualification), 2.12 (Supervisory Duties), 2.15 (Responding to Judicial and Lawyer Misconduct), 2.16 (Cooperation with Disciplinary Authorities), 3.1 (Extrajudicial Activities in General), 4.1 (Political and Campaign Activities of Judges) of the Code and Colo. RPC 1.7(a)(2) (Conflict of Interest), 1.13(b) (Organization as Client), 3.3(a) (Candor Toward the Tribunal), 3.4 (Fairness to Counsel), 3.5(a) (Impartiality of Tribunal), 4.1 (Truthfulness in Statements to Others), 5.1 (Responsibilities of Supervisory Lawyer), 6.4 (Law Reform Activities), 8.3 (Reporting Professional Misconduct), 8.4 (a-1), (b)-(d), (f), (h) (violation of RPC, commission of criminal act, dishonesty/fraud/deceit, conduct prejudicial to administration of justice, assisting judicial misconduct, wrongfully harming others).

By failing to disqualify themselves and the DOJ-Denver Office from the investigation of and prosecution decisions as to the Colorado Judicial Scandal, Civil Division Chief Kevin Traskos and Assistant U.S. Attorney Bryan Fields similarly violated the law and should be subject to discipline for further violating their duties under Colo. RPC 1.7(a)(2), 1.10(a), 4.1, 5.1, 8.3, 8.4(a-1), (b)-(d), (f), (h).  By intentionally disregarding the Complainant's reporting of suspected crimes and public fraud, there is also probable cause to suspect that Bryan Fields and

Kevin Traskos jointly and severally committed the crime of obstruction of justice (18 U.S.C. §

1503) and that Kevin Traskos criminally violated 18 U.S.C. § 208.[4]

 **WHEREFORE**, the Complainant respectfully requests that this Court, through a

conflict-free Disciplinary Panel and Committee on Conduct, initiate an investigation and attorney

discipline proceedings according to D.C.COLO.LAttyR 7.  Concurrently, the Complaint

respectfully requests that the U.S. Court of Appeals for the 10th Circuit initiate attorney discipline

proceedings under 10th Cir. R. Add. III.

 Dated: September 30, 2025


       /s/ Christopher S.P. Gregory
       **Christopher S.P. Gregory, Esq.**
       The Gregory Law Firm, LLC
       201 Coffman St., #1822
       Longmont, CO 80502
       Telephone: (970) 648-0642
       E-mail: cspgregory@thegregorylawfirm.net
       *Pro Se* Attorney Complainant
       Christopher S.P. Gregory

---

[4] 18 U.S.C. § 208(a) provides, in relevant parts:

 **(a)** Except as permitted by subsection (b) hereof, whoever, being an
 officer or employee of the executive branch of the United States
 Government . . .  participates personally and substantially as a
 Government officer or employee, through decision, approval, disapproval,
 recommendation, the rendering of advice, investigation, or otherwise, in a
 judicial or other proceeding, application, request for a ruling or other
 determination, contract, claim, controversy, charge, accusation, arrest, or
 other particular matter in which, to his knowledge, he, ***his spouse***, minor
 child, general partner, organization in which he is serving as officer,
 director, trustee, general partner or employee, or any person or
 organization with whom he is negotiating . . . has a financial interest--
 Shall be subject to the penalties set forth in section 216 of this title.
 (Emphasis added).

-15-

To the best of my knowledge, I declare under penalty of perjury under the law of Colorado that the foregoing facts and circumstances described in this Complaint are true and correct.

Executed on the 30th day of September 2025 at Longmont, Boulder County, Colorado.

_____

Christopher S.P. Gregory

-15-

## Christopher Gregory

| | |
|---|---|
| **From:** | Christopher Gregory |
| **Sent:** | Tuesday, September 16, 2025 11:08 AM |
| **To:** | Brita Horn; info@coloradodems.org |
| **Subject:** | Public Corruption |
| **Attachments:** | 250914 CSPG BK Eml re Gov Race.pdf |

Good morning Republican Party Chair Horn and Democratic Party Chair Murib,

I write to you as a retaliated-against former member, Vice-Chair, Chair, and Executive Director of the Colorado Commission on Judicial Discipline.

I am concerned that legitimate and grave concerns about the integrity of Colorado Attorney General Phil Weiser are being ignored in the 2026 Colorado Governor's race.  Through the attached emails, I brought these concerns and issues to Senator/Candidate Barbara Kirkmeyer's attention.  Both political parties need to address Attorney General Weiser's involvement in over $4 million of publicly funded non-disclosure agreements and in the Colorado Supreme Court / Attorney General's Office having concealed the Masias Memo from the Colorado State Auditor as part of federally related audits / investigations into the Colorado Judicial Scandal.  My attached emails to Senator Kirkmeyer contain an error—the February 12, 2021 article was published in the *Denver Post* rather than the *Denver Gazette*.  It is equally concerning that the major media outlets are aware of these issues but have yet to report on them.

Both political parties need to make integrity in government (regardless of policy differences) the core issue of the 2026 election.  Addressing and deterring public corruption is a non-partisan endeavor.

Sincerely,

Christopher Gregory



The Gregory Law Firm, LLC
Christopher S.P. Gregory
Attorney at Law

201 Coffman St., #1822, Longmont, CO 80502
● Phone:  970.648.0642 ● Fax:  970.648.0643 ●

This e-mail transmission contains information from the Gregory Law Firm, LLC which may be confidential or protected by the attorney-client privilege.  If you are not the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is prohibited.  If you have received this transmission in error, please notify us immediately by e-mail and delete the original transmission.

Appendix 4        1

## Christopher Gregory

| | |
|---|---|
| **From:** | Christopher Gregory |
| **Sent:** | Sunday, September 14, 2025 11:33 AM |
| **To:** | barbara.kirkmeyer.senate@coleg.gov |
| **Subject:** | RE: 2026 Governor's Race |
| **Attachments:** | Attachments.txt |

---

**ShareFile Attachments**                                        Expires March 16, 2026

---

210212 DP Art AGs Aware Masias Memo.pdf                          5.9 MB

**Download Attachments**

Christopher Gregory uses ShareFile to share documents securely.

---

Dear Senator Kirkmeyer,

I did not realize that I had pulled a relevant (but not the core) article reporting on the Attorney General's Office withholding the Masias Memo from the Office of the State Auditor.  Here is the more relevant / core article.

David Migoya, *Colorado Attorney General's Office Lawyers Knew about Judicial Misconduct Memo*, DENVER GAZETTE, February 12, 2021.

Warmest regards,

Christopher Gregory



The Gregory Law Firm, LLC

Christopher S.P. Gregory
Attorney at Law

201 Coffman St., #1822, Longmont, CO 80502
● Phone:  970.648.0642 ● Fax:  970.648.0643 ●

This e-mail transmission contains information from the Gregory Law Firm, LLC which may be confidential or protected by the attorney-client privilege.  If you are not the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is prohibited.  If you have received this transmission in error, please notify us immediately by e-mail and delete the original transmission.

Case No. 1:25-cv-03361-KHV-GEB   Document 1-10   filed 10/23/25   USDC Colorado
pg 55 of 75

NEWS > COLORADO NEWS • Investigative, News

# Colorado Attorney General's Office lawyers knew about judicial misconduct memo

Whether they could, should or did tell Attorney General, other authorities is unclear



Did Colorado state... Case No. 1:25-cv-03361-KHV-GEB ...Document 1-10 ...filed 10/23/25 ...USDC Colorado -court...

pg 56 of 75



**Denver Post file photo**

DENVER, CO. NOVEMBER 14: The Ralph Carr Judicial Center at 1300 Broadway, in Denver, Colorado is seen on November 14, 2013. (Photo by Hyoung Chang/The Denver Post)



By **DAVID MIGOYA** | The Denver Post

PUBLISHED: February 12, 2021 at 6:00 a.m. | UPDATED: February 18, 2021 at 12:14 p.m.

At least two high-ranking lawyers in the Colorado Attorney General's Office were aware of the contents of a memo that enumerated allegations of judicial and official misconduct two years before it became public, The Denver Post has learned, but it's not clear if they ever reported the alleged conduct to authorities or their boss.



Did Colorado state attorney chabe... a cover-up of judicial misc... Document 1-10 filed 10/23/25 /02/USDC Colorado court...

Case No. 1:25-cv-03361-KHV-GEB

pg 57 of 75

The two attorneys – LeeAnn Morrill, a first-assistant attorney general in charge of its public officials unit, and Grant Sullivan, the AG's assistant solicitor general – were briefed about the memo and its contents by former State Court Administrator Christopher Ryan at a meeting in July 2019 just as he was about to resign, Ryan told The Post.

Law professors who teach professional responsibility say the rules of professional conduct are clear that attorneys should disclose judicial improprieties to authorities when they learn of them, but a requirement to maintain client confidentiality might get in the way.

"In the interest of justice, one ought to report, but it's not quite that firm of an obligation," University of Colorado law professor Richard Collins said. "The rule about judicial misconduct is very clear and involves some complex judgment such as what makes a judge unfit for office. If it's serious enough and part of confidential information they received from a client, then it appears to need their consent to disclose it."

The memo is central to a $2.5 million five-year judicial training contract awarded in April 2019 to the department's chief of staff, Mindy Masias, who Ryan said threatened to file a sex-discrimination lawsuit if she were fired over financial irregularities. Masias resigned in March 2019 just weeks before signing the contract, which officially began that June. It was canceled in July 2019 amid a Denver Post investigation into the deal.

The memo detailed more than a dozen instances of misdeeds by judges and other high-level officials within the department that were glossed over or covered up by the agency.

"I provided them the information and chronology that has been relayed" in Denver Post stories, Ryan said of the AG attorneys. "The meeting culminated in me delivering the copy of the memo to (department chief legal counsel Terri) Morrison so she could provide it to Morrill."

Ryan said he does not believe any action was taken on allegations listed in the memo – allegations that reach to the state's Court of Appeals and Supreme Court.

"I have no knowledge of any investigation that was undertaken relative to the information in the memo, and after offering to assist in one, I was not asked to provide any further information," Ryan said, referring to state auditors who later looked into the Masias contract.



The head of the Colorado Judicial Disciplinary Commission, which investigates allegations against jurists and whose findings generally remain secret, would not say whether the body was aware of the memo or its contents, but did say it was keenly interested.

Did Colorado sta... Case No. 1:25-cv-03361-KHV-GEB sc... Document 1-10 filed 10/23/25 /02/ USDC Colorado -court...

pg 58 of 75

"We are committed to learn more about this either through our own efforts or through the two investigations ordered by the court," its executive director, William Campbell, told The Post.

Attorney General Phil Weiser on Tuesday said that "Coloradans expect transparency and accountability from public officials entrusted to lead state government. … Independent investigations into the allegations contained in the memo are necessary steps to … instill confidence in the judiciary."

But Weiser would not say if he was previously aware of the document or its contents.

"The Colorado Rules of Professional Conduct prohibit a lawyer from revealing information or documents related to the representation of that lawyer's client," Weiser's office told The Denver Post in an email Wednesday. "The Attorney General's Office is required under state law to be the legal counsel to the Judicial Department and the State Auditor, and all state lawyers must follow these rules requiring confidentiality of client information."

Asked directly whether Weiser knew, his spokesman would not say.

"We cannot confirm or deny any information," Lawrence Pacheco wrote in an email to The Post.

Former Attorney General Cynthia Coffman told The Post that at the minimum, Weiser should have been told, and that there was a duty to report the alleged misconduct contained in the memo.

"My expectation and policy, as well as the gravity of that memo's content, would have required them to tell me as the attorney general of Colorado," Coffman said in a telephone interview. "We are all officers of the court and we take an oath to report all allegations of misconduct. At the minimum, I would have had a conversation with the chief justice" of the Supreme Court.

Colorado's rules of professional conduct for attorneys requires any lawyer aware of potential judicial misconduct to report it.

"A lawyer who knows that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judge's fitness for office shall inform the appropriate authority," according to Rule 8.3 of professional conduct.

Another rule, number 1.6, deals with attorneys maintaining the confidentiality of a client and information they learn from them, but could supercede Rule 8.3. The attorney general represents all branches of Colorado government, including the Judicial Department.



Did Colorado state... Case No. 1:25-cv-03361-KHM-GEB isc... Document 1-10 filed 10/23/25 /02/ USDC Colorado court...

pg 59 of 75

Morrill is a 17-year veteran of the AG's office and for the past eight years and has led the team that counsels and represents Gov. Jared Polis as well as the Judicial Department, the Secretary of State, State Auditor, Department of Local Affairs and the Department of Military and Veterans Affairs.

Sullivan is a 10-year veteran of the AG's office, all as its assistant solicitor general, and was the appellate law clerk to then-Supreme Court Justice Nathan "Ben" Coats from September 2010 through August 2011. Coats was named chief justice in 2018.

Neither Morrill nor Sullivan responded to Denver Post efforts to reach them.

Ryan has said the memo dates to January 2019 when then-human resources director Eric Brown said Masias was prepared to file a lawsuit baring the department's secrets.

The Colorado Supreme Court on Monday released the document which it had previously denied Denver Post efforts to obtain under the department's open records rules. Morrill and Sullivan vigorously defended the department's withholding the memo.

The unsigned document lists 27 bullet points Brown referred to in a meeting with Ryan, then-Chief Justice Coats and his counsel, attorney Andrew Rottman.

Brown managed to read only part-way through the two-page memo before Coats waved for him to stop and asked what they could do to prevent Masias from following through with the threats, Ryan said.

She was ultimately given a five-year $2.5 million contract to provide judicial training for the whole department. A public bidding process yielded no bids despite dozens of companies requesting information about participating. Several companies previously told The Post that they felt the proposal request by the State Court Administrator's Office was too narrowly focused to offer a bid.

Supreme Court Chief Justice Brian Boatright said the court is hiring an independent investigator to look into the memo and allegations it was the crux behind the Masias contract. Boatright and the other six sitting justices have denied that the contract was intended to keep the allegations in the memo quiet.

Gov. Jared Polis weighed in, saying he supports the call for an inquiry.

"This memo describes unacceptable behavior within our judicial system, both among members of the bench as well as judicial employees. This type of conduct has no place in Colorado," he said in a statement. "Every person should feel safe in the workplace and every Coloradan should be able to feel confident in the integrity of our judicial system and the high standards to which we hold our judges and our judicial system."



The memo described a chief justice – it's unclear which one – ordering the destruction of a note alleging sexual misconduct, the paying of a settlement to a Court of Appeals law clerk to protect a sitting appellate judge's chances for appointment to the Supreme Court, and the passing of pornographic videos by two judges who would later be named chief judge in their district when no action was taken against them.

Legal associations have also backed the call for investigations.

"We urge the Colorado (Judicial) Department to be fully transparent and to take the necessary steps to redress these issues promptly in order to maintain the public's faith in the administration of justice in Colorado," the Colorado Bar Association said in a statement.

All the justices approved of Masias' contract at the time, but Boatright said they saw the memo for the first time this week. It remains unclear whether Coats told any of them about the memo at the time.

 The Trust Project ∨

**Prime is Now $179, But Few Know this Free Savings Hack**

Online Shopping Tools | Sponsored

**California Heart Surgeon Begs Americans: "Stop Doing This To Your Avocados"**

Gundry MD | Sponsored

Watch Now

**Here's What a New Walk-in Shower Should Cost You in 2024**

HomeBuddy | Sponsored

**'Never Going Back to Prime'—Why 20,000 Users Prefer This Shopping Secret**

Online Shopping Tools | Sponsored



**California Surgeon: Dark Spots Are No Match For This Genius**

**From:** Christopher Gregory
**Sent:** Wednesday, September 10, 2025 12:35 PM
**To:** barbara.kirkmeyer.senate@coleg.gov
**Subject:** 2026 Governor's Race

| **ShareFile Attachments** | Expires March 12, 2026 |
| --- | --- |
| 211215 DG Art re Morrill & Sullivan Aware...emo.pdf | 2 MB |
| 221113 DG Art re Confid Agrmts.pdf | 7.6 MB |

Download Attachments

Christopher Gregory uses ShareFile to share documents securely.

Dear Senator Kirkmeyer,

I hope that all is well for you.

After some reflection, I think that the issues in the democratic gubernatorial primary and general election are simple. Phil Weiser presents himself as "the people's attorney" and an anti-corruption champion when he is, in fact, one of the worst offenders. Questioning Weiser about his role in authorizing over $4 million in illegal/unethical non-disclosure agreements is critical. It is also necessary to question Weiser about his knowledge of the Masias Memo in 2019. Knowingly concealing material information from the Colorado State Auditor (i.e. the existence of the Masias Memo) as she performed functions related to the federally required Single Statewide Audit, constitutes multiple felony-level federal crimes.

Weiser has two very exposed Achilles heels in this contest.

With respect to the non-disclosure agreements, you were the champion of reform and the sponsor of SB 23-053 (which now ostensibly prohibits the practice).

I have attached the two critical newspaper articles which broke the stories on these issues.

> David Migoya, *Colorado Supreme Court Justices Knew about Memo Alleging Misconduct 2 Years Before It Became Public*, DENVER GAZETTE, December 15, 2021.
> David Migoya, *Nondisclosures Under Fire: State Confidentiality Agreements Cost Millions, Silence Whistleblowers*, DENVER GAZETTE, November 13, 2022.

Just so you are also aware of some additional background. When Phil Weiser ran for Attorney General in 2018, I donated to his campaign after specifically asking him about his commitment to protecting civil liberties. When he announced his run for Governor earlier this year, he sent me an automated text asking to donate again. I responded by sending a link to the above article about nondisclosure agreements. There was no response from Weiser's campaign and I was apparently removed from his solicitation list. Weiser knows that he does not have any good answers to these questions and that he cannot explain away his involvement in the Colorado Judicial Scandal.

2

Please do not hesitate to let me know if you have any questions or if I can better explain the need for a meaningful legislative response to the Colorado Judicial Scandal.

Warmest regards,
Christopher Gregory



The Gregory Law Firm, LLC

Christopher S.P. Gregory
Attorney at Law

201 Coffman St., #1822, Longmont, CO 80502
● Phone:  970.648.0642 ● Fax:  970.648.0643 ●

This e-mail transmission contains information from the Gregory Law Firm, LLC which may be confidential or protected by the attorney-client privilege.  If you are not the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is prohibited.  If you have received this transmission in error, please notify us immediately by e-mail and delete the original transmission.

3

# Colorado Supreme Court justices knew about memo alleging misconduct 2 years before it became public

David Migoya, The Gazette   Dec 15, 2021



The Ralph L. Carr Colorado Judicial Center in downtown Denver, home of the Colorado Supreme Court.

iStock

Colorado's Supreme Court justices were generally aware of a memo containing allegations about judicial misconduct nearly two years before it was made public, according to testimony one of the justices gave in an unrelated federal lawsuit deposition.

**Investigations into alleged judicial misconduct underway as Colorado signs contracts**
David Migoya David.migoya@gazette.com

It is the first acknowledgment that the members of the court knew about the memo shortly after it was the catalyst of an alleged quid-pro-quo $2.5 million contract given in March 2019 to a former Judicial Department official who threatened a tell-all sex discrimination

lawsuit.

The revelation brings into question what else the justices knew about the memo, the contract and the allegations swirling around it. Aside from canceling the contract and the resignation of two top officials, no other action was taken on the memo or its allegations by anyone in the judicial branch until details about the memo were revealed two years later in newspaper stories. The memo is now at the center of at least a half dozen investigations.

The court in February 2021 only said the justices had seen the memo for the first time just before deciding to make it public on the heels of newspaper stories that revealed its existence, but the court at the time did not say whether the justices were aware of the document before it was shown to them.

Justice Melissa Hart says she and the other justices knew about the memo sometime in 2019 because then-Chief Justice Nathan "Ben" Coats had told them about it.



Colorado Supreme Court Justice Melissa Hart (colorado.edu)

"Chief Justice Coats described the document to myself and my colleagues when we were meeting in conference one day," Hart testified in October during a deposition in a federal job discrimination lawsuit. "I first became aware of the specifics of this document in February 2021 (following the newspaper stories). I was aware in 2019 that there was a document that I think could have been this document, but I didn't know any details about it."



**Colorado judicial system makes public memo detailing alleged misconduct in alleged hush money contract**

Hart said Coats described it as "a list of allegations" but nothing more.

The court did not have an immediate comment when asked Wednesday about Hart's deposition.

The two-page memo is at the center of several investigations into a contract awarded to the department's former chief of staff, Mindy Masias, who was being fired at the time over financial irregularities.

Its allegations include the destruction of evidence, judges trading pornography, misconduct by department officials and a work environment that generally encouraged sexism and misogyny.

Portions of the depositions appear in a discrimination lawsuit filed in 2019 by Michele Brown, who was passed over for a job a year earlier as a staff rules attorney for the Supreme Court for someone less experienced. Brown, who is Black, alleges her age – she was 64 at the time – and her race were a factor. She had been a staff attorney at the Office of Legislative Legal Services for about 25 years.

In a separate deposition tied to Brown's lawsuit, the alleged author of the memo – then-Human Resources Director Eric Brown – denied knowing of the memo or anything about it, according to a court filing. The deposition represents Eric Brown's first remarks about the controversy.

But Hart testified that Coats told them Eric Brown had read from the memo during a meeting he had with him, according to Hart's deposition, but she did not say which justices were there. Coats generally met with the justices as a group. Justice Maria Berkenkotter was not a member of the court at the time.

Hart said Coats told them "there was a list that Eric (Brown) had read from" and that it was "from a part of a list of allegations."

However, Hart indicated that Coats didn't offer any context.

1981 Topps Joe Montana
Rookie Card Pulls in High…

"It was vaguely described to me in 2019," she testified. "It was not described in a way that I would have understood everything that it was."

It's unclear if Coats told the justices what the purpose of the meeting was. The federal magistrate judge presiding over Michele Brown's case barred her from asking Hart about the specifics of the meeting or what Coats said about it, only allowing questions about the memo's mention of an EEOC complaint against two justices involved with filling the job she had applied for.

Those justices were Hart and Justice Richard Gabriel.

Michele Brown on Wednesday filed a 116-page response to a department request to dismiss her lawsuit in which portions of Hart's and Eric Brown's testimony were included.

Former chief court administrator Christopher Ryan has alleged that only parts of the two-page memo were read at a meeting in January 2019 between himself, Eric Brown, Coats and counsel to the chief justice, Andrew Rottman. It was decided then that the contract could go to Masias, according to Ryan.

The memo described payoffs to keep harassment victims silent, allegations that judges ordered the destruction of evidence, and the misconduct of other judges and Judicial Department officials that was simply ignored, conduct that permeated the agency's highest ranks for years. Ryan did not detail the memo's contents, which became known only when the court made the document public.

For his part, Eric Brown – he is not related to Michele Brown – testified that he didn't recall meeting with Coats about the memo, was not its author and opined that "more than one person may have drafted this memo," according to the court filing.

Apple TV+ Subscription Price
Raises by 30% in the United…

Effective August 21st, 2025, Apple TV+
subscription prices will raise to $12.99 a
month. Keep reading to learn more about…

Eric Brown testified he had at some point "seen some of these allegations" that were noted in the memo when it was shown to him during the deposition and that he and Masias had discussed them.

Neither Eric Brown nor Masias has responded to repeated efforts to reach them for comment.

Masias was on family medical leave at the time of the meeting and had already created her company – The Leadership Practice – when the contract for judicial training was put out for public bid later that month. Ryan has said he insisted on the public bid process to avoid giving it directly to Masias.

But none of about 400 companies that received information about the contract put in a bid, not even Masias. The contract was later awarded directly to Masias within days of her official resignation and she was also given back pay and other benefits.

The department has since required employees to be separated at least six months before they can accept any contract work with it.

The Denver Post exposed the contract – but not the memo – in July 2019. The department cancelled the deal and Ryan resigned. Coats later told legislators that Eric Brown also resigned, although the latter said in his deposition that his resignation was related to family medical issues, not the Masias scandal or any other reason involving his job there.

The Post revealed the existence of the memo in February 2021, but did not actually have a copy of it. The court had denied the newspaper's repeated requests for the document.

8 Classic American Dishes
Everyone Should Try At Leas…

Try these classic American dishes to
spruce up your dinners, featuring a variety
of styles like Creole, Southern, and fusion…

After initially denying Ryan's allegations – and days after the newspaper's stories appeared – the court made the memo public.

"We believe this is the correct course of action – both to determine any actual wrongdoing and to clear those wrongly accused," the court said in a email issued at the time by Chief Justice Brian Boatright to judges and judicial employees statewide.

Boatright said the court had also given the memo to then-Colorado Auditor Dianne Ray "to assist in her fully investigating the circumstances surrounding the contract with former Chief of Staff Mindy Masias' company."

That investigation is reaching its conclusion, Boatright recently told a recent gathering of the Colorado Bar Association's board of governors, but said only an executive summary of its findings would be made public, according to several attorneys who heard him speak.

When Boatright released the memo he also "steadfastly" denied that the contract was an effort to "keep information about the department quiet."

Boatright said in the Feb. 8, 2021, email that "we met as a court and viewed the memo for the first time," but did not say whether the court was previously aware of its existence or the general nature of its content, as Hart testified they had.

Boatright replaced Coats as chief justice when Coats retired on Dec. 31, 2020, three weeks after a different state audit revealed a slew of problems inside the state court administrator's office. Berkenkotter was named to the bench in January 2021 to fill the spot Coats vacated.

### Disney Cross-Platform Strategy Features New Sho…

Disney's streaming calendar for September 2025 is coming together within the new Disney cross-platform ideology.…

It was that audit report, which laid much of the blame for the department's issues at Ryan's feet, that caused him to step forward about the memo.

Auditors said the Masias deal "degrades the public trust" and "gives the appearance of impropriety and appears to be a violation of the Judicial Code of Conduct."

Five other investigations into the memo and its contents are ongoing, including two by a pair of companies hired by the judicial department, one by the FBI, another by the state's Attorney Regulation Counsel that oversees lawyer licensing and discipline, and the last by the Colorado Commission on Judicial Discipline.

*David Migoya can be reached at* [david.migoya@gazette.com](mailto:david.migoya@gazette.com)

## CRYPTO
Collapsed FTX hit by rogue transactions; $1B in customer funds may have vanished. **C1**

## FOOTBALL
Wyoming holds off CSU 14-13 to claim Border War, Bronze Boot. **D12**



## THEATER
Family's harrowing, hopeful journey through COVID-19 ends up on stage. **E1**

# The Denver Gazette

SERVING DENVER & THE METRO AREA • DENVERGAZETTE.COM    MOSTLY SUNNY • HIGH 47; LOW 23    SUNDAY, NOVEMBER 13, 2022

# NONDISCLOSURES UNDER FIRE

**IN NATIONAL POLITICS**

## DEMS KEEP SENATE



REUTERS

Democratic Sen. Catherine Cortez Masto leads a rally ahead of the midterm elections Monday in Henderson, Nev.

Democratic Sen. Catherine Cortez Masto of Nevada has won a second term, defeating Republican Adam Laxalt to clinch the party's control of the chamber. Democrats now hold a 50-49 edge in the Senate and will retain control no matter how next month's Georgia runoff plays out, by virtue of Vice President Kamala Harris' tiebreaking vote. **Story, A18**

**Inside**

Vince Bzdek: Where do Colorado Republicans go from here? **Column, A5**

## State confidentiality agreements cost millions, silence whistleblowers

**BY DAVID MIGOYA**
The Denver Gazette

With increasing frequency, Colorado is mandating its employees — some of them whistleblowers calling out misconduct or malfeasance — sign nondisclosure clauses in any financial settlement they make with the state, effectively silencing them from ever letting anyone know what happened in their cases, according to interviews and dozens of records reviewed by The Denver Gazette.

**COLORADO WATCH**

The Denver Gazette's investigative team

In other instances over the past three years, records show state employees who faced discipline for alleged misconduct were instead given lucrative send-offs and assurances of the government's silence through similar nondisclosure deals.

Confidentiality agreements have the potential to bury evidence and prevent investigations of crimes, discrimination, sexual harassment and wage inequality, leading to a growing chorus of lawmakers and advocacy groups calling for them to be abolished.

The Denver Gazette also uncovered dozens more examples where state employees agreed to the nondisclosure

**SEE CONFIDENTIAL • PAGE 9**

DENVER & STATE A5   |   NATION & WORLD A21   |   BUSINESS C1   |   SPORTS D1   |   OUT THERE E9   |   COMICS E14

pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

> 10. __NON-DISPARAGEMENT.__ Employee agrees that following the execution of this Agreement, Employee will refrain from making any disparaging remarks about Employer or any of its employees. The following individuals agree not to make disparaging remarks about Employee: ██████████████ ████████
>
> 11. __SETTLEMENT PAYMENT.__ Employer shall pay $50,000 as follows:
>
> a. Employer will issue a 1099 to Employee on a $26,160 payment for emotional distress;

The leader of Colorado Parks and Wildlife retired after an investigation into racially insensitive remarks he allegedly made. He was given $26,000 for his own "emotional distress" in the ordeal and agreed not to say anything bad about anyone in the department.

## CONFIDENTIAL

**FROM PAGE 1**

clauses, sometimes for a payment of as little as $2,000, with little public record available to explain why.

Since 2019, there have been more than 80 settlement agreements with state employees totaling more than $4 million in taxpayer payouts, each with a nondisclosure clause preventing them from discussing it with anyone, records show.

Critics say the agreements are little more than government efforts to prevent the airing of its dirty laundry. The few proponents of the practice say it's an effective method of trimming the number of potential claims that would be filed if word of the settlements and their dollar amounts were to easily become public.

"I absolutely hate them. They are so hypocritical," said attorney Diane King, whose clients have signed some of the deals. "Public policy is that the public should know this stuff, but those who know what happened aren't allowed to talk about it. That's just muzzling and it's offensive. But we routinely have to agree to it if they want to settle."

Public records laws stop a government agency from hiding the amount of a settlement or with whom, but do

not extend to the reasons or underlying complaints behind a settlement unless they are already in a public record such as a lawsuit or official complaint.

The Denver Gazette was often forced to track down those other public records, sometimes via open-records requests when the documents could be found, to unravel the details behind taxpayer-funded financial settlements. Those settlements have included:

• A $50,000 payment — $26,000 of it for his own "emotional distress" — to the state's former Parks and Wildlife director who retired this month after using a racially insensitive remark to a fellow employee at a conference earlier this year. That employee was separately handed a year's salary — $75,634 — to resign.

• The long-time woman's softball coach at Adams State University who was paid $62,000 — $10,000 more than his annual salary — to resign following a Title IX investigation that

> "Public policy is that the public should know this stuff, but those who know what happened aren't allowed to talk about it. That's just muzzling and it's offensive. But we routinely have to agree to it if they want to settle."
>
> **Attorney Diane King**

determined he bullied and retaliated against his ballplayers.

• A Department of Education finance official who was paid nearly $183,000 to resign after complaining about internal control problems that he claimed involved the misuse of public funds.

• A $750,000 settlement to seven women in the education department who each received more than $64,000 — and their attorney another $300,000 — to not sue the state after a male co-worker was convicted of a felony for taking up-skirt photos of them on the job.

• A Department of Human Services supervising nurse was paid nearly $384,000 to resign after being disciplined for disclosing unlicensed pharmacy technicians at Wheat Ridge Regional Center were dispensing medications without supervision.

• More than $160,000 was paid to an attorney at the Department of Public Health and Environment to resign after she claimed the lack of enforcement actions against some assisted-living facilities were the result of political connections.

• A $100,000 settlement to a Department of Corrections prison guard who repeatedly complained of harassment that included being handcuffed to a pipe by his bosses, having a firearm pointed at him, being arrested on ginned-up criminal charges, and being tasered while sitting at a prison computer.



Attorney Mark Zaid of Washington said governments can make it appear employees need to sign nondisclosure agreements "when it's known that no such legal prohibitions actually exist."

### Deals would be illegal

Nearly all the agreements would be illegal if they were with federal employees under federal law, legal experts say. Colorado has a law banning retaliation against an employee who properly discloses information to a whistleblower agency, but not a prohibition on silencing them with cash payments.

"There are over-breadth steps taken by government — state and federal — to make it appear to employees that they are legally bound to maintain silence when it's known that no such legal prohibitions actually exist," said Mark

**SEE CONFIDENTIAL • PAGE 10**

SUNDAY, NOVEMBER 13, 2022  |  THE DENVER GAZETTE  |  **A9**

p pressreader   PRINTED AND DISTRIBUTED BY PRESSREADER  PressReader.com +1 604 278 4604  COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

## CONFIDENTIAL

**FROM PAGE 9**

Zaid, a Washington, D.C., attorney and national expert on nondisclosure deals. "Most people would think that if they want to settle they need to sign and won't believe anything to the contrary. Few would think to challenge it."

And the state is steadily increasing its mandate on requiring ND clauses in employee settlements, according to attorneys familiar with the practice who would only confirm the trend anonymously for fear of affecting negotiations with their clients.

Attorney General Phil Weiser's office, which largely negotiates every settlement agreement with a state employee, denied coercing anyone into signing an ND clause.

"The Department of Law represents state agencies in state employee/employer disputes. In settlement negotiations, the department attorneys discourage the use of nondisclosure or nondisparagement clauses," AG spokesman Lawrence Pacheco told The Denver Gazette. "Some agencies opt to use them anyway depending on the extenuating circumstances."

Attorneys who represent state workers, however, say that's not accurate.

"In cases where I have represented state employees, the Attorney General's office routinely not only encourages but requires the employee to agree to a nondisclosure provision in exchange for a settlement," Denver attorney Casey Leier said. "We used to have some ability to negotiate the exact scope of the nondisclosure, but this year, the state has changed its position and appears to be requiring a complete and total ban on any speech by the employee about their case and what they went through."

Several employees interviewed by The Denver Gazette say they frequently felt pressured to sign the documents while others said being silenced should not be allowed.

"They just make you feel as if you have to, that it's part of the deal, that everybody does it," said a state employee who refused to sign an NDA and agreed to discuss it only if their name was not used for fear of additional retaliation. "If I feel like they're doing something wrong, I should be able to say something, otherwise nothing will ever get fixed."

Said another: "I was just done with all the hassle, all the problems, all the threats. Signing was the easiest way for it to all go away and I could just get on with my life."

Efforts by Colorado's legislature to



TIMOTHY HURST, THE DENVER GAZETTE

Casey Leier, an attorney with Leventhal Lewis Kuhn Taylor Swan PC, sits for a portrait in his office Friday in Denver.

*In cases where I have represented state employees, the Attorney General's Office routinely not only encourages but requires the employee to agree to a nondisclosure provision in exchange for a settlement."*

**Denver attorney Casey Leier**

pass a law prohibiting all nondisclosure clauses with state employees have been unsuccessful as recently as two years ago. Colorado is among a majority of states that allow nondisclosure settlements with public employees.

Three states — Oregon, Washington and California — recently joined a growing number of others prohibiting the practice, largely the result of the #MeToo movement. After a wave of sexual misconduct allegations were made against powerful men such as movie mogul Harvey Weinstein, nondisclosure agreements that bar victims from discussing past claims of harassment

or abuse came under fire nationally, with calls from politicians and advocacy groups to abolish them.

"This is concerning, particularly in cases of discrimination, harassment, and wage inequality, because the public deserves to know when this illegal conduct is occurring," Leier said. "For instance, we know that when one woman has been harassed, we often later learn that there were many other women who were victims of the same treatment. The state can silence individual employees one by one, but the only way to stop discrimination in the long run is to bring the root cause to light."

### Nondisparagement deals common

The Denver Gazette even found nondisparagement agreements in which both the employees and the state agreed not to say bad things about each other. One of them, involving Secretary of State Jena Griswold, even restricted the employee, then-deputy Secretary of State Jenny Flanagan, from saying anything outside of a list of specific talking points outlined in the agreement.

Before joining Griswold's staff, Flanagan was vice president of state operations for Common Cause, a group that touts its efforts at keeping government transparent and accountable.

Neither Flanagan nor Griswold responded to efforts to reach them.

A similar nondisparagement and nondisclosure agreement exists between Erin Mewhinney, the former director of early care and learning at the Office of Early Childhood for the Colorado Department of Human Services, and her supervisors in that division.

Mewhinney was paid about $40,000 to resign in May 2021. There is no available document to explain why.

Yet her agreement appears to have been so cavalierly written that it re-

**SEE CONFIDENTIAL • PAGE 11**

**A10** | THE DENVER GAZETTE | SUNDAY, NOVEMBER 13, 2022

 pressreader    PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

## CONFIDENTIAL

**FROM PAGE 10**

stricts Michelle Barnes, the executive director of DHS, Mary Alice Cohen, the deputy executive director of the Colorado Office of Early Childhood, and Anne-Marie Braga, the deputy executive director of community partnerships at DHS, from saying anything bad about each other, but not about Mewhinney.

Mewhinney did not respond to efforts to reach her.

And when Christopher Castilian left the Great Outdoors Colorado Trust Fund (GoCo) in June 2021 after a four-year tenure as its executive director, he pocketed $52,000 and both sides agreed not to mention the agreement or even its existence to anyone. In exchange, Castilian agreed not to disparage anyone, including Gov. Jared Polis and his staff — and everyone at any level of state government in any department is barred from talking badly about Castilian.

Unlike the other settlements reviewed by The Denver Gazette, however, Castilian's does not carry a provision that the document is accessible under the Colorado Open Records Act. That's because it did not go through the state controller's office, which routinely ensures that language is contained in any separation agreement.

"As far as we are concerned, and as a matter of practice, settlement agreements don't require an NDA, but must have a CORA clause," said Doug Platt, spokesman for the Department of Personnel and Administration, which houses the Office of the State Controller. "The other sides of an agreement might require the NDA, but that's not our business."

Pacheco at the AG's office told The Denver Gazette that while other state agencies have agreed to the ND clauses, "The Department of Law has not asked any employees separating from the DOL to sign a settlement with a nondisclosure clause, and no DOL employee has signed one" while Weiser has been at the helm.

That's sort of true.

The department in April finalized a $15,000 settlement with paralegal Tatyana Smith in which she agreed not to publicize any aspect of the agreement.

Smith had sued the department in U.S. District Court in Denver in 2020 claiming she was fired in retaliation for racial and religious discrimination she experienced in the department in the short five months she'd worked there beginning in March 2019.

Earlier claims she filed with the state's Civil Rights Division over alleged racism and discrimination were dismissed.

The AG's office said in the settlement document Smith was fired because of poor performance.

"This was actually to settle a lawsuit filed against the state, so it's not really a separation agreement," Pacheco said. "It's a bit of a different application of the settlement agreement."

### Colorado's effort quickly died

Sen. Barbara Kirkmeyer in 2021 sponsored Senate Bill 21-23, which would have prohibited state agencies from restricting employees from disclosing factual circumstances concerning their jobs. The only limits would be when disclosure would breach any privacy laws or reveal matters that were required to remain confidential, such as trade secrets, grand jury testimony or the like.

During committee hearings, Kirkmeyer said it was the ongoing judiciary scandal in which a number of high-ranking Judicial Department employees had signed nondisclosure settlements that had prompted her proposed legislation. One of them, former Chief of Staff Mindy Masias, landed a



**TIMOTHY HURST, THE DENVER GAZETTE**

Secretary of State Jena Griswold signed a nondisclosure deal with her former Deputy Jenny Flanagan that only allowed Flanagan to use specific talking points when discussing the office.

multi-million-dollar training contract with the state just after signing her settlement.

Masias was to be fired when she allegedly threatened a tell-all sex-discrimination lawsuit in which she would reveal years of judicial misconduct that went undisciplined or was handled quietly. That threat included a two-page memo that outlined the alleged misconduct.

The author of the memo, then-operations chief Eric Brown, similarly signed a nondisclosure settlement when he resigned after news of the Masias deal became public in the summer of 2019.

Kirkmeyer at the time said the Masias story and ensuing scandal was partly responsible for why she drafted the bill.

"State government employees are public servants. They're hired to serve the public. They're paid with public funds. Non-disclosure agreements raise both ethical and legal implications," Kirkmeyer, a Weld County Republican, told the Senate Judiciary Committee in the bill's lone hearing before the legislature in March 2021. "A government employee should not be allowed to have their speech silenced, to be muzzled. The public is entitled to know

what public employees are doing and what their government is doing."

Miller Hudson, the former president of the Colorado Association of Public Employees, testified that state agencies will insist on a nondisclosure clause in a settlement agreement "when there's something they're trying to hide."

"By enforcing the nondisclosure deal, you essentially muzzle the employee and you put them in a position, even if they get a financially satisfactory settlement, they're left in a kind of PTSD position about what really happened," Hudson testified. "I'm aware of some employees who carried it to their grave, bitterness about the way that they were dealt with, signing their voice away."

Hudson said that at the CAPE he frequently witnessed the AG's office ramp up the state's settlement offer with an employee's refusal to sign the nondisclosure clause.

"The employee refused to sign at $180,000, so they were asked if they'd sign at $250,000 or $300,000," Hudson said. "This is not any way anyone wants to see government operate."

The bill ultimately died in committee

**SEE CONFIDENTIAL • PAGE 13**

SUNDAY, NOVEMBER 13, 2022 | THE DENVER GAZETTE | **A11**

 pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER PressReader.com +1 604 278 4604 COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

## CONFIDENTIAL

**FROM PAGE 11**

in a 3-2 vote that followed party lines, Democrat over Republican. The committee chairman, Sen. Pete Lee, D-Colorado Springs, told The Denver Gazette recently that he felt the bill was "simply too broad, too sweeping, covered too much ground."

Hudson today said he's not changed his mind, that nondisclosure deals are bad news.

"They're simply done to the employees you want to go away," he said. "They work their magic, asking what do we have to give you to make you leave and shut up."

### Several states enact prohibitions

At least 16 states have laws that deal with confidentiality agreements, largely in the private sector, although they would apply to government employees. Some are restricted only to the type of nondisclosure, such as ensuring names of victims in sexual misconduct cases are protected.

In Oregon, state law allows anyone to sue their employer for violating any confidentiality agreement and Illinois offers protection to whistleblowers who sign confidentiality agreements, preventing them from being enforced.

Maine this year banned employers from using confidentiality agreements that would stop workers from reporting misconduct to law enforcement.

Washington passed the "Silence No More" Act that bans confidentiality agreements in all workplace discrimination cases, as well wage claims and workplace conduct that are "against a clear mandate of public policy."

In Colorado, the prohibition is on re-

9. **NON-DISCLOSURE.** The parties agree that they shall not affirmatively disclose to or discuss with any third party any aspect of the claims or allegations that form the basis for this agreement, the contents of the settlement negotiations among the parties, and the terms of the settlement among the parties, except (a) to the extent disclosure is required for tax, retirement, benefits, insurance or banking purposes, or in response to a valid subpoena, and (b) Employer may disclose the claims or allegations, the contents of the settlement negotiations among the parties, and the terms of the settlement to its Controller. Without violating the terms of this Agreement, the parties may disclose, if asked by a third party, that the matter has been resolved by settlement.

10. **RESIGNATION.** Employee agrees that Employee will voluntarily resign effective July 29, 2022. Employee will submit a letter of resignation when this Agreement is signed and will complete all applicable separation documents. The University agrees to accept the voluntary resignation effective July 29, 2022 and will place the resignation letter in Employee's official personnel file.

11. **SETTLEMENT PAYMENT.** The University will provide Employee with a settlement payment of $62,513.32, which represents disputed wages. The University will issue employee a W-2 on the payment.

*The women's softball coach at Adams State University was found to have bullied and retaliated against his ballplayers. The state gave him more than a year's salary to resign as long as he did not disclose the deal or reason to anyone.*

taliating against any public employee for having disclosed information, leaving some to wonder if confidentiality agreements are even enforceable.

"These agreements seek to waive the rights of that statute," said Steve Zansberg, a First Amendment attorney in Denver who represents a number of news organizations including The Denver Gazette. "Aside from the First Amendment issues, one way to challenge any contract that includes a confidentiality clause is it's unenforceable and void since it is against public policy."

Agreements that prevent a public employee from speaking about them "are one-way deals, meaning the parties are in such an unfair bargaining position, the courts could call them unenforceable," he said.

That Colorado even allows confidentiality clauses in separation agreements with state employees, even in matters that settle litigation, "significantly reduces transparency and government accountability," according to Defend Colorado, a political group that funds

conservative causes.

"If whistleblowers are silenced through government-funded payouts, it diminishes accountability, protects poorly functioning agencies, and hides systemic workplace problems," the group said in a statement. "Equally troubling, there are no standards or uniformity to dictate when an NDA should be offered or what terms should be included. As a result, state officials have enormous discretion to determine who should be silenced with taxpayer dollars."

# John Ramsey says pain remains after 26 years

9News

It's been 26 years since the body of six year-old JonBenet Ramsey was found inside her Boulder home. It was December 26, 1996.

"You know, Christmas Day, for several years we just didn't have Christmas anymore, it was just too difficult," said John Ramsey, JonBenet's father.

Ramsey said the pain of JonBenet's still-unsolved murder remains, as does the anger.

"Boulder police has never contacted me, nor has the DA's office," Ramsey said.

Earlier this week, Boulder police issued a news release updating the investigation into JonBenet's murder. There was actually no new information, just a recap of the number of leads they've pursued, people they've interviewed and agencies with whom they've worked.

"It's like what they put out before, we're doing everything we can, we're trying really hard," Ramsey said.

The one aspect of the news release that Ramsey said drew his attention was its mention of DNA testing. According to Boulder police, the amount

of DNA evidence available for analysis is extremely small and could be destroyed by testing. As a result, there are apparently no plans to test that evidence, which Ramsey said is a big mistake.

"Why aren't those being tested? They should be. Right now. Waiting for the next generation of DNA technology is silly," Ramsey said. "Why in the world you wouldn't test them now, given that the technology has advanced dramatically in 25 years, I don't understand that."

Ramsey said he sent a letter to Governor Jared Polis about a month ago asking him to ensure that the remaining DNA evidence in the case is tested by a private lab with the latest technology. So far, Ramsey said, he has not heard back from the Governor's Office.

When asked if he thought the case will ever be solved, Ramsey responded, "Not if it stays in the hands of the Boulder police, no, I don't, I really don't," Ramsey said.

**For more on this and other stories, visit our partners at 9News.com.**

SUNDAY, NOVEMBER 13, 2022 | THE DENVER GAZETTE | **A13**

pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER PressReader.com +1 604 278 4604 COPYRIGHT AND PROTECTED BY APPLICABLE LAW