## Christopher Gregory

| | |
|---|---|
| **From:** | Christopher Gregory |
| **Sent:** | Monday, September 29, 2025 9:48 AM |
| **To:** | 'Cindy Dennis' |
| **Subject:** | RE: AIC Professionalism Award |

Good morning Cindy,

I hope that all is well for you.  An issue has come up that I hope you can help clarify.

Through the email chain below, I had informed you and the American Inns of Court of problems with Colorado Supreme Court Justice Richard Gabriel's application for the 2024 10th Circuit Professionalism Award.  It was my understanding that you and/or the AIC's then-Executive Director Malinda E. Dunn brought this issue to the attention of the awards committee, who further consulted with the 10th Circuit's Chief Judge Jerome E. Holmes before making the ultimate decision to give the award to Justice Gabriel instead of Senior U.S. District Court Judge John L. Kane (who I had alternatively nominated and who had founded Colorado's first American Inn of Court—the William E. Doyle Inn).  Can you please confirm that Judge Holmes was informed of the concerns as to Justice Gabriel's integrity, which I raised through the newspaper articles that I provided you?

Again, I appreciate your assistance and willingness to respond to my request for clarification.  Given the gravity of the situation and issues involved, I understand if you believe my request merits a more formal response from the AIC's current Executive Director and/or its President.  Please do not hesitate to contact me if I can provide any additional information or if you have any questions.

Warmest regards,

Christopher Gregory



The Gregory Law Firm, LLC
Christopher S.P. Gregory
Attorney at Law

201 Coffman St., #1822, Longmont, CO 80502
● Phone:  970.648.0642 ● Fax:  970.648.0643 ●

This e-mail transmission contains information from the Gregory Law Firm, LLC which may be confidential or protected by the attorney-client privilege.  If you are not the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is prohibited.  If you have received this transmission in error, please notify us immediately by e-mail and delete the original transmission.

---

**From:** Cindy Dennis <cdennis@innsofcourt.org>
**Sent:** Wednesday, April 24, 2024 12:28 PM
**To:** Christopher Gregory <cspgregory@thegregorylawfirm.net>
**Subject:** RE: AIC Professionalism Award

Thank you Chris.



1

**Cindy Dennis**
*Awards & Scholarships Coordinator*
**American Inns of Court**
225 Reinekers Ln, Suite 770 | Alexandria, VA 22314
Direct: 571-319-4703 | Main: 703-684-3590 ext. 104
*Ask me about the 2024 AIC Circuit Professionalism Awards nomination process and deadlines.*

---

**From:** Christopher Gregory <cspgregory@thegregorylawfirm.net>
**Sent:** Wednesday, April 24, 2024 2:17 PM
**To:** Cindy Dennis <cdennis@innsofcourt.org>
**Subject:** AIC Professionalism Award

---

| **ShareFile Attachments** | Expires October 24, 2024 |
| --- | --- |

AIC Documents.pdf                                          24 MB

**Download Attachments**

Christopher Gregory uses ShareFile to share documents securely.

---

Hi Cindy,

If you can keep this email anonymous, download, and forward the attached documents, I would greatly appreciate it.

Warmest regards,
Christopher Gregory


The Gregory Law Firm, LLC
Christopher S.P. Gregory
Attorney at Law

201 Coffman St., #1822, Longmont, CO 80502
● Phone:  970.648.0642 ● Fax:  970.648.0643 ●

This e-mail transmission contains information from the Gregory Law Firm, LLC which may be confidential or protected by the attorney-client privilege.  If you are not the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is prohibited.  If you have received this transmission in error, please notify us immediately by e-mail and delete the original transmission.

The Denver Gazette

## COVER STORY

# Judicial branch mum on details of alleged settlement

**BY CHRISTOPHER OSHER**
The Denver Gazette

Colorado's judicial branch will neither confirm nor deny whether it has any additional records on the allegation that a Court of Appeals judge negotiated an agreement with a law clerk to prevent the clerk from disclosing sexual harassment claims, citing a provision of its rules that requires confidentiality for all investigations it conducts into sexual harassment claims against judges.

Terri Morrison, the legal counsel for Colorado's Judicial Department, denied a records request from The Gazette seeking details about the alleged release agreement, which was one of nearly two dozen misconduct allegations listed in a recent memo The Gazette and The Denver Post obtained.

"Without confirming or denying the factual assumptions in your request, any record responsive to your request necessarily would be required to be withheld," she said, citing a portion of the court system's rules for governing public access to information and records.

The section she cited states that a records custodian "must deny" public inspection of "any records of sexual harassment complaints and investigations, whether or not such records are maintained as part of a personnel file."

"Disclosure of all or a part of any records of sexual harassment complaints and investigations to the person in interest is permissible to the extent that the disclosure can be made without permitting the identification, as a result of the disclosure, of any individual involved," the section further states.

That section also states that harassment complaints and any investigation into those complaints can be made public by a "a person of interest" when

such "record supports the contention that a publicly reported, written, printed or spoken allegation of sexual harassment against such a person is false."

Jeffrey Roberts, executive director of the Colorado Freedom of Information Coalition, said details about the release agreement should be made public.

"The fact that there appears there was a settlement, which involved compensation to this law clerk, it's hard to see how that fits the definition of a sexual harassment complaint or investigation into such a complaint," Roberts said. "There could be details in this agreement that would have to be redacted, but the fact of the agreement and the exchange of money or payment of money, that would be seem to be something that would not be covered by that rule."

He added: "The public needs to know if this happened. If the allegation is true that there was a negotiated agreement to protect a Court of Appeals judge, that has to come out at some point."

Last week, the alleged release agreement between the law clerk and the Appeals Court judge was mentioned in a memo that became public detailing nearly two dozen instances of misconduct involving judges and court administrators. The memo stated that the release agreement was negotiated to settle allegations of harassment, and that the settlement preserved the judge's chances for potential selection to the Colorado Supreme Court.

The memo contained no further details about the settlement and did not reveal whether any money was paid as part of the settlement or detail any names involved in the settlement.

The release agreement was one of nearly two dozen instances of misconduct involving judges and administra-



**Mindy Masias**                    COURTESY PHOTO

tors in the court system. The memo also states that Mindy Masias, the former chief of staff to the Colorado Supreme Court, was told to destroy an anonymous complaint alleging sexism and harassment by a former chief justice of the Colorado Supreme Court, who also was not identified.

The memo further alleged that two lower court judges were promoted to chief judge status in their judicial districts despite sending pornographic emails on their judicial emails and details instances involving court administrators, including one who allegedly was having sex with his staff.

The Colorado Supreme Court made the memo public after The Denver Post reported its existence. Christopher Ryan, Colorado's former state court administrator, told The Post he took the memo to Nathan "Ben" Coats, who at

that time was chief justice of the Colorado Supreme Court.

Ryan alleges that Coats agreed with Ryan's suggestion that they give Masias a sole source training contract worth up to $2.72 million to prevent her from filing a lawsuit that would make the misconduct detailed in the memo public.

The Colorado Supreme Court has denied that the contract, which later was terminated, was given to Masias to keep her allegations from becoming public. Brian Boatright, the current chief justice of the Colorado Supreme Court, announced this week that he will have the governor, Legislature and Colorado Attorney General's Office convene a panel that will select an independent counsel to investigate the allegations in the memo and release the results of that investigation to the public.

# Women's Bar seeks meeting with high court on sexual harassment

**BY MICHAEL KARLIK**
The Denver Gazette

The Colorado Women's Bar Association has requested a meeting with the state's Supreme Court justices to discuss sexual harassment within the judiciary.

"Recent revelations regarding complaints of sexual harassment within the judicial system, and their nontransparent handling, have been profoundly demoralizing to our members," wrote Miranda K. Hawkins, the president of

the association which represents approximately 1,5000 attorneys and other legal professionals.

Earlier this month, reports emerged of a multimillion dollar contract awarded to a former Judicial Department employee in exchange for her silence on a slew of misconduct allegations, including harassment and sexism.

"In keeping with our mission, we request an immediate meeting to discuss the following preliminary recommen-

dations for systemic reform," Hawkins added. "We value the independence of the judiciary along with safety for women, and offer our expertise to help build solutions that respect your independence but create sorely needed accountability."

Among the possible reforms to the judiciary, the CWBA proposed allowing judicial staff to anonymously review judges, soliciting any experiences of discrimination, harassment or bias.

The bar association also suggested including statistics about those types of complaints in judges' retention evaluations. The judicial retention process accounts for such factors as demeanor or knowledge of the law in a judge's public work, but may not describe the totality of complaints against judges for voters.

Finally, CWBA asked for the hiring of an independent investigator within the judiciary specifically for discrimination and harassment complaints.

FRIDAY, FEBRUARY 19, 2021 | THE DENVER GAZETTE | **A9**

pressreader    PRINTED AND DISTRIBUTED BY PRESSREADER PressReader.com +1 604 278 4604 COPYRIGHT AND PROTECTED BY APPLICABLE LAW

**NEWS** > **COLORADO NEWS** • Investigative, News

# Supreme Court Justice Richard Gabriel faced harassment accusation while a candidate for Colorado's high court

Agreement with accuser kept the issue from tainting his chances, memo says



Justice Richard L. Gabriel listens as Chief Justice of the Colorado Supreme Court Brian D. Boatright delivers an emotional speech about misconduct within the state's justice department to the House of Representatives at the Colorado State Capitol Building on Thursday, February 18, 2021. Allegations of sexual misconduct, harassment and a possible coverup contract worth $2.5 million have resulted in a request by the supreme court to other branches of the government to investigate the department. (Photo by AAron Ontiveroz/The Denver Post)

By **DAVID MIGOYA** | dmigoya@denverpost.com | The Denver Post
PUBLISHED: February 26, 2021 at 6:00 a.m. | UPDATED: February 26, 2021 at 8:02 a.m.

A harassment accusation made nearly eight years ago against Colorado Supreme Court Justice Richard Gabriel, then a judge on the state Court of Appeals, by a newly hired law clerk was settled quickly and quietly, according to two people with knowledge of the agreement, essentially ensuring it would not sully his shot at the high court.



Case No. 1:25-cv-03361-KHV-GEB    Document 1-11    filed 10/23/25    USDC Colorado
pg 5 of 51
Colorado Supreme Court Justice Gabriel faced harassment accusation while candidate for the high court

To safeguard that secrecy, the Colorado Judicial Department had the female appellate law clerk who made the accusation in September 2013 – then a 34-year-old who was a year out of an Ivy League law school – sign a non-disclosure agreement that kept her on the payroll for a year in return for her promise not to sue, the sources confirmed for The Denver Post.

The woman claimed the judge and a male law clerk in the court created an uncomfortable work environment for her shortly after her arrival in August 2013, the sources said.

In an email to The Post, Gabriel said that "any suggestion that I engaged in any form of harassment of anyone at any time is false."

At the time Gabriel hired the woman to work for him as a judicial clerk, he was an applicant for an opening on the state Supreme Court.

An internal department investigation was inconclusive about the woman's allegations. The release agreement she signed was allegedly approved by a chief justice and kept from reaching the Supreme Court Nominating Commission.

The allegation that the release agreement was crafted to keep Gabriel "safe" during the Supreme Court nomination process is part of a two-page memo at the center of a scandal over a $2.5 million contract awarded to a former department official. That official, Mindy Masias, was prepared to file a tell-all sex discrimination lawsuit if she was fired over financial irregularities.

Who conducted the investigation into the woman's complaint is unclear. Masias was the department's director of human resources at the time.

> **RELATED:** _Colorado Supreme Court releases memo citing examples of sex-discrimination, judicial misconduct that led to alleged contract for silence_

The woman left the department before her one-year contract was completed but continued to be paid for the full term, according to the sources, who refused to be identified because they could be disciplined for discussing the confidential matter publicly. Another female law clerk replaced the woman on Gabriel's staff in December 2013, she told The Post in an interview and one of the sources confirmed.

The Judicial Department has refused repeated Denver Post requests for a copy of the agreement under the judiciary's open records rules, saying internal personnel investigations and sexual harassment complaints and investigations are protected from disclosure.

Steven Zansberg, a 1st Amendment attorney for The Post, argued that settlement agreements between former public employees, in all branches of government, and their former government employers are routinely declared to be public records — even in cases where sexual harassment allegations are at issue.

The former clerk was paid about $50,400 in all, payroll records confirm, the standard annual salary for an appellate law clerk at the state's Court of Appeals.

Details of the conduct that led the woman to complain are unclear, but one of the sources described the alleged harassment as "a 2 on a scale of 1 to 10," and, at its heart, a misunderstanding over what was said.

The agreement was intended to "not ruin her career, to put this behind her and (allow her) to move on," the person said, refusing to offer specifics. "Basically it wasn't what she had signed up for. It wasn't a good fit. It was a very uncomfortable situation for her."

The former law clerk, now an attorney specializing in employment law outside of Colorado, did not respond to repeated telephone and email messages from The Post. The newspaper does not name the alleged victims of harassment without their permission, but sources confirmed her identity and judicial department records confirm her employment.

> **RELATED:** _Colorado Judicial Department gave $2.5 million contract to prevent tell-all sex discrimination lawsuit about judges', court officials' misconduct_

The male law clerk involved, now an attorney in private practice, confirmed a department investigation was conducted.

"I was interviewed as part of an internal investigation and during that process I was specifically told by the investigator that no allegations of inappropriate conduct had been made against me," he told The Post in an email. "I have never been made aware of any allegations of misconduct against me by (the woman) or anyone else during my time at the Judicial Department. I never engaged in any misconduct."

The memo, authored by then-Human Resources Director Eric Brown, highlighted a number of situations in the department in which alleged gender discrimination and sexually explicit misdeeds by male judges and other high-ranking officials dating back nearly a decade were ignored or covered up to protect them.

Brown was Masias' deputy when the law clerk's allegations were investigated.

The decision to negotiate the settlement with the law clerk was "per the chief justice," the memo said, though it did not name the judge. Chief Justice Michael Bender was retiring at the time and Chief Justice Nancy Rice was to replace him.

"Negotiated a release agreement with a law clerk who accused her COA (Court of Appeals) judge of harassment in order to keep the COA judge 'safe' during the ... Supreme Court Justice selection process per the chief justice," the memo says.



Case No. 1:25-cv-03361-KHV-GEB    Document 1-11    filed 10/23/25    USDC Colorado
pg 6 of 51
Colorado Supreme Court Justice Gabriel faced harassment accusation while candidate for the high court

At the request of the Supreme Court, a panel of eight people was named last week by Gov. Jared Polis, Attorney General Phil Weiser and the Legislature to hire and monitor an independent investigator to look into the memo's allegations. Simultaneously, Colorado Auditor Dianne Ray's office is investigating the assertion that the $2.5 million contract was given to Masias, the department's former chief of staff, to avoid the tell-all lawsuit.

Responding to an email from The Post seeking comment on the circumstances and details of the negotiated settlement with the former clerk, Gabriel said: "Your recitation of the facts of this matter is incorrect," but he declined to elaborate.

Gabriel also said he welcomed the inquiry.

"I will cooperate fully with the forthcoming independent investigation and will be fully vindicated," he said in the email. "Pending completion of that investigation, I will have no further comment."

While Gabriel was not among three Supreme Court finalists named in October 2013 to replace the retiring Bender – Justice William Hood eventually received the appointment – the release agreement ensured Gabriel's hopes for the state's highest court would not be marred.

Bender told The Denver Post he was not aware of any harassment complaint against any Court of Appeals judge applicant to the Supreme Court at the time. As an ex-officio chairman of the nominating commission, Bender said he would have been duty-bound to report any such incident to them, no matter how slight.

Then-incoming Chief Justice Rice has told The Post she was aware of the harassment complaint as detailed in the memo, but didn't say when she knew of it. She said she knew a department investigation had ensued and that there was a resolution.

She would not say whether the complaint was founded or not, or what the resolution was.

The Colorado Commission on Judicial Discipline has said none of the incidents listed in the memo was sent to them despite a department directive that requires the referral of all harassment complaints. The commission must disclose any founded complaint to a judicial nominating commission.

Several members of the 15-person Supreme Court nominating commission from that time have told The Post they recall Gabriel was an applicant for Bender's slot. They said they do not recall learning of any negative issues regarding anyone who applied for the court's open seat, and that such information would likely have had a material impact on whether an applicant would get nominated to the governor.

The commission fans out to conduct extensive interviews of the applicants, as well as associates and colleagues, then conducts multiple votes before deciding on three names to be forwarded to the governor.

Gov. John Hickenlooper appointed Gabriel to the Supreme Court in June 2015, replacing retiring Justice Gregory Hobbs Jr. Gabriel had been an appellate judge for eight years.

In a recent public hearing in which the Supreme Court heard comments regarding increased transparency in the attorney discipline process, Gabriel said there should be some limitation on what complaints become public.

"I am concerned with this, unlimited, everything is open to the world (approach) because I fear the damage, reputationally, that it could do to very fine lawyers who did nothing wrong, and clients using it as a weapon against a lawyer," Gabriel said.

He has also emailed others to say initial Denver Post stories that revealed the existence of the memo, the judicial department's refusal to release it, and former State Court Administrator Christopher Ryan's assertions of a quid-pro-quo contract were "simply not true."

"As in (The Post's) past articles on the branch, which are uniformly negative, in this one, (The Post) found an unhappy ex-employee and (The Post) ran with the one-sided, sensationalist narrative (The Post) was told," Gabriel emailed his staff on Feb. 3, the morning The Post's first story appeared, according to a copy obtained by the newspaper via an open records request.

The court released the memo five days later after the justices said they read it for the first time, and Chief Justice Brian Boatright called for an independent investigation into its contents and the auditor's inquiry into Ryan's claims.

AdChoices                     Sponsored

Case No. 1:25-cv-03361-KHV-GEB     Document 1-11     filed 10/23/25     USDC Colorado
pg 7 of 51
Colorado Supreme Court Justice Gabriel faced harassment accusation while candidate for the high court

Policies
Report an Error
Contact Us
Submit a News Tip

 The Trust Project

TAGS:   **COLORADO COURT OF APPEALS**,   **COLORADO JUDICIARY SCANDAL**,   **COLORADO SUPREME COURT**,
**CONTRACT**,   **COURT**,   **COURTS**,   **DISCRIMINATION**,   **EMPLOYMENT**,   **GENDER**,   **HARASSMENT**,
**INVESTIGATION**,   **INVESTIGATIONS**,   **LAWSUIT**,   **OPEN RECORDS**,   **SEXUAL HARASSMENT**



### David Migoya | Investigative Reporter

David writes investigative projects and has been at The Denver Post since 1999. He was a founding member of the
investigations team before moving on to write about banking, finance, human services and consumer affairs, then
returned to investigations. David has also worked at publications in New York City, St. Louis and Detroit over a career
that began at the Post in 1983.

dmigoya@denverpost.com

Follow David Migoya @davidmigoya



SPONSORED CONTENT

### Higher Ed investment can reduce Latino equity gap

By Education Today | Presented by Western Governors University

WGU

The Colorado Latino community has the lowest educational attainment and
the lowest college enrollment rate of any group in the state.





# COLORADO JUDICIAL BRANCH INVESTIGATION REPORT
# AND ASSESSMENT OF WORKPLACE CULTURE

## INVESTIGATIONS LAW GROUP, LLC

*Elizabeth R. Rita, Esq.*
*Anne R. McCord, SPHR, SHRM-SCP, PI, AWI-CH*







**Allegation Three: Release Agreement with Law Clerk**

> *"Negotiated a release agreement with a law clerk who accused her COA judge of harassment in order to keep the COA judge 'safe' during the selection Supreme Court Justice selection process per the Chief Justice."*

### A.    Methodology

My investigation determined that these events happened during the period of September 2013 to August 2014.  While the investigation corroborated certain portions of the allegation, I did not find that the evidence supports a conclusion that a release agreement was signed to keep a Court of Appeals judge "safe" in a Supreme Court selection process.  This allegation misstates certain facts and omits essential information.

I interviewed seventeen (17) people with knowledge about this situation and received written response to questions from an 18th individual. I interviewed the (then) Court of Appeals Judge involved in this situation, members of the Judicial Nominating Commission at this time, the Chief Justice at that time, and members of the legal and HR teams who were aware of this situation and assisted in its resolution. I met with the HR representative who interviewed the woman law clerk— on whose behalf her male co-clerk went to HR with the harassment complaint.  This HR representative also interviewed the male co-clerk at the time of these events. I interviewed attorneys who weighed in on the situation and helped advise on next steps at the time.

I reached out to the woman law clerk and her male co-clerk for interviews. The woman law clerk did not respond to four attempts to reach her, including reaching out via a family member. The male co-clerk responded through his attorney and declined an interview but provided answers in writing to questions posed via email.

I sought out records relating to this situation and found a large amount of documentary evidence from both the Court of Appeals Judge this relates to and the Office of the State Court Administrator. These records included email and other communication, audio recordings of interviews with the woman law clerk as well as her male co-clerk, records from the Judicial Nominating Commission for the Supreme Court nomination process at issue, records relating to the law clerk's leave of absence, records relating to the law clerk's compensation, an Agreement and Release of Claims entered into between Judicial and the woman law clerk, and correspondence from Ms. Masias indicating the allegations of harassment made by the woman law clerk were "unfounded."

I submitted a full report on this investigation to counsel for the Judicial Branch on May 10, 2022. On May 24, 2022, I was directed to prepare Report Summaries on all matters for public release.  I completed this Report Summary pursuant to this requirement.

### B.    Summary of Material Evidence

The woman law clerk was hired on August 19, 2013.  Early in her employment with the Branch, her male co-clerk invited her out socially to meet the clerk who preceded her ("her predecessor clerk"). Her male co-clerk thought it would be helpful for woman law clerk to meet the person

20

who had held her job previously. He also knew the woman law clerk was new in Denver and did not know many people. He invited the woman law clerk out for an evening with her predecessor clerk (and his girlfriend), and she accepted. The four went out on September 11, 2013.

There is no allegation that there was any inappropriate behavior at this social event. After the social gathering, when co-clerk was dropping woman law clerk off at home, she told him she was uncomfortable with their Judge. She said he had "touched her shoulder." Male co-clerk was concerned by this statement.

The next day, he met with the woman law clerk and told her he would go to Human Resources with her, or for her, to report her concerns. She told him she was okay with him going to HR and he did so that day, reporting the statements woman law clerk had made to him.

HR started an immediate inquiry. An HR team member interviewed the male co-clerk and the woman law clerk on September 12, 2013. The interviews were recorded, and I listened to them. In the recording, the woman law clerk said that the Judge "touched her on the arm (once) when I first met him" and sent "jokey" texts to her and her co-clerk at night. She said she could not remember what the texts said precisely but recalled there was a joking discussion about wearing shorts in the office. She said she thought her co-clerk wanted to make it seem as though they were dating, and she objected to him making their relationship more personal. The woman law clerk also said she felt a difference in behavior towards her from the Court of Appeals Judge, starting a week before, when he "stopped talking to me about the work." She said he and the male co-clerk would speak in the mornings and "ignore" her.

Ms. Masias interviewed the Judge on September 15, 2013. She initially asked him if he had any information about the woman law clerk's allegations regarding her co-clerk: "She said, 'There's been an allegation against your clerk.' The gist was that [the co-clerk] was showing her unwarranted attention – asking her to go out to bars- asking to walk her home from clerk happy hour." According to the Judge, "[I]t was a really short conversation, 5-10 minutes." The Judge said, "Toward the end she then said, 'Was there some issue of you touching her elbow, even inadvertently?' I remember that vividly. I said 'No.' That was about the size of that. [The woman law clerk] is a very nice woman, a really introverted shy person, a person who needs space. I would have been extremely careful. I was certain I had not touched her elbow. She said, 'Thank you we will let you know if we need anything.'"

According to the Judge, Ms. Masias returned the same day about two hours later, and told him that the woman law clerk had disclaimed her allegation about him. He stated Ms. Masias told him, "I just want to let you know we have talked to [the woman law clerk] and she said you have never touched her elbow." "That was the last I heard about anything relating to my involvement in this." He was asked about the touch on the arm, but not about "jokey" texts, discussions of wearing shorts, or the allegation that he "ignored" woman law clerk.

The woman law clerk went out on administrative leave, which started on the date she interviewed with HR. She was out on leave for one month. It is unclear who decided upon or authorized the leave.

21

While the woman law clerk was out on leave, the Court of Appeals Judge interviewed for a seat on the Colorado Supreme Court. He had submitted his application on September 13, 2013, two days before he was aware of this harassment complaint. He interviewed on either October 8th or 9th, a day or two before the woman law clerk returned from leave. He was not selected as a finalist. According to the Judge and the commissioners I interviewed from the Supreme Court Nominating Commission, this matter was not raised in the interviews.

I could not find any evidence that further work was done on the HR inquiry after the initial three interviews. Neither of the clerks were re-interviewed, no additional witnesses were interviewed, and the Judge was not re-interviewed after his initial meeting with Ms. Masias on September 15, 2013. There is no investigation file or report.

When the woman law clerk returned from leave on October 10, 2013, she was placed in a different assignment. A decision was made to change her work assignment in discussions with the Human Resources department, the Legal Department, and the Chief Judge of the Court of Appeals. She was moved out of the chambers where she had been hired and was made the "Senior Judge Clerk." She provided clerking assistance to all the Senior Court of Appeals judges and shared an office space with the clerk of the court.

This new assignment did not prove successful for the woman law clerk. According to the clerk of the court, she began exhibiting attendance problems. The woman law clerk reached out with concerns about her new role on April 10, 2014, and raised concerns of unlawful treatment in her reassignment:

> It's actually illegal to have an incomparable job to your original one after reporting sexual harassment (even though someone reported it on my behalf), so I don't think I should have moved from being a lawyer to being a secretary when I came back from the administrative leave (which I think I probably shouldn't have been put on). I was trying to go along with everything to be agreeable, but it gave me a huge career problem that I didn't end up getting the legal experience that I had originally intended, and I have no job reference for legal work right now. I had actually been considering talking to human resources about it again recently anyway. . .. I feel like I need to straighten out my job situation again with human resources and was wondering if you think that would be the next best step.[10]

The recipient of this email had begun working with HR and the Chief Judge about a response when the woman law clerk sent an email two days later to Ms. Masias saying the situation "has resolved itself."

Two months later, the woman law clerk sent several emails out over a 24-hour period referencing problems with her assignment, the previous concerns she had, and her belief this reassigned clerkship would hurt her career prospects. Among other things, she said, "I probably can't be a lawyer because I wouldn't go to bars with [my co-clerk] all year or he would throw me under the bus (to eliminate the job competition not because of attraction) by reporting himself and [the Court of Appeals judge] to human resources (I do not think this was sane behavior and therefore do not judge him for it), but I'm not completely sure what to do next." She said, 19 minutes later, "And

---

[10] Email from woman Law clerk dated April 10, 2014.

22

if being [her co-clerk's] fake girlfriend for a year was the price I needed to pay to be a lawyer, of course, it wasn't worth it."  She accused HR of trying to "cover for" her male co-clerk and said that "[A]s long as anyone retaliates against me [] HR can't help me anyway."

The woman law clerk asked for the remainder of her clerkship to be served from home so she could look for another job. Two days later, the Chief Judge granted that request.  He wrote a letter to the woman law clerk thanking her for her work and stating that she would be paid through the end of her agreed-upon clerkship.  He also said, "Further, we will place you on paid administrative leave as of today's date to allow you time to explore future employment opportunities per your request."

On June 26, 2014, there was an exchange of emails about her photograph being sent to State Patrol and about restricting her ability to send emails to members of the Judicial Branch. On June 27, 2014, Ms. Masias asked for access to the woman law clerk's email saying it was a time sensitive situation because of safety concerns.[11]

One member of the legal team stated they were "appalled" with how this situation "had come down":

> She files a complaint and then she is penalized by putting her off in a corner. I know they thought that was a good idea, but I think that was traumatizing. Legal wasn't consulted about putting her in a different position. I was not involved until the [family member] reached out [to the Legal Department employee]

The referenced family member of hers, who is an attorney, reached out to the Judicial Branch about negotiating an agreement that would give the woman law clerk a clean reference for the year and the chance to put this experience behind her [according to the attorney for Judicial who negotiated the agreement]. A release agreement was negotiated between the family member (on behalf of the clerk) and the lawyer for the Judicial Branch. It was signed on August 4, 2014. The agreement provided the woman law clerk would be paid through the end of her clerkship year, which was scheduled to end on August 31, 2014, and would receive a good reference. Both these contingencies were fulfilled.

The attorney who negotiated the agreement on behalf of the Judicial Branch indicated that the main concerns during the creation of the release were the recent statements about retaliation by the woman law clerk, and not the earlier allegations of harassment, which Ms. Masias had determined were unfounded.  They said:

> In this case – I don't remember ever thinking it was a sexual harassment claim against the judge. There was some discomfort with the clerk and maybe the judge favored the male clerk. I can't remember any facts that he sexually harassed her. I may not have been told those facts.
>
> But it was a really bad way to address her concerns – she was in a way arguably retaliated against. I don't think she actually was and I think instead that they didn't know what to do with her. But it was a bad call unless she asked for this different assignment and wanted to do something like that.

---

[11] No one else I interviewed remembered what the specific safety concerns were about.

23

In an email from July 2014, Ms. Masias made the following statement about her finding in the HR inquiry:

> Jerry is out for the next week, so I will share my thoughts. . . .   As far as the gag order, I don't think I feel comfortable giving on this either since she can discuss that she filed a complaint against the judge of sexual harassment, but she doesn't need to divulge **that it was unfounded**. This would be so damaging for the judge. (Emphasis added.)

Finally, the allegation states the settlement agreement with the woman law clerk was entered to "[K]eep the Court of Appeals judge 'safe' during the selection Supreme Court Justice selection process **per the Chief Justice**." (Emphasis added.) I interviewed both the sitting Chief Justice at this time as well as the person who was poised to assume that position several months later. Neither one acknowledged any agreement or plan to settle this complaint, or otherwise keep it quiet to keep this Court of Appeals Judge "safe."  No other witness or document provided corroboration for this allegation.

## C.    Analyses and Finding(s)

### 1. Analysis

The Judicial Branch Anti-Harassment and Anti-Discrimination Policy in effect at the time of these events reads:

> (4) Investigation. Reports of harassment and discrimination **from employees warranting an investigation shall be referred to the Human Resources Division of the State Court Administrator's Office for investigation**. In some instances, **an initial inquiry** will be completed as a primary review by the Human Resources Division to determine whether there is cause to conduct a full investigation. **A full investigation, at a minimum, will include conferences with the complainant, the alleged perpetrator, and any witnesses to the incident.** Any party involved in a harassment complaint may submit any documentation they believe to be relevant to the matter at issue to the investigating authority.

(Emphasis added.)[12]

The credible evidence in this investigation does not support the allegation.  This is so for three primary reasons.  The timeline does not support a substantiated finding; the evidence does not corroborate that the harassment complaint, which was ultimately unfounded, was concealed; and the release agreement was more likely than not motivated by the later concerns the woman law clerk raised.

First, the allegation that a settlement agreement was negotiated to protect the Court of Appeals Judge in his application for a seat on the Colorado Supreme Court is refuted by the timeline. The Court of Appeals Judge applied for the Supreme Court seat on August 13, 2013, and a final decision was reached in the nomination process on October 25, 2013. The Branch began negotiating a release agreement with the clerk no earlier than June 26, 2014 – eight months after

---

[12] Chief Justice Directive: 08-06, Attachment A (Amendment date July 2017).

24

the selection process was complete. The timing is persuasive evidence that the agreement was not negotiated to protect the Court of Appeals Judge in his Supreme Court selection process.

Second, there is no credible evidence that the harassment complaint was improperly concealed during the Supreme Court nomination process. On the date the Court of Appeals Judge interviewed for the Supreme Court, he credibly did not believe there was any ongoing HR investigation involving him. He had been interviewed by HR on September 15, 2013 and was told the same day that the woman law clerk was disclaiming her allegations against him. He heard nothing further about it.

I looked to additional evidence to determine whether or not the Judge's statements here are credible. As the person accused I could not rely on his statements alone. Here, his credibility is strengthened by corroboration from other evidence. First there is no record showing that a "full investigation" took place here. There is no evidence of additional investigative work after September 15th, 2013. The Court of Appeals judge was not interviewed about several other statements the woman Law clerk made, there is no evidence that HR interviewed additional witnesses, and there is no record of an investigation report. This suggests that HR did an "initial inquiry," per Chief Justice Directive 08-06 but did not believe there was enough evidence to proceed to a full investigation. Furthermore, the timing of the woman Law clerk's return to work – the day after Supreme Court interviews – suggests the initial inquiry was likely over before the Court of Appeals judge interviewed. The sum of this evidence suggests, consistent with Ms. Masias's statement in the July 19, 2014, email, that the allegations were promptly determined to be unfounded.

Finally, the evidence suggests the release was ultimately negotiated and executed because of later complaints from the clerk, implicating retaliation concerns but not involving the Court of Appeals Judge. The timeline strongly supports this finding.

Starting in April 2014, more than seven months after the initial harassment inquiry, the clerk made a series of statements that she felt retaliated against by the new job placement she received when she came back to work after her leave. She complained about this with urgency and some hyperbole. Her statements raised retaliation concerns on their face. Upon receiving these concerns, the woman law clerk was permitted to take leave for the remainder of her term and negotiations on a Release Agreement commenced thereafter.

The lawyer for Judicial who drafted the release had these later allegations in mind when they negotiated the agreement. This attorney believed that a Release Agreement was not only necessary under these facts but also fair to the clerk. They had no recollection of any concern about sexual harassment allegations involving the Court of Appeals Judge being the motivator for the Release. Instead, they remembered the motivation being these later allegations. I found their memory of the events persuasive because it is consistent with the other evidence, which shows direct connections between these retaliation concerns and the release agreement.

Finally, I note that throughout this chronology, the woman law clerk's concerns were objectively mishandled. Initially, a decision was made to place the woman law clerk on leave after her harassment concerns were raised, with no evidence that she requested this. Neither Respondent

25

was placed on leave from the workplace. Moreover, the woman law clerk was returned to an objectively different and arguably less prestigious job placement when she returned. When she complained about this new posting, in language clearly raising retaliation concerns, no investigation was conducted. She was placed on leave (again) while her departure was negotiated. Someone should have investigated this situation, but no one did. These decisions failed to meet the requirements of Chief Justice Directive 08-06 or best practices from an HR, legal, and/or investigative standpoint.

### 2. *Findings*

For the reasons set forth above, I find:

- The allegation that a settlement agreement was negotiated with a law clerk to keep a Court of Appeals Judge 'safe' during a Supreme Court nomination process is **Not Substantiated.**

- The allegation that this agreement was negotiated, and/or this situation was concealed, by the Chief Justice or anyone else is **Not Substantiated.**

- The processes that HR and Court Administration utilized to address the concerns raised by this clerk were not managed appropriately or consistently under applicable policy or standards for HR, legal or investigations best practices.

Colorado Supreme Court justices sought to delay reform bill from blog.mvjverify.com/2024/13/cdsdoc court-ju...

Case No. 1:25-cv-03361-KHV-GEB   Document 1-1   filed 10/23/25   USDC Colorado
pg 16 of 51

NEWS > COURTS • News

SUBSCRIBER ONLY

# After judicial scandal, Colorado Supreme Court justices privately sought to delay reform bill

## Members of high court publicly proclaimed support for reform, but privately raised objections with lawmakers



**AAron Ontiveroz, The Denver Post**
Chief Justice of the Colorado Supreme Court Brian D. Boatright delivers an emotional speech about misconduct within the state's Judicial Department to the House of Representatives at the Capitol in Denver on Thursday, Feb. 18, 2021.



2/29/2024, 2:26 PM



By **SHELLY BRADBURY** | sbradbury@denverpost.com | The Denver Post

PUBLISHED: April 13, 2022 at 5:23 p.m. | UPDATED: April 13, 2022 at 7:03 p.m.

Members of the Colorado Supreme Court for months privately raised objections and lobbied lawmakers to delay a bill that would revamp the state's process for disciplining judges — all while publicly proclaiming their support for reform, The Denver Post found.

Chief Justice Brian Boatright and Justice Monica Márquez personally met with state Sen. Julie Gonzales, a Denver Democrat who sits on the Senate Judiciary Committee, in early March to express concerns about the bill and suggest the reform effort be delayed until after the conclusion of several investigations into an alleged blackmail scandal within the Colorado Judicial Department, Gonzales said.

Boatright on Wednesday also sent an email to all of the state's judges in which he said he supports some parts of the reform bill — SB22-201, which was introduced Monday — but that he believes it also has "serious flaws."

Sen. Pete Lee, D-El Paso County, a sponsor of the judicial discipline bill, said he received pushback from the Judicial Department throughout the process of drafting the legislation, which seeks to give more independence to the Colorado Commission on Judicial Discipline, the group responsible for disciplining the state's judges for violating professional or ethical rules.

The commission's leaders complained publicly in January that some of their investigative efforts connected to the blackmail scandal were stalled by the state Supreme Court.

"I want to take the Chief Justice at his word…," Lee said. "I think he said, 'I want to get us out of judicial discipline,' or, in other words, 'We don't want to do it internally.' But they say that, then they resist — they have expressed resistance to — provisions in the bill that would facilitate that removal."

The behind-the-scenes effort to influence the bill and the state Supreme Court's months-long back-and-forth with the Colorado Commission on Judicial Discipline was detailed to The Post by lawmakers and in 713 pages of documents and emails obtained this week under the state's public record laws.

"Not to be alarmists (sic), but the discipline issue is in some ways getting more high-stakes and will probably be more public soon," judicial branch legislative liaison Terry Scanlon, the department's lobbyist, wrote in a March 22 email to chief judges Michelle Amico and James Hartmann, seeking a meeting about the bill. Neither chief judge returned requests for comment Wednesday.

## "How do you say no to that?"

Earlier that month, on March 7, Boatright, Márquez and Scanlon met with Gonzales about the reform bill. At that point, the bill was still a draft and Gonzales had not yet seen it, she said.

The justices had "several concerns," and suggested the bill should be delayed, Gonzales said, adding they did not seem to be trying to stop the bill entirely during the 45-minute meeting, but were concerned about the timing of the reform effort.

"I took the meeting because I am interested to hear their perspective, but I will state I came away from that meeting surprised over their raising concerns on a draft of a policy I had not yet had the opportunity to review," she said, adding she'd normally delay meetings with stakeholders until a bill is introduced or until she'd had a chance to talk with the bill's sponsors, but made an exception in this case in light of who requested the meeting.



"The appropriate and polite thing to do is to sit down and have a meeting with the chief justice of the Colorado Supreme Court," she said. "You know? How do you say no to that?"

Colorado Supreme Court justices lobbied lawmakers privately to kill reform bill | Denver... denverpost.com/2024/13/colorado-supreme-court-ju...

Case No. 1:25-cv-03361-KHV-GEB   Document 1-11   filed 10/23/25   USDC Colorado
pg 19 of 51

Bill sponsors Sen. Bob Gardner, R-El Paso County, and Rep. Mike Weissman, D-Arapahoe County did not return requests for comment about the bill and it was not clear Wednesday if they'd also been approached by justices.

Personal lobbying by members of the state's highest court is highly unusual, but does not violate the justices' ethical boundaries, said David Kaplan, past chair of the Commission of Judicial Performance.

The state's Judicial Code of Conduct specifically authorizes judges and justices to consult with lawmakers over issues that concern the legal system or the administration of justice, he said.

"The more interesting topic is not that they're lobbying against it, but that they're doing that while they're not acting efficiently and effectively to renew confidence in the judicial disciplinary process, which is what the (bill) is trying to do," Kaplan said. "While they're giving reasons why it shouldn't pass, if they would have taken a more proactive position on fortifying the discipline process, they probably wouldn't have needed to be presented the legislation."



**RJ Sangosti, The Denver Post**

Colorado Supreme Court hears public feedback at the Ralph Carr Judicial Center in Denver on Dec. 7, 2021.



## Months of back-and-forth

Emails between the Colorado Judicial Discipline Commission and the state Supreme Court show months of back-and-forth debate over information sharing and funding in 2021.

"Chief Justice Boatright, the decisions made by your predecessors are fixtures of history at this point," commission vice-chair and District Court Judge David Prince wrote in a July 23 letter. "However, you now chart the course of interactions with the Commission for the Department and your staff… the Commission implores you to reconsider the overall approach to the Commission pursued to date this year."

In a statement Wednesday, Judicial Department spokesman Rob McCallum said Boatright "is supportive of thoughtful, transparent and inclusive efforts at reform."

"The Chief Justice and the Court are not opposed to reform, including reform of our system of judicial discipline, as long as it is done thoughtfully and includes many important voices in the process," the statement said.

In an email Boatright sent to judges Wednesday, obtained by The Post through an open records request, Boatright reiterated his belief that some of the reform efforts should be put on hold until investigations into the blackmail scandal conclude, which is expected to happen within a few months.

"Those investigations will provide important insight into issues that need to be addressed in the disciplinary process, and the reports are expected to include specific recommendations for change," he wrote. "It makes little sense to try to 'fix' perceived problems before the issues are actually identified."

Boatright also said the changes proposed in the bill would "place a large burden" on Judicial Department staff because the bill requires the department to gather basic information about complaints about judges before handing that information over to the commission. The bill would require those records be kept for three years.

"We had hoped to have a more meaningful dialogue with the prime bill sponsor prior to introduction, but he has largely not engaged with us or sought our feedback in the process," Boatright wrote. "Although I think there are serious flaws in the bill that would have significant unintended consequences and some of the language is unnecessarily inflammatory, there are some provisions of the bill that I wholeheartedly support."



## Support for independent funding

Colorado Supreme Court justices sign on to reform bill born from Denver Post ... 4/13/... USDC Colorado court-ju...

Case No. 1:25-cv-03361-KHV-GEB   Document 1-1   filed 10/23/25   USDC Colorado

pg 21 of 51

The bill would help the justices get out of the "awkward position" of overseeing the budget of the Commission on Judicial Discipline, Boatright wrote. He previously told lawmakers during a January public hearing that the justices "completely support" giving the commission independent funding, and a spokesman for the Judicial Department reiterated that stance in a statement Wednesday.

Boatright said he plans to testify about the bill at a Senate Judiciary Committee meeting Thursday, and told judges to loop in the Judicial Department if they plan to follow suit.

"Our ability to advocate on behalf of the Department is strengthened when we speak with one voice and when we work together," he wrote.

The push for judicial reform follows reporting by The Post last year that uncovered an alleged blackmail scandal and high-level cover-up in which a top judicial administrator was accused of threatening to publicly reveal judges' unaddressed misconduct unless she was given a lucrative state contract.

As work progressed on the reform bill, Scanlon, the Judicial Department lobbyist, said in a March 17 email to Colorado Court of Appeals Judge John Dailey that the department's relationship with Lee and, "I guess, more largely the General Assembly" was in "a challenging stage."

The pair were discussing a letter Lee sent about another bill he sponsored aimed at reducing implicit bias in jury selection that has since been defeated.

"I've proposed an outline of the response," Dailey wrote, suggesting they tell the state senator: "Thanks. You've got a few things wrong. And don't try to tell the supreme court what to do."

 The Trust Project ∨



**Amazon Hates When You Do This, But They Can't Stop You (It's Genius)**

Online Shopping Tools | Sponsored

## UKRAINE
Russian forces are ramping up efforts in the South and East, officials warn. **A13**

## PANDEMIC
The CDC has extended a mask mandate for travelers through May 3. **A20**



## ARTS NEWS
Quirky Equinox Theater Company begins comeback with 'First Date.' **E1**

# The Denver Gazette

SERVING DENVER & THE METRO AREA · DENVERGAZETTE.COM    MOSTLY SUNNY · HIGH 59; LOW 19    THURSDAY, APRIL 14, 2022

# House panel advances fentanyl bill

**IN BUSINESS**

## TRUCK GRIDLOCK AT BORDER



OMAR ORNELAS, THE EL PASO TIMES VIA THE ASSOCIATED PRESS

Truckers block the entrance into the Santa Teresa Port of Entry in Ciudad Juárez going into New Mexico on Tuesday as a protest to the prolonged processing times implemented by Texas Gov. Greg Abbott.

Texas announced Wednesday that state troopers will stop inspections of trucks at one border crossing following a Mexican governor's concession to Texas' demands, but inspections will continue at many other crossings despite growing pressure from businesses. The inspections, part of a border crackdown by Gov. Greg Abbott, have snarled trade and raised fears of shortages or increased prices for some fruits and vegetables. **Story, C1**

## Amendments target a middle-of-the-road approach on possession

**BY SETH KLAMANN AND MARIANNE GOODLAND**
The Denver Gazette

A panel of Colorado legislators advanced a bill Wednesday that increases criminal penalties for possessing small amounts of fentanyl, a middle-of-the-road approach between factions who want harsher penalties and those who decry going back to the tough-on-crime strategy of the past.

The House Judiciary Committee advanced House Bill 1326, the Legislature's sweeping attempt to address the worsening fentanyl crisis, on an 8-3 vote.

The committee's approval came after more than three hours of debate and discussion Wednesday and hours of public testimony that began Tuesday afternoon and ended more than 13 hours later. The measure now will go to the House Appropriations

**SEE FENTANYL · PAGE 7**

**IN DENVER & STATE**

## JUSTICES LOBBY AGAINST SENATE BILL

Sources say that, in an unusual show of political pressure, at least three Colorado Supreme Court Justices have been lobbying lawyers and lawmakers about their concerns with a proposed bill that could remove judicial discipline from the court's oversight and form a new office free of its influence. **A4**

DENVER & STATE A4    |    NATION & WORLD A19    |    BUSINESS C1    |    SPORTS D1    |    OUT THERE E8    |    COMICS E13

pressreader    PRINTED AND DISTRIBUTED BY PRESSREADER PressReader.com +1 604 278 4604 COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# DENVER&STATE

DENVERGAZETTE.COM/NEWS

THURSDAY, APRIL 14, 2022

# Justices lobbying against judicial discipline bill

**BY DAVID MIGOYA**
The Denver Gazette

At least three Colorado Supreme Court justices — including Chief Justice Brian Boatright and his successor Justice Monica Márquez — have quietly but persistently been lobbying lawyers and lawmakers about concerns they have with proposed legislation that aims to create an independent office of judicial discipline the court would not control.

In a highly unusual show of political pressure, the justices have been pressing members of the specialty bar associations — the Colorado Women's Bar and the Sam Cary Bar Association among them — and a handful of legislators about their concerns with Senate Bill 22-201, which could ultimately remove the Colorado Commission on Judicial Discipline from under the Supreme Court's oversight and form a new office free of its influence, according to several people familiar with the meetings and conversations.

Each one told The Denver Gazette that they were uncomfortable with visits from the justices and with discussing their problems with the proposed legislation.

"When those at the top of the system are telling you to have a certain opinion, I mean, Holy Moses!" said one.

Another said they could not recall a time when a sitting Colorado Supreme Court justice made such an appeal,



COURTESY OF JUDICIAL DEPARTMENT

Colorado Supreme Court justices, back row from left: Carlos A. Samour Jr., Richard L. Gabriel, Melissa Hart and Maria K. Berkenkotter. Front row from left: Monica M. Marquez, Chief Justice Brian D. Boatright, and William W. Hood III.

calling it "bizarre," "very unusual," and "strange."

"I'm concerned they are not remaining independent," said another.

One legislator who agreed to speak publicly — Sen. Julie Gonzales, vice chair of the Senate judiciary committee that on Thursday is scheduled to take up the bill — recalled a March meeting with Boatright and Márquez in which the two expressed a desire to see the bill, which had not been introduced yet, put off. Gonzales said they also said they worried the Supreme Court would have to take up the constitutionality of any changes the legislature makes to how judicial discipline currently works.

The bill was introduced late Monday.

"Chief Justice Boatright stated that another concern was that they did not want to find themselves in the position of ruling that this bill was unconstitutional, and that he did not want to create a constitutional crisis," according to notes Gonzales took of the meeting, copies of which The Denver Gazette acquired under an open-records request.

On Wednesday, Boatright took the additional step of emailing the state's 400 judges to encourage them to let legislators know of their concerns with the bill.

"Our ability to advocate on behalf of the (Judicial) Department is strengthened when we speak with one voice and when we work together," Boatright wrote in the email, a copy of which was acquired by The Denver Gazette.

"I know that you have concern about changes to the judicial discipline process," Boatright wrote. "So do I. As a state, we need to be deliberate and thoughtful in considering changes to our existing constitutional process to ensure that any new proposals balance accountability, transparency, and fairness."

Boatright said he planned to testify before the Senate committee hearing,

SEE JUSTICES • PAGE 5

## CORONAVIRUS IN COLORADO
As of Wednesday

| 7-DAY TOTAL DEATHS | HOSPITALIZATIONS * | 7-DAY AVERAGE OF NEW DAILY CASES | VACCINATIONS IN COLORADO |
|---|---|---|---|







Unvaccinated: 22.7%
First of two doses: 8.0%
Fully vaccinated: 34.0%
'Boosted': 35.4%

*UPDATED WEEKLY

SOURCE: COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT; CHARTS BY EVAN WYLOGE, THE DENVER GAZETTE

**A4** | THE DENVER GAZETTE | THURSDAY, APRIL 14, 2022

pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

The Denver Gazette

## DENVER & STATE

# Bill protecting sex workers headed to governor

**BY HANNAH METZGER**
The Denver Gazette

Legislation to protect sex workers from violent crime is on its way to the governor's desk after receiving approval from the lawmakers on Wednesday.

House Bill 1288 would allow sex workers to report violent crimes without fear of being arrested by granting victims and witnesses of violent crime immunity from prostitution-related charges when reporting to police. The bill was unanimously passed in the Senate and the House.

"Sex workers are victims of crime almost every single day," said bill sponsor Sen. Rhonda Fields, D-Aurora. "Just because you do that kind of work, doesn't mean that you should not elevate your hand when you are experiencing sexual assault. It shouldn't be about your profession that you are chilled and silenced."

Supporters of the bill described sex workers as "easy targets" who are specifically chosen by criminals because they are less likely to go to the police.

Of adult sex workers, 82% have been physically assaulted, 83% have been threatened with a weapon, 68% have been violently raped and 84% were or are currently homeless, according to the Academic Journal of Women's Health.

In addition to receiving bipartisan support, the bill also has bipartisan sponsorship, with two Republican men

> ### "We feel this is a very, very important bill."
>
> **Sen. Jim Smallwood, sponsor of a bill to protect sex workers from violence**

and two Democratic women leading the legislation.

"We feel this is a very, very important bill," said bill sponsor Sen. Jim Smallwood, R-Parker. "When I was talking to members of my caucus, they were concerned about two items — immunity from what and for what witnessed offenses. This is very limited."

Under the bill, victims would receive immunity from prosecution-related charges when reporting crimes including human trafficking, stalking, kidnapping, assault and murder.

Rep. Brianna Titone, D-Arvada, led the drafting of the bill. Titone said she started working on the bill last year after her friend, Pasha Ripley, told her about when she was brutally beaten and raped by a client while Ripley was a sex worker.

"The last thing he said as he walked out the door was, 'Who are you going to tell? What are you going to do?' Because if I go to the police, it's very likely that I would be arrested," Ripley said while testifying in support of the bill during a committee meeting.

---

# JUSTICES

**FROM PAGE 4**

which Gonzales will chair because Sen. Pete Lee, who heads the committee, is the bill's primary sponsor.

Boatright also told the jurists that Lee has not sought the chief justice's input.

"We had hoped to have a more meaningful dialogue with the prime bill sponsor prior to introduction, but he has largely not engaged with us or sought our feedback in the process," Boatright wrote.

The politicking comes just after public statements the court and Judicial Department have made supporting the legislation, saying it welcomed an independent body to investigate and discipline judges.

A Judicial Department spokesman said justices "routinely speak" with legislators when any proposed law "impacts the administration of the courts and probation," noting that the Colorado Code of Judicial Conduct makes an allowance for it.

"Department leadership has an obligation to transparently raise concerns with legislators early in the legislative process," spokesman Rob McCallum wrote in an email to The Denver Gazette. "Sometimes this outreach comes through department staff or the State Court Administrator, and sometimes it comes through justices or judges."

Several people told The Denver Gazette that the justices have privately said in meetings over the past several weeks that the legislature might be overstepping its bounds by meddling with an office that is created by the Colorado Constitution.

Several sources refused to be identified publicly because they feared reprisal, explaining they are attorneys who could appear before the justices and whose professional licensing is controlled by the Office of Attorney Regulation Counsel, which is overseen by the Supreme Court.

Gonzales, a paralegal, said the meeting was unsettling, with an "extraordinary power differential" sitting before the state's top jurists.

"I think that evening I was really surprised by it," she said in an interview with The Denver Gazette. "In the days following, I mellowed out about it because I do believe that people who are impacted by policy should have the opportunity to speak to said policies. However, what I struggle with is that it's exceptionally rare that judges (personal) opinions are questioned, and I think that's a bit of the tension that I felt."

The Judicial Department normally sends its legislative liaison, Terry Scanlon, to speak with legislators about any proposed or upcoming bills.

The specialty bar associations each represent a specific group of attorneys. For example, the Sam Cary Bar Association represents Black lawyers and judges and the Asian Pacific American Bar Association of Colorado represents attorneys from that segment of the community.

The leaders of the specialty bar association groups collectively gather as the President's Diversity Council through the Colorado Bar Association.

That council was scheduled to meet Wednesday and hear a presentation from the judicial discipline commission about the bill, a meeting the council requested following approaches by the justices, people familiar with the meeting said.

At the root of the bill are several investigations into allegations of judicial misconduct that went unpunished over several years. Those allegations came from a former Judicial Department official who was being fired and threatened a tell-all sex-discrimination lawsuit.

To prevent the lawsuit, the department allegedly gave the official — former chief of staff Mindy Masias — a $2.5 million contract for judicial training. The information Masias would allegedly reveal in a lawsuit was contained in a two-page memo that was read to then-Chief Justice Nathan "Ben" Coats in a January 2019 meeting in which it was decided to award the contract. The contract was subsequently cancelled.

In his letter to the state's judges, Boatright said he thought the legislation should be put off until the investigations are completed, a sentiment Sen. Gonzales said the chief justice expressed to her as well.

"Those investigations will provide important insight into issues that need to be addressed in the disciplinary process, and the reports are expected to include specific recommendations for change," Boatright wrote. "It makes little sense to try to 'fix' perceived problems before the issues are actually identified."

Judicial Department spokesman McCallum added: "An interim committee that receives input from a diverse group of stakeholders in a deliberate and transparent fashion is best positioned to make meaningful reform. So no, the Chief Justice and the court are not opposed to reform, including reform of our system of judicial discipline, as long as it is done thoughtfully and includes many important voices in the process."

Boatright explained in his email that an eight-person committee the Senate bill creates to look deeper into changing how judicial discipline occurs should be larger.

The committee would consist of four state senators and four state representatives.

"And although I welcome the concept of an interim committee, I believe that committee should include representatives from everyone who has a stake in this process, including judges, the governor's office, the CBA (Colorado Bar Association), the CWBA (Colorado Women's Bar Association) and affinity bar organizations, and local and national experts on judicial branch operations," Boatright wrote. "Currently, the bill contemplates a committee comprised solely of legislators."

Any changes to the Constitution would require a voter referendum. Currently the judicial discipline commission sits beneath the Supreme Court and operates under rules created by the high court.

Additionally, any discipline the commission metes out — except for private sanctions or other measures that are not public — must be approved by the Supreme Court.

The proposed legislation sets the stage for changing all of that, but first ensures the commission is funded by the legislature, not the Supreme Court as it is now.

Commission members in January took the unusual step of telling legislators that it could not pay for lawyers it hired to look into the Masias scandal because the Supreme Court would not approve the additional funding.

pressreader   PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

Opinion: Intimidation tactics from the ju... Case No. 1:25-cv-03361-KHV-GEB and... Document 1-11 www.denverpost.com/2023/03/27/USDC Colorado attorne...

pg 25 of 51

OPINION > **OPINION COLUMNISTS** • Opinion, Opinion Columnist

# Opinion: Intimidation tactics from the judicial branch cannot stand



**Hyoung Chang, The Denver Post**

Steven Vasconcellos, Colorado's state court administrator, front left, and Judge Ted Tow of the Colorado Court of Appeals, front right, are in the first meeting of the Legislative Interim Committee on Judicial Discipline, which is tasked with reforming the state's discipline system for judges in the wake of the judicial scandal, at Colorado State Capitol Building in Denver, Colorado on Tuesday, June 14, 2022.

By **PETE LEE** | Guest Commentary

March 27, 2023 at 6:01 a.m.



Opinion: Intimidation tactics from the ju... Case No. 1:25-cv-03361-KHV-GEB and... Document 1-11 www.denverpost.com/2023/03/27/USDC Colorado attorne...

1 of 5

Opinion: Intimidation... Case No. 1:25-cv-03361-KHV-GEB and... Document 1-11 denver filed 10/23/25 03/2 USDC Colorado attorne...

pg 26 of 51

The Colorado Supreme Court's Attorney Regulation Counsel — the government officials charged with investigating misconduct by lawyers and judges — threatened discipline recently against attorneys for their testimony to the Colorado General Assembly.

I read with grave concern The Colorado Springs Gazette's story explaining that members of the Colorado Commission on Judicial Discipline had received letters threatening discipline for their testimony.

Unlike its usual role of looking into allegations such as sexual harassment, stealing clients' money, driving while impaired or neglecting cases, this letter was about the attorney's testimony presented before a joint House and Senate Judiciary Committee. The regulator disagreed with the factual statements made to the Committee, so she threatened their licenses to practice law.

Such threats and intimidation strike at the heart of the legislative process — the necessity of elected representatives to both obtain public testimony as they consider policy and to provide oversight of government agencies. To allow this regulator's action to stand will chill all potential testimony to the legislature, as each witness will have to calculate the price of speaking truth to power and weigh the risk of career suicide out of fear that a politically motivated bureaucrat may want to prevent their public testimony, cover-up possible wrong-doing or exact retribution.

All the attorney members of the Judicial Discipline Commission are volunteers who do this work out of a commitment to the integrity and improvement of the legal system, to ensure that only the most upright judges serve the people of Colorado and that allegations of misconduct are investigated independently. They are all esteemed lawyers with impeccable credentials and long community service records. We should seek and welcome, not discourage, their testimony.

As a lawyer for 50 years, and the son of a lawyer, I have always held judges, particularly Supreme Court Justices, in the highest esteem.

The justices are at the apex of the legal hierarchy, having been appointed after rigorous selection processes based on distinguished careers and the recommendations of peers and appointment by the chief executive. They were the "creme dela crème," the intellectual elite, ethical and principled without question.

But after the last few years in the legislature, however, where I served as chairperson of the House and then Senate Judiciary Committees and having read reports and heard testimony about continuing scandals and allegations of misconduct at the highest levels in the Judicial Branch, my perspective and idealism have been tempered.

Three years of narratives about misbehavior, cover-ups, administrative incompetence, mistakes, inappropriate lobbying, false candor, and lack of transparency have compelled me to alter my views of some of the legal profession's leaders.

Contributing to my disillusionment has been the opposition of the Supreme Court and Judicial Branch, every step of the way, to provisions in three bipartisan bills I sponsored to reform and improve the Judicial Branch. All three passed and became law.

Their opposition took the form of a pattern and practice of tactics to defeat bills, silence their critics and neutralize opposition. One victim of sexual harassment by a judge would only testify via an anonymous letter to the committee; she described the negative treatment she received from the OARC. Now that office is makings accusations against six respected lawyers on the Commission on Judicial Discipline because it disagrees with their testimony to the legislature, with veiled threats to their licenses to practice law.

Opinion: Intimidation tactics... filed by... Case No. 1:25-cv-03361-KHV-GEB and... Document 1-11 denver filed 10/23/25 3/27 USDC Colorado attorne...

pg 27 of 51

It seems that the branch is more interested in maintaining its power than promoting independent oversight, exposing and rooting out judicial misconduct, and ensuring that aberrant judges are sanctioned.

Let me state unequivocally that Colorado has been nationally recognized for the quality of its judicial system and the competency of its judges. That has been my experience as a practicing lawyer in El Paso County for decades.

But, as in any group, there are some judges who deviate from expected standards of professional conduct. Judges are only human. Thus, we need a credible process to ensure errant judges are identified and then corrected or disqualified. That is the role of the Commission on Judicial Discipline, working in conjunction with the Office of Attorney Regulation Counsel.

Attorney Regulation Counsel enforces the professional standards of lawyers and judges and serves at the pleasure of the Supreme Court. Its intimidating letter to the Commission's lawyer members pertained to issues in dispute between the Supreme Court and the Commission regarding implementing a bill to reform the Judicial branch.

By sending the threatening letter, ARC could be viewed as putting a finger on the scales to tip future testimony in favor of the Supreme Court's position, inhibit candor, and undermine the goal of creating independent oversight and assessment of judicial misconduct.

While past actions have, in my view, undermined attempts to improve the Judicial Branch, recent actions at the highest level of the Judicial Branch are now impacting the legislative branch in its lawmaking role. Threatening the law licenses of attorneys testifying before legislative committees will deprive lawmakers of critically important information, perspectives, and opinions of men and women who are often deeply knowledgeable about the issues being considered.

Having served in both the Colorado House and Senate and attended hundreds of hearings, I know the importance of hearing testimony from as many perspectives as possible. Sound public policy should only be developed with significant public input. The legislative process will be significantly impaired if lawyers can be intimidated by an over-eager attorney regulation counsel. These patterns and practices are unacceptable, and the Supreme Court should end them.

*Pete Lee is a former Colorado state senator and representative from Colorado Springs.*

*Sign up for Sound Off to get a weekly roundup of our columns, editorials and more.*

*To send a letter to the editor about this article, submit online or check out our guidelines for how to submit by email or mail.*

**T** The Trust Project ∨

It's Never Late to Start Dating Again

DateMyAge | Sponsored

Try Now

https://gazette.com/opinion/perspective-colorado-s-judicial-integrity-in-question/article_a319d072-f8aa-11ec-ad4c-e747649eb207.html

# PERSPECTIVE: Colorado's judicial integrity in question

Dennis Maes and Frances Koncilja
Jul 2, 2022



The justices on the Colorado Supreme Court and all the judges in the state of Colorado are the beneficiaries of battles decades ago to create a merit system for the selection of judges as opposed to a partisan political system in which judges would be elected. Our judges can focus on their jobs as opposed to raising money and campaigning. Our judges do not have to fear that an unhappy litigant might fund a judge's opponent in an election.

This fight for merit selection of judges in Colorado started in 1945. In 1966, when the General Assembly once again refused to put merit selection on the ballot, the League of Women Voters, the Colorado Bar Association, the Colorado Medical Association, and numerous citizens gathered over 47,000 signatures to place merit selection of judges on the ballot and then worked for its adoption. Finally, in November 1966, Colorado voters approved adding Article VI to the Colorado Constitution. The late Colorado Supreme Court Justice Gregory Hobbs compiled a detailed history of these efforts which was published in The Colorado Lawyer in April 2006 titled "Colorado Judicial Merit Selection — a Well-Deserved 40th Anniversary Celebration".

Article VI also created the Colorado Commission on Judicial Discipline ("Discipline Commission") — a commission of 10; four judges, two lawyers and four non-attorney citizens — that has the responsibility and authority to investigate and discipline judges, including Supreme Court justices.



Drug Price Caps are the Wrong Solution for Patients

COLORADO BIOSCIENCE ASSOCIATION

PAID FOR BY COLORADO BIOSCIENCE ASSOCIATION



Drug Price Caps are the Wrong Solution for Patients

LEARN MORE

COLORADO BIOSCIENCE ASSOCIATION

In 1994, there was another attack on merit selection with Amendment 12 that would have destroyed the independence of judges and put them back into politics with recall elections. Once again, the Colorado Bar was at the forefront in defeating Amendment 12.

Merit selection and independence of judges, balanced with the authority of the Discipline Commission to investigate and discipline judges, have served the public interest of all Coloradans for over 50 years.

### Commission subverted

We are concerned that Chief Justice Brian Boatright and Justice Monica Marquez, who appear to be the faces of the current leadership at the Supreme Court, are in the process of torching and burning down the merit selection system by their stubborn and misguided refusal to allow the Discipline Commission to do its work. The commission has been attempting to investigate a scandal swirling around the Supreme Court since 2019: Did then-Chief Justice Coats encourage, authorize and or approve a $2.75 million contract for Mindy Masais, the former chief of staff of the Supreme Court Administrative Office ("SCAO"), to keep her from going public with "dirt" she allegedly had on some Colorado judges and the Colorado Judicial Department?

Rather than allowing the Discipline Commission to do its work, Justice Boatright has insisted that the Supreme Court should hire the investigators and control the scope of the investigation. The court waited over two years after this scandal went public to hire investigators, which effectively prohibited the Discipline Commission from doing its work. In October 2021, the court hired a company set up by former United States Attorney Robert Troyer to conduct the investigation into whether Coats was willing to take $2.75 million in funds from the Judicial Department to essentially buy the silence of Masais ("Troyer Report"). Judge Boatright, we assume with the blessing of the other justices, at the same time hired another company and will pay them $225,000 to investigate the culture at the Judicial Department. That investigation was supposed to be concluded in June but has been delayed because of the voluminous number of employees who have asked to be interviewed.

Case No. 1:25-cv-03361-KHV-GEB    Document 1-11    filed 10/23/25    USDC Colorado
pg 30 of 51
PERSPECTIVE    Colorado's judicial integrity in question | Opinion | gazette com

The effect of these late and expensive investigations — remember, the complaints occurred back in 2019 — is that there still is no accountability and there likely will be none. Instead, the delays, caused primarily by, we are reluctant to say it, Justice Boatright, have had the effect of insuring there will be no criminal charges against anyone because the statute of limitations has run. It is mind-boggling that the Colorado Supreme Court, the attorney general and the Denver district attorney allowed the statute of limitations to expire in a matter of such importance.

The state auditor has already investigated many of these items that Troyer investigated and made recommendations in her performance audit dated November 2020. The state auditor commenced the audit because of the media reports in 2019 that there was wasteful spending, excessive use of paid leave and potential fraud at the Judicial Department. In addition, the state auditor had received an anonymous complaint on April 15, 2019, through the fraud hotline alleging fraud at the Judicial Department.

## Undue delays

The state auditor's report on the fraud hotline complaint came out last Feb. 4 and recommended criminal investigations. One might ask why the report took so long. It appears that the Judicial Department, under the leadership of Justices Boatright and Marquez, made the process burdensome by insisting on controlling access to the data and evidence; asserting confidentiality over many of the documents, and providing the information under an "access" agreement, meaning it would be kept confidential.

The state auditor's executive summary of the fraud hotline investigation recommended a criminal referral to investigate possible crimes committed by Masias, Eric Brown (the administrator of the SCOA) and Chris Ryan the head of Human Services at SCOA). The full investigation contained so many redactions when it was given to the Denver district attorney, and came so close to the expiration of the statute of limitations, that the Denver DA said she could not prosecute anyone for anything.

The Troyer Report issued last week paints a picture of Coats as incompetent and ignorant of the facts and therefore concludes, wrongly, in our opinion, that Coats did not commit any acts of official misconduct and this mess is not his fault. The Troyer Report ignores numerous uncomfortable facts; fawns over the justices as being very co-operative and forthcoming, and ignores the auditor's report and the recent report of the Discipline Commission to the interim legislative committee looking into these issues. The deficiencies in the Troyer Report are perfect examples of why this investigation should have been conducted by the Discipline Commission.

## Dubious report

Case No. 1:25-cv-03361-KHV-GEB    Document 1-11    filed 10/23/25    USDC Colorado
pg 31 of 51
PERSPECTIVE    Colorado's judicial integrity in question | Opinion | gazette com

The Troyer Report concludes that Coats was not made aware of the memo with the dirt in it until sometime in 2019, and that he could not have agreed to it to cover up this memo with the $2.75 million contract because — are you ready for this? — Coats wanted to fire Masias in the fall of 2018 for financial improprieties and was considering giving her a "leadership training" contract to encourage her to resign. Why would anyone, let alone the chief judge, even consider a multimillion-dollar "leadership training" contract for someone accused of financial improprieties at the court unless Coats was trying to buy her silence? The Troyer Report concluded that the financial services division of the SCAO was refusing to sign a management representation letter required for the completion of statewide audit unless Masias was fired. The Troyer Report states at page 12:

"Ryan and Coats were reluctant to terminate Masias but believed that their options were limited because the department needed a signed management Representation Letter. They were also concerned about the optics of terminating the highest-ranking female employee at the SCAO, who had also recently been denied the SCAO position. Masias was well-regarded in many of the department's 24 judicial districts. Both Ryan and coats therefore preferred demoting Masias for her dishonesty, placing her in a position to oversee leadership training and removing her spending and signature authorities."

The Troyer Report further concludes that Coats never read or even allowed the memo with the "dirt" to be read to him and so Coats could not have been involved in any cover up because he did not know the details. The Troyer Report also states that Coats failed to review the leadership contract for $2.75 million; never asked about its terms, including the duration (five years) or the amount to be paid, and therefore there was no coverup by Coats because he did not know the details. (These leaps of "logic" make one's head hurt.)

The Troyer Report then goes on to make the jaw-dropping allegation that somehow this mess is not the fault of Coats, because no one trained him to be the chief justice; there were no manuals or training material, and he had no experience managing an organization, especially a large organization such as the Judicial Department that has almost 4,000 employees and a budget of over a half billion dollars a year. In its desperate search for another "reason" to exonerate Coats, the Troyer Report concludes that this mess was also caused by the other justices of the Supreme Court because they did not offer to assist Coats in his supervisory duties as well as the design of that stunning new Supreme Court building that cost taxpayers over $750 million — because the employees of the Judicial Department were in the office tower next to the courts, and Coats was not aware of the toxic environment among the employees. We guess Coats was not trained to walk over to the next building to meet with the actual people who work for the Judicial Department, and he needed a manual to instruct him to do that.

### Absurd findings

If this sounds like rubbish to you, you are correct. Assuming for the for the sake of argument, as we lawyers say, that it is true that Coats was worried about the gender bias claim and that is why he agreed to a "leadership training" contract for Masias, how is that a defense to a charge of official misconduct? There was still a quid pro quo — no public complaint, no lawsuit and you get a multimillion-dollar contract.

The Troyer Report does not even mention, let alone analyze, the criminal statutes that Coats might have violated: conspiracy to commit bribery and or official misconduct under CRS18-8-404 and 405 if a public servant "refrains from performing a duty imposed upon him by law."

There is no legal analysis in this $75,000 report other than to a reference to the state procurement code. There is no legal analysis of what obligations the other six justices had under the Code of Judicial Conduct if it is true that Coats was incompetent. There is no reference, let alone analysis of Coats' obligations under the Code of Judicial Conduct, 2.5, 2.12 or 21.5 or Disciplinary Rules 4 and 5, which prohibit a judge from handling a matter he is not competent to handle and require a judge to discharge his supervisory duties diligently. There is no mention or analysis of the obligation of Coats or the other justices to turn over to the Discipline Commission claims of wrongdoing by a judge.

While heaping praise on the court for its open and transparent co-operation with the Troyer group, the report does not even mention that the delay of Chief Justice Boatright in hiring Troyer means the statute of limitations has run and there can be no criminal prosecution.

No one held a gun to Coats' head to force him to be the chief justice. His colleagues voted for him, most likely after he lobbied for the position. He had been a judge on that court for 18 years before he became the chief. What did he think being the chief involved? Just giving speeches and acting important? He was elected to be the chief executive officer of the Colorado Judicial Department, which has almost 4,000 employees and a budget of over a half billion dollars. If he did not think he was qualified, he should not have asked for the job.

Justice Boatright has taken the incredible position at the legislature that the reason he has not provided access to all the documents and data involving this mess is because he is protecting the court from financial liability. We guess the evidence must be pretty damning, but that is what evidence is about — establishing liability. If either of us made an argument to a federal judge in a discovery dispute with that kind of "logic," we would be cooling our heels in the holding cells of the federal marshal and stripped of our privileges to practice law. How can the Supreme Court have any credibility in decisions involving discovery disputes when it applies a different standard to itself? The Troyer Report omits any of this in fawning over the court's transparency and co-operation.

### Credibility in question

In summary, the Troyer Report is rubbish and clearly establishes why the court should have turned this mess over to the Discipline Commission three years ago.

The leadership of the court, Justices Boatright and Marquez have, in our opinion, lost all credibility and legitimacy.

Colorado owes a huge debt to the courage and independence of the Discipline Commission for standing up to the unprincipled refusal of the Supreme Court to allow the commission to do its job. To force a vote on another constitutional amendment will encourage someone to put election of judges on the ballot at the same time.

We have no confidence in Justice Boatright and Marquez as the leaders of the court and request that they resign and that the rest of the justices rethink this dangerous and improper fight with the Discipline Commission.

Forcing the Discipline Commission to request amendments to the constitution to "clarify" what is already clear — the commission is independent and has the authority and obligation to investigate complaints concerning judge — is outrageous and dangerous and could burn the whole place down.

Dennis Maes served for 24 years as a judge in Colorado's 10th Judicial District in Pueblo — and as the district's chief judge for 17 of those years — before retiring from the bench in 2012. He also served on the state's Judicial Discipline Commission. Frances Koncilja is an attorney who served on the Colorado Supreme Court and Court of Appeals Nominating Commission and was the Tenth Circuit's representative on the American Bar Association Judicial Review Committee. She also served on the judicial advisory committees recommending federal judge candidates for U.S. Sens. Ken Salazar, Michael Bennet and John Hickenlooper. Koncilja also is a former commissioner on Colorado's Public Utilities Commission.

## You Might Also Like

Recommended by Outbrain



**People Born Before 1969 Eligible For Walk-In Tubs**

clearliving.com/walk-in-bathtubs



**[Photos] 25 T-shirts That Went Too Viral**

27 T-shirt Fails That Went Too Viral
Networth Magazine



**Getting A Loan Today Might Be Easier Than You Think (Take A Look)**

TopSearchesNow






**[Photos] 27 Awkward Photos That Are Hard to Forget**

27 Awkward Photos That Are Hard to Forget
The Super Mommy



**20 Movies That Are So Good, They're Considered Perfect.**

StandardNews



**Find Results For scheduling software for business**

Discover cheap scheduling software that doesn't compromise on functionality....
Yahoo Search



## PRIMARIES
Donald Trump notches three more easy caucus victories. **A19-A21**

## MIDEAST
U.S.: Israel has agreed to framework for cease-fire; now it's up to Hamas. **A23**

## HOCKEY
NHLPA assistance program helps Nichushkin, others get back on the ice. **D1**

# The Denver Gazette

SERVING DENVER & THE METRO AREA · DENVERGAZETTE.COM    RAIN/SNOW · HIGH 53; LOW 32    SUNDAY, MARCH 3, 2024

# SKI JORING RULES

Thousands lined the streets of Leadville on Saturday to cheer on competitors in the 76th annual Leadville Ski Joring. In the event, a horse and rider race down the street pulling a skier who's holding onto a rope. The skier flies over jumps and spears rings along the course. The event continues at noon on Sunday.



PARKER SEIBOLD, THE DENVER GAZETTE
Rider Noah Gregory pulls Bryon Coll in the 76th annual Leadville Ski Joring on Saturday.

# Deli dream lives on through 3 generations

**BY SETH BOSTER**
The Denver Gazette

Tom Craft walks into a busy Bagel Deli, where owner Jared Kaplan and others behind the counter are slicing meats to stack on rye while shouting at customers for orders.

"Whaddya need?" goes Kaplan's common line.

Craft wants a — "I know, I know," Kaplan says, cutting off the regular. Another Reuben piled high, half corned beef, half pastrami.

More importantly, "How's your boy doing?" Kaplan asks. Craft's boy is just fine, though surely he would prefer to be here with his dad for another Bagel Deli run.

Craft has been coming for years. The reason is simple. "This is the best deli in Denver," he says, "if not the only *real* deli in Denver."

Or take it from Terry Varkony, another regular of 35

SEE DELI · PAGE 14

# Top judges ignored colleague's drinking

**BY DAVID MIGOYA**
The Denver Gazette

At least three judges — Colorado's Supreme Court chief justice and a now-retired appellate court judge among them — years ago knew of a Denver juvenile court judge's drinking problems but never reported them, then maintained that silence while a courthouse manager who had sought their help in confronting the judge faced firing instead, The Denver Gazette has learned.



**COLORADO WATCH**

Denver Gazette investigations

**Inside**
Documents: Judicial discipline case 'slow-walked' in Adams County. **A8**

The judge, D. Brett Woods, 63, presided over Denver's juvenile court until he resigned Feb. 8, seven weeks after he was suspended pending an inquiry by the Colorado Commission on Judicial Discipline into recent allegations of misconduct. The commission has not disclosed the nature of the inquiry — commission investigations are by law secret — and the case

SEE DRINKING · PAGE 8

| DENVER & STATE A5 | NATION & WORLD A23 | BUSINESS C1 | SPORTS D1 | OUT THERE E9 | COMICS E14 |

pressreader    PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

# Docs: AdamsCo judicial discipline case 'slow-walked'

**BY DAVID MIGOYA**
The Denver Gazette

A second judicial discipline case, that of 17th Judicial District Judge Robert Kiesnowski Jr. who resigned last year, has key connections with Colorado Supreme Court Chief Justice Brian Boatright, according to documents and interviews.

Despite promises by Boatright to state legislators in 2021 that he would monitor all complaints of judicial misconduct personally and ensure they're handled promptly, the state's discipline commission said the Kiesnowski case took months to reach it and then languished for another two years before action was taken.

In that case, Kiesnowski, whose courtroom was in Adams and Broomfield counties, agreed to resign after admitting to a campaign of harassment and retaliation that lasted for years against a court clerk who had begun complaining to her courthouse superiors about his conduct as early as 2016.

Kiesnowski had accused his courtroom clerk, Emily Betz, of talking behind his back about an extra-marital affair he was having with another courthouse employee who was Betz's supervisor and who eventually became the judge's wife, according to public discipline records.

Kiesnowski embarked on a protracted campaign to harass Betz, including efforts to prevent her from speaking to anyone while working her courthouse job for him, public discipline records show.

Although Betz's superiors took her concerns to the upper levels of the Judicial Department, they never made it to the discipline commission, people familiar with those events said.

When the harassment didn't stop — Kiesnowski's paramour was not transferred to a different judicial district as personnel rules required — Betz filed her own complaint with human resources within the Judicial Department's State Court Administrator's Office in May 2021, documents reviewed by The Denver

SEE CASE · PAGE 9

## DRINKING

**FROM PAGE 1**

remains open.

But Woods' use of alcohol, which multiple sources confirm is at the core of his discipline case, wasn't new to anyone except commission investigators, and several judges, including Supreme Court Chief Justice Brian Boatright, were aware of it for years, The Denver Gazette has learned.

Woods did not respond to telephone messages from The Denver Gazette.

The discipline commission, the state's constitutional authority for investigating and sanctioning judicial misconduct, only recently learned that Boatright and other judges knew about Woods' drinking and did not report it nor the subsequent alleged retaliation against the courthouse manager. That happened in January when the commission investigated a complaint filed last summer, people familiar with the inquiry confirmed. It was last summer's complaint that led to Woods' resignation last month.

Since 1966, the Colorado Constitution has recognized that a judge's problems with alcohol, called "intemperance," are reason enough to remove the judge from the bench. The state's judicial discipline rules define intemperance as including the abuse of alcohol. And the state's Code of Judicial Conduct prohibits retaliation for reporting any alleged misconduct.

The commission handles all violations of the code of conduct and recommends discipline for any infractions, which could include a judge being removed from the bench. That can only happen with the Supreme Court's approval or by a special tribunal if a conflict of interest exists. The legislature also has constitutional authority to impeach judges and justices, though that has never happened.

The commission has disciplined judges for problematic alcohol consumption outside of the courtroom, including at public events such as conferences or other semi-official gatherings.

The current complaint against Woods came from courthouse employees concerned about Woods' drinking who were reticent, for some time, to come forward because they feared the same retaliation the



**JUDGE BRETT WOODS**
Presiding Judge
Denver Juvenile Court

COURTESY OF THE CITY AND COUNTY OF DENVER

Juvenile Court Presiding Judge D. Brett Woods

courthouse manager had faced earlier, people familiar with the inquiry confirmed to The Denver Gazette.

Several high-ranking Denver juvenile court employees in 2019 planned to confront Woods about his drinking and their concerns it was impacting his work as a judge, similar to an intervention session held with a colleague or family member suffering from addiction, The Denver Gazette has learned.

To that end, the employees asked for support or advice from at least three judges — Boatright, now-retired Court of Appeals Judge Karen Ashby, and Denver Juvenile Court Judge Laurie Clark — according to several people with knowledge of the events.

At least two — Ashby and Boatright — offered their support to the employees, sources confirmed, though it's unclear whether either agreed to participate in any intervention plan.

Additionally, commission investigators were told that Clark had been approached multiple times by the courthouse manager, but that stopped when it appeared no help was forthcoming, sources said.

SEE DRINKING · PAGE 9



SCOTT CRABTREE, GRAND JUNCTION SENTINEL
Colorado Supreme Court Justice Brian Boatright listens to oral arguments May 4 at Colorado Mesa University in Grand Junction.

**A8** | THE DENVER GAZETTE | SUNDAY, MARCH 3, 2024

pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

## DRINKING

#### FROM PAGE 8

Additionally, investigators learned that Clark had allegedly expressed her own concerns with the court manager about Woods' alcohol use in discussions about a class the judges co-taught at a law school, sources confirmed.

Despite ethics rules compelling judges to tell the discipline commission about any troublesome conduct of their colleagues or to take other appropriate action, none reported Woods' drinking, according to several sources who asked not to be identified because they feared repercussions or were not authorized to discuss the matter publicly.

Then, when Woods learned of the court manager's efforts to confront him, he instead pursued disciplinary measures against the manager specifically because discussions about his personal conduct and alcohol use were had with others, including his judicial colleagues, according to interviews and documents reviewed by The Denver Gazette.

That discipline included an admonishment against the manager for having said Woods was disengaged and frequently absent from court, according to documents and interviews.

The manager was told by a superior that Woods had lost confidence in the manager and was likely to fire them, according to people familiar with that conversation and documents reviewed by The Denver Gazette.

Though the judges who were notified of Woods' alcohol use were also aware of the alleged retaliatory discipline he pursued, none of them reported it to the commission, though two of the judges — Ashby and Boatright — agreed to provide the manager with a favorable job reference going forward, people familiar with those discussions said.

Clark told The Denver Gazette that she was unaware of Wood's drinking on the job and does not know the focus of the discipline commission's inquiry.

"I want to be clear, no employee ever came to me regarding Judge Woods use of alcohol related to court business," she wrote in an email. "I never had a concern regarding any alcohol use by Judge Woods at the courthouse or while we co-taught at the" law school."

 

COURTESY OF 9NEWS · COURTESY PHOTO

**Court of Appeals Judge Karen Ashby, left, and District Court Judge Robert W. Kiesnowski Jr.**

Regarding the manager's discipline, Clark said she knew little about it.

"I was aware of the firing but had no information regarding the purpose of that firing," Clark wrote in an email to The Denver Gazette. "I have never been privy to the basis of that firing."

Ashby told The Denver Gazette she wasn't aware of any concerns that Woods' drinking had impacted his performance on the bench and that employees only expressed a general concern to her of his lack of leadership and the poor performance of the juvenile court.

"There were no specific allegations that he was drinking on the job, that he was drunk on the bench or at the courthouse," Ashby said. "Had there been, I would have the responsibility to report that kind of thing."

As an at-will employee of the juvenile court's presiding judge, the manager chose to resign rather than be fired in June 2019, leaving behind a career that spanned more than two decades and relinquishing nearly all the retirement benefits that came from it,

according to people with knowledge of that outcome.

The Judicial Department also required the manager to sign a non-disclosure agreement, which would not be possible today following legislation last year banning the practice in state government.

Several high-ranking positions within a judicial district — Denver's juvenile court is viewed as wholly separate from the overarching Second Judicial District in which it sits — are hired at the discretion of the presiding or chief judge. Because they are at-will employees, they can be terminated at any time and without reason.

None of the colleagues who assisted the manager in planning the intervention with Woods, nor the judges whose advice they sought, came to the manager's assistance when the manager was suspended and faced termination, sources confirmed.

Ashby was the only one of the judges to remain in touch with the manager and offer additional support — but still did not report any of Woods' conduct or

SEE DRINKING · PAGE 10

## CASE

#### FROM PAGE 8

Gazette show.

However, the discipline commission said in public documents that her complaint was not to them until August 2021 — roughly four months later, an assertion SCAO denies.

In February 2021 — three months before Betz filed her complaint to the SCAO, which answers to the chief justice — Boatright told a joint gathering of both houses of Colorado's General Assembly that he would personally monitor all allegations of judicial misconduct across the state.

Betz's complaint would have been one of them.

Boatright made the announcement just two weeks after newspaper reports exposed a multi-million-dollar contract that had been given to a high-ranking Judicial Department employee who faced firing. It was allegedly to silence the employee's threats of a tell-all sex-discrimination lawsuit exposing years of undisclosed judicial misconduct. The allegations were laid out in a two-page memo the Judicial Department kept secret until the newspaper stories appeared.

"The branch takes allegations of misconduct by judges and staff extremely seriously," Boatright told the legislators on Feb. 18, 2021, in response to the newspaper stories.

Then, referring to the memo, he told the General Assembly: "We need to know if human resources investigated any of these allegations, and if they did, what action was taken. And if they didn't ... we need to know why."

Named chief justice just seven weeks earlier, Boatright called for a special investigation into the memo and its allegations of covered-up or soft discipline against judges.

"Until the investigation is completed and any recommendations are implemented, I am to be made aware of any new allegations of misconduct and kept appraised of the progress of any investigation on a weekly basis," he said.

Two days before his General Assembly speech, Boatright issued a statement that said he had made a department-wide order that he get the weekly updates "to ensure each (complaint) is fully investigated and acted on as appropriate without delay."

Boatright told The Denver Gazette he has maintained that vigilance.

SEE CASE · PAGE 10

SUNDAY, MARCH 3, 2024 | THE DENVER GAZETTE | **A9**

pressreader · PRINTED AND DISTRIBUTED BY PRESSREADER · PressReader.com +1 604 278 4604 · COPYRIGHT AND PROTECTED BY APPLICABLE LAW

The Denver Gazette

# COVER STORY

## DRINKING

**FROM PAGE 9**

the retaliation to the discipline commission, according to interviews.

Ashby told The Denver Gazette that she was unaware of the reasons for the court manager's discipline, did not ask why, but did say the manager was "in my experience a very good employee. I didn't like the fact that it happened."

Many of the manager's colleagues at the time feared for their jobs if they said anything or approached the manager, several people with knowledge of their thinking told The Denver Gazette.

The Woods' inquiry has again put Chief Justice Boatright in the spotlight of scrutiny. He was named to the Colorado Supreme Court in 2011 and became its chief justice in January 2021.

In just the past several months, The Denver Gazette has learned Boatright is at the center of at least two additional matters before the commission. They include recent allegations that a judicial misconduct complaint that led to the resignation of 17th Judicial District Judge Robert Kiesnowski Jr. was slow-walked to the commission — claims the Supreme Court quickly forced the commission to remove from the public record — at a time when Boatright had assured legislators he was personally tracking all misconduct complaints to ensure they were handled promptly.

Also before the commission is an inquiry into the Supreme Court's public denial in February 2021 of allegations that former Chief Justice Nathan "Ben" Coats had approved a quid-pro-quo contract to silence claims that judicial misconduct was being covered up for years. That denial was delivered by Boatright although it was signed as coming from the Supreme Court's seven justices.

Coats was later censured by the judicial discipline commission for his role in that scandal. In November 2022, former 10th Judicial District Chief Judge Dennis Maes filed a formal complaint — known as a "request for evaluation" — with the discipline commission about the Supreme Court's public denial because judges are precluded from expressing public opinions on matters that might come before them. Maes' com-



TIMOTHY HURST, THE DENVER GAZETTE
**Colorado Supreme Court justices and Gateway High School students take their seats before hearing arguments in the County of Jefferson v. Beverly Stickle case during Courts in the Community on Oct. 26 at Gateway High School in Aurora.**

plaint remains under investigation.

Importantly, Boatright has grappled with the discipline commission the past few years over when a judge is required under the Code of Judicial Conduct to report the misconduct of others, which Boatright has said only applies to a judge's "actual" first-hand knowledge of any misconduct rather than through someone else, such as what occurred with Woods, no matter how credible they might be.

In an emailed statement to The Denver Gazette through a spokesman, Boatright said he could not comment about discipline matters or the issues involving Woods.

"As you know, matters pending before the Colorado Commission on Judicial Discipline are confidential

pursuant to the Colorado Constitution. As a result, I am unable to comment directly on the questions you've posed," the statement read. "That said, the Judicial Department fully cooperates with every investigation by the Commission."

He added that he has recused himself from every judicial disciplinary case brought to the Supreme Court whenever he had information gleaned while he has been chief judge.

### New complaint exposes prior knowledge

What had been kept quiet in 2019 was allowed to fester for four more years before another courthouse

**SEE DRINKING · PAGE 11**

## CASE

**FROM PAGE 9**

"After I committed publicly to ensuring all complaints are appropriately routed to the Commission on Judicial Discipline, I have recused on every disciplinary matter before the Supreme Court when I have learned information in my capacity as chief justice," he said in an email statement.

The independent investigations into the memo were not made public until June 2022 — a year after Betz had filed her complaint to SCAO.

In the months following Boatright's speech, the Supreme Court and the discipline commission tangled over several issues involving their investigation into

the memo scandal. As a result, Betz's complaint languished for two years.

Finally, in March 2023, Kiesnowski agreed to resign in July that year, but for reasons that would remain secret from the public.

Just before he was to retire, however, the discipline commission found Kiesnowski had helped a family member during an unrelated criminal investigation, another violation of the rules of judicial conduct that prohibit sitting judges from working as attorneys.

It was over that misconduct the commission in October 2023 publicly asked the Supreme Court to admonish Kiesnowski. But in doing so, the commission also revealed the details behind the earlier private sanction behind his resignation. Those details implied the earliest allegations of misconduct against Kiesnowski from 2016 had been covered up.

The discipline commission's recommendation also

revealed that the chief judge and court administrator in the 17th Judicial District where Kiesnowski worked were aware of his extramarital relationship but did not transfer his girlfriend as was required nor reported the infraction to the commission, according to a copy of the document obtained by The Denver Gazette at the time the document was made public.

The commission also revealed that the 17th district's court administrator had actually written SCAO officials in 2018 about the judge's personal relationship and raised concerns about suspected violations of judicial conduct rules and potential criminal misconduct. That letter, the commission said, was never forwarded to them.

Lastly, the commission noted in its public recommendation for discipline how Betz's complaint

**SEE CASE · PAGE 11**

**A10** | THE DENVER GAZETTE | SUNDAY, MARCH 3, 2024

 pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY

## DRINKING

### FROM PAGE 10

employee, fed up and indignant over Woods' conduct, reported him last summer.

But courthouse employees remained reticent to cooperate with any investigation, still fearful for their jobs, people familiar with their thinking said. That changed last December at a retirement reception for another district court judge, where Woods' conduct again came into question, sources said.

Notably, when the Supreme Court suspended Woods in December pending the discipline commission's investigation, Boatright did not participate in that decision, according to a copy of the court's order.

The court did not give a reason for Boatright's recusal and it is not required that he provide one.

Commission investigators soon learned of the courthouse manager who lost their job in 2019 and interviewed them in January, revealing the details of the three judges' knowledge about Woods' drinking and the alleged retaliation, people familiar with the inquiry said.

The Judicial Department's personnel rules take a hardline stance against retaliation, calling it a fireable offense. However, department insiders say there is a serious argument that those personnel rules don't specifically apply to judges.

The nature of the Woods inquiry has not been made public, but The Denver Gazette has learned the complaint surrounds only his use of alcohol and has nothing to do with the cases he presided over or any of the juveniles who appeared in his court. It's unclear if Woods was ever believed to be in court under the influence of alcohol.

Concerns over Woods' drinking started to become evident during an October 2018 awards dinner held in Denver by the Colorado Judicial Institute where several judges' performance was to be honored, sources told The Denver Gazette. A number of judges from across the state attended — it's unclear if Boatright or Ashby did — and commented about Woods' drinking, the sources said.

At the CJI event, judges and staff from Denver's juvenile courts, including Woods, sat at one table; judges and staff from Denver's district court sat nearby. Other judges sat with their staffs at other tables.



COLORADO JUDICIAL BRANCH
**4th Judicial District Judge David Prince**

At one point, someone had a discussion with Woods over his ability to drive home from the event, several people said.

Juvenile Court Judge Clark, who attended the event, had already been approached several times previously by at least one courthouse employee to discuss Woods' alcohol use, several people said.

Clark told The Denver Gazette that had she known about Woods' excessive drinking at any time, "I would have reported it, as I am required to do so."

Concerns about Woods drinking came to a head again in April 2019 during a Colorado mountain resort conference on juvenile justice, according to several people who attended that event.

It was there the manager and at least two other high-ranking Denver juvenile court employees approached Ashby and asked for her help about confronting Woods, several people said. Offering her support, Ashby told them she would also reach out to Boatright to inform him of their efforts.

Ashby later confirmed to the two employees that she had spoken to Boatright — he was referred to as

"Brian" in their communications — and that they had his approval and support, several sources confirmed.

Ashby told The Denver Gazette she only spoke to Boatright generally about the concerns regarding Woods' judicial performance, but not his drinking.

"If there were concerns about his drinking they were never concerns that it impacted his performance or (that he) was drinking on the job," Ashby said. "They were (employee) concerns he was not a good leader for the (juvenile) court. I didn't discuss alcohol (with Boatright), I discussed just the leadership."

Ashby said she couldn't recall if Boatright took any action about Woods following their conversation.

Within weeks, Woods placed the manager on administrative leave pending discipline, specifically noting it was because the manager had spoken to others about his alcohol use.

Clark is the interim presiding judge of Denver's juvenile court following Woods' resignation. Ashby was the presiding judge of that court until she was appointed to the Court of Appeals in 2013. She retired in May 2019.

Boatright was a member of the Supreme Court at the time of the mountain conference, but not its chief justice. He was previously a district court judge in Jefferson County who was noted for his expertise in juvenile and family law.

It's unclear whether any of the judges had spoken with Woods about his use of alcohol at the time.

### 'Actual' knowledge vs. second-hand

Boatright has tangled with the discipline commission over the requirement that a judge report alleged misconduct of a colleague. The sticking point was whether the judge has the information through firsthand knowledge or through a second-hand source.

The Code of Judicial Conduct is an array of rules judges are required to follow. They span a variety of topics that include conflicts of interest, personal conduct, and issues related to their work on the bench.

A key and often-discussed mandate (Rule 2.15) deals with a judge's obligation to report any misconduct, whether actual or alleged.

It says: "A judge, having knowledge that another judge has committed a violation of this code that raises a substantial question regarding the judge's honesty, trustworthiness or fitness as a judge in other respects shall inform the appropriate authority."

**SEE DRINKING · PAGE 13**

## CASE

### FROM PAGE 10

in 2021 took months to reach them, implying that Boatright would have known about it and, despite his promise to legislators for swift action, it languished nonetheless.

Boatright would not comment about any matters before the commission and said he has properly recused himself from any discipline cases brought to the Supreme Court when necessary.

State Court Administrator Steven Vasconcellos told The Denver Gazette the matter was actually shared with the commission on July 1, 2021, and the com-

mission's executive director at the time asked for the SCAO to gather additional information, which it did. The entire matter was then handed over in August, Vasconcellos said.

"Your understanding of the timing is incorrect," Vasconcellos wrote The Denver Gazette. "The Commission has not communicated any concerns to me about the timing of our referral in this matter."

Within days of the commission making its recommendation public, the Supreme Court ordered it to remove it from the commission's website and, more specifically, to delete from any resubmission it would make the four paragraphs that described the delay for Betz's complaint to make it to the discipline commission, as well as any reference that Kiesnowski's misconduct wasn't reported to the commission years earlier.

Boatright recused himself from participating in that Supreme Court order, records show.

The commission asked the court to reconsider its order to remove references to Kiesnowski's private discipline, arguing it was an unprecedented — and likely unconstitutional — censure of the commission's public recommendations for judicial discipline, records show.

The commission did not, however, ask the court to reconsider its order to remove its allegations of a cover-up, records show.

The court agreed and Kiesnowski's previous discipline remained on the record, according to the court's order. The cover-up and slow-walk allegations, which the court called "irrelevant" and "unproven assertions," however, remained deleted, records show.

Boatright did not participate in that decision, either.

pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER PressReader.com +1 604 278 4604 COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# COVER STORY



GETTY IMAGES

The Ralph L. Carr Colorado Judicial Center in downtown Denver houses the Colorado Supreme Court.

## DRINKING

**FROM PAGE 11**

That "appropriate authority" in Colorado is defined as the Commission on Judicial Discipline.

The rule goes on: "A judge who receives information indicating a substantial likelihood that another judge has committed a violation of this code shall take appropriate action."

What "appropriate action" actually means is not defined, but it extends to virtually any potential violation of the code of conduct. It's the commission's function to determine whether a violation actually occurred.

The rule was at the heart of a back-and-forth exchange between the discipline commission and Boatright as the alleged contract-for-silence scandal unfolded in 2021.

The commission repeatedly admonished the Supreme Court for not being forthcoming with information it said it needed to determine whether a deeper investigation into the scandal was necessary, The Denver Gazette has reported previously.

Despite Boatright's public assurances of transparency and cooperation with investigations into the misconduct allegations, the letters between him and the commission portrayed a broader showdown between two constitutionally created entities, each pressing for control of what it deemed to be its mandate.

Specifically at issue was the commission's charge to investigate any form of judicial misconduct, no matter whether the Judicial Department's personnel office in SCAO had already deemed it to be inconsequential, and the Supreme Court's view that judges need only report the misbehavior of another judge if they witnessed it firsthand.

Much of the commission's annoyance appeared rooted in concerns it was learning the details of the contract-memo scandal through press reports and not from the judiciary itself, The Denver Gazette reported.

Rather than answer the commission's questions about what it was reading in the newspaper, Boatright — and by extension the Judicial Department — appeared to delay, asking the commission for more specifics or that it provide a "better understanding" of what it wanted.

For its part, the commission said it merely needed the court to report what it knew.

Boatright wrote the commission in June 2021 — just a month after an Adams County court clerk, Emily Betz, filed her complaint about Judge Kiesnowski — that the panel seemed to misunderstand when a judge is required to report allegations of misconduct by another judge. The commission's 10-member board includes 4 judges who are appointed by the chief justice.

Judges need only report if they actually witness the conduct, Boatright wrote.

"I'm concerned that the duty of individual judicial officers to report known violations of the Colorado Code of Judicial Conduct (to the commission) ... has been misconstrued as encompassing the duty to report either unsubstantiated allegations of judicial misconduct leveled indirectly by a third-party long after the fact," Boatright wrote.

"We need to start with the same basic understanding ... because 'knowledge' ... is limited to 'actual knowledge,'" he wrote, adding that "I of course recognize and take very seriously" the obligation "to report known violations" to the commission and would "promptly comply" if he had "actual knowledge" of them.

The commission replied that Boatright was wrong.

"The Commission does not agree with the suggestion ... that your office and the department are relieved of disclosure and cooperation obligations if information is outside the 'actual knowledge' of an individual judicial officer," El Paso County District Judge David Prince, then the acting-chairman of the commission, wrote Boatright in July 2021. "The Commission renews its prior requests to you for disclosure and active cooperation in the Commission's fulfillment of its constitutional obligations."

Prince left the commission in July 2023 after six years when Boatright, as chief justice, did not reappoint him to a second term.

Two weeks after the commission learned of Boatright's knowledge in the Woods' matter last month, it removed Christopher Gregory as its executive director. He had been a vocal critic of the department's response to the scandal since it began when he was the commission's chairman.

David is an award-winning Senior Investigative Reporter at The Gazette and has worked in Colorado for more than two decades. He has been a journalist since 1982 and has also worked in New York, St. Louis, and Detroit.

David is an award-winning Senior Investigative Reporter at The Gazette and has worked in Colorado for more than two decades. He has been a journalist since 1982 and has also worked in New York, St. Louis, and Detroit.

SUNDAY, MARCH 3, 2024  |  THE DENVER GAZETTE  |  **A13**

pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# SUNDAY PERSPECTIVE

DENVERGAZETTE.COM

SUNDAY, MARCH 3, 2024

**GUEST COLUMNIST**



**DENNIS MAES**

The Watergate scandal clearly shows that covering up governmental wrongdoings is oftentimes more egregious than the scandal itself. A two-bit burglary eventually led to the disgraceful resignation of the most powerful person in the world, President Richard Nixon.

The Gazette news staff uncovered the now infamous pay-for-silence scandal that had its roots in the Colorado Supreme Court beginning in 2019. Then-Chief Justice Nathan Coats offered a $2.5 million contract to Mindy Masias, state court administrator chief of staff, at a time she was facing dismissal over financial irregularities. Masias allegedly threatened to go public concerning numerous allegations of judicial and official misconduct that had gone unreported if she were not awarded the contract. The contract was never consummated and Coats would subsequently become the first Colorado Supreme Court justice to be disciplined by the Colorado Commission on Judicial Discipline (CCJD).

That's when the dominoes began — and continue — to fall, resulting in numerous missteps by the present Supreme Court under the leadership of Chief Justice Brian Boatright. The missteps threaten the very safeguards which were enacted to convince the electorate to adopt the present merit selection system of Colorado judges also known as the Missouri Plan. One of the safeguards was the establishment of the CCJD.

The commission is comprised of 10 citizen members. Four of the members are judges appointed by the chief justice of the Colorado Supreme Court; two are lawyers who are appointed by the governor, and four citizens who are neither lawyers nor judges also appointed by the governor. It has the

**SEE CLOUDS · PAGE 2**



GETTY IMAGES

# CLOUDS over Colorado's highest court

---

## MORE INSIDE

The GOP's governing crisis: Chaos in the House is just the beginning. **B4**



## OUR TAKE

Wolves bite back at Polis' picks for members of wildlife commission. **B7**

## CALDARA

People in Colorado should be allowed to smoke if they want to. **B9**

SUNDAY, MARCH 3, 2024  |  THE DENVER GAZETTE  |  **B1**

pressreader
PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

The Denver Gazette

## PERSPECTIVE

# CLOUDS

**FROM PAGE 1**

responsibility to investigate allegations of judicial misconduct and suggest disciplinary action to the Colorado Supreme Court. The Colorado Constitution requires any allegation of judicial misconduct to be referred to the CCJD.

Throughout the investigation into the scandal, there have been numerous occasions when the Colorado Supreme Court has ignored the constitutional requirement and thereby compromised the integrity of the CCJD.

The CCJD vigorously and with a great deal of courage and integrity challenged the behavior of the Supreme Court during its investigation of the scandal, including testifying before a legislative body which was charged to look into potential judicial reform as a result of the Supreme Court's interference. In July 2023, the CCJD experienced a significant change in its membership and diligence in discharging its responsibilities.

Gov. Jared Polis and Chief Justice Boatright appointed six members to the commission, which now comprised the majority. Although Judge David Prince, a member of the commission and outspoken critic of the Supreme Court, was eligible for reappointment, Boatright refused to reappoint him and instead replaced him with a judge who had been critical of the CCJD.

I filed a Request for Evaluation of the current members of the Colorado Supreme Court who might have been on the bench at the time of the Masias contract and its aftermath. An RFE is the method for bringing allegations of judicial misconduct before the CCJD. The RFE was filed on Nov. 15, 2022. The CCJD confirmed receipt of my request on Nov. 28 of that year.

On or about Feb. 27, 2023, I gave permission to the CCJD to forward my RFE to the Colorado Supreme Court and disclose my identity. This action indicated my allegations were sufficient to be processed as a complaint under the rules.

The appropriate rule provides that written notice to the subject judge(s) shall be provided, "as soon as practicable after the members of the commission have concluded that the allegations are sufficient to be processed as a complaint."

Along the way, but prior to July 1, 2023, Jessica Yates, executive director of the Office of Attorney Regulation Counsel (OARC) chose to inform Judge Prince that previous testimony he had given "may have been in violation" of professional conduct that is expected to be followed by all attorneys. OARC is charged with ensuring that "Colorado providers of legal services are compe-



THE DENVER GAZETTE FILE

The Ralph L. Carr Colorado Judicial Center in downtown Denver is the home of the Colorado Supreme Court.

tent, diligent, communicative, honest and in compliance with the Colorado Rules of Professional Conduct." The OARC, incidentally, serves at the pleasure of the Colorado Supreme Court.

The CCJD retained David Kaplan, former Colorado public defender, to respond to the perceived threat by Yates and adamantly denied that any commission members would make false statements. Yates extended her accusations to include Christopher Gregory, the then-executive director of the CCJD "and all attorney/judge members of the commission in a potential violation ... if they assisted in the alleged violations." Kaplan described Yates' allegation as having a "terrible chilling effect" on anyone asked to testify before the legislature. Kaplan responded to Yates on or about June 29, 2023, just days before the massive commission membership turnover on the CCJD.

The CCJD lacked the diligence required in processing my RFE although, on numerous occasions, I inquired about the status of the investigation. It appeared the "as soon as practicable" requirement had somehow taken on a different meaning.

On this past Jan. 5, some 13 months after I filed the RFE, I demanded that action be taken on the RFE.

Executive Director Gregory advised me on Jan. 8 the RFE had been sent to Chief Justice Boatright on Dec. 14, 2023, and he was requested to respond to the allegations on or before Jan. 15, 2024. Boatright complied with the request.

On Jan. 19, four days after the

Boatright response, the CCJD announced that Gregory was placed "on leave and is unavailable to engage in Commission on Judicial Discipline business."

I have since been advised that all matters shall remain confidential unless and until the Commission files a recommendation with the Supreme Court.

Not to be lost in the litany of concerns caused by the failings of the Boatright court and its cronies is the circumstances surrounding Sen. Pete Lee of Colorado Springs, who chaired a 2022 interim special legislative committee looking into judicial reform as a result of the scandal. Lee resigned after he was faced with unfounded allegations of voter fraud in part because of records submitted by the OARC, as reported by The Gazette. Recall that the OARC is the entity that threatened the lawyer members of the CCJD, threatened to withhold funding from the CCJD and aided in the efforts to stall the work of the CCJD. Felony charges were dismissed against Lee shortly after he left the committee.

The thrust of this narrative is to expose the damage caused by the Colorado Supreme to the integrity and independence of the CCJD, which is charged with the responsibility to ensure the judicial branch of government is free from taint and committed to transparency.

The Colorado Supreme Court has failed to abide by its own set of rules and procedures by interfering with the process designed to address judicial misconduct by protecting its own when convenient, by allowing the OARC

to intimidate commission members without consequence, by sanctioning the transmission of unfounded allegations against a member of a separate branch of government, and by arguably retaliating against a judge member of the CCJD who had the courage to call the integrity of the behavior of the highest court into question by refusing to reappoint him to the commission.

It is for the reader to draw their own conclusions whether the delay involved in handling the RFE was a result of the Yates reprimand of the lawyer commissioners or the influx of a majority of new commissioners who may or may not have had questions about moving forward with the RFE after determining it merited a response from Chief Justice Boatright.

It is for the reader to draw their own conclusion as to what prompted the CCJD to relieve Executive Director Gregory of his duties within days after Boatright filed his response.

Suffice to say, the scandal exposed the tremendous influence the Supreme Court exerts over the CCJD to the extent the court can dictate their desired results.

The only way to avoid the mess that has ensued since the uncovering of the pay-for-silence scandal is to remove the Colorado Supreme Court from any involvement with the Colorado Commission on Judicial Discipline.

*Dennis Maes served 24 years as a 10th Judicial District judge in Pueblo and was chief judge for 17 of those years. He previously served as director of Pueblo County Legal Services Inc., as a public defender and as an attorney in private practice.*



pressreader  PRINTED AND DISTRIBUTED BY PRESSREADER PressReader.com +1 604 278 4604 COPYRIGHT AND PROTECTED BY APPLICABLE LAW

2023 WL 5006248

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Colorado, Special Tribunal.

In the Matter of Complainant: The People of the State of Colorado, and
Respondent: Nathan B. Coats, a Former Chief Justice of the Colorado Supreme Court.

Supreme Court Case No. 23SA114
|
August 7, 2023

*Original Proceeding in Discipline*

Colorado Commission on Judicial Discipline Case No. 21-118

**Attorneys and Law Firms**

Appearing for the Colorado Commission on Judicial Discipline: Christopher Gregory, Executive Director, Denver, Colorado

Attorneys for Respondent: Burns, Figa & Will, PC, John S. Gleason, Alec Rothrock, Greenwood Village, Colorado

Attorneys for Complainant: Rathod Mohamedbhai, LLC, Qusair Mohamedbhai, Omeed Azmoudeh, Denver, Colorado

en banc

**Order re: Recommendation of the Colorado Commission on Judicial Discipline and Public Censure**

PER CURIAM

**\*1** ¶ 1 Former Chief Justice Nathan B. Coats, you appear before the Special Tribunal of the Colorado Supreme Court ("the Special Tribunal") for imposition of discipline based on violations of the duties of your office as a Justice of the Colorado Supreme Court. The Special Tribunal was convened because the Supreme Court was required to recuse itself in this matter under Rule 41(b) of the Colorado Rules of Judicial Discipline ("RJD").

¶ 2 The Colorado Commission on Judicial Discipline ("the Commission") recommends approval of the Amended Stipulation for Public Censure ("the Amended Stipulation"), which you and the Commission executed pursuant to RJD 37(e).

¶ 3 Consistent with the Amended Stipulation, the Commission recommends that the Special Tribunal issue a public censure. The Special Tribunal adopts this recommendation.

**I. Stipulated Facts**

¶ 4 In the Amended Stipulation, you and the Commission agreed to the following facts:

1. In 2000, Justice Coats was appointed to the Colorado Supreme Court, where he served as an Associate Justice until he became the

Case No. 1:25-cv-03361-KHV-GEB    Document 1-11    filed 10/23/25    USDC Colorado
pg 43 of 51
In the Matter of Complainant: The People of the State Of..., --- P.3d ---- (2023)
2023 CO 44

Chief Justice on June 30, 2018. As provided by the Colorado Constitution, "the supreme court select(s) a chief justice from its own membership to serve at the pleasure of a majority of the court, who shall be the executive head of the judicial system." Colo. Const. Art. VI, sec. 5(2).

2. Also by constitutional mandate, the Supreme Court appoints a State Court Administrator, Colo. Const. Art. VI, sec. 5(3), who by statute is responsible to the supreme court and who, in addition to the other duties dictated by the legislature, is directed to perform the duties assigned to him by the chief justice and the supreme court. Sec. 13-3-101(1), C.R.S. The State Court Administrator is also directed by statute to employ such other personnel as the Supreme Court deems necessary to aid the administration of the courts. Sec. 13-3-101(2), C. R. S.

3. In or around August of 2018, Justice Coats was briefed by Christopher T. Ryan, the State Court Administrator, of allegations that Mindy Masias, the Chief of Staff and second in command of the State Court Administrator's Office ("SCAO"), who had narrowly failed in her bid to be appointed State Court Administrator in the previous year, had falsified the date of an invoice in connection with a request for reimbursement for two chairs purchased for the Judicial Department rather than simply refiling her request on forms for the next fiscal year, as ordered by the SCAO Controller. Justice Coats also learned there was no apparent financial gain in Masias's decision to falsify the date of the invoice, given that she would have been entitled to the reimbursement with or without falsification.

4. Around the same time, Justice Coats, Ryan, and Andrew J. Rottman, Counsel to the Chief Justice, determined that if the allegations were true, appropriate discipline could depend upon whether this was an isolated incident of dishonesty or part of a pattern of misconduct. To that end, they decided that an independent employment investigator should be retained to determine whether Masias had actually falsified the date of the invoice, and that Masias's past requests for reimbursement should be audited to determine whether this was an isolated case of dishonesty or part of a pattern of misconduct.

*2 5. David Powell of the law firm of Ogletree Deakins was retained to conduct the independent investigation regarding the falsified invoice and ultimately concluded that, in the absence of direct evidence, he could not find that Masias altered the invoice in question. At the same time, however, he could not find any evidence to support her account of initially returning the items and therefore having received multiple invoices. Notwithstanding Powell's findings, Justice Coats personally concluded that it appeared likely that Masias had in fact falsified the invoice and then continued lying to Powell and SCAO officials to avoid admitting her earlier dishonesty.

6. Tracey Griffith, a member of the SCAO's internal audit staff, produced a memorandum summarizing a broader audit of select requests for reimbursement by Masias, which identified a number of irregularities

Case No. 1:25-cv-03361-KHV-GEB    Document 1-11    filed 10/23/25    USDC Colorado
pg 44 of 51
In the Matter of Complainant: The People of the State Of..., --- P.3d ---- (2023)
2023 CO 44

in Masias's past requests for reimbursement. When expressly queried by Justice Coats, Ryan represented to him and Rottman that the audit had revealed nothing beyond minor errors. Justice Coats asserts that he only learned of the existence of the Griffith memo much later, well after Ryan had resigned.

7. However, on October 5, 2018, Ryan forwarded Justice Coats an email describing the significant negative impact of Masias's conduct on the financial controls of the Judicial Department. The email referenced Griffith's memo as evidence. Justice Coats made no further inquiry into the email or Griffith's memo, an inquiry which may have resulted in his or Rottman's review of additional findings regarding Masias. Indeed, when shown the email much later, Justice Coats acknowledged receiving it but recalled nothing of its contents. Justice Coats stated that had he seen Griffith's memo earlier, he likely would have decided that Masias would be unfit to work for the Judicial Department in any capacity.

8. Justice Coats recalls that, weighing in favor of Masias's fitness to continue work for the Judicial Department, Ryan made clear that Masias was very important to his ability to function as State Court Administrator, in large part because of her experience and long-standing relationships with the chief judges and leadership teams throughout the state. According to Justice Coats, although not typical of personnel matters, considering Masias's high rank in the SCAO, various disciplinary remedies were discussed with Justice Coats, who kept the full Supreme Court apprised of the investigation and options under consideration.

9. During this same period, the SCAO was undergoing the Annual Financial and Compliance Audit conducted by the Office of the State Auditor ("OSA"). While discussions continued concerning appropriate discipline for Masias, Ryan reported to Justice Coats that the Financial Services Division would refuse to sign off on the audit unless Masias's employment was terminated. Ryan also discussed with Justice Coats the enmity between members of the Financial Services Division and Masias. Representing that Masias's continued employment with the SCAO would therefore place him in an untenable position, Ryan nevertheless suggested that Masias could still serve an important role with the Judicial Department as an independent contractor serving in a teaching and coordinating capacity. In response, and after consultation with the full Supreme Court, Justice Coats indicated that if no misconduct by Masias beyond the falsification of the invoice came to light, the Court would consider such a role — Justice Coats understood that if other misconduct by Masias did come to light, the Supreme Court had the authority to foreclose consideration of Masias for any such contract. If the Supreme Court objected to any such contract, and Ryan disregarded the Supreme Court's direction, the Supreme Court would be constitutionally empowered to remove Ryan from office.

**\*3** 10. On November 7, 2018, with Justice Coats's knowledge and approval, Ryan therefore presented Masias with a Notice of Disciplinary Decision. The Notice described Masias's falsification of

records and subsequent dishonesty as having "created a lack of trust" and as having jeopardized "Judicial's financial records and systems" during the OSA Annual Audit. The Notice gave Masias an ultimatum to resign by November 15, 2018 or be terminated. Rather than choose either course of action, Masias requested and was granted leave by Ryan under the Family Medical Leave Act for a period of 12 weeks, and later extended through March of 2019.

11. As part of the OSA's Annual Audit, Justice Coats signed off on a management representation letter dated December 7, 2018, attesting to the Judicial Department's financial controls. Justice Coats did not require that this compliance letter be amended, or take any other action, to indicate to the OSA that the Judicial Department might consider a post-resignation contract with Masias.

12. On December 14, 2018, at an unscheduled meeting with Justice Coats attended by Rottman, Ryan, and Eric Brown, the Director of Human Resources for SCAO, Brown indicated that Masias felt her termination was unfair and that she could raise prior incidents of misconduct or discrimination by judges and staff resulting in lesser or no punishment, which could put the Judicial Department in an unfavorable light. Justice Coats recalled that, after reciting three or four such allegations, which Justice Coats asserts he discounted as obviously false or inconsequential, Brown asked whether Justice Coats wanted to hear any more. Justice Coats also recalled that when Ryan failed to respond to Justice Coats's inquiry whether there was any reason

for him to hear more, Justice Coats simply told Brown he did not need to hear more because such information would not affect his evaluation of Masias. In conjunction with Masias's apparent complaint regarding unfair treatment and her medical issues, Justice Coats recalls directing that Masias be reassured that "nobody's trying to hurt [Masias]." Others recall these events differently. Justice Coats asserts that he was not aware of the notes Brown was using at the meeting, what the press later called the "Brown Memo," which referenced other allegations of discrimination or undisciplined misconduct spanning more than 20 years. Justice Coats further asserts that he and the rest of the [Supreme] Court did not learn of the Brown Memo until much later, after Ryan's departure from the SCAO.

13. At that meeting, Brown subsequently raised the question whether a training contract with Masias might still be a possibility. Justice Coats again agreed that he and the Supreme Court would consider approving such a contract, so long as no additional misconduct by Masias came to light.

14. Following that meeting, Justice Coats states that he was concerned that Brown might proceed with Masias on his own regarding a post-resignation contract. As a result, Justice Coats left Rottman a voice message, which was saved, instructing him to emphasize to Brown that he could make no representations to Masias, and Justice Coats recalls having similarly emphasized to Ryan in a phone call that any future contract with Masias could be entered into, if at all, only after she had resigned and

only if the contract could be executed in strict compliance with all applicable statutes, rules, and departmental policies.

15. Justice Coats agreed to a recommendation from SCAO staff that any contract to replace the fast-expiring existing leadership training contract should be put out for bid via a Request for Proposal ("RFP"). Justice Coats reports that as Chief Justice, he had no role in the RFP and only later was informed by Ryan that it had produced no bids and therefore a sole source determination for a contract to Masias was permissible. Several investigations have uncovered improprieties underlying this RFP which are beyond the scope of this [Amended] Stipulation.

 *4  16. On March 1, 2019, prior to Masias's resignation, Justice Coats was made aware that the hard drive on a M[ac] laptop, for which Masias had received authorization to conduct office business, had been corrupted such that no information on it was recoverable. Although it was explained to him that this could result from various causes, and Justice Coats ordered further analysis, the actual cause remains unexplained. Justice Coats believed it possible that Masias, or someone acting on her behalf, intentionally wiped the laptop to destroy evidence of misconduct—but this belief did not cause Justice Coats to reconsider contracting with Masias.

17. Throughout March of 2019, the SCAO legal staff negotiated Masias's separation agreement with Masias's attorney. Justice Coats asserts that as Chief Justice he was not involved in these negotiations, did not

see the executed separation agreement until after Ryan's resignation, was not aware that Masias's attorney had unsuccessfully sought the promise of a training contract as part of that agreement, and was not aware that Masias's attorney had *successfully* sought the promise of a post-resignation meeting with Justice Coats regarding the training contract as part of those negotiations. Masias's resignation became effective March 19, 2019. Had Justice Coats personally reviewed the executed separation agreement, he likely would have learned of Masias's surreptitious recording of former Chief Justice Nancy Rice, information which would have (and eventually did) cause him and the full Supreme Court to determine that a contract with Masias was inappropriate.

18. On March 21, 2019, Justice Coats met with Masias, Ryan, and Rottman in his chambers for discussion of Justice Coats's vision of the kind of training he considered necessary for the different job categories in the Judicial Department and a briefing on what kind of training Masias was prepared to provide. After this meeting, Justice Coats understood that the State Court Administrator, acting on behalf of the Judicial Department, would negotiate a contract with Masias.

19. On April 15, 2019, a month after signing her separation agreement, Masias emailed the entire Judicial Department that she was resigning as Chief of Staff due to a very serious health condition. On the same day, Justice Coats and the rest of the Supreme Court received an anonymous letter alleging all manner of misconduct by Masias, as well as Ryan, Brown, and

David Kribs, Chief Financial Officer of the SCAO. Justice Coats and the Supreme Court had particular concerns about one allegation regarding a separation agreement with an SCAO employee, which included a lengthy period of administrative leave with pay, as to which Justice Coats asserts neither he nor anyone else on the Supreme Court had been made aware. This employee had been accused of conducting improper surveillance of personnel in the Carr Center, including Masias and Brown. Specifically, the letter stated: "[This employee] disappeared one day because she was watching Mindy Masias and Eric Brown. She has been paid for months to not disclose what she had."

20. After discussing this letter with the Supreme Court, Justice Coats therefore convened a meeting with Rottman, Ryan, Brown, as well as Terri Morrison and Beth Robinson, two members of the SCAO legal staff. Justice Coats learned that Masias had structured and negotiated the separation agreement with the employee, which was then approved by Ryan. The separation agreement included a non-disclosure provision. Justice Coats considered the agreement outrageous, said it was one of the "stupidest" things he had ever heard of, and was outraged that the Supreme Court had not been informed. Justice Coats demanded that in the future he be informed of all but the most mundane personnel actions. Justice Coats recalls that shortly after convening the meeting with SCAO staff, there were additional concerns about the allegation when Attorney General Phil Weiser called Justice Coats to say that the Controller was raising a similar allegation among employees in his office,

that the allegation appeared very serious, and that the allegation warranted special attention. In response to direct questioning, however, Justice Coats recalls Ryan assuring him that the separation agreement may have been an overly cautious attempt to prevent a lawsuit but was not improper in any way. Justice Coats also recalls Morrison advising him that the separation agreement itself did not violate any applicable laws. Justice Coats therefore did not consider these anonymous allegations sufficient to foreclose consideration of Masias for the post-resignation contract.

**\*5** 21. On May 16, 2018, Justice Coats received a written notice from the OSA triggered by the April 15 anonymous letter. The OSA's notice advised Justice Coats that it had received the anonymous letter and, by statute, all tips concerning employment fraud require formal investigation, which could be conducted either by the OSA or the State Court Administrator. By letter dated May 29, 2019, Justice Coats advised the OSA that he and the Supreme Court had received the anonymous letter, looked into the allegations, and consulted with the Attorney General. Justice Coats requested that the OSA conduct the formal investigation.

22. Even though there existed allegations of serious misconduct by Masias, the veracity of which were subject to a barely begun formal OSA investigation, neither Justice Coats nor the Supreme Court ordered a halt to the consideration of Masias for a contract. Relatedly, when responding to the OSA inquiry whether it or the SCAO should conduct the investigation, Justice Coats did not mention that the Judicial Department was

also close to finalizing a post-resignation contract with Masias.

23. Undisputed evidence reveals that Ryan, on behalf of the Judicial Department, entered into a contract with Masias on April 11, 2019, before the Judicial Department received the anonymous letter. Justice Coats asserts he had no knowledge of Ryan's execution of the contract in April. However, on June 3, 2019, with Justice Coats's and the Supreme Court's knowledge, Ryan publicly signed the same training contract on behalf of the Judicial Department with Masias. The contract contemplated a five-year arrangement with the Judicial Department paying Masias between $2,660,000 and $2,750,000 with an allowance for Masias to seek additional reimbursement for pre-approved travel and other expenses. Because the contract, however, provided duties for only a single year, Justice Coats was assured by the SCAO legal staff, in writing, that the contract committed the Judicial Department to pay for Masias's services for no more than that single year and was therefore a one-year contract.

24. On July 15, 2019, Justice Coats personally learned for the first time that Masias had surreptitiously recorded a conversation with former Chief Justice Rice concerning the reasons she had not been chosen to be the State Court Administrator. In March 2019, Justice Coats was aware that Masias had signed a separation agreement with the Judicial Department. Had Justice Coats exercised due diligence by obtaining and reviewing the final separation agreement, he could have learned of the recording earlier, prior to

the execution of the contract with Masias. After Justice Coats discussed the matter with the Supreme Court in July 2019, consensus was reached that a contract to teach judges could not be fulfilled by someone known to surreptitiously record them and that the Court no longer had confidence in Ryan. It was therefore agreed that the Judicial Department should withdraw from the contract and that Ryan should resign, both of which occurred in subsequent days.

## II. Stipulated Admissions
## to Judicial Misconduct

¶ 5 Former Chief Justice Coats failed to "perform judicial and administrative duties competently and diligently," as required by Canon Rule 2.5(A) of the Colorado Code of Judicial Conduct. By allowing the Judicial Department to contract with the former Chief of Staff after she had resigned in lieu of termination from the SCAO, former Chief Justice Coats undermined the public's confidence in the integrity of the judiciary and failed to exercise diligence in the performance of his administrative duties.

*6 ¶ 6 That is, former Chief Justice Coats allowed the potentially multimillion-dollar contract to be awarded to an employee the Judicial Department had earlier been willing to terminate for falsifying an invoice, despite having set a standard that the contract would not go forward if additional causes for concern arose and having subsequently learned of strong circumstantial evidence of misconduct on Masias's part that demonstrated dishonesty while she was still employed with the SCAO.

Case No. 1:25-cv-03361-KHV-GEB    Document 1-11    filed 10/23/25    USDC Colorado
pg 49 of 51
In the Matter of Complainant: The People of the State Of..., --- P.3d ---- (2023)
2023 CO 44

That circumstantial evidence included the meeting about Masias's "knowing some bad stuff" about the Judicial Department, Masias's corrupted laptop, and Masias's role in the surveillance-related separation agreement that Justice Coats considered outrageous and by which Masias was alleged to have used state funds to silence a witness to her own conduct. Particularly concerning is that former Chief Justice Coats was separately contacted by the Attorney General and the State Auditor to advise him of the need to investigate the April 15 letter's allegations, which included Masias, but he did not notify the Attorney General or the OSA about the contemplated contract with a subject of the allegations. Nor did he await the results of the OSA's formal investigation before approving the post-resignation contract with the person being investigated. Although former Chief Justice Coats authorized withdrawal from the contract immediately upon his learning of Masias's surreptitious recording of former Chief Justice Rice, compliance with the Colorado Code of Judicial Conduct required that former Chief Justice Coats prevent the Judicial Department from entering the contract prior to its public execution in June 2019.

¶ 7 By way of mitigation, the Commission acknowledged that former Chief Justice Coats made many of these decisions with, or based on the representations and recommendations of, the State Court Administrator, fellow judicial officers, non-lawyer professionals, and lawyers.

## III. Stipulated Resolution of Formal Proceedings

¶ 8 RJD 37(e), titled "Stipulated Resolution of Formal Proceedings," allows the Commission to file a "stipulated resolution" as a recommendation to the Special Tribunal in a disciplinary proceeding. In filing such a stipulation, the Commission has authority to recommend, among other possible sanctions, that the Special Tribunal "censure the [Justice] publicly ... by written order." RJD 36(e); *accord* Colo. Const. art. VI, § 23(3)(e).

¶ 9 Under RJD 40, after considering the evidence and the law, the Special Tribunal is required to issue a decision concerning the Commission's recommendations. If the Commission recommends adoption of a stipulated resolution, "the [Special Tribunal] shall order it to become effective and issue any sanction provided in the stipulated resolution, unless the [Special Tribunal] determines that its terms do not comply with Rule 37(e) or are not supported by the record of proceedings." RJD 40.

¶ 10 By the Amended Stipulation, former Chief Justice Coats waived his right to a hearing in formal proceedings and review by the Special Tribunal and agreed with the Commission's recommendations that he be publicly censured. (Pursuant to RJD 6.5(a) and RJD 37(e), the Amended Stipulation, the Commission's recommendations, and the record of proceedings became public when the Commission filed its recommendations with the Special Tribunal.)

Case No. 1:25-cv-03361-KHV-GEB    Document 1-11    filed 10/23/25    USDC Colorado
pg 50 of 51
In the Matter of Complainant: The People of the State of..., --- P.3d ---- (2023)
2023 CO 44

¶ 11 The Commission noted that it often seeks an award of fees and costs in disciplinary matters. The Commission also noted that the expenses of this investigation were unusually high due to obstacles it encountered. But the Commission found that former Chief Justice Coats was cooperative in the investigation, and it did not attribute the obstacles to him. In light of his cooperation, the Commission does not seek fees or costs in this case.

¶ 12 Upon consideration of the law, the evidence, the record of proceedings, the Amended Stipulation, and the Commission's recommendations, and being sufficiently advised in the premises, the Special Tribunal concludes that the terms of the Amended Stipulation comply with RJD 37(e) and are supported by the record of proceedings. Therefore, the Special Tribunal orders the Amended Stipulation to become effective and issues the agreed-upon sanction.

¶ 13 The Special Tribunal hereby publicly censures you, former Chief Justice Nathan B. Coats, for violating Colorado Code of Judicial Conduct Canon Rule 2.5(A).

The Special Tribunal:

Hon. David M. Furman

Hon. Anthony J. Navarro

Hon. Elizabeth L. Harris

Hon. Rebecca R. Freyre

Hon. Craig R. Welling

Hon. Jaclyn C. Brown

Hon. Christina F. Gomez

CHIEF JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE HOOD, JUSTICE GABRIEL, JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER did not participate.

**All Citations**

--- P.3d ----, 2023 WL 5006248, 2023 CO 44

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

## Christopher Gregory

| | |
|---|---|
| **From:** | Cindy Dennis <cdennis@innsofcourt.org> |
| **Sent:** | Friday, May 24, 2024 9:45 PM |
| **To:** | Cindy Dennis |
| **Subject:** | American Inns of Court Professionalism Award in the Tenth Circuit |

The American Inns of Court Professionalism Award in the Tenth Circuit will be presented to the Honorable Richard L. Gabriel, Supreme Court of Colorado justice, at the 2024 Tenth Circuit Judicial Conference.

Thank you for participating in the nomination of one or more outstanding candidates for the American Inns of Court Professionalism Award in the Tenth Circuit.

The selection committee was deeply impressed with the professionalism and commitment to mentoring demonstrated by each of the nominees.

### Members of the American Inns of Court Awards Committee

Hon. Carl E. Stewart, Chair – U.S. Court of Appeals for the Fifth Circuit
Hon. Deanell Reece Tacha, Vice Chair – Former Chief Judge, U.S. Court of Appeals for the Tenth Circuit and
    Former Dean, Pepperdine University School of Law
Kim J. Askew, Esq. – DLA Piper LLP
Hon. Consuelo M. Callahan – U.S. Court of Appeals for the Ninth Circuit
Hon. Denny Chin – U.S. Court of Appeals for the Second Circuit
Hon. Kent A. Jordan – U.S. Court of Appeals for the Third Circuit
Hon. William C. Koch, Jr. – Former Justice, Tennessee Supreme Court and Dean, Nashville School of Law
Hon. Cheryl A. Krause – U.S. Court of Appeals for the Third Circuit
Thomas C. Leighton – Thomson Reuters Legal
Hon. Mary M. Schroeder – U.S. Court of Appeals for the Ninth Circuit
Hon. Collins J. Seitz, Jr. – Chief Justice, Delaware Supreme Court

### Cindy Dennis
*Awards & Scholarships Coordinator*
### American Inns of Court
225 Reinekers Ln, Suite 770 | Alexandria, VA 22314

Direct: 571-319-4703 | Main: 703-684-3590 ext. 104
*Ask me about the Randy J. Holland Pegasus Scholarship Endowment.*