COUNTY COURT,
CITY AND COUNTY OF DENVER, COLORADO
SECOND JUDICIAL DISTRICT ATTORNEY'S OFFICE

AFFIDAVIT FOR ARREST WARRANT

Investigator R. Boatright, being duly sworn upon oath says:

That the foregoing offense(s) alleged was committed of this affiant's own personal knowledge, and the facts stated therein are true.

Investigator R. Boatright, Your Affiant, is a commissioned police officer in the State of Colorado and has served in that capacity for approximately 25 years. At the present time, Your Affiant is employed as an investigator for the First Judicial District Attorney's Office and has worked in that capacity for approximately 2 years. Prior to becoming employed with the First Judicial District Attorney's Office, Your Affiant retired from the Arvada Colorado Police Department, after serving that agency for 23 years. While serving for the Arvada Police Department, Your Affiant was assigned as either an investigator or detective for approximately 21 of those years. In the capacity of an investigator or detective, Your Affiant worked a variety of assignments to include: undercover narcotics, property (burglary/theft), juvenile crime (all levels), crimes against children (CAC Unit), domestic violence and person's crimes (homicide, suicide, accidental death, sexual assault, aggravated assaults and robbery). Your Affiant was assigned on a regular basis to oversee and train new detectives assigned to the Criminal Investigations Bureau with the Arvada Police Department. Your affiant has received in excess of a thousand hours of training related to specific and general aspects of law enforcement. During Your Affiant's law enforcement career, the concentration of his investigative duties has been in the area of person's crimes, interview and interrogation, as well as sexual assault. Since approximately 1994, Your Affiant has been a certified polygraph examiner, maintaining full membership in two national organizations identified as the American Polygraph Association (APA) and the American Association of Police Polygraphists (AAPP). Your affiant is a member of the Jefferson County Critical Incident Response Team, which is composed of various investigators from law enforcement agencies (in Jefferson County), and are utilized in the investigation of incidents involving the use of deadly force by officers of Jefferson County. Over Your Affiant's law enforcement career he has also been called upon by various outside agencies to assist in major investigations, such a "Columbine", where he was assigned as the lead detective ("Team Leader / Library Team") responsible for investigating the ten murders which took place in the library. In addition, Your Affiant still provides instruction to law enforcement personnel (and others) on various subjects when requested.

On February 23, 2007, at the request of Mitchell Morrissey, District Attorney, in and for the Second Judicial District, State of Colorado, it was requested that the First Judicial District Attorney, State of Colorado, be appointed as Special Prosecutor for the Second Judicial District in the matter of "THE PEOPLE OF THE STATE OF COLORADO, IN RE: the investigation of



PLAINTIFF'S EXHIBIT 1

Lawrence Manzanares involving the possible violation of the Colorado Revised Statues 18-4-401 Theft (F-4), 18-8-407 Embezzlement of Public Property (F-5) or any other criminal law concerning the reported theft of a Gateway tablet laptop computer, laptop case and power supply taken in January 2007 from the Denver City and County Building" located at 1437 Bannock St., City of Denver, State of Colorado. On that same date (2/23/07), Denver District Court Judge William Robbins signed the order appointing the office of the District Attorney of the First Judicial District as the Special Prosecutor in the above mentioned case.

Your affiant requests that an arrest warrant be issued for Lawrence Anthony Manzanares (DOB: 12/29/56), based on the following related incident(s) alleged to have occurred in the City and County of Denver, state of Colorado, along with the residence of Lawrence Manzanares located at 2201 S Adams St., Denver Colorado. Through the review of official Denver Police Department reports (includes a search warrant affidavit), interviews of detectives and witnesses involved, along with additional follow up investigation, Your Affiant gleaned the following information.

On February 23, 2007, at approximately 2:30 P.M., Your Affiant was requested to meet with Senior Chief Deputy District Attorney Mark Pautler and Chief Deputy District Attorney Robert Weiner. During the meeting, Mark Pautler informed Your Affiant that on February 22, 2007, he was approached by Charles Lepley, First Assistant District Attorney for the Second Judicial District. Mark Pautler indicated during his communication with Charles Lepley, the issue of appointing a Special Prosecutor was discussed. Mark Pautler briefly explained that the Second Judicial District had a conflict related to an investigation involving a stolen laptop computer. Mark Pautler told Your Affiant that the suspect in the case was the present "City Attorney" for the City and County of Denver. The suspect was further identified as "Larry Manzanares" (AKA Lawrence Manzanares). According to Mark Pautler, the official court order appointing the First Judicial District Attorney as the Special Prosecutor was in the process of being sent to this office.

Mark Pautler further indicated that Lawrence Manzanares was a former Denver District Court Judge who recently left that position to become the City Attorney for the City and County of Denver. Mark Pautler subsequently supplied Your Affiant with a Denver Police Department

report, identified by case number as 7-5002031. In addition to the police report, a packet of information was also received which contained, an affidavit in support of a search warrant, the actual search warrant and return of inventory, along with documentation related to the Denver District Attorney's Office (referring to the office of the Second Judicial District).

Upon review of the documentation supplied above, Your Affiant obtained the following information. Your Affiant initially reviewed the "Denver Police Department General Incident Report", identified by case report number as 7-5002031. The report further reflected that the information was "completed by victims". The individual actually making the report is identified as Kelly Chastain, computer technician currently employed by the State Court Administrator's Office (assigned to the Second Judicial District). The actual victim listed on the report is the "State Court Administrator Office" located at 1301 Pennsylvania, Suite 300, City and County of Denver, state of Colorado.

The incident report identifies the offense as a "theft" which reportedly occurred at 1437 Bannock Street, room 39, City and County of Denver, state of Colorado (referring to the Denver City and County Building). The date and time of offense is listed as "on or between" January 2, 2007 at 2:00 P.M. to January 26, 2007 at 12:00 P.M. The date and time the report was completed is identified as January 26, 2007 at 2:45 P.M.

The stolen property is listed as one "Gateway M280 tablet laptop", (computer serial number 0036701989). The value of the laptop computer was listed at $1,579. In addition, one laptop case, along with one Gateway M280 power supply was also listed as stolen. Both the aforementioned items were listed as having a value of $100 each. The total value of the stolen property was listed as $1,779.

In the narrative of the incident report, Kelly Chastain described going to a "locked storage room inside room 39 at 1437 Bannock" on January 26, 2007, for the purpose of locating the computer described above to install it. Your Affiant learned that the computer was scheduled to be reissued to Magistrate Messer. Magistrate Messer was originally issued the computer in June of 2006 (reportedly delivered to the Magistrate on June 26, 2006) and was subsequently secured

from his chambers when he took an extended medical leave in July of 2006 (reportedly collected on June 30, 2006). The report narrative clarifies that Kelly Chastain was unable to locate the laptop computer requested. Kelly Chastain documented that "all areas" to include "other staff" were checked with negative results. Kelly Chastain noted in his documentation that "tracking software" had been installed on the computer and that same software disclosed that the computer had been used on the internet on "1-25-06". Your Affiant determined that the date indicated by Kelly Chastain in the report is in error as it relates to the year. The date should reflect that the computer was being used on the internet as of January 25, 2007.

Your Affiant next reviewed Denver Police Department supplemental report case number 7-5002031, prepared by Detective Robert Lawrence, badge number 98013. Detective Lawrence's report began by summarizing the Denver Police Department's general incident report completed by Kelly Chastain. Detective Lawrence went on to indicate that on January 31, 2007 he was assigned this case for follow-up investigation. Detective Lawrence indicated he initially contacted Kelly Chastain verifying the information supplied in the incident report. Detective Lawrence further confirmed that Kelly Chastain last reported seeing the missing computer on January 2, 2007. Detective Lawrence further verified with Kelly Chastain that only two people had keys to the locked storage area and no signs of forced entry had been observed. Based on Detective Lawrence's report, Your Affiant concluded that Kelly Chastain was indicating that the stolen computer had been taken from the locked storage area.

Detective Lawrence went on to confirm with Kelly Chastain, the storage area is normally locked, however, there may have been brief periods where the room was left unsecured. Detective Lawrence noted that the storage area where the computer was kept was located inside "room 39", which could be accessible to the general public. Detective Lawrence noted that room 39 was located next to the records section within the Denver City and County Building. Kelly Chastain was unable to supply Detective Lawrence with any other information concerning how the computer was actually taken. Detective Lawrence was made aware that Kelly Chastain's supervisor, Tony Petruccelli had communications with "Computrace" (later identified as the Absolute Software Corporation) and was able to determine that the computer had been used on the internet on January 25, 2007.

Detective Lawrence subsequently contacted Tony Petruccelli and learned that the forenamed had been in contact with another Denver Detective, Detective Tom Brennan. Detective Lawrence's report indicated that Detective Brennan was assigned to the Denver Police Department's Computer Crimes unit. Detective Lawrence then made contact with Detective Brennan who verified that he had also been in contact with "Computrace" and subsequently received a "Comcast IP address", which would eventually identify the location where the computer had been while on the internet. Detective Lawrence indicated that Detective Brennan was preparing a search warrant to obtain the subscriber information from Comcast, which would then confirm the specific address where the computer had been used.

Detective Lawrence next reported that on February 15, 2007, he was contacted by Detective Brennan and advised that the subscriber information came back to "Lawrence Manzanares" (address later determined to be 2201 South Adams Street, Denver, state of Colorado 80210, telephone number 303-782-4809). Detective Brennan further informed Detective Lawrence that it was his (Detective Brennan's) understanding that Lawrence Manzanares was a "District Court Judge in Denver".

With follow-up investigation, Detective Lawrence was then able to contact Miles Flesche (District Court Administrator for the Second Judicial District). Miles Flesche subsequently informed Detective Lawrence that Lawrence Manzanares was presently the "City Attorney for the City and County of Denver". Detective Lawrence, Denver Detective Buschy (badge number 98010), along with Miles Flesche then met with Lawrence Manzanares in the City Attorney's office. Based on Detective Lawrence's report, Your Affiant concluded that contact occurred on February 15, 2007, shortly before 9:00 A.M. Your Affiant was able to determine that the subscriber information identifying the location of the stolen computer was received by Detective Brennan on February 14, 2007, pursuant to the search warrant.

Detective Lawrence related that upon meeting with Lawrence Manzanares, he then explained that a search warrant had been obtained identifying that the stolen computer had been used from his residence. According to Detective Lawrence's report, Lawrence Manzanares denied having a

computer belonging to the State of Colorado. Lawrence Manzanares did explain that he still checked his "District Court email address" but added, he had actually turned in the computer he was issued from the State when he vacated the bench. Detective Lawrence along with Miles Flesche further explained to Lawrence Manzanares that the stolen computer had "Computrace software" installed in the system and on February 2, 2007, records through "Comcast" indicated it was used at his "IP address". Your Affiant later learned that the Absolute Software Corporation continued to maintain a "call log" (tracking) for the computer in question, which confirmed the computer was at the same location (Lawrence Manzanares's residence) from January 12, 2007 through February 15, 2007.

After being supplied with the explanation (as noted by Detected Lawrence), Lawrence Manzanares indicated he did in fact have a laptop computer that was issued to him by the City of Denver. Lawrence Manzanares indicated the laptop computer issued to him was either a "Dell" or possibly a "Gateway". According to Detective Lawrence's report, Lawrence Manzanares indicated he would bring the laptop "into the office" on February 16, 2007 to verify whether or not it was the State Judicial computer that was reported stolen. The specific "office" where the computer was to be delivered was not clarified in the report.

Detective Lawrence indicated that on February 16, 2007 (later determined to be during the morning hours), he was contacted by Miles Flesche who indicated that Lawrence Manzanares had returned the stolen computer to him (referring to Miles Flesche). Detective Lawrence went on to indicate that at the time Lawrence Manzanares returned the computer to Miles Flesche "no explanation" was provided. Detective Lawrence indicated that the computer Miles Flesche received was in fact the one reported stolen. During that same discussion, Detective Lawrence reported that Miles Flesche indicated that since the computer had been returned, "no criminal charges would be pursued". The report went on to indicate that the decision not to pursue criminal charges was then verified by Denver Detective Sergeant Scott Brungardt, badge number 89026.

Your Affiant concluded from the report that on the same date, Detective Lawrence contacted "City Attorney Manzanares via telephone". The report goes on to indicate that Lawrence

Manzanares stated he was "embarrassed" regarding this incident. Detective Lawrence further indicated that during the contact with Lawrence Manzanares, the forenamed reported that he did not take the computer and when it was discovered he was in possession of the stolen computer, he brought it back. According to Detective Lawrence's report, Lawrence Manzanares indicated he did not want to make any additional statements.

Detective Lawrence indicated on February 20, 2007, he then contacted Carol Haller (legal counsel for the Office of the State Court Administrator). During that discussion, Carol Haller indicated that the "State Administrator's Office" was declining to pursue criminal charges "at this time". Detective Lawrence reported that he subsequently obtained a written statement from Carol Haller documenting the same.

Detective Lawrence's report went on to indicate that the case facts gathered in this investigation were subsequently submitted to the Denver District Attorney's Office and the "case was refused". Detective Lawrence then closed out his case as "exceptionally cleared".

Your Affiant next reviewed a Denver Police Department "statement" form. The statement form was prepared by Carol Haller, dated February 20, 2007, at 2:15 P.M. The "statement" appeared to be the documentation referred to in Detective Lawrence's report, which indicated that the "State Administrator's Office" was declining to pursue criminal charges "at this time". Upon review of the written statement, Your Affiant noted that Carol Haller made specific reference to reviewing police reports and discussing the situation with the "State Court Administrator, Gerald A. Marroney". Carol Haller went on to indicate her office was asking that "no prosecution take place at this time". Carol Haller further documented that the computer in question had been returned and it was being reviewed (referring to an internal system examination)

The next document reviewed by Your Affiant was the "DA Case Filing Form". This form identifies the Denver Police Department case number as 7-5002031, noting that the suspect was identified as Lawrence Manzanares. The investigative detective was identified as "Lawrence". The charge under investigation was identified as "theft". In the lower section of that document,

the Deputy District Attorney reviewing the case (identified as "G. Moryor") noted that the case was refused, citing "no reasonable likelihood of conviction". Under the "other" section, Deputy District Attorney G. Moroye noted that the State Court Administrator "refused to prosecute". Below that verbiage, G. Moroye wrote the names of Carol Haller and Gerald Marroney. The aforementioned form was dated February 21, 2007.

Also contained on that form was a handwritten notation signed by Chuck Lepley. The handwritten notation was dated February 22, 2007. The written notation indicated "this refusal is vacated". Chuck Lepley also documented that a "special prosecutor" would need to review the case. Other notations were by Chuck Lepley, primarily pertaining to a motion that needed to be filed with the court.

Your Affiant next reviewed an affidavit for a search warrant prepared by Denver Detective Tom Brennan, number 82087. In brief, the affidavit requested "all records pertaining to the subscriber account, assigned to the Internet protocol address (IP), 24.9.98.158 on 1-31-07 at 12:12 A.M., Pacific Standard time through 1-31-07 at 8:32 A.M. Pacific Standard Time". The facts in the affidavit indicated that Detective Brennan is a Denver Police Officer assigned to the "Computer Crime Investigation Unit". Detective Brennan indicated that he had more than 20 years of law enforcement experience which included training in the field of computer crime and Internet investigations. Detective Brennan then summarized Detective Lawrence's original investigation related to the stolen computer. Detective Brennan went on to indicate that the Gateway laptop computer which was reported stolen had "Computrace Plus" software installed, which is monitored by "Theft Recovery Services, Absolute Software Corporation". In his affidavit, Detective Brennan provides an explanation of how the "Computrace Plus" tracking software works, along with how that information is used to obtain the "IP address" and ultimately how the "IP address" is then used to confirm the location were the computer is connected to the Internet on a particular date and time. YOUR AFFIANT WOULD NOTE; many of the explanations supplied by Detective Brennan were corroborated by other knowledgeable individuals during the course of this investigation. It is not Your Affiant's intention to duplicate this information in the body of this affidavit. Your Affiant will note any additions or discrepancies he was able to identify as it related other interviews or information received.

According to Detective Brennan's affidavit, the installed software ("Computrace Plus") instructs the computer to contact the "Absolute Monitoring Center on a periodic basis, when the computer is connected to the Internet". Depending on whether the "computer is accessing the Internet" using a "Direct Service line (DSL)" or a "cable service using the Ethernet card" a "Media Access Control (MAC) address" is identified for the computer in use. The "MAC address is a unique serial number , assigned to communication hardware that may be visible on a computer network". The "Absolute Monitoring Center" system is then able to "capture" or identify the "Internet protocol (IP) address" (also referred to as "caller station identification") and notes the specific date and time of the computer connection. The IP address can then be "resolved" or identified to determine the Internet service provider the computer used to access the Internet. The Internet service provider (identified as "Comcast Communications") then maintains account and billing information for the "subscriber" assigned the IP address through the telephone number, utilized by the computer in question when accessing the Internet. Ultimately the Internet service provider is then able to provide the subscriber information, which subsequently identifies the subscriber and location from which the computer is being utilized while on the Internet.

Detective Brennan then describes the process involved in retrieving the information which ultimately identifies the subscriber account. Detective Brennan was able to determine that the IP address (24.9.98.158) came back to "Comcast Communications" (referring to the Internet service provider). The search warrant itself was then requesting "Comcast Communications" to provide the subscriber account information along with the billing records related to the previously mentioned IP address. Detective Brennan specifically requested that the information above be supplied for the dates and times identified as January 31, 2007 at 12:12 A.M. (Pacific Standard Time – PST) through January 31, 2007 at 8:32 A.M.

The aforementioned search warrant was signed on February 2, 2007 at 8:30 A.M. Your Affiant was unable to decipher the name of the judge who actually signed the search warrant but later determined it was Judge Okamoto. Accompanying the aforementioned affidavit was the copy of the search warrant and the return of inventory.

The actual information received by Detective Brennan (pursuant to the search warrant) was transmitted to him via a facsimile from Victoria Gonzales (legal analyst) with Comcast Communications (sent February 12, 2007 per facsimile). The information supplied by Comcast Communications identified the subscriber name on the account as Lawrence "Manzoneras" (spelling as documented on the record received), listing his address as 2201 South Adams Street, Denver, Colorado 80210, telephone number 303-782-4800, account number 8497303066610271. The subscriber information indicated that the account was created on December 20, 2003 and utilized email user identification of "Wharfrat5, Wharfrat6". In addition to the subscriber information submitted to Detective Brennan, there was also what appeared to be a billing document, however, due to the poor quality of the copy Your Affiant is unable to decipher the contents.

Also attached to the search warrant was a "call log" which appeared to be prepared by Theft Recovery Services, Absolute Software Corporation. The "call log" indicates that the information relates to the IP addresses of 24.9.98.158, captured on January 31, 2007 beginning at 12:12 A.M. through January 31, 2007 at 8:32 A.M. The IP address (24.9.98.158), appeared to be captured on approximately twenty-minute increments. The call log also documented the Denver Police Department case number as 075002031 and identified the make and model of the computer as a "Gateway M280", with serial number 0036701989. The "Computrace File Number" is identified as "13740" with an "ESN" number of "1BF88G3TONAA11US0504".

On February 23, 2007 (the same date) at approximately 4:35 P.M., Your Affiant determined that the computer was presently being held by members of the State Court Administrator's IT Department (also known as Judicial Business Integrated Technology Services or "JBITS"). Arrangements were subsequently made for Your Affiant to pickup the computer this date

On the same date at approximately 4:45 P.M., Your affiant arrived at 1726 Cole Boulevard, Suite 300, Golden, Colorado (JBITS), for the purpose of retrieving the computer in question. Upon arrival at that location Your Affiant met with Bob Roper (Chief Information Officer with the Office of the State Court Administrator), along with Tony Petruccelli (Technical Service

Manager). After a brief discussion, Tony Petruccelli then relinquished custody of the computer along with the various accessories. Specifically, Your Affiant took custody of what was described as a "Gateway tablet computer, model 280E (also referred to as M280E or M280) , serial number 0036701989, one "Gateway port replicator, part number GTW-250DC", one "Gateway A/C adaptor, model number 0302C19120", along with one "Targus" laptop carrying case (black in color), model number ONT002US. Your Affiant subsequently secured those items as evidence. No additional investigation efforts were undertaken that date.

On February 26, 2007, Your Affiant began conducting follow up investigation. On the same date at approximately 10:30 A.M., Detective Brennan contacted Your Affiant per request. Your Affiant subsequently confirmed with Detective Brennan the information contained in his search warrant affidavit, to include how determined the location of the stolen computer through the subscriber information. When asked if he had any additional information, which was not contained in his affidavit, Detective Brennan responded in the affirmative. Detective Brennan did note that when conducting his initial investigation, he interviewed the reporting party to the crime, Kelly Chastain. During the interview Kelly Chastain indicated there were possibly times when the locked storage room (where the stolen computer was reportedly stored at the time of the theft) was left unsecured. Detective Brennan related that information was not initially contained in the police report. Detective Brennan then clarified an additional issue. Detective Brennan related that when he initially began his investigation, he was unaware that the case had been assigned to Detective Lawrence. Detective Brennan stated, once that information was known, he then assisted Detective Lawrence with the investigation. Detective Brennan related his primary involvement in the case involved obtaining the subscriber information. Your Affiant did obtain additional statements from Detective Brennan during that contact and will address that information later in this affidavit if relevant.

During the same contact, Detective Brennan also identified additional documentation he prepared and accumulated during his investigation, which was not contained the packet of information Your Affiant originally received. Your Affiant later obtained that information and if referred to in this affidavit, a description of the materials and its origin will be provided.

During the course of Your Affiant's investigation, beginning on February 23, 2007, numerous interviews were conducted and various confirmatory documentation was collected. Much of the investigation just referred to, relates to general historic information. For purposes of this affidavit, Your Affiant will attempt to consolidate much of the basic background information pertaining to clarification issues which set up a foundation for understanding the events that transpired related to the theft, embezzlement, destruction/tampering with evidence and other misuse of the computer. Your Affiant will present this information in a synopsis format. Any issues identified, which appear to be in conflict will be noted and explained.

Your Affiant will now document the general historical information obtained during his investigation which was consistent or corroborative in nature. With respect to the purpose for utilizing the Computrace Software, Your Affiant was told that this was not the first time that a computer belonging to the State Court Administrator's Office had been stolen. At that time Your Affiant learned there had been approximately four computers stolen in the last two years (to include the computer in this case),which were taken from the Denver courts, housed in the Denver City and County building. Other computers owned by the State Court Administrators Office have been stolen but Your Affiant only intends to briefly address the ones referred to above.

Based on documentation later supplied from the State Court Administrator's Office, Your Affiant learned that one of the four stolen computers was reportedly taken out of a judges chambers, while one of the computers was taken from the locked storage area in room 39 (contained in the Denver City and County building). Both of those stolen computers were taken in July of 2005 (one stolen over the 4th of July weekend) and the thefts coincided with the process involved when transferring court rooms. In the reports documenting those two thefts, Lawrence Manzanares's name was identified as a Judge who was either being moved or was having equipment installed. Neither of those computers were ever issued to Lawrence Manzanares. No follow up investigative reports were identified by Your Affiant related to those thefts, but it is known that the computers have not been recovered.

Your affiant was also made aware, pursuant to standard operating procedure for the City of Denver, whenever an employee is terminated an inventory audit is performed relative to all city property issued to former employee. During the inventory related to Lawrence Manzanares, Your Affiant was told that computer technicians located a three items associated with the city attorney's laptop computer which had been confirmed were not been issued by the city. One item was a "Wi Fi card" that allows for wireless internet access. The second item is "Logitech" wireless mouse and the third item is a "Gateway" power supply. One of the stolen computers referred to above was a Gateway computer. Your Affiant did confirm with the former Acting City Attorney (Chris Mootz), the property described above did not belong to him nor did he have any idea as to the origin of that property. Your Affiant is in possession of those items. Your Affiant has attempting follow up investigation related to those thefts, but at this time no specific suspects have been identified.

The third computer theft occurred from an area in the juvenile court clerk's office, (over a weekend) also in the year 2005. The forth stolen computer referred to above, relates to this case. As previously noted, that computer was originally issued to Magistrate Messer (June of 2006) and by the nature of his position, he did have contact with the juvenile court clerks office. Your Affiant is aware, based on an interviews he conducted with Shana Klek (Acting Juvenile Clerk of the Court) and former Magistrate Messer, that the Magistrate was requested to supply his computer password to that office in the past. Your Affiant was told that only happened once and it would have occurred over a year ago. Magistrate Messer did tell Your Affiant that it was his recollection, while in the capacity of a Magistrate, he would change his password "monthly". At the present time, Your Affiant has no additional information related to that situation.

Continuing with the information supplied by Bob Roper and Tony Petruccelli, Your Affiant learned that due to the number of computer thefts statewide, measures were undertaken to deter the thefts as well as recover stolen property. Among other efforts it was ultimately determined that the Computrace tracking system would be installed on the State Judicial computers in the event they were stolen. Your Affiant was told that the State Court Administrator's Office purchased the Computrace software from the Absolute Software Corporation on September 28, 2006. Your Affiant confirmed that the Computrace software is a theft recovery system which is

an outside service (monitored by Absolute Software Corporation) and paid for by the State Court Administrator's Office. Your Affiant further verified through documentation supplied by the Absolute Software Corporation and the State Court Administrator's Office, the Computrace Plus software was installed on the stolen computer (identified as a Gateway M280E, serial number 0036701989) on November 16, 2006 and first connected to the Internet at 10:45 A.M. that same date. The first Internet connection was established from room 39 (Denver City and County Building) identified by IP address as 165.127.12.75.

When generally asked to explain how the State Court Administrator's used the Computrace software, Your Affiant was provided the following explanation. It was explained that once the tracking software is installed on a computer, it would individually track each computer through an IP address, once that unit connects to the Internet. It was related to Your Affiant that once a computer with the Computrace software is connected to the Internet, it then "calls home" (also referred to as "pings, reports or notify/notifies". It was explained that when referring to "calling home", the computer is signaling the theft recovery company (Absolute Software Corporation) that it is connected to the Internet and then the individual IP address is recorded. Your Affiant was told, the Computrace software is programmed to have the computer "call home" each time it connects to the Internet and if it remains connected to the internet for extended periods of time, the software is programmed to have the computer "call home" once every 24 hours. In addition to identifying the IP address, the Computrace software also performs an internal system audit which relates to both software and hard drive functions. Your affiant is still in the process of confirming if the internal system audit records are maintained and available for specific dates and times.

It was further explained that also built into the Computrace software is a program that notifies the Absolute Monitoring Center when a specific computer has not "called home" for a twenty-day period. Pursuant to the agreement with the Absolute Software Corporation, a notification is then made to the computer owner/customer (in this case referring to the State Court Administrator's Office, specifically Tony Petruccelli), requesting that the computer is physically located and connect to the Internet. It was clarified that the Absolute Monitoring Center then directly notifies Tony Petruccelli that a specific computer has not "called home" for a period of

twenty days. Upon receipt of that notification, Tony Petruccelli sends out an email to all computer technicians with a complete list of computers which have not reported in for the twenty-day period. Each computer technician is then required to physically locate the computer and confirm its whereabouts. The computer technician is then required to connect the computer to the Internet so it can "call home" or notify the Absolute Monitoring Center.

It was next explained to Your Affiant, once it is determined that a computer is missing, a police report is filed with the appropriate law enforcement agency and the investigator or detective assigned the case is assisted with locating the computer by the recovery service personnel for the Absolute Software Corporation. Your Affiant was told, almost simultaneous to the process described above, Tony Petruccelli notifies the Absolute Monitoring Center that a computer is missing. Once the Absolute Monitoring Center is notified a computer is missing, the Computrace software is then programmed to have the computer "call home" approximately every twenty minutes while connected to the Internet. In the theft recovery mode, the other rules associated with the Computrace software are still in effect, noting that each time the computer connects to the Internet it "calls home". The computer will continue to "call home" approximately every twenty minutes while connected to the Internet. From the last "call home" or notification, the time the computer was disconnected from the Internet can be determined within an approximate twenty minute window. In addition to the other information collected through the Computrace software, Your Affiant was advised that the system also performs an internal system audit of the computers software as well as hardware. Your Affiant was told that the Absolute Software Corporation does store or record that information, however, as of this date it has not been confirmed if that information is retrievable.

Your Affiant did confirm with recovery services personnel at the Absolute Software Corporation, the time recorded on their "call log" is extremely accurate and is reported in Pacific Standard Time. The time reported on their call log also reflects the time the connection occurs with their server. The individual computer's internal clock is irrelevant as it pertains to the dates and times reflected on the call log.

Your Affiant further verified with the Absolute Software Corporation (located at 111 Dumsmuirst, Suite 800, Vancouver, BC, Canada) and independently, that Denver Colorado is on the same Daylight Savings Time (DST) transition as them. Your Affiant would note that DST did not come into effect until March 11, 2007. The time frames involved in this investigation are correctly reported as Mountain Standard Time (MST) and Pacific Standard Time (PST) respectively. For clarification, MST is one hour ahead of PST.

Your Affiant was informed, the procedures described above are followed routinely to ensure that State Court Administrator's Office is in compliance with the agreement outlined by the Absolute Software Corporation. Your Affiant was told that the Absolute Software Corporation provides a type of insurance coverage or guarantee if the appropriate procedures are followed by the customer. The agreement provides that if the Absolute Software Corporation is unable to locate the computer after thirty days, they reimburse the customer up to $1,000 for the loss. According to what Your Affiant learned, this is the first computer stolen from the State Court Administrator's Office, which had the specific Computrace software installed. Your Affiant confirmed that the above procedure was followed in this case.

When asked to provide information related to an individual computer's identification, Your Affiant was provided the following information. Your Affiant learned that each "judicial computer" (referring to computers owned by the State Court Administrator's Office) is identified by the individual unit serial number. Your Affiant was told no other external identifying information is used to identify each computer. Your Affiant confirmed that accessories associated with each computer (referring to replicators, AC adaptors and power cords, etc.) are not individually tracked. Your Affiant further confirmed that the State Court Administrator's Office does not use identifying property tags for any specific property owned, if it is under $5,000 in value. Your Affiant would note there is an exception to what is reported above, as it relates to the stolen computer. Pursuant to an interview conducted Sherry Byers (Computer Technician for the State Court Administrator's Office, assigned to the Second Judicial District), she had placed a sticky label on the top of the stolen computer. The label identified the "user" as Magistrate Messer and then the computer's serial number was also listed. No one (referring to

individual who had contact with the stolen computer since it was recovered) has reported to Your Affiant that they observed that label.

With respect to any other identifiers associated with each individual computer, Your Affiant was told the following. In addition to what was previously described in this affidavit, related to identifying individual computers associated with Internet use, Your Affiant was told that internally there are a number of ways to distinguish individual computers. Internally, specific identifiers for a computer can relate to "user names, passwords, software", along with information contained on the hard drive. Your Affiant was told that software is usually licensed to a "user" (usually the owner of the computer) and different software programs can display various user screens, which specifically identify the computer's owner (such as the State Court Administrator's office). Your Affiant was provided with a list of obvious user display screens and software which would identify the stolen computer as being owned by the State Court Administrator's Office.

With respect to the user display screens, Your Affiant was informed that when initially turning on a "State Judicial" computer a standard Microsoft Windows sign on box is displayed. Your Affiant was told the appearance of the "sign on box" did not vary with any model of computer used in the State Judicial system. Your Affiant was able to view this screen. The general screen has a blue background with a smaller rectangular box in the middle. The header in the sign on box identifies it as Microsoft Widows product. Below the header are three locations for information to be entered. From the sign in box the user is required to enter the "user name" and "password". In addition the user is given two choices to select from when accessing the computer. The two selections are displayed in the form of a "drop down box". The first choice was referred to as the "local, domain, or administrator" (allowing access to just the local computer) which is not particularly unique when trying to identify the computer's owner. The second choice is labeled "judicial" (allowing access to only the "Judicial Network"), which is unique to the State Court Administrator's Office. Your Affiant was told that anyone who had previously been allowed access to the State Judicial computer system would be familiar with the "judicial" selection. It is not required for a user to select "judicial" when accessing the local computer.

With respect to additional user display screens, Your Affiant was told the State Judicial computer system utilized an "Intranet" access (also called a "default Internet screen), which can then used to gain access to the Internet or internal information related to Colorado State Judicial Branch. There is no requirement for a user to access this screen when attempting to log on to the Internet. When accessed, the display screen associated with the Intranet displays an image which clearly identifies computer ownership. Your Affiant has personally observed this screen and was able to see the background is comprised of a pictured image of a mountain scenery. The header has the words printed "Eclipse" and in bold "Colorado State Judicial". Other headings or titles are also displayed which make reference to the courts, probation, legal research, West Law, etc. Your Affiant was told that anyone who had previously been allowed access to the State Judicial computer system would be familiar with this screen and its uses.

The next user display screen was referred to as a "desktop". Your affiant was told that when a computer is "set up" (prior to being issued to a specific individual) a "standard desktop" is utilized. The standard desktop for a Gateway M280E and a M275E vary in there appearance but the access to the software within each computer is similar. The icons are depicted as small images that are titled to identify the software they represent. Lawrence Manzanares had been issued a Gateway M275E computer for use as a District court Judge, while Magistrate Messer was issued the Gateway M280E. The Gateway M280E was identified as a newer model from that of the M275E. Your Affiant was also able to view the desktop screens associated with both those computers. Your Affiant was told that the desktop icons are primarily set up so that a user can easily access various software programs. Your Affiant also learned that a "desktop" is considered a personal preference and can be modified by any individual user without notifying personnel at JBITS.

With respect to the M280E, Your Affiant observed that the background was basically various shades of blue with the standard Microsoft Windows in the lower right corner. The desktop icons are arranged in basically three rows, vertically down the left column. Many of the icons are standard software programs that are part of the Microsoft Windows package. There are however, specific icons which connect to software that is unique to the State Judicial computer

system. Some of obvious and unique icons were identified to Your Affiant as "Child Support Guidelines, Westlaw Sign-On, Westlaw Check 4.5, WestMate 7.37, Premice 4 and Business Recovery WS".

With Respect to the M275E, Your Affiant observed that the background was a solid blue with primarily one row of vertical icons down the left column. Two additional icons appear in a second row. Personnel at JBITS stated at the present time they could not confirm any of those icons were specifically unique to the State Judicial computer system but thought that the "Business Recovery" icon did relate to there system. As of this date that information has not been verified. It was clarified to Your Affiant, the unique "standard" internal software for both computers was similar, with the exception that the software on the M280E was possibly an updated version.

Your Affiant did review a printed list of "standard" software which is "set up" on each of the computers respectively. From that review, Your Affiant can personally confirm that he identified that both systems had "WestCheck 4.5" listed as part of the "standard" installed software. Your Affiant also knows from his work experience at the First Judicial District Attorney's Office that "West Law" programs are unique to the legal profession and password access is required. As with the other display screens, Your Affiant was told that the icons, as imaged and titled for the desktop (representing software installed on the M280E computer), would be recognizable to anyone who had previously been allowed access to the State Judicial computer system.

Pursuant to records maintained at the State Court Administrator's Office, Your Affiant learned that Lawrence Manzanares was appointed to the County Court bench on January 16, 1992 for the Second Judicial District. On February 14, 1992, Lawrence Manzanares was sworn in as a County Court Judge. Lawrence Manzanares served as a County Court Judge until he was appointed as a District Court Judge on September 29, 1998. Lawrence Manzanares was sworn in as a District Court Judge for the Second Judicial District on November 13, 1998. Your Affiant was also provided with documentation from the State Court Administrator's Office confirming that Lawrence Manzanares was supplied with a "Judicial User Profile" on November 29, 2005,

related to the last computer he was issued ("Gateway Tablet M275"). Lawrence Manzanares's Judicial Network privileges were removed on February 7, 2007 (associated with his retirement from the District Court bench). Your Affiant only accessed the most recent record related to Lawrence Manzanares's State Judicial computer privileges.

Your Affiant will next briefly address general security issues associated with internal computer system access. As previously stated, when an individual is issued a State Judicial computer they are supplied with a "user name" and then are required to create within specified parameters) a "password" (also referred to as an "administrative password"), giving them individual access (sign on privileges) to the local computer issued. Access to the Judicial Network, through the Internet also requires a "password" which could be same. Other applications or access associated with the State Judicial computer system require additional "passwords", such as "Outlook" which facilitates use of the email system. Your Affiant was told that personnel at JBITS (referring to computer technicians and supervisors) would also have access to an individual's local computer through the use of an "administrative tech code". The password just referred to has a higher level of authority or "administrative rights" then the password created by an individual user. By the use of an "administrative tech code", an individual could also grant or "enable" additional "administrative rights" to passwords that were originally assigned only limited access to the computer system.

As with any "password" system, that information is to be protected by people possessing passwords. Your Affiant did make investigative efforts to confirm that unauthorized individuals did not possess a password (relevant to this case), but he could not state positively that did not occur, even though he received no information to contrary. Your Affiant did verify, over approximately the last five years, the "administrative tech code" had only been changed once (approximately two years ago), due to a possible security violation.

It was clarified to Your Affiant, (in theory) access to any individual's "local" computer would require the use of one of the two passwords referred to above. Even to change an existing password, the "old password" would still need to be known. Your Affiant did speak with individuals during this investigation who discussed in general terms, ways they believed

someone could "by-pass" or "brake" a password, giving them access to a State Judicial computer. Other theories were also mentioned (under certain circumstances) which could allow someone to "take over" a computer without one of the proper passwords. Based on forensic computer analysis (conducted by certified computer examiners), related to the stolen computer in this case, the computer's current password was identified and it was further determined when that password was set up. Your Affiant will address that issue later in affidavit.

Your Affiant will next address the general security issues associated with room 39, the locked storage room contained in room 39 (initially reported as the last known location of the stolen computer), noting both locations are within the Denver City and County Building. Based on Your Affiant's investigation he would first note, access to the Denver City and County Building in general is very porous. Your Affiant was told that after hours the building can be accessed by authorized individuals (with security in place). Once in the building, access to room 39 did not appear to be restricted. Even when the door to room 39 is locked (locked only after normal business hours during the time frame of the theft) a "general master key" allowed access. Your Affiant learned that numerous individuals are issued general master keys, to include maintenance, custodial and security personnel. In addition to others, various court personnel are issued general master keys. Your Affiant learned Lawrence Manzanares was issued a general master key, which he turned in when vacating the bench. Your Affiant was unable to determine how many general master keys have been issued or are in use.

Individuals interviewed provided Your Affiant with general descriptions of room 39, along with the locked storage room. With the exception of locked storage room no one indicated other significant security measures were in place to prevent or detect the theft of the stolen computer. Your Affiant was consistently told (and did not discover anything to the contrary) that only two keys had been cut and issued (issued to the two computer technicians assigned to the Second Judicial District), which would allow access to the locked storage room. As previously noted, there were possibly times when the storage room could have been left unsecured. Your Affiant did personally observe room 39 and the locked storage room.

Your Affiant will describe room 39 and note other observations made while at that location. Your Affiant will describe room 39 as if the room is being viewed from the doorway entrance. Located just to the right of the doorway is Sherry Byers' office (computer technician). Your Affiant confirmed that a separate lock and key (not the general master key) is utilized to gain access to her office. The second office to the right is reported to be that of Kevin Kroger, Records Supervisor. The third office to the right is considered a storage area for the records section.

In the center of the room were various cubicle setups, Your Affiant was told the cubicles were not present when the computer in question was taken. To the left of the doorway entrance to room 39 is the locked storage room. The storage room was locked when Your Affiant first observed it. As previously indicated only two keys existed for that room and Your Affiant learned it was "re-keyed in 2005". It was reported, at that time only Sherry Byers and Andre Clair (computer technician later replaced by Kelly Chastain) had the keys to that room. When Andre Clair was transferred (approximately January of 2006) from the Second Judicial District, his key to the storage room was then given to Kelly Chastain. The second office to the left of the room entrance is occupied by Kelly Chastain (not initially present when Your Affiant arrived at room 39). The door to Kelly Chastain's office was open and unsecured at that time. When locked, Kelly Chastain's door can be accessed by a "general master key". Past Kelly Chastain's office on the left, is a shelved storage area that appears to contain various records. That area is open and not secured.

Your Affiant also identified a "pass through" allowing access to room 38, records or file storage area. Your Affiant would note that when entering room 39, if you immediately turned to the left and continue walking, you would go past the locked computer storage room and eventually arrive in the file room area. Your Affiant would further note, there is a separate entrance to room 38 from the main hallway, giving access to room 39. Your Affiant did clarify that the "pass through" is primarily used by court records personnel but the public could also "pass through" that area.

Your Affiant was also able examine the storage room keys given to both computer technicians. The aforementioned keys are a "Yale" brand and are brass in color. No other markings specifically identify the key. Your Affiant found that the keys do not indicate that they cannot be duplicated.

When Your Affiant examined the storage room he noted it contained several portable shelving units with various items distributed on the shelves. Your Affiant also observed when entering room 39, many of the ceiling tiles had been disturbed from both sides of the common wall associated with the storage room. When that observation was made Your Affiant was told that when the cubicle furniture was moved into room 39 (referring to January 16, 2007), many of the ceiling tiles were disturbed. Prior to that date the ceiling tiles were reported to be intact. Based on the ceiling tiles which were disturbed in front of the computer storage room common wall, Your Affiant observed that access to that room could be gained via the ceiling.

Your Affiant further observed that access to the computer storage room could again be gained through the common wall in Kelly Chastain's office by removing ceiling tiles. When examining Kelly Chastain's office Your Affiant found that a table was positioned against the common wall that separated his office from the computer storage room. Your Affiant noted that if someone stood on that table, they could easily gain access to the computer room by removing the ceiling tiles or simply lifting them up and then use a device (for example a broom handle with a hook) to access equipment in the storage room. Your Affiant did not observe any debris on the table (or under the table) which would be indicative of someone disturbing the ceiling tiles and gaining access to the computer storage room. Your Affiant did confirm with Kelly Chastain that he did not seen any debris on that table or under the table (during the timeframe in question), which could indicate someone gained access to the computer storage room, through his office. Your Affiant also did not observe any scuff marks on the common wall which could have occurred if someone pulled themselves over the wall. Your Affiant made the same observation related to the other common wall (associated with the open area outside the storage room entrance), but there was evidence on the floor of debris caused from the ceiling tiles being disturbed during the furniture move. When examining the storage room door, door frame and door lock, Your Affiant did not see any signs that indicated it was tampered with or forced open. In brief, Your Affiant's

initial observations of the locked storage room indicated it lacked any serious security and at best the security could be described as a deterrent.

Your Affiant will next summarize the events which led up to the theft of the computer. As previously indicated, the stolen computer (issued to Magistrate Messer) had been placed in the locked storage room during the latter part of June 2006. On November 16, 2006 the computer was removed from the storage room by a computer technician and the Computrace software was installed. The computer was then connected to the Internet at 10:45 A.M. (PST) from room 39. Your Affiant confirmed through the Absolute Software Corporation "call log", the computer continuously remained connected to the Internet from November 16, 2006 through at least November 27, 2007. The computer was disconnected from the Internet sometime after 6:04 P.M. (PST) that date, noting the computer did not "call home" or notify the Absolute Monitoring Center (AMC) again until January 2, 2007. For clarification purposes, at that time the Computrace software was programmed to have the computer notify the AMC on 24 hour basis.

On December 31, 2006, Tony Petruccelli was notified electronically from the Technical Support at the Absolute Software Corporation, the Gateway M280, serial number J0036701989 (among others) had failed to "call home" for at least twenty days. Pursuant to the Computrace software agreement, along with internal policies in place, Tony Petruccelli sent out an email on January 1, 2007, notifying the state's computer technicians that any computer they were responsible for (which was identified from the list attached to the email) needed to be located and connected to the Internet. That email was received by Kelly Chastain on January 2, 2007. Kelly Chastain confirmed in an email address to Tony Petruccelli (dated January 2, 2007 at 8:52 A.M.), he located the computer in question in "our stock room" and he was going to "put it back on the network so it will check in and update". Your Affiant located in the AMC CALL LOG that the computer in question notified their center on the same date (January 2, 2007) at 7:51 A.M. (PST) (confirming the computer "called home"). Kelly Chastain initially indicated (verbally as well as documenting in the Denver Police report), the computer was last seen when it was returned to the storage room on January 2, 2007 by 2:00 P.M.

The next reported activity associated with the computer occurred on January 26, 2007, when Sherry Byers went to locate the computer (believed to be in the storage room), so it could be reissued to Magistrate Messer. When Sherry Byers was unable to locate the computer, Kelly Chastain was contacted. Kelly Chastain confirmed the last time he saw the computer, he had placed it back in the storage room as previously indicated. Efforts were made to locate the computer, however they were unsuccessful. Tony Petruccelli was ultimately notified and he requested that it be confirmed that the computer was in fact missing, prior to making a police report.

When it was determined that the computer could not be located, Kelly Chastain was directed by Tony Petruccelli to file a police report. Kelly Chastain subsequently filed the police report (previously addressed in this affidavit) that same date (January 26, 2007) at 2:45 P.M. Also on January 26, 2007, Tony Petruccelli contacted the Absolute Software Recovery Team to report the computer was missing. In response, the Absolute Software Corporation then reprogrammed the Computrace software into the recovery mode. From that point, the Computrace software was programmed to have the computer "call home" every twenty minutes when connected to the Internet.

Your Affiant previously documented the investigative efforts made by the Denver Police Department related to the events leading up to when the computer was located and subsequently returned by Lawrence Manzanares. The following is what Your Affiant learned occurred after the computer was delivered to Miles Flesche on February 16, 2007 at approximately 10:00 A.M.

On February 26, 2007, Your Affiant conducted an interview with Tony Petruccelli (Technical Services Manager for the State Court Administrator's Office). Your Affiant initially obtained general information from the forenamed previously documented in this affiaidavit. Your Affiant will provide information supplied by Tony Petruccelli related to his involvement in this case, beginning from February 16, 2007. Tony Petruccelli related that February 16, 2007, was the first time he was made aware that Lawrence Manzanares actually had the computer and returned it to Miles Flesche. Tony Petruccelli verified that on February 15, 2007, he was aware that the stolen computer had been traced to Lawrence Manzanares residence, but the forenamed denied having a

state owned computer. Tony Petruccelli was also made aware that Lawrence Manzanares indicated he possessed a city issued computer and it was to be confirmed (through a serial number) that it was not the stolen state computer. Your Affiant confirmed with Tony Petruccelli he did not speak with Lawrence Manzanares regarding this case and the information supplied above was received from other individuals within the State Court Administrator's Office as well as the Denver Police Department.

When asked to report what he recalled occurring on February 16, 2007, Tony Petruccelli stated after learning the computer had been returned to Miles Flesche, he met with Jerry Marroney (mid afternoon that same day) for the purpose of examining the computer. Tony Petruccelli stated he knew that either Bob Roper or Jerry Marroney had specifically requested that he examine the computer related to security issues. Tony Petruccelli confirmed he was present in the area (Colorado Supreme Court Building) when Jerry Marroney received the computer from Miles Flesche.

Tony Petruccelli confirmed he then made efforts to examine the computer. Your Affiant would note that Tony Petruccelli is not a certified forensic computer examiner. Your Affiant also confirmed that Jerry Marroney was present when he initially tried to access the computer. According to Tony Petruccelli, the computer was initially taken to the Colorado Supreme Court Building. It was confirmed Tony Petruccelli originally examined the computer from "Justice Martinez's courtroom", specifically his chambers, noting that the Justice was out on vacation. Tony Petruccelli explained that only he and Jerry Marroney were present at that time.

Tony Petruccelli stated he was specifically requested (by Jerry Marroney) to attempt to access the computer in an effort to determine "what happened with it", referring to "the security and software for the computer". Through additional questioning, Tony Petruccelli explained that Jerry Marroney was concerned as to how (or if) someone was able to bypass the computer's password and if any of the software had been deleted. Tony Petruccelli reported Jerry Marroney was also concerned in terms of whether or not the "Judicial Network" had been accessed or compromised. Tony Petruccelli explained his primary goal was to see if he could logon to the

computer and from there determine what if anything had changed in terms of the "files and software" contained in the "hard drive".

Tony Petruccelli stated that after turning on the computer they were initially unable to logon "because the password changed on the domain". Your Affiant confirmed with Tony Petruccelli he was specifically referring to accessing the local computer itself and not through the Judicial Network. Your Affiant went on to confirm that Tony Petruccelli was unable to logon to the local computer. Tony Petruccelli explained because of his administrative rights (via his password) he concluded the password had been changed. Tony Petruccelli stated he did recall Jerry Marroney either contacting Lawrence Manzanares or Miles Flesche in order to obtain the new password. Tony Petruccelli stated a short time later he was provided with the password of "one, two, three, four, five". Your Affiant confirmed that information came to him through Jerry Marroney. Tony Petruccelli indicated he was still unable to access the local computer with the aforementioned password.

Tony Petruccelli stated, due to the fact they were unable to access the computer through the local computer they then connected to the Internet and accessed the computer through the Judicial Network. Tony Petruccelli stated the administrative password he had for the Judicial Network allowed him to sign on the computer and access the system. Your Affiant confirmed with Tony Petruccelli he was referring to the "sign on box" where he subsequently filled in his "password" and then selected from the dropdown box "Judicial". Tony Petruccelli stated he did not believe he needed to type in a user ID when utilizing his password in the manner indicated.

Your Affiant next confirmed with Tony Petruccelli that he was able to logon to the computer through "Judicial". When asked what screen came up after the sign on box closed, Tony Petruccelli stated "the standard judicial desktop". Tony Petruccelli stated that the judicial desktop has various icons that specifically identify the computer as belonging to the State Court Administrator's Office. Tony Petruccelli reiterated as soon as he was able to logon through "Judicial" he "immediately recognized it as ours".

When asked what he did after logging onto the computer initially, Tony Petruccelli stated he was then directed by Jerry Marroney to see if he could "break the password" in order to get into the "computer's domain", referring to local computer. Your Affiant did verify that the CALL LOG (provided the Absolute Software Corporation) recorded the computer in question connecting to the Internet from IP address 165.127.12.75 on February 16, 2007 at 2:25 P.M. (PST).

Tony Petruccelli next explained he subsequently took the computer home over the weekend (referring to February 17, 2007 through February 19, 2007) and made various attempts to "break the code" but was unsuccessful. Tony Petruccelli acknowledged using the stolen computer to access the Internet (through the Judicial Network) while at his residence. Internet websites accessed at that time related to password breaking information. Tony Petruccelli confirmed he was still unable to access the local computer or identify the correct password. Your Affiant again was able to confirm from the CALL LOG that the computer connected to Internet on February 17th through February 19th (2007) from the same IP address, identified as 71.229.163.68.

Tony Petruccelli indicated he then brought the computer back into work (JBITS) the following week (February 20, 2007 a Tuesday because Monday was a holiday). Tony Petruccelli stated he believed it was not until February 23, 2007 that he made any additional effort to gain access to the computer. Tony Petruccelli reported it was actually while he was attempting to gain access to the computer that he was notified by either Bob Roper or Jerry Marroney that the Jefferson County District Attorney's Office wanted to collect the computer as evidence. Tony Petruccelli stated at that time he shut down the computer and made no additional efforts to gain access. Your Affiant confirmed with Tony Petruccelli that he was never able to gain access to the local computer or identify the correct password. Your Affiant would note that per the CALL LOG the computer connected to the Internet on February 23, 2007 at 1:51 P.M. (PST) from IP address 165,127.12.75.

Your Affiant did confirm with Tony Petruccelli that at his residence no other individuals had access to the computer but himself. Your Affiant went on to verify with Tony Petruccelli that after returning the computer to his office, again no one had access to the computer but himself. Tony Petruccelli then qualified that statement by indicating that on February 23, 2007, it was

possible other JBITS staff could have been with him during the time he was attempting to gain access to the computer. Tony Petruccelli indicated he could not recall with any certainty who would have been present at that time. Tony Petruccelli stated to his knowledge no one other than himself made any direct attempts to gain access to the computer.

On February 27, 2007, Your Affiant met with Detective Lawrence for the purpose of gathering additional information related to this case. Detective Lawrence provided Your Affiant with the following summarized information relevant to this affidavit, which was either not documented or clarified in his report. Your Affiant did confirm with Detective Lawrence the information he provided in his police report. Detective Lawrence indicated that on January 31, 2007, his Sergeant (referring to Sergeant Brungardt, DPD #89026) assigned him a follow up investigation reference this case. Detective Lawrence indicated he confirmed the information supplied in the general incident report with Kelly Chastain. Pursuant to questioning, Detective Lawrence stated that when he spoke with Kelly Chastain the forenamed was certain that the last time he actually saw the computer was on January 2, 2007 around 2:00 P.M. when it was locked in the storage area contained within room 39. Detective Lawrence went on to indicate that during his discussions with Kelly Chastain he made an effort to confirm that the computer had not simply been misplaced or loaned out. Detective Lawrence indicated it was his understanding when speaking with Kelly Chastain that the storage area is normally locked and secured. Detective Lawrence reported that Kelly Chastain did acknowledge there were instances where the storage area could be left open.

Detective Lawrence indicated that in a subsequent conversation with Detective Brennan (possibly on February 14, 2007), he did learn that the forenamed identified the location of the computer as coming from "Judge Manzanares's house". Detective Lawrence noted that during his discussion with Detective Brennan, he recalled discussing the possibility that there was some confusion related to the missing computer.

Your Affiant confirmed with Detective Lawrence that his introduction to Miles Flesche occurred on the date he actually met with Lawrence Manzanares (February 15, 2007). When asked what if anything he told Miles Flesche prior to meeting with Lawrence Manzanares, Detective

Lawrence indicated he briefly described the nature of his investigation. Detective Lawrence stated he also remembered Miles Flesche thinking that there was a "misunderstanding" as it related to the missing computer.

Detective Lawrence then recalled that on February 15, 2007 (during the morning hours) he along with Miles Flesche and Detective Buschy then went to the City Attorney's Office. Your Affiant later confirmed with Detective Buschy, the above meeting took place sometime between 8:30 A.M. and 9:00 A.M. that date (based on the time he had a warrant signed that morning).

With respect to the contact involving Lawrence Manzanares, Detective Lawrence clarified that the contact was brief but "respectful", and at no time was anyone specifically accusatory. Detective Lawrence added, it was clear the interview was going to be brief because Lawrence Manzanares never invited anyone to sit down. Detective Lawrence noted that the interview took place with everyone standing around a conference table located in the office. Detective Lawrence described Lawrence Manzanares as being "stoic" and "evasive" during the interview. Detective Lawrence confirmed that at no time did Lawrence Manzanares admit to having possession of the stolen computer and confirmed he returned the only one he had. Detective Lawrence recalled Lawrence Manzanares initially denying he even had a laptop computer and trying to explain there could be "confusion" based on the fact he had been checking his judicial email. Detective Lawrence reported that after being confronted with the tracking software information, Lawrence Manzanares acknowledged that the city had issued him a laptop computer and also indicated that could be part of the confusion.

Detective Lawrence reported that based on the fact Lawrence Manzanares had suggested that the confusion was possibly related to the city issued computer, he (referring to Lawrence Manzanares) was then asked to check the serial number on that specific unit. Detective Lawrence indicated that Lawrence Manzanares informed him that his city issued computer was presently at home. Detective Lawrence did ask Lawrence Manzanares if anyone at home could check the serial number to verify it was not the missing computer. According to Detective Lawrence, Lawrence Manzanares indicated that no one was home at the present time and he would need to confirm that information after work. Detective Lawrence told Your Affiant he

provided Lawrence Manzanares with his business card, assuming the forenamed would contact him after verifying the city issued computer's serial number. Detective Lawrence reiterated that the interview only lasted approximately "five or six minutes and then we left".

Your Affiant next asked Detective Lawrence, if while in Lawrence Manzanares's office had he noticed anything on his desk. Detective Lawrence immediately responded in the affirmative, indicating he observed a "laptop computer that was attached to the monitor screen" on the desk of Lawrence Manzanares. Detective Lawrence acknowledged he did not specifically ask Lawrence Manzanares about that computer, due to the fact the forenamed was very clear in terms of his denial related to the state owned computer and the fact his city issued computer was reportedly at home. Detective Lawrence did not recall the brand on the laptop computer that was attached to the monitor on Lawrence Manzanares's desk.

Detective Lawrence next reported it was not until February 16, 2007 that he became aware of additional information related to this investigation. Detective Lawrence recalled at some time during the early morning hours that date, he received a telephone call from Miles Flesche. Miles Flesche reported that Lawrence Manzanares had returned the computer. Detective Lawrence stated upon learning that information he then confirmed that Miles Flesche was in possession of the stolen computer. Detective Lawrence indicated he then asked Miles Flesche if Lawrence Manzanares provided "any explanation" for how he came into possession of the computer to which the forenamed responded in the negative. Detective Lawrence recalled that Miles Flesche specifically indicated that when Lawrence Manzanares returned the computer "he simply turned it over and didn't provide any explanation". When asked why he was certain that Miles Flesche indicated that there was no explanation provided by Lawrence Manzanares when he returned the computer, Detective Lawrence stated he remembered asking the obvious question and also remembered supplying that same information to his sergeant. Detective Lawrence stated he was then requested by his sergeant to contact Lawrence Manzanares and inquire as to how he obtained the computer. Detective Lawrence told Your Affiant, based Lawrence Manzanares's denials, related to possessing the stolen computer (the previous date), he remembered being surprised he now returned it. Detective Lawrence stated he was also confused as why to the

computer was returned to Miles Flesche and not the police department. Detective Lawrence clarified he thought it was expressed to Lawrence Manzanares that he was to contact him the following day with at least the serial number information.

Your Affiant did confirm with Sergeant Brungardt that it was reported to him that Lawrence Manzanares did not provide any explanation as to how he obtained the computer. Sergeant Brungardt further confirmed that he directed Detective Lawrence to contact Lawrence Manzanares to ascertain how he originally acquired the computer.

During that same first conversation, Detective Lawrence also confirmed Miles Flesche telling him, based on the fact the computer was returned, "they" (referring to the State Court Administrator's Office) were not interested in pursuing charges against Lawrence Manzanares. Detective Lawrence explained, per Denver Police Department's policy, whenever a "victim" decides not to have charges pursued against the suspect, it needs to be "witnessed by another detective". Detective Lawrence then recalled having Sergeant Brungardt speak briefly with Miles Flesche to witness the fact the forenamed did not want charges pursued. Your Affiant later confirmed with Sergeant Brungardt that he did speak with Miles Flesche at that time and was told his office did not want charges pursued in this case, primarily because the computer was returned.

Detective Lawrence was then asked if he recalled having more than one conversation that morning (or day) with Miles Flesche and if so, what was discussed. Detective Lawrence recalled that his other phone conversation with Miles Flesche was to cancel their earlier appointment to get a written statement requesting no charges be pursued. Detective Lawrence explained that subsequent to Miles Flesche indicating that he did not want charges filed, it was learned from Tony Petruccelli that Miles Flesche did not have that authority. Detective Lawrence stated he believed that Tony Petruccelli referred him to Carol Haller in terms of discussing that issue. Detective Lawrence went on to clarify, it was during that timeframe that (in addition to his sergeant), his Commander (Debra Dilly) also become involved.

Detective Lawrence confirmed his subsequent conversation with Lawrence Manzanares occurred on February 16, 2007 (after speaking with Miles Flesche). When asked if he recalled anything additional from that conversation, Detective Lawrence provided information consistent with what he previously reported. Your Affiant did confirm that Lawrence Manzanares acknowledged having the computer but did not want to make any statements.

Detective Lawrence was told it had been learned that when Lawrence Manzanares returned the computer he did supply an explanation to Miles Flesche, as to how he acquired the computer. Detective Lawrence confirmed that information was never supplied to him, noting he had specifically questioned Miles Flesche on that issue.

Detective Lawrence stated he then began to make efforts to contact Carol Haller in terms of confirming whether or not the State Court Administrator's Office wanted charges pursued against Lawrence Manzanares. Detective Lawrence went on to clarify that during that process he was aware that Sergeant Brungardt had made contact with Carol Haller and subsequent to that, Commander Dilly had also spoken to her.

Detective Lawrence stated he was ultimately (with in a few days) directed to make contact with Carol Haller to obtain a written statement indicating the State Court Administrator's Office did not want charges pursued against Lawrence Manzanares. Detective Lawrence confirmed he contacted Carol Haller on February 20, 2007 and obtained a written statement, previously documented in this report.

Detective Lawrence stated that based on "normal protocol" he then took his case filing and the declination statement prepared by Carol Haller, to the assigned Deputy District Attorney for review. Detective Lawrence identified the Deputy District Attorney reviewing the case filing and declination as Geanne Moroye. Detective Lawrence confirmed that his case filing and the written declination was reviewed by Deputy District Attorney G. Moroye on February 21, 2007. Detective Lawrence stated that when Deputy District Attorney G. Moroye reviewed the case filing and written declination, she indicated that it would be appropriate for the Denver District Attorney, Mitch Morrissey to review the case. Detective Lawrence reported that "a couple hours

later", he was contacted by Assistant District Attorney Chuck Lepley and advised that the case filing refusal was "put on hold".

Detective Lawrence indicated that on February 22, 2007 he did meet with Chuck Lepley and the case was discussed. Detective Lawrence stated at that time he was advised that the Denver District Attorney's Office was going to request that a special prosecutor be appointed to the case. Detective Lawrence stated he had not conducted any additional investigation since time.

On February 27, 2007, Your Affiant was contacted by Investigator Russell Bohner, a trained forensic computer examiner. Per request, Investigator Bohner subsequently supplied Your Affiant with a copy of an affidavit and search warrant (search warrant number 07-84, obtained this same date, signed by the Honorable Judge J. Archuleta of the First Judicial District) which authorized him to examine the Gateway laptop computer, model M280E, serial number 0036701989. As previously noted Investigator Bohner was requested to conduct a forensic examination related to the above described computer. Your Affiant subsequently retrieved the computer and accessories which were previously described in this report and turned them over to Investigator Bohner. For purposes of clarification, Your Affiant recovered the above items from a branch office of the State Court Administrator on February 23, 2007. The aforementioned items were secured in Your Affiant's care, custody and control from the date they were recovered, up until this time.

On February 28, 2007, Your Affiant interviewed Melinda Olivarez, Executive Assistant to the Denver City Attorney (Lawrence Manzanares). Melinda Olivarez clarified she was promoted to the position of Executive Assistant to the City Attorney by Lawrence Manzanares on February 12, 2007. Melinda Olivarez confirmed that she replaced Mary Harris as the Executive Assistant to the City Attorney.

With respect to her duties, Melinda Olivarez indicated she reported directly to the City Attorney and performed various administrative functions. Melinda Olivarez described her specific duties by indicating she would assist the City Attorney with scheduling appointments, handling telephone communication and performed other miscellaneous tasks upon request. Your Affiant

confirmed with Melinda Olivarez that she did have access to the City Attorney calendar as well as various contact information necessary when scheduling appointments.

Melinda Olivarez was next asked if she was familiar with any city equipment that was issued to Lawrence Manzanares while functioning as a City Attorney. Melinda Olivarez responded in the affirmative. Melinda Olivarez indicated that she was aware that Lawrence Manzanares had a "Dell laptop docking station" on his desk. Melinda Olivarez stated that the aforementioned computer could then connect to a separate monitor screen and keyboard which was also located on his desk. Melinda Olivarez was also aware that the city issued Lawrence Manzanares a "Blackberry tutorial", which in addition to other tasks, functioned as a cell phone.

When asked if she had ever seen Lawrence Manzanares leave work with the previously described Dell laptop computer, Melinda Olivarez responded in the negative. Melinda Olivarez told Your Affiant she very rarely saw Lawrence Manzanares leave work during the evening, noting that she usually left before he did. Melinda Olivarez was asked if she ever observed Lawrence Manzanares leave his office during the day carrying the Dell laptop computer, Melinda Olivarez responded in the negative. Melinda Olivarez stated that to her knowledge the previously described computer did not leave the office. Melinda Olivarez indicated that based on her recollection, she always remembered seeing the Dell laptop computer on Lawrence Manzanares's desk when she entered his office but noted that was not something she was specifically looking for.

Your Affiant next asked Melinda Olivarez if she ever recalled seeing Lawrence Manzanares using any other computer, outside of the one she previously described. Melinda Olivarez responded in the negative. Melinda Olivarez stated to her knowledge, Lawrence Manzanares only utilized the computer that was located in his office.

IO next asked Melinda Olivarez if she was working on February 15, 2007. Melinda Olivarez responded in the affirmative. When asked if she recalled Lawrence Manzanares having a meeting in his office that day, Melinda Olivarez responded in the affirmative, pointing out the one she was thinking of was "kind of strange". When asked what she was referring to, Melinda

Olivarez stated she was specifically recalling an appointment that occurred shortly before 9:00 A.M. on February 15, 2007. When asked to elaborate further, Melinda Olivarez explained that the appointment she just referred to was "not an appointment at all, they just showed up" and did not identify themselves. Melinda Olivarez further describe she was approached at her desk by "at least two men" (possibly a third), who were requesting to speak with Lawrence Manzanares for an unspecified purpose.

Melinda Olivarez stated she then contacted Lawrence Manzanares's and advised there were some "gentlemen" that were requesting to meet with him. Melinda Olivarez stated she subsequently determined from Lawrence Manzanares's reaction, he appeared to know at least one of the individuals who were requesting to meet with him. Melinda Olivarez stated she then returned to her desk after Lawrence Manzanares invited those individuals into his office.

Melinda Olivarez stated that the door to Lawrence Manzanares's office remained open for a short time but was subsequently closed. When asked if she was ever told or became aware as to the nature of that meeting, Melinda Olivarez recalled hearing the words "laptop and chambers". Melinda Olivarez stated she could not specifically put those words into context but noted she could have possibly heard additional conversation. Melinda Olivarez stated she believed the meeting lasted approximately fifteen minutes at the most (possibly less), after which the individuals who had met with Lawrence Manzanares left. Melinda Olivarez stated she believed that Lawrence Manzanares then closed his door behind them as they left.

Melinda Olivarez next noted, when reviewing the city attorney calendar, Lawrence Manzanares had additional meetings scheduled for that morning (beginning at 9:00 A.M.). Per the city attorney calendar, Melinda Olivarez reported that Lawrence Manzanares had additional morning appointments scheduled to last until approximately 11:30 A.M. Your Affiant did verify the morning appointments with the individuals who were scheduled to meet with Lawrence Manzanares. Based on her lunch schedule, Melinda Olivarez estimated that Lawrence Manzanares left his office between 12:00 P.M. and 1:00 P.M. that day. Lawrence Manzanares did not indicate where he was going but stated he would "be back". When asked if she thought it

was unusual for Lawrence Manzanares to be leaving his office at that time, Melinda Olivarez responded in the negative

When asked if she recalled at what time Lawrence Manzanares returned to work, Melinda Olivarez stated she was certain that Lawrence Manzanares did not return to the City Attorney's Office prior to her going to lunch, noting that she probably started her lunch break at approximately 1:30 P.M. Melinda Olivarez went on to indicate that her lunch break would last approximately one hour and then she would return to the office. Melinda Olivarez stated when she did return from her lunch break she did not recall Lawrence Manzanares being present. Melinda Olivarez did point out she was certain Lawrence Manzanares did return to work that date because he had an appointment scheduled for 4:30 P.M. that afternoon. Melinda Olivarez estimated that Lawrence Manzanares could have probably returned to the office sometime after 2:30 P.M. but prior to 4:30 P.M.

With respect to the following day (referring to February 16, 2007), Melinda Olivarez did not recall anything unusual occurring. Melinda Olivarez did indicate that Lawrence Manzanares had cancelled an appointment scheduled for that morning (set from 9:30 A.M. to 10:30 A.M.) but noted that would not be particularly unusual. Melinda Olivarez did not know the reason for cancellation.

Melinda Olivarez was next asked to describe anything else that occurred that was unusual during the time she worked for Lawrence Manzanares. Melinda Olivarez indicated that the next thing she recalled was when "Tony Kovaleski started calling". When asked to identify what date that occurred, Melinda Olivarez stated "Friday the twenty-third" (referring to February 23, 2007). Melinda Olivarez reported that Tony Kovaleski called several times that day and requested to speak with Lawrence Manzanares on matter that was "personal". Melinda Olivarez confirmed that information was forwarded on to the "Mayor's communication assistant". Melinda Olivarez noted, later that day Lawrence Manzanares subsequently submitted to a media interview with Tony Kovaleski.

Melinda Olivarez stated that just before Tony Kovaleski arrived (sometime after approximately 3:30 P.M.), Lawrence Manzanares called her into his office. Lawrence Manzanares then told Melinda Olivarez that he was going to be doing an interview with Tony Kovaleski that deals with a "personal issue that will affect the office". Melinda Olivarez stated that Lawrence Manzanares had explained to her the nature of Tony Kovaleski's inquiry.

Melinda Olivarez recalled that Lawrence Manzanares next told her, he was approached in a "parking lot" that was a "couple blocks south" of the City and County Building. Melinda Olivarez recalled Lawrence Manzanares indicated that he was approached in the parking lot by a male (assumed to be unknown) but no further description was supplied. Lawrence Manzanares next told Melinda Olivarez that the male then asked him if he was "interested in buying some speakers" adding "Larry said no". Melinda Olivarez recalled that the male also reportedly told Lawrence Manzanares that he was selling property because "he needed to make bail money". Pursuant to questioning Melinda Olivarez stated that Lawrence Manzanares never clarified to her whether or not the bail money was for the individual selling the property or someone else.

Melinda Olivarez next remembered being told that once Lawrence Manzanares declined to purchase the speakers, the same male then asked "what about a computer". Melinda Olivarez stated that Lawrence Manzanares next commented "to make a long story short, I bought it". Melinda Olivarez stated that Sharon Trujillo (Executive Assistant to Kelly Brough) interrupted the contact by stating "Channel seven's here". Melinda Olivarez recalled that Lawrence Manzanares then requested she tell the news media to give him five minutes and he would meet with them. Melinda Olivarez indicated that her discussion regarding the incident in question, ended at that time.

When asked if she could remember anything else about the conversation she just had with Lawrence Manzanares, Melinda Olivarez stated "I can't say exactly how he said this, but I got the impression this happened after work". When asked if Lawrence Manzanares gave any indication as to when he purchased the computer (referring to the date), Melinda Olivarez responded in the negative. Through additional discussion Melinda Olivarez stated at the present

time she could not recall any additional details related to her conversation with Lawrence Manzanares.

At the conclusion of the television interview, Melinda Olivarez recalled Lawrence Manzanares returning to his office. Melinda Olivarez stated as Lawrence Manzanares went into his office she then asked him "how'd it go". According to Melinda Olivarez, Lawrence Manzanares responded by stating "it is what it is". Melinda Olivarez also recalled Lawrence Manzanares commenting that the interview could also be dependant on "how they edit it". Melinda Olivarez stated she did not have any additional contact with Lawrence Manzanares that day.

Melinda Olivarez stated that since February 23, 2007, she has not spoken with Lawrence Manzanares regarding this matter. Melinda Olivarez did indicate that she was exposed to media reports related to this situation.

On March 1, 2007, Your Affiant interviewed Marsha Noel, System Administrator for the Denver City Attorney's Office. It was confirmed with Marsha Noel that part of her duty would involve setting up computer systems for employees. Your Affiant confirmed with Marsha Noel she in fact performed that function for Lawrence Manzanares when he took office as the City Attorney.

Marsha Noel was then asked to explain what occurred in terms of setting up a computer system or computer access for Lawrence Manzanares. Marsha Noel stated that on January 10, 2007 she setup "VPN access" for Lawrence Manzanares. Marsha Noel explained that "VPN access" simply refers to establishing a "virtual private network for the city computer system". Pursuant to questioning, Marsha Noel stated that Lawrence Manzanares was not issued a new computer, noting she simply setup his "VPN access" through the "Dell laptop docking station" which was already located "on his desk".

Marsha Noel explained that in addition to performing the actual computer "setup" there are some other formalities which take place. Marsha Noel specifically made reference to documentation which needed to be signed by the "user", which in this case was Lawrence Manzanares. With respect to that documentation, in addition to the "VPN access", Lawrence Manzanares was also

supplied with "forms" which he needed to review and sign in order to have "remote access". Your Affiant confirmed with Marsha Noel she was referring to "remote access forms" which would allow Lawrence Manzanares to use the city computer from an outside location.

When asked if Lawrence Manzanares was interested in having "remote access" Marsha Noel stated she was uncertain. Marsha Noel indicated she supplied Lawrence Manzanares with the appropriate documentation but during that discussion he commented "I don't know if I wanna take it home every day". Marsha Noel went on to indicate that after making that statement, Lawrence Manzanares went on to indicate that he "had one at home". When asked what he meant by that statement, Marsha Noel indicated that in the context of their conversation, he was referring to a computer. Through additional questioning, Marsha Noel stated that Lawrence Manzanares did not specify whether or not he was referring to a laptop style computer or a "PC" (personal computer).

Marsha Noel went on to indicate, during that same conversation she then informed Lawrence Manzanares, he would have to physically bring in the computer from home in order for her to "setup for the VPN". According to Marsha Noel, Lawrence Manzanares responded by stating "okay". When asked if that ever occurred, Marsha Noel responded in the negative. Marsha Noel went on to explain that from the time she established Lawrence Manzanares's access to the city computer system (referring to the date of January 10, 2007) until the date of his resignation, (referring to February 27, 2007) he never returned to her the "signed policy".

When asked to elaborate, Marsha Noel again referenced the "remote access forms" which need to be completed before any employee is allowed to access the city computer system from home (with either a city issued computer or one they owned). Marsha Noel went on to state that per policy, that request would first need to be approved by the Mayor. Your Affiant subsequently confirmed with Marsha Noel that Lawrence Manzanares would have returned to her any documentation indicating it was his intention to access the city computer system from home or to be allowed to remove his Dell laptop docking station to be used from home. Your Affiant then confirmed with Marsha Noel that there would be no reason for Lawrence Manzanares to take home his city issued computer, due to the fact he knew he would not have access.

After confirming that information, Marsha Noel did clarify that Lawrence Manzanares would have had remote email access to the city email system, via the Internet (from any computer). Marsha Noel stated the email access "setup" occurred subsequent to the signed policy agreement she received from Lawrence Manzanares on December 5, 2006. Marsha Noel indicated that Lawrence Manzanares would have then been setup for email access sometime between December 6, 2006 and December 8, 2006. Marsha Noel clarified that she was aware that Lawrence Manzanares's email access to the city computer system was setup prior to when he actually took office as the City Attorney.

On March 2, 2007, Your Affiant interviewed Alvin Lacabe, Manager of Public Safety for the City of Denver. Upon contact with Alvin Lacabe, Your Affiant confirmed that during the afternoon on February 23, 2007 he had a communication with Lawrence Manzanares. Alvin Lacabe was then asked to explain any involvement he had in this investigation prior to February 23, 2007.

Alvin Lacabe indicated he was "generally aware" that the Denver Police Department was looking into that matter. Alvin Lacabe indicated some time during the previous week (referring to the dates of February 15 or February 16, 2007), he was advised by Denver Police Chief Gerald Whitman that a (stolen) computer belonging to the State Court Administrator's Office had been traced to the home of Lawrence Manzanares. Alvin Lacabe stated he obviously knew Lawrence Manzanares was the City Attorney for the City and County of Denver. According to Alvin Lacabe, it was not confirmed to him that Lawrence Manzanares was suspected of stealing the computer. Alvin Lacabe recalled that Chief Whitman provided general information reference the situation but confirmed no details were discussed. Alvin Lacabe recalled that when speaking with Chief Whitman he remembered the forenamed indicating that there was "possibly some misunderstanding", in terms of Lawrence Manzanares's involvement.

Your Affiant subsequently confirmed with Alvin Lacabe that the only person he had actually discussed this matter with, prior to February 23, 2007 was Chief Whitman. Alvin Lacabe

confirmed February 23, 2007, was the only time he spoke with Lawrence Manzanares regarding this situation.

When asked to explain what occurred on February 23, 2007, Alvin Lacabe stated that shortly before 3:00 P.M. that afternoon he was contacted via telephone by Lawrence Manzanares. Alvin Lacabe stated that when he first spoke to Lawrence Manzanares the forenamed began discussing official city business. Alvin Lacabe indicated it was during that conversation (towards the end) when Lawrence Manzanares specifically mentioned the situation involving the stolen computer.

Alvin Lacabe told Your Affiant that Lawrence Manzanares introduced the subject by either indicating that the press had called him (specifically referring to Tony Kovaleski) or that he had "done something stupid". Alvin Lacabe reported that very early into that specific discussion, Lawrence Manzanares asked if he (referring to Alvin Lacabe) was aware that he was identified as a "suspect in the theft of a computer". Alvin Lacabe indicated he responded to Lawrence Manzanares by stating "I don't think so, I hadn't heard that". Alvin Lacabe stated he also believed by this point, Lawrence Manzanares had agreed to speak with Tony Kovaleski.

Alvin Lacabe told Your Affiant, based on what was previously reported to him by Chief Whitman, he initially told Lawrence Manzanares he could make a statement to Tony Kovaleski, indicating that he was not aware of Lawrence Manzanares being named as a suspect in the theft of a computer. Alvin Lacabe told Your Affiant, moments after making that statement , he did indicate that information would first need to be confirmed from a reliable source (referring to the police or District Attorney's Office) prior to going public. Alvin Lacabe indicated he did not supply Lawrence Manzanares with any information concerning his conversation with Chief Whitman.

Alvin Lacabe next recalled, Lawrence Manzanares commenting "I did something stupid" and then made reference to purchasing the stolen computer from a "guy in a parking lot". Alvin Lacabe stated he did not ask Lawrence Manzanares any questions regarding what he was being told. Alvin Lacabe next indicated that he told Lawrence Manzanares, before he (referring to Lawrence Manzanares) spoke with the media, he should first confer with the Mayor's office.

Alvin Lacabe stated that Lawrence Manzanares indicated that he had spoken with staff at the Mayor's office and "everyone felt it was the right thing to do" in terms of talking to the media.

Alvin Lacabe explained after speaking with Lawrence Manzanares he then attempted to confirm whether or not he could make any comment to the press regarding this investigation. Alvin Lacabe stated he initially spoke with Chief Whitman who ultimately referred him to Commander Dilly so he could obtain the details of this investigation. Alvin Lacabe stated he subsequently spoke with Commander Dilly who provided him with the general details of the investigation.

Alvin Lacabe recalled Commander Dilly indicating that the State Court Administrator's Office had reported a computer was stolen and because of the tracking software installed on the computer, it was traced to Lawrence Manzanares's residence. Commander Dilly told Alvin Lacabe that Lawrence Manzanares subsequently returned the computer. Alvin Lacabe stated he did share with Commander Dilly the information supplied by Lawrence Manzanares concerning how he acquired the computer. Alvin Lacabe indicated that Commander Dilly responded to that information by indicating, Lawrence Manzanares never told her detectives that he purchased the computer in a parking lot. Alvin Lacabe stated he believed Commander Dilly indicated that her detectives were initially told by Lawrence Manzanares that he never had the computer. Pursuant to questioning, Alvin Lacabe stated he did recall being told prior to his contact with Commander Dilly that the computer had been returned by Lawrence Manzanares, but he was not clear as to who supplied him with that information. Alvin Lacabe stated it was possible either Lawrence Manzanares or Chief Whitman supplied him with that information. Alvin Lacabe related that Commander Dilly did confirm there was an investigation into the theft of the computer and the Denver District Attorney's Office had been contacted. Alvin Lacabe stated he had also been made aware that there were questions raised, relating to a prosecution in the case.

Alvin Lacabe clarified, he did ultimately speak with Chuck Lepley and confirm the situation. Alvin Lacabe stated he did not pursue the details of that situation when he realized the investigation was "ongoing" and further knew he would not be able to comment to the media.. Alvin Lacabe stated his impression was that Lawrence Manzanares's involvement was being

"looked at", but the matter was not resolved. Alvin Lacabe was aware that the Jefferson County District Attorney's Office had been appointed as the special prosecutor in the case.

Alvin Lacabe indicated he did speak with Lawrence Manzanares again at some point later that day. Alvin Lacabe stated when he spoke with Lawrence Manzanares he was aware that the forenamed had already spoken to "Channel Seven". Alvin Lacabe stated that he told Lawrence Manzanares he would be unable to comment to the media at this time, due to the fact this was an "ongoing investigation". Alvin Lacabe stated he did not supply Lawrence Manzanares with specific details concerning his conversations with the Denver Police Department or with the Assistant District Attorney (referring to Chuck Lepley). Alvin Lacabe indicated that Lawrence Manzanares understood and did not supply any additional details concerning his involvement in this investigation.

Between March 2nd and 5th of 2007, Your Affiant conducted two primary interviews with Miles Flesch. Your Affiant was provided the following information. Miles Flesche acknowledged that he was aware of an ongoing investigation involving the stolen computer. Miles Flesche was next asked to define his relationship with Lawrence Manzanares. Miles Flesche responded by stating he interacted with the forenamed on strictly a "professional basis".

Miles Flesche was then asked to explain when he first became involved as it related to this investigation. Miles Flesche explained that during the "latter part of January" he was notified by either Kelly Chastain or Sherry Byers that a State Judicial computer was missing and a police report was going to be filed. Miles Flesche went on to state he was further informed that a computer software program had been installed on that specific computer which could "track" its location. Miles Flesche reported his next involvement with this case occurred on February 15, 2007.

With respect to his recollection of what occurred on February 15, 2007. Miles Flesche stated he remembered "first thing in the morning, 8:00 or 8:30" he was contacted at the Denver City and County Building by Kelly Chastain, Detective Lawrence and another detective whose name he could not recall. Miles Flesche stated when he initially met with the above named, he was

informed they had confirmed where the missing computer was located. Miles Flesche stated that was the first time he learned that the computer was at Lawrence Manzanares's residence. Miles Flesche confirmed that he was the one who informed the Denver Police that Lawrence Manzanares was now the "City Attorney" for the City and County of Denver.

Miles Flesche indicated that other possibilities similar to the situation with the email account were generally presented, however, no situation could account for why the computer was located at Lawrence Manzanares's residence. Miles Flesche commented that someone possibly mentioned that this could "just be a mistake". When asked if there was a sense of disbelief as it related to the computer being at Lawrence Manzanares's residence, Miles Flesche stated "well yeah, I guess, but that's where it was". When asked if anyone questioned the accuracy of the software involved in tracking the computer, Miles Flesche responded in the negative. Miles Flesche reiterated "we were just trying to think of some possible reason that he would have the computer at his house".

Miles Flesche related that during the above discussion he "suggested speaking with" Lawrence Manzanares. Miles Flesche stated it was subsequently decided that they would go to the City Attorney's Office and attempt to contact Lawrence Manzanares. Pursuant to questioning, Miles Flesche stated that only he along with the detectives went to speak with Lawrence Manzanares. Miles Flesche indicated he assumed his role in that situation was to act as an intermediary, again making reference to his professional relationship with Lawrence Manzanares and the fact he worked for the State Court Administrator's Office (owners of the computer).

When asked to describe the contact with Lawrence Manzanares, Miles Flesche initially recalled asking Lawrence Manzanares's executive assistant if they could meet with him. Miles Flesche stated shortly after arriving at the City Attorney's Office, they were greeted by Lawrence Manzanares, who was "standing away" from his desk near what was described as a "conference table". Miles Flesche confirmed that everyone remained standing throughout their contact with Lawrence Manzanares. Miles Flesche clarified that Lawrence Manzanares did not invite anyone to sit down during that contact. Miles Flesche did report that Lawrence Manzanares was "friendly" during the contact but also seemed "perplexed" and later"concerned".

With respect to the contact, Miles Flesche stated "I started out". Miles Flesche clarified he was referring to introducing those present to each other. Miles Flesche reported he then told Lawrence Manzanares that his office (referring to the Office of the State Court Administrator) was "missing a laptop", more specifically, a "state laptop was missing". Miles Flesche noted that the computer was taken from room 39. Miles Flesche then informed Lawrence Manzanares that the computer was subsequently "tracked to his house". Miles Flesche stated he did not believe Lawrence Manzanares responded to the information he supplied. Miles Flesche stated at that point he requested that Detective Lawrence explain to Lawrence Manzanares how the missing computer was actually tracked to his residence. Miles Flesche stated that Detective Lawrence subsequently provided a brief explanation in terms of the tracking software and how it was actually traced to his residence. Your Affiant confirmed with Miles Flesche, Lawrence Manzanares had not said anything in terms of responding to what he had been told. Miles Flesche clarified it was possible that Lawrence Manzanares was making very brief verbal acknowledgements, which simply indicated he was listening to what he was being told.

Miles Flesche indicated that once Detective Lawrence completed the above explanation he (Miles Flesche) then told Lawrence Manzanares that neither Kelly Chastain nor Sherry Byers had been able to locate the missing computer. Miles Flesche stated it may have been at this point that Lawrence Manzanares made reference to "checking his judicial emails" after leaving the bench. Miles Flesche stated he also remembered telling Lawrence Manzanares that neither Kelly Chastain nor Sherry Byers had any recollection of loaning out a computer in order for him to "check on emails".

Miles Flesche next explained what he specifically recalled during that part of the conversation was that Lawrence Manzanares "made it very clear he didn't have it". When asked if he recalled the exact words used by Lawrence Manzanares, Miles Flesche reported he said "I don't have a laptop". When asked if Lawrence Manzanares was referring to any laptop style computer, Miles Flesche qualified his response. Miles Flesche told Your Affiant he knew Lawrence Manzanares was making a general reference to not having a laptop, but was specifically denying that he had the "state laptop". Miles Flesche went on recall (shortly thereafter), Lawrence Manzanares

acknowledged he did have "the city laptop". Miles Flesche stated that Lawrence Manzanares subsequently suggested the possibility the two computers had become "confused". Miles Flesche stated he knew by that point that Lawrence Manzanares had already mentioned checking his "judicial emails", suggesting that could have contributed to the confusion. Miles Flesche stated that Lawrence Manzanares gave some general indication that he could have or probably checked his "judicial emails" through the city laptop computer "from home".

Miles Flesche reported that the detective subsequently requested that Lawrence Manzanares verify the serial number for the city laptop computer. Miles Flesche stated after the detective made that request, Lawrence Manzanares confirmed that the city laptop computer was presently at his residence and "he would get the serial number from home". Miles Flesche explained he remembered Detective Lawrence asking Lawrence Manzanares if he could obtain the serial number for the city laptop computer now. Miles Flesche indicated he remembered Lawrence Manzanares reporting that no one was presently at his residence and he would need to get that information when he returned home from work later this date. Your Affiant verified with Miles Flesche that he had "no question" in his mind that Lawrence Manzanares was telling those present that the city laptop computer issued to him was presently at his home. Miles Flesche was then asked if he recalled seeing anything on Lawrence Manzanares's office desk. Miles Flesche responded in the negative indicating that he "didn't look".

Miles Flesche was then asked if it was clarified who Lawrence Manzanares was going to notify after he obtained the serial number for the city laptop computer. Miles Flesche stated when the contact ended, he was under the impression that Lawrence Manzanares was going to contact Detective Lawrence with that information. When asked if that was specifically discussed during the contact, Miles Flesche indicated he could not remember but added, "I know that's what I was thinking when we left". Miles Flesche clarified that Detective Lawrence gave Lawrence Manzanares his business card during the timeframe the serial number was being discussed. Miles Flesche reported the meeting ended soon thereafter, noting the entire contact was about "five or ten minutes".

Miles Flesche was then asked to report what occurred once the contact with Lawrence Manzanares ended. Miles Flesche recalled that he had a brief interaction with the detectives, again noting that Detective Lawrence told him he was "gonna keep in touch". Miles Flesche did report that everyone was somewhat "cautious" in terms of how this situation was being handled. Through additional discussion, Miles Flesche clarified he was referring to the fact that he, along with the detectives, were somewhat apprehensive about directly accusing Lawrence Manzanares of stealing the missing computer. Miles Flesche told Your Affiant, it didn't seem to make sense that Lawrence Manzanares would steal a computer but yet his explanation of why the computer was tracked to his residence "didn't quite seem right".

Miles Flesche stated after concluding contact with the detectives, he spoke briefly with Chief Judge Naves. Based on his position as the District Court Administrator, Miles Flesche normally reports to the Chief Judge. Miles Flesche indicated he wanted to inform the Chief Judge as to the general situation involving the missing computer. Miles Flesche stated he informed Chief Judge Naves that a State Judicial computer was missing and that it had been tracked to Lawrence Manzanares's residence. Miles Flesche indicated he also mentioned that Lawrence Manzanares was asked about the missing computer but denied ever possessing it. Miles Flesche stated he told Chief Judge Naves that Lawrence Manzanares was going to check the serial number on his city issue laptop computer (presently at his residence) to verify it was not the computer reported missing. Miles Flesche stated that after supplying that information, Chief Judge Naves simply requested that he be updated as to the status of the situation. Chief Judge Naves did not give Miles Flesche any direction regarding this situation. Miles Flesche indicated he had no further involvement in this case until the following morning.

Miles Flesche was then asked to report what he recalled occurring on February 16, 2007. Miles Flesche explained that he arrived at work sometime around 8:00 A.M. Miles Flesche indicated that his "staff assistant" then informed him that Lawrence Manzanares had previously been there (sometime between 7:40 A.M. and 7:50 A.M.), stating "the judge wanted to talk to you". Miles Flesche also remembered the staff assistant indicating that Lawrence Manzanares told her he would return sometime between 9:30 A.M. and 10:00 A.M. that morning. Miles Flesche stated

he did not recall any additional information being supplied by his staff assistant. Miles Flesche told Your Affiant, he had absolutely no expectation that Lawrence Manzanares was going to bring in the stolen computer that morning. Miles Flesche reiterated, he assumed Lawrence Manzanares wanted to speak with him about the stolen computer, but he had no idea as to the specific issue.

When asked what occurred next, Miles Flesche stated that Lawrence Manzanares did not actually return to his office until approximately 10:05 A.M., noting that he (Miles Flesche) had a scheduled meeting set for 10:00 A.M. with Chief Judge Naves. Miles Flesche confirmed on February 16, 2007 at approximately 10:05 A.M. he met with Lawrence Manzanares and recovered the computer. Miles Flesche next verified that Lawrence Manzanares did provide an explanation of how he acquired the stolen computer.

Specifically, Lawrence Manzanares told Miles Flesche that "one night after work I was walking down the alley" to the parking garage where he had assigned judge's parking (referred to as the "Boiler House" parking garage). Lawrence Manzanares was then approached by an unknown male who had come from a "white pick up truck" and was "offered speakers", which he refused. The unknown male then "offered a laptop" to Lawrence Manzanares. Lawrence Manzanares then went to the male's truck to examine the "laptop". Lawrence Manzanares commented that he was "looking for a laptop for my son". The male then "showed him how to sign on" to the computer. Lawrence Manzanares then indicated he purchased the computer, noting that was "stupid". When asked if Lawrence Manzanares ever mentioned anything about that individual needing "bail money", Miles Flesche responded in the negative. Lawrence Manzanares next reported that "a couple weeks ago" he had seen "things" on the computer which he recognized. The "things" were subsequently referred to as "software" by either him (Miles Flesche) or Lawrence Manzanares. The "things" were also referred to as "Judicial software" by Lawrence Manzanares and he knew the computer was owned by the "State" (referring to the State of Colorado). According to Miles Flesche, Lawrence Manzanares did not refer to the software by a specific name (or brand) and only noted it was "judicial software".

Lawrence Manzanares next reported to Miles Flesche, "I panicked, I didn't know what to do". Miles Flesche told Your Affiant that Lawrence Manzanares was communicating he was very concerned and was not sure how to handle the situation. Miles Flesche told Your Affiant the above statement even further confirmed to him, Lawrence Manzanares knew he possessed a State Judicial computer because of his concern and the dilemma he faced. According to Miles Flesche, Lawrence Manzanares did not provide any additional information as to how he obtained the computer.

Prior to the contact ending, Lawrence Manzanares asked Miles Flesche what he was going to do regarding this situation and was told he (referring to Miles Flesche) would be contacting the detective. At no time did Lawrence Manzanares ever attempt to influence Miles Flesche as it related to situation.

After confirming that information, Your Affiant asked if Lawrence Manzanares ever indicated when (a date) he purchased the computer. Miles Flesche responded in the negative but added, he concluded from their conversation that Lawrence Manzanares had the computer for some period time prior to when he realized the computer was State Judicial property. Miles Flesche related he was referring to the comment Lawrence Manzanares made about coming to that realization "a couple weeks ago".

When asked if Lawrence Manzanares ever indicated whether or not he was a Judge or a City Attorney when he purchased the computer, Miles Flesche responded in the negative. Your Affiant would note, it was confirmed that as a District Court Judge, Lawrence Manzanares was assigned "first floor parking" ("slot 1-9"), at the "boiler house garage" (located a block to the south of the City and County Building). That same parking space was reassigned to Judge Whitney (after he was sworn in on January 9, 2007) and he actually first used that space on January 11, 2007. Your Affiant also verified, as the City Attorney, Lawrence had reserved or assigned parking available in the west lot of the Denver City and County Building. Your Affiant learned that Lawrence Manzanares made inquiries as to that assigned parking but city parking records indicated, he never applied for the parking nor was there ever a payroll deduction associated with that parking (as required).

When asked if Lawrence Manzanares ever indicated what he paid for the computer, Miles Flesche responded in the negative. When asked if Lawrence Manzanares ever confirmed whether or not he gave the computer to his "son", Miles Flesche provided the same response. When asked if Lawrence Manzanares ever indicated that anyone else used the computer, Miles Flesche again responded in the negative. When asked if Lawrence Manzanares indicated what he or anyone else did with the computer (referring how the computer was utilized), Miles Flesche responded in the negative.

When asked if Lawrence Manzanares ever explained why he lied to him and the police on February 15, 2007, Miles Flesche stated "not really like that". Miles Flesche was asked to explain that response. Miles Flesche related in the context of his conversation with Lawrence Manzanares, when the forenamed stated he "panicked' and then indicated "I didn't know what to do", he (Miles Flesche) took that to be some type of explanation for his deception on February 15, 2007.

With respect to the disposition of the computer, Miles Flesche confirmed that the computer was contained in the black canvas bag (along with various accessories) and he simply set it down near his desk. Miles Flesche stated the only time he actually opened the computer bag was when he was requested to do so by the detective. Miles Flesche told Your Affiant that the computer remained in his nonpublic access office (although he was not in his office for that entire time), until he removed it to go meet with Jerry Marroney.

Miles Flesche did clarify at approximately 11:30 A.M. that morning (prior to meeting with Jerry Marroney), he had contact with Detective Lawrence and reported the stolen computer was returned by Lawrence Manzanares. Miles Flesche subsequently acknowledged he also told Detective Lawrence and his Sergeant, the State Court Administrator's Office was requesting that no charges be pursued in this case (primarily because the computer was returned). Miles Flesche reported he had not conferred with any of his supervisors at the time he made that request. Miles Flesche confirmed, his supervisors ultimately had authority in this matter. Your Affiant verified

with Miles Flesche, no one person or any governmental agency/department that was involved in this case, influenced the request he made to the Denver Police Department.

Miles Flesche clarified at some point later that day, he did have a conference call involving Jerry Marroney, Carol Haller and Chief Judge Naves (the Chief Judge was primarily an observer to the conference call). Your Affiant did interview the individuals identified above and did not receive information which directly conflicted the information supplied by Miles Flesche related to the conference call.

During the conference call, Miles Flesche did provide basic information as how he recovered the computer and what Lawrence Manzanares reported. There was also a discussion related to whether or not charges should be filed. Miles Flesche stated he did not specifically recall telling those participating in the call, he had previously requested that the Denver Police Department not pursue charges in this case. Miles Flesche speculated that information was already known.

Your Affiant again referred Miles Flesche to the telephone contact he had with Detective Lawrence at approximately 11:30 A.M. on February 16, 2007. Miles Flesche initially stated he did not recall discussing with Detective Lawrence what was said by Lawrence Manzanares at the time the computer was returned. Through additional discussion, Your Affiant verified with Miles Flesche that Detective Lawrence did ask about any explanations or statements made by Lawrence Manzanares when the computer was returned. With respect to that issue, Your Affiant confirmed with Miles Flesche he remembered giving some type of response that the detective would have understood to mean that no statement was supplied by Lawrence Manzanares (when the computer was returned), but he could not specifically recall what he said at this time. Miles Flesche indicated it was his understanding, he would provide a statement to Detective Lawrence at some point later. Your Affiant would note that did not occur.

Miles Flesche indicated arrangements were tentatively made to meet with Jerry Marroney later that afternoon, either at the State Court Administrator's Office or the "Supreme Court Building". Miles Flesche stated that the computer was ultimately delivered to Jerry Marroney "on the corner" near the Supreme Court Building sometime during the mid to late afternoon on February

16, 2007. Miles Flesche stated that after turning over the computer, Tony Petruccelli had walked up into the area.

Miles Flesche reported that after returning to his office he was contacted (via telephone) by Jerry Marroney. Miles Flesche stated that Jerry Marroney indicated they were not able to gain access to the computer and "needed the code". Miles Flesche reported that Jerry Marroney then requested he call Lawrence Manzanares and obtain the password.

Miles Flesche indicated he complied with Jerry Marroney's request and attempted contact with Lawrence Manzanares. Miles Flesche indicated that Lawrence Manzanares was unavailable, however, he left a message requesting the password for the computer. Miles Flesche indicated that a short time later he received a return call from Lawrence Manzanares in the form of voice message. The message indicated that the password for the computer was "1, 2, 3, 4, 5", that information was then relayed to Jerry Marroney.

Miles Flesche stated that on either "Monday or Tuesday" of the following week, he recalled receiving a voice message from Jerry Marroney advising him that the password supplied by Lawrence Manzanares "didn't work". Miles Flesche stated that he understood from the communication that Jerry Marroney was requesting that he again contact Lawrence Manzanares and confirm the password.

Miles Flesche stated he complied with Jerry Marroney's request and "called the judge back". Miles Flesche confirmed that he actually spoke with Lawrence Manzanares on that occasion. Miles Flesche indicated that when contacting Lawrence Manzanares, he initially informed him that the "code didn't work". Miles Flesche stated he then confirmed what he was originally told by Lawrence Manzanares, identifying the password as "1, 2, 3, 4, 5". When asked how Lawrence Manzanares responded when told the password "didn't work", Miles Flesche stated he remembered the forenamed indicating "that was the code I was using". Lawrence Manzanares had also repeated back the same password, confirming it was accurate. Your Affiant asked Miles Flesche if Lawrence Manzanares made any statements indicating that he had changed the password or if that was the password he was originally shown by the unknown individual who

sold him the computer. Miles Flesche stated that Lawrence Manzanares did not make any distinction when supplying the password. Miles Flesche stated that Lawrence Manzanares simply seemed confident in terms of the password he supplied. Miles Flesche indicated it was his clear understanding that Lawrence Manzanares "was using that code" when accessing the computer. Miles Flesche clarified that Lawrence Manzanares did not make any other specific references to the computer password other than "that's the one he said he was using". Miles Flesche stated that Lawrence Manzanares then apologized to him. When asked to clarify the apology, Miles Flesche stated that Lawrence Manzanares was simply indicating that he was sorry that he (Miles Flesche) had become involved in this situation.

On March 5, 2007, Your Affiant met with Senior Chief Deputy District Attorney Mark Pautler (First Judicial District). During the subsequent discussion, Mark Pautler informed Your Affiant that he had been contacted by defense counsel for Lawrence Manzanares. During that discussion, Your Affiant asked that Mark Pautler contact defense counsel for Lawrence Manzanares and request an interview with the forenamed. That request was later denied. Your Affiant subsequently made a second request to communicate (in a written format) with Lawrence Manzanares, through his defense counsel. In that request Your Affiant was asking that Lawrence Manzanares respond to a series of questions pertaining to his account of how he obtained the computer. Your Affiant was trying to obtain a description of subject selling the computer, his vehicle description, location of the transaction, the date and time of the alleged event, in addition to other information which could assist in verifying Lawrence Manzanares's account of the situation. Your Affiant was also trying to obtain general information relevant to the forensic computer examination, which could be beneficial in that same regard. That request was also denied.

On March 7, 2007, Your Affiant conducted an interview Kelly Brough (Chief of Staff to the Mayor of Denver). Your Affiant had previously confirmed with Kelly Brough that she was familiar with this investigation. Your Affiant then confirmed with Kelly Brough that she and Sue Cobb (acting media representative for the mayor's office) had met with Lawrence Manzanares prior to his press conference on February 23, 2007.

Kelly Brough indicated that on February 23, 2007 (sometime in the morning) she received an email reference a "personal matter" which involved the "city attorney" in accordance with administrative protocol. Kelly Brough indicated the media inquiry was specific as to "allegations of a stolen laptop". Your Affiant did confirm with Kelly Brough, this was the first time the Mayor's Office was made aware of any situation involving a stolen computer and Lawrence Manzanares.

Kelly Brough indicated that through the course of the day she and Sue Cobb, met at various times with Lawrence Manzanares. Kelly Brough clarified that she and Sue Cobb met with Lawrence Manzanares both together and separately. The following is a summary of the contacts Kelly Brough had with Lawrence Manzanares that day.

Kelly Brough related that when initially meeting with Lawrence Manzanares he was already aware that the media was making inquiries regarding the laptop computer in question. Kelly Brough indicated that Lawrence Manzanares acknowledged his embarrassment as well as his use of poor judgment in respect to how he came to possess the stolen computer. With respect to how he actually acquired the computer, Kelly Brough stated Lawrence Manzanares indicated he was contacted by a "guy" in the "parking lot" sometime in "January" of 2007, adding that the transaction occurred approximately "three weeks ago". Kelly Brough stated it was her impression since Lawrence Manzanares was indicating he was going through a parking lot, he was either coming to work or leaving when the contact occurred. Kelly Brough related the only description provided by Lawrence Manzanares concerning the "guy", was that he was wearing "work clothes" like a "construction worker".

Kelly Brough stated that the "guy" then offered to sell Lawrence Manzanares some "speakers", however he declined. Lawrence Manzanares went on to state as he continued walking through the parking lot the "guy" starts walking with him and then offers to sell a laptop computer. Lawrence Manzanares indicated he then walked back with the male to a "pickup truck". Lawrence Manzanares reported it was at that time he was allowed to view the computer, pointing out that the individual offering it for sale "turned it on". Lawrence Manzanares noted that the

person offering to sell the computer had the "password". Kelly Brough stated that Lawrence Manzanares explained, after he was allowed to look at the computer, the individual told him the asking price was "five hundred". Lawrence Manzanares reportedly told the individual that he "didn't have five hundred dollars". Lawrence Manzanares stated the individual then reduced the price to "three hundred dollars" and he agreed to purchase it. Lawrence Manzanares indicated that he gave the individual three hundred dollars "cash" for the computer.

Kelly Brough specifically recalled talking with Lawrence Manzanares about whether or not a criminal investigation had been initiated. Kelly Brough indicated that Lawrence Manzanares could not confirm that information but noted he had been contacted by the police regarding this matter. Kelly Brough recalled Lawrence Manzanares reporting that at the time he spoke to the policed he was not certain he actually possessed the stolen computer. Kelly Brough recalled Lawrence Manzanares indicating, at the point he actually learned he possessed the stolen computer, he returned it immediately. Kelly Brough asked Lawrence Manzanares if he suspected that the computer was stolen. Lawrence Manzanares responded in the negative, pointing out the person who sold him the computer was able to "turn it on and could show him how to use it".

Kelly Brough further explained, Lawrence Manzanares indicated that he had called Alvin Lacabe, giving the impression the purpose of that call was to clarify the above issue (related to a possible criminal investigation). Kelly Brough stated her impression was that Lawrence Manzanares had not received any definitive response from Alvin Lacabe. Kelly Brough stated the other reason she did not feel that Lawrence Manzanares had received any definitive information from Alvin Lacabe, was because she recalled suggesting he not do that again.

Kelly Brough stated in addition to cautioning Lawrence Manzanares about being completely truthful when speaking with the media, issues were also addressed related to any impropriety. Kelly Brough stated she was very concerned that nothing occur during the course of this incident, which would jeopardize the city's position. Kelly Brough added, both she and Sue Cobb made it very clear to Lawrence Manzanares that he should not do anything which would

compromise the integrity of the Mayor's Office. Kelly Brough related that Lawrence Manzanares was cautioned not to seek out any type of favoritism due to his position within the city. Kelly Brough indicated the situation with Lawrence Manzanares related to the theft of a computer, which were clearly exclusive and outside the scope of his professional duties.

Kelly Brough explained after Lawrence Manzanares submitted to the media interview she informed him that he needed to meet with her and the mayor regarding this matter. With respect to the meeting involving the mayor, Kelly Brough stated the focus of that meeting dealt with how this situation was going to be handled administratively and it was not intended to be a fact-gathering interview. Kelly Brough stated that during the meeting the importance of dealing with this situation with integrity was stressed. Kelly Brough noted it was again made clear to Lawrence Manzanares that it was the expectation of the Mayor's Office that this situation would precede along a routine or normal course, to avoid even any speculation that he was receiving preferential treatment. Kelly Brough indicated that due to the nature of the situation it was concluded that Lawrence Manzanares should take a "leave of absence" from his position as a city attorney until this matter was resolved.

Kelly Brough next indicated that during the same meeting Lawrence Manzanares briefly summarized for the mayor how he originally came to possess the computer in question. Kelly Brough clarified that Lawrence Manzanares generally described having contact with an unknown male in a parking lot and ultimately agreeing to purchase the computer. Kelly Brough indicated that Lawrence Manzanares generally referred to why he believed the computer was not stolen at the time he purchased it and then went on to indicate his embarrassment for exercising poor judgment in the situation. Kelly Brough noted that it was also discussed with Lawrence Manzanares that he should have brought this matter to their attention when he first discovered there was a potential problem. Kelly Brough stated that Lawrence Manzanares agreed that he made an error in judgment when not addressing this matter sooner with the Mayor's office.

On March 7, 2007, Your Affiant conducted an interview with Sue Cobb, currently assigned to the Mayor's office as the media relations representative. Your Affiant also verified with Sue Cobb she recalled the events which occurred on February 23, 2007. Sue Cobb subsequently

provided her recollection of the events which occurred on February 23, 2007, noting both she and Kelly Brough had spoken to Lawrence Manzanares, together and alone at various times during the day. Sue Cobb related, based on her involvement in situation, she did know that the Mayor's Office had not been previously informed as to this matter.

Sue Cobb indicated that on February 23, 2007, she first became aware of this situation sometime during the mid to late morning. Sue Cobb indicated she initially believed she had received a message from Tony Kovaleski with Channel 7 News requesting to speak with Lawrence Manzanares. According to Sue Cobb, Tony Kovaleski indicated that the matter dealt with a "stolen computer" and there was an investigation. Sue Cobb also made mention of following administrative protocol with media matter.

Sue Cobb subsequently met with Lawrence Manzanares who appeared to be "upset" and "embarrassed". Lawrence Manzanares explained, one of the reasons he was "embarrassed" was because he "already had a laptop". Sue Cobb stated that Lawrence Manzanares did not specify as to whether the laptop he already had was his personal computer or issued to him by the city. Sue Cobb specifically recalled Lawrence Manzanares commenting "this could be the end of my career".

Sue Cobb indicated Lawrence Manzanares reported, in "January" he had been approached by an unknown male (possibly some type of construction worker) while in a parking lot that was located to the south, across the street from the City and County Building. Lawrence Manzanares had also mentioned as he was approached by the male, he had been walking down an "alley". At that time the male asked Lawrence Manzanares if he was interested in purchasing a computer. Lawrence Manzanares reported the individual related he needed "bail of bond money". Lawrence Manzanares originally indicated he was not interested but then agreed to purchase the computer for three hundred dollars cash.

Lawrence Manzanares told Sue Cobb that he did not know the computer was stolen because the individual selling it "had the password". Lawrence Manzanares indicated he was advised by court personnel or the police, the "computer was stolen from the courts". Lawrence Manzanares

reported he further learned from those same individuals, the computer had been kept in a locked storeroom, adding "I don't even have a key for it". Lawrence Manzanares then stated that the computer was tracked to his residence by the use of some type of "software" or "chip". Lawrence Manzanares related that once he realized he possessed the stolen computer, he "brought it right in". Lawrence Manzanares reported he turned in the computer into Miles Flesche with the Denver courts. Lawrence Manzanares acknowledged that he had made a "big mistake". Sue Cobb clarified that Lawrence Manzanares was referring to even purchasing the computer when stating he made a "big mistake".

During one of the meetings where both she and Kelly Brough were present, Sue Cobb indicated that Kelly Brough was very "frank" and subsequently informed Lawrence Manzanares that the mayor needed to be advised as to the situation. Sue Cobb also recalled Kelly Brough indicating to Lawrence Manzanares that he had to be truthful regarding this situation, specifically if he was going to agree to a media interview.

There were also issues addressed regarding whether or not a criminal investigation was underway. Lawrence Manzanares then mentioned being interviewed by the police and then went on to indicate he had no information that this was being pursued criminally. Lawrence Manzanares advised that he had previously spoken with Alvin Lacabe, related to that same issue, but Sue Cobb was not clear if anything was clarified. Sue stated Kelly Brough told Lawrence Manzanares not to make any further inquires because it could be seen as "inappropriate".

Lawrence Manzanares again stated he did not know the computer was stolen but did make a statement he had been told that the stolen computer was possibly a "training computer, locked in a storage room". Your Affiant would note, based on his investigation, Lawrence Manzanares was never told by anyone that the stolen computer was possibly a "training computer". That information becomes relevant when addressing the results of the forensic computer analysis.

Sue Cobb confirmed that Lawrence Manzanares was only interviewed by Tony Kovaleski with Channel 7 News at that time. When asked if Lawrence Manzanares provided any additional or conflicting information during his news conference with Tony Kovaleski, Sue Cobb responded

in the negative. When asked if she had an opportunity to review the media broadcast, Sue Cobb indicated she had. Sue Cobb indicated she believed the information she viewed on the newscast was consistent with what she observed during the media interview and also consistent with what she had previously been told by Lawrence Manzanares. Sue Cobb has noted that some of the information they covered with Lawrence Manzanares was not addressed in the media interview. Sue Cobb did confirm that Lawrence Manzanares did meet alone with Kelly Brough and the Mayor after the media interview.

Sue Cobb reported she did have a conversation with Jerry Marroney on February 23, 2007. The primary purpose of the contact was to confirm if there was a criminal investigation into this matter. During that contact Sue Cobb indicated Jerry Marroney was told information related to what Lawrence Manzanares previously told the Mayor's Office. After receiving that information, Jerry Marroney commented that this was the third version Lawrence Manzanares had told related to the computer. Based on what Jerry Marroney told her, Sue Cobb stated it was her understanding that Lawrence Manzanares initially denied having the computer and then offered an explanation in terms of a city computer he was issued being confused with the state owned computer that was missing. Sue Cobb indicated the "third story" that Lawrence Manzanares provided, related to purchasing the computer in the parking lot. Your Affiant did interview Jerry Marroney and knows he did possess the information supplied to Sue Cobb.

On March 8, 2007, Investigator Bohner provided Your Affiant with a copy of the affidavit and search warrant reference search warrant number 2007-108. The search warrant was authorized by the Honorable Judge T. Olsen, with the First Judicial District. Your Affiant had previously discussed with Investigator Bohner obtaining this particular search warrant. In brief, the search warrant was requesting from Comcast Communications all records pertaining to the subscriber account based on two separate Internet Protocol addresses. The first Internet Protocol address or "IP" was identified as 24.9.98.158. The aforementioned IP address was assigned on January 12, 2007 at 1:42 A.M. (Pacific Standard Time) and continued to exist through February 8, 2007 at 11:07 P.M. (Pacific Standard Time). The second IP address was identified as 67.190.191.54. The aforementioned IP address was assigned on February 9, 2007 at1:27 A.M. (Pacific Standard Time) and continued through February 15, 2007 at 12:14 P.M. (Pacific Standard Time). Both

the aforementioned IP addresses were identified through the call log previously obtained from Absolute Software Corporation. The aforementioned IP addresses related to the tracking of the missing computer between the dates and times indicated above. Investigator Bohner indicated he would supply IO with the results of the search once they were received. .

On March 13, 2007, Your Affiant requested assistance from Investigator Amy Ruppeck (with the First Judicial District Attorney's Office) reference a postal inquiry at the address identified as 2201 South Adams Street, Denver, Colorado 80210. Your Affiant would note that the aforementioned address had previously been identified as a residence of Lawrence A. Manzanares, aka Larry Manzanares. Your Affiant was attempting to identify other individuals who resided at the residence. Your Affiant subsequently received the results of the postal inquiry. Your Affiant learned that in addition to Lawrence Manzanares receiving at that address, a female adult is also listed as receiving mail. Your Affiant is familiar with the relationship Lawrence Manzanares has with that person.

With respect to anyone else who may reside at the above address (location where the computer connected to the internet during the time frame in question), Your Affiant did conduct additional investigation into that situation. It was determined that the female adult residing in the home, had two biological children from a previous relationship. Both children were adults during the timeframe in question. One child is reportedly has been living out of state for a number of years (currently attending graduate school) and lists a permanent address from that state (per DMV records). The other child reportedly moved from the above address in December of 2006. The above information (related to both children) was corroborated by one of the children's biological parents. If was further reported that the "son" who Lawrence Manzanares indicated he purchased the computer for, received a new computer (provided by a biological parent) when beginning college during the school year for 2005 / 2006. With respect to where the children are presently living, Lawrence Manzanares confirmed similar information to Investigator Jenkins (with the Jefferson County District Attorney's Office) when he went to the residence to contact the children. Specifically, Lawrence Manzanares stated one of the children attends school out of state, noting the other child does not reside at the residence (no timeframe referenced). Lawrence Manzanares denied knowing a telephone number or where that child presently lived.

At the present time, Your Affiant has no information would indicate that anyone other than Lawrence Manzanares and the adult female reside at the above address.

On March 14, 2007, Investigator Bohner indicated he submitted a "Request for Service" to Rocky Mountain Regional Computer Forensic Labbortaory (RMRCFL), related to additional forensic analysis. The service request relates to supplemental computer analysis Your Affiant wanted performed. The specific request notes "need administrator password and date of change, original password was *********** (Your Affiant would note, he is concealing the original "administrative tech password" in the event it is still active). Need cloned hard drive and password to boot in native environment. Would like to determine if password was changed through legit access or boot disk". Your Affiant is aware that investigator Bohner is still conducting his computer analysis previously requested.

March 14, 2007, Your Affiant received (from the State Court Administrator's Office) information pertaining to the "Outlook web access logs". The Outlook web logs are maintained on the main computer "server" for the State Court Administrator's Office. Your Affiant would note, the information relates email usage (or access) to the account set up for Lawrence Manzanares. The specific time periods involved are defined. Your Affiant confirmed from the hard copy records (later received), that Lawrence Manzanares's judicial email account was accessed from the IP address of 24.9.98.158 (previously confirmed as the IP address coming from Lawrence Manzanares's residence when utilizing the stolen computer). The IP address of 24.9.98.158 was first identified (by the Absolute Software Corporation's CALL LOG) as coming from Lawrence Manzanares's residence on January 12, 2007 at 1:42 A.M. (PST).

The dates and times the Outlook web or email account was accessed are identified as Friday, January 12, 2007 (from 6:12 A.M. to 6:19 A.M.), Saturday, January 13, 2007 (beginning at 5:51 P.M. and continuing sporadically to 11:59 P.M.) and into Sunday, January 14, 2007 (Beginning at 12:00 A. M. to 12:02 A.M.) The last email account access recorded (noting that Lawrence Manzanares's account was disabled on February 7, 2007) was Tuesday, January 16, 2007 (from 4:25 A.M. to 4:40 A.M. and then from 10:53 P.M. to 11:30 P.M.). No Outlook web access logs

were identified for the IP address known as 67.190.191.54. That specific IP address was not assigned to the residence of Lawrence Manzanares until February 9, 2007 at 1:27 A.M. (PST).

As of March 15, 2007, Your Affiant reviewed the Channel 7 News interview between Investigative Reporter Tony Kovaleski and Lawrence Manzanares. The interview was reported to have occurred on February 23, 2007 and was subsequently broadcast by Channel 7 News. The interview could also be reviewed at Channel 7's website. When reviewing the above interview, Lawrence Manzanares disclosed he purchased a used computer which was later identified as being stolen from the courts. Lawrence Manzanares clarified (more than once) he did not know the computer was stolen at the time he purchased it and when that information was made known to him, he returned it immediately. Lawrence Manzanares had further indicated there were factors surrounding the purchase of the computer which led him to believe he was conducting some type of a legitimate transaction. Lawrence Manzanares did make reference to the individual selling the computer having the "password". Lawrence Manzanares also concluded that the computer was owned by the person selling it because he assumed someone would not be "brazen" enough to sell a stolen computer from the location where the alleged transaction occurred.

Your Affiant understood (from the interview above) that Lawrence Manzanares denied knowing the individual who sold him the stolen computer. With respect to that unknown individual, Lawrence Manzanares did state "I could recognize him again, if I saw him". When asked questions surrounding a possible criminal investigation specifically related to being interviewed by the police, Lawrence Manzanares provided a response that rephrased the original question. Lawrence Manzanares qualified his answer by indicating he had not been interviewed since he returned the computer. Your Affiant would note that Lawrence Manzanares made additional statements during the course of his interview with Tony Kovaleski, however, those statements will not be detailed at this time. Based on this investigation, for purposes of this affidavit, Your Affiant knows certain information supplied by Lawrence Manzanares during his interview with Tony Kovaleski is contradicted by witnesses interviewed and evidence gathered in this case.

Your Affiant knows (based on his investigation) that Lawrence Manzanares was interviewed by Detective Lawrence on February 16, 2007 after the computer had been returned. That contact was previously described in this affidavit. Your Affiant notes, although short in duration, Lawrence Manzanares told the detective he was embarrassed and that he did not steal the computer. Lawrence Manzanares then told the detective he did not want to make any additional statements.

Your Affiant also knows (based on his investigation) that Lawrence Manzanares made statements to Miles Flesche reporting he identified the computer's owner from the software he recognized, weeks before he returned the computer. Your Affiant further knows (from the forensic analysis of the computer), significant changes or alterations, to include "massive" deletions were made to the computer on February 15, 2007, beginning at approximately 1:26 P.M. (after Lawrence Manzanares was notified the police had tracked the stolen computer to his residence). Your Affiant will elaborate further on those specifics later in this affidavit.

Later that same date (March 15, 2007) Investigator Bohner provided Your Affiant with his initial forensic analysis related to the computer in question. The information was supplied to Your Affiant primarily in the form of an interactive CD. When reviewing the CD, Your Affiant noted it was divided into sections. The sections were titled as follows: Analysis Summary, Images, JPG's in Unallocated Clusters, Videos, History, Web Cache, Search Hits for Manzanares, Search Hits for Warfrat 5, and Case Processor. With the exception of the sections titled "Images, JPG's in Unallocated Clusters" and "Videos", the information contained under the remaining titles/sections appeared to be of a technical nature.

With respect to the sections titled "Images, JPG's in Unallocated Clusters" and "Videos", Your Affiant was able to review that information. When reviewing the section titled "Images", Your Affiant found that Investigator Bohner reported there were a total of 16,951 image files. Investigator Bohner provided Your Affiant with 2,080 images to review. From the images not selected to review, Investigator Bohner told Your Affiant they consisted of "un-notable system file software or un-viewable images".

When reviewing those image files (the 2080 images selected for review), Your Affiant found that the vast majority of images contained pictures/images which were either sexually graphic, sexually overt, or were titled in a sexually explicit manner. Your Affaint will not describe in detail the sexually graphic pictures or images, but would note they graphically depicted individuals engaging in a variety of sexual activity, to include acts of sodomy (defined as unnatural sexual acts). Some of the images were titled by a generic file name while others were given more descriptive names or titles. When referring to a generic file name, Your Affiant is making reference to titles such as "02[1].jpg" or "Nicole6[1].jpg". The more specific or descriptive titles were named (for example) "piss-voyer-01[1].jpg, tittyfuck[1].gif, www.innocenthigh.com, old_man_tales_03[1].jpg, home incestvideo.com, teencumdumpsters.com, tnschoolgirls_31[1].jpg and meatholes".

The much smaller percentage of images reviewed were either undetermined or did not appear to have any sexual connotations. In the images either undetermined or not obviously sexual, Your Affiant did find a very small percentage which depicted airplanes or were somehow aircraft related. Your Affiant is aware that Lawrence Manzanares has an interest in aviation and is a licensed pilot.

With respect to all (Your Affiant will note the exceptions) the images (the 2080 images, sexual and nonsexual) which are referred to above, Your Affiant did not find a "file creation date" which proceeded January 17, 2007 or exceeded the date of February 15, 2007 (noting the computer was first identified being located at Lawrence Manzanares's residence on January 12, 2007 and was returned on February 16, 2007). The exception to that statement is as follows; there were a small percentage of images which depicted variations of the Colorado flag or State of Colorado type logos/identifiers. In addition, there were other logos or images which had the words written "add attorney, judgments, concurrent/consecutive" and "Colorado State Judicial", to name just a few. All of those types of images appeared to have a 'file creation date" during the year 2006 (prior to when the computer went missing). There is only one single image that shows a "file creation date" which exceeds the date when the computer was returned. That date is identified as February 23, 2007. That date refers to when Tony Petruccelli still had custody of the computer and it was confirmed from the CALL LOG that the computer was connected to the

Internet at 1:51 P.M. (PST) from a State Court Administrator IP address. Your Affiant did recover the stolen computer that day, but secured it and can confirm it was not turned on. Your Affiant was told the above situation was an "anomaly" and is not relevant within the scope of the forensic computer examination. In addition, the specific image showing the "file creation date" of February 23, 2007, is described as a visual advertisement for a "Stripper" scene saver. That same image appears at least three times in the 2080 images reviewed. The "file creation dates" for the three images all show creation dates within the timeframes identified for when the computer was known to be connected to the Internet at Lawrence Manzanares's residence.

When further reviewing the summary CD report prepared by Investigator Bohner, Your Affiant accessed the section titled "JPG's in Unallocated Clusters". Investigator Bohner reported to Your Affaint there were a total of 2,371 JPG files located in the "Unallocated Clusters". Due to nature of the unallocated clusters, Your Affiant was told a "file creation date" can not be determined. In the summary CD report, Investigator Bohner provided Your Affiant with 386 images for review. Investigator Bohner did note that there were additional images located within the "Unallocated Clusters", however, they were not identified as JPG files which made them difficult to retrieve and review.

When reviewing the images in the "Unallocated Clusters", Your Affiant noted, the majority of the images were either sexually graphic, sexually overt, or were titled in a sexually explicit way. For purposes of this affidavit, Your Affiant will not detail that information but would note when reviewing the "Unallocated Clusters" they were very similar to what was described when reviewing the "Images" previously described.

Of the remaining images in the "Unallocated Clusters", again those images were either undetermined or did not appear to have any obvious sexual connection. There were a small percentage of images which related to aircrafts. There were also a small number of images which depicted titles or logs related to "jury instruction, lexis nexis" and "Colorado DUI Benchbook" to name a few.

Your Affaint next reviewed the section titled "Videos" contained in the summary CD report. Investigator Bohner did indicate to Your Affiant he was able to locate 187 videos/movie titles which were retrieved during the computer forensic analysis. Investigator Bohner subsequently supplied Your Affaint with 26 videos/movies to review. Your Affiant would note he was only able to review 12 of the video files, the remaining files would either not open related to "file corruption" issues or Your Affaint did not have the appropriate software or knowledge to open the file. When viewing the 12 videos, Your Affiant found that they lasted in duration from approximately 10 seconds to 2 minutes and 39 seconds.

With respect to the 12 videos reviewed, Your Affiant noted that ten contained graphic sexual activity, while two depicted images of airplanes crashing. The videos/movies which contained the graphic sexual activity were either titled in a sexual manner (ie "magic 2-try teens.com" or "granny pussy"). There were other titles which appeared to have generic computer file names such as "3 [1] mpg". With respect to that specific video/movie, Your Affiant noted when the image played, it depicted graphic sexual activity with the title of "unclelust.com" appearing at the bottom of the screen.

With respect to the remaining 14 videos/movies which Your Affiant was unable to review, eight had written titles which appeared to suggest the content. As an example, there were titles such as "Ashley-fox, pigtail-teen-sex" and "ultra fat fuck". The generic computer file names which would not play were similar to the one noted in the paragraph above, for the video/movie which did play.

Your Affiant was able to review a file name list for all 187 video/movie files. When conducting that review, it was noted that approximately 159 of those files indicated a "file creation date" which begins on January 18, 2007 and ends on February 15, 2007. All of the video/movie files which indicated a creation date beginning on or after January 18, 2007, reflected they were deleted.

Your Affiant would also note with respect to the 187 video/movie names there are approximately 28 which have titles that appear to identify the content, such as "working with annotations" and

"calibrating the tablet pen". All of the above 28 video/movie names are described as "read only" files or "archive" files. All 28 video/movie names indicate a creation date which proceeds January 12, 2007 (the first date the stolen computer is identified as being at Lawrence Manzanares's residence). The most recent created date for those 28 videos/movies is identified as January 26, 2006 (the year prior).

During the review of the summary CD report for the section title previously indicated (related to sexual material), Your Affiant did not observe any individual depicted who could be positively identified as being under 18 years of age. There were however, numerous females (possibly some males) whose chronological age was questionable (referring to the possibility those individuals could have been under the age of 18). For that reason, Your Affiant will be submitting the images retrieved from the stolen computer to the National Center for Missing and Exploited Children (NCMEC). Your Affiant is aware that NCMEC maintains a system database where images submitted can be compared for identification purposes.

On March 15, 2007, Your Affiant received the results of the computer examination which was conducted by RMRCFL. The examination was conducted by Arapahoe County Investigator Corky Hilton (assigned to RMRCFL), a certified forensic computer examiner. For purposes of clarification, RMRCFL had been requested to identify the correct password for the computer in question and the date it was requested. Your Affiant learned that RMRCFL was able to successfully identify the administrative password for the computer. The administrative password was determined to be "1, 2, 3, 4, 5, 6". Your Affaint would note, Lawrence Manzanares previously told Miles Flesche (on two separate occasions) the administrative password he had been using was "1, 2, 3, 4, 5".

From the examination conducted, RMRCFL verified the administrative password for the computer was last successfully accessed on February 16, 2007 at "7:34 A.M.", using an unknown or not as yet determined password. It was further confirmed that the administrative password was then changed to "1, 2, 3, 4, 5, 6" at "7:26 A.M." (on the same date). Your Affiant clarified on February 16, 2007 at 7:34 A.M., someone had successfully accessed the stolen computer with an unidentified administrative password. Your Affiant went on to clarify that

within less than two minutes (time 7:36 A.M.) someone changed the administrative password to "1, 2, 3, 4, 5, 6". Your Affaint is aware that on February 16, 2007, shortly before 8:00 A.M., Lawrence Manzanares tried unsuccessfully to meet with Miles Flesche at his office. At approximately 10:00 A.M. that same morning, Lawrence Manzanares did meet with Miles Flesche and returned the stolen computer. With respect to the administrative password, Miles Flesche reported to Affaint that when he received the password from Lawrence Manzanares (incorrect password of "1,2,3,4,5'), it was communicated by the forenamed that was the password he had been using. Miles Flesche never recalled Lawrence Manzanares ever indicating he had changed the password on the computer just prior to retuning it, or at any other time. Your Affiant confirmed that the password of "1,2,3,4,5,6" (the new correct password), had never been used to access the stolen computer at any time.

On March 21, 2007, Investigator Bohner provided Your Affaint with a return and inventory pursuant to a search warrant he obtained on March 8, 2007. The search warrant requested that "Comcast" produce subscriber account records related to the IP addresses of 24.9.98.158 from January 12, 2007 at 1:42 A.M. (PST) to February 8, 2007 at 11:07 P.M. (PST) along with IP address 67.190.191.54 from February 9, 2007 at 1:27 A.M. (PST) to February 15, 2007 at 12:14 A.M. (PST).

The results of the search warrant indicated that the subscriber information for both these above-listed IP addresses for the timeframes specified, came back to "Lawrence Manzoneras" (spelled as documented) at the address of 2201 Adams Street, Denver, State of Colorado 80210 (telephone number 303-782-4809). The results of the search warrant also indicate that Lawrence Manzanares had set up his Comcast account on December 20, 2003 with the email and "user IDs" identified as "wharfrat5 and wharfrat6".

On March 29, 2007, at approximately 1:30 P.M., IO had contact with Mindy Masias (Director of Human Resources with the Office of the State Court Administrator). Your Affaint was previously aware that Mindy had begun an internal investigation but stopped that process at Your Affiant's request. Your Affaint was also aware that Mindy Masias had conducted two interviews with individuals employed through the State Court Administrator's Office. Those individuals

were identified as Miles Flesche and Sherri Byers. Your Affaint was provided with a general overview of the statements those individuals provided, noting the internal investigation was not complete. Your Affaint will only refer to specific information obtained from Miles Flesche.

In brief, Mindy Masias indicated that she conducted an interview with Miles Flesche on March 8, 2007. During the interview, Miles Flesche reported that "Judge Manzanares" returned the computer to him (date not specified). Miles Flesche went on to indicate that when the computer was returned, Lawrence Manzanares informed him that he had purchased the laptop computer from "someone off the street in the alley behind the courthouse when leaving work and walking to his car". Miles Flesche further indicated, Lawrence Manzanares reported that the individual selling the computer was associated with a "white truck" and had also offered to sell speakers. Miles Flesche reported that Lawrence Manzanares declined to purchase the speakers but confirmed he did purchase the laptop computer. Miles Flesche went on to indicate, Lawrence Manzanares reported he purchased the computer sometime "near the end of December 2006". Miles Flesche stated that Lawrence Manzanares indicated he purchased the computer for his "son" who was still in school. Miles Flesche was further told by Lawrence Manzanares that when he discovered "what looked like judicial software he realized he was going to need to determine what to do with the computer".

On April 13, 2007, through previous arrangements, Your Affaint delivered the computer in question (and accessories) to John Davis, a private certified forensic computer examiner who has been court recognized as expert in this field. John Davis was requested to conduct additional examinations related to the computer.

On April 30, 2007 the District Attorney's Office was provided with a polygraph report, chart tracings and question list, relative to a private polygraph examination submitted to by Lawrence Manzanares on March 21, 2007. The polygraph was conducted by Kenneth A. Vardell, retired F.B.I. At the request of this office, Your Affaint reviewed the information submitted. Your Affiant previously noted, in addition to performing investigative duties for the District Attorney's Office, he is also a polygraph examiner.

Your Affaint initially reviewed the polygraph report prepared by Kenneth Vardell, dated April 5, 2007. In the body of the report, Lawrence Manzanares denied stealing the computer, indicating he purchased the computer from an unknown individual "south of the court house". Lawrence Manzanares also reported "upon learning that the computer was city property" he returned it. Aspects of the statement or explanation attributed to Lawrence Manzanares, is contradicted, based on Your Affiant's investigation. Your Affaint noted, Kenneth Vardell incorrectly reported case facts not in dispute and made an assumption as to at least one issue (reported in the context of a case fact), which has not been confirmed and is still in question. Your Affiant would note that Kenneth Vardell did not have the opportunity to review the investigative reports prior to conducting this polygraph examination.

With respect to the two relevant questions (which contained separate specific issues) Your Affiant found that relevant question "A" (as listed in the report) is based on an assumed (and possibly incorrect) case fact. Relevant question "B" (as listed in the report) is formulated from information solely supplied and supported by Lawrence Manzanares.

The report subsequently provides in Kenneth Vardell's opinion, Lawrence Manzanares's "recorded responses are not indicative of deception" and that the forenamed "was being truthful in his assertions". Your Affiant did review the chart tracings reportedly produced by Lawrence Manzanares during the administration of the polygraph examination. Your Affiant reviewed four separate chart tracings with specific question sets, as it related to this examination. In brief, the charts lacked certain chart markings or examiner notations, which Your Affiant would normally expect to see when viewing (in totality) the type of chart tracings produced during this examination. In addition, the chart tracings produced during the examination appeared to contain probable countermeasures (referring to the probability Lawrence Manzanares deliberately tried to falsify his physiological responses), which seemed to occur with consistency when only certain questions were asked. For the reasons stated above, Your Affiant did not numerically score the charts. Based on the information supplied above (with the exception of any unreported explanation), Your Affaint does not agree with the opinion of Kenneth Vardell as to Lawrence Manzanares's truthfulness.

On May 2, 2007, Your Affiant began to prepare a schedule or timeline which compared the Absolute Software Corporation's CALL LOG (related to the tracking software installed on the stolen computer), the city attorney's appointment calendar, the city attorney's telephone logs (all lines to include the Blackberry), along with other relevant activity related to specific dates and times. The Absolute Software Corporation's CALL LOG documents dates and times beginning on November 16, 2006 at 10:45 A.M. (PST), when the computer's tracking software was installed through February 23, 2007 at 1:51 P.M. (PST), reflective of the date the computer was recovered by Your Affiant at 4:45 P.M.

The city attorney's appointment calendar documents activities beginning on December 11, 2006 and continues through March 4, 2007. Lawrence Manzanares was not sworn in as the city attorney until January 4, 2007 and did not officially take office until January 9, 2007. Lawrence Manzanares is however, scheduled on the city attorney appointment calendar beginning on December 11, 2006. Lawrence Manzanares then resigned his position as the city attorney on February 27, 2007.

The city attorney phone logs consist of four separate official lines of telephone communication for the City Attorney's Office. The phone logs relate to the "Blackberry" (cell) usage (phone 303-898-2102) issued to Lawrence Manzanares from January 9, 2007 to March 4, 2007, the "direct dial" to Lawrence Manzanares's office desk line (phone 720-865-8730), the phone line to the executive assistant to the city attorney (phone 720-865-8770) from January 4, 2007 to February 27, 2007, along with the main office line to the Denver City Attorney's Office (phone 720-865-8600) from January 4, 2007 to February 27, 2007.

The "other activity" section of the schedule relates primarily to issues involving information obtained from the forensic analysis of the computer conducted by John Davis and other specific relevant events.

With respect to the schedule document (which was prepared utilizing all the information described above), it identifies the computer's specific location (to include date and time) relative to when it is connected to the Internet. The calendar activity and phone logs also assist with

identifying activity associated with Lawrence Manzanares on certain dates and times. When comparing the above information to the "other activity" section of the schedule, Your Affaint found that Lawrence Manzanares would have been available to connect the stolen computer to the Internet each time a new connection was recorded by the tracking software. Your Affaint would note, due to the nature or mobility of the "Blackberry" (utilized in the capacity of a cell phone) Lawrence Manzanares's availability would not be an issue. Your Affaint also did not find any date, time or activity which would have excluded Lawrence Manzanares from being the primary or exclusive user of the computer while in his possession or at his residence. The "other activity" section further documents when and how the computer was primarily utilized and what efforts were engaged in to conceal or destroy evidence. There is also corroborative information contained in the schedule which clearly contradicts statements previously made by Lawrence Manzanares related to the stolen computer.

Your Affaint will only summarize in this affidavit the schedule document as it relates to February 15, 2007. Within this summary, Your Affaint will specifically denote the times that events occur, in either Mountain Standard Time (MST) or Pacific Standard Time (PST) to avoid confusion. Your Affiant also needs to clarify one additional issue, discussed in the paragraph below.

With respect to the computer examination, John Davis utilized "restore points" to conduct some of his analysis. Your Affiant was told that a "restore point" can be created when the computer is directed to perform a "restore operation", which in effect can allow the computer's system files to go back to specific a point in time (a date). That process can then allow the computer to restore or replace system files to the specifications (or condition) they were in for the date selected in the past. Based on forensic computer examination conducted by John Davis, he was able to confirm the image or visual appearance of the computer's desktop (specifically the icons) on January 3, 2007 (which is prior to the theft). As previously indicated, the desktop is the screen that appears once a person has successfully logged on to the computer. John Davis verified on that date, the icon identified as "Child Support Guidelines" was present and visually observable on the desktop. Using the same process, John Davis confirmed the "Child Support Guidelines" icon was present and visually observable on the computers desktop through

February 14, 2007, the date prior to when Lawrence Manzanares was notified that the stolen computer had been traced to his residence. The schedule or timeline for February 15, 2007 is as follows.

Beginning at 12:00 A.M. (MST) the CALL LOG reflected that the computer was connected to the Internet from the Manzanares residence. The Computrace software was in the theft recovery mode and required the computer to notify the AMC every twenty minutes. Active computer use was occurring at that time (continuing from February 14, 2007). The computer use reflected the computer was downloading sexually explicit materials. The computer last notified the AMC at 11:47 P.M. (PST), indicating the computer was disconnected from the Internet within approximately twenty minutes of 12:47 A.M. (MST). No Additional activity was noted until sometime prior to 9:00 A.M. (MST) that date.

Between approximately 8:30 A.M. and 9:00 A.M. (MST), Lawrence Manzanares is met at his office by Miles Flesche, Detective Lawrence and Detective Buschy. Lawrence Manzanares is told a stolen computer has been tracked to his residence. Additional discussion occurs which has been previously noted. The contact is brief in nature.

At 9:00 A.M. (MST) the city attorney calendar has scheduled an appointment for "Larry and John" in Lawrence Manzanares's office. The appointment is scheduled to end at 9:30 A.M. (MST). Your Affiant confirmed that appointment occurred within the approximate timeframe indicated.

At 9:30 A.M. (MST) the city attorney calendar has scheduled an appointment for "Larry and Karen" in Lawrence Manzanares's office. The appointment is scheduled to end at 10:00 A.M. (MST). Your Affiant confirmed that appointment occurred within the approximate timeframe indicated.

At 10:00 A.M. (MST) the city attorney calendar has scheduled an appointment for "Weekly Litigation meeting" in Lawrence Manzanares's office. The appointment is scheduled to end at

11:30 A.M. (MST). Your Affiant confirmed that appointment occurred within the approximate timeframe indicated.

Between 12:00 P.M. and 1:00 P.M. (MST), the Executive Assistant recalled Lawrence Manzanares leaving the office indicating he will return.

At 1:14 P.M. (MST), or 12:14 P.M. (PST), per the CALL LOG the computer notifies ("calls home") the AMC, which indicates the computer is now reconnected to the internet.

At 1:26 P.M. (MST), the forensic examination indicated that files began to be deleted. John Davis indicated that specific Internet files on the computer were knowingly or deliberately accessed and then "massive deletions" occurred. John Davis stated the internet files were deleted in less than 5 seconds. John Davis further clarified that the computer's "recycle bin" was also deleted. Your Affiant confirmed the deleted Internet files were the same images (sexually explicit images) previously discussed in this affidavit.

As of 1:45 P.M. (MST), the CALL LOG does not report that the computer notified the AMC. The absence of a notification indicates the computer was disconnected from the internet within the approximate 20 minute timeframe from the last notification at 1:14 P.M. (MST).

At 2:33 P.M. (MST), Lawrence Manzanares's Blackberry phoned the desk of his executive assistant. The duration of the call was identified as 1 minute.

At 3:01 P.M. (MST), the computer examination revealed that a "restore point" was created. Additional forensic examination reveled that the desktop icon, identified as "Child Support Guidelines" was "now missing from the Desktop" and it was further confirmed that same icon was still "missing" from the desktop when Lawrence Manzanares returned the computer on February 16, 2007. The "Child Support Gridlines" icon was one of the icons that identified this computer as belonging to State Court Administrators Office.

At 3:11 P.M. (MST), the computer examination revealed that a "restore point" was created. Additional forensic examination reveled that a restore operation was used to at least "view" the desktop icons for that date. The desktop icons present and visually observable for that date were identified as "Child Support Guidelines", two Westlaw icons and a "Premise" icon. Again, those icons were reported to specifically identify the computer as belonging to the State Court Administrator's Office. There was no forensic evidence indicating that the desktop image for that date, was restored to February 15, 2007.

At 3:50 P.M. (MST), the voice mail for Lawrence Manzanares's Blackberry was called from the Blackberry. Per the phone records it appeared that is the method used to check for messages. The duration of the call was identified as 2 minutes.

At 3:59 P.M. (MST), the Blackberry was called from a telephone number identified as Lawrence Manzanares's residence. The duration of the call was identified as 4 minutes.

At 4: 30 P.M. (MST), the city attorney calendar has scheduled an appointment for "Diversity & Safety Report with Katherine, Al Lacabe, Kelly, Larry Manzanares (Mayor's Office). The appointment was scheduled to last until 5:10 P.M. The Executive Assistant recalled Lawrence Manzanares returning to work sometime after 2:30 P.M. and before 4:00 P.M. The calendar did not indicate the appointment was cancelled.

There was no additional activity reported with computer until 7:34 A.M. on February 16, 2007, as it related to the password change previously discussed.

On May 15, 2007, Your affiant contacted John Davis at his request. John Davis indicated during his forensic analysis (not as yet completed), he discovered a "user name" which had not been previously been identified. John Davis indicated the "user name" was "JTC1". John Davis reported the user account or user name was set up on the computer January 4, 2007, indicating that the computer had to be turned on but not necessarily connected to the for that to occur. John Davis requested Your Affaint to confirm through the State Court Administrator's Office who, if anyone, was issued that specific user name.

John Davis also reported that pursuant to his examination, it was further determined that on January 4, 2007 at approximately 1:00 A.M., the computer received an update from Microsoft. John Davis confirmed the computer would have to be turned on and connected to the Internet for that to occur. John Davis stated, no one would need to be physically present at the computer for that to occur. John Davis next explained that on the same date at approximately 4:01 A.M. the Microsoft update was accepted or installed. John Davis related to accept or install the Microsoft update, the computer would need to be programmed for that function which is common or someone was present to accept and authorize the update. Your Affiant was told, from the examination the conducted, it can not be determined how the update was accepted.

Your Affaint subsequent confirmed the "user name", is assigned routinely as a "training ID" or training user name for individuals receiving training through JBITS. A temporary password is also assigned to the training user name, which in theory is disabled (the password) when the training is completed. In theory, the training user name and password have minimal administrative rights and unless provided with those rights, could not change any existing administrative password. According to individuals at JBITS, to include Kelly Chastain (last one to work on the stolen computer), there would not be a reason to grant a training user name those rights. It was clarified, in order to set up the training user name initially, the exiting administrative password would have to be utilized. Your Affaint was told that if a computer is accessed with the administrative password and left on, in theory someone could then set up a new user name utilizing "JTC1". Your Affiant was further told, a bank of training computers are maintained at JBITS specifically for training and there would not be a legitimate reason for a computer, being issued in the field, to be set up with a training user name.

With respect to the stolen computer, Your Affiant confirmed no records exist from the date the computer was purchased until it was received by Magistrate Messer, indicating that is was used for training purposes. Your Affaint did confirm with Magistrate Messer that he did not use or set up the training user name "JTC1" on the stolen computer when he possessed it. Magistrate Messer also denied ever giving out his password to anyone (noting that he changed the password monthly), with the one past exception, previously noted in this affidavit.

Your Affiant also addressed that issue with Kelly Chastain. Kelly Chastain denied he set up the training user name "JTC1" on Magistrate Messer's computer. It was also addressed with Kelly Chastain that he recalled returning the computer to the locked storage room on January 2, 2007 after he completed connecting it to the Internet, so it could "call home". It was then confirmed to Kelly Chastain that per the CALL LOG records, the stolen computer notified the Absolute Monitoring Center (AMC) on January 3, 2007 at 8:30 A.M. (PST), with what would be within the normal 24 hour reporting cycle (indicating it was never disconnected from the Internet on January 2, 2007). Kelly Chastain subsequently recalled leaving the stolen computer in his locked office over night and disconnecting it from the internet during the morning of January 3, 2007. Kelly Chastain confirmed, when returning any computer to the locked storage room, the unit is disconnected from the Internet and turned off.

Your Affaint next told Kelly Chastain, the stolen computer reflected that on January 4, 2007 a new user account was added, "JTC1". Kelly Chastain stated he did not remove the computer from the storage room after it "called home" and was returned. Kelly Chastain added, he was sure he did not set up the training user name "JTC1" on the computer at any time on January 4 2007. When told the computer examination also reflected that on January 4, 2007, a Microsoft update was received and later accepted, Kelly Chastain stated he had no explanation for how that occurred. Kelly Chastain agreed that the computer would have to be connected to Internet for that to occur. Kelly Chastain was next told that the CALL LOG did not indicate the computer had been reconnected to the Internet at anytime on January 4, 2007 (not scheduled to report on the 24 hour cycle until after approximately 9:00 A.M. that morning). Your Affiant confirmed to Kelly Chastain that based on the programming for the Computrace software, it did not appear that the computer was disconnected from the Internet on January 3, 2007, as he was now reporting. Kelly Chastain again stated he could not explain what had occurred. Kelly Chastain did acknowledge his memory could impaired as it related to when or if the computer was actually returned to storage room, as he originally thought. Without any other explanation Your Affiant would note, the possibility does exist for the computer to have been stolen from Kelly Chastain's office and not from the "locked storage room".

On May 22, 2007, Your Affaint received a written report from Investigator Jenkins relative to follow up investigation he was requested to conduct on this case. Specifically Investigator Jenkins was requested to determine whether or not any exterior cameras or video surveillance existed in and around the area where Lawrence Manzanares claimed he originally purchased the stolen computer. Your Affaint had previously confirmed recorded video surveillance did not exist as it related to the Denver City and County Building.

Your Affaint would note, Lawrence Manzanares (through his attorneys) declined to provide any detail in terms of the date, time, and location, along with suspect description or further suspect vehicle description, which related to the alleged purchase of the stolen computer. In brief, Investigator Jenkins documented numerous locations he identified which could possibly provide a vantage point to the area potentially concerned. Investigator Jenkins reported he was unsuccessful in his efforts with one exception. Investigator Jenkins did locate a vantage point associated with the Denver Art Museum. Detective Jenkins subsequently learned that the Denver Art Museum utilized approximately 500 cameras both internally and externally, some of which could have possibly covered the area in question. Detective Jenkins then confirmed the cameras do have the ability to record but noted not all cameras recorded at all times. Investigator Jenkins stated that there were variables associated with which camera was recording on any specific day or time. Investigator Jenkins did note that security does monitor the cameras but that was also subject to variables. Investigator Jenkins told IO that without having a more specific timeframe in terms of when the alleged computer transaction occurred, based on manpower usage and the likelihood of success, it seemed pointless to pursue this lead at this time.

Based on official Denver Police Department reports and Your Affiant investigation, Your Affiant requests an arrest be issued for Lawrence Anthony Manzanares, DOB: 12/29/56. Lawrence Manzanares is described as a male with light to medium toned skin, approximately 5'7" in height, weight approximately 155 pounds, with brown hair and hazel eyes. Lawrence Manzanares is issued a valid Colorado driver's license number [redacted] with a social security number of [redacted] Lawrence Manzanares is currently residing at 2201 S Adams St. Denver, CO 80210.

Your Affiant requests an arrest warrant be issued based on probable cause for the crimes listed, defined in the Colorado Revised Statues as the following:

Count 1: Theft, C.R.S. 18-4-401 (1), (2)(c) (F4)

Count 2: Embezzlement of Public Property, C.R.S. 18-8-407 (F5)

Count 3: Tampering With Physical Evidence, C.R.S. 18-8-610 (1)(a) (F6)

Count 4: First Degree Official Misconduct, C.R.S. 18-8-404 (M2)

Count 5: Computer Crime, C.R.S. 18-5.5-102 (1)(a) (M2)

[signature]

Investigator R. Boatright, Affiant

**Subscribed and sworn to before me this** 13th **day of** June, **20**07

[signature]

**Judge ~~/ Notary Public~~** **Notary commission expires**

| | |
|---|---|
| County Court, City and County of Denver, Colorado<br>City and County Building, Room 111<br>1437 Bannock Street<br>Denver, CO 80202 | |
| Plaintiff: The People Of The State Of Colorado<br><br>Defendant: **LAWRENCE MANZANARES**<br>D.O.B.: 12/29/56 | COURT USE ONLY |
| | Case Number: 07CR03496<br><br>Div. Criminal Courtroom: |
| **ARREST WARRANT** | |

THE PEOPLE OF THE STATE OF COLORADO

TO: Any Peace Officer authorized by law to execute arrest warrants:

WHEREAS, the District Attorney for the First Judicial District, acting as duly appointed Special Prosecutor for the Second Judicial District, City and County of Denver, State of Colorado, has this date filed a Complaint/Information in this Court charging **LAWRENCE MANZANARES**, with the crime(s) of **THEFT a class 4 felony; EMBEZZLEMENT OF PUBLIC PROPERTY a class 5 felony; TAMPERING WITH PHYSICAL EVIDENCE a class 6 felony; FIRST DEGREE OFFICIAL MISCONDUCT a class 2 misdemeanor; COMPUTER CRIME a class 2 misdemeanor.**

AND WHEREAS, the Court has examined the attached affidavit and has satisfied itself that there is probable cause to believe that the above named offense(s) charged have been committed by the above named person;

AND WHEREAS, the District Attorney for the First Judicial District, acting as duly appointed Special Prosecutor for the Second Judicial District has requested that an arrest warrant be issued for the above named person.

THEREFORE, you are hereby commanded to arrest and bring **LAWRENCE MANZANARES** without unnecessary delay before the nearest available judge of a county or district court.

ORDERED: ______________________
Judge

and

______________________
Court Clerk

BAIL FIXED AT $ 5000^00 P.R DATE: 6/13/07

Original Duly Verified

STATE OF COLORADO } ss
COUNTY OF DENVER }

**RETURN OF WARRANT**

I hereby certify that I duly executed this warrant as commanded by arresting:

**LAWRENCE MANZANARES, DOB: 12/29/56**

on ______________________, __________.

______________________
Arresting Officer

2007 JUN 13 PM 3:02

| | |
|---|---|
| County Court, City and County of Denver, Colorado<br>City and County Building, Room 111<br>1437 Bannock Street<br>Denver, CO 80202 | |
| Plaintiff: The People of the State of Colorado<br><br>Defendant: **LAWRENCE MANZANARES** | |
| | σ COURT USE ONLY σ |
| Scott William Storey, Reg. No. 13482<br>District Attorney, First Judicial District<br>Duly Appointed Special Prosecutor<br>500 Jefferson County Pkwy<br>Golden, CO 80401-6020<br>Phone Number: 303-271-6800<br>Fax Number: 303-271-6888 | Case Number: **07CR03496**<br><br>**Ctrm:** 6 |
| **COMPLAINT AND INFORMATION** | |

**FIVE CHARGES:**

**COUNT 1: THEFT, C.R.S 18-4-401(1),(2)(c) (F4) {0801P}**
**COUNT 2: EMBEZZLEMENT OF PUBLIC PROPERTY, C.R.S 18-8-407 (F5) {24132}**
**COUNT 3: TAMPERING WITH PHYSICAL EVIDENCE, C.R.S 18-8-610(1)(a) (F6) {26062}**
**COUNT 4: FIRST DEGREE OFFICIAL MISCONDUCT, C.R.S 18-8-404 (M2) {24101}**
**COUNT 5: COMPUTER CRIME, C.R.S 18-5.5-102(1)(a) (M2) {15021}**

Bond set at: $ 5000 PR Judge: [signature] Date 6/13/07
Signature

Scott William Storey, District Attorney for the First Judicial District, duly appointed Special Prosecutor, of the State of Colorado, in the name and by the authority of the People of the State of Colorado, informs the court of the following offenses committed, or triable, in the county of Denver:

**COUNT 1: THEFT (F4)**

Between and including approximately January 3, 2007 and February 16, 2007, LAWRENCE MANZANARES unlawfully, feloniously, and knowingly obtained or exercised control over a thing of value, namely: GATEWAY M280 COMPUTER, of STATE OF COLORADO, with the value of five hundred dollars or more but less than fifteen thousand dollars, without authorization, or by threat or deception, and knowingly used, concealed, or abandoned the thing of value in such manner as to permanently deprive STATE OF COLORADO of its use or benefit; in violation of section 18-4-401(1)(b),(2)(c), C.R.S.

**COUNT 2: EMBEZZLEMENT OF PUBLIC PROPERTY (F5)**

Between and including approximately January 3, 2007 and February 16, 2007, LAWRENCE MANZANARES, a public servant in possession of public monies or public property, the property of State of Colorado Judicial Department, a political subdivision of the State of Colorado, unlawfully, feloniously, and knowingly converted the public monies or property to his own use or to a use other than the public use authorized by law; in violation of section 18-8-407, C.R.S.

**COUNT 3: TAMPERING WITH PHYSICAL EVIDENCE (F6)**

On or about February 15, 2007, LAWRENCE MANZANARES, believing that an official proceeding was pending or about to be instituted, and acting without legal right or authority, unlawfully and feloniously destroyed, mutilated, concealed, removed, or altered physical evidence with intent to impair its verity or availability in the pending or prospective official proceeding; in violation of section 18-8-610(1)(a), C.R.S.

**COUNT 4: FIRST DEGREE OFFICIAL MISCONDUCT (M2)**

Between and including approximately January 3, 2007 and February 16, 2007, LAWRENCE MANZANARES, a public servant, with intent to obtain a benefit for any person or maliciously cause harm to another, unlawfully and knowingly violated a statute or lawfully adopted rule or regulation relating to his office; in violation of section 18-8-404, C.R.S.

**COUNT 5: COMPUTER CRIME (M2)**

Between and including approximately January 3, 2007 and February 1, 1960, LAWRENCE MANZANARES unlawfully and knowingly accessed, exceeded authorized access to, or used a computer, computer network, or computer system, or any part thereof without authorization or in excess of authorized access; in violation of section 18-5.5-102(1)(a), C.R.S.

All offenses against the peace and dignity of the People of the State of Colorado.

**WITNESS LIST**

**RUSSELL BOATRIGHT**
JEFFERSON COUNTY DISTRICT ATTORNEY
500 JEFFERSON COUNTY PARKWAY
GOLDEN, CO 80401

***STATE OF COLORADO***
AUTHORIZED AGENT JUDICIAL DEPARTMENT

5. Commander Debra Dilly
Denver Police Department
District 6
1566 Washington Street
Denver, Colorado 80203
720-913-6168

6. Chief Gerald Whitman
Chief of Police
Denver Police Department
1331 Cherokee Street
Denver, Colorado 80204

7. Alvin LaCabe
Manager of Public Safety
City and County of Denver
1331 Cherokee Street
Denver, Colorado 80204

8. Detective Thomas Brennan
Badge # 82-087
Denver Police Department
Attn: Computer Crimes Investigations Unit
1331 Cherokee Street
Denver, Colorado 80204

9. Sue Cobb
Acting Media Representative
Denver Mayor's Office
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-865-9049

10. Kelly Brough
Chief of Staff to the Mayor of Denver
Denver Mayor's Office
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-865-9015

11. Marsha Noel
System Administrator
City Attorney's Office
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-913-3327

12. Mayor John Hickenlooper
Mayor, City of Denver
Denver Mayor's Office
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-865-9015

13. Melinda Olivarez
Executive Assistant to the City Attorney
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-865-8770

14. Sharon Trujillo
Executive Assistant to Kelly Brough
Denver Mayor's Office
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-865-9015

15. Chief Judge Larry Naves
Colorado Judicial Branch
2nd Judicial District
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-865-8301

16. Magistrate Bernard Messer
Colorado Judicial Branch
2nd Judicial District
Retired
In the process of moving

17. Gerald Marroney
State Court Administrator
Office of the State Court Administrator
Colorado Judicial Department
1301 Pennsylvania Street, Suite 300
Denver, Colorado 80203

18. Carol Haller
Legal Advisor
Office of the State Court Administrator
Colorado Judicial Department
1301 Pennsylvania Street, Suite 300
Denver, Colorado 80203
303-861-1111 x4583

19. Bob Roper
Chief Information Officer
Office of the State Court Administrator
Colorado Judicial Branch
Judicial Business Integrated Technology Services (JBITS)
1726 Cole Blvd., Bldg. 22, Suite 300
Golden, Colorado 80401
720-921-7835 – office
303-356-7209 – cell

20. Tony Petrucelli
Technical Services Manager
Office of the State Court Administrator
Colorado Judicial Branch
Judicial Business Integrated Technology Services (JBITS)
1726 Cole Blvd., Bldg. 22, Suite 300
Golden, Colorado 80401
720-921-7811 – office
303-356-8752 – cell (pending transfer to new position)

21. Sherry Byers
Computer Technician
Office of the State Court Administrator
Colorado Judicial Branch
Judicial Business Integrated Technology Services (JBITS)
1726 Cole Blvd., Bldg. 22, Suite 300
Golden, Colorado 80401
720-865-8492 – office

720-490-6580 - cell

22. Kelly Chastain
Computer Technician
Office of the State Court Administrator
Colorado Judicial Branch
Judicial Business Integrated Technology Services (JBITS)
1726 Cole Blvd., Bldg. 22, Suite 300
Golden, Colorado 80401
720-490-6579

23. Andre Claire
Office of the State Court Administrator
Colorado Judicial Branch
Judicial Business Integrated Technology Services (JBITS)
1726 Cole Blvd., Bldg. 22, Suite 300
Golden, Colorado 80401
303-476-8784

24. Shana Klek
Acting Juvenile Clerk of Courts
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-865-8248

25. Tony Kovaleski
Channel 7 News
KMGH Denver's Channel 7
123 Speer Blvd.
Denver, Colorado 80203
303-830-7777

26. Mary Harris
Former Executive Assistant to the City Attorney
Webb Building
201 W. Colfax Avenue
Denver, Colorado 80202
720-865-8778

27. Stephen Sholler
Facilities Superintendent
Denver City and County Building
1437 Bannock Street

Denver, Colorado 80202
720-865-7527 – office
303-589-5726 - cell

28. Lyle Singular
Absolute Software Corp.
111 Dunsmuir Street, Suite 800
Vancouver, British Columbia
Canada V6B 6A3

29. Representative/Custodian of Records
Absolute Software Corp.
111 Dunsmuir Street, Suite 800
Vancouver, British Columbia
Canada V6B 6A3

30. Warren Smith
Absolute Software Corp.
Theft Recovery Officer
111 Dunsmuir Street, Suite 800
Vancouver, British Columbia
Canada V6B 6A3

31. Representative/Custodian of Records
Comcast Internet Services
650 Centerton Road
Moorestown, New Jersey 08057
856-317-7200

32. Mindy Masias
Director of Human Resources
Office of the State Court Administrator
Colorado Judicial Department
1301 Pennsylvania Street, Suite 300
Denver, Colorado 80203
303-356-7080

33. Sarah King
Legal Administrator City of Denver
City Attorney's Office
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-865-8750

34. George Delaney
Deputy Manager of Public Works
City of Denver
Webb Building
201 W. Colfax Avenue
Denver, Colorado 80202
720-865-8630

35. Victoria Gonzales
Comcast Legal Counsel
650 Centerton Road
Moorestown, New Jersey 08057
856-317-7200

36. John Davis
Colorado Computer Forensics (CCF)
14501 East Alameda, Suite 1
Aurora, Colorado 80012
303-524-4589

37. A. "Corky" Hilton
Investigator, Arapahoe County Sheriff's Office
Forensic Computer Examiner
Assigned to:
Rocky Mountain Regional Computer Forensic Labs (RMRCFL)
9195 East Mineral Avenue, Suite 300
Centennial, Colorado 80112
303-649-7900

38. Chris Mootz
Director of Human Services Legal Section
City of Denver
Webb Building
201 W. Colfax Avenue
Denver, Colorado 80202
720-944-2978

39. Jared Ruge
Technical Supervisor
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-865-7575 – office
303-880-3732 – cell

40. John Redman
Assistant City Attorney
City Attorney's Office
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-913-8059

41. Karen Aviles
Assistant City Attorney
City Attorney's Office
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-865-8752

42. Xavier Duran
Assistant City Attorney
City Attorney's Office
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-913-3114

43. Emily Arnold or Representative
Staff Analyst, Child Victim Identification Program
National Center for Missing and Exploited Children
PO Box 19853
Alexandria, Virginia 22320-9853
703-837-6308

44. Bob Nicholson
Investigator
Denver Public School System
900 Grant Street
Denver, Colorado 80203

45. Judge Whitney
Colorado Judicial Branch
2nd Judicial District
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202

46. Commander John Kish
CU – Boulder Police Department
502 UCB
Boulder, Colorado 80309-0502

47. Kim Pasco
Security Superintendent
Hospital Shared Services
1395 South Platte River Drive
Denver, Colorado 80223
720-641-6783

48. Tony Rios
Custodial Supervisor
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-865-7670 – office
720-641-7208 – cell

49. Sam Dykstra
Assistant City Attorney
City Attorney's Office
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-913-8410

50. Miles Flesche
District Court Administrator
2nd Judicial District State Court Administrator's Office
Denver City and County Building
1437 Bannock Street
Denver, Colorado 80202
720-865-8301

51. Brian Hanrahan
Computer Technician
Office of the State Court Administrator
Colorado Judicial Branch
Judicial Business Integrated Technology Services (JBITS)
1726 Cole Blvd., Bldg. 22, Suite 300
Golden, Colorado 80401

303-210-3284

52. Wanda Clary
Supervisor, Computer Technicians
Office of the State Court Administrator
Colorado Judicial Branch
Judicial Business Integrated Technology Services (JBITS)
1726 Cole Blvd., Bldg. 22, Suite 300
Golden, Colorado 80401

53. Pat Herbert
Supervisor, Computer Technicians
Office of the State Court Administrator
Colorado Judicial Branch
Judicial Business Integrated Technology Services (JBITS)
1726 Cole Blvd., Bldg. 22, Suite 300
Golden, Colorado 80401

54. Gina Martinez
Parking Coordinator, Webb Building
201 W. Colfax Avenue
Denver, Colorado 80202
720-913-1735

55. Amy Alonzo
Danielle Anglada
Linda Angove
Carl Blesch
Russell Bohner
Patricia Brecheisen
Jim Burkhalter
David Cillessen
Donna Clausen
Fred Cope
Nichole Dean
Debbie Farnum
Mike Gallagher
Kimberly Gallerani
Cassandra Harris
Mike Harris
Kim Holmes
William Jenkins
John Lauck
David Lynn
George Mumma

Greg Neal
Bruce Norton
Deb Ohno
Tara Pacheco
Rita Rodriguez Reed
Peggy Rowlett
Amy Ruppeck
Keith Sorci
Susanne Stephens
Pat Vondenkamp
Cliff Yablon
Investigations
1st Judicial District Attorney's Office
500 Jefferson County Parkway
Golden, Colorado 80401

---

**DEFENDANT INFORMATION**

DOB: 12/29/1956
Alias:
Race: White
Gender: Male
Height:
Weight: lbs.
Hair: Black
Eye: Brown
Birthplace: N/A
Tattoo: N/A
Driver Lic. #:
DPD Number: N/A
DAID: 020612070001
NCIC #: N/A
SID #: N/A
Home Phone #: (303) 640-3924
Work Phone #: N/A
Address: Home Address
2201 S Adams St
Denver, CO 80210

---

**CASE INFORMATION**

Arresting Agency: DPD - CODPD0000
Filing Agency#: DPD - CODPD0000
Arrest #: N/A
Agency Case #: 20075002031
Date of Arrest: 6/12/2007
BAC: N/A

---

BY: [signature]

Deputy District Attorney: Reg. No.: 21572

Filed on: June 13, 2007.

JMF

Office of the District Attorney
First Judicial District
Jefferson and Gilpin Counties

Scott W. Storey
District Attorney

**For Immediate Release - June 13, 2007**

**Contact:** Pam Russell
Public Information
303-271-6905

RE: Former Denver City Attorney Lawrence Manzanares Charged

---

District Attorney Scott Storey announced today that charges have been filed against former Denver City Attorney Lawrence Anthony Manzanares, DOB: 12-26-56. Manzanares is accused of having stolen a laptop computer from the Denver District Court in the City and County of Denver.

The charges include:

1. Theft (F-4);
2. Embezzlement of public property (F-5);
3. Tampering with physical evidence (F-6);
4. First degree official misconduct (M-2); and
5. Computer crime (M-3).

This investigation began on January 26, 2007 when the State Court Administrator's Office filed a report with the Denver Police Department alleging that a laptop computer had been stolen.

By February 16 the Denver Police Department determined the missing computer to be at the home of the newly appointed City Attorney, Larry Manzanares. Denver Police notified Manzanares that the computer had been determined to be at his house. Manzanares took the laptop computer to the State Court Administrator's Office that same day.

*-- more --*

On February 21 the Denver Police Department referred the investigation to the Denver District Attorney's Office.

The following day, February 22, the Denver District Attorney's Office determined the need for a special prosecution.

The First Judicial District Attorney was appointed as special prosecutor on February 23. District Attorney Investigators then took the lead in the investigation.

District Attorney Scott Storey says, "This has been a very complex investigation. We want acknowledge the cooperation we received from Mayor Hickenlooper's Office as well as the outstanding police work that was done by the Denver Police Department in the first few weeks of the investigation."

Manzanares will turn himself in today to the Denver Police Department and it is expected that he will be released on a PR bond. This case will be handled in the Denver District Court by prosecutors from the First Judicial District (Jefferson and Gilpin counties).

***-- End --***

-----Original Message-----
From: Pam Russell [mailto:PRussel@co.jefferson.co.us]
Sent: Wednesday, June 13, 2007 2:41 PM
To: KOA; Channel 9; nicole vap; Paula Woodward; Bruce Norton; Marilyn Robinson; Keith Coffman; Deborah Krause; AP news releases; AP; AP; AP; Channel 4; Channel 4; Channel 4; CBS News; Channel 4; KOA,KBCO,KNOW,TKLK,KTCL; KOA,KBCO,KNOW,KTCL,KTLK; KOA,KBCO,KHOW,KTLK,KTCL; Espinoza, Annette; Schrader, Ann; Nicholson, Kieran; McPhee, Mike; DP Newsroom; Portia Berrey; Heath Urie; Couriers, Times; Steve Knapp; FOX; Charlie Brennan; Julie Hayden; Tammy Vigil; Aaron storms; Monica Stalter; Mary Hastings; Channel 7; Tyler Lopez; bruce norton; Briana Hovendick; Jeff Francis; Neda; Mile High News; Gilpin Gazette; Able, Charley; Griego, Tina; Lindsay, Sue; RMN Metro; Poppen, Julie; Prieto, Bianca; Denver Daily News; Channel 2 News; Groves, Karen
Subject: Manazanares Charged - News Conference today

News Conference
Today, June 13
3:30

DA's Office
500 Jefferson County Parkway
Golden, CO
303-271-6800

Pam Russell
Director of Public Information
First Judicial District Attorney
500 Jefferson County Parkway
Golden, CO 80401
303-271-6905

Close Window Send To Printer

denver & the west

# Official on leave in probe of laptop

By George Merritt
Denver Post Staff Writer
Denver Post

Article Last Updated: 02/25/2007 12:17:45 AM MST

Jefferson County prosecutors will investigate how the Denver city attorney wound up with a laptop computer stolen from the City and County Building, city officials said Saturday.

Mayor John Hickenlooper placed Larry Manzanares on "investigatory leave" after learning that police had traced the stolen computer to Manzanares' home.

Manzanares said Saturday he was trying to save money when he bought a used computer from someone in a parking lot.

"I unwittingly - and certainly in hindsight, without good judgment - bought a computer ... and it turned out to be stolen," he said.

Manzanares was appointed by Hickenlooper at the end of last year and took office in January. Prior to that position, he had been a Denver District Court judge since 1998.

The computer was stolen from Denver District Court.

"It turns out it was owned by the District Court where, ironically, I previously had worked," Manzanares said. "Although not from where I worked. My understanding is that it was in a locked storeroom."

The issue, first reported by Denver's KMGH-TV Channel 7, sparked private speculation in city circles that Manzanares would have to step down.

Police informed Manzanares that they suspected he had a stolen computer more than a week ago, he said.

"We're concerned about the serious issues raised by this situation and the fact we were not made aware of the matter until yesterday," Hickenlooper said in a statement Saturday.

The statement noted Manzanares' "distinguished career in our community, much of it in public service as a judge."

The mayor added: "We fully expect the investigation to clearly lay out all of the facts."

Asked if his job was in jeopardy, Manzanares said: "I can't answer that.

"Certainly this is not one of the smartest things I've done in my life. I was embarrassed and mortified to find out that I had a stolen computer, but I'm going to be straight up about it and try to deal with it."

*Staff writer George Merritt can be reached at 303-954-1657 or gmerritt@denverpost.com.*

Case No. 1:25-cv-03361-KHV-GEB Document 12-1 filed 11/15/25 USDC Colorado pg 101 of 162

# TheDenverChannel.com

## Denver's City Attorney Resigns

***7NEWS Investigation: Stolen Laptop Found In Manzanares' Home***

POSTED: 12:39 pm MST February 27, 2007
UPDATED: 8:23 pm MST February 27, 2007

Related To Story



**CITY ATTORNEY**

- **Video:** Preferential Treatment?
- **Video:** City Council Reacts
- **Exclusive Video:** Entire Interview With Manzanares
- **Video:** Manzanares Resigns
- **Video:** Exclusive 7NEWS Interview
- **Statement:** To Denver Police (PDF)
- **Statement:** Judicial Branch (PDF)

**DENVER** -- Less than two months after he took office, City Attorney Larry Manzanares resigned his position Tuesday following an exclusive 7NEWS investigation into a stolen laptop that was found in his home.

Manzanares notified the mayor's office of his decision on Tuesday.

In a statement, Denver Mayor John Hickenlooper accepted the resignation saying, "We fully respect Larry's decision and wish him and his family the very best during this difficult time. The fact that he did not want the ongoing investigation or questions surrounding this situation to interfere with the important work of the City Attorney's Office speaks to the character and integrity he demonstrated during his respected career as an attorney and District Court judge."

In a statement to 7NEWS regarding his resignation, Manzanares said, "Current events which have been highlighted by the media have created an untenable distraction for the mayor's office and the position of Denver city attorney. The position of city attorney should be uncompromised by such distractions, and it would be unfair to the city and to the many fine attorneys in the City Attorney's Office to allow such a situation to continue.

"Therefore, I believe it is in the best interests of the city and the City Attorney's Office that I resign my position as city attorney. I have had very many well-wishers and supporters encourage me to ride out the storm, and while I am grateful for their support, I believe the continued effectiveness of the City Attorney's Office must come first," he said.

In light of 7NEWS' story, which broke on Friday night, Denver's mayor initially placed Manzanares on "investigatory leave" and promoted deputy city attorney Arlene Dykstra to acting city attorney over the weekend.

Dykstra will continue as acting city attorney until the mayor can appoint a new city attorney, the mayor's office said.

Manzanares remains under criminal investigation after a laptop belonging to Denver District Court was found in his home. Manzanares told 7NEWS that he bought the laptop from a stranger in the parking lot of

the City and County Building and he had no idea that the computer was stolen.

"When I was informed that there was a computer that was stolen and that it might be one that I had, I immediately brought it back because, until that point, I had no idea. The minute I learned that there was a stolen computer, I brought it in," Manzanares said.

Manzanares said he did not take the computer from the City and County Building. He said he bought the computer sometime in mid-January from a man who said he needed to sell the laptop to help with bail money.

Manzanares said he did not know the man but could pick him out of a lineup.

"The honest truth is I do feel foolish. I hope we're not measured by our mistakes but instead by the ... you know, the career that I've had for many years, a distinguished career. I hope that's how people think of me, but you know, I did something which is not very smart -- which is I bought a computer in a parking lot," Manzanares said.

7NEWS has also learned that a special prosecutor from Jefferson County has been appointed to investigate the case to avoid conflicts of interest. A representative for the Jefferson County District Attorney's Office said there's no timetable on when the investigation will be complete but that they "will move on it quickly."

The computer was stolen from a storage room in Denver District Court, where Manzanares was a former judge. The computer is worth more than $1,500, according to a police report.

Manzanares' friends and colleagues were baffled by the investigation. They describe him as hard-working, smart man with integrity and character.

Hickenlooper appointed Manzanares on Nov. 11 and he took office Jan. 4.

**Have a question or comment on this story? Or have a story idea or news tip? Call us at 303-832-TIPS or e-mail us.**

**Previous Story:**

- February 23, 2007: Stolen Property Found In Home Of Denver's City Attorney

*Copyright 2007 by TheDenverChannel.com. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

Close Window Send To Printer

# City attorney resigns over stolen laptop

By George Merritt
Denver Post Staff Writer
Denver Post

Article Last Updated:02/27/2007 04:18:35 PM MST

City Attorney Larry Manzanares resigned today, four days after Mayor John Hickenlooper placed him on leave for possessing a computer that was stolen from the city last month.

Manzanares, formerly a county and district court judge, told authorities on Saturday he purchased the computer from a man in a parking lot sometime in January. Manzanares told the Denver Post he could not remember how much he paid for it.

Mayor John Hickenlooper accepted Manzanares' resignation this afternoon.

"We fully respect Larry's decision and wish him and his family the very best during this difficult time," the mayor said. "The fact that he did not want the ongoing investigation or questions surrounding this situation to interfere with the important work of the City Attorney's Office speaks to the character and integrity he demonstrated during his respected career as an attorney and District Court judge."

Manzanares was sworn in as Denver's City Attorney on January 4, 2007. Deputy City Attorney Arlene Dykstra will serve as Acting City Attorney until a new City Attorney is appointed by the mayor.

In a prepared statement, Manzanares said, "Current events which have been highlighted by the media have created an untenable distraction for the Mayor's office and the position of Denver City Attorney. The position of City Attorney should be uncompromised by such distractions, and it would be unfair to the City and to the many fine attorneys in the City Attorney's Office to allow such a situation to continue. Therefore, I believe it is in the best interests of the City and the City Attorney's Office that I resign my position as City Attorney. I have had very many well-wishers and supporters encourage me to ride out the storm, and while I am grateful for their support, I believe the continued effectiveness of the City Attorney's Office must come first."

The Gateway M280 computer, worth about $1,600, was reported stolen from a city storage locker on Jan. 26. City officials said it could have been stolen anytime between Jan. 1 and Jan. 26.

The computer was traced to Manzanares' home using tracking software that recorded when the computer was logged onto the Internet and by whom.

Officials from the Jefferson County District Attorney's office were brought in to investigate the incident.

Close Window | Send To Printer

editorial

## Attorney's resignation lets city move forward

**A bizarre personnel episode entangles city hall. Officials were wise to shift the investigation to the district attorney's office in Jefferson County.**

Article Last Updated:02/27/2007 07:25:48 PM MST

Denver's new city attorney, Larry Manzanares, did the right thing when he resigned his position Tuesday, sparing the city the embarrassment of having its top legal officer under criminal investigation for his befuddling possession of a stolen laptop computer.

It's a sad chapter in what had been a stellar career of public service for the Harvard-educated lawyer who had served 15 years as a respected local judge. He had been at city hall for only two months when the scandal broke, and we're told his performance and demeanor had been exceptional.

Manzanares' version of events is incomprehensible - and even if it proves true, it bespeaks incredibly poor judgment. He says he bought the computer sometime in January from some guy in a parking lot. Manzanares told The Post he didn't recall how much he paid. This is a man who had heard all manner of cases as a county and district court judge. Surely, he'd know better than to buy a hot laptop.

Manzanares told Mayor John Hickenlooper last Friday that police were asking him about the $1,500 laptop, and recounted his story. The mayor asked him, "What were you thinking?" and Manzanares responded: "I don't know what I was thinking. I wasn't thinking."

Denver officials were smart to ask Jefferson County officials to take over the investigation of the theft of the laptop. It was taken sometime in January from a locked storage room in the building where Manzanares had worked as a judge. The laptop had embedded in it a tracking device allowing authorities to find that it was hooked up to the Internet in Manzanares' house.

Hickenlooper put Manzanares on "investigatory leave" upon learning of the situation. He said he was shocked, having known of Manzanares' fine reputation for years. "He's lectured on ethics," Hickenlooper said. " I think it's in all dimensions tragic."

The mayor said at this point he's not sure what lessons he can take away. The city, Hickenlooper said, had done background checks on Manzanares and turned up nothing.

The search for Manzanares' successor should begin immediately. The city attorney plays an important role in the Hickenlooper government. The administration, which has taken some public hits over the election commission fiasco and snow removal controversy, must fill the job with a strong professional.

Before long, details of the laptop fiasco will surely emerge. Manzanares' resignation was essential. His decision allows the city to move forward in the meantime.

Close Window Send To Printer

jim spencer | columnist

# Exit only option for Manzanares

By Jim Spencer
Denver Post Staff Columnist
Denver Post

Article Last Updated:02/28/2007 01:34:31 AM MST

Denver City Attorney Larry Manzanares did the right thing. But he also did the only thing that made sense.

Manzanares resigned Tuesday, four days after news surfaced that he was caught with a stolen laptop computer.

Manzanares, a former Denver judge, claimed that he bought the laptop from some dude in a parking lot. He claimed that he couldn't remember what he paid for the computer, which was reported stolen from the city courthouse Jan. 26.

Mayor John Hickenlooper called Manzanares' fall "tragic."

Feel free to add the adjectives "inexplicable" and "bizarre."

Manzanares' acquisition of the stolen laptop, which police found at his home, remains under criminal investigation.

If a special prosecutor thinks Manzanares committed a crime, he should be charged. He could have knowingly accepted stolen property or stolen the computer himself.

But even without a charge, Manzanares' credibility was shot. He had to go.

"It seemed clear to me that what he was wrestling with was the magnitude of what he'd done and what he would do to atone, to try to make it right," Hickenlooper said Tuesday afternoon.

The mayor believed that would lead Manzanares to resign.

It was the only option. Manzanares' case was about more than possible criminal behavior. It was about a mayoral Cabinet member who failed an ethics smell test like a bad case of flatulence.

Forget criminal charges, Denver's chief legal officer could not have survived his bad judgment and convenient amnesia.

Manzanares chose not to answer repeated requests for an interview.

I wanted to ask him why he didn't at least suspect - as the rest of the world would - that a deeply discounted laptop for sale in a parking lot was probably stolen. That suspicion alone should have killed the sale.

I also wanted to ask why, if Manzanares truly bought the computer, he couldn't remember what he paid for it barely a month later.

Hickenlooper was not aware that Manzanares had pleaded forgetfulness of the computer's price. But the mayor said Manzanares was sticking to his story about buying the computer in January from a guy in a parking lot.

Manzanares had a world-class résumé and impeccable references when Hickenlooper hired him Jan. 4 to replace City Attorney Cole Finegan, who left to return to a private law practice. "He was a finalist (for city attorney) the first time," Hickenlooper said of Manzanares.

He went to Harvard Law School. He spent 14 years on the county and district court benches in Denver. Manzanares seemed to have it all professionally.

Today, his career is in the dumper.

Hickenlooper was right when he said that Manzanares' mistake does not make the man "a bad person." What it made him was unfit for further public service.

Discretion and common sense are at the heart of this scandal. They will still be the keys if special prosecutor Scott Storey of Jefferson County determines that Manzanares knew he was buying stolen property or that Manzanares took the nearly $1,600 Gateway laptop from a locked room at the Denver courthouse.

The city's black eye was never going to heal until Manzanares left.

A Denver police report of the computer theft suggests that Computrace, a security technology installed on the laptop, led police to Manzanares' home.

Here's what the website of Absolute Software, the maker of Computrace, says about finding stolen laptops: "The analysis of a computer theft reveals that laptops connect to the Internet soon after they've been stolen. ... Once a computer connects to the Internet, ... Computrace ... quietly reports its location."

It seems that whiz-bang science undid Manzanares. But technological genius paled in comparison to the stupidity of the former judge and now former city attorney.

True or not, the some-dude- in-a-parking-lot deal was the absolute best-case scenario for Larry Manzanares.

It was, however, never enough to save his job.

*Jim Spencer's column appears Monday, Wednesday and Friday. Reach him at 303-954-1771, jspencer@ denverpost.com or blogs.denverpost.com/spencer.*

Close Window | Send To Printer

denver & the west

# City attorney steps down

## Laptop-theft case Manzanares' ruin

By George Merritt
Denver Post Staff Writer
Denver Post

Article Last Updated:02/28/2007 08:52:25 AM MST

Denver City Attorney Larry Manzanares resigned Tuesday - less than two months after he took office - done in by a stolen computer he said he bought from a man in a parking lot.

The move punctuated a four-day controversy for the former judge and Harvard Law School alumnus and created a setback for Mayor John Hickenlooper's administration.

"His whole life, he has lectured on ethics," Hickenlooper said of Manzanares "I don't know what was going through his head. But I don't think that makes him a bad person. I think it's, in all dimensions, tragic."

Manzanares had hoped to get past the controversy, even after Hickenlooper placed him on leave Friday. He said he was "embarrassed and mortified," to learn the computer was stolen but planned to "deal with it."

On Tuesday, however, Manzanares said the media attention surrounding him "created an untenable distraction for the mayor's office and the position of Denver city attorney."

A special prosecutor at the Jefferson County district attorney's office has been named to investigate how Manzanares had the computer.

Hickenlooper downplayed any effect on his administration when asked about the city attorney's short tenure.

"We'll be fine," he said. "You guys will have plenty of opportunities to second-guess, but I worry about the guy."

Councilwoman Jeanne Robb said that given Manzanares' credentials, there was little the mayor's office could do.

"I'm afraid it isn't a failure of selection," she said. "It's a human failure, and we all have human failures. But I'm sorry we have to be looking for a city attorney again so soon."

**Lost out to Finegan**

Manzanares had been a finalist for the city attorney post at the beginning of the Hickenlooper administration, losing out to Cole Finegan. When Finegan moved to private practice last year, Hickenlooper said the Denver District Court judge came highly recommended as a successor. Manzanares was sworn in Jan. 4.

Later that month, Manzanares said, he met a man in a parking lot near city hall and bought a Gateway m280 laptop. On Saturday, Manzanares said he could not remember how much he paid for it.

The computer belonged to the very district where Manzanares had been a judge. And it was equipped with a tracking device designed to allow authorities to pinpoint the location of missing computers

On Jan. 26, an official in the state court administrator's office reported the $1,579 computer stolen. He noted that the tracking software showed the computer had been used the day before

Manzanares said he returned the computer as soon as police contacted him, noting that he had no idea it came from the court office.

It was about a week later that Hickenlooper found out about the issue. He put Manzanares on paid "investigatory" leave.

Meanwhile, Jefferson County district attorney's office spokeswoman Pam Russell said Tuesday that Manzanares' resignation will not stop its investigation.

Russell said a decision on whether to pursue charges would not come before at least the end of the week.

Manzanares did not return calls for comment Tuesday, but in a statement, he said the investigation would create an unfair distraction for his office.

**Deputy takes reins**

"I have had very many well- wishers and supporters encourage me to ride out the storm," he said. "While I am grateful for their support, I believe the continued effectiveness of the city attorney's office must come first."

Hickenlooper said Arlene "Sam" Dykstra, the deputy city attorney, will continue to fill in as head of the office. But he said he would begin a search for a new appointee.

*Staff writer George Merritt can be reached at 303-954-1657 or gmerritt@denverpost.com.*

Close Window Send To Printer

opinion | letters to the editor

# Letters, 3/2

Article Last Updated:03/01/2007 09:06:38 PM MST

## Theft of laptop and city attorney's resignation

**Re:** "City attorney steps down," Feb. 28 news story.

Let's see, we have a former judge and prosecutor, Larry Manzanares, who claims to have brokered a deal for a $1,600 laptop computer in your average parking lot. This Harvard whiz kid can't remember how much he paid for this expensive item. He probably can't remember anything about laws regarding "theft by receiving," either. Naturally, the item had been recently stolen from the City and County of Denver. Anyone believing this probably served on O.J. Simpson's jury.

Why, then, doesn't Manzanares broker a deal with the Jefferson County prosecutor by admitting that he is a thief who wants to do the right thing, since he's probably going to end up skating anyway?

**Terry Chellus,** *Grand Junction*

...

Why must we always assume the worst about people? Let's look at the data. On Craigslist Wednesday, there were 988 used laptops for sale locally, and on eBay there were 45,530. Some of these laptops might be stolen, but the safe assumption is that the vast majority are legitimate. The simple truth is that folks sell their used stuff these days.

But instead of assuming the best about the man selling a used laptop, Larry Manzanares' big sin is that he didn't assume the worst in his fellow man. I guess that's not a quality we want in a city official. And now we, as a city, assume the worst about a man who has devoted his professional career to serving the city in a noble and ethical fashion. Shame on all of us. Somewhere along the line, we have become a society of cynics who have a fascination with seeing a good person fall. It is a sad day when our city loses the services of such a man.

**Jim Castle,** *Denver*

...

I wonder how many times former Judge Larry Manzanares admonished defendants appearing before him for using "I didn't know it was stolen" or "I should've known better" as defenses when sentencing them to prison for felony theft by receiving.

**K. Kyle,** *Sterling*

---

## Death of another young Broncos player

**Re:** "Stunned Broncos ponder the randomness of death," Feb. 26 sports story.

For the second time in as many months, our community mourns the death of a 24-year-old member of the Denver Broncos football team. Again we read team players and coaches responding to these unexpected losses by saying, "This just makes you realize we don't know how much time we have. That's up to our maker," and, "This was not our call. This was God's decision."

If the divine must be invoked to explain these sad deaths, let it be said that God created the world finite and free. Physical evil such as heart failure is the natural implication of a finite world. Moral evil such as drive-by shootings is the tragic implication of a free world. May we also take comfort and hope in the belief that the Almighty knows our pain in such losses.

**Michael D. Dent,** *Senior Pastor, Trinity United Methodist Church, Denver*

---

Close Window | Send To Printer

al lewis | columnist

# Executive class has its kleptos

By Al Lewis
Denver Post Staff Columnist
Denver Post

Article Last Updated:03/04/2007 01:22:04 PM MST

Many otherwise honest people turn into kleptos once they get to work.

In a survey titled "Office Kleptomania," 10 percent of workers admitted to stealing from their employers and 38 percent of hiring managers reported firing people for theft. This survey of more than 2,200 workers - conducted in June by online job website CareerBuilders.com - has a low count compared to others.

A poll last year by a legal resources company called Lawyers.com found that 18 percent of 2,350 surveyed admitted taking office supplies from work. And in 2005, a career information company called Vault.com, said 67 percent of 1,150 people it queried admitted the same.

"It's usually about half or more," said Jeffrey Alstete, a professor at the Hagan School of Business at Iona College in New York, who has seen many surveys.

Alstete studies employee theft. He says workers will take anything that's not bolted down, for all kinds of reasons.

"A lot of times, employees feel they are underpaid, so they have a right to take what's owed to them," Alstete said.

Other times, stealing makes employees feel as if they are exerting control over their bosses. For bosses who steal, it may be to feed an ego - or it may be a subconscious act of self-destruction.

Last year, Thomas Coughlin, former vice chairman of Wal-Mart, pleaded guilty to stealing hundreds of thousands of dollars worth of merchandise. He'd joined Wal-Mart as a loss-prevention director. He was a personal friend of founder Sam Walton. He made more than $6 million a year and had amassed stock worth more than $50 million over a 27-year career. Yet he stole things like dog food and Celine Dion CDs.

"Some people feel they don't deserve the position and the status they have, so they do this kind of behavior to be brought down a notch," Alstete said.

Last week, Larry Manzanares came down several notches after being found in the possession of a stolen laptop computer. Manzanares, 50, resigned as Denver City Attorney, a $125,473-a-year job that he'd held for two months.

Before becoming one of the most powerful members of Mayor John Hickenlooper's administration, the Harvard Law School graduate had been a Denver county and Denver district court judge. When Manzanares was named to the county post in 1992, he was the third member of his family to preside over a court.

The laptop that police found at Manzanares' home had been reported stolen from the locked storage room of a state court administrator. It was the same court where Manzanares worked.

Manzanares, however, has said he purchased the computer from a guy in a parking lot. This is a disturbing story from a man who once lectured on legal ethics.

Of course, employers can't rely on ethics when anyone from the chairman on down might be stealing.

What they really need is LoJack.

The computer that got Manzanares in trouble was loaded with a product by Absolute Software Corp. of Vancouver, B.C. The business version of this software is called CompuTrace and the consumer version is called LoJack for Laptops.

When a stolen computer logs onto the Internet, this software alerts authorities to the phone number or Internet protocol address it is using. The service, which costs $50 a year, is so much like the one used to track stolen cars that Absolute licensed the LoJack name.

The software can't be detected. It will recreate itself when a thief replaces a stolen laptop's hard drive. It has only been loaded in about 1 million computers. But Absolute now has deals with several manufacturers, so this product may soon be as standard as anti-virus software.

Absolute spokesman Matt Fisher said the software now recovers 25 to 50 stolen laptops a week. It works everywhere.

"We once saw a laptop go from Boston to London, then Dubai, then back to London, down to Miami and back up to Boston," Fisher said. "Somebody stole it, sold it on eBay, and a Hong Hong businessman was using it as he traveled."

This is the beginning of a bad trend for all of you thieves in the workplace.

"When the detectives knock on the door, so often the criminals say, 'How one earth did you find me? How could you possibly know?"' Fisher said. "They have no idea how they got caught."

*Al Lewis' column appears Sundays, Tuesdays and Fridays. Respond to Lewis at 303-954-1967, denverpostbloghouse.com/lewis, or alewis@denverpost.com.*

Rocky Mountain News

To print this page, select **File** then **Print** from your browser
URL: http://www.rockymountainnews.com/drmn/local/article/0,1299,DRMN_15_5402672,00.html

# Courts swayed stolen laptop case

Deputy DA cited request in decision not to prosecute

**By Lou Kilzer, Rocky Mountain News**
**March 8, 2007**

Three days before the story broke that a former Denver judge had been caught in possession of a stolen state laptop computer, a top Colorado judicial department official asked Denver police to drop the case.

Carol Haller, legal counsel for the state court administrator's office, says in a written statement to Denver police that she had reviewed police reports and discussed the issue with State Court Administrator Gerald Marroney and asked "that no prosecution take place at this time."

Citing that request, a deputy Denver district attorney the next day officially declined to file charges against former Judge Larry Manzanares, who was then Denver's city attorney.

She was quickly overruled by top DA brass, who on the same day decided to turn the case over to a special prosecutor because of the conflict of interest with the Denver DA's office.

The Jefferson County district attorney is now handling the case and will decide whether Manzanares will be charged.

Haller and Marroney were unavailable Wednesday to make clear whether the reports they reviewed and discussed identified Manzanares, a former employee of their department, as the suspect.

A spokesman for the agency could not say.

"I think that it would be likely" that the state judicial branch knew when it reviewed the police reports that the subject was former Judge Larry Manzanares, Lynn Kimbrough, a spokeswoman for the Denver district attorney's office said.

Kimbrough said that ordinarily, if a theft victim doesn't want to prosecute, that could be enough to derail the case.

"If it had been a routine theft of property in which the property had been returned and the victim did not want to cooperate with the prosecution, we might honor the victim's request," she said. "But it was a mistake, because it was not routine."

Rob McCallum, public information officer for the state court administrator, said that officials with his agency wanted to examine the computer before taking a position on prosecution.

"Now before we made any decision one way or the other, we wanted to be able to look at the computer and understand what may have been done," McCallum said.

"We had just received the computer back. We didn't even know what it was we were being asked to make a decision on."

He said the the state wanted to review the contents of the computer before making any decisions.

"We needed to have time to do the diligence to find out what had happened to the machine before we could make an assertion as to whether or not something happened," he said.

## On-again, off-again laptop prosecution

- **Jan. 26:** State court administrator worker reports $1,579 laptop computer missing from Denver City and County Building.

- **Jan. 31:** Theft detection software installed in the missing laptop sends notification to an electronic monitoring center that the computer is logged on to the internet, recording the Internet Protocol (IP) address.

- **Feb. 7:** Denver County Court Judge Melvin Okamoto issues a search warrant allowing a Denver police detective access to Comcast records that identify the subscriber through the IP address.

- **Feb. 20:** Carol Haller, legal counsel for the state court administrator's office, asks Denver police not to prosecute anyone in the laptop theft.

- **Feb. 21:** A deputy DA initially decides she can drop the case because of Haller's request, but the prosecutor's superiors reverse the decision after learning that Denver City Attorney Larry Manzanares, a former judge, is the suspect.

- **Feb. 23:** Mayor John Hickenlooper puts Manzanares on leave after being contacted by a Denver's 7 reporter. The station breaks the story about Manzanares having the stolen laptop in his possession that night.

- **Feb. 27:** Manzanares resigns, saying the investigation had become an "untenable distraction."

*kilzerl@RockyMountainNews.com or 303-954-2644*

Copyright 2007, Rocky Mountain News. All Rights Reserved.

## Rocky Mountain News

To print this page, select **File** then **Print** from your browser

URL: http://www.rockymountainnews.com/drmn/local/article/0,1299,DRMN_15_5402672,00.html

# Courts swayed stolen laptop case

Deputy DA cited request in decision not to prosecute

**By Lou Kilzer, Rocky Mountain News**
**March 8, 2007**

Three days before the story broke that a former Denver judge had been caught in possession of a stolen state laptop computer, a top Colorado judicial department official asked Denver police to drop the case.

Carol Haller, legal counsel for the state court administrator's office, says in a written statement to Denver police that she had reviewed police reports and discussed the issue with State Court Administrator Gerald Marroney and asked "that no prosecution take place at this time."

Citing that request, a deputy Denver district attorney the next day officially declined to file charges against former Judge Larry Manzanares, who was then Denver's city attorney.

She was quickly overruled by top DA brass, who on the same day decided to turn the case over to a special prosecutor because of the conflict of interest with the Denver DA's office.

The Jefferson County district attorney is now handling the case and will decide whether Manzanares will be charged.

Haller and Marroney were unavailable Wednesday to make clear whether the reports they reviewed and discussed identified Manzanares, a former employee of their department, as the suspect.

A spokesman for the agency could not say.

"I think that it would be likely" that the state judicial branch knew when it reviewed the police reports that the subject was former Judge Larry Manzanares, Lynn Kimbrough, a spokeswoman for the Denver district attorney's office said.

Kimbrough said that ordinarily, if a theft victim doesn't want to prosecute, that could be enough to derail the case.

"If it had been a routine theft of property in which the property had been returned and the victim did not want to cooperate with the prosecution, we might honor the victim's request," she said. "But it was a mistake, because it was not routine."

Rob McCallum, public information officer for the state court administrator, said that officials with his agency wanted to examine the computer before taking a position on prosecution.

"Now before we made any decision one way or the other, we wanted to be able to look at the computer and understand what may have been done," McCallum said.

"We had just received the computer back. We didn't even know what it was we were being asked to make a decision on."

He said the the state wanted to review the contents of the computer before making any decisions.

"We needed to have time to do the diligence to find out what had happened to the machine before we could make an assertion as to whether or not something happened," he said.

## On-again, off-again laptop prosecution

• **Jan. 26:** State court administrator worker reports $1,579 laptop computer missing from Denver City and County Building.

• **Jan. 31:** Theft detection software installed in the missing laptop sends notification to an electronic monitoring center that the computer is logged on to the Internet, recording the Internet Protocol (IP) address.

• **Feb. 7:** Denver County Court Judge Melvin Okamoto issues a search warrant allowing a Denver police detective access to Comcast records that identify the subscriber through the IP address.

• **Feb. 20:** Carol Haller, legal counsel for the state court administrator's office, asks Denver police not to prosecute anyone in the laptop theft.

• **Feb. 21:** A deputy DA initially decides she can drop the case because of Haller's request, but the prosecutor's superiors reverse the decision after learning that Denver City Attorney Larry Manzanares, a former judge, is the suspect.

• **Feb. 23:** Mayor John Hickenlooper puts Manzanares on leave after being contacted by a Denver's 7 reporter. The station breaks the story about Manzanares having the stolen laptop in his possession that night.

• **Feb. 27:** Manzanares resigns, saying the investigation had become an "untenable distraction."

*kilzerl@RockyMountainNews.com or 303-954-2644*

Copyright 2007, Rocky Mountain News. All Rights Reserved.

Rocky Mountain News

To print this page, select **File** then **Print** from your browser

URL: http://www.rockymountainnews.com/drmn/local/article/0,1299,DRMN_15_5404010,00.html

# Officials deny preferential treatment in laptop theft

By Lou Kilzer, Rocky Mountain News
March 8, 2007

Colorado judicial authorities knew that former district court judge and then-Denver City Attorney was suspected of stealing a $1,600 state computer when they told police they didn't want him prosecuted "at this time."

That fact and others were contained in a news release by the State Court Administrator's office Thursday.

However, the judicial authorities said Larry Manzanares did not receive "any preferential treatment" by administrator's office, which they said was conducting its own investigation, independent of Denver police.

The release and an attached timeline show that Denver cops approached the state twice to get officials to go along with the prosecution of Manzanares. Both times — Feb. 16 and Feb. 20 — the state put them off.

The decision on the 20th to ask for no prosecution had immediate impact on the investigation. The next day, a Denver deputy district attorney declined to file charges, citing the judicial officials' position.

That decision was reversed when DA brass learned the identity of the suspect and decided to ask for a special prosecutor. Top DA officials kicked the case to a special prosecutor.

Thursday's release said that court officials "wanted to take the necessary time to investigate both the theft and the use of the computer, while at the same time comply with the Denver Police Department's request for a statement?"

In the timeline, the state court said that police found the laptop in Manzanares home on Feb. 15 and notified the State Court Administrator's Office the same day.

On Wednesday, a spokesman for the administrator's office said he could not confirm that the state authorities knew the identity of the person the police wanted prosecuted for theft.

The state reported the computer stolen Jan. 26.

Copyright 2007, Rocky Mountain News. All Rights Reserved.

Case No. 1:25-cv-03361-KHV-GEB Document 12-1 filed 11/15/25 USDC Colorado pg 117 of 162

Rocky Mountain News

To print this page, select **File** then **Print** from your browser
URL: http://www.rockymountainnews.com/drmn/local/article/0,1299,DRMN_15_5404010,00.html

# Officials deny preferential treatment in laptop theft

By Lou Kilzer, Rocky Mountain News
March 8, 2007

Colorado judicial authorities knew that former district court judge and then-Denver City Attorney was suspected of stealing a $1,600 state computer when they told police they didn't want him prosecuted "at this time."

That fact and others were contained in a news release by the State Court Administrator's office Thursday.

However, the judicial authorities said Larry Manzanares did not receive "any preferential treatment" by administrator's office, which they said was conducting its own investigation, independent of Denver police.

The release and an attached timeline show that Denver cops approached the state twice to get officials to go along with the prosecution of Manzanares. Both times — Feb. 16 and Feb. 20 — the state put them off.

The decision on the 20th to ask for no prosecution had immediate impact on the investigation. The next day, a Denver deputy district attorney declined to file charges, citing the judicial officials' position.

That decision was reversed when DA brass learned the identity of the suspect and decided to ask for a special prosecutor. Top DA officials kicked the case to a special prosecutor.

Thursday's release said that court officials "wanted to take the necessary time to investigate both the theft and the use of the computer, while at the same time comply with the Denver Police Department's request for a statement?"

In the timeline, the state court said that police found the laptop in Manzanares home on Feb. 15 and notified the State Court Administrator's Office the same day.

On Wednesday, a spokesman for the administrator's office said he could not confirm that the state authorities knew the identity of the person the police wanted prosecuted for theft.

The state reported the computer stolen Jan. 26.

Copyright 2007, Rocky Mountain News. All Rights Reserved.

Close Window | Send To Printer

denver & the west

# Court officials say ex-judge got no special treatment

By George Merritt
Denver Post Staff Writer
Denver Post

Article Last Updated:03/09/2007 01:28:48 AM MST

State court officials knew a stolen computer was tracked to former Judge Larry Manzanares when they asked Denver police not to prosecute.

Manzanares stepped down last month as Denver city attorney after tracking software led police looking for the stolen laptop to his home.

Manzanares returned the stolen computer to the State Court Administrator's Office on Feb. 16, the same day police contacted him. Manzanares, who served less than two months as city attorney, said he bought the computer from a man in a parking lot.

On Feb. 20, the judicial office filed a report with police to "ask that no prosecution take place at this time."

But Assistant District Attorney Chuck Lepley overruled the request and asked for a special prosecutor to review the case.

The State Court Administrator's Office on Thursday was quick to respond to the implication that officials gave preferential treatment to a former colleague.

Spokesman Rob McCallum said the request that the case not be prosecuted was the result of a hasty police deadline.

"The Denver Police Department was pressing us for a decision," McCallum said, noting the computer was returned and the statement was filed on either end of a long weekend. "We had not concluded our due diligence on that computer ... and we felt as though we couldn't move forward until we had more information."

McCallum said his office asked for more time but police officials denied it.

He said technology officials in the office planned to examine the computer to find out how it had been used. If they had found a reason to, McCallum said, they could have gone back to police and asked for prosecution.

Denver police spokesman John White did not offer a response, saying the department has a policy of not talking about an open case once it has passed the case to another agency.

The case was nearly dropped Feb. 21 when a Denver prosecutor, heeding the request of the judicial office, elected not to pursue a case.

Assistant District Attorney Lepley overruled the decision the same day and said a special prosecutor would be needed.

"Our deputy ... shouldn't have declined it," Denver district attorney's office spokeswoman Lynn Kimbrough said. "That decision really needs to be made by someone who is independent to make sure that there is not a conflict of interest."

The Jefferson County district attorney's office is reviewing the case as a special prosecutor. A spokeswoman there said it has not made a decision.

Manzanares maintained he had no idea the computer belonged to his former employer.

McCallum confirmed Thursday that the computer has no markings, labels or software to indicate it belonged to the state.

"The way we track them is by serial numbers," he said. "Just by looking at the machine, there is no way of knowing that it belongs to anybody."

*Staff writer George Merritt can be reached at 303-954-1657 or gmerritt@denverpost.com.*

Rocky Mountain News

To print this page, select **File** then **Print** from your browser

URL: http://www.rockymountainnews.com/drmn/local/article/0,1299,DRMN_15_5405436,00.html

# Ethics experts divided on case

Laptop a bad call, scholars say, but after that it's hard

**By John C. Ensslin, Rocky Mountain News**
**March 9, 2007**

Some legal ethics experts say it's not hard to find fault with a lawyer buying a laptop computer from a stranger in a parking lot, as former Denver City Attorney Larry Manzanares claims he did.

But these same scholars say the ethics issues posed by the state court administrator requesting that no charges be filed over the stolen state-owned computer that wound up in Manzanares' possession is a tougher call.

Manzanares, a former Denver District Court judge, resigned on Feb. 27, less than two months after he was sworn in as city attorney, after an anti- theft device on the computer led to its discovery in his possession.

He told investigators that he purchased the laptop, valued at $1,579, from a man in a parking lot one block south of city hall.

A special prosecutor from the Jefferson County district attorney's office is investigating. Prior to the incident becoming public, State Court Administrator Gerald Marroney's office asked Denver police "that no prosecution take place at this time."

Buie Seawell, chairman of the department of business ethics and legal studies at the University of Denver, said that even if the case turns out not to be a violation of the law, buying a computer under such circumstances was a bad decision.

"You could argue from an ethics point of view that he knew or should have known that it was more likely than not that these were goods that the seller did not have legal title to," Seawell said.

As a lawyer, Manzanares should have known that, Seawell said.

On the question of the court administrator declining prosecution, Seawell said he could not offer an opinion.

"I don't know what factors the state court administrator took into account," he said And the mere request not to prosecute does not stop the prosecution, he noted.

"That isn't his (Marroney's) choice; it's just his opinion," Seawell said. "As for the ethics of saying, 'Let's not make a felony out of it,' he may know some mitigating circumstances that we don't know "

Alec Rothrock, a lawyer who specializes in legal ethics, said he saw nothing wrong with the state court administrator's action.

"People have their own reasons for not wanting to prosecute charges," Rothrock said. "I don't think there's anything wrong with the court administrator deciding not to press charges."

*ensslinj@RockyMountainNews.com or 303-954-5291*

Copyright 2007, Rocky Mountain News. All Rights Reserved.

Rocky Mountain News

To print this page, select **File** then **Print** from your browser
URL: http://www.rockymountainnews.com/drmn/local/article/0,1299,DRMN_15_5405501,00.html

# Ex-judge's role was known



Manzanares is a former judge and Denver city attorney.

Courts urged no prosecution over stolen computer

**By Lou Kilzer, Rocky Mountain News**
**March 9, 2007**

Colorado judicial authorities knew that a former district court judge was suspected of stealing a $1,600 state computer when they told police last month that they didn't want him prosecuted "at this time."

That was revealed in a statement released by the state court administrator's office on Thursday.

However, the statement from the office of State Court Administrator Gerald Marroney said Larry Manzanares, who became Denver city attorney in January, did not receive "any preferential treatment" by the administrator's office.

The office said it declined to recommend prosecution because it was conducting its own investigation.

On Wednesday, a court administrator's office spokesman said he did not know whether senior officials knew that Manzanares was the target when they recommended against prosecution.

A timeline accompanying the court administrator's statement says state officials knew by Feb. 15 that Manzanares was implicated.

Jefferson County officials, who are acting as special prosecutors in the case, said a decision whether to charge Manzanares could be made as soon as next week.

Denver police approached officials from the state court administrator's office twice, on Feb. 16 and Feb. 20, to get them to go along with the prosecution of Manzanares.

The decision on the 20th to ask for no prosecution "at this time" had an immediate impact on the investigation.

The next day, a Denver deputy district attorney declined to file charges, citing the judicial officials' position.

That decision was reversed when DA brass learned the identity of the suspect. They referred the matter to Jefferson County prosecutors, who continue to investigate.

Thursday's release said that state court officials delayed a decision because they "wanted to take the necessary time to investigate both the theft and the use of the computer, while at the same time comply with the Denver Police Department's request for a statement."

The two officials known to be involved in the no-prosecution recommendation are State Court Administrator Marroney and the department's legal counsel, Carol Haller.

Rob McCallum, a spokesman for the state court administrator, said Thursday that another official, Colorado Chief Justice Mary Mullarkey, "was clearly briefed on the issue, but she never gave any directives."

He said he did not know when the chief justice was briefed, though he noted, "Gerry Marroney's boss is the chief justice."

On Feb. 23, the Jefferson County special prosecutor took the laptop from the administrator's office.

McCallum said all the state's actions were above board and not intended to protect a former judicial colleague.

"From the state court administrator's perspective, there would be no obstruction of justice with how we handled this," he said.

## Tracing the 'parking lot' laptop

- Jan. 26: State court administrator worker reports $1,579 laptop computer missing from Denver City and County Building.

- Jan. 31: Theft detection software installed in the missing laptop sends notification to an electronic monitoring center that the computer is logged on to the Internet, recording the Internet Protocol (IP) address.

- Feb. 7: Denver County Court judge issues a search warrant granting Denver police access to Comcast records that identify the subscriber through the IP address.

- Feb. 15: Police trace the laptop to the home of Denver City Attorney Larry Manzanares, a former district and county court judge.

- Feb. 16: Manzanares returns the laptop to Denver District Court. Police ask the state court administrator if the agency wants the case prosecuted. The agency asks for time to review the computer.

- Feb. 20: Carol Haller, legal counsel for the state court administrator's office, asks Denver police not to prosecute anyone for the laptop theft "at this time."

- Feb. 21: In light of Haller's request, a deputy DA initially decides she can drop the case, but her superiors reverse the decision after learning that Manzanares is the suspect.

- Feb. 23: Mayor John Hickenlooper puts Manzanares on leave after being contacted by a Denver's 7 reporter. The station breaks the story about Manzanares having the stolen laptop in his possession that night.

- Feb. 27: Manzanares resigns.*Sources: State Court Administrator'S Office, Denver Police Reports And Court Documents.*

*kilzerl@RockyMountainNews.com or 303-954-2644*

Copyright 2007, Rocky Mountain News. All Rights Reserved.

Rocky Mountain News

To print this page, select **File** then **Print** from your browser
URL: http://www.rockymountainnews.com/drmn/editorials/article/0,2777,DRMN_23964_5404556,00.html

# The Manzanares muddle

Explanation by court brass leaves much to be desired

**March 9, 2007**

As far as we knew, the Office of the State Court Administrator devoted itself entirely to administering state courts. It handles payroll, budget, computer coordination, long-range planning, probation services, lobbying the legislature for money - the boring basics.

We had no idea that it might also try to directly intervene in the pursuit - or is it obstruction? - of justice. At least when one of its own is under suspicion.

It turns out that Carol Haller, the office's legal counsel, asked police not to prosecute former Denver District Judge Larry Manzanares *after* she and State Court Administrator Gerald Marroney had been told that a missing court laptop had turned up in Manzanares' home.

Haller's statement, written Feb. 20 on a Denver Police Department form, said that after reviewing police reports and discussing the issue with Marroney, "the \[judicial] branch position is to ask that no prosecution take place at this time."

Although Manzanares isn't mentioned by name in the note, Marroney and his immediate superior, Chief Justice Mary Mullarkey, conceded in a joint statement issued Thursday that the office had been informed of Manzanares' link to the case on Feb. 15, five days earlier.

Their statement raises far more questions than it answers. Such as:

- Do state court administrators usually argue against prosecution in possible thefts of comparable magnitude from their own offices? If so, why? Doesn't the public expect the courts, of all institutions, to pursue punishment for lawbreakers?

- On the other hand, if the administrator's position favoring no prosecution in this case was unusual, doesn't it amount to special treatment for Manzanares - treatment that Mullarkey and Marroney specifically deny?

- Their statement refers twice to the desire of the administrator's office to analyze data on the computer before deciding whether to support prosecution. Why? What was the relevance of such an analysis to a decision to prosecute? After all, Mullarkey and Marroney acknowledge they had no concern that "confidential information about court users had been compromised." If that's so, why wasn't the decision on whether to recommend prosecution based on whether a stolen computer is in and of itself serious enough to warrant charges? Why the hand-wringing about the computer's contents?

- Why were the state courts intent on running an investigation parallel to the police and district attorney's? That's what Thursday's statement implies the administrator's office at least hoped to do. Is such a probe undertaken in every theft from court offices? Or is it only done when a theft might have been committed by a prominent former employee?

- What did Mullarkey know about this case, and when did she know it? A press spokesman for the state court administrator, Rob McCallum, told a *Rocky* reporter Thursday that Mullarkey had been "briefed" on the case, but could not say when or to what extent. He did say "she never gave any directives." OK, but did she offer any advice? A former district judge was potentially in bigtime trouble, after all; surely that was a matter of keen concern to her, as would be any matter affecting the reputation of the courts.

Incredibly, the court administrator's advice to the police almost quashed the case. An unidentified deputy Denver district attorney recommended no prosecution based on Haller's note, but was overruled by her bosses. They had the good sense not to let their decisions be based on recommendations by court administrators.

The DA's office turned the case over to a special prosecutor in Jefferson County to avoid the suggestion of conflict of interest.

Manzanares, who had been named Denver city attorney Nov 30, returned the laptop Feb. 16. He told reporter Tony Kovaleski of Denver's 7 that he had bought the computer from someone in a parking lot. He was put on "investigatory" leave by Mayor John Hickenlooper Feb 23 and resigned four days later

The theft of a laptop may not be a big deal under normal circumstances. But the court administrator's intervention to urge no prosecution against a former judge certainly is a major concern. And in trying to offer an explanation for it Thursday, top court officials have left matters more confused than ever.

Copyright 2007, Rocky Mountain News. All Rights Reserved.

Rocky Mountain News

To print this page, select **File** then **Print** from your browser
URL: http://www.rockymountainnews.com/drmn/local/article/0,1299,DRMN_15_5405436,00.html

# Ethics experts divided on case

Laptop a bad call, scholars say, but after that it's hard

**By John C. Ensslin, Rocky Mountain News**
**March 9, 2007**

Some legal ethics experts say it's not hard to find fault with a lawyer buying a laptop computer from a stranger in a parking lot, as former Denver City Attorney Larry Manzanares claims he did.

But these same scholars say the ethics issues posed by the state court administrator requesting that no charges be filed over the stolen state-owned computer that wound up in Manzanares' possession is a tougher call.

Manzanares, a former Denver District Court judge, resigned on Feb. 27, less than two months after he was sworn in as city attorney, after an anti- theft device on the computer led to its discovery in his possession.

He told investigators that he purchased the laptop, valued at $1,579, from a man in a parking lot one block south of city hall.

A special prosecutor from the Jefferson County district attorney's office is investigating. Prior to the incident becoming public, State Court Administrator Gerald Marroney's office asked Denver police "that no prosecution take place at this time."

Buie Seawell, chairman of the department of business ethics and legal studies at the University of Denver, said that even if the case turns out not to be a violation of the law, buying a computer under such circumstances was a bad decision.

"You could argue from an ethics point of view that he knew or should have known that it was more likely than not that these were goods that the seller did not have legal title to," Seawell said.

As a lawyer, Manzanares should have known that, Seawell said.

On the question of the court administrator declining prosecution, Seawell said he could not offer an opinion.

"I don't know what factors the state court administrator took into account," he said. And the mere request not to prosecute does not stop the prosecution, he noted.

"That isn't his (Marroney's) choice; it's just his opinion," Seawell said. "As for the ethics of saying, 'Let's not make a felony out of it,' he may know some mitigating circumstances that we don't know."

Alec Rothrock, a lawyer who specializes in legal ethics, said he saw nothing wrong with the state court administrator's action.

"People have their own reasons for not wanting to prosecute charges," Rothrock said. "I don't think there's anything wrong with the court administrator deciding not to press charges."

*ensslinj@RockyMountainNews.com or 303-954-5291*

Copyright 2007, Rocky Mountain News. All Rights Reserved.

# Rocky Mountain News

To print this page, select **File** then **Print** from your browser
URL: http://www.rockymountainnews.com/drmn/local/article/0,1299,DRMN_15_5405501,00.html

## Ex-judge's role was known



Manzanares is a former judge and Denver city attorney.

Courts urged no prosecution over stolen computer

**By Lou Kilzer, Rocky Mountain News**
**March 9, 2007**

Colorado judicial authorities knew that a former district court judge was suspected of stealing a $1,600 state computer when they told police last month that they didn't want him prosecuted "at this time."

That was revealed in a statement released by the state court administrator's office on Thursday.

However, the statement from the office of State Court Administrator Gerald Marroney said Larry Manzanares, who became Denver city attorney in January, did not receive "any preferential treatment" by the administrator's office.

The office said it declined to recommend prosecution because it was conducting its own investigation.

On Wednesday, a court administrator's office spokesman said he did not know whether senior officials knew that Manzanares was the target when they recommended against prosecution.

A timeline accompanying the court administrator's statement says state officials knew by Feb. 15 that Manzanares was implicated.

Jefferson County officials, who are acting as special prosecutors in the case, said a decision whether to charge Manzanares could be made as soon as next week.

Denver police approached officials from the state court administrator's office twice, on Feb. 16 and Feb. 20, to get them to go along with the prosecution of Manzanares.

The decision on the 20th to ask for no prosecution "at this time" had an immediate impact on the investigation.

The next day, a Denver deputy district attorney declined to file charges, citing the judicial officials' position.

That decision was reversed when DA brass learned the identity of the suspect. They referred the matter to Jefferson County prosecutors, who continue to investigate.

Thursday's release said that state court officials delayed a decision because they "wanted to take the necessary time to investigate both the theft and the use of the computer, while at the same time comply with the Denver Police Department's request for a statement."

The two officials known to be involved in the no-prosecution recommendation are State Court Administrator Marroney and the department's legal counsel, Carol Haller.

Rob McCallum, a spokesman for the state court administrator, said Thursday that another official, Colorado Chief Justice Mary Mullarkey, "was clearly briefed on the issue, but she never gave any directives."

He said he did not know when the chief justice was briefed, though he noted, "Gerry Marroney's boss is the chief justice."

On Feb. 23, the Jefferson County special prosecutor took the laptop from the administrator's office.

McCallum said all the state's actions were above board and not intended to protect a former judicial colleague.

"From the state court administrator's perspective, there would be no obstruction of justice with how we handled this," he said.

## Tracing the 'parking lot' laptop

• Jan. 26: State court administrator worker reports $1,579 laptop computer missing from Denver City and County Building.

• Jan. 31: Theft detection software installed in the missing laptop sends notification to an electronic monitoring center that the computer is logged on to the Internet, recording the Internet Protocol (IP) address.

• Feb. 7: Denver County Court judge issues a search warrant granting Denver police access to Comcast records that identify the subscriber through the IP address.

• Feb. 15: Police trace the laptop to the home of Denver City Attorney Larry Manzanares, a former district and county court judge.

• Feb. 16: Manzanares returns the laptop to Denver District Court. Police ask the state court administrator if the agency wants the case prosecuted. The agency asks for time to review the computer.

• Feb. 20: Carol Haller, legal counsel for the state court administrator's office, asks Denver police not to prosecute anyone for the laptop theft "at this time."

• Feb. 21: In light of Haller's request, a deputy DA initially decides she can drop the case, but her superiors reverse the decision after learning that Manzanares is the suspect.

• Feb. 23: Mayor John Hickenlooper puts Manzanares on leave after being contacted by a Denver's 7 reporter. The station breaks the story about Manzanares having the stolen laptop in his possession that night.

• Feb. 27: Manzanares resigns.*Sources: State Court Administrator'S Office, Denver Police Reports And Court Documents.*

*kilzerl@RockyMountainNews.com or 303-954-2644*

Copyright 2007, Rocky Mountain News. All Rights Reserved.

# Rocky Mountain News

To print this page, select **File** then **Print** from your browser

URL: http://www.rockymountainnews.com/drmn/editorials/article/0,2777,DRMN_23964_5404556,00.html

## The Manzanares muddle

Explanation by court brass leaves much to be desired

**March 9, 2007**

As far as we knew, the Office of the State Court Administrator devoted itself entirely to administering state courts. It handles payroll, budget, computer coordination, long-range planning, probation services, lobbying the legislature for money - the boring basics.

We had no idea that it might also try to directly intervene in the pursuit - or is it obstruction? - of justice. At least when one of its own is under suspicion.

It turns out that Carol Haller, the office's legal counsel, asked police not to prosecute former Denver District Judge Larry Manzanares *after* she and State Court Administrator Gerald Marroney had been told that a missing court laptop had turned up in Manzanares' home.

Haller's statement, written Feb. 20 on a Denver Police Department form, said that after reviewing police reports and discussing the issue with Marroney, "the \[judicial] branch position is to ask that no prosecution take place at this time."

Although Manzanares isn't mentioned by name in the note, Marroney and his immediate superior, Chief Justice Mary Mullarkey, conceded in a joint statement issued Thursday that the office had been informed of Manzanares' link to the case on Feb. 15, five days earlier.

Their statement raises far more questions than it answers. Such as:

• Do state court administrators usually argue against prosecution in possible thefts of comparable magnitude from their own offices? If so, why? Doesn't the public expect the courts, of all institutions, to pursue punishment for lawbreakers?

• On the other hand, if the administrator's position favoring no prosecution in this case was unusual, doesn't it amount to special treatment for Manzanares - treatment that Mullarkey and Marroney specifically deny?

• Their statement refers twice to the desire of the administrator's office to analyze data on the computer before deciding whether to support prosecution. Why? What was the relevance of such an analysis to a decision to prosecute? After all, Mullarkey and Marroney acknowledge they had no concern that "confidential information about court users had been compromised." If that's so, why wasn't the decision on whether to recommend prosecution based on whether a stolen computer is in and of itself serious enough to warrant charges? Why the hand-wringing about the computer's contents?

• Why were the state courts intent on running an investigation parallel to the police and district attorney's? That's what Thursday's statement implies the administrator's office at least hoped to do. Is such a probe undertaken in every theft from court offices? Or is it only done when a theft might have been committed by a prominent former employee?

• What did Mullarkey know about this case, and when did she know it? A press spokesman for the state court administrator, Rob McCallum, told a *Rocky* reporter Thursday that Mullarkey had been "briefed" on the case, but could not say when or to what extent. He did say "she never gave any directives." OK, but did she offer any advice? A former district judge was potentially in bigtime trouble, after all; surely that was a matter of keen concern to her, as would be any matter affecting the reputation of the courts.

Incredibly, the court administrator's advice to the police almost quashed the case. An unidentified deputy Denver district attorney recommended no prosecution based on Haller's note, but was overruled by her bosses. They had the good sense not to let their decisions be based on recommendations by court administrators.

The DA's office turned the case over to a special prosecutor in Jefferson County to avoid the suggestion of conflict of interest.

Manzanares, who had been named Denver city attorney Nov. 30, returned the laptop Feb. 16. He told reporter Tony Kovaleski of Denver's 7 that he had bought the computer from someone in a parking lot. He was put on "investigatory" leave by Mayor John Hickenlooper Feb. 23 and resigned four days later.

The theft of a laptop may not be a big deal under normal circumstances. But the court administrator's intervention to urge no prosecution against a former judge certainly is a major concern. And in trying to offer an explanation for it Thursday, top court officials have left matters more confused than ever.

Copyright 2007, Rocky Mountain News. All Rights Reserved.

ORIGINAL

CT. RM. 6 JUN 22 2007

| | |
|---|---|
| District Court, City and County of Denver, State of Colorado<br><br>Court Address:<br>1437 Bannock Street<br>Denver, Colorado 80202 | COURT USE ONLY |
| **Plaintiff:** THE PEOPLE OF THE STATE OF COLORADO<br><br>**Defendant:** LAWRENCE MANZANARES | Case Number: 07 CR 03496<br><br>Division/Courtroom: |
| Attorney:<br><br>Gary Lozow, Reg. No. 2031<br>Isaacson Rosenbaum P.C.<br>633 17th Street, Suite 2200<br>Denver, Colorado 80202<br>Phone Number: (303) 292-5656<br>Fax Number: (303) 292-3152<br>E-mail: glozow@ir-law.com | |

**MOTION FOR GAG ORDER**

Comes now the Defendant, Lawrence (Larry) Manzanares, by and through his attorneys, Isaacson Rosenbaum, P.C. and submits this motion as a supplement to Defendant's previous motion seeking to seal the arrest warrant in the case herein and requests that this Honorable Court enter an appropriate gag order and as grounds therefor states as follows:

1. In February and March of 2007, considerable publicity about and concerning the Defendant was generated. Of course, there was no criminal case pending at the time. (*See* attachment 1.)

2. On June 13, 2007, the People submitted an 80-page Arrest Warrant to this Honorable Court in support of the criminal charges alluded to therein.

3. On said date the Defendant filed a motion asking this Honorable Court to seal the arrest warrant affidavit because the public release of it would generate substantial adverse publicity thereby tainting the prospective jury pool in the case herein.

4. At the time the motion was filed, neither the Defendant nor his counsel were given an opportunity to thoroughly read and review the arrest warrant.

5. During the hearing on June 13, 2007, the People, through Mark Pautler advised this Honorable Court that the day before or on June 12, 2007, the People filed an *ex parte* motion requesting a County Court judge to seal the complaint which outlined the charges against this Defendant. According to Mr. Pautler, the *ex parte* motion was necessary because of the concern of publicity being generated by concerning the premature disclosure of the charges against Larry Manzanares.

6. The People then argued, however, that they were opposed to the Defendant's request to seal the arrest warrant, but provided little justification for their position. Nor did the People disclose their plans to stage and hold a press conference and hand out the arrest warrant to the media.

7. This Honorable Court opined that it had never sealed an arrest warrant, but also agreed that it never had an arrest warrant in its 30+ years on the bench which took an hour and 40 minutes to read.

8. The Defendant respectfully submits that this Honorable Court erred in denying the Defendant's request to seal the arrest warrant. The Court's comments about hoping the press coverage would be "fair" fell on deaf ears, based on the prosecutors' plan to ensure maximum, sensational press coverage.

9. This Court could not have known at the time, since the prosecution declined to inform the Court, that the press was going to be hand-fed many details concerning Larry Manzanares that had absolutely nothing to do with probable cause or the charges against him, and that under no circumstances should have been included in an arrest warrant affidavit.

10. This Court's decision not to seal the affidavit opened the door for the flood of prejudicial pretrial publicity orchestrated by the prosecution.

11. Hours before the charges were authorized by this Honorable Court, a representative from the district attorney's office notified the media that there would be some type of press conference concerning Larry Manzanares at 3:00 p.m., on June 13, 2007.

12. At or about 2:30 p.m., the Jefferson County District Attorney's office sent out a press release (*see* attachment 2).

13. At 3:30 p.m., the Jefferson County District Attorney's office held a press conference at which the Jefferson County District Attorney, Scott Storey, spoke to "invited" members of the press and electronic media about the "serious" case against Mr. Manzanares (*see* attachment 3).

14. Remarkably, and without any regard to Mr. Manzanares' rights, the Jefferson County District Attorney handed out the 80 page arrest warrant to members of the media at or about the time of the press conference.

15. During the press conference, Mr. Storey, with cameras and microphones capturing every word, on more than one occasion, invited the media present to read the affidavit.

16. Furthermore, the affidavit referred to issues such as pornography, innuendos about other criminal wrongdoing, communication between the district attorney and defense attorneys relating to negotiations between the prosecutor and the defense, and polygraph examinations. These matters present serious problems of unfair pretrial publicity and evidentiary issues the court will have to address. These issues should not have been the subject of various and pervasive references in an affidavit which the prosecution planned to deliver to the media.

17. Mr. Storey broached the subject of pornography being on the computer connected to Mr. Manzanares and made other gratuitous offerings which served only to increase the press' appetite to fill their upcoming news coverage and thereby damage and prejudice Mr. Manzanares' right to a fair trial.

18. Predictably, five local news channels had multiple stories on the Manzanares case over the following two days including June 13 and 14, 2007. (A sampling of this television coverage is on order.)

19. Furthermore, the Denver papers, namely the *Rocky Mountain News*, the *Denver Post* and the *Denver Daily News* carried front page stories concerning this case including a "mug shot" photo of the Defendant on the front page of the *Rocky Mountain News* and the *Denver Daily News*. (*See* attached).

20. The actions by the district attorney in this case served no other purpose than to deliberately, and in a calculated fashion, create an atmosphere which would make Larry Manzanares' ability to obtain a fair trial unlikely.[1]

21. Prosecutors have a higher ethical responsibility than other lawyers because of their dual role as both the sovereigns representative in the courtroom and as advocates for justice *People v. Pautler*, 35 P.3d 571, 579 (Colo. 2001)..

22. The ABA Standards for Criminal Justice Prosecution and Defense Function 3d Ed. (1993) sets out the following prohibition Standard § 1.4 Public Statements:

    (a) A prosecutor should not make or authorize the making of an extra judicial statement that a reasonable person would expect to be disseminated by means of public communication if the prosecutor knows or reasonably should know that it will have a substantial likelihood of prejudicing a criminal proceeding.

[1] In light of the sequence of events outlined hereon counsel is presently doing a legal analysis of whether to move to disqualify this special prosecutor.

(*See also*, Rule 3.6 Trial Publicity Rule 3.8 Special Responsibility of a Prosecutor).

23. One cannot help but be reminded of Justice Frankfurter's concurring opinion in *Irvin v. Dowd*, 366 S.Ct. 1639, 1646 (1961):

> One of the rightful boasts of Western civilization is that the State has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure. These rudimentary conditions for determining guilt are inevitably wanting if the jury which is to sit in judgment on a fellow human being comes to its task with its mind ineradicably poisoned against him. How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered in the jury box, their minds were saturated by press and radio for months preceding the matter designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception.

24. Here the bell has been rung so loudly that actions taken by the Court in the future will have little likelihood of unringing the bell. Substantial and immeasurable damage has been done to this Defendant's chances of obtaining a fair trial. But this Court can take steps to minimize additional pretrial prejudice.

25. The District Attorneys will, of course, argue that any Court's restraints on prosecutional releases of information are equated to or merged into restraints of press. But there is a difference between imposing limitations on the prosecution and imposing limitations on the press, *U.S. v. Alberico*, 604 F.2d 1315 (1979).

26. This Honorable Court has a responsibility to prevent those over whom it has control, including prosecutors, from frustrating the functions of justice, *Sheppard v. Maxwell*, 384 U.S. 333 (1966). At a minimum, this Court should act to minimize similar prosecutorial actions in the future.

27. Mr. Manzanares has been charged with serious criminal offenses. The United States and Colorado Constitutions grant him the right to a fair trial by jury, including the right to be free from unfair and prejudicial pretrial publicity. The prosecution has already demonstrated its disregard for Mr. Manzanares's rights and for the need to avoid tainting the jury pool. The only way to ensure the prosecution does not continue to prejudice Mr. Manzanares is to forbid the prosecution and defense counsel from speaking with or to the press about this case. While the bell the prosecution has rung cannot be unrung, this Court can make sure the bell does not ring again.

WHEREFORE, the Defendant prays that this Honorable Court enter an Order prohibiting members of the Jefferson County District Attorneys Office, and all law enforcement officers associated in any fashion with the prosecution of this case, from making any comments about and concerning this case, other than ethically appropriate comments made during and in the course of Court proceedings.

**ISAACSON ROSENBAUM P.C.**

By: ______________________________

Gary Lozow
633 17th Street, Suite 2200
Denver, Colorado 80202
Telephone: (303) 292-5656
Facsimile: (303) 292-3152

**ATTORNEY FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on the 22 day of June, 2007, a true and correct copy of the foregoing **MOTION FOR GAG ORDER** was served via facsimile, to the following:

Mark C. Pautler
Sr. Chief Deputy District Attorney
500 Jefferson County Parkway
Golden, CO 80401

FAX: 303-271-6888
PHONE: 303-271-6800

A Boudreaux

Denied in Open Court [illegible] Judge 6/13/07

| | |
|---|---|
| District Court, City and County of Denver, State of Colorado<br><br>Court Address:<br>1437 Bannock Street<br>Denver, Colorado 80202 | COURT USE ONLY |
| **Plaintiff:** THE PEOPLE OF THE STATE OF COLORADO<br><br>**Defendant:** LAWRENCE MANZANARES | Case Number:<br><br>Division/Courtroom: |
| Attorney:<br><br>Gary Lozow, Reg. No. 2031<br>Isaacson Rosenbaum P.C.<br>633 17th Street, Suite 2200<br>Denver, Colorado 80202<br>Phone Number: (303) 292-5656<br>Fax Number: (303) 292-3152<br>E-mail: glozow@ir-law.com | |

**MOTION TO SEAL PROBABLE CAUSE INFORMATION**

Comes now the Defendant, Lawrence (Larry) Manzanares, by and through his attorneys, Isaacson Rosenbaum, P.C. and requests that this Honorable Court enter an order sealing public access to the Probable Cause Warrant or Arrest Warrant in relation to the charges to be filed against the Defendant and as grounds therefore states as follows:

1. The Defendant has been advised that special prosecutors from Jefferson County, Colorado have or will submit a very lengthy arrest warrant or probable cause affidavit in support of the filing of charges against the Defendant.

2. From the outset of this investigation, there has been substantial and pervasive publicity about and concerning this Defendant and this episode.

3. The wholesale publication of what has been described as a lengthy outline of the evidence against this Defendant will inexorably taint the Defendant's ability to obtain a fair trial.

4. No prejudice will result to the People by reason of the Court sealing this information until admissible evidence is offered in a judicial proceeding concerning the charges against the Defendant.

WHEREFORE, the Defendant prays that this Honorable Court enter an order sealing the records in question until further order of Court.

Respectfully submitted this 13th day of June 2007.

**ISAACSON ROSENBAUM P.C.**

By: ______________________

Gary Lozow
633 17th Street, Suite 2200
Denver, Colorado 80202
Telephone: (303) 292-5656
Facsimile: (303) 292-3152

**ATTORNEY FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of June, 2007, a true and correct copy of the foregoing **MOTION TO SEAL PROBABLE CAUSE INFORMATION** was served ~~via facsimile~~, to the following:

Mark C. Pautler
Sr. Chief Deputy District Attorney
500 Jefferson County Parkway
Golden, CO 80401

FAX: 303-271-6888
PHONE: 303-271-6800

A Boudreau
_______________________

DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO

CASE NO. 07CR3496 COURTROOM 6

---

NOTICE OF DIRECT FILING

---

THE PEOPLE OF THE STATE OF COLORADO

VS.

LAWRENCE MANZANARES DEFENDANT

---

TO THE DENVER COUNTY SHERIFF, BE ADVISED THAT THE ABOVE NAMED DEFENDANT HAS BEEN CHARGED IN THE DENVER DISTRICT COURT

D.P.D. NUMBER: UNKNOWN

DATE OF BIRTH: 12-29-56

FILING DATE: 06-13-07

BOND AMOUNT: 5,000

RETURN DATE: 06-22-07

CHARGES: THEFT (F4)

SABRA MILLETT
CLERK OF THE DISTRICT COURT

[signature]

Deputy Clerk

| | |
|---|---|
| ARREST # | 1544725 |
| BOND # | 282468 |
| DCC CASE # | 07OC03494 |
| COUNTY | DENVER |

IN THE COUNTY COURT IN AND FOR THE
CITY AND COUNTY OF DENVER AND THE STATE OF COLORADO

BOND TYPE

PERSONAL RECOGNIZANCE

DENVER DISTRICT CIVIL COURT Case # 07CR3496

# APPEARANCE BOND

2007 ... 9:44

The People of the State of Colorado and of
STATE OF COLORADO, Plaintiff, vs:

| MANZANARES | LAWRENCE | | 12/29/1956 |
|---|---|---|---|
| Last | First | Middle | DOB |

We as, LAWRENCE MANZANARES (Defendant/Principal) and LAWRENCE MANZANARES (Surety)

do acknowledge ourselves to owe and be indebted unto the People of the State of Colorado, in the penal sum of

**$5,000.00** FIVE THOUSAND DOLLARS AND 00 CENTS

to be levied if there is a default in the following action:

**DEFENDANT CHARGES**

THEFT SERIES OVER 200
EMBEZZLEMENT PUBLIC PR
TAMPER WITH EVIDEN
OFFICIAL MISCONDUCT
COMPUTER CRIME-THEFT 1

The conditions of this obligation are such that the above named defendant shall appear personally as ordered in

**DENVER DISTRICT CIVIL COURT 1437 BANNOCK ST DENVER, CO 80202 Courtroom CV6**

on the following date: June 27, 2007 at 9:00 AM or as ordered in the jurisdiction for which this bond was made

Further, the defendant shall not depart the jurisdiction of the Court without permission and shall abide by all orders and judgment of this court, this bond may be continued from time to time until an entry of a plea of guilty; the surety will be responsible for the defendant's appearance on such dates as directed. If all conditions are not complied with, the Court has the power to revoke the release of defendant, to increase the bail bond or to change any bond conditions. If the defendant does not appear as directed, the bond will be forfeited and a citation to show cause will issue against the defendant and/or surety, as well as a warrant for the defendant's arrest. No bond shall be continued in effect following a plea of guilty or of nolo contendere, or following conviction unless the written consents of the sureties, if any, are filed of record. (C.R.S. 16-4-201)

Executed, Approved and Dated this June 13, 2007 at 3:40 PM in Denver, Co

MATTHEW M. McCONVILLE - CLERK of Denver County Court

By: X [signature]
DEPUTY CLERK/SHERIFF #

X [signature]
SURETY'S SIGNATURE

X [signature]
DEFENDANT'S SIGNATURE

**SIGN HERE IF FUNDS CAN BE REFUNDED TO DEFENDANT**
Note: Upon signing you are giving up the right to a cash bond refund. Any assessed fees/costs will be subtracted from the bond.

X

SIGNATURE OF SURETY IS REQUIRED

If this bond is made for another court, either County or Municipal, it is mandatory that the return date be set a minimum of five weeks in the future. Should this bond be mistakenly returnable on a Holiday or weekend, it will automatically be continued for the next day of court business. (C.R.S. 24-11-101)

MANDATORY INFORMATION

Full Name of Defendant (including Alias): LAWRENCE MANZANARES
Address: 2201 S Adams St
City, State and Zip Code: Denver CO 80210
Home Phone No. or No. Where Message May Be Left: 303 996-2102
Employer's Name:
Employer's Address: Work Phone No.

**PLEASE NOTE - IMPORTANT**

Denver County Court cash bonds may be refunded from 8:00 A.M. to 4:30 P.M. at the City and County Building Bannock Street and West Colfax Ave. Checks will be issued for all released cash or credit card bonds.

Traffic Division, Room 109
Criminal Division, Room 111
General Sessions Division, Room 140

BOND REFUNDS
One of the following will be required for all bond refunds:
1. Valid Colorado Driver's License; OR
2. Valid Colorado State ID; OR
3. Valid Out of State Driver's License

**APPEARANCE IS REQUIRED AT:**

DENVER DISTRICT CIVIL COURT
1437 BANNOCK ST
DENVER, CO 80202

| In Courtroom | On | At |
|---|---|---|
| CV6 | June 27, 2007 | 9:00 AM |

Full Name of Surety: LAWRENCE MANZANARES
License No. of Surety:
Address:
City, State and Zip Code:
Phone Number:

Original - File

COURT ACCOUNTING - RETURN ORIGINAL TO COURT IMMEDIATELY
Date Printed 06/13/2007 3:40 PM
Printed By: SLC

2007 JUN 14 AM 9:44

| | |
|---|---|
| County Court<br>City and County of Denver<br>Court Address:<br>City and County Building<br>Denver, CO | Filed in County Court<br>City & County of Denver, Colorado<br>JUN 13 2007<br>CLERK OF COURT<br>COURT USE ONLY |
| PEOPLE OF THE STATE OF COLORADO<br>v.<br>LAWRENCE MANZANARES<br>Defendant | |
| Scott W. Storey, District Attorney<br>Mark C. Pautler, SCDDA<br>Special Prosecutors<br>500 Jefferson County Parkway<br>Golden, CO 80401-6002<br><br>Phone Number: (303)271-6800<br>FAX Number: (303)271-6888<br>E-mail:<br>Attorney Reg. #6438 | Case No.<br>07-CR-3496<br><br>Div:<br><br>Ctrm: |
| MOTION TO SEAL CHARGES | |

SCOTT W. STOREY, District Attorney in and for the First Judicial District, County of Jefferson, State of Colorado, Special Prosecutor appointed for this action, respectfully requests this Honorable Court to order the charges presently filed in this action to be sealed until futher order of the Court

As grounds for this request the People state that on June 11, 2007, the Office of the Second Judicial District Attorney's Office prepared the charges in this matter for the Special Prosecutor. In preparing these charges, when a court number was obtained, the information concerning the charges was automatically entered into the ICON (Courtlink) computer system prematurely.

This Special Prosecutor has not had an opportunity to review and approved said charges and the affidavit that is the basis of the charges has not been approved by the Court.

It is anticipated that these charges will be finalized on June 13 or 14, 2007, but until then it is appropriate and proper that they be sealed.

WHEREFORE, the People respectfully request this temporary sealing.

Respectfully submitted,

SCOTT W. STOREY
District Attorney

By: [signature]
MARK C. PAUTLER
Senior Chief Deputy District Attorney
Registration No. 6438

# Order

The Court having reviewed the People's Motion to Seal and finding good cause therein does ORDER that the charges in case No. 07CR3496 be sealed until further order of the Court.

[signature] 6-12-07, 4 pm.
Judge Date

Order vacated 6/13/08 at 2:10 P.M. Perrusine, Judge

| | |
|---|---|
| County Court<br>City and County of Denver<br>Court Address:<br>City and County Building<br>Denver, CO | Filed in County Court<br>City & County of Denver, Colorado<br><br>JUN 12 2007<br><br>CLERK OF COURT<br>COURT USE ONLY |
| **PEOPLE OF THE STATE OF COLORADO**<br>v.<br>**LAWRENCE MANZANARES**<br>Defendant | |
| Scott W. Storey, District Attorney<br>Mark C. Pautler, SCDDA<br>Special Prosecutors<br>500 Jefferson County Parkway<br>Golden, CO 80401-6002<br><br>Phone Number: (303)271-6800<br>FAX Number: (303)271-6888<br>E-mail:<br>Attorney Reg. #6438 | Case No.<br>07-CR-3496<br><br>Div:<br><br>Ctrm: |
| MOTION TO SEAL CHARGES | |

SCOTT W. STOREY, District Attorney in and for the First Judicial District, County of Jefferson, State of Colorado, Special Prosecutor appointed for this action, respectfully requests this Honorable Court to order the charges presently filed in this action to be sealed until futher order of the Court

As grounds for this request the People state that on June 11, 2007, the Office of the Second Judicial District Attorney's Office prepared the charges in this matter for the Special Prosecutor. In preparing these charges, when a court number was obtained, the information concerning the charges was automatically entered into the ICON (Courtlink) computer system prematurely.

This Special Prosecutor has not had an opportunity to review and approved said charges and the affidavit that is the basis of the charges has not been approved by the Court.

It is anticipated that these charges will be finalized on June 13 or 14, 2007, but until then it is appropriate and proper that they be sealed.

WHEREFORE, the People respectfully request this temporary sealing.

Respectfully submitted,

SCOTT W. STOREY
District Attorney

By: [signature]
MARK C. PAUTLER
Senior Chief Deputy District Attorney
Registration No. 6438

303-886-8681

---

# Order

The Court having reviewed the People's Motion to Seal and finding good cause therein does ORDER that the charges in case No. 07CR3496 be sealed until further order of the Court.

[signature] 6-12-07

Judge Date

DISTRICT COURT
DENVER, COLORADO
——— M

2007 JUN 18 AM 11:25

R/A

| | |
|---|---|
| County Court, City and County of Denver, Colorado<br>City and County Building, Room 256<br>1437 Bannock Street<br>Denver, CO 80202 | |
| **PEOPLE OF THE STATE OF COLORADO**<br>v.<br>LAWRENCE MANZANARES<br>Defendant | |
| Scott W. Storey, Reg. No. 13482<br>District Attorney, First Judicial District<br>Duly Appointed Special Prosecutor<br>500 Jefferson County Parkway<br>Golden, CO 80401-6020<br>Phone Number: (303) 271-6800<br>FAX Number: (303) 271-6888 | ▲ COURT USE ONLY ▲<br><br>Case Number: 07CR3496<br><br>Div.: Ctrm: 6 |
| **Motion and Order to Amend Complaint and Information** | |

SCOTT W. STOREY, District Attorney in and for the First Judicial District, County of Jefferson, State of Colorado, duly appointed special prosecutor, respectfully requests this Honorable Court to amend the Complaint and Information for the above-referenced case as follows:

1. Count Five of Computer Crime should read as follows: "Between and including approximately January 3, 2007 and February 16, 2007, LAWRENCE MANZANARES unlawfully and knowingly accessed, exceeded authorized access to, or used a computer, computer network, or computer system, or any part thereof without authorization or in excess of authorized access; in violation of section 18-5.5-102(1)(a), C.R.S.

2. The following witness should be stricken from the complaint:

   State of Colorado
   Authorized Agent Judicial Department

3. The following witnesses should be added to the witness list as follows:

   1. Russell Boatright
      Investigator
      Jefferson County District Attorney

500 Jefferson County Parkway
Golden, Colorado 80401

2. Detective Robert Lawrence
Badge #98-013
Denver Police Department
District 6
1566 Washington Street
Denver, Colorado 80203
720-913-2818

3. Detective Greg Buschy
Badge #98-010
Denver Police Department
District 6
1566 Washington Street
Denver, Colorado 80203
720-913-2825

4. Sgt. Scott Brungardt
Badge #89-026
Denver Police Department
District 6
1566 Washington Street
Denver, Colorado 80203
720-913-2820

4. Page four of the complaint, detailing defendant's information should be deleted as it is replicated on page fourteen.

Respectfully submitted,

Scott W. Storey
District Attorney

By: [signature]
MARK C. PAUTLER
Senior Chief Deputy District Attorney
Registration No. 6438

COUNTY COURT, DENVER COUNTY, COLORADO
COURT CASE NO.: 07CR3496

---

ORDER TO AMEND COMPLAINT AND INFORMATION

---

The foregoing Motion to Amend Complaint and Information is hereby (granted) (~~denied~~) this 29th day of June, 2007.

BY THE COURT:

[signature]
Judge

---

CERTIFICATE OF MAILING

---

I hereby certify that a true and correct copy of the above and foregoing Motion to Amend Complaint and Information was mailed on June 15, 2007 by depositing same in the U.S. Mail, postage prepaid, and addressed as follows:

Gary Lozow
Attorney for the defendant
633 17th Street, #2200
Denver, Colorado 80202-3622

[signature]

---

## DEFENDANT INFORMATION

DOB: 12/29/1956

Alias:

Race: White

Gender: Male

Height:

Weight: lbs.

Hair: Black

Eye: Brown

Birthplace: N/A

Tattoo: N/A

Driver Lic. #:

DPD Number: N/A

DAID: 020612070001

NCIC #: N/A

SID #: N/A

Home Phone #: (303) 640-3924

Work Phone #: N/A

Address: Home Address
2201 S Adams St
Denver, CO 80210

---

## CASE INFORMATION

Arresting Agency: DPD - CODPD0000

Filing Agency#: DPD - CODPD0000

Arrest #: N/A

Agency Case #: 20075002031

Date of Arrest: 6/12/2007

BAC: N/A

---

BY: [signature]

Deputy District Attorney: Reg. No.: 21572

Filed on: June 13, 2007.

JMF

ORIGINAL

CT. RM. 6 JUN 2 2 2007

CT. RM. 6 JUN 2 2 2007

| | |
|---|---|
| District Court, City and County of Denver, State of Colorado<br><br>Court Address:<br>1437 Bannock Street<br>Denver, Colorado 80202 | COURT USE ONLY |
| **Plaintiff:** THE PEOPLE OF THE STATE OF COLORADO<br><br>**Defendant:** LAWRENCE MANZANARES | Case Number: 07 CR 03496<br><br>Division/Courtroom: |
| Attorney:<br><br>Gary Lozow, Reg. No. 2031<br>Isaacson Rosenbaum P.C.<br>633 17th Street, Suite 2200<br>Denver, Colorado 80202<br>Phone Number: (303) 292-5656<br>Fax Number: (303) 292-3152<br>E-mail: glozow@ir-law.com | |

**MOTION FOR DISCOVERY**

Defendant Lawrence ("Larry") Manzanares, by and through his attorneys, Isaacson Rosenbaum P.C., requests that this Honorable Court require disclosure by the District Attorney as soon as possible of:

1. The names and addresses of all persons the District Attorney intends to call as witnesses, together with their relevant written or recorded statements and/or any relevant written or recorded statements of endorsed witnesses whose testimony will be introduced as hearsay.

2. The police, arrest, offense, and/or incident reports, including statements (whether oral, written or videotaped) of all witnesses and the Defendant.

3. Any reports or statements of experts made in connection with this particular case, including results of physical or mental examinations and scientific tests, experiments or comparisons, and any computer analyses done by any such experts in relation to the case herein.

4. Any books, papers, documents, photographs, electronic recordings, computer files and disks, or tangible objects held as evidence in this case or otherwise relating to this case.

5. Any record of prior criminal convictions of the Defendant, and/or any person the District Attorney intends to call as a witness in the case.

6. All reports received by Denver law enforcement officials from citizens who may have been approached in a public setting by any third parties, known or unknown, seeking to sell items such as stereos, computers, televisions or other related items or equipment.

7. All written reports and hand written notes generated by Russell Boatright in relation to the case herein.

8. All reports generated by law enforcement officials in relation to any computers missing from the Denver court system in the last five years.

9. All material or information in whatever form that tends to negate the guilt of the Defendant as to the offense charged or would tend to reduce the punishment therefore.

WHEREFORE, Defendant respectfully requests this Court require the District Attorney to provide the foregoing requested documents as soon as possible.

Respectfully submitted this 25 day of June 2007.

**ISAACSON ROSENBAUM P.C.**

By: ____________________

Gary Lozow
633 17th Street, Suite 2200
Denver, Colorado 80202
Telephone: (303) 292-5656
Facsimile: (303) 292-3152

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on the 22 day of June 2007, a true and correct copy of the foregoing **MOTION FOR DISCOVERY** was sent via facsimile to the following:

Mark C. Pautler
Sr. Chief Deputy District Attorney
500 Jefferson County Parkway
Golden, CO 80401

FAX: 303-271-6888
PHONE: 303-271-6800

A Boudreau [signature]

RECEIVED JUN 30 2007

Senior Chief Deputy District Attorney
Registration No. 6438

| | |
|---|---|
| District Court<br>City and County of Denver<br>Court Address:<br>City and County Building<br>Denver, CO | |
| **PEOPLE OF THE STATE OF COLORADO**<br>v.<br>**LAWRENCE MANZANARES**<br>Defendant | **COURT USE ONLY** |
| Scott W. Storey, District Attorney<br>Mark C. Pautler, SCDDA<br>Special Prosecutors<br>500 Jefferson County Parkway<br>Golden, CO 80401-6002<br><br>Phone Number: (303)271-6800<br>FAX Number: (303)271-6888<br>E-mail: mpautler@jeffco.us<br>Attorney Reg. #6438 | Case No.<br>07-CR-3496<br><br>Div: 6<br><br>Ctrm: |

CERTIFICATE OF MAILING

I hereby certify that a true and correct copy of the above and foregoing Motion and Order to Set Forthwith Hearing was mailed on June 26, 2007, by depositing same in the U.S. Mail, postage prepaid, to the address below and was also sent by facsimile on the same date to: 303-292-3152:

Gary Lozow
Attorney at Law
633 17th Street, Suite 2200
Denver, Co. 80202

[signature]

| | |
|---|---|
| County Court<br>City and County of Denver<br>Court Address:<br>City and County Building<br>Denver, CO | |
| **PEOPLE OF THE STATE OF COLORADO**<br>v.<br>**LAWRENCE MANZANARES**<br>Defendant | **COURT USE ONLY** |
| Scott W. Storey, District Attorney<br>Mark C. Pautler, SCDDA<br>Special Prosecutors<br>500 Jefferson County Parkway<br>Golden, CO 80401-6002<br><br>Phone Number: (303)271-6800<br>FAX Number: (303)271-6888<br>E-mail:<br>Attorney Reg. #6438 | Case No.<br>07-CR-3496<br><br>Div:<br><br>Ctrm: |
| MOTION TO SET FORTHWITH HEARING | |

SCOTT W. STOREY, District Attorney in and for the First Judicial District, County of Jefferson, State of Colorado, Special Prosecutor appointed for this action, respectfully requests this Honorable Court to set a date certain to hear People's Motion to Dismiss Case and Temporary Gag Order.

The People would like to resolve this action through dismissal of the case based on the death of the Defendant. In addition, the People would like to be able to respond to contacts with our office concerning this case.

The People will provide a copy of this Motion to Set Forthwith Hearing to the Defendant's Counsel and will attempt to obtain availability dates from him. We will then notify the Court as to the time to determine its availability.

We ask that this hearing be set no later than noon, Thursday, June 28, 2007.

Respectfully submitted,

SCOTT W. STOREY
District Attorney

By: [signature]
MARK C. PAUTLER

| | |
|---|---|
| County Court<br>City and County of Denver<br>Court Address:<br>City and County Building<br>Denver, CO | |
| **PEOPLE OF THE STATE OF COLORADO**<br>v.<br>**LAWRENCE MANZANARES**<br>Defendant | **COURT USE ONLY** |
| Scott W. Storey, District Attorney<br>Mark C. Pautler, SCDDA<br>Special Prosecutors<br>500 Jefferson County Parkway<br>Golden, CO 80401-6002<br><br>Phone Number: (303)271-6800<br>FAX Number: (303)271-6888<br>E-mail:<br>Attorney Reg. #6438 | Case No.<br>07-CR-3496<br><br>Div:<br><br>Ctrm: |

ORDER TO SET FORTHWITH HEARING

The Court having reviewed People's Motion to Set Forthwith Hearing does order that said hearing be set as soon as possible based on Counsels' availability.

This hearing shall be set ~~no later than noon~~ on June 28, 2007. at 9:30 AM

Done this 26th day of June, 2007

GASPAR PERRICONE, SENIOR JUDGE

RECEIVED JUN 3 0 2007

| | |
|---|---|
| County Court<br>City and County of Denver<br>Court Address:<br>City and County Building<br>Denver, CO | |
| **PEOPLE OF THE STATE OF COLORADO**<br>v.<br>**LAWRENCE MANZANARES**<br>Defendant | **COURT USE ONLY** |
| Scott W. Storey, District Attorney<br>Mark C. Pautler, SCDDA<br>Special Prosecutors<br>500 Jefferson County Parkway<br>Golden, CO 80401-6002<br><br>Phone Number: (303)271-6800<br>FAX Number: (303)271-6888<br>E-mail:<br>Attorney Reg. #6438 | Case No.<br>07-CR-3496<br><br>Div:<br><br>Ctrm: |
| MOTION TO SET FORTHWITH HEARING | |

SCOTT W. STOREY, District Attorney in and for the First Judicial District, County of Jefferson, State of Colorado, Special Prosecutor appointed for this action, respectfully requests this Honorable Court to set a date certain to hear People's Motion to Dismiss Case and Temporary Gag Order.

The People would like to resolve this action through dismissal of the case based on the death of the Defendant. In addition, the People would like to be able to respond to contacts with our office concerning this case.

The People will provide a copy of this Motion to Set Forthwith Hearing to the Defendant's Counsel and will attempt to obtain availability dates from him. We will then notify the Court as to the time to determine its availability.

We ask that this hearing be set no later than noon, Thursday, June 28, 2007.

Respectfully submitted,

SCOTT W. STOREY
District Attorney

By: [signature]
MARK C. PAUTLER

| | |
|---|---|
| County Court<br>City and County of Denver<br>Court Address:<br>City and County Building<br>Denver, CO | |
| **PEOPLE OF THE STATE OF COLORADO**<br>v.<br>**LAWRENCE MANZANARES**<br>Defendant | **COURT USE ONLY** |
| Scott W. Storey, District Attorney<br>Mark C. Pautler, SCDDA<br>Special Prosecutors<br>500 Jefferson County Parkway<br>Golden, CO 80401-6002<br><br>Phone Number: (303)271-6800<br>FAX Number: (303)271-6888<br>E-mail:<br>Attorney Reg. #6438 | Case No.<br>07-CR-3496<br><br>Div:<br><br>Ctrm: |
| ORDER TO SET FORTHWITH HEARING | |

The Court having reviewed People's Motion to Set Forthwith Hearing does order that said hearing be set as soon as possible based on Counsels' availability.

This hearing shall be set ~~no later than noon~~ on June 28, 2007. at 9:30 AM

Done this 26th day of June, 2007

[signature]
GASPAR PERRICONE, SENIOR JUDGE

RECEIVED JUN 30 2007

| | |
|---|---|
| District Court<br>City and County of Denver<br>Court Address:<br>City and County Building<br>Denver, CO | |
| **PEOPLE OF THE STATE OF COLORADO**<br>v.<br>**LAWRENCE MANZANARES**<br>Defendant | **COURT USE ONLY** |
| Scott W. Storey, District Attorney<br>Mark C. Pautler, SCDDA<br>Special Prosecutors<br>500 Jefferson County Parkway<br>Golden, CO 80401-6002<br><br>Phone Number: (303)271-6800<br>FAX Number: (303)271-6888<br>E-mail: mpautler@jeffco.us<br>Attorney Reg. #6438 | Case No.<br>07-CR-3496<br><br>Div: 6<br><br>Ctrm: |
| MOTION TO DISMISS CASE AND TEMPORARY GAG ORDER | |

SCOTT W. STOREY, District Attorney in and for the First Judicial District, County of Jefferson, State of Colorado, Special Prosecutor appointed for this action, respectfully requests this Honorable Court to dismiss this action and the temporary gag order on the grounds that the Defendant is deceased.

Respectfully submitted,

SCOTT W. STOREY
District Attorney

By: [signature]
MARK C. PAUTLER
Senior Chief Deputy District Attorney
Registration No. 6438

<table>
<tr><td>District Court<br>City and County of Denver<br>Court Address:<br>City and County Building<br>Denver, CO</td><td rowspan="2"><br><br><br><br><br><br>COURT USE ONLY</td></tr>
<tr><td>PEOPLE OF THE STATE OF COLORADO<br>v.<br>LAWRENCE MANZANARES<br>Defendant</td></tr>
<tr><td>Scott W. Storey, District Attorney<br>Mark C. Pautler, SCDDA<br>Special Prosecutors<br>500 Jefferson County Parkway<br>Golden, CO 80401-6002<br><br>Phone Number: (303)271-6800<br>FAX Number: (303)271-6888<br>E-mail: mpautler@jeffco.us<br>Attorney Reg. #6438</td><td>Case No.<br>07-CR-3496<br><br>Div: 6<br><br>Ctrm:</td></tr>
<tr><td colspan="2">ORDER TO DISMISS CASE AND TEMPORARY GAG ORDER</td></tr>
</table>

The Court having read the Motion to Dismiss Case and Temporary Gag Order, hereby grants said Motion.

Done and signed on June 25, 2007.

BY THE COURT:

GASPAR PERRICONE, SENIOR JUDGE

<table>
<tr><td>District Court<br>City and County of Denver<br>Court Address:<br>City and County Building<br>Denver, CO</td><td rowspan="2">COURT USE ONLY</td></tr>
<tr><td>PEOPLE OF THE STATE OF COLORADO<br>v.<br>LAWRENCE MANZANARES<br>Defendant</td></tr>
<tr><td>Scott W. Storey, District Attorney<br>Mark C. Pautler, SCDDA<br>Special Prosecutors<br>500 Jefferson County Parkway<br>Golden, CO 80401-6002<br><br>Phone Number: (303)271-6800<br>FAX Number: (303)271-6888<br>E-mail: mpautler@jeffco.us<br>Attorney Reg. #6438</td><td>Case No.<br>07-CR-3496<br><br>Div: 6<br><br>Ctrm:</td></tr>
<tr><td colspan="2">CERTIFICATE OF MAILING</td></tr>
</table>

I hereby certify that a true and correct copy of the above and foregoing Motion to Dismiss Case and Temporary Gag Order was mailed on June 25, 2007, by depositing same in the U.S. Mail, postage prepaid, to the address below and was also sent by facsimile on the same date to: 303-292-3152:

Gary Lozow
Attorney at Law
633 17th Street, Suite 2200
Denver, Co. 80202

______________________________

| | |
|---|---|
| District Court<br>City and County of Denver<br>Court Address:<br>City and County Building<br>Denver, CO | |
| **PEOPLE OF THE STATE OF COLORADO**<br>v.<br>**LAWRENCE MANZANARES**<br>Defendant | **COURT USE ONLY** |
| Scott W. Storey, District Attorney<br>Mark C. Pautler, SCDDA<br>Special Prosecutors<br>500 Jefferson County Parkway<br>Golden, CO 80401-6002<br><br>Phone Number: (303)271-6800<br>FAX Number: (303)271-6888<br>E-mail: mpautler@jeffco.us<br>Attorney Reg. #6438 | Case No.<br>07-CR-3496<br><br>Div: 6<br><br>Ctrm: |

ORDER TO DISMISS CASE AND TEMPORARY GAG ORDER

---

The Court having read the Motion to Dismiss Case ~~and Temporary Gag Order~~, hereby grants said Motion, and all orders entered by this Court are vacated.

Done and signed on 6/28, 2007.

BY THE COURT:

[signature]

GASPAR PERRICONE, SENIOR JUDGE

JOHN W HICKENLOOPER
Mayor


# CITY AND COUNTY OF DENVER


DEPARTMENT OF ENVIRONMENTAL HEALTH
OFFICE OF THE MEDICAL EXAMINER
660 Bannock Street
Denver, Colorado 80204-4507
Telephone: (303) 436-7711
Fax: (303) 436-7709


Wednesday, June 27, 2007

TO WHOM IT MAY CONCERN:

The undersigned is the Chief Deputy Coroner of the City and County of Denver, State of Colorado, U.S.A. As such, I am the official custodian of the records of the Coroner's Office.

This is to certify that the records of this office reveal that:

Name: **Lawrence MANZANARES** Age: **50**
Date of Birth: **12/29/1956** Male ☑ Female ☐
Died at **Eisenhower Park** on **06/22/2007**

at approximately **7:12 PM** Autopsy performed: ☑

[signature]
Michelle D. Weiss-Samaras
Chief Deputy Coroner

RECEIVED JUN 2 8 2007

| | |
|---|---|
| District Court<br>City and County of Denver<br>Court Address:<br>City and County Building<br>Denver, CO | |
| **PEOPLE OF THE STATE OF COLORADO**<br>v.<br>**LAWRENCE MANZANARES**<br>Defendant | **COURT USE ONLY** |
| Scott W. Storey, District Attorney<br>Mark C. Pautler, SCDDA<br>Special Prosecutors<br>500 Jefferson County Parkway<br>Golden, CO 80401-6002<br><br>Phone Number: (303)271-6800<br>FAX Number: (303)271-6888<br>E-mail: mpautler@jeffco.us<br>Attorney Reg. #6438 | Case No.<br>07-CR-3496<br><br>Div: 6<br><br>Ctrm: |
| MOTION TO DISMISS CASE AND TEMPORARY GAG ORDER | |

SCOTT W. STOREY, District Attorney in and for the First Judicial District, County of Jefferson, State of Colorado, Special Prosecutor appointed for this action, respectfully requests this Honorable Court to dismiss this action and the temporary gag order on the grounds that the Defendant is deceased.

Respectfully submitted,

SCOTT W. STOREY
District Attorney

By: [signature]
MARK C. PAUTLER
Senior Chief Deputy District Attorney
Registration No. 6438